1   MARIO N. ALIOTO, ESQ. (56433)
    LAUREN C. RUSSELL, ESQ. (241151)
2   TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
    2280 Union Street
3   San Francisco, CA 94123
    Telephone: (415) 563-7200
4   Facsimile: (415) 346-0679
5   malioto@tatp.com
    laurenrussell@tatp.com
6
    Attorneys for Plaintiff
7

8

9                       UNITED STATES DISTRICT COURT

10                    NORTHERN DISTRICT OF CALIFORNIA

11  CRAGO, INC., on behalf of itself and all      )  Case No. CV-07-5944 SC
    others similarly situated,                     )
12                                                 )
                                                   )
13              Plaintiff,                          )  **DECLARATION OF LAUREN C.**
                                                   )  **RUSSELL IN SUPPORT OF**
14              v.                                  )  **ADMINISTRATIVE MOTION TO**
                                                   )  **CONSIDER WHETHER CASES SHOULD**
15  CHUNGWHA PICTURE TUBES, LTD., et              )  **BE RELATED (Civil Local Rules 3-12 &**
    al.                                            )  **7-11)**
16                                                 )
                                                   )
17              Defendants.                         )
                                                   )
18  **This document relates to:**                  )
                                                   )
19  Jeffrey Figone v. LG Electronics, et al., Case )  The Honorable Samuel Conti
    No. CV-07-6331-MMC                             )
20                                                 )
                                                   )
21  Michael Juetten, et al. v. Chungwha Picture   )
    Tubes, Ltd., et al., Case No. CV-07-6225-JL   )
22                                                 )

23

24

25

26

27

28

I, Lauren C. Russell, declare as follows:

1.       I am an associate with the firm Trump, Alioto, Trump & Prescott, LLP and am a member in good standing of the State Bar of California. This Declaration is based on personal knowledge, except where specified that information is based on information and belief, and if called to testify, I could and would do so competently as to the matters set forth herein. I am counsel for Plaintiff Jeffrey Figone in *Jeffrey Figone v. LG Electronics, Inc, et al.*, Case No. CV-07-6331 MMC. I submit this Declaration in support of Plaintiff Jeffrey Figone's Administrative Motion to Consider Whether Cases Should be Related.

2.       Attached hereto as Exhibit A is a true and correct copy of the complaint entitled *Jeffrey Figone v. LG Electronics, Inc., et al.,* Case No. CV-07-6331 MMC ("*Figone*"), filed on December 13, 2007 in the Northern District of California and assigned to the Honorable Maxine M. Chesney.

3.       Attached hereto as Exhibit B is a true and correct copy of the complaint entitled *Michael Juetten, et al. v. Chungwha Picture Tubes, Ltd.,* Case No. CV-07-6225 JL ("*Juetten*"), filed on December 10, 2007 in the Northern District of California and assigned to the Honorable James Larson.

4.       The *Figone* and *Juetten* actions are proposed class actions on behalf of indirect purchasers of cathode ray tubes ("CRTs") from defendants. Like *Crago Inc. v. Chungwha Picture Tubes, Ltd., et al.,* Case No. CV-07-5944 SC ("*Crago*"), the *Figone* and *Juetten* actions allege a conspiracy to fix, raise, maintain and stabilize the price of CRTs in violation of Section 1 of the Sherman Act, 15 U.S.C. §1. The *Figone* and *Juetten* actions also allege that the same conduct violated certain state antitrust and consumer protection statutes.

5.       Judge Conti has previously related the following similar matter to the *Crago* action: *Nathan Muchnick v. Chungwha Picture Tubes, Ltd., et al.,* Case No. CV-07-5981 ("*Muchnick*").

6.       On December 13, 2007, plaintiff *City Electronics* filed an administrative motion to relate the *Crago* and *Muchnick* actions to *Hawel A. Hawel d/b/a City Electronics v. Chungwha Picture Tubes, Ltd., et al.,* Case No. CV-07-6279 EMC (*City Electronics*").

**DECLARATION OF LAUREN C. RUSSELL IN SUPPORT OF ADMINSTRATIVE MOTION TO CONSIDER WHETHER CASE SHOULD BE RELATED**

7.  Like the *Crago, Muchnick* and *City Electronics* actions, *Figone* and *Juetten* allege that substantially the same defendants engaged in a conspiracy to fix the prices for CRTs.

8.  Plaintiff Jeffrey Figone has not appeared in this or any of the related actions currently pending in the Northern District of California. Civil Local Rule 3-12 requires that an Administrative Motion to Consider Whether Cases Should Be Related be promptly filed. Accordingly, and as the defendants are in the process of being served, a stipulation could not be obtained prior to filing Plaintiff's Administrative Motion.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 17th day of December 2007 at San Francisco, California.

/s/ Lauren C. Russell
Lauren C. Russell

**DECLARATION OF LAUREN C. RUSSELL IN SUPPORT OF ADMINSTRATIVE MOTION TO CONSIDER WHETHER CASE SHOULD BE RELATED**

# EXHIBIT A

MARIO N. ALIOTO, ESQ. (56433)
LAUREN C. RUSSELL, ESQ. (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA  94123
Telephone:  (415) 563-7200
Facsimile: (415) 346-0679
E-mail: malioto@tatp.com
laurenrussell@tatp.com

JOSEPH M. PATANE, ESQ. (72202)
LAW OFFICE OF JOSEPH M. PATANE
2280 Union Street
San Francisco, CA  94123
Telephone:  (415) 563-7200
Facsimile: (415) 346-0679
E-mail: jpatane@tatp.com

Attorneys for Plaintiff Figone

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

JEFFREY FIGONE, on behalf of himself and all others
similarly situated,

        Plaintiff,

vs.

LG ELECTRONICS, INC.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG SDI CO.,
LTD.; SAMSUNG ELECTRONICS AMERICA, INC.;
SAMSUNG SDI AMERICA, INC.; SAMTEL
COLOR, LTD.; TOSHIBA CORPORATION;
TOSHIBA AMERICA ELECTRONIC
COMPONENTS, INC.; TOSHIBA AMERICA
INFORMATION SYSTEMS, INC.; MATSUSHITA
TOSHIBA PICTURE DISPLAY CO., LTD.; MT
PICTURE DISPLAY CORPORATION OF AMERICA
(NEW YORK); MT PICTURE DISPLAY
CORPORATION OF AMERICA (OHIO);
MATSUSHITA ELECTRIC INDUSTRIAL CO.,
LTD.; PANASONIC CORPORATION OF NORTH
AMERICA; BEIJING-MATSUSHITA COLOR CRT
COMPANY, LTD.; ORION ELECTRIC CO., LTD.;
ORION AMERICA, INC.; HITACHI LTD.; HITACHI
AMERICA LTD.; HITACHI ASIA, LTD.;

Case No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**1**
**CLASS ACTION COMPLAINT**

1  CHUNGHWA PICTURE TUBES LTD.;                    )
   CHUNGHWA PICTURE TUBES (MALAYSIA)                )
2  SDN. BHD.; LP DISPLAYS INTERNATIONAL,            )
   LTD.; KONINKLIJKE PHILIPS ELECTRONICS            )
3  N.V.; PHILIPS ELECTRONICS NORTH AMERICA;         )
4  IRICO GROUP CORP.; IRICO DISPLAY DEVICES         )
   CO., LTD.; THAI CRT COMPANY, LTD.; and           )
5  TATUNG COMPANY OF AMERICA, INC.,                 )
                                                    )
6                    Defendants                     )

7

8                      **CLASS ACTION COMPLAINT**

9       Plaintiff Jeffrey Figone ("Figone") on behalf of himself and all others similarly situated

10  in the United States, brings this action for damages and injunctive relief under state and federal

11  antitrust, unfair competition, and consumer protection laws against the Defendants named

12  herein, demanding trial by jury, and complaining and alleging as follows:

13                       **NATURE OF THE CASE**

14      1.      This lawsuit is brought as a class action on behalf of individuals and entities that

15  indirectly purchased products containing cathode ray tubes ("CRT Products") (as further defined

16  below), in the United States from Defendants, their predecessors, or their controlled subsidiaries

17  and affiliates during the period beginning at least January 1, 1995 through the present (the

18  "Class Period"). Plaintiff alleges that during the Class Period the Defendants conspired to fix,

19  raise, maintain or stabilize prices of CRT Products sold in the United States. Because of

20  Defendants' unlawful conduct, Plaintiff and other Class Members paid artificially inflated prices

21  for CRT Products and have suffered antitrust injury to their business or property.

22                      **JURISDICTION AND VENUE**

23      2.      This action is instituted under Section 16 of the Clayton Act, 15 U.S.C. §26, to

24  obtain injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. §1, to recover

25  damages under state antitrust and consumer protection laws, and to recover costs of suit,

26  including reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly

27  situated sustained as a result of the Defendants' violations of those laws.

28

1    3.    The Court has subject matter jurisdiction over the federal claim under 28 U.S.C.

2    §§ 1331 and 1337. The Court has subject matter jurisdiction over the state law claims under 28

3    U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the

4    same case or controversy.

5    4.    This court also has subject matter jurisdiction over this class action pursuant to

6    the Class Action Fairness Act of 2005, which amended 28 U.S.C. § 1332 to add a new

7    subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of

8    a class of Plaintiffs is a citizen of a state different from any Defendant and the aggregated

9    amount in controversy exceeds $5,000,000, exclusive of interest and costs." This Court also has

10   jurisdiction under 28 U.S.C. § 1332(d) because "one or more members of the class is a citizen of

11   a state within the United States and one or more of the Defendants is a citizen or subject of a

12   foreign state."

13   5.    Venue is laid in this District pursuant to 28 U.S.C. § 1391. Venue is proper in

14   this judicial district because during the Class Period one or more of the Defendants resided,

15   transacted business, was found, or had agents in, this district, and because a substantial part of

16   the events giving rise to Plaintiff's claims occurred in this district, and a substantial portion of

17   the affected portion of the interstate trade and commerce described below has been carried out in

18   this district.

19                          **DEFINITIONS**

20   6.    As used herein, the term "CRT Products" means cathode ray tubes and products

21   containing cathode ray tubes, including television sets and computer monitors.

22   7.    The "Class Period" or "relevant period" means the period beginning at least

23   January 1, 1995 through the present.

24   8.    "Person" means any individual, partnership, corporation, association, or other

25   business or legal entity.

26   9.    The "Indirect Purchaser States" are Arizona, California, District of Columbia;

27   Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico,

28

                          3

1    North Carolina. North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and
2    Wisconsin.

3        10.    The "Consumer Fraud States" are Arkansas, California, District of Columbia,
4    Florida. Hawaii. Kansas. Maine. Massachusetts, Nebraska, New York, New Hampshire, New
5    Mexico. North Carolina, Rhode Island, Vermont, and West Virginia.

6                                    **PLAINTIFF**

7        11.    Plaintiff Jeffrey Figone ("Figone") is a California resident. During the relevant
8    period. Figone indirectly purchased CRT Products from one or more of the Defendants or their
9    co-conspirators and has been injured by reason of the antitrust violations alleged in this
10   Complaint.

11                                   **DEFENDANTS**

12       12.    Defendant LG Electronics, Inc. ("LG Electronics") is a corporation organized
13   under the laws of Korea with its principal place of business located at LG Twin Towers, 20
14   Yeouido-dong. Yeoungdeungpo-gu. Seoul 150-721, South Korea. LG Electronics is a $48.5
15   billion global force in consumer electronics. home appliances and mobile communications,
16   which established its first overseas branch office in New York in 1968. The company's name
17   was changed from GoldStar Communications to LG Electronics in 1995, the year in which it
18   also acquired Zenith in the United States. During the Class Period, LG Electronics
19   manufactured. sold and distributed CRT Products to customers throughout the United States.

20       13.    Defendant Samsung Electronics Co., Ltd. is a company organized under the laws
21   of Korea with its principal place of business located at Samsung Main Building, 250, 2-ga,
22   Taepyong-ro, Jung-gu. Seoul 100-742, South Korea. During the Class Period, Samsung
23   Electronics Co.. Ltd. manufactured, sold and distributed CRT Products to customers throughout
24   the United States.

25       14.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Co., Ltd. is a
26   company organized under the laws of Korea with its principal place of business located at 15th –
27   18th Floor. Samsung Life Insurance Building, 150. 2-ga, Taepyong-ro, Jung-gu, Seoul, 100-716,
28   South Korea. Samsung SDI Co., Ltd. is a public company. Samsung Electronics Co., Ltd. is its

4
CLASS ACTION COMPLAINT

1  majority shareholder holding almost 20 percent of the stock. Founded in 1970, Samsung SDI

2  Co., Ltd. claims to be the world's leading company in the display and energy businesses, with

3  28,000 employees and facilities in 18 countries. Samsung SDI Co., Ltd. has offices in Chicago

4  and San Diego. During the Class Period, Samsung SDI Co. Ltd. manufactured, sold and

5  distributed CRT Products to customers throughout the United States.

