# Exhibit A

1 | Francis O. Scarpulla (41059)
Craig C. Corbitt (83251)
2 | Matthew R. Schultz (220641)
Judith A. Zahid (215418)
3 | ZELLE HOFMANN VOELBEL
MASON & GETTE LLP
4 | 44 Montgomery Street, Suite 3400
San Francisco, CA  94104
5 | Telephone:     (415) 693-0700
Facsimile:      (415) 693-0770
6 | fscarpulla@zelle.com
ccorbitt@zelle.com
7 |
Richard M. Hagstrom
8 | Michael Jacobs
ZELLE HOFMANN VOELBEL
9 | MASON & GETTE LLP
500 Washington Ave. South, Suite 400
10 | Minneapolis, MN 55415
Telephone:     (612) 339-2020
11 | Facsimile:      (612) 336-9100
rhagstrom@zelle.com
12 | mjacobs@zelle.com

13 | *Attorneys for Plaintiffs*

**E-filing**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

MICHAEL JUETTEN, a California resident,
and CHAD KLEBS, a Minnesota resident, on
behalf of themselves and all others similarly
situated,

              Plaintiffs,

              v.

CHUNGHWA PICTURE TUBES, LTD.; LP
DISPLAYS INTERNATIONAL, LTD.;
MATSUSHITA ELECTRIC INDUSTRIAL
CO., LTD.; MT PICTURE DISPLAY CO.,
LTD.; KONINKLIJKE PHILIPS
ELECTRONICS NV; SAMSUNG SDI CO.;
TOSHIBA CORP.; TOSHIBA AMERICA,
INC.

              Defendants.

CASE NO.     C 07 6225

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

1

CLASS ACTION COMPLAINT

1    Plaintiffs Michael Juetten and Chad Klebs, on behalf of themselves and the classes defined

2    below ("Plaintiffs"), by their attorneys, bring this civil action for damages and injunctive relief

3    against the above-named Defendants, and demanding a trial by jury, complain and allege as

4    follows:

5                        I.        **INTRODUCTION**

6         1.    This case arises out of a long-running conspiracy extending from at least May 1,

7    1998 through November 9, 2007 (the "Class Period") among Defendants and their co-conspirators,

8    with the purpose and effect of fixing, raising, and/or maintaining the prices for cathode ray tubes

9    ("CRTs") sold indirectly to Plaintiffs and other indirect purchasers throughout the United States.

10        2.    CRTs are used in a number of products, including but not limited to, televisions and

11   computer monitors.  Throughout the Class Period, Defendants' conspiracy was intended to, and

12   did, moderate the downward pressure on CRTs (and, as a result, products containing CRTs) caused

13   by the rapidly increasing popularity of flat panel products using liquid crystal displays ("LCD")

14   and plasma display panels ("PDP") (collectively, "FPD").

15        3.    Defendants and their co-conspirators formed an international cartel to illegally

16   restrict competition in the CRT market, targeting and severely burdening indirect-purchasers

17   throughout the United States.  During the Class Period, Defendants' conspiracy affected billions of

18   dollars of commerce throughout the United States.  As a result of this conspiracy, Plaintiff and

19   indirect-purchasers have been injured in their business and property by paying more for CRTs than

20   they otherwise would have paid in the absence of Defendants' conspiracy.

21        4.    Plaintiffs bring this action seeking federal injunctive relief under Section 16 of the

22   Clayton Act, 15 U.S.C. § 26 for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to

23   recover damages under state antitrust, consumer protection, unfair trade, and/or deceptive trade

24   practices laws, common law principles of restitution, disgorgement, unjust enrichment, as well as

25   to recover the costs of suit, including reasonable attorneys fees, for the injuries that Plaintiffs and

26   all others similarly situated sustained as a result of the Defendants' conspiracy to fix, raise,

27   maintain and stabilize the prices of CRTs.

28

## II. JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Section 16 of the Clayton Antitrust Act (15 U.S.C. 26) and Title 28 United States Code Sections 1331 and 1337, and Section 1 of the Sherman Act (15 U.S.C. 1). This Court has subject matter jurisdiction of the state-law claims asserted in this action under Title 28, United States Code Sections 1332(d) and 1367, in that the matter in controversy exceeds the sum of $5 million exclusive of interest and costs, members of the indirect-purchaser plaintiff class are citizens of states different from Defendants, and certain Defendants are citizens or subjects of foreign states.

6.      Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391, because one or more of the Defendants reside, is licensed to do business, or is found or transacts business in this District, and a substantial part of the events or omissions giving rise to the Plaintiffs' claims arose in this District.

7.      Defendants conduct business throughout the United States, including in this jurisdiction, and they have purposefully availed themselves of the laws of the United States, including specifically the laws of the individual states listed herein. Defendants' products are sold in the flow of interstate commerce, and Defendants' activities had a direct, substantial and reasonably foreseeable effect on such commerce.

