EXHIBIT
A

1   Bruce L. Simon (Bar No. 96241)
      bsimon@psswplaw.com
2   Esther L. Klisura (Bar No. 221171)
      eklisura@psswplaw.com
3   PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
    44 Montgomery Street, Suite 1200
4   San Francisco, California 94104
    Telephone:  (415) 433-9000
5   Facsimile:   (415) 433-9008

6   P. John Brady
      jbrady@stklaw.com
7   Daniel D. Owen
      dowen@stklaw.com
8   SHUGHART THOMSON & KILROY, P.C.
    Twelve Wyandotte Plaza
9   120 West 12th Street
    Kansas City, Missouri 64105
10  Telephone:  (816) 421-3355
    Facsimile:   (816) 374-0509

11
    [Additional counsel on signature page]
12  *Attorneys for Plaintiff and the Proposed*
    *Direct Purchaser Class*
13

14                    UNITED STATES DISTRICT COURT

15                   NORTHERN DISTRICT OF CALIFORNIA

16  Crago, Inc., on behalf of itself and others       CASE NO.
    similarly situated.
17                                                     **CLASS ACTION COMPLAINT**
                      Plaintiff,
18                                                     **JURY TRIAL DEMAND**
          vs.
19
20  Chunghwa Picture Tubes, Ltd., Chunghwa
    Picture Tubes (Malaysia) Sdn. Bhd., Hitachi,
21  Ltd., Hitachi America, Ltd., Hitachi Asia, Ltd.,
    Irico Group Corp., Irico Display Devices Co.,
22  Ltd., LG Electronics, Inc., Matsushita Electric
    Industrial Co, Ltd., Panasonic Corporation of
23  North America, Orion Electric Co., Ltd., Orion
    America, Inc., Koninklijke Philips Electronics
24  N.V., Philips Electronics North America,
    Samsung SDI Co., Ltd., Samsung SDI America,
25  Inc., Samtel Color, Ltd., Thai CRT Company,
    Ltd., Toshiba Corporation, Beijing-Matsushita
26  Color CRT Company, Ltd., Matsushita Toshiba
    Picture Display Co., Ltd., and LP Displays
27  International, Ltd.

28                    Defendants.

ECF DOCUMENT
I hereby attest and certify this is a printed copy of a
document which was electronically filed with the United States
District Court for the Northern District of California.

Date Filed: 11-26-07

RICHARD W. WIEKING, Clerk

By: _____ , Deputy Clerk

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

## I.   INTRODUCTION

1.      Plaintiff Crago, Inc. brings this action on behalf of itself individually and on behalf of a plaintiff class (the "Class") consisting of all persons and entities who purchased products containing a cathode ray tube ("CRT Products" or "CRTs") in the United States directly from one or more named defendants between January 1, 1995 and the present (the "Class Period").   Defendants are the leading manufacturers of televisions, computer monitors, and other electronic devices containing CRTs.  Defendants control the majority of the CRT Product industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.   During the class period, virtually every household in the United States owns, or has owned, at least one CRT Product.

2.      Since the mid-1990's, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  Plaintiff is informed and believes, and thereon alleges, that in order to maintain price stability, increase profitability, and extend the life of the CRT market, defendants conspired, combined and contracted to fix, raise, maintain, and stabilize the price at which CRT Products were sold in the United States.   Plaintiff is further informed and believes, and thereon alleges, that defendants fraudulently concealed their anticompetitive conduct from plaintiff and the Class in the furtherance of the conspiracy.  As a result of defendants' unlawful conduct, plaintiff and the other members of the Class paid artificially inflated prices for CRT Products during the class period.  Such prices exceeded the amount they would have paid if the price for CRT Products had been determined by a competitive market.

## II.   JURISDICTION AND VENUE

3.      Plaintiff brings this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1367.

CLASS ACTION COMPLAINT

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

5.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), in that at least one of the defendants resides in this judicial district, is licensed to do business or is doing business in this judicial district.

### III.   PARTIES

**A.     Plaintiff**

6.     Plaintiff Crago, Inc. is a business entity incorporated under the laws of the State of Kansas. Plaintiff purchased CRT Products directly from certain of the defendants and their subsidiaries during the Class Period. Plaintiff's purchases included, but were not limited to, purchases of numerous 17-inch and 19-inch CRT monitors from defendant Hitachi America, Ltd.

**B.     Defendants**

**Chunghwa**

7.     Defendant Chunghwa Picture Tubes, Ltd. is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan. It was established in 1971 by Tatung Corporation to manufacture CRTs. In 1974, Chunghwa Picture Tubes, Ltd.'s CRTs received certification by the United States, giving the company entry into that market. By 1991, Chunghwa Picture Tubes, Ltd. had claimed the leading position in the global CRT industry. Ten years later, in 2001, Chunghwa Picture Tubes, Ltd. remained one of the top two competitors in the worldwide CRT market with a 15 to 20 percent market share. During the Class Period, Chunghwa Picture Tubes, Ltd. manufactured, sold, and distributed CRT Products throughout the United States.

