# EXHIBIT A

Francis O. Scarpulla (41059)
Craig C. Corbitt (83251)
Matthew R. Schultz (220641)
Judith A. Zahid (215418)
Traviss Galloway (234678)
ZELLE HOFMANN VOELBEL
    MASON & GETTE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Telephone:    (415) 693-0700
Facsimile:    (415) 693-0770
fscarpulla@zelle.com
ccorbitt@zelle.com

Terry Rose Saunders
    (*Pro Hac Vice* Admission Pending)
Thomas A. Doyle
    (*Pro Hac Vice* Admission Pending)
SAUNDERS & DOYLE
20 South Clark Street, Suite 1720
Chicago, IL  60603
Telephone:    (312) 551-0051
Facsimile:    (312) 551-4467
trsaunders@saundersdoyle.com
tadoyle@saundersdoyle.com

Christopher Lovell
Imtiaz Siddiqui
LOVELL STEWART & HALEBIAN, LLP
500 Fifth Avenue, 58th Floor
New York, NY  10110
Telephone:    (212) 608-1900
Facsimile:    (212) 719-4677
clovell@lshllp.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WILLIAM E. STACK, a Tennessee resident, and MARGO STACK, a Tennessee resident, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>    v.<br><br>CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA) SDN. BHD.; KONINKLIJKE PHILIPS ELECTRONICS NV; LG ELECTRONICS INC.; LP DISPLAYS INTERNATIONAL, LTD.; MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD.; MATSUSHITA TOSHIBA PICTURE DISPLAY CO., LTD.; BEIJING-MATSUSHITA COLOR CRT COMPANY, LTD.; LTD.; ORION ELECTRIC CO., [Caption continued on next page] | CASE NO.   1319<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

-1-

CLASS ACTION COMPLAINT

1  LTD.; ORION AMERICA, INC.;                           )
   PANASONIC CORPORATION OF NORTH                        )
2  AMERICA; PHILIPS ELECTRONICS                          )
   NORTH AMERICA; SAMSUNG SDI CO.,                       )
3  LTD.; SAMSUNG SDI AMERICA, INC.;                      )
   SAMTEL COLOR, LTD.; TCL                               )
4  INTERNATIONAL HOLDINGS LTD. (TCL);                    )
   THOMSON S.A.; TCL THOMSON                             )
5  ELECTRONICS CORPORATION;                              )
   TOSHIBA CORPORATION; and TOSHIBA                      )
6  AMERICA, INC.,                                        )
                                                         )
7                  Defendants.                           )
                                                         )
8  _____

9          Plaintiffs William E. Stack and Margo Stack, for themselves and on behalf of the

10  classes defined below ("Plaintiffs"), by their attorneys, bring this civil action for injunctive

11  relief and for damages against the Defendants named herein and, demanding a trial by jury,

12  complain and allege as follows:

13                              **INTRODUCTION**

14          1.      This case arises out of a long-running conspiracy extending from at least May

15  1, 1998 through November 9, 2007 (the "Class Period") among Defendants and their co-

16  conspirators, with the purpose and effect of fixing, raising, and/or maintaining the prices for

17  cathode ray tubes ("CRTs") and products containing CRTs ("CRT Products") sold indirectly

18  to Plaintiffs and other indirect purchasers throughout the United States.

19          2.      CRTs are used in a number of products, including but not limited to,

20  televisions and computer monitors. Throughout the Class Period, Defendants' conspiracy

21  was intended to, and did, moderate the downward pressure on CRTs and CRT Products

22  caused by the rapidly increasing popularity of flat panel products using liquid crystal displays

23  ("LCD") and plasma display panels ("PDP") (collectively, "FPD").

24          3.      Defendants and their co-conspirators formed an international cartel to illegally

25  restrict competition in the CRT and CRT Products markets, targeting and severely burdening

26  indirect-purchasers throughout the United States.  During the Class Period, Defendants'

27  conspiracy affected billions of dollars of commerce throughout the United States. As a result

28  of this conspiracy, Plaintiffs and indirect-purchasers have been injured in their business and

property by paying more for CRTs and CRT Products than they otherwise would have paid in the absence of Defendants' conspiracy.

4.     Plaintiffs bring this action seeking federal injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26 for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to recover damages under state antitrust laws of Tennessee, common law principles of restitution, disgorgement, unjust enrichment, as well as to recover the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly situated sustained as a result of Defendants' conspiracy to fix, raise, maintain and stabilize the prices of CRTs and CRT Products.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Section 16 of the Clayton Antitrust Act (15 U.S.C. §26) and Title 28, United States Code, Sections 1331 and 1337, and Section 1 of the Sherman Act (15 U.S.C. §1). This Court has subject matter jurisdiction of the claims asserted under Tennessee law, pursuant to Title 28, United States Code, Sections 1332(d) and 1367, in that the matter in controversy exceeds the sum of $5 million, exclusive of interest and costs, class members are citizens of states different from Defendants, and certain Defendants are citizens or subjects of foreign states.

6.     Venue is proper in this District pursuant to Title 15, United States Code, Section 22 and Title 28, United States Code, Section 1391, because one or more of the Defendants reside, is licensed to do business, or is found or transacts business in this District and a substantial part of the events or omissions giving rise to the Plaintiffs' claims arose in this District.

7.     Defendants conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States, including specifically the laws of Tennessee. Defendants' products are sold in the flow of

-3-

CLASS ACTION COMPLAINT

1   interstate commerce, and Defendants' activities had a direct, substantial and reasonably

2   foreseeable effect on such commerce.

3         8.    The activities of the Defendants and their co-conspirators, as described herein,

4   substantially affected commerce throughout the United States, as well as in Tennessee,

5   because Defendants, directly or through their agents, engaged in activities affecting

6   Tennessee and other states. Defendants have purposefully availed themselves of the laws of

7   Tennessee in connection with their activities relating to the production, marketing, and/or

8   sale of CRTs and CRT Products. Defendants produced, promoted, sold, marketed, and/or

9   distributed CRTs and CRT Products in the United States, thereby purposefully profiting from

10  access to indirect-purchaser end-user businesses and consumers in Tennessee and elsewhere.

11  Defendants also contracted to supply or obtain goods or revenue related to the business for

12  CRTs and CRT Products in the United States. As a result of the activities described herein,

13  Defendants:

14           a.    Caused damage to the residents of Tennessee;

15           b.    Caused damage in Tennessee by acts or omissions committed outside

16                 Tennessee that had an effect in Tennessee;

17           c.    Engaged in persistent courses of conduct within Tennessee and/or

18                 derived substantial revenue from the marketing of CRTs and CRT

19                 Products in Tennessee (and services relating to such marketing); and

20           d.    Committed acts or omissions that they knew or should have known

21                 would cause damage (and did, in fact, cause such damage) in

22                 Tennessee while regularly doing or soliciting business in Tennessee,

23                 engaging in other persistent courses of conduct in Tennessee, and/or

24                 deriving substantial revenue from the marketing of CRTs and CRT

25                 Products in Tennessee.

26        9.    The conspiracy described herein affected adversely every person nationwide,

27  and every person in Tennessee, who indirectly bought Defendants' CRTs and CRT products.

28

-4-

CLASS ACTION COMPLAINT

1    Defendants' conspiracy has resulted in an adverse monetary effect on indirect-purchasers

2    nationwide and in Tennessee.

3          10.      Prices of CRTs and CRT Products in Tennessee can be manipulated by

4    conspirators within that state, outside of it, or both. Without enforcing the antitrust and/or

5    consumer protection laws of Tennessee, companies that break the law will go unpunished.

6    Defendants knew that commerce in Tennessee would be adversely affected by implementing

7    their conspiracy.

