1248JW

**Time of Request:** Thursday, March 15, 2007  14:04:46 EST
**Client ID/Project Name:** Indirect Plastic Additives
**Number of Lines:** 1520
**Job Number:**     1842:17569948

Research Information

**Service:**   LEXSEE(R) Feature
**Print Request:** Current Document: 1
**Source:** Get by LEXSEE(R)
**Search Terms:** 30 wm mitchell l rev 1351

**Send to:**  KARON, DANIEL
          GOLDMAN SCARLATO & KARON
          101 W ELM ST STE 360
          CONSHOHOCKEN, PA 19428-2075

LEXSEE 30 WM MITCHELL L REV 1351

Copyright (c) 2004 William Mitchell Law Review
William Mitchell Law Review

2004

*30 Wm. Mitchell L. Rev. 1351*

**LENGTH:** 24413 words

ARTICLE: "YOUR HONOR, TEAR DOWN THAT ILLINOIS BRICK WALL!" THE NATIONAL MOVEMENT TOWARD INDIRECT PURCHASER ANTITRUST STANDING AND CONSUMER JUSTICE

**NAME:** Daniel R. Karon+

**BIO:** + B.A. (1988), Indiana University-Bloomington; J.D. (1991), The Ohio State University College of Law. The author is a class-action trial attorney specializing in antitrust, consumer fraud and securities fraud litigation and manages Weinstein Kitchenoff Scarlato Karon & Goldman Ltd.'s Cleveland, Ohio office.

**SUMMARY:**
 ...  The manufacturers' conspiracy was "the most pervasive and harmful criminal antitrust conspiracy ever uncovered," and it impacted consumers every time they paid for food containing these manufacturers' vitamins - from "cereal to orange juice to vitamin pills ... ." The vitamin manufacturers targeted our nation's consumers as their ultimate victims, since without an end-use consumer market no demand for their vitamins would have existed, and their price fixing conspiracy would have been meaningless. ...  And importantly, courts in four non-repealer states, Arizona, Iowa, North Carolina and Tennessee, have ruled indirect purchasers have standing to pursue damage claims under their states' antitrust statutes. ... " The consumer-plaintiffs urged the court to find that federal law did not control Iowa's antitrust law and that indirect purchasers could sue under it. ...  With these considerations in mind, as well as the Illinois Brick Court's concession that allowing indirect purchaser suits ultimately resulted in no redress for the indirect purchaser actually injured by paying an overcharge, the Comes court held Iowa's "antitrust law contemplated all injured consumers [were] authorized to bring suit to enforce [Iowa's] antitrust laws," and the class had stated a claim upon which relief could be granted. ...  In particular, he ruled the Louisiana Attorney General could not assert indirect purchaser claims under the Louisiana Antitrust Act "because federal law does not give indirect purchasers standing. ... Why the Montana Antitrust Act Permits Indirect Purchasers to Pursue Damage Claims for Price Fixing Violations ...

**TEXT:**
 [*1352]

    I. Introduction

 "The scope of the conspiracy boggles the mind." n1 But for the sinister background music, the worldwide vitamin manufacturers' recent global price fixing conspiracy resembles a James Bond film, as "for a full decade, top executives at some of the world's largest drug companies met secretly in hotel suites and at conferences" n2 throughout Europe and the United States to "carve up the vitamin market" n3 and to fix vitamin prices used in products bought and consumed by all Americans everyday. n4 "When Federal investigators were closing in, they moved to the homes of high-level European executives." n5 Meeting clandestinely in places like Paris, France; Basel, Switzerland; and Lugwigshafen, Germany, these manufacturers illegally fixed, raised, maintained and stabilized vitamin prices and allocated global

vitamin markets with impunity. The manufacturers' conspiracy was "the most pervasive and harmful criminal antitrust conspiracy ever uncovered," n6 and it impacted consumers every time they paid for food containing these manufacturers' vitamins - from "cereal to orange juice to vitamin pills ... ." n7 The vitamin manufacturers targeted our nation's consumers as their ultimate victims, since without an end-use consumer market no demand for their vitamins would have existed, and their price fixing conspiracy would have been meaningless.

 [*1353]  But the vitamin manufacturers were eventually caught. For their crimes, two of the three conspiracy leaders, F. Hoffman-La Roche Ltd. and BASF AG, pleaded guilty and paid fines to the U.S. Department of Justice, n8 while the conspiracy's third leader, Rhone-Poulenc, S.A., avoided a criminal fine by cooperating in the DOJ's investigation. n9 Afterward, many of the conspiracy's other participants also pleaded guilty and paid criminal fines. n10 Customers who purchased vitamins directly from the manufacturers sued and recovered damages under federal antitrust law, n11 which permits only price fixed products' direct purchasers to recover overcharges for price fixing violations. n12 Indirect vitamin purchasers at multiple levels, such as brokers, distributors and,  [*1354]  most of all, consumers, also sued under various states' antitrust laws and recovered illegal overcharges passed on to them. n13

But in many states, indirect vitamin purchasers, namely consumers, have not recovered their overcharges. This is because either these states' courts have improperly ruled that consumers lack antitrust standing under their antitrust laws, or these states' consumers did not realize they had valid price fixing claims because indirect purchaser antitrust claims have not traditionally been pursued there. As a result, these states' consumers remain uncompensated for being victimized by the vitamin manufacturers despite having possessed entirely valid, yet unrealized or wrongly denied, indirect purchaser antitrust claims. n14

This article will first examine the origin of indirect purchaser antitrust litigation. n15 It will then explain how certain state antitrust statutes include specific language permitting indirect purchasers standing to pursue antitrust claims. n16 Next, it will examine how courts in some states without specific indirect purchaser legislation have nonetheless interpreted their state antitrust statutes to confer indirect purchaser standing. n17 This article will then demonstrate how additional states without specific indirect purchaser legislation also permit standing to indirect purchasers, yet these states' consumers fail to realize these claims' existence. n18 Next, it will explain how some state courts have wrongly denied indirect purchaser antitrust standing to consumers when, under federal and state case law, as well as federalism principles, their state antitrust acts actually permit standing. n19 Finally, this article will conclude that, despite established convention, thirty-nine (and arguably as many as forty-four) states, plus the District of Columbia, actually provide indirect purchasers some remedy for price fixing  [*1355]  violations. n20

II. Federal Law Permits States to Protect Indirect Purchasers

 Enacted in 1890, the Sherman Antitrust Act n21 prohibits any agreement among competitors to restrain trade, including agreements to fix prices and allocate markets. The Clayton Act of 1914 gives the U.S. district courts jurisdiction to "prevent and restrain violations of [the Sherman Act]." n22 Until 1977, both direct and indirect purchasers were permitted to sue under the Clayton Act for Sherman Act violations. n23 In 1968, however, indirect purchaser standing began to erode. In Hanover Shoe, Inc. v. United Shoe Machinery Corp., n24 a shoe-making machinery manufacturer defended a monopoly claim on the basis that the plaintiff, a shoe manufacturer that bought its machinery, had passed on the entire monopoly overcharge to the plaintiff's customers; as a result, the plaintiff had not been injured. n25 The United States Supreme Court ultimately held an antitrust defendant could not defend a damages suit on the basis that the plaintiff had shifted the cost of the defendant's wrongdoing to the plaintiff's customers. n26

While Hanover Shoe foreclosed pass-on damages' "defensive use" in antitrust cases, their "offensive use" was considered ten years later in Illinois Brick Co. v. Illinois. n27 In Illinois Brick, plaintiffs brought suit against concrete block manufacturers alleging defendants "had engaged in a combination and conspiracy to fix the prices of concrete block in violation of section 1 of the Sherman Act." n28 But consistent with (yet the reverse of) its Hanover Shoe ruling, the Court held indirect purchasers could not maintain  [*1356]  an action for a Sherman Act violation when alleging that defendants' illegal overcharges had been passed on to them. n29 The Court's main bases for its decision

were that lawsuits involving both direct and indirect purchasers might create multiple liability risks for defendants n30 and that such actions would be overly complicated. n31 With this ruling, indirect purchasers could no longer maintain federal lawsuits for damages caused by Sherman Act violations. n32

In reaching its result, the majority, in an opinion written by Justice White, declined to follow the U.S. Justice Department, which had urged the door be left open for indirect purchaser suits. n33 Three dissenting Justices agreed with the Justice Department. Justice Brennan wrote that the majority had ignored antitrust law's fundamental policy to compensate victims:

[Hanover Shoe's] same policies of insuring the continued effectiveness of the treble-damages action and preventing wrongdoers from retaining the spoils of their misdeeds favor allowing indirect purchasers to prove that overcharges were passed on to them. n34

Lack of precision in apportioning damages between direct and indirect purchasers is thus plainly not a convincing reason for denying indirect purchasers an opportunity to prove their injuries and damages. Moreover, from the deterrence standpoint, it is irrelevant to whom damages are paid, so long as someone redresses the violation. Antitrust violators are equally deterred whether the [*1357] judgments against them are in favor of direct or indirect purchasers. Hanover Shoe said as much. n35

Justice Blackmun, another dissenter, wrote that the Court's opinion adopted "a wooden approach ... entirely inadequate when considered in the light of the objectives of the Sherman and Clayton Acts." n36

Illinois Brick immediately generated major controversy as the Court's concerns about multiple liability and overly complex litigation proved unfounded. Courts realized they were "fully capable of ensuring antitrust defendants are not forced to pay more in damages than amounts to which the injured parties are entitled." n37 They noted the "absence of cases in which ... court[s were] faced with the impossible task of apportioning damages," n38 and that "there [were] few, if any, reported instances of a defendant paying treble damages to two different classes of purchasers based on a single antitrust violation." n39 Courts further recognized "complexity [was] not a foreign concept in the world of antitrust" n40 and "the day [was] long past when courts ... [would] deny relief to a deserving plaintiff merely because of procedural difficulties or problems of apportioning damages." n41

Even Congress recognized the Court's overreaction to the potential for complexity:

The House Report on H.R. 11942 ... concluded that the Court had overstated the problem of complexity in Illinois Brick. The Senate Judiciary Committee, in its report on S. 1874, acknowledged the difficulty of proving pass-on but [*1358] concluded that this difficulty did not justify ignoring the important rights of indirect purchasers. The Senate Committee also concluded that the courts or the legislature could solve any procedural and judicial management problems. In its report on the Rodino-Kennedy bill, the Senate Committee again rejected the Supreme Court's conclusion that apportioning damages between plaintiffs was too complex a task for courts to handle, based on their performance in the period between Hanover Shoe and Illinois Brick. The Committee observed that judicial functions in a wide variety of cases outside the antitrust area were no less complex than those inherent in pass-on cases. n42

But despite its controversy, the Illinois Brick ruling never purported to limit applying state antitrust laws to parties indirectly injured by antitrust violations. The United States Supreme Court expressed this proposition twelve years later in California v. ARC America Corp. n43 where, in another opinion written by Justice White, the Court unanimously

held that states had the right to enact and enforce laws permitting indirect purchasers to recover for antitrust violations. n44 As amici curiae, thirty-eight state attorneys general also supported this position that state law should fill in the indirect purchaser void. n45

In ARC America, plaintiffs, four states, were indirect purchasers of cement and concrete used for state projects. n46 Plaintiffs filed antitrust actions involving this cement and concrete, in part, under their respective state antitrust statutes, seeking damages for defendants' price fixing. n47 The Ninth Circuit Court of Appeals held the four state antitrust laws were preempted because they [*1359] conflicted with Illinois Brick's Sherman Act interpretation. n48

As a starting point, the Court noted Congress has the authority to preempt state law. n49 If Congress has not expressly preempted an area of state law, it can impliedly do so under two circumstances:

First, when Congress intends that federal law occupy a given field, state law in that field is pre-empted. Second, even if Congress has not occupied the field, state law is nevertheless pre-empted to the extent it actually conflicts with federal law, that is, when compliance with both state and federal law is impossible, or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." n50

The Court then instructed that for the defendants to successfully argue that federal law had preempted the states' indirect purchaser laws (meaning only direct purchasers could sue for antitrust violations), they had to first overcome the presumption against finding state law preemption in areas traditionally regulated by the states:

When Congress legislates in a field traditionally occupied by the States, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Given the long history of state common-law and statutory remedies against monopolies and unfair business practices, it is plain that this is an area traditionally regulated by the States. n51

The Court further highlighted that "at the time of the enactment of the Sherman Act, 21 States had already adopted their own antitrust laws," and that "the Sherman Act itself, in the words of Senator Sherman, "[did] not announce a new principle of law, but applied old and well recognized principles of the common law to the complicated jurisdiction of our State and Federal Government.'" n52

State indirect purchaser statutes, the Court explained, "are consistent with the broad purposes of the federal antitrust laws: [*1360] deterring anticompetitive conduct and ensuring the compensation of victims of that conduct," n53 and "nothing in Illinois Brick suggests that it would be contrary to congressional purposes for States to allow indirect purchasers to recover under their own antitrust laws." n54 The Court further explained, "it is plain that this is an area traditionally regulated by the States," n55 and that Illinois Brick was limited to construing federal, not state, law's application:

When viewed properly, Illinois Brick was a decision construing the federal antitrust laws, not a decision defining the interrelationship between the federal and state antitrust laws. The congressional purposes on which Illinois Brick was based provide no support for a finding that state indirect purchaser statutes are pre-empted by federal law. n56

The Court concluded, "Congress intended the federal antitrust laws to supplement, not displace, state antitrust remedies," n57 and "the Court of Appeals erred in holding that the state indirect purchaser statutes [were] pre-empted." n58 With ARC America it was finally determined that indirect purchasers were not proscribed from pursuing price

fixing claims under state antitrust laws.

III. The National Movement Toward Indirect Purchaser Standing

As one court recently commented:

It is one thing to consider the congressional policies identified in Illinois Brick and Hanover Shoe in defining what sort of recovery federal antitrust law authorizes; it is something altogether different, and in our view inappropriate, to consider them as defining what federal law allows States to do under their own antitrust law. n59

[*1361]  Not surprisingly, then, in Illinois Brick's wake, several states passed so-called Illinois Brick "repealer statutes" explicitly permitting damage actions by or on behalf of indirect purchasers, including ultimate consumers. Presently, twenty-five states and the District of Columbia's antitrust acts contain repealer statutes permitting either their states' consumers or attorneys general as parens patriae to pursue indirect purchaser price fixing claims. n60 Washington's consumer fraud act permits its attorney general to sue for consumers' price fixing damages as parens patriae, n61 and Massachusetts, n62 Nebraska, n63 Vermont, n64 Florida n65 and New Jersey n66 [*1362]  courts have ruled indirect purchasers can pursue damages claims for antitrust violations under their states' consumer protection statutes. And importantly, courts in four non-repealer states, Arizona, n67 Iowa, n68 North Carolina n69 and Tennessee, n70 have ruled indirect purchasers have standing to pursue damage claims under their states' antitrust statutes. n71

All told, thirty-three states and the District of Columbia, which represent about seventy percent of our nation's population, provide some claim for indirect purchasers. n72 This leaves seventeen states: eight where courts have specifically ruled, albeit wrongly, against indirect purchaser standing; n73 and nine where the issue has not yet been decided. Of the latter nine states, two do not have [*1363]  antitrust acts n74 and one state's antitrust act does not apply to price fixing. n75 The remaining six non-repealer states, n76 however, actually permit indirect purchaser antitrust claims, yet the states' consumers have to date failed to recognize these claims' existence and have failed to assert their rights to pursue them. n77

IV. Non-Repealer States that Permit Indirect Purchasers to Pursue Price Fixing Cases Under Their Antitrust Laws

Just because a state legislature has not enacted specific "repealer legislation" does not mean its consumers cannot pursue antitrust cases for damages caused by price fixing. This is, in part, because many state antitrust laws already provide indirect purchasers standing even absent specific repealer legislation.

