1248JW

**Time of Request:** Thursday, March 15, 2007  14:09:37 EST
**Client ID/Project Name:** Indirect Plastic Additives
**Number of Lines:** 3260
**Job Number:**      1823:17570880

Research Information

**Service:**   LEXSEE(R) Feature
**Print Request:** Current Document: 1
**Source:** Get by LEXSEE(R)
**Search Terms:** 74 temple l rev 689

**Send to:**  KARON, DANIEL
        GOLDMAN SCARLATO & KARON
        101 W ELM ST STE 360
        CONSHOHOCKEN, PA 19428-2075

LEXSEE 74 TEMPLE L REV 689

Copyright (c) 2001 Temple University of the Commonwealth System of Higher Education
Temple Law Review

Winter, 2001

*74 Temp. L. Rev. 689*

**LENGTH:** 39579 words

REPORT: THIRD CIRCUIT TASK FORCE REPORT ON SELECTION OF CLASS COUNSEL

**NAME:** Chief Judge Edward R. Becker

**SUMMARY:**
  ...  Recently two developments have altered the class action landscape: the use of judicial auctions to select class counsel and the enactment of the Private Securities Litigation Reform Act ("PSLRA"). ...  Professor Daniel J. Capra of Fordham Law School served as the Reporter to the Task Force; Professor Eleanor W. Myers of Temple Law School served as Associate Reporter. ...  Auctions are inconsistent with the goal of the PSLRA, which is to assure that the "most adequate" plaintiff will choose counsel and negotiate a reasonable fee. ...  The PSLRA adopts the model of a "client-driven" class action, in contrast to the "court-driven" auction model. ...  The reaction has ranged from a total prohibition of auctions to a view that the auction process is perfectly consistent with the PSLRA. ...  In passing on the propriety of multiple counsel, the court should not be content with conclusory assertions that multiple counsel is necessary to assure input from more class members or to avoid disputes among counsel for various plaintiffs. ... The Gunter factors were developed before the PSLRA, but the factors have obvious relevance to whether a fee is reasonable in any class action, including those brought under the PSLRA. ...

**TEXT:**
 [*689]

   I. Introduction

   A. The Promise and Challenge of Class Actions

 Courts have struggled with the challenges of managing class actions. One significant concern has been selecting appropriate counsel to litigate cases on behalf of the class; another has been the awarding of fair attorney fees. Courts also review the credentials of the lead plaintiff according to the standards of *Fed. R. Civ. P. 23*, in particular the requirement that the "representative parties will fairly and adequately protect the interests of the class." n1 Traditionally the choice of lead plaintiff constituted the choice of lead counsel, and the court awarded fees to class counsel at the end of the case in light of the result. Recently two developments have altered the class action landscape: the use of judicial auctions to select class counsel n2 and the enactment of the Private Securities Litigation Reform Act ("PSLRA"). n3

   The Third Circuit has been in the vanguard in the management of class actions in both its jurisprudence and its study. n4 In that tradition, Chief Judge  [*690]  Edward R. Becker convened the present Task Force on the Selection of Class Counsel to evaluate the emerging practice of several district court judges throughout the country of selecting class counsel and setting fees through a bidding or auction process, and to investigate more generally the problems involved in selection of class counsel.

Case 4:07-cv-05944-JST   Document 165-8   Filed 03/21/08   Page 3 of 108

Page 2
74 Temp. L. Rev. 689, *690

The redrafting of Rule 23 in 1966 opened the door more widely to class actions seeking damages arising from harms to multiple individuals or entities in a variety of contexts. The drafters recognized that it was inefficient, impractical and often impossible for injured persons with small claims to bring lawsuits to recover damages, no matter how strong their claims. Justice Ginsburg's opinion for the Supreme Court in Amchem Products, Inc. v. Windsor, n5 cited a Seventh Circuit decision describing the function of most class actions seeking money damages pursuant to Rule 23 (b)(3):

The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor. *Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (1997).*

The drafters also foresaw that, even when damages might be substantial enough to provide an incentive for litigation, multiple lawsuits raising very similar questions of fact and mixed questions of fact and law could drain scarce judicial resources and might do no more justice than a single suit brought on behalf of all who would have the right to file individual actions.

What was thought to be true in 1966 appears to be true today: namely, that the interests of justice are well served by class actions that vindicate rights that might otherwise go unprotected and that spare courts the burden of handling numerous lawsuits, some small and some not so small, arising from a common set of facts. Over the last 35 years, the American legal system has handled a variety of class actions involving an enormous array of claims. In many situations, the class action has been successful in identifying public harms, discovering a substantial percentage of likely victims, making the party responsible for the harm rectify much of the damage caused, and distributing damages among the injured parties.

B. Funding and Prosecution of Class Actions

Class actions are generated and funded in a number of ways. Some class actions are brought through the efforts of public interest advocacy groups; these actions usually involve constitutional and civil rights claims - e.g., school desegregation suits, employment discrimination actions, and challenges to statutes, regulations and ordinances on free speech grounds. Such groups may be funded by members, supported by contributors, or both. They may use in-house counsel who are paid a salary, outside counsel who often receive nothing  [*691]  unless they are successful in bringing suit so that attorney fees may be sought pursuant to statute, or a combination. The reported decisions and anecdotal reports of judges and lawyers in these cases suggest that it is relatively rare for there to be a fight among lawyers for appointment as lead counsel. The motivating force in these cases is vindication of principle. The prospect of attorney fees may be an incentive - in some cases, an important one - for groups or lawyers to risk their time and effort on such a case. But, the possibility that attorney fees might be awarded appears not to be the driving force for either the groups who bring suit or their lawyers. It is the principle at stake that drives the case. Those who share a belief in the principle are more likely to assist the litigation than to compete with it.

In other cases, particularly those in which injured parties have suffered a financial injury, the desire to be made whole may be as strongly held as principles that drive other litigation, but there is no public interest group or other not-for-profit entity volunteering to seek recourse on behalf of those who are injured. Instead, the injured find that justice depends on the availability of plaintiffs' counsel of sufficient experience, skill, and resources. It is the plaintiffs' bar, and particularly the plaintiffs' class action bar, that provides the legal representation that enables large groups of people to vindicate their right to legal redress for wrongs inflicted upon them.

It does not impugn the service that the plaintiffs' class action bar provides to note that the driving force in most cases is the opportunity to share in the plaintiffs' risk and ultimately in any reward they may receive. Like most prudent individuals, plaintiffs' counsel would not seek involvement in most class action cases, particularly those involving no principle greater than "the defendant wrongly deprived me of something of value," unless the financial reward justified

the risk that counsel undertakes. Because they have abilities that could be put to other uses, plaintiffs' counsel must find something in a class action that signals that it is financially attractive to be class counsel. n6

It is plaintiffs' counsel who pay the expenses of the lawsuit, and who expect that they will lose much if not all of their out-of-pocket expenses if they are not ultimately successful in having a court certify a class and achieving either a settlement or a litigation victory. n7 It is plaintiffs' counsel who work to obtain whatever recovery any member of the class who has not opted out of the  [*692]  litigation will receive. n8 The fact that there will be no payment if there is no settlement or trial victory means that there is greater risk for plaintiffs' counsel in these class action cases than in cases in which an hourly rate or flat fee is guaranteed. The quid pro quo for the risk, and for the delay in receiving any compensation in the best of circumstances, is some kind of risk premium if the case is successful.

C. Perceptions About Common Fund Class Actions

 The cases upon which the Task Force has focused are common fund cases. These are cases in which plaintiffs obtain class action certification and generate a pool of damages by way of settlement or litigation with one or more defendants. The larger the pool, the more each plaintiff might receive - depending, of course, on what the lawyers receive from the same pool. The lawyers expect compensation from the fund for creating it, as well as a risk premium for bearing all of the financial risks in the litigation. n9

The Task Force is well aware that there is a perception among a significant part of the non-lawyer population and even among lawyers and judges that the risk premium is too high in class action cases and that class action plaintiffs' lawyers are overcompensated for the work that they do. This perception is fostered by a belief that class action lawyers receive 25% to 33% of the recovery in common fund cases irrespective of how much (or worse, how little) work they do and irrespective of the quality of their representation.

We make no claim to being able to identify the "right" amount of compensation in particular cases. But the evidence before us is clear that the perception as to how lawyers in class action cases are compensated is often distorted. When there is a public reaction to an attorney fee award in a given case, the public is usually unaware of what the lawyers actually did, what risks they took, what investment they made, and how important their lawyering was to victory for the class. n10

 [*693]  The cases that account to some extent for a negative public view of some plaintiffs' class action lawyers are those in which class members receive in a settlement something perceived to be of little value or even a slap in the face of the plaintiffs - e.g., in a case involving a defective product, coupons entitling plaintiffs to purchase another product by the same manufacturer at a discount - while the lawyers seek and obtain what seems to be large sums of cash. n11 It is beyond the scope of the work of this Task Force to identify the most troublesome cases and to comment on the merits of particular settlements or other dispositions. n12 It is sufficient, we think, to note that these cases exist and have an effect on public and judicial reactions to class actions.

The data that the Task Force has reviewed, however, demonstrates that class action cases are not always winners, the risks in bringing such actions are often quite real, and the cases that are dismissed early in litigation may receive less publicity than those that settle with money changing hands. The larger the sum in a settlement or judgment, the more interest various press entities have in reporting and commenting on it. n13

D. Appointing Counsel and Awarding Reasonable Attorney Fees

 For more than a quarter century, lawyers have competed to control common fund financial recovery class action litigation. Much of the time they work out among themselves a voluntary plan to allocate responsibility, often referred to as "private ordering." In other cases, however, judges must decide who should speak for the plaintiffs and serve as lead counsel. In both scenarios, the court has the obligation to decide who should represent the plaintiff class, either by reviewing counsel's private arrangements or by choosing among competing counsel. The court's decision may reward

some counsel and disappoint others.

   [*694]  Until the 1990s, the choice of lead counsel in common fund cases was either left to the plaintiffs' lawyers to work out voluntarily, subject to the approval of the court (which was likely to follow), or to a decision by the court based on the court's judgment as to who could most adequately represent the class. Two recent innovations concerning appointment of class counsel have created controversy and gave rise to the appointment of this Task Force.

   First, some judges have experimented with conducting an auction as a way of choosing lead counsel. Simply put, these judges asked lawyers who wanted to serve as lead counsel to submit a bid as to what they would require by way of fees and expenses. As this Report will demonstrate, bidding has taken various forms and utilized a number of different measures.

   Second, Congress enacted the Private Securities Litigation Reform Act in 1995. This Act created the concept of the "most adequate" plaintiff and envisioned that this lead plaintiff n14 would choose counsel for the class, subject to review by the court. The Act raises a number of questions, including the degree to which a court should defer to the lead plaintiff's choice of counsel and whether a court-sponsored auction is permissible in securities class actions.

   As will become evident as we proceed, the Task Force found it impossible to separate three basic questions:

1. How to choose lead counsel?

2. How to compensate lead counsel?

3. When to make the compensation decision?

 The reason these questions are interrelated is that the case for bidding is an argument for reducing attorney fees and for ex ante as opposed to ex post determination of fees and expenses. Similarly, one argument for deferring to the lead plaintiff's choice of counsel in securities class actions is the assumption that the empowered plaintiff will be willing and able to control attorney fees and expenses.

   The Task Force's deliberations on the fundamental questions of appointment, fees and timing were informed by the professional responsibility questions presented by the management of class actions. n15 In class actions, the  [*695]  ordinary assumptions about the attorney-client relationship do not apply. In other types of litigation, clients may be counted on to manage the litigation, because they are naturally involved and concerned. Moreover those clients are paying counsel's bills, either out of their pockets as the case goes along or out of their recovery at the conclusion of the case. For those reasons, clients can be expected to act in their own interest to monitor the litigation and to assess the reasonableness of the lawyers' fees. Client involvement is the primary means by which the attorney's core responsibilities of diligence, n16 loyalty, n17 and competence n18 are monitored and a reasonable fee negotiated. This is the structure envisioned by the professional responsibility rules, which mandate that the attorney communicate the material facts to the client to enable the client to make informed decisions about the representation n19 and provide that it is the client's decision that governs the objectives of the representation. n20 The general  [*696]  model of client involvement also assures that the client has the power to hire and fire the lawyer and to make decisions about settlement. n21 The Rules also require attorney fees to be reasonable. n22

   In class actions, most members of the class do not participate in retaining counsel or in negotiating the representation arrangements. Class members are usually geographically dispersed. Ordinarily, class counsel is not even

personally acquainted with most members of the class. Moreover, because the common fund class action is designed to pool a number of small claims, many members of the class do not know and may not care about the litigation. There are lead plaintiffs in all class action cases, and theoretically these lead plaintiffs could monitor the performance of their counsel. But, often a lead plaintiff has only a small stake in the litigation and lacks the resources, sophistication or interest to engage in monitoring. In these circumstances, the ordinary relationship between lawyer and client cannot be relied on to safeguard the interests of the class. n23

Counsel for a class is in a unique position. Absent class members are not individual clients. Thus, the ordinary attorney-client relationship does not exist between each class member and class counsel. Yet, there clearly is a duty imposed upon class counsel - by the rules of professional conduct and by *Fed. R. Civ. P. 23* - to protect the entire class fairly and adequately and to work diligently to maximize class recovery.

The goal of all the procedures surrounding the appointment of class counsel and the setting of fees is to establish appropriate structures and monitoring mechanisms to substitute for the ordinary attorney-client relationship and to assure performance of the fiduciary responsibilities owed by both the lawyer and the lead plaintiff to the class. An overriding concern for the Task Force was to provide recommendations that enhance and support professional behavior by class counsel and that reduce or minimize conflicts between the interests of class counsel and the interests of the class.

[*697] The Task Force has examined the various ways that class action counsel are selected - voluntary agreements among plaintiffs' counsel ratified by the court; judicial selection of lead counsel by the court; judicial deference to an empowered plaintiff's choice of counsel; and auctions. We have become increasingly aware that no method of selection is beyond criticism, none assures the "right" amount of compensation to counsel, none guarantees maximum recovery for class members, and none eliminates the possibility of conflicts of interest between counsel and the class. Each of the methods of selection might end up with the best counsel being selected and paid the fairest price, but none assures this result and there is no readily available mechanism to evaluate the success or failure of a selection method.

Voluntary agreements among plaintiffs' counsel with judicial approval may lead to selection of the best lawyers, and judicial oversight of fee applications at the conclusion of the case may offer a theoretically perfect opportunity for setting the "right" fee in light of all that has occurred. But, voluntary agreements among lawyers may create cartel-like groupings that favor some lawyers and disfavor others on the basis of factors that have little to do with ability or fees, and such agreements may also result in overstaffing and padded hours. In order to reach a "deal," lead counsel may have to "cut in" so many lawyers that the representation of the class becomes inefficient and the ultimate fee request becomes inflated. n24 Judicial selection of lead counsel may reflect a judge's past experience with certain lawyers and may not permit all competitors to compete on an even playing field. Review of fee applications at the conclusion of the case may be theoretically perfect, but realistically the judge may be hard-pressed to assess the risks as perceived ex ante, the difficulty of the case, and the benefits provided by counsel. n25 The judge may also have a difficult time determining the reasonableness of a fee request in the absence of a real adversarial testing after a settlement has been reached. Judicial deference to the choice of counsel by a sophisticated, empowered lead plaintiff might result in selection of the best firm on the best conditions, or it might confirm the politically charged "pay-to-play" regime that is said to exist in some places. A bidding system might identify lawyers who appear savvy about a case and who are willing to seek less in fees than other lawyers, but it might instead result in an [*698] underestimation or overestimation of the value of a case ex ante that threatens to impair the lawyer's incentive and ability to carry the case forward effectively under the stipulations set forth in the bid.

Some scholars have proposed other mechanisms designed to eliminate or reduce the agency problem that arises when class action lawyers represent class action plaintiffs, but for each proposed solution there are major problems. One such proposal is to auction class claims to the highest bidder. The Task Force finds that proposal to be unworkable in practice. n26 An auction of claims would currently violate rules of professional conduct prohibiting lawyers from having a financial interest in the client's claim, n27 and would require changes in the law that have not yet garnered

74 Temp. L. Rev. 689, *698

support outside of some academic circles. In view of the thus-far purely academic nature of the debate, the Task Force focused its attention on the bidding process for lead counsel, which actually has generated some judicial as well as academic support. n28

It is with the view that we operate in an imperfect world that the Task Force presents its report. We seek neither to identify one way to choose lead counsel in all cases nor to discourage experimentation in appropriate cases. Our goal is to identify factors that judges, counsel and plaintiffs might think about as they consider how to choose counsel in common fund class action cases and how the choice relates to the method of compensating chosen counsel and the timing of the compensation decision.

II. The Task Force and Its Methodology

Chief Judge Becker established the Task Force on Selection of Class Counsel to evaluate the emerging practice of several distinguished district court judges throughout the country of selecting class counsel through a judiciallyconducted [*699] auction process, as well as the subject of selection of class counsel in general. In his charge to the Task Force, he stated that while auctions seemed to result in lower transaction costs and therefore greater benefits to the class, there were many judges and lawyers who believed that the process was "deeply flawed." Judge Becker stressed the importance of assisting courts, especially new judges, in determining how to proceed with appointment and compensation of counsel in class actions. The Task Force was asked to report its tentative recommendations at the 2001 Third Circuit Judicial Conference.

Because the problem of appointment of class counsel confronts every federal court in the country, the Task Force's membership was not limited to judges and attorneys within the Third Circuit. Indeed, one of the reasons for forming the group was to learn from experience outside the Third Circuit.

The Task Force was co-chaired by Professor Stephen A. Saltzburg of George Washington University Law School and Gregory P. Joseph, Esq., of New York City. The Task Force was composed of current and former federal judges; the Chancellor of the Delaware Court of Chancery; lawyers in varied areas of practice, including plaintiff's class action, class action defense, and in-house corporate representation; and an academic who has done significant scholarly work on class actions. Professor Daniel J. Capra of Fordham Law School served as the Reporter to the Task Force; Professor Eleanor W. Myers of Temple Law School served as Associate Reporter. Ms. Toby D. Slawsky, Circuit Executive, Third Circuit Court of Appeals, provided invaluable assistance to the Task Force. Judith F. Ambler served as Research Assistant. In addition, the work of the Task Force was aided considerably by research conducted by Laural Hooper and Marie Leary of the Federal Judicial Center. n29

The Task Force formulated a comprehensive list of questions on which it sought and received public comment. Those questions are as follows:

1. Auction of class counsel appointment as an alternative to traditional appointment

a. Does auctioning tend to create a better result for class members than traditional appointment? Or do the lower attorney fees associated with the auctioning cases correspond to a proportionately lower recovery for the class?

b. The lodestar formula has been criticized for providing an incentive for class counsel to expend unnecessary hours, sometimes with the permission or even encouragement of the defendant. Is there any empirical evidence to indicate that such an incentive is operating? Does auctioning reduce that incentive? Does it instead create a contrary incentive to settle the claim at [*700] the earliest possible opportunity?

c. Why isn't the judge's ability to set the fee at the end of the case sufficient to address all issues that bidding is used to address?

d. Does the auction process unfairly benefit large firms over small firms?

e. Does the auction process discourage plaintiff's attorneys from conducting a thorough pre-complaint investigation? Will lawyers invest money to work up class actions if there is a significant risk that they will not be selected as counsel for the class?

f. It has been suggested that one benefit of an auction is that it allows firms that have not previously had the opportunity to serve as lead counsel to do so. Is there any evidence to indicate that this has happened or are the same firms continually winning the bidding process?

g. Are the costs associated with traditional appointment of class counsel (e.g., ex post fee determinations) eliminated or reduced by auctioning?

h. What costs are imposed by auctioning? (e.g., determining the value of the claim ex ante, scrutinizing bids, etc.)

i. Are the costs associated with auctioning greater or less than those associated with traditional appointment?

j. How does the timing of the initial counsel selection decision (well prior to Rule 23 certification) affect the propriety or appropriateness of auctioning? Is the judge too invested in the up-front selection if auctioning is used?

    2. Professional responsibility questions

a. Which procedure, auction or traditional appointment, better promotes counsel's loyalty to the class by aligning the interests of class counsel with those of the class?

b. Some winning bids have included caps on fees or costs. Do these caps affect counsel's independent judgment on behalf of the class?

74 Temp. L. Rev. 689, *700

c. Some winning bids have included a promise not to take a fee if the settlement is below a certain number. Does this arrangement create a conflict of interest for class counsel?

d. How might the auction procedure be structured to best preserve class counsel's independence and loyalty on behalf of the class?

e. Are there other professional responsibility concerns raised specifically by the auction procedure?

    3. Auction procedures and implementation

a. Assuming that auctioning is a viable alternative to [*701] traditional appointment, is it more appropriate in some circumstances than others (e.g., antitrust actions, mass tort actions, small claimant actions)? Should there be different procedures for different types of cases? Are there some kinds of cases in which auctioning is never appropriate? For example, if the contemplated recovery is something other than money (e.g., equitable relief, coupons, ADR), would an auction procedure be unworkable?

b. What considerations other than price, if any, should the court take into account in awarding the appointment? Should the court attempt to replicate the considerations that a client would take into account in addition to price, e.g., experience, financial resources, etc.? If so, how?

c. How should court and counsel obtain enough information about the claim to determine its value for bidding purposes?

d. Should a court consider the degree of concentration in the market of class counsel? Should it be an objective of the bidding process to expand the field of attorneys who serve as lead counsel?

e. Is there evidence of collusion or incentives to collusion in the auctioning process? If so, should procedures be employed to prevent collusion? If so, what procedures should be used?

f. What are the advantages or disadvantages of the following features of auction procedure?

74 Temp. L. Rev. 689, *701

i. Sealed bids;

ii. Disclosure of the terms of the winning bid;

iii. Permitting or prohibiting bids from a consortium of firms;

iv. Caps on expenses;

v. Caps on the fee;

vi. Modification of caps at the time of the fee award;

vii. Structuring the bids, e.g., according to stage of the litigation;

viii. Use of an X factor, i.e., a figure below which 100% of the amount of recovery goes to the class;

ix. Use of rising, falling or straight percentages as the basis for auctioning;

x. Permitting certain bidding counsel to have a right to match the best bid;

g. How does the court determine whether the winning bid is "too good," i.e., such a "good deal" for the class that it raises a question about counsel's qualifications or ability to assess the case?

h. Should the court compensate lawyers who conduct the initial investigation and file the initial complaint if they do not win the auction?

[*702]

i. Are any special considerations necessary for "coattail" or "follow-on" class actions?

74 Temp. L. Rev. 689, *702

j. Should the appointment of lead counsel go to a single lawyer or a single law firm?

    4. Auctioning of class counsel and the Private Securities Litigation Reform Act

a. Is auctioning class counsel consistent with the lead plaintiff provision of the Private Securities Litigation Reform Act? How much deference should the court give to the presumptive lead plaintiff's choice of counsel?

b. If the auction is won by counsel other than one chosen by the lead plaintiff, should or must the court accommodate the lead plaintiff's choice of counsel? For example, should lead plaintiff's counsel have a right of first refusal on the bid?

    5. Suggested procedures for traditional appointment of class counsel

a. What procedures can be suggested for improving the traditional process of appointing class counsel?

    6. Other solutions

a. Can the "empowered plaintiff" rationale of the PSLRA be applied to other kinds of class actions, so that appointment should be left in the hands of the plaintiff with the greatest stake in the action?

b. Academics have suggested an auction of claims as opposed to an auction of class counsel. See, e.g., Macey and Miller, The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform, *58 U. Chi. L. Rev. 1 (1991).* Is this a viable option? If so, should the defendant be permitted to bid?

    7. Related questions

a. Do derivative actions pose special questions for appointment of counsel by the auction procedure?

b. Does the use of steering committees create any special problems or concerns respecting the auction procedure?

  [*703]  The Task Force took three days of testimony from judges, lawyers and academics on the subject of

appointment of class counsel, with an emphasis on the propriety and workability of auctions and the viability of auctions under the PSLRA. Witnesses at the hearings included federal judges who have conducted auctions for class counsel; a federal judge who chairs the subcommittee responsible for preparing the proposed amendments to Rule 23; academics who have published extensively on class actions generally and on auctions in particular; lawyers who represent institutional investors; lawyers who represent plaintiffs in class actions; lawyers who represent defendants in class actions; lawyers who represent public interest organizations; and a researcher for the Federal Judicial Center with extensive expertise in class actions. Most of these witnesses supplied written statements for the benefit of the Task Force; a number of non-witnesses supplied written statements as well. n30

The Task Force met formally on six occasions to exchange views and comment on drafts. Drafts were revised in accordance with the consensus of Task Force members at these meetings. In its deliberations, the Task Force evaluated the witness statements, testimony at the hearings, the pertinent case law, academic scholarship, and empirical research on appointment of counsel and fee awards in class actions. The Task Force also relied heavily on the factual information prepared by the Federal Judicial Center concerning the cases in which auctions have been used.

A draft of the Task Force report was prepared for discussion at the Third Circuit Judicial Conference. The draft report was the subject of a lively and enlightening exchange of ideas by three panels of judges, lawyers and academics respectively. The comments received at the Judicial Conference were most helpful to the Task Force in highlighting possible problems and inaccuracies in the draft report. In addition, the Task Force invited public comment on the draft report and received a number of extensive and insightful comments. The Task Force considered all of the comments made at the Conference and submitted by the public, and made a number of changes to the draft report in light of those comments. The result is this final report on selection of counsel in class actions. n31

[*704]

III. Summary and Recommendations

This Report analyzes the bid or auction method of choosing class counsel and contrasts it with other methods of counsel selection. n32 Because the question of appointment of counsel is intimately tied to the question of fee awards, the Report also analyzes procedures used by courts in awarding counsel fees in class actions. The Report evaluates the auction process in comparison to more traditional methods and makes recommendations on best practices for selection of class counsel, monitoring class litigation, and awarding counsel fees.

The Task Force unanimously makes the following conclusions and recommendations:

1. Auctioning class counsel represents a creative and energetic innovation, and the Task Force hesitates to restrict the use of new initiatives at such an early stage of their development. However, the risks and complications associated with a judicially-controlled auction counsel against its use except under certain limited circumstances described in greater detail in this Report.

2. The paradigmatic case in which an auction might be considered is one in which the defendants' liability appears clear (often as the result of a governmental investigation or an admission of the defendants); the damages appear to be both very large and collectible (thus ensuring a significant number of competing bids); and the lead plaintiff is not a sophisticated litigant that has already retained counsel of its choice through a reasonable, arm's-length process. n33 Even in a seemingly paradigmatic case, however, there still remains uncertainty based on the limited record before the

Task Force that the auction process will maximize net class recovery and ensure the best representation for the class. It has yet to be established that the auction process will save judicial time and resources, given the dictates of *Fed.R.Civ.P. 23* and the emerging case law holding that the use of an auction ex ante does not relieve the court of its duty ex post to review the reasonableness of fees sought by class counsel.

3. The traditional methods of selecting class counsel, with significant reliance on private ordering, are preferable to auctions in most class action cases. In using those traditional methods, however, the court  [*705]  must guard against overstaffing by lawyer groups.

4. Auctions are inconsistent with the goal of the PSLRA, which is to assure that the "most adequate" plaintiff will choose counsel and negotiate a reasonable fee. The PSLRA mandates that class actions are to be client-driven, not court-driven. To the extent that an auction is even permissible under the PSLRA, it should be conducted only if the lead plaintiff's choice of counsel, or process in choosing counsel, is so infirm as to rebut the presumption that the plaintiff is "most adequate" under the statute, and then only if the alternative candidates for the "most adequate plaintiff" are not willing or able to engage in a meaningful search for and negotiation with counsel.

5. Although some ex ante guidance to class counsel is desirable, Rule 23 ultimately requires the court to examine the fairness of the fees requested by counsel at the conclusion of the case. Thus, at best the benefits of auctions appear speculative, except that they might over time provide the courts with an additional source of data for determining what fees are reasonable in class actions. A percentage fee, tailored to the realities of the particular case, remains superior to any other means of determining a reasonable fee for class counsel. In setting a percentage fee, the court should avoid rigid adherence to a "benchmark."

6. Courts should require public institutional investors seeking appointment as lead plaintiffs to disclose whether chosen counsel has made contributions to the campaign of any public officials who have authority or substantial influence over the institutional decisionmaker.

IV. Problems Arising From Appointment of Counsel In Common Fund Class Actions

A. Traditional Methods of Appointment and Awarding of Fees

 The common fund class action can alter the traditional attorney-client relationship, in which an individual client has a sufficient stake in the outcome to choose counsel, agree to compensation, and monitor counsel's conduct. Where the traditional client controls are absent, courts are left to oversee appointment of the lead plaintiff and lead counsel and compensation of class counsel. The Judge has a continuing obligation under *Fed.R.Civ.P. 23* to assure that counsel can and does adequately represent the class, and that counsel fees are reasonable.

In deciding on appointment, courts in class actions have traditionally exercised case-by-case discretion, often relying on competing counsel to work out an arrangement, also known as private ordering  n34 Where counsel cannot [*706]  agree, or where courts have raised substantial questions about the way that private ordering has worked out in a particular case, courts have then engaged in a qualitative analysis to choose counsel, framed by the experience, knowledge and discretion of the particular judge.

In deciding on fees, courts have traditionally considered a fee application at the end of the class action. Two different formulas have been used: lodestar n35 and percentage of recovery. n36 Both methods have encountered criticism.

The lodestar method requires a calculation of the hours spent in conducting the litigation, multiplied by an appropriate hourly rate, and adjusted, if appropriate, by a multiplier factor for quality and risk. The lodestar approach is problematic because it encourages the expenditure of hours, and so can lead to class lawyers running up the bill. n37 The lodestar also may create incentives for counsel to postpone an early settlement that would favor the class, in order to bill more hours. n38 Thus, the lodestar does not necessarily align the interests of counsel with the interests of the class. Finally, a court using the lodestar method must expend valuable judicial time and resources to undertake a detailed review of expense sheets and billing records, because the judge will have to determine  [*707]  whether the hours claimed were reasonable in relation to the action. n39

The percentage of recovery method has received its share of criticism as well - at least when applied by courts in an automatic fashion. If courts simply apply a "standard" percentage no matter what, they risk awarding windfall recoveries to lawyers in some cases and denying reasonable compensation in others. n40 If applied in a by-rote fashion, the percentage of recovery method can justly be criticized as arbitrary. n41 It has also been argued that percentage fee awards may create incentives for counsel to settle early, when working to obtain a higher settlement or going to trial would cost more than counsel is likely to recover in a percentage, even if the overall recovery after a later settlement or trial might be more advantageous to the class. n42

A more general complaint about the traditional method of determining fees in class actions is that there is sometimes no adversarial testing of counsel's fee submission. In a common fund case, the defendant has little incentive to contest the award because the fee will come from the amount the defendant has already agreed to pay. n43 So unless a class objector appears to contest the fee request, the  [*708]  judge does not have the benefit of an adversary's views.

B. The Auction Innovation

 Frustrated with the difficulties of lodestar and percentage of recovery methods utilized at the end of the case, some courts have begun to experiment with an auction method of selecting class counsel relatively early in the case. n44 Under the auction method, firms seeking appointment as lead counsel submit bids to the court proposing a fee structure for conducting the litigation. The court uses the bids, and any other information it considers relevant, to select lead counsel. Lead counsel is awarded to the qualified firm submitting the best bid. By selecting a "winning" bid, the court simultaneously selects lead counsel and determines counsel's fee.

Courts have resorted to auctions for at least two reasons. First, an auction has been thought to be an effective way to replicate the market process by which a client chooses and negotiates a fee agreement with counsel outside the class action context. n45 Second, some judges conducting an auction have found it to be a device that helps to assure those judges that the fiduciary obligations of lead plaintiffs are fulfilled.

There are substantial questions raised by the auction process, however, including whether the class is best served by selecting the counsel who offers the lowest bid (even if the court includes qualitative factors in its determination); whether a court can replicate a client's choice without becoming unduly involved in the selection and negotiation process; and whether a meaningful fee agreement can be reached in advance of the case, when the judge remains bound under Rule 23 to review the fee at the end of the case. n46 Additionally, there are substantial legal questions whether the auction procedure is consistent with the PSLRA, which requires the court to appoint as lead plaintiff the "most adequate plaintiff," n47 who is presumed to be the person or group with the largest financial stake, and to permit that lead plaintiff to select counsel, subject to court approval. n48

 [*709]

74 Temp. L. Rev. 689, *709

C. Professional Responsibility Concerns

Professional responsibility concerns are at the heart of the issues surrounding the selection of class counsel, in an auction or otherwise. Ordinarily, the fiduciary relationship between client and lawyer is the method by which the lawyer's loyalty, n49 competence, n50 and dedication n51 to the client's cause are assured. "The relationship between lawyer and client is at the core of the law of lawyering... Although it is true that lawyers owe duties to third persons who are not clients, to courts and other tribunals, and to the legal system and the law generally, the most basic duties run to clients." n52 There is a preference for client-centered relationships even when clients are not fully capable of assuming the client role because of competence or other disabilities. n53 Moreover, where a client is not competent and it is in the client's best interest, lawyers are encouraged to see that a client representative is appointed. n54

In class action litigation, it is widely acknowledged that plaintiffs' generally small financial stakes, wide dispersion, disorganization, inadequate knowledge and lack of interest often combine to make the ordinary presumptions about client-monitored litigation unrealistic. n55

[*710]

A fundamental premise of American adjudicative structures is that clients, not their counsel, define litigation objectives. Thus [the professional responsibility rules] emphasize that an attorney must defer to the client's wishes on matters affecting the merits of legal action. However, by presupposing an individual client with clearly identifiable views, these codes elide a frequent and fundamental difficulty in class action proceedings. In many such cases, the lawyer represents an aggregation of litigants with unstable, inchoate, or conflicting preferences. The more diffuse and divided the class, the greater the problems in defining its objectives. n56

In the absence of the usual attorney-client relationship, alternative structures and methods for managing class actions have developed. Traditionally, class counsel's professionalism has been left to the lawyers' own commitment to professional obligations, n57 with court oversight over the prosecution of the action and the lawyer's fee. n58 Recently, the judicial auction process was devised, in part, to compensate for the absence of a meaningful  [*711]  client-lawyer relationship in certain types of class actions, and in an attempt to assure that the lead plaintiff's fiduciary obligations to the class are fulfilled. In essence, the auction process substitutes a judge-centered process for the traditional client-centered process. The question that the Task Force considered is whether this extensive judicial involvement, at the outset of the case, creates more problems than it solves.

