1248JW

**Time of Request:** Thursday, March 15, 2007   14:11:00 EST
**Client ID/Project Name:** Indirect Plastic Additives
**Number of Lines:** 897
**Job Number:**      2822:17571161

Research Information

**Service:**    LEXSEE(R) Feature
**Print Request:** Current Document: 1
**Source:** Get by LEXSEE(R)
**Search Terms:** 46 santa clara l rev 567

**Send to:**   KARON, DANIEL
          GOLDMAN SCARLATO & KARON
          101 W ELM ST STE 360
          CONSHOHOCKEN, PA 19428-2075

LEXSEE 46 SANTA CLARA L REV 567

Copyright (c) 2006 School of Law, Santa Clara University
Santa Clara Law Review

2006

*46 Santa Clara L. Rev. 567*

**LENGTH:** 11166 words

ARTICLE: "HOW DO YOU TAKE YOUR MULTI-STATE, CLASS-ACTION LITIGATION? ONE LUMP OR TWO?" INFUSING STATE CLASS-ACTION JURISPRUDENCE INTO FEDERAL, MULTI-STATE, CLASS-CERTIFICATION ANALYSES IN A "CAFA-NATED" WORLD

**NAME:** Daniel R. Karon*

**BIO:** * B.A., Indiana University-Bloomington, 1988; J.D., The Ohio State University College of Law, 1991. The author is an adjunct faculty member at Cleveland-Marshall College of Law, Cleveland State University where he teaches class-action law He is a member of Loyola University Chicago School of Law's Institute for Consumer Antitrust Studies' U.S. Advisory Board and co-chairs the ABA's Class Action and Derivatives Suits Committee's Antitrust Subcommittee. He is a class-action trial attorney specializing in antitrust, consumer-fraud, and securities-fraud litigation and manages Goldman Scarlato & Karon, P.C.'s Cleveland, Ohio office.

**SUMMARY:**
 ...  By federalizing essentially all interstate class-action lawsuits, CAFA introduced multiple substantive, jurisdictional, and other theoretical challenges that the bench and bar will need to work through together, hopefully to sensible resolutions. ...  But even though federal courts regularly apply state substantive law in diversity cases, this particular state-law issue is curious in that it involves a procedural overlay - Federal Rule 23 - that affects federal courts' traditional ability to invoke state substantive law and to conduct multi-state, class-certification analyses. ... Where federal courts, pre-CAFA, were asked to consider multi-state class certification - because, for instance, diversity existed and the requested injunctive relief was considered as meeting or exceeding the jurisdictional amount in controversy - federal courts, as first suggested by Hague and later by Shutts, sometimes invoked Klaxon to conclude that the forum state's choice-of-law rules applied, pursuant to which these courts could blithely rule that one state's substantive law applied to the controversy: ... More generally, Erie is understood to mean that "federal courts sitting in diversity cases, when deciding questions of "substantive' law, are bound by state court decisions as well as state statutes. ...

**TEXT:**
 [*567]

    I. Introduction

    The Class Action Fairness Act of 2005 n1 (CAFA) arguably created more problems than it solved. n2 By federalizing  [*568]  essentially all interstate class-action lawsuits, n3 CAFA introduced multiple substantive, jurisdictional, and other theoretical challenges that the bench and bar will need to work through together, hopefully to sensible resolutions. One of these challenges concerns whether federal judges may rely on years of state class-action jurisprudence to decide class certification under *Federal Rule of Civil Procedure 23* when considering multi-state, class-action lawsuits alleging a single state law's substantive application.

Before CAFA, federal courts conducted multi-state, substantive-law analyses infrequently. CAFA has changed this situation markedly, and denying federal courts the ability to invoke years of well-developed, state-court jurisprudence forces them to decide multi-state class certification alleging a single state law's substantive application from a somewhat blank legal slate. But even though federal courts regularly apply state substantive law in [*569] diversity cases, n4 this particular state-law issue is curious in that it involves a procedural overlay - Federal Rule 23 - that affects federal courts' traditional ability to invoke state substantive law and to conduct multi-state, class-certification analyses.

After describing the recently enacted Class Action Fairness Act and the way it fundamentally changed traditional, interstate class-action subject-matter jurisdictional conventions, n5 this Article will explain the choice-of-law conundrum that CAFA created. n6 It will next demonstrate why state choice-of-law jurisprudence, taken alone, insufficiently resolves this predicament n7 and will then describe why the U.S. Supreme Court's Erie R.R. Co. v. Tompkins n8 and its progeny n9 become critical to this newly required jurisdictional analysis. n10 Finally, it will conclude, despite the admitted, if not predominant, procedural nature of a Federal Rule 23 class-certification analysis, that consistent with U.S. Supreme Court doctrine - albeit never intended to be so invoked - federal courts may draw upon state-law decisions alleging a single state law's substantive application when deciding multi-state class certification under Federal Rule 23.

II. CAFA and Its Effect on Traditional, Interstate Class-Action Subject-Matter Jurisdiction

CAFA fundamentally changed federal subject-matter jurisdictional doctrine as it relates to class-action claims based on diversity jurisdiction. n11 Before CAFA amended *28* [*570] *U.S.C. 1332* - the federal diversity-jurisdiction statute - to create federal jurisdiction for claims involving minimal diversity n12 and amounts in controversy that, individually, total less than $ 75,000, n13 federal courts were not permitted to aggregate class members' claims to establish the jurisdictional minimum.

In Snyder v. Harris, n14 a class-action shareholder lawsuit and the seminal case concerning non-aggregation, n15 the U.S. Supreme Court explained that "when two or more plaintiffs, having separate and distinct demands, unite for convenience and economy in a single suit, it is essential that the demand of each be of the requisite jurisdictional amount." n16 The Snyder Court based its ruling on two considerations. First, the Court sensed that a contrary holding would wreak havoc on the federal judiciary's workload. n17 Second, it believed that Congress had come to rely on the Court's interpretation in continually re-enacting 1332's amount-in-controversy threshold. n18

Harkening back to Snyder, the Court in Zahn v. International Paper Co., n19 later elucidated that "class actions involving plaintiffs with separate and distinct claims were subject to the usual rule that a federal district court can [*571] assume jurisdiction over only those plaintiffs presenting claims exceeding the $ 10,000 n20 minimum specified in 1332[, and that a]ggregation of claims was impermissible." n21 Instead, "each plaintiff in a Rule 23(b)(3) class action must satisfy the jurisdictional amount, and any plaintiff who does not must be dismissed from the case ... ." n22 And while the Zahn Court never expressly mentioned supplemental jurisdiction (or its antecedents, pendent and ancillary jurisdiction), the Court's language also effectively precluded district courts from exercising subject-matter jurisdiction over class members with (at least arguably) less than $ 75,000 in damages. n23 Accordingly, district courts could not automatically consider absent class members' claims even if the named plaintiffs' claimed that damages satisfied the minimum jurisdictional requirement. n24

[*572] But believing, due to Snyder and Zahn's non-aggregation rule, that "class-actions [were long being] manipulated for personal gain," n25 and that "lawyers who represent plaintiffs from multiple states [were] shopping around for the state court where they expected to win the most money," n26 on February 10, 2005, Congress passed CAFA, and on February 18, 2005, President Bush signed it into law. CAFA amended 1332 and abrogated Zahn, thus creating original federal-court jurisdiction for class-action claims that exceed $ 5,000,000 in potential aggregate damages. n27 Accordingly, [*573] plaintiffs can no longer pursue multi-state, class-action cases in state courts - assuming their claims involve any meaningful class-wide damages (i.e., over $ 5,000,000) - but must instead file in federal court. In this manner, at least as contemplated by President Bush and Congress, class-action defendants will be

treated more fairly; although, not surprisingly, debate raged, and still does, concerning this belief's soundness and CAFA's fairness. n28 But regardless of [*574] this debate's eventual outcome, CAFA effectively ended the days of filing multi-state, class-action lawsuits in state courts.

III. The Choice-of-Law Problem CAFA Created

Having explained CAFA's contours and how it fundamentally changed federal-diversity jurisdiction, an example will help elucidate the substantive-procedural/choice-of-law issue that CAFA inadvertently created. In the pre-CAFA (or "de-CAFA-nated") world, plaintiffs routinely filed multi-state, class-action cases in state courts. n29 Plaintiffs based this practice on the U.S. [*575] Supreme Court's Phillips Petroleum v. Shutts n30 decision, which plaintiffs regularly cite for the proposition that a court (formerly a state court) can certify a multi-state class action under a single state's substantive law.

