1  GUIDO SAVERI (22349)
    guido@saveri.com
2  R. ALEXANDER SAVERI (173102)
    rick@saveri.com
3  GEOFFREY C. RUSHING (126910)
    grushing@saveri.com
4  CADIO ZIRPOLI (179108)
    cadio@saveri.com
5  GIANNA GRUENWALD (228969)
    gianna@saveri.com
6  SAVERI & SAVERI, INC.
   706 Sansome Street
7  San Francisco, CA  94111
   Telephone:  (415) 217-6810
8  Facsimile:   (415) 217-6813

9  *Interim Lead Counsel for the Direct Purchaser Plaintiffs*
   [Additional Attorneys Appear on Signature Page]

10

11                    **UNITED STATES DISTRICT COURT**

12                   **NORTHERN DISTRICT OF CALIFORNIA**

13                      **SAN FRANCISCO DIVISION**

14

15 | IN RE: CATHODE RAY TUBE (CRT) | Case No. 3:07-cv-5944 SC
     ANTITRUST LITIGATION         |
16 |                              | MDL No. 1917
17 | _____ | **CLASS ACTION**
18 | This Document Relates to:     | **DIRECT PURCHASER PLAINTIFFS'**
                                     **CONSOLIDATED AMENDED**
19 | Direct Purchaser Actions      | **COMPLAINT**
20 |                              | **JURY TRIAL DEMANDED**
21 | _____ | The Honorable Samuel Conti
22
23
24
25
26
27
28

1

## TABLE OF CONTENTS

2   I. INTRODUCTION .................................................................................................... 1

3   II. JURISDICTION AND VENUE ............................................................................ 2

4   III. PARTIES

5       A. Plaintiffs ....................................................................................................... 3

6       B. Defendants ................................................................................................... 5

7   IV. AGENTS AND CO-CONSPIRATORS ................................................................ 19

8   V. CLASS ACTION ALLEGATIONS ....................................................................... 19

9   VI. TRADE AND COMMERCE ................................................................................ 21

10   VII. FACTUAL ALLEGATIONS ............................................................................. 21

11       A. CRT Technology and Products .................................................................... 21

12       B. Oligopolistic Nature of the CRT Industry .................................................. 24

13       C. International Antitrust Investigations ........................................................... 26

14       D. Collusive Contacts, Meetings, And Agreements Among Members of the CRT
15           Products Industry ......................................................................................... 30

      E. Summary of Specific Defendant Participation In Unlawful Meetings And
16           Agreements .................................................................................................. 34

17       F. Use of Trade Associations And Trade Events To Facilitate The Conspiracy ............... 39

18       G. Effects of Defendants' Antitrust Violations ................................................ 40

19           1. Examples of Reductions in Manufacturing Capacity by Defendants ............... 40

20           2. Examples of Collusive Pricing for CRT Products ............................................ 41

21       H. Summary Of Effects Of The Conspiracy Involving CRT Products ............................. 43

22       I. Fraudulent Concealment ............................................................................... 43

23   VIII. CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1 ................................................ 45

24   IX. DAMAGES ........................................................................................................ 47

25   X. PRAYER FOR RELIEF ....................................................................................... 47

26   XI. JURY TRIAL DEMANDED .............................................................................. 48

27

28

i

## I. INTRODUCTION

1.      Plaintiffs bring this action on behalf of themselves individually and on behalf of a Plaintiff class (the "Class") consisting of all persons and entities who directly purchased a Cathode Ray Tube Product, as defined below, in the United States from any Defendant or any subsidiary or affiliate thereof between March 1, 1995 and November 25, 2007 (the "Class Period"). Defendants are among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are cathode ray tubes ("CRTs") used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors). For the purposes of this Consolidated Amended Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products." Also for the purposes of this Consolidated Amended Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products." CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

2.      Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue. During the Class Period, virtually every household in the United States owned at least one CRT Product.

3.      Since the mid-1990's, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry. Plaintiffs are informed and believe, and thereon allege, that in order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain, and stabilize the price at which CRT Products were sold in the United States.

4.      As part of and in furtherance of this conspiracy, Defendants or their agents engaged in various collusive practices with respect to CRT Products.

5.      With respect to CRT Products, Defendants or their agents agreed, *inter alia*, to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, inter alia, shipments, prices, production, and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some

1

1    of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the

2    agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales;

3    (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit

4    competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of

5    certain key customers' sales; and (k) restrict output.

6         6.    The conspiracy concerning CRT Products commenced with bilateral meetings that

7    began in at least March of 1995 and continued throughout the Class Period. Also beginning in

8    1995, the co-conspirators began to engage in informal group meetings. By 1997, these group

9    meetings had become more formalized, as described in greater detail below. There were at least

10   500 meetings during the Class Period, including hundreds of group meetings and hundreds of

11   bilateral meetings. These meetings occurred in various locales, including Taiwan, South Korea,

12   Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe. These meetings included

13   representatives from the highest levels of the respective companies, as well as regional managers

14   and others.

15        7.    This conspiracy is being investigated by the United States Department of Justice

16   ("DOJ") and by multiple foreign competition authorities. The first participant to be indicted by the

17   DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd.,

18   who had a two-count indictment issued against him by a federal grand jury in San Francisco on

19   February 10, 2009.

20                           **II. JURISDICTION AND VENUE**

21        8.    Plaintiffs bring this action to obtain injunctive relief and to recover damages,

22   including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants'

23   violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

24        9.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a)

25   and 1367.

26        10.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28

27   U.S.C. § 1391(b) and (c), in that at least one of the Defendants resides in this judicial district, is

28   licensed to do business or is doing business in this judicial district.

2

### III. PARTIES

**A.      Plaintiffs**

11.      Plaintiff Crago, d/b/a Dash Computers, Inc., is a Kansas corporation with its principal place of business in Merriam, Kansas.  During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

12.      Plaintiff Arch Electronics, Inc., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and has its principal place of business in Philadelphia, Pennsylvania.  During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

13.      Plaintiff Electronic Design Company, is a corporation with its principle place of business in Shoreview, Minnesota.  During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

14.      Plaintiff Hawel A. Hawel, d/b/a City Electronics, is a California business with its principal place of business in Modesto, California.  During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

15.      Plaintiff Meijer, Inc. and Meijer Distribution, Inc., are Michigan corporations with their principal place of business in Grand Rapids, Michigan.  During the Class Period, these Plaintiffs purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

16.      Plaintiff Nathan Muchnick, Inc., was a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and had its principal place of business in Philadelphia, Pennsylvania.  During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

3

17.     Plaintiff Orion Home Systems, LLC, is a Minnesota limited liability corporation with its principal place of business in Eagan, Minnesota.  During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

18.     Plaintiff Paula Call d/b/a Poway-Rancho Bernardo TV, is a California business with its principal place of business in San Diego, California.  During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

19.     Plaintiff Princeton Display Technologies, Inc., is a New Jersey corporation with its principal place of business in Princeton, New Jersey.  During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

20.     Plaintiff Radio & TV Equipment, Inc., is a business headquartered in Fargo, North Dakota.  During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

21.     Plaintiff Royal Data Services, Inc., is a Hawaii corporation with its principal place of business in Honolulu, Hawaii.  During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

22.     Plaintiff Studio Spectrum, Inc., is a California business with its principal place of business in Burbank, California.  During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

23.     Plaintiff Wettstein and Sons, Inc., d/b/a Wettstein's is a corporation organized and existing under the laws of the State of Wisconsin with its principal place of business in La Crosse, Wisconsin.  During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants'

4

1  unlawful conduct.

2  **B.     Defendants**

3       **Chunghwa Entities**

4       24.    Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese

5  company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan,

6  Taiwan.   It was established in 1971 by Tatung Corporation to manufacture CRTs.   In 1974,

7  Chunghwa PT's CRTs received certification by the United States, giving the company entry into

8  that market.   Throughout the Class Period, Chunghwa PT was one of the major global CRT

9  manufacturers. During the Class Period, Chunghwa PT manufactured, sold, and distributed CRT

10  Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary)

11  throughout the United States.

12       25.    Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia")

13  is a Malaysian company with its principal place of business at Lot 1, Subang Hi-Tech Industrial

14  Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.   It is a wholly-owned and

15  controlled subsidiary of Chunghwa.   Chunghwa Malaysia is focused on CRT production, and it

16  has established itself as one of the leading worldwide suppliers of CRTs.   During the Class Period,

17  Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through

18  its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and

19  controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust

20  violations alleged in this complaint.

21       26.    Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to

22  herein as "Chunghwa."

23       **Daewoo Entities**

24       27.    Defendant Daewoo International Corporation ("Daewoo International") is a

25  corporation organized under the laws of Korea with its principal place of business located at 84-11

26  Namdaemunno 5-ga, Jung-gu, Seoul, Korea (100-753). Daewoo International is a successor in

27  interest to the Daewoo Group which was dismantled in or around 1999. During the Class Period,

28  Daewoo International manufactured, sold, and distributed CRT Products either directly or through

5

1  its subsidiaries or affiliates throughout the United States.

2      28.     Defendant Daewoo Electronics Corporation f/k/a Daewoo Electronics Company,

3  Ltd. ("Daewoo Electronics") is a corporation organized under the laws of South Korea with its

4  principal place of business located at 686 Ahyeon-dong, Mapagu, Seoul, South Korea. Daewoo

5  Electronics is a subsidiary of Daewoo International. Plaintiffs are informed and believe that

6  Daewoo Electronics was, along with Daewoo Telecom Company, Daewoo Corporation, and Orion

7  Electric Components Company (all of whom were members of what is known as the "Daewoo

8  Group"), a major shareholder of Orion Electric Company ("Orion"), a South Korean corporation

9  that filed for bankruptcy in 2004. During the Class Period, Orion was a major manufacturer of

10  CRT Products. In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

11  Products. Orion was involved in CRT Products sales and manufacturing joint ventures and had

12  subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United

13  States. Defendant Daewoo Electronics and Orion were 50/50 joint venture partners in an entity

14  called Daewoo-Orion Société Anonyme ("DOSA") in France. As of approximately 1996, DOSA

15  produced 1.2 million CRTs annually. Daewoo sold DOSA's CRT business in or around 2004. In

16  December 1995, Orion partnered with Defendant Toshiba Corporation and two other non-

17  Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.

