MARIO N. ALIOTO, ESQ. (56433)
LAUREN C. RUSSELL, ESQ. (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA  94123
Telephone:  (415) 563-7200
Facsimile: (415) 346-0679
E-mail: malioto@tatp.com
laurenrussell@tatp.com

***Interim Lead Counsel***
***for the Indirect Purchaser Plaintiffs***
[Additional Attorneys Appear After Signature Page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** ) ) ) ) ) ) ) ) ) | Master File No. 3:07-cv-5944 SC<br><br>MDL No. 1917<br><br>**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT** |
| **This document relates to:** ) ) | |
| **ALL INDIRECT PURCHASER ACTIONS** ) ) ) ) ) | The Honorable Samuel Conti |

1

## <u>TABLE OF CONTENTS</u>

2   I.      INTRODUCTION ................................................................... 1

3   II.     JURISDICTION AND VENUE ...........…..…................................. 2

4   III.    DEFINITIONS ...............……....…..…....................................... 4

5   IV.     PLAINTIFFS .................................................................... 5

6   V.      DEFENDANTS .................................................................. 9

7   VI.     AGENTS AND CO-CONSPIRATORS ...…………………................... 26

8   VII.    INTERSTATE TRADE AND COMMERCE ..……………………….......... 27

9   VIII.   FACTUAL ALLEGATIONS ................................................... 27

10          A.    CRT Technology…………………………….......................... 27

11          B.    Structural Characteristics Of The CRT Market…………………… 28

12                a.    Market Concentration.………………………….................. 28

13                b.    Information Sharing………………………….................... 28

14                c.    Consolidation……………………………........................ 29

15                d.    Multiple Interrelated Business Relationships…………………… 29

16                e.    High Costs Of Entry Into The Industry……………………….. 30

17                f.    The Maturity Of The CRT Product Market…………………… 31

18                g.    Homogeneity Of CRT Products………………………….. 32

19          C.    Pre-Conspiracy Market……………………….................... 32

20          D.    Defendants' And Co-Conspirators' Illegal Agreements………………... 32

21                a.    "Glass Meetings"……………………………................... 33

22                b.    Bilateral Discussions……………………………............. 37

23                c.    Defendants' And Co-Conspirators' Participation In Group
                        And Bilateral Discussions……………………………........ 39

24          E.    The CRT Market During The Conspiracy……………………….. 44

25          F.    International Government Antitrust Investigations…………………… 47

26   IX.    THE PASS-THROUGH OF OVERCHARGES TO CONSUMERS…….... 50

27   X.     CLASS ACTION ALLEGATIONS…………………………………. 55

XI.     **VIOLATIONS ALLEGED**………………………………………………     58

        A.      First Claim For Relief: Violation of Section 1 of the Sherman Act.........     58

        B.      Second Claim For Relief: Violation of State Antitrust Statutes ………..     60

        C.      Third Claim For Relief: Violation of State Consumer Protection and
                Unfair Competition Statutes……………………………………………..     73

        D.      Fourth Claim For Relief: Unjust Enrichment and Disgorgement
                Of Profits…………………………………………………………………     88

XII.    **FRAUDULENT CONCEALMENT**…………………………………………     89

XIII.   **PRAYER FOR RELIEF**……………………………………………………     90

XIV.    **JURY DEMAND**................................................................................................     92

Plaintiffs Brian Luscher, Jeffrey Figone, Carmen Gonzalez, Dana Ross, Steven Ganz, Brady Lane Cotton, Colleen Sobotka, Daniel Riebow, Travis Burau, Southern Office Supply, Inc., Andrew Kindt, James Brown, Kory Pentland, Alan Rotman, Chad Klebs, David Norby, Ryan Rizzo, Charles Jenkins, Daniel R. Hergert, Samuel J. Nasto, Adrienne Belai, Craig Stephenson, Joshua Maida, Gary Hanson, Rosemary Ciccone, Donna Marie Ellingson, Frank Warner, Albert Sidney Crigler, Margaret Slagle, John Larch, and Brigid Terry ("Plaintiffs"), individually and on behalf of a Class of all those similarly situated in the United States, bring this action for damages and injunctive relief under state and federal antitrust, unfair competition, and consumer protection laws against the Defendants named herein, demanding trial by jury, and complaining and alleging as follows:

## I. **INTRODUCTION**

1. Plaintiffs bring this antitrust class action on behalf of individuals and entities that indirectly purchased Cathode Ray Tube Products ("CRT Products") (as further defined below), in the United States from Defendants, their predecessors, any subsidiaries or affiliates thereof, or any of their unnamed co-conspirators, during the period beginning at least as early as March 1, 1995 until at least November 25, 2007 (the "Class Period"). Plaintiffs allege that during the Class Period the Defendants conspired to fix, raise, maintain and/or stabilize prices of CRT Products sold in the United States. Because of Defendants' unlawful conduct, Plaintiffs and other Class Members paid artificially inflated prices for CRT Products and have suffered antitrust injury to their business or property.

2. As further detailed below, beginning in at least 1995, Defendants Samsung, Philips, Daewoo, LG and Chunghwa met or talked with at least one other Defendant in order to discuss and agree upon CRT Product prices and the amount of CRT Products each would produce. Over time, these Defendants reached out to the other Defendant CRT Product manufacturers, including Toshiba, Panasonic, Hitachi, BMCC, IRICO, Thai CRT and Samtel, who then also met or talked with their competitors for the purpose of fixing the prices of CRT Products. By 1997, a formal system of multilateral and bilateral meetings was in place,

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

1    involving the highest levels of the Defendant corporations, all with the sole purpose of fixing the

2    prices of CRT Products at supracompetitive levels.

3         3.    Throughout the Class Period, Defendants' conspiracy was effective in

4    moderating the normal downward pressure on prices for CRT Products caused by periods of

5    oversupply and competition from new technologies, such as TFT-LCD and Plasma. Defendants'

6    conspiracy resulted in unusually stable pricing and even rising prices in a very mature, declining

7    market. As a result of Defendants' unlawful conduct, Plaintiffs and Class members paid higher

8    prices for CRT Products than they would have paid in a competitive market.

9         4.    This global conspiracy is being investigated by the Antitrust Division of the

10   United States Department of Justice ("DOJ"), and by several other international competition

11   authorities. On February 10, 2009, a federal grand jury in San Francisco issued a two-count

12   indictment against C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture

13   Tubes, Ltd., for his participation in a global conspiracy to fix the prices of CRTs used in

14   computer monitors and televisions. This is the first indictment to be issued in the DOJ's ongoing

15   investigation into the CRT industry.

## II.  JURISDICTION AND VENUE

17        5.    This action is instituted under Section 16 of the Clayton Act, 15 U.S.C. § 26, to

18   obtain injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, to recover

19   damages under state antitrust, unfair competition, and consumer protection laws, and to recover

20   costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and all others

21   similarly situated sustained as a result of the Defendants' violations of those laws.

22        6.    The Court has subject matter jurisdiction over the federal claim under 28 U.S.C.

23   §§ 1331 and 1337. The Court has subject matter jurisdiction over the state law claims under 28

24   U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the

25   same case or controversy.

26        7.    This court also has subject matter jurisdiction over the state law claims pursuant

27   to the Class Action Fairness Act of 2005, which amended 28 U.S.C. § 1332 to add a new

28   subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

1  a class of Plaintiffs is a citizen of a state different from any Defendant and the aggregated

2  amount in controversy exceeds $5,000,000, exclusive of interest and costs." This Court also has

3  jurisdiction under 28 U.S.C. § 1332(d) because "one or more members of the class is a citizen of

4  a state within the United States and one or more of the Defendants is a citizen or subject of a

5  foreign state."

6          8.      Venue is proper in this Judicial District pursuant to Section 12 of the Clayton Act

7  (15 U.S.C. § 22) and 28 U.S.C. § 1391 (b), (c) and (d), because during the Class Period one or

8  more of the Defendants resided, transacted business, was found, or had agents in, this district,

9  and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this

10 district, and a substantial portion of the affected portion of the interstate trade and commerce

11 described below has been carried out in this district.

12         9.      Defendants conduct business throughout the United States, including this

13 jurisdiction, and they have purposefully availed themselves of the laws of the United States,

14 including specifically the laws of the state of California and the individual states listed herein.

15 Defendants' products are sold in the flow of interstate commerce, and Defendants' activities had

16 a direct, substantial and reasonably foreseeable effect on such commerce.

17         10.     Defendants' conspiracy to fix the prices of CRT Products substantially affected

18 commerce throughout the United States and in each of the states identified herein, because

19 Defendants directly or through their agents, engaged in activities affecting each such state.

20 Defendants have purposefully availed themselves of the laws of each of the states identified

21 herein in connection with their activities relating to the production, marketing, and sale and/or

22 distribution of CRT Products. Defendants produced, promoted, sold, marketed, and/or

23 distributed CRT Products, thereby purposefully profiting from access to indirect purchaser

24 consumers in each such state. As a result of the activities described herein, Defendants:

25              a.      Caused damage to the residents of the states identified herein;

26              b.      Caused damage in each of the states identified herein by acts or omissions

27                      committed outside each such state and by regularly doing or soliciting

28                      business in each such state;

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

c.     Engaged in a persistent course of conduct within each state and/or derived substantial revenue from the marketing and sale of CRT Products in each such state; and

d.     Committed acts or omissions that they knew or should have known would cause damage (and, in fact, did cause damage) in each such state while regularly doing or soliciting business in each such state, engaging in other persistent courses of conduct in each such state, and/or deriving substantial revenue from the marketing and sale of CRT Products in each such state.

11.     The conspiracy described herein adversely affected every person nationwide, and more particularly, consumers in each of the states identified in this Complaint, who indirectly purchased Defendants' CRT Products. Defendants' conspiracy has resulted in an adverse monetary effect on indirect purchasers in each state identified herein.

12.     Prices of CRT Products in each state identified in this Complaint were raised to supracompetitive levels by the Defendants and their co-conspirators. Defendants knew that commerce in CRT Products in each of the states identified herein would be adversely affecting by implementing their conspiracy.

## III.  **DEFINITIONS**

13.     As used herein, the term "CRT" or "CRTs" stands for "cathode ray tube(s)." A CRT is a display technology used in televisions, computer monitors and other specialized applications. The CRT is a vacuum tube that is coated on its inside face with light sensitive phosphors. An electron gun at the back of the vacuum tube emits electron beams. When the electron beams strike the phosphors, the phosphors produce either red, green, or blue light. A system of magnetic fields inside the CRT, as well as varying voltages, directs the beams to produce the desired colors. This process is rapidly repeated several times per second to produce the desired images.

14.     There are two types of CRTs: color display tubes ("CDTs") which are used in computer monitors and other specialized applications; and color picture tubes ("CPTs") which

are used in televisions. CDTs and CPTs are collectively referred to herein as "cathode ray tubes" or "CRTs."

15.     As used herein "CRT Products" includes (a) CRTs; and (b) products containing CRTs, such as television sets and computer monitors.

16.     The "Class Period" or "relevant period" means the period beginning at least March 1, 1995 through at least November 25, 2007.

17.     "Person" means any individual, partnership, corporation, association, or other business or legal entity.

18.     "OEM" means any Original Equipment Manufacturer of CRT Products.

### IV.   **PLAINTIFFS**

19.     Plaintiff Brian Luscher is an Arizona resident. During the relevant period, Mr. Luscher indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

20.     Plaintiff Jeffrey Figone is a California resident. During the relevant period, Mr. Figone indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

21.     Plaintiff Carmen Gonzalez is a California resident. During the relevant period, Ms. Gonzalez indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

22.     Plaintiff Dana Ross is a California resident. During the relevant period, Mr. Ross indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

23.     Plaintiff Steven Ganz is a California resident. During the relevant period, Mr. Ganz indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

24. Plaintiff Brady Lane Cotton is a Florida resident. During the relevant period, Mr. Cotton indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

25. Plaintiff Colleen Sobotka is a Florida resident. During the relevant period, Ms. Sobotka indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

26. Plaintiff Daniel Riebow is a Hawaii resident. During the relevant period, Mr. Riebow indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

27. Plaintiff Travis Burau is an Iowa resident. During the relevant period, Mr. Burau indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

28. Plaintiff Southern Office Supply, Inc. is a Kansas corporation. During the relevant period, Southern Office Supply, Inc. indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

29. Plaintiff Andrew Kindt is a Michigan resident. During the relevant period, Mr. Kindt indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

30. Plaintiff James Brown is a Michigan resident. During the relevant period, Mr. Brown indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

31. Plaintiff Kory Pentland is a Michigan resident. During the relevant period, Mr. Pentland indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

32. Plaintiff Alan Rotman is a Minnesota resident. During the relevant period, Mr. Rotman indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

33.     Plaintiff Chad Klebs is a Minnesota resident. During the relevant period, Mr. Klebs indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

34.     Plaintiff David Norby is a Minnesota resident. During the relevant period, Mr. Norby indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

35.     Plaintiff Ryan Rizzo is a Minnesota resident. During the relevant period, Mr. Rizzo indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

36.     Plaintiff Charles Jenkins is a Mississippi resident. During the relevant period, Nasto indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

37.     Plaintiff Daniel R. Hergert is a Nebraska resident. During the relevant period, Mr. Hergert indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

38.     Plaintiff Samuel J. Nasto is a Nevada resident. During the relevant period, Mr. Nasto indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

39.     Plaintiff Craig Stephenson is a New Mexico resident. During the relevant period, Mr. Stephenson indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

40.     Plaintiff Adrienne Belai was a New York resident during the Class Period. During the relevant period, Ms. Belai indirectly purchased CRT Products in New York from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

41.     Plaintiff Joshua Maida was a North Carolina resident during the Class Period. During the relevant period, Mr. Maida indirectly purchased CRT Products in North Carolina

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

1    from one or more of the Defendants or their co-conspirators and has been injured by reason of

2    the antitrust violations alleged in this Complaint.

3        42.    Plaintiff Gary Hanson is a North Dakota resident. During the relevant period, Mr.

4    Hanson indirectly purchased CRT Products from one or more of the Defendants or their co-

5    conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

6        43.    Plaintiff Rosemary Ciccone is a Rhode Island resident. During the relevant

7    period, Ms. Ciccone indirectly purchased CRT Products from one or more of the Defendants or

8    their co-conspirators and has been injured by reason of the antitrust violations alleged in this

9    Complaint.

10       44.    Plaintiff Donna Marie Ellingson is a South Dakota resident. During the relevant

11   period, Ms. Ellingson indirectly purchased CRT Products from one or more of the Defendants or

12   their co-conspirators and has been injured by reason of the antitrust violations alleged in this

13   Complaint.

14       45.    Plaintiff Frank Warner is a Tennessee resident. During the relevant period, Mr.

15   Warner indirectly purchased CRT Products from one or more of the Defendants or their co-

16   conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

17       46.    Plaintiff Albert Sidney Crigler is a Tennessee resident. During the relevant

18   period, Mr. Crigler indirectly purchased CRT Products from one or more of the Defendants or

19   their co-conspirators and has been injured by reason of the antitrust violations alleged in this

20   Complaint.

21       47.    Plaintiff Margaret Slagle is a Vermont resident. During the relevant period, Ms.

22   Slagle indirectly purchased CRT Products from one or more of the Defendants or their co-

23   conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

24       48.    Plaintiff John Larch is a West Virginia resident. During the relevant period, Mr.

