1  Bruce H. Jackson, State Bar No. 98118
   Robert W. Tarun, State Bar No. 64881
2  **BAKER & McKENZIE LLP**
   Two Embarcadero Center, 11th Floor
3  San Francisco, CA 94111-3802
   Telephone: +1 312 861 8000
4  Facsimile:  +1 312 861 2899
   bruce.h.jackson@bakernet.com
5  robert.w.tarun@bakernet.com

6  Patrick J. Ahern (*pro hac vice*)
   Roxane C. Busey (*pro hac vice*)
7  Karen Sewell (*pro hac vice*)
   **BAKER & McKENZIE LLP**
8  One Prudential Plaza, Suite 3500
   130 East Randolph Drive
9  Chicago, IL  60601
   Telephone: +1 312 861 8000
10 Facsimile:  +1 312 861 2899
   patrick.j.ahern@bakernet.com
11 roxane.c.busey@bakernet.com
   karen.sewellWbakernet.com
12
   Attorneys for Defendant
13 Tatung Company of America

14

15              UNITED STATES DISTRICT COURT

16              NORTHERN DISTRICT OF CALIFORNIA

17              SAN FRANCISCO DIVISION

18

19 | | |
   |---|---|
   | | **Case No.  MDL No. 1917** |
   | **IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF TATUNG COMPANY OF AMERICA'S MOTION TO DISMISS DIRECT AND INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINTS AND DECLARATION IN SUPPORT THEREOF** |
   | This Document Relates to: | |
   | ALL ACTIONS | |
   | | Date:     August 4, 2009 |
   | | Time:     9:00 AM |
   | | Judge:    Honorable Charles A. Legge (Ret.), Special Master |

Baker & McKenzie LLP
One Prudential Plaza, Suite
3500
130 East Randolph Drive
Chicago, IL  60601

1

Case No MDL No. 1917
Request for Judicial Notice in Support of Tatung Company of America's Motion to Dismiss

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that the Defendant Tatung Company of American hereby requests, pursuant to Rule 201 of the Federal Rules of Evidence, that this Court take judicial notice of the following documents, true and correct copies of which are authenticated in the attached Declaration of Patrick J. Ahern in Support of Tatung Company of America's Request for Judicial Notice.

- Exhibit 1: *In re Ditropan XL Antitrust Litigation*, M:06-CV-01761-JSW, MDL No. 1761, 2007 U.S. Dist. LEXIS 78423 (N.D. Cal. Oct. 11, 2007)
- Exhibit 2: *Miller v. Int'l Bus. Machines Corp. (IBM)*, No. C02-2118, 2006 WL 2792416 (N.D. Cal. Sept. 26, 2006)
- Exhibit 3: *In re Travel Agent Com'n Antitrust Litig.*, No. 1:03 CV 30000, 2007 WL 3171675 (N.D. Ohio Oct. 29, 2007).
- Exhibit 4: *E. & J. Gallo Winery v. Encana Energy Svcs., Inc.*, CV F 03-5412 AWI LJO, 2008 U.S. Dist. LEXIS 46927 (E.D. Cal. May 27, 2008)

This Court properly may take judicial notice of these documents pursuant to Federal Rule of Evidence 201. *See Aramark v. Service Employees*, 530 F.3d 817 , 826 n.4 (9th Cir. 2008) (court may take judicial notice of legislative materials); *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (court may take judicial notice of proceedings in state or federal court if such proceedings have a direct relation to matters at issue); *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) (court may take judicial notice of "matters of public record" outside the pleadings in conjunction with a motion to dismiss); *In re DRAM Antitrust Litig.*, 516 F.Supp.2d 1072, 1094 n.8 (taking judicial notice of relevant unpublished authority, including *Cornelison* transcript cited above, with respect to "an issue directly before the court").

Tatung Company of America's Request for Judicial Notice is based upon the arguments herein, the declaration of Patrick J. Ahern, the pleadings and papers on file in this action, and such oral argument as this Court may entertain.

Baker & McKenzie LLP
One Prudential Plaza, Suit
3500
130 East Randolph Drive
Chicago, IL  60601

2

Case No MDL No. 1917
Request for Judicial Notice in Support of Tatung Company of America's Motion to Dismiss

1

2

3   Dated:   May 18, 2009                    BAKER & McKENZIE LLP

4

5                                           By:   _/s/ Patrick J. Ahern_____

6                                               BRUCE H. JACKSON (98118)
7                                               Email:  bruce.h.jackson@bakernet.com)
                                                ROBERT W. TARUN (64881)
8                                               Email:  robert.w.tarun@bakernet.com
                                               **BAKER & MCKENZIE LLP**
9                                               Two Embarcadero Center, 11th Floor
                                                San Francisco, CA  94111-3802
10                                              Telephone:   (415) 576-3000
                                                Facsimile:    (415) 576-3099
11
                                                PATRICK J. AHERN (*pro hac vice*)
12                                              Email:  patrick.j.ahern@bakernet.com
                                                ROXANE C. BUSEY (*pro hac vice*)
13                                              Email:  roxane.c.busey@bakernet.com
                                                KAREN SEWELL *(pro hac vice)*
14                                              Email:  karen.sewell@bakernet.com
                                               **BAKER & MCKENZIE LLP**
15                                              130 E. Randolph Dr., Suite 3500
16                                              Chicago, IL 60601
                                                Telephone:   (312) 861-8000
17

18                                             ***Attorneys for Tatung Company of America, Inc.***

19

20   CHIDMS1/2705864.2

21

22

23

24

25

26

27

28

Baker & McKenzie LLP
One Prudential Plaza, Suite
3500
130 East Randolph Drive
Chicago, IL  60601

1   In re Cathode Raty Tube (CRT) Antitrust Litigation
    United States District Court for the Northern District of California Case No. MDL No. 1917
2

3   ## DECLARATION OF PATRICK J. AHERN IN SUPPORT OF
    ## TATUNG COMPANY OF AMERICA'S REQUEST FOR JUDICIAL NOTICE

4   I, Patrick J. Ahern, declare:

5   I am an attorney at law duly admitted and licensed to practice in Illinois and am admitted on

6   a *pro hac vice* basis to practice before this Court in the above-captioned case.  I have my

7   professional office at One Prudential Plaza, Suite 3500, 130 East Randolph Drive, Chicago, Illinois

8   60601.

9   I am one of the attorneys of record for Tatung Company of America in the above-entitled

10  matter.

11  Attached as Exhibit 1 hereto is a true and correct copy of *In re Ditropan XL Antitrust*

12  *Litigation*, M:06-CV-01761-JSW, MDL No. 1761, 2007 U.S. Dist. LEXIS 78423 (N.D. Cal. Oct. 11,

13  2007).

14  Attached as Exhibit 2 hereto is a true and correct copy of *Miller v. Int'l Bus. Machines Corp.*

15  *(IBM)*, No. C02-2118, 2006 WL 2792416 (N.D. Cal. Sept. 26, 2006).

16  Attached as Exhibit 3 hereto is a true and correct copy of *In re Travel Agent Com'n Antitrust*

17  *Litig.*, No. 1:03 CV 30000, 2007 WL 3171675 (N.D. Ohio Oct. 29, 2007).

18  Attached as Exhibit 4 hereto is a true and correct copy of *E. & J. Gallo Winery v. Encana*

19  *Energy Svcs., Inc.*, CV F 03-5412 AWI LJO, 2008 U.S. Dist. LEXIS 46927 (E.D. Cal. May 27,

20  2008).

21  I am informed and believe that the matters stated therein are true and, on that ground, I allege

22  that the matters stated therein are true.

23  I declare under penalty of perjury under the laws of the United States that the foregoing is

24  true and correct.

25
26  Executed on May 18, 2009 at Chicago, Illinois.

27  */s/ Patrick J. Ahern*
    Patrick J. Ahern

28  CHIDMS1/2705855.1

Baker & McKenzie LLP
One Prudential Plaza, Suit
3500
130 East Randolph Drive
Chicago, IL  60601

Case No MDL No. 1917
Declaration of Patrick J. Ahern in Support of Tatung Company of America's Request for Judicial Notice

# Exhibit 1



LEXSEE 2007 U.S. DIST. LEXIS 78423

**IN RE: DITROPAN XL ANTITRUST LITIGATION; This Order Relates to: ALL CASES**

**CASE NO. M:06-CV-01761-JSW, MDL No. 1761**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2007 U.S. Dist. LEXIS 78423; 2007-2 Trade Cas. (CCH) P75,907*

**October 11, 2007, Decided
October 11, 2007, Filed**

**SUBSEQUENT HISTORY:** Motion denied by *In re Ditropan XL Antitrust Litig., 2007 U.S. Dist. LEXIS 83693 (N.D. Cal., Nov. 5, 2007)*

**PRIOR HISTORY:** *In re Ditropan XL Antitrust Litig., 529 F. Supp. 2d 1098, 2007 U.S. Dist. LEXIS 38068 (N.D. Cal., May 11, 2007)*

**CORE TERMS:** purchaser, conspiracy, purported, indirect, co-conspirator, seller, Sherman Act, standing to sue, declaration, manufactures, oral argument, antitrust claim, anti-competitive, coconspirators, admonition, vertical, entity, class action, antitrust suits, matter jurisdiction, factual allegations, fully executed, plead facts, co-conspirator-intermediary, demonstrating, preexisting, competitor, non-moving, non-direct, circumvent

**COUNSEL:** [*1] For City of Fargo Health Trust Fund, Plaintiff: Anne K. Mandt, Charfos & Christensen, P.C., Detroit, MI; Edward A. Wallace, Wexler Toriseva Wallace LLP, Chicago, IL; Gregory P. Sautter, Timothy J. Becker, Zimmerman Reed PLLP, Minneapolis, MN; Jason John Thompson, J. Thompson & Associates PLC, Southfield, MI; Mark John Tamblyn, Wexler Toriseva Wallace, LLP, Sacramento, CA; Mike Miller, Solberg Stewart Miller Johnson & Tjon, Fargo, ND.

For United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund, Plaintiff: Mark John Tamblyn, Wexler Toriseva Wallace, LLP, Sacramento, CA; Andrae P Reneau, Kenneth A. Wexler, Wexler Toriseva Wallace LLP, Chicago, IL; Curtis Brooks Cutter, William Alter Kershaw, Kershaw Cutter & Ratinoff LLP, Sacramento, CA; Edward A. Wallace, Wexler Toriseva Wallace LLP, Chicago, IL.

For Teamsters Local No. 35 Health Plans, Plaintiff: Elaine T. Byszewski, LEAD ATTORNEY, Hagens Berman LLP, Los Angeles, CA; Jay S. Cohen, Jeffrey L. Kodroff, Patrick Howard, Theodore M. Lieverman, LEAD ATTORNEYS, Spector, Roseman & Kodroff, P.C., Philadelphia, PA; Edward A. Wallace, Wexler Toriseva Wallace LLP, Chicago, IL; Mark John Tamblyn, Wexler Toriseva Wallace, [*2] LLP, Sacramento, CA; Steve C. Richman, Markowitz & Richman, Philadelphia, PA.

For Local 28 Sheet Metal Workers, on behalf of itself and all others similarly situated, Plaintiff: Ann K. Mandt, Charfoos & Charistensen, P.C., Detroit, MI; Edward A. Wallace, Wexler Toriseva Wallace LLP, Chicago, IL; Gregory P. Sautter, Timothy J. Becker, Zimmerman Reed PLLP, Minneapolis, MN; Jason John Thompson, J. Thompson & Associates PLC, Southfield, MI; Mark John Tamblyn, Wexler Toriseva Wallace, LLP, Sacramento, CA.

For Jabo's Pharmacy, Inc., on behalf of itself and all others similarly situated in the States of TN, AL, AR, FL, HI, IA, KS, ME, MA, MI, MN, MS, NB, NV, NM, NY, NC, ND, SC, SD, VT, WV, WI and the District of Columbia, Plaintiff: Gordon Ball, LEAD ATTORNEY, Ball & Scott, Knoxville, TN.

For American Sales Co., Inc., Plaintiff: Thomas M. Sobol, LEAD ATTORNEY, Hagens Berman Sobol Shapiro LLP, Cambridge, MA; Elaine T. Byszewski, Hagens Berman LLP, Los Angeles, CA; Lee M. Gordon, Hagens Berman Sobol Shapiro LLP, Los Angeles, CA.

For SAJ Distributers, Inc., Stephen L LaFrance, Plaintiffs: Elaine T. Byszewski, Hagens Berman LLP, Los Angeles, CA; Lee M. Gordon, Hagens Berman Sobol Shapiro LLP, Los [*3] Angeles, CA.

For Alza Corporation, a California corporation, Defendant: Taggart Hansen, LEAD ATTORNEY, Gibson, Dunn & Crutcher LLP, Denver, CO; Aileen Y. Mo, San Francisco, CA; John W. Treece, Sidley Austin Brown & Wood, Chicago, IL; Joshua Lipton, Washington, DC; M. Sean Royall, Washington, DC; Michael Aaron Sitzman, Gibson Dunn & Crutcher LLP, San Francisco, CA; Samuel Ray Miller, Sidley Austin LLP, San Francisco, CA.

For Johnson & Johnson, Defendant: Melinda Meador, LEAD ATTORNEY, Bass, Berry and Sims, Knoxville, TN; Michael Aaron Sitzman, Gibson Dunn & Crutcher LLP, San Francisco, CA.

For Ortho-McNeil Pharmaceuticals, inc., Defendant: Melinda Meador, LEAD ATTORNEY, Bass, Berry and Sims, Knoxville, TN; John W. Treece, Sidley Austin Brown & Wood, Chicago, IL; Michael Aaron Sitzman, Gibson Dunn & Crutcher LLP, San Francisco, CA; Samuel Ray Miller, Sidley Austin LLP, San Francisco, CA.

For Mylan Laboratories, Inc., Mylan Laboratories, Inc. and Mylan Pharmaceuticals, Inc., Movant: Edward Vincent King, Jr., LEAD ATTORNEY, King & Kelleher, LLP, San Francisco, CA.

For Stephen L. LaFrance, Holiday, Inc., 3rd party defendant: Lee M. Gordon, Hagens Berman Sobol Shapiro LLP, Los Angeles, CA.

For [*4] Plumbers and Pipefitters Local 572 Health and Welfare Fund, Interested Party: Mark John Tamblyn, LEAD ATTORNEY, Wexler Toriseva Wallace, LLP, Sacramento, CA; Edward A. Wallace, Wexler Toriseva Wallace LLP, Chicago, IL.

**JUDGES:** JEFFREY S. WHITE, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JEFFREY S. WHITE

**OPINION**

**AMENDED ORDER GRANTING DEFENDANTS' MOTION TO DISMISS DIRECT PURCHASER'S SECOND AMENDED COMPLAINT**

Now before the Court is the motion to dismiss plaintiff American Sales Company's ("ASC") second amended class action complaint ("SAC") filed by defendants Alza Corporation ("Alza") and Ortho-McNeil

Pharmaceutical, Inc. ("Ortho-McNeil") (collectively, "Defendants"). Having considered the parties' arguments, relevant legal authority, and having had the benefit of oral argument, the Court hereby grants the motion to dismiss the ASC's SAC. [1]

> 1   The Court denies ASC's administrative motion to lodge a statement of recent decision because the opinion cited is inapplicable to the issues before the Court on the pending motion to dismiss.

**BACKGROUND**

This is an antitrust action. ASC alleges that Alza Corporation ("Alza") filed a baseless complaint to preclude a competitor from producing a generic version of the drug Ditropan XL, [*5] as well as other anti-competitive conduct. (SAC, PP 5, 8.) ASC alleges that Ortho-McNeil participated in the anti-competitive conduct by filing a citizen's petition in front of the Food and Drug Administration. (*Id.,* PP 8, 58.) Both Alza and Ortho-McNeil are wholly owned subsidiaries of Johnson & Johnson. (*Id.,* P 6.) According to ASC, through such anti-competitive conduct, Alza and Ortho-McNeil were able to maintain a monopoly and charge supra-competitive prices for Ditropan XL. Based on such conduct, ASC asserts a claim under *Section 2* of the Sherman Act, *15 U.S.C. § 2.*

Although ASC brings this action as a direct purchaser, it is undisputed that ASC did not purchase Ditropan XL from either Alza or Ortho-McNeil. Rather, ASC's claim is premised on Cardinal Health, Incorporated's ("Cardinal"). purchases of Ditropan XL from Ortho-McNeil. ASC contends that it has standing to sue as a direct purchaser based on purported assignments from Cardinal to sue Ortho-McNeil and Alza. Defendants challenge the validity of any such assignments.

The Court will address additional specific facts as required in the analysis.

**ANALYSIS**

**A. Legal Standards Applicable to a Motion to Dismiss.**

Standing pertains to [*6] a federal court's subject-matter jurisdiction under Article III, and thus, is properly raised in a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(1)* ("Rule 12(b)(1)"). *White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000).* When a defendant moves to dismiss a complaint or claim for lack of subject matter jurisdiction, the plaintiff bears the burden of proving that the court has jurisdiction to decide the claim. *Thornhill Publ'n Co. v. General Tel. & Elecs. Corp., 594 F.2d 730,-733,(9th Cir. 1979); see also Wilbur v. Locke,*

2007 U.S. Dist. LEXIS 78423, *; 2007-2 Trade Cas. (CCH) P75,907

*423 F.3d 1101, 1107 (9th Cir. 2005)* (plaintiff bears burden of establishing standing).

A motion to dismiss for lack of subject matter jurisdiction under *Rule 12(b)(1)* may be "facial or factual." *Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004).* Where an attack on jurisdiction is a "facial" attack on the allegations of the complaint, the factual allegations of the complaint are taken as true and the non-moving party is entitled to have those facts construed in the light most favorable to him or her. *Federation of African Amer. Contractors v. City of Oakland, 96 F.3d 1204, 1207 (9th Cir. 1996).* If the jurisdictional attack is "factual," [*7] a defendant may rely on affidavits or other evidence that would be properly before the Court, and the non-moving party is not entitled to any presumptions of truthfulness with respect to the allegations in the complaint. Rather, he or she must come forward with evidence establishing jurisdiction. *Thornhill, 594 F.2d at 733.*

**B. ASC Lacks Standing to Sue Ortho-McNeil.**

Defendants raise two defects with ASC's asserted standing based on a purported assignment from Cardinal. First, Defendants argue that ASC does not have an executed assignment from Cardinal to sue Ortho-McNeil. Second, Defendants contend that any such assignment would be barred by the Distribution Performance Agreement between Cardinal and Ortho-McNeil.

Whether a plaintiff has standing to sue "is determined as of the date of filing the complaint.... The party invoking the jurisdiction of the court cannot rely on events that unfolded after the filing of the complaint to establish its standing." *Wilbur, 423 F.3d at 1107* (citation omitted). The assignment ASC initially relied on to sue Ortho-McNeil only provides authority to sue Alza and Johnson & Johnson. (Declaration of Michael A. Sitzman, Ex. 1.) ASC attempts to cure this defect [*8] by submitting another assignment from Cardinal. [2] ASC submitted a document entitled: "[Proposed] Assignment of Claims from Cardinal ...." (Declaration of Elaine T. Byszewski, P 4, Ex, A.) This purported assignment, which does name Ortho-McNeil, is dated July 2, 2007, after ASC filed its SAC, and is not signed by ASC. At the oral argument on the instant motion to dismiss, ASC represented that it now possesses a fully executed assignment from Cardinal to sue Ortho-McNeil. Nevertheless, any such assignment post-dates SAC's filing of the SAC and is thus insufficient to confer standing. *See Wilbur, 423 F.3d at 1107.*

2   The Court disagrees with ASC that the purported assignment's failure to name Ortho-McNeil as one of the Manufacturer Defendants

who may be sued by ASC is merely a technical failure. (Opp. at 6.)

Even if SAC had presented a fully executed assignment from Cardinal naming Ortho- McNeil, SAC's standing suffers from another defect -- any such assignment is precluded by the Distribution Performance Agreement between Cardinal and Ortho-McNeil. (Supplemental Declaration of Jill Lavitsky ("Suppl. Lavitsky Decl."), Ex. 2.) The DPA prohibits either Cardinal or Ortho-McNeil from assigning [*9] rights or obligations arising under the DPA without the consent of the other party. (*Id.,* Ex. 2.) Ortho-McNeil has not consented to any assignment by Cardinal. (*Id.,* P 4.) Defendants submit evidence to show that the Distribution Performance Agreement ("DPA") governs Cardinal's purchases of Ditropan XL from Ortho-McNeil. (Suppl. Lavitsky Decl., P 3 ("Cardinal's purchases of Ditropan XL from Ortho- McNeil are made pursuant to the terms of the DPA.").) Despite having notice of this argument and evidence since at least November 3, 2006, when Defendants filed a similar declaration in support of their first motion to dismiss, ASC did not submit any contrary evidence. Instead, ASC relies solely on the language of the DPA to argue that it does not apply to purchases, but rather is merely an inventory replenishment agreement. However, the Court notes that the DPA discusses price control protection. (*Id.,* Ex. 2 at 7-9. ) Therefore, the agreement may not be construed accurately as merely an inventory replenishment agreement. In light of Defendants' uncontradicted evidence demonstrating that the DPA governs the relationship between Ortho- McNeil and Cardinal and that Cardinal's purchases of Ditropan [*10] XL from Ortho-McNeil are made pursuant to the terms of the DPA, the Court finds that ASC's purported assignment is barred by Cardinal's failure to obtain Ortho-McNeil's consent. Accordingly, the Court grants Defendants' motion to dismiss as to Ortho-McNeil.

**C. ASC Fails to Allege Facts Supporting It Claim Against Alza.**

Without standing to sue Ortho-McNeil, ASC must allege facts demonstrating it can bring a direct purchaser action against Alza, a company that admittedly did not sell the Ditropan XL during the purported class period. With limited exceptions, only direct purchasers may bring an antitrust claim under *Section 2* of the Sherman Act. *See Illinois Brick Co. v. Illinois, 431 U.S. 720, 730-36, 97 S. Ct. 2061, 52 L. Ed. 2d 707 (1977); Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 492-94, 88 S. Ct. 2224, 20 L. Ed. 2d 1231 (1968).* In *Illinois Brick,* the Supreme Court suggested there were two exceptions to this prohibition against indirect purchaser antitrust suits: (1) if an indirect purchaser received goods from the direct purchaser according to a preexisting

Case 4:07-cv-05944-JST   Document 465   Filed 05/18/09   Page 9 of 63

Page 4
2007 U.S. Dist. LEXIS 78423, *; 2007-2 Trade Cas. (CCH) P75,907

"cost-plus contract;" or (2) if the direct purchaser is controlled or owned by another party, either by the seller or the indirect purchaser. *Illinois Brick*, 431 U.S. at 726 n. 2, 736 n. 16; [*11] *see also Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 326 (9th Cir. 1980) (applying ownership or control exception to allow indirect purchaser's suit). The Supreme Court later clarified that these exceptions should be read narrowly and not expanded. *Kansas v. Utilicorp United, Inc., 497 U.S. 199, 216-17, 110 S. Ct. 2807, 111 L. Ed. 2d 169 (1990); see also Burkhalter Travel Agency v. MacFarms International., Inc., 141 F.R.D. 144, 148 (ND. Cal.1991)* ("The Supreme Court has made it clear that these are very limited exceptions."). ASC has not alleged any facts, or even argued, that its claim falls within either of these two exceptions.

Instead, ASC contends that it can maintain its antitrust claim against Alza because it alleges that Alza and Ortho-McNeil were "business partners" and conspired together to exclude competitors from the market. However, this argument suffers from several defects. First, despite the Court's admonition in the order dismissing the first amended class action complaint to "be careful to plead facts that demonstrate a basis to maintain a direct purchaser action against ... Alza based on sales by Ortho-McNeil" (Docket No. 66 at 3 n.2), the SAC does not actually contain any allegations which, [*12] if true, would demonstrate the existence of a conspiracy between Alza and Ortho-McNeil. The Supreme Court recently clarified that to plead a conspiracy under *Section 1* of the Sherman Act, a plaintiff must allege "enough factual matter (taken as true) to suggest that an agreement was made. ... [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1966, 1971 n.10, 167 L. Ed. 2d 929 (2007)*. While a complaint need not contain detailed factual allegations, a plaintiff must do more that provide mere "labels and conclusions .... Factual allegations must be enough to raise a right to relief above the speculative level." *Id. at 1964-65* (finding allegations of conspiracy insufficient where "the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies"). Although ASC's claim arises under *Section 2* of the Sherman Act, the Court finds no reasoned basis to avoid the application of the standard set forth in *Twombly* here, especially in light of the fact that ASC's sole basis upon which it asserts its direct purchaser action against Alza is predicated on a purported conspiracy.

Second, it is not clear that there [*13] is a valid co-conspirator exception to the prohibition on indirect purchaser suits. In *UtiliCorp United*, the Supreme Court "cautioned lower federal courts against creating new exceptions to the *Illinois Brick* rule." *Dickson v. Micro-*

*soft Corp., 309 F.3d 193, 214 (4th Cir. 2002)* (quoting *UtiliCorp United, 497 U.S. at 216*: "The rationales underlying *Hanover Shoe* and *Illinois Brick* will not apply with equal force in all cases. We nonetheless believe ample justification exists for our stated decision not to carve out exceptions to the direct purchaser rule."); *see also In re Bank Name Prescription Drugs Antitrust Litig., 123 F.3d 599, 605 (7th Cir. 1997)* ("*Utilicorp* implies that the only exceptions to the *Illinois Brick* doctrine are those stated in *Illinois Brick* itself."). The Fourth Circuit noted that despite the Supreme Court's admonition, several courts have recognized a "co-conspirator exception" to the direct purchaser rule. *Dickson, 309 F.3d at 215* (reserving on ruling whether the court would recognize such an exception). The Ninth Circuit has not addressed the purported co-conspirator exception to *Illinois Brick* since the Supreme Court's admonition in *UtiliCorp United*. Thus, it [*14] is not clear whether such an exception is valid. However, the Court need not decide whether such an exception would be valid because ASC is barred from relying on any such exception based on its inability to sue the seller, Ortho-McNeil.

