# EXHIBIT A

1

```
 1   STATE OF SOUTH DAKOTA      )          IN CIRCUIT COURT
                                : ss.
 2   COUNTY OF PENNINGTON       )      SEVENTH JUDICIAL DISTRICT

 3   ****************************************************************

 4   LINDA CORNELISON, on behalf )
     of herself and all others   )         COPY
 5   similarly situated,         )
                                 )
 6           Plaintiff,          )
                                 )         Motion Hearing
 7   vs.                         )         Case No. CIV03-1350
                                 )
 8   VISA USA, INC., MASTERCARD  )
     INTERNATIONAL, INC.,        )
 9                               )
             Defendant.          )
10
     ****************************************************************
11
     PROCEEDINGS:  The above-entitled matter commenced on the 28th
12
                   day of September, 2004, at the Pennington County
13
                   Courthouse, Rapid City, South Dakota.
14
     BEFORE:       The Honorable Janine M. Kern
15
     ****************************************************************
16

17

18

19

20

21

22

23

24

25
```

Jean A. Kappedal, RPR

```
 1   APPEARANCES:    Mr. Aaron D. Eisland
                     Attorney at Law
 2                   PO Box 6900
                     Rapid City, SD  57709
 3                   Representing the Plaintiff.

 4                   Mr. Steven J. Mitby
                     Attorney at Law
 5                   601 Montgomery Street, Suite 601
                     San Francisco, CA 94111
 6                   Representing the Plaintiff.

 7                   Mr. Gene LeBrun
                     Attorney at Law
 8                   PO Box 8250
                     Rapid City, SD  57709
 9                   Representing Defendant Visa.

10                   Mr. Stephen V. Bomse
                     Attorney at Law
11                   333 Bush Street
                     San Francisco, CA  94104
12                   Representing Defendant Visa.

13                   Mr. Gregory Erlandson
                     Attorney at Law
14                   PO Box 2670
                     Rapid City, SD  57709
15                   Representing Defendant Mastercard.

16                   Ms. Patricia C. Crowley
                     Attorney at Law
17                   1615 L Street N.W., Suite 1300
                     Washington, DC 20036-5694
18                   Representing Defendant Mastercard.

19

20

21

22

23

24

25
```

Jean A. Kappedal, RPR

1       **THE COURT:**   This is the time and place set for

2   motion hearing in File Civil C03-1350, in the matter of

3   Linda Cornelison, on behalf of herself and all others

4   simply situated, plaintiffs, versus Visa USA, Inc. and

5   Mastercard International, Inc.

6       If the Plaintiffs would begin by noting their

7   appearance with local counsel first, please.

8       **MR. EISLAND:**   Aaron Eisland, local counsel for

9   Plaintiff.

10       **MR. MITBY:**   Steve Mitby, your Honor, for

11   Plaintiff.   I will spell my last name, M-I-T-B-Y.

12       **THE COURT:**   Thank you.

13       **MR. LEBRUN:**   Gene LeBrun for Visa USA, Inc.

14       **MR. ERLANDSON:**   Good afternoon, Greg Erlandson,

15   local counsel on behalf of Mastercard.

16       **MR. BOMSE:**   Stephen Bomse, B-O-M-S-E, for Visa.

17       **MS. CROWLEY:**   Good afternoon, Patricia Crowley

18   on behalf of Mastercard International, Incorporated.

19       **THE COURT:**   Thank you.   Mr. Bushnell (sic) and

20   Mr. Erlandson, you have filed a motion to dismiss.   I

21   would like to begin with you and then I'll hear from

22   Plaintiff's counsel.

23       I'm sorry, Mr. LeBrun.

24       **MR. LEBRUN:**   Mr. Bromse will make the argument.

25       **MR. BOMSE:**   Your Honor, I don't know if you

1   have any preference as to whether or not counsel stands

2   when they address you or remain seated.

3            THE COURT:  Either.  Whatever you are most

4   comfortable with.  You can sit, you can stand.

5            MR. BOMSE:  I'm actually going to stand up and

6   test my eye sight here, but if I find my notes are

7   swimming, I may change my mind.

