1    purchaser cases where a good is sold to one purchaser who

2    passes it onto another who passes that onto a third and

3    even onto a fourth, that more than just the first

4    indirect purchaser would be entitled to recover.   There

5    are several case that address the very issue we have

6    cited, some of them unbriefed and in the Holder versus

7    Archer Daniels Midland case where numerous indirect

8    purchasers of citric acid and other ingredients in food

9    products brought suit against Archer Daniels Midland for

10   price fixes and Archer Midland's principle argument,

11   look, these people don't have standing to sue.   They

12   didn't buy citric acid, they bought orange juice and that

13   citric acid passed through a series of transformations in

14   the factory, passed through a series of distributers.

15   How can these purchasers even begin to tell us how much

16   they were overcharged because of illegal price fixing

17   conspiracy?  Well, this case is really not much different

18   than that except the difference is overcharges were

19   passed directly to the consumers by the merchants.   They

20   didn't pass through the middle man.   There was no change

21   of the product or repeated changing of hands in this

22   transaction.   The merchants decided, after they saw the

23   bill from Visa, how much they were going to raise their

24   prices on all consumer goods in order to compensate them

25   for some of that increased cost.

1          This is also not like some daisy chain of causation

2     where the telephone company is fix pricing and suddenly

3     everybody who buys anything is a victim of a vast

4     antitrust conspiracy because everybody is using --

5     because every merchant in the world uses a telephone.

6     That's not the case at all.   In this case, again, the

7     charge is passed on directly to consumers.   There is just

8     one middle man, that's the merchant, and the plaintiffs

9     are entitled to try to prove that there is a specific

10    amount by which they were injured in each of these cases.

11    And the -- I think this Court should consider, you know,

12    revisiting the issue of speculativeness after there are

13    some facts on the table by which the plaintiffs can try

14    to show exactly what types of injuries they sustained and

15    how much.

16          I'd like to address next the defendants' reliance on

17    case law from states with narrower remedial statutes than

18    South Dakota's.   I have to confess that I have not seen a

19    copy of the Minnesota decision.   It wasn't sent to me.   I

20    don't have one in front of me.   I would be happy to

21    comment on it at greater length for this Court after

22    having a chance to review what the Minnesota Appellate

23    Court in this case actually said.   But I would submit

24    initially that the Minnesota case is a decision that has

25    not passed through appellate review including review by

1    the Supreme Court of Minnesota and this Court should pay

2    special attention to what the Supreme Court of Minnesota

3    says the law says because the Supreme Court of Minnesota,

4    reading the same type of statute, has interpreted it very

5    broadly as they did in the Blue Cross Blue Shield case.

6    Keep in mind that Blue Cross Blue Shield was suing

7    tobacco companies for driving up health care costs even

8    though I don't think anyone would argue that Blue Cross

9    Blue Shield was, in some sense, was a consumer that

10   bought products from the tobacco companies.  So the

11   Minnesota Supreme Court needs a chance to be heard on

12   whether this decision is consistent with Minnesota law

13   before this Court assumes that Minnesota law would reject

14   these claims.

15       Secondly, plaintiffs rely on decisions from New York

16   and North Dakota.  Well, New York and North Dakota do not

17   have statutes that are anything like Section 37-1-33.  In

18   fact, if I may approach, your Honor, I brought a handout

19   for the Court that compares the language of the North

20   Dakota and New York statutes with the language of the

21   South Dakota statute.  May I approach, your Honor?

22              THE COURT:  Do you have a copy for counsel?

23              MR. MITBY:  Yes, I do.  Thank you, your Honor.

24   As your Honor will note, Section 5108.1 -- 08 and in any

25   tax for damages under this section, the fact that the

1    state said, "a person threatened with injury or injured
2    in its business or property by any violation of the
3    provisions of this chapter has not dealt directly with
4    the defendant does not bar recovery". And looking to the
5    language of New York general business law section 340
6    subsection six, the state uses similar language. It
7    says, "the fact that the plaintiff hasn't dealt directly
8    with the defendant, doesn't bar recovery". That's very
9    different from saying that any person injured by an
10   antitrust violation has the right to sue. These statutes
11   tell courts what fact they can't use as a way of denying
12   recovery all together. The South Dakota law is an
13   affirmative grant of the right to sue and implicitly of
14   standing to sue for any type of antitrust violation.
15       Now, defendants also point to the Michigan statute
16   which is approximately the same as the South Dakota
17   statute, however what defendants failed to note is that
18   Michigan courts have interpreted the rights of indirect
19   purchasers much more narrowly than South Dakota courts.
20   And I would refer your Honor to page 679 of the Microsoft
21   antitrust litigation opinion which was from the South
22   Dakota Supreme Court. It's cited actually by the
23   defendants in their brief. And when you look at what the
24   South Dakota Supreme Court has to say about Michigan law,
25   first the Supreme Court noted that Michigan was one of

