GUIDO SAVERI (22349)
  guido@saveri.com
R. ALEXANDER SAVERI (173102)
  rick@saveri.com
GEOFFREY C. RUSHING (126910)
  grushing@saveri.com
CADIO ZIRPOLI (179108)
  cadio@saveri.com
GIANNA GRUENWALD (228969)
  gianna@saveri.com
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA  94111
Telephone:  (415) 217-6810
Facsimile:   (415) 217-6813

*Interim Lead Counsel for the Direct Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 3:07-cv-5944 SC |
| | MDL No. 1917 |
| | **CLASS ACTION** |
| This Document Relates to:<br><br>    All Direct Purchaser Actions | **DECLARATION OF GUIDO SAVERI IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**<br><br>Date:    October 5, 2009<br>Time:    9:00 a.m.<br>Judge:  Honorable  Charles  A.  Legge  (Ret.)<br>            Special Master |

I, Guido Saveri, declare:

1.    I am a partner at the law firm of Saveri & Saveri, Inc., Interim Lead Counsel for the Direct Purchaser Plaintiff Class in the above-captioned action. I am a member in good standing of the Bar of the State of California and am admitted to practice in the Northern District of California. I submit this Declaration in support of Direct Purchaser Plaintiffs' Combined Opposition to Defendants' Motions to Dismiss. I make this declaration, except where noted, of my own personal knowledge and, if called upon to do so, could and would testify competently to the facts that it contains.

2.    Attached hereto as Exhibit 1 is a true and correct copy of an Order Granting In Part And Denying In Part Defendants' Motion To Dismiss, (June 25, 2008) in *In re Korean Air Lines Antitrust Litig.*, MDL No. 07-01891 (C.D. Cal.) (Docket No. 155).

3.    Attached hereto as Exhibit 2 is a true and correct copy of the Order Denying Defendants Motion to Dismiss Plaintiffs' Complaint in *Thomas & Thomas Rodmakers, Inc., et al. v. Newport Adhesives and Composites, Inc., et al.,* Case No. CV 99-07796 GHK (C.D. Cal., Jan. 13, 2000) (Docket No. 70).

4.    Attached hereto as Exhibit 3 is a Chart Comparing Allegations in the First Amended Direct Purchaser Plaintiffs' Consolidated Complaint in *In re TFT-LCD (FLAT PANEL) Antitrust Litigation,* Master File No. M07-1827 SI, MDL No. 1827, filed Dec. 5, 2008, (N.D. Cal.) (Docket No. 748) ("*TFT-LCD Litigation*") and the Direct Purchaser Plaintiffs' Consolidated Amended Complaint in this case.

5.    Attached hereto as Exhibit 4 is a true and correct copy of the First Amended Direct Purchaser Plaintiffs' Consolidated Complaint in the *TFT-LCD Litigation*, filed Dec. 5, 2008, (Docket No. 748).

6.    Attached hereto as Exhibit 5 is a true and correct copy of Magistrate Judge Hay's Report and Recommendation in *In re NBR Antitrust Litig.,* No. 03-1898, (W.D. Pa) (Docket No. 170).

7.    I am also counsel of record for plaintiffs in the *TFT-LCD Litigation* which involves

DECLARATION OF GUIDO SAVERI IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS – Case No. 3:07-cv-5944 SC

allegations of price-fixing among producers and sellers of TFT-LCD display panels and products containing them. Earlier this year, Tatung Company of America ("Tatung") brought a nearly identical motion to dismiss in that action. The Honorable Susan Illston, based on virtually the same evidence presented here denied Tatung's motion to dismiss.

8.     Attached hereto as Exhibit 6 is a true and correct copy of the Declaration of Jordan Elias in Support of Plaintiffs' Supplemental Brief in Opposition to Defendant Tatung Company of America Inc.'s Motion to Dismiss in the *TFT-LCD Litigation*, filed February 20, 2009 (Docket No. 855). The attached copy and accompanying Exhibits A-L were downloaded from the publicly available CM/ECF filing system for the United States District Court for the Northern District of California.

9.     Attached hereto as Exhibit 7 is a true and correct copy of the February 10, 2009 indictment of C.Y. Lin, a Chunghwa PT executive indicted for participating in a conspiracy to fix the prices of CRTs sold in the United States. (Case No. 3-09-cr-00131-WHA (N.D. Cal.)

10.     Paragraph 173 of Direct Purchaser Plaintiffs' Consolidated Amended Complaint (the "Complaint") (Docket # 436) currently reads as follows and contains three typographical errors, which have been underlined:

> 173.   BMCC participated in at over 20 illegal <u>bilateral group</u> meetings between 1998 and <u>2001</u> in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products (including CDT Products and CPT Products) occurred. These meetings occurred in China. BMCC never effectively withdrew from this conspiracy. None of BMCC's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government; BMCC was acting to further its independent private interests in participating in this conspiracy.

Paragraph 173 (with changes underlined) should read as follows:

> 173.   BMCC participated <u>in over</u> 20 illegal bilateral <u>and</u> group meetings between 1998 and <u>2007</u> in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products (including CDT Products and CPT Products) occurred. These meetings occurred in China. BMCC never effectively withdrew from this conspiracy. None of BMCC's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government; BMCC was acting to further its independent private interests in participating in this conspiracy.

3

1

I declare under the penalty of perjury under the laws of the United States of America that the

2

foregoing is true and correct.  Executed this 3rd day of August, 2009, at San Francisco, California.

3

4

*/s/ Guido Saveri*<br>Guido Saveri

5

6

7

8

Crt.151

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF GUIDO SAVERI IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS – Case No. 3:07-cv-5944 SC

# EXHIBIT 1

1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   IN RE: KOREAN AIR LINES CO., LTD.      )   MDL No. 07-01891
     ANTITRUST LITIGATION                   )
12                                          )   Master File No. CV 07-05107 SJO (AGRx)
                                            )
13                                          )   **ORDER GRANTING IN PART AND**
                                            )   **DENYING IN PART DEFENDANTS'**
14                                          )   **MOTIONS TO DISMISS**
                                            )   [Docket Nos. 99 & 102]
15   _____    )

16          This matter is before the Court on Defendants Korean Airlines Co., Ltd.'s ("Korean Air") and

17   Asiana Airlines, Inc.'s ("Asiana") Motions to Dismiss, both filed April 4, 2008. Plaintiffs Laura Albee,

18   Joon Chung, Jason Lee, Timothy Murphy, Sungshic Park, Yoon Park, Howard Ree, Leon Song,

19   and Edward Yoo (collectively, "Plaintiffs") filed a single Opposition, to which Korean Air and Asiana

20   (collectively, "Defendants") each replied. The Court heard oral argument on June 9, 2008. Having

21   considered the arguments made in the briefs and at the hearing, the Court GRANTS IN PART and

22   DENIES IN PART Defendants' Motions for the reasons stated below.[1]

23

24   _____

25          [1] Following oral argument, Korean Air and Plaintiffs filed requests for judicial notice of court
     records in the recently-settled case *In re International Air Transportation Surcharge Antitrust*
26   *Litigation*, MDL No. 1793, Case No. M: 06-cv-01793-CRB. (*See* Docket Nos. 149, 152, & 153.)
     The requests are GRANTED. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746
27   n.6 (9th Cir. 2006) (taking judicial notice of documents related to a settlement in another case).
            Prior to oral argument, Korean Air also filed a request for judicial notice of airfares posted
28   on its website. (Docket No. 143.) For reasons explained later in this Order, the request is DENIED.

## I.   BACKGROUND

Korean Air and Asiana are primary competitors in the air passenger market between the United States ("U.S.") and the Republic of Korea ("Korea"). (Second Am. Consol. Class Action Compl. ("SAC") ¶ 23.) On August 1, 2007, the U.S. Department of Justice ("DOJ") charged Korean Air with conspiring with an unnamed co-conspirator from January 2000 to July 16, 2006, to fix prices on passenger flights from the U.S. to Korea. (SAC ¶ 36.) Korean Air pled guilty to the charges and paid a $300 million fine.[2] (SAC ¶¶ 37, 39.)

After the plea, numerous class-action lawsuits were filed against Korean Air and Asiana. These lawsuits were transferred to this Court for pretrial purposes, where they were divided into two consolidated actions: one for direct purchasers and one for indirect purchasers. Plaintiffs filed their SAC on February 29, 2008, on behalf of the direct purchasers, alleging that, from January 1, 2000 to August 1, 2007 (the "Class Period"), Defendants conspired to fix prices on passenger flights between the U.S. and Korea in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.[3]

Defendants now move to dismiss the SAC, or portions thereof, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on the following grounds: (1) Plaintiffs fail to allege sufficient facts showing that they are direct purchasers and thus have standing to pursue Sherman Act claims; (2) Plaintiffs' Korea-purchase claims – i.e., those claims based on purchases of tickets for air travel originating in Korea – are barred by the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), 15 U.S.C. § 6a; (3) Plaintiffs' Korea-purchase claims fail for want of antitrust standing; (4) Plaintiffs fail to allege sufficient facts showing that Asiana is Korean Air's unnamed coconspirator and showing that the alleged conspiracy extends to all flight segments between the

---

[2] The plea, and corresponding fine, also encompassed criminal antitrust violations for Korean Air's involvement in a price-fixing conspiracy concerning air cargo transportation. (SAC ¶ 39.)

