EXHIBIT 4

1   Bruce L. Simon (State Bar No. 96241)
    PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
2   44 Montgomery Street, Suite 1430
    San Francisco, CA 94104
3   Telephone:    (415) 433-9000
    Facsimile:    (415) 433-9008
4
5   Richard M. Heimann (State Bar No. 63607)
    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
6   275 Battery Street, 30th Floor
    San Francisco, CA 94111-3339
    Telephone:    (415) 956-1000
7   Facsimile:    (415) 956-1008

8   *Interim Co-Lead Counsel for the Direct Purchaser Plaintiffs*

9   [Additional counsel listed on signature page]

10

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                       SAN FRANCISCO DIVISION

14

15  IN RE: TFT-LCD (FLAT PANEL)          Master File No. M07-1827 SI
    ANTITRUST LITIGATION
16                                        MDL No. 1827

17  ─────────────────────────

18  This Document Relates to:            **FIRST AMENDED DIRECT
                                         PURCHASER PLAINTIFFS'
    ALL DIRECT PURCHASER ACTIONS         CONSOLIDATED COMPLAINT**
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................. 1

II.     JURISDICTION AND VENUE ................................................ 3

III.    PARTIES ............................................................................. 3

        A      Plaintiffs ................................................................... 3

        B.     Japanese Defendants.................................................... 5

               1.      Epson America............................................... 5

               2.      Hitachi............................................................ 5

               3.      Sharp.............................................................. 6

               4.      Toshiba........................................................... 6

               5.      Toshiba Matsushita......................................... 7

        C.     Korean Defendants...................................................... 7

               1.      LG Display...................................................... 7

               2.      Samsung......................................................... 8

        D.     Taiwanese Defendants.................................................. 9

               1.      AU Optronics................................................... 9

               2.      Chi Mei........................................................... 9

               3.      Chunghwa........................................................ 11

               4.      HannStar.......................................................... 12

IV.     AGENTS AND CO-CONSPIRATORS ................................... 12

V.      CLASS ACTION ALLEGATIONS ........................................ 14

VI.     TRADE AND COMMERCE ................................................... 16

VII.    FACTUAL ALLEGATIONS ................................................. 16

        A.     TFT-LCD Technology.................................................. 16

        B.     Structure of the TFT-LCD Industry.............................. 18

               1.      Market Concentration....................................... 18

| | | 2. | Information Sharing | ...........................................................18 |
| | | 3. | Consolidation | ...........................................................19 |
| | | 4. | Multiple Interrelated Business Relationships | ........................19 |
| | | 5. | High Costs of Entry Into the Industry | .............................20 |
| | | 6. | The "Crystal Cycle" | ...............................................20 |
| | | 7. | Dominant Products | ..................................................21 |
| | C. | | Pre-Conspiracy Market | ...........................................................22 |
| | D. | | Defendants' and Co-Conspirators' Illegal Agreements | .....................23 |
| | | 1. | "Crystal Meetings" | .................................................23 |
| | | 2. | Bilateral Discussions | ...............................................25 |
| | | 3. | Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions | ....................................................26 |
| | E. | | International Government Antitrust Investigations | ...........................29 |
| | F. | | Market During the Conspiracy | ...............................................32 |
| | | 1. | 1996 | ....................................................................33 |
| | | 2. | 1997-1998 | ..............................................................34 |
| | | 3. | 1999 | ....................................................................35 |
| | | 4. | 2000-2001 | ..............................................................36 |
| | | 5. | 2002-2003 | ..............................................................38 |
| | | 6. | 2004 | ....................................................................41 |
| | | 7. | 2005 | ....................................................................41 |
| | | 8. | 2006 | ....................................................................43 |
| | G. | | The Role of Trade Associations During the Conspiracy Period | ...........44 |
| VIII. | | | FRAUDULENT CONCEALMENT | ..............................................47 |
| IX. | | | CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1 | ...............................49 |
| X. | | | PRAYER FOR RELIEF | ..........................................................50 |
| XI. | | | JURY TRIAL DEMANDED | ......................................................51 |

1    Plaintiffs (1) A.M. Photo & Imaging Center, Inc., (2) CMP Consulting Services,

2    Inc., (3) Crago, Inc., (4) Home Technologies Bellevue LLC, (5) Nathan Muchnick, Inc.,

3    (6) Omnis Computer Supplies, Inc., (7) Orion Home Systems, LLC, (8) Phelps Technologies,

4    Inc., (9) Royal Data Services, Inc., (10) Univisions-Crimson Holding, Inc., and (11) Weber's

5    World Company, individually and on behalf of a Class of all those similarly situated, bring this

6    action for damages and injunctive relief under the antitrust laws of the United States against the

7    defendants, and allege on information and belief as follows:

8    **I.     INTRODUCTION**

9          1.      Plaintiffs bring this antitrust class action on behalf of all persons and

10   entities who directly purchased a Thin Film Transistor-Liquid Crystal Display ("TFT-LCD")

11   panel, or a product containing a TFT-LCD panel, in the United States from the named defendants,

12   any subsidiaries or affiliates thereof, or any co-conspirators as identified in this Complaint

13   between January 1, 1996 and December 11, 2006 (the "Class Period"). TFT-LCDs are used in a

14   number of products, including but not limited to, computer monitors, televisions, and cellular

15   telephones. As used herein, "TFT-LCD Products" refers to TFT-LCD panels, and products

16   containing TFT-LCD panels, manufactured by any of the named defendants or their subsidiaries,

17   affiliates, or co-conspirators.

18         2.      As explained in further detail below, TFT-LCD panels are made by

19   sandwiching liquid crystal compound between two pieces of glass called substrates. The

20   resulting screen contains hundreds or thousands of electrically charged dots, called pixels, that

21   form an image. This panel is then combined with a backlight unit, a driver, and other equipment

22   to create a "module" allowing the panel to operate and be integrated into a television, computer

23   monitor, or other product.

24         3.      TFT-LCDs are manufactured in fabrication plants, or "fabs" as they are

25   known in the industry. Fabrication plants are very expensive. The number of panels produced

26   has a direct and significant effect on the price of both raw TFT-LCDs as well as the applications

27   into which they are placed. Although TFT-LCD panels are used in different applications, the

28   TFT-LCD production process is such that manufacturers' output and prices can be measured in a

1    consistent and homogeneous way. These and other conditions in the TFT-LCD industry enabled

2    the price-fixing conspiracy detailed in this Complaint. In particular, these conditions enabled

3    defendants to engage in direct discussions about the prices to be charged for TFT-LCD Products.

4    Additionally, these conditions made it economically feasible to maintain artificially high prices

5    through manipulation of supply.

6          4.      Beginning in at least 1996, defendants located in Japan, including but not

7    limited to Hitachi, Sharp, and Toshiba, met or talked with at least one other defendant in order to

8    agree on TFT-LCD Product prices and the amount of TFT-LCD Products each would produce.

9    As production in Korea began to increase, the Japanese defendants expanded their meetings to

10   involve their Korean competitors, including defendants LG Display and Samsung, which also

11   agreed to fix prices and to control supply. In 2001, the Korean defendants convinced Taiwanese

12   TFT-LCD Product manufacturers, including defendants AU Optronics, Chi Mei, Chunghwa, and

13   HannStar, to join the conspiracy to fix prices and to control product supply. Defendants'

14   conspiracy included agreements on the prices at which defendants would sell TFT-LCD Products

15   to their own corporate subsidiaries and affiliates, as well as their co-conspirators, thereby

16   ensuring TFT-LCD Product prices remained consistent among defendants and their customers,

17   which was an attempt to prevent any price discrepancies to consumers.

18         5.      Throughout the Class Period, defendants' conspiracy was effective in

19   moderating the normal downward pressures on prices for TFT-LCD Products caused by periods

20   of oversupply and technological change. Defendants' conspiracy resulted in unusually long

21   periods of high prices and high profits. Although there were periods when prices for TFT-LCD

22   Products temporarily declined as a result of new entrants being assimilated, or breakdowns in the

23   effectiveness of the conspiracy, those price declines were from levels that had been set

24   conspiratorially high, rather than from levels set by free and open competition. In addition, prices

25   declined less than they would have in a competitive market. As a result of defendants' unlawful

26   conduct, plaintiffs and members of the Class paid higher prices for TFT-LCD Products than they

27   would have paid in a competitive market.

28

## II.     JURISDICTION AND VENUE

6.      Plaintiffs bring this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

7.      The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

8.      Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce was carried out in this district, and one or more of the defendants reside in this district.

9.      Defendants are subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their contacts with the State of California.

## III.    PARTIES

### A.      Plaintiffs

10.     Plaintiff A.M. Photo & Imaging Center, Inc. is a Georgia corporation with its principal place of business in Atlanta, Georgia.  During the Class Period, plaintiff purchased a TFT-LCD Product directly from one of the defendants and suffered injury as a result of defendants' unlawful conduct.

11.     Plaintiff CMP Consulting Services, Inc. is a Florida corporation with its principal place of business in Miami, Florida.  During the Class Period, plaintiff purchased TFT-LCD Products directly from one or more defendants and suffered injury as a result of defendants' unlawful conduct.

12.     Plaintiff Crago, Inc., formerly known as Dash Computers, Inc., is a Kansas corporation with its principal place of business in Merriam, Kansas.  During the Class Period, plaintiff purchased TFT-LCD Products directly from one or more defendants and suffered injury as a result of defendants' unlawful conduct.

13.    Plaintiff Home Technologies Bellevue LLC is a Washington limited liability company with its principal place of business in Bellevue, Washington. During the Class Period, plaintiff purchased TFT-LCD Products directly from one or more of the defendants and suffered injury as a result of defendants' unlawful conduct.

14.    Plaintiff Nathan Muchnick, Inc. was a Pennsylvania corporation that had its principal place of business in Philadelphia, Pennsylvania. During the Class Period, plaintiff purchased TFT-LCD Products directly from one or more defendants and suffered injury as a result of defendants' unlawful conduct.

15.    Plaintiff Omnis Computer Supplies, Inc. is a New York corporation with its principal place of business in Schenectady, New York. During the Class Period, plaintiff purchased TFT-LCD Products directly from one or more defendants and suffered injury as a result of defendants' unlawful conduct.

16.    Plaintiff Orion Home Systems, LLC is a Minnesota limited liability corporation with its principal place of business in Eagen, Minnesota. During the Class Period, plaintiff purchased TFT-LCD Products directly from one or more defendants and suffered injury as a result of defendants' unlawful conduct.

17.    Plaintiff Phelps Technologies, Inc. is a Missouri corporation with its principal place of business in Overland Park, Kansas. During the Class Period, plaintiff purchased TFT-LCD Products directly from one or more defendants and suffered injury as a result of defendants' unlawful conduct.

18.    Plaintiff Royal Data Services, Inc. is a Hawaii corporation with its principal place of business in Honolulu, Hawaii. During the Class Period, plaintiff purchased TFT-LCD Products directly from one or more defendants and suffered injury as a result of defendants' unlawful conduct.

19.    Plaintiff Univisions-Crimson Holding, Inc. is a New York corporation with its principal place of business in Syracuse, New York. During the Class Period, plaintiff purchased TFT-LCD Products directly from one or more defendants and suffered injury as a result of defendants' unlawful conduct.

20.    Plaintiff Weber's World Company is a partnership that operates a retail store in Dana Point, California. During the Class Period, plaintiff purchased TFT-LCD Products directly from one or more defendants and suffered injury as a result of defendants' unlawful conduct.

**B.    Japanese Defendants**

**1.    Epson America**

21.    Defendant Epson Electronics America, Inc. ("Epson America") is a California corporation with its principal place of business at 2580 Orchard Parkway, San Jose, California. Epson America is a wholly-owned and controlled subsidiary of Seiko Epson Corporation, which is also the ultimate parent company of co-conspirator Epson Imaging Devices Corporation. During the Class Period, Epson America sold and distributed TFT-LCD Products manufactured by Epson Imaging Devices Corporation to customers throughout the United States.

**2.    Hitachi**

22.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. The company was one of the original producers of TFT-LCDs. In 2002, it spun off its TFT-LCD manufacturing assets to Hitachi Displays, Ltd., a wholly-owned subsidiary. During the Class Period, Hitachi, Ltd. manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

23.    Defendant Hitachi Displays, Ltd. is a Japanese company with its principal place of business at AKS Bldg. 5F, 6-2 Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan. Hitachi Displays, Ltd. was formed in 2002 and acquired defendant Hitachi, Ltd.'s TFT-LCD manufacturing business. Hitachi Displays, Ltd. is a wholly-owned and controlled subsidiary of Hitachi, Ltd. During the Class Period, Hitachi Displays, Ltd. manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States. Hitachi Displays, Ltd. is a member of the joint venture IPS Alpha Technology, Ltd.

24.    Defendant Hitachi Electronic Devices (USA), Inc. is a Delaware corporation with its principal place of business at 575 Mauldin Road, Greenville, South Carolina.

1    Its ultimate parent company is Hitachi, Ltd.  During the Class Period, Hitachi Electronic Devices

2    (USA), Inc. sold and distributed TFT-LCD Products manufactured by Hitachi, Ltd. and Hitachi

3    Displays, Ltd. to customers throughout the United States.

4             25.     Defendants Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic

5    Devices (USA), Inc. are sometimes referred to collectively herein as "Hitachi."

6             **3.    Sharp**

7             26.     Defendant Sharp Corporation is a Japanese company with its principal

8    place of business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan.  The company was

9    one of the earliest producers of TFT-LCDs.  During the Class Period, Sharp Corporation

10   manufactured, sold, and distributed TFT-LCD Products to customers throughout the United

11   States.

12            27.     Defendant Sharp Electronics Corporation is a New York corporation with

13   its principal place of business at Sharp Plaza, Mahwah, New Jersey.  Sharp Electronics

14   Corporation is a wholly-owned and controlled subsidiary of defendant Sharp Corporation.

15   During the Class Period, Sharp Electronics Corporation sold and distributed TFT-LCD Products

16   manufactured by defendant Sharp Corporation to customers throughout the United States.

17            28.     Defendants Sharp Corporation and Sharp Electronics Corporation are

18   sometimes referred to collectively herein as "Sharp."

19            **4.    Toshiba**

20            29.     Defendant Toshiba Corporation is a Japanese company with its principal

21   place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  Toshiba

22   Corporation participates in two joint ventures that manufacture, sell, and distribute TFT-LCD

23   Products – Toshiba Matsushita Display Technology Co., Ltd. and IPS Alpha Technology, Ltd.

24   During the Class Period, Toshiba Corporation manufactured, sold, and distributed TFT-LCD

25   Products to customers throughout the United States.

26            30.     Defendant Toshiba America Electronic Components, Inc. is a California

27   corporation with its principal place of business at 19900 MacArthur Boulevard, Suite 400, Irvine,

28   California.  Toshiba America Electronic Components, Inc. is a wholly-owned and controlled

1   subsidiary of Toshiba America, Inc., a holding company for defendant Toshiba Corporation.

2   Toshiba America Electronic Components, Inc. is the United States sales and marketing

3   representative for defendants Toshiba Corporation and Toshiba Matsushita Display Technology

4   Co., Ltd.  During the Class Period, Toshiba America Electronic Components, Inc. sold and

5   distributed TFT-LCD Products manufactured by Toshiba Corporation to customers throughout

6   the United States.

7           31.     Defendant Toshiba America Information Systems, Inc. is a California

8   corporation with its principal place of business at 9470 Irvine Boulevard, Irvine, California.

9   Toshiba America Information Systems, Inc. is a wholly-owned and controlled subsidiary of

10  Toshiba America, Inc.  During the Class Period, Toshiba America Information Systems, Inc. sold

11  and distributed TFT-LCD Products manufactured by Toshiba Corporation to customers

12  throughout the United States.

13          32.     Defendants Toshiba Corporation, Toshiba America Electronics

14  Components, Inc., and Toshiba America Information Systems, Inc. are sometimes referred to

15  collectively herein as "Toshiba."

