GUIDO SAVERI (22349)
  guido@saveri.com
R. ALEXANDER SAVERI (173102)
  rick@saveri.com
GEOFFREY C. RUSHING (126910)
  grushing@saveri.com
CADIO ZIRPOLI (179108)
  cadio@saveri.com
GIANNA GRUENWALD (228969)
  gianna@saveri.com
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA  94111
Telephone:  (415) 217-6810
Facsimile:   (415) 217-6813

*Interim Lead Counsel for the Direct Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 3:07-CV-5944 SC |
| | MDL No. 1917 |
| _____ | **CLASS ACTION** |
| This Document Relates to: | **DIRECT PURCHASER PLAINTIFFS' COMBINED  OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |
|    All Direct Purchaser Actions | Date:   October 5, 2009<br>Time:   9:00 a.m.<br>Judge: Honorable Charles A. Legge (Ret.)<br>Special Master |

## **<u>TABLE OF CONTENTS</u>**

I. INTRODUCTION AND FACTUAL BACKGROUND ........................................ - 1 -

II. ARGUMENT.............. ........................................................................ - 4 -

    A.  The Court Has Subject Matter Jurisdiction Over The Claims In The
        Amended Complaint........................................................................ - 4 -

        1.  Plaintiffs' Amended Complaint Alleges A Conspiracy Aimed
            At, Furthered Partially In, And Proximately Causing
            Adverse Impacts In, The United States ................................ - 5 -

        2.  The FTAIA Does Not Apply To The Conduct Alleged In The
            Amended Complaint................................................................ - 7 -

        3.  The FTAIA Also Does Not Apply Because The Conduct
            Alleged Import Trade Or Commerce.................................... - 10 -

        4.  Even Assuming *Arguendo* That The FTAIA Does Apply, The
            Applicability Of The "Domestic Effects" Exception Cannot
            Be Decided on the Pleadings ............................................... - 13 -

    B.  The Plaintiffs Have Standing To Sue Under *AGC*................................. - 14 -

        1.  Plaintiffs Have Standing Under *AGC* Because They Purchased
            CRT Products at Supra-Competitive Prices Directly From
            Cartel Members ................................................................... - 14 -

        2.  Plaintiffs Have Sufficiently Pled An Antitrust Injury Under § 4
            of the Clayton Act............................................................... - 16 -

        3.  The Complaint Alleges Precisely The Type of Injury the
            Antitrust Laws Seek to Redress........................................... - 17 -

        4.  Plaintiffs' Antitrust Injury Is a Direct Result of Defendants'
            Conduct And Is Not Barred By *Illinois Brick* ..................... - 19 -

        5.  Plaintiffs' Harm Is Not Speculative Or Too Remote ................... - 20 -

        6.  There Is No Risk of Duplicative Recovery ............................... - 21 -

        7.  Apportioning Damages Will Not Be Difficult .......................... - 21 -

    C.  The Statute of Limitations Does Not Bar Plaintiffs' Claims for
        Unlawful Conduct That Occurred More Than Four Years Before
        the Filing of the Amended complaint. ........................................... - 22 -

        1.  The amended complaint Alleges Numerous Affirmative Acts of
            Fraudulent Concealment....................................................... - 24 -

        2. Plaintiffs Had Neither Actual Nor Constructive Knowledge of
            the Conspiracy ...............................................................- 29
            -

        3.  Plaintiffs' Allegations of Due Diligence Are More Than
            Sufficient ........................................................................... - 32 -

    D.  Under the Applicable Standards for Assessing a Pleading on a Motion
        to Dismiss, Plaintiffs Have Alleged Far More Than Is Required to
        State a  Plausible Conspiracy........................................................ - 33 -

        1.  Notice Pleading Standards Apply....................................... - 33 -

2. The Facts Alleged in This Case Bear No Resemblance to Those Alleged in *Twombly* ................................................................... - 37 -

3. Plaintiffs' Conspiracy Allegations Need Not Be Detailed Defendant By Defendant .................................................... - 39 -

4. On The Issue Of Allegations Linking Each Defendant To A Conspiracy, *TFT-LCD II* And *Flash Memory* Are Particularly Pertinent Here .................................................... - 41 -

E. The Amended Complaint More Than Adequately Alleges The Involvement Of Each Moving Defendant In The Claimed Conspiracy. ...................................................................... - 45 -

1. BMCC .................................................................................... - 45 -

   a. Plaintiffs' Factual Allegations As To BMCC. ................... - 46 -

   b. The Claims Against BMCC Are Not Time-Barred .......... - 48 -

      i. Withdrawal. ...................................................... - 48 -

      ii. Fraudulent Concealment. ................................... - 53 -

2. Samsung Entities ................................................................. - 54 -

   a. The Alleged Participation of the SE Defendants in the CRT Products Conspiracy Is Plausible and Makes Perfect Economic Sense ........................................... - 56 -

   b. The Amended Complaint Adequately Alleges the SE Defendants' Participation in the Price-Fixing Conspiracy ................................................................. - 60 -

   c. The SE Defendants' Liability Is Based On Their *Own* Unlawful Conduct and Participation in the Conspiracy, and Not Vicarious Liability, As They Erroneously Claim .................................................... - 61 -

   d. The Amended Complaint Satisfies the Requirements of *Twombly* and Rule 8 ............................................. - 63 -

3. Tatung America ................................................................... - 65 -

   a Tatung America Participated in the CRT Product Price-Fixing Conspiracy ................................................... - 65 -

   b. Tatung America Is Not a Direct Purchaser of CRT Products Under *Illinois Brick* and *Royal Printing* ............. - 68 -

4. Toshiba ................................................................................. - 73 -

   a. Toshiba is Wrong In Claiming That Plaintiffs' Allegations Against Them Differ Materially From The Allegations Against Other Defendants ........................ - 75 -

      i. Allegations Regarding Criminal Investigations and Cases Against Other Defendants Support The Plausibility of The Alleged Conspiracy, But Such Allegations Need Not Be Made Against Each Defendant .................................. - 76 -

      ii. Allegations Regarding The Toshiba Entities' Market Dominance Do Not Sufficiently

Distinguish Them from Other Defendants ..................... - 77 -

iii.  Allegations Regarding Pricing and Production Do Not Serve a Basis for Distinguishing The Toshiba Entities from Other Defendants ........................ - 78 -

iv.  Allegations Of Participation In Express Conspiratorial Meetings, As Well As Meetings Providing An Opportunity To Conspire, Are Made With Respect To Toshiba ......................................................................... - 79 -

b.  The Amended Complaint Adequately Alleges Participation In The Claimed Conspiracy By Each Of The Toshiba Entities ............................................. - 79 -

c.  Toshiba's Withdrawal Argument Is Unavailing ............................... - 82 -

5.  Hitachi .................................................................................. - 83 -

a.  Overview ........................................................................ - 83 -

b.  Allegations As To Hitachi ............................................ - 84 -

c.  Plaintiffs Have Adequately Pled Hitachi's Involvement In The Alleged Conspiracy ................................................. - 86 -

d.  Plaintiffs Have Stated a Claim Against the Hitachi Entities ............................................................................. - 88 -

e.  The Statute of Limitations Does Not Bar Plaintiffs' Claims Against Hitachi ..................................................... - 91 -

6.  LG Defendants ....................................................................... - 92 -

a.  Overview ........................................................................ - 92 -

b.  Allegations Relating To The LG Defendants' Participation In The Alleged Conspiracy ....................... - 94 -

c.  The Well Plead Factual Allegations Of The DP-CAC Preclude a Finding that LGEI Withdrew From The Conspiracy In 2001 ......................................................... - 97 -

d.  Assuming LGEI Withdrew from the Conspiracy As A Matter Of Law in 2001 Plaintiffs Have More Than Adequately Plead Fraudulent Concealment Tolling The Applicable Statute of Limitations ............................ - 98 -

e.  The DP-CAC Provides Each of The LG Defendants With Fair Notice Of The Claims Against Them And Of Their Respective Roles In The Alleged Conspiracy Rendering Dismissal Or A More Definite Statement Inappropriate .......................................... - 99 -

7.  Panasonic Entities ................................................................ - 101 -

a.  Plaintiffs' Allegations Against the Panasonic Defendants Satisfy Rule 8's Pleading Standards ........................................ - 101 -

b.  Plaintiffs Have Adequately Identified the Panasonic Defendants and Alleged Their Role in the Conspiracy ....................................................................... - 104 -

8. Philips Defendants ................................................................................. - 106 -

   a. Overview ...................................................................................... - 106 -

   b. The Philips Defendants Cannot Rewrite The DP-CAC ................. - 109 -

   c. The Philips Defendants' Arguments Do Not Provide
      Any Basis For Dismissal Of Plaintiffs' Claims ....................... - 110 -

   d. The Philips Defendants Are Not Shielded From Each
      Others' Wrongful Acts ............................................................ - 112 -

   e. Plaintiffs' Claims Against The Philips Defendants Are
      Not Time-Barred ...................................................................... - 114 -

   f. Plaintiffs Have Sufficiently Pled Fraudulent
      Concealment ............................................................................ - 117 -

9. Samtel .................................................................................................. - 117 -

III. CONCLUSION ................................................................................................. - 117 -

# TABLE OF AUTHORITIES

## CASES

*American Ad Mgmt., Inc. v. General Telephone Company of California*

190 F.3d 1051 (9th Cir. 1999) ..............................................................17, 21

*Animal Science Prods. Inc. v. China Nat'l Metals & Minerals Import & Export Corp.*

596 F.Supp.2d 842 (D.N.J. 2008)....................................................................10

*Arizona v. Shamrock Foods Co.*

729 F.2d 1208 (9th Cir. 1984) ........................................................................73

*Armco Steel Co. L.P. v. CSX Corp*

790 F. Supp. 311 (D.D.C. 1991).....................................................................49

*Ashcroft v. Iqbal*

129 S.Ct. 937 (2009) .............................................................................passim

*Associated General Contractors. v. California State Council of Carpenters*

459 U.S. 519 (1983) ...................................................................................4, 17

*Autery v. United States*

424 F.3d 944 (9th Cir. 2005) ..........................................................................14

*Baggett v. Hewlett-Packard Co.*

582 F.Supp.2d 1261 (C.D. Cal. 2007) ............................................................23

*Bell Atlantic v. Twombly*

550 U.S. 544 (2007) ...............................................................................passim

*Beltz Travel Service, Inc. v. Int'l Air Transport Ass'n*

620 F.2d 1360 (9th Cir. 1980)....................................................................28, 40

*Bhan v. NME Hospitals, Inc.*

772 F.2d 1467 (9th Cir. 1985) ........................................................................19

*Blue Shield of Virginia v. McCready*

457 U.S. 465 (1982) ...................................................................................16, 17

*Boyd v. AWB, Inc.*

544 F.Supp.2d 236 (S.D.N.Y. 2008) ..............................................................10

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*

429 U.S. 477 (1977) .................................................................16

*Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*

227 F.3d 62 (3d Cir. 2000) ....................................................11, 12

*City of Moundridge v. Exxon Mobil Corp.*

250 F.R.D. 1 (D.D.C. 2008) ......................................................37

*Conmar Corp. v. Mitsui & Co. (U.S.A.) Inc.*

858 F.2d 499 (9th Cir. 1988) .............................................passim

*Continental Ore Co. v. Union Carbide & Carbon Corp.*

370 U.S. 690 (1962) ...............................................................35

*Cortez v. U.S.*

337 F.2d 699 (9th Cir. 1964) ....................................................66

*Crompton Corp. v. Clariant Corp.*

220 F.Supp.2d 569 (M.D. La. 2002) ...........................................13

*Dee-K Enterprises v. Heveafil Sdn Bhd.*

299 F.3d 281 (4th Cir. 2002) ..................................................10

*Dell, Inc. v. This Old Store, Inc.*

No. H-07-0561, 2007 WL 1958609 (S.D. Tex., July 2, 2007)................45

*Dent v. Cox Communications Las Vegas, Inc.*

502 F. 3d 1141 (9th Cir. 2007) .................................................14

*Dion LLC v. Infotek Wireless, Inc.*

No. C 07-1431 SBA, 2007 WL 3231738 (N.D. Cal., Oct. 30, 2007) ...........62

*E.W. French & Sons, Inc. v. General Portland, Inc.*

885 F.2d 1392 (9th Cir. 1989) ...........................................passim

*Empagran v. F. Hoffman-LaRoche Ltd., S.A.*

417 F.3d 1267 (D.C. Cir. 2005)................................................8, 9

*Ernest W. Hahn, Inc. v. Codding*

615 F.2d 830 (9th Cir. 1980) ...................................................22

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

vi

*F. Hoffman-LaRoche Ltd. v. Empagran, S.A.*

   542 U.S. 155 (2004) ................................................................................7, 13

*Fisher v. Building Service 32B-J HealthFund*

   No. CIV. A. 01-7707, 2001 WL 1586689 (S.D.N.Y. , Dec. 11, 2001) ......................101

*General Leaseways, Inc. v. National Truck Leasing Ass'n*

   744 F.2d 588 (7th Cir. 1984) ........................................................................38

*General Refractories Co. v. Stone Container Corporation*

   1999 WL 14498, (N.D. Ill. Jan. 8, 1999)................................................16,  20

*Gilbert v. Concentra Health Servs., Inc.*

   No. 03:07-CV-00264-LRH-VPC, 2008 WL 318356 (D. Nev. Jan. 31, 2008)..............62

*Hamilton v. State Farm Fire & Cas. Co.*

   270 F.3d 778 (9th Cir. 2001) ........................................................................71

*Harris Rutsky & Co. Ins .Servs., Inc., v. Bell & Clements, Ltd.*

   328 F.3d 1122 (9th Cir. 2003) ......................................................................14

*Hill v. Morehouse Med. Assoc., Inc.*

   No. 02-14449, 2003 WL 22019936 (11th Cir., Aug. 15, 2003) ...................................41

*Home Design Services, Inc. v. B&B Custom Homes, LLC*

   No CIV. A. 06-00249, 2006 WL 3328140 (D. Colo., Nov. 15, 2006)........................101

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*

   253 F.Supp.2d 262 (D.Conn.2003) .................................................................39

*Illinois Brick Co. v. Illinois*

   431 U.S. 720 (1977) ...................................................................4, 19, 68, 69

*In re Air Cargo Shipping Servs. Antitrust Litig.*

   No. MD 06-1775 (JG)(VVP), 2008 WL 5958061 (E.D.N.Y., Sept. 26, 2008)..............12

*In re Arizona Dairy Products Litig.*

   1983-2 Trade Cas. (CCH) ¶ 65,666 (D. Ariz. 1983) ..................................................31

*In re Aspartame Antitrust Litig.*

   2007 WL 52131 at (E.D. Pa Jan. 18, 2007)......................................................23, 26, 39

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

*In re Brand Name Prescription Drugs*

  123 F.3d 599 (7th Cir. 1997) ...................................................................73

*In re Bulk Extruded Graphite Products Antitrust Litig.*

  No. 02-6030 (WHW), 2007 WL 1062979 (D.N.J., April 4, 2007) .........................31, 32

