### 3. Plaintiffs' Conspiracy Allegations Need Not Be Detailed Defendant By Defendant

Contrary to Defendants' assertions, detailed pleading of each Defendant's participation in the conspiracy is not a requirement. That point was recently addressed in *Flash Memory*, 2009 WL 1096602 at *5 n. 7, where the court stated:

> In addition to the joint motion to dismiss, Toshiba, Mitsubishi, Hitachi, SanDisk and Hynix filed their own, separate motions to dismiss. The arguments adduced in those motions overlap with those presented in the joint submission. Their central point of contention appears to be the lack of specific allegations directed at their particular company. This argument fails. For pleading purposes, allegations of antitrust conspiracy need not be detailed on a "defendant by defendant" basis. *See SRAM*, 580 F. Supp. 2d at 903-907 (rejecting argument plaintiffs must allege each defendant's specific role in an antitrust conspiracy); *accord In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 822 (3rd Cir. 1982); *In re [NASDAQ] Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 712 (S.D.N.Y. 1995).

*Accord, e.g., OSB*, 2007 WL 2253419 at *5 ("[a]ntitrust conspiracy allegations need not be detailed defendant by defendant").[21]

Defendants rely on cases like *Jung v. Association of American Medical Colleges*, 300 F.Supp.2d 119 (D.D.C. 2004) ("*Jung*") or *TFT-LCD I*. Their reliance is misplaced. In *Jung*, the district court stated that a plaintiff "need not allege overt acts committed by each defendant in furtherance of a conspiracy," 300 F.Supp.2d at 164 n. 27 (citing *In re Vitamins Antitrust Litig.*, No. 99-197, 2000 WL 1475705 (D.D.C. 2000) ("*Vitamins II*"); *see also Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F.Supp.2d 262, 278 (D.Conn.2003). And as for *TFT-LCD I*, while the court did say that a plaintiff must allege that each defendant joined the conspiracy and played some part in it (586

---

[21] *See also  In re Mercedes-Benz Antitrust Litig.*, 157 F.Supp. 2d 355, 375 (D.N.J. 2001) ('the short answer is that plaintiffs have alleged that all of the named defendants were participants in the conspiracy.  That a particular defendant may or may not have joined in a specific event or act in furtherance of the conspiracy, such as attending a meeting, does not affect its status as a conspirator"); *Aspartame*, 2007 WL 5215231 at *9- *10 (E.D. Pa Jan. 19, 2007) ("to require plaintiffs' to name each defendant each time [the complaint] refers to the conspiracy would be repetitive and patently unnecessary…since the complaint alleges that the defendants took these actions and includes Holland as a defendant, the complaint gives Holland fair notice of the plaintiffs' claim and the grounds upon which it rests").

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

1  F.Supp.2d at 1117), that requirement posed no onerous burden and does not require the

2  pleading of evidentiary detail. This point is illustrated by the same court's subsequent

3  opinion in *TFT-LCD II*:

> Defendants contend that the amended consolidated
> complaints do not adequately allege each defendant's role
> in the alleged conspiracy. Defendants argue that the
> amended complaints continue to "lump together" the
> twenty-six different named defendants in general
> allegations referring to "defendants," or groups of
> defendants sorted by country or corporate family. All
> plaintiffs counter that the new paragraphs added to the
> amended complaints sufficiently allege each defendant's
> participation and role in the alleged conspiracy.
>
> The Court finds that the amended consolidated complaints
> more than adequately allege the involvement of each
> defendant and put defendants on notice of the claims
> against them. Contrary to defendants' suggestion, neither
> *Twombly* nor the Court's prior order requires elaborate fact
> pleading. Further, the Supreme Court has recognized that
> "in complex antitrust litigation," "motive and intent play
> leading roles," and "the proof is largely in the hands of the
> alleged conspirators." *Poller v. Columbia Broad. Sys., Inc.*,
> 368 U.S. 464, 473…(1962).

15  599 F.Supp.2d at 1184.

16      This view is a sensible one. "[A]n antitrust complaint should be viewed as a

17  whole, and the plaintiff must allege that each individual defendant joined the conspiracy

18  and played some role in it." *OSB,* 2007 WL 2253419 at *5.  Pleading particular overt acts

19  by each defendant is unnecessary, "because a single overt act by just one of the

20  conspirators is enough to sustain a conspiracy claim even on the merits." *Vitamins*, 2000

21  WL 1475705 at *11.

22      Likewise, it is not necessary to plead each defendant had a role in "every detail in

23  the execution of the conspiracy . . . to establish liability, for each conspirator may be

24  performing different tasks to bring about the desired result." *Beltz*, 620 F. 2d 1at 1367.

25  Plaintiffs need only plead "the existence of a conspiracy in violation of the antitrust laws

26  and that [defendants] were a part of such a conspiracy, [defendants] will be liable for the

27  acts of all members of the conspiracy in furtherance of the conspiracy, regardless of the

28  nature of [defendants'] own actions."). *Id.; see also Rubber Chems.*, 504 F. Supp.

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

1   2d at 790  (allegations of defendant's involvement in agreement to implement price

2   increases and other allegations of "general participation" in conspiracy sufficient to state

3   antitrust claim); *Commercial Explosives*, 945 F. Supp. at 1492 (alleging acts of

4   conspiracy by defendants generally "fairly informs [one defendant] that it is accused of

5   engaging in a conspiracy to fix the prices of commercial explosives and that it did so by

6   such activities as meeting with competitors to discuss and agree on prices; discussing the

7   setting of prices over the telephone, exchanging pricing documents, agreeing to raise

8   prices. . . .") *See also Flat Glass*, 385 F.3d at 363 ("If six firms act in parallel fashion and

9   there is evidence that five of the firms entered into an agreement, for example, it is

10  reasonable to infer that the sixth firm acted consistent with the other five firms' actions

11  because it was also a party to the agreement.  That is especially so if the sister firm's

12  behavior mirrored that of the five conceded coconspirators.").[22]

### 4. On The Issue Of Allegations Linking Each Defendant To A Conspiracy, *TFT-LCD II* And *Flash Memory* Are Particularly Pertinent Here.

The decisions in *TFT-LCD II* and *Flash Memory* are particularly pertinent on the

issue of whether plaintiffs are required to detail each defendant's involvement in an

alleged price fixing conspiracy.

---

[22]  There is no logical reason why any Defendant should be unable to formulate a response to Plaintiffs' claims and prepare a defense.  This is especially true because Defendants, having met and communicated in secret, are uniquely positioned to know more about the conspiracy than Plaintiffs.  Courts recognize that pleading standards are relaxed where facts are "peculiarly within the defendant's knowledge or control." *Hill v. Morehouse Med. Assoc., Inc.*, No. 02-14449, 2003 WL 22019936, at *3 (11th Cir., Aug. 15, 2003) (citing *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Ga., Inc.*, 755 F. Supp. 1040, 1052 (S.D. Ga. 1990)).  *Accord, United States ex rel. Russell v. Epic Healthcare Mgmt. Group*, 193 F.3d 304, 308 (5th Cir. 1999).  Although these were fraud cases where Rule 9's heightened pleading standard was applied, their reasoning as to why the pleading threshold was lowered should govern here because Rule 8 and Rule 9 are intended to serve the same purpose – to provide notice to defendants. *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996) ("Rule 9(b) serves to give defendants adequate notice to allow them to defend against the charge…").  The complete details of Defendants' price-fixing conspiracy rest within Defendants' knowledge and control.  As a result, Plaintiffs' allegations of each Defendant's role in the conspiracy, together with detailed information about conspiratorial acts, more than satisfy the notice requirement of Rule 8.

**Direct Purchaser Plaintiffs' Combined Opposition**                                                      - 41 -
**Case No. 3:07-CV-5944 SC**

As noted above, in *TFT-LCD II*, Judge Illston denied renewed motions to dismiss, finding that plaintiffs "adequately allege the involvement of each defendant and put defendants on notice of the claims against them," citing several types of allegations to support its denial of the motions to dismiss, including:

- Details about numerous illicit conspiratorial communications between and among defendants;

- Facts of guilty pleas;

- Information about the group and bilateral conspiratorial meetings, including that the group meetings were attended by employees at three levels of defendants' corporations, and the structure and content of the meetings;

- Conspiratorial group meetings were supplemented by bilateral discussions about pricing, in the form of in-person meetings, telephone calls, and e-mails;

- The types of meetings among the defendants, including in some instances the year of a meeting; and

- That the individual participants in the conspiratorial meetings did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family

599 F. Supp. 2d at 1184-85

The amended complaint herein contains strikingly similar allegations. *See* Saveri Decl., Exh. 3, Chart Comparing Allegations in amended complaints in *TFT-LCD II* and this case; *TFT-LCD* First Amended Direct Purchaser Plaintiffs' Consolidated Complaint attached as Ex. 4 to the Saveri Decl. Applying the reasoning of *TFT-LCD II*, Defendants' motions to dismiss should be denied in the instant action as well.

As Judge Illston stated in *TFT-LCD II*:

> Defendants complain that the amended complaints still do not differentiate between related corporate entities. As described in the amended complaints, the alleged conspiracy was organized at the highest level of the defendant organizations and carried out by both executives and subordinate employees. The amended complaints allege that the conspiracy was implemented by subsidiaries and distributors within a corporate family, and that "individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families." DP-CAC ¶ 130; see also

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 42 -

> IPSACC ¶¶ 96, 100. Plaintiffs also allege that "the individual participants in conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts nor did they distinguish between the entities within a corporate family." *Id.* The amended complaints allege a complex, multinational price-fixing conspiracy and, taken as a whole, they sufficiently allege each defendants' participation in that conspiracy, as well as present a factual basis for the allegations of agency.

599 F.Supp. 2d at 1185. The complaint contains the exact language here.  DP-CAC ¶ 154.

Similarly, the court in *Flash Memory* rejected defendants' argument "that the pleadings fail to allege the specific time, place, or person who had any meetings or communications regarding flash memory pricing or output."  2009 WL 1096602 at *4. There, the court found a complaint sufficient to give rise to a plausible suggestion of conspiracy under *Twombly* where it, like the DP-CAC herein, alleged: (1) the companies and/or individuals directly involved in setting price for NAND flash memory; (2) the time frame of the anticompetitive conduct; (3) facts about the coordination of production as a means to control pricing; and (4) facts showing that the market was conducive to coordinated pricing, including a concentrated market dominated by a few entities with significant barriers to entry.  *Id.* at *4-*5. [23]

The antitrust cases cited by Defendants involved amended complaints that rested *solely* on allegations of parallel conduct.  *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ("*Kendall*") (holding that plaintiffs "failed to plead *any evidentiary*

---

[23]   In *Iqbal*, while the Supreme Court held that the complaint did not contain sufficient facts plausibly showing that petitioners Ashcroft and Mueller "purposefully adopted a policy of classifying post-September-11 detainees as 'of high interest' because of their race, religion or national origin," 129 S.Ct. at 1952, the Supreme Court specifically noted that, in the context of a *Bivens* action, "petitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic" and that "respondent's complaint does not contain any factual allegation sufficient to plausibly suggest petitioners' discriminatory state of mind."  *Id.*  Given the defendant-specific state of mind allegations required in a *Bivens* action, the Court should reject any attempt by Defendants to characterize *Iqbal* as requiring that Plaintiffs' complaint contain any greater defendant-by-defendant antitrust conspiracy allegations than the detailed allegations contained in the instant complaint.

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

1  *facts beyond parallel conduct* to prove their allegation of a conspiracy" and observing

2  that plaintiffs failed to allege "who, did what, to whom (or with whom), where, and

3  when" but not requiring such for successful pleading) (emphasis supplied)[24]; *In re*

4  *Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) ("*Elevator*") (complaint relied

5  entirely on parallel conduct, conclusory allegations of conspiracy, and reference to

6  European antitrust investigation where the court found no "linkage" between the

7  European and U.S. markets for elevators and their maintenance); [25] *Mountain View*

8  *Pharmacy v. Abbott Labs.*, 630 F.2d 1383, 1387 (10th Cir. 1980) ("*Mountain View*

9  *Pharmacy*")[26] (complaint "'did little more than recite the relevant anti-trust laws'").[27]

---

10  [24]  In *Kendall*, the plaintiffs alleged a conspiracy predicated solely on the fact that certain
11  banks who issued Visa and MasterCard credit cards also had a "proprietary interest" in
    the Visa and MasterCard "consortiums" and that the consortiums set interchange fees
12  which they charged to the banks, which were then passed onto the merchants. 518 F.3d at
    1048. The Ninth Circuit held that bare allegations of ownership and control of the
13  consortiums that set fees did not state a Section 1 claim. *Id.* at 1050. The Ninth Circuit
    also noted that plaintiffs failed to allege that the banks agreed to abide by or charge the
14  fees set by the consortiums, thus failing to allege a basic agreement. *Id.* at 1048. *See*
    *also In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 373, n.8
15  (M.D. Pa. 2008) ("*Labelstock*") (distinguishing *Kendall* from the complaint in that case,
    which the court described as "go[ing] beyond allegations of parallel conduct and
16  describ[ing] market conditions, discussions between [defendants], and other facts that
    suggest [defendant] acted pursuant to an agreement").

