1  minimum, further evidentiary showings must be made to determine whether the Toshiba

2  entities "no longer obtained benefits" after 2002.

### 5.    Hitachi.

#### a.    Overview

5  Defendants Hitachi, Ltd., Hitachi Displays, Ltd. ("Hitachi Displays"), Hitachi

6  America, Ltd. ("Hitachi America"), Hitachi Asia, Ltd. ("Hitachi Asia"), Hitachi

7  Electronic Devices (USA) ("HEDUS"), and Shenzhen SEG Hitachi Color Display

8  Devices, Ltd. ("Hitachi Shenzhen") (collectively "Hitachi") feature prominently in the

9  amended complaint and are expressly alleged to have engaged in overt acts in furtherance

10  of the conspiracy, including participation at meetings where members of the cartel

11  reached unlawful agreements to fix prices, restrict outputs, and allocate customers.

12  Hitachi moves to dismiss the DP-CAC on three grounds:  (1) that the DP-CAC

13  does not contain detailed allegations regarding each Hitachi entity's participation in the

14  conspiracy, and instead, treats all the Hitachi entities as one corporate family; (2) that the

15  DP-CAC fails to meet the notice pleading standards of Fed. R. Civ. P. 8; and (3) that

16  Plaintiffs' claims are barred by the statute of limitations.  Each of Hitachi's arguments

17  ignores specific allegations in the DP-CAC and misconstrues relevant law.  Hitachi's

18  motion to dismiss should be denied.

19  *First*, contrary to Hitachi's suggestion, Plaintiffs are under no obligation to plead

20  detailed facts regarding each individual Defendant's role in the conspiracy.  Instead, as

21  even the cases cited by Hitachi hold, to survive a motion to dismiss, the DP-CAC need

22  only contain allegations *plausibly suggesting* that each Hitachi entity participated in the

23  conspiracy.  *See TFT-LCD II*, 599 F. Supp. 2d at 1184-85.  Plaintiffs have surpassed that

24  standard by pleading specific overt acts of the Hitachi corporate family in furtherance of

25  the conspiracy and also alleging that each Hitachi entity acted for, and on behalf of, all

26  the other Hitachi entities with respect to the conspiracy.

27  *Second*, the DP-CAC easily meets the pleading standards of Fed. R. Civ. P. 8.

28  The DP-CAC does not rely on the inferences drawn from parallel conduct.  Instead,

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 83 -

1   it contains detailed, direct allegations of "actual agreement" – including allegations

2   regarding meetings where Hitachi and its co-conspirators formed illegal agreements to fix

3   prices and restrict output.

4         *Finally,* Hitachi's assertion that the claim against it is barred by the statute of

5   limitations is meritless.  Hitachi and its co-conspirators engaged in overt acts in

6   furtherance of the conspiracy – including participation in conspiratorial meetings and

7   selling CRT Products at inflated fixed prices – through November 2007. There are no

8   allegations in the DP-CAC supporting Hitachi's contention that it withdrew from the

9   conspiracy.  In any event, Plaintiffs have sufficiently pled that the statute of limitations

10  was tolled by Defendants' fraudulent concealment of the conspiracy.

11          **b.**    **Allegations As To Hitachi**

12        Hitachi is among the leading manufacturers of CRTs and CRT products (*e.g.*,

13  televisions and computer monitors).  DP-CAC ¶ 1. From March 1, 1995 through

14  November 25, 2007, Hitachi and the other Defendants engaged in a conspiracy in the

15  CRT products market to: "(a) fix target prices and price guidelines; (b) exchange

16  pertinent information on, *inter alia*, shipments, prices, production, and customer demand;

17  (c) coordinate public statements regarding available capacity and supply; (d) resolve

18  issues created by asymmetrical vertical integration among some of the co-conspirators;

19  (e) keep their collusive meetings secret; (f) expose cheating on the agreements and

20  discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g)

21  influence and, at times, coordinate pricing with producers in other geographic areas; (h)

22  limit competition for certain key customers; (i) allocate customers; (j) allocate each

23  producer's share of certain key customers' sales; and (k) restrict output." *Id.* ¶ 5.

24        The details of this conspiracy – including the overt acts of Hitachi's co-

25  conspirators and examples of agreed-upon output reductions and price fixing – are set out

26  in the complaint. *See id.* ¶¶ 134-97. The complaint also details the numerous worldwide

27  antitrust enforcement actions and investigations involving Hitachi and the other

28  Defendants, including the indictment of the former CEO and Chairman of

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

1   Defendant Chunghwa PT, as well as Hitachi Displays' recent guilty plea to a DOJ

2   indictment alleging antitrust price fixing in the TFT-LCD market – the successor

3   technology to CRTs.  *See id.* ¶¶ 122-33

4          Plaintiffs have asserted claims against six entities within the Hitachi corporate

5   family.  Hitachi, Ltd. is the "parent company for the Hitachi brand of CRT Products,"

6   DP-CAC ¶ 30, and throughout the class period it "dominated and controlled the finances,

7   policies and affairs" of the five other Hitachi defendants.  *Id.* ¶¶ 31-35.  In 2002, Hitachi

8   Ltd. spun off its CRT business into its affiliate company, Defendant Hitachi Displays.  *Id.*

9   ¶ 31.  Following this transaction, however, Hitachi, Ltd. continued to control and

10  dominate the business of Hitachi Displays.  *Id.*

11         Defendants Hitachi America, Hitachi Asia, and HEDUS, are wholly-owned

12  subsidiaries of Hitachi Ltd. and manufactured, sold, and/or distributed CRT products

13  throughout the United States.  *Id.* ¶¶ 32-34.  Defendant Hitachi Shenzhen, an affiliate of

14  Hitachi Ltd. and Hitachi Displays, also manufactured, sold, and distributed CRT products

15  throughout the United States.  *Id.* ¶ 35.  For all but the last two weeks of the class period,

16  Hitachi Displays owned at least a 25% interest in Hitachi Shenzhen and Hitachi, Ltd. and

17  Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi

18  Shenzhen relating to the conspiracy.  DP-CAC ¶ 35; "Declaration of Thomas R. Green,"

19  ¶ 2 (May 18, 2009) ("Green Decl.").[52]   On November 8, 2008, Hitachi Displays sold its

20  25% ownership interest in Hitachi Shenzhen to a third party.  *See* Green Decl. ¶ 2.

21         Each Hitachi Defendant was a participant in, and a beneficiary of, the conspiracy.

22  Representatives of the Hitachi corporate family participated "in over a dozen illegal

23  bilateral and group meetings from 1996 through at least 2001 in which unlawful

24  agreements as to, *inter alia*, price, output restrictions, and customer and market allocation

25  of CRT Products occurred.  These included more than ten bilateral meetings and more

26  ―――――――――――――――
   [52] Counsel for Hitachi has informed Plaintiffs that Hitachi Shenzhen is not a "wholly-
27  owned . . . subsidiary of Defendant Hitachi Displays" as alleged in paragraph 35 of the
    DP-CAC.  Plaintiffs are in the process of independently verifying this representation and
28  will amend the DP-CAC, if necessary, to correct this assertion.

**Direct Purchaser Plaintiffs' Combined Opposition**                                    - 85 -
**Case No. 3:07-CV-5944 SC**

1  than five group meetings . . . which took place in Taiwan and China." DP-CAC ¶ 157.

2  The DP-CAC particularizes the types of conspiratorial meetings held, the corporate-level

3  representatives that attended, where meetings were typically held, the procedures

4  followed, and the illegal agreements that were reached. *Id.* ¶¶ 134-53.

5        The individual Hitachi representatives who attended the conspiratorial meetings

6  often neither disclosed their affiliation to a particular Hitachi entity, nor distinguished

7  among the separate Hitachi defendants. *Id.* ¶ 154.  Instead, these individuals acted as

8  agents for the entire Hitachi corporate family and "entered into agreements on behalf of,

9  and reported these meetings and discussions to, [each member of the Hitachi] corporate

10  famil[y].  As a result, the entire [Hitachi] corporate family was represented in meetings

11  and discussions by their agents and was a party to the agreements reached in them." *Id.*

### c.   Plaintiffs Have Adequately Pled Hitachi's Involvement In The Alleged Conspiracy

14        Mirroring the argument in Defendants' joint motion to dismiss, Hitachi asserts

15  that the DP-CAC improperly "lumps" all the Hitachi Defendants together and thus

16  "fail[s] to provide the required notice to any of the Hitachi Defendants."  Hitachi Mot. at

17  10.  Hitachi misstates the law and ignores allegations in the DP-CAC.  As explained

18  above, to satisfy the notice pleading standards of Fed. R. Civ. P. 8, an amended complaint

19  need only contain allegations that *plausibly suggest* that each Defendant participated in

20  the alleged conspiracy.  There is no requirement that plaintiffs detail facts regarding each

21  individual defendant's specific role in the conspiracy.  The DP-CAC contains allegations

22  indistinguishable from those held to state a claim against each defendant in *TFT-LCD II*.

23  Among other things, the DP-CAC alleges as follows concerning Hitachi:

24   •   That the illegal conspiracy was organized at the highest level of the Hitachi
25       corporate family and executed through Hitachi regional managers and other
         subordinate employees.  DP-CAC ¶¶ 6, 151, 154, 157-58;

26   •   That the Hitachi corporate family "participated in over a dozen illegal bilateral
27       and group meetings from 1996 through at least 2001 in which unlawful
         agreements as to, *inter alia,* price, output restrictions, and customer and
28       market allocation of CRT Products occurred," and that these "included more

**Direct Purchaser Plaintiffs' Combined Opposition**                              - 86 -
**Case No. 3:07-CV-5944 SC**

than ten bilateral meetings and more than five group meetings . . .which took place in Taiwan and China." *Id.* ¶¶ 157-58;

- That the individual participants in the conspiratorial meetings "entered into agreements on behalf of, and reported these meetings and discussions to" other members of the Hitachi family. *Id.* ¶ 154 (alleging also that "the entire corporate family was represented in meetings and discussions by their agents and was a party to the agreements reached in them");

- That "the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family." *Id.*; and

- That each Hitachi Defendant was a knowing participant in the conspiracy and that none of the Hitachi Defendants "effectively withdrew from this conspiracy." *Id.* ¶¶ 157-58.

Moreover, Plaintiffs have also pled that each Hitachi entity acted as an agent for the other entities within the Hitachi corporate family. *Id.* ¶ 154; *id.* ¶¶ 30-36 (alleging that Hitachi, Ltd., "the parent company for the Hitachi brand of CRT products . . . dominated and controlled the finances, policies and affairs of" the other Hitachi defendants); *id.* ¶ 154 (alleging that the individual participants in the conspiratorial meetings acted as agents for the entire Hitachi corporate family). In this circuit, allegations of agency are liberally construed and accepted as true at the pleading stage. *See, e.g., Weinstein v. Saturn Corp.*, 303 Fed. Appx. 424, 426 (9th Cir. 2008) ("*Weinstein*") (holding that allegation that car manufacturer exercised "substantial control" over the dealership was sufficient at the pleading stage to establish agency).

