# EXHIBIT 1

```
                                                                    '3124909'
```

FILED
ALAMEDA COUNTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

JUN 1 7 2004

IN AND FOR THE COUNTY OF ALAMEDA

CLERK OF THE SUPERIOR COURT
By Charlotte Marir
                                                                      Deputy

| Coordinated Proceeding, C.R.C. 1550(b) | No. J.C.C.P 4199 |
|---|---|
| IN RE AUTOMOTIVE REFINISHING PAINT CASES | ORDER GRANTING MOTION OF PLAINTIFFS FOR CLASS CERTIFICATION. |
| | Date: June 7, 2004<br>Time: 2:00 p.m.<br>Dept.: 22 |

The motion of Plaintiffs for class certification came on for hearing on June 7, 2004, in Department 22 of this Court, the Honorable Ronald M. Sabraw presiding. Counsel appeared on behalf of Plaintiffs and Defendants. After consideration of the points and authorities and the evidence, as well as the oral argument of counsel, the Court orders as follows:

The motion of Plaintiffs for class certification is GRANTED.

SUMMARY.

This is a purported class action alleging that Defendants have engaged in a horizontal conspiracy not to compete in the sale of automobile refinishing paint. This case is brought by the indirect purchasers of automobile refinishing paint. There is a separate federal action brought by the direct purchasers of automobile refinishing paint. *In re Refinishing Paint Antitrust Litigation*, MDL 1426.

The Second Consolidated Amended Class Action Complaint filed December 31, 2002, alleges two causes of action: (1) Restraint of trade in violation of the Cartwright Act, Business and Professions Code 16720, and (2) Unlawful and Unfair Business Practices under the Unfair Competition Law, Business and Professions Code 17200.

Plaintiffs are seeking class certification of both causes of action and suggest two subclasses: (1) a subclass of merchants who bought the paint and resold it to others (the "Refinishor Class") and (2) a class of end users (the "End User Class").

LEGAL FRAMEWORK

The guiding principles for deciding a motion for class certification are well defined. "To obtain certification, a party must establish the existence of both an ascertainable class and a well-defined community of interest among the class-members." *Linder v. Thrifty Oil Co.* 23 Cal.4th 429, 435 (citing *Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462). The latter inquiry involves the following three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class. *Richmond, supra*, 29 Cal.3d at 470. Other relevant considerations include the probability that each class member will come forward ultimately to prove his or her separate claim to a portion of the total recovery and whether the class approach would actually serve to deter and redress alleged wrongdoing. *Linder*, 23 Cal.4th at 429. In addition, the trial court may assess the advantages of alternative procedures for handling the controversy. *Caro v. Procter & Gamble Co.* (1993) 18 Cal. App. 4th 644, 660-662.

It is plaintiffs' burden to support each of the above factors with a factual showing. *Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal. 4th 1096, 108. The determination of

whether a class should be certified is a procedural question and does *not* include a weighing of whether the action is legally or factually meritorious. *Linder*, 23 Cal.4th at 439-40.

NUMEROSITY.

Defendants do not contest numerosity. The Court finds that the proposed subclasses are numerous and that it is impracticable to bring all members of the subclasses before the court.

ASCERTAINABILITY.

A class must be defined in terms of objective characteristics and common transactional facts making the ultimate identification of class members possible. *Hicks v. Kaufman and Broad Home Corp.* (2001) 89 Cal.App.4th 908, 915; *Bartold v. Glendale Federal Bank* (2000) 81 Cal. App. 4th 816, 828. At this stage of the proceedings a plaintiff is not required to establish the existence and identity of class members. *Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1275.

Defendants argue that the subclasses are not ascertainable because not all members of the proposed subclass may have been affected by the alleged conspiracy. This argument concerns commonality, not ascertainability.

Plaintiffs' proposed class definitions are inadequate because they are in conflict with the class definitions proposed by Plaintiffs' expert, Dr. Greer, and because the Court needs to alter the proposed class structure to address commonality and competency concerns. The Court can, however, define classes that permit objective determinations of whether a person is in either the Refinisher Class or the End User Class.

3

COMMONALITY - BACKGROUND.

Class certification is determined with reference to each claim asserted, and must take into account whether a class is appropriate for each claim. *Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal. App. 4th 908, 916 fn 22.

Plaintiffs' Cartwright Act claim is asserted by the named plaintiffs individually and on behalf of the members of the putative class and alleges that Defendants engaged in a horizontal conspiracy in restraint of trade.

