# EXHIBIT 4

supported by the trial testimony of plaintiffs' expert, as well as economic theory and factors regarding the efficient administration of the settlement fund. Any attempt to further refine the method of allocation would unduly diminish and delay the payments to individual class members with no material improvement in the fairness of the plan. Accordingly, the Court approves the revised plan of allocation.

IT IS THEREFORE ORDERED that settlement counsel's *Motion For Approval Of Revised Plan Of Allocation* (Doc. #1040) filed May 26, 2000 be and hereby is SUSTAINED.

IT IS FURTHER ORDERED that the *Motion For Attorney's Fees* (Doc. #1027) filed by Gerald H. Abrams on April 25, 2000 be and hereby is OVERRULED.

---

[¶ 73,013]  Microsoft I-V Cases, Coordination Proceedings Special Title (Rule 1550(b)).

California Superior Court, City and County of San Francisco. No. J.C.C.P. No. 4106. Filed August 29, 2000.

### California Cartwright Act

**Class Actions—State Laws—Class Certification—Standard—Computers, Computer Software.**—Two purported classes of California indirect purchasers of software products produced by a computer software company (purchasers of the company's operating system software and purchasers of the company's word processing or spreadsheet software) were certified to proceed with California state law claims against the company. The plaintiffs alleged that the company harmed consumers by establishing and maintaining a monopoly of the Intel-compatible personal computer markets for operating systems software and for word processing and spreadsheet applications software. The matter was suitable for resolution on a classwide basis. The proposed classes were ascertainable; the classes were sufficiently numerous; the named representatives' claims were typical of those of the classes and the interests of the classes would be fairly and adequately represented. In addition, common questions of fact or law predominated, and a class action was the superior method for adjudicating the matter.

See ¶ 9410.05.

**Class Actions—State Laws—Class Certification—Monopolization—Computers, Computer Software.**—For purposes of class certification in a state antitrust law class action by California indirect purchasers against a computer software company for engaging in monopolization, plaintiffs made a sufficient threshold showing that issues of law and fact regarding the company's antitrust violations were subject to common proof by pointing to findings of fact and conclusions of law against the company in a federal/state enforcement action. Issues as to whether the company violated the Cartwright Act were not differentiated among individual consumers.

See ¶ 9410.05.

**Class Actions—State Laws—Class Certification—Fact of Injury—Computers, Computer Software.**—For purposes of class certification in a state antitrust law class action by California indirect purchasers against a computer software company for engaging in monopolization, the plaintiffs established that the harm suffered by consumers as a result of the company's anticompetitive practices—or fact of injury—was capable of proof on a classwide basis. While the task was formidable, it was not impossible. The plaintiffs proposed several methodologies shown to be widely accepted within the profession and submitted published empirical analyses to demonstrate general harm to consumers as a result of the company's conduct. The plaintiffs did not have to prove that each and every plaintiff paid a supracompetitive price for the relevant software products.

See ¶ 9410.05.

**Class Actions—State Laws—Class Certification—Damages Calculation—Computers, Computer Software.**—For purposes of class certification in a state antitrust law class action by California indirect purchasers against a computer software company for engaging in monopolization, the plaintiffs demonstrated that the amount of damages resulting from the company's alleged overcharges was susceptible to classwide proof. Damages could be calculated in the aggregate for the class. Summing of all individual claims was not required.

See ¶ 9410.05.

**Class Actions—State Laws—Class Certification—Superiority of Class Action Methodology—Computers, Computer Software.**—A class action was the superior method for adjudicating a state law monopolization action by California indirect purchasers of software products produced by a computer software company against that company. The case involved a very large number of claimants with relatively small amounts at stake. Most consumers had little incentive to

litigate independently, since the costs of litigation would have overwhelmed their potential recovery. Moreover, the potential recovery was not so insignificant to warrant the assumption that individual consumers would not be motivated to claim any recovery to which they were entitled or that a favorable outcome would only benefit attorneys. The denial of class treatment could result in repetitious litigation and inconsistent judgments to the extent that purchasers of large quantities of the company's software elected to pursue individual claims.

See ¶ 9410.05.

For plaintiffs: Eugene Crew, Daniele J. Gurniss, Richard L. Grossman, and Theodore T. Herhold of Townsend & Townsend & Crew, San Francisco, Cal., R. Stephen Berry, J. Daniel Leftwich, Michael J. Quinn, and Gregory Baruch of Berry & Leftwich, Washington, D.C., Michael K. Kellogg, Mark C. Hansen, and Steven F. Benz of Kellogg, Huber, Hansen, Todd & Evans, Washington, D.C., Craig C. Corbitt of Zelle, Hofmann, Voelbel & Gette, San Francisco, Cal., William Bernstein, Joseph R. Saveri, and Steven M. Tindall of Lieff, Cabraser, Heimann & Bernstein, San Francisco, Cal., Leonard B. Simon of Milberg, Weiss, Bershad, Hynes & Lerach, New York, Daniel J. Mogin, San Diego, Cal., Guido Saveri and R. Alexander Saveri of Saveri & Saveri, Inc., San Francisco, Cal., Josef D. Cooper and Tracy R. Kirkham of Cooper & Kirkham, San Francisco, Cal., Lingel H. Winters, San Francisco, Cal., Jeffrey J. Parish, Oakland, Cal., and Francis O. Scarpulla, San Francisco, Cal. For defendant: Robert A. Rosenfeld and Stephen V. Bomse of Heller, Ehrman, White & McAuliffe, San Francisco, Cal., David Tulchin and Michael Lacovara of Sullivan & Cromwell, New York, N.Y., Steve W. Berman of Hagens & Berman, Seattle, Wash., Thomas W. Burt, Richard J. Wallis, and Steven J. Aeschbacher, Redmond, Wash.

## ORDER RE CLASS CERTIFICATION

POLLAK, J.: This is a coordinated proceeding brought by plaintiffs as representatives of two purported classes of California indirect purchasers of software products produced by defendant Microsoft Corporation.

