# EXHIBIT 13

[¶ 74,274] Daniel Gordon; Brandon Welter, David Ellingson, Kari A. Wallace, on behalf of themselves and all others similarly situated, Plaintiffs v. Microsoft Corp., Defendant.

Minnesota District Court, Fourth Judicial Circuit, Hennepin County. No. MC 00-5994. Dated December 15, 2003.

### Minnesota Antitrust Law

Class Actions—State Laws—Certification—Proof of Class-wide Injury—Monopolization—Computers, Computer Software.—Decertification of two indirect purchaser classes bringing a monopolization suit against a computer software company under Minnesota law would not be appropriate because the classes' evidence of pass-through overcharges could suffice to establish class-wide injury. A dispute as to the strength of the evidence of overcharges prior to the class period and the length of the price lag was a question of fact for trial and, alone, was not fatal to the certification of the class. An argument by the defending company that many individual distributors' testimony as to their actual cost and pricing history could be offered to prove that some class members were damaged little, if at all, by monopoly overcharges did not necessitate a finding that individual issues predominated over common ones or that trial would be unmanageable. Such "unremarkable" testimony would quickly become redundant and would likely be limited by the court at trial. Moreover, no evidence was offered by the company that would compromise the reasonableness of using average pass-through rates to prove damages. Although the classes abandoned the methodology and expert witness through which they initially obtained certification, their proposed claims procedure—whereby a class member would identify the product purchased and the year, after which damages could be awarded to that class member based upon a damages grid—still appeared to be a mechanical means of awarding damages and avoiding mini-trials.

See ¶ 9410.25.

For plaintiff: Richard H. Hagstrom and Michael E. Jacobs of Zelle, Hofmann, Voelbel, Mason & Gette, Minneapolis, Minn. For defendants: Charles B. Casper, Robert L. DeMay of Leonard, Street and Deinard, Minneapolis, Minn.

### ORDER

1. By order of December 4, 2003, the court denied Microsoft's motion for decertification. The accompanying memorandum explaining the court's decision is made part of that order.

### MEMORANDUM

PETERSON, D.J.: Microsoft has moved to decertify two classes of Minnesota purchasers of its operating systems and applications software. This is the third time that the court has reviewed extensive briefing and heard detailed arguments about whether the rate that monopoly overcharges to direct purchasers are passed through to consumers can be proved on a class-wide basis. Each time Microsoft has vigorously contended that the question of pass through is too complex to answer in the mechanical fashion required for a class action. In the order certifying the original class over two and one-half years ago, the court expressed the policy basis behind its analysis:

> As a practical matter, denying class certification usually constitutes the functional dismissal of a consumer antitrust lawsuit. Denying class certification based merely on economic complexity would effectively abrogate the indirect purchaser provision [of Minn. Stat. § 325D.57] altogether since economic complexity is inherent in indirect purchaser actions. In order to effectuate the Minnesota legislature's intent, standards for class certification should be interpreted if at all possible in a fashion that indirect purchasers can meet.

Order Granting Class Certification, March 30, 2001, at 9. The court still adheres to this reasoning.

The basic facts creating the issue of pass-through are not in dispute. Plaintiffs propose to prove that Microsoft charged a monopoly overcharge to its direct customers. But the two certified classes are made up of indirect purchasers, who by definition bought their Microsoft products from an intermediary rather than from Microsoft itself. The question then is how much did this alleged increase in cost to direct purchasers result in an increased price to class members, i.e., how much of the monopoly overcharge was passed through to them? The problem is difficult because a product can follow a large number of different pathways from Microsoft to a consumer, passing through one or more intermediaries, each of which faces its own competitive conditions.

The court certified the two classes based on representations from Plaintiffs about what pass through evidence they would develop for Minnesota consumers. That evidence is now in, and Microsoft challenges its adequacy. Plaintiffs have produced a report of economists who opine that, on average, at least 100% of a Microsoft monopoly overcharge is ultimately passed on to consumers. They rely on five sources of evidence for this conclusion. First, economic theory predicts that when distribution markets are competitive, a cost increase to distributors will cause a price increase of the same amount to consumers. The experts find the distribution markets involved here to be competitive. They also reviewed three sources of existing evidence which they believe corroborates the theoretical prediction—Microsoft internal documents, surveys conducted by Microsoft consultants, and the testimony of Microsoft experts. Finally, they conducted regression analyses with a relatively small percentage of the transactions at issue here and found that the actual data support a pass through rate of at least 100%.

