# EXHIBIT 25

1   EDMUND G. BROWN, JR.
    Attorney General of the State of California
2   THOMAS GREENE
    Chief Assistant Attorney General
3   KATHLEEN E. FOOTE
    Senior Assistant Attorney General
4   State Bar No. 65819
    EMILIO E. VARANINI
5   Deputy Attorney General
    State Bar No. 163952
6   NICOLE S. GORDON
    Deputy Attorney General
7   State Bar No. 224138
       455 Golden Gate Avenue
8      San Francisco, California  94102
       Telephone: (415) 703-5555
9      Fax: (415) 703-5480
       Email: kathleen.foote@doj.ca.gov

10

11  Michael I Spiegel – California Bar No. 32651
    Charles M. Kagay – California Bar No. 73377
    Wayne M. Liao –  California Bar No. 66591
12  SPIEGEL LIAO & KAGAY
    388 Market Street, Suite 900
13  San Francisco, California  94111
    Telephone:  (415) 956-5959
14  E-Mail: cmk@slksf.com

15  Attorneys for the State of California

16                    IN THE UNITED STATES DISTRICT COURT

17                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

18

| 19 20 | IN RE DYNAMIC RANDOM ACCESS MEMORY (DRAM) ANTITRUST LITIGATION | Case No.: M-02-1486 PJH MDL No. 1486 |
|---|---|---|
| 21 | This Document Relates To: | **State of California's *Amicus* Brief in Support of Plaintiffs' Motion for Leave to File Second Amended Complaint** |
| 22 23 | Petro Computer Sys., Inc., et al. V. Micron Technology, Inc., et al., | |
| 24 | Northern District of California, Case No. C-05-02472 | |

25

26

27

28

**Table of Contents**

I.      INTRODUCTION ................................................................ 1

II.     INTEREST OF AMICUS CALIFORNIA ATTORNEY GENERAL ........... 1

III.    ARGUMENT .................................................................... 2

        A.      Summary of Argument ............................................. 2

        B.      Plaintiffs Who Purchased Products in Which DRAM Is a
                Component Do Not, as a Matter of Law, Lack Standing to Assert a
                Cartwright Act Claim ............................................. 2

        C.      The Sources of Error in the 6/1/07 Order ......................... 8

                1.      The Cartwright Act Has a Standing Requirement, but the
                        Requirement Is Very Different from that of Federal Law ........ 8

                2.      The Applicable Authority Strongly Indicates that Plaintiffs
                        Have Antitrust Standing ...................................... 9

                        a.      The Authorities Underlying the 6/1/07 Order Provide
                                Weak Support, at Best, for Its Conclusions ........... 10

                        b.      Other Authorities Strongly Indicate that Plaintiffs Do
                                Have Standing .......................................... 13

                3.      The *AGC* Factors, to the Extent They Can Be Squared with
                        the Cartwright Act, Are Satisfied in this Case ............... 15

                        a.      The "Antitrust Injury" Factor Does Not Weigh Against
                                Standing .............................................. 16

                        b.      The "Directness of the Injury" Factor Does Not Weigh
                                Against Standing ...................................... 20

                        c.      The "speculative nature of the harm" factor, the "risk
                                of duplicative recovery" factor, and "the complexity in
                                apportioning damages" factors do not weigh against
                                standing .............................................. 22

IV.     CONCLUSION ................................................................ 24

i

**Table of Authorities**

**Cases**

*Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459
U.S. 519 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 9, 13-15, 17

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) . . . . . . . . . . . . . . . 16

*Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228 (9th
Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) . . . . . . . . . . . . . . . . . . . . . 18

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) . . . . . . . . . 6, 16

*California v. ARC America Corp.*, 490 U.S. 93 (1989) . . . . . . . . . . . . . . . . . . . . . . . 7

*Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986) . . . . . . . . . . . . . . . . . . . 16

*Cellular Plus, Inc. v. Superior Court of San Diego County*, 14 Cal. App. 4th
1224 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Chicago Professional Sports Ltd. Partnership v. National Basketball Ass'n*, 961
F.2d 667 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Crouch v. Crompton Corp.*, 2004 WL 2414027 (N.C. Super. 2004) . . . . . 10-12, 20

*Crowe v. Wiltel Communications Systems*, 103 F.3d 897 (9th Cir. 1996) . . . . . . . . . . . . 3

*D.R. Ward Const. Co. v. Rohm and Haas Co.*, 470 F.Supp.2d 485 (E.D. Pa. 2006) . . . 13

*Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251 (1972) . . . . . . . . . . . . . . . . . . . . . 6

*Hyde v. Abbott Laboratories, Inc.*, 123 N.C.App. 572, 473 S.E.2d 680
(1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) . . . . . . . . . . . . . . . 3-6, 8, 9, 12-14, 20

*In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144 (3rd Cir. 1993) . . . 15

*In re Warfarin Sodium Antitrust Litigation*, 214 F.3d 395 (3rd Cir. 2000) . . . . . . . . . . . 15

*In re Wholesale Electricity Anti-Trust Cases I & II*, 147 Cal.App.4th 1293
(2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) . . . . . . 8, 16

*Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3rd Cir.
1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 23

*Obstetrical and Gynecological Associates of Neenah, S.C. v. Landig*, 384 N.W.2d
719 (Wis. Ct. App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ii

*Ogden Martin Systems, Inc. v. San Bernardino County, Cal.*, 932 F.2d 1284
  (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Stark v. Visa U.S.A. Inc.*, 2004 WL 1879003 (Mich. Cir. Ct. 2004) . . . . . . . . 10, 12

*Strang v. Visa U.S.A., Inc.*, 2005 WL 1403769 (Wis. Cir. Ct. 2005) . . . . . . . . . . 10

*Union Carbide Corp. v. Superior Court*, 36 Cal.3d 15 (1984) . . . . . . . . . . . . . 4, 5

*Verizon Communications, Inc. v. F.C.C.*, 535 U.S. 467 (2002) . . . . . . . . . . . . . . . . . . . 23

*Vinci v. Waste Management, Inc.*, 36 Cal.App.4th 1811 (1995) . . . . . . . . . . . . . . . 8

*Weaver v. Cabot Corp.*, 2004 WL 3406119 (N.C. Super. 2004) . . . . . . . . . . . 10, 22, 23

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) . . . . . . . . . . . . . 23

## Constitution

California Constitution, article V, § 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## Statutes

15 U.S.C. § 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

15 U.S.C. § 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

28 U.S.C. § 1652 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

California Business and Professions Code § 16720 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . 2

California Business and Professions Code § 16750(a) . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

California Business and Professions Code § 16760 . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## Rules

Federal Rule of Civil Procedure 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Michigan Court Rules 7.215 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

North Carolina Rules of Appellate Procedure 30(e)(3) . . . . . . . . . . . . . . . . . . . . . . 10

Wisconsin Statutes Annotated § 809.23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## Miscellaneous

Areeda & Hovenkamp, Antitrust Law (1995 & 1998 Supp.) . . . . . . . . . . . . . . . . . . . . 18

Areeda, Antitrust Analysis: Problems, Text, Cases (2d ed. 1974) . . . . . . . . . . . . . . 6

iii

I.    **INTRODUCTION**

On June 1, 2007, this Court ruled on a motion for judgment on the pleadings in the indirect private purchasers' action. That ruling held "that the indirect purchaser plaintiffs whose claims are based on the purchase of products in which DRAM is a component, lack standing to assert a claim under California's Cartwright Act." 6/1/07 Order at 18. Those plaintiffs are now asking the Court to entertain a motion to file an amended complaint that cures the defects the Court found. The State of California, through its Attorney General, strongly urges the Court to grant plaintiffs' motion for leave to amend and insofar as the Court considers its prior order a bar to plaintiffs' amendment, the Attorney General submits that the Court's prior order be reconsidered. For the reasons stated below, the Court must not, on a pleading motion, hold that the indirect private purchaser plaintiffs lack standing to assert a claim under the Cartwright Act.