6      15.    Defendant Samsung Electronics America, Inc. is a New York corporation with its

7  principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New

8  Jersey 07660. Samsung Electronics America, Inc. is a wholly-owned and controlled subsidiary

9  of defendant Samsung Electronics Co., Ltd. During the Class Period, Samsung Electronics

10  America, Inc. manufactured, sold and distributed CRT Products to customers throughout the

11  United States.

12      16.    Defendant Samsung SDI America, Inc. is a California corporation with its

13  principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California.

14  Samsung SDI America, Inc. is a wholly owned and controlled subsidiary of Samsung SDI Co.,

15  Ltd., which is in turn a wholly owned and controlled subsidiary of Samsung Electronics Co.,

16  Ltd. During the Class Period, Samsung SDI America, Inc. manufactured, sold and distributed

17  CRT Products to customers throughout the United States.

18      17.    Defendants Samsung Electronics Co., Ltd., Samsung SDI Co., Ltd., Samsung

19  Electronics America, Inc., and Samsung SDI America, Inc. are referred to collectively herein as

20  "Samsung."

21      18.    Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its principal

22  place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.

23  Samtel's market share for CRT products sold in India is approximately 40%. Samtel is India's

24  largest exporter of CRT products. Samtel has gained safety approvals from the United States,

25  Canada, Germany and Great Britain for its CRT products. During the Class Period, Samtel

26  manufactured, sold and distributed CRT Products to customers throughout the United States.

27      19.    Defendant Toshiba Corporation ("Toshiba") is a business entity organized under

28  the laws of Japan, with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku,

1    Tokyo 105-8001, Japan. In 2001, Toshiba held a 5-10 percent worldwide market share for CRTs

2    used in televisions and computer monitors. In 2002, Toshiba entered into a joint venture with

3    defendant Matsushita Electric called Matsushita Toshiba Picture Display Co., Ltd. in which the

4    entities consolidated their CRT businesses. In 2004, Toshiba entered into a contract with

5    defendant Orion whereby Orion became the supplier and maker of Toshiba-branded CRT

6    televisions. During the Class Period, Toshiba manufactured, sold and distributed CRT Products

7    to customers throughout the United States.

8        20.    Toshiba America Electronics Components, Inc. is a California corporation with

9    its principal place of business located at 9775 Toledo Way, Irvine, California 92618, and 19000

10    MacArthur Boulevard, Suite 400, Irvine, California 92612. Toshiba America Electronics

11    Components, Inc. is a wholly owned and controlled subsidiary of Toshiba America, Inc., which

12    is a holding company for Defendant Toshiba Corporation, and the sales and marketing

13    representative for Defendant Matsushita Toshiba Picture Display Co., Ltd. During the Class

14    Period, Toshiba Electronics Components, Inc. manufactured, sold and distributed CRT Products

15    to customers throughout the United States.

16        21.    Defendant Toshiba America Information Systems, Inc. is a California corporation

17    with its principal place of business located at 9470 Irvine Boulevard, Irvine, California 92718.

18    Toshiba America Information Systems, Inc. is a wholly owned and controlled subsidiary of

19    Toshiba America, Inc., a holding company for Defendant Toshiba Corporation. During the Class

20    Period, Toshiba America Information Systems, Inc. manufactured, sold and distributed CRT

21    Products to customers throughout the United States.

22        22.    Defendants Toshiba Corporation, Toshiba America Electronics Components, Inc.

23    and Toshiba America Information Systems, Inc. are referred to collectively herein as "Toshiba."

24        23.    Defendant Matsushita Toshiba Picture Display Co., Ltd. ("Matsushita-Toshiba")

25    was established as a CRT joint venture between Defendants Matsushita and Toshiba.

26    Matsushita-Toshiba is a Japanese entity with its principal place of business located at 1-1,

27    Saiwai-cho, Takatsuki-shi, Osaka 569-1193, Japan. On April 3, 2007, Defendant Matsushita

28    Electric purchased the remaining stake in Matsushita-Toshiba, making it a wholly owned

1     subsidiary, and renaming it MT Picture Display Co., Ltd. During the Class Period, Matsushita-

2     Toshiba manufactured, sold and distributed CRT Products to customers throughout the United

3     States.

4     24.     Defendant MT Picture Display Corporation of America (New York)

5     ("MTPDA(NY)") is a dissolved Maryland corporation previously located at 100 Westinghouse

6     Circle, Horseheads, New York 14845. MTDPA(NY) was a wholly owned and controlled

7     subsidiary of Defendant Matsushita-Toshiba. MTDPA(NY) specialized in the manufacture of

8     CRT televisions above 30 inches wide, supplying some 950,000 units annually to the North

9     American market. Matsushita and Toshiba announced plans to discontinue operations on

10     December 29, 2005. During the Class Period prior to December 2005, MTDPA(NY)

11     manufactured, sold and distributed CRT Products to customers throughout the United States.

12     25.     Defendant MT Picture Display Corporation of America (Ohio) ("MTDPA(OH)")

13     was a Delaware corporation with its principal place of business located at 1554 McKaig

14     Avenue, Building A, Troy, Ohio 45373. MTDPA(OH) was dissolved on March 27, 2007.

15     MTDPA(OH) was a wholly owned and controlled subsidiary of Defendant Matsushita-Toshiba.

16     During the Class Period prior to February 2006. MTDPA(OH) manufactured, sold and

17     distributed CRT Products to customers throughout the United States.

18     26.     Defendant Matsushita Electric Industrial Co., Ltd. ("Matsushita Electric") is a

19     Japanese entity with its principal place of business located at 1006 Oaza Kadoma, Kadoma-shi,

20     Osaka 571-8501, Japan. In 2002, Matsushita Electric entered into a CRT joint venture with

21     Defendant Toshiba forming Defendant Matsushita-Toshiba. Matsushita Electric was the

22     majority owner with 64.5 percent. On April 3, 2007. Matsushita Electric purchased the

23     remaining 35.5 percent stake in the joint venture, making Matsushita-Toshiba a wholly owned

24     subsidiary of Matsushita Electric. Matsushita Electric is best known for its Panasonic brand,

25     which in 2005 had the highest CRT revenue in Japan. During the Class Period, Matsushita

26     Electric manufactured, sold and distributed CRT Products to customers throughout the United

27     States.

28

7
CLASS ACTION COMPLAINT

1      27.     Defendant Panasonic Corporation of North America ("Panasonic") is a Delaware

2 corporation with its principal place of business located at One Panasonic Way, Secaucus, New

3 Jersey. Panasonic is a wholly owned and controlled subsidiary of Defendant Matsushita Electric.

4 During the Class Period. Panasonic manufactured. sold and distributed CRT Products to

5 customers throughout the United States.

6      28.     Defendant Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a

7 Chinese company with its principal place of business located at No. 9, Jiuxianqiao N. Rd.,

8 Dashanzi Chaoyang District. Beijing, China. BMCC is the second largest producer of CRTs for

9 televisions in China. During the Class Period, BMCC manufactured, sold and distributed CRT

10 Products throughout the United States.

11      29.     Defendant Orion Electric Co., Ltd ("Orion Electric") is a Japanese company

12 with its principal places of business at 41-1 Iehisa-cho, Echizen-shi, Fukui 915-8555, Japan.

13 Orion Electric currently manufactures CRT Products for Defendant Toshiba Corporation.

14 During the Class Period. Orion Electric manufactured, sold and distributed CRT Products to

15 customers throughout the United States.

16      30.     Defendant Orion America. Inc. ("Orion America") is an Indiana corporation with

17 its principal place of business located at Hwy 1 North. Orion Place, Princeton, Indiana. Orion

18 America is a wholly owned and controlled subsidiary of Defendant Orion Electric. During the

19 Class Period. Orion America manufactured, sold and distributed CRT Products to customers

20 throughout the United States.

21      31.     Defendant Hitachi, Ltd. is a business entity organized under the laws of Japan,

22 with its principal place of business located at 6-1 Marunouchi Center Building 13F, Chiyoda-ku,

23 Tokyo 100-8280. Japan. Hitachi Ltd. is the parent company for the Hitachi brand of CRT

24 products. During the Class Period, Hitachi Ltd. manufactured, sold and distributed CRT

25 Products to customers throughout the United States.

26      32.     Defendant Hitachi America, Ltd. ("Hitachi America") is a wholly owned and

27 controlled subsidiary of defendant Hitachi. Hitachi America is a business entity organized under

28 the laws of New York, with its principal place of business located at 2000 Sierra Point Parkway,

**8**
CLASS ACTION COMPLAINT

1  Brisbane, California 94005. During the Class Period, Hitachi America manufactured, sold and
2  distributed CRT Products to customers throughout the United States.

3      33.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its
4  principal place of business located at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore,
5  049318. Hitachi Asia is a wholly owned and controlled subsidiary of defendant Hitachi. During
6  the Class Period, Hitachi Asia manufactured, sold and distributed CRT Products to customers
7  throughout the United States.

8      34.    Defendants Hitachi Ltd., Hitachi America, and Hitachi Asia are collectively
9  referred to herein as "Hitachi."

10     35.    Defendant Chunghwa Picture Tubes Ltd. ("Chunghwa Picture Tubes") is a
11 business entity organized under the laws of Taiwan, with its principal place of business located
12 at 1127 Heping Road, Bade City, Taoyuan, Taiwan R.O.C. Chunghwa Picture Tubes is a
13 leading manufacturer of CRT Products. During the Class Period, Chunghwa Picture Tubes
14 manufactured, sold and distributed CRT Products to customers throughout the United States.

15     36.    Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chungwha
16 Malaysia") is a Malaysian company with its principal place of business located at Lot 1, Subang
17 Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.
18 Chunghwa Malaysia a wholly owned and controlled subsidiary of defendant Chungwha Picture
19 Tubes. Chungwha Malaysia is also a leading worldwide supplier of CRT Products. During the
20 Class Period, Chungwha Malaysia manufactured, sold and distributed CRT Products to
21 customers throughout the United States.

22     37.    Defendants Chungwha Picture Tubes and Chungwha Malaysia are collectively
23 referred to herein as "Chungwha."

24     38.    Defendant LP Displays International, Ltd. f/k/a LG Philips Displays ("LP
25 Displays") was created in 2001 as a 50/50 joint venture between defendants LG Electronics and
26 Royal Philips Electronics of The Netherlands. In March 2007, LP Displays became an
27 independent company organized under the laws of Hong Kong with its principal place of
28 business located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road

1  Central. Sheung Wan. Hong Kong. LP Displays is a leading supplier of color picture tubes for
2  use in television sets and computer monitors with annual sales for 2006 of over $2 billion. LP
3  Displays announced in March 2007 that Royal Philips and LG Electronics would lose control
4  over the company and the shares would be owned by financial institutions and private equity
5  firms. During the Class Period, LP Displays manufactured, sold and distributed CRT Products to
6  customers throughout the United States.

7       39.    Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics
8  N.V. ("Royal Philips") is a company organized under the laws of The Netherlands with its
9  principal place of business located at Amstelplein 2, Breitner Center, 1070 MX Amsterdam, The
10  Netherlands. Royal Philips, founded in 1891, is one of the world's largest electronics
11  companies, with 160,000 employees located in over 60 countries. Royal Philips had sole
12  ownership of its CRT business until 2000. In 2001, Royal Philips transferred its CRT business
13  to a 50/50 CRT joint venture with LG Electronics forming defendant LP Displays. In December
14  2005, as a result of increased pressure on demand and prices for CRTs, Royal Philips wrote off
15  the remaining book value of 126 million Euros of its investment and said it would not inject
16  further capital into the joint venture. During the Class Period, Royal Philips manufactured, sold
17  and distributed CRT Products to customers throughout the United States.

18       40.    Defendant Philips Electronics North America Corporation ("Philips Electronics
19  NA") is a Delaware corporation with its principal palce of business located at 1251 Avenue of
20  the Americas. New York, NY 10020-1104. Philips Electronics NA is a wholly owned and
21  controlled subsidiary of defendant Royal Philips. During the Class Period, Philips Electronics
22  NA manufactured, sold and distributed CRT Products to customers throughout the United
23  States.

24       41.    Defendant Irico Group Corporation is a Chinese entity with its principal place of
25  business located at 1 Caihong Rd., Xianyang City. Shaanxi Province 712021. Irico Group
26  Corporation is the parent company for multiple subsidiaries engaged in the manufacture,
27  distribution. and sale of CRT Products. During the Class Period, Irico Group Corporation
28  manufactured, sold and distributed CRT Products throughout the United States.

10<br>CLASS ACTION COMPLAINT

1   42.    Irico Display Devices Co., Ltd. is a Chinese entity with its principal place of
2   business located at No. 16, Fenghui South Road West, District High-tech Development Zone,
3   Xi'an, SXI 710075. Irico Display Devices Co., Ltd. is a partially-owned subsidiary of defendant
4   Irico Group Corporation. In 2006, Irico Display Devices Co., Ltd. was China's top CRT maker.
5   During the Class Period, Irico Display Devices Co., Ltd. manufactured, sold and distributed
6   CRT Products throughout the United States.

7   43.    Defendants Irico Group Corporation and Irico Display Devices Co., Ltd. are
8   collectively referred to herein as "Irico."