8.      The activities of the Defendants and their co-conspirators, as described herein, substantially affected commerce throughout the United States and in each of the states identified herein because Defendants, directly or through their agents, engaged in activities affecting each such state. Defendants have purposefully availed themselves of the laws of each of the states identified herein in connection with their activities relating to the production, marketing, and/or sale of CRTs. Defendants produced, promoted, sold, marketed, and/or distributed CRTs, thereby purposefully profiting from access to indirect-purchaser end-user businesses and consumers in each such state. Defendants also contracted to supply or obtain goods or revenue related to the business for CRTs. As a result of the activities described herein, Defendants:

CLASS ACTION COMPLAINT

a.   Caused damage to the residents of the states identified herein;

b.   Caused damage in each of the states identified herein by acts or omissions committed outside each such states by regularly doing or soliciting business in each such state;

c.   Engaged in persistent courses of conduct within each such state and/or derived substantial revenue from the marketing of CRTs or the products in which they are used in each such state (and services relating to such marketing); and

d.   Committed acts or omissions that they knew or should have known would cause damage (and did, in fact, cause such damage) in each such state while regularly doing or soliciting business in each such state, engaging in other persistent courses of conduct in each such state, and/or deriving substantial revenue from the marketing of CRTs or the products in which they are used in each such state.

9.   The conspiracy described herein affected adversely every person nationwide and in each of the states identified in this Complaint who indirectly bought Defendants' CRTs. Defendants' conspiracy has resulted in an adverse monetary effect on indirect-purchasers in each state identified herein.

10.   Prices of CRTs in each state can be manipulated by conspirators within that state, outside of it, or both. Without enforcing the antitrust and/or consumer protection laws of each of the states identified herein, companies that break the law will go unpunished. Defendants knew that commerce in each of the states identified herein would be adversely affected by implementing their conspiracy.

### III.   THE PARTIES

#### A.   The Plaintiffs

11.   Michael Juetten, a resident of California, indirectly purchased a CRT from one or more defendants during the Class Period, and was injured as a result of defendants' illegal conduct.

4

12.     Chad Klebs, a resident of Minnesota, indirectly purchased a CRT from one or more of the defendants during the Class Period, and was injured as a result of defendants' illegal conduct.

**B.     The Defendants**

13.     Defendant Chunghwa Picture Tubes Ltd. is a Taiwan business entity with its principal place of business at No. 1127, Heping Rd, Bade City, Taoyuan, Taiwan, 334.  During the Class Period, said defendant manufactured, marketed, sold and/or distributed CRTs to customers throughout the United States.

14.     Defendant LP Displays International, Ltd., f/k/a/ LG Philips Displays, Ltd., is a Hong Kong business entity with its principal place of business at 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  During the Class Period, said defendant manufactured, marketed, sold and/or distributed CRTs to customers throughout the United States.

15.     Defendant Matsushita Electric Industrial Co., Ltd. (d/b/a "Panasonic"), is a Japanese business entity with its principal place of business at 1006, Kadoma, Kadoma City, Osaka 571-8501 Japan.  During the Class Period, said defendant manufactured, marketed, sold and/or distributed CRTs to customers throughout the United States.

16.     Defendant MT Picture Display Co., Ltd. (f/k/a Matsushita Toshiba Picture Display Co.), a wholly-owned subsidiary of Matsushita Electric Industrial Co., Ltd., with its principal place of business located at Takatsuki-shi, Osaka, Japan.  MT Picture Display Co. was formerly owned and controlled by both Defendants Matsushita and Toshiba Corp. until earlier this year, when Toshiba Corp. sold its share of the business.  During the Class Period, MT Picture Display Co., Ltd. manufactured, marketed, sold and/or distributed CRTs to customers throughout the United States.

17.     Defendant Koninklijke (Royal) Philips Electronics NV, is a Dutch business entity, with its principal place of business at Breitner Center, Amselplein 2, 1096 BC Amsterdam, The Netherlands.  During the Class period, said defendant manufactured, marketed, sold and/or distributed CRTs to customers throughout the United States.

18.     Defendant Samsung SDI Co., is a South Korea business entity, with its principal place of business at 575 Shin-dong, Youngtong-gu, Suwon, Kyongi, South Korea.  During the Class Period, said defendant manufactured, marketed, sold and/or distributed CRTs to customers throughout the United States.

19.     Defendant Toshiba Corp. is a Japanese business entity, with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  During the Class Period, said defendant manufactured, marketed, sold and/or distributed CRTs to customers throughout the United States.

20.     Defendant Toshiba America, Inc., is a wholly-owned subsidiary of Toshiba Corp., and has its principal place of business at 1251 Avenues of the Americas, New York, NY.  During the Class Period, said defendant manufactured, marketed, sold and/or distributed CRTs to customers throughout the United States.

C.     **Co-Conspirators**

21.     Various persons and entities, whose identities are at this time unknown to plaintiffs, participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.  When plaintiffs learn the identities of such co-conspirators, plaintiffs will seek leave to amend this complaint to add such co-conspirators as defendants.

22.     The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered, or done by their respective officers, agents, employees, or representatives while actively engaged in the management of each defendant's business or affairs.

23.     Each of the Defendants named herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.  Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs made by its parent company.

## IV.   FACTUAL ALLEGATIONS

### A.   CRT Technology

24.   CRT is a widely used technology utilized in products such as TVs and computer monitors that allow devices to display images upon the screen.