8.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot 1, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. It is a wholly-owned and controlled subsidiary of Chunghwa Picture Tubes, Ltd. Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. Its product line ranges from 10-inch CRTs to 29-inch CRTs. During the Class Period, Chunghwa Malaysia manufactured, sold, and distributed

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

1   CRT Products throughout the United States.

2       9.    Defendants Chunghwa Picture Tubes, Ltd. and Chunghwa Malaysia are

3   collectively referred to herein as "Chunghwa."

4   **Hitachi**

5       10.    Defendant Hitachi, Ltd. is a Japanese company with its principal executive

6   office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is

7   the parent company for the Hitachi brand of CRT Products.   In 1996, Hitachi, Ltd.'s

8   worldwide market share for color CRTs was 20 percent.  During the Class Period, Hitachi,

9   Ltd. manufactured, sold, and distributed CRT Products throughout the United States.

10      11.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

11  company with its principal place of business at 2000 Sierra Point Parkway, Brisbane,

12  California.  Hitachi America is a wholly-owned and controlled subsidiary of defendant

13  Hitachi, Ltd.  During the Class Period, Hitachi America sold and distributed CRT Products

14  manufactured by Hitachi, Ltd. throughout the United States.

15      12.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

16  with its principal place of business at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore

17  049318.   Hitachi Asia is a wholly-owned and controlled subsidiary of defendant Hitachi,

18  Ltd.   During the Class Period, Hitachi Asia manufactured, sold, and distributed CRT

19  Products throughout the United States.

20      13.    Defendants Hitachi, Ltd., Hitachi America, and Hitachi Asia are collectively

21  referred to herein as "Hitachi."

22  **Irico**

23      14.    Defendant Irico Group Corporation is a Chinese entity located at 1 Caihong

24  Rd., Xianyang City, Shaanxi Province 712021.  Irico Group Corporation is the parent

25  company for multiple subsidiaries engaged in the manufacture, distribution, and sale of

26  CRT Products.  During the Class Period, Irico Group Corporation manufactured, sold, and

27  distributed CRT Products throughout the United States.

28  ///

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

15.     Irico Display Devices Co., Ltd. is a Chinese entity located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.   Irico Display Devices Co., Ltd. is a partially-owned subsidiary of defendant Irico Group Corp. In 2006, Irico Display Devices Co., Ltd. was China's top CRT maker.   During the Class Period, Irico Display Devices Co., Ltd. manufactured, sold, and distributed CRT Products throughout the United States.

16.     Defendants Irico Group Corporation and Irico Display Devices, Co., Ltd. are collectively referred to herein as "Irico."

**LG Electronics**

17.     Defendant LG Electronics, Inc. ("LG Electronics") is a Korean entity headquartered at LG Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, South Korea 150-721.   In 2001, LG Electronics entered into a joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays, in which the entities combined their CRT businesses.   In 2002, LG Electronics had a 24.4 percent worldwide CRT market share.   On April 1, 2007, LG.Philips Displays became an independent company and changed its name to LP Displays International, Ltd.   During the Class Period, LG Electronics manufactured, sold, and distributed CRT Products throughout the United States.

**Matsushita**

18.     Defendant Matsushita Electric Industrial Co., Ltd. ("Matsushita Electric") is a Japanese entity located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.   In 2002, Matsushita Electric entered into a joint venture with defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.   Matsushita Electric was the majority owner with 64.5 percent.   On April 3, 2007, Matsushita Electric purchased the remaining 35.5 percent stake in the joint venture, making it a wholly-owned subsidiary of Matsushita Electric.   Matsushita Electric is best known for its Panasonic brand, which in 2005 had the highest CRT revenue in Japan.   During the Class Period, Matsushita Electric sold and distributed CRT Products throughout the United States.

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

19.    Defendant Panasonic Corporation of North America ("Panasonic") is a Delaware corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey.   Panasonic is a wholly-owned and controlled subsidiary of defendant Matsushita Electric.   During the Class Period, Panasonic sold and distributed CRT Products manufactured by Matsushita Electric.

20.    Defendants Matsushita Electric and Panasonic are collectively referred to herein as "Matsushita."

**Orion**

21.    Defendant Orion Electric Co., Ltd. is a Japanese company with its principal place of business at 41-1 Iehisa-cho Echizen-shi Fukui 915-8555, Japan.   It is the parent company of the Orion entities.  Orion Electric, Ltd. currently manufactures CRT Products for defendant Toshiba Corporation.  During the Class Period, Orion Electric Co., Ltd. manufactured, sold, and distributed CRT Products throughout the United States.

22.    Defendant Orion America, Inc. ("Orion America") is an Indiana corporation with its principal place of business at Hwy 41 North, Orion Place, Princeton, Indiana. Orion America is a wholly-owned and controlled subsidiary of defendant Orion Electric Co., Ltd.  During the Class Period, Orion America manufactured, sold, and distributed CRT Products throughout the United States.