8                      **THE PARTIES**

9      **A.**      **The Plaintiffs**

10         11.      William E. Stack, a resident of Tennessee, indirectly purchased a CRT and/or

11    CRT Product from one or more Defendants during the Class Period, and was injured as a

12    result of Defendants' illegal conduct.

13         12.      Margo Stack, a resident of Tennessee, indirectly purchased a CRT and/or

14    CRT Product from one or more of the Defendants during the Class Period, and was injured as

15    a result of Defendants' illegal conduct.

16      **B.**      **The Defendants**

17         13.      Chunghwa Picture Tubes, Ltd., a Taiwanese company with its principal place

18    of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan, is hereby named as a

19    defendant. Chunghwa was established in 1971 by Tatung Corporation to manufacture CRTs.

20    In 1974, Chunghwa's CRTs received certification by the United States, giving the company

21    entry into that market. By 1991, Chunghwa had claimed the leading position in the global

22    CRT industry. Ten years later, in 2001, Chunghwa remained one of the top two

23    manufacturers of CRTs worldwide with a 15 to 20 percent market share.  During the Class

24    Period, Chunghwa manufactured, sold, and distributed CRTs and/or CRT Products

25    throughout the United States.

26         14.      Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia"), a

27    Malaysian company with its principal place of business at Lot 1, Subang Hi-Tech Industrial

28    Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia, is hereby named as a

CLASS ACTION COMPLAINT

1    defendant. Chunghwa Malaysia is a wholly-owned and controlled subsidiary of Chunghwa.

2    Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the

3    leading worldwide suppliers of CRTs. Its product line ranges from 10-inch CRTs to 29-inch

4    CRTs.  During the Class Period, Chunghwa Malaysia manufactured, sold, and distributed

5    CRTs and/or CRT Products throughout the United States.

6         15.    Defendants Chunghwa Picture Tubes, Ltd. and Chunghwa Picture Tubes

7    (Maylaysia) Sdn. Bhd. are referred to collectively herein as "Chunghwa."

8         16.    Koninklijke Philips Electronics N.V. ("Royal Philips"), which translates to

9    Royal Philips Electronics, a Dutch entity with its principal place of business at Breitner

10   Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands, is hereby named as a

11   defendant. In 2000, Royal Philips was the leading global supplier of CRTs. In 2001, Royal

12   Philips entered into a joint venture with Defendant LG Electronics called LG.Philips

13   Displays, in which the entities combined their CRT businesses. On April 1, 2007, LG.Philips

14   Displays became an independent company and changed its name to LP Displays

15   International, Ltd.  During the Class Period, Royal Philips manufactured, sold, and

16   distributed CRTs and/or CRT Products throughout the United States.

17        17.    LG Electronics Inc. ("LG Electronics"), a Korean entity headquartered at LG

18   Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, South Korea 150-721, is hereby

19   named as a defendant. In 2001, LG Electronics entered into a joint venture with Defendant

20   Koninklijke Philips Electronics N.V. called LG.Philips Displays, in which the entities

21   combined their CRT businesses. In 2002, LG Electronics had a 24.4 percent worldwide CRT

22   market share. On April 1, 2007, LG.Philips Displays became an independent company and

23   changed its name to LP Displays International, Ltd.  During the Class Period, LG Electronics

24   manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

25        18.    LP Displays International, Ltd. ("LP Displays"), a Hong Kong company

26   located at 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong, is

27   hereby named as a defendant. LP Displays was formed as a CRT joint venture between

28   Defendants LG Electronics and Royal Philips, called Philips Displays. On April 1, 2007,

1    LG.Philips Displays became an independent company and changed its name to LP Displays.

2    LP Displays is a leading CRT supplier, and currently produces one in every four CRT

3    televisions and computer monitors sold. LP Displays had a worldwide CRT market share of

4    27% in 2006.  During the Class Period, LP Displays manufactured, sold, and distributed

5    CRTs and/or CRT Products to customers throughout the United States.

6         19.    Matsushita Electric Industrial Co., Ltd. ("Matsushita Electric"), a Japanese

7    entity located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan, is hereby named

8    as a defendant. In 2002, Matsushita Electric entered into a joint venture with Defendant

9    Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture

10   CRTs. Matsushita Electric was the majority owner with 64.5 percent. On April 3, 2007,

11   Matsushita Electric purchased the remaining 35.5 percent stake in the joint venture, making it

12   a wholly-owned subsidiary of Matsushita Electric. Matsushita Electric is best known for its

13   Panasonic brand, which in 2005 had the highest CRT revenue in Japan.  During the Class

14   Period, Matsushita Electric sold and distributed CRTs and/or CRT Products throughout the

15   United States.

16        20.    Matsushita Toshiba Picture Display Co., Ltd. ("MT Picture Display Co."), a

17   Japanese entity located at 1-1, Saiwai-cho, Takatsuki-shi, Osaka 569-1193, Japan, is hereby

18   named as a defendant.  MT Picture Display Co. was formed as a CRT joint venture between

19   Defendants Matsushita Electric and Toshiba. On April 3, 2007, Defendant Matsushita

20   Electric purchased the remaining stake in MT Picture Display Co., making it a wholly-owned

21   subsidiary.  During the Class Period, MT Picture Display Co. manufactured, sold, and

22   distributed CRTs and/or CRT products throughout the United States.

23        21.    Beijing-Matsushita Color CRT Company, Ltd. ("BMCC"), a Chinese

24   company with its principal place of business at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang

25   District, Beijing, China, is hereby named as a defendant. BMCC is the second largest

26   producer of CRTs for televisions in China.  During the Class Period, BMCC manufactured,

27   sold, and distributed CRTs and/or CRT Products throughout the United States.

28

CLASS ACTION COMPLAINT

1    22.    Defendants Matsushita Electric, MT Picture Display Co., and BMCC are

2  referred to collectively herein as "Matsushita."

3    23.    Orion Electric Co., Ltd., a Japanese company with its principal place of

4  business at 41-1 lehisa-cho Echizen-shi Fukui 915-8555, Japan, is hereby named as a

5  defendant. It is the parent company of the Orion entities. Orion Electric, Ltd. currently

6  manufactures CRTs and CRT Products for Defendant Toshiba Corporation.  During the Class

7  Period, Orion Electric Co., Ltd. manufactured, sold, and distributed CRTs and/or CRT

8  Products throughout the United States.

9    24.    Orion America, Inc., an Indiana corporation with its principal place of

10  business at Hwy 41 North, Orion Place, Princeton, Indiana, is hereby named as a defendant.

11  Orion America is a wholly-owned and controlled subsidiary of Defendant Orion Electric Co.,

12  Ltd.  During the Class Period, Orion America manufactured, sold, and distributed CRTs

13  and/or CRT Products throughout the United States.

14    25.    Defendants Orion Electric Co., Ltd. and Orion America, Inc. are referred to

15  collectively herein as "Orion."

16    26.    Panasonic Corporation of North America ("Panasonic"), a Delaware

17  corporation with its principal place of business at One Panasonic Way, Secaucus, New

18  Jersey, is hereby named as a defendant. Panasonic is a wholly-owned and controlled

19  subsidiary of Defendant Matsushita Electric.  During the Class Period, Panasonic sold and

20  distributed CRTs and/or CRT Products manufactured by Matsushita Electric.