A. Iowa: Comes v. Microsoft Corp.

In Comes v. Microsoft Corp., n78 "[a] group of consumers filed suit alleging Microsoft maintained or used a monopoly in conjunction with its Windows 98 operating system for the purpose of excluding competition or controlling, fixing, or maintaining prices in violation of the Iowa Competition Law [its antitrust act]." n79 On  [*1364]  appeal, "the only issue [was] whether the United States Supreme Court case, Illinois Brick, should be followed in interpreting the Iowa Competition Law." n80 The consumer-plaintiffs urged the court to find that federal law did not control Iowa's antitrust law and that indirect purchasers could sue under it. n81

As a starting point, the Iowa Supreme Court noted the "very broad category of persons [permitted] to maintain a suit in [Iowa] state courts for damages resulting from anticompetitive conduct. "[A] person who is injured ... by conduct prohibited under this chapter may bring suit to: ... recover actual damages resulting from conduct prohibited under this chapter.'" n82 The court believed Iowa's antitrust statute was "clear on its face," n83 and the words "a person" permitted indirect purchasers to sue for violations:

This statute does not restrict the class of persons who may bring suit under the Iowa Competition Law. Nothing in the statute says in order to seek redress for antitrust violations a purchaser must be directly injured. The legislature did not specifically limit standing to direct purchasers, but instead it simply authorized "[a] person who is injured" to sue. Legislative intent is determined by what the legislature said, not by what it did not say or might have said. Therefore, we do not regard our legislature's failure to explicitly authorize indirect purchasers to maintain a suit for antitrust violations as an expression of its agreement with Illinois Brick. Given the clear, broad language of the state antitrust law, we conclude the Iowa Competition Law creates a cause of action for all consumers, regardless of one's technical status as a direct or indirect purchaser. n84

Despite the statute's plain meaning, Microsoft argued that Iowa's Competition Law did not permit indirect purchasers redress because Iowa's legislature had "mandated that the Iowa Competition Law shall be construed to complement federal law ... . Therefore, ... Iowa [was] bound by the federal law [namely Illinois Brick]." n85 To support this argument, Microsoft [*1365] relied on the Iowa Competition Law's "harmonization" clause, which instructs:

This chapter shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter. This construction shall not be made in such a way as to constitute a delegation of state authority to the federal government, but shall be made to achieve uniform application of the state and federal laws prohibiting restraints of economic activity and monopolistic practices. n86

But the court found that this provision did not require Iowa courts to interpret Iowa's Competition Law the same way federal courts have interpreted federal law. n87 The court explained the issue was not preemption, in that "Congress intended federal antitrust laws to supplement, not displace state antitrust remedies." n88 Because Illinois Brick construed only federal antitrust law, "it did not define the connection, if any, between federal and state antitrust laws." n89 The court instructed instead that "the "concept of federalism assumes power, and duty, of independence in interpreting [a state's] own organic law.'" n90 Because federal law did not preempt it, the court construed the Iowa Competition Law to encourage antitrust law's primary goal. n91

In construing the Competition Law's harmonization clause, the court did not believe the clause was aimed at defining who could sue under the Competition Law, but was instead intended to achieve the state and federal laws' uniform application prohibiting monopolistic practices:

The purpose behind both state and federal antitrust law is to apply a uniform standard of conduct so that businesses will know what is acceptable conduct and what is not acceptable conduct. To achieve this uniformity or predictability, we are not required to define who may sue in our state courts in the same way federal courts have defined who may maintain an action in federal court. Rather, our guiding principle in interpreting the Iowa [*1366] Competition Law is to do so in such way as to prohibit "restraints of economic activity and monopolistic conduct." Harmonizing our construction and interpretation of state law as to what conduct is governed by the law satisfies the harmonization provision. n92

The court also acknowledged the consistency between the policies underlying Iowa's Competition Law and federal antitrust law:

The United States Supreme Court [in ARC America] has held that two statutes, both of which prohibit anticompetitive

conduct, are not inconsistent merely because one allows indirect purchasers to sue for damages while the other does not. The federal antitrust statute shows Congress' concern with the protection of competition, not competitors. The goal of federal antitrust law is to prohibit restraint of economic activity and monopolistic practices. Our state antitrust law promotes the same consumer protection policies as does federal antitrust law by "assuring customers the benefits of price competition." In order for us to agree with Microsoft that the harmonization statute requires us to prohibit suits by indirect consumers, we must accept the fact that real victims - those who purchase goods and pay the overcharge - cannot recover. This result would overwhelmingly defeat the purpose of the Iowa Competition Law. Consumers in this state are best protected by permitting all injured purchasers to bring suit against those who violate our antitrust laws. n93

 Importantly, the court also considered the legislature's purpose and intent at the time the Iowa Competition Law was enacted:


The Iowa legislature passed the current Iowa Competition Law one year before the decision in Illinois Brick. Consequently, it was impossible for the legislature to have adopted a judicial construction which did not exist at that time. The legislature did not have the opportunity to discuss Illinois Brick and accept or reject its law before passing the Iowa Competition Law. n94

 Further, because Iowa "took its cues" from federal law when  [*1367]  creating its Competition Law, it was significant that "prior to Illinois Brick, most federal courts construed section four of the Clayton Act to allow suits by indirect purchasers," n95 and that "even the United States Supreme Court prior to Illinois Brick consistently recognized Congress' intent in enacting section four of the Clayton Act was to protect all victims of antitrust infringements." n96

    Mindful of this chronology, the court appreciated that "when the Iowa legislature enacted the Iowa Competition Law, it did so considering the federal law prior to Illinois Brick, which allowed indirect purchasers to bring antitrust suits." n97 The federal law's status before Illinois Brick formed still further support for the court's conclusion that "the Iowa legislature intended indirect purchasers to have standing under the Iowa Competition Law." n98

    Finally, the court realized the Illinois Brick Court was primarily concerned with policy considerations such as multiple liability and litigation complexity that had "not materialized," and which had "little, if any, applicability to antitrust suits in state court." n99 The court observed "few, if any, reported instances of a defendant paying treble damages to two different classes of purchasers based on a single antitrust violation," n100 and that "courts [were] fully capable of ensuring antitrust defendants are not forced to pay more in damages than amounts to which the injured parties are entitled." n101

    The court likewise explained "complexity is not a foreign  [*1368]  concept in the world of antitrust,"  n102 and "there [was] an absence of cases in which [courts had been] faced with the impossible task of apportioning damages." n103 The court acknowledged even Congress' belief that the Illinois Brick Court had overstated the potential for complex litigation. n104 "We should not defeat the ends of justice simply because the litigation may be complicated," n105 reasoned the court, and difficulty proving pass-on damages did not justify ignoring indirect purchasers' rights since courts can typically resolve any management problems that might arise during litigation. n106 With these considerations in mind, as well as the Illinois Brick Court's concession that allowing indirect purchaser suits ultimately resulted in no redress for the indirect purchaser actually injured by paying an overcharge, n107 the Comes court held Iowa's "antitrust law contemplated all injured consumers [were] authorized to bring suit to enforce [Iowa's] antitrust laws," n108 and the class had stated a claim upon which relief could be granted. n109

    B. Arizona: Bunker's Glass Co. v. Pilkington PLC

Bunker's Glass Co. v. Pilkington PLC n110 involved two consolidated class action antitrust cases brought by indirect

purchasers against various flat glass manufacturers and tobacco manufacturers. n111 The Arizona Court of Appeals reversed both trial courts' orders dismissing the indirect purchasers' antitrust claims, n112 and the Arizona Supreme Court "granted Defendants' petitions for review to resolve whether indirect purchasers may sue under the Arizona Antitrust Act." n113

[*1369] The court began its discussion by noting the "case turned upon the interpretation of a provision of the Arizona Antitrust Act that permits a "person' to sue to redress an antitrust injury." n114 Considering the Act's "plain language," n115 the court "defined "person' as including "an individual' " n116 and observed "nothing in this language restricted the right of action to direct purchasers injured by violations of the Arizona Antitrust Act or precluded indirect purchasers from suing." n117 "By defining the term "person' to include an "individual,' " explained the court, "the legislature signaled its intent to allow indirect purchasers to sue, because individuals are rarely direct purchasers." n118

Defendants, however, argued strict adherence to Illinois Brick precluded plaintiffs from pursuing their antitrust claims. n119 But the court disagreed, noting first that Arizona's Antitrust Act was enacted "three years before Illinois Brick was decided," and that Arizona courts are instructed that they "may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes." n120

Employing the Arizona Antitrust Act's liberal "federal guidance clause," n121 the court further disagreed that the Arizona Legislature had "directed the court to follow the Supreme Court's holding in Illinois Brick." n122 The court did "not read the federal guidance clause as manifesting a legislative intent to rigidly follow federal precedent on every issue of antitrust law regardless of whether differing concerns and interests exist in the state and federal systems." n123 Instead, the word "may" made applying Illinois Brick "permissive rather than mandatory." n124 The court reiterated that the guidance clause "evinced no specific legislative intent to prohibit indirect purchaser actions because the guidance clause was [also] enacted before Illinois Brick was decided," and the only "specific case law regarding indirect purchasers [the legislature could have had] in mind when it included the guidance clause ... [*1370] would have been ... [cases] permitting indirect purchaser suits [because that] was the prevailing rule nationwide before the Court decided Illinois Brick." n125

The court further noted the Arizona Attorney General had historically interpreted the Act as providing indirect purchaser claims and had "brought several actions on behalf of the state and its agencies for harm incurred as an indirect purchaser." n126 These actions, the court believed, "reflected the state policy of accepting the benefits of indirect purchaser lawsuits and protecting Arizona taxpayers in their role as indirect purchasers." n127

Citing Comes, the court agreed the guidance clause's goal was "uniformity in the standard of conduct required, [and] not necessarily in procedural matters such as who may bring an action for injuries caused by violations of the standard of conduct." n128 The court also confirmed that ARC America held "allowing state laws to protect indirect purchasers would not interfere with the federal antitrust policy examined in Illinois Brick ... ." n129

The defendants next suggested that allowing indirect purchaser lawsuits was to "involve the court in "judicial activism' " n130 and argued the only valid way to avoid applying Illinois Brick was by specific repealer statute. n131 But the court did "not view [its] rejection of Illinois Brick as judicial activism because the legislature [had] specifically granted the right of action to indirect purchasers in 44-1408 [of the Arizona Antitrust Act]." n132 Accordingly, the court "simply reject[ed a] judicial interpretation of the parallel federal act that would prohibit suits by indirect purchasers despite the statutory language granting such a right of action," n133 explaining:

The Arizona statute broadly grants a right of action to any "person" injured in business or property by the anti-competitive acts of another. The Plaintiffs certainly fall within the definition of persons. The complaints, which must be taken as true for purposes of a motion to dismiss, [*1371] allege that the Defendants' illegal activity injured them in their business or property. So why do the Plaintiffs not have a right of action according to Defendants? Because

the Supreme Court in Illinois Brick judicially limited the comparable federal statute. In the absence of the federal guidance clause, Arizona's statutory language would plainly include indirect purchasers. Viewed against this background, Illinois Brick repealer statutes do not expand the right-of-action statutes, they simply reject a judicially imposed limitation on the right to sue originally granted by statute. By refusing to construe the federal guidance clause as requiring that Arizona courts follow Illinois Brick's limitation on the scope of the right of action granted by the legislature, the court is simply choosing to follow the expressed legislative intent that persons injured in their business or property by anti-competitive activity have a right of action. The court defers to the legislature, not the federal courts, to create exceptions to the rule. n134

The defendants also sought to "use the Illinois Brick repealer statutes as the standard for uniformity, asserting that uniformity mandated that the court leave it to the legislature to depart from federal law." n135 The court believed this argument "elevated form over substance," n136 and instead explained that "the law in most of the states that have considered the issue provides that indirect purchasers may bring a private action," n137 and "the importance of uniformity [lay] in the rule of law, not in how that law came into effect." n138

Finally, considering defendants' "multiple liability" argument, the court believed the multiple liability risk was one the trial courts were competent to handle n139 and that the courts were in the best position to solve the double-recovery problem. n140 As for "complexity," the court explained "the complexity of proving damages through multiple levels of sales [was] a daunting task, but one to which [its] courts [were] equal," n141 and it "[could not] say ... that damages to indirect purchasers [were] too speculative  [*1372]  because they [were] difficult to measure and prove." n142 Instead, history indicated that courts can manage complex indirect purchaser recovery in antitrust cases, n143 and neither the court nor defendants could cite cases involving unresolvable complexity. n144 The court explained "recent developments in multistate litigation showed that plaintiffs may be able to produce satisfactory proof of damages," n145 and "allowing the courts to attempt to achieve justice in the antitrust realm comported with the longstanding policy of this state to protect consumers and deter anti-competitive behavior." n146

Accordingly, the court affirmed the appellate courts' decisions and remanded both cases to their respective trial courts for further proceedings. n147

C. Tennessee: Sherwood v. Microsoft Corp.

Sherwood v. Microsoft Corp. n148 involved the identical consumer claim as Comes. This time, Microsoft argued indirect purchasers had no claim under the Tennessee Trade Practices Act (Tennessee's antitrust act). n149

The court first considered Illinois Brick and noted its application to antitrust injury and standing under federal antitrust law:

  [*1373]

It is one thing to consider the congressional policies identified in Illinois Brick and Hanover Shoe in defining what sort of recovery federal antitrust law authorizes; it is something altogether different, and in our view inappropriate, to consider them as defining what federal law allows States to do under their own antitrust law. n150

The court acknowledged Tennessee had not adopted an Illinois Brick repealer statute, and that the Tennessee General Assembly had sought to pass such legislation three times. n151 The court also recognized that "proposed legislation, not enacted, had no consequence whatever upon the interpretation of an existing statute." n152

The court then turned its attention to the Act's language and the broad class of claimants to whom it applied: "The law provides a civil remedy to "any person who is injured or damaged by such arrangement.' " n153 Relying partly on Comes, the court took the term "any person" to "reflect[] an intent to protect and provide a remedy to individuals who are the ultimate consumers." n154

As further support for its conclusion, the court considered the Sherman and Tennessee Acts' purposes:

While the purpose of the federal antitrust statutes is to protect competition and commerce, the state act's purposes are to protect both commerce and the consuming public. It is clear that the legislature intended that consumers, or ultimate purchasers, of goods be provided a remedy for any injury, including higher prices, sustained due to the prohibited anticompetitive conduct. There is no basis to presume that the legislature intended to protect only those consumers who purchased directly from the violator. There is clear intent to the contrary. We hold that indirect purchasers are "persons" who may bring an action for an injury caused by violation of the TTPA. n155

 [*1374]  The court also "weighed the policy concerns raised by the Court in Illinois Brick," n156 agreeing (i) "that allowing indirect purchasers to sue would not pose a risk of deterring lawsuits because of apportionment of recovery" n157 because indirect purchasers would sue under state antitrust laws in state court and direct purchasers would sue under federal antitrust laws in federal court, n158 and (ii) that courts found "concerns over complexity and apportionment less worrisome or inapplicable in the cases before them and were sympathetic to the arguments that indirect purchasers usually suffer the real loss." n159