The ethical concerns at the heart of judicial auctions involve the lawyer's duty of loyalty to the class, n59 and the relationship between that duty and the setting of reasonable attorney fees. Lawyers are not permitted to represent clients if there is a material limitation on their responsibilities to their clients arising from their own personal or financial interests. n60 The size of potential fees in class actions and the absence of meaningful client oversight combine to present particular conflict of interest concerns in class actions, that may not arise in traditional attorney-client relationships. n61

The Model Rules of Professional Conduct, like its predecessor the Model Code, requires that attorney fees be reasonable. n62 Among the factors to be considered in determining reasonableness are: the time, labor and skill required; the novelty and difficulty of the work; fees customarily charged for similar services; the amount involved and the results obtained; the experience, reputation and ability of the lawyer, and whether the fee is fixed or contingent. n63

Judicial auctions were devised in part to foster greater loyalty by counsel to the class and to award reasonable fees, by setting fees up front and creating structures that were intended to maximize attorney incentives to work faithfully and diligently, while minimizing the conflicts which characterized the  [*712]  alternatives. A central question for the Task Force was whether judicial auctions, in fact, reduced the potential conflicts between the class and counsel or whether they exchanged one set of potential conflicts for another.

While the professional rules center on client relationships, they also presuppose that lawyers retain core fiduciary obligations, which exist outside client control. The attorney-client relationship is premised on general agency principles, which require the agent's fidelity to the principal's interest, particularly in situations where the principal may be unable to monitor the agent's conduct. n64 Many of the Rules require adherence to professional obligation irrespective of the client's ability to monitor the lawyer's behavior and even in situations where the client might be willing to consent to a modification of the obligation. n65 Thus, clients may not consent to the payment of unreasonable fees n66 or contingency fees in certain situations, n67 nor may clients consent to representation by a single lawyer in all situations. n68 In class actions, for example, lawyers may be not be able to represent all class members, if the interests of some class members diverge materially from others, even though the class representatives may consent. n69

[*713] The professional responsibility rules acknowledge that the complexity and technical nature of lawyers' work may preclude effective client monitoring, even in non-class action settings. Lawyers nevertheless retain core responsibilities to be faithful and dedicated fiduciaries to client interests. Ultimately clients must rely on the character and integrity of their lawyers to fulfill those responsibilities. The Task Force notes that many witnesses referred to the professionalism of individual lawyers as important to a client's choice of counsel, and others emphasized the motivation of lawyers to achieve good results for clients regardless of their own interests. n70

It is important that whatever approach is taken to selection and compensation of class counsel, there must be judicial review. Rule 23 requires, and logic supports, a review at the conclusion of a case - at a minimum to examine whether counsel met fiduciary obligations and performed at the level expected when the case began. Even if one concludes that an ex ante bidding process is advantageous, it is difficult to believe in the class action context that one would abolish a final look at the attorneys' work at the conclusion of the case. Professionalism is assumed, but there are failures in class actions as in every other part of life. Thus, the Task Force assumed that lawyers would meet professional standards , but that there could be failures and that there must be a final review in class actions by the court. Also the class, as well as counsel, will feel more satisfied if there is closure through a court order on the question of fees.

In its deliberations, the Task Force evaluated alternative structures for managing class actions with the goal of encouraging a lawyer's adherence to professional obligations. Its recommendations on judicial auctions arise, in part, from a perception that the auction procedure is not well-suited to appraising the intangible quality of lawyer professionalism. n71 The Task Force concluded that procedures that enhanced client control and emphasized the experience, wisdom and judgment of the bench were generally superior to judicially-controlled [*714] auctions. n72

V. The Auction Cases

A. Courts Using the Auction Process

The idea of an auction process was first raised and employed by Judge Vaughn R. Walker in In re Oracle Securities Litigation. n73 As of September, 2001, according to research conducted by the Federal Judicial Center, only seven federal judges had utilized auctions in a total of 14 cases. n74 Thus it is fair to state [*715] that the method of auctioning class counsel is at the experimental stage. n75

As the FJC Report indicates, the judges who have employed auctioning have ordinarily done so in an attempt to replicate through competition the market that usually exists when a client outside the class action context chooses a lawyer. n76 In some cases, the court has seemed to believe that private ordering has not worked out and that counsel were actively competing before the court for the appointment. n77 In other cases, it appears that the court believed that counsel was controlling the prospective class plaintiff rather than the other way around, a phenomenon that might be in conflict with the fiduciary obligation of the lead plaintiff to select a diligent and effective class counsel. n78 And in still others, courts seem to have gravitated toward auctions simply because they believed that they represent a better and more efficient process than traditional appointment. n79

74 Temp. L. Rev. 689, *715

In In re Auction Houses Antitrust Litigation, n80 Judge Lewis A. Kaplan, in addition to expressing dissatisfaction with the results of lawyer-driven litigation, relied on positive indicators existing in the case that in his view justified an auction. Judge Kaplan identified the following factors as supporting an auction under the circumstances:

[*716]

1. A highly publicized government investigation had led to the filing of complaints so that no private firm was required to ferret out wrongdoing.

2. The publicity had attracted a large number of able plaintiffs' attorneys so the court was reasonably confident that there would be a critical mass of bidding counsel.

3. A significant amount of information was already available to prove both the defendants' liability and the amount of damages to the class.

4. Judge Kaplan had already become familiar with the case and therefore could assess the settlement value of the claim without substantial up-front court costs, and without an appearance that he was prejudging the merits in his evaluation of bids. n81

As discussed below, the Task Force believes that the circumstances found in Auction Houses include some of the paradigm conditions in which the benefits of an auction process might outweigh its costs.

B. Auction Procedures

Judges have differed in the procedures they employ in conducting an auction. For example, Judge Walker required bids to be structured so that counsel set forth a number of bids that would take effect at certain points in time in the litigation and at certain points of recovery. n82 Judge Kaplan structured the bidding in the Auction House cases to require the bidders to submit a single number, an "X" factor, below which counsel would receive no fee at all. In contrast, Judge Shadur did not structure the bidding process, believing that any attempt to impose a structure would stifle the creativity of counsel in forming their bids. n83

Beyond the general question of structure, courts using auctions have encountered a number of procedural questions. Some of them are:

. Sealed Bids. All courts have required bids to be made under seal. n84 But some district courts have ordered the bids to be unsealed when class counsel is appointed, reasoning that members of the class have the right to be apprised of the process of appointment of  [*717]  counsel. n85 The judges in Auction Houses and Cendant kept the bids sealed until the case was concluded. The rationale for sealing the bidding process is to prevent defendants from obtaining an unfair advantage by knowing the winning bidder's fee arrangement. n86 A defendant who knows precisely what the plaintiffs' counsel has at stake at a particular point in the litigation might be able to pressure counsel into a settlement that maximizes the attorney's recovery but is unfair to the class.

74 Temp. L. Rev. 689, *717

The problem with sealing the bids, however, is that the bids can be considered judicial records that are presumptively public. Moreover, sealing the bids denies information not only to the defendants, but also to the class members. The recent opinion in In re Cendant Corp., n87 raises substantial questions about the use of sealed bids in auctions. The Cendant Court held that "in deciding to seal the bids, the District Court failed to recognize that the bids were judicial records, subject to the common law presumption of public access. As a result, the District Court failed to articulate the necessary findings to override the presumption of access when issuing the confidentiality order." The Court's most serious concern was that the sealing of the bids prevented members of the class from obtaining essential information about the class action. The Cendant Court noted that the "only stage at which class members can exercise effective control is in the selection of class counsel. Throwing a veil of secrecy over the selection process deprives class members of that opportunity." Accordingly, the Court declared that in a class action there is "a strong presumption that the bids and the in camera proceeding would be part of an open process, accessible to the public." The Cendant Court strongly suggested that no circumstances could be found that would outweigh the public right of access to the bidding process. At a minimum, if the bidding process is to be sealed, the district court following Cendant must find and articulate specifically the "compelling countervailing interests" that authorize the closure of that process.

. Compensation of Lawyers Who Do Not Win the Bidding Process but Who Contributed to the Action Being Brought. Some courts have been concerned about firms that do significant preliminary work on the class claim and then lose the auction. If such firms are not compensated, it might deter lawyers from engaging in this  [*718]  important work in the future, for fear of a deadweight loss. n88 Some judges have provided specifically for an award for counsel who loses the auction but contributed meaningfully to the investigation and preparation of the action. n89

. Caps on Attorney Fees or Expenses. Some judges have awarded lead counsel status to lawyers who have submitted a bid with a cap on their recoveries of attorney fees n90 or expenses. n91 Others express concern that such caps may create disincentives for plaintiffs' counsel to litigate the case beyond the levels of maximum fee or expense reimbursement. n92

. Joint Bidding. Most judges have prohibited law firms from forming bidding consortia. n93 The concern appears to be that consortia will drive down the number of bidders and fail to produce a competitive auction. n94 It should be noted, though, that joint bidding may well be a way for smaller firms to compete in the auction process, and so may increase rather than decrease competition.

. Limits on Collusion. Judges have generally imposed limitations on discussions and negotiations between bidding firms, because they believe such collusion would be anticompetitive, resulting in less attractive bids for the class. n95 Certainly, collusion on prices is inconsistent with the very idea of an auction. However, the fact that trial judges must monitor the auction process for collusion is just another indicator of the extent of judicial management required to conduct an auction for class counsel.

 [*719]

. Increasing or Declining Percentages of Recovery. Most courts have expressed a preference for declining percentages as the amount of recovery increases. n96 Many believe that a large recovery may simply reflect a large class or unusually high damages, rather than a particularly noteworthy effort by counsel. n97 Judge Shadur has prohibited law

74 Temp. L. Rev. 689, *719

firms from submitting bids in which percentages increase as the amount of recovery increases. n98 Others have argued that a modestly increasing percentage provides the best match between the lawyer's interest and the interest of the class in maximizing recovery. n99

### C. Factual Findings Regarding Cases in Which an Auction Was Employed

The Federal Judicial Center has conducted an in-depth review of the cases in which class counsel was appointed through auction. n100 The findings of the FJC can be summarized as follows:

1. The number of bidding cases is too few to draw any conclusions about whether the auction procedure has resulted in a net benefit to the class, as compared to traditional methods of appointment.

2. The auction process has only been used in securities (12 cases) and antitrust (two cases) class actions.

3. The number of bids received in the auction cases ranges from two to twenty-one.

4. Eight of the cases in which auctions were employed have settled as of September 1, 2001, and most of the settlements were between $ 25 million and $ 50 million.

5. Attorney fees awarded in the auction cases were "generally less than the reported percentages in other class actions in the respective circuits."

6. Judges experienced with auctions report the following circumstances that make certain types of cases better candidates for  [*720]  auctions than others:

a. the defendant has clearly accepted or stipulated liability;

b. information is available from a criminal investigation;

c. substantial information about the case is publicly known;

74 Temp. L. Rev. 689, *720

d. the case is clearly defined;

e. multiple cases are consolidated in one jurisdiction;

f. there is a strong potential for a very large recovery;

g. the defendant is able to pay for any recovery;

h. there is a single class that is well-defined;

i. there are a number of qualified firms who will be bidding; and

j. the case is a common fund class action.

7. Interviews with a small number of experienced judges who use traditional methods of appointing counsel and awarding a fee in class actions revealed that these judges generally have not experienced substantial problems in selecting counsel or awarding a fee.

VI. Asserted Benefits of the Auction Method

The Task Force heard from several judges, lawyers and academics who enthusiastically endorsed the benefits of judicial auctioning of class counsel in appropriate cases. n101 The following benefits are frequently cited:

. Benefits to the Class From Lower Attorney Fees: It appears that the percentage of the recovery awarded to counsel in the auction cases is often less than that awarded by traditional methods. n102 Professor Joseph A. Grundfest relies on research to conclude that fees in securities fraud litigation in the 1990's averaged approximately 30% of gross settlements, and ranged from 25% to 33%. By contrast, in auction cases and cases involving "hard bargaining by a competent named plaintiff," awards range from 7% to 21.2%. n103 Likewise, Professor John C. Coffee reported that it is reasonable to assume that "a series of antitrust class action auctions demonstrated that qualified counsel would generally offer to represent the class for fee awards in the 10-15% range," n104 whereas [*721] in the two antitrust class actions in which counsel was appointed by auction the fee percentage has been in the single digits. Auction proponents argue that lower fees result in more settlement assets going to benefit the class members.

. Judicial Economy: The judges who have used auctioning contend that there is less expenditure of judicial resources, compared to the ex post assessments of attorney fees required for fee awards in cases of traditional appointment.

. Eliminates "Race to the Courthouse": Although rewarding the first lawyer to file an action with the designation of lead counsel may incentivize counsel to ferret out wrongdoing, it can also lead to hasty filing, superficial complaints, and the selection of counsel who may have fortuitously found a client, rather than the most qualified counsel. n105 The auction approach avoids the "race to the courthouse" method of appointment. n106

. Ex ante Fee Determination: When private parties retain counsel for non-class actions, they set the fee at the outset of the representation. The auction attempts to replicate this process. Setting fees in this manner is said to avoid an indeterminate ex post assessment of fees. "It is inherently illogical for lawyers to undertake litigation on the basis of the risks and rewards they perceive at the beginning, yet be compensated on the basis of the risks and rewards the court perceives at the end of the litigation." n107

. Aligning Incentives of Counsel With the Best Interests of the Class: Those who favor auctions contend that the auction allows the judge to structure a fee arrangement at the outset of the case that best aligns the interests of counsel and the class, thereby assuring counsel's loyalty and dedication to class interests. n108

 [*722]

. Competition: Auction proponents champion competition as a healthy process by which to obtain legal services. They contend that an auction provides a market test for the cost of lawyer's services, and that it leads counsel to "sharpen" their bids, by cutting unnecessary expenses, reducing fee expectations, or developing innovative litigation strategies in order to make the best bid. All of these modifications are said to inure to the benefit of the class. n109

. Database: There is undeniably some difficulty in determining appropriate attorney fees at the conclusion of a class action. Auction proponents argue that the use of auctions can supply a database that can be used to assess what is a reasonable "benchmark" for attorney fees in class actions. They assert that there is an existing "benchmark" of something in the neighborhood of 25%, and contend that this figure is arbitrary and without an empirical basis in the market. n110 In their view, the use of auctions over a period of time will provide a more accurate benchmark that can be used by courts employing more traditional methods of appointing counsel. n111

. Increasing the Pool of Qualified Lawyers: An auction assertedly places all lawyers vying for the position of lead counsel on an even playing field, depending upon the extent to which judges incorporate qualitative selection criteria into their auctions. It is possible that auctions may create opportunities for new lawyers to litigate class actions. n112 As Professor Coffee puts it, "new entrants can enter the field through competitive bidding in auctions, whereas they would be unlikely to win elections as class  [*723]  counsel if the selection were resolved by the vote of participating counsel." n113

VII. The Case Against Auctions

Case 4:07-cv-05944-JST   Document 165-8   Filed 03/21/08   Page 22 of 108

Page 21
74 Temp. L. Rev. 689, *723

 A majority of the witnesses who testified before the Task Force concluded that the asserted benefits of an auction are, at least at this early stage, unproven and that whatever benefits might exist are either outweighed by the risks and costs of an auction or are available in only a limited range of cases. n114 Most of the scholarship is to the same effect. n115 The experience of the Task Force members is consistent with this testimony and scholarship.

   The major contention of auction proponents is that auctions replicate the market and result in savings to the class due to lower counsel fees. Based on the empirical evidence, witness testimony, legal scholarship, and the collective experience of its members, the Task Force is unpersuaded. The Task Force rejects this central assertion on several grounds:

. Auctions May Not Maximize Net Recovery: The goal of appointment should be to maximize the net recovery to the class and to provide fair compensation to the lawyer, not to obtain the lowest attorney fee. n116 The lawyer who charges a higher fee may  [*724]  earn a proportionately higher recovery for the class than the lawyer who charges a lesser fee. n117 The auction process fails to take into account the possibility that a higher bidder may have factored in more resources to be put into the action, or is simply a higher quality firm, thereby increasing the possibility of a higher net class recovery. "The lowest percentage bidder may simply be lawyers with lesser overhead, lesser ambition, or volume discounters." n118 While some auctions have probably resulted in lower fees than would have been awarded otherwise, engaging in an auction is no guarantee that class recovery will be maximized. n119 This is because the auction system is more likely to reward those attorneys who can bid the lowest by expending the least in prosecution of the class action. The Task Force agrees with Professor Arthur Miller's conclusion that "questing after the "lowest bid' and preoccupation with the class' share, or worrying about the occasional "windfall' may be penny-wise and pound-foolish, and not in the best interest of the class members." n120

. Non-auction Cases Have Resulted In Fee Awards Below Traditional Benchmarks: The conclusion that auctions result in lower fees is based on the assumption that fees awarded in the traditional manner generally adhere to a 25-33% benchmark. But this assumption, if ever accurate, is probably no longer correct - especially in the kind of large recovery cases in which auctions have been used. In large recovery cases, percentage recoveries in traditional appointment class actions have often been well below 25%. n121

 [*725]

. Auctions Do Not Guarantee Reasonable Fees: Appointing counsel through an auction is no guarantee of a reasonable fee. The Third Circuit's recent decision in In re Cendant Corp. Prides Litigation n122 is an example of a fee awarded through an auction that was considered too high by traditional Rule 23 standards of review. The Court there remanded for redetermination a fee award, set by auction, that was by the court's calculation 7.3% of the fund. Cendant Prides is another indication that there is no longer a "benchmark" of 25-33% for post-hoc review of attorney fees in class action cases.

Moreover, some evidence indicates that auctions can result in higher fees than could be obtained by a well-financed, empowered lead plaintiff in the market. In In re Cendant Corp. Litigation, n123 the bid chosen by the court through auction provided for a fee award that was $ 76 million higher than the result produced under the retainer agreement entered into between the institutional lead plaintiff and counsel.

. Auctions May Not Result In a Net Saving of Judicial Resources: Structuring an appropriate auction process and carefully evaluating the bids requires a significant expenditure of judicial time and resources. As Judge Walker acknowledged in discussing the duties of a class representative: "Selecting between different law firms and proposals can be expensive, time consuming and even a difficult process." n124 Thus, an auction process merely shifts some of the judicial costs of fee assessment from the end to the beginning of the case. Indeed, the costs of fee assessment ex ante are likely to be substantial, as the court will be required to evaluate a number of bids, whereas with traditional appointments the court must only evaluate the reasonableness of the lead counsel's fee request. n125

 [*726]

Uncertainties in bidding due to imperfect information will often require judges at the end of the case to deal with situations that were not anticipated at the time of bidding. Several judges have explicitly left open the possibility of revisiting the fee at the end of the case if it turned out that the fee arrangement awarded ex ante would undercompensate counsel. n126 While such an ex post assessment may be necessary to provide a fair fee, this very need to assess the fee after the fact reduces whatever asserted advantage exists in an ex ante award of fees by way of auction. A judge who is assessing changed circumstances after the fact is really engaged in the same kind of analysis as a judge awarding fees after a traditional appointment. n127

Even if the action proceeds as envisioned at the time of bidding, the auction will probably save the court little time in the way of ex post assessment of attorney fees. This is because Rule 23 requires courts to review the reasonableness of attorney fees at the end of the case. A court's approval of a fee through auction at the beginning of the case does not satisfy that obligation. In this regard, the Third Circuit has found that "though the result of a bidding process may be of use to a district court in awarding fees at the end of the case, it cannot supplant post-settlement analysis to determine a reasonable fee." n128 Thus, the auctioning process does not do away with an ex post assessment. At best, what is gained is an additional point of reference for determining the reasonableness of an ex post fee award.

 In sum, the asserted benefit to the class of the auction procedure is at this point speculative. Balanced against the dubious benefit are the risks and costs of the auction process. The Task Force has determined that these risks and costs are substantial enough to caution against the use of auctions except in limited circumstances, as specified below. What follows is a discussion of some of the  [*727]  negative effects created by auctions of class counsel:

. Risk That Low Fee Will Lead to Low Quality Representation: The auction method could encourage firms to submit unduly low bids in order to win the position of class counsel. Underbidding can result in lawyers cutting corners or settling too early in order to maintain a profit margin. n129 Where the winning firm's bid is too low - as it will often be due to the pressures of competitive bidding and the imperfect information available at the time of the auction - the firm will have a conflict of interest. Its own interest in securing reasonable compensation for time spent will be in conflict with its duty to vigorously prosecute the case to maximize the class recovery.

It could be argued that lawyers who submit the low bid in an auction will have an ethical obligation to perform on behalf of the class even though their monetary incentive might be to cut corners or sell out the class. Moreover, lawyers have a reputation to keep. Can we not rely on the ethical standards of lawyers, and their interest in maintaining a reputation, to overcome whatever negative incentives might arise from an auction? The answer is given by Professor Bebchuk:

To be sure, ethical constraints (and reputational considerations) would ensure by themselves that counsel would make the investment needed to satisfy what is required by professional ethics and reputational concerns. But it would often be desirable to have counsel make investments substantially above the floor established by ethical and reputational constraints. And given that counsel is likely to be best informed about the cost-benefit calculus for such additional investments, a substantial degree of counsel discretion in this matter is inevitable. It follows that to encourage counsel to make investments in the wide range above the floor established by ethics and reputation, the incentives provided to counsel by the fee schedule are highly important. n130

Unfortunately, the bidding process will often result in the lowest bidder having negative financial incentives, contrary to the interest of the class in maximizing recovery. n131

  [*728]

. Risk That Litigation Uncertainty Will Distort the Bids: Counsel may be unable to make a realistic prediction about the value of the case at the time of bidding, which obviously must be conducted in the early stages of the litigation. n132 Lack of information about the case, and the unpredictability of class action litigation generally, may significantly distort the bidding process and result in bids that are unduly low. n133

  [*729]

Another aspect of uncertainty is identified by economics scholars as the "winner's curse" which arises when the value of the auctioned item is not easy to determine. n134 In that situation, in order to win, the firm seeking the appointment must make a better bid than the economically optimum bid. If designated class counsel discover that they have bid too optimistically (that is, they have set their fee too low), they will have a conflict of interest in prosecuting the case, either settling too soon and for too little or refusing to settle at a level that will best serve the class, if the fee in that settlement range is not in their favor. n135 As Professor Issacharoff has noted, lawyers who win an auction by bidding too low "are likely to be unwilling to invest greatly in the prosecution of the claim, particularly at the all important investigatory stage." n136 Conversely, some bidders may raise their fee proposal in order to avoid the winner's curse. This could lead to a fee proposal that is too high to maximize class recovery.

. Difficulty of Comparing Bids: Competing bids are often difficult for the court to compare. n137 One bid might be better at a certain  [*730]  point of recovery and another bid might be better at a different point. That is, there are "crossover" points where a bid that was higher than another now becomes lower than another. For example, consider the intentionally oversimplified hypothetical of two competing bids: Bid 1 proposes a fee recovery of 5% of the first $ 10 million and 25% of anything over that; Bid 2 proposes a fee recovery of 7% of the first $ 10 million and 10% of anything over that. Bid 1 is better if the value of the claim is less than $ 10 million; but at some point just above a recovery of $ 10 million, there is a crossover point at which Bid 2 becomes the lower bid. Because it is hard to assess the value of a claim at the outset of the action, it is similarly hard to assess which bid is optimal. n138 Where crossover points exist, a court will be required to make difficult assumptions about the likely outcome of the case. n139 There is a serious risk that the court will make a wrong prediction about the case and actually award lead counsel on the basis of a bid that is less optimal for the class. n140 The difficulty of assessing bids is even greater if the bids factor in both the time-stage of the litigation and the amount of recovery (e.g., 10% of the first million with rising percentages, if the case is settled before trial, 15% of the first million with declining percentages if the case proceeds to judgment.). In those

situations, the judge comparing the bids is really comparing apples and oranges, and the risk of erroneous  [*731] assessment of the bids will increase. These crossover point evaluation problems have arisen in many of the auction cases. n141

Evaluation of competing bids is somewhat less of a problem where the court provides a single-factor structure for bidding, such as the X factor structure employed in In re Auction Houses Antitrust Litigation - in which bidders submitted a single number, below which they would receive no fee and above which they would receive 25%. The X factor is nevertheless problematic, because the court must estimate the value of the claim early in the litigation to determine which bid will best serve the class.

Comparing bids will also be difficult in another sense. How does the court know whether the winning bid is too good? At the outset of the case it will often be difficult if not impossible to determine whether a bid is so low that it virtually guarantees inadequate or conflicted representation of the class. As Arlin Adams puts it: "It is not clear how a court would be able to tell whether a bid was "too good to be true' or simply very competitive." n142

. Inability To Eliminate Subjective Evaluations: The courts that have conducted auctions have recognized that price cannot be the sole factor in awarding class counsel; there must be some quality control as well. n143 Yet if the court takes into account anything other than price to choose among competing bids, it enters into the same kind of subjective determinations as occur under the traditional method of appointing class counsel. n144 Courts conducting auctions have [*732]  considered such non-price factors as quality of counsel, experience, resources, and willingness to litigate. n145 Once the court begins to evaluate those factors, little may be gained by resorting to an auction. n146 Moreover, the quality-based standards used by courts conducting auctions are quite similar to the submissions that institutional lead plaintiffs require from firms competing to be counsel in securities class actions under the PSLRA. n147 Thus, it is difficult to see what advantage an auction would have over the private retention of lead counsel by a sophisticated and well-financed lead plaintiff. n148

. Disincentive To Investigate Claims: The auction process reduces the incentive for plaintiffs' firms to investigate potential claims, because the investigating firm must consider the risk of losing the bidding process and having to internalize its up-front expenses. n149  [*733]  As Professor Coffee has stated, auctions "do not reward the original attorney who undertook search costs to discover a violation of law; hence, an auction system implies a reduced incentive for private attorney generals to seek out violations of law." n150 Even if the court ultimately decides to compensate losing firms for early contributions to the case, n151 the ex ante risk of noncompensation may deter efforts that might be beneficial to the class. n152 In the view of the Task Force, it is not enough to promise a firm compensation for prefiling investigation when that compensation would come from a fund that does not yet, and may never, exist and which counsel will no longer have any role in attempting to create. Moreover, the possibility that up-front investigation costs may not be compensated creates the incentive for free-riding or "claim-jumping." n153

. Shortage of Qualified Bidders: Experience has shown that the bidding process can lead to a shortage of qualified firms submitting bids. n154 The Task Force notes that the preparation of a bid can be  [*734]  costly. A bidding firm must investigate the case as thoroughly as possible and predict the expected recovery, as well as the cost associated with each possible recovery, including necessary staffing, in order to propose a rational bid structure. In the absence of careful

investigation, a firm exposes itself to the risk that it will be burdened with an unduly low bid if it wins the auction. Moreover, courts conducting auctions have often required extensive submissions such as a description of the case and quality assurances, and the preparation of these materials can require significant cost and effort - all expended with the risk of zero recovery. Confronted with the substantial cost of preparing a bid and the risk that such preparation will be a deadweight loss, some firms have decided that participation in the auction process is simply not worth it. n155 The incentive to take part in an auction is especially diminished if the value of a case is difficult to assess at the outset. n156

More importantly, the auction process itself may lead firms of higher quality to forego any attempt to represent the class. Higher quality firms usually cannot compete with lower quality firms on the basis of price, making it likely that those firms will drop out of an auction they cannot win, rather than incur the deadweight cost of participation in the auction. This means that even if there are enough "qualified" bidders to support an auction, the bidders are more likely to be minimally than highly qualified. As Professor Fisch notes, the auction process "creates a potential "lemons' problem, in which lower quality lawyers are disproportionately represented in the pool of bidding firms." n157

 [*735]

In Comdisco, Judge Shadur provided another explanation for the shortage of bidders. The Third Circuit's Cendant Corp. Prides decision n158 may be a disincentive to prospective bidders, because it requires the court to make an ex post assessment of the reasonableness of a fee, even if it was awarded by auction. Judge Shadur persuasively argues that Cendant Prides has "placed bidders in a no-win situation, in which if they prove successful in becoming lead counsel the terms of their successful bids would set a ceiling on fees, while on the downside they would be subject to ex post second guessing by the court's utilization of a lodestar comparison as a benchmark." n159 The threat of stringent ex post review of the fee accordingly diminishes the pool of bidders and, more broadly, imposes a substantial reason for rejecting auctions as a practical matter, because a major reason for conducting an auction is to establish a relatively certain fee ex ante. At the very least, the use of the auction process is problematic in jurisdictions following the Cendant Prides analysis. n160

. Risk of Discouraging Prospective Lead Plaintiffs: Auctions or the possibility of an auction may discourage qualified lead plaintiffs from coming forward to spend time and resources to find and negotiate with counsel. Prospective plaintiffs will have to take account of the risk that they may be deprived of their choice of counsel or their preferred fee arrangements. Every representative of institutional plaintiffs who testified before the Task Force emphasized that auctions interfered with their ability to take an active and meaningful role in the class action. They uniformly counseled against shotgun marriages of a lead plaintiff with counsel whom it did not choose. n161

. Risk of Compromising Judicial Impartiality: Auctions often require a preliminary look at the merits, as there may be no other way to assess whether the bids are realistic or which crossover points, if any, are relevant. This preliminary assessment by the court may appear to constitute a prejudgment of the merits, in tension with the court's role as an impartial adjudicator at the settlement stage and at trial. n162 Moreover, there is a possibility that  [*736]  the court will be seen as having become invested in its initial assessment of the case and in its choice of counsel. n163 There are legitimate concerns that after an auction, a court may be perceived as making good on the value of the franchise that it has sold. The Task Force agrees with Professor Fisch that despite the best intentions, a court conducting an auction runs a risk:

74 Temp. L. Rev. 689, *736

By casting the court as auctioneer and referee, lead counsel auctions also threaten the court's neutrality. First ... in evaluating the auction bids, the court must form an opinion on the merits of the case and the predicted recovery. This opinion, formed without the benefit of discovery or any submission by the defendant, may influence the court's subsequent evaluation of a motion or a proposed settlement. Second, the court's selection of counsel, which includes a determination that counsel is qualified and has made a reasonable evaluation of the case, may create an unintentional bias that the defendant cannot overcome. Indeed, having conducted an auction, the court may be particularly unwilling to terminate the case in a manner that would preclude class counsel from recovering a reasonable fee. Third, judicial control over the selection of counsel makes counsel accountable to the court, not to the class. This control may allow institutional factors, such as judicial interest in docket control, to influence litigation decision-making. n164

. Risk of Perpetuating an Impression of Windfalls To Lawyers: Auctions may perpetuate an impression of windfalls to lawyers. If an auction is to work as most proponents want, the key is to decide ex ante what the attorney fees will be if there is a recovery. The problem, as seen in Cendant Prides, is that what seems reasonable at the outset of a case may seem totally unreasonable at the end. Rule 23 requires an ex post review of fees in part to assure that the best interest of the class is served. If that ex post view trumps  [*737]  whatever the ex ante view was, an auction has served little purpose. But, if the ex post view defers too much to the ex ante approved bid, the appearance of a windfall to lawyers may be exacerbated by the auction process.

. Risk of Collusion Between Defense Counsel and Certain Bidders: Auctions create the potential for collusion between the defendant and bidding counsel. n165 The defendant may give information to its "chosen" counsel on its willingness to settle and the settlement range. n166 This inside information could improve counsel's chance to submit the winning bid; and this might lead to sweetheart settlements that promote counsel's fee at the expense of the class. n167

Conclusion On Costs and Benefits of the Auction Process

In addition to the substantial concerns addressed above, the Task Force concludes that auctions generally fail in their basic stated purpose of replicating the private market for legal services. Auctions do not in fact replicate the market in which clients choose counsel outside the class action context. When parties choose counsel for themselves, cost is only one of many factors that drive their decision. n168 Auctions replete with structure, matrices, crossover points and the like are nothing like an arm's-length negotiation between a client and  [*738]  counsel. n169 More importantly, the auction's predominant focus on price in no way approximates a client's market search for counsel. n170

The experience of the Task Force members is deep and broad enough to embrace a few situations in which they or other counsel were retained largely on the basis of the fee that they agreed to charge. But our experience is that in almost all instances the fee is only a number of factors that clients consider when choosing counsel. Other factors often dominate the decision-making process. Those factors include but are not limited to reputation, experience, firm resources, particularized competence, prior track record in similar matters, personal qualities, pre-existing lawyer-client relationship, relationship of counsel to other parties and their lawyers, and commitment to a prompt resolution of a matter. The auction process focuses primarily on bids, with much less attention to the other qualities that ordinary clients typically seek in their counsel.

It is true, as discussed above, that courts conducting auctions emulate the market in a limited sense by restricting participation in bidding to those firms that pass a threshold of qualification. But it is one thing to eliminate unqualified candidates and it is another to replicate the goal of a client in the market, which is to choose the most qualified counsel who will obtain the best result at the fairest price. As Professor Bebchuk notes, "eliminating unqualified candidates still does not give as much weight to quality considerations as an informed client or informed lead plaintiff would be likely

to do. An informed client or lead plaintiff would also attach weight to differences among...candidates that fall within the substantial range above the threshold of minimal qualification." n171

The truth is that no judicially controlled selection process will replicate the [*739] market process because judges conducting an auction will have great difficulty in capturing all of the qualities that clients consider in choosing counsel. In the real world, some clients may ask lawyers to engage in a "beauty contest" and may set the rules for the contest so that all counsel are addressing the same issues in a prescribed way. Other clients may prefer to have the competing lawyers choose the issues to be addressed, the order to present them, and the mode of presentation. Either way, the client has in mind the particular factors of greatest relative importance to it in selecting counsel: it knows what it is looking for. n172 In auction cases, a single judge chooses one or the other approach, but does so without any information as to what a typical member or most members of the class would deem of greatest relative significance in making the choice of counsel. This helps explain why an auction approach will not replicate the market; it will replicate only one judge's assumption about what would occur between a client seeking to retain a lawyer from among a group of available lawyers. n173

Some argue that auctions are an effective means of assuring that the lead plaintiff will fulfill its fiduciary obligation to retain effective counsel for the class. n174 Yet it is in part precisely because we hold lead plaintiffs to that fiduciary duty that, on balance, we conclude that auctions are a highly imperfect device. The lead plaintiff has the fiduciary obligation not to retain the cheapest qualified counsel, but rather to obtain the qualified counsel that is best able to obtain a maximum net recovery for the class.