Shutts involved gas royalty owners' claims against Philips Petroleum for delaying royalty payments. n31 The royalty owners resided in all fifty states, n32 but three of them, including Shutts, filed a class-action lawsuit in Kansas, where Shutts lived, alleging that Phillips had violated Kansas contract and equity law. n33 Plaintiffs argued that Kansas substantive law governed the entire class's claims "notwithstanding that over 99% of the gas leases and some 97% of the plaintiffs ... had no apparent connection to the State of Kansas except for the lawsuit." n34 Although Phillips argued that "the trial court should have looked to the laws of each State where the leases were located to determine, on the basis of conflict of laws principles, whether interest on the suspended royalties was recoverable, and at what rate," n35 the Kansas Supreme Court "stated that generally the law of the forum controlled all claims unless "compelling reasons' existed to apply a different law." n36 Finding no compelling reasons, it affirmed the trial court's decision applying Kansas substantive law to the entire class's claims. n37

On appeal to the U.S. Supreme Court, Phillips argued that applying Kansas substantive law "violated the constitutional limitations on choice of law mandated by the Due Process Clause of the Fourteenth Amendment and the [*576] Full Faith and Credit Clause." n38 Drawing upon its earlier Allstate Insurance Co. v. Hague n39 decision, which also involved a choice-of-law determination, n40 the Court explained that "in many situations a state court may be free to apply one of several choices of law." n41 The Court ruled that doing so in a class-action setting is appropriate so long as the law sought to be applied "is not in conflict with that of any other jurisdiction connected to the suit." n42 If a conflict exists, the state whose law plaintiff seeks to apply "must have a "significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class ... "creating state interests,' in order to ensure that the choice of [one state's] law is not arbitrary or unfair." n43 Considering Kansas's "lack of "interest' in claims unrelated to [Kansas, as well as] the substantive conflict with jurisdictions such as Texas," n44 the Court concluded that the "application of Kansas law to every claim in [the] case [was] sufficiently arbitrary and unfair as to exceed constitutional limits" n45 and the Court refused to apply Kansas substantive law to the multi-state class members' claims. n46

[*577] Given Shutts's teachings, a hypothetical best demonstrates how Shutts affected multi-state, class-action lawsuits. If a plaintiff, pre-CAFA, filed a multi-state, class-action lawsuit against, for example, an Ohio corporation in Ohio state court for breach of contract, plaintiff's theory for countering defendant's "predominance" argument n47 during the class-certification stage and obtaining nationwide class certification would be that, under Shutts's first prong, Ohio's contract law does not conflict with any other state's contract law; therefore, Ohio law applies to class members located in multiple states. n48 On the other hand, if plaintiff's lawsuit alleged that defendant had violated Ohio's Consumer-Protection Act, n49 plaintiff's response to defendant's [*578] predominance argument and theory for obtaining nationwide class certification would be that, under Shutts's second prong, applying Ohio substantive law - Ohio's Consumer-Protection Act - neither violates due process nor creates fundamental unfairness because defendant is headquartered in Ohio, defendant's scheme was hatched and implemented in Ohio, and defendant profited from its fraud in Ohio. n50 Importantly (and germane to this Article), when making either argument plaintiff would invoke all Ohio state-court, class-action decisions applying Ohio substantive law to multi-state classes. And defendant, of course, would cite all Ohio state-court, class-action decisions refusing to apply Ohio substantive law to multi-state classes.

46 Santa Clara L. Rev. 567, *578

But in today's CAFA-nated world, defendant would immediately remove plaintiff's state-court, multi-state, class-action lawsuit to federal court. n51 Once there, a major issue at [*579] class certification would be to what extent, if any, the federal judge could call upon or properly be influenced by Ohio state-court decisions considering class certification under Ohio Rule 23 and applying (or not) Ohio's substantive law to multi-state classes. After all, class certification is a procedural question under Federal Rule 23, and, as such, the U.S. Supreme Court's Erie decision, n52 generally directing that federal courts in diversity cases (which multi-state class actions are) must apply state substantive law but are directed to apply federal procedural law, n53 arguably requires the federal judge to consider only federal jurisprudence.

But can't it be suggested that determining whether a particular state's substantive law applies to class-wide claims is a substantive question to be decided under the forum state's jurisprudence, meaning that federal judges may consider and apply state law, whether the forum state's or some other's, when deciding predominance under Federal Rule 23? n54 If so, [*580] might the fact that a federal court is considering what state's substantive law to use render this inquiry substantive despite the court's larger procedural analysis? Thus, might a federal court's procedural class-action analysis be permitted a "substantive twist," specifically where predominance under Federal Rule 23(b)(3) (i.e., which state's or states' substantive law should apply) is concerned? And if so, does considering state-court, class-action decisions run afoul of Erie, or is making a substantive inquiry when conducting a larger procedural one a necessary part of a new CAFA-nated, class-action analysis? n55

[*581]

IV. The Fallacy of Relying Exclusively on State Choice-of-Law Jurisprudence

When attempting to resolve this conundrum, federal courts might be inclined to rely principally, if not exclusively, on state choice-of-law jurisprudence and the U.S. Supreme Court's Klaxon Co. v. Stentor Electric Manufacturing Co. n56 holding. The Klaxon Court considered whether, in a diversity case, federal courts must follow conflict-of-laws rules prevailing in the forum state. n57 Explaining that Erie's scope extended to the field of conflict of laws, n58 the Klaxon Court ruled that "the conflict of laws rules to be applied by the [sitting] federal court ... must conform to those prevailing in [the forum state's] state courts." n59

Where federal courts, pre-CAFA, were asked to consider multi-state class certification - because, for instance, diversity existed and the requested injunctive relief was considered as meeting or exceeding the jurisdictional amount in controversy n60 - federal courts, as first suggested by Hague [*582] and later by Shutts, sometimes invoked Klaxon to conclude that the forum state's choice-of-law rules applied, pursuant to which these courts could blithely rule that one state's substantive law applied to the controversy:

If a conflict of law is found to exist in this [multi-state, class-action] litigation, this Court, sitting in diversity, is bound to apply the choice of law rules of the forum state, New York. In the event that a conflict of substantive law [does] exist ... New York courts apply a "center of gravity" or "grouping of contracts" test ... and apply "the law of the jurisdiction having the greatest interest in the litigation." n61

But a traditional choice-of-law analysis and decision that predominance is satisfied under the forum state's substantive law fails to consider the larger procedural overlay that courts must appreciate when analyzing a procedural question under Federal Rule 23. A shorthand analytical approach, per Klaxon, ignores Erie and its progeny's generally understood directive to consider federal law with respect to procedural matters and state law with respect to substantive matters; although, a Federal Rule 23 predominance analysis may well be a substantive matter, just not entirely. n62

Moreover, conducting solely a Hague/Shutts analysis and determining "that for a State's substantive law to be [*583] selected in a constitutionally permissible manner, that State must have a significant contact or significant

aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair," n63 also undermines, indeed entirely neglects, any meaningful procedural analysis. Any federal court merely contemplating the substantive choice-of-law issues raised by Hague and Shutts, while ignoring the procedural realities that a Rule 23 predominance analysis necessarily engenders, similarly ignores the Supreme Court's long-standing Erie doctrine and instead favors another analytically short-shrift choice-of-law approach when considering multi-state, class-action litigation and a single state law's substantive application.

V. Erie and its Progeny

Examining Erie R.R. Co. v. Tompkins n64 and its progeny provides some better and more complete guidance concerning federal courts' ability to invoke state-law jurisprudence when considering multi-state, class-action claims and applying a single state's substantive law.

A. The Erie Doctrine

Appreciating Erie first requires an explanation and understanding of the U.S. Supreme Court's Swift v. Tyson n65 decision. In Swift, the Court held that federal courts exercising diversity jurisdiction in general jurisprudential matters were not required to apply the forum state's unwritten laws. Rather, federal courts could exercise independent judgment as to what the state's common law was or should have been:

The true interpretation of the 34th section [of the 1789 Judiciary Act] limited its application to state laws strictly local, that is to say, to the positive statutes of the state, and the construction thereof adopted by the local tribunals, and to rights and titles to things having a permanent locality, such as the rights and titles to real estate, and other matters immovable and intraterritorial in their nature and character. It never has been supposed [*584] by us, that the section did apply, or was designed to apply, to questions of a more general nature, not at all dependent upon local statutes or local usages of a fixed and permanent operation, as, for example, to the construction of ordinary contracts or other written instruments, and especially to questions of general commercial law, where the state tribunals are called upon to perform the like functions as ourselves, that is, to ascertain upon general reasoning and legal analogies, what is the true exposition of the contract or instrument, or what is the just rule furnished by the principles of commercial law to govern the case. And we have not now the slightest difficulty in holding, that this section, upon its true intendment and construction, is strictly limited to local statutes and local usages of the character before stated, and does not extend to contracts and other instruments of a commercial nature, the true interpretation and effect whereof are to be sought, not in the decisions of the local tribunals, but in the general principles and doctrines of commercial jurisprudence. Undoubtedly, the decisions of the local tribunals upon such subjects are entitled to, and will receive, the most deliberate attention and respect of this court; but they cannot furnish positive rules, or conclusive authority, by which our own judgments are to be bound up and governed. n66

The Erie Court reworked its Swift holding considerably. In Erie, an object protruding from an Erie freight train injured Tompkins, a Pennsylvania resident, while he was walking in Pennsylvania along a commonly used beaten footpath that ran alongside the railroad tracks. n67 When Tompkins brought his claim in New York federal court, because Erie was incorporated there, n68 Erie contended that under Pennsylvania law, "its duty to Tompkins was no greater than that owed to a trespasser." n69 For Tompkins's part, he "denied that any such rule had been established by the decisions of the Pennsylvania courts; and contended that, since there was no statute of the State on the subject, the railroad's duty and liability [was] to be determined in federal [*585] courts as a matter of general law," which favored Tompkins. n70 "The question for decision," explained the Court, was "whether the oft-challenged doctrine of Swift v. Tyson shall now be disapproved." n71

The Erie Court explained that the Swift doctrine had exposed serious political and social defects, that Swift's expected benefits had never accrued, and that persistent state courts' questions concerning common law had prevented

46 Santa Clara L. Rev. 567, *585

uniformity:

The mischievous results of the doctrine had become apparent. Diversity of citizenship jurisdiction was conferred in order to prevent apprehended discrimination in state courts against those not citizens of the State. Swift v. Tyson introduced grave discrimination by non-citizens against citizens. It made rights enjoyed under the unwritten "general law" vary according to whether enforcement was sought in the state or in the federal court; and the privilege of selecting the court in which the right should be determined was conferred upon the non-citizen. Thus, the doctrine rendered impossible equal protection of the law. In attempting to promote uniformity of law throughout the United States, the doctrine had prevented uniformity in the administration of the law of the State. n72

 The Court added that Justice Holmes, in Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co., n73 had articulated the "fallacy" n74 underlying Swift's rule:

The doctrine rests upon the assumption that there is "a transcendental body of law outside of any particular State but obligatory within it unless and until changed by statute," that federal courts have the power to use their judgment as to what the rules of common law are; and that in the federal courts "the parties are entitled to an independent judgment on matters of general law":

 "But law in the sense in which courts speak of it today does not exist without some definite authority behind it.  [*586] The common law so far as it is enforced in a State, whether called common law or not, is not the common law generally but the law of that State existing by the authority of that State without regard to what it may have been in England or anywhere else... .