18  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. During

19  the Class Period, Daewoo Electronics manufactured, marketed, sold and/or distributed CRTs

20  and/or CRT Products, either directly or through its subsidiaries or affiliates (specifically including

21  Orion and DOSA), to customers throughout the United States. Defendants Daewoo International

22  and Daewoo Electronics dominated and controlled the policies and affairs of Orion and DOSA

23  relating to the antitrust violations alleged in this complaint

24      29.     Daewoo International, Daewoo Electronics, Orion, and DOSA are collectively

25  referred to herein as "Daewoo."

26  **Hitachi Entities**

27      30.     Defendant Hitachi, Ltd. is a Japanese company with its principal executive office at

28  6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent

company for the Hitachi brand of CRT Products. In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Class Period, Hitachi, Ltd. manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

31. Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at AKS Building, 3 Kandaneribeicho 3, Chiyoda-ku, Tokyo, 101-0022, Japan. Hitachi Displays, Ltd. was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Class Period, Hitachi Displays sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

32. Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business at 2000 Sierra Point Parkway, Brisbane, California. Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Class Period, Hitachi America sold and distributed CRT Products either directly (through, *inter alia*, its HED Home Electronics Division) or through its subsidiaries or affiliates (such as Hitachi Home Electronics (America), Inc. or Hitachi Sales Corporation of Hawaii, Inc.) throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

33. Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore 049318. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Class Period, Hitachi Asia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

7

34.     Defendant Hitachi Electronic Devices (USA) ("HEDUS") is a Delaware corporation with its principal place of business at 575 Mauldin Road Greenville, South Carolina 29607. HEDUS is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Class Period, HEDUS manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

35.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") is a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China. Hitachi Shenzhen is a wholly-owned and controlled subsidiary of Defendant Hitachi Displays. During the Class Period, Hitachi Shenzhen manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

36.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, Hitachi Shenzhen and HEDUS are collectively referred to herein as "Hitachi." Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

**Irico Entities**

37.     Defendant Irico Group Corporation ("IGC") is a Chinese entity located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  Irico Group Corporation is the parent company for multiple subsidiaries engaged in the manufacture, distribution, and sale of CRT Products.  During the Class Period, Irico Group Corporation manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

38.     Defendant Irico Group Electronics Co., Ltd. ("IGE") is a Chinese entity located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by IGC and engages in the manufacture, distribution, and sale of CRT Products.  During the Class Period, IGE manufactured,

8

sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

39.     Irico Display Devices Co., Ltd. ("IDDC") is a Chinese entity located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of Defendant IGC. In 2006, IDDC was China's top CRT maker. During the Class Period, IDDC manufactured, distributed, and sold CRT Products either directly or through its subsidiaries or affiliates or through other Defendants in the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IDDC Asia relating to the antitrust violations alleged in this complaint.

40.     Defendants IGC, IGE, and IDDC are collectively referred to herein as "Irico."

**LG Electronics Entities**

41.     Defendant LG Electronics, Inc. ("LGEI") is a South Korean entity headquartered at LG Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, South Korea 150-721. In 2001, LGEI entered into a joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays, in which the entities combined their CRT businesses. In 2002, LGEI had a 24.4 percent worldwide CRT market share. On April 1, 2007, LG.Philips Displays became an independent company and changed its name to LP Displays International, Ltd. During the Class Period, LGEI manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as Zenith Electronics Corporation) throughout the United States.

42.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business at 1000 Sylvan Ave., Englewood Cliffs, N.J. 07632. During the Class Period, LGEUSA manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

43.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No.47, Lane3, Jihu Road, NeiHu District,

9

1   Taipei City, Taiwan. LGETT is a wholly-owned and controlled subsidiary of Defendant LG
2   Electronics, Inc. During the Class Period, LGETT manufactured, sold, and distributed CRT
3   Products either directly or through its subsidiaries or affiliates throughout the United States.
4   Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to
5   the antitrust violations alleged in this complaint.

6       44.     Defendant LP Displays International, Ltd. ("LP Displays") is a Hong Kong
7   company located at 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong
8   Kong. LP Displays is the successor entity to LGPD. During the Class Period, LP Displays
9   manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or
10  affiliates throughout the United States.

11      45.     Defendants LGEI, LGEUSA, LGETT, and LP Displays are referred to collectively
12  herein as "LG Electronics."

13      **Panasonic Entities**

14      46.     Defendant Panasonic Corporation, f/k/a Matsushita Electric Industrial Co, Ltd.
15  ("MEI"), is a Japanese entity located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501,
16  Japan. The entity known as MEI operated under that name until October 1, 2008 when it changed
17  its name to Panasonic Corporation. In 2002, MEI entered into a joint venture with Defendant
18  Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.
19  MEI was the majority owner with 64.5 percent. On April 3, 2007, MEI purchased the remaining
20  35.5 percent stake in the joint venture, making it a wholly-owned subsidiary of MEI. Panasonic
21  Corporation is best known for its Panasonic brand, which in 2005 had the highest CRT revenue in
22  Japan. During the Class Period, MEI sold and distributed CRT Products either directly or through
23  its subsidiaries or affiliates throughout the United States.

24      47.     Defendant Matsushita Electronic Corporation (Malaysia) Sdn Bhd. ("Matsushita
25  Malaysia") is a Malaysian entity located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah
26  Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia is a wholly-owned and
27  controlled subsidiary of Defendant Panasonic Corporation (formerly MEI). During the Class
28  Period, Matsushita Malaysia sold and distributed CRT Products manufactured by MEI either

10

1 directly or through its subsidiaries or affiliates. Defendant Panasonic Corporation (formerly MEI)

2 dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the

3 antitrust violations alleged in this complaint.

4       48.    Defendant Panasonic Corporation of North America ("PCNA") is a Delaware

5 corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey

6 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.

7 During the Class Period, PCNA sold and distributed CRT Products either directly or through its

8 subsidiaries or affiliates (such as Panasonic Digital Security & Imaging Co., Panasonic Logistics

9 Co., and Panasonic Broadcast & Television Systems Co.) or Panasonic Company West of

10 America) throughout the United States. Defendant Panasonic Corporation (f/k/a MEI) dominated

11 and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged

12 in this complaint.

13       49.    Defendant Panasonic Consumer Electronics Co. ("PACEC") is a Delaware

14 corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey

15 07094.  PACEC is a wholly-owned and controlled subsidiary of Defendant PCNA.  During the

16 Class Period, PACEC sold and distributed CRT Products either directly or through its subsidiaries

17 or affiliates throughout the United States. Defendant Panasonic Corporation (formerly MEI)

18 dominated and controlled the finances, policies and affairs of PACEC relating to the antitrust

19 violations alleged in this complaint.

20       50.    Defendants Panasonic Corporation (f/k/a MEI), Matsushita Malaysia, PCNA, and

21 PACEC are collectively referred to herein as "Panasonic."

22     **Philips Entities**

23       51.    Defendant Koninklijke Philips Electronics N.V. ("Royal Philips"), which translates

24 to Royal Philips Electronics, is a Dutch entity with its principal place of business at Breitner

25 Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands.  In 2000, Royal Philips was the

26 leading global supplier of CRTs.  Royal Philips operated in Asia directly through divisions (such

27 as Philips Components Asia and Philips BGTV) and through wholly-owned and separately

28 incorporated subsidiaries. In 2001, Royal Philips entered into a joint venture with Defendant LG

11

1   Electronics called LG.Philips Displays ("LGPD"), in which the entities combined their CRT
2   businesses. LGPD operated in Asia and in Europe through its division LG.Philips Displays
3   Europe Region. On April 1, 2007, LG.Philips Displays became an independent company and
4   changed its name to LP Displays International, Ltd. During the Class Period, Royal Philips
5   manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or
6   affiliates throughout the United States.

7          52.    Defendant Philips Electronics Industries Ltd. ("PEIL") is a Taiwanese corporation
8   with its principal place of business at 15F, 3-1 Yuanqu St., Nangang District, Taipei 115, Taiwan.
9   PEIL is a subsidiary of Defendant Royal Philips. During the Class Period, PEIL sold and
10  distributed CRT Products either directly or through its subsidiaries or affiliates throughout the
11  United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs
12  of PEIL relating to the antitrust violations alleged in this complaint.

13         53.    Defendant Philips Electronics North America ("Philips America") is a Delaware
14  corporation with its principal place of business at 1251 Avenue of the Americas, New York, New
15  York, 10020. Philips America is a subsidiary of Defendant Royal Philips. During the Class
16  Period, Philips America sold and distributed CRT Products either directly or through its
17  subsidiaries or affiliates throughout the United States. Defendant Royal Philips dominated and
18  controlled the finances, policies and affairs of Philips America relating to the antitrust violations
19  alleged in this complaint.

20         54.    Defendant Philips Consumer Electronics Co. ("PCEC") has its principal place of
21  business at 64 Perimeter Center E, Atlanta, GA 30346-2295. PCEC is a subsidiary of Defendant
22  Royal Philips. During the Class Period, PCEC sold and distributed CRT Products either directly
23  or through its subsidiaries or affiliates throughout the United States. Defendant Royal Philips
24  dominated and controlled the finances, policies and affairs of PCEC relating to the antitrust
25  violations alleged in this complaint.

26         55.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a
27  Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street,
28  Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips.