25   Larch indirectly purchased CRT Products from one or more of the Defendants or their co-

26   conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

27

28

49.    Plaintiff Brigid Terry is a Wisconsin resident. During the relevant period, Ms. Terry indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

## V.   DEFENDANTS

**LG Electronics Entities**

50.    Defendant LG Electronics, Inc. is a corporation organized under the laws of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeoungdeungpo-gu, Seoul 150-721, South Korea. LG Electronics, Inc. is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968. The company's name was changed from GoldStar Communications to LG Electronics, Inc. in 1995, the year in which it also acquired Zenith in the United States. In 2001, LG Electronics, Inc. transferred its CRT business to a 50/50 CRT joint venture with Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V. forming Defendant LG.Philips Displays (n/k/a LP Displays International, Ltd.). During the Class Period, LG Electronics, Inc. manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

51.    Defendant LG Electronics U.S.A., Inc. ("LGEUSA) is a Delaware corporation with its principal place of business located at 1000 Sylvan Avenue, Englewood Cliffs, NJ 07632. LG Electronics USA, Inc. is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc. During the class period, LG Electronics U.S.A., Inc. manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant LG Electronics, Inc. dominated and controlled the finances, policies, and affairs of LGEUSA relating to the antitrust violations alleged in this Complaint.

52.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No.47, Lane3, Jihu Road, NeiHu District, Taipei City, Taiwan. LGETT is a wholly-owned and controlled subsidiary of Defendant

1   LG Electronics, Inc. During the class period, LGETT manufactured, marketed, sold

2   and/or distributed CRT Products, either directly or indirectly through its subsidiaries or

3   affiliates, to customers throughout the United States. Defendant LG Electronics, Inc.

4   dominated and controlled the finances, policies, and affairs of LGETT relating to the

5   antitrust violations alleged in this Complaint.

6          53.    Defendants LG Electronics, Inc., LGEUSA, and LGETT are collectively

7   referred to herein as "LG."

8   **Philips Entities**

9          54.    Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics

10  N.V. ("Royal Philips") is a Dutch company with its principal place of business located at

11  Amstelplein 2, Breitner Center, 1070 MX Amsterdam, The Netherlands. Royal Philips, founded

12  in 1891, is one of the world's largest electronics companies, with 160,900 employees located in

13  over 60 countries. Royal Philips had sole ownership of its CRT business until 2001. In 2001,

14  Royal Philips transferred its CRT business to a 50/50 CRT joint venture with defendant LG

15  Electronics, Inc. forming Defendant LG.Philips Displays (n/k/a LP Displays International, Ltd.).

16  In December 2005, as a result of increased pressure on demand and prices for CRT Products,

17  Royal Philips wrote off the remaining book value of 126 million Euros of its investment and

18  said it would not inject further capital into the joint venture. During the Class Period, Royal

19  Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or

20  indirectly through its subsidiaries or affiliates, to customers throughout the United States.

21         55.    Defendant Philips Electronics North America Corporation ("PENAC") is a

22  Delaware corporation with its principal place of business located at 1251 Avenue of the

23  Americas, New York, NY 10020-1104. Philips Electronics NA is a wholly owned and

24  controlled subsidiary of Defendant Royal Philips. During the Class Period, Philips Electronics

25  NA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

26  through its subsidiaries or affiliates, to customers throughout the United States. Defendant

27  Royal Philips dominated and controlled the finances, policies, and affairs of PENAC

28  relating to the antitrust violations alleged in this Complaint.

56.     Defendant Philips Electronics Industries, Ltd. ("PEIL") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. PEIL is a subsidiary of Defendant Royal Philips. During the Class Period, PEIL manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies, and affairs of PEIL relating to the antitrust violations alleged in this Complaint.

57.     Defendant Philips Consumer Electronics Co. ("PCEC") is a company with its principal place of business located at 64 Perimeter Center E., Atlanta, GA 30346-2295. PCEC is a subsidiary of Defendant Royal Philips. During the Class Period, PCEC sold and distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies, and affairs of PCEC relating to the antitrust violations alleged in this Complaint.

58.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Electronics Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Electronics Taiwan is a subsidiary of Defendant Royal Philips. During the Class Period, Philips Electronics Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips Electronics Taiwan relating to the antitrust violations alleged in this Complaint.

59.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Class Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant

1  Royal Philips dominated and controlled the finances, policies, and affairs of Philips

2  Brazil relating to the antitrust violations alleged in this Complaint.

3      60.    Defendants Royal Philips, PENAC, PEIL, PCEC, Philips Electronics Taiwan,

4  and Philips Brazil are collectively referred to herein as "Philips."

5  **LP Displays**

6      61.    Defendant LP Displays International, Ltd. f/k/a LG.Philips Displays ("LP

7  Displays") was created in 2001 as a 50/50 joint venture between Defendants LG Electronics,

8  Inc. and Royal Philips Electronics of The Netherlands. In March 2007, LP Displays became an

9  independent company organized under the laws of Hong Kong with its principal place of

10 business located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road

11 Central, Sheung Wan, Hong Kong. LP Displays is a leading supplier of CRTs for use in

12 television sets and computer monitors with annual sales for 2006 of over $2 billion, and a

13 market share of 27%. LP Displays announced in March 2007 that Royal Philips and LG

14 Electronics would cede control over the company and the shares would be owned by financial

15 institutions and private equity firms. During the Class Period, LP Displays manufactured,

16 marketed, sold and distributed CRT Products, either directly or indirectly through its

17 subsidiaries or affiliates, to customers throughout the United States.

18 **Samsung Entities**

19     62.    Defendant Samsung Electronics Co., Ltd. ("SEC") is South Korean company

20 with its principal place of business located at Samsung Main Building, 250, 2-ga, Taepyong-ro,

21 Jung-gu, Seoul 100-742, South Korea. During the Class Period, SEC manufactured, marketed,

22 sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or

23 affiliates, to customers throughout the United States.

24     63.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

25 corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

26 Ridgefield Park, New Jersey 07660. SEAI is a wholly-owned and controlled subsidiary of

27 defendant SEC. During the Class Period, SEAI manufactured, marketed, sold and/or distributed

28 CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers

1   throughout the United States. Defendant SEC dominated and controlled the finances,

2   policies, and affairs of SEAI relating to the antitrust violations alleged in this

3   Complaint.

4   64.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Co., Ltd.

5   ("Samsung SDI"), is a South Korean company with its principal place of business located at 15th

6   – 18th Floor, Samsung Life Insurance Building, 150, 2-ga, Taepyong-ro, Jung-gu, Seoul, 100-

7   716, South Korea. Samsung SDI is a public company. SEC is a major shareholder holding

8   almost 20 percent of the stock. Founded in 1970, Samsung SDI claims to be the world's leading

9   company in the display and energy businesses, with 28,000 employees and facilities in 18

10  countries. In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs;

11  more than another other producer. Samsung SDI has offices in Chicago and San Diego. During

12  the Class Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products,

13  either directly or indirectly through its subsidiaries or affiliates, to customers throughout the

14  United States. Defendant SEC dominated and controlled the finances, policies, and

15  affairs of Samsung SDI relating to the antitrust violations alleged in this Complaint.

16  65.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

17  corporation with its principal place of business located at 3333 Michelson Drive, Suite 700,

18  Irvine, California. Samsung SDI America is a wholly-owned and controlled subsidiary of

19  Samsung SDI. During the Class Period, Samsung SDI America manufactured, marketed, sold

20  and/or distributed CRT Products, either directly or indirectly through its subsidiaries or

21  affiliates, to customers throughout the United States. Defendants SEC and Samsung SDI

22  dominated and controlled the finances, policies, and affairs of Samsung SDI America

23  relating to the antitrust violations alleged in this Complaint.

24  66.    Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a

25  Mexican company with its principal place of business located at Blvd. Los Olivos, No.21014,

26  Parque Industrial El Florido, Tijuana, B.C. Mexico. Samsung SDI Mexico is a wholly-owned

27  and controlled subsidiary of Defendant Samsung SDI. During the Class Period, Samsung SDI

28  Mexico manufactured, marketed, sold and/or distributed CRT Products to customers, either

directly or indirectly through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this Complaint.

67.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil. Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Class Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products to customers, either directly or indirectly through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this Complaint.

68.     Defendant Shenzhen Samsung SDI Co. Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Class Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this Complaint.

69.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Class Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this Complaint.

70.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian company with its principal place of business located at Lot 635 & 660, Kawasan Perindustrian, Tuanku, Jaafar, 71450 Sungai Gadut, Negeri Semblian Darul Khusus, Malaysia. Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI Co., Ltd. During the Class Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this Complaint.

71.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Samsung SDI Malaysia are referred to collectively herein as "Samsung."

**Toshiba Entities**

72.     Defendant Toshiba Corporation is a Japanese corporation with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, Toshiba Corporation held a 5-10 % worldwide market share for CRTs used in televisions and computer monitors. In December 1995, Toshiba Corporation partnered with Orion Electric Company (n/k/a Daewoo Electronics Corporation) and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2002, Toshiba Corporation entered into a joint venture with Defendant Panasonic Corporation called MT Picture Display Co., Ltd. in which the entities consolidated their CRT businesses. During the Class Period, Toshiba Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

73.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, NY 10020. Toshiba America is a wholly owned and controlled subsidiary of defendant Toshiba Corporation. During the Class Period, Toshiba America sold and/or distributed CRT

1  Products, either directly or indirectly through its subsidiaries or affiliates, to customers

2  throughout the United States. Defendant Toshiba Corporation dominated and controlled

3  the finances, policies, and affairs of Toshiba America relating to the antitrust violations

4  alleged in this Complaint.

5        74.   Defendant Toshiba America Consumer Products, LLC ("TACP") is

6  headquartered in 82 Totawa Rd., Wayne, New Jersey 07470-3114. TACP is a wholly owned and

7  controlled subsidiary of Defendant Toshiba Corporation through Toshiba America. During the

8  Class Period, TACP sold and/or distributed CRT Products, either directly or indirectly through

9  its subsidiaries or affiliates, to customers throughout the United States. Defendant Toshiba

10  Corporation dominated and controlled the finances, policies, and affairs of TACP

11  relating to the antitrust violations alleged in this Complaint.

12        75.   Defendant Toshiba America Consumer Products, Inc. ("TACPI") is a company

13  that is headquartered at 1420-B Toshiba Drive, Lebanon, Tennessee, 37087.  TACPI is a

14  wholly-owned and controlled subsidiary of Defendant Toshiba Corporation through Toshiba

15  America.  During the Class Period, TACPI sold and distributed CRT Products either directly or

16  through its subsidiaries or affiliates throughout the United States. Defendant Toshiba

17  Corporation dominated and controlled the finances, policies and affairs of TACPI relating to the

18  antitrust violations alleged in this complaint.

19        76.   Toshiba America Information Systems, Inc. ("TAIP") is a California corporation

20  with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92718. TAIP

21  is a wholly owned and controlled subsidiary of Toshiba Corporation through Toshiba America,

22  Inc. During the Class Period, TAIP manufactured, marketed, sold and/or distributed CRT

23  Products, either directly or indirectly through its subsidiaries or affiliates, to customers

24  throughout the United States. Defendant Toshiba Corporation dominated and controlled

25  the finances, policies, and affairs of TAIP relating to the antitrust violations alleged in

26  this Complaint.

27        77.   Toshiba America Electronics Components, Inc. ("TAEC") is a California

28  corporation with its principal place of business located at 9775 Toledo Way, Irvine, California

92618, and 19000 MacArthur Boulevard, Suite 400, Irvine, California 92612. TAEC is a wholly owned and controlled subsidiary of Toshiba America, Inc., which is a holding company for defendant Toshiba Corporation. TAEC is currently the North American sales and marketing representative for defendant MTPD. Before MTPD's formation in 2003, TAEC was the North American engineering, manufacturing, marketing and sales arm of defendant Toshiba Corporation. During the Class Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of TAEC relating to the antitrust violations alleged in this Complaint.

78. Toshiba Display Devices (Thailand) Company, Ltd. ("TDDT") is a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000. TDDT is a wholly-owned and controlled subsidiary of defendant Toshiba Corporation. During the Class Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of TDDT relating to the antitrust violations alleged in this Complaint.

79. Defendants Toshiba Corporation, Toshiba America, Inc., TACP, TACPI, TAIP, TAEC and TDDT are referred to collectively herein as "Toshiba."

**Panasonic Entities**

80. Defendant Panasonic Corporation, which was at all times during the Class Period known as Matsushita Electric Industrial Co., Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity with its principal place of business located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. In 2002, Panasonic Corporation entered into a CRT joint venture with defendant Toshiba forming defendant MT Picture Display Co., Ltd. ("MTPD"). Panasonic Corporation was the majority owner with 64.5 percent. On April 3, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making

1 MTPD a wholly-owned subsidiary of Panasonic Corporation. In 2005, the Panasonic brand had

2 the highest CRT Product revenue in Japan. During the Class Period, Panasonic Corporation

3 manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

4 through its subsidiaries or affiliates, to customers throughout the United States.

5     81.    Defendant Panasonic Corporation of North America ("Panasonic NA") is a

6 Delaware corporation with its principal place of business located at One Panasonic Way,

7 Secaucus, New Jersey. Panasonic NA is a wholly owned and controlled subsidiary of Defendant

8 Panasonic Corporation. During the Class Period, Panasonic NA manufactured, marketed, sold

9 and/or distributed CRT Products, either directly or indirectly through its subsidiaries or

10 affiliates, to customers throughout the United States. Defendant Panasonic Corporation

11 dominated and controlled the finances, policies, and affairs of Panasonic NA relating to

12 the antitrust violations alleged in this Complaint.

13     82.    Panasonic Consumer Electronics Company (Panasonic Consumer

14 Electronics") is a Delaware corporation with its principal place of business located at One

15 Panasonic Way, Secaucus, New Jersey. Panasonic Consumer Electronics is a wholly owned and

16 controlled subsidiary of Defendant Panasonic Corporation. During the Class Period, Panasonic

17 Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either

18 directly or indirectly through its subsidiaries or affiliates, to customers throughout the United

19 States. Defendant Panasonic Corporation dominated and controlled the finances,

20 policies, and affairs of Panasonic Consumer Electronics relating to the antitrust

21 violations alleged in this Complaint.

22     83.    Defendant Matsushita Electronic Corporation (Malaysia) Sdn Bhd. ("Matsushita

23 Malaysia") is a Malaysia company with its principal place of business located at Lot 1, Persiaran

24 Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam, Malaysia 40000.

25 Matsushita Malaysia is a wholly-owned and controlled subsidiary of Defendant Panasonic

26 Corporation. During the Class Period, Matsushita Malaysia manufactured, marketed, sold and/or

27 distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to

28 customers throughout the United States. Defendant Panasonic Corporation dominated and

1    controlled the finances, policies, and affairs of Matsushita Malaysia relating to the

2    antitrust violations alleged in this Complaint.

3        84.    Defendants Panasonic Corporation, Panasonic NA, Panasonic Consumer

4    Electronics, and Matsushita Malaysia are collectively referred to herein as "Panasonic."

5        85.    Defendant MT Picture Display Co., Ltd. ("MTPD") was established as a CRT

6    joint venture between defendants Panasonic Corporation and Toshiba. MTPD is a Japanese

7    entity with its principal place of business located at 1-1, Saiwai-cho, Takatsuki-shi, Osaka 569-

8    1193, Japan. On April 3, 2007, defendant Panasonic Corporation purchased the remaining stake

9    in MTPD, making it a wholly-owned subsidiary, and renaming it MT Picture Display Co., Ltd.