Alleged co-conspirator-intermediaries, whose participation must be demonstrated if a vertical conspiracy is to be proved and *Illinois Brick* circumvented, must be named as defendants. [3] *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig., 691 F.2d 1335, 1342 (9th Cir. 1982)* ("joinder of [direct sellers] is required to prevent a serious risk of multiple liability"); [4] *see also Link v. Mercedes-Benz of N. Am., Inc., 788 F.2d 918, 931 (3d Cir. 1986)* ("We decline to recognize this exception where, as here, the alleged co-conspirators are not also joined as co-defendants."); *In re Midwest Milk Monopolization Litig., 730 F.2d 528, 532 (8th Cir. 1984)* ("[A]ssuming plaintiffs' argument to be a valid exception to *Illinois Brick*, joinder of the ... unnamed coconspirators[ ] is required to prevent a substantial risk of duplicitous liability."); *In re Beef Indus. Antitrust Litig., 600 F.2d 1148, 1163 (5th Cir. 1979)* ("[W]e do not think that [*15] the reasoning of *Illinois Brick* permits recognizing the exception when, as here, the alleged co-conspirator middlemen are not named as parties defendant."). Here, as discussed above, ASC does not have standing to sue Ortho-McNeil, the alleged co-conspirator-intermediary. Thus, ASC cannot rely on any conspiracy exception to bring its suit against Alza, a non-direct seller. Accordingly, the Court grants Defendants' motion as to Alza.

3   At the oral argument on the instant motion to dismiss, ASC argued that there was no *Illinois Brick* issue present here because there was only one level of selling. However, as ASC alleges, Alza owns the patent for Ditropan XL. (SAC, PP 6, 50.) Thus, in order for Ortho-McNeil to sell

2007 U.S. Dist. LEXIS 78423, *; 2007-2 Trade Cas. (CCH) P75,907

Ditropan XL, Alza must have sold a licence or otherwise transacted with Ortho-McNeil regarding Ditropan XL. Moreover, it is not clear which entity manufactures Ditropan XL. In paragraph 6 of its SAC, ASC alleges that Alza manufactures the drug, but in paragraph 51, ASC alleges that Ortho-McNeil is the entity that manufactures Ditropan XL. To the extent Alza is the entity that manufactures Ditropan XL, Ortho-McNeil must have purchased Ditropan XL from Alza. Therefore, ASC is an [*16] indirect purchaser with respect to Alza and *Illinois Brick's* prohibition against antitrust suits by indirect purchasers is fully applicable.

4   The Court notes that the Ninth Circuit in *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014 (9th Cir. 1981)*, stated that a plaintiff was "not required to sue all of the alleged coconspirators inasmuch as antitrust coconspirators are jointly and severally liable for all damages caused by the conspiracy." *Id. at 1053.* However, in *William Inglis*, the plaintiff did not allege a vertical conspiracy to circumvent *Illinois Brick. See In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig., 1992-2 Trade Cases P 69,915, 1992 U.S. Dist. LEXIS 14434, *15, 1992 WL 220753, * 5 (C.D. Cal. July 16, 1992)* (distinguishing *William Inglis,* noting that *William Inglis* stands for the general proposition that a plaintiff need not name all members of a conspiracy in order to proceed against any conspirator, but that a plaintiff must join the direct seller if it alleges a vertical conspiracy to circumvent *Illinois Brick*); *see also In re Midwest Milk Monopolization Litig., 730 F.2d 528, 531 (8th Cir. 1984)* (noting that the court in *William Inglis* did not [*17] discuss the issue of joining coconspirators in terms of *Illinois Brick*").

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss. The Court's dismissal of Ortho-McNeil is with prejudice. With respect to Alza, the Court will provide ASC one last opportunity to amend its complaint to plead facts to show ASC may bring an antitrust claim against this non-direct seller. As noted above, ASC did not plead or argue that its claim falls within one of the two exceptions stated in *Illinois Brick:* (1) if Ortho-McNeil received goods from Alza according to a preexisting "cost-plus contract;" or (2) if Ortho-McNeil is controlled or owned by Alza. If ASC has a good faith belief that one of these two exceptions is applicable, it may file an amended complaint by within twenty-one days. If ASC does not file an amended complaint within twenty-one days, its action shall be dismissed.

**IT IS SO ORDERED.**

Dated: October 11, 2007

JEFFREY S. WHITE

UNITED STATES DISTRICT JUDGE

# Exhibit 2

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2006 WL 2792416 (N.D.Cal.)
**(Cite as: 2006 WL 2792416 (N.D.Cal.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
Ralph I. MILLER, an individual, and as Succes-
sor-in-Interest to Best-of-China.Com, Inc., a Califor-
nia corporation, Plaintiff,
v.
INTERNATIONAL BUSINESS MACHINES
CORPORATION, Defendant.
No.C02-2118 MJJ.

Sept. 26, 2006.

Byron Clayton Thompson, Law Offices of Byron C.
Thompson, Oakland, CA, William F. Mueller,
Clemente Mueller & Tobia, Morristown, NJ, for
Plaintiff.

Andrea K. Pallios, Loren Kieve, Quinn Emanuel
Urquhart Oliver & Hedges, LLP, San Francisco, CA,
Derrick Wade Toddy, Morgan Miller Blair, A Law
Corporation, Walnut Creek, CA, for Defendant.

**ORDER RE IBM'S MOTION FOR SUMMARY
JUDGMENT**

MARTIN J. JENKINS, District Judge.

*1 Pending before the Court is Defendant Interna-
tional Business Machines Corporation's ("IBM")
Motion for Summary Judgment (Doc. # 485). Plaintiff
Ralph Miller has filed an Opposition (Doc. # 570), to
which IBM filed a Reply (Doc. # 593). For the fol-
lowing reasons, the Court **GRANTS** IBM's Motion.

I. Background

This case centers on the aftermath of
Best-of-China.Com's ("BCC") attempt to establish a
web portal and e-commerce site for Internet users in
China. Toward this end, in 1999, BCC contracted with
IBM World Trade Corporation ("WTC"), IBM China,
and IBM Engineering Technology (Shanghai) Co.,
Ltd. ("ETC"), for the provision of consulting services,
software, and hardware to establish the web portal.
However, the portal project failed, prompting Mr.

Miller to initiate this lawsuit in April 2002. He charges
that the equipment the defendants provided was sub-
standard and inadequate for the requirements of its
intended use, and that IBM and its subsidiaries
impermissibly accessed BCC's computers, causing
them to be disabled and damaged. As a result of this
conduct, Mr. Miller alleges that he was deprived of the
fruits of BCC's tangible and intellectual property,
business opportunities and investments, salary and
other compensation; denied the opportunity to recoup
substantial capital investments that he made in BCC;
and suffered other direct monetary losses, loss of
business       opportunities,       and       good       will.
(Sec.Am.Compl.¶ 20.) In his Second Amended Com-
plaint, Mr. Miller asserts claims for: (1) breach of
various contracts relating to the portal project; (2)
conversion; (3) trespass; (4) fraud in the inducement;
(5) fraud/intentional misrepresentation; (6) negli-
gence/negligent misrepresentation; (7) fraud/active
concealment of known facts; (8) breach of express and
implied warranties of fitness; and (9) fraud and related
activity in connection with computers in violation of
18 U.S.C. § 1030.

After four years of highly-contentious litigation, IBM
now moves for summary judgment on all of Mr.
Miller's claims.

II. Legal Standard

Rule 56(c) of the Federal Rules of Civil Procedure
authorizes summary judgment if there is no genuine
issue as to any material fact and the moving party is
entitled to judgment as a matter of law. *See Anderson v.
Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct.
2505, 91 L.Ed.2d 202 (1986). The moving party bears
the initial burden of demonstrating the basis for the
motion and identifying the portions of the pleadings,
depositions, answers to interrogatories, affidavits, and
admissions on file that establish the absence of a tri-
able issue of material fact. *Celotex Corp. v. Catrett,*
477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265
(1986). If the moving party meets this initial burden,
the burden then shifts to the non-moving party to
present specific facts showing that there is a genuine
issue for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at
324; *Matsushita Elec. Indus. Co. v. Zenith Radio
Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Page 2

Not Reported in F.Supp.2d, 2006 WL 2792416 (N.D.Cal.)
**(Cite as: 2006 WL 2792416 (N.D.Cal.))**

L.Ed.2d 538 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Anderson,* 477 U.S. at 247-48. An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute might affect the case's outcome. *Id.* at 248.Factual disputes are genuine if they "properly can be resolved in favor of either party." *Id.* at 250.Thus, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *See id.*"If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

III. Discussion

A. Factual Background

**\*2** In the late 1990's, BCC wanted to establish a web portal site in China to provide news, information, products, and services over the internet to consumers in China. Mr. Miller was BCC's chairman and chief executive officer from its founding until its dissolution in May 2002. In late 1999 and early 2000, BCC contacted ETC about providing software development services, and supplying computer hardware and products to BCC for manufacture and delivery in China.

BCC ultimately executed a series of agreements in connection with the web portal project. On December 31, 1999, BCC and IBM WTC executed a Stock Subscription Agreement, through which WTC obtained shares of BCC stock. On January 16, 2000, BCC and ETC executed a Services Agreement, wherein the parties agreed that ETC would provide certain services and that BCC would pay the charges set forth in the Statement of Work ("SOW"). The Services Agreement also provided that ETC's responsibilities were conditioned on BCC's fulfilment of the SOW. In January 2000, BCC and ETC also executed the SOW. The SOW stated that BCC would make payments based on task performance and that BCC would pay within 30 days of receipt of an invoice. On October 2, 2000, BCC and IBM executed an Amended and Restated Subscription to Corporate Stock Agreement, which superseded the Stock Subscription Agreement. Pursuant to the Amended Agreement,

IBM was substituted *ab initio* for WTC as the subscriber of BCC's stock. The Amended Agreement further provided that full consideration for these shares was "received as of December 31, 1999," and "received as of June 30, 2000."

In accordance with these agreements, ETC and IBM China began performing software development services for BCC. Subsequently, BCC began to experience difficulties with funding. ETC sent BCC invoices for the services it provided, but BCC failed to pay. According to Mr. Miller, BCC planned to pay the amounts due when BCC's received its "B round" of funding. ETC and IBM China never agreed to defer being paid until BCC obtained additional funding.

After BCC failed to make its payments and owed ETC and IBM China over $1 million, ETC and IBM China terminated their services. IBM asserts that because BCC had not paid ETC or IBM China for their software services, ETC and IBM China removed the software from BCC's server before returning it to BCC in the United States.

BCC was dissolved on May 15, 2002. Mr. Miller claims that before the dissolution, on October 31, 2001, BCC's Board passed a "Closing Resolution," stating that BCC "assign[ed] all right, title and interest in and to the property of [BCC] (including all intellectual property and contract interest rights)" to Mr. Miller. Thereafter, on April 30, 2002, Mr. Miller initiated this lawsuit, asserting claims for breach of contract, fraud, conversion, and trespass. IBM ow moves for summary judgment on all claims Mr. Miller has asserted against it.

B. IBM's Motion for Summary Judgment

1. Assignment

**\*3** IBM first argues that it is entitled to summary judgment because Mr. Miller lacks standing to sue on BCC's behalf. According to IBM, Mr. Miller was not a party to any of the contracts between BCC and ETC and IBM China, and Mr. Miller's only evidence of the purported assignment-BCC's Closing Resolution-is insufficient to show that BCC validly assigned its rights to him.

Specifically, IBM asserts that the Closing Resolution

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2792416 (N.D.Cal.)
**(Cite as: 2006 WL 2792416 (N.D.Cal.))**

did not effect a valid assignment for five reasons: (1) there is no competent evidence that the signatories were elected directors of BCC who had the authority to assign BCC's rights; (2) the purported assignment is not sufficiently clear to be a valid assignment and is subject to conditions precedent that were not fulfilled; (3) it is not an assignment, but merely an authorization for Mr. Miller to be a limited collection agent; (4) any purported assignment in the Closing Resolution is ineffective because it seeks to prefer certain creditors and avoid obligations to others; and (5) on its face, the Closing Resolution does not transfer any of BCC's obligations or liabilities, as required for any unconditional assignment.

First, IBM asserts that Mr. Miller has no evidence that Mr. Gallagher or Mr. Guthrie, two of the three signatories to the Closing Resolution, were elected directors of BCC, or that Mr. Miller, Mr. Gallagher, or Mr. Guthrie had authority to assign BCC's rights. Mr. Miller, however, has proffered Mr. Guthrie's Declaration, wherein he avers that he, Mr. Miller, and Mr. Gallagher, were members of BCC's Board; that the Board of Directors had authority to assign's BCC's rights in order to wind down the corporation's affairs; and that on October 31, 2001, the Board exercised this authority and assigned BCC's rights to Mr. Miller, as memorialized by the Closing Resolution.[FN1] The Court finds this evidence sufficient to raise a triable issue of fact as to whether the signatories to the Closing Resolution were authorized to assign BCC's rights. Further, the Court rejects IBM's argument that, absent some corroborating documentary evidence, Plaintiff cannot establish a valid assignment by clear and positive evidence with Mr. Guthrie's statements alone.

> FN1. IBM moves to strike Mr. Guthrie's Declaration in accordance with Magistrate Judge James's Order, on the ground that Mr. Miller did not provide current contact information in a discovery response for Mr. Guthrie. (*See* Docs. # 420 & # 458.)

IBM also contends that, in any event, Mr. Guthrie's statements are insufficient because neither Mr. Guthrie or Mr. Miller has provided the Court with a BCC corporate document to substantiate the statements. IBM therefore asserts that Mr. Guthrie's statements fails to provide clear and positive evidence to prove an assignment under

California law. The Court, however, rejects IBM's argument.

Next, IBM advances that the language of the Closing Resolution is not sufficiently clear to be an effective assignment. Despite its charge that the language of the purported assignment lacks clarity, IBM fails to specify what language is ambiguous or was omitted. As set forth above, the Closing Resolution expressly states that the Board is irrevocably assigning all right, title, and interest in and to BCC's property to Mr. Miller. The Court finds no ambiguity in this language.

IBM also argues that there is no competent evidence that the conditions precedent in the Closing Resolution-namely, the procurement of insurance by Mr. Miller-were met. The Closing Resolution states:

> Conditional on a pro-rata share payment by the Directors below, Miller shall purchase "D & O Tail Insurance" covering the Company's operations through October 31, 2001, for a period of one (1) year, through October 31, 2002.

*4 IBM claims that Mr. Miller failed to satisfy this condition. Mr. Miller, however, has submitted a Certificate of Liability Insurance, which he claims establishes that he did purchase D & O Tail Insurance. IBM counters that the document is not properly authenticated because Mr. Miller has no personal knowledge of it; that it is not properly before the Court because Mr. Miller failed to produce it during discovery; and that it does not provide insurance for the period required by the Closing Resolution-October 31, 2001 through October 31, 2002. Examining the Certificate, the document indicates that BCC had Directors & Officers Liability insurance coverage effective on October 30, 2000, and expiring on October 30, 2001. The Certificate also indicates: "The above D & O Policy includes election of the Optional Extension Period of 365 days (commonly known as Tail Coverage.)" If this language is construed to mean that BCC was insured under the D & O Tail Policy for 365 days after the expiration of the initial D & O Policy on October 30, 2001, Mr. Miller can show that he satisfied the condition in the Closing Resolution. Thus, there is a question of fact as to whether Mr. Miller procured D & O Tail insurance covering October 31, 2001 to October 31, 2002, in accordance with the Closing Resolution. Summary judgment in favor of IBM on this basis is therefore inappropriate.

Third, IBM contends that the Closing Resolution does not assign BCC's rights to Mr. Miller, but merely makes him a collection agent to wind up BCC's affairs. According to IBM, the Closing Resolution "required [Mr.] Miller to disburse all net proceeds from the exercise of the rights granted to satisfy employee claims, secured claims, unsecured claims, preferred shareholders, and common shareholders." The Court, however, is unpersuaded by IBM's argument. Even conceding that the Closing Resolution required Mr. Miller to disburse the net proceeds, this does not foreclose an assignment of BCC's rights. In fact, IBM acknowledges in its argument that Mr. Miller was to disperse all net proceeds *from the exercise of the rights granted.* Thus, in order to carry out the disbursement, BCC had to transfer its rights to enable Mr. Miller to exercise them. The Court therefore rejects IBM's argument that the Closing Resolution only made Mr. Miller a collection agent.

Fourth, IBM contends that the Closing Resolution improperly attempts to order BCC's liability and arbitrarily and unfairly excludes certain liabilities. Particularly, IBM contends that BCC owes ETC and IBM China over $1 million, but there is no provision in the Closing Resolution to pay either entity. IBM also argues that although Mr. Miller claims that IBM is a BCC shareholder, there is nothing in the Closing Resolution that purports to treat IBM the same way that IBM is required to treat other shareholders. IBM thus contends that the Closing Resolution does not protect IBM, as an obligor, from any further claim by the primary obligee, BCC, and therefore fails to satisfy California's requirements for a valid assignment. In opposition, Mr. Miller argues that, upon execution of the Amended and Restated Subscription Agreement, IBM became the holder of BCC common stock. According to Mr. Miller, under the Closing Resolution, common shareholders such as IBM are protected under Section B-5. The Court finds this evidence sufficient to create a triable issue of fact as to whether the Closing Resolution unfairly excludes BCC's alleged liabilities to IBM, ETC, or IBM China.

*5 Finally, IBM asserts that Mr. Miller cannot establish that the Closing Resolution effected a valid assignment because there is no evidence that BCC assigned its rights and obligations to him. Rather, IBM proffers that the Closing Resolution stated that "except for the above [covenants and conditions] Miller

assumes no liability for [BCC's obligations[.]" It argues that BCC cannot avoid liability by assigning its assets to an individual that is effectively a continuation of the old corporation.

Mr. Miller, however, argues that under California law a company may validly assign rights alone to an individual to facilitate winding-up, and cites *Trubowitch v. Riverbank Canning Company,* 30 Cal.2d 335, 338-40, 182 P.2d 182 (Cal.1947), and *Balfour, Guthrie & Co. v. Hansen,* 227 Cal.App.2d 173, 186-188, 38 Cal.Rptr. 525 (Cal.Ct.App.1964), in support of this principle. The Court has reviewed these decisions and agrees with Mr. Miller. The Court therefore rejects IBM's argument that the Closing Resolution did not effect a valid assignment.

2. IBM's Liability for Conduct of its Subsidiaries

Next, IBM contends that it is entitled to summary judgment because Mr. Miller's claims arise out of BCC's business dealings with ETC and IBM China, not IBM, and Mr. Miller has failed to present any basis to hold IBM liable for its subsidiaries' conduct.

a) Alter Ego Theory

First, IBM contends that Mr. Miller cannot hold IBM liable for ETC and IBM China's actions under an alter ego theory. Generally, a parent corporation is not liable for the conduct of its subsidiaries. *See U.S. v. Bestfoods,* 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). However, a parent may be held liable for its subsidiary's conduct under an alter ego theory of liability. "To demonstrate that the parent [corporation] and subsidiary are 'not really separate entities' and satisfy the alter ego exception to the general rule that a subsidiary and the parent are separate entities, the plaintiff must make out a *prima facie* case '(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist; and (2) that failure to disregard [their separate identities] would result in fraud or injustice.'" *Doe v. Unocal Corp.,* 248 F.3d 915, 926 (9th Cir.2001). "The first pong of this test has alternatively been stated as requiring a showing that the parent controls the subsidiary 'to such a degree as to render the latter the mere instrumentality of the former.'" *Id.* (quoting *Calvert v. Huckins,* 875 F.Supp. 674, 678 (E.D.Cal.1995)). Stated another way, the question is whether "sufficient respect was paid to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2792416 (N.D.Cal.)
**(Cite as: 2006 WL 2792416 (N.D.Cal.))**

corporate formalities." *Ministry of Defense of the Islamic Rep. of Iran v. Gould, Inc.,* 969 F.2d 764, 769 (9th Cir.1992). In assessing whether the alter ego theory applies, the Court examines: (1) commingling of funds and other assets; (2) holding out by one entity that is liable for the debts of another; (3) identical equitable ownership of the two companies; (4) use of the same offices and employees; (5) use of one company as a mere shell for the other; (6) inadequate capitalization; (7) lack of segregation of corporate records; and (8) identical directors and officers. *Sonora Diamond Corp. v. Superior Court,* 83 Cal.App.4th 523, 539, 99 Cal.Rptr.2d 824 (Cal.Ct.App.2000).

*6 IBM contends that none of the foregoing factors justifies application of alter ego liability in this case. In support, it proffers Mr. Wu's Declaration. As to the first, second, and sixth factors, IBM submits Mr. Wu's statements that neither ETC or IBM China commingles its assets with IBM's and that both ETC and IBM China are sufficiently capitalized and maintain their own bank accounts, financial accounts, and profits and losses separate from IBM. (Wu Decl. ¶¶ 9-11.) With respect to the fourth factor, Mr. Wu states that ETC's principal place of business is in Shanghai, China, IBM China's principal place of business is in Beijing, China, and that neither one shares office space with IBM. (*Id.* ¶¶ 6-8, 99 Cal.Rptr.2d 824.) He further avers that although some of IBM's employees are former ETC and IBM China employees, the subsidiaries do not share employees with IBM. (*Id.* ¶ 6, 99 Cal.Rptr.2d 824.) As to factor five, Mr. Wu avers that, although IBM may occasionally be involved in general policy decisions affecting ETC and IBM China, it is not involved in the day-to-day operation of either entity. (*Id* ¶ 13, 99 Cal.Rptr.2d 824.) Responsive to factor eight, Mr. Wu states that ETC and IBM China are managed by their own corporate officers, who are distinguishable from those who manage IBM. (*Id.* ¶ 8, 99 Cal.Rptr.2d 824.) Regarding the seventh factor, Mr. Wu avers that ETC and IBM China maintain separate corporate records from IBM. (*Id.* ¶ 12, 99 Cal.Rptr.2d 824.) Taken together, IBM asserts that these facts demonstrate that sufficient respect has been paid to corporate formalities, such that alter ego liability should not apply.

Mr. Miller counters that there are three grounds to find that IBM China and ETC are mere instrumentalities of IBM. First, citing to *Unocal,* he contends that a parent

may be liable when it uses its subsidiary "as a marketing conduit" and attempts to shield itself from liability based on the subsidiary's activities. 248 F.3d at 926. He argues that, here, "IBM's own employees looked at the subsidiaries as merely marketing conduits, describing the IBM Corporation, not its subsidiaries, as BCC's 'equipment vendor, service provider, and shareholder,' " and cites a memorandum from Robert Putnam in support. The Court has considered this evidence and finds that Mr. Putnam's isolated comment, without more, is insufficient to show that IBM was using IBM China and ETC to distribute its products in an effort to shield IBM from liability.

Next, Mr. Miller argues that IBM can be held liable because it dictated ETC, IBM China, and WTC's business and general policy decisions by providing unsolicited functional guidance to the heads of each subsidiary, and cites Mr. Putnam's deposition testimony in support. Mr. Miller's argument, however, falls short. Although Mr. Putnam testified that IBM occasionally provided guidance on general policy issues to IBM China, this fact does not establish that IBM and IBM China were indistinguishable corporate entities. Rather, Mr. Putnam's testimony merely provides that IBM as the parent company had some involvement in IBM China and ETC's functions. None of the testimony Mr. Miller cites, however, demonstrates that IBM set anything more than general policies for the subsidiaries. *See Unocal,* 248 F.3d at 928 (finding that the plaintiff's evidence that the parent "is an active parent corporation involved directly in decision-making about its subsidiaries' holdings," insufficient, in light of parent's observance of corporate formalities necessary to maintain corporate separateness, to establish first prong of alter ego test). The Court thus agrees with IBM that this evidence fails to satisfy the first prong.

*7 Third, Mr. Miller contends that "IBM and its subsidiaries share employees to such a degree that, for example, in one instance Mr. Putnam was ostensibly an employee of the IBM Corporation, drafting memorandum on the letterhead of IBM Global Services, for projects under the auspices of IBM China."Mr. Miller also refers the Court to Exhibit G to his Declaration, which he claims contains "documents evidencing the consolidated and integrated nature of the agreements entered into among the various IBM entities engaged in the BCC Portal Project and

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

BCC[.]" The Court has thoroughly reviewed this proffered evidence and finds it unavailing. As IBM points out, the fact that a subsidiary uses part of a parent's trade name is insufficient to show that the parent and subsidiary are not separate entities. *See Pearson v. Component Tech. Corp.,* 247 F.3d 471, 485 (3d Cir.2001). Moreover, aside from compiling these documents, Mr. Miller fails to explain how they evidence a unity of interest and ownership between IBM and its subsidiaries. As to Mr. Miller's argument that Mr. Putnam worked for both IBM and IBM China, Mr. Putnam testified that at the time he authored the memorandum, he was acting for IBM China and ETC as part of a continuation of a project until a new local attorney was brought on to assume his responsibilities. (Thompson, Ex. C, Putnam Depo. 169:16-21.) Aside from this instance, Mr. Miller has not provided any other competent evidence to rebut Mr. Wu's statements that IBM did not share employees with either ETC or IBM China.

Considering Mr. Miller's arguments and supporting evidence in its entirety, the Court concludes that he has failed to adduce sufficient evidence supporting his contention that IBM controlled ETC and IBM China to such a degree that they were merely IBM's instrumentalities. The Court therefore finds that Mr. Miller cannot satisfy the first prong of the alter ego analysis.

Under the second prong of the alter ego test, Mr. Miller must demonstrate that he will suffer from an inequitable result if the conduct at issue is treated as that of ETC and IBM China alone. To make this showing, Mr. Miller must identify a right that will be defeated if he is not permitted to pursue his claims against IBM. *See Wady v. Provident Life & Accident Ins. Co.,* 216 F.Supp.2d 1060, 1070 (C.D.Cal.2002). IBM argues that Mr. Miller cannot make this showing. Particularly, it argues that Mr. Miller should have sued ETC and IBM China in China, where BCC's contacts with these entities occurred. In response, Mr. Miller argues that the Court's refusal to disregard the separate identities of IBM and its subsidiaries would result in fraud or injustice. Specifically, he contends that "[t]he inequity from the failure to pierce the corporate veil is that Defendant IBM is allowed to erect a Chinese wall, shifting any liability away from the parent company to distant, financially dubious entities throughout communist China and the rest of Asia, where a judgment would be difficult to enforce."(Opp. at 14.) The Court is unpersuaded by Mr. Miller's argument. As the Court

previously held, BCC's dealings with IBM China and ETC-both based in China-occurred in China. Thus, the Court finds no inequity in Mr. Miller having to pursue legal remedies against these entities in China. Further, as IBM points out, the Ninth Circuit has recognized that "an inability to collect does not, by itself, constitute an inequitable result." *Ministry of Defense of the Islamic Rep. of Iran v. Gould, Inc.,* 969 F.2d 764, 769 (9th Cir.1992).