8        Thank you, your Honor.  It's very nice of the Court

9   to set aside this time to hear us on this motion.  As

10  your Honor may be aware, from the papers, this is one of

11  a number of what we call follow-on lawsuits which were

12  filed in various states around the country, approximately

13  20 of them, in the wake of the settlement of a federal

14  antitrust class action against my client, Visa and

15  Mastercard.  And the way we have been doing this in the

16  various states, is Mastercard and Visa have divided up

17  the arguments so I will be speaking this afternoon

18  principally on behalf of both defendants.  If the

19  Court --

20           THE COURT:  That's fine.

21           MR. BOMSE:  In those cases we have argued a

22  number of these motions previously and five of them have

23  been decided already.

24       We referenced three in our papers, New York,

25  Michigan and North Dakota, where the courts granted our

Jean A. Kappedal, RPR

1   motions to dismiss essentially on the same grounds that

2   we urge here.  There is a fourth case that was decided

3   subsequent to the last briefs which is Minnesota.  It's a

4   case called Gordon Gutzwiller and the Court has received

5   that opinion which we sent in subsequently.

6       There is -- in addition, a fifth case, which, like

7   the other four, also dismissed the antitrust claims,

8   although in that case it was on entirely unrelated

9   grounds.  Obviously, we hope that we'll be able to

10  persuade your Honor that those cases were correctly

11  decided and that your Honor will elect to follow them.

12      We believe that while it is clear that South Dakota,

13  like the other states in which these cases are pending,

14  has decided that it does not wish to bar all indirect

15  purchaser cases.  That in no means grants a license for

16  any and all indirect purchases or cases without regard to

17  any standing limitations.  We believe rather that the

18  intention of the legislature was that in appropriate

19  cases indirect purchaser cases be permitted, but that

20  there still needs to be an analysis of standing under

21  what the Supreme Court and various other courts have

22  referred to as the analytically distinct requirement of

23  standing.  Analytically distinct, that is from the

24  Illinois Brick Rule which is a specific federal policy

25  based rule.

1      Now, just to put this matter in some context
2   factually.  We, of course, accept the allegations of
3   Plaintiff's complaint for these purposes.  They claim
4   that Visa and Mastercard have rules which improperly tie
5   the acceptance of Visa and Mastercards credit cards to
6   Visa and Mastercards debit cards.  They claim that, as a
7   result of that, merchants ended up paying more to accept
8   Visa debit cards then they otherwise would have.  To that
9   extent, these cases and the federal case are entirely
10  common.  That was that description I just gave you was a
11  description of the claim in the federal case.
12      In the federal case, that was where it stopped.
13  That is, the merchants claimed that they ended up paying
14  too much money and as your Honor again may know, if
15  you've had an opportunity to read the papers, we settled
16  those cases on the eve of trial facing a 100 billion
17  dollar damage exposure paying three billion dollars
18  seemed like the better part of valor.
19      Now, in these cases, we regard as important and we
20  find depositively a different additional step because the
21  claim now made is that once those merchants pay too much,
22  as it's alleged, to accept Visa and Mastercard debit
23  cards, they, in turn, raise the prices of everything they
24  sold to every consumer and regardless of how that
25  consumer paid for those things.  Thus we don't have a

1  claim here that involves the purchase of our service, our
2  debit card service, which is offered to merchants.  We
3  don't even have a claim, based upon the resale of a
4  product containing that service as an ingredient.  It's
5  hard -- hard to imagine litigation.  Particularly what
6  that means, it's clear that it doesn't include the claims
7  here because in fact we know that according to the
8  plaintiff's theory and their complaint, it doesn't matter
9  whether a debit card in fact entered into the resale
10  transaction.
11        In that sense, these claims are what we have
12  referred to in our papers as overhead claims.  It is, as
13  if some cost of doing business, we gave an example of a
14  telephone service where the telephone prices went up to
15  merchants and the theory would be the merchants then
16  raised the price of spaghetti or tennis rackets or
17  television sets because they paid too much for telephone
18  service.  Or to use an example that the Plaintiffs seem
19  to be fond of.  They say this is a tax and a tax is in
20  effect a form of overhead.  It's a cost of doing
21  business.  And the question that we confront here today
22  is, can you bring a claim like that merely because South
23  Dakota, which generally follows federal law, and there is
24  abundant law that says that they are expected to follow
25  antitrust law merely because in this case the South