1      only two states in the country that allowed indirect

2      purchaser suits, but actually refused to permit indirect

3      purchasers to participate in antitrust class actions.   So

4      the Michigan Supreme Court -- or the South Dakota Supreme

5      Court first noted that Michigan is an out liar in giving

6      a narrow reading to its antitrust remedies provision and

7      then it refused to follow Michigan's interpretation of

8      that statute finding that it's interpretation was too

9      narrow.

10          So I would submit, your Honor, that Michigan and

11     South Dakota, even faced with the same type of statute,

12     have taken different paths.   The South Dakota Supreme

13     Court is likely to give full effect to the broad remedial

14     provision that the legislature enacted.   Thus none of the

15     defendants' authorities really address the fundamental

16     difference in this case between South Dakota law and the

17     law of the states on which they place their reliance.

18          I'd like to close by noting that, you know,

19     defendants have not argued that there are no standing

20     requirements at all in South Dakota law.   That's a false

21     choice.   First of all, plaintiffs have to be able to show

22     that they sustained an injury for which they can show

23     damages and at some point in this litigation, after some

24     evidence has been presented, this Court will have to

25     determine whether defendants have presented a genuine

1      issue of material fact on that point so there are

2      limitations on who can bring an antitrust claim except

3      that those limitations are not necessarily ones that can

4      be applied at this stage of the proceedings before any

5      type of discovery.

6           The second point is that there are other standing

7      tests that this Court could adopt.  South Dakota law has

8      not specifically defined what the standing tests should

9      be for actions by indirect purchasers or other victims of

10     antitrust violations but Justice Brennan gave a full

11     account of what he thought the test should be in his

12     dissent in Illinois Brick.  I think this Court is

13     entitled to give some weight to Justice Brennan in

14     Illinois Brick.  That it's ultimately the decision that

15     the South Dakota legislature agreed with and Justice

16     Brennan said that the test should be whether the

17     plaintiff's injury would be a reasonably foreseeable

18     consequence of the defendant's illegal conduct.

19          That's the so-called target area test and it is

20     based accordingly on, Justice Brennan, an accepted

21     general tort principles who can sue for tort injury and

22     who can't.  But the point to return to is that the

23     defendants are trying to craft an antitrust standing rule

24     which the Supreme Court adopted for the purpose of

25     furthering federal antitrust policy on to South Dakota

Jean A. Kappedal, RPR

1   law which has an entirely different policy and entirely

2   different scope and that effort should be rejected by

3   this Court because it's inconsistent with the will of the

4   South Dakota legislature.  Thank you, your Honor.

5         THE COURT:  All right.  We'll take a short

6   recess and then I'll hear your response.

7         MR. BOMSE:  Thank you, your Honor.

8             (Whereupon, a recess was taken.)

9         THE COURT:  All right.  Mr. Bomse.

10        MR. BOMSE:  Thank you, your Honor.  It seemed

11  to me trying to put Mr. -- put this argument together, we

12  are kind of following progression.  The first is that

13  there are no standing requirements.  Second, Associated

14  General Contractors is really just Illinois Brick.

15  Third, we don't --

16        THE COURT:  Would you repeat that, please?

17        MR. BOMSE:  Yes.  The second is that the

18  Associated General Contractors is just Illinois Brick.

19  It's the same considerations and the same analysis.

20        THE COURT:  Well, if the South Dakota

21  legislature, in drafting 37-1-33, is attempting to use an

22  Illinois Brick repealer, what does that do to the

23  standing factors set out in the contractor's case?