[3] Section 1 of the Sherman Act provides, in part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

1 U.S. and Korea; and (5) Plaintiffs fail to sufficiently plead fraudulent concealment so as to toll the

2 four-year statute of limitations for Sherman Act claims.

3 II.    DISCUSSION

4     A.    Motions to Dismiss for Lack of Subject Matter Jurisdiction

5     A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may be "facial

6 or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack,

7 the challenger asserts that the allegations contained in a complaint are insufficient on their face

8 to invoke federal jurisdiction." *Id.* Courts presume the plaintiff's allegations to be true and resolve

9 all reasonable inferences in the plaintiff's favor. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir.

10 2004).

11     Defendants raise a facial attack on Plaintiffs' standing to seek *any* damages under the

12 Sherman Act because, Defendants argue, Plaintiffs fail to show that they are direct purchasers.[4]

13 Alternatively, Defendants raise a facial attack on Plaintiffs' ability to pursue their Korea-purchase

14 claims because, Defendants argue, these claims are barred by the FTAIA. Defendants also

15 challenge the antitrust standing of the Korea-purchase Plaintiffs.[5]

16

17

18

19

20     [4] Defendants do not specify whether this argument is to be considered under Rule 12(b)(1)
21 or Rule 12(b)(6). Because the Court does not have subject matter jurisdiction if Plaintiffs lack
standing to assert their Sherman Act claim, *cf. Warren v. Fox Family Worldwide, Inc.*, 328 F.3d
22 1136, 1140 (9th Cir. 2003) ("[I]f Warren lacks standing to assert his federal copyright claims, the
district court did not have subject matter jurisdiction and dismissal was appropriate."), the Court
23 addresses the issue under Rule 12(b)(1), *see In re Dixtropan XL Antitrust Litig.*, MDL No. 1761,
2007 WL 2978329, at *1 (N.D. Cal. Oct. 11, 2007) (reviewing a challenge to the plaintiff's direct
24 purchaser status under Rule 12(b)(1)).

25     [5] The Court recognizes that a motion to dismiss for lack of antitrust standing is more
26 properly considered under Rule 12(b)(6). *See NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449-50 (6th
Cir. 2007); *see also Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002). However,
27 because the antitrust standing analysis follows from the FTAIA analysis, the Court includes its brief
antitrust standing discussion in this section of the Order for purposes of organizational coherence
28 and clarity.

1          1.   <u>Plaintiffs Have Sufficiently Alleged That They Are Direct Purchasers.</u>

2          Private suits to enforce the Sherman Act are authorized by § 4 of the Clayton Act, 15

3    U.S.C. § 15(a). *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000). In

4    *Illinois Brick Co. v. Illinois*, the Supreme Court held that, with limited exception, only persons

5    purchasing a product or service *directly* from a defendant may recover damages under § 4 for

6    price fixing in violation of the Sherman Act.[6] 431 U.S. 720, 728-29 (1977). According to

7    Defendants, Plaintiffs fail to show that they are direct purchasers or otherwise entitled to proceed

8    under *Illinois Brick*.

9          Plaintiffs must provide "a short and plain statement of the grounds for the court's jurisdiction

10   . . . ." Fed. R. Civ. P. 8(a)(1). Plaintiffs allege that they "purchased passenger air transportation

11   services between the U.S. and Korea *from one or both Defendants* during the Class Period." (SAC

12   ¶¶ 7-15 (emphasis added).) This allegation is sufficient under Rule 8(a)(1) to invoke the Court's

13   jurisdiction, as one can reasonably infer from it that Plaintiffs purchased tickets "[directly] from one

14   or both Defendants." Plaintiffs need not detail the specifics of their respective purchases at this

15   time.[7]

16

17

18

19

20

---

21        [6] The exceptions to this rule are: (1) where an indirect purchaser receives goods from the
22   direct purchaser according to a preexisting cost-plus contract; or (2) where the direct purchaser
     is controlled or owned by another party, either by the seller or the indirect purchaser. *In re*
23   *Ditropan*, 2007 WL 2978329, at *3 (citing *Illinois Brick*, 431 U.S. at 726 n.2, 736 n.16).

24        [7] Defendants contend that SAC's class definition "inevitably includes those who did not
     purchase directly and who do not come within either *Illinois Brick* exception." (Asiana Mot. 5.)
25   While the class definition appears overbroad (*see* SAC ¶ 47), "[b]ecause no class has yet been
     certified in this putative class action, the Court must treat the action as an individual action by the
26   named plaintiffs." *Latino Quimica-Amtex S.A. v. Akzo Nobel Chems. B.V.*, No. 03 Civ. 10312, 2005
27   WL 2207017, at *1 n.2 (S.D.N.Y. Sept. 8, 2005). As stated, the named Plaintiffs have sufficiently
     alleged that they are direct purchasers. The Court will address the class definition at the class
28   certification stage.

1        2.    <u>Plaintiffs Have Sufficiently Alleged That the Court Has Jurisdiction over Their</u>

2              <u>Korea-Purchase Claims.</u>

3       "The [FTAIA] excludes from the Sherman Act's reach much anticompetitive conduct that

4   causes only foreign injury." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 158

5   (2004).[8] Specifically:

6       [The Sherman Act] shall not apply to conduct involving trade or commerce (other

7       than import trade or import commerce) with foreign nations unless -

8       (1) such conduct has a direct, substantial, and reasonably foreseeable effect -

9           (A) on trade or commerce which is not trade or commerce with foreign

10          nations, or on import trade or import commerce with foreign nations; or

11           (B) on export trade or export commerce with foreign nations, of a person

12          engaged in such trade or commerce in the United States; and

13       (2) such effect gives rise to a claim under the provisions of [the Sherman Act], other

14       than this section.

15  15 U.S.C. § 6a.

16       The Supreme Court has formulated a two-part test for employing the FTAIA's rather

17  "technical language." *Empagran*, 542 U.S. at 162. First, the FTAIA "lays down a general rule

18  placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach." *Id.*

19  Second, "such conduct" is only subject to the Sherman Act if it "*both* (1) sufficiently affects

20  American commerce, *i.e.*, it has a 'direct, substantial, and reasonably foreseeable effect' on

21  American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that

22  antitrust law considers harmful, *i.e.*, the 'effect' must 'giv[e] rise to a [Sherman Act] claim.'" *Id.*

23

24

---

25     [8] "Federal courts have struggled for decades to determine when United States courts have jurisdiction over allegations of foreign restraints of trade." *United States v. LSL Biotechnologies*,

26  379 F.3d 672, 677 (9th Cir. 2004). "In an effort to provide a single standard to determine whether American antitrust laws apply to a given extraterritorial transaction, Congress enacted the [FTAIA]

27  in 1982." *O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.*, 830 F.2d 449, 451 (2d Cir. 1987); *see also LSL Biotechnologies*, 379 F.3d at 679 ("[T]he FTAIA provides the guiding

28  standard for jurisdiction over foreign restraints of trade.").

1    Applying this test, the Court concludes that Plaintiffs' Korea-purchase claims are not on

2    their face barred by the FTAIA.[9]

3                    a.    Trade or Commerce (Other than Import Trade or Import Commerce)

4                          with Foreign Nations

5    The first part of the FTAIA inquiry focuses on Defendants' conduct alleged to constitute a

6    violation of the Sherman Act. *See Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293, 305 n.13 (3d

7    Cir. 2002). According to Plaintiffs, the relevant conduct is "a conspiracy to fix the prices charged

8    for the service of flying passengers between Korea and the U.S." (Opp'n 19; *see also* SAC ¶ 1.)

9    Defendants contend, however, that for purposes of the FTAIA inquiry, the relevant conduct is

10   "Defendants' alleged agreement to fix the price of airline tickets sold in Korea." (Korean Air Mot.

11   5; *see also* Asiana Mot. 8 ("[T]his 12(b)(1) motion is limited to defendants' alleged agreement to

12   fix the prices as to tickets sold abroad . . . .").) The Court declines to adopt Defendants' definition.

13   First, the target of the alleged conspiracy is not the price of airline tickets, but air travel. A

14   "ticket" has no value to a customer separate and apart from the air travel. *See Spirit Airlines, Inc.*

15   *v. Nw. Airlines, Inc.*, 431 F.3d 917, 933 ("[A]t its most basic level, the unit of output of a passenger

16   airline is transportation of passengers between cities.") (internal quotation marks omitted). Second,

17   Defendants' attempt to divorce foreign from domestic conduct for purposes of the FTAIA analysis

18   is misplaced; it is not Defendants' conduct that is "split [and] analyzed for its separate domestic

19   and foreign components," but Plaintiffs' Sherman Act claim that arises from said conduct, *see In*

20

21

22

23

24

25

26          [9] This decision is subject to change following discovery. *See Emrich v. Touche Ross & Co.*,

27   846 F.2d 1190, 1194 n.2 (9th Cir. 1988) ("It is elementary that the subject matter jurisdiction of the
     district court is not a waivable matter and may be raised at anytime by one of the parties, by

28   motion or in the responsive pleadings, or *sua sponte* by the trial or reviewing court.").