16          **5.      Toshiba Matsushita**

17          33.     Defendant Toshiba Matsushita Display Technology Co., Ltd. ("Toshiba

18  Matsushita") is a Japanese company with its principal place of business at Rivage Shinagawa, 1-

19  8, Konan c4-chome, Minato-ku, Tokyo 108-0075, Japan.  Toshiba Matsushita is a joint venture

20  between Toshiba Corporation and Panasonic Corporation (formerly known as Matsushita Electric

21  Industrial Co., Ltd.).  Toshiba Matsushita was created for the purpose of manufacturing TFT-

22  LCD Products.  During the Class Period, Toshiba Matsushita manufactured, sold, and distributed

23  TFT-LCD Products to customers throughout the United States.

24      **C.      Korean Defendants**

25          **1.      LG Display**

26          34.     Defendant LG Display Co., Ltd., formerly known as LG.Philips LCD Co.,

27  Ltd., is a Korean entity with its principal place of business at 17th Floor, West Tower, LG Twin

28  Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, Korea 150-721.  LG Display Co., Ltd. was

1   created in July 1999 as a joint venture between LG Electronics, Inc. and Koninklijke Philips

2   Electronics N.V.  In July 2004, LG Display Co., Ltd. became a public company, with LG

3   Electronics, Inc. and Koninklijke Philips Electronics N.V. as the controlling shareholders.  LG

4   Display Co., Ltd. describes itself as "the global leader in the development and manufacture of

5   TFT-LCD panels for televisions, computer monitors, notebooks and emerging mobile

6   applications."  During the Class Period, LG Display Co., Ltd. manufactured, sold, and distributed

7   TFT-LCD Products to customers throughout the United States.

8           35.     Defendant LG Display America, Inc., formerly known as LG.Philips LCD

9   America, Inc., is a California corporation with its principal place of business at 150 East Brokaw

10  Road, San Jose, California.  LG Display America, Inc. is a wholly-owned and controlled

11  subsidiary of LG Display Co., Ltd.  During the Class Period, LG Display America, Inc. sold and

12  distributed TFT-LCD Products manufactured by LG Display Co., Ltd. to customers throughout

13  the United States.

14          36.     Defendants LG Display Co., Ltd. and LG Display America, Inc. are

15  sometimes referred to collectively herein as "LG Display."

16          **2.      Samsung**

17          37.     Defendant Samsung Electronics Co., Ltd. is a Korean company with its

18  principal place of business at Samsung Main Building, 250, Taepyeongno 2-ga, Jung-gu, Seoul

19  100-742, Korea.  It is the world's largest producer of TFT-LCD Products.  During the Class

20  Period, it manufactured, sold, and distributed TFT-LCD Products to customers throughout the

21  United States.

22          38.     Defendant Samsung Electronics America, Inc. ("Samsung America") is a

23  New York corporation with its principal place of business at 105 Challenger Road, Ridgefield

24  Park, New Jersey.  Samsung America is a wholly-owned and controlled subsidiary of defendant

25  Samsung Electronics Company, Ltd.  During the Class Period, Samsung America sold and

26  distributed TFT-LCD Products manufactured by Samsung Electronics Company, Ltd. to

27  customers throughout the United States.

28

39.     Samsung Semiconductor, Inc. is a California corporation with its principal place of business at 3655 North First Street, San Jose, California.  Samsung Semiconductor, Inc. is a wholly-owned and controlled subsidiary of defendant Samsung Electronics Company, Ltd.  During the Class Period, Samsung Semiconductor, Inc. sold and distributed TFT-LCD Products manufactured by Samsung Electronics Company, Ltd. throughout the United States.

40.     Defendants Samsung Electronics Company, Ltd., Samsung America, and Samsung Semiconductor, Inc. are sometimes referred to collectively herein as "Samsung."

### D.     Taiwanese Defendants

#### 1.     AU Optronics

41.     Defendant AU Optronics Corporation is a Taiwanese company with its principal place of business at No. 1, Li-Hsin Road 2, Hsinchu Science Park, Hsinchu 30078, Taiwan.  AU Optronics Corporation was created in 2001 by the merger of Acer Display Technology, Inc. and Unipac Electronics, both of which were involved in the manufacture of TFT-LCD Products.  During the Class Period, AU Optronics Corporation manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

42.     Defendant AU Optronics Corporation America ("AU America") is a California corporation with its principal place of business at 9720 Cypresswood Drive, Suite 241, Houston, Texas.  AU America was formerly known as Acer Display Technology America, Inc.  AU America is a wholly-owned and controlled subsidiary of defendant AU Optronics Corporation.  In 2006, Hsuan Bin Chen, the president and Chief Operating Officer of AU Optronics Corporation, was simultaneously the Chairman of AU America.  During the Class Period, AU America sold and distributed TFT-LCD Products manufactured by AU Optronics to customers throughout the United States.

43.     Defendants AU Optronics Corporation and AU America are sometimes collectively referred to herein as "AU Optronics."

#### 2.     Chi Mei

44.     Defendant Chi Mei Corporation ("CMC") is a Taiwanese company with its principal place of business located at No. 59-1, San Chia, Jen Te, Tainan County, Taiwan 71702.

1   CMC is the parent company for all of the Chi Mei entities herein.  During the Class Period, CMC

2   manufactured, sold, and distributed TFT-LCD Products to customers throughout the United

3   States.

4             45.      Defendant Chi Mei Optoelectronics Corporation ("CMO") is a Taiwanese

5   company with its principal place of business at No. 3, Sec. 1, Huanshi Road, Southern Taiwan

6   Science Park, Sinshih Township, Tainan County, 74147 Taiwan.  It is a subsidiary of CMC.

7   CMO was formed in 1998, and has since become a major manufacturer of TFT-LCD Products.

8   During the Class Period, CMO manufactured, sold, and distributed TFT-LCD Products to

9   customers throughout the United States.

10             46.      Defendant CMO Japan Co., Ltd. ("CMO Japan") is a Japanese company

11   headquartered at Nansei-Yaesu Bldg. 4F, 2-2-10 Yaesu, Chuo-ku, Tokyo 104-0028, Japan.  Up

12   until 2006, CMO Japan was known as International Display Technology, Ltd.  CMO Japan is a

13   wholly-owned and controlled subsidiary of defendant CMO.  CMO Japan has been in the TFT-

14   LCD business since 2001.  During the Class Period, CMO Japan manufactured, sold, and

15   distributed TFT-LCD Products throughout the United States.

16             47.      Defendant Chi Mei Optoelectronics USA, Inc. ("CMO USA") is a

17   Delaware corporation with its principal place of business at 101 Metro Drive, Suite 510, San Jose,

18   California.  Up until 2006, CMO USA was known as International Display Technology U.S.A.,

19   Inc.  CMO USA is a wholly-owned and controlled subsidiary of defendant CMO Japan.  The

20   Chairman of CMO USA in 2006, Chen-Lung Kuo, was previously the Chairman of CMO Japan's

21   predecessor, and in or about 2007 became Vice President in charge of sales and marketing for

22   CMO.  Similarly, the President of CMO USA in 2006, Junichi Ishii, was previously the President

23   of CMO Japan's predecessor.  During the Class Period, CMO USA sold and distributed TFT-

24   LCD Products manufactured by CMO Japan to customers throughout the United States.

25             48.      Defendant Nexgen Mediatech, Inc. ("Nexgen") is a Taiwanese company

26   with its principal place of business at No. 11-2, Jen Te 4th St., en Te Village Jen Te, Tainan 717

27   Taiwan.  Nexgen is a wholly-owned and controlled subsidiary of CMC.  During the Class Period,

28

1    Nexgen sold and distributed TFT-LCD Products manufactured by CMO to customers throughout

2    the United States.

3              49.    Defendant Nexgen Mediatech USA, Inc. ("Nexgen USA") is a California

4    corporation with its principal place of business at 16712 East Johnson Drive, City of Industry,

5    California. Nexgen USA is a wholly-owned and controlled subsidiary of CMC. During the Class

6    Period, Nexgen USA sold and distributed TFT-LCD Products manufactured by CMO to

7    customers throughout the United States.

8              50.    Defendants CMC, CMO, CMO Japan, CMO USA, Nexgen, and Nexgen

9    USA are sometimes referred to collectively herein as "Chi Mei."

10             **3.    <u>Chunghwa</u>**

11             51.    Defendant Chunghwa Picture Tubes, Ltd. is a Taiwanese company with its

12    principal place of business at 1127 Heping Road, Bade City, Taoyuan, Taiwan. It is a subsidiary

13    of Tatung Company, a consolidated consumer electronics and information technology company

14    based in Taiwan. Chunghwa Picture Tubes, Ltd.'s Board of Directors includes representatives

15    from Tatung Company. The Chairman of Chunghwa Picture Tubes, Ltd., Weishan Lin, is also

16    the Chairman and General Manager of Tatung Company. During the Class Period, Chunghwa

17    Picture Tubes, Ltd. manufactured, sold, and distributed TFT-LCD Products to customers

18    throughout the United States.

19             52.    Tatung Company of America, Inc. ("Tatung America") is a California

20    corporation with its principal place of business at 2850 El Presidio Street, Long Beach,

21    California. Tatung America is a subsidiary of Tatung Company. Currently, Tatung Company

22    owns approximately half of Tatung America. The other half is owned by Lun Kuan Lin, the

23    daughter of Tatung Company's former Chairman, T.S. Lin. During the Class Period, Tatung

24    America sold and distributed TFT-LCD Products manufactured by Chunghwa Picture Tubes, Ltd.

25    to customers throughout the United States.

26             53.    Defendants Chunghwa Picture Tubes, Ltd. and Tatung America are

27    sometimes referred to collectively herein as "Chunghwa."

28

**4.**   **HannStar**

54.   Defendant HannStar Display Corporation ("HannStar") is a Taiwanese company with its principal place of business at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan.  HannStar has been in the business of manufacturing and selling TFT-LCD Products since 1998.  During the Class Period, HannStar manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

**IV.**   **AGENTS AND CO-CONSPIRATORS**

55.   The acts alleged against the defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of defendants' businesses or affairs.

56.   Each defendant acted as the principal, agent, or joint venturer of, or for, other defendants with respect to the acts, violations, and common course of conduct alleged by plaintiffs.

57.   Various persons and/or firms not named as defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators include, but are not limited to, the companies listed in the following paragraphs.

58.   Co-conspirator Epson Imaging Devices Corporation ("Epson Japan") is a Japanese company with its principal place of business at 4F Annex, World Trade Center Building, 2-4-1 Hamamatsu-cho, Minato-ku, Tokyo 105-6104 Japan.  Up until December 28, 2006, Epson Japan was known as Sanyo Epson Imaging Devices Corporation.  The company was originally formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd. but is now a wholly-owned subsidiary of Seiko Epson Corporation.  During the Class Period, Epson Japan manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

59.   Co-conspirator Hydis Technologies Co., Ltd., formerly known as BOE Hydis Technology Co., Ltd. ("Hydis"), is a Korean manufacturer of TFT-LCD Products.  The company originated in 1989 as the LCD business division of Hyundai Electronics Industries Co.

FIRST AMENDED DIRECT PURCHASER
PLAINTIFFS' CONSOLIDATED COMPLAINT
Master File No. M07-1827 SI

1   ("Hyundai"). It spun-off from Hyundai in 2001, and it was subsequently acquired by the BOE

2   Group. On September 18, 2006, Hydis filed for Court Receivership in South Korea. During the

3   Class Period, Hydis manufactured, sold, and distributed TFT-LCD Products to customers

4   throughout the United States.

5           60.     Co-conspirator IPS Alpha Technology, Ltd. ("IPS Alpha") is a Japanese

6   entity with its principal place of business at 3732 Hayano, Mobara-shi, Chiba 297-0037, Japan.

7   IPS Alpha was formed in January 2005 as a joint venture by Hitachi Displays, Ltd., Toshiba

8   Corporation, and Panasonic Corporation to manufacture and sell TFT-LCD panels for televisions.

9   During the Class Period, IPS Alpha manufactured, sold, and distributed TFT-LCD Products to

10  customers throughout the United States.

11          61.     Co-conspirator Mitsubishi Electric Corporation ("Mitsubishi") is a

12  Japanese entity with its principal place of business located at 2-7-3 Marunouchi, Chiyoda-ku,

13  Tokyo 100-8310, Japan. Mitsubishi was an early developer of TFT-LCD technology, and in

14  1991, it entered into a joint venture with Asahi Glass Co., Ltd. to mass produce TFT-LCD panels.

15  Mitsubishi owned 80 percent of the joint venture, called Advanced Display Incorporated. In

16  September 1999, Mitsubishi purchased Asahi Glass' stake in Advanced Display Incorporated,

17  making it a wholly-owned subsidiary. During the Class Period, Mitsubishi manufactured, sold,

18  and distributed TFT-LCD Products to customers throughout the United States.

19          62.     Co-conspirator Mitsui & Co., Ltd. ("Mitsui") is a Japanese entity with its

20  principal place of business at Building 2-1, Ohtemachi 1-chome, Chiyoda-ku, Tokyo 100-0004,

21  Japan. Mitsui, known as Mitsui Bussan Kabashiki Kaisha in Japanese, is a trading house for a

22  diverse group of products. During the Class Period, Mitsui sold and distributed TFT-LCD

23  Products to customers throughout the United States.

24          63.     Co-conspirator NEC LCD Technologies, Ltd. ("NEC") is a Japanese

25  company with its principal place of business at 1753 Shimonumabe, Nakahara-Ku, Kawasaki,

26  Kangawa, 211-8666, Japan. It has been in the TFT-LCD business since 1993. During the Class

27  Period, NEC manufactured, sold, and distributed TFT-LCD Products to customers throughout the

28  United States.

1    64.    Co-conspirator Panasonic Corporation ("Panasonic"), is a Japanese entity

2    with its principal place of business at 1006 Oaza Kadoma, Kadoma, Osaka 571-8501, Japan.  Up

3    until October 1, 2008, Panasonic was known as Matsushita Electric Industrial Co., Ltd.

4    Panasonic holds a minority stake in two joint ventures – Toshiba Matsushita and IPS Alpha.

5    During the Class Period, Panasonic manufactured, sold, and distributed TFT-LCD Products to

6    customers throughout the United States.

7    65.    Co-conspirator Panasonic Corporation of North America, formerly known

8    as Matsushita Electric Corporation of America, is a Delaware corporation with its principal place

9    of business at 1 Panasonic Way, Secaucus, New Jersey.  Panasonic Corporation of North America

10    is a wholly-owned and controlled subsidiary of co-conspirator Panasonic.  During the Class

11    Period, Panasonic Corporation of North America sold and distributed TFT-LCD Products

12    manufactured by Panasonic to customers throughout the United States.

13    **V.    CLASS ACTION ALLEGATIONS**

14    66.    Plaintiffs bring this action on behalf of themselves and all others similarly

15    situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

16    The Class is defined as follows:

17    All persons and entities who, between January 1, 1996 and
      December 11, 2006, directly purchased a TFT-LCD Product in the
18    United States from any defendant or any subsidiary or affiliate
      thereof, or any co-conspirator.  Excluded from the Class are
19    defendants, their parent companies, subsidiaries and affiliates, any
      co-conspirators, all governmental entities, and any judges or
20    justices assigned to hear any aspect of this action.

21    67.    The Class definition encompasses those who bought a TFT-LCD Product

22    directly from a defendant, even if the TFT-LCD panel contained therein was manufactured by an

23    affiliated entity, principal, agent, or co-conspirator.

24    68.    Plaintiffs do not know the exact size of the Class because such information

25    is in the exclusive control of the defendants.  Due to the nature of the trade and commerce

26    involved, however, plaintiffs believe that the Class members are numerous and geographically

27    dispersed throughout the United States, rendering joinder of all Class members impracticable.