*In re Bulk Popcorn Antitrust Litig.*

  1990 WL 123753 (D. Minn., June 16, 1990) ...........................................26

*In re Carbon Black Antitrust Litig.*

  2005 WL 2323184 (D. Mass. Sept. 8 2005) .............................................59

*In re Catfish Antitrust Litig.*

  908 F.Supp. 400 (D. Miss. 1995) .......................................................26

*In re Chocolate Confectionary Antitrust Litig.*

  602 F. Supp. 2d 538 (M.D. Pa. 2009).................................................36, 59

*In re Commercial Explosives Litig.*

  945 F.Supp. 1488 (D. Utah 1996) ...................................................32, 41, 55

*In re Conseco Ins. Co. Annuity Mktg. & U Sales Practices Litig.*

  No. C-05-04726 RMW, 2008 WL 4544441 (N.D. Cal.,Sept. 30, 2008)....................23

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*

  782 F.Supp. 487 (C.D. Cal. 1992) ...................................................passim

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*

  No. C 02-1486 PJH, 2006 WL 515629 (N.D. Cal. March 1, 2006), *aff'd*, 546 F.3d 931
  (2d Cir. 2008) ...............................................................5, 8, 13, 19

*In  re Dynamic Random Access Memory (DRAM) Antitrust Litig.*

  516 F. Supp. 2d 1072 (N.D. Cal. 2007)..................................................21

*In re Elevator Antitrust Litig.*

  502 F.3d 47 (2d Cir. 2007) ............................................................44

*In re Flash Memory Antitrust Litig.*

  No. C 07-0086 SBA 2009 WL 1096602 (N.D. Cal. Mar. 31, 2009).....................passim

*In re Flat Glass Antitrust Litig.*

   385 F.3d 350 (3d. Cir.2004) ……………………………………… 38, 41, 59

*In re Flat Glass Antitrust Litig. (II)*

   MDL No. 1942, 2009 WL 331361 (W.D. Pa. Feb. 11, 2009).......................37

*In re Flat Glass Antitrust Litig.*

   191 F.R.D. 472 (W.D. Pa. 1999) ...........................................................31

*In re Graphics Processing Units Antitrust Litig.*

   527 F. Supp. 2d 1011 (N.D. Cal. 2007)....................................................77

*In re High Fructose Corn Syrup Antitrust Litig.*

   295 F.3d 651 (7th Cir. 2002) .......................................................38, 51, 59

*In re Hypodermic Prods. Antitrust Litig.*

   No. 05-CV-1602 (JLL/CCC), 2007 WL 1959225 (D.N.J. June 29, 2007) ..................37

*In re Initial Public Offering Antitrust Litig.*

   2004 WL 487222 (S.D.N.Y. Mar. 12, 2004).................................................32

*In re Intel Microprocessor Antitrust Litig.*

   452 F.Supp.2d 555 (D. Del. 2006) ..........................................................9

*In re Korean Air Lines Antitrust Litig.*

   MDL No. 07-01891 (C.D. Cal.) ......................................................5, 11, 12

*In re Late Fee & Over-Limit Fee Litig.*

   528 F. Supp 2d 953 (N.D. Cal. 2007)........................................................47

*In re Linerboard Antitrust Litig.*

   305 F.3d 145 (3d Cir. 2002) ......................................................16, 21, 38

*In re Magnetic Audio Tape Antitrust Litig.*

   2002 WL 975680 (S.D.N.Y., May 9, 2002) ..................................................32

*In re Mercedes-Benz Antitrust Litig.*

   157 F.Supp. 2d 355 (D.N.J. 2001).........................................................39

*In re Midwest Milk Monopolization Litig.*

   730 F.2d 528 (8th Cir. 1984)............................................................58

*In re NBR Antitrust Litig.*

   No. 03-1898 (W.D. Pa. Sept. 28, 2005) ................................................52, 53

*In re New Motor Vehicles Canadian Export*

   307 F.Supp.2d 145 (D. Me. 2004)............................................................106

*In re OSB Antitrust Litig.*

   No. 06-826, 2007 WL  2253419 (E.D. Pa., Aug. 3, 2007)...............37, 39, 40

*In re Pressure Sensitive Lablestock Antitrust Litig.*

   2006 WL 433891 (M.D. Pa., Jan. 3, 2006) ................................... - 33, 44, 59

*In re Rail Freight Fuel Surcharge Antitrust Litig.*

   587 F.Supp.2d 27 (D.D.C. 2008)........................................................35, 36

*In re Rexplore, Inc. Securities Litig.*

   685 F. Supp. 1132 (N.D. Cal. 1988)..........................................................23

*In re Rubber Chems. Antitrust Litig.*

   504 F.Supp.2d 777 (N.D. Cal. 2007)...................................................passim

*In re Sagent Tech. Derivative Litig.*

   278 F. Supp. 2d 1079 (N.D. Cal. 2003)......................................................44

*In re Scrap Metal Antitrust Litig.*

   527 F.3d 517 (6th Cir. 2008) .................................................................28

*In re Southeastern Milk Antitrust Litig.*

   555 F. Supp. 2d 934 (E.D. Tenn. 2008) ...............................................35, 36

*In re Stac Elecs. Sec. Litig.*

   89 F.3d 1399 (9th Cir. 1996) ....................................................................41

*In re Static Random Access Memory (SRAM) Antitrust Litig.*

   580 F.Supp.2d 896 (N.D. Cal. 2008)........................................25, 36, 45, 91

*In re Sugar Industry Antitrust Litig.*

   579 F.2d 13 (3d Cir.1978) .......................................................18, 19, 20, 21

*In re TFT-LCD (Flat Panel) Antitrust Litig.*

   2009 WL 533130 (N.D. Cal. Mar. 3, 2009) ........................................passim

*In re TFT-LCD Antitrust Litig.*

    599 F. Supp. 2d 1179 (N.D. Cal. 2009)...................................................................passim

*In re TFT-LCD (Flat Panel) Antitrust Litig.*

    586 F. Supp. 2d 1109 (N.D. Cal. 2008)...................................................................passim

*In re Vitamins Antitrust Litig.*

    No. 99-197, 2000 WL 1475705 (D.D.C. 2000)......................................................39, 40

*In re Vitamins Antitrust Litig.*

    No. Misc. 99-197, 2000 WL 1475705 (D.D.C. May 9, 2000) ........................31, 32, 60

*Ingram Corp. v. J. Ray McDermott & Co.*

    1980-1 Trade  Cas. (CCH) (E.D. La. 1980) ................................................................31

*International Norcent Tech v. Koninklijke Philips Elecs. N.V.*

    No. 07-00043, 2007 WL 4976364 (C.D. Cal,. Oct. 29, 2007) ....................................90

*Johnson Service Co. v. Transamerica Ins. Co.*

    485 F.2d 164 (5th Cir. 1973) ......................................................................................71

*Jung v. Association of American Medical Colleges*

    300 F.Supp.2d 119 (D.D.C. 2004)..........................................................................39, 48

*Kendall v. Visa U.S.A, Inc.*

    518 F.3d 1042 (9th Cir. 2008) ...............................................................................passim

*King & King Enterprises v. Champlin Petroleum Co.*

    657 F.2d 1147 (10th Cir. 1981) .............................................................................26, 31

*Knevelbaard Dairies v. Kraft Foods, Inc.*

    232 F.3d 979 (9th Cir. 2000).........................................................15, 18, 20, 35

*Kruman v. Christie's Int'l PLC*

    284 F.3d 384 (2d Cir. 2002) .......................................................................................12

*K-Swiss, Inc. v GFTM, Inc.*

    278 Fed. Appx. 772 (9th Cir. 2008) ...........................................................................14

*Laub v. U.S. Dep't of Interior*

    342 F.3d 1080 (9th Cir. 2003)....................................................................................73

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

*Lazy Y Ranch Ltd. v. Behrens*

   546 F. 3d 580 (9th Cir. 2008) .................................................................56

*Los Angeles Memorial Coliseum Commission v. National Football League*

   791 F. 2d 1356 (9th Cir. 1986) .............................................................20

*MacDonald v. Grace Church Seattle*

   2006 WL 1009283 (W.D. Wash. Apr. 14, 2006) .................................114

*Mathias v. Daily News, L.P.*

   152 F. Supp. 2d 465 (S.D.N.Y. 2001) ..................................................18

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*

   475 U.S. 574 (1986) .............................................................................56

*Metz v. Unizan Bank*

   416 F. Supp. 2d 568 (N.D. Ohio 2006) ................................................53

*MM Global Servs., Inc. v. Dow Chem. Co.*

   No. Civ. 3:02CV 1107(AVC), 2004 WL 556577 (D. Conn., March 18, 2004)............13

*Moore v. Kayport Packages Express, Inc.*

   885 F.2d 531, (9th Cir. 1989) ..............................................................24

*Moreno v. Health Partners Health Plan*

   4 F.Supp.2d 888 (D. Ariz. 1998) ...........................................................5

*Morton's Market Inc. v. Gustafson's Dairy Inc.*

   198 F.3d 823 (11th Cir. 1999) .................................................49, 50, 99

*Mountain View Pharmacy v. Abbott Labs.*

   630 F.2d 1383 (10th Cir. 1980) ............................................................44

*Nasious v. Two Unknown B.I.C.E. Agents*

   492 F.3d 1158 (10th Cir. 2007) ...........................................................44

*New York v. Hendrickson Bros., Inc.*

   840 F.2d 1065 (2nd Cir.) ......................................................................29

*Ohio Valley Electric Corp. v. General Electric Co.*

   244 F.Supp.914 (S.D.N.Y. 1965) ........................................................26

*Operating Engineers' Pension Trust Fund v. Clark's Welding & Machine*

    2009 WL1324049 (N.D. Cal. May 8, 2009)...................................................................35

*Paper Sys. Inc. v. Nippon Paper Indus.*

    281 F.3d 629 (7th Cir. 2002) ........................................................................................73

*Reiter v. Sonotone Corp.*

    442 U.S. 330 (1979) .......................................................................................15, 18, 21

*Rendoen v. Fresno Police Dept.*

    No. CIV. A. 05-006610, 2005 WL 1925859 (E.D. Cal., Aug. 11, 2005)....................101

*Richards v. Maleski*

    662 F.2d 65 (D.C. Cir. 1981)........................................................................................32

*Riddell v. Riddell Wash. Corp.*

    866 F.2d 1480 (D.C. Cir. 1989)..............................................................................26, 29

*Riesman v. United States*

    409 F.2d 789 (9th Cir. 1969)........................................................................................53

*Ronson Corp. v. Liquifin Aktiengesellschaft*

    375 F. Supp. 628 (S.D.N.Y. 1974) ..............................................................................72

*Royal Printing Co. v. Kimberly-Clark Corp.*

    621 F.2d 323 (9th Cir. 1980) ....................................................................55, 60, 68, 69

*Rutledge v. Boston Woven Hose & Rubber Co.*

    576 F.2d 248 (9th Cir. 1978) ..................................................................................24, 27

*Safe Air for Everyone for Meyer*

    373 F.3d 1035 (9th Cir. 2004) ......................................................................................5

*Scarano v. Central R.R.*

    203 F.2d 510 (3d Cir. 1953) ........................................................................................72

*Sherman v. British Leyland Motors, Ltd.*

    601 F.2d 429 (9th Cir. 1979) .......................................................................................67

*Siemers v. Wells Fargo and Co.*

    No. 05-04518, 2006 WL 2355411 ................................................................................88

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

xiii

*Silvas v. E\*Trade Mortg. Corp.*

    514 F. 3d 1001 (9th 2008) ...................................................................................56

*Standard Iron Works v. ArcelorMittal*

    No. 08 C 5214, 2009 WL 1657449 (N.D. Ill. June 12, 2009) ................................37, 59

*Stark v. Gov't Accounting Solutions Inc.*

    No. CIV. A. 07-755, 2008 WL 2796499 (S.D. Ohio July 17, 2008) .........................101

*State of Illinois v. Sperry Rand Corp.*

    237 F.Supp. 520 (N.D. Ill. 1965) ...............................................................................26

*State of Texas v. Allan Const. Co. Inc.*

    851 F.2d 1526 (5th Cir. 1988) ....................................................................................26

*Supermarket of Marlinton Inc. v. Meadow Gold Dairies, Inc.*

    71 F.3d 119 (4th Cir. 1995) .........................................................................................32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*

    127 S. Ct. 2499 (2007) ................................................................................................38

*Thomas & Thomas Rodmakers, Inc., et al. v. Newport Adhesives and Composites, Inc., et al.*

    Case No. CV 99-07796 GHK (C.D. Cal., Jan. 13, 2000).....................................23, 24

*Turicentro, S.A. v. American Airlines, Inc.*

    303 F.3d 293 (3d Cir.2002) ...................................................................................11, 12

*U.S. Gypsum Co. v. Indiana Gas. Co., Inc.*

    350 F.3d 623, 626-27 (7th Cir. 2003).........................................................................17

*United National Records Inc. v. MCA Inc.*

    609 F.Supp. 33 (N.D. Ill. 1984).............................................................................26, 31

*United Phosphorus, Ltd. v. Angus Chem. Co.*

    131 F.Supp.2d 1003 (N.D. Ill. 2001)............................................................................9

*United States ex rel. Russell v. Epic Healthcare Mgmt. Group*

    193 F.3d 304 (5th Cir. 1999) ......................................................................................41

*United States v. Anderson*

    1999 WL 79656 (D. Kan., Jan. 22, 1999) ...................................................................52

*United States v. Antar*

   53 F.3d 568 (3d Cir. 1995) ...................................................................51

*United States v. Basey*

   613 F.2d 198 (9th Cir. 1979) ..................................................... 49, 50 -

*United States v. Bullis*

   77 F.3d 1553 (7th Cir. 1996) ...............................................................51

*United States v. Consolidated Packaging Corp.*

   575 F.2d 117 (7th Cir. 1978) ...............................................................36

*United States v. Dunn*

   758 F.2d 30 (1st Cir. 1995) ..................................................................49

*United States v. Eisen*

   974 F.2d 246 (2d Cir. 1992) ................................................................51

*United States v. Handler*

   1978 WL 5690 (C.D. Cal. Aug. 3, 1978) .......................................49, 50

*United States v. Krasn*

   614 F.2d 1229 (9th Cir. 1980) .............................................................49

*United States v. Lash*

   937 F.2d 1077 (6th Cir. 1991) .............................................................52

*United States v. Lothian*

   976 F.2d 1257, 1261 (9th Cir. 1992) .............................................50, 51

*United States v. Lowell*

   649 F.2d 950 (3rd Cir. 1981) ...............................................................51

*United States v. Miller*

   771 F.2d 1219 (9th Cir. 1985) .............................................................91

*United States v. Sax*

   39 F.3d 1380 (7th Cir. 1994) .....................................................49, 51, 52

*United States v. Shaw*

   106 F. Supp. 2d 103 (D. Mass. 2000) ..................................................50

*United States v. Swiss Valley Farms Co.*

    912 F. Supp. 401 (C.D. Ill. 1995) ............................................................52

*United States v. United States Gypsum Co.*

    438 U.S. 422 (1978) ............................................................................50

*United States v. Young*

    39 F.3d 1561 (11th Cir. 1994) ............................................................50

*United States v. Zimmer*

    299 F.3d 710 (8th Cir. 2002) ............................................................49

*United States v. Casarez-Bravo*

    181 F.3d 1074 (9th Cir. 1999) ............................................................66

*United States v. Flores*

    279 Fed. Appx. 443 (9th Cir. 2008) ....................................................50

*United Virginia Bank/Seaboard Nat. v. B.F. Saul Real Estate Inv. Trust*

    641 F.2d 185 (4th Cir. 1981) ............................................................72

*Vess v. Ceiba-Geigy Corp.*

    317 F.3d 1097 (9th Cir. 2003) ............................................................23

*Walton v. Mead*

    2004 WL 3415037 (N.D. Cal. Oct. 28, 2004) ....................................114

*Weinstein v. Saturn Corp.*

    303 Fed. Appx. 424, 426 (9th Cir. 2008) ............................................87

*William O. Gilley Enterprises, Inc. v. Atl. Richfield Co.*

    561 F.3d 1004, 1009 (9th Cir. 2009) ......................................33, 34, 35

*Yungk v. Campbell/Hausefeld/Scott Fetzer, Co.*

    No. CIV. A. 06-00120, 2007 WL 2100114 (D. Conn., July 17, 2007) ......................101