17  [25]  *See also Flash Memory*, 2009 WL 1096602 at *9 (distinguishing *Elevator* from the
18  *Flash Memory* complaint which "provide[d] much more detail regarding the
    intracompetitor communications directed at coordinating flash memory pricing and facts
19  regarding the flash memory market structure showing its conduciveness towards
    collusive pricing schemes").

20  [26]  Defendants incorrectly ascribe *Mountain View Pharmacy* to the Ninth Circuit, when it
21  was decided by the Tenth Circuit.

22  [27]  The other cases relied upon by Defendants are equally inapposite. *Nasious v. Two*
    *Unknown B.I.C.E. Agents*, 492 F.3d 1158 (10th Cir. 2007), involved a *pro se* Section
23  1983 claim against at least 42 individual defendants "as well as scores of John and Jane
    Doe defendants" in a complaint described as "[n]o model of clarity." *Id.* at 1160-61; *see*
24  *also id.* at 1163 (describing the complaint at issue as "rambling, and sometimes
    incomprehensible"). Nevertheless, the Tenth Circuit held that the district court
25  improperly dismissed the complaint with prejudice and reversed and remanded for further
    proceedings. The language cited by Defendants (Defs. Br. at 30) was actually the Tenth
26  Circuit chastising the district court for failing to explain to the *pro se* litigant, in layman's
    terms, the types of allegations that would "permit[] the defendant sufficient notice to
27  begin preparing its defense and the court sufficient clarity to adjudicate the merits." 492
    F.3d at 1163. In *In re Sagent Tech. Derivative Litig.*, 278 F. Supp. 2d 1079, 1094-95
28  (N.D. Cal. 2003), cited for the proposition that the "'lumping' related groups of
    defendants together is wholly improper," (Defs. Br. at 30), the court dismissed plaintiffs'

1    In sum, Plaintiff's allegations are more than specific enough to put Defendants on

2    fair notice of the claims against them.  Plaintiffs "only need to make allegations that

3    plausibly suggest that each Defendant participated in the alleged conspiracy." *SRAM*, 580

4    F. Supp. 2d at 904.  Viewed in its totality, Plaintiffs' amended complaint contains more

5    than sufficient allegations to demonstrate that each Defendant joined the conspiracy and

6    played some role in it.  *See TFT-LCD II*, 599 F. Supp. 2d at 1184-85.[28]

7    **E.    The Amended Complaint More Than Adequately Alleges The
        Involvement Of Each Moving Defendant In The Claimed Conspiracy.**

8          **1.    BMCC**

9    When the DP-CAC is viewed in its entirety, Beijing Matsushita Color CRT Co.,

10   Ltd. ("BMCC") cannot reasonably question why it has been sued.  The amended

11   complaint totals 222 paragraphs of detailed allegations, describing the conspiracy and

12   BMCC's role and participation in it.  Instead of confronting the amended complaint in its

13   entirety, BMCC would have this Court consider in isolation only two paragraphs of it.

14   As noted above, such an approach is contrary to well-established standards.

15         BMCC's statute of limitations argument also fails. This argument is based on a

16   typographical error in paragraph 173 of the DP-CAC. That paragraph says BMCC

17   attended conspiratorial meetings between 1998 and *2001*. It should read that such

18   meetings occurred between 1998 and *2007*.  Saveri Decl., ¶ 10.  The indirect purchaser

19   complaint so reads and BMCC has not attacked it on statute of limitations grounds. If

20   necessary, Plaintiffs ask the Court to permit them to amend the DP-CAC to make this

---

22   claims for fiduciary breach because "[o]f the six sitting members of the board, only two
     were on the board during the period October 1999 through February 2000, when the

23   alleged misappropriation/insider trading/waste of corporate assets occurred." *Id.* at 1093.
     Finally *Dell, Inc. v. This Old Store, Inc.*, No. H-07-0561, 2007 WL 1958609 at *2 (S.D.

24   Tex., July 2, 2007), involved fraud claims evaluated under Rule 9, which is a higher
     pleading standard than Rule 8 and requires that "the circumstances constituting fraud or

25   mistake shall be stated with particularity."

26   [28] Nonetheless, should the Court determine that the amended complaint is insufficient in
     any way, Plaintiffs respectfully request leave to amend.  Fed. R. Civ. P. 15(a) provides

27   that leave to amend "shall be freely given when justice so requires," and the Ninth Circuit
     has held that leave to amend should be granted with "extreme liberality."  *Eminence*

28   *Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).

**Direct Purchaser Plaintiffs' Combined Opposition**                                                    - 45 -
**Case No. 3:07-CV-5944 SC**

1  correction.  In any event, BMCC's limitations argument should fail for other reasons. Its

2  assertion that Plaintiffs' allegations establish as a matter of law that it withdrew from the

3  alleged conspiracy by 2002, and, therefore, that the statute of limitations has run, grossly

4  misreads the complaint – it alleges the opposite – and mischaracterizes the law.  BMCC's

5  assertion that Plaintiffs have not adequately alleged fraudulent concealment also fails.

6          **a.**        **Plaintiffs' Factual Allegations As To BMCC.**

7       Plaintiffs allege that Defendants, who control the majority of the CRT industry,

8  conspired to fix the prices of CRT Products.  As noted above, the DP-CAC details the

9  many collusive contacts, meetings and agreements among members of the CRT Products

10  Industry, including BMCC.  *See id.* ¶¶ 134-153.  Among other things, Plaintiffs describe

11  the various meetings known as "Glass Meetings" organized and attended by  CRT

12  makers.[29]  Plaintiffs also allege that Defendants, including BMCC, reached "[a]greements

13  as to CRT Products" at these and other meetings.  *Id.* ¶ 140.

14       Plaintiffs also specifically allege that BMCC participated in over 20 illegal

15  bilateral and group meetings between 1998 and 2001 (as noted above, this should read

16  "2007").  DP-CAC ¶ 173.  Plaintiffs further allege that, during these more than 20

17  bilateral and group meetings, "unlawful agreements as to, *inter alia*, price, output

18  restrictions, and customer and market allocation of CRT Products (including CDT

19  Products and CPT Products) occurred."  *Id.*  Plaintiffs allege the location of the meetings

20  – China – and that BMCC never effectively withdrew from the conspiracy.  *Id.*

21       BMCC's arguments that Plaintiffs have not met their pleading requirements

22  ignore and mischaracterize these allegations.  First, its assertion that Plaintiffs have not

23  _____

24  [29] Plaintiffs allege, and BMCC admits, that BMCC was a CRT producer.  *Id.* ¶ 80; *see* "Beijing Matsushita Color CRT Co., Ltd.'s Motion To Dismiss The Direct Purchaser

25  Plaintiffs' Consolidated Amended Complaint And The Indirect Purchaser Plaintiffs' Consolidated Amended Complaint", p. 2 (May 18, 2009) ("BMCC Mot.").  Plaintiffs also

26  allege that "[d]uring the Class Period, BMCC manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United

27  States."  *Id.* ¶ 80.

28  **Direct Purchaser Plaintiffs' Combined Opposition**      - 46 -
**Case No. 3:07-CV-5944 SC**

1    alleged that BMCC was a party to any illegal agreements because paragraph 173 of the

2    DP-CAC alleges only that it "participated" in over twenty meetings at which illegal

3    agreements "occurred" is frivolous.  Not only does BMCC ignore the many allegations

4    throughout the complaint that "Defendants", including BMCC, were parties to illegal

5    agreements, (*see e.g.*, DP-CAC ¶¶ 134-153), BMCC misreads paragraph 173.  The clear

6    import of that paragraph is that BMCC's "participation" extended to the illegal

7    agreements, especially when considered in the overall context of a complaint expressly

8    alleging illegal price fixing agreements among all Defendants.  BMCC's pinched

9    interpretation of paragraph 173 also violates a cardinal principle on a motion to dismiss:

10   that the complaint must be read broadly and all reasonable inferences drawn in the

11   plaintiffs' favor.  *Operating Engineers' Pension Trust Fund v. Clark's Welding &*

12   *Machine*, 2009 WL1324049, at *2.

13        Second, BMCC's argument that Plaintiffs have not supplied sufficient detail

14   regarding BMCC's participation in the conspiracy also fails.  As explained above, the law

15   does not require the specificity BMCC demands.  This argument also ignores the

16   extraordinarily detailed description of the alleged conspiracy in the complaint, as well as

17   the specific details regarding BMCC.  When the complaint is viewed as a whole, it is

18   clear that BMCC is alleged to be a participant in a plausible conspiracy.[30]

19        Viewing the amended complaint as a whole, Plaintiffs' allegations are more than

20   sufficient to establish the nature of the CRT Products conspiracy, how the conspiracy

21   operated, the products involved, and that BMCC joined and participated in it. [31]

---

[30] BMCC misapplies the quote it attributes to *Kendall*.  The Ninth Circuit did *not* hold that a plaintiff must plead the "basic questions" as to each defendant, as BMCC states (*see* BMCC's Mot. at 4); rather, the court held that a plaintiff must plead the "basic questions" in the complaint: "[e]ven after the depositions taken, the complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and when?" 518 F.3d at 1048.

[31] BMCC's reliance on Judge Armstrong's opinion in *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp 2d 953 (N.D. Cal. 2007) ("*Late Fee*") is similarly misplaced.  Like *Kendall*, in *Late Fee,* plaintiffs failed to allege any agreement among the defendants.  *Id.* at 961.  The "heart of plaintiffs' antitrust allegations" in *Late Fee* was a "chart of allegedly current late-fee levels of six defendant banking organizations," which the court found to allege "merely parallel conduct." *Id.* at 962.  Accordingly, the court dismissed

**Direct Purchaser Plaintiffs' Combined Opposition**                                        - 47 -
**Case No. 3:07-CV-5944 SC**

### b.    The Claims Against BMCC Are Not Time-Barred

BMCC's argument that Plaintiffs' claims against it are barred by the statute of limitations is likewise without merit, even apart from the typographical error on which it depends. BMCC's contention that the Court should conclude as a matter of law that it withdrew from the conspiracy based on Plaintiffs' allegations that it participated in more than twenty illegal conspiratorial meetings with its co-defendant/co-conspirators between 1998 and 2001, and that it never withdrew from the conspiracy, is an argument that "up" is "down." It also ignores the stringent requirements the law imposes for withdrawal from a conspiracy, which preclude such a finding on a motion to dismiss. BMCC's contention that Plaintiffs' allegations of fraudulent concealment are inadequate and insufficient to toll the statute of limitations is also incorrect.

### i.    Withdrawal.

There is no basis in the Complaint to find that BMCC withdrew from the alleged conspiracy at any time. The DP-CAC alleges that BMCC attended conspiratorial meetings from 1998 through 2001. (DP-CAC at ¶ 173) It also expressly alleges that BMCC never withdrew from the conspiracy. *Id.* These allegations – and BMCC relies on no others – simply cannot support a conclusion that it withdrew from the conspiracy at any time, much less early enough to implicate the statute of limitations. Indeed, the fact that the complaint (erroneously) does not identify any conspiratorial conduct by BMCC after 2001 cannot even support a conclusion that that BMCC's participation ceased. The complaint reflects Plaintiffs' present knowledge – unaided by any discovery – of BMCC's secret conduct; it does not by any means constitute a positive assertion that BMCC never committed another conspiratorial act. Moreover, as even BMCC must

---

the complaint because the complaint failed to include the necessary details. *Id.* In *Flash Memory,* in a case analogous to this one, Judge Armstrong distinguished her opinion in *Late Fee* on this basis. *Flash Memory,* 2009 WL 1096602 at *9. Similarly, in *Jung,* another case upon which BMCC relies, the court merely held that while it "must" consider individual motions to dismiss in the context of the larger conspiracy the plaintiffs were still obligated to allege "that each individual defendant joined the conspiracy and played some role in it." 300 F. Supp. 2d at 164.

1   acknowledge, the complaint alleges continuing conduct by BMCC and its co-

2   conspirators, including agreements related to future conduct.   At the very least,

3   construing the complaint in Plaintiffs' favor as required, these allegations establish that

4   BMCC's conspiratorial conduct continued well beyond 2001.

5         Understandably, BMCC cites no authority in support of this argument  because it

6   is well settled that mere cessation of conspiratorial activity by a defendant is insufficient

7   to establish withdrawal.[32]  Thus, even if the allegation in the DP-CAC on which BMCC

8   hangs its proverbial hat is construed to allege that BMCC ceased participation in the

9   conspiracy after 2001 (an inference in favor of BMCC that is impermissible on a motion

10  to dismiss), it still can point to nothing in the DP-CAC that establishes BMCC's

11  withdrawal from the conspiracy as a matter of law.[33]

12        Withdrawal is an affirmative defense, and the burden of proof is on the defendant.

13  *See United States v. Krasn*, 614 F.2d 1229, 1236 (9th Cir. 1980); *United States v. Basey*,

14  613 F.2d 198, 202 (9th Cir. 1979) ("*Basey*"); *Armco Steel Co. L.P. v. CSX Corp.,* 790 F.

15  Supp. 311, 322 (D.D.C. 1991) ("*Armco Steel*").   Courts have stressed that the burden of

16  proving withdrawal is "stringent" and "rigorous" for "[t]he defendant cannot set in

17  motion a criminal scheme and then limit its responsibilities for the harm cause by the

18  scheme by simply ceasing to participate in the scheme."  *Id.*  The withdrawal inquiry is

19  normally fact intensive and thus usually inappropriate for determination on the pleadings.