Hitachi argues, however, that Plaintiffs created a "fictional" Hitachi collective by including Hitachi Shenzhen in the Hitachi corporate family. "Hitachi Defendants' Notice of Motion And Motion To Dismiss the Direct-Purchasers' Consolidated Amended Complaint And The Direct-Purchasers' Consolidated Amended Complaint ," pp. 3, 10, 11, 12 (May 18, 2009) (Hitachi Mot."). Assuming Hitachi is correct (and it is not) that Hitachi Shenzhen is not a member of the Hitachi corporate family, this says nothing about the adequacy of Plaintiffs allegations about the remaining Hitachi Defendants. Further, by Hitachi's own admission, for all but the last two weeks of the class period, Hitachi Displays owned at least a 25% interest in Hitachi Shenzhen. Mot. at 3-4

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 87 -

1   (stating that Hitachi Display sold its ownership interest in Hitachi Shenzhen on

2   November 8, 2007); Green Decl. ¶ 2 (same).[53]   The DP-CAC further alleges that

3   "Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances,

4   policies and affairs of [Hitachi Shenzhen][54] relating to the antitrust violations alleged in

5   the amended complaint." DP-CAC ¶ 35.  On a motion to dismiss, well-pleaded

6   allegations of control and agency must be accepted at true.  *See Weinstein*, 303 Fed.

7   Appx. at 424; *Fair Housing of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002) ("the

8   general rule is that well-pled allegations in the amended complaint regarding liability are

9   deemed true.").[55]   Accordingly, the term "Hitachi" as used in the DP-CAC is not

10  ambiguous or confusing.  The DP-CAC plainly alleges that each Hitachi Defendant,

11  including Hitachi Shenzhen, acted as an agent on behalf of all the other Hitachi

12  Defendants, and that each Hitachi entity is a member of and participant in the

13  overarching conspiracy.

**d.    Plaintiffs Have Stated a Claim Against the Hitachi
        Entities**

14

15       Next, Hitachi argues that the DP-CAC contains nothing more than a "'formulaic

16  recitation of the elements of a cause of action.'"  Hitachi Mot. at 13 (quoting *Twombly*,

17  550 U.S. at 555).  The allegations of the DP-CAC show that Hitachi is wrong.

18       The DP-CAC contains far more than an incantation of the elements of an antitrust

19  claim.  It does not rely on circumstantial allegations of parallel conduct to create the

20

---

21  [53] Hitachi is careful to state in its motion that "neither [Hitachi Displays] nor any other
    Hitachi entity *has* an ownership or control over Hitachi Shenzhen."  Hitachi Mot. at 3
22  n.2.  Whether any of the other five Hitachi entities currently has ownership or control
    over Hitachi Shenzhen is irrelevant.  As, Hitachi admits, Hitachi Displays owned at least
23  25% of Hitachi Shenzhen for nearly the entire class period.

24  [54] Paragraph 35 of DP-CAC incorrectly refers to "HEDUS" instead of "Hitachi
    Shenzhen" in the last sentence of the paragraph.

25  [55] *See also Siemers v. Wells Fargo and Co.*, No. 05-04518, 2006 WL 2355411 at *14
26  (N.D. Cal., Aug. 14, 2006) (holding in analogous context of control person liability under
    Section 20(a) of the Securities Act, that allegations of control need not be plead with
27  particularity).

28

**Direct Purchaser Plaintiffs' Combined Opposition**                                  - 88 -
**Case No. 3:07-CV-5944 SC**

1  inference of a conspiracy. *Compare Twombly*, 550 U.S. at 565 n.11 (noting that that the

2  amended complaint "proceed[ed] exclusively via allegations of parallel conduct").

3  Plaintiffs have pled, in detail, the "who-what-when-where" particulars of a twelve-year

4  conspiracy to fix prices and control output.

5       Among other things, the DP-CAC sets forth the numerous conspiratorial meetings

6  between and among Defendants – including in particular the Hitachi Defendants: (a)

7  bilateral meetings (DP-CAC ¶¶ 5, 6, 138); (b) informal multilateral meetings (*id.*); (c)

8  formal multilateral "glass" meetings (*id.* ¶¶ 5, 6, 140-53); and (d) "green meetings" (*id.*

9  ¶141). Also alleged are the corporate level attendees at each category of meeting, (*id.* ¶¶

10  141,151), how each meeting was conducted (*id.* ¶¶ 143-44, 148-49); where the meetings

11  were conducted (*id.* ¶¶ 141, 151), and what was discussed and agreed to among the co-

12  conspirators (*id.* ¶¶ 144-52).

13       The DP-CAC further specifies that the Hitachi entities "participated in over a

14  dozen illegal bilateral and group meetings from 1996 through at least 2001 in which

15  unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market

16  allocation of CRT Products occurred. These included more than ten bilateral meetings

17  and more than five group meetings . . . which took place in Taiwan and China." *Id.* ¶

18  157. Moreover, the DP-CAC alleges that many of the Defendants are under investigation

19  by the Department of Justice and other authorities around the world for the very same

20  anticompetitive conduct in the CRT industry as alleged in the DP-CAC. For instance, the

21  former Chairman and CEO of one Defendant, Chunghwa PT, has already been indicted

22  for "conspiring with others to suppress and eliminate competition by fixing prices,

23  reducing output and allocating market shares of color display tubes (CDTs) to be sold in

24  the U.S. and elsewhere . . . ." *Id.* ¶¶ 125-33.

25       Nevertheless, Hitachi asserts that the DP-CAC is deficient because it does not set

26  out the precise dates and locations of the meetings attended by Hitachi representatives,

27  the names of the Hitachi representatives that attended each meeting, and the other

28  participants in such meetings. Mot. at 10-11. As noted above, however, Plaintiffs,

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

1  are under no obligation to plead such facts with particularity: antitrust claims still sound

2  under Rule 8, not Rule 9(b).

3     Hitachi's additional argument that the claim against it must be dismissed because

4  the DP-CAC does not plead parallel conduct (Hitachi Mot. at 16-17) is unfounded.

5  Plaintiffs' conspiracy claim does not rely meaningfully on inferences drawn from parallel

6  conduct as in *Twombly*.  Rather, it is predicated on detailed allegations of Defendants'

7  meetings where illegal agreements were made to fix prices and control output.

8  Therefore, even absent extensive allegations of parallel conduct, the amended complaint

9  pleads a cause of action.[56]

10    But, even putting aside the direct allegations of a conspiracy, the DP-CAC

11 contains circumstantial allegations, which alone create a plausible inference that a

12 conspiracy exists.  The DP-CAC alleges parallel conduct in the form of reductions in

13 manufacturing capacity during the class period (including specific plant closures, DP-

14 CAC ¶¶ 181-87), and CRT price movements including price increases in the face of

15 lower costs and lower demand that are plausibly explained by collusion among the

16 Defendants.  *Id.* ¶¶ 188-97.  The DP-CAC also alleges that many of the same Defendants

17 here have colluded to fix prices in the TFT-LCD market – the successor technology to

18 CRTs – and that Hitachi Displays has plad guilty to participation in the conspiracy and

19 agreed to pay a $31 million fine.  *Id.* ¶ 124.  As in *SRAM*, Hitachi's guilty plea for

20 conspiracy in a related market "support[s] an inference of a conspiracy in the [CRT]

21 industry." 580 F. Supp. 2d at 903.  Finally, the DP-CAC alleges that Hitachi was a

22 member of trade associations, such as the Society for Information Display, and attended

23 trade shows such as the Korea Display Conference.  DP-CAC ¶ 176-79.  *SRAM* also

24 recognized that "such participation demonstrates how and when Defendants had

25 ───────────────

26 [56] *International Norcent Tech v. Koninklijke Philips Elecs. N.V.,* No. 07-00043, 2007 WL 4976364 (C.D. Cal,. Oct. 29, 2007) is not to the contrary.  That case stands for the unremarkable proposition that a motion to dismiss should be granted where plaintiffs

27 have failed to plead an actual agreement to restrain trade *and* failed to plead parallel conduct.  *See id.* at *10.

28

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 90 -

1   opportunities to exchange information or make agreements." *SRAM*, 580 F. Supp. 2d at

2   903.

3        Finally, there is no merit in Hitachi's argument that it must be dismissed because

4   its market share declined.  To the contrary, there is nothing inconsistent with a declining

5   market share and participation in a conspiracy to fix prices and reduce output.

6   Notwithstanding Hitachi's dwindling market share, Hitachi, as an acknowledged

7   participant in the CRT market throughout the class period, continued to enjoy the benefits

8   of artificially inflated prices for the CRT products it sold.[57]

9              **e.    The Statute of Limitations Does Not Bar Plaintiffs'
                       Claims Against Hitachi**
10

11       The limitations period does not begin to run on Plaintiffs' claims against Hitachi

12   as long as Hitachi's "co-conspirators continu[ed] to engage in overt acts designed to

13   accomplish the objectives of the conspiracy."  *United States v. Miller*, 771 F.2d 1219,

14   1226 (9th Cir. 1985).  Although the amended complaint does not expressly allege that

15   Hitachi took part in conspiratorial meetings after 2001, it undeniably alleges that

16   Hitachi's co-conspirators engaged in numerous overt acts through the end of the class

17   period, including attending "Glass" meetings where co-conspirators agreed to fix the

18   price of CRT products and reduce outputs, DP-CAC ¶¶155, 164, and selling CRT

19   products at prices that have been "raised, fixed, maintained and stabilized at artificially

20   high and noncompetitive levels." *Id.* ¶¶ 198, 218.  Accordingly, Hitachi's argument that

21   the claims asserted against it are barred because they rely exclusively on "activity outside

22   of the statute of limitations" is incorrect.

23       Hitachi Ltd.'s additional argument, that it withdrew from the conspiracy in 2002

24   ――――――――――
     [57] Hitachi's reliance on *In re Citric Acid Litig.*, 996 F. Supp. 951 (N.D. Cal. 1998) is

25   misplaced.  In that case, the court determined at the summary judgment stage that
     defendant's market share *growth* of several percent was inconsistent with allegations that

26   the conspirators had "allocate[ed] market share within a tenth of a percent." *Id.* at 961. As
     set forth above, there is nothing inconsistent with plaintiffs' conspiracy allegations and

27   Hitachi's decline in market share during the class period.

28

**Direct Purchaser Plaintiffs' Combined Opposition**                          - 91 -
**Case No. 3:07-CV-5944 SC**

when "Hitachi, Ltd. left the CRT industry and spun off all of its departments related to the display business to [Hitachi Displays]" (Mot. at 17-18) fares no better.

Hitachi Ltd. cannot have withdrawn from the conspiracy simply by spinning off its CRT departments into another Hitachi affiliate, which it continued to "dominate[] and control[]." DP-CAC ¶ 34. As discussed above, numerous courts have held that a defendant's sale of a business, or resignation from an enterprise, does not constitute effective withdrawal, especially when the defendant continues to be involved in or receives benefits from the successor business or from the enterprise. Moreover, given the DP-CAC's allegations that Hitachi, Ltd. dominated and controlled the other members of the Hitachi corporate family, Hitachi, Ltd. remained integrally involved in, and benefitted from, the illegal conspiracy through November 2007. *See* section II.E.1.b.i. *supra*.