Plaintiffs' UCL claim is asserted by the named plaintiffs individually and on behalf of the members of the putative class and asserts that Defendants engaged in unlawful and unfair business practices. The UCL claim is not brought in the interest of the "general public." The alleged unlawful and unfair business practices are substantially similar to the alleged violations of the Cartwright Act.

There is no material distinction between the Cartwright Act claim and the UCL claim, so the Court considers them together. The essential elements of both claims are (1) the existence of a conspiracy, (2) an injury to the proposed class (impact), and (3) damages.

COMMONALITY – EXISTENCE OF A CONSPIRACY.

The existence of a conspiracy in restraint of trade is the central factual issue in this case. If there is a conspiracy, then Defendants are liable and the remaining issues are determining the amount of aggregate damages and discerning who is entitled to recover what amount of damages.

The Court finds that the existence of a conspiracy is a common issue. Defendants do not seriously contest this point. (As a practical matter, if the existence of a conspiracy is determined

4

in the federal antitrust action, then that decision might have issue preclusion (collateral estoppel) effect in this case.)

COMMONALITY - PRESUMPTION OF IMPACT - HISTORICAL DIGRESSION.

An inquiry into the presumption of impact and the extent of any such presumption requires a brief historical digression.

California's Cartwright Act is modeled after the federal Sherman Act, and before 1977 both the Cartwright and Sherman Acts permitted claims by direct and indirect purchasers. Most of the pre-1977 case law concerns direct purchasers. There are, however, cases that address the problems of determining whether indirect purchasers have standing, have suffered injury, the amount of any injury, and related issues. Many of these cases arise in the context of whether indirect purchasers have standing to assert antitrust claims. *In re Western Liquid Asphalt Cases* (9th Cir. 1973) 487 F.2d 191 (liquid asphalt in road materials); *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.* (E.D. Pa. 1970) 50 F.R.D. 13, aff'd sub nom *Mogano v. American Radiator & Standard Sanitary Corp.* (3rd Cir. 1971) 438 F.2d 1187(plumbing fixtures in houses); *In re Sugar Industry Antitrust Litigation* (E.D. Pa. 1976) 73 F.R.D. 322, 339 (sugar); *In re Antibiotic Antitrust Actions* (S.D.N.Y. 1971) 333 F. Supp. 310, 312 (antibiotics in animal feed); *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* (1987) 191 Cal. App. 3d 1341, 1353 fn 9 (collecting cases).

In *Illinois Brick Co. v. Illinois* (1977) 431 U.S. 720, the Court held that the possibility of claims by direct and indirect purchasers presented an unacceptable risk of duplicative recovery and held an indirect purchaser may not claim damages from an antitrust violator measured by the amount of overcharge passed through to the indirect purchaser. The Court reasoned that the

5

statute would be adequately enforced by the direct purchasers. The California Legislature thought otherwise and amended Business and Professional Code 16750 to expressly permit damage claims by indirect purchasers. The legislation states that the 1978 amendment to section 16750 "does not constitute a change in, but is declaratory of, the existing law." Stats 1978 ch 536, sec 2. This suggests that the Legislature intended to incorporate pre-*Illinois Brick* case law. *Union Carbide Corp. v. Superior Court* (1984) 36 Cal. 3d 15, 19-20, suggests that the Legislature intended to incorporate the dissenting opinion in *Illinois Brick*.

Assuming that the California Legislature adopted the reasoning of the dissent in *Illinois Brick*, the Court must consider that reasoning in determining the extent of any presumption of impact. The dissent in *Illinois Brick* suggests (1) permitting recovery by indirect purchasers will further the statute's purpose, 431 U.S. at 754-755, (2) the need for "massive evidence and complicated theories" in determining the existence and amount of injury should not deter the court from resolving those issues at trial, 431 U.S. at 758-760, and (3) the possibility of double recovery can be limited through prudent case management, 431 U.S. at 762-763, (4) but that there is a point beyond which the wrongdoer should not be held liable, 431 U.S. at 760-761.

COMMONALITY - PRESUMPTION OF IMPACT - CALIFORNIA LAW.

Under California case law, if Plaintiffs prove a conspiracy regarding the sale of manufactured goods, then the trier of fact can generally presume an injury to all direct or indirect purchasers. *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* (1987) 191 Cal. App. 3d 1341, 1350 ("Courts have shown no hesitancy in ruling that when a conspiracy to fix prices has been proven and plaintiffs have established they purchased the price-fixed goods or services, the jury can *infer* plaintiffs were damaged."); *Rosack v. Volvo of America Corp.* (1982) 131 Cal. App. 3d 741, 760

6

( "Once a price-fixing conspiracy has been established, it follows that the class has been injured to some extent.").