The operative complaint for all of the coordinated actions[1] alleges causes of action under the Cartwright Act (Bus. & Prof. Code, § 16720 et seq.) and the Unfair Competition Act (Bus. & Prof. Code, § 17200 et seq.). Plaintiffs allege that defendant engaged in numerous violations of these Acts in establishing and maintaining an illegal monopoly of the Intel-compatible personal computer markets for operating systems software and for word processing and spreadsheet applications software. Plaintiffs allege that Microsoft harmed California consumers by overcharging for its software as a result of the abuse of its monopoly power and by depriving consumers of other benefits that would have been derived from competition in those markets.

Plaintiffs seek to bring this action on behalf of California individuals and entities that purchased software programs indirectly from Microsoft. Specifically, plaintiffs request that two classes be certified:

(1) The "*Windows and MS-DOS Operating System Software Class*:" All persons or entities within the State of California who, on or after May 18, 1994, indirectly purchased "Microsoft Windows operating system software or MS-DOS operating system software" and who did not purchase it for the purpose of resale.

(2) The "*Word and Excel Software Class*:" All persons or entities within the State of California who, on or after May 18, 1994, indirectly purchased Microsoft "Word" word processing software and/or "Excel" spreadsheet software compatible with "Microsoft Windows operating system software or MS-DOS operating system software" and who did not purchase it for the purpose of resale.

Excluded from the class[es] are government entities, Microsoft officers and directors, subsidiaries in which Microsoft has greater than a 50 percent ownership interest, and any judges or justices assigned to hear any aspect of this litigation. Also excluded are persons or entities who make their purchases after the date of notice to the class.[2]

Microsoft contends that the complexities of this case preclude common proof of the key issue of whether any illegal practices adversely impacted California consumers, and that certification is therefore inappropriate. "[S]hort of making an individual inquiry as to each proposed class member, [there is] no way of proving the key 'fact of injury' or 'impact' element in an antitrust class action: that the alleged monopolistic 'overcharge' actually worked a discernible,

---

[1] The Amended Complaint for Violations of California Business and Professions Code §§ 16720 and 17200 Seeking Damages, Restitution and Injunctive Relief: Class Action, filed March 19, 1999 in *Lingo v. Microsoft Corporation*, San Francisco Superior Court No. 301357 (hereafter "Complaint").

[2] Microsoft notes that because it does not actually "sell" its software to anyone (rather, it "licenses" its products), it is technically incorrect to refer to putative class members as indirect "purchasers." However, for the sake of simplicity, the court will also adopt plaintiffs' use of the widely recognized terminology. However, the term "licensed" should be inserted in the definition of the classes to be certified.


tangible impact on the vast majority of end-users in the proposed class. Nor could the amount of the alleged overcharge, if any, passed on to an end-user be estimated without individual investigation." (Microsoft Corporation's Memorandum of Points and Authorities in Support of Its Opposition to Plaintiffs' Renewed Motion for Class Certification ("Opp.") at p. 3.)

While plaintiffs urge that "[t]here is nothing extraordinary about [this] motion" (Memorandum of Points and Authorities in Support of Plaintiffs' Renewed Motion for Class Certification ("Motion") at p. 1), the application for certification of a class in this case is hardly run of the mill. Unlike virtually all reported decisions in antitrust cases in which classes of indirect purchasers have been certified, plaintiffs do not base their claim for recovery on allegations that defendant committed a *per se* violation—a critical factor that would permit a classwide presumption of injury. Moreover, there undoubtedly is a basis for Microsoft's emphasis on the number of software programs it has marketed over the purported class period, the pricing differences that have existed over this period of more than six years, the rapid pace of change in the computer industry over this period, the varied channels through which its software has been distributed, and the critical fact that its software was frequently incorporated into personal computers and represented only a small fraction of the consumers' purchase price. These factors require the court to consider with utmost care the particular issues raised by the allegations and the way in which plaintiffs intend to meet their burden of proof. The question at this point, however, is not whether plaintiffs will be able to prove their case, but only whether their contentions can be evaluated in a manner that does not require consideration of so many individualized circumstances as to be completely impracticable.

### A. Standard for Class Certification.

Class suits are authorized in California when "the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." (Code Civ. Proc., §382.) A class should be certified when the party seeking certification has demonstrated the existence of an ascertainable class and a well-defined community of interest among the class members. (*Richmond v. Dart Indus., Inc.* (1981) 29 Cal.3d 462, 470; see also *Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 704.) The community

of interest requirement embodies three factors: "(1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 (citing *Richmond v. Dart Indus., Inc., supra*, 29 Cal.3d at p. 470).) In addition, the party seeking certification must establish that the class action is a superior method of adjudicating the matter. (*Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1279-1280.) In the absence of controlling state authority, California courts look to Rule 23 of the Federal Rules of Civil Procedure and to the federal case law interpreting this rule. (*Richmond v. Dart Indus., Inc., supra*, 29 Cal.3d at pp. 469-470.)[3]

The party seeking certification of the class carries the burden of establishing that the requirements for certification are met. (*Richmond v. Dart Indus., Inc., supra*, 29 Cal.3d at p. 470.) Courts encourage the use of the class action to "prevent a failure of justice in our judicial system." (*Linder v. Thrifty Oil Co., supra*, 23 Cal.4th at p. 434.) Consumers' individual damages frequently are insufficient to justify the costs of litigation, so that in the absence of class treatment, violations of law inflicting substantial damages in the aggregate would go unremedied. But to ensure that no party suffers a failure of justice, it is necessary to "carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." (*Linder v. Thrifty Oil Co., supra*, 23 Cal.4th at p. 435.)