Trade Regulation Reports                                           ¶74,274

At the hearing, Microsoft counsel focused on two specific problems with the experts' report. First, he contended that an increase in price by Microsoft could not work its way through the distribution system immediately. He referred to Plaintiffs' initial expert, Dr. Keith Leffler. Leffler contended that the price overcharges at issue would have been embedded in the prices at all levels of the distribution system by the beginning of the class period because Microsoft's monopolistic conduct began a substantial time before the class period. Microsoft's counsel pointed out that the new experts' quantification of Microsoft's overcharges starts with 1994, the beginning of the class period, so there is no reliable evidence of an earlier overcharge that would have impacted consumers who made their purchases toward the beginning of the class period. Plaintiffs' counsel responded that, while the actual quantification of overcharges did not begin until the class period, there is ample evidence in the record of Microsoft's monopolistic practices prior to the class period from which a jury could infer an embedded overcharge. This dispute depends on the strength of the evidence of monopoly overcharges prior to the class period and the length of the price lag, neither of which have been addressed with any specificity by the parties. Thus, the matter will have to be resolved at trial. In any event, this problem alone should not be fatal to the certification of the class, since at most it would warrant a shortening of the class period.

Second, at the hearing Microsoft's counsel highlighted evidence that some intermediate distributors did not automatically raise their prices in response to cost increases. Sometimes they maintained specific focal point prices and absorbed cost increases for several months without changing the price. From this evidence Microsoft argued that there may be class members who were damaged little, if at all, by monopoly overcharges. Counsel argued that Microsoft is entitled to call many intermediate distributors as witnesses to testify about their actual cost and pricing history. Thus, Microsoft contended, individual issues predominate over common ones and the classes should be decertified, or the trial will be unmanageable.

Although it has a superficial appeal, Microsoft's argument is ultimately not persuasive. Microsoft has offered no evidence or expert to establish that the pass-through rate is different or unique for any particular product, any distribution channel, any time frame, or any subset of class members. If that were true, this case might have to be broken into pieces, i.e., "minitrials". Too many minitrials would necessitate decertification. But all Microsoft offers is the testimony of intermediate distributors to establish the unremarkable general proposition that distributors do not always raise their prices right away in response to a cost increase. Microsoft offers no pattern for this behavior, which probably results from each distributor's own economic circumstances at the time. Microsoft can make that point at trial with a limited number of witnesses. Such witnesses will quickly become redundant, and the court may legitimately exclude such redundant evidence. Thus, Microsoft's argument about the necessity to call a large number of witnesses, thereby rendering the trial unmanageable, does not support decertification.

Although the court is unpersuaded by Microsoft's argument that it is entitled to call so many witnesses that the trial will be unmanageable, Microsoft's evidence of the behavior of intermediate distributors raises the possibility that some class members may have suffered little or no injury and highlights the fact that Plaintiffs intend to prove only average damages. Plaintiffs readily acknowledge this. Their experts explain that regression analysis identifies the average rate at which the consumer price changes in response to changes in Microsoft prices. Nonetheless, the use of average pass through rates, even in combination with Microsoft's evidence that individual distributors sometimes absorbed specific cost increases, falls short of suggesting that any significant number of class members escaped injury. Neither party has directed the court's attention to evidence about just how long it took for the alleged monopoly overcharge to develop. There could hardly have been just one jump that increased the price from the competitive price to the full monopoly price. Presumably Microsoft's price diverged from the competitive price gradually over time. The gradual divergence may have been due to the competitive price declining and Microsoft not following suit, as well as to actual price increases by Microsoft not matched by the competitive price. Thus, even if specific distributors sometimes absorbed specific cost increases, there is no evidence before the court that any distributor absorbed all the cost increases making up the full monopoly overcharge. Moreover, even a distributor which absorbed a cost increase might still have reduced its price if Microsoft had matched a declining competitive price by reducing its price.

Thus, the problem appears more complex than Microsoft suggests. The damages question for trial is presumably not about whether a specific Microsoft price increase found its way through the distribution chain and resulted in an increase in the price paid by a specific class member. Rather, the question is how a series of Microsoft price increases, and/or a series of Microsoft failures to reduce prices, impacted the price each consumer paid. The question of what would have happened but for Microsoft's monopoly overcharge is a hypothetical, and a hypothetical question generally cannot be answered by historical data about what actually happened, but must often be answered by general principles about what generally tends to happen. Thus, average pass through rates appear reasonable and even necessary to prove damages here.

Other courts have explicitly approved the use of average damage calculations in antitrust cases. In *NASDAQ Market-Makers Antitrust Litigation* [1996-2 TRADE CASES ¶ 71,643], 169 F.R.D. 493 (S.D.N.Y. 1996), buyers and sellers of securities brought an antitrust action against NASDAQ. On a motion for class certification, the district judge rejected the need for individualized damages:

¶ 74,274                                                                                          ©2004, CCH INCORPORATED

Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range was affected *generally* ...