II.   **INTEREST OF AMICUS CALIFORNIA ATTORNEY GENERAL**

The California Attorney General has an obvious interest in this Court's interpretation of antitrust standing under the Cartwright Act. The Attorney General represents the State of California in related litigation. Many of the claims that the Attorney General advances in his action on behalf of the State, of class member governmental entities, and of the California citizens *parens patriae*,[1] resemble the claims of the private plaintiffs, in that they concern purchases of products in which DRAM is a component. The Attorney General is concerned that this Court has not yet had the benefit of any input from the State on the very serious issues that have been addressed. As the Court itself stated at the December 6, 2006 hearing that resulted in the 6/1/07 Order:

> I'm just a little concerned that the AGs might make a presentation different than the presentations that the plaintiffs had made in their opposition briefs. And I'm just a little concerned about consistency, and I mean the Court's consistency in how I look at these issues.

---

[1]There are different statutory rules governing *parens patriae* claims that differentiate them from the private plaintiffs' consumer class claims on the issue of antitrust standing. Cal. Bus. & Prof. Code § 16760. These differences are not addressed in this *amicus* brief.

1

1  RT 12/6/06 16-20. At the very least, the Court must keep an open mind on these issues with
2  respect to the State cases until such time as the States can brief and argue them fully.

3       The California Attorney General has another important interest in this closely-
4  watched private plaintiffs' case. He is the chief law enforcement officer for the State and is
5  charged with enforcing the antitrust laws, and in particular the Cartwright Act. Cal. Const.,
6  art. V, § 13; Cal. Bus. and Prof. Code §§ 16720 *et seq.* The Attorney General is in a real
7  sense the guardian of the statute, and has a vital stake in its proper interpretation. The
8  Attorney General is concerned that the effect of the Court's ruling is to materially weaken
9  California antitrust enforcement by gutting the Cartwright Act's protections for consumers
10 who often bear the brunt of anticompetitive conduct. The Court should not reach a definitive
11 conclusion on the issue without first considering the insights that the California Attorney
12 General can add.

13 **III.  ARGUMENT**

14 **Summary of Argument**

15      The California Legislature purposefully amended the Cartwright Act to give parties
16 such as plaintiffs standing to press the type of claims that plaintiffs have pleaded. The
17 California Supreme Court has held that this was the Legislature's intent, and this Court is
18 bound to adhere to that Court's interpretation of this state law.

19      The factors relevant to a determination of antitrust standing under federal law, as
20 articulated in *Associated Gen. Contractors, Inc. v. California State Council of Carpenters*,
21 459 U.S. 519 (1983) (*AGC*), must be carefully adapted to the Cartwright Act, which allows
22 a far wider range of claims to be brought. The *AGC* factors, particularly as they must be
23 adapted to California law, cannot support judgment in defendants' favor on antitrust standing
24 grounds at the pleading stage. The handful of unpublished state trial court decisions
25 underpinning the 6/1/07 Order do not support the conclusions reached in that Order.

26
27
28

2

**Plaintiffs Who Purchased Products in Which DRAM Is a Component Do Not, as a Matter of Law, Lack Standing to Assert a Cartwright Act Claim**

The 6/1/07 Order holds that the indirect purchaser plaintiffs whose claims are based on the purchase of products in which DRAM is a component necessarily lack standing to assert a claim under California's Cartwright Act. 6/1/07 Order at 18. Because the Order grants a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), this conclusion was reached a matter of law, on the assumption that all of the allegations of the Complaint are true.

In this subsection, we will demonstrate that this ruling is an incorrect statement of California law. In the following subsection, we will trace through the specific conclusions of the 6/1/07 Order to show how the Court was led into error by certain of defendants' arguments.

We begin with the proposition that, in interpreting the California Cartwright Act, this Court must adhere to California law. 28 U.S.C. § 1652, (Rules of Decision Act); *Crowe v. Wiltel Communications Systems*, 103 F.3d 897, 899 (9th Cir. 1996).

The question before the Court is purely one of statutory interpretation. Specifically, in enacting California Business and Professions Code section 16750(a), did the California Legislature intend that indirect purchaser plaintiffs, whose claims are based on the purchase of products in which the price-fixed product is a component, would lack standing to assert a claim under California's Cartwright Act?

As in any exercise in statutory interpretation, the first recourse is to the language of the statute. The statute to be interpreted, California Business and Professions Code section 16750(a), reads as follows:

> Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor . . . . This action may be brought by **any person who is injured** in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, **regardless of whether such injured person dealt directly or indirectly with the defendant**.

(Emphasis added.)

3

1    In particular, the Court's task is to interpret the second sentence of this quotation,

2    which the Legislature added to the statute in 1978 in direct response to the Supreme Court's

3    decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). The amendment is commonly

4    called the "*Illinois Brick* repealer statute," the terminology adopted in the 6/1/07 Order.

5    ("[P]laintiffs are correct – and defendants concede – that California's Cartwright Act is an

6    *Illinois Brick* repealer statute . . . ." 6/1/07 Opinion at 8.)

7    This language makes clear that the Legislature had no intention of barring, as a matter

8    of law, suits by purchasers of products in which the price-fixed product is a component. It

9    certainly does not mandate the result that such purchasers lack standing to bring a claim

10   under section 16750(a). To the extent that the language is ambiguous on this question, it

11   must be resolved through statutory interpretation.

12   Given that the repealer statute unquestionably was intended to shield the Cartwright

13   Act from the *Illinois Brick* decision, the answer on whether the Legislature intended that

14   purchasers of products containing price-fixed components have standing to sue should be

15   easy to discern. *Illinois Brick* was a case in which the price-fixed products (concrete blocks)

16   were incorporated as components into other products (masonry buildings) that the plaintiffs

17   bought. 431 U.S. at 720. Applying the 6/1/07 Order, the *Illinois Brick* plaintiffs would not

18   have had standing to bring that case under the Cartwright Act. In other words, according to

19   the Order, the California Legislature passed an "*Illinois Brick* repealer statute" under which

20   the result in *Illinois Brick* would be completely unchanged – an *Illinois Brick* repealer that

21   did not repeal *Illinois Brick*!

22   Lest the Court believe this perverse result might actually have been the California

23   Legislature's intention, the holding of the California Supreme Court counsels otherwise. In

24   performing any interpretation of California's statutes, this Court's first recourse must be to

25   any applicable decisions of the California Supreme Court. Federal courts are "bound to

26   follow the decisions of a state's highest court in interpreting that state's law." *Ogden Martin*

27   *Systems, Inc. v. San Bernardino County, Cal.*, 932 F.2d 1284, 1288 (9th Cir. 1991).