9   44.    Defendant Thai CRT Company, Ltd. ("Thai CRT") is a Thai company with its
10  principal place of business located at 1/F Siam Cement Road, Bangsue Dusit, Bangkok,
11  Thailand. Thai CRT is a subsidiary of Siam Cement Group. It was established in 1986 as
12  Thailand's first manufacturer of CRTs for color televisions. During the Class Period, Thai CRT
13  manufactured, sold and distributed CRT Products throughout the United States.

14  45.    Defendant Tatung Company of America, Inc. ("Tatung America") is a California
15  corporation with its principal place of business located at 2850 El Presidio Street, Long Beach,
16  California. Tatung America was founded in 1972 and is a wholly owned and controlled
17  subsidiary of Tatung Company of Taiwan. During the Class Period, Tatung America
18  manufactured, sold and distributed CRT Products throughout the United States.

19  ## DEFENDANTS AND CO-CONSPIRATORS

20  46.    Various other persons, firms and corporations, not named as Defendants herein,
21  and presently unknown to Plaintiff, have participated as co-conspirators with Defendants and
22  have performed acts and made statements in furtherance of the conspiracy and/or in furtherance
23  of the anticompetitive, unfair or deceptive conduct.

24  47.    Whenever in this Complaint reference is made to any act, deed or transaction of
25  any corporation, the allegation means that the corporation engaged in the act, deed or transaction
26  by or through its officers, directors, agents, employees or representatives while they were
27  actively engaged in the management, direction, control or transaction of the corporation's
28  business or affairs.

11
CLASS ACTION COMPLAINT

48.     Each of the Defendants named herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein. Each Defendant which is a subsidiary of a foreign parent acts as the sole United States agent for CRT Products made by its parent company.

## INTERSTATE TRADE AND COMMERCE

49.     Throughout the Class Period, there was a continuous and uninterrupted flow of CRT Product sales in interstate and international commerce throughout the United States.

50.     Defendants' unlawful activities, as described herein, took place within the flow of interstate commerce to CRT Product purchasers located in states other than the states in which Defendants are located, as well as throughout the world, and had a direct, substantial and reasonably foreseeable effect upon interstate and international commerce, including the United States CRT Products market.

## CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action on behalf of himself and as a class action under the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the following class:

> All persons and or entities residing in the United States (excluding Defendants, co-conspirators, their subsidiaries and affiliates, all governmental entities, and any judicial officer presiding over this action, including members of his/her immediate family and judicial staff, and any juror assigned to this action) who or which indirectly purchased CRT Products in the United States for their own use and not for resale, at any time during the period from January 1, 1995 through the present.

52.     This action has been brought and may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

a.     The Class is ascertainable and there is a well-defined community of interest among members of the Class;

b.     Based upon the nature of trade and commerce involved and the number of indirect purchasers of CRT Products, Plaintiff believes that the number of Class members is very large, and therefore joinder of all Class members is not practicable;

1             c.       Plaintiff's claims are typical of the claims of the members of the Class

2   because Plaintiff indirectly purchased CRT Products manufactured by Defendants or their co-

3   conspirators, and therefore Plaintiff's claims arise from the same common course of conduct

4   giving rise to the claims of the members of the Class and the relief sought is common to the

5   Class;

6             d.       The following common questions of law or fact, among others, exist as to

7   the members of the Class:

8             i.       Whether Defendants formed and operated a combination or

9   conspiracy to fix, raise, maintain, or stabilize the prices of CRT Products;

10             ii.       Whether the combination or conspiracy caused CRT Products

11   prices to be higher than they would have been in the absence of Defendants' conduct;

12             iii.      The operative time period of Defendants' combination or

13   conspiracy;

14             iv.      Whether Defendants' conduct caused injury to the business or

15   property of Plaintiff and the members of the Class;

16             v.       The appropriate measure of the amount of damages suffered by

17   the Class;

18

19             vi.      Whether Defendants' conduct violates Section 1 of the Sherman

20   Act (15 U.S.C. § 1) as alleged in the First Claim for Relief;

21             vii.     Whether Defendants' conduct violates the Indirect Purchaser

22   States' antitrust laws as alleged in the Second Claim for Relief;

23             viii.    Whether Defendants' conduct violates the unfair competition and

24   consumer protection laws of the Consumer Protection States as alleged in the Third Claim for

25   Relief;

26             ix.      The appropriate nature of class-wide equitable relief.

27

28

1            e.     These and other questions of law and fact common to the members of the

2  Class predominate over any questions affecting only individual members, including legal and

3  factual issues relating to liability and damages;

4            f.     After determination of the predominant common issues identified above,

5  if necessary or appropriate, the Class can be divided into logical and manageable subclasses;

6            g.     Plaintiff will fairly and adequately protect the interests of the Class in that

7  Plaintiff has no interests that are antagonistic to other members of the Class and has retained

8  counsel competent and experienced in the prosecution of class actions and antitrust litigation to

9  represent him and the Class;

10            h.     A class action is superior to other available methods for the fair and

11  efficient adjudication of this litigation since individual joinder of all damaged Class members is

12  impractical. The damages suffered by the individual Class members are relatively small, given

13  the expense and burden of individual prosecution of the claims asserted in this litigation. Thus,

14  absent the availability of class action procedures it would not be feasible for Class members to

15  redress the wrongs done to them. Even if the Class members could afford individual litigation,

16  the court system could not. Further, individual litigation presents the potential for inconsistent or

17  contradictory judgments and would greatly magnify the delay and expense to all parties and the

18  court system. Therefore, the class action device presents far fewer case management difficulties

19  and will provide the benefits of unitary adjudication, economy of scale and comprehensive

20  supervision in a single court;

21            i.     Defendants have acted, and/or refused to act, on grounds generally

22  applicable to the Class, thereby making appropriate final injunctive relief with respect to the

23  Class as a whole; and

24            j.     In the absence of a class action, Defendants would be unjustly enriched

25  because they would be able to retain the benefits and fruits of its wrongful conduct.

### CRT PRODUCT MARKET

27       53.     CRT stands for "cathode ray tube." A CRT is a vacuum tube that is coated on its

28  inside face with light sensitive phosphors. An electron gun at the back of the vacuum tube emits

1   electron beams. When the electron beams strike the phosphors, the phosphors produce either

2   red, green, or blue light. A system of magnetic fields inside the CRT, as well as varying

3   voltages, directs the beams to produce the desired colors. This process is rapidly repeated

4   several times per second to produce the desired images.

5         54.    CRT technology was first developed more than a century ago. The first

6   commercially practical CRT television was made in 1931. However, it was not until the RCA

7   Corporation introduced the product at the 1939 World's Fair that it became widely available to

8   consumers. Since then, CRTs have become the heart of most display products, including

9   televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs. Even

10   large public displays, including many scoreboards at sports arenas, are comprised of thousands

11   of single color CRTs.

12         55.    Until the last few years. CRTs were the dominant technology used in displays,

13   including television and computer monitors. During the Class Period, this translated into the sale

14   of millions of CRT Products, generating billions of dollars in annual profits.

15         56.    Conventional CRT televisions are being rapidly replaced by liquid crystal and

16   plasma displays, resulting in this alleged price fixing scheme to slow down the declining CRT

17   Product prices. Between 2000 and 2006, revenues from the sale of CRT televisions in the United

18   States declined by 50.7 percent and are predicted to decline by an additional 84.5 percent

19   between 2006 and 2010.

20         57.    Although demand has been sharply declining as a result of the popularity of flat-

21   panel LCDs and plasma televisions. CRT televisions were still being sold during the Class

22   Period, making collusion and the international price fixing conspiracy worthwhile. Due to the

23   high costs of LCD panels and plasma displays during the Class Period, a niche market for CRTs

24   existed as a cheaper alternative to these new technologies.

25             **STRUCTURAL CHARACTERISTICS OF THE CRT PRODUCT MARKET**

26         58.    The structural characteristics of the CRT Product market are conducive to the

27   type of collusive activity alleged in this Complaint.

28

1    59.    CRT Products are commodity-like products which are manufactured in
2    standardized sizes. One defendant's CRT Product for a particular application, such as a
3    particular size television set or computer monitor, is substitutable for another's. Defendants sell
4    and Plaintiff (and Class members) purchases CRT Products primarily on the basis of price.

5    60.    It is easier to form and sustain a cartel when the product in question is
6    commodity-like because it is easier to agree on prices to charge and to monitor those prices once
7    an agreement is formed.

8    61.    Demand for CRT Products is declining. Static or declining demand is another
9    factor which makes the formation of a collusive arrangement more likely because it provides a
10   greater incentive to firms to avoid price competition.

11   62.    Defendants are horizontal competitors, meaning that they sell at the same
12   wholesale or retail level of the distribution chain. This makes it easier to monitor adherence to
13   the cartel.

14   63.    There are substantial barriers to entry in the CRT Products industry. It would
15   require substantial time. resources and industry knowledge to even potentially overcome the
16   barriers to entry. It is also extremely unlikely that a new producer would enter the market in
17   light of the declining demand for CRT products.

18   64.    Newer industries are typically characterized by rapid growth, innovation and high
19   profits. The CRT Product market is a mature one, and like many mature industries, is
20   characterized by slim profit margins, creating a motivation to collude.

21   65.    During the Class Period. the CRT industry has been dominated by relatively few
22   companies. In 2004, Defendants Samsung SDI. LP Displays, MT Picture Display and
23   Chunghwa Picture Tubes together held a collective 78% share of the global CRT market. The
24   high concentration of market share facilitates coordination since there are fewer cartel members
25   among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing
26   and production of other cartel members.

27   66.    The CRT industry also had significant consolidation during the Class Period,
28   including but not limited to: (a) the creation of LG Philips Displays in 2001 as a joint venture

16
CLASS ACTION COMPLAINT

1  between Royal Philips and LG Electronic's CRT business; (b) the 2002 merger of Toshiba and

2  Matsushita into Matsushita-Toshiba; and (c) Orion's agreement to manufacture CRT Products

3  for Toshiba. which effectively took Toshiba's capacity out of the market.

4        67.     Involvement in long standing joint ventures. both in the CRT market and closely

5  related markets. also gave these "competitors" continuous opportunities to discuss pricing,

6  capacity utilization. and other important prospective market information. The mutually

7  beneficial nature of the business relations between certain Defendants not only provided the

8  opportunity to conspire; it also created a financial incentive to do so.

9        68.     Examples of the high degree of cooperation among Defendants in both the CRT

10  market and other closely related markets include the following:

11          a.     Defendant Chungwha has a long standing joint venture with Defendant

12  Samsung Electronics Co., Ltd. for the production of liquid crystal display panels. Chungwha

13  now licenses the technology from Defendant Royal Philips, although this is a recent

14  development that helped resolve a patent infringement suit filed in 2002.

15          b.     Defendants LG Electronics and Hitachi Ltd. entered into a joint venture in

16  2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

17          c.     Defendant Samtel participates in a joint venture. Samcor Glass Limited,

18  with Defendant Samsung Electronics Co., Ltd. and non-Defendant Corning Inc., USA for the

19  production and supply of picture tube glass.

20          d.     Defendant Orion participates in a joint venture for the manufacture of

21  CRT Products with Defendant Toshiba. as well as non-Defendants P.T. Tabung Gambar

22  Indonesia and Japanese trading company Sumitomo Corporation.

23          e.     Defendant Samtel claims to have supplied CRTs to Defendants LG

24  Electronics. Samsung. Royal Philips, and Matsushita.

25        69.     Defendants also maintain their close relationships through common membership

26  in trade associations. Defendants Chungwha, Hitachi and Samsung are all members of the

27  Society for Information Display. Defendants Samsung and LG Electronics are two of the co-

28  founders of the Korea Display Industry Association. Similarly, Defendants Orion, LG

1  Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial

2  Research Association. Upon information and belief, Defendants use these trade associations as

3  vehicles for discussing and agreeing upon their pricing for CRT Products. At the meetings of

4  these trade associations, Defendants exchange proprietary and competitively sensitive

5  information which they use to implement and monitor the conspiracy.

6                    **DEFENDANTS' COLLUSIVE ACTIVITIES**

7          70.    Plaintiff is informed and believes, and thereon alleges, that in order to control and

8  maintain profitability during declining demand for CRTs, Defendants and their co-conspirators

9  have engaged in a contract, combination, trust or conspiracy, the effect of which has been to

10  raise the prices at which they sold CRT Products to artificially inflated levels from at least

11  January 1, 1995 through the present.

12         71.    Defendants' collusion is evidenced by unusual price movements in the CRT

13  market. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for

14  CRTs that did not fully materialize. Despite these predictions, and the existence of economic

15  conditions warranting a drop in prices, CRT prices nonetheless remained stable.

16         72.    During the Class Period, while demand in the United States for CRT Products

17  continued to decline, defendants' conspiracy was effective in moderating the normal downward

18  pressures on prices for CRT Products caused by the entry and popularity of the new generation

19  LCD panels and plasma display products.

20         73.    During the Class Period, there were not only periods of unnatural and sustained

21  price stability, but there were also unexplained increases in prices of CRT Products. These price

22  increases were despite the declining demand due to the approaching obsolescence of CRT

23  Products caused by the emergence of a new, potentially superior and clearly more popular

24  substitutable technology.