25.   Known for their brightness, resolution, rich colors, contrast, and reliability, CRTs evolved from early black-and-white TV sets and monitors to today's high-resolution, digital-ready graphic models.  The basic components of a CRT are (a) a heated, cylindrical cathode, or electron gun, that emits a steady stream of electrons; (b) a shadow mask that directs the electron beams, (c) a phosphor-coated screen that absorbs the beams, (c) a deflection yoke that directs the scanning electron beam, which strikes the screen to produce light; and (d) an evacuated glass envelope that allows the entire process to take place in a vacuum.

26.   CRTs are manufactured in several standard sizes, including 17 inch, 19 inch, 27 inch, and 23 inch.  They are commodity products; those manufactured by Defendants are interchangeable.

### B.   The CRT Market

27.   CRTs have no independent utility, and have value only as components of other products, primarily televisions and computer monitors.  Direct purchasers buy CRTs in order to include them as components in televisions and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

28.   The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT products markets.  The market for CRT and the markets for the products in which CRTs are placed are, for all intents and purposes, inseparable in that one would not exist without the other.

29.   The largest direct purchasers of CRTs are television and computer OEMs.  Significantly, some of the defendants are (or were, during the Class Period) also CRT television and/or computer OEMs, such as Toshiba Corp. and Samsung SDI and/or its parent corporation.

30.   Plaintiffs and the indirect purchaser class members have participated in the market

CLASS ACTION COMPLAINT

1  for CRTs through their purchases of products containing CRTs. To the extent plaintiffs and

2  indirect purchasers bought CRTs as part of a television or computer monitor, Defendants' unlawful

3  conspiracy inflated the prices at which OEMs resold such products.

4    31.    The market for CRTs in the United States is and remains extremely large. In 1997,

5  the worldwide CRT market exceeded $24 billion. In 2006, industry experts estimated that

6  televisions containing CRTs made up at least half of all of the projected 29,000,000 televisions

7  shipped to North America that year.

8    32.    Nonetheless, while CRTs were once the dominant display screen technology used in

9  television and computer monitors, the market for CRT televisions and computer screens has been

10  in decline during the Class Period, due to the increased demand for FPD Products which are used

11  in place of CRT models.

12    33.    FPD Products such as televisions and computer monitors first began competing

13  with CRT models in the 1990s. By 1998, FPD products had taken over 32% of the market for

14  televisions and computer monitors.

15    34.    While priced much higher than televisions and computer screens using CRTs, FPDs

16  offered benefits to businesses and consumers unavailable in CRT models. Televisions using FPD

17  technology offer smaller dimensions, increased aperature ratios, higher brightness, and lower

18  power consumption. Computers using FPD technology offer greater mobility due to their smaller

19  size, and lower power consumption.

20    35.    Despite the high difference in price between televisions and computer screens using

21  CRTs and those using FPD technology, throughout the Class Period, the percentage of televisions

22  and computer screens purchased in the United States using FPD technology increased dramatically,

23  while the percentage of those utilizing CRTs fell.

24    36.    CRT televisions currently account for only 37% of television set revenues in the

25  United States. Industry experts have predicted that by 2008, CRT screen shipments will constitute

26  only 23% of the total television shipments in North America, while LCD screen shipments will

27  compromise over 50% of the total shipments.

28

CLASS ACTION COMPLAINT

C.     **Structural Features Of The CRT Industry**

37.     The CRT industry is characterized by a number of structural features that facilitate collusion.

38.     First, there is significant market concentration. The increase in the popularity of FPD Products caused many CRT manufacturers to exit the market during the Class Period. This caused increased consolidation and concentration in the CRT manufacturing industry.

39.     During the Class Period, the Defendants collectively owned the majority of the market share for CRTs used in televisions and computer monitors.

40.     Defendant Samsung SDI is currently the largest manufacturer of products containing CRTs. In 2004, it held (approximately) a 30% share of the global CRT market.

41.     Defendant LP Displays currently has the second largest share of the global CRT market. In 2004, it held (approximately) a 27% share of the global CRT market.

42.     Defendant MT Picture Display held (approximately) a 9% share of the global CRT market in 2004.

43.     Defendant Chunghwa Picture Tubes held (approximately) a 6.9% share of the global CRT market in 2005.

44.     There are also significant barriers to entry in the CRT industry in the form of high manufacturing and technological barriers to entry. Construction and maintenance of fabrication plants is extremely expensive. Because of increased competition and ongoing technological advances, manufacturers' research and development expenses are also extremely high.

45.     There are also multiple interrelated business relationships in the CRT industry. For example, in November 2000, Defendants LG Electronics and Koninklijke Philips Electronics agreed to enter into a joint venture that combined their CRT manufacturing operations. The resulting company (LG Philips Displays, now known as LP Displays) entered the market with a 25% share in the global CRT market.

46.     Defendants Matsushita Electric Industrial Co., Ltd. and Toshiba Corporation also entered into a joint venture combining their CRT manufacturing operations during the Class

CLASS ACTION COMPLAINT

1  Period.  The resulting company (MT Picture Display Co.) immediately enjoyed a significant share

2  of the global CRT market.

3       47.    In 2005, Defendants Samsung SDI and LG Philips Displays entered into an

4  agreement to work together by sharing parts with respect to CRTs.