23.    Defendants Orion Electric Co., Ltd. and Orion America are collectively referred to herein as "Orion."

**Philips**

24.    Defendant Koninklijke Philips Electronics N.V. ("Royal Philips"), which translates to Royal Philips Electronics, is a Dutch entity with its principal place of business at Breitner Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands.  In 2000, Royal Philips was the leading global supplier of CRTs.  In 2001, Royal Philips entered into a joint venture with defendant LG Electronics called LG.Philips Displays, in which the entities combined their CRT businesses. On April 1, 2007, LG.Philips Displays became an independent company and changed its name to LP Displays International, Ltd.  During the

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

1  Class Period, Royal Philips manufactured, sold, and distributed CRT Products throughout

2  the United States.

3       25.     Defendant Philips Electronics North America ("Philips America") is a

4  Delaware corporation with its principal place of business at 1251 Avenue of the Americas,

5  New York, New York, 10020.  Philips America is a subsidiary of defendant Royal Philips.

6  During the Class Period, Philips America sold and distributed CRT Products manufactured

7  by Royal Philips throughout the United States.

8       26.     Defendants Royal Philips and Philips America are collectively referred to

9  herein as "Philips."

10  **Samsung**

11       27.     Defendant Samsung SDI Co., Ltd. ("Samsung SDI") is a Korean company

12  with its principal place of business at 575 Shin-dong, Youngtong-gu Suwon, Kyonggi,

13  South Korea.  Samsung SDI is one of the largest CRT producers in the world.  Samsung

14  SDI was the top manufacturer for CRTs in 2000, with a market share of approximately

15  20%.  During the Class Period, Samsung SDI manufactured, sold, and distributed CRT

16  Products throughout the United States.

17       28.     Defendants  Samsung  SDI  America,  Inc.  ("Samsung  America")  is  a

18  California corporation with its principal place of business at 3333 Michelson Drive, Suite

19  700, Irvine, California.  Samsung America is a wholly-owned and controlled subsidiary of

20  defendant Samsung SDI.  During the Class Period, Samsung America sold and distributed

21  CRT Products manufactured by Samsung SDI throughout the United States.

22       29.     Defendants Samsung SDI and Samsung America are collectively referred to

23  herein as "Samsung."

24  **Samtel**

25       30.     Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its

26  principal place of business at 52, Community Centre, New Friends Colony, New Delhi-

27  110065.  Samtel's market share for CRTs sold in India is approximately 40%, and is that

28  country's largest exporter of CRT Products.  Samtel has gained safety approvals from the

7

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

1   United States, Canada, Germany, and Great Britain for its CRT Products. During the Class

2   Period, Samtel manufactured, sold, and distributed CRT Products throughout the United

3   States.

4   **Thai CRT**

5   31.   Defendant Thai CRT Company, Ltd. ("Thai CRT") is a Thai company

6   located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a

7   subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first

8   manufacturer of CRTs for color televisions. During the Class Period, Thai CRT

9   manufactured, sold, and distributed CRT Products throughout the United States.

10  **Toshiba**

11  32.   Defendant Toshiba Corporation ("Toshiba") is a Japanese company with its

12  principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.

13  In 2001, Toshiba held a 5 to 10 percent worldwide market share for CRTs used in

14  televisions and in computer monitors. In 2002, Toshiba entered into a joint venture with

15  defendant Matsushita Electric called Matsushita Toshiba Picture Display Co., Ltd., in

16  which the entities consolidated their CRT businesses. In 2004, Toshiba entered into a

17  contract with defendant Orion whereby Orion became the supplier and maker of Toshiba-

18  branded CRT televisions. During the Class Period, Toshiba manufactured, sold, and

19  distributed CRT Products throughout the United States.

20  **Joint Ventures**

21  33.   Defendant Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a

22  Chinese company with its principal place of business at No. 9 Jiuxianqiao N. Rd.,

23  Dashanzi Chaoyang District, Beijing, China. BMCC is the second largest producer of

24  CRTs for televisions in China. During the Class Period, BMCC manufactured, sold, and

25  distributed CRT Products throughout the United States.

26  34.   Defendant Matsushita Toshiba Picture Display Co., Ltd. ("Matsushita-

27  Toshiba") is a Japanese entity located at 1-1, Saiwai-cho,. Takatsuki-shi, Osaka 569-1193,

28  Japan. Matsushita-Toshiba was formed as a CRT joint venture between defendants

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

1    Matsushita Electric and Toshiba.   On April 3, 2007, defendant Matsushita Electric

2    purchased the remaining stake in Matsushita-Toshiba, making it a wholly-owned

3    subsidiary.   During the class period, Matsushita-Toshiba manufactured, sold, and

4    distributed CRT products throughout the United States.