21    27.    Philips Electronics North America ("Philips America"), a Delaware

22  corporation with its principal place of business at 1251 Avenue of the Americas, New York,

23  New York, 10020, is hereby named as a defendant. Philips America is a subsidiary of

24  Defendant Royal Philips.  During the Class Period, Philips America sold and distributed

25  CRTs and/or CRT Products manufactured by Royal Philips throughout the United States.

26    28.    Samsung SDI Co., Ltd. ("Samsung SDI"), a Korean company with its

27  principal place of business at 575 Shin-dong, Youngtong-gu Suwon, Kyonggi, South Korea,

28  is hereby named as a defendant. Samsung SDI is one of the largest CRT producers in the

1   world. Samsung SDI was the top manufacturer for CRTs in 2000, with a market share of

2   approximately 20%.  During the Class Period, Samsung SDI manufactured, sold, and

3   distributed CRTs and/or CRT Products throughout the United States.

4       29.    Samsung SDI America, Inc. ("Samsung America"), a California corporation

5   with its principal place of business at 3333 Michelson Drive, Suite 700, Irvine, California, is

6   hereby named as a defendant.  Samsung America is a wholly-owned and controlled

7   subsidiary of Defendant Samsung SDI.  During the Class Period, Samsung America sold and

8   distributed CRTs and/or CRT Products manufactured by Samsung SDI throughout the United

9   States.

10      30.    Defendants Samsung SDI Co., Ltd. and Samsung SDI America, Inc. are

11  referred to collectively herein as "Samsung."

12      31.    Samtel Color, Ltd. ("Samtel"), an Indian company with its principal place of

13  business at 52, Community Centre, New Friends Colony, New Delhi-110065, is hereby

14  named as a defendant. Samtel's market share for CRTs sold in India is approximately 40%,

15  and is that country's largest exporter of CRT Products. Samtel has gained safety approvals

16  from the United States, Canada, Germany, and Great Britain for its CRT Products.  During

17  the Class Period, Samtel manufactured, sold, and distributed CRTs and/or CRT Products

18  throughout the United States.

19      32.    Defendant TCL International Holdings Ltd. (TCL) is headquartered at 13th

20  Floor, TCL Tower, 8 Tai Chung Road, Tsuen Wan, Hong Kong.  During the Class Period,

21  TCL manufactured, sold and distributed CRTs and/or CRT Products throughout the United

22  States.

23      33.    Defendant Thomson S.A. (Thomson) is a French company, with its

24  headquarters at 46, quai Alphonse Le Gallo, Boulogne, France 92100.  During the Class

25  Period, Thomson manufactured, sold and distributed CRTs and/or CRT products throughout

26  the United States.

27      34.    Defendant TCL Thomson Electronics Corporation (TTE) is a joint venture

28  formed in 2004 by TCL and Thomson. TTE Corporation is headquartered at TCL Building,

-9-

CLASS ACTION COMPLAINT

1    South Nanhai Road, Nanshan District, Shenzhen, Guangdong, China. TTE is best known in

2    the United States for its "RCA" brand electronics.  During the Class Period, TTE

3    manufactured, sold and distributed CRTs and/or CRT Products throughout the United States.

4         35.    Defendants TCL, Thomson S.A. and TCL Thomson Electronics Corporation

5    shall be referred to collectively herein as "Thompson."

6         36.    Toshiba Corporation ("Toshiba Corp."), a Japanese company with its

7    principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan, is

8    hereby named as a defendant. In 2001, Toshiba held a 5 to 10 percent worldwide market

9    share for CRTs used in televisions and in computer monitors. In 2002, Toshiba entered into a

10   joint venture with Defendant Matsushita Electric called Matsushita Toshiba Picture Display

11   Co., Ltd., in which the entities consolidated their CRT businesses. In 2004, Toshiba entered

12   into a contract with Defendant Orion whereby Orion became the supplier and maker of

13   Toshiba-branded CRT televisions.  During the Class Period, Toshiba manufactured, sold, and

14   distributed CRTs and/or CRT Products throughout the United States.

15        37.    Toshiba America, Inc., a wholly-owned subsidiary of Toshiba, with its

16   principal place of business at 1251 Avenue of the Americas, New York, NY, is hereby

17   named as a defendant.  During the Class Period, said Defendant manufactured, marketed,

18   sold and/or distributed CRTs and/or CRT Products throughout the United States.

19        38.    Defendants Toshiba Corp. and Toshiba America, Inc. shall be referred to

20   hereinafter as "Toshiba."

21   **C.    Co-Conspirators**

22        39.    Various persons and entities, whose identities are at this time unknown to

23   Plaintiffs, participated as co-conspirators in the violations alleged herein and performed acts

24   and made statements in furtherance thereof.  When Plaintiffs learn the identities of such co-

25   conspirators, Plaintiffs will seek leave to amend this Complaint to add such co-conspirators

26   as defendants.

27        40.    The acts charged in this Complaint have been done by Defendants and their

28   co-conspirators, or were authorized, ordered, or done by their respective officers, agents,

1   employees, or representatives while actively engaged in the management of each Defendant's

2   business or affairs.

3          41.     Each of the Defendants named herein acted as the agent or joint venturer of or

4   for the other Defendants with respect to the acts, violations and common course of conduct

5   alleged herein. Each Defendant that is a subsidiary of a foreign parent acts as the sole United

6   States agent for CRTs and/or CRT Products made by its parent company.

7                            **FACTUAL ALLEGATIONS**

8          **A.     The CRT Industry**

9          42.     CRT is a widely used technology utilized in products such as TVs and

10  computer monitors that allow devices to display images upon the screen.

11         43.     Known for their brightness, resolution, rich colors, contrast, and reliability,

12  CRTs evolved from early black-and-white TV sets and monitors to today's high-resolution,

13  digital-ready graphic models. The basic components of a CRT are (a) a heated, cylindrical

14  cathode, or electron gun, that emits a steady stream of electrons; (b) a shadow mask that

15  directs the electron beams, (c) a phosphor-coated screen that absorbs the beams, (d) a

16  deflection yoke that directs the scanning electron beam, which strikes the screen to produce

17  light; and (e) an evacuated glass envelope that allows the entire process to take place in a

18  vacuum.

19         44.     CRTs are manufactured in several standard sizes, including 17 inch, 19 inch,

20  23 inch, and 27 inch. They are commodity products; those manufactured by Defendants are

21  interchangeable.

22         **B.     The CRT Market**

23         45.     CRTs have no independent utility, and have value only as components of

24  other products, primarily televisions and computer monitors. Original Equipment

25  Manufacturers ("OEMs") buy CRTs in order to include them as components in televisions

26  and computer monitors. The demand for CRTs thus directly derives from the demand for

27  CRT Products.

28

46.     The market for CRTs and the market for CRT Products are one and the same, because the CRT market exists to serve only the CRT Products market. The market for CRTs and the market for CRT Products are, for all intents and purposes, a single market, as one would not exist without the other.

47.     The largest direct purchasers of CRTs are television and computer OEMs. Significantly, many of the Defendants are (or were, during the Class Period) also CRT television and/or computer OEMs (original equipment manufacturers), such as Toshiba and Samsung SDI and/or its parent corporation.

48.     Plaintiffs and class members have participated in this market through their purchases of CRT Products. When Plaintiffs bought CRT Products, Defendants' unlawful conspiracy inflated the prices at which such products are sold to Plaintiffs and class members.

49.     The market for CRTs in the United States is extremely large. In 1997, the worldwide CRT market exceeded $24 billion. In 2006, industry experts estimated that televisions containing CRTs made up at least half of all of the projected 29,000,000 televisions shipped to North America that year.

50.     CRT televisions currently account for 37% of television set revenues in the United States.

C.    **Structural Features of the CRT Industry**

51.     The structure of the CRT industry facilitates collusion.

52.     During the Class Period, the Defendants collectively owned the majority of the market share for CRTs used in televisions and computer monitors.

53.     Defendant Samsung SDI is currently the largest manufacturer of products containing CRTs. In 2004, it held about 30% of the global CRT market.