    Accordingly, and consistent with its earlier Blake v. Abbott Laboratories, Inc. n160 ruling, where the court also held indirect purchasers had standing to sue for damages under the Tennessee Antitrust Act, n161 the court "concluded that indirect purchasers such as Plaintiffs herein [could] sue for injury caused them by violation of the TTPA." n162

    D. North Carolina: Hyde v. Abbott Laboratories, Inc.

 In Hyde v. Abbott Laboratories, Inc., n163 plaintiffs, who were indirect purchasers from defendants, filed a class action alleging defendants had violated North Carolina's antitrust laws by fixing infant formula wholesale prices. n164 According to the North Carolina Antitrust Act:

If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing ... in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action ... . n165

 Defendants argued that although the Act applied to "persons," the "General Assembly somehow intended to exclude a large class  [*1375]  of persons - indirect purchasers - from recovery for non-business injuries ... ." n166 The court, however, emphasized the General Assembly's choice to include the phrase "any person" and that by doing so, "the General Assembly intended to provide a recovery for all consumers." n167

    While the defendants argued the court should interpret the Act consistent with Illinois Brick, the court noted that under North Carolina case law, "federal case law interpretations of the federal antitrust laws [were merely] persuasive authority in construing [its] own antitrust statutes." n168 Even the Bunker's court recognized and found "instructive" n169 that North Carolina and Tennessee lacked "federal guidance clauses" n170 and had, accordingly, "rejected judicial attempts to constrict the range of persons injured by illegal activity who [could] maintain a state-law-based antitrust cause of action in state court." n171

    Like in Comes and Bunker's, the court also explained that the most recent substantive change to the North Carolina Antitrust Act occurred in 1969, but that Illinois Brick was not decided until 1977. "It follows," explained the court, "that [the] General Assembly could not have intended to adopt a judicial construction of [the Antitrust Act] which did not exist at the time of the revision." n172 After all, "it is a familiar canon of statutory construction that when a legislature borrows from the statutes of another legislative body, the provisions of that legislation should be construed as they were

in the other jurisdiction at the time of their adoption." n173 Accordingly, the court "considered as persuasive authority federal cases interpreting the federal antitrust laws as they existed in 1969." n174

Defendants next argued that the "General Assembly's failure to explicitly amend [the Act] to allow an indirect purchaser standing ... demonstrated that the General Assembly accepted  [*1376]  the Illinois Brick rule." n175 But the court disagreed, citing Blake v. Abbott Laboratories and explaining, "the intent of the General Assembly may only be discerned by its actions, and not its failure to act." n176 As a result, the lack of "indirect purchaser" language in the Act was "of no consequence." n177

Finally, the court agreed that the Illinois Brick Court's concerns about multiple liability and complexity were groundless. n178 According to ARC America, Illinois Brick was "concerned solely with the construction of federal antitrust laws, and not at all with state courts' constructions of state antitrust laws;" n179 ARC America held that "no federal policy [existed] against states imposing liability in addition to that imposed by federal law" n180 and that both direct and indirect purchasers had sufficient incentive to sue for antitrust violations. n181 Since North Carolina's state courts were "free to interpret [their] antitrust laws in a manner believed to be most consistent with the purposes behind [them]," n182 the court held indirect purchasers had standing under the North Carolina Antitrust Act to sue for price fixing violations. n183

V. Non-Repealer States that Permit Indirect Purchasers to Pursue Price Fixing Claims Under Their Antitrust Laws, But Where Consumers Have Never Realized or Pursued Their Claims

Like Iowa, Arizona, Tennessee and North Carolina, other states' antitrust statutes also permit indirect purchasers to pursue price fixing claims, but those states' consumers do not realize claims exist and, accordingly, have never pursued them.

 [*1377]

A. Louisiana

1. Why the Louisiana Antitrust Act Permits Indirect Purchasers to Pursue Damage Claims for Price Fixing Violations

The Louisiana Antitrust Act reads,

Any person who is injured in his business or property by any person by reason of any act or thing forbidden by this Part may sue in any court of competent jurisdiction and shall recover threefold the damages sustained by him [or her], the cost of suit, and a reasonable attorney's fee. n184

Louisiana courts are instructed to "give effect to all parts of a statute and should not give a statute an interpretation that makes any part superfluous or meaningless, if that result can be avoided." n185 And "when a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." n186

The Louisiana Act's plain wording does not exclude any class of "person injured," nor require, much less suggest, a person must have been directly injured. Instead, its plain language is all-inclusive. When considering this identical issue, the Comes, Bunker's, Sherwood and Hyde courts, whose states' antitrust statutes contain similar "person" language, all concluded "person" was unambiguous, all-inclusive, and meant indirect purchasers, and they all applied their states' antitrust acts to them. n187 The Louisiana Act's subject is "any person," n188 and according to the Louisiana Civil Code, "there are two kinds of persons: natural persons and juridical persons. A natural person is a

human being." n189 Given the Civil Code's unambiguous definition, the Louisiana Act likewise applies to consumers.

But despite the clarity of the term "persons," if a Louisiana  [*1378]  court believed "person" was ambiguous, it would need to interpret this term. "The interpretation of a term within a statute is not merely a question of semantics, but requires an inquiry into the reason, purpose, context and legislative history of the statute as well as other laws relative to the same subject matter": n190

The meaning and intent of a law is determined by considering the law in its entirety and all other laws on the same subject matter, placing a construction on the provision in question that is consistent with the express terms of the law and with the obvious intent of the legislature enacting it. n191

"Because the rules of statutory construction require that the general intent and purpose of the legislature in enacting the law must, if possible, be given effect," n192 a Louisiana statute must "be applied ad [sic] interpreted in a manner which is consistent with logic and the presumed fair purpose and intention of the legislature in passing it." n193

As the Comes, Bunker's, and Hyde courts noted of their states' antitrust statutes, the Louisiana Antitrust Act's history reveals it was enacted at the same time as the Sherman Act - long before Illinois Brick was ever decided and during which time indirect purchasers had antitrust standing:

A review of the legislative history of the Louisiana Anti-trust Legislation reveals that the first legislation prohibiting trusts and conspiracies in restraint of trade and a prohibition of monopolies was passed by La. Acts No. 86 in 1890, the same year the federal Sherman Antitrust Act was enacted. Since that time the legislation has changed very little. See *Louisiana Power & Light v. United Gas Pipe Line, 493 So. 2d 1149 (La. 1986).*

It is apparent that the concerns which spurred the enactment of the federal Sherman Antitrust Act are the same as those which influenced Louisiana's adoption of virtually identical antitrust legislation. n194

 [*1379]  Given Illinois Brick's nonexistence at the time the Louisiana Act was enacted and that indirect purchasers could freely pursue federal antitrust claims at that time, the Louisiana Legislature's intent could not have been to preclude indirect purchasers from pursuing price fixing claims. Authority suggesting such preclusion would not exist for almost another hundred years. Because the Louisiana Legislature's 1890 antitrust legislation did not specifically limit standing to direct purchasers (nor has it since, for that matter), the term "person" cannot be taken to preclude indirect purchasers, but must instead be read to include them. Thus, if the term "any person" was even subject to judicial interpretation, the Act could only be taken to confer natural persons antitrust standing, as they had standing at the time the Louisiana Act was enacted.

While a potential price fixing defendant may consider it noteworthy that Louisiana's Legislature has chosen not to repeal the Illinois Brick decision, no need for such action existed considering the legislature's intent. The legislature's understandable inaction contrasts markedly with the Tennessee Legislature's, which "on three occasions [unsuccessfully] ... sought to pass legislation to expressly confer standing on indirect purchasers." n195 Yet despite these three failed efforts, the Blake court believed "proposed legislation, not enacted, had no consequence whatever on the interpretation of an existing statute," n196 and it granted standing to indirect purchasers. Because no similar efforts have ever been proposed to, much less rejected by, Louisiana's Legislature, even more reason exists to interpret the Louisiana Antitrust Act as granting standing to indirect purchasers.

Louisiana's Antitrust Act also contains no harmonization clause. Because its Act "is a counterpart to 1 of the Sherman Antitrust Act, the United States Supreme Court's interpretation of the Sherman Act should be a persuasive influence on the interpretation of our own state enactment. However, the federal analysis is not controlling," n197 and Louisiana courts are nowhere  [*1380]  required to mechanically invoke Illinois Brick to extinguish their consumers' indirect purchaser price fixing claims.

Finally, not to be forgotten is that Illinois Brick merely instructed that indirect purchasers could not pursue price fixing claims under the federal antitrust laws. n198 Illinois Brick said nothing as to whether indirect purchasers could sue under state antitrust laws. Instead, ARC America addressed this issue and held indirect purchasers could pursue state antitrust claims and that doing so did not conflict with prevailing federal law. In this respect, construing the Louisiana Antitrust Act as permitting indirect purchasers to pursue price fixing claims is actually consistent with, not contrary to, federal law.

2. Why Free v. Abbott Laboratories and FTC v. Mylan Laboratories, Inc. Do Not Preclude Louisiana Indirect Purchaser Standing

In Free v. Abbott Laboratories, n199 Judge John Parker concluded that "Louisiana would be on sound ground in following the lead of the Supreme Court in Hanover Shoe and Illinois Brick and [held] that these indirect purchasers have suffered no antitrust damage under Louisiana's antitrust law ... ." n200 But in addition to Free being wrongly decided for the reasons already explained, federal decisions, particularly those concerning standing, are considered merely persuasive and not binding on Louisiana state courts:

Federal cases are generally more restrictive in finding standing than are state court opinions because of the provisions of Article III of the United States Constitution, which limits the federal judicial power to "cases and controversies." No comparable limitation is found in the Louisiana Constitution. Article VII, Section 3 of the Louisiana Constitution provides, in part: "No function shall ever be attached to any court of record, or to the judges thereof, except such as are judicial ... ." This has  [*1381]  been interpreted as limiting the jurisdiction of the State courts to "justiciable controversies." *Stoddard v. City of New Orleans, 246 La. 417, 165 So. 2d 9 (1964).* Thus, the federal decisions should be considered persuasive to the extent that they recognize "justiciability", but are not necessarily limitations on the jurisdiction of the state courts. n201

In FTC v. Mylan Laboratories, Inc. (Mylan I), n202 the FTC and thirty-two state attorneys general as parens patriae sued certain drug companies for, among other things, alleged Sherman and Clayton Act violations relating to producing and marketing certain brand-name drugs. n203 The defendant drug companies moved to dismiss, arguing that plaintiffs had not stated claims upon which relief could be granted, and that the court lacked subject matter jurisdiction over certain aspects of the plaintiffs' complaints. n204 Judge Thomas Hogan granted the defendants' motions to dismiss twenty-one states' restitution or disgorgement claims for indirect purchasers because he believed these claims were unauthorized under section 16 of the Clayton Act. n205 In particular, he ruled the Louisiana Attorney General could not assert indirect purchaser claims under the Louisiana Antitrust Act "because federal law does not give indirect purchasers standing." n206

But in Mylan II, n207 sixteen state attorneys general, including Louisiana's, requested that Judge Hogan reconsider his ruling dismissing their restitution claims. n208 In doing so, Judge Hogan recognized an "internal inconsistency" n209 in his ruling granting defendants' motions to dismiss and acknowledged that myriad states actually "permit the state to pursue equitable remedies" on behalf of indirect purchasers. n210 Reinstating "Louisiana's claims for equitable monetary relief under [the Louisiana Antitrust Act]," n211  [*1382]  Judge Hogan instructed that the Louisiana Attorney General is authorized to sue under the Antitrust Act, n212 and the Act "does not limit the state's ability to pursue the full range of equitable relief." n213 Accordingly, "the Court ... granted Louisiana's motion and permitted the state to pursue claims for restitution on behalf of both direct and indirect purchasers." n214

B. South Carolina

1. Why the South Carolina Antitrust Act Permits Indirect Purchasers to Pursue Damage Claims for Price Fixing Violations

The South Carolina Antitrust Act reads:

Any person who may be injured or damaged by any such arrangement, contract, agreement, trust or combination described in [the Antitrust Act] may sue for and recover, in any court of competent jurisdiction in this State, from any person operating such trust or combination, the full consideration or sum paid by him [or her] for any goods, wares, merchandise or articles the sale of which is controlled by such combination or trust. n215

South Carolina's Antitrust Act further instructs that " "person' shall include natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations and any other legal entity." n216 South Carolina courts have indicated that "the cardinal rule of statutory construction is to ascertain and effectuate the legislative intent whenever possible." n217 "If a statute's language is plain and unambiguous, and conveys a clear and definite meaning, there is no occasion for employing rules of statutory interpretation and the court has no right to look for or  [*1383]  impose another meaning." n218 "The legislature is presumed to have fully understood the meaning of the words used in a statute and, unless this meaning is vague or indefinite, intended to use them in their ordinary and common meaning or in their well-defined legal sense." n219 Given this directive, "person" can only be said to mean indirect purchasers or consumers.

But should a South Carolina court somehow believe the term "person" to be ambiguous, the court would be required to construe the Antitrust Act, and its primary function when doing so would be "to ascertain and effectuate the intent of the legislature." n220 "A statutory provision should be given a reasonable construction consistent with the purpose and policy expressed in the statute," n221 and "any ambiguity in a statute should be resolved in favor of a just, equitable, and beneficial operation of the law." n222

Like the Sherman Act, the South Carolina Antitrust Act was enacted in 1897 - long before Illinois Brick was decided. As a result, the South Carolina Legislature could only have intended to permit antitrust standing to all persons - including consumers - when it passed the Act, as both direct and indirect purchasers had antitrust standing at that time.

Moreover, the South Carolina Antitrust Act contains no harmonization clause. As a result, federal court decisions "may be persuasive," not mandatory, authority, n223 and South Carolina courts are not required to follow them when interpreting their Antitrust Act. n224 Indeed, where no South Carolina court has addressed an issue, South Carolina courts "may look to other states to determine if the issue has been decided and if the decision is persuasive  [*1384] authority." n225 In this manner, South Carolina courts are free to consider the well-reasoned Comes, Bunker's, Sherwood and Hyde decisions when holding their Antitrust Act applicable to consumers.

2. Why In re Wiring Device Antitrust Litigation and FTC v. Mylan Laboratories, Inc. Do Not Preclude South Carolina Indirect Purchaser Standing

In In re Wiring Device Antitrust Litigation, n226 Judge Jack Weinstein believed, "even were [South Carolina's] antitrust laws to be construed to apply to wholly interstate shipments, South Carolina courts would deny recovery to plaintiff because it would construe its statute to permit recovery only by direct purchasers in the same way that the Supreme Court has interpreted the Sherman Act." n227 Not only was In re Wiring Device wrongly decided for the reasons described, as likewise explained, federal decisions are persuasive, not binding, on South Carolina state courts. n228 And while in Mylan I, Judge Hogan also wrongly dismissed South Carolina's Unfair Trade Practices Act claim, believing "indirect purchasers [could] not seek damages or restitution ... [because n]o provision in the statute expressly

authorized such relief and ... absent explicit authorization by state statute or case law, such relief [could] not be granted," n229 in Mylan II he "reinstated South Carolina's claim for restitution on behalf of indirect purchasers under the South Carolina UTPA." n230

   C. Montana

   1. Why the Montana Antitrust Act Permits Indirect Purchasers to Pursue Damage Claims for Price Fixing Violations

 According to the Montana Antitrust Act, "any person, if injured thereby, ... may maintain an action to enjoin a continuance of an act in violation of [the Montana Antitrust Act]  [*1385]  and for the recovery of damages." n231 Montana's Antitrust Act is found in its Unfair Trade Practices Act (UTPA), and according to the UTPA's "Definitions" section, " 'person' includes any person, partnership, firm, corporation, joint-stock company, or other association engaged in business within this state." n232

   When considering to whom its antitrust act applies, Montana courts are required to interpret the Act's words according to the legislature's intent and the words' ordinary meaning:

When interpreting statutes, this Court's only function is to give effect to the intent of the Legislature. When we interpret a statute we determine legislative intent based on the plain and ordinary language used by the Legislature whenever possible. This Court must reasonably and logically interpret statutory language in a manner giving words their usual and ordinary meaning. n233

 Despite this instruction, should a Montana court consider "person" ambiguous, the court is simply to interpret a statute according to the "plain meaning of the words and phraseology employed," giving words their usual construction. n234 The standard dictionary definition instructs that "person" means "individuals," n235 and "person" can only be taken to mean indirect purchasers or consumers.