There is, moreover, a fundamental tension between the notion of the lead plaintiff as a fiduciary to the class and judicial intervention, in the first instance, in the selection of class counsel. The Task Force is well aware that there are many different types of lead plaintiffs, from sophisticated institutions with a great deal at stake that have painstakingly selected their own counsel, to solitary individuals with little at stake who have effectively been recruited by prospective [*740] counsel. Not all selections of class counsel are entitled to the same deference. Where, however, a lead plaintiff has engaged in a responsible process leading to its selection and retention of class counsel, fully honoring its fiduciary duties of good faith, reasonableness and loyalty to the class in that effort, its choice of counsel should not be supplanted by the judicial intrusion of an auction. Even where the lead plaintiff has not undertaken a rigorous, independent process for the selection of lead counsel, the Task Force believes that the court's review of all relevant factors bearing on counsel's ability to represent the class is usually preferable to initiation of an auction process, with all of its uncertainties and costs. Moreover, since an auction, to be effective, will usually be conducted prior to class certification, it is difficult to see how the sometimes extensive proceedings entailed in an auction could do other than invest the court in the selection of class counsel prior to the time that the defense has had an opportunity to raise Rule 23 concerns.

VIII. Should Auctions Be Used? If So, In What Kinds of Cases?

A. Task Force Recommendation

As stated above, the auction alternative is in an experimental stage. The Task Force is sympathetic to any attempt to fairly maximize class recovery and to make the process of appointing counsel and awarding fees more efficient. However, for the reasons expressed in this Report, the Task Force is skeptical of auctions. We believe that class recovery generally can be maximized more effectively by using the traditional methods of appointing counsel: private ordering where that is possible, court selection on the basis of quality of counsel if private ordering is not workable, and court control over the fee award in all cases. Any argument that traditional methods lead to higher fees for counsel is countered by the fact that the court has the discretion to depart from any perceived benchmark in awarding fees, as the circumstances require - and as many courts have done. n175 All in all, counsel has a greater incentive to litigate the case with diligence and vigor if the fee is dependent on the court's rigorous assessment of actual performance, as opposed to the sometimes negative incentives that a low bidder will have after winning an auction. n176

Despite its reservations, the Task Force is not prepared at this early stage to conclude that a court should never have

the discretion to conduct an auction. n177 [*741] The Task Force therefore concludes that auctions might be considered, within the court's discretion, in certain limited situations. n178 Some factors that are pertinent to whether an auction might be used are set forth below.

The Task Force believes that in the limited class of cases in which we identify auctions as potentially useful there is an opportunity for experimentation and for generating data regarding what fees are reasonable in class actions. This data gathered pursuant to auctions could be useful to federal judges who conduct ex post review of attorneys' fees. n179

B. Relevant Factors

Based on the existing auction cases and the extensive testimony and academic commentary on the subject, the Task Force recommends that a court entertaining the possibility of an auction should consider the factors set forth immediately below. n180 In evaluating these factors, the court should proceed from the premise that auctions are appropriate only in a limited number of cases. n181 Thus, auctions should be an exception to the rule that qualified counsel can be selected either by private ordering or by judicial selection of qualified counsel and that a reasonable fee is to be awarded by the court at the end of the case. n182 The Task Force concludes that the following factors are relevant to whether an auction might be considered as an option: n183

[*742]

. Whether the Case Is a Common Fund Class Action. Auctions should be used only in cases where the outcome would be a cash fund, rather than structural relief, ADR, etc., and only in cases where counsel would not be called on to provide extensive counseling and other services to individual plaintiffs. For class actions not involving common funds it is difficult even to conceptualize a market of competing lawyers that can be structured by auction. n184

. Whether the Case Involves Mass Torts. The Task Force recommends that auctions not be considered for mass tort class actions. n185 The outcome of these actions, especially the amount of recovery, is notoriously hard to predict; and the less predictable the action, the more difficult it is to value and the more likely the auction will be erratic. Another aspect of unpredictability is the distinct possibility that mass tort actions will be broken down into subclasses at some point. All of these uncertainties militate against the use of an auction.

. Whether Liability Is In Doubt. The greater the uncertainty about liability, the less appropriate it is to use an auction. n186 It will be difficult to align incentives between counsel and the class if the winning bid is based on a litigation scenario that is not realistic. If counsel has made a winning bid that turns out to be too low, it may lead to an underinvestment of time and resources. On the other hand, if counsel has bid too high a fee in relation to the outcome, it may lead to a windfall fee at the expense of the class, exactly what auctions were designed to counteract.

. Another downside of disputed liability in relation to an auction is that the judge will have to make evaluative judgments about the case in order to determine which of the competing bids will result in the lowest reasonable fee. To the extent that preliminary evaluative judgments are required, the court suffers the appearance that it is prejudging the merits in the course of [*743] conducting the auction. The possibility of an appearance of partiality counsels strongly against using the auction process in cases where the judge must delve into disputed facts in advance of the case.

74 Temp. L. Rev. 689, *743

In contrast, if liability is clear, such as in a "coattail" class action in which the government has already obtained an admission or adjudication of wrongdoing, the auction alternative will be more viable. n187

. Whether It Will Be Easy To Estimate and Collect a Large Amount of Damages. As stated above, the greater the uncertainty at the beginning of a case, the more likely that an auction will fail to result in the best outcome for the class and the more likely it is that the judge will be appearing to prejudge the case. It is entirely possible that liability may be relatively certain, and yet damages difficult to predict. The Task Force concludes that uncertainty as to damages is just as problematic for an auction as is uncertainty on the merits.

. Whether the Size of the Class Or Class Certification Is In Doubt. For auctions to be useful, they must be conducted at an early point in the case; otherwise substantial deadweight costs will have been expended by lawyers who end up on the losing end of the bidding. This means that an auction ordinarily will have to be conducted well before the class is certified. n188 It is obviously inefficient to conduct an auction if the court is doubtful about granting class certification. n189 Moreover, if the size of the class is indeterminate at the time of the auction, the bidding process will be skewed [*744] because lawyers will find it difficult or impossible to value the class claim. Thus, if the number of class members likely to be eligible for relief is in doubt, this cuts against conducting an auction. Similarly, if there is a possibility of intra-class conflict, leading to the further possibility of creation of sub-classes, this cuts against conducting an auction because of the difficulty that lawyers and judges will have in valuing the class claim for bidding purposes. n190

. Whether the Action Involves Significant Prefiling Investigation By Private Lawyers. When significant preliminary work has been done, the auction or prospect of an auction creates disincentives for counsel to continue with that work. Indeed, the prospect that an auction will deprive a firm of a class action may discourage firms from incurring search costs in the first instance. This would have an unfortunate effect on the private attorney general function of plaintiffs' lawyers. n191

. Whether There Is a Lead Plaintiff That Is Able and Willing To Enter Into a Good Faith Search For and Fee Negotiation With Counsel. There is no need for a court to be heavily involved in creating a market through an artificial structure if an experienced plaintiff with substantial resources is capable and willing to enter into a competitive search for, and fee negotiation with, qualified counsel. n192

. Whether It Is Likely That the Court Will Receive a Significant Number of Bids From Qualified Bidders. Setting a minimum number of bidders is arbitrary; but the fact is that an auction with only a handful of bidders does not come close to replicating a market search for counsel, which is the very reason for conducting the auction. n193

[*745]

. Whether Lead Counsel Is Contested Or the Choice Is Otherwise Unclear Under Traditional Criteria. The Task Force concludes that in cases where there is only one lead plaintiff and counsel before the court, and that counsel is qualified under the standards of Rule 23 to prosecute the action, it is not sensible to incur the expense and uncertainty of an auction. In that situation, the court should satisfy itself that counsel is qualified. Any concern that the fee arrangement

74 Temp. L. Rev. 689, *745

may result in excessive fees can be handled by providing advance warnings about limitations that will be observed in a final review of the fee request, and appropriate ex post review. The Task Force further concludes that even when private ordering has failed, traditional criteria for appointing class counsel are preferable, in most cases, to the use of an auction.

IX. Suggested Procedures To Be Employed If the Auction Method Is To Be Used

If the court in its discretion is convinced that circumstances exist that support an auction for class counsel, it will have to consider what procedures to employ in administering the auction. Generally speaking, courts have taken two approaches to auctions. Some courts have essentially opened up the process to all bidders in an unstructured fashion. Others have required that the bids be structured in certain detailed ways.

After reviewing the practices employed by the courts, the Task Force makes the following recommendations concerning procedures to be used by a court conducting an auction for class counsel:

. Sealed Bids: As a policy, sealed bids make sense. If the defendant knows about the terms of the winning bid, it will be aware of class counsel's financial incentives. The defendant could then structure its litigation tactics in a way that could hurt the class - for example by offering a settlement at a certain point, knowing that counsel's fee percentage will go down after that point. n194 Thus, sealed bids would seem to be a prerequisite for the integrity of any auction. The problem, however, is that bids are judicial documents entitled to a presumption of public access. The court in Cendant n195 indicated that the presumption of public disclosure runs especially high where the "public" includes the very class members whose lawyer is being chosen by the court. But the right of public access is not limited to class members. The sealing order in Cendant was  [*746]  invalidated because it "prevented many class plaintiffs and defendants from accessing the bids for lead counsel." n196

The Task Force concludes that it is essential to distinguish between (1) access by class members and access by the defendants, and (2) access during the bidding process and access thereafter. The Task Force believes that the court should have the authority to enter a protective order barring access by the defendants to the bids. Courts frequently see, for example, arguably privileged materials in camera, and opposing parties are not allowed to see them unless and until the court rules on their status. The mere fact that they are court documents once submitted to the court should not be dispositive.

The Task Force therefore disagrees with the result in the Cendant sealing opinion, to the extent it fails to recognize the importance of protecting bidding information from defendants. If an auction is to be conducted, the integrity of the process requires that bids remain sealed from the defendants until the litigation is concluded. The Task Force also concludes that if the bidding process is to be effective, all bids must be sealed from any public disclosure during the time that the bids are being submitted. If, however, class members have a legitimate interest in seeing the winning bid after the court has received the last bid, there is no reason, in the Task Force's view, why they should not be afforded access to it, under an appropriate protective order and without disclosure to the defendant, so that the class members can have a meaningful voice in the selection process. Finally, the fee arrangement should be disclosed publicly at the time of any fee application or in connection with any proposed settlement, because at that time there is no risk that the defendant will use the bidding information as part of a litigation strategy.

The Task Force recognizes, however, that under the Third Circuit's decision in Cendant, the sealing of bids at any point is problematic and may be prohibited; at a minimum the case means that there is a heavy presumption against sealing that can only be overcome through application of a stringent balancing test, under which the dangers of disclosure of the bids clearly outweigh the interest in public disclosure. Moreover, even if sealing is permitted initially, the Cendant Court made clear that "the sealing order must be lifted at the earliest possible moment when the reasons for sealing no longer obtain." n197 Of course if governing law requires unimpeded access to the bids, the defendant will be aware of the bids and this is just one more reason for the court to favor traditional methods of appointment over an auction.

The Cendant opinion on sealing raises a question that has largely been ignored in decided cases: namely, should a defendant know the precise terms of plaintiffs' counsel's representation? In a  [*747]  traditional case, the defendant does not inquire into the financial relationship between a plaintiff client and an attorney. In most class action cases, there is no need for an inquiry because the fees are not fixed until the close of a case. Under the PSLRA as well as in the auction context, where fees are set ex ante, there is a trade-off between sealing to protect against the defendant obtaining an advantage and public disclosure to assure that the members of the class are fully heard on the question of fees. If sealing is to be preferred, then the presumption in favor of a winning bid may well be weaker when the bid is challenged by members of a class who are not privy to the specifics of the bid until a settlement is proposed. If public disclosure is to be preferred, the presumption in favor of a winning bid might be somewhat stronger. n198

. Consortium Bids: Judges Walker and Shadur have generally prevented firms from submitting a joint bid, although Judge Shadur has permitted counsel who have jointly filed a complaint to bid together. n199 The rationale for such a ban has not been fully discussed, but it appears that the Judges are concerned that if law firms form coalitions, there will be too few competitive bids. n200

The Task Force opposes any limitation on consortium bids. If the idea of an auction is to replicate the market, and firms wish to and are permitted to band together in the market, then it is inconsistent for the court to ban such a practice when conducting an auction. Moreover, if firms are permitted to pool assets and thereby spread the risk, it is actually more rather than less likely that they will enter the bidding process and make strong bids. Firms large and small might well find it necessary to pool their resources in order to counteract a vigorous and well-funded defendant. n201 The Task Force also notes that small firms can be  [*748]  disadvantaged if they are not permitted to join with other firms to bid. n202 As to the concern that the formation of consortia will result in too few bids: if the resulting number of bidders is too small, the court simply should not hold an auction.

. Quality Control: As stated above, the lowest bidder is not necessarily the best counsel for the class. Some courts have attempted to impose quality standards on counsel taking part in the bidding process. Judge Walker has required the following submissions:

A. A description of the background and experience of the firm and who would be working in the action.

74 Temp. L. Rev. 689, *748

B. Specific qualifications of the firm to complete the work necessary.

C. Willingness to post a completion bond or other monetary assurance of performance.

D. A statement concerning malpractice insurance coverage.

E. A description of how expenses are to be covered.

F. An assessment of the case. n203

The Task Force notes that these are basically the same factors that the courts use to determine whether counsel is qualified in cases of traditional appointment of class counsel, and there is every reason to commend them for use in an auction - recognizing that the asserted "objectivity" of the auction process will of necessity be compromised.

. Fee Caps: Judge Shadur has approved the use of fee caps as part of the bidding process and appears to have used them with considerable success. The Task Force concludes, however, that as a general matter fee caps are problematic because counsel who receives a settlement offer at or near the cap has little incentive to continue with the action, even if pressing the matter further would benefit the class. n204 Fee caps may therefore create conflicts of interest between class counsel and the class. Judge Shadur has responded to this concern by holding open the possibility that he would consider awarding counsel fees above the cap in particular [*749] cases. But as stated previously, the need to revisit the fee could skew the bidding process, for example, by encouraging a firm to bid an artificially low cap in the hope that the judge will lift it in ex post review. At the very least the possibility of an award beyond the cap adds another level of unpredictability to the bidding process. On the other hand, if the ex post lifting of fee caps becomes a routine practice, as the law may, indeed, require in order for counsel to obtain a reasonable fee, the Task Force questions whether an auction with a fee cap provides an advantage over traditional ex post review.

The practical problem with pre-set fee caps is that no bidding firm will be working exclusively on the auctioned case, and no case goes entirely as expected. If the auctioned case takes an unexpected turn and becomes more problematic and less lucrative than envisaged when the bid was made, there will be a very real incentive for counsel to divert attention and resources to other matters and not to take the potentially embarrassing step of returning to the auctioning court and requesting relief from the cap.

. Caps On Expenses: Like fee caps, expense caps are subject to criticism for creating negative incentives for class counsel. Counsel operating near the cap may have an incentive to refrain from taking steps necessary to maximize recovery if those steps entail costs that bring expenses near or above the cap. This could lead to a settlement that is not

in the best interests of the class. Expense caps may also create a disincentive to incur extraordinary expenses, even when those expenses may benefit the class. n205 Moreover, if the defense is aware of the existence of an expense cap (which is certainly a possibility in jurisdictions prohibiting the sealing of bids), the defense will have an incentive to run up the expenses of plaintiff's counsel towards the cap. This situation may create a powerful limitation on counsel's dedication to and advancement of the case. n206 There is some evidence that cases have settled at or just under the expense cap. n207 The Task Force concludes that caps on expenses should not be used or mandated as part of a bid in an auction. n208

 [*750]

. Structured Bids By Time Points In the Litigation and/or By Amount of Recovery: Bids can be structured in various ways, such as by requiring bidders to state their fee as a flat percentage of the recovery, or as a percentage of the recovery for particular time periods, litigation events, or dollar ranges. Judge Shadur refuses to impose any structure on bids. His rationale is that it would stifle the creativity of the bidding lawyers. Yet if the bids are completely unstructured, the court may find it difficult to compare the bids to determine which is best and at what point. On the other hand, if courts employ excessive structure, the question becomes how such a structure could ever purport to emulate a market process for selecting counsel. At this experimental stage in the use of auctions, the Task Force takes no position on whether it is preferable for bids to be structured by the court.

. Use of an X Factor: The X factor used by Judge Kaplan with apparent success in Auction Houses cannot be accused of over-structuring the bidding process. All that is required from the bidders is a single number, below which the bidder will receive no fee, and above which the bidder will receive a flat percentage. It also avoids the possibility that the winning bidder will settle quickly and cheaply, because this would only serve to limit or even eliminate the lawyer's fee. But the X factor can be accused of providing bad incentives in some cases - especially if the value of the case turns out to be near or below the X factor. Fundamentally the X factor raises the same concerns as a fee cap. n209 The problem with both fee caps and base dollar amounts is that they involve recovery ranges for which counsel would receive a 0% fee, leading to perverse incentives and conflicts of interest. For this reason, an X factor should not be used. n210

. Increasing Or Declining Percentages: Judge Shadur argues that the use of increasing percentages creates an unconscionable windfall for class counsel. Others criticize declining percentages and argue that slightly increasing percentages provide a proper incentive, encouraging counsel to maximize the total recovery. n211 The Task  [*751] Force is aware from its own experience that different clients prefer different approaches, and that either increasing or declining percentages may reasonably be used. The Task Force believes that these are questions that should be left to the market, especially since the court retains its power and obligation to review the fee at the end of the case for reasonableness, even in auction cases. We conclude that a firm should not be disqualified from bidding simply because it proposes increasing (or declining) percentages. n212 Such a categorical disqualification is inconsistent with the market process that the auction purports to emulate. n213

. Open Bidding: In most auction cases, the bidding has been opened to any interested counsel. Even counsel without a class member as a client have been invited to participate. n214 The Task Force concludes that such an open bidding process should not be used, despite the advantage in potentially increasing the number of bidders. While class actions stretch traditional notions of the lawyer-client relationship, the Task Force is not prepared to abandon the idea that a lawyer who seeks to represent a class should have a client who is a member of that class. Moreover, as Judge Shadur has noted, bidding should not be open to the world because this creates the risk of bidding by lawyers with no

knowledge of the case. n215

. Information Parity: If information has been imparted by the defendant to one or more of the bidders, it should be made available to all. n216 Otherwise the defendants may be able to engineer their own choice of counsel by providing one bidder  [*752]  inside information about the value of the case.

. Timing: If auctions are to be used, they should be employed at the earliest possible opportunity, and that will usually be well before the court certifies the class. Otherwise some firms might expend resources in order to advance the case and obtain a traditional appointment, only to be surprised by the court's decision to hold an auction.

. Administration of Auction By Someone Other Than the Presiding Judge: The Task Force is aware that the auctions to date have been conducted by the judge presiding over the case without apparent problems. As a matter of prudence, however, we believe that the judge who orders the auction should at least consider having someone else, e.g., a magistrate judge, administer the auction and appoint lead counsel. n217 If someone other than the sitting judge runs the auction, it will tend to reduce the concerns about the presiding judge prejudging the merits or otherwise becoming invested in the selection of class counsel before any Rule 23 motions have been heard. Moreover, the risk of ex parte argument through the bidding process will be minimized.

We note, however, that there are practical problems with the notion of separation. The presiding judge must review attorney fees at the end of a case, even if there is an auction at the beginning. Unless the judicial officer who conducts the auction places everything, including his or her view of the case, on the record at the outset, the presiding judge may not know what assumptions were made and why the judicial officer conducting the auction approved the winning bid. There may be a disconnect between the assumptions of the judicial officer conducting the auction ex ante and the presiding judge who looks at the case ex post. To the extent that a presumption, whether slight or more robust, may arise in an auction case that the ex ante bid is reasonable, that presumption may be undermined by the separation of judicial roles. This is certainly a concern that the presiding judge should take into account in deciding whether to get involved in an auction. Another factor to be considered is that appointment of a different judicial officer may result in delay of the proceedings.

X. Auctioning Class Counsel In Actions Subject to the PSLRA

A. Description and Analysis of the Statute

The Private Securities Litigation Reform Act of 1995 n218 was designed to remedy the perceived problem that securities class actions were being brought  [*753]  and controlled by lawyers rather than class plaintiffs. n219 The PSLRA adopts the model of a "client-driven" class action, in contrast to the "court-driven" auction model. The Act seeks to maintain the traditional client-lawyer relationship by adopting a presumption that the plaintiff with the largest financial stake in the litigation who is willing to serve as lead plaintiff is the "most adequate" plaintiff and should be appointed as lead plaintiff for the class. n220 With respect to choice of class counsel, the Act provides that "the most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." n221 Congress intended, by these provisions, to direct courts to designate a lead plaintiff who would have the resources and the incentive to choose capable counsel, monitor class counsel's performance and negotiate a reasonable fee. n222 The

legislative history emphasizes that the Act is "intended to increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and action of plaintiff's counsel." n223 Congress wanted to "encourage institutional investors to take a more active role in securities class action lawsuits [which] would ultimately benefit shareholders and assist courts by improving the quality of representation." n224 The PSLRA establishes what has been referred to as an "empowered plaintiff" model - identifying a sophisticated plaintiff with substantial resources and a large economic stake in the action, and allowing that plaintiff to appoint counsel and negotiate a reasonable fee. n225

The PSLRA provides that the presumption of adequacy resulting from the largest financial stake may be rebutted only upon proof that the designated most adequate plaintiff "will not fairly and adequately protect the interests of the [*754] class; or is subject to unique defenses." n226 The Act further provides that total attorney fees and expenses awarded by the court "shall not exceed a reasonable percentage of the amount of any damages...actually paid to the class."

Read as a whole, the Act appears to contemplate that the judge will be more active at the outset of a case in investigating the qualifications and procedures utilized by the lead plaintiff in selecting counsel, initiating the litigation and negotiating a fee, and less active in directly overseeing the choice of counsel and the fee arrangement. n227 It also contemplates that the judge will be active in reviewing the proposed fee and expenses at the end of the case. By contrast, the auction cases seem to emphasize the judge's active involvement at the beginning of the case in selecting counsel and setting fees, and less active involvement in the final review.

B. Politics and the PSLRA

Recently, public institutions such as pension funds have served as lead plaintiffs in securities class actions. In several cases, their designation as lead plaintiff has been contested by parties claiming that the institutional plaintiff's appointment of counsel has been driven by political contributions rather than by concern about finding the best counsel for the class. n228 Charges have been made [*755] that class counsel has been appointed as a payback for significant campaign contributions to those officials responsible for choosing counsel. n229 Pay-to-play allegations obviously undermine the confidence that might otherwise be reposed in these institutions to choose the best counsel and strike a hard bargain with counsel on behalf of the class.

Most of the lawyers representing public institutional investors who testified before the Task Force acknowledged that pay-to-play might be a concern in the actions of some public institutional investors. However, all of the witnesses testified that precautions had been taken to insulate their particular institutional processes from such influence. n230 For example, the Trustees of the State of Florida Pension Fund Retirement System have delegated the decision to choose counsel to the Executive Director of the Fund (a non-elected official) to attempt to insulate the decision from political pressure. n231 And in Connecticut there is legislation making it illegal to contract with the office of the State Treasurer if someone has contributed to the Treasurer's political campaign. n232

The Task Force notes that in February 2000, the ABA amended the Model Rules of Professional Conduct to add Rule 7.6, which makes it a disciplinary violation for a lawyer or law firm to accept a "governmental legal engagement" if the lawyer or firm has made or solicited political contributions for the purpose of being considered for that appointment. n233 Accordingly, in addition to protections that the institutions may impose on themselves, it may be increasingly common for lawyers to be required by disciplinary rules to eliminate pay-to-play.

The change in the Model Rules may not be as helpful as it might seem, however, in the context of class actions. The question will arise whether "a governmental legal engagement" occurs when a governmental litigant recommends a law firm for approval by the court as class counsel. The fact that the governmental litigant may reach an agreement on counsel fees is not [*756] dispositive, because the court will have to approve the fees. After all, counsel is counsel for the class (not the governmental litigant) and must be deemed adequate by the court. Thus, it may be that Rule 7.6 will have little, if any, effect on private securities class actions. Moreover, even if Rule 7.6 were to apply to such actions, it

is unlikely that a campaign contribution can ever be tied directly to any particular appointment of counsel. So even if it applies, the Rule may lack teeth in the securities class action context.  n234

Another question that arises is, where does political pressure come from in the particular jurisdiction? A pension fund may appear to be apolitical, but may in fact be subject to influence by the Governor or another political figure. It will not always be possible for a court to know how much pressure is exerted on the selection of counsel by political figures and what the reasons for the pressure are. Thus, the possibility of collusion between institutional investors and chosen counsel remains of concern to the Task Force and warrants some skepticism about the contention that the "empowered plaintiff" model results in a more careful, neutral selection process.

C. Case Law On PSLRA and Auctions

Cases following enactment of the PSLRA are not uniform in analyzing the relationship between class counsel auctions and the lead plaintiff provisions of the PSLRA. The reaction has ranged from a total prohibition of auctions to a view that the auction process is perfectly consistent with the PSLRA.

In In re Razorfish, Inc. Securities Litigation, n235 Judge Rakoff declared that auctioning class counsel was not "remotely consistent with the Reform Act." In his view, the PSLRA requires the trial court to put its primary focus on the selection of the lead plaintiff, not on the selection of counsel. Judge Rakoff recognized that in selecting the lead plaintiff, the court would have to review the fee arrangements and qualifications of lead counsel to gauge the plaintiff's ability to represent the class adequately. He also recognized that the court could make a "modest intervention" to ensure that the fee arrangement between the lead plaintiff and chosen counsel was reasonable. But he concluded that the court could not force a choice of counsel on the lead plaintiff. As the Razorfish Court put it, the court's power under the PSLRA to disapprove the lead plaintiff's choice of counsel "cannot be transmogrified into a right to arrange a shotgun marriage between strangers." n236

 [*757]  Other courts have tried various approaches to reconcile auctions with the PSLRA. For example, in In re Bank One Shareholders Class Actions, n237 and In re Comdisco Securities Litigation, n238 Judge Shadur held that the statutory presumption of "most adequate plaintiff" would be overcome if the lead plaintiff chose a firm that did not submit the best bid for the class and refused to take the qualified firm that did submit the best bid. Judge Shadur's ruling explicitly permitted the lead plaintiff to work with both its preferred counsel and the court's designated counsel, as long as the court's designated lead counsel performed lead counsel's functions and the fee arrangements were those approved in the auction. Judge Shadur's approach does not result in the lead plaintiff being forced to work with counsel against its will. Rather, it would result in the designation of another lead plaintiff as "most adequate" if the original lead plaintiff refused to work with the court-approved counsel. n239 Judge Shadur reasoned that "if the presumptive lead plaintiffs were to insist on their class counsel handling the action on the hypothesized materially less favorable contractual basis, that insistence would effectively rebut the presumption that the putative class representatives, despite the amounts that they have at stake personally, were indeed the "most adequate plaintiffs'...." n240

In In re Quintus Securities Litigation, n241 Judge Walker took a somewhat different view in an attempt to reconcile auctions and the PSLRA. Under his interpretation, the PSLRA did not alter the traditional Rule 23 requirement that the lead plaintiff must "fairly and adequately protect the interests of the class." This Rule 23 requirement would be met if the lead plaintiff could show that it had conducted a market search for counsel and reached a fee agreement through arm's-length negotiation. However, if the lead plaintiff had not engaged in a competitive search for counsel and a real negotiation of the fee, the court would not approve the lead plaintiff's choice and the court, pursuant to its fiduciary obligation to protect the class, could conduct an auction. Therefore, under Judge Walker's reasoning, an auction would be consistent with the PSLRA if it appeared that the lead plaintiff did not enter into a true market search and negotiation in choosing counsel. n242 In Quintus, the court's selection of lead  [*758]  counsel was imposed on its designated lead plaintiff, who actively resisted dealing with the court's designated counsel. n243

In In re Cendant Corp. Litigation, n244 Judge Walls took yet another approach. He permitted counsel for the

court-designated lead plaintiff the opportunity to match the terms of the auction winner. If lead plaintiff's counsel agreed to those terms, it would be designated lead counsel. If not, the lowest qualified bidder would be selected as lead counsel, even over the objection of the lead plaintiff. But the Third Circuit rejected this approach as inconsistent with the language and goals of the PSLRA. n245 The Court noted that the PSLRA is based on the premise that a sophisticated lead plaintiff with a large stake in the action "would likely do a better job than courts at selecting, retaining, and monitoring counsel." n246 It observed that the PSLRA specifically states that the lead plaintiff has the power to "select and retain" lead counsel, and the lead plaintiff's choice of counsel is "subject to the approval of the court." n247 It also reasoned that the statutory term "approval" cannot be stretched in the ordinary case to mean that the court can actually override the lead plaintiff's selection by appointing counsel through an auction; a court appointing counsel through an auction is doing something more than simply "approving" or "disapproving" the lead plaintiffs' choice. Such a court is actually engaging in the "select and retain" function that the PSLRA delegates to the lead plaintiff. The Cendant Court concluded that Judge Shadur's reading of the PSLRA (i.e., that the lead plaintiff is not "adequate" if it does not accept the counsel that made the best bid in an auction) would give the court the basic right to select and retain counsel, even though that right is explicitly granted in the first instance to the lead plaintiff under the terms of the PSLRA. The Cendant Court concluded that the PSLRA

evidences a strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to counsel selection and counsel retention. When a properly-selected lead plaintiff asks the court to approve its choice of lead counsel and of a retainer agreement, the question is not whether the court believes that the lead plaintiff could have made a better choice or gotten a better deal. Such a standard would eviscerate the Reform Act's underlying assumption that, at least in the typical case, a properly selected lead plaintiff is likely to do as good or better job than the court at these tasks. Because of this, we think that the court's inquiry is appropriately limited to whether the lead plaintiff's selection and agreement with counsel are reasonable on their own terms. n248

 [*759]  The Cendant Court did not completely rule out the use of auctions in PSLRA cases. It noted that there might be an unusual circumstance in which the putative lead plaintiff's choice of counsel or negotiation of a fee agreement is inadequate - either because counsel is unqualified or the agreement with counsel was not the result of meaningful negotiation. If the putative lead plaintiff has "repeatedly undertaken a flawed process of selecting and retaining lead counsel," this would overcome the PSLRA's "most adequate" presumption; but even this default would not in itself justify resort to an auction. Rather it would justify selecting a new lead plaintiff to undertake a search for counsel. But what happens if none of the potential lead plaintiffs could do the job of selecting counsel and negotiating a reasonable fee agreement? For this extremely unusual situation, the Cendant Court observed that an auction might be a possibility - but even then, the court is not required to conduct an auction:

It is possible that the court could conclude that, perhaps due to the nature of the case at hand, none of the possible lead plaintiffs is capable of fulfilling the model contemplated by the Reform Act, i.e., a sophisticated investor who has suffered sizeable losses and can be counted on to serve the interests of the class in an aggressive manner. In such a situation, it would be permissible for a court to conclude that its obligation to protect the interests of the plaintiff class makes it necessary for the court to assume direct control over counsel selection and counsel retention, and, were the court to so conclude, an auction would be one permissible means by which the court could select and retain counsel on behalf of the class. n249

 The Cendant Court emphasized that the role of auctions in PSLRA cases was limited to unusual cases:

We stress, however, that it is not sufficient justification for an auction in a case governed by the Reform Act that the court prefers a process of counsel selection or counsel retention that it, rather than the lead plaintiff, controls, nor is it enough that the court thinks that an auction is an inherently superior mechanism for determining a reasonable fee. n250

### D. Analysis of Case Law On PSLRA and Auctions

The Task Force has considered the various interpretations of the PSLRA as it relates to auctions. The Task Force declines to provide a "legal opinion" on the proper reading of the statute. n251 We note, however, that until the dispute [*760] among the courts over the viability of auctions is resolved by Congress or the Supreme Court, the use of auctions in PSLRA cases threatens to absorb time and expense in what may prove ultimately to be an empty exercise.

A further problem is that when the court intervenes to conduct an auction, this is done at a time when the "most adequate plaintiff" is being selected; and during this time, the defense is barred by statute from having any voice in the appointment issues. n252 If an auction is conducted in a PSLRA case the defendant may find it difficult to raise a meaningful challenge not only to the lead plaintiff but also to the court's selection of plaintiffs' counsel at the necessarily later time the Rule 23 class certification issue comes before the court. So the use of an auction in PSLRA cases threatens to disentitle not only the lead plaintiff but the defendant as well.

The Task Force also notes that some of the alternatives chosen by the courts create certain practical and conceptual problems that warrant consideration. For example, the right of first refusal utilized by the district court in Cendant is likely to have a negative effect on the bidding incentives in the auction. n253 It certainly means that the lead plaintiff's choice of counsel has no [*761] incentive to place a competitive bid, because it would only create a possibility that the bid would be lower than the one that counsel could otherwise match. Thus, the right of first refusal results in at least one less bidder and a less competitive auction. It also skews the incentives of other counsel. n254 To win the auction, counsel would have to submit a bid so low that it would be unattractive to the lead plaintiff's counsel to match - the obvious risk is that such a bid will be too low to benefit the class, thereby creating a conflict of interest between counsel and the class.