 "The authority and only authority is the State, and if that be so, the voice adopted by the State as its own [whether it be of its Legislature or of its Supreme Court] should utter the last word." n75

 Accordingly, the Erie Court overruled Swift and held that "except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State... . There is no federal general common law." n76 Thus, under Pennsylvania law, the only duty owed to Tompkins, a trespasser, "was to refrain from wilful [sic] or wanton injury." n77

    More generally, Erie is understood to mean that "federal courts sitting in diversity cases, when deciding questions of "substantive' law, are bound by state court decisions as well as state statutes." n78 But later Supreme Court decisions considering other federal/state-law quandaries transformed Erie's lesson and reshaped Erie's mandate. And these later Erie-related cases - Erie's progeny - help elucidate Erie's ultimate utility when conducting a CAFA-nated, choice-of-law analysis.

    B. Erie's Transformation: Guaranty Trust Co. v. York

 Of Erie's progeny, Guaranty Trust Co. v. York n79 offers perhaps the most valuable analytical succor, at least for this Article's purpose. In York, plaintiff-noteholder brought a class-action lawsuit in federal court based on diversity of citizenship. n80 Plaintiff alleged breach of trust by defendant for defendant's alleged failure to protect her and other noteholders' interests. n81 The district court granted defendant's motion for summary judgment, in which  [*587]

defendant argued that the state statute of limitations had precluded plaintiff's lawsuit. n82 The Second Circuit reversed, explaining that the district court was "not required to apply the State statute of limitations that ... governed like suits in the courts of a State where the federal court [was] sitting even though the exclusive basis of federal jurisdiction [was] diversity of citizenship." n83

The Supreme Court was "concerned with the [appellate court's] holding that the federal courts in a suit like [that] one [were] not bound by local law." n84 As this concern specifically affected the state statute of limitations, the Court believed the case "reduced itself to the narrow question whether, when no recovery could be had in a State court because the action [was] barred by the statute of limitations, a federal court in equity [could] take cognizance of the suit because there [was] diversity of citizenship between the parties." n85

The Court's analysis underscored Erie's objective to ensure that where a federal court is exercising diversity jurisdiction, the litigation's outcome in federal court should be substantially the same as if tried in state court:

Is the outlawry [or endorsement], according to State law, of a claim created by the States a matter of "substantive rights" to be respected by a federal court of equity when that court's jurisdiction is dependent on the fact that there is a State-created right, or is such statute of "a mere remedial character," ... which a federal court may disregard? n86

Withdrawing from Erie's substantive versus procedural construct, the Court explained that "matters of 'substance' and matters of 'procedure' are much talked about in the books as though they define[] a great divide cutting across the whole domain of law. But of course 'substance' and 'procedure' are the same keywords to very different problems." n87 The Court therefore reformulated the question it [*588] had considered in Erie, focusing no longer on the substantive-procedural distinction but rather marking the emergence of its "outcome determinative test":

And so the question is not whether a statute of limitations is deemed a matter of "procedure" in some sense. The question is whether such a statute concerns merely the manner and the means by which a right to recover, as recognized by the State, is enforced, or whether such statutory limitation is a matter of substance in the aspect that alone is relevant to our problem, namely, does it significantly affect the result of a litigation for a federal court to disregard a law of a State that would be controlling in an action upon the same claim by the same parties in a State court? n88

The Court considered it "immaterial whether statutes of limitation [were] characterized either as 'substantive' or 'procedural,'" n89 as Erie never endeavored to formulate scientific terminology. Rather, Erie expressed a policy touching vitally on the judicial power's proper distribution between state and federal courts. n90 And despite lower courts' sometimes slavish adherence to nomenclature, Erie's intent was to ensure the same result in state and federal courts exercising diversity jurisdiction, not to entangle courts with analytical or terminological niceties:

The intent of [Erie] was to insure that, in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court. The nub of the policy that underlies Erie R.R. Co. v. Tompkins is that for the same transaction the accident of a suit by a non-resident litigant in a federal court instead of in a State court a block away should not lead to a substantially different result. n91

A federal tribunal, explained the Court, does not afford out-of-state litigants another body of law. n92 Rather, state law [*589] is the source of substantive rights enforced by a federal court exercising diversity jurisdiction:

Here we are dealing with a right to recover derived not from the United States but from one of the States. When, because the plaintiff happens to be a non-resident, such a right is enforceable in a federal as well as in a State court, the forms and mode of enforcing the right may at times, naturally enough, vary because the two judicial systems are not identic. But since a federal court adjudicating a State-created right solely because of the diversity of citizenship of the parties is for that purpose, in effect, only another court of the State, it cannot afford recovery if the right to recover is made unavailable by the State nor can it substantially affect the enforcement of the right as given by the State. n93

 In keeping with its purpose to avoid federal courts reaching different results than state courts, the Court ruled that the state statute of limitations applied to plaintiff's claim. n94

   C. York's "Outcome-Determinative" Test Modified: Byrd v. Blue Ridge Rural Electric Cooperative, Inc.

 The Court modified its outcome-determinative test thirteen years later in Byrd v. Blue Ridge Rural Electric Cooperative, Inc. n95 The question on remand in Byrd was who should decide the factual issue of whether plaintiff was an employee or independent contractor - the judge or the jury? n96 Under state law, the judge decided this question, while under federal law, the jury decided it. The Court reiterated Erie's directive that "federal courts in diversity cases must respect the definition of state-created rights and obligations by the state courts." n97 It therefore examined state law to determine whether the particular judge versus jury issue was "bound up with these rights and obligations in such a way that its application in the federal court [was] required." n98

   [*590]  The Court first reiterated York's outcome-determinative test and acknowledged that this test broadened Erie:

Cases following Erie have evinced a broader policy to the effect that the federal courts should conform as near as may be - in the absence of other considerations - to state rules even of form and mode where the state rules may bear substantially on the question whether the litigation would come out one way in the federal court and another way in the state court if the federal court failed to apply a particular local rule. n99

 The Court then withdrew slightly from York's test, explaining that under certain conditions federal law trumped state law:

There are affirmative countervailing considerations at work here. The federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction. An essential characteristic of that system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury and, under the influence - if not the command - of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury. The policy of uniform enforcement of state-created rights and obligations cannot in every case exact compliance with a state rule - not bound up with rights and obligations - which disrupts the federal system of allocating functions between judge and jury. Thus the inquiry here is whether the federal policy favoring jury decisions of disputed fact questions should yield to the state rule in the interest of furthering the objective that the litigation should not come out one way in the federal court and another way in the state court. n100

 The Court believed that the federal court in Byrd should not have followed the state rule because it "[could not] be [disputed]" that there is a strong federal policy against allowing state rules to disrupt the judge-jury relationship in the federal courts." n101 As an additional basis for its decision, the Court added that, with respect to the litigation's potentially different outcome based on "whether the issue of immunity [was] decided by a judge or jury," n102 it did not

46 Santa Clara L. Rev. 567, *591

[*591]  "think the likelihood of a different result [was] so strong as to require the federal practice of jury determination of disputed factual issues to yield to the state rule in the interest of uniformity of outcome." n103

This wrinkle to York's outcome-determinative test requires federal courts to weigh the policies behind the relevant federal and state rules in determining whether a substantial possibility exists that different results will occur under federal law. Thus, if the state practice reflects a weak state policy - one "not bound up" with the underlying state statute - the federal practice reflects a strong policy - like the Seventh Amendment's jury trial guarantee - and if no substantial possibility exists that different results will occur by using federal law, then the federal practice is preferred.

    D. A Return to York: Hanna v. Plumer

 Seven years after Byrd, the Court swung back Erie and York's way in Hanna v. Plumer. n104 In Hanna, the Court considered whether to require "service of process ... in the manner prescribed by state law or that set forth in *Rule 4(d)(1) of the Federal Rules of Civil Procedure*." n105 Synthesizing the preceding cases, the Court again acknowledged Erie's rule that "federal courts sitting in diversity cases, when deciding questions of "substantive' law, are bound by state court decisions as well as state statutes." n106 It clarified that under York, "Erie-type problems were not to be solved by reference to any traditional or common-sense substance-procedure distinction." n107 As the Court had explained in Byrd, York's outcome-determinative test "was never intended to serve as a talisman." n108 Instead, York required that "choices between state and federal law are to be made not by application of any automatic, "litmus paper' criterion, but rather by reference to the policies underlying  [*592]  the Erie rule." n109

    Applying *Federal Rule of Civil Procedure 4(d)(1)*, the Court reiterated that the natural difference between federal and state courts ought not substantively affect a claim just because the claim is pending in federal court. "Erie and its offspring," explained the Court, "cast no doubt on the long-recognized power of Congress to prescribe housekeeping rules for federal courts even though some of those rules will inevitably differ from comparable state rules." n110 Rather, federal courts' natural "housekeeping rules" should not affect the essence of claims brought in federal court, and federal courts should avoid inequitably administering state substantive laws merely because diversity exists and the claims reside in federal court.