12

During the Class Period, Philips Taiwan sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

56.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Class Period, Philips Brazil sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

57.     Defendants Royal Philips, PEIL, PCEC, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**Samsung Entities**

58.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business at 250, 2-ga, Taepyong-ro, Jung-gu, Seoul 100-742, South Korea. It is South Korea's top electronics company. During the Class Period, SEC manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

59.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660. SEAI is a wholly-owned and controlled subsidiary of Defendant SEC. During the Class Period, SEAI manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

60.     Defendant Samsung SDI (Malaysia) Sdn Bhd. ("Samsung Malaysia") is a Malaysian corporation with its principal place of business at Lots 635 & 660, Kawasan

13

1   Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.

2   Samsung Malaysia is a wholly-owned and controlled subsidiary of Defendant SEC.  During the

3   Class Period, Samsung Malaysia sold and distributed CRT Products either directly or through its

4   subsidiaries or affiliates throughout the United States. Defendant SEC dominated and controlled

5   the finances, policies and affairs of Samsung Malaysia relating to the antitrust violations alleged in

6   this complaint.

7   61.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company

8   ("Samsung SDI") is a South Korean company with its principal place of business at 15th – 18th

9   Floor, Samsung Life Insurance Building, 150, 2-ga, Taepyong-ro, Jung-gu, Seoul, 100-716, South

10  Korea. Samsung SDI is a wholly-owned and controlled subsidiary of Defendant SEC. Samsung

11  SDI is one of the largest CRT producers in the world. Samsung SDI was the top manufacturer for

12  CRTs in 2000, with a market share of approximately 20%.  During the Class Period, Samsung SDI

13  manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or

14  affiliates throughout the United States. Defendant SEC dominated and controlled the finances,

15  policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

16  62.    Defendant Samsung SDI America, Inc. ("Samsung America") is a California

17  corporation with its principal place of business at 3333 Michelson Drive, Suite 700, Irvine,

18  California.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung

19  SDI.   During the Class Period, Samsung America sold and distributed CRT Products either

20  directly or through its subsidiaries or affiliates throughout the United States. Defendant SEC and

21  Samsung SDI dominated and controlled the finances, policies and affairs of Samsung America

22  relating to the antitrust violations alleged in this complaint.

23  63.    Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a

24  Mexican company with its principal place of business located at Blvd. Los Olivos, No.21014,

25  Parque Industrial El Florido, Tijuana, B.C. Mexico. Samsung SDI Mexico is a wholly-owned and

26  controlled subsidiary of Defendant Samsung SDI. During the Class Period, Samsung SDI Mexico

27  sold and distributed CRT Products either directly or through its subsidiaries or affiliates

28  throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the

14

finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

64.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil. Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Class Period, Samsung SDI Brazil sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

65.     Defendant Shenzhen Samsung SDI Co. Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Class Period, Samsung SDI Shenzhen sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

66.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Class Period, Samsung SDI Tianjin sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

67.     Defendants SEC, Samsung SDI, Samsung America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung Malaysia are collectively referred to herein as "Samsung."

15

**Samtel**

68.     Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its principal place of business at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CPTs sold in India is approximately 40%, and it is that country's largest exporter of CPT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CPT Products.  During the Class Period, Samtel manufactured, sold, and distributed CPT Products throughout the United States.

**Tatung Company of America, Inc.**

69.     Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California. Tatung America is a subsidiary of Tatung Company. Currently, Tatung Company owns approximately half of Tatung America. The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin. Following Lun Kuan Lin's recent death, her share passed to her two children. During the Class Period, Tatung America manufactured, marketed, sold and/or distributed CRT Products manufactured by, among others, Chungwa Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United States.

**Thai CRT**

70.     Defendant Thai CRT Company, Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Class Period, Thai CRT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

**Toshiba Entities**

71.     Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, Toshiba held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.   In 2002, TC entered into a joint venture with Defendant MEI (now Panasonic

16

Corporation) called Matsushita Toshiba Picture Display Co., Ltd., in which the entities consolidated their CRT businesses. During the Class Period, TC manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

72. Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business at 1251 Avenue of the Americas, Suite 4110, New York, NY 10020. Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC. During the Class Period, Toshiba America sold and distributed CRT Products either directly or through its subsidiaries or affiliates (such as Toshiba Hawaii, Inc.) throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

73. Defendant Toshiba America Consumer Products LLC ("TACP") is a limited liability company that is headquartered at 82 Totawa Rd., Wayne, New Jersey 07470-3114. TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Class Period, TACP sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

74. Defendant Toshiba America Consumer Products, Inc. ("TACPI") is a company that is headquartered at 1420-B Toshiba Drive, Lebanon, Tennessee, 37087. TACPI is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Class Period, TACP sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TACPI relating to the antitrust violations alleged in this complaint.

75. Defendant Toshiba America Electronic Components, Inc. ("TAEP") is headquartered at 9740 Irvine Blvd., Irvine, California 92718-1697. TAEP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Class Period, TAEP sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant TC dominated and controlled the finances, policies and

17

1 affairs of TAEP relating to the antitrust violations alleged in this complaint.

2       76.     Defendant Toshiba America Information Systems, Inc. ("TAIP") is headquartered

3 at 9740 Irvine Blvd., Irvine, California 92718-1697. TAIP is a wholly-owned and controlled

4 subsidiary of Defendant TC through Toshiba America. During the Class Period, TAIP sold and

5 distributed CRT Products either directly or through its subsidiaries or affiliates throughout the

6 United States. Defendant TC dominated and controlled the finances, policies and affairs of TAIP

7 relating to the antitrust violations alleged in this complaint.

8       77.     Toshiba Display Devices (Thailand) Company, Ltd. ("TDDT") is a Thai company

9 with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon

10 Road, Pathum Thani, Thailand 12000. TDDT is a wholly-owned and controlled subsidiary of

11 Defendant TC. During the Class Period, TAIP sold and distributed CRT Products either directly or

12 through its subsidiaries or affiliates throughout the United States. Defendant TC dominated and

13 controlled the finances, policies and affairs of TAIP relating to the antitrust violations alleged in

14 this complaint.

15       78.     Defendants TC, Toshiba America, TDDT, TACP, TACPI, TAEP and TAIP are

16 referred to collectively as "Toshiba."

17 **Joint Ventures**

18       79.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display

19 Co., Ltd. ("MTPD") is a Japanese entity located at 1-1, Saiwai-cho,. Takatsuki-shi, Osaka 569-

20 1193, Japan. MTPD was formed as a CRT joint venture between Defendants Panasonic

21 Corporation (f/k/a MEI) and Toshiba. On April 3, 2007, Defendant MEI purchased the remaining

22 stake in MTPD, making it a wholly-owned subsidiary. During the class period, MTPD

23 manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or

24 affiliates throughout the United States.

25       80.     Defendant Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a Chinese

26 company with its principal place of business at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang

27 District, Beijing, China. BMCC is the second largest producer of CRTs for televisions in China.

28 During the Class Period, BMCC manufactured, sold, and distributed CRT Products either directly

18

1   or through its subsidiaries or affiliates throughout the United States.

2   ### IV.  AGENTS AND CO-CONSPIRATORS

3   81.     Various persons that are not named as Defendants herein have participated in the

4   violations alleged herein and have performed acts and made statements in furtherance thereof.

5   Plaintiffs reserve the right to name some or all of these persons as Defendants at a later date.

6   82.     Whenever in this complaint reference is made to any act, deed or transaction of any

7   corporation, the allegation means that the corporation engaged in the act, deed or transaction by or

8   through its officers, directors, agents, employees or representatives while they were actively

9   engaged in the management, direction, control or transaction of the corporation's business or

10  affairs.

11  83.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by

12  companies they acquired through mergers and acquisitions.

13  84.     Each of the Defendants named herein acted as the agent of, co-conspirator with, or

14  joint venturer of the other Defendants with respect to the acts, violations and common course of

15  conduct alleged herein. Each Defendant that is a subsidiary of a foreign parent acts as the United

16  States agent for CRTs and/or CRT Products made by its parent company.

17  ### V.  CLASS ACTION ALLEGATIONS

18  85.     Plaintiffs bring this action both on behalf of themselves, and as a class action

19  pursuant to Federal Rules of Civil Procedure, Rule 23(a) and (b)(3), on behalf of the following

20  class (the "Class").

21  All persons and entities who, between March 1, 1995 and November 25, 2007,
    directly purchased a CRT Product in the United States from any defendant or any
22  subsidiary or affiliate thereof, or any co-conspirator. Excluded from the Class are
    Defendants, their parent companies, subsidiaries and affiliates, any co-
23  conspirators, all governmental entities, and any judges or justices assigned to hear
    any aspect of this action.

24  86.     The Class definition encompasses those who bought a CRT Product directly from a

25  Defendant, even if the CRT contained therein was manufactured by an affiliated entity, principal,

26  agent, or co-conspirator.

27  87.     Plaintiffs do not know the exact number of Class members because such

28

19

1    information is in the exclusive control of Defendants.  Plaintiffs believe that, due to the nature of

2    the trade and commerce involved, there are most likely thousands of Class members,

3    geographically dispersed throughout the United States such that joinder of all class members is

4    impracticable.

5         88.    Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs are direct

6    purchasers of CRT Products. All Class members were damaged by the same wrongful conduct of

7    Defendants and their co-conspirators as alleged herein, and the relief sought is common to the

8    class.

9         89.    Numerous questions of law or fact arise from Defendants' anticompetitive conduct

10   that is common to the Class, including but not limited to:

11             a.    Whether Defendants engaged in a contract, combination, and/or conspiracy

12   to fix, raise, maintain, or stabilize prices of CRT Products sold in the United States;

13             b.    Whether Defendants engaged in a contract, combination, and/or conspiracy

14   to restrict output of CRT Products sold in the United States

15             c.    Whether Defendants shared non-public information, allocated markets and

16   customers, restricted output of CRT Products sold in the United States and committed other

17   conduct in furtherance of the alleged conspiracy;

18             d.    Whether Defendants' conduct caused the prices of CRT Products sold in the

19   United States to be at artificially high and noncompetitive levels;

20             e.    Whether Plaintiffs and the other members of the Class were injured by

21   Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class

22   members; and

23             f.    The scope of any injunctive relief to which Plaintiffs and the other members

24   of the Class are entitled.