10   During the Class Period, MTPD manufactured, sold and distributed CRT Products, either

11   directly or indirectly through its subsidiaries or affiliates, to customers throughout the United

12   States.

13       86.    Defendant Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a

14   Chinese company with its principal place of business located at No. 9, Jiuxianqiao N. Rd.,

15   Dashanzi Chaoyang District, Beijing, China. BMCC is a joint venture company, 50% of which

16   is held by defendant MTPD. The other 50% is held by Beijing Orient Electronics (Group) Co.,

17   Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

18   enterprise), and Beijing Yayunchun Branch of the Industrial and Commercial Bank of China,

19   Ltd. (a China state-owned enterprise). Formed in 1987, BMCC was Matsushita's (n/k/a

20   Panasonic) first CRT manufacturing facility in China. BMCC is the second largest producer of

21   CRTs in China. During the Class Period, BMCC manufactured, marketed, sold and/or

22   distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to

23   customers throughout the United States.

24   **Hitachi Entities**

25       87.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of

26   business located at 6-1 Marunouchi Center Building 13F, Chiyoda-ku, Tokyo 100-8280, Japan.

27   Hitachi Ltd. is the parent company for the Hitachi brand of CRT Products. In 1996, Hitachi,

28   Ltd.'s worldwide market share for color CRTs was 20 percent. During the Class Period, Hitachi

1   Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

2   through its subsidiaries or affiliates, to customers throughout the United States.

3       88.    Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its

4   principal place of business located at AKS Building, 3 Kandaneribeicho 3, Chiyoda-ku, Tokyo,

5   101-0022, Japan. Hitachi Displays, Ltd. was originally established as Mobara Works of Hitachi,

6   Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development,

7   design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun

8   off to create a separate company called Hitachi Displays, Ltd. During the Class Period, Hitachi

9   Displays, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or

10  indirectly through its subsidiaries or affiliates, to customers throughout the United States.

11  Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of

12  Hitachi Displays relating to the antitrust violations alleged in this Complaint.

13      89.    Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation

14  with its principal place of business located as 1000 Hurricane Shoals Road, Ste. D-100,

15  Lawrenceville, GA 30043. HEDUS is a subsidiary of defendants Hitachi Displays, Ltd. and

16  Hitachi, Ltd. During the Class Period, HEDUS manufactured, marketed, sold and/or distributed

17  CRT Products to customers, either directly or indirectly through its subsidiaries or affiliates, to

18  customers throughout the United States. Defendant Hitachi, Ltd. and Hitachi Displays, Ltd.

19  dominated and controlled the finances, policies, and affairs of HEDUS relating to the

20  antitrust violations alleged in this Complaint.

21      90.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company

22  with its principal place of business located at 2000 Sierra Point Parkway, Brisbane, California

23  94005. Hitachi America is a wholly-owned and controlled subsidiary of defendant Hitachi, Ltd.

24  During the Class Period, Hitachi America sold and/or distributed CRT Products, either directly

25  or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

26  Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of

27  Hitachi America relating to the antitrust violations alleged in this Complaint.

28

91.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singapore company with its principal place of business located at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore, 049318. Hitachi Asia is a wholly owned and controlled subsidiary of defendant Hitachi, Ltd. During the Class Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Asia relating to the antitrust violations alleged in this Complaint.

92.     Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") is a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China. Hitachi Shenzhen is a wholly-owned and controlled subsidiary of defendant Hitachi Displays, Ltd. During the Class Period, Hitachi Shenzhen manufactured, sold and distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this Complaint.

93.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, HEDUS, Hitachi Asia, and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

**Tatung Entities**

94.     Defendant Tatung Company is a Taiwanese corporation with its principal place of business located at 22, Sec. 3, Chung-Shan N. Rd., Taipei City, 104 Taiwan. Tatung Company dominated and controlled the finances, policies and affairs of Defendant Chunghwa relating to the antitrust violations alleged in this Complaint. Tatung Company lists Chunghwa on its website as one of its "global subsidiaries." Similarly, Tatung Company's website has recent investor presentations describing Chunghwa as part of the Tatung Group in the optoelectronics sector. And the Chairman of Chunghwa's 14- person Board of Directors, along with seven other members of that board, are executives and/or directors of Tatung Company or various of its subsidiaries. A ninth member of that board is a director at Tatung University.

1   During the Class Period, Tatung Company manufactured, marketed, sold and/or distributed CRT

2   Products, either directly or indirectly through its subsidiaries or affiliates (specifically

3   Chunghwa and Tatung Company of America), to customers throughout the United States.

4          95.      Defendant Tatung Company of America, Inc. ("Tatung America") is a California

5   corporation with its principal place of business located at 2850 El Presidio Street, Long Beach,

6   California. Tatung America is a subsidiary of Tatung Company. Currently, Tatung Company

7   owns approximately half of Tatung America. The other half used to be owned by Lun Kuan Lin,

8   the daughter of Tatung Company's former Chairman, T.S. Lin. Following Lun Kuan Lin's

9   recent death, her share recently passed to her two children.  During the Class Period, Tatung

10  America manufactured, marketed, sold and/or distributed CRT Products, either directly or

11  indirectly through its subsidiaries or affiliates, to customers throughout the United States.

12  Defendant Tatung Company dominated and controlled the finances, policies, and affairs

13  of Tatung America relating to the antitrust violations alleged in this Complaint.

14         96.      Defendants Tatung Company and Tatung America are collectively

15  referred to herein as "Tatung."

16  **Chunghwa Entities**

17         97.      Defendant Chunghwa Picture Tubes Ltd. ("CPT") is a Taiwanese company with

18  its principal place of business located at 1127 Heping Road, Bade City, Taoyuan, Taiwan. CPT

19  was founded in 1971 by Defendant Tatung Company. Throughout the majority of the Class

20  Period, Tatung Company owned a substantial share in CPT. Although Tatung Company's

21  holdings in CPT have fallen over time, it retains substantial control over CPT's operations.

22  Tatung Company lists Chunghwa on its website as one of its "global subsidiaries." And the

23  Chairman of CPT, Weishan Lin, is also the Chairman and General Manager of Tatung

24  Company. CPT is a leading manufacturer of CRTs. During the Class Period, CPT manufactured,

25  marketed, sold and/or distributed CRT Products, both directly and through its wholly-owned and

26  controlled subsidiaries in Malaysia, China, and Scotland, to customers throughout the United

27  States. Defendant Tatung Company dominated and controlled the finances, policies, and

28  affairs of CPT relating to the antitrust violations alleged in this Complaint.

98.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business located at Lot 1, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. Chunghwa Malaysia a wholly-owned and controlled subsidiary of defendant Chunghwa Picture Tubes. Chunghwa Malaysia is a leading worldwide supplier of CRTs. During the Class Period, Chunghwa Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendants Tatung Company and CPT dominated and controlled the finances, policies, and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this Complaint.

99.     Defendants CPT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**IRICO Entities**

100.     Defendant IRICO Group Corporation ("IGC") is a Chinese corporation with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, sale and/or distribution of CRT Products. During the Class Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

101.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of defendant IGC. In 2006, IDDC was China's top CRT maker. During the Class Period, IDDC manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this Complaint.

102. Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGE is owned by Defendant IGC. According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs. Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit and taxation. During the Class Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this Complaint.

103. Defendants IGC, IDDC, and IGE are collectively referred to herein as "IRICO."

**Thai CRT**

104. Defendant Thai CRT Company, Ltd. ("Thai CRT") is a Thai company with its principal place of business located at 1/F Siam Cement Road, Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement Group. It was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During the Class Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

**Samtel**

105. Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40%. Samtel is India's largest exporter of CRTs. Samtel has gained safety approvals from the United States, Canada, Germany and Great Britain for its CRT Products. During the Class Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

//

**Daewoo Entities**

106.     Defendant Daewoo International Corporation ("Daewoo International") is a corporation organized under the laws of Korea with its principal place of business located at 84-11 Namdaemunno 5-ga, Jung-gu, Seoul, Korea (100-753). Daewoo International is a successor in interest to the Daewoo Group which was dismantled in or around 1999. During the Class Period, Daewoo International manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

107.     Defendant Daewoo Electronics Corporation f/k/a Daewoo Electronics Company, Ltd. ("Daewoo Electronics") is a corporation organized under the laws of Korea with its principal place of business located at 686 Ahyeon-dong, Mapagu, Seoul, Korea. Daewoo Electronics is a subsidiary of Daewoo International. Plaintiffs are informed and believe that Daewoo Electronics was, along Daewoo Telecom Company, Daewoo Corporation, and Orion Electric Components Company (all of whom were members of the "Daewoo Group"), a major shareholder of Orion Electric Company ("Orion"). Thus, Orion was wholly-owned by the Daewoo Group. Orion was a Korean corporation which filed for bankruptcy in 2004. During the Class Period, Orion was a major manufacturer of CRTs. In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRTs. Orion was involved in CRT Product sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States. Defendant Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France. As of approximately 1996, DOSA produced 1.2 million CRTs annually. Daewoo sold DOSA's CRT business in or around 2004. In December 1995, Orion partnered with defendant Toshiba and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. Defendant Daewoo Electronics dominated and controlled the finances, polices and affairs of Orion and DOSA relating to the antitrust violations alleged in this Complaint. During the Class Period, Daewoo Electronics manufactured, marketed, sold

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates (specifically including Orion and DOSA), to customers throughout the United States. Defendant Daewoo International dominated and controlled the finances, policies and affairs of Daewoo Electronics relating to the antitrust violations alleged in this Complaint.

108.    Daewoo International, Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

109.    All of the above-listed defendants are collectively referred to herein as "Defendants."

## VI.   <u>AGENTS AND CO-CONSPIRATORS</u>

110.    Various other persons, firms and corporations, not named as Defendants herein, and presently unknown to Plaintiffs, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy and/or in furtherance of the anticompetitive, unfair or deceptive conduct. Plaintiffs reserve the right to name some or all of these Persons as Defendants at a later date.

111.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

112.    Defendants are also liable to acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

113.    Each of the Defendants named herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein. Each Defendant which is a subsidiary of a foreign parent acts as the sole United States agent for CRT Products made by its parent company.

//

//

## VII.  INTERSTATE TRADE AND COMMERCE

114.    Throughout the Class Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate and international commerce, including through and into this judicial district.

115.    During the Class Period, Defendants collectively controlled the vast majority of the market for CRT Products, both globally and in the United States.

116.    Defendants' unlawful activities, as described herein, took place within the flow of interstate commerce to purchasers of CRT Products located in states other than the states in which Defendants are located, as well as throughout the world, and had a direct, substantial and reasonably foreseeable effect upon interstate and international commerce, including the United States markets for CRT Products.

## VIII.  FACTUAL ALLEGATIONS

### A.  CRT Technology

117.    CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. It was not until the RCA Corporation introduced the product at the 1939 World's Fair, however, that it became widely available to consumers. Since then, CRTs have become the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs. Even large public displays, including many scoreboards at sports arenas, are comprised of thousands of single color CRTs.

118.    As noted above, the CRT is a vacuum tube that is coated on its inside face with light sensitive phosphors. An electron gun at the back of the vacuum tube emits electron beams. When the electron beams strike the phosphors, the phosphors produce either red, green, or blue light. A system of magnetic fields inside the CRT, as well as varying voltages, directs the beams to produce the desired colors. This process is rapidly repeated several times per second to produce the desired images.

119.     The quality of a CRT display is dictated by the quality of the CRT itself. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole product such that the product is often simply referred to as "the CRT."

120.     Until the last few years, CRTs were the dominant technology used in displays, including television and computer monitors. During the Class Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

**B.  Structural Characteristics Of The CRT Market**

121.     The structural characteristics of the CRT Product market are conducive to the type of collusive activity alleged in this Complaint. These characteristics include market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, maturity of the CRT Product market, and homogeneity of products.

**a.      Market Concentration**

122.     During the Class Period, the CRT industry was dominated by relatively few companies. In 2004, defendants Samsung SDI, LG.Philips Displays (n/k/a LP Displays), MT Picture Display and Chunghwa together held a collective 78% share of the global CRT market. The high concentration of market share facilitates coordination since there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**b.      Information Sharing**

123.     Because of common membership in trade associations for the CRT Product market and related markets (for e.g., TFT-LCD), interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information. The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages. Defendants took advantage of these opportunities to discuss and agree upon their pricing for CRT Products.

124.     Defendants Chunghwa, Hitachi and Samsung are all members of the Society for Information Display. Defendants Samsung and LG Electronics, Inc. are two of the co-founders of the Korea Display Industry Association. Similarly, Daewoo, LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association. Upon information and belief, Defendants used these trade associations as vehicles for discussing and agreeing upon their pricing for CRT Products. At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### c.     Consolidation

125.     The CRT Product industry also had significant consolidation during the Class Period, including but not limited to: (a) the creation of LG.Philips Displays (n/k/a LP Displays) in 2001 as a joint venture between Royal Philips and LG Electronics, Inc.; and (b) the 2002 merger of Toshiba and Matsushita/Panasonic's CRT business into MTPD.

126.     Defendants also consolidated their manufacturing facilities in lower cost venues such as China and reduced manufacturing capacity to prop up prices.

### d.     Multiple Interrelated Business Relationships

127.     The CRT Product industry has a close-knit nature whereby multiple business relationships between supposed competitors blur the lines of competition and provided ample opportunity to collude. These business relationships also created a unity of interest among competitors so that the conspiracy was easier to implement and enforce than if such interrelationships did not exist.

128.     Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

a.     The formation of the CRT joint venture LG.Philips Displays in 2001 by Defendants LG Electronics, Inc. and Royal Philips.

b.     Defendants LG Electronics, Inc. and Royal Philips also formed LG.Philips LCD Co., Ltd., n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.     The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d.     Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.     In December 1995, Defendants Daewoo and Toshiba partnered with two other non-Defendant entities to form P.T. Tosummit which manufactured CRTs in Indonesia.

f.     Defendants Daewoo and Toshiba also signed a cooperative agreement relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN LCDs, and Toshiba, which had substituted its STN LCD production with TFT LCD production, marketed Daewoo's STN LCDs globally through its network.

g.     Also in 1995, Defendant Chunghwa entered into a technology transfer agreement with Defendant Toshiba for large CPTs.

h.     Defendant Chunghwa has a joint venture with Defendant Samsung Electronics Co., Ltd. for the production of liquid crystal display panels. Chunghwa now licenses the technology from Defendant Royal Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.     Defendants LG Electronics, Inc. and Hitachi Ltd. entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.     Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung Electronics Co., Ltd. and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k.     Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Inc., Samsung, Royal Philips, and Panasonic.

**e.     High Costs Of Entry Into The Industry**

129.   There are substantial barriers to entry in the CRT Products industry. It would require substantial time, resources and industry knowledge to even potentially overcome the

barriers to entry. It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

**f.      The Maturity Of The CRT Product Market**

130.      Newer industries are typically characterized by rapid growth, innovation and high profits. The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

131.      Demand for CRT Products was declining throughout the Class Period. Static or declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

132.      In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and Plasma displays. This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices. Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and are predicted to decline by an additional 84.5 percent between 2006 and 2010.

133.      Although demand was declining as a result of the popularity of flat-panel LCD/plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Class Period, making Defendants' collusion and the international price fixing conspiracy worthwhile. Due to the high costs of LCD panels and plasma displays during the Class Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

134.      In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America. By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

135.      As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share. CRT televisions continue to dominate the global television market, accounting for 75 percent of worldwide TV units in 2006.

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

g.      **Homogeneity Of CRT Products**

136.    CRT Products are commodity-like products which are manufactured in standardized sizes. One Defendant's CRT Products for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sell and Plaintiffs (and Class members) purchase CRT Products primarily on the basis of price.