*\*8 In sum, the Court finds that Mr. Miller has failed to present competent evidence that there is such unity of interest and ownership between IBM and ETC and IBM China that the separate identities of the entities no longer exist, or that failing to hold IBM responsible for its subsidiaries' actions will result in fraud or injustice. The Court therefore denies Mr. Miller's request to hold IBM liable for IBM China and ETC's conduct under an alter ego theory.

b) Agency Theory

Next, IBM contends that it cannot be held liable for its subsidiaries' conduct under an agency theory. Generally, "[c]ontrol is the key characteristic of the agent/principal relationship." *Sonora Diamond Corp.,* 83 Cal.App. 4th at 541;*accord Unocal,* 248 F.3d at 928. "Accordingly, if a parent exercises such a degree of control over its subsidiary corporation that the subsidiary can legitimately be described as only a means through which the parent acts, or nothing more than an incorporated department of the parent, the subsidiary will be deemed to be the agent of the parent." *Sonora Diamond,* 83 Cal.App.4th at 541."The nature of the control exercised by the parent over the subsidiary necessary to put the subsidiary in an agency relationship with the parent must be over and above that to be expected as an incident of the parent's ownership of the subsidiary and must reflect the parent's purposeful disregard of the subsidiary's independent corporate existence. The parent's general executive control over the subsidiary is not enough; rather there must be a strong showing beyond simply facts evidencing 'the broad oversight typically indicated by [the] common ownership and common directorship' present in a normal parent-subsidiary relationship."*Id.* at 542 (citations omitted).

Mr. Miller first argues that a reasonable jury could find that the control IBM exercises over its subsidiaries is so pervasive and continual that its subsidiaries

Not Reported in F.Supp.2d                                                              Page 7
Not Reported in F.Supp.2d, 2006 WL 2792416 (N.D.Cal.)
**(Cite as: 2006 WL 2792416 (N.D.Cal.))**

may be considered nothing more than IBM's agents. In support, Mr. Miller proffers that IBM dictated broad policy decisions by providing unsolicited functional direction and policy guidelines to the heads of each subsidiary; dictated routine maters of daily operation, such as how each subsidiary could store and dispose of paperwork; and dictated the boilerplate language the subsidiaries could use in their contracts. The Court has considered these facts and the supporting evidence, and finds that they fail to establish that the degree of control IBM exercises over its subsidiaries is such that IBM has disregarded the subsidiaries' independent corporate existence.

Mr. Miller also contends that a reasonable jury could find that the subsidiaries functioned as IBM's agents in Asia by engaging in activities that, but for the subsidiaries' presence, IBM would have had to undertake for itself. In support, Mr. Miller contends that: (1) "[w]henever a problem arose in the IBM organization, communication across corporate lines was swift and far reaching"; (2) IBM "actively dictated its subsidiaries' business policy"; (3) "IBM has vocally acknowledged its international subsidiaries' operations as crucial to the overall success of Defendant IBM's operations"; and (4) "IBM's subsidiaries, in their capacities as agents of Defendant IBM, were acting within the scope of their authority during the BCC Portal Project[.]" Again, the Court has considered these facts and the supporting evidence and finds them insufficient to establish liability on an agency theory. At best, the evidence demonstrates that IBM communicated with its subsidiaries and set general policy with respect to the Asian market. None of the evidence Mr. Miller cites demonstrates that the subsidiaries carried out functions that, had the subsidiaries not existed, IBM would have carried out itself.

*9 In sum, the Court finds that Mr. Miller has failed to present any competent evidence that IBM exercised such extensive control over ETC or IBM China that these subsidiaries could be described as only a means through which IBM acts, or nothing more than an incorporated department of IBM. The Court therefore rejects Mr. Miller's argument that IBM is liable for ETC or IBM China's conduct under an agency theory.

c) Joint Venture Liability

Mr. Miller also contends that IBM is liable for its subsidiaries' actions under a joint venture liability theory. Under California law, "[a] joint venture ... is an undertaking by two or more persons jointly to carry out a single business enterprise for profit." *April Entr., Inc., v. KTTV*, 147 Cal.App.3d 805, 819, 195 Cal.Rptr. 421 (Cal.App.1983). Generally, "[t]here are three basic elements of a joint venture: the members must have joint control over the venture (even though they may delegate it), they must share the profits of the undertaking, and the members must each have an ownership interest in the enterprise." *JeldWen, Inc. v. Superior Court*, 131 Cal.App.4th 853, 872, 32 Cal.Rptr.3d 351 (Cal.App.2005) (quoting *Orosco v. Sun-Diamond Corp.*, 51 Cal.App.4th 1659, 1666, 60 Cal.Rptr.2d 179 (Cal.Ct.App.1997))."Such a venture or undertaking may be formed by parol agreement, or it may be assumed as a reasonable deduction from the acts and declarations of the parties." *Nelson v. Abraham*, 29 Cal.2d 745, 749-50, 177 P.2d 931 (Cal.1947)."[W]here evidence is in dispute the existence or non-existence of a joint venture is a question of fact to be determined by the jury." *April Enter.*, 147 Cal.App.3d at 820, 195 Cal.Rptr. 421.

Here, Mr. Miller claims that the series of agreements that BCC and the various IBM entities executed establishes that a joint venture existed. Specifically, Mr. Miller submits that BCC and WTC entered into the Subscription to Corporate Stock Agreement, wherein BCC was to issue $6,098,090 in stock to WTC, and WTC would pay $1,570,000 to BCC and that the remainder of the value would be provided to BCC in the form of professional services as defined in the Statement of Work. Mr. Miller further proffers that BCC, ETC, and IBM-China executed the Services Agreement, pursuant to which WTC was to provide 3,700 man days worth of professional services to BCC, in consideration for $6,098,090 worth of stock issued to WTC. BCC, ETC, and IBM-China then entered into the Statement of Work, which incorporated the Services Agreement. Finally, BCC, IBM, and WTC executed the Amended and Restated Subscription to Corporate Stock Agrement, pursuant to which IBM-WTC assigned to IBM all of its right, title, and interest in the Subscription to Corporate Stock Agreement *ab initio*. Relying on these agreements, Mr. Miller asserts that, "[i]t is preposterous to think that the interrelated nature of these agreements gives rise to anything but the reasonable deduction that Defendant IBM and its subsidiaries engaged in a joint profit sharing enterprise."

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**\*10** IBM counters that Mr. Miller "has merely cobbled together various provisions of the contracts between BCC and ETC and IBM China and given his own glass on them. [Mr. Miller] does not cite any competent evidence-not even his own declaration-that establishes any of the elements of a joint venture." The Court agrees with IBM. While Mr. Miller correctly recites the terms of each of the contracts BCC and the various IBM entities entered into, he fails to specify how these agreements operate to give IBM (along with ETC and IBM China) joint control over the business enterprise; how the agreements establish that IBM will share in the profits and losses or the enterprise; or that IBM had a shared ownership interest in the enterprise. Further, although IBM replaced WTC in the Amended and Restated Subscription to Corporate Stock Agreement, this fact, without more, does not establish the requisite elements of a joint venture. Because Mr. Miller has failed to produce sufficient evidence to at least raise a triable issue of fact with respect to the existence of a joint venture, the Court rejects Mr. Miller's argument that IBM may be held liable under a joint venture theory.

d) Conclusion

In sum, Mr. Miller has failed to present a viable legal theory to hold IBM liable for its subsidiaries' business dealings with BCC. Because Mr. Miller has failed to show that IBM is liable under an alter ego, agency, or joint liability theory, he cannot proceed on his claims against IBM. The Court therefore **GRANTS** summary judgment on all of Mr. Miller's claims in favor of IBM.

3. Mr. Miller's Claims

Notwithstanding the foregoing conclusion, even presuming that Mr. Miller can establish a valid basis to hold IBM liable for its subsidiaries' conduct, IBM is entitled to summary judgment on Counts one, two, four, six, seven, eight, nine, ten, and eleven.[FN2]

> FN2. As detailed below, Mr. Miller voluntarily withdrew count twelve of his Second Amended Complaint for violation of 18 U.S.C. § 1030.

a) Count Four-Breach of Oral Agreement

In Mr. Miller's fourth claim, he alleges that in August 2000, BCC entered into an oral contract with the defendants for the production and delivery of demonstration computer software and preparation of related documentation to BCC. Pursuant to the terms of the oral agreement, BCC was to pay the defendants $200,000. Mr. Miller alleges that, although BCC made the required payments, the defendants failed to perform.

IBM brings three challenges to this claim. First, IBM argues that, pursuant to California Civil Code section 1625, the Amended and Restated Stock Subscription Agreement, executed on October 2, 2000, superceded any purported oral agreement. Second, IBM argues that any oral agreement fails because there was no valid consideration exchanged. Particularly, it asserts that BCC's payment of $200,000 was to defray part of the amount that BCC owed to ETC, and was not part of any oral agreement. Third, IBM argues that there is no competent evidence that IBM was involved in making the oral agreement.

Mr. Miller has failed to proffer any argument or evidence in response to these challenges. In particular, as IBM points out, Mr. Miller has failed to cite to any record evidence establishing that IBM was a party to the alleged oral agreement, setting forth the terms of the oral agreement, or demonstrating that IBM breached the terms of the agreement. Because Mr. Miller has failed to come forward with sufficient evidence to sustain his claim, the Court **GRANTS** summary judgment on Mr. Miller's breach of oral agreement in favor of IBM.

a) Count Two-Breach of the Services Agreement

**\*11** In his second claim, Mr. Miller asserts that BCC entered into a written Services Agreement with IBM China and ETC, whereby IBM China and ETC agreed to provide professional services and certain materials to BCC in furtherance of the Subscription Agreement. Specifically, Mr. Miller claims that the Services Agreement required IBM China and ETC to provide custom computer software, system components, design, documentation, and approximately 3700 work days of design and programming services to BCC. In exchange, BCC was to pay $1.7 million in cash, and $1 million in shares pursuant to the terms of the Subscription Agreement. Mr. Miller alleges that BCC timely performed all of its obligations under the Ser-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2792416 (N.D.Cal.)
**(Cite as: 2006 WL 2792416 (N.D.Cal.))**

vices Agreement, but IBM China and ETC failed to perform the required work and failed to deliver the contracted-for materials to BCC. According to Mr. Miller, when IBM China and ETC delivered the non-conforming server system and materials to BCC in August 2001, they failed to develop the software pursuant to the Services Agreement, removed all of BCC's software that was produced under the Services Agreement, and removed and/or caused physical damage to certain partS of the server system's hardware components, rendering the server system wholly inoperable. Mr. Miller further alleges that BCC assigned its rights in and to the Services Agreement to him on October 31, 2001.

IBM contends that Mr. Miller's claim for breach of the Services Agreement fails because Mr. Miller has no evidence that anyone at BCC asked for ETC's consent to the purported assignment of BCC's rights under the Services Agreement to Mr. Miller, or that ETC gave its consent, as is required by Article 10 of the Services Agreement. Specifically, Article 10 of the Services Agreement provides: "Subject to the right that Seller [ETC] has granted to Buyer [BCC] to sublicense the Materials pursuant to article 7 hereof, Buyer will not assign its rights or delegate its obligations with respect to all or any part of this agreement without the prior consent of the Seller."

In response, Mr. Miller contends that he "testified at a hearing in this matter that he gave oral notice of the intended assignment to Charles Wu during a telephone call, and that Charles Wu did not object upon receipt of notice."(Opp. at 17.) However, as IBM notes, Mr. Miller fails to proffer any citation to the record in support of this assertion. Absent evidentiary support that BCC obtained ETC's consent to the assignment, Mr. Miller's claim fails.[FN3] Accordingly, the Court **GRANTS** summary judgment in favor of IBM on Mr. Miller's claim for breach of the Services Agreement.

> FN3. In his Second Amended Complaint, Mr. Miller alleges:
>
> Notwithstanding such consent, the Subscription Agreement, on which the Services Agreement is conditioned, contains no assignment restriction. Absent specific language in the Services Agreement providing a method for resolving conflicts of language between the agreements, Article

3 of the Statement of Work, [ ] sets Order of Precedence to the master agreement, which in the case of the Services Agreement and the Subscription Agreement, is the latter, which contains no restrictions regarding assignments. The assignment is therefore enforceable on its face; irrespective of the precedence hierarchy.

(SAC ¶ 54.) However, he has not presented any argument or evidence in support of this allegation in his Opposition.

c) Count Six-Trespass

In count six, Mr. Miller asserts a claim for trespass. He alleges that "the accessing without authorization of a protected computer, server system and programs owned by BCC for the purpose of disabling said server system ... constituted a trespass by Defendants on [Mr. Miller's] and BCC's property."(SAC ¶ 87.) Additionally, Mr. Miller alleges that "defendants' trespass on BCC's proprietary, valuable and time sensitive property ... interfered with [his] and BCC's rights to derive income and/or value therefore, was wrongful and caused severe direct damage to Plaintiffs, including [ ], expenses incurred by both Plaintiffs for transporting, storing and insuring the valueless Server System." (*Id.* ¶ 88, 195 Cal.Rptr. 421.)

*\*12* To prevail on this claim, Mr. Miller must prove: (1) IBM intentionally and without authorization interfered with BCC's possessory interest in its server system; and (2) the unauthorized use proximately resulted in damage to BCC. *See eBay, Inc. v. Bidder's Edge, Inc.,* 100 F.Supp.2d 1058, 1069-70 (N.D.Cal.2000)."[N]o trespass can be found if actual consent to entry was given." *Baugh v. CBS, Inc.,* 828 F.Supp. 745, 756 (N.D.Cal.1993).

IBM contends that Mr. Miller cannot prove either element of his trespass claim. As to the first element, IBM contends that IBM China and ETC's use of BCC's server was authorized by the parties' agreements. Mr. Miller counters that the contracts solely authorized IBM China and ETC to access the Server System in the context of building and maintaining it, and that none of the agreements permitted IBM China or ETC to access the Server System for the purpose of disabling it. Thus, he contends that IBM China and ETC exceeded the scope of any accessed authorized

Not Reported in F.Supp.2d                                        Page 10
Not Reported in F.Supp.2d, 2006 WL 2792416 (N.D.Cal.)
**(Cite as: 2006 WL 2792416 (N.D.Cal.))**

under the agreements.

Neither party disputes that to build and maintain BCC's Server System, IBM China and ETC needed to access this system. However, as Mr. Miller points out, his claim is premised on IBM China and ETC's acts of accessing the Server System to extract and/or delete software. While IBM contends that it only removed applications that BCC failed to pay for, and therefore lacked any possesory interest in, the key question is whether it had authority to access the Server System for this purpose, either under the terms of the parties' agreements or on some other extra-contractual ground. Although IBM maintains that extraction of the components was justified by BCC's failure to pay for its subsidiaries' services and materials, this issue is in dispute, and therefore cannot support judgment in IBM's favor on this claim.

Alternatively, IBM contends that Mr. Miller cannot prove that ETC and IBM China's use of the system caused any damages to BCC's Server System. The only evidence Mr. Miller has cited in support of his claim are a series of email messages exchanged between him and Mr. Hui, wherein they discuss the removal of the software that ETC developed. (Miller Decl. Ex. D.) In his Second Amended Complaint and in his Opposition, Mr. Miller contends that the removal of this software disabled the system, rendered it valueless, interfered with his and BCC's right to derive income and value from the Server System, and caused BCC to expend unnecessary expenses in transporting, storing, and insuring the Server System. Aside from these allegations, however, Mr. Miller has proffered no evidentiary support for his claim that he and/or BCC incurred damages as a result of IBM China and ETC's alleged trespass. Consequently, the Court **GRANTS** summary judgment in favor of IBM on this claim.

d) Counts One, Seven, Eight, Nine, & Ten-Fraud Claims

In his Second Amended Complaint, Mr. Miller assets five fraud-based claims. In count one, Mr. Miller asserts that Defendants fraudulently misrepresented facts regarding the Server System and Materials contrary to the Stock Subscription Agreement. In count seven, Mr. Miller asserts a claim for fraud in the inducement. He alleges that Defendants made certain promises, assurances, and representations to him and

BCC to induce BCC to enter into the various agreements, which were false and misleading. In count eight, Mr. Miller alleges that the defendants fraudulently misrepresented the origin, configuration, functionality, and merchantability of the Server System and Materials, and negotiated the Amended Stock Subscription Agreement knowing that they had a non-conforming hardware and software. (*Id.* ¶ 102.)In count nine, Mr. Miller asserts a claim for negligent misrepresentation. He alleges that Defendants were negligent in making the representations regarding the hardware and software and had no reasonable grounds for believing the representations to be true when they made them. In count ten, Mr. Miller asserts a claim for active concealment of known facts. He alleges that Defendants actively concealed or suppressed material facts relating to the agreements; Defendants' ability to fulfill their obligations under the agreements; and regarding defects in the Server System and Materials known to Defendants. (*Id.* ¶ 113.)

**\*13** IBM moves for summary judgment on each of Mr. Miller's fraud claims on the ground that he cannot prove essential elements to sustain the claims. As to Mr. Miller's fraud/intentional misrepresentation, fraud in the inducement, and active concealment of known facts claims, IBM argues that Mr. Miller cannot prove that any representative of IBM made any representations to BCC. It further argues that Mr. Miller cannot prove that ETC or IBM China's representatives knew their statements were false or made any statements with the intent to defraud BCC.

As to Mr. Miller's negligent misrepresentation claim, IBM contends that Mr. Miller lacks any evidence that any IBM representative made statements to BCC without reasonable ground for believing them to be true.

In response, Mr. Miller argues as follows:

Among Defendant IBM's more egregious frauds was to promise BCC that in exchange for $6,098,090 worth of BCC issued stock, Defendant IBM and its subsidiaries would in return provide an equal amount of real value in the form of development support, consulting services, software and hardware, and advertising and promotion. (SAC, Ex. A, Ex. B, Ex. C, Ex. D., Ex. E). Instead, Defendant IBM only delivered unqualified employees for professional services (Thompson Decl., Ex. F,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2792416 (N.D.Cal.)
(Cite as: 2006 WL 2792416 (N.D.Cal.))

"BCC Project Assessment Executive Summary": "The customer has raised concerns that the [ ] committed man days stated in the proposal is much higher than actual and yet the billable amount is so high. The reasons [sic] is mainly due to the following: a. Flyin [sic] support which has a much higher billing rate[;] b. Use of BJ resources versus SISC resources (different of billing rate) due to experience and skill requirement [.]"; Thompson Decl., Ex. G, "BCC: Project Assessment Executive Summary": "The biggest exposure of this project is the staffing and the experience level of 00 technical staff. Currently, there are still some uncertainties of the resources assignment ... [i]mmediate action will be needed to avoid late delivery and customer satisfaction issues.").

On the basis above, a reasonable jury could find that Plaintiff Miller presented sufficient evidence to prove Defendant IBM intentionally defrauded BCC.

(Opp. at 20.) The Court has considered Mr. Miller's argument and reviewed the evidence he has proffered in support, and finds it insufficient to support his fraud-based claims. As IBM points out, Mr. Miller has failed to cite to any evidence in the record substantiating his allegations that IBM, ETC, or IBM China made representations to BCC regarding the products and services that formed the bases of the parties' agreements, that IBM, ETC, or IBM China knew that they were false, or that they made them with the intent to defraud BCC. Instead, the evidence Mr. Miller has cited merely shows that after the parties began performance under the agreements, IBM's subsidiaries undertook project assessments to evaluate the progress of the hardware and software development. Nothing in this assessment demonstrates that IBM or its subsidiaries knowingly and intentionally made false statements to BCC regarding the products and services. Thus, the Court agrees with IBM that Mr. Miller has failed to adduce sufficient evidence to support his fraud/intentional concealment, fraud in the inducement, and active concealment claims. Further, none of the evidence proffered indicates that IBM, ETC, or IBM China made statements to BCC regarding the contracted-for products and services without reasonable grounds for believing them to be true. Accordingly, Mr. Miller's negligent misrepresentation claim fails, as well. Accordingly, the Court **GRANTS** summary judgment in favor of IBM on counts one, seven, eight, nine, and ten.

e) Count Eleven-Breach of Warranty Claim

*14 In his eleventh claim, Mr. Miller asserts that IBM breached the express and implied warranty of fitness. (SAC ¶ 22.) He alleges that in the sale of goods that occurred under the written agreement, there was both an express and an implied warranty that the Server System and the Materials purchased would be merchantable, and that BCC's Sever System and Materials would possess certain characteristics fit for the purposes for which they were specified in the agreements. (*Id.* ¶ 119.)He claims that IBM breached the express and implied warranties when the Server System and Materials subsequently shipped to BCC failed to meet the performance specifications defined in the BRD and related agreements. (*Id.* ¶ 122.)He further alleges that the Server System and Materials were never configured or delivered as specified and/or were disabled prior to the delivery to BCC.

IBM contends that Mr. Miller's warranty claims fail for three reasons. First, it argues that the only agreement that IBM signed was the Amended and Restated Subscription Agreement. According to IBM, this agreement did not involve the sale of goods, but only involved the sale of BCC common stock, which under the Uniform Commercial Code is an investment security. *See*Cal. Com.Code § 8101. Next, IBM argues that the Court need not decide whether the goods delivered to BCC were fit for their particular purpose because ETC and IBM China were not obligated to deliver any goods to BCC because BCC never tendered payment for those goods. The Court, however, is unpersuaded by this argument. As indicated above, a question of fact exists as to whether BCC was is arrears on its payments to IBM China and/or ETC. Thus, this argument cannot support summary judgment in favor of IBM. Third, IBM asserts that nothing in any of the agreements obligated ETC or IBM China to deliver any goods. Rather, IBM contends that the agreements merely obligated them to perform engineering services, with no warranty for any given result or product.

Mr. Miller does not respond to any of these arguments. Rather, he contends that the basis for IBM's liability stems from BCC's purchase of hardware necessary for the Server System from IBM's business partner and shipping agent, Golden Horse Networking Technology (HK). According to Mr. Miller, "BCC purchased

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the hardware for the BCC Server System through an IBM business partner, Golden Horse, and accordingly, under the IBM Customer Agreement, Defendant IBM is responsible for the accompanying warranties."(Opp. at 21.) Mr. Miller's argument, however, is unavailing. As IBM correctly notes, the only agreement that IBM was a party to was the Amended and Restated Stock Subscription Agreement, which concerned the transfer of BCC stock. Mr. Miller has not presented any colorable evidence demonstrating that by signing the Amended and Restated Stock Subscription Agreement, IBM became a party to any of the other agreements, or otherwise warrantied products from other entities, such as Golden Horse. Further, Mr. Miller has not proffered any explanation and supporting evidence regarding what was nonconforming about the hardware BCC received from Golden Horse. Having failed to present sufficient evidence establish a basis to hold IBM liable for the Golden Horse products and to establish that the Golden Horse products were non-conforming, Mr. Miller cannot sustain his breach of warranty claim against IBM. Accordingly, the Court **GRANTS** summary judgment on Mr. Miller's breach of warranty claim.

f) Count Twelve-Violation of Federal Computer Fraud and Abuse Act

**\*15** In count twelve, Mr. Miller asserts a claim for violation of the federal Computer Fraud Abuse Act, 18 U.S.C. § 1030. He alleges that Defendants "voluntarily and deliberately accessed an electronic banking and financial transaction computer belonging to BCC (hereinafter "protected Computer") and caused the unauthorized interstate and/or foreign transmission of a program, information, code or command [directed] to damage the Protected Computer, and as a result of that conduct, intentionally caused such damage in violation of 18 U.S.C. Section 1030(a), et seq." (SAC ¶ 126.) At oral argument on IBM's Motion, Mr. Miller voluntarily withdrew this claim.

C. Mr. Miller's Request for Additional Discovery Pursuant to Rule 56(f)

In his Opposition, Mr. Miller urges the Court to deny IBM's Motion and allow him additional an opportunity to conduct additional discovery pursuant to Federal Rule of Civil Procedure 56(f).Rule 56(f) provides:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Thus, Rule 56(f)"provides a device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence." *United States v. Litsap Physicians Service,* 314 F.3d 995, 1000 (9th Cir.2002). As Rule 56(f) indicates, if the affidavit demonstrates that a continuance is needed to obtain facts essential to preclude summary judgment, then the court should continue the summary judgment motion. *State of Calif. v. Campbell,* 138 F.3d 772, 779 99th Cir.1998). However, if the party seeking the continuance pursuant to Rule 56(f) failed "to conduct discovery diligently," the court may deny the request. *See Pfingston v. Ronan Eng'g Co.,* 284 F.3d 999, 1005 (9th Cir.2002). Further, when a party requests a Rule 56(f) continuance after the discovery deadline set forth in the Rule 16 Scheduling Order, the party must also demonstrate "good cause" exists under Rule 16(b) to conduct further discovery. *See Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 607-08 (9th Cir.1992)."Rule 16(b)'s 'good cause' requirement, like that for Rule 56(f) relief, considers the diligence of the party seeking relief." *FMC Corp. v. Vendo Co.,* 196 F.Supp.2d 1023, 1030 (E.D.Cal.2002).

In support of his Rule 56(f) request, Mr. Miller contends that "[t]here has been no discovery allowed as to Defendant's subsidiaries [ ] and no authentication of Mr. Wu's documents, under [P]laintiff's Request for Admissions[ ]." (Opp. at 23.) Mr. Miller also contends that he "has not been allowed to depose Charles Wu[ ], and as Defendant IBM bases its motion on the [D]eclaration of an individual whom Plaintiff Miller cannot cross examine, Defendant IBM's [M]otion for summary judgment should be denied."(*Id.*)

**\*16** IBM opposes Mr. Miller's request, arguing that fact discovery in this matter closed on November 18, 2005, and Mr. Miller had ample time to obtain the information necessary to prosecute his case during discovery. Further, IBM argues that Mr. Miller could have sought information relating to the subsidiaries in when deposing Mr. Putnam, who IBM designated as

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2792416 (N.D.Cal.)
 **(Cite as: 2006 WL 2792416 (N.D.Cal.))**

it's Rule 30(b)(6) witness. The Court agrees with IBM.
Mr. Miller has failed to articulate what specific facts
would be revealed by further discovery and how those
facts would preclude summary judgment, as required
by Rule 56(f). Further, Mr. Miller has not proffered
any explanation as to why he was unable to obtain the
evidence he now seeks during the normal discovery
period. The Court therefore **DENIES** his request un-
der Rule 56(f).

IV. Conclusion

For the foregoing reasons, the Court **GRANTS** IBM's
Motion for Summary Judgment. Further, the Court
**DENIES** Plaintiff's Rule 56(f) request for leave to
take additional discovery. All other pending motions
in this case are **DENIED AS MOOT.**

**IT IS SO ORDERED.**

N.D.Cal.,2006.
Miller v. International Business Machines Corp.
Not Reported in F.Supp.2d, 2006 WL 2792416
(N.D.Cal.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# Exhibit 3

Westlaw.

Not Reported in F.Supp.2d                                                                      Page 1
Not Reported in F.Supp.2d, 2007 WL 3171675 (N.D.Ohio), 2007-2 Trade Cases P 75,933
**(Cite as: 2007 WL 3171675 (N.D.Ohio))**

c

United States District Court,
N.D. Ohio,
Eastern Division.
In re TRAVEL AGENT COMMISSION ANTI-
TRUST LITIGATION
This Document Relates To: All Actions.
**MDL Docket No. 1561.**
**No. 1:03 CV 30000.**

Oct. 29, 2007.