1    Dakota legislature has decided that we are going to a
2    limited extent to depart from federal law by allowing
3    indirect purchaser cases to be brought.
4        They say that the language of the statute begins and
5    ends.  The inquiry although, as I'll explain in a few
6    minutes, even they don't really believe that because they
7    don't argue that there is no standing limitation.  They
8    just want you to adopt a different one.  Something they
9    call target area and I'll come back to that.
10       But their basic position is when Illinois Brick was
11   disavowed in South Dakota, that was the end of standing.
12   We say that that is not so.  Any more than it was found
13   to be so in New York or Michigan or North Dakota or
14   Minnesota and any more than courts in those states in
15   other cases not involving the Visa and Mastercard have
16   simply abandoned the standing inquiry because they are
17   Illinois Brick repealer states.
18       **THE COURT:**  Well, how would you respond to the
19   Plaintiff's alternative suggestion to the Court that if
20   the Court is persuaded by your argument, that they should
21   be allowed to redefine the class to include only South
22   Dakota residents who purchase goods or services using
23   Visa or Mastercard branded debit cards?
24       **MR. BOMSE:**  Well, I would say this.  I would
25   say that it is a class definition which makes no sense in

1    terms of the allegations.  It's an attempt really in a --
2    I don't want to be projective in suggesting it's cute
3    because that's not exactly what it is.  But it is
4    attempting to connect two things that have no connection.
5    Let me explain what I mean.  The theory that they have,
6    because that's -- we know it from the class that they
7    have originally defined here and everywhere is a class in
8    which the presence or absence of a debit card has nothing
9    to do with the offense.  So we know, as we start out,
10   that there is no causation here that involves a debit
11   card otherwise that would have been the class that they
12   would have defined.
13        Their theory inside is in the same way as my
14   telephone or tax or janitorial service example, somebody
15   pays too much, they end up passing the cost along in all
16   products.  So that the presence or absence of a debit
17   card is therefore unrelated to the theory of violation.
18   To give the Court an example, I'll go back to my
19   telephone example.  Let us say that the theory was that
20   there was a conspiracy to raise telephone prices.  The
21   claim is brought.  Say prices of everything were raised
22   to every purchaser in the State of South Dakota.  Motion
23   to dismiss is made.  They say, well, let us redefine our
24   class as people who bought things over the telephone as
25   opposed to coming into the store.  It seems to me we

1    would fairly say there, as we ought to fairly say here,

2    hey, wait a minute, that makes no sense.  The existence

3    of a telephone sale as opposed to an in-person sale has

4    nothing to do with the theory of what was wrong anymore

5    than it does in this case.

6        So it seems to me that their attempt ought to fail

7    because it really doesn't have anything to do with the

8    case.  I could in fact go further, but I think I would be

9    outside of the pleadings.  But when we were arguing this

10   case with one of counsel's partners in Washington, DC,

11   the Judge said, you know -- because the same argument was

12   made by the same lawyers -- the Judge said, "you know, I

13   understand the theory, but isn't it somehow backwards to

14   say that it's the debit card people who somehow ought to

15   have the claim as opposed to anybody else?  After all,

16   the debit card people are the people who presumably got

17   the benefit of having a debit card. They wanted to use

18   the debit card."

19       Now, I don't think you need to go that far here.  I

20   think you merely need to find that there is no

21   relationship between the offense and the proposed

22   redefined class in order to say that that kind of a

23   redefinition isn't appropriate.  Again, while this Court,

24   of course, is going to make up its own mind, this issue

25   was briefed specifically in Michigan on a motion for

1  reconsideration which the Court denied as having raised

2  no new arguments.