24        MR. BOMSE:  It says that you have to interpret

25  Associated General Contractors in light of that and

1    that's --

2              THE COURT:  What does that mean, which survive?

3              MR. BOMSE:  Very simple.  The first factor

4    needs to be modified.  That is, the first factor is

5    whether somebody is a competitor or a consumer.  That

6    factor means that you have to have somebody who is

7    someone somewhere in the chain of defendants

8    distribution.  That is, you can't -- you can't simply

9    have an interpretation which does away with what the

10   South Dakota legislature does any more than you can

11   simply interpret what the South Dakota legislature did as

12   doing away with all antitrust standing requirements.  So,

13   what you do is you look to the defendants chain of

14   distribution.  And the problem here is that the

15   plaintiffs don't satisfy that.  They are not somewhere in

16   the defendant's chain of distribution.

17        Now, where do I get that?  Well, I get that from the

18   statute -- from the notion that we want to reject

19   Illinois Brick.  But I get it somewhere else.  I get it

20   from Justice Brennan's dissent.  What you were told when

21   we finally got to the fourth step in plaintiff's argument

22   on page 20 of their brief where the heading is "standing

23   under South Dakota's antitrust law should be determined

24   according to the target area test from Justice Brennan's

25   dissent in Illinois Brick".  If you go to Justice

1    Brennan's dissent in Illinois Brick, this is what you

2    find.  You find Justice Brennan saying, "I concede that

3    despite the broad wording of Section 4, there is a point

4    beyond which the wrongdoer should not be held liable".

5    This is on pages 760 and 761 of that opinion.  And then

6    he goes down in the paragraph and he says, "but if the

7    broad language of Section 4 means anything, surely it

8    must render the defendant liable to those within the

9    defendant's chain of distribution".  That is, if you have

10    an indirect purchaser who bought a product further down

11    the chain or although I think this is less clear, you

12    have somebody who bought a product that contains an

13    ingredient, their vitamin example or the Microsoft

14    example, where the operating system gets incorporated

15    into a computer that is purchased by a consumer, you

16    would meet the South Dakota test, at least that part of

17    it.  But where you have just what we have called an

18    overhead suit.  That is something that just says because

19    the costs of doing business are increased, everybody can

20    sue for anything, then you're way outside.

21          **THE COURT:**  So you submit that the first factor

22    of Associated Contractors survives and Illinois Brick is

23    a repealer?

24          **MR. BOMSE:**  I suggested it survives in the

25    modified format indicated, yes.  Yes.

```
 1              THE COURT:  What about the remaining factors?
 2              MR. BOMSE:   The second factor is about whether
 3    injury is direct or derivative.   The Court in Associated
 4    General Contractors used the term indirect.   But if you
 5    go to that portion of the opinion, you'll see that they
 6    didn't cite Illinois Brick.   They weren't invoking the
 7    Illinois Brick part.   What they were talking about was
 8    injury that is derivative.   Injury that has some
 9    intervening cause.   And if you understand it in the way
10    that the Supreme Court actually is talking about it, as
11    opposed to turning into it into a simple slogan, then
12    that phrase applies -- that part of the test applies as
13    well.
14         The third factor is, is there somebody else more
15    directly injured?  It seems to me that the -- that is
16    what the Court in Minnesota suggested.   It's hard to
17    apply that factor literally here.   Although let me have a
18    caveat to that.  Because the factor actually is there is
19    somebody more directly injured with a motivation to sue.
20    What they're really saying is, do we have a trouble of
21    antitrust violation perhaps not being pursued by anybody
22    and if you take Microsoft as an example, in Microsoft,
23    the indirect purchaser suits.   The consumer suits tended
24    to be the only ones that were brought at least initially.
25    So in that case somebody could argue, under South Dakota
```

1    law, we would meet the third -- the third factor.

2         Then when you get to the fourth factor, and at some

3    point I'm gonna outrun my memory, but we are concerned

4    with speculativeness of damages and I would suggest to

5    the Court that that factor absolutely was intended still

6    to apply.

7         THE COURT:  All right.  Now, does 37-1-33,

8    which refers to the duplicative recovery which is the

9    fifth factor.  What is the South Dakota legislature --

10   the fifth factor under Associated General Contractors is

11   whether the claim risk duplicative recovery.  What is the

12   South Dakota legislature intended by the last sentence of

13   37-1-33 when they indicate that the Court may take any

14   steps necessary to avoid duplicative recovery against a

15   defendant?