1 | *re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 784 (N.D. Cal. 2007).[10] As such, the Court

2 | adopts Plaintiffs' articulation of Defendants' conduct for its FTAIA inquiry.

3 |      Having identified the "conduct" at issue, the Court now must determine whether this

4 | conduct involves "trade or commerce with foreign nations" or "import trade or commerce with

5 | foreign nations" or neither. *Turicentro*, 303 F.3d at 301 & n.7. Defendants' conduct plainly involves

6 | trade or commerce with foreign nations; Defendants, foreign airlines, allegedly conspired to fix the

7 | prices charged to Koreans for the service of flying them from Korea to the U.S. *See Empagran*,

8 | 542 U.S. at 163 (stating that the phrase "trade or commerce with foreign nations" includes

9 | commerce that is "wholly foreign").[11] Whether Defendants' conduct involves "import trade or

10 | commerce" is less obvious.

11 |      "While the FTAIA does not explicitly define the term 'import,' 'the term generally denotes

12 | [that] a product (or perhaps a service) has been brought into the United States from abroad.'" *CSR*

13 | *Ltd. v. CIGNA Corp.*, 405 F. Supp. 2d 526, 539 (D.N.J. 2005) (quoting *Turicentro*, 303 F.3d at 303

14 | (citing various dictionary definitions)). In determining whether conduct "involv[es]" import trade or

15 | commerce under the FTAIA, courts take a narrow view:

16 | _____

17 |     [10] This approach is consistent with the Supreme Court's approach in *Empagran*. There, the alleged conduct was "a price-fixing conspiracy, raising the price of vitamin products to customers in the United States and to customers in foreign countries." 542 U.S. at 158. The Court did not split the conduct for purposes of the FTAIA inquiry. *See id.* at 164 ("The price-fixing conduct significantly and adversely affects both customers outside the United States and customers within the United States . . . ."). However, the Court did split the plaintiffs' Sherman Act claim based on domestic versus foreign purchasers. *Id.* at 159. ("We conclude that, in this scenario, a purchaser in the United States could bring a Sherman Act claim under the FTAIA based on domestic injury, but a purchaser in Ecuador could not bring a Sherman Act claim based on foreign harm."). Here, Defendants do not dispute that claims based on travel originating in the U.S. are cognizable; thus, while the conduct is defined in a manner that encompasses the claims of both U.S. and Korean purchasers, the Court only considers whether it has subject matter jurisdiction over the foreign claims.

25 |     [11] Plaintiffs do not contest this point. Indeed, their argument regarding the applicability of the FTAIA assumes as much:

        Plaintiffs appear to concede that their antitrust claims implicate foreign trade or commerce by arguing that the FTAIA does not apply because the alleged conduct constitutes "import trade or import commerce." Such argument necessarily assumes that the conduct involves trade or commerce with foreign nations.

28 | *CSR Ltd. v. CIGNA Corp.*, 405 F. Supp. 2d 526, 539 (D.N.J. 2005).

1      [T]he FTAIA differentiates between conduct that "involves" [import trade or]

2      commerce, and conduct that "directly, substantially, and foreseeably" affects such

3      [trade or] commerce. To give the latter provision meaning, the former must be given

4      a relatively strict construction.

5    *Carpet Group Int'l v. Oriental Rug Imps. Ass'n*, 227 F.3d 62, 72 (3d Cir. 2000). In sum, the Court

6    must determine whether "defendants . . . *directly* br[ought] items or services into the United States

7    or *directly* increase[d] or decrease[d] United States imports." *CSR*, 405 F. Supp. 2d at 541.[12]

8      Plaintiffs contend that passengers traveling from Korea to the U.S. are "a type of 'import,'"

9    and thus, "a price-fixing agreement targeting the costs of air travel into the U.S. involves 'import

10   commerce.'" (Opp'n 19.) This argument is unconvincing. Air passengers are not products like the

11   oriental rugs that were found to be the object of import commerce in *Carpet Group*, 227 F.3d at

12   72, and Plaintiffs have failed to make a strong case for why they should be treated as such, *see*

13   *Smith v. Turner*, 48 U.S. (7 How.) 283, 325 (1849) ("No one thinks of calling men imports or

14   exports or cargo, but passengers."). The sole authority offered in support of their position is

15   strained and without context. According to Plaintiffs, "in *Empagran*, the Supreme Court stated that

16

17        [12] Defendants argue that their conduct does not involve import trade or commerce

18   "because the 'object of the conspiracy' is directed to [Korea] and the alleged injury (if any) would be felt abroad." (Asiana Mot. 9 (quoting *Kruman v. Christie's Int'l, PLC*, 284 F.3d 384, 395-96 (2d

19   Cir. 2002), *abrogated on other grounds by Empagram*, 542 U.S. 155).) In other words, Defendants contend the Court need not even inquire as to whether the provision of passenger air service

20   between Korea and the U.S. constitutes import trade or commerce. (*See* Korean Air Mot. 9 ("Other activities of Defendants – *e.g.*, flying airplanes to and from the U.S. – are irrelevant to the FTAIA

21   analysis.").) This argument follows from Defendants' definition of the conduct at issue as the fixing of prices of airline tickets sold in Korea, which the Court rejected above. The three cases cited by

22   Defendants in support of their argument – *Kruman*, *Turicentro*, and *CSR* – are thus readily distinguishable from the present case. In those cases, the service that was the object of the

23   alleged conspiracies took place outside of domestic commerce, and to the extent that it took place

24   in domestic commerce, it was a result of plaintiffs' conduct. As the court stated in *Turicentro*, "[n]o items or services were brought into the United States by [the defendants' conduct] alone." 303

25   F.3d at 304; *see also CSR*, 405 F. Supp. 2d at 542 ("[N]o services were brought into the United States by Defendants' issuance of coverage alone."). That is not the situation here, where the

26   relevant service *is* transport into the United States. By Defendants' conduct alone, purchasers of

27   airline tickets were brought aboard airplanes into the United States. Whether such transit may properly be deemed *import* trade or commerce is thus the key question before the Court. As to this

28   question, the Court, like Defendants, answers in the negative.

1   tourists traveling from the U.S. to the Dominican Republic were 'a kind of export.'" (Opp'n 19

2   (quoting 542 U.S. at 172).) The Court was merely describing what a district court had said in a

3   case decided prior to the enactment of the FTAIA. The Court ultimately concluded that the district

4   court opinion "[could not] be taken as significant support for application of the Sherman Act here."

5   *Empagran*, 542 U.S. at 172. Plaintiffs' largely unsupported assertion that air passengers are a type

6   of import is insufficient to establish subject matter jurisdiction.[13]

7                    b.      The FTAIA's "Domestic-Injury" Exception

8            As noted above, where price-fixing activity constitutes "conduct involving trade or

9   commerce . . . with foreign nations," such conduct "nonetheless [may fall] within a domestic-injury

10  exception to the general rule, an exception that applies (and makes the Sherman Act nonetheless

11  applicable) where the conduct (1) has a 'direct, substantial, and reasonably foreseeable effect' on

12  domestic commerce, and (2) 'such effect gives rise to a [Sherman Act] claim.'" *Empagran*, 542

13  U.S. at 158-59 (quoting 15 U.S.C. § 6a(1)(A), (2)).

14                   I.      Direct, Substantial, and Reasonably Foreseeable Effect

15           A conspiracy to fix the prices charged for the service of flying passengers between Korea

16  and the U.S. has a direct, substantial, and reasonably foreseeable effect on domestic commerce:

17  higher prices in the U.S. *See, e.g., Empagran*, 542 U.S. at 175 (describing the "adverse domestic

18  effect" of an international price-fixing conspiracy as "higher prices in the United States"); *In re

19  Monosodium Glutamate Antitrust Litig.*, 477 F.3d 535, 539-40 (8th Cir. 2007) (same); *Sun

20  Microsystems Inc. v. Hynix Semiconductor Inc.*, 534 F. Supp. 2d 1101, 1113 (N.D. Cal. 2007)

21  (same).[14]

22

23

24          [13] Plaintiffs also state that, "[b]ecause Defendants' conduct involves a conspiracy to fix
    prices for a service (passenger air travel) brought into the U.S. from abroad, the FTAIA is
25  inapplicable under the 'import commerce' provision . . . ." (Opp'n 18.) Plaintiffs offer no authority
    to support this far from self-evident argument. Accordingly, it is without merit.
26

27          [14] According to Defendants, "Plaintiffs have not alleged, and cannot allege, any effect that
    a ticket sale in Korea might have on U.S. domestic commerce . . . ." (Asiana Mot. 9.) Again, this
28  argument is premised on Defendants' already-rejected definition of the conduct at issue.

1                 ii.     Whether Such Effect Gives Rise to a Sherman Act Claim

2        Plaintiffs must show that the domestic effect in question – higher prices in the U.S. – gives

3 rise to a Sherman Act claim for those Plaintiffs who purchased tickets for air travel originating in

4 Korea.[15]

5        In *Empagran*, vitamin sellers around the world conspired to fix prices, leading to higher

6 vitamin prices in the U.S. and abroad. The Supreme Court held that foreign purchasers could not

7 bring a Sherman Act claim where the harm they suffered was independent of any adverse

8 domestic effect (i.e., higher prices in the U.S.). 542 U.S. at 175 ("We have assumed that the

9 anticompetitive conduct here independently caused foreign injury; that is, the conduct's domestic

10 effects did not help bring about that foreign injury."); *id.* at 173 ("Congress would not have intended

11 the FTAIA's exception to bring independently caused foreign injury within the Sherman Act.").