28

69.    The questions of law or fact common to the Class include but are not limited to:

a.    whether defendants engaged in a contract, combination, and/or conspiracy to fix, raise, maintain, or stabilize prices of TFT-LCD Products sold in the United States;

b.    whether defendants engaged in a contract, combination, and/or conspiracy to restrict output of TFT-LCD Products sold in the United States;

c.    whether defendants' conduct caused the prices of TFT-LCD Products sold in the United States to be at artificially high and noncompetitive levels;

d.    whether plaintiffs and the other members of the Class were injured by defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

e.    whether plaintiffs and the Class are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

70.    These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

71.    Plaintiffs' claims are typical of the claims of the Class because plaintiffs directly purchased TFT-LCD Products from one or more of the defendants.

72.    Plaintiffs will fairly and adequately represent the interests of the Class in that plaintiffs are direct purchasers of TFT-LCD Products and have no conflict with any other members of the Class.  Furthermore, plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

73.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

1    74.    This class action is superior to the alternatives, if any, for the fair and

2    efficient adjudication of this controversy.  Prosecution as a class action will eliminate the

3    possibility of repetitive litigation.  There will be no material difficulty in the management of this

4    action as a class action.

5    75.    The prosecution of separate actions by individual Class members would

6    create the risk of inconsistent or varying adjudications, establishing incompatible standards of

7    conduct for defendants.

8    **VI.    TRADE AND COMMERCE**

9    76.    During the Class Period, each defendant, or one or more of its subsidiaries,

10    sold TFT-LCD Products in the United States in a continuous and uninterrupted flow of interstate

11    commerce and foreign commerce, including through and into this judicial district.

12    77.    During the Class Period, defendants collectively controlled a vast majority

13    of the market for TFT-LCD Products, both globally and in the United States.

14    78.    The business activities of the defendants substantially affected interstate

15    trade and commerce in the United States and caused antitrust injury in the United States.

16    **VII.    FACTUAL ALLEGATIONS**

17    **A.    TFT-LCD Technology**

18    79.    The technology behind TFT-LCDs is not new.  In the 1950s and 1960s,

19    RCA Corp. researched whether liquid crystals could be the basis for a new, lightweight, low-

20    power display technology.  In the 1970s, after RCA Corp. discontinued its efforts, Japanese

21    companies took the lead in commercializing liquid crystal technology.  These efforts resulted in

22    monochrome calculators and watches.  By at least the early 1990s, liquid crystal technology was

23    introduced in notebook computers and small, low-resolution televisions.  In the mid-1990s, the

24    technology advanced further with the development of TFT-LCDs.

25    80.    As noted above, the basic structure of a TFT-LCD panel is two glass

26    substrates sandwiching a layer of liquid crystal compound.  Liquid crystals change orientation

27    under an applied electric field and can thereby block or pass light.  One glass substrate has thin

28    chemical films that act as transistors, and the other glass substrate is coated with liquid pigments

1    that act as color filters.  When voltage is applied to the transistors, the liquid crystal bends,

2    causing light to pass through the filters to create red, green, or blue pixels.  Pixels are the smallest

3    unit in a picture image, and the density of pixels in a display determines the resolution.

4         81.    The term "active matrix" describes the ability to switch each pixel in a

5    display individually.  Unlike older LCDs that have one transistor for each row and column of

6    pixels, TFT-LCDs have a transistor for each pixel.  Thus, the term "active matrix LCD" is

7    sometimes used interchangeably with TFT-LCD.  Active matrix displays are brighter and sharper

8    than passive matrix displays of the same size.

9         82.    The glass substrates used for TFT-LCD panels begin with a "motherglass,"

10   a sheet of glass that is cut to make multiple panels.  TFT-LCDs are manufactured in fabs that are

11   equipped to handle a particular size motherglass.  Technological innovations over time have

12   allowed manufacturers to begin the manufacturing process with larger and larger size motherglass

13   sheets.  This, in turn, has resulted in the ability to fabricate larger and/or more TFT-LCD panels.

14   Each increase in motherglass size is described as a generation.  Third generation fabs in the 1998

15   to 1999 period typically utilized 550 millimeter ("mm") by 650 mm motherglass, while some

16   current (eighth generation) fabs utilize 2160 mm by 2460 mm motherglass.  The use of larger

17   motherglass provides substantial cost savings to manufacturers.

18        83.    TFT-LCDs are capable of producing the same image as cathode ray tubes

19   ("CRTs"), but in a much smaller package.  TFT-LCDs also have lower energy requirements, are

20   generally easier to read, and do not flicker like CRTs.  TFT-LCD panels of approximately 10

21   inches or less in diagonal are considered "small" or "medium" displays.  They are also referred to

22   as "mobile displays."  These displays are commonly used in cell phones, personal digital

23   assistants, and cameras.

24        84.    TFT-LCDs of 10 inches in diagonal and larger are considered "large-area

25   displays."  Large-area displays are most commonly used for desktop computer monitors,

26   notebook computers, and televisions.  The core products during most of the Class Period were

27   displays for notebook computers and computer monitors.  During much of the Class Period, 14-

28   inch and 15-inch notebook computers and 15-inch to 17-inch computer monitors were the most

1   popular TFT-LCD Products, representing as much as 80 percent of all TFT-LCDs produced for

2   notebook computers or computer monitors.

3       **B.    Structure of the TFT-LCD Industry**

4           85.    The TFT-LCD industry has several characteristics that facilitated a

5   conspiracy, including market concentration, ease of information sharing, the consolidation of

6   manufacturers, multiple interrelated business relationships, significant barriers to entry,

7   heightened price sensitivity to supply and demand forces, and homogeneity of products.

8           **1.    Market Concentration**

9           86.    The market for TFT-LCD Products is very large.  A September 28, 2006

10  *Reuters* article reported that "[m]anufacturers are expected to pump out 48.4 million LCDs for

11  TVs this year alone, up 70 percent over 2005, while flat-panel sales – most of those using LCD

12  technology – are expected to reach $US 88 billion this year and $US 100 billion in 2007."

13          87.    Despite its enormous size, the TFT-LCD industry is highly concentrated, a

14  factor that is conducive to the type of collusive activity alleged by plaintiffs.  In 2005, the top five

15  suppliers – Samsung, LG Display, Sharp, AU Optronics, and Chi Mei – collectively shipped 90

16  percent of all TFT-LCD panels for television use.  According to estimates in late 2006 from

17  industry analyst iSuppli Corporation ("iSuppli"), LG Display had the greatest share of LCD

18  television shipments in the first quarter of 2006 (22.3%), followed by Samsung (20%), Chi Mei

19  (18.7%), AU Optronics (16.8%), and Sharp (13.9%).  These companies were the five largest

20  producers as measured by market share during much of the Class Period.

21          **2.    Information Sharing**

22          88.    Because of common membership in trade associations, interrelated

23  business arrangements such as joint ventures, allegiances between companies in certain countries,

24  and relationships between the executives of certain companies, there were many opportunities for

25  defendants to discuss and exchange competitive information.  The ease of communication was

26  facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  Defendants

27  took advantage of these opportunities to discuss, and agree upon, their pricing for TFT-LCD

28  Products as alleged below.

89.    Additionally, the TFT-LCD industry is analyzed by several market research firms. Each of these firms offers, for a fee, monthly market data on pricing, supply, utilization of fabs, and other key indicators of market activity. The capacity and pricing data reported by these firms comes directly from manufacturers. Manufacturers typically report historical, current, and perhaps most importantly, prospective information. Thus, defendants had access to each other's future plans for bringing capacity on line, capacity utilization, market share, pricing, and the advent of new technology. Because there were very few companies that needed to be analyzed in order to obtain this data, all competitors in the TFT-LCD market had ready and timely access to reliable information about their competition's pricing as well as future supply and capacity decisions. By meeting together as herein below alleged as well as monitoring and analyzing this information over time, participants in the conspiracy were able to signal their respective intent, verify that the conspiracy was working, and identify any parties who might be deviating from the conspiracy.

### 3.    Consolidation

90.    The TFT-LCD industry experienced significant consolidation during the Class Period, including: (a) the creation of AU Optronics in 2001 through the merger of Acer Display and Unipac Electronics; (b) the creation of Toshiba Matsushita in 2002; (c) Fujitsu, Ltd.'s transfer of its LCD business to Sharp in 2005; (d) the formation of IPS Alpha in 2005 by Hitachi, Panasonic, and Toshiba; and (e) AU Optronics' acquisition in 2006 of Quanta Display, which resulted in AU Optronics becoming the third-largest manufacturer of TFT-LCD Products.

### 4.    Multiple Interrelated Business Relationships

91.    The industry is marked by a web of cross-licensing agreements, joint ventures, and other cooperative arrangements that can facilitate collusion. AU Optronics, for example, entered into licensing arrangements with Sharp in 2005 and Samsung in 2006. Chunghwa did likewise with Sharp in December of 2006. Chi Mei has licensing arrangements with Sharp, AU Optronics, Chunghwa, HannStar and Hitachi. A diagram illustrating these various licensing arrangements is attached hereto as Exhibit A.

92.     The industry has a close-knit nature whereby multiple business relationships between supposed competitors blur the lines of competition and provided ample opportunity to collude.  These business relationships also created a unity of interest among competitors so that the conspiracy was easier to implement and enforce than if such interrelationships did not exist.  Exhibit A illustrates these relationships.

**5.     High Costs of Entry Into the Industry**

93.     There are significant manufacturing and technological barriers to entry into the TFT-LCD industry.  Efficient fabs are large and costly.  TFT-LCD Products are also subject to technological advances, so that firms within the industry must spend significant capital on research and development.  DisplaySearch, a research firm in Austin, Texas that covers the TFT-LCD industry, reported in September 2005 that the top TFT-LCD manufacturers collectively spend $30 million a day on property, plant, and equipment.  A January 2006 DisplaySearch report noted that a typical seventh generation fab can cost more than $3 billion.

94.     During the Class Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.  Later in the conspiracy, approximately 70 percent of the cost of TFT-LCD panel production was attributable to the cost of raw materials.  The combination of price discussions and manipulation of the output of TFT-LCD Products allowed defendants to keep prices above where they would have been but for the conspiracy.

**6.     The "Crystal Cycle"**

95.     Like all markets, the TFT-LCD industry is subject to business cycles of supply and demand.  In the TFT-LCD industry, this cycle is known as the "crystal cycle."  This cycle has been described as "boom and bust" periods caused by alternating periods of oversupply and shortages, which create downward and upward pressures on prices for TFT-LCD Products.  One fact that can affect such oversupply is the perceived demand for such products and whether manufacturers have adequately predicted such demand in determining how much capacity to build and how many TFT-LCD Products to produce.

FIRST AMENDED DIRECT PURCHASER
PLAINTIFFS' CONSOLIDATED COMPLAINT
Master File No. M07-1827 SI

96.     Another factor is the entry of new competitors.  Typically, when a new competitor enters a market, it brings incremental production online thereby adding supply, and prices drop until an equilibrium is reached.  In the TFT-LCD industry, however, defendants conspired to rein in and discipline these new entrants until the new entrants were assimilated into the conspiracy.  This had the effect of tempering price drops and preventing them from reaching a competitive equilibrium.

97.     The conspiracy did not completely eliminate the effects of the crystal cycle in the TFT-LCD industry.  There were periods when defendants' collusive practices drove prices for TFT-LCD Products so high that demand began to fall to the point that defendants lowered prices for short periods of time.  However, defendants' efforts to stabilize prices were successful in moderating the effects of the crystal cycle, including the impact on prices paid by direct purchasers.  To the extent that prices for TFT-LCD Products fell, they fell from levels that had been set conspiratorially, rather than from levels set by free and open competition.  Additionally, prices did not fall as low as they would have absent the conspiratorial conduct.

## 7.     **Dominant Products**

98.     Notwithstanding that there may be different applications for TFT-LCDs, there is a consistent and homogeneous way for defendants to monitor, analyze, discipline, and enforce their conspiracy.  This can be done by looking at the predominant, or most popular, size panels and the applications for those panels that represent the highest percentage of sales.  This can also be accomplished by looking at standardized statistics used in the industry, such as the amount of glass produced and revenues per metric ton of glass.  By using these, and other industry analytics, defendants could monitor, analyze, discipline, and enforce their conspiracy.

99.     For example, from the fourth quarter of 1999 through mid-2003, half or more of the TFT-LCD monitor shipments were 15-inch monitors.  From mid-2003 to early 2006, 17-inch monitors were the predominant size.  As for TFT-LCD televisions, from the fourth quarter of 1999 through the fourth quarter of 2000, shipments were predominantly of 10-inch to 14-inch models.  During 2001 and much of 2002, sales of 13-inch to 15-inch models dominated.  And in 2004 and 2005, the majority of shipments were of 20-inch and 32-inch models.  The

1    following chart shows the popularity of 14-inch to 15-inch notebook and 15-inch to 17-inch

2    computer monitors.



**Share of Shipments by Category**
**14-15" Notebook LCDs and 15-17" LCD Monitors**

16    **C.**    **Pre-Conspiracy Market**

17          100.    Until the mid-1990s, Japanese companies like Hitachi, Toshiba, and Sharp

18    were essentially the exclusive suppliers of TFT-LCD panels.

19          101.    In early 1995, the industry faced declining TFT-LCD panel prices, which

20    industry analysts attributed to advances in technology and improving efficiencies.  One analyst in

21    this period noted that the "flat panel display industry is following the classic cyclical business

22    pattern of the semiconductor industry."  The Japanese manufacturers realized that the capacity

23    growth from investing in new plants was weakening the price of TFT-LCDs, and they slowed the

24    rate of their investments.  This, however, provided an opening to Korean manufacturers.

25          102.    In 1995, three Korean companies – Samsung, LG Electronics, Inc. and, to a

26    lesser extent, Hyundai – entered the market.  These Korean firms offered comparable products at

27    reduced prices in an effort to quickly gain market share.  This resulted in increased competition in

28    1995, which contributed to the significant price declines seen during that timeframe.

FIRST AMENDED DIRECT PURCHASER
PLAINTIFFS' CONSOLIDATED COMPLAINT
Master File No. M07-1827 SI

103.    Increases in manufacturing capacity and decreases in manufacturing costs seemed to assure continuing price declines.  By mid-1995, the Japanese companies and the new Korean competitors had a total capacity to supply 14 million TFT-LCD panels, while demand for them was only about three million.  In addition to the surges in capacity during 1995, "[costs] were also dropping as production volume increases and manufacturing methods improved."

104.    By late 1995, the effect of the entry by Korean suppliers had pushed down the price of some TFT-LCD panels by 50 percent from the previous year.  The origin of the TFT-LCD conspiracy may be traceable to this trough in prices.

**D.    Defendants' and Co-Conspirators' Illegal Agreements**

105.    The TFT-LCD conspiracy was effectuated through a combination of group and bilateral discussions.  In the formative years, when the Japanese defendants first entered into the conspiracy, bilateral discussions were the primary method of communication.  During this period of the conspiracy, Hitachi, Sharp, and Toshiba met, or talked to, at least one other defendant about the prices for TFT-LCD Products, and thereby created a model for how the conspiracy would be carried out after the Korean, and later the Taiwanese defendants joined.  These meetings among Hitachi, Sharp, and Toshiba included the discussion of price as well as capacity utilization.  As more manufacturers entered the conspiracy, however, group meetings became more prevalent, until by 2001 a formal system of multilateral and bilateral meetings was in place.

**1.    "Crystal Meetings"**

106.    The group meetings among the participants in the TFT-LCD price-fixing conspiracy were referred to as "crystal meetings."  Crystal meetings were attended by employees at three general levels of the defendants' corporations.  The first level of these meetings were attended by the Chief Executive Officers or Presidents, and were known as "CEO" or "top" meetings.  The second level were management-level meetings, referred to as "commercial" or "operation" meetings.  The third level were meetings attended by lower-level sales and marketing personnel.

1       107.    In a typical crystal meeting, the participants established a meeting agenda

2   that included a discussion of the past month's producer shipments, customer demand, capacity

3   utilization, and prices.  Meeting participants shared information relating to all of these topics so

4   that defendants could agree on what price each would charge for TFT-LCD panels to be sold in

5   the following month.  Meeting participants discussed and agreed upon target prices, floor prices,

6   and price ranges for TFT-LCD panels.  They also discussed prices of TFT-LCD panels that were

7   sold to specific customers, and agreed upon target prices to be used in negotiations with large

8   customers.