## RULES

Federal Rule of Civil Procedure 12 ..............................................20, 68, 69, 733

Federal Rule of Civil Procedure 9 ....................................................................23

## I.   **INTRODUCTION AND FACTUAL BACKGROUND**

The Direct Purchaser Plaintiffs' ("Plaintiffs") Consolidated Amended Complaint (Dkt. No. 436) (the "complaint", "amended complaint" or "DP-CAC") alleges a conspiracy to fix the prices of cathode ray color picture tubes ("CPTs"), cathode ray color display tubes ("CDTs", collectively "CRTs"), and electronic devices incorporating them ("CRT Products").  The amended complaint herein is unlike many other antitrust conspiracy complaints filed in federal court.  It is not premised merely on averments of circumstantial evidence of conspiracy.  Instead, it alleges *hundreds* of bilateral and group meetings, conducted over the course of many years, at which agreements to fix prices, restrict output and allocate customers were discussed, reached and implemented.  The locations of, participants in, subjects discussed in, and organizational structure of, these meetings are set forth in extensive detail.  The only antitrust conspiracy complaint on file in this district containing a similar wealth of detail is that filed in the TFT-LCD antitrust litigation, which survived motions to dismiss.  Indeed, many of the same companies are named as defendants in both cases.  Moreover, in both cases, the detailed information reflected in the DP-CAC came from the same cooperating Defendant, who is an amnesty applicant to the United States Department of Justice ("DOJ").  This informant possesses, and will eventually produce in discovery, detailed notes of these conspiratorial meetings.

The DP-CAC also puts Defendants' agreements in context, explaining industry conditions and structure conducive to collusion and Defendants' motivation for colluding. Aside from the obvious goal of enhancing their profits at the expense of their customers who paid inflated prices as a result of the conspiracy, Defendants' collusion was effective in moderating the normal downward pressure on prices inevitable in the declining market of CRT Products, where new generations of competing technologies (such as plasma screens and LCD technology) were being introduced.  *E.g.*, DP-CAC ¶¶3, 188, 191, 193, 194, 196.  Indeed, not only were there periods of sustained price stability for CRT Products, but there were also increases in the prices of CRT Products. *Id.*

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 1 -

1   Contrary to Defendants' suggestion that Plaintiffs have failed to set forth

2   sufficient factual detail regarding their price-fixing conspiracy ("Defendants' Notice of

3   Motion and Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended

4   complaint," pp. 29-31(May 18, 2009) ("Defs. Br.")), the amended complaint contains

5   highly particularized allegations concerning the participation of each of the Defendants.

6   The DP-CAC includes the following factual averments.

- Detailed allegations about numerous conspiratorial communications between
  and among Defendants, had: (a) at bilateral meetings between co-conspirators
  that began by March 1995 and continued throughout the Class Period (*e.g.,*
  DP-CAC ¶¶5, 6, 138, 155-168, 170-175); (b) at informal multilateral or "group
  meetings", also beginning in 1995, which were formalized by 1997 (*id.* ¶¶5, 6,
  138, 155-168, 170-175); and (c) at more formal "Glass Meetings" (*id.* ¶¶5, 6,
  138, 140-153, 155-168, 170-175).

- Particulars about the four different categories of formal Glass Meetings, which
  consisted of: (1) "Top Meetings", attended by Defendants' senior executives,
  in South Korea, Taiwan and China, typically on a quarterly basis, focusing on
  longer term agreements and dispute resolution (*id.* ¶141.a); (2) "Management
  Meetings", typically on a monthly basis, attended by high-level sales and
  marketing employees, in South Korea, Taiwan, China, Indonesia, Japan and
  Thailand (*id.* ¶141.b); (3) "Working Level Meetings", attended by lower level
  sales and marketing employees, in South Korea, Taiwan and China (*id.*
  ¶¶141.c., 151); and (4) "Green Meetings", held on golf courses (*id.* ¶141.d.).

- Specific allegations describing how Defendants not only agreed on price
  guidelines (a range of price increases or price floors)--including the price to be
  charged by the cathode ray tube manufacturing arm of the vertically integrated
  Defendants to their division or subsidiary that manufactured or sold CRT
  Products (DP-CAC ¶144) – but also how Defendants agreed on coordinated
  output restrictions (such as production line shutdowns), accompanied by
  policing audits of one Defendant's facilities by a co-conspirator to ensure that
  the agreed output restrictions were being implemented (*id.* ¶146).

- Specific allegations regarding each Defendant's participation in the conspiracy,
  including details concerning approximately how many meetings each
  Defendant and its affiliates participated in, and the time period during which
  and the locations in which those meetings occurred.  *See* DP-CAC ¶¶140-153,
  155-168, 170-175.  These are not "cookie cutter" allegations, but differ on a
  Defendant by Defendant basis.  *Compare id.* ¶159 (Defendant Irico and its
  affiliates participated in bilateral meetings and at least several dozen illegal
  group meetings in China from 1998 to 2006), *with id.* ¶60 (LG Electronics and
  its affiliates participated in more than a dozen illegal bilateral meetings and
  more than a hundred group meetings in Taiwan, South Korea, Indonesia,
  Thailand, Singapore, Malaysia and China, from 1995 to 2006).

Moreover, the amended complaint makes clear that as to each corporate family
of Defendant, when one or more employee or agent attended a conspiratorial
meeting, that employee or agent attended *on behalf of and as a representative*

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 2 -

*of every company in that family.*  DP-CAC ¶154.

• Detailed allegations about the particulars of the February 10, 2009 two- count indictment issued by the DOJ against the former Chairman and Chief Executive Officer of Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT"). As the DOJ's press release describing the indictment stated, in part:

> The indictment . . . charges . . . C.Y. Lin . . . with conspiring with others to suppress and eliminate competition by fixing prices, reducing output and allocating market shares of color display tubes (CDTs) to be sold in the U.S. and elsewhere, beginning at least as early as Jan. 28, 1997, until at least as late as April 7, 2003 . . . [and] fixing prices for color picture tubes (CPTs) to be sold in the U.S. and elsewhere, beginning at least as early as March 12, 1997, until at least as late as April 7, 2003.

> \*   \*   \*

> "This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices," said Scott D. Hammond, Acting Assistant Attorney General in charge of the Antitrust Division. …

DP-CAC ¶126.[1]

Taken as a whole, Plaintiffs' allegations are more than sufficient to provide each Defendant with fair notice of the claims against it.  The extraordinary detail of Plaintiffs' factual allegations, made prior to any discovery, state a claim against all Defendants.

---

[1]  Since the filing of the amended complaint, it was disclosed on July 11, 2009 that the Japanese Fair Trade Commission ("JFTC") intends to fine the Asian manufacturing subsidiaries or affiliates of Samsung and LG Electronics, as well as Matsushita Toshiba Picture Display Co., Ltd. ("MTPD"), the joint venture between Panasonic and Toshiba, millions of yen for participation in a cartel to fix prices for CRTs. http://online.wsj.com/article/BT-CO-20090711-700058.html. According to one report, "[t]he Southeast Asian subsidiaries sold CRT units made in Indonesia and Malaysia to local subsidiaries of Japanese electronics makers that produce TV and personal computer monitors. The [J]FTC suspects the firms formed a cartel over several years through 2007. Senior company officials met in Southeast Asia to set target prices for CRT products sold to Japanese companies, the sources said. Chunghwa Picture Tubes Ltd. of Taiwan is also suspected of being a member of the cartel, but it is likely to escape penalties under a leniency system." http://www.asahi.com/english/Herald-asahi/TKY200907130055.html. Notably, these foreign affiliates/subsidiaries of Samsung have *not* moved to dismiss the amended complaint based on any argument that the amended complaint alleges an improbable conspiracy. Likewise, the motion to dismiss by certain Panasonic entities specifically concedes that "[t]he present motion does not challenge Plaintiffs' inclusion of MTPD in the Complaints under *Twombly*." "Notice of Motion And Motion To Dismiss Direct And Indirect Purchaser Plaintiffs' Consolidated Amended Complaints As To Panasonic Corp. And Panasonic Corp. of North America," p. 1 n.3 (May 18, 2009) ("Panasonic Mot.").

1    II.   **ARGUMENT**

2         The organization of Plaintiffs' argument herein is as follows. First, Plaintiffs will

3    respond to three arguments advanced by all Defendants: (a) that Plaintiffs' claims are

4    jurisdictionally barred by the Foreign Antitrust Improvements Act of 1982 (15 U.S.C.

5    §6a) ("FTAIA") (Defs Br., pp. 6-13); (b) that Plaintiffs lack standing to sue under the

6    principles set forth by the United States Supreme Court in *Associated General*

7    *Contractors. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*")

8    and *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ("*Illinois Brick*") (Defs Br., pp. 13-

9    18); and (c) that a portion of Plaintiffs' claims are barred by the applicable statute of

10   limitations (*id.*, pp. 18-28). Next, Plaintiffs will address Defendants' general argument

11   that the DP-CAC fails to state a claim under the principles set forth by the United States

12   Supreme Court in *Bell Atlantic v. Twombly*, 550 U.S. 544, 556 (2007) ("*Twombly*") and

13   *Ashcroft v. Iqbal*, 129 S.Ct. 937 (2009) ("*Iqbal*"). Defs. Br., pp. 28-31. To the extent

14   sections of Defendants' *Twombly* arguments are contained in the separate briefs filed by

15   the eight different groups of Defendants here, Plaintiffs will address the arguments

16   *seriatim*. To the extent some Defendants raise separate issues of their own—such as

17   withdrawal from the alleged conspiracy—those issues will also be addressed in the

18   sections of this brief relating to each such Defendant.

19        **A.   The Court Has Subject Matter Jurisdiction Over The Claims In The**
          **Amended Complaint**

20

21        The facts pleaded in the DP-CAC establish this Court's subject matter jurisdiction

22   over Plaintiffs' claims. Those claims, as elaborated below, are for purchases made in the

23   United States at prices artificially inflated by a global conspiracy among participants (or

24   their affiliates) in the United States market who intended to (and did) increase prices in

25   the United States for their products. The FTAIA does not immunize these Defendants for

26   this conduct. To the contrary, the cases that close United States courts to foreign

27   purchasers' claims for foreign transactions *all* recognize that U.S. courts are open to

28

claims of domestic purchasers for domestic purchases made at prices inflated by conspiracies abroad.

### 1.   Plaintiffs' Amended Complaint Alleges A Conspiracy Aimed At, Furthered Partially In, And Proximately Causing Adverse Impacts In, The United States

Defendants argue that the Court lacks subject matter jurisdiction over the claims raised in the DP-CAC because those claims are based on foreign sales of CRTs that cannot be remedied under the Sherman Act. To support this contention, Defendants rely on the FTAIA, which states, in pertinent part, that the Sherman Act "shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations…" 15 U.S.C. § 6a.

Because Defendants' jurisdictional challenge is based on the face of the DP-CAC, "all allegations of the amended complaint are taken as true and all disputed issues of fact are resolved in favor of the non-moving party." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. C 02-1486 PJH, 2006 WL 515629 at *1 (N.D. Cal. March 1, 2006), aff'd, 546 F.3d 931 (2d Cir. 2008) ("*DRAM  I*"); *accord Safe Air for Everyone for Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004); "Order Granting In Part And Denying In Part Defendants' Motion To Dismiss," p. 3 (June 25, 2008) in *In re Korean Air Lines Antitrust Litig.*, MDL No. 07-01891 (C.D. Cal.) ("*KAL*"), attached as Exh. 1 to the Declaration of Guido Saveri in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Saveri Decl.").

The complaint alleges a conspiracy to fix the prices of "CRT Products." DP-CAC ¶¶1, 5-7, 134, 138, 139, 141, 215-21. Defendants, however, claim that the conspiracy is really only about CRTs. To the contrary, the DP-CAC specifically alleges that in setting prices for CRTs, Defendants also had to ensure that the prices for electronic devices containing CRTs were kept at specified levels. *Id.* ¶¶ 144, 146, 154-75. As one court has said in a different context, "[t]he plaintiff is the master of [its] complaint, not the defendant." *Moreno v. Health Partners Health Plan*, 4 F.Supp.2d 888, 889 (D. Ariz. 1998). Accordingly, Defendants' attempt to rewrite the DP-CAC must be rejected.

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 5 -

The amended complaint also asserts that, during the relevant period, every Defendant manufactured, sold or distributed CRT Products in the United States, either directly or through affiliated companies.  DP-CAC ¶¶ 24-80. The proposed class is expressly limited to entities that *purchased in the United States*:

> All persons and entities who, between March 1, 1995 and November 25, 2007, purchased a CRT Product *in the United States* from any defendant or any subsidiary or affiliate thereof.

*Id.* ¶85 (emphasis added).  The class definition encompasses only "those who bought a CRT Product directly from a defendant, even if the cathode ray tube contained therein was manufactured by an affiliated entity, principal, agent, or co-conspirator." *Id.* ¶ 86. The DP-CAC also contains allegations regarding the amount of United States commerce affected by the alleged conspiracy. *Id.* ¶¶ 96, 110.

In announcing the prosecution of C.Y. Lin of Chunghwa PT, the DOJ stated that customers in the United States were harmed (*id.* ¶126):

> *"This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices," said Scott D. Hammond, Acting Assistant Attorney General in charge of the Antitrust Division.* "The Antitrust Division will continue to prosecute individuals, wherever they are located and however high their position on the corporate ladder, who engage in price fixing aimed at U.S. businesses and consumers." (Emphasis added).

Numerous United States based Defendants were represented at collusive meetings held abroad and were parties to the agreements reached at them.  *Id.* ¶¶158, 161, 163, 167, 169, 172.  These paragraphs assert that each of the entities identified, to the extent they "distributed CRT Products to direct purchasers, … played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings."

Numerous allegations describe conduct in the United States to facilitate or further the alleged conspiracy such as:  (i) the facilitating role of the United States Display Consortium (*id.* ¶176);  (ii) plant closures in New York, Ohio and Indiana in furtherance

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 6 -

of the conspiracy (*id.*¶¶183, 185, 187);  (iii) United States prices for CRT Products (*id.*¶¶188-97); and (iv) agreements stated in United States dollars, reflecting the importance of the United States market (*id.*¶144). The DP-CAC explicitly alleges adverse price effects in the United States proximately caused by Defendants' claimed unlawful activities (*id.*¶¶188-89):

> The above combination and conspiracy has had the following effects, among others:
>
> a. Price competition in the sale of CRT Products by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;
>
> b. Prices for CRT Products sold by Defendants has been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and
>
> c. Direct purchasers of CRT Products from Defendants have been deprived of the benefit of free and open competition in the purchase of CRT Products.
>
> *As a direct and proximate result of the unlawful conduct of Defendants,* Plaintiffs and other members of the class have been injured in their business and property in that they paid more for CRT Products than they otherwise would have paid in the absence of the unlawful conduct of Defendants. (Emphasis added.)