20  *See, e.g., id.* at 321-23 (ambiguities in conduct alleged in amended complaint precluded

---

21  [32]  *See, e.g., United States v. Zimmer*, 299 F.3d 710, 718 (8th Cir. 2002); *Morton's*
22  *Market Inc. v. Gustafson's Dairy Inc.,* 198 F.3d 823, 828 (11th Cir. 1999) ("*Morton's*
    *Market*"); *United States v. Dunn,* 758 F.2d 30, 37-38 (1st Cir. 1995); *United States v. Sax,*
23  39 F.3d 1380, 1386 (7th Cir. 1994) ("*Sax*"); *United States v. Handler,* 1978 WL 5690 *19
    (C.D. Cal. Aug. 3, 1978) ("*Handler*").

24  [33]  Four other Defendant groups (Hitachi, LG, Philips and Toshiba) also argue that they
    should be dismissed based on the premise that, before the start of the limitations period,
25  they withdrew from the conspiracy because (generally) they joint ventured, spun-off or
    otherwise "ceased" CRT manufacture.  As explained below, none of these transactions
26  rises to the level necessary to sustain a defense of withdrawal as a matter of law.  Rather
    than belabor the Court with five restatements of the applicable law, Plaintiffs concentrate
27  that discussion here for the sake of brevity.  Application of the law to each Defendant
    will be made in conjunction with the response to its separate brief.
28

**Direct Purchaser Plaintiffs' Combined Opposition**                                              - 49 -
**Case No. 3:07-CV-5944 SC**

1 determination that defendant withdrew from conspiracy as a matter of law); *Handler,* at

2 *51-*52 (denying motion to dismiss on grounds that validity of withdrawal defense

3 raised questions of fact that could only be fairly and adequately assessed at trial); *United*

4 *States v. Shaw,* 106 F. Supp. 2d 103, 123 (D. Mass. 2000) (denying defendant's motion to

5 dismiss indictment on ground that defendant withdrew from the conspiracy because

6 withdrawal turned on issues of fact).

7       To prove withdrawal from an antitrust conspiracy, the defendant must show

8 "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a

9 manner reasonably calculated to reach co-conspirators." *United States v. United States*

10 *Gypsum Co.,* 438 U.S. 422, 464-65 (1978); *see also Morton's Market, Inc. v. Gustafson's*

11 *Dairy, Inc.*, 198 F.3d 823, 839 (11th Cir. 1999) ("*Morton's Market*") ("the law has given

12 effect to a conspirator's abandonment of the conspiracy only where the conspirator can

13 demonstrate that he retired from the business, *severed all ties to the business*, and

14 deprived the remaining conspirator group of the services which he provided to the

15 conspiracy"); *United States v. Young*, 39 F.3d 1561, 1571 (11th Cir. 1994) (holding that

16 withdrawal is not available to a defendant who merely ceases to participate, but does not

17 affirmatively withdraw); *see also Basey*, 613 F.2d at 202 ("participation in the conspiracy

18 is presumed to continue until the last overt act of the conspirators unless [the defendant]

19 produces affirmative evidence of withdrawal."). "To withdraw from a conspiracy a

20 defendant must either disavow the unlawful goal of the conspiracy, affirmatively act to

21 defeat the purpose of the conspiracy or take definite, decisive and positive steps to show

22 that the defendant's dissociation from the conspiracy is sufficient." *United States v.*

23 *Lothian,* 976 F.2d 1257, 1261 (9th Cir. 1992) ("*Lothian*"). *Accord United States v.*

24 *Flores,* 279 Fed. Appx. 443 (9th Cir. 2008).

25       In the context of a conspiracy which is carried out through the regular activities of

26 otherwise legitimate business, the courts have found withdrawal only where a conspirator

27 can prove that it completely retired from the business, severed all ties to the business, and

28 deprived the remaining conspirators of the services which it had previously

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 50 -

1   provided to the conspiracy.  *United States v. Lowell,* 649 F.2d 950, 955 (3rd Cir. 1981)

2   ("where fraud constitutes the standard operating procedure of a business enterprise,

3   affirmative action sufficient to show withdrawal as a matter of law from the conspiracy

4   embodied in the business association may be demonstrated by the retirement of a co-

5   conspirator from the business, severance of all ties to the business and consequent

6   deprivation to the remaining conspirator group of the services that constituted the

7   retiree's contribution to the fraud."); *Lothian,* 976 F.2d at 1264 (quoting the above

8   passage from *Lowell* with approval);  *In re High Fructose Corn Syrup Antitrust Litig.,*

9   293 F. Supp. 2d 854, 860-61 (C.D. Ill. 2003).

10        Numerous courts have held that a defendant's sale of a business, or resignation

11   from an enterprise, does not constitute effective withdrawal, especially when the

12   defendant continues to be involved in or receives benefits from the successor business or

13   from the enterprise.  *See United States v. Antar*, 53 F.3d 568, 583 (3d Cir. 1995)

14   ("*Antar*") (holding that that resignation from enterprise did not constitute withdrawal,

15   where defendant "did not sever all his ties with the enterprise"); *Sax,* 39 F.3d at 1387 (7th

16   Cir. 1995) (holding that defendant did not withdraw from conspiracy by selling illegal

17   drug business); *United States v. Eisen,* 974 F.2d 246, 269 (2d Cir. 1992) (holding that

18   defendant-attorney had not withdrawn from a conspiracy when he "continued to be

19   entitled to a percentage of the recovery on all cases he tried including those giving rise to

20   his pre-[resignation] racketeering acts") (internal quotation marks omitted).

21        Moreover, in determining whether there has been withdrawal, as a matter of law,

22   from a conspiracy, a court must consider any "post-retirement" acts of a defendant which

23   bear on the question of whether the defendant has truly repudiated the object of the

24   conspiracy.[34] Thus, for example, combining forces with another defendant to form a joint

---

[34] *See United States v. Bullis*, 77 F.3d 1553, 1561-63 (7th Cir. 1996) (in case alleging
price fixing on dairy products, defendant leaving his job with dairy did not constitute
withdrawal as a matter of law because defendant continued telephone calls with co-
conspirators in which he expressed concern over a pending price fixing investigation and
hinted that the conspiracy ought to be covered up.); *Antar*, 53 F.3d at 583 ("analysis of
these cases leads to the following principals: (1) resignation from the enterprise does not,
in and of itself constitute withdrawal from a conspiracy as a matter law; (2) total severing

**Direct Purchaser Plaintiffs' Combined Opposition**                    - 51 -
**Case No. 3:07-CV-5944 SC**

1    venture, does not constitute effective withdrawal. Indeed, continuing the business through

2    a joint venture is a fact that supports a plaintiff's conspiracy allegations. *See Flash*

3    *Memory*, 2009 WL 1096602, at *6–*9 (finding that joint ventures and cross-licensing

4    agreements can be used to facilitate collusive behavior). In *Flash Memory*, plaintiffs

5    alleged that joint venture and cross-licensing agreements were used to maintain and

6    achieve the aims of the conspiracy by controlling supply, and thereby permitting

7    increases in price. *Id.* at *8. Furthermore, *Flash Memory* holds that it was plausible to

8    conclude that the formation of a joint venture by two defendants in that case "was itself a

9    conspiratorial act to control prices and supply." *Id.* at *27 n.9.

10   Further illustration of the relevance of "post-retirement" conduct is found in

11   Magistrate Judge Hay's report and recommendation in *In re NBR Antitrust Litig.,* No.

12   03-1898, (W.D. Pa) (Dkt. No. 170) ("*NBR*"), adopted by the district court on September

13   28, 2005 (Dkt. No. 226), attached as Exh. 5 to Saveri Decl. *NBR* was a price fixing

14   conspiracy case involving synthetic rubber. There, a defendant – relying on its 10 year

15   contract with another party to sell it all its NBR production, transfer its entire customer

16   base, product technology and contracts to that party – moved to dismiss, contending its

17   limitations period had run in view of its withdrawal from the alleged conspiracy more

18

---

19   of ties with the enterprise may constitute withdrawal from the conspiracy; however, (3)
     even if a defendant completely severs…ties with the enterprise, the defendant still may
20   remain a part of the conspiracy if he or she continues to do acts in furtherance of the
     conspiracy and continues to receive benefits from the conspiracy's operations."); *Sax*, 39
21   F.3d at 1387 (defendant did not withdraw from conspiracy to distribute marijuana by
     selling business where he continued to receive profits and participated in laundering of
22   drug sales proceeds); *United States v. Lash*, 937 F.2d 1077, 1084 (6th Cir. 1991) ("[t]he
     Supreme Court has ruled that even if a defendant has taken affirmative action contrary to
23   a conspiracy it is a jury question whether there was withdrawal if there is evidence that
     the defendant acquiesced in the conspiracy after the affirmative act.…[H]is subsequent
24   acts neutralized his withdrawal and indicated his continued acquiescence."); *United
     States v. Swiss Valley Farms Co.*, 912 F. Supp. 401, 403 (C.D. Ill. 1995) (where, after
25   resuming competitive practices, defendant continued to receive payments on rigged bids,
     resumption of competitive practices could not establish withdrawal as a matter of law as
26   it continued to "enjoy the fruits of the charged conspiracy."); *United States v. Anderson*,
     1999 WL 79656 at *3 (D. Kan., Jan. 22, 1999) (defendant's failure to sever all financial
27   ties with the conspiracy precluded a finding of withdrawal as a matter of law).

28

**Direct Purchaser Plaintiffs' Combined Opposition**                                    - 52 -
**Case No. 3:07-CV-5944 SC**

than four years before the action was commenced.  The court held that the defendant had

not "completely severed its ties with the enterprise of manufacturing and selling NBR"

because it continued to manufacture and sell NBR.  *NBR*, slip op. at 8.  The Magistrate

Judge pointed out that "the mere fact that [defendant] no longer had the motivation or

opportunity to fix NBR prices does not establish the [defendant] severed all ties with the

business enterprise, particularly as it concededly continues to manufacture NBR".  *Id.* at

9.  Neither, the Magistrate Judge noted, did the defendant establish that it had given

notice to its co-conspirators that it had disavowed the object of the conspiracy.  *Id.*  at 10.

The defendant's motion to dismiss was therefore denied.  *See also Riesman v. United*

*States,* 409 F.2d 789, 793 (9th Cir. 1969) (finding of withdrawal inappropriate where

defendant resigned and ceased to participate in company's day to day business

operations, but remained a major shareholder and took no affirmative action to disavow

or defeat the activities he joined in setting the unlawful scheme in motion.).

In light of these authorities, it is plain that nothing in the complaint comes close to

establishing that BMCC withdrew from the alleged conspiracy as a matter of law.

### ii.   Fraudulent Concealment.

As explained above, Plaintiffs have adequately pleaded fraudulent concealment.

In particular, as also discussed above, the acts of concealment of BMCC's co-defendant

co-conspirators, during the course of and in furtherance of the conspiracy are legally

attributable to BMCC as a matter of substantive conspiracy law. [35]

Thus, even assuming *arguendo* that BMCC withdrew from the conspiracy, the

statute of limitations on Plaintiffs' cause of action did not begin running until November,

2007 because of Defendants' fraudulent concealment.  Accordingly, BMCC is still liable

---

[35] BMCC cites *Metz v. Unizan Bank*, 416 F. Supp. 2d 568 (N.D. Ohio 2006) ("*Metz*"), for support.  But *Metz* does not compel a contrary conclusion.  First, *Metz*, a case from the Northern District of Ohio, is contrary to the recent line of cases in this district – *Rubber Chems., SRAM* and *TFT-LCD I* – that rejects defendant-by-defendant fraudulent concealment pleading requirements.  Second, it does not appear that the plaintiffs in *Metz* even alleged fraudulent concealment and, therefore, the court never considered the sufficiency of their allegations for fraudulent concealment purposes. *Id.*  at 577, 579.

**Direct Purchaser Plaintiffs' Combined Opposition**                                        - 53 -
**Case No. 3:07-CV-5944 SC**

1    for antitrust violations that occurred before its alleged withdrawal from the conspiracy.

2    *See Rubber Chems.*, 504 F. Supp. 2d at 789-90 (citing *Morton's Market, Inc. v.*

3    *Gustafson's Dairy, Inc.*, 211 F.3d 1224 (11th Cir. 2000) (defendant still liable for

4    antitrust violations that occurred before it withdrew from price-fixing conspiracy if

5    statute of limitations was tolled due to fraudulent concealment)).  Finally, even assuming

6    *arguendo* that Plaintiffs' fraudulent concealment allegations are insufficient, BMCC is

7    still legally responsible for the acts of its co-defendant/co-conspirators in furtherance of

8    the conspiracy during the four year portion of the conspiracy immediately preceding the

9    commencement of this action, because it did not withdraw from the conspiracy.

10              **2.       Samsung Entities**

11              Only two Samsung entities ("SE")—Samsung Electronics Co., Ltd. ("SEC") and

12   Samsung Electronics America, Inc. ("SEAI")—have filed a separate motion to dismiss.

13   That motion is based primarily on one central false premise:  their claim that the price-

14   fixing conspiracy alleged in the amended complaint is limited to cathode ray tubes

15   ("CRTs"), and because the SE Defendants did not manufacture CRTs, they are not liable.