Finally, Hitachi's assertion that plaintiffs fail to adequately plead fraudulent concealment is also baseless. As explained above, Plaintiffs have alleged numerous specific acts of fraudulent concealment that toll the statutory period for CRT sales that occurred prior to November 26, 2003[58]. Hitachi's argument that plaintiffs must allege acts of fraudulent concealment as against each co-conspirator is wrong as a matter of law[59].

### 6. LG Defendants

#### a.    Overview

Defendants LG Electronics Inc. ("LGEI"), LG Electronics U.S.A. Inc., ("LGEUSA") and LG Electronics Taiwan Taipei Co. Ltd. ("LGETT") (all members of the LG Electronics corporate family), have moved to dismiss the DP-CAC on the grounds that: (1) LGEI withdrew, as a matter of law, from the alleged CRT Products price fixing

---

[58] The first direct purchaser complaint was filed on November 26, 2007.

[59] Hitachi takes language out of context from cases outside of the Ninth Circuit for the proposition that Plaintiffs may not "imput[e] allegations of active concealment committed by any other Defendant to the Hitachi defendants." Hitachi Mot. at 19. None of the cases cited by Hitachi explores the specific issue of whether plaintiffs are required to allocate specific acts of fraudulent concealment to each participant in a conspiracy on a motion to dismiss.

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

1   conspiracy by "exiting" the CRT business in 2001 and, that as a result of its purported

2   withdrawal, the statute of limitations applicable to Plaintiffs' claim against LGEI ran

3   before this action was commenced and (2) the DP-CAC lacks sufficient individualized

4   allegations regarding each LG Defendant's participation in the conspiracy and therefore

5   fails to provide fair notice of the claims being asserted against them. In the alternative,

6   the moving LG Defendants seek an order directing Plaintiffs to provide a more definite

7   statement of their claim pursuant to Fed. R. Civ. P. 12(e).

8       As explained below, the well pleaded factual allegations of the DP-CAC preclude

9   any finding that LGEI withdrew, as a matter of law, from the CRT Products price fixing

10  conspiracy in 2001. The DP-CAC alleges that LGEI was in the business of

11  manufacturing and selling CRT Products during the class period; that *both* CRT Products

12  and CRTs were encompassed in Defendants' price fixing scheme; and that LGEI

13  continued to participate in the business of manufacturing and selling CRTs until April

14  2007 through a joint venture (LG Philips Displays) which it formed with one of its co-

15  defendant co-conspirators in 2001. The DP-CAC also alleges that LGEI was represented,

16  from 1995 through at least 2006, in CRT Product price fixing meetings at which

17  agreements on price, output and customer/market allocation were reached and at which

18  proprietary information was exchanged to implement the conspiracy. The DP-CAC also

19  alleges that, during the class period, LGEI took affirmative steps to fraudulently conceal

20  the existence of the CRT Products price fixing scheme. All of these allegations are

21  inconsistent with the notion that LGEI withdrew from the conspiracy, as a matter of law,

22  in 2001. Moreover, even if LGEI were able to conclusively demonstrate that it withdrew

23  from the scheme in 2001, the DP-CAC's fraudulent concealment allegations are

24  adequately plead and sufficient to toll the running of the applicable four year statute of

25  limitations until at least November 2007. In short, Plaintiffs' well pleaded allegations

26  relating to the issues of both withdrawal and fraudulent concealment, taken as true as

27  they must be at this juncture, raise disputed issues of fact which require denial of the LG

28  Defendants' motion to dismiss. Finally, the DP-CAC, on its face, adequately and

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

1    "plausibly" alleges the involvement of each of the LG Defendants in the CRT Products

2    conspiracy, the role that each LG Defendant played in the scheme, and puts each LG

3    Defendant on fair notice of the claims against it, requiring denial of both their motion to

4    dismiss and their alternative motion for a more definite statement.

**b.      Allegations Relating To The LG Defendants'
Participation In The Alleged Conspiracy**

7         The DP-CAC alleges that LGEI, LGEUSA, LGETT, and LP Displays

8    International Ltd. ("LP Displays," formerly known as LG Philips Displays ("LGPD")),

9    (collectively referred to as the LG Defendants), participated with their co-defendants and

10   others in a conspiracy to fix, raise, maintain and stabilize the prices of CRT Products

11   which commenced at least as early as March 1, 1995 and continued until at least

12   November 2007.  DP-CAC  ¶¶ 6, 41-44, 85, 160-161, 175-180. The CRT Products,

13   encompassed by Defendants' price fixing scheme, were *both* CRTs *and* electronic

14   devices containing CRTs. *Id.*  ¶ 1.  The scheme artificially inflated the prices direct

15   purchasers paid for CRT Products in the United States. *Id.* ¶¶85, 198-99.

16        During the class period, (March 1, 1995 to November 25, 2007) (*id.*¶ 85), LGEI,

17   LGUSA and LGETT manufactured, sold and distributed CRT Products directly or

18   through their subsidiaries or affiliates throughout the United States. *Id.* ¶ ¶41-43.

19        In 2001 LGEI formed a joint venture with its co-defendant Koninklijke Philips

20   Electronics N.V. ("Royal Philips") called "LG Philips Displays" (or "LGPD") to engage

21   in the manufacture/sale of CRTs (*id.* ¶¶ 41, 51).[60]  LG Philips Displays was operated by

22   LGEI and Royal Philips as a joint CRT venture until April 2007 when it became an

23   independent company and changed its name to LP Displays International Ltd. ("LP

24   Displays") (*id.* ¶ 41).  By 2002, LGEI, through its joint venture with Royal Philips, had a

25   24.4 percent worldwide CRT market share.  *Id.*  LP Displays is the successor to LG

---

27   [60]   The LG Defendants concede that prior to sometime in 2001 LGEI was engaged in the
manufacture/sale of CRTs.

**Direct Purchaser Plaintiffs' Combined Opposition
Case No. 3:07-CV-5944 SC**

- 94 -

Philips Displays.  LP Displays manufactured, sold and distributed CRTs during the Class period. (*id.* ¶ 44).[61]  LP Displays is a Defendant herein. (*id.* ¶¶ 41, 44, 51).

The CRT Products price fixing conspiracy was effectuated and implemented largely through hundreds of bilateral and multilateral meetings held between and among the Defendants and their co-conspirators during the class period.  The nature, substance and locations of these collusive meetings are set forth in the amended complaint.  *Id.* ¶¶ 6, 134-153, 81-86.  LGEI (and each of the LG Defendants, including LGETT) participated in more than a dozen bilateral and more than a hundred group conspiratorial meetings from 1995 to 2006 in which agreements on price, output restrictions and customer and market allocation of CRT Products were reached.  The meetings were held in Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, and China. *Id.* ¶ 160. LP Displays participated in *over one hundred* bilateral and group meetings between 2001 and 2006 in which agreements on price, output restrictions and customer and market allocation of CRT Products were reached.  These meetings were held in Taiwan, South Korea, Japan, Malaysia, Thailand, Singapore, Indonesia, and China. *Id.* ¶ 175.  LGEUSA was represented at these meetings and was a party to the agreements reached during the meetings.  To the extent LGEUSA distributed CRT Products to direct purchaser class members it played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at their meetings.  LGEUSA was an active, knowing participant in the conspiracy.  *Id.* ¶ 161.

During the conspiratorial meetings described in the DP-CAC, the entire group of LG Defendants was represented by one or more employees of the particular LG Defendants in attendance at each meeting.  *Id.* ¶ 154.  The individual LG Defendants

---

[61]   LGPD, the joint CRT venture of LGEI and Royal Philips, and Defendant LP Displays are the same corporate entity.  The corporate entity ceased operating as a joint venture of LGEI and Royal Philips in April 2007 and changed its name to LP Displays.  LP Displays is currently party to a bankruptcy proceeding pending in Hong Kong and is not party to any of the pending motions.

1    participating in the meetings entered into agreements on behalf of all LG Defendants and

2    reported the discussions and the results of the meetings back to all LG Defendants.  *Id.*

3    All LG Defendants were represented at the meetings and discussions where agreements

4    and understandings were reached on price, output restrictions and market and customer

5    allocation of CRT Products.  *Id.*  The individual LG Defendants participating in collusive

6    meetings acted as agents and/or representatives of all LG Defendants with respect to the

7    understandings reached during the conspiratorial meetings alleged.  *Id.*  Indeed,

8    participants in the collusive meetings did not always know the exact corporate affiliations

9    of their counterparts and did not distinguish between entities within a corporate family.

10   *Id.*  LGEI dominated and controlled the finances, policies and affairs of LGEUSA and

11   LGETT relating to the antitrust violations alleged in the DP-CAC.  *Id.* ¶¶ 42-43.

12       The conspiracy was also furthered by trade associations and trade events

13   including the Korea Display Conference ("KDC") hosted by DisplayBank and, since the

14   summer of 2004, by the Korea Display Equipment Material Industry Association

15   ("KODEMIA").  Prior to the summer of 2004, the KDC was hosted by the Electronic

16   Display Industrial Research Association of Korea ("EDIRAK"). *Id.* 176.  The LG

17   Defendants were members of KODEMIA and EDIRAK and participated extensively in

18   the KDCs.  KDC meetings took place in Seoul, Korea and other Korean venues on

19   December 4, 2002, June 12, 2003, December 9-10, 2003, June 9-10, 2004, November 23-

20   24, 2004, November 3-4, 2005, July 6-7, 2006 and June 26-27, 2007.  Top executives of

21   the LG Defendants participated in these meetings and events including S.T. Kim, S.

22   Trinker and Ney Corsino. *Id.* ¶ 178.  At these trade associations and trade events and in

23   meetings related to these trade associations and events, Defendants, including the LG

24   Defendants, shared proprietary and competitively sensitive information.  The exchange of

25   this information was used to implement and maintain the conspiracy.  *Id.* ¶ 180.

26       During the Class period the Defendants reduced manufacturing capacity to prop

27   up prices. *Id.* ¶ 181.  In this connection, in July of 2005 LG Philips Displays (n/k/a LP

28   Displays), stopped producing CRTs at its Durham, UK plant.  *Id.* ¶ 184.  To conceal

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

1    the conspiracy, during the Class period, the LG Defendants periodically issued press

2    statements falsely asserting that CRT prices were being driven lower by intense

3    competition. *Id.* ¶ 210.

4            c.      **The Well Pled Factual Allegations Of The DP-CAC**
                     **Preclude A Finding That LGEI Withdrew From The**
5                    **Conspiracy In 2001**

6            LGEI argues that it withdrew, as a matter of law, from the conspiracy in 2001

7    because it supposedly "exited" the CRT business. This argument misconstrues the law of

8    withdrawal and ignores the well plead factual allegations that show that there was no

9    such "exit" by LGEI or any other LG Defendant.