It is unclear how far this presumption extends. This Court can identify two distinct approaches to determining limits on the presumption of impact on a motion for class certification. First, the Court could presume that the impact of an unlawful conspiracy extends indefinitely. Following class certification, the parties could then resolve whether all subclasses have standing to assert antitrust claims. Second, the Court could presume that the impact of an unlawful conspiracy extends only to persons or entities who have standing to assert claims. This is a practical approach that might be appropriate if the parties agreed to address the standing issue in the context of class certification. *Linder*, 23 Cal.4th at 439-40. The Court finds that the first approach is most consistent with *Linder's* admonition not to merge the procedural class certification determination with any substantive determination. *Linder*, 23 Cal.4th at 439-40.

The presumption of common impact can be rebutted. Evidence Code 601. In *Global Minerals & Metals Corp. v. Superior Court* (2003) 113 Cal. App. 4th 836, 856-857, the Court held that a class should not be certified because the plaintiffs had not demonstrated that the alleged restraint of trade actually affected the prices that the class members had to pay. After noting the presumption of impact, the Court in *Global Minerals* recited the facts presented by Defendants and then held that the facts demonstrating a lack of common impact overcame the presumption of common impact.

The presumption of common impact is a presumption affecting the burden of proof rather than a presumption affecting the burden of producing evidence. Evidence Code 603-606. Presumptions affecting the burden of proof further a public policy and do not just facilitate the determination of the action. The California Legislature's amendment of Business and

7

1  Professions Code section 16750 in 1978 and its implicit incorporation of the *Illinois Brick*
2  dissent indicate that the Legislature determined that permitting recovery by indirect purchasers
3  furthers California public policy of enforcing the antitrust laws fully. *B.W.I Custom Kitchen,* 191
4  Cal.Appp.3d at 1355, then holds that indirect purchasers cannot meaningfully enforce the
5  antitrust laws unless there is a presumption of impact at the class certification stage. The
6  characterization of the presumption as one affecting the burden of proof is significant because it
7  shifts the burden to Defendants to disprove the existence of impact at the class certification stage.
8  Evidence Code 606.

The Court does not address whether there is a presumption of impact affecting the burden of proof at trial.

## COMMONALITY - IMPACT - APPLICATION TO THIS CASE.

Plaintiffs rely on the presumption of impact. Plaintiffs also present the testimony of Dr. Greer, who opines that changes in manufacturer list prices correlated strongly with changes in the prices charged to refinishers. Dr. Greer states that price increases were passed from manufacturers to jobbers to refinishers. (Greer Dec 44-68.) Dr. Greer presents limited testimony regarding the pass through of price increases to end users. (Greer Dec 92-93.)

Defendants present evidence that there is no common impact on the putative class members. First, Defendants present evidence that there are numerous distribution chains. Second, Defendants assert that prices did not always pass from jobbers to refinishers. Dr. Snyder states that actual transactional records of jobbers and refinishers were scarce (Snyder, para 64), that he examined the records of one jobber (among the hundreds in California) concerning one type of automotive refinishing product (among the hundreds of products) (Snyder, para 67), and

that he concluded the data did not support the proposition that price increases passed from manufacturers to jobbers to refinishers. Dr. Snyder expressly stated that his analysis was only a starting point and that the data probably contained false positives and false negatives due to individualized factors such as (1) volume and long term contracts, (2) rebates to refinishers, and (3) offsets such as technical services, customers support, and free equipment. (Snyder para 74-85.) Third, Defendants argue that prices did not always pass from refinishers to end users because refinishers base their charges primarily on labor costs and because consumers may have suffered no out of pocket injury if their costs were paid by insurance. (Snyder para 27-29, 56-58.)

Refinisher Class. The Court finds that common issues predominate concerning impact on the Refinisher Class. There is a presumption of common impact. In addition, Dr. Greer concludes that (assuming liability) there is a common adverse impact at the refinisher level. (Greer Dec, para 69, 84.) The Court in particular notes that DuPont, BASF, PPG, and AKZO NOBEL all had documents that referred to suggested prices for refinishers even though the manufacturers did not sell directly to the refinishers. (Greer Dec., Exh 24, 25, 26, and 27.) These documents and the documents concerning the maintenance of jobber margins suggest that the defendants expected that increases in their prices to the jobbers would be passed on to the refinishers. The variations among members of the Refinisher Class concerning specific contracts, products and circumstances do not overcome the presumption of common impact.