In considering a class certification motion, the court accepts the facts alleged in the complaint as true. (See *Linder v. Thrifty Oil Co., supra*, 23 Cal.4th at p. 443; *Blackie v. Barrack* (9th Cir. 1975) 524 F.2d 891, 901, fn. 17.) The Supreme Court has recently emphasized that certification of a class is a procedural question that should not be conditioned upon a showing that the class claims are likely to succeed on the merits. (*Linder v. Thrifty Oil Co., supra*, 23 Cal.4th at pp. 439-440, 443.) The Supreme Court also has repeated that courts should resolve any doubt as to whether to certify a class in favor of certification. (See, e.g., *Richmond v. Dart Indus., Inc., supra*, 29 Cal.3d at pp. 473-475; *La Sala v. American Savings & Loan Ass'n* (1971) 5 Cal.3d 864, 883; *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 807.)

---

[3] Rule 23 of the Federal Rules of Civil Procedure requires that plaintiff show common questions of fact or law, numerosity of the class, typicality of the named plaintiff's claim and adequacy of representation. In addition, plaintiff must show that the common questions of law or fact predominate over questions affecting only individual class members and

that the class action is superior to other methods for fairly and efficiently resolving the dispute. (Fed. Rules Civ. Proc., Rule 23(a), (b)(3), 28 U.S.C.; *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* [1985-1 Trade Cases ¶ 66,653], (1987) 191 Cal.App.3d 1341, 1347, fn. 5.)

While issues affecting the merits may be enmeshed with class action requirements, the issue at this stage of the proceedings is only whether the matter is suitable for resolution on a class-wide basis. (*Linder v. Thrifty Oil Co., supra,* 23 Cal.4th at p. 443.) Plaintiffs are not now required to prove their case. (*See id.,* at p. 438-39, 443; *Eisen v. Carlisle & Jacquelin* [1974-1 TRADE CASES ¶75,082] (1974) 417 U.S. 156, 177; *In re Catfish Antitrust Litigation* [1993-2 TRADE CASES ¶70,395] (N.D. Miss. 1993) 826 F.Supp. 1019, 1038-1039.) Rather, they are required to make a "threshold showing" that the antitrust violations, if proven, have had a common impact on the class. (*In re Catfish Antitrust Litigation, supra,* at pp. 1041-1042.) Plaintiffs are also required to advance a method for proving generalized damages on a classwide basis "not so insubstantial that it amount[s] to no method at all." (*Id.,* at p. 1042.) In response to plaintiffs' showing that all of the requirements for class certification have been met, Microsoft disputes only whether common questions of law or fact predominate.[4]

### B. Indirect Purchaser Suits for Damages in California.

California is one of a minority of states that permits indirect purchasers to maintain antitrust suits for damages. Rejecting *Illinois Brick Co. v. Illinois* [1977-1 TRADE CASES ¶61,460] (1977) 431 U.S. 720, in which the United States Supreme Court held that such suits could not be maintained under the federal Sherman Act, the California Legislature amended the Cartwright Act specifically to permit indirect purchaser actions under California law. (Bus. & Prof. Code, §16750(a).) The California Supreme Court noted that this legislative action constituted an endorsement of Justice Brennan's dissenting opinion in *Illinois Brick,* and "a mandate to avoid unnecessary procedural barriers to indirect purchasers' prosecution of California antitrust suits." (*Union Carbide v. Superior Court* (1984) 36 Cal.3d 15, 21-22.)

### C. Common Questions of Law or Fact Predominate over Individual Questions.

Plaintiffs' burden is to establish that common questions of law or fact predominate over individual issues. This inquiry "turns on an interpretation of substantive issues of antitrust law." (*Rosack v. Volvo of America Corp.* [1982-83 TRADE CASES ¶65,145] (1982) 131 Cal.App.3d 741, 751 (*Rosack*).) Federal case law interpreting the Sherman and Clayton Acts is applicable to interpretation of California's antitrust law. (*Ibid.*) To establish liability, plaintiffs must prove an antitrust violation and demonstrate that the class suffered injury or impact as a result of the violation. (*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* [1988-1 TRADE CASES ¶68,053] (1987) 191 Cal.App.3d 1341, 1350 (*B.W.I. Custom Kitchen*).) For class certification purposes, plaintiffs may satisfy this requirement by making a "threshold showing that the antitrust violation, if proven, had a common impact on the class members." (*In re Catfish Antitrust Litigation, supra,* 826 F.Supp. at pp. 1038-1039.) "If plaintiffs have stated claims of illegality and impact which can be proved predominantly with facts applicable to the class as a whole, rather than by a series of facts relevant to only individual or small groups of plaintiffs, then prosecution of this case as a class action is appropriate and desirable." (*Rosack, supra,* 131 Cal.App.3d at p. 752.) Plaintiffs' proposed method for generalized proof of dam-

---

[4] Microsoft does not seem to contest that the proposed classes are ascertainable. Whether a class is ascertainable depends on the clarity of the class definition, the numerosity of the putative class and the means available to identify potential class members. (*Reyes v. Board of Supervisors, supra,* 196 Cal.App.3d at p. 1274.) The class definitions make clear that any California consumer of the software at issue who purchased the product(s) for his, her or its own use and not for resale within the class period is a member of the class. The definitions also make clear who is excluded from the classes. Moreover, according to declarations submitted with the moving papers, the named plaintiffs who seek to represent one or both classes are themselves members of one or both of the classes.

The numerosity requirement also is not disputed and is satisfied because the class members are so numerous that it is "impracticable to bring them all before the court." (Code Civ. Proc., §382.) There is no predetermined number of class members necessary as a matter of law for the maintenance of a class action. (*Hebbard v. Colgrove* (1972) 28 Cal.App.3d 1017 (not inappropriate to certify class involving a minimum of 28 members); *Chodosrigger, Inc. v. GTE Corp.* (1987) 191 Cal.App.3d 605 (mere size of proposed class numbering over 600 million members did not make proposed class action unmanageable).) Here plaintiffs allege there are "clearly millions of class members." (Motion at p. 19.)

The typicality requirement is satisfied if the representative plaintiff's claim "has the essential characteristics common to the claims of the class." (*In re Flat Glass Antitrust Litigation* [1998-2 TRADE CASES ¶72,713] (1999) 191 F.R.D. 472, 479.) The named plaintiffs' claims here, that they paid illegal overcharges due to defendant's antitrust violations, are identical to those of the class, and are, therefore, typical of those of the class.