*Id.* at 523 (emphasis added). Relying on "general" price increases, of course, raises the possibility that, as here, some class members suffered no damage at all. The trial judge in *NASDAQ* responded to this:

Even if it could be shown that some individual class members were not injured, class certification, nevertheless, is appropriate where the antitrust violation has caused widespread injury to the class.

*Id.*

*NASDAQ* relied on the opinion of another trial judge who wrote 20 years earlier in *Presidio Golf Club v. National Linen Supply Corp.*, 1976 WL 1359 (N.D. Cal.1976). In that case plaintiffs alleged that defendants had fixed prices and allocated markets and customers. The court did not require proof that overcharges were imposed upon each item rented to plaintiffs. The court required "only an illustration of generalized injury". *Id.* at *5. The judge in that case also recognized and set aside the problem that certain class members might have escaped damage altogether:

[T]he fact that certain members of plaintiffs' class escaped injury altogether would not preclude certification or destroy the class's prima facie case of impact.

*Id.*

More recently, in *In Re: Cardizem CD Antitrust Litigation* [2001-1 TRADE CASES ¶ 73,284], 200 F.R.D. 326 (E.D. Mich. 2001), a Sherman Act case, defendants claimed that the use of average prices would violate their due process rights. The Court rejected the argument, in part relying on *2 Newberg on Class Actions*, Ch. 10, Section 10.05, at 10-13, 3rd Ed., 1998:

Far from being vulnerable to constitutional or statutory authorization challenges, aggregate proof of the defendant's monetary liability promotes the deterrence objectives of the substantive laws underlying the class actions and promotes the economy and judicial access for small claims objectives of Rule 23.

*See also, In re Domestic Air Transport Antitrust Litigation* [1991-2 TRADE CASES ¶ 69,517], 137 F.R.D. 677 (N.D. Ga. 1991), which *In Re: Cardizem* relied upon.

These holdings approving the use of average damages and disregarding the fact that some class members may have escaped injury altogether can perhaps be seen as a special variety of the more general, well-recognized principle, that in a class action the threshold for proof of damages is quite low. Ten years ago, in *In Re Bulk Popcorn Antitrust Litigation* [1992-2 TRADE CASES ¶ 70,070], 792 F.Supp. 650 (D.Minn. 1992), Judge Magnuson went so far as to state:

In proving the amount of damages, the antitrust plaintiff need only present evidence from which the fact finder may make a just and reasonable estimate of the damage that is not based on speculation or guesswork .... Given proof of the fact of damage, proof of losses which border on the speculative is allowed in order to facilitate the policy of the antitrust laws.

*Id.* at 653. Judge Magnuson's language of "a just and reasonable estimate of the damage that is not based on speculation or guesswork" is 8th Circuit law. *See National Farmers Organization, Inc. v. Associated Milk Producers, Inc.* [1988-2 TRADE CASES ¶ 68,128], 850 F.2d 1286, 1293 (8th Cir. 1988).

The Minnesota case the court finds most instructive is not directly on point, but enunciates principles which seem to apply here. In *Group Health Plan, Inc. v. Philip Morris, Inc.* [2001-1 TRADE CASES ¶ 73,190], 621 N.W.2d 2 (Minn. 2001), the Minnesota Supreme Court answered certified questions arising from a lawsuit against tobacco companies asserting violations of Minnesota's misrepresentation in sales statutes and other claims. At issue was the interpretation of Minn. Stat. § 8.31, subd. 3(a), which creates private remedies for violations of the substantive misrepresentation statutes at issue. Subd. 3(a) creates remedies for "any person injured by a violation of any of the laws referred to in Subdivision 1". The Supreme Court ruled that this language eliminated the common law requirement of reliance in a misrepresentation case. Nonetheless, the requirement that a person be injured by a violation of the misrepresentation statutes required the plaintiffs to establish a causal relationship between the alleged injury and the wrongful conduct. Plaintiffs acknowledged this requirement, but the parties disagreed about how this causation element could be proven:

The HMOs believe they can satisfy the requirement with circumstantial proof, such as studies and expert testimony, that will establish the general impact of the defendants' wrongful conduct on the sale and consumption of tobacco products. The tobacco companies contend that the issue of how causation must be proven is premature and beyond the scope of the certified question, although they acknowledged in oral argument that, when that issue is reached, their position will be that causation can only be proven by evidence of reliance by individual consumers of their products."

*Id.* at 14. The court resolved this dispute by rejecting the view expressed in two federal district court decisions that proof of individual reliance was required. As the court explained:

[I]n cases such as this, where the plaintiffs' damages are alleged to be caused by a lengthy course of prohibited conduct that affected a large number of consumers, the showing of reliance that must be made to prove a causal nexus need not include direct evidence of reliance by individual consumers of defendants' products. Rather, the causal nexus and its reliance component may be established by other direct or circumstantial evidence that the district court determines is relevant and probative.

as to the relationship between the claimed damages and the alleged prohibited conduct."