28

4

1    The California Supreme examined the legislative intent behind the repealer statute not

2  long after it was passed.  In *Union Carbide Corp. v. Superior Court*, 36 Cal.3d 15 (1984),

3  the Court addressed the question of whether, in an indirect purchaser suit authorized by the

4  repealer statute, plaintiffs were required to join all intermediate purchasers in the chain of

5  distribution.   To answer that question, the Court undertook a careful review of the

6  Legislature's intentions in passing the repealer statute.

7    In *Union Carbide*, the California Supreme Court went to great lengths to emphasize

8  that "we must take care to avoid an application of [the joinder statute] that would thwart the

9  legislative intent . . . to retain the availability of indirect-purchaser suits as a viable and

10 effective means of enforcing California's antitrust laws." 36 Cal.3d at 21. Specifically, the

11 California Legislature intended to adopt for California the view of the dissenting justices in

12 *Illinois Brick*:

13      **The dissenting opinion [in *Illinois Brick*] concluded** that "the hypothetical
        possibility that a few defendants might be subjected to the danger of multiple
14      liability does not . . . justify erecting a bar against all recoveries by indirect
        purchasers without regard to whether the particular case presents a significant
15      danger of double recovery." (*Id.*, at p. 761, 97 S.Ct. at p. 2082.) **The dissent
        declared** that the majority's decision "regrettably weakens the effectiveness
16      of the private treble-damages action as a deterrent to antitrust violations by, in
        most cases, precluding consumers from recovering for antitrust injuries." (*Id.*,
17      at p. 764, 97 S.Ct. at p. 2084.) **The 1978 amendment . . . implies legislative
        endorsement of those dissenting views, as applied to the Cartwright Act,
18      and a mandate to avoid unnecessary procedural barriers to indirect
        purchasers' prosecution of California antitrust suits.**
19
   *Id.* (emphasis added).   Later in the decision, the Court returned to the theme that the
20
   interpretation of the repealer is to be guided by the *Illinois Brick* dissent:
21
        Moreover, the fact of purchasers intermediate between plaintiffs and direct
22      purchasers in the chain of distribution, even if assumed, would not establish
        a substantial risk of multiple liability.   . . .   **We turn again to the views
23      expressed by the *Illinois Brick* dissenting opinion that seem to have met
        with the California Legislature's approval when it amended section
24      16750, subdivision (a), in 1978.**

25 *Id.* at 23-24 (emphasis added).

26    Thus, the California Supreme Court has dictated that the *Illinois Brick* dissent is the

27 Rosetta Stone for discerning the Legislature's intent in passing the repealer statute.  On its

28 face, the 6/1/07 Order's conclusion that the Legislature in passing the repealer statute would

5

1   have sided with the majority and against the dissent in the specific fact situation presented

2   in *Illinois Brick* seems to be plainly wrong.

3       More particularly, though, the California Supreme Court's holding in *Union Carbide*

4   that the *Illinois Brick* dissent should guide the interpretation of the repealer statute yields a

5   very specific result when applied to the question now before this Court. The *Illinois Brick*

6   dissent had a lot to say about indirect purchaser plaintiffs whose claims are based on the

7   purchase of products in which the price-fixed product is a component.

8       First, the *Illinois Brick* dissent expressly considered and rejected the contention that

9   an indirect purchaser should not, as a matter of law, be allowed to sue if the product for

10  which the price was raised was merely a component of what he or she purchased:

11  **Nor should the fact that the price-fixed product in this case (the concrete
    block) was combined with another product (the buildings) before resale

12  operate as an absolute bar to recovery.** It may well be true as the State
    claims, that the cost of the block was included separately in the project bids

13  and therefore can be factored out from the price of the building with relative
    certainty. **In any case, this is a factual matter to be determined based on**

14  **the strength of the plaintiff's evidence.** Admittedly, there will be many
    cases in which the plaintiff will be unable to prove that the overcharge was

15  passed on. In others, the portion of the overcharge passed on may be only
    approximately determinable. But again, this problem hardly distinguishes this

16  case from other antitrust cases. Reasoned estimation is required in all antitrust
    cases, but "while the damages (in such cases) may not be determined by mere

17  speculation or guess, it will be enough if the evidence show the extent of the
    damages as a matter of just and reasonable inference, although the result be

18  only approximate." *Story Parchment Co. v. Paterson Paper Co.*, 282 U.S. 555,
    563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). **Lack of precision in**

19  **apportioning damages between direct and indirect purchasers is thus
    plainly not a convincing reason for denying indirect purchasers an**

20  **opportunity to prove their injuries and damages.**

21  *Illinois Brick*, 431 U.S. at 759-760 (Brennan, Marshall, and Blackmun, dissenting) (emphasis

22  added, footnote and some citations omitted).

23      Furthermore, the *Illinois Brick* dissent went straight to the question of whether

24  purchasers like the State of Illinois in that case had "antitrust standing" to pursue their

25  claims:

26  I concede that despite the broad wording of [15 U.S.C.] § 4 there is a point
    beyond which the wrongdoer should not be held liable. See, e.g., *Brunswick*

27  *Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d
    701 (1977); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 92 S.Ct. 885,

28  31 L.Ed.2d 184 (1972). **Courts have therefore developed various tests of
    antitrust "standing," not unlike the concept of proximate cause in tort**

6

1 **law, to define that point. . . . But if the broad language of § 4 means**
2 **anything, surely it must render the defendant liable to those within the**
**defendant's chain of distribution.** It would indeed be "paradoxical to deny
3 recover to the ultimate consumer while permitting the middlemen a windfall
recovery." P. Areeda, Antitrust Analysis: Problems, Text, Cases 75 (2d ed.
4 1974).

5 *Id.* at 760-61 (emphasis added).

6     The legislative history of the 1978 repealer statute (A.B. 3222) confirms the holding

7 of the California Supreme Court – that the *Illinois Brick* dissent was a major guidepost for

8 the Legislature in enacting the statute.  In particular, the Bill Digest prepared by the

9 Assembly Committee on the Judiciary (*see* California's Request for Judicial Notice of

10 Legislative History) emphasized again and again the conclusions of the *Illinois Brick* dissent

11 as reasons why the *Illinois Brick* rule should not be implemented.  Overall, the legislative

12 history drives home the point that the end consumer is to be protected.

13     To recapitulate: In interpreting the Cartwright Act and its repealer statute, this Court

14 must follow the decisions of the California Supreme Court.  The California Supreme Court

15 directs that the repealer statute is a "legislative endorsement" of the views of the dissenting

16 justices in *Illinois Brick*.  And the views of the dissenting justices in *Illinois Brick* include:

17 1) that indirect purchaser plaintiffs whose claims are based on the purchase of products in

18 which the price-fixed product is a component should be allowed to pursue a claim under the

19 antitrust statutes, and 2) that such purchasers have antitrust standing to pursue these claims.

20     The Court should also note that its interpretation of the Cartwright Act appears to be

21 inconsistent with the views of the United States Supreme Court.  In *California v. ARC*

22 *America Corp.*, 490 U.S. 93 (1989), that Court reversed lower court decisions refusing to

23 allocate part of a settlement under the Sherman Act and the Cartwright Act to indirect

24 purchasers.  The basis of this refusal was the lower courts' belief that the Sherman Act, as

25 interpreted in *Illinois Brick*, preempted any state law giving indirect purchasers relief.  In

26 ruling in favor of the indirect purchasers, the Supreme Court did not have any problem at all

27 with the fact that the plaintiff "State and the local governments were all indirect purchasers

28 of concrete block – that is, they did not purchase concrete block directly from the

7

---

*Amicus* Brief of California re 2nd Amended Complaint – No. C-02-1486 PJH, MDL. No. 1486

1  price-fixing defendants but rather purchased products or contracted for construction into
2  which the concrete block was incorporated by a prior purchaser." *Id.* at 96.