25         74.    These price increases and price stability in the market for CRT Products during

26  the Class Period are inconsistent with a competitive market for a product facing rapidly

27  decreasing demand caused by a new, substitutable technology.

28

1    75.   On November 8, 2007, antitrust authorities in Europe, Japan and South Korea

2  raided the offices of manufacturers of CRT Products as part of an international investigation of

3  alleged price fixing.

4    76.   Defendant MT Picture Display Co., Ltd., the CRT unit of Defendant Matsushita

5  Electric, has confirmed that it was raided by Japan's Fair Trade Commission.

6    77.   *Kyodo News* reported on November 8, 2007, upon information and belief, that

7  MT Picture Display fixed prices for CRTs with manufacturers in three Asian countries,

8  including South Korea's Samsung SDi Co.

9    78.   *Kyodo News* further reported that:

10       Officials of these three companies are believed to have had at least 10
        meetings since 2005 in major Asian cities to coordinate target prices when
11       delivering their products to TV manufacturers in Japan and South Korea,
        the sources said.
12

13   79.   Defendant Samsung SDI Co., Ltd. was raided by South Korea's Fair Trade

14  Commission, which has started an investigation into Samsung's CRT business.

15   80.   The European Commission confirmed that it had carried out surprise inspections

16  at the European offices of CRT Product manufacturers, seeking evidence of cartel activity in the

17  sector.

18   81.   According to Japan's *Nikkei Business Daily*, authorities in the United States were

19  also involved in the investigation of an alleged international cartel of CRT manufacturers.

20   82.   The *Asian Shimbun* further reported on November 10, 2007 that "[t]he

21  representatives held meetings in Southeast Asia where the companies operate CRT factories, the

22  sources said. The European Commission, the European Union's executive branch, and the U.S.

23  Justice Department have been investigating four companies' [referring to the four Asian-based

24  manufacturers—MT Picture Display, Samsung SDI Co., Chungwha Picture Tubes, LP Displays]

25  overseas units and are closely consulting with the Fair Trade Commission by sharing

26  information."

27   83.   On November 12, 2007, *Dow Jones International News* reported that Defendant

28  Chungwha Picture Tubes Ltd. had received a subpoena on November 9, 2007 issued by a

1   California District Court "to assist in an investigation into whether cathode ray tube
2   manufacturers had set up a cartel."

3       84.   Unnamed sources close to the investigation report that the firms are suspected of
4   fixing the amount they charge TV manufacturers for CRTs in an effort to stop prices from
5   dropping.

6       85.   On November 21, 2007, Defendant Royal Philips publicly disclosed that it too is
7   subject to one or more investigations into anticompetitive conduct in the CRT industry. Royal
8   Philips spokesman Joon Knapen declined to comment on which jurisdictions have started
9   investigations. Royal Philips stated that it intended to assist the regulators.

10      86.   As outlined above, Defendants have a history of competitor contacts resulting
11  from joint ventures, numerous cross-licensing agreements, and other alliances in related
12  businesses in the electronics industry

13      87.   Several Defendants have a history of "cooperation" and anticompetitive conduct.
14  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in
15  October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access
16  Memory.

17      88.   Defendants Samsung and Toshiba have acknowledged being contacted by the
18  U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static
19  Random Access Memory and NAND Flash Memory.

20      89.   In December 2006, authorities in Japan, Korea, the European Union and the
21  United States revealed a comprehensive investigation into anticompetitive conduct among CRT
22  manufacturers. Defendant Samsung, Toshiba and LG Philips (a joint venture between
23  Defendants LG Electronics and Royal Philips) are under criminal investigation for price fixing
24  in the closely related CRT market.

25      90.   By engaging in collusive conduct in the market for CRT Products, Defendants
26  were able to manipulate and artificially fix, raise, maintain or stabilize the prices for the CRT
27  Products that they manufactured and sold in the United States.

28

1    91.    During the Class Period, Plaintiff and the class members indirectly purchased

2   CRT Products manufactured by the Defendants or their co-conspirators.

3    92.    Plaintiff and the class members paid more for their indirect CRT Product

4   purchases than they would have paid had Defendants not fixed CRT Product prices and

5   cooperated in other aspects of the CRT Product market.

6    93.    As a direct and proximate result of Defendants' conspiracy, Plaintiff and the class

7   members have been injured and financially damaged in their respective businesses and property

8   in presently undetermined amounts.

9                          **VIOLATIONS ALLEGED**

10                          **First Claim for Relief**

11                   **(Violation of Section 1 of the Sherman Act)**

12    94.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and

13   every allegation set forth in the preceding paragraphs of this Complaint.

14    95.    Beginning at a time unknown to Plaintiffs, but at least as early as January 1,

15   1995, through at the present, the exact dates being unknown to Plaintiffs and exclusively within

16   the knowledge of Defendants. Defendants and their co-conspirators, entered into a continuing

17   agreement, understanding, and conspiracy to unreasonably restrain trade and commerce in the

18   United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

19    96.    In particular, Defendants have combined and conspired to fix, raise, maintain or

20   stabilize the prices of CRT Products sold in the United States.

21    97.    Defendants, by their unlawful conspiracy, artificially raised, inflated and

22   maintained the market prices of CRT Products as herein alleged.

23    98.    The contract, combination or conspiracy consisted of a continuing agreement,

24   understanding and concert of action among Defendants and their co-conspirators, the substantial

25   terms of which were to fix, raise, maintain and stabilize the prices of CRT Products they sold in

26   the United States and elsewhere.

27    99.    In formulating and carrying out the alleged agreement, understanding, and

28   conspiracy, the Defendants and their co-conspirators did those things that they combined and

21
CLASS ACTION COMPLAINT

1  conspired to do, including, but not limited to the acts, practices, and course of conduct set forth

2  above, and the following, among others:

3              a.      Participated in meetings and conversations to discuss the prices of CRT

4                    Products;

5              b.      Agreed to manipulate prices and supply of CRT Products in a manner that

6                    deprived purchasers of CRT Products of free and open competition;

7              c.      Issued price announcements and price quotations in accordance with the

8                    agreements reached; and

9              d.      Sold CRT Products to customers in the United States at non-competitive

10                    prices.

11          100.     The combination and conspiracy alleged herein has had the following effects,

12  among others:

13              a.      Price competition in the sale of CRT Products has been restrained,

14                    suppressed and/or eliminated in the United States;

15              b.      Prices for CRT Products sold by Defendants and their co-conspirators

16                    have been fixed, raised, maintained and stabilized at artificially high, non-

17                    competitive levels throughout the United States; and

18              c.      Those who purchased CRT Products directly or indirectly from

19                    Defendants have been deprived the benefits of free and open competition.

20          101.     As a direct result of the unlawful conduct of Defendants and their co-conspirators

21  in furtherance of their continuing contract, combination or conspiracy, Plaintiff and the members

22  of the class have been injured and will continue to be injured in their business and property by

23  paying more for CRT Products purchased indirectly from the Defendants and their co-

24  conspirators than they would have paid and will pay in the absence of the combination and

25  conspiracy.

26          102.     These violations are continuing and will continue unless enjoined by this Court.

27

28

1      103.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff and the Class

2   seek the issuance of an injunction against Defendants, preventing and restraining the violations

3   alleged herein.

4                                      **Second Claim For Relief**

5                               **(Violation of State Antitrust Statutes)**

6      104.    Plaintiff incorporates and realleges, as though fully set forth herein, each and

7   every allegation set forth in the preceding paragraphs of this Complaint.

8      105.    Defendants' intentional and purposeful anticompetitive acts that are described

9   above, including but not limited to acts of collusion to set prices and the actual act of price

10   fixing itself, were intended to and did in fact case Plaintiff and the members of the Class to pay

11   supracompetitive prices for CRT Products purchased in the Indirect Purchaser States.

12      106.    Defendants' contract, combination and conspiracy as described above is in

13   violation of the following state antitrust statutes:

14      107.    By reason of the foregoing, Defendants have entered into agreements in restraint

15   of trade in violation of Arizona Revised Stat. §§44-1401 et seq.

16      108.    By reason of the foregoing, Defendants have entered into agreements in restraint

17   of trade in violation of California Business & Professions Code §16720 et seq.

18      109.    By reason of the foregoing, Defendants have entered into agreements in restraint

19   of trade in violation of District of Columbia Code Ann. §§28-4503 et seq.

20      110.    By reason of the foregoing, Defendants have entered into agreements in restraint

21   of trade in violation of Iowa Code §§553.1 et seq.

22      111.    By reason of the foregoing, Defendants have entered into agreements in restraint

23   of trade in violation of Kansas Stat. Ann. §§50-101 et seq.

24      112.    By reason of the foregoing, Defendants have entered into agreements in restraint

25   of trade in violation of Maine Rev. Stat. Ann. 10, §§1101 et seq.

26      113.    By reason of the foregoing, Defendants have entered into agreements in restraint

27   of trade in violation of Michigan Comp. Laws Ann. §§445.773 et seq.

28

1    114.    By reason of the foregoing, Defendants have entered into agreements in restraint

2  of trade in violation of Minnesota Stat. §§325D.52 et seq.

3    115.    By reason of the foregoing, Defendants have entered into agreements in restraint

4  of trade in violation of Mississippi Code Ann. §75-21-1 et seq.

5    116.    By reason of the foregoing, Defendants have entered into agreements in restraint

6  of trade in violation of Nebraska Rev. Stat. §59-801 et seq.

7    117.    By reason of the foregoing, Defendants have entered into agreements in restraint

8  of trade in violation of Nevada Rev. Stat. Ann. §§598A et seq.

9    118.    By reason of the foregoing, Defendants have entered into agreements in restraint

10  of trade in violation of New Mexico Stat. Ann. §§57-1-1 et seq.

11    119.    By reason of the foregoing, Defendants have entered into agreements in restraint

12  of trade in violation of North Carolina Gen. Stat. §§75-1 et seq.

13    120.    By reason of the foregoing, Defendants have entered into agreements in restraint

14  of trade in violation of North Dakota Cent. Code §§51-08.1-01 et seq.

15    121.    By reason of the foregoing, Defendants have entered into agreements in restraint

16  of trade in violation of South Dakota Codified Laws Ann. §§37-1 et seq.

17    122.    By reason of the foregoing, Defendants have entered into agreements in restraint

18  of trade in violation of Tennessee Code Ann. §§47-25-101 et seq.

19    123.    By reason of the foregoing, Defendants have entered into agreements in restraint

20  of trade in violation of Vermont Stat. Ann. 9 §§2453 et seq.

21    124.    By reason of the foregoing, Defendants have entered into agreements in restraint

22  of trade in violation of West Virginia Code §§47-18-1 et seq.

23    125.    By reason of the foregoing, Defendants have entered into agreements in restraint

24  of trade in violation of Wisconsin Stat. §§133.01 et seq.

25    126.    Class members in each of the states listed above paid supracompetitive,

26  artificially inflated prices for CRT Products. As a direct and proximate result of Defendants'

27  unlawful conduct, Plaintiffs and members of the Class have been injured in their business and

28

1   property in that they paid more for CRT Products than they otherwise would have paid in the
2   absence of Defendants' unlawful conduct.

3        127.    As a result of Defendants' and their co-conspirators' violation of the above
4   Indirect Purchaser States' antitrust laws, Plaintiff seeks damages, to be trebled where permitted
5   by a particular State's antitrust law, and costs of suit, including reasonable attorneys' fees, to the
6   extent permitted by the above Indirect Purchaser States' antitrust laws.

7                              **Third Claim for Relief**

8        **(Violation of State Consumer Protection and Unfair Competition Statutes)**

9        128.    Plaintiff incorporates and realleges, as though fully set forth herein, each and
10   every allegation set forth in the preceding paragraphs of this Complaint.

11       129.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or
12   fraudulent acts or practices in violation of the state consumer protection and unfair competition
13   statutes listed below.

14       130.    Defendants have engaged in unfair competition or unfair or deceptive acts or
15   practices in violation of Arkansas Code §4-88-101 et seq.

16       131.    Defendants have engaged in unfair competition or unfair or deceptive acts or
17   practices in violation of California Business & Professions Code §17200 et seq.

18       132.    Defendants have engaged in unfair competition or unfair or deceptive acts or
19   practices in violation of District of Columbia Code §28-3901 et seq.

20       133.    Defendants have engaged in unfair competition or unfair or deceptive acts or
21   practices in violation of Florida Stat. §501.201 et seq.

22       134.    Defendants have engaged in unfair competition or unfair or deceptive acts or
23   practices in violation of Hawaii Rev. Stat. §480 et seq.

24       135.    Defendants have engaged in unfair competition or unfair or deceptive acts or
25   practices in violation or Kansas Stat. §50-623 et seq.

26       136.    Defendants have engaged in unfair competition or unfair or deceptive acts or
27   practices in violation of 5 Maine Rev. Stat. §207 et seq.