5      **D.**    **The Defendants' Illegal Conspiracy**

6       48.    The price of CRTs during the Class Period did not fully reflect the sharp decline in

7  demand for CRTs caused by the entry of the new generation of competing technologies.  Despite

8  the introduction of technologically superior and increasingly popular alternatives to televisions and

9  monitors using CRTs, the price of CRTs remained unnaturally high throughout the Class Period,

10  with periods of sustained and unnatural price stability.

11       49.    The concentration of CRT manufacturers, the declining CRT share of the total

12  market for television and computer screens, and the higher price of FPD Products gave Defendants

13  the means and incentive to conspire and collude to artificially fix, maintain, and/or stabilize the

14  prices at which CRTs were sold.

15       50.    During the class period, Defendants and their co-conspirators agreed, combined,

16  and conspired artificially to raise, maintain, and stabilize the prices at which CRTs were sold

17  directly and indirectly in the United States at artificial levels.  This illegal combination was

18  effectuated by means of illegal contracts, agreements, or secret negotiations between Defendants

19  through their officers, directors and employees.

20       51.    For example, despite falling demand and increased use of FPD technology in

21  televisions and computer monitors, Defendants increased the prices of CRTs sold in February of

22  2002 and at other points of time throughout the Class Period.  This price increase was the result of

23  an agreement among Defendants to collectively raise the prices of CRTs.

24       52.    Defendants also agreed to fix, maintain, and/or stabilize the price of CRTs by

25  collectively agreeing to reduce the production of CRTs through plant closures and work

26  slowdowns.

27       53.    This conspiracy resulted in unnaturally higher prices for CRTs which were

28

CLASS ACTION COMPLAINT

1  fundamentally inconsistent with the low demand for them and their rapidly approaching

2  obsolescence.

3        **E.    International Antitrust Investigations**

4        54.    On or about November 8, 2007, government agencies from Japan, South Korea, the

5  European Union and the United States each opened coordinated investigations into CRT

6  manufacturers based on a suspicion that they formed an international price cartel to fix the prices

7  for CRTs.

8        55.    On or about November 8, 2007, news reports stated that CRT manufacturers are

9  "suspected of holding meetings to discuss the price targets in Southeast Asian countries where

10  CRT manufacturing bases are located."  Another stated that "[t]he CRT manufacturers are

11  suspected of operating an international cartel since 2005 or earlier."

12        56.    On or about November 8, 2007, Defendant Matsushita Electric Industrial Company

13  confirmed that Japan's Fair Trade Commission raided MT Picture Display Co. as part of this

14  international price-fixing investigation.  Akira Dadota, a spokesman for Matsushita, admitted that

15  Japan's Fair Trade Commission conducted an on-site inspection of MT Picture Display Company's

16  offices in Japan.  Up until earlier this year, MT Picture Display was formerly owned by Toshiba

17  Corp. as well as Defendant Matsushita Electric Industrial Company.

18        57.    On or about November 8, 2007, Defendant Samsung SDI confirmed that South

19  Korea's Fair Trade Commission launched a probe into Samsung SDI as part of this international

20  price-fixing investigation.

21        58.    On or about November 8, 2007, news reports stated that defendant LP Displays was

22  visited by antitrust regulators as part of this international price-fixing investigation.

23        59.    On or about November 12, 2007, Defendant Chunghwa Picture Tubes admitted that

24  the company had received a summons from the United States Department of Justice ("DOJ") as

25  part of this international price-fixing investigation.

26        60.    On or about November 21, 2007, Defendant Royal Phillips Electronics admitted

27  that the company is subject to this international price-fixing investigation.

28                                    11

1    **F.**    **The Pass-Through Of The Overcharges To End-Users**

2        61.    OEMs and retailers of televisions and monitors containing CRTs are all subject to

3    vigorous price competition.  Televisions and computers are commodities, with little or no brand

4    loyalty, such that aggressive pricing causes businesses and consumers to switch preferences to

5    different brands.  Television and computer prices are closely based on production costs, which are

6    in turn directly determined by component costs, as assembly costs are minimal.  OEMs accordingly

7    use component costs, like the cost of CRTs, as the starting point for all price calculations.

8    Television and computer monitor prices thus closely track increases and decreases in component

9    costs.

10        62.    Defendants' conspiracy to raise, fix, or maintain the price of CRTs at artificial

11    levels resulted in harm to Plaintiffs and the indirect-purchaser classes alleged herein because it

12    resulted in them paying higher prices for televisions and monitors containing CRTs than they

13    would have in the absence of Defendants' conspiracy.  The entire overcharge for CRTs at issue

14    was passed on to plaintiffs and members of the indirect-purchaser class.

15        63.    An increase in the cost of purchasing a CRT significantly affects the price of

16    television or computer monitors using CRTs.

17        64.    CRTs account for a significant percentage of the overall cost of a television or

18    computer monitor.  For example, CRTs account for approximately thirty (30) percent of the cost of

19    manufacturing a television set.

20        65.    CRTs are commodity products, with functionally equivalent products available

21    from the Defendants, which manufacture them pursuant to standard specifications and sizes.

22        66.    Because OEMs and retailers have thin net margins, they must pass on any increase

23    in component costs, such that increases in the price of CRTs lead to quick corresponding price

24    increases at the OEM and retail level for products containing CRTs.

25        67.    Thus, all supracompetitive overcharges are always passed through to the indirect-

26    purchaser, end-user plaintiff class members, which pay more for televisions and monitors

27    containing CRTs than in a competitive market place.