5        35.    Defendant LP Displays International, Ltd. ("LP Displays") is a Hong Kong

6    company located at 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan,

7    Hong Kong.   LP Displays was formed as a CRT joint venture between defendants LG

8    Electronics and Royal Philips, called Philips Displays.   On April 1, 2007, LG.Philips

9    Displays became an independent company and changed its name to LP Displays.   LP

10   Displays is a leading CRT supplier, and currently produces one in every four CRT

11   televisions and computer monitors sold.   LP Displays had a worldwide CRT market share

12   of 27% in 2006.   During the Class Period, LP Displays manufactured, sold, and distributed

13   CRT Products to customers throughout the United States.

14              IV.    AGENTS AND CO-CONSPIRATORS

15       36.    The acts charged in this Complaint have been done by defendants or were

16   ordered or done by defendants' officers, agents, employees, or representatives, while

17   actively engaged in the management of defendants' affairs.

18              V.    CLASS ACTION ALLEGATIONS

19       37.    Plaintiff brings this action both on behalf of itself, and as a class action

20   pursuant to Federal Rules of Civil Procedure, Rule 23(a) and (b)(3), on behalf of the

21   following class (the "Class").

22       All persons and entities who purchased CRT Products in the United States
         directly from one or more defendants between January 1, 1995 and the
23       present.  Excluded from the Class are defendants, their parent companies,
         subsidiaries and affiliates, any co-conspirators, all governmental entities,
24       and any judges or justices assigned to hear any aspect of this action.

25       38.    The Class definition encompasses those who bought a CRT Product directly

26   from a defendant, even if the cathode ray tube contained therein was manufactured by an

27   affiliated entity, principal, agent, or co-conspirator.

28   ///

CLASS ACTION COMPLAINT

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

39.    Plaintiff does not know the exact number of class members because such information is in the exclusive control of defendants.  Plaintiff believes that, due to the nature of the trade and commerce involved, there are most likely thousands of class members, geographically dispersed throughout the United States such that joinder of all class members is impracticable.

40.    Plaintiff's claims are typical of the claims of the class in that plaintiff is a direct purchaser of CRT Products, all Class members were damaged by the same wrongful conduct of defendants and their co-conspirators as alleged herein, and the relief sought is common to the class.

41.    Numerous questions of law or fact arise from defendants' anticompetitive conduct that is common to the class, including but not limited to:

    a.    Whether defendants engaged in a contract, combination, and/or conspiracy to fix, raise, maintain, or stabilize prices of CRT Products sold in the United States;

    b.    Whether defendants engaged in a contract, combination, and/or conspiracy to restrict output of CRT Products sold in the United States;

    c.    Whether defendants' conduct caused the prices of CRT Products sold in the United States to be at artificially high and noncompetitive levels;

    d.    Whether plaintiff and the other members of the Class were injured by defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

    e.    Whether plaintiff and the other members of the Class are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

42.    These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

1    43.    Plaintiff's claims are typical of the claims of the Class because plaintiff

2   directly purchased CRT Products from one or more of the defendants.

3    44.    Plaintiff will fairly and adequately represent the interests of the Class in that

4   plaintiff is a direct purchaser of CRT Products and has no conflict with any other members

5   of the Class.   Furthermore, plaintiff has retained competent counsel experienced in

6   antitrust, class action, and other complex litigation.

7    45.    Defendants have acted on grounds generally applicable to the Class, thereby

8   making final injunctive relief appropriate with respect to the Class as a whole.

9    46.    This class action is superior to the alternatives, if any, for the fair and

10   efficient adjudication of this controversy.  Prosecution as a class action will eliminate the

11   possibility of repetitive litigation.  There will be no material difficulty in the management

12   of this action as a class action.

13    47.    The prosecution of separate actions by individual Class members would

14   create the risk of inconsistent or varying adjudications, establishing incompatible standards

15   of conduct for defendants.

16                        **VI.    TRADE AND COMMERCE**

17    48.    During the Class Period, each defendant, or one or more of its subsidiaries,

18   sold CRT Products in the United States in a continuous and uninterrupted flow of interstate

19   commerce and foreign commerce, including through and into this judicial district.

20    49.    During the Class Period, defendants collectively controlled a majority of the

21   market for CRT Products, both globally and in the United States.

22    50.    The business activities of the defendants substantially affected interstate

23   trade and commerce in the United States and caused antitrust injury in the United States.

24                        **VII.    FACTUAL ALLEGATIONS**

25   **A.    CRT Technology and Products**

26    51.    Greatly simplified, a cathode ray tube ("CRT") consists of a vacuum tube

27   that is coated on its inside face with light sensitive phosphors.  An electron gun at the back

28   of the vacuum tube emits electron beams.  When the electron beams strike the phosphors,

the phosphors produce either red, green, or blue light.  A system of magnetic fields inside the CRT, as well as varying voltages, direct the beams to produce the desired colors.  This process is rapidly repeated several times per second to produce the desired images.