54.     Defendant LP Displays currently has the second largest share of the global CRT market. In 2004, it held about 27% of the global CRT market.

55.     Defendant MT Picture Display Co. held about 9% of the global CRT market in 2004.

56.     Defendant Chunghwa held about 6.9% of the global CRT market in 2005.

57.     There are also significant barriers to entry in the CRT industry in the form of high manufacturing and technological barriers to entry. Construction and maintenance of fabrication plants is extremely expensive. Because of technological advances, manufacturers' research and development expenses are extremely high.

58.     There are multiple interrelated business relationships in the CRT industry. For example, in November 2000, Defendants LG Electronics and Royal Philips agreed to enter into a joint venture that combined their CRT manufacturing operations. The resulting company (Defendant LP Displays) entered the market with a 25% share of the global CRT market.

59.     Defendants Matsushita Electric and Toshiba also entered into a joint venture combining their CRT manufacturing operations during the Class Period. The resulting company, Defendant MT Picture Display Co., immediately enjoyed a significant share of the global CRT market.

60.     In 2002, Matsushita Electric and TCL formed a "collaborative relationship" in the consumer electronics business. The stated purpose of the collaboration is to "achiev[e] mutually beneficial effects" by supply of cathode-ray tubes to TCL from Matsushita Electric, sales of Matsushita Electric's products through TCL's sales channels in China, collaboration in the supply of products, including televisions, through OEM and ODM (original design manufacturing) and collaboration on research and development

61.     In 2005, Defendants Samsung SDI and LP Displays f/k/a LG Philips Displays also entered into an agreement to work together by sharing parts with respect to CRTs.

**D.      The Defendants' Illegal Conspiracy**

62.     The price of CRTs or CRT Products during the Class Period did not fully reflect the sharp decline in demand for CRTs caused by the entry of the new generation of competing technologies. Despite the introduction of technologically superior and increasingly popular alternatives to televisions and monitors using CRTs, the price of CRTs

1   or CRT Products remained artificially high throughout the Class Period, with periods of

2   sustained and unnatural price stability.

3       63.    CRTs, as the established technology, had a distinct price advantage over these

4   new technologies. In contrast to an emerging industry where participants invest heavily in

5   research, development, and bringing capacity online, the CRT industry made and recouped

6   such investments long before the start of the Class Period.  Thus, CRT manufacturers had

7   very little debt or interest expense on their facilities, and the pressure to produce at full

8   capacity (to avoid default) was lessened.  The concentration of CRT manufacturers, the

9   declining CRT share of the total market for television and computer screens, and the higher

10  price of FPD Products gave Defendants the means and incentive to conspire and collude to

11  artificially fix, maintain, and/or stabilize the prices at which CRTs and CRT Products were

12  sold.

13      64.    During the Class Period, the CRT industry faced significant market pressures

14  and reduced profitability.  As stated in a September 25, 2001 article on ZDNet News entitled

15  Report. CRT Revenue to plunge:

16          After decades of growth, revenue from cathode ray tube
            monitors is expected to drop significantly over the next several
17          years … 'A combination of price erosion, a slowing in the
            movement to large screens, and a gradual shift in market
18          opportunities from developed regions to developing regions is
            causing the drop in revenue,' Stanford Resources analyst
19          Rhonda Alexander said Tuesday. The growing popularity of
            flat panel monitors will also have an effect on CRT revenue.
20

21      65.    Market research firm iSuppli Corp. predicted in 2006 that sales of LCD

22  televisions in 2007 would, for the first time, surpass sales of CRT televisions.  The firm also

23  forecasted that sales of CRTs would drop from an estimated 14.4 million units in 2006 to

24  10.4 million units in 2007.  iSuppli predicted that in 2010, CRT televisions would account for

25  only 2.1 million of the 44 million televisions sold.

26      66.    Due to their price and durability, CRTs still remain popular in schools and

27  other public areas, as well as in developing countries like China. CRT technology is also

28  maintaining its popularity in the area of low-cost monitor and smaller size televisions.

-14-

CLASS ACTION COMPLAINT

1   According to Japanese industry estimates, some 60 percent of the demand for color

2   televisions in the 12 month period ending in March of 2008 will be for CRT-based models.

3   Recent press reports have indicated that slim CRT televisions developed by Samsung and LG

4   Electronics may help to revitalize the category.

5        67.    DisplaySearch Inc. predicts that the worldwide capacity to manufacture CRTs

6   will decrease from over 250 million units in 2006 to less than 150 million units by 2010. At

7   various times during the conspiracy, in order to keep prices high, Defendants colluded to

8   restrain output of CRTs as alleged below.

9        68.    The Defendants herein consolidated their manufacturing facilities in lower-

10   cost venues such as China and reduced manufacturing capacity to prop up prices during the

11   Class Period.

12        69.    On July 15, 2003, Mitsubishi Electric closed a CRT plant in northern Mexico,

13   just five years after the plant was opened. The plant's closure resulted in a loss of capacity to

14   manufacture 2.7 million CRTs a year for 17-inch computer monitors. This was one of the

15   principal applications for CRTs during this time period.

16        70.    In December of 2004, MT Picture Display Co. closed its American

17   subsidiary's operations in Horseheads, New York citing price and market erosion. Matsushita

18   Electric announced that the closing was part of the company's "global restructuring

19   initiatives in the CRT business." The company further stated that in the future, "CRTs for the

20   North American market will be supplied by other manufacturing locations in order to

21   establish an optimum CRT manufacturing structure."

22        71.    In December 2004, Toshiba announced that it too would discontinue

23   manufacturing traditional CRT televisions. Thereafter, Toshiba entered into an agreement to

24   have Orion manufacture all Toshiba-brand CRT televisions.

25        72.    In July 2005, LG Philips discontinued CRT production at its Durham,

26   England facility, citing a shift in demand from Europe to Asia.

27        73.    In December 2005, MT Picture Display Co. announced it would close its

28   American subsidiary's operations in Ohio. The company also announced that it would close

1   its operations in Germany, by early 2006. Similar to LG Philips, the company explained that

2   it was shifting its CRT operations to Asian and Chinese markets.

3       74.   In late 2005, Samsung SDI closed its CRT factory in Germany, following the

4   lead of other CRT manufacturers.

5       75.   In July 2006, Orion America shut down a CRT manufacturing plant in

6   Princeton, Indiana. In the same month, Matsushita Electric announced it was shutting down

7   its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

8       76.   Plaintiffs are informed and believe, and thereon allege, that in order to control

9   and maintain profitability during a time when the demand for CRTs was declining,

10   Defendants conspired to fix, raise, maintain, and stabilize the price at which CRT Products

11   were sold in the United States at artificially inflated and anticompetitive levels.

12       77.   Despite the ever-increasing popularity of, and intensifying competition from,

13   flat panel displays, prices for CRTs were "stuck stubbornly at high price levels" throughout

14   1995 according to a CNET News.com article.  This price stabilization was purportedly due to

15   a shortage of critical components such as glass.  However, this was a pretext used to conceal

16   the conspiracy.

17       78.   On June 1, 2004, LG Electronics raised the prices of its 15-inch and 17-inch

18   CRT monitors in India.  This price hike was falsely attributed to a shortage of glass needed to

19   manufacture CRTs.

20       79.   Over the course of the conspiracy period, despite the natural trend in most

21   technology products to go down over time, the price of CRTs remained stable, and in some

22   instances went up in an unexplained manner. Given the mature nature of CRT technology,

23   the costs of production were relatively low compared to other emerging technologies. Yet,

24   CRT prices withstood downward price pressures and remained stable over a period of many

25   years. Even in periods of declining prices caused by outside factors, such as the Asian

26   currency crisis, the prices of CRT Products did not fall as much as they would have absent

27   anticompetitive conduct.  As Finsen Yu, President of Skyworth Macao Commercial Offshore

28

CLASS ACTION COMPLAINT

1  Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT

2  technology is very mature; prices and technology have become stable."