   Montana's Antitrust Act also dates back to 1937 - long before Illinois Brick was decided. Because Montana courts' "function when interpreting statutes "is to give effect to the intent of the legislature,' " n236 its Antitrust Act could only have been intended to confer antitrust standing on all persons, which necessarily includes indirect purchasers.

   Finally, Montana's Antitrust Act contains no harmonization clause. Accordingly, not only are federal decisions merely persuasive authority when interpreting the Act, n237 but Montana courts may also consider "persuasive authorities from [Montana's]  [*1386]  sister states," n238 such as Iowa, Arizona, Tennessee and North Carolina, where indirect purchaser standing has been approved.

   2. Why Smith v. Video Lottery Consultants, Inc. Does Not Preclude Montana Indirect Purchaser Standing

 In Smith v. Video Lottery Consultants, Inc., n239 the Montana Supreme Court confessed "there is minimal Montana law interpreting the Unfair Trade Practices Act, and no cases interpreting [Montana's Antitrust Act]." n240 The court also explained the differences between Montana and the Sherman Act's "restraint of trade" sections:

Although this section is modeled after 1 of the Sherman Act, it differs in one critical respect. The Sherman Act requires two or more persons to be involved in the unlawful trade restraint; in effect, a conspiracy must exist. However, the Montana counterpart states that a "person" may violate this section. Thus, the Montana statute on restraint of trade facially appears to be broader than the Sherman Act, as one person acting alone may violate the Montana statute. n241

 With regard to the Montana "monopolization" section, however, the court explained it was "very similar to 2 of the Sherman Act ... [and that the court] will give due weight to the federal courts' interpretation of this type of alleged antitrust violation." n242

While a potential price fixing defendant may engage the foregoing language to suggest Montana courts must slavishly follow Illinois Brick to deny indirect purchasers standing, indirect purchaser cases do not involve monopolization claims, and indirect purchaser ("unlawful trade restraint") claims are to be construed more "broadly" than if brought under the Sherman Act. And in any event, federal cases do not necessarily control Montana courts since they are considered merely "persuasive" authority. n243

 [*1387]

VI. Non-Repealer States with Antitrust Acts that Contain Harmonization Clauses, Yet Indirect Purchasers May Still Properly Pursue Price Fixing Claims

 Of the six non-repealer states where indirect purchasers have standing to pursue antitrust claims, three states' antitrust acts contain harmonization clauses. When considering harmonization clauses, some courts (as will be discussed later) have improperly interpreted them to deny indirect purchaser standing pursuant to Illinois Brick, n244 while others have not. n245

A. Utah

1. Why the Utah Antitrust Act Permits Indirect Purchasers to Pursue Damage Claims for Price Fixing Violations

 Section 76-10-919 of Utah's Antitrust Act, entitled "Person may bring action for injunctive relief and damages," explains that "[a] person who is injured or is threatened with injury in his business or property by a violation of the Utah Antitrust Act may bring an action for injunctive relief and damages." n246

Utah's Criminal Code, where its Antitrust Act is found, defines "person" as "an individual." n247 In Utah, "the primary rule of statutory interpretation is to give effect to the intent of the legislature in light of the purposes the statute was meant to achieve," n248 and the "best evidence of the legislature's intent is the plain meaning of the statute." n249 Where, like here, "the relevant statutory language is unambiguous," n250 it ""may not be interpreted to contradict its plain meaning,'" n251 and "person" must necessarily include consumers or indirect purchasers.

However, if a Utah court was compelled to interpret the Act because it considered the term "person" ambiguous, the court's primary goal must be "to evince the "true intent and purpose of the  [*1388]  Legislature.'" n252 Because the Legislature enacted Utah's Antitrust Act in 1953 - more than twenty years before Illinois Brick was decided - the Legislature could only have intended that its Act grant standing to all persons, including indirect purchasers, because no contrary legislative or judicial scheme existed at that time.

Because "no Utah case has evaluated the elements of a civil antitrust violation under the Utah Antitrust Act," n253 Utah courts invoking the Act's harmonization statute are to be "guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes." n254 The Act's harmonization clause does not require that Utah courts interpret their Antitrust Act to deny indirect purchasers standing pursuant to Illinois Brick. Instead, it explains that state court decisions (such as Comes, Bunker's, Sherwood and Hyde) concerning comparable state antitrust statutes can also be considered when construing the Act. n255 To the extent the Sherman Act interpretations are considered, Utah's harmonization clause can be described not as defining who can sue under its Antitrust Act, but instead as advancing Utah and federal laws' uniform application prohibiting anticompetitive conduct, as explained by the Comes and Bunker's courts. n256 And not to be overlooked, federal law - ARC America - instructed that indirect purchasers can pursue price fixing claims under state antitrust statutes.

30 Wm. Mitchell L. Rev. 1351, *1388

2. Why FTC v. Mylan Laboratories, Inc. Does Not Preclude Utah Indirect Purchaser Standing

In Mylan I, Judge Hogan dismissed Utah's indirect purchaser claims, explaining "no statutory or common law authority specifically addresses the issue of damages for such purchasers or for equitable monetary relief ... . [and] absent express [*1389] authorization, such relief will not be granted." n257 But in Mylan II, although Judge Hogan still denied Utah's damages claim on behalf of indirect purchasers, he reinstated "Utah's claims for restitution under the Utah Antitrust Statute ... ." n258 While this ruling may appear internally inconsistent, it nevertheless endorses Utah indirect purchaser claims' vitality, albeit for restitution only.

    B. Virginia

The Virginia Antitrust Act, entitled "Personal suit for injunction or actual damages," provides:


(a) Any person threatened with injury or damage to his [or her] business or property by reason of a violation of this chapter may institute an action or proceeding for injunctive relief when and under the same conditions and principles as injunctive relief is granted in other cases.


(b) Any person injured in his [or her] business or property by reason of a violation of this chapter may recover the actual damages sustained, and, as determined by the court, the costs of suit and reasonable attorney's fees. If the trier of facts finds that the violation is willful or flagrant, it may increase damages to an amount not in excess of three times the actual damages sustained. n259

When interpreting a statute, Virginia courts are to consider the statute's plain words:


In interpreting those subsections, we look no further than the words utilized by the General Assembly. "We must ... assume that the legislature chose, with care, the words it used when it enacted the relevant statute, and we are bound by those words as we interpret the statute." "The manifest intention of the legislature, clearly disclosed by its language, must be applied." n260

According to Virginia's Antitrust Act, "the term "person' includes, unless the context otherwise requires, any natural person ... ." n261 Furthermore, "unless otherwise defined by statute [which has not occurred], the term "natural person' means just [*1390] that - a natural person." n262 And "when the legislature has spoken plainly it is not the function of courts to change or amend its enactments under the guise of construing them [since t]he province of construction lies wholly within the domain of ambiguity, and that which is plain needs no interpretation." n263

    Because the Act's plain wording does not exclude any class of persons, but rather describes persons as just that - natural persons - the Act, by its terms, can be invoked by indirect purchasers. But to the extent a Virginia court may believe "person" "is ambiguous, [it] must construe the Statute to ascertain and give effect to the intention of the legislature." n264 The Virginia Antitrust Act was enacted in 1974 - three years before Illinois Brick. Because "the object of judicial interpretation of a statute is to ascertain the intention of the legislature," n265 the Act could have, again, only been intended to apply to indirect purchasers.

    But while Virginia courts "have authority ... to act with respect to violations of the Virginia Antitrust Act[, u]nder [its harmonization statute], the Virginia Antitrust Act must be applied and construed harmoniously with the Sherman Act." n266 In particular, Virginia's Antitrust Act "shall be applied and construed to effectuate its general purposes in

harmony with judicial interpretation of comparable federal statutory provisions." n267 Again, this harmonization clause does not require Virginia courts to blindly follow Illinois Brick and deny indirect purchasers standing because this clause can be described not as defining who can sue under its Antitrust Act, but instead as intended to achieve uniform application prohibiting anticompetitive conduct under Virginia and federal laws. n268 Additionally, of course, under ARC America, federal law permits indirect purchaser lawsuits to be brought under  [*1391]  state law. n269

C. Delaware n270

 According to the Delaware Antitrust Act, only "the Attorney General may bring suit as parens patriae on behalf of natural persons residing in this State to secure monetary relief for such persons who are injured in their businesses or property by a violation of this chapter." n271 Although the Act does not define "natural persons," "principles of statutory construction require that undefined words in a statute be given their common, ordinary meaning." n272 In addition to the standard dictionary definition of "person," Delaware case law discussing other statutes routinely interprets "natural persons" to mean individuals. n273

Should a Delaware court consider "natural person" ambiguous, however, it is instructed to "resolve the ambiguity by reconciling the statutory language with the legislative intent." n274 "The language of [the Delaware Antitrust Act] is virtually identical to the opening provision of the Sherman Antitrust Act," n275 and the Act's harmonization clause n276 suggests "it was the Delaware  [*1392]  Legislature's intention to adopt not only the language but the judicial interpretation and application of the Sherman Act." n277 In keeping with Comes' harmonization clause analysis and ARC America's teachings, as well as the Delaware Antitrust Act's purpose "to promote the public benefits of a competitive economic environment based upon free enterprise," n278 the Delaware Antitrust Act's harmonization clause does not require that Delaware courts automatically deny standing to indirect purchasers. n279

VII. Non-Repealer States that Do Not, Yet Should, Permit Indirect Purchasers to Pursue Price Fixing Cases Under Their Antitrust Laws

 Despite having antitrust statutes containing identical "any person" n280 language and defining "person" broadly, n281 courts in five  [*1393]  of the eight non-repealer states where indirect purchaser standing to pursue price fixing antitrust claims has been denied ruled against indirect purchaser standing largely because their states' antitrust statutes contain harmonization clauses. n282 Courts in the three remaining states have imposed "de facto" harmonization requirements n283 even though their antitrust statutes employ similarly broad "person" language and do not contain harmonization clauses. n284

 [*1394]  Adhering to strict harmonization, however, is a dangerous proposition. By denying indirect purchasers standing, these eight courts, perhaps unwittingly, adopted an "ongoing parallel federal-state construction" rule when considering cases under their state antitrust acts. These rulings mean that when interpreting their state antitrust acts, these courts must perpetually follow all federal antitrust jurisprudence's twists and turns, including federal courts' frequent and oftentimes disparate "u-turns" or "hairpin turns." n285 Requiring courts interpreting state antitrust acts to follow ever-changing federal antitrust jurisprudence raises vexing practical problems, undermining the antitrust acts' stability and integrity.

For example, where the federal circuits are split (such as was the case before Illinois Brick, when most rejected the direct purchaser requirement), what federal court must a state court following the "ongoing parallel federal-state construction" rule treat as the authoritative source on federal antitrust law and, accordingly, its antitrust act? Only the view expressed by the United States Supreme Court, which oftentimes comes only after years of circuit splits, as occurred in Illinois Brick? Absent a United States Supreme Court decision, must a state court follow the majority of the federal circuits? What case law must a state court follow if no clear majority view even exists? And, as more circuits weigh in and the previous majority view becomes the minority view, must state courts reinterpret their antitrust acts? If no federal circuits but only federal district courts have considered a particular issue, must state courts defer to them as well? And what if a split between federal district courts and federal courts of appeals exists? These questions cannot

really be answered but rather serve to  [*1395]  demonstrate why fastening state antitrust act interpretations to the federal judiciary's ongoing Sherman Act interpretations is unworkable, which is, of course, why none of these state legislatures has ever required it.

Instead, to the extent harmonization is required, harmonization aimed not at defining who can sue under a state's antitrust act, but instead at achieving the state and federal laws' uniform application prohibiting noncompetitive practices, such as advanced in Comes n286 and Bunker's n287 is a much more workable solution. Because state and federal laws regarding similar issues can and do coexist and oftentimes complement each other by advancing a common purpose, to the extent harmonization is required, harmonization of this sort permits state courts to avoid unworkable ongoing parallel federal-state construction problems. This is because the conduct proscribed by the Sherman Act, like the conduct proscribed by these state antitrust acts - namely price fixing - has always been consistent. Moreover, because ARC America actually permits indirect purchasers to sue for price fixing violations under state law, these state courts would be acting in harmony with federal law, not contrary to it, by permitting indirect purchaser antitrust standing rather than denying it.

The notion that courts interpreting state antitrust statutes are powerless to depart from the interpretation a federal court has given to a federal statute represents a very real and dangerous self-imposed limitation on these courts' judicial powers. These states' constitutions place judicial power inalienably in these states' supreme courts, courts of appeals, and lower courts' hands. n288  [*1396]  Under these state constitutions and settled federalism principles, the power to interpret their state antitrust statutes belongs to state courts and can neither be taken away by the federal judiciary nor surrendered by any state court. An ongoing parallel federal-state construction doctrine abrogates these bedrock principles, and as Ohio Appellate Judge Mark Philip Painter explained in Johnson v. Microsoft Corp., "to suggest that Ohio should continue to apply an ongoing parallel federal-state construction here undermines Ohio courts' authority and robs consumers of their day in court." n289

This type of unquestioning adherence to federal Sherman Act jurisprudence also contrasts markedly with the deference and regard these state courts typically pay when considering other federal statutory interpretations. For instance, these state courts regularly consider federal procedural decisions when interpreting their own civil rules, yet many refuse to adopt every federal rule interpretation in every instance. For example, in Gulf Oil Co. v. Bernard, n290 the United States Supreme Court overturned an order banning a class action defendant's unilateral communications with putative class members under Federal Rule 23(d). n291 Of course, the normal federal court practice is to permit these communications. n292 Nevertheless, the Ohio Supreme Court and Texas Court of Appeals have held that defendants' unilateral communications with putative class members are barred in Ohio and Texas state court class actions. n293 In General Telephone Co. v. Falcon, n294 the United States  [*1397]  Supreme Court allowed federal judges to "probe behind the pleadings" n295 when deciding class certification," yet the Connecticut Court of Appeals requires a trial court to look solely to the allegations raised in a plaintiff's complaint. n296 And while the Federal Rules of Civil Procedure permit mere notice pleading, n297 Missouri's Civil Rules require fact pleading. n298 As demonstrated, looking to, considering or being persuaded by federal statutory interpretations does not mechanically equate to slavishly adopting all federal statutory interpretations.