More generally, replacing the lead plaintiff's choice of counsel through an auction is in tension with the empowered plaintiff model of the PSLRA. n255 Auctions may deter appropriate plaintiffs such as institutional investors from even seeking the role of lead plaintiff, due to the risk that they will have to work with counsel they did not select and the probability that they will not be able to control counsel that is selected by the court. n256 Professor Elliot J. Weiss, co-author of the article that formed the basis for the lead plaintiff provisions of the PSLRA, n257 supplied the following written testimony to the Task Force:

If courts insist in overriding institutional investor-lead plaintiff's selection and/or retention of counsel, in situations where lead plaintiffs have acted carefully and responsibly, they will discourage qualified institutions from volunteering to serve as lead plaintiffs in the future...I have had occasion to discuss the lead plaintiff provisions and the possibility of acting as lead plaintiffs with numerous institutional investors. Almost all approach that possibility with considerable trepidation. Their major incentive for getting involved is the prospect that their involvement will translate into a higher net recovery for the institution and the class, through the institution's (1) selection of [*762] counsel...; (2) monitoring counsel's conduct of the litigation; and (3) negotiation of fee arrangements that...protect the class against fees that represent a windfall... n258

Representatives of institutional investors appearing before the Task Force fully supported these conclusions. They stated that institutional investors would not assume the burdens of the lead plaintiff unless those efforts were justified by increased control over the litigation, which would result in tangible benefits for the institution. They emphasized the amount of work involved in serving as lead plaintiff, not only the burden of selecting and negotiating a fee with counsel

and monitoring the litigation, but also the burden of responding to extensive discovery. n259 Representatives of the lead plaintiff in Cendant emphasized that the right of first refusal utilized in that case "irretrievably damaged" the working relationship that had been established between lawyer and client, ceding "ownership" of the case to the court. n260

Another disincentive to institutional involvement imposed by auctions stems from the obvious fact that a plaintiff's choice of counsel is only partly based on price. Institutional client representatives identified the following factors that influenced their choice of counsel in class actions: experience, claims analysis, litigation strategy, investigation results, client responsiveness, reputation, trial capabilities, character, and compatibility. n261 Few of these considerations are likely to be factored meaningfully into the judge's choice of counsel by way of auction - and to the extent such factors are considered by the judge, the asserted market-based advantages of an auction are thereby diminished, making an auction look quite like the selection process that the  [*763]  institutional investor used in the first place. In addition, institutional investors may have an interest in promoting diversity as a factor in the selection of counsel; this interest would surely be frustrated by use of an auction. n262

Nor are the significant disadvantages of an auction in securities class actions necessarily offset by lower fees. For example, lead plaintiff representatives in In re Cendant Corp. showed that the fee arrangement that it had reached with lead counsel was more beneficial to the class than the one selected for the class by the court after an auction. n263

E. Task Force Determination On Auctions Under the PSLRA

 The PSLRA requires that the most adequate plaintiff's choice of counsel is entitled to deference if it is the result of a careful and independent process. This is the essence of the client-driven litigation model established by the PSLRA. The Task Force concludes that once the court has identified the "most adequate" plaintiff under the terms of the Act, that party's choice of counsel should be reviewed with the deference given to any other business decision. n264 The Task Force recommends that scrutiny akin to the business judgment rule, ordinarily applied in the context of corporate board decisions, should be applied to the lead plaintiff's choice of counsel and to the fee arrangements. n265

As is the case under the business judgment rule, the reviewing court evaluating the lead plaintiff's choice of counsel should look at the process by which the lead plaintiff appointed counsel and reached a fee agreement. n266 If  [*764]  that process appears to be independent, well-informed, and conducted in good faith, with no indication of self-dealing or personal aggrandizement, the court should ordinarily honor it, even if it might prefer the plaintiff to have made a different choice or employed a different selection process. n267 Even if the plaintiff has not employed a formal competitive process in the choice of counsel, this does not necessarily mean that the presumptive lead plaintiff's choice should be rejected. n268 The question is whether the plaintiff has employed a reasonable process, and has acted in good faith, with independence, and without violation of its duty of loyalty to the class. n269

The determination of whether the lead plaintiff has exercised independent judgment should focus in part on the possibility, previously discussed, of political contributions improperly influencing the choice of counsel. The Task Force agrees with the statement in In re Cendant Corp. Litigation, n270 "that actual proof of pay-to-play would constitute strong (and quite probably dispositive) evidence" that the most adequate plaintiff presumption has been rebutted. A plaintiff that chooses counsel on the basis of political contributions, rather than  [*765]  traditional considerations such as the quality and expertise of counsel, is not providing adequate representation to the class.

In order to protect against the possibility that pay-to-play has tainted the process, the Task Force recommends that courts require public institutional investors seeking appointment as lead plaintiffs to disclose whether chosen counsel has made contributions to the campaign of any public official who has direct authority over institutional decisionmaking. If such contributions have been made, the court should require a showing that the choice of counsel was not affected by any campaign contribution.

In making the determination of whether lead counsel has used an appropriate process in choosing counsel and negotiating a fee, the court may consider posing questions substantially similar to those outlined in the SEC's brief in In

re Cendant Corp: n271

What procedures did the lead plaintiff follow to identify a reasonable number of counsel with the skill and ability necessary to represent the class in the pending matter?

What procedures did the lead plaintiff follow in inviting competent counsel to compete for the right to represent the class?

What procedures did the lead plaintiff follow to negotiate a fee and expense reimbursement arrangement that promotes the best interests of the class?

On what basis can the lead plaintiff reasonably conclude that it has canvassed and actively negotiated with a sufficient number of counsel and obtained the counsel that is likely to obtain the highest net recovery to the class?

Did the lead plaintiff make inquiries into the full set of relationships between proposed lead counsel and the lead plaintiff and other members of the class, and did the lead plaintiff reasonably conclude either that there are no such relationships or that they did not adversely affect the exercise of the plaintiff's or counsel's fiduciary obligations to the class? n272

 In evaluating the responses to these questions, the court must of course consider whether the lead plaintiff's chosen counsel is qualified to prosecute the action. If counsel is simply unqualified to prosecute the class action (e.g., counsel is inexperienced in class actions or clearly lacks resources), then the court must refuse to approve the arrangements, business judgment rule notwithstanding. In such an unusual circumstance, the court may direct the  [*766]  plaintiff to find and negotiate with different counsel; n273 but there is also a possibility that the court would find that the plaintiff's choice of unqualified counsel renders that plaintiff "inadequate" under the terms of the PSLRA, and so the next "most adequate" plaintiff would be designated as lead plaintiff. n274 In neither circumstance, however, should the court simply impose its own counsel, by way of auction, against the lead plaintiff's wishes. n275 Appointing a new lead plaintiff with the resources, experience and interest to conduct a search for counsel and an arm's-length negotiation of the fee is vastly preferable to imposing a dysfunctional attorney-client relationship on the class.

    The Task Force acknowledges that a case might arise in which the putative lead plaintiff has failed to conduct an adequate search for qualified counsel, and no other party has stepped up with the resources, experience and interest to conduct a true market search for and negotiation with counsel, i.e., a sophisticated investor who has suffered substantial economic loss. In these very limited circumstances, the Task Force does not rule out the possibility that the court may designate a "most adequate plaintiff" - as is required under the statute - and yet find it appropriate to employ either an auction or a traditional appointment process that would be used in non-PSLRA cases. n276 But an auction is not appropriate simply because the court disagrees with the plaintiff's choice of counsel or thinks that an auction will result in selection of a counsel who will agree to a lower fee. n277

     [*767]  The Task Force notes that besides its obligation under the PSLRA to review the process of selection and negotiation and the qualifications of counsel at the outset of the case, the court remains obligated under Rule 23 to

review the reasonableness of the fee at the end of the case. n278 This process - a deferential review of the plaintiff's appointment decision, a review to determine whether counsel is qualified, and an ex post review of the fee for reasonableness - should be sufficient to assure the fairest net recovery for the class.

In many PSLRA cases, the identification of the most adequate plaintiff under the statutory criteria will be straightforward. Sometimes, however, there are competing factions on the question of which plaintiff or set of plaintiffs has suffered the greatest loss and is therefore most adequate. Competition for the "most adequate" label has been the subject of some litigation, but the questions presented in most such cases relate to amount of loss and relatedness of proposed group members, not choice of counsel. n279 The Task Force believes that [*768] if parties are competing for the "most adequate" plaintiff designation, the court should first determine which of the contestants is most adequate under the statutory criteria. Then the court should review that party's choice of counsel and fee arrangement subject to the same standards and with the same deference as in other PSLRA cases.

The Task Force recommendations are made in light of the obvious tension between the PSLRA model of client-driven litigation and the auction model of court-controlled choice of counsel. We conclude that to the extent that an auction is even permissible under the PSLRA, it should only be considered if the lead plaintiff's choice of counsel, or process in choosing counsel and arriving at a fee, is so infirm as to rebut the presumption that the plaintiff is "most adequate" under the statute, and even then only if the alternative candidates for the "most adequate plaintiff" do not appear willing or able to engage in a meaningful search for and negotiation with counsel.

Finally, even if an auction is a possible option because of unusual circumstances in a PSLRA case, it is clear that an auction is only one option. Private ordering and traditional appointment will also be an option in those unusual circumstances in which the lead plaintiff provisions of the PSLRA will not generate an appropriate process for selection of and negotiation with counsel. As discussed in Section VIII, supra, traditional methods of appointment are ordinarily superior to auctions in most cases.

XI. Application of the "Most Adequate" Plaintiff Model Outside PSLRA Cases

The "most adequate" plaintiff notion established in the PSLRA is still quite new. At this point, the Task Force declines to recommend that the PSLRA model be extended to the appointment of counsel in other kinds of class actions, such as antitrust cases. While there is some anecdotal evidence that the model can work well and result in lower attorney fees, n280 the model is not only largely unproven but also in tension with a fundamental premise animating the class action proceeding - namely, that the class action is designed to aggregate claims that are individually too small to support litigation by any single class member. In the experience of the Task Force, it is the exceptional class action (not the rule) to find a lead plaintiff who has suffered a loss that would financially support an individual suit, yet who prefers to prosecute a class action, taking on fiduciary duties to others and incurring the delay and expense of all the attendant procedures. The Task Force also believes that, to the extent those [*769] plaintiffs exist, defining the party with the largest loss as the "most adequate plaintiff" is too narrow. The party who lost the most is not by that fact always the best party to control the case and control the lawyers.

The Task Force recommends that in non-securities cases the amount of loss should be no more than a factor in determining the lead plaintiff. n281 The prospective lead plaintiff should also be evaluated as to whether the party has the sophistication, experience, and incentive to monitor counsel and negotiate a reasonable fee. In making that determination, the Court should evaluate the actual relationship between prospective counsel and plaintiff to determine: 1) whether the party has exercised control over the litigation to date; 2) whether the party has experience in managing litigation; 3) whether the party has experience in acting as a fiduciary; 4) any pre-existing lawyer-client relationship, including in prior class actions; and 5) whether the party has the financial resources and time to commit to managing the litigation. n282 In other words, the concept of an empowered plaintiff - one with the resources, experience and interest to seek out qualified counsel, negotiate a fee, and monitor counsel's efforts - should be distinguished from the single-factor "most adequate" plaintiff as that term is defined in PSLRA cases. If the court, applying the factors set forth immediately above, determines in a non-PSLRA case that the putative lead plaintiff is "empowered" in this broader

sense, and has engaged in a good faith search for qualified counsel and has negotiated an arm's-length fee with that counsel, then the decisions of that plaintiff should be subject to deference by analogy to the business judgment rule.

It is, of course, quite likely that in most class actions outside the securities context there will be no plaintiff that approximates the institutional investor in PSLRA cases. The more common scenario is that the class will be comprised of a large number of claimants with small individual losses. In these circumstances, the empowered plaintiff model has no relevance. This does not by any means lead to the conclusion, however, that in the absence of an empowered plaintiff the court should conduct an auction to appoint class counsel. As discussed throughout this Report, the Task Force has concluded that auctions are generally an inferior way of appointing a counsel who will maximize class recovery.

XII. Description and Analysis of Criteria Used In Traditional Appointment of Class Counsel

Case law and experience indicates that the dominant scenario for appointing class counsel is deference to private ordering. The Task Force believes that there is generally no reason to hold an auction when the court is presented with qualified counsel who has been chosen through private  [*770]  ordering. n283

But this does not mean that the court has no role in scrutinizing the appointment of counsel and controlling unreasonable fees in cases of private ordering. n284 The court has an obligation to determine whether counsel chosen through private ordering is indeed qualified and capable of providing effective representation to the class. n285 The court should reject the counsel arrangement if the best interests of the class will not be served. Moreover, the court should rightly be concerned if private ordering has resulted in excessive staffing of the case by various law firms who have cut a deal. The court at the outset should scrutinize the staffing arrangement and should not hesitate to intervene by removing counsel if it appears that lawyers are simply in the case as part of a negotiating process for everyone to get a piece of the pie. At the same time the court should be cognizant of the possibility that the class could benefit from the combined resources and expertise of a number of counsel, especially in a complex case where the defendants are represented by a number of large and highly qualified law firms. n286

 [*771]  In passing on the propriety of multiple counsel, the court should not be content with conclusory assertions that multiple counsel is necessary to assure input from more class members or to avoid disputes among counsel for various plaintiffs. n287 As the SEC has put it, "lead counsel should be able to explain to the court why and how the use of additional law firms promotes the effective, efficient prosecution of the litigation, rather than serving the interests of the law firms." n288 The court should also specify that it reserves the right to alter the counsel structure if it discovers substantial duplication of effort or finds that the litigation is being unduly delayed due to the presence of multiple counsel.

If private ordering is not successful, or if the court has substantial questions about whether an agreement reached among counsel will result in effective and efficient representation of the class, then the court is faced with the choice of selection. n289 This does not necessarily mean, however, that the court should resort to an auction. Rather, courts have noted several criteria that might be considered in assessing who is the best among competing counsel to prosecute the class action. n290 In this section, the Task Force evaluates these criteria.

Cases can be found in which lead counsel was awarded solely on the basis of "first to file." n291 But the better reasoned decisions and the academic  [*772]  commentary rightly criticize a first to file rule. n292 A first to file rule can create a perverse incentive to race to the courthouse with a skeletal complaint. Speed is a poor surrogate for determining the best counsel to prosecute the particular class action.

The Task Force concludes that counsel's diligence in filing an action is a relevant consideration, but only if the filing indicates that counsel has done some real investigation into and work on the case. The filing of a skeletal complaint should be a negative rather than a positive factor. This view of the Task Force is consistent with the proposed amendment to *Fed. R. Civ. P. 23*. Proposed subdivision (g) provides criteria that the court "must consider" in appointing class counsel, one of which is "the work counsel has done in identifying or investigating potential claims in this case."

74 Temp. L. Rev. 689, *772

The filing of a well-prepared complaint after significant investigation is relevant "work"; the filing of a skeletal complaint is no "work" at all.  n293

Beyond prefiling investigation and preparation, a number of selection criteria have been cited in the cases. These include: n294

[*773]

a. Does counsel's client have the ability and motivation to supervise and monitor counsel's work for the class?

b. What is the firm's reputation and experience in the type of class action before the court? n295

c. Has counsel been successful in handling class actions and other complex litigation? n296

d. Does the firm have sufficient resources to fund and staff the prosecution of the particular class action and does it appear willing to expend those resources?

e. Does counsel have appropriate malpractice insurance?

f. Does it appear that counsel has a good sense of what the case is about, and what the value of the case might be?

g. Does counsel have any financial arrangements with plaintiffs or other counsel that may be detrimental to the proper prosecution of the case?

h. Does counsel represent a plaintiff with a significant economic stake in the litigation in comparison with other contestants? n297

i. Has counsel prosecuted the lawsuit to this point with greater energy and to better effect than other contestants by creating work product that will be useful in the future progress of the litigation? n298

j. Does the court have previous experience with counsel that is relevant to whether counsel is likely to perform professionally, diligently and effectively in this action? n299

 The Task Force endorses the use of this non-exclusive list of factors when courts find it necessary to appoint lead

counsel other than through private ordering.

   [*774]

   XIII. Suggested Procedures For Reviewing Fees In Non-Auction Cases

   The question of appointment cannot be divorced from the question of fees. The auction experiment developed partly in response to the concern over perceived windfall awards of attorney fees arising from the difficulty of making an informed ex post assessment of a reasonable fee. The Task Force believes that while there are advantages to conducting a fee negotiation at the beginning of the case, a precise ex ante determination of fees is usually unworkable. An ex post assessment, while obviously not perfect, is usually preferable to the difficulties presented by an auction. Given the uncertainty of class action litigation and given the Rule 23 requirement that the court review a fee award for reasonableness at the end of the case, it is not possible to set a precise fee at a preliminary stage of the proceedings. n300

   The Task Force believes that the judge will better serve the class by appointing counsel in the traditional manner and reviewing the fee for reasonableness at the end of the matter. This is not to say, however, that courts should be uninvolved in the fee question until the end of the case. Ignoring fee questions until the end of the case raises the specter of more costly ex post review, and the possibility that an award will be excessive due to the court's inability to determine the precise effect or extent of the efforts expended by counsel.

   Therefore, the Task Force recommends that the topic of attorney fees should be addressed at the early stages of the case as well as throughout the prosecution of the case. n301 At the outset of the case, the court may be well-advised to direct counsel to propose the terms for a potential award of fees; the potential fees might be established within ranges, with the court making it clear  [*775]  to the parties that the fee remains open for further review for reasonableness. n302 A preliminary fee arrangement may provide a helpful structure for the court when it conducts its reasonableness review at the end of the case. n303

   The courts are by no means uniform in their approach to awarding fees in class actions. Most courts use the percentage of the fund method. n304 Other courts use the lodestar. n305 The Third Circuit, following the recommendations of the 1985 Task Force, n306 has favored the use of the percentage of the fund method in common fund cases. n307 However, the Third Circuit has also suggested that a district court conduct a lodestar cross-check on the percentage award. n308 The lodestar cross-check is intended to give the court some guidance on whether the  [*776]  proposed percentage award is unreasonably high. n309

   The 1985 Task Force made a compelling case for rejecting the lodestar approach in common fund cases. We see nothing that has changed in the interim to diminish the power of the arguments made in 1985. The lodestar remains difficult and burdensome to apply, and it positively encourages counsel to run up the bill, expending hours that are of no benefit to the class. Moreover, use of the lodestar may result in undercompensation of talented attorneys. Experienced practitioners know that a highly qualified and dedicated attorney may do more for a class in an hour than another attorney could do in ten. The lodestar can end up prejudicing lawyers who are more effective with a lesser expenditure of time. n310

   Given the substantial problems with the lodestar approach generally, the Task Force is highly skeptical about the use of the lodestar even as a cross-check when awarding a percentage of the common fund. The inherent flaws of the lodestar method are diminished, but certainly not eliminated, by making the lodestar a relevant rather than dispositive factor. n311 The Task Force notes that in the Third Circuit the lodestar cross-check is only a "suggested" and not a mandated procedure. n312 We emphasize that the lodestar is at most a relevant factor if it is to be used at all, and it should not receive exaggerated importance in assessing the appropriate fee. We also emphasize that even if a lodestar cross-check is to be conducted, it is only a "cross-check" and not a full-blown lodestar inquiry. n313 The court should be satisfied with a summary of the hours expended  [*777]  by all counsel at various stages with less detailed

breakdown than would be required in a lodestar jurisdiction. This would enable the court to make a judgment as to whether the percentage appears too high or low given the time required to handle the case. The court will, of course, be aware that lawyers have an incentive to increase their hours for cross-check purposes just as they have an incentive to maximize them when seeking lodestar compensation, but possessed of this awareness the court may well assume that the hours are stated on the high side and take that into account in deciding how to factor in the amount of time devoted to the case when arriving at a percentage figure.

In setting a fee at the end of a case, the Task Force emphasizes the point made by decisions cited throughout this Report: that judges have ample discretion to set fees that depart from any supposed "benchmark." n314 Indeed, departure from any asserted "benchmark" is required by Rule 23 if such a fee would be unreasonably high, or low, under the circumstances. n315 There is nothing in the percentage approach that requires a locked-in or "standard" percentage to apply automatically in every class action. n316

The Task Force notes that there is a well-developed body of case law that will assist the district court in setting a reasonable percentage fee after the litigation. In Gunter v. Ridgewood Energy Corp., n317 the Court set forth a list of relevant factors from the "well developed and familiar" Third Circuit case law. The Gunter Court described that case law in the following passage:

In common fund cases of this sort - in which the attorneys' fees and the clients' award come from the same source and the fees are based on a percentage amount of the clients' settlement award - district courts should consider several factors in setting a fee award. Among other things, these factors include: (1) the size of the fund created and the number of persons benefited; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases. See *In re* [*778] *Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 336-40 (3d Cir. 1998); In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768, 819-22 (3d Cir. 1995);* MOORE'S FEDERAL PRACTICE, MANUAL FOR COMPLEX LITIGATION (THIRD) 24.121, at 207 (1997). n318

Most importantly, the Gunter Court emphasized that the factors that it listed should not be applied in a formulaic way. Each case is different, and the weight to be given to any of the factors will depend on the circumstances. Thus, the Gunter Court appropriately cautioned that district courts are not to be slavish adherents to a benchmark. n319 The court must consider awards in similar cases, but this does not mean that the court is bound by a benchmark.

Application of the factors listed in Gunter has led to fee awards in many cases below what some have argued to be a "benchmark" of 25%. n320 The Task Force commends the use of these Gunter factors as a means of providing fair compensation to class counsel under the specific circumstances of the case. n321 [*779] The Task Force also notes that courts may wish to consider whether the results in auction cases are useful as a source of information in determining what is a reasonable fee in class actions. n322

The Gunter factors were developed before the PSLRA, but the factors have obvious relevance to whether a fee is reasonable in any class action, including those brought under the PSLRA. The Task Force believes, however, that the deference to the empowered plaintiff's choice of counsel in PSLRA cases should extend to the ex post review of the fee agreement in those cases. The PSLRA establishes a model of client control that extends not only to appointment of counsel but also to monitoring of counsel and negotiation of the fee. The Task Force concludes, therefore, that strict scrutiny of the fee agreement is inconsistent with the client-driven litigation model established in the PSLRA. This means that a court should presume that the fee is reasonable when it is the result of an agreement between the "most adequate" plaintiff and chosen counsel. n323 The fee reached by agreement between the "most adequate" plaintiff and counsel should be accepted by the court unless 1) it is clearly excessive; n324 2) [*780] it has been rendered unfair by

unforeseen developments; n325 or 3) it is found in an ex post review that the fee was not reached by arm's-length negotiation between the lead plaintiff and counsel. n326 In making this ultimate determination of reasonableness, the court should apply the Gunter factors, set forth above, but with greater deference than in a non-PSLRA case.

The court may in PSLRA cases follow the recommendation of the 1985 Third Circuit Task force and seek to do some review of the retainer agreement and its reasonableness at the outset of the litigation. If there are concerns about aspects of the agreement that ought to be aired earlier rather than later, early review would provide guidance to both the lead plaintiff and the lead counsel. No matter what the court does at the outset, a final review of the fees at the conclusion of the case is clearly required by both the PSLRA and Rule 23. Our suggestion is that the deference to the negotiated agreement at the end of the case might well be greatest when there has been preliminary judicial review early on. Naturally, changed circumstances could affect the final review no matter how carefully the court examined the agreement at the outset of the case. But absent changed circumstances, judicial approval of an agreement at the beginning ought to create a presumption that the agreement will be valid at the end of the case.

XIV. Conclusion

The Task Force recognizes that the recommendations contained in this Report largely concern a practice that is in an embryonic stage. It also  [*781]  recognizes that assertions on either side of the debate are mostly unproven by hard evidence; for example, we have a collective sense that the lowest fee does not necessarily lead to the best outcome for the class, but the hard data to prove our point does not as yet exist. The Task Force hopes that its recommendations will be accepted for what they are - an effort to sound a cautionary note on auctions and to provide guidance for courts in using traditional methods of appointment of class counsel. The matters addressed in this Report could usefully occupy years of study; the Task Force's time was limited. However, we are convinced that this Report serves an important function in illustrating the problems created by auctioning class counsel, and in setting forth suggested practices for departing from a "benchmark" fee award where such a departure is warranted.

Date: January 15, 2002

[*782]

THIRD CIRCUIT TASK FORCE ON SELECTION OF CLASS COUNSEL

Co-Chairs
Professor Stephen A. Saltzburg

Gregory P. Joseph

Members

Hon. Thomas L. Ambro

Louis C. Bechtle

Melvin C. Breaux

Hon. William B. Chandler, III

Professor Howard M. Erichson

John J. Gibbons

74 Temp. L. Rev. 689, *782

John G. Harkins, Jr.

Stephen J. Harmelin

Joseph C. Kohn

Ronald L. Marmer

Dianne M. Nast

Lisa J. Rodriguez

Melvyn I. Weiss

Reporter

Professor Daniel J. Capra

Associate Reporter

Professor Eleanor W. Myers

Secretary

Toby D. Slawsky

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Civil ProcedureClass ActionsClass CounselFeesCivil ProcedureClass ActionsClass CounselAppointmentsSecurities
LawLiabilityPrivate Securities LitigationLead Plaintiff

**FOOTNOTES:**

n1. *Fed. R. Civ. P. 23(a).*

n2. Some commentators refer to "auctions" only as they relate to an auction of a class claim. We use the
term "auction" here as synonymous with bidding for an appointment as lead counsel - i.e., where counsel
seeking to be named class counsel compete with each other through a bidding process monitored by a judge. We
note that courts have used the term "auction" as we do, in reference to judicially-controlled bidding for
appointment of class counsel. See, e.g., *In re Cendant Corp. Litig., 264 F.3d 201, 270-71 (3d Cir. 2001)*
(reviewing "the District Court's decision to employ an auction to select lead counsel").

n3. *15 U.S.C. 78u-4*(a)(3) (2000).

n4. *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp., 487 F.2d 161 (3d Cir. 1973),* appeal following remand, *540 F.2d 102 (3d Cir. 1976); In re Cendant Corp. Prides Litig., 243 F.3d 722 ( 3d Cir. 2001); In re Cendant Corp. Litig., 264 F.3d 201 (3d Cir. 2001).* In 1985, then Chief Judge Ruggiero J. Aldisert convened a Task Force to study the question of how attorney fees should be awarded in class actions. Its report, Court *Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237 (1985),* has been very influential in the development of the law and procedures for managing attorney fees in class actions.

n5. *521 U.S. 591, 617 (1997).*

n6. See, e.g., John C. Coffee, The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action, *54 U. Chi. L. Rev. 877 (1987)* (describing and noting the need for economic incentives for plaintiffs' lawyers in common fund class actions).

n7. Advancing expenses and court costs, the repayment of which are contingent on the outcome of the litigation, is permitted by Rule 1.8(e), Model Rules of Professional Conduct. Most states follow that Rule. Stephen Gillers & Roy D. Simon, Regulation of Lawyers: Statutes and Standards, pp. 101-07 (2001). (But see New York Code of Professional Responsibility D.R.5-103(b)(1), codified at 22 N.Y.C.R.R. 1200.22(b)(1), requiring that the client remain ultimately liable for such expenses). The ABA Ethics 2000 project proposes to add a comment to the Model Rule stating: "[A] prohibition on a lawyer lending a client court costs and litigation expenses [is not warranted], because these advances are virtually indistinguishable from contingent fees and help ensure access to the courts."

n8. See Jill E. Fisch, Aggregations, Auctions and Other Developments in the Selection of Lead Counsel Under the PSLRA, 64 Law & Contemp. Probs. 53, 56 (2001):

Lawyer-driven litigation is not inherently undesirable. The willingness of plaintiffs' lawyers to investigate potential causes of action, mobilize the plaintiff class, and bear the costs and risks associated with the suit leads to an increase in enforcement and provides a valuable contribution to the deterrence of corporate misconduct. Indeed, by providing suitable financial incentives for these activities, class actions have led to the evolution of entrepreneurial plaintiffs' lawyers, who play a central role in rendering the class action a meaningful vehicle for compensating victims and deterring wrongful conduct.

74 Temp. L. Rev. 689, *782

n9. "The common-fund doctrine...allows a person who maintains a lawsuit that results in the creation, preservation, or increase of a fund in which others have a common interest, to be reimbursed from that fund for litigation expenses incurred." Court *Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237, 241 (1985).*

n10. For example, a study of class actions in four federal districts, conducted by the Federal Judicial Center, rendered results that "did not show recurring situations where (b)(3) class actions produced minimal benefits in relation to attorneys' fees." The study noted some cases in which "the settlement produced relatively small payments to the class as well as to attorneys for the class." Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts 77 (Federal Judicial Center 1996).

n11. See, e.g., *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768 (3d Cir. 1995),* where the original settlement called for class counsel to receive attorney fees in the amount of $ 9.5 million, and class members received no more than a $ 1,000 certificate towards a GM truck.

n12. It is worth noting that many of the concerns about coupon settlements can be alleviated by basing counsel fees on the value of coupons actually redeemed, rather than the theoretical value of coupons awarded. Statement of Brian Wolfman, submitted to the Task Force, at 14-15 ("By tying counsel's fate to that of their clients, the typical coupon settlement would become a thing of the past, and only settlements in which the coupon has a cash redemption value or the settlement includes the participation of a secondary market-maker - in other words, a settlement that actually broadly benefits the class - would be worth counsel's efforts.").

n13. Although we are unaware of any scientific study of the matter, the Task Force believes that most nonlawyers are unaware of many of the risks faced by lawyers who take on and assume responsibility for class actions. There often is substantial publicity of successful class actions, and the focus of the publicity will naturally be on the amount of the recovery if it is large. Large recoveries get public attention, and large recoveries often result in substantial attorneys' fees that also attract attention. When class actions are dismissed, the publicity is often sparse or nonexistent, and the fact that class lawyers are uncompensated is often not understood. Motions to dismiss on the pleadings are not big news, although they are common in a number of class action scenarios.

n14. Outside of securities cases and the PSLRA, the concept of "lead plaintiff" is a familiar one. We shall use the term "lead plaintiff" as synonymous with the "most adequate plaintiff" in discussing securities class actions.

n15. Throughout this Report, we cite to the applicable sections of the ABA Model Rules of Professional Conduct ("Model Rules"). These rules form the basis of the professional rules of the majority of the states. Stephen Gillers & Roy D. Simon, Regulation of Lawyers Statutes and Standards, p. xxiii (2001) ("As of Fall, 1999, more than 40 states and the District of Columbia had adopted all or a significant portion of the Model Rules."). In 1997, the ABA appointed the Ethics 2000 Commission ("Ethics 2000"), to recommend changes and to update the Model Rules. The recommendations of Ethics 2000 are available at http://www.abanet.org/cpr/ethics2k.html. Ethics 2000 has submitted its Final Report to the ABA House of Delegates, which is in the process of considering its recommendations. Conference Report ABA Annual Meeting, 17 ABA/BNA Lawyers' Manual on Professional Conduct 492 (August 15, 2001). Whatever the outcome in the ABA House of Delegates, the states are free to adopt or reject Ethics 2000 recommendations. Those proposals adopted by the ABA are likely to become the most influential. Pertinent recommendations of Ethics 2000 will also be referred to in this Report. Several states retain all or parts of the ABA Model Code of Professional Responsibility ("Model Code"), which was the predecessor to the Model Rules. Pertinent provisions of the Model Code will be cited in this Report. In 2000, the ALI published the Restatement of Law Governing Lawyers. A product of 14 years of work, the Restatement is likely to become influential on many topics. Pertinent provisions of the Restatement are also included in this Report.