    VI. Federal Courts' Freedom to Consider State-Court, Class-Action Jurisprudence

 How does all this affect whether federal courts, when considering multi-state class certification under Federal Rule 23 pursuant to a single state's substantive law, may rely on state-court decisions applying a single state's substantive law? After all, multiple state-law decisions exist upon which federal judges can potentially draw when considering the multi-state, class-certification issues that state-court judges had previously decided for years. n111

    Given that Federal Rule 23 is, of course, a procedural rule, analyzing this question exclusively under Erie encourages solely applying federal decisions when deciding class certification. But as we know, class certification, particularly when considering a single state law's substantive application under Federal Rule 23's predominance requirement, isn't entirely a procedural undertaking - various courts' Klaxon analyses, which analyze and apply states' substantive laws, confirm this. n112

    [*593]  Instead, state laws undeniably create the claims upon which most multi-state, class-action lawsuits are based, whether involving consumer fraud, n113 deceptive trade practices, n114 breach of contract, n115 unjust enrichment, n116 or  [*594]  some other state-law statutory or common-law theory. In this manner, state laws and their application cannot help but to "significantly affect the result of a litigation," n117 since federal lawsuits based on diversity jurisdiction necessarily involve state-law claims. Accordingly, neglecting state law, either substantive or sometimes procedural, would preclude federal courts from fully and properly deciding multi-state, class-action claims under a single state's substantive law.

    Erie made clear that state substantive law had a significant place in federal courts' legal analyses. Indeed, York

confirmed that federal courts may not disregard state law as explicated in state-court decisions. After all, if Erie's intent was to ensure the same substantive results in federal courts exercising diversity jurisdiction as in state courts, and state law is the source from which all substantive rights enforced by federal courts exercising diversity jurisdiction derive, then no more authoritative source for state law exists than state-court decisions, including state-court decisions considering a single state law's substantive application under state class-action rules.

Moreover, considering state-court, class-action decisions advances Erie and its progeny's directive that a lawsuit's outcome remains substantially the same despite the court in which the lawsuit is pending. And although Byrd scaled back York's outcome-determinative test, explaining that uniformly applying state-created rights and obligations (here, state-law, class-action decisions interpreting and applying state substantive law) need not apply where these state laws are "not bound up with the [state] rights and obligations" n118 sought to be invoked, state-court, class-action decisions can fairly be considered as bound up with - or essential to - state class-action rules' fundamental purposes since, in light of these rules' purposes, state-court, class-action decisions considered, interpreted, and applied these state class-action rules from the time these rules were enacted. Moreover, acceding to state-court decisions doesn't risk disrupting or otherwise offending the federal system, as occurred in Byrd since almost all state class-action statutes mirror Federal [*595]  Rule 23. n119

Viewed from the opposite end, using federal class-action decisions alone is not so bound up in Federal Rule 23's predominance analysis - like, for example, the right to a jury trial is in the Constitution n120 - that state-court jurisprudence considering predominance should be abandoned, especially considering the near, if not complete, identity between most states' class-action rules and Federal Rule 23. n121 To be sure, no "strong federal policy" n122 exists against federal courts using state-court, class-action decisions when analyzing the identical predominance inquiries and single state law's classwide application that had principally been, until recently, considered in state courts. And a predominance inquiry's outcome may differ based on the influence of the state-court decisions invoked versus the comparably limited federal authority on this newly developing subject, which is yet another basis Byrd suggested for invoking state substantive law and, accordingly, state-court decisions.

As suggested by Hanna, the fact that CAFA has federalized essentially all interstate, class-action claims should not substantively affect these claims' determination. Although state and federal courts are not identical, federal courts should avoid ignoring or inequitably administering state laws merely because CAFA now confers original federal-court, subject-matter jurisdiction on interstate, class-action lawsuits. Rather, federal courts' adherence to state-court, class-certification jurisprudence advances Erie and its progeny's age-old pronouncements and helps ensure that federal judges will decide newly federalized state-court claims substantially the same in federal court - their new forum - as state-court judges had traditionally decided these claims in state court.

Finally, as a practical matter, absent state-law consideration, federal courts sitting in diversity - many of  [*596] which will imminently be considering this issue for the first time - will lack significant guidance concerning applying a single state's substantive law to multi-state claims. To abandon years of well-developed, state-court jurisprudence forces busy and newly challenged federal judges to analyze this issue from a largely blank federal slate, surely an undesirable consequence n123 and one that hardly comports with the judiciary's obvious and fundamental interest to adjudicate claims - especially class-action claims - judiciously, efficiently, and economically. n124

VII. Conclusion

 Whether to apply a single state's substantive law when considering predominance under Federal Rule 23 necessarily traverses the substantive and procedural divide, and this query's unique nature evokes Erie's fundamental essence. Examining Erie and its progeny alongside Klaxon, Hague, and Shutts demonstrates that federal courts may, in fact, consider state-court decisions when deciding multi-state class certification alleging a single state law's substantive application. Indeed, considering state-court jurisprudence respects Erie's original mandate while embracing its progeny's amplifications and nuances.

46 Santa Clara L. Rev. 567, *596

And although this issue is merely one of the many still to come from CAFA's recent enactment, as federal, multi-state, class-action lawsuits move toward class certification, this issue will surely receive significant attention. Erie and its progeny, although never contemplating their invocation in this new world order, nonetheless demonstrate the appropriateness of invoking state-law, class-action [*597] jurisprudence in federal class-certification proceedings considering a single state law's substantive application. Federal courts considering multi-state class certification under Federal Rule 23 may therefore sit back and drink in state-court, class-action jurisprudence involving, analyzing, and determining single state laws' substantive application in today's CAFA-nated world.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Civil ProcedureJurisdictionGeneral OverviewCivil ProcedureFederal & State InterrelationshipsErie DoctrineCivil ProcedureClass ActionsCertification

**FOOTNOTES:**

n1. *28 U.S.C. 1332*(d) (LexisNexis 2005).

n2. For example, by way of unintended consequences, federal court antitrust filings have already begun to increase because price-fixed products' indirect purchasers can't bring lawsuits under the Clayton Act, *15 U.S.C. 4* (2000), for violating the Sherman Act, *15 U.S.C. 1* (2000), yet can make claims under certain states' antitrust or consumer-fraud statutes, see Daniel R. Karon, "Your Honor, Tear Down That Illinois Brick Wall!" The National Movement Toward Indirect Purchaser Antitrust Standing and Consumer Justice, *30 Wm. Mitchell L. Rev. 1351, 1401 (2004)* (arguing that "thirty-nine (and arguably as many as forty-four) states grant indirect purchasers standing, either on their own or through their attorneys general as parens patriae, to pursue price fixing claims"), and common law. See Daniel R. Karon, Undoing the Otherwise Perfect Crime - Applying Unjust Enrichment to Consumer Price-Fixing Claims, *108 W. Va. L. Rev. 395, 405 (2005)* (arguing that, in all states, "unjust enrichment [is] an entirely viable, yet often underutilized, theory for pursuing consumer price-fixing claims"). Indirect purchasers typically filed claims in state court, where only complete diversity jurisdiction existed as defendants' basis for removal to federal court. But CAFA only requires minimal diversity and permits defendants to aggregate damages. See infra Part II. Therefore, antitrust litigation that would have remained in state court pre-CAFA must now be filed in federal court.

Also, where "two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed," *28 U.S.C. 1332*(d)(4)(B), the federal court must decline jurisdiction. But to properly rebut this threshold, a defendant must prove that the majority of the class is outside the state, which requires an empirical class analysis, such as defendant producing its customer lists pre-class certification - not a welcome undertaking for any defendant.

Finally, "if a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed." *28 U.S.C. 1712*(a). Accordingly, plaintiffs' counsel have already become, naturally, less inclined to resolve class-action lawsuits for coupons and have instead begun insisting on money damages - a result that defendants, while believing favorable during the pre-CAFA debate, have, in some situations, begun to regret.