25        90.    These and other questions of law and fact are common to the Class, and

26   predominate over any questions affecting only individual Class members.

27        91.    Plaintiffs' claims are typical of the claims of the Class because Plaintiffs directly

28   purchased CRT Products from one or more of the Defendants.

DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT
Case No. 3:07-cv-5944 SC; MDL No. 1917

92.    Plaintiffs will fairly and adequately represent the interests of the Class in that Plaintiffs are direct purchasers of CRT Products and have no conflict with any other members of the Class. Furthermore, Plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

93.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

94.    This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

95.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VI. TRADE AND COMMERCE

96.    During the Class Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

97.    During the Class Period, Defendants collectively controlled a majority of the market for CRT Products, both globally and in the United States.

98.    The business activities of the Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## VII. FACTUAL ALLEGATIONS

**A.    CRT Technology and Products**

99.    A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image. A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated

21

with multiple colors of phosphor produces a polychromatic image. An aperture or shadow mask--a thin screen of perforated metal--is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

100.    CRT technology was first developed more than a century ago.    The first commercially practical CRT television was made in 1931.    However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.    Since then, CRTs have become the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs.    Even large public displays, including many scoreboards at sports arenas, are comprised of thousands of single-color CRTs.

101.    The quality of a CRT itself determines the quality of the CRT display.    No external control or feature can make up for a poor quality tube.    In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

102.    Early CRT televisions displayed only black and white images.    CRT technology was revolutionized in 1950 with the advent of the color CRTs.    Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to the one that RCA unveiled in 1950.

103.    CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

104.    Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors.    During the Class Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

22

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

105. CRTs are a declining but still popular technology. CRT televisions typically require a deep cabinet to accommodate the vacuum tube assembly. In the 1990s, technological innovations allowed companies to introduce flat panel displays that are slimmer and less bulky than CRT displays. Flat panel displays were introduced in consumer products such as computer monitors and televisions. Before their introduction, CRTs had dominated the market for these applications.

106. As the established technology, CRTs had a price advantage over these new technologies. Unlike an emerging industry where participants must invest heavily in research, development, and bringing capacity online, the CRT industry made and recouped such investments well before the start of the Class Period. Thus, CRT manufacturers had very little debt or interest expense on their CRT manufacturing facilities, and the pressure to produce at full capacity (to avoid default) was lessened. This provided an environment in which collusion to fix prices, even at the risk of lower demand, was possible.

107. The CRT industry faced significant market pressures and reduced profitability during the latter part of the Class Period due in part to the introduction and rise of competing television technologies, such as plasma screens and liquid crystal display ("LCD") technology.

108. Nonetheless, this decline took some time to materialize. In 2004, it was estimated that CRT televisions constituted 75% of the North American television market, accounting for 19.32 million units. In 2006, the market research firm iSuppli Corp. ("iSuppli") estimated that CRT televisions still accounted for only 46% of all televisions shipped to North American retailers

---

[1] Estimated market value of CRT units sold.

23

1   and the global market share for CRTs in that period was approximately 71%.

2       109.    In 2006, iSuppli predicted that sales of LCD televisions in 2007 would, for the first

3   time, surpass sales of CRT televisions.  The firm forecasted that sales of CRTs would fall from an

4   estimated 14.4 million units in 2006 to 10.4 million units in 2007.  iSuppli predicted that CRT

5   televisions would account for only 2.1 million of the 44 million televisions sold in 2010.

6       110.    CRTs still remain popular, however. For example, in the weeks leading up to the

7   2007 Super Bowl, unit sales of CRTs increased 60%, while revenues increased by 46%. At the

8   Consumer Electronics Show ("CES") held in Las Vegas in 2007, Samsung introduced a new line

9   of "slim" CRTs intended to emulate the form factor of flat panel LCD televisions. CRTs also

10  remain popular with visual effects technicians, in schools and in other public areas for their

11  combination of color calibration, price and durability, as well as in developing countries like

12  China.  CRT technology is also holding its own in the area of low-cost monitor and smaller size

13  televisions.  According to DisplaySearch Inc. ("DSI"), a Texas based research firm, CRTs will

14  maintain a 65 percent share of 25-inch to 29-inch displays sold in 2009, whereas CRTs will have

15  only a 1 percent share of 35-inch to 39-inch displays sold in 2009.

16      111.    DSI further estimates that the worldwide capacity to manufacture CRTs will fall

17  from over 250 million units in 2006 to less than 150 million units by 2010.  At various times

18  during the conspiracy, in order to keep prices high, Defendants colluded to restrain output of

19  CRTs, as alleged below.

20  **B.      Oligopolistic Nature of the CRT Industry**

21      112.    During the Class Period, the CRT industry has been dominated by relatively few

22  companies.  In 2002 for example, three companies – Defendants LP Displays (formerly known as

23  LGPD), Samsung, and Chunghwa – controlled approximately 62 percent of the CRT market, as

24  reflected in the following chart:

25

26

27

28

24

| Company | Share |
|---|---|
| LGPD | 27% |
| Samsung SDI | 24% |
| Chunghwa PT | 11% |
| Japanese Producers[2] | 15% |
| Others | 23% |

113.    The CRT industry also had significant consolidation during the Class Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and MEI's CRT businesses into MTPD.

114.    This concentration of market share facilitated Defendants' ability to implement the conspiracy.  Involvement in long-standing joint ventures, both in the CRT market and closely related markets, also gave these supposed competitors continuous opportunities to discuss pricing, capacity utilization, and other important prospective market information.  The mutually beneficial nature of the business relations between certain Defendants not only provided the opportunity to conspire; it also created a financial incentive to do so.

115.    The concentration of the CRT industry was further exacerbated by various types of intercompetition or cooperation.

116.    Chunghwa, for example, has a long-standing joint venture with Defendant Samsung's corporate parent for the production of liquid crystal display panels.  Defendant Chunghwa now licenses technology from Philips, although this is a recent development that helped resolve a patent infringement suit filed in 2002. Chunghwa also entered into multiple technology transfer agreements with Toshiba, including one entered into in 1995.

117.    Similarly, Samsung's corporate family has a very long-standing relationship with Chinese state-owned picture tube manufacturers, dating back to a 1993 joint venture.

---

[2]    "Japanese Producers" includes Defendants Hitachi and Toshiba.

118. Likewise, LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale, and distribution of optical storage products such as DVD drives.

119. Samtel also participates in a joint venture, Samcor Glass Limited, with Defendant Samsung's corporate parent and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

120. Furthermore, at least four of the competitors obtain picture tubes from the same Indian company. Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic during at least part of the Class Period.

121. Similarly, Orion participates in a joint venture for the manufacture of CRT products with Defendant Toshiba, as well as non-Defendants P.T. Tabung Gambar Indonesia and the Japanese trading company Sumitomo Corporation.

C. **International Antitrust Investigations**

122. Defendants have been the subject of multiple government investigations for their cartel activity in recent years. For example, Samsung admitted guilt and paid a $300 million fine following an investigation by the DOJ into price-fixing among manufacturers of dynamic random access memory ("DRAM") computer chips.

123. More recently, the DOJ and the European Commission ("EC") have commenced investigations of Samsung, Toshiba, LGPD and Hitachi, among others, concerning collusion among manufacturers of thin-film transistor liquid crystal displays ("TFT-LCDs"). Samsung, Toshiba and Hitachi are also being investigated by the DOJ in connection with the price-fixing of flash memory computer chips.

124. In December of 2008, it was announced that LP Display would plead guilty to a DOJ indictment alleging antitrust price-fixing allegations with respect to TFT-LCDs. It has agreed to pay a $400 million fine. Likewise, Chunghwa PT pled guilty to participation in the same conspiracy and was fined $65 million. In January of 2009, it was announced that C.Y. Lin (Chunghwa PT's former Chairman and CEO); Wen Jung Cheng (Assistant Vice-President of Marketing & Sales for Chunghwa PT); Duk Mo Koo (Executive Vice-President & Chief Sales Officer for LG.Philips LCD Co., Ltd.); Chang Suk Chung (Vice-President of Monitor Sales for

26

1  LG Display, Ltd., the predecessor of LP Display); Chih-Chun Liu (Chunghwa PT's Vice-President

2  of LCD Sales); and Hsueh-Lung Lee (also one of Chunghwa PT's Vice-Presidents of LCD Sales)

3  pled guilty to participation in the TFT-LCD conspiracy. Wen Jung Cheng (Assistant Vice-

4  President of Marketing & Sales for Chunghwa PT) and Duk Mo Koo (Executive Vice-President &

5  Chief Sales Officer for LG.Philips LCD Co., Ltd.) have also been indicted in connection with the

6  DOJ's TFT-LCD investigation. As explained below, Mr. Lin is involved in the conspiracy relating

7  to CRT Products. It is believed that several of the other individuals are involved as well. Most

8  recently, on March 10, 2009, it was announced that Hitachi Displays had pled guilty to

9  participation in the price-fixing conspiracy involving TFT-LCDs and had agreed to pay a $31

10  million fine.

11       125.    Many of the Defendants are currently under investigation by government

12  authorities around the world for anticompetitive conduct in connection with the CRT industry.

13  The United States investigation of the CRT conspiracy is being conducted by the DOJ's Antitrust

14  Division's office in the Northern District of California.

15       126.    On February 10, 2009, C.Y. Lin of Chunghwa PT was indicted for participating in

16  a conspiracy to fix the prices of CRTs. The DOJ's announcement of the indictment explained it as

17  follows:

18       The indictment, filed today in U.S. District Court in San Francisco, charges Cheng
         Yuan Lin, aka C.Y. Lin, a resident of Taiwan, with conspiring with others to

19       suppress and eliminate competition by fixing prices, reducing output and
         allocating market shares of color display tubes (CDTs) to be sold in the U.S. and

20       elsewhere, beginning at least as early as Jan. 28, 1997, until at least as late as
         April 7, 2003. The indictment also charges C.Y. Lin with conspiring with others

21       to suppress and eliminate competition by fixing prices for color picture tubes
         (CPTs) to be sold in the U.S. and elsewhere, beginning at least as early as March

22       12, 1997, until at least as late as April 7, 2003.