137.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

C.  **Pre-Conspiracy Market**

138.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and the Defendants began serving customers that were also being served by other international companies. During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers. A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity, and customers.

139.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa and Orion visited each other's factories in S.E. Asia. During this period, these producers began to include discussions about price in their meetings. The pricing discussions were usually limited, however, to exchanges of the range of prices that each competitor had quoted to specific customers.

D.  **Defendants' And Co-Conspirators' Illegal Agreements**

140.    Plaintiffs are informed and believe, and thereon allege, that in order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRT Products to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

141.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings. In the formative years of the conspiracy (1995-1996), bilateral discussions

were the primary method of communication and took place on an informal, ad hoc basis. During this period, representatives from Defendants LG, Samsung and Daewoo visited the other Defendant manufacturers including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba, and Panasonic to discuss increasing prices for CRT Products in general and to specific customers. These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia, and Singapore.

142.    Defendants Samsung, Chunghwa, LG and Daewoo also attended several ad hoc group meetings during this period. The participants at these group meetings also discussed increasing prices for CRT Products.

143.    As more manufacturers formally entered the conspiracy, group meetings became more prevalent. Beginning in 1997, the Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Class Period.

144.    The overall CRT conspiracy raised and stabilized worldwide prices (including United States prices) that Defendants charged for CRT Products.

a.    "Glass Meetings"

145.    The group meetings among the participants in the CRT price-fixing conspiracy were referred to by the participants as "Glass Meetings" or "GSM." Glass Meetings were attended by employees at three general levels of the Defendants' corporations.

146.    The first level of these meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "Top Meetings." Top Meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements. Because attendees at Top Meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at Top Meetings were also able to resolve disputes because they were decision makers who could make agreements.

147.    The second level of meetings were attended by the Defendants' high level sales managers and were known as "Management Meetings." These meetings occurred more

1   frequently, typically monthly, and handled implementation of the agreements made at Top

2   Meetings.

3        148.    Finally, the third level of meetings were known as "Working Level Meetings"

4   and were attended by lower level sales and marketing employees. These meetings generally

5   occurred on a weekly or monthly basis and were mostly limited to the exchange of information

6   and discussing pricing since the lower level employees did not have the authority to enter into

7   agreements. These lower level employees would then transmit the competitive information up

8   the corporate reporting chain to those individuals with pricing authority. The Working Level

9   Meetings also tended to be more regional and often took place near Defendants' factories. In

10  other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean

11  manufacturers' employees met in Korea, the Chinese in China, and so on.

12       a.    The Chinese Glass Meetings began in 1998 and generally occurred on a

13  monthly basis following a top or management level meeting. The China meetings had the

14  principal purpose of reporting what had been decided at the most recent Glass Meeting to the

15  Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located

16  in China, such as IRICO and BMCC, as well as the China-based branches of the other

17  Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung

18  SDI Tianjin, and Chunghwa.

19       b.    Glass Meetings also occurred occasionally in various European countries.

20  Attendees at these meetings included those Defendants which had subsidiaries and/or

21  manufacturing facilities located in Europe, including Philips, LG, LP Displays, Chunghwa,

22  Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), and IRICO.

23       149.    Representatives of the Defendants also attended what were known amongst

24  members of the conspiracy as "Green Meetings." These were meetings held on golf courses.

25  The Green Meetings were generally attended by top and management level employees of the

26  Defendants.

27       150.    During the Class Period, Glass Meetings took place in Taiwan, South Korea,

28  Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia.

151.    Participants would often exchange competitively sensitive information prior to a Glass Meeting. This included information on inventories, production, sales and exports. For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

152.    The Glass Meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends, and forecasts of sales volumes for coming months. The participants also updated the information they had provided in the previous meeting. Each meeting had a rotating, designated "Chairman" who would write the information on a white board. The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter. They discussed and agreed upon target prices, price increases, so-called "bottom" prices, and price ranges for CRTs. They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers. Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

153.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions. This was referred to as setting a "bottom price."

154.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors. Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs. In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

155.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed. Like CRTs themselves, the market for CRT Products was a mature one, and

there were slim profit margins. The Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers. In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

156.    The agreements reached at the Glass Meetings included:

    a.   agreements on CRT Product prices, including establishing target prices, "bottom" prices, price ranges, and price guidelines;

    b.   placing agreed-upon price differentials on various attributes of CRT Products, such as quality or certain technical specifications;

    c.   agreements on pricing for intra-company CRT Product sales to vertically integrated customers;

    d.   agreements as to what to tell customers about the reason for a price increase;

    e.   agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    f.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

    g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

    h.   agreements to coordinate uniform public statements regarding available capacity and supply;

    i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

    j.   agreements to allocate customers;

    k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

    l.   agreements to keep their meetings secret.

157.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of the Defendants themselves. When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition in a mutual interest in living up to the target price and living up to the agreements that had been made.

158.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group Glass Meetings became less frequent and bilateral meetings again became more prevalent. In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### b.    Bilateral Discussions

159.    Throughout the Class Period, the Glass Meetings were supplemented by bilateral discussions between various Defendants. The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

160.    During the Class Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and Mexico.

161.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and Europe.

162.    In order to ensure the efficacy of their global conspiracy, the Defendants also used bilateral meetings to coordinate pricing with CRT Product manufacturers in Brazil and Mexico, such as Philips Brazil, Samsung SDI Brazil, and Samsung SDI Mexico. These

1   Brazilian and Mexican manufacturers were particularly important because they served the North

2   American market for CRT Products. As further alleged herein, North America was the largest

3   market for CRT televisions and computer monitors during the Class Period. Because these

4   Brazilian and Mexican manufacturers are all wholly-owned and controlled subsidiaries of

5   Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements. In

6   this way, the Defendants ensured that prices of all CRT Products imported into the United States

7   were fixed, raised, maintained and/or stabilized at supracompetitive levels.

8        163.    Defendants also used bilateral discussions with each other during price

9   negotiations with customers to avoid being persuaded by customers to cut prices. The

10   information gained in these communications was then shared with supervisors and taken into

11   account in determining the price to be offered.

12        164.    Bilateral discussions were also used to coordinate prices with CRT Product

13   manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi,

14   Toshiba, Panasonic, Thai CRT, and Samtel. It was often the case that in the few days following

15   a Top or Management Meeting, the attendees at these group meetings would meet bilaterally

16   with the other Defendant manufacturers for the purpose of communicating whatever CRT

17   Product pricing and/or output agreements had been reached during the meeting.

18        165.    For example, Samsung had a relationship with Hitachi and was responsible for

19   communicating CRT Product pricing agreements to Hitachi. LG had a relationship with Toshiba

20   and was responsible for communicating CRT Product pricing agreements to Toshiba. And Thai

21   CRT had a relationship with Samtel and was responsible for communicating CRT Product

22   pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon

23   pricing as conveyed by Samsung, LG, and Thai CRT. Sometimes Hitachi and Toshiba also

24   attended the Glass Meetings. In this way, Hitachi, Toshiba and Samtel participated in the

25   conspiracy to fix prices of CRT Products.

26   //

27   //

28

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

c.  **Defendants' And Co-Conspirators' Participation In Group And Bilateral Discussions**

166.    Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin, participated in at least 200 Glass Meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Samsung. Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Samsung agreed on prices and supply levels for CRT Products.

167.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them. To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the Glass Meetings. Thus, SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

168.    Between at least 1995 and 2001, Defendant LG, through LG Electronics, Inc. and LGETT, participated at least 100 Glass Meetings at all levels. After 2001, LG participated in the CRT Product conspiracy through its joint venture with Philips, LG.Philips Displays (n/k/a LP Displays). A substantial number of these meetings were attended by the highest ranking executives from LG. LG also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, LG agreed on prices and supply levels for CRT Products. LG never effectively withdrew from this conspiracy.

169.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them. To the extent LGEUSA sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

170. Between at least 1996 and 2001, Defendant Philips, through Royal Philips, Philips Taiwan, and PEIL participated at least 100 Glass Meetings at all levels. After 2001, Philips participated in the CRT Product conspiracy through its joint venture with LG, LG.Philips Displays (n/k/a LP Displays). A substantial number of these meetings were attended by high level executives from Philips. Philips also engaged in numerous bilateral discussions with other Defendants. Through these discussions, Philips agreed on prices and supply levels for CRT Products. Philips never effectively withdrew from this conspiracy.

171. Defendants PENAC, Philips Brazil, and PCEC were represented at those meetings and were a party to the agreements entered at them. To the extent PENAC, Philips Brazil and PCEC sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, PENAC, Philips Brazil and PCEC were active, knowing participants in the alleged conspiracy.

172. Between at least 2001 and 2006, Defendant LP Displays (f/k/a LG.Philips Displays) participated at least 100 Glass Meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from LP Displays. Certain of these high level executives from LP Displays had previously attended meetings on behalf of defendants LG and Philips. LP Displays also engaged in bilateral discussions with other Defendants. Through these discussions, LP Displays agreed on prices and supply levels for CRT Products.

173. Between at least 1995 and 2006, Defendant Chunghwa, through CPT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 Glass Meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of CPT, C.Y. Lin. Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Chunghwa agreed on prices and supply levels for CRT Products.

174.    Defendants Tatung Company and Tatung America were represented at those meetings and were a party to the agreements entered at them. To the extent Tatung Company and Tatung America sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Tatung Company and Tatung America were active, knowing participants in the alleged conspiracy.

175.    Between at least 1995 and 2004, Defendant Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 Glass Meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Daewoo. Daewoo also engaged in bilateral discussions with other Defendants on a regular basis. Through these discussions, Daewoo agreed on prices and supply levels for CRT Products. Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

176.    Defendant Daewoo International was represented at those meetings and was a party to the agreements entered at them. To the extent Daewoo International sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Daewoo International was an active, knowing participant in the alleged conspiracy.

177.    Between at least 1995 and 2003, Defendant Toshiba, through Toshiba Corporation and TDDT, participated in several Glass Meetings. After 2003, Toshiba participated in the CRT conspiracy through its joint venture with Panasonic, MTPD. These meetings were attended by high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG. Through these discussions, Toshiba agreed on prices and supply levels for CRT Products. Toshiba never effectively withdrew from this conspiracy.

178. Defendants Toshiba America, TAIP, TACP, TACPI and TAEC were represented at those meetings and were a party to the agreements entered at them. To the extent Toshiba America, TAIP, TACP, TACPI and TAEC sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Toshiba America, TAIP, TACP, TACPI, and TAEC were active, knowing participants in the alleged conspiracy.

179. Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in several Glass Meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRT Products. Hitachi never effectively withdrew from this conspiracy.

180. Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them. To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

181. Between at least 1996 and 2003, Defendant Panasonic (known throughout the class period as Matsushita Electric Industrial Co., Ltd.), through Panasonic Corporation and Matsushita Malaysia, participated in several Glass Meetings. After 2003, Panasonic participated in the CRT conspiracy through its joint venture with Toshiba, MTPD. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with other Defendants. Through these discussions, Panasonic agreed on prices and supply levels for CRT Products. Panasonic never effectively withdrew from this conspiracy.

182.     Panasonic NA and Panasonic Consumer Electronics were represented at those meetings and were a party to the agreements entered at them. To the extent Panasonic NA and Panasonic Consumer Electronics sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Panasonic NA and Panasonic Consumer Electronics were active, knowing participants in the alleged conspiracy.

183.     Between at least 2003 and 2006, Defendant MTPD participated in multiple Glass Meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high level sales managers from MTPD. MTPD also engaged in bilateral discussions with other Defendants. Through these discussions, MTPD agreed on prices and supply levels for CRT Products.

184.     Between at least 1998 and 2007, Defendant BMCC participated in multiple Glass Meetings. These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for CRT Products. None of BMCC's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government. BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

185.     Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE, and IDDC, participated in multiple Glass Meetings. These meetings were attended by the highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRT Products. None of IRICO's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

186.     Between at least 1997 and 2006, Defendant Thai CRT participated in multiple Glass Meetings. These meetings were attended by the highest ranking executives from Thai

CRT. Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel. Through these discussions, Thai CRT agreed on prices and supply levels for CRT Products. Thai CRT never effectively withdrew from this conspiracy.

187.    Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT. These meetings were attended by high level executives from Samtel. Through these discussions, Samtel agreed on prices and supply levels for CRT Products. Samtel never effectively withdrew from this conspiracy.

188.    When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.   The CRT Market During The Conspiracy**

189.    Until the last few years, CRTs were the dominant technology used in displays, including television and computer monitors. During the Class Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

190.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------|------|------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

191.    During the Class Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America. By 2002, North America still consumed around 35 percent of the world's CRT monitor supply. *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

192.    Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Class Period. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Information Display 9/92 p.19. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

193.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years…."

194.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose. The price increase was allegedly based on increasing global demand. In fact, this price increase was a result of the collusive conduct as herein alleged.

195.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

196.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October….While computer monitor price increases

may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

197.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips, and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes. Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be 20% hike in the price of our CRT monitors."

198.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

199.    For example, the Defendants' CRT factory utilization percentage fell from 90 percent in the third quarter of 2000 to 62 percent in the first quarter of 2001. This is the most dramatic example of a drop in factory utilization. There were sudden drops throughout the Class Period but to a lesser degree. Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by the Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRT Products.

200.    During the Class Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products. As Finsen Yu, President of Skyworth Macao Commerical Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

201.    During the Class Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

202.    These price increases and price stability in the market for CRT Products during the Class Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.  Internatiional Government Antitrust Investigations**

203.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRT Products sold in the United States during the Class Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ") and others in November 2007.

204.    On November 8, 2007, antitrust authorities in Europe, Japan and South Korea raided the offices of manufacturers of CRTs as part of an international investigation of alleged price fixing.

205.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Defendant Chunghwa Picture Tubes, Ltd., Cheng Yuan Lin, aka C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry." The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in the Northern District of California.

206.    Defendant MT Picture Display Co., Ltd., the CRT unit of Defendant Panasonic, has confirmed that it was raided by Japan's Fair Trade Commission.

207.    *Kyodo News* reported on November 8, 2007, upon information and belief, that MT Picture Display fixed prices for CRTs with manufacturers in three Asian countries, including South Korea's Samsung SDI Co.

208.    *Kyodo News* further reported that:

Officials of these three companies are believed to have had at least 10 meetings since 2005 in major Asian cities to coordinate target prices when delivering their products to TV manufacturers in Japan and South Korea, the sources said.

209.     Defendant Samsung SDI Co., Ltd. was raided by South Korea's Fair Trade Commission, which has started an investigation into Samsung's CRT business.

210.     The *Asian Shimbun* further reported on November 10, 2007 that "[t]he representatives held meetings in Southeast Asia where the companies operate CRT factories, the sources said. The European Commission, the European Union's executive branch, and the U.S. Justice Department have been investigating four companies' [referring to the four Asian-based manufacturers—MT Picture Display, Samsung SDI Co., Chunghwa Picture Tubes, LP Displays] overseas units and are closely consulting with the Fair Trade Commission by sharing information."

211.     On November 21, 2007, Defendant Royal Philips publicly disclosed that it too is subject to one or more investigations into anticompetitive conduct in the CRT industry. Royal Philips spokesman Joon Knapen declined to comment on which jurisdictions have started investigations. Royal Philips stated that it intended to assist the regulators.

212.     In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

213.     On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel. The HCA described the cartel as follows:

The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Picture Tubes (UK), Ltd., Chunghwa Picture Tubes, Ltd., Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany Gmbh, Matsushita Global HQ, Matsushita European HQ.