*MEMORANDUM OPINION AND ORDER*

PETER C. ECONOMUS, United States District
Judge.

**\*1** This matter is before the Court upon Defendants'
Motions to Dismiss Plaintiff's First Amended Com-
plaint made pursuant to Rule 12(b)(6). Oral argu-
ments were held on October 18, 2007.

**I. BACKGROUND**

The instant case is brought by travel agents who
opted out of the plaintiff class in *Hall v. United Air
Lines, Inc., 296 F.Supp.2d 652 (E.D.N.C.2003).*FN1
The Court allowed Plaintiffs in the *Tam Travel* action
to file an Amended Complaint on September 14,
2007, in light of the recent Supreme Court decision in
*Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955
(2007). Defendants, in turn, filed Motions to dismiss
asserting that Plaintiffs cannot meet the new pleading
standard enunciated by the Court in
*Twombly.*Defendants Alaska Airlines, Inc.
("Alaska"), Alaska Air Group, Inc. ("AGA"), Air
Tran Airlines, Inc. ("ATA"), American Airlines, Inc.
("American"), America West Airlines, Inc.
("AWA"), Continental, Airlines Inc. ("Continental"),
Delta Airlines, Inc. ("Delta"), Horizon Air Industries
("Horizon"), Frontier Airlines, Inc. ("Frontier"),
KLM Royal Dutch Airlines ("KLM"), Northwest
Airlines, Inc. ("Northwest"), and United Airlines,
Inc. ("United") filed the following eight Motions to
Dismiss FN2:

FN1. The instant matter consists of two ac-

tions transferred to this court and coordi-
nated for pretrial proceedings: (1) *Tam
Travel, Inc., et al. v. Delta Airlines, Inc., et
al.,* filed in the U.S. District Court for the
Northern District of California on April 9,
2003; and (2) *Swope Travel Agency, Inc., et
al. v. Orbitz, LLC, et al.,* filed in the U.S.
District Court for the Eastern District of
Texas on June 5, 2003. On November 10,
2003, the Judicial Panel on Multidistrict
Litigation transferred Tam and *Swope* to this
District pursuant to 28 U.S.C. § 1407 so that
pretrial proceedings could be coordinated or
consolidated with the case *Fausky, et al. v.
American Airlines, et al.,* filed in this Court
on May 8, 2003. (Master Dkt. # 1). The
*Fausky* case has since been dismissed.
(*Fausky* Dkt. # 25). Tam and *Swope,* how-
ever, remain before the Court.

FN2. Plaintiffs dismissed U.S. Airways, Inc.
and U.S. Airways Group on September 13,
2007 without prejudice.

Motion to Dismiss First Amended Complaint filed by
Northwest Airlines, Inc. (Dkt.# 142)

12(b)(6) Motion to Dismiss Tam Travel Plaintiffs'
First Amended Complaint Filed by 8 Moving De-
fendants (Dkt.# 144)

Motion to Dismiss First Amended Complaint Filed
by Delta Airlines, Inc. (Dkt. # 145)

Motion to Dismiss the First Amended Complaint
filed by Frontier Airlines (Dkt. # 146)

Motion to Dismiss TAM Travel Plaintiffs' First
Amended Complaint filed by America West Air-
lines, Inc. (Dkt.# 147)

Motion to Dismiss First Amended Complaint Filed
by Alaska Airlines (Dkt. # 148)

Motion to Dismiss the First Amended Complaint
Filed by United Airlines, Inc. (Dkt.# 150)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2007 WL 3171675 (N.D.Ohio), 2007-2 Trade Cases P 75,933
**(Cite as: 2007 WL 3171675 (N.D.Ohio))**

Page 2

Motion to Dismiss the First Amended Complaint Filed by ATA Airlines (Dkt. # 166) [FN3]

> FN3. Although Defendant ATA filed its Motion to Dismiss on November 25, 2007, after the deadline, the Court will now consider ATA's Motion because it raises the same issues as the other seven Motions to Dismiss.

## II. STANDARD OF REVIEW

When presented with a motion to dismiss under Rule 12(b)(6), a court evaluates whether a plaintiff's complaint pleads a cognizable claim. *Gentile v. Fifth Ave. Otolaryngology, Inc.,* 2006 WL 2505915 (N.D.Ohio Aug. 28, 2006). All allegations in the complaint must be taken as true and construed in a light most favorable to the nonmovant. *Ang v. Proctor & Gamble Co.,* 932 F.2d 540, 544 (6th Cir.1991). While the court must accept a plaintiff's factual allegations as true, it "must not accept plaintiff's legal conclusions or unwarranted factual inferences as true." *Gentile,* 2006 WL 2505915, at *3 (citing *Lewis v. ACB Bus. Servs.,* 135 F.3d 389, 405-06 (6th Cir.1998)).

A complaint alleging a conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, must set forth sufficient factual allegations "to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1965, 1974 (2007). To survive a motion to dismiss, the plaintiff must file "a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 1965.Recently, the Supreme Court addressed the sufficiency of pleadings under a Section 1 Sherman Act claim under a Fed.R.Civ.P. 12(b)(6) standard, holding that "we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly,* 127 S.Ct. at 1974. As such, the Court did not mandate a "heightened" pleading of specific facts, but instead held that the facts themselves must "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 1965.It is under the "plausibility standard" set out in *Twombly* that the Defendant airlines contend that the Plaintiffs' antitrust claims must be dismissed.

*2 In *Twombly,* the plaintiffs alleged that the defen-

dants conspired to restrain trade by inflating charges for local telephone and high-speed Internet services. *Id.* at 1962.The plaintiffs contended that there was a lack of meaningful competition in their telephone and Internet markets because the defendants had engaged in parallel conduct to prevent competition. *Id.* at 1962-63.The plaintiffs also stated that they had a "belief" that the defendants entered into a contract, combination or conspiracy to prevent competitive entry in their markets. *Id.* at 1963.In examining "what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act," the Court determined that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made."Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."*Id.* at 1965.The Court went on to hold that "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy ... when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement."*Id.* at 1966.

In applying the plausibility standard to the complaint, the Court concurred with the district court that the complaint failed because the plaintiffs based their claims on descriptions of parallel conduct, "and not on any independent allegation of actual agreement among [the defendants]."*Id.* at 1970.The Court noted that the basis of the complaint concerned the alleged parallel conduct of the defendants to keep competitors out of their markets and implied that those actions demonstrated an illegal agreement on the part of the defendants. *Id.* at 1970-71.The Court therefore found that the supposed agreement between the defendants to disobey the 1996 Telecommunications Act was more of a natural and "unilateral reaction" of each defendant to resist competition, and that such individual actions by the defendants did not "plausibly suggest" an agreement or conspiracy by the defendants. *Id.* at 1971.Lastly, the Court emphasized that "we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face," stating that in a complaint a plaintiff must "nudge" its § 1 claim "across the line from conceivable to plausible."*Id.* at 1973.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2007 WL 3171675 (N.D.Ohio), 2007-2 Trade Cases P 75,933
 (Cite as: 2007 WL 3171675 (N.D.Ohio))

In the instant case, Defendants request that in light of *Twombly,* the Court now determine whether Plaintiffs' Amended Complaint should be dismissed for failure to state a claim under FRCP 12(b)(6).

## III. LAW AND ANALYSIS

The Court's construction of the Amended Complaint and Defendant's Motions to Dismiss reveals four distinct arguments: (1) Plaintiffs have failed to demonstrate parallel conduct with respect to AWA, Alaska, AGA, Frontier, and Horizon; (2) Plaintiffs failed to allege any facts regarding KLM's participation in the alleged conspiracy; (3) Defendants Delta, United and Northwest's assertion that Plaintiffs' Amended Complaint should be dismissed because they have been discharged in bankruptcy; and (4) Plaintiffs have not plead sufficient facts that "plausibly suggest" an agreement or conspiracy. The Court will address each set of arguments in turn.

### A. AWA, Alaska, Frontier, and Horizon

*3 Defendants AWA, Alaska, Frontier and Horizon [FN4] contend that Plaintiffs are unable to demonstrate that they acted in parallel to reduce and eliminate travel commissions between 1995 and 2002. As stated earlier, the Court made clear in *Twombly,* "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* While the larger airlines focus on the allegations necessary to suggest the required context for a conspiracy claim (commonly referred to as "plus factors"), Defendants AWA, Alaska, Frontier, and Horizon assert that Plaintiffs have failed to demonstrate parallel conduct because AWA, Alaska, Frontier, and Horizon did not have the same role in the reduction of travel agent commissions.

> FN4. Plaintiff also names Alaska Air Group ("AGA"), a holding company, as a Defendant. AGA is mentioned by name only once in the Amended Complaint. As a holding company, Defendant AGA points out, it did not pay commissions to travel agents. (Dkt.# 148). Therefore, Plaintiffs claims against AGA must be dismissed because there is no

factual matter to plausibly suggest that AGA joined or participated in an unlawful conspiracy. *Twombly* 127 S.Ct. at 1956.

Plaintiffs allege that Defendants conspired to cap or cut the travel agent commissions on six separate occasions: 1995, 1997, 1998, 1999, 2001, and 2002.

### 1. 1995

In the Amended Complaint, Plaintiffs allege that in 1995, Delta, American, Northwest, United and Continental imposed a cap of $25 for one-way domestic tickets and $50 for round-trip domestic tickets. (Amend.Compl.¶ 31). Plaintiffs do allege, however, that AWA, Alaska, Frontier, and Horizon imposed caps at this time.

### 2. 1997

Between September 18 and 25, 1997, United, American, Delta, Northwest, Continental, U.S. Airways, the airlines reduced commissions from 10 to 8 percent. (Amend.Compl.¶ 34, 41). AWA reduced commissions a few days later, on September 29th and Alaska followed suit on September 30th. (Amend.Compl.¶ 40). Frontier, however, did not reduce commissions until March 2008. (Amend.Compl.¶ 41).

### 3. 1998

Between November 12 and December 2, 1998, United, American, Delta, Northwest, Continental and U.S. Airways imposed a cap on commissions on international tickets. (Amend.Compl.¶ 43-39). The Amended Complaint does not allege that AWA, Alaska, Frontier, and Horizon implement such a cap on international commissions at this time.

### 4. 1999

On October 7, 1999, United reduced commissions again from 8 to 5 percent. (Amend.Compl.¶ 51). American instituted the same reduction on October 8, with Delta and Northwest following on October 11. (Amend.Compl.¶ 52-54). Continental and U.S. Airways then reduced commissions to 5 percent on October 12. (Amend.Compl.¶ 55-56). AWA and Alaska followed suit on October 18, and Frontier implement the reduction on November 2. (Amend.Compl.¶ 57-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                Page 4
Not Reported in F.Supp.2d, 2007 WL 3171675 (N.D.Ohio), 2007-2 Trade Cases P 75,933
**(Cite as: 2007 WL 3171675 (N.D.Ohio))**

59).

**5. 2001**

On August 18, 2001, American capped commissions payable to travel agents on domestic flights at $10 and $20 for one-way and round-trip flights, respectively. (Amend.Compl.¶ 61). On August 22, United and Delta implemented an identical cap, and Northwest and U.S. Airways followed suit the next day. (Amend.Compl.¶ 64, 66). Continental and AWA announced their intention to implement the cap. (Amend.Compl.¶ 65, 67). Frontier and Alaska did not follow until September 4 and November 1, respectively. submit evidence that they did not impose the commission cap until nearly three weeks later. (Amend.Compl.¶ 68, 69).

**6. 2002**

*4 On March 14, 2002, Delta announced their intention to eliminate the travel agents' commissions completely. (Amend.Compl.¶ 71). On March 18, American and Continental did the same. (Amend.Compl.¶ 72, 75). Northwest followed the next day, and United eliminated the commissions on March 20. (Amend.Compl.¶ 73, 74). On March 21, U.S. Airways and AWA followed suit. (Amend.Compl.¶ 76, 77). On May 31, 2002, Frontier and Alaska also eliminated commissions completely. (Amend.Compl.¶ 78, 79).

The above named airlines allege that on the six occasions they either: (1) did not follow the commission moves of their larger competitors at all; (2) when they did implement caps or cuts similar to those implemented by larger airlines, they followed the commission moves only after periods ranging from several weeks to six months; or (3) only implemented the caps or cuts partially.

"One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry." *Reserve Supply Corp. v. Owens Corning Fiberglas Corp.,* 971 F.3d 37, 53 (7th Cir.1992); *United States v. Int'l Harvester Co.,* 274 U.S. 693, 708-709 (1927) ("The fact that competitors may see proper, in the exercise of their own judgment, to follow the prices of another [firm] does not establish any suppression of competition or show any sinister domination."). Plaintiffs have not put forth any "fac-

tual matter" suggesting that AWA, Alaska, Frontier, and Horizon engaged in parallel conduct because. according to the Amended Complaint, the four airlines either failed to implement the caps entirely or implemented the caps after the larger airlines. *Twombly,* 127 S.Ct. at 1965 ("stating a claim requires a complaint with enough factual matter (taken as true) to suggest agreement was made."). Absent such evidence, Plaintiffs claims against AWA, Alaska, Frontier, and Horizon must fail.

**B. KLM**

KLM asserts that Plaintiffs' Amended Complaint fails to allege that KLM "reduce[d], cap[ped] and eliminate[d] commissions paid to travel agencies and travel agents" at any time. (Amend.Compl.¶ 32). As KLM points out, the Amended Complaint does not allege any specific action taken by KLM. (Dkt.# 1144). The only appearance of KLM in the Amended Complaint, other than its identification as a Defendant, is the allegation that KLM was represented at three trade association meetings. (Amend.Compl.¶ 97, 98, 101). Because Plaintiffs failed to allege that KLM engaged in parallel conduct, the claims against KLM must also be dismissed.

**C. Bankruptcy**

Northwest, United, and Delta allege that Plaintiffs' Amended Complaint must be dismissed because it asserts a claim that has been discharged by the bankruptcy court. Delta, Northwest, and United point out that their reorganization plans were confirmed in 2007, 2005 and 2006, respectively. (Dkt.# 143, 145, 150).[FN5] The commission reductions alleged by Plaintiffs, however, occurred between 1995 and March 2002. Therefore, Defendants assert that Plaintiffs' claims must be dismissed because they accrued in 2002, prior to Defendants' discharge in bankruptcy.

> FN5. Northwest, United and Delta each petitioned for Chapter 11 bankruptcy and had their reorgnization plan approved by the bankruptcy court. On December 9, 2002, United petitioned for Chapter 11 bankruptcy. On January 20, 2006, the bankruptcy court confirmed United's reorganization plan, which became effective February 1, 2006. (Dkt.# 150). On September 14, 2005, Delta filed a petition for bankruptcy in

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                 Page 5
Not Reported in F.Supp.2d, 2007 WL 3171675 (N.D.Ohio), 2007-2 Trade Cases P 75,933
**(Cite as: 2007 WL 3171675 (N.D.Ohio))**

United States Bankruptcy Court for the Southern District of New York. On April 25, 2007, the Bankruptcy Court entered an order confirming the reorganization plan, effective April 30, 2007. (Dkt.# 145). On September 25, 2005, Northwest filed a Notice of Bankruptcy and the instant case was stayed against Northwest pursuant to <u>section 362 of the Bankruptcy Code, 11 U.S.C. § 362(a)(1)</u>.

## 1. Public Records

\*5 Normally, when conducting a review of a 12(b)(6) motion to dismiss, the Court cannot consider facts outside the pleadings. In the instant case, Defendants attached to their Motions to Dismiss, copies of orders surrounding Defendants bankruptcy petitions. These orders are public records from United States Bankruptcy Courts and, therefore, possess the requisite level of reliability. Although the Court "must only take judicial notice of facts which are not subject to reasonable dispute," Plaintiffs refer to the bankruptcy proceedings in the Amended Complaint. *Passa v. City of Columbus,* 123 Fed. Appx. 694, 697 (6th Cir.2005). As a result, consideration of the attachments does not require conversion of the motion into one for summary judgment under Rule 56. *Wyser-Pratte,* 413 F.3d at 560;*see also Palay v. United States,* 349 F.3d 418, 425 n. 5 (7th Cir.2003) (a district court is entitled to take judicial notice of matters in the public record). Therefore, the Court may review the public records relied upon by Defendants.

## 2. Continuing Antitrust Violation

Plaintiffs argue that even though Defendants were discharged in bankruptcy after the 2002 commission reduction, the alleged conspiracy to eliminate the travel agents' commissions was a "continuing conspiracy" because the airlines "continued to abide bye the conspiracy" after the commissions were capped in 2002. (Dkt.# 152).

"In the context of a continuing conspiracy to violate the antitrust laws," a cause of action accrues "each time a plaintiff is injured by an act of the defendants." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971)."Thus, 'even when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt

act.' " *Peck v. General Motors Corp.,* 894 F.2d 844, 849 (6th Cir.1990) (quoting *Pace Indus., Inc. v. Three Phoenix Co.,* 813 F.2d 234, 237 (9th Cir.1987)).

For purposes of claim accrual, the fact that an antitrust plaintiff may suffer continuing damages from an on-going conspiracy is irrelevant. In the antitrust context, "the focus is on the timing of the causes of injury, i.e., the defendant's overt acts, as opposed to the effects of the overt acts."*Id.* Accordingly, accrual of an antitrust claim depends on the commission of an "injurious act" rather than "the abatable but unabated inertial consequences" of that act. *Barnosky Oils, Inc. v. Union Oil Co. of California,* 665 F.2d 74, 81 (6th Cir.1981) (quoting *Poster Exchange, Inc. v. National Screen Service Corp.,* 517 F.2d 117, 128 (5th Cir.1975)). Although continuing damages may of course be recovered, "if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date." *Zenith,* 401 U.S. at 339.

\*6 Plaintiffs' Amended Complaint alleges that after the three airlines emerged from bankruptcy, they "had knowledge" of the alleged conspiracy, "ratified" the alleged conspiracy by failing to change its policies, and has "never taken any action to disavow" the alleged conspiracy. (Amend.Compl.¶ 116-118). To give rise to a new cause of action, "an overt act must have two elements: 1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff." *Martinez v. Western Ohio Health Care Corp.,* 872 F.Supp. 469, 472 (S.D.Ohio 1994); *see also Grand Rapids Plastics, Inc. v. Lakian,* 188 F.3d 401, 406 (6th Cir.1999); *DXS, Inc. v. Siemens Med. Sys., Inc.* 100 F.3d 462, 467-68 (6th Cir.1996); *Pace,* 813 F.2d at 238 (9th Cir.1987). Thus, even if the airlines continued to participate in the conspiracy alleged by plaintiffs after having emerged from bankruptcy, that fact alone would not give rise to a new antitrust claim. *See, e.g., Varner v. Peterson Farms,* 371 F.3d 1011, 1019 (8th Cir.2004) (where allegedly anticompetitive conduct was pursuant to previously agreed-upon contract, conduct did not give rise to antitrust claim, which had already accrued when contract was signed); *Kaw Val-*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2007 WL 3171675 (N.D.Ohio), 2007-2 Trade Cases P 75,933

**(Cite as: 2007 WL 3171675 (N.D.Ohio))**

*ley Elec. Coop. Co. v. Kan. Elec. Power Coop., Inc.,* 872 F.2d 931, 933 (10th Cir.1989) (continued conduct based on previously taken final decision does not create new antitrust claim); *Garelich v. Goerlich's, Inc.,* 323 F.2d 854, 856 (6th Cir.1963) (continuation of previously initiated conduct does not give rise to a new antitrust claim); *Martinez, 872 F.Supp. at 472* (antitrust defendant's continued adherence to a prior, allegedly unlawful decision, did not give rise to a new claim because the plaintiffs "continue to suffer the same injury that was previously inflicted upon them, albeit in an ever increasing amount").

Plaintiffs allege that Delta, Northwest, and United "conformed" their "commission levels and caps" to those of the co-conspirators when it exited from Chapter 11. (Amend.Compl.¶ 118). But that post-Chapter 11 "conformance" consisted solely of the airlines continuing the same commission policies that it had followed for years, both before and during its Chapter 11 proceeding. Therefore, Plaintiffs are unable to demonstrate an overt act other than the alleged commission reduction in 2002.

**3. Pre-petition Debt**

The formerly bankrupt Defendants assert that because Plaintiff's claim accrued in 2002, it is a pre-petition debt that cannot be brought against them. The Bankruptcy Code clearly provides that the confirmation of a reorganization plan discharges "any debt" owed by the debtor as of the date of confirmation, unless such plan provides otherwise. 11 U.S.C. § 1141(d)(1) ("Except as otherwise provided ... in the plan, ... the confirmation of a plan ... discharges the debtor from any debt that arose before the date of such confirmation ... whether or not ... the holder of such claim has accepted the plan....").

*7 Delta, Northwest, and United's alleged liability to Plaintiffs constitutes a "debt" within the meaning of the Bankruptcy Code. The term "debt" is defined to mean "liability on a claim." 11 U.S.C. § 101(12). The term "claim" is, in turn, broadly defined to mean a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5). As the Supreme Court has noted, "Congress intended by this language to adopt the

broadest available definition of 'claim.' " *Johnson v. Home State Bank,* 501 U.S. 78, 83 (1991); *see also In re Jensen,* 995 F.2d 925, 930 (9th Cir.1993). Congress adopted an all-encompassing definition of "claim" so that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case." H.R. REP. NO. 95-595, at 309 (1977). Accordingly, Plaintiffs' antitrust claims "constitute bankruptcy 'claims' within the meaning" of the Bankruptcy Code. *In re Penn Central Transp. Co.,* 771 F.2d 762, 766 (3d Cir.1985).

The court-approved bankruptcy plans for Delta, United, and Northwest specifically provide that all pre-petition claims against the respective airlines were discharged. (Dkt. # 150, Ex. A to Ex. 1, discharging against United, "Claims and Causes of Action of any nature whatsoever, ... whether known or unknown, against ... the Debtors ..., including without limitation ... Causes of Action that arose before the Confirmation Date"); (Dkt. # 143, the Northwest plan provides that "all holders of claims ... along with their respective present or former employees, agents, officers, directors or principals, shall be enjoined from taking any action to interfere with the implementation or consummation of the Plan.); (Dkt. # 145, *See id.* ¶ 78 (Delta's plan provides that, "upon the Effective Date, all existing claims against the Debtors and Interests in the Debtors shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Interests shall be precluded and enjoined from asserting against the Reorganized Debtors.")

Because the three airlines were discharged in bankruptcy proceedings, Plaintiffs are permanently enjoined from pursuing their antitrust claim against Delta, Northwest, and United. By statute, the discharge of a debt "operates as an injunction against the commencement or continuation of an action to collect [or] recover ... any such debt."11 U.S.C. § 524(a)(2).

**D. Joint Motion to Dismiss**

Plaintiffs attempt to meet the *Twombly* standard against the remaining Defendant airlines-Continental and United-by pointing to five separate facts that suggest a conspiracy: (1) averments of parallel conduct; (2) opportunity to conspire; (3) evidence that the actions were against Defendants' self-interest; (4)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

evidence that information regarding the reduction of travel agent commissions was common knowledge; and (4) industry practice.

**1. Gunn Deposition**

**\*8** Before proceeding to the legal analysis, it is necessary to address whether the deposition of American's executive Michael W. Gunn ("Gunn") is properly before the Court. Plaintiff's Amended Complaint refers to portions of Gunn's testimony. (Amend.Compl.¶ 87). Defendants respond in their Motions to Dismiss, by referring to additional portions of Gunn's testimony that were not included in the Amended Complaint. (Dkt.# 144).

As discussed with respect to the bankruptcy Defendants, Rule 12(b) of the Federal Rules of Civil Procedure provides that if "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."Under certain circumstances, however, a document that is not formally incorporated by reference or attached to a complaint may still be considered part of the pleadings. *See* 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.30[4] (3d ed.1998). This occurs when "a document is referred to in the complaint and is central to the plaintiff's claim...."*Id.*In such event, "the defendant may submit an authentic copy to the court to be considered on a motion to dismiss, and the court's consideration of the document does not require conversion of the motion to one for summary judgment."*Id.; see, e.g., Weiner v. Klais & Co.,* 108 F.3d 86, 89 (6th Cir.1997) (considering pension plan documents that defendant attached to the motion to dismiss part of the pleadings because the documents were referred to in the complaint and were central to plaintiff's claim for benefits under the plan).

In the present case, the portions of Gunn's deposition referred to in the Amended Complaint are not "matters outside the pleadings." The deposition is referred to throughout the Amended Complaint and is central to the Plaintiffs' claims. The Court's consideration of the policies, therefore, does not require conversion of Defendants' motions to dismiss into a motions for summary judgment. See *Weiner,* 108 F.3d at 89. Fur-

thermore, when "a document is referred to in the complaint and is central to the plaintiff's claim," the defendant "may submit an authentic copy to the court to be considered on a motion to dismiss, and the court's consideration of the document does not require conversion of the motion to one for summary judgment."*Id.* Therefore, the Court will also Consider Defendant's copy of Gunn's July 31, 2007 deposition attached to their motion to dismiss. (Dkt.# 144, Ex. 3).

**1. Parallel Conduct**

In the Amended Complaint, Plaintiffs added a section titled "Simultaneity and Uniformity of Commission Cuts and Caps."Paragraph 28 states that "at a time unknown to Plaintiffs, Defendants, through their top executives and Chief Officers, agreed that they would collectively act to cap, reduce and ultimately eliminate commissions paid to travel agents for the sale of airline tickets. (Amend.Compl.¶ 28).

**\*9** As the Court pointed out in *Twombly,*"a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly,* 127 S.Ct. at 1966. There must be more than "a few stray statements [that] speak directly of agreement." *Id.* at 1970.For example, the plaintiffs in *Twombly* alleged that "ILECs engaged in a 'contract, combination or conspiracy' and agreed not to compete with one another."*Id.* The Court held that "on fair reading ... [those] are merely legal conclusions."*Id.* Similarly, in *In re Elevator Antitrust Litig.,* the court held that, "averments of agreements made at some unidentified place and time ... are insufficient to establish a plausible inference of agreement, and therefore to state a claim."

Plaintiffs' Amended Complaint alleges that Defendants took parallel actions to reduce or limit commissions paid to travel agents on six occasions, pointing to similar pricing and proximity in time as indications that Defendants conspired. As stated earlier, *Twombly* requires more than averments of parallel conduct, and "without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief." *Twombly,* 127 S.Ct. at 1966. Therefore, Plaintiffs assertion of parallel conduct alone is not enough to meet the requirements under *Twombly.*As a result, the Court will now

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                      Page 8
Not Reported in F.Supp.2d, 2007 WL 3171675 (N.D.Ohio), 2007-2 Trade Cases P 75,933
(Cite as: 2007 WL 3171675 (N.D.Ohio))

turn to the additional factual assertions Plaintiffs of-
fer as evidence of the conspiracy.