3      Now, your Honor, if we go back to the question of

4  why we say standing rules still ought to apply here.  It

5  seems to me, that we go back to the fact that we do have

6  a difference between Illinois Brick and standing rules.

7  As I said, analytically distinct.  And courts have

8  recognized that one needs to still look at whether a

9  claim is so remote, whether the damages claimed are so

10  speculative and complicated in proof that we really are

11  beyond the bounds of what is sensible even in a place

12  where indirect purchaser cases are allowed.

13      As I say, in none of the states where we have been

14  successful so far has the law been any different.  We

15  have here not a claim that somebody's bought a product

16  that indirectly passed through a chain of distribution,

17  we don't have a claim that this is a product that became

18  an ingredient in something that passed through a chain of

19  distribution.  We have a claim here that is in effect for

20  every single product purchased by anybody not even in a

21  way that involves this product.  This is, as we say, a

22  non-purchaser case just as the Court found in Michigan

23  and then more recently in Minnesota and North Dakota.

24      You really don't have an assault, Plaintiffs

25  arguments to the contrary notwithstanding.  You don't

1    have an assault here on indirect purchaser cases.  You

2    have here a sensible application of some limits to claims

3    which really can't be proven and if we think about what

4    it is that's being alleged here and what it is the Court

5    is being asked to embark upon if this case goes forward,

6    I think that that becomes clear.  I don't know what it is

7    that Ms. Cornelison does or doesn't do herself in terms

8    of purchase, but if I think of myself on a Saturday

9    morning going out to do the errands, you go to the gas

10   station, you fill up your tank and you pay perhaps with

11   cash.  You go to the grocery store, maybe you buy 20 or

12   30 different items.  You might write a check there.  You

13   go pickup the dry cleaning, maybe you go and buy yourself

14   a new tennis racket, at night maybe you go out to dinner.

15   One day one person we now have to know what is it that

16   happened with respect to the dry cleaning and the corn

17   flakes and the gasoline and the meal in the restaurant

18   and the tennis racket.  We have to know what it is that

19   happened to the price of those goods because of some tiny

20   little fraction.  Because, to begin with, the price that

21   merchant pays for card services is on the order of one to

22   one and a half percent, if it's a debit card.  By the

23   time you spread -- decide what portion of that is, quote,

24   "an overcharge", and you then spread out that overcharge

25   out among all of the purchases, you can't be talking

1   about more than let's say ten cents on a hundred dollar

2   purchase.

3        And yet the theory is that for all of these various

4   things, somehow prices were affected in a way that

5   adversely affected Ms. Cornelison and any other consumer

6   in a class to be certified in this state.  And it doesn't

7   seem to me that once you think of it in those terms, that

8   the rhetoric which the courts have been prompted to use

9   in Michigan and in New York and in Minnesota is really

10  hyperbolic at all when they say these claims are far

11  beyond the capacity of a court to try.  So speculative

12  that no expert could possibly deal with them and

13  therefore not of a kind that are capable of being

14  adjudicated under the antitrust laws whether you allow

15  indirect purchaser claims or you don't.

16       I really do think that in some ways the Minnesota

17  Court, which is the most recent and I think the most

18  elaborate, pretty well incapsulated what we would have to

19  say to your Honor in the summary of its ruling.  The

20  Court said that, "despite the broad language of the

21  Minnesota antitrust law as set forth in that statute and

22  the broad language contained in a case in that court,

23  called Philip Morris, not every person claiming some

24  remote or tangential injury from an antitrust violation

25  can maintain a suit under the Minnesota antitrust laws."