16        MR. BOMSE:  Well, I could -- I could be very

17   aggressive in my reading of that and say that the South

18   Dakota legislature intended not to allow this kind of a

19   suit where there already has been an earlier suit with a

20   recovery.  But I don't think that's right.  I think that

21   would be an overreading on my part.  Now, I don't have

22   legislative history here which answers that question

23   either way, but I don't want to over argue this because

24   I'm telling you that I think we have to have an

25   appropriate reading one way, so I'm not gonna tell you

1    that this was meant to take away this case as a matter of

2    law.  We didn't argue that in our papers.  I think what

3    it was reflecting was a clear sensitivity to it.  It is

4    plainly reflecting the notion that somewhere down the

5    line, if this case were to go forward, we would need to

6    deal with that, whether it means we're gonna bring in all

7    of the merchants in South Dakota and seek indemnity from

8    them.

9              THE COURT:  Is factor affecting standing?

10             MR. BOMSE:  I don't think it's factor.  I don't

11   think it's a factor here affecting standing, but I

12   certainly think that it is a factor that is pertinent --

13   I think I'm not -- I think I didn't articulate that

14   correctly.  I don't think that this clause that you read

15   has to do with standing.  I do think that duplicative

16   recovery does have to do with standing.  That is, it is

17   something you are expected to take into account.

18   Remember, Associated General Contractors, your Honor, if

19   you look at the opinion, the Court is very clear about

20   this.  It's saying, look, we can't just give all federal

21   courts a checklist of things to go down in every case and

22   if you hit three out of five, you lose.  If you only hit

23   one out of five you win.  They said that's not the way

24   you do this.  You have to look at the overall situation

25   in light of these factors and you have to make a

1    judgment.

2              THE COURT:  Are you urging the Court to find

3    that the action will result in a duplicative recovery?

4              MR. BOMSE:  Absolutely.

5              THE COURT:  And therefore should bar standing?

6              MR. BOMSE:  I'm asking the Court to find that

7    because of the clear potential for duplicative recovery,

8    there is less need for this kind of litigation and that

9    is something that ought to be part of the Court's

10   calculus.  It is not sufficient standing alone, no pun

11   intended, to bar standing.  But it certainly is something

12   that plainly was intended to be taken into account and

13   the legislature made that clear.

14        All we're suggesting, your Honor, is that it is

15   clear enough that standing requirements are not simply

16   subsumed by Illinois Brick or by an Illinois Brick

17   repealer.  They are not the same thing.  If you go back

18   to footnote seven in Illinois Brick, the Court has a long

19   discussion there about the relationship between standing

20   on one hand and Illinois Brick on the other.  And that's

21   where the phrase analytically distinct comes from.

22        In fact, in that case, the Court recites the history

23   in footnote seven.  In that case, the defendants had

24   actually won on standing grounds in the lower court, but

25   then the Supreme Court chose, after it granted the cert,

1    not to go off on generalized standing, but to in fact

2    adopt the policy based response, the corollary to Hanover

3    Shoe, and say we're not going to allow any indirect

4    purchaser suits.  That's a bright line test.

5        As counsel pointed out to you, it was about seven

6    years later when the Court got to the generalized

7    question of standing in Associated General Contractors.

8    Illinois Brick was already on the books.  And it then

9    went through those factors because it said and the Court

10   there in Associated General Contractors, started out with

11   actually the same kind of observation that you heard from

12   Mr. Mitby.  That's with the observation that a literal

13   reading of the statute is broad enough to encompass every

14   harm that can be attributed directly to or indirectly to

15   the consequences of an antitrust violation.

16       And the Court then proceeded, of course, to reject

17   that.  It did it by going through and I was -- I'm

18   starting here on pages 529 and 530.  But if you then

19   start there and go through the next several pages, you

20   will see the Supreme Court, going through a very

21   elaborate analysis of limitations on similarly broad

22   statutes, saying you can't mean what that says.  You have

23   to have some limitations.  And it goes through the

24   variety of limitations that were applied at common law in

25   both tort and contract actions and it does it actually

1    for several pages.  It's not something we kind of throw

2    off.  And that was then the preclude to their discussion

3    of standing factors.  And as we say, the courts have been

4    fairly resolute and the Illinois Brick repealer states in

5    still, saying, yeah, we have to have standing limitations

6    because otherwise you get into certain situations that

7    really don't make any sense and in some ways if you

8    allow, as the Minnesota court concluded, a case this

9    broad, what do you really have?  You have, as I said,

10   these overhead cases with damages, to use its word,

11   "inherently and hopelessly speculative".