12 However, the Court "expressly left open the question whether the Sherman Act may apply to

13 foreign claims linked to domestic effects (i.e., claims in which the foreign injury is not independent

14 of the domestic effect)." *Sun Microsystems*, 534 F. Supp. 2d at 1113. Accordingly, the matter was

15 remanded for consideration of whether "the foreign injury was not independent," and sufficiently

16 so "to bring the price-fixing conduct within the scope of the FTAIA's exception." *Empagran*, 542

17 U.S. at 175.

18        In *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.* ("*Empagran II*"), the D.C. Circuit held that

19 a plaintiff must allege proximate cause to establish the requisite "nexus" between the domestic

20 effect and the foreign injury. 417 F.3d 1267, 1271 (D.C. Cir. 2005) ("The statutory language –

21 'gives rise to' – indicates a direct causal relationship, that is, proximate causation . . . ."). There,

22 the plaintiffs asserted that, "[b]ecause the [defendants'] product (vitamins) was fungible and

23 globally marketed, they were able to sustain super-competitive prices abroad only by maintaining

24 super-competitive prices in the United States as well." *Id.* at 1270. The court rejected this

25 argument: "While maintaining super-competitive prices in the United States may have facilitated

26

27 _____

28     [15] As already noted, it is uncontested that the effect of higher prices in the U.S. gives rise
to a Sherman Act claim for Plaintiffs who purchased tickets for air travel originating in the U.S.

1   the appellees' scheme to charge comparable prices abroad, this fact demonstrates at most but-for

2   causation." *Id.* at 1271; *see also, e.g., Rubber Chems.*, 504 F. Supp. 2d at 786 ("[Plaintiffs']

3   allegations constitute no more than the indirect, but-for causation that *Empagran II* and its progeny

4   have rejected.").

5       According to Defendants, the instant case is analogous to *Empagran II*, in that "it is the

6   foreign effect of the conspiracy – i.e., super-competitive prices charged in Korea – that gives rise

7   to [Plaintiffs'] Korea-purchase claims." (Korean Air Mot. 14.) Plaintiffs counter that, "unlike in

8   *Empagran II*, the inflated prices Defendants charge on the flight segment from Korea to the U.S.

9   [are] 'inextricably bound up' with and dependent upon the inflated price charged on the segment

10   from the U.S. to Korea; if this were not the case, Defendants could not charge artificially inflated

11   prices on roundtrip airfare, a core component of their business." (Opp'n 23 (quoting *Empagran*,

12   542 U.S. at 171-72).)

13       The parties' disagreement stems mainly from differing conceptions of the relevant

14   geographic market, or markets, here at issue. Under Defendants' theory, the price-fixing

15   conspiracy is aimed at two wholly independent markets, the U.S. and Korea. If true, this case

16   seems to fit within the *Empagran II* mold; the foreign effect of Defendants' conduct (higher prices

17   in Korea) independently gives rise to the claims of foreign purchasers. Under Plaintiffs' theory,

18   however, the relevant market is the Korea-U.S. route. If true, this case appears to be

19   distinguishable from *Empagran II*; the foreign effect of Defendants' conduct (higher prices in

20   Korea) may well be proximately related to the domestic effect of Defendants' conduct (higher

21   prices in the U.S.), jointly giving rise to the claims of foreign and domestic purchasers alike.

22       In support of their argument, Defendants ask the Court to take judicial notice of airfares

23   printed on their website. According to Defendants, the different fares for flights originating in Korea

24   versus flights originating in the U.S. demonstrate the existence of two independent markets. The

25   Court denies this request. Not only do the materials reference dates outside of the Class Period,

26   but they also require "the Court to draw complicated inferences . . . without the benefit of any

27   testimony to explain the meaning and significance of their contents." *See Darensburg v. Metro.*

28   *Transp. Com'n*, No. C-05-01597, 2006 WL 167657, at *1 (N.D. Cal. Jan. 20, 2006). Further,

1    Defendants' argument seems at odds with authority suggesting that the relevant market should

2    be understood as the Korea-U.S. route. *Cf. In re Nw. Airlines Corp. Antitrust Litig.*, 197 F. Supp.

3    2d 908, 915 (E.D. Mich. 2002) ("Regarding [the] use of 'city-pairs' as the relevant geographic

4    markets in this case, Plaintiffs have produced a wealth of government reports, air travel data

5    compilations, and statements by airline officials that use city-pairs as their frame of reference for

6    discussing and evaluating various aspects of the air travel industry.").

7          On the present record, and construing all reasonable inferences in Plaintiffs' favor, the

8    Court finds that Plaintiffs' single market theory warrants further discovery, and does not now serve

9    as a basis for dismissal of Plaintiffs' Korea-purchase claims.

10         3.    Plaintiffs Have Sufficiently Alleged That Korea-purchase Plaintiffs Have

11              Antitrust Standing.

12         To establish standing to bring an antitrust claim, plaintiffs "must have suffered an injury the

13   antitrust laws were intended to prevent, and the injury must flow from that which makes the

14   defendants' acts unlawful." *Turicentro*, 303 F.3d at 307. "This analysis implicates many of the

15   same jurisdictional issues under the FTAIA." *Rubber Chems.*, 504 F. Supp. 2d at 786 n.7; *see also*

16   *Sun Microsystems*, 534 F. Supp. 2d at 1116 ("Whether or not plaintiffs have standing to bring

17   claims on behalf of their subsidiaries and affiliates is related to the proximate cause inquiry.").

18         According to Defendants, "Korea-purchase plaintiffs' claims arise from alleged injuries

19   suffered entirely outside of U.S. commerce - the payment of alleged super-competitive prices for

20   airline tickets purchased in Korea. Accordingly, they cannot show antitrust injury and their claims

21   must be dismissed for lack of antitrust standing." (Korean Air Mot. 18.) This argument mirrors

22   Defendants' FTAIA argument. "[B]ecause [P]laintiffs' claims based on foreign injury may be

23   cognizable under U.S. antitrust law as discussed above, [P]laintiffs may have standing to pursue

24   those claims. . . . [T]he [C]ourt is of the view that discovery is necessary to completely evaluate

25   this argument." *See Sun Microsystems*, 534 F. Supp. 2d at 1117.[16]

26   _____

27         [16]   Defendants also argue that Plaintiffs lack antitrust standing because "'the more
     appropriate plaintiffs to bring suit against defendants are the consumers injured by defendants'
28   actions in the United States.'" (Korean Air Mot. 19 (quoting *Galavan Supplements, Ltd. v. Archer*

B.    Motions to Dismiss for Failure to State a Claim

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003). A court accepts the plaintiff's material allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *See Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). Dismissal is proper if the complaint lacks a "cognizable legal theory" or "sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). In pleading sufficient facts, a plaintiff must proffer "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007).

Defendants move to dismiss the SAC for Plaintiffs' failure to plead sufficient facts to support their Sherman Act claim and to toll the applicable statute of limitations.

1.    Plaintiffs Satisfy the Pleading Standard for Their Sherman Act Claim.

a.    *Twombly* Does Not Create a Heightened Pleading Standard.

In *Twombly*, the Supreme Court clarified what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . . Factual allegations must be enough to raise a right to relief above the speculative level . . . . In applying these general standards to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a

---

*Daniels Midland Co.*, No. C 97-3259, 1997 WL 732498, at *4 (N.D. Cal. Nov. 19, 1997)).) This argument depends on the assumption that the Korea-purchase Plaintiffs were not injured by Defendants' conduct in the U.S. The Court has elsewhere questioned this assumption. Accordingly, dismissal of the Korea-purchase claims is not now appropriate.

1    probability requirement at the pleading stage; it simply calls for enough fact to raise

2    a reasonable expectation that discovery will reveal evidence of illegal agreement.

3    127 S. Ct. at 1964-66. The Ninth Circuit, in *Kendall v. Visa U.S.A., Inc.*, applied *Twombly* in the

4    context of a § 1 claim, stating that, "[a]t least for the purposes of adequate pleading in antitrust

5    cases, the Court specifically abrogated the usual 'notice pleading' rule, found in [Rule] 8(a)(2) and

6    *Conley v. Gibson*, 355 U.S. 41, 47 (1957) . . . ." 518 F.3d 1042, 1047 n.5 (9th Cir. 2008).

7    According to Defendants, *Twombly*, as interpreted in *Kendall*, imposes on Plaintiffs a more

8    particularized pleading requirement than that found in Rule 8(a)(2). (*See* Asiana Mot. 11.) Plaintiffs

9    disagree.