9       108.    The purpose of the CEO or top meetings was to stabilize or raise prices.  At

10  the CEO meetings, the participants discussed prices and the supply and demand situation.  The

11  participants also discussed monthly and quarterly TFT-LCD fab output and supply figures, as

12  well as the number of production days the fabs would operate for the next month, and agreed on

13  output restrictions.  Each meeting had an individual designated as the "chairman" who would use

14  a projector or a whiteboard to put up figures on supply and demand and price for the group to

15  review.  The attendees would take turns making comments and adjusting the numbers.  At some

16  point during the meeting, the participants would reach an agreement on price.

17      109.    The commercial or operation meetings were attended by the defendants'

18  respective Vice Presidents of sales and marketing and other senior sales employees.  The structure

19  and content of the commercial meetings was largely the same as the CEO meetings.  The

20  participants discussed price, output, capacity, and the general market situation.  These meetings

21  occurred approximately monthly and sometimes quarterly.

22      110.    Each of the participants in these meetings knew, and in fact discussed, the

23  significant impact that the price of TFT-LCD panels has on the cost of the finished products into

24  which they are placed.  Defendants knew that the conspiratorially high prices of TFT-LCD panels

25  would be reflected in the prices for finished TFT-LCD Products, and thus, there was no need to

26  specifically discuss the prices of finished TFT-LCD Products.

27      111.    The agreements reached at these meetings included:  (1) establishing target

28  prices, floor prices, and price ranges; (2) placing agreed-upon values on various attributes of

1  panels, such as quality or certain technical specifications; (3) what to tell customers as the reason

2  for price increases; (4) coordinating uniform public statements regarding anticipated supply and

3  demand; (5) exchanging information about fabrication plant utilization and production capacity;

4  and (6) reaching out to other competitors to encourage them to abide by the agreed-upon pricing.

5  The meeting participants also agreed to maintain or lower production capacity.

6         112.    Compared to the CEO and commercial meetings, the lower level meetings

7  were less formal, and typically occurred at restaurants over lunch.  The purpose of the lower level

8  meetings was to exchange market information that would facilitate implementation of the

9  conspiracy and carry out the agreements made at the CEO and commercial meetings.  Participants

10 in the lower level meetings exchanged information relating to past and future prices of TFT-LCD

11 Products and shipment quantities.

12        113.    In the summer of 2006, defendants discontinued the lower level meetings

13 in favor of coordinated one-on-one meetings.  The meetings were coordinated so that on the same

14 date, two sets of competitors met one-on-one.  After that meeting, each of them met one-on-one

15 with another competitor.  This continued until all competitors met with each other.  These

16 coordinated meetings took place until about November or December 2006.  It was defendants'

17 specific intent to conceal their meetings and for these coordinated one-on-one meetings to

18 accomplish the same purposes as the group meetings.

19        **2.      Bilateral Discussions**

20        114.    The crystal meetings were supplemented by bilateral discussions between

21 various defendants.  The purpose of the bilateral discussions was to exchange information about

22 past and future pricing, as well as information about shipments.

23        115.    Defendants had bilateral discussions with each other during price

24 negotiations with customers to avoid being persuaded by customers to cut prices.  These

25 discussions, usually between sales and marketing employees, took the form of in-person

26 meetings, telephone calls, e-mails, and instant messages.  The information gained in these

27 communications was then shared with supervisors and taken into account in determining the price

28 to be offered.

1    116.    Bilateral discussions were also used to synchronize prices with

2    manufacturers that did not ordinarily attend the group meetings.  For example, HannStar was

3    responsible for notifying Hitachi of the pricing agreements reached at the crystal meetings.

4    Hitachi implemented the agreed-upon pricing as conveyed by HannStar.  In this way, Hitachi

5    participated in the conspiracy to fix the prices of TFT-LCD Products.

6            **3.**    **Defendants' and Co-Conspirators' Participation in Group and**
**Bilateral Discussions**

7

8    117.    Defendant AU Optronics participated in multiple CEO, commercial, and

9    lower level meetings, as well as bilateral discussions, between at least 2001 and 2006.

10   Additionally, Quanta Display Inc. and Unipac Electronics, which merged with AU Optronics,

11   participated in lower level meetings.  Through these discussions, AU Optronics agreed on prices

12   and supply levels for TFT-LCD Products.

13   118.    Defendant Chi Mei participated in multiple CEO, commercial, and lower

14   level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these

15   discussions, Chi Mei agreed on prices and supply levels for TFT-LCD Products.

16   119.    Defendant Chunghwa participated in multiple CEO, commercial, and lower

17   level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these

18   discussions, Chunghwa agreed on prices and supply levels for TFT-LCD Products.

19   120.    Defendant HannStar participated in multiple CEO, commercial, and lower

20   level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these

21   discussions, HannStar agreed on prices and supply levels for TFT-LCD Products.

22   121.    Defendant Hitachi had multiple bilateral discussions during the Class

23   Period, and agreed on prices and supply levels for TFT-LCD Panels.

24   122.    Defendant LG Display participated in multiple CEO, commercial, and

25   lower level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through

26   these discussions, LG Display agreed on prices and supply levels for TFT-LCD Products.

27

28

1        123.    Defendant Samsung participated in multiple CEO, commercial, and lower

2    level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these

3    discussions, Samsung agreed on prices and supply levels for TFT-LCD Products.

4        124.    Defendant Sharp participated in multiple group and bilateral meetings

5    during the Class Period, and agreed on prices and supply levels for TFT-LCD Products.

6        125.    Defendant Toshiba participated in bilateral discussions during the Class

7    Period, and agreed on prices and supply levels for TFT-LCD Products.

8        126.    Co-conspirator Hydis participated in multiple lower level meetings

9    between at least 2002 and 2005.  In addition, Hydis had a bilateral meeting with a Taiwanese

10    defendant at least as recently as 2005.  Through these discussions, Hydis agreed on prices and

11    supply levels for TFT-LCD Products.

12        127.    Co-conspirator Mitsubishi participated in multiple lower level meetings in

13    2001 with Chi Mei, Chunghwa, Samsung, and Unipac Electronics (later AU Optronics).  Through

14    these meetings, Mitsubishi agreed on prices and supply levels for TFT-LCD Products.

15        128.    Co-conspirator Mitsui had at least one bilateral meeting, which included a

16    discussion about customers and future pricing, with a Taiwanese defendant in 2001.  Mitsui was

17    acting as an agent for co-conspirator Epson Japan in this discussion.  Mitsui and Epson Japan

18    agreed on prices and supply levels for TFT-LCD Products.

19        129.    Co-conspirator NEC participated in meetings or discussions during the

20    Class Period with at least one other defendant or co-conspirator, which included discussions

21    about prices for TFT-LCD Products.

22        130.    When plaintiffs refer to a corporate family or companies by a single name

23    in their allegations of participation in the conspiracy, it is to be understood that the plaintiffs are

24    alleging that one or more employees or agents of entities within the corporate family engaged in

25    conspiratorial meetings on behalf of every company in that family.  In fact, the individual

26    participants in the conspiratorial meetings and discussions did not always know the corporate

27    affiliation of their counterparts, nor did they distinguish between the entities within a corporate

28    family.  The individual participants entered into agreements on behalf of, and reported these

1   meetings and discussions to, their respective corporate families.  As a result, the entire corporate

2   family was represented in meetings and discussions by their agents and were parties to the

3   agreements reached in them.  Furthermore, to the extent that subsidiaries within the corporate

4   families distributed TFT-LCD Products to direct purchasers, these subsidiaries played a

5   significant role in the conspiracy because defendants wished to ensure that the prices for such

6   products paid by direct purchasers would not undercut the pricing agreements reached at these

7   various meetings.  Thus, all entities within the corporate families were active, knowing

8   participants in the alleged conspiracy.

9         131.   Defendant Epson America is a wholly-owned and controlled subsidiary of

10   co-conspirator Epson Japan and, as alleged above, Epson Japan was represented by co-

11   conspirator Mitsui at one of the bilateral meetings described above.  Mitsui served as an agent of,

12   and under the direction of, Epson Japan and Epson America.  Epson Japan and Epson America,

13   through their agent, were parties to the agreements made at those meetings and acted as co-

14   conspirators.  In addition, to the extent Epson America distributed TFT-LCD Products to direct

15   purchasers, it played a significant role in the conspiracy because defendants wished to ensure that

16   the prices for such products paid by direct purchasers did not undercut the pricing agreements

17   reached at these various meetings.  Epson America was an active, knowing participant in the

18   alleged conspiracy.

19         132.   Defendant Toshiba Matsushita is a joint venture between Toshiba

20   Corporation and Panasonic, and one or more of the partners in this joint venture participated in

21   the meetings described above.  As a result, Toshiba Matsushita was represented at those meetings

22   by its agents and was a party to the agreements entered into by its joint venture partners at them.

23   As explained above, the agreements at these meetings included agreements on price ranges and

24   output restrictions.  The joint venture partners controlled Toshiba Matsushita's production levels

25   and the prices of TFT-LCD Products the joint ventures sold both to the joint venture partners and

26   other non-affiliated companies.  Thus, this defendant was an active, knowing participant in the

27   alleged conspiracy.

28

FIRST AMENDED DIRECT PURCHASER
PLAINTIFFS' CONSOLIDATED COMPLAINT
Master File No. M07-1827 SI

133.   Co-conspirator IPS Alpha is a joint venture among Hitachi Displays, Ltd., Toshiba Corporation, and Panasonic, and one or more of the partners in this joint venture participated in the meetings described above.  As a result, IPS Alpha was represented at those meetings and was a party to the agreements entered into by its joint venture partners at them.  As explained above, the agreements at these meetings included agreements on price ranges and output restrictions.  The joint venture partners had substantial control over IPS Alpha's production levels and the prices of TFT-LCD Products the joint ventures sold both to the joint venture partners and other non-affiliated companies.  Thus, IPS Alpha and Panasonic were active, knowing participants in the alleged conspiracy.

**E.**   **International Government Antitrust Investigations**

134.   Defendants' conspiracy to restrict artificially the output of, and to raise the prices for, TFT-LCD Products sold in the United States during the Class Period, is demonstrated by a multinational investigation commenced by the United States Department of Justice ("DOJ") and others in late 2006.

135.   In December of 2006, government authorities in Japan, Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti-competitive activity among TFT-LCD manufacturers.  In a December 11, 2006 filing with the Securities and Exchange Commission, defendant LG Display disclosed that officials from the Korea Fair Trade Commission and Japanese Fair Trade Commission ("JFTC") had visited the company's Seoul and Tokyo offices and that the DOJ had issued a subpoena to its San Jose office.

136.   On December 12, 2006, news reports indicated that in addition to LG Display, TFT-LCD makers Samsung, Sharp, Epson, and AU Optronics were also under investigation.  The JFTC stated that the probe was related to price-fixing.  On that same date, the European Commission confirmed publicly that it as well was investigating the possibility of a cartel agreement and price-fixing among manufacturers of TFT-LCD Products.

137.   On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers – LG Display Co. Ltd. (and its U.S. subsidiary, LG Display

1   America Inc.), Sharp Corporation, and Chunghwa Picture Tubes, Ltd. – to plead guilty and pay a

2   total of $585 million in criminal fines for their roles in the conspiracy to fix prices of TFT-LCD

3   panels.

4          138.   LG Display Co. Ltd and LG Display America Inc. agreed to plead guilty

5   and pay a $400 million fine for their participation in a conspiracy from September 2001 to June

6   2006 to fix the price of TFT-LCD panels sold in the United States.

7          139.   Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a $65 million

8   fine for its participation in a conspiracy from September 2001 to December 2006 to fix the price

9   of TFT-LCD panels sold in the United States.

10         140.   The DOJ charged LG Display Co., Ltd., LG Display America Inc., and

11  Chunghwa Picture Tubes, Ltd. with carrying out the conspiracy by:

12              a.   participating in meetings, conversations, and communications in

13                   Taiwan, Korea and the United States to discuss the prices of TFT-

14                   LCD panels;

15              b.   agreeing during those meetings, conversations and communications

16                   to charge prices for TFT-LCD panels at certain pre-determined

17                   levels;

18              c.   issuing price quotations in accordance with the agreements reached;

19                   and

20              d.   exchanging information on sales of TFT-LCD panels, for the

21                   purpose of monitoring and enforcing adherence to the agreed-upon

22                   prices.

23         141.   Sharp Corporation agreed to pay a $120 million fine for its participation in

24  conspiracies to fix the price of TFT-LCD panels sold to Dell, Inc. from April 2001 to December

25  2006 for use in computer monitors and laptops; to Motorola, Inc. from autumn 2005 to the middle

26  of 2006 for use in Razr mobile phones; and to Apple Computer, Inc. from September 2005 to

27  December 2006 for use in iPod portable music players.

28

142.     Sharp Corporation agreed to plead guilty to fixing the price of TFT-LCD panels sold to Dell between 2001 and 2006 by:

    a.     participating in bilateral meetings, conversations, and communications in Japan and the United States to discuss the prices of TFT-LCD panels to be sold to Dell;

    b.     agreeing during those bilateral meetings, conversations and communications to charge prices of TFT-LCD panels at certain pre-determined levels to Dell;

    c.     issuing price quotations in accordance with the agreements reached; and

    d.     exchanging information on sales of TFT-LCD panels to be sold to Dell for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

143.     Sharp Corporation agreed to plead guilty to fixing the price of TFT-LCD panels sold to Motorola and Apple between 2005 and 2006 by:

    a.     participating in bilateral meetings, conversations, and communications in Japan and the United States to discuss the prices of TFT-LCD panels to be sold to Apple and Motorola;

    b.     agreeing during those bilateral meetings, conversations and communications to charge prices of TFT-LCD panels at certain pre-determined levels to Apple and Motorola;

    c.     issuing price quotations in accordance with the agreements reached; and

    d.     exchanging information on sales of TFT-LCD panels to be sold to Apple and Motorola, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

144.     These guilty pleas demonstrate that the investigations into the TFT-LCD industry are not mere information gathering efforts by regulatory authorities.  In fact, as the

1   DOJ's representative told this Court at the September 19, 2007 hearing, the DOJ's investigation

2   into the TFT-LCD industry is premised in part on insider information that presents a detailed

3   "road map" of the conspiracy.  Plaintiffs hereby incorporate by reference the *in camera*

4   submissions made by the DOJ to this Court that have been represented to explain the contours of

5   this conspiracy.

6          145.    The guilty plea by Sharp has significant ramifications for Toshiba.

7   Toshiba was one of Sharp's principal competitors in the sale of TFT-LCD panels to Dell and

8   Apple during the periods set forth in the DOJ's information against Sharp.  Toshiba sold TFT-

9   LCD panels to Dell between 2000 and 2006, and it sold TFT-LCD panels for use in Apple's iPod

10  music players between 2001 and 2006.  In fact, Toshiba was one of Apple's largest, if not largest,

11  supplier of iPod screens for a substantial part of the Class Period.  In the small-to-medium size

12  TFT-LCD display market, Toshiba Matsushita was ranked second (behind Sharp) in worldwide

13  market share in the first half of 2005, holding a 15.4 percent market share during the first quarter

14  and a 14.1 percent market share during the second quarter.  Toshiba's high percentage of TFT-

15  LCD revenues dictated that no conspiracy would be effective without its participation.  Sharp

16  could not have successfully fixed the prices of the TFT-LCD panels it sold to Dell and Apple

17  unless Toshiba, one of its biggest competitors, agreed not to undersell it.

18          F.     **Market During the Conspiracy**

19          146.    After initial introduction into a market, consumer electronics products and

20  their component parts are typically characterized by downward pricing trends.  However, since at

21  least 1996, the TFT-LCD Products market has been characterized by unnatural and sustained

22  price stability, as well as certain periods of substantial increases in prices.  Defendants achieved

23  price stability and price increases by agreeing to fix and maintain prices and to restrict supply

24  through decreases in capacity utilization and restraint in new plant investment.