In summary, the DP-CAC alleges both foreign and United States-based conspiratorial conduct by Defendants (many of which are United States-based) which is the proximate cause of economic harm to a class of direct purchasers *who purchased in the United States.*

### 2.      The FTAIA Does Not Apply To The Conduct Alleged In The Amended Complaint.

Given all of the foregoing allegations, the Court has subject matter jurisdiction over Plaintiffs' claims.  Nothing in the FTAIA divests the Court of its jurisdiction.

This conclusion is directly supported by the United States Supreme Court's opinion construing the FTAIA in *F. Hoffman-LaRoche Ltd. v. Empagran, S.A.*, 542 U.S. 155 (2004) ("*Empagran I*"), on which Defendants rely.  That case involved the antitrust claims of "*foreign* purchasers ... each of which bought vitamins from petitioners for

**Direct Purchaser Plaintiffs' Combined Opposition**                                         - 7 -
**Case No. 3:07-CV-5944 SC**

delivery outside the United States." *Id.* at 159-160 (emphasis in original).  The question raised was whether foreign purchasers, who suffered adverse foreign effects from a worldwide vitamin price-fixing conspiracy (presumed to be independent of adverse effects in the United States) could sue under the Sherman Act.  The Court held that they could not.  It distinguished Sherman Act claims brought to redress *domestic* injury caused by foreign conduct, from Sherman Act claims brought to redress *solely independent foreign injury* caused by foreign conduct:

> [o]ur courts have long held that application of our antitrust laws to foreign anticompetitive conduct is nonetheless reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress domestic antitrust injury that foreign anticompetitive conduct has caused. …
> ****
> But why is it reasonable to apply those laws to foreign conduct insofar as that conduct causes independent foreign harm and that foreign harm alone gives rise to the plaintiff's claim? Like the former case, application of those laws creates a serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs. But, unlike the former case, the justification for that interference seems insubstantial.

*Id.* at 165.

The Court remanded for consideration of whether the foreign injury was in fact independent from the domestic harm.  *Id.* at 175. On remand, in *Empagran II*, the District of Columbia Circuit held that to satisfy the "domestic effects" exception to the FTAIA,  it must be shown that "the U.S. effects of the appellees' conduct--*i.e.*, increased prices in the United States--proximately caused the foreign appellants' injuries."  *Empagran  v. F. Hoffman-LaRoche Ltd., S.A.*, 417 F.3d 1267, 1271 (D.C. Cir. 2005) ("*Empagran II*"), *cert. denied*, 546 U.S. 1092 (2006).

This same theme was sounded in the Ninth Circuit's opinion in *DRAM  I*, another decision upon which Defendants rely.  In that case, Centerprise, a British company, sued under the Sherman Act for purchases made outside of United States commerce. 2006 WL 515629 at *2.  The Ninth Circuit upheld the dismissal of the complaint, employing the proximate cause test utilized in *Empagran II*.  In so doing, however, it noted:

> The case before us illustrates this point well. At oral argument, Centerprise acknowledged "[it] could" bring suit in the United Kingdom against the defendants for their anticompetitive conduct. We recognize that some of the defendants here are American corporations, but many are not, and Centerprise does not dispute that all of its purchases were made outside U.S. commerce, making real the risk of interference with a foreign nation's ability to regulate its commercial affairs.

546 F.3d at 987 n.8. The Ninth Circuit distinguished cases where, as here, there was "pled direct participation in domestic commerce, unlike Centerprise whose amended complaint concerns only wholly foreign transactions." *Id.* at 989 n.9.

Defendants' other authorities follow a similar pattern. For example, in *In re Rubber Chems. Antitrust Litig.*, 504 F.Supp.2d 777 (N.D. Cal. 2007) ("*Rubber Chems.*"), the plaintiffs, *inter alia*, "demanded damages for injuries allegedly suffered in foreign commerce under the Sherman and Clayton Act." *Id.* at 779. The district court dismissed those claims pursuant to the FTAIA. In doing so, however, it noted that "[p]laintiffs may proceed with their Sherman Act claims to the extent they seek to recover damages for domestic injury, *i.e.*, the purchase of rubber chemicals, at allegedly inflated prices in the domestic market or for use within the United States." *Id.* at 790. Similarly, in *In re Intel Microprocessor Antitrust Litig.*, 452 F.Supp.2d 555 (D. Del. 2006), plaintiff AMD was raising, *inter alia*, claims "based upon the foreign effect of Intel's alleged conduct." *Id.* at 557. The district court granted dismissal, but limited its ruling to claims "based on alleged lost sales of AMD's microprocessors to foreign customers." *Id.* at 563. Likewise, in *United Phosphorus, Ltd. v. Angus Chem. Co.*, 131 F.Supp.2d 1003 (N.D. Ill. 2001), *aff'd*, 322 F.3d 942 (7th Cir. 2002), *cert denied*, 540 U.S. 1003 (2003) ("*United Phosphorus*"), the district court was dealing with claims by two Indian plaintiffs and an American plaintiff that was once part of a joint venture that wanted to do business with them who asserted that defendants interfered with the Indian companies' plan to produce the prescription drug AB. 131 F.Supp.2d at 1006-1007. The district court dismissed these claims under the FTAIA after extensive discovery, because it concluded, on the basis of a full evidentiary record, that: (a) the Indian plaintiffs never had the intention or the ability to sell AB in the United States and (b) the only prospective United States-based

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 9 -

1    buyer would not have bought the drug from them. *Id.* at 1010-14.  And in *Boyd v. AWB,*

2    *Inc.*, 544 F.Supp.2d 236 (S.D.N.Y. 2008), the claim turned on an effort by an Australian

3    wheat board to monopolize the Iraqi wheat market. *Id.* at 239.

4         The distinctions between this case and the foregoing cases are clearcut. This case

5    involves *United States-based plaintiffs* seeking to represent a putative class of direct

6    purchasers of CRT Products *in the United States*. The Defendants sold and distributed

7    those products *in this country*, the purchases were made *here*, and the injury (in the form

8    of collusively-inflated prices) was felt *here*. This case does *not* involve foreign plaintiffs

9    using the United States antitrust laws to seek recovery for injuries brought about by

10   *foreign purchases*. Indeed, the putative direct purchaser class plead here is not unlike the

11   direct purchaser classes plead in the *DRAM, SRAM, Flash Memory,* and *TFT-LCD* cases

12   in this district, all of which survived motions at the pleading stage.[2]

13        For the foregoing reasons, the FTAIA does not apply to the claims asserted in the

14   DP-CAC and does not deprive this Court of subject matter jurisdiction.

**3.       The FTAIA Also Does Not Apply Because The Conduct
             Alleged Involves Import Trade Or Commerce.**

17        By its plain language, the FTAIA is inapplicable to bar this action. The FTAIA

18   states that the Sherman Act does "not apply to conduct involving trade or commerce

19   (*other than import trade or import commerce*) with foreign nations.... 15 U.S.C. § 6A

20   (emphasis added)."  This language sets up what is known as the "import trade or

---

[2] Defendants' reliance on cases such as *Dee-K Enterprises v. Heveafil Sdn Bhd.*, 299 F.3d 281 (4th Cir. 2002) ("*Heveafil*") and *Animal Science Prods. Inc. v. China Nat'l Metals & Minerals Import & Export Corp.*, 596 F.Supp.2d 842 (D.N.J. 2008) ("*Animal Science*") which involved U.S. purchasers is equally misplaced. *Heveafil*, upheld a *jury verdict after an eight day trial*. 299 F.3d at 283. The appellate court was asked to decide a narrow issue of law concerning the adequacy of a jury instruction on a matter that did not involve the FTAIA.  *Id.* at 287 & n. 3.  The court in *Heveafil* expressly found that the FTAIA did not apply "[b]ecause this case involves importation of foreign-made goods. . . – conduct Congress *expressly exempted* from FTAIA coverage. . . ." *Id.* at 287.  In *Animal Science,* the district court dismissing with leave to replead, noted that the complaint was unclear whether defendants brought the price-fixed product into the United States. 596 F.Supp.2d at 869. Here, the complaint alleges that Defendants sold and distributed CRT Products in the United States and identifies as Defendants numerous United States-based entities who imported CRT Products into the United States from abroad.

**Direct Purchaser Plaintiffs' Combined Opposition
Case No. 3:07-CV-5944 SC**

- 10 -

1    commerce exception" to the FTAIA: "the initial sentence of Section 6a, along with its

2    'import trade or commerce' parenthetical, provides that the antitrust law *shall* apply to

3    conduct 'involving' import trade or commerce with foreign nations (provided, of course,

4    that jurisdiction is found to exist under the Sherman Act itself)." *Carpet Group Int'l v.*

5    *Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 69 (3d Cir. 2000) ("*Carpet Group*");

6    *accord Turicentro, S.A. v. American Airlines, Inc.*, 303 F.3d 293, 302 (3d Cir.2002)

7    ("*Turicentro*") ("plaintiffs' claims could still be cognizable under the Sherman Act,

8    because the Foreign Trade Antitrust Improvements Act only removes certain non-import

9    commerce from federal antitrust jurisdiction"). The corollary of this proposition is that

10   "[s]ince the FTAIA clearly states that the Sherman Act is not applicable to trade or

11   commerce other than import trade or import commerce, the Sherman Act continues to

12   apply to import trade and import commerce, thereby rendering the FTAIA's requirement

13   of a direct, substantial, and reasonably foreseeable effect inapplicable to an action

14   alleging an impact on import trade and import commerce." *Carpet Group*, 227 F.3d at 72;

15   *accord, Turicentro*, 303 F.3d at 302-03.

16       The term "import" denotes a product or service brought into the United States

17   from abroad. *Id.* at 303; *KAL*, slip op. at 7 (citing *CSR Ltd. v. CIGNA Corp.*, 405

18   F.Supp.2d 526, 541(D.N.J. 2005) ("*CSR*")). The applicability of the exception based on

19   import trade or commerce turns not on plaintiffs' status, but on defendants' conduct. *See*

20   *Carpet Group*, 227 F.3d at 71. As the Third Circuit explained in *Carpet Group*:

21
22       The Magistrate Judge held that this case did not fall into the FTAIA's
         parenthetical exclusion, *i.e.*, did not "involve" import trade or commerce,
23       because the plaintiffs in this case were not importers, but merely brokers.
         As plaintiffs observe, this is plainly an inaccurate reading of the FTAIA.
24       It is an incorrect focus on the plaintiffs' function rather than *the*
         *defendants' conduct*. The FTAIA's exemption from the Sherman Act
25       focuses on the latter's application to "*conduct involving trade or*
         *commerce* (other than import trade or import commerce) with foreign
26       nations." 15 U.S.C. § 6a (emphasis added). The implication that the
         Sherman Act provisions "apply to import trade and import commerce is
27       unmistakable." *Eskofot A/S v. E.I. DuPont De Nemours & Co.*, 872
         F.Supp. 81, 85 (S.D.N.Y.1995). The proper inquiry was therefore
28       whether the alleged conduct by the defendants "involved" import trade
         or commerce, not on whether the *plaintiff's* conduct, which is not being

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**                                                  - 11 -

1   challenged as violative of the Sherman Act, "involved" import trade or commerce.

2   227 F.3d at 71; *accord, Turicentro*, 303 F.3d at 303; *Kruman v. Christie's Int'l PLC*, 284

3   F.3d 384, 395 (2d Cir. 2002). As noted in *KAL*, for purposes of the "import trade or

4   commerce" exception, it is relevant to know if defendants directly brought goods or

5   services into the United States or if they directly decreased or increased United States

6   imports. *KAL*, slip op. at 8 (citing *CSR*, 405 F.Supp.2d at 541).

7         Here, the amended complaint alleges that Defendants sold CRT Products into the

8   United States either directly or through their various domestic co-defendant subsidiaries.

9   DP-CAC ¶¶ 24-80. While some CRT Products were manufactured in the United States

10   during the class period, this practice virtually ceased as time went on. *Id.* ¶¶ 183, 185,

11   187.  The vertically integrated Defendant groups typically manufactured the CRT

12   Products abroad, and then (a) either the parent entity directly brought them into the

13   United States or (b) it transferred them to its co-defendant United States-based

14   distribution subsidiaries, which, in effect, functioned as importers, who in turn sold the

15   CRT Products to direct purchasers.  Non-vertically integrated Defendants often sold CRT

16   Products that they manufactured to vertically-integrated Defendant groups, who in turn

17   brought them into the United States. *See* DP-CAC ¶¶84-86. Likewise, by closing United

18   States CRT Product manufacturing facilities, as alleged in the complaint (*id.* ¶¶ 183, 185,

19   187), Defendants directly caused United States imports of CRT Products to increase.

20         Thus, the "import trade or commerce exception" applies and the FTAIA does not

21   affect the amended complaint.[3]

22

23   _____

[3] The main opinion in this Circuit dealing with the "import commerce or trade exception"
24   is *KAL*. The court there declined to apply the exception because the alleged price-fixing
involved surcharges on air passenger fares and the district court declined to view air
passengers as a type of import. *KAL*, slip op. at 8. Of course, here, the amended
25   complaint contains allegations as to price-fixing of *products*, so *KAL* is distinguishable in
this respect. Indeed, in a case involving allegations of surcharges on air *cargo* fares, a
26   magistrate judge in the Eastern District of New York (in a decision now being appealed)
ruled that the "import trade or commerce exception" pertained and the FTAIA was
27   inapplicable. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. MD 06-1775
(JG)(VVP), 2008 WL 5958061 at *11-*15 (E.D.N.Y., Sept. 26, 2008).

28

**Direct Purchaser Plaintiffs' Combined Opposition**                              - 12 -
**Case No. 3:07-CV-5944 SC**

4.    **Even Assuming *Arguendo* That The FTAIA Does Apply, The Applicability Of The "Domestic Effects" Exception Cannot Be Decided On The Pleadings.**

Finally, even assuming *arguendo* that FTAIA applies to the amended complaint, there is enough of a factual issue as to the applicability of the "domestic injury exception" contained in the statute to warrant denial of the motions to dismiss.  In *Empagran I,* the Supreme Court explained that the FTAIA created

> a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach. It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful *i.e.*, the "effect" must "giv[e] rise to a [Sherman Act] claim."

542 U.S. at 162 (emphases in original). The Ninth Circuit in *DRAM I* explained "that the 'gives rise to' language of the domestic injury exception requires a direct or proximate causal relationship." 546 F.3d at 987.

Here, the amended complaint alleges a direct, substantial and reasonably foreseeable effect on American commerce and that Plaintiffs and the class were overcharged in the United States as a proximate result of Defendants' conduct. Plaintiffs' damage claim is based on the effects of Defendants' conduct, a fact underscored by the Defendants' election to set their fixed prices in United States dollars.  While Defendants dispute the interpretation of the facts alleged and contest the truth of the proximate causation allegations, this is not a dispute that can properly be decided on the pleadings.