16   However, contrary to the SE Defendants' improper attempt to recast Plaintiffs'

17   allegations, the DP-CAC clearly and specifically alleges an antitrust conspiracy in the

18   *CRT Products* market, which includes CRT Products such as computer monitors and

19   televisions manufactured and sold in the United States by the SE Defendants.  *See* DP-

20   CAC, ¶¶ 1-7, 134-175, 181-199.  In fact, the complaint alleges that Plaintiffs purchased

21   CRT Products directly from cartel members (including the SE Defendants) at supra-

22   competitive prices as a result of a conspiracy to fix and stabilize prices.  These allegations

23   are more than sufficient to plead an antitrust conspiracy in the CRT Products market.

24              The SE Defendants also contend that the complaint fails to allege plausible

25   grounds for relief because the claimed conspiracy is "economically senseless."  However,

26   to survive a motion to dismiss under *Twombly*, the Complaint need only "state a claim to

27   relief that is plausible on its face."  550 U.S. at 570.  Here, the Complaint alleges both a

28   logical and economically plausible price-fixing conspiracy in which the SE

**Direct Purchaser Plaintiffs' Combined Opposition**                                    - 54 -
**Case No. 3:07-CV-5944 SC**

1   Defendants participated. Samsung is a vertically integrated entity that makes and sells

2   CRTs and finished CRT Products. DP-CAC ¶¶ 58-67. Samsung set the prices of CRTs

3   and marked up its CRT Products through its affiliated companies who assembled and

4   sold the finished CRT Products to direct purchasers (like Plaintiffs) at supra-competitive

5   prices. *Id.* ¶¶ 58-67, 82-86, 134-154, 166-67, 176-77, 191-99. The SE Defendants were

6   the Samsung affiliates used to distribute and sell Samsung CRT Products in the United

7   States at supra-competitive prices. Thus, it makes perfect economic sense that the CRT

8   Products made and sold by the SE Defendants incorporated the full amount of the

9   conspiratorial overcharge (*id.* ¶¶ 166-67), which is more than enough to survive a motion

10  to dismiss. *See Commercial Explosives*, 945 F. Supp. at 1492 ( (alleging acts of

11  conspiracy by defendants generally is sufficient). Indeed, recent decisions in this district,

12  such as *TFT-LCD II* and *Flash Memory*, have upheld similar complaints alleging price-

13  fixing conspiracies among manufacturers and their affiliated distributors.

14          Further, the SE Defendants ignore the long standing principle of antitrust law

15  holding that direct purchaser damage claims are not reduced or cut off by transactions

16  through corporate affiliates, because it is unlikely that corporate affiliates will sue each

17  other, especially in a price-fixing case. *See Freeman*, 322 F.3d at 1145-46 ("indirect

18  purchasers can sue for damages if there is no realistic possibility that the direct purchaser

19  will sue its supplier over the antitrust violation"); *Royal Printing Co. v. Kimberly-Clark

20  Corp.*, 621 F.2d 323, 326 (9th Cir. 1980) ("*Royal Printing*") ("*Illinois Brick* does not bar

21  an indirect purchaser's suit where the direct purchaser is a division or subsidiary of a co-

22  conspirator."). As stated in the complaint, and as the SE Defendants concede, they are the

23  CRT Product manufacturing and distribution arm of the Samsung family. *See* DP-CAC

24  ¶¶ 58-59; SE Defendants Br. at p. 5. So even if the SE Defendants may not have made

25  CRTs, they did manufacture and sell marked up CRT Products with price-fixed CRTs

26  supplied by their Samsung affiliate – conduct that falls squarely within the horizontal

27  price fixing conspiracy alleged in the Complaint. *See In re TFT-LCD (Flat Panel)

28  Antitrust Litig.*, 2009 WL 533130 (N.D. Cal. Mar. 3, 2009) ("*TFT-LCD III*"). Thus,

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 55 -

1    under *Royal Printing* and *Freeman*, the SE Defendants are properly named.

2         Finally, the SE Defendants' assertions that they "purchased" CRTs from their

3    Samsung affiliates and that such "purchases" would supposedly decrease their profit

4    margins is not alleged anywhere in the Complaint, nor are such facts—even if true—

5    subject to judicial notice.  The SE Defendants' attempt to assert facts that are contrary to

6    those alleged in the Complaint is improper on a motion to dismiss.  *Lazy Y Ranch Ltd. v.*

7    *Behrens*, 546 F. 3d 580, 588 (9th Cir. 2008); *Silvas v. E\*Trade Mortg. Corp.*, 514 F. 3d

8    1001, 1003 (9th 2008) ("*Silvas*").

9

10         **a.**     **The Alleged Participation of the SE Defendants in the**
          **CRT Products Conspiracy Is Plausible and Makes**

11        **Perfect Economic Sense**

12        The SE Defendants concede that under *Twombly*, a complaint need only state a

13   plausible claim for relief in order to survive a motion to dismiss.  *See* SE Defendants'

14   MTD at 8.  Purporting to rely on *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

15   475 U.S. 574 (1986) ("*Matsushita*"), a case involving the evidence needed to withstand

16   *summary judgment*, the SE Defendants contend that the complaint should be dismissed at

17   the pleadings stage because it fails to allege a conspiracy that makes economic sense.

18   This argument is without merit.  First, the SE Defendants wrongly claim that the

19   amended complaint alleges a price fixing conspiracy for CRTs (which they did not

20   make), when in actuality,  it alleges a conspiracy related to *CRT Products* (which the SE

21   Defendants did make and sell directly to the proposed class).  *See* DP-CAC ¶¶ 1-7, 144,

22   146, 154-177.  The SE Defendants' self-serving attempt to redraft the amended complaint

23   contradicts the requirement that the allegations of the complaint be accepted as true.

24        Second, contrary to the SE Defendants' claim, the horizontal price fixing

25   allegations asserted in the complaint make perfect economic sense.  Here, Samsung is a

26   vertically integrated enterprise that manufactures and sells CRTs *and* the products that

27   incorporate them.  DP-CAC ¶¶ 58-67.  As alleged in the amended complaint, Samsung

28

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

1    colluded with the other Defendants to set supra-competitive prices for CRTs and to mark

2    up its own CRT Products through its affiliated Samsung manufacturers and distributors

3    so that the CRT Products bought by direct purchasers incorporated the entire amount of

4    the conspiratorial overcharge. *Id.* ¶¶ 58-67, 82-86, 134-154, 166-67, 176-77, 191-99.

5    The SE Defendants nevertheless contend that the conspiracy alleged in the amended

6    complaint is illogical because the Samsung American subsidiary would not conspire with

7    its Korean parent corporation to increase the price of CRT components, which would

8    have decreased the American subsidiary's profit margins.[36]  Aside from the fact that this

9    argument improperly challenges the truthfulness of the allegations pled, it also

10   conveniently ignores that SEC held a substantial ownership interest in the business of

11   manufacturing/selling CRTs by virtue of its ownership interest in its affiliate, Defendant

12   Samsung SDI Co. Ltd. ("Samsung SDI"), which, as the SE Defendants concede,

13   manufactured and sold CRTs during the conspiracy. DP-CAC ¶¶ 58-67.

14         As the amended complaint alleges, the SE Defendants dominated and controlled

15   the policies and affairs of their co-defendant Samsung SDI Co. Ltd. relating to the

16   antitrust violations alleged in the complaint.  DP-CAC ¶ 61. Under the circumstances, the

17   SE Defendants' suggestion that they had no economic incentive to participate in a

18   conspiracy encompassing the CRT component of products which they manufactured

19   and/or sold is without merit.  The manner in which the CRT Products conspiracy

20   operated so as to account for the vertically integrated structure of some of the Defendant

21   groups of co-conspirators, like Samsung, is described in detail in the amended complaint.

22   The complaint first alleges that the object of the conspiracy was to artificially inflate the

23   prices that Defendants charged their direct customers for CRT Products.  DP-CAC ¶¶ 1,

24   5-6, 134-180, 214-221.  The complaint further alleges that to that end, and in furtherance

25   of the conspiracy, Defendants agreed upon internal transfer prices for CRTs transferred

26   _____

27   [36] The SE Defendants' argument is itself implausible and makes no economic sense
     because if Samsung allowed one of its subsidiaries to undercut the agreed-upon price fix
     by charging less for the CRT Products, then the entire purpose of the conspiracy would
28   be defeated and it would have collapsed (which obviously did not occur).

**Direct Purchaser Plaintiffs' Combined Opposition**                                - 57 -
**Case No. 3:07-CV-5944 SC**

between affiliated companies and on external floor prices for CRTs sold by various

Defendant manufacturers of CRTs to Defendants manufacturing/selling products

containing CRTs.  DP-CAC ¶ 144.  The amended complaint also asserts that Defendants

considered their pricing of CRT products in setting their price levels on CRTs and also

considered "downstream" prices for products containing CRTs when agreeing upon

output restrictions.  *Id* ¶¶ 144, 146.  In short, the amended complaint charges that

Defendants agreed to "resolve issues created by asymmetrical vertical integration among

some of the co-conspirators" and to fix target prices and price guidelines for all "CRT

Products" which included both CRTs and products containing CRTs.  *Id.* at ¶ 138.

Consequently the conspiracy, as alleged by Plaintiffs, affected prices for *both* CRTs and

products containing CRTs sold in the United States.  *Id* at ¶ 139.  The increased prices of

CRTs were not, as the SE Defendants suggest, absorbed by any Samsung company, but

were fully reflected in the prices the SE Defendants (and other Defendants) charged

putative class members.

      The SE Defendants' assertion that their participation in a CRT Products

conspiracy is "implausible" also ignores the federal cases most directly on point – those

that analyze price fixing of goods by vertically integrated cartel participants.  As noted

above, several cases have addressed situations where Plaintiffs directly purchased

downstream "finished" goods from a cartel of manufacturers who also made and fixed

the price of "upstream" components of those goods.  These cases demonstrate that the SE

Defendants' "implausibility" argument is without merit and contrary to accepted antitrust

principles.[37]  Contrary to the SE Defendants' argument, vertically integrated cartel

participants can readily recoup the benefits of price fixing at both levels of the market.

They can take price fixing gains at the upstream level, by overcharging upstream

purchasers and at the downstream level, by overcharging downstream purchasers.  Where

---

[37] *See In re Midwest Milk Monopolization Litig.,* 730 F.2d 528, 530, n.2 (8th Cir. 1984);
*Sugar,* 579 F.2d at 16-18; *Linerboard.,* 203 F.R.D. at 216; *Flat Glass,* 191 F.R.D. at 480-
81; *General Refractories*, 1999 WL 14498.

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

1   cartel members jointly control an upstream market, they are able to inject supra-

2   competitive pricing directly into a downstream market in which they also participate.  In

3   short, the conspirators can raise downstream prices by increasing prices of cost inputs.

4   Indeed to enforce the alleged conspiracy and reap its maximum rewards, it was important

5   for the Defendant conspirators herein to ensure that their co-conspirators were not

6   stealing market share in downstream markets by undercutting the CRT Product price

7   levels set by the cartel.  *See* DP-CAC ¶¶ 144, 153, 158, 161-172.

8          In light of the amended complaint's allegations, the participation of the SE

9   Defendants in the CRT Products price-fixing cartel is logical and makes economic sense.

10  *See Flat Glass,* 385 F.3d at 358 ("[p]laintiffs' theory of conspiracy, an agreement among

11  oligopolists to fix prices at a supracompetitive level, makes perfect economic sense");

12  *Chocolate*, 602 F. Supp. 2d at 577 (alleged price fixing agreement "represents an

13  economically sensible course of action"); *Labelstock,* 566 F. Supp. 2d at 371  (nothing in

14  *Twombly* compels reversal of determination that the alleged agreement "to fix prices at a

15  supra- competitive level makes perfect economic sense because the amended complaint

16  describes market conditions that support an inference that collusive conduct was both

17  plausible and in [Defendants'] economic interests."); *Standard Iron Works,*  2009 WL

18  1657449 at *17 (rejecting argument that alleged conspiracy was implausible because

19  conspiracy involved both raw steel and "downstream" steel products where defendants

20  collectively controlled both the components product and the downstream products).[38]

---

21  [38]  The SE Defendants cite to the indictment of Chen Yuan Lin, which charges criminal
22  offenses related to color display tubes and color picture tubes, and argue that a price
    fixing conspiracy encompassing products containing CRTs is implausible. This argument
23  is a *non sequitur*.  The absence, to date, of criminal charges relating to CRT containing
    Products does not in any way negate the existence of such price fixing activity.  As a
24  threshold matter, the government's criminal investigation of the CRT Products industry is
    ongoing. Moreover, the government's non-prosecution of certain conduct or certain
25  defendants, to date, is not probative of whether Defendants did or did not commit the
    price fixing acts alleged by Plaintiffs in their amended complaint. See *High Fructose,* 295
26  F.3d at 664-65  ("neither can [non-prosecution] be used, as defendants wish to use it in
    this case, to show that because the Justice Department has not moved against the alleged
27  HFCS conspiracy, there must not have been one"). *Cf. In re Carbon Black Antitrust Litig.*
    2005 WL 2323184 *1 (D. Mass. Sept. 8 2005) ("[n]eedless to say, the defendants will not
28  be permitted to introduce evidence on the merits that the closing of the [DOJ]
    investigation is somehow evidence that no conspiracy exists"). Finally, the government

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 59 -

1    Moreover, even if, as the SE Defendants allege, they hold only a 20 percent

2  equity stake in Samsung SDI, that is irrelevant since neither Plaintiffs' allegations nor

3  their right to collect damages depends on the precise equity stake the SE Defendants have

4  in one of their corporate affiliates.  What matters is that the SE Defendants, along with

5  their Samsung affiliates, are engaged in a common economic enterprise to sell Samsung

6  CRT Products at supra-competitive prices.  Indeed, transporting, selling and distributing

7  CRT Products at supra-competitive prices constitutes an overt act of the conspiracy.  And

8  this is precisely what the SE Defendants are alleged to have done.  DP-CAC ¶¶ 166-167.