10           As noted above, a conspiracy is presumed to exist until there has been an

11   affirmative showing that it has terminated and its members continue to be conspirators

12   until there has been an affirmative showing that they have withdrawn. The burden of

13   proving withdrawal from a conspiracy rests on the defendant seeking to establish its

14   withdrawal. The standard for withdrawal has already been discussed above in connection

15   with BMCC's motion to dismiss. Mere cessation of activity in furtherance of a

16   conspiracy is not sufficient. Unless LGEI's withdrawal from the alleged conspiracy is

17   conclusively established as matter of law *on the face of the DP-CAC*, the LG Defendants'

18   motion to dismiss, based on LGEI's purported withdrawal in 2001, must be denied.

19           As set forth above, the DP-CAC alleges that LGEI (and the other LG Defendants)

20   did not withdraw from the conspiracy (DP-CAC ¶ 160) and LGEI has pointed to nothing

21   on the face of the DP-CAC that conclusively establishes its withdrawal in 2001.

22   Plaintiffs allege, and LGEI cannot dispute that it manufactured and sold electronic

23   products containing CRTs during the class/conspiracy period. This alone belies any

24   contention by LGEI that, in 2001, it "exited" the business of selling the products which

25   were the subject of the price fixing scheme. The DP-CAC plainly alleges that

26   Defendants' price fixing scheme encompassed both CRTs *and electronic devices*

27   *containing CRTs,* a well plead fact the LG Defendants conveniently ignore. With respect

28   to CRTs, LGEI concedes that it manufactured/sold CRTs until sometime in 2001

**Direct Purchaser Plaintiffs' Combined Opposition**                                    - 97 -
**Case No. 3:07-CV-5944 SC**

(See LG Defendants' Brief at 5), and the DP-CAC alleges that from 2001 until at least April 2007, LGEI continued to manufacture and sell CRTs as part of a joint venture (LGPD) it formed with its co-defendant co-conspirator, Royal Philips.  This allegation is inconsistent with LGEI's suggestion that it withdrew from the conspiracy by "exiting" the CRT business in 2001.[62]  Moreover, the DP-CAC alleges that LGEI was represented by its agents at conspiratorial meetings which were held throughout the class period and continued through at least 2006, *i.e.*, well after the year LGEI supposedly withdrew from the conspiracy.  The DP-CAC's allegations regarding LGEI's continued participation in the conspiracy through at least 2006 are clearly inconsistent with LGEI's contention that it withdrew from the scheme in 2001.

Finally, the DP-CAC alleges that LGEI took affirmative steps during the class/conspiracy period to conceal the existence of the conspiracy – another well plead fact inconsistent with the argument that LGEI withdrew in 2001.  In short, the DP-CAC's well plead factual allegations flatly preclude any finding that LGEI (or any of the LG defendants) withdrew from the conspiracy, as a matter of law, in 2001, as LGEI argues. The DP-CAC's factual allegations, taken as true as they must be on a motion to dismiss, raise disputed questions of fact which are not properly determinable on a motion brought under Fed. R. Civ. P. 12(b)(6).

> **d.   Assuming LGEI Withdrew from the Conspiracy As A Matter Of Law in 2001 Plaintiffs Have More Than Adequately Plead Fraudulent Concealment Tolling The Applicable Statute of Limitations**

Withdrawal becomes a complete defense to a charge of conspiracy only when coupled with a valid statute of limitations defense.  *Morton's Market*, 198 F.3d at 837; *Antar,* 53 F.3d at 584.  To prevail on its motion, LGEI must demonstrate not only that the DP-CAC , on its face, shows that it withdrew from the alleged conspiracy more than four

---

[62]   To find that LGEI's 2001 decision to continue its manufacture/sale of CRTs through a joint venture with its co-defendant/co-conspirator Royal Philips somehow constituted an exit from the CRT business and withdrawal from the conspiracy as a matter of law would be to exalt form over substance.

years before this action was commenced (which, as shown above, it has not and cannot

demonstrate), but also that the running of the statute was not otherwise tolled by

Defendants' fraudulent concealment of the conspiracy.  As discussed above, the DP-

CAC's allegations regarding Defendants' fraudulent concealment of the conspiracy

exceed the requirements of Fed. R. Civ. P. 8(a) and 9(b).  *See* DP-CAC ¶¶ 137-138, 148,

195, 200-212.  Accepting as true Plaintiffs' well pleaded allegations of fraudulent

concealment (as they must be accepted on a motion to dismiss), the running of the

limitations period for Plaintiffs' claims was tolled until (and did not begin to run until) at

least November 2007, when the existence of government investigations of the CRT

Products industry first became public.  Accordingly, even if LGEI withdrew from the

conspiracy in 2001, the claims against LGEI were nonetheless asserted well within the

limitations period, thus requiring denial of the LG Defendants' motion to dismiss.

Against the allegations of fraudulent concealment, the LG Defendants raise only disputed

issues of fact as to whether the limitations period was tolled, a question to be answered

after discovery and not on the pleadings.

        **e.**     **The DP-CAC Provides Each Of The LG Defendants
With Fair Notice Of The Claims Against Them And Of
Their Respective Roles In The Alleged Conspiracy
Rendering Dismissal Or A More Definite Statement
Inappropriate**

     The DP-CAC alleges the involvement of each of the LG Defendants in the CRT

Products conspiracy, the role that it played in the scheme and fairly puts each on notice of

the claims against it.  The DP-CAC contains extensive information regarding the group

and bilateral meetings by which the conspiracy was effectuated and implemented and at

which the LG Defendants were all represented. DP-CAC ¶¶ 134-154, 160-61, 175.

Plaintiffs allege detail about the substance and content of those conspiratorial meetings

and describe the types of employees who attended the meetings.  *Id.*  The DP-CAC

further describes trade association sponsored events and related meetings of Defendants

at which all LG Defendants were represented and during which proprietary, competitive

information was exchanged to implement and maintain the conspiracy.  *Id.* ¶¶ 176-

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

80.  The dates and venues of those meetings and the identity of various individuals representing the LG Defendants at those meetings is also plead. *Id.* ¶ 178. Viewed in their totality, the DP-CAC allegations are more than sufficient to put the LG Defendants on fair notice of the claims asserted against them and to satisfy any "plausibility" requirement imposed by the Supreme Court's decisions in *Twombly* and *Iqbal.*

The moving LG Defendants argue that the DP-CAC is insufficient because it fails to differentiate between corporate entities by failing to allege the identity of each employee of each LG Defendant who attended each particular meeting.  The moving LG Defendants elaborate that Plaintiffs are attempting to "pierce the corporate veil" of LGEI's subsidiaries and affiliates or to treat the subsidiaries and affiliates of LGEI as the "alter egos" of LGEI.  This argument is a strawman which distorts the operative factual allegations of the DP-CAC.  First, as discussed above, neither the Federal Rules of Civil Procedure nor the Supreme Court's decisions in *Twombly* and *Iqbal* mandate the kind of highly detailed fact or evidence pleading LG Defendants demand.  Second, Plaintiffs are not asking this Court to pierce any corporate veils or to treat any affiliate or subsidiary of LGEI as its alter ego. The DP-CAC alleges that one or more employees of the LG Defendant corporate family attended the conspiratorial meetings, described in the DP-CAC, and that when they did so they were *attending on behalf of and representing every company in the LG Defendant corporate family* and acting as their agents for purposes of the agreements and understandings reached at those meetings.  In this connection, strikingly similar allegations were found sufficient to defeat a strikingly similar motion to dismiss in *TFT-LCD II.*

The moving LG Defendants' request, in the alternative to dismissal, that Plaintiffs be required to provide a more definite statement of their claim pursuant to Fed. R. Civ. P. 12(e).  This request should be denied.  A more definite statement is appropriate only as to complaints "so vague or ambiguous that the [opposing] party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e).  The rule is designed to strike at *unintelligibility* in a pleading, not a supposed lack of detail.  A more definite statement is not a

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 100 -

substitute for discovery, which is specifically provided for elsewhere in the Rules.
Accordingly, where, as here, the amended complaint satisfies the notice pleading
requirements of the Federal Rules, courts have uniformly ruled that a more definite
statement is unwarranted and denied the motion.[63]

### 7. Panasonic Entities

The separate motion by the Panasonic Defendants – Panasonic Corp.
("Panasonic") and Panasonic Corp. of North America ("PCNA") – to dismiss the
amended complaint should be denied. Plaintiffs allege specifically and in detail
Panasonic and PCNA's role in Defendants' anticompetitive conspiracy regarding CRTs
and CRT Products. Plaintiffs' allegations satisfy the *Twombly* pleading standards for
stating a plausible antitrust claim.

#### a. Plaintiffs' Allegations Against the Panasonic Defendants Satisfy Rule 8's Pleading Standards.

Plaintiffs' allegations regarding Panasonic and PCNA's participation in the
conspiracy are more than sufficient under *Twombly* and "raise a reasonable expectation
that discovery will reveal evidence of illegal agreement." *Id.*

Panasonic and PCNA misrepresent the amended complaint when they contend
that Plaintiffs' claims against them consist only of a few isolated, broad assertions

---

[63] *See Stark v. Gov't Accounting Solutions Inc.*, No. CIV. A. 07-755, 2008 WL 2796499,
*5 (S.D. Ohio July 17, 2008) (motion for a more definite statement may not be properly
used as a substitute for discovery); *Yungk v. Campbell/Hausefeld/Scott Fetzer, Co.*, No.
CIV. A. 06-00120, 2007 WL 2100114 at *2 (D. Conn., July 17, 2007) (if complaint
satisfies notice pleading requirements of Federal Rules motion for more definite
statement is not warranted); *Rendoen v. Fresno Police Dept.*, No. CIV. A. 05-006610,
2005 WL 1925859 at *2 (E.D. Cal., Aug. 11, 2005) (motion for more definite statement
must be considered in light of the liberal notice pleading standards set forth in the Federal
Rules); *Home Design Services, Inc. v. B&B Custom Homes, LLC*, No CIV. A. 06-00249,
2006 WL 3328140 at *4-*5 (D. Colo., Nov. 15, 2006) (a motion for more definite
statement is not a proper substitute for discovery and should be denied if the complaint
satisfies notice pleading requirements); *Fisher v. Building Service 32B-J HealthFund*,
No. CIV. A. 01-7707, 2001 WL 1586689 (S.D.N.Y. , Dec. 11, 2001) (motions for more
definite statement generally disfavored because of their dilatory effect; if a complaint
meets the notice pleading requirements of the Federal Rules, a Rule 12(e) motion should
be denied).

"without any specific factual claims." Panasonic Mot. at 2. In fact, Plaintiffs' allegations against the Panasonic Defendants contain ample detail of the illegal group and bilateral meetings in which the Panasonic Defendants are alleged to have participated. For instance, Plaintiffs allege that "Panasonic … participated in several dozen illegal bilateral and group meetings from 1996 through at least 2003 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products occurred. These included bilateral meetings and group meetings of the types described herein. These meetings took place in Taiwan, Malaysia, and China. Panasonic never effectively withdrew from this conspiracy." DP-CAC ¶ 162.