End User Class. The Court finds that common issues predominate concerning impact on the End User Class. There is very little evidence of any sort concerning the impact on the end users. Dr. Greer's conclusions regarding impact are limited to the refinisher class (Greer Dec, para 69, 84) and Dr. Snyder's testimony consists of general observations about the refinisher/end user/insurer relationship (Snyder para 27-29, 56-58, 86-94). Neither Dr. Greer nor Dr. Snyder

9

present empirical data concerning whether refinishers pass their paint costs through to end users. Dr. Snyder's observation that end users are frequently reimbursed by insurance is not relevant because the effect of insurance is not considered under the collateral source rule. In the absence of evidence to rebut the presumption of impact, the Court finds that a common impact exists.

Consistent with *Linder's* admonition not to reach the merits the Court does not address whether the End User Class has standing.

COMMONALITY – DAMAGES.

The Court's determination whether there is any commonality in the actual damages incurred by the class members turns on the degree of certainty required at this stage of the proceeding. Plaintiffs argue that they need only to present a credible plan to allocate damages among the classmembers. Defendants argue that Plaintiffs should be required to present, and have not presented, a plan that can withstand scrutiny and will ensure that the rights of Defendant and the classmembers are protected.

The Court holds that the lower standard suggested by Plaintiffs is appropriate for two reasons. First, the amount of damages to be awarded can be determined in the aggregate. *Bruno v. Superior Court* (1981) 127 Cal. App. 3d 120, 135 n9. Therefore, the trier of fact can determine the aggregate amount of damages and the Court can later devise an equitable means to apportion those damages among the class members. Second, *B.W.I. Custom Kitchen* suggests that the presence of individual damage issues should not bar certification as long as the Plaintiffs can suggest a reasonable approach to allocating damages among the members of the putative class.

Allocation between the Refinisher Class and the End User Class. Dr. Greer asserts that he can allocate any damages between the Refinisher Class and the End User Class through a multiple regression analysis (Greer para 92-93, Greer Reply para 69-71) and Dr. Snyder states he has no confidence that that approach will work (Snyder para 115). The allocation of damages between the two plaintiff classes can be determined on a classwide basis and will not necessarily require an inquiry into each transaction. The Court has confidence that the separate counsel representing the two Plaintiff classes will ensure that any allocation between the two classes is based on a thorough presentation of the evidence and an explanation of that evidence by competent experts.

Allocation among the Refinisher Class. The Court finds that the allocation of damages among members of the Refinisher Class does not present undue manageability concerns. *B.W.I. Custom Kitchen*, 191 Cal.App.3d at 1354, holds that where the class consists of business entities that presumably have records, that the Court should be able to devise remedial procedures to channel the individual damage determinations.

Allocation among the End User Class. The Court finds that the allocation of damages among members of the End User Class does not present undue manageability concerns. Unlike the Refinisher Class, the members of the End User Class are not business entities and they probably do not have records. The Court can, however, devise remedial mechanisms such as notice by publication and the use of claim forms that will permit an allocation among End-Users.

TYPICALITY AND ADQUACY OF REPRESENTATION.

Plaintiffs propose two subclasses. Therefore, the Court addresses typicality and adequacy issues separately for the representative in each subclass.

11

Typicality. Defendants do not contest the typicality of the named plaintiffs for the subclasses. Competition Collision Center, LLC and Harold's Autobody and Paint Shop are the named plaintiffs for the Refinisher Class. Shannon Nishida and Gabrielle Romero are the named plaintiffs for the End User Class.

Adequacy. "Adequacy of representation depends on whether the plaintiff's attorney is qualified to conduct the proposed litigation and the plaintiff's interests are not antagonistic to the interests of the class." *McGhee v. Bank of America* (1976) 60 Cal.App.3d 442, 450. See also *Lazar v. Hertz Corp.* (1983) 143 Cal.App.3d 128, 141-142. Plaintiffs have retained counsel that are qualified, experienced and generally able to conduct the proposed litigation. *Miller v. Woods* (1983) 148 Cal.App.3d 862, 874-875.

Defendants argue that there are conflicts between the Refinisher Class and the End User Class. *Global Minerals*, 113 Cal. App. 4th at 851-854. Defendants are correct, but the use of separate classes, each with their own counsel, should address the concerns raised by the conflicts. In future proceedings counsel for the separate classes may choose to collaborate or work separately as is appropriate in the interests of their clients.

SUPERIORITY/DETERRING AND REDRESSING THE ALLEGED WRONGDOING.

The Court has considered the suitability of alternative procedures for handling the controversy. *Linder*, 23 Cal.4th at 435.