Again, the parties do not take issue with the adequacy of representation requirement, which is met by (1) retaining class counsel competent to handle the litigation; and (2) ensuring that the class representatives' interests are not antagonistic to those of the class. In approving plaintiffs' proposed organization of counsel, this court found plaintiffs' counsel to be well qualified to conduct this litigation. (*See* Pretrial Order No.1, filed Mar. 9, 2000, and supporting documentation filed by plaintiffs in support thereof.) The named plaintiffs' claims arise through the same set of facts as do those of the class and their claimed injuries are the same. Through declarations, the named plaintiffs attest to their ability and willingness to prosecute the litigation and protect the interests of the class.

¶73,013

©2000, CCH INCORPORATED

ages must not be "so [insubstantial] that it amount[s] to no method at all." (*In re Catfish Antitrust Litigation*, supra, 826 F.Supp. at p. 1042.)

Plaintiffs frame the common questions presented by this action as follows:

(1) whether Microsoft possesses monopoly power in the relevant computer software markets; (2) whether Microsoft has acquired, maintained and increased its market power through violations of the Cartwright Act and the Unfair Competition Act (Bus. & Prof. Code §§ 16720, 16727 and 17200); (3) whether Microsoft exploited its illegal monopoly to cause substantial harm to competition in the relevant markets; (4) whether Microsoft exploited its illegal monopoly to cause substantial harm to consumers by overcharging them for inferior products, suppressing innovation and denying consumers their freedom of choice in a competitive market; (5) whether Microsoft should be required to make full restitution for the harm it unlawfully inflicted upon consumers and the profit it unlawfully reaped from consumers; and (6) whether Microsoft should be enjoined from continuing its violations of law.

(Plaintiffs' Reply In Support of Renewed Motion for Class Certification ("Reply") at pp. 10-11.) The issues presented fall into three categories: (1) whether Microsoft violated California's antitrust law; (2) whether any such violation caused harm to the classes; and (3) what relief is appropriate.

**1. Violation.**

Plaintiffs allege numerous antitrust violations by Microsoft that had the purpose and effect of establishing and maintaining an illegal monopoly of the personal computer operating systems, word processing and spreadsheet software markets. (Compl. at ¶¶ 37, 38, 104-107.) Plaintiffs allege that Microsoft exploited its monopoly power[5] to cause substantial harm to competition and to the ultimate consumers of Microsoft's products in California, including overcharges for the software programs at issue. (Compl. at ¶¶ 104, 105, 107.) Such conduct, if proven, violates the Cartwright Act, which prohibits combinations or conspiracies in restraint of trade. (Bus. & Prof. Code, § 16720 et seq.)

As evidence of the substantiality of their claims and the susceptibility of these claims to classwide analysis, plaintiffs point to the Findings of Fact in the antitrust action brought by the United States against Microsoft. (*United States v. Microsoft Corp.* [2000-1 TRADE CASES ¶72,839] (D.D.C. 1999) 65 F.Supp.2d 1 [hereinafter "Findings of Fact"]; *see also United States v. Microsoft Corp.* [2000-1 TRADE CASES ¶72,839] (D.D.C. 2000) 87 F.Supp.2d 30 [hereinafter "Conclusions of Law"].) There, the District Court made detailed findings of various forms of anticompetitive conduct by Microsoft. Judge Jackson found that Microsoft engaged in anticompetitive conduct to protect Windows, its core asset, from competition (*e.g.* Findings of Fact ¶¶ 132, 194, 409-412; *see also* Conclusions of Law §I.2), including restrictions on personal computer manufacturers, internet access providers and internet content providers. (*E.g.* Findings of Fact ¶¶ 155, 203, 215, 221, 234, 235, 237, 242-336.) Judge Jackson found that Microsoft charged higher prices than it would have in a competitive environment, consistent with monopoly power (Findings of Fact ¶¶ 62, 63),[6] and concluded that Microsoft's conduct had "harmed consumers in ways that are immediate and discernible." (Findings of Fact ¶ 409.)

Such Sherman Act violations also constitute violations of the Cartwright Act and violations of the Unfair Competition Act (*Quelimane Co. v. Stewart Title Guaranty Co.* [1998-2 TRADE CASES ¶ 72,285] (1998) 19 Cal.4th 26, 42-43), and will entail proof of the same conduct by Microsoft as to each class member. (*Rosack*, *supra*, 131 Cal.App.3d at p. 752; *In re Catfish Antitrust Litigation*, *supra*, 826 F.Supp. at p. 1039.) Microsoft's actions in this regard are not differentiated with respect to individual consumers; the focus is squarely on Microsoft's conduct, not the conduct of individual class members. Thus, the proof required to demonstrate the "existence, implementation and effect" of the alleged unlawful conduct will require "a common thread of evidence" which will "correspond to evidence which otherwise would be introduced by absentee class members." (*B.W.I. Custom Kitchen*, *supra*, 191 Cal.App.3d at p. 1349 [quoting *In re Sugar Indus. Antitrust Litigation* [1976-2 TRADE CASES ¶ 61,215] (E.D. Pa. 1976) 73 F.R.D. 322, 345]; *In re Flat Glass Antitrust Litigation* [1999-2 TRADE CASES ¶72,713] (W.D. Pa. 1999) 191 F.R.D. 472, 484.) Plaintiffs have made a sufficient "threshold showing" that the issues of fact and law regarding Microsoft's alleged violations of the Cartwright Act and the Unfair Competition Act are subject to common proof.

---

[5] Plaintiffs allege that Microsoft controls approximately 90% of the operating systems, word processing and spreadsheet software markets. (Compl. ¶¶ 29, 34, 36.)

[6] In further support of their motion, plaintiffs submitted the opinion of Professor David J. Parker describing the nature of the competition that would have existed absent Microsoft's alleged anticompetitive conduct (the "but for" world) and opining that pricing for operating systems and applications software would have been lower had Microsoft not engaged in such conduct. (Declaration of David J. Parker in Support of Plaintiffs' Renewed Motion for Class Certification ("Parker Decl.") ¶¶ 34, 57.)