*Id.*

While the Supreme Court in *Group Health* was conducting an analysis of specific statutory language, the court sees no reason why the same principle should not apply to the antitrust statute. The Minnesota antitrust statute requires: "Any person . . . *injured directly or indirectly by a violation* of sections 325D.49 to 325D.66, shall recover three times the actual damages sustained. . . ." (emphasis added), which is not much different from Minn. Stat. §8.31. Thus, it appears that under Minnesota law proof of damages in antitrust class action cases may be made by indirect or circumstantial evidence such as studies and expert testimony, rather than by direct evidence of damage to individual consumers.

The authorities cited by Microsoft are less persuasive. Relying on cases such as *Execu-Tech Business Systems, Inc. v. Appleton Paper Inc.*, 743 S.2d 19, 22 (Fl. D.C. App. 1999) and *City of St. Paul v. FMC Corp.*, 1990 WL 259683 (D.Minn) November 14, 1990, Microsoft points out that the fact of injury must be proved and not presumed or inferred. This court has stated the same thing in prior orders. Perhaps if it appeared that any material number of class members have not been harmed, there would be a problem here. Microsoft has not shown this, nor does it purport to be able to do so at trial. The use of average pass through rates appears to be a reasonable means of establishing the damages every individual class member would likely have suffered absent Microsoft's alleged monopoly overcharges.

Important questions still remain, such as whether Plaintiffs' experts get the pass through rate right or whether the average pass through rate changes for different distribution channels. Plaintiffs' experts appear to be reputable economists with appropriate credentials. In a responsive affidavit they have rebutted point by point each of the technical challenges raised by Microsoft to their methodology. They explain why their use of mark-up to approximate pass-through, the relatively small size of their samples, and their lack of information about each step in the distribution chain, as long as they have information from the bottom, do not affect the validity of their answers. They also explain why economically there are only two distribution channels, even though there are a number of different pathways through which the product can flow from Microsoft to the consumer. (This court's description of multiple distribution channels in its original class certification order was merely a description of the pathways identified by Microsoft and did not purport to have an economic basis.) They explain why the market they are analyzing is for distribution services, so the pass through rates for different products should be the same. Their responses to Microsoft's technical challenges are not obviously wrong, and in the absence of any definitive expert testimony from Microsoft to the contrary, Microsoft's challenges are clearly matters for the jury.[1]

The ultimate legal question as to the adequacy of class-wide proof is whether it will result in a mechanical method for calculation of damages or whether individual mini-trials will be necessary for particular class members. Plaintiffs' experts profess to be able to provide damages estimates for individual products in each year or even in each month. Netz/Mackie-Mason Report at 196. A claims procedure whereby a class member would identify the product purchased and the year, after which damages could be awarded to that class member based upon a damages grid, certainly appears to be a mechanical means of awarding damages and avoiding mini-trials.

### CONCLUSION

This is not a simple matter. Plaintiffs have made it more complicated by obtaining class certification initially based on a method and an expert which they then abandoned. What they have to offer now is less persuasive. Be that as it may, the court is satisfied that it meets the requirements of Rule 23. Microsoft's motion must be denied.

---

[¶74,275] Global NAPs, Inc., Plaintiff v. Bell Atlantic-New Jersey, Inc., et al., Defendants.

U.S. District Court, District of New Jersey. No. 99-4074 (JAG). Dated September 30, 2003. 287 F.Supp.2d 532.

Sherman Act

Exemptions and Immunity—Inducing Government Action—Opposition to State Administrative Actions—Sham Activities—Telecommunications.—A telecommunications company that was the incumbent local exchange carrier (ILEC) in its market was entitled to immunity from antitrust liability for its actions in

---

[1] In response to the question of whether Microsoft would be prejudiced by the use of average pass-through rates, Microsoft counsel gave two different responses. First, counsel pointed out that if institutional purchasers who suffered large damages opt out of the class and attempted to recoup their losses individually, Microsoft would pay more than its fair share to consumers, perhaps those with below average actual damages, who remained in the class. At this point, this is just speculation. Microsoft has produced no evidence that institutional purchasers suffered larger than average damages. Second, counsel pointed out that if distributors were absorbing cost increases just before the end of the class period, class members who purchased during that time would have lower actual damages but would receive the average damages amount, to Microsoft's detriment. The problem with that argument is that there are so many distributors that one would think the ones absorbing cost increases versus increasing prices just before the end of the class period would cancel each other out. Moreover, presumably the same thing would have happened at the beginning of the class period, with some distributors possibly making price increases right at the beginning of the class period which Microsoft will not have to pay for fully if average pass through rates are used.