3      The foregoing should demonstrate convincingly to the Court that it erred in holding,
4  as a matter of law, that the indirect purchaser plaintiffs lacked antitrust standing to press
5  claims for purchases in which the price-fixed product was a component.  In the following
6  subsection, we will explore the sources of that error.

7  **The Sources of Error in the 6/1/07 Order**

8          **1.      The Cartwright Act Has a Standing Requirement, but the**
                     **Requirement Is Very Different from that of Federal Law**
9

10     The 6/1/07 Order adheres closely to the antitrust standing requirements of federal law
11  in evaluating the Cartwright Act claims.  "The concept of "antitrust standing" has its roots
    in federal law."  6/1/07 Order at 4.  "Although this discussion highlights federal antitrust
12
    standing principles, these federal principles – and in particular, federal concern over the
13
    remoteness of a plaintiff's injury – are central to defendants' arguments and the court's
14
    discussion here."  6/1/07 Order at 6.
15
16     The Cartwright Act has many similarities to the federal antitrust laws, and federal
17  precedents can provide useful insights into the interpretation of the Cartwright Act.  But the
    two statutes are different, in both their wording and their origin, and therefore "federal
18
    precedents must be used with caution because the acts, although similar, are not
19
    coextensive." *Freeman v. San Diego Ass'n of Realtors*, 77 Cal.App.4th 171, 183 (1999).
20
    "There are . . . differences in statutory wording and legislative history that lead, in some
21
    respects, to different results." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 985
22
23     The California courts have at least twice recited the *AGC* factors in the course of
24  analyzing antitrust standing under the Cartwright Act. *In re Wholesale Electricity Anti-Trust*
    *Cases I & II*, 147 Cal.App.4th 1293, 1309 (2007); *Vinci v. Waste Management, Inc.*, 36
25
    Cal.App.4th 1811, 1814 (1995).  The Ninth Circuit has done the same. *Knevelbaard*, 232
26
    F.3d at 987.
27

28

8

1      It does not follow, however, that the *AGC* factors can be applied uncritically to a
2   Cartwright Act claim.  As the Ninth Circuit noted, "California law affords standing more
3   liberally than does federal law." *Knevelbaard*, 232 F.3d at 987.

4      The manifest reason for the necessary difference in application of the *AGC* factors
5   between California and federal law is that *AGC* drew much of its analysis directly from
6   *Illinois Brick.* Of the five *AGC* factors, the Supreme Court derived four partly or wholly
7   from *Illinois Brick*: 2) the directness of the injury; (3) the speculative measure of the harm;
8   (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages.  459
9   U.S. at 544-45.  And the 6/1/07 Order draws *Illinois Brick* concerns directly into the other
10  factor, antitrust injury.  The Order holds that plaintiffs did not suffer "antitrust injury"
11  specifically because they bought DRAM only indirectly as a component of another product
12  instead of directly from defendants. 6/1/07 Order at 13-15.  "[P]laintiffs who are purchasing
13  products in which DRAM is a component, rather than DRAM itself, are participating in a
14  secondary market that is incidental to the primary pricefixed market." *Id.* at 15.

15     With one exception, the Order ignores the possibility that the Cartwright Act, as a
16  statute that does not recognize *Illinois Brick*, would have a different take on the concerns that
17  *Associated General Contractors* derived directly from *Illinois Brick*.  Specifically, the Order
18  concedes in one paragraph that duplicative recovery is not an issue because California's
19  *Illinois Brick* repealer reflects a policy decision that duplicative recovery is acceptable.
20  6.1.07 Order at 18.  But beyond this concession, the Order's analysis of the *AGC* factors
21  appears to be indistinguishable from the analysis that would be made under the Sherman Act.

22              **2.    The Applicable Authority Strongly Indicates that Plaintiffs Have
                       Antitrust Standing**
23

24     The 6/1/07 Order's analysis of the whether plaintiffs have standing relies almost
25  entirely on four unpublished state trial court decisions.  The Order does not address far more
26  substantial authority on the same point that is directly to the contrary.

27     The following two subsections will take a comprehensive general look at the authority
28  the Order relies on, and the authority the Order does not address.  The subsequent discussion

9

1   of the Order's analysis of the *AGC* factors will apply that authority directly to the issues

2   raised.

3                    **a.    The Authorities Underlying the 6/1/07 Order Provide Weak**
                    **Support, at Best, for Its Conclusions**

4

5          The four authorities upon which the 6/1/07 Order rests most of its conclusions are

6   *Crouch v. Crompton Corp.*, 2004 WL 2414027 (N.C. Super. 2004); *Weaver v. Cabot Corp.*,

7   2004 WL 3406119  (N.C. Super. 2004); *Stark v. Visa U.S.A. Inc.*, 2004 WL 1879003

8   (Mich. Cir. Ct. 2004); and *Strang v. Visa U.S.A., Inc.*, 2005 WL 1403769 (Wis. Cir. Ct.

9   2005).  All four are unpublished decisions of a state trial court.

10         As unpublished trial court decisions, these cases should have little if any persuasive

11  authority.  Under North Carolina law, unpublished decisions of even appellate courts are not

12  binding legal authority, and citation is disfavored. N.C.R. App. P. 30(e)(3). Under Michigan

13  law, an unpublished opinion is not precedentially binding under the rule of stare decisis.

14  Mich. Court R. 7.215. Under Wisconsin law, "an unpublished [appellate] opinion is of no

15  precedential value and for this reason may not be cited in any court of this state as precedent

16  or authority . . . ." W.S.A. § 809.23.  These cases should therefore be treated with skepticism

17  as authority for how the California Supreme Court will interpret a California statute.  But

18  even if reliance on these opinions were justified, they do not provide the support the 6/1/07

19  Order suggests.

20         *Crouch* resolves two very different indirect purchaser cases.  In one, tire purchasers

21  sued for passed-on overcharges due to price-fixed chemical rubber ingredients.  In the other,

22  customers of merchants subject to an illegal tie between credit cards and debit cards sued for

23  the part of the overcharge attributable to the tying allegedly passed on to their customers.

24  Superficially, *Crouch* resembles the 6/1/07 Order – it is a Rule 12 decision (apparently North

25  Carolina procedural rules track the Federal Rules) dismissing on antitrust standing grounds

26  the claims of indirect purchasers who were buying something other than an unmodified

27  version of the price-fixed product.  But there are significant differences.

28

                                             10

1    For one thing, North Carolina does not have an *Illinois Brick* repealer statute.  An

2 intermediate court of appeals decision had created the right of indirect purchasers to sue, and

3 the trial court was openly skeptical of the continuing viability and sweep of the decision:

4    [*Hyde v. Abbott Laboratories, Inc.*, 123 N.C.App. 572, 473 S.E.2d 680 (1996),
   *disc. rev. denied*, 344 N.C. 734, 478 S.E.2d 5 (1996)] is the only North

5    Carolina appellate decision dealing with indirect purchaser standing. That case
   was settled . . . before review by the North Carolina Supreme Court. . . .

6

7    This Court has previously held that unless and until *Hyde* is overruled
   by the Supreme Court or new legislation is passed, this Court is bound by the
   decision in *Hyde* . . . .

8

9    Since *Hyde* was briefed and argued there have been several
   developments which might have impacted the scope, if not the actual outcome,

10    of that decision. Those developments demonstrate that the landscape upon
   which these types of claims are viewed has changed significantly since *Hyde*
   was decided.

11

*Crouch*, 2004 WL 2414027 at *10 -12.