28

1     137.   Defendants have engaged in unfair competition or unfair or deceptive acts or

2 practices in violation of Massachusetts G.L. c. 93A. §2 et seq.

3     138.   Defendants have engaged in unfair competition or unfair or deceptive acts or

4 practices in violation of Nebraska Rev. Stat. §59-1601 et seq.

5     139.   Defendants have engaged in unfair competition or unfair or deceptive acts or

6 practices in violation of New Hampshire Revised Statutes §358-A:1 et seq.

7     140.   Defendants have engaged in unfair competition or unfair or deceptive acts or

8 practices in violation of New Mexico Stat. §57-12-1 et seq.

9     141.   Defendants have engaged in unfair competition or unfair or deceptive acts or

10 practices in violation of New York Gen Bus. Law §349 et seq.

11     142.   Defendants have engaged in unfair competition or unfair or deceptive acts or

12 practices in violation of North Carolina Gen. Stat. §75-1.1 et seq.

13     143.   Defendants have engaged in unfair competition or unfair or deceptive acts or

14 practices in violation of Rhode Island Gen. Laws §6-13.1-1 et seq.

15     144.   Defendants have engaged in unfair competition or unfair or deceptive acts or

16 practices in violation of Vermont Stat. Ann. Title 9, §2451 et seq.

17     145.   Defendants have engaged in unfair competition or unfair or deceptive acts or

18 practices in violation of West Virginia Code §46A-6-101 et seq.

19     146.   Class members in each of the Consumer Fraud States listed above paid

20 supracompetitive, artificially inflated prices for CRT Products. As a direct and proximate result

21 of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their

22 business and property in that they paid more for CRT Products than they otherwise would have

23 paid in the absence of Defendants' unlawful conduct.

24     147.   Plaintiff and the Class are therefore entitled to all appropriate relief as provided

25 for by the above Consumer Fraud States' laws, including but not limited to, actual damages,

26 injunctive relief, attorneys' fees and equitable relief such as restitution and/or disgorgement of

27 all revenues, earnings, profits, compensation and benefits which may have been obtained by

28 Defendants as a result of their unlawful conduct.

26

1

## Fourth Claim for Relief

2

### (Unjust Enrichment and Disgorgement of Profits)

3    148.    Plaintiff incorporates and realleges. as though fully set forth herein, each and
4  every allegation set forth in the preceding paragraphs of this Complaint.

5    149.    Defendants have been unjustly enriched through overpayments by Plaintiff and
6  the Class members and the resulting profits.

7    150.    Under common law principles of unjust enrichment, Defendants should not be
8  permitted to retain the benefits conferred via overpayments by Plaintiff and the members of the
9  Class.

10    151.    Plaintiff seeks disgorgement of all profits resulting from such overpayments and
11  establishment of a constructive trust from which Plaintiff and the Class members may seek
12  restitution.

13

## FRAUDULENT CONCEALMENT

14    152.    Throughout the relevant period. Defendants affirmatively and fraudulently
15  concealed their unlawful conduct against Plaintiff and the Class.

16    153.    Plaintiff and the members of the Class did not discover, and could not discover
17  through the exercise of reasonable diligence. that Defendants were violating the antitrust laws as
18  alleged herein until shortly before this litigation was commenced. Nor could Plaintiff and the
19  members of the Class have discovered the violations earlier than that time because Defendants
20  conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in
21  furtherance thereof. and fraudulently concealed their activities through various other means and
22  methods designed to avoid detection. The conspiracy was by its nature self-concealing.

23    154.    Defendants engaged in a successful, illegal price-fixing conspiracy with respect
24  to CRT Products. which they affirmatively concealed, in at least the following respects:

25    a.    By agreeing among themselves not to discuss publicly, or otherwise
26  reveal. the nature and substance of the acts and communications in furtherance of their illegal
27  scheme: and

28

1            b.    By giving false and pretextual reasons for their CRT Product price

2    increases during the relevant period and by describing such pricing falsely as being the result of

3    external costs rather than collusion.

4          155.    As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiff

5    and the Class assert the tolling of any applicable statute of limitations affecting the rights of

6    action of Plaintiff and the members of the Class.

7                                     **PRAYER FOR RELIEF**

8          WHEREFORE. Plaintiff prays as follows:

9          A.    That the Court determine that this action may be maintained as a class action

10   under Rule 23 of the Federal Rules of Civil Procedure;

11         B.    That the Court adjudge and decree that the unlawful conduct, contract,

12   combination and conspiracy alleged herein constitutes:

13             a.   A violation of the Sherman Act, 15 U.S.C. §1, as alleged in the First Claim

14               for Relief;

15             b.   A violation of the Indirect Purchaser States' antitrust laws as alleged in the

16               Second Claim for Relief;

17             c.   A violation of the Consumer Fraud States' consumer protection and unfair

18               competition laws as alleged in the Third Claim for Relief; and

19             d.   Acts of unjust enrichment as set forth in the Fourth Claim for Relief herein.

20         C.    That Plaintiff and the Class recover damages, as provided by the Indirect

21   Purchaser States' antitrust laws and the Consumer Fraud States' consumer protection and unfair

22   competition laws, and that a joint and several judgment in favor of Plaintiff and the Class be

23   entered against the Defendants in an amount to be trebled in accordance with such laws;

24         D.    That Defendants, their co-conspirators, successors, transferees, assigns, parents,

25   subsidiaries, affiliates, and the officers, directors, partners, agents and employees thereof, and all

26   other persons acting or claiming to act on behalf of Defendants, or in concert with them, be

27   permanently enjoined and restrained from, in any manner, directly or indirectly, continuing,

28   maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of

1    action, or adopting or following any practice, plan, program or design having a similar purpose

2    or effect in restraining competition;

3       E.    That Plaintiff be awarded restitution, including disgorgement of profits obtained

4    by Defendants as a result of its acts of unfair competition and acts of unjust enrichment;

5       F.    That the Court award Plaintiff and the class he represents pre-judgment and post-

6    judgment interest as permitted by law;

7       G.    That Plaintiff and the members of the Class recover their costs of suit, including

8    reasonable attorneys' fees as provided by law; and

9       H.    That the Court award Plaintiff and the Class he represents such other and further

10    relief as may be necessary and appropriate.

11

12                                **JURY DEMAND**

13    Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

14    Dated: December 13, 2007        By:    _Mario N. Alioto_

15                                    Mario N. Alioto (56433)
                                      Lauren C. Russell (241151)
16                                    TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
                                      2280 Union Street
17                                    San Francisco, CA 94123
                                      Telephone: (415) 563-7200
18                                    Facsimile: (415) 346-0679
                                      mailto@tatp.com ; laurenrussell@tatp.com
19

20                                    Joseph M. Patane (72202)
                                      LAW OFFICES OF JOSEPH M. PATANE
21                                    2280 Union Street
                                      San Francisco, CA 94123
22                                    Telephone: (415) 563-7200
                                      Facsimile: (415) 346-0679
23                                    E-mail: jpatane@tatp.com
24

25

26

27

28

                                        29
                              CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Lawrence G. Papale (67068)
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street #117
St. Helena, CA 94574
Telephone: (707) 963-1704
Facsimile: (707) 963-0706
E-mail: lgpapale@papalelaw.com

Attorneys for Plaintiff Figone
And All Others Similarly Situated

# EXHIBIT B

1 | Francis O. Scarpulla (41059)
Craig C. Corbitt (83251)
2 | Matthew R. Schultz (220641)
Judith A. Zahid (215418)
3 | ZELLE HOFMANN VOELBEL
MASON & GETTE LLP
4 | 44 Montgomery Street, Suite 3400
San Francisco, CA 94104
5 | Telephone:   (415) 693-0700
Facsimile:    (415) 693-0770
6 | fscarpulla@zelle.com
ccorbitt@zelle.com
7 |
Richard M. Hagstrom
8 | Michael Jacobs
ZELLE HOFMANN VOELBEL
9 | MASON & GETTE LLP
500 Washington Ave. South, Suite 400
10 | Minneapolis, MN 55415
Telephone:   (612) 339-2020
11 | Facsimile:    (612) 336-9100
rhagstrom@zelle.com
12 | mjacobs@zelle.com

13 | *Attorneys for Plaintiffs*

E-filing

14 |

15 | UNITED STATES DISTRICT COURT

16 | NORTHERN DISTRICT OF CALIFORNIA

17 | SAN FRANCISCO DIVISION

18 | MICHAEL JUETTEN, a California resident, )    CASE NO.
and CHAD KLEBS, a Minnesota resident, on )
19 | behalf of themselves and all others similarily )    **CLASS ACTION COMPLAINT**
situated, )
20 | )    JURY TRIAL DEMANDED
Plaintiffs, )
21 | )
)
22 | v. )
)
23 | CHUNGHWA PICTURE TUBES, LTD.; LP )
DISPLAYS INTERNATIONAL, LTD.; )
24 | MATSUSHITA ELECTRIC INDUSTRIAL )
CO., LTD.; MT PICTURE DISPLAY CO., )
25 | LTD.; KONINKLIJKE PHILIPS )
ELECTRONICS NV; SAMSUNG SDI CO.; )
26 | TOSHIBA CORP.; TOSHIBA AMERICA, )
INC. )
27 | )
Defendants. )
28 | _____ )

1

1    Plaintiffs Michael Juetten and Chad Klebs, on behalf of themselves and the classes defined

2  below ("Plaintiffs"), by their attorneys, bring this civil action for damages and injunctive relief

3  against the above-named Defendants, and demanding a trial by jury, complain and allege as

4  follows:

5                              **I.    INTRODUCTION**

6    1.    This case arises out of a long-running conspiracy extending from at least May 1,

7  1998 through November 9, 2007 (the "Class Period") among Defendants and their co-conspirators,

8  with the purpose and effect of fixing, raising, and/or maintaining the prices for cathode ray tubes

9  ("CRTs") sold indirectly to Plaintiffs and other indirect purchasers throughout the United States.

10    2.    CRTs are used in a number of products, including but not limited to, televisions and

11  computer monitors. Throughout the Class Period, Defendants' conspiracy was intended to, and

12  did, moderate the downward pressure on CRTs (and, as a result, products containing CRTs) caused

13  by the rapidly increasing popularity of flat panel products using liquid crystal displays ("LCD")

14  and plasma display panels ("PDP") (collectively, "FPD").

15    3.    Defendants and their co-conspirators formed an international cartel to illegally

16  restrict competition in the CRT market, targeting and severely burdening indirect-purchasers

17  throughout the United States. During the Class Period, Defendants' conspiracy affected billions of

18  dollars of commerce throughout the United States. As a result of this conspiracy, Plaintiff and

19  indirect-purchasers have been injured in their business and property by paying more for CRTs than

20  they otherwise would have paid in the absence of Defendants' conspiracy.

21    4.    Plaintiffs bring this action seeking federal injunctive relief under Section 16 of the

22  Clayton Act, 15 U.S.C. § 26 for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to

23  recover damages under state antitrust, consumer protection, unfair trade, and/or deceptive trade

24  practices laws, common law principles of restitution, disgorgement, unjust enrichment, as well as

25  to recover the costs of suit, including reasonable attorneys fees, for the injuries that Plaintiffs and

26  all others similarly situated sustained as a result of the Defendants' conspiracy to fix, raise,

27  maintain and stabilize the prices of CRTs.

28

2

CLASS ACTION COMPLAINT

## II. JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Section 16 of the Clayton Antitrust Act (15 U.S.C. 26) and Title 28 United States Code Sections 1331 and 1337, and Section 1 of the Sherman Act (15 U.S.C. 1). This Court has subject matter jurisdiction of the state-law claims asserted in this action under Title 28, United States Code Sections 1332(d) and 1367, in that the matter in controversy exceeds the sum of $5 million exclusive of interest and costs, members of the indirect-purchaser plaintiff class are citizens of states different from Defendants, and certain Defendants are citizens or subjects of foreign states.

6. Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391, because one or more of the Defendants reside, is licensed to do business, or is found or transacts business in this District, and a substantial part of the events or omissions giving rise to the Plaintiffs' claims arose in this District.

7. Defendants conduct business throughout the United States, including in this jurisdiction, and they have purposefully availed themselves of the laws of the United States, including specifically the laws of the individual states listed herein. Defendants' products are sold in the flow of interstate commerce, and Defendants' activities had a direct, substantial and reasonably foreseeable effect on such commerce.

8. The activities of the Defendants and their co-conspirators, as described herein, substantially affected commerce throughout the United States and in each of the states identified herein because Defendants, directly or through their agents, engaged in activities affecting each such state. Defendants have purposefully availed themselves of the laws of each of the states identified herein in connection with their activities relating to the production, marketing, and/or sale of CRTs. Defendants produced, promoted, sold, marketed, and/or distributed CRTs, thereby purposefully profiting from access to indirect-purchaser end-user businesses and consumers in each such state. Defendants also contracted to supply or obtain goods or revenue related to the business for CRTs. As a result of the activities described herein, Defendants:

3

1           a.    Caused damage to the residents of the states identified herein;

2           b.    Caused damage in each of the states identified herein by acts or omissions

3                 committed outside each such states by regularly doing or soliciting business

4                 in each such state;

5           c.    Engaged in persistent courses of conduct within each such state and/or

6                 derived substantial revenue from the marketing of CRTs or the products in

7                 which they are used in each such state (and services relating to such

8                 marketing); and

9           d.    Committed acts or omissions that they knew or should have known would

10                cause damage (and did, in fact, cause such damage) in each such state while

11                regularly doing or soliciting business in each such state, engaging in other

12                persistent courses of conduct in each such state, and/or deriving substantial

13                revenue from the marketing of CRTs or the products in which they are used

14                in each such state.