28

**G.    The Effect Of The Price Of CRTs On The Price Of Products**

68.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. CRTs are identifiable, discreet physical objects that do not change form or become an indistinguishable part of TVs or computer monitors.

69.    Thus, CRTs follow a traceable physical chain from the defendants to the OEMs to the purchasers of the finished products incorporating the CRT.

70.    Moreover, just as CRTs can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of CRTs affect prices paid by indirect purchasers of televisions and monitors containing CRTs.

71.    Because Defendants control the market for CRTs, there are virtually no choices for persons and businesses that require products containing such products other than buying such products manufactured by a direct purchaser that paid supracompetitive prices for CRTs to Defendants because of Defendants' conspiracy alleged herein.

72.    When distribution markets are highly competitive, as they are in the case of televisions and monitors containing CRTs, all of the overcharge will be passed through to ultimate end user businesses and consumers, such as the indirect-purchaser plaintiffs and class members.  In addition, most of the defendants themselves manufacture, market, and distribute televisions and monitors containing CRTs.  This means that these defendants will pass through to their customers 100% of the supracompetitive price increases that result from the defendants' conspiracy, combination, and agreement to fix, increase, and stabilize the prices for CRTs.

73.    Hence, the inflated prices of televisions and monitors containing CRTs resulting from defendants' price-fixing conspiracy have been passed on to plaintiffs and the other class members by direct purchasers.

74.    During the Class Period, a number of large OEMs sold televisions and monitors containing CRTs directly to end-buyers.  For example, the OEM with the largest share of computer monitor sales in the United States market, Dell, sold exclusively to end-buyers, as did Gateway. During the Class Period, Compaq and Apple also sold large portions of their computer monitors

CLASS ACTION COMPLAINT

1  directly to the end-buyer.

2      75.   Computer models sold by other OEMs to retailers were generally updated several

3  times a year, and the price was changed for each new model. For example, for one large retailer,

4  more than 90 percent of the computers sold during 2000 were either new models or were sold at a

5  different price from the price in the previous month. OEMs, retailers and distributors often use a

6  "standard markup" method to set prices, meaning that they add a standard percentage to their own

7  costs to determine selling prices. Thus, changes in the price of CRTs were passed on rapidly rather

8  than absorbed.

9      76.   In retailing, it is common to use a "markup rule." The retail price is set as the

10 wholesale cost plus a percentage markup designed to recover non-product costs and to provide a

11 profit. This system guarantees that increases in costs to the retailer will be passed on to end

12 buyers. For example, CDW, a large seller of computer monitors, uses such a system, and a

13 declaration in the DRAM case from CDW's director of pricing details exactly how they calculated

14 selling prices:

15         In general, CDW employs a "building block" approach to setting
           its advertised prices. The first building block is the Cost of Goods
16         Sold (COGS), which represents the price CDW paid to acquire the
           product...CDW... adds a series of positive markups to the cost to
17         CDW to acquire a given product. These markups are in addition to
           the pass through effect of changes in the costs charged to CDW for
18         that product by a given vendor.

19     77.   The economic and legal literature has recognized that unlawful overcharges in a

20 component normally result in higher prices for products containing that price-fixed component. As

21 Professor Herbert Hovenkamp, a noted antitrust scholar, has stated in his treatise, FEDERAL

22 ANTITRUST POLICY, THE LAW OF COMPETITITON AND ITS PRACTICE (1994) at 564:

23         A monopoly overcharge at the top of a distribution chain generally
           results in higher prices at every level below. For example if
24         production of aluminum is monopolized or cartelized, fabricators
           of aluminum cookware will pay higher prices for aluminum. In
25         most cases they will absorb part of these increased costs
           themselves and pass part along to cookware wholesalers. The
26         wholesalers will charge higher prices to the retail stores, and the
           stores will do it once again to retail consumers. Every person at
27         every stage in the chain likely will be poorer as a result of the
           monopoly price at the top.

28

1    Theoretically, one can calculate the percentage of any overcharge
2    that a firm at one distributional level will pass on to those at the
     next level.

3        78.    Similarly, two other antitrust scholars – Professors Robert G. Harris (Professor

4    Emeritus and former Chair of the Business and Public Policy Group at the Haas School of

5    Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor

6    of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust)

7    – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is

8    not the exception: it is the rule."

9        79.    As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information

10   and Computer Science and Professor of Economics and Public Policy at the University of

11   Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving

12   Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class

13   certification):

14       As is well known in economic theory and practice, at least some of
         the overcharge will be passed on by distributors to end consumers.
15       When the distribution markets are highly competitive, as they are
         here, all or nearly the entire overcharge will be passed on through
16       to ultimate consumers... Both of Microsoft's experts also agree
         upon the economic phenomenon of cost pass through, and how it
17       works in competitive markets.  This general phenomenon of cost
         pass through is well established in antitrust laws and economics as
18       well.