52.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  Since then, CRTs have become the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs.  Even large public displays, including many scoreboards at sports arenas, are comprised of thousands of single-color CRTs.

53.     The quality of a CRT display is dictated by the quality of the CRT itself.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole product such that the product is often simply referred to as "the CRT."

54.     Early CRT televisions displayed only black and white images.  CRT technology was revolutionized in 1950 with the advent of the color CRTs.  Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today "is astonishingly similar to the one that RCA unveiled in 1950."[1]

55.     Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Class Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.  The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry.

/ / /

/ / /

---

[1] *See* Graham Prophet, *Farewell to the CRT,* EDN Europe (February 2006).

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------|------|------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[2] | $235 |

## B.   Oligopolistic Nature of the CRT Industry

56.   During the Class Period, the CRT industry has been dominated by relatively few companies. In 2002 for example, three companies – defendants LP Displays (formerly known as LG.Philips Displays), Samsung, and Chunghwa – controlled approximately 62 percent of the CRT market. In addition to these three companies, the other named defendants formed a substantial portion of the remaining CRT market.

| Company | Share |
|---------|-------|
| LG.Philips Displays | 27% |
| Samsung SDI | 24% |
| Chunghwa Picture Tubes | 11% |
| Japanese Producers[3] | 15% |
| Other | 23% |

Source: The Electronic Times, compiled by DigiTimes, June 2002

57.   The CRT industry also had significant consolidation during the Class Period, including but not limited to: (a) the creation of LG.Philips Displays in 2001, which was a joint venture between Philips and LG Electronics' CRT businesses; (2) the 2002 merger of Toshiba and Matsushita into Matsushita-Toshiba; and (c) Orion's agreement to manufacture CRT Products for Toshiba, which effectively took Toshiba's capacity out of the market.

---

[2]   Estimated market value of CRT units sold.

[3]   "Japanese Producers" includes defendants Hitachi and Toshiba.

13

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

1    58.    This concentration of market share facilitated defendants' ability to

2  implement the conspiracy.  Involvement in long-standing joint ventures, both in the CRT

3  market and closely related markets, also gave these supposed competitors continuous

4  opportunities to discuss pricing, capacity utilization, and other important prospective

5  market information.   The mutually beneficial nature of the business relations between

6  certain defendants not only provided the opportunity to conspire; it also created a financial

7  incentive to do so.

8  C.    High Level of Cooperation in the CRT Industry

9    59.    The CRT industry is marked by a high degree of cooperation among

10  supposed competitors.  As stated above, many of the major competitors have joint ventures

11  that involve other competitors, either in the CRT market or in closely related markets.

12  Additionally, several of the major players obtain CRTs from the same Indian company –

13  defendant Samtel.

14    60.    One of the most striking examples of cooperation between competitors in the

15  CRT market involves the non-defendant, TPV Holdings, Inc. ("TPV").  TPV bills itself as

16  the world's largest producer of CRT monitors.  TPV has a series of joint ventures with

17  defendant Philips, which, as alleged above, has joint ventures with defendant LG.   In

18  addition, TPV also has joint ventures with defendant CPT and another major Taiwanese

19  manufacturer, HannStar.

20    61.    Defendant Chunghwa, in turn, has a long-standing joint venture with

21  defendant Samsung's corporate parent for the production of liquid crystal display panels.

22  Defendant Chunghwa now licenses technology from defendant Philips, although this is a

23  recent development that helped resolve a patent infringement suit filed in 2002.

24    62.    Defendant Samsung's corporate family has a very long-standing relationship

25  with Chinese state-owned picture tube manufacturers, dating back to a 1993 joint venture.

26    63.    Defendant LG Electronics and Hitachi, Ltd. entered into a joint venture in

27  2000 for the manufacture, sale, and distribution of optical storage products such as DVD

28  drives.

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

64.     Defendant Samtel participates in a joint venture, Samcor Glass Limited, with defendant Samsung's corporate parent and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

65.     Defendant Orion participates in a joint venture for the manufacture of CRT products with defendant Toshiba, as well as non-defendants P.T. Tabung Gambar Indonesia and Japanese trading company Sumitomo Corporation.

66.     Furthermore, at least four of the competitors obtain picture tubes from the same Indian company.  Defendant Samtel claims to have supplied CRTs to defendants LG, Samsung, Philips, and Matsushita during at least part of the Class Period.

67.     In addition to these formalized business relationships, defendants maintain close relationships through common membership in trade associations.   For example, defendants Chunghwa, Hitachi, and Samsung are all members of the ·Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, defendants Orion, LG Electronics, LP Displays (formerly LG.Philips Displays), and Samsung are members of the Electronic Display Industrial Research Association.  Defendants used these common memberships as vehicles for discussing, and agreeing upon, their pricing for CRT Products.  In particular, defendants, through these trade associations, and in meetings related to these trade associations, shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**D.     The Impact of Emerging Flat Panel Technologies**

68.     CRT televisions require a deep cabinet to accommodate the vacuum tube assembly.  In the 1990s, technological innovations allowed companies to introduce flat panel displays that would be slimmer and less bulky than CRT displays.   Flat panel displays were introduced in consumer products such as computer monitors and televisions.  Before their introduction, CRTs had dominated the market for these applications.