3      80.  Defendants' collusive activities have also been furthered by trade associations

4  and trade events which provided opportunities to conspire and share information. One

5  example is the Korea Display Conference ("KDC"), hosted by Displaybank and, since the

6  summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry

7  Association. KODEMIA is a national trade organization representing approximately 80

8  member companies in the Korean display industry, including manufacturers and suppliers.

9  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display

10  Industrial Research Association of Korea. EDIRAK had a stated goal of "promoting co-

11  activity with foreign organizations related to display industries."

12      81.  Samsung and LG Electronics were members of both KODEMIA and

13  EDIRAK, and have participated extensively in the KDCs. In addition to Samsung and LG

14  Electronic's participation in EDIRAK, Orion Electric Co., Ltd. and LP Displays f/k/a LG

15  Philips Displays were also members of the association.

16      82.  The KDC has taken place in Seoul, Korea or other Korean venues on

17  December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24,

18  2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives in the

19  CRT operations of Samsung, LG Electronics, and Hitachi attended these events, including,

20  among others, H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Oyun and H.C. Kim of

21  Samsung, S.T. Kim, S. Trinker and Ney Corsino of LG Electronics, and Zenzou Tashima of

22  Hitachi.

23      83.  In May of 2007, EDIRAK and KODEMIA were subsumed into the Korean

24  Display Industry Association ("KDIA"). The companies which were the initial participants in

25  this association included those within Samsung and LG Electronics which had responsibility

26  for CRT Products. Lee Sang-Wan of Samsung promised that "[w]e will carve out the future

27  of the industry through official gatherings of the association."

28

84. This cooperation is not confined to South Korea. In August of 2007, Samsung's Lee Sang-Wan stated:

> [M]ore than any other industry field, the global partnership among the companies in the display field has been in good operation, and this has been the driving force behind the technology development of displays and industrial growth . . . . [O]ur association, too, plans to seek global coexistence and cooperation among the panel producing countries that happen to be concentrated in Northeast Asia; that is Japan, Taiwan, and China. Specifically, we plan to set up a system that can handle the matters related with the information sharing between the producers, cope with the issues of intellectual property rights, request governments to improve systems and jointly deal with the regulations of North America and Europe. To achieve this, we plan to arrange a meeting among the heads of display associations so that they can discuss ways to enhance mutual cooperation within the end of this year.

85. Other opportunities to collude among the Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

86. This conspiracy resulted in artificially higher prices for CRTs and CRT Products which were fundamentally inconsistent with the low demand for them and their rapidly approaching obsolescence.

E.   **International Antitrust Investigations**

87. On or about November 8, 2007, government agencies from Japan, South Korea, the European Union and the United States each opened coordinated investigations into CRT manufacturers based on a plausible belief that they formed an international cartel to fix the prices for CRTs.

88. On or about November 8, 2007, news reports stated that CRT manufacturers are "suspected of holding meetings to discuss the price targets in Southeast Asian countries where CRT manufacturing bases are located." Another stated that "[t]he CRT manufacturers are suspected of operating an international cartel since 2005 or earlier."

89.     On or about November 8, 2007, Defendant Matsushita Electric Industrial Company confirmed that Japan's Fair Trade Commission raided MT Picture Display Co. as part of this international price-fixing investigation. Akira Dadota, a spokesman for Matsushita, admitted that Japan's Fair Trade Commission conducted an on-site inspection of MT Picture Display Co.'s offices in Japan. Up until earlier 2007, MT Picture Display Co. was formerly owned by Toshiba Corp. as well as Matsushita Electric.

90.     On or about November 8, 2007, Defendant Samsung SDI confirmed that South Korea's Fair Trade Commission launched a probe into Samsung SDI as part of this international price-fixing investigation.

91.     On or about November 8, 2007, news reports stated that Defendant LP Displays was visited by antitrust regulators as part of this international price-fixing investigation.

92.     On or about November 12, 2007, Defendant Chunghwa Picture Tubes admitted that the company had received a summons from the United States Department of Justice ("DOJ") as part of this international price-fixing investigation.

93.     On or about November 21, 2007, Defendant Royal Phillips admitted that the company is the subject of this international price-fixing investigation.

**F.     Recent Department of Justice Action**

94.     On February 21, 2008, the DOJ filed a motion to intervene in the pending CRT price-fixing litigation, citing its "ongoing criminal grand jury investigation."

95.     In order for the DOJ to institute a grand jury investigation, a DOJ Antitrust Division attorney must believe that a crime has been committed and prepare a detailed memo to that effect. Antitrust Grand Jury Practice Manual, Vol. 1, Ch. I.B.1. Then, the request for a grand jury must be approved by the Assistant Attorney General for the Antitrust Division based on the same standard of a crime having been committed. The fact that the DOJ Antitrust Division's investigation is criminal, as opposed to civil, is particularly relevant to the plausibility of the allegations of CRT and CRT Product price-fixing. The Antitrust Division's "Standards for Determining Whether to Proceed by Civil or Criminal

-19-

1    Investigation" state: "In general, current Division policy is to proceed by criminal

2    investigation and prosecution in cases involving horizontal, *per se* unlawful agreements such

3    as price fixing, bid rigging and horizontal customer and territorial allocations. Antitrust

4    Division Manual, Ch. III.C.5. (emphasis added).  In short, the DOJ's initiation and

5    continuation of criminal proceedings shows that there is good reason to believe that

6    Defendants violated the antitrust laws.

7        **G.**    **The Pass-Through of the Overcharges To End-Users**

8        96.    OEMs of televisions and monitors containing CRTs and retailers of CRT

9    Products would be subject to vigorous price competition absent Defendants' collusion.

10   Televisions and computer monitors are commodities, with little or no brand loyalty, such that

11   aggressive pricing causes businesses and consumers to switch preferences to different brands.

12   Television and computer monitor prices are based on production costs, which are in turn

13   directly determined by component costs, as assembly costs are minimal.  OEMs accordingly

14   use component costs, like the cost of CRTs, as the starting point for all price calculations.

15   Television and computer monitor prices thus closely track increases in component costs.

16   Likewise, retailers set the price of CRT Products based on the costs of good sold.  When

17   Samsung, for example, increases the prices of its CRT Products to retailers, retailers pass on

18   these increased costs to their customers.

19       97.    Defendants' conspiracy to raise, fix, or maintain the price of CRTs at artificial

20   levels resulted in harm to Plaintiffs and the classes alleged herein because it resulted in their

21   paying higher prices for CRT Products than they would have in the absence of Defendants'

22   conspiracy.  The entire supracompetitive overcharge for CRTs at issue was passed on to

23   Plaintiffs and the class members.

24       98.    An increase in the cost of purchasing a CRT or a CRT Product by OEMs or

25   retailers significantly affects the price consumers will ultimately pay.

26       99.    CRTs account for a significant percentage of the overall cost of a television or

27   computer monitor. For example, CRTs account for approximately thirty percent (30%) of the

28   cost of a television set.

100.    CRTs are commodity products, with functionally equivalent products available from the Defendants, which manufacture them pursuant to standard specifications and sizes.

101.    Because OEMs and retailers have thin net margins, they must pass on any increase in component costs, such that increases in the price of CRTs and CRT Products lead to quick corresponding price increases at the OEM and retail level.

**H.    The Effect of the Price of CRTs on the Price of Products**

102.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. CRTs are identifiable, discreet physical objects that do not change form or become an indistinguishable part of TVs or computer monitors.