These courts' holdings also belie these states' long-standing pronouncements that their courts must apply their legislatures' intent at the time a statute was adopted until such time as it is amended. n299 The federal courts' direct purchaser requirement was  [*1398]  not adopted until Illinois Brick in 1977, yet all these states' antitrust acts (except for Oklahoma's recently reformed act) were enacted before 1977. n300 Because Illinois Brick's direct purchaser requirement was not imposed until 1977, federal case law permitted both indirect and direct purchasers to recover under the Clayton Act for Sherman Act violations at the time almost all of these state antitrust acts were enacted. Because these states' legislatures likely, if not certainly, considered the federal courts' Sherman Act construction when they created their own antitrust acts, their acts' constructions had to resemble that which existed when they were enacted; namely, a construction allowing indirect purchaser claims. n301

By ignoring their state legislatures' intentions and instead adopting harmonization clause constructions that are

unworkable, not practical, and offend their courts' sovereign rights, these state courts have chosen to deny recovery to price fixers' ultimate and intended victims based on an inference drawn from their legislatures' inactions. Courts must let their legislatures' actions - not their inactions - prevail. The language in these state antitrust acts permitting all persons who have been injured by anticompetitive conduct to pursue their claims must control, even (if not, especially) absent specific repealer legislation.

Paradoxically, these states' decisions to impose a direct [*1399] purchaser requirement concerned public policy and, according to the Johnson opinion, should have been made by their legislatures rather than their courts. n302 But in the many years since these state antitrust acts were first adopted, and on the occasions when their legislatures deemed it necessary to amend them, their legislatures have never altered their antitrust acts' language giving all injured persons the right to bring claims. Indirect purchasers' rights should not be judicially curtailed by superimposing unstated direct purchaser requirements onto these states' antitrust acts.

Instead of treating this issue as one their state legislatures should decide, these courts essentially treat this issue as having been automatically made the instant Illinois Brick was decided (while paying no regard to ARC America). These courts believe that not only did the direct purchaser requirement automatically become part of their antitrust acts as soon as the Illinois Brick Court recognized its applicability to Clayton Act claims, but also that their own state courts are powerless to depart from this federal interpretation absent specific direction from their state legislatures. It is entirely inconsistent, however, to rule that their state legislatures' assent is not necessary to make the direct purchaser requirement part of their antitrust acts, yet their legislatures' affirmative action is necessary to "remove" it, despite these legislatures having never adopted this requirement in the first place.

Finally, interpreting these state antitrust acts as permitting only direct purchaser claims renders them largely meaningless. Under this interpretation, direct purchasers' damages claims would arise not only under the Clayton Act but invariably under these state antitrust acts as well. After all, to constitute a Sherman Act violation, the conspiratorial conduct must have been "in restraint of trade or commerce among the several States," n303 which describes nearly all modern-day commerce. n304 Accordingly, a direct purchaser would virtually always pursue a federal claim alleging a Sherman Act violation rather than a state antitrust claim, which if originally brought in state court would most certainly be removed by a defendant to federal court. As a practical matter, then, these [*1400] courts' antitrust act interpretations leave essentially only "intrastate" conspiracies within their antitrust acts' scope, such as when one local newspaper sues another local newspaper for anticompetitive activities. This restrictive application contrasts markedly with these states' directives that entire statutes are intended to be effective and must not be interpreted to render them largely meaningless. n305

These eight courts' decisions neglect their antitrust acts' language, the policies underlying their antitrust laws' enforcement, their citizens' rights, the practicality of pursuing indirect purchaser litigation and Illinois Brick and ARC America's true teachings. No sensible reasons exist for these states to deny their citizens, all of them consumers, from pursuing indirect purchaser antitrust claims when these consumers have been victimized by price fixing in the same manner as consumers in states where indirect purchaser claims can be brought. n306

[*1401]

VIII. Conclusion

In a way, the Vitamins defendants committed the perfect crime, one from which they reaped billions of dollars yet were never required to compensate their ultimate victims - consumers in every state. The fact that more than half our nation's consumers sued and recovered for their indirect purchaser price fixing claims only exacerbates this injustice, especially considering that non-recovering consumers either misapprehended their claims' existence or had their claims wrongly extinguished by earlier, misguided courts.

Despite traditional thinking, the truth is that thirty-nine (and arguably as many as forty-four n307) states grant

indirect purchasers standing, either on their own or through their attorneys general as parens patriae, to pursue price fixing claims. Among Comes, Bunker's, Sherwood and Hyde, all logical arguments to the contrary have been presented, considered, and rejected. If indirect purchaser claims in the other non-repealer states seem novel, this is only because these states' consumers have never pursued them. Indeed, these claims were likely considered novel when first advanced in Iowa, Arizona, Tennessee, and North Carolina. But consumers' failure to pursue, or when pursued to succeed on, these claims must not be taken to mean these claims do not rightly exist. Instead, non-repealer states' consumers, like consumers in Iowa, Arizona, Tennessee and North Carolina, have had antitrust standing and  [*1402]  remedies all along.

Price fixers should not be allowed to retain their crimes' spoils while their victims remain uncompensated. Because virtually every state's antitrust (or consumer protection) laws provide consumers a remedy for these crimes, consumers and attorneys general need to begin testing and enforcing consumers' rights. Our states' antitrust laws were enacted to address consumers' indirect purchaser claims. These laws, when coupled with considerations of natural justice and society's unwillingness to permit criminals to profit from their crimes, implore the need, indeed the necessity, for enforcement. In most states, consumers already pursue their indirect purchaser rights, and it is now time that justice be pursued, and had, by all.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Antitrust & Trade LawPrivate ActionsPurchasersIndirect PurchasersAntitrust & Trade LawSherman ActRemediesDamagesAntitrust & Trade LawPrivate ActionsPurchasersDirect Purchasers

**FOOTNOTES:**



n1. David Barboza, Tearing Down the Facade of "Vitamins Inc.," N.Y. Times, Oct. 10, 1999, at C1.

n2. Id.

n3. Id. at 2.

n4. Id. See also United States v. F. Hoffman-La Roche Ltd., No. 99-CR-184-R (N.D. Tex. May 20, 1999) (Department of Justice Guilty Plea at P 4(b)), available at http://www.usdoj.gov/atr/cases/f2400/hoffman.pdf (last visited May 15, 2004); United States v. BASF Aktiengesellschaft, No. 3-99-CR-200-R (N.D. Tex. May 20, 1999) (BASF AG's Guilty Plea at P 4(b)), available at http://www.usdoj.gov/atr/cases/f2400/basf.pdf (last visited May 15, 2004).

n5. Barboza, supra note 1, at 1.

n6. Id.

n7. Id.

n8. Press Release, U.S. Department of Justice, F. Hoffman-La Roche and BASF Agree to Pay Record Criminal Fines for Participating in International Vitamin Cartel (May 20, 1999) (noting F. Hoffman-La Roche Ltd.'s $ 500 million fine and BASF AG's $ 225 million fine), available at http://www.usdoj.gov/atr/public/press releases/1999/2450.htm (last visited May 15, 2004).

n9. Id.

n10. Press Release, U.S. Department of Justice, Five Executives, One Company Charged with Price Fixing and Agree to Cooperate in Investigation of Worldwide Vitamins Price Fixing Conspiracy (Mar. 2, 1999) (noting Lonza AG's guilty plea and $ 10.5 million fine), available at http://www.usdoj.gov/atr/public/press releases/1999/2266.htm (last visited Mar. 30, 2004); Press Release, U.S. Department of Justice, Three Japanese Companies Agree to Plead Guilty, Pay Criminal Fines, for Participating in International Vitamin Cartel (Sept. 9, 1999) (noting Takeda Chemical Industries Ltd.'s guilty plea and $ 72 million fine, Eisai Co. Ltd.'s guilty plea and $ 40 million fine and Daiichi Pharmaceutical Co. Ltd.'s guilty plea and $ 25 million fine), available at http://www.usdoj.gov/atr/public/press releases/1999/3659.htm (last visited Mar. 30, 2004); Press Release, U.S. Department of Justice, Canadian Vitamin Company Agrees to Plead Guilty for Role in International Vitamin Cartel (Sept. 29, 1999) (noting Chinook Group Ltd.'s guilty plea and $ 5 million fine), available at http://www.usdoj.gov/atr/public/press releases/1999/3726.htm (last visited Mar. 30, 2004); Press Release, U.S. Department of Justice, Two German Firms and Two U.S. Corporations Agree to Plead Guilty to Participating in International Vitamin Cartels (May 5, 2000) (noting Merck KgaA, Degussa-Huls AG, Nepera, Inc. and Reilly Industries Inc.'s guilty pleas and combined $ 33 million fine), available at http://www.usdoj.gov/atr/public/press releases/2002/4684.htm (last visited May 15, 2004). Myriad individuals from these companies also pleaded guilty and paid fines personally.

n11. See In re Vitamins Antitrust Litig., No. MDL 1285, 2000 U.S. Dist. LEXIS 17369 (D.D.C. Nov. 17, 2000) (order approving settlement agreement with multiple Vitamins defendants).

n12. Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977) (discussed infra). For a more complete discussion on federal, direct purchaser antitrust litigation, see Daniel R. Karon, Price Fixing, Market Allocation and Bid

30 Wm. Mitchell L. Rev. 1351, *1402

Rigging Conspiracies: How to Counsel Your Clients to Detect Violations and Inform You of Potential Claims, *25 Am. J. Trial Advoc. 241 (2001).*

n13. See Master Settlement Agreement 15, Schedule A (Jan. 22, 2001), available at http://www.vitaminlitigation.com/MASTERSETTLEMENT.pdf (last visited May 15, 2004) (noting the $ 225,250,000 settlement on behalf of indirect purchasers in Arizona, the District of Columbia, Florida, Kansas, Maine, Michigan, Minnesota, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia and Wisconsin as states and areas where indirect purchasers have recovered for illegal overcharges resulting from the defendants' conspiracy).

n14. Unfortunately, the statutes of limitations have run on all these states' antitrust acts.

n15. See infra Part II.

n16. See infra Part III.

n17. See infra Part IV.

n18. See infra Parts V, VI.

n19. See infra Part VII.

n20. See infra Part VIII.

n21. *15 U.S.C. 1*-7 (2003).

30 Wm. Mitchell L. Rev. 1351, *1402

n22. Id. 4.

n23. Before Illinois Brick, six of the seven federal courts of appeals that considered this issue held indirect purchasers could recover damages for antitrust violations. See, e.g., *In re W. Liquid Asphalt Cases, 487 F.2d 191, 199 (9th Cir. 1973); W. Va. v. Chas. Pfizer & Co., 440 F.2d 1079 (2d Cir. 1971).*

n24. *392 U.S. 481 (1968).*

n25. *Id. at 487-88.*

n26. *Id. at 494.*

n27. *431 U.S. 720, 726 (1977)* ("Having decided [in Hanover Shoe] that in general a pass-on theory may not be used defensively by an antitrust violator against a direct purchaser plaintiff, we must now decide whether that theory may be used offensively by an indirect purchaser plaintiff against an alleged violator.").

n28. *Id. at 726-27.*

n29. *Id. at 727-28.*

n30. *Id. at 730.*

n31. *Id. at 731-32.* The Court also added its belief that "the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." *Id. at 735.*

30 Wm. Mitchell L. Rev. 1351, *1402

n32. Although this article describes the issue as one relating to "standing," debate exists as to whether Illinois Brick is concerned with standing or the definition of "injury." As the Illinois Brick Court noted, who has standing and who has sustained injury are "analytically distinct," and Illinois Brick's precise holding was that the direct purchaser, not the indirect purchaser, was the one "injured" for purposes of federal antitrust law. *Id. at 728 n.7.* While this analytical distinction exists, these two concepts merge for practical purposes, and the word "standing" is generally used to denote a person who has sustained an injury sufficient to give rise to an actionable Clayton Act claim for a Sherman Act violation.

n33. Brief for the United States as Amicus Curiae, passim, *Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977)* (No. 76-404).

n34. *Illinois Brick, 431 U.S. at 753* (Brennan, J., dissenting).

n35. *Id. at 759-60.*

n36. *Id. at 766* (Blackmun, J., dissenting).

n37. *Comes v. Microsoft Corp., 646 N.W.2d 440, 449-50 (Iowa 2002)* [hereinafter Comes]; see also *Hyde v. Abbott Labs., Inc., 473 S.E.2d 680, 687 (N.C. Ct. App. 1996)* [hereinafter Hyde] ("We find that a slight risk of multiple liability is greatly outweighed by the benefit of advancing the aforementioned policies of [North Carolina's Antitrust Act].").

n38. *Comes, supra* note 37, at 451.

n39. *Id. at 449* (quoting *Hyde, 473 S.E.2d at 687).*

n40. Id. at 451.

30 Wm. Mitchell L. Rev. 1351, *1402

n41. *Id. Accord Bunker's Glass Co. v. Pilkington PLC, 75 P.3d 99, 109 (Ariz. 2003)* [hereinafter Bunker's] (noting "courts can manage the complexity of indirect purchaser recovery in antitrust cases ... ."). Many commentators have also criticized Illinois Brick for its bad public policy. See Joseph P. Bauer, The Stealth Assault on Antitrust Enforcement: Raising the Barriers for Antitrust Injury and Standing, *62 U. Pitt. L. Rev. 437* passim (2001); Kevin J. O'Connor, Is the Illinois Brick Wall Crumbling?, *15 Antitrust 34, 34-35, 37-38 (2001);* Roger D. Blair & Jeffrey L. Harrison, Reexamining the Role of Illinois Brick in Modern Antitrust Standing Analysis, *68 Geo. Wash. L. Rev. 1* passim (1999).

n42. Cynthia Urda Kassis, The Indirect Purchaser's Right to Sue Under Section 4 of the Clayton Act: Another Congressional Response to Illinois Brick, *32 Am. U. L. Rev. 1087, 1116 (1983).*

n43. *490 U.S. 93 (1989).*

n44. *Id. at 105-06;* see also *Comes, supra* note 37, at 444 ("[ARC America] held nothing in the Sherman Act or in Illinois Brick prevents the states from allowing indirect purchasers to bring antitrust actions, even if this results in multiple recoveries.") (footnote omitted).

n45. *ARC Am., 490 U.S. at 95;* see also Brief of Thirty-Five States and the District of Columbia as Amici Curiae in *Support of Appellants, State of California v. ARC America Corp., 490 U.S. 93 (1987)* (No. 87-1862).

n46. *ARC Am., 490 U.S. at 96.*

n47. *Id. at 98.* (Plaintiffs' "claims under these state indirect purchaser statutes are the focus of this case.").

n48. *In re Cement & Concrete Antitrust Litig., 817 F.2d 1435, 1446-47 (9th Cir. 1987).*

n49. *ARC Am., 490 U.S. at 100.*

30 Wm. Mitchell L. Rev. 1351, *1402

n50. *Id. at 100-01* (citations omitted).

n51. *Id. at 101* (citations omitted).

n52. Id. at n.4.

n53. Id. at 102; see also *In re Brand Name Prescription Drugs Antitrust Litig., 123 F.3d 599, 611 (7th Cir. 1997)* ("Antitrust law ... is a field in which Congress has not sought to replace state with federal law.") (citation omitted).

n54. *ARC Am., 490 U.S. at 103*.

n55. *Id. at 101*.

n56. *Id. at 105-06* (emphasis added).

n57. *Id. at 102*.

n58. *Id. at 101*.

n59. Sherwood v. Microsoft Corp., No. M2000-1850-COA-R9-CV, 2003 Tenn. Ct. App. LEXIS 539, at 80 (July 31, 2003) [hereinafter Sherwood] (emphasis added); see also *Mack v. Bristol-Myers Squibb Co., 673 So. 2d 100, 108 (Fla. Dist. Ct. App. 1996)* ("Issues such as whether deterrence, compensation, or efficient judicial administration should be promoted by antitrust laws and whether and to what extent these goals can or should be harmonized are fundamental policy decisions for the legislature of each state.") (internal footnote omitted).

n60. *Ala. Code 6-5-60* (2003); *Alaska Stat. 45.50.577* (Michie 2003) (authorizing attorney general action as parens patriae); *Ark. Code Ann. 4-75-315* (Michie 2003) (authorizing attorney general action as parens patriae); *Cal. Bus. & Prof. Code 16750* (2003); *Colo. Rev. Stat. 6-4-111* (2003) (authorizing attorney general action as parens patriae); *D.C. Code Ann. 28-4509* (2003); *Haw. Rev. Stat. 480-13* (2003); *Idaho Code 48-113* (2003); *740 Ill. Comp. Stat. 10/7* (2003) (authorizing attorney general action as parens patriae); *Kan. Stat. Ann. 50-161* (2003); *Me. Rev. Stat. Ann. tit. 10, 1104* (West 2003); *Md. Code Ann., Com. Law I 11-209* (2003) (authorizing attorney general action as parens patriae); *Mich. Comp. Laws 445.778* (2003); *Minn. Stat. 325D.57* (2003); *Miss. Code Ann. 75-21-9* (2003); *Neb. Rev. Stat. 59-821* (2003); *Nev. Rev. Stat. 598A.160* (2003) (authorizing attorney general action as parens patriae); *N.M. Stat. Ann. 57-1-3* (Michie 2003) (authorizing attorney general action as parens patriae); N.Y. Gen. Bus. 340 (2003); *N.D. Cent. Code 51-08.1-08* (2003); *Or. Rev. Stat. 646.780* (2003) (authorizing attorney general action as parens patriae); *R.I. Gen. Laws 6-36-12* (2003) (authorizing attorney general action as parens patriae); *S.D. Codified Laws 37-1-33* (Michie 2003); *Vt. Stat. Ann. tit. 9, 2465* (2003); W. Va. Code St. R. 142-9-1, 142-9-2 (2003); *Wis. Stat. 133.18* (2003).