Whatever the specific articulation, the core values comprising the responsibilities of lawyers are the same. Pertinent to the Task Force's inquiry, lawyers owe clients duties of loyalty, dedication, and competence and are prohibited from charging unreasonable fees. (Other core values include duties of communication and confidentiality, which are not directly implicated here.)

n16. Model Rule 1.3 (Comment 1: "A lawyer should act with commitment and dedication to the interests of the client and zeal in advocacy upon the client's behalf."); Model Code DR6-101(A)(1)( A lawyer shall not handle a matter "which he knows or should know that he is not competent to handle ..."); Restatement of the Law Governing Lawyers 52 (Comment c "The lawyer must perform tasks reasonably appropriate to the representation including, where appropriate, inquiry into the facts, analysis of law, exercise of professional judgment, communication with the client, rendering of practical and ethical advice, and drafting of documents.").

n17. Model Rule 1.7 (Comment 1: "Loyalty is an essential element in the lawyer's relationship to a client."); Model Code EC 5-1 ("The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client."); Restatement of the Law Governing Lawyers 121 (Comment b. "The law seeks to assure clients that their lawyers will represent them with undivided loyalty. A client is entitled to be represented by a lawyer whom the client can trust.").

n18. Model Rule 1.1 ("Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."); Model Code EC 6-1 ("Because of his vital role in the legal process, a lawyer should act with competence and proper care in representing clients."); Restatement of the Law Governing Lawyers 52 (Comment b) (the duty of competence is "the skill and knowledge normally possessed by members of that profession or trade in good standing.").

n19. Model Rule 1.4 (b) ("A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."); Model Code EC 7-8 ( a lawyer "should exercise his best efforts to insure that decisions of his client are made only after the client has been informed of relevant considerations."); Restatement of the Law Governing Lawyers 20.

n20. Model Rule 1.2(a) ("A lawyer shall abide by a client's decisions concerning the objectives of representation . ."); Model Code EC 7-7 ( "In certain areas of legal representation not affecting the merits of the cause ... , a lawyer is entitled to make decisions on his own. But otherwise the authority to make decisions is exclusively that of the client ..."); Restatement of the Law Governing lawyers 21, 22 (permitting the lawyer and client to alter by agreement the usual allocation of decisionmaking responsibility).

n21. Model Rule 1.2(c), Comment 5 ("The client may not be asked to agree to representation so limited in scope as to violate [the duty to perform competently], or to surrender the right to terminate the lawyer's services or the right to settle litigation that the lawyer might wish to continue."); Model Code EC 7-7 ( "It is for the client to decide whether he will accept a settlement offer ...").

n22. Model Rule 1.5(a) ("A lawyer's fee shall be reasonable."); Model Code DR 2-106(A) & (B) (A lawyer "shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee." A fee is "clearly excessive when, ... a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee."). Ethics 2000 would amend Rule 1.5 to provide that an attorney be precluded from charging unreasonable amounts for expenses as well as fees. See also ABA Formal Opinion 93-379 (Dec. 6, 1993) (holding that the Rule 1.5 "reasonableness" standard also applies to expenses).

n23. Randall S. Thomas & Robert G. Hansen, Auctioning Class Action and Derivative Lawsuits: A Critical Analysis, *87 Nw. U. L. Rev. 423, 433 (1993)* ("Despite the strictures of the received legal model of the attorney-client relationship, the plaintiffs' attorney, not the plaintiffs, in these actions, controls the conduct of every important aspect of the litigation... . Individual plaintiffs cannot, by themselves, effectively control the agency costs that arise from the attorney-client relationship in these cases.").

n24. See John C. Coffee, The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action, *54 U. Chi. L. Rev. 877, 908 (1987)* (observing that under private ordering, competing groups have sometimes invited other attorneys into the action in order to secure their vote for lead counsel, and that the result of some private ordering is a "political compromise," the price of which is "often both overstaffing and an acceptance of the free-riding or marginally competent attorney, whose vote gave him leverage that his ability did not"). See also *In re Milestone Sci. Sec. Litig., 187 F.R.D. 165, 175 (D.N.J. 1999)* (noting that a

Case 4:07-cv-05944-JST   Document 165-8   Filed 03/21/08   Page 53 of 108

Page 52
74 Temp. L. Rev. 689, *782

"litigation by committee" approach to securities class actions may prove wasteful and harmful to the class). But see *In re Oxford Health Plans, Inc. Sec. Litig, 182 F.R.D. 42, 46 (S.D.N.Y. 1998)* (noting the benefits of pooling the resources of multiple counsel "in order to support what could prove to be a costly and time-consuming litigation").

n25. See, e.g., *In re Synthroid Marketing Litig., 264 F.3d 712, 719 (7th Cir. 2001)* ("Only ex ante can bargaining occur in the shadow of the litigation's uncertainty; only ex ante can the costs and benefits of particular systems and risk multipliers be assessed intelligently.").

n26. See Jonathan R. Macey & Geoffrey P. Miller, The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform, *58 U. Chi. L. Rev. 1 (1991)* (proposing auctions of class action claims); Randall S. Thomas & Robert G. Hansen, Auctioning Class Action and Derivative Lawsuits: A Critical Analysis, *87 Nw. U. L. Rev. 423, 423-24 (1993)* (criticizing Miller & Macey proposal as unworkable in practice, and questionable under the current rules of professional responsibility); Statement of Professor Samuel Issacharoff, submitted to the Task Force, at 6 (noting that the size of the class claims at stake render it unlikely that they could be purchased by a plaintiff's firm, and that the only realistic prospective bidders would be the defendants or their insurers, leading to the problem "of the class created through the contrivance of the defendant, rather than through the adversarial process.").

n27. See Model Rule 1.8(j) and Model Code DR 5-103(A) (both prohibiting a lawyer from acquiring a proprietary interest in the cause of action).

n28. The Task Force familiarized itself with the literature on auctioning of claims and made a decision not to discuss in this Report the question whether it thought that auctions of claims might make sense in certain kinds of cases. As noted in the text, auctioning of claims would require changes in the law that as yet appear highly unlikely to be made. Indeed, if auctions of claims were seriously considered by lawmakers, it might well make sense to begin slowly with auctions of single, as opposed to class, claims. The issues that arise in auctions of claims differ from those that arise when bidding for lead counsel occurs. This Report will demonstrate that auctions of lead counsel raise a number of issues that require careful analysis. We chose to confine ourselves to that analysis and to leave for the future and for others the subject of the possibility, let alone the desirability, of auctioning class claims.

n29. The Task Force expresses its thanks to the Federal Judicial Center and its Director, Judge Fern M. Smith, for the invaluable assistance provided to the work of the Task Force. The Report prepared for the Task Force by Laural Hooper & Marie Leary, Auctioning the Role of Class Counsel in Class Action Cases: A Descriptive Study (Federal Judicial Center 2001) ("FJC Report"), is posted on the Task Force website at www.ca3.uscourts.gov.

n30. All written statements of the witnesses submitted to the Task Force are available on the Third Circuit website at www.ca3.uscourts.gov. They can be found alphabetically by the name of the person who submitted the statement. The statements submitted to the Task Force are referred to throughout this Report as "Statements submitted to the Task Force," as distinguished from the actual testimony before the Task Force. The testimony before the Task Force is posted separately on the Third Circuit website. Citations to "Testimony" throughout this report refer to testimony at the Task Force hearings.

n31. Two of the judges with the most experience with auctioning class counsel, Judge Milton I. Shadur and Judge Vaughn R. Walker, participated extensively in the Third Circuit Judicial Conference discussions. Each pointed out perceived failings in the Task Force's draft report. Each took the time after the Conference to submit extensive written comments, which are posted on the Third Circuit web site. Their willingness to engage on the subject, to invest time to assist us in our effort, and their obvious dedication to and concern for the interests of individuals and entities who depend on our judicial system for justice is much appreciated. While we may disagree in this Final Report with some of their views, we have enormous respect for the intellectual commitment they have given to our work. Nothing in this Report should be construed as criticism of any of the auctions that they or any other judge has conducted, or of the results in any particular case. In the hands of some judges, procedures that might seem problematic as a general matter work well. The Task Force examined the concept of auctioning class counsel with an eye to how the auction process would work if used routinely by district judges. Our goal is to point out the advantages and disadvantages of various selection options in order to assist judges in making their choice of the option that they believe will work best in particular cases.

n32. Judge Leonard I. Garth invited the Task Force's attention to the effect of an arbitration demand by a class member on class action certification and settlement. In re Cendant Corp. Litig., No. 00-2185, slip op. at 42 (3d Cir. May 9, 2001) (Garth, J., dissenting), vacated on grant of rehearing en banc, June 5, 2001:

Indeed, just recently this Court has announced the formation of a Task Force on selection of class counsel and has enumerated a number of issues for the Task Force to consider. I suggest that this question of arbitration-class certification is one which in my opinion should assume prominence in the Task Force's labors.

 The Task Force did not understand that Judge Becker's charge fairly included this question and therefore, respectfully, considered it to be outside its jurisdiction.

n33. The Task Force, in Section X, supra, provides recommendations for appropriate procedures to be used in those cases in which an auction might be considered.

n34. The Delaware Courts rely heavily on private ordering. A description of that process is set forth in the

Case 4:07-cv-05944-JST   Document 165-8   Filed 03/21/08   Page 55 of 108

Page 54
74 Temp. L. Rev. 689, *782

Statements of R. Franklin Balotti and Joseph Rosenthal, submitted to the Task Force. See also *TCW Technology Limited Partnership v. Intermedia Communications, Inc., 2000 WL 1654504* (Del.Ch.) ("Traditionally, the Court of Chancery has allowed counsel representing individual, class or derivative plaintiffs to engage in a type of private ordering, that is, to coordinate prosecution of the litigation and to propose the most efficient means of consolidation."). Many federal courts have recognized a preference for private ordering as well. See, e.g., *In re Continental Illinois Securities Litig., 572 F. Supp. 931, 935 (N.D. Ill. 1983)* ("In the event a class is certified, I would prefer to designate counsel who are nominated by plaintiffs' attorneys. I therefore suggest that plaintiffs' counsel confer together with a view toward submitting a proposed roster that will be no larger than necessary to provide effective representation ...").

n35. The Third Circuit has described the lodestar method as follows:

A court determines an attorney's lodestar award by multiplying the number of hours he or she reasonably worked on a client's case by a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer.

*Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000).*

n36. The Third Circuit has stated "that the percentage of recovery method "resembles a contingent fee in that it awards counsel a variable percentage of the amount recovered for the class." *In re General Motors Trucks, 55 F.3d 768, 819 n.38 (3d Cir. 1995).*

n37. See *Goldberger v. Integrated Resources, 209 F.3d 43, 48 (2d Cir. 2000)* (noting that the lodestar creates "a temptation for lawyers to run up the number of hours for which they could be paid.") See also Howard M. Downs, Federal Class Actions: Diminished Protection for the Class and the Case for Reform, *73 Neb. L. Rev. 646, 667 (1994)* (noting that under the lodestar method attorneys can "pad their hours and otherwise engage in unethical activities to enhance their fees"); *Kirchoff v. Flynn, 786 F.2d 320, 324 (7th Cir. 1986)* (observing that the lodestar method creates an incentive to run up hours).

n38. Court *Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237, 248 (1985)* (the lodestar approach "creates a disincentive for the early settlement of cases" because of the emphasis on hours worked; "there appears to be a conscious, or perhaps unconscious, desire to keep the litigation alive despite a reasonable prospect of settlement, to maximize the number of hours to be included in computing the lodestar."). See also *Goldberger v. Integrated Resources, 209 F.3d 43, 48 (2d Cir. 2000)* (noting that the lodestar "created an unanticipated disincentive to early settlements."); Statement of Professor Arthur Miller, submitted to the Task Force, at 3 ("The lodestar method also can create unfortunate incentives for a plaintiff's lawyer to engage in unnecessary work to prolong the litigation in an effort to justify a larger fee, which, of course, causes inefficiency, inhibits settlement, and misaligns the interests of counsel and class.").

74 Temp. L. Rev. 689, *782

n39. See, e.g., *Goldberger v. Integrated Resources, 209 F.3d 43, 48 (2d Cir. 2000)* (noting that the "primary source of dissatisfaction" with the lodestar "was that it resurrected the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimlet-eyed review of line-item fee audits" resulting in "an inevitable waste of judicial resources"); *Skelton v. General Motors, 860 F.2d 250, 258 (7th Cir. 1988)* (noting the administrative difficulties imposed by the lodestar method). See also Court *Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. at 246* (criticizing lodestar approach as unduly burdensome on the judiciary).

n40. See Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts at 71 (Federal Judicial Center 1996) (noting the problem of using a percentage of recovery method that is not case-sensitive). See also Martha Pacold, Attorneys' Fees in Class Actions Governed by Fee-Shifting Statutes, *68 U. Chi. L. Rev. 1007, 1021 (2001)* ("In the 1970s, many courts began to view the percentage method as problematic because it generated windfalls for attorneys in cases with exceptionally large funds. Some courts avoided this problem by reducing the percentage awarded. However, this exposed the method to criticism as unprincipled.").

n41. See, e.g., *Gunter v. Ridgewood Energy Corp., 223 F. 3d 190, 196 (3d Cir. 2000),* which remanded a percentage fee award for redetermination by the District Court because the fee opinion was too "cursory and conclusory" to be adequately reviewed. See also *In re Quintus Securities Litigation, 148 F. Supp. 2d 967, 974 (N.D. Cal. 2001)* (criticizing the automatic award of a "benchmark" percentage).

n42. *In re Auction Houses Antitrust Litig., 197 F.R.D. 71, 77 (S.D.N.Y. 2000);* Statement of Arlin M. Adams, submitted to the Task Force, at 10 (noting that percentage of recovery method may create incentives for counsel to "cut corners"; lawyers "may settle too early, because they may prefer to spend relatively few hours (and thus maximize the amount they are paid per hour), rather than spend more time and increase the plaintiff's recovery").

n43. Statement of Arlin M. Adams, submitted to the Task Force, at 4 (when fees are determined at the end of the action, "the adversary process breaks down, because defendants are eager to settle the case and those in the class often lack the incentive or means to mount a serious challenge to an award of fees."); Statement of Professor Joseph A. Grundfest, submitted to the Task Force, at 7 ("The defendant could care less about the size of the fee because the defendant's obligation to fund the pool is fixed by the settlement, and a lower fee award therefore would not provide any benefit to the defendant... The absent class members are rationally apathetic and have no cause to object."); Statement of Brian Wolfman, submitted to the Task Force, at 17 ("Indeed, class counsel often negotiate "clear sailing' arrangements, where the defendant agrees not to contest a fee up to a certain amount, the very purpose of which is to eliminate an adversary contest regarding fees.").

74 Temp. L. Rev. 689, *782

n44. The first judge to utilize an auction was Judge Vaughn R. Walker in *In re Oracle Securities Litig., 131 F.R.D. 688, 698 (N.D. Cal. 1990).*

n45. See *In re Oracle Securities Litig., 131 F.R.D. 688, 693 n.12 (N.D. Cal. 1990)* (explaining that the use of an auction would "make use of the mechanisms of a competitive market").

n46. See, e.g., *In re Cendant Corp. Prides Litig., 243 F.3d 722, 735 n.18 (3d Cir. 2001)* ("A preliminary bidding process cannot replace subsequent analysis ... The circumstances and progression of every case are different, and these unique factors must be taken into account by district courts awarding attorney's fees. Therefore, though the result of a bidding process may be of use to a district court in awarding fees at the end of the case, it cannot supplant post-settlement analysis to determine a reasonable fee.")

n47. *15 U.S.C. 78u-4*(a)(3)(B).

n48. *In re Razorfish, Inc. Securities Litig., 143 F. Supp. 2d 304, 311 (S.D.N.Y. 2001)* (finding that under the PSLRA the primary focus is on choosing the lead plaintiff and then deferring to that plaintiff's choice of counsel).

n49. Model Rule 1.7(b) ("A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to ... a third person or ... a lawyer's own interests.").

n50. Model Rule 1.1 ("A lawyer shall provide competent representation to a client.").

n51. Model Rule 1.3. ("A lawyer shall act with reasonable diligence and promptness in representing a client."). Lawyers also owe clients duties of communication (Model Rule 1.4) and confidentiality (Model Rule 1.6).

n52. Geoffrey C. Hazard & W. William Hodes, The Law of Lawyering 2.1 (3d ed. 2001) (observing that the Model Rules reverse the common reference to the "lawyer-client" relationship, referring instead to the "client-lawyer" relationship to emphasize the primacy of the client's interests).

n53. Model Rule 1.14: "When a client's ability to make adequately considered decisions ... is impaired, ... the lawyer shall as far as reasonably possible, maintain a normal client-lawyer relationship with the client."; Restatement of the Law Governing Lawyers, 24.

n54. Model Rule 1.14; Restatement of the Law Governing Lawyers, 24 (4).

n55. Jill E. Fisch, Aggregation, Auctions, and Other Developments in the Selection of Lead Counsel under the PSLRA, 64 Law and Contemp. Probs. 53, 71-72 ("Although the group [of plaintiffs] may have a large financial interest in the aggregate, the small individual stakes reduce the likelihood that group members will participate actively in the litigation process."); Randall S. Thomas & Robert G. Hansen, Auctioning Class Action and Derivative Lawsuits: A Critical Analysis, *87 N.W. U. L. Rev. 423, 433 (1993)* ("Our analysis of the agency costs inherent in class action...lawsuits conflicts with the received legal model of the attorney-client relationship. This model presumes that the attorney is the agent of the client. Under the legal profession's ethical rules, the attorney has a duty to advance the client's interest to the furthest extent permissible. Clients are to keep watch over their attorneys using monitoring devices, bonding mechanisms, and incentive structures... Despite the strictures of the received legal model of the attorney-client relationship, the plaintiffs' attorney, not the plaintiffs, in these actions controls the conduct of every important aspect of the litigation."); Jonathan R. Macey & Geoffrey P. Miller, The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform, *58 U. Chi. L. Rev. 1, 20 (1991)* (noting that class counsel operates essentially unregulated by clients); Restatement of the Law Governing Lawyers 14 Comment f. ("Members of the class often lack the incentive or knowledge to monitor the performance of class representatives.").

n56. Deborah L. Rhode, Class Conflicts in Class Actions, *34 Stan. L. Rev. 1183, 1183 (1982).* See also *In re Cendant Corp. Litig., 264 F.3d 201 at 254 (3d Cir. 2001):*

Lawyers operate under ethical rules that require them to serve only their clients' interests. When a representation involves a single client, the ability to select, retain, and monitor counsel gives clients reason to be confident that their lawyers will live up to this obligation. The power to select counsel lets clients choose lawyers with whom they are comfortable and in whose ability and integrity they have confidence... . Most of the safeguards we have described vanish in the class action context, where "the client" is a sizeable, often far-flung group. Logistical and coordination problems invariably preclude class members from meeting and agreeing on anything, and, at all events, most class members generally lack the economic incentive or sophistication to take an active role.

n57. See generally Model Rule 1.7 and Model Rule 5.2(a) ("A lawyer is bound by the rules of professional

conduct notwithstanding that the lawyer acted at the direction of another person."); *Greenfield v. Villager Industries, Inc., 483 F.2d 824, 832 (3d Cir. 1973)* ("In addition to the normal obligations of an officer of the court, and as counsel to parties to the litigation, class action counsel possess, in a very real sense, fiduciary obligations to those not before the court.").


n58. *In re Cendant Corp. Litig., 264 F.3d 201 at 255 (3d Cir. 2001)* (in the absence of effective client oversight and because there are inherent conflicts of interest between counsel and the class, the court is traditionally the agent designated to oversee the relationship between counsel and the class.).

The Task Force notes that class actions are not the only situations in which judges are called on to oversee counsel's fidelity to clients. Cases in which the client is a trustee or fiduciary, guardianships over infants or the mentally incompetent, bankruptcy and the purchase of legal services by governmental units to litigate on behalf of the public are other situations in which the court is called on to be the primary monitor of counsel's activity and fee. Geoffrey C. Hazard & W. William Hodes, The Law of Lawyering, 8.7 (3d ed. 2001) ("In several recurring situations, courts increase the rigor of their scrutiny... When the lawyer's' client is a trustee or other fiduciary, for example, the fee that the client pays will be charged against the estate or other res that is the subject of the proceedings and thus will effectively be borne by the beneficiary... On this rationale, heightened scrutiny of the reasonableness of attorney fees is routine in trust and estate administration, guardianships over infants and the mentally incompetent, as well as in bankruptcy proceedings... Class action litigation provides another example of "built-in' enhanced scrutiny of attorney fees."). Accordingly, judges are called on to develop methods and procedures to safeguard client interests in a variety of situations, in addition to the class action cases that are the focus of this Report.


n59. *In re Auction Houses Antitrust Litig., 197 F.R.D. 71, 75 (S.D.N.Y. 2001)* ("The class action mechanism is not free of problems, foremost among them for purposes of this case, difficulties in obtaining counsel who will manage the case efficiently and effectively on behalf of the class and the mismatch of economic incentives between the plaintiff class and its attorney."); Statement of Prof. Samuel Issacharoff, submitted to the Task Force, at 3 ("The central issue is therefore the determination of which manner of selecting and compensating class counsel best attracts skillful lawyers and then best structures the incentives for faithful representation of the class.")


n60. A Comment to Model Rule 1.5 states: "A [fee] agreement may not be made whose terms might induce the lawyer improperly to curtail services for a client or perform them in a way contrary to a client's interest." This Comment recognizes the possibility that fee agreements may influence the lawyer's loyalty to a client.


n61. See *In re Cendant Corp. Litig., 264 F.3d 201, 254-55 (3d Cir. 2001)* ("[A] rational self-interested client seeks to maximize net recovery; he or she wants the representation to terminate when his or her gross recovery minus his or her counsel's fee is the largest. In contrast, at least in theory and often in practice, a rational self-interested lawyer looks to maximize his or her net fee, and thus wants the representation to end at the moment when the difference between his or her net fee and costs...is greatest. These two points rarely

converge. As a result there is often a conflict between the economic interests of clients and their lawyers, and this fact creates reason to fear that class counsel will be highly imperfect agents for the class.").

n62. Model Rule 1.5(a); Model Code DR2-106(A)&(B).

n63. Under the recommendations by the ABA's Ethics 2000 Commission, Model Rule 1.5 would be amended to preclude lawyers from charging an unreasonable amount for expenses as well as fees. See also ABA Formal Opinion. 93-379 (Dec. 6, 1993) (holding that the Rule 1.5 "reasonableness" standard also applies to expenses).

n64. Jonathan R. Macey & Geoffrey P. Miller, The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform, *58 U. Chi. L. Rev. 1, 20 (1991)* (describing the agency problems presented by class actions).

n65. Restatement of the Law Governing Lawyers, Ch. 2, Introductory Note ("A lawyer is an agent, to whom clients entrust matters, property, and information, which may be of great importance and sensitivity, and whose work is usually not subject to detailed client supervision because of its complexity. Because those characteristics of the client-lawyer relationship make clients vulnerable to harm, and because of the importance to the legal system of faithful representation, the law stated [in the Restatement] provides a number of safeguards for clients beyond those generally provided to principals.").

n66. Geoffrey C. Hazard & W. William Hodes, The Law of Lawyering, 8.6, pp. 8-15 (3d ed. 2001) ("This focus on procedural requirements [in Model Rule 1.5], however, should not obscure the fact that contingent fee agreements must also satisfy the threshold substantive requirement of reasonableness."); Restatement of Law Governing Lawyers 34 ("A lawyer may not charge a fee that is larger than is reasonable in the circumstances....").

n67. Model Rule 1.5(d) prohibits contingent fees in criminal and domestic relations matters. Restatement of the Law Governing Lawyers 35 is similar.

n68. Model Rule 1.7, the general rule governing loyalty and conflicts of interest, provides that a lawyer may not seek a client's consent for a representation that may materially limit the lawyer's responsibilities to that client unless "the lawyer reasonably believes the representation will not be adversely affected." Model Rule 1.7(b)(2).

Case 4:07-cv-05944-JST   Document 165-8   Filed 03/21/08   Page 61 of 108

Page 60
74 Temp. L. Rev. 689, *782

Ethics 2000 proposed a change in the form of this Rule but not its substance. A new comment to Rule 1.7 is proposed which elaborates on the idea of non-consentable conflicts of interest: "The proposed Rule makes clear that in certain situations a conflict may not be waived by the client. That is, the representation may not go forward even with the client's consent... This standard is set forth in a separate paragraph, both to reflect the separate steps required in analyzing conflicts (i.e., first identify potentially impermissible conflicts, then determine if the representation is permissible with the client's consent) and to highlight the fact that not all conflicts are consentable." Restatement of the Law Governing Lawyers 122(2)(c) ("Notwithstanding the informed consent of each affected client or former client, a lawyer may not represent a client if...in the circumstances, it is not reasonably likely that the lawyer will be able to provide adequate representation to one or more of the clients.").

n69. Restatement of the Law Governing Lawyers 122, Comment g (iv) and 128d(iii). See generally, *Lazy Oil v. Witco, 166 F.3d 581, 588 (3d Cir. 1999)* (suggesting that a strict reading of the conflict of interest rules in class actions should be tempered, because the very nature of a class action is to combine many divergent interests).

n70. Testimony of Lawrence A. Sucharow, June 1, 2001, p. 138-39 ("I only know that in all my years of practice, I have understood what a fiduciary duty is, and I tried to carry that out... I believe that most, the vast majority of counsel and courts understand what fiduciary duties are and carry them out in connection with class actions."); Testimony of H. Laddie Montague, June 1, 2001 p. 153-154 ("There is a real feeling of doing good and when we get into cases, we really take up the [cudgels] for the principals... Is it a case that will redress a wrong that otherwise might not be made?"); Statement of Horace Schow II, submitted to the Task Force, at 3 ("Legal services are not a commodity. The quality of counsel, their reputation and experience in the field, knowledge of [the client], and their openness to negotiating with us on a fee structure appropriate to the case as we assess it at the outset, are all factors to be considered together [when retaining counsel].").

n71. Statement of Sherrie R. Savett, submitted to the Task Force, at 9 ("Experience, resources, and other factors such as accessability, demeanor, reputation, etc. are all elements that an individual client takes into consideration in selecting an attorney. It is exceptionally difficult for a court to take these factors into consideration when conducting an auction. One cannot easily quantify an unquantifiable element.")

n72. Testimony of Prof. Arthur R. Miller, June 1, 2001, p. 196 ("I love judicial discretion. I know some judges on the courts of appeal...want to rein that discretion in but I think one of the beauties of the Unites States district judge is his or her discretion."); Testimony of Hon. Louis C. Bechtle, June 1, 2001, p. 121 ("I don't agree totally with Judge Kaplan's assertion that a percentage [attorney's fee recovery] is out of the air. Percentages come from years and years of experience and history in these cases.").

n73. *131 F.R.D. 688 (N.D. Cal. 1990); 132 F.R.D. 538 (N.D. Cal. 1990); 136 F.R.D. 639 (N.D. Cal 1991).*

Case 4:07-cv-05944-JST   Document 165-8   Filed 03/21/08   Page 62 of 108

Page 61
74 Temp. L. Rev. 689, *782

n74. See Laural L. Hooper & Marie Leary, Auctioning the Role of Class Counsel in Class Action Cases: A Descriptive Study (Federal Judicial Center 2001). The auction cases cited and analyzed by the FJC are: *In re Oracle Securities. Litig., 131 F.R.D. 688 (N.D. Cal. 1990)); In re Wells Fargo Securities. Litig., 157 F.R.D. 467 (N.D. Cal. 1994); In re Amino Acid Lysine Antitrust Litig., 918 F. Supp 1190 (N.D. Ill. 1996); In re California Micro Devices Securities Litig., 168 F.R.D. 257 (N.D. Cal. 1996); In re Cendant Corp. Litig., 182 F.R.D. 144 (D.N.J. 1998),* rev'd, *264 F.3d 201 (3d Cir. 2001); In re Network Assocs. Inc., Securities Litig., 76 F. Supp. 2d 1017 (N.D. Cal. 1999); Sherleigh Assocs. LLC v. Windmere-Durable Holdings, Inc., 184 F.R.D. 688 (S.D. Fla. 1999); In re Lucent Techs. Inc. Securities. Litig., 194 F.R.D. 137 (D.N.J. 2000); In re Bank One Shareholders Class Actions, 96 F. Supp. 2d 780 (N.D. Ill. 2000); Wenderhold v. Cylink Corp., 188 F.R.D. 577 (N.D. Cal. 1999); In re Auction Houses Antitrust Litig., 197 F.R.D. 71 (S.D.N.Y. 2001); In re Quintus Securities Litig., 148 F. Supp.2d 967, 986-87 (N.D. Cal. 2001);* In re Commtouch Software Ltd. Securities Litig., No. 01-C-00719, Order Re Lead Plaintiff Selection and Class Counsel Selection (N.D. Cal. June 27, 2001); *In re Comdisco Securities Litig., 141 F. Supp. 2d 951 (N.D. Ill. 2001).* The Judges who have used the auction procedure are: Judge Vaughn R. Walker, Northern District of California (five cases); Judge Milton I. Shadur, Northern District of Illinois (three cases); Judge William H. Alsup, Northern District of California (two cases); Judge Alfred J. Lechner, Jr., District of New Jersey (twice in In re Lucent); Judge William A. Walls, District of New Jersey (one case); Judge Joan A. Lenard, Southern District of Florida (one case); and Judge Lewis A. Kaplan, Southern District of New York (one case). *The Report by the Federal Judicial Center, supra,* lists and provides details on all of the cases in which an auction process has been used to date.

The FJC Report indicates that the number of cases in which courts considered conducting an auction but rejected the idea "remains unknown." FJC Report, at 4. Fred B. Burnside, in "Go Pick a Client - And Other Tales of Woe Resulting From the Selection of Class Counsel by Court-Ordered Competitive Bidding (unpublished manuscript, on file with the Task Force), states that after the Oracle decision "the overwhelming majority of courts have not adopted competitive bidding" and cites the following cases in which bidding was considered but rejected: Cooperman v. Powell, No. 91-37- *FR, 1991 U.S. Dist. LEXIS 4941, at4-5 (D. Or.);* Davis v. Coopers & Lybrand, No. 90- *C-7173, 1991 U.S. Dist. LEXIS 10384, at 12-13 (N.D. Ill.);* In re In-Store Advertising Securities. Litig., Civ. No. 90-5594 (S.D.N.Y. 1990); In re Computer Assocs. Int'l, Inc. Securities. Litig., No. CV-90-2394, et al. (E.D.N.Y. 1990); In re Software Toolworks, Inc. Securities Litig., Master File No. CA 90-3191-FMS (N.D. Cal. 1990); Sutton v. MarchFirst, Inc., 00-C-6676 (N.D. Ill. Feb. 7, 2001) (minute order provides for counsel to submit fee agreement to court, but implicitly rejects earlier suggestion of defendants to adopt competitive bidding by not doing so); In re AT&T Corp. Sec. Litig., Civ. No. 00-5364 (GEB) (D.N.J. Jan. 29, 2001) (appointing the New Hampshire Group as lead plaintiff over defendant's suggestion of competitive bidding); Rosenberg v. Nationsbanc Montgomery Sec. Inc., No. C-98-20956 RMW (N.D. Cal. 1998) (appointing lead counsel without resorting to bidding despite the request in prior pleadings of one group of plaintiffs to auction off lead counsel position); *In re IBP, Inc. Securities Litig., 2001 U.S. Dist. LEXIS 7898 (D. S.D.); In re Diamond Multimedia Sys. Securities Litig., 1997 U.S. Dist. LEXIS 21558 (N.D. Cal.); In re Aronson v. McKesson HBOC, Inc., 79 F. Supp. 2d 1146 (N.D. Cal. 1999); Sakhrani v. Brightpoint, 78 F. Supp. 2d 845, 854 (S.D. Ind. 1999)* (rejecting the suggestion for an open competition for lead counsel because "the court is satisfied based on prior submissions that the two proposed lead firms can represent a proposed class effectively"); *In re Critical Path Sec. Litig., CV-01-0551 (WHO), 156 F. Supp. 2d 1102 (N.D. Cal. 2001);* In re Calico Commerce, 01-CV-3221, Hearing Transcript at 11-17 (S.D. N.Y. June 12, 2001).

n75. See Jill E. Fisch, Aggregations, Auctions and Other Developments in the Selection of Lead Counsel Under the PSLRA, 64 Law & Contemp. Probs. 53, 82 (2001) ("Lead counsel auctions remain a work in

Case 4:07-cv-05944-JST   Document 165-8   Filed 03/21/08   Page 63 of 108

Page 62
74 Temp. L. Rev. 689, *782

progress. Judicial experience with the auction process is limited, and few cases utilizing an auction have progressed to a stage in which it is possible to evaluate the result."); Statement of Guy Miller Struve on behalf of the Association of the Bar of the City of New York, submitted to the Task Force, at 2 ("The limited base of knowledge cautions us that reaching definitive conclusions at this early juncture is a hazardous endeavor.").

n76. See FJC Report, at 15 ("We found the most common reason judges gave for employing bidding was to foster competition among counsel by replicating the private marketplace for legal services.").

n77. Testimony of Judge Vaughn R. Walker, March 16, 2001, pp. 38 et seq.

n78. See, e.g., *In re Amino Acid Lysine Antitrust Litig., 918 F. Supp. 1190, 1194 (N.D. Ill. 1996)* (noting that the "difficulty comes when a lawyer who is not of one's choosing is foisted on one, as is inevitable in the class action context").

n79. See, e.g. *In re Bank One Shareholders Class Actions, 96 F. Supp. 2d 780, 785 (N.D. Ill. 2000)* ("That [auction] procedure is superior to any alternatives that the caselaw or other authorities have entertained.").

n80. *In re Auction Houses Antitrust Litigation, 197 F.R.D. 71 (S.D.N.Y. 2000).*

n81. Testimony of Judge Lewis A. Kaplan, June 1, 2001, pp. 66 et seq.

n82. See, e.g., *In re Quintus Securities Litig., 148 F. Supp.2d 967, 986-7 (N.D. Cal. 2001).*

n83. *In re Amino Acid Lysine Antitrust Litig., 918 F. Supp. 1190 (N.D. Ill. 1996); In re Bank One Shareholders Class Actions, 96 F. Supp. 2d 780, 785 (N.D. Ill. 2000)* ("any bidding constraints that this Court (not having more than threshold knowledge of the litigation and its prospects) might have imposed on the outside in the form of mandated structural limitations would necessarily have generated corresponding limitations on the exercise of imagination by bidding counsel in devising proposals that they thought would provide the maximum benefit to the class.").

Case 4:07-cv-05944-JST   Document 165-8   Filed 03/21/08   Page 64 of 108

Page 63
74 Temp. L. Rev. 689, *782

n84. See FJC Report, at 60 ("In all of the bidding cases, the court required the bids to be submitted under seal and the court kept the bids under seal at least until the bids were evaluated and the winning bidder was chosen or the bids were rejected.").

n85. See, e.g., *In re California Micro Devices Securities Litig., 168 F.R.D. 257, 259-60 (N.D. Cal. 1996); In re Amino Acid Lysine Antitrust Litig., 918 F. Supp. 1190, 1192, 1201 (N.D. Ill. 1996); In re Bank One Shareholders Class Actions, 96 F. Supp.2d 780, 782, 785 (N.D. Ill. 2000); In re Wells Fargo Securities Litig., 157 F.R.D. 467, 468 (N.D. Cal. 1995).*

n86. See *In re Auction Houses Antitrust Litig., 197 F.R.D. 71, 80 (S.D.N.Y. 2000)* ( "If disclosed to defendants, the fee [arrangement] also can lead defendants to exploit the disjuncture of interests between the plaintiffs' and their counsel by making a firm settlement offer in the amount that would exactly maximize counsel's fee, even if defense counsel otherwise would be prepared to go higher.").

n87. *260 F.3d 183, 193 (3d Cir. 2001).*

n88. See, e.g., *In re Cendant Corp. Litig., 264 F.3d 201, 259 (3d Cir. 2001)* (expressing the concern that "because auctions do not award the attorneys who discover legal violations, they may reduce lawyers' incentives to seek out and disclose illegality (because unless they are selected as lead counsel, they may not be compensated for the time they spend doing so)").

n89. See, e.g., *In re Bank One Shareholders Class Action, 916 F. Supp. 2d 780, 789-90 n.13 (N.D. Ill. 2000).*

n90. *In re Amino Acid Lysine Antitrust Litigation, 918 F. Supp. at 1198-99 (N.D. Ill. 1996)* (class counsel chosen who would not receive a percentage of any recovery in excess of $ 25 million).

n91. *In re Quintus Securities Litig., 148 F. Supp.2d 967, 986 (N.D. Cal. 2001).*

n92. *In re Auction Houses Antitrust Litig., 197 F.R.D. 71, 80 (S.D.N.Y. 2000).*

74 Temp. L. Rev. 689, *782

n93. See, e.g. *In re Oracle Securities Litig., 131 F.R.D. 688, 690 (N.D. Cal. 1990); In re Amino Acid Lysine Antitrust Litig., 918 F. Supp. at 1992 n.7 (N.D. Ill. 1996).* Judge Shadur testified that he permits lawyers who have jointly filed a complaint (other than jointly with a common liaison counsel) to prepare a joint bid. Testimony of Judge Shadur, March 16, 2001, pp. 10 & 94.

n94. *In re Lucent Technologies, Inc. Securities Litig., 194 F.R.D. 137, 156-57 (D.N.J. 2000)* (preventing joint bids "is necessary to protect the interests of the proposed class").

n95. See, e.g., *In re Oracle Securities Litig., 131 F.R.D. 688, 697 (N.D. Cal. 1990)* ("Each firm submitting an application shall certify to the court that its compensation proposal was prepared independently and that no part thereof was revealed to any other bidder prior to filing with the court.").

n96. See, e.g. *In re Quintus Securities Litig., 148 F. Supp. 2d 967, 977 (N.D. Cal. 2001).*

n97. Herbert B. Newberg & Albert Conte, 3 Newberg on Class Actions 14.03 (3d ed. Supp. Dec. 2000).

n98. *In re Comdisco Securities Litig., 150 F. Supp. 2d 943, 951-52 (N.D. Ill. 2001).*

n99. Andrew K. Niebler, In Search of Bargained-For Fees for Class Action Plaintiffs' Lawyers: The Promise and Pitfalls of Auctioning the Position of Lead Counsel, *54 Bus. Law 763, 802 (1999)* (discussing the advantages of increasing percentages). See also Statement of Professor John C. Coffee, submitted to the Task Force, at 4-5 (arguing for modestly increasing percentages).

n100. Laural L. Hooper & Marie Leary, Auctioning the Role of Class Counsel in Class Action Cases: A Descriptive Study (Federal Judicial Center 2001).

n101. Testimony of Judge Vaughn R. Walker, Judge Milton I. Shadur, Judge William A. Walls, March 16, 2001; Testimony of Judge Lewis A. Kaplan, Professor Joseph A. Grundfest, Andrew T. Berry, Richard B.