46 Santa Clara L. Rev. 567, *597

n3. According to CAFA:

The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $ 5,000,000, exclusive of interest and costs, and is a class action in which -

(A) any member of a class of plaintiffs is a citizen of a State different from any defendant;

(B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or

(C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

*28 U.S.C. 1332*(d)(2)(A)-(C).

n4. See *Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)* ("Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State.").

n5. See discussion infra Part II.

n6. See discussion infra Part III.

n7. See discussion infra Part IV.

n8. *Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).*

n9. *Guaranty Trust Co. v. York, 326 U.S. 99 (1945); Byrd v. Blue Ridge Rural Elec. Coop., Inc., 356 U.S. 525 (1958); Hanna v. Plumer, 380 U.S. 460 (1965).*

46 Santa Clara L. Rev. 567, *597

n10. See discussion infra Part V.

n11. Before CAFA, federal courts determined subject-matter jurisdiction over class-action claims pursuant to *28 U.S.C. 1332* (LexisNexis 2005):

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $ 75,000, exclusive of interest and costs, and is between -

(1) citizens of different States;

(2) citizens of a State and citizens or subjects of a foreign state;

(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

(4) a foreign state, defined in section 1603(a) of this title *[28 U.S.C. 1603*(a)], as plaintiff and citizens of a State or of different States.

n12. *28 U.S.C. 1332*(d)(2)(A).

n13. Id. 1332(d)(2)(C).

n14. *Snyder v. Harris, 394 U.S. 332 (1969).*

n15. *Id. at 333* ("[Plaintiff] brought suit against members of the company's board of directors alleging that

they had sold their shares of the company's stock for an amount far in excess of its fair market value, [and] that this excess represented [an illegal] payment to these particular directors").

n16. *Id. at 336* (citing *Troy Bank v. G.A. Whitehead & Co., 222 U.S. 39, 40 (1911))*.

n17. Id. at 340 ("The expansion of the federal caseload could be most noticeable in class actions brought on the basis of diversity of citizenship.").

n18. Id. at 339 ("To overrule the aggregation doctrine at this late date would run counter to the congressional purpose in steadily increasing through the years the jurisdictional amount requirement."). See also *Zahn v. Int'l Paper Co., 414 U.S. 291, 301 (1973)* ("We have no good reason to disagree with ... the historic construction of the jurisdictional statutes left undisturbed by Congress over these many years.").

n19. *Zahn v. Int'l Paper Co., 414 U.S. 291 (1973)*.

n20. On May 18, 1989, Congress amended 1332's jurisdictional-minimum requirement from $ 10,000 to $ 50,000, and on January 17, 1997, amended it from $ 50,000 to $ 75,000.

n21. *Zahn, 414 U.S. at 299*.

n22. *Id. at 301*. Interestingly, though, the Court excused unnamed plaintiffs from satisfying 1332's "diversity of citizenship" requirement. See *Supreme Tribe of Ben-Hur v. Cauble, 255 U.S. 356, 366 (1921)* ("The intervention of the Indiana citizens in the [class-action] suit [against defendants who were Indiana citizens] would not have defeated the [district court's diversity] jurisdiction."). The Court never explained why it treated 1332's diversity-of-citizenship and amount-in-controversy requirements differently, other than to suggest that allowing unnamed plaintiffs to evade both requirements would open the federal litigation floodgates - a result the federal courts surely wanted to avoid but must now face. See also *Snyder, 394 U.S. at 340* ("To allow aggregation of claims where only one member of the entire class is of diverse citizenship could transfer into the federal courts numerous local controversies involving exclusively questions of state law.").

n23. See *Zahn, 414 U.S. at 300* ("Any plaintiff without the jurisdictional amount must be dismissed from

the case, even though others allege jurisdictionally sufficient claims.").

n24. According to some federal courts, *28 U.S.C. 1367* (2000), which Congress enacted in 1990 and which provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution," id. 1367(a), "overruled the Supreme Court's opinion in Zahn and required district courts to aggregate the claims of class members to calculate the amount in controversy for purposes of diversity jurisdiction ... ." *Dawalt v. Purdue Pharm. L.P., 397 F.3d 392, 396 (6th Cir. 2005).* See also *State Nat'l Ins. Co. v. Yates, 391 F.3d 577, 580 n.15 (5th Cir. 2004)* ("The force of the argument that 1367 overrules Zahn is untouched by the presence of multiple defendants unless we adopt the illogical (indeed, absurd) conclusion that 1367 overrules Zahn only in single defendant cases."); *Rosmer v. Pfizer, Inc., 263 F.3d 110, 114-15 (4th Cir. 2001)* ("Since the pendent claims of the absent class members raise similar questions of law and fact to [plaintiff's] claim, they are necessarily a 'part of the same case or controversy.' Therefore, the district court has supplemental jurisdiction over the other claims [pursuant to 1367(a)]."); *Stromberg Metal Works v. Press Mech., Inc., 77 F.3d 928, 931 (7th Cir. 1996)* ("If 1367(a) allows suit by a pendent plaintiff who meets the jurisdictional amount but not the diversity requirement, it also allows suit by a pendent plaintiff who satisfies the diversity requirement but not the jurisdictional amount."); *In re Abbott Labs., 51 F.3d 524, 528 (5th Cir. 1995)* ("The statute's first section vests federal courts with the power to hear supplemental claims generally, subject to limited exceptions set forth in the statute's second section. Class actions are not among the enumerated exceptions."). Other courts, as described, believed that 1367 did not overrule Zahn and that 1332's requirement that all class members' claims meet the jurisdictional minimum remained the rule. See *Trimble v. Asarco, Inc., 232 F.3d 946, 962 (8th Cir. 2000)* ("Congress in 1367(a) expressly excepted claims brought under 1332 and its well-understood definition of "matter in controversy.""); *Meritcare Inc. v. St. Paul Mercury Ins. Co., 166 F.3d 214, 218 (3d Cir. 1998)* (The claims of those plaintiffs who fail to meet the amount in controversy must be remanded."); *Leonhardt v. W. Sugar Co., 160 F.3d 631, 640 (10th Cir. 1998)* ("Congress in 1367(a) expressly excepted claims brought under 1332 and its well-understood definition of "matter in controversy.'"). The Supreme Court, albeit after CAFA's enactment, ultimately confirmed that 1367 overruled Zahn and that "interpreting 1367 to foreclose supplemental jurisdiction over plaintiffs in diversity cases who [did] not meet the minimum amount in controversy [was] inconsistent with the text, read in light of other statutory provisions and our established jurisprudence." *Exxon Mobil Corp. v. Allapattah Servs., 125 S. Ct. 2611, 2625 (2005).*

n25. Press Release, The White House, President Signs Class-Action Fairness Act of 2005, http://www.whitehouse.gov/news/releases/2005/02/20050218-11.html (last visited June 18, 2006).

n26. Id.

n27. *28 U.S.C. 1332*(d)(2)(A) (LexisNexis 2005). See also *Exxon, 125 S. Ct. at 2627-28* ("[CAFA] abrogates the rule against aggregating claims, a rule this Court recognized in Ben-Hur and reaffirmed in Zahn."). While CAFA also makes clear that, to satisfy 1332's diversity requirement, only "minimal diversity is required," meaning that only one class member need be a citizen of a different state from any defendant, even pre-CAFA it

was "well-settled that a class action may satisfy 1332 if there [was] diversity only between the representative plaintiffs and the defendants." *United States ex rel. Sero v. Preiser, 506 F.2d 1115, 1129 (2d Cir. 1974)* (citing *Ben Hur, 255 U.S. at 366)*. In this manner, CAFA's new "minimum diversity" requirement does not greatly impact the federal-jurisdictional analysis since minimum diversity had effectively been the standard beforehand.


n28. Fierce public debate preceded CAFA's enactment, with numerous public officials and consumer groups voicing strident opposition. According to Nancy Pelosi, House Democratic Leader, "[CAFA], which discourages class action lawsuits, is far from fair. It is instead another way for Republicans to align themselves with special interests at the expense of American consumers and the justice system." Email from the People Over Profits Action Network containing a message from House Democratic Leader Nancy Pelosi (Mar. 4, 2005) (on file with author). Speaker Pelosi added her belief that "Republicans [were] bringing to the floor ... a payback to big business at the expense of consumers[, and that t]he Republican agenda is to ensure that some Americans do not get their day in court." Id. Considering that "federal courts are already overwhelmed by the large number of criminal drug cases and immigration case [and] do not have the resources to handle complex issues of state law," Ass'n of Trial Lawyers of Am. (ATLA), Don't Let Class Action "Reform" Deny Justice to Consumers, Mar. 7, 2002, http://www.atla.org/private/factsheets/classaction/CA deny.pdf (last visited July 31, 2006), in 2003 Chief Justice William Rehnquist and the Judicial Conference of the United States sent a letter to the Senate Judiciary Committee expressing their concerns about CAFA and reiterating their opposition to many of its jurisdictional provisions, ATLA, Federal Judicial Conference Opposes Federalizing Class Actions, http://www.atla.org/homepage/fjc.aspx (last visited Feb. 4, 2005) (on file with author), explaining that CAFA "would add substantially to the work load of the federal courts and is inconsistent with principles of federalism." NACA, What the Experts are Saying About the So-Called "Class Action Fairness Act'" (on file with author). The Conference of Chief Justices, which represents the interests of state supreme courts, also "came out against the class action "reform' legislation," ATLA Press Room, Conference of Chief Justices Weighs Against Class Action "Reform" Legislation, http://www.atla.org/homepage/ccj.aspx (last visited Feb. 4, 2005) (on file with author), explaining that they saw "no hard evidence of the inability of state judicial systems to hear and decide fairly class actions brought in state courts," and expressing their belief that "state courts and state legislatures should be responsible for correcting any problems (with class actions), and history has shown that will occur." NACA, What the Experts are Saying About the So-Called "Class Action Fairness Act'" (on file with author). Multiple consumer groups also went on record in opposition to CAFA's enactment, such as the ACLU, AFL-CIO, Coalition to Stop Gun Violence, Consumer Federation of America, Consumers Union, NAACP Legal Defense and Educational Fund, National Association of Consumer Advocates, National Consumer Law Center, NOW Legal Defense Fund, Public Citizen, Sierra Club, and United Steelworkers of America. See ATLA Press Room, Public Interest Organizations Support Access to Justice - With Federal Courts Clogged, Class Actions Will Die, http://www.atla.org/ConsumerMediaResources/Tier3/pess room/FACTS/classactions/CoalitionforJustice (last visited Feb. 4, 2005) (on file with author). Even the Los Angeles Times commented that "when corporate executives gush over any bill with the word "fairness' in its title, consumers had best check their wallets," A Failure of Fairness, L.A. Times, July 3, 2005. The New York Times observed that CAFA "would move almost all major class-action lawsuits to overburdened federal courts from state courts [and that s]uch a shift is likely to delay or deny justice in numerous instances, and, ultimately, to dilute the impact of the strong consumer protection laws in many states." Paul Krugman, Class-Action Unfairness, N.Y. Times, July 6, 2004, at A26.