23
         CRTs consist of evacuated glass envelopes that contain an electron gun and a

24       phosphorescent screen. When electrons strike the screen, light is emitted, creating
         an image on the screen. CDTs and CPTs are each types of CRTs. CDTs are used

25       in computer monitors and other specialized applications, while CPTs are used in
         color televisions. The worldwide market for CRTs, including CPTs and CDTs, in

26       1997, at the start of the conspiracies has been estimated as approximately $26
         billion.

27
         "This conspiracy harmed countless Americans who purchased computers and

28       televisions using cathode ray tubes sold at fixed prices," said Scott D. Hammond,

27

Acting Assistant Attorney General in charge of the Antitrust Division. "The Antitrust Division will continue to prosecute individuals, wherever they are located and however high their position on the corporate ladder, who engage in price fixing aimed at U.S. businesses and consumers."

According to the charges, C.Y. Lin and co-conspirators carried out the CDT conspiracy by, among other things:

--Attending meetings and engaging in conversations and communications in Taiwan, Korea, Malaysia, China and elsewhere to discuss the prices, output and market shares of CDTs;

--Agreeing during those meetings, conversations and communications to charge prices of CDTs at certain target levels or ranges;

--Agreeing during those meetings, conversations and communications to reduce output of CDTs by shutting down CDT production lines for certain periods of time;

--Agreeing during those meetings, conversations and communications to allocate target market shares for the CDT market overall and for certain CDT customers;

--Exchanging CDT sales, production, market share and pricing information for the purpose of implementing, monitoring and enforcing adherence to the agreed-upon prices, output reduction and market share allocation;

--Implementing an auditing system that permitted co-conspirators to visit each other's production facilities to verify that CDT production lines had been shut down as agreed;

--Authorizing and approving the participation of subordinate employees in the conspiracy;

--Issuing price quotations and reducing output in accordance with the agreements reached; and

--Taking steps to conceal the conspiracy and conspiratorial contacts through various means.

C.Y. Lin is charged with carrying out the CPT conspiracy with his co-conspirators by, among other things:

--Attending meetings and engaging in conversations and communications in Taiwan, Korea, Malaysia, China, Thailand, Indonesia and elsewhere to discuss the prices of CPTs;

--Agreeing during those meetings, conversations and communications to charge prices of CPTs at certain target levels or ranges;

--Exchanging CPT pricing information for the purpose of implementing, monitoring and enforcing adherence to the agreed-upon prices;

28

--Authorizing and approving the participation of subordinate employees in the conspiracy;

--Issuing price quotations in accordance with the agreements reached; and

--Taking steps to conceal the conspiracy and conspiratorial contacts through various means.[3]

127.   The DOJ is not acting alone against the manufacturers of CRTs. Multiple foreign antitrust enforcement authorities are also investigating the CRT cartel.

128.   On November 8, 2007, it was reported that EC officials carried out unannounced raids on manufacturers of CRTs based on suspected anticompetitive conduct. That same day, the EC issued a press release stating that, "[t]he commission has reason to believe that the companies concerned may have violated EU rules against price-fixing, sharing markets or exchanging market information."

129.   On November 9, 2007, MEI (now known as Panasonic Corporation) and Samsung reported that they were cooperating with the Japanese Fair Trade Commission ("JFTC"), which raided the companies' CRT production facilities on suspicion of anticompetitive conduct.

130.   On that same day, a Samsung spokesperson announced that its CRT subsidiary in South Korea was being investigated by the Korean Fair Trade Commission ("KFTC") as "part of an international probe into alleged price-fixing."

131.   On November 12, 2007, Chunghwa announced that it had received a summons from the DOJ with respect to involvement in a CRT price-fixing cartel.

132.   And on November 21, 2007, Defendant Philips acknowledged that it was being investigated as well. The *International Herald Tribune* reported that "competition authorities in several jurisdictions had started investigations," and that the company "would assist regulators."

133.   On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel. The HCA described the cartel as follows:

---

[3] The significance of the April 7, 2003 ending date in this indictment is that is when C.Y. Lin left the employ of Chunghwa PT.

DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT
Case No. 3:07-cv-5944-SC; MDL No. 1917

The Hungarian Competition Authority (Gazdasági Versenyhivatal - GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co. Ltd, Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

**D.      Collusive Contacts, Meetings, And Agreements Among Members of the CRT Products Industry**

134.    The antitrust conspiracy involving CRT Products went on for over twelve years (1995-2007), involved the various Defendant companies, and was effectuated through agreements and common understandings reached in at least 500 bilateral or multilateral meetings that occurred in Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K., and Europe.

135.    Bilateral contacts and communications among Defendants commenced in the late 1980s-early 1990s on an *ad hoc* basis. Competitively sensitive information on pricing, production capacity, product mix and customer information was exchanged. In 1995, these bilateral meetings began to increase in frequency. There were more than a dozen such meetings in 1995 and several dozen such meetings in 1996 alone. The meetings continued throughout the Class Period. Bilateral contacts and communications were conducted in person, by telephone or by e-mail.

136.    During 1995-96, certain of the Defendants commenced participation in informal group meetings. There were several such meetings in 1995 and over a dozen more in 1996. As time went on, bilateral meetings encompassed specific intercompany agreements or followed up

30

1  on agreements reached at group meetings. Bilateral meetings were conducted in person, by
2  telephone or by e-mail.

3       137.   Beginning in 1997, CRT makers started to meet in a more organized, systematic
4  fashion.  At some point, these meetings became known as "Glass Meetings" or "GSM."  Until
5  June of 2000, "Glass Meetings" involving CDT Products and CPT Products were typically held
6  back to back at the same venue. Thereafter, in order to limit detection, they were held separately at
7  different venues.

8       138.   With respect to CRT Products, Defendants or their agents agreed to, *inter alia*: (a)
9  fix target prices and price guidelines; (b) exchange pertinent information on, inter alia, shipments,
10 prices, production, and customer demand; (c) coordinate public statements regarding available
11 capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some
12 of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the
13 agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales;
14 (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit
15 competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of
16 certain key customers' sales; and (k) restrict output.

17      139.   The overall CRT conspiracy affected worldwide prices (including prices in the
18 United States) that Defendants charged for CRT Products.

19      140.   Agreements as to CRT Products were conducted through bilateral meetings as
20 described above, through informal multilateral meetings as described above, and through more
21 formal "Glass Meetings."

22      141.   The "Glass Meetings" conducted with respect to CRT Products fell into several
23 categories:

24          a.     "Top Meetings" – meetings held by individuals at the highest level of the
25 Defendant companies.  These happened less frequently, typically on a quarterly basis, and were
26 focused on longer term agreements and dispute resolution. Top Meetings occurred in South Korea,
27 Taiwan, and China.

28

1    b.    "Management Meetings" – meetings held by high-level sales executives.
2  These meetings occurred more frequently, typically on a monthly basis, and handled
3  implementation of agreements made at "Top Meetings." Management level meetings occurred in
4  South Korea, Taiwan, China, Indonesia, Japan, and Thailand.

5    c.    "Working Level Meetings" – meetings of lower level sale and marketing
6  employees to exchange data and discuss pricing. Working level meetings occurred in South Korea,
7  Taiwan, and China.

8    d.    "Green Meetings" – meetings on golf courses.

9    142.    Attending Defendants would often exchange competitively sensitive information
10  prior to a Glass Meeting. This included information on inventories, production, sales and exports.
11  For some such meetings, where information could not be gathered in advance of the meeting, it
12  was brought to the meeting and shared.

13    143.    The meetings themselves followed a typical pattern. First, attending Defendants
14  exchanged information regarding pricing subjects, such as pricing and anticipated future demand
15  for the upcoming quarter.  The chairman of these meetings, who was selected on a rotating basis
16  from among the attending Defendants (although, with respect to meetings on CPT Products, one
17  person typically served as chair after 2002), displayed this information on a whiteboard or
18  projector. Each attending Defendant was given the opportunity to update the information it had
19  previously provided.  Attending Defendants often computed overall production for each product
20  and compared that to estimated demand.

21    144.    Based on this information, Defendants agreed on price guidelines, either a range of
22  price increases or a range of price floors (known as "bottom prices").  The price guideline could
23  serve as a floor in declining markets or could serve as a basis for a price increases in rising
24  markets. Failure to object indicated assent. The agreements encompassed prices in United States
25  dollars to specific third party customers, and prices reflecting inclusion of specific features in a
26  CRT (such as certain types of coating or the differing types of shadow mask). The agreements
27  encompassed not only prices charged to third party customers, but, in the case of vertically
28  integrated manufacturers who produced both CRTs and CRT Products, also encompassed: (a)

32

prices charged by the CRT manufacturing arm of each such integrated company to the corporate division or subsidiary that manufactured or sold computer monitors, televisions or other similar products and (b) price floors on quotations offered by the competitors of the integrated company to such a division or subsidiary. Defendants also considered the internal pricing of products containing CRTs in agreeing upon the prices at which CRTs were set.

145.    In addition to agreements about price, Defendants at Glass Meetings often also made agreements related to both overall market share and the share of a particular customer's purchases.  As part of the latter type of agreement, respective Defendants were designated as the "major supplier" to certain customers.  This designation was based on the historical relationships that were already in place between the suppliers and customers.

146.    In addition to agreements on market shares, the Defendants often also agreed and implemented coordinated output restrictions.  These output agreements began as agreements to shut down production lines for a certain number of days.  As time went on, they changed to agreements to shut down entire production lines.   To police this aspect of the conspiracy, there were in-person follow-up audits, in which a designated co-conspirator would visit the facilities of another co-conspirator in order to ensure that output restrictions were being implemented. Sometimes, they also discussed plans related to future capacity expansion.  Defendants based these determinations on what the market would look like, after jointly analyzing anticipated supply and demand. The analysis often included consideration of downstream prices for televisions, computer monitors, or similar products and how they would affect the price ranges being collusively set.