Based on the data available, the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including colored picture tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

214. As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

215. Several Defendants also have a history of "cooperation" and anticompetitive conduct. For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory (DRAM).

216. Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory and NAND Flash Memory.

217. In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

218. On December 12, 2006, news reports indicated that Defendants Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics, Inc, LG Display Co., Ltd., were all under investigation for price fixing of TFT-LCDs.

219.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation, and Defendant Chunghwa Picture Tubes, Ltd.—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

220.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, Ltd., a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

221.    The indictments of LG Display Co., Ltd., Sharp Corporation, Chunghwa Picture Tubes, Ltd. and Hitachi Displays, Ltd., all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in the Northern District of California.

## IX.    THE PASS-THROUGH OF OVERCHARGES TO CONSUMERS

222.    Defendants' conspiracy to fix, raise, maintain and stabilize the price of CRT Products at artificial levels resulted in harm to Plaintiffs and the indirect purchaser consumer classes alleged herein because it resulted in their paying higher prices for CRT Products than they would have paid in the absence of Defendants' conspiracy. The entire overcharge at issue was passed on to Plaintiffs and members of the indirect purchaser classes. As the DOJ acknowledged in announcing the indictment of defendant Chunghwa's former Chairman and CEO, "This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices."

223.    The Defendants identified above that attended the Glass Meetings, monitored the prices of televisions and computer monitors sold in the U.S. and elsewhere on a regular basis. The purpose and effect of investigating such retail market data was at least three fold. First, it permitted Defendants, such as Chunghwa, which did not manufacture CRT televisions or computer monitors the way that Samsung, LG, Daewoo, Panasonic, Toshiba, Philips, and Hitachi did, to police the price fixing agreement to make sure that intra-defendant CRT sales were kept at supra-competitive levels. Secondly, it permitted all Defendants to police their price

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

fixing agreement to independent OEMs who would reduce prices for finished goods if there was a corresponding reduction in CRT prices from a Defendant. Finally, as discussed above, Defendants used the prices of finished products to analyze whether they could increase prices or should agree to a "bottom" price instead. The Defendants concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers (for e.g., retailers and computer OEMs). In this way, Defendants assured that 100% of the supracompetitive overcharges for CRT Products were passed on to indirect purchaser consumers.

224.    The indirect purchaser consumer buys CRT Products from either a computer or TV OEM such as Dell or Sharp, or a reseller such as Best Buy.

225.    Because of the breadth of the price-fixing conspiracy here, the direct purchaser CRT TV and monitor manufacturers were not constrained by their competitors from passing on the overcharge. Because each of the direct purchaser's competitors were also buying CRTs at supracompetitive prices from conspiracy members, no direct purchaser faced end-product price competition from a competitor that was not paying supracompetitive prices for CRTs.

226.    The price of CRT Products is directly correlated to the price of CRTs. The margins for CRT TV and monitor makers are sufficiently thin that price increases of CRTs force them to increase the prices of their CRT Products. This means that increases in the price of CRTs lead to quick corresponding price increases at the OEM level for CRT Products.

227.    Computer and TV OEMs and retailers of CRT Products are all subject to vigorous price competition, whether selling CRT TVs or computer monitors. The demand for CRTs is ultimately determined by purchasers of products containing such products. The market for CRTs and the market for CRT Products are therefore inextricably linked and cannot be considered separately. Defendants are well aware of this intimate relationship, and use forecasts of CRT TVs and computer monitors to predict sales of and determine production levels and pricing for CRTs.

228.     Computers and televisions are commodities with little or no brand loyalty such that aggressive pricing causes consumers to switch preferences to different brands. Prices are closely based on production costs, which are in turn directly determined by component costs, as assembly costs are minimal. OEMs accordingly use component costs, like the cost of CRTs, as the starting point for all price calculations. On information and belief, computer and TV OEMs price their end-products on a "cost-plus" basis. Thus, computer and television prices closely track increases and decreases in component costs.

229.     The CRT is the most expensive component in the products into which they are incorporated. On information and belief, the cost of the CRT in a computer monitor is approximately 60% of the total cost to manufacture the computer monitor. On information and belief, the cost of the CRT in a television is a slightly smaller percentage of the total manufacturing cost because a television has more components than a computer monitor, such as the tuner and speakers.

230.     Economic and legal literature recognizes that the more pricing decisions are based on cost, the easier it is to determine the pass-through rate. The directness of affected costs refers to whether an overcharge affects a direct (*i.e.,* variable) cost or an indirect (*i.e.,* overhead) cost. Overcharges will be passed through sooner and at a higher rate if the overcharges affect direct costs. Here, CRTs are a direct and substantial cost of CRT Products. Therefore, Plaintiffs will be able to show that the overcharge on the CRTs was passed through to indirect purchasers.

231.     Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. CRTs are identifiable, discreet, physical objects that do not change form or become an indistinguishable part of the TV or computer monitor in which they are contained. Thus, CRTs follow a traceable physical chain from the Defendants to the OEMs to the purchasers of finished products incorporating CRTs.

232.     Moreover, just as CRTs can be physically traced through the supply chain, so can their price by traced to show that changes in the prices paid by direct purchasers of CRTs affect prices paid by indirect purchasers of CRT Products. On information and belief, computer and TV OEMs price their end-products on a "cost-plus" basis.

233.    In retailing, it is common to use a "mark-up rule." The retail price is set as the wholesale cost plus a percentage markup designed to recover non-product costs and to provide a profit. This system guarantees that increases in costs to the retailer will be passed on to end buyers. For example, CDW, a large seller of CRT monitors, uses such a system. A declaration in the *DRAM* case from CDW's director of pricing details exactly how they calculated selling prices:

> In general, CDW employs a "building block" approach to setting its advertised prices. The first building block is the Cost of Goods Sold (COGS), which represents the price CDW paid to acquire the product…CDW…adds a series of positive markups to the cost to CDW to acquire a given product. These markups are in addition to the pass through effect of changes in the costs charged to CDW for that product by a given vendor.

234.    Economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. As Professor Herbert Hovenkamp, a noted antitrust scholar, has stated in his treatise, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 624:

> A monopoly charge at the top of the distribution chain generally results in higher prices at every level below. For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and will pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain will be poorer as a result of the monopoly price at the top.
>
> Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

235.    Similarly, two other antitrust scholars—Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Hass School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern School of Law and author of the Handbook of the

1  Law of Antitrust)—have observed that "in a multiple-level chain of distribution, passing on

2  monopoly overcharges is not the exception; it is the rule."

3      236.    As Professor Jeffrey McKie-Mason (Arthur W. Burks Professor for Information

4  and Computer Science, Professor of Economics and Public Policy, and Associate Dean for

5  Academic Affairs in the School of Information at the University of Michigan), an expert who

6  presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation,

7  said (in a passage quoted in a judicial decision in that case granting class certification):

8              As is well known in economic theory and practice, at least some of the
             overcharge will be passed on by distributors to end consumers. When the
9              distribution markets are highly competitive, as they are here, all or nearly
             the entire overcharge will be passed on through to ultimate consumers….
10             Both of Microsoft's experts also agree upon the economic phenomenon of
             cost pass through and how it works in competitive markets. This general
11             phenomenon of cost pass through is well established in antitrust laws and
             economics as well.
12

13

14      237.    The purpose of Defendants' conspiratorial conduct was to fix, raise, maintain and

15  stabilize the price of CRTs and, as a direct and foreseeable result, CRT Products. The market for

16  CRTs and the market for CRT Products are inextricably linked. One exists to serve the other.

17  Defendants not only knew, but expressly contemplated that prices of CRT Products would

18  increase as a direct result of their increasing the prices of CRTs.

19      238.    Finally, many of the Defendants and/or co-conspirators themselves have been

20  and are currently manufacturers of CRT TVs and computer monitors. Such manufacturers

21  include, for example, Samsung, LG, Hitachi, Toshiba, Philips, and Panasonic. Having agreed to

22  fix prices for CRTs, the major component of the end products they were manufacturing, these

23  Defendants intended to pass on the full cost of this component in their finished products, and in

24  fact did so.

25      239.    As a direct and proximate result of Defendants' illegal conduct, Plaintiffs and

26  other indirect purchasers have been forced to pay supra-competitive prices for CRT Products.

27  These inflated prices have been passed on to them by direct purchaser manufacturers,

28  distributors and retailers.

# X.  CLASS ACTION ALLEGATIONS

240.    Plaintiffs bring this action individually and as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the following class (the "Nationwide Class"):

> All persons and or entities who or which indirectly purchased in the United States for their own use and not for resale, CRT Products manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or co-conspirator thereof, at any time during the period from at least March 1, 1995 through at least November 25, 2007. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and, any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local government entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

241.    Plaintiffs also bring this action on behalf of themselves and as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all members of the following State classes or subclasses (collectively "Indirect Purchaser State Classes"): Arizona, California, Florida, Hawaii, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

242.    Each of the Indirect Purchaser State Classes is defined as follows:

> All persons and or entities who or which indirectly purchased in each of the above States for their own use and not for resale, CRT Products manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or co-conspirator thereof, at any time during the period from at least March 1, 1995 through at least November 25, 2007. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and, any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local government entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

243. This action has been brought and may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

a. The Classes are ascertainable and there is a well-defined community of interest among members of the Classes;

b. Based upon the nature of trade and commerce involved and the number of indirect purchasers of CRT Products, Plaintiffs believe that the number of Class members is very large, and therefore joinder of all Class members is not practicable;

c. Plaintiffs' claims are typical of Class members' claims because Plaintiffs indirectly purchased CRT Products manufactured by Defendants or their co-conspirators, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Classes and the relief sought is common to the Classes;

d. The following common questions of law or fact, among others, exist as to the members of the Classes:

i. Whether Defendants formed and operated a combination or conspiracy to fix, raise, maintain, or stabilize the prices of CRT Products;

ii. Whether the combination or conspiracy caused CRT Product prices to be higher than they would have been in the absence of Defendants' conduct;

iii. The operative time period of Defendants' combination or conspiracy;

iv. Whether Defendants' conduct caused injury to the business or property of Plaintiffs and the members of the Classes;

v. The appropriate measure of the amount of damages suffered by the Classes;

vi. Whether Defendants' conduct violates Section 1 of the Sherman Act (15 U.S.C. § 1) as alleged in the First Claim for Relief;

vii. Whether Defendants' conduct violates the Indirect Purchaser States' antitrust laws as alleged in the Second Claim for Relief;

1            viii.      Whether Defendants' conduct violates the unfair competition and

2 consumer protection laws of the Consumer Protection States as alleged in the Third Claim for

3 Relief;

4            ix.      The appropriate nature of class-wide equitable relief.

5       e.      These and other questions of law and fact common to the members of the

6 Classes predominate over any questions affecting only individual members, including legal and

7 factual issues relating to liability and damages;

8       f.      After determination of the predominant common issues identified above,

9 if necessary or appropriate, the Classes can be divided into logical and manageable subclasses;

10      g.      Plaintiffs will fairly and adequately protect the interests of the Classes in

11 that Plaintiffs have no interests that are antagonistic to other members of the Classes and have

12 retained counsel competent and experienced in the prosecution of class actions and antitrust

13 litigation to represent them and the Classes;

14      h.      A class action is superior to other available methods for the fair and

15 efficient adjudication of this litigation since individual joinder of all damaged Class members is

16 impractical. The damages suffered by the individual Class members are relatively small, given

17 the expense and burden of individual prosecution of the claims asserted in this litigation. Thus,

18 absent the availability of class action procedures it would not be feasible for Class members to

19 redress the wrongs done to them. Even if the Class members could afford individual litigation,

20 the court system could not. Further, individual litigation presents the potential for inconsistent or

21 contradictory judgments and would greatly magnify the delay and expense to all parties and the

22 court system. Therefore, the class action device presents far fewer case management difficulties

23 and will provide the benefits of unitary adjudication, economy of scale and comprehensive

24 supervision in a single court;

25      i.      Defendants have acted, and/or refused to act, on grounds generally

26 applicable to the Classes, thereby making appropriate final injunctive relief with respect to the

27 Classes as a whole; and

28

1      j.      In the absence of a class action, Defendants would be unjustly enriched

2    because they would be able to retain the benefits and fruits of its wrongful conduct.

3                      XI.  **VIOLATIONS ALLEGED**

4    A.  **First Claim for Relief: Violation of Section 1 of the Sherman Act**

5        244.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and

6    every allegation set forth in the preceding paragraphs of this Complaint.

7        245.    Beginning at a time unknown to Plaintiffs, but at least as early as March 1, 1995,

8    through at least November 25, 2007, the exact dates being unknown to Plaintiffs and exclusively

9    within the knowledge of Defendants, Defendants and their co-conspirators, entered into a

10   continuing agreement, understanding, and conspiracy to unreasonably restrain trade and

11   commerce in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

12       246.    In particular, Defendants have combined and conspired to fix, raise, maintain or

13   stabilize the prices of CRT Products sold in the United States.

14       247.    Defendants, by their unlawful conspiracy, artificially raised, inflated and

15   maintained the market prices of CRT Products as herein alleged.

16       248.    The contract, combination or conspiracy consisted of a continuing agreement,

17   understanding and concert of action among Defendants and their co-conspirators, the substantial

18   terms of which were to fix, raise, maintain and stabilize the prices of CRT Products they sold in

19   the United States and elsewhere.

20       249.    In formulating and carrying out the alleged agreement, understanding, and

21   conspiracy, the Defendants and their co-conspirators did those things that they combined and

22   conspired to do, including, but not limited to the acts, practices, and course of conduct set forth

23   above, and the following, among others:

24           a.      Participated in meetings and conversations to discuss the prices and

25                   supply of CRT Products in the United States and elsewhere;

26           b.      Agreed to manipulate prices and limit supply of CRT Products sold in the

27                   United States and elsewhere in a manner that deprived direct and indirect

28                   purchasers of CRT Products of free and open competition;

c.      Issued price announcements and price quotations in accordance with the agreements reached;

d.      Sold CRT Products to customers in the United States at non-competitive prices; and

e.      Invoiced customers in the United States at the agreed-upon, fixed prices for CRT Products and transmitting such invoices via U.S. mail and other interstate means of delivery.

250.    The combination and conspiracy alleged herein has had the following effects, among others:

a.      Price competition in the sale of CRT Products has been restrained, suppressed and/or eliminated in the United States;

b.      Prices for CRT Products sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

c.      Those who purchased CRT Products directly or indirectly from Defendants have been deprived the benefits of free and open competition.

251.    As a direct result of the unlawful conduct of Defendants and their co-conspirators in furtherance of their continuing contract, combination or conspiracy, Plaintiffs and the members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for CRT Products purchased indirectly from the Defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy.

252.    These violations are continuing and will continue unless enjoined by this Court.

253.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Nationwide Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

//

//

1

**B.  Second Claim For Relief: Violation of State Antitrust Statutes**

2   254.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and

3   every allegation set forth in the preceding paragraphs of this Complaint.

4   255.   Plaintiff Brian Luscher ("Arizona Plaintiff") incorporates and realleges each and

5   every allegation set forth in the preceding paragraphs of this Complaint and further alleges as

6   follows:

7   a.   Defendants' combinations or conspiracies had the following effects: (1)

8   CRT Product price competition was restrained, suppressed, and

9   eliminated throughout Arizona; (2) CRT Product prices were raised,

10   fixed, maintained, and stabilized at artificially high levels throughout

11   Arizona; (3) the Arizona Plaintiff and members of the Arizona Indirect

12   Purchaser Class paid supracompetitive, artificially inflated prices for CRT

13   Products.

14   b.   During the Class Period, Defendants' illegal conduct substantially

15   affected Arizona commerce.