**2. Opportunities to Conspire**

The Amended Complaint also includes an "Opportu-
nities for Defendants to Combine and Conspire" Sec-
tion. Specifically, Plaintiffs allege that Defendants
met frequently during the period when the cuts and
caps were allegedly negotiated. (Amend.Compl.¶ 90-
102). Additionally, Plaintiffs point out that Defen-
dants had the opportunity to conspire at private meet-
ings (Amend.Compl.¶ 92); through industry associa-
tions (Amend, Compl.¶ 93, 95, 97, 98); at trade shoes
(Amend.Compl.¶ 96); through jointly formed busi-
ness ventures (Amen.Compl. ¶ 99); and while playing
golf (Amend.Compl.¶ 102).

Proof that Defendants had an opportunity to conspire
does not satisfy Plaintiff's burden of proving a price-
fixing agreement, *Petruzzi's IGA Supermarkets, Inc.
v. Darlin-Delaware Co.,* 998 F.2d 1224, 124 n. 15
(3rd Cir.1993) ("Proof of opportunity to conspire,
without more, will not sustain an inference that a
conspiracy has taken place."); *Weit v. Continental
Illinois National Bank,* 641 F.2d 457, 468-469 (7th
Cir.1981) (affirming directed verdict and noting that
evidence that "points of contact or relationships for
promotion of mutual interest existed among the de-
fendants" did not give rise to an reasonable inference
of conspiracy). Plaintiffs assertion of an opportunity
to conspire, without more, does not suggest that there
was an agreement to reduce commissions.

**3. Against Self-Interest**

**\*10** In a section of the Amended Complaint titled
"Commission Cuts Against Defendants' Individual
Self-Interest," Plaintiffs allege that "any airline uni-
laterally [reducing or capping travel agent commis-
sions] would suffer a substantial loss of business
when travel agents directed their customers to other
airlines      that      had      not      reduced    and/or
capped."(Amen.Compl.¶ 81). Plaintiffs support is not
grounded in fact but merely a conclusory statement
that airlines would reduce or cap commissions "only
if a common understanding existed."*Id.* Plaintiffs
only rely on United and American's failed attempt to
institute commission reductions in the 1980s.
(Amend.Compl.¶ 85). Plaintiffs also allege that:

On July 31, 2007, Michael Gunn, former Executive
Vice President of Marketing and Planning of
American testified that 'industry consensus' on new
commission levels was necessary for the commis-
sion cuts and caps to hold. Mr. Gunn further testi-
fied that if any other Defendant set commission
rates either above or below the new level, other
Defendants would be forced to rescind the cuts.
Mr. Gunn further testified that he had to match
commission cuts exactly or he would undercut the
movement by Defendants to reduce and cap com-
missions.

(Amend.Compl.¶ 87). Defendants, however, cite a
portion of Gunn's deposition transcript to counter
Plaintiffs' assertion that "industry consensus" was
necessary for commission cuts and caps to hold:

Q: And that-would you agree that the most important
issue was to gain the industry consensus that the
commissions need to go down?

A: No. I think the issue is we made a decision to cut
the commissions. I hoped like heck that the com-
petitors would follow, and to succeed they would
have to follow. But that's their choice.

Q: But that was the most important issue, that you
had to gain industry consensus that the commis-
sions need to go down. Otherwise, any effort by
you would be futile.

A: I don't think there was an issue. Maybe we are
debating terminology here. It's not an issue of con-
sensus. It's the issue of we initiated. If others fol-
lowed, it would [succeed]. If they didn't, there was
a likelihood it would not succeed.

Q: Consensus means to you common agreement,
doesn't it? Isn't that what consensus means?

A: That sounds fair.

Q: It was, in fact, represented to you by another per-
son at American that in order for these reductions
of commissions to work that you had to get com-
mon agreement of the industry; that was the most
important thing?

A: I would respond again that my belief is you have
to be matched if the cut is to be [successful]. But I

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

don't know I don't care if there's a common agreement or other. All I care about is how people behave if I do something or how I believe if they do something. To me that's not consensus. That's taking a common action after the fact which is to me a lot different than consensus. Consensus speaks to prior agreement. There certainly wasn't any prior agreement in these cases.

*11 (Dkt.144, Ex. 5).

To support an inference of conspiracy, "evidence of action that is against self-interest or motivated by profit must go beyond mere interdependence ... [and] must be so unusual that in the absence of an advance agreement, no reasonable firm would have engaged in it ." _Baby Food Antitrust Litigation,_ 166 F.3d 112, 135 (3d Cir.1999). The Sixth Circuit has also found that actions taken against self-interest are but one of several "plus factors" in analyzing anticompetitive behavior. See _Re/ Max Int'l, Inc. v. Realty One,_ Inc., 173 F.3d 995, 1009 (6th Cir.1999) (setting forth factors relevant in determining whether circumstantial evidence tends to exclude independent conduct and finding that a plaintiff's circumstantial evidence "must tend to exclude the possibility of independent conduct"). Gunn's deposition testimony indicates that, although each Defendant airline hoped the others would match the commissions reductions because it would be more economically beneficial, there was no agreement or conspiracy to do so.

**4. Common Knowledge**

Plaintiffs also allege that each Defendant knew that the other airlines were reducing and capping travel agent commissions because the information was common knowledge. (Amend.Compl.¶ 27, 29, 30). However, the Supreme Court has held that "the exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." _United States v. U.S. Gypsum Co.,_ 438 U.S. 422, 443 n. 16, 57 L.Ed.2d 854, 98 S.Ct. 2864 (1978). The Court does not find the availability of Defendants' commission rates for all to see as possible evidence of a conspiracy.

**5. Industry Practice**

Finally, Plaintiffs allege that a series of price fixing cases and investigations support their allegations that the airlines conspire to reduce the commissions of the travel agents. (Amend.Compl.¶ 22-25). For example, Plaintiffs refer to the government investigation of a conspiracy involving computer reservation systems from the "late 1980s and early 1990s."(Amend.Compl.¶ 24). Plaintiffs also mention a current investigation of "a) a conspiracy to fix air-cargo rates, b) a cartel affecting fuel surcharges on passenger flights between Europe and the U.S., and c) a cartel involving surcharges on flights in Asia."(Amend.Compl.¶ 25).

In _Hall v. United Airlines,_ 296 F. Supp 2d 652, a case that also involved an alleged Sherman Act Section 1 conspiracy regarding the reduction and elimination of travel agent base commissions paid by airlines, the district court found that past instances of collusion or alleged collusion are not relevant to an instant claim of conspiracy:

   [T]here appears to be "no case law ... where 'history of collusion' is used as a plus factor courts consider in cases alleging illegal collusion in an oligopolistic market. The ... 'history of collusion' in the industry does not tend to exclude the possibility that Defendants were engaged in lawful conduct during" the period relevant to the complaint.

*12 _Hall,_ 296 F.Supp.2d 662 (citing _Williamson Oil Co., et al. v. Philip Morris Cos., et al.,_ 231 F.Supp.2d 1253, 1305 (N.D.Ga.2002), aff'd sub nom. _Williamson Oil Co. v. Philip Morris USA,_ 346 F.3d 1287 (11th Cir.2003)); aff'd _Hall v. Am. Airlines, Inc.,_ 118 Fed. Appx. 680, 683 (4th Cir.2004).

The _Hall_ court further held that "attempts to offer background of the 'anticompetitive conduct of the [airline] industry' by describing investigations by the U.S. Department of Justice and other legal action taken against the airline industry relating to various forms of alleged anti-competitive conduct" is "not only completely immaterial to plaintiff's claim, but is also arguably prejudicial and these paragraphs will be stricken from the complaint."_Id._

**IV. CONCLUSION**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2007 WL 3171675 (N.D.Ohio), 2007-2 Trade Cases P 75,933
**(Cite as: 2007 WL 3171675 (N.D.Ohio))**

Page 10

For the foregoing reasons, Plaintiffs have failed to meet the pleading standards enunciated in *Twombly.*Therefore, Defendants Motions to Dismiss are **GRANTED.**(Dkt.# 142, 144, 145, 146, 147, 148, 150, 166). As Plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted, the instant case is hereby **DISMISSED.**

**IT IS SO ORDERED.**

N.D.Ohio,2007.
In re Travel Agent Com'n Antitrust Litigation
Not Reported in F.Supp.2d, 2007 WL 3171675 (N.D.Ohio), 2007-2 Trade Cases P 75,933

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# Exhibit 4



LEXSEE 2008 U.S. DIST. LEXIS 46927

**E. & J. GALLO WINERY, Plaintiff, v. ENCANA ENERGY SERVICES, INC., a Delaware corporation, formerly known as PANCANADIAN ENERGY SERVICES INC.; ENCANA CORPORATION, a Canadian corporation, formerly known as and successor to PANCANADIAN ENERGY CORPORATION, Defendants**

**CV F 03-5412 AWI LJO**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA**

*2008 U.S. Dist. LEXIS 46927*

**May 23, 2008, Decided**
**May 27, 2008, Filed**

**PRIOR HISTORY:** *E. & J. Gallo Winery v. EnCana Energy Servs., 2005 U.S. Dist. LEXIS 40141 (E.D. Cal., Aug. 15, 2005)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff wine company sued defendants, a Canadian producer of natural gas (parent company) and a wholly-owned marketing subsidiary, alleging multiple antitrust and unfair competition claims under both federal and state law. Plaintiff moved for partial summary judgment on liability of the parent company under a theory of principal/agent.

**OVERVIEW:** Plaintiff alleged that the parent company designated the subsidiary as the exclusive marketer of its natural gas in the United States (U.S.). Plaintiff further alleged that the parent company set the transfer pricing to the U.S. in 1998 at a Canadian index price plus the cost of the long term pipeline commitments without any negotiations with the subsidiary. Then, when California prices reached record levels, the parent company changed the pricing to U.S. index prices and reaped more than $ 50 million of additional profits on gas shipped on the pipeline to California. The district court found that how the parties or entities referred to themselves or one another was not determinative of a principal/agent relationship. The setting of an overall ethics policy by the parent company that was applicable to its subsidiaries was an important part of its risk management policy and lay well within the parent company's accepted authority to set general policies and procedures without transform-

ing the parent/subsidiary relationship to a principal/agent relationship. Plaintiff failed to show that the parent company had operational control over the subsidiary.

**OUTCOME:** The motion for partial summary judgment was denied.

**CORE TERMS:** subsidiary, material facts, marketing, undisputed, proffered, natural gas, pipeline, principal agent relationship, agency relationship, marketer, summary judgment, moving party, entity, matter of law, producer, infer, negotiation, operational, non-moving, predecessor, summarized, undisputed facts, opposing party, deposition, pricing, long-term, proffer, senior, alter ego, hedging

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN1] Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c).*

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*

[HN2] Under summary judgment practice, the moving party always bears the initial responsibility of informing and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
[HN3] With regard to a motion for summary judgment, when the moving party has the burden of proof at trial, that party must carry its initial burden at summary judgment by presenting evidence affirmatively showing, for all essential elements of its case, that no reasonable jury could find for the non-moving party. If the party moving for summary judgment bears the burden of proof on an issue, he cannot prevail unless the evidence that he provides on that issue is conclusive.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
[HN4] With regard to a motion for summary judgment, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *Fed. R. Civ. P. 56(e)*. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Standards > Appropriateness*
[HN5] With regard to a motion for summary judgment, in the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial. Thus, the purpose of summary judgment is to

pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. *Fed. R. Civ. P. 56(e)* advisory committee's note on 1963 amendments.

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
[HN6] In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. *Fed. R. Civ. P. 56(c)*. The evidence of the opposing party is to be believed and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.

*Business & Corporate Law > Corporations > General Overview*
*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Alter Ego > General Overview*
*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Single Business Enterprise*
[HN7] The law allows corporations to organize for the purpose of isolating liability of related corporate entities. Only in unusual circumstances will the law permit a parent corporation to be held either directly or indirectly liable for the acts of its subsidiary. Among the "unusual circumstances" where the law will hold a parent corporation liable for the acts of a subsidiary are: (1) where the circumstances of the organization of the two entities are such that the corporate form should be disregarded (often referred to as "alter ego" liability); (2) where the subsidiary acts as an agent of the parent corporation; and, (3) where the parent corporation aids, abets or ratifies the acts of the subsidiary corporation.

*Antitrust & Trade Law > General Overview*
*Antitrust & Trade Law > Trade Practices & Unfair Competition > State Regulation > General Overview*
*Business & Corporate Law > Agency Relationships > Duties & Liabilities > Authorized Acts of Agents > Liability of Principal*
[HN8] With regard to claims under California's Cartwright Act, *Cal. Bus. & Prof. Code § 16720, et seq.*, and California's Unfair Competition Law, *Cal. Bus. & Prof. Code § 17200 et seq.*, a principal may be held liable for the unlawful anti-competitive acts of an agent where the

agent has "actual or ostensible authority." *Cal. Civil Code § 2330.*

***Business & Corporate Law > Agency Relationships > Establishment > Proof of Agency > General Overview***
[HN9] The determination of whether a principal/agent relationship exists under state law requires the same analysis as is required under federal common law.

***Business & Corporate Law > Agency Relationships > Establishment > Proof of Agency > General Overview***
***Business & Corporate Law > Corporations > General Overview***
***Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Single Business Enterprise***
[HN10] The independence of a subsidiary from the parent corporation is to be presumed. In order to overcome the presumption that a subsidiary is independent of the parent company, a plaintiff will be required to show that the subsidiary is so extensively controlled by the parent company that a relationship of principal and agent is created.

***Business & Corporate Law > Agency Relationships > Establishment > Elements > General Overview***
[HN11] Agency is defined as the fiduciary relationship that arises when one person (a principal) manifests assent to another person (an agent) that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.

***Business & Corporate Law > Agency Relationships > Establishment > Elements > General Overview***
***Business & Corporate Law > Corporations > General Overview***
[HN12] To demonstrate that an agency relationship exists between a parent company and a subsidiary, a plaintiff must show that: (1) there was a manifestation by the parent company that the subsidiary would act on the parent company's behalf; (2) the subsidiary accepted or consented to so act; and, (3) that it was understood that the parent company would be in control of the subsidiary's undertaking on the parent company's behalf.

***Business & Corporate Law > Agency Relationships > Duties & Liabilities > Authorized Acts of Agents > Liability of Principal***

***Business & Corporate Law > Agency Relationships > Duties & Liabilities > Negligent Acts of Agents > Liability of Principals***
***Business & Corporate Law > Agency Relationships > Ratification > Liabilities***
[HN13] With respect to the acts of an agent giving rise to liability against the principal, the principal may be held directly liable if the agent acts with actual authority or the principal ratifies the agent's conduct. The principal may be held vicariously liable for the acts of an agent where the agent is an employee who commits a tort or tort-like act while acting within the scope of employment, or where the employee acts with apparent authority on behalf of the principle.

***Business & Corporate Law > Agency Relationships > Establishment > Proof of Agency > General Overview***
[HN14] The common law of agency clearly establishes that how the parties or entities refer to themselves or one another is not determinative of a principal/agent relationship. An agency relationship arises only when the elements stated in the Restatement (Third) of Agency are present. Whether a relationship is characterized as agency in an agreement between parties or in the context of industry or popular usage is not controlling.

***Business & Corporate Law > Agency Relationships > Establishment > Proof of Agency > Burdens of Proof***
***Business & Corporate Law > Agency Relationships > Establishment > Proof of Agency > Questions of Fact & Law***
[HN15] Whether a relationship is one of agency is a legal conclusion made after an assessment of the facts of the relationship and the application of the law of agency to those facts. Although agency is a consensual relationship, how the parties to any given relationship label it is not dispositive. Nor does party characterization or nonlegal usage control whether an agent has an agency relationship with a particular person as principal. The parties' reference to functional characteristics may, however, be relevant to determining whether a relationship of agency exists. The party asserting that a relationship of agency exists generally has the burden in litigation of establishing its existence.

***Business & Corporate Law > Agency Relationships > Establishment > Elements > Manifestation by Principal***
***Business & Corporate Law > Corporations > General Overview***
[HN16] Although the terms used by a parent and a subsidiary to refer to themselves or each other are not determinative of an agency relationship, such facts may go

to support the arguments of the party asserting an agency relationship that one party manifested intent that the other should act on its behalf, and the other party assented.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Absence of Essential Element of Claim*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
[HN17] Although the moving party that would have the burden of production and proof at trial is sometimes described as carrying a "relatively heavier burden" in the context of a motion for summary judgment, the difference is actually one of quantity of proof rather than standard of proof. Where the moving party would bear the burden of production and persuasion as to a claim or affirmative defense at trial, the moving party must affirmatively prove the lack of any issue of material fact as to each element of the claim/defense pled. The moving party cannot rely on opposing party's lack of evidence where moving party would have burden of production at trial. In the context of making the required affirmative showing, there is no basis for any distinction between the absence of any material issue of fact and the requirement that the moving party must establish beyond peradventure all of the essential elements of the claim/affirmative defense. In each case, the party having the burden must present admissible evidence as to each element of the claim and the opposing party need only produce evidence sufficient to raise a genuine issue of material fact as to any one element in order to defeat the motion. *Fed. R. Civ. P. 56(c).*

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN18] With regard to a motion for summary judgment, a district court does not "weigh evidence" and must make every inference in favor of the non-moving party.

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
[HN19] With regard to a motion for summary judgment, the requirement that a court must make every necessary inference in favor of the non-moving party means that, with respect to every undisputed material fact that relies on an inference in order to support the moving party's contention, the non-moving party need only offer some additional fact that tends to negate the inference in order to defeat the factual support for the motion.

*Business & Corporate Law > Agency Relationships > Establishment > Elements > General Overview*
*Business & Corporate Law > Agency Relationships > Establishment > Proof of Agency > Questions of Fact & Law*
*Business & Corporate Law > Corporations > General Overview*
[HN20] With regard to an agency relationship, the control a principal exerts over a subsidiary must be more than mere ownership of the stock, and more than the supervision of "finance and capital budget decisions" and responsibility for the setting of general policies and procedures for the subsidiary. Proof that the parent corporation appoints members to the subsidiary's board of directors or hires its officers is also not sufficient to establish a principal/agent relationship. The determination of whether a principal/agent relationship exists between a parent corporation and its subsidiary involves a fact-intensive inquiry into the extent to which the parent exercises control over the activities of the subsidiary. There is no agency relationship where the alleged principal has no right of control over the alleged agent.

*Business & Corporate Law > Agency Relationships > Establishment > Elements > General Overview*
*Business & Corporate Law > Corporations > General Overview*
[HN21] How much control the parent company must exert over subsidiary in order for liability to attach against the parent under principal/agent theory is a subject over which courts have long struggled. The question defies resolution by "mechanical formulae" for the inquiry is inherently fact-specific. The type of control that typifies the principal/agent relationship is control over the operations of the agent that lie outside the controls normally imposed by contract between a provider and receiver of services.

*Business & Corporate Law > Agency Relationships > Establishment > Elements > General Overview*
[HN22] The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents. The term "interim instructions" as used by the Restatement (Third) of Agency means instructions that go beyond the scope of instructions of a customer to a provider or a buyer to a seller and that encompass basic and substantial business decisions that would normally be made internally by officers, directors or employees of the subsidiary.

2008 U.S. Dist. LEXIS 46927, *

*Business & Corporate Law > Agency Relationships > Establishment > Elements > Right to Control by Principal*
*Business & Corporate Law > Corporations > General Overview*
[HN23] A review of case law authority indicates there are two basic formulations for the determination of whether a parent company's authority over a subsidiary is such that a principal/agent relationship is established. In the first formulation, the court focuses on the parent corporation's control over the operations of its subsidiary. In this formulation, an agency relationship is proved if a parent corporation exercises such a degree of control over its subsidiary that the subsidiary can legitimately be described as only a means through which the parent acts. As a practical matter, the parent must be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's day-to-day operations in carrying out that policy.

*Business & Corporate Law > Agency Relationships > Establishment > Elements > General Overview*
*Business & Corporate Law > Corporations > General Overview*
[HN24] There are two basic formulations for the determination of whether a parent company's authority over a subsidiary is such that a principal/agent relationship is established. In the second formulation, the court asks whether the subsidiary functions as the parent corporation's representative in that it performs services that are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar service. At an irreductable minimum, the general agency test requires that the agent perform some service or engage in some meaningful activity in the forum state on behalf of its principal such that its presence substitutes for the presence of the principal.

*Business & Corporate Law > Agency Relationships > Establishment > General Overview*
[HN25] Cases that approach the issue of principal/agency relationships in the context of jurisdiction are instructive where the issue is the establishment of liability in that they illustrate the considerations that are relevant to the determination of the principal/agent relationship.

*Business & Corporate Law > Agency Relationships > Establishment > Elements > General Overview*

*Business & Corporate Law > Corporations > General Overview*
[HN26] The representative services doctrine applies where the function the subsidiary is performing assists the parent's own business, but the doctrine does not support jurisdiction where the parent is merely a holding company whose only business pursuit is the investment in the subsidiary. In the context of establishing personal jurisdiction over a foreign party, the United States District Court for the Eastern District of California has used an analytical approach identical to the "representative services doctrine" analysis as set forth in Sonora Diamond Corp. v. Superior court and Doe v. Unocal Corp. It is not true that the issue of control is wholly irrelevant to the general agency test. Rather, it is not the sine qua non of the general agency test.

*Business & Corporate Law > Agency Relationships > Establishment > Elements > Right to Control by Principal*
*Business & Corporate Law > Corporations > General Overview*
[HN27] The determination of whether the amount of control exerted by a parent company over a subsidiary is of a degree and kind that the relationship between the two should be deemed that of a principal/agent is a determination that is not susceptible to analysis by simple formulae. Different control relationships inhere in different multinational structures, and courts lose sight of the economic realities if courts insist on masking these distinctions behind simplistic formulae. The kind of "day-to-day- control," to the extent such a nebulous concept can be made concrete, will vary depending on the kind of subsidiary involved. Thus, while "day-to-day control" might be required to attribute the activities of a relatively autonomous manufacturing subsidiary to its conglomerate parent, this by no means implies such a requirement as to a wholly-owned sales and marketing subsidiary which is the conduit for the sales of a single product in the domestic market. A foreign manufacturing subsidiary selling entirely to its own market and to third countries will obviously have more of a life of its own than a wholly-owned sales and marketing subsidiary.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN28] With regard to a motion for summary judgment, a court may not make inferences in the moving party's favor.

*Business & Corporate Law > Agency Relationships > Establishment > Elements > Right to Control by Principal*
*Business & Corporate Law > Agency Relationships > Establishment > Proof of Agency > General Overview*
*Business & Corporate Law > Corporations > General Overview*

[HN29] The nature of the control exercised by the parent over the subsidiary necessary to put the subsidiary in an agency relationship with the parent must be over and above that to be expected as an incident of the parent's ownership of the subsidiary and must reflect the parent's purposeful disregard of the subsidiary's independent corporate existence. The extent of communications between a parent and a subsidiary, the degree to which the subsidiary's policies are set by the parent, and degree to which parent and subsidiary share officers and directors are important considerations in the determination of whether a principal/agent relationship might exist. However, that some or all of these factors may be present to some degree in a parent/subsidiary relationship is not sufficient to determine that the relationship is one of principal/agent as a matter of law. Parental supervision of finance and capital budget decisions and articulation of general policies and procedures are not indicative of principal/agent relationship. Interlocking directors and officers, consolidation of activities of parent and subsidiary into annual report, provision of legal services between a parent and a subsidiary and underwriting of promissory notes by the parent corporation is usual business practice that is not necessarily indicative of a principal/agent relationship.

*Business & Corporate Law > Agency Relationships > Establishment > General Overview*
*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Alter Ego > General Overview*

[HN30] An alter ego or agency relationship is typified by parental control of the subsidiary's internal affairs or daily operations.

*Business & Corporate Law > Agency Relationships > Duties & Liabilities > General Overview*
*Business & Corporate Law > Corporations > General Overview*
*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Alter Ego > General Overview*

[HN31] With regard to parent companies and subsidiaries, courts should analyze the same factors in determining whether jurisdiction exists under either an alter ego or general agency theory.

*Business & Corporate Law > Agency Relationships > Establishment > Elements > Right to Control by Principal*
*Business & Corporate Law > Corporations > General Overview*

[HN32] The United States District Court for the Eastern District of California in Modesto City Schools v. Riso Kagaku Corp., has carefully distinguished the United States Court of Appeals for the Ninth Circuit's approach to the question of control of the subsidiary by the parent not to suggest that the analysis of day-to-day control of the subsidiary by the parent is irrelevant to the determination of the question of agency, but to show that agency can alternatively be found under what the California courts have called the representative services doctrine.

*Business & Corporate Law > Agency Relationships > Establishment > Elements > General Overview*
*Business & Corporate Law > Agency Relationships > Establishment > Elements > Right to Control by Principal*

[HN33] Risk, compensation, and credit are management issues that lie at the core of corporate decision making and are well within the scope of the parent corporation's right to generally supervise finance and capital budgets and articulate general policies and procedures without establishing a principal/agent relationship.

*Business & Corporate Law > Agency Relationships > Establishment > Elements > General Overview*
*Business & Corporate Law > Agency Relationships > Establishment > Elements > Right to Control by Principal*

[HN34] A parent may set the general policies and procedures of its subsidiary, including conditions that manage risk, without establishing a principal/agent relationship. More broadly, a producer may set certain conditions on a third-party marketer in order to manage the producer's risk. Thus, it would be normal for a producer to contractually require acceptable terms for the sale of its product that could encompass such things as currency requirements, minimum pricing, promotional obligations of the marketer, credit risk exposure, etc.

*Business & Corporate Law > Agency Relationships > Establishment > Elements > General Overview*

[HN35] In requiring certain ethical standards of a marketer, a producer does not necessarily step outside of what conditions would normally be imposed by an arms-length marketing contract with a third party. A producer

might, for example, require that a marketer not falsely advertise its product or make unauthorized warranty representations. Such a requirement serves the risk management requirements of the producer and imposes certain ethical requirements on the marketer without creating a principal/agent relationship.

*Energy & Utilities Law > Gas Industry > Distribution & Sale*

[HN36] With regard to natural gas, in a market where increases in cost can be passed through directly to the consumer, the marketer is not necessarily disadvantaged, and can in some cases be advantaged, by having to pay higher prices to the producer.

*Energy & Utilities Law > Gas Industry > Distribution & Sale*
*Energy & Utilities Law > Transportation & Pipelines > Pipelines > General Overview*

[HN37] With regard to natural gas, long term pipeline commitments benefit the producer by guaranteeing access to marketing destinations and by hedging against the risk of price spikes in the short-term pipeline market. In hedging against the risks of pipeline unavailability or price increases due to competition for volume availability, the long term commitment holder takes on the risk of having to pay the contract price for the pipeline volume whether it is used or not. The holder also takes the risk that the short-term transmission rate might fall below the long-term rate for a long period of time.