1   The Judge then said "a literal reading of the Minnesota
2   statute is broad enough to encompass any harm it can be
3   attributed either directly or indirectly to the
4   consequences of an antitrust violation."  That being, of
5   course, exactly the argument that the plaintiffs make.
6   They say, "even though" -- I'm sorry, the Court in
7   Minnesota said, "even though the language of the statute
8   is clear and unambiguous, the Court must interpret the
9   statute in a manner which will not lead to an illogical
10  or absurd result."
11      "In this case, the Plaintiff's proposed
12  interpretation would lead to a decision that would
13  provide a remedy in damages for any injury, however
14  minor, that might conceivably be traced to the antitrust
15  violation in issue.  In short, the Plaintiff's proposed
16  construction of the Minnesota antitrust law, carried to
17  its logical conclusion, would provide the general public
18  and/or general taxpayer standing to sue for most
19  antitrust causes of action."
20      "In this case, the Plaintiff's proposed class is
21  likely as large or larger than a class limited to
22  Minnesota residents who pay property or income taxes."
23      "In this case, Plaintiff has only an abstract or
24  tenuous connection to the subject matter of the case.
25  Therefore, he lacks standing to sue for the injuries he

1    claims to have incurred."

2         Now, that's longer than I ordinarily would trouble

3    the Court to read, but it seems to me that there is a

4    particular reason why it is appropriate to read to the

5    Court at that length from the Minnesota opinion.  And

6    that is that the Plaintiff's have in fact told your Honor

7    that you ought to pay particular attention.

8              **THE COURT:**  What page, Counsel?

9              **MR. BOMSE:**   Page 12.  There is pages eight and

10   nine and pages 12 here.  I'm reading, your Honor,

11   Minnesota's antitrust statute, exactly like South

12   Dakota's, grants standing to persons injured directly or

13   indirectly by an antitrust violation.  They then refer to

14   this Philip Morris case which was referenced also by the

15   Judge.  Then to quote again, "because Philip Morris

16   decisively rejects defendant's arguments, it must be

17   considered in some detail."  In other words, they are

18   saying, take a look at the same statutory language, take

19   a look at what Minnesota does.  Well, we say, amen to

20   that, but the decision that one, of course, needs to take

21   a look at, we suggest, is the decision addressing a claim

22   which is virtually identical brought by the same counsel

23   and decided within the past few weeks.

24         It is also the case, your Honor, that South Dakota

25   actually has a statute which urges the Court to construe

16

1        its laws in a way that is congruent with the laws of

2        other states.  Not only the federal law, but the laws of

3        other states.  It's 37-1-22.  And Plaintiff's also, in

4        their brief, again urge the same -- the same thing here

5        at pages eight and nine.  Decisions -- again quoting,

6        "decisions from other state courts construing statutes

7        with virtually identical language provide persuasive

8        authority as to how South Dakota courts should interpret

9        South Dakota's antitrust law and they quote there SDCL

10       37-1-22.  It is the intent of the legislature that in

11       construing this chapter, that the courts may use as a

12       guide, interpretations given by state courts to

13       comparable antitrust statutes.

14            I would say, your Honor, that in this case the

15       comparable antitrust statutes, by their own terms, is

16       Minnesota, but it also is New York which is a repealer

17       state.  Michigan, that's the Stark case, which has

18       essentially identical language and is a case again

19       brought allegedly essentially identical violations by the

20       same counsel, and North Dakota.  It is not merely that

21       those courts have ruled in the way they have done, but

22       the fact that their analysis, we believe, is correct,

23       that together with the statute urging conformance, we

24       would suggest, adds yet further support for the broad

25       argument that we would make.

1    So, your Honor, we have tried to set out as

2    carefully as we can and as clearly as we can why we think

3    these cases can't go forward.  I've tried today to

4    summarize for the Court what our views are on that issue

5    and while I'm, of course, happy to respond to questions

6    that the Court has, at this point that would be our

7    submission.

8              THE COURT:  All right.  The Court would like to

9    hear from Ms. Crowley.  Is there anything you want to

10   add?

11             MS. CROWLEY:  No, I have nothing to add.  Thank

12   you, your Honor.

13             THE COURT:  All right.  Counsel?

14             MR. MITBY:  Thank you, your Honor.  Steven

15   Mitby on behalf of the -- on behalf of the Plaintiff.

16        Your Honor, this case is about South Dakota law not

17   federal law, not New York law and not the law of any

18   other state.