12        I mean, on our way to lunch today we were talking

13   about the telephone example, Mr. LeBrun and I, and he

14   observed that under this theory of standing and the

15   telephone case really isn't, with all respect to

16   Mr. Mitby, any different in terms of it's breath or in

17   terms of the number of layers.  You have a situation in

18   which the telephone company overcharges a business, a law

19   firm.  A law firm raises its rates to its clients.  The

20   clients, a restaurant, then serves food to a consumer and

21   the consumer says I paid an overcharge somewhere in that

22   because it would be passed down along that chain.  I

23   mean, if one wants to really say that that is it because

24   of the words of the statute, I think you have done a

25   disservice to what the South Dakota legislature actually

1    had in mind in these cases.  I think that granting our

2    motion to dismiss here is not in any way going to cause

3    harm to the intent of the legislature and to appropriate

4    indirect purchaser cases.

5        I think on the other hand, opening up this kind of

6    an overhead case will do that kind of harm.  And I think

7    that the standing rules exist for the purpose of

8    preventing that from happening and they do have an

9    independent life independent of Illinois Brick.

10       The argument here, you know, it isn't like standing

11   somehow was invented after or at the time of Illinois

12   Brick.  We have had standing rules in antitrust cases

13   both federal and state going well back into the beginning

14   of the Sherman Act.  One of the most famous cases Hawaii

15   against -- Hawaiian Standard Oils in 1972 and many other

16   standing cases before that.

17       What they are suggesting to you is that somehow when

18   the State of South Dakota responded to Illinois Brick by

19   saying we're gonna allow indirect purchaser claims, that

20   they somehow silently intended to wipe out that whole

21   body of law and I think that's just a heroic and

22   unjustified reading which will have mischief and, you

23   know, I don't know if I'm being persuasive to this Court,

24   but I have been persuasive in other courts because I

25   think that when you do think, and I tried to listen

1    carefully, and the one thing that I didn't hear, other

2    than the conclusions about how this isn't speculative and

3    it isn't something that we can decide now, I didn't hear

4    a response to how you deal with what is manifest on the

5    face of this complaint.

6         My example about the Saturday morning errands or my

7    discussion of overhead or the fact that you are simply

8    opening the doors to claims that we don't need to have

9    further procedures in order to determine that they're

10   inherently and hopefully less speculative or as the Court

11   in New York said, "the complexity and speculative nature

12   are overwhelming" or as Michigan said, "the claims are

13   speculative and would be incredibly complex".  I

14   respectfully submit, your Honor, that it stands there on

15   the face of this -- of this complaint.  Standing cases

16   are resolved with all respect at the pleading stage.

17   That's almost always the way they are resolved because we

18   can cut them off that way.  We're not asking you to deny

19   the allegations of the complaint, we're asking you to

20   accept them and to say accepting them, but accepting them

21   without leaving our common sense at the door.  We can

22   figure out what it is you're asking us to do here and

23   we're gonna say that this simply goes -- goes too far.

24        Now, you know, I have some very specific things I

25   could tell your Honor about what plaintiffs have to say.

1    For example, their reference to Article III standing in

2    the case that they gave you.  I was -- I was puzzled,

3    since most of us know who do antitrust, that Article III

4    standing and antitrust standing are two different

5    animals.  And if you need to have a cite for that, it

6    happens that the Court said it in Associated General

7    Contractors in footnote 31 where they talk about the fact

8    that the two things are different.  I mean, it talks

9    about court antitrust cases needing to make a further

10   determination whether the plaintiff is a proper party to

11   bring a private antitrust action so it isn't just Article

12   III standing.

13       The other piece of paper that we were all handed

14   about the difference between New York and North Dakota

15   antitrust laws versus South Dakota.  I would say that

16   while the words may not be identical, the meaning is

17   identical and, of course, that leaves Michigan and

18   Minnesota unaddressed at all including the assertions

19   made in the briefs that were submitted by the plaintiffs'

20   firm here about how the Minnesota statute is identical

21   and interpretations are particularly important.