10    While *Kendall*'s footnote 5 seems to suggest that Rule 8(a)(2) is inapplicable in the context

11    of a § 1 claim, the Court does not read the footnote as holding so broadly. *Twombly* is quite explicit

12    in its retention of Rule 8(a)(2)'s pleading standard, *see, e.g.*, 127 S. Ct. at 1966 ("The need at the

13    pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects

14    the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w]'

15    that the pleader is entitled to relief.'") (quoting Fed. R. Civ. P. 8(a)(2)); *id.* at 1973 n.14 ("In

16    reaching this conclusion, we do not apply any 'heightened' pleading standard, nor do we seek to

17    broaden the scope of Federal Rule of Civil Procedure 9 . . . ."), and *Kendall* does not recognize

18    any disagreement with *Twombly*, *see* 518 F.3d at 1047 (citing *Twombly* with approval). What

19    *Twombly* does abrogate, however, is the Rule 8(a)(2) standard *as articulated in Conley* "'that a

20    complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that

21    the plaintiff can prove no set of facts in support of his claim which would entitle him to relief,'" *see*

22    *Twombly*, 127 S. Ct. at 1968 (quoting *Conley*, 355 U.S. at 45-46); *id.* at 1968-69 (stating that

23    *Conley*'s "construing [of] Rule 8" has "earned its retirement"). On this basis, footnote 5 is more

24    properly read as only adopting *Twombly*'s abrogation of *Conley*'s "no set of facts" language. More

25    recent Ninth Circuit authority supports this limited interpretation. *See Canyon County v. Syngenta*

26    *Seeds, Inc.*, 519 F.3d 969, 975 n.8 (9th Cir. 2008) (referencing *Twombly*'s "recent 'retirement' of

27    the 'no set of facts' standard . . . and its adoption of a new 'plausibility' standard" but making no

28    independent mention of Rule 8(a)(2)).

1    Accordingly, the question here is simply whether Plaintiffs have pled allegations that "reach

2    the level suggesting conspiracy" – i.e., that demonstrate a "reasonably founded hope that the

3    [discovery] process will reveal relevant evidence to support [their] § 1 claim." *Twombly*, 127 S. Ct.

4    at 1967 (internal quotation marks omitted). As stated in *Kendall*:

5    To state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, claimants must

6    plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if

7    true, will prove: (1) a contract, combination or conspiracy among two or more

8    persons or distinct business entities; (2) by which the persons or entities intended

9    to harm or restrain trade or commerce among the several States, or with foreign

10   nations; (3) which actually injures competition.

11   518 F.3d at 1047.

12          b.   <u>Plaintiffs Have Plausibly Alleged that Asiana Participated in the Price-</u>

13            <u>Fixing Conspiracy with Korean Air.</u>

14   Defendants argue that the SAC is insufficiently particularized to support the existence of

15   a conspiracy between Korean Air and Asiana. In addition to Korean Air's plea that it conspired to

16   fix prices for flights from the U.S. to Korea with a competitor trans-Pacific passenger air carrier,

17   Plaintiffs allege the following facts in their SAC:

18   (1)   As Korea's only two carriers, Korean Air and Asiana are primary competitors in the air

19        transportation market for travel between the U.S. and Korea. (SAC ¶ 23.) Together, they

20        serve a substantial majority of all passengers flying between the U.S. and Korea. (SAC ¶

21        23.)

22   (2)   Defendants "have a history of collusive and anticompetitive behavior in other markets."

23        (SAC ¶ 29.) Specifically, in 2001, the Korean Fair Trade Commission ("KFTC") fined

24        Defendants for conspiring to set domestic passenger air transportation prices in Korea.

25        (SAC ¶ 29.)

26   (3)   In April 2004, Defendants applied to the Korean Ministry of Construction and Transportation

27        to collect fuel surcharges for their international passenger transportation, which request

28        was denied. (SAC ¶ 30.) Subsequently, in March 2005 and in April 2005, Defendants

1    adopted passenger fuel surcharges on flights inbound to Korea in identical amounts, and

2    agreed to review and, if necessary, adjust their fuel surcharges at the middle of each

3    following month. (SAC ¶¶ 31-32.) Defendants did adjust their fuel surcharges at

4    approximately the same times and in the same amounts, using the same complex

5    adjustment method. (SAC ¶¶ 32-33.)

6    (4)    In February 2006, the KFTC raided Defendants' offices as part of an investigation into fuel

7           surcharges relating to investigations in Europe and the U.S. (SAC ¶ 35.)

8    (5)    Attendant to Korean Air's guilty plea, Asiana has supplied requested information to U.S.

9           authorities and, as of August 2, 2007, "is waiting for a ruling" from the DOJ. (SAC ¶ 38.)

10   (6)    Defendants are members of the Association of Asia Pacific Airlines ("AAPA"), a trade

11          association, which "facilitated the exchange of information about pricing and market

12          conditions between [Defendants]." (SAC ¶ 40.) During the Class Period, key topics at AAPA

13          meetings included fuel costs, cost containment, and effects of profitability. (SAC ¶ 40.)

14          These allegations "nudge[ Plaintiffs'] claims across the line from conceivable to

15   plausible . . . ." See Twombly, 127 S. Ct. at 1974. Unlike in Twombly and Kendall, where mere

16   parallel conduct was insufficient to support the existence of a price-fixing conspiracy, the existence

17   of such a conspiracy is beyond doubt in the present case given Korean Air's guilty plea. "Although

18   Plaintiffs will need to provide evidence of [Asiana's] participation in [the] conspiracy, they now only

19   need to make allegations that plausibly suggest that [Asiana] participated in the alleged

20   conspiracy." In re Static Random Access Memory (SRAM) Antitrust Litig., No. M:07-cv-01819,

21   2008 WL 426522, at *6 (N.D. Cal. Feb. 14, 2008). Plaintiffs have done so. While the above

22   allegations, standing alone, may not suffice to establish a conspiracy, taken together, against the

23   backdrop of Korean Air's guilty plea, they render Plaintiffs' allegation of a price-fixing conspiracy

24   between Defendants plausible.

25

26

27

28

1    c. Plaintiffs Have Plausibly Alleged That the Price-Fixing Conspiracy

2      Encompasses Travel from Korea to the U.S. but Have Not Plausibly

3      Alleged That the Price-fixing Conspiracy Encompasses Travel That

4      Includes a U.S.-Korea Flight Segment but Where the Original

5      Departure or Ultimate Arrival Country Is Not Korea or the U.S.

6   Plaintiffs' claims cover "routes that included a *flight segment* between the United States and

7 the Republic of Korea on the airlines of Defendants . . . ." (SAC ¶ 47 (emphasis added).)

8 Defendants argue that the SAC should be dismissed to the extent that Plaintiffs allege a

9 conspiracy to fix the prices of tickets for travel other than travel, one-way or round-trip, from the

10 U.S. to Korea.[17] According to Defendants, Korean Air's plea was limited to travel from the U.S. to

11 Korea, and Plaintiffs have alleged no facts plausibly suggesting a broader conspiracy.

12   The Court finds that Plaintiffs have alleged sufficient facts to support claims based on travel,

13 one-way or round-trip, from Korea to the U.S. On any given flight between the U.S. and Korea,

14 there are passengers whose travel originated in the U.S. and passengers whose travel originated

15 in Korea. As to the former, Defendants do not appear to contest that Plaintiffs have adequately

16 pled claims based on one-way as well as round-trip travel. Given the potentially interrelated nature

17 of Plaintiffs' U.S.- and Korea-purchase claims, the Court finds that, to the extent Plaintiffs have

18 adequately alleged a conspiracy to fix prices for travel to Korea originating in the U.S. – which they

19 have – Plaintiffs have adequately alleged a conspiracy to fix prices for travel to the U.S. originating

20 in Korea.[18]

21

22

———————————————

23   [17] Such travel would include: (a) travel from Korea to the U.S.; (b) travel from Korea
 through the U.S.; (c) travel from the U.S. through Korea; (d) travel to Korea that does not originate
24 in the U.S. but that includes a U.S. to Korea segment; (e) travel to the U.S. that does not originate
 in Korea but that includes a Korea to U.S. segment; and (f) travel that does not originate or
25 terminate in the U.S. or Korea but that includes a U.S.-Korea segment.

26
   [18] Although the guilty plea appears limited to travel from the U.S. to Korea, such limitation
27 is not fatal to Plaintiffs' claims, as it is not uncommon for civil allegations based on the same
 nucleus of facts underlying a defendant's guilty plea to be broader than said plea. *See, e.g., In re*
28 *Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 159-60 (D. Mass. 2003).

1    As to all other claims – i.e., claims based on travel that includes a U.S.-Korea flight segment
2    but where the original departure or ultimate arrival country is not Korea or the U.S. – the Court
3    finds that Plaintiffs have not met their pleading burden. Notably, in their Opposition, Plaintiffs fail
4    to offer any argument to support such claims. (See Opp'n 14.) When asked at oral argument
5    whether they are seeking recovery for these so-called "pass-through" claims, Plaintiffs responded
6    in the affirmative. Yet, Plaintiffs were unable to provide the Court with any facts, let alone the
7    requisite "evidentiary facts," see Kendall, 518 F.3d at 1047, to support recovery on behalf of this
8    class of claimants. In the absence thereof, the Court finds that Plaintiffs have failed to plausibly
9    allege a price-fixing conspiracy for travel other than strictly between the U.S. and Korea. See
10   Shoulders v. Lovelace, No. 3:07cv236, 2008 WL 872295, at *3 (S.D. Miss. Mar. 27, 2008).
11   ("Based on the complete lack of evidence produced by plaintiff and his failure to respond to this
12   issue in his opposition to the defendants' motions [to dismiss], the court will assume . . . that the
13   plaintiff has waived [this issue] . . . .").