25          147.    As described herein, defendants' TFT-LCD cartel evolved over time.

26  Defendants initiated their cartel when TFT-LCD Products were in their relative infancy.  At that

27  time, defendants balanced the desire to set prices collusively with the industry goal of establishing

28  their products in the marketplace.  As the cartel matured, new entrants were co-opted, and

1    production costs declined.  At the same time, conspirators learned how they could best mitigate

2    the crystal cycle by agreeing on prices and output.

3              **1.    1996**

4              148.    By early 1996, analysts were lamenting the excess supply and drastic price

5    cuts in the TFT-LCD markets.  The downward pressure on prices, which had already fallen 40 to

6    50 percent in 1995, was projected to continue due to lower manufacturing costs.  Despite this,

7    TFT-LCD Product prices actually rose in 1996, allegedly due to insufficient production capacity.

8    In reality, defendants were fixing the prices.

9              149.    During this period, the Japanese companies herein began to partner with

10   Taiwanese companies to trade technology and collaborate on supply.  Japanese engineers were

11   lent to Taiwanese firms, and Taiwanese output was shipped to Japan.  This mutually beneficial

12   relationship between purported competitors continued into at least 1999.

13             150.    A few months into 1996, there was a reversal in the downward trend in

14   TFT-LCD Product prices and an alleged inability of manufacturers to supply enough TFT-LCD

15   panels to meet demand.  By May of 1996, an industry magazine was reporting that, "[f]lat-panel-

16   display purchasers are riding a roller coaster of pricing in the display market, with no clear

17   predictability anytime soon . . . .  Perplexed purchasers trying to keep up with the gyrating market

18   can take solace that even vendors are constantly being surprised by the sudden twists and turns."

19             151.    By mid-1996, industry analysts were commenting on an unusual rise in

20   TFT-LCD panel prices that was noted to be "quite rare in the electronics industry."

21             152.    The "rare" increase in TFT-LCD panel prices was due to the agreements

22   reached by the Japanese companies to increase prices.  These companies met and agreed to

23   increase prices and control supply in order to stop any price erosion as herein alleged.

24             153.    1996 also brought the advent of third generation fabs.  In order to stay

25   current with technology, manufacturers were moving quickly into third generation motherglass.

26   LG Electronics, Inc. was scheduled to have its third generation fab online by 1997, and Hyundai

27   was scheduled to do so by early 1998.  However, manufacturers falsely claimed to be operating at

28   full capacity and unable to meet demand, despite the millions of units of over-capacity that had

1    supposedly existed months earlier.  This resulted in surging prices.  These price increases were

2    also inconsistent with the fact that production had become more efficient and cost effective.

3              **2.     1997 – 1998**

4              154.    By 1997, Japanese manufacturers were steadily sending engineers to

5    Taiwan to provide the Taiwanese manufacturers with the most up-to-date technology.  In return,

6    the Japanese received output from Taiwanese plants.  In 1998, Chi Mei entered into such a

7    strategic alliance with Fujitsu, a Japanese manufacturer that Sharp acquired in 2005.  These

8    arrangements between Japanese and Taiwanese companies resulted in cooperative discussions

9    between supposed competitors.  It was also expected to contribute to an increase in supply of

10   TFT-LCD panels.

11             155.    By 1998, the TFT-LCD industry still had excess capacity, due in part to the

12   still recent entry of the Korean companies.  A March 30, 1998 article in *Electronic News* reported

13   that Hyundai's production lines were running at only 20 to 50 percent of capacity.  The article

14   quoted Rob Harrison, director of marketing for Hyundai's display division, as saying, "There is

15   plenty of inventory and capacity available to suit any shortage . . . .  You have to get your

16   production up to full capacity again before you can even talk about there being a shortage and I

17   think there are plenty of under-capacity fabs right now to bear the burden."

18             156.    During this period, Samsung made a concerted effort to get other

19   manufacturers in the industry to limit production.  Yoon-Woo Lee, President and CEO of the

20   Semiconductor Division of Samsung Electronics Co., Ltd. gave the keynote address at the

21   Eighteenth International Display Research Conference (known as Asia Display 98).  Mr. Lee

22   said:

23              In order to maintain the tradition of top CRT manufacturer, we need
                to capture the high end market [and] deviate from the volume
                production of CRTs and LCDs.
24

25              Taiwan is trying to enter TFT-LCD business because it has the
                advantage of the large PC production.  To survive in this rapidly
26              changing environment, we have to revise our previous strategies
                and redirect our business plans.  It is time for fundamental shift for
27              future decisions, time for transformation from volume driven to
                cost driven, time for driving value added strategies.

28

793124.1                                   34                  FIRST AMENDED DIRECT PURCHASER
                                                               PLAINTIFFS' CONSOLIDATED COMPLAINT
                                                               Master File No. M07-1827 SI

*If we prepare now by shifting from the traditional business*
*approach, to value added new approach, we may be able to deviate*
*from repeating the "crystal cycle" again.*

[Emphasis added.]

157.     Samsung's effort to limit production, capacity restraints and the price-fixing agreement caused decreases in prices of TFT-LCD Products to slow and stop in late 1998. The chart below depicts the short-lived price fall in 1998 caused by the entry of Korean competitors, as well as the rise and eventual stabilization of prices in the first quarter of 2000, as the new entrants joined the conspiracy.



**Average Selling Price of High-Volume LCD Monitors and Notebook LCDs**

Source: DisplaySearch.

### 3.     <u>1999</u>

158.     The efforts commenced by Samsung in 1998 continued to bear fruit.  In 1999, TFT-LCD Product prices surged during that year due to a claimed "massive undersupply." This was despite the entry of Taiwanese manufacturers and several new fabs coming online.

159.     At the beginning of 1999, industry publications suggested that the Japanese and Korean manufacturers were going to have the opportunity to recoup previous years' losses:

1   "The AM-LCD imbalance has triggered cash-strapped Japanese and Korean vendors to up their

2   tags in an effort to wash away the stain left by years of red ink . . . ."

3         160.    By mid-1999, a Korean source was reporting: "[w]ith the supply shortage

4   for TFT-LCD panels unlikely to be corrected in the near future, the domestic LCD industry is

5   gleefully increasing its sales targets amid a sharp price rise."  The lack of supply was a pretextual

6   reason given publicly to justify a price increase.

7         161.    Significantly, Boch Kwon, Vice President of LG Display's Sales Division

8   and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, announced the

9   following in the same trade publication:

> LG LCD will raise prices across its entire TFT-LCD portfolio by 30
> to 40 percent this year, Kwon said, although he expects that prices
> will stabilize some time in the second half.  According to Samsung,
> demand for larger panels is reducing capacity because each display
> is eating up more square inches per motherglass substrate.  This,
> combined with a stagnation in capital spending by many panel
> makers, will keep the LCD industry in a period of relative shortage
> until 2001, Lee said. The shortage has become acute, and has
> created an unusual market in which prices could rise as much as
> 30% to 80% in one year according to Ross Young, President of
> DisplaySearch, a research firm in Austin, Texas.

16         162.    Also in 1999, the three major TFT-LCD producers in Korea became two,

17   when LG Electronics, Inc. merged with Hyundai.  The year 1999 also saw an additional merger

18   when LG Electronics, Inc. and Koninklijke Philips Electronics N.V. created defendant LG

19   Display.

20       **4.**    **<u>2000 - 2001</u>**

21         163.    By January of 2000, prices for TFT-LCD Products were falling again.  The

22   price decline in this period was substantially influenced by the entry of six new Taiwanese

23   competitors, including Chi Mei, Chunghwa, HannStar, and Acer Display Technology, Inc. (later

24   part of AU Optronics).  Taiwanese defendants began their entry into the market in late 1999 and

25   early 2000, by undercutting the collusively high prices of the other defendants to gain immediate

26   market share.  However, by 2000-2001, the Taiwanese defendants had increased their market

27   share to the point that it made sense to participate in the conspiracy, and they then moderated the

28   volume of their production.

164.    Concurrent with the entry of the Taiwanese firms, the Koreans, just as the Japanese had done earlier, were investing in Taiwanese manufacturing capacity. Two of the largest Korean firms announced plans to invest billions in Taiwanese TFT-LCD panel production and to locate manufacturing facilities in Taiwan.

165.    Newer generation fabs reduced costs and provided opportunities for additional profits at cartelized prices. In fact, a leading industry research house indicated that LCD manufacturers would pour $5 billion into new manufacturing in 2000, roughly equivalent to the amount the industry spent in the previous three years combined.

166.    In October 2000, *The Korea Herald* reported that, "IDC estimates that the global LCD supply is one to two percent in excess and the unbalance will rise to seven percent next year as manufacturers continue to book their output."

167.    Then, despite what was billed as massive and growing overcapacity in 2000 and early 2001, prices of TFT-LCD panels stopped declining in mid-2001, and actually increased. In late 2001, a senior official at LG Display stated that the global market faced a supply shortage, and that this would "rapidly resolve the industry's oversupply and improve its profitability." Similarly, industry insiders suggested that the price increases were the result of an inability to meet increased demand. However, published data for 2001 showed that several defendants were operating their fabs significantly below capacity. For example, Chunghwa had a 75.3 percent utilization rate and Quanta Display, Inc. (which later merged with AU Optronics) had a 52 percent utilization rate. Based on the data indicating reduced capacity utilization during a time of rising prices and supposedly tight supply, the Taiwanese firms had begun actively cooperating with Japanese and Korean incumbents to restrict supply. Again, defendants reacted to the price trough by conspiring to fix prices. This agreement was reached in part at the bilateral and group meetings described above.

168.    The rise in prices made no economic sense at this point in time and was the product of defendants' setting the price of TFT-LCD Products by agreement. First, defendants were bringing new plants on line that utilized larger motherglass, which was more cost effective. Second, as reported by an industry source, the variable cost of producing TFT-LCDs was

1   declining during the latter part of 2001 and into 2002.  With lower production costs and capacity

2   to spare, it made little economic sense for defendants not to utilize their full capacity other than

3   agreement by them not to do so.  The chart below compares the variable costs of production per

4   square meter of motherglass with the price per square meter of finished TFT-LCDs during the

5   same period.

### Price/m$^2$ and Cash Cost/m$^2$ Development for a Tier-1 Maker



*Source: DisplaySearch, "TFT LCD Business Cycles and Trends".*

### 5.   2002 - 2003

169.   Prices continued to rise from the second half of 2001 through the second

half of 2002.  Industry analysts attributed these price increases to a "larger-than-expected panel

shortage," despite continuing capacity expansion.  In reality, the price increases were the result of

agreements reached in the crystal meetings and bilateral discussions described above.

170.   By the second half of 2002, the cartel's success at propping up prices led to

lagging demand, and the cartel's response was to let prices level off and even begin to fall.  Such

downward price trends are not inconsistent with a monopoly or cartel.  For example, the chart

1   below depicts defendant Sharp steadily dropping the prices on 20-inch televisions during a two-
2   year period when it was the only company making that product, and one of only two companies
3   making any TFT-LCD televisions larger than 15.2 inches.

### Quarterly ASP by Manufacturer for 20.0" LCD TVs



18   171.   Throughout 2002, industry leaders shifted to fifth generation motherglass
19   production technology.  According to officials at Samsung, "[t]he new fifth-generation facilities
20   offer panels that are 11.5 times bigger in size than those of the first-generation production line,
21   while production cost is 20 percent lower than the fourth-generation counterpart because of the
22   decrease in number of necessary parts."

23   172.   Industry analysts took note of the unusual trends in the pricing of TFT-
24   LCD Products.  In February 2004, CNET.com quoted an analyst from IDC, a market research
25   firm, as saying that, "LCD is one of the few [markets] where things have actually gone up in
26   price."  As described above and as further detailed in Section VIII below, defendants explained
27   these price increases with false statements about market conditions in order to cover up the
28   conspiracy.

1          173.    During five consecutive quarters in 2003 and 2004, TFT-LCD Product

2  prices rose significantly.  AU Optronics reported that the price for certain of its TFT-LCD

3  Products increased 28 percent between the second quarter of 2003 and the second quarter of

4  2004.  Similarly, LG Display reported that its pricing increased by 21 percent over the same

5  period.  This price increase can be seen in the chart at paragraph 157, entitled *Average Selling*

6  *Price of High-Volume LCD Monitors and Notebook LCDs*.

7          174.    These soaring prices resulted in similar increases in the profits reaped by

8  the TFT-LCD Product manufacturers.  For example, the eight largest TFT-LCD Product

9  manufacturers reported a collective profit increase of 740 percent between the second quarter of

10  2003 and the second quarter of 2004.  These record profits resulted from defendants' collective

11  action to fix, raise, maintain or stabilize the price of TFT-LCD Products.  Again, the sharing of

12  information about price and production, the under-utilization of capacity, and restraints on output

13  drove up the prices of TFT-LCDs.

14          175.    Around this time, industry analysts suggested that there were too many

15  competitors in the TFT-LCD Product marketplace.  Some industry participants went as far as

16  overtly suggesting that the industry should seek to curtail supply through mergers.  These

17  suggestions were carried out.  Significant consolidation and collaboration among competitors in

18  the TFT-LCD Product market occurred.

19          176.    While TFT-LCD Product prices were increasing in late 2003, AU

20  Optronics, Chi Mei, and HannStar decreased capacity utilization, as had been agreed to in crystal

21  meetings.

22          177.    As noted above, Toshiba Corporation and Panasonic merged their TFT-

23  LCD operations.  The joint venture announced plans to solicit investment from other companies

24  involved in the production of TFT-LCD panels, including device manufacturers and material

25  suppliers.  NEC formed an alliance with Casio.  In addition, Taiwanese TFT-LCD manufacturers

26  agreed to supply Panasonic with TFT-LCD panels for use in televisions.

27

28

178.     Consolidation and collaboration continued in 2003 as Chi Mei bought Japan's IDT, a former subsidiary of IBM, and AU Optronics purchased a 20 percent stake in Japan's Fujitsu Display Technology.

179.     Despite the increased efficiency and costs savings of fifth generation fabs, the industry experienced higher prices in 2003, purportedly because of a shortage of the most popular sizes of TFT-LCD panels.  In order to keep prices artificially high, defendants chose not to operate at full capacity, nor to take advantage of lower variable costs.

### 6.    2004

180.     Pursuant to defendants' agreement to fix and stabilize prices, prices continued to rise during the first half of 2004.  In fact, between 2003 and mid-2004, panel prices increased for five consecutive quarters.  Various types of crystal meetings were ongoing during this period.

181.     The cartel's success at raising prices slowly dampened demand.  In response, the cartel allowed prices to once again level off and began to decline in the second half of 2004.  During this period of time, the market for TFT-LCD televisions started to grow, with the 32-inch panel representing approximately 9 percent of the market.

182.     In late 2004, AU Optronics reduced financial forecasts, claiming that overcapacity-driven price declines were eroding profits.  AU Optronics publicly announced plans to reduce capacity at its sixth generation fabs by 30 percent and to delay a planned seventh generation facility.

183.     Consolidation and collaboration among and between competitors continued as Samsung and Sony launched their joint venture, named S-LCD Corp.

### 7.    2005

184.     Analysts widely predicted a continuing period of oversupply and declining prices throughout 2005.  However, by the third quarter of 2005, it was clear that the industry was not facing oversupply, but rather was reaping the benefits of a panel shortage and stable, or increasing, panel prices.

185. By 2005, 15-inch notebooks had surpassed 14-inch notebooks as the predominant product, and the volume of 32-inch panels for televisions took off as well. In 2005, 32-inch panels represented almost 27 percent of sales.

186. Around this time, Samsung announced its intention to increase production of 40-inch TFT-LCD panels from 20,000 units in the second quarter to 150,000 units in the fourth quarter. An immediate increase to 100,000 units occurred the very next month. Samsung's ability to immediately increase output so drastically shows how quickly manufacturers could ramp up capacity and increase utilization.