Where factual and jurisdictional issues are intertwined, as here, the Court should not dismiss for lack of subject matter jurisdiction without full discovery.  As in *Crompton Corp. v. Clariant Corp.*, 220 F.Supp.2d 569, 574 (M.D. La. 2002), "this case is one where 'factual and jurisdictional issues are completely intermeshed.' . . . [I]t would be inappropriate to dismiss these claims for lack of subject matter jurisdiction when more jurisdictional discovery is warranted." *See also MM Global Servs., Inc. v. Dow Chem. Co.*, No. Civ. 3:02CV 1107(AVC), 2004 WL 556577 at *6 (D. Conn., March 18,

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

1   2004) (declining to dismiss a complaint under the FTAIA "[i]n the absence of additional

2   discovery"). In other contexts, the Ninth Circuit has held that jurisdictional discovery

3   ought to be permitted before a complaint is dismissed. *See, e.g., K-Swiss, Inc. v GFTM,*

4   *Inc.*, 278 Fed. Appx. 772, 773 (9th Cir. 2008); *Harris Rutsky & Co. Ins .Servs., Inc., v.*

5   *Bell & Clements, Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003). As the Ninth Circuit said in

6   *Autery v. United States*, 424 F.3d 944, (9th Cir. 2005), "[h]owever, where-as is the case

7   here-'the jurisdictional issue and substantive claims are so intertwined that resolution of

8   the jurisdictional question is dependent on factual issues going to the merits, the district

9   court should employ the standard applicable to a motion for summary judgment.' " *Id.* at

10  956 (quoting *Rosales v. United States*, 824 F.2d 799, 803 (9th Cir. 1987)).

11  **B.     The Plaintiffs Have Standing To Sue Under *AGC***

12          **1.     Plaintiffs Have Standing Under *AGC* Because They Purchased
13                   CRT Products at Supra-Competitive Prices Directly From
                     Cartel Members**

14          Defendants next claim that Plaintiffs lack antitrust standing and that their alleged

15  injury is too remote under *AGC*.[4]  Neither of these arguments has any merit.  First,

16  Defendants argue that because Plaintiffs only bought finished products that contain

17  CRTs, they have not suffered antitrust injury "because they are not participants in the

18  relevant market (*i.e.*, the market for CRTs, whose prices are alleged to be fixed)." *See*

19  Defs Br., p. 17. However, in advancing this argument, Defendants ignore Plaintiffs'

20  allegations that they conspired to charge class members supra-competitive prices for

21  CRTs *and the products that incorporate them*, which Plaintiffs purchased directly from

22  the Defendants.  DP-CAC ¶¶ 1, 4, 5, 144, 146.  Factual allegations in the complaint are to

23  be accepted as true on a motion to dismiss. *Dent v. Cox Communications Las Vegas,*

24  _____

25  [4] In support of their claim that the direct purchaser Plaintiffs supposedly lack standing
    under *AGC*, the Defendants assert only two arguments: (1) they have not suffered an
26  antitrust injury; and (2) their claimed injury is "too remote." *See* Defs Br., pp. 17-18.  In
    a footnote, Defendants purport to incorporate by reference their arguments (spanning 13
27  pages) as to the indirect purchasers. *Id.* at 17 n. 9.  However, arguments concerning the
    allegations contained in an entirely separate complaint brought by a proposed class of
28  *indirect* purchasers are inapplicable to the *direct* purchaser Plaintiffs' complaint.

**Direct Purchaser Plaintiffs' Combined Opposition**                                    - 14 -
**Case No. 3:07-CV-5944 SC**

1   *Inc.*, 502 F. 3d 1141, 1143 (9th Cir. 2007).  Defendants may not ignore or redraft

2   Plaintiffs' allegations.  *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 989-

3   91 (9th Cir. 2000) ("*Knevelbaard*").  Defendants' assertion that no Plaintiff directly

4   purchased CRTs or CPTs is also incorrect.

5       Here, the amended complaint clearly asserts a conspiracy to fix and stabilize the

6   prices of *CRT Products*, and that each Defendant entered into unlawful agreements on

7   price and supply of *CRT Products* sold in the United States.  DP-CAC ¶¶ 1, 4.  In

8   reaching their conspiratorial agreements, the Defendants "considered the pricing of

9   products containing CRTs (*i.e.* finished products) in agreeing upon the prices at which

10  CRTs were set." *Id.* ¶ 144.  The amended complaint further alleges that Defendants also

11  considered "downstream prices for televisions, computer monitors, or similar products"

12  when they agreed on output restrictions.  *Id.* ¶ 146.  Furthermore, Defendants agreed to

13  target prices and price guidelines for CRT Products.  *Id.* ¶5.  Consequently, the

14  conspiracy affected prices charged by Defendants for both CRTs and products containing

15  CRTs sold in the United States.  *Id.* ¶ 139.  Plaintiffs bought price-fixed goods directly

16  from cartel members and have thus suffered antitrust injury.  *See, e.g., Reiter v. Sonotone*

17  *Corp.*, 442 U.S. 330, 342 (1979) ("*Reiter*") ("[t]he essence of the antitrust laws is to

18  ensure fair price competition in an open market.  Here, where petitioner alleges a

19  wrongful deprivation of her money because the price of the hearing aid she bought was

20  artificially inflated by reason of respondents' anticompetitive conduct, she has alleged

21  injury to her 'property' under § 4 [of the Clayton Act].").

22       Defendants fail to cite a single case in support of their novel proposition that a

23  purchaser who buys price-fixed goods directly from a cartel member does not

24  "participate" in the same market in which the conspiracy operates.  This is not surprising

25  since, as discussed below, the only cases that have considered the argument advanced by

26  Defendants have rejected it.

27       Finally, contrary to Defendants' conclusory assertions, Plaintiffs' damages are not

28  speculative or remote, and are no more difficult to apportion than in any other direct

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**                                              - 15 -

1   purchaser case.  In fact, in *In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002),

2   *cert. denied sub nom. Gaylord Container Corp. v. Garrett Paper Co.*, 538 U.S. 977

3   (2003) ("*Linerboard*"), the court certified a class of direct purchasers of the downstream

4   products, corrugated sheets and corrugated boxes. 305 F. 3d 159-60.  *See also General*

5   *Refractories Co. v. Stone Container Corporation*, Nos. 98 C 3543, 98 C 4612, 98 C 4659,

6   1999 WL 14498, at *3 (N.D. Ill. Jan. 8, 1999) ("*General Refractories*") (holding that

7   plaintiffs had standing where they alleged a conspiracy to fix the price of corrugated

8   sheets, which incorporated price-fixed linerboard and purchased sheets directly from one

9   or more cartel members).

10          2.      **Plaintiffs Have Sufficiently Plead An Antitrust Injury Under §**
                    **4 of the Clayton Act**
11

12          Section 4 of the Clayton Act states that "any person who shall be injured in his

13   business or property by reason of anything forbidden in the antitrust laws may sue

14   therefor. . . ." 15 U.S.C. § 15(a).  The " lack of restrictive language reflects Congress'

15   'expansive remedial purpose in enacting § 4.'" *Blue Shield of Virginia v. McCready*, 457

16   U.S. 465, 472 (1982) ("*McCready*").  The "unrestrictive language of the section, and the

17   avowed breadth of the congressional purpose, cautions us not to cabin § 4 in ways that

18   will defeat its broad remedial purpose." *Id*. at 477.  The "expansive" nature of the

19   Clayton Act reflects the fundamental importance of private civil suits to enforce antitrust

20   laws and to ensure competition in the United States.  "[O]nly by requiring violators to

21   disgorge the 'fruits of their illegality' can the deterrent objectives of antitrust laws be fully

22   served." 457 U.S. at 473 n. 10.

23          This private right of action extends only to "antitrust injury," *i.e.*, "injury of the

24   type the antitrust laws were intended to prevent and that flows from that which makes

25   defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477,

26   489 (1977).  The "injury should reflect the anticompetitive effect either of the violation or

27   of anticompetitive acts made possible by the violation.  It should, in short, be 'the type of

28   loss that the claimed violations…would be likely to cause." *Id.* (quoting *Zenith*

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

1  *Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125 (1969)).  The requirement of

2  antitrust injury exists "to filter out complaints by competitors and others who may be hurt

3  by productive efficiencies, higher output, and lower prices, all of which the antitrust laws

4  are designed to encourage."  *U.S. Gypsum Co. v. Indiana Gas. Co., Inc.*, 350 F.3d 623,

5  626-27 (7th Cir. 2003).

6          In *AGC*, the Supreme Court recognized that not every person "tangentially

7  affected by an antitrust violation" should be allowed to bring treble damages actions.  459

8  U.S. at 535.  To determine whether a plaintiff has standing under *AGC*, courts consider

9  the following factors: "(1) the nature of the plaintiff's alleged injury; that is, whether it

10  was the type the antitrust laws were intended to forestall; (2) the directness of the injury;

11  (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the

12  complexity in apportioning damages."  *American Ad. Mgmt., Inc. v. General Telephone*

13  *Company of California*, 190 F.3d 1051, 1054 (9th Cir. 1999) ("*American Ad.*").

14  Plaintiffs do not have to establish each factor to have antitrust standing.  *Id.*  Instead,

15  courts balance these factors, giving "great weight to the nature of plaintiff's alleged

16  injury."  *Id.*  In their motion to dismiss, Defendants address only two *AGC* factors: (1)

17  antitrust injury; and (2) the speculative measure of the harm.  *See* Defs Br., pp. 16-18.

### 3.  The Complaint Alleges Precisely The Type of Injury the Antitrust Laws Seek to Redress

20          Defendants claim that Plaintiffs cannot allege an antitrust injury because they are

21  not "participants in the relevant market," having purchased CRT Products and not CRTs.

22  *See* Defs Br., p. 17.  However, the amended complaint alleges that Plaintiffs bought CRT

23  Products directly from cartel members at supra-competitive prices as a result of an

24  unlawful agreement amongst the Defendants to fix and stabilize the prices of CRT

25  Products.  Plaintiffs participated in the same market as the cartel members just as

26  "assuredly" as they suffered antitrust injury.  *McCready*, 457 U.S. at 482-84 (paying

27  supra-competitive prices is "assuredly" one kind of antitrust injury, but not the "only"

28  kind).  Plaintiffs were not "tangentially affected" by Defendants' conduct.  They

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**                                    - 17 -

suffered the "prototypical example of antitrust injury" – paying higher prices as a result

of purchasing price-fixed products directly from the cartel. DP-CAC ¶¶ 139-144, 166-67,

191-99. *See Freeman v. San Diego Ass'n of Realtors*, 322 F. 3d 1133, 1144 (9th Cir.

2003) ("*Freeman*") ("[n]o antitrust violation is more abominated than the agreement to

fix prices."); *see also Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 478 (S.D.N.Y.

2001) ("the prototypical example of antitrust injury is an allegation by consumers that

they have had to pay higher prices (or experienced a reduction in the quality of service)

as a result of a defendant's anticompetitive conduct"). The Supreme Court has

emphasized that:

> [W]here [plaintiff] alleges a wrongful deprivation of her
> money because the price of [what] she bought was
> artificially inflated by reason of respondents'
> anticompetitive conduct, *she has alleged an injury in her
> "property" under § 4* .

*Reiter*, 442 U.S. 330, 342 (1979) (emphasis added). Notably, Defendants fail to cite a

*single* case that supports their novel theory that plaintiffs who purchase directly from a

cartel do not have standing. No such case exists. *See, e.g., In re TFT-LCD (Flat Panel)*

*Antitrust Litig.*, 586 F. Supp. 2d 1109, 1118 (N.D. Cal. 2008) ("*TFT-LCD I*")

("[d]efendants do not cite any case holding that a plaintiff who purchases directly from an

alleged cartel does not have standing. In contrast, courts have found antitrust standing

where plaintiffs purchased downstream goods from a cartel of manufacturers who made,

and fixed the price of, a component of those goods." (citing *Linerboard* and *In re Sugar*

*Industry Antitrust Litig.,* 579 F.2d 13 (3d Cir.1978) ("*Sugar*")).

In addition, where a complaint alleges that plaintiffs participated in the same

market as defendants, those allegations must be accepted as true on a motion to dismiss.

*See Knevelbaard*, 232 F.3d at 989.[5] Even after *Twombly*, to establish antitrust standing,

---

[5] In *Knevelbaard*, plaintiffs were milk producers, and defendants were cheese makers.
*Id.* at 982. Defendants argued that plaintiffs lacked antitrust standing because they
contended the existence of two markets – one for cheese and one for milk. *Id.* at 989.
The Ninth Circuit rejected this argument as contrary to the complaint: "the complaint's
allegations unmistakably place all parties in the milk market – the defendants as buyers
and the plaintiffs as sellers – and even have them transacting business with each other.
For present purposes those allegations must be accepted as true." *Id.*

**Direct Purchaser Plaintiffs' Combined Opposition**                                                      - 18 -
**Case No. 3:07-CV-5944 SC**

1    plaintiffs need only allege that there is a single market for the price-fixed product and the

2    product that plaintiffs purchased.  *See In re Dynamic Random Access Memory (DRAM)*

3    *Antitrust Litig.*, No. M02-1486 PJH, 2007 WL 2385112 at *3 (N.D. Cal. Aug. 17, 2007)

4    ("even if plaintiffs cannot ultimately prove that the DRAM market and computer markets

5    are actually analogous to a single market, or that DRAM prices themselves are directly

6    traceable, it is enough that plaintiffs have here alleged as much.")

7         Finally, "a product should not be excluded from a market because it requires an

8    additional input in order to be a reasonable substitute for other products in the market."

9    *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1471 (9th Cir. 1985).

10        **4.    Plaintiffs' Antitrust Injury Is a Direct Result of Defendants'
            Conduct And Is Not Barred By *Illinois Brick***

11

12        Defendants next argue that there is no direct injury because the price-fixed

13   product is only a component of what Plaintiffs purchased.  This argument must be

14   rejected.  First, Plaintiffs allege that Defendants fixed the prices of *both* CRTs and CRT

15   Products.  *See* DP-CAC ¶¶ 1-7, 134-175, 181-199.  Second, *Illinois Brick* does not bar

16   purchasers of finished products from asserting antitrust claims against component

17   manufacturers, as has been explained above.  Plaintiffs allege that Defendants fixed the

18   prices of "CRT Products."  *See* DP-CAC ¶¶ 4-5.  It makes perfect sense that price

19   manipulation of CRTs would be coextensive with price manipulation of products

20   containing them because, as Plaintiffs explain, the "quality of a CRT itself determines the

21   quality of the CRT display," and "the CRT defines the whole CRT product."  *Id.* ¶ 101.

22        *Illinois Brick*'s "proscription against recovery for indirect purchases" does not

23   "extend to the product as well as the buyer."  *Sugar*, 579 F.2d at 16.  In *Sugar*, plaintiffs

24   alleged that defendants conspired to fix the prices of sugar.  However, plaintiffs' claims

25   were based on purchases of sugar-containing products, not sugar, from defendants.  The

26   district court granted summary judgment in defendants' favor, and the Third Circuit

27   reversed.  The Third Circuit explained:

28

**Direct Purchaser Plaintiffs' Combined Opposition**                                    - 19 -
**Case No. 3:07-CV-5944 SC**

[T]o deny recovery in this instance would leave a gaping hole in the administration of the antitrust laws.  It would allow the price-fixer of a basic commodity to escape the reach of a treble-damage penalty simply by incorporating the tainted element into another product.