9  As made clear in *Royal Printing* and *Freeman*, where there is "no realistic possibility"

10  that the SE Defendants will bring a Sherman Act claim against one of their Samsung

11  corporate affiliates for price-fixing, those who purchased from the SE Defendants are

12  considered direct purchasers, and may proceed with damages claims under the Sherman

13  Act.  *See Freeman*, 322 F. 3d at 1145-46; *Royal Printing*, 621 F. 2d at 326.

14    In sum, the amended complaint alleges direct evidence of a conspiracy to fix the

15  prices of CRT Products.  Accordingly, there is no merit to the SE Defendants' claim that

16  Plaintiffs have failed to assert sufficient facts to state a plausible grounds for relief.

17    **b.    The Amended Complaint Adequately Alleges the SE**
18    **Defendants' Participation in the Price-Fixing Conspiracy**

19    As noted above, the law does not require a detailed defendant-by-defendant

20  account of participation in the claimed conspiracy. Here, the complaint does not presume

21  the SE Defendants' participation in the alleged antitrust conspiracy in the CRT Products

22  market, it alleges specific and detailed facts that show the SE Defendants directly

23  participated in the alleged conspiracy.  *See* DP-CAC ¶¶ 3-7, 58-66, 144, 146, 54-77.

24    The amended complaint also states that SEC in particular "participated in

25
───────────────────────────────
has limited prosecutorial resources requiring selective allocation of those resources
26  among many provable criminal matters that come to its attention. As a result, the
government is unable to criminally prosecute every provable charge and may drop or
27  bargain away  criminal charges or portions thereof in the ordinary course, depending
upon its deterrence and other goals and the array of potential criminal cases under review.
28  *See Vitamins.*, 2000 WL 1475705 at *11.

**Direct Purchaser Plaintiffs' Combined Opposition**    - 60 -
**Case No. 3:07-CV-5944 SC**

hundreds of illegal bilateral and illegal group meetings from 1995 through at least 2006 in which unlawful agreements as to, *inter alia*, price output restrictions, and customer and market allocation of CRT Products occurred. *Id.* ¶ 166. The amended complaint states that Samsung Electronics America, Inc. ("SEAI") was "represented at those meetings and [was] a party to the agreements entered at them" and that SEAI "played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings." *Id.* ¶ 167. Thus, Samsung Electronics Co., Ltd. ("SEC") and SEAI were both active, knowing participants in the conspiracy.

Plaintiffs' allegations against all Defendants, together with allegations specific to the SE Defendants, are more than sufficient to establish Plaintiffs' claims.

c.      The SE Defendants' Liability Is Based On Their *Own* Unlawful Conduct and Participation in the Conspiracy, and Not Vicarious Liability, As They Erroneously Claim

The SE Defendants argue that they cannot be held vicariously liable for the acts of Samsung SDI. This argument ignores the averments of the amended complaint. The amended complaint specifically alleges that SEC participated in numerous collusive meetings, a fact which the SE Defendants completely ignore. DP-CAC ¶166. Thus, it is being sued for its own misconduct, not on any theory of vicarious liability. The complaint further states that SEAI, among others, was represented at those meetings by other Samsung companies. Id. ¶167. This is consistent with paragraph 154 of the DP-CAC:

> When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that the Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to,

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 61 -

their respective corporate families. As a result, the entire
corporate family was represented in meetings and
discussions by their agents and was party to the agreements
reached in them. For the various meeting participants
identified below, in many instances, their high-ranking
executives participated in a significant number of the
meetings described.

Thus, the amended complaint sets forth averments that Samsung SDI acted as the agent

of SEAI at the various Glass meetings described therein. Judge Illston in *TFT-LCD II*

found such allegations sufficient to plead agency. 599 F.Supp.2d at 1185.[39]

Such a determination is also supported by the practicalities of Samsung's overall

structure. Samsung SDI is part of what Samsung itself calls the "Samsung Group."

http://www.samsung.com/hk_en/aboutsamsung/samsunggroup/affiliatedcompanies/SAM

SUNGGroup_AffiliatedCompanies.html. The companies within this group are closely

interrelated and operate interactively. Indeed, Samsung's own website goes on to state:

> SAMSUNG electronics subsidiaries include SAMSUNG
> Electronics, SAMSUNG Electro-Mechanics, SAMSUNG
> SDI, SAMSUNG Corning, SAMSUNG SDS, SAMSUNG
> Networks and SAMSUNG Corning Precision Glass. These
> affiliates produce, market, and sell a wide variety of
> electronic parts and components such as next generation
> memory chips, computer and telecommunications
> equipment, color TV picture tubes, and glass bulbs. They
> also develop computer systems and produce general
> electronics and precision machines.
>
> All these companies share the same goal of becoming
> world-class, high-tech companies at the beginning of the
> 21st century and are concentrating their investments into
> promising future fields to achieve that target. Despite being
> independent, systematic cooperation takes place between
> the companies that enable the development of state-of-the-
> art electronic products.

---

[39] *See, also Gilbert v. Concentra Health Servs., Inc.,* No. 03:07-CV-00264-LRH-VPC,
2008 WL 318356 at *2 (D. Nev. Jan. 31, 2008) ("[b]ecause the specific facts will be
revealed through discovery, it is not necessary for Plaintiff's amended Complaint to set
forth detailed allegations of agency. Arguments as to whether the evidence supports the
allegations are more appropriately considered in a motion for summary judgment"); *Dion
LLC v. Infotek Wireless, Inc.,* No. C 07-1431 SBA, 2007 WL 3231738, at *4 (N.D. Cal.,
Oct. 30, 2007) (rejecting defendant's argument that a plaintiff asserting a claim based on
agency relationship must plead the elements of agency; plaintiff need only place the
defendant on notice that its claim is based on an agency theory).

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

http://www.samsung.com/hk_en/aboutsamsung/samsunggroup/affiliatedcompanies/SAM

SUNGGroup_ElectronicIndustries.html.

      This was equally true in earlier years. As one scholar noted in 2003:

> Samsung Electronics is closely interlinked with Samsung
> SDI, a manufacturer of television tubes, which in turn relies
> on Samsung Corning, which produces glass bulbs for the
> tubes, as indicated by the fact that 61% of its total revenue
> comes from Samsung SDI. Samsung SDI, in turn, supplies
> 52% of its products to Samsung Electronics.

Sea-Jin Chang, Financial Crisis And Transformation of Korean Business Groups at 118-

20 (Cambridge University Press, 2003).

      As discussed above, the complaint alleges specific and detailed facts that show

the SE Defendants colluded with their co-conspirators to reap supra-competitive prices

for CRT Products they assembled and sold to direct purchasers in the United States.

Thus, the basis of the SE Defendants' inclusion in the Complaint is predicated on their

*own* illegal conduct, and not on a theory of vicarious liability as they incorrectly contend.

### d.      The Amended Complaint Satisfies the Requirements of *Twombly* and Rule 8

      Relying on *Kendall*, the SE Defendants next assert that to satisfy Rule 8, a

complaint must allege (before any discovery has occurred) the specific "who, what,

where" of the alleged conspiratorial agreement.  Before addressing the SE Defendants'

erroneous interpretation of *Kendall*, it is important to note why that case is readily

distinguishable from the amended complaint at issue here.  The Ninth Circuit's decision

in *Kendall* addressed a complaint that was patently deficient, both before and after

*Twombly*.  In *Kendall*, the plaintiffs alleged a conspiracy based solely on the facts that

certain banks who issued VISA and MasterCard credit cards also had a "proprietary

interest" in the VISA and MasterCard "consortiums," and that the consortiums set

interchange fees which they charged to the banks, which were then ultimately passed on

to merchants.  518 F.3d at 1045-46.  The plaintiffs merely alleged, in conclusory fashion,

1   that the banks conspired through and with the consortiums to which they belonged. *Id.* at

2   1048.  Not surprisingly, the Ninth Circuit held that bare allegations of ownership and

3   control of the consortiums that set the fees did not state a Section One claim. *Id.* at 1048-

4   49 (plaintiffs "simply allege the consortiums are coconspirators, without providing any

5   facts to support such an allegation, despite having deposed executives from both

6   MasterCard and Visa").  Notably absent was any allegation that the banks agreed to abide

7   by or charge the fees set by the consortiums.  Without more, the plaintiffs had failed to

8   allege even a basic agreement.  The court also found it significant that the plaintiffs had

9   deposed executives of the consortiums prior to filing an amended complaint.

10      In contrast to *Kendall*, the amended complaint in the instant case contains specific

11  and detailed facts concerning the existence of a classic agreement among horizontal

12  conspirators to fix prices and restrict output.  The amended complaint asserts numerous

13  allegations of unusual price movements, agreements to restrict output in order to inflate

14  prices, customer and market allocation of CRT Products, exchanges of sensitive

15  proprietary and competitive information through secret meetings and trade associations,

16  and governmental investigations.  These are *per se* antitrust violations, as opposed to the

17  bare assertion of a conspiracy that formed the basis of the complaint in *Kendall*.

18      In short, neither Rule 8 nor *Twombly* require Plaintiffs to do the impossible: plead

19  the complaint as if they were actual observers of the conspiracy, or were present in every

20  room in which the Defendants met to formulate and carry out their unlawful price-fixing

21  agreements.  Rather, as the Supreme Court held in *Twombly*, in order to state a Section

22  One claim, a complaint must contain sufficient factual allegations "to raise a right to

23  relief above the speculative level." *Twombly*, 550 U.S. at 555.  The Court further

24  explained that "such a claim requires a complaint with enough factual matter (taken as

25  true) to *suggest* that an agreement was made.  Asking for plausible grounds to *infer* an

26  agreement does not impose a probability requirement at the pleading stage; it simply calls

27  for enough fact to raise a reasonable expectation that discovery will reveal evidence of

28  illegal agreement." *Id.* at 556 (emphasis added).  Here, Plaintiffs' detailed amended

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 64 -

1    complaint more than satisfies the threshold articulated in *Twombly*.

2              **3.    Tatung America**

3          Tatung Company of America, Inc.'s ("Tatung America") motion ("TA Mot.")

4    should also be denied.  The motion rests on two grounds: 1) that Plaintiffs have not

5    sufficiently alleged Tatung America's participation in the conspiracy; and 2) that it

6    should be regarded as a direct purchaser of the price-fixed products rather than a member

7    of the conspiracy.  Both lack merit.

8          First, like many of the other Defendants, Tatung America's motion is based on a

9    fundamental misreading of Plaintiffs' allegations.  The alleged conspiracy is not limited

10   to CRTs, but also extends to products containing CRTs – CRT Products – manufactured

11   and/or sold by Defendants, including Tatung America.  The amended complaint more

12   than adequately details Tatung America's role in the cartel:  the company distributed and

13   sold Defendants' CRT Products, including its corporate affiliate Chunghwa PT's CRT

14   Products, in the United States at supracompetitive prices.  DP-CAC ¶¶ 24, 69, 169.

15         Second, Tatung America's jurisdictional motion to dismiss under Rule 12(b)(1)

16   also fails.  Apart from the fact that it is alleged to be a member of the conspiracy in its

17   own right, the evidence submitted by Tatung America fails to show that it is not affiliated

18   with Chungwha PT.   To the contrary, there can be little doubt that the two companies

19   are closely related.  Both are subsidiaries of Tatung Company ("Tatung Taiwan"), both

20   are dominated and controlled by Tatung Taiwan, and together they operate to

21   manufacture, sell, and distribute CRTs and CRT Products in the United States and

22   throughout the world.  Indeed, Judge Illston has already so ruled on a virtually identical

23   motion to dismiss filed by Tatung America in the *LCD* case, which Tatung America fails

24   to cite. *TFT-LCD III,* 2009 WL 533130 * 1-2.

25             **a.    Tatung America Participated in the CRT Product Price-
                       Fixing Conspiracy**
26

27         In more than sufficient detail, the amended complaint alleges that, beginning in

28   March 1995 at the latest, the CRT Product cartel was organized; Tatung America,

**Direct Purchaser Plaintiffs' Combined Opposition**                        - 65 -
**Case No. 3:07-CV-5944 SC**

1  its sister company Chunghwa PT, and the other Defendants agreed to join; and, as a

2  result, the prices of CRT Products sold to customers, including customers in the United

3  States were raised, fixed, and stabilized. *See e.g.*, DP-CAC ¶¶ 1, 5, 6, 24, 25, 69, 134.[40]

4        The aim of the conspiracy was to inflate and maintain prices of both CRT panels

5  as well as the full range of CRT Products that Defendants manufactured or sold in the

6  United States and throughout the world, either by themselves or through affiliates and

7  entities within their vertically integrated enterprises. *Id.*  Defendants made these

8  anticompetitive agreements to enrich themselves, not only by imposing higher prices than

9  would exist in a competitive market, but also by taking steps to prevent competition in

10  the downstream CRT product markets in the United States from undercutting their

11  agreements on the prices and supply of CRT panels.  As the amended complaint explains

12  at various points, to the extent that corporate families distributed CRT Products to direct

13  purchasers, these subsidiaries played a significant role in the conspiracy because

14  Defendants wished to ensure that prices for such products paid by the direct purchasers

15  would not undercut the pricing agreements reached at the[] various meetings. *See e.g.*,

16  ¶144,169; *see also id.* at ¶ 84 ("Each Defendant that is a subsidiary of a foreign parent

17  acts as the United States agent for CRTs and CRT Products made by its parent

18  company.").