Plaintiffs' amended complaint specifically alleges what transpired at those bilateral and group meetings in which Panasonic participated. As noted above, Plaintiffs allege that numerous conspiratorial communications took place between and among Defendants, including bilateral meetings between co-conspirators, informal multilateral or "group meetings," and more formal "Glass Meetings." DP-CAC ¶¶5, 6, 138, 140-153, 155-168, 170-175. Defendants' formal "Glass Meetings" comprised "Top Meetings," attended by Defendants' senior executives, typically quarterly (*id.* ¶141.a); "Management Meetings," attended by high-level sales and marketing employees, typically monthly (*id.* ¶141.b); "Working Level Meetings," attended by lower level sales and marketing employees (*id.* ¶¶141.c., 151); and "Green Meetings," held on golf courses (*id.* ¶141.d.).

Plaintiffs also allege the details of the agreements Defendants reached in their meetings and communications in which Panasonic participated. Plaintiffs allege that Defendants agreed on price guidelines (a range of price increases or price floors), including the price to be charged by the CRT manufacturing arm of the vertically integrated Defendants to their division or subsidiary that manufactured or sold CRT-containing computer monitors, televisions or the like (DP-CAC ¶144) – an allegation with obvious pertinence to Defendant PCNA, as discussed below. Plaintiffs also allege that Defendants' meetings included discussions of prices in United States dollars to specific third party customers, and prices reflecting inclusion of specific features in

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 102 -

1  a CRT (such as certain types of coating or the differing types of shadow marks). *Id.*

2  ¶144.

3        Contrary to the Panasonic Defendants' argument that Plaintiffs do not allege a

4  plausible role in the conspiracy for PCNA (a seller of televisions containing CRTs)

5  (Panasonic Mot. at 6), Plaintiffs specifically allege that the illegal meetings and

6  communications in which the Panasonic Defendants participated encompassed not only

7  prices charged to third party customers, but in the case of vertically integrated

8  manufacturers who produced both CRTs and CRT Products (such as the Panasonic

9  Defendants), the meetings and communications also encompassed prices charged by the

10  CRT manufacturing arm of each such integrated company to the corporate division or

11  subsidiary that manufactured or sold computer monitors, televisions or other similar

12  products, and price floors on quotations offered by the competitors of the integrated

13  company to such a division or subsidiary (DP-CAC ¶144). In their meetings,

14  Defendants also considered the internal pricing of CRT Products in agreeing upon the

15  prices at which CRTs were set. *Id.* ¶144.

16        Thus, far from asserting implausible claims regarding CRT Products and PCNA,

17  Plaintiffs' allegations indicate that, in order to be successful, the conspiracy participants

18  needed assurance that there was compliance at each level of the supply chain.

19  Defendants jointly analyzed anticipated supply and demand in the CRT market, including

20  "consideration of downstream prices for televisions, computer monitors, or similar

21  products and how they would affect the price ranges being collusively set." *Id.* ¶146. Of

22  course, these downstream prices include those charged by PCNA and similarly situated

23  Defendants for the CRT Products they sold. Thus, PCNA and similar Defendants were

24  necessary participants in the conspiracy and, as Plaintiffs allege and as is discussed

25  below, PCNA was represented in Defendants' illegal meetings and communications.

26        PCNA's contention that it would have been hurt by the conspiracy and thus its

27  participation is implausible (Panasonic Mot. at 6) simply ignores Plaintiffs' detailed

28  allegations, including allegations that Defendants discussed prices charged by the

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

CRT manufacturing arm to subsidiary sellers such as PCNA, price floors on quotations offered by competitors of sellers such as PCNA, and the internal pricing of products containing CRTs, such as those sold by PCNA.  DP-CAC ¶144.

Plaintiffs also allege that in their meetings and communications, Defendants often agreed to implement coordinated output restrictions, accompanied by in-person follow-up audits to ensure that the agreed output restrictions were being implemented (*id.* ¶146). As Plaintiffs allege, "These output agreements began as agreements to shut down production lines for a certain number of days.  As time went on, they changed to agreements to shut down entire production lines."  *Id.* ¶ 146.  Plaintiffs allege further that "during the Class Period, the Defendants … reduced manufacturing capacity to prop up prices," *id.* ¶ 181, and then specifically allege that in December 2004, Defendant MTPD – Panasonic's joint venture with Defendant Toshiba (*id.* ¶ 79) – closed its American subsidiary's operations in Horseheads, NY, citing price and market erosion.  *Id.* ¶ 183. Panasonic announced that the closing was part of its "global restructuring initiatives in the CRT business."  *Id.*  Thus, Plaintiffs have alleged that pursuant to an agreement with other Defendants to "prop up prices," Panasonic closed one of its facilities as part of an overall plan to reduce output.

These allegations (especially when taken together and as a whole as they must be) stand in bright contrast to the allegations in *Twombly*, where the complaint "proceed[ed] *exclusively* via allegations of parallel conduct…"  550 U.S. at 565 n.11 (emphasis added).

**b.   Plaintiffs Have Adequately Identified the Panasonic Defendants and Alleged Their Role in the Conspiracy.**

As noted above and contrary to Panasonic's contention, antitrust conspiracy allegations need not be detailed on a "defendant by defendant" basis.  Plaintiffs specifically allege that the Panasonic Defendants participated in several dozen illegal bilateral and group meetings from 1996 through at least 2003 in Taiwan, Malaysia, and China in which specific, detailed and unlawful agreements were made.  As discussed above, and as courts have found in similar circumstances, such allegations put the

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 104 -

Panasonic Defendants on notice of Plaintiffs' claims against them.

Here, the DP-CAC specifically names the entities which they refer to collectively as "Panasonic":

- Panasonic Corporation, f/k/a Matsushita Electrical Industrial Co., Ltd. (DP-CAC ¶46);

- Matsushita Electronic Corporation (Malaysia) Sdn Bhd. (*Id.* ¶47);

- Panasonic Corporation of North America (*Id.* ¶48); and

- Panasonic Consumer Electronics Co. (*Id.* ¶49).

Plaintiffs also specifically identify a related Panasonic entity, MTPD. *Id.* ¶79. As noted above, MTPD is not seeking to dismiss the amended complaint on the ground that it fails to state a plausible conspiracy.

Not only is Plaintiffs' collective reference to the Panasonic Defendants legally sufficient, it mirrors the manner in which Defendants conducted themselves in their illegal meetings and communications. Plaintiffs allege that as to each Defendant corporate family, when one or more employee or agent attended a conspiratorial meeting, that employee or agent attended *on behalf of every company in that family*. DP-CAC ¶154. As common sense would dictate, and as Plaintiffs allege, individual participants in the conspiratorial meetings and discussions did not always distinguish between the entities within a corporate family, and participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. *Id.*

Of course, the Panasonic Defendants not only held themselves out as one family in their secret conspiratorial meetings with other Defendants, they do so in the outside world as well.[64] When, as is the case here, corporate families go out of their way to describe the global nature and interconnectedness of their various subsidiaries, a

---

[64] For instance, Panasonic Corporation of North America's website states: "Panasonic Corporation of North America (PNA), based in Secaucus, NJ, is the principal North American subsidiary of Osaka, Japan-based Panasonic Corporation (NYSE: PC) and the hub of its branding, marketing, sales, service, product development and R&D operations in the U.S. and Canada." Panasonic Corporation of North America, Company Profile, http://www.panasonic.com/about/overview.asp.

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 105 -

1  conspiratorial link is more likely to be found for each individual entity.  *In re New Motor*

2  *Vehicles Canadian Export*, 307 F.Supp.2d 145, 153-54 n.6 (D. Me. 2004).  The

3  Panasonic Defendants' efforts to apply a different standard in this Court than they

4  themselves use everywhere else should be rejected.

5      Finally, it is nonsense for the Panasonic Defendants to claim that they should

6  never have been named as Defendants because they "are only alleged to have sold 'CRT

7  Products'" *i.e.,* finished products containing CRTs (Panasonic MTD 1).  Once again, the

8  Panasonic Defendants simply ignore allegations in Plaintiffs' amended complaint.

9  Plaintiffs specifically allege that Defendants conspired to fix the price of CRT Products,

10  which include color picture tubes, color display tubes, and electronic devices containing

11  color picture tubes or color display tubes.  DP-CAC  ¶1.  These CRT Products include

12  PCNA and Panasonic products.  Furthermore, as discussed above, Defendants'

13  conspiracy included discussion and agreements on these downstream prices.  Plaintiffs'

14  allegations are therefore more than sufficient to inform Panasonic and PCNA of the

15  claims against them.

16              **8.      Philips Defendants**

17              **a.      Overview**

18      In addition to joining in Defendants' overall motion to dismiss, the Philips

19  Defendants[65] have filed a motion to dismiss particular to their corporate family.[66]  In

20  support of their motion, the Philips Defendants attempt to rewrite the DP-CAC to change

21  facts that do not weigh in their favor.  For example, despite Plaintiffs' allegations that the

22  conspiracy concerned all CRT Products, the Philips Defendants claim the conspiracy

23  _____

24  [65] The "Philip Defendants" include:  Koninklijke Philips Electronics N.V., ("KPE");
   Philips Electronics North America Corporation ("PENAC"); Philips Electronics

25  Industries (Taiwan), Ltd. ("PEIT"); and, Philips da Amazonia Industria Electronica Ltda.
   ("Philips da Amazonia").

26  [66] *See* "Koninklijke Philips Electronics N.V., Philips Electronics North America

27  Corporation, Philips Electronics Industries (Taiwan), Ltd. and Philips da Amazonia
   Industria Electronica Ltda.'s Motion to Dismiss the Direct Purchaser Plaintiffs'

28  Consolidated Amended Complaint" (May 18, 2009) (cited herein as "Philips Mot.").

**Direct Purchaser Plaintiffs' Combined Opposition**                           - 106 -
**Case No. 3:07-CV-5944 SC**

1    concerned "tubes alone."  They then argue that Plaintiffs' claims should be denied

2    because:  (1) Plaintiffs do not parse out their allegations "defendant by defendant" for

3    each member of their corporate family; and (2) Plaintiffs' claims are time-barred.[67]

4    Aside from the basic impropriety of changing Plaintiffs' allegations (which must be taken

5    as true on a motion to dismiss), the Philips Defendants' arguments do not provide any

6    basis for dismissal of Plaintiffs' claims:

7         First, the Philips Defendants employ the wrong pleading standard.  They assert

8    that Plaintiffs must do the impossible on a motion to dismiss – plead as if they were eye

9    witnesses to the conspiracy, present in every room and at every meeting where

10   conspiratorial conduct allegedly took place.  They argue that, even at this early stage of

11   the litigation, Plaintiffs are required to describe every alleged wrongful act in elaborate

12   detail, identify every person that attended every conspiratorial meeting, and identify the

13   exact Defendant entity that represented their corporate family in each conspiratorial act.