Defendants suggest that even if a class is certified the Court will still need to make thousands of individual damage determinations, which will eliminate any benefits of class certification. *J. P. Morgan & Co., Inc. v. Superior Court* (2003) 113 Cal. App. 4th 195, 215-216.

This overlooks that the trier of fact can determine damages in the aggregate and the Court can devise a means of allocating any damages among the class members.

. There is no suitable alternative procedure to address the alleged wrong. As noted in *B.W.I. Custom Kitchen*, a class action is often the only means to provide compensation to persons harmed by anticompetitive business practices. *B.W.I. Custom Kitchen* states, "courts should avoid interpreting procedural requirements in such a way as "would thwart the legislative intent . . . to retain the availability of indirect-purchaser suits as a viable and effective means of enforcing California's antitrust laws."" 191 Cal.App.3d at 1355.

## EVIDENCE

The Court has considered all the declarations submitted, as well as the exhibits attached thereto. The Court notes that its consideration of the evidence is be limited to the motion for class certification only and shall not be construed as an indication of admissibility in future motions or at trial.

Regarding the Reply Declaration of Greer, the Court finds that it is focused primarily, if not entirely, on rebutting the testimony of Dr. Snyder. The Motion of Defendants to strike the Reply Declaration of Greer is DENIED. The Motion of Defendants for leave to present oral testimony under C.R.C. 323(b) is DENIED.

By separate order, the Motion of Defendants to seal certain portions of the record is GRANTED.

///

///

13

## CLASS DEFINITION

The Court certifies two classes, a Refinisher Class and an End User Class. Based on Dr. Greer's definitions of the two classes, the distinction between the two classes is whether the paint is purchased in liquid form or as applied to a vehicle. (Greer Dec, para 19-26.) Specifically, Dr. Greer states that most of the End-User Class are persons "who have had their vehicles repaired and/or repainted." (Greer Dec, para 26.) This suggests that it is inappropriate to distinguish between the classes based on whether the paint was purchased "for resale or incorporation into another product for resale." This redefinition will affect the Fleet Refinisher and Fleet OE class members, which would have been End Users under Plaintiffs' proposed class definition, but will be Refinishers under the Court's definition.

The class definitions are:

> Refinishing class: All persons or entities located in California that purchased liquid automotive refinishing products manufactured by defendants from persons other than defendants from January 1, 1993, through December 31, 2002. Excluded from the class are governmental entities and the defendants and their parents, subsidiaries, and affiliates.

> End User class: All persons or entities located in California that purchased applied automotive refinishing products manufactured by defendants from persons other than defendants from January 1, 1993, through December 31, 2002. Excluded from the class are governmental entities and the defendants and their parents, subsidiaries, and affiliates.

At the hearing on June 7, 2004, counsel for Plaintiffs informed the Court which counsel would be representing which class. The Refinisher Class will be represented by (1) Berman DeValerio Pease Tabacco Burt & Pucillo, (2) Cotchett, Pitre, Simon & McCarthy; (3) Saveri & Saveri; (4) Glancy Binkow & Goldberg; and (5) the Terrell Law Group. The End-User Class will

be represented by (1) Zelle, Hoffman, Voelbel, Mason & Gette; (2) Gross & Belsky; (3) Wassserman, Comden & Casselman; and (4) the Mogin Law Firm.

CLASS NOTICE.

Class notice is appropriate under C.R.C. 1856. Absent class members must be provided adequate notice and an opportunity to opt out. The parties are to meet and confer regarding the timing, content, and means of distributing the class notice as well as the allocation of the costs related to class notice.

FURTHER PROCEEDINGS.

The next CMC is set for June 24, 2004, at 2:00 pm. Counsel should be prepared to discuss the following:

Organization of Plaintiffs' Counsel. The structure ordered in Pre-trial Order No. 1, filed December 12, 2001, is inappropriate given the creation of two classes. Prior to the CMC, counsel for Plaintiffs are to meet and confer regarding the reorganization of Plaintiffs' counsel.

Class Definition. Counsel may suggest any modifications to the class definitions.

Class Notice. Counsel should meet and confer regarding class notice issues. If the parties cannot reach agreement regarding class notice, then the Counsel should be prepared to discuss a schedule for Plaintiffs to file a motion for approval of class notice and allocation of costs.

Discovery on merits issues.

Substantive motions.

Mediation/Settlement prospects.

15

The status of *In re Refinishing Paint Antitrust Litigation*, MDL 1426. It is unclear what effect, if any, the settlements in that action may have on this case. The Court will also inquire whether there are indirect purchaser cases pending in other state courts.

Setting a trial date.

Dated: June 17, 2004

Judge Ronald M. Sabraw