### 2. Fact of Injury.

Plaintiffs must also demonstrate that whether consumers suffered harm as a result of Microsoft's anticompetitive conduct is also capable of proof on a classwide basis. (*B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1350.)[7] "[A]n antitrust plaintiff's 'burden of proving the fact of damage . . . is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage.'" (*Ibid.* [citing *Zenith Corp. v. Hazeltine* (1969) 395 U.S. 100, 114, fn. 9].) Plaintiffs contend that Microsoft harmed the class by charging supracompetitive prices for its software. Plaintiffs must, therefore, make a "threshold showing" that proof of the overcharge is common to the class.

There is considerable authority for the proposition that in a case alleging price fixing the fact of injury may be determined on a classwide basis. (See, e.g., *B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d 1341; *Rosack, supra*, 131 Cal.App.3d 741; *In re Catfish Antitrust Litigation, supra*, 826 F.Supp. 1019; *In re Sugar Antitrust Litigation, supra*, 73 F.R.D. 322.) Because price fixing is a per se violation of antitrust law, a presumption of harm arises from proof of such a violation. (*B.W.I. Custom Kitchen, supra*, at pp. 1350-1353; *Rosack, supra*, at pp. 753-754.) "It has been held that impact will be presumed once a plaintiff demonstrates the existence of an unlawful conspiracy that had the effect of stabilizing, maintaining or establishing product prices beyond competitive levels." (*In re Sugar Indus. Antitrust Litigation, supra*, at p. 347.) A per se violation raises a presumption of harm because conduct such as a conspiracy to fix prices has the sole purpose of artificially raising the price of the item. It follows that consumers of the product pay more than they would in a competitive market even if the prices charged to direct purchasers vary. (*B.W.I. Custom Kitchen, supra*, at pp. 1350-1351.) Thus, a plaintiff need not provide evidence of harm to direct purchasers above and beyond establishing "the existence of an unlawful conspiracy that had the effect of stabilizing, maintaining, or establishing product prices beyond competitive levels." (*In re Sugar Indus. Antitrust Litigation, supra*, at p. 347.)

Holding monopoly power, however, is not itself a violation of any antitrust provision. Whether particular practices engaged in to acquire, maintain or extend such power constitute violations must be evaluated under the rule of reason. (*Bert G. Gianelli Distrib. Co. v. Beck &*

*Co.* [1985-2 Trade Cases ¶ 66,851] (1985) 172 Cal.App.3d 1020, 1047-1048; *Standard Oil Co. v. United States* (1910) 221 U.S. 1, 61-62.) Some practices that flow from the existence of monopoly power may benefit rather than harm consumers, so that injury may not be presumed simply from proof that the defendant engaged in the conduct in question. (*Standard Oil Co. v. United States, supra*, 221 U.S. at pp. 61-62.) Here, Microsoft makes exactly that contention: that the various practices that are challenged—such as preventing other products from being used with its operating systems and bundling its Internet browser with its operating system—have been of great benefit to the public by enhancing product standardization and increasing the ease of computer use and internet access.

But while the presence of these additional issues in a monopolization case such as this may preclude any presumption of harm, as in a price-fixing case, the existence of these issues does not necessarily mean that common issues do not predominate. Without regard to the possibility that some of the relevant issues in this case may be conclusively determined by the final outcome in the Government's action against Microsoft, remaining issues concerning the legality of defendant's practices are issues common to all members of the classes plaintiffs seek to certify. As discussed in section C.1 above, the fundamental and predicate issues as to whether defendant violated the Cartwright Act are not differentiated among individual consumers. In this respect, the situation is no different from a case involving an alleged conspiracy that would constitute a per se violation of the statute.

If it should be determined that defendant's practices unlawfully elevated prices to direct purchasers of Microsoft's software, the complexities of the marketplace to which defendant refers will affect the ability to analyze whether, and the extent to which, these higher prices were passed on to consumers. However, once the existence of unlawfully inflated prices at the direct purchaser level has been established, the difficulties of determining whether the price increase was absorbed by those direct purchasers or passed on to successive purchasers in the chain of distribution are no greater in a monopolization case than in a per se price-fixing case. There is no ascertainable difference between the analysis of the impact of the abuse of a monopoly and of price fixing once the overcharge to direct purchasers has been established, and in response to the court's inquiry at oral argument Microsoft offered none. The starting point in both situations is artificially high prices set in an anticompetitive market. The same economic

---

[7] The parties acknowledge the distinction between the fact of harm or impact, on the one hand, and actual damages, on the other. "Fact of damage pertains to the existence of injury, as a predicate to liability; actual damages involve the quantum of injury, and relate to the appropriate measure of individual relief." (*B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1350, fn. 7 [citation omitted].)

models and analyses that have been accepted for purposes of tracing a supracompetitive price that results from a price fixing conspiracy are relevant and applicable to trace the pass-through resulting from monopoly abuse.

Unlike the conclusion reached by the Supreme Court in *Illinois Brick* and by the courts of some other states, the California courts have made clear that the difficulties in tracing the pass-through of artificially inflated prices do not necessarily create insuperable obstacles to classwide analysis and to class certification. "In certifying a plaintiff class, the courts have found it appropriate to look past surface distinctions among the products purchased by class members or the marketing mechanisms involved when allegations of anticompetitive behavior embracing all of the various products and distribution patterns have been credibly pleaded. [Citation omitted.] Identical products, uniform prices, and unitary distribution patterns are not indispensable for class certification in this context." (*B.W.I. Custom Kitchen*, supra, 191 Cal.App.3d at p. 1350 [quoting *Shelter Realty Corp. v. Allied Maintenance Corp.* [1977-2 TRADE CASES ¶61,691] (S.D.N.Y. 1977) 75 F.R.D. 34, 37]; *Rosack*, supra, 131 Cal.App.3d at p. 757 [same].) "[C]ontentions of infinite diversity of product, marketing practices, and pricing have been made in numerous cases and rejected." (*Rosack*, supra, 131 Cal.App.3d at p. 755 [quoting *In re Folding Carton Antitrust Litigation* [1977-2 TRADE CASES ¶61,596] (N.D. Ill. 1977) 75 F.R.D. 727, 734].) "It should also be emphasized that courts have applied these principles to markets, such as this one, characterized by individually negotiated prices, varying profit margins, and intense competition." (*B.W.I. Custom Kitchen*, supra, at p. 1351.)