12

13    Thus, the *Crouch* decision arose in a context in which the court openly questioned

14 whether the Legislature intended that any indirect purchasers should be allowed to recover.

15 In contrast, a court interpreting the Cartwright Act knows to a certainty that the Legislature

16 wants indirect purchasers to recover.

17    The *Crouch* allegations were also quite different factually from those presented in the

18 DRAM cases.  Rubber chemicals are indistinguishable ingredients in rubber, which is an

19 ingredient in tires.  The price-fixed chemicals were sold to manufacturers, who incorporated

20 them into tires and sold them to wholesalers, who sold them to retailers, who sold them to

21 plaintiffs.  Credit card charges elevated by tying are even more attenuated; they are an

22 incidental service expense of merchants that form no physical part of the products the

23 merchant sells. The *Crouch* court emphasized that other products, **specifically including**

24 **DRAM**, could present an entirely different factual situation:

25    Each case must be analyzed individually. There will be cases where the
   economic analysis is not difficult. . . . There could be other examples where

26    a component, such as a computer chip, is price fixed, and its costs passed
   through directly to purchasers of the product in which it is incorporated.

27    [Footnote: **The Court notes that certain manufacturers of DRAM chips
   used in a variety of computer products have been accused of price fixing.**

28    . . . **The Court expresses no opinion on standing in that situation.** Each
   case must be judged on its own merits, and that case is not before the Court.

11

1    The Court simply notes that **the nature of the component can make a difference**.]

2

3    *Crouch* , 2004 WL 2414027 at 23 (emphasis added).

4    *Weaver*, another North Carolina case, is simply an abbreviated version of the portion

5    of *Crouch* having to do with tire purchasers.  The factual allegations are identical.  *Crouch*,

6    2004 WL 2414027 at *15.

7    *Stark*, the Michigan case, was another credit card overcharge case, like the credit card

8    portion of *Crouch*.  Michigan does have an *Illinois Brick* repealer statute.  The *Stark* court

9    noted that a Michigan appellate decision had held that the repealer language addressed

10   "'indirect purchasers' such as 'an end user or licensee' of the product that the defendant had

11   manufactured." *Stark*, 2004 WL 1879003 at *4, citing *A & M Supply Co. v. Microsoft Corp.*,

12   252 Mich.App. 580, 583, 654 N.W.2d 572 (2002).  This would not include the customers of

13   merchants injured by credit card tying, but probably would include end-use purchasers of

14   devices in which DRAM was a component.

15   In *Strang*, the Wisconsin case, the court decided it "must join the chorus" of other

16   state trial courts that had dismissed similar suits on antitrust standing grounds.  The *Strang*

17   court did so, however, by applying federal precedent without conducting any independent

18   analysis of Wisconsin antitrust law.  If the *Strang* court had looked to Wisconsin law it

19   would have discovered an unequivocal holding by the Wisconsin Court of Appeals, which

20   determined over twenty years ago that federal law should not govern standing analysis under

21   the Wisconsin antitrust statute.   In *Obstetrical and Gynecological Associates of Neenah,*

22   *S.C. v. Landig*, 384 N.W.2d 719, 723-24 (Wis. Ct. App. 1986), the Wisconsin Court of

23   Appeals rejected the federal approach to standing.  Because the Wisconsin legislature had

24   adopted an *Illinois Brick* repealer, the court reasoned, "[t]here is no need to make the direct-

25   indirect distinction under our statute." *Id.* at 723.  In upholding the plaintiff's standing to

26   sue, the court also focused on the explicit instruction from the state legislature that courts

27   give the Wisconsin antitrust statute "the most liberal construction to achieve the aim of

28   competition." Wis. Stat.  § 133.01.  *See Landig*, 384. N.W.2d2d at 724.  Thus, *Strang* is

12

1 | unreliable not only because it is unpublished, but also because it is directly contrary to

2 | Wisconsin law.

3 | These four state trial court decisions form essentially the entire basis of the 6/1/07

4 | Order's conclusion that plaintiffs lack antitrust standing under the Cartwright Act. For the

5 | reasons discussed above, that is a very shaky foundation for a decision having such a

6 | profound impact in this case, or for drawing such sweeping conclusions about how the

7 | California Supreme Court would interpret the Cartwright Act.

8 |

9 |

**b.  Other Authorities Strongly Indicate that Plaintiffs Do Have Standing**

10 | In contrast to the unpublished authorities underlying the 6/1/07 Order, there are

11 | published authorities that vigorously indicate that plaintiffs' standing must be recognized,

12 | particularly at the pleading stage.

13 | In *D.R. Ward Const. Co. v. Rohm and Haas Co.*, 470 F.Supp.2d 485 (E.D. Pa. 2006),

14 | indirect purchasers of products containing plastics additives brought antitrust actions against

15 | the makers of the plastics additives under the antitrust statutes of Arizona, Tennessee, and

16 | Vermont. The defendants in that case brought a Rule 12(b)(6) motion to dismiss, on

17 | essentially the same ground as those on which defendants brought their motion for judgment

18 | on the pleadings here:

19 |

20 |

21 |

> defendants argue that plaintiffs lack standing to bring their state antitrust claims; defendants reason that the Supreme Court's standing analysis in *Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, . . . applies to plaintiffs' state antitrust claims, and that the injury suffered by plaintiffs, as indirect purchasers, is to[o] remote to satisfy this standing analysis.

22 | *Id.* at 491.

23 | The court first concluded that application of the *AGC* factors would not be appropriate

24 | under the state laws that plaintiffs invoked, for the reason that the states had  all rejected

25 | *Illinois Brick*. Among the reasons cited by the court for this conclusion were the following:

26 | 1) the states did not require uniformity between federal and state precedent (*id.* at 497, 499);

27 | 2) many of the considerations that motivated the Supreme Court in *AGC* were rejected by

28 | the states in declining to apply *Illinois Brick* to their antitrust statutes (*id.*); and 3) the states

13

1    had expressed an intent to provide a remedy for indirect purchasers (*id.*). All of these

2    considerations apply with equal force to the Cartwright Act.

3        However, the *D.R. Ward* court went even further. It independently addressed what

4    the result would be if the *AGC* factors actually did apply to the state antitrust law claims

5    before it. *Id.* at 502-05. After a thorough review of each of the factors, it concluded as

6    follows:

7           assuming *arguendo* the applicability of the *AGC* factors to claims under the
           [state antitrust laws], the Court finds that the allegations in the complaint
8         satisfy each of the *AGC* factors at the motion to dismiss stage. An antithetical
           ruling not only would require the Court to impermissibly rely on facts external
9         to the pleadings, but also would deprive plaintiffs of the opportunity to
           discover and to confirm such facts through the discovery process.
10

11    *Id.* at 505.

12        There is also highly pertinent authority on the question of the antitrust standing of

13    indirect purchasers to sue under **federal** law. This authority arises because not all indirect

14    purchasers are barred from suing under federal law. In particular, indirect purchasers may

15    sue for injunctive relief under federal antitrust laws, *Illinois Brick* notwithstanding. *Lucas

16    Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1235 (9th Cir.

17    1998). Thus, federal law can shed light on whether purchasers of products in which the

18    price-fixed product is a component can claim standing to sue.