15      9.    The conspiracy described herein affected adversely every person nationwide and in

16  each of the states identified in this Complaint who indirectly bought Defendants' CRTs.

17  Defendants' conspiracy has resulted in an adverse monetary effect on indirect-purchasers in each

18  state identified herein.

19      10.    Prices of CRTs in each state can be manipulated by conspirators within that state,

20  outside of it, or both. Without enforcing the antitrust and/or consumer protection laws of each of

21  the states identified herein, companies that break the law will go unpunished. Defendants knew

22  that commerce in each of the states identified herein would be adversely affected by implementing

23  their conspiracy.

### III.    THE PARTIES

**A.    The Plaintiffs**

26      11.    Michael Juetten, a resident of California, indirectly purchased a CRT from one or

27  more defendants during the Class Period, and was injured as a result of defendants' illegal conduct.

28

4

1    12.    Chad Klebs, a resident of Minnesota, indirectly purchased a CRT from one or more
2  of the defendants during the Class Period, and was injured as a result of defendants' illegal
3  conduct.

4    **B.    The Defendants**

5    13.    Defendant Chunghwa Picture Tubes Ltd. is a Taiwan business entity with its
6  principal place of business at No. 1127, Heping Rd, Bade City, Taoyuan, Taiwan, 334. During the
7  Class Period, said defendant manufactured, marketed, sold and/or distributed CRTs to customers
8  throughout the United States.

9    14.    Defendant LP Displays International, Ltd., f/k/a/ LG Philips Displays, Ltd., is a
10  Hong Kong business entity with its principal place of business at 6th Floor, ING Tower, 308 Des
11  Voeux Road Central, Sheung Wan, Hong Kong. During the Class Period, said defendant
12  manufactured, marketed, sold and/or distributed CRTs to customers throughout the United States.

13    15.    Defendant Matsushita Electric Industrial Co., Ltd. (d/b/a "Panasonic"), is a
14  Japanese business entity with its principal place of business at 1006, Kadoma, Kadoma City, Osaka
15  571-8501 Japan. During the Class Period, said defendant manufactured, marketed, sold and/or
16  distributed CRTs to customers throughout the United States.

17    16.    Defendant MT Picture Display Co., Ltd. (f/k/a Matsushita Toshiba Picture Display
18  Co.), a wholly-owned subsidiary of Matsushita Electric Industrial Co., Ltd., with its principal place
19  of business located at Takatsuki-shi, Osaka, Japan. MT Picture Display Co. was formerly owned
20  and controlled by both Defendants Matsushita and Toshiba Corp. until earlier this year, when
21  Toshiba Corp. sold its share of the business. During the Class Period, MT Picture Display Co.,
22  Ltd. manufactured, marketed, sold and/or distributed CRTs to customers throughout the United
23  States.

24    17.    Defendant Koninklijke (Royal) Philips Electronics NV, is a Dutch business entity,
25  with its principal place of business at Breitner Center, Amselplein 2, 1096 BC Amsterdam, The
26  Netherlands. During the Class period, said defendant manufactured, marketed, sold and/or
27  distributed CRTs to customers throughout the United States.

28

5

1    18.    Defendant Samsung SDI Co., is a South Korea business entity, with its principal
2  place of business at 575 Shin-dong, Youngtong-gu, Suwon, Kyongi, South Korea. During the
3  Class Period, said defendant manufactured, marketed, sold and/or distributed CRTs to customers
4  throughout the United States.

5    19.    Defendant Toshiba Corp. is a Japanese business entity, with its principal place of
6  business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. During the Class
7  Period, said defendant manufactured, marketed, sold and/or distributed CRTs to customers
8  throughout the United States.

9    20.    Defendant Toshiba America, Inc., is a wholly-owned subsidiary of Toshiba Corp.,
10  and has its principal place of business at 1251 Avenues of the Americas, New York, NY. During
11  the Class Period, said defendant manufactured, marketed, sold and/or distributed CRTs to
12  customers throughout the United States.

13    **C.    Co-Conspirators**

14    21.    Various persons and entities, whose identities are at this time unknown to plaintiffs,
15  participated as co-conspirators in the violations alleged herein and performed acts and made
16  statements in furtherance thereof. When plaintiffs learn the identities of such co-conspirators,
17  plaintiffs will seek leave to amend this complaint to add such co-conspirators as defendants.

18    22.    The acts charged in this Complaint have been done by Defendants and their co-
19  conspirators, or were authorized, ordered, or done by their respective officers, agents, employees,
20  or representatives while actively engaged in the management of each defendant's business or
21  affairs.

22    23.    Each of the Defendants named herein acted as the agent or joint venturer of or for
23  the other Defendants with respect to the acts, violations and common course of conduct alleged
24  herein. Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for
25  CRTs made by its parent company.

26

27

28
6

1

## IV.    FACTUAL ALLEGATIONS

2

**A.    CRT Technology**

3        24.    CRT is a widely used technology utilized in products such as TVs and computer
4   monitors that allow devices to display images upon the screen.

5        25.    Known for their brightness, resolution, rich colors, contrast, and reliability, CRTs
6   evolved from early black-and-white TV sets and monitors to today's high-resolution, digital-ready
7   graphic models. The basic components of a CRT are (a) a heated, cylindrical cathode, or electron
8   gun, that emits a steady stream of electrons; (b) a shadow mask that directs the electron beams, (c)
9   a phosphor-coated screen that absorbs the beams, (c) a deflection yoke that directs the scanning
10  electron beam, which strikes the screen to produce light; and (d) an evacuated glass envelope that
11  allows the entire process to take place in a vacuum.

12       26.    CRTs are manufactured in several standard sizes, including 17 inch, 19 inch, 27
13  inch, and 23 inch. They are commodity products; those manufactured by Defendants are
14  interchangeable.

15

**B.    The CRT Market**

16       27.    CRTs have no independent utility, and have value only as components of other
17  products, primarily televisions and computer monitors. Direct purchasers buy CRTs in order to
18  include them as components in televisions and computer monitors. The demand for CRTs thus
19  directly derives from the demand for such products.

20       28.    The market for CRTs and the market for the products into which they are placed are
21  inextricably linked and intertwined because the CRT market exists to serve the CRT products
22  markets. The market for CRT and the markets for the products in which CRTs are placed are, for
23  all intents and purposes, inseparable in that one would not exist without the other.

24       29.    The largest direct purchasers of CRTs are television and computer OEMs.
25  Significantly, some of the defendants are (or were, during the Class Period) also CRT television
26  and/or computer OEMs, such as Toshiba Corp. and Samsung SDI and/or its parent corporation.

27       30.    Plaintiffs and the indirect purchaser class members have participated in the market

28

7

1  for CRTs through their purchases of products containing CRTs. To the extent plaintiffs and
2  indirect purchasers bought CRTs as part of a television or computer monitor, Defendants' unlawful
3  conspiracy inflated the prices at which OEMs resold such products.

4      31.     The market for CRTs in the United States is and remains extremely large. In 1997,
5  the worldwide CRT market exceeded \$24 billion. In 2006, industry experts estimated that
6  televisions containing CRTs made up at least half of all of the projected 29,000,000 televisions
7  shipped to North America that year.

8      32.     Nonetheless, while CRTs were once the dominant display screen technology used in
9  television and computer monitors, the market for CRT televisions and computer screens has been
10  in decline during the Class Period, due to the increased demand for FPD Products which are used
11  in place of CRT models.

12      33.     FPD Products such as televisions and computer monitors first began competing
13  with CRT models in the 1990s. By 1998, FPD products had taken over 32% of the market for
14  televisions and computer monitors.

15      34.     While priced much higher than televisions and computer screens using CRTs, FPDs
16  offered benefits to businesses and consumers unavailable in CRT models. Televisions using FPD
17  technology offer smaller dimensions, increased aperature ratios, higher brightness, and lower
18  power consumption. Computers using FPD technology offer greater mobility due to their smaller
19  size, and lower power consumption.

20      35.     Despite the high difference in price between televisions and computer screens using
21  CRTs and those using FPD technology, throughout the Class Period, the percentage of televisions
22  and computer screens purchased in the United States using FPD technology increased dramatically,
23  while the percentage of those utilizing CRTs fell.

24      36.     CRT televisions currently account for only 37% of television set revenues in the
25  United States. Industry experts have predicted that by 2008, CRT screen shipments will constitute
26  only 23% of the total television shipments in North America, while LCD screen shipments will
27  compromise over 50% of the total shipments.

28

8

CLASS ACTION COMPLAINT

C.   **Structural Features Of The CRT Industry**

37.   The CRT industry is characterized by a number of structural features that facilitate collusion.

38.   First, there is significant market concentration. The increase in the popularity of FPD Products caused many CRT manufacturers to exit the market during the Class Period. This caused increased consolidation and concentration in the CRT manufacturing industry.

39.   During the Class Period, the Defendants collectively owned the majority of the market share for CRTs used in televisions and computer monitors.

40.   Defendant Samsung SDI is currently the largest manufacturer of products containing CRTs. In 2004, it held (approximately) a 30% share of the global CRT market.

41.   Defendant LP Displays currently has the second largest share of the global CRT market. In 2004, it held (approximately) a 27% share of the global CRT market.

42.   Defendant MT Picture Display held (approximately) a 9% share of the global CRT market in 2004.

43.   Defendant Chunghwa Picture Tubes held (approximately) a 6.9% share of the global CRT market in 2005.

44.   There are also significant barriers to entry in the CRT industry in the form of high manufacturing and technological barriers to entry. Construction and maintenance of fabrication plants is extremely expensive. Because of increased competition and ongoing technological advances, manufacturers' research and development expenses are also extremely high.

45.   There are also multiple interrelated business relationships in the CRT industry. For example, in November 2000, Defendants LG Electronics and Koninklijke Philips Electronics agreed to enter into a joint venture that combined their CRT manufacturing operations. The resulting company (LG Philips Displays, now known as LP Displays) entered the market with a 25% share in the global CRT market.

46.   Defendants Matsushita Electric Industrial Co., Ltd. and Toshiba Corporation also entered into a joint venture combining their CRT manufacturing operations during the Class

9

1 | Period. The resulting company (MT Picture Display Co.) immediately enjoyed a significant share
2 | of the global CRT market.

3 |     47.    In 2005, Defendants Samsung SDI and LG Philips Displays entered into an
4 | agreement to work together by sharing parts with respect to CRTs.

5 | **D.    The Defendants' Illegal Conspiracy**

6 |     48.    The price of CRTs during the Class Period did not fully reflect the sharp decline in
7 | demand for CRTs caused by the entry of the new generation of competing technologies. Despite
8 | the introduction of technologically superior and increasingly popular alternatives to televisions and
9 | monitors using CRTs, the price of CRTs remained unnaturally high throughout the Class Period,
10 | with periods of sustained and unnatural price stability.

11 |     49.    The concentration of CRT manufacturers, the declining CRT share of the total
12 | market for television and computer screens, and the higher price of FPD Products gave Defendants
13 | the means and incentive to conspire and collude to artificially fix, maintain, and/or stabilize the
14 | prices at which CRTs were sold.

15 |     50.    During the class period, Defendants and their co-conspirators agreed, combined,
16 | and conspired artificially to raise, maintain, and stabilize the prices at which CRTs were sold
17 | directly and indirectly in the United States at artificial levels. This illegal combination was
18 | effectuated by means of illegal contracts, agreements, or secret negotiations between Defendants
19 | through their officers, directors and employees.

20 |     51.    For example, despite falling demand and increased use of FPD technology in
21 | televisions and computer monitors, Defendants increased the prices of CRTs sold in February of
22 | 2002 and at other points of time throughout the Class Period. This price increase was the result of
23 | an agreement among Defendants to collectively raise the prices of CRTs.

24 |     52.    Defendants also agreed to fix, maintain, and/or stabilize the price of CRTs by
25 | collectively agreeing to reduce the production of CRTs through plant closures and work
26 | slowdowns.

27 |     53.    This conspiracy resulted in unnaturally higher prices for CRTs which were

28 |

10

1  fundamentally inconsistent with the low demand for them and their rapidly approaching
2  obsolescence.

3      E.      **International Antitrust Investigations**

4      54.     On or about November 8, 2007, government agencies from Japan, South Korea, the
5  European Union and the United States each opened coordinated investigations into CRT
6  manufacturers based on a suspicion that they formed an international price cartel to fix the prices
7  for CRTs.