19       80.    The purpose of the conspiratorial conduct of the defendants was to raise, fix or

20   stabilize the price of CRTs and, as a direct and foreseeable result, televisions and monitors

21   containing CRTs.  Economists have developed techniques to isolate and understand the

22   relationship between one "explanatory" variable and a "dependent" variable in those cases when

23   changes in dependent variable are explained by changes in a multitude of variables— when all

24   such variables may be changing simultaneously.  That analysis-called regression analysis- is

25   commonly used in the real world and in litigation to determine the impact of a price increase on

26   one cost in a product (or service) that is an assemblage of costs.  Thus, it is possible to isolate and

27   identify only the impact of an increase in the price of CRTs on prices for televisions and monitors

28   containing CRTs even though such products contain a number of other components whose prices

                                                15

1  may be changing over time.  A regression model can explain how variation in the price of CRTs

2  affects changes in the price of televisions and monitors containing CRTs.  In such models, rather

3  than being treated as the dependent variable, the price of CRTs is treated as an independent or

4  explanatory variable.  The model can isolate how changes in the price of CRTs impact the price of

5  televisions and monitors containing such CRTs while holding controlling for the impact of other

6  price-determining factors.

7       81.    Economic and legal literature recognizes that the more pricing decisions are based

8  on cost, the easer it is to determine the pass-through rate.  The directness of affected costs refers to

9  whether an overcharge affects a direct (*i.e.* variable) cost or an indirect (*i.e.*, overhead) cost.

10  Overcharges will be passed-through sooner and at a higher rate if the overcharge affects direct

11  costs.  Here CRTs are a direct (and substantial) cost of products containing CRTs.

12       82.    Other factors that lead to the pass-through of overcharges include: (i) whether price

13  changes are frequent; (ii) the duration of the anti-competitive overcharge; (iii) whether pricing

14  decisions are based on cost; (iv) whether the overcharge affects variable, as opposed to overhead,

15  costs; (v) whether the resellers' production technology is uniform; (vi) whether the reseller supply

16  curve exhibits a high degree of elasticity; and (vii) whether the demand of the resellers is inelastic.

17  All of these factors were present in the CRT market during the Class Period.  The precise amount

18  of such an impact on the prices of products containing CRTs can be measured and quantified.

19  Commonly used and well-accepted economic models can be used to measure both the extent and

20  the amount of the supracompetitive charge passed-through the chain of distribution.

21       83.    Plaintiffs and other indirect purchasers have been forced to pay supracompetitive

22  prices for televisions and monitors containing CRTs.  These inflated prices have been passed on to

23  them by direct purchaser manufacturers, distributors, and retailers.  Those overcharges have

24  unjustly enriched defendants.

25                  **V.    CLASS ACTION ALLEGATIONS**

26       84.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule

27  23 of the Federal Rules of Civil Procedure on behalf of all members of the following Class (the

28

"Nationwide Class"):

> All persons and entities residing in the United States which, from January 1, 1998 through and including November 9, 2007, indirectly purchased in the United States, for their own use and not for resale, a CRT which was manufactured and/or sold by one or more of the Defendants. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

85.    Plaintiffs also bring this action on their own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all members of the following classes or subclasses (collectively, the "Indirect Purchaser State Classes"):

a.    **CALIFORNIA:** All persons and entities in California who indirectly purchased CRTs manufactured and/or sold by one or more of the Defendants during the Class Period for their end use and not for resale. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "California Class").

b.    **MINNESOTA:** All persons and entities in Minnesota who indirectly purchased CRTs manufactured and/or sold by one or more of the Defendants during the Class Period for their end use and not for resale. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any judicial officer presiding over this

17

1    action and the members of his/her immediate family and judicial staff, and

2    any juror assigned to this action (the "Minnesota Class").

3    86.    Plaintiffs do not know the exact size of the Classes at the present time. However,

4    Plaintiffs believe that due to the nature of the trade and commerce involved, there are at least

5    thousands in each separate state class, and hundreds of thousands of class members geographically

6    dispersed throughout the United States, such that joinder of all class members would be

7    impracticable.

8    87.    Plaintiffs' claims are typical of the claims of their respective Classes, and Plaintiffs

9    will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident

10   with, and not antagonistic to, those of the members of their respective Classes. Plaintiffs have

11   retained competent counsel experienced in class action and complex antitrust and consumer

12   protection litigation.

13   88.    Common questions of law and fact exist, including:

14        a.    Whether Defendants and their Co-Conspirators engaged in a contract,

15             combination or conspiracy among themselves to fix, raise, maintain or

16             stabilize the process of, or allocate the market of CRTs sold in the United

17             States;

18        b.    The duration and extent of the contract, combination or conspiracy;

19        c.    Whether the Defendants and their co-conspirators were participants in the

20             contracts, combinations or conspiracies alleged herein;

21        d.    Whether Defendants and their co-conspirators engaged in conduct that

22             violated Section 1 of the Sherman act;

23        e.    Whether Defendants and their co-conspirators engaged in unlawful, unfair

24             or deceptive contracts, combinations or conspiracies among themselves,

25             express or implied, to fix, raise, maintain, or stabilize prices of CRTs sold in

26             and/or distributed in the United States;

27        f.    Whether the Defendants and their co-conspirators engaged in conduct in

28                                    18

1   violation of the antitrust, consumer protection, unfair trade, and/or deceptive

2   trade practices laws of the various Indirect Purchaser States as alleged

3   below;

4       g.    Whether the anticompetitive conduct of the Defendants and their co-

5   conspirators caused prices of CRTs to be artificially inflated to non-

6   competitive levels;

7       h.    Whether the Defendants and their co-conspirators unjustly enriched

8   themselves as a result of their inequitable conduct at the expense of the

9   members of the Classes;

10      i.    Whether Defendants and their co-conspirators fraudulently concealed the

11  existence of their unlawful conduct;

12      j.    Whether Plaintiffs and the Classes are entitled to injunctive relief; and

13      k.    Whether Plaintiffs and other members of the Indirect Purchaser Classes

14  were injured by the conduct of Defendants and, if so, the appropriate

15  measure of damages for each of the Classes.