///

CLASS ACTION COMPLAINT

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

69.    As the established technology, CRTs had a price advantage over these new technologies.    Unlike an emerging industry where participants must invest heavily in research, development, and bringing capacity online, the CRT industry made and recouped such investments well before the start of the Class Period.    Thus, CRT manufacturers had very little debt or interest expense on their facilities, and the pressure to produce at full capacity (to avoid default) was lessened.    This provided an environment in which collusion to fix prices, even at the risk of lower demand, was possible.

70.    The CRT industry faced significant market pressures and reduced profitability during the Class Period.    As stated in a September 25, 2001 article entitled *Report: CRT Revenue to plunge*:

> After decades of growth, revenue from cathode ray tube monitors is expected to drop significantly over the next several years ... 'A combination of price erosion, a slowing in the movement to large screens, and a gradual shift in market opportunities from developed regions to developing regions is causing the drop in revenue,' Stanford Resources analyst Rhonda Alexander said Tuesday.    The growing popularity of flat panel monitors will also have an effect on CRT revenue.[4]

71.    In 2006, market research firm iSuppli Corp. predicted that sales of LCD televisions in 2007 would, for the first time, surpass sales of CRT televisions.    The firm forecasted that sales of CRTs would fall from an estimated 14.4 million units in 2006 to 10.4 million units in 2007.    iSuppli predicted that CRT televisions would account for only 2.1 million of the 44 million televisions sold in 2010.

72.    CRTs still remain popular in schools and other public areas for their combination of price and durability, as well as in developing countries like China.    CRT technology is also holding its own in the area of low-cost monitor and smaller size televisions.    According to DisplaySearch Inc., a Texas based research firm, CRTs will maintain a 65 percent share of 25-inch to 29-inch displays sold in 2009, whereas CRTs will have only a 1 percent share of 35-inch to 39-inch displays sold in 2009.

---

[4]    Shim, Richard, *Report: CRT Revenue to plunge*, ZDNet News (Sep 25, 2001) (*available at* http://news.zdnet.com/2100-9595_22-812906.html) (last viewed on November 13, 2007).

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

73.   DisplaySearch Inc. further estimates that the worldwide capacity to manufacture CRTs will fall from over 250 million units in 2006 to less than 150 million units by 2010.   At various times during the conspiracy, in order to keep prices high, defendants colluded to restrain output of CRTs as alleged below.

**E.    Reductions in Manufacturing Capacity by Defendants**

74.   During the Class Period, the defendants herein consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

75.   On July 15, 2003, Mitsubishi Electric closed a CRT plant in northern Mexico, just five years after the plant was opened.  The plant's closure resulted in a loss of capacity to manufacture 2.7 million CRTs a year for 17-inch computer monitors.  This was one of the principal applications for CRTs during this time period.

76.   In December 2004, Matsushita Toshiba closed its American subsidiary's operations in Horeseheads, New York citing price and market erosion.   Matsushita announced that the closing was part of the company's "global restructuring initiatives in the CRT business."   The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

77.   In December 2004, Toshiba announced that it too would discontinue manufacturing traditional CRT televisions.  Thereafter, Toshiba contracted to have Orion manufacture all Toshiba-brand CRT televisions.

78.   In July 2005, LG Philips ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

79.   In December 2005, Matsushita-Toshiba announced it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

/ / /

17

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

80.    In late 2005, Samsung SDI followed the lead of other manufacturers and closed its CRT factory in Germany.

81.    In July 2006, Orion America shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Matsushita announced it was shutting down its CRT factory in Malaysia and liquidate its joint venture with Toshiba.

**F.    Defendants Collude on Prices for CRTs**

82.    Plaintiff is informed and believes, and thereon alleges, that in order to control and maintain profitability during declining demand for CRTs, defendants conspired to fix, raise, maintain, and stabilize the price at which CRT Products were sold in the United States at artificially inflated and anticompetitive levels.

83.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p. 19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

84.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

85.    In reality, consumer prices for CRT monitors never approached $50 in 1997, and were consistently more than double this price.

86.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

/ / /

87.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

88.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst defendants.

89.     After experiencing an oversupply of 17-inch CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 200 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

90.     On June 1, 2004, LG Electronics raised the prices of its 15-inch and 17-inch CRT monitors in India.  This price hike was falsely attributed to a shortage of glass needed to manufacture CRTs.