103.    Thus, CRTs follow a traceable physical chain from the Defendants to the OEMs to the purchasers of the finished products incorporating the CRT.

104.    Moreover, just as CRTs can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers such as OEMs and retailers of CRTs and CRT Products affect prices paid by indirect purchasers of CRT Products.

105.    Because Defendants control the market for CRTs, there are virtually no choices for persons and businesses that require CRT Products other than buying such products manufactured by a direct purchaser that paid supracompetitive prices for CRTs to Defendants because of Defendants' conspiracy alleged herein.

106.    When distribution markets are highly competitive, as they are in the case of televisions and monitors containing CRTs, all of the overcharge will be passed through to ultimate end user businesses and consumers, such as the Plaintiffs and class members.  In addition, most of the Defendants themselves manufacture, market, and distribute televisions and monitors containing CRTs. This means that these Defendants will pass through to their customers 100% of the supracompetitive price increases that result from the Defendants' conspiracy, combination, and agreement to fix, increase, and stabilize the prices for CRTs.

107.   Hence, the inflated prices of CRT Products resulting from Defendants' price-fixing conspiracy have been passed on to Plaintiffs and the other class members by direct purchasers.

108.   During the Class Period, a number of large OEMs sold televisions and monitors containing CRTs directly to consumers. For example, the OEM with the largest share of computer monitor sales in the United States market, Dell, sold exclusively to consumers, as did Gateway.  During the Class Period, Compaq and Apple also sold large portions of their computer monitors directly to the consumers.

109.   Computer monitors sold by direct-purchasing OEMs to retailers were generally updated several times a year, and the price was changed for each new model. OEMs, distributors and retailers often use a "standard markup" method to set prices, meaning that they add a standard percentage to their costs to determine selling prices. Thus, changes in the price of CRTs were passed on rapidly and were not absorbed.

110.   In retailing, it is common to use a "markup rule." The retail price is set as the wholesale cost plus a percentage markup designed to recover non-product costs and to provide a profit. This system guarantees that increases in costs to the retailer will be passed on to end buyers. For example, CDW, a large seller of computer monitors, uses such a system, and a declaration in the DRAM case from CDW's director of pricing details exactly how they calculated selling prices:

> In general, CDW employs a "building block" approach to setting its advertised prices. The first building block is the Cost of Goods Sold (COGS), which represents the price CDW paid to acquire the product ... CDW ... adds a series of positive markups to the cost to CDW to acquire a given product. These markups are in addition to the pass through effect of changes in the costs charged to CDW for that product by a given vendor.

111.   The economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. As Professor Herbert Hovenkamp, a noted antitrust scholar has stated in his treatise, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITITON AND ITS PRACTICE (1994) at 624:

1

2

3

4

5

6

> A monopoly overcharge at the top of a distribution chain generally results in higher prices at every level below. For example if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain likely will be poorer as a result of the monopoly price at the top.

7

8

> Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

9    112.    Similarly, two other antitrust scholars -- Professors Robert G. Harris

10   (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas

11   School of Business at the University of California at Berkeley) and the late Lawrence A.

12   Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the

13   Handbook of the Law of Antitrust) -- have observed that "in a multiple-level chain of

14   distribution, passing on monopoly overcharges is not the exception: it is the rule."

15   113.    As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for

16   Information and Computer Science and Professor of Economics and Public Policy at the

17   University of Michigan), an expert who presented evidence in a number of the indirect-

18   purchaser antitrust class action involving Microsoft Corporation, said (in a passage quoted in

19   the judicial decision in that case granting class certification):

20

21

22

23

24

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers... Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

25   114.    The purpose and effect of the conspiratorial conduct of the Defendants was to

26   raise, fix or stabilize the price of CRTs and CRT Products. Economists have developed

27   techniques to isolate and understand the relationship between one "explanatory" variable and

28   a "dependent" variable in those cases when changes in dependent variable are explained by

-23-

CLASS ACTION COMPLAINT

changes in a multitude of variables – when all such variables may be changing simultaneously. That analysis – called regression analysis – is commonly used in the real world and in litigation to determine the impact of a price increase on one component part in a product (or service) that is an assemblage of many parts. Thus, it is possible to isolate and identify only the impact of an increase in the price of CRTs on prices for televisions and monitors containing CRTs even though such products contain a number of other components, whose prices may change over time. A regression model can explain how variation in the price of CRTs affects changes in the price of televisions and monitors containing CRTs. In such models, rather than being treated as the dependent variable, the price of CRTs is treated as an independent or explanatory variable. The model can isolate how changes in the price of CRTs impact the price of televisions and monitors containing such CRTs while holding controlling for the impact of other price-determining factors.

115.    Economic and legal literature recognizes that the more pricing decisions are based on cost, the easer it is to determine the pass-through rate. The directness of affected costs refers to whether an overcharge affects a direct (*i.e.*, variable) cost or an indirect (*i.e.*, overhead) cost. Overcharges will be passed-through sooner and at a higher rate if the overcharge affects direct costs. Here CRTs are a direct (and substantial) cost of products containing CRTs.

116.    Other factors that lead to the pass-through of overcharges include:  (i) whether price changes are frequent; (ii) the duration of the anti-competitive overcharge; (iii) whether pricing decisions are based on cost; (iv) whether the overcharge affects variable, as opposed to overhead, costs; (v) whether the resellers' production technology is uniform; (vi) whether the reseller supply curve exhibits a high degree of elasticity; and (vii) whether the demand of the resellers is inelastic.  All of these factors were present in the CRT and CRT Products market during the Class Period.  The precise amount of such an impact on the prices of products containing CRTs can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed through the chain of distribution.

1    117.    Plaintiffs and the class members have been forced to pay supracompetitive

2    prices for CRT Products. These inflated prices have been passed on to them by direct-

3    purchaser OEMs, distributors, and retailers. Those overcharges have unjustly enriched

4    Defendants.

5                           **CLASS ACTION ALLEGATIONS**

6    118.    Plaintiffs bring this action on their own behalf and as a class action pursuant

7    to Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the following

8    class (the "Nationwide Class"):

9            All persons and entities residing in the United States who, from
             January 1, 1998 through and including November 9, 2007,
10           indirectly purchased in the United States, for their own use and
             not for resale, a CRT or CRT Product which was manufactured
11           and/or sold by one or more of the Defendants. Specifically
             excluded from this Class are the Defendants; the officers,
12           directors or employees of any Defendant; any entity in which
             any Defendant has a controlling interest; and any affiliate, legal
13           representative, heir or assign of any Defendant. Also excluded
             are any judicial officer presiding over this action and the
14           members of his/her immediate family and judicial staff, and
             any juror assigned to this action.
15

16    119.    Plaintiffs also bring this action on their own behalf and as a class action

17    pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the

18    following class or subclass (the "Tennessee Class"):

19           All persons and entities residing in Tennessee who, from
             January 1, 1998 through and including November 9, 2007,
20           indirectly purchased a CRT or CRT Product manufactured
             and/or sold by one or more of the Defendants for their end use
21           and not for resale. Specifically excluded from this Class are the
             Defendants; the officers, directors or employees of any
22           Defendant; any entity in which any Defendant has a controlling
             interest; and any affiliate, legal representative, heir or assign of
23           any Defendant. Also excluded are any judicial officer presiding
             over this action and the members of his/her immediate family
24           and judicial staff, and any juror assigned to this action.

25    120.    Plaintiffs do not know the exact size of the classes at the present time.

26    However, Plaintiffs believe that, due to the nature of the trade and commerce involved, there

27    are at least thousands in each of the classes, and hundreds of thousands of class members

28

---

1  geographically dispersed throughout the United States, such that joinder of all class members

2  would be impracticable.