Moreover, in *FTC v. Mylan Labs., Inc. (Mylan II), 99 F. Supp. 2d 1, 10-11 (D.D.C. 1999),* Judge Thomas Hogan, the judge who presided over In re Vitamins Antitrust Litigation, ruled that Illinois Brick did not preclude the Alaska, Arkansas, Connecticut, Florida, Kentucky, Louisiana, Maine, North Carolina, Ohio, Oklahoma, South Carolina, Utah, Vermont and West Virginia attorneys general from seeking restitution or damages resulting from price fixing on behalf of consumers under these states' consumer protection or unfair trade practices statutes. Judge Hogan also held that Washington's damages claim for indirect purchasers was limited to state governmental entity purchasers. Id. passim.

n61. *Wash. Rev. Code 19.86.080* (2003); see also *Blewett v. Abbott Labs., 938 P.2d 842, 847 (1997)* ("If direct purchasers decide not to sue, the indirect purchaser is not entirely without a remedy. While a private plaintiff must "be injured in his or her business or property' in order to bring any suit under the Act, this requirement does not exist in the section of the Act that enables actions by the attorney general.").

n62. *Ciardi v. F. Hoffman-La Roche, Ltd., 762 N.E.2d 303, 312 (Mass. 2002).*

n63. *Arthur v. Microsoft Corp., 267 Neb. 586,* [7], *No. S-01-1325, 2004 Neb. LEXIS 43, 22 (2004).*

n64. *Elkins v. Microsoft Corp., 817 A.2d 9, 18-20 (Vt. 2002)* (noting indirect purchasers can also sue under Vermont's antitrust statute).

n65. *Mack v. Bristol-Myers Squibb Co., 673 So. 2d 100, 110 (Fla. Dist. Ct. App. 1996).*

30 Wm. Mitchell L. Rev. 1351, *1402

n66. Cement Masons Local Union No. 699 v. Mylan Labs., Inc., No. 431-99, slip op. at 10-11 (N.J. Super. Ct. Apr. 18, 2000) (order denying motion to dismiss consumer fraud claim on behalf of consumer indirect purchasers). But see Wilson v. General Motors Corp., No. L-1287-03, slip op. at 2 (N.J. Super. Ct. Oct. 3, 2003) (order dismissing plaintiff's consumer fraud claim for indirect purchaser price fixing injury); *Kieffer v. Mylan Labs., Inc., No. BER-L-365-99-EM, 1999 WL 1567726* (N.J. Super. Ct. Sept. 9, 1999) (letter opinion holding indirect purchasers lack standing under New Jersey's antitrust and consumer fraud acts).

n67. *Bunker's, supra* note 41, at 110.

n68. *Comes, supra* note 37, at 451.

n69. *Hyde, supra* note 37, at 688.

n70. Sherwood, supra note 59, at 115; Blake v. Abbott Labs., Inc., No. 03*AO1-9509-CV-00307, 1996 Tenn. App. LEXIS 184, at 19* (Mar. 27, 1996).

n71. Consumers have also sought to recover their antitrust overcharges by alleging defendants' unjust enrichment. See *In re Cardizem CD Antitrust Litig., 105 F. Supp. 2d 618, 668 (E.D. Mich. 2000)* (denying defendants' motion to dismiss consumers' class action unjust enrichment claims for overcharges under various states' laws); Freeman Indus., LLC v. Eastman Chem. Co., No. C34355-L, slip op. at 2 (Law Court Sullivan Cty., Kingsport, Tenn. July 15, 2002) ("Defendants' Motion to Dismiss is overruled and denied with respect to Plaintiffs' [sic] claim and cause of action on the theory of unjust enrichment under Tennessee law.").

n72. *O'Connor, supra* note 41, at 35. For additional discussion on the number of indirect states, see Thomas Greene, Kevin O'Connor & Robert L. Hubbard, State Antitrust Law and Enforcement, 1252 PLI/Corp. 1129, 1152-1156 (2001).

n73. See *Vacco v. Microsoft Corp., 793 A.2d 1048 (Conn. 2002); Berghausen v. Microsoft Corp., 765 N.E.2d 592 (Ind. Ct. App. 2002);* Arnold v. Microsoft Corp., No. 2000-*CA-002144-MR, 2001 WL 1835377* (Ky. Ct. App. Nov. 21, 2001); *Duvall v. Silvers, Asher, Sher & McLaren, M.D.'s, Neurology, P.C., 998 S.W.2d 821 (Mo. Ct. App. 1999); Minuteman, LLC v. Microsoft Corp., 795 A.2d 833 (N.H. 2002)); Johnson v. Microsoft Corp., 802 N.E.2d 712 (Ohio Ct. App. 2003)* [hereinafter Johnson]; *Major v. Microsoft Corp., 60 P.3d 511 (Okla. Civ. App. Div. No. 3 2002); Abbott Labs., Inc. v. Segura, 907 S.W.2d 503 (Tex. 1995).*

30 Wm. Mitchell L. Rev. 1351, *1402

n74. Georgia and Pennsylvania.

n75. Wyoming's antitrust laws provide private remedies for only a few civil offenses, which do not include price fixing. See *Wyo. Stat. Ann. 40-4-114* (Michie 2003).

n76. Louisiana, South Carolina, Montana, Utah, Virginia and Delaware.

n77. However, in *In re Lorazepam & Clorazepate Antitrust Litigation, 205 F.R.D. 369, 374 (D.D.C. 2002)*, which involved attorneys general, consumers, and the FTC's lawsuits against defendant drug manufacturers for violating various federal and state antitrust laws by monopolizing the markets for the generic anti-anxiety drugs Lorazepam and Clorazepate, the court actually granted final class action settlement approval to all plaintiffs' claims. The court explained that consumers "in twenty states - Arizona, California, the District of Columbia, Florida, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, New York, North Carolina, North Dakota, Pennsylvania, South Dakota, Tennessee, West Virginia, and Wisconsin ... have specific indirect purchaser statutes or case law permitting private parties to sue" and approved indirect purchasers' claims in the "thirty-one other states - Alaska, Alabama, Arkansas, Colorado, Connecticut, Delaware, Georgia, Hawaii, Iowa, Idaho, Illinois, Indiana, Kentucky, Maryland, Missouri, Mississippi, Montana, Nebraska, New Hampshire, Nevada, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, Texas, Utah, Virginia, Vermont, Washington, and Wyoming" as well. Id. The court further approved all fifty states' attorneys general settlements, pursuant to the attorneys general's parens patriae authority to pursue state consumer antitrust claims. *Id. at 386-88.*

n78. *Comes, supra* note 37.

n79. *Id. at 441.*

n80. *Id. at 442.*

n81. *Id. at 441.*

30 Wm. Mitchell L. Rev. 1351, *1402

n82. *Id. at 443* (emphasis added); see also *Iowa Code 553.12* (2003).

n83. *Comes, supra* note 37, at 445.

n84. Id. (internal citations and footnote omitted).

n85. *Id. at 445-46.*

n86. *Id. at 446;* see also *Iowa Code 553.2* (2003).

n87. *Comes, supra* note 37, at 446.

n88. Id. (citing *Emergency One, Inc. v. Waterous Co., 23 F. Supp. 2d 959, 967 (E.D. Wis. 1998)).*

n89. Id.

n90. Id. (citing *Pool v. Super. Ct., 677 P.2d 261, 271 (Ariz. 1984)).*

n91. Id.

n92. Id. (emphasis added).

n93. Id. at 447 (internal citations omitted).

30 Wm. Mitchell L. Rev. 1351, *1402

n94. Id. (emphasis added).


n95. Id.


n96. Id. at 447-48 (citing Kassis, supra note 42, at 1098); see also *Radovich v. National Football League,
352 U.S. 445, 454 (1958)* (finding that antitrust laws protected victims, as well as the public, and courts should
not burden private litigants with additional requirements in a case in which plaintiff sued under section 4 of the
Clayton Act, alleging defendants had conspired to monopolize professional football); *Mandeville Island Farms,
Inc. v. Am. Crystal Sugar Co., 334 U.S. 219, 236 (1948)* (finding that the statute did not confine its protection to
consumers, purchasers, competitors, or sellers, but that its terms and coverage were comprehensive, "protecting
all who are made victims of the forbidden practices" in case where sugar beet growers sued sugar refiners and
distributors under the Sherman Act for price fixing); *Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264-66
(1946)* (in Sherman and Clayton Acts claim for monopolistic practices involving exhibiting motion pictures,
explaining that to require plaintiffs to demonstrate specific damages where defendants have made it difficult to
do so would induce more grievous wrongdoing).


n97. *Comes, supra* note 37, at 448.


n98. Id.


n99. *Id. at 449.*


n100. Id. (quoting *Hyde, supra* note 37, at 685).


n101. Id. at 449-50 (citing *Bunker's, supra* note 41, at 1130).


n102. *Comes, supra* note 37, at 451.

30 Wm. Mitchell L. Rev. 1351, *1402

n103. Id.

n104. Id. (citing Kassis, supra note 42, at 1116 ("The House Report on H.R. 11942, ... concluded that the Court had overstated the problem of complexity in Illinois Brick[, and t]he Senate Judiciary Committee, in its report on S. 1874, acknowledged the difficulty of proving pass-on but concluded that this difficulty did not justify ignoring the important rights of indirect purchasers.")).

n105. Id.

n106. Id.

n107. Id. at 450 (citing *Illinois Brick, 431 U.S. at 746).*

n108. Id. at 451.

n109. Id.

n110. *75 P.3d 99 (Ariz. 2003).*

n111. *Id. at 101.*

n112. Id.; see also *Bunker's, supra* note 41, at 1130; Gray v. Philip Morris, Inc., No. Civ A. C2000078, slip op. (Ariz. Feb. 28, 2001).

30 Wm. Mitchell L. Rev. 1351, *1402

n113. *Bunker's, supra* note 41, at 102.

n114. Id.; see also *Ariz. Rev. Stat. 44-1408* (2003).

n115. *Bunker's, supra* note 41, at 102.

n116. Id. (quoting *Ariz. Rev. Stat. 44-1401*).

n117. Id.

n118. Id.

n119. Id.

n120. Id. (emphasis added).

n121. Id.; see *Ariz. Rev. Stat. 44-1412* (2003).

n122. *Bunker's, supra* note 41, at 102.

n123. Id.

n124. *Id. at 102-03.*

30 Wm. Mitchell L. Rev. 1351, *1402

n125. *Id. at 103* (emphasis added).

n126. *Id. at 103* (citing *California v. ARC Am. Corp., 490 U.S. 93, 97-98 (1989)).*

n127. *Id. at 106.*

n128. Id.

n129. Id. (emphasis added).

n130. Id.

n131. *Id. at 106.*

n132. *Id. at 106-07* (emphasis added).

n133. *Id. at 107.*

n134. Id. (emphasis added) (citations omitted).

n135. *Id. at 109.*



n136. Id.

n137. Id. (emphasis added).

n138. Id.

n139. *Id. at 108.*

n140. *Id. at 108.*

n141. Id.

n142. Id. (citing Edmund H. Mantell, Denial of a Forum to Indirect-Purchaser Victims of Price Fixing Conspiracies: A Legal and Economic Analysis of Illinois Brick, *2 Pace L. Rev. 153, 204-10 (1982)* (presenting formula for calculating damages and arguing the suggested difficulties for such calculations are exaggerated); Robert G. Harris & Lawrence A. Sullivan, Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis, *128 U. Pa. L. Rev. 269, 315 (1979)* (suggesting "reasonable estimation of passing on which will closely approximate the truth in the majority of cases requires no mystical powers or elaborate, extensive economic analysis")). The In re Vitamins Defendants' Indirect Purchaser Master Settlement Agreement also demonstrates damages are not too complex to compute and allocate.

n143. *Bunker's, supra* note 41, at 109.

n144. Id.

n145. Id.; see also *In re S.D. Microsoft Antitrust Litig., 657 N.W.2d 668, 679 (S.D. 2003)* (cited by Bunker's, where the court noted virtually all courts considering indirect purchasers' claims against Microsoft have upheld class certification based on plaintiffs' testimony regarding proving pass-on damages).

n146. *Bunker's, supra* note 41, at 110.

n147. Id.

n148. *No. M2000-01850-COA-R9-CV, 2003 Tenn. App. LEXIS 539* (Tenn. Ct. App. July 31, 2003).

n149. Id. at 2.

N150. Id. at 82.

n151. Id. at 86-87.

n152. Id. at 87; see also *Jo Ann Forman, Inc. v. Nat'l Council on Comp. Ins., Inc., 13 S.W.3d 365, 373 (Tenn. Ct. App. 1999)* (indicating that the court was bound by Tennessee case law concerning the definition of the term "article" in the TTPA and was not permitted to broaden this term to cover plaintiffs' claim despite three failed legislative attempts to broaden it).

n153. Sherwood, supra note 59, at 98 (emphasis added) (quoting *Tenn. Code Ann. 47-25-106* (2003)).

n154. Id. at 98.

n155. Id. at 99.

n156. Id. at 101.

n157. Id.; see also supra text accompanying note 31.

n158. One need merely observe the federal-direct purchaser Vitamins case and myriad state-indirect purchaser Vitamins cases to see this concept demonstrated. See supra notes 11 & 13.

n159. Sherwood, supra note 59, at 101.

n160. No. 03A01-9509-CV-00307, 1996 Tenn. App. LEXIS 184 (Tenn. Ct. App. Mar. 27, 1996).

n161. Id. at 10.

n162. Sherwood, supra note 59, at 103.

n163. 473 S.E.2d 680 (N.C. Ct. App. 1996).

n164. Id. at 681.

n165. N.C. Gen. Stat. 75-16 (2003) (emphasis added).

n166. Hyde, supra note 37, at 684.