74 Temp. L. Rev. 689, *782

Drubel, June 1, 2001.


n102. Testimony of Judge Walker, March 16, p. 39-40, Statement of Richard B. Drubel, submitted to the Task Force, at 5.


n103. Statement of Professor Joseph A. Grundfest, submitted to the Task Force, at 6-7 (relying on Todd S. Foster, Denise M. Martin, Vinita M. Juneja and Frederick C. Dunbar, Trends in Securities Litigation and the Impact of PSLRA (August 1999)). Professor Grundfest cautions that the data indicating lower fees in auction cases must be "interpreted with caution" because the data comes from a small sample of auction cases.


n104. John C. Coffee, The PSLRA and Auctions, N.Y.L.J., May 17, 2001, p. 5.


n105. See Jill E. Fisch, Class Action Reform: Lessons From Securities Litigation, *39 Ariz. L. Rev. 533, 538 (1997)* (noting that traditional appointments that rely on a race to the courthouse provide a poor proxy for quality of counsel).


n106. Statement of Arlin M. Adams, submitted to the Task Force, at 16 (appointment of lead counsel on the basis of first to file "does not reflect market forces in any meaningful way. If anything, it reflects which firm is best able to put together a complaint with a minimum of investigation and research. The auction method avoids rewarding such behavior.").

This argument assumes, of course, that appointment other than through an auction will always be based on a "first to file" principle. As discussed later in this Report, appointment of class counsel through "traditional" methods should not mean an automatic appointment based on the first to file.


n107. *In re Oracle Securities Litig., 131 F.R.D. 688, 692 (N.D. Cal. 1990). See also In re Synthroid Marketing Litig., 264 F.3d 712, 718-21 (7th Cir. 2001)* (holding that an attorney fee in a class action should be set as the market would set it before the representation, and noting that an auction is one means of determining an ex ante fee).


n108. *In re Auction Houses Antitrust Litig., 197 F.R.D. 71, 82 (S.D.N.Y. 2000).*

74 Temp. L. Rev. 689, *782

n109. Statement of Richard B. Drubel, submitted to the Task Force, at 8; Testimony of Andrew T. Berry, June 1, 2001, pp. 36-37.

n110. See, e.g., *Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1376 (9th Cir. 1993)* (recognizing a "benchmark" percentage recovery of 25% for attorney fees in class actions). For a criticism of "benchmark" fee awards, see Statement of Brian Wolfman, submitted to the Task Force, at 11 ("Starting from the market rate for contingency fee lawyers in individual cases ... and tweaking the numbers a bit, while doing nothing to evaluate the actual risks of class litigation, does not reflect the market in which the class action is actually operating. As a result, the benchmark "market' rates for class actions, accepted over and over again by the courts, were established tautologically, with courts simply looking to other courts that have engaged in the identical exercise.").

n111. See *In re Synthroid Marketing Litig., 264 F.3d 712, 720-21 (7th Cir. 2001)* ("The judicial opinions from auction cases are helpful [to courts determining fees ex post] because they provide detailed analysis of the market rate for attorneys facing different levels of risk. Forcing firms to bid at least approximates a market," and "a court can examine the bids and the results to see what levels of compensation attorneys are willing to accept in competition."); *In re Comdisco Securities Litig., 150 F. Supp. 2d 943, 951 (N.D. Ill. 2001)* (noting the possibility "that at some future point the increased use of bidding for legal representation will itself have generated enough evidence of the propriety of a new set of "norms' at much lower percentages").

n112. Statement of Arlin M. Adams, submitted to the Task Force, at 7.

n113. Statement of Professor John C. Coffee, submitted to the Task Force, at 2. See also Statement of Professor Joseph A. Grundfest, submitted to the Task Force, at 8 (arguing that "market check procedures are attracting talented counsel who traditionally did not represent plaintiff classes but who are now willing to represent the class at lower fees (see, e.g., the Boies, Schiller & Flexner bid in the Auction Houses litigation)").

n114. Statements and testimony from Professor Elliott J. Weiss, Professor Jill E Fisch, Arlin M. Adams Professor John C. Coffee, Professor Samuel Issacharoff, Edward Labaton, Joseph Rosenthal, Stephen A. Sheller, Howard A. Specter, Sherrie R. Savett, Michael D. Fishbein, Stuart H. Savett, Keith Johnson, Professor Arthur R. Miller, Arthur M. Kaplan, Lawrence Sucharow, Horace Schow II, H. Laddie Montague, Jr., Catherine E. LaMarr, Lorna Goodman, Stuart M. Grant, Jay W. Eisenhofer, Howard I. Langer, Leonard Barrack, and F. Franklin Balotti. All submitted to the Task Force.

n115. See, e.g., Jill E. Fisch, Aggregations, Auctions and Other Developments in the Selection of Lead

74 Temp. L. Rev. 689, *782

Counsel Under the PSLRA, 64 Law & Contemp. Probs. 53 (2001); Jonathan R. Macey & Geoffrey P. Miller, The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform, *58 U. Chi. L. Rev. 1 (1991)* (criticizing auction of lead counsel as providing disincentives to effective representation); Developments in the Law, The Paths of Civil Litigation, *113 Harv. L. Rev. 1827, 1829 (2000)* (arguing that auctioning of counsel "tends to exacerbate rather than resolve the problems inherent in the judicial regulation of plaintiffs' attorneys' fees").

n116. We recognize that the term "maximum net recovery" is somewhat slippery. It might appear, for example, that an attorney fee of 20% rather than 15% in a given case would lower the maximum net recovery to the class. Yet, this is not necessarily so. If attorney fees of 20% are available, counsel may, for example, assume the risk of pursuing a difficult secondary or tertiary defendant. If fees are limited to 15%, this may not occur. Assuming that liability is established and damages awarded against additional defendants, the overall class recovery may increase as a result of a greater percentage of recovery for class counsel. We have recognized throughout this Report that there is a risk factor to be considered when attorney fees are assessed, and it is therefore important that the maximum net recovery concept not ignore the risk assumed by counsel. Our conception of maximum net recovery is one that takes into account the risk incurred by counsel. It would be neither fair nor reasonable to assume that as an attorney's fees rise, a class recovery shrinks. Rising attorney fees may cause an overall increase in the potential class recovery.

n117. See Statement of Professor Samuel Issacharoff, submitted to the Task Force, at 5 ("A smaller percentage [attorney fee] may make the class worse off if the underlying corpus is reduced because of lawyer incompetence or because of incentives not to maximize the amount to be sought in the class action.").

n118. Statement of Professor Samuel Issacharoff, submitted to the Task Force, at 4.

n119. See Statement of Professor Arthur Miller, submitted to the Task Force, at 15 ("the real issue is not whether a particular fee regime will give class members a larger percentage share of the common fund recovery, but whether it will maximize the net recovery class members actually receive.")

n120. Statement of Professor Arthur Miller, submitted to the Task Force, at 16. See also Statement of Professor Jill E. Fisch, submitted to the Task Force, at 1-2, noting that the case for auctions maximizing class recovery remains unproven:

Current experience with auctions is limited, and many existing cases involved flawed auction designs or limited competition. The absence of comparable control groups makes it impossible to identify the extent to which auctions reduce legal fees or, more problematically, whether any fee savings are the result of reduced attorney

74 Temp. L. Rev. 689, *782

effort, poor attorney quality, or both... As a result, empirical analysis cannot readily address the effect of auctions on the net recovery to the plaintiff class.

n121. See, e.g., *In re Cendant Corp. Prides Litig., 243 F.3d 722, 737 (3d Cir. 2001)* (listing 12 recent cases in which the fees were substantially less than 25-30% of the settlement); *In re Dreyfus Aggressive Growth Mutual Fund Litigation, 2001 WL 709262, at 4* (S.D.N.Y.) (finding 30% of a common fund award to be "at the far end" of reasonableness for securities class actions, and awarding attorney fees amounting to 15% of the fund); *Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 52 (2d Cir. 2000)* (affirming a fee award of 4% of the class recovery and rejecting counsel's objections to the fee as a substantial departure from the 25% "benchmark" in the profession); *Varljen v. H.J. Myers & Co., 2000 WL 1683656, at 5 (S.D.N.Y. 2000)* (awarding attorney fees of 20% of class recovery); *In re Fine Host Corp. Securities Litig., 2000 WL 33116538* (S.D.N.Y. Nov. 8, 2000) (awarding attorney fees amounting to 17.5% of the class recovery). See also *In re Comdisco Securities Litig., 150 F. Supp. 2d 943, 947 (N.D. Ill. 2001)* (arguing that Cendant Corp. Prides table of cases "undercuts severely" the idea that 25-30% is the normal benchmark). In *Goldberger, supra,* the Second Circuit observed that the asserted 25% "benchmark" reflected a contingency risk that was unlikely to be present in every securities fraud lass action. *209 F.3d at 51-52.* The Court held that a 25% fee would be unreasonably high in the absence of a significant risk of non-recovery in the specific case.

n122. *243 F.3d 722 (3d Cir. 2001).*

n123. *264 F.3d 201 (3d Cir. 2001).*

n124. Statement of Judge Vaughn R. Walker, submitted to the Task Force, at 11.

n125. Statement of Sherrie R. Savett, submitted to the Task Force, at 5-6 (arguing that the court "is likely to bear more costs" in an auction "as it must evaluate fee and expense proposals from a potentially unlimited number of plaintiff's firms"). See also Statement of Professor Arthur Miller, submitted to the Task Force, at 21 ("Evaluating each bid is a time consuming and highly subjective matter, and requires the court - in the absence of a developed record - to make numerous assessments and assumptions that may (or may not) be correct, and that may (or may not) ultimately have to be reconsidered at the end of the case... One must ask whether one of the system's most precious and limited resources - judicial time - is better expended in running competitive bidding regimes or devoted to other, more judicial, matters").

74 Temp. L. Rev. 689, *782

n126. See, e.g., *In re Comdisco Securities Litig., 150 F. Supp. 2d 943, 951 (N.D.Ill. 2001)* (holding open the possibility that the winning bid could be adjusted in light of developments unforeseen at the time of bidding).

n127. It is not clear to what extent the judges who have conducted auctions engage in the same ex post review of fees as judges who selected counsel by other methods. The key question is whether the judge should-in fairness to both counsel and the class-be satisfied at the end of the case that the fee is reasonable. If so, the auction procedure may add a layer of costs without providing much benefit at the end of the case.

n128. *In re Cendant Corp. Prides Litig., 243 F.3d 722, 735, n.18 (3d Cir. 2001).* The Third Circuit has also held that a fee set in an auction is entitled to no special deference in determining whether it is a reasonable award at the conclusion of the action. See *In re Cendant Corp. Litig., 264 F.3d 201, 282-83 (3d Cir. 2001).*

n129. See Letter from Professor John Leubsdorf to the Task Force, May 30, 2001 (on file with the Task Force) ("It seems to me that, in most instances, an auction is not a desirable way to select the lawyers who will do most for their clients. It tends to select the cheapest but not necessarily the best counsel, and may also result in a fee structure that will not provide incentives for optimal performance").

n130. Statement of Professor Lucian Bebchuk, submitted to the Task Force, at 9.

n131. See Bruce Hay, Contingent Fees and Agency Costs, *25 J. Leg. Stud. 503, 513 (1996)* (optimal contingent fee, providing the best incentive to the lawyer and maximum return to the client, is generally above the level that a bidding process would produce).

Judge Walker contends in a written submission to the Task Force (available on the Task Force web site) that any problem with attorney performance after winning an auction is controlled by the fact that lawyers who lose the bidding will monitor the performance of the successful bidder and will be in a position to object to a fee application. The Task Force could find no evidence, however, that this monitoring by losing bidders actually occurs. It is in fact counterintuitive. Losing bidders drop from a case. It is difficult to imagine why they would invest time and resources in monitoring the counsel who has won and will receive fees. When we contrast auctions with private ordering, we note that in private ordering there may be lead counsel and other counsel sharing certain responsibilities. Although shared responsibilities raises a concern about overstaffing, it provides an opportunity for firms to monitor each other and an incentive to do so - after all, there is nothing to share if the class does not prevail and too little to share if the recovery is not all it should be.

n132. Statement of Brian Wolfman, submitted to the Task Force, at 3-4:

74 Temp. L. Rev. 689, *782

My chief concern is that in many, and probably most, cases, the putative plaintiffs' lawyer simply does not have the information to participate sensibly in a pre-litigation auction... . Many key points of law and fact are in substantial doubt at the outset of the case (or even half way into it), and only gradually come into focus as the litigation matures. Some of the unknowns are:

(1) the legal viability of one or more of the key claims for relief;

(2) facts that might prove necessary or important to establish a viable legal claim (indeed in some cases, the "historical" facts themselves are still developing);

(3) whether the case can be maintained as a class action, or whether instead the case cannot be maintained at all or can be maintained only individually or in some other form of aggregated litigation;

(4) key facts bearing on the amount of damages suffered by the class (assuming liability);

(5) the financial ability of the defendant to withstand full liability, or, rather, whether recovery is possible only on a "limited fund" basis, in bankruptcy, or must be sought, in whole or in part, from other parties not believed to be principally responsible;

(6) the form of relief (for instance, cases in which money damages initially are sought, but, as the litigation develops, only injunctive relief, ADR, or some other form of relief is viable);

(7) the size of the class, and perhaps more important, the approximate number of class members likely to be eligible for relief on account of the defendant's alleged misconduct;

74 Temp. L. Rev. 689, *782

(8) the potential for intra-class conflict, and the resulting need for sub-classes requiring separate sub-class counsel.

n133. A number of experienced counsel testified that it is all but impossible to predict the outcome of a class action as of the time that an auction would have to be conducted. See, e.g., Statement of Michael D. Fishbein, submitted to the Task Force, at 1-2 ("Even where the objective facts known to counsel at the outset of litigation make it appear as though a lawsuit is a "slam dunk,' such cases will frequently be unsuccessful because of unknown facts subsequently unearthed in discovery, unforeseen changes in the existing science, changes and variations in the application of law, or even the peculiarities of a given judge or jury."). See also the Statements of Sherrie R. Savett and John Innelli, both submitted to the Task Force.

The Task Force notes that in the cases in which bidding has been conducted, judges have not permitted any type of preliminary discovery to assist the bidders in forming their bids. See FJC Report, at 33 ("None of the bidding cases give any indication that the judge permitted any type of preliminary discovery by any of the bidders to assist them with the proposals prior to the commencement of the initial bidding period. Discovery either had not yet commenced in the case, or, if it had, once the court requested bids, discovery in the case was stayed.").

n134. Professor Fisch describes the "winner's curse" as follows:

Where bidders bid for an item of unknown value, an auction model known as the common value model, the successful bidder is the one who estimates the value of the item at the highest level. Because this bidder will have made an estimate that is higher than any other bidder, and because the bidders are acting without full information about the outcome of the litigation, the winning bidder will therefore face the risk of overpayment, or the "winner's curse" problem. The possibility of overpayment causes rational bidders to discount for that risk and can lead to inefficient, rather than competitive, prices.

Jill E. Fisch, Aggregations, Auctions and Other Developments in the Selection of Lead Counsel Under the PSLRA, 64 Law & Contemp. Probs. 53, 89 (2001).

n135. Professor John Coffee explained the "winner's curse" in the context of the actual bids in In re Auction Houses Antitrust Litig., supra. John C. Coffee, Untangling the ""Auction Houses' Aftermath, N.Y. L. J., Nov. 30, 2000, p. 1. In that case, the judge required counsel to state an X factor below which they would not receive a fee; above that amount, counsel would take 25% of the recovery. The X factor of the winning bid was more than twice as high as the next bid. Had the value of the class action turned out to be well below the X factor, it would have created a conflict of interest between counsel and the class, because counsel would have had the incentive to settle the case at the earliest opportunity, even though more effort might result in a higher settlement (though below the X factor). Moreover the large disparity in bids suggested the possibility that the winning bid might have been too high in light of what was known at the time.

Case 4:07-cv-05944-JST   Document 165-8   Filed 03/21/08   Page 73 of 108

Page 72
74 Temp. L. Rev. 689, *782

Professor Coffee has stated that the Auction Houses case indicates that the "winner's curse" problem "does have real world analogues." Statement of John C. Coffee, submitted to the Task Force, at 6. In contrast, Richard B. Drubel, who submitted the winning bid in Auction Houses, contends that the disparity in bids was not the result of a "winner's curse" but rather was due to the fact that the winning bidder had a reputation as an excellent litigation firm, willing to take a case to trial. Therefore, the claim had a higher value to his firm than to competing firms who might not have the same reputation. Statement of Richard B. Drubel, submitted to the Task Force, at 2.

n136. Statement of Professor Samuel Issacharoff, submitted to the Task Force, at 4.

n137. Statement of Andrew Niebler, submitted to the Task Force, at 2-4.

n138. Professor Fisch elaborates on the difficult if not impossible task for a court evaluating auction bids for appointment of class counsel:

The court must determine the likely recovery and predict the process by which that recovery will be achieved. The court must then evaluate each bid against those predictions to determine how the proposed structure will affect counsel's ability to achieve the predicted outcome. The auction requires the court to make these predictions at the outset of the case, before discovery reveals the facts and before motion practice uncovers the legal issues. Accordingly, the court has extremely limited information on the probability, amount, and range of possible recovery.

 Professor Fisch contrasts this ex ante assessment of optimal fees to the ex post approach used with traditional appointment of class counsel:

In contrast, if the court decides on the appropriate fee award at the conclusion of the case, the court can assess the amount and the quality of counsel"s work effort. Moreover, although the court may not have complete information on the merits of the case, particularly if the case is resolved by settlement, the court is likely to have a better sense of the strength of the case and the degree of risk associated with the litigation. Most important, by reserving its determination of the appropriate fee award until the conclusion of the case, the court can address many of the incentive problems previously identified.

 Jill E. Fisch, Aggregations, Auctions and Other Developments in the Selection of Lead Counsel Under the PSLRA, 64 Law & Contemp. Probs. 53, 88-89 (2001).

n139. Statement of Arlin M. Adams, submitted to the Task Force, at 21 ("a problem in analyzing and comparing bids is that doing so may require the court to make some assumptions about the likely outcome of the

Case 4:07-cv-05944-JST   Document 165-8   Filed 03/21/08   Page 74 of 108

Page 73
74 Temp. L. Rev. 689, *782

case... Aside from the dangers of speculating (on the record) about the court's view of the difficulty of litigating the claims involved and the length of time the court expects it to take to reach settlement, such assumptions may insert a degree of subjectivity into the analysis of the bids.").

n140. See Statement of Lorna Goodman, submitted to the Task Force, at 6-7 (noting that the district court in Cendant rejected what turned out to be the lowest bid by assuming that class recovery would be far less than $ 1 billion; the recovery in Cendant turned out to be $ 3 billion).

n141. See, e.g., *In re Quintus Securities Litig., 148 F. Supp. 2d 967 (N.D. Cal. 2001); In re Oracle Securities Litig., 131 F.R.D. 688 (N.D.Cal. 1990); In re Amino Acid Lysine Antitrust Litig., 918 F.Supp. 1190 (N.D. Ill. 1996); In re Bank One Shareholders Class Actions, 96 F.Supp. 2d 780 (N.D Ill. 2000).*

n142. Statement of Arlin M. Adams, submitted to the Task Force, at 17.

n143. See, FJC Report at 53 ("Although each judge who has employed some type of auction procedure to select class counsel emphasized and evaluates certain factors differently when comparing bids and selecting the winning bidder, all judges said they weighed both price considerations and qualitative factors when comparing the bids."). See also *In re Synthroid Marketing Litig., 264 F.3d 712, 720 (7th Cir. 2001)* ("Judges don't look for the lowest bid; they look for the best bid - just as any private individual would do in selecting a law firm, an advertising firm, or a construction company. Bidding law firms provide the judge with firm profiles, testimonials of former clients, predictions of expected recovery, fee proposals, and arguments on why their firm provides good value. The judge in turn acts as an agent for the class, selecting the firm that seems likely to generate the highest recovery net of attorneys' fees.").

n144. Jill E. Fisch, Aggregations, Auctions and Other Developments in the Selection of Lead Counsel Under the PSLRA, 64 Law & Contemp. Probs. 53, 82-83 (2001) ("For bids to provide the court with an objective basis on which to distinguish among counsel, the court's determination must focus primarily on price."). See also Statement of Professor Arthur R. Miller, submitted to the Task Force, at 20-21:

Although auctions may create the appearance of objectivity to an unsophisticated observer (as the "lodestar" methodology once gave the appearance of mathematical precision), in reality virtually every element of a class counsel auction is subjective. For example, a court's perception of a bidding firm's quality, experience, resources, willingness to litigate ... all have substantial subjective elements. Similarly, determining what weight to give to the varying perceived strengths and weaknesses of different law firms and competences in various substantive contexts is inherently subjective...

In addition...price is not necessarily objective. To the contrary, to the extent that auction advocates have supported the use of fee grids...or "caps" or other variable structures, determining what bid is "lowest" is dependent on a court's subjective ex ante perception of a range of factors. These include the likely value of the case, the likelihood that a case will settle early or late, and on and on.

n145. See, e.g., *In re Lucent Technologies Securities Litig., 194 F.R.D. 137, 157 (D.N.J. 2000)* ("Each bidding firm is required to submit a declaration of matters such as: the firm's experience in securities class action litigation; the qualifications of the firm to perform the work required; whether the firm will post a completion bond; a description of malpractice insurance for the firm and for each lawyer working on the case; a demonstration of familiarity with the case, including a specification of the probability of recovery and its possible range.").

n146. Statement of Arlin M. Adams, submitted to the Task Force, at 20 ("depending on the importance given certain factors by some judges but not others, the auction method may be applied in as subjective a manner as the lodestar method or an adjustment to a percentage method.").

n147. See Attachment to the Statement of State of Wisconsin Investment Board, submitted to the Task Force (setting forth quality-based standards for selection of class counsel).

n148. The fact that no court has relied or suggested that it would be wise to rely on the low bid irrespective of who makes it also suggests that the claim that auctions may open the door to new entrants in the class action field is probably overstated. New entrants who make extremely low bids may raise eyebrows, and may fail the "experience" prong of any analysis. The fact is that in auctions as in other methods of selecting class counsel, judges will probably be wary of entrusting the responsibility of representing large numbers of class members to lawyers without much experience in class action cases.

n149. Statements of Arlin M. Adams at 1, H. Laddie Montague, Jr. at 5, and Arthur M. Kaplan at 5, all submitted to the Task Force. See also Jill E. Fisch, Aggregations, Auctions and Other Developments in the Selection of Lead Counsel Under the PSLRA, 64 Law & Contemp. Probs. 53, 93-94 (2001):

In addition to the practical issues presented by the auction structure, a selection process that disregards differences in the competing firms' early efforts creates undesirable incentives with respect to future litigation.

74 Temp. L. Rev. 689, *782

The public interest is served by lawyers who carefully conduct investigations prior to filing a complaint... Investigation, however, is costly, and a lawyer's investigatory efforts are penalized if they can be appropriated by a low-bidding latecomer. Under the auction model, the firms that perform work early in a case face a risk that they will not be compensated; firms that do no initial work preserve lower cost structures that give them an advantage in the auction.

n150. Statement of Professor John C. Coffee, submitted to the Task Force, at 3.

n151. *In re Bank One Shareholders Class Actions, 96 F. Supp. 2d 780 (N.D. Ill. 2000)* (promising compensation to counsel who had prepared the consolidated class action). The SEC supports the position that firms that do valuable work in investigating securities claims should be separately compensated if they are not chosen as lead counsel. Memorandum of the Securities and Exchange Commission, Amicus Curiae, at 9 n.5, *In re Milestone Scientific Securities Litig., 183 F.R.D. 404 (D.N.J. 1998).*

n152. Statement of Arlin M. Adams, submitted to the Task Force, at 23 ("even if counsel are compensated for their time in investigating, the incentive may not be great enough to encourage attorneys to pursue such early investigation.").

n153. Statement of Sherrie R. Savett, submitted to the Task Force, at 5 ("The auction process gives plaintiff's attorneys an incentive to sit back and let others do all of the work, so as to swoop in at the last minute and submit a bid. An auction process discourages the filing of initial complaints, but encourages the filing of duplicative or copycat complaints where most of the work has already been performed by others."). But see Statement of Richard B. Drubel, submitted to the Task Force, at 6 (arguing that claim jumping is not necessarily bad because the investigating lawyer "may be a great investigator but an inexperienced or inept trial lawyer"). Mr. Drubel's proposed solution is "to reward the finder separately for his work in some fashion, but to auction the position of lead counsel to the firm that can get the most value to the class."

n154. *In re Wells Fargo Securities Litig., 157 F.R.D. 467 (N.D. Cal. 1994)* (three bids); *In re Comdisco Securities Litig., 150 F. Supp. 2d 143 (N.D. Ill. 2001)* (three bids; the court notes the decrease in number of qualified bidders in other cases); *In re California Micro Devices Securities Litig., 168 F.R.D. 257 (N.D. Cal. 1996)* (two bids); *Wenderhold v. Cylink Corp., 191 F.R.D. 600 (N.D. Cal. 2000)* (one bid; after the court rejected the bid and reopened the bidding, the court received three bids). See Jill E. Fisch, Aggregations, Auctions and Other Developments in the Selection of Lead Counsel Under the PSLRA, 64 Law & Contemp. Probs. 53, 90 (2001):

Several of the cases in which courts have used auctions suggest that the risk of limited bidder participation is real. For example, only four firms submitted bids in the Oracle auction, and Judge Walker had to conduct two rounds of bidding to obtain a total of three bids in Cylink. The auction in In re California Micro Devices Securities Litigation, resulted in only two bids, although seventeen firms had previously entered appearances representing members of the plaintiff class. Even the auction conducted in In re Amino Acid Lysine Antitrust Litigation resulted in the submission of only eight bids, despite the fact that approximately thirty-eight firms had entered an appearance prior to the court's decision to use an auction.

n155. Statement of Arlin M. Adams, submitted to the Task Force, at 26 ("When confronted with a complex bidding process at the outset, particularly where the use of the auction method is still relatively novel, some firms may decide that the opportunity cost to them of analyzing the case sufficiently to put together a winning bid is too great, and they may choose to pursue other cases in non-auction jurisdictions instead.").

Notably, courts have often required the bid to be structured in relation to certain mileposts in the litigation, and many of these mileposts are unlikely to be reached. For example, it is quite unlikely that a class action will be resolved after a trial or on appeal. As Professor Fisch puts it: "By including a variety of marginally relevant contingencies, litigation milepost grids increase the cost of bid preparation and complicate the task of bid comparison." Statement of Professor Jill E. Fisch, submitted to the Task Force, at 3.

n156. But see Statement of Richard B. Drubel, submitted to the Task Force, at 8. Mr. Drubel does not see a problem with an auction so long as there is more than one qualified bidder:

One benefit of an auction is to drive each participant to compete against the others for the benefit of the class. Unless a bidder is assured in advance that no one else will bid, that competitive discipline will still exist - and the class will still reap the benefits - whether there is one bidder or twenty.

n157. Jill E. Fisch, Aggregations, Auctions and Other Developments in the Selection of Lead Counsel Under the PSLRA, 64 Law & Contemp. Probs. 53, 84-85 (2001). See also Andrew K. Niebler, In Search of Bargained-For Fees for Class Action Plaintiffs' Lawyers: The Promise and Pitfalls of Auctioning the Position of Lead Counsel, *54 Bus. Law. 763, 777-78 (1999)* (discussing the "lemons" problem in the context of auction of class counsel).

n158. *In re Cendant Corp. Prides Litig., 243 F.3d 722, 734 (3d Cir. 2001).*

n159. *In re Comdisco Securities Litig., 150 F. Supp. 2d 943, 947 (N.D. Ill. 2001).*

n160. See Statement of Professor Samuel Issacharoff, submitted to the Task Force, at 3 n.2 ("If the auction process is to have any effect, there must be a quasi-contractual expectation that the auction will indeed set the expected terms governing the retention and compensation of class counsel"; this premise has been "called into question" by Cendant Prides).

n161. Statements of Keith Johnson at 5, Catherine E. LaMarr at 3-4, Horace Schow at 4-5, and Lorna Goodman at 5-6, all submitted to the Task Force.

n162. See, e.g. *In Re Bank One Shareholders Class Actions, 96 F. Supp. 2d 780, 785 (N.D. Ill. 2000)* ("Variation...among the several proposals will necessitate some...assumptions by the Court about the potential class recovery in the process of comparing bids."); Statement of Professor Elliott Weiss, submitted to the Task Force, at 3 ("A court often will not be able to evaluate competing bids without pre-judging aspects of the case before it.").

n163. Statement of Howard Langer, submitted to the Task Force, at 1 (arguing that the auction process "creates an appearance of impropriety or bias."). The Task Force is aware that judges are often called upon to make rulings that could influence their view of a case. For example, a judge could rule a confession invalid and preside over a trial at which the confession was excluded despite knowing its contents. We assume that judges are able to set aside matters that they know but are not permitted to consider. The issue is not, however, whether any possible influence on a judge's decision should be avoided at all costs. Rather, the question is whether certain procedures create too great a risk that judicial neutrality could be compromised or that an appearance of partiality could be raised.

n164. Jill E. Fisch, Aggregations, Auctions and Other Developments in the Selection of Lead Counsel Under the PSLRA, 64 Law & Contemp. Probs. 53, 95 (2001). See also Statement of Guy Miller Struve on behalf of the Association of the Bar of the City of New York, submitted to the Task Force, at 6 ("Our most serious concern with an auction procedure is the impact it may have on the role of the court as neutral arbiter.").

n165. Statement of Arthur M. Kaplan, submitted to the Task Force, at 3 (contending that the auction procedure "encourages cozy communications between well-connected plaintiffs' counsel and defense counsel" with the potential for "sweetheart deals in which a winning bid is based upon information available only to the

74 Temp. L. Rev. 689, *782

bidder favored by defense counsel").

n166. During the bidding in In re Auction Houses Antitrust Litigation, Judge Kaplan became aware that certain bidding counsel had engaged in settlement discussions with defendants and had obtained information from defendants to aid in those discussions. Judge Kaplan ordered the information to be made available to all bidders. *In re Auction Houses Antitrust Litig., 197 F.R.D. 71,74 (S.D.N.Y. 2000).*

n167. Statement of Michael D. Fishbein, submitted to the Task Force, at 3 ("In virtually every case we know of where the auction approach has been used, there are rumors that the successful bid was predicated on an undisclosed prior agreement with defendants concerning settlement. Regardless of whether these rumors ever have any validity, there is no question that they undermine confidence in the legal process.").

n168. See Statement of Keith Johnson, submitted to the Task Force, at 4, discussing the considerations that institutional investors take into account in selecting lead counsel in class actions:

Fee levels are one of the most significant factors considered in the selection process. However, they are not the only factor. Experience, claim analysis, investigation results, client responsiveness, reputation, and trial capabilities are among the other factors that might be taken into consideration.

See also Statements of Lorna Goodman at 7, and Stuart M. Grant and Jay Eisenhofer at 4-5, submitted to the Task Force.

n169. When a sophisticated investor - an institutional investor who is the most qualified plaintiff under the PSLRA, for example - assumes the role of lead plaintiff and has a substantial interest in the outcome of a case, the negotiations over fees ex ante may be closer to the typical case where a client hires a lawyer and agrees to a fee. There is no bar, however, to the institutional investor and the lawyer agreeing that they will reexamine the fee agreement as the case progresses and when it ends to see whether the assumptions made going into the case were valid. The problem in class actions in which there is no lead plaintiff with sufficient interest and ability to negotiate a fee is that the unknowns in a class action may be far more substantial than in a single plaintiff case. This makes reliance on an ex post appraisal more important.

n170. See Jill E. Fisch, Aggregations, Auctions and Other Developments in the Selection of Lead Counsel Under the PSLRA, 64 Law & Contemp. Probs. 53, 83 (2001):

74 Temp. L. Rev. 689, *782

Clients in the market for legal services do not choose their lawyer based solely on price. Indeed, the depth of the market for legal services, with its wide variation in billing rates, demonstrates the importance of non-price considerations. As in many markets, lawyer price and quality are often directly related. Those lawyers who offer higher quality legal services are able to command a higher price for their services. Less qualified lawyers charge a lower price. Lawyer quality is an important component of the selection process because a higher quality lawyer maximizes the client's expected recovery by increasing the likelihood of recovery, the amount of recovery, or both.