n29. See, e.g., *Compaq Computer Corp. v. Lapray, 135 S.W.3d 657, 661 (Tex. 2004)* (nationwide class action "alleging that the affected computers, some thirty-seven models of Compaq Presario computers, contain

defective FDCs, which control the transfer of data ... between a computer's memory and a floppy disk"); *Portwood v. Ford Motor Co., 701 N.E.2d 1102, 1102 (Ill. 1998)* (nationwide class action by "thousands of people who purchased Ford automobiles [and] sustained property damage as a result of collisions which occurred when the vehicles' transmissions shifted from "park' to "reverse" without warning"); *Orman v. Charles Schwab & Co., 688 N.E.2d 620, 621 (Ill. 1997)* (nationwide class action alleging that "defendants violated Illinois agency and/or contract law when they failed to remit to plaintiffs order flow payments received in executing plaintiffs' securities transactions"); *Connick v. Suzuki Motor Co., 675 N.E.2d 583, 598 (Ill. 1996)* (nationwide class action alleging "that a defect in the Samurai's design caused all of the vehicles to roll over during turns or evasive maneuvers"); *Wash. Mut. Bank v. Superior Court, 15 P.3d 1071, 1075 (Cal. 2001)* (nationwide class-action where defendant bank was alleged to have "victimized its borrowers by systematically overcharging for the replacement insurance coverage and secretly profiting through cash commissions or in-kind services from the vendors of the replacement insurance"); Discover Bank v. Superior Court, *36 Cal. Rptr. 3d 456, 457 (Cal. Ct. App. 2005)*, rev'd as to whether Federal Arbitration Act preempted California law concerning unconscionability of class-action waivers and class-wide arbitration, *36 Cal. 4th 148 (Cal. 2005)* ("Nationwide class action against Discover Bank ... alleging claims for breach of contract and violation of the Delaware Consumer Fraud Act."); *Renaissance Cruises, Inc. v. Glassman, 738 So. 2d 436, 437 (Fla. Ct. App. 1999)* (nationwide class action "asserting that [cruise line held] out [certain] charges as being wholly due to the ports, but then [kept] the money that [was] in excess of the actual port charges"); *State Farm Mut. Auto. Ins. Co. v. Superior Court, 114 Cal. App. 4th 434, 438 (2003)* (nationwide class action by "[a] group of policyholders [who] contended that the insurance company's board of directors did not pay the dividends it promised"); *Fink v. Ricoh Corp., 839 A.2d 942, 948-50 (N.J. Super. Ct. Law Div. 2003)* (nationwide class action against camera manufacturer for allegedly misrepresenting certain camera's features).

n30. *Phillips Petroleum Co. v. Shutts, 472 U.S. 797 (1985).*

n31. *Id. at 799.*

n32. Id.

n33. *Id. at 800.*

n34. *Id. at 814-15.*

n35. *Id. at 802-03.*

n36. *Shutts, 472 U.S. at 803.*

n37. *Id. at 803, 816.*

n38. *Id. at 816.*

n39. *Allstate Ins. Co. v. Hague, 449 U.S. 302 (1981).*

n40. In Hague, decedent, a motorcycle passenger, was killed in an automobile accident in Wisconsin. *Id. at 305.* Although decedent worked in Minnesota, he, the motorcycle operator, and the other driver lived in Wisconsin, as did decedent's wife. Id. While neither the motorcycle operator nor the other driver held valid insurance, decedent held an Allstate policy covering his three automobiles. Id. Decedent's policy contained an uninsured motorist clause insuring him against loss incurred from accidents with uninsured motorists that limited coverage to $ 15,000 for each automobile. Id. Following the accident, decedent's wife relocated to Minnesota, married a Minnesota resident, and decedent's estate filed suit in Minnesota seeking to stack the policy's uninsured motorist coverage, which Minnesota law permitted but Wisconsin law did not. Id. Affirming the Minnesota Supreme Court's decision to apply Minnesota's stacking law to decedent's estate's claim, the Court ruled that "Minnesota had a significant aggregation of contacts with the parties and the occurrence, creating state interests, such that application of its law was neither arbitrary nor fundamentally unfair." *Id. at 320.* Accordingly, the Court believed "the choice of Minnesota law by the Minnesota Supreme Court did not violate the Due Process Clause or the Full Faith and Credit Clause." Id.

n41. *Shutts, 472 U.S. at 823.*

n42. *Id. at 816.*

n43. *Id. at 821* (citing *Hague, 449 U.S. at 312-13).*

n44. Id. at 822.

n45. Id.

n46. Id. at 823 ("We ... reverse [the Kansas Supreme Court's] judgment insofar as it held that Kansas law was applicable to all of the transactions which it sought to adjudicate.").

n47. According to *Federal Rule of Civil Procedure 23(b)(3)*, when alleging a class-action claim for money damages, one of the multiple requirements that a plaintiff must prove to obtain class certification is that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." (emphasis added). Generally referred to as Rule 23's "predominance requirement," "the Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor, 521 U.S. 591, 623 (1997).* As a practical matter, "in order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof."" *In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 136 (2d Cir. 2001)* (citing *Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1233 (11th Cir. 2000)).* Importantly, "the predominance requirement calls only for predominance, not exclusivity, of common questions." *Shelter Realty Corp. v. Allied Maint. Corp., 75 F.R.D. 34, 37 (S.D.N.Y. 1977).*

n48. See, e.g., *Stetser v. TAP Pharmaceutical Prods. Inc., 598 S.E.2d 570, 581 (N.C. App. 2004)* (explaining that "the trial court's application of North Carolina law to a nationwide plaintiff class will pass constitutional muster only if the substantive laws of each of these states does not materially differ from North Carolina's law on plaintiffs' claims"); *Microsoft Corp. v. Manning, 914 S.W.2d 602, 616 (Tex. Ct. App. 1995)* (affirming multi-state class certification under Texas law, explaining that "no one will be injured in applying Texas law ... if it is not in conflict with that of any other jurisdiction connected to this suit"); *Delgozzo v. Kenny, 266 628 A.2d 1080, 1092 (N.J. Super. Ct. App. Div. 1993)* (reversing order denying certification of a multi-state fraud and fraudulent concealment class-action claim under New Jersey law, explaining that "the additional problems with possible multi-state consumer fraud or other statutory claims raise manageable questions. The problems inherent in certifying a class presenting conflict of laws issues are not unsurmountable [sic] ... .").

n49. Under some states' consumer-protection laws, the plaintiff must be a state resident for the statute to apply. See, e.g., *Avery v. State Farm Ins. Co., 835 N.E.2d 801, 854 (Ill. 2005)* ("We conclude, therefore, that the out-of-state plaintiffs in this case have no cognizable cause of action under the Consumer Fraud Act."); *Goshen v. Mut. Life Ins. Co., 774 N.E.2d 1190, 1195 (N.Y. 2002)* ("To qualify as a prohibited act under the statute, the deception of a consumer must occur in New York.").

n50. See, e.g., *Renaissance Cruises, Inc. v. Glassman, 738 So. 2d 436, 439 (Fla. Ct. App. 1999)* (affirming class certification under Florida consumer-protection law where "the trial court found that Florida had significant connections, [such as a]ppellant's principal place of business [was] in Florida, ... appellant's U.S.