147.    Each attending Defendant at Glass Meetings gave a report with price and projected future output.  The information reported included new capacity, new product lines, and other relevant information.   Each of the other attending Defendants then had the opportunity to challenge the presenter on information being presenting, thus reflecting monitoring of the conspiracy.

148.    Defendants would also agree on what to say about price changes or output restrictions to their customers in order to conceal their conspiracy. Often, one co-conspirator was

33

chosen to make the first price announcement, with the others following on an agreed-upon schedule.

149.   Finally, the attending Defendants would organize the next upcoming meeting.

150.   During the course of these meetings, attending Defendants would be assigned the task of contacting non-attendees in order to secure their consent to the agreements reached.

151.   In contrast to Top or Management Meetings, Working Level Meetings were attended by more junior level executives or sale employees and regional level managers. At these meetings, attending Defendants exchanged sales, shipment, and price information. The meetings also included agreements on pricing. The Working Level Meetings occurred at various locations, including Malaysia, Thailand, Indonesia, Taiwan, South Korea, Singapore, Europe, and China.

152.   The attending Defendants at these meetings also often agreed to follow up with non-attending Defendants in order to communicate the agreements reached at these meetings and secure adherence to them. These efforts were successful.

153.   Agreements at these meetings were also reached to: (a) coordinate in giving customers pretextual reasons for the implementation of the price guidelines agreed upon, (b) expose and eliminate any cheating on the agreements reached, and (c) with respect to CPT Products, coordinate pricing and supply by CPT producers located in India, Europe, and Brazil.

E.   **Summary of Specific Defendant Participation In Unlawful Meetings And Agreements**

154.   When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that the Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and was a party to the agreements reached in them. For the various meeting participants identified below, in many

34

1  instances, their high-ranking executives participated in a significant number of the meetings
2  described.

3      155.    Chunghwa, through Chunghwa PT and Chunghwa Malaysia, participated in
4  hundreds of illegal bilateral and group meetings from 1995 to 2007 in which unlawful agreements
5  as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products
6  occurred. These included hundreds of bilateral meetings and hundreds of group meetings of all the
7  types described herein that took place in Southeast Asia, China, Europe and Scotland. The
8  representatives of Chunghwa who participated in some of these meetings included its highest
9  executives, such as the former Chairman and CEO of Chunghwa PT, C.Y. Lin.

10     156.    Daewoo International, either directly or through Daewoo Electronics or Orion,
11  participated in multiple illegal bilateral and at least several dozen group meetings from 1996 to
12  2004 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and
13  market allocation of CRT Products occurred. These meetings occurred in China, South Korea,
14  Malaysia, Taiwan, Thailand, and the U.K. Daewoo never effectively withdrew from this
15  conspiracy.

16     157.    Hitachi, through Hitachi Ltd., Hitachi Shenzhen, Hitachi Displays, and Hitachi
17  Asia, participated in over a dozen  illegal bilateral and group meetings from 1996 through at least
18  2001 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and
19  market allocation of CRT Products  occurred. These included more than ten bilateral meetings and
20  more than five group meetings of the types described herein, which took place in Taiwan and
21  China. Hitachi never effectively withdrew from this conspiracy.

22     158.    Hitachi America and HEDUS were represented at those meetings and were parties
23  to the agreements entered at them.  Further to the extent Hitachi America and HEDUS distributed
24  CRT Products to direct purchasers, they played a significant role in the conspiracy because
25  Defendants wished to ensure that the prices for such products paid by direct purchasers would not
26  undercut the pricing agreements reached at these various meetings.  Thus, Hitachi America and
27  HEDUS were active, knowing participants in this conspiracy.

28     159.    Irico, through IGC, IGE, and IDDC, participated in multiple illegal bilateral and at

35

1    least several dozen illegal group meetings from 1998 to 2006 in which unlawful agreements as to,
2    *inter alia*, price, output restrictions, and customer and market allocation of CRT Products
3    occurred. These meetings took place in China. Irico never effectively withdrew from this
4    conspiracy. None of Irico's conspiratorial conduct in connection with CRT Products was
5    mandated by the Chinese government; Irico was acting to further its independent private interests
6    in participating in this conspiracy.

7    160.    LG Electronics participated, through LGPD, LP Displays, LGEI, and LGETT, in
8    more than a dozen illegal bilateral and more than a hundred illegal group meetings from 1995 to
9    2006 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and
10   market allocation of CRT Products occurred. These meetings took place in Taiwan, South Korea,
11   Indonesia, Thailand, Singapore, Malaysia, and China. LG Electronics never effectively withdrew
12   from this conspiracy.

13   161.    LGEUSA was represented at these meetings and was a party to the agreements
14   entered at them. To the extent LGEUSA distributed CRT Products to direct purchasers, it played
15   a significant role in the conspiracy because Defendants wished to ensure that the prices for such
16   products paid by direct purchasers would not undercut the pricing agreements reached at these
17   various meetings. Thus, LGEUSA was an active, knowing participant in this conspiracy.

18   162.    Panasonic, directly or through Matsushita Malaysia, participated in several dozen
19   illegal bilateral and group meetings from 1996 through at least 2003 in which unlawful
20   agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT
21   Products occurred. These included bilateral meetings and group meetings of the types described
22   herein. These meetings took place in Taiwan, Malaysia, and China. Panasonic never effectively
23   withdrew from this conspiracy.

24   163.    PCNA and PACEC were represented at those meetings and was a party to the
25   agreements entered at them. To the extent PCNA and PACEC distributed CRT Products to direct
26   purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that
27   the prices for such products paid by direct purchasers would not undercut the pricing agreements
28   reached at these various meetings. Thus, PCNA and PACEC were active, knowing participants in

36

the alleged conspiracy.

164. Philips, through Royal Philips, Philips Taiwan, PEIL, LGPD, and LP Displays, participated in over 100 illegal bilateral and group meetings from 1996 through 2007 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products occurred. These included several bilateral meetings and over 100 group meetings of the types described herein. These meetings occurred in Korea, Taiwan, China, Malaysia, Scotland, the U.K., and various locations in Europe. Philips participated through Royal Philips or its subsidiaries into 2001 and participated thereafter through LGPD. Philips never effectively withdrew from this conspiracy.

165. Philips America, Philips Brazil, and PCEC were represented at those meetings and were a party to the agreements entered at them. To the extent Philips America, Philips Brazil, and PCEC distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings. Thus, Philips America, Philips Brazil, and PCEC were active, knowing participants in this conspiracy.

166. Samsung, through SEC, Samsung SDI, Samsung Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin, participated in hundreds of illegal bilateral and illegal group meetings from 1995 through at least 2006 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products (including CDT Products and CPT Products) occurred. These included dozens of bilateral meetings and several hundred group meetings of the types described herein. These meetings occurred in South Korea, Taiwan, China, Malaysia, Japan, Singapore, Thailand, the United Kingdom, and various locations in Europe. Samsung never effectively withdrew from this conspiracy.

167. Samsung America, SEAI, Samsung SDI Brazil, and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them. To the extent Samsung America, SEAI and Samsung SDI Mexico distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing

37

1  agreements reached at these various meetings. Thus, Samsung America, SEAI, and Samsung SDI
2  Mexico were active, knowing participants in this conspiracy.

3      168.    Samtel participated in multiple illegal bilateral meetings between 1998 and 2006 in
4  which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market
5  allocation of CPT Products occurred. These meetings occurred in Malaysia. Samtel never
6  effectively withdrew from this conspiracy.

7      169.    To the extent Tatung America distributed CRT Products to direct purchasers, it
8  played a significant role in the conspiracy because Defendants wished to ensure that the prices for
9  such products paid by direct purchasers would not undercut the pricing agreements reached at
10 these various meetings. Thus, Tatung America was an active, knowing participant in the alleged
11 conspiracy.

12     170.    Thai CRT participated in over 50 illegal bilateral and group meetings between 1998
13 and 2006 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer
14 and market allocation of CPT Products occurred. These meetings occurred in Taiwan, South
15 Korea, Thailand, Malaysia, Indonesia, Singapore, and China.  Thai CRT never effectively
16 withdrew from this conspiracy.

17     171.    Toshiba, through TC and TDDT, participated in over 50 illegal bilateral and group
18 meetings between 1995 and 2003 in which unlawful agreements as to, *inter alia*, price, output
19 restrictions, and customer and market allocation of CRT Products occurred. These meetings
20 occurred in Taiwan, Thailand, and Indonesia.  Toshiba never effectively withdrew from this
21 conspiracy.

22     172.    Toshiba America, TAIP, TACP, TACPI, and TAEP were represented at those
23 meetings and were a party to the agreements entered at them.  To the extent Toshiba America,
24 TAIP, TACP, and TAEP distributed CRT Products to direct purchasers, they played a significant
25 role in the conspiracy because Defendants wished to ensure that the prices for such products paid
26 by direct purchasers would not undercut the pricing agreements reached at these various meetings.
27 Thus, Toshiba America, TAIP, TACP, and TAEP were active, knowing participants in this
28 conspiracy.

38

173.    BMCC participated in at over 20 illegal bilateral group meetings between 1998 and 2001 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products (including CDT Products and CPT Products) occurred. These meetings occurred in China.  BMCC never effectively withdrew from this conspiracy. None of BMCC's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government; BMCC was acting to further its independent private interests in participating in this conspiracy.

174.    MTPD participated in at several dozen illegal bilateral and group meetings between 1998 and 2001 in which unlawful agreements as to, inter alia, price, output restrictions, and customer and market allocation of CPT Products occurred. These meetings occurred in Malaysia, Thailand, Singapore, Taiwan, and Indonesia.   MTPD never effectively withdrew from this conspiracy.

175.    LP Display and its predecessor entity LGPD participated in over 100 illegal bilateral and group meetings between 2001 and 2006 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products (including CDT Products and CPT Products) occurred. These meetings occurred in Taiwan, South Korea, Japan, Malaysia, Thailand, Singapore, Indonesia, and China.  Neither LP Display nor LGPD ever effectively withdrew from this conspiracy.