16   c.   As a direct and proximate result of Defendants' unlawful conduct, the

17   Arizona Plaintiff and members of the Arizona Indirect Purchaser Class

18   have been injured in their business and property and are threatened with

19   further injury.

20   d.   By reason of the foregoing, Defendants have entered into agreements in

21   restraint of trade in violation of Ariz. Rev. Stat. §§44-1401, *et seq*.

22   Accordingly, the Arizona Plaintiff and the members of the Arizona

23   Indirect Purchaser Class seek all forms of relief available under Ariz. Rev.

24   Stat. §§ 44-1401, *et seq.*

25   256.   Plaintiffs Jeffrey Figone, Carmen Gonzalez, Dana Ross, and Steven Ganz

26   ("California Plaintiffs") incorporate and reallege each and every allegation set forth in the

27   preceding paragraphs of this Complaint and further alleges as follows:

28

a.  Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professional Code. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of CRT Products at supra-competitive levels.

b.  The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for CRT Products.

c.  For the purpose of forming and effectuating the unlawful trust, the defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices, and course of conduct set forth above and the following: (1) fixing, raising, stabilizing and/or maintaining the price of CRT Products; and (2) allocating among themselves the production of CRT Products.

d.  The combination and conspiracy alleged herein has had, *inter alia,* the following effects: (1) price competition in the sale of CRT Products has been restrained, suppressed and/or eliminated in the State of California; (2) prices for CRT Products sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and (3) those who purchased CRT Products directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

**61**
**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

e.       As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the California Class have been injured in their business and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 *et seq.* of the California Business and Professions Code, Plaintiffs seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

257.     Plaintiff Travis Burau ("Iowa Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.       Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout the Iowa; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the Iowa; (3) the Iowa Plaintiff and the members of the Iowa Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

b.       During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

c.       As a direct and proximate result of Defendants' unlawful conduct, the Iowa Plaintiff and members of the Iowa Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.       By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1 et *seq*. Accordingly,

1    the Iowa Plaintiff and the members of the Iowa Indirect Purchaser Class

2    seek all forms of relief available under Iowa Code §§ 553.1.

3    258.    Plaintiff Southern Office Supply, Inc. ("Kansas Plaintiff") incorporates and

4  realleges each and every allegation set forth in the preceding paragraphs of this Complaint and

5  further alleges as follows:

6         a.    Defendants' combinations or conspiracies had the following effects: (1)

7              CRT Product price competition was restrained, suppressed, and

8              eliminated throughout Kansas; (2) CRT Product prices were raised, fixed,

9              maintained, and stabilized at artificially high levels throughout Kansas;

10             (3) the Kansas Plaintiff and members of the Kansas Indirect Purchaser

11             Class paid supracompetitive, artificially inflated prices for CRT Products.

12        b.    During the Class Period, Defendants' illegal conduct substantially

13             affected Kansas commerce.

14        c.    As a direct and proximate result of Defendants' unlawful conduct, the

15             Kansas Plaintiff and members of the Kansas Indirect Purchaser Class have

16             been injured in their business and property and are threatened with further

17             injury.

18        d.    By reason of the foregoing, Defendants have entered into agreements in

19             restraint of trade in violation of Kansas Stat. Ann. §§50-101 *et seq.*

20             Accordingly, the Kansas Plaintiff and the members of the Kansas Indirect

21             Purchaser Class seek all forms of relief available under Kansas Stat. Ann.

22             §§50-101 *et seq.*

23    259.    Plaintiffs Andrew Kindt, James Brown, and Kory Pentland ("Michigan

24  Plaintiffs") incorporate and reallege each and every allegation set forth in the preceding

25  paragraphs of this Complaint and further allege as follows:

26        a.    Defendants' combinations or conspiracies had the following effects: (1)

27             CRT Product price competition was restrained, suppressed, and

28             eliminated throughout Michigan; (2) CRT Product prices were raised,

fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) the Michigan Plaintiffs and members of the Michigan Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

      b.    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

      c.    As a direct and proximate result of Defendants' unlawful conduct, the Michigan Plaintiffs and members of the Michigan Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

      d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771 *et seq.* Accordingly, the Michigan Plaintiffs and the members of the Michigan Indirect Purchaser Class seek all forms of relief available under Michigan Comp. Laws Ann. §§ 445.771 *et seq.*

260.    Plaintiffs Chad Klebs, David Norby, Alan Rotman, and Ryan Rizzo ("Minnesota Plaintiffs") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

      a.    Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) the Minnesota Plaintiffs and members of the Minnesota Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

      b.    During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

1      c.     As a direct and proximate result of Defendants' unlawful conduct, the

2          Minnesota Plaintiffs and members of the Minnesota Indirect Purchaser

3          Class have been injured in their business and property and are threatened

4          with further injury.

5      d.     By reason of the foregoing, Defendants have entered into agreements in

6          restraint of trade in violation of Minnesota Stat. §§ 325D.50 *et seq.*

7          Accordingly, the Minnesota Plaintiffs and the members of the Minnesota

8          Indirect Purchaser Class seek all forms of relief available under

9          Minnesota Stat. §§ 325D.50 *et seq.*

10     261.     Plaintiff Charles Jenkins ("Mississippi Plaintiff") incorporates and realleges each

11 and every allegation set forth in the preceding paragraphs of this Complaint and further alleges

12 as follows:

13      a.     Defendants' combinations or conspiracies had the following effects: (1)

14          CRT Product price competition was restrained, suppressed, and

15          eliminated throughout Mississippi; (2) CRT Product prices were raised,

16          fixed, maintained, and stabilized at artificially high levels throughout

17          Mississippi; (3) the Mississippi Plaintiff and members of the Mississippi

18          Indirect Purchaser Class paid supracompetitive, artificially inflated prices

19          for CRT Products.

20      b.     During the Class Period, Defendants' illegal conduct substantially

21          affected Mississippi commerce.

22      c.     As a direct and proximate result of Defendants' unlawful conduct, the

23          Mississippi Plaintiff and members of the Mississippi Indirect Purchaser

24          Class have been injured in their business and property and are threatened

25          with further injury.

26      d.     By reason of the foregoing, Defendants have entered into agreements in

27          restraint of trade in violation of Mississippi Code Ann. §75-21-1 et seq.

28          Accordingly, the Minnesota Plaintiff and the members of the Mississippi

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

1        Indirect Purchaser Class seek all forms of relief available under

2        Mississippi Code Ann. §75-21-1 et seq.

3        262.    Plaintiff Daniel R. Hergert ("Nebraska Plaintiff") incorporates and realleges each

4   and every allegation set forth in the preceding paragraphs of this Complaint and further alleges

5   as follows:

6            a.    Defendants' combinations or conspiracies had the following effects: (1)

7                  CRT Product price competition was restrained, suppressed, and

8                  eliminated throughout Nebraska; (2) CRT Product prices were raised,

9                  fixed, maintained, and stabilized at artificially high levels throughout

10                 Nebraska; (3) the Nebraska Plaintiff and members of the Nebraska

11                 Indirect Purchaser Class paid supracompetitive, artificially inflated prices

12                 for CRT Products.

13           b.    During the Class Period, Defendants' illegal conduct substantially

14                 affected Nebraska commerce.

15           c.    As a direct and proximate result of Defendants' unlawful conduct, the

16                 Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class

17                 have been injured in their business and property and are threatened with

18                 further injury.

19           d.    By reason of the foregoing, Defendants have entered into agreements in

20                 restraint of trade in violation of Nebraska Rev. Stat. § 59-801 *et seq.*

21                 Accordingly, the Nebraska Plaintiff and the members of the Nebraska

22                 Indirect Purchaser Class seek all forms of relief available under Nebraska

23                 Rev. Stat. § 59-801 *et seq.*

24       263.    Plaintiff Samuel Nasto ("Nevada Plaintiff") incorporates and realleges each and

25   every allegation set forth in the preceding paragraphs of this Complaint and further alleges as

26   follows:

27           a.    Defendants' combinations or conspiracies had the following effects: (1)

28                 CRT Product price competition was restrained, suppressed, and

**66**
**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

1                      eliminated throughout Nevada; (2) CRT Product prices were raised, fixed,

2                      maintained, and stabilized at artificially high levels throughout Nevada;

3                      (3) the Nevada Plaintiff and members of the Nevada Indirect Purchaser

4                      Class paid supracompetitive, artificially inflated prices for CRT Products.

5        b.        During the Class Period, Defendants' illegal conduct substantially

6                      affected Nevada commerce.

7        c.        As a direct and proximate result of Defendants' unlawful conduct, the

8                      Nevada Plaintiff and members of the Nevada Indirect Purchaser Class

9                      have been injured in their business and property and are threatened with

10                    further injury.

11       d.        By reason of the foregoing, Defendants have entered into agreements in

12                    restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq.*

13                    Accordingly, the Nevada Plaintiff and the members of the Nevada

14                    Indirect Purchaser Class seek all forms of relief available under Nevada

15                    Rev. Stat. Ann. §§ 598A *et seq.*

16      264.    Plaintiff Craig Stephenson ("New Mexico Plaintiff") incorporates and realleges

17 each and every allegation set forth in the preceding paragraphs of this Complaint and further

18 alleges as follows:

19        a.        Defendants' combinations or conspiracies had the following effects: (1)

20                    CRT Product price competition was restrained, suppressed, and

21                    eliminated throughout New Mexico; (2) CRT Product prices were raised,

22                    fixed, maintained, and stabilized at artificially high levels throughout New

23                    Mexico; (3) the New Mexico Plaintiff and members of the New Mexico

24                    Indirect Purchaser Class paid supracompetitive, artificially inflated prices

25                    for CRT Products.

26        b.        During the Class Period, Defendants' illegal conduct substantially

27                    affected New Mexico commerce.

28

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

c.      As a direct and proximate result of Defendants' unlawful conduct, the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq.* Accordingly, the New Mexico Plaintiff and the members of the New Mexico Indirect Purchaser Class seek all forms of relief available under New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

265.    Plaintiff Joshua Maida ("North Carolina Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.      Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) the North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

b.      During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, the North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1 *et seq.* Accordingly, the North Carolina Plaintiff and the members of the North

1   Carolina Indirect Purchaser Class seek all forms of relief available under

2   North Carolina Gen. Stat. §§ 75-1 *et seq.*

3   266.   Plaintiff Gary Hanson ("North Dakota Plaintiff") incorporates and realleges each

4   and every allegation set forth in the preceding paragraphs of this Complaint and further alleges

5   as follows:

6       a.   Defendants' combinations or conspiracies had the following effects: (1)

7       CRT Product price competition was restrained, suppressed, and

8       eliminated throughout North Dakota; (2) CRT Product prices were raised,

9       fixed, maintained, and stabilized at artificially high levels throughout

10      North Dakota; (3) the North Dakota Plaintiff and members of the North

11      Dakota Indirect Purchaser Class paid supracompetitive, artificially

12      inflated prices for CRT Products.

13      b.   During the Class Period, Defendants' illegal conduct substantially

14      affected North Dakota commerce.

15      c.   As a direct and proximate result of Defendants' unlawful conduct, the

16      North Dakota Plaintiff and members of the North Dakota Indirect

17      Purchaser Class have been injured in their business and property and are

18      threatened with further injury.

19      d.   By reason of the foregoing, Defendants have entered into agreements in

20      restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01

21      *et seq.* Accordingly, the North Dakota Plaintiff and the members of the

22      North Dakota Indirect Purchaser Class seek all forms of relief available

23      under North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

24      267.   Plaintiff Donna Marie Ellingson ("South Dakota Plaintiff") incorporates and

25   realleges each and every allegation set forth in the preceding paragraphs of this Complaint and

26   further alleges as follows:

27      a.   Defendants' combinations or conspiracies had the following effects: (1)

28      CRT Product price competition was restrained, suppressed, and

**69**

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**

**MDL NO. 1917**

eliminated throughout South Dakota; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) the South Dakota Plaintiff and members of the South Dakota Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

b.      During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, the South Dakota Plaintiff and members of the South Dakota Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1 *et seq.* Accordingly, the South Dakota Plaintiff and the members of the South Dakota Indirect Purchaser Class seek all forms of relief available under South Dakota Codified Laws Ann. §§ 37-1 *et seq.*

268.     Plaintiffs Frank Warner and Albert Sidney Crigler ("Tennessee Plaintiffs") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

a.      Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) the Tennessee Plaintiffs and members of the Tennessee Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

b.      During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce.

**70**
**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

c.     As a direct and proximate result of Defendants' unlawful conduct, the Tennessee Plaintiffs and members of the Tennessee Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101 *et seq.* Accordingly, the Tennessee Plaintiffs and the members of the Tennessee Indirect Purchaser Class seek all forms of relief available under Tennessee Code Ann. §§ 47-25-101 *et seq.*

269.    Plaintiff Margaret Slagle ("Vermont Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.     Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Vermont; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) the Vermont Plaintiff and members of the Vermont Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

b.     During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, the Vermont Plaintiff and members of the Vermont Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453 *et seq.* Accordingly, the Vermont Plaintiff and the members of the Vermont

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

1    Indirect Purchaser Class seek all forms of relief available under Vermont

2    Stat. Ann. 9 §§ 2453 *et seq.*

3    270.    Plaintiff John Larch ("West Virginia Plaintiff") incorporates and realleges each

4    and every allegation set forth in the preceding paragraphs of this Complaint and further alleges

5    as follows:

6        a.    Defendants' combinations or conspiracies had the following effects: (1)

7        CRT Product price competition was restrained, suppressed, and

8        eliminated throughout West Virginia; (2) CRT Product prices were raised,

9        fixed, maintained, and stabilized at artificially high levels throughout

10       West Virginia; (3) the West Virginia Plaintiff and members of the West

11       Virginia Indirect Purchaser Class paid supracompetitive, artificially

12       inflated prices for CRT Products.

13       b.    During the Class Period, Defendants' illegal conduct substantially

14       affected West Virginia commerce.

15       c.    As a direct and proximate result of Defendants' unlawful conduct, the

16       West Virginia Plaintiff and members of the West Virginia Indirect

17       Purchaser Class have been injured in their business and property and are

18       threatened with further injury.

19       d.    By reason of the foregoing, Defendants have entered into agreements in

20       restraint of trade in violation of West Virginia Code §§ 47-18-1 *et seq.*

21       Accordingly, the West Virginia Plaintiff and the members of the West

22       Virginia Indirect Purchaser Class seek all forms of relief available under

23       West Virginia Code §§ 47-18-1 *et seq.*

24   271.    Plaintiff Brigid Terry ("Wisconsin Plaintiff") incorporates and realleges each and

25   every allegation set forth in the preceding paragraphs of this Complaint and further alleges as

26   follows:

27       a.    Defendants' combinations or conspiracies had the following effects: (1)

28       CRT Product price competition was restrained, suppressed, and

eliminated throughout Wisconsin; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) the Wisconsin Plaintiff and members of the Wisconsin Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

b.    During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, the Wisconsin Plaintiff and members of the Wisconsin Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§133.01 *et seq.* Accordingly, the Wisconsin Plaintiff and the members of the Wisconsin Indirect Purchaser Class seek all forms of relief available under Wisconsin Stat. §§133.01 *et seq.*

## C.  Third Claim for Relief: Violation of State Consumer Protection and Unfair Competition Statutes

272.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

273.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

274.    California Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege as follows:

a.    Beginning on a date unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up through and including

**73**

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

1      November 25, 2007, Defendants committed and continue to commit acts

2      of unfair competition, as defined by Sections 17200, *et seq.* of the

3      California Business and Professions Code, by engaging in the acts and

4      practices specified above.