*Business & Corporate Law > Agency Relationships > Establishment > General Overview*
*Business & Corporate Law > Corporations > General Overview*

[HN38] A parent company spinning off a subsidiary may broadly set the policies and procedures of that company as well as determine the subsidiary's officers and board members without establishing a principal/agent relationship with the subsidiary.

*Business & Corporate Law > Agency Relationships > Establishment > General Overview*
*Business & Corporate Law > Corporations > General Overview*

[HN39] Arms-length loans between companies are common, and even where a parent intrudes into the business of a subsidiary to the point of acting as guarantor of the subsidiary's promissory notes, the relationship is not necessarily one of principal/agent. A parent guaranteeing

a subsidiary's promissory note is a normal feature of parent-subsidiary relationships.

*Business & Corporate Law > Agency Relationships > Establishment > Elements > General Overview*
*Business & Corporate Law > Corporations > General Overview*

[HN40] With regard to a principal/agency relationship between a parent company and a subsidiary, the United States District Court for the Eastern District of California has listed the following "factors:" (1) percent of the parent's business coming from the resident subsidiary; (2) whether the subsidiary was the parent's only agent in the forum; (3) whether the parent conducted any marketing in the forum; (4) the interchange of personnel between parent and subsidiary; (5) the overlap of directors and officers; (6) percent of parent's production that moved through the subsidiary; (7) the significance of the subsidiary in the parent's organizational life; (8) the subsidiary's marketing of the parent's products; (9) the extent to which the parent was informed of activities undertaken by the subsidiary; and (10) the relationship between the cause of action alleged against the subsidiary on behalf of the parent.

*Business & Corporate Law > Agency Relationships > Establishment > Elements > General Overview*
*Business & Corporate Law > Corporations > General Overview*

[HN41] With regard to a principal/agency relationship between a parent company and a subsidiary, the United States Court of Appeals for the Ninth Circuit does not list any "factors" with respect to its analysis of the alleged agency relationship, but rather focuses on whether, but for the existence and activities of the subsidiary, a parent company would have been required to carry out the same functions itself. The general agency test requires that the agent perform some service or engage in some meaningful activity in the forum state on behalf of its principal such that the agent's presence substitutes for the presence of the principal.

*Business & Corporate Law > Agency Relationships > Establishment > Elements > General Overview*
*Business & Corporate Law > Corporations > General Overview*

[HN42] With regard to a principal/agency relationship between a parent company and a subsidiary, the United States District Court for the Northern District of California has stated that the "factors" include the degree and content of communications from the subsidiary to the parent, the degree to which the parent set policy, the of-

ficers and directors the parent and subsidiary had in common and the reliance by the parent on revenue produced by the subsidiary.

**Business & Corporate Law > Agency Relationships > Establishment > Elements > General Overview**
**Business & Corporate Law > Corporations > General Overview**
[HN43] With regard to a principal/agency relationship between a parent company and a subsidiary, some or most of the "factors" listed -- overlap of directors and officers, extent to which parent is kept informed of subsidiary activities, degree to which parent sets policy, and reliance by parent on revenue produced by subsidiary -- are factors that are not, in and of themselves, determinative of a principal/agent relationship. In addition, the other "factors" including percent of the parent's business coming from subsidiary, and percent of parent's production that moved through the subsidiary, are factors that will always be greater than zero in any parent/subsidiary relationship but do not admit of clear cut-offs or levels at which a principal/agency relationship is presumptive.

**Business & Corporate Law > Agency Relationships > Establishment > Elements > General Overview**
**Business & Corporate Law > Corporations > General Overview**
[HN44] With regard to a principal/agency relationship between a parent company and a subsidiary, the United States District Court for the Eastern District of California holds that the "factors" listed by the United States Court of Appeals for the Ninth Circuit and the United States District Court for the Northern District of California are not factors in the usual sense of being elements of proof that must be addressed to make a required showing. Rather the "factors" are simply groupings of facts that were found useful on an ad hoc basis to explain what a court considers when it comes to that particular decision.

**Business & Corporate Law > Agency Relationships > Establishment > Proof of Agency > Burdens of Proof**
**Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview**
[HN45] Affirmatively proving that the presence of a subsidiary in a foreign jurisdiction substitutes for the presence of the parent as a matter of law represents a high hurdle for the moving party. The undisputed facts need only support a colorable argument that the parent could function as well without the subsidiary in order to defeat the summary judgment motion.

**COUNSEL:**  [*1] For E & J Gallo Winery, a California corporation, Plaintiff: Barbara L Lyons, The Furth Firm LLP, San Francisco, CA; D. Greg Durbin, Timothy John Buchanan, William Hadley Littlewood, McCormick Barstow Sheppard Wayte & Carruth LLP, Fresno, CA; G Kip Edwards, Law Offices of G Kip Edwards, Kings Beach, CA; Joseph W. Cotchett, Cotchett, Pitre, Simon & Mccarthy, San Francisco Airport Office Center, Burlingame, CA; Steven N Williams, Cotchett, Pitre & McCarthy, San Francisco Airport Office Center, Burlingame, CA.

For Gibson, Dunn & Crutcher LLP, Gibson, Dunn & Crutcher LLP, Petitioner: David A. Battaglia, LEAD ATTORNEY, Gibson Dunn & Crutcher, Los Angeles, CA.

For Encana Energy Services, Inc, a Delaware corporation, Defendant: David A. Battaglia, LEAD ATTORNEY, Jason C. Lo, Louis E. Shoch, III, Matthew A. Hoffman, Gibson Dunn & Crutcher, Los Angeles, CA; Heather L Richardson, LEAD ATTORNEY, Gibson, Dunn & Crutcher LLP, Los Angeles, CA; J. Christopher Jennings, James P. Fogelman, LEAD ATTORNEYS, Gibson Dunn and Crutcher LLP (Los Angeles), Los Angeles, CA; Duane R. Lyons, Quinn Emanuel Urquhart Oliver and Hedges, LLP, Los Angeles, CA; Stephen Roy Cornwell, Cornwell and Sample, Fresno, CA; William [*2] C. Hahesy, Law Offices of William C. Hahesy, Fresno, CA.

For Encana Corporation, a Canadian corporation, Defendant: David A. Battaglia, LEAD ATTORNEY, Jason C. Lo, Louis E. Shoch, III, Matthew A. Hoffman, Richard P Levy, Gibson Dunn & Crutcher, Los Angeles, CA; George L O'Connell, LEAD ATTORNEY, Stevens and O'Connell, Sacramento, CA; Heather L Richardson, LEAD ATTORNEY, Gibson, Dunn & Crutcher LLP, Los Angeles, CA; J. Christopher Jennings, James P. Fogelman, LEAD ATTORNEYS, Gibson Dunn and Crutcher LLP (Los Angeles), Los Angeles, CA; Duane R. Lyons, Quinn Emanuel Urquhart Oliver and Hedges, LLP, Los Angeles, CA; Stephen Roy Cornwell, Cornwell and Sample, Fresno, CA; William C. Hahesy, Law Offices of William C. Hahesy, Fresno, CA.

**JUDGES:** Anthony W. Ishii, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Anthony W. Ishii

**OPINION**

**MEMORANDUM OPINION AND ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUM-**

## MARY JUDGMENT ON LIABILITY OF DEFENDANT ENCANA ENERGY CORP. UNDER THEORY OF PRINCIPAL/AGENT

**Doc. # 504**

This is an action for damages and declaratory relief by plaintiff E. & J. Gallo Winery ("Gallo") against defendants EnCana Corp. ("EnCana"), a Canadian producer of natural gas, and WD Energy Services ("WD"), formerly EnCana Energy Services, [*3] Formerly Pan Canadian Energy Services, Inc. WD, a Delaware corporation, is a wholly-owned marketing subsidiary of EnCana. In the instant motion, Gallo seeks summary adjudication on the issue of whether WD's parent company, EnCana, [1] can be held liable under agency theory for acts by WD Energy Services giving rise to liability under Gallo's first, second and third claims for relief. For the reasons that follow, Gallo's motion will be denied.

> 1 Hereinafter "Defendants" refers to WD, EnCana, and their predecessors collectively.

## PROCEDURAL HISTORY

The First Amended Complaint ("FAC") was filed on January 24 2005. The instant motion for summary adjudication on the issue of EnCana's liability under agent/principal theory was filed on July 25, 2005. Defendant's opposition was filed [2] on August 15, 2005. Gallo's reply was filed under seal on August 23, 2005. On October 17, 2005, the court granted Defendants' motion for certificate of appealability as to the court's order of September 30, 2005, denying Defendants' motion for summary judgment on the grounds of filed rate doctrine and federal preemption (hereinafter the "September 30 Order"). The court's order of October 17 stayed further proceedings [*4] in this case pending judgment by the Ninth Circuit Court of Appeal on Defendants' interlocutory appeal of the court's September 30 Order. The judgment of the Ninth Circuit Court of Appeal affirming this court's order of September 30 Order, was received by this court on December 6, 2007. The stay that had been imposed pending interlocutory appeal was lifted on November 21, 2007.

> 2 The docket report indicates EnCana's opposition was lodged on August 15, 2005, together with an application to file under seal. It is not clear whether that request was granted. The court will, as a precaution, grant EnCana's request to file its opposition under seal and deems the opposition filed on August 15, 2005.

## GENERAL FACTUAL BACKGROUND

The general background facts of this case have been recited in numerous prior orders of the court and need not be repeated here. For purposes of the this discussion, the critical facts are not related to Gallo's allegations of improper trading activity, but to the business relationship between the two defendant entities, EnCana and WD, formerly EnCana Energy Services, Inc., formerly Pan Canadian Energy Services, Inc. For the sake of maintaining continuity with the court's [*5] September 30 Order and with the opinion of the Ninth Circuit Court of Appeal, filed on September 19, 2007, affirming the September 30 Order, the court will refer throughout this discussion to "EnCana" and "WD." The term "EnCana" as used here refers to EnCana Corporation, as well as its predecessors, Pan Canadian Energy Corp., and Pan Canadian Petroleum ("PCP"), as well as to Pan Canadian Energy, Inc. Similarly, the term "WD" refers to WD Energy Services, as well as its predecessors EnCana Energy Services, and Pan Canadian Energy Services, Inc. Because a good deal of the factual background and discussion that follows pertains to the evolution of the corporate entities involved in this action, the court finds it necessary in some instances to specifically refer to the entities that preceded either EnCana or WD. In this context, the term "PCES" refers to Pan Canadian Energy Services including both PCES, Canada and PCES, Inc.

## UNDISPUTED MATERIAL FACTS

### II. Plaintiff's Factual Allegations

Gallo alleges fourteen "undisputed facts," each supported by numerous factual elements drawn from discovery sources and alleged in individual undisputed material facts, that, in sum, support Gallo's contention [*6] that WD and its predecessors are agents of EnCana and its predecessors acting with actual authority for purposes of liability arising from the unlawful acts of WD traders. The fourteen "undisputed material facts" are:

> 1. EnCana publicly described and internally referred to PCES as its North American natural gas marketing arm and natural gas business unit that operated from offices in the U.S. and Canada, and PCES accepted this role.

> 2. EnCana perceived the "PanCanadian" brand had value and chose to have PCES use the PanCanadian name, logo and tagline.

> 3. PCES understood it represented EnCana in the marketing of natural gas in North America.

4. EnCana set up and operated the U.S. and Canadian marketing and trading operations as an integrated function in many important respects, including senior management, budgeting, strategic planning, risk management, credit, detailed reporting to senior management of EnCana, and bonus program.

5. EnCana defined the primary objectives of PCES to include enhancing the value of EnCana's natural gas production and obtaining the best prices for that production, and PCES agreed to those objectives.

6. EnCana designated PCES as the exclusive marketer for its [*7] natural gas in North America and designated the U.S. operations (now WD) as the exclusive marketer in the United States.

7. EnCana required the U.S. operations of PCES (now WD) to purchase and market sufficient natural gas to fill all of the capacity on the long-term pipeline commitments even though the cost of that gas was higher than other gas available to the U.S. operations.

8. EnCana required the U.S. operations of PCES (now WD) to hold the pipeline commitments for the benefit of EnCana even though it was not common or typical for a marketing company to hold such commitments and even though the costs of those commitments literally made the difference of whether the U.S. operation was profitable or not.

9. EnCana employed a bonus program for the traders, marketers and originators a PCES that was designed to encourage them to increase profits.

10. Encana required the U.S. operations (now WD) to sell the gas on terms that were acceptable to EnCana (and EnCana never objected to any of the prices the U.S. operations received.)

11. EnCana required the PCES personnel to comply with business and ethical standards that EnCana set, but did not prohibit or even address wash sales, talking to [*8] competitors about prices or making false transaction reports to trade publications, nor did EnCana even pro-

vide any training on what was illegal price fixing.

12. EnCana set the transfer pricing to the United States in 1998 at a Canadian index price plus the cost of the long term pipeline commitments without any negotiations with PCES. Then, when California prices reached record levels, EnCana changed the pricing in early 2001 to U.S. index prices and reaped more than $ 50 million of additional profits on gas shipped on the pipeline to California without any negotiations with PCES and without even amending the written transfer pricing agreement governing those transfers.

13. The incorporation of the U.S. operations in a U.S. subsidiary that EnCana named PanCanadian Energy Services, Inc. (now WD) was part of an overall tax strategy of EnCana.

14. In 2000 and 2001, PanCanadian Energy Services, Inc. marketed in the U.S. more than 30% of EnCana's total natural gas production and generated more than 40% of EnCana's total consolidated revenue.

Doc. # 504 at pp. 3-4.

Due to the very large number of individually alleged "undisputed material facts" that are proffered by Gallo, and the almost-equally [*9] large number of additional facts proffered by Defendants, the court will refer to the above-listed of fourteen as the proposed "summarized material facts." In the discussion that follows, the term "UMF" refers to Gallo's proposed individual undisputed material facts.

## II. Defendant's Opposition and Additional Facts

Generally, Defendants do not directly dispute the undisputed material facts proffered by Gallo. Rather, Defendants offer, with respect to those facts they oppose, additional facts that tend to cast the undisputed material fact in the context of actions taken independently by WD without the control of EnCana. Defendants also proffer a large number of "additional material facts" that, in sum, seek to support Defendants' contention that the business decisions that Gallo claims evince control over WD by EnCana were actually business decisions that were carried out by WD for the benefit of WD. The court will examine the parties' factual allegations as they pertain to Gallo's contentions in the discussion that follows.

2008 U.S. Dist. LEXIS 46927, *

## LEGAL STANDARD

[HN1] Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled [*10] to judgment as a matter of law. *Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); Poller v. Columbia Broadcast System, 368 U.S. 464, 467, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985); Loehr v. Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th Cir. 1984).*

[HN2] Under summary judgment practice, the moving party always bears the initial responsibility of informing and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* [HN3] When the moving party has the burden of proof at trial, that party must carry its initial burden at summary judgment by presenting evidence affirmatively showing, for all essential elements of its case, that no reasonable jury could find for the non-moving party. *United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir.1991)* (en banc); *Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986);* see also *E.E.O.C. v. Union Independiente De La Autoridad De Acueductos Y Alcantarillados De Puerto Rico, 279 F.3d 49, 55 (1st Cir. 2002)* [*11] (stating that if "party moving for summary judgment bears the burden of proof on an issue, he cannot prevail unless the evidence that he provides on that issue is conclusive.")

[HN4] If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979).* In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).* The opposing party must demonstrate that the fact in contention is material,

i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986);* [*12] *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987),* and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Anderson, 477 U.S. at 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).*

[HN5] In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631.* Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita, 475 U.S. at 587* (quoting *Fed. R. Civ. P. 56(e)* advisory committee's note on 1963 amendments); *International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).*

[HN6] In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together [*13] with the affidavits, if any. *Rule 56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982).* The evidence of the opposing party is to be believed, *Anderson, 477 U.S. at 255,* and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *Matsushita, 475 U.S. at 587* (citing *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962)* (per curiam); *Abramson v. University of Hawaii, 594 F.2d 202, 208 (9th Cir. 1979).* Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),* aff'd, *810 F.2d 898, 902 (9th Cir. 1987).*

## DISCUSSION

### I. General Legal Framework for Principal/Agent Liability

[HN7] "The law allows corporations to organize for the purpose of isolating liability of related corporate entities. [Citation.] Only in unusual circumstances will the law permit a parent corporation to be held either directly or indirectly liable for the acts of its subsidiary." *Bowoto v. Chevron Texaco Corp., 312 F.Supp.2d 1229, 1234 (N.D. Cal. 2004).* [*14] Among the "unusual circumstances" where law will hold a parent corporation liable

for the acts of a subsidiary are: (1) where the circumstances of the organization of the two entities are such that the corporate form should be disregarded (often referred to as "alter ego" liability); (2) where the subsidiary acts as an agent of the parent corporation; and, (3) where the parent corporation aids, abets or ratifies the acts of the subsidiary corporation. See *id.* at 1235.

In the present motion, Gallo seeks summary judgment as to the liability of EnCana on the theory that WD acted as an agent [3] of EnCana when WD traders engaged in the wash trades and other anti-competitive practices that Gallo alleges harmed Gallo. Gallo applies the principal/agent theory of liability against EnCana with respect to its first three claims for relief. Those claim allege, in order, violation of the Sherman Antitrust Act, *15 U.S.C. § 1*, violation of California's Cartwright Act, Business and Professions Code *§§ 16720, et seq.*, and violation of California' Unfair Competition Law, Business and Professions Code *§§ 17200, et seq.*

> 3   The court notes that Gallo's FAC alleges liability against EnCana on the theories of [*15] alter ego and aiding, abetting or ratification, as well as on agency theory. The court expresses no opinion as to EnCana's liability on Gallo's theories of alter ego or aiding and abetting.

With respect to Gallo's Sherman Act claim, the existence of an agency relationship between EnCana and WD is determined according to federal common law, which relies on the Restatement of Agency [4] in the context of alleged antitrust violations. With regard to Gallo's [HN8] claims under California's Cartwright Act and the Unfair Competition Law, a principal may be held liable for the unlawful anti-competitive acts of an agent where the agent has "actual or ostensible authority." *California Civil Code § 2330*. The parties appear to agree that [HN9] the determination of whether a principal/agent relationship exists under state law requires the same analysis as is required under federal common law.

> 4   Gallo and most of the case authority cited by Gallo relies on the Restatement (Second) of Agency. The Restatement (Third) of agency was published on May 17, 2005, and was therefore authoritative at the time this motion was filed. The court will refer to Restatement (Third) of Agency and will discuss any significant differences [*16] with the Restatement (Second) of Agency should they arise.

[HN10] The independence of a subsidiary from the parent corporation is to be presumed. *California v. NRG Energy, Inc., 391 F.3d 1011, 1025 (9th Cir. 2004), rev'd on other grounds by Powerex Corp. v. Reliant Energy Services, Inc., 127 S.Ct. 2411, 168 L. Ed. 2d 112 (2007).*

In order to overcome the presumption that WD is independent of EnCana, Gallo will be required to show that WD "'is so extensively controlled by [EnCana] that a relationship of principal and agent is created.' [Citation.]" *Id.* The Restatement (Third) of Agency defines agency as:

> . . . [HN11] the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.

*Section 1.01.* Thus, [HN12] to demonstrate that an agency relationship exists between EnCana and WD, Gallo must show that: (1) there was a manifestation by EnCana that WD would act on EnCana's behalf; (2) WD accepted or consented to so act; and, (3) that it was understood that EnCana would be in control of WD's undertaking on EnCana's behalf. *Bowoto, 312 F.Supp.2d at 1239.*

[HN13] With [*17] respect to the acts of an agent giving rise to liability against the principal, the principal may be held directly liable if the agent "acts with actual authority or the principal ratifies the agent's conduct." *Restatement (Third) of Agency § 7.03* (2005). The principal may be held vicariously liable for the acts of an agent where "the agent is an employee who commits a tort [or tort-like] act while acting within the scope of employment," or where the employee acts with apparent authority on behalf of the principle. Id.; see also *Am. Soc. Mech. Eng'rs, Inc. v. Hydrolevel Corp., 456 U.S. 556, 577, 102 S. Ct. 1935, 72 L. Ed. 2d 330 (1982)* (upholding liability on apparent authority theory in the context of antitrust claim).

## II. Manifestation by EnCana and Assent by WD and its Predecessors

Gallo's proffered summarized material facts numbered 1, 2, 3, 5, and 6 are aimed at establishing EnCana's purpose in allocating its marketing and "midstream" activities to entities that eventually became WD, EnCana's marketing subsidiary in the United States, and PCES Canada, EnCana's Canadian marketing subsidiary. The proffered summarized material facts are also offered to establish that EnCana's predecessor, PCP, manifested its intention [*18] that PCES, Inc. should act on PCP's behalf in marketing natural gas in the United States and that PCES, Inc. assented. The summarized material facts are: (1) EnCana publicly described and internally referred to PCES as its North American natural gas mar-

keting arm and natural gas business unit that operated from offices in the U.S. and Canada, and PCES accepted this role; (2) EnCana perceived the "PanCanadian" brand had value and chose to have PCES use the PanCanadian name, logo and tagline; (3) PCES understood it represented EnCana in the marketing of natural gas in North America; (5) EnCana defined the primary objectives of PCES to include enhancing the value of EnCana's natural gas production and obtaining the best prices for that production and PCES agreed to those objectives; and (6) EnCana designated PCES as the exclusive marketer for its natural gas in North America and designated the U.S. operations (now WD) as the exclusive marketer in the United States.

As an initial matter, the court notes that Gallo, through its individual proffered undisputed material facts in support of the foregoing summarized material facts, makes much of how the marketing entities were referred to in [*19] internal and external communications by EnCana and by the marketing entities themselves. [HN14] The common law of agency clearly establishes that how the parties or entities refer to themselves or one another is not determinative of a principal/agent relationship.

> An agency relationship arises only when the elements stated in § 1.01 are present. Whether a relationship is characterized as agency in an agreement between parties or in the context of industry or popular usage is not controlling.

*Restatement (Third) of Agency, § 1.02* (2005).

[HN15] Whether a relationship is one of agency is a legal conclusion made after an assessment of the facts of the relationship and the application of the law of agency to those facts. Although agency is a consensual relationship, how the parties to any given relationship label it is not dispositive. Nor does party characterization or nonlegal usage control whether an agent has an agency relationship with a particular person as principal. The parties' reference to functional characteristics may, however, be relevant to determining whether a relationship of agency exists.

Id. at cmt. a. "The party asserting that a relationship of agency exists generally has the burden [*20] in litigation of establishing its existence." Id. at cmt. d.

[HN16] Although the terms used by parent and subsidiary to refer to themselves or each other are not determinative of an agency relationship, such facts may go to support the arguments of the party asserting an agency relationship that one party manifested intent that the other should act on its behalf, and the other party assented. Id. at cmt. a. Such is the case here.

The individual undisputed material facts proffered by Gallo to support the above-listed summarized material facts provide a useful historical context for the evaluation of the relationship of the two entities with respect to the issues of manifestation and assent. Based on Gallo's proffered individual material facts and on Defendants' objections thereto, the court finds the following facts not to be materially disputed.

EnCana's predecessor, PCP, internally divided its activities with regard to natural gas into three groups. "Upstream activities" pertain to the exploration and drilling for, and production of, natural gas at the wellhead. "Midstream activities" pertain to the transportation of produced natural gas to distant markets through pipelines. "Marketing activities" [*21] pertain to the sales of natural gas produced by PCP/EnCana to third party wholesale or retail buyers. In 1995 PCP entered into a marketing arrangement with National Gas & Electric ("NG&E") to market natural gas in the United States. On June 1, 1996, NG&E became a wholly owned subsidiary of PCP. NG&E continued to market PCP's gas in the United States up to 1998.

In 1998 PCP combined its marketing for electricity and natural gas in the United States and Canada to form Pan Canadian Energy Services. While there is some dispute as to when, or if, the United States and Canadian branches of PCES became separate entities, it is generally agreed that by the time of the trading activities giving rise to this action, the midstream and marketing activities in the United States were carried out by PCES, Inc., a United States corporation located in Delaware and doing business principally in Texas. The marketing and midstream activities in Canada were carried out by "PCES, a Division of Pan Canadian Petroleum, Limited" (hereinafter "PCES Canada").

The gas produced by EnCana or its predecessor was sold exclusively to either PCES Canada for marketing in Canada, or to PCES, Inc. for marketing in the United [*22] States. In addition to the gas purchased from EnCana by either PCES Canada or PCES, Inc., both marketing subsidiaries purchased natural gas from other producers. The volume of gas produced by EnCana and sold to PCES Canada or PCES, Inc. is termed "equity volume," and the volume purchased from other suppliers is termed "third party volume." The equity volume produced by EnCana constituted about one-third of the total

volume purchased by PCES, Inc. in the years at issue in this case.

Gallo proffers a number of undisputed material facts that allege that in various statements to the public and in some internal communications, EnCana or its predecessor, PCP, referred to PCES Canada and PCES, Inc. as being the same entity. Gallo also alleges that PCP repeatedly referred to PCES, Inc. as its "marketing arm" or "marketing division." As previously noted, how EnCana or PCP or either of the marketing entities referred to themselves, either internally or externally, does not determine the existence or non-existence of an agency relationship. However, the individual undisputed material facts proffered by Gallo do establish that the labels used by the parties are reflective of the underlying undisputed [*23] fact that all of the natural gas that was produced by PCP/EnCana was sold in the United States by PCES, Inc. Likewise, all of the natural gas sold in Canada that was produced by PCP/EnCana was sold by PCES Canada.

Gallo's proposed undisputed material facts numbered 77 through 84 are aimed in various ways at proving that a primary objective of PCES included "enhancing the value of EnCana's natural gas production." Gallo offers no facts to indicate that "enhancing the value of" is different from "selling," or that it implies anything more about the relationship between PCES, Inc. and EnCana beyond the acknowledged fact that PCES, Inc. is the sole marketer of EnCana's natural gas in the United States.

There is no real dispute that PCP/EnCana manifested an intent that PCES, Inc. would represent PCP/EnCana's effort to sell the natural gas it produced in Canada in the United States market. That PCES, Inc. assented to carry out PCP/EnCana's intent is evidenced by the facts that PCP/EnCana established PCES, Inc. as its marketing subsidiary in the United States and PCES, Inc./WD did, in fact, sell all of the gas that was produced by EnCana that was sold in the United States. See *Comind, Companhia De Seguros v. Sikorsky Aircraft, 116 F.R.D. 397, 404 (D. Conn. 1987)* [*24] (wholly owned subsidiary had no choice but to accept role as parent's sole marketer of product in foreign country). The court finds Defendants' efforts to distinguish *Comid* on factual grounds unpersuasive. The court finds that Gallo has met its burden to allege undisputed material facts sufficient to show that (1) PCP/EnCana manifested an intent that PCES, Inc. should act on EnCana's behalf to market natural gas produced by EnCana; and, (2) that PCES, Inc. assented to so act.