19        First, motions to dismiss are extremely disfavored

20   under South Dakota law and are rarely granted unless this

21   case is an extremely unusual case in which the pleadings

22   alone demonstrate to your Honor that there is no way that

23   the Plaintiffs could prove a cause of action, this Court

24   should not consider dismissing these claims of the

25   pleadings.

18

1      Secondly, by enacting one of the broadest antitrust

2    remedial statutes in the United States, the South Dakota

3    legislature explicitly rejected the very limitations on

4    standing that the Defendants advance here.   South Dakota

5    Codified Law 37-1-33 states unequivocally, and I'm going

6    to quote, "no provision of this chapter may deny any

7    person who is injured directly or indirectly in his

8    business or property by a violation of this chapter, the

9    right to sue for and obtain any relief afforded under

10   Section 37-1-14.3".

11      Now, under the expressed terms of this statute,

12   Plaintiffs have an absolute right to bring this action in

13   a South Dakota court because they were injured by

14   defendant's anti-competitive conduct.  Defendant's

15   illegal tying arrangement caused injury to consumers by

16   raising the price of consumer goods throughout and in

17   fact, the defendants do not even deny that consumers made

18   a portion of the fees that they charged to merchants and

19   how could they?  Whatever portion.  Excessive fees

20   merchants didn't absorb of your overhead, consumers might

21   have paid in higher prices in this case.  There are two

22   groups of victims in the Defendants' anti-competitive

23   conduct, consumers and merchants.  Moreover, the injury

24   to merchants is not speculative or remote.  While

25   merchants absolve and part of it, like 12 billion dollars

1   over the nation by out of pocket.  No one, including the

2   defendants, disputes that the consumers also paid a

3   substantial share of those costs.

4        Now, in an effort to avoid the implication was South

5   Dakota broad remedial and defendants are here seeking to

6   draft the federal standing requirement under 37-1-33.

7   Federal standing requirements are not appropriate for

8   South Dakota law because they're based on an entirely

9   different type of antitrust injury.  Federal law doesn't

10  recognize antitrust injury to indirect purchasers or

11  anyone else besides those who bought directly from the

12  defendant engaged in the illegal anti-competitive

13  practice.

14       In this case, your Honor, the defendants ask this

15  Court to adopt the Supreme Court's five factor test for

16  antitrust standing which was articulated in the

17  Associated General Contractors case.  That case was

18  decided ten years after the Supreme Court decided the

19  Illinois Brick case and adopted the direct purchaser

20  limitation.  At the time Associated General Contractors

21  was decided, the direct purchaser limitation was a

22  feature federal antitrust law and standing requirements

23  were crafted liberally in order to further the purposes

24  of the federal antitrust statute which was to limit

25  compensation to direct purchasers and avoid a series of

1     lawsuits by indirect purchasers who couldn't be

2     compensated under substantive federal law anyway.  And

3     consistent with the Supreme Court standing, Juris

4     Prudence in other areas, the Court adopted a test that

5     quite logically focussed on whether the plaintiff had

6     sustained a legally cognizable injury and was capable of

7     recovering damages.  That's the five factor test that the

8     Supreme Court adopted and the Supreme Court encouraged

9     lower courts in the federal system to consider factors

10    such as whether the plaintiff is a consumer or a

11    competitor in the restrained market, whether the injury

12    alleged is direct firsthand impact of the restraint

13    alleged, whether there were more directly injured

14    plaintiffs with a motivation to sue and whether the

15    plaintiffs claims would resist duplicative recoveries or

16    compensation from damages.  Precisely factors that

17    prompted the Court in Illinois Brick to adopt the direct

18    purchaser limitation in the first place, your Honor.

19        So the South Dakota legislature had an opportunity

20    to consider these factors when it rejected the direct

21    purchaser limitation and adopted Section 37-1-33 which

22    gives anyone who has been injured by an antitrust

23    violation the explicit right to sue.

24        **THE COURT:**  What is the import of the last part

25    of that statute "in any subsequent action arising from

1   the same conduct, the Court may take any steps necessary

2   to avoid duplicative recovery against a defendant"?