22       I think I have dealt with the target area issue in

23   the sense of explaining to you exactly what it was

24   they're arguing, the Justice Brennan test and referring

25   you to what he had to say what that means.  I mean, their

1    own recognition that there needs to be some test, says

2    that even they can't bring themselves at the end of the

3    day to really argue that there should be no standing

4    limits.  What they want you to do is instead to accept a

5    test that has been rejected and reject a test which has

6    been accepted, but when we look at the test that they

7    offer you, it is a test that were in fact -- that they

8    don't meet.  That is, Justice Brennan, in the chain of

9    distribution.  These people who are not in the chain of

10   distribution don't even have to have a debit card.

11   They're not indirect purchasers.  They're not purchasers

12   of a product with ingredients.  They are simply people

13   who purchased something that's supposedly went up in cost

14   because instead of telephone service or janitorial

15   services or rent being increased, debit card fees were

16   increased and that brings us back to whereas the

17   Minnesota court, we think, correctly concluded, you have

18   no limits at all.  We don't think that makes sense.

19            **THE COURT:**  Mr. Mitby, do you want to respond?

20            **MR. MITBY:**  Thank you, your Honor.  We're not

21   arguing for no limits at all.  There are limits.  The

22   limits are that you have a cognizable antitrust injury

23   that the Plaintiffs have done in this case.  It is not a

24   situation where some law firm was passing a minute charge

25   from on a telephone bill to its customers.  This is a

1    situation where the debit card fees are in the order of

2    1.5 percent or a little bit less on every hundred dollars

3    spent using a debit card.  That's a lot of money.  That's

4    why we have alleged that the actual damages in this case

5    exceed 12 billion dollars, treble would be 36 billion

6    potentially and that's why we believe that consumers in

7    South Dakota bore a significant part of this overcharge.

8    It's not a daisy chain of causation.  In this case there

9    are two injured parts here, merchants and consumers.

10   Whatever portion of these illegal overcharges, the

11   merchants did not absorb in their overhead, consumers had

12   to pay out of pocket.  Consumers under South Dakota law

13   have standing to sue because Section 37-1-33 grants

14   standing to any party who has been injured by an

15   antitrust violation and the courts across the country

16   have dealt with consumer class actions in the antitrust

17   context and outside the antitrust context.  It's not a

18   case that the complexities in this instance are so

19   overwhelming that we should disregard the plain language

20   of the South Dakota legislature and decide to ignore the

21   South Dakota legislature's rejection of the very standard

22   that the defendants advocate here and then simply allow

23   these claims to go without any compensation at all.

24   Should the defendants just get away with this?  Should

25   the defendants be allowed to get away with illegal

```
1    antitrust activity simply because they adopted rules that
2    require merchants to plead the costs?  These illegal
3    arrangements controls all goods instead of simply charge
4    the debit customers on those goods, that would allow
5    defendants to profit from their own ability to implement
6    this illegal scheme in a particular way.  And this Court
7    shouldn't allow that.  That's gonna allow every defendant
8    to structure its conduct so that it can come into court,
9    as the defendants are doing today, and argue that the
10   very victims of their illegal practices don't have
11   standing or fail for some other reason under the
12   antitrust laws.
13        Now, I like to address the point that Mr. Bomse made
14   regarding the so-called analytical distinction between
15   standing requirements and the concept of a legal injury
16   question.  The two injuries may be analytically distinct,
17   but as a practical matter, they're related.  That's why
18   five out of five of the factors are articulated in
19   Associated General Contractors relate to whether the
20   plaintiff had suffered a cognizable injury under federal
21   law, i.e. was a direct purchaser, and whether the
22   plaintiff was in a position to recover damages for that.
23   And I've given you one example of a standing case in the
24   Article III context where the Court explained the
25   relationship between substantive injury and standing, but
```

```
1     could I give you examples from other contexts as well?  I
2     don't think -- and I think perhaps the best example is
3     Associated General Contractors, itself, where the
4     standing factors that the Supreme Court asked courts to
5     consider when evaluating standing are based on the same
6     set of factors that it used in Illinois Brick to adopt
7     the direct purchaser rule.  The point is that if a
8     standing requirement is based on the notion that only
9     direct purchasers are ever gonna be entitled to recover
10    for an antitrust injury and so therefore we ought not to
11    hear claims from people who don't allege that they are in
12    fact direct purchasers, we can't import that concept into
13    South Dakota law because, your Honor, if we import that
14    concept into South Dakota law, we'll be overriding what
15    the legislature intended which is for anyone injured by
16    antitrust violations to be able to recover not just
17    direct purchasers, as the US Supreme Court has said.
18              THE COURT:  What assumption can you draw about
19    the repealer?  Are you assuming that the repealer goes
20    beyond the mere holding of Illinois Brick?
21              MR. MITBY:  Yes, your Honor, I am assuming that
22    because the repealer is broader than repealers adopted by
23    other states.  We seen two examples, North Dakota and New
24    York.  Those repealers are not substantively identical as
25    the defendants claim.  What they say is that a Court
```