14                    2.    Plaintiffs Sufficiently Plead Fraudulent Concealment.

15   Claims brought under the Sherman Act are subject to a four-year statute of limitations. 15
16   U.S.C. § 15b. The first case in this litigation was filed on August 2, 2007.[19] Thus, absent an
17   applicable tolling doctrine, Plaintiffs' claims are limited to injuries suffered from ticket purchases
18   on or after August 2, 2003.

19   In their SAC, Plaintiffs allege that Defendants fraudulently concealed their alleged
20   conspiracy, tolling the statute of limitations until August 1, 2007, when the DOJ publicly announced
21   Korean Air's plea. (SAC ¶ 46.) According to Defendants, Plaintiffs have failed to adequately plead
22   fraudulent concealment, warranting dismissal of Plaintiffs' claims arising prior to August 2, 2003.

23   To plead fraudulent concealment, Plaintiffs must "plead facts showing that [Defendants]
24   actively misled [them], [and] that [they] had neither actual nor constructive knowledge of the facts
25   constituting [their] claim for relief despite [their] diligence in trying to discover the pertinent facts."
26   See Rutledge v. Boston Woven Hose & Rubber Co., 576 F.2d 248, 249-50 (9th Cir. 1978).

27   _____

28        [19]  See Chung v. Korean Air Lines Co., No. C 07 3985 (N.D. Cal., filed Aug. 2, 2007).

1   "[B]ecause fraud is the underlying theory of the doctrine of fraudulent concealment, the heightened

2   pleading requirements of [Rule] 9(b) applies."[20] *Rambus Inc. v. Samsung Elecs. Co.*, No.

3   C-05-02298, 2007 WL 39374, at *6 (N.D. Cal. Jan. 4, 2007). However, "Rule 9(b) may be relaxed

4   to permit discovery in a limited class of corporate fraud cases where the evidence of fraud is within

5   a defendant's exclusive possession." *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245

6   F.3d 1048, 1052 (9th Cir. 2001). Furthermore, "[t]he requirement for diligence is only meaningful

7   . . . when facts exist that would excite the inquiry of a reasonable person." *Conmar Corp. v. Mitsui*

8   *& Co. (U.S.A.)*, 858 F.2d 499, 504 (9th Cir. 1988).

9          Plaintiffs allege that Defendants affirmatively concealed their conspiracy in several

10  respects:

11  (1)   First, Plaintiffs claim that Defendants agreed amongst themselves, in secret meetings,

12        conversations, and communications, not to discuss publicly or to reveal the nature of their

13        illegal acts and communications. (SAC ¶ 45(a)-(b).) Specifically, Plaintiffs point to Korean

14        Air's admission that it engaged in discussions and attended meetings with representatives

15        of another trans-Pacific airline in furtherance of the conspiracy to fix the prices of

16        passenger airfares. (SAC ¶ 39.)

17  (2)   Second, Plaintiffs claim that Defendants publicly gave false and pretextual reasons for their

18        pricing and price increases (SAC ¶ 45(c).) Specifically, Plaintiffs point to a *Yonhap News*

19        report that, during March 2005, Defendants submitted a report to the Korean Ministry of

20        Construction and Transportation informing it of their intention to implement passenger fuel

21        surcharges (SAC ¶ 31) and Defendants agreed to review and, if necessary, adjust their fuel

22        surcharges at the middle of each month (SAC ¶ 32).

23  (3)   Third, Plaintiffs claim that Defendants denied any price-fixing of passenger airfares in their

24        public statement. (SAC ¶ 45(d).)

25

26

27

---

28      [20]  "In alleging fraud or mistake, a party must state with particularity the circumstances
        constituting fraud or mistake." Fed. R. Civ. P. 9(b).

1  According to Plaintiffs, because of these affirmative acts of concealment, there was no inquiry

2  notice of their claims prior to August 1, 2007, preventing Plaintiffs from discovering Defendants'

3  conspiracy earlier through the exercise of due diligence.

4      "While it is true that the allegations of fraudulent concealment forwarded by [Plaintiffs] are

5  absent many specifics, it is similarly true that such details cannot be ascertained until discovery

6  is undertaken." *See In re Infant Formula Antitrust Litig.*, No. MDL 878, 1992 WL 503465, at *2

7  (N.D. Fla. Jan. 13, 1992). "As many courts have noted in the antitrust conspiracy context, it is

8  generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the

9  motion to dismiss stage, particularly where the proof relating to the extent of the fraudulent

10  concealment is alleged to be largely in the hands of the alleged conspirators." *Rubber Chems.*,

11  504 F. Supp. 2d at 789. The instant case is thus unlike *Conerly v. Westinghouse Electric Corp.*,

12  cited by Defendants, in which the plaintiff unsuccessfully sought to toll the statute of limitations for

13  24 years following his allegedly discriminatory termination, given that he returned to work after his

14  layoff and could have readily observed that others with less seniority were advancing more quickly

15  than he. 623 F.2d 117, 120-21 (9th Cir. 1980). Here, the primary facts that might have suggested

16  the existence of a price-fixing conspiracy – namely, higher prices for tickets – are alleged to have

17  been explained away by Defendants as the product of changes in fuel prices, not a conspiracy to

18  fix prices.

19      Plaintiffs have sufficiently alleged fraudulent concealment.

20  III.    <u>RULING</u>

21      For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendants'

22  Motions. Plaintiffs' claims based on travel that includes a U.S.-Korea flight segment but where the

23  original departure or ultimate arrival country is not Korea or the U.S. – the so-called "pass-through"

24  claims – are DISMISSED WITH PREJUDICE. The remainder of Plaintiffs' claims are now ripe for

25  discovery.

26      IT IS SO ORDERED.                                    /S/ S. James Otero

27  June 25, 2008

28                                                          _____
                                                            S. JAMES OTERO
                                                            UNITED STATES DISTRICT JUDGE

EXHIBIT 2

_____ Priority
_____ Send
_____ Clsd
_____ Enter
_____ JS-5/JS-6
_____ JS-2/JS-3

# ORIGINAL

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES-GENERAL

Case No.: CV 99-07796 GHK (CTx)          Date: January 13, 2000

Title:   Thomas & Thomas Rodmakers, Inc., et al. v. Newport
         Adhesives and Composites, Inc., et al.

==============================================================

DOCKET ENTRY

==============================================================

PRESENT:
         Hon. George H. King, United States District Judge

         Beatrice Herrera              None Present
         Deputy Clerk                  Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:      ATTORNEYS PRESENT FOR DEFENDANTS:

                                       None Present
None Present

PROCEEDINGS:   Defendants' Motion to Dismiss the Complaint

     This matter comes before the court on defendants' motion to
dismiss plaintiffs' complaint.  This motion is appropriate for
decision without oral argument.  See Fed. R. Civ. P. 78; Local
Rule 7.11.  After fully considering the briefs and papers
pertaining to this matter, the court rules as follows:

I.   FACTUAL AND PROCEDURAL BACKGROUND

     On October 4, 1999, plaintiffs Thomas & Thomas Rodmakers,
Inc., et al., filed their complaint as a purported class action
against defendants Newport Adhesives and Composites, Inc., et al.
Plaintiffs allege that defendants colluded to fix carbon fiber
prices in the United States in violation of the Sherman Act, 15
U.S.C. § 1.  To support their allegations, plaintiffs reference
an ongoing grand jury investigation looking into one defendant's
possible anticompetitive activities.

     Defendants move to dismiss plaintiffs' Amended and
Consolidated Class Action Complaint ("complaint") for failure to
comply with Federal Rule of Civil Procedure 8(a), or in the
alternative, to limit the time period covered by the complaint to



ENTERED ON ICMS

JAN 1 4 2000

10.

four years from the date the first action was filed, pursuant to Rule 9(b) of the Federal Rules.

## II. DISCUSSION

### A. Motion to Dismiss Standard

A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." California Dump Truck Owners Assoc., Inc. v. Associated General Contractors of Am., 562 F.2d 607, 614 (9th Cir. 1977) (citing Conley v. Gibson, 355 U.S. 41, 45 (1957)). In resolving a Rule 12(b)(6) motion, we must: (1) construe the complaint in the light most favorable to the plaintiff; (2) accept all well-pleaded factual allegations as true; and (3) determine whether plaintiff could prove any set of facts to support a claim that would merit relief. Cahill v. Liberty Mut. Inc. Co., 80 F.3d 336, 337-38 (9th Cir. 1996).

### B. Dismissal Under Rule 8(a)

The basic requirement for a proper complaint under the federal rules is that the complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Rule 8(a) "do[es] not require a claimant to set out in detail the facts upon which he bases his claim." Yamaguchi v. United States Dep't of the Air Force, 109 F.3d 1475, 1481 (9th Cir. 1997) (citing Conley v. Gibson, 355 U.S. 41, 47 (1957)). All that is required are sufficient allegations to put defendants fairly on notice of the claims against them, McKeever v. Block, 932 F.2d 795, 798 (9th Cir. 1991).