187. Analysts forecast excess production capacity in 2005 because of large TFT-LCD plants from Samsung and LG Display being brought on line. However, Sharp executive director Toshishige Hamano reported in October 2005 that the supply of LCD panels, particularly for use in televisions larger than 32 inches, would fall short of demand by 15 to 30 percent. The shortage came as a surprise to analysts.

188. This shortage was the result of collusion among defendants. Dr. Hui Hsiung, Executive Vice President and Director of AU Optronics, admitted in November of 2005 that his company persuaded its competitors to lower the inventory for TFT-LCD Products:

> I think our policy, our strategy, has always been minimizing our inventory and that turned out to be quite successful in past few years by keeping the inventory lower. And I think in the past we did have some problem convincing our competitors doing the same thing. *But in recent months, especially this year, actually, it did start to happen. I think that the industry understand[s] the benefit of keeping the capacity low.* Again, even if the scenario does happen that we have a 5% over capacity this is not the drastic action to reduce about 5% of the loading. And this, coupled with the fact that many of the product cost structure is some 80% are actually material costs. So, fixed costs at 20% if you reduced the 5%, even 10%, loading, that impact on cost is actually, not very big. So, we think the industry become more mature. That is precisely what our competitors would do.

[Emphasis added.]

189. Indeed, earlier that year, spokespersons for LG Display and Samsung had predicted that market stabilization.

190.   A Samsung presentation from November of 2005 made by Sang-Wan Lee, the President of Samsung's TFT-LCD Products business, noted that it was possible to "secure a reasonable amount of profit while following the industry leaders."

191.   These collusive actions were being perpetuated through the series of ongoing meetings as alleged above.

192.   The effect of the conspiracy can be seen both in the way prices followed each other as depicted in the chart at paragraph 157, and the way prices for particular products converged as the conspiracy progressed.  The chart below, which relates to 15-inch computer monitors, illustrates how the price dispersion among defendants diminished as the conspiracy matured.

## Dispersion of Manufacturer ASPs for 15.0" LCD Monitors



### 8.   2006

193.   A temporary oversupply of TFT-LCD Products occurred in 2006, which had the effect of reducing prices in the short term.  Again, in the face of a price trough, defendants fixed and stabilized prices through their cartel activities.  On May 25, 2006, at a

1    Taiwanese trade show, Mr. Hsiung of AU Optronics stated publicly that his company was

2    reducing production of those products in order to avoid further price erosion. He expressed the

3    view that his competitors should follow suit, saying that production ought to be reduced by at

4    least 15 percent. Eddie Chen, a spokesperson for Chi Mei who was present at the trade show,

5    promised to take similar steps in conjunction with his company's peers. A June 13, 2006 article

6    in *InfoWorld* noted that as a result of Mr. Hsiung's statements, "[t]he chatter is growing louder

7    each day."

8    194.    Chi Mei was not the only one to follow AU Optronics' invitation to restrict

9    the output and increase the prices of TFT-LCD Products. In May of 2006, in discussions between

10    executives of the two companies, AU Optronics convinced Quanta Display, a company that it

11    acquired in October of 2006, to reduce production of TFT-LCD Products. By June of 2006, LG

12    Display also announced plans to cut production of TFT-LCD Products.

13    195.    By the summer of 2006, this ongoing conspiracy was being effectuated

14    through bilateral meetings as alleged above.

15    196.    Despite the fact that certain of the defendants may have cut back on, or

16    discontinued, their conspiratorial conduct in 2006 upon the commencement of the governmental

17    investigations described below, the impact of the conspiracy continued at least through the end of

18    that year. This carry-over in the antitrust injury was due, in part, to the nature of the pricing

19    mechanisms in the industry, such as supply contracts.

20    **G.    The Role of Trade Associations During the Conspiracy Period**

21    197.    The TFT-LCD industry is served by several major trade organizations that

22    put on industry-wide meetings several times a year. These meetings have facilitated collusion,

23    and the trade associations have themselves functioned as a means for defendants to cooperate and

24    discuss prices.

25    198.    One such trade association is the Taiwan TFT-LCD Association ("TTLA"),

26    to which AU Optronics, Chi Mei, and HannStar belong. Founded in 2000, TTLA's self-described

27    mission is to "assist [] [the] TFT-LCD industry, condensing the consensus through various

28    activities, promoting the cooperation within competition, acting as a window for interaction with

1    international organization[s] and promoting the integrated growth to [the] whole display

2    industry."  TTLA's annual fiscal plans refer repeatedly to one of its activities being the "call[ing

3    of] international meeting[s] on TFT-LCD field and invit[ing] JAPAN and Korea TFT LCD

4    affiliations to visit TTLA."  Thus, TTLA was not merely a trade association that provided an

5    opportunity to conspire; it was a vehicle by which the conspiracy was effectuated and

6    implemented.

7           199.    South Korean manufacturers, including LG Display and Samsung, had

8    similar trade associations during the Class Period, known as EDIRAK (the Electronic Display

9    Industrial Research Association of Korea) and KODEMIA (the Korea Display Equipment

10   Material Industry Association).  EDIRAK's stated goal was "promoting co-activity with foreign

11   Organizations related to display industries."  Since 1996, EDIRAK has had a cooperation pact

12   with the United States Display Consortium ("USDC").  Describing the pact, Malcolm Thompson,

13   then-Chairman of USDC's governing board, said "[e]ven competitors should cooperate on

14   common issues."

15          200.    Japanese manufacturers of TFT-LCD Products have a similar organization

16   of their own.  The Semiconductor Equipment Association of Japan ("SEAJ"), founded in 1995,

17   serves Japanese manufacturers of TFT-LCD Products.  Its members include Sharp, Toshiba,

18   NEC, Hitachi, and a Japanese subsidiary of Samsung.  Like the KODEMIA and TTLA, the SEAJ

19   was not merely a trade association that provided an opportunity to conspire; it was a vehicle by

20   which the conspiracy was effectuated and implemented.

21          201.    In addition to these national trade associations, the Society for Information

22   Display ("SID") put on multiple meetings each year that were attended by executives from all of

23   the major producers.  One of these meetings had been known as the SID Symposium, but was

24   renamed the "SID International Symposium and Business Conference."  SID also puts on a long-

25   running conference called the International Display Research Conference ("IRDC").

26          202.    The 2004 SID International Symposium and Business Conference ("SID

27   2004") featured a presentation entitled "Beyond the Crystal Gateway," by H.B. Chen, President

28   and CEO of AU Optronics.  This was followed shortly by a presentation entitled "The FPD

1    Capital Equipment Investment Environment," which informed the attendees about "investments

2    planned at the major display manufacturers." A representative of DisplaySearch also spoke about

3    the LCD market. There were presentations by analysts from iSuppli/Stanford Resources, and

4    other industry experts. This was all followed by a "networking reception – sponsored by

5    LG.Philips LCD," to which all conference attendees were invited to participate.

6              203.    SID 2005 featured a reprise of the SID 2004 speech by H.B. Chen of AU

7    Optronics. This time it was called "2005: Beyond the Crystal Gateway." A DisplaySearch

8    representative provided "the latest outlook for flat panel displays covering pricing, demand, and

9    supply . . . and the cost and margin outlook for key FPDs will be projected." Again, these

10   discussions about the market were followed by a "networking reception." Among the attendees at

11   SID 2004 were Bruce Berkoff of LG Display, Jun Souk and Dong-Hun Lee of Samsung, H.B.

12   Chen of AU Optronics, Larry Weber of Panasonic, and Joel Pollack of Sharp. Senior executives

13   from Sharp and Hitachi also attended.

14             204.    The SID 2005 conference was very similar to SID 2004 but was even more

15   blatant in its discussion of the crystal cycle. Jun H. Souk, Executive Vice President of Samsung,

16   gave a presentation entitled "Managing the Crystal Cycles," which was paraphrased as follows:

17   "By reviewing what happened during the business up and down cycles of the LCD in the past, we

18   have learned lessons that will reduce the burden in future cycles. Efforts made in cost reduction,

19   line-investment timing, and new market generation will be described."

20             205.    SID 2005 provided a prime opportunity for one of the dominant

21   manufacturers to explain to all of its key competitors how to manage supply and maximize "line-

22   investment timing." Among the attendees at SID 2005 were Bruce Berkoff of LG Display and

23   Sang Wan Lee, Jun Souk, and Joe Virginia of Samsung. SID 2005 also featured presentations

24   regarding developments in LCD technology by officials from AU Optronics, Sharp, LG Display,

25   Samsung, and Hitachi.

26             206.    The conspiracy was also carried out at the annual meetings of the Global

27   FPD Partners' Conference ("GFPC"), which have been held since 2005. The initial conference

28

1  was held in March of 2005 in Tokyo and the 2006 conference was held from February 28 to

2  March 3, 2006 in Okinawa, Japan.

3       207.    Participants in the 2006 GFPC noted how successful the event was in

4  promoting information exchanges and "networking" among the co-conspirators.  Or, as Dr. Hui

5  Hsiung has said, "[i]n an industry growing as rapidly as the flat panel display industry, it is

6  increasingly important to build connections across the supply chain and around the world . . . the

7  GFPC plays a vital part in building those connections and growing our business."

8       208.    Among the participants at GFPC 2006 were Mr. Souk and Ho Kyoon

9  Chung of Samsung, Shigaeki Mizushima of Sharp, Kiyoshi Jan-o of NEC, Mr. Ogura of Toshiba

10  Matsushita, Yoshihide Fuji of Toshiba, Mr. Nakajima of Panasonic, and Dr. Hui Hsiung of AU

11  Optronics.

12       209.    As indicated by the public pronouncements, these trade association

13  meetings facilitated the conspiracy by giving defendants further opportunities to discuss prices

14  and output.

15  **VIII.   FRAUDULENT CONCEALMENT**

16       210.    Plaintiffs had neither actual nor constructive knowledge of the facts

17  supporting their claim for relief despite diligence in trying to discover the pertinent facts.

18  Plaintiffs and members of the Class did not discover, and could not have discovered through the

19  exercise of reasonable diligence, the existence of the conspiracy alleged herein until December

20  2006, when investigations by the DOJ and other antitrust regulators became public.  Defendants

21  engaged in a secret conspiracy that did not give rise to facts that would put plaintiffs or the Class

22  on inquiry notice that there was a conspiracy to fix the prices of TFT-LCD Products.

23       211.    The participants in the crystal meetings agreed to keep the meetings secret.

24  In some instances, the location of the meeting was circulated only the day before in an effort to

25  avoid detection.  Furthermore, the participants agreed on what pretexts they would cite when

26  questioned about rising prices.  The participants also agreed to lie to the media and report that

27  their fabs were operating at full capacity even when they were not, in order to create the

28  appearance of a supply shortage.

1        212.    Defendants have used a variety of other purportedly market-based

2    explanations for price increases in order to conceal their conspiracy.  In 1999, Joel Pollack, a

3    marketing manager for Sharp, blamed the sharp price rises of early 1999 on under-capitalization:

4            Prices have dropped at a steady rate over the past couple of years to
        the point where it was difficult to continue the necessary level of
5            capitalization.  The [low prices] have starved the industry.

6        213.    Also, in early 1999, Omid Milani, a marketing manager for NEC, stated

7    that "demand by fair is outstripping our supply capability" and predicted that "prices will

8    continue to increase until a reasonable balance is achieved."

9        214.    Also in 1999, Boch Kwon, Vice President of LG Display's Sales Division,

10   and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, falsely reported

11   that price increases resulted from "acute" shortages.

12       215.    On February 4, 2001, Bruce Berkoff, Executive Vice President at LG

13   Display, was quoted by News.com as saying that price increases were due to shortages.  He

14   claimed, "demand grew so fast that the supply can't keep up."

15       216.    In the latter half of 2001, Koo Duk-Mo, an executive at LG Display,

16   predicted a 10 to 15 percent price increase, purportedly resulting from increased demand during

17   the holiday season.

18       217.    Hsu Jen-Ting, a Vice President at Chi Mei, and Chen Shuen-Bin, President

19   of AU Optronics, offered another rationale for the 2001 price increase in an interview for the

20   *Taiwan Economic News* in October 2001.  They blamed "component shortages due to the late

21   expansion of 5th generation production lines and new demand from the replacement of traditional

22   cathode ray tubes with LCD monitors."

23       218.    In a PowerPoint shown to investors on September 16, 2003, Toshiba gave

24   the following pretextual explanation for its soaring revenues: "*LCDs*: Profitability recovered

25   faster than originally expected."  A question-and-answer sheet released to investors that same day

26   offered a better clue to its participation in the ongoing conspiracy: "Q4.  How are recent prices for

27   LCDs . . .?  [Answer:] They remain high."

28

1        219.    These explanations were pretextual and served to cover up the conspiracy.

2  Later price increases were explained by industry leaders as derived from new demand for LCD

3  televisions.  In 2005, Koo Duk-Mo of LG Display stated "[w]e are seeing much stronger demand

4  for large-size LCD TVs than expected, so LCD TV supply is likely to remain tight throughout the

5  year."

6        220.    As a result of defendants' fraudulent concealment of their conspiracy, the

7  running of any statute of limitations has been tolled with respect to any claims of plaintiffs and

8  the Class members arising from the anticompetitive conduct alleged in this Complaint.

9  **IX.    CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1**

10        221.    Plaintiffs incorporate by reference all the above allegations as if fully set

11  forth herein.

12        222.    Beginning no later than January 1, 1996, the exact date being unknown to

13  plaintiffs and exclusively within the knowledge of defendants, defendants and their co-

14  conspirators entered into a continuing contract, combination or conspiracy to unreasonably

15  restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by

16  artificially reducing or eliminating competition in the United States.

17        223.    In particular, defendants combined and conspired to raise, fix, maintain or

18  stabilize the prices of TFT-LCD Products sold in the United States.

19        224.    As a result of defendants' unlawful conduct, prices for TFT-LCD Products

20  were raised, fixed, maintained and stabilized in the United States.

21        225.    The contract, combination or conspiracy among defendants consisted of a

22  continuing agreement, understanding, and concerted action among defendants and their co-

23  conspirators.

24        226.    For purposes of formulating and effectuating their contract, combination or

25  conspiracy, defendants and their co-conspirators did those things they contracted, combined, or

26  conspired to do, including:

27            a.    participating in meetings and conversations to discuss the prices

28              and supply of TFT-LCD Products;

1          b.       communicating in writing and orally to fix target prices, floor

2                   prices, and price ranges for TFT-LCD Products;

3          c.       agreeing to manipulate prices and supply of TFT-LCD Products

4                   sold in the United States in a manner that deprived direct purchasers

5                   of free and open competition;

6          d.       issuing price announcements and price quotations in accordance

7                   with the agreements reached;

8          e.       selling TFT-LCD Products to customers in the United States at non-

9                   competitive prices;

10         f.       exchanging competitively sensitive information in order to facilitate

11                  their conspiracy;

12         g.       agreeing to maintain or lower production capacity; and

13         h.       providing false statements to the public to explain increased prices

14                  for TFT-LCD Products.

15         227.   As a result of defendants' unlawful conduct, plaintiffs and the other

16  members of the Class were injured in their businesses and property in that they paid more for

17  TFT-LCD Products than they otherwise would have paid in the absence of defendants' unlawful

18  conduct.

19  **X.    PRAYER FOR RELIEF**

20         WHEREFORE, plaintiffs pray that the Court enter judgment on their behalf and on

21  behalf of the Class herein, adjudging and decreeing that:

22         A.     This action may proceed as a class action, with plaintiffs as the designated

23  Class representatives and their counsel as Class Counsel;

24         B.     Defendants engaged in a contract, combination, and conspiracy in violation

25  of Section 1 of the Sherman Act (15 U.S.C. § 1), and plaintiffs and the members of the Class were

26  injured in their business and property as a result of defendants' violations;

27         C.     Plaintiffs and the members of the Class shall recover damages sustained by

28  them, as provided by the federal antitrust laws, and a joint and several judgment in favor of

1    plaintiffs and the Class shall be entered against the defendants in an amount to be trebled in

2    accordance with such laws;

3              D.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees

4    and the respective officers, directors, partners, agents, and employees thereof, and all other

5    persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained

6    from continuing and maintaining the combination, conspiracy or agreement alleged herein;

7              E.     Plaintiffs and members of the Class shall be awarded pre-judgment and

8    post-judgment interest, and such interest shall be awarded at the highest legal rate from and after

9    the date of service of the initial complaint in this action;

10             F.     Plaintiffs and members of the Class shall recover their costs of this suit,

11   including reasonable attorneys' fees as provided by law; and

12             G.     Plaintiffs and members of the Class shall receive such other or further

13   relief as may be just and proper.