*Id.* at 18.  "[W]here a plaintiff is injured by one facet of a multi-faceted conspiracy he is entitled to damages regardless of whether the other facets of the defendants' collusion had any economic impact on him."  *Knevelbaard*, 232 F.3d at 991.[6]

### 5.    Plaintiffs' Harm Is Not Speculative Or Too Remote

Defendants claim that because CRT Products have other components, any attempt to trace the harm to the price-fixing of CRTs would be "remote, speculative and unmanageably complex."  This argument, which is once again unsupported by *any* legal authority, ignores that the Complaint explicitly alleges a conspiracy to fix and stabilize the prices of *CRT Products*, not just CRTs.  Further, simply because more than one input may determine the price of a CRT Product does not preclude antitrust standing.  *See Sugar*, 579 F.2d at 18.  Defendants' arguments are inappropriate at the pleading stage. *Knevelbaard*, 232 F.3d at 991 ("[w]hether experts will be able to measure the difference between the allegedly restrained price for milk and the price that would have prevailed but for the antitrust violation remains to be seen; in deciding a Rule 12(b)(6) motion we are dealing only with the complaint's allegations, which in this instance do not make the claim speculative.");  *Los Angeles Memorial Coliseum Commission v. National Football League*, 791 F. 2d 1356, 1366 (9th Cir. 1986), *cert. denied*, 484 U.S. 826 (1985) (a claim for damages under the Sherman Act need only be supported by "proof that the violation was a material cause" of plaintiff's injury, not the "only cause.");  *TFT-LCD I*, 586 F. Supp.2d at 1118-19 (citing *Sugar*, *supra*).  Moreover, "[t]o the extent that defendants raise questions about the scope of the market, or contend that damages will be difficult to

---

[6] Similarly, in *General Refractories*, plaintiffs alleged a conspiracy to fix the prices of corrugated sheets, as well as the prices of linerboard, a component of corrugated sheets. 1999 WL 14498 at *3 (ND Ill. 1999).  Plaintiffs alleged that "the corrugated sheet price inflation was a derivative of linerboard manipulation," and that "manipulation of the former allegedly caused the plaintiffs to suffer the tangible harm of paying increased prices for the ultimate product – corrugated sheets." *Id.*  This is analogous to what Plaintiffs here allege.

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

1  ascertain, the Court finds that these are factual questions that are better addressed on a

2  fuller record, and not at the pleadings stage" *Id.* at 1118.

3              **6.      There Is No Risk of Duplicative Recovery**

4          That indirect purchasers may seek damages or restitution under state laws does

5  not defeat the antitrust standing of the Plaintiffs under *AGC*.  *See In re Dynamic Random*

6  *Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1094 (N.D. Cal. 2007)

7  ("*DRAM II*") ("[s]tates . . . which have repealed *Illinois Brick* and allowed indirect

8  purchasers to sue for antitrust violations, have necessarily made the policy decision that

9  duplicative recovery may permissibly occur.  Duplicative recovery is, in many if not all

10 cases alleging a nationwide conspiracy with both direct and indirect purchaser classes, a

11 necessary consequence that flows from indirect purchaser recovery.  Accordingly, it is no

12 bar against standing, and this factor does not weigh against standing.").

13             **7.      Apportioning Damages Will Not Be Difficult**

14         Notably, difficulty in ascertaining damages does not defeat standing because

15 antitrust cases "'invariably involve complicated questions of causation and damages.'"

16 *American Ad.,* 190 F.3d at 1059, citing *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1478

17 (9th Cir. 1997), *cert. denied*, 525 U.S. 996 (1998).  As set forth above, courts have held

18 that it is feasible to trace overcharges from components through a distribution chain, and

19 that any complexities that arise should not be a bar to standing.  *See, e.g., Linerboard*,

20 305 F. 3d at 159; *Sugar*, 579 F. 2d at 18.

21         The amended complaint alleges in great detail how Plaintiffs suffered the

22 prototypical antitrust injury – paying supra-competitive prices for CRT Products to

23 members of the cartel – that the antitrust laws were designed to protect against and

24 remedy.  *See Reiter*, 442 U.S. at 342.  Defendants' unsupported and conclusory assertions

25 to the contrary should be rejected.

26

27

28

**Direct Purchaser Plaintiffs' Combined Opposition**                               - 21 -
**Case No. 3:07-CV-5944 SC**

**C.    The Statute of Limitations Does Not Bar Plaintiffs' Claims for Unlawful Conduct That Occurred More Than Four Years Before the Filing of the Amended complaint.**

The complaint satisfies the requirements for pleading fraudulent concealment, which tolls the statute of limitations until the date by which Plaintiffs discovered (or should, in the exercise of reasonable diligence, have discovered) Defendants' illegal cartel-- November of 2007 (when governmental antitrust investigations into the cartel became public). *See* DP-CAC ¶200. Thus, the four-year statute of limitations for antitrust claims (15 U.S.C. § 15b) does not bar any part of Plaintiffs' claims.

To plead fraudulent concealment, a plaintiff must allege: (1) that the defendant engaged in affirmative acts to fraudulently conceal the conspiracy, (2) that the plaintiff did not discover, or could not have discovered, the facts that form the basis of his/her claims, and (3) that the plaintiff exercised due diligence in attempting to discover the facts. *See E.W. French & Sons, Inc. v. General Portland, Inc.*, 885 F.2d 1392, 1399 (9th Cir. 1989) ("*French*"); *Conmar Corp. v. Mitsui & Co. (U.S.A.) Inc.*, 858 F.2d 499, 502 (9th Cir. 1988), *cert. denied sub nom. VSL, Inc. v. Conmar Corp.*, 488 U.S. 1010 (1989) ("*Conmar*"). Due diligence is only required "when facts exist that would excite the inquiry of a reasonable person." *Conmar*, 858 F.2d at 504.

The standard for pleading fraudulent concealment is not "stringent," (Defs. Br. p. 20), particularly in antitrust conspiracy cases. "As many courts have noted in the antitrust conspiracy context, it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly where the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators."[7] *Rubber Chems.*, 504 F.Supp.2d at 789; *see also Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830, 834 (9th Cir. 1980) ("… there is a policy

---

[7] Even at the summary judgment stage, where the parties have had an opportunity to conduct discovery, "'…a defendant has an extremely difficult burden to show that [fraudulent concealment allegations are] barred as a matter of law.'" *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 782 F.Supp. 487, 489 (C.D. Cal. 1992) ("*Petroleum Products*") (quoting *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1417 (9th Cir. 1987)).

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 22 -

disfavoring the pre-trial dismissal of antitrust actions because the proof lies largely in the hands of the defendants."). Furthermore, concealment allegations can be "attributed generally to 'defendants'" and need not be "allocated individually to any particular Moving Defendant." *In re Conseco Ins. Co. Annuity Mktg. & U Sales Practices Litig.*, No. C-05-04726 RMW, 2008 WL 4544441 at *9 (N.D. Cal.,Sept. 30, 2008). *See also In re Rexplore, Inc. Securities Litig.*, 685 F. Supp. 1132, 1138 (N.D. Cal. 1988) ("this Court rejects the view that each defendant must independently engage in affirmative acts of fraudulent concealment in order for the doctrine of equitable tolling to apply to that defendant. . . . once the plaintiff has been lulled into inaction by the fraudulent concealment of one defendant, the statute of limitations is tolled as to all the defendants.") (abrogated on separate grounds).

Although the "circumstances constituting fraud" must be plead with particularity (Fed. R. Civ. Proc. 9(b)), a "fraud by concealment claim can succeed without the same level of specificity required by a normal fraud claim."[8] *Baggett v. Hewlett-Packard Co.*, 582 F.Supp.2d 1261, 1267 (C.D. Cal. 2007) ("*Baggett*") (quoting *Falk v. General Motors Corp.*, 496 F.Supp.2d 1088, 1098-99 (N.D.Cal.2007) (internal quotations and citations omitted)). "[T]he requirements of Rule 9(b) must be read in harmony with those of Rule 8." *Thomas & Thomas Rodmakers, Inc., et al. v. Newport Adhesives and Composites, Inc., et al.*, Case No. CV 99-07796 GHK (C.D. Cal., Jan. 13, 2000) ("*Thomas*") (attached as Exhibit 2 to the Saveri Decl.), at p.6 (citing *Civil Procedure Before Trial* at § 8:39 ("*CPBT*")). "The requirement of particularity in pleading fraud should not be overdone and does not encompass pleading the specifics of plaintiff's trial evidence." *Id.* at 7 (citing *CPBT*, § 8:48); *see also In re Aspartame Antitrust Litig.*, 2007 WL 52131 at *3

---

[8] Defendants' reliance on *Vess v. Ceiba-Geigy Corp.*, 317 F.3d 1097 (9th Cir. 2003) ("*Vess*"), for the proposition that Plaintiffs fail to allege the "who, what, when, where, and how" of the fraud is inapposite. *Vess* involved claims grounded in fraud and did not address fraudulent concealment. *Id.* at 1106-09. As set forth in *Baggett*, fraudulent concealment claims may proceed without the same level of specificity as a fraud claim because, as a practical matter, the information about the fraudulent concealment is in the Defendants' hands and Plaintiffs have not yet had an opportunity to conduct discovery. 582 F.Supp.2d at 1267.

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 23 -

1   n.5 (E.D. Pa Jan. 18, 2007) (under Rule 9(b), plaintiffs are not, prior to discovery,

2   required to plead specific details peculiarly within the knowledge of defendants and a

3   flexible application of Rule 9(b) is therefore appropriate).  A plaintiff's fraudulent

4   concealment allegations need only satisfy the purpose of Rule 9(b), which is to provide a

5   defendant with fair notice of the plaintiff's claims so that they can prepare an adequate

6   answer. *See Moore v. Kayport Packages Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989)

7   ("*Moore*").

8          Defendants assert that Plaintiffs' allegations are inadequate because they are

9   conclusory, they fail to connect specific acts of concealment with particular defendants,

10  and they show that Plaintiffs should have discovered the facts that form the basis of their

11  claims earlier.  These arguments ignore significant portions of the amended complaint.

12  The amended complaint here provides Defendants with more than sufficient notice and

13  meets the pleading requirements of the Federal Rules.

### 1.    The Amended Complaint Alleges Numerous Affirmative Acts of Fraudulent Concealment.

16         Plaintiffs' allegations are more than sufficient to satisfy the requirement of

17  pleading affirmative acts of fraudulent concealment.  Only a few affirmative acts need to

18  be pleaded to survive a motion to dismiss.  *See, e.g., Conmar*, 858 F.2d at 505; *French*,

19  885 F.2d at 1399-1400; *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248,

20  250 (9th Cir. 1978) ("*Rutledge*") ("an affirmative act of denial may be enough if the

21  circumstances make the plaintiff's reliance on the denial reasonable.").[9]

22         In three price-fixing cases in this district (none of which Defendants cite), courts

23  have upheld the pleading of fraudulent concealment on allegations similar to those here.

24  In *Rubber Chems.*, the court denied defendants' motion to dismiss, finding the plaintiffs

25  "alleged, with specificity, numerous affirmative acts of concealment in furtherance of the

---

[9] *See also Thomas*, slip op. at p.8 (finding that plaintiffs adequately pleaded fraudulent concealment in alleging that defendants "falsely attributed price increases to increases in the cost of materials and shortage of supply when, in fact, price increases were the direct result of collusive activity…").

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 24 -

conspiracy ... including secret meetings to set prices, agreement not to publicly discuss the nature of the scheme, destruction of documents that might evidence their actions, and pretextual justifications for the inflated prices . . ." 504 F.Supp.2d at 787-88.

Likewise, the court in *TFT-LCD I* found that the plaintiffs pleaded fraudulent concealment with sufficient particularity because "the amended complaint allege[d] many acts of fraudulent concealment during the relevant period, including defendants providing numerous specific pretextual reasons for the inflated prices of LCDs . . . (reasons such as undercapitalization leading to insufficient capacity, undersupply due to demand for larger panels, shortages due to late expansion of production lines, and rapid demand growth). 586 F.Supp.2d at 1119-20. *See also In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F.Supp.2d 896, 904 (N.D. Cal. 2008) ("*SRAM*").

Here, as in *Rubber Chems., SRAM,* and *TFT-LCD*, the amended complaint alleges numerous acts of fraudulent concealment with specificity, including pretextual justifications for conspiratorial price increases, false press releases, and other acts designed to prevent detection of the conspiracy:

- After 2000, Defendants started holding "Glass Meetings" (secret meetings between Defendants used to effectuate and monitor the conspiracy) for CDT and CPT Products at different venues to limit detection (DP-CAC ¶¶137, 202, 205);

- Glass Meeting participants "were told not to take minutes," and "[a]ttending companies ... reduced the number of their respective attendees to maintain secrecy" (*Id.* ¶ 205);

- "In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose," and Defendants blamed the price increase on "global demand for the products" when it was due to their price-fixing conspiracy (*Id.*¶ 207);

- In 2001, "prices for CRT monitors were stuck stubbornly at high price levels," which Defendants blamed on a "shortage of critical components such as glass" (*Id.*¶ 208);

- "[W]hen several CRT manufacturers, including Defendants Samsung, Philips, and LG Electronics, increased the price of CRT Products in 2004, the price hike was blamed on a shortage of glass shells used for manufacturing CRT monitors. In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

phenomena and every company has to increase the prices of CRT monitors in due course of time." (*Id.*¶ 209);

- "Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition." (*Id.*¶ 210);

- Defendants provided customers with pretextual reasons for coordinated price increases, choosing one co-conspirator "to make the first price announcement, with the others following on an agreed-upon schedule" (*Id.*¶¶ 148, 153);

- Defendants used trade association meetings, such as the Korea Display Conference (held each year from 2002-2007 in Korea), to conceal their price-fixing conspiracy and to exchange competitive information (*Id.*¶¶ 176-80); and

- Defendants used "the telephone or in-person meetings in order to prevent … written records …" (*Id.*¶204).