19        The allegations against Chunghwa PT and Tatung America are consistent with

20  this pattern and describe a vertically integrated corporate family.  Both are alleged to be

21  subsidiaries of Tatung Taiwan. *Id.* at 24 (Chunghwa PT "established in 1971 by Tatung

22  Corporation"), 69.  Both are alleged to be members of the conspiracy in their own right.

23  _____

24  [40] Plaintiffs also allege that on February 10, 2009, a Chunghwa PT executive was indicted
    for participating in a conspiracy to fix the prices of CRTs sold in the United States. *Id.* at
25  ¶¶ 7, 124-126. *See* Saveri Decl., ¶ 9 (Exh. 7 (February 10, 2009 indictment of C.Y. Lin,
    Case No. 3-09-cr-00131-WHA (N.D. Cal.))).  An indictment, the facts stated therein, and
26  the fact that a federal indictment usually leads to a guilty plea, are the proper subjects of
    judicial notice. *See United States. v. Casarez-Bravo*, 181 F.3d 1074, 1077 (9th Cir. 1999)
27  (indictment contains "judicially noticeable facts"); *Cortez v. U.S.*, 337 F.2d 699, 701 (9th
    Cir. 1964) ("[w]e take judicial notice of the fact that the vast majority of those who are
28  indicted for federal crimes plead guilty.").

1   *See e.g., id.* at 154, 155.   Chunghwa PT is alleged to be a CRT manufacturer; Tatung

2   America is alleged to have "manufactured, marketed, sold and/or distributed" products

3   containing Chunghwa PT CRTs.  *See id.* at 24, 69, 169. Chunghwa PT attended over five

4   hundred conspiratorial meetings, and Plaintiffs' specifically allege that "the entire

5   corporate family" – *i.e.,* including Tatung America – was represented in the

6   conspiratorial meetings.  *Id.* at 154, 155.[41]   Contrary to its assertions, moreover, Tatung

7   America's membership and role in the conspiracy is specifically alleged:  "To the extent

8   Tatung America distributed CRT Products to direct purchasers, it played a significant

9   role in the conspiracy because Defendants wished to ensure that the prices for such

10   products paid by direct purchasers would not undercut the pricing agreements reached at

11   these various meetings.  Thus, Tatung America was an active, knowing participant in the

12   alleged conspiracy."  *Id.* ¶ 169.

13          These allegations are plainly sufficient to state a claim against Tatung America.

14   As explained above, Tatung America's contention that the law requires more detail of

15   their participation in the conspiracy is incorrect.  These allegations are amply sufficient to

16   put it on fair notice of Plaintiffs' claims.  Tatung America's lengthy discussion of alter

17   ego theory is also not pertinent.  As the foregoing makes clear, Tatung America's liability

18   does not depend on Plaintiffs' ability to "pierce the corporate veil."  It is alleged to be a

19   member of the conspiracy in its own right.[42]

---

20   [41] The fact that Tatung Taiwan, unlike some other Defendant parent companies herein, is

21   not a named Defendant, therefore, is not relevant.

22   [42] Moreover, for purposes of the United States antitrust laws, corporate affiliates are
     treated as a single entity or unit.  The Supreme Court held in *Copperweld Corp. v.*

23   *Independence Tube Corp.*, 467 U.S. 752 (1984) ("*Copperweld*"), that entities within a
     corporate family cannot be held to have conspired with one another.  *Id.* at 769, 771.  A

24   corollary to this rule is that such entities are treated as a single unit when specific
     conspirators are identified.  As the Ninth Circuit concluded, "[w]here there is substantial

25   common ownership, a fiduciary obligation to act for another entity's economic benefit or
     an agreement to divide profits and losses, individual firms function as an economic unit

26   and are generally treated as a single entity" under the Sherman Act.  *Freeman*, 322 F.3d
     at 1147-48.  Tellingly, four of the six cases that Tatung America cites as requiring a veil-

27   piercing analysis of Plaintiffs' allegations are not antitrust cases and are thus not on point.
     Of the two antitrust cases, one—*Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429,
     454-56 (9th Cir. 1979)—predates *Copperweld* and relies on a contractual analysis that is

28   defective after *Copperweld*.  The other case—*Invamed, Inc. v. Barr Labs., Inc.*, 22 F.

**Direct Purchaser Plaintiffs' Combined Opposition**                                                                        - 67 -
**Case No. 3:07-CV-5944 SC**

### b.    Tatung America Is Not a Direct Purchaser of CRT Products Under *Illinois Brick* and *Royal Printing*

Tatung America argues that its customers are not members of the Direct Purchaser Class, according to the Supreme Court's holding in *Illinois Brick*. Based on *Illinois Brick*, Tatung America claims to be a direct purchaser and, therefore, a member of the class and not a proper defendant. On this basis, Tatung America moves to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).[43]

This argument makes little sense. First, as explained above, Tatung America is alleged to be a member of the conspiracy in its own right and the alleged conspiracy extends to CRT Products sold by it to class members.

Second, the law is clear that transactions between corporate affiliates do not, under *Illinois Brick,* insulate them from federal antitrust liability. As noted, Judge Illston has already rejected a motion from Tatung America based on virtually identical arguments and evidence. The evidence is equally clear here that Tatung Taiwan, Chunghwa, and Tatung America are part of the same corporate family and are under common ownership and control. *Illinois Brick* provides Tatung America no protection.

It is well-established under *Illinois Brick* that a purchaser from a corporate affiliate of a conspirator is entitled to bring a damages action under the federal antitrust laws. *See Freeman*, 322 F.3d at 1145-46; *Royal Printing*, 621 F.2d at 326. Ignoring this well-established doctrine for a second time, Tatung America misconceives the basic tenets of *Illinois Brick*. The point of *Illinois Brick* was to enable and encourage private antitrust enforcement, not to discourage it. *See Illinois Brick*, 431 U.S. at 735 ("the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially

---

Supp. 2d 210, 222 (S.D.N.Y. 1998)—predates the Ninth Circuit's decision in *Freeman* and does not consider either the impact of *Copperweld* on substantive antitrust law or the implications of economic unity of interest among defendants.

[43] As a procedural matter, Tatung America's motion is not proper under Rule 12(b)(1). The Court has subject matter jurisdiction over federal statutory claims under the Sherman Act, 15 U.S.C. § 15(a); 28 U.S.C. § 1331.

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

1   affected by the overcharge to sue only for the amount it could show was absorbed by

2   it."). *Illinois Brick* accomplished this purpose by locating the right to assert Sherman Act

3   damage claims in the entities or persons most likely to assert such claims:  direct

4   purchasers.  Direct purchasers, by definition, are third parties that conduct business with

5   cartel members or co-conspirators through arm's length transactions. *Illinois Brick* limits

6   federal antitrust claims further down the distribution chain, not because a particular

7   defendant did not damage indirect purchasers, but rather "because the defendants *did* sell

8   to a third party who (after *Hanover Shoe*) could recover for any injury they claimed."

9   *Loeb Indus. v. Sumitomo Corp.*, 306 F.3d 469, 482 (7th Cir. 2001).

10      *Royal Printing* makes clear that *Illinois Brick* was not intended to allow cartel

11   members to foreclose damage claims by the artifice of a sale to a related party. *Royal

12   Printing*, 621 F.2d at 326.  To rule otherwise would substantially impair antitrust

13   enforcement, because in such situations there is "no realistic possibility" that the related

14   party will bring a Sherman Act damages claim. *Id., see also Freeman*, 322 F.3d at 1145-

15   46 (" . . . [I]ndirect purchasers can sue for damages if there is no realistic possibility that

16   the direct purchaser will sue its supplier over the antitrust violation.")

17      As noted, Tatung America brought an indistinguishable motion in the *TFT-LCD*

18   price-fixing litigation. As here, the defendants in that case include Tatung America and

19   Chunghwa PT.  Relying on the same arguments and factual averments put forward here,

20   Tatung America moved to dismiss under Rules 12(b)(1) and 12(b)(6).  Judge Illston

21   denied the motion:

> The Court finds that the amended complaint sufficiently
> alleges a basis for TUS's [Tatung America's] liability.  The
> factual record is disputed as to the relationship between
> TUS, CPT, and Tatung Taiwan, as well whether TUS's
> purchases of LCDs and finished products containing LCDs
> was truly arms-length or in furtherance of the alleged
> conspiracy.  On this record, TUS has not shown that it is
> not a proper defendant under *Royal Printing* and *Freeman*.
> Upon a fuller factual record, TUS may renew its arguments
> in a motion for summary judgment.

28   *TFT-LCD III*, 2009 WL 533130, at *2; *see also, id.* (evidence "showing that Tatung

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**
                                                                                    - 69 -

Taiwan owns and controls both TUS and CPT and that the three firms have intertwined

economic interests; that TUS has described itself as a subsidiary of Tatung Taiwan . . .

and TUS has never sued Tatung Taiwan or CPT.")

Tatung America's claim that it is an arm's length purchaser from Chunghwa PT

remains baseless.  Limited discovery in the *TFT-LCD* litigation demonstrates that

Chunghwa PT is a close corporate affiliate of Tatung America and Tatung Taiwan, that

the three entities collectively operate in vertically integrated fashion to manufacture, sell,

and distribute CRTs and CRT Products in the United States, and that the three entities

have intertwined economic interests.  There is no realistic possibility that Tatung

America will sue Chunghwa PT or any other entity within the Tatung corporate family or

any member of the conspiracy.

Tatung America is entirely owned by Tatung Taiwan and the family that controls

Tatung Taiwan.  Tatung Taiwan owns 50%; the former chairwoman of Tatung America,

Lun Kuan Lin, owned 46 percent at her death in 2007; prior to her death, her son and

daughter each held a 2 percent interest.  Upon her death, Ms. Lin bequeathed her 46

percent interest in Tatung America to her children.  Saveri Decl., ¶¶ 7, 8; Exh. 6

(Declaration of Jordan Elias (hereinafter "Elias Decl.")), ¶ 8, exh. G, at 7-9, 27-28

[Deposition of Michael Lai].

Five of Tatung America's six directors are members of the Lin family or are

employees of Tatung Taiwan.  *Id.* at ¶¶ 6, 8; Exh. G, at 6, 19-24 [Lai]; Exh. E, at 75-77

[Deposition of Edward Chen].  Put another way, Tatung America's board consists of

Tatung Taiwan's chairman, his two sisters, his nephew, a Tatung Taiwan employee, and

a former Tatung Taiwan employee.  *Id.*

Similarly, Chunghwa PT is owned by Tatung Taiwan. Tatung America represents

to potential customers that "Tatung owns Chunghwa Picture Tube (CPT)."  *Id.* at ¶ 9;

Exh. H, at TUSP0026399.  Edward Chen, the executive vice president in charge of

Tatung America's commercial division, testified:  "I think Tatung Group, Tatung

headquarter[s], does own the CPT."  *Id.* at ¶ 6; Exh. E, at 47 [Chen].

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

1   Neither of the two Tatung America executives who gave deposition testimony

2   could identify any instance when Tatung America sued Tatung Taiwan or Chunghwa. *Id.*

3   at ¶¶ 6, 8; Exh. G, at 27 [Lai]; Exh. E, at 82-83 [Chen].  Tatung America, Tatung Taiwan,

4   and Chunghwa have been sued on multiple occasions for their collective participation in

5   agreements and transactions involving the sale of TFT-LCD panels and products,

6   including the *LG v. Tatung* patent litigation brought against Tatung Taiwan and its

7   affiliated entities, including Tatung America . *See id.* at ¶ 7; Exh. F.

8   Finally, Tatung America admits that it and Chunghwa PT are part of a vertically

9   integrated enterprise.  Tatung America holds itself out to the public as a subsidiary of

10  Tatung Taiwan, telling potential customers that "Tatung Company of America, Inc. is *the*

11  *subsidiary* of Tatung Company based in Taiwan." *Id.* at ¶¶ 2, 3; Exh. A, at

12  TUSP009432; Exh. B, at TUSP0009430 (emphasis added)); *see also id. at* ¶¶ 4-6, Exh.

13  C, at TUSP0009356; Exh. D, at TUSP0009379; Exh. E, at 60-66 [Chen].  Tatung

14  America identifies Tatung Taiwan's customers as its own.  Specifically, Tatung America

15  stated that it sold products to Hitachi, NEC, and Apple, among other firms, when in

16  reality these firms were customers of Tatung Taiwan and never bought anything from

17  Tatung America. *Id.* at ¶ 6; Exh. E, at 22-29); *see id.* at ¶¶ 5, 12; Exh. D, at

18  TUSP0009379; Exh. K, at TUSP0024290.  Tatung America and Tatung Taiwan

19  confirmed that they are a single corporate entity in a Rule 7.1 corporate disclosure

20  statement filed on September 2, 2005, in the patent suit brought by LG. Philips LCD Co.,

21  Ltd. ("LG") against Tatung Group in the federal court for the District of Delaware. *Id.* at

22  ¶ 7; Exh. F.[44]  Likewise, Tatung America confirmed that Chunghwa PT is "*our own*

23  ――――――――――――――

[44] Tatung America is estopped from asserting the contrary. *See Johnson Service Co. v.