14        This argument ignores the fundamental rule mandating that, on a motion to

15   dismiss, Plaintiffs' allegations must be viewed as a whole and need not be parsed out on a

16   "defendant by defendant" basis.  Rather, as noted above, to survive a motion to dismiss,

17   the amended complaint must allege an overall conspiracy and contain allegations to

18   plausibly suggest that each Defendant participated in that conspiracy.  Here, the DP-CAC

19   contains a wealth of allegations describing an overall, worldwide conspiracy to fix prices

20   of CRTs, CDTs, and CRT Products that were sold in the United States during the class

21   period.  The DP-CAC also contains allegations that each of the Philips Defendants

22   participated in that conspiracy.  On a motion to dismiss, nothing further is required.

23        The Philips Defendants' argument that to the extent any of them *did* participate in

24   the alleged conspiracy, they are shielded from each others' wrongful acts because they

25

─────────────────────

26   [67] The Philips Defendants also argue that the Court does not have personal jurisdiction
     over PEIT and Philips da Amazonia.  However, all personal jurisdiction issues raised by
     Defendants, including issues related to service, are being briefed separately pursuant to
27   stipulated order. Dkt. No. 519. Accordingly, the personal jurisdiction arguments raised by
     the Philips Defendants are not addressed in this brief.
28

**Direct Purchaser Plaintiffs' Combined Opposition**                              - 107 -
**Case No. 3:07-CV-5944 SC**

are separately incorporated and Plaintiffs do not sufficiently allege agency, is also off the

mark. This Court rejected the very same argument made by defendants (including some

of the Philips Defendants) in *TFT-LCD III*. In *TFT-LCD III*, the Court held that

corporate entities within a corporate family cannot hide behind their corporate structure

to avoid antitrust liability and that agency is sufficiently alleged where, among other

things, plaintiffs allege that the lines of participation in a conspiracy are blurred among

entities within a corporate family. 2009 WL 533130 at *2. *See also SRAM*, 580 F. Supp.

2d at 904. Here, Plaintiffs' allegations against the Philips Defendants (as a corporate

family and concerning agency) are nearly identical to the allegations found to be

sufficient by this Court in *TFT-LCD*.

Second, the Philips Defendants' argument that Plaintiffs' claims are time-barred

fails on every level. To set the stage for this otherwise empty argument, the Philips

Defendants rely on their rewrite of the conspiracy to pertain to tubes alone. Based on

their newly created version of the conspiracy, the Philips Defendants then argue that

Plaintiffs' claims are time-barred because they withdrew from the "tube business" in June

2001. The Philips Defendants claim that they effectively withdrew from the tube

business when they combined forces with Defendant LG Electronics, Inc. ("LGEI") to

form the LG Philips Displays ("LGPD") joint venture.[68]

Plaintiffs, however, have alleged a conspiracy that concerns *all* CRT Products

(not just tubes), and that the Philips Defendants participated in it within the relevant

statutory periods.

Moreover, the Philips Defendants' withdrawal argument also fails. As explained

above, continuing business through a joint venture does not constitute withdrawal. In

---

[68] In June 2001, KPE formed the LGPD joint venture with Defendant LGEI to engage in
the manufacture and sale of CRT tubes. DP-CAC ¶¶ 41, 51. By 2002, LGPD had a 24.4
percent worldwide CRT market share. *Id.* On April 1, 2007, LGPD ceased operating as
a joint venture between KPE and LGEI and changed its name to LP Displays
International Ltd. ("LP Displays"). *Id.*¶ 41. LP Displays sold and distributed CRTs
during the class period and is also named as a Defendant in the Complaints. *Id.*¶¶ 41, 44,
51. However, LP Displays is currently party to a bankruptcy proceeding pending in
Hong Kong and is not party to any of the pending motions to dismiss.

**Direct Purchaser Plaintiffs' Combined Opposition**                              - 108 -
**Case No. 3:07-CV-5944 SC**

1   fact, the formation of the LGPD joint venture makes Plaintiffs' conspiracy allegations

2   more plausible, inasmuch as Plaintiffs have alleged that the conspiracy was effectuated

3   through industry consolidation and that joint ventures provided opportunities for

4   Defendants to conspire.

5         Finally, regardless of the Philips Defendants' withdrawal argument, Plaintiffs

6   have sufficiently alleged fraudulent concealment so as to toll the limitations period until

7   November 2007, when governmental investigations of the CRT Products industry first

8   became known to the public.  Therefore, the Philips Defendants' time-bar argument fails.

9                   b.         **The Philips Defendants Cannot Rewrite The DP-CAC**

10        As an initial matter, the Philips Defendants cannot rewrite the DP-CAC to change

11   or eliminate damaging facts.  Despite Plaintiffs' detailed allegations regarding the scope

12   of the conspiracy and the CRT Products affected (*see, e.g.*, DP-CAC  ¶¶ 1, 85-86, 99-

13   111), the Philips Defendants recharacterize Plaintiffs' allegations as a conspiracy

14   concerning "tubes alone."  *See* Philips Mot. at 4-6.  They then assert that PEIT, PENAC,

15   and Philips da Amazonia all stopped making tubes in June 2001 when the LGPD joint

16   venture was formed.  *Id.* at 2 & n.4.  They also assert that KPE never manufactured any

17   tubes, despite its 50% ownership of the LGPD joint venture with Defendant LGEI.

18   Philips MTD at 2.  The Philips Defendants play semantic games, claiming that Plaintiffs

19   do not allege that they ever purchased "tubes" from any of the Philips Defendants

20   because Plaintiffs refer only to purchases of "CRT Products."  *Id.* at 2, 6 & n.8.[69]  The

21   Philips Defendants further twist Plaintiffs' allegations, claiming that Plaintiffs' use of the

---

22   [69] The Philips Defendants also mischaracterize other allegations made by Plaintiffs in the
23   Complaints.  For example, Plaintiffs make allegations that Defendants participated in 500
     multilateral and bilateral meetings throughout Asia and Europe.  DP-CAC  ¶¶ 6, 134-53.
24   The Philips Defendants restate these allegations as  "Plaintiffs therefore admit that all of
     the alleged meetings occurred outside of the U.S."  Philips Mot. at 4 & n.6.  Here,
25   however, Plaintiffs allege a worldwide conspiracy that harmed U.S. purchasers.  DP-
     CAC  ¶¶ 1, 85, 97, 111, 217-22.  In a worldwide conspiracy, it makes no difference
26   where the conspiratorial meetings occurred as long as the alleged meetings were in
     furtherance of the conspiracy and had the effect of fixing prices to U.S. purchasers of
27   CRT Products.  Moreover, this misstatement obscures the fact that discovery is in its
     early stages and Plaintiffs will likely uncover many more meetings (either in the U.S. or
28   elsewhere).

**Direct Purchaser Plaintiffs' Combined Opposition**                                              - 109 -
**Case No. 3:07-CV-5944 SC**

term "CRT Products" means that "Plaintiffs *never* specifically allege any misconduct regarding the pricing of televisions or computer monitors." *Id.* at 5.

The Philips Defendants' attempt to debate Plaintiffs' allegations by interposing additional facts regarding the scope of the conspiracy and the nature of their business. These factual disputes are not properly considered. Rather, on this motion to dismiss, the DP-CAC is to be construed in the light most favorable to Plaintiffs, with all properly pleaded factual allegations to be taken as true. Here, the DP-CAC alleges a conspiracy to fix the price of all CRT Products, not just tubes. DP-CAC ¶ 1. The DP-CAC also sufficiently alleges facts to plausibly suggest that each of the Philips Defendants participated in the conspiracy. *Id.* ¶¶ 51-53, 56-57, 82-84, 112-113, 120, 124, 154, 164-165, 175, 209. Plaintiffs' allegations must be taken as true and must be viewed in the light most favorable to Plaintiffs. As the Court held in *TFT-LCD*, it is inappropriate for the Philips Defendants to rewrite the facts in the DP-CAC or to insert new facts at the motion to dismiss stage. In short, the Court must consider this motion to dismiss based on the conspiracy Plaintiffs have alleged – a conspiracy involving all CRT Products.

### c.   The Philips Defendants' Arguments Do Not Provide Any Basis For Dismissal Of Plaintiffs' Claims

In addition to their rewrite of the DP-CAC, the Philips Defendants argue that Plaintiffs' claims should be dismissed because: (1) Plaintiffs do not parse out their allegations "defendant by defendant" for each member of their corporate family; and (2) Plaintiffs' claims are time-barred. These arguments do not provide any basis for dismissal of Plaintiffs' claims.

The Philips Defendants argue that Plaintiffs cannot address them as a corporate family and that Plaintiffs must provide "defendant by defendant" allegations to show how *each* Philips entity participated in the alleged conspiracy. Philips Mot. at 8-9. However, as noted above, on a motion to dismiss, allegations of antitrust conspiracy must be viewed as a whole and need not be detailed on a "defendant by defendant" basis. Rather, to survive a motion to dismiss, Plaintiffs "only need to make allegations that

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 110 -

1  plausibly suggest that each Defendant participated in the alleged conspiracy." *TFT-LCD*

2  *II*, 599 F. Supp. 2d at 1184-85.

3      Here, Plaintiffs have provided sufficient factual allegations in the DP-CAC

4  regarding Defendants' overall conspiracy.  For example, the DP-CAC alleges:  the CRT

5  Products affected by the conspiracy (DP-CAC ¶ 1); the purchasers affected by the

6  conspiracy (*id.* ¶¶ 213-22); the time period for the conspiracy (1995-2007) (*id.* ¶ 134); the

7  pressures that led to formation of the conspiracy (*id.* ¶ 3); that Defendants conspired,

8  combined, and contracted to fix, raise, maintain, and stabilize the price at which CRT

9  Products were sold in the U.S. (*id.* ¶ 3); the specific collusive conduct by Defendants or

10  their agents in furtherance of the conspiracy (*id.* ¶¶ 4-5); and, that Defendants

11  participated in over 500 multilateral and bilateral meetings in furtherance of the

12  conspiracy (*id.* ¶ 6).  The DP-CAC also allege detailed facts regarding CRT technology

13  and products (*id.* ¶¶ 99-111); the oligopolistic nature of the CRT industry (*id.* ¶¶ 112-21);

14  the existence of domestic and international antitrust investigations into the CRT industry

15  (*id.* ¶¶ 122-33); the collusive contacts, meetings, and agreements among members of the

16  CRT Products industry (*id.* ¶¶ 134-53); the use of trade associations and trade events to

17  facilitate the conspiracy (*id.* ¶¶ 176-80); the effects of Defendants' antitrust violations (*id.*

18  ¶¶ 181-99); and Defendants' acts of fraudulent concealment (*id.* ¶¶ 200-12).

19      Plaintiffs have also sufficiently alleged facts to plausibly suggest that each of the

20  Philips Defendants joined and participated in the alleged conspiracy.  *See id.* ¶¶ 51-53,

21  56-57, 154, 164-65, 175.  The DP-CAC contains detailed descriptions of each Philips

22  entity's business structure and alleges that each manufactured, sold, and/or distributed

23  CRT Products directly or through its subsidiaries or affiliates throughout the United

24  States.  *Id.* ¶¶ 51-53, 56-57.  Plaintiffs also alleges that the Philips Defendants

25  "participated in over 100 bilateral and group meetings from 1996 through 2007" in which

26  unlawful agreements as to price, output restrictions, and customer and market allocation

27  of CRT Products occurred, as well as the locations for some meetings.  *Id.* ¶¶ 164-65.