Nonetheless, defendant argues that the complexity and changing nature of the software markets over the past six years have been so great as to render classwide analysis "impossible" in this case. (Opp. at p. 1.) Focusing almost exclusively on the market for operating systems software, defendant emphasizes that over the class period it marketed a progression of product "families"—from MS DOS to the most current Windows NT Workstation system. The variety of illegal practices in which defendant allegedly engaged necessarily affected the price defendant was able to and did charge at different times and for different products. If defendant engaged in predatory pricing, the price to some purchasers presumably would have been less than a competitively determined price, so that some class members may have benefited from the practice, rather than having been damaged by it. Because of the high level of competition among computer manufacturers ("original equipment manufacturers" or "OEMs"), each OEM that purchased software directly from Microsoft made its own pricing decisions and therefore each may have absorbed rather than passed on a different portion of any excess in the price paid to Microsoft. Because the software represents only a small percentage of the cost of the computer, and because there are many other factors which may inhibit passing on price changes (such as "focal point" pricing and "menu costs"), whether, and the extent to which, any given OEM passed on the excess will differ from case to case. The amount passed through by distributors or retailers purchasing from the OEMs, or purchasing directly from Microsoft, may also vary, so that the fact, much less the amount, of any overcharge reaching a consumer will be a function of so many variables, defendant argues, that the impact of any violation cannot possibly be considered collectively. In the words of Microsoft's economist, Professor Jerry A. Hausman, "any analysis of whether an overcharge may have been passed on to an eventual final purchaser would require an evaluation of a large number of individual-specific facts that essentially will amount to an individualized inquiry for each final purchaser." (Declaration of Jerry A. Hausman ("Hausman Decl.") ¶32.)

Such a broad statement proves too much. If true, it would invalidate the entire study of microeconomics. In his Findings of Fact, Judge Jackson concluded that Microsoft's conduct had "harmed consumers in ways that are immediate and discernible." (Findings of Fact ¶409.) To demonstrate that impact on consumers can be proven on a non-individualized and classwide basis, plaintiffs rely heavily on the expert opinion of Professor Jeffrey K. MacKie-Mason, an economist. Accepting the allegations in the Complaint and the Findings of Fact, and based upon his knowledge of the industry, Professor MacKie-Mason opined that plaintiffs could demonstrate common impact on the classes "by showing that, as a result of Microsoft's monopoly power (derived from or maintained by the anticompetitive conduct alleged) consumers (1) were charged supra-competitive prices for [the relevant software] and (2) experienced less choice and innovation in [the relevant software markets] than they would have enjoyed in a competitive market." (Declaration of Jeffrey K. MacKie-Mason In Support of Plaintiffs' Renewed Motion for Class Certification ("MacKie-Mason Decl.") ¶6(a), (c).) "When a monopolist sets prices above competitive levels to its distributors, it generally results that all customers suffer harm." (Declaration of Jeffrey K. MacKie-Mason in Support of Plaintiffs' Reply re Renewed Motion for Class Certification ("MacKie-Mason Reply Decl.") ¶5.) Summarizing his conclusions, Professor MacKie-Mason stated:

As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly all of the overcharge will be passed through to ultimate consumers.... Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust law and economics as well."

(MacKie-Mason Reply Decl. ¶ 6.)

Professor MacKie-Mason described several recognized methods to estimate what Microsoft's prices to its direct purchasers would have been in a hypothetical "but for" world in which Microsoft had not engaged in the allegedly anticompetitive conduct. These include the use of "yardstick" prices based on the prices of products when the markets were more competitive or the prices of similar goods sold in more competitive markets; the comparative margin method (calculating the price at which Microsoft's margin on a product would equal the average margin of other software manufacturers); and constructing models of equilibrium in the relevant markets. (MacKie-Mason Decl. ¶¶ 28-36.) He further described two methods to measure the extent to which particular increased costs were passed on to final purchasers, both based on equilibrium models of distribution channels. (MacKie-Mason Decl. ¶¶ 38-40.)

Professor MacKie-Mason did not commit himself to the use of any one or more of these approaches nor did he make the necessary calculations or attempt to prove that any of these methods ultimately will be able to support plaintiffs' burden of proof at trial. Nonetheless, his declarations contain a good bit more than a plea to "trust me," as the defendant would characterize his testimony. (Opp. at p. 3.)

In addition to proposing several methodologies shown to be widely accepted within the profession, plaintiffs submitted several published works by prominent economists and consumer groups that have conducted empirical analyses to demonstrate general harm to consumers as a result of Microsoft's conduct (Hall, *Toward A Quantification of the Effects of Microsoft's Conduct* (2000) American Economic Review 90; Fisher & Rubinfeld, *United States v. Microsoft: An Economic Analysis* in Did Microsoft Harm Consumers? Two Opposing Views (AEI-Brookings Joint Center for Regulatory Studies 2000); Fisher & Rubinfeld, *Misconceptions, Misdirection, and Mistakes* in Did Microsoft Harm Consumers? Two Opposing Views (AEI-Brookings Joint Center for Regulatory Studies 2000); Consumer Federation of America, Media Access Project, U.S. Public Interest Research Group, The Consumer Cost of the Microsoft Monopoly: $10 Billion, of Overcharges and Counting (Jan. 1999).) Moreover, the opposing experts agree that equilibrium economic models can be used to calculate damages in antitrust cases. According to the defense expert, Professor Hausman:

> Economists have developed various theoretical models of competition in markets with limited numbers of sellers. These models are based on a series of strong simplifying assumptions. They can provide useful bases for suggestive theoretical analyses, but they do not provide reliable bases for calculating damages *unless carefully designed and calibrated to fit the actual conditions of the market in question.*

(Hausman Decl. ¶ 125 (emphasis added).)