19        The Third Circuit explored this issue in detail in *Mid-West Paper Products Co. v.

20    Continental Group, Inc.*, 596 F.2d 573 (3rd Cir. 1979). In that case, the manufacturers of

21    consumer bags were sued for price-fixing; the plaintiffs included indirect purchasers that had

22    bought products that had been packaged and sold in the price-fixed consumer bags – i.e., the

23    bags were merely components in the products that plaintiffs bought. *Id.* at 575. The indirect

24    purchasers were not allowed to press damage claims. *Id.* at 578-87.

25        In contrast, though, the indirect purchasers were allowed to press their claims for

26    injunctive relief under 15 U.S.C. § 16. To reach this conclusion, the Third Circuit undertook

27    a detailed examination of the indirect purchaser plaintiffs' standing under the antitrust laws

28    to make their injunction claims. It concluded that "for purposes of § 16, the damages if any

     sustained by the supermarket plaintiffs [which purchased products in which the price-fixed

14

---

1 bags were a component], as indirect purchasers, are proximately caused by the price-fixers'
2 violations. . . . *Illinois Brick* does not preclude indirect purchasers from suing for injunctive
3 relief and that they have standing to sue under § 16 . . . ." *Id.* at 594.

4     The *Mid-West Paper Products* decision predated *Associated General Contractors*,
5 so the standing analysis in the former case does not track the latter precisely. However, the
6 Third Circuit has since held that *Mid-West Paper* is consistent with *Associated General*
7 *Contractors*, and has applied the two decisions together to determine antitrust standing. *In*
8 *re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144, 1167-1168 (3rd Cir. 1993);
9 see also, *In re Warfarin Sodium Antitrust Litigation*, 214 F.3d 395, 399-402 (3rd Cir. 2000)
10 (district court erred under *Mid-West Paper Products* in using *AGC* factors to dismiss, on
11 standing grounds, claims of indirect purchasers twice-removed from defendant
12 manufacturers).

13     Thus, available published precedent strongly indicates, under both state and federal
14 antitrust law, that fact that price-fixed goods are acquired as components of other products
15 does not, as a matter of law, necessarily deprive their purchasers of antitrust standing.

16          **3.    The *AGC* Factors, to the Extent They Can Be Squared with the
                    Cartwright Act, Are Satisfied in this Case**
17
18     The 6/1/07 Order's result was more or less pre-determined by its use of the *Illinois*
   *Brick*-derived *AGC* factors to evaluate a claim that would be prohibited by *Illinois Brick*.
19
   The same analysis could well yield the same result if applied to an indirect purchaser case
20
   for a product that is resold without modification or incorporation, though most of the factors
21
   would arguably apply to a lesser degree. But the effect of such shadings of factual
22
   conclusions should properly be a question of fact and not a question of law.
23
     The 6/1/07 Order reaches the following conclusion about the *AGC* factors:
24
   (1) the nature of the plaintiffs' injury weighs against standing (pp. 13-15);
25
   (2) the directness of the injury weighs against standing (pp. 16-17);
26
   (3) the speculative nature of the harm weighs against standing (pp. 17-18);
27
   (4) the risk of duplicative recovery does not weigh against standing (p. 18); and
28
   (5) the complexity in apportioning damages weighs against standing (pp. 17-18).

15

1    Each of these factors, and the Order's conclusions about them, is considered below.

2  In almost every case, the Order's application of federal principles to these Cartwright Act

3  claims is demonstrably incorrect.

4            **a.      The "Antitrust Injury" Factor Does Not Weigh Against
                       Standing**

5

6    The 6/1/07 Order's conclusion that plaintiffs did not suffer antitrust injury is, with all

7  respect, simply wrong.

8    In evaluating antitrust injury, the 6/1/07 Order uncritically applies the federal law of

9  antitrust injury to the Cartwright Act. However, because section 16750 allows suits by both

10  direct and indirect purchasers, the scope of the term "antitrust injury" is necessarily broader

11  under California than under federal law. *Cellular Plus, Inc. v. Superior Court of San Diego*

12  *County*, 14 Cal. App. 4th 1224, 1234 (1993). Thus, precisely because the Cartwright Act

13  includes an *Illinois Brick* repealer, "the more restrictive definition of 'antitrust injury' under

14  federal law does not apply to section 16750." *Ibid; Knevelbaard*, 232 F.3d at 991. Though

15  the 6/1/07 Order mentions *Cellular Plus* or *Knevelbaard* in other contexts, it ignores them

16  in its analysis of the antitrust injury issue – relying instead entirely on federal law and

17  unpublished decisions in other states addressing other statutes.

18    The 6/1/07 Order misconstrues the federal law concerning antitrust injury as well.

19  Antitrust injury arises as a problem where the complained-of offense is pro-competitive, and

20  the party suing wishes to avoid competition. "The antitrust injury doctrine of *Atlantic*

21  *Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990);

22  *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427

23  (1986); and *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50

24  L.Ed.2d 701 (1977), requires every plaintiff to show that its loss comes from acts that reduce

25  output or raise prices to consumers." *Chicago Professional Sports Ltd. Partnership v.*

26  *National Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992). The present case alleges

27  horizontal agreements restricting output and raising prices paid by plaintiffs, so the

28  competitiveness of defendants' actions can scarcely be considered an issue.

16

1    The 6/1/07 Order finds an antitrust injury problem through an overly-literal
2  application of the usual formulation of the standard: "1) unlawful conduct, (2) causing an
3  injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4)
4  that is of the type the antitrust laws were intended to prevent." *American Ad Management,*
5  *Inc. v. General Telephone Co. of California,* 190 F.3d 1051, 1055 (9th Cir. 1999).  The
6  6/1/07 Order necessarily found for plaintiffs on the first three points.  6/1/07 Order at 13.
7  But it found the question of whether plaintiffs' injury is of the type the antitrust laws were
8  intended to prevent "more troubling."  *Id.*  It should not be.

9    The requirement that the injury be "of the type the antitrust laws were intended to
10  prevent" is just an articulation of the familiar principle that the injury be the result of
11  restricted competition rather than enhanced competition.  This is clear from the Supreme
12  Court's original statement of the requirement:

13    Plaintiffs must prove antitrust injury, which is to say **injury of the type the
      antitrust laws were intended to prevent** and that flows from that which
14    makes defendants' acts unlawful.  **The injury should reflect the
      anticompetitive effect either of the violation or of anticompetitive acts
15    made possible by the violation.**

16  *Brunswick,* 429 U.S. at 489 (emphasis added).

17    The 6/1/07 Order gives "antitrust injury" an entirely different meaning.  It starts by
18  quoting *AGC* and *American Ad Management* to the effect that the requirement is aimed at
19  "protecting the economic freedom of participants in the relevant market."  As it was used in
20  those two cases, the obvious meaning of the phrase was, again, that antitrust injury occurs
21  only where the restraint lessens, rather than increases, economic freedom.

22    But the 6/1/07 Order focuses instead on the subordinate phrase "in the relevant
23  market."  According to the 6/1/07 Order, the "relevant market" is the market for DRAM, and
24  not the market for components containing DRAM.  "The market plaintiffs allege as the
25  source for the purportedly illegal price-fixing conspiracy was the general market for DRAM,
26  a market that is distinct from the market for electronic products that include DRAM."  6/1/07
27  Order at 15.  Consequently, the Order holds, "plaintiffs who are purchasing products in
28  which DRAM is a component, rather than DRAM itself, are participating in a secondary

1  market that is incidental to the primary pricefixed market (i.e., the market for DRAM

2  modules themselves)." *Id.*

3      Thus, according to the 6/1/07 Order, a plaintiff does not suffer antitrust injury, even

4  if the injury is unquestionably the result of a lessening of competition caused by defendants'

5  acts, if the injury does not occur in the "relevant market." And what is the "relevant

6  market"? The Order says that the market for products that include the price-fixed product

7  as a component is not the relevant market, even though, according to the allegations of the

8  complaint, defendants' anticompetitive acts raised prices to consumers in this market. And

9  why is this market not "relevant"? This the Order does not say.