8      55.     On or about November 8, 2007, news reports stated that CRT manufacturers are
9  "suspected of holding meetings to discuss the price targets in Southeast Asian countries where
10  CRT manufacturing bases are located." Another stated that "[t]he CRT manufacturers are
11  suspected of operating an international cartel since 2005 or earlier."

12      56.     On or about November 8, 2007, Defendant Matsushita Electric Industrial Company
13  confirmed that Japan's Fair Trade Commission raided MT Picture Display Co. as part of this
14  international price-fixing investigation. Akira Dadota, a spokesman for Matsushita, admitted that
15  Japan's Fair Trade Commission conducted an on-site inspection of MT Picture Display Company's
16  offices in Japan. Up until earlier this year, MT Picture Display was formerly owned by Toshiba
17  Corp. as well as Defendant Matsushita Electric Industrial Company.

18      57.     On or about November 8, 2007, Defendant Samsung SDI confirmed that South
19  Korea's Fair Trade Commission launched a probe into Samsung SDI as part of this international
20  price-fixing investigation.

21      58.     On or about November 8, 2007, news reports stated that defendant LP Displays was
22  visited by antitrust regulators as part of this international price-fixing investigation.

23      59.     On or about November 12, 2007, Defendant Chunghwa Picture Tubes admitted that
24  the company had received a summons from the United States Department of Justice ("DOJ") as
25  part of this international price-fixing investigation.

26      60.     On or about November 21, 2007, Defendant Royal Phillips Electronics admitted
27  that the company is subject to this international price-fixing investigation.

28

11

1       F.      **The Pass-Through Of The Overcharges To End-Users**

2       61.     OEMs and retailers of televisions and monitors containing CRTs are all subject to
3   vigorous price competition. Televisions and computers are commodities, with little or no brand
4   loyalty, such that aggressive pricing causes businesses and consumers to switch preferences to
5   different brands. Television and computer prices are closely based on production costs, which are
6   in turn directly determined by component costs, as assembly costs are minimal. OEMs accordingly
7   use component costs, like the cost of CRTs, as the starting point for all price calculations.
8   Television and computer monitor prices thus closely track increases and decreases in component
9   costs.

10      62.     Defendants' conspiracy to raise, fix, or maintain the price of CRTs at artificial
11  levels resulted in harm to Plaintiffs and the indirect-purchaser classes alleged herein because it
12  resulted in them paying higher prices for televisions and monitors containing CRTs than they
13  would have in the absence of Defendants' conspiracy. The entire overcharge for CRTs at issue
14  was passed on to plaintiffs and members of the indirect-purchaser class.

15      63.     An increase in the cost of purchasing a CRT significantly affects the price of
16  television or computer monitors using CRTs.

17      64.     CRTs account for a significant percentage of the overall cost of a television or
18  computer monitor. For example, CRTs account for approximately thirty (30) percent of the cost of
19  manufacturing a television set.

20      65.     CRTs are commodity products, with functionally equivalent products available
21  from the Defendants, which manufacture them pursuant to standard specifications and sizes.

22      66.     Because OEMs and retailers have thin net margins, they must pass on any increase
23  in component costs, such that increases in the price of CRTs lead to quick corresponding price
24  increases at the OEM and retail level for products containing CRTs.

25      67.     Thus, all supracompetitive overcharges are always passed through to the indirect-
26  purchaser, end-user plaintiff class members, which pay more for televisions and monitors
27  containing CRTs than in a competitive market place.

28

12

1    G.    **The Effect Of The Price Of CRTs On The Price Of Products**

2        68.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it
3    moves through the distribution system. CRTs are identifiable, discreet physical objects that do not
4    change form or become an indistinguishable part of TVs or computer monitors.

5        69.    Thus, CRTs follow a traceable physical chain from the defendants to the OEMs to
6    the purchasers of the finished products incorporating the CRT.

7        70.    Moreover, just as CRTs can be physically traced through the supply chain, so can
8    their price be traced to show that changes in the prices paid by direct purchasers of CRTs affect
9    prices paid by indirect purchasers of televisions and monitors containing CRTs.

10        71.    Because Defendants control the market for CRTs, there are virtually no choices for
11   persons and businesses that require products containing such products other than buying such
12   products manufactured by a direct purchaser that paid supracompetitive prices for CRTs to
13   Defendants because of Defendants' conspiracy alleged herein.

14        72.    When distribution markets are highly competitive, as they are in the case of
15   televisions and monitors containing CRTs, all of the overcharge will be passed through to ultimate
16   end user businesses and consumers, such as the indirect-purchaser plaintiffs and class members. In
17   addition, most of the defendants themselves manufacture, market, and distribute televisions and
18   monitors containing CRTs. This means that these defendants will pass through to their customers
19   100% of the supracompetitive price increases that result from the defendants' conspiracy,
20   combination, and agreement to fix, increase, and stabilize the prices for CRTs.

21        73.    Hence, the inflated prices of televisions and monitors containing CRTs resulting
22   from defendants' price-fixing conspiracy have been passed on to plaintiffs and the other class
23   members by direct purchasers.

24        74.    During the Class Period, a number of large OEMs sold televisions and monitors
25   containing CRTs directly to end-buyers. For example, the OEM with the largest share of computer
26   monitor sales in the United States market, Dell, sold exclusively to end-buyers, as did Gateway.
27   During the Class Period, Compaq and Apple also sold large portions of their computer monitors

28
                                                    13

1   directly to the end-buyer.

2       75.    Computer models sold by other OEMs to retailers were generally updated several

3   times a year, and the price was changed for each new model. For example, for one large retailer,

4   more than 90 percent of the computers sold during 2000 were either new models or were sold at a

5   different price from the price in the previous month. OEMs, retailers and distributors often use a

6   "standard markup" method to set prices, meaning that they add a standard percentage to their own

7   costs to determine selling prices. Thus, changes in the price of CRTs were passed on rapidly rather

8   than absorbed.

9       76.    In retailing, it is common to use a "markup rule." The retail price is set as the

10  wholesale cost plus a percentage markup designed to recover non-product costs and to provide a

11  profit. This system guarantees that increases in costs to the retailer will be passed on to end

12  buyers. For example, CDW, a large seller of computer monitors, uses such a system, and a

13  declaration in the DRAM case from CDW's director of pricing details exactly how they calculated

14  selling prices:

15              In general, CDW employs a "building block" approach to setting
                its advertised prices. The first building block is the Cost of Goods
16              Sold (COGS), which represents the price CDW paid to acquire the
                product...CDW... adds a series of positive markups to the cost to
17              CDW to acquire a given product. These markups are in addition to
                the pass through effect of changes in the costs charged to CDW for
18              that product by a given vendor.

19      77.    The economic and legal literature has recognized that unlawful overcharges in a

20  component normally result in higher prices for products containing that price-fixed component. As

21  Professor Herbert Hovenkamp, a noted antitrust scholar, has stated in his treatise, FEDERAL

22  ANTITRUST POLICY, THE LAW OF COMPETITITON AND ITS PRACTICE (1994) at 564:

23              A monopoly overcharge at the top of a distribution chain generally
                results in higher prices at every level below. For example if
24              production of aluminum is monopolized or cartelized, fabricators
                of aluminum cookware will pay higher prices for aluminum. In
25              most cases they will absorb part of these increased costs
                themselves and pass part along to cookware wholesalers. The
26              wholesalers will charge higher prices to the retail stores, and the
                stores will do it once again to retail consumers. Every person at
27              every stage in the chain likely will be poorer as a result of the
                monopoly price at the top.

28
                                          14

1

> Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

2

78.      Similarly, two other antitrust scholars – Professors Robert G. Harris (Professor

Emeritus and former Chair of the Business and Public Policy Group at the Haas School of

Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor

of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust)

– have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is

not the exception: it is the rule."

79.      As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information

and Computer Science and Professor of Economics and Public Policy at the University of

Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving

Microsoft Corporation. said (in a passage quoted in the judicial decision in that case granting class

certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers... Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

80.      The purpose of the conspiratorial conduct of the defendants was to raise, fix or

stabilize the price of CRTs and, as a direct and foreseeable result, televisions and monitors

containing CRTs. Economists have developed techniques to isolate and understand the

relationship between one "explanatory" variable and a "dependent" variable in those cases when

changes in dependent variable are explained by changes in a multitude of variables--- when all

such variables may be changing simultaneously. That analysis-called regression analysis- is

commonly used in the real world and in litigation to determine the impact of a price increase on

one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate and

identify only the impact of an increase in the price of CRTs on prices for televisions and monitors

containing CRTs even though such products contain a number of other components whose prices

15

1   may be changing over time. A regression model can explain how variation in the price of CRTs
2   affects changes in the price of televisions and monitors containing CRTs. In such models, rather
3   than being treated as the dependent variable, the price of CRTs is treated as an independent or
4   explanatory variable. The model can isolate how changes in the price of CRTs impact the price of
5   televisions and monitors containing such CRTs while holding controlling for the impact of other
6   price-determining factors.

7       81.     Economic and legal literature recognizes that the more pricing decisions are based
8   on cost, the easer it is to determine the pass-through rate. The directness of affected costs refers to
9   whether an overcharge affects a direct (*i.e.* variable) cost or an indirect (*i.e.*, overhead) cost.
10  Overcharges will be passed-through sooner and at a higher rate if the overcharge affects direct
11  costs. Here CRTs are a direct (and substantial) cost of products containing CRTs.

12      82.     Other factors that lead to the pass-through of overcharges include: (i) whether price
13  changes are frequent; (ii) the duration of the anti-competitive overcharge; (iii) whether pricing
14  decisions are based on cost; (iv) whether the overcharge affects variable, as opposed to overhead,
15  costs; (v) whether the resellers' production technology is uniform; (vi) whether the reseller supply
16  curve exhibits a high degree of elasticity; and (vii) whether the demand of the resellers is inelastic.
17  All of these factors were present in the CRT market during the Class Period. The precise amount
18  of such an impact on the prices of products containing CRTs can be measured and quantified.
19  Commonly used and well-accepted economic models can be used to measure both the extent and
20  the amount of the supracompetitive charge passed-through the chain of distribution.

21      83.     Plaintiffs and other indirect purchasers have been forced to pay supracompetitive
22  prices for televisions and monitors containing CRTs. These inflated prices have been passed on to
23  them by direct purchaser manufacturers, distributors, and retailers. Those overcharges have
24  unjustly enriched defendants.

25              V.      **CLASS ACTION ALLEGATIONS**

26      84.     Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule
27  23 of the Federal Rules of Civil Procedure on behalf of all members of the following Class (the

28                                          16

1    "Nationwide Class"):

2            All persons and entities residing in the United States which, from
             January 1, 1998 through and including November 9, 2007,
3            indirectly purchased in the United States, for their own use and not
             for resale, a CRT which was manufactured and/or sold by one or
4            more of the Defendants.  Specifically excluded from this Class are
             the Defendants; the officers, directors or employees of any
5            Defendant; any entity in which any Defendant has a controlling
             interest; and any affiliate, legal representative, heir or assign of any
6            Defendant.  Also excluded are any judicial officer presiding over
             this action and the members of his/her immediate family and
7            judicial staff, and any juror assigned to this action.

8        85.    Plaintiffs also bring this action on their own behalf and as a class action pursuant to

9    Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all

10   members of the following classes or subclasses (collectively, the "Indirect Purchaser State

11   Classes"):

12           a.    CALIFORNIA: All persons and entities in California who indirectly

13                 purchased CRTs manufactured and/or sold by one or more of the Defendants

14                 during the Class Period for their end use and not for resale.  Specifically

15                 excluded from this Class are the Defendants; the officers, directors or

16                 employees of any Defendant; any entity in which any Defendant has a

17                 controlling interest; and any affiliate, legal representative, heir or assign of

18                 any Defendant.  Also excluded are any judicial officer presiding over this

19                 action and the members of his/her immediate family and judicial staff, and

20                 any juror assigned to this action (the "California Class").

21           b.    MINNESOTA: All persons and entities in Minnesota who indirectly

22                 purchased CRTs manufactured and/or sold by one or more of the Defendants

23                 during the Class Period for their end use and not for resale.  Specifically

24                 excluded from this Class are the Defendants; the officers, directors or

25                 employees of any Defendant; any entity in which any Defendant has a

26                 controlling interest; and any affiliate, legal representative, heir or assign of

27                 any Defendant.  Also excluded are any judicial officer presiding over this

28
                                            17

1        action and the members of his/her immediate family and judicial staff, and

2        any juror assigned to this action (the "Minnesota Class").

3    86.    Plaintiffs do not know the exact size of the Classes at the present time. However,

4    Plaintiffs believe that due to the nature of the trade and commerce involved, there are at least

5    thousands in each separate state class, and hundreds of thousands of class members geographically

6    dispersed throughout the United States, such that joinder of all class members would be

7    impracticable.

8    87.    Plaintiffs' claims are typical of the claims of their respective Classes, and Plaintiffs

9    will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident

10   with, and not antagonistic to, those of the members of their respective Classes. Plaintiffs have

11   retained competent counsel experienced in class action and complex antitrust and consumer

12   protection litigation.