16      89.    These and other questions of law and fact are common to the Classes and

17  predominate over any questions affecting only individual class members, including legal and

18  factual issues relating to liability, damages, and restitution.

19      90.    Class action treatment is a superior method for the fair and efficient adjudication of

20  this controversy because:

21      a.    It will avoid a multiplicity of suits and consequent burden on the courts and

22  Defendants;

23      b.    It would be virtually impossible for all members of the Classes to intervene

24  as parties-plaintiff in this action;

25      c.    It will allow numerous individuals with claims too small to adjudicate on an

26  individual basis because of the prohibitive cost of this litigation, to obtain

27  redress for their economic injuries;

28

d.      It is appropriate for treatment on a fluid recovery basis, which obviate any

manageability problems; and

e.      It will provide court oversight of the claims process, once Defendants'

liability is adjudicated.

91.     The named plaintiffs will fairly and adequately protect the interests of the Class in that the named plaintiffs have no interests antagonistic to the interests of the other members of the Class, and have retained counsel competent and experienced in the prosecution of class actions and antitrust cases to represent themselves and the Class.

92.     This case is also appropriate for certification as a class action because the defendants have acted and refused to act on grounds generally applicable to the Class, so that final injunctive relief will be appropriate with respect to the Class as a whole.

93.     The claims asserted herein are also appropriate for class certification under each of the states under which claims are asserted.

## VI.     FRAUDULENT CONCEALMENT

94.     Plaintiffs and members of the Classes alleged herein did not discover and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until after November 9, 2007, when the investigations by the DOJ and other antitrust regulators became public, because defendants and their co-conspirators actively and fraudulently concealed the existence of their contract, combination or conspiracy.  Because defendants' agreement, understanding and conspiracy were kept secret, plaintiffs and Class members were unaware of defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRTs and the products in which they were used.

95.     The affirmative acts of the defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

96.     By its very nature, defendants' price-fixing conspiracy was inherently self-concealing.  As alleged above, defendants had secret discussions about price and output. Defendants agreed not to publicly discuss the existence or the nature of their agreement.

20

CLASS ACTION COMPLAINT

97.   As a result of defendants' fraudulent concealment of their conspiracy, the running of any statue of limitations has been tolled with respect to any claims that plaintiffs and the Class members have as a result of the anticompetitive conduct alleged in this Complaint

## VII.   VIOLATIONS ALLEGED

### First Claim for Relief
### (Violation of Section 1 of the Sherman Act)

98.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

99.   Beginning at a time currently unknown to plaintiffs, but at least as early as January 1, 1997, and continuing through November of 2007, the exact dates being unknown to plaintiffs, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, stabilize, and peg prices for CRTs and televisions and monitors containing CRTs sold in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

100.   In formulating and carrying out the alleged agreement, understanding, and conspiracy, the defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

    a.   Fixing, raising, stabilizing, and pegging the price of CRTs; and

    b.   Allocating among themselves and collusively reducing the production of CRTs.

101.   The combination and conspiracy alleged herein has had the following effects, among others:

    a.   Price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the United States;

    b.   Prices for CRTs sold by defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive

levels throughout the United States; and

c.    Those who purchased CRTs directly or indirectly from defendants and their co-conspirators have been deprived of the benefits of free and open competition.

102.    Plaintiffs and other Nationwide Class members have been injured and will continue to be injured in their businesses and property by paying more for CRTs purchased indirectly from the defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy, including paying more for televisions and monitors in which CRTs are included, as a result of higher prices paid for CRTs by the direct purchasers of CRTs.

103.    Plaintiffs and the Nationwide Class are entitled to an injunction against defendants, preventing and restraining the violations alleged herein.

### Second Claim for Relief
### (Unjust Enrichment and Disgorgement of Profits)

104.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

105.    Defendants have been unjustly enriched through overpayments by plaintiffs and class members and the resulting profits.

106.    Under principles of unjust enrichment which exist in every state, Defendants should not be permitted to retain the benefits conferred via overpayments by plaintiffs and class members.

107.    Plaintiffs and all members of the Nationwide Class seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which plaintiffs and class members may seek restitution.

### Third Claim for Relief
### (Violation of State Antitrust Laws)

108.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

109.    Defendants' intentional and purposeful anti-competitive acts that are described above including but not limited to acts of collusion to set prices and the actual act of price-fixing

1  itself was intended to and did cause Plaintiff to pay supra-competitive prices for CRT prices

2  charged for consumer products containing CRTs in the Indirect Purchaser States.