91.     Over the course of the conspiracy period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  And yet, CRT prices resisted downward price pressures and remained stable over a period of many years. Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.   The stability of the price of CRTs was accomplished by defendants exchanging information about their prices, price moves, contract prices to large customers; capacity, capacity utilization, as well as technological and manufacturing advances. These discussions amongst defendants occurred through e-mail communications, telephone calls,

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

CLASS ACTION COMPLAINT

and in person meetings.  This price stability for the period of 2004 to 2007 is depicted in the following charts of average sale prices ("ASP"):

### ASP of Small (10" - 21") SD CRTs Sold in North America



### ASP of Medium (22" - 29") SD CRTs Sold in North America



CLASS ACTION COMPLAINT

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

**G.     International Antitrust Investigations**

92.     Defendants have been the subject of multiple government investigations for their cartel activity in recent years.  For example, Samsung admitted guilt and paid a $300 million fine following an investigation by the United States Department of Justice ("DOJ") into price-fixing among manufacturers of dynamic random access memory ("DRAM") computer chips.  In addition, Samsung, Hitachi and Toshiba have all acknowledged being contacted by the DOJ as part of an ongoing investigation into collusion among manufacturers of static random access memory ("SRAM") computer chips.

93.     More recently, the DOJ has commenced an investigation of Samsung, Toshiba and Hitachi, among others, concerning collusion among manufacturers of thin film transistor liquid crystal display ("TFT-LCDs") and flash memory computer chips.

94.     Plaintiff is informed and believes, and thereon alleges, that defendants are currently under investigation by government authorities around the world for anticompetitive conduct in connection with the CRT industry.  Plaintiff is further informed and believes, and thereon alleges, that the US investigation of the CRT conspiracy is being conducted by the DOJ's Antitrust Division in the Northern District of California.

95.     On November 8, 2007, *Bloomberg.com* reported that European Commission officials carried out unannounced raids on manufacturers of CRTs based on suspected anticompetitive conduct.  That same day, the European Commission issued a press release stating that, "The commission has reason to believe that the companies concerned may have violated EU rules against price-fixing, sharing markets or exchanging market information."[5]

96.     On November 9, 2007, defendants Matsushita Electric and Samsung reported that they were cooperating with Japanese antitrust authorities who reportedly raided the

---

[5]   *See* Newman, Matthew, *EU, Japan Raid Cathode-Ray Tube Makers in Cartel Case,* bloomberg.com (November 8, 2007) (*available at* http://www.bloomberg.com/apps/news?pid=email_en&refer=japan&sid= aEJ8N7GKCk8I).

CLASS ACTION COMPLAINT

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

1  companies' CRT production facilities on suspicion of anticompetitive conduct.[6]

2      97.    Similarly, on November 12, 2007, defendant Chunghwa announced that it

3  had received a summons from the DOJ for involvement in a CRT price-fixing cartel.[7]

4      98.    Finally, on November 21, 2007, defendant Philips acknowledged that it is

5  being investigated as well.  The *International Herald Tribune* reported that "competition

6  authorities in several jurisdictions had started investigations," and that the company

7  "would assist regulators."

8  **H.    Effects of Defendants' Antitrust Violations**

9      99.    The above combination and conspiracy has had the following effects, among

10  others:

11      a.    Price competition in the sale of CRT Products by defendants and their

12      co-conspirators has been restrained, suppressed and eliminated

13      throughout the United States;

14      b.    Prices for CRT Products sold by defendants has been raised, fixed,

15      maintained and stabilized at artificially high and noncompetitive levels

16      throughout the United States; and

17      c.    Direct purchasers of CRT Products from defendants have been

18      deprived of the benefit of free and open competition in the purchase of

19      CRT Products.

20      100.    As a direct and proximate result of the unlawful conduct of defendants,

21  plaintiff and other members of the class have been injured in their business and property in

22  that they paid more for CRT Products than they otherwise would have paid in the absence

23  of the unlawful conduct of defendants.

24

25  [6]   *See* Soble, Jonathan and Song, Jung-a, *Matsushita and Samsung Under Investigation*, Financial Times

26  (November 9, 2007) (*available at* http://www.ft.com/cms/s/0/c5237446-8e72-11dc-8591-0000779fd2ac. html).

27  [7]   *See* Chuang, Emily, *CPT Receives Notification of CRT Price-Fixing Matter in US*, Digitimes (November 12, 2007) (*available at* http://www.digitimes.com/print/a20071112PM200.html).

28

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

**I.      Fraudulent Concealment**

101.    Plaintiff had neither actual nor constructive knowledge of the facts constituting their claim for relief despite diligence in trying to discover the pertinent facts. Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until November of 2007, when investigations by the European Commission and Japanese Authorities became public.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put plaintiff or the Class on inquiry notice that there was a conspiracy to fix prices for CRTs.

102.    Plaintiff is informed believes and thereon alleges that defendants had secret discussions about price and output.  Defendants agreed not to publicly discuss the nature of the scheme and gave pretextual justifications for the inflated prices of CRTs in furtherance of the conspiracy.

103.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst defendants, which was undisclosed at the time.