3      121.  Plaintiffs' claims are typical of the claims of the classes, and Plaintiffs will

4  fairly and adequately protect the interests of the classes.  Plaintiffs' interests are coincident

5  with, and not antagonistic to, those of the class members.  Plaintiffs have retained competent

6  counsel experienced in class action and complex antitrust and consumer protection litigation.

7      122.  Common questions of law and fact exist, including:

8        a.  Whether Defendants and their Co-Conspirators engaged in a contract,

9  combination or conspiracy among themselves to fix, raise, maintain or

10  stabilize the process of, or allocate the market of, CRTs or CRT

11  Products sold in the United States;

12        b.  The duration and extent of the contract, combination or conspiracy;

13        c.  Whether the Defendants and their co-conspirators were participants in

14  the contracts, combinations or conspiracies alleged herein;

15        d.  Whether Defendants and their co-conspirators engaged in conduct that

16  violated Section 1 of the Sherman Act;

17        e.  Whether Defendants and their co-conspirators engaged in unlawful,

18  unfair or deceptive contracts, combinations or conspiracies among

19  themselves, express or implied, to fix, raise, maintain, or stabilize

20  prices of CRTs or CRT Products sold in and/or distributed in the

21  United States;

22        f.  Whether the Defendants and their co-conspirators engaged in conduct

23  in violation of the antitrust laws of Tennessee;

24        g.  Whether the anticompetitive conduct of the Defendants and their co-

25  conspirators caused prices of CRTs or CRT Products to be artificially

26  inflated to non-competitive levels;

27

28

CLASS ACTION COMPLAINT

h.      Whether the Defendants and their co-conspirators unjustly enriched themselves as a result of their inequitable conduct at the expense of the members of the classes;

i.      Whether Defendants and their co-conspirators fraudulently concealed the existence of their unlawful conduct;

j.      Whether Plaintiffs and the class members are entitled to injunctive relief; and

k.      Whether Plaintiffs and other members of the Tennessee Class were injured by the conduct of Defendants and, if so, the appropriate measure of damages for the Tennessee Class.

123.    These and other questions of law and fact are common to the classes and predominate over any questions affecting only individual class members, including legal and factual issues relating to liability, damages, and restitution.

124.    Class action treatment is a superior method for the fair and efficient adjudication of this controversy because:

a.      It will avoid a multiplicity of suits and consequent burden on the courts and Defendants;

b.      It would be virtually impossible for all members of the classes to intervene as parties-plaintiff in this action;

c.      It will allow numerous individuals with claims too small to adjudicate on an individual basis, because of the prohibitive cost of this litigation, to obtain redress for their economic injuries;

d.      It is appropriate for treatment on a fluid recovery basis, which obviates any manageability problems; and

e.      It will provide court oversight of the claims process, once Defendants' liability is adjudicated.

125.    Plaintiffs will fairly and adequately protect the interests of the classes in that Plaintiffs have no interests antagonistic to the interests of the other class members, and have

-27-

CLASS ACTION COMPLAINT

1   retained counsel competent and experienced in the prosecution of class actions and antitrust

2   cases to represent themselves and the classes.

3        126.    This case is also appropriate for certification as a class action because the

4   Defendants have acted and refused to act on grounds generally applicable to the classes, so

5   that final injunctive relief will be appropriate with respect to the classes as a whole.

6        127.    The claims asserted herein are also appropriate for class certification under

7   Tennessee law.

8                          **FRAUDULENT CONCEALMENT**

9        128.    Plaintiffs and the Class members did not discover and could not have

10  discovered, through the exercise of reasonable diligence, the existence of the conspiracy

11  alleged herein until after November 9, 2007, when the investigations by the DOJ and other

12  antitrust regulators became public, because Defendants and their co-conspirators actively and

13  fraudulently concealed the existence of their contract, combination or conspiracy. Because

14  Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs and class

15  members were unaware of Defendants' unlawful conduct alleged herein and did not know

16  that they were paying artificially high prices for CRTs or CRT Products.

17       129.    By its very nature, Defendants' price-fixing conspiracy was inherently self-

18  concealing. As alleged above, Defendants had secret discussions about price and output.

19  Defendants agreed not to discuss publicly the existence or the nature of their agreement.

20       130.    As alleged above, despite increased competition from flat panel monitors,

21  prices for CRT monitors were "stuck stubbornly at high price levels." This price

22  stabilization was purportedly the result of a shortage of critical components such as glass.

23  This was a pretext used to conceal the conspiracy.

24       131.    Additionally, when several CRT manufacturers, including Defendants

25  Samsung, Philips, and LG Electronics, increased the price of CRT Products in 2004, the price

26  hike was attributed to a shortage of glass shells use for manufacturing CRT monitors. In

27  justifying this price increase, a Deputy General Manager for an LG Electronics distributor in

28  India stated (in an article available at

1   www.techtree.com/techtree/jsp/article.jsp?article_id=52715&cat_id=581), that "[t]his

2   shortage [of glass shells] is a global phenomena and every company has to increase the prices

3   of CRT monitors in due course of time."

4        132.   Plaintiffs had no reason to disbelieve these statements which on their face

5   appeared to explain reasonably the increase in the prices of CRTs and CRT Products.

6   Furthermore, most of the explanations provided by Defendants involved non-public and/or

7   proprietary information that was within Defendants' control, such that Plaintiffs and the class

8   members could not verify their accuracy. Defendants' purported reasons for the price

9   increases of CRTs were materially false and misleading and were made for the purpose of

10  concealing Defendants' anti-competitive scheme as alleged herein.

11       133.   These affirmative acts of the Defendants, including acts in furtherance of the

12  conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

13       134.   As a result of Defendants' fraudulent concealment of their conspiracy, the

14  running of any statute of limitations has been tolled with respect to any claims that Plaintiffs

15  and the class members have as a result of the anticompetitive conduct alleged in this

16  Complaint.

17                          **VIOLATIONS ALLEGED**

18                          **First Claim for Relief**
                   **(Violation of Section 1 of the Sherman Act)**
19

20       135.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and

21  every allegation set forth in the preceding paragraphs of this Complaint.

22       136.   Beginning at a time currently unknown to Plaintiffs, but at least as early as

23  January 1, 1997, and continuing through November of 2007, the exact dates being unknown

24  to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement,

25  understanding, and conspiracy in restraint of trade artificially to fix, raise, stabilize, and peg

26  prices for CRTs and CRT Products sold in the United States, in violation of Section 1 of the

27  Sherman Act (15 U.S.C. § 1).

28

137.   In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

a.   Fixing, raising, stabilizing, and pegging the price of CRTs and CRT Products; and

b.   Allocating among themselves and collusively reducing the production of CRTs and CRT Products.

138.   The combination and conspiracy alleged herein has had the following effects, among others:

a.   Price competition in the sale of CRTs and CRT Products has been restrained, suppressed, and/or eliminated in the United States;

b.   Prices for CRTs and CRT Products sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

c.   Those who purchased CRTs and CRT Products directly or indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

139.   Plaintiffs and other Nationwide Class members have been injured and will continue to be injured in their businesses and property by paying more for CRTs and CRT Products purchased indirectly from the Defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy.

140.   Plaintiffs and the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

///

///

///

**Second Claim for Relief**
**(Unjust Enrichment and Disgorgement of Profits)**

141.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

142.   Defendants have been unjustly enriched through overpayments by Plaintiffs and class members and the resulting profits.

143.   Under principles of unjust enrichment which exist in every state, Defendants should not be permitted to retain the benefits conferred *via* overpayments by Plaintiffs and class members.