30 Wm. Mitchell L. Rev. 1351, *1402

n167. Id. (emphasis added).

n168. Id.

n169. *Bunker's, supra* note 41, at 103.

n170. Id.

n171. Id.

n172. *Hyde, supra* note 37, at 684.

n173. Id. (citing *Shannon v. United States, 512 U.S. 573 (1994); Carolene Prods. Co. v. United States, 323 U.S. 18, 25-26 (1944)).*

n174. Id. (listing the federal cases pre-Illinois Brick where indirect purchasers were granted standing to sue under the Clayton Act for Sherman Act violations).

n175. Id. at 686.

n176. Id. at 687.

n177. Id.

30 Wm. Mitchell L. Rev. 1351, *1402

n178. *Hyde, supra* note 37 at 687.

n179. Id. (emphasis added).

n180. Id.

n181. Id.

n182. Id.

n183. *Id. at 688.*

n184. *La. Rev. Stat. Ann. 51:137* (West 2003) (emphasis added).

n185. See, e.g., *City of Pineville v. Am. Fed'n of State, County & Mun. Employees, 791 So. 2d 609, 612 (La. 2001).*

n186. *Cleco Evangeline, LLC v. La. Tax Comm'n, 808 So. 2d 740, 744 (La. Ct. App. 2001).*

n187. *Bunker's, supra* note 41, at 107; *Comes, supra* note 37, at 445; *Hyde, supra* note 37; Sherwood, supra note 59, at 92; see also *Elkins v. Microsoft Corp., 817 A.2d 9, 13 (Vt. 2002)* (holding "any person" means indirect purchasers for purposes of Vermont's consumer fraud act).

n188. *La. Rev. Stat. Ann. 51:129* (2003).

30 Wm. Mitchell L. Rev. 1351, *1402

n189. La. Civ. Code Ann. art. 24 (West 2003) (emphasis added).

n190. *Reppond v. City of Denham Springs, 572 So. 2d 224, 228 (La. Ct. App. 1990).*

n191. *City of Pineville v. Am. Fed'n of State, County & Mun. Employees, 791 So. 2d 609, 612 (La. 2001).*

n192. Id.

n193. Id.; see also *Board of Comm'rs v. S. D. Hunter Found., 354 So. 2d 156, 168 (La. 1977)* (holding that the district court's statutory interpretation properly considered the legislature's intention at the time it passed the statute).

n194. *Reppond, 572 So. 2d at 228.*

n195. *Blake, 1996 Tenn. App. LEXIS 184, at 9.*

n196. Id.; see also *Hyde, supra* note 37, at 687 ("The rule in North Carolina is clear that the intent of the General Assembly may only be discerned by its actions, and not its failure to act.").

n197. *Louisiana Power & Light Co. v. United Gas Pipe Line Co., 493 So. 2d 1149, 1158 (La. 1986)* (emphasis added); accord *State ex rel. Ieyoub v. Bordens, Inc., 684 So. 2d 1024, 1027 (La. Ct. App. 1996)* ("The U.S. Supreme Court's interpretation of the Sherman Act is a persuasive influence on the interpretation of our state statutes."); *Reppond v. Denham Springs, 572 So. 2d 224, 228 n.2 (La. Ct. App. 1990)* ("Although the federal jurisprudence interpreting the Sherman Antitrust Act is not controlling, it may be used as persuasive interpretation of our own state anti-trust statute.").

n198. See *Hyde, supra* note 37, at 687 ("The United States Supreme Court in ARC America stated that Illinois Brick was concerned solely with the construction of federal antitrust laws, and not at all with state court

constructions of state antitrust laws.").

n199. *982 F. Supp. 1211 (M.D. La. 1997).*

n200. *Id. at 1218.*

n201. *Louisiana Indep. Auto Dealers Assoc. v. State, 295 So. 2d 796, 799 n.1 (La. 1974).* See also *Louisiana Assoc. Gen. Contractors v. Louisiana, 669 So. 2d 1185, 1192 (La. 1996)* (holding that federal decisions on standing and justiciability "should be considered persuasive").

n202. *62 F. Supp. 2d 25 (D.D.C. 1999)* [hereinafter Mylan I].

n203. *Id. at 32-33.*

n204. *Id. at 33.*

n205. *Id. at 44-53.*

n206. *Id. at 47.*

n207. *99 F. Supp. 2d 1 (D.D.C. 1999)* [hereinafter Mylan II].

n208. *Id. at 3.*

30 Wm. Mitchell L. Rev. 1351, *1402

n209. *Id. at 5.*

n210. Id.

n211. *Id. at 6;* see also supra text accompanying note 60, P2.

n212. *Mylan II, supra* note 207, at 6.

n213. Id.

n214. *Id. at 7.*

n215. *S.C. Code Ann. 39-3-30* (Law Co-op. 2003) (emphasis added).

n216. *Id. 39-5-10* (defining "person" in the context of South Carolina's Unfair Trade Practices Act, which, like its Antitrust Act, is found both in Title 39 (the Code's "Trade and Commerce" section) and is intended to protect consumers and commerce) (emphasis added); see also *Bob Jones Univ. v. South Carolina Tax Comm'n, 261 S.E.2d 309, 310 (S.C. 1979)* (defining "person" as "natural person" in a tax dispute).

n217. *Joint Legis. Comm. for Judicial Screening ex rel. McConnell v. Huff, 464 S.E.2d 324, 326 (S.C. 1995).*

n218. *City of Columbia v. ACLU of S.C., Inc., 475 S.E.2d 747, 749 (S.C. 1996);* see also *Brown v. State, 540 S.E.2d 846, 850 (S.C. 2001)* ("When the terms of a statute are clear and unambiguous, the Court must apply them according to their literal meaning.").

30 Wm. Mitchell L. Rev. 1351, *1402

n219. *Pee v. AVM, Inc., 543 S.E.2d 232, 235 (S.C. Ct. App. 2001).*

n220. *Lester v. S.C. Workers' Comp. Comm'n, 514 S.E.2d 751, 753 (S.C. 1999).*

n221. *Davis v. Nationscredit Fin. Servs. Corp., 484 S.E.2d 471, 472 (S.C. 1997).*

n222. *City of Sumter Police Dep't v. One (1) 1992 Blue Mazda Truck, 498 S.E.2d 894, 896 (S.C. Ct. App. 1998)* (citing *Bennett v. Sullivan's Island Bd. of Adjustment, 438 S.E.2d 273, 274 (S.C. Ct. App. 1993)).*

n223. See *State v. Colf, 525 S.E.2d 246, 248 (S.C. 2000)* (Where state rules are the same as federal rules, "federal cases may be persuasive.").

n224. See *State v. Thrift, No. 23957, 1994 S.C. LEXIS 25, at 23* (S.C. Jan. 17, 1994) (noting "the federal interpretation of the Fifth Amendment, while persuasive, [is] not binding"); *Cone v. Nettles, 417 S.E.2d 523, 524 (S.C. 1992)* (explaining that federal decisions are "persuasive" authority).

n225. *Silva v. Silva, 509 S.E.2d 483, 485 (1998).*

n226. *498 F. Supp. 79 (E.D.N.Y. 1980).*

n227. *Id. at 85-86* (citing *Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977)).*

n228. See supra notes 223, 224.

n229. Mylan I, supra note 202, at 51.

30 Wm. Mitchell L. Rev. 1351, *1402

n230. *Mylan II, supra* note 207, at 9; see also supra note 60, P 2.

n231. *Mont. Code Ann. 30-14-222* (2003) (emphasis added).

n232. *Id. 30-14-202*(7) (2003).

n233. *Crone v. Crone, 77 P.3d 167, 169 (Mont. 2003)* (citations omitted).

n234. *State v. Hayes, 32 P. 415, 416 (Mont. 1893).*

n235. See Webster's Ninth New Collegiate Dictionary 877 (1991) (defining "person" as "human, individual").

n236. *State v. Lacasella, 60 P.3d 975, 983 (2002)* (Rice, J., dissenting).

n237. See *Bradley v. Crow Tribe of Indians, 67 P.3d 306, 310 (Mont. 2003)* ("We find several decisions in the federal circuits to be persuasive ... ."); *Roosevelt v. Montana Dep't of Revenue, 975 P.2d 295, 302 (Mont. 1999)* (considering federal authority "to the extent that ... [it was] persuasive ... .").

n238. *Melton v. Oleson, 530 P.2d 466, 470 (Mont. 1974).*

n239. *858 P.2d 11 (1993).*

30 Wm. Mitchell L. Rev. 1351, *1402

n240. *Id. at 13.*

n241. Id. (emphasis added) (citations omitted).

n242. Id. (emphasis added).

n243. *Roosevelt v. Montana Dep't of Revenue, 975 P.2d 295, 302 (Mont. 1999)* (explaining federal authority is merely "persuasive" authority).

n244. See infra n.282.

n245. See *Comes, supra* note 37, at 446; *Bunker's, supra* note 41, at 102.

n246. *Utah Code Ann. 76-10-919* (2003) (emphasis added).

n247. Id. 76-1-601.

n248. *De Baritault v. Salt Lake City Corp., 913 P.2d 743, 746 (Utah 1996)* (quoting *Sullivan v. Sconlar Grain Co., 853 P.2d 877, 880 (Utah 1993)).*

n249. *Cache County v. Property Tax Div. of the Utah State Tax Comm'n, 922 P.2d 758, 767 (Utah 1996).*

n250. *State v. Hodges, 63 P.3d 66, 70 (Utah 2002).*

30 Wm. Mitchell L. Rev. 1351, *1402

n251. Id. (quoting *Zoll & Branch, P.C. v. Asay, 932 P.2d 592, 594 (Utah 1997)).*

n252. *Lovendahl v. Jordan Sch. Dist., 63 P.3d 705, 710 (2002)* (quoting *State v. Tooele County, 44 P.3d 680 (2002)).*

n253. *Brixen & Christopher Architects, P.C. v. State, 29 P.3d 650, 661 (Utah 2001).*

n254. *Utah Code Ann. 76-10-926* (1953); see also *id. at 661* (explaining Utah courts invoke harmonization clause when interpreting Utah's Antitrust Act).

n255. See *Utah Code Ann. 76-10-926.*

n256. *Comes, supra* note 37, at 446; *Bunker's, supra* note 41, at 106. For a more comprehensive discussion concerning indirect purchaser standing despite harmonization clauses, see infra Part VII.

n257. Mylan I, supra note 202, at 52.

n258. *Mylan II, supra* note 207, at 9; see also supra note 60, P 2.

n259. *Va. Code Ann. 59.1-9.12* (Michie 1974).

n260. *Homeside Lending, Inc. v. Unit Owners Ass'n of Antietam Square Condo., 540 S.E.2d 894, 896 (Va. 2001)* (citations and quotations omitted).

n261. *Va. Code Ann. 59.1-9.3* (Michie 1974).

30 Wm. Mitchell L. Rev. 1351, *1402

n262. *Armstrong v. NEWVA Enter., 23 Va. Cir. 352, 354 (1991)* (also noting "Black's Law Dictionary ... states: Person. In general usage, a human being (i.e., natural person), though by statute term may include a firm, labor organizations, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, or receivers.").

n263. *Winston v. Richmond, 83 S.E.2d 728, 731 (Va. 1954).*

n264. *Armstrong v. Erasmo, 263 S.E.2d 655, 659 (Va. 1980).*

n265. *Sellers v. Bles, 92 S.E.2d 486, 494 (Va. 1952)* (citing *Miller v. State Entomologist, 135 S.E. 813, 817 (Va. 1926)).*

n266. *Kuhn v. West Alexandria Prop., Inc., 22 Va. Cir. 439, 457 (1980).*

n267. *Va. Code Ann. 59.1-9.17* (Michie 1974).

n268. *Comes, supra* note 37, at 446; *Bunker's, supra* note 41, at 106; see also infra Part VII.

n269. *490 U.S. 93 (1989).*

n270. Because the Delaware Antitrust Act was enacted in 1979, this section contains no discussion concerning it predating Illinois Brick. See 62 Del. Laws, ch. 89, 1 (1979).

n271. *Del. Code Ann. tit. 6, 2108* (2003); see also *Maddock v. Greenville Ret. Cmty., L.P., No. 12564, 1997 Del. Ch. LEXIS 24, 22* ("The Delaware [antitrust] statute does not permit individuals to enforce their rights by bringing private actions ... . Instead of providing for a private right of action, the Delaware statute expressly

30 Wm. Mitchell L. Rev. 1351, *1402

grants the state attorney general the right to bring remedial actions.").

n272. *Jackson v. Multi-Purpose Criminal Justice Facility, 700 A.2d 1203, 1205 (Del. 1997).*

n273. *S&R Assocs., L.P., III v. Shell Oil Co., 725 A.2d 431, 437-48 (Del. Super. Ct. 1998)* (in context of U.C.C. claim, explaining that legislature intended "natural persons" to mean "individuals," not corporations or limited partnerships); see also St. Paul Fire & Marine Ins. Co. v. Elkay Mfg. Co., Nos. 98C-11-262 WCC and 99C-*11-144 WCC, 2003* Del. Super. LEXIS 13, 27-28 (Jan. 17, 2003) ("The legislature has specifically defined "natural person' to exclude corporations."); Industrial Accident Bd. Second Injury & Contingency Fund v. Photo Color, Inc., Nos. 97A-01-018-WCC and 97*A-06-014-WCC, 1999 Del. Super. LEXIS 660, 8* (Nov. 30, 1999) ("While "person' is not specifically defined in the statute, it has been commonly defined as, "a human being (i.e., natural person) ... .' ").

n274. *Jackson, 700 A.2d at 1205.*

n275. *Hammermill Paper Co. v. Palese, No. 7128, 1983 Del. Ch. LEXIS 400, 12* (June 14, 1983).

n276. *Del. Code Ann. tit. 6, 2113* (2003) ("This chapter shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes.").

n277. *Hammermill, 1983 Del. Ch. LEXIS at 12.*

n278. *Del. Code Ann. tit. 6, 2101* (2003) (emphasis added); see also Webster's, supra note 235, at 952 (defining "public" as "a group of people having common interests or characteristics") (emphasis added).

n279. See also infra Part VII.

n280. *Conn. Gen. Stat. 35-35* (2003) ("The state, or any person, including, but not limited to, a consumer,

injured in its business or property by any violation of the provisions of this chapter shall recover treble damages ... .") (emphasis added); *Mo. Rev. Stat. 416.121* (2003) ("Any person ... who is injured in his [or her] business or property by reason of anything forbidden or declared unlawful by [the Antitrust Act] may sue therefor in any circuit court of this state ... and such person may: (1) Sue for damages sustained by him ... .") (emphasis added); *N.H. Rev. Stat. Ann. 356:11* (2003) ("Any person injured in his business or property by reason of a violation of this chapter may recover the actual damages sustained ... .") (emphasis added); *Okla. Stat. tit. 79, 205* (2003) ("Any person who is injured in his or her business or property by a violation of this act, may obtain appropriate injunctive or other equitable relief and monetary damages and shall recover threefold the damages sustained ... .") (emphasis added); *Tex. Bus. & Com. Code Ann. 15.21* (2003) ("Any person ... whose business or property has been injured by reason of any conduct declared unlawful in [the Antitrust Act] may sue any person, other than a municipal corporation, in district court in any county of this state ... .") (emphasis added).