 See also Statement of Arlin M. Adams, submitted to the Task Force, at 21, n.8 ("some clients are willing to pay more even for marginally better representation, and class action plaintiffs should not be assumed to be any different.").

n171. Statement of Professor Lucian Bebchuk, submitted to the Task Force, at 6.

n172. Statement of Professor Jill E. Fisch, submitted to the Task Force, at 8, reporting research indicating that

institutional investors have adopted a variety of procedures for the selection of counsel, all of which involve a high level of competition. Institutions actively invite a range of firms to compete for the lead counsel position by obtaining recommendations, circulating requests for proposals, and, in some cases, retaining a law firm specifically to assist in the process of selecting class counsel... Following the identification of these firms, institutions conduct a rigorous evaluation process utilizing both quality and price criteria. Institutions report checking references, reviewing performance in comparable cases, and reviewing writing samples. Institutions typically conduct beauty contests akin to those used by corporate clients-face to face meetings in which they evaluate familiarity with the case, general legal expertise, and proposed litigation strategy. Institutions report placing a premium on firm style and client relationship issues, stressing the importance of selecting a firm that is willing to engage in joint decisionmaking and regular reporting.

n173. Statement of Arthur M. Kaplan, submitted to the Task Force, at 1 (observing that "auction procedures sharply deviate from the way sophisticated private litigants select their counsel in high-stakes litigation" and that "sophisticated private litigants evaluate quality first" with fee negotiation "usually the final step, explored only with the final candidate or a few candidates").

n174. See Statement of Judge Shadur, commenting on Draft Task Force Report, posted on Task Force web site, at 2.

n175. See cases cited in note 121, supra, indicating substantial downward departures from a supposed "benchmark."

n176. Statement of Professor Arthur E. Miller, submitted to the Task Force, at 16.

n177. Several members of the Task Force were prepared to conclude that auctions are never appropriate. Ultimately the Task Force was persuaded by the testimony of many witnesses who urged that courts be encouraged to innovate and find creative solutions to these important issues. See, e. g., Testimony of Judge Vaughn R. Walker at 52, and Judge William A. Walls at 155, March 16, 2001; Testimony of Elizabeth Cabraser at 74, May 5, 2001; and Testimony of Professor Joseph A. Grundfest at 210, June 1, 2001. See also Statement of Brian Wolfman, submitted to the Task Force, at 3 ("In money damages actions where the alleged cause of action is well established and the amount of potential damages is well understood at the outset, an auction may produce a better deal for the class than the prevailing method of retrospective fee determination."). The Task Force was also persuaded by the thoughtful comments of judges and others at the Third Circuit Judicial Conference, who urged the Task Force not to discourage potentially useful judicial innovation.

n178. Statement of Thomas Willging of the Federal Judicial Center, at 2 (noting that the cases in which judges have found bidding to be appropriate are "few and distinct").

n179. We also believe that the experience of institutional investors in setting attorney fees in class actions can be useful to judges when they consider an award of attorneys' fees in other class actions.

n180. The FJC Report, at 88, indicates that the seven judges who have conducted auctions reported a number of characteristics that made certain types of cases better candidates for auctions than others. Those characteristics are:

clearly accepted or stipulated liability; information from a criminal investigation; publicly known details about the case; clearly defined case; multiple cases consolidated in one jurisdiction; existence of a well-defined class; multiple firms competing for lead counsel position; and common fund cases.

n181. Statement of Arlin M. Adams, submitted to the Task Force, at 29 ("the auction procedure may be a viable option only in limited situations, where not much pre-filing investigation is necessary, the amount of

expected damages is relatively easy for participating firms to estimate, and the expected recovery, media attention, or other circumstances are present that will ensure an adequate number of qualified auction participants."). Of course, more experience with auctions in the cases we identify as appropriate candidates might lead to a conclusion that the class of cases in which auctions might be useful should be expanded or contracted.

n182. Statement of Leonard Barrack, submitted to the Task Force, at 5 ("auctions should be undertaken only in cases where the court can, at a minimum: (a) reasonably anticipate that numerous, competent law firms will seek appointment as class counsel; (b) reasonably evaluate the likelihood of a recovery for the class; and (c) reasonably foresee a very substantial recovery.").

n183. As discussed in Section X, infra, auctions are not viable in PSLRA actions unless the "most adequate" plaintiff provisions fail to produce a lead plaintiff with the interest, resources and expertise to select and negotiate with counsel. The factors that follow in the Text are pertinent to whether to conduct an auction in PSLRA cases, after the court has already found that the "most adequate" plaintiff provisions will not result in a proper choice of counsel.

n184. Statement of Guy Miller Struve on behalf of the Association of the Bar of the City of New York, submitted to the Task Force, at 3 ("An auction procedure would be unworkable in cases where injunctive relief is likely to be the sole or major form of relief or where the form of likely relief is unclear.").

n185. Testimony of Paul Reingold at 126, and Professor Judith Resnik at 121, March 16, 2001; Testimony of Professor Samuel Issacharoff at 63, Elizabeth Cabraser at 70, Michael Fishbein at 75, and Joseph Rosenthal at 117, May 5, 2001; and Testimony of Hon. Lewis A. Kaplan at 73-74, and R. Franklin Balotti at 24, June 1, 2001.

n186. Statement of Leonard Barrack, submitted to the Task Force, at 6 ("Where the court and counsel cannot make a realistic assessment in advance of the potential liability of the defendants, the level of potential damages or any likely recovery, counsel would be bidding "blind' and the court would have no way to gauge whether bids were realistic in terms of providing the proper incentives to class counsel.").

n187. See Howard M. Erichson, Coattail Class Actions: Reflections on Microsoft, Tobacco, and the Mixing of Public and Private Lawyering in Mass Litigation, *34 U.C. Davis L. Rev. 1 (2000),* for a discussion of the phenomenon of private class actions riding the coattails of successful government prosecutions. See also Statement of Professor Arthur Miller, submitted to the Task Force, at 24-25 (noting that some experimentation

Case 4:07-cv-05944-JST   Document 165-8   Filed 03/21/08   Page 83 of 108

Page 82
74 Temp. L. Rev. 689, *782

with auctions may be justified "when the auction is on the heels of the initiation of a government action"; in these circumstances, "(a) there may be sufficient public knowledge of pertinent underlying facts at the beginning of the private civil action for the court to make a more informed assessment of the relative merits of competing bids...and (2) there is less risk that independent investigations into wrongful conduct by members of the plaintiffs' bar would be discouraged by an auction..."); Statement of Professor Samuel Issacharoff, submitted to the Task Force, at 6:

If the principal drawback of an auction is the underincentive to investigate and ferret out wrongdoing prior to filing, that failing will be least pronounced in cases in which the elements of liability are relatively clear independent of pre-filing investigation. This is most likely to be the case when private enforcement follows some form of independent public disclosure of wrongdoing - as for example when regulatory submissions or governmental criminal prosecution expose the basis for the subsequent civil recovery action.

n188. See FJC Report, at 29 ("In almost all of the cases where class counsel was chosen from a competitive bidding process, the judge decided very early on in the life of the litigation that he or she would solicit bids. Class counsel was usually chosen before any dispositive motions were decided, prior to addressing Rule 23 certification issues, but after the appointment of the lead plaintiff in post-PSLRA securities cases.").

n189. Statement of Brian Wolfman, submitted to the Task Force, at 4 (noting that uncertainty over class certification will negatively affect bidding).

n190. Statement of Brian Wolfman, submitted to the Task Force, at 4 (cautioning against the use of auctions when 1) the number of class members entitled to relief is in doubt, and 2) the potential exists for intra-class conflict).

n191. A proposed amendment to *Fed. R. Civ. P. 23* would add a new subdivision (g), providing criteria for appointment of counsel. Among the factors that the court "must consider" are "(ii) the work counsel has done in identifying or investigating potential claims in this case." The Task Force agrees that prefiling investigation is a relevant factor in appointment of counsel. There is nothing inconsistent in also concluding that the existence of significant prefiling investigation counsels against the use of an auction to appoint counsel.

n192. Testimony of Professor Jill E. Fisch at 110, March 16, 2001 (describing efforts of institutional investors to develop selection and monitoring procedures for lead counsel in class actions). See also Statement of Arlin M. Adams, submitted to the Task Force, at 25-26 ("where a strong plaintiff with a sufficient stake in the

74 Temp. L. Rev. 689, *782

litigation emerges...there may be no need for the court to act as a surrogate for the plaintiff class. In such situations, it may be more desirable to allow the ordinary atttorney-client relationship to govern the arrangements to the extent possible."); Statement of Guy Miller Struve on behalf of the Association of the Bar of the City of New York, submitted to the Task Force, at 5 ("In situations where there is no client with a sufficient stake in the litigation, resources or knowledge of the market for legal services, auctions may provide a means of reaching a fee arrangement similar to that which a client with such a stake, resources and knowledge might achieve.").

n193. Statement of Professor John C. Coffee, submitted to the Task Force, at 9. Professor Coffee suggests that the minimum number of qualified bidders should be six. The Task Force believes that, while there may be merit in this suggestion, imposing any strict minimum is in the last analysis arbitrary, and that this should be left to the discretion of the court. A fixed limit may be particularly problematic if, as the Task Force recommends infra, consortium bidding is allowed.

n194. Statement of Sherrie R. Savett, submitted to the Task Force, at 2 ("To the extent defendants are aware of a predetermined fee structure, that too presents an element of danger for the class, as any settlement proposals will be designed to appeal to class counsel's interests rather than the class's interests.").

n195. *In re Cendant Corp., 260 F.3d 183 (3d Cir. 2001).*

n196. *260 F.3d at 197 (3d Cir. 2001)* (emphasis added).

n197. *In re Cendant Corp., 260 F.3d at 196 (3d Cir. 2001).*

n198. The question whether a fee arrangement should be publicly disclosed has been lurking since the 1985 Third Circuit Task Force Report. That Report recommended that consideration be given to setting a percentage fee by some kind of bargaining at the outset of a case. That Report was silent, however, as to whether the fee arrangement would be disclosed to the class and to the defendant, and if so, when disclosure would take place.

n199. See also *In re Lucent Techs. Securities Litig., 194 F.R.D. 137, 157 (D.N.J. 2000)* (stating that joint proposals will not be considered); *Sherleigh Assocs. v. Windmere-Durable Holdings, Inc., 186 F.R.D. 669, 670 (S.D. Fla. 1999)* (rejecting consortium bid).

74 Temp. L. Rev. 689, *782

n200. Judge Shadur has indicated that he believes that, if counsel has filed a class action complaint, he or she has represented a capability of prosecuting the class action alone and thus should be barred from joining with other counsel to submit a consortium bid. Although there is logic behind this approach, the Task Force observes that it can create a problem for firms. Even judges who have used bidding do not do so in all class action cases. If a judge decides to require bidding after one or more complaints are filed in a case, a firm that was willing to be lead counsel and to submit to ex post review of a fee application must now decide how much of a risk it is willing to take regarding fees ex ante. It would not be surprising that a firm willing to assume a class counsel role in a traditional case might be reluctant to engage in bidding without sharing the risk with other firms.

n201. Statement of Leonard Barrack, submitted to the Task Force, at 16 (in class actions, "defendants are typically represented by highly regarded lawyers who defend such cases vigorously"; if plaintiffs' firms can submit joint bids, they will be able to "put a structure in place to prosecute the action fully and underwrite the costs for the action").

n202. Statement of Sherrie R. Savett, submitted to the Task Force, at 11 ("allowing a consortium of firms to bid allows smaller firms to play an active role in cases in which they might otherwise feel too uncomfortable to submit a singular bid. Smaller firms would have an opportunity to take advantage of economies of scale.").

n203. See FJC Report at 32-34 for a complete discussion of the guidelines for qualitative submissions used by the courts that have conducted auctions.

The Task Force notes the difficulty of requiring counsel to provide an assessment of the case at the early stage in which an auction is conducted. As stated previously, the likelihood of success of a class action is often notoriously difficult to predict. Moreover, counsel has an incentive to put the case in the best light at this point, in order to convince the court of the merits of the case. But in doing so counsel might understate the risk involved.

n204. This problem is compounded if the defendant has access to the bid prior to the conclusion of the litigation.

n205. Testimony of John Innelli, pp. 54 et seq., June 1, 2001.

n206. Statement of Sherrie R. Savett, submitted to the Task Force, at 7 ("The expense of litigation is something that is not entirely within plaintiff's counsel's control. Much depends on how the defendants decide to litigate and spend money. It is important for the defendants to know that they will not have the luxury of spending plaintiffs to death. If defendants believe that litigation expenses are capped...they will be tempted to spend more, so as to force plaintiff's counsel to reach the point at which they are no longer comfortable spending money which cannot possibly be reimbursed.").

n207. Jill E. Fisch, Aggregations, Auctions and Other Developments in the Selection of Lead Counsel Under the PSLRA, 64 Law & Contemp. Probs. 53, 86 (2001) (noting that in Oracle, "the case settled precisely at the point at which class counsel hit the cap on expenses").

n208. The Task Force questions whether most plaintiffs in the marketplace for legal services would prefer expense caps. Task Force members have experience in cases in which clients indicate that they want a budget for expenses, but in most cases there are opportunities for counsel and the client to discuss whether the budget should be exceeded. The problem with bidding is that expense caps are likely to viewed as "hard" caps by counsel. It would be possible, of course, for the court to entertain motions to increase the cap as a case progresses. But, such motions would involve the judge even more in the plaintiffs' case in ways that might compromise the appearance of neutrality.

n209. Statement of Guy Miller Struve on behalf of the Association of the Bar of the City of New York, submitted to the Task Force, at 5-6 ("if, in a case in which an auction is based on a bid of a dollar amount below which counsel will receive no fee, it becomes apparent that the recovery will not reach the dollar amount, counsel's incentive may be to resolve the case, even if the interest of the class would be to obtain a larger recovery (though still lower than the dollar amount of the bid).").

n210. Statement of Professor John C. Coffee, submitted to the Task Force, at 10 ("The truth is that most fee formulas can create conflicts, but these conflicts are exacerbated when radical discontinuities are built into the fee formula (such as the "zero-percent-up-to-the-bid-level-and-25% thereafter' formula used by Judge Kaplan).").

n211. *In re Synthroid Marketing Litig., 264 F.3d 712, 721 (7th Cir. 2001)* (declining percentage fee structures "create declining marginal returns to legal work, ensuring that at some point attorneys' opportunity cost will exceed the benefits of pushing for a larger recovery, even though extra work could benefit the client"); Statements of Professor John C. Coffee at 5-6 and Andrew K. Niebler at 5, submitted to the Task Force; Statement of Howard A. Specter, submitted to the Task Force, at 6 (increasing percentages give counsel the incentive to pursue "the difficult to obtain "last dollars' that might be obtained in settlement or trial").

n212. The Task Force notes that a lawyer who uses an increasing percentage is not violating any standards of professional responsibility. See ABA Formal Opinion 94-389 (Dec. 5, 1994) (stating that a contingent fee percentage may increase with the amount of recovery, "since everyone would agree that it is the last dollars, not the first dollars, of recovery that require the greatest effort and/or ability on the part of the lawyer").

n213. See Statement of State of Wisconsin Investment Board, submitted to the Task Force, at 4 ("SWIB has not used a descending fee schedule out of concern that it might operate to impose an artificial cap on lead counsel's incentives at the point where the fee percentage starts to decline. The last dollars are usually the hardest to obtain and lead counsel should be duly incentivized to get them.").

n214. See FJC Report, at 31 (noting that only Judge Shadur has limited the bidding to attorneys of record in the action).

n215. See FJC Report, n.136 (relating a telephone conversation with Judge Shadur).

n216. See *In re Auction Houses Antitrust Litig. 197 F.R.D. 71, 74 (S.D.N.Y. 2001),* where the court found that interim lead counsel had engaged in settlement discussions with the defendants and had obtained information regarding potential damages. Judge Kaplan made this information available to all of the bidding firms. He explained that the release of this information was necessary to level the playing field, as well as to improve the quality of the bids.

n217. See Statement of Professor Elliott Weiss, submitted to the Task Force, at 6 (suggesting the use of a special master).

n218. *15 U.S.C. 78u-4.*

n219. H.R. Conf. Rep. No. 104-369, at 35 (1995). See also *Berger v. Compaq Computer Corp., 257 F.3d 475, 484 (5th Cir. 2001)* (noting that under the PSLRA, "class action lawsuits are intended to serve as a vehicle for capable, committed advocates to pursue the goals of the class members through counsel, not for capable, committed counsel to pursue their own goals through those class members.").

n220. "The court shall adopt a presumption that the most adequate plaintiff...is the person or group of persons that...has the largest financial interest in the relief sought by the class [and who] otherwise satisfies the requirements of Rule 23...." *15 U.S.C. 78u-4(a)(3)(B)(iii)(I).*

n221. *15 U. S. C. 78u-4(a)(3)(B)(v).*

n222. See the discussion of the legislative history in *In re Cendant Corp. Litig., 264 F.3d 201, 261-62 (3d Cir. 2001).*

n223. H.R. Conf. Rep. No. 104-369 at 32 (1995). See also Jill E. Fisch, Aggregations, Auctions and Other Developments in the Selection of Lead Counsel Under the PSLRA, 64 Law & Contemp. Probs. 53 (2001) ("The statute reflects the expectation that the lead plaintiff, presumptively the investor with the largest financial interest in the litigation, will oversee the conduct of the case and monitor the decisions of class counsel.")

n224. H.R. Conf. Rep. No. 104-369 at 37 (1995).

n225. Statement of Professor Jill E. Fisch, submitted to the Task Force, at 9 (the PSLRA formalizes the "empowered lead plaintiff position"). The concept of empowered plaintiffs in securities actions was first raised by Professors Elliott J. Weiss and John S. Beckerman, in Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions, *104 Yale L.J. 2053 (1995).* This article provided the conceptual basis for the PSLRA. See *In re Cendant Corp. Litig., 264 F.3d 201, 262 (3d Cir. 2001)* (PSLRA lead plaintiff provisions are "unquestionably based on Weiss and Beckerman's proposal.").

n226. *15 U. S.C. 78u-4(a)(3)(B)(II).*

n227. The Task Force notes that there is nothing explicit in the statutory language of the PSLRA that requires the "most adequate" plaintiff to negotiate a fee with counsel in advance of the action. However, the statute clearly envisions that the empowered plaintiff will monitor and control counsel for the benefit of the class, and negotiation of the fee is a critical component of this monitoring. See Elliott Weiss & John Beckerman, Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions, *104 Yale L.J. 2053, 2105 (1995)* (arguing that the court should defer to the most adequate plaintiff's discretion in negotiating and setting attorney fees, and noting that courts "might well feel confident in assuming that a fee arrangement an institutional investor had negotiated with its lawyers before initiating a class action

maximized those lawyers' incentives to represent diligently the class's interests, reflected the deal a fully informed client would negotiate, and thus was presumptively reasonable."); *In re Cendant Corp. Litig., 264 F.3d 201, 265 (3d Cir. 2001)* (holding that in deciding whether the movant with the largest losses satisfies the typicality and adequacy requirements of the PSLRA and Rule 23, the Court should "inquire whether the movant has demonstrated a willingness and ability to select competent class counsel and to negotiate a reasonable retainer agreement with that counsel"). Moreover, institutional investors are unlikely to become involved as lead plaintiffs unless they are given the opportunity to negotiate a fee with counsel. See Statements of Counsel for institutional investors, Keith Johnson at 2, Lorna B. Goodman at 1, Horace Schow II at 5, and Catherine LaMarr at 1, all submitted to the Task Force, indicating that the major incentive for participation by institutional plaintiffs is the opportunity to negotiate a counsel fee for the benefit of the class. Thus, to the extent the PSLRA is designed to encourage the participation of institutional investors, it implicitly establishes a regime in which the most adequate plaintiff will negotiate a fee with counsel; and this will usually occur at the beginning of the case. See Weiss & Beckerman, supra, at 2107 ("The change we propose also will place institutional investors in a position to negotiate fee arrangements with plaintiffs' lawyers before class actions are initiated.").

n228. *In re Cendant Corp. Litig., 182 F.R.D. 144, 148 (D.N.J. 1998).* See also Jill E. Fisch, Aggregations, Auctions and Other Developments in the Selection of Lead Counsel Under the PSLRA, 64 Law & Contemp. Probs. 53, 79 (2001) (arguing that "allegations that institutional investors will select a law firm on the basis of political contributions undermine judicial willingness to trust the lead plaintiff's retention decision.").

n229. See *In re Cendant Corp. Litig. 264 F.3d 201, 270 n.49 (3d Cir. 2001):*

The concern is that an informal quid pro quo could develop in which law firms specializing in securities class actions would contribute to the campaign coffers of the elected officials who oversee these funds, and that, in exchange (and in the hopes of getting more contributions), those officials would use their control over the funds to select those firms to serve as lead counsel for cases in which the funds are the lead plaintiff. In such a situation, there would also be reason to fear that the lead plaintiff would be complacent and unwilling to object to an excessive fee request, thus defeating the Reform Act's goal of lead plaintiff-controlled, rather than lead counsel-controlled, litigation.

 See also Statement of Professor John C. Coffee, submitted to the Task Force, at 2 (noting that "the increasing prevalence of public pension funds as lead plaintiffs in securities class actions raises the danger that political contributions to the elected public official who in many states and municipalities determines the policies of the pension fund may determine the choice of counsel.").

n230. Testimony of Keith Johnson at 49, May 5, 2001; Testimony of Horace Schow II at 98, Lorna Goodman at 81-82, and Catherine LaMarr at 98 et seq., June 1, 2001.

74 Temp. L. Rev. 689, *782

n231. Testimony of Horace Schow II at 92, 98 June 1, 2001.

n232. Testimony of Catherine LaMarr at 99, June 1, 2001; *Conn. Gen. Stat. 1-84* (2001).

n233. See Stephen Gillers & Roy D. Simon, Regulation of Lawyers: Statutes and Standards 400 (2001).

n234. Whatever the effect of the current language of Model Rule 7.6, the states are free to adopt their own versions of that Rule that would meet the concerns regarding pay-to-play in PSLRA cases. It is clear that the ABA was concerned about the same issues that concern judges in this area. See Comment 1 to Model Rule 7.6 ("When lawyers make or solicit political contributions in order to obtain an engagement for legal work awarded by a government agency, or to obtain an appointment by a judge, the public may legitimately question whether the lawyers engaged to perform the work are selected on the basis of competence and merit. In such circumstances, the integrity of the profession is undermined.").

n235. *143 F. Supp. 2d 304, 311 (S.D.N.Y. 2001).*

n236. See also *In re Microstrategy Inc. Securities Litig., 110 F. Supp. 2d 427, 437-8 (E.D. Va. 2000)* (rejecting the use of auctions under the PSLRA, noting that "the lead plaintiff's duty is to "select and retain counsel to represent the class'" and that "while plaintiff's selection of lead counsel is "subject to the approval of the court,' approval should not be based on whether plaintiff's chosen counsel promises to charge a cheaper fee than anyone else.").

n237. *96 F. Supp. 2d 780 (N.D. Ill. 2000).*

n238. *141 F. Supp. 2d 951 (N.D.Ill. 2001).*

n239. Testimony of Hon. Milton I. Shadur, p. 18, March 16, 2001.

74 Temp. L. Rev. 689, *782

n240. *In re Bank One Shareholders Class Actions, 96 F. Supp. 2d 780, 784 (N.D. Ill. 2000).*

n241. *148 F. Supp. 2d 967 (N.D. Cal. 2001).*

n242. See *In re Network Associates, Inc., Securities Litig., 76 F. Supp. 2d 1017, 1033-34 (N.D. Cal. 1999)* (prospective lead plaintiff is not "most adequate" under the PSLRA where it refuses to negotiate fee arrangements with the law firm it selected). But see *In re Comdisco Securities Litig., 150 F. Supp. 2d 943, 947 (N.D. Ill. 2001)* (rejecting the idea that a prospective lead plaintiff will perform a market-based search for counsel on the ground that it is "hardly reasonable to expect any plaintiff, on the speculative prospect of acting for a class, to engage on his, her or its own in the kind of comprehensive and studied beauty contest required to search out a cadre of law firms ready, willing and able to act as class counsel and to ascertain which of those firms is prepared to do so on the terms most favorable to the entire class"). The Court in Comdisco concluded that "a neutrally conducted and confidential competitive bidding process under the auspices of the court affords the best means - in fact, it would seem the only means - to derive that necessary information, so that the class gets the best available combination of highly competent representation at the least cost."

n243. Jason Hoppin, Attorneys Getting the Silent Treatment, The Recorder, June 19, 2001, at 1.

n244. *182 F.R.D. 144, 149 (D.N.J. 1998).*

n245. *264 F.3d 201, 276 (3d Cir. 2001).*

n246. *In re Cendant Corp. Litig., 264 F.3d at 276 (3d Cir. 2001).*

n247. *15 U.S.C. 78u-4*(a)(3)(B)(v).

n248. *In re Cendant Corp. Litig., 264 F.3d at 275-76 (3d Cir. 2001).*

n249. *In re Cendant Corp. Litig., 264 F.3d at 277 (3d Cir. 2001).*

n250. *In re Cendant Corp. Litig., 264 F.3d at 277 (3d Cir. 2001).* Applying these standards to the facts, the Cendant Court found that the district court had abused its discretion in ordering an auction. There was nothing to indicate that the putative lead plaintiff had failed to conduct a good faith search for counsel or had failed to negotiate a reasonable fee agreement. Thus, the lead plaintiff had not defaulted on or abused its power granted by the PSLRA to "select and retain" counsel. The district court's desire to hold down attorney fees by "simulating" the market was not a sufficient reason to conduct an auction because it "would apply in every case, and thus cannot be enough to justify a procedure that we have concluded may be used only rarely." *264 F.3d at 278.*

n251. Chief Judge Becker carefully instructed the Task Force that it should feel free to disagree with any opinion of the Third Circuit, since his goal in appointing the Task Force was to have a report that would be national in scope and emphasis. The Chief Judge also indicated that the Task Force should not hesitate to make recommendations for statutory changes - in the PSLRA or other statutes - if it thought them desirable. It was the Task Force's decision not to take a position on legal issues like the interpretation of the PSLRA. That the courts may differ amongst themselves does not mean that we are equipped to provide the only correct answer. We have confined ourselves to taking a position on how judges should consider auctions under the PSLRA if they have the option to do so (either because the statute, properly interpreted, now authorizes it, or were Congress to amend the statute to provide any necessary authorization).

Readers of this report will find that our recommendations are consistent with the legal interpretation of the PSLRA set forth in Chief Judge Becker's opinion in Cendant, discussed immediately above. The Chairs of the Task Force and the drafters of this Report wish to emphasize that each of the recommendations contained in this Report was voted on and adopted in June 2001, well before the Cendant opinion was released on August 28, 2001. We are comforted by the fact that the Cendant panel's analysis of the statute is similar to ours, but we can state categorically that our recommendations would be the same even if the panel had taken a more favorable view of auctions under the PSLRA.

Judge Ambro was appointed to the Task Force before he was randomly selected to serve on the panel hearing the appeal in Cendant. He recognized early on that there could be an appearance problem if he participated in Task Force discussions regarding the PSLRA given his status as one of the panel members hearing a part of the Cendant litigation. Thus, he recused himself from any Task Force discussion of the PSLRA, as well as any presentation at the Task Force hearings on these matters. Judge Ambro did not know what the Task Force decided to recommend until a draft version of this Report was circulated to him as well as the other Task Force members in September 2001, after the date of the Cendant opinion. Judge Ambro took great pains to avoid any discussion that could conceivably be linked - even by inference - to issues that were before the Third Circuit. In doing so, he not only demonstrated an acute sense of judicial propriety, but reaffirmed for the other Task Force members that neither the Chief Judge who appointed the Task Force nor any other member of the Third Circuit sought to influence the decisonmaking of the Task Force on any issue.

n252. See *15 U.S.C. 78u-4*(a)(3)(B)(iii)(II).

74 Temp. L. Rev. 689, *782

n253. See In re Bank One Shareholders Class Actions, No. 00-C-880, Transcript of Proceedings Before Judge Shadur, statements by Judge Shadur (the right of first refusal "is the best way to get an automatic depressing effect on bidders. Certainly fewer people are going to be prepared to bid seriously if they know they can lose out even if they turn out to have submitted the best offer").

n254. Statement of Professor John C. Coffee, submitted to the Task Force, at 9 (right of first refusal "tells all future bidders that they are not participating in a true auction.").

n255. Statement of Professor Lucian Bebchuk, submitted to the Task Force, at 18 ("Having the selection of lead counsel done by competitive bidding would take away the decision from the lead plaintiff. The selection would be done by the court, based on the court's judgment as to which of the qualified bidders have made the lowest bid. By leaving the lead plaintiff with little say in the selection of lead counsel, competitive bidding would greatly diminish the role of the lead plaintiff.")

Even a right of first refusal clashes with the empowered plantiff model of the PSLRA. See *In re Cendant Corp. Litig., 264 F.3d 201, 277-78 (3d Cir. 2001)* (the right of first refusal is given to counsel, not the plaintiff, thus undermining the concept of client control; moreover, under a right of first refusal the lead plaintiff's ability to retain counsel is conditioned by fee terms set by the court).

n256. Statement of Professor Lucian Bebchuk, submitted to the Task Force, at 19-20:

Since the lead plaintiff is not compensated, the incentive to become an effective and active lead plaintiff in the interest of the class - of the type contemplated by the PSLRA - must arise from the combination of (i) having a substantial stake and (ii) expecting that becoming a lead plaintiff would enable having a significant influence of the conduct of the litigation. Clearly, if a selected lead plaintiff could not expect to influence the litigation by selecting the lead counsel and subsequently working with the lead counsel of the lead plaintiff's choice, then the incentive to become lead plaintiff would very much decrease even for a shareholder with a significant stake.

n257. Elliot J. Weiss & John S. Beckerman, Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions, *104 Yale L. J. 2053 (1995).*

n258. Statement of Professor Elliott J. Weiss, submitted to the Task Force, at 4. See also John C. Coffee,

74 Temp. L. Rev. 689, *782

The PSLRA and Auctions, N.Y.L.J., May 17, 2001, at 5.


n259. See, e.g., Declaration of Roger Pugh, Assistant Corporation Counsel, City of New York, In re Cendant Corp. Litigation (May 30, 2000) ("There are few benefits to be gained from serving as lead plaintiff for institutional investors... For a public pension fund, such designation requires a significant commitment of time and resources, not the least of which is responding to extensive discovery propounded by defendants. In taking away the lead plaintiffs' right to choose its own counsel as well as their ability to negotiate attorneys' fees to maximize recovery for the class, the auction procedure virtually nullified the City Pension Funds' incentive to serve as lead plaintiff"). Accord: Statement of Keith Johnson, Chief Legal Counsel, State of Wisconsin Investment Board, at 2-5; Statement of Horace Schow, General Counsel, Florida State Board of Administration, at 3 (stating that his client has opted out of class actions rather than be forced to be represented by counsel it did not choose), Statement of Catherine E. LaMarr, General Counsel, Office of the Connecticut State Treasurer, at 3 (comparing lead plaintiff experiences where client had chosen counsel to those where court had designated counsel), all submitted to the Task Force.


n260. Statement of Lorna Goodman on behalf of the City of New York, submitted to the Task Force, at 5. See also Jill E. Fisch, Aggregations, Auctions and Other Developments in the Selection of Lead Counsel Under the PSLRA, 64 Law & Contemp. Probs. 53, 92 (2001) ("The lead plaintiff cannot be expected to develop a close working relationship with a lawyer appointed by the court. Nor can the lead plaintiff be expected to monitor court-appointed counsel effectively, absent control over counsel's compensation in the case at bar and the potential for repeat business in comparable cases.").


n261. Statement of Lorna Goodman on behalf of the City of New York at 2-5; Statement of Keith Johnson, Chief Legal Counsel, State of Wisconsin Investment Board, at 2-5, both submitted to the Task Force.


n262. Statement of Catherine E. LaMarr, submitted to the Task Force, at 5 ("Sensitive to diversity issues and interested in expanding the base of available counsel, Connecticut has in fact already selected a diverse group of counsel in its selection process. An auction process is likely to eliminate opportunities for diversity in the selection of counsel.").


n263. See In re Cendant Corp. Litig., 264 F.3d 201, 220 (3d Cir. 2001) (noting that fee awarded by auction was $ 76 million higher than the fee agreed to between the lead plaintiff and chosen counsel).


n264. Jill E. Fisch, Aggregations, Auctions and Other Developments in the Selection of Lead Counsel Under the PSLRA, 64 Law & Contemp. Probs. 53, 94 (2001) ("Selection of counsel is a business decision, and

courts are poorly suited to make business decisions.").