46 Santa Clara L. Rev. 567, *597

business operations [were] controlled and carried out from [Florida,] any overages were kept by appellant in Fort Lauderdale[, thus] indicating the parties' mutual expectation that Florida law would apply"); *Gordon v. Boden, 586 N.E.2d 461, 466 (Ill. App. Ct. 1991)* (explaining that "if the trial court found that Illinois had significant contact to the claims asserted by each class member, the court could apply Illinois substantive law to this multi-state class action[, and that t]his finding would ensure that the application of Illinois law [was] neither arbitrary nor unfair").

n51. According to *28 U.S.C. 1441,* "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." *28 U.S.C. 1441* (2000). Furthermore, according to CAFA, "the amendments made by this Act shall apply to any civil action commenced on or after the date of enactment of this Act[, February 18, 2005]." Pub. L. No. 109-2, 9, 119 Stat. 14 (2005). Consequently, since CAFA's enactment, defendants have routinely begun removing state-court, class-action cases to federal court where original jurisdiction, pursuant to CAFA, is claimed to exist. See, e.g., *Natale v. Pfizer, Inc., 424 F.3d 43, 44 (1st Cir. 2005)* (affirming district court's remand order where defendant removed plaintiff's pre-CAFA lawsuit, explaining that a state lawsuit "commences" when it begins in state court, not when the defendant removes it to federal court.); *Brill v. Countrywide Home Loans, Inc., 427 F.3d 446, 447 (7th Cir. 2005)* (reversing district court's order denying remand to state court following removal under CAFA where plaintiff's "suit was commenced after February 18, 2005, the Act's effective date."); *Bush v. Cheaptickets, Inc., 425 F.3d 683, 684 (9th Cir. 2005)* (affirming district court's order remanding case to state court following removal under CAFA because "by its own terms, the Act became effective for all actions that "commenced on or after' February 18, 2005."); *Dinkel v. GMC, 400 F. Supp. 2d 289, 292 (D. Me. 2005)* (denying plaintiff's motion for remand since plaintiff's lawsuit, in which he failed to serve defendants all defendants within ninety days of his pre-CAFA complaint's filing, was not considered as having "commenced" pre-CAFA: "Under Kansas Rules of Civil Procedure, however, filing the complaint alone does not necessarily "commence' the lawsuit. That filing "commences' the lawsuit only if process is served within 90 days thereafter. Otherwise (i.e., if more than 90 days passes), the lawsuit does not "commence' until service of process occurs... ."); Eufaula Drugs, Inc. v. Scripsolutions, No. CIV.A. 2:05cv370-*A, 2005 U.S. Dist. LEXIS 24821, at 12-13* (M.D. Ala. Oct. 6, 2005) (remanding pre-CAFA case to state court even though plaintiff filed its amended complaint after CAFA's enactment, explaining that "the Amended and Restated Complaint would relate back [and that] this case was commenced for purposes of the CAFA before the effective date of the CAFA").

n52. *Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).*

n53. *Id. at 78* ("Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State"). See infra Part V (discussing Erie and its progeny).

n54. See, e.g., *Simer v. Rios, 661 F.2d 655, 672 (7th Cir. 1981)* ("Our inquiry into the predomination analysis must[, in part,] be on the substantive elements of plaintiffs' cause of action and inquire into the proof necessary for the various elements."); Murray v. America's Mortgage Banc, Inc., Nos. 03 C 5811, 03 C 6816,

*2005 U.S. Dist. LEXIS 11751, at 9* (N.D. Ill. May 5, 2005) ("The predominance factor requires consideration of the substantive elements of the plaintiffs' cause of action."); *In re Tri-State Crematory Litig., 215 F.R.D. 660, 691 (N.D. Ga. 2003)* ("The Court will begin its predominance analysis by setting forth the elements of the substantive law for each cause of action."); *In re Vitamins Antitrust Litig., 209 F.R.D. 251, 263 (D.D.C. 2002)* ("The predominance inquire also requires the identification of the elements of the substantive law at issue."); Ploog v. Homeside Lending, Inc., No. 00 C 6391, *2001 U.S. Dist. LEXIS 15697, at 22* (N.D. Ill. Sept. 28, 2001) ("In determining whether the predominance requirement has been met, the "Court considers the substantive elements of the Plaintiff's cause of action, the proof necessary for the various elements, and the manageability of the trial on these issues.'"); *Ingram v. Coca-Cola Co., 200 F.R.D. 685, 700 (N.D. Ga. 2001)* ("[The p]redominance requirement focuses on the substantive aspects of class members' legal claims... ."); Panache Broad. v. Richardson Elecs., No. 90 C 6400, *1995 U.S. Dist. LEXIS 14462, at 38* (N.D. Ill. Sept. 27, 1995) ("[A] court should begin the predominance inquiry by focusing on the substantive elements of the cause of action, and then examine the evidence necessary to prove those elements in order to determine whether common or individual questions are likely to predominate in the litigation.").

n55. Perhaps state-court Rule 23 decisions considering what state's substantive law to apply are sufficiently procedural such that they can necessarily be used according to Erie, just like state courts frequently used Federal Rule 23 decisions when considering class certification under their state Rule 23 or equivalent procedural statute. See, e.g., *Sw. Refining Co., Inc. v. Bernal, 22 S.W.3d 425, 433 (Tex. 2000)* ("[Texas Rule 42] is patterned after *Federal Rule of Civil Procedure 23*; consequently, federal decisions and authorities interpreting current federal class action requirements are persuasive authority."); *Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole, 896 So. 2d 773, 777 (Fla. Ct. App. 2004)* ("The federal cases on the issue are persuasive, because Florida Rule 1.220, which governs certification of a class, is modeled on Federal Rule 23, which is interpreted in the above federal cases."); In re Logan, No. 47301-8-*I, 2002 Wash. App. LEXIS 475, at 11* (Wash. Ct. App. Mar. 11, 2002) ("Federal Rule 23 and Washington CR 23 are the same. "thus, federal cases interpreting the analogous federal provision are highly persuasive.'"); *CSX Transp. v. Clark, 646 N.E.2d 1003, 1007 (Ind. Ct. App. 1995)* ("Federal class action cases decided under Federal Rule 23 are persuasive authority for Indiana Courts interpreting Ind. Trial Rule 23."); Sisters of St. Mary v. Aaer Sprayed Insulation, No. 85*CV5952, 1987 Wisc. App. LEXIS 4440, at 11 n.8* (Wisc. Ct. App. Dec. 17, 1987) ("our courts have relied on Federal Rule 23 and federal cases addressing it to approve of procedural determinations made by Wisconsin trial courts in class action cases."); *Perry v. Meek, 618 P.2d 934, 940 (Okla. Ct. App. 1985)* ("Insofar as the issues under consideration arise from provisions of *12 O.S. Supp. 1979 13-18,* which are actually similar to the provisions of *Federal Rule of Civil Procedure 23,* the federal case law on those points is instructive persuasive authority in this forum."); Williams v. Motorists Ins. Corp., No. 76 CA 148, *1977 Ohio App. LEXIS 10012, at 11* (Ohio Ct. App. Aug. 12, 1977) ("As to the law that would apply in the instant case, it is helpful to resort to federal cases dealing with a similar rule, Federal Rule 23."). This query, though, is one for another article.

n56. *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941).*

n57. *Id. at 494.*

n58. *Id. at 496.*


n59. Id.


n60. See, e.g., *Kanter v. Warner-Lambert Co., 265 F.3d 853, 860 (9th Cir. 2001)* (explaining that federal jurisdiction exists in cases where "it is apparent that injunctive relief is the primary relief sought."); *Steinberg v. Nationwide Mut. Ins. Co., 224 F.R.D. 67, 71 (E.D.N.Y. 2004)* ("The injunctive relief sought by the plaintiff furnishes the basis for federal jurisdiction."); Jackson v. Johnson & Johnson, Inc., No. 01-2113 DA, 2001 U.S. Dist. LEXIS 22329, at 15 (D. Tenn. Apr. 3, 2001) (denying plaintiffs' motion for remand because they "were seeking injunctive relief in the form of the medical monitoring program[, and t]he amount in controversy, therefore, was measured by the value of the object of litigation."); *Hubbard v. Gen. Motors Corp., No. 95 Civ. 4362, 1996 U.S. Dist. LEXIS 6974, at 8 (S.D.N.Y. May 22, 1996)* ("The Court finds that plaintiff and the alleged class members have a common and undivided interest in the injunctive and declaratory relief sought herein. Therefore, the jurisdictional amount requirement is satisfied if their interests collectively exceed $ 50,000."); *Gibbs v. E.I. DuPont De Nemours & Co., 876 F. Supp. 475, 479 (W.D.N.Y. 1995)* ("In a suit for injunctive or declaratory relief, the amount in controversy is measured by the value of the object of the litigation. The value of the medical monitoring program sought by plaintiffs is well in excess of $ 50,000, even using defendants' figures." (citation omitted)).


n61. *Steinberg, 224 F.R.D. at 78* (suggesting that applying New York substantive law to multi-state claims when conducting Federal Rule 23's predominance inquiry was appropriate). See also *Simon v. Philip Morris, Inc., 124 F. Supp. 2d 46, 70 (E.D.N.Y. 2000)* ("The significant contacts with New York state in this [multi-state, class-action] case satisfy Due Process and Full Faith and Credit under Shutts."); *Gruber v. Price Waterhouse, 117 F.R.D. 75, 82 (E.D. Pa. 1987)* (finding selection of forum law constitutional in securities litigation where defendant "Pennsylvania had the most significant relationship ... since the financial statements alleged to contain the misstatements emanated from Pennsylvania."); *In re ORFA Sec. Litig., 654 F. Supp. 1449, 1455 (D.N.J. 1987)* ("It is clear that New Jersey law applied to the questions raised by Count V of the Complaint" because defendant's principle place of business was New Jersey and its alleged misrepresentations originated there.); *In re Lilco Sec. Litig., 111 F.R.D. 663, 670 (E.D.N.Y. 1986)* ("After Shutts it is not at all certain that application in this case of one state's law is unconstitutional and in the event New York is applied, it may be that New York choice of law rules direct the application of New York law."); *In re Activision Sec. Litig., 621 F. Supp. 415, 431 (N.D. Cal. 1985)* (The "court ... entertained a presumption that California law ... control[ed the] case" because defendant maintained its principle place of business there, issued securities there, and the purchasers' acceptances were directed there.).


n62. See generally cases cited in note 54.


n63. *Hague, 449 U.S. at 312-13.*

46 Santa Clara L. Rev. 567, *597

n64. *Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).*

n65. *Swift v. Tyson, 41 U.S. 1 (1842).*

n66. *Id. at 18-19.*

n67. *Erie, 304 U.S. at 69.*

n68. Id.

n69. *Id. at 70.*

n70. Id.

n71. *Id. at 69.*

n72. *Id. at 74-75* (footnote omitted).

n73. *Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co., 276 U.S. 518 (1928).*

n74. *Erie, 304 U.S. at 79.*

46 Santa Clara L. Rev. 567, *597

n75. Id. (quoting *Black & White Taxicab, 276 U.S. at 532-36*).

n76. Id. at 78.

n77. Id. at 80.

n78. *Hanna v. Plumer, 380 U.S. 460, 465 (1965)*.

n79. *Guaranty Trust Co. v. York, 326 U.S. 99 (1945)*.

n80. *Id. at 100.*

n81. Id.

n82. Id.

n83. *Id. at 101*.

n84. Id.

n85. *York, 326 U.S. at 107*.