F.      **Use of Trade Associations And Trade Events To Facilitate The Conspiracy**

176.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information. One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers. Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea. EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK had a cooperation pact with the United States Display

39

1    Consortium ("USDC"). In describing that pact, Malcolm Thompson, then the Chairman of

2    USDC's governing board, said "[e]ven competitors should cooperate on common issues."

3         177.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and

4    have participated extensively in the KDCs.

5         178.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4,

6    2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November

7    3-4, 2005; July 6-7, 2006; and June 26-27, 2007. Top executives of Samsung's and LG

8    Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong

9    Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney

10   Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou

11   Tashima of Hitachi.

12        179.    Other opportunities to collude among the Defendants were provided by events

13   sponsored by the Society for Information Display, such as the annual Asian Symposiums on

14   Information Display, the annual International Display Manufacturing Conference and Exhibition

15   (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on

16   Information Displays (held each August in Daegu, Korea) and the annual International Display

17   Workshops (the most recent ones of which have been held in Japan).

18        180.    Through these trade association and trade events, and in meetings related to these

19   trade associations and trade events, on information and belief, Defendants shared what would

20   normally be considered proprietary and competitively sensitive information. This exchange of

21   information was used to implement and monitor the conspiracy.

22   G.    **Effects of Defendants' Antitrust Violations**

23        1.    **Examples of Reductions in Manufacturing Capacity by Defendants**

24        181.    As explained above, during the Class Period, the Defendants consolidated their

25   manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity

26   to prop up prices.

27        182.    On July 15, 2003, Mitsubishi Electric closed a CRT plant in northern Mexico, just

28   five years after the plant was opened. The plant's closure resulted in a loss of capacity to

40

1    manufacture 2.7 million CRTs a year for 17-inch computer monitors. This was one of the

2    principal applications for CRTs during this time period.

3         183.   In December of 2004, MTPD closed its American subsidiary's operations in

4    Horeseheads, New York citing price and market erosion. Panasonic announced that the closing

5    was part of the company's "global restructuring initiatives in the CRT business." The company

6    further stated that in the future, "CRTs for the North American market will be supplied by other

7    manufacturing locations in order to establish an optimum CRT manufacturing structure."

8         184.   In July of 2005, LGPD ceased CRT production at its Durham, England facility,

9    citing a shift in demand from Europe to Asia.

10        185.   In December of 2005, MTPD announced that it would close its American

11   subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG

12   Philips, the company explained that it was shifting its CRT operations to Asian and Chinese

13   markets.

14        186.   In late 2005, Samsung SDI followed the lead of other manufacturers, closing its

15   CRT factory in Germany.

16        187.   In July of 2006, Orion America shut down a CRT manufacturing plant in Princeton,

17   Indiana. The same month, Panasonic announced it was shutting down its CRT factory in Malaysia

18   and liquidating its joint venture with Toshiba.

19        **2.    Examples of Collusive Pricing for CRT Products**

20        188.   Defendants' collusion is evidenced by unusual price movements in the CRT market.

21   In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did

22   not fully materialize. For example, in 1992, an analyst for Market Intelligent Research

23   Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements

24   and advances in manufacturing techniques, will produce a drop in the price of the average

25   electronic display to about $50 in 1997." Despite such predictions, and the existence of economic

26   conditions warranting a drop in prices, CRT prices nonetheless remained stable.

27        189.   In 1996, another industry source noted that "the price of the 14" tube is at a

28   sustainable USD50 and has been for some years . . . ."

190.    In reality, consumer prices for CRT Products never approached $50 in 1997, and were consistently more than double this price.

191.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.   This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.   This was a pretext used to conceal the conspiracy.

192.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.   This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

193.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.   The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

194.    After experiencing an oversupply of 17-inch CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.   A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

195.    On June 1, 2004, LG Electronics raised the prices of its 15-inch and 17-inch CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

196.    Over the course of the conspiracy period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.   CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of

42

1    2007, "[t]he CRT technology is very mature; prices and technology have become stable."

2       197.    Indeed, CRT prices resisted downward price pressures and remained stable over a

3 period of many years. Even in periods of decreasing prices caused by outside factors, such as the

4 Asian currency crisis, the prices of CRT Products did not decline as much as they would have

5 absent the conspiracy. The stability of the price of CRTs was accomplished by the collusive

6 activities alleged above.

7 **H.     Summary Of Effects Of The Conspiracy Involving CRT Products**

8       198.    The above combination and conspiracy has had the following effects, among

9 others:

10       a.     Price competition in the sale of CRT Products by Defendants and their co-

11 conspirators has been restrained, suppressed and eliminated throughout the United States;

12       b.     Prices for CRT Products sold by Defendants has been raised, fixed,

13 maintained and stabilized at artificially high and noncompetitive levels throughout the United

14 States; and

15       c.     Direct purchasers of CRT Products from Defendants have been deprived of

16 the benefit of free and open competition in the purchase of CRT Products.

17       199.    As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs

18 and other members of the class have been injured in their business and property in that they paid

19 more for CRT Products than they otherwise would have paid in the absence of the unlawful

20 conduct of Defendants.

21 **I.     Fraudulent Concealment**

22       200.    Plaintiffs had neither actual nor constructive knowledge of the facts constituting

23 their claim for relief despite diligence in trying to discover the pertinent facts. Plaintiffs and

24 members of the Class did not discover, and could not have discovered through the exercise of

25 reasonable diligence, the existence of the conspiracy alleged herein until November of 2007, when

26 the governmental investigations described above became public. Defendants engaged in a secret

27 conspiracy that did not give rise to facts that would put Plaintiffs or the Class on inquiry notice

28 that there was a conspiracy to fix prices for CRT Products.

43

201.     Because the Defendants' agreement, understanding and conspiracy was kept secret, Plaintiffs and Class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRT Products.

202.     The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. As noted above, Defendants organized Glass Meetings to avoid detection, conducted bilateral meetings in secret and agreed at Glass Meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions. Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

203.     By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

204.     Plaintiffs and the Class members could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between the Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

205.     As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection. Participants at Glass Meetings were also told not to take minutes. Attending companies also reduced the number of their respective attendees to maintain secrecy.

206.     Defendants also agreed at Glass Meetings and bilateral meetings to give pretextual

44

1  reasons for price increases and output reductions to their customers.

2      207.   As alleged above, in early 1999, despite declining production costs and the rapid

3  entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price

4  increase was allegedly based on increasing global demand for the products.  In fact, this price rise

5  was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

6      208.   As alleged above, despite increased competition from flat panel monitors, prices for

7  CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization

8  was purportedly due exclusively to a shortage of critical components such as glass.  This was a

9  pretext used to cover up the conspiracy.

10     209.   In addition, when several CRT manufacturers, including Defendants Samsung,

11  Philips, and LG Electronics, increased the price of CRT Products in 2004, the price hike was

12  blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price

13  increase, a Deputy General Manager for an LG Electronics  distributor in India stated, "[t]his

14  shortage [of glass shells] is a global phenomena and every company has to increase the prices of

15  CRT monitors in due course of time."

16     210.   Manufacturers such as LG Electronics periodically issued press statements falsely

17  asserting that CRT prices were being driven lower by intense competition.

18     211.   Plaintiffs are informed and believe, and thereon allege, that Defendants' purported

19  reasons for the price increases of CRT Products were materially false and misleading and made for

20  the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

21     212.   As a result of Defendants' fraudulent concealment of their conspiracy, the running

22  of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the Class

23  members have as a result of the anticompetitive conduct alleged in this complaint.

24              **VIII.  CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1**

25     213.   Plaintiffs incorporate by reference all the above allegations as if fully set forth

26  herein.

27     214.   From March 1, 1995, the exact date being unknown to Plaintiffs and exclusively

28  within the knowledge of Defendants, Defendants and their co-conspirators entered into a

                                    45

continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

215.   In particular, Defendants have combined and conspired to raise, fix, maintain or stabilize the prices of CRT Products sold in the United States.

216.   As part of and in furtherance of this conspiracy, Defendants or their agents engaged in various collusive practices with respect to CRT Products.

217.   With respect to CRT Products, Defendants or their agents agreed, *inter alia*, to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, inter alia, shipments, prices, production, and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g)  influence and, at times,  coordinate pricing with producers in other geographic markets; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

218.   As a result of Defendants' unlawful conduct, prices for CRT Products were raised, fixed, maintained and stabilized in the United States.

219.   The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

220.   For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.   Participating in meetings and conversations to discuss and agree upon the prices and supply of CRT Products;

b.   Communicating in writing and orally to fix prices, allocate customers, and restrict output;

46

1            c.      Agreeing to manipulate prices and supply of CRT Products sold in the

2    United States, and to allocate customers of such products, in a manner that deprived direct

3    purchasers of free and open competition;

4            d.      Issuing price announcements and price quotations in accordance with the

5    agreements reached;

6            e.      Selling CRT Products to customers in the United States at non-competitive

7    prices; and

8            f.      Providing false statements to the public to explain increased prices for CRT

9    Products.

10       221.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of

11   the Class have been injured in their businesses and property in that they have paid more for CRT

12   Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

13                                   **IX. DAMAGES**

14       222.    During the Class Period, Plaintiffs and the other members of the Class purchased

15   CRT Products directly from Defendants, or their subsidiaries, agents, and/or affiliates, and, by

16   reason of the antitrust violations herein alleged, paid more for such products than they would have

17   paid in the absence of such antitrust violations.  As a result, Plaintiffs and the other members of

18   the Class have sustained damages to their business and property in an amount to be determined at

19   trial.