5   b.   This claim is instituted pursuant to Sections 17203 and 17204 of the

6      California Business and Professions Code, to obtain restitution from these

7      Defendants for acts, as alleged herein, that violated Section 17200 of the

8      California Business and Professions Code, commonly known as the

9      Unfair Competition Law.

10   c.   The Defendants' conduct as alleged herein violated Section 17200. The

11      acts, omissions, misrepresentations, practices and non-disclosures of

12      Defendants, as alleged herein, constituted a common continuous and

13      continuing course of conduct of unfair competition by means of unfair,

14      unlawful and/or fraudulent business acts or practices within the meaning

15      of California Business and Professions Code, Section 17200, *et seq.*,

16      including, but not limited to, the following: (1) the violations of Section 1

17      of the Sherman Act, as set forth above; (2) the violations of Section

18      16720, *et seq.,* of the California Business and Professions Code, set forth

19      above;

20   d.   Defendants' acts, omissions, misrepresentations, practices and non-

21      disclosures, as described above, whether or not in violation of Section

22      16720, *et seq.* of the California Business and Professions Code, and

23      whether or not concerted or independent acts, are otherwise unfair,

24      unconscionable, unlawful or fraudulent; Defendants' act and practices are

25      unfair to consumers of CRT Products in the State of California and

26      throughout the United States, within the meaning of Section 17200,

27      California Business and Professions Code; and

28

**74**
**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

e.   Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

f.   California Plaintiffs and each of the California Indirect Purchaser Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

g.   The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

h.   The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause the California Plaintiffs and the members of the California Indirect Purchaser Class to pay supra-competitive and artificially-inflated prices for CRT Products. The California Plaintiffs and the members of the Class suffered injury in fact and lost money or property as a result of such unfair competition.

i.   The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

j.   As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. The California Plaintiffs and the members of the California Indirect Purchaser Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business practices, pursuant to California Business & Professions Code §17200 *et seq.*

275.     Plaintiffs Brady Lane Cotton and Colleen Sobotka ("Florida Plaintiffs") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

a.       Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in Florida.

b.       The foregoing conduct constitutes "unfair methods of competition," and "unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Florida Stat. § 501.204.

c.       During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

d.       Defendants' unlawful conduct had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Florida; (2) CRT Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) the Florida Plaintiffs and members of the Florida Indirect Purchaser Class were deprived of free and open competition; and (4) the Florida Plaintiffs and members of the Florida Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

e.       As a direct and proximate result of Defendants' conduct, the Florida Plaintiffs and members of the Florida Indirect Purchaser Class have been injured and are threatened with further injury.

f.       Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201 *et seq.*, and accordingly, the Florida Plaintiffs and members of the Florida Indirect Purchaser Class seek all relief available under that statute.

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

276.     Plaintiff Daniel Riebow ("Hawaii Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in Hawaii.

b.     The foregoing conduct constitutes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Hawaii Rev. Stat. § 480-2.

c.     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

d.     Defendants' unlawful conduct had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) CRT Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Hawaii; (3) the Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class were deprived of free and open competition; and (4) the Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

e.     As a direct and proximate result of Defendants' conduct, the Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class have been injured and are threatened with further injury.

f.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-2, and accordingly, the Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class seek all relief available under Hawaii Rev Stat. § 480 *et seq*.

277.    Plaintiff Barbara Caldwell ("Massachusetts Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.    Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

b.    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in Massachusetts.

c.    Defendants took efforts to conceal their agreements from the Massachusetts Plaintiff and members of the Massachusetts Indirect Purchaser Class.

d.    The foregoing conduct constitutes "unfair competition or unfair or deceptive acts or practices" within the meaning of Massachusetts G.L. c. 93A, §2 *et seq.*

e.    During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.

f.    Defendants' unlawful conduct had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) CRT Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Massachusetts; (3) the Massachusetts Plaintiff and members of the Massachusetts Indirect Purchaser Class were deprived of free and open competition; and (4) the Massachusetts Plaintiff and members of the Massachusetts Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

g.     As a direct and proximate result of Defendants' conduct, the Massachusetts Plaintiff and members of the Massachusetts Indirect Purchaser Class have been injured and are threatened with further injury.

h.     By reason of the foregoing, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts G.L. c. 93A, §2. Defendants' and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling the Massachusetts Plaintiffs and members of the Massachusetts Indirect Purchaser Class to multiple damages.

278.     The Nebraska Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in Nebraska.

b.     The foregoing conduct constitutes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Neb. Rev. Stat. § 59-1602.

c.     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

d.     Defendants' unlawful conduct had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) CRT Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class were deprived of free and open competition; and (4) the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

e.     As a direct and proximate result of Defendants' conduct, the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class have been injured and are threatened with further injury.

f.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §§ 59-1601 *et seq.*, and accordingly, the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class seek all relief available under that statute.

279.   The New Mexico Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in New Mexico.

b.     Defendants also took efforts to conceal their agreements from the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class.

c.     The foregoing conduct constitutes "unfair or deceptive trade practices" and "unconscionable trade practices in the conduct of any trade or commerce" within the meaning of New Mexico Stat. § 57-12-3, in that such conduct resulted in a gross disparity between the value received by New Mexico Plaintiffs and the members of the New Mexico Indirect Purchaser Class and the prices paid by them for CRT Products as set forth in New Mexico Stat. § 57-12-2E.

d.     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

e.     Defendants' unlawful conduct had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) CRT Product prices were raised, fixed, maintained and

stabilized at artificially high levels throughout New Mexico; (3) the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class were deprived of free and open competition; and (4) the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

f.   As a direct and proximate result of Defendants' conduct, the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class have been injured and are threatened with further injury.

g.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1 *et seq.*, and accordingly, the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class seek all relief available under that statute.

280.   Plaintiff Adrienne Belai ("New York Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in New York.

b.   Defendants also took efforts to conceal their agreements from the New York Plaintiff and members of the New York Indirect Purchaser Class.

c.   Defendants' illegal conduct substantially affected New York commerce and consumers.

d.   The conduct of Defendants as described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State

in an honest marketplace in which economic activity is conducted in a competitive manner.

e.   As consumers, the New York Plaintiff and the members of the New York Indirect Purchaser Class were targets of the conspiracy.

f.   Defendants' secret agreements as described herein were not known to the New York Plaintiff or the members New York Indirect Purchaser Class.

g.   Defendants made public statements about the price of CRT Products that Defendants knew would be seen by the New York Plaintiff and the members of the New York Indirect Purchaser Class; such statements either omitted material information that rendered these statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for CRT Products; and, Defendants alone possessed material information that was relevant to consumers, but failed to provide the information.

h.   Because of Defendants' unlawful trade practices in the State of New York, there was a broad impact on the New York Plaintiff and the members of the New York Indirect Purchaser Class who indirectly purchased CRT Products; and the New York Plaintiff and the members of the New York Indirect Purchaser Class have been injured because they have paid more for CRT Products than they would have paid in the absence of Defendants' unlawful trade acts and practices, and are threatened with further injury.

i.   Because of Defendants' unlawful trade practices in the State of New York, the New York Plaintiff and the members of the New York Indirect Purchaser Class who indirectly purchased CRT Products were misled to believe that they were paying a fair price for CRT Products, or that the price increases for CRT Products were for valid business reasons.

j.     Defendants knew that their unlawful trade practices with respect to pricing of CRT Products would have an impact on the New York Plaintiff and the members of the New York Indirect Purchaser Class and not just Defendants' direct customers;

k.     Defendants knew that their unlawful trade practices with respect to pricing of CRT Products would have a broad impact, causing consumer class members who indirectly purchased CRT Products to be injured by paying more for CRT Products than they would have paid in the absence of Defendants' unlawful trade acts and practices.

l.     During the Class Period, each of the Defendants named herein, directly or indirectly through affiliates they dominated and controlled, manufactured, sold and/or distributed CRT Products in New York.

m.    The New York Plaintiff and members of the New York Indirect Purchaser Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial. Without prejudice to their contention that Defendants' unlawful conduct was willful and knowing, the New York Plaintiff and members of the New York Indirect Purchaser Class do not seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus. Law § 349 (h).

281.   The North Carolina Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in North Carolina.

b.     Defendants also took efforts to conceal their agreements from the North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class.

c.       The conduct of Defendants as described herein constitutes consumer-

oriented deceptive acts or practices within the meaning of North Carolina

Gen. Stat. §75-1.1 *et seq.*, which resulted in consumer injury and broad

adverse impact on the public at large, and harmed the public interest of

North Carolina consumers in an honest marketplace in which economic

activity is conducted in a competitive manner.

d.       During the Class Period, Defendants' illegal conduct substantially

affected North Carolina commerce and consumers.

e.       Defendants' unlawful conduct had the following effects: (1) CRT Product

price competition was restrained, suppressed, and eliminated throughout

North Carolina; (2) CRT Product prices were raised, fixed, maintained

and stabilized at artificially high levels throughout North Carolina; (3) the

North Carolina Plaintiff and members of the North Carolina Indirect

Purchaser Class were deprived of free and open competition; and (4) the

North Carolina Plaintiff and members of the North Carolina Indirect

Purchaser Class paid supracompetitive, artificially inflated prices for CRT

Products.

f.       As a direct and proximate result of Defendants' conduct, the North

Carolina Plaintiff and members of the North Carolina Indirect Purchaser

Class have been injured and are threatened with further injury.

g.       During the Class Period, each of the Defendants named herein, directly or

indirectly through affiliates they dominated and controlled, manufactured,

sold and/or distributed CRT Products in North Carolina.

h.       Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of North Carolina Gen. Stat. § 75-1.1 *et seq.*, and

accordingly, the North Carolina Plaintiff and members of the North

Carolina Indirect Purchaser Class seek all relief available under that

statute.

**84**
**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

282.     Plaintiff Rosemary Ciccone ("Rhode Island Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

    a.   Rhode Island Plaintiff and members of the Rhode Island Indirect Purchaser Class purchased CRT Products primarily for personal, family, or household purposes.

    b.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in Rhode Island.

    c.   Defendants deliberately failed to disclose material facts to the Rhode Island Plaintiff and members of the Rhode Island Indirect Purchaser Class concerning Defendants' unlawful activities and artificially inflated prices for CRT Products. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that Defendants CRT Product prices were competitive and fair.

    d.   Defendants made public statements that Defendants knew would be seen by the Rhode Island Plaintiff and members of the Rhode Island Indirect Purchaser Class who indirectly purchased CRT Products primarily for personal, family or household purposes; such statements created a likelihood of confusion or misunderstanding with respect to the real reasons that the prices of CRT Products were rising; and, such statements either omitted material information that rendered the statements materially misleading and confusing, or affirmatively deceived such consumers about the real cause of price increases for CRT Products.

e.   Because of Defendants' unlawful and unscrupulous trade practices in Rhode Island, the Rhode Island Plaintiff and members of the Rhode Island Indirect Purchaser Class who indirectly purchased CRT Products primarily for personal, family or household purposes were misled or deceived to believe that they were paying a fair price for CRT Products or that the price increases for CRT Products were for valid business reasons.

f.   Defendants knew that their unscrupulous and unlawful trade practices with respect to pricing CRT Products would have an impact on Rhode Island natural persons who indirectly purchased CRT Products primarily for personal, family or household purposes and not just Defendants' direct customers.

g.   Defendants knew that their violations with respect to pricing of CRT Products would have a broad impact, causing natural persons who indirectly purchased CRT Products primarily for personal, family or household purposes to be injured by paying more for CRT Products than they would have paid in the absence of Defendants' unlawful trade acts and practices.

h.   Defendants' violations adversely affected public policy in Rhode Island.

i.   Defendants' unlawful conduct had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) CRT Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) the Rhode Island Plaintiff and members of the Rhode Island Indirect Purchaser Class were deprived of free and open competition; and (4) the Rhode Island Plaintiff and members of the Rhode Island Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

j.    As a direct and proximate result of Defendants' illegal conduct, the Rhode
Island Plaintiff and the members of the Rhode Island Indirect Purchaser
Class suffered an ascertainable loss of money or property as a result of
Defendants' use or employment of unconscionable and deceptive
commercial practices as set forth above. That loss was caused by
Defendants' willful and deceptive conduct, as described herein.

k.    Defendants have engaged in unfair competition or unfair or deceptive
acts or practices in violation of Rhode Island Gen. Laws § 6-13.1-1, *et
seq.,* and accordingly, the Rhode Island Plaintiff and members of the
Rhode Island Indirect Purchaser Class seek all relief available under that
statute.

283.    The Vermont Plaintiff incorporates and realleges each and every allegation set
forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce
by affecting, fixing, controlling and/or maintaining, at artificial and/or
non-competitive levels, the prices at which CRT Products were sold,
distributed or obtained in Vermont.

b.    Defendants deliberately failed to disclose material facts to the Vermont
Plaintiff and members of the Vermont Indirect Purchaser Class
concerning Defendants' unlawful activities and artificially inflated prices
for CRT Products. Defendants owed a duty to disclose such facts, and
considering the relative lack of sophistication of the average, non-business
consumer, Defendants breached that duty by their silence. Defendants
misrepresented to all consumers during the Class Period that Defendants
CRT Product prices were competitive and fair.

c.    Because of Defendants' unlawful and unscrupulous trade practices in
Vermont, the Vermont Plaintiff and members of the Vermont Indirect
Purchaser Class who indirectly purchased CRT Products were misled or

**87**

deceived to believe that they were paying a fair price for CRT Products or that the price increases for CRT Products were for valid business reasons.

d.       Defendants' unlawful conduct had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Vermont; (2) CRT Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) the Vermont Plaintiff and members of the Vermont Indirect Purchaser Class were deprived of free and open competition; and (4) the Vermont Plaintiff and members of the Vermont Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

e.       As a direct and proximate result of Defendants' illegal conduct, the Vermont Plaintiff and the members of the Vermont Indirect Purchaser Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

f.       Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of Vermont Stat. Ann. Title 9, § 2451 *et seq.,* and accordingly, Vermont Plaintiff and members of the Vermont Indirect Purchaser Class seek all relief available under that statute.

**D.   Fourth Claim for Relief: Unjust Enrichment and Disgorgement of Profits**

284.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

285.     Defendants have been unjustly enriched through overpayments by Plaintiffs and the Class members and the resulting profits.

286.     Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred via overpayments by Plaintiffs and class members in

the following states: Arizona, California, Hawaii, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

287.    Plaintiffs and class members in each of the states listed above seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and the Class members may seek restitution.

## XII.  FRAUDULENT CONCEALMENT

288.    Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct against Plaintiffs and the Classes.

289.    Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, that Defendants were violating the law as alleged herein until shortly before this litigation was commenced. Nor could Plaintiffs and the Class members have discovered the violations earlier than that time because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection. In addition, the conspiracy was by its nature self-concealing.