## II. Control of Subsidiary by Parent

The issue that is sharply contested in Gallo's instant motion for summary judgment is whether Gallo can allege undisputed material facts sufficient to show that

EnCana retained a right of control over PCES, Inc. to such a degree that there remains no disputed issue of material fact that PCES, Inc. functioned as the agent of EnCana. As an initial matter the parties disagree as to the evidentiary burden Gallo faces because it would have the burden at trial to prove that PCES, Inc. was the agent of EnCana at the time of the events that gave rise to this action. Defendants cite *Synbiotics Corp. v. Heska Corp., 137 F.Supp.2d 1198, 1201-1202 (S.D. Cal. 2000)* for the proposition that, [*25] where the moving party would have the burden of proof at trial, the moving party must make an evidentiary showing sufficient for the court to hold that no reasonable jury could possibly find for the non-moving party. Gallo contends Defendants substantially overstate the standard and that they need only prove there is no material fact with respect to each element of their claim that WD/PCES, Inc. is an agent of PCP/EnCana.

[HN17] Although the moving party that would have the burden of production and proof at trial is sometimes described as carrying a "relatively heavier burden" in the context of a motion for summary judgment, *Mateo v. M/S Kiso, 805 F. Supp. 761, 774 (N.D. Cal. 1991)*, the difference is actually one of quantity of proof rather than standard of proof. Where the moving party would bear the burden of production and persuasion as to a claim or affirmative defense at trial, the moving party must *affirmatively* prove the lack of *any* issue of material fact as to each element of the claim/defense pled. *Id.*; see *Synbiotics, 137 F.Supp.2d at 1201* (moving party cannot rely on opposing party's lack of evidence where moving party would have burden of production at trial). In the context of [*26] making the required *affirmative* showing, the court sees no basis for any distinction between the absence of any material issue of fact, as asserted by Gallo, and the requirement that the moving party must "'establish beyond peradventure *all* of the essential elements . . .'" of the claim/affirmative defense. *Mateo, 805 F. Supp. at 775* (emphasis in original). In each case, the party having the burden must present admissible evidence as to each element of the claim and the opposing party need only produce evidence sufficient to raise a genuine issue of material fact as to any one element in order to defeat the motion. *Fed. R. Civ. P. 56(c)*.

While the court rejects the proposition that the standard (as opposed to the quantity) of proof is greater where the moving party would have the burden of proof at trial, there is one practical sense in which Gallo, as the moving party, may be said to carry a heavier burden with respect to the issue of proof of control of the subsidiary by the parent. This "heavier burden" arises from the fact that [HN18] a district court does not "weigh evidence" and must make every inference in favor of the non-moving party. *Suzuki Motor Corp. v. Consumers Union*

*of the U.S., Inc.*, 330 F.3d 1110, 1140 (9th Cir. 2003). [*27] While a jury can weigh the aggregate of many factors to determine if, on balance, it is more likely than not that PCP/EnCana asserted a level of control over PCES that would give rise to a principal/agent relationship, the court ruling on a summary judgment motion cannot. Thus, a jury considering many factors, each pointing inconclusively toward the conclusion that PCP/EnCana controlled PCES, could weigh the aggregate of the factors to find there was an agency relationship. The court, on the other hand, would be required to deny the summary judgment motion if no single fact or combination of facts established control as a matter of law. The court would be required to infer in favor the non-moving party that a jury, finding no conclusive evidence of control, could rationally come to the conclusion there was not a level of control necessary to infer an agency relationship.

Further, [HN19] the requirement that a court must make every necessary inference in favor of the non-moving party means that, with respect to every undisputed material fact that relies on an inference in order to support the moving party's contention, the non-moving party need only offer some additional fact that tends to [*28] negate the inference in order to defeat the factual support for the motion. As will be discussed *infra*, a significant proportion of the UMF's Gallo relies upon require an inference to be applicable to the issue of EnCana's control over WD. Thus, where Gallo's argument relies to a significant extent on facts that require an inference in Gallo's favor, any proffer of additional evidence by Defendants that tends to support an opposing inference will be sufficient to negate Gallo's proffer.

The court must address each of Gallo's proposed summary material facts, and the individual undisputed material facts that support them, to see if any one proffered summary fact or proffered individual undisputed material fact is truly undisputed and, if so, whether it establishes a principal/agency relationship as a matter of law. If no such fact or combination of facts are found, Gallo will not prevail on its summary judgment motion even though each of the proposed summarized material facts may weigh in favor of a finding of a principal/agent relationship.

### A. Legal Framework for Analysis of Control

[HN20] The control the principal exerts over the subsidiary must be more than mere ownership of the stock, *Restatement (Third) of Agency, § 1.01 cmt. f (2)* [*29] (2005), and more than the supervision of "finance and capital budget decisions" and responsibility for the setting of general policies and procedures for the subsidiary. *United States v. Bestfoods*, 524 U.S. 51, 72, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998). Proof that the parent corporation appoints members to the subsidiary's board of directors or hires its officers is also not sufficient to establish a principal/agent relationship. *Trans-America Leasing, Inc. v. La Republica de Venezuela*, 339 U.S. App. D.C. 385, 200 F.3d 843, 849 (D.C. Cir. 2000). The determination of whether a principal/agent relationship exists between a parent corporation and its subsidiary involves a fact-intensive inquiry into the extent to which the parent exercises control over the activities of the subsidiary. *NRG Energy*, 391 F.3d at 1025. "'There is no agency relationship where the alleged principal has no right of control over the alleged agent.' [Citation.]" *Bowoto*, 312 F.Supp.2d at 1239.

[HN21] How much control the parent must exert over subsidiary in order for liability to attach against the parent under principal/agent theory is a subject over which courts have long struggled. *TransAmerica Leasing*, 200 F.3d at 849. "The question defies resolution by 'mechanical formula[e],' [*30] for the inquiry is inherently fact-specific." Id. The type of control that typifies the principal/agent relationship is control over the operations of the agent that lie outside the controls normally imposed by contract between a provider and receiver of services. *Restatement (Third) of Agency, § 1.01 cmt. f (1)* (2005). As the Restatement puts it:

> [HN22] The power to give *interim* instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents.

Id. (emphasis added). Based on the context of the discussion in the Restatement, the court concludes that the term "interim instructions" as used by the Restatement means instructions that go beyond the scope of instructions of a customer to a provider or a buyer to a seller and that encompass basic and substantial business decisions that would normally be made internally by officers, directors or employees of the subsidiary.

[HN23] A review of case authority indicates there are two basic formulations for the determination of whether a parent company's authority over a subsidiary is such that a principal/agent relationship is established. See *Bowoto*, 312 F.Supp.2d at 1241-1242.

In [*31] the first formulation, the court focuses on the parent corporation's control over the operations of its subsidiary. *Bowoto*, 312 F.Supp.2d at 1241; see also *Sonora Diamond Corp. v. Superior Court*, 83 Cal.App.4th 523, 540-541, 99 Cal. Rptr. 2d 824 (5th Dist. 2000) ("Sonora Diamond"). In this formulation, an agency relationship is proved "if a parent corporation exercises such a degree of control over its subsidiary that the subsidiary can legitimately be described as only a

means through which the parent acts." *Sonora Diamond, 83 Cal.App.4th at 541.* [5] "As a practical matter, the parent must be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's day-to-day operations in carrying out that policy." *Id. at 542.*

> 5   As a state appellate court decision, Sonora Diamond is not authoritative in this court. However, each proposition cited herein from the decision in Sonora Diamond is supported by both state and federal case authority. The court therefore finds the Fifth District's decision in *Sonora Diamond* persuasive for the proposition(s) cited.

[HN24] In the second formulation, the court asks whether "the subsidiary functions [*32] as the parent corporation's representative in that it performs services that are 'sufficiently important to the foreign [6] corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar service." *Doe v. Unocal Corp., 248 F.3d 915, 928 (9th Cir. 2000)* ("Unocal") (quoting *Chan v. Society Expeditions, Inc., 39 F.3d 1398, 1405 (9th Cir. 1994)*). "At an irreductable minimum, the general agency test requires that the agent perform some service or engage in some meaningful activity in the forum state on behalf of its principal such that its 'presence substitutes for the presence of the principal.' [Citation]" *Id. at 930.*

> 6   Unocal is typical of the case type where agency issues seem to arise most often. In Unocal, the principal/agent relationship is asserted as the basis for the court's ability to assert personal jurisdiction over the foreign parent based on the acts of its United States subsidiary. See *Unocal, 248 F.3d at 930-931* (finding no jurisdiction based on plaintiff's failure to establish agent/principal relationship). See also *Modesto City Schools v. Riso Kagaku Corp., 157 F.Supp. 2d 1128, 1136 (E.D. Cal. 2001)* [*33] (denying challenge to jurisdiction over foreign corporation based on actions by it United States marketing subsidiary). The Northern District in Bowoto noted that a number of the cases cited approach the issue of agency as a means of establishing jurisdiction over foreign entities. Like the court in Bowoto, this court finds that [HN25] cases that approach the issue of principal/agency relationships in the context of jurisdiction are instructive where the issue is the establishment of liability in that they illustrate the considerations that are relevant to the determination of the princi-

pal/agent relationship. See *Bowoto, 312 F.Supp.2d at 1243.*

In Sonora Diamond, the Fifth District Court of Appeal termed the formulation set forth in Unocal the "representative services doctrine." *Sonora Diamond, 83 Cal.App.4th at 543.* Relying on *Gallagher v. Mazda Motor of America, Inc., 781 F.Supp. 1079, 1085 (E.D. Penn. 1992)*, the Sonora Diamond court observed that [HN26] the representative services doctrine applies where the function the subsidiary is performing "assists the parent's *own* business, but the doctrine does not support jurisdiction where the parent is merely a holding company whose only business pursuit [*34] is the investment in the subsidiary." *Sonora Diamond, 83 Cal.App.4th at 543* (emphasis in original). In the context of establishing personal jurisdiction over a foreign party, this court has used an analytical approach identical to the "representative services doctrine" analysis as set forth in Sonora Diamond and Doe v. Unocal Corp. In *Modesto City Schools v. Riso Kagaku Corp., 157 F.Supp.2d 1128 (E.D. Cal. 2001)*, the court rejected the foreign defendant's contention that a finding of day-to-day control over the subsidiary corporation was necessary in order to impute the court's jurisdiction over the subsidiary to the parent. *Id. at 1134-1135.* The Modesto City Schools court held that it is not true that the issue of "control is wholly irrelevant to the general agency test. Rather, the court finds that it is not the *sine qua non* of the general agency test." *Id. at 1134.*

Because EnCana is not a holding company and because WD and its predecessors existed to help EnCana conduct EnCana's business by marketing the gas EnCana produced, this court concludes that the analysis employed in *Modesto City Schools*, and termed the "representative services doctrine" in *Sonora Diamond* may be applied in [*35] this case. Gallo need not prove that EnCana directed the day-to-day activities of WD, although such proof might be sufficient to deem the subsidiary the agent of the parent. Gallo may show that WD functioned as the agent of EnCana if it can show that WD "engaged in some meaningful activity" in California on behalf of EnCana such that WD's presence in California "substitut[ed] for the presence of the principal." *Unocal, 248 F.3d at 930.*

As noted previously, [HN27] the determination of whether the amount of control exerted by EnCana over WD is of a degree and kind that the relationship between the two should be deemed that of a principal/agent is a determination that is not susceptible to analysis by simple formulae. *TransAmerica Leasing, 200 F.3d at 849.* As has been observed:

> . . . different control relationships inhere in different multinational structures, and

we lose sight of the economic realities if we insist on masking these distinctions behind simplistic formulae. The kind of "day-to-day- control," to the extent such a nebulous concept can be made concrete, will vary depending on the kind of subsidiary involved. Thus, while "day-to-day control" might be required to attribute the activities [*36] of a relatively autonomous manufacturing subsidiary to its conglomerate parent, this by no means implies such a requirement as to a wholly-owned sales and marketing subsidiary which is the conduit for the sales of a single product in the [domestic] market.

*Bulova Watch Co. v. K. Hattori & Co., Ltd., 508 F. Supp. 1322, 1343 (E.D. N.Y. 1981).* "A foreign manufacturing subsidiary selling entirely to its own market and to third countries will obviously have more of a life of its own than a wholly-owned sales and marketing subsidiary." Id.

**B. EnCana's Operational Control over WD**

Gallo argues that, using either the operational control test or the representative services test, the undisputed facts of this case illustrate that EnCana asserted control over WD. The court will begin by examining Gallo's fourteen proposed undisputed material and/or corresponding groups of Gallo's facts to determine whether those facts establish that EnCana asserted operational control over WD as a matter of law. The court will then examine Gallo's alleged undisputed material facts under the representative services formulation.

**1. Gallo's Preliminary Factual Allegations; Summary Facts 1, 2, &3**

Gallo's proffered summarized [*37] material facts numbered 1, 2, and 3 were discussed above in connection with the court's analysis of the issues of manifestation of intent by PCP/EnCana and assent by WD/PCES, Inc. As previously noted, most of Gallo's proffered individual undisputed material facts supporting summary material facts 1, 2, and 3, including those facts that reflect how the parties labeled themselves and each other, do not address the issue of control. Among Gallo's proffered individual undisputed material facts, however, there are two that warrant some comment because they appear at first blush to bear upon the issue of control exerted on WD by EnCana.

The two proffered undisputed material facts that may possibly go to the issue of EnCana's control over WD are found at Gallo's undisputed material fact ("UMF") # 35, and UMF # 37. Gallo's UMF # 35 alleges

"Mr. Elias conceded that with respect to PCP's [. . .] natural gas production sold in California in the latter part of 2000 and the early part of 2001, PCES, Inc. made the same margin they would have without the high prices and it was the parent company that benefitted from the price increases that occurred." Doc. # 658 at 25. The implication is that PCP [*38] so controlled PCES, Inc. that the latter was prevented from capturing a share of the sharp rise in prices of natural gas that occurred in 2000 and 2001 because the parent company controlled the profit margin PCES, Inc. could realize, thereby directing the benefit from the inflated price of natural gas to the parent. It is undisputed that a sharp rise in natural gas prices occurred in 2000-2001 and it is also undisputed that PCP/EnCana realized profits substantially in excess of the amount budgeted in 2000 as a result of the spike in natural gas market prices.

Defendants point out that Mr. Elias' deposition testimony, upon which Gallo relies for its proffered undisputed material fact, continues on to state that while PCP/EnCana reaped the benefit from the increase in profit margin from the sale of their equity volumes of natural gas, the third-party producers of gas that PCES, Inc. marketed benefitted similarly. Id. While Gallo contends its undisputed material fact is not disputed, the remainder of relevant portions of Mr. Elias' testimony implies that the fact that PCES, Inc. could not have raised its profit margin was because of economic realities in the natural gas marketing sector [*39] at the time.

While Gallo's proffered UMF # 35 at least raises the possibility that PCP/EnCana had a direct role in determining PCES, Inc.'s profit margin, Defendants have pointed to the same evidence to show that the inability of natural gas marketers to increase their profit margins was widespread in the gas marketing sector and not indicative of PCP/EnCana's direct control. Because the court can make no inferences in favor of Gallo if EnCana can offer any support for an opposing inference, the court cannot conclude as a matter of law that the fact that PCES, Inc.'s profit margin remained the same during the natural gas price spike of 2000-2001 was a result of control over PCES, Inc.'s marketing activities by PCP/EnCana.

Gallo's UMF # 37 alleges that "[a]t the direction of senior management of PCP [. . .], hedges were put on for the price of natural gas in December 2000. The total gain on the hedges put on at Malin (located near the Oregon/California border) was more than $ 40 million." Doc. # 658 at 27. The court has reviewed the portion of the deposition of Mr. Andrew Brink submitted in support of Gallo's UMF # 37. The deposition testimony submitted supports the allegation that between [*40] December 1, 2000 and January 31, 2001, the senior management of PCP either directly placed, or caused their risk management division to place, hedges on deliveries to the Ore-

gon-California border for deliveries between November of 2001 and October of 2002. The cited deposition testimony also indicates PCP/EnCana profited from the hedges in the amount of about $ 14.5 million.

What the cited deposition testimony does not show is any connection between PCP's hedging activities and PCES, Inc. The proffered undisputed material facts do not reveal, for example, who placed the hedge, what risks were addressed by hedging and who the counterparty was. In order to accept Gallo's proffered material facts as indicating that PCP's hedging activities indicated that PCES, Inc. was acting in the role of PCP's agent, the court would be required to infer that PCP was hedging risks that actually belonged to PCES, Inc. and that the hedges that PCP placed addressed that risk. The cited deposition testimony and other associated facts do not make the required showing and, as previously stated, the [HN28] court may not make inferences in the moving party's favor.

### 2. PCP/EnCana's Set-Up of its Marketing Subsidiaries

Gallo's [*41] fifth summarized material fact alleges that "EnCana set up and operated the U.S. and Canadian marketing and trading operations as an integrated function in many important respects, including senior management, budgeting, strategic planning, risk management, credit, detailed reporting to senior management of EnCana, and bonus program." In broad terms, Gallo's argument has three logical elements. First, Gallo alleges individual undisputed material facts that tend to show that PCES, Inc. and PCES Canada functioned as two divisions of a single entity, PCES, which reported to PCP/EnCana's senior management. See Gallo's UMF # 93. Second, Gallo alleges individual facts to support its contention that PCP/EnCana senior officers were appointed to and served as officers and board members of PCES Canada/PCES, Inc. See Gallo's UMF # 103. Third, Gallo alleges individual facts that support its contention that PCP/EnCana controlled the terms of a number of PCES policies and practices including PCES's risk management policy, see Gallo's UMF # 128, performance incentive policy, see Gallo's UMF # 123, and a credit policy. See Gallo's UMF # 141. Gallo also alleges that PCES, Inc. regularly prepared budgeting [*42] and marketing reports for PCP/EnCana at the direction of the latter. See Gallo's UMF's ## 117 - 119.

Although each element of Gallo's argument is vigorously disputed by Defendants, the court will assume for the moment that Gallo's individual material facts are not disputed and that each of the lines of argument listed above are proven. The initial question is whether the individual material facts proffered by Gallo, and which the court will assume are true, are sufficient in and of themselves to establish that WD/PCES, Inc. functioned

as an agent of PCP/EnCana. The court must conclude that Gallo's proffered summary material fact and the supporting individual undisputed material facts, while they may indicate the possibility or even the probability of the existence of a principal/agent relationship, do not establish that relationship as a matter of law.

As an initial matter, Gallo does not directly explain how the alleged connection between PCES, Inc. and PCES Canada furthers its argument that PCES, Inc. is an agent of PCP/EnCana. Assuming, *arguendo,* that PCES Canada and PCES, Inc. are two divisions of the same company (again, an allegation vigorously denied by Defendants), the connection [*43] between the two is only important insofar as the control asserted by PCP/EnCana over one could be deemed to be asserted over both. The court assumes this is true for purposes of the present discussion. In making that assumption, the court will proceed to determine if any facts alleged as to either PCES Canada or PCES, Inc. are sufficient to show the level of control necessary to deem either PCES entity an agent of PCP/EnCana as a matter of law.

"[HN29] The nature of the control exercised by the parent over the subsidiary necessary to put the subsidiary in an agency relationship with the parent must be over and above that to be expected as an incident of the parent's ownership of the subsidiary and must reflect the parent's purposeful disregard of the subsidiary's independent corporate existence." *Sonora Diamond, 83 Cal.App.4th at 542.* As previously noted, the extent of communications between parent and subsidiary, the degree to which the subsidiary's policies are set by the parent, and degree to which parent and subsidiary share officers and directors are important considerations in the determination of whether a principal/agent relationship might exist, *Bowoto, 312 F.Supp.2d at 1243; Modesto City Schools, 157 F.Supp.2d at 1135.* [*44] However, that some or all of these factors may be present to some degree in a parent/subsidiary relationship is not sufficient to determine that the relationship is one of principal/agent as a matter of law. See *United States v. Bestfoods, 524 U.S. 51, 72, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998)* (parental supervision of finance and capital budget decisions and articulation of general policies and procedures not indicative of principal/agent relationship); *Calvert v. Huckins, 875 F.Supp.674, 678-679 (E.D. Cal. 1995)* (interlocking directors and officers, consolidation of activities of parent and subsidiary into annual report, provision of legal services between parent and subsidiary and underwriting of promissory notes by parent corporation is usual business practice that is not necessarily indicative of principal/agent relationship). [7]

    7  The court is mindful that the court in Calvert was concerned with the issue of alter ego, not

agency. However, a number of courts have used the cited portion of *Calvert* in the analysis of issues of alleged agency relationship, see, e.g., *Doe v. Unocal Corp., 248 F.3d 915, 929 (9th Cir. 2001)*, and some district courts have suggested that the factors indicating control of one entity by [*45] another are the same whether the issue is agency or alter ego. See, e.g., *In re: Phenylpropanolamine Prods. Liab. Litig., 344 F. Supp. 2d 686, 691 (W.D. Wash. 2003)* ("[HN30] An alter ego or agency relationship is typified by parental control of the subsidiary's internal affairs or daily operations."). This court's discussion in Modesto City Schools is not inapposite. In Modesto City Schools the court made note of the fact that the discussion in Calvert and as adopted in Unocal seemed to suggest that [HN31] courts "should analyze the same factors in determining whether jurisdiction exists under either an alter ego or general agency theory." *Modesto City Schools, 157 F.Supp.2d at 1133*. [HN32] The Modesto City Schools court carefully distinguished Unocal's approach to the question of control of the subsidiary by the parent not to suggest that the analysis of day-to-day control of the subsidiary by the parent was irrelevant to the determination of the question of agency, but to show that agency could alternatively be found under what the Sonora Diamond court called the representative services doctrine. See *Modesto City Schools, 157 F.Supp.2d at 1134-1135*.

Viewed in light of the foregoing, Gallo's allegations with [*46] regard to EnCana officers and board members functioning as PCES officers and board members, and PCES regularly preparing reports to EnCana at the direction of the latter are not sufficient to conclusively establish that PCP/EnCana controlled PCES to the extent that the later should be deemed an agent of the former. Likewise Gallo's allegations that PCP/EnCana controlled the terms of a number of PCES policies and practices including PCES's risk management policy, performance incentive policy, and credit policy does not establish an agent/principal relationship as a matter of law. [HN33] Risk, compensation and credit are management issues that lie at the core of corporate decision making and are well within the scope of the parent corporation's right to generally supervise finance and capital budgets and articulate general policies and procedures without establishing a principal/agent relationship. *Bestfoods, 524 U.S. at 72*.

In addition to the foregoing allegations by Gallo, Gallo alleges a number of undisputed material facts that appear to allege that PCP/EnCana established an ethics policy that applied to PCES, Inc. as well as PCES Canada. See Gallo's UMF's # 145-152. The proffered individual [*47] material facts allege that, while the ethics policy forbade illegal conduct generally, it did not specifically prohibit wash trades or other trader conduct that gave rise to this action. The point of Gallo's proffer of these undisputed material facts is not entirely clear. To the extent Gallo alleges these facts to show that PCP/EnCana exerted control over PCES such that a principal/agent relationship existed, the court finds that the setting of an overall ethics policy by a parent that is applicable to the parent's subsidiaries is an important part of its risk management policy and lies well within the parent's accepted authority to set general policies and procedures without transforming the parent/subsidiary relationship to a principal/agent relationship. Id.

### 3. PCES was Exclusive Marketer of Natural Gas in United States and Canada

Gallo alleges a number of facts beginning at Gallo's UMF # 155 and continuing through UMF # 215 that are generally aimed at demonstrating that PCES acted as an exclusive sales agent, rather than as an independent sales subsidiary. Gallo makes three basic arguments to support its contention that WD/PCES is an agent of EnCana/PCP. First, Gallo contends the [*48] terms of the contract that governed the sale of natural gas by EnCana to WD indicated that EnCana retained authority to control WD's activities with respect to the sale of natural gas. Second, Gallo points to the apparent detachment of WD's CEO from the process of negotiation of changes to the gas sales agreement from which Gallo argues that the changes were not the result of arms-length negotiations, but were simply the result of imposition of changes by EnCana on WD. Third, Gallo argues that EnCana's control over WD is evinced by the fact that EnCana assigned the responsibility for EnCana's long-term pipeline commitments third-party pipeline companies where an independent subsidiary would not have accepted the risk.

In Gallo's UMF's 155-163, Gallo alleges facts to show that sometime between 1998 and 2000, PCP/EnCana committed to aggressively growing its natural gas production, and PCES aggressively pursued the marketing of natural gas. Gallo alleges that Mr. Elias, the CEO of PCES understood that PCP/EnCana wanted PCES to aggressively expand the marketing business within the areas of the United States defined by PCP/EnCana. Gallo alleges that PCES ranked in the top 20 of marketers [*49] in North America.

PCP/EnCana decided to launch PCES in April 1998. PCP/EnCana had previously contracted with an unnamed marketing company for sale of their natural gas in Canada and sold the gas under the terms of a marketing contract that was first put in effect in 1994. Until 1998, the original gas sales contract was continued with periodic

modifications. Gallo's UMF's 169-185. Gallo alleges that the sales contract, called the "Gas Sales Agreement," ("GSA") was modified in January of 1998 and again when PCES was formed in April 1998. The modifications altered the basis for computation of prices charged by PCP/EnCana for the gas it sold to PCES. Prior to the 1998 amendments the price PCP/EnCana received was the price the marketer received in the United States, less a marketing fee and transportation costs. Gallo's UMF # 173. After the 1998 amendments, the price for sale of gas by PCP/EnCana to PCES was determined by an index called the AECO. Gallo's UMF # 179. The April 1998 modification added a one-cent per million BTU fee to the AECO index price. There were no further written amendments to the GSA until May 1, 2002.

The GSA granted WD/PCES the exclusive right to market all the natural [*50] gas EnCana/PCP produced and designated for sale in the United States. UMF # 187. WD was therefore the only company that marketed EnCana's equity production in the United States. The GSA required WD to "sell the Daily Contract Quantities that equated to the long-term pipeline commitments; keep [EnCana] informed on the [natural gas] market; sell the gas on terms acceptable to [EnCana]; and conform to the business and ethical standards set by [EnCana]." Doc. # 504 at 31:14 - 16

The court has examined Gallo's undisputed material facts with respect to the content of the GSA and finds that although Gallo's representations concerning the contents of the agreement are accurate, they do not show that PCP/EnCana controlled the activities of WD/PCES to such an extent that EnCana is conclusively shown to be the Principal and WD the agent as a matter of law.