3         **MR. MITBY:**  Well, I think that is a logical

4   outgrowth of the statute.  It gives the Court the right

5   to limit damages in some way or take some other measure

6   in the context of an individual case to prevent a

7   duplicative recovery and that makes sense.  But what the

8   South Dakota legislature rejected, and I think this

9   second sentence of the statute proves it, is the idea

10   that the risk of duplicative recovery should somehow be

11   generalized that a standing requirement that applies to

12   all cases.

13       The South Dakota legislature has vested this court

14   and every other court in South Dakota with the duty of

15   fashioning remedies in a particular case such as

16   limitations on damages, such as some way of bringing

17   together all of the potential plaintiffs into a single

18   lawsuit as a way of avoiding duplicative recoveries.  The

19   legislature didn't authorize South Dakota courts to adopt

20   general rules of standing that would preclude a recovery

21   by an indirect purchaser simply because there is an

22   inherent risk of duplicative recoveries.

23       So I think that the second sentence of that statute

24   confirms the point that the Plaintiffs are trying to make

25   in this case, which is that we -- we are entitled to a

1     case -- a decision in the context of this individual case

2     about how best to reduce any potential risk of

3     duplicative recoveries and I think, as this Court will

4     recognize after discovery has been completed, the

5     settlement that Defendants paid to the merchants as a

6     result of the class action, the prior merchant class

7     action, was only a tiny fraction of the damage that was

8     actually caused in those cases and that is inconsistent

9     with the purpose of the antitrust laws which is to

10    provide for treble damages for violations of antitrust

11    policy.

12         **THE COURT:**  The parties chose to settle.  We

13    don't know what the damages would have been should the

14    matter been tried.

15         **MR. MITBY:**  That's correct, your Honor, but my

16    point is that this Court would be entitled to give them

17    settlement credit or find some other remedy to ensure

18    that there is no duplicative recovery in this case.  But

19    South Dakota has rejected the notion that the risk of

20    duplicative recovery should be incorporated into

21    generalized standing requirements.  The source that the

22    federal system has adopted.

23      The standing test in Associated General Contractors

24    is related to the types of injuries that are compensable

25    under federal law and, of course, this makes sense

1   because the Supreme Court has explained again and again

2   that a legally recognized injury is a fundamental

3   requirement for standing.   There is a series of decisions

4   on this point and I have brought along one with me to

5   show to the Court for illustrative purposes.   May I

6   approach, your Honor?

7                   THE COURT:   Yes.

8                   MR. MITBY:   This is a recent decision, Bennett

9   versus Spear from the 1997 term of the Court.   And if,

10   your Honor, will look to the highlighted text, Justice

11   Sclera wrote, "to satisfy the case or controversy

12   requirement of Article III, a plaintiff must, generally

13   speaking, and demonstrate that he has suffered injury in

14   fact, that the injury is fairly traceable to the actions

15   of the defendant and that the injury will likely be

16   redressed by a favorable decision".   There is language of

17   this sort in a variety of decisions from the United

18   States Supreme Court over the years addressing standing.

19       The point of this is that in the federal system

20   courts adopt standing rules that further the goal of

21   compensating plaintiffs who are entitled to be

22   compensated and who can show an injury.   Under federal

23   law an indirect purchaser can't show that type of injury

24   because that type of injury isn't recognized by federal

25   antitrust laws.   It would not make sense to take standing

1    requirements that have been developed for the sole

2    purpose of trying to screen out folks that can't allege a

3    legally recognized injury and import them into South

4    Dakota law which has rejected the federal concept of

5    injury allows indirect purchaser suits.  In fact, goes so

6    far to say that anyone injured by an antitrust violation

7    has a right to sue for damages under South Dakota law.

8         The only factor in the federal test that is not

9    explicitly related to whether the antitrust injury was

10   direct or indirect, is whether the damages claims are

11   speculative.  And in this case the defendants have no

12   basis at this very preliminary stage of the litigation

13   for arguing that the damages claims are speculative

14   because there has been no discovery, there has been no

15   expert analysis.  Plaintiffs haven't had an opportunity

16   to come forward to this Court as in responding to a

17   motion for summary judgment and show exactly what

18   evidence we have adduced that demonstrates that these

19   claims for damages are not speculative.