1      can't use the fact that the plaintiff didn't have a

2      direct relationship with the antitrust violater.   In

3      other words, won't in privity.

4          I believe that the language from the statute is

5      dealt directly.  You can't use the fact that the

6      plaintiff didn't deal directly with the defendant to bar

7      recovery.   That's different from saying that anyone who

8      suffers an injury and I'll just quote the statute from

9      the beginning again.   The statute says "no provision of

10     this chapter may deny any person who is injured directly

11     or indirectly in his business or property, by a violation

12     of this chapter, the right to sue for and obtain any

13     relief afforded under 37-1-14-3".   That's different from

14     saying simply that's the fact and I quote, "the fact that

15     the state political subdivision, public agency or person

16     threatened with injury or injured in its business or

17     property by any violation of the provisions of this

18     chapter, has not dealt directly with the defendant, does

19     not bar recovery".   In other words, in North Dakota and

20     New York other factors might bar recovery even from

21     someone who has a bona fide antitrust injury.   In South

22     Dakota the legislature has said that that approach is

23     wrong and is not gonna be the policy of this state.

24          I'd like to call your Honor's attention to the

25     second part of 37-1-33 which allows this Court to take

1    measures necessary to prevent duplicative recoveries.  I

2    notice from your Honor's questions that your Honor is

3    wondering about the relationship between those two

4    provisions and contrary to what the defendants are

5    saying, I submit to you that that second part of the

6    statute basically says the legislature says we recognize

7    the concerns about duplicative recoveries, but we don't

8    want to simply bar indirect purchaser suits all together

9    whether on standing grounds or injury grounds.  We want

10   courts to deal with this on a case-by-case basis and we

11   want courts to use the many tools that are available from

12   joinder to class action devices to settlement credits to

13   some kind of jury instruction reducing the amount of

14   damages in an appropriate case.  We want courts to make

15   this decision on a case-by-case basis, not a Supreme

16   Court to incorporate the concern about duplicative

17   recoveries into a bar to standing which is one of the

18   things that the -- which is the approach that federal law

19   has taken.  South Dakota's rejected that approach and it

20   has instead asked courts to do the work in an individual

21   case of deciding how to minimize the risk of duplicative

22   recoveries rather than trying to generalize that issue

23   into a bar to standing that would leave some people

24   uncompensated.

25        In this case, we have conduct that, according to the

1    allegations in this complaint, I don't even think the

2    defendants are disputing this part of it.   That

3    Mastercard and Visa don't allow their merchant

4    subscribers to pass on the charges of these debit

5    transactions to debit customers.   They have to spread

6    them across the cost of goods generally or else they get

7    thrown out of the Mastercard/Visa system.   Now, should

8    Mastercard and Visa be entitled to profit from an illegal

9    tying arrangement that has this feature by being able to

10   bar consumers at the courthouse door, I think not.   And I

11   think that -- I submit to you, your Honor, that the South

12   Dakota legislature has said that anyone who suffers an

13   antitrust injury is entitled to sue for damages and these

14   consumers are entitled to sue.   Thank you.

15          MR. BOMSE:   Your Honor, may I, as moving party,

16   in closing in less than a minute, I believe.

17          THE COURT:   You may.

18          MR. BOMSE:   First of all, may I respectfully

19   rise to the challenge that was made.   It isn't in the

20   motion you would have to justify the proceedings, maybe

21   it's entirely incorrect in his statement about our rules.