There is no special rule requiring more factual specificity for antitrust pleadings. Franchise Realty Interstate Corp. v. San Francisco Local Jt. Exec. Bd. of Culinary Workers, 542 F.2d 1076, 1082 (9th Cir. 1976), cert. denied, 430 U.S. 940 (1977). The level of specificity required in a complaint depends on the particular issue in question. See 5 Wright & Miller, Federal Practice and Procedure: Civil 2d §1218 (1990). However, in Big Bear Fireworks, Inc. v. Anco Management Servs. Inc., 1992 U.S. Dist. LEXIS 21918 (N.D. Cal. 1992), the court noted:

CV

> [i]n an antitrust action, courts tend to be less
> rigorous in requiring specificity. The antitrust
> plaintiff is usually a bystander without access to
> evidence of the anticompetitive actions. Often only
> anticompetitive consequences, such as high market
> share, are observable without discovery. The Ninth
> Circuit follows a "policy disfavoring the pre-trial
> dismissal of antitrust actions because the proof lies
> largely in the hands of the defendants." Ernest W.
> Hahn v. Codding, 615 F.2d 830, 834 (9th Cir. 1980).
> This admonition is most compelling when dismissal is
> sought prior to discovery.

Id. at *8. See also Norfolk Monument Co. v. Woodlawn Mem'l
Gardens, Inc., 394 U.S. 700, 704 (1969) (cautioning against
summary proceedings in antitrust actions as the proof in these
cases is largely in the hands of the alleged conspirators);
Hospital Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 746
(1976) ("in antitrust cases . . . dismissal prior to giving
plaintiff ample opportunity for discovery should be granted very
sparingly").

The initial inquiry before us is whether the complaint
states sufficient allegations to put defendants on notice of the
facts underlying plaintiffs' claims. After a careful review of
the complaint, we conclude that plaintiffs' antitrust allegations
are adequate to provide defendants with sufficient notice of the
claims against them.[1]

---

[1] Specifically, plaintiffs' complaint alleges that
defendants engaged in the following conduct:

> ¶ 42. Beginning at least as early as January 1993, and
> continuing until at least January 31, 1999, . . .
> defendants and their co-conspirators engaged in a
> continuing agreement, . . . to artificially raise, fix,
> maintain, or stabilize prices for Carbon Fiber in the
> United States . . .
> ¶ 43. [Defendants engaged in the following
> anticompetitive activities:]
>> (a) Defendants participated in meetings and
>> conversations, including through various trade
>> organizations and conventions, to discuss the
>> prices of Carbon Fiber in the United States and
>> elsewhere;

3

This case is distinguishable from <u>Big Bear Fireworks</u>, upon which defendants rely, where the court held that defendants were entitled to a more definite statement under Rule 12(e) because the conclusory statements of law in plaintiffs' complaint did not even minimally inform the defendants of the factual basis for the charges against them.  <u>Id.</u> at *11-15.  Specifically, the court noted, "[t]he only factual details alleged are that prices were fixed at meetings, and that the time period for the price fixing was 1988 to the present."  <u>Id.</u>

Here, plaintiffs' complaint contains more specificity than the conclusory allegations in <u>Big Bear</u>.  In addition to simply asserting that prices were fixed at meetings during a broad period, plaintiffs discuss how they believe defendants actually fixed prices (e.g. issuing price announcements and price quotations in accordance with the agreements reached), and discuss what effect this price fixing had on plaintiffs (e.g. plaintiffs paid more for the carbon fiber that they purchased from defendants and/or their co-conspirators than they would have paid under conditions of free and open competition).  (Comp. ¶¶ 43, 46.)  While these allegations are not particularly detailed, they are sufficient to put defendants on notice of the claims against them.

Defendants also rely on <u>California Dump Truck Owners Assoc., Inc. v. Associated General Contractors of Am.</u>, 562 F.2d 607 (9th Cir. 1977).  <u>California Dump Truck Owners</u> dealt with antitrust

_____

> (b) Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and maintain prices of Carbon Fiber sold in the United States and elsewhere;
> (c) Defendants issued price announcements and price quotations in accordance with the agreements reached;
> (d) Defendants sold Carbon Fiber to various customers in the United States at non-competitive prices; and
> (e) Defendants agreed to allocate the volumes of, sales of, or customers or markets for Carbon Fiber in the United States.

(Comp. ¶¶42-43.)

4

claims based primarily on a collective bargaining agreement.
After finding that the agreement, by itself, did not violate the
antitrust laws, the court analyzed the remainder of plaintiff's
complaint, which simply alleged that defendants combined and
conspired to fix and maintain prices, eliminate competitors,
restrain business, and boycott plaintiffs in Southern California.
Id. at 614.  The court concluded that these allegations were
overly broad and vague and insufficient to put defendants on
notice of the claims against them in light of the court's earlier
determination regarding the collective bargaining agreement.  Id.
at 614-15.

    California Dump Truck Owners is distinguishable because
plaintiffs' claims provide more specificity to put defendants on
notice of the claims against them.  Moreover, plaintiffs'
complaint does not suffer from the problem in California Dump
Truck Owners where the heart of plaintiffs' antitrust claims was
really based on a collective bargaining agreement which the court
ultimately found not to be anticompetitive.

    The remaining Ninth Circuit and Central District cases which
defendants cite all involve instances where a complaint did not
plead sufficient facts to establish a particular element of the
cause of action alleged.  None contained, as is presently the
case, a complaint where sufficient facts are alleged, albeit not
with great detail.

    Plaintiffs' complaint is unquestionably spartan with
relevant details, but does more than just make conclusory
statements.  The complaint references meetings at trade
organizations and conventions, alleges that during these meetings
price-fixing agreements were made, and these anticompetitive
agreements were carried out by issuing price announcements and
quotations based on agreed prices, thereby injuring competition.
(Comp. ¶¶ 43-47.)  These allegations are sufficient to comply
with Rule 8, and defendants' motion to dismiss on this ground is
denied.

C.  **Dismissal Under Rule 9(b)**

    Even though plaintiffs' complaint is sufficient under Rule
8, it is not necessarily sufficient under the heightened pleading
requirements of Rule 9 for the fraudulent concealment
allegations, without which plaintiffs would not be able to assert
any claims prior to July 29, 1995 (based on the four-year statute

of limitations for antitrust actions, 15 U.S.C. § 15(b)).[2]
Plaintiffs' complaint includes claims dating back as early as
January 1, 1993.

To prove fraudulent concealment, plaintiffs must show: (1)
that defendants affirmatively misled it, and (2) that plaintiffs
had neither actual nor constructive knowledge of the facts giving
rise to its claim, (3) despite its diligence in trying to uncover
those facts. Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc., 858
F.2d 499, 502 (9th Cir. 1988), cert. denied, 488 U.S. 1010
(1989). The absence of any one of these elements precludes any
tolling. See id.

Under Rule 9(b), an averment of fraud should state with
particularity the circumstances constituting the fraud.[3] The
purpose of the particularity requirement is to provide defendants
with adequate notice of both the nature and grounds of the claim
so that defendants can prepare an adequate answer. See Moore v.
Kayport Package Express, Inc., 885 F.2d 531, 540 (9th Cir. 1989);
Schwarzer, Tashima & Wagstaffe, California Practice Guide: Civil
Procedure Before Trial § 8:37 (The Rutter Group 1999) ("Civ.
Proc. Before Trial"). Nevertheless, the requirements of Rule
9(b) must be read in harmony with those of Rule 8.[4] See Civ.

---

[2] A claim of fraudulent concealment can serve to toll the
four-year antitrust statute of limitations. See Mt. Hood Stages,
Inc. v. Greyhound Corp., 555 F.2d 687 (9th Cir. 1977), vacated
and remanded on other grounds, 437 U.S. 322 (1978).

[3] Averments of fraudulent concealment are subject to Rule
9(b). 389 Orange St. Partners v. Arnold, 179 F.3d 656, 662 (9th
Cir. 1999).

[4] The resolution of the interplay between Rule 8 and Rule
9(b) is all the more difficult where, as the court described in
In re Corrugated Container Antitrust Litigation, MDL No. 310
(S.D. Texas 1978), "fraud is not the essence of the cause of
action but appears . . . as a procedural means of tolling the
statute of limitations in an action based on an alleged long-term
conspiracy. To make the problem even more difficult of
resolution, these cases are horizontal price-fixing cases where
by the very nature of the alleged offense plaintiffs may be
expected to have little concrete data in their hands at the
pleading stage." Id. at p. 2-3. Moreover, courts in other
districts have held that the level of particularity needed to

Proc. Before Trial at § 8:39.

Under Rule 9(b), allegations that are vague or conclusory are insufficient. See Moore v. Kayport Package Express, Inc., 885 F.2d 531, 540 (9th Cir. 1989). In cases involving several defendants, the complaint should set forth the role of each defendant in the fraud. See Neubronner v. Milken, 6 F.3d 666, 671 (9th Cir. 1993). However, if the complaint adequately identifies a particular defendant with a category of defendants allegedly responsible for some continuing course of conduct, allegations that "defendants" committed described acts cover each member of the group. In re Equity Funding Corp. of Am. Sec. Litig., 416 F. Supp. 161, 181 (C.D. Cal. 1976).