14   **XI.   <u>JURY TRIAL DEMANDED</u>**

15             Pursuant to Federal Rule of Civil Procedure 38(b), plaintiffs demand a trial by jury

16   of all of the claims asserted in this Complaint so triable.

17

18   Dated:  December 5, 2008                    By:  /s/ Bruce L. Simon
19                                               Bruce L. Simon
                                                 Daniel L. Warshaw
                                                 Jonathan M. Watkins
20                                               Esther L. Klisura
                                                 Bobby Pouya
21                                               PEARSON, SIMON, SOTER, WARSHAW
                                                 & PENNY, LLP
22                                               44 Montgomery Street, Suite 1430
                                                 San Francisco, CA 94104
23                                               Telephone:   (415) 433-9000
                                                 Facsimile:   (415) 433-9008
24
25                                               *Interim Co-Lead Counsel for the Direct*
                                                 *Purchaser Plaintiffs and the Proposed Class*
26

27

28

1 Dated:  December 5, 2008      By:  /s/ Richard M. Heimann

2              Richard M. Heimann
              Joseph R. Saveri

3              Eric B. Fastiff
              Jordan Elias

4              Andrew S. Kingsdale
              LIEFF, CABRASER, HEIMANN &

5              BERNSTEIN, LLP
              275 Battery Street, 30th Floor

6              San Francisco, CA 94111-3339
              Telephone: (415) 956-1000

7              Facsimile: (415) 956-1008

8              *Interim Co-Lead Counsel for the Direct*
              *Purchaser Plaintiffs and the Proposed Class*

9

10     Pursuant to General Order 45, Part X-B, the filer attests that concurrence in the

11 filing of this document has been obtained from Richard M. Heimann.

12

13              Daniel C. Girard
              Elizabeth C. Pritzker

14              GIRARD GIBBS LLP
              601 California Street, 14th Floor

15              San Francisco, CA 94108
              Telephone: (415) 981-4800

16              Facsimile: (415) 981-4846

17              *Interim Liaison Counsel for the Direct*
              *Purchaser Plaintiffs and the Proposed Class*

18

19              H. Laddie Montague
              Ruthanne Gordon

20              BERGER & MONTAGUE, P.C.
              1622 Locust Street

21              Philadelphia, PA 19103
              Telephone: (215) 875-3000

22              Facsimile: (215) 875-4604

23              Joseph J. Tabacco, Jr.
              Christopher T. Heffelfinger

24              BERMAN DEVALERIO PEASE &
              TABACCO, PC

25              425 California Street, Suite 2100
              San Francisco, CA 94104

26              Telephone: (415) 433-3200
              Facsimile: (415) 433-6382

27

28

793124.1        52      FIRST AMENDED DIRECT PURCHASER
                   PLAINTIFFS' CONSOLIDATED COMPLAINT
                   Master File No. M07-1827 SI

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Manuel Juan Dominguez
BERMAN DEVALERIO PEASE &
TABACCO, PC
222 Lakeview Avenue, Suite 900
West Palm Beach, FL 33401
Telephone:    (561) 835-9400
Facsimile:    (561) 835-0322

David Boies, III
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612
Telephone:    (510) 874-1000
Facsimile:    (510) 874-1460

Anthony J. Bolognese
BOLOGNESE & ASSOCIATES, LLC
1617 JFK Boulevard, Suite 650
Philadelphia, PA 19103
Telephone:    (215) 814-6750
Facsimile:    (215) 814-6764

Peter S. Pearlmann
Jeffrey W. Herrmann
COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
Park 80 Plaza West-One
Saddle Brook, NJ 07663
Telephone:    (201) 845-9600
Facsimile:    (201) 845-9423

Kevin B. Love
CRIDEN & LOVE, P.A.
7301 Southwest 57th Court, Suite 515
South Miami, FL 33143
Telephone:    (305) 357-9000
Facsimile:    (305) 357-9050

Steven A. Kanner
Douglas A. Millen
FREED KANNER LONDON & MILLEN
LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone:    (224) 632-4500
Facsimile:    (224) 632-4519

Stephen M. Garcia
GARCIA LAW FIRM
One World Trade Center, Suite 1950
Long Beach, CA 90831
Telephone:    (562) 216-5270
Facsimile:    (562) 216-5271

Daniel R. Karon
GOLDMAN SCARLATO & KARON
101 W. Elm Street, Suite 360
Conschohocken, PA 19428
Telephone:     (484) 342-0700
Facsimile:     (484) 342-0701

Anthony D. Shapiro
George W. Sampson
HAGENS BERMAN SOBOL SHAPIRO
LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone:     (206) 623-7292
Facsimile:     (206) 623-0594

Michael P. Lehmann
HAUSFELD LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone:     (415) 633-1908

Vincent J. Esades
HEINS MILLS & OLSON PLC
3550 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone:     (612) 338-4605
Facsimile:     (612) 338-4692

Robert N. Kaplan
Linda P. Nussbaum
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone:     (212) 687-1980
Facsimile:     (212) 687-7714

Joseph C. Kohn
William E. Hoese
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone:     (215) 238-1700
Facsimile:     (215) 238-1968

Howard J. Sedran
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3697
Telephone:     (215) 592-1500
Facsimile:     (215) 592-4663

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

W. Joseph Bruckner
Elizabeth R. Odette
LOCKRIDGE GRINDAL NAUEN, PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone:     (612) 339-6900
Facsimsile:    (612) 339-0981

Steven J. Greenfogel
MEREDITH COHEN GREENFOGEL &
SKIRNICK, P.C.
Architects Building
117 South 17th Street, 22nd Floor
Philadelphia, PA 19103
Telephone:     (215) 564-5182
Facsimile:     (215) 569-0958

Harry Schulman
THE MILLS LAW FIRM
145 Marina Boulevard
San Rafael, CA 94901
Telephone:     (415) 455-1326
Facsimile:     (415) 455-1327

Christopher Moscone
James Quadra
MOSCONE, EMBLIDGE & QUADRA,
LLP
220 Montgomery Street
Mills Tower, Suite 2100
San Francisco, CA 94104
Telephone:     (415) 362-3599
Facsimile:     (415) 362-2006

Gregory L. Russell
PETERSON RUSSELL KELLY PLLC
1850 Skyline Tower
10900 NE Fourth Street
Bellevue, WA 98004-8341
Telephone:     (425) 462-4700
Facsimile:     (425) 451-0714

Garrett D. Blanchfield
REINHARDT WENDORF &
BLANCHFIELD
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Telephone:     (651) 287-2100
Facsimile:     (651) 287-2103

| | |
|---|---|
| 1 | Guido Saveri |
| | R. Alexander Saveri |
| 2 | Cadio Zirpoli |
| | SAVERI & SAVERI, INC. |
| 3 | 706 Sansome Street |
| | San Francisco, CA 94111 |
| 4 | Telephone:     (415) 217-6810 |
| | Facsimile:     (415) 217-6813 |
| 5 | |
| | P. John Brady |
| 6 | Daniel D. Owen |
| | SHUGHART THOMSON & KILROY, PC |
| 7 | Twelve Wyandotte Plaza |
| | 120 West 12th Street, Suite 1600 |
| 8 | Kansas City, MO 64105 |
| | Telephone:     (816) 421-3355 |
| 9 | Facsimile:     (816) 374-0509 |
| 10 | Eugene A. Spector |
| | SPECTOR ROSEMAN & KODROFF PC |
| 11 | 1818 Market Street, Suite 2500 |
| | Philadelphia, PA 19102 |
| 12 | Telephone:     (215) 496-0300 |
| | Facsimile:     (215) 496-6611 |
| 13 | |
| | *Counsel for Direct Purchaser Plaintiffs and* |
| 14 | *the Proposed Class* |

793124.1

56

FIRST AMENDED DIRECT PURCHASER
PLAINTIFFS' CONSOLIDATED COMPLAINT
Master File No. M07-1827 SI

EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE NBR | ) | |
| ANTITRUST LITIGATION | ) | Master Docket |
| | ) | Civil Action No. 03-1898 |
| THIS DOCUMENT RELATES TO: | ) | |
| ALL ACTIONS | ) | Judge Cercone |
| | ) | Magistrate Judge Hay |

## REPORT AND RECOMMENDATION

I.   RECOMMENDATION

     It is respectfully recommended that the Motion to Dismiss submitted on behalf of defendant DSM Copolymer, Inc. (Docket No. 76) be denied.

II.   REPORT

     Plaintiffs commenced this class action suit under Section 1 of the Sherman Act, 15 U.S.C. § 1, alleging that defendants are manufacturers and sellers of NBR, or acrylonitrile-butadiene rubber, and have engaged in a "global combination or conspiracy to suppress and eliminate competition which had the effect of raising, maintaining, or stabilizing the price of NBR sold in the United States and elsewhere."[1]

     Defendant DSM Copolymer, Inc. ("DCI") has presently filed a motion to dismiss arguing that the claims plaintiffs have

---

[1]   Consolidated Amended Class Action Complaint ("the Complaint"), ¶¶ 38, 45 (Docket No. 33).  NBR is apparently a synthetic rubber that is highly resistant to petroleum products, alcohols and heat and is used to manufacture a variety of commercial and industrial products.  Id. at ¶¶ 40, 41.

brought against it are barred by the statute of limitations.
Specifically, DCI argues that the applicable limitations period
is four years and that because it withdrew from the NBR market in
March of 1999, thereby effectively withdrawing from any
conspiracy to fix NBR prices, plaintiffs were obligated to bring
their claims within four years of that date, or by March of 2003.
Because the original complaint was not filed until December 9,
2003, DCI contends it is untimely.

Plaintiffs, of course, disagree, initially arguing that
whether a defendant has withdrawn from a conspiracy is a factual
issue that should be considered by a jury or on a motion for
summary judgment after discovery.  The cases upon which
plaintiffs rely, however, do not stand for the cited proposition.

Indeed, in Armco Steel Co. v. CSX Corp, 790 F. Supp.
311 (D.D.C. 1991), rather than decline to address the issue of
withdrawal merely because it was raised in a motion to dismiss,
the Court thoroughly addressed it noting that "on certain
occasions, a Court may find, as a matter of law, that a
conspirator withdrew from the conspiracy." Id. at 322.  Although
the Court concluded that the record before it was insufficient to
permit a finding that the defendant withdrew from the conspiracy
and that any such evidence would nevertheless be outside the
pleadings in that case, those findings do not suggest that it is
never appropriate for a court to address the issue in a motion to

2

dismiss or from finding, where the record permits, that the defendant withdrew from the conspiracy.  Id.

Similarly, in United States v. N.A. Waldrop, 786 F. Supp. 1194 (M.D. Pa. 1991), affirmed, 983 F.2d 1054 (3d Cir. 1992), cert. denied, 508 U.S. 950 (1993), upon which plaintiffs also rely, the Court merely held that it could not determine, "as a matter of law, that defendants ... effectuated a withdrawal from the conspiracy from the facts presently before it." Id. at 1200.  The Court did not find, as plaintiffs have suggested, that the court is precluded from addressing the issue of withdrawal until after discovery has been conducted.

Thus, while it may very well be, at least at this juncture, that there is insufficient evidence of record from which this Court can conclude that DCI withdrew from the conspiracy in March of 1999, the Court is not precluded from addressing the issue merely because the question was presented in a motion to dismiss.  Nor is it precluded from finding that a withdrawal was properly effectuated where supported by the record.  The question remains, however, whether the evidence of record in this case sufficiently supports a finding that DCI withdrew from the alleged NBR price-fixing conspiracy.

Here, DCI contends that it effectively withdrew from any price-fixing conspiracy on March 19, 1999, when it entered into a Raw Material Purchase and Sale Agreement with Zeon

3

Chemicals L.P. ("Zeon") pursuant to which DCI agreed to sell all
of the NBR it produced to Zeon for a term of ten years commencing
on January 1, 1999.[2]  As well, in a separate Sale and Purchase
Agreement entered into between DCI and Zeon, which became
effective on February 24, 1999, DCI relinquished all rights to
market and sell NBR transferring its NBR client base, product
technology, contracts and good will to Zeon.[3]  Thus, DCI argues
that the statute of limitations began to run in March of 1999,
rendering plaintiffs' claims untimely.[4]

---

[2]   DCI's Brief, pp. 3-4; DCI's Exhibit A: Raw Material Purchase
and Sale Agreement.

[3]   Id.; DCI's Exhibit B: Sale and Purchase Agreement.  The Raw
Material Purchase and Sale Agreement and the Sale and
Purchase Agreement are hereinafter collectively referred to
as "the Agreements."

[4]   Plaintiffs initially suggest in a footnote that the
Agreements upon which DCI relies are not properly considered
by the Court on a motion to dismiss since plaintiffs do not
refer to them in the complaint and have not otherwise based
their claims on them.  Although generally courts may
consider only the allegations set forth in the complaint,
any exhibits attached thereto and matters of public record
in resolving a motion to dismiss, "a court may consider an
undisputedly authentic document that a defendant attaches as
an exhibit to a motion to dismiss if the plaintiff's claims
are based on the document...."  Pension Benefit Guaranty
Corp. v. White Consolidated Industries, Inc., 998 F.2d 1192,
1196 (3d Cir. 1993), cert. denied, 510 U.S. 1042 (1994).
This exception is premised on the notion that where the
plaintiff has relied upon certain documents in framing the
complaint, lack of notice to the plaintiff is no longer a
concern.  In re Burlington Coat Factory Securities
Litigation, 114 F.3d 1410, 1426 (3d Cir. 1997).  Here,
plaintiffs have alleged in the Complaint that "in 1999,
[DCI] entered into a contractual agreement with defendant
[Zeon], whereby [Zeon] buys, markets and resells all of the
NBR produced by [DCI]."  Complaint ¶ 20.  This, in our view,
not only clearly references the Agreements but alleviates
any concern regarding notice to plaintiffs.  Moreover,

4

It appears undisputed that under section 4B of the
Clayton Act, "[a]ny action to enforce any cause of action under
section 15, 15a, or 15c shall be forever barred unless commenced
within four years after the cause of action accrued," and that a
cause of action accrues when a defendant commits an act that
injures a plaintiff's business.  15 U.S.C. § 15b; Zenith Radio
Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971).  See
In re Linerboard Antitrust Litigation, 305 F.3d 145, 160 (3d Cir.
2002), cert. denied, 538 U.S. 977 (2003).  Further, in the
context of a continuing conspiracy to violate the antitrust laws,
each time a plaintiff is injured by the act of a defendant, a
cause of action accrues to him to recover damages caused by that
act for which all the co-conspirators are liable.  Zenith Radio
Corp. v. Hazeltine Research, Inc., 401 U.S. at 338; United States
v. Kushner, 305 F.3d 194, 198 (3d Cir. 2002).

It also appears undisputed, however, that where a
defendant has effectively withdrawn from the conspiracy the
statute of limitations against that defendant begins to run on
the date that their involvement was terminated.  United States v.
Antar, 53 F.3d 568, 582 (3d Cir. 1995), abrogated on other
grounds, Smith v. Berg, 247 F.3d 532 (3d Cir. 2001) ("Antar").

---

although plaintiffs make much of the fact that they have not
conceded the authenticity of the Agreements as DCI suggests
they have, nor have they expressly disputed their
authenticity.  Under these circumstances, it appears that
the Agreements are properly considered without converting
the motion to one for summary judgment.

5

See United States v. Kushner, 305 F.3d at 198 (Defendant remains liable for acts of his own and that of co-conspirators in furtherance of the conspiracy even after withdrawal until the statute of limitations has run.)