- Defendants agreed to keep their collusive meetings secret. (*Id.*¶¶ 138, 204).[10]

---

[10] The foregoing acts clearly qualify as affirmative acts of fraudulent concealment sufficient to toll the statute of limitations. *See French*, 885 F.2d at 1399 (innocent explanations for collusive pricing constitute affirmative acts of concealment); *Riddell v. Riddell Wash. Corp.*, 866 F.2d 1480, 1491 (D.C. Cir. 1989) ("*Riddell*") (misrepresentations and misleading statements may constitute affirmative acts of concealment); *Conmar*, 858 F.2d at 505 (providing innocent explanations for collusive conduct constituted affirmative concealment); *State of Texas v. Allan Const. Co. Inc.*, 851 F.2d 1526, 1535 n.3 (5th Cir. 1988) (orchestration of secret meetings constituted affirmative acts of concealment); *King & King Enterprises v. Champlin Petroleum Co.*, 657 F.2d 1147, 1155 (10th Cir. 1981), *cert. denied*, 454 U.S. 1164 (1982) ("*King*") (confining knowledge of conspiratorial communications to select group of persons within conspirator companies constitutes affirmative concealment); *TFT-LCD I*, 586 F.Supp. 2d at 1119, 1132 (secret discussions about price and output, an agreement to conceal price-fixing and pretextual justifications for collusive pricing qualify as affirmative acts of concealment); *Rubber Chems.*, 504 F. Supp. 2d at 778 (secret meetings, defendants' agreement not to disclose their collusion and pretextual justifications for inflated prices all qualified as affirmative acts of concealment); *In re Catfish Antitrust Litig.*, 908 F.Supp. 400, 408 (D. Miss. 1995) (failure to keep minutes of collusive meeting was concealment); *Petroleum Products*, 782 F.Supp. at 490-91) (efforts to avoid written records of conspiratorial activity qualify as affirmative acts of concealment); *United National Records Inc. v. MCA Inc.*, 609 F.Supp. 33, 36-37 (N.D. Ill. 1984) ("*United*") (providing alternative innocent explanations for collusive pricing and secret meetings both qualified as affirmative acts of concealment); *Ohio Valley Electric Corp. v. General Electric Co.*, 244 F.Supp.914, 931-32 (S.D.N.Y. 1965) (directions to participants not to divulge conspiratorial activity constitutes affirmative acts of concealment); *State of Illinois v. Sperry Rand Corp.*, 237 F.Supp. 520 (N.D. Ill. 1965) (private collusive telephone communications constitute affirmative acts of concealment); *In re Aspartame Antitrust Litig.*, 2007 WL 5215231 at *6 (E.D. Pa Jan. 19, 2007) ("*Aspartame*") (use of trade organizations as cover for collusive activities qualifies as act of concealment); *In re Bulk Popcorn Antitrust Litig.*, 1990 WL 123753 *5 (D. Minn., June 16, 1990) (use of otherwise legitimate trade association as cover for collusive activity qualifies as an affirmative act of concealment).

1    The foregoing allegations satisfy the particularity requirement of Rule 9(b).

2    Plaintiffs describe "the circumstances constituting fraud" by setting forth the particular

3    year, the specific title of Defendants' meetings, and the pretextual justifications used to

4    explain higher prices.[11]  Defendants are unable to explain why these allegations fail to

5    provide them with sufficient notice to draft an adequate answer to the DP-CAC.  *See*

6    *French*, 885 F.2d at 540.  Plaintiffs' allegations here are similar to those found to be

7    sufficient in *TFT-LCD I, SRAM,* and *Rubber Chems.*, and are more extensive than those

8    that survived summary judgment in *Conmar* and a directed verdict in *French*. [12]

9        The complaint contains more than conclusory allegations of "elaborate schemes"

10   or "secrecy to avoid detection."  *Cf. Rutledge* 576 F.2d at 250.  Plaintiffs allege specific

11   dates, specific meetings, and specific procedures used by Defendants to conceal the

12   conspiracy.  Moreover, Plaintiffs have not previously litigated this matter and do not have

13   the benefit of discovery, as did the plaintiff in *Rutledge.  See id.*

14       In addition, Defendants mistakenly argue that Plaintiffs' fraudulent concealment

15   allegations are inadequate because they do not connect each Defendant with a particular

16   affirmative act of concealment or with particular pretextual justifications for price

---

[11] In response to the allegation that Defendants concealed the conspiracy by blaming higher prices on a shortage of glass (DP-CAC ¶209), Defendants argue that this allegation is insufficient because Plaintiffs failed to plead that there was not a shortage of glass. Defs. Br. at 23. This argument is improper at this stage because it raises a question of fact (*i.e.*, whether there was actually a glass shortage) and requires the Court to make a factual determination, which is not permitted on a motion to dismiss.

[12] Defendants also inaptly analogize Plaintiffs' allegations here to those found to be insufficient in *Rutledge*. There, the plaintiff alleged: "'Defendant has fraudulently concealed the existence of the aforesaid price discrimination through the adoption of elaborate schemes, resorting to secrecy to avoid detections, and by denying that such discrimination or price differential existed.'" 576 F.2d at 250. The Ninth Circuit found that the only part of this allegation that was not conclusory was "the allegation that defendant denied that such discrimination or price differential existed." *Id.* The appellate court went on to hold that a single act of denying wrongdoing "***may*** constitute fraudulent concealment where the circumstances make the plaintiff's reliance upon the denial reasonable ..." *Id.* (emphasis added). It was, however, not reasonable for the plaintiff to rely on this denial of wrongdoing because the plaintiff previously expressed his suspicion about the defendant's price-fixing to government attorneys and had already sued the defendant's alleged co-conspirator in a virtually identical price-fixing case, which gave the plaintiff an opportunity for extensive discovery. *Id.*

**Direct Purchaser Plaintiffs' Combined Opposition**                               - 27 -
**Case No. 3:07-CV-5944 SC**

increases.  This argument ignores key allegations.  Plaintiffs allege that each Defendant

engaged in affirmative acts of fraudulent concealment.  For example, the amended

complaint alleges that each defendant attended "Glass Meetings" (DP-CAC ¶¶ 155-175)

where they secretly discussed prices and coordinated pretextual justifications.[13]  *Id.*  ¶¶

137, 154, 202, 205, 206.  Plaintiffs allege that Samsung, Philips, and LG Electronics

blamed higher prices on a glass shell shortage (*id.* ¶209), and LG Electronics issued false

press statements to explain higher prices (*id.* ¶210).  These allegations, which must be

taken as true at this juncture, connect individual Defendants with the alleged acts of

concealment and provide Defendants with notice to answer.  Nothing further is required.

*See French,* 885 F.2d at 540; *Rubber Chems.*, 504 F.Supp.2d at 788 (complaint

adequately alleged "that the individual Defendants played a role in the affirmative acts of

concealment, including the offering of false and pretextual reasons for the price-fixing

meetings that these individual Defendants allegedly attended."); *see also Beltz Travel*

*Service, Inc. v. Int'l Air Transport Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980) ("*Beltz*")

("[p]articipation by each conspirator in every detail in the execution of the conspiracy is

unnecessary to establish liability, for each conspirator may be performing different tasks

to bring about the desired result.").

   Moreover, it is well settled that affirmative acts of concealment of one defendant

co-conspirator, undertaken during the course and in furtherance of a conspiracy, are

legally attributable to all co-defendant co-conspirators under principles of substantive

conspiracy law and joint and several liability.  *See In re Scrap Metal Antitrust Litig.*, 527

---

[13] The amended complaint refers to individual Defendants by their corporate family
name, alleging that "the corporate family engaged in conspiratorial meetings on behalf of
every company in that family." DP-CAC ¶154.  This is because Defendants themselves
did not "always know the corporate affiliation of their counterparts, nor did they
distinguish between the entities within a corporate family." *Id.*  Such allegations are
sufficient at the pleading stage. *See Thomas*  at p.7 ("if the complaint adequately
identifies a particular defendant with a category of defendants allegedly responsible for
some continuing course of conduct, allegations that 'defendants' committed described
acts cover each member of the group")(citing *In Re Equity Finding Corp. of Am. Sec.
Litig.*, 416 F.Supp. 161, 181 (C.D. Cal. 1976)).

F.3d 517, 537 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 1673 (2009): *Riddell*, 866 F.2d at 1493; *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083-86 (2nd Cir.), *cert. denied*, 488 U.S. 848 (1988).

Finally, Defendants argue that Plaintiffs' fraudulent concealment allegations concern only the pricing of television sets and computer monitors. Defendants assert these are not part of the price-fixing conspiracy. Defs. Br. at 20:8-12. The argument is meritless. First, nothing in the language of Plaintiffs' fraudulent concealment allegations, (Defendants do not cite any) limits Defendants' acts of concealment to televisions and monitors. *See generally* DP-CAC ¶¶ 200-12. Second, the amended complaint plainly alleges that Defendants conspired to fix the prices of CRTs and products containing CRTs. *See, e.g., id.* ¶¶ 1, 5. 138. Defendants rely upon Paragraph 144 of the amended complaint for the proposition that Plaintiffs concede televisions and computer monitors were not part of the conspiracy. But paragraph 144 simply states that the prices agreed upon by Defendants involved not only prices charged to third-party customers, but also prices charged by the CRT Monitoring arm of each vertically integrated manufacturer to the corporate division or subsidiary that manufactured or sold computer monitors, televisions and similar products. *Id.* ¶144.

### 2.   Plaintiffs Had Neither Actual Nor Constructive Knowledge of the Conspiracy

Plaintiffs adequately allege that they did not, and could not have had, knowledge of the conspiracy.[14] "Constructive knowledge exists when a plaintiff 'should have been alerted to facts that, following duly diligent inquiry, could have advised it of its claim.'" *Petroleum Products*, 782 F.Supp. at 493 (quoting *Conmar*, 858 F.2d at 502). "However, knowledge of facts relevant to [a plaintiff's] claim will not amount to constructive knowledge if those facts were not of a type to prompt investigation." *Id.* Additionally, "public access to information does not incontrovertibly establish constructive knowledge of one's claims." *Id.* (citing *French*, 885 F.2d at 1400; *Conmar*, 858 F.2d at 504).

---

[14] Defendants do not contend that Plaintiffs had actual knowledge of the conspiracy.

**Direct Purchaser Plaintiffs' Combined Opposition**                                    - 29 -
**Case No. 3:07-CV-5944 SC**

1  Accordingly, in *Conmar,* the Ninth Circuit held that there were genuine issues of material

2  fact as to whether, as a matter of law, the publication of articles in major newspapers that

3  described an investigation into the same violations alleged in the plaintiffs' complaint, as

4  well as an indictment, were sufficient to put the plaintiff on notice of its claims.  858 F.2d

5  at 504-05.  This was so even though the plaintiff relied on the indictments in its

6  complaint.  *Id.* at 502.  Similarly, in *Petroleum Products*, the district court held that

7  media coverage of federal grand jury investigations into antitrust violations similar to

8  those alleged by the plaintiff was not, as a matter of law, sufficient to prompt plaintiffs to

9  investigate their claims.  782 F.Supp. at 496-97; *see also French*, 885 F.2d at 1400

10  (existence of earlier law suit charging the named defendants with price fixing is "not

11  tantamount to actual or constructive knowledge of the price-fixing claim."); *Rubber*

12  *Chems.*, 504 F.Supp.2d at 788 (allegations that the defendants engaged in a self-

13  concealing conspiracy that involved secret meetings to set prices, agreements not to

14  disclose the collusion, destruction of documents, and pretextual justifications for inflated

15  prices would not, if true, "give rise to any information that would 'excite the inquiry of a

16  reasonable person' and thereby require Plaintiffs to engage in affirmative steps to attempt

17  to discover the conspiracy.")

18       Here, Defendants improperly rely on allegations regarding market conditions

19  conducive to collusion, output production, and increasing prices as reasons why Plaintiffs

20  should have had notice of the conspiracy.  First, as noted above, the decision in *Conmar*

21  makes clear that reliance on historical events – including indictments for related conduct

22  – in a complaint to support an allegation of an antitrust violation does not establish

23  constructive notice of the claim.  858 F. 2d at 502.  Second, if media coverage of federal

24  grand jury investigations, indictments, and earlier filed lawsuits concerning the same

25  matters alleged in a plaintiff's  complaint are not sufficient to find, as a matter of law,

26  that a plaintiff had notice of their claims at an earlier date (*see Conmar*, 858 F.2d at 504-

27  05; *French*, 885 F.2d at 1400; *Petroleum Products*, 782 F.Supp. at 496-97), then certainly

28  market conditions conducive to collusion and rising or parallel prices are not

**Direct Purchaser Plaintiffs' Combined Opposition**                    - 30 -
**Case No. 3:07-CV-5944 SC**

sufficient to impute constructive knowledge to a plaintiff.  Indeed, several courts have held that mere knowledge of rising and/or parallel pricing is not sufficient to put a plaintiff on constructive notice of a price-fixing conspiracy.  *See, e.g, King*, 657 F.2d at 1155-56; *United*, 609 F.Supp. at 37; *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 488 (W.D. Pa. 1999) ("*Flat Glass*")("the issue is not whether the plaintiffs knew that prices paid were higher than they should have been, rather the primary issue is whether the named plaintiffs and the members of each of the classes knew of the alleged conspiracy among defendants"); *In re Bulk Extruded Graphite Products Antitrust Litig.*, No. 02-6030 (WHW), 2007 WL 1062979 at *3 (D.N.J., April 4, 2007);  *In re Vitamins Antitrust Litig.*, No. Misc. 99-197, 2000 WL 1475705 at *5 (D.D.C. May 9, 2000) ("*Vitamins*") ("market trends as a matter of law do not constitute notice that particular defendants were engaged in acts of price fixing"); *In re Arizona Dairy Products Litig.*, 1983-2 Trade Cas. (CCH) ¶ 65,666 (D. Ariz. 1983) (information concerning identical prices did not establish notice of conspiracy as a matter of law); *Ingram Corp. v. J. Ray McDermott & Co.*, 1980-1 Trade  Cas. (CCH) ¶ 63,277 at 78,416 (E.D. La. 1980), *rev'd in part on other grounds*, 698 F.2d 1295 (5th Cir. 1980) (inability to generate competitive bids did not establish notice of conspiracy).  Defendants do not cite any authority for the proposition that apparently normal market events or conditions are sufficient to put a plaintiff on notice of a price-fixing conspiracy.[15]

---

[15] Defendants' constructive notice argument undermines their arguments regarding the pleading requirements of Rule 8 and *Twombly*. *See* Defs. Br. at 29-31.  That is, on the one hand, Defendants argue that the amended complaint does not satisfy the pleading requirements of Rule 8 and *Twombly* because there is not sufficient information to put them on notice of the claims. *Id.* at 29.  But, on the other hand, Defendants argue that the allegations in the amended complaint demonstrate that Plaintiffs had sufficient notice of their antitrust claims at an earlier date. *Id.* at 24.  Defendants cannot have it both ways.

### 3.    Plaintiffs' Allegations of Due Diligence Are More Than Sufficient.

Plaintiffs' allegations of due diligence are likewise more than adequate under the pleading requirements of the Federal Rules.  The DP-CAC alleges that Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claims despite their exercise of due diligence and that because Defendants affirmatively concealed their conspiracy, Plaintiffs could not, in the exercise of reasonable diligence, have discovered the conspiracy earlier than November 2007, when the existence of governmental antitrust investigations of the CRT Products industry first became public.  DP-CAC ¶¶ 200-201, 204.  Numerous courts have found virtually identical due diligence allegations sufficient to defeat motions to dismiss in antitrust price-fixing cases.[16]

As the Ninth Circuit admonished in *Conmar*, "the requirement of diligence is only meaningful…when facts exist that would excite the inquiry of a reasonable person."  858 F.2d at 504.  To the same effect is *Supermarket of Marlinton Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 128 (4th Cir. 1995), where the court explained that a plaintiff can satisfy the due diligence requirement "without demonstrating that it engaged in any specific inquiry."  *Accord, Vitamins*, 2000 WL 1475705 at *4 ("the plaintiff need not show the actual exercise of diligence in order to toll the limitations period…actual proof of an investigation is not required."); *Magnetic Audiotape*, 2002 WL 957680 at *9 ("without a tip-off that a price fixing conspiracy existed, plaintiffs had no reason to exercise due diligence").  In this connection it is clear that "[p]laintiffs are not under a duty continually to scout around to uncover claims which they have no reason to suspect they might have [quoting from *Petroleum Products.*, 782 F. Supp. at 489]".  *Accord, Rubber Chems.*, 504 F.Supp. 2nd at 788; *see also Richards v. Maleski*, 662 F.2d 65, 71

---

[16] *See, e.g., TFT-LCD I*, 586 F. Supp. 2d at 1119; *Rubber Chems.*, 504 F. Supp. 2d at 788; *In re Commercial Explosives Litig.*, 945 F.Supp. 1488, 1493 (D. Utah 1996) ("*Commercial Explosives*"); *In re Initial Public Offering Antitrust Litig.*, 2004 WL 487222 at *5 (S.D.N.Y. Mar. 12, 2004); *In re Bulk Extruded Graphite Products Antitrust Litig.*, 2007 WL 1062979 at *3-*4 (D.N.J., Oct. 26, 2004); *In re Magnetic Audio Tape Antitrust Litig.*, 2002 WL 975680 *2 (S.D.N.Y., May 9, 2002) ("*Magnetic Audiotape*"); *Vitamins,* 2000 WL 1475705 at *5-*7.