24  Transamerica Ins. Co.*, 485 F.2d 164, 174 (5th Cir. 1973) (at common law "a party is estopped merely by the fact of having alleged or admitted in his pleadings in a former

25  proceeding under oath the contrary to the assertion sought to be made. . . . [I]t is not necessary that the party invoking this doctrine have been a party to the former

26  proceeding"); *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782-83 (9th Cir. 2001) ("[t]he application of judicial estoppel is not limited to bar the assertion of

27  inconsistent positions in the same litigation, but is also appropriate to bar litigants from making incompatible statements in two different cases."); *United Virginia*

28  *Bank/Seaboard Nat. v. B.F. Saul Real Estate Inv. Trust*, 641 F.2d 185, 190 (4th Cir. 1981) (under judicial estoppel doctrine, "courts have prohibited litigants from 'playing

1  *sister company*" and an "affiliates [sic] company." *Id.* at ¶¶ 10, 5; Exh. I, at

2  TUSP0002458 (emphasis added); Exh. D, at TUSP0009381).  Together with Chunghwa

3  PT, Tatung America is an important part of Tatung's "well-established vertical

4  integration" and Chunghwa PT is its "primary" supplier. *Id.* at ¶ 12; Exh. K, at

5  TUSP0024266, TUSP0024282; ¶¶ 4, 5; Exh. C, at TUSP0009356; Exh. D, at

6  TUSP0009381).

7        The evidence before the court makes it clear that Tatung America and Chunghwa

8  PT are corporate affiliates.  Both are owned by the same entity, Tatung Taiwan.  Tatung

9  Taiwan and the Lin family together own 100 percent of Tatung America.  Every single

10 director of Tatung America has a connection with Tatung Taiwan or with the Lin family,

11 the family that controls the business operations of Tatung Taiwan, Tatung America, and

12 Chunghwa.  Tatung America and Tatung Taiwan confirmed that they are a single

13 corporate entity in a Rule 7.1 corporate disclosure statement filed in federal court.

14 Similarly, Tatung America holds itself out as being fully integrated with the Tatung

15 corporate family, including both Chunghwa and Tatung Taiwan.   Given these facts,

16 there is no realistic possibility that Tatung America will ever sue Tatung Taiwan or

17 Chunghwa PT over antitrust violations.  Therefore, as Judge Illston previously held on

18 these facts, the corporate affiliate exception to *Illinois Brick* preserves the Court's

19 jurisdiction.  *TFT-LCD III*, 2009 WL 533130 at *2.

20       The two declarations on which Tatung America relies cannot alter this conclusion.

21 They are *silent* about the source of any CRT Products that Tatung America is

22 "purchasing," and allow for that fact that Tatung America "purchases" CRT Products

23 from Chunghwa PT and other members of the conspiracy or their agents.  Simply

24 because transfers of products to Tatung America are styled as "purchases" does not

25 convert those transactions into arm's length sales.  Nor does it transform Tatung America

26 ────────────────────────────
   fast and loose,' *Scarano v. Central R.R.*, 203 F.2d 510, 513 (3d Cir. 1953), or 'blow[ing]

27 hot and cold,' *Ronson Corp. v. Liquifin Aktiengesellschaft*, 375 F. Supp. 628, 630
   (S.D.N.Y. 1974), by barring them from taking inconsistent positions during the course of

28 litigation.").

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 72 -

into an entity independent of indicted cartel member Chunghwa PT or their mutual

parent, Tatung Taiwan.

Mr. Lai quibbles that "[c]urrently" Tatung Taiwan owns "only approximately

30%" of Chunghwa and has "never" owned 100% of Chunghwa.  Lai Decl. ¶ 2.  So

what?  The amended complaint does not assert that that Chunghwa PT is a *wholly-owned*

subsidiary of Tatung Taiwan—and neither Plaintiffs' allegations, nor their right to collect

damages, depend on such a fact. [45]

In sum, Tatung America's arguments pursuant to Rule 12(b)(1) should be

rejected, in light of Judge Illston's ruling, the evidence submitted with this opposition,

and the inadequacy of the declarations on which Tatung America relies.  However, to the

extent that the Court finds here that the declarations raise factual issues, Plaintiffs request

the Court allow them to take discovery necessary to respond to Tatung America's motion

and supplement their response.  "'[D]iscovery should ordinarily be granted where

pertinent facts bearing on the question of jurisdiction are controverted or where a more

satisfactory showing of the facts is necessary.'"  *Laub v. U.S. Dep't of Interior*, 342 F.3d

1080, 1093 (9th Cir. 2003) (quoting *Butcher's Union Local No. 498 v. SDC Inv., Inc.*,

788 F.2d 535, 540 (9th Cir. 1986)).

### 4. Toshiba

Despite the comprehensive allegations of the amended complaint, the Toshiba and

various related entities ("Toshiba") argue that, as compared to the other Defendants, the

pleading requirements of Rule 8 have not been met as to them. "Toshiba Entities'

---

[45] Tatung America's argument, even if correct, would not affect its joint and several liability as a co-conspirator for all acts of the conspiracy.  Co-conspirators in price-fixing actions, such as Tatung America here, are fully liable if they have sold price-fixed products through distributors who are also co-conspirators. *See Paper Sys. Inc. v. Nippon Paper Indus.*, 281 F.3d 629, 631-32 (7th Cir. 2002); *Lowell v. American Cyanamid Co.*, 177 F.3d 1228, 1230-31 (11th Cir. 1999); *In re Brand Name Prescription Drugs*, 123 F.3d 599, 604-05 (7th Cir. 1997), *cert. denied*, 522 U.S. 1153 (1998) ("*BNPD*"); *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1211 (9th Cir. 1984), *cert. denied*, 469 U.S. 1197 (1985).

1    Motions To Dismiss (1) The Direct Purchaser Plaintiffs' Consolidated Amended

2    Complaint And (2) The Indirect Purchaser Plaintiffs' Consolidated Amended

3    Complaint," p. 1 (May 18, 2009) ("Toshiba Mot.").   Specifically, Toshiba seeks to

4    distinguish themselves on the grounds that:  (1) no Toshiba entity has been the subject of

5    a criminal investigation or a criminal case regarding CRT Products (or products in other

6    electronics industries) (*id.* at 2-5); (2) Toshiba did not have as significant market share as

7    other Defendants (*id.* at 5-6); (3) the DP-CAC does not provide specific examples of

8    price increases or production decreases by Toshiba (*id.* at 6-7); and (4) the DP-CAC does

9    not include allegations of Toshiba's participation in trade associations or shows (*id.* at 7).

10   Toshiba also contends that the DP-CAC does not include sufficiently detailed allegations

11   about the role played by each Toshiba entity in the alleged conspiracy (*id.* at 8-18).[46]

12        To make such arguments, however, Toshiba ignores basic legal standards (*e.g.*,

13   reading the complaint as a whole and in Plaintiffs' favor, and recognizing the role that

14   circumstantial evidence can play in proving a conspiracy), and misunderstands the

15   threshold showing that Plaintiffs must make at the pleading stage, as compared to

16   summary judgment or trial.  Plaintiffs now need only make allegations that plausibly

17   suggest that a conspiratorial agreement was made, or that raise a reasonable expectation

18   that discovery will reveal evidence of illegal agreement.  The DP-CAC does this,

19   including as to Toshiba, because the most essential aspects of the alleged conspiracy have

20   been sufficiently alleged – *i.e.*, an economically plausible conspiracy to fix prices, reduce

21   production, and allocate market share among major manufacturers of CRT Products that:

22   (1) was carried out through a long-standing practice of meetings, primarily "Glass

23   Meetings," which are thoroughly described in the DP-CAC; and, (2) is corroborated by

24   the indictment of  Defendant Chunghwa PT's former Chairman and CEO, C.Y. Lin.

---

26   [46] The Toshiba entities also make an argument based on their having exited the
27   CRT industry in 2002, but those arguments are essentially duplicative of their argument
     about why such an exit should be deemed a withdrawal from the conspiracy. *Cf.* Toshiba
28   Mot. at 7-8 with 18-20.  That argument is separately addressed below.

**Direct Purchaser Plaintiffs' Combined Opposition**                          - 74 -
**Case No. 3:07-CV-5944 SC**

1    None of the specific factors that Toshiba points to as supposed shortcomings are

2    required at the pleading stage.  To the extent such factors are alleged with respect to other

3    Defendants (*e.g.*, a Defendant being indicted), such factors provide further support for the

4    existence of the alleged conspiracy, but their absence as to Toshiba does not provide

5    grounds for dismissal.  This last point is particularly significant with respect to Toshiba's

6    arguments that the DP-CAC does not include sufficiently detailed allegations about the

7    role played by each Toshiba entity in the alleged conspiracy.  As evident in cases

8    applying *Twombly*, once a conspiracy has been sufficiently alleged, the primary purpose

9    of further alleging each Defendant's involvement is simply to "put defendants on notice

10   of the claims against them."  *TFT-LCD II,* 599 F. Supp. 2d at 1184.  When, as here, the

11   conspiracy is otherwise sufficiently alleged, details (*e.g.*, describing overt acts by each

12   specific Defendant) are unnecessary to satisfy the notice requirement.  *Id.*  Here, there is

13   "a reasonable expectation that discovery will reveal evidence of" Toshiba's entering the

14   illegal agreement.  Toshiba has been sufficiently apprised of the allegations against it.

15   The DP-CAC should be upheld as against those entities.

16   Finally, Toshiba's arguments about withdrawal are misplaced.  Even though

17   authorities cited acknowledge that an effective withdrawal at least requires a complete

18   severance of all benefits flowing from the alleged conspiracy.  Moreover, the issue of

19   withdrawal is a disputed matter not to be resolved by a motion to dismiss.  Here, because

20   Toshiba retained a significant interest in the CRT business through their joint venture

21   with Matsushita at least until 2007 (and because the pleadings do not, as Toshiba

22   suggests, reveal that it exited *all* aspects of the CRT Products business (*e.g.*,

23   manufacturing televisions and computer monitors) in 2002) granting a motion to dismiss

24   on this ground is not warranted.

25            **a.    Toshiba Is Wrong In Claiming That Plaintiffs'**
                      **Allegations Against Them Differ Materially From The**
26                    **Allegations Against Other Defendants.**

27

28   Toshiba claims that there are "nine key areas" in which the DP-CAC differs as to

**Direct Purchaser Plaintiffs' Combined Opposition**                           - 75 -
**Case No. 3:07-CV-5944 SC**

1   it and then goes on to argue that there is a lack of specific allegations showing how each

2   Toshiba entity was involved in the alleged conspiracy.  Toshiba Mot. at 1, 8-9.  These

3   claims actually amount to only four challenges to the sufficiency of Plaintiffs' allegations

4   against the Toshiba entities, and none of those four challenges withstand scrutiny.

5

6                              i.      **Allegations Regarding Criminal Investigations
                                      and Cases Against Other Defendants Support
7                                     The Plausibility of The Alleged Conspiracy, But
                                      Such Allegations Need Not Be Made Against
8                                     Each Defendant**

9            The first "four" areas of the DP-CAC upon which the Toshiba entities seek to

10  distinguish themselves are actually only one area, lack of governmental action.  That is,

11  Toshiba says that it should be dismissed because its component entities have not been

12  indicted, put under U.S. Department of Justice or foreign criminal investigation, or plead

13  guilty in a kindred product area. [47]  But the absence of such an allegation is hardly fatal to

14  the sufficiency of the DP-CAC against Toshiba.

15           Although the DP-CAC does not allege that Toshiba was the subject of a criminal

16  case or investigation, Plaintiffs' core allegations against it remain, most significantly:

17  (1) detailing the hundreds of meetings, including "Glass Meetings," held over a twelve-

18  year period during which Toshiba participated at least 50 times over a seven-year period

19  (DP-CAC ¶¶ 134-153, 171); and (2) corroborating the existence of such meetings and

20  conspiracy related to CRT Products, as evidenced by the indictment of Chunghwa PT's

21  former Chairman and CEO C.Y. Lin (DP-CAC ¶ 126).

22           In short, the absence of an allegation of criminal enforcement agencies having

23  initiated (or succeeded) in bringing a criminal matter against Toshiba does not serve as an

24  irrefutable badge of innocence.  Toshiba misses the fundamental point – which is that the

25  _____
    [47] The Toshiba entities make reference to Plaintiffs allegations in other industries,
26  including "LCD, DRAM, SRAM, Flash Memory."  Toshiba Mot. at 4.  Plaintiffs,
    however, only make allegations as to cases related to the TFT-LCD and DRAM
27  industries, cases in which guilty pleas were obtained.  *See* DP-CAC ¶¶ 122-24. The DP-
    CAC does not rely on the civil actions against certain Toshiba entities and other
28  Defendants here in cases related to the SRAM and Flash Memory industries.