28

**Direct Purchaser Plaintiffs' Combined Opposition**                                    - 111 -
**Case No. 3:07-CV-5944 SC**

1    Despite all of the detailed factual allegations, the Philips Defendants claim that

2    the DP-CAC does not mention each of them enough.  They claim that despite allegations

3    that they were among those who participated in more than 500 multilateral and bilateral

4    meetings with competitors, Plaintiffs must, at this early stage, be able to identify

5    specifically which Philips Defendants were involved in each meeting and exactly what

6    was agreed upon.  Philips Mot. at 8-9.  As explained above, this is not required under

7    Ninth Circuit law to survive a motion to dismiss.  In addition, Ninth Circuit courts

8    recognize that because the very nature of a conspiracy is secret, it is nearly impossible for

9    Plaintiffs to have such proof, which would be largely in the hands of the alleged

10   conspirators.  Here, the DP-CAC identifies sufficient facts to plausibly allege the overall

11   price-fixing conspiracy.  *See, e.g.*, DP-CAC ¶¶ 1-7, 85-86, 112-53, 176-80, 188-99.  The

12   DP-CAC also sufficiently alleges that the Philips Defendants participated in that

13   conspiracy.  *See, e.g., id.* ¶¶ 51-57, 154, 164-65.  Nothing more is required.

14

15              **d.    The Philips Defendants Are Not Shielded From Each
                         Others' Wrongful Acts**

16   In addition to arguing the wrong pleading standard, the Philips Defendants argue

17   that to the extent any of them ***did*** participate in the alleged conspiracy, they should be

18   shielded from each others' wrongful acts because they are separately incorporated

19   entities.  Philips Mot. at 10-14.  They also argue that Plaintiffs do not sufficiently allege

20   agency to hold them liable for each others' wrongful conduct.  *Id.* at 14-15.  These

21   arguments are unavailing.

22   The Philips Defendants claim that they are protected from Plaintiffs' allegations

23   under a doctrine of "corporate separateness."[70]  *Id.*  at 10-14.  They claim that Plaintiffs

24   cannot "pierce the corporate veil" to hold any one responsible for the wrongful conduct

25   of any other unless Plaintiffs can show that the entities act as alter egos of one another.

26   —————————————————

27   [70] Plaintiffs have alleged that that KPE "dominated and controlled the finances, policies
     and affairs" of its subsidiaries, PEIT, PENAC, and Philips da Amazonia, DP-CAC

28   ¶¶ 52-53, 56.

**Direct Purchaser Plaintiffs' Combined Opposition**                              - 112 -
**Case No. 3:07-CV-5944 SC**

1   Id. at 10-14. Yet, consideration of this argument is not necessary because Plaintiffs have

2   sufficiently alleged agency to hold the Philips Defendants' accountable for each others'

3   wrongful acts. (*See* discussion at pp. 62, note 40, 88-89, *supra.*)

4          Here, Plaintiffs make the same allegations that were found to be sufficient to

5   allege agency in *TFT-LCD*. Plaintiffs allege: (1) a high-level conspiracy that was carried

6   out by both executives and subordinate employees (DP-CAC ¶¶ 6, 141); (2) the

7   conspiracy was implemented by subsidiaries and distributors within the Philips

8   Defendants' corporate family (*id.* ¶¶ 51-57, 154, 164-65); (3) the individual participants

9   in conspiratorial meetings and discussions did not always know the corporate affiliation

10  of their counterparts and did not distinguish between the entities with a corporate family

11  (*id.* ¶ 154); and, (4) a multinational price-fixing conspiracy existed (*id.* ¶ 139). The DP-

12  CAC also presents a factual basis for agency allegations. *Id.* ¶¶ 82-84, 138, 154.

13         The Philips Defendants make no mention of the relevant decisions from *TFT-*

14  *LCD* and provide no persuasive authority to support their position.[71] Philips MTD at 14-

15  15. The Philips Defendants cite to *Walton v. Mead*, 2004 WL 2415037 at *4 (N.D. Cal.

16  Oct. 28, 2004), an employment action for race and gender discrimination, where the

17  Court found that plaintiff could not allege agency between his employer and his

18  employer's insurance carrier for the employer's discriminatory acts against him. *Id.* at

19  *4. The Court found plaintiff's allegations insufficient because plaintiff did not cite any

20  authority and made only bare conclusory allegations that one was the agent of the other,

21  without more. *Id.* at *4. *MacDonald v. Grace Church Seattle*, 2006 WL 1009283 at *3

22  (W.D. Wash. Apr. 14, 2006), an action for wrongful discharge and negligent supervision,

---

23  [71] The Philips Defendants incorrectly cite to *TFT-LCD I* as support for their argument
    that the Complaints improperly make allegations against them as a corporate family,
24  claiming that the *TFT-LCD* Court found that "Hitachi" could not be referred to as a
    corporate family. Philips Mot. at 9. As noted above, in *TFT-LCD II*, the Court rejected
25  defendants' arguments that the complaints still did not differentiate between related
    corporate entities, finding that the complaints were sufficient because they now included
26  allegations as to the overlap among entities with a corporate family at meetings.  Here,
    the amended complaint mirrors the allegations of agency found to be sufficient by the
27  Court in its *TFT-LCD II* order (*see* DP-CAC ¶ 154); therefore, the Philips Defendants'
    argument on this point is not well taken.
28

**Direct Purchaser Plaintiffs' Combined Opposition**                              - 113 -
**Case No. 3:07-CV-5944 SC**

1  is also inapposite.  In *MacDonald*, the plaintiff's claims were dismissed at summary

2  judgment where it failed to present anything to show that employer and employee were

3  each others' agents.  Neither *Walton* nor *MacDonald* concerned agency allegations

4  against entities within the same corporate family.

5      Here, Plaintiffs have properly asserted allegations against the Philips Defendants

6  as a corporate family and have sufficiently alleged agency under Ninth Circuit standards.

7  Plaintiffs here provide sufficient agency allegations to hold the Philips Defendants liable

8  for each others' wrongful acts.  *See* DP-CAC ¶¶ 82-84, 138, 154.

9          **e.    Plaintiffs' Claims Against The Philips Defendants Are**
                **Not Time-Barred**
10

11      The Philips Defendants claim that they "exited" the "tube business" in June 2001,

12  when they combined forces with Defendant LGEI to form the LGPD joint venture.  *Id.* at

13  16-17.  They argue that this "exit" in June 2001 constituted an withdrawal from the

14  conspiracy more than four years before this action commenced, and, therefore, Plaintiffs'

15  claims are time-barred.  Philips MTD at 16-17.[72]  This argument fails for multiple

16  reasons:

17      First, consideration of a whether a claim is time-barred is appropriate on a motion

18  to dismiss only if the time bar is apparent on the face of the complaint.  Here, Plaintiffs

19  allege a conspiracy affecting ***all*** CRT Products, not just tubes.  DP-CAC ¶ 1.  Plaintiffs

20  allege facts to plausibly suggest that each of the Philips Defendants joined and

21  participated in the alleged price-fixing conspiracy (concerning all CRT Products) within

22  the limitations periods.[73]  *Id.* ¶¶ 51-53, 56-57, 82-84, 112-13, 120, 124, 154, 164-65, 175,

23  ───────────────

[72] The Philips Defendants assert that the first complaints were filed against KPE and
24  PENAC on November 26, 2007 (for which Plaintiffs claims would have started to accrue
    on November 26, 2003) and the first complaints were filed against PEIT and Philips da
25  Amazonia on March 16, 2009 (for which Plaintiffs' claims would have started to accrue
    on March 16, 2005).  Philips mot. at 16.

26  [73] Plaintiffs allege that KPE manufactured, sold, and distributed CRT Products during the
    class period throughout the United States.  DP-CAC ¶ 51.  Plaintiffs allege that PEIT sold
27  and distributed CRT Products during the class period throughout the United States.  *Id.*
    ¶ 52.  Plaintiffs allege that PENAC, sold and distributed CRT Products during the class
28  period throughout the United States.  DP-CAC ¶ 53.  Plaintiffs allege that Philips da

**Direct Purchaser Plaintiffs' Combined Opposition**                              - 114 -
**Case No. 3:07-CV-5944 SC**

209.  There are no allegations on the face of the DP-CAC that limit the conspiracy to tubes or that any of the Philips Defendants ever effectively withdrew from the CRT Products market so as to trigger any statute of limitation.  The Philips Defendants participated in the CRT Products conspiracy with respect to tubes *both before and after June 2001* (as a co-owner of the LGPD joint venture) and with respect to the manufacture, sale and/or distribution of finished products throughout the class period.  Therefore, there is no basis for any time-bar argument, and it is improper for the Court to consider any other evidence in deciding a time-bar argument on a motion to dismiss.

Even if, however, the Court were to consider the Philips Defendants' version of the conspiracy – that it concerned tubes only – the Philips Defendants' claims would still not be time-barred because they did not effectively withdraw from the tube business in June 2001.  Rather, they merely combined forces with Defendant LGEI to continue their tube business through a new joint venture called LGPD.  As explained above, continuance of their CRT business in a different form cannot constitute withdrawal from a conspiracy (*See section* II.E.1.b.i.*, supra*).

*Morton's Market* is not to the contrary, and actually reinforces Plaintiffs' argument that the Philips Defendants did not effectively withdraw.  In *Morton's Market*, on a motion for summary judgment, a defendant was found to have withdrawn from a conspiracy to fix milk prices when it sold its dairy, because there was no evidence that it had maintained any ties with the dairy business or its co-conspirators after the sale.  198 F.3d at 839.  The Eleventh Circuit found the defendant had completely and permanently severed its ties to the enterprise and its co-conspirators, did nothing more to assist or participate in the price-fixing activities of the other dairies, and communicated its retirement from the business thought the media.  *Id.*  In stark contrast, the Philips Defendants continued to participate in the CRT Products market throughout the class

---

Amazonia sold or distributed CRT Products during the class period throughout the United States. *Id*¶ 56.

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 115 -

1   period, and they continued to operate their tube business through the LGPD joint venture

2   until at least 2007.

3        Moreover, the DP-CAC alleges that during the class period, the CRT industry

4   experienced significant consolidation, including the creation of the LGPD joint venture in

5   2001, which merged the Philips Defendants and the LG Electronics' CRT businesses.

6   *See* DP-CAC ¶ 113.  The DP-CAC also alleges that joint ventures facilitated the

7   concentration of the market and gave Defendants opportunities to discuss pricing,

8   capacity utilization, and other important prospective market information.  *See Id.* ¶ 114.