Professor Hausman asserts that none of the methods proposed by Professor MacKie-Mason will work because none of them "accounts for the real world complexities of the products and the distribution chains at issue." (Hausman Decl. ¶ 113.) However, the experts agree on the importance of product differentiation in reaching dependable conclusions (Hausman Decl. ¶ 126; MacKie-Mason Decl. ¶ 108.), but, not surprisingly, disagree over the extent to which Professor MacKie-Mason's anticipated models will reflect reality. (See, e.g., Hausman Decl. at pp. 40-52; MacKie-Mason Decl. at pp. 38-52.) The question at this stage is not whether plaintiffs will be able to carry their burden of proving that their experts' analyses are reliable, but whether it appears that the differences between the experts can be intelligently presented and evaluated within the framework of a class action. On a motion for class certification, it is inappropriate to resolve a "battle of the experts." (*In re Catfish Antitrust Litigation, supra,* 826 F.Supp. at p. 1042.) "Whether or not [plaintiff's expert] is correct in his assessment of common impact/injury is for the trier of fact to decide at the proper time. [Citations omitted.] For now, the court is persuaded that for the purposes of a class certification motion, plaintiffs have made [the required] threshold showing ....". (*Ibid.*) The court is similarly persuaded here.

It may be, as defendant has argued, that closer examination of the facts will disclose that nor all class members were harmed by Microsoft's practices.[a] However, plaintiffs need not prove that each and every class member

---

[a] Some skepticism is warranted as to the extent to which defendant will be able to prove its assertion in this regard. Microsoft contends, for example, that its conduct benefited rather than harmed consumers because consumers received Microsoft's Web browser, Internet Explorer, at "no charge." Judge Jackson found that Microsoft's practice of bundling its Web browser with Windows was designed to harm the ability of Netscape's Navigator Web browser to compete

paid a supracompetitive price for the relevant software products. As explained in *Rosack*, "[t]he courts have rejected the notion that each member of the purported class must prove that he or she absorbed at least some portion of the overcharges in order to establish liability. [Citations omitted] '[C]lass certification does not require that common questions be completely dispositive . . . as to all potential members of the class. [Citations omitted.] The fact that certain members of the class may not have been injured at all does not defeat class certification. [Citations omitted.]" (*Rosack, supra*, 131 Cal.App.3d at pp. 753-754.) Similarly, the *B.W.I. Custom Kitchen* court pointed out that "[e]ven if it were shown that certain class members escaped having to pay any of the overcharge . . . , the fact remains that in the vast majority of cases at least a portion of the illegal overcharge was passed on by the independent distributors to class members in the form of higher prices." (*B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1353.) Whether that is true in this case will depend upon an evaluation of the evidence at trial.

Defendant is correct that the multiple products embraced within each of the two proposed classes, the multiple distribution channels; and the extraordinary rate at which changes have occurred in the relevant markets over the six-year class period will complicate the analysis of the impact of any illegal practices in which Microsoft is found to have engaged. The trier of fact undoubtedly will be required to do more than make a single determination of whether any damages were incurred by the respective classes over the six-year period. However, plaintiffs advise that their evidence and expert studies will be presented in a manner that will permit, at a minimum, annual comparisons of prices paid by consumers for particular software products with the prices that would have prevailed in the hypothetical "but for" world in the absence of the unlawful practices. Moreover, since the relevant comparison is not between actual prices and prices in a perfectly competitive market, or even between actual prices and prices lawfully obtained in a monopoly market, plaintiffs' evidence will need to establish "the price increment caused by the anticompetitive conduct that originated or augmented the monopolist's control over the market." (*Berkey Photo, Inc. v. Eastman Kodak Co.* [1979-1 TRADE CASES ¶ 62,718] (2d Cir. 1979) 603 F.2d 263, 297.) The task is formidable, but not impossible. As the case proceeds towards trial, careful consideration will have to be given to the possibility of creating subclasses, bifurcating issues, making special findings, or using other techniques that may facilitate the presentation and consideration of the relevant evidence. At this point, the court is not persuaded that a comprehensible analysis of these issues cannot be made within the context of properly managed trial proceedings.

3. Calculation of Damages.

Plaintiffs must also meet their burden of demonstrating that the amount of damages is susceptible to classwide proof. With respect to calculating damages once liability has been established; individual issues will not bar certification of a class, (*B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1354; *Rosack, supra*, 131 Cal.App.3d at p. 761.) "[I]t has been recognized consistently that differences among potential class members concerning damages do not preclude class treatment so long as common questions regarding conspiracy and impact allegations predominate." (*Rosack, supra*, at p. 761.) Courts recognize a somewhat relaxed standard of proof once the antitrust violation and resulting injury have been proven. (*In re Catfish Antitrust Litigation, supra*, 826 F.Supp. at p. 1042.) This is the logical result of an inability to ascertain exactly what "plaintiff's position would have been in the absence of defendant's antitrust violation." (*Ibid.*) "Hence, the willingness to accept some uncertainty stems from a simple, equitable notion that the wrongdoer should not be allowed to profit by an insistence upon an unattainable standard of proof." (*Id.*, at pp. 1042-1043; *see also Bigelow v. RKO Radio Pictures, Inc.* [1946-1947 TRADE CASES ¶ 57,445] (1946) 327 U.S. 251, 264.)

The basic measure of damages for overcharges resulting from Microsoft's alleged anticompetitive conduct is the difference between the price paid by a class member for a particular product and the price that would have been paid absent the alleged anticompetitive conduct. (*See In re Catfish Antitrust Litigation, supra*, 826 F.Supp. at p. 1043; MacKie-Mason Decl. ¶¶ 25, 40.) To determine this amount, as discussed in section C.2 above, it is of course necessary to determine both the amount of the overcharge by Microsoft and the amount of such overcharge passed through to the consumer. Total classwide damages are the sum of the overcharges on all software programs sold to class members during the class period. (MacKie-Mason Decl. ¶ 40.)