10     The Court's concept of the "relevant market" is contrary not only to the general law

11 of antitrust injury enunciated by the Supreme Court, but also to the *American Ad*

12 *Management* decision from which it is supposedly derived. That decision held:

13         While consumers and competitors are most likely to suffer antitrust injury,
           there are situations in which other market participants can suffer antitrust
14         injury. See generally Areeda & Hovenkamp, Antitrust Law (1995 & 1998
           Supp.) (analyzing possible antitrust injury of indirect purchasers . . . .
15

   *American Ad Management*, 190 F.3d at 1057.
16

17     Under federal law, it is quite clear that the "relevant market" for standing purposes

18 is not simply the market in which the restrained product is sold. *Blue Shield of Virginia v.*

19 *McCready*, 457 U.S. 465 (1982) (insured could sue insurer for refusing to reimburse

20 psychotherapy conducted by psychologists). For example, in *Ostrofe v. H.S. Crocker Co.,*

21 *Inc.*, 740 F.2d 739, 746 (9th Cir. 1984), an employee had standing to sue for his firing, which

22 allegedly resulted from his employer's participation in a price-fixing scheme, because "[a]

23 wooden application of a technical requirement of 'antitrust injury' narrowly defined would

   have little to recommend it."
24
       The 6/1/07 Order's reasoning on this point is, in fact, circular. The Order holds:
25
   1)  the only market protected by the Cartwright Act – the only "relevant market" – is the
26
       market for the product that is price-fixed;
27
   2)  therefore injury in the market for products containing price-fixed components is not
28
       antitrust injury under the Cartwright Act;

                                        18

3)     therefore plaintiffs alleging such injury lack antitrust standing;

4)     therefore the Cartwright Act only protects the market for the product that is price-fixed – i.e., this is the only market that is "relevant".

Under this chain of reasoning, the *Illinois Brick* repealer statute would be nugatory. The 6/1/07 Order holds that the relevant market is the one in which prices are fixed, and that any injury occurring outside that one market cannot be antitrust injury. If the market for an incorporating product is distinguishable from the market for the incorporated component, then the wholesale market for the product should be distinguishable from the retail market for the component. If this is so, then an indirect purchaser of even an unchanged product has not suffered antitrust injury. But clearly that conclusion is wrong under the repealer statute.

The *D.R. Ward* decision rejected a similar contention as follows:

(b) Nature of Injury in Relation to Purpose of Antitrust Statutes

There is no indication that the [state antitrust laws] were enacted to provide remedies to certain types of indirect purchasers, such as those who participate in the immediate market subject to the price-fixing conspiracy, but not to other categories of indirect purchasers which function at a lower level in the distribution chain, such as end consumers who purchase products containing an ingredient subject to the price-fixing conspiracy.

*Id.* at 502-03. Consequently, the question was one of proof, not pleading:

[I]f plaintiffs can show that the unlawful increase in the price of plastics additives affected the cost of the products they purchased, regardless of whether plaintiffs participated in the immediate market for plastics additives or the secondary market for products with plastics additives, the [state antitrust laws] would appear to contemplate recovery. . . . **This factor therefore weighs in favor of standing.**

*Id.* at 503 (emphasis added).

The 6/1/07 Order misinterprets the concept of "antitrust injury," and incorrectly concludes that plaintiffs have not alleged antitrust injury.

### b.     The "Directness of the Injury" Factor Does Not Weigh Against Standing

The 6/1/07 Order's conclusion that plaintiffs' injury is too indirect to permit antitrust standing is, with all respect, also wrong.

The 6/1/07 Order begins its discussion of the "directness of the injury" factor by stating: "The fact that plaintiffs are indirect purchasers does not, as mentioned previously,

19

have negative bearing on this factor, as plaintiffs have explicitly been granted indirect purchaser standing pursuant to state law." 6/1/07 Order at 16. The Order further concedes at the outset that "[t]o be sure, in most instances, some portion of a price-fixed cost gets passed directly along to the ultimate consumer, and this could readily apply to a DRAM component that was eventually incorporated into an end product." *Id.* That would seem to resolve the matter on a pleading motion. Paradoxically, though, the Order then somehow concludes that plaintiffs' indirect purchaser status really does have a very negative impact on this factor.

Citing *Crouch* for the proposition that "the directness can be impacted by the nature of the item subject to price-fixing . . . ," the 6/1/07 Order notes that a multitude of electronic devices, not just computers, contain DRAM. *Id.* at 16-17. The Order uses this fact to conclude that "the price for the actual product paid by plaintiffs is reflective of much more than just the component price for DRAM." *Id.* at 17. This might well be true, to a greater or lesser degree, but then it would also be true, to a greater or lesser degree, for virtually any indirectly purchased product, modified or not, absent a pre-existing fixed-quantity cost-plus contract. The *Illinois Brick* repealer statute inevitably contemplates that such price differentials between direct and indirect sales are not enough to deny plaintiff standing.

The *D.R. Ward* decision met the question of directness head-on and found that it supported antitrust standing:

> **(c) Directness of Injury**
>
> **[P]laintiffs allege that they paid an inflated price for plastics additives due to defendants' price-fixing agreement, thereby implying that the direct harm of the price-fixing conspiracy was passed through the stream of commerce to them, purchasers of products containing plastics additives.** . . . To the extent that defendants challenge the veracity of these allegations, the discovery process is necessary to develop an array of factual issues that bear upon the directness of the plaintiffs' injury . . . . Accordingly, **accepting the allegations in the complaint as true, the Court finds that the directness of the injury prong weighs in favor of standing.**

470 F.Supp.2d . at 503 (emphasis added). That decision also dealt with the contention that other purchasers dealt more directly with the price-fixers, and noted that this contention cannot apply to an action under an *Illinois Brick* repealer:

20

**(d) More Direct Purchasers**

> There are clearly more direct victims of the alleged price-fixing conspiracy. However, **this factor loses relevance when applied to antitrust statutes that permit indirect purchaser claims, which, by definition, necessarily presuppose the existence of more direct purchasers**. Put differently, the strict application of this factor, in the context of indirect purchasers, would always caution against standing, an outcome incompatible with the purpose of Illinois Brick repealer statutes . . . .

*Id.* at 503. The decision also found this to be a matter that could not be resolved at the pleading stage:

> Furthermore, to the extent that this factor should be to evaluate the existence of other indirect purchasers with a more direct link to the price-fixing conspiracy, this Court lacks the necessary facts to perform this evaluation. . . . **This factor therefore does not mandate dismissal at this procedural stage in this litigation.**

*Id.* at 503-04.

In the end, the 6/1/07 Order also appears to acknowledge that any problems related to the directness of the injury are just a failure to plead enough facts. "[P]laintiffs' complaint sets forth no allegations that demonstrate that, within the final purchase price of a given product purchased by plaintiffs for 'end use,' the ultimate cost of the DRAM component is somehow directly traceable and/or distinguishable." *Id.* at 17. If this really is the problem, it should be readily correctable through amendment. Cf., *D.R. Ward*, 470 F.Supp.2d at 502: "[A]lthough facts external to the complaint, such as the percentage of plastic additives in the products plaintiffs purchased, carry the potential to impact the causation analysis, these facts are irrelevant to the resolution of defendants' motion to dismiss, which relies entirely upon what the complaint states."