13   88.    Common questions of law and fact exist, including:

14        a.    Whether Defendants and their Co-Conspirators engaged in a contract,

15             combination or conspiracy among themselves to fix, raise, maintain or

16             stabilize the process of, or allocate the market of CRTs sold in the United

17             States;

18        b.    The duration and extent of the contract, combination or conspiracy;

19        c.    Whether the Defendants and their co-conspirators were participants in the

20             contracts, combinations or conspiracies alleged herein;

21        d.    Whether Defendants and their co-conspirators engaged in conduct that

22             violated Section 1 of the Sherman act;

23        e.    Whether Defendants and their co-conspirators engaged in unlawful, unfair

24             or deceptive contracts, combinations or conspiracies among themselves,

25             express or implied, to fix, raise, maintain, or stabilize prices of CRTs sold in

26             and/or distributed in the United States;

27        f.    Whether the Defendants and their co-conspirators engaged in conduct in

28

18

1    violation of the antitrust, consumer protection, unfair trade, and/or deceptive

2    trade practices laws of the various Indirect Purchaser States as alleged

3    below;

4    g.    Whether the anticompetitive conduct of the Defendants and their co-

5    conspirators caused prices of CRTs to be artificially inflated to non-

6    competitive levels;

7    h.    Whether the Defendants and their co-conspirators unjustly enriched

8    themselves as a result of their inequitable conduct at the expense of the

9    members of the Classes;

10    i.    Whether Defendants and their co-conspirators fraudulently concealed the

11    existence of their unlawful conduct;

12    j.    Whether Plaintiffs and the Classes are entitled to injunctive relief; and

13    k.    Whether Plaintiffs and other members of the Indirect Purchaser Classes

14    were injured by the conduct of Defendants and, if so, the appropriate

15    measure of damages for each of the Classes.

16    89.    These and other questions of law and fact are common to the Classes and

17    predominate over any questions affecting only individual class members, including legal and

18    factual issues relating to liability, damages, and restitution.

19    90.    Class action treatment is a superior method for the fair and efficient adjudication of

20    this controversy because:

21    a.    It will avoid a multiplicity of suits and consequent burden on the courts and

22    Defendants;

23    b.    It would be virtually impossible for all members of the Classes to intervene

24    as parties-plaintiff in this action;

25    c.    It will allow numerous individuals with claims too small to adjudicate on an

26    individual basis because of the prohibitive cost of this litigation, to obtain

27    redress for their economic injuries;

28
19
CLASS ACTION COMPLAINT

1             d.     It is appropriate for treatment on a fluid recovery basis, which obviate any

2                       manageability problems; and

3             e.     It will provide court oversight of the claims process, once Defendants'

4                       liability is adjudicated.

5        91.    The named plaintiffs will fairly and adequately protect the interests of the Class in

6    that the named plaintiffs have no interests antagonistic to the interests of the other members of the

7    Class, and have retained counsel competent and experienced in the prosecution of class actions and

8    antitrust cases to represent themselves and the Class.

9        92.    This case is also appropriate for certification as a class action because the

10   defendants have acted and refused to act on grounds generally applicable to the Class, so that final

11   injunctive relief will be appropriate with respect to the Class as a whole.

12       93.    The claims asserted herein are also appropriate for class certification under each of

13   the states under which claims are asserted.

14                     **VI.    FRAUDULENT CONCEALMENT**

15       94.    Plaintiffs and members of the Classes alleged herein did not discover and could not

16   have discovered, through the exercise of reasonable diligence, the existence of the conspiracy

17   alleged herein until after November 9, 2007, when the investigations by the DOJ and other antitrust

18   regulators became public, because defendants and their co-conspirators actively and fraudulently

19   concealed the existence of their contract, combination or conspiracy. Because defendants'

20   agreement, understanding and conspiracy were kept secret, plaintiffs and Class members were

21   unaware of defendants' unlawful conduct alleged herein and did not know that they were paying

22   artificially high prices for CRTs and the products in which they were used.

23       95.    The affirmative acts of the defendants alleged herein, including acts in furtherance

24   of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

25       96.    By its very nature, defendants' price-fixing conspiracy was inherently self-

26   concealing. As alleged above, defendants had secret discussions about price and output.

27   Defendants agreed not to publicly discuss the existence or the nature of their agreement.

28                                           20

1    97.    As a result of defendants' fraudulent concealment of their conspiracy, the running

2  of any statue of limitations has been tolled with respect to any claims that plaintiffs and the Class

3  members have as a result of the anticompetitive conduct alleged in this Complaint

## VII.    VIOLATIONS ALLEGED

### First Claim for Relief
### (Violation of Section 1 of the Sherman Act)

7    98.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

8  allegation set forth in the preceding paragraphs of this Complaint.

9    99.    Beginning at a time currently unknown to plaintiffs, but at least as early as January

10  1, 1997, and continuing through November of 2007, the exact dates being unknown to plaintiffs,

11  defendants and their co-conspirators entered into a continuing agreement, understanding, and

12  conspiracy in restraint of trade artificially to fix, raise, stabilize, and peg prices for CRTs and

13  televisions and monitors containing CRTs sold in the United States, in violation of Section 1 of the

14  Sherman Act (15 U.S.C. § 1).

15    100.    In formulating and carrying out the alleged agreement, understanding, and

16  conspiracy, the defendants and their co-conspirators did those things that they combined and

17  conspired to do, including but not limited to the acts, practices, and course of conduct set forth

18  above, and the following, among others:

19         a.    Fixing, raising, stabilizing, and pegging the price of CRTs; and

20         b.    Allocating among themselves and collusively reducing the production of

21             CRTs.

22    101.    The combination and conspiracy alleged herein has had the following effects,

23  among others:

24         a.    Price competition in the sale of CRTs has been restrained, suppressed,

25             and/or eliminated in the United States;

26         b.    Prices for CRTs sold by defendants and their co-conspirators have been

27             fixed, raised, maintained and stabilized at artificially high, non-competitive

28

21

1            levels throughout the United States; and

2            c.    Those who purchased CRTs directly or indirectly from defendants and their

3                  co-conspirators have been deprived of the benefits of free and open

4                  competition.

5       102.    Plaintiffs and other Nationwide Class members have been injured and will continue

6  to be injured in their businesses and property by paying more for CRTs purchased indirectly from

7  the defendants and their co-conspirators than they would have paid and will pay in the absence of

8  the combination and conspiracy, including paying more for televisions and monitors in which

9  CRTs are included, as a result of higher prices paid for CRTs by the direct purchasers of CRTs.

10      103.    Plaintiffs and the Nationwide Class are entitled to an injunction against defendants,

11  preventing and restraining the violations alleged herein.

12                          **Second Claim for Relief**
                    **(Unjust Enrichment and Disgorgement of Profits)**
13
        104.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every
14
   allegation set forth in the preceding paragraphs of this Complaint.
15
        105.    Defendants have been unjustly enriched through overpayments by plaintiffs and
16
   class members and the resulting profits.
17
        106.    Under principles of unjust enrichment which exist in every state, Defendants should
18
   not be permitted to retain the benefits conferred via overpayments by plaintiffs and class members.
19
        107.    Plaintiffs and all members of the Nationwide Class seek disgorgement of all profits
20
   resulting from such overpayments and establishment of a constructive trust from which plaintiffs
21
   and class members may seek restitution.
22
                            **Third Claim for Relief**
23                          **(Violation of State Antitrust Laws)**

24      108.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

25  allegation set forth in the preceding paragraphs of this Complaint.

26      109.    Defendants' intentional and purposeful anti-competitive acts that are described

27  above including but not limited to acts of collusion to set prices and the actual act of price-fixing

28                                  22

1  itself was intended to and did cause Plaintiff to pay supra-competitive prices for CRT prices

2  charged for consumer products containing CRTs in the Indirect Purchaser States.

3      110.    Defendants' monopolistic and anticompetitive acts as described above violate the

4  following state antitrust statutes:

5      111.    Defendants have violated California Business and Professions Code § 16720, *et seq.*

6      112.    Defendants have violated Minnesota Statutes § 325D.51, *et seq.*

7      113.    Plaintiff and the Indirect Purchasers Classes in states with statute antitrust statutes

8  listed above seek actual damages for their injuries caused by these violations in amount to be

9  determined at trial.

10     114.    Plaintiff and the Indirect Purchaser Classes in states with statute antitrust statutes

11 listed above further seek treble damages and attorneys' fees pursuant to the Indirect Purchaser

12 States' antitrust laws as stated above to the extent allowed by law.

13     115.    Plaintiffs and the Indirect Purchaser Classes in states with statute antitrust statutes

14 listed above further seek attorneys' fees and costs pursuant to the Indirect Purchaser States'

15 antitrust laws as stated above to the extent allowed by law, due to Defendants' willful and unlawful

16 conduct as alleged above.

17                          **Fourth Claim for Relief**
                    **(Violation of California Unfair Competition Law)**
18
       116.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every
19
   allegation set forth in the preceding paragraphs of this Complaint.
20
       117.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or
21
   fraudulent acts or practices in violation of the California Business & Professions Code § 17200, *et*
22
   *seq.*
23
       118.    Plaintiff Juetten and the California Class seek restitution and disgorgement of
24
   defendant's unlawfully obtained profits for their injuries caused by these violations, in an amount
25
   to be determined at trial.
26
       119.    Plaintiffs and the Indirect Purchaser Class in California seek attorneys' fees due to
27
   Defendants' willful and unlawful conduct where allowable by law.
28
                                                23

## VIII. PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray:

A.      That the Court determine that the Sherman Act, California and Minnesota antitrust law, and California unfair competition law claims alleged herein may be maintained as class actions under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, as informed by the respective state class action laws.

B.      That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

1.      A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;

2.      Acts of unjust enrichment as set forth in the Second Claim for Relief;

3.      An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the California and Minnesota antitrust laws identified in the Third Claim for Relief; and

4.      A violation of the California Unfair Competition Law as alleged in the Fourth Claim for Relief.

C.      On the First Claim for Relief, that defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.      On the Second Claim for Relief, that plaintiffs and the members of the Nationwide Class recover the amounts by which the defendants have been unjustly enriched as a result of their unlawful conduct;

24

1    E.    On the Third Claim for Relief, that the plaintiffs and the members of the California

2  and Minnesota Classes recover damages, to the maximum extent allowed under such laws as

3  provided by the state antitrust laws listed above, and that a joint and several judgment in favor of

4  plaintiffs and these classes be entered against the defendants in an amount to be trebled to the

5  extent permitted by such laws;

6    F.    On the Fourth Claim for Relief, that plaintiff Juetten and the members of the

7  California Class be awarded restitution, including disgorgement of profits obtained by defendants

8  as a result of their acts of unfair competition and acts of unjust enrichment;

9    G.    That plaintiffs and members of each of the classes listed herein be awarded pre- and

10  post-judgment interest as provided by law, and that such interest be awarded at the highest legal

11  rate from and after the date of service of the initial complaint in this action;

12    H.    That plaintiffs and members of each of the classes listed herein recover their costs

13  of suit, including a reasonable attorney's fee, as provided by law; and

14    I.    That plaintiffs and members of each of the classes listed herein have such other,

15  further, and different relief as the case may require and the Court may deem just and proper under

16  the circumstances.

17  Dated: December 7, 2007                                Respectfully submitted,

18

19

20                                                        Francis O. Scarpulla (41059)
                                                          Craig C. Corbitt (83251)
21                                                        Matthew R. Schultz (220641)
                                                          Judith Zahid (No. 215418)
22                                                        ZELLE HOFMANN VOELBEL MASON &
                                                          GETTE LLP
23                                                        44 Montgomery Street, Suite 3400
                                                          San Francisco, CA 94104
24                                                        Telephone:    (415) 693-0700
                                                          Facsimile:    (415) 693-0770
25                                                        fscarpulla@zelle.com
                                                          ccorbitt@zelle.com

26

27

28
                                                   25

Richard M. Hagstrom
Michael Jacobs
ZELLE HOFMANN VOELBEL MASON &
GETTE LLP
500 Washington Ave. South, Suite 400
Minneapolis, MN 55415
Telephone:    (612) 339-2020
Facsimile:    (612) 336-9100
rhagstrom@zelle.com
mjacobs@zelle.com

*Attorneys for Plaintiffs*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

26

**JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by jury.

Dated: December 7, 2007

Francis O. Scarpulla (41059)
Craig C. Corbitt (83251)
Matthew R. Schultz (220641)
Judith A. Zahid (215418)
ZELLE HOFMANN VOELBEL MASON &
GETTE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone:    (415) 693-0700
Facsimile:    (415) 693-0770
fscarpulla@zelle.com
ccorbitt@zelle.com

Richard M. Hagstrom
Michael Jacobs
ZELLE HOFMANN VOELBEL MASON &
GETTE LLP
500 Washington Ave. South, Suite 400
Minneapolis, MN 55415
Telephone:    (612) 339-2020
Facsimile:    (612) 336-9100
rhagstrom@zelle.com
mjacobs@zelle.com

*Attorneys for Plaintiffs*

#3171415v1

27