3      110.   Defendants' monopolistic and anticompetitive acts as described above violate the

4  following state antitrust statutes:

5      111.   Defendants have violated California Business and Professions Code § 16720, *et seq.*

6      112.   Defendants have violated Minnesota Statutes § 325D.51, *et seq.*

7      113.   Plaintiff and the Indirect Purchasers Classes in states with statute antitrust statutes

8  listed above seek actual damages for their injuries caused by these violations in amount to be

9  determined at trial.

10      114.   Plaintiff and the Indirect Purchaser Classes in states with statute antitrust statutes

11  listed above further seek treble damages and attorneys' fees pursuant to the Indirect Purchaser

12  States' antitrust laws as stated above to the extent allowed by law.

13      115.   Plaintiffs and the Indirect Purchaser Classes in states with statute antitrust statutes

14  listed above further seek attorneys' fees and costs pursuant to the Indirect Purchaser States'

15  antitrust laws as stated above to the extent allowed by law, due to Defendants' willful and unlawful

16  conduct as alleged above.

## Fourth Claim for Relief
### (Violation of California Unfair Competition Law)

17

18      116.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

19  allegation set forth in the preceding paragraphs of this Complaint.

20      117.   Defendants engaged in unfair competition or unfair, unconscionable, deceptive or

21  fraudulent acts or practices in violation of the California Business & Professions Code § 17200, *et*

22  *seq.*

23      118.   Plaintiff Juetten and the California Class seek restitution and disgorgement of

24  defendant's unlawfully obtained profits for their injuries caused by these violations, in an amount

25  to be determined at trial.

26      119.   Plaintiffs and the Indirect Purchaser Class in California seek attorneys' fees due to

27  Defendants' willful and unlawful conduct where allowable by law.

28
CLASS ACTION COMPLAINT

## VIII.   PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray:

A.   That the Court determine that the Sherman Act, California and Minnesota antitrust law, and California unfair competition law claims alleged herein may be maintained as class actions under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, as informed by the respective state class action laws.

B.   That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

    1.   A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;

    2.   Acts of unjust enrichment as set forth in the Second Claim for Relief;

    3.   An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the California and Minnesota antitrust laws identified in the Third Claim for Relief; and

    4.   A violation of the California Unfair Competition Law as alleged in the Fourth Claim for Relief.

C.   On the First Claim for Relief, that defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.   On the Second Claim for Relief, that plaintiffs and the members of the Nationwide Class recover the amounts by which the defendants have been unjustly enriched as a result of their unlawful conduct;

1    E.    On the Third Claim for Relief, that the plaintiffs and the members of the California

2  and Minnesota Classes recover damages, to the maximum extent allowed under such laws as

3  provided by the state antitrust laws listed above, and that a joint and several judgment in favor of

4  plaintiffs and these classes be entered against the defendants in an amount to be trebled to the

5  extent permitted by such laws;

6    F.    On the Fourth Claim for Relief, that plaintiff Juetten and the members of the

7  California Class be awarded restitution, including disgorgement of profits obtained by defendants

8  as a result of their acts of unfair competition and acts of unjust enrichment;

9    G.    That plaintiffs and members of each of the classes listed herein be awarded pre- and

10  post-judgment interest as provided by law, and that such interest be awarded at the highest legal

11  rate from and after the date of service of the initial complaint in this action;

12    H.    That plaintiffs and members of each of the classes listed herein recover their costs

13  of suit, including a reasonable attorney's fee, as provided by law; and

14    I.    That plaintiffs and members of each of the classes listed herein have such other,

15  further, and different relief as the case may require and the Court may deem just and proper under

16  the circumstances.

17  Dated:  December 7, 2007                    Respectfully submitted,

18

19

20                                Francis O. Scarpulla (41059)
                                  Craig C. Corbitt (83251)
21                                Matthew R. Schultz (220641)
                                  Judith Zahid (No. 215418)
22                                ZELLE HOFMANN VOELBEL MASON &
                                  GETTE LLP
23                                44 Montgomery Street, Suite 3400
                                  San Francisco, CA  94104
24                                Telephone:    (415) 693-0700
                                  Facsimile:    (415) 693-0770
25                                fscarpulla@zelle.com
                                  ccorbitt@zelle.com
26

27

28

Richard M. Hagstrom
Michael Jacobs
ZELLE HOFMANN VOELBEL MASON &
GETTE LLP
500 Washington Ave. South, Suite 400
Minneapolis, MN 55415
Telephone:    (612) 339-2020
Facsimile:     (612) 336-9100
rhagstrom@zelle.com
mjacobs@zelle.com

*Attorneys for Plaintiffs*

26

**JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by jury.

Dated:  December 7, 2007

Francis O. Scarpulla (41059)
Craig C. Corbitt (83251)
Matthew R. Schultz (220641)
Judith A. Zahid (215418)
ZELLE HOFMANN VOELBEL MASON &
GETTE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Telephone:      (415) 693-0700
Facsimile:      (415) 693-0770
fscarpulla@zelle.com
ccorbitt@zelle.com

Richard M. Hagstrom
Michael Jacobs
ZELLE HOFMANN VOELBEL MASON &
GETTE LLP
500 Washington Ave. South, Suite 400
Minneapolis, MN 55415
Telephone:      (612) 339-2020
Facsimile:      (612) 336-9100
rhagstrom@zelle.com
mjacobs@zelle.com

*Attorneys for Plaintiffs*

#3171415v1

CLASS ACTION COMPLAINT