104.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 2001. This price stabilization was purportedly due to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

105.    In addition, when several CRT manufacturers, including defendants Samsung, Philips, and LG Electronics, increased the price of CRT Products in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors. In justifying this price increase, a Deputy General Manager for an LG Electronics

///

///

CLASS ACTION COMPLAINT

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

1   distributor in India stated, "This shortage [of glass shells] is a global phenomena and every

2   company has to increase the prices of CRT monitors in due course of time."[8]

3        106.   Plaintiff is informed believes and thereon alleges that defendants' purported

4   reasons for the price increases of CRTs were materially false and misleading and made for

5   the purpose of concealing defendants' anti-competitive scheme as alleged herein.

6   As a result of defendants' fraudulent concealment of their conspiracy, the running of any

7   statue of limitations has been tolled with respect to any claims that plaintiff and the Class

8   members have as a result of the anticompetitive conduct alleged in this

9        **VIII.  CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1**

10        107.   Plaintiff incorporates by reference all the above allegations as if fully set

11   forth herein.

12        108.   Beginning at least as early as January 1, 1995, the exact date being unknown

13   to plaintiff and exclusively within the knowledge of defendants, defendants and their co-

14   conspirators entered into a continuing contract, combination or conspiracy to unreasonably

15   restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

16   by artificially reducing or eliminating competition in the United States.

17        109.   In particular, defendants have combined and conspired to raise, fix, maintain

18   or stabilize the prices of CRT Products sold in the United States.

19        110.   As a result of defendants' unlawful conduct, prices for CRT Products were

20   raised, fixed, maintained and stabilized in the United States.

21        111.   The contract, combination or conspiracy among defendants consisted of a

22   continuing agreement, understanding and concerted action among defendants and their co-

23   conspirators.

24   ///

25

26   _____

27   [8]   *See* Das, Shilpi, *Major Monitor Manufacturers hike CRT prices, LG follows Suit* (May 26, 2004)
(available at http://www.techtree.com/India/News/Major_Monitor_Manufacturers_hike_CRT_prices_LG_
follows_Suit/551-52715-581.html) (*last viewed on* November 19, 2007).

28

CLASS ACTION COMPLAINT

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

112.    For purposes of formulating and effectuating their contract, combination or conspiracy, defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.    Participating in meetings and conversations to discuss the prices and supply of CRT Products;

    b.    Communicating in writing and orally to fix prices;

    c.    Agreeing to manipulate prices and supply of CRT Products sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.    Issuing price announcements and price quotations in accordance with the agreements reached;

    e.    Selling CRT Products to customers in the United States at non-competitive prices; and

    f.    Providing false statements to the public to explain increased prices for CRT Products.

113.    As a result of defendants' unlawful conduct, plaintiff and the other members of the Class have been injured in their businesses and property in that they have paid more for CRT Products than they otherwise would have paid in the absence of defendants' unlawful conduct.

## IX.    DAMAGES

114.    During the Class Period, plaintiff and the other members of the class purchased CRTs directly from defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of the antitrust violations herein alleged, paid more for such products than they would have paid in the absence of such antitrust violations. As a result, plaintiff and the other members of the Class have sustained damages to their business and property in an amount to be determined at trial.

///

///

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

## X.    PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class herein, adjudging and decreeing that:

A.    This action may proceed as a class action, with plaintiff as the designated Class representative and its counsel as Class Counsel;

B.    Defendants have engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and that plaintiff and the members of the Class have been injured in their business and property as a result of defendants' violations;

C.    Plaintiff and the members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of plaintiff and the Class be entered against the defendants in an amount to be trebled in accordance with such laws;

D.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

E.    Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.    Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.    Plaintiff and members of the Class receive such other or further relief as may be just and proper.

///

///

///

## XI.   JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

DATED:  November 26, 2007

By: _____

Bruce L. Simon (Bar No. 92641)
  bsimon@psswplaw.com
Esther L. Klisura (Bar No. 221171)
  eklisura@psswplaw.com
PEARSON, SIMON, SOTER,
  WARSHAW & PENNY, LLP
44 Montgomery Street, Suite 1200
San Francisco, CA 94104
Telephone:  (415) 433-9000
Facsimile:   (415) 433-9008

Clifford H. Pearson (Bar No. 108523)
  cpearson@psswplaw.com
Gary S. Soter (Bar No. 67622)
  gsoter@psswplaw.com
Daniel L. Warshaw (Bar No. 185365)
  dwarshaw@psswplaw.com
PEARSON, SIMON, SOTER,
  WARSHAW & PENNY, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone:  (818) 788-8300
Facsimile:   (818) 788-8104

P. John Brady
  jbrady@stklaw.com
Daniel D. Owen
  dowen@stklaw.com
SHUGHART THOMSON &
  KILROY, P.C.
Twelve Wyandotte Plaza
120 West 12th Street
Kansas City, Missouri 64105
Telephone:  (816) 421-3355
Facsimile:   (816) 374-0509

*Attorneys for Plaintiff and the Proposed Direct Purchaser Class*

CLASS ACTION COMPLAINT