144.   Plaintiffs and all members of the Nationwide Class seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and class members may seek restitution.

**Third Claim for Relief on Behalf Of Tennessee Class**
**(Violation of the Tennessee Antitrust Law)**

145.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

146.   Defendants' intentional and purposeful anti-competitive acts that are described above including but not limited to acts of collusion to set prices and the actual act of price-fixing itself was intended to and did cause Plaintiffs to pay supra-competitive prices for CRT and CRT Products in Tennessee.

147.   Defendants' monopolistic and anticompetitive acts as described above violate the antitrust law of the state of Tennessee (Tenn. Code Ann. §§ 47-25-101, *et seq.*), as follows:

a.   Defendants' combinations or conspiracies had the following effects: (1) price competition for CRTs and CRT Products was restrained, suppressed and eliminated throughout Tennessee; (2) prices for CRTs and CRT Products were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and the

-31-

1   members of the Tennessee Class were deprived of free and open

2   competition; and (4) Plaintiffs and members of the Tennessee Class

3   paid supracompetitive, artificially inflated prices for CRTs and CRT

4   Products.

5        b.    During the Class Period, Defendants' illegal conduct had a substantial

6   effect on Tennessee commerce as CRTs and CRT Products were sold

7   in Tennessee.

8        c.    As a direct and proximate result of Defendants' unlawful conduct,

9   Plaintiffs and members of the Tennessee Class have been injured in

10   their business and property and are threatened with further injury.

11        d.    By reason of the foregoing, Defendants have entered into agreements

12   in restraint of trade in violated of Tennessee Code Ann. §§ 47-25-101,

13   *et seq.* Accordingly, Plaintiffs and all members of the Tennessee Class

14   seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et*

15   *seq.*

16   148.   Plaintiffs and the Tennessee Class seek actual damages for their injuries

17   caused by these violations in an amount to be determined at trial.

18   149.   Plaintiffs and the Tennessee Class further seek treble damages and attorneys'

19   fees pursuant to the Tennessee antitrust laws to the extent allowed by law.

20   150.   Plaintiffs and the Tennessee Class further seek attorneys' fees and costs

21   pursuant to Tennessee law to the extent allowed by law, due to Defendants' willful and

22   unlawful conduct as alleged above.

23   **PRAYER FOR RELIEF**

24   WHEREFORE, Plaintiffs pray:

25   A.   That the Court determine that the Sherman Act, unjust enrichment, and

26   Tennessee antitrust law claims alleged herein may be maintained as class actions under Rules

27   23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, as informed by the

28   respective state class action laws.

1    B.    That the unlawful conduct, contract, conspiracy or combination alleged herein

2    be adjudged and decreed to be:

3         1.    A restraint of trade or commerce in violation of Section 1 of the

4                Sherman Act, as alleged in the First Claim for Relief;

5         2.    Acts of unjust enrichment as set forth in the Second Claim for Relief;

6                and

7         3.    An unlawful combination, trust, agreement, understanding, and/or

8                concert of action in violation of the Tennessee antitrust laws identified

9                in the Third Claim for Relief.

10   C.    On the First Claim for Relief, that Defendants, their affiliates, successors,

11   transferees, assignees, and the officers, directors, partners, agents, and employees thereof,

12   and all other persons acting or claiming to act on their behalf or in concert with them, be

13   permanently enjoined and restrained from in any manner continuing, maintaining, or

14   renewing the conduct, contract, conspiracy or combination alleged herein, or from entering

15   into any other conspiracy alleged herein, or from entering into any other contract, conspiracy

16   or combination having a similar purpose or effect, and from adopting or following any

17   practice, plan, program, or device having a similar purpose or effect;

18   D.    On the Second Claim for Relief, that the Plaintiffs and the members of the

19   Nationwide Class recover the amounts by which the Defendants have been unjustly enriched

20   as a result of their unlawful conduct;

21   E.    On the Third Claim for Relief, that the Plaintiffs and the members of the

22   Tennessee Class recover damages, to the maximum extent allowed under Tennessee law, and

23   that a joint and several judgment in favor of Plaintiffs and the Tennessee Class be entered

24   against the Defendants in an amount to be trebled to the extent permitted by applicable law;

25   F.    That Plaintiffs and members of the classes identified herein be awarded pre-

26   and post-judgment interest as provided by law, and that such interest be awarded at the

27   highest legal rate from and after the date of service of the initial complaint in this action;

28

CLASS ACTION COMPLAINT

1      G.      That Plaintiffs and members of the classes identified herein recover their costs

2  of suit, including reasonable attorneys' fees, as provided by law; and

3      H.      That Plaintiffs and members of the classes identified herein have such other,

4  further, and different relief as the case may require and the Court may deem just and proper

5  under the circumstances.

6  Dated: March 7, 2008        By:         _____

                                            Matthew R. Schultz (220641)

7

8                          Francis O. Scarpulla (41059)
                          Craig C. Corbitt (83251)

9                          Judith A. Zahid (215418)
                          Traviss Galloway (234678)

10                       ZELLE HOFMANN VOELBEL MASON
                               & GETTE LLP

11                       44 Montgomery Street, Suite 3400
                        San Francisco, CA  94104

12                       Telephone:   (415) 693-0700
                        Facsimile:    (415) 693-0770

13                       fscarpulla@zelle.com
                        ccorbitt@zelle.com

14                       Terry Rose Saunders
                        Thomas A. Doyle

15                       SAUNDERS & DOYLE
                        20 South Clark Street, Suite 1720

16                       Chicago, IL  60603
                        Telephone:   (312) 551-0051

17                       Facsimile:    (312) 551-4467
                        trsaunders@saundersdoyle.com

18                       tadoyle@saundersdoyle.com

19                       Christopher Lovell
                        Imtiaz Siddiqui

20                       LOVELL STEWART & HALEBIAN, LLP
                        500 Fifth Avenue, 58th Floor

21                       New York, NY  10110
                        Telephone:  (212) 608-1900

22                       Facsimile:  (212) 719-4677
                        clovell@lshllp.com

23

24                       Attorneys for Plaintiffs

25

26

27

28

1

## JURY TRIAL DEMAND

2      Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a

3   trial by jury.

4   Dated: March 7, 2008                  By:   _____
                                                Matthew R. Schultz (220641)
5

6                                               Francis O. Scarpulla (41059)
                                                Craig C. Corbitt (83251)
7                                               Judith A. Zahid (215418)
                                                Traviss Galloway (234678)
8                                               ZELLE HOFMANN VOELBEL MASON
                                                   & GETTE LLP
9                                               44 Montgomery Street, Suite 3400
                                                San Francisco, CA  94104
10                                              Telephone:    (415) 693-0700
                                                Facsimile:    (415) 693-0770
11                                              fscarpulla@zelle.com
                                                ccorbitt@zelle.com
12
                                                Terry Rose Saunders
13                                              Thomas A. Doyle
                                                SAUNDERS & DOYLE
14                                              20 South Clark Street, Suite 1720
                                                Chicago, IL  60603
15                                              Telephone:    (312) 551-0051
                                                Facsimile:    (312) 551-4467
16                                              trsaunders@saundersdoyle.com
                                                tadoyle@saundersdoyle.com
17
                                                Christopher Lovell
18                                              Imtiaz Siddiqui
                                                LOVELL STEWART & HALEBIAN, LLP
19                                              500 Fifth Avenue, 58th Floor
                                                New York, NY  10110
20                                              Telephone:  (212) 608-1900
                                                Facsimile:  (212) 719-4677
21                                              clovell@lshllp.com

22                                              Attorneys for Plaintiffs

23

24

25

26

27

28   3172515

-35-

CLASS ACTION COMPLAINT