n281. *Conn. Gen. Stat. 35-25* (2003) (" 'Person' means any individual, proprietorship, corporation, limited liability company, firm, partnership, incorporated and unincorporated association, or any other legal or commercial entity ... ."); *Mo. Rev. Stat. 416.021* (2003) (" 'Person' means any individual, corporation, firm, partnership, incorporated or unincorporated association or any other legal or commercial entity ... ."); *N.H. Rev. Stat. Ann. 356:1* (2003) (" 'Person' shall include, where applicable, natural persons, trusts, government entities, corporations, partnerships, limited partnerships, proprietorships, incorporated or unincorporated associations, and any other legal entity."); *N.H. Rev. Stat. Ann. 356:13* (2003) ("For the purposes of this chapter, "person" shall mean an individual, corporation, trust, estate, partnership, association, or any other legal entity."); *Okla. Stat. tit. 79, 202* (2003) ("'Person' means a natural person ... ."); *Tex. Bus. & Com. Code Ann. 15.03* (2003) ("The term "person' means a natural person ... .").


n282. *Vacco v. Microsoft Corp., 793 A.2d 1048, 1058-59 (Conn. 2002)* (invoking its Antitrust Act's harmonization clause, the Connecticut Supreme Court overbroadly explained its "legislature intended to "[give] Connecticut an [antitrust] law similar to the existing federal [antitrust] law in every respect' "); *Duvall v. Silvers, 998 S.W.2d 821, 824 (Mo. Ct. App. 1999)* ("Missouri's antitrust statutes [must] be construed "in harmony with ruling judicial interpretations of comparable federal antitrust statutes.' ") (citing *Mo. Rev. Stat. 416.141* (2003)); *Minuteman v. Microsoft Corp., 795 A.2d 833, 837 (N.H. 2002)* ("By including RSA 356:14 [the harmonization clause] in the statute, the legislature expressly encouraged a uniform construction with federal antitrust law."); *Major v. Microsoft Corp., 60 P.3d 511, 514 (Okla. Ct. App. 2002)* ("Oklahoma legislature manifested its clear intent to harmonize the Act with federal antitrust law when it enacted 212 [its harmonization clause]."); *Abbott Labs. v. Segura, 907 S.W.2d 503, 505 (Texas 1995)* ("We begin with the Legislature's mandate that Texas antitrust law be harmonized with federal antitrust law." (citing *Tex. Bus. & Com. Code 15.04* (2003)).


n283. See *Johnson, supra* note 73, at 718 n.9 ("The holding of Illinois Brick is at its core a definition of who can be said to have suffered injury under federal antitrust law, and, therefore, by applying Illinois Brick to R.C. 1331.08, it must be said that an indirect purchaser is not "the person injured.' " (emphasis added)); *Berghausen v. Microsoft Corp., 765 N.E.2d 592, 594 (Ind. Ct. App. 2002)* ("The Indiana Act was modeled after section two of the Sherman Antitrust Act ... and has been interpreted consistent with the federal law interpreting the Federal Act."); Arnold v. Microsoft Corp., No. 2999-*CA-002144-MR, 2001 WL 1835377, 3* (Ky. Ct. App. Nov. 21, 2001) ("We, like the trial court, find the reasoning of Illinois Brick to be highly persuasive ... and because the [Kentucky] statute is based upon the Sherman Act, the interpretation of the Sherman Act given by the United

States Supreme Court is highly instructive."). Importantly, Arnold is an unpublished opinion, which "shall never be cited or used as authority in any other case in any court of this state." Id. at caption. See also Ky. R. Civ. P. 76.28(4)(c) ("Opinions that are not to be published shall not be cited or used as authority in any other case in any court of this state.")


n284. *Ohio Rev. Code Ann. 1331.08* (2003) ("the person injured in the person's business or property by another person ... may sue therefor ... and recover treble the damages sustained by the person and the person's costs of suit") (emphasis added); id. 1331.01 (2003) (" 'Person' includes corporations, partnerships, and associations existing under or authorized by any state or territory of the United States, and solely for the purpose of the definition of division (B) of this section, a foreign governmental entity."); *Ind. Code Ann. 24-1-2-7* (2003) ("Any person who shall be injured in his business or property by any person or corporation by reason of the doing by any person or persons of anything forbidden or declared to be unlawful by this chapter may sue therefor in the circuit or superior court of any county ... .") (emphasis added); id. 24-1-2-10 (2003) ("The words 'person' or 'persons' whenever used in this chapter shall be deemed to include corporations, associations, limited liability companies, joint stock companies, partnerships, limited or otherwise ... ."); *Ky. Rev. Stat. Ann. 367.220* (2003) ("Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss [by violation of the Antitrust Act] may bring an action ... .") (emphasis added); id. 367.110 (2003) (" 'Person' means natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity.").


n285. And surely Illinois Brick qualifies as a decisional "u-turn" given the contrary federal case law that preceded it and that followed it, namely ARC America.


n286. See *Comes, supra* note 37, at 446.


n287. See *Bunker's, supra* note 41, at 106.


n288. Conn. Const. art. V, 1 ("The judicial power of the state shall be vested in a supreme court, an appellate court, a superior court, and such lower courts as the general assembly shall, from time to time, ordain and establish."); Ind. Const. art. 7, 1 ("The judicial power of the State shall be vested in one Supreme Court, one Court of Appeals, Circuit Courts, and such other courts as the General Assembly may establish."); Ky. Const. 109 ("The judicial power of the Commonwealth shall be vested exclusively in one Court of Justice which shall be divided into a Supreme Court, a Court of Appeals, a trial court of general jurisdiction known as the Circuit Court and a trial court of limited jurisdiction known as the District Court."); Mo. Const. art. 5, 1 ("The judicial power of the state shall be vested in a supreme court, a court of appeals consisting of districts as prescribed by law, and circuit courts."); N.H. Const. pt. 2, art. 72-a ("The judicial power of the state shall be vested in the supreme court, a trial court of general jurisdiction known as the superior court, and such lower courts as the legislature may establish ... ."); Ohio Const. art. 4, 1 ("The judicial power of the state is vested in a supreme

court, courts of appeals, courts of common pleas and divisions thereof, and such other courts inferior to the Supreme Court as may from time to time be established by law."); Okla. Const. art. VII, 1 ("The judicial power of this State shall be vested in the Senate ... a Supreme Court ... and such intermediate appellate courts as may be provided by statute ... ."); Tex. Const. art. V 1 ("The judicial power of this State shall be vested in one Supreme Court, in one Court of Criminal Appeals, in Courts of Appeals, in District Courts, in County Courts, in Commissioners Courts, in Courts of Justices of the Peace, and in such other courts as may be provided by law.").

n289. *Johnson, supra* note 73, at 722 (Painter, J., dissenting).

n290. *452 U.S. 89 (1981).*

n291. *Id. at 104.*

n292. Federal Judicial Center, Manual for Complex Litigation (Third) 30.24 (1995).

n293. *Hamilton v. Ohio Sav. Bank, 694 N.E.2d 442, 451-52 (Ohio 1998)* ("Unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal. The damage from misstatements could well be irreparable.") (citation omitted); *Monsanto Co. v. Davis, 25 S.W.3d 773, 788 (Tex. Ct. App. 2000)* ("The anti-suit injunction serves the same purpose by preventing Defendants from communicating with the absent class members via another legal proceeding. Thus, we conclude that the court could have found the no-communication injunction and the anti-suit injunction were necessary to prevent the evasion of an important public policy.").

n294. *457 U.S. 147 (1982).*

n295. *Id. at 160.*

n296. *Rivera v. Veterans Mem'l Med. Ctr., 818 A.2d 731, 743 (Conn. 2003)* ("In determining whether to certify the class, a [trial] court is bound to take the substantive allegations of the complaint as true.") (quoting *O'Connor v. N. Amn., Inc., 197 F.R.D. 404, 410 (C.D. Cal. 2000)).*

n297. See *Fed. R. Civ. P. 8(a)(2)*, requiring a complaint include only "a short and plain statement of the claim showing that the pleader is entitled to relief."

n298. *ITT Commercial Fin. Corp. v. Mid-America Marine Supply Corp., 854 S.W.2d 371, 379 (Mo. 1993)* ("Missouri is not a "notice pleading' state.").

n299. See *Collins v. Colonial Penn Ins. Co., 778 A.2d 899, 907 (Conn. 2001)* ("When we construe a statute, our fundamental objective is to ascertain and give effect to the apparent intent of the legislature ... .") (quoting *Conway v. Wilton, 680 A.2d 242, 248 (1996)); Barber v. Echo Lake Mobile Home Cmty., 759 N.E.2d 253, 256 (Ind. Ct. App. 2001)* ("Our primary objective when interpreting the meaning of a statute is to give effect to the intent of the legislature that enacted the statute."); *Fiscal Court of Jefferson County v. Louisville, 559 S.W.2d 478, 480 (Ky. 1977)* ("In the interpretation of statutes, the function of this or any court is to construe the language so as to give effect to the intent of the legislature."); *State ex rel. Sikes v. Williams, 121 S.W. 64, 68 (Mo. 1909)* ("It is fundamental that, in the construction of statutes, the courts should so interpret them as to conform with the intent of the law making power that enacted them."); *Ahern v. Laconia Country Club, 392 A.2d 587, 588 (N.H. 1978)* ("It is well-established law that the intention of the legislature as expressed in the statute is the touchstone to its meaning."); *Henry v. Central Nat'l Bank, 242 N.E.2d 342, 344 (Ohio 1968)* ("The primary purpose of the judiciary in the interpretation or construction of statutes is to give effect to the intention of the Legislature, as gathered from the provisions enacted, by the application of well settled rules of interpretation; the ultimate function being to ascertain the legislative will.") (quoting *State ex rel. Shaker Heights Pub. Library v. Main, 80 N.E.2d 261, 263-64 (Ohio Ct. App. 1948)); Knight v. Int'l Harvester Credit Corp., 627 S.W.2d 382, 384 (Tex. 1982)* ("The cardinal rule to be observed in any case involving statutory interpretation is that a court must look to the intent of the legislature and must construe the statute so as to give effect to that intent.").

n300. Connecticut's Antitrust Act was enacted in 1971, Indiana's in 1907, Kentucky's in 1972, Missouri's in 1974, New Hampshire's in 1917 (yet its section providing a civil remedy to "persons" was enacted in 1973), Ohio's in 1898 and Texas' in 1961. Oklahoma repealed its original antitrust act and enacted its Antitrust Reform Act in 1998.

n301. Ohio's Johnson court also relied on its earlier, unreported *Acme Wrecking Co., Inc. v. O'Rourke Const. Co., No. C-930856, 1995 Ohio App. LEXIS 745* (Mar. 1, 1995), decision to extend the holding of *C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp., 407 N.E.2d 507 (Ohio 1980),* concerning the Valentine and Sherman Acts' interrelationship to find a comparable interrelationship between the Valentine and Clayton Acts. See *Johnson, supra* note 73, at 714-15. But while the Valentine Act was adopted in 1898, eight years after Congress enacted the Sherman Act in 1890, the Clayton Act was not enacted until 1914 - eighteen years after the Valentine Act had already become law. While Ohio's General Assembly clearly had the prior Sherman Act in mind (which enunciated certain newly proscribed conduct) when it adopted the Valentine Act, it could not have had the Clayton Act in mind (which created civil claims for Sherman Act violations). Thus, unlike the Sherman

Act, Ohio's General Assembly could not have even considered the Clayton Act when it passed the Valentine Act. So while the court maintained it was required to read the Valentine Act "in light of" the Sherman Act, the same cannot be said with respect to the Clayton Act, but neither the Acme Wrecking nor Johnson courts ever considered this important distinction.

n302. *Johnson, supra* note 73, at 717.

n303. *15 U.S.C. 1* (2003).

n304. See *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985)* ("It is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines ... .").

n305. See *AvalonBay Communities, Inc. v. Town of Orange, 775 A.2d 284, 305 (Conn. 2001)* ("It is a basic tenet of statutory construction that the legislature did not intend to enact meaningless provisions. Accordingly, care must be taken to effectuate all provisions of the statute.") (citations omitted); *Guinn v. Light, 558 N.E.2d 821, 823 (Ind. 1990)* ("In construing a statute, the court must consider the whole act and, if possible, effect must be given to every word and clause therein."); *Felts v. Edwards, 204 S.W. 145, 146-47 (Ky. 1918)* ("The general rule of interpretation is, that effect must be given to every word in a statute ... ."); *State ex rel. Dean v. Daues, 14 S.W.2d 990, 1002 (Mo. 1929)* ("It is an elementary and cardinal rule of construction that effect must be given, if possible, to every word, clause, sentence, paragraph, and section of a statute, and a statute should be so construed that effect may be given to all of its provisions, so that no part, or section, will be inoperative, superfluous, contradictory, or conflicting, and so that one section, or part, will not destroy another."); *Town of Wolfeboro (Planning Bd.) v. Smith, 556 A.2d 755, 757 (N.H. 1989)* ("We assume that all words in a statute were meant to be given meaning in the interpretation of a statute."); *Ford Motor Co. v. Ohio Bureau of Employment Servs., 571 N.E.2d 727, 730 (Ohio 1991)* ("Every word in a statute is designed to have some effect, and hence the rule that, "in putting a construction upon any statute, every part shall be regarded, and it shall be so expounded, if practicable, as to give some effect to every part of it."') (citations omitted); *Muskogee Elec. Traction Co. v. Doering, 172 P. 793, 795 (Okla. 1918)* ("As a general rule, statutes are presumed to use words in their popular sense; but the safest rule of construction is to take the entire provisions of the statute, and thereby ascertain, if possible, what the Legislature intended."); *Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 493 (Tex. 2001)* ("We must presume that the Legislature intends an entire statute to be effective and that a just and reasonable result is intended.").

n306. It should also be noted that the Ohio and Oklahoma attorneys general believe their states' antitrust acts provide indirect purchaser remedies as evidenced by their having brought and settled parens patriae claims on behalf of state agency indirect vitamin purchases. See generally *Alaska ex rel. Atty. Gen. Botelho v. Hoffman-La Roche, Inc., No. A. 01 1583, 2001 WL 1230932* (D.D.C. Aug. 3, 2001). Ohio's attorney general also

recently filed and settled another parens patriae case on behalf of indirect sorbates (a food additive) purchasers. (No reported or unreported decisions exist from the Ohio attorney general's Indirect Sorbates litigation, but a copy of Ohio's complaint is on file with the author.)

    n307. Only three of the eight non-repealer states whose courts have ruled against indirect purchaser standing - Connecticut, New Hampshire, and Texas - involve state supreme court decisions. When presented with convincing arguments, these state supreme courts have been known to overrule their own earlier opinions. Therefore, the number of indirect purchaser states would increase to forty-seven if reversals were ultimately made. See *City of Waterbury v. Town of Wash., 800 A.2d 1102, 1126 (Conn. 2002)* (Court overruled its own prior cases, noting "in assessing the force of stare decisis, our case law has emphasized that we should be especially cautious about overturning a case that concerns statutory construction. Despite this reluctance, however, we have, on occasion, overruled cases that have involved the interpretation of a statute.") (internal quotations and citations omitted); *Lempke v. Dagenais, 547 A.2d 290, 298 (N.H. 1988)* (overruling earlier New Hampshire Supreme Court ruling); *Lubbock County v. Trammel's Lubbock Bail Bonds, 80 S.W.3d 580, 585 (Tex. 2002)* (overruling earlier Texas Supreme Court ruling).

1248JW

********** Print Completed **********

Time of Request: Thursday, March 15, 2007  14:04:46 EST

Print Number:    1842:17569948
Number of Lines: 1520
Number of Pages: 55

Send To:  KARON, DANIEL
          GOLDMAN SCARLATO & KARON
          101 W ELM ST STE 360
          CONSHOHOCKEN, PA 19428-2075