Professor Elliot Weiss suggested that the presumption in favor of a lead plaintiff's choice of counsel should not be as strong as the business judgment rule presumption. Statement of Professor Elliot Weiss, submitted to the Task Force, at 3-5. The Task Force believes that there is sufficient flexibility in the application of the business judgment rule that courts will develop a framework for review that will accord appropriate deference to lead plaintiffs while still carefully scrutinizing the process, alert for political considerations or other factors that might lead to doubt regarding the quality or appropriateness of plaintiff's choice. See *In re Cendant Corp. Litig., 264 F.3d 201, 270 n.49 (3d Cir. 2001)* (even under the deference required by the PSLRA, a court should find the lead plaintiff inadequate if counsel was appointed as a result of campaign contributions).

n265. See Statement of Keith Johnson, submitted to the Task Force, at 5-6 (for lead plaintiffs to fulfill the role contemplated for them by the PSLRA, the courts must "defer to counsel selection decisions made by lead plaintiffs where a reasonable, client-controlled process was used to obtain competent representation at a fair price, much like the courts defer to decisions of corporate boards under the Business Judgment Rule.").

n266. See, e.g., *Brehm v. Eisner, 746 A.2d 244, 264 n.66 (Del. 2000)* ("Due care in the decisionmaking context is process due care only... [The business judgment rule] is a presumption that in making a business decision the directors...acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation. Thus, the directors' decisions will be respected by the courts unless the directors are interested or lack independence...do not act in good faith...or reach their decision by a grossly negligent process.").

n267. See Statement of Stuart M. Grant and Jay W. Eisenhofer, submitted to the Task Force, at 5 ("The court should review the lead plaintiff's choice of counsel applying the tenets of the business judgment rule. When applied to lead plaintiff's counsel selection, the business judgment rule would create a presumption that the decision will be left undisturbed as long as it was made in good faith and on an informed basis. The selection can be judged to have been made in good faith if the process leading up to it was fair and free of nepotism (i.e., choosing counsel based on familial or political relationships). The lead plaintiff will have met its duty to act in an informed manner if it has followed a process of selection with the earmarks of the beauty contest - testing what the market of lawyers skilled in that practice will bear.").

n268. See "Brief of the Securities and Exchange Commission as Amicus Curiae in Support of Appellants on the Issues Specified," In re Cendant Corp. Litig. (3d Cir. 2001) at 3-5 ("The court should not itself conduct an auction unless it has evaluated the lead plaintiff's own selection and retention of counsel, has particular concerns about the lead plaintiff's own selection and retention of counsel, has particular concerns about the lead plaintiff or its efforts, and, if feasible, has directed it to undertake a proper competitive selection process. It is not sufficient that the court merely prefers a process that it, rather than the lead plaintiff controls, or assumes that an auction is inherently superior to a negotiated agreement."). See also Statement of Catherine E. LaMarr, submitted to the Task Force, at 5 ("significant consideration should be given to institutional plaintiffs that have

taken the time to negotiate fees and gain sufficient comfort with the style of the counsel selected" and "the presumption should be that the institutional investor has a sufficient level of sophistication in these matters to effectively select appropriate and competent counsel to serve the needs of the class."). Compare *Raftery v. Mercury Fin. Co., 1997 WL 529553, at 2* (N.D. Ill.) (finding the putative lead plaintiff inadequate where the fee agreement reached with counsel called for a 1/3 fee that was "not the result of hard bargaining.").

n269. See *In re Cendant Corp. Litig., 264 F.3d 201, 276 (3d Cir. 2001)* ("the ultimate inquiry is always whether the lead plaintiff's choices were the result of a good faith selection and negotiation process and were arrived at via meaningful arm's-length bargaining."); *In re Quintus Securities Litig., 201 F.R.D. 475, 490-91 (N.D. Cal. 2001)* (refusing to appoint as lead plaintiff a movant who had made no attempt to negotiate "anything close to a competitive fee" and who provided "no specifics" about the process by which the movant had selected counsel).

n270. *264 F.3d 201, 269 (3d Cir. 2001).*

n271. "Brief of the Securities and Exchange Commission as amicus curiae in Support of Appellants on the Issues Specified, (December, 2000)," at 18-19, citing with approval Professor Joseph Grundfest's declaration in *In re McKesson HBOC Inc. Sec. Litig., 97 F. Supp. 2d 993 (N.D. Cal. 1999).*

n272. The court clearly has the authority to require the putative lead plaintiff to provide information concerning its process of selection of counsel, given the fact that the court must approve the choice of counsel under the terms of the PSLRA. See *15 U.S.C. 78u-4*(a)(3)(B)(v).

n273. *15 U.S.C. 78u-4*(a)(3)(B)(v).

n274. *15 U.S.C. 78u-4*(a)(3)(B)(iii). See *In re Cendant Corp. Litig. 264 F.3d 201, 265-66 (3d Cir. 2001)* (stating that a court might find the putative lead plaintiff inadequate under the PSLRA if the plaintiff "lacked legal experience or sophistication, intended to select as lead counsel a firm that was plainly incapable of undertaking the representation, or had negotiated a clearly unreasonable fee agreement with its chosen counsel.").

n275. Statement of Lawrence Sucharow, submitted to the Task Force, at 6 ("If the lead plaintiff is, as Congress intended, to take a meaningful and active role in the supervision of lead counsel and the progress of

the litigation, the attorney-client relationship must be voluntary and based on the client's evaluation of the competency of its counsel, the resources that counsel can bring to bear on the matters at issue in the litigation, and feeling of respect for and confidence in that counsel's judgment. The Court...should not make a shotgun marriage of a relationship as sensitive as one of attorney-client.").


n276. See In re Commtouch Software Ltd. Securities Litig., No. C 01-00719, Order re Lead Plaintiff Selection and Class Counsel Selection (N.D. Cal. June 27, 2001) (the plaintiff with the greatest economic loss was an individual with limited English skills, who resided in Israel, and no alternative lead plaintiff appeared capable of conducting a market search for counsel; consequently, the court ordered the lead plaintiff to conduct an auction and established procedures for the lead plaintiff to follow). The Task Force notes that ordering the lead plaintiff to conduct an auction is a less intrusive alternative to a court-conducted auction, given the clear preference in the PSLRA for client-driven litigation.


n277. See *In re Cendant Corp. Litig., 264 F.3d 201, 277 (3d Cir. 2001)* (noting that "it is possible that the court could conclude that, perhaps due to the nature of the case at hand, none of the possible lead plaintiffs is capable of fulfilling the model contemplated by the Reform Act"; in such an unusual case, "it would be permissible for a court to conclude that its obligation to protect the interests of the plaintiff class makes it necessary for the court to assume direct control over counsel selection and, if the court were so to conclude, an auction would be one permissible means by which the court could select and retain counsel on behalf of the class"; however, it is not enough "that the court thinks that an auction is an inherently superior mechanism for determining a reasonable fee").


n278. *In re Cendant Corp. Prides Litig., 243 F.3d 722, 730-31 (3d Cir. 2001).*


n279. The Task Force notes that much of the concern in the cases is over the concept of "aggregation." Several courts have held that the financial losses of unrelated class members cannot be aggregated in determining the "most adequate" plaintiff(s) under the PSLRA. See, e.g., *In re Network Associates Securities Litig., 76 F. Supp. 2d 1017, 1022 (N.D. Cal. 1999)* (rejecting aggregation of unrelated plaintiffs and discussing case law); *Sakhrani v. Brightpoint, Inc., 78 F. Supp. 2d 845, 847 (S.D. Ind. 1999)* (rejecting aggregation of unrelated plaintiffs; appointing a single investor as lead plaintiff). The suspicion of these courts appears to be that aggregation is a device for lawyer-generated groups to take over the class action, contrary to the client-driven model of the *PSLRA. In re Donkenny, Inc., Securities Litig., 171 F.R.D. 156, 157-58 (S.D.N.Y. 1997)* (allowing aggregation of unrelated interests would foster lawyer-driven rather than client-driven litigation, contrary to the premise of the PSLRA).

The Task Force notes that while some attempts to aggregate interests appear to be lawyer-driven, others appear to be client-driven. For example, a number of sophisticated investors might form a coalition in order to obtain greater bargaining power and control over chosen counsel. As a practical matter, aggregation on this level might still be problematic because the aggregated plaintiffs may have different interests, different management styles, and different decisionmaking processes that could result in conflict. However, it is possible that in certain

cases aggregation of empowered plaintiffs may be useful in monitoring counsel and the litigation. Thus, courts would further the intent of the PSLRA by rejecting lawyer-driven aggregation, while being more tolerant of client-driven aggregation. See, e.g., *In re Tyco International, Ltd. Securities Litig., 2000 WL 1513772, at 4* (D.N.H.) (determining that "the appointment of a group of three substantial shareholders as lead plaintiffs is consistent with the language and purpose of the PSLRA" and noting that "while a group comprised of many small shareholders might be unwieldy and lack the proper incentive to serve as an effective lead plaintiff, a group that consists of a small number of large shareholders should be capable of managing this litigation and providing direction to class counsel"). Compare *In re Razorfish, Inc., Securities Litig., 143 F. Supp. 2d 304, 307-08 (S.D.N.Y. 2001)* (rejecting as lead plaintiff a group that "was simply an artifice cobbled together for the obvious purpose of creating a large enough grouping of investors to qualify as "lead plaintiff,' which can then select the equally artificial grouping of counsel as "lead counsel'"). The Court in Cendant took the view consistent with that of the Task Force, declaring that lawyer-driven aggregation would render a lead plaintiff "inadequate" under the terms of the PSLRA, but that aggregation of unrelated interests could be permissible if client-driven. See *In re Cendant Corp. Litig., 264 F.3d 201, 268 (3d Cir. 2001)* (finding no error in appointing a group as lead plaintiff where there was no indication that the group "was artificially created by its lawyers" and "no obvious reason to doubt that its members could operate effectively as a single unit.").

For a full discussion of the cases dealing with aggregation, and an argument that permitting aggregation compromises the principles of the PSLRA, see Jill E. Fisch, Aggregations, Auctions and Other Developments in the Selection of Lead Counsel Under the PSLRA, 64 Law & Contemp. Probs. 53 (2001).

n280. Jay Eisenhofer & Cynthia Calder, Fee Auctions: Are Courts Selling out the Class to the Lowest Bidder? The Legal Intelligencer, March 30, 2001, at 5. See also Testimony of Lorna Goodman at 223, June 1, 2001 (counsel fees negotiated as lead plaintiff ranged from 3-4% to 15% of the recovery); Testimony of Keith Johnson at 12, May 5, 2001 (fees negotiated as lead plaintiff were in the range of 15-20% of the recovery).

n281. If a prospective plaintiff has the other qualities discussed in this paragraph, the amount of the loss might be probative of the plaintiff's motive and interest in monitoring the litigation.

n282. See Testimony of Professor Joseph A. Grundfest at 173, June 1, 2001 (the court should evaluate whether the plaintiff "has the ability to fend for himself.").

n283. See *TCW Technology Limited Partnership v. Intermedia Communications Inc., 2000 WL 1654504, at 3* (Del. Ch.):

Traditionally, the Court of Chancery has allowed counsel representing individual, class or derivative plaintiffs to engage in a type of private ordering, that is, to coordinate prosecution of the litigation and to propose the most efficient means of consolidation. Over the past ten years, members of the Court of Chancery have been asked, with increasing frequency, to become involved in the sometimes unseemly internecine struggles within the

plaintiffs' bar over the power to control, direct and (one suspects) ultimately settle shareholder lawsuits filed in this jurisdiction. In every single instance that I am able to recall, this Court has resisted being drawn into such disputes. In every instance, the plaintiffs' bar has been able to work out a consolidation compromise. It may have been imperfect, but the compromise has always seemed, in the end, to accommodate reasonably the interests of all the parties and the Court.

See also Herbert B. Newberg & Albert Conte, 2 Newberg on Class Actions 9.35 at 9-95 (3d ed. 1992) ("the court should always encourage the parties themselves to agree on lead counsel, while imposing its own choice only in extraordinary circumstances.").

n284. See *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litig., 55 F.3d 768, 819-22 (3d Cir.1995)* (noting, in a case involving private ordering, that the court has a fiduciary obligation under Rule 23 to assure that counsel is adequate and that the fee is reasonable).

n285. Statement of Elizabeth Cabraser, submitted to the Task Force, at 4 ("In serving as a fiduciary for the class, the court must, at a minimum, look at the qualifications of counsel. If the court abdicates this duty and does nothing to ensure that counsel for the class are, at the very least, qualified and adequate, there can be no assurance that the class's best interests are being served.").

n286. See, e.g., *In re Tyco International, Ltd., Securities Litig., 2000 WL 1513772, at 9* (D.N.H.) (approving an arrangement in which four law firms would operate as co-lead counsel; noting that in this case "the potential dangers stemming from multiple representation, while real, are less weighty than the benefits that it may produce."). The court in Tyco was satisfied that the co-lead counsel would devise "a system for dividing and managing the workload arising from this litigation efficiently and without duplication." It put counsel on notice "that this court will not approve any award of fees and expenses that reflects duplication, inefficiency, or the costs of coordinating the efforts of the firms involved in the representation."

See also Memorandum of the SEC, Amicus Curiae, in In re Milestone Scientific Securities Litig., No. 98-2854, at 4 (D.N.J.) (noting that multiple counsel carry the danger of duplication of fees, but also that multiple counsel "may be justified where the firms provide necessary resources, skill, experience or expertise"); *Oxford Health Plans, Inc. Securities Litig., 182 F.R.D. 42, 46, 49 (S.D.N.Y. 1998)* (approving multiple counsel arrangement; pooling of resources and experience was necessary given the "magnitude" of the class action and to "ensure that the litigation will proceed expeditiously against Oxford and the experienced counsel it has retained to represent it"). In Oxford, the multiple counsel arrangement was approved "with the understanding that there shall be no duplication of attorneys' services and that the use of co-lead counsel will not in any way increase attorneys' fees and expenses."

n287. Memorandum of the SEC, Amicus Curiae, in In re Milestone Scientific Securities Litig., No. 98-2854, at 4 (D.N.J.) ("The court should not rely on, or give weight to, generic asserted benefits such as assuring input from more rather than fewer class members or lawyers or avoiding disputes among competing

lead plaintiff movants and among their counsel.").

n288. Memorandum of the SEC, Amicus Curiae, in In re Milestone Scientific Securities Litig., No. 98-2854, at 17 (D.N.J.).

n289. See Arthur R. Miller, Attorneys' Fees in Class Actions, at 344 (Federal Judicial Center 1980) (in some class actions, "the attorneys involved will agree among themselves to establish a reasonable structure and present it to the court. Otherwise, the judge should appoint lead counsel or establish any other organizational plan conducive to the management of the case.").

n290. Data from the 1996 Federal Judicial Center study indicates that judges become involved in selecting class counsel in about one in five cases. See Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, Empirical Study of Class Actions in Four Federal Districts 77 (Federal Judicial Center 1996). According to Thomas Willging of the FJC, an "informed but untested hunch" from the data is that "an educated estimate of the amount at stake will be a major factor in a judge's decision about whether to become involved in selecting counsel." The more money at stake, the more likely the judge will be involved in appointing counsel - probably because as the stakes increase, private agreement among the attorneys becomes less likely. Another factor relevant to judicial involvement in selection of counsel is the strength of the case on the merits. Statement of Thomas Willging, submitted to the Task Force, at 5-6.

n291. See Elliott J. Weiss & John S. Beckerman, Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions, *104 Yale L.J. 2053, 2062-63 (1995)* (discussing, and criticizing, cases in which lead counsel was awarded largely on the basis of the first to file).

n292. See, e.g., *TCW Technology Limited Partnership v. Intermedia Communications Inc., 2000 WL 1654504, at 3* (Del. Ch.):

Although it might be thought, based on myths, fables, or mere urban legends, that the first to file a lawsuit in this Court wins some advantage in the race to represent the shareholder class, that assumption, in my opinion, has neither empirical nor logical support.

Too often judges of this Court face complaints filed hastily, minutes or hours after a transaction is announced, based on snippets from the print or electronic media. Such pleadings are remarkable, but only because of the

Case 4:07-cv-05944-JST   Document 165-8   Filed 03/21/08   Page 101 of 108

Page 100
74 Temp. L. Rev. 689, *782

speed with which they are filed in reaction to an announced transaction. It is not the race to the courthouse door, however, that impresses the members of this Court when it comes to deciding who should control and coordinate litigation on behalf of the shareholder class.

Professor Fisch has justly criticized the first to file approach to appointment of lead counsel:

The natural and foreseeable consequence of this approach is the creation of a race to the courthouse. There are at least three problems with this result. First, lawyers are encouraged to file complaints rapidly and defer their investigation of the merits of those complaints until after filing. Second, to file a complaint rapidly, lawyers must seek out prospective plaintiffs rather than waiting to be approached by a disgruntled investor. Finally, class counsel is appointed with little consideration given to qualifications.

Jill E. Fisch, Aggregations, Auctions and Other Developments in the Selection of Lead Counsel Under the PSLRA, 64 Law & Contemp. Probs. 53, 56-57 (2001). See also Herbert B. Newberg & Albert Conte, 3 Newberg on Class Actions 9.35 at 9-96 (3d ed. 1992) ("The first attorney to file is not entitled to special consideration for appointment as lead counsel simply by winning the race to the courthouse.").

n293. The Committee Note to the proposed amendment to Rule 23 states: "The fact that a given attorney filed the action, for example, might not weigh heavily in the decision [to appoint] if that lawyer had not done significant work identifying or investigating claims."

n294. The specific criteria for appointment set forth in the proposed amendment to Rule 23 are: "(i) counsel's experience in handling class actions and other complex litigation, (ii) the work counsel has done in identifying or investigating potential claims in this case, and (iii) the resources counsel will commit to representing the class...." These criteria are not exclusive, however, as the proposal goes on to provide that the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." The Task Force believes the criteria set forth in the text are consistent with and supported by the proposed amendment to Rule 23.

n295. See, e.g., *Feldman v. Hanley, 49 F.R.D. 48, 51 (S.D.N.Y. 1969)* (one counsel chosen over another due to the firm's "long experience and demonstrated skill").

n296. Herbert B. Newberg & Albert Conte, 3 Newberg on Class Actions 9.35 at 9-97 (3d ed. 1992) (relevant factors in the selection of lead counsel "include experience and prior success record").

n297. See *TCW Technology Limited Partnership v. Intermedia Communications Inc., 2000 WL 1654504, at*

Case 4:07-cv-05944-JST   Document 165-8   Filed 03/21/08   Page 102 of 108

Page 101
74 Temp. L. Rev. 689, *782

*4* (Del. Ch.) (stating that "the Court should give weight to the shareholder plaintiff that has the greatest economic stake in the outcome of the lawsuit."). Consideration of this factor is not inconsistent with the Task Force position, supra, that the "most adequate plaintiff" model of the PSLRA should not be extended to other cases. Under the PSLRA, economic loss is the sole factor used to establish the presumptive lead plaintiff. The Task Force position is that the plaintiff's economic stake in the action is a relevant but not dispositive factor.

n298. See *TCW Technology Limited Partnership v. Intermedia Communications Inc., 2000 WL 1654504, at 4* (Del. Ch.) (stating that the court should "accord some weight" to whether counsel has performed with more energy and vigor than other contestants).

n299. See FJC Report, at 91 (noting interviews with a small number of judges experienced in class actions; those judges consider it highly relevant that counsel has previously prosecuted other class actions before the court and fees were reasonable and counsel performed effectively in those actions).

n300. *In re Cendant Corp. Prides Litig., 243 F.3d 722, 742-43 (3d Cir. 2001)* (requiring an ex post assessment of the reasonableness of a fee even where the fee was set ex ante through an auction).

n301. See Manual for Complex Litigation (Third) 24.21 at 195 ("At the commencement of the litigation, the court should also establish guidelines, ground rules, and procedures that will lighten the burdens on the participants, clarify expectations, and reduce the opportunities for disputes. This should be done at an early conference after consultation with counsel"). See also *In re First Fidelity Bancorp Securities Litig., 750 F. Supp. 160, 162 (D.N.J. 1990)* (setting a fee structure at the outset of the case); *Seinfeld v. Coker, Civ. No. 16964, 2000 Del. Ch. LEXIS 172, at 26, n.36* (recognizing that an auction system "may not lead to a fully motivated class counsel, especially if the auction process has caused counsel to discount aggressively their bid," and concluding that negotiated fee arrangements "may provide a superior ex ante approach to creating the proper incentives"); Restatement of the Law Governing Lawyers 251, Comment f. ("A more appropriate arrangement [in class action representations], where possible, is for the lawyer's fee to be negotiated initially by the client and the lawyer at the onset of the relationship, it being understood and disclosed to the client that the award may be scrutinized by the opposing party and approved by the court.").

The Task Force recommendation is basically consistent, in our view, with the recommendations of the 1985 Third Circuit Task Force. The 1985 Task Force suggested, as we do, that the subject of fees should be addressed early in the case. The 1985 Report also suggested that a court might want to consider appointment of a representative to negotiate a fee at the outset with class counsel. We do not reject such an approach, but feel bound to note that we cannot find any instances in which courts have experimented with it. In some cases, the recommendation might work, but even without the appointment of a class representative, the court can engage in preliminary discussions with class counsel as to how the court will approach a fee determination if the class prevails.

Case 4:07-cv-05944-JST   Document 165-8   Filed 03/21/08   Page 103 of 108

Page 102
74 Temp. L. Rev. 689, *782

n302. See *In re Synthroid Marketing Litig., 264 F.3d 712, 719 (7th Cir. 2001)* ("Before the litigation occurs, a judge can design a fee structure that emulates the incentives a private client would put in place."). Model Rule 1.5 requires that fees be set before or a reasonable time after commencing representation in situations where the lawyer has not regularly represented the client. It also provides specific protections to clients paying contingent fees.

n303. See *In re Unisys Corp. Retiree Medical Benefits ERISA Litig., 886 F. Supp. 445, 461 (E.D. Pa. 1995)* (observing that "a negotiated agreement would infuse simplicity, certainty, and fairness into the attorneys' fees process.").

The Committee Note to the proposed amendment to Rule 23 provides:

The court may ... direct counsel to propose terms for a potential award of attorney fees and nontaxable costs... . Attorney fee awards are an important feature of class action practice, and attention to this subject from the outset may often be a productive technique for dealing with these issues. Paragraph (2)(C) therefore authorizes the court to provide directions about attorney fees and costs when appointing class counsel.

The Committee Note to the proposed subdivision (h), providing procedural guidelines for the award of attorney fees, declares that one of the intentions of the proposal is to "afford an opportunity for the court to provide an early framework for an eventual fee award, or for monitoring the work of class counsel during the pendency of the action." The suggestions in the Committee Note to the proposed amendment are consistent with the position of the Task Force that the topic of fees should be addressed at an early stage and throughout the class proceedings.

n304. See, e.g., *Camden I Condominium Assoc., Inc. v. Dunkle, 946 F.2d 768, 774 (11th Cir. 1991)* ("Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class."); *Swedish Hospital Corp. v. Shalala, 1 F.3d 1261, 1272 (D.C. Cir. 1993)* (holding that the percentage of the fund method is the only permissible method for awarding attorney fees in common fund class actions); *Chatelain v. Prudential-Bache Sec., Inc., 805 F. Supp. 209, 215 (S.D.N.Y. 1992)*.

n305. See, e.g., *Hanlon v. Chrysler Corp., 150 F.3d 1011 (9th Cir. 1998)* (approving a fee awarded by use of the lodestar method, and noting that the district court has discretion to use either the lodestar method or the percentage of the fund method for determining fees). For a circuit-by-circuit survey of percentage versus lodestar approach to fee determinations, see Herbert B. Newberg & Albert Conte, 3 Newberg on Class Actions Appendix 14-1 (3d ed. Supp. 2000).

n306. See Court *Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237, 255 (1985)* (criticizing the lodestar approach and recommending the use of the percentage of the fund method in

Case 4:07-cv-05944-JST   Document 165-8   Filed 03/21/08   Page 104 of 108

Page 103
74 Temp. L. Rev. 689, *782

common fund cases).


n307. See, e.g., *Gunter v. Ridgewood Energy Corp., 223 F. 3d 190, 198 (3d Cir. 2000).*


n308. See *In re Cendant Corp. Prides Litig., 243 F.3d 722, 735 (3d Cir. 2001)* (noting that a lodestar cross-check is the "suggested practice for district courts setting fee awards by the percentage-of-recovery method."). See also *In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 333 (3d Cir. 1998)* (stating that "it is sensible for a court to use a second method of fee approval to cross check its initial fee calculation.").


n309. See, e.g., *LaChance v. Harrington, 965 F. Supp. 630, 649 (E.D. Pa. 1997)* (applying the lodestar cross-check to ensure that the percentage awarded did not create an unreasonably high fee). See also *In re Cendant Corp. Litig., 264 F.3d 201, 285 (3d Cir. 2001)* (the goal of the lodestar cross-check "is to ensure that the proposed fee award does not result in counsel being paid a rate vastly in excess of what any lawyer could reasonably charge per hour, thus avoiding a "windfall' to lead counsel.").


n310. See, e.g., *Swedish Hospital Corp. v. Shalala, 1 F.3d 1261, 1269 (D.C. Cir. 1993)* (noting that it "matters little to the class how much the attorney spends in time or money to reach a successful result."); *In re SmithKline Beckman Corp. Securities Litig., 751 F. Supp. 525, 554 (E.D. Pa. 1990)* ("it would be the height of folly to penalize an efficient attorney for settling a case on the ground that less total hours were expended in the litigation.").


n311. See, e.g., *In re Cendant Corp. Litig., 264 F.3d 201, 285 (3d Cir. 2001)* (noting that the lodestar cross-check is "very time consuming.").


n312. See *In re Cendant Corp. Prides Litig., 243 F.3d 722, 735 (3d Cir. 2001)* (referring to lodestar cross-check as a "suggested practice."). The Task Force does not believe it dispositive that the Court in *In re Cendant Corp. Litig., 264 F.3d 201, 285 n. 57 (3d Cir. 2001),* speculated that the Court in Cendant Prides may have raised the lodestar cross-check from discretionary to mandatory. The Court in Cendant Prides referred to the lodestar as a "suggested," not "mandatory" practice. Given all the problems involved in the use of the lodestar, and the solid precedent endorsing the use of the percentage method, the Task Force believes that the Court in Prides would have had to be more explicit than it was to conclude that the lodestar cross-check is now mandatory. The Court in In re Cendant Corp. Litig. only raised the inference of a mandatory lodestar in a sentence that begins, "Arguably...".  *In re Cendant Corp. Litig., 264 F.3d at 285 n.57.*

Case 4:07-cv-05944-JST   Document 165-8   Filed 03/21/08   Page 105 of 108

Page 104
74 Temp. L. Rev. 689, *782

n313. See, e.g., Di Giacomo v. Plains All American Pipeline, Civ. No. H-99-4137, at 23 (S.D. Tex. 2001) (Court conducts a lodestar cross-check but notes that it "will not conduct a detailed analysis of charged hours and hourly rates" because to do so "would undermine the utility of the percentage method.").

n314. See *In re Dreyfus Aggressive Growth Mutual Fund Litig., 2001 WL 709262, at 6* (S.D.N.Y.) (awarding attorney's fees amounting to 15% of the fund, citing the "emerging trend within the Circuit of awarding attorneys considerably less than 30% of common funds in securities class actions, even where there is considerable contingency risk.").

n315. See *Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 52-53 (2d Cir. 2000)* (criticizing the use of a "benchmark" percentage as an "all too tempting substitute for the searching assessment that should properly be performed in each case" and stating that "a fee award should be assessed based on scrutiny of the unique circumstances of each case, and a jealous regard to the rights of those who are interested in the fund.").

n316. See *Mashburn v. National Healthcare, Inc., 684 F. Supp. 679, 692 (M.D. Ala. 1988)* ("There is no general rule of what percentage of a common fund may reasonably be awarded as a fee because the amount of any fee must be determined upon the facts of each case.") See also Bruce Hay, Contingent Fees and Agency Costs, *25 J. Leg. Stud. 503, 521 (1996)* (optimal contingent fee, providing the best incentive to the lawyer and maximum return to the client, depends on the characteristics of the case and thus varies from case to case).

n317. *223 F.3d 190, 195 n.1 (3d Cir. 2000).*

n318. See also *In re Cendant Corp. Prides Litig., 243 F.3d 722, 737-38 (3d Cir. 2001)* (applying the factors set forth in Gunter and reversing a fee award where the district court apparently failed without explanation to consider a number of the factors); *Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 50-54 (2d Cir. 2000)* (citing the Gunter factors with approval). The Task Force notes that the factors listed in Gunter are similar to the factors enumerated in the Rules of Professional Conduct governing the reasonableness of attorney fees generally. See Model Rule 1.5.

n319. See also *In re Cendant Corp. Prides Litig., 243 F.3d 722, 737 (3d Cir. 2001)* (declaring that "a district court may not rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case."). The Conference Report to the PSLRA states, consistent with this precedent, that judges awarding fees are not to be locked into a benchmark. The Report observes that the PSLRA does not fix the percentage of fees and costs counsel may receive, and states that the intent of the Committee was "to give the court flexibility in determining what is reasonable on a case-by-case basis." H.R.

74 Temp. L. Rev. 689, *782

Conf. Rep. 104-369, at 36.

n320. See Testimony of Professor Joseph A. Grundfest at 9, noting that some courts employ a benchmark of 25%, and that there is "no persuasive argument that the norm was ever a reasonable approximation of the fee that would result from an arm's-length bargain over representation in a securities fraud class action lawsuit." For cases departing far downward from any such asserted benchmark, see the cases cited in note 121, supra. See also *In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 339 (3d Cir. 1998)* (noting that the district court in that case "examined the fee awards in class actions with recoveries exceeding $ 100 million and found the fee percentages ranges from 4.1% to 17.92%"); *Shaw v. Toshiba America Information Systems, Inc., 91 F. Supp. 2d 942, 946 (E.D. Tex. 2000)* (14% awarded; court finds it unnecessary to conduct a lodestar cross-check).

The Task Force also notes some substantial evidence that institutional investors have reached fee agreements that award attorneys significantly less than any supposed 25% "benchmark." See State of Wisconsin Investment Board v. Godfield, Civil No. 3:96-CV-1353-R (N.D. Tex.) (18%) ; In re Physicians Computer Network Securities Litig., Civil No. 98-981 (D.N.J.)(15%) ; In re Orbital Sciences Corp. Securities Litig., Civil Action No. 99-197-A (E.D. Va.) (15%); In re UCAR International Inc. Securities Litig., 3098-CV-00600 (D. Ct.) (22.5%); *In re California Micro Devices Securities Litig., 965 F. Supp. 1327, 1331-32* (N.D. Cal.) (less than 8%). See also Statement of Lawrence Sucharow, submitted to the Task Force, at 6 (counsel who represented several institutional lead plaintiffs in class actions concludes that "they frequently interview several firms before selecting one to represent them in a litigation and they often aggressively negotiate the maximum amount lead counsel may seek upon the successful conclusion of a litigation."). While the fee negotiated by an empowered plaintiff must be reviewed for reasonableness at the end of an action under Rule 23 and Cendant Prides, the point is that these cases indicate that there is no need for rigid adherence to a benchmark.

n321. Witnesses before the Task Force suggested additional factors for courts to consider in conducting a fee review at the end of the case. Professor Jill Fisch suggested that counsel be judged against its own undertakings at the beginning of the case in its application to become lead counsel, such as the undertaking to be accountable to class members. Testimony of Professor Jill E. Fisch at 164, March 16, 2001. Professor Joseph Grundfest suggested that the court consider market rates for private commercial recoveries. Testimony of Professor Joseph A. Grundfest at 202, June 1, 2001. One way to bring that information into court is for the court to appoint a special master to report on fees in the relevant market. Testimony of Howard I. Langer at 291, June 1, 2001. Another indicator is "data from securities suits where large investors have chosen to hire counsel up front." *In re Synthroid Marketing Litig., 264 F.3d 712, 720 (7th Cir. 2001)* (noting that data about fee arrangements between counsel and institutional investors "have been widely available since the changes to securities practice wrought by legislation in the mid 1990s."). The Task Force commends all of these factors for consideration by district courts.

Another possible factor to consider in setting the fee, which raises complex issues beyond the scope of this Report, is whether the class action resulted in improvements in corporate governance. See *In re Cendant Corp. Litig., 264 F.3d 201 (3d Cir. 2001)* (approving a settlement including corporate governance changes).

n322. See *In re Synthroid Marketing Litig., 264 F.3d 712, 720 (7th Cir. 2001)* (outcome of auctions can provide some relevant information for the court in awarding fees ex post).

74 Temp. L. Rev. 689, *782

n323. See *In re Cendant Corp. Litig., 264 F.3d 201, 220 (3d Cir. 2001)* (holding that under the PSLRA, "courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel."). See also In re California Micro Devices Securities Litig., Reporter's Transcript of Proceedings of May 24, 2001, Final Fairness Hearing, at 20 (Judge Vaughn R. Walker, N.D. Cal.) ("the best indication that the fee requested is a reasonable one is that it was calculated under a fee arrangement negotiated by sophisticated, informed institutional investors serving as lead plaintiffs.").

n324. The PSLRA requires the court to determine that fees do not exceed "a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." *18 U.S.C. 78u-4*(a)(6). This language does not permit strict scrutiny review of the fee award, given the general premise of the PSLRA that it is the lead plaintiff, and not the court, that is to choose counsel and negotiate the fee. However, the language does justify rejection of fees that are clearly excessive in relation to the amount awarded to the class. See *In re Cendant Corp. Litig. 264 F.3d 201, 283 (3d Cir. 2001)* (noting that the presumption that a negotiated fee was reasonable "may be rebutted by a prima facie showing" that the agreement is "clearly excessive").

n325. For example, if the case appeared at the time of the fee negotiation to be quite difficult and then a bombshell development (such as a public concession from the defendant) resulted in a substantially easier case, a fee award of a high percentage might no longer be justified. See *In re Cendant Corp. Litig., 264 F.3d 210, 282-83 (3d Cir. 2001)* (the presumption that the negotiated fee is reasonable "could likely be abrogated entirely were the court to find that the assumptions underlying the original retainer agreement had been materially altered by significant and unusual factual and/or legal developments that could not reasonably have been foreseen at the time of the original agreement."). Even if the assumptions underlying the original agreement have not materially changed, there may be cases in which subsequent events suggest that some modification - perhaps not huge in percentage or actual terms - might be appropriate. Our assumption is that most of these changes would result in a reduction of fees, a result sought by the objectors in the Cendant litigation. It is possible, however, that litigation might well be so much more onerous or affected by mid-stream changes in the law that both the empowered plaintiff and lead counsel would join in an effort to raise the percentage originally agreed upon. There may also be cases in which lead counsel seeks an increase because of changed circumstances and the empowered plaintiff objects.

n326. If the court had found at the time of appointment of the lead plaintiff that the fee agreement reached with counsel was not the result of bargaining, then that would have been a reason to hold the lead plaintiff inadequate under the terms of the PSLRA, or to order such negotiations to take place. It is possible, however, that information about the fee negotiation might not be presented at the time of appointment. See *In re Cendant Corp. Litig., 264 F.3d 201, 257 (3d Cir. 2001)* (noting that the PSLRA does not require the putative lead plaintiff to volunteer information concerning fee negotiations at the outset of the case). The fact that a failure to negotiate comes to light in an ex post review does not diminish its importance. Moreover, if there is an allegation of "pay-to-play" that arises late in the litigation, the court may want to hear evidence with regard to the allegation because such evidence may undermine a claim of arm's-length, good faith bargaining.

1248JW

********** Print Completed **********

Time of Request: Thursday, March 15, 2007  14:09:37 EST

Print Number:   1823:17570880
Number of Lines: 3260
Number of Pages: 106

Send To:  KARON, DANIEL
          GOLDMAN SCARLATO & KARON
          101 W ELM ST STE 360
          CONSHOHOCKEN, PA 19428-2075