46 Santa Clara L. Rev. 567, *597

n86. *Id. at 107-08.*

n87. *Id. at 108.* See also *Hanna, 380 U.S. at 472* ("[A] federal court system ... carries with it congressional power to make rules governing the practice and pleading in those courts, which in turn includes a power to regulate matters which, though falling within the uncertain area between substance and procedure, are rationally capable of classification as either.").

n88. *York, 326 U.S. at 109* (emphasis added).

n89. Id.

n90. Id.

n91. Id.

n92. *Id. at 112.*

n93. *Id. at 108-09* (emphasis added).

n94. See *York, 326 U.S. at 112.*

n95. *Byrd v. Blue Ridge Rural Elec. Coop., Inc., 356 U.S. 525 (1958).*

n96. *Id. at 533.*

46 Santa Clara L. Rev. 567, *597

n97. *Id. at 535.*

n98. Id.

n99. *Id. at 536-37* (footnote omitted).

n100. *Id. at 537-38* (emphasis added) (citations omitted).

n101. *Byrd, 360 U.S. at 538.*

n102. *Id. at 539.* If plaintiff was considered an employee, he was barred from suing defendant because the workers compensation laws provided him an exclusive remedy. See id. at 527.

n103. Id. at 540 (footnote omitted).

n104. *Hanna v. Plumer, 380 U.S. 460 (1965).*

n105. *Id. at 461.*

n106. *Id. at 465.*

n107. *Id. at 465-66.*

n108. *Id. at 466-67* (citation omitted).

n109. *Id. at 467* (citation and footnotes omitted).

n110. *Hanna, 380 U.S. at 473.*

n111. See supra note 29 (mentioning pre-CAFA multi-state, class-action suits brought in state courts).

n112. See, e.g., *Coghlan v. Wellcraft Marine Corp., 240 F.3d 449, 452 n.2 (5th Cir. 2001)* (analyzing substantive, state choice-of-law question under Klaxon); *Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1187 (9th Cir. 2001)* (same); *Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 725 n.6 (11th Cir. 1987)* (same); *Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d 56, 60 n.10 (3rd Cir. 1982)* (same).

n113. See, e.g., *Spector v. Toys "R" Us, Inc., 12 A.D.3d 358, 359 (N.Y. App. Div. 2004)* (class-action, consumer-fraud claim against Toys "R" Us involving claim "where gift receipts were presented upon an item being returned, the person presenting it would receive an amount less than that paid for the item"); *Small v. Lorillard Tobacco Co., 252 A.D.2d 1, 5 (N.Y. App. Div. 1998)* (class-action, consumer-fraud case for allegedly "deceiv[ing consumers] into becoming smokers because defendants lied about nicotine's addictive properties while secretly manipulating the nicotine content of their products in order to addict consumers"); *Clothesrigger, Inc. v. GTE Corp., 191 Cal. App. 3d 605, 619-20 (Cal. Ct. App. 1987)* ("Class action complaint ... regarding charges for incompleted calls ... .").

n114. See, e.g., *Bally Total Fitness Corp. v. Jackson, 53 S.W.3d 352 (Tex. 2001)* (class-action, deceptive-trade-practices claim alleging that Bally's "was liable under the Texas Deceptive Trade Practices Act for unconscionable conduct and for representing that [its member] agreements conferred rights and obligations prohibited by law"); *Chase Manhattan Mortgage Corp. v. Porcher, 898 So. 2d 153, 156 (Fla. Ct. App. 2005)* (class-action, deceptive-trade-practices claim "alleging that Chase had a deliberate policy of failing to post mortgage payments on the same date they were received so that it can charge unwarranted late fees"); *J.M. Smucker Co. v. Rudge, 877 So. 2d 820, 821 (Fla. Ct. App. 2004)* (class-action, deceptive-trade-practices claim "alleging that Smucker's Simply 100% Fruit products [didn't] contain 100% fruit").

n115. See, e.g., *Avery v. State Farm Mut. Auto. Ins. Co., 835 N.E. 801, 811 (Ill. 2005)* (class-action, breach-of-contract claim against State Farm disputing "the propriety of State Farm's uniform practice of

46 Santa Clara L. Rev. 567, *597

specifying the use of non-OEM crash parts to repair its policyholders' cars in every instance in which such cheaper parts are available"); *Discover Bank v. Superior Court, 36 Cal. 4th 148, 154 (Cal. 2005)* (class-action, breach-of-contract claim against Discover Bank for allegedly "breaching its cardholder agreement by imposing a late fee of approximately $ 29 on payments that were received on the payment due date, but after Discover Bank's undisclosed 1:00 p.m. "cut-off time"'); *Carolla v. Am. Family Mut. Ins. Co., No. A03-0021, 2003 Minn. App. LEXIS 1109, at 2* (Minn. Ct. App. Sept. 9, 2003) (class-action, breach-of-contract claim "asserting that the value of [plaintiff's] car was diminished as a result of being in an accident and that American Family's Minnesota Family Car Policy covered that diminished-value loss").

n116. See, e.g., *Ortiz v. Ford Motor Co., 909 So. 2d 479, 480 (Fla. Ct. App. 2005)* (class-action, unjust-enrichment claim "alleging [that plaintiff] overpaid for his 1998 Ford Explorer beyond its true value due to the Defendant's concealment of a design defect"); *Balt. Football Club, Inc. v. Superior Court, 171 Cal. App. 3d 352, 356 (Cal. Ct. App. 1985)* (class-action, unjust-enrichment action where class asserted "claims of unjust enrichment from the use of season ticket purchase money during a year in which games were cancelled due to the strike"); *Boldt v. Correspondence Mgmt., 726 A.2d 975, 977 (N.J. Super. Ct. App. Div. 1999)* (class-action, unjust-enrichment claim for "alleged photocopying overcharges by health care providers").

n117. *Guaranty Trust Co. v. York, 326 U.S. 99, 109 (1945).*

n118. *Byrd v. Blue Ridge Rural Elec. Coop., Inc., 356 U.S. 525, 536 (1958).*

n119. See, e.g., Ariz. R. Civ. P. 23; Ark. R. Civ. P. 23; Fla. R. Civ. P. 1.220; Ind. R. Trial P. 23; Ky. R. Civ. P. 23.01, 23.02; Me. R. Civ. P. 23; Mass. R. Civ. P. 23; Mich. Ct. R. 3.501; Minn. R. Civ. P. 23.01, 23.02; N.Y. Civ. Prac. L. & R. 901; Ohio R. Civ. P. 23; Pa. R. Civ. P. 1702; Tenn. R. Civ. P. 23.01, 23.02; Tex. R. Civ. P. 42; Vt. R. Civ. P. 23 (mirroring Federal Rule 23 and its prerequisites).

n120. *Byrd, 356 U.S. at 540.*

n121. See supra note 119 (listing various state class-action rules that mirror Federal Rule 23).

n122. *Byrd, 356 U.S. at 538.*

46 Santa Clara L. Rev. 567, *597

n123. See, e.g., *Local Union No. 12004, USW v. Massachusetts, 377 F.3d 64, 77 (1st Cir. 2004)* (expressing discomfort with deciding an issue "on a blank slate"); *Visser v. Magnarelli, 542 F. Supp. 1331, 1338 (N.D.N.Y. 1982)* (emphasizing the importance of precedent so as to avoid deciding issues "on a tabula rasa").

n124. See, e.g., *Carson v. Polley, 689 F.2d 562, 585 (5th Cir. 1982)* ("District courts are entitled to manage their cases with the aim of conducting litigation efficiently."); Lowth v. Town of Cheektowaga, No. 94-CV-0486E(F), *1997 U.S. Dist. LEXIS 5589, at 7* (W.D.N.Y. Mar. 7, 1997) ("This Court believes that a logical - indeed laudable - desire to litigate their claims as efficiently as possible - and not due to "undue vexatiousness' - motivated the plaintiffs to bring their motion."); *Gabelli v. Sikes Corp., No. 90 Civ. 4904 (JMC), 1990 U.S. Dist. LEXIS 17015, at 16* (S.D.N.Y. Dec. 14, 1990) ("The desire to avoid piecemeal litigation and promote judicial economy are concerns that strongly support the issuance of a stay.").

```
                                                                 1248JW

********** Print Completed **********

Time of Request: Thursday, March 15, 2007  14:11:00 EST

Print Number:    2822:17571161
Number of Lines: 897
Number of Pages: 29
```

```
Send To:  KARON, DANIEL
          GOLDMAN SCARLATO & KARON
          101 W ELM ST STE 360
          CONSHOHOCKEN, PA 19428-2075
```