20                           **X. PRAYER FOR RELIEF**

21       WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf and on behalf of

22   the Class herein, adjudging and decreeing that:

23       A.    This action may proceed as a class action, with Plaintiffs as the designated Class

24   representatives and its counsel as Class Counsel;

25       B.    Defendants have engaged in a contract, combination, and conspiracy in violation of

26   Section 1 of the Sherman Act (15 U.S.C. § 1), and that Plaintiffs and the members of the Class

27   have been injured in their business and property as a result of Defendants' violations;

28       C.    Plaintiffs and the members of the Class recover damages sustained by them, as

47

1   provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs

2   and the Class be entered against the Defendants in an amount to be trebled in accordance with

3   such laws;

4           D.       Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the

5   respective officers, directors, partners, agents, and employees thereof and all other persons acting

6   or claiming to act on their behalf be permanently enjoined and restrained from continuing and

7   maintaining the combination, conspiracy, or agreement alleged herein;

8           E.       Plaintiffs and members of the Class be awarded pre-judgment and post-judgment

9   interest, and that such interest be awarded at the highest legal rate from and after the date of

10   service of the initial complaint in this action;

11           F.       Plaintiffs and members of the Class recover their costs of this suit, including

12   reasonable attorneys' fees as provided by law; and

13           G.       Plaintiffs and members of the Class receive such other or further relief as may be

14   just and proper.

## XI. JURY TRIAL DEMANDED

16           Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all

17   of the claims asserted in this Complaint so triable.

18

19   DATED: March 16, 2009         By:   */s/ Guido Saveri*
                                  Guido Saveri
20                                   R. Alexander Saveri
                                  Geoffrey C. Rushing
21                                   Cadio Zirpoli
                                  Gianna Gruenwald
22                                   SAVERI & SAVERI, INC.
                                  706 Sansome Street
23                                   San Francisco, California 94111
                                  Telephone: (415) 217-6810
24

25                                   *Interim Lead Counsel for Direct Purchaser Plaintiffs*

26

27

28

1
2
3
4

Bruce L. Simon
Jonathan Watkins
Esther L Klisura
PEARSON, SIMON, WARSHAW & PENNY, LLP
44 Montgomery Street , Suite 1430
San Francisco, CA 94104
Telephone: (415) 433-9000

5
6
7

Michael P. Lehmann
HAUSFELD LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 633-1908

8
9
10
11

H. Laddie Montague, Jr.
Ruthanne Gordon
Candice Enders
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000

12
13
14

Joseph J. Tabacco, Jr.
Christopher T. Heffelfinger
BERMAN DEVALERIO PEASE & TABACCO, P.C.
425 California Street, Suite 2025
San Francisco, CA 94104
Telephone: (415) 433-3200

15
16
17
18

Anthony J. Bolognese
Joshua H. Grabar
BOLOGNESE & ASSOSCIATES, LLC
1500 JFK Boulevard
Philadelphia, PA 19102
Telephone: (215) 814-6751

19
20
21

Bryan L. Clobes
Ellen Meriwether
CAFFERTY FAUCHER LLP
1717 Arch Street, Suite 3610
Philidelphia, PA 19103
Telephone: (215) 864-2800

22
23
24

Charles H. Johnson
CHARLES H. JOHNSON & ASSOCIATES PA
2599 Mississippi Street
New Brighton, MN 55113
Telephone: (651) 633-5685

25
26
27
28

49

Joseph W. Cotchett
Steven N. Williams
Aron K. Liang
COTCHETT, PITRE & McCARTHY
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  (650) 697-6000

Roger M. Schrimp
Betty L. Julian
Fred A. Silva
Kathy L. Monday
DAMRELL NELSON SCHRIMP
PALLIOS PACHER & SILVA
1601 I St, 5th Floor
Modesto, CA 95354
Telephone: (209) 526-3500

John G. Emerson
Scott E. Poynter
EMERSON POYNTER LLP
The Museum Center
500 President Clinton Ave., Suite 305
Little Rock, AR 72201
Telephone: (501) 907-2555

Roberta Liebenberg
FINE, KAPLAN AND BLACK, R.P.C.
1835 Market Street, 28th Floor
Philadelphia, PA 19103
Telephone:  (215) 567-6565

Steven A. Kanner
William London
Douglas A. Millen
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500

Joseph Goldberg
FREEDMAN BOYD HOLLANDER GOLDBERG & IVES, PA
20 First Plaza, Suite 700
Albuquerque, NM 87102
Telephone: (505) 346-2222

Robert J. Gralewski, Jr.
GERGOSIAN & GRALEWSKI LLP
655 West Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619)237-9500

50

1  Marc Jeffrey Greenspon
   LAW OFFICES OF MARC J. GREENSPON
2  6200 Spring Isles Blvd.
   Lake Worth, FL 33463
3  Telephone: (954) 817-6272

4  Martin E. Grossman
   LAW OFFICES OF MARTIN E. GROSSMAN
5  2121 Green Brier Drive
   Villanova, PA 19085
6  Telephone: (610) 527-3277

7  Daniel E. Gustafson
   Jason S. Kilene
8  Sung Yun K. Smith
   GUSTAFSON GLUEK PLLC
9  650 Northstar East
   608 Second Avenue South
10 Minneapolis, MN 55402
   Telephone: (612) 333-8844
11
   Randy R. Renick
12 HADSELL STORMER KEENY RICHARDSON &
   RENICK
13 128 North Fair Oaks Avenue, Suite 204
   Pasadena, CA 91103
14 Telephone: (626) 585-9600

15 Anthony D. Shapiro
   Ronnie Seidel Spiegel
16 HAGENS BERMAN SOBOL SHAPIRO
   1301 5th Avenue, Suite 2900
17 Seattle, WA 98101
   Telephone: (206) 623-7292
18
   Vincent J Esades
19 Renae D. Steiner
   HEINS MILLS & OLSON, PLC
20 310 Clifton Ave
   Minneapolis, MN 55403
21 Telephone: (612) 338-4605

22 Michael Stoker
   JOHNS FLAHERTY & COLLINS S.C.
23 Exchange Building, Suite 600
   205 Fifth Avenue South
24 P.O. Box 1626
   LaCrosse, WI 54602
25 Telephone: (608) 784-5678

26

27

28

DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT
Case No. 3:07-cv-5944 SC; MDL No. 1917

Robert N. Kaplan
Linda P. Nussbaum
Gregory K. Arenson
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980

Steven F. Benz
William J. Conyngham
Andrew C. Shen
KELLOGG, HUBER, HANSEN, TODD & EVANS,
P.L.L.C.
1615 k Street NW, Suite 400
Washington, DC 20036-3209
Telephone: (202) 326-7900

Richard M. Heimann
Joseph R. Saveri
Eric B. Fastiff
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000

W. Joseph Bruckner
Elizabeth R. Odette
LOCKRIDGE  GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone (612) 339-6900

Joel Cary Meredith
Steven J. Greenfogel
Daniel Bruce Allanoff
MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C.
1521 Locust Street, 8th Floor
Philadelphia, PA 19102
Telephone: (215) 564-5182

Harry Shulman
THE MILLS LAW FIRM
145 Marina Boulevard
San Rafael, CA 94901
Telephone: (415) 445-1326

Brian D. Brooks
MURRAY FRANK & SAILER LLP
275 Madison Avenue Suite 801
New York, NY 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

52

Neal A Eisenbraun
NEAL A. EIESENBRAUN, CHARTERED
2599 Mississippi Street, Suite 201
New Brighton, MN 55113
Telephone: (651) 633-5685

Richard J. Arsenault
NEBLETT BEARD & ARSENAULT
2220 Bonaventure Court
PO Box 1190
Alexandria, LA 71309
Telephone: (800) 256-1050

Mark Reinhardt
Garrett D. Blanchfield, Jr.
REINHARDT WENDORF & BLANCHFIELD
East 1250 First National Bank Building
322 Minnesota Street
St. Paul, MN 55101
Telephone: (651) 287-2100

Dianne M. Nast
RODANAST, PC
801 Estelle Drive
Lancaster, PA 17601
Telephone: (717) 892-3000

Michael D. Shaffer
SHAFFER & GAIER, LLC
One Penn Center
1617 JFK Boulevard, Suite 946
Philadelphia, PA 19103
Telephone: (215) 741-0100

Natalie Finkelman-Bennett
Jayne Goldstein
SHEPHERD, FINKELMAN, MILLER & SHAH, LLC
35 East State Street
Media, PA 19063
Telephone: (610) 891-9880

Daniel D. Owen
P. John Brady
POLSINELLI SHUGHART, P.C.
Twelve Wyandotte Plaza, Suite 1600
120 W. 12th Street
Kansas City, MO 64105
Telephone: (816) 395-0671

Eugene A. Spector
William G. Caldes
SPECTOR ROSEMAN & KODROFF PC
1818 Market Street, 25th Floor
Philadelphia, PA 19103
Telephone: (215) 496-0300

53

1   Paul E. Slater
SPERLING & SLATER
2   55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
3   Telephone: (312) 641-6492

4   Allan Steyer
STEYER LOWENTHAL BOODROOKAS ALVAREZ &
5   SMITH LLP
One California Street, Third Floor
6   San Francisco, CA 94104
Telephone: (415) 421-3400

7
Lisa J. Rodriguez
8   TRUJILLO, RODRIGUEZ & RICHARDS, LLP
8 Kings Highway West
9   Haddonfield, NJ 08033
Telephone: (856) 795-9002

10
Joseph M. Vanek
11   David P. Germaine
VANEK VICKERS MASINI, P.C.
12   111 S. Wacker, Suite 4050
Suite 4050
13   Chicago, IL 60606
Telephone:  (312) 224-1500

14
Kenneth A. Wexler
15   WEXLER TORISEVA WALLACE LLP
One North LaSalle Street Suite 2000
16   Chicago, IL 60602
Telephone: (312) 346-2222

17
Mary Jane Fait
18   WOLF HALDENSTEIN ADLER FREEMAN & HERZ
LLC
19   55 W. Monroe Street, Suite 1111
Chicago, IL 60603
20   Telephone: (312) 984-0000

21
Attorneys for Plaintiffs
22

23

24   crt.122

25

26

27

28

54