290.    Defendants engaged in a successful, illegal price-fixing conspiracy with respect to CRT Products, which they affirmatively concealed, in at least the following respects:

       a.    By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme, and by agreeing to expel those who failed to do so;

       b.    By agreeing among themselves to limit the number of representatives from each Defendant attending the meetings so as to avoid detection;

       c.    By agreeing among themselves to refrain from listing the individual representatives of the Defendants in attendance at meetings in any meeting report;

       d.    By agreeing among themselves to refrain from taking meeting minutes or taking any kind of written notes during the meetings;

1    e.    By giving false and pretextual reasons for their CRT Product price

2  increases during the relevant period and by describing such pricing falsely as being the result of

3  external costs rather than collusion;

4    f.    By agreeing among themselves on what to tell their customers about price

5  changes, and agreeing upon which attendee would communicate the price change to which

6  customer;

7    g.    By agreeing among themselves to quote higher prices to certain customers

8  than the fixed price in effect to give the appearance that the price was not fixed;

9    h.    By agreeing among themselves upon the content of public statements

10  regarding capacity and supply;

11    i.    By agreeing among themselves to eliminate references in expense reports

12  which might reveal the existence of their unlawful meetings; and

13    j.    By agreeing on other means to avoid detection of their illegal conspiracy

14  to fix the prices of CRT Products.

15    291.    As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiffs

16  and the Classes assert the tolling of any applicable statute of limitations affecting the rights of

17  action of Plaintiffs and the members of the Classes.

18                    **XIII.   PRAYER FOR RELIEF**

19    WHEREFORE, Plaintiffs pray as follows:

20    A.    That the Court determine that the claims alleged herein under the Sherman Act,

21  state antitrust laws, state consumer protection and/or unfair competition laws may be maintained

22  as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, as

23  informed by the respective state class action laws;

24    B.    That the Court adjudge and decree that the unlawful conduct, contract,

25  combination and conspiracy alleged herein constitutes:

26    a.    A violation of the Sherman Act, 15 U.S.C. §1, as alleged in the First Claim

27      for Relief;

28

        b.   A violation of the state antitrust laws as alleged in the Second Claim for Relief;

        c.   A violation of the state consumer protection and unfair competition laws as alleged in the Third Claim for Relief; and

        d.   Acts of unjust enrichment as set forth in the Fourth Claim for Relief herein.

C.      That Plaintiffs and the Indirect Purchaser State Classes recover damages, as provided by the state antitrust, consumer protection, and unfair competition laws alleged herein, and that a joint and several judgment in favor of Plaintiffs and the Classes be entered against the Defendants in an amount to be trebled in accordance with such laws;

D.      That Defendants, their co-conspirators, successors, transferees, assigns, parents, subsidiaries, affiliates, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on behalf of Defendants, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action, or adopting or following any practice, plan, program or design having a similar purpose or effect in restraining competition;

E.      That Plaintiffs and the Classes be awarded restitution, including disgorgement of profits obtained by Defendants as a result of its acts of unfair competition and acts of unjust enrichment;

F.      That the Court award Plaintiffs and the Classes they represent pre-judgment and post-judgment interest as permitted by law;

G.      That Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees as provided by law; and

H.      That the Court award Plaintiffs and the Classes they represent such other and further relief as may be necessary and appropriate.

//

//

//

## XIV.   <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: March 16, 2009            By:      /s/ Mario N. Alioto
                                          Mario N. Alioto (56433)
                                          Lauren C. Russell (241151)
                                          **TRUMP, ALIOTO, TRUMP & PRESCOTT,**
                                          **LLP**
                                          2280 Union Street
                                          San Francisco, CA  94123
                                          Telephone:  (415) 563-7200
                                          Facsimile: (415) 346-0679
                                          malioto@tatp.com
                                          laurenrussell@tatp.com

                                          ***Interim Lead Counsel***
                                          ***for the Indirect Purchaser Plaintiffs***

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

**Plaintiffs' Counsel:**

| | |
|---|---|
| Joseph M. Patane<br>**LAW OFFICES OF JOSEPH M. PATANE**<br>2280 Union Street<br>San Francisco, CA 94123<br>Telephone: (415) 563-7200<br>Facsimile: (415) 346-0679<br>jpatane@tatp.com | Francis O. Scarpulla<br>Craig C. Corbitt<br>Judith A. Zahid<br>Qianwei Fu<br>**ZELLE, HOFMANN, VOELBEL & MASON, LLP**<br>44 Montgomery Street, Suite 3400<br>San Francisco, CA 94104<br>fscarpulla@zelle.com<br>ccorbitt@zelle.com<br>jzahid@zelle.com<br>qfu@zelle.com |
| Christopher Lovell<br>Craig Essenmacher<br>Keith Essenmacher<br>Imtiaz A. Siddiqui<br>**LOVELL STEWART HALEBIAN LLP**<br>500 Fifth Avenue, Floor 58<br>New York, NY 10110<br>clovell@lshllp.com<br>cessenmacher@lshllp.com | Lawrence G. Papale<br>**LAW OFFICES OF LAWRENCE G. PAPALE**<br>1308 Main Street #117<br>St. Helena, CA 94574<br>Telephone: (707) 963-1704<br>Facsimile: (707) 963-0706<br>lgpapale@papalelaw.com |
| Marvin A. Miller<br>Lori A. Fanning<br>Matthew E. Van Tine<br>**MILLER LAW LLC**<br>115 South LaSalle Street, Suite 2910<br>Chicago, IL 60603<br>mmiller@millerlawllc.com<br>lfanning@millerlawllc.com | Terry R. Saunders<br>Thomas A. Doyle<br>**SAUNDERS & DOYLE**<br>20 South Clark Street, Suite 1720<br>Chicago, IL 60603<br>trsaunders@saundersdoyle.com<br>tadoyle@saundersdoyle.com |
| Sherman Kassof<br>**LAW OFFICES OF SHERMAN KASSOF**<br>954 Risa Road, Suite B<br>Lafayette, CA 94549<br>Telephone: (510) 652 2554<br>Facsimile: (510) 652 9308<br>heevay@att.net | Andrew Morganti<br>Peter Safirstein<br>**MILBERG LLP**<br>One Pennsylvania Plaza<br>49th Floor<br>New York, New York 10119<br>Telephone: (212) 594-5300<br>Facsimile: (212) 868-1229<br>amorganti@milberg.com |

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

| | |
|---|---|
| Seymour J. Mansfield<br>Jean B. Roth<br>Charles Horowitz<br>**MANSFIELD, TANICK & COHEN, P.A.**<br>1700 U.S. Bank Plaza<br>220 South Sixth Street<br>Minneapolis, MN  55402<br>Telephone: (612) 339-4295<br>Facsimile: (612) 339-3161<br>smansfield@mansfieldtanick.com | Joel Flom<br>**JEFFRIES, OLSON & FLOM, P.A.**<br>1202 27th Street South<br>Fargo, N.D. 58103<br>Telephone: (701) 280-2300<br>Facsimile: (701) 280-1800<br>joel@jeffrieslaw.com |
| Michael G. Simon<br>M. Eric Frankovitch<br>**FRANKOVITCH, ANETAKIS, COLANTONIO & SIMON**<br>337 Penco Road<br>Weirton, WV  26062<br>Telephone: (304) 723-4400<br>Facsimile: (304) 723-5892<br>msimon@facslaw.com | Robert Gerard<br>**GERARD & OSUCH, LLP**<br>2840 South Jones Blvd.<br>Building D, Unit 4<br>Las Vegas, NV 89146<br>Telephone: (702) 251-0093<br>rgerard@gerardlaw.com |
| Robert G. Methvin, Jr.<br>Philip W. McCallum<br>Matt Stephens<br>**McCALLUM, METHVIN & TERRELL, P.C.**<br>2201 Arlington Avenue South<br>Birmingham, AL 35305<br>Telephone: (205) 939-0199<br>Facsimile: (205) 939-0399<br>Rgm@mmlaw.net<br>pwm@mmlaw.net<br>rem@mmlaw.net | Rodney Ray<br>**FORD & RAY**<br>301 Fifth Street South, Suite C<br>P.O. Box 1018<br>Columbus, MS 39703<br>Telephone: (662) 329-0110<br>Facsimile: (662) 329-3522<br>rray@fordraylaw.com |
| Christy Crow<br>**JINKS, CROW & DICKSON, P.C.**<br>P.O. Box 350<br>219 Prairie Street N.<br>Union Springs, AL 36089<br>Telephone: (334) 738-4225<br>Facsimile: (334) 738-4229<br>cdc@jinkslaw.com | Joel Smith<br>**WILLIAMS, POTTHOFF, WILLIAMS & SMITH**<br>125 South Orange Avenue<br>Eufaula, AL 36027<br>Telephone: (334) 687-5834<br>Facsimile: (334) 687-5722<br>joelpsmith@bellsouth.net |

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

| | |
|---|---|
| Chris Cantrell<br>Kit Belt<br>**BELT LAW FIRM PC**<br>Lakeshore Park Plaza, Suite 208<br>2204 Lakeshore Drive<br>Birmingham, AL 35209<br>keithb@beltlawfirm.com<br>chris@beltlawfirm.com | Brent Irby<br>Eric Hoagland<br>**McCALLUM, HOAGLAND, COOK &<br>IRBY, LLP**<br>905 Montgomery Street, Suite 201<br>Vestavia Hills, AL 35216<br>birby@mhcilaw.com<br>ehoagland@mhcilaw.com |
| Richard F. Horsley<br>1 Metroplex Drive, Suite 280<br>Birmingham, AL 35209-6895<br>rfhala@cs.com | Jeff Crabtree<br>**LAW OFFICES OF JEFF CRABTREE**<br>820 Mililani Street, Suite 701<br>Honolulu, HI 96813<br>lawyer@consumerlaw.com |
| Daniel R. Karon<br>Mark S. Goldman<br>Brian D. Penny<br>**GOLDMAN SCARLATO & KARON,<br>P.C.**<br>55 Public Square, Suite 1500<br>Cleveland, OH 44113<br>karon@gsk-law.com | S. Randall Hood<br>William A. McKinnon<br>**McGOWAN HOOD & FELDER, LLC**<br>1659 Healthcare Drive<br>Rock Hill, SC 29732 |
| John G. Felder, Jr.<br>**McGOWAN HOOD & FELDER, LLC**<br>1405 Calhoun Street<br>Columbia, SC 29201 | Krishna B. Narine<br>**LAW OFFICE OF KRISHNA B. NARINE**<br>7839 Montgomery Avenue<br>Elkins Park, PA 19027<br>knarine@kbnlaw.com |
| Isaac L. Diel<br>**SHARP McQUEEN**<br>135 Oak Street<br>Bonner Springs, KS 66012<br>dslawkc@aol.com | Donna F. Solen<br>**THE MASON LAW FIRM, LLP**<br>1225 19th Street, N.W., Suite 500<br>Washington, DC 20036<br>dsolen@masonlawdc.com |
| Mary G. Kirkpatrick<br>**KIRKPATRICK & GOLDSBOROUGH,<br>PLLC**<br>Lakewood Commons<br>1233 Shelburne Road, Suite E-1<br>South Burlington, VT 05401<br>mkirk@vtlawfirm.com | Robert J. Pohlman<br>**RYLEY CARLOCK & APPLEWHITE**<br>One North Central Avenue, Suite 1200<br>Phoenix, AZ 85004-4417<br>rpohlman@rcalaw.com |

| Charles M. Kester | Bruce Mulkey |
|---|---|
| **THE KESTER LAW FIRM** | **THE MULKEY ATTORNEYS GROUP, P.A.** |
| P.O. Box 184 | 1039 W. Walnut, Suite 3 |
| Fayetteville, AR 72702-0184 | Rogers, AR 72756 |
| cmkester@nwark.com | bruce@mulkeylaw.com |

| David Boies | Daniel E. Birkhaeuser |
|---|---|
| Timothy Battin | Jennifer S. Rosenberg |
| Christopher Le | **BRAMSON, PLUTZIK, MAHLER &** |
| **STRAUS & BOIES, LLP** | **BIRKHAEUSER, LLP** |
| 4041 University Drive, Fifth Floor | 2125 Oak Grove Road, Suite 120 |
| Fairfax, VA 22030 | Walnut Creek, CA 94598 |
| dboies@straus-boies.com | dbirkhaeuser@bramsonplutzik.com |
| tbattin@straus-boies.com | jrosenberg@bramsonplutzik.com |
| cle@straus-boies.com | |

| Joseph M. Alioto | James H. McManis |
|---|---|
| **ALIOTO LAW FIRM** | Marwa Elzankaly |
| 555 California Street, 31 st Floor | **McMANIS FAULKNER & MORGAN** |
| San Francisco, CA 94104 | A Professional Corporation |
| sexton@aliotolaw.com | 50 W. Fernando Street, 10 th Floor |
| | San Jose, CA 95113 |
| | jmcmanis@mfmlaw.com |
| | melzankaly@mfmlaw.com |

| Donald Amamgbo | Reginald Terrell |
|---|---|
| **AMAMGBO & ASSOCIATES** | **THE TERRELL LAW GROUP** |
| 7901 Oakport Street, Suite 4900 | 223 25th Street |
| Oakland, CA 94621 | Richmond, CA 94804 |
| donald@amamgbolaw.com | reggiet2@aol.com |

| Susan G. Kupfer (skupfer@glancylaw.com) | Robert Bonsignore (rbonsignore@aol.com) |
|---|---|
| Kathleen S. Rogers | ATTORNEY AT LAW |
| **GLANCY BINKOW & GOLDBERG, LLP** | 23 Forest Street |
| One Embarcadero Center, Suite 760 | Medford, MA 02155 |
| San Francisco, CA 94111 | |
| Tel: (415) 972-8160 | |
| Fax: (415) 972-8166 | |

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

| | |
|---|---|
| Eric J. Pickar (epickar@bangsmccullen.com) **BANGS, McCULLEN, BUTLER, FOYE & SIMMONS, LLP** 333 West Boulevard, Suite 400 P.O. Box 2670 Rapid City, SD 57709-2670 Tel: (605) 343-1040 | David Freedman (daf@fbdlaw.com) Joseph Goldberg **FREEDMAN, BOYD, HOLLANDER, GOLDBERG & IVES, PA** 20 First Plaza, Suite 700 Albuquerque, NM 87102 Tel: (505) 842-9960 Fax: (505) 842-0761 |
| Jeffrey Bartos (jbartos@geclaw.com) **GUERRIERI, EDMOND, CLAYMAN & BARTOS PC** 1625 Massachusetts Ave., N.W. Suite 700 Washington, DC 20036 Tel: (202) 624-7400 | Frank Balint (fbalint@bffb.com) **BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.** 2901 North Central Avenue, Suite 1000 Phoenix, AZ 85012-3311 Tel: (602) 274-1100 Fax: (602) 274-1199 |
| Terry Gross (terry@grossbelsky.com) **GROSS & BELSKY, LLP** 180 Montgomery Street, Suite 2200 San Francisco, CA 94104 Tel: (415) 544-0200 Fax: (415) 544-0201 | Jennie Lee Anderson **ANDRUS ANDERSON LLP** 155 Montgomery Street, 9th Floor San Francisco, California 94104 Telephone: (415) 986-1400 Facsimile: (415) 986-1474 jennie@andrusanderson.com |
| Kenneth L. Valinoti **VALINOTI & DITO LLP** 180 Montgomery Street, Suite 940 San Francisco, CA 94104 Telephone: (415) 986-1338 Facsimile: (415) 986-1231 kvalinoti@valinoti-dito.com | Josef D. Cooper Tracy D. Kirkham **COOPER & KIRKHAM, P.C.** 357 Tehama Street, Second Floor San Francisco, CA 94103 Telephone: (415) 788-3030 Facsimile: (415) 882-7040 jdc@coopkirk.com |
| Guri Ademi Shpetim Ademi **ADEMI & O'REILLY, LLP** 3620 East Layton Ave. Cudahy, WI 53110 Telephone: (414) 482-8000 Facsimile: (414) 482-8001 gademi@ademilaw.com | |

**Attorneys For Plaintiffs**

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917**