The fact that PCP/EnCana assigned its long-term pipeline commitment to PCES at the time it decided to spin off its marketing activities into a subsidiary corporation does not require the inference that PCP/EnCana retained a right of control over PCES operations. A parent corporation must necessarily determine the starting conditions for its subsidiary [*51] at the time the subsidiary is formed. As will be discussed further, *infra*, because long-term pipeline commitments represent a hedge against risks of upward shifts in transportation costs on the short-term market, it is rational that PCP/EnCana would assign the long-term pipeline commitments to PCES because PCES would be most able to benefit from the hedging capability of the commitments and most able to avoid the risk of failing to fill the commitments. Because the court must make every inference in favor of the non-moving party, the court cannot infer that EnCana simply off-loaded risk onto PCES by assigning the long-term pipeline commitments to PCES. The court must infer that the assignment was a rational way of providing

PCES with a marketing tool that would be better handled by the subsidiary than the parent.

Gallo's allegation that the GSA required PCES to sell gas on terms that were acceptable to PCP/EnCana fails to demonstrate control of the latter over the former primarily because it lacks specificity. As previously noted, [HN34] a parent may set the general policies and procedures of its subsidiary, including conditions that manage risk, without establishing a principal/agent relationship. [*52] More broadly, a producer may set certain conditions on a third-party marketer in order to manage the producer's risk. Thus, it would be normal for a producer to contractually require acceptable terms for the sale of its product that could encompass such things as currency requirements, minimum pricing, promotional obligations of the marketer, credit risk exposure, etc. Since Gallo's proffered undisputed material facts lack specificity as to exactly what is encompassed by "acceptable terms" under the GSA, the court may not infer that the requirement for such terms amounts to control of PCES by PCP/EnCana.

The requirement that PCES keep PCP/EnCana informed as to the market is similarly lacking in the sort of detail that would indicate control of the former by the latter. Because PCP/EnCana, as producer, is aided in meeting production demands by knowing in advance what the demands will be and whether the demand will increase or decrease, it is reasonable that producer might require a marketing entity to provide such information, whether the marketer is a subsidiary or a third party.

The requirement that PCES was required to conform its conduct to PCP/EnCana's code of ethics has been discussed. [*53] Briefly, [HN35] in requiring certain ethical standards of a marketer, a producer does not necessarily step outside of what conditions would normally imposed by an arms-length marketing contract with a third party. A producer might, for example, require that a marketer not falsely advertize its product or make unauthorized warranty representations. Such a requirement serves the risk management requirements of the producer and imposes certain ethical requirements on the marketer without creating a principal/agent relationship. Gallo's proffered undisputed facts fail to show that the ethical standards imposed by PCP/EnCana on PCES exceeded the scope of what might be included in a contractual arrangement to the extent that a principal/agent relationship would be established as a matter of law.

Gallo's allegations that PCP/EnCana's control over WD/PCES is evinced by the fact that PCES's CEO was apparently absent from and unaware of his company's participation in negotiation of changes in the GSA refer to two instances where the GSA was modified during the time when Mr. Elias was CEO of PCES. Gallo alleges

that the 1998 amendments to the GSA were signed by Mr. Elias but Mr. Elias was not involved [*54] in negotiating the terms of the GSA and was not familiar with the obligations of PCES under the GSA. Gallo also alleges the corporate deposition designee for PCES/EnCana could not identify anyone who was involved in negotiations. UMF's 182-184.

Gallo's argument fails because it requires the court to make inferences in Gallo's favor. The implication the court is invited to make is that, if the CEO of PCES did not participate in and was unaware of the terms of the GSA or the modifications thereto, it must follow that the changes were imposed by PCP/EnCana through its right of control over its agent. Defendant's opposition to Gallo's proffered individual material facts #'s 182-184 offers the alternative inference. In their opposition to Gallo's proposed undisputed facts, Defendants allege that WD/PCES's CFO, Brent Heagy reviewed the 1998 amendments and assignment and approved the changes and recommended adoption. Defendants point out that the fact that a deponent cannot remember the details of a paper signed several years previously is not necessarily indicative of control of the subsidiary's processes by the parent. The court must agree. The court, being bound to draw all inferences in [*55] favor of the non-moving party, must infer that the undisputed facts show that WD/PCES's CEO was a person with a short memory and a propensity to delegate important decisions.

Gallo's individual proffered material facts #'s 203-215 pertain to the 2002 amendments to the GSA. Gallo alleges, in sum, that the 2002 amendments altered both the pricing index and the pricing points both prospectively and retrospectively to 1998. Gallo also alleges that prior to the written amendments in 2002, there were unwritten operational changes in pricing that occurred in 2001 that altered both the index and the pricing points for some of PCP/EnCana's sales to WD/PCES. Gallo contends that the modifications brought about both by the operational changes in 2001 and the amendments in 2002 would be contrary to WD/PCES's interests and therefore both the operational changes and the adoption of the 2002 amendments evince PCP/EnCana's controls over WD/PCES. The central UMF alleged by Gallo states that the operational changes instituted in 2001 had the effect if increasing the price WD/PCES paid for natural gas in 2001 by $ 50 million over the prior method of price computation. UMF # 215. Defendants vigorously oppose [*56] Gallo's UMF and allege that, because of the retroactivity of the changes, PCP/EnCana was required to pay WD/PCES $ 11 million. Defendants also allege the changes in computation of pricing were beneficial to WD/PCES because they brought WD/PCES practices into conformity with prevailing industry practices.

Gallo's argument with respect to the 2001 operational changes and the 2002 amendments does not provide a basis for the court to find that PCP/EnCana exerted, or had the right to exert, control over WD/PCES. There are two reason. First, the court finds that Defendants have raised an issue of material fact as to Gallo's central proffered undisputed material fact. Gallo does not actually dispute Defendants' allegation that the changes resulted in a net payment of $ 11 million to WD/PCES. Thus, Gallo has not established that the changes actually resulted in, or would have been understood to result in, economic disadvantage to WD/PCES. Second, even if Gallo's proffered material fact was unopposed, the court cannot make the necessary inference that the changes were necessarily disadvantageous to WD/PCES just because WD/PCES would have had to pay more for the natural gas. [HN36] In a market where [*57] increases in cost could be passed through directly to the consumer, the marketer is not necessarily disadvantaged, and could in some cases be advantaged, by having to pay higher prices to the producer. Again, Gallo's argument requires the court make impermissible inferences in favor of the moving party. This the court cannot do.

With respect to WD/PCES's approval of the 2001 operational changes and the 2002 amendments to the GSA, Gallo alleges that WD/PCES's CEO, Mr. Elias, was unable to recollect approving the changes and did not participate in negotiations that produced the changes. As with Gallo's allegations regarding the 1998 amendments to the GSA, Gallo's allegations are insufficient to support a finding that PCP/EnCana controlled WD/PCES because the court cannot make the required inferences in Gallo's favor. As with Gallo's allegations regarding the 1998 amendments, Defendants allege, and Gallo does not dispute, that the negotiations with respect to the 2001 operating changes and the 2002 amendments to the GSA were negotiated by WD/PCES's CFO. As before, the court cannot infer that PCP/EnCana controlled WD/PCES's acceptance of the changes when it can, on the same evidence, infer [*58] in the non-moving party's favor that WD/PCES was headed by a person with a short memory who delegated responsibility.

### 4. Longterm Pipeline Commitments Held by WD/PCES

Gallo's UMF's # 216 through 242 are proffered to support Gallo's contention that PCP/EnCana's assignment of long term pipeline commitments originally held by PCP/EnCana to WD/PCES evince control by the former over the latter. Long term pipeline commitments are, so far as the court can discern from the proffered UMF's, contracts that secure constant defined rights to daily pipeline capacity for a defined term between defined points at a defined price. [HN37] Long term pipeline commitments benefit the producer by guaranteeing ac-

cess to marketing destinations and by hedging against the risk of price spikes in the short-term pipeline market. In hedging against the risks of pipeline unavailability or price increases due to competition for volume availability, the long term commitment holder takes on the risk of having to pay the contract price for the pipeline volume whether it is used or not. The holder also takes the risk that the short-term transmission rate might fall below the long-term rate for a long period of time.

The original [*59] pipeline commitment secured by PCP/EnCana was for a term of twenty years. The parties do not dispute that PCP/EnCana assigned its long term pipeline commitment to WD/PCES at the time the latter was formed in 1998. Gallo contends, and the court agrees, that the assignment of the long term pipeline commitment at the inception of WD/PCES resulted in the off-loading of the risk associated with the commitment onto WD/PCES while PCP/EnCana maintained the benefit of guaranteed pipeline access for its product. Gallo alleges that during the time period at issue, it was not normal for a marketing company to hold pipeline commitments because the benefit accrued for the most part with the producer, not with the marketer. Defendants contend that at the time PCP/EnCana entered into the long term commitment, the structure of the market was such that the assignment of the commitment to the marketing subsidiary would have worked to the benefit of the subsidiary. Defendants allege, and Gallo does not dispute, that in 2000, as a result of an audit by the firm Price Waterhouse Cooper ("PwC"), "EnCana made contributions to WD/PCES to offset the liabilities associated with the pipeline commitments." Opp. [*60] to Gallo's UMF # 226. Defendants also allege, and Gallo does not dispute, that the contributions by PCP/EnCana to WD/PCES were retroactive to 1998 so that the net effect was that PCP/EnCana assumed all liability for the long term commitments from the date of WD/PCES's beginning.

Gallo's argument that the assignment of the long term commitments to WD/PCES evinces PCP/EnCana's control over the former fails because Gallo has failed to show that the nature of the risk assigned to WD/PCES at its inception was something the new subsidiary could control. There is no dispute that the long term pipeline commitments that were assigned to WD/PCES preexisted the formation of the subsidiary, and Gallo offers no authority for the proposition that a subsidiary has authority to determine the risk it will assume at or before the time it is created. As previously noted, [HN38] a parent company spinning off a subsidiary may broadly set the policies and procedures of that company as well as determine the subsidiary's officers and board members without establishing a principal/agent relationship with the subsidiary. Seen in this light, the court must infer in

favor of the non-moving party that the initial decision [*61] to assign the risk of the long term commitment(s) to WD/PCES was a decision made during the start-up of WD/PCES that was later reversed with the consent of both parties for their mutual benefit. As such, the initial decision to assign the risk to WD/PCES does not conclusively evince control by PCP/EnCana, nor does the later decision by the parties to shift the risk back to PCP/EnCana evince control by the latter.

Again, Gallo proffers undisputed evidence that WD/PCES's president, Mr. Elias was not involved in the assignment of the long term commitments to WD/PCES nor was he involved in the PCP/EnCana's contribution that shifted the risk back to PCP/EnCana. As previously noted, the court cannot make the inference that because Elias was not involved, the decisions were made by or controlled by the parent company. Again, the court must infer that, in accord with Defendants' opposition to Gallo's UMF's, the responsibility for negotiation of the shifting of risk for the long term commitments was delegated to others in the organization.

### 5. The Audited Financial Statement

Gallo proffers undisputed material facts numbered 249 to 261 in which Gallo appears to allege that PwC prepared an audited [*62] financial statement in 2001 to cover WD/PCES's financial activities for the years 1998, 1999, and 2000. Gallo alleges PwC's statement contained a note (note 8 of the report) that explained the decision to retroactively transfer the risk of the long term pipeline commitments to PCP/EnCana in language that was supplied by PCES, Inc. The facts proffered by Gallo also allege Elias was not involved in any negotiations with PCP/EnCana concerning the modifications of the GSA and the CFO for WD/PCES, Mr. Heagy, did not recall any reasons given to WD/PCES by PCP/EnCana for the changes to the GSA.

Defendants vigorously oppose Gallo's proffered facts to the extent Gallo alleges Heagy was not involved in negotiations with PCP/EnCana concerning the terms of the changes to the GSA. Regardless of Defendants' opposition to Gallo's proffered facts, the court has examined Gallo's proffered material facts and cannot see any connection between what was found in the PwC report and Gallo's overall contention that PCP/EnCana had authority to, or did, control WD/PCES. Gallo does not dispute that WD/PCES requested the audit and the court can see no significance to the fact WD/PCES may have provided some of [*63] the language contained therein. The court finds Gallo's proffered undisputed material facts numbered 249 through 261 informative but not particularly relevant.

### 6. Transactions Between WD/PCES, EnCana, and Po Mex

In proffered undisputed material facts numbered 263 through 277 Gallo details a series of loan transactions that transpired between WD/PCES, EnCana and a natural gas company called Pan Canadian Mexico, Inc. ("PoMex"). The upshot of the alleged facts is that in 2000 EnCana found itself paying taxes on the interest generated by a loan to WD/PCES in both Canada and the United States and decided to take steps to essentially transfer the loan to the PoMex. It appears that, in essence, WD and EnCana loaned to each other and netted the loan amounts so that $ 54 million was owing from EnCana to WD. WD then loaned PoMex the $ 54 million and PoMex returned the $ 54 million to EnCana as a return of capital and made payments to WD on its loan at market rates. Presumably EnCana netted out its $ 54 million loan to WD and the payment on the $ 54 million loan from PoMex to WD was only subject to taxation in the United States.

The purpose of Gallo's inclusion of Gallo's UMF's ## 263 through 277 [*64] must be inferred because there is no direct reference to these facts in Gallo's moving papers or in Gallo's reply to Defendants' opposition. The court presumes Gallo's intent is to bolster its arguments that EnCana had the right to control WD because it presumably directed WD's actions in exchanging loan transactions with EnCana and with PoMex, and because it did so as part of EnCana's overall tax strategy. Defendants point out that each of the transactions involved in the tax-reduction transactions were carried out at appropriate market rates. Defendants also point out that EnCana's pay-off of the loan to WD was consistent with EnCana's rights under the terms of the loan and was beneficial for all parties.

Gallo's proffered undisputed individual material facts numbered 263 through 277 add little to Gallo's argument. Given that EnCana had need of a means to reduce its tax burden and probably approached WD and the other companies to make the necessary transactions, it does not necessarily follow that the participation of WD and PoMex in the transactions demonstrates EnCana's right of control over either of these entities. Again, Gallo's proffered undisputed material facts invite the [*65] court to improperly infer that the transactions were controlled and/or direct by EnCana. [HN39] Arms-length loans between companies are common, and even where a parent intrudes into the business of a subsidiary to the point of acting as guarantor of the subsidiary's promissory notes, the relationship is not necessarily one of principal/agent. See *Calvert, 875 F.Supp. at 679* (parent guaranteeing subsidiary's promissory note is "normal feature of parent-subsidiary relationships). The court must therefore infer in Defendants' favor that the transactions were beneficial to all parties and were the sort of transactions that would have been entered into by any truly independent corporation in similar circumstances or that were within the realm of normal parent-subsidiary relationships.

The undisputed material facts Gallo alleges to support its contention that EnCana had the right of operational control over WD fall into one of three categories. Some of the undisputed facts are unpersuasive because they fail to show the sort of *interim control* that is necessary to establish a principal/agent relationship. For example, allegations that WD was required to make regular reports concerning the gas market [*66] or that it was required to conduct sales according to requirements set by EnCana fails to show a level of control that is beyond the control that a producer could contractually assert over a marketer. Some of the facts alleged by Gallo tend to support the contention that WD was controlled by EnCana, but fail to prove the contention as a matter of law. Examples include the alleged facts that EnCana appointed WD's officers and directors or that EnCana set broad elements of WD policies and procedures with regard to compensation or risk management. The third category of undisputed material facts alleged by Gallo fail to show EnCana had the right of operational control over WD because the facts alleged require that inferences be drawn in favor of Gallo. Examples include Gallo's allegations that WD's CEO was non-participatory in the negotiation of the GSA or knowledgeable of its contents, or that WD was burdened with EnCana's long term pipeline contract at the time WD was formed.

As previously noted, Gallo's burden is to offer some fact or set of facts that definitely and unequivocally proves that EnCana had the right to control WD's operations at the time of the events giving rise to this [*67] case. Gallo's proffer of undisputed material facts fails to make this proof with respect to Gallo's contention that EnCana had operational control of WD.

### C. Representative Services Doctrine -- Unocal and Modesto City Schools

Gallo's second argument contends that WD was the agent of EnCana because WD fulfilled a significant function in the United States such that WD's presence in the United States substituted for the presence of EnCana. In other words, Gallo contends its proffered undisputed material facts establish that WD was the agent of EnCana according to the representative services doctrine as articulated in Unocal and Modesto City Schools. For the reasons that follow, the court finds Gallo's argument unpersuasive.

Unocal, Modesto City Schools, and Bowoto, represent decisions by district courts of this district that have analyzed the issue of agency using what the court in

Bowoto described as a test focusing "on the parent's dependence on the subsidiary's services," *Bowoto, 312 F.Supp.2d at 1243*, and Sierra Diamond called the "representative services doctrine." The Modesto City Schools court summarized the several "factors" examined in *Chan v. Soc'y Expeditions, Inc., 39 F.3d 1398 (9th Cir. 1994)* [*68] , and *Bulova Watch Co., Inc. v. Hattori & Co., Ltd., 508 F.Supp. 1322 (E.D. N.Y. 1981)*. The Modesto City Schools court [HN40] listed the following "factors:" (1) percent of the parent's business coming from the resident subsidiary; (2) whether the subsidiary was the parent's only agent in the forum; (3) whether the parent conducted any marketing in the forum; (4) the interchange of personnel between parent and subsidiary; (5) the overlap of directors and officers; (6) percent of parent's production that moved through the subsidiary; (7) the significance of the subsidiary in the parent's organizational life; (8) the subsidiary's marketing of the parent's products; (9) the extent to which the parent was informed of activities undertaken by the subsidiary; and (10) the relationship between the cause of action alleged against the subsidiary on behalf of the parent. *Modesto City Schools, 157 F.Supp.2d at 1135*.

The Unocal court did not list [HN41] any "factors" with respect to its analysis of the alleged agency relationship, but rather focused on whether, but for the existence and activities of the subsidiar[y], Unocal would have been required to carry out the same functions itself. See *Unocal, 248 F.3d at 930* [*69] ("the general agency test requires that the agent perform some service or engage in some meaningful activity in the forum state on behalf of its principal such that [the agent's] presence substitutes for the presence of the principal"). The court in Botowo cited Modesto City Schools but went on to list the facts particular to that case that received that court's particular attention. Those [HN42] "factors" included the degree and content of communications from the subsidiary to the parent, the degree to which the parent set policy, the officers and directors the parent and subsidiary had in common and the reliance by the parent on revenue produced by the subsidiary. *Bowoto, 312 F.Supp.2d at 1243*.

As has been previously discussed, [HN43] some or most of the "factors" listed -- overlap of directors and officers, extent to which parent is kept informed of subsidiary activities, degree to which parent sets policy, and reliance by parent on revenue produced by subsidiary -- are factors that are not, in and of themselves, determinative of a principal/agent relationship. In addition, the other "factors" listed above, including percent of the parent's business coming from subsidiary, and percent of parent's [*70] production that moved through the subsidiary, are factors that will always be greater than zero in any parent/subsidiary relationship but do not admit of

clear cut-offs or levels at which a principal/agency relationship is presumptive.

[HN44] The court concludes the "factors" listed in *Bowoto* and *Modesto City Schools* are not factors in the usual sense of being elements of proof that must be addressed to make a required showing. Rather the "factors" are simply groupings of facts that were found useful on an *ad hoc* basis to explain what a court considered when it came to that particular decision. This point is important because what the courts in Bowoto, Unocal, and Modesto City Schools were deciding is whether the party asserting the agency relationship had adduced facts sufficient to make a *prima facie* case of agency such that the evidence could be presented to a jury.

The district court decisions in Unocal and Modesto City Schools addressed situations where the court was called upon to decide *defensive* motions to dismiss for lack of jurisdiction. The decision in Bowoto, applied the approach used by Unocal, Modesto City Schools, Bulova Watch and others to address a *defensive* motion for summary [*71] judgment on the issue of liability. The defensive posture of the moving party in these cases means that the court was called upon only to decide if the non-moving party had pled or adduced facts sufficient to show a *prima facie* case for agency such that the matter could be tried before a jury. See *Bowoto, 312 F.Supp.2d at 1246* (non-moving party presented facts from which a *jury* could find agency). In that context the "factors" do not represent elements of an agency relationship, but rather are categories of facts that a *jury* could examine and weigh to determine if an agency relationship existed under the particular facts of that case.

In the present case, the court need not look at any "factors" as Gallo suggests because the court is not looking to see if there is evidence upon which a *jury* could find that WD's presence in the United States substituted for EnCana's. What the court is looking for in this case is whether undisputed facts exist from which a jury could rationally determine that WD's presence in the United States did *not* substitute for EnCana's.

Two undisputed material facts argue in favor of the proposition that a jury could find undisputed facts upon which it could rationally [*72] decide that WD's presence in the United States did not substitute for that of EnCana. First, EnCana sold gas to a third-party marketing company before it created WD/PCES and there is nothing that would indicate that EnCana could not contract with a third party to market its equity production in the United States if WD were not present. This fact is bolstered by the fact that EnCana began marketing gas through WD in 1998 and made the decision in 2002 to discontinue its marketing operations after only four years. Gallo's UMF # 290. This strongly suggests that

WD's sales activities in the United States, even they accounted for a substantial portion of EnCana's total equity sales, were not central to EnCana's overall business.

In Modesto City Schools, the court found the size and importance of the market was an important factor in determining whether a sales subsidiary is fulfilling a function that the parent would fill but for the subsidiary's presence. *Modesto City Schools, 157 F.Supp.2d at 1136.* In *Modesto City Schools*, the court found a jury could, on the facts adduced, find that where the parent company sold about 20% of its product through a sales subsidiary that it established more [*73] than 10 years before the action, the jury *could find* that the sales subsidiary functioned as an agent of the parent. Here the situation is reversed, the court finds that the undisputed evidence of the temporary nature of EnCana's sales subsidiary in the United Sates means that a jury *could find* that the sales subsidiary *did not* fill a function that EnCana would have to fill but for the subsidiary's (WD's) presence in the United States.

Second, while WD sold all of EnCana's equity production that was sold in the United States, that equity production accounted for only about a third of WD's total sales. From this, the court may infer that EnCana's equity production could reasonably be handled by one or a small number of third-party marketers in the United States. This fact distinguishes the present case from Modesto City Schools in another important way. In Modesto City Schools, the defendant foreign corporation marketed its product through a *network* of exclusive dealers who belonged to the subsidiary marketing corporation. *Id. at 1132.* Here, no such network of exclusive dealers exists. Where the Modesto City Schools court found that it could not be convinced on the evidence that the [*74] parent corporation *could* sell its product in the United States in the absence of the subsidiary, *id. at 1136*, this court finds in the instant case that it is not convinced that EnCana *could not* sell its product in the United States through third-party marketers in the absence of WD.

It should be apparent by this point that the court's main concern with respect to Gallo's argument for application of the representative services doctrine is the nature of the proof Gallo is required to produce because of its posture as a moving party trying to affirmatively establish a principal/agent relationship for the purpose of attaching liability to the principal. [HN45] Affirmatively proving that the presence of a subsidiary in a foreign jurisdiction substitutes for the presence of the parent as a matter of law represents a high hurdle for the moving party. The undisputed facts need only support a colorable argument that the parent could function as well without the subsidiary in order to defeat the summary judgment motion. Given the inherently ambiguous nature of the representative services doctrine, it is no accident that the

court can find no case where a court has granted summary judgment to a party [*75] that has moved to affirmatively establish liability from a principal/agent relationship using the representative services doctrine.

Of the case authority cited by the parties, the court can only identify a single case where the court was required to consider an offensive motion to determine an agency relationship as a matter of law. In Comind, the plaintiff, an insurer, sought complete subrogation of payments it made as a result of a helicopter crash in Brazil. The helicopter was sold pursuant to a contract that the defendants contended contained tort disclaimer provision that prevented the suit against the sales subsidiary corporation. *Comind, 116 F.R.D. at 400-401.* In the motion before the Comind court, the manufacturing parent corporation sought summary judgment that the sales subsidiary acted as its agent in the sale thereby making the protection of the tort disclaimer provision of the sales contract available to the parent manufacturing corporation. Id.

Significantly, the *Comind* court's analysis focused on the degree of operational control of the parent over the subsidiary, not on the importance of the subsidiary to the parent's business. The court found that a principal/agent relationship [*76] was evinced by undisputed facts showing that personnel from the parent prepared the sales contract and its amendments for the subsidiary; "participated and dominated the negotiations for the [sales] contract; prepared invoices on [the subsidiaries] letterhead; arranged for the delivery of the aircraft; and prepared the bill of sale. Additionally [the principal had the subsidiary] grant it an express power of attorney authorizing [the subsidiary] to bind [the parent] to the contract." *Id. at 403.*

At least one other court has expressed some discomfort in granting an offensive motion for summary judgment motion for liability on a representative services theory of agency. See *Presbyterian Church of Sudan v. Talisman Energy, Inc., 453 F.Supp.2d 633, 688 (S.D. N.Y. 2006)* (stating doubts that liability could be imposed where there was no proof of control of the subsidiary by the parent). Although this court also has some doubts that the representative services doctrine presents a proper framework for the analysis of a putative principal/agent relationship where the context is an offensive summary judgment motion to impose liability, the court need not decide the issue in this case because [*77] Gallo's proof is insufficient to establish as a matter of law that WD substituted for EnCana's presence in the United States.

## CONCLUSION

Gallo's motion for summary judgment on the issue of EnCana's liability under a theory of principal/agent

must fail because Gallo has failed to adduce facts sufficient to show that EnCana controlled WD or that WD's presence in the United States substituted for that of the parent company. The reason Gallo fails to adduce sufficient facts is that many of the facts offered by Gallo require impermissible inferences in Gallo's favor or because the facts adduced do not conclusively show that EnCana retained the right of control over WD.

The court will deny the Gallo's present motion for summary judgment and will continue to take under submission the two remaining dispositive motions. No additional briefing by the parties will be required unless and until requested by the court.

THEREFORE, for the reasons discussed above, Gallo's motion for summary adjudication on the issue of EnCana's liability under a theory of principal/agent is hereby DENIED.

IT IS SO ORDERED.

**Dated: May 23, 2008**

> **/s/ Anthony W. Ishii**

> UNITED STATES DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that a true and correct copy of the foregoing document was served upon the parties and counsel of record, through the Court's ECF system, on May 18, 2009.

    /s/ Patrick J. Ahern
Patrick J. Ahern
One of the Attorneys for Defendant
Tatung Company of America, Inc.

CHIDMS1/2705864.2

Baker & McKenzie LLP
One Prudential Plaza, Suite 3500
130 East Randolph Drive
Chicago, IL  60601

1

Case No MDL No. 1917
Request for Judicial Notice in Support of Tatung Company of America's Motion to Dismiss