20        If, at some point down the road, defendants can

21   convincingly argue to this Court that the damages claims

22   are speculative, couldn't be proved with certainty,

23   aren't entitled to compensation under South Dakota law,

24   then this Court can and should revisit Battley

25   (phonetic), but defendants aren't arguing that because

1    thus motion to dismiss and under South Dakota law the
2    defendants can't attach any evidence or make any
3    evidentiary arguments that are based on the facts of this
4    case.  They have to look solely to the pleadings.
5          I would submit that when counsel for Visa says that
6    the damages claims in this case are speculative, he is
7    relying on an assumption about what the evidence is going
8    to show at a later stage and we, as Plaintiffs, have not
9    had the opportunity to show to this Court what the
10   evidence in fact proves.  So we would like to -- we would
11   like to save those arguments about whether this is --
12   this claim is speculative or not until both sides are in
13   full possession of the facts.
14         Now, defendants, throughout their argument this
15   morning, have offered no reason for this Court to
16   disregard the plain language of Section 33-1-33.
17   Defendants proposed limitation on standing would leave
18   most of the injured parties in this case without any kind
19   of remedy at all.  And I submit that that result,
20   your Honor, is plainly contrary to the legislature's
21   purpose in enacting Section 37-1-33 and that purchase was
22   to afford, quote, "any person", end of quote, injured by
23   an antitrust violation, the right to sue regardless of
24   whether the injury was direct or indirect.  And under
25   defendants rule, only the merchants could sue for

1    inflated prices paid to consumers as a result of an

2    illegal tying arrangement.  This approach would leave

3    consumers who are, by far, the most populous group of the

4    defendants antitrust victims without any kind of redress

5    at all.

6         I want to respond briefly to a point that the

7    defendants made when they said that that the overcharges

8    are alleged to be spread over a wide variety of consumer

9    goods and weren't really limited to people who were

10   consumers in one imagination or another of Visa and

11   Mastercard.  I think that that argument really proves too

12   much.  It would leave consumers in this case without a

13   remedy precisely because of the manner in which the

14   defendants chose to implement their tying ring.  In

15   particular, Visa and Mastercard specifically prohibit

16   merchants from assessing on a debit card transaction a

17   fee directly to the debit card user.  Under Visa's own

18   rules merchants are required to spread whatever portion

19   of that cost that they don't absorb in that overhead on

20   to all consumers.  They can't just target pick debit card

21   users.  Presumably not very many people would use the

22   Visa debit card.  This puts defendants in the position of

23   being able to adopt policies that automatically deny most

24   of their victims standing to sue and thus any possibility

25   of compensation and this lesson will not be lost on

27

1    future antitrust violaters.   It will almost certainly

2    endeavor to structure their conduct as to take advantage

3    of any judicially created bars to recover.   Given the

4    South Dakota legislature's unambiguous mandate in favor

5    of broad antitrust remedies, this outcome would be

6    unaccepted.

7         The defendants have also claimed that the

8    Plaintiff's injuries are somehow derivative or remote.

9    This is wrong for several reasons.   First, no one

10   disputes that South Dakota law provides a remedy for an

11   indirect purchasers injury.   Counsel for Visa has

12   conceded this afternoon, and I don't think there is

13   anyone that would attempt to read that type of provision

14   out of the statute, but in this case the injury to

15   consumers, is actually a lot less derivative or remote

16   than the injuries for indirect purchasers have recovered

17   in other cases.

18        In this case, remember, your Honor, that there are

19   only two groups of people who are potential plaintiffs

20   and potential victims of this tying arrangement,

21   merchants and consumers.   There is no long supply chain.

22   There is no long, long distribution chain.   There is no

23   passing through these charges through a series of middle

24   man.   There is two groups of merchants and consumers and

25   the defendants would concede, I suspect, that indirect

Jean A. Kappedal, RPR