22   If the Court had any question about that, we could submit

23   the rule which does allow a differential in pricing, but

24   I don't think it's here nor there.   I just don't want to

25   let that misstatement go uncorrected, particularly when

1    it's suggested we concede that that is the situation.

2    But as I say, that is neither here nor there.

3         It seems to us, and this is the only point I want to

4    make, that Plaintiffs have really put to the Court a

5    challenge.  That is to conclude that the legislature

6    silently intended to do more than repeal Illinois Brick,

7    when I think it's quite clear from the legislative

8    history here, as everywhere else, that it was an Illinois

9    Brick repealer statute.  The timing all came about, it

10   would have been an easy enough thing for the legislature

11   to say that we intend to eliminate standing requirements.

12   So I think that they are in fact asking your Honor to go

13   beyond where the legislature actually chose to go.

14        I would observe, your Honor, that if you go back to

15   the federal statute, itself, that was at issue in AGC.

16   It is every bit as broad in its terms as the statute in

17   South Dakota.  Any person who shall be injured in his

18   business or property by reason of anything forbidden in

19   the antitrust laws may sue therefore that's the statute

20   that the Court -- the Supreme Court voted in AGC just

21   before it talked about how a literal reading of the

22   statute is broad enough to encompass any harm that can be

23   contributed to directly or indirectly to the consequence

24   of a antitrust violation.  So we have -- this Court has

25   the same issue in front of it that the Court had -- the

·54

1    United States Supreme Court, that is the AGC case, that

2    is what to make of this language and both sides have

3    suggested to you what we think you should make of it.

4            THE COURT: .All right.  Thank you. Counsel,

5    the Court has considered the numerous authorities that

6    you have presented and the briefs you have submitted as

7    well as the at least an hour and a half of oral argument.

8    The Court in this case grants the motion to dismiss.  The

9    Court relies on significant portions of Associated

10   General Contractors in applying several of the factors,

11   specifically factors one and five.  The Court finds that

12   the Plaintiffs lack standing as they are not alleging

13   injury as consumers in the relevant market.  Debit card

14   services that the antitrust law would seek to protect and

15   since the class of merchants has already recovered a

16   judgment, this suit would only threaten to duplicate the

17   recovery.

18       So the Court relies on factor one in Associated

19   General Contractor and factor five in making its

20   determination that the plaintiffs lack standing in this

21   case.

22       Again, the plaintiffs are not participants in the

23   relative market affected by the anti-competitive conduct

24   and further that the merchants have already recovered and

25   that there is a significant and real risk of duplicative

55

1    recovery.

2         The Court assumes that there may be an appeal

3    brought to the South Dakota Supreme Court from this

4    Court's ruling and the Court thanks you for the effort

5    that you have put into preparing both of your arguments.

6    They were very well prepared and well argued.

7         You are directed to prepare an order for dismissal

8    on behalf of Visa and Mastercard, Mr. Bomse to submit it

9    to Mr. Mitby for his review prior to submission to the

10   Court.

11        With that, we're adjourned.

12             (End of proceedings.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1  STATE OF SOUTH DAKOTA        )
                                 ) ss.        CERTIFICATE
 2  COUNTY OF PENNINGTON         )

 3

 4

 5          I, Jean A. Kappedal, RPR, Official Court Reporter

 6  of the Seventh Judicial Circuit and Notary Public

 7  within and for the State of South Dakota, do

 8  hereby certify that the testimony of the proceedings

 9  that came on for hearing in the aforecaptioned matter,

10  contained on the foregoing pages, 1 - 55, inclusive,

11  was reduced to stenographic writing by me and hereafter

12  caused to be transcribed; that said testimony commenced

13  on the 28th day of September, 2004, in the Courtroom

14  of the Pennington County Courthouse, Rapid City,

15  South Dakota; and the foregoing is a full, true and

16  complete transcript of my shorthand notes of the

17  proceedings had at the time and place above set forth.

18          Dated this 22nd day of October, 2004.

19

20

21

22                              COPY

23                              ─────────────────────────
                                Jean A. Kappedal, RPR
24                              My Commission Expires:  2/13/10

25
```

Jean A. Kappedal, RPR