The requirement of particularity in pleading fraud should not be overdone and does not encompass pleading the specifics of plaintiff's trial evidence. See Civ. Proc. Before Trial § 8:48; 5 Wright & Miller, Federal Practice and Procedure: Civil 2d § 1298 (1990) ("it is inappropriate to focus exclusively on the fact that Rule 9(b) requires particularity in pleading fraud. This is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.") (citation omitted). Thus, clairvoyance is not required at the pleading stage. Where the missing facts are within the defendant's control, courts are reluctant to dismiss until plaintiff has had a reasonable opportunity for discovery. Neubronner v. Milken, 6 F.3d 666, 671 (9th Cir. 1993). As the court held in Serpa v. Jolly King Restaurants, Inc., 62 F.R.D. 626 (S.D. Cal. 1974), "allegations of time and place are unnecessary in the . . . complaint in view of the number of plaintiffs and [the court's] conclusion that defendants can prepare an adequate answer from the allegations in the complaint." Id. at 635. See also 5 Wright & Miller, Federal Practice and Procedure: Civil 2d § 1298 (1990) ("the sufficiency

---

plead fraudulent concealment is not as stringent as that necessary to plead fraud generally. See e.g. Shaw v. Brown & Williamson Tobacco Corp., 973 F. Supp. 539, 552 (D. Md. 1997) (particularities of time, place, speaker, and contents of allegedly false statements cannot be met in concealment cases because an omission cannot be described in these terms, thus, "these particularity requirements are less strictly applied with respect to claims of fraud by concealment."); Bethlehem Steel Corp. v. Fischbach and Moore, Inc., 641 F. Supp. 271, 275-76 (E.D. Pa. 1986).

of a fraud pleading also varies with the complexity of the
transaction.  When the issues are complicated or the transactions
cover a long period of time, courts tend to require less of the
pleader.")

    1.   **Plaintiffs Specific Allegations of Fraudulent
        Concealment**

        a.   **Defendants' Acts of Concealment**

    Allegations of fraudulent concealment must do more than
assert that conduct was by its nature self-concealing.  <u>See</u>
<u>Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.</u>, 858 F.2d 499, 502
(9th Cir. 1988), <u>cert. denied</u>, 488 U.S. 1010 (1989).  A plaintiff
alleging fraudulent concealment must "establish that its failure
to have notice of its claim was the result of affirmative conduct
by the defendant. . . .  Passive concealment of information is
not enough to toll the statute of limitations, . . . unless the
defendant had a fiduciary duty to disclose information to the
plaintiff. . . .  An affirmative act of denial, however, is
enough if the circumstances make the plaintiff's reliance on the
denial reasonable."  <u>Id.</u> at 505.  Thus, to satisfy the pleading
requirement for fraudulent concealment, plaintiffs must show some
affirmative act which defendants took to conceal their
conspiracy.

    In plaintiffs' complaint, they make the following
allegations regarding their fraudulent concealment claims:

        ¶ 49.  Defendants and their co-conspirators engaged in
        a successful, illegal price-fixing conspiracy that by
        its very nature was inherently self-concealing.

        ¶ 50. . . .  Among other things, defendants falsely
        attributed price increases to increases in the cost of
        materials and shortage of supply when, in fact, price
        increases were the direct result of collusive activity
        among defendants.

(Comp. ¶¶ 49, 50.)  These statements satisfy the requirements of
<u>Conmar</u>.  They allege affirmative conduct which precluded them
from obtaining notice of their claim (namely because defendants
allegedly falsely attributed price increases to increases in the
cost of materials and shortage of supply when, in fact, price
increases were the direct result of collusive activity among

defendants).

Furthermore, these statements provide enough specificity to distinguish this case from In re Fertilizer Antitrust Litig., 1979-2 Trad. Case ¶ 62,894, 1979 U.S. Dist. LEXIS 9818 (E.D. Wash. 1979) (upon which defendants rely). In In re Fertilizer, the complaint alleged concealment of a price-fixing agreement by stating that:

> (f) there were affirmative acts of concealment by defendants including
>> (1) the submission of bids which were required to be competitive, had the appearance of regularity and were by their submission represented to be competitive and regular, but which in fact were not;
>> (2) falsely signing non-collusion affidavits and/or certificates of regularity;
>> (3) making false and misleading statements concerning the cause of and justification for prices and price increases and the existence of shortages; and
>> (4) other acts presently unknown to plaintiffs.

Id. at *20-21. The court held that these allegations were insufficient under Rule 9(b) because: (1) the submission of bids was only passive conduct; (2) falsely signing non-collusion affidavits alone would be insufficient to justify plaintiffs' not being on notice of defendants' activities and amounts to no more than a denial of wrongdoing; and (3) the statements are no more than conclusory. See id. at *21-22. Additionally, the court criticized plaintiffs for not stating when the alleged fraudulent concealment was discovered (or what was discovered) and for not explaining why the facts which prompted plaintiffs to file their complaint were not available at an earlier date. See id. at *23-24.

In the current case, plaintiffs state both what information they discovered and why it was unavailable to them earlier, (Comp. ¶ 51), and they set out specific affirmative conduct which they allege defendants engaged in to conceal their price-fixing. While more specificity would unquestionably be desirable, more than mere conclusory statements are clearly provided, and defendants are given sufficient information to have notice of the nature and grounds of the fraudulent concealment claims against

9

them so that they may prepare an adequate answer.[5]  No more is
required under Rule 9 in light of the particular difficulties
antitrust plaintiffs have in accessing information to show
fraudulent concealment.

   b.   Plaintiffs' Due Diligence

   Finally, defendants argue that plaintiffs' claims also fail
to establish the requisite element of due diligence necessary for
a fraudulent concealment claim.  See Conmar Corp. v. Mitsui & Co.
(U.S.A.), Inc., 858 F.2d 499, 502 (9th Cir. 1988), cert. denied,
488 U.S. 1010 (1989).  However, the diligence requirement for a
fraudulent concealment claim does not require actual diligence in
investigating a fraud claim, but rather requires diligence only
"when the facts exist that would excite the inquiry of a
reasonable person."  Conmar, 858 F.2d at 504.  Plaintiffs allege
that no facts existed prior to the 1999 disclosure by defendant
Hexcel that it was being investigated for price fixing which
would have put them on notice of defendants' alleged wrongful
conduct.  (Comp. ¶ 51.)  Defendants have put forward no evidence
to suggest that plaintiffs should have been on notice any
earlier.  In any event, this question is largely one of fact and
thus is inappropriate for resolution at this time.  See e.g.
Designer Floor Covering, Inc. v. Shaw Indus., Inc., No. 4:98-CV-
0267-HLM (N.D. Ga. 1999).

   Accordingly, plaintiffs have adequately pled their
fraudulent concealment claims, and defendants' motion to limit
plaintiffs' complaint to the four-year antitrust statute of
limitations period is denied.

---

   [5]  Other courts which have considered this issue have found
that complaints with similar specificity satisfied the
requirements of Rule 9(b).  See e.g.  In re Commercial Explosives
Litig., 945 F. Supp. 1489, 1492-94 (D. Utah 1996); State of
Illinois v. Sperry Rand Corp., 237 F. Supp. 520, 523-24 (N.D.
Ill. 1965).

## III. DISPOSITION

Defendants' motion to dismiss the complaint is **DENIED**. Defendants shall answer the operative complaint within 10 days hereof. See Fed. R. Civ. P. 12(a)(4)(A).


IT IS SO ORDERED.

**MINUTES FORM 11**
**CIVIL-GEN**                    Initials of Deputy Clerk

11

# EXHIBIT 3

**EXHIBIT 3**

**Comparison of Allegations Upheld in *In re TFT-LCD Antitrust Litig.*, 599 F. Supp. 2d 1179 (N.D. Cal. 2009),
with the Allegations in Direct Purchaser Plaintiffs' Consolidated Amended Complaint (Docket No. 436)**

| Allegations described in *In re TFT-LCD Antitrust Litig.*, 599 F. Supp. at 1184-85 | Paragraphs From the *TFT-LCD* Direct Purchaser Plaintiffs' First Amended Consolidated Complaint (Exhibit ___ hereto) Cited by the Court | Comparable Allegations in Direct Purchaser Plaintiffs' Consolidated Amended Complaint (Docket No. 436) |
|---|---|---|
| Detailed allegations concerning conspiratorial meetings | 105-133 | 134-175 |
| Allegations regarding criminal prosecutions | 137-145 (guilty pleas by three defendant manufacturers) | 126 (indictment of C.Y. Lin) |
| Particulars about the types of meetings by which the alleged price-fixing conspiracy was effectuated | 106-113 | 134-153 |
| Allegations that the conspiratorial group meetings were supplemented by bilateral meetings and that discussions between various defendants about pricing and that these discussions took the form of in-person meetings, telephone calls, and e-mails | 114-115 | 134-135 |
| Specific allegations implicating each defendant in the conspiracy | 117-133 | 155-175 |
| Allegations that the individual participants in the conspiratorial meetings did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family | 130 | 154 |
| Allegations that individual participants entered into agreements on behalf of their respective corporate families | 130 | 154 |

Malta 467319