The defendant bears the initial burden of demonstrating a prima facie showing of withdrawal. Antar, 53 F.3d at 582. If successful, the burden shifts to the plaintiff to rebut the defendant's prima facie showing, which it may do either by challenging the defendant's prima facie evidence or by presenting evidence that the defendant engaged in conduct in furtherance of the conspiracy subsequent to its alleged withdrawal. Id., quoting United States v. Local 560 (I.B.T.), 974 F.2d 315, 338 (3d Cir. 1992).

Relying on Hyde v. United States, 225 U.S. 347, 369-70 (1912), wherein the United States Supreme Court held that withdrawal from a conspiracy will be found only where the defendant does some act "to disavow or defeat the purpose" of the unlawful scheme, the Court of Appeals for the Third Circuit has described the defendant's burden as a "rigorous" one, further finding that:

> "[m]ere cessation of activity in furtherance
> of an illegal conspiracy does not necessarily
> constitute withdrawal." *United States v.*
> *Steele*, 685 F.2d 793, 803 (3d Cir. 1982),
> *cert. denied*, 459 U.S. 908, 103 S. Ct. 213,
> 74 L.Ed.2d 170 (1982). Rather, "[t]he
> defendant must present evidence of some
> affirmative act of withdrawal on his part,

6

> typically either a full confession to the
> authorities or communication to his
> co-conspirators that he has abandoned the
> enterprise and its goals. " *Id.* at 803-04
> (emphasis added); *see also United States v.
> Heckman*, 479 F.2d 726, 729 (3d Cir. 1973).

Antar, 53 F.3d at 582.   See United States v. U.S. Gypsum Co., 438

U.S. 422, 464-65 (1978) ("Affirmative acts inconsistent with the

object of the conspiracy and communicated in a manner reasonably

calculated to reach co-conspirators have generally been regarded

as sufficient to establish withdrawal or abandonment.")

The Court then went on to analyze earlier cases in

which it had addressed the issue of withdrawal where a

conspirator had retired or resigned from the conspiring

enterprise and found three principles controlling: 1) that

resignation from the enterprise does not, in and of itself,

constitute withdrawal from a conspiracy; 2) that completely

severing ties with the enterprise may constitute withdrawal from

the conspiracy; unless 3) the defendant continues to do acts in

furtherance of the conspiracy and continues to receive benefits

from the conspiracy's operation.   Antar, 53 F.3d at 583.

Applying these principles in context of the shifting burdens of

proof, the Court ultimately held that:

> if the defendant completely severs his or her
> relationship with the enterprise, he or she
> has established a prima facie showing of
> withdrawal from the conspiracy without
> showing any other affirmative act
> inconsistent with the conspiracy and without
> giving any further notice to his or her

7

>           co-conspirators.  Once the defendant makes
>           this showing, the burden shifts to the
>           [plaintiff] either to rebut the defendant's
>           showing or to establish that the defendant
>           continued to participate as a co-conspirator.
>           However, if the defendant has not completely
>           severed his ties with the enterprise, then in
>           order to establish a prima facie case, he
>           must demonstrate either that he gave notice
>           to his co-conspirators that he disavows the
>           purpose of the conspiracy or that he did acts
>           inconsistent with the object of the
>           conspiracy.

Id.  See United States v. Boone, 279 F.3d 163, 192-93 (3d Cir.),

cert. denied, 535 U.S. 1089 (2002) (Finding that defendant "was

required to make a prima facie showing of affirmative acts to

defeat or disavow his membership in the conspiracy.")

        In the instant case, it does not appear that DCI has

completely severed ties with the "enterprise" of manufacturing

and selling NBR.  To the contrary, it appears clear that it has

continued to produce NBR, which it now sells to Zeon pursuant to

the Agreements.  Indeed, DCI has not argued that they have

completely severed ties with the NBR business but, rather,

relying on Matsushita Electric Industrial Co. v. Zenith Radio

Corp., 475 U.S. 574 (1986) ("Matsushita"), argues only that

withdrawal can be found simply because after it entered into the

Agreements it no longer had the incentive or opportunity to fix

prices.  DCI's reliance on Matsushita, however, appears to be

misplaced as the issue in that case was whether there was

sufficient evidence of record from which it could be concluded

that the petitioner participated in a conspiracy in the first instance and not whether, having already joined in the illegal scheme, the defendant did some act to disavow or defeat its purpose as is the case here.  See Antar, 53 F.3d at 369-70. Indeed, the mere fact that DCI no longer had the motivation or opportunity to fix NBR prices does not establish that DCI completely severed ties with the business enterprise, particularly as it concededly continues to manufacture NBR, and does not serve to defeat the conspiracy.

In this manner, Antar, is instructive.  In that case, the defendants were charged with engaging in a RICO conspiracy which defendant Mitchell argued that he had withdrawn from when he resigned from the company.  Although he seemingly no longer had the opportunity or motivation to falsify the company's financial statements at that point, the Court declined to find that he had withdrawn from the conspiracy because he had retained stock in the company and, therefore, had not severed all ties with the enterprise.  Like Mitchell, DCI has not totally severed its ties with the enterprise and, thus, cannot be said to have withdrawn from the conspiracy simply because it no longer had the motivation or opportunity to fix prices.[5]

---

[5]      Conversely, in Morton's Market, Inc. v. Gustafson's Dairy, Inc., 198 F.3d 823 (11th Cir. 1999), to which DCI cites, the defendant was found to have withdrawn from the conspiracy to fix milk prices when it sold its dairy.  Because there was no evidence that he had otherwise maintained ties with the dairy business the Court found it completely and permanently

Having failed to establish that it has completely severed ties with the enterprise, DCI must demonstrate either that it gave notice to its co-conspirators that it disavowed the purpose of the conspiracy or did acts inconsistent with the object of the conspiracy in order to make a prima facie showing of withdrawal. <u>Antar</u>, 53 F.3d at 583. In our view, merely entering into the Agreements to sell its NBR exclusively to Zeon fails to satisfy this burden. Rather, the Agreements appear to evidence only that DCI ceased activities in furtherance of the conspiracy, <u>i.e.</u>, fixing prices, which is clearly insufficient to establish withdrawal from the conspiracy. <u>Id.</u> at 582. <u>See</u> <u>United States v. Patel</u>, 879 F.2d 292, 294 (7th Cir. 1989), <u>cert.</u> <u>denied</u>, 494 U.S. 1016 (1990) ("[H]aving set in motion a criminal scheme, a conspirator will not be permitted by the law to limit his responsibility for its consequences by ceasing, however definitely, to participate.")

It therefore appears that DCI has failed to make a prima facie showing of withdrawal from the conspiracy and, thus, has failed to demonstrate that plaintiffs claims are barred by

---

severed its ties with the enterprise. <u>Id.</u> at 839. DCI, on the other hand, has remained in the business of producing and selling NBR and has initially agreed only to sell its product to Zeon through 2009.

10

the statute of limitations. As such, DCI's motion is properly denied.[6]

      For these reasons, it is recommended that the Motion to Dismiss submitted on behalf of defendant DSM Copolymer, Inc. (Docket No. 76) be denied.

      Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

      Respectfully submitted,


      s/Amy Reynolds Hay
       AMY REYNOLDS HAY
      United States Magistrate Judge

Dated: 18 July, 2005

---

[6]   Having found that DCI has failed to establish that it withdrew from the conspiracy in 1999 or that plaintiffs' claims are barred by the statute of limitations, we have not addressed DCI's alternative argument that plaintiffs have not alleged sufficient facts to permit the statute of limitations to be tolled. Nor have we considered the supplemental authority submitted by DCI in support of its motion and, thus, have not addressed its relevancy or whether properly considered by the Court in the first instance.

11

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE NBR                            )
ANTITRUST LITIGATION                 )        Master Docket
_____              )        Civil Action No. 03-1898
                                     )
THIS DOCUMENT RELATES TO:            )
                                     )        Judge Cercone
_____              )        Magistrate Judge Hay

## O R D E R

AND NOW, this __27__ day *September* 2005, after the plaintiffs filed an action

in the above-captioned case, and after a Motion to Dismiss was submitted on behalf of defendant

DSM Copolymer, Inc., and after a Report and Recommendation was filed by the United States

Magistrate Judge granting the parties ten days after being served with a copy to file written

objections thereto, and upon consideration of the objections filed by defendant, DSM Copolymer,

Inc., the response to those objections filed by plaintiffs, and a reply filed by defendant, DSM

Copolymer, and upon independent review of the motion and the record, and upon consideration

of the Magistrate Judge's Report and Recommendation, which is adopted as the opinion of this

Court,

IT IS ORDERED that defendant, DSM Copolymer, Inc.'s Motion to Dismiss

[Docket No.76] is DENIED.

IT IS FURTHER ORDERED that, pursuant to Rule 4(a)(1) of the Federal Rules

of Appellate Procedure, if the plaintiff desires to appeal from this Order he/she must do so within

thirty (30) days by filing a notice of appeal as provided in Rule 3, Fed.R.App.P.

_____
DAVID S. CERCONE
United States District Judge

cc:   Honorable Amy Reynolds Hay
      United States Magistrate Judge

      Stanley M. Stein, Esquire
      Feldstein, Grinberg, Stein & McKee
      428 Boulevard of the Allies
      Pittsburgh, PA 15219

      Daniel M. Berger, Esquire
      Berger & Lagnese
      437 Grant Street
      912 Frick Building
      Pittsburgh, PA 15219

      Michael D. Hausfeld, Esquire
      Steven H. Schulman, Esquire
      Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
      1100 New York Avenue, N.W.
      Suite 500, West Tower
      Washington, D.C. 20005-3934

      Robert N. Kaplan, Esquire
      Richard J. Kilsheimer, Esquire
      Jason A. Zweig, Esquire
      Kaplan, Kilsheimer & Fox
      805 Third Avenue
      22nd Floor
      New York, NY 10022

      Steven O. Sidener, Esquire
      Joseph M. Barton, Esquire
      Gold, Bennett, Cera & Sidener, L.L.P.
      595 Market Street, Suite 2300
      San Francisco, CA 94105-2835

      Howard J. Sedran, Esquire
      Levin, Fishbein, Sedran & Berman
      510 Walnut Street, Suite 500
      Philadelphia, PA 19106

      Bernard J. Berry, Jr., Esquire
      Giordano, Halleran & Ciesla
      125 Half Mile Road
      P.O. Box 190
      Middletown, NJ 07748

Andrew B. Sacks, Esquire
John Weston, Esquire
Sacks, Weston, Smolinsky, Albert & Luber
510 Walnut Street
Suite 400
Philadelphia, PA 19106

Steven J. Miller, Esquire
Mark Darnell, Esquire
Goodman Weiss Miller
100 Erieview Plaza
27th Floor
Cleveland, OH 44114-1882

Conrad S.P. Williams, III, Esquire
St. Martin & Williams
4084 Highway 311
Houma, LA 70361-2017

Michael P. Lehman, Esquire
Thomas P. Dove, Esquire
255 Bush Street
15th Floor
San Francisco, CA 94104

John C. Evans, Esquire
Specter, Specter, Evans & Manogue
Koppers Building
26th Floor
Pittsburgh, PA 15219

Bruce E. Gerstein, Esquire
Garwin, Bronzaft, Gersteine & Fisher
1501 Broadway
New York, NY 10036

Steven J. Greenfogel, Esquire
Meredith, Cohen, Greenfogel & Skirnick
117 South Seventeenth Street
22nd Floor, Architects Building
Philadelphia, PA 19103

Steven A. Kanner, Esquire
Much, Shelist, Freed, Denenberg,
  Ament, Bell & Rubenstein
191 North Wacker
Suite 1800
Chicago, IL 60606

Bernard D. Marcus, Esquire
James S. Larrimer, Esquire
Marcus & Shapira LLP
301 Grant Street
35th Floor, One Oxford Centre
Pittsburgh, PA 15219-6401

William J. Baer, Esquire
Richard L. Rosen, Esquire
Franklin J. Liss, Esquire
Robert Mascola, Esquire
John Hutchins, Esquire
Arnold & Porter
Thurman Arnold Building
555 Twelfth Street, N.W.
Washington, DC 20004-1206

W. Joseph Bruckner, Esquire
Yvonne M. Flaherty, Esquire
Lockridge, Grindal, Nauen & Holstein, P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401

Anthony J. Bolognese, Esquire
Bolognese & Associates, LLC
One Penn Center
1617 JFK Boulevard, Suite 650
Philadelphia, PA 19103

Mitchel Zemel, Esquire
Samuel H. Foreman, Esquire
Weber Gallagher Simpson Stapleton Fires & Newby LLP
Two Gateway Center, Suite 1450
603 Stanwix Street
Pittsburgh, PA 15222

Daniel I. Booker, Esquire
Debra H. Dermody, Esquire
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219-1886

Benjamin G. Bradshaw, Esquire
Richard G. Parker, Esquire
Ian Simmons, Esquire
O'Melveny & Myers LLP
1625 I Street, N.W.
Washington, DC 20006-4001

Ruthanne Gordon, Esquire
H. Laddie Montague, Jr., Esquire
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365

Joseph C. Kohn, Esquire
Kohn, Swift & Graf, P.C.
One South Street, Suite 2100
Philadelphia, PA 19107

Marc H. Edelson, Esquire
Edelson & Associates, LLC
45 West Court Street
Doylestown, PA 18901

Bernard J. Berry, Jr., Esquire
Giordano, Halleran & Ciesla
125 Half Mile Road
P.O. Box 190
Middletown, NJ 07748

John G. Unice, Esquire
Jones, Day, Reavis & Pogue
500 Grant Street
31st Floor, One Mellon Center
Pittsburgh, PA 15219

James M. Lynch, Esquire
12197 Brecknock Street
Oakton, VA 22124-2348

Susan G. Kupfer, Esquire
Glancy, Binkow & Goldberg
445 Market Street
Suite 1810
San Francisco, CA 94105

Mary Jane Edelstein Fait, Esquire
Wolf Haldenstein Adler Freeman & Herz LLC
55 West Monroe Street, Suite 1111
Chicago, IL 60603

Daniel R. Karon, Esquire
Weinstein, Kitchenoff, Scarlato, Karon & Goldman
55 Public Square
Suite 1500
Cleveland, OH 44113-1998

Mitchel Zemel, Esquire
Samuel H. Foreman, Esquire
Weber Gallagher Simpson
 Stapleton Fires & Newby LLP
Two Gateway Center, Suite 1450
603 Stanwix Street
Pittsburgh, PA 15222

Kevin B. Byrd, Esquire
William V. O'Reilly, Esquire
J. Andrew Read, Esquire
Jones Day
51 Louisiana Avenue
Washington, D.C. 20001

Britt M. Miller, Esquire
Andrew S. Marovitz, Esquire
Andrew J. Schaefer, Esquire
Mayer, Brown, Rowe & Maw, LLP
190 South La Salle Street
Chicago, IL 60603-3441

Jay Christopher Rooney, Esquire
Carmody & Torrance, LLP
18th Floor
195 Church Street
New Haven, CT 06509-1950

Bruce S. Kaplan, Esquire
Robert S. Loigman, Esquire
Friedman, Kaplan, Seiler & Adelman
1633 Broadway
New York, NY 10019

Evan A. Davis, Esquire
Deborah M. Buell, Esquire
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006

Mark Leddy, Esquire
Cleary Gottlieb Steen & Hamilton
2000 Pennsylvania Avenue, N.W.
Washington, D.C. 20006-1801

Stewart M. Weltman, Esquire
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
39 South LaSalle Street
Suite 1100
Chicago, IL 60603

Brian Byrne, Esquire
Leah Brannon, Esquire
Jeffrey Leasure, Esquire
Cleary Gottlieb Steen & Hamilton
2000 Pennsylvania Avenue, N.W.
Washington, D.C. 20006-1801

Michael W. Byrne, Esquire
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500 West Tower
Washington, D.C. 20005

Gregory K. Arenson, Esquire
Kaplan, Kilsheimer & Fox
805 Third Avenue
22nd Floor
New York, NY 10022