(D.C. Cir. 1981) quoting *Hudak v. Economic Research Analysts,* 499 F. 2d 996, 1002

(5th Cic 1974) (the due diligence requirement does not require "that an aggrieved party

proceed from the outset as if he were dealing with thieves…").  Here, as the DP-CAC

alleges, there was no reason for Plaintiffs, in the exercise of reasonable diligence, to

suspect collusion until November of 2007, because Defendants were successful in

concealing their unlawful conduct from Plaintiffs and putative Class Members until

November 2007, when the existence of governmental antitrust inquiries and

investigations of the CRT Products industry became public for the first time.  To the

extent Defendants are contending that Plaintiffs have a duty to plead that they made

specific inquiries regarding the existence of a conspiracy they had no reason to suspect in

the first place more than four years before they commenced this action, their argument is

counterintuitive at best and contrary to law.  Here the DP-CAC alleges when and how

Plaintiffs acquired knowledge of Defendants' collusive activities and why they were

unable to acquire such knowledge at an earlier date in the exercise of reasonable

diligence.  Such allegations clearly satisfy the pleading requirements of the Federal Rules

of Civil Procedure.  *See In re Pressure Sensitive Lablestock Antitrust Litig.*, 2006 WL

433891 at *4 (M.D. Pa., Jan. 3, 2006) ("[d]ismissal for lack of due diligence…is

appropriate only 'when the facts from which knowledge may be imputed are clear from

the pleadings'…As a general rule, rejection of a fraudulent concealment claim on the

pleadings for failure to allege due diligence is not appropriate.").

    **D.**    **Under the Applicable Standards for Assessing a Pleading on a Motion to Dismiss, Plaintiffs Have Alleged Far More Than Is Required to State a Plausible Conspiracy.**

    **1.**    **Notice Pleading Standards Apply**

    To survive a motion to dismiss, Plaintiffs are only required to plead facts that

plausibly suggest the existence of a conspiracy. *Twombly*, 550 U.S. at 556.  Plaintiffs'

complaint is to be judged under the standards applicable to Rule 8 notice pleading:

> To successfully state a claim under § 1 of the Sherman Act,
> a plaintiff need only meet the notice pleading standard
> articulated in Fed. R. Civ. P. 8(a)(2).  Rule 8(a)(2) requires
> "a short and plain statement of the claim showing that the

pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests."

*William O. Gilley Enterprises, Inc. v. Atl. Richfield Co.*, 561 F.3d 1004, 1009 (9th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555). Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556.

The recent *Iqbal* decision reaffirmed the Rule 8 pleading requirements recited in *Twombly*, confirming several accepted pleading precepts. First, the Supreme Court reemphasized that Rule 8 does not require detailed factual allegations. *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555). Second, "[u]nder *Twombly*'s construction of Rule 8," a plaintiff merely has to "nudge[] [its] claims... 'across the line from conceivable to plausible.'" *Id.* at 1951 (quoting *Twombly*, 550 U.S. at 570). Third, the Supreme Court reiterated that it was not imposing a probability requirement at the pleading stage. *Id.* at 1949 ("[t]he plausibility standard is not akin to a 'probability requirement...'"); *see also Twombly*, 550 U.S. at 556 ("[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage."). Moreover, by explaining that the *Twombly* standard applies to all civil actions, the Supreme Court acknowledged that the standard is not heightened for antitrust actions. *Iqbal*, 129 S.Ct. at 1953.

Neither *Twombly* nor *Iqbal* require that plaintiffs plead a complaint as if actual observers of the conspiracy, present in every room where the defendants met to fix prices or restrict output. Rather, a plaintiff advancing a Section 1 claim need only allege parallel conduct plus a measure of additional facts that support a "plausible" inference of concerted activity. The amended complaint in this case alleges more than enough to satisfy Rule 8 and to put Defendants on fair notice of the claims against them. Moreover, the following fundamental propositions are unaltered by *Twombly* and *Iqbal*:

> • A complaint is to be construed in the light most favorable to the plaintiff, with all properly pleaded

factual allegations to be taken as true,[17] and all reasonable inferences to be drawn in plaintiffs' favor. *Operating Engineers' Pension Trust Fund v. Clark's Welding & Machine*, 2009 WL1324049 at *2 (N.D. Cal. May 8, 2009) (Conti, J.) (citations omitted). The Court must address the complaint as it has been alleged, not as the defendants have recast or ignored plaintiffs' allegations. *See Knevelbaard.*, 232 F.3d at 989-91. "[D]ismissals for failure to state a claim are disfavored in antitrust actions." *William O. Gilley Enterprises*, 561 F.3d at 1009 (citing *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976)).

• Allegations in a price-fixing case are to be considered as a whole, not on a piecemeal basis. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("*Continental Ore*"); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F.Supp.2d 27, 33 n. 4 (D.D.C. 2008) ("*Rail Freight*") ("*Twombly* did not change this principle: '[T]he character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts.'") (quoting *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943-44 (E.D. Tenn. 2008) ("*Southeastern Milk*")).

• The longstanding rule that a conspiracy can be stated solely through circumstantial allegations (from which conspiracy might plausibly be inferred) is as true after *Twombly* and *Iqbal* as before. "The Ninth Circuit has aptly observed that 'direct evidence will rarely be available' to prove the existence of a price fixing conspiracy. It is for that reason that 'circumstantial evidence is the lifeblood of antitrust law.'" *In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA 2009 WL 1096602 at *10 (N.D. Cal. Mar. 31, 2009) ("*Flash Memory*") (quoting *U.S. v. Falstaff Brewing Corp.*, 410 US 526, 534 n 13 906 F.2d 432, 439 (9th Cir. 1990), *cert. denied sub nom. Chevron Corp. v. Arizona*, 500 U.S. 959 (1991) ). Circumstantial evidence is usually necessary because antitrust conspiracies are felonies, conceived in secret; direct proof is often difficult to come by, especially where, as here, discovery has not commenced. *See, e.g., In re TFT-LCD Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009) ("*TFT-LCD II*") ("the Supreme Court has long recognized that, 'in complex antitrust litigation,' 'motive and intent play leading roles' and 'the proof is largely in the hands of the alleged conspirators.'") (quoting

---

[17] While "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," *Iqbal*, 129 S.Ct. at 1949, Plaintiffs here have pleaded facts (*not* legal conclusions) describing the conspiracy to artificially inflate prices for CRT Products, including the who, what, when and where of Defendants' agreements to fix target prices and price guidelines, to allocate market share of overall sales, to allocate customers and to restrict output, all in a declining market in which there were not only periods of sustained price stability but also price increases.

*Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962)); *In re Graphics Processing Units Antitrust Litig.*, 540 F.Supp.2d 1085, 1096 (N.D. Cal. 2007) ("direct allegations of conspiracy are not always possible given the secret nature of conspiracies. Nor are direct allegations necessary"); *United States v. Consolidated Packaging Corp.*, 575 F.2d 117, 126 (7th Cir. 1978) (law of conspiracy must "keep up with the ingenuity and subtlety of sophisticated businessmen...").

Plaintiffs readily meet the plausibility standards established in *Twombly* and *Iqbal*. The plausibility of the conspiracy alleged is supported by details regarding numerous conspiratorial communications and the participation of specific Defendants in those communications, with detailed allegations of where each Defendant attended conspiratorial meetings and the subjects discussed, and by the two count indictment issued against the former Chairman and CEO of Defendant Chunghwa PT.

Numerous decisions have recognized that factual allegations comparable to those made here, properly state a price-fixing conspiracy claim. *See Flash Memory*, 2009 WL 1096602 at *5-*11 (allegations of exchange of pricing information, market concentration, supply shortages, unnatural price stability, various joint ventures and licensing agreements among defendants, and participation in trade associations supported a plausible inference of conspiracy); *TFT-LCD I,* 586 F. Supp. 2d at 1115-16 (pleading "complex and unusual pricing practices by defendants which cannot be explained by forces of supply and demand," public invitations to agree by defendants, exchanges of sensitive information, and pretextual reasons for price increases or output restrictions sufficient to survive a motion to dismiss); *SRAM*, 580 F. Supp. 2d at 901-03 (holding that allegations of market structure conducive to collusion, along with rising prices, trade association activities, and exchanges of price information satisfied *Twombly*).[18]

---

[18] For examples from outside this district, *see, e.g., In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 576-77 (M.D. Pa. 2009) ("*Chocolate*") (denying defendants' motion to dismiss where plaintiffs alleged three coordinated price increases, a market featuring concentrated sellers and dispersed buyers, high barriers to entry, and stable costs and finding that the alleged conspiracy "represents an economically sensible course of action"); *Rail Freight*, 587 F. Supp. 2d at 32 ("[m]ore than mere parallelism is described in the complaint, and plaintiffs have supported their theory of conspiracy with sufficient factual details to bring their allegations beyond the realm of bare legal conclusions."); *Southeastern Milk*, 555 F. Supp. 2d at 943 ("[t]his Court is constrained to

1    *Twombly* defines plausibility as pleading "enough fact to raise a reasonable

2    expectation that discovery will reveal evidence of illegal agreement." 550 U.S. at 556.

3    The amended complaint here sets forth "well-pleaded factual allegations" and the Court

4    "should assume their veracity." *Iqbal*, 129 S.Ct. at 1950.

5         **2.   The Facts Alleged in This Case Bear No Resemblance to Those Alleged in**
            ***Twombly***
6

7         The facts alleged here stand in stark contrast to the facts alleged in *Twombly*,

8    where the amended complaint "proceed[ed] *exclusively* via allegations of parallel

9    conduct[.]" 550 U.S. at 565, n.11 (emphasis added).  The plaintiffs in *Twombly* alleged

10   that regional phone companies must have colluded in violation of the Sherman Act based

11   on two types of parallel conduct, each equally consistent with collusion and

12   competition.[19]  First, they alleged that each defendant had tried to frustrate the entry of

13   _____

14   agree with the plaintiffs.  These complaints, while not answering all specific questions
     about 'who, what, when and where,' do put the defendants on notice concerning the basic
     nature of their complaints against defendants and the grounds upon which their claims
15   exist."); *City of Moundridge v. Exxon Mobil Corp.*, 250 F.R.D. 1, 4 (D.D.C. 2008)
     (denying defendants' motion to dismiss where plaintiffs "provid[ed] circumstantial
16   evidence of a price-fixing agreement" including "that the prices had risen and never
     fallen below an agreed-upon price, that the defendants had reported high profits, and that
17   Hurricanes Katrina and Rita should not have affected the market as the defendants
     claimed and they were only a pretextual reason to justify withholding market supply to
18   create an artificial shortage"); *Standard Iron Works v. ArcelorMittal*, No. 08 C 5214,
     2009 WL 1657449 at *4-*12 (N.D. Ill. June 12, 2009) ("*Standard Iron Works*") (denying
19   motion to dismiss where the complaint alleged that defendant engaged in face-to-face
     trade meeting communications for purpose of controlling the supply of steel, coordinated
20   production cuts, and that output decreased and prices increased significantly in response);
     *In re Flat Glass Antitrust Litig. (II)*, MDL No. 1942, 2009 WL 331361 at *2-*3 (W.D.
21   Pa. Feb. 11, 2009) (finding that allegations that defendants engaged in lockstep price
     increases with identical justifications until the European Commission launched raids of
22   the industry complied with Rule 8(a)(2) and *Twombly*);  *In re OSB Antitrust Litig.*, No.
     06-826, 2007 WL 2253419 at *1  (E.D. Pa., Aug. 3, 2007) ("*OSB*") ("[p]laintiffs have
23   made specific factual allegations of Defendants' wrongdoing – including actions in
     furtherance of the conspiracy, Defendants' purported motive, the approximate time and
24   manner of their agreement, and the mechanism by which Defendants fixed prices.
     *Twombly* requires no more."); *In re Hypodermic Prods. Antitrust Litig.*, No. 05-CV-1602
25   (JLL/CCC), 2007 WL 1959225 at *3, *13-*14 (D.N.J. June 29, 2007) (general
     allegations that defendant Becton conspired with other medical device manufacturers to
26   force healthcare entities to fill a dominant percentage of their hypodermic products with
     Becton products and parallel imposition by group purchasing organizations of buying
27   plans that implemented this scheme).

28   [19]  Of course, even post-*Twombly*, the Supreme Court has recognized that to survive a
     Rule 12(b)(6) motion (there, concerning the allegations of a scienter in a securities fraud

1  the new phone companies into its region, and, second, they alleged that the defendants,

2  also in parallel fashion, had refrained from entering one another's region.  *Id.* at 567.  The

3  Supreme Court held that the plaintiffs failed to state a claim, finding that "there is no

4  reason to infer that the companies had agreed among themselves to do what was only

5  natural anyway." *Id.* at 566.

6       Notwithstanding the cursory allegations in *Twombly*, the Supreme Court's opinion

7  repeatedly indicates that the plaintiff's allegations came "close to stating a claim,"

8  although "stop[ping] short of the line between possibility and plausibility of

9  'entitle[ment] to relief.'" *Id.* at 557; *see id.* at 559 (allegations "just shy of a plausible

10  entitlement to relief"), 570 (more needed to "nudge" the complaint to sufficiency).

11       Unlike *Twombly*, this is not an esoteric case resting on parallel conduct that was

12  permitted and largely the result of prior federal regulation.  Instead, as the Seventh

13  Circuit said in *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th

14  Cir. 2002), *cert. denied*, 537 U.S. 1188 (2003) ("*High Fructose*"), "the charge in this case

15  involves no implausibility.  The charge is of a garden-variety price-fixing

16  conspiracy…"[20]  Defendants' alleged horizontal agreement to restrict output is

17  tantamount to price fixing and is equally plausible.  *See Linerboard*, 305 F.3d at 152 ("[a]

18  reduction in supply will cause prices to rise"); *General Leaseways, Inc. v. National Truck*

19  *Leasing Ass'n*, 744 F.2d 588, 594-95 (7th Cir. 1984).

20

21

22

23

---

24  case), a plaintiff need only show that "when the allegations are accepted as true and taken
collectively, would a reasonable person deem the inference of scienter at least as strong

25  as any opposing inference?"  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct.

26  2499, 2511 (2007).

27  [20]  *Accord, In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 358 (3d Cir. 2004) ("*Flat Glass*") ("plaintiffs' theory of conspiracy – an agreement among oligopolists to fix prices

28  at a supracompetitive level – makes perfect economic sense.")