**Direct Purchaser Plaintiffs' Combined Opposition**                              - 76 -
**Case No. 3:07-CV-5944 SC**

1  DP-CAC expressly implicates it in a non-conclusory manner.  The standard for obtaining

2  a criminal conviction (as well as the reasons for initiating a criminal investigation) is

3  different from that for sustaining a civil complaint.  *See also* note 38, *supra.*  Moreover,

4  as discussed further below, Toshiba had exited production by the time in 2007-08 that the

5  investigations began.  In 2007 it sold its one-third interest in Matsushita Toshiba Picture

6  Display Co., Ltd. ("MTPD"), which was its CRT manufacturing entity.[48]

7
8
                  ii.      **Allegations Regarding The Toshiba Entities'**
                                     **Market Dominance Do Not Sufficiently**
                                     **Distinguish Them from Other Defendants**

9          The second area of the DP-CAC upon which Toshiba seeks to distinguish itself

10  from the other Defendants is with respect to their respective shares of the CRT Products

11  market.  First, Toshiba bickers with the well-established principle that allegations of

12  market dominance are often a key component of antitrust complaints and then describes

13  itself as an entity without market power.  To the contrary, *In re Graphics Processing*

14  *Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007) (cited by Toshiba) and

15  similar cases do not stand for the proposition that collective market dominance among

16  defendants is irrelevant to the sufficiency of a complaint.  Rather such cases merely

17  explain that collective market dominance alone should be coupled with additional

18  allegations supporting the inference of a conspiracy.  *Id.*  The DP-CAC certainly contains

19  such additional allegations.

20          Toshiba also misses the mark with its arguments that its market share was too

21  small to affect price, that there was no interdependence among it and the other

22  Defendants who together controlled approximately 60% of the CRT Products market (LG

23  Product Displays – 27%, Samsung SDI – 24%, Chunghwa PT – 11%), or that, as a small

24  player, it had an incentive to compete with the conspiracy.  First, it ignores the express

25  allegation that Toshiba, along with other Japanese producers of CRT Products, controlled

26
27
28
---
[48] The Toshiba entities do remain active participants in the LCD Products market, the main successor to to the CRT Products market, and the DOJ and foreign antitrust authorities are investigating whether the Toshiba entities participated in a conspiracy to restrain trade in that market.

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

15% of the market – well above the 11% of the market that was control by Chunghwa PT.  Toshiba, like Chunghwa PT, had the choice of using its smaller market share to either undercut the conspiracy's pricing (and perhaps gain market share), or instead join the conspiracy and enjoy inflated prices, which it did.

Second, Toshiba ignores the critical role that "small" participants often play in ensuring the success of a conspiracy.  Non-conspiring small players are the proverbial competitive fringe that can expand output, at the expense of larger entities charging supra-competitive prices.  Under Toshiba's "must be large market player" reasoning, only LG Product Displays and Samsung SDI should have conspired but these two only controlled approximately 50% of the CRT Products market and would have been undercut on price by smaller players, such as Chunghwa PT and Toshiba, if those smaller players did not join the conspiracy.  It is the *collective* market power, not the individual market power, of defendants that is critical to an effective conspiracy.

In sum, it is not critical for Plaintiffs to have alleged significant market dominance by the Toshiba entities alone.

iii.    **Allegations Regarding Pricing and Production Do Not Serve a Basis for Distinguishing The Toshiba Entities from Other Defendants**

Toshiba also seeks to distinguish itself from the other Defendants with respect to allegations about pricing increases and production cuts.  First, while Defendant-specific pricing and production allegations lend added heft to Plaintiffs' claims about the conspiracy, those allegations primarily supplement Plaintiffs' core allegations (*e.g.*, Defendant meetings; C.Y. Lin's indictment).  These Defendant-specific allegations are coupled with an equal number of pricing and production allegations applicable to all Defendants, including Toshiba.  *See, e.g.,* DP-CAC ¶¶ 188-97 (describing price stability or increases for all CRT Products).[49]

---

[49] It is also worth noting that Toshiba's joint venture, MTPD, is one of the Defendants specifically identified as decreasing supply in furtherance of the conspiracy.  DP-CAC ¶ 183.  While Toshiba changed the form of its participation in the CRT manufacturing business in 2002 when MTPD was established, Toshiba had a one-third ownership of

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

iv.   **Allegations Of Participation In Express Conspiratorial Meetings, As Well As Meetings Providing An Opportunity To Conspire, Are Made With Respect To Toshiba.**

Toshiba's fourth point is that the DP-CAC's lack of explicit detail concerning their misuse of trade associations is exculpatory in view of the allegations that LG and Samsung furthered the conspiracy through their membership in two Korean trade associations.  First, this arguments fails to recognize that the DP-CAC contains express allegations about how and when the conspiratorial meeting (*e.g.*, "Glass Meetings") took place.  DP-CAC ¶¶ 134-53.  Hence, Plaintiffs here do not need to rely on allegations about trade associations or trade shows as providing opportunities for Defendants to conspire.  In any event, while the LG and Samsung Defendants are expressly referenced as being members of these two Korean trade associations, the DP-CAC does allege that attendance at other industry trade shows was indeed open to and provided the means for numerous Defendants, including the Toshiba entities, and not just the LG and Samsung Defendants, to further the conspiracy.  *Compare, e.g.,* DP-CAC ¶ 178 (top executives of LG and Samsung attending Korean Display Conference) *with* ¶ 179 ("[o]ther opportunities to collude among Defendants were provided by event sponsored by the Society for Information Display. . . .").  Moreover, a Defendant could participate in a conspiracy to fix prices even if it did not attend trade association meetings.  Attendance at such meetings has never been held to be a requirement to participate in a conspiracy.

b.   **The Amended Complaint Adequately Alleges Participation In The Claimed Conspiracy By Each Of The Toshiba Entities**

Toshiba seeks to challenge the DP-CAC on the grounds that it does not sufficiently detail the role played by each Toshiba entity in the alleged conspiracy.  That argument is based on the claim that *Twombly* and *Kendall* do not permit a "bare

---

MTPD and had an interest in MTPD continuing the conspiracy that the Toshiba entities actively participated in from 1996 through 2003.  As noted above, MTPD does not seek to dismiss the complaint on the ground that it fails to state a plausible conspiracy.

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

1   allegation of conspiracy" to be maintained against a defendant because such an allegation

2   is "almost impossible to defend against."  Toshiba Mot. at 9 *citing Kendall*, 518 F.3d at

3   1047.  Toshiba goes on to cite *Kendall*, arguing that a complaint must always provide the

4   "who, did what, to whom (or with whom), where, and when" for each defendant.  *Id.*

5           Toshiba errs when it argues that the ostensible who/what/where/when-

6   requirement imposed by *Kendall* is not satisfied by the DP-CAC as to each Toshiba

7   entity.  *Kendall*, addresses the need for who/what/where/when allegations when the

8   underlying complaint (unlike here) offers no more than the bare assertion of conspiracy

9   following from parallel pricing, without any allegation about how the alleged

10  conspiratorial agreement was reached, implemented, carried out, or policed.  Here, of

11  course, there are significant allegations about such matters, including the total number of

12  conspiratorial meetings, the number of conspiratorial meetings attended by each

13  Defendant and its affiliates, the means by which information was collected for and

14  disseminated at such meetings, and, of course, corroboration of the existence of such

15  meetings by C.Y Lin's indictment.  DP-CAC ¶¶ 134-53, 126.

16          As noted above, in several post-*Kendall* cases in this District that have considered

17  the issue of Defendant-specific allegations – cases not only similar to the instant case but

18  also involving many of the same Defendants (and in one case involves a conspiracy that

19  essentially overlaps with the conspiracy alleged here) – this Court has consistently held

20  that allegations such as those in the DP-CAC are sufficient.  The Toshiba entities,

21  however, disregard these on-point cases.

22          The essence of Toshiba's argument is that the DP-CAC does not recite each

23  Defendant's name enough times to allege sufficiently its participation in the price fixing

24  conspiracy.  Curiously, in their discussion of this issue, the Toshiba entities begin their

25  analysis of cases applying *Twombly* (and *Kendall*) with *TFT-LCD I*, saying that the

26  amended complaint must allege that each individual defendant joined the conspiracy and

27  played some role in it.  But, as noted above, Toshiba then fails to recognize that Judge

28  Illston in *TFT-LCD II* (discussed above), after considering the same cases that

**Direct Purchaser Plaintiffs' Combined Opposition**                                    - 80 -
**Case No. 3:07-CV-5944 SC**

1    Toshiba now cites, ultimately rejected the proposition that, in the context of a motion to

2    dismiss, plaintiffs are required to provide detailed allegations as to each defendant.

3         Because, as noted above, the DP-CAC contains virtually identical allegations in

4    connection with the (predecessor) conspiracy for TFT-LCD Products, it necessarily

5    follows that the DP-CAC is sufficient as to the Toshiba entities.  In particular, Plaintiffs'

6    allegations here that "Toshiba, through TC and TDDT, participated in over 50 bilateral

7    and group meetings between 1995 and 2003…" (DP-CAC ¶ 171) and that "[t]he

8    individual participants entered into agreements on behalf of, and reported these meeting

9    and discussions to, their respective corporate families" (DP-CAC ¶ 154) were the kinds

10   of allegation held sufficient in *TFT-LCD II*.  The latter allegation regarding employees of

11   various corporate families acting as agents for each other is particularly proper in light of

12   the express allegation that attendees at conspiratorial meeting, such as the "Glass

13   Meetings," "the individual participants . . . did not always know the corporate affiliation

14   of their counterparts, nor did they distinguish between entities within a corporate family."

15   (DP-CAC ¶ 154.)[50]  Likewise, Toshiba should not be heard to argue (as it did in *Flash*

16   *Memory* and *SRAM*) that the DP-CAC is deficient with respect to the Toshiba

17   subsidiaries such as TAI, TAEC, TAIS, or TAEC on the grounds that "Plaintiffs do not

18   identify the time of the meeting, where the meeting occurred, or the other parties to the

19   agreements."  Toshiba Mot. at 13-14.  Finally, as noted above, the key cases upon which

20   Toshiba relies are easily distinguishable; particularly because those cases involved

21   complaints that rested solely on allegations of parallel conduct.

22        In sum, the allegations in the DP-CAC are more than specific enough to put the

23   Toshiba entities on notice of the claims against them, including participation in the

24

25

26   [50] Plaintiffs rely on principles of agency, including direct misconduct among and between
     employees of the various Toshiba companies (*see, e.g.,* DP-CAC ¶¶ 154, 171-72), and,
27   therefore do not address here Toshiba's argument regarding alter-ego theories of liability
     (Toshiba Mot. at 11-12).
28

**Direct Purchaser Plaintiffs' Combined Opposition**                                - 81 -
**Case No. 3:07-CV-5944 SC**

1    alleged conspiracy with the other identified Defendants, at the identified meetings, during

2    the 1995-2003 time period. [51]

3                        c.          **Toshiba's Withdrawal Argument Is Unavailing.**

4              Toshiba also argues that it should be dismissed because it withdrew from the

5    conspiracy in 2002, more than four years before Plaintiffs' amended complaint was filed,

6    by exiting the CRT Products market when they formed a joint venture, MTPD, with

7    Matsushita Electronics, Inc. ("MEI"). Toshiba Mot. at 18-20. Those arguments,

8    however, are not well taken. The applicable law has been explained above in response to

9    BMCC. (Section II.E.1.b.i. *supra).* Toshiba's arguments are no more availing. Indeed,

10   even the cases cited by Toshiba (*Morton's Market, Antar*) recognize that continued

11   receipt of benefits from the conspiracy (here, participation and payment from MTPD) is

12   incompatible with a claim of withdrawal.

13             Even assuming that the DP-CAC allegations about Toshiba Corp. forming MTPD

14   with MEI in 2002 resulted in all the Toshiba entities ceasing active participation in all of

15   the CRT Products market (*i.e.*, exiting the CRT television and computer display market,

16   as well as the CRT component market), the DP-CAC does not show unequivocal

17   abandonment by the Toshiba entities of all of the benefits of the CRT Products

18   conspiracy. Indeed, the exact opposite is alleged, *i.e.*, that the Toshiba entities maintain a

19   one-third interest in the MTPD. Thus, to the extent MTPD continued the conspiratorial

20   practices begun prior to the Toshiba entities' supposed exit from the CRT Product

21   market, they would indeed remain the beneficiaries of their prior conspiratorial conduct.

22   Therefore, it cannot be said the DP-CAC shows on its face an effective withdrawal. At a

---

23   [51] To the extent that Toshiba's argument on this issue is based on whether specific
24   Toshiba companies were (or were not) the subject of criminal investigations in the TFT-
     LCD market (Toshiba Mot. at 16-17), it repeats the argument addressed above. For the
25   same reason that argument lacks merit with respect to the sufficiency of allegations as to
     the participation in the conspiracy by the Toshiba entities generally, it also lacks merit
26   with respect to the need for more detailed, defendant-specific allegations as to each
     Toshiba entity's participation in the conspiracy. *See also Flash Memory*, 2009 WL
27   1096602 at *11-*12 (explaining why allegations of misconduct in one market can, in
     some instances, support allegations of misconduct in another, arguably unrelated
28   market.).

**Direct Purchaser Plaintiffs' Combined Opposition**                                    - 82 -
**Case No. 3:07-CV-5944 SC**