9   Further, the DP-CAC alleges that the LGPD joint venture reduced manufacturing

10   capacity in accord with the conspiracy.  *Id* ¶ 184.  Therefore, evidence regarding the

11   LGPD joint venture does not constitute effective withdrawal.  Rather, it serves to make

12   Plaintiffs' conspiracy allegations more plausible.

13        The Philips Defendants take their withdrawal argument one step further, by

14   claiming that after formation of the LGPD joint venture, they actually became victims of

15   the conspiracy because they began buying tubes directly from their co-conspirators and,

16   thus, were forced to pay supra-competitive prices like Plaintiffs.  Philips Mot. at 17.  The

17   Philips Defendants cite no relevant cases for this proposition and they do not identify

18   which conspirators they bought tubes from, nor do they indicate if they bought tubes

19   from the LGPD joint venture, which presumably was the primary source of their tube

20   purchases.  In any case, evidence that the Philips Defendants may have purchased tubes

21   from their co-conspirators after June 2001 makes Plaintiffs' conspiracy allegations more

22   plausible.  For example, Plaintiffs allege that in the case of vertically integrated

23   Defendants such as the Philips Defendants (*i.e.*, those that manufactured both tubes and

24   finished products), Defendants agreed on prices charged between and among those in the

25   same corporate family.  DP-CAC ¶ 144.  Plaintiffs allege that Defendants agreed on what

26   prices the tube manufacturing arm of a corporate family would offer to the corporate

27   division or subsidiary that manufactured its finished products, and agreed on price floors

28

**Direct Purchaser Plaintiffs' Combined Opposition**                                        - 116 -
**Case No. 3:07-CV-5944 SC**

1    for such transfers. *Id*. Therefore, purchasing tubes from co-conspirators does not show

2    that the Philips Defendants withdrew from the alleged conspiracy.

3            Finally, as noted above, a determination of whether a defendant has withdrawn

4    from a conspiracy is fact intensive, and the validity of such a defense is generally

5    inappropriate for determination on a motion to dismiss. Accordingly, at this stage, the

6    Court may not even consider the facts asserted by the Philips Defendants in support of

7    their withdrawal argument.

8                    **f.      Plaintiffs Have Sufficiently Pled Fraudulent
                             Concealment**
9

10           Like those of the other Defendants, the Philips Defendants' argument that

11   Plaintiffs have not sufficiently plead fraudulent concealment also fails, as explained

12   above.

13           **9.      Samtel**

14           Pursuant to a court-approved stipulation (Dkt. No. 519), the briefing schedule and

15   hearing date on Samtel's motion to dismiss has been vacated and therefore, Plaintiffs will

16   make no response to that motion at this time.

17   **III.   CONCLUSION**

18           As stated at the beginning of this brief, the amended complaint herein is unlike

19   most other antitrust conspiracy complaints filed in federal court. It is not based only on

20   allegations of circumstantial evidence. Rather, it alleges hundreds of conspiratorial

21   meetings at which agreements to fix prices, restrict output and allocate customers were

22   reached and implemented. Yet, with just one or two exceptions, not one Defendant has

23   admitted that the amended complaint states a plausible action against it. This is a perfect

24   example of the extremes to which defendants in antitrust actions today abuse *Twombly*.

25   Plaintiffs respectfully submit that all of Defendants' motions to dismiss should be denied

26   in their entirety.

27

28

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

DATED:  August 3, 2009          By:     /s/ Guido Saveri

Guido Saveri
R. Alexander Saveri
Geoffrey C. Rushing
Cadio Zirpoli
Gianna Gruenwald
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, California 94111
Telephone:  (415) 217-6810

*Interim Lead Counsel for Direct Purchaser
Plaintiffs*

Bruce L. Simon
Jonathan Watkins
Esther L Klisura
PEARSON, SIMON, WARSHAW &
PENNY, LLP
44 Montgomery Street , Suite 1430
San Francisco, CA 94104
Telephone: (415) 433-9000

Michael P. Lehmann
HAUSFELD LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 633-1908

H. Laddie Montague, Jr.
Ruthanne Gordon
Candice Enders
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000

Joseph J. Tabacco, Jr.
Christopher T. Heffelfinger
BERMAN DEVALERIO PEASE &
TABACCO, P.C.
425 California Street, Suite 2025
San Francisco, CA 94104
Telephone: (415) 433-3200

Anthony J. Bolognese
Joshua H. Grabar
BOLOGNESE & ASSOCIATES, LLC
1500 JFK Boulevard
Philadelphia, PA 19102
Telephone: (215) 814-6751

Bryan L. Clobes
Ellen Meriwether
CAFFERTY FAUCHER LLP
1717 Arch Street, Suite 3610
Philadelphia, PA 19103
Telephone: (215) 864-2800

Charles H. Johnson
CHARLES H. JOHNSON & ASSOCIATES
PA
2599 Mississippi Street
New Brighton, MN 55113
Telephone: (651) 633-5685

Joseph W. Cotchett
Steven N. Williams
Neil Swartzberg
COTCHETT, PITRE & McCARTHY
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  (650) 697-6000

Roger M. Schrimp
Betty L. Julian
Fred A. Silva
Kathy L. Monday
DAMRELL NELSON SCHRIMP
PALLIOS PACHER & SILVA
1601 I St, 5th Floor
Modesto, CA 95354
Telephone: (209) 526-3500

John G. Emerson
Scott E. Poynter
EMERSON POYNTER LLP
The Museum Center
500 President Clinton Ave., Suite 305
Little Rock, AR 72201
Telephone: (501) 907-2555

Roberta Liebenberg
FINE, KAPLAN AND BLACK, R.P.C.
1835 Market Street, 28th Floor
Philadelphia, PA 19103
Telephone:  (215) 567-6565

Steven A. Kanner
William London
Douglas A. Millen
FREED KANNER LONDON & MILLEN
LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 119 -

Joseph Goldberg
FREEDMAN BOYD HOLLANDER
GOLDBERG & IVES, PA
20 First Plaza, Suite 700
Albuquerque, NM 87102
Telephone: (505) 346-2222

Robert J. Gralewski, Jr.
GERGOSIAN & GRALEWSKI LLP
655 West Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619)237-9500

Terry Gross
GROSS BELSKY ALONSO LLP
180 Montgomery Street
San Francisco, CA 94104
Telephone: (415) 544-0200

Marc Jeffrey Greenspon
LAW OFFICES OF MARC J.
GREENSPON
6200 Spring Isles Blvd.
Lake Worth, FL 33463
Telephone: (954) 817-6272

Martin E. Grossman
LAW OFFICES OF MARTIN E.
GROSSMAN
2121 Green Brier Drive
Villanova, PA 19085
Telephone: (610) 527-3277

Daniel E. Gustafson
Jason S. Kilene
Sung Yun K. Smith
GUSTAFSON GLUEK PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Telephone:  (612) 333-8844

Randy R. Renick
HADSELL STORMER KEENY
RICHARDSON & RENICK
128 North Fair Oaks Avenue, Suite 204
Pasadena, CA 91103
Telephone: (626) 585-9600

Anthony D. Shapiro
Ronnie Seidel Spiegel
HAGENS BERMAN SOBOL SHAPIRO
1301 5th Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 120 -

Vincent J Esades
Renae D. Steiner
HEINS MILLS & OLSON, PLC
310 Clifton Ave
Minneapolis, MN 55403
Telephone: (612) 338-4605

Michael Stoker
JOHNS FLAHERTY & COLLINS S.C.
Exchange Building, Suite 600
205 Fifth Avenue South
P.O. Box 1626
LaCrosse, WI 54602
Telephone: (608) 784-5678

Gary Specks
KAPLAN FOX & KILSHEIMER LLP
1655 Lake Cook Road, Suite 139
Highland Park, IL 60035
Telephone: (847) 831-1585

Robert N. Kaplan
Linda P. Nussbaum
Gregory K. Arenson
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980

Steven F. Benz
William J. Conyngham
Andrew C. Shen
KELLOGG, HUBER, HANSEN, TODD &
EVANS, P.L.L.C.
1615 k Street NW, Suite 400
Washington, DC 20036-3209
Telephone: (202) 326-7900

Richard M. Heimann
Joseph R. Saveri
Eric B. Fastiff
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000

W. Joseph Bruckner
Elizabeth R. Odette
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone (612) 339-6900

**Direct Purchaser Plaintiffs' Combined Opposition**
**Case No. 3:07-CV-5944 SC**

- 121 -

Joel Cary Meredith
Steven J. Greenfogel
Daniel Bruce Allanoff
MEREDITH COHEN GREENFOGEL &
SKIRNICK, P.C.
1521 Locust Street, 8th Floor
Philadelphia, PA 19102
Telephone: (215) 564-5182

Harry Shulman
THE MILLS LAW FIRM
145 Marina Boulevard
San Rafael, CA 94901
Telephone: (415) 445-1326

Brian D. Brooks
MURRAY FRANK & SAILER LLP
275 Madison Avenue Suite 801
New York, NY 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

Neal A Eisenbraun
NEAL A. EIESENBRAUN, CHARTERED
2599 Mississippi Street, Suite 201
New Brighton, MN 55113
Telephone: (651) 633-5685

Richard J. Arsenault
NEBLETT BEARD & ARSENAULT
2220 Bonaventure Court
PO Box 1190
Alexandria, LA 71309
Telephone: (800) 256-1050

Mark Reinhardt
Garrett D. Blanchfield, Jr.
REINHARDT WENDORF &
BLANCHFIELD
East 1250 First National Bank Building
322 Minnesota Street
St. Paul, MN 55101
Telephone: (651) 287-2100

Dianne M. Nast
RODANAST, PC
801 Estelle Drive
Lancaster, PA 17601
Telephone: (717) 892-3000

Michael D. Shaffer
SHAFFER & GAIER, LLC
One Penn Center
1617 JFK Boulevard, Suite 946
Philadelphia, PA 19103
Telephone: (215) 741-0100

Natalie Finkelman-Bennett
Jayne Goldstein
SHEPHERD, FINKELMAN, MILLER &
SHAH, LLC
35 East State Street
Media, PA 19063
Telephone:  (610) 891-9880

Daniel D. Owen
P. John Brady
POLSINELLI SHUGHART, P.C.
Twelve Wyandotte Plaza, Suite 1600
120 W. 12th Street
Kansas City, MO 64105
Telephone:  (816) 395-0671

Eugene A. Spector
William G. Caldes
SPECTOR ROSEMAN & KODROFF PC
1818 Market Street, 25th Floor
Philadelphia, PA 19103
Telephone: (215) 496-0300

Paul E. Slater
SPERLING & SLATER
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
Telephone: (312) 641-6492

Allan Steyer
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
One California Street, Third Floor
San Francisco, CA 94104
Telephone: (415) 421-3400

Lisa J. Rodriguez
TRUJILLO, RODRIGUEZ & RICHARDS,
LLP
8 Kings Highway West
Haddonfield, NJ 08033
Telephone: (856) 795-9002

Joseph M. Vanek
David P. Germaine
VANEK VICKERS MASINI, P.C.
111 S. Wacker, Suite 4050
Suite 4050
Chicago, IL 60606
Telephone:  (312) 224-1500

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kenneth A. Wexler
WEXLER TORISEVA WALLACE LLP
One North LaSalle Street Suite 2000
Chicago, IL 60602
Telephone: (312) 346-2222

Mary Jane Fait
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC
55 W. Monroe Street, Suite 1111
Chicago, IL 60603
Telephone: (312) 984-0000

*Attorneys for Plaintiffs*