Plaintiffs need not present a method to calculate each class member's damage individually. California courts permit calculation of damages in the aggregate for a class and do not require

(Footnote Continued)

and caused harm to consumers. (Findings of Fact ¶¶ 143, 155-160, 166-168, 171-177; Conclusions of Law at pp. 38-40, 42-43.) Moreover, as Professor Mackie-Mason explained, the effect of an overcharge is not cured by the marketing strategy "buy three lines, get the fourth the free." (MacKie-Mason Reply Decl. ¶ 21.)

summing all individual claims. (*Daar v. Yellow Cab Co.*, supra, 67 Cal.2d at pp. 706, 714, 716; *Bruno v. Superior Court* (1991) 127 Cal.App.3d 120, 128-129 & fn. 4.) A reasonable basis for computing damages is permissible, even if it involves approximation or estimation. (*Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc.* [1980-1 TRADE CASES ¶63,040] (1980) 101 Cal.App.3d 532, 545; *Bigelow*, supra, 327 U.S. at pp. 264-265.) Other courts in antitrust proceedings have found similar approaches to be sufficiently viable for purposes of class certification. (See, e.g., *In re Catfish Antitrust Litigation*, supra, 826 F.Supp. at p. 1043; *In re Domestic Air Transportation Antitrust Litigation* [1991-2 TRADE CASES ¶69,518] (N.D. Ga. 1991) 137 F.R.D. 677, 692; *In re Corrugated Container Antitrust Litigation* [1978-2 TRADE CASES ¶62,220] (S.D. Tex. 1978) 80 F.R.D. 244, 251.) Moreover, it is not necessary that plaintiffs demonstrate to a certainty that their proposed methods will succeed, and it would be improper for the court to make a determination as to the likely success of plaintiffs' proposed methods. (*In re Domestic Air Transportation Antitrust Litigation*, supra, at p. 693; *In re Flat Glass Antitrust Litigation*, supra, 191 F.R.D. at p. 487.)

The method of calculating the amount of any recovery that will be received by each class member and the method of distributing damages to class members are different questions altogether that need not be addressed at this point, and which the parties have not argued. Suffice it to say that there is no reason to presume that conventional techniques for notifying class members of their right to submit claims and for submitting and processing claims will not be feasible in this litigation. Nor is there any reason to assume that the amounts to which individual class members may be entitled will be insufficient to justify the effort and expense of a claim procedure. Moreover, as noted by plaintiffs, fluid class recovery is also a possibility. (*Bruno*, supra, 127 Cal.App.3d at p. 135; *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 119-120.) Should problems in calculating damages appear to outweigh the benefits of class treatment, the court may reconsider its certification order and vacate or amend the certification. (*B.W.I. Custom Kitchen*, supra, 191 Cal.App.3d at p. 1348 [citations omitted].)

### D. A Class Action Is a Superior Method of Adjudicating the Matter.

Finally, plaintiffs must demonstrate that a class action would be of substantial benefit to the litigants and the court. (See *Blue Chip Stamps v. Superior Court* (1976) 18 Cal.3d 381, 385.) This requirement incorporates the superiority standard of Rule 23 of the Federal Rules of Civil Procedure. (*Schneider v. Vennard* (1986) 183 Cal.App.3d 1340, 1347.) The matters pertinent to this determination include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

(Fed. Rules Civ. Proc., Rule 23(b)(3); 28 U.S.C.) The various indirect purchaser claims filed in California against Microsoft already have been consolidated in this court, which is specifically called upon to utilize innovative methods to manage complex cases as part of the Judicial Council's Complex Civil Litigation pilot program. (See also *B.W.I. Custom Kitchen*, supra, 191 Cal.App.3d at p. 1355 [calling upon courts to adopt innovative methods for handling indirect purchaser class actions].)

This case involves a very large number of claimants with relatively small amounts at stake. Most consumers have little incentive to litigate independently since the costs of litigation undoubtedly would overwhelm their potential recovery. "The problems which arise in the management of a class action involving numerous small claims do not justify a judicial policy that would permit the defendant to retain the benefits of its wrongful conduct and to continue that conduct with impunity." (*Linder v. Thrifty Oil Co.*, supra, 23 Cal.4th at p. 446.) Moreover, the potential recovery here is not so insignificant to warrant the assumption that individual consumers will not be motivated to claim any recovery to which they may be entitled, or that a favorable outcome would benefit only the attorneys involved. And, to the extent that purchasers of large quantities of Microsoft software should elect to pursue their individual claims, denying class treatment could result in repetitious litigation and inconsistent adjudication of similar issues and claims. (*Richmond v. Dart Indus., Inc.*, supra, 29 Cal.3d at p. 469.) Under the circumstances, the superiority of a class action is apparent.

### CONCLUSION

In keeping with the Supreme Court's mandate, this court must "avoid interpreting procedural requirements in such a way as 'would thwart the legislative intent . . . to retain the availability of indirect-purchaser suits as a viable and effective means of enforcing California's antitrust laws.'" (*B.W.I. Custom Kitchen*, supra, 191 Cal.App.3d at p. 1355 [quoting *Union Carbide Corp. v. Superior Court*, supra, 36 Cal.3d at p. 21].) The court finds that the proposed classes are ascertainable, that the classes are suffi-

Cited 2000-2 Trade Cases
*Nutting v. RAM Southwest, Inc.*

88,565

ciently numerous, that the named representatives' claims are typical of those of the classes, and that the interests of the classes will be fairly and adequately represented. In addition, common questions of fact or law predominate, and a class action is the superior method for adjudicating the matter. Accordingly, the two proposed classes will be certified, and the litigation will proceed as a class action. Counsel should confer concerning the method of giving notice to the classes and the content of the notice, and be prepared to discuss these issues at the status conference scheduled for October 4, 2000.