**c.     The "speculative nature of the harm" factor, the "risk of duplicative recovery" factor, and "the complexity in apportioning damages" factors do not weigh against standing**

The 6/1/07 Order's conclusion that the "speculative nature of the harm" and "the complexity in apportioning damages" argue against antitrust standing is, with all respect, plainly wrong.

The 6/1/07 Order only briefly discusses these three factors, in a single short section. 6/1/07 Order at 17-18.

21

The Order treats the third and fifth factors (speculative nature of the harm and complexity in apportioning damages) together, although in the balancing of factors they still appear to count as two. For these factors, the 6/1/07 Order mostly draws on the unpublished North Carolina case, *Weaver v. Cabot Corp.*, 2004 WL 3406119.

*Weaver* does not say anything specific about the "speculative nature" and "complexity" factors, but it does contain some economic speculation. The 6/1/07 Order cites *Weaver* for the proposition that "plaintiffs who are in secondary markets in which they purchase the price-fixed product as a component, would need to allege that the secondary market sellers themselves were in an oligopoly and fixing prices, in order to demonstrate non-speculative damages." Decision at 18, citing *Weaver* at *1. From this, the 6/1/07 Order concludes, as a matter of law, that "[p]laintiffs . . . would need to allege that the market for personal computers and other secondary markets was itself restrained as a result of defendants' conduct, in order to establish that the damages ultimately suffered by them are sufficiently concrete, and capable of determination." 6/1/07 Order at 18.

Neither decision says where these economic "facts" come from. If this were the time to weigh economic arguments, a far more likely hypothesis is that the pass-on of increases in the price of inputs is more precise in a competitive market than it is in a restrained market. As the Supreme Court has observed, "[i]n a perfectly competitive market, retail prices drop instantly to the marginal cost of the most efficient company." *Verizon Communications, Inc. v. F.C.C.*, 535 U.S. 467, 505 (2002).

The Third Circuit has give a far more plausible assessment of the economic realities of indirect purchasing (including, in that case, purchases of products into which the price-fixed product has been incorporated as a component:

> **[I]ndirect purchasers can state unequivocally that under all circumstances prevalent in the real economic world, money is passing from their hands into the pockets of the price fixers as a result of the conspiracy, and that no rational pricing decisions by any intermediary will erase this fact.** [Footnote: . . . [O]nly in a hypothetical economic model would no portion of the illegal overcharge be absorbed by the indirect purchaser, and then only if the indirect purchaser's demand for the product was perfectly elastic or if the middleman did not wish to maximize its profits and therefore absorbed the entire overcharge on its own. . . .

22

---

1    *Mid-West Paper Products,* 596 F.2d at 593 (emphasis added).

2        Beyond adopting the dubious economic analysis of *Weaver,* the 6/1/07 Order does not

3 analyze the "speculative nature" and "complexity in apportioning damages" factors. On their

4 face, though, these are inherently factual issues. Whether and how much the purchaser of

5 the incorporating product is damaged, and how those damages should be allocated, are issues

6 that can only be addressed on the evidence. In every antitrust case, damages are uncertain.

7 *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123-124 (1969). Whether a

8 case crosses the line from acceptable uncertainty to unacceptable speculation and complexity

9 depends entirely upon the facts of the case. The issues simply cannot be decided on a

10 pleading motion.

11        The *D.R. Ward* decision emphasizes that these questions are inappropriate for decision

12 on the pleadings:

13      **(e) Speculative Nature and Complexity of Damages**

14      **This Court . . . refuses to find as a matter of law that damages to indirect**
15      **purchasers under the [state antitrust laws] are *per se* too speculative or**
      **too tenuously connected to the alleged wrongdoing to confer antitrust**
16      **standing [or] that a determination of the existence and amount of any**
      **overcharge suffered by the instant plaintiffs requires inappropriate**
17      **guesswork or unmanageably complex analyses,** particularly without the
      benefit of any discovery or expert testimony. . . . Accordingly, this factor
18      does not weigh in favor of dismissal for lack of antitrust standing at this point
      in the proceedings.

19 470 F.Supp.2d at 504 (emphasis added).

20        Regarding the risk of duplicative recovery, the 6/1/07 Order concludes that this factor

21 does not weigh against standing because "States such as California, which have repealed

22 Illinois Brick and allowed indirect purchasers to sue for antitrust violations, have necessarily

23 made the policy decision that duplicative recovery may permissibly occur," and because

24 "[d]uplicative recovery is . . . a necessary consequence that flows from indirect purchaser

25 recovery." 6/1/07 Order at 18. In other words, duplicative recovery cannot weigh against

26 standing here because the California Legislature, in passing an *Illinois Brick* repealer statute,

27 has decreed that the problem of duplicative recovery, to the extent it arises because the price-

28

1  fixed product is incorporated into the purchased product, as in *Illinois Brick*, will not weigh

2  against a plaintiff's standing.

3       This is undoubtedly correct, but the same logic applies to all of the factors governing

4  standing. For exactly the same reasons, a lack of federal antitrust injury cannot weigh against

5  the standing of a plaintiff like the *Illinois Brick* plaintiff because the California Legislature,

6  in passing an *Illinois Brick* repealer statute, has decreed that the fact that the price-fixed

7  product is incorporated into the purchased product, as in *Illinois Brick*, will not weigh against

8  a plaintiff's standing. Nor can the indirectness of the injury, the speculative nature of the

9  harm, or the complexity in apportioning damages, weigh against standing here.

10  **IV.    CONCLUSION**

11       The Court erred in holding, as a matter of law on a pleading motion, that plaintiffs

12  cannot assert Cartwright Act claims for injuries suffered in purchasing products in which

13  price-fixed DRAM was a component. The Court in effect held that the California

14  Legislature did not do what it and the California Supreme Court said it did – repeal *Illinois*

15  *Brick* in California antitrust law.

16       The federal standing principles that the 6/1/07 Order applies uncritically, and the

17  unpublished trial court decisions of other states upon which the Order relies, cannot serve

18  as a basis for rewriting the Cartwright Act. Under any principles of standing conceivably

19  applicable to the Cartwright Act, plaintiffs cannot be said to lack antitrust standing as a

20  matter of law on the basis of their complaint.

21

22

23

24

25

26

27

28

24

1     For all of these reasons, the Court should grant plaintiffs' motion for leave to file a

2  Second Amended Complaint, and further should consider vacating *sua sponte* the 6/1/07

3  Order and entering a different order denying defendants' motion for judgment on the

4  pleadings.

5

6  Dated: July 5, 2007

                                    EDMUND G. BROWN JR.
7                                    Attorney General of the State of California

8                                    J. THOMAS GREENE
                                    Chief Assistant Attorney General
9
                                    KATHLEEN E. FOOTE
10                                   Senior Assistant Attorney General

11                                   EMILIO E. VARANINI
                                    Deputy Attorney General
12
                                    NICOLE S. GORDON
13                                   Deputy Attorney General

14                                   Office of the Attorney General of California
                                    455 Golden Gate Avenue, Suite 11000
15                                   San Francisco, CA 94102
                                    (415) 703-5555
16
                                    Spiegel Liao & Kagay
17
                                     /s/ Charles M. Kagay
18                                   Charles M. Kagay

19                                   Attorneys for the State of California

20

21

22

23

24

25

26

27

28

25