# EXHIBIT 29

# Chapter III   Investigation and Case Development

A.   Finding and Evaluating Antitrust Complaints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-6

B.   Recommending a Preliminary Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-7
   1.   Standards for Approving a Preliminary Investigation . . . . . . . . . . . . . . . . . . . . . . . . III-7
   2.   Making a Request for Preliminary Investigation Authority . . . . . . . . . . . . . . . . . . . III-8
   3.   FTC Clearance Procedure and the Short Form Preliminary Investigation
      Memo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-11
   4.   Referral of a Matter to Another Prosecutorial Agency . . . . . . . . . . . . . . . . . . . . . . III-12

C.   Conducting the Preliminary Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-12
   1.   Planning the Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-12
   2.   Obtaining Assistance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-15
      a.   Federal Agencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-15
         i.   Federal Bureau of Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-15
         ii.   Other Federal Agencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-16
      b.   Non-Federal Agencies and Other Entities . . . . . . . . . . . . . . . . . . . . . . . . . . III-16
   3.   Obtaining Information by Voluntary Requests . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-17
      a.   Voluntary Requests and the Merger Review Process Initiative . . . . . . . . . . . III-17
      b.   Considerations in Using Voluntary Information Requests . . . . . . . . . . . . . . . III-18
      c.   Confidentiality Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-18
   4.   Status Reports on Investigations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-20
   5.   Standards for Determining Whether to Proceed by Civil or Criminal
      Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-20
   6.   Evaluating the Results of a Preliminary Investigation . . . . . . . . . . . . . . . . . . . . . . III-21
   7.   Closing an Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-22

D.   Conducting a Merger Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-23
   1.   A Basic Guide to the Premerger Notification Statute and Rules . . . . . . . . . . . . . . . III-23
      a.   Determining Whether the Act Applies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-24
         i.   Tests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-24
         ii.   Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-25
         iii.   Calculating Whether the Thresholds Are Met . . . . . . . . . . . . . . . . . III-25
         iv.   Special Types of Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-25
      b.   Exemptions to the Reporting Requirements . . . . . . . . . . . . . . . . . . . . . . . . . III-26
      c.   Filing Mechanics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-27
      d.   Waiting Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-28
      e.   Early Termination of the Waiting Period . . . . . . . . . . . . . . . . . . . . . . . . . . . III-29
      f.   Request for Additional Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-30
      g.   Other Provisions of the Act and the Rules . . . . . . . . . . . . . . . . . . . . . . . . . III-31
         i.   Preliminary Injunction; Hearings . . . . . . . . . . . . . . . . . . . . . . . . . . III-31
         ii.   Enforcement of the Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-31
         iii.   Confidentiality of HSR Materials . . . . . . . . . . . . . . . . . . . . . . . . . . III-32
         iv.   Relationship of Premerger Notification to Other Statutes . . . . . . . . . III-34
   2.   Reviewing Premerger Filings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-34

|  | a. | Procedures for Getting Premerger Filings to Staff for Review | III-34 |
|  | b. | Substantive Review of the Filing | III-35 |
|  |  | i. | Contents of the Form | III-35 |
|  |  | ii. | Other Sources of Information | III-36 |
|  | c. | Assessing the Completeness of the Filing | III-37 |
|  | d. | Recommendation to Open or Not Open an Investigation | III-37 |
|  |  | i. | The No-Interest Memorandum | III-37 |
|  |  | ii. | Opening a Preliminary Investigation | III-38 |
|  | e. | Clearance Procedure | III-38 |
|  | f. | Preclearance Contacts with the Parties | III-39 |
|  | g. | Maintaining the Filings | III-39 |
| 3. | Merger Investigation Overview | III-39 |
|  | a. | The Preliminary Investigation | III-39 |
|  | b. | CIDs | III-40 |
|  | c. | Second Requests | III-40 |
|  |  | i. | Model Second Requests | III-41 |
|  |  | ii. | Procedures for Issuing Second Requests | III-42 |
|  |  | iii. | Negotiating Modifications | III-43 |
|  |  | iv. | Compliance with the Second Request | III-44 |
|  | d. | After the Second Request Is Issued | III-45 |
|  | e. | Timing Agreements | III-46 |
|  | f. | After the Parties Are in Substantial Compliance | III-46 |
| 4. | Procedures for Recommending Suit | III-47 |

| E. | Issuing Civil Investigative Demands | III-47 |
| 1. | Function of Civil Investigative Demands | III-47 |
|  | a. | Where CIDs Can Be Used | III-47 |
|  | b. | Criminal Investigations | III-49 |
|  | c. | Other Matters Wherein CID Use Is Not Authorized | III-49 |
|  | d. | Basic Characteristics of CIDs | III-50 |
| 2. | Legislative History of the Antitrust Civil Process Act and Amendments | III-51 |
|  | a. | 1962 Act | III-51 |
|  | b. | 1976 Amendments | III-52 |
|  | c. | 1980 Amendments | III-52 |
|  | d. | 1994 Amendments | III-52 |
| 3. | Types of CIDs | III-52 |
|  | a. | CIDs for Documentary Material | III-53 |
|  |  | i. | Description | III-53 |
|  |  | ii. | Originals and Copies | III-53 |
|  |  | iii. | Products of Discovery | III-53 |
|  |  | iv. | Time Allowed for Production | III-54 |
|  |  | v. | Manner of Production | III-55 |
|  |  | vi. | Offer to Discuss Problems Raised by CID with Recipients | III-55 |
|  | b. | CIDs for Written Interrogatory Responses | III-57 |
|  | c. | CIDs for Oral Testimony | III-57 |
|  |  | i. | Notice | III-57 |
|  |  | ii. | Location and Procedure for Taking Testimony | III-58 |
|  |  | iii. | Right to Counsel, Objections, Privilege, Cross-Examination | III-59 |

|  |  | iv. | Immunity | III-59 |
|  |  | v. | Witness's Review and Signature of Transcript | III-60 |
|  |  | vi. | Witness's Right to a Copy of Transcript | III-61 |
| 4. | Procedures for Issuing CIDs | | | III-62 |
| 5. | Service of CIDs | | | III-63 |
|  | a. | Service on Domestic Respondents | | III-63 |
|  | b. | Service on Respondents Situated Abroad | | III-64 |
|  | c. | Proof of Service | | III-65 |
| 6. | Confidentiality and Permitted Uses of CID Materials | | | III-65 |
|  | a. | DOJ Use and Outside Disclosure of CID Materials | | III-65 |
|  | b. | Requests for Additional Limitations on Use or Disclosure of CID Material | | III-66 |
|  |  | i. | General Policies | III-66 |
|  |  | ii. | Disclosure to Congress | III-67 |
|  |  | iii. | Disclosure to the Federal Trade Commission | III-68 |
|  |  | iv. | Disclosure in the Context of a CID Deposition | III-68 |
|  |  | v. | Disclosure in Judicial or Administrative Proceedings | III-70 |
| 7. | CID Custodians and Deputy Custodians | | | III-73 |
| 8. | Grounds for Objection and Judicial Proceedings Concerning CIDs | | | III-74 |
|  | a. | General Standards—Both Grand Jury and Civil Discovery Standards Apply | | III-74 |
|  | b. | Objections Based on Procedural Requirements of the Act | | III-77 |
|  | c. | Objections Based on the Government's Motives | | III-78 |
|  | d. | Objections Based on Jurisdictional Grounds | | III-80 |
|  | e. | Objections Based on Preexisting Protective Orders | | III-81 |
|  | f. | Miscellaneous Objections | | III-82 |
|  | g. | Judicial Proceedings to Enforce or Quash CIDs | | III-82 |
|  | h. | Discovery by CID Recipient Against the Division | | III-83 |
|  | i. | Appellate Review and Remedy Provisions | | III-85 |
| 9. | Return of CID Materials at End of Investigation | | | III-85 |
| 10. | Criminal Penalties | | | III-86 |
| F. | Conducting a Grand Jury Investigation | | | III-87 |
| 1. | Requesting a Grand Jury Investigation | | | III-87 |
| 2. | Empaneling and Scheduling the Grand Jury | | | III-89 |
| 3. | Rule 6(e)(3)(B) Notices | | | III-90 |
| 4. | Issuing Grand Jury Subpoenas | | | III-90 |
|  | a. | Subpoenas *Duces Tecum* | | III-91 |
|  | b. | Subpoenas Ad Testificandum | | III-94 |
|  | c. | Subpoenas for Exemplars | | III-95 |
| 5. | Search Warrants | | | III-96 |
| 6. | Procedures for a Grand Jury Session | | | III-98 |
| 7. | Requests for Statutory Immunity | | | III-99 |
|  | a. | Division Procedures for Processing Requests for Statutory Immunity | | III-99 |
|  | b. | Division Standards for Seeking Immunity Authorization | | III-100 |
| 8. | Informal Immunity | | | III-101 |
| 9. | Corporate and Individual Leniency ("Amnesty") | | | III-102 |
|  | a. | Criteria for Corporate Leniency | | III-103 |

     i.  Leniency Before an Investigation Has Begun ("Type A
        Leniency") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-103
     ii. Alternative Requirements for Leniency ("Type B Leniency") . . . . . . . . . III-104
     iii. Leniency for Corporate Directors, Officers, and Employees . . . . . . . . . . . III-105
    b. Criteria for Individual Leniency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-105
    c. Procedure for Conferring Leniency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-106
     i.  Markers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-106
     ii. Recommendations for Conditional Grant of Leniency . . . . . . . . . . . . . . . III-107
     iii. Recommendation for Final Grant of Leniency . . . . . . . . . . . . . . . . . . . . . . III-108
     iv. Confidentiality Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-108
    d. Amnesty Plus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-108
  10. Requesting Internal Revenue Service Information During a Grand Jury
    Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-110
  11. Notification or Approval Procedures in Certain Types of Investigations . . . . . . . . . . . III-110
    a. Notice of Subjects of Sensitive Criminal Investigations . . . . . . . . . . . . . . . . . . . III-111
    b. Approval of Subpoenas to and Indictment of Members of the News
     Media and News Organizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-111
    c. Issuance of Subpoenas to Attorneys for Information Relating to the
     Representation of Clients . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-112
    d. Notification of Matters Involving Foreign Government Interests . . . . . . . . . . . . III-113
  12. Investigating Related Criminal Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-114
    a. Offenses Related to Sherman Act Violations . . . . . . . . . . . . . . . . . . . . . . . . . . III-114
    b. Offenses that Affect the Integrity of the Investigatory Process . . . . . . . . . . . . . III-115

G. Completing the Investigation and Recommending Civil or Criminal Suit . . . . . . . . . . . . . . . III-115
  1. Preparing to Recommend a Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-115
    a. Role of Antitrust Division Economists . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-116
    b. Notification to Prospective Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-116
    c. Dual and Successive Prosecution Policy ("Petite" Policy) . . . . . . . . . . . . . . . . . . III-117
  2. Case Recommendation Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-119
    a. Recommending a Nonmerger Civil Action . . . . . . . . . . . . . . . . . . . . . . . . . . . III-120
    b. Recommending a Merger Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-121
    c. Recommending a Criminal Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-123
     i.  Recommending an Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-125
     ii. Recommending a Plea Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-129
  3. Procedures for Review of Case Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . III-130

H. Other Investigative Functions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-131
  1. Business Review Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-131
    a. Origin and Development of Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-131
    b. Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-132
    c. Manner of Request . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-132
    d. Processing the Request . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-133
    e. Timing of Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-133
    f. Investigating a Business Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-134
    g. Review Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-134
    h. Judicial Interpretation and Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-135
  2. National Cooperative Research and Production Act of 1993 . . . . . . . . . . . . . . . . . . . . . III-136

a.  Purpose and Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-136
b.  Notification to DOJ and FTC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-137
c.  Review by Section . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-139
    i.   Original Notifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-140
    ii.  Supplemental Notifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-140
d.  Preparation of the Federal Register Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . III-141
e.  Notice to Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-141
f.  Review and Publication of Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-142
3.  Export Trade Certificates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-142
a.  Overview of the ETC Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-142
b.  Initial Processing of an Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-144
c.  Requests for Supplemental Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-145
    i.   Informal Requests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-145
    ii.  Formal Requests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-145
d.  Confidentiality of Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-146
e.  Analysis of the Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-147
f.  Recommendation and Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-148
g.  Decision by the Assistant Attorney General . . . . . . . . . . . . . . . . . . . . . . . . . III-149
h.  ETC Notebook . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-149
4.  Judgment Monitoring, the JTS System, and Judgment Enforcement . . . . . . . . . . . . . . III-150
a.  Judgment Monitoring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-150
b.  JTS and Reporting Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-150
c.  Judgment Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-151
5.  Judgment Modifications and Terminations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-153
a.  Phase One: Obtaining Approval to Consent to Modification or
    Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-153
    i.   Initiation of the Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-153
    ii.  Recommendation, Review, and Applicable Standards . . . . . . . . . . . . . . . III-154
b.  Phase Two: Procedures for Termination or Modification . . . . . . . . . . . . . . . . III-155
    i.   Necessary Papers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-155
    ii.  Notice, Publication Costs, and Multiple Defendants . . . . . . . . . . . . . . . III-156
    iii. Review, Filing, and Other Procedural Aspects . . . . . . . . . . . . . . . . . . . . III-157

## A.   Finding and Evaluating Antitrust Complaints

The Division's investigations arise from a variety of sources including:

- Complaints received from citizens and businesses when they believe that companies or individuals are engaged in unlawful conduct.

- Analysis and evaluation of filings under the premerger notification provisions of the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

- Press reports of various practices that come to the Division's attention through the monitoring of newspapers, journals, and the trade press.

- "Inside" information obtained from informants or individuals or companies applying for amnesty.

- Complaints and information received from other government departments or agencies.

- Complaints and referrals received from United States Attorneys and state attorneys general.

- Analysis of particular industry conditions by Division attorneys and economists, including systematic industry screenings. (Screening investigations require an "MTS New Matter Form" (ATR 141).)

- Monitoring of private antitrust litigation to determine whether the Division should investigate the matter.

The assignment of specific responsibilities to each of the sections and field offices assists in uncovering suspected violations. Each section and field office is responsible for identifying violations within its area of responsibility. In addition, general complaints received by the Front Office are referred to a section or field office, as appropriate.

The attorney, economist, or paralegal who receives a complaint should develop information from the complainant, from trade publications and other public sources, and from federal governmental entities. *See* Chapter VI, Part B. Except under unusual circumstances that require the approval of the appropriate Director of Enforcement, the attorney, economist, or paralegal must not communicate with other individuals within the industry or individuals and corporations that may be implicated in the alleged violation, for three reasons. First, the Division does not begin a formal investigation until a policy and factual determination has been made that an investigation should proceed and the Division's resources should be committed. Second, the Division and the FTC clear proposed investigations with each other before they are opened. The purpose of this clearance procedure is to

ensure that both agencies are not investigating the same conduct and to avoid burdening the parties under investigation and potential witnesses with duplicative requests. *See* Chapter III, Part B.3, and Chapter VII, Part A. Third, contact may prematurely tip off the subject of the investigation that an investigation has been or may be initiated.

## B.   Recommending a Preliminary Investigation

### 1.   Standards for Approving a Preliminary Investigation

Generally, a preliminary investigation will be authorized by the Division if (a) there are sufficient indications of evidence of an antitrust violation; (b) the amount of commerce affected is substantial; (c) the investigation will not needlessly duplicate or interfere with other efforts of the Division, the FTC, a United States Attorney, or a state attorney general; and (d) resources are available to devote to the investigation. Although an investigation does not formally become "civil" or "criminal" until compulsory process – in the form of civil investigative demands (CIDs), second requests, or grand jury subpoenas – is issued, a preliminary judgment is usually made when the preliminary investigation memo is submitted as to whether the investigation will be pursued as a civil or criminal matter. Generally, the type of conduct will govern the civil/criminal determination (e.g., merger matters are pursued civilly, *per se* price fixing is pursued criminally). *See* Chapter III, Part C.5 (standards for determining whether to proceed by civil or criminal investigation).

In a civil matter, from the outset, attention should be given to the legal theory, relevant economic learning, the strength of likely defenses, any policy implications, the potential doctrinal significance of the matter, and the availability of an effective and administrable remedy. The greater the potential significance of the matter, the more likely the request will be approved.

In a matter where the suspected conduct appears to meet the Division's standard for proceeding criminally, the decision whether to open an investigation will depend on three questions. The first is whether the allegations or suspicions of a criminal violation are sufficiently credible or plausible to call for a criminal investigation. This is a matter of prosecutorial discretion and is based on the experience of the approving officials; legal authorities provide little firm guidance. The second question is whether the matter is significant. Determining which matters are significant is a flexible, matter-by-matter analysis that involves consideration of a number of factors, including the volume of commerce affected; the breadth of the geographic area impacted (including whether the matter is international); the potential for expansion of the investigation or

prosecution from a particular geographic area and industry to an investigation or prosecution in other areas or industries; the deterrent impact and visibility of the investigation or prosecution; the degree of culpability of the conspirators (e.g., the duration of the conspiracy, the amount of overcharge, any acts of coercion or discipline of cheaters); and whether the scheme involved fraud on the federal government. Because the Division's mission requires it to seek redress for any criminal antitrust conspiracy that victimizes the federal government and, therefore, injures American taxpayers, this last factor is potentially by itself dispositive. The third question—what resources will be required to investigate and prosecute the matter—is asked only for matters that are assessed as having lesser significance; the Division is committed to prosecuting all matters of major significance.

Based on these general guidelines, a request for a preliminary investigation is reviewed by the appropriate Director of Enforcement. If the request is approved and the Division obtains clearance from the FTC, then preliminary investigation authority is granted.

## 2.   Making a Request for Preliminary Investigation Authority

Once an attorney has developed a sufficient factual and legal basis to believe that a matter is appropriate for formal investigation, the attorney should prepare a preliminary investigation memo describing the nature and scope of the activity. For all civil matters, the attorney must consult with an economist in the Economic Analysis Group (EAG) about the proposed investigation during the preparation of the preliminary investigation memo. All preliminary investigation memos should set forth the following information on the first page:

- The commodities or services to be investigated.

- The alleged illegal practices. The specific practices should be outlined if practicable (e.g., price fixing, boycott, illegal acquisition, monopolization, unreasonable agreement among competitors, "restraint of trade").

- All relevant statutes (e.g., 15 U.S.C. § 1; 18 U.S.C. § 371).

- The parties involved (the full name and location of the known companies and their corporate parents, as well as individuals involved).

- The amount of commerce affected on an annual basis (if information is unknown, provide a reasonable estimate).

- The geographic areas involved (e.g., nationwide, worldwide, eastern Virginia).

- Whether the investigation would be an international matter. An international matter is loosely defined as one that involves possible adverse impact on U.S. domestic or foreign commerce and meets any one of the following criteria: (1) a party or witness is not a U.S. citizen or business; (2) a party or witness is located outside the United States.; (3) relevant information is located outside the United States; (4) conduct potentially illegal under U.S. law occurred outside the United States; or (5) substantive foreign government consultation or coordination is likely to be undertaken.

- For civil matters, which states have expressed an interest in the investigation, if any.

- For civil matters, the name of the EAG contact for the investigation and whether EAG concurs.

- For HSR matters, the date on which the initial waiting period expires.

- For criminal matters, whether staff is requesting expedited review and, if so, a brief explanation of the reason for the request.

This detailed information is necessary to help evaluate the request, to obtain FTC clearance, and to determine whether any other Division component is investigating, or has investigated, the same activity. The information also helps the Division in monitoring its investigations and maintaining its relationships with other antitrust enforcers. Staff must develop all of the information for its preliminary investigation memo only from public sources, federal governmental entities, or the complainant because staff may not initiate contact with the parties or other private entities prior to approval of the request and FTC clearance. For procedures when the parties initiate contact with the Division, see Chapter III, Part D.2.f.

After the basic information is set forth, staff should provide a factual summary of the information upon which the request is based. Preliminary investigation memos differ based on the type of investigation proposed.

For proposed merger investigations, staff should discuss the transaction itself (including any complaints received or concern expressed in the press); theor(ies) of competitive harm; possible product markets; possible geographic markets; best estimate of market shares; ease or difficulty of entry and potential barriers; possible efficiencies; the significance of the matter (including any unusual reasons to pursue or not to pursue it); the initial investigative approach; and the outcome of any past investigations in the industry.

For proposed civil nonmerger investigations, the format is more flexible but the criteria for opening one is not different. Generally, staff should describe briefly

the evidence supporting a potential antitrust violation and any contrary evidence. Staff should also discuss special considerations, such as the existence of private litigation, the possible precedential or deterrent impact of the matter, or other legal or factual circumstances relevant to the decision-making process. Staff should identify potential defenses and outline relevant economic issues.  Staff should indicate that consideration has been given to the availability of an effective and administrable remedy. The memo also should describe briefly the proposed course of the investigation, including the estimated duration, anticipated developments, and important (or even dispositive) issues.

For proposed criminal investigations, staff should address the background and source of the information presented, the alleged conduct, the significance of the matter, its proposed investigative approach, and past investigations. Staff also should discuss special considerations such as a statute of limitations problem, the presence of a governmental agency as a potential victim, the possible precedential or deterrent impact of the matter, or other legal or factual circumstances relevant to the decision-making process. In some instances, staff already may have developed sufficient information to request authority to conduct a grand jury investigation. In these circumstances, staff may bypass preliminary investigation authority and simply request grand jury authority. For more information on the process for requesting grand jury authority, see Chapter III, Part F.

Staff should forward its completed preliminary investigation memo to the section or field office chief for review. If the chief approves, then the section or field office should e-mail the preliminary investigation memo to the ATR-Premerger-PI Requests mailbox and the appropriate special assistant. If the preliminary investigation is likely to be pursued as a criminal matter, the section or field office also should e-mail the preliminary investigation memo to the ATR-CRIM-ENF mailbox. Each preliminary investigation memo should be accompanied by an "MTS New Matter Form" (ATR 141), which should be sent to the Premerger Notification Unit at its ATR-Premerger-MTS Forms mailbox. For instructions on the completion of this form, see Division Directive ATR 2810.1 "Matter Tracking System."

After receiving a preliminary investigation memo or grand jury request memo, the Premerger Notification Unit requests clearance from the FTC (for a more detailed discussion, see Chapter VII, Part A) and e-mails a copy of the memo to all chiefs and assistant chiefs (the "Clearance Request" e-mail). When clearance is resolved on a civil nonmerger matter, the Premerger Notification Unit e-mails a copy of the preliminary investigation memo—marked with the clearance result and date of resolution—to all chiefs and assistant chiefs (the "Clearance Resolved" e-mail). When final preliminary investigation authority has been

granted, the Premerger Notification Unit e-mails a copy of the preliminary investigation memo—marked with the clearance result, date of resolution, the name of the individual authorizing the preliminary investigation, the date of authorization, and the file number for the investigation—to all chiefs and assistant chiefs (the "PI Solved" e-mail). Absent special circumstances, such as special expertise held by a certain section or field office or resource allocation issues, the section or field office seeking the preliminary investigation will receive the assignment. For all civil matters, the chief of the appropriate EAG section will assign an economist. The assigned economist will work with the legal staff on all portions of the investigation requiring economic or statistical analysis.

### 3.   FTC Clearance Procedure and the Short Form Preliminary Investigation Memo

All requests for authority to initiate a new investigation are cleared with the FTC. The Premerger Notification Unit requests FTC clearance for each new investigation when the preliminary investigation memo is submitted to the PI Requests mailbox. Depending on the circumstances, staff may be asked to provide more detailed information to facilitate the clearance process.

Where time is of the essence, it is important to submit a preliminary investigation memo immediately if a section or field office wishes to conduct an investigation. In special circumstances, such as a cash tender offer in a merger matter or upcoming opportunities to conduct consensual monitoring in a potential criminal investigation, the chief or assistant chief should immediately contact the appropriate special assistant so that expedited clearance can be requested from the FTC.

In limited circumstances, a clearance request for a civil investigation may be submitted in short form. Those circumstances include clearance requests contesting an FTC HSR merger clearance request; mergers involving a cash tender offer or bankruptcy; HSR matters in which a significant portion of the waiting period already has expired before clearance is sought; or HSR matters for which it is clear at the outset that clearance will be contested by the FTC. Except when approved by the relevant Director of Enforcement, the short form clearance form should not be used in civil nonmerger investigations. When a short form clearance request has been submitted, staff must submit a full preliminary investigation memo within 48 hours.

Staff should contact the FTC liaison in the Office of Operations with any inquiries regarding FTC clearance. The Division's clearance and liaison procedures with the FTC are described in detail in Chapter VII, Part A.

### 4. Referral of a Matter to Another Prosecutorial Agency

Sometimes a particular matter more properly should be investigated by another federal agency or a state or local prosecutorial agency rather than the Division. A matter that involves an issue that is not of direct antitrust significance may be referred to a more appropriate authority (e.g., a state consumer protection agency).

If the matter is an antitrust matter that impacts a relatively small geographic region and involves a relatively small amount of commerce, the Division may refer the matter to the antitrust section of the appropriate state attorney general's office. When such a referral is under consideration, the appropriate Director of Enforcement and the Special Counsel for Federal-State Cooperation should be consulted. For more information on referrals to and from state attorney generals, see Chapter VII, Part C.4.

## C. Conducting the Preliminary Investigation

When a section or field office requests preliminary investigation authority, staff and section or field office management should plan the investigation, giving consideration to time limitations. Although each investigation will be different, certain general principles apply to assist staff in (a) allocating resources effectively; (b) obtaining useful documentary and testimonial evidence; and (c) using the services and technical resources of the Division. *See* Chapter VI, Part B.

### 1. Planning the Investigation

At the beginning of any investigation, staff should immediately determine the scope and focus of its investigative effort. Planning sessions should take place at the time the preliminary investigation memo is being drafted, and the preliminary investigation memo should describe the initial investigative approach. At this early stage, the chief and the legal and economic staff should establish a plan describing what is to be done, how and when it will be done, and who will do each task. All investigation plans should address, at least, candidate theories of competitive harm; evidence that would support each theory, and from where the evidence could be obtained; the specific tasks that are necessary to obtain the necessary evidence; when staff plans to accomplish those tasks; and which staff

members will be primarily responsible for those tasks. The most effective investigations are very often the result of carefully planned strategies that are well developed at the outset of the investigation.

Staff should tailor its investigative plan based on the information available to it at the start of the investigation. Often staff will be able to quickly determine, for example, that a proposed merger raises little or no competitive concern. In these circumstances, staff should work to pinpoint any competitive concerns and to resolve the matter as quickly and efficiently as possible. Staff may be presented with a set of facts that leave few issues to be resolved; in these circumstances, staff's investigative plan should be centered around resolving those issues. When staff is presented with competitive concerns that warrant a more in-depth investigation, staff should quickly adapt its investigative plan to obtain the additional information that will be required to resolve the matter.

For example, in a civil investigation, thought should be given as to how best to elicit different types of information—from interviews, depositions, documents, or interrogatories—as well as what economic evidence, and what support from EAG, is needed. The plan should provide for early development of relevant legal and economic theories and a determination of the relief to be sought. The key premise of investigative planning is that, from the outset of an investigation, staff's theory of the case is well defined, although with some flexibility warranted to account for the possibility that developing additional facts or analysis will disclose a theory that had not previously been considered fruitful.

In most instances, the plan should include drafting an outline of proof. An outline of proof is a living document prepared jointly by the legal and economic staff that should be revised regularly as the factual underpinnings of the case come into focus. For civil nonmerger cases, this outline will normally start with a recommendation outline and end in findings of fact. In merger cases, the outline should provide the evidence for each element of the Merger Guidelines with highlights from the best documents, depositions, or affidavits. It should also include an evaluation of the merging parties' arguments, including their legal and economic theories and the evidence preferred to support them.

For merger investigations, staff must be mindful of time constraints. Staff must balance the usefulness of each proposed task against the opportunity cost of the time the proposed task will consume as a proportion of the time left before the waiting period or timing agreement expires. For example, staff may wish to obtain large amounts of data that will allow for a very thorough evaluation of the proposed transaction, but should be aware of potential consequences of this approach: e.g., producing significant amounts of data often takes a long time, staff could end up with only a short period of time to process the information,

and staff could be left with insufficient time to complete even the most basic tasks. On the other hand, if staff obtains too little information, the Division may not have enough facts to sufficiently analyze the proposed transaction and make an enforcement decision. The more staff's competitive concerns lead to an assessment that the matter will result in an extended investigation, the more appropriate it is that staff allocate the time and resources for very burdensome information requests.

For civil nonmerger investigations, Division policy requires that staff submit an investigative schedule to the appropriate special assistant shortly after the preliminary investigation is opened, typically within one week. The investigative schedule should set target dates for recommending, issuing, and receiving discovery; for status meetings; and for recommending and deciding whether to pursue a civil action. Each plan should be carefully tailored to the investigation and target dates should be established on a case-by-case basis. Each plan must be approved by the Office of Operations and the relevant Deputy Assistant Attorney General. In addition, staff must obtain approval from the Office of Operations and the relevant Deputy Assistant Attorney General on all modifications to the investigative schedule. Approvals will be coordinated by the appropriate special assistant.

Investigating antitrust violations is a multi-stage process, and staff's investigative plan should be a "living" document. Staff should ensure that it updates the focus of its investigative plan at each stage of the investigative process. As the investigation develops, staff should expand its investigative plan to more completely address all of the potentially relevant issues, such as staffing needs, whether to hire technical or economic experts, and possible remedies. In addition, staff should ensure that its investigative plan is informed by ongoing discussions among staff and section management about staff's current substantive analysis. In civil matters, staff should consult with the economist assigned to the investigation and should include EAG's perspective in developing and pursuing the investigation. Moreover, in civil matters, staff should engage the parties in discussion early in the investigation, obtain the parties' substantive evaluation of the matter, and share its own substantive evaluation with the parties. An ongoing critical analysis of a proposed transaction and a transparent discussion of that transaction can lead to a quicker and more effective process of arriving at the ultimate enforcement decision.

Resources available to staff in commencing the investigation are outlined in Chapter VI, Part B. That part of the manual provides detail about the Division's investigatory techniques and procedures, including use of economic resources, data processing and other information retrieval methods, and other source materials that have proven useful in investigation and litigation efforts.

## 2.   Obtaining Assistance

### a.   Federal Agencies

During the course of the preliminary investigation, staff may require assistance in conducting interviews of industry officials, locating individuals whose whereabouts are unknown, compiling statistical data, or performing various other investigative functions. When such assistance is necessary, staff should consider requesting the services of other federal agencies.

#### i.   Federal Bureau of Investigation

To obtain FBI assistance, staff, with the concurrence of the chief, should prepare a Request for FBI Assistance. The Request should be sent via e-mail to the ATR-CRIM-ENF mailbox with a cc:/ to the appropriate special assistant. Staff must submit a Request for FBI Assistance even when the local office of the FBI has indicated that it will assist staff or when staff plans to use the FBI agent detailed to the field office.

The Director of Criminal Enforcement reviews and approves the memo before sending it to FBI Headquarters. Once FBI Headquarters has processed the request and assigned it to the appropriate FBI office (a routine request takes about ten working days), the agent assigned to the matter will contact staff directly and begin the investigation. After the initial request is made and an agent is assigned, further requests for assistance may be made directly to the assigned agent.

If staff requires FBI assistance to perform a criminal records search in connection with trial preparation and the FBI has not previously participated in the investigation of the matter, then a memorandum from the Division's Director of Criminal Enforcement must be sent to the Chief, Public Integrity in Government/Civil Rights Section, Criminal Investigative Division, Federal Bureau of Investigation, and to the attention of the Chief, Public Corruption/Governmental Fraud Unit. The memorandum should include the following sections:

I.      Introduction. A statement requesting assistance in conducting a criminal records check of defendants and potential witnesses in connection with a trial. The statement should include the following information: the name of the case, the criminal number, the judicial district, the date the trial is expected to begin, the date the results of the FBI check are needed, and the name and phone number of the contact person at the Division.

II.    The Indictment. A brief statement of the charges in the indictment and when the indictment was returned.

III.    Identifying Information. A list of the defendants first and then the witnesses (each in alphabetical order) with the following identifying information: name, address, country of citizenship, Social Security number, and date of birth. If a defendant is a company, indicate after the company name the name of a high-ranking official (e.g., owner, president, CEO) with the identifying information listed above for that person.

### ii.    Other Federal Agencies

If an investigation involves procurement by a federal agency such as the Department of Defense, staff should consider seeking the assistance of the Inspector General's Office for the agency. Inspector General agents have proven to be helpful in collecting and analyzing bid or pricing data, interviewing potential witnesses, and helping Division attorneys to understand a particular agency's procurement system and regulations. No special Division procedures are required for obtaining the assistance of Inspector General agents, and each section or field office should make whatever arrangements are appropriate directly with the Inspector General's office for the agency involved. If questions or problems arise, however, staff should discuss the matter with the appropriate Director of Enforcement or Deputy Assistant Attorney General.

Before contacting an agency with which the Division has a regular relationship, staff should contact the relevant section within the Division to coordinate contacts with that agency. For example, contact with the Department of Defense in any civil matters should be coordinated through the Litigation II section. For additional information on dealing with the Department of Defense, see Chapter VII, Part E.2. Before making contact with any foreign entities, staff should coordinate with the Division's Foreign Commerce Section. For example, if staff would like to conduct a third-party interview with foreign national or corporation, staff should first contact the Foreign Commerce Section to obtain clearance.

## b.    Non-Federal Agencies and Other Entities

The Division has developed strong relationships with a number of antitrust enforcement agencies and with relevant entities throughout the United States and the world. For additional information on consultation with non-federal agencies and other entities, see Chapter VII.

### 3.    Obtaining Information by Voluntary Requests

During the preliminary investigation stage, staff often relies upon voluntary requests for information—in the form of both interviews and requests for documents and information—from the potential subjects of the investigation, other companies within the industry, customers, trade associations, and other sources. Voluntary requests may be useful to keep communications less formal, avoid the adversarial tone injected by use of compulsory process, and speed collection of useful information. Voluntary requests to obtain documentary evidence should be considered by staff in developing and implementing its investigative strategy, even though the Antitrust Civil Process Act of 1976 (ACPA) provides the Division with broad authority to issue compulsory process through civil investigative demands (CIDs). For a more comprehensive explanation of CIDs and the ACPA, see Chapter III, Part E.

#### a.    Voluntary Requests and the Merger Review Process Initiative

The Division's 2001 Merger Review Process Initiative encourages staff actively to tailor investigative plans and strategies to each proposed transaction, with the goals of more quickly identifying critical legal, factual, and economic issues; facilitating more efficient and focused discovery; and providing for a more effective process for evaluating relevant evidence. The Initiative encourages staff to be as aggressive as possible during the initial waiting period. That aggressiveness should allow staff quickly to close those investigations that should be closed and to narrow and refine issues for matters that warrant more significant investigation.

The Initiative specifies that, as soon as possible during the initial waiting period, staff should contact the parties and request that they voluntarily provide relevant documents and information. Such a request might include:

- A list and description of all overlap and potentially relevant products;

- Product/marketing brochures;

- Business plans, market studies, strategic plans, and information on market shares and competitor positioning;

- A list of competitors, suppliers, and customers;

- Readily available data regarding sales and output; and

- Analyses or studies regarding the transaction.

The Initiative also specifies that, as soon as possible during the initial waiting period, staff should request a consultation with the parties to discuss their views

of the transaction and other important issues. Staff may want to request that the parties have the appropriate business persons participate in the consultation and that they provide the voluntarily requested documents and information in advance of the consultation. In addition, 2006 amendments to the Merger Review Process Initiative contemplate that The Division may significantly reduce the number of custodians whose files must be searched in return for an agreement that protects The Division's ability to obtain appropriate discovery should it decide to challenge the deal in court.

b.    Considerations in Using Voluntary Information Requests

While there are no firm rules to guide Division attorneys in deciding whether to use a voluntary request or a CID in seeking documents and other information, some guidelines may be of assistance. Voluntary requests are generally sent to merging parties during the initial 30-day waiting period in an HSR matter, to gather information to help determine whether second requests will be required. However, when a large volume of documents is sought, it is best to proceed by compulsory process. The formalities of compulsory process are better designed to ensure full and timely compliance with an extensive request than the less formal procedures of the voluntary request. Additionally, when an investigation may result in an application for a preliminary injunction, use of CID process should normally be employed to avoid the possibility that voluntary cooperation may cease or that production of requested documents may be delayed so long that it interferes with the Division's ability to present a strong case for preliminary relief.

c.    Confidentiality Considerations

The Freedom of Information Act (FOIA) does not require disclosure of materials obtained through CIDs (such as documents, interrogatory responses, and transcripts of oral testimony) or materials obtained as part of the HSR process. *See* 5 v. 15 U.S.C. §552(b)(3) (authorizes withholding of information that is specifically exempt from disclosure by a statute other than the FOIA); and 15 U.S.C. §1314(g) (CIDs); 15 U.S.C. §18a(h) (HSR process). For an in-depth discussion of CID confidentiality protections, see Chapter III, Part E.6. Information that is not produced in response to a CID or as part of the HSR process (including information revealed in an interview conducted in lieu of a CID deposition) is not protected by the statutory provisions of the CID or HSR statutes. Accordingly, parties will often seek written assurances that the information they submit will be protected from disclosure or that they will be given advance notice if such disclosure is contemplated. It is not uncommon for the Division to provide a confidentiality letter for information produced voluntarily, particularly for interviews, at the request of parties in order to

expedite an investigation. Staff should consult the Division's model voluntary production confidentiality letter before issuing such a letter.

Staff may not provide broader assurances than those contained in the Division's model letter without consulting the FOIA Unit and the appropriate Director of Enforcement in advance. Assurances of confidentiality and notice normally should not exceed those established by Department regulation. *See* 28 C.F.R. § 16.8. Any assurances of confidentiality or notice should cover only information that the party who submitted the information has in good faith designated confidential and should be limited to a reasonable time period. Further, the assurance should never guarantee absolute confidentiality, but rather should bind the Division only as to what action it will take in its initial response to a FOIA request. *See* 28 C.F.R. §16.8. FOIA disclosure of non-CID, non-HSR confidential business information is governed by 28 C.F.R. §16.8 and FOIA Exemption 4, 5 U.S.C. §552(b)(4). *See Critical Mass Energy Project v. Nuclear Regulatory Commission*, 975 F.2d 871 (D.C. Cir. 1992). For the exemption and regulation to apply, those submitting documents should request confidential treatment and identify confidential documents. For a detailed description of FOIA procedures and exemptions, see Chapter VII, Part G.

The administrative burdens involved in complying with non-statutory assurances of confidentiality or advance notification, sometimes years later, are not easily managed, particularly when documents are involved. For this reason, in the case of documents, staff should carefully consider whether to use a confidentiality letter or CID. (In either case, parties should mark the appropriate documents "confidential" and indicate a period of time for which confidential treatment is requested, if greater than ten years, recognizing that such designations are not binding on a court.)

Parties frequently want to provide white papers discussing aspects of an investigation. If they desire CID protection, the Division can issue a CID either with an interrogatory asking for their views on whatever is contained in the white paper or a CID with a single document request identifying the white paper by name and date. In the case of an interview, use of a CID is not possible without converting the interview into a deposition, which may not be desirable. Accordingly, a confidentiality letter may be the only option in some situations.

Ultimately, if the recipient of a voluntary request declines to furnish information absent the usual assurances of confidentiality, the better practice is usually for staff to prepare a CID compelling the production of the desired documents or information.

4.     **Status Reports on Investigations**

A periodic update on the progress of each investigation is given at the section's or field office's periodic status meeting with the appropriate Deputy Assistant Attorney General and Director of Enforcement. These status meetings are designed to monitor the progress of each investigation and to discuss the legal and economic theories underlying the investigation. In addition to these meetings, special status meetings are held for individual investigations at critical points. For civil nonmerger investigations, staffs often plan one or more status reports prior to appointing potential trial counsel or hiring testifying experts. Ordinarily, staff should prepare an updated order/outline of proof for distribution and presentation at such meetings. *See* Chapter III, Part C.1.

5.     **Standards for Determining Whether to Proceed by Civil or Criminal Investigation**

Many investigations conducted by the Division are by their very nature civil investigations (e.g., merger investigations). Nevertheless, there are some situations where the decision to proceed by criminal or civil investigation requires considerable deliberation. In general, current Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, *per se* unlawful agreements such as price fixing, bid rigging, and customer and territorial allocations. Civil process and, if necessary, civil prosecution is used with respect to other suspected antitrust violations, including those that require analysis under the rule of reason as well as some offenses that historically have been labeled "*per se*" by the courts. There are a number of situations where, although the conduct may appear to be a *per se* violation of law, criminal investigation or prosecution may not be appropriate. These situations may include cases in which (1) the case law is unsettled or uncertain; (2) there are truly novel issues of law or fact presented; (3) confusion reasonably may have been caused by past prosecutorial decisions; or (4) there is clear evidence that the subjects of the investigation were not aware of, or did not appreciate, the consequences of their action.

During the preliminary investigation stage of the investigation, staff makes the determination on whether to conduct the remainder of the investigation as a grand jury or CID investigation. In general, however, the nature of the suspected underlying conduct should determine the nature of the investigation. Thus, when the conduct at issue appears to be conduct that the Division generally prosecutes in a criminal case, the investigation should begin as a criminal investigation absent clear evidence that one of the complicating factors that might make the case inappropriate for criminal prosecution is present. Where it is unclear

whether the conduct in question would be a civil or criminal violation, the relevant Director of Enforcement should be consulted before any decision is made concerning the nature of the investigation. Among other things, early Front Office involvement might result in a decision that certain conduct is inappropriate for criminal prosecution. Alternatively, staff might be instructed to continue its preliminary investigation but to focus on facts that might be relevant in determining whether a grand jury should be convened.

The decision to convene a grand jury has several consequences, including restrictions on how the government can use certain evidence gathered during the course of the grand jury's investigation. In *United States v. Sells Engineering, Inc.*, 463 U.S. 418 (1983) and *United States v. Baggot*, 463 U.S. 476 (1983), the Supreme Court restricted the government's ability to use evidence gathered during the course of a grand jury investigation in a subsequent civil case. In *Sells*, the Court held that Federal Rule of Criminal Procedure 6(e) prohibits the disclosure of grand jury materials to Department of Justice attorneys who were not involved in the grand jury proceedings unless the government obtains a court order based on a showing of particularized need. However, the Court expressly declined to address "any issue concerning continued use of grand jury materials, in the civil phase of a dispute, by an attorney who himself conducted the criminal prosecution." *Sells*, 463 U.S. at 431 n.15. However, the Court resolved that issue in *United States v. John Doe, Inc. I*, 481 U.S. 102 (1987). There, it held that an attorney who conducted a criminal prosecution may make continued use of grand jury materials in the civil phase of the dispute without obtaining a court order to do so under Rule 6(e) and "Rule 6(e) does not require the attorney to obtain a court order before refamiliarizing himself or herself with the details of a grand jury investigation." 481 U.S. at 111. For a more complete discussion of Rule 6(e) issues, including the *Sells* and *Doe* decisions, see U.S. Department of Justice, Executive Office for United States Attorneys, Office of Legal Education, Federal Grand Jury Practice (2000).

## 6.   Evaluating the Results of a Preliminary Investigation

The normal period of time required to conduct a preliminary investigation ranges from a few weeks to a few months. After this period, staff should be prepared either to proceed (by issuing voluntary requests, CIDs, or second requests, or opening a grand jury investigation) or to close the investigation.

In making this determination, staff should consult with the section or field office chief and the relevant EAG chief to discuss the results of the investigation. In many investigations, the next step in the investigation will be relatively clear; in others, however, the decision whether to continue the investigation will require

deliberation and consultation. If there are questions that remain to be resolved, the section or field office chief may wish to consult informally with the relevant Director of Enforcement before making a recommendation.

Staff recommendation to proceed by grand jury investigation or CID investigation must be processed through the appropriate Director of Enforcement and the appropriate Deputy Assistant Attorney General, and such investigations require the approval of the Assistant Attorney General. Case recommendation procedures are discussed in Chapter III, Part G.

## 7.   Closing an Investigation

If, after analysis of the conduct or transaction, staff and the chief believe that the matter should not be investigated further, staff should prepare a memorandum recommending that the investigation be closed. For civil matters, staff's memorandum should state whether the economist assigned to the matter concurs in the recommendation to close. If the chief concurs, then the section or field office should e-mail the memorandum, along with an MTS "Matter Modify/Close Form" to the appropriate special assistant and the ATR-Premerger-Closing mailbox for the section or field office. Criminal closing recommendations also should be e-mailed to the ATR-CRIM-ENF mailbox. The appropriate Director of Enforcement will review the memorandum and, in consultation with the relevant DAAG, either close the investigation or request additional information or investigation.

After the decision is made to close the investigation, the section or field office will be notified by the appropriate special assistant that the matter is closed and then receive a confirming e-mail stating that the matter is closed and the closing memo is posted on the Division's intranet (ATRnet). When the matter is closed, staff should notify the subjects of the investigation, close its file on the matter, and process all documentary material received during the investigation in accordance with the provisions of Division Directive ATR 2710.1, "Procedures for Handling Division Documents." In the event that staff needs to know quickly when a matter has been closed, staff should call the appropriate special assistant or the Premerger Notification Unit. For additional procedures on early terminations under the Hart-Scott-Rodino Act, see Chapter III, Part D.1.e. In a criminal matter, staff should provide written notification of closure to any company in the subject industry that submitted documents to the Division pursuant to a grand jury subpoena or whose documents were seized pursuant to a search warrant, as well as to any company or individual who has been notified by the Division that the company or individual was a "target" of the investigation.

At staff's discretion, other appropriate persons, such as cooperating witnesses or victims, may also be notified.

## D.   Conducting a Merger Investigation

The Antitrust Division investigates proposed mergers and acquisitions to determine whether they may substantially affect competition and violate Sections 1 or 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, or Section 7 of the Clayton Act, 15 U.S.C. § 18. Staff should apply stated Division merger enforcement policy in determining whether a merger is anticompetitive. The Division's enforcement policy concerning horizontal mergers is articulated in the joint DOJ/FTC Horizontal Merger Guidelines released in 1992 and revised in 1997. Division policy on vertical mergers is found in the DOJ Merger Guidelines of 1984. Other sources of Division policy include the public statements of Division officials.

The great majority of mergers and acquisitions do not raise serious competitive issues and staff should endeavor to review these transactions as expeditiously as possible. *See* Chapter III, Part C.3.a (discussing the Merger Review Process Initiative, which encourages staff to actively tailor investigations in an effort to actively employ the Division's resources more efficiently). When investigating a transaction that raises significant competitive issues, staff should always keep in mind its dual role: as analysts seeking to objectively determine whether a proposed transaction substantially lessens competition and as litigators developing the evidence necessary to support a challenge if the Division ultimately decides to file a suit.

Most significant mergers and acquisitions must be reported to the Division and the FTC before they occur. The premerger notification provisions of Section 7A to the Clayton Act, 15 U.S.C. § 18a, enacted as part of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, require enterprises exceeding certain thresholds to notify the Division and the FTC of the proposed transaction, submit documents and other information to the agencies concerning the transaction, and refrain from closing the transaction until a specific waiting period has expired. Since most of the Division's merger investigations will be conducted under the provisions of the HSR statute, attorneys should be familiar with its provisions and rules.

## 1.   A Basic Guide to the Premerger Notification Statute and Rules

This section describes the premerger notification procedures employed by the Division and FTC. Section 7A of the Clayton Act, 15 U.S.C. § 18a (Title II of the HSR Act, as amended), requires parties to certain acquisitions of voting securities

or assets to notify both the Division and the FTC before consummating the proposed transaction and to submit certain information to both agencies. After notification, the parties must wait a specified time, usually 30 days (15 days for cash tender offers or bankruptcy sales, *see* 11 U.S.C. § 363(b)(2)), before the transaction can be consummated. The statute also allows the enforcement agencies to make a request for additional information which extends the waiting period.

The statute grants broad rulemaking authority to the FTC, with Division concurrence, to implement Title II. The HSR Rules, Regulations, Statements, and Interpretations under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (Rules) are codified at 16 C.F.R. §§ 801-803. Questions regarding specific aspects of the Rules should be directed to the Legal Policy Section, the Premerger Notification Unit, or the appropriate special assistant. The Act, Rules, Formal Interpretations, and additional current information relating to HSR can be found on the FTC Premerger Notification Office's web page. *See also* ABA Section of Antitrust Law, The Merger Review Process (3d ed. 2005).

This section sets forth the basic rules with which attorneys conducting merger investigations should be familiar. The complete text of the Act and Rules should be consulted for specific information. Staff should generally not attempt to answer questions from the public about the reportability of particular transactions, filing mechanics, and filing fees. Such questions should be directed to the FTC Premerger Notification Office (telephone number 202-326-3100).

a.    Determining Whether the Act Applies

i.    **Tests**

For a transaction to be reportable it must first satisfy the "commerce test." Either the acquiring or the acquired person must be engaged in commerce or in any activity affecting interstate commerce. *See* 15 U.S.C. § 18a(a)(1). If the transaction meets the commerce test and, as a result of such acquisition, the acquiring person would hold voting securities or assets worth in the aggregate more than $200 million (as adjusted), the transaction is reportable. *See* 15 U.S.C. § 18a(a)(2)(A). If, however, the acquiring person would hold voting securities or assets worth in the aggregate less than $200 million (as adjusted), the transaction must satisfy the following two tests in addition to the commerce test described above:

■    Size-of-person test: One party to the transaction must have annual sales or assets of at least $100 million (as adjusted) and the other party $10 million (as adjusted). *See* 15 U.S.C. § 18a(a)(2)(B)(ii). When the acquired person is not engaged in manufacturing and does not have at least $100 million (as

adjusted) of sales or assets, then it must have assets (not sales or assets) of at least $10 million (as adjusted). *See* 15 U.S.C. § 18a(a)(2)(B)(ii)(II).

■ Size-of-transaction test: As a result of such acquisition, the acquiring person must hold voting securities or assets of the acquired person worth in the aggregate more than $50 million (as adjusted). *See* 15 U.S.C. § 18a(a)(2)(B)(i).

Thus, $50 million (as adjusted) is an absolute floor on reporting; if an acquiring person would not hold voting securities or assets of the acquired person valued at greater than $50 million (as adjusted) as a result of an acquisition, the acquisition is not reportable.

Note that the 2000 amendment of the HSR Act requires these size-of-person and size-of-transaction thresholds to be adjusted annually, beginning with fiscal year 2005, for changes in the gross national product during the previous year. The FTC will provide notice of the changes each year by press release.

## ii.    Definitions

The Rules define the statutory terms in these tests and the methods for calculating whether the size-of-person and size-of-transaction tests are met. *See* 16 C.F.R. § 801.1. The definition of "person," "entity," and "ultimate parent entity" in subpart (a), the definition of "control" in subpart (b), and the definition of "hold" in subpart (c) will be particularly important in making these determinations.

## iii.    Calculating Whether the Thresholds Are Met

The Rules explain how to calculate whether the size-of-person test is met. *See* 16 C.F.R. § 801.11. Sections 801.10 and 801.13 explain how to determine the value of voting securities or assets to be acquired, for purposes of deciding whether the "size-of-transaction" test is met.

## iv.    Special Types of Transactions

The Rules also contain a series of rules dealing with special types of transactions. Section 801.4 explains the concept of "secondary acquisitions." Whenever as a result of an acquisition (the primary acquisition), an acquiring person will obtain control of an entity that holds voting securities of another entity which it does not control, then that second aspect of the acquisition (the secondary acquisition) is separately subject to the Act and the Rules under Section 801.4.

Section 801.30 provides that the waiting period begins for certain types of acquisitions when the acquiring person files. The acquired person in such transactions is required to file within 15 days (10 days in the case of cash tender offers). Among the seven types of transactions afforded this special treatment under Section 801.30 are (a) acquisitions of voting securities on a national securities exchange or "over the counter," (b) acquisition of voting securities by means of a tender offer, (c) acquisitions (other than mergers and consolidations) in which voting securities are acquired from someone other than the issuer or related entity, and (d) secondary acquisitions. For all other acquisitions, the waiting period does not begin until all persons required to file have filed.

Section 801.32 makes clear that conversion of convertible voting securities is a potentially reportable acquisition under the Act. Section 801.40 establishes the reporting scheme for formation of new corporations, particularly new corporate joint ventures. Under Section 801.40(a), each contributor to the corporate joint venture is deemed an acquiring person, and the corporation itself is deemed an acquired person.

The HSR Rules were amended in 2005 in order to reconcile, as far as is practical, what had been disparate treatment of corporations and noncorporate entities (such as partnerships and limited liability companies) under the Rules. In particular, the Rule amendments address the formulation of non-corporate entities and acquisitions of interests in these entities. The central thrust of the rules is that meaningful antitrust review should occur at the point at which control of an unincorporated entity changes. Control of an unincorporated entity continues to be defined as having the right to 50 percent or more of the profits of the entity or 50 percent or more of its assets upon dissolution. Questions about the HSR treatment of partnerships or LLCs should be directed to the Legal Policy Section.

b.    Exemptions to the Reporting Requirements

Exemptions to the reporting scheme are found in Section 7A(c) of the Clayton Act, 15 U.S.C. § 18a(c). These statutory exemptions include:

- Acquisitions of goods and realty transferred in the ordinary course of business.

- Acquisitions of non-voting securities.

- Acquisitions of voting securities, solely for the purpose of investment, if as a result of such acquisition the acquiring person does not hold more than 10 percent of the voting securities of the issuer.

- Transactions which require agency approval under certain statutes, such as the Bank Holding Company Act (in certain cases, material submitted to the agency must be filed with the FTC and the Antitrust Division 30 days before consummation).

- Transfer to or from a federal agency or a state or a political subdivision thereof.

- Transactions specifically exempted from the antitrust laws.

- Transactions specifically exempted from the antitrust laws if approved by a federal agency and if copies of all material submitted to such agencies are contemporaneously filed with the FTC and the Antitrust Division.

Part 802 of the Rules explains these exemptions and contains additional ones. The Act grants the FTC, with the concurrence of the Division, authority to exempt from premerger reporting classes of transactions that are not likely to violate the antitrust laws. *See* 15 U.S.C. § 18a(d)(2)(B). For example, Section 802.2-.3 exempts certain real estate acquisitions, such as shopping centers, hotels and motels, agricultural property, and, unless much higher thresholds are met, acquisitions of oil, gas, and coal reserves. Section 802.21 exempts acquisitions of voting securities if a notification threshold will not be met or exceeded. (The notification thresholds are defined in Section 801.1(h).) Section 802.23 deals with renewed and amended tender offers. Section 802.30 exempts intraperson transactions. Sections 802.50-.53 exempt many types of transactions dealing with foreign assets and/or foreign persons, often on the basis of limited nexus to U.S. commerce. Specifically, Section 802.50 exempts certain acquisitions of foreign assets, and Section 802.51 exempts certain acquisitions of voting securities of a foreign issuer. Certain acquisitions by creditors, insurers, and institutional investors are also exempted by Sections 802.63-.64.

c.    Filing Mechanics

Part 803 provides transmittal rules. The Notification and Report Form (Appendix to Part 803 of the Rules) must be completed in accordance with Section 803.1, and with the instructions in Section 803.2, and on the form itself. Whenever the person filing notification is unable to supply a complete response to any item on the form, a statement of reasons for noncompliance must be supplied, in accordance with Section 803.3. Each Notification and Report Form must be accompanied by one or more affidavits and must be certified, as provided in Sections 803.5-.6 of the Rules.

In some circumstances in which a foreign acquired person refuses to file notification, Section 803.4 may allow the acquiring person to file notification on behalf of the foreign person.

Section 803.7 provides that reported transactions must be consummated within one year following the expiration of the waiting period. If the reported transaction is not consummated within one year, an additional filing must be made and waiting period observed before the transaction may be consummated.

Section 803.8(a) requires existing English translations of all or part of any documents required to be submitted with the Notification and Report Form but does not otherwise require translation of documents submitted with the Form. The agencies can require the parties to translate documents provided in response to a second request under Section 803.8(b).

### d.    Waiting Period

Sections 7A(a) and (b) of the Clayton Act state that, where notification is required with respect to a contemplated acquisition of assets or voting securities, that transaction may not legally be completed until notification has been accomplished and a 30-day waiting period has thereafter expired (only 15 days is required in the case of a cash tender offer or a bankruptcy filing). The waiting period may be extended by issuance of a request for additional information. The request generally extends the waiting period until 30 days (10 days in the case of a cash tender offer or bankruptcy filing) after the parties comply with the request. However a request for additional information to the target of a tender offer (whether or not a cash tender) or to an acquired person in a bankruptcy transaction covered by 11 U.S.C. § 363(b) does not extend the waiting period. *See* 15 U.S.C. § 18a(e)(2); *see also* Chapter III, Part D.f. If the waiting period would otherwise expire on a Saturday, Sunday, or legal holiday, the waiting period is extended to the following business day. *See* 15 U.S.C. § 18a(k). The waiting period is not extended merely because some offices of the federal government are closed; for example, the waiting period expires even if the federal government is shut down due to inclement weather.

In some instances, parties have wanted to give the agencies additional time to determine whether to issue a request for additional information. This objective may be accomplished in some instances without payment of an additional filing fee by the acquiring person withdrawing its HSR form and refiling by 5:00 p.m. of the second business day following withdrawal. Parties should contact the FTC Premerger Notification Office for details on using this procedure.

Section 803.10(a) of the Rules explains when the waiting period begins, and Section 803.10(b) explains when it expires. It also addresses deficient filings. If the initial filing or second request response does not comply with the Rules, the filing person is to be notified promptly of the deficiencies. The FTC determines whether filing rules have been met and issues any notification of non-compliance. *See* Chapter III, Part D.2.c (discussing procedures in cases of deficiencies). When a filing complying with the rules is received, the filing is deemed complete for purposes of triggering the running of the waiting period. Section 7A(b)(2) of the Clayton Act permits the FTC and the Division to terminate the waiting period before it expires in certain cases.

e.    Early Termination of the Waiting Period

Section 7A(b)(2) of the Clayton Act, 15 U.S.C. § 18a(b)(2), authorizes the FTC and the Division to grant early termination of the Act's waiting period. A Formal Interpretation has been issued that describes the standards for early termination. Under the Formal Interpretation, early termination will normally be granted where (1) it has been requested in writing (the HSR form itself contains a box to be checked if the filing entity requests early termination), (2) all parties have submitted their Notification and Report Forms, and (3) both enforcement agencies have determined not to take enforcement action during the waiting period. In addition, early termination may be granted even absent a request in instances in which a second request has been issued. *See* 16 C.F.R. § 803.11(c).

All early terminations, regardless of when granted, must be cleared through the FTC and the Act requires that notice that early termination has been granted be published in the Federal Register. Grants of early termination are also published on the FTC's website and communicated to the parties by the FTC.

If no preliminary investigation authority has been sought and the section or field office chief and staff agree that early termination is appropriate, they should notify the Division's Premerger Notification Unit promptly so that the response to the request may be relayed to the FTC without delay. *See* Chapter III, Part D.2.d(i).

If the Division has opened a preliminary investigation and the chief and EAG concur in staff's recommendation to grant early termination and to close the investigation, staff should e-mail a closing memorandum to the appropriate special assistant recommending early termination and closing. *See* Chapter III, Part C.7. After the investigation is closed, the Premerger Notification Unit will promptly relay the decision to grant early termination to the FTC. The chief or staff must also submit an MTS closing form via e-mail to the Premerger Notification Unit by sending it to the ATR-Premerger-MTS Forms mailbox. This

procedure applies to granting early termination when requests for additional information have been issued, whether or not complied with. Thus, staff should not withdraw the outstanding requests until the Division's Premerger Notification Unit has initiated the early termination procedures.

The FTC is responsible for notifying the parties that early termination has been granted by both agencies, even in situations where the investigation has been cleared to the Division. The FTC is also responsible for handling other procedural requirements, including Federal Register publication. Accordingly, if contacted by the parties, staff should not advise them that the Division is willing to grant early termination, but rather should advise the parties to contact the FTC's Premerger Office for further information.

f.    Request for Additional Information

Pursuant to Section 7A(e) of the Clayton Act, 15 U.S.C. § 18a(e), the Division or the FTC, but not both, may request additional information or documentary materials from any person required to file a notification (commonly referred to as a "second request") or from any officer, director, agent, or employee of such person. A second request must be made prior to the expiration of the 30-day waiting period (or 15-day waiting period in the case of a cash tender offer or bankruptcy filing). A second request extends the waiting period before which the transaction may be consummated for 30 days (10 days in the case of a cash tender offer or an acquisition from a debtor in bankruptcy) from the time when both parties (or, in the case of any kind of tender offer or a bankruptcy transaction, the acquiring person) have substantially complied with the request.

Where the transaction is any kind of tender offer, the second request to the acquired person does not extend the waiting period, which expires 10 days (cash tenders) or 30 days (other tenders) after the acquiring person has substantially complied with the second request, even if the target has not complied. *See* 15 U.S.C. § 18a(e)(2). The target must still respond to the second request within a reasonable time, *see* 16 C.F.R. § 803.21, or be subject to enforcement proceedings under Section 7A(g), 15 U.S.C. § 18a(g). To ensure that the necessary information is obtained in a timely fashion, the Division will generally issue both a second request and a CID to the acquired person in a tender offer or bankruptcy transaction (11 U.S.C. § 363(b)(2) provides that the waiting period can be extended by a second request in the same manner as a cash tender offer). When presented with such an instance, staff should notify the appropriate special assistant.

A second request is effective if received within the original waiting period by the party filing notification or if notice of the issuance of such request is given within

the original waiting period to the person to which it is directed, provided the
written request is mailed to that person within the initial waiting period (requests
to individuals must be sent by certified or registered mail). Notice of issuance of
the second request may be given by telephone or in person to the individual
named in Item 1(g) of the filing, and the schedule must be read to the recipient, if
requested, *see* 16 C.F.R. § 803.20. (In practice, the second request letters and
schedules are typically faxed or e-mailed upon request, but it is still necessary to
mail them under the statute.) Ideally, staff should provide notice by telephone
before 5:00 p.m. on the day the waiting period expires and mail the second
requests before midnight. Foreign companies are required to name in Item 1(h)
an individual designated to receive service of a second request. Absent a second
request, the waiting period expires at 11:59 p.m. Eastern Time on the 30th
calendar day (15th calendar day in case of a cash tender offer or acquisition from
a debtor in bankruptcy) following the beginning of the waiting period. *See* 16
C.F.R. § 803.10(b). If the waiting period would otherwise expire on a Saturday,
Sunday, or legal holiday, the waiting period is extended to the following business
day. *See* 15 U.S.C. § 18a(k). The waiting period is not extended merely because
some offices of the federal government are closed; for example, the waiting
period expires even if the federal government is shut down due to inclement
weather.

g.    Other Provisions of the Act and the Rules

   i.    **Preliminary Injunction; Hearings**

        Section 7A(f) of the Clayton Act, 15 U.S.C. § 18a(f), provides that when the
        Division or the FTC files a motion for a preliminary injunction and certifies to
        the district court that the public interest requires relief *pendente lite*, the Chief
        Judge of such district shall immediately notify the Chief Judge of the Court of
        Appeals for that circuit who shall designate a district judge to whom the action is
        to be assigned for all purposes.

   ii.   **Enforcement of the Act**

        Sections 7A(g)(1) and (g)(2) of the Clayton Act, 15 U.S.C. § 18a(g)(1)-(2),
        provide the enforcement mechanism for the Act. Under § 7A(g)(1), any person
        (or any officer, director, or partner thereof) who fails to comply with any
        provision of the Act may be liable, in an action brought by the United States, for
        a civil penalty of up to $11,000 for each day during which such person is in
        violation of the Act. (The $11,000 daily maximum is to be adjusted periodically
        for inflation. The Debt Collection Improvement Act of 1996, Pub. L. No.
        104-134, § 31001, 110 Stat. 1321, which amended the Federal Civil Monetary
        Penalties Inflation Adjustment Act of 1990, requires that civil penalties be

adjusted for inflation at least once every four years.) A 1991 Memorandum of Agreement between the Department of Justice and the FTC, for the purpose of promoting efficient and effective handling of civil penalty actions, provides that when the FTC requests that the Department of Justice bring a HSR civil penalty action, FTC attorneys may be appointed as Special Attorneys, under the supervision and control of the Attorney General.

Under § 7A(g)(2), 15 U.S.C. § 18a(g)(2), either enforcement agency can seek injunctive relief if there has not been substantial compliance with the notification requirements of the Act and the Rules or with a second request. Under this section, the district court may order compliance and "shall extend the waiting period . . . until there has been substantial compliance." (The Act contains one exception: where a person whose stock is sought to be acquired by means of a tender offer (either cash or non-cash) has not substantially complied, the waiting period may not be extended.) Section 7A(g)(2)(C), 15 U.S.C. § 18a(g)(2)(C), also authorizes the court to "grant such other equitable relief as the court in its discretion determines necessary or appropriate."

### iii.   Confidentiality of HSR Materials

Section 7A(h) of the Clayton Act, 15 U.S.C. § 18a(h), provides that HSR material ("[a]ny information or documentary material" filed with the Division or the FTC pursuant to the HSR Act) may not be made public except "as may be relevant to any administrative or judicial action or proceeding." The FTC and the Division interpret this provision to mean an administrative or judicial action or proceeding to which the FTC or the Department of Justice is a party. Thus, HSR material may be disclosed in a complaint, brief, motion, or other pleading filed in an action to which the Department is a party. HSR material may also be disclosed, pursuant to the statute, to Congress.

HSR material is expressly exempted from disclosure under the FOIA. It may not be disclosed to state or foreign enforcement agencies or to third parties during depositions or interviews without the consent of the party producing the material. The Division has taken the position that it will not disclose HSR material to other federal agencies except the FTC itself. The confidentiality constraints apply not only to HSR information contained in HSR filings, second request responses and information provided voluntarily by the merger partners during an HSR investigation, but also to the fact that an HSR filing has been made, the fact that a second request has been issued, and the date the waiting period expires.

Section 7A(h) has been interpreted by the two circuits that have addressed the issue as prohibiting the agencies from disclosing HSR information to state attorney general offices. *See Lieberman v. FTC*, 771 F.2d 32 (2d Cir. 1985);

*Mattox v. FTC*, 752 F.2d 116 (5th Cir. 1985). Mechanisms have been developed by the National Association of Attorneys General (NAAG), the Division, and the FTC that encourage parties in some instances to provide state enforcement officials with HSR materials and allow greater coordination between federal and state authorities investigating the same merger. NAAG's Voluntary Premerger Disclosure Compact allows parties voluntarily to file with a designated liaison state a copy of their initial HSR filings, and copies of second request schedules and production, in return for the Compact signatories agreeing not to serve their own compulsory process during the HSR waiting period.

To facilitate coordination of parallel federal and state merger investigations as much as possible within statutory constraints, the Department announced and implemented a Protocol in March 1992 (revised in March 1998). By its terms, the Protocol applies where all acquiring and acquired persons in a transaction submit a letter to the Division that (1) agrees to provide the designated liaison state (as identified by the NAAG Compact) all information submitted to the Division under the HSR Act or pursuant to CIDs, and (2) waives the HSR and CID confidentiality provisions to the extent necessary to allow discussions of protected materials between the Division and the state attorneys general. Where these requirements are met, the Division will provide the coordinating state copies of the Division's second request and CID schedules and the HSR waiting period expiration date. The Protocol further states: "To the extent lawful, practicable and desirable in the circumstances of a particular case, the Antitrust Division . . . and the State Attorneys General will cooperate in analyzing the merger." *See* Chapter VII, Part C.5 (describing in more detail the relationship between the Division and state attorneys general in merger investigations). Waivers of HSR and CID confidentiality may also be used to allow sharing of parties' confidential information with foreign antitrust authorities and with other federal agencies.

Staff may frequently receive requests for greater protection for HSR material than that provided by the statute. As a policy matter, the Division will not grant greater restrictions on the Division's use of HSR material than that contained in the statute. An exception to this policy can only be made after consultation with the section chief, the FOIA Unit, and the Office of Operations.

The Division's policy is to try to give a submitter ten days' notice, whenever possible, before placing HSR material on the public record in any administrative or judicial action or proceeding, regardless of whether the submitter is a party. Exceptions to this policy may be authorized by the Assistant Attorney General, especially in cases where ten days' notice is not feasible (for example, where a temporary restraining order is being sought or where documents are attached to

initial motion papers). Use of HSR material during litigation should be governed by a court-ordered protective order. *See* 45 Fed. Reg. 21,215-16 (1980).

In contrast to the ACPA, which expressly permits CID material to be used by the Division in connection with the taking of oral testimony pursuant to CID, *see* 15 U.S.C. § 1313(c)(2), Section 7A does not expressly authorize the use of HSR material in CID depositions. Thus, use of HSR material at depositions is governed by Section 7A's requirement that no such information or documentary material "may be made public." Accordingly, HSR material produced by a party should not be shown to another party or third party during a CID deposition or otherwise.

### iv.   Relationship of Premerger Notification to Other Statutes

Section 7A(i), 15 U.S.C. § 18a(i), contains two important explanations of the relationship between the Act and other activities of the Division and the FTC. Under § 7A(i)(1), any action by either agency or any failure of either agency to take any action under the premerger notification legislation has no effect on any proceeding under any other provision of the HSR Act or any other provision of law. This means, for example, that the Division may challenge a transaction even if the waiting period has expired or if the Division has early terminated the waiting period. Moreover, under § 7A(i)(2), the ability of the enforcement agencies to make full use of the ACPA, the Federal Trade Commission Act, and any other provision of law "to secure at any time from any person documentary material, oral testimony, or other information" is not affected by the premerger notification requirements.

## 2.   Reviewing Premerger Filings

### a.   Procedures for Getting Premerger Filings to Staff for Review

The HSR Act requires parties to notify the FTC and the Department of Justice of certain proposed transactions. Three copies of the premerger notification form (and one set of attachments) must be submitted to the Division's Premerger Notification Unit and an additional two copies (and one set of attachments) must be submitted to the FTC. The filings are date stamped and immediately logged in. The FTC's Premerger Office assigns a premerger number to the transaction and computes the original waiting period. This information is immediately available to the Division through a direct link to the FTC's computer database. The Division's Premerger Notification Unit assigns the filing to the appropriate section based on the commodities involved in the transaction and the location of the parties. One copy of the filings with attachments is sent to the appropriate section for review and a copy of the filings without the attachments is sent to

EAG. The Premerger Notification Unit attaches to the filing a cover sheet that identifies the parties and when each filed, the premerger number, the date by which the section or field office needs to complete its initial review (the "section chief's response due" date), and when the waiting period expires.

### b.   Substantive Review of the Filing

Generally, within five business days of receipt of a HSR filing (three days for a cash tender offer or bankruptcy filing), staff should decide whether the filing raises competitive issues that need to be investigated. The primary basis for this determination is the HSR form and its attachments, although a large number of other sources of information are also available.

### i.   Contents of the Form

The Notification and Report Form, which appears as an appendix to Part 803 of the Rules, is designed to provide the enforcement agencies with the information needed for an initial evaluation of any competitive impact of a proposed acquisition.

General background about the parties and the transaction is found in Items 1-3. Item 1 identifies what type of transaction is being reported and in what capacity the reporting person is reporting (e.g., as an acquiring person or as an acquired person). Items 2 and 3 identify all other parties to the transaction and require a description of the assets or securities to be acquired. Also required are disclosure of the proposed consummation date and submission of certain documents constituting the agreement.

Sales are categorized by each appropriate North American Industrial Classification System (NAICS) number. Item 5 requires submission of revenue data on a six-, seven-, and ten-digit NAICS basis. Six-digit data are sought for a base year (currently 2002). More detailed seven-digit product data for the base year are also submitted. The ten-digit data must be updated to reflect added or deleted products. Seven- and ten-digit data for manufacturing industries are sought for the most recent year. In non-manufacturing industries, only six-digit data from the most recent year are provided.

Staff should identify all six-, seven-, and ten-digit overlaps and determine market shares using census data. Census data show the number of companies and total sales for most NAICS codes. When reviewing NAICS information, staff should be aware that the classifications are not intended to track antitrust product markets. NAICs can be used as an initial proxy for markets, but are often either too broad or too narrow. In reviewing NAICS data, staff should keep in mind that

while a domestic manufacturer will report sales under a manufacturing NAICS (with codes that start with 2, 3, or 4), firms that make products abroad and sell them in the United States through sales offices or agents typically report their sales under a wholesaling NAICS code. The result is that two firms can be each others' primary competitors even though the HSR form shows no NAICS overlap. In addition, NAICS categories are not always clear and some businesses may legitimately be placed in more than one category.

The limitations of NAICS categories require staff always to review Item 4 documents that accompany the HSR form, even when the form does not reveal any NAICS code overlap. Item 4 requires the reporting person to furnish copies of a variety of documents. Item 4(a) seeks a number of Securities and Exchange Commission documents including proxy statements, 10-K reports, 10-Q reports, 8-K reports, and registration statements. Item 4(b) requires submission of the most recent annual reports, annual audit statements, and balance sheets. Item 4(c) asks for studies, surveys, analyses, and reports prepared by or for officers or directors for the purpose of evaluating or analyzing the acquisition with respect to various aspects of competition. Documents produced in response to Item 4(c) may include, for example, board of director presentations and offering memoranda created to find a purchaser for the acquired firm. These 4(c) documents contain the firms' own analyses of the affected markets and the benefits they perceive from the proposed acquisition. Parties are not required to translate Item 4 documents, but are required to submit English language outlines, summaries, or translations that already exist. *See* 16 C.F.R. § 803.8(a).

Item 6 seeks information on significant (but less than controlling) shareholders and shareholdings of the reporting person.

Item 7(c) requires submission of geographic market data for transactions where six-digit industry overlaps exist. This is important when reviewing industries characterized by local or regional markets.

Item 8 seeks merger history data where six-digit NAICS code overlaps exist.

In response to items 5, 7, and 8, information need be supplied only with respect to operations conducted in the United States. *See* 16 C.F.R. § 803.2(c)(1).

ii.    **Other Sources of Information**

If a review of the HSR form and attachments raises competitive issues, staff should conduct a search of publicly available information to decide whether an investigation should be opened. These sources include, among others, online articles about the relevant industries and companies and press accounts of the

proposed transaction, Internet sources such as company web pages, and standard reference books kept in the Antitrust Division Library.

c.    Assessing the Completeness of the Filing

In addition to substantively reviewing every HSR filing, staff should ensure that HSR filings are complete. When an HSR filing is incomplete or inaccurate, the FTC has the responsibility of notifying the parties. The FTC will require that the parties submit a corrected filing and file a new certification that the filing is complete. In those cases where the deficiency is significant, the waiting period will begin when the corrected filing is resubmitted. The FTC must inform parties of filing deficiencies promptly after the deficiency is discovered, but a filing can be rejected (or "bounced") whenever a deficiency is discovered, even if second requests have been issued and responses have been produced by the parties. The attorney reviewing the filing should promptly contact the FTC Premerger Notification Office and the Division's Legal Policy Section about any questions regarding the accuracy or completeness of a filing. If, for example, second request or voluntarily produced documents include documents that should have been submitted with the initial filing pursuant to Item 4(c), the Legal Policy Section and the FTC Premerger Notification Office should be promptly informed.

d.    Recommendation to Open or Not Open an Investigation

Once an HSR filing has been assessed for completeness and substantively reviewed, staff should determine whether the proposed transaction poses no likely competitive harm or whether it raises questions sufficiently serious to warrant a preliminary investigation. All decisions to recommend the opening of a preliminary investigation and all close decisions not to do so should be discussed with the appropriate section chief or assistant chief before the recommendation is made.

i.    The No-Interest Memorandum

When staff decides that a transaction does not warrant investigation, staff must fill out a "No-Interest" form. The form records information such as the identity of the parties, the HSR transaction number, NAICS codes, product and geographic overlaps, and a summary of the transaction. In the comments section, staff should explain why it recommends that no investigation be initiated. The form should be sent electronically to the reviewing official, usually the chief, assistant chief, or section HSR coordinator. If the reviewer concurs in the recommendation, he or she will sign off on the recommendation and will electronically inform the Division's Premerger Notification Unit.

ii.     **Opening a Preliminary Investigation**

A staff decision to seek preliminary investigation authority should be discussed with the chief of the appropriate legal section before being drafted. Both staff and the chief of the legal section should consult with the economist assigned to the matter before seeking preliminary investigation authority. When a section decides to seek a preliminary investigation, staff should draft a preliminary investigation memo. *See* Chapter III, Part B.2. After the section chief reviews the memorandum and approves it, the section will send it to the Premerger Notification Unit by e-mailing it to the ATR-Premerger-PI Requests mailbox and the appropriate special assistant. The recommendation will be reviewed and clearance will be sought from the FTC to open the investigation.

e.    **Clearance Procedure**

Since the FTC and the Division share enforcement responsibility for mergers and acquisitions, the two agencies have developed a clearance process to allocate responsibility between themselves for reviewing each proposed transaction. Only the agency with clearance may issue a second request. To trigger the clearance process at the Division, the section reviewing the transaction must submit a request to the Premerger Notification Unit to conduct a preliminary investigation. In limited circumstances, a clearance request for a civil investigation may be submitted in short form. Those circumstances include clearance requests contesting an FTC HSR merger clearance request, mergers involving a cash tender offer or bankruptcy, HSR matters in which a significant portion of the waiting period already has expired before clearance is sought, or HSR matters for which it is clear at the outset that clearance will be contested by the FTC. Except when approved by the relevant Director of Enforcement, the short form clearance form should not be used in civil nonmerger investigations. When a short form clearance request has been submitted, staff must submit a full preliminary investigation memo within 48 hours.

The Division and the FTC have agreed to a clearance process in mergers based primarily on past experience and expertise. The process begins with the transmittal of a clearance request, an electronic form that lists the clearance number, the parties and the conduct being investigated, the geographic area, the premerger number, and the end of the waiting period. If clearance is contested, written claims justifying each agency's right to investigate the matter will be exchanged. The claims form should list each previous investigation or case claimed as expertise with a priority given to those matters handled within the past five years, identify how the matter relates to the transaction at issue, list any party expertise, and indicate whether the investigation was "substantial" (in this context, substantial means the use of compulsory discovery). In compiling a

claim, staff should request the Division's Premerger Notification Unit to conduct a search for all Division matters involving the contested parties and NAICS codes. Clearance is granted to the agency with the stronger claim. For a more detailed description of the clearance process, see Chapter VII, Part A.1.

    f.    **Preclearance Contacts with the Parties**

Parties often request the opportunity to meet with the Division or to provide written information or analysis before clearance is resolved in order to assist the clearance process or to make better use of the initial review period. The Division and the FTC have agreed to a preclearance contacts policy which provides that if the parties do not initiate contact with staff, the Agencies will not initiate contact with the parties without first notifying the other agency and offering the other agency the opportunity to participate. If a party initiates contact, the contacted agency will advise the party that clearance has not been resolved and that any information should be provided simultaneously to both agencies. If a preclearance meeting is deemed appropriate, the contacted agency will coordinate with the other agency to offer the requesting party a joint meeting with both agencies. If a party initiating the contact asks staff if it has any questions, the contacted agency should tell the party that clearance has not been resolved. The contacted agency may ask follow-up questions, but any written information provided in response to these questions should be submitted simultaneously to both agencies.

    g.    **Maintaining the Filings**

The Division takes the position that it may maintain HSR filings for future investigations. Each section has been directed to establish its own system of retaining HSR filings and periodically destroy filings that are no longer of interest to the section. Each document that is retained because it may be useful in future investigations should be kept with a cover sheet that identifies the party that submitted the documents and makes clear that they are protected from disclosure under the Act.

3.    **Merger Investigation Overview**

    a.    **The Preliminary Investigation**

The first phase of a merger investigation commences when FTC clearance has been granted and staff has been granted preliminary investigation authority. Staff should use this period to determine whether the proposed transaction raises issues substantial enough to warrant the issuance of a second request. To this end, when preliminary investigation authority is obtained, staff should outline its

provisional theory of anticompetitive harm and should begin contacting customers, trade associations, competitors, and other relevant parties to determine whether there are likely competitive concerns in any relevant markets.

Staff should include the economist assigned to the investigation in all relevant aspects of the investigation, such as interviews, team meetings about the direction of the investigation, and the distribution of "hot" documents. In addition, in cases where divestiture is considered a possible remedy or where efficiencies or "failing company" issues may be present, the Division's Corporate Finance Unit of the Economic Litigation Section should be advised at the earliest possible time.

Early in the investigation, staff should contact the parties to discuss possible competitive concerns and request information. *See* Chapter III, Part C.3.a (detailing information staff should request). The HSR Rules specifically provide for the enforcement agencies to request amplification or clarification of the information in the initial filing. Such requests are informal and voluntary, and they do not extend the waiting period or affect the Division's right to make a second request. The Division deems voluntarily provided information as coming within the confidentiality protections of section 7A(h) of the Clayton Act, 15 U.S.C. § 18a(h). *See* Chapter III, Part D.1.g.(iii). Care should be taken, however, to inform the parties that the voluntary request is not a formal second request.

b.    CIDs

As early as the preliminary investigation phase of a merger investigation, staff may find it advantageous to issue CIDs. While interviews are the primary tool available to staff at the preliminary investigation phase, in limited instances, CIDs—even CIDs for oral testimony—are the proper tool and necessary to help staff make significant progress toward resolving important issues (e.g., market definition, competitive overlaps, entry, efficiencies, and failing firm defenses). Early CIDs are commonly used when staff would like to provide confidentiality protections to a third party hesitant to produce information or to compel a third party to produce information critical to a quick and efficient resolution of the investigation. For additional information on CIDs, see Chapter III, Part E.

c.    Second Requests

If staff concludes that a transaction might raise competitive problems and more information is needed to evaluate it, staff should draft a second request and obtain approval to issue it before the expiration of the applicable waiting period. The authority to issue a second request has been delegated to the Director and Deputy Director of Operations. A recommendation to issue a second request

should be e-mailed to the appropriate special assistant three full business days before the initial waiting period is due to expire. The recommendation should include a memorandum recommending a second request, second request letters to the parties, and the schedules setting forth the documents and information being sought. The memorandum should include sections that address:

- The transaction.

- The investigation.

- The investigative theory. This section should include subsections explaining the theories of competitive harm, possible product and geographic markets, best estimate of market shares and concentration, probable ease or difficulty of entry and any entry barriers, possible efficiencies, weaknesses in a potential case and ways they can be overcome, and other theories investigated and discarded.

- EAG projects underway or planned (along with any special concerns of EAG).

- Defense arguments and the Division's initial response.

- Outcome of past investigations in the industry.

- The ultimate likelihood or attractiveness of a case.

- The basis for any proposed deviations from the model second request.

Since a second request may have substantial consequences for the parties to the transaction, staff should carefully assess both the need for and the scope of the request; if a second request is necessary, staff should tailor it to the transaction and its possible anticompetitive consequences.

Staff may negotiate very narrow second requests where merging parties agree to an expanded period of discovery after certifying compliance. Absent such circumstances, staff should obtain the information necessary to obtain preliminary relief.

i.    **Model Second Requests**

The Division and the FTC have agreed to a DOJ/FTC model second request schedule that increases consistency between the agencies and reduces compliance burdens on the parties. In addition, the Division has modified the model second request to update the schedule's instructions on electronic discovery. The Division's model second request is available on ATRnet. Staff may find both models useful in crafting its second request. Staff should consult with the

economist assigned to the matter to craft matter-specific document and information requests.

### ii.   Procedures for Issuing Second Requests

Second requests should be directed to the entity making the filing, unless directed to a specific subsidiary or division of the entity, or to a specific officer, director, agent, or employee of the entity. *See* 16 C.F.R. § 803.20(a)(1). The name and address of the entity making the filing is found in Item 1(a) of the HSR form.

For second requests to be effective and extend the HSR waiting period, staff must either: (1) give the entity written notice of the second request that is received within the initial 30- or 15-day waiting period; or (2) give notice of the second request to the entity via in-person or telephone communication with the person listed in Item 1(g) of the HSR form (Item 1(h) if the 1(g) person is outside of the United States), offering to read the full text of the Second Request to that person and reading the full request if asked. Also, staff must send written confirmation of the second request via U.S. mail to the entity within the initial waiting period. *See* 16 C.F.R. § 803.20(a)(2). In the case of a second request issued to a natural person (*e.g.,* a board member of a corporation), written notice must be provided to the entity as in (1) or (2) above, and a written copy must also be hand-delivered or sent certified or registered mail to that person's home or business address.

To ensure timely effective notice of the second requests under both of the options described above, staff should email the Item 1(g) contact person several days prior to the expiration of the initial waiting period if a second request is likely to be issued, requesting written confirmation that the 1(g) contact person will accept service of a possible second request on behalf of the entity. Staff should provide notice of the second request to the Item 1(g) contact person by telephone before 5:00 p.m. and mail the second requests before midnight on the day the waiting period expires, keeping in mind the building's mail pick-up schedule to ensure the correct postmark. In addition to mailed written copies, staff should fax or email the second request to the 1(g) contact person before 5:00 p.m., and courtesy copies of the second request to other representatives of the entity as appropriate (*e.g.,* counsel for the entity who are the day-to-day contact with staff).

Cover letters signed by the Director of Operations or the Deputy Director of Operations accompany the second request. These letters follow a standard format and should be sent to the special assistant when the recommendation is made to issue second requests. Once confirmation is received that the 1(g) contact person will accept service of the second request on behalf of the entity,

the letter should be addressed to the entity (or person or entity's subsidiary receiving the second request) c/o the 1(g) contact person.

Since a second request issued to the acquired person in a tender offer (whether or not a cash tender) or bankruptcy transaction covered by 11 U.S.C. § 363(b) does *not* extend the waiting period, *see* 15 U.S.C. § 18 a(e)(2), the second request letter to the acquired person in a tender offer or bankruptcy transaction should not include the language extending the waiting period.  *See* Chapter III.D.1.f. Instead, the letter should state that compliance with the concurrently issued CID will be considered compliance with the second request.

The proposed second request schedules and cover letters should be emailed, along with the accompanying recommendation memorandum, to the appropriate special assistant three full business days before the initial waiting period expires.

iii.    **Negotiating Modifications**

Every second request modification must be agreed to in writing by the appropriate Division representative; without that written consent, the modification is not valid. Parties receiving second requests are encouraged to contact staff to negotiate limitations or modifications to the second request. In considering requests for modifications, staff should consider the competitive issues involved, the manner in which information and documents are maintained by the parties, the type of information available to the parties, and the relative burdens to the parties of producing the requested information. Staff should respond to all requested modifications in writing within five business days.

If any issues arise in the course of modification discussions with staff, the parties may contact the chief or assistant chief to discuss the matter. Such discussions with the chief or assistant chief are relatively common during the second request modification process. In the event that any issue cannot be resolved at the section level, the Division has adopted a Second Request Internal Appeal Procedure for requested modifications to a second request. *See also* 15 U.S.C. § 18a(e)(1)(B)(i). This process provides for the party seeking modifications to appeal the chief's decision to a senior official who does not have direct responsibility for the review of any enforcement recommendation in the matter. Typically, this will be a Deputy Assistant Attorney General not involved in the decision-making process of the case. Staff should contact the appropriate special assistant to determine which official will handle the appeal and notify the parties. Staff should also notify the parties that the appeal should be in writing and no more than ten pages long and that it should include a concise explanation of the reasons why further compliance would be unduly burdensome and a summary of compliance discussions with staff and the chief. The reviewer may request additional

information within two business days of receipt of the appeal and will render a decision on the appeal within seven business days after receipt of all necessary information.

iv.   **Compliance with the Second Request**

Staff attorneys conducting the investigation are responsible for ensuring that the parties have complied with the second request. Clear instructions should be given as to where the response should be sent. Second request responses delivered after 5:00 p.m. eastern time on a regular business day, or at any time on any day other than a regular business day, shall be deemed received on the next regular business day. Delivery is effected on the last day when all the requested material is received and the parties have certified compliance with the second request. The Rules require that a complete response be supplied to any request for additional information. *See* 16 C.F.R. § 803.3. If a party is unable to supply a complete response, it should provide a statement of the reasons for noncompliance.

Staff should determine whether the parties are in substantial compliance with the second request as soon as possible (generally well before the expiration of the second statutory waiting period, even if there is a timing agreement extending the waiting period or otherwise committing the parties to delay the closing). If the parties are in substantial compliance, staff should inform the parties and confirm the date that the waiting period will expire. If the submission is not in substantial compliance, staff should prepare a deficiency letter, for the section chief's signature, specifying the areas in which the submission is deficient and that the parties failed to provide a sufficient explanation for noncompliance. If the section chief concurs, the deficiency letter may be issued, but the parties may appeal to a senior official who does not have direct responsibility for the review of any enforcement recommendation in the matter. Typically, this will be a Deputy Assistant Attorney General not involved in the decision-making process of the case. Staff should contact the appropriate special assistant to determine which official will handle the appeal and notify the parties. As with disputes over modifications, staff should also notify the parties that the appeal should be in writing and no longer than ten pages and that it should include a concise explanation of the reasons why the party believes it is in compliance and a summary of the discussions with staff and the chief. The reviewer may request additional information within two business days and must render a decision on the appeal within three business days after receipt of all necessary information.

While evaluating compliance, staff should be mindful that, pursuant to Clayton Act § 7A(g)(2), it is possible for the Division to seek an injunction preventing the parties from closing their transaction until the parties have substantially

complied. *See*, *e.g.*, *FTC v. Blockbuster, Inc.*, Civ. No. 1:05CV00463 (D.D.C. filed March 11, 2005).

### d.   After the Second Request Is Issued

In the period between the issuance of the second request and substantial compliance by the parties, staff should conduct a thorough investigation that will allow it to decide whether the transaction is anticompetitive and should be challenged in court. Shortly after the issuance of a second request, staff must offer to engage in a second request conference with each party to discuss the competitive concerns that exist at that stage in the investigation. Staff should schedule any such conference within five days of the issuance of the second request. If at any time staff believes that a transaction is not likely to adversely affect competition, it may recommend that the investigation be closed. For procedures on closing investigations, see Chapter III, Part C.7.

When staff believes that the resolution of discrete issues through the examination of limited additional information could be sufficient to satisfy the Division that the transaction is not anticompetitive, staff may arrange a "quick look" investigation. In a "quick look" investigation, the parties refrain from complying fully with the second request and instead provide limited documents and information, and staff commits to tell the parties, by a particular date, whether full compliance will be necessary. In other investigations, it will be clear from the onset that the transaction raises serious issues that can only likely be resolved after a full investigation and compliance with the second request.

A full second request investigation typically will include issuing CIDs to third parties to obtain information necessary to compute market shares and documents necessary to assess the relevant markets and competitive significance of the transaction; taking depositions and obtaining statements for use in court; retaining and working with experts; conducting legal research; reviewing second request documents; using litigation support systems; and preparing economic and other evidence on the competitive effects of the transaction.

Because much has to be accomplished in a limited time period, staff should carefully develop a comprehensive plan for conducting the investigation. The plan should include who is responsible for implementing each part of the plan and when the task is to be accomplished. The focus should be on bringing the most persuasive evidence to bear on the issues of the investigation and include the appropriate use of discovery tools. One or more meetings are generally held with the Office of Operations and the appropriate Deputy Assistant Attorney General to discuss the case plan, case theory, and progress of the investigation.

e.   **Timing Agreements**

The parties may want more time than the waiting periods in the Act allow to discuss fully the competitive significance of transactions with the Division. Accordingly, section management, in consultation with the relevant Deputy Assistant Attorney General, may enter into specific procedural agreements in exchange for specific undertakings by the parties regarding their submission of information and compliance with particular investigative requests. Timing agreements allow for the orderly review of information and dialogue on the competitive significance of a transaction, and staff should contact the parties within three days after issuing second requests to determine if a timing agreement is appropriate for its investigation. In these agreements, the parties typically promise not to close the transaction for some period of time after the expiration of the waiting period. The form of these agreements appropriately varies from transaction to transaction. Some potential commitments that may be included in the agreement include commitments for modification of and compliance with second requests and other discovery; early access to the parties' technical personnel and, if necessary, dates for depositions of the parties' executives (staff should consider conditioning these depositions on the receipt of certain documents in advance); the mutual exchange of economic information and dates for discussions between the Division's and the parties' economists; dates by which white papers and staff recommendations will be completed; and dates for meetings between the parties and Division management.  For more detailed guidance, see the [Merger Review Process Initiative](#) for a fuller discussion of Division policy and practice in negotiating timing agreements.  In addition, 2006 amendments to the Merger Review Process Initiative contemplate that The Division may significantly reduce the number of custodians whose files must be searched in return for an agreement that protects The Division's ability to obtain appropriate discovery should it decide to challenge the deal in court.

f.   **After the Parties Are in Substantial Compliance**

Once the parties are in substantial compliance, *see* Chapter III, Part D.3.b.(iv), the waiting period ends after 30 days (10 days in the case of a cash tender offer or bankruptcy filing). Unless the parties have committed not to close the transaction as part of a timing agreement, the Division must make a decision on whether to challenge the transaction and seek preliminary relief to prevent the transaction from closing.

After the parties have responded to a second request and certified that they are in substantial compliance, staff needs to carefully review the submission substantively, assess the completeness of the submission and whether a deficiency letter should be issued, finish remaining interviews, affidavits, and

depositions, and forward a recommendation (with, if applicable, a revised order of proof and any proposed pleadings) to the Office of Operations. Merger case recommendations generally should be provided to the Front Office three business days before any Front Office meeting with the parties.

## 4.   Procedures for Recommending Suit

From the outset of its investigation, staff should be constantly assessing the possibility of challenging the proposed transaction and should conduct the investigation with an eye on proving any violation in court. If it appears likely that staff will recommend challenging the acquisition prior to consummation, staff should prepare the order of proof, evidentiary attachments, and proposed pleadings at the earliest point practicable. Staff should prepare affidavits and exhibits as it completes its investigation. When staff plans to accompany its motion papers, if suit is brought, with a declaration from an economist, the testifying economist assigned to the case should begin to prepare a declaration and accompanying exhibits. The legal basis for challenges to acquisitions prior to consummation is set forth in detail in Chapter IV, Part B, and staff should consult this analysis in preparing the necessary papers. In addition, staff should consult the Division's Internet site for specific pleadings filed in other matters.

Because of the time constraints placed on staff by the HSR Act and Premerger Notification Rules, staff should notify the Office of Operations as soon as it believes a recommendation to file suit is likely. Staff should also coordinate with the Appellate Section, as their assistance may be useful in the event that it becomes necessary to seek a temporary restraining order or preliminary injunction. For more information on recommending a merger case, see Chapter III, Part G.2.b.

## E.   Issuing Civil Investigative Demands

### 1.   Function of Civil Investigative Demands

#### a.   Where CIDs Can Be Used

In most of the civil matters handled in the Antitrust Division, CIDs can be used to compel production of information and documents if voluntary requests, *see* Chapter III, Part C.3, are judged to be inadequate or inappropriate for the Division's needs. Under the ACPA, 15 U.S.C. §§ 1311-14, CIDs may be served on any natural or juridical person, including suspected violators, potentially injured persons, witnesses, and record custodians, if there is "reason to believe" that the person may have documentary material or information "relevant to a civil

antitrust investigation." 15 U.S.C. § 1312(a). If there is "reason to believe" that
any violation within the Division's scope of authority has occurred, there is
sufficient authority to issue a CID even in the absence of "probable cause" to
believe that any particular violation has occurred. *See, e.g., Australia/Eastern
U.S.A. Shipping Conference v. United States*, 1982-1 Trade Cas. (CCH) ¶ 64,721,
at 74,064 (D.D.C. 1981), *modified*, 537 F. Supp. 807 (D.D.C. 1982), *vacated as
moot*, Nos. 82-1516, 82-1683 (D.C. Cir. Aug. 27, 1986).

The ACPA defines "antitrust investigations" to include "any inquiry" by an
"antitrust investigator" to ascertain if "any person is or has been engaged in any
antitrust violation or in any activities in preparation for a merger, acquisition,
joint venture, or similar transaction, which, if consummated, may result in an
antitrust violation." 15 U.S.C. § 1311(c). An "antitrust investigator" is "any
attorney or investigator employed by the Department of Justice who is charged
with the duty of enforcing or carrying into effect any antitrust law" 15 U.S.C. §
1311(e). "Antitrust violation" means as "any act or omission in violation of any
antitrust law, any antitrust order or, with respect to the International Antitrust
Enforcement Assistance Act of 1994, any of the foreign antitrust laws." 15
U.S.C. § 1311(d).

CIDs are the compulsory process tool of choice in civil antitrust investigations of
potential violations of the Sherman Act, 15 U.S.C. §§ 1-7, or the Wilson Tariff
Act, 15 U.S.C. §§ 8-11, and in civil investigations under the International
Antitrust Enforcement Assistance Act of 1994, 15 U.S.C. §§ 6201-6212. CIDs
are also available for use in investigations of potential violations of the Clayton
Act, 15 U.S.C. §§ 12-27; however, in merger investigations, second requests are
usually the preferred form of compulsory process for obtaining information from
the parties. Service of CIDs does not extend the initial waiting period. However,
in bankruptcy and cash tender transactions, a second request to the acquired
person does not extend the waiting period; to ensure that the necessary
information is obtained in a timely fashion, the Division will generally issue both
a second request and a CID to the acquired person in such a transaction. *See*
Chapter III, Part D.1. In addition, CIDs are usually the only form of compulsory
process available to compel production by third parties. Moreover, brief CIDs
served on parties in such investigations early in the waiting period may serve to
permit more precise drafting of second requests in some instances. CIDs can also
be served on parties to supplement the second request, although obtaining timely
production of material so requested may prove problematic.

While CIDs can be served only before the Division institutes a civil or criminal
action, *see* 15 U.S.C. § 1312(a), they may be issued after the Division has
decided to file a civil case and not yet actually filed the case. CIDs cannot be
enforced after a complaint is filed. CIDs can also be used to investigate

compliance with final judgments and orders in antitrust cases, although in specific situations it may be more efficient to gather compliance evidence by relying upon the "visitation" provisions incorporated in most of the Division's civil judgments. A decision to issue CIDs generally involves a significant expansion in resources committed by the Division and should be made only after serious consideration and a thoughtful reassessment of the matter's potential significance.

### b.   Criminal Investigations

In the event that a civil antitrust investigation uncovers evidence indicating that criminal prosecution is more appropriate than civil enforcement, a grand jury investigation should be opened. Further investigation may not be conducted by CID but rather must proceed by the grand jury process. Thus, for instance, CIDs may not be used to investigate violations of Section 3 of the Robinson-Patman Act, 15 U.S.C. § 13(a), which imposes solely criminal penalties. Evidence already obtained by CIDs may, however, be presented to the grand jury. *See* 15 U.S.C. § 1313(d)(1).

### c.   Other Matters Wherein CID Use Is Not Authorized

CIDs cannot be issued to investigate conduct that is clearly exempt from the antitrust laws, but CIDs can be issued to determine whether specific conduct falls within an exempt category. *See* Chapter III, Part E.8.d. Nor can CIDs be issued for preparing responses to requests for Business Review Letters, *see* 28 C.F.R. § 50.6, or to investigate violations of the Federal Trade Commission Act, *see* 15 U.S.C. § 1311(a). CIDs also cannot be issued to investigate violations of the Newspaper Preservation Act of 1970, 15 U.S.C. § 1803(b); however, if the Attorney General orders a public hearing in such a case, the presiding administrative law judge may permit any party (including the Antitrust Division) to conduct discovery "as provided by the Federal Rules of Civil Procedure." 28 C.F.R. § 48.10(a)(3).

There is also no authority to issue CIDs in connection with the Division's participation in proceedings before federal regulatory agencies, but information previously gathered by CIDs validly issued for other purposes may be used in such proceedings. *See* 15 U.S.C. § 1313(d)(1). Given the statutory definition of "antitrust investigation," 15 U.S.C. § 1311(c), CIDs cannot be used to investigate possible terminations of judgments or violations of stipulations during the Tunney Act public comment period prior to entry of a consent decree.

### d.    Basic Characteristics of CIDs

CIDs can require a recipient to produce specified documentary material, give sworn answers to written interrogatories, give a sworn oral deposition, or furnish any combination of such responses. A CID can also require production of products of discovery undertaken in other matters, *see* 15 U.S.C. § 1312(a), which includes depositions, documents, interrogatory answers, and other items obtained by discovery in any judicial or administrative litigation "of an adversarial nature." 15 U.S.C. § 1311(i). The requirements for requesting production of products of discovery by CID are more fully discussed in Chapter III, Part E.3.a.(iii).

CIDs should be prepared after the theory of the violation being investigated has been carefully formulated and should request the information needed to develop and establish the violation in accordance with that theory. Additional breadth of scope is generally to be avoided as unnecessary, inasmuch as additional CIDs can subsequently be served on the same person or others if the need for additional material later develops. Unnecessarily broad CIDs can delay an investigation by consuming additional time for respondents' production and staff's review of material that is not likely to contribute to the investigation's outcome. Special care should be taken to keep CIDs served upon third parties as narrow as possible, consistent with the investigation's goals. In some situations, a sharply honed CID with minimal instructions and definitions and only a very limited number of requests can encourage a prompt response.

CIDs issued for purposes that satisfy the requirements of the ACPA must nevertheless conform to all other applicable legal requirements and regulations. Additional considerations exist, for example, when issuing CIDs to:

- An attorney for information relating to the representation of a client. *See* United States Attorney's Manual § 9-13.410.

- A reporter or news media organization for information gathered in the course of reporting news. *See* 28 C.F.R. §50.10; *see also* Chapter III, Part F.11.b (discussing analogous procedures which apply in the context of issuing grand jury subpoenas to news organizations).

- A financial institution for customer transaction records. *See* Right to Financial Privacy Act of 1978, 12 U.S.C. §§ 3401-22.

## 2.   Legislative History of the Antitrust Civil Process Act and Amendments

### a.   1962 Act

The ACPA had its origin in the final report of the 1955 Attorney General's National Committee to Study the Antitrust Laws, which noted that one of the problems faced by the Department of Justice in effectively enforcing the antitrust laws was the lack of compulsory process to obtain evidence during investigations where civil proceedings were contemplated from the outset. Report of Attorney General's National Committee to Study the Antitrust Laws 343-45 (1955). As the Committee pointed out, inadequate investigative tools may lead to incomplete investigations that may in turn mean civil proceedings that a more careful search and study would have shown to be unjustified. The ultimate social cost may be "a futile trial exhausting the resources of the litigants and increasing court congestion." *Id.* at 344. To remedy this deficiency, the Committee recommended legislation to authorize the Department of Justice to issue CIDs requiring the production of documents relevant to a civil antitrust investigation.

The need for such legislation was buttressed by the Supreme Court's opinion in *United States v. Procter & Gamble Co.*, 356 U.S. 677, 683 (1958), which condemned the use of the grand jury for the purpose of eliciting evidence for a civil case. This opinion drew further attention to the fact that the Division was forced to rely in civil investigations on the voluntary cooperation of those under investigation. Congress responded by passing the ACPA in 1962. Soon after its enactment, CIDs issued under ACPA were challenged on constitutional grounds. However, all such challenges were rejected by the courts. *Hyster Co. v. United States*, 338 F.2d 183 (9th Cir. 1964); *In re CBS*, 235 F. Supp. 684 (S.D.N.Y. 1964); *In re Gold Bond Stamp Co.*, 221 F. Supp. 391 (D. Minn. 1963), *aff'd per curiam*, 325 F.2d 1018 (8th Cir. 1964). A later challenge to a CID based in part on constitutional grounds was also rejected in *First Multiple Listing Serv. v. Shenefield, Inc.*, 1980-81 Trade Cas. (CCH) ¶ 63,661 (N.D. Ga. 1980).

As originally enacted, the ACPA authorized the issuance of CIDs for service only upon corporations and other nonnatural persons that were the targets of a civil investigation and only to compel the production of documents. In 1965, this narrow reach of the original ACPA was confirmed by the Ninth Circuit's decision in *United States v. Union Oil Co.*, 343 F.2d 29, 31 (9th Cir. 1965), where the court concluded that a CID had to be "confined to material relevant to the ascertainment of whether or not a person 'is or has been engaged in any antitrust violation.'" Moreover, the court held that this did not include investigations of activity that might result in a future violation, such as proposed acquisitions or mergers.

b.    1976 Amendments

The Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-435, 90 Stat. 1383, amended the ACPA to provide the Division with additional tools for the conduct of effective civil investigations. As so amended, the ACPA permits the Division to issue CIDs for oral testimony and interrogatory answers in addition to documents and permits CIDs to be served on natural persons as well as on corporate or other legal entities. The amendment also allows CIDs to be used to investigate potential violations such as contemplated mergers and permits CIDs to be served on persons who are not suspected violators.

c.    1980 Amendments

Additional amendments to the ACPA were made by the Antitrust Procedural Improvements Act of 1980. Pub. L. No. 96-349, 94 Stat. 1154. These amendments authorize the Division to obtain products of discovery by CID even though the material is subject to a protective order restricting its disclosure. *See* Chapter III, Parts E.3.a.(iii) and E.8.e. The 1980 amendments also expressly authorize the Division to disclose CID material to "agents" of the Division, such as independent contractors specializing in automated document retrieval (who may be retained for indexing) or to economic experts or industry specialists. *See* Chapter III, Part E.6.

d.    1994 Amendments

The International Antitrust Enforcement Assistance Act of 1994, 15 U.S.C. §§ 6201-6212, Pub. L. No. 103-438, 108 Stat. 4597, further amends the Act. This statute authorizes the Attorney General and the FTC to enter into "antitrust mutual assistance agreement[s]" with antitrust enforcement authorities of foreign countries or multinational entities to allow reciprocal disclosure of evidence concerning possible violations of the antitrust laws of such a country. *See* 15 U.S.C. § 6201. To that end, this statute broadens the ACPA's definition of "antitrust violation," 15 U.S.C. § 1311(d), to include "with respect to the International Antitrust Enforcement Assistance Act of 1994, any of the foreign antitrust laws." 15 U.S.C. § 6202(b).

## 3.    Types of CIDs

Every CID must identify the conduct being investigated and the statute potentially being violated, *see* 15 U.S.C. § 1312(b)(1), and must name a custodian and deputy custodian, *see* 15 U.S.C. § 1313(a). Care should be taken in drafting the CID form. Some CID challenges have been based in part on allegations that the conduct described is not an antitrust violation or that the

requests are not tailored to the conduct. *See* Chapter III, Part E.8. If the investigation is later transferred to other personnel, staff should draft a letter for the Assistant Attorney General's signature to the CID recipient notifying it of the transfer of its CID materials to a different custodian. *See* Chapter III, Part E.7. In addition, every CID should state the name and telephone number of a Division attorney who can answer inquiries about the CID and should draw attention to the text of 18 U.S.C. § 1505 printed on the back of the CID form.

a.   CIDs for Documentary Material

   i.   **Description**

The ACPA requires that CIDs for documentary material must "describe the class or classes of documentary material to be produced thereunder with such definiteness and certainty as to permit such material to be fairly identified," 15 U.S.C. § 1312(b)(2)(A), a standard comparable to the one applied in civil discovery and to grand jury subpoenas *duces tecum*. For a discussion of judicial interpretation of this standard, see Chapter III, Part E.8.

   ii.   **Originals and Copies**

The Act's definition of "documentary material" expressly includes the "original or any copy" of requested documents. 15 U.S.C. § 1311(g). In practice, the Division agrees to accept copies rather than original documents. By specifying that "each nonidentical copy" of each requested document be produced, comments written on widely circulated documents can be obtained.

   iii.   **Products of Discovery**

CIDs for documentary materials can be used to compel production of any "product of discovery" that was "obtained by any method of discovery in any judicial litigation or in any administrative litigation of an adversarial nature," 15 U.S.C. § 1311(i), that is in the possession, custody, or control of the CID respondent. Moreover, a CID for products of discovery "supersedes any inconsistent order, rule, or provision of law . . . preventing or restraining disclosure of such product of discovery to any person." 15 U.S.C. § 1312(c)(2). Thus, the CID respondent may not resist production on the basis of protective orders previously entered in the litigation wherein the products of discovery were obtained. 15 U.S.C. § 1312(c)(2) also provides that the disclosure to the Division of a product of discovery, pursuant to an express demand for products of discovery, "does not constitute a waiver of any right or privilege" such as the work product privilege.

In order to enable the person from whom the products of discovery were obtained to protect any legitimate interest in preventing or conditioning their production in response to a CID, the ACPA requires that the Division serve a copy of any CID for products of discovery upon the person from whom the discovery originally was obtained, *see* 15 U.S.C. § 1312(a) (last sentence), and requires that the respondent wait at least 20 days after such service before producing the products of discovery in response to the CID, *see* 15 U.S.C. § 1312(b) (last sentence). Thus, the Division must provide the CID to its intended recipient and copies of it, with any accompanying schedule, to each person whose documents will be produced by the recipient. Service to the person from whom discovery was obtained can be made by mail and should include a [cover letter](). Both the person receiving the CID and the person from whom the discovery products were obtained have the right to object to the CID. *See* 15 U.S.C. §§ 1314(b)(1)(B), 1314(d).

Barring unusual circumstances, requests for the production of products of discovery obtained from a particular source should be made by a separate CID. This step will avoid delay in the response to other requests included in the CID and minimize the dissemination of information concerning the requests being made of the CID recipient. Products of discovery producible in response to a CID include deposition transcripts, interrogatories, documents, admissions, "thing[s]," "results of inspection of land or other property," and "any digest, analysis, selection, compilation, or any derivation thereof; and any index or manner of access thereto." 15 U.S.C. § 1311(i). The ACPA defines the products of discovery obtainable by CID more broadly than it defines "documentary material." *Compare* 15 U.S.C. § 1311(g) *with* 15 U.S.C. § 1311(i). Thus, for instance, a CID recipient can be required to produce "things" obtained as products of discovery, a category of materials that a CID respondent could not be compelled to produce if the respondent had not obtained it by discovery.

iv.     **Time Allowed for Production**

The CID must specify a return date that "will provide a reasonable time within which the material so demanded may be assembled and made available for inspection and copying or reproduction." 15 U.S.C. § 1312(b)(2)(B). The length of time to be allowed for response in a specific case obviously depends on such circumstances as the number of files and locations required to be searched in preparing the response, other proceedings involving the respondent (e.g., depositions) occurring simultaneously, and the needs of the Division. The return date stated in the CID must often be selected on the basis of incomplete knowledge by the Division as to the factors that determine its reasonableness. Consequently, CIDs are commonly served with a cover letter inviting the respondent or its counsel to telephone staff promptly after receipt of the CID to

discuss a reasonable response time. For a more complete discussion of negotiations with CID recipients after service of a CID, see Chapter III, Part E.3.a.(vi).

As previously mentioned, CIDs containing an "express demand for any product of discovery" cannot be made returnable fewer than 20 days before a copy of the CID has been served on the person from whom the discovery was obtained. 15 U.S.C. § 1312(b) (last sentence).

**v.    Manner of Production**

The Act requires the respondent to make the requested documentary material "available for inspection and copying or reproduction" on the return date at its principal place of business, but authorizes alternative means of compliance by agreement with the Division. 15 U.S.C. § 1313(b). In most instances, CIDs are served with a cover letter specifying that the respondent may comply by mailing or shipping copies of the requested documentary materials to a specified address at the Division by the return date but reserving the Division's right subsequently to request production of the originals. Since such alternative means of production are usually more convenient both for the respondent and the Division, requests to reimburse respondents for copying costs are usually unjustified. Moreover, the Division is not authorized to reimburse respondents for the cost of searching for responsive documents, and no agreement for such reimbursement should ever be made. A request by several CID recipients that the Division be required to share the cost of compliance was rejected by a district court, albeit without discussing whether the Division could be required to do so. *See Finnell v. U.S. Dep't of Justice*, 535 F. Supp. 410, 415 (D. Kan. 1982).

If document copies are produced that are illegible and the respondent refuses to produce the originals, the Attorney General is authorized to petition the appropriate District Court for an enforcing order. *See* 15 U.S.C. § 1314(a).

A CID response is not complete without proper execution of the certificate of compliance on the back of the CID form. *See* 15 U.S.C. § 1312(g).

**vi.   Offer to Discuss Problems Raised by CID with Recipients**

At the time CIDs are drafted, Division staff often lacks information about the manner in which respondent's documents are organized, their geographic distribution, accessibility, and other factors relevant to setting a reasonable response date. Consequently, the Division generally serves CIDs with a cover letter inviting the respondent, or its counsel, to telephone an antitrust investigator identified in the letter in order to attempt to resolve any avoidable problems

created by the CID. Responders to this invitation almost always engage staff in a compliance negotiation, seeking to modify the scope of the request and enlarge the time for response.

The first step in compliance negotiations is often to encourage counsel for the respondent to provide an oral summary of the functions of relevant company personnel and the types and locations of company records. Where there is a question whether voluminous files would be helpful to the investigation, staff may specify that, initially, sample files be produced for inspection and evaluation. Early in the negotiation, staff should bring up issues of production related to the company's electronic data systems and obtain an explanation of the manner in which the company's documents and information are stored and the types of information that is available on electronic sources.

Respondents' proposals to narrow the scope of the request must obviously be assessed in the context of the Division's needs for information and evidence necessary to satisfy the objectives of the investigation. The credibility of respondent's representations in support of such proposals must be carefully scrutinized before they are accepted as grounds for narrowing the scope of a CID. When staff is confident that certain information or documents requested may not be necessary to satisfy the objectives of the investigation, the recipient may be permitted to defer production of such material. Outright cancellation of portions of the CID, as opposed to deferral, should not be agreed to until the investigation has progressed to the point that the lack of need for the deferred material has been convincingly established.

Generally, responses will be made more quickly if staff attorneys can initially narrow the required search to the files of a few key personnel. Again, search of other personnel's files should not be canceled, but only deferred, unless it is clear the additional materials will not be needed, even in litigation. Often, narrowing the requests themselves will not save significant additional time, because once an individual's files have to be searched, the number or breadth of the requests may not significantly affect the amount of time it takes to conduct the search of those files.

Before determining which files should be searched at the outset, staff should ensure that they fully understand what files the CID recipient maintains and where they are located as well as the range of responsibilities of all relevant personnel. General statements of counsel that "we have no such documents" in response to a CID request should be the beginning of the discussion, not its end. If necessary to reach important information, an additional CID can be issued.

Revisions to the response date are best discussed after agreement is reached on all proposed revisions to scope. An agreed-upon schedule for staggered production often benefits both the respondents and the Division. In working out such a schedule, production of documents and information likely to hold the key to the investigation's further progress should obviously be given a high priority.

**b.   CIDs for Written Interrogatory Responses**

CIDs for written interrogatory responses may demand statements of facts and contentions. The Act requires that they be "propound[ed] with definiteness and certainty." 15 U.S.C. § 1312(b)(3)(A). Respondents are required to answer each interrogatory "separately and fully in writing under oath, unless it is objected to, in which event the reasons for the objection shall be stated in lieu of an answer." 15 U.S.C. § 1312(h). As is the case with CIDs for documentary materials, phased responses are authorized and the CID response is not complete without proper execution of the certificate of compliance on the back of the CID form. *See id.* Usually, interrogatories aimed at obtaining facts and data are more useful than those aimed at contentions, but the latter are useful on occasion.

**c.   CIDs for Oral Testimony**

**i.   Notice**

A CID for oral testimony must state the date, time, and place where the testimony will be taken and identify an antitrust investigator who will conduct the examination. *See* 15 U.S.C. § 1312(b)(4). Although the Act defines "antitrust investigator" broadly as to include non-lawyers, 15 U.S.C. § 1311(e), CID depositions should be conducted by lawyers in the absence of exceptional circumstances. Moreover, although the Act requires that only one antitrust investigator be designated on the face of the CID to conduct the examination, 15 U.S.C. § 1312(i)(2) indicates that more than one Division antitrust investigator may be present at a CID deposition. This point was also made by Senator Hart in the Senate debates on the Hart-Scott-Rodino Antitrust Improvements Act of 1976 when he stated that "the oral examination is to be conducted by the antitrust investigator (accompanied by any assistants he may need)." 123 Cong. Rec. S15,416 (daily ed. Sept. 8, 1976) (statement of Sen. Hart).

The CID form must identify a custodian for the transcript of the deposition. The ACPA neither expressly authorizes nor forbids deposing corporations and other entities by a procedure comparable to that authorized under Rule 30(b)(6), Fed. R. Civ. P. In appropriate circumstances, a CID can be issued to such a nonnatural person to produce, in order to testify on its behalf, the persons most knowledgeable on specified subjects. Such CIDs should be addressed to the

corporation or other entity and accompanied by a schedule. The schedule should identify the subject matters to be covered in the deposition and state that persons designated as knowledgeable about those matters are required to provide oral testimony. Examples of 30(b)(6)-style schedules may be found on ATRnet. Alternatively, albeit with some delay, the Division may serve CID interrogatories requesting identification of the most knowledgeable person concerning specified subject matter and then serve a CID for the oral deposition of that person.

If staff intends to compel a CID recipient to produce documents at the time and place of the deposition, a practice similar to that authorized by Rule 30(b)(5), Fed. R. Civ. P., staff should use the CID form for oral testimony and documentary material. This combined form is not appropriate, however, if the witness is to produce documents in advance of the deposition. If the date for production of documents is different than the date of the deposition, then staff should issue a CID compelling oral testimony and a separate CID compelling the production of documentary material.

ii.    **Location and Procedure for Taking Testimony**

The statute provides that testimony may be taken in the federal judicial district where the witness resides, is found, or transacts business, or in any other place agreed upon by the Division and the deponent. *See* 15 U.S.C. § 1312(i)(3). A CID deponent is entitled to the same fees and mileage as is paid to witnesses in U.S. district courts. 15 U.S.C. § 1312(i)(8). Payment should be arranged through the U.S. Marshal's Office or the U.S. Attorney's Office in the district where the deposition is being taken. Division attorneys should consult with the U.S. Attorney's Office to determine the local practice. The general practice is to conduct the deposition at an office of either the Division or the U.S. Attorney for the district in which the deposition is being taken.

The deposition must be taken before an officer authorized to administer oaths and affirmations, and the testimony must be taken stenographically and transcribed. *See* 15 U.S.C. § 1312(i)(1). In addition, the CID form specifies that the testimony may also be recorded by sound or sound and visual means. The stenographer should be reminded at the outset of any CID deposition, and perhaps again thereafter, that the deposition transcript is to be marked as protected under the ACPA, and that no copies thereof are to be released to the witness or to anyone other than the antitrust investigator or custodian named in the CID. Usually, the stenographer who records the testimony serves as the officer administering the oath or affirmation. *Cf.* Division Directive ATR 2570.1, "Payment of Litigation-Related Expenses" (concerning arranging for the services of a stenographic reporter).

CID depositions are closed to the public. Only the person testifying, his or her counsel, the antitrust investigators conducting the deposition, the officer before whom the testimony is to be taken, and any stenographer taking the testimony may be present. *See* 15 U.S.C. § 1312(i)(2); *see also* Chapter VII, Part C.5.b.(ii) (regarding the presence of state attorneys general staff at CID depositions).

### iii.   Right to Counsel, Objections, Privilege, Cross-Examination

A CID deponent may be accompanied, represented, and advised by counsel at the deposition. *See* 15 U.S.C. § 1312(i)(7)(A). If an issue arises concerning counsel's conflict of interest in representing both the witness and the witness's employer or principal, it may be useful to have the witness's statement on the record as to who his or her lawyer is. If the witness does not so identify the lawyer at the deposition, that lawyer must be excluded from the deposition. Counsel may advise the witness, in confidence, either upon the request of the witness or upon the counsel's own initiative with respect to any question asked of the witness.

The witness or counsel may object on the record to a question and briefly state the reason for the objection. The ACPA provides that an objection may properly be made, received, and entered upon the record when it is claimed that the witness is entitled to refuse to answer the question on grounds of any constitutional or other legal right or privilege, including the privilege against self-incrimination, which is discussed below. The statute provides that there is no other ground for refusing to answer a question or for interrupting the oral examination. *See* 15 U.S.C. § 1312(i)(7)(A). If the witness refuses to answer a question, the antitrust investigator conducting the examination may petition the district court for an order compelling the witness to answer. *See* 15 U.S.C. § 1314(a); *see also* Chapter III, Part E.8 (discussing judicial enforcement). The CID statute does not provide for questioning by the witness's counsel at the close of the Division's questions, and such questioning is generally not permitted (although in some situations staff may choose to allow a few clarifying questions from counsel). CID depositions differ in this respect from depositions taken pursuant to Fed. R. Civ. P. 30.

### iv.   Immunity

A CID deponent may refuse to respond to a question on the basis of the privilege against self-incrimination (a privilege only available to natural persons, not to corporations). Since a CID deposition is a "proceeding before . . . an agency of the United States" as contemplated in 18 U.S.C. § 6002(2), the Department of Justice may compel the testimony of the deponent under a grant of immunity in accordance with 18 U.S.C. § 6004. Under the latter section, a governmental agency may, with the approval of the Attorney General, issue an order

compelling the testimony of an individual in an agency proceeding providing that the agency determines that the prospective testimony is necessary to the public interest and will otherwise be withheld under a Fifth Amendment self-incrimination claim. The authority of the Department of Justice to issue a compulsion order in connection with a CID deposition has been specifically delegated to the Assistant Attorney General and the Deputy Assistant Attorneys General of the Antitrust Division. *See* 28 C.F.R. § 0.175(c).

If a CID deponent has refused or will likely refuse to testify without immunity, staff should notify the Office of Operations. If staff recommends granting immunity to the deponent, staff should follow the procedures set forth in Chapter III, Part F.7 (discussing procedures and standards for seeking statutory immunity). All requests for statutory immunity must be approved by the Deputy Assistant Attorney General for Criminal Enforcement (Criminal DAAG) and cleared by the Criminal Division. Requests for immunity must be received by the Office of Criminal Enforcement at least two weeks before the date that staff will need the immunity authorization letter.

### v.     Witness's Review and Signature of Transcript

After the testimony is transcribed, the witness must be afforded a reasonable opportunity to examine the transcript, unless such examination is waived by the witness. *See* 15 U.S.C. § 1312(i)(4). If appropriate under the circumstances, the witness may be afforded the requisite opportunity to review and sign the transcript, accompanied by counsel, without letting the transcript out of the Division's possession. Any changes in form or substance that the witness desires to make are to be entered and identified upon the transcript by the officer/stenographer or antitrust investigator, together with a statement of the reasons given by the witness for making these changes.

The transcript is then to be signed by the witness unless the witness waives signature in writing, is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within 30 days of being afforded a reasonable opportunity to examine it, the officer/stenographer or antitrust investigator is authorized to sign it and state on the record the fact of the waiver, illness, absence of the witness, or the refusal to sign, together with the reason, if any, given for the refusal. The transcript must contain a certificate of the officer to the effect that the witness was duly sworn by him or her and that the transcript is a true record of the testimony given by the witness. *See* 15 U.S.C. § 1312(i)(5).

vi.    **Witness's Right to a Copy of Transcript**

A witness who has given a CID deposition has the right to receive a copy of the deposition transcript for a reasonable fee unless the Assistant Attorney General determines that the transcript should be withheld for good cause. *See* 15 U.S.C. § 1312(i)(6). Generally, CID deponents are allowed to obtain a copy of their deposition transcripts from the Division as a matter of course. *Cf.* Chapter III, Part E.6.b.(iv) (regarding whether third-party documents used in the deposition should be provided as exhibits to the transcript).

Congress, however, recognized that under certain circumstances it may be an investigative necessity to withhold CID deposition transcripts from the deponent. Thus, at the time the statute was passed, members of Congress stated that the Assistant Attorney General may find good cause to withhold a CID transcript in investigations where there is a possibility of:

- Witness intimidation.

- Economic reprisal.

- The "programmed" formulation of a common defense by possible co-conspirators who "tailor" their testimony to match the evidence held by the government.

- Perjury.

- The circulation of the copy to co-conspirators seeking to orchestrate testimony.

*See* Antitrust Civil Process Act Amendments of 1976, H.R. Rep. No. 94-1343, at 14-15 (1976) (witness intimidation, economic reprisal, tailored testimony); *see also* 122 Cong. Rec. 30,875-76 (Sept. 16, 1976) (witness intimidation, perjury, orchestrated testimony).

The Assistant Attorney General's authority to determine good cause is not delegable. Accordingly, when staff believes that withholding a CID deposition transcript or series of transcripts is appropriate, staff should forward a short memorandum to the Office of Operations requesting a good cause determination from the Assistant Attorney General. In such an instance, staff should immediately remind the court reporter not to disseminate the transcript to anyone outside the Division. Requests to withhold transcripts should be forwarded as soon as the need to withhold is identified. The requesting memorandum should succinctly explain the circumstances prompting the request, identify the good cause exception on which the attorney's request is based, and explain the reasons for which the general policy of disclosure should be overridden in this instance. Once a deponent requests a copy of the transcript, any conscious decision to

delay release of the transcript can be construed as a decision to withhold. *See* 15 U.S.C. § 1312(i)(6); Antitrust Civil Process Act Amendments of 1976, H.R. Rep. No. 94-1343, at App. B (1976) (Letter from Thomas E. Kauper, Assistant Attorney General, Antitrust Division, to Peter W. Rodino, Chairman, the Committee on the Judiciary, U.S. House of Representatives); Testimony of Mark Green, Director, Corporate Accountability Research Group, Antitrust Civil Process Act Amendment, Hearings of the Subcommittee on Monopolies and Commercial Law of the Committee on the Judiciary, H.R. 39, 94th Cong., 1st Sess. 149, 151-52, 156 (1975).

A deponent may appeal a determination by the Assistant Attorney General not to release a CID deposition transcript. Such appeals are to be made in the United States District Court in which the CID document custodian's office is located. *See* 15 U.S.C. § 1314(d). Even when the Division withholds a copy of the transcript, however, CID deponents have an absolute right to inspect the transcript of their CID testimony. *See* 15 U.S.C. § 1312(i)(4).

## 4.   Procedures for Issuing CIDs

As soon as a section or field office has been authorized to conduct a preliminary investigation into a possible civil antitrust violation, it may request the Assistant Attorney General to issue CIDs. The request is made by forwarding a memorandum to the chief, explaining the need for the CIDs, requesting a production date (in practice, it is best to specify a number of days from the date of issuance), and attaching the requested CIDs and schedules. If the CIDs are the first to be issued in the particular investigation, careful consideration should be given to the potential significance of the matter and the resources they will consume.

Each CID should be prepared on the appropriate form. Separate forms exist for demands for documentary material, oral testimony, written interrogatories, documentary material and written interrogatories, and oral testimony and documentary material. If the CID seeks documents or written interrogatories, a schedule itemizing the requested documentary material or interrogatories must be submitted.

CIDs for corporate documents and interrogatory answers should be addressed to the corporation and not an individual in the corporation. When possible, the CID should include a notation that it is to the "attention of" or "c/o" the General Counsel or another individual known to have authority to bind the corporation.

The chief will review these materials and, if she or he concurs, approve the CID package, which includes the requesting memorandum, cover memorandum from section management (if desired), CIDs, and schedules. Once approved, the section or field office should e-mail the package to the appropriate special assistant.

The Office of Operations will then review the package and forward it with a recommendation to the Front Office. The ACPA requires that all CIDs be signed by the Attorney General or the Assistant Attorney General. *See* 15 U.S.C. § 1312(a). In practice, all CIDs are approved by the Assistant Attorney General. In the Assistant Attorney General's absence, an Acting Assistant Attorney General will be designated to approve and sign CIDs. Once a CID is signed, it is given an identifying number, logged in by the Office of Operations, and returned to the requesting section or field office for service. The Office of Operations may arrange for service of field office CIDs to avoid the delay of returning signed CIDs to the field office for service.

When CIDs are returned for service, they are given to the lead attorney, who prepares a cover letter. If the CID is addressed to a person whose counsel has already been in contact with the Division with regard to the investigation, a courtesy copy of the cover letter and CID may also be sent by express mail or fax to counsel to enable preparation of the responses without delay.

## 5.   Service of CIDs

The provisions of the ACPA relating to the manner of service, 15 U.S.C. § 1312 (d), (e), and (f), apply equally to all forms of CIDs (i.e., interrogatory, documentary, and oral deposition) and to petitions by the Division under 15 U.S.C. § 1314(a) for enforcement of a CID.

### a.   Service on Domestic Respondents

In most instances, CIDs to be served "at any place within the territorial jurisdiction of any court of the United States," 15 U.S.C. § 1312(d)(1), are served by mail (i.e., by "depositing [a duly executed] copy in the United States mails, by registered or certified mail, return receipt requested." 15 U.S.C. §§ 1312(e)(1)(C), 1312(e)(2)(B). CIDs for an individual are to be mailed to his or her residence or principal office or place of business. *See* 15 U.S.C. § 1312(e)(2)(B). CIDs for a partnership, corporation, association, or other nonnatural entity are to be mailed to its principal office or place of business. *See* 15 U.S.C. § 1312(e)(1)(C). U.S. Postal Service Express Mail, certified and return receipt requested may be used, but use of private courier or commercial overnight delivery companies does not conform with the statutory service-by-mail

requirement and should not be used exclusively. Alternatively, service can be accomplished by personal "delivery" by an "antitrust investigator" (e.g., a Division-employed attorney or paralegal, *see* 15 U.S.C. § 1311(e)) or by a United States marshal or deputy marshal. *See* 15 U.S.C. § 1312(d)(1). CIDs for a partnership, corporation, association, or other entity can be served by delivering a duly executed copy to any partner, executive officer, managing agent or general agent thereof, or to any agent thereof authorized by appointment or by law to receive service of process on its behalf, *see* 15 U.S.C. § 1312(e)(1)(A), or to its principal office or place of business. *See* 15 U.S.C. § 1312(e)(1)(B). CIDs for an individual can be served by delivering a duly executed copy thereof to the individual. *See* 15 U.S.C. § 1312(e)(2)(A). Although, per agreement with counsel, a copy of the CID may be provided by a means not specified in the statute (e.g., fax, commercial overnight delivery company), the CID should always be served via one of the statutorily authorized methods.

b.    Service on Respondents Situated Abroad

Under the CID statute, even CID respondents situated abroad may be amenable to domestic service. Thus, a foreign corporation can be served by complying with the provisions for service on its domestic subsidiary, if an adequate measure of the foreign parent's control over the domestic subsidiary can be established. Alternatively, if a partner, executive officer, or managing or general agent of the corporation travels to the United States, personal service upon him or her on United States soil is effective service on the foreign corporation. A border watch can be arranged so that the person to be personally served upon entry to the country can be intercepted at the border, interviewed, and asked where he or she can be found while in the United States.

The Office of Criminal Enforcement (OCE) should be contacted to arrange for a border watch. Staff should provide the full name of the foreign nationals for whom it is looking, and telephone numbers where the antitrust investigators to be notified can be reached any time of day or night. It is important to notify OCE to call off a border watch when it is no longer needed to avoid unnecessary interference with anyone's freedom of movement.

The Act also prescribes means of CID service on a person "not to be found within the territorial jurisdiction of any court of the United States," but such service will only be effective if "the courts of the United States can assert jurisdiction over such person consistent with due process." 15 U.S.C. § 1312(d)(2). The Act authorizes service on such persons, *see id.*, in accordance with any of the means for service prescribed by Rule 4(f), Federal Rules of Civil Procedure, for service on individuals in a foreign country. 15 U.S.C. § 1312(d)(2) provides for such service "in such manner as the Federal Rules of

Civil Procedure prescribe for service in a foreign country." Rule 45(b)(2) and Rule 4(f), Fed. R. Civ. P., both contain provisions prescribing means for service abroad, but an analysis of those provisions indicates that Rule 4(f) is the applicable provision. Of the alternatives provided in Rule 4(f), service by registered mail, return receipt requested, pursuant to a court order directing such service pursuant to Rule 4(f)(3), has occasionally been successfully invoked. Service pursuant to Rule 4(f)(3), Fed. R. Civ. P., can be obtained by submitting to the clerk of the United States District Court for the District of Columbia a [Request for Service of Civil Investigative Demand](), a duly signed copy of the CID to be served, and envelopes displaying the proper postage and return receipts. No hearing or appearance before a judge is required. Rather, the court clerk accomplishes the mailing and returns the signed Certificate of Mailing to the Division.

While, as the above discussion demonstrates, the CID statute explicitly provides for service upon foreign nationals and entities, in conducting investigations that require documents that are located outside the United States, the Department first considers requests for voluntary cooperation when practical and consistent with enforcement objectives. When compulsory measures are needed, the Department seeks whenever possible to work with the foreign government involved. It is essential that the Foreign Commerce Section be notified before service of a CID is attempted, regardless of the means employed, upon a foreign national, corporation, or other entity, or upon a domestic subsidiary thereof.

### c.   Proof of Service

Proof of service requires a verified return setting forth the manner of service by the individual making service. *See* 15 U.S.C. § 1312(f). Where service has been by registered or certified mail, the return must include the signed post office return receipt of delivery. *See id.* Staff should retain all evidence of service.

## 6.   Confidentiality and Permitted Uses of CID Materials

### a.   DOJ Use and Outside Disclosure of CID Materials

While the ACPA permits authorized Department of Justice personnel to use CID material in the performance of their official duties, *see* 15 U.S.C. § 1313(c)(2), it provides for only four circumstances under which CID material may be disclosed to third parties without the consent of the producing party. The ACPA authorizes disclosure of CID material to individuals other than the producing party or authorized Department of Justice personnel without the consent of the producing party as follows:

- To Congress. *See* 15 U.S.C. § 1313(c)(3).

- To the FTC, which is bound by the same rules as DOJ with respect to the use of CID material. *See* 15 U.S.C. § 1313(d)(2).

- To third parties "in connection with the taking of oral testimony" pursuant to the CID statute. *See* 15 U.S.C. § 1313(c)(2).

- For official use in connection with court cases, grand juries, or a federal administrative or regulatory proceeding in which the DOJ is involved. *See* 15 U.S.C. § 1313(d)(1).

Regulations further governing the use of CID material by Department of Justice personnel are set forth in 28 C.F.R. §§ 49.1-.4.

In general, documents, answers to interrogatories, and transcripts of oral testimony obtained pursuant to a CID cannot be disclosed to state, foreign, or other federal agencies (except for the FTC), nor can they be disclosed during the course of interviews with other parties, without the consent of the producing party. 15 U.S.C. § 1313(c)(3). CID materials are also explicitly exempt from disclosure under the Freedom of Information Act, but the CID and schedule issued by the Division are not exempt. *See* 15 U.S.C. § 1314(g). This FOIA exemption does not apply to non-CID materials, such as white papers, that CID respondents may voluntarily submit to the Division in the course of an investigation. For this reason, parties may ask that a CID be issued for such materials.

Despite these statutory limitations on disclosure of CID materials, the producing parties often seek to restrict further how the Division may use these materials. Parties seeking to limit the Division's use of their CID materials may either seek the consent of the Division or request that a court enter a protective order.

b.   Requests for Additional Limitations on Use or Disclosure of CID Material

   i.   **General Policies**

As noted above, documents, answers to interrogatories, and transcripts of oral testimony obtained pursuant to a CID may be used internally by authorized officials, employees, and agents of the Department of Justice in the performance of their official duties. *See* 15 U.S.C. § 1313(c)-(d). Agents include economic experts, industry specialists, and independent contractors specializing in automated document retrieval. *See* 15 U.S.C. § 1313(c)(2). Each agent should sign a confidentiality agreement with the Division before the disclosure of any CID material is made; disclosure, however, may be made if necessary before the contract containing payment terms has been fully processed.

Copies of CID material may be made for the official use of Department of Justice personnel. *See* 15 U.S.C. § 1313(c). The Division's use of CID material is not restricted to the pending investigation. *See* Chapter III, Part E.9 (discussing the Division's return of CID materials at the end of an investigation). Moreover, as a matter of policy the Division will not agree to restrict its use of CID material to the pending investigation. *See* 28 C.F.R. §§ 49.1-.4 (governing the use of CID material by the Department of Justice); *see also* Division Directive ATR 2710.l, "Procedures for Handling Division Documents."

Parties producing CID material sometimes seek written commitments from the Division limiting how or when the Division will exercise its statutory authority to disclose CID materials. The Division discourages such additional confidentiality commitments. Such additional commitment should be granted only with the approval of the chief, and all members of the investigative staff should be notified of its existence. The FOIA Unit should also be notified before any such additional commitment is granted to make sure that any additional protection conforms to Division policy. If staff seeks to use anything other than pre`approved language for such commitments, it must seek the prior approval of both the FOIA Unit and the appropriate Director of Enforcement. If the agreement involves potential disclosure of materials to Congress, the Legal Policy Section also should be consulted before any promises are made.

When asked for confidentiality commitments beyond those contained in the statute, staff should consider providing a letter consistent with confidentiality letters issued by the Division in similar circumstances in the past. Although parties are not statutorily entitled to such commitments, courts have issued protective orders in some circumstances limiting how the Division may disclose certain CID material. *See* Chapter III, Part E.6.b. Such additional commitments limit the Division's flexibility and burden staff with additional procedural requirements. In limited circumstances, however, providing additional commitments may be necessary or appropriate. Requests for such commitments should be considered on a case-by-case basis and should only be granted where there is a clearly demonstrated need. If any such commitment is made, the additional commitment should be defined as narrowly as possible, tailored to the specific request of the party, and confirmed in writing.

ii.   **Disclosure to Congress**

On several occasions, CID recipients have attempted to obtain a commitment that the Division would refuse to disclose to Congress material produced pursuant to CIDs. The Division does not have the authority to withhold information from Congress and staff shall not make such a promise. *See* 15 U.S.C. § 1313(c).

The Division may agree, however, in very limited circumstances, to give "as much notice as is practicable" to a CID recipient before disclosing CID material to Congress. The Division's preferred practice is to explain to the CID recipient that the Division does not unnecessarily release confidential information to Congress, tries to respond to congressional inquiries in a manner that does not disclose such information, and is rarely asked to give CID material to Congress. As noted above, staff should consult the FOIA Unit to ascertain whether the proposed commitment conforms to Division policy, and both the Legal Policy Section and appropriate Director of Enforcement should be consulted before making a commitment of this nature.

iii.    **Disclosure to the Federal Trade Commission**

The custodian of CID material is authorized, in response to a written request from the FTC, to deliver copies of CID material to the FTC for use in connection with an investigation or proceeding under the FTC's jurisdiction. CID material furnished to the FTC may only be used by the FTC in such manner and subject to such conditions as apply to the Department of Justice. The Division has discretionary power to either deliver or withhold CID material requested by the FTC. 15 U.S.C. § 1313(d)(2).

On occasion, CID recipients have attempted to obtain commitments that the Division will refuse to disclose specified CID material to the FTC. As a policy matter, the Division will not promise to withhold material from the FTC. On limited occasions, the Division will agree to give notice, but only "when practicable," before giving CID material to the FTC. As noted above, staff should consult with the FOIA Unit and the appropriate Director of Enforcement before making any commitment beyond what is contained in the statute.

iv.    **Disclosure in the Context of a CID Deposition**

The Division is authorized to use CID material without the consent of the producing party "in connection with the taking of oral testimony" in a CID deposition of either a third party or the producing party. *See* 15 U.S.C. § 1313(c)(2). Note, however, that the Division is not authorized under the antitrust statutes to use material submitted in response to a second request under the HSR filing in connection with the deposition of a person that did not submit the material. Although it is occasionally useful to use CID materials in a deposition of a third party where the third party has already seen the materials, or is at least generally aware of their substance, it is very rarely necessary to use CID materials in connection with a deposition of a third party that is unfamiliar with the contents of those materials. Nevertheless, some CID recipients ask the Division to agree to limit the use of CID documents in third-party depositions.

Parties expressing concern as to such use should be told that the Division has an interest in seeing that competitors do not receive access to each other's confidential information, is sensitive to confidentiality concerns, and does not unnecessarily reveal such information.

In some special circumstances, the Division has agreed to provide advance notice, "if practicable," before using the producing party's CID material in a third-party deposition. The notice may be a specific number of days or simply for a period of time that is "reasonable under the circumstances." Generally, this commitment should only be offered for a very limited number of documents that the producing party reasonably designates as "restricted confidential" or "highly confidential." The purpose for offering such notice is to give the producing party the time to object or seek a protective order. The disadvantage to offering such a commitment is that it reduces the Division's flexibility at the deposition and may require the Division to identify to third parties persons whose depositions it is taking.

If CID material not produced by the deponent is used in a deposition, staff should consider carefully whether the deponent should be permitted to retain a copy of the material. Although the deponent has a right to review the material in connection with his or her review of the transcript, the Division has discretion as to whether to allow the deponent to keep a copy of the material. Division policy is to protect the legitimate confidentiality interests of parties and thereby encourage compliance with CIDs; thus, in circumstances where the deponent is not entirely aware of the substance of the document and the third party producer could reasonably object to the document being retained by the deponent, the deponent should not be permitted to retain a copy of the document. Examples of this include notes of a meeting in which the deponent participated produced by another participant and that include observations, reflections, or commentary, or a document that staff initially believes the deponent authored or read but that the deponent denies having seen.

In such a case the preferred practice is either to (a) allow the deponent to receive a copy of the document as an exhibit while reviewing the transcript, but require the exhibit to be returned with a signed affirmation (or letter from counsel) stating that no copies have been made, or (b) allow the deponent to receive a copy of the transcript without the exhibit attached, but permitting review of the document at Division (or other Department of Justice) offices if such a review of the document is necessary to the review of the transcript. *Cf.* Chapter III, Part E.3.c.(vi) (discussing when the Division may withhold the transcript from the deponent). On the other hand, if the deponent is already aware of the substance of the document in question, it is permissible to allow the deponent to receive and retain a copy of the transcript with the third party document attached as an

exhibit; providing the third-party document as an exhibit is an appropriate courtesy and may make it more convenient for the deponent to review, correct, and inspect the transcript. Examples falling into this category include depositions where a document authored or received by the deponent was produced by his or her former employer; an agreement signed by the deponent where the copy of the agreement was produced by the other party to the agreement; correspondence involving the deponent or his or her firm; or widely circulated newsletters that the deponent likely read.

### v.    Disclosure in Judicial or Administrative Proceedings

(a)    Agreements Concerning Notice

The Division is authorized, pursuant to 15 U.S.C. § 1313(d)(1), to use CID material in connection with any court case or grand jury, federal administrative proceeding, or regulatory proceeding in which the Division is involved. The Division's policy is to try to avoid using competitively sensitive information in complaints or openly discussing competitively sensitive information, but the Division will not agree to refrain from disclosing CID material in a judicial or administrative proceeding. If competitively sensitive information is to be used in a pleading, the Division's general policy is to make reasonable efforts to allow the party that produced the material the opportunity to seek a protective order. Alternatively, the Division may voluntarily file the document or portion of the pleading under seal.

Notifying parties in writing of the Division's general practice is preferable to making a specific commitment to provide notice. This is because promises regarding how and when the Division may use CID material in judicial and administrative proceedings may impose unnecessary procedural burdens on staff and limit the use of material under circumstances that could not be foreseen at the time the promise was made.

On limited occasions, the Division has agreed to certain limitations on its use of CID material in judicial or administrative proceedings. These agreements have been in the form of promises:

- To notify the producing party in advance, "to the extent that it is reasonably practicable" that the Division plans to use CID information produced by the party in a proceeding or has filed a complaint.

- To make "reasonable efforts" to notify the producing party before turning over material pursuant to a discovery request in litigation in order to provide the party with a reasonable opportunity to seek a protective order.

- To file under seal any information from a very limited number of documents containing CID information the producing party has reasonably designated "highly confidential" or "restricted confidential."

- Not to oppose the party's appearance to seek a protective order or to use the Division's best efforts to secure a reasonable protective order.

If an agreement regarding notice is made, it should be as limited as possible and apply only to information or documentary material that the party, for legitimate reasons, designates as "highly confidential" or "restricted confidential." Giving such notice should be agreed to only with parties that promise not to seek declaratory relief.

(b)    Protective Orders During the Investigatory Stage

Producing parties that are not satisfied with the protection offered under the statute or by consent of the Division may seek a protective order issued by a court. Courts usually will issue such protective orders once a case is filed and, on occasion, even during the investigative stage. In *Aluminum Co. of America v. United States Dep't of Justice*, 444 F. Supp. 1342 (D.D.C. 1978), the court held that it was within its power to issue a protective order to limit disclosure to third parties of confidential information obtained by the Division through the production of documents in response to a CID. The *Aluminum* opinion was followed by the Second Circuit in *United States v. GAF Corp.*, 596 F.2d 10 (2d Cir. 1979); accord *Finnell v. U.S. Dep't of Justice*, 535 F. Supp. 410, 413 (D. Kan. 1982).

(c)    Discovery/Protective Orders During Proceedings

Once a case is filed, the use of CID material in that case will typically be governed by a protective order issued by the court in which the suit is pending. Whenever a civil action is commenced based on information obtained by CID, the defendants in that action may invoke their full discovery rights under the Federal Rules of Civil Procedure and obtain CID information gathered in the investigation that is relevant to their defense. The House Report on the 1976 amendments to the ACPA noted that the defendants will thus be able fully to protect their rights at trial by interrogating, cross-examining, and impeaching CID witnesses. The House Report also noted that the scope of civil discovery is not unlimited and that the court has broad discretion under the Federal Rules to set limits and conditions on discovery, typically by issuing a protective order. *See* H.R. Rep. No. 94-1343, at 2610 (1976).

During pretrial discovery, parties will typically request that some, or all, CID materials be provided either voluntary or by compulsory process. In the past, when some producers of CID materials have sought to prevent disclosure of their material in litigation, the Division has taken the position that they are discoverable. Although defendants have the right to discover any CID materials obtained by the Division during the investigation that resulted in the civil litigation to which they are a party (subject to any limitations on discovery provided by the Federal Rules of Civil Procedure and any court-imposed protective order) defendants may also attempt to discover CID materials obtained by the Division during the course of other investigations.

The Division's position with respect to a discovery request for CID materials from another investigation is that CID confidentiality continues to apply to such materials, and they are not subject to discovery, unless (1) the materials being sought have been made public during the course of prior litigation before a court or federal administrative or regulatory agency; (2) the litigant seeking discovery has the consent of the person who produced the CID materials to the disclosure; or (3) the Division has used such materials during the course of the instant pretrial investigation or intends to make use of them at trial. Use during the investigation means more than simply perusing the materials to determine whether they are relevant; they must be put to some more direct use during the pretrial stage. The Division essentially adheres to the position adopted by Judge Greene in *United States v. Am. Tel. & Tel. Co.*, 86 F.R.D. 603, 647-48 (D.D.C. 1979) (concerning the discoverability of CID materials produced in other investigations).

The Division's position on the reasonableness of protective orders is guided by balancing the public interest in conducting litigation in the open to the greatest extent possible, *see* 28 C.F.R. § 50.9, against the harm to competition from having competitively sensitive information disclosed to competitors. Staffs should also keep in mind that the disclosure of third-party confidential business information obtained through CIDs may cause third-party CID recipients to be less cooperative with the Division in the future.

Typical protective order provisions include:

- Providing both litigating and third parties with the opportunity to designate material as confidential if they have not already done so.

- Requiring parties to restrict their use of any confidential information they have obtained to the preparation and trial of the pending action.

- Restricting access to confidential material and information to the Division, the parties' outside counsel, and certain consultants, denying access by the

defendants' business personnel to competitively sensitive documents from competitors.

■   Requiring any court submission that contains confidential information or material to be placed under seal, with properly redacted copies available to the public.

■   Requiring that the producing party be given an opportunity to request in camera treatment before disclosure of any confidential material or information at trial.

Regardless of whether the Division has filed a case, CID deposition transcripts may be discoverable from the deponent by a third party, and staff should so inform a deponent who is concerned about confidentiality. *See In re NASDAQ Market-Makers Antitrust Litig.*, 929 F. Supp. 723, 727 (S.D.N.Y. 1996); *In re Air Passenger Computer Reservation Sys. Antitrust Litig.*, 116 F.R.D. 390, 393 (C.D. Cal. 1986). Although the issue is not settled, the government may be able to assert a qualified privilege over such materials. *See McCray v. Illinois*, 386 U.S. 300, 309-11 (1967) (citing *Vogel v. Gruaz*, 110 U.S. 311 (1884)) and *Three Crown Ltd. P'ship v. Salomon Bros., Inc.*, 1993-2 Trade Cas. (CCH) ¶ 70,320, at 70,665 (S.D.N.Y. 1993). A Division attorney who has sufficient concern about keeping the information in a deposition from the subject of the investigation may want to consider withholding the copy of the transcript from the witness. *See* Chapter III, Part E.3.c.(vi).

## 7.   CID Custodians and Deputy Custodians

The Act requires that the Assistant Attorney General designate an antitrust investigator to serve as custodian, and such additional antitrust investigators as the Assistant Attorney General may from time to time determine to be necessary to act as deputy custodians, of documentary material, answers to interrogatories, and transcripts or oral testimony received under the Act. *See* 15 U.S.C. § 1313(a). When a CID is issued, the general Division practice is to appoint the chief of the requesting section or field office as the custodian and the lead attorney on the matter as the deputy custodian. (Staff may also designate additional attorneys as deputy custodians.) Staff should complete the section of the CID specifying the custodian and deputy custodian by first writing the title then the name of the custodian (e.g., Chief, Litigation II Section, Maribeth Petrizzi) followed by the title then the name of the deputy custodian (e.g., Lead Trial Attorney, Anthony E. Harris).

The custodian and deputy custodians are responsible for taking physical possession of the documentary material, interrogatory answers, and transcripts of

oral testimony produced pursuant to the CID, for protecting these materials against unauthorized use or disclosure, and for their eventual return. *See* 15 U.S.C. § 1313(c). Persons appointed to these positions should arrange for their removal when transfers, reassignments, resignations, or the like no longer permit them to carry out their custodial obligations.

## 8.   Grounds for Objection and Judicial Proceedings Concerning CIDs

### a.   General Standards—Both Grand Jury and Civil Discovery Standards Apply

The ACPA provides that no CID shall require the production of any documentary material, the submission of any answers to written interrogatories, or the giving of any oral testimony that would be protected from disclosure under either (1) the standards applicable to grand jury subpoenas or (2) the standards applicable to discovery requests under the Federal Rules of Civil Procedure "to the extent that the application of [civil discovery standards] to any such demand is appropriate and consistent with the provisions and purposes" of the ACPA. 15 U.S.C. § 1312(c)(l).

The civil discovery protections were added to the existing grand jury subpoena standards in 1976. *See* Hart-Scott-Rodino Antitrust Improvements Act of 1976 (1976 amendments), 15 U.S.C. § 18a. Since that date, CID recipients have litigated the issue of which standard applies when the standard governing the extent of permissible civil discovery is in conflict with the standard that applies in grand jury investigations. The legislative history of the 1976 amendments and the cases recognize that, in general, civil antitrust investigations usually more closely resemble grand jury investigations than typical civil discovery because they are usually broader in scope and less precise in nature than typical civil discovery. Consequently, these authorities generally avoid rigid application of postcomplaint civil discovery standards to CIDs. Successful challenges to CIDs are rare and generally have been limited to burden and relevance issues.

The House Report on the 1976 amendments stressed that their purpose was to increase the effectiveness of antitrust investigations and that application of civil discovery standards must be consistent with this purpose. *See* H.R. Rep. No. 94-1343, at 2606-07 (1976). (Note that the House Report specifically provided that one category of discovery objections permitted under the Federal Rules of Civil Procedure may not be raised against a CID: objections based not on the burdensome or irrelevant nature of the CID but instead on the various procedural requirements of the civil rules, such as rights of notification, intervention, confrontation, and cross-examination.) According to the Second Circuit, this House Report "reveals a preference for [applying] the less stringent grand jury subpoena standard, 'tailored as it is to reflect the broader scope and less precise

nature of investigations [as compared to adjudications].'" *Associated Container Transp. (Australia) Ltd. v. United States*, 705 F.2d 53, 58 (2d Cir. 1983). The Second Circuit reasoned that civil discovery standards are tailored to meet the requirements of formal, adversary, adjudicatory proceedings involving detailed pleadings setting forth specific allegations and responses. *See id.* at 58 n.9. Since the issues in adjudications will be more narrowly drawn and well-defined than in an investigation, the grand jury standard is more appropriately applied to antitrust investigations. *See id.*

Senator Philip Hart's explanation of the intent behind the 1976 amendments also supports the theory that civil discovery standards have limited application to CIDs:

> We included the House language . . . because the qualification in that language limited the application of discovery standards in the FRCP to those that are appropriate and consistent with the purposes of the Act. This important qualification provides assurances that unreasonable constraints will not be applied to the Department's investigations. See H. Rep. 94-1343. We view the FRCP standard as essentially incorporating the "oppressive" and "burdensome" standards of Rule 26(c). So limited, this standard is consistent with the purposes underlying the Act and would not breed unnecessary litigation by persons seeking to thwart civil antitrust investigations.

Cong. Rec. S15,416 (daily ed. Sept. 8, 1976) (statement of Sen. Hart). Additionally, Senator Hart outlined the "important" factors that should be taken into account in deciding which civil discovery grounds are "appropriate and consistent" for application to CIDs:

■ Investigations, unlike pretrial discovery and litigation, are not adversary or adjudicatory.

■ Pretrial discovery and litigation have different purposes, a narrower scope, and more clearly defined issues than investigations.

■ Parties to pretrial discovery and litigation are clearly identified, while there are no parties in investigations; possible antitrust wrongdoers may not be firmly identified until late in the investigation.

■ Parties in pretrial discovery and litigation have certain rights with respect to notification, participation, intervention, confrontation, and cross-examination, whereas there are no such rights (even for targets) in investigations.

- Narrow, technical, or merely procedural objections which frustrate expeditious [sic] civil antitrust investigations are normally not "appropriate and consistent."

- Relevance in an investigation may be different from relevance in pretrial discovery; once litigation is begun, the interests and scope of the matter tend to be much more specific and refined than in investigations.

- Civil antitrust investigations are nonetheless investigations, and they are in most respects closer to grand jury investigations than they are to pretrial discovery or litigation.

*See also United States v. Witmer*, 835 F. Supp. 201, 207 n.8 (M.D.Pa. 1993), *vacated in part on other grounds on reconsideration by* 835 F. Supp. 208 (M.D. Pa. 1993), *aff'd by* 30 F.3d 1489 (3rd Cir. 1994) (noting that to the extent the 1976 amendments cite with approval Cleveland Trust and Hyster, "this court believes that Congress intended to approve the use of the discovery rules primarily as a source of protection for privileged information and from vexations or overbroad requests for information").

In addition to the Second Circuit's opinion in *Associated Container*, at least one other post-1976 court decision specifically refers to grand jury subpoena standards as more appropriate to antitrust investigations. *Maccaferri Gabions, Inc. v. United States*, 938 F. Supp 311, 314 (D. Md. 1995) (citing Petition of Gold Bond Stamp Co., 221 F. Supp. 391 (D. Minn. 1963), aff'd per curiam, 325 F.2d 1018 (8th Cir. 1964)), holds that CIDs cannot contain any requirement that would be considered unreasonable if contained in a grand jury subpoena *duces tecum*.

There is little other case precedent concerning the application of civil discovery standards to CIDs, but where such objections have been raised, the courts, like Senator Hart, have focused on burden and relevance. *See, e.g., Material Handling Inst., Inc. v. McLaren*, 426 F.2d 90, 92-93 (3d Cir.), *cert. denied*, 400 U.S. 826 (1970) (relevancy and discovery of records maintained in non-documentary form); *Maccaferri*, 938 F. Supp. at 314 (citing *Finnell* for the proposition that appropriately modified overbroad or unduly burdensome CIDs are enforceable); *Finnell*, 535 F. Supp. 410, 412 (D. Kan. 1982) (objections on grounds, inter alia, of burden and relevance denied, with court noting that "[t]he Government has a relatively light burden in proving the relevance of the CIDs to the ongoing investigation"); *Phoenix Bd. of Realtors, Inc. v. U.S. Dep't of Justice*, 521 F. Supp. 828, 832 (D. Ariz. 1981) (CIDs held not to be unduly burdensome where Division attorneys had repeatedly indicated a willingness to negotiate with recipient regarding burden and scope of demands); *Australia/Eastern U.S.A. Shipping Conference v. United States*, 1982-1 Trade

Cas. (CCH) ¶ 64,721, at 74,062 (D.D.C. 1981), *modified*, 537 F. Supp. 807 (D.D.C. 1982), *vacated as moot*, Nos. 82-1516, 82-1683 (D.C. Cir. Aug. 27, 1986) (objections may be made if demand is too broad and sweeping, not relevant, not limited to reasonable time period, burdensome, privileged); *First Multiple Listing Serv. v. Shenefield*, 1980-81 Trade Cas. (CCH) ¶ 63,661 (N.D. Ga. 1980) (certain original demands found to be burdensome, but compliance ordered after modification of demands); *Sterling Drug, Inc. v. Clark*, 1968 Trade Cas. (CCH) ¶ 72,629 (S.D.N.Y. 1968) (CID requiring second search of company files not unduly burdensome); *In re CBS, Inc.*, 235 F. Supp. 684, 688 (S.D.N.Y. 1968) (reasonableness of demand); *Gold Bond*, 221 F. Supp. at 394 (CID must be in writing and relevant to antitrust investigation, state nature of conduct constituting alleged violation, state provision of applicable law, and define documents sought with sufficient particularity); *Houston Indus. v. Kaufman*, Civ. No. H-95-5237, 1996 WL 580418 (S.D. Tex. March 7, 1996) (relevance determination of Department of Justice to be given wide latitude).

b.   Objections Based on Procedural Requirements of the Act

In addition to objections on grounds of the applicable standards, CID recipients have objected on grounds of failure to comply with the Act's procedures and requirements. For example, the Act requires that each CID state the nature of the conduct, activity, or proposed action under investigation and the provision of law applicable to the investigation. *See* 15 U.S.C. § 1312(b)(l). In the first of several cases in which this challenge was made, Gold Bond, the Division alleged that it was investigating "restrictive practices and acquisitions involving the dispensing, supplying, sale or furnishing of trading stamps and the purchase and sale of goods and services in connection therewith." 221 F. Supp. at 397. The court overruled recipient's motion to quash, noting that the sufficiency of the description must be in accordance with the Act's purpose to enable the Attorney General to determine whether there was a violation of the antitrust laws and, if so, properly to allege the violation in a civil complaint. From this, the court concluded:

> Necessarily, therefore, the nature of the conduct [under investigation] must be stated in general terms. To insist upon too much specificity with regard to the requirement of this section would defeat the purpose of the Act, and an overly strict interpretation of this section would only breed litigation and encourage everyone investigated to challenge the sufficiency of the notice.

*Id.*

Since the *Gold Bond* decision, at least seven cases have involved challenges to the adequacy of description of the investigation. In each instance, the *Gold Bond* decision was followed and the descriptions were found to be satisfactory. *See, e.g., Material Handling Inst.*, 426 F.2d at 92. (holding that "possible violation of section l of the Sherman Act by a 'contract or combination in unreasonable restraint of trade'" presents serious concern as to adequacy, but is rendered legally sufficient by subsequent correspondence and conversations between the government and the recipient prior to issuance of CID); *Lightning Rod Mfrs. Ass'n v. Staal*, 339 F.2d 346, 347 n.1 (7th Cir. 1964) (alleging "[c]onspiracy to restrain trade by fixing the prices of lightning protection systems and components thereof and by conspiring to refuse to deal with a purchaser of components thereof; conspiracy to monopolize by agreeing to exclude a seller of lightning protection systems from the sale thereof"); *Hyster Co. v. United States*, 338 F.2d 183, 184 n.4 (9th Cir. 1964) (alleging "concerted action with manufacturers of tractor equipment, accessories and parts to control production and distribution, and restrictions upon pricing and distribution of those products"); *Maccaferri Gabions v. United States*, 938 F. Supp. 311, 314 (D. Md. 1995) (alleging "violation of §§ 1, 2 of the Sherman Act; § 3 of the Clayton Act by conduct of activities of the following nature: Agreements and conduct restraining trade in the gabion and gabion fastening industries"); *Finnell*, 535 F. Supp. at 412 (alleging "restraints of trade in the sale of used automotive parts" as supplemented by conversations between CID recipient and Division attorney); *First Multiple Listing Serv. v. Shenefield*, 1980-81 Trade Cas. (CCH) ¶ 63,661, at 77,550 (N.D. Ga. 1980) (holding reference to "restrictive membership and other anticompetitive practices in connection with the operation of a real estate multiple listing service" sufficient in light of prior informal communication between Division and CID recipient); *In re Emprise Corp.*, 344 F. Supp. 319, 322 (W.D.N.Y. 1972) (alleging "[t]he use by Emprise Corporation or its subsidiaries or affiliates of lending power or other collateral inducements to obtain concession rights at sports arenas with the effect of foreclosing its competitors from a substantial volume of interstate commerce").

c.    Objections Based on the Government's Motives

As with other types of discovery, CIDs may be quashed if they are not issued in good faith. While a presumption of regularity applies to the issuance of CIDs (*see Finnell*, 535 F. Supp. at 411; *accord Hyster Co.*, 338 F.2d at 187; *see also Lightning Rod Mfrs. Ass'n*, 339 F.2d at 347), it has been held that a CID may be quashed if it is issued for the purpose of intimidating or harassing the recipient. In *Chattanooga Pharm. Ass'n v. United States Dep't of Justice*, 358 F.2d 864 (6th Cir. 1966), the government declined to answer the recipient's allegations that the purpose of the CID was to intimidate and harass the recipient into terminating a pending suit for enforcement of a state fair trade act. Since the

government did not respond, the court held that the allegations were admitted and set aside the CID. Subsequently, in *Am. Pharm. Ass'n v. United States Dep't of Justice*, 344 F. Supp. 9 (E.D. Mich. 1971), *aff'd* 467 F.2d 1290 (6th Cir. 1972), recipients similarly charged that CIDs were issued for the purpose of harassing the recipients. The motions to quash the CIDs were denied, however, when the Assistant Attorney General filed an unrefuted affidavit stating why the CIDs were issued and denying any intent or purpose to harass or bring duress on recipients.

Recipients have challenged CIDs and asked for discovery on the grounds that they were allegedly issued in response to outside political interference and pressure or to pay off a political debt and were not in a bona fide attempt to determine whether a violation occurred. In *In re Cleveland Trust Co.*, 1972 Trade Cas. (CCH) ¶ 73,991, at 92,122 (N.D. Ohio 1969), the court applied grand jury standards applicable to issuance of a subpoena *duces tecum* to hold that the recipient was entitled to certain discovery to establish that the investigation was not a bona fide attempt to ascertain an antitrust violation. *But see United States v. Cotton Valley Operators Comm.*, 75 F. Supp. 1, 6 (W.D. La. 1948) (holding evidence antitrust suit was induced by political considerations and to pay a political debt is irrelevant because the court must award judgment, even though the case may have been politically motivated, if evidence supported the government's allegations); *Finnell*, 535 F. Supp. at 413 ("We would note that the genesis of the investigation does not appear important to the validity of the CIDs as long as the investigation and the CIDs are pursued in good faith"). In *Finnell*, the court denied discovery on the basis of a Division section chief's affidavit rebutting a charge that the allegation that recipients were being harassed for opposing certain legislation. 535 F. Supp. at 413. In *Maccaferri*, the court denied discovery on the basis of a Division statement denying improper purpose in issuing a CID and its own examination of each of petitioner's grounds to see if any rational basis existed to believe that discovery would lead to evidence establishing improper purpose. 938 F. Supp. at 315-319.

Similar issues were raised, but different results reached, in the *Emprise* case, where the court denied discovery to CID recipients who had charged improper motives on the part of the government, but the Acting Assistant Attorney General denied the charges by affidavit. *Emprise*, 344 F. Supp. at 321-22. Petitioner sought, as an alternative to quashing the CID, to address interrogatories to the Division to determine if an improper purpose existed. The court concluded that the Assistant Attorney General's affidavit answered the question of improper motives and that the interrogatories were, therefore, neither necessary nor appropriate. In so holding, the court distinguished *Cleveland Trust* which permitted limited interrogatories to the Division seeking the identity of the persons who worked on the preparation of the CID and who participated in the

decision to issue the demand. *See* Chapter III, Part E.8.h (providing a general discussion of discovery in proceedings to enforce or quash a CID).

### d.    Objections Based on Jurisdictional Grounds

A valid ground for objecting to a CID is that the Division has no jurisdiction to conduct an investigation. *See Phoenix Bd. of Realtors v. U.S. Dep't of Justice*, 521 F. Supp. 828, at 830 (holding that "an activity which is exempt from antitrust laws, cannot form the basis of an antitrust investigation"); *accord Associated Container Transp. (Australia) Ltd. v. United States*, 705 F.2d 53, 58 (2d Cir. 1983). Investigations may, however, be conducted on any matter within the scope of the Division's authority. *Australia/Eastern U.S.A. Shipping Conference v. United States*, 1982-1 Trade Cas. (CCH) ¶ 64,721, at 74,064 (D.D.C. 1981), *modified*, 537 F. Supp. 807 (D.D.C. 1982), *vacated as moot*, Nos. 82-1516, 82-1683 (D.C. Cir. Aug. 27, 1986). Probable cause to believe that any particular violation has occurred is not necessary. *See id.* Moreover, the legislative history to the 1976 amendments stresses that the scope of many antitrust exemptions is not precisely clear, and in many cases the applicability of an asserted exemption may be a central issue in the case. The House Report to the 1976 amendments concluded that the mere assertion of an exemption should not be allowed to halt the investigation. *See* H.R. Rep. No. 94-1343, at 2606 (1976).

The few cases that address challenges to CIDs on grounds that the conduct is exempt from, or outside the scope of, the antitrust laws, allow such challenges only when the exemption is clear and where no factual development is required to determine the issue. *Amateur Softball Ass'n of America v. United States*, 467 F.2d 312 (10th Cir. 1972) (holding that CID recipient's mere assertions that baseball exemption covers softball and amateur athletics and that it is not engaged in commerce does not prevent investigation and inquiry into antitrust issues raised); *Australia/Eastern U.S.A.*, 1982-1 Trade Cas. (CCH) at 74,062 (holding that where the question of antitrust coverage is not absolutely determined by authority, and facts surrounding coverage are unresolved, investigation is authorized). In other words, the Division may issue a CID to determine whether there is a factual basis for a claim of exemption.

In *United States v. Time Warner, Inc.*, Misc. No. 94-338 (HHG) (D.D.C. Jan. 22, 1997), the court ordered CIDs enforced despite the recipients' claim that their conduct was exempt from the antitrust laws under the Foreign Trade Antitrust Improvements Act. The court, relying in part on *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 209 (1946), suggested that the Division need not affirmatively establish the basis for its subject matter jurisdiction in order to conduct an investigation, but rather could use CIDs to determine whether the purported antitrust exemption was applicable. In *Associated Container*, 705 F.2d

at 58-60, CIDs were enforced over a claim that the activities under investigation were exempt under the Shipping Act, the Noerr-Pennington doctrine, and Act of State doctrine. The court reasoned that the Division's utilization of its investigative authority was necessary to determine whether the companies qualified for the exemptions. In *Houston Industries v. Kaufman*, Civ. No. H-95-5237, 1996 WL 580418 (S.D. Tex. March 7, 1996), the court came to a similar conclusion with regard to the Noerr-Pennington and state action doctrines. In *Phoenix Board of Realtors*, 521 F. Supp. at 830, the court refused to quash CIDs in a case where the CID recipient argued that its conduct was exempt (a) because it had been "sanctioned" by the Department of Justice in consent decrees in other cases, and (b) because the Department was collaterally estopped from challenging it. However, in *Australia/Eastern U.S.A. Shipping Conference v. United States*, 537 F. Supp. 807, 812 (D.D.C. 1982), *vacated as moot*, Nos. 82-1516, 82-1683 (D.C. Cir. Aug. 27, 1986), the district court quashed parts of CIDs that sought material relating to Noerr-Pennington-protected conduct on the grounds that, in light of First Amendment values, the government failed to articulate a showing of need other than "official curiosity." The court held, however, that if the government could show that the material sought was strongly needed to confirm or prove specific suspected violations of the antitrust laws, the balance between First Amendment values and the need for discovery would tip in the government's favor. *See id.* Cross-appeals were filed and the case was argued before the D.C. Circuit Court of Appeals. The case remained undecided for several years and the Division eventually withdrew the CIDs in question. The D.C. Circuit dismissed the appeal as moot and vacated the district court decision. *See Australia/Eastern U.S.A. Shipping Conference v. United States* Nos. 82-1516, 82-1683 (D.C. Cir. Aug. 27, 1986) (unpublished order).

e.    Objections Based on Preexisting Protective Orders

A CID for the products of discovery supersedes any inconsistent court order, rule, or provision of law preventing or restraining disclosure of such discovery product. *See* 15 U.S.C. § 1312(c)(2). (This section also provides that the disclosure to the Division of a product of discovery, pursuant to an express demand for products of discovery, does not constitute a waiver of any right or privilege, such as the work product privilege.) However, the Division must serve a copy of the CID upon the person from whom the discovery originally was obtained, *see* 15 U.S.C. § 1312(a), and such a demand shall not be returned or returnable by the recipient until 20 days after a copy of the demand has been served upon the originator, *see* 15 U.S.C. § 1312(b), to enable the person from whom the products of discovery were obtained to seek additional protection.

The confidentiality protection for products of discovery extends to the person from whom discovery was obtained, *see* 15 U.S.C. § 1313(c)(3), and that person

has standing to seek a court order requiring the custodian of the CID material to perform the duties imposed by the Act. *See* 15 U.S.C. § 1314(d). Finally, the person from whom the discovery was obtained may file a petition to set aside or modify the demand in the district court where the proceeding in which the discovery was obtained is or was last pending. *See* 15 U.S.C. § 1314(c).

f.    Miscellaneous Objections

Courts have held that CIDs should not be quashed nor recipients relieved of their duty to respond based on recipient's objections that the information and documents sought were in the possession of another federal agency. *See Phoenix Bd. of Realtors v. U.S. Dep't of Justice*, 521 F. Supp. 828 (D. Ariz.1981) (court would not quash subpoenas even though information and documents were in the hands of the FTC and could be obtained by the Division); *accord In re CBS, Inc.*, 235 F. Supp. 684 (S.D.N.Y. 1964); *see also Australia/Eastern U.S.A. Shipping Conference v. United States*, 1982-1 Trade Cas. (CCH) ¶ 64,721 (D.D.C. 1981) (requests for information already provided to another federal agency were not found to be unreasonable), *modified*, 537 F. Supp. 807 (D.D.C. 1982), *vacated as moot*, Nos. 82-1516, 82-1683 (D.C. Cir. Aug. 27, 1986). At least one court also has refused to set aside CIDs based on the recipient's objection that another federal agency had primary jurisdiction over the activity and was conducting an investigation that duplicated the Division's investigation. *See Australia/Eastern U.S.A.*, 1982-1 Trade Cas. (CCH) ¶ 64,721, at 74,066.

g.    Judicial Proceedings to Enforce or Quash CIDs

A recipient who objects to a CID has two options: to refuse to respond to the CID or to file a petition to quash or modify the CID. If the recipient follows the first option, the Division must petition for enforcement of the CID if the Division wishes to pursue the matter. If the recipient chooses to follow the second option, the recipient must file a petition for an order modifying or setting aside the CID within 20 days after the CID is served or at any time before the specified return date, whichever period is shorter. *See* 15 U.S.C. § 1314(b)(1). The time allowed for compliance does not run during the pendency of a petition, but the petitioner must comply with portions of the CID not sought to be modified or set aside. *See* 15 U.S.C. § 1314(b)(2). A recipient who objects to only part of a CID must comply with the unobjectionable parts. *See* H.R. Rep. No. 94-1343, at 2608 (1976).

Where a CID expressly seeks a product of discovery and where the person from whom the discovery was obtained objects to the CID, the procedures are somewhat different. These procedures are explained above. *See* Chapter III, Part E.8.e.

Petition by the Division for enforcement should be drafted in accordance with the advice of the relevant United States Attorney's Office as to local forms and practice. Unless local practice is to the contrary, the Petition should be captioned United States of America, Petitioner v. (Name of CID Recipient), Respondent. The petition should be supported by a memorandum setting forth the factual and legal basis for enforcement of the CID. The recipient must be served with a copy of the petition. Service of such petitions may be accomplished by any of the means provided for service of CIDs. *See* 15 U.S.C. §§ 1312(d), 1312(e). The proper venue for a petition by the Division to enforce, as well as by the respondent to modify or quash, is any judicial district within which the recipient resides, is found, or transacts business. *See* 15 U.S.C. § 1314(b). A petition to enforce a CID is a miscellaneous proceeding that enjoys no special immunity from the delays inherent in federal court litigation. *See, e.g., United States v. Time Warner, Inc.,* Misc. No. 94-338 (HHG) (D.D.C. filed Nov. 3, 1994) (involving delay of two years before a decision was reached). Division attorneys facing a court proceeding to enforce a CID should seek the advice of the local U.S. Attorney's Office as to the most expeditious procedure to use in that District. For example, in one matter a motion for an order to show cause was filed; in another matter, the petition was accompanied by a motion requesting expedited consideration.

h.    Discovery by CID Recipient Against the Division

A CID recipient involved in a proceeding to enforce, modify, or quash a CID may, in certain circumstances, be permitted limited discovery under the Federal Rules of Civil Procedure. However, such discovery is not a matter of right. *See United States v. Seitz*, No. MS2-93-063, 1993 WL 501817, at *2 (S.D. Ohio Aug. 26, 1993), *aff'd*, 53 F.3d 332 (6th Cir. 1995). However, the cases generally have held that discovery against the government in CID court proceedings must be used sparingly to avoid destroying the usefulness of the CID process by delaying compliance. Recipients must make a substantial and supported showing that enforcement of the CID would work an abuse of the court's process. *See United States v. Witmer*, 835 F. Supp. 201 (M.D. Pa. 1993). Both *Seitz* and *Witmer* concerned CIDs issued under the False Claims Act, but the courts interpreted the legislative history of the 1976 amendments to the CID statute to reach their conclusions. The False Claims Act discovery provision closely parallels the antitrust CID provision and the False Claims Act was modeled after the ACPA. *See Witmer*, 835 F. Supp. at 205 (stating that Congress "intended the legislative history and case law interpreting the Antitrust CID provision to 'fully apply' to the False Claims Act CID provision") (citing S. Rep. No. 99-345, at 33 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5298). The *Witmer* court also relied on *Australia/Eastern U.S.A Shipping Conference* and *Finnell v. U.S. Dep't of Justice*, 535 F. Supp. 410, 415 (D. Kan. 1982), for its holding that a recipient

must make a "substantial and supported showing" that the CID would work an abuse of the court's process in order to be permitted limited discovery. *Witmer*, 835 F. Supp. at 207.

Courts ordered discovery against the Division in *In re Cleveland Trust Co.*, 1972 Trade Cas. (CCH) ¶ 73,991 (N.D. Ohio 1969), and in *Associated Container Transportation (Australia) Ltd. v. United States*, 502 F. Supp. 505 (S.D.N.Y. 1980). The court in *Cleveland Trust* held that the right to discovery afforded by the Federal Rules of Civil Procedure was available to a CID recipient under the Act where improper motives in issuing the CID were alleged. The court permitted limited interrogatories to the Division seeking the identity of the persons who worked on the preparation of the CID and who participated in the decision to issue the demand. The Assistant Attorney General had filed an affidavit, but it did not address the improper motives issue.

In *Associated Container*, the court concluded that reasonable discovery was available in CID proceedings but that a court, in passing on the discovery, should bear in mind that the purpose of the CID procedure—to allow the Division to investigate antitrust violations without prematurely becoming involved in full-blown litigation—would be defeated if extended discovery were permitted to delay unduly CID enforcement proceedings. *See id.* at 510. The court permitted the CID recipient to serve limited interrogatories on the Division to substantiate its claim that the conduct under investigation was exempt from the antitrust laws and the Division therefore had no jurisdiction to issue the CID.

Several courts have disagreed with this aspect of the *Associated Container* decision. *See Witmer*, 835 F. Supp. at 207 (noting that the language in *Cleveland Trust* and *Associated Container* was broader than the actual relief afforded). According to the *Witmer* court, the actual discovery allowed is consistent with the view that wholesale discovery in CID enforcement proceedings would, in fact, be inconsistent with the purposes and effectiveness of the CID statutory scheme. *See id.* In *Finnell*, the court quashed a deposition notice to a Division attorney after concluding that discovery was not warranted in the matter; the court cited the concern that extended discovery would destroy the usefulness of CIDs. *See* 535 F. Supp. at 410. In *Australia/Eastern U.S.A Shipping Conference v. United States*, the court noted that the law in the District of Columbia Circuit strictly limits discovery in such proceedings, but recognized that discovery may be available in some investigative subpoena enforcement proceedings. The court, however, quashed the interrogatories to the Division on the basis that they were overly broad. *Australia/Eastern*, 1981-1 Trade Cas. (CCH) ¶ 63,943 (D.D.C. 1981).

In *Maccaferri Gabions, Inc. v. United States*, 938 F. Supp. 311 (D. Md. 1995), the court disagreed with the *Associated Container* holding that discovery was "available as a matter of right" and noted that the holding had not obtained widespread acceptance. *See id.*, 938 F. Supp. at 316 (quoting *Associated Container*, 502 F. Supp. at 509). As noted above, *see* Chapter III, Part E.8.c., the *Maccaferri* court determined that the Antitrust Division's affidavits were not necessarily "conclusive" and examined each of the grounds upon which Maccaferri based its contention that an improper purpose existed. *See id.* at 316-17. After that examination the court found that discovery was not warranted because (1) the affidavit of the Assistant Attorney General put to rest the allegation that she was personally and unusually involved in the investigation; (2) even if the Division had already concluded, prior to issuing the CID, that Maccaferri was "guilty," such a conclusion did not indicate an improper purpose; and (3) the Assistant Attorney General's affidavit conclusively refuted the allegation that political influence was a motivating factor in issuing the CID. *See id.* at 318. The court noted that not one scintilla of evidence raised a reasonable suspicion that political influence caused the authorization of the CID. *See id.*; *see also In re Emprise Corp.*, 344 F. Supp. 319 (W.D.N.Y. 1972) (disallowing service of interrogatories to show improper motive on basis that the interrogatories served no purpose in light of a Division affidavit denying improper motives).

i.   Appellate Review and Remedy Provisions

Any final order entered by a district court upon a petition for enforcement or quashing of a CID is appealable under 28 U.S.C. § 1291. Contempt of court sanctions are authorized for disobedience to a court enforcing a CID. *See* 15 U.S.C.§ 1314(e); *see also Maccaferri Gabions v. United States*, Civ. No. MJG-95-1270 (D. Md. Apr. 16, 1996) (holding firm in civil contempt for failure to comply with order enforcing CID, and imposing fine of $10,000 per day of continued noncompliance).

## 9.   Return of CID Materials at End of Investigation

At the close of an investigation or of any case or proceeding arising out of an investigation, the custodian is required, upon written request of a person who produced documentary material under the CID, to return to that person any original documentary material that has not passed into the control of any court, grand jury, or agency. *See* 15 U.S.C. § 1313(c)(3). The custodian should ensure that the original documents are returned intact and that any stickers and extraneous matter are removed from the materials to be returned. The Division is required to return only original documents.

Where the Division has made copies or is furnished with copies of documentary material pursuant to 15 U.S.C. §§ 1313(b) and (c)(2), the copies do not have to be returned to the person who produced the documents. *See* 15 U.S.C. § 131(c)(3); Division Directive ATR 2710.1, "Procedures for Handling Division Documents." For parties producing copies of documents, staff should suggest that the producing party agree to have its CID materials destroyed rather than returned. Otherwise, the party requesting the return of nonoriginal material must pay for the return of the material. The Division may retain copies of CID materials for use in other matters.

Although the Division takes the position that materials obtained pursuant to CID are exempt from disclosure under the Freedom of Information Act, if the documents to be returned or destroyed are subject to an open FOIA request, return or destruction must be delayed until the FOIA request is resolved.

When the custodian delivers CID material to a Division attorney for use in connection with a court, grand jury, or federal administrative proceeding, the attorney assumes responsibility, upon the completion of the proceeding, for returning to the custodian any material that has not passed into the control of the court, grand jury, or agency. *See* 15 U.S.C. § 1313(d)(l).

## 10.  Criminal Penalties

It a criminal offense intentionally to withhold, misrepresent, conceal, destroy, alter, or falsify any documentary material, answers to written interrogatories, or oral testimony that is the subject of a CID. *See* 18 U.S.C. § 1505. Where there is reason to believe that a CID recipient has intentionally withheld documents or information or has in any other way attempted to evade, avoid, or obstruct compliance with a CID, initiation of a grand jury investigation should be considered.

Authority to conduct an obstruction of justice investigation, including authority to investigate by grand jury, is obtained by following the standard procedures for requesting preliminary investigation and grand jury authority. Under 28 C.F.R. § 0.179a, matters involving obstruction of justice are under the supervisory jurisdiction of the Division having responsibility for the case or matter in which the alleged obstruction occurred. However, the regulations provide that, in order to determine the appropriate supervisory jurisdiction, the Division should consult with the Criminal Division prior to the initiation of an obstruction of justice grand jury investigation or enforcement proceeding.

## F.   Conducting a Grand Jury Investigation

Many of the procedures set forth below vary by judicial district. When unfamiliar with local practice, staff should consult with the appropriate field office or U.S. Attorney's Office. Before a staff initiates a grand jury investigation or consults with a U.S. Attorney's Office about the initiation of a grand jury investigation in a judicial district in the territory of another field office, staff should notify the chief of that office.

### 1.   Requesting a Grand Jury Investigation

Consistent with the standards developed in Part C.5. of this chapter on whether to proceed by criminal or civil investigation, staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution. To request a grand jury investigation, staff should prepare a memorandum on behalf of the section or field office chief to the Director of Criminal Enforcement detailing the information forming the basis of the request. That information may be based on the results of a preliminary investigation or a CID investigation, but often information received from a complainant provides a sufficient basis for the request without conducting a preliminary investigation. The request for grand jury authority should, to the extent possible:

- Identify the companies, individuals, industry, and commodity or service involved.

- Estimate the amount of commerce involved on an annual basis.

- Identify the geographic area affected and the judicial district in which the investigation will be conducted.

- Describe the suspected criminal violations, including nonantitrust violations, and summarize the supporting evidence.

- Evaluate the significance of the possible violation from an antitrust enforcement standpoint (*see* Chapter III, Part B.1.).

- Explain any unusual issues or potential difficulties staff has identified.

- Identify the attorneys who will be assigned to the investigation.

- Explain the background of the investigation, including the source of the information.

- Explain the initial steps in staff's proposed investigative plan.

- State whether there have been any past criminal investigations by the Division of the product or service that is the subject of the grand jury request.

Staff should forward the grand jury request memorandum to the section or field office chief for review. If approved by the chief, the grand jury request memorandum should be e-mailed to the ATR-CRIM-ENF and ATR-Premerger-GJ Request mailboxes with a cc:/ to the appropriate senior counsel and special assistant. Send the appropriate MTS form (the "New Matter Form" (ATR 141) if a preliminary investigation was not authorized or a preliminary investigation was authorized and will remain open, or the "New Phase Form" (ATR 142) if a preliminary investigation was conducted, the investigation is being upgraded to a grand jury investigation, and the preliminary investigation will be closed) to the Premerger Notification Unit/FTC Liaison Office by e-mailing the form to the ATR-Premerger MTS Forms mailbox. *See* Division Directive ATR 2810.1, "Matter Tracking System." The assigned special assistant will prepare a memorandum for the Director of Criminal Enforcement, who will make his or her recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation.

Staff should determine whether the district where the grand jury will sit requires the filing of letters of authority. If so, they should be filed under seal. If not, they should be maintained in the section or field office files. If attorneys are added to the original staff, the chief should notify the office of the Director of Criminal Enforcement and request additional letters of authority.

The investigation must be conducted by a grand jury in a judicial district in which the violation occurred or in which subjects of the investigation are located or do business. In determining the district in which to conduct the grand jury investigation, staff should consider (1) the degree of nexus between the location and the conduct under investigation; (2) the convenience for staff and potential witnesses, including the production and review of documents; (3) the availability of grand jury time (including the availability of antitrust-only versus "shared" grand juries, the frequency of meetings, and the duration of the grand juries' terms); (4) potential difficulties in conducting grand juries in particular jurisdictions; and (5) the judicial districts in which any resulting prosecution likely would be brought.

When seeking grand jury authority, staff should begin planning the grand jury investigation in much the same manner as planning the preliminary investigation. *See* Chapter III, Part C. Staff should establish an investigative plan which should

be modified frequently as the investigation progresses. Staff should identify in its plan:

- Subjects of the investigation.

- Factual issues relevant to determining guilt, the validity of potential defenses, or the economic impact of the violation (for both trial and sentencing purposes).

- Potential fact witnesses, whether they should be subpoenaed or interviewed and whether they are candidates for immunity.

- Types of documentary evidence that may be relevant to factual issues.

- Potential sources of documentary evidence and whether to obtain such evidence voluntarily, by subpoena, or by search warrant.

- Opportunities for covert investigation, such as consensual monitoring or the use of search warrants.

When appropriate, staff should give strong consideration to seeking the assistance of appropriate government agents and utilizing them as members of staff.

## 2.  Empaneling and Scheduling the Grand Jury

Among the first decisions staff must make after authority is granted is whether to request empanelment of a new grand jury or to use an existing one. Staff should attempt to estimate the number of sessions and the amount of time necessary to complete the investigation. When the investigation will likely take a considerable number of sessions and a substantial amount of grand jury time, it is best to begin a new 18-month grand jury that will be empaneled specifically for antitrust investigations. (Rule 6(g) of the Federal Rules of Criminal Procedure permits the court to extend the term of the grand jury up to an additional six months.) In that way, the Division can maintain better control over the scheduling of grand jury time and operate more efficiently. In some districts, the court is unlikely to empanel a new grand jury for the exclusive use of the Antitrust Division, and staff will share a grand jury with the U.S. Attorney's Office. In such districts, staff usually should attempt to use the most recently empaneled grand jury (i.e., the grand jury with the greatest time left in its term). Staff generally should not seek to empanel a new grand jury when the Antitrust Division will be unable to utilize a significant portion of its available time. Underutilized grand juries may strain relations with the U.S. Attorney and court personnel.

Grand jury procedures can vary significantly in different jurisdictions. Staff should follow the procedures that have been established in the district in which the grand jury will sit. Each field office has a liaison with the U.S. Attorney's Offices in its district. When an investigation will be conducted in an unfamiliar district, staff should consult the designated U.S. Attorney liaison to discuss local practice and, if sharing a grand jury, to discuss potential scheduling conflicts. Staff should develop a good working relationship with the local U.S. Attorney's Office whenever an investigation will be conducted outside of a district in which a field office is located. Staff should inform the U.S. Attorney's Office, typically through its liaison, that the Division will be conducting the investigation. The U.S. Attorney liaison can assist in empaneling or scheduling the grand jury, familiarize staff with local procedures, and provide other advice and assistance. In some jurisdictions, staff will schedule the grand jury through the clerk of the court. In those jurisdictions, staff should develop a working relationship with the clerk's office.

### 3.    Rule 6(e)(3)(B) Notices

Rule 6(e)(3)(B) of the Federal Rules of Criminal Procedure requires the attorneys for the government to provide the court with the names of people other than government attorneys to whom grand jury materials have been disclosed (e.g., economists, agents) and to certify that the attorneys have advised such persons of their obligation of secrecy. Secretaries, paralegals, and clerical staffs need not be listed as they may be considered the alter egos of the attorneys, economists, agents, and others whom they assist. *See* Antitrust Division Grand Jury Practice Manual Chapter II.D. Staff should consult with the local U.S. Attorney's Office and follow local practice in preparing this information for the court.

### 4.    Issuing Grand Jury Subpoenas

During the course of its proceedings, the grand jury will issue subpoenas *duces tecum* and subpoenas ad testificandum. Subpoenas *duces tecum* require the submission of documentary materials to the grand jury. Subpoenas ad testificandum require individuals to appear before the grand jury to testify. The grand jury may also subpoena individuals to provide various types of exemplars, such as handwriting samples. Subpoena recipients typically receive significant lead time to comply with subpoenas, but in exceptional circumstances when there is a risk of flight or destruction or fabrication of evidence, subpoenas may require speedy compliance, usually within one day. Such "forthwith" subpoenas should be used rarely and will likely be subject to close judicial scrutiny. *See* United States Attorneys' Manual § 9-11.140. Subpoenas are discussed at length in the Antitrust Division Grand Jury Practice Manual.

a.    Subpoenas *Duces Tecum*

Subpoenas *duces tecum* often are issued to collective entities, such as corporations and partnerships, for which the Fifth Amendment privilege against self-incrimination is not available. Thus, a custodian of documents for a collective entity cannot refuse to comply with a subpoena for records of that entity because the act of production might incriminate him or her. However, the government cannot introduce into evidence the fact that a particular person complied with the subpoena for records of the collective entity. *Braswell v. United States*, 487 U.S. 99, 118 (1988).

Subpoenas *duces tecum* for documents may also be issued to individuals or sole proprietors, who are treated as individuals. Although the contents of voluntarily created, preexisting documents are not protected by the Fifth Amendment privilege, *In re Grand Jury Subpoena Duces Tecum dated Oct. 29, 1992*, 1 F.3d 87, 93 (2d Cir. 1993), an individual's act of producing such documents may be self-incriminating by implicitly conceding the existence of the documents, the individual's possession of the documents, or the authenticity of the documents. Before issuing a subpoena *duces tecum* to an individual, staff should consider whether the individual's act of producing the subpoenaed documents may have such testimonial significance, and whether alternative methods of proof are available. Staff may consider requesting authority to compel individuals to produce documents through an immunity order limited to the act of production. In such cases, staff should examine the individual to the extent necessary to establish compliance with the subpoena, but care should be taken to limit inquiries solely to matters relevant to the act of production. *See* United States Attorneys' Manual § 9-23.250. The power of the grand jury to issue subpoenas *duces tecum* is described in the Antitrust Division Grand Jury Practice Manual, Chapter III.A.

Efforts to obtain evidence located outside the United States present special considerations. Staff should consult with the Foreign Commerce Section to discuss possible methods of obtaining such evidence, including alternatives to subpoenas. Special requirements regarding notification of foreign governments are discussed below. *See* Chapter III, Part F.11.d. It is prudent to notify the Foreign Commerce Section any time an investigation involves a foreign witness, subject or target, foreign commerce, activity occurring outside the United States, or evidence located outside the United States. The policies and procedures for notifying foreign governments are constantly evolving. Close contact with the Foreign Commerce Section will help avoid any oversights.

The schedule of documents to be attached to a subpoena *duces tecum* should include those documents necessary to a full investigation of the conduct in

question. Such schedules should be based on the techniques described in Chapter III.D. of the Antitrust Division Grand Jury Practice Manual. Before being served, the subpoena schedule must be reviewed to ensure its completeness and to guard against burdensomeness or other grounds for possible motions to quash.

As described below, *see* Chapter III, Part F.9, the Division has a Corporate Leniency Policy regarding the possible grant of amnesty to corporate violators. Attaching to corporate subpoenas a notice informing the recipient of the Division's program may lead to increased awareness of the program. It is not mandatory to attach a Corporate Leniency Policy to subpoenas served on subjects. If, however, staff wishes to do so, for consistent treatment the policy statement should be attached to subpoenas served on each corporate subject in the investigation.

Staff should determine how the subpoena will be served, often by an FBI agent or other government agent. Staff and counsel may also agree to voluntary acceptance of service by counsel on behalf of the recipient. Usually, staff will arrange for service of subpoenas, but in some jurisdictions the U.S. Attorney's Office may control the process.

The subpoena return date should provide a sufficient period of time for service of the subpoena and a document search and production. The subpoena return date must be a day when the grand jury will be sitting within the district. Staff, on behalf of the grand jury, may permit the recipient to return documents directly to the section or field office rather than producing them before the assembled grand jury. Before permitting this option, staff should consider the benefit of requiring the document custodian to testify before the grand jury. Such testimony can provide important information regarding the scope of the search and production and may result in the identification of documents withheld on a questionable assertion of privilege.

Once the subpoena is issued, counsel for the recipient may claim the subpoena is overly burdensome, especially in connection with data stored on the company's computer systems. As such, counsel may request a deferral of certain categories of documents, sometimes threatening a motion to quash. Because schedules typically are drafted without knowledge of what documents exist and the form in which they are kept, staff should consider, when appropriate, requests for such deferrals. Staff may agree, for example, to accept representative samples or defer production of specific types of documents. If a reasonable accommodation cannot be reached, it is the policy and practice of the Antitrust Division to defend its subpoenas vigorously against motions to quash. Various bases for quashing grand jury subpoenas duces tecum are described in Chapter III.F of the Antitrust Division Grand Jury Practice Manual.

Prior to engaging in negotiations, staff should ensure that counsel has reviewed the schedule thoroughly with the recipient and understands the recipient's ability to comply with each demand. In most cases, negotiations will result in a satisfactory resolution. Every deferral must be reduced to writing, preferably in a letter from staff to counsel making the request. Failure to do so may seriously compromise staff's ability to preserve the integrity of the subpoena and will make more difficult any subsequent attempt to pursue an obstruction case for withheld or destroyed documents. If litigation is necessary, staff should move to file all papers under seal and conduct the proceedings in chambers to prevent any breach of grand jury secrecy.

It is common to subpoena records from telephone companies and financial institutions. Telephone companies need not notify a subscriber whose records are subpoenaed. To prevent premature disclosure that an investigation exists, staff should include with the subpoena a certification that the subpoena has been issued in connection with a criminal investigation, requesting that the existence of the subpoena not be disclosed to the customer. Under certain circumstances, staff may obtain a court order preventing disclosure. Subpoenas to financial institutions seeking individual account information are governed by the [Right to Financial Privacy Act, 12 U.S.C. §§ 3401-22](). The Act requires that all such subpoenaed records be returned and actually presented to the grand jury and provides for reimbursement to the institution for the costs incurred in responding to the subpoena. Banks typically will comply with a letter requesting nondisclosure of the subpoena for a set period of time, which may be extended by a subsequent letter. Staff may obtain a court order prohibiting disclosure of the subpoena under certain circumstances.

The Division's standard document subpoena requires companies to produce all electronically stored data in its possession that is responsive to the subpoena. The term "document" is defined in the schedule to the subpoena to include all information stored on a company's computer systems. The subpoena also contains a lengthy instruction describing what steps the company must take to preserve all potentially responsive electronic data in its possession. That instruction describes what types of data must be preserved (e.g., e-mails) and how that data should be preserved in various locations on the company's computer systems (e.g., servers). Finally, the subpoena requires that all electronic data must be produced in an electronic format and that the company must contact staff to determine whether the company's proposed electronic format is compatible with the Division's equipment and resources. Production of electronic data in a paper format should never be accepted.

b.    Subpoenas Ad Testificandum

Testimony before the grand jury should be scheduled to utilize the grand jury
efficiently. When issuing subpoenas ad testificandum, staff should attempt to
schedule sufficient witnesses for a full session and should provide adequate lead
time to minimize last minute cancellations. Subpoenas usually will be served by a
U.S. Marshal or an agent or may be accepted voluntarily by counsel on behalf of
the recipient. Service by agent may provide an opportunity to interview the
witness prior to the witness's grand jury appearance and often is quicker than
service by U.S. Marshal.

The subpoena ad testificandum should include the following attached statement
of the witness's rights and obligations in appearing before the grand jury, unless
circumstances render such advice clearly superfluous (*see* United States
Attorneys' Manual § 9-11.151):

Advice of Rights

- The Grand Jury is conducting an investigation of possible violations of
  federal criminal laws involving antitrust offenses under the Sherman Act,
  15 U.S.C. §§ 1 and 2.

  (State here the general subject matter of the inquiry (e.g., conspiring to fix
  prices of widgets in violation of 15 U.S.C. § 1).)

- You may refuse to answer any question if a truthful answer to the question
  would tend to incriminate you.

- Anything that you do say may be used against you by the Grand Jury or in
  a subsequent legal proceeding.

- If you have retained counsel, the Grand Jury will permit you a reasonable
  opportunity to step outside the grand jury room to consult with counsel if
  you so desire.

The subpoena should also have as an attachment the procedures a witness must
follow to receive reimbursement for travel expenses and a witness fee. This is
often handled by the Victim-Witness coordinator for the section or field office.

In addition to the notification given to an individual when subpoenaed, the
witness should be made aware of the following at the time of the witness's
appearance before the grand jury:

- The identity of the government attorneys and the presence of the grand
  jurors and the court reporter.

- The nature of the inquiry (e.g., possible price fixing for the sale of widgets).

- The witness's status as a target, if that is the case. (Staffs should be aware of the Department's position on subpoenaing "subjects" or "targets" of an investigation, see United States Attorneys' Manual §§ 9-11.150 to .160, as well as the Department's position on requests by subjects and targets to testify before the grand jury, *see id.* § 9-11.152.)

- The witness's Fifth Amendment right to refuse to answer any question if a truthful answer would tend to incriminate him or her.

- That anything the witness says may be used against the witness in any criminal proceeding.

- That the witness will be afforded a reasonable opportunity to leave the room to consult with counsel.

- That the grand jury proceedings are secret. While there are exceptions pursuant to statute, such as subsequent trials, no one other than the witness may disclose publicly what has occurred in the grand jury. The witness may disclose what has occurred in the grand jury to anyone if he or she wishes, but is not required to disclose such information to anyone.

- If the witness has been immunized, that the witness understands the effect of the immunity order and that the witness's testimony could still be used in a prosecution for perjury or making a false statement to the grand jury.

The witness should be asked to acknowledge his or her understanding of each of the identified rights and obligations.

c.    Subpoenas for Exemplars

In addition to issuing subpoenas for documents or testimony, the grand jury may issue subpoenas requiring individuals to provide various types of exemplars. Most typical in antitrust investigations are subpoenas to provide samples of handwriting for use in establishing authorship or authentication of documentary evidence. Prior to issuing the subpoena, staff must arrange with an investigative agent to take the exemplar. When the witness appears before the grand jury, the foreperson will inform the witness that a particular person has been designated the grand jury's agent to take the exemplar and will direct the witness to provide the exemplar at a particular time and place. Usually, upon receipt of the subpoena, the recipient will agree to provide the exemplar at a mutually convenient time and place without appearing before the grand jury.

## 5.    Search Warrants

When appropriate, staff should consider using search warrants prior to or in addition to issuing subpoenas *duces tecum*. If probable cause does not exist at the beginning of an investigation, staff should consider the possibility of developing probable cause before issuing compulsory process, making voluntary requests, conducting interviews, or taking other steps that would make the investigation public.

Search warrants can be an effective means for gathering incriminating evidence. The use of search warrants as opposed to subpoenas *duces tecum* minimizes the opportunity for document destruction and concealment, prevents the failure to produce responsive documents either deliberately or through inadvertence, and often spurs a race for leniency. During the course of an investigation, staff may learn that material documents responsive to a subpoena *duces tecum* have been withheld. If staff believes documents have been withheld intentionally rather than being inadvertently overlooked, staff should consider applying for a search warrant instead of providing the recipient a second chance to produce the documents in response to the original or a new subpoena. The requisite probable cause underlying the application may be based on the substantive crime under investigation or, if sufficient evidence exists, on obstruction of justice due to the withholding of subpoenaed materials.

Search warrants may be applied for when there is probable cause to believe that a crime has been committed, that documents or other items evidencing the crime exist, and that such items to be seized are at the premises to be searched. The elements of probable cause are the same for an antitrust crime as for other crimes, both as a matter of law and Division policy. It is not necessary to have probable cause to believe that evidence of the crime may be destroyed or withheld if not seized by search warrant.

The warrant must describe with particularity the property to be seized; state that the property is evidence of a specified criminal offense; provide an exact description of the location to be searched; note the period of time within which the search is to be executed (the period may be no greater than within ten days pursuant to Fed. R. Crim. P. 41(e)(2)(A)); and note whether the search will be conducted in the daytime (which is defined in Fed. R. Crim. P. 41(a)(2)(B) as 6:00 a.m. to 10:00 p.m.) or whether it may be executed at any time. The Division will rarely seek permission to conduct a nighttime search, which must be based on a showing of good cause pursuant to Fed. R. Crim. P. 41(e)(2)(B). The degree of specificity with which the warrant must describe the documents to be seized and the location to be searched may vary depending on the circumstances. When

seeking business records, it is usually sufficient that the warrant describes records of a type usually maintained by the business at the business location.

The factual basis establishing the probable cause for the search will be set forth in the search warrant affidavit. The affidavit must include sufficient facts to establish probable cause both that the crime was committed and that evidence of the crime is at the search location. Supporting evidence of probable cause must not be "stale" (i.e., too old), but there is no set time period after which staleness is presumed. The affidavit may be based entirely on hearsay, as long as the source of the evidence is reliable.

Staff must submit the search warrant affidavit and other documents in the application package to the section or field office chief, who is responsible for reviewing and authorizing staff's application for the search warrant. When seeking a search warrant, staff must obtain the assistance of an investigative agency, usually the FBI.

The application for the search warrant will be made to a magistrate in the judicial district where the property is located. The affidavit should be filed under seal. Staff should consult with the local U.S. Attorney's Office concerning local practices and procedures, including whether the affidavit is automatically filed under seal, or if a motion to file under seal must be made at the time of application.

Once approved, the search is conducted by a team of agents, who may also seek to interview individuals on site. No staff attorney should be present during the search, but an attorney should be available by telephone for consultation with the agents. Upon the conclusion of the search, the agents should serve a subpoena *duces tecum* on the company requiring the production of documents covered by the search warrant and any additional documents needed by the grand jury. The subpoena should include documents subject to the search warrant in order to obtain documents maintained at other locations or that were not seized at the search location.

If staff believes that privileged documents may have been seized during the search, or if counsel for the subject claims that to be the case, procedures should be followed to ensure that staff and the case agent are not tainted by reading privileged documents. For a more detailed discussion of search warrants, staffs should consult Chapter III.I. of the Antitrust Division Grand Jury Practice Manual. For detailed information and guidance on searching computers, staffs should consult the Criminal Division's *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations*.

## 6.    Procedures for a Grand Jury Session

This section provides suggested procedures for the preparation and conduct of a grand jury session. As indicated above, the Division generally follows the procedures used by the U.S. Attorney in a given district. Staff should consult with the local U.S. Attorney liaison when unfamiliar with local practice.

In setting up a grand jury session, staff should:

■    Inform the clerk's office or U.S. Attorney's Office of the timing of the session at least one month in advance of the session, so that room arrangements may be made and the jurors may be notified of the schedule. If the Division is sharing a grand jury with the U.S. Attorney's Office or another section or field office, arrangements should be made as early as practicable to ensure availability of grand jury time. Staffs should be aware that in some districts, staff is responsible for notifying the grand jurors of a scheduled session; in other districts, the U.S. Attorney's Office or the clerk will issue the notices.

■    Arrange to obtain a court reporter at the time the session is scheduled and the jurors are notified. *See* Division Directive ATR 2570, "Payment of Litigation-Related Expenses." In some jurisdictions, arrangements will be made by the local U.S. Attorney's Office.

■    If subpoena service will be made by the U.S. Marshal, send subpoenas to the U.S. Marshal in the relevant district with a cover letter indicating the date of the testimony, the date by which service is required, and other relevant information. Because marshals in large metropolitan areas have a number of duties and may take as long as two weeks to serve subpoenas (and occasionally longer), staff should provide as much lead time as possible for service. Counsel for a prospective witness will often insist that the witness be immunized. When staff anticipates compelling a witness's testimony, they must allow sufficient time after service to negotiate with counsel and receive a proffer of the witness's testimony, if appropriate.

Except when few documents are sought, compliance with subpoenas *duces tecum* requires more lead time than testimonial subpoenas. The subpoena return date should be selected to allow sufficient time after service for document search and retrieval. The time needed for compliance, however, is often subject to negotiation and may be extended if necessary.

■    Prepare immunity clearance requests for witnesses who may claim their Fifth Amendment privilege at the session. The immunity clearance papers (*see* Chapter III, Part F.7) must be received by OCE at least two weeks before the date on which staff will need the clearance and possession of the

immunity authorization letter. The date that staff needs the letter is the date that the U.S. Attorney will review the motion papers, or the date the judge will be asked to sign the order.

- Immediately before the session begins, determine whether the stenographer has been sworn before the grand jury. If not, check that a copy of the stenographer's oath is available to be administered by the foreperson prior to the stenographer recording any statement or testimony.

## 7.   Requests for Statutory Immunity

The Organized Crime Control Act of 1970 established the present statutory basis for granting use immunity to witnesses before a grand jury, at trial, and in other judicial proceedings. *See* 18 U.S.C. § 6001-6005. All requests for statutory immunity must be approved by the section or field office chiefs and submitted to OCE, which will request clearance from the Criminal Division.

### a.   Division Procedures for Processing Requests for Statutory Immunity

For each witness for whom staff seeks immunity, staff should prepare (1) an original and one copy of Form OBD-111, and (2) a letter from the Deputy Assistant Attorney General, Antitrust Division, to the U.S. Attorney in the appropriate district requesting that the U.S. Attorney apply to the court for an immunity order. The text of the letter from the Criminal DAAG to the U.S. Attorney is as follows:

Dear _____:

Pursuant to the authority vested in me by 18 U.S.C. § 6003(b) and 28 C.F.R. § 0.175(b), you are authorized to apply to the United States District Court for the [XXX] District of [State] for an order pursuant to 18 U.S.C. §§ 6002-6003 requiring [name of witness] to give testimony or provide other information in the above matter and in any further proceedings resulting therefrom or ancillary thereto.

Sincerely,

Deputy Assistant Attorney General

The forms and letters should be submitted to OCE with a cover memorandum from the chief to the Criminal DAAG. The memorandum should state that the chief concurs in staff's recommendation to grant use immunity to the prospective witnesses.

Requests for statutory immunity must be received by OCE at least two weeks before the date that staff will need the immunity authorization letter in its possession. In exceptional circumstances, the procedure may be shortened. The Division must clear all immunity requests through the Witness Records Unit of the Criminal Division. *See* United States Attorneys' Manual § 9-23.130. The Criminal Division requires ten working days (exclusive of holidays) to conduct a search of the Department's files, for which it requires each witness's full name, address, Social Security number, and date of birth. In addition to the time required for obtaining immunity clearance, staff must allow sufficient additional time to obtain the U.S. Attorney's signature on the immunity motion. If more than six months have elapsed since the witness was previously immunized or authorized for immunity, staff should contact OCE to determine whether the witness must be recleared by the Criminal Division.

When sending OBD-111 forms forward, staff must also send informational copies to the U.S. Attorney to provide the U.S. Attorney an opportunity to make an independent determination that an immunity order is in the public interest. *See* United States Attorneys' Manual § 9-23.110. Prior to seeking the order to compel, staff must obtain the U.S. Attorney's signature on the petition. Depending on the jurisdiction and the judge to whom the matter is assigned, the court may require a hearing on the petition at which the witness must appear or may simply sign the petition without a hearing.

b.    **Division Standards for Seeking Immunity Authorization**

The following factors are among those to be considered in determining whether it is in the public interest to compel the testimony of a person under the use immunity statute (*see* United States Attorneys' Manual § 9-23.210):

- The importance of the investigation to effective enforcement of the criminal antitrust laws.

- The quality of the person's testimony or information.

- The likelihood that the person's testimony will enhance the prospect of successful prosecution against more culpable individuals;

- The likelihood of prompt and full compliance by the witness and the effectiveness of available sanctions if there is no such compliance.

- The person's relative culpability in connection with the offense being investigated and the person's history with respect to criminal activity.

- The possibility of successfully prosecuting the person prior to compelling the person to testify or produce information.

- The likelihood of adverse collateral consequences to the person if he or she testifies or provides information under a compulsion order.

Since it is the Division's charging policy to prosecute the highest-ranking culpable individuals from each organization against whom the Division is likely to develop an indictable case, the most significant considerations for staffs should be the individual's degree of culpability and the anticipated value of the individual's expected testimony in advancing the investigation against more culpable individuals.

Staff ordinarily should avoid compelling the testimony of a witness who is a close family relative of a subject of the investigation. Compulsion usually is appropriate, however, when the witness and the relative participated in a common business enterprise and the testimony will relate to that business, or when the testimony will relate to illegal conduct in which there is reason to believe both the witness and the relative participated. *See* United States Attorneys' Manual § 9-23.211.

The Division usually will not seek immunity authorization for an individual who is a potential target of the investigation unless that individual or counsel provides a full and candid statement of the individual's proposed testimony.

## 8.   Informal Immunity

Judicious use of "letter" or "informal immunity" can enhance the effectiveness and efficiency of the Division's investigations and avoid the unnecessary waste of grand jury time. Informal immunity may be used to conduct interviews with witnesses before or in lieu of grand jury appearances. Also, as witnesses appearing before the grand jury may accept informal immunity rather than going through the sometimes lengthy process of obtaining court-ordered immunity, which in some districts requires an appearance before a judge.

The Division considers the bar against its use of immunized testimony against a witness obtained pursuant to informal immunity to be the practical equivalent of court-ordered immunity. Since the practical restriction against Division use is the same, the standards for obtaining informal and court-ordered immunity are the same; any notion of a "lower" standard for "lesser" immunity is incorrect. However, informal immunity is not the legal equivalent of statutory immunity (for example, statutory immunity is binding upon the states whereas informal immunity is not). Thus, no letter conferring immunity should state or suggest that the immunity the letter provides is coextensive with court-ordered immunity under 18 U.S.C. §§ 6001-6005.

Informal immunity is conferred by a letter from the Division setting forth the terms under which a witness's statements may or may not be used against that witness. The model informal immunity letter must be used when conveying informal immunity. The model informal immunity letter is limited to the Division's agreement not to make "direct or indirect use" of any statements, documents, or objects provided by the witness, and is binding upon the United States.

When preparing an immunity letter, staff must limit the scope of the "no direct or indirect use" provision by reference to specific statutes, industry, geographic area, and time period. With regard to the statutory limitations, the "no use" provision in the model letter is confined to prosecution of the witness for a violation of Section 1 of the Sherman Act or for a violation of "any other federal criminal statute" committed in connection with the anticompetitive scheme. Inserting a laundry list of statutes may create a false impression with a jury that the witness has exposure (and faces jail time) under each of the enumerated statutes.

All staff requests for informal immunity must be reviewed and approved by the section or field office chief. The factors to be considered in determining whether it is in the public interest to grant informal immunity to a prospective witness are the same as those when granting formal, statutory immunity. *See* Chapter III, Part F.7.b.

## 9.   Corporate and Individual Leniency ("Amnesty")

On August 10, 1993, the Division modified its Corporate Leniency Policy under which a corporation can avoid criminal conviction and fines (i.e., obtain "leniency") by confessing its role in an antitrust violation, fully cooperating with the Division, and meeting other specified conditions. The conditions differ based on whether the corporation comes forward before or after the Division is aware of the illegal activity. Prior policy precluded the grant of leniency after an investigation had begun. The revised Corporate Leniency Policy also includes conditions under which corporate employees will receive protection from criminal convictions, fines, and prison terms. On August 10, 1994, the Division also established a new Leniency Policy for Individuals for persons who approach the Division on their own behalf, not as part of a corporate proffer or confession.

These leniency policies, also referred to as "amnesty" programs, are intended to induce self-reporting by fully disclosing the factors the Division considers in determining who is eligible for leniency and thus providing greater certainty to parties considering whether to come forward. Under the Division's policy,

leniency will be granted if a party that comes forward meets the specified conditions, even if a corporate applicant is one of only two companies that participated in the conspiracy. The leniency program has proven effective in uncovering the existence of previously undetected antitrust violations and in increasing the efficient use of Division resources by quickly advancing investigations.

The Division has issued a comprehensive Frequently Asked Questions paper regarding the operation of the Division's leniency program. This paper is available on the Leniency Program page on the Division's Web site. This page also includes links to the Division's Corporate Leniency Policy, Individual Leniency Policy, model leniency letters, leniency application telephone numbers, and other policy papers discussing the operation of the leniency program. Division attorneys are expected to review the Frequently Asked Questions paper before handling a leniency matter.

a.    Criteria for Corporate Leniency

Only the first qualifying corporation may be granted leniency as to a particular antitrust violation. If the company that first applies for conditional leniency does not meet the qualifications, conditional leniency remains available for the next company that applies and meets the qualifications. Under the rule that only the first qualifying corporation receives conditional leniency, there have been dramatic differences in the disposition of the criminal liability of corporations whose respective leniency applications to the Division were very close in time. Staffs should be aware that sometimes applicants make leniency applications directly to the Director of Criminal Enforcement or the Criminal DAAG rather than to a Division criminal section chief or staff.  If an application is made to a Division section chief or staff, the section chief or staff should immediately report the application to the Director of Criminal Enforcement and the Criminal DAAG.

i.    Leniency Before an Investigation Has Begun ("Type A Leniency")

The conditions a company must meet to qualify for corporate leniency vary depending on when it comes forward.  Staff should recommend, and leniency will be granted to, a corporation reporting its illegal antitrust activity before an investigation has begun if the following six conditions are met:

■    At the time the corporation comes forward, the Division has not received information about the illegal activity being reported from any other source.

- Upon the corporation's discovery of the conduct, the corporation took prompt and effective action to terminate its participation in the illegal activity.

- The corporation reports the wrongdoing with candor and completeness and provides full, continuing, and complete cooperation to the Division throughout the investigation.

- The confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials.

- Where possible, the corporation makes restitution to injured parties.

- The corporation did not coerce another party to participate in the illegal activity and clearly was not the leader in, or the originator of, the activity.

ii.    **Alternative Requirements for Leniency ("Type B Leniency")**

The major change in the 1993 Leniency policy provides that a company will qualify for leniency even after the Division is aware of the illegal activity, whether this is before or after an investigation has begun, if the following conditions are met:

- The corporation is the first to come forward and qualify for leniency with respect to the illegal activity being reported.

- At the time the corporation comes in, the Division does not have evidence against the company that is likely to result in a sustainable conviction.

- Upon the corporation's discovery of the illegal activity being reported, the corporation took prompt and effective action to terminate its participation in the activity.

- The corporation reports the wrongdoing with candor and completeness and provides full, continuing and complete cooperation that advances the Division in its investigation.

- The confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials.

- Where possible, the corporation makes restitution to injured parties.

- The Division determines that granting leniency would not be unfair to others, considering the nature of the illegal activity, the confessing corporation's role in it, and when the corporation comes forward.

In applying the last condition, the primary considerations are how early the corporation has come forward and whether the corporation coerced another party to participate in the illegal activity or clearly was the leader in, or originator of,

the activity. The burden of satisfying the last condition will be low if the corporation comes forward before the Division has begun an investigation into the illegal activity. That burden will increase the closer the Division comes to having evidence that is likely to result in a sustainable conviction.

### iii.   Leniency for Corporate Directors, Officers, and Employees

If a corporation qualifies for leniency under the conditions set forth in Part F.9.a.(i) ("Leniency Before an Investigation Has Begun" or "Type A" leniency), all directors, officers, and employees of the corporation who admit their involvement in the illegal antitrust activity as part of the corporate confession will also receive leniency if they admit their wrongdoing with candor and completeness and continue to assist the Division throughout the investigation. If their corporation qualifies for leniency only under Part F.9.a.(ii) ("Type B" leniency) or does not qualify for leniency at all, individuals who come forward with the corporation will still be considered for immunity from criminal prosecution on the same basis as if they had approached the Division individually.

## b.   Criteria for Individual Leniency

An individual who approaches the Division on his or her own behalf to report illegal antitrust activity may qualify for leniency under the Leniency Policy for Individuals. The individual must approach the Division before it has become aware of the illegal activity and must not have approached the Division previously as part of a corporate approach seeking leniency for the same illegal conduct. Once a corporation attempts to qualify for leniency under the Corporate Leniency Policy, individuals who come forward and admit their involvement in the illegal activity as part of the corporate confession will be considered for leniency solely under the provisions of the Corporate Leniency Policy. They may not be considered for leniency under the Leniency Policy for Individuals.

As explained above for corporate leniency applications, individual leniency applications should be reported promptly to the Director of Criminal Enforcement and the Criminal DAAG.  Staff should recommend, and leniency will be granted to, an individual reporting illegal antitrust activity before an investigation has begun if the three conditions listed below are met.

- ■   At the time the individual comes forward to report the illegal activity, the Division has not received information about the illegal activity being reported from any other source. (Thus, it is not possible to grant conditional leniency to an individual under the Leniency Policy for Individuals after a corporation has applied for leniency, although a

cooperating individual could still be considered for immunity outside of the Leniency Policy for Individuals.  However, it may be possible to grant a corporation "Type B" conditional leniency after an individual has been granted conditional leniency if the Division does not yet have evidence against the company that is likely to result in a sustainable conviction against it and the company meets the other requirements of Type B leniency.)

- ■   The individual reports the wrongdoing with candor and completeness and provides full, continuing and complete cooperation to the Division throughout the investigation.

- ■   The individual did not coerce another party to participate in the illegal activity and clearly was not the leader in, or the originator of, the activity.

Any individual who does not qualify for leniency under the corporate or individual leniency policies may still be considered for statutory or informal immunity. See Chapter III, Parts F.7, F.8.

c.   Procedure for Conferring Leniency

i.   **Markers**

The Division frequently gives a leniency applicant a "marker" to hold its place in line for leniency in the event that counsel needs to gather additional information before completing its leniency application (i.e., to "perfect" the application). While the marker is in effect, no other subsequent potential applicant can "leapfrog" over the applicant that has the marker. To obtain a marker, counsel must identify the industry, product, or service involved in terms that are narrow enough to allow the Division to determine whether leniency is still available and to preserve the marker for the applicant; state that counsel has uncovered some information or evidence indicating that his client has engaged in a criminal antitrust violation; and disclose the client's identity and the general nature of the conduct discovered.  A mere request for a marker, not identifying the information listed above, in order to allow counsel time to investigate to determine whether the client engaged in an antitrust violation will not suffice to obtain a marker. For example, if counsel states his client just received a grand jury subpoena and that he wants a marker for his client while he investigates whether the client has any criminal antitrust exposure in the matter under investigation, such a representation would not be a sufficient basis for a marker.  In some cases, an identification of the industry will be sufficient for the Division to determine whether leniency is available.  For example, there may be no investigations of any products or services in that particular industry.  In other cases, an identification of the specific product or service may be necessary in order for the Division to determine whether leniency is available.

When corporate counsel first obtains indications of a possible criminal antitrust violation, authoritative personnel for the company may not have sufficient information to enable them to admit definitively to such a violation. While confirmation of a criminal antitrust violation is not required at the marker stage, in order to receive a marker counsel must report that he or she has uncovered information or evidence suggesting a possible criminal antitrust violation. Confirmation of a criminal antitrust violation will, however, be required before the applicant can receive a conditional leniency letter.

The marker should be for a relatively short, finite period, with the amount of time given based on factors such as the location and number of company employees counsel needs to interview, the amount and location of documents counsel needs to review, and whether the Division already had an ongoing investigation at the time the marker was requested. A 30-day period for an initial marker is not unusual, particularly in Type "A" leniency applications. If necessary, the marker may be extended solely at the Division's discretion for an additional finite period as long as the applicant demonstrates it is making a good-faith effort to complete its application in a timely manner.

### ii.    Recommendations for Conditional Grant of Leniency

Staffs should forward leniency recommendations with the concurrence of the office chief to the Criminal DAAG, through the Director of Criminal Enforcement, setting forth the reasons why conditional leniency should be granted. Staff should also include a copy of the proposed conditional leniency letter, and the recommendation memo should identify and explain any proposed deviations in the agreement from the model leniency letter. The materials should be e-mailed to the ATR-CRIM-ENF mailbox with a cc:/ to the appropriate senior counsel and special assistant. As indicated earlier, staff should notify the Criminal DAAG and the Director of Criminal Enforcement as soon as they begin leniency discussions with a corporation or individual so there is a clear record of who first approached the Division. Staff should make its recommendation in a timely manner. The Criminal DAAG will review the request and forward it to the Assistant Attorney General for final decision. If staff recommends against conditional leniency, the applicant's counsel may seek a meeting with the Criminal DAAG to discuss the leniency request. Although counsel are not entitled to such a meeting, the opportunity generally will be afforded.

The initial grant of leniency is conditional because many of the leniency requirements must be fulfilled during the course of the criminal investigation and resulting prosecutions of co-conspirators, such as the applicant's establishment of its eligibility for leniency, its full, truthful, and continuing cooperation with the Division, and the payment of restitution to victims. In addition, the final grant of

leniency is conditioned on the Division's verification of the applicant's representations regarding its eligibility.

### iii.    Recommendation for Final Grant of Leniency

At the conclusion of the Division's investigation and prosecution of the cartel members, the Division will grant the applicant a final leniency letter if the applicant has met all the conditions of the conditional leniency letter. A staff recommendation for a final grant of leniency should be sent, with the concurrence of the office chief, to the Criminal DAAG, through the Director of Criminal Enforcement, setting forth how the applicant has satisfied all of the leniency conditions. Staff should also include a copy of the proposed final leniency agreement. The materials should be e-mailed to the ATR-CRIM-ENF mailbox with a cc:/ to the appropriate senior counsel and special assistant.

### iv.    Confidentiality Policy

The Division has a strict confidentiality policy concerning the identity of leniency applicants and the information obtained from them. The Division will not publicly disclose a leniency applicant's identity or the information it provides, unless the applicant has previously made such a disclosure or the Division is authorized to make such a disclosure by the applicant or by court order. Consistent with this policy, the Division will not disclose to foreign authorities the identity of a leniency applicant or the information provided by a leniency applicant unless the applicant agrees to the disclosure. See Gary R. Spratling, [Making Companies an Offer They Shouldn't Refuse: The Antitrust Division's Corporate Leniency Policy - An Update](), Speech Before the Bar Association of the District of Columbia's 35th Annual Symposium on Associations and Antitrust (Feb. 16, 1999); Gary R. Spratling, [The Corporate Leniency Policy: Answers to Recurring Questions](), Speech Before ABA Antitrust Section 1998 Spring Meeting (Apr. 1, 1998). Applicants have consented to a "limited waiver" so staff can share certain information, such as attorney proffers, with international authorities to minimize the time and expense to the leniency applicant of protracted investigations and to facilitate the successful investigation and prosecution of the applicant's former coconspirators.

## d.    Amnesty Plus

A large percentage of the Division's international cartel investigations result from spin-offs from other Division investigations. For example, evidence developed during the investigation of one cartel can lead to the discovery of a second cartel. This rollover pattern led to what is now known as the Division's "Amnesty Plus" program. Under Amnesty Plus, staffs routinely take affirmative steps to discover

cartel behavior in additional markets through the use of the "omnibus question" and by encouraging subjects and targets of one investigation to consider whether they qualify for leniency in additional markets. Staffs investigating one cartel routinely ask witnesses at the conclusion of an interview the "omnibus question" (i.e., whether the witness has information about any other cartel). In anticipation of the omnibus question, well-informed defense counsel should explore this question with their clients in preparation for Division interviews and plea negotiations.

In plea negotiations, disclosure of an additional cartel can result in substantial benefits for a company under the Division's Amnesty Plus program. Under the Amnesty Plus program, a company pleads guilty to the antitrust violation currently under investigation; cooperates in the investigation of that violation; and discloses, and cooperates in the subsequent investigation of, a second antitrust conspiracy. The company can receive two benefits for its disclosure of the second offense under the Amnesty Plus program. First, the company can receive leniency for its disclosure of the second offense if it meets the requirements of the leniency program for that offense. Second, the company can also receive a substantial additional reduction in its fine for its participation in the first offense (i.e., the offense to which the company is pleading guilty) pursuant to U.S.S.G. §8C4.1. See Scott D. Hammond and Belinda A. Barnett, Frequently Asked Questions Regarding the Antitrust Division's Leniency Program and Model Leniency Letters (Nov. 19, 2008); Scott D. Hammond, When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?, Speech Before the 15th Annual National Institute on White Collar Crime (Mar. 8, 2001); Gary R. Spratling, Making Companies an Offer They Shouldn't Refuse: The Antitrust Division's Corporate Leniency Policy – An Update, Speech Before the Bar Association of the District of Columbia's 35th Annual Symposium on Associations and Antitrust (Feb. 16, 1999).

Companies not taking advantage of the Division's Amnesty Plus program risk harsh consequences. If a company decides not to report its participation in a second antitrust offense and the Division subsequently uncovers the conduct and prosecutes the company for the conduct, the Division may urge the sentencing court to consider the failure of the company to report the second offense as an aggravating sentencing factor, possibly meriting imposition of a term and conditions of probation, a sentence at the upper end of the Sentencing Guidelines range, or even an upward departure from the Guidelines range. In addition, where multiple convictions occur, the company may receive an increase in its Guidelines calculations under U.S.S.G. §8C2.5(c) based on its prior criminal history. See Scott D. Hammond, When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an

*Individual's Freedom?*, Speech Before the 15th Annual National Institute on White Collar Crime (Mar. 8, 2001).

## 10. Requesting Internal Revenue Service Information During a Grand Jury Investigation

Division attorneys sometimes conduct criminal tax investigations when possible tax violations are inextricably linked to, or will further, an antitrust investigation, *see* Chapter III, Part F.12.a., such as in the case of a corrupt purchasing agent who accepts cash kickbacks in exchange for allowing a competitive bidding process to be corrupted and fails to report those kickbacks as income. In such cases, tax returns and taxpayer information may be obtained from the IRS by the tax agent assigned to the investigation, and no court order is necessary.

When Division attorneys require information from the IRS, they must comply with the procedures set forth in 26 U.S.C. § 6103. Tax information retained by a source other than the IRS is not subject to § 6103 and may be obtained by subpoena.

Section 6103 classifies information into three general categories: returns, taxpayer return information, and return information other than taxpayer return information. Returns and taxpayer return information consist generally of the returns themselves and any supporting or related information furnished by the taxpayer or by someone on the taxpayer's behalf. A court order is required before the IRS may disclose such information to Division personnel in connection with nontax matters. Return information other than taxpayer return information is information gathered by the IRS from third parties. The IRS may disclose such information to Division personnel upon written request by the Assistant Attorney General to the Commissioner of the IRS.

The procedures to be followed in obtaining information from the IRS are set out at in United States Attorneys' Manual § 9-13.900. All requests for such information must be processed through the Director of Criminal Enforcement and approved by the Assistant Attorney General.

## 11. Notification or Approval Procedures in Certain Types of Investigations

In certain circumstances, investigations or investigative steps may be subject to additional reporting or approval requirements. Additional requirements exist in the following circumstances: (1) a public figure or entity is the subject of an investigation, (2) staff intends to subpoena or indict a member of the news media or news media organization, (3) staff intends to subpoena an attorney concerning

his or her representation of a client, or (4) a foreign government or foreign national is the subject of an investigation or will be issued a subpoena.

a.    Notice of Subjects of Sensitive Criminal Investigations

As set forth in Division Directive ATR 3300.1, "Notification of Sensitive Criminal Investigations," it is the policy and practice of the Department of Justice to keep appropriate Department officials, including the Assistant Attorney General of the Criminal Division, the Associate Attorney General, the Deputy Attorney General, and the Attorney General, advised of sensitive criminal investigations, particularly those where public officials or entities are the subjects of the investigation. The notification function is for information purposes only and is not intended to interrupt, delay, or otherwise affect the normal conduct of the investigation. No special authorization for the investigation is required.

Staff should orally notify the Criminal DAAG whenever it determines that the grand jury investigation is a sensitive investigation as described at United States Attorneys' Manual § 9-2.155. Staff should then prepare a memorandum from the Assistant Attorney General, Antitrust Division, to the Assistant Attorney General, Criminal Division, naming the subject and briefly describing the investigation, including its current status and the subject's role in the matter.

The memorandum should be sent to the Criminal DAAG, through the Director of Criminal Enforcement, by e-mailing it to the ATR-CRIM-ENF mailbox. The memo will be reviewed and then forwarded to the Assistant Attorney General, Antitrust Division, for approval. If approved, the memorandum is sent to the Assistant Attorney General, Criminal Division, who is responsible for notifying the appropriate Department officials of the investigation and providing them with copies of the memorandum.

b.    Approval of Subpoenas to and Indictment of Members of the News Media and News Organizations

Staff may not indict nor issue a subpoena regarding news gathering functions to members of the news media or news organizations, including industry or trade publications, without the express approval of the Attorney General. This requirement applies only to subpoenas regarding news gathering functions and does not apply to subpoenas seeking only business records. As to the latter, however, Division policy requires a determination by the Assistant Attorney General that the information sought relates solely to commercial or financial information before a subpoena may be issued.

Whenever an investigation requires information available from the news media, staff first should attempt to obtain the necessary information from nonmedia sources. If such attempts are unsuccessful and news media sources are the only reasonable sources of the information, staff should attempt to negotiate voluntary provision of the information. If negotiations fail, staff must obtain the approval of the Attorney General to issue subpoenas based on the standards set forth at 28 C.F.R. § 50.10. *See also* United States Attorneys' Manual § 9-11.255. If uncertain whether these provisions are applicable to particular circumstances, staff should consult with the Director of Criminal Enforcement.

To obtain the Attorney General's approval, staff should provide a memorandum to the Criminal DAAG, through the Director of Criminal Enforcement, explaining the circumstances justifying the subpoena request or proposed indictment. Staff should also provide a memorandum from the Assistant Attorney General, Antitrust Division, to the Attorney General setting forth the factual situation and the reasons for the request, in accordance with the principles in 28 C.F.R. § 50.10.

During the time the Assistant Attorney General and the Attorney General are reviewing the request, staff should take no steps to begin the process of subpoenaing or otherwise interrogating any member of the news media. Staff should allow substantial review time for its request.

This procedure provides the most effective means to maintain a consistent policy of fairness in balancing two important concerns, the importance of a free press and the need for specific information to uncover violations of the law.

c.   Issuance of Subpoenas to Attorneys for Information Relating to the Representation of Clients

Because of its potential adverse effect upon an attorney-client relationship, staff in all litigating divisions must obtain the authorization of their respective Assistant Attorney General and the Assistant Attorney General for the Criminal Division before issuing a subpoena to an attorney for information relating to the representation of a client. Before seeking authorization to issue a subpoena, staff should attempt to obtain information from alternative sources or voluntarily from the attorney, unless such efforts may compromise the investigation. The following conditions must be met before the Assistant Attorney General will approve the issuance of a subpoena:

■   The information must be reasonably necessary to investigate or prosecute a crime that is being or has been committed by any person.

■   All reasonable attempts to secure the information from alternative sources must have failed.

■   The need for the information must outweigh the adverse impact on the attorney-client relationship.

■   The information must not be protected by a valid claim of privilege.

*See* United States Attorneys' Manual § 9-13.410.

To obtain the required approvals, staff should submit the following documents to the ATR-CRIM-ENF mailbox with a cc:/ to the appropriate special assistant:

■   A memorandum to the Criminal DAAG, through the Director of Criminal Enforcement, setting forth the factual circumstances, the reasons for the request, and an analysis of how the subpoena satisfies each of the conditions set forth above.

■   The Criminal Division's Form 264, "Request for Authorization to Issue a Subpoena to an Attorney for Information Relating to Representation of a Client."

■   If staff proposes to issue a subpoena *duces tecum*, then staff should submit a draft of the subpoena *duces tecum*. The subpoena *duces tecum* must be narrowly drafted and directed at material information regarding limited subject matter and covering a reasonable, limited time period. *See* United States Attorneys' Manual § 9-13.410.

These materials will be forwarded to the Assistant Attorney General and the Criminal Division for approval.

d.   Notification of Matters Involving Foreign Government Interests

Various multilateral and bilateral agreements require the United States to notify foreign governments regarding antitrust activities affecting their interests. In accordance with Division Directive ATR 3300.2, "Notification of Antitrust Activities Involving Foreign Companies, Individuals or Governments," staff must notify the Foreign Commerce Section whenever Division attorneys undertake actions which may affect the interests of a foreign government. (For a list of actions which may trigger notification requirements, see Chapter VII, Part D.1.) When a grand jury is involved, staff may need to obtain a 6(e) disclosure order prior to notifying the foreign government. Notification prior to staff's first session with the grand jury may preclude the need to obtain a 6(e) order.

## 12.  Investigating Related Criminal Activity

The Division often uncovers evidence of other criminal offenses while investigating Sherman Act violations. Sometimes the Division refers such evidence to the appropriate U.S. Attorney. When appropriate, the Division investigates and prosecutes these offenses. Typical non-Sherman Act offenses that the Division investigates fall into two general categories: (1) offenses that are related to the conduct under investigation as Sherman Act violations and (2) offenses that affect the integrity of the investigatory process.

As set forth below, the Division must consult with other divisions or agencies prior to investigating or prosecuting certain offenses. While retaining the authority to conduct the investigation or prosecution, Division staff may seek assistance from the Criminal Division or the appropriate U.S. Attorney's Office in conducting or prosecuting the matter.

### a.  Offenses Related to Sherman Act Violations

The Division typically investigates other substantive offenses when they occur in connection with an anticompetitive scheme. The Division exercises its prosecutorial discretion when determining whether the prosecution of crimes in addition to a Sherman Act violation is warranted. The Division also charges other crimes independently when appropriate.

The substantive offenses most commonly charged by the Division are conspiracy to defraud the United States (18 U.S.C. § 371), false statements to a government agency (18 U.S.C. § 1001), mail and wire fraud (18 U.S.C. §§ 1341 and 1343, respectively), and tax offenses (26 U.S.C. § 7201). A conspiracy to defraud count generally is considered when a government agency has been defrauded by a bid-rigging or market allocation scheme. A false statement count generally is considered when an affidavit of noncollusion or a certificate of independent bid price determination has been signed in connection with a rigged bid to a government agency. A mail or wire fraud count generally is considered when the U.S. mails or interstate wires are used in furtherance of an anticompetitive scheme or in instances of anticompetitive conduct that do not violate the Sherman Act (e.g., an unsuccessful attempt to fix prices or rig bids).

With respect to tax offenses, the Division must coordinate all tax investigations with the Criminal Investigative Division of the IRS and obtain authorization from the Tax Division to conduct the grand jury investigation on its behalf. Typically, the Tax Division will assign an IRS special agent to work with Antitrust Division staff. In accordance with the IRS and Tax Division review procedures, the special agent submits a written report to the Office of Regional Counsel for the relevant

IRS region at the conclusion of an investigation. The Regional Counsel reviews the report to determine if there is sufficient evidence to justify prosecution and, if so, refers the matter to the Tax Division for its approval. Staff should indicate in its case recommendation memo whether Tax Division approval has been obtained or is pending; in the latter case, staff should notify the appropriate special assistant once the Tax Division has given its approval. The Antitrust Division typically conducts the prosecution of tax matters it has investigated.

b.    Offenses that Affect the Integrity of the Investigatory Process

The Division has the authority to protect the integrity of the grand jury system and to prosecute charges of obstruction of justice (18 U.S.C. §§ 1501-1520), perjury (18 U.S.C. § 1621), and false declarations before a grand jury or court (18 U.S.C. § 1623) if the conduct occurred in a Division investigation or case. Staff should forward any such recommendation through OCE.

# G.    Completing the Investigation and Recommending Civil or Criminal Suit

As staff develops evidence that may establish a criminal or civil violation, it should begin to determine what type of case or cases, if any, will be recommended and how the investigation should be concluded. As indicated earlier in this chapter, staff should be aware of local rules of court governing the filing of civil cases and the return of indictments. This is especially true where staff wishes to seek preliminary relief to stop an acquisition or other practice because district practices differ markedly.

## 1.    Preparing to Recommend a Case

Staff should make every effort to prepare its case fully during the investigation. Staff should not rely on the potential ability to develop a case using postcomplaint or postindictment discovery. The document production, interrogatory, and deposition powers of the Antitrust Division under the HSR Act and the ACPA, as well as voluntary interviews, declarations, and affidavits, should be fully utilized to prepare a prima facie presentation and rebut likely defenses. The powers of the grand jury should likewise be used to develop all relevant information in a criminal investigation.

a.    Role of Antitrust Division Economists

The Division's Economic Analysis Group assigns one or more economists to each merger and civil nonmerger matter to assist the legal staff in investigating, developing, and analyzing the competitive effects of the proposed acquisition or

other conduct being investigated. Among other things, the legal staff in civil matters should include such Division economists as participants in formulating theories to investigate, drafting HSR second requests and interrogatory and document CIDs, creating an investigatory plan designed to maximize the potential of developing a triable case, and drafting and asking interview and CID deposition questions. Also, Division economists should participate fully in developing and implementing quantitative analysis of anticompetitive effects of mergers and other business conduct and in providing or securing expert economic testimony.

b.   Notification to Prospective Defendants

As the conclusion of an investigation nears, but before the field office or section makes a formal recommendation, staff generally should afford counsel for the parties an opportunity to present their views to staff and the chief, time permitting. Staff should make this offer to all counsel whose clients staff believes, in good faith, may be parties to a suit. This practice allows staff, after a single meeting or series of meetings, to evaluate efficiently the arguments of all prospective defendants and make a better informed assessment of the evidence based on information from such parties. When time constraints are severe, a chief may decide to limit the number and duration of meetings with parties and may consider using telephone interviews.

In general, counsel should be informed that the Division has identified competitive concerns, but that the Assistant Attorney General has made no determination about a suit. Counsel should not be informed that the Division has determined that the party will be sued or indicted, because the final responsibility for making a decision to file suit or recommend an indictment rests with the Assistant Attorney General. Nor should counsel be told that staff is recommending suit (without express authorization from the appropriate Director of Enforcement). Counsel should be informed about the nature of the possible case.  In civil matters, staff should inform counsel of the theories of competitive harm underlying the proposed case, the nature of the evidence that support it (without violating CID, HSR, or grand jury confidentiality provisions or exposing sources or potential witnesses), the staff's economic analysis and the possible scope of relief. This information should be conveyed to counsel sufficiently in advance of the meeting with staff and the section chief so that counsel may respond.

At an appropriate point in the course of the Division's deliberations, staff also will usually inform counsel that it will forward any request of counsel for an appointment to meet on the matter with senior Antitrust Division officials. In general, parties who may be sued or recommended for indictment are usually

afforded an opportunity to meet with a senior Antitrust Division official prior to a decision whether or not to file suit or seek an indictment. However, counsel are not entitled to such a meeting as a matter of right. If it is a close question about whether a meeting would or would not be useful, the appropriate Deputy Assistant Attorney General will advise staff whether there is or is not interest in hearing a presentation on behalf of a particular party. As a general rule, any argument which counsel for a prospective party wishes to be considered by senior officials should first be presented to staff.

c.   Dual and Successive Prosecution Policy ("Petite" Policy)

A number of states have enacted antitrust laws that provide for criminal penalties. This raises the question of under what circumstances a federal prosecution will be instituted or continued following a state criminal prosecution based on substantially the same act or acts. The issue has arisen, for example, in connection with bid rigging on state construction projects.

There is no constitutional bar to federal prosecution for the same offense as to which there has been a state prosecution. The Double Jeopardy Clause simply does not apply to this situation. *See Abbate v. United States*, 359 U.S. 187 (1959); *Bartkus v. Illinois*, 359 U.S. 121 (1959). Further, while Congress has expressly provided that as to certain specific offenses a state judgment of conviction or acquittal on the merits shall be a bar to any subsequent federal prosecution for the same act or acts, it has not included violations of the antitrust laws in this category. *See, e.g.,* 18 U.S.C. §§ 659, 660, 2117 and 15 U.S.C. § 80a-36.

Nonetheless, since 1959, the Department of Justice has followed the policy of not initiating or continuing a federal prosecution following a state prosecution based on substantially the same act or acts unless there is a compelling federal interest supporting the dual prosecution. This policy is known as the "Petite policy" based on *Petite v. United States*, 361 U.S. 529 (1960) (granting the Solicitor General's petition to vacate the second of two federal subornation of perjury convictions after the government indicated its intention to avoid successive federal prosecutions arising from a single transaction, just as it had earlier announced that it would generally avoid duplicating state criminal prosecutions). The Petite policy provides that only the appropriate Assistant Attorney General may make the finding of a compelling federal interest, and failure to secure the prior authorization of the Assistant Attorney General for a dual prosecution will result in a loss of any conviction through a dismissal of the charges, unless it is later determined that there was in fact a compelling federal interest supporting the prosecution and a compelling reason for the failure to obtain prior authorization. This policy is, of course, designed to regulate prosecutorial

discretion in order to ensure efficient use of the Department's resources and to protect persons charged with criminal conduct from the unfairness that can be associated with multiple prosecutions and multiple punishments for substantially the same act or acts. *See Rinaldi v. United States*, 434 U.S. 22, 27 (1977).

This dual prosecution policy applies, and authorization must be obtained from the Assistant Attorney General for the Antitrust Division, whenever there has been a prior state proceeding (including a plea bargain) resulting in an acquittal, a conviction, or a dismissal or other termination of the case on the merits. It does not apply, and thus authorization is not required, where the state proceeding has not progressed to the stage at which jeopardy attaches, or was terminated in a manner that would not, under the Double Jeopardy Clause, preclude a further state prosecution for the same offense. For example, the Division will not hesitate to indict price fixers simply because they have already been indicted by a state.

Where the policy does apply, a subsequent federal prosecution may proceed only if the Assistant Attorney General makes a finding that there is a compelling federal interest supporting the dual prosecution. Thus, a federal prosecution will not normally be authorized after completion of the state proceeding unless the state proceeding left substantial federal interests demonstrably unvindicated. As a general rule, cases coming within the priority areas of federal jurisdiction, including the protection of free and unfettered competition under the antitrust laws, are more likely to meet this requirement. Thus, as a general rule, the Division will be inclined to authorize federal antitrust prosecution despite dismissal of, or an acquittal on, parallel state charges, most particularly when there is a substantial basis for believing that the state result was affected by (1) blatant disregard of the evidence by the court or jury, (2) the failure to prove an element of the state offense that is not an element of the federal offense, (3) the unavailability of significant evidence in the state proceeding either because it was not timely discovered or because it was suppressed based on state law grounds or on an erroneous view of federal law, or (4) other substantial prejudice to the state's prosecution.

Even where a state prosecution results in a conviction, there are certain circumstances in which the Division would be inclined to authorize dual prosecution. It is the Division's policy that culpable individuals should be sentenced to incarceration. Accordingly, dual prosecution may be authorized in cases where the Division anticipates an enhanced sentence in its case. This may include situations where the state conviction was for a misdemeanor whereas the Sherman Act violation is a felony. A subsequent federal prosecution may also be warranted where either the state antitrust charge carried a maximum penalty substantially below the maximum Sherman Act penalty, or the choice by the state prosecutor or grand jury of the state charges, or the state court determination of

the severity of the sentence, was affected by any of the factors noted earlier as strengthening the Division's inclination to authorize federal antitrust prosecution after state acquittal or dismissal.

Finally, dual prosecution will not generally be authorized where there has been a state antitrust prosecution that resulted in a conviction and reasonable sentence. Moreover, even when the state prosecution results in acquittal, dual prosecution will not be authorized if the state prosecutors offered essentially the same evidence the Division would offer, and there was no reason to believe that the verdict of acquittal reflected anything but a good faith reasonable doubt on the part of the judge or jury.

Additional information on the dual prosecution policy may be found in United States Attorney's Manual § 9-2.031.

## 2.   Case Recommendation Procedures

Upon completing its investigation of the evidence and evaluation of enforcement options, staff, in consultation with its chief, should prepare case recommendation materials for the Division's Front Office communicating staff's summary of the evidence, assessment, and recommendation. In addition to evaluating the strengths and weaknesses of the evidence, staff's assessment should evaluate the main settlement or disposition options. Such advance evaluation of settlement prospects is important because when a matter is submitted to the appropriate Deputy Assistant Attorney General and the Assistant Attorney General, the pace of developments often will accelerate, leaving little time for additional study, particularly in fast-track merger matters. Staff should draft its case recommendation materials with a view towards fully explaining the case to individuals with less detailed knowledge of the industry and facts (e.g., the chief and the Front Office). In the event that staff believes that a civil or criminal suit is not warranted, staff should prepare a closing memo explaining its rationale. The closing memo should indicate whether the chief concurs and should be e-mailed to the appropriate special assistant. For more details on closing memos, see Chapter III, Part C.7.

The case recommendation package submitted by staff should typically consist of the case recommendation memoranda, draft pleadings, a proposed press release (where applicable), and any other documents deemed most relevant to a full consideration of the case, including its critical and contested elements, and its strengths and weaknesses. Because procedures vary somewhat depending on the type of case, unique features of civil nonmerger, merger, and criminal case recommendations are described below. To help ensure that recommendations are

in the format preferred by the Front Office, the appropriate special assistant will, upon request, provide an exemplar of a recent case recommendation memorandum that has been considered particularly effective.

Staff should always submit the case recommendation memorandum and accompanying materials to the chief for review. The chief will analyze the matter and send the recommendation materials to the appropriate Director, Deputy Assistant Attorney General, and other appropriate Front Office personnel, sometimes with, and sometimes without, a separate memorandum expressing the chief's individual views. In either case, when the chief sends the recommendation materials, his or her recommendation should be clearly indicated to the Front Office. The case recommendation materials must be delivered to the Front Office sufficiently in advance of any meeting between representatives of the prospective defendants and senior Division officials to permit a meaningful advance review of the material submitted.

a.    Recommending a Nonmerger Civil Action

Staff should keep the Director of Operations informed as a prospective civil nonmerger case moves toward settlement or litigation. Staff recommendations relating to civil nonmerger cases will vary according to the nature and complexity of the matter under consideration. If settlement is uncertain, the legal and economic case recommendations should include at least:

- A brief (one paragraph or less) description of what the prospective case is about.

- A conceptual discussion of the case and why it is an important one for the Division to bring, including the theory and statutes on which a case is recommended; the elements of the theory and statutes being relied upon; theories investigated but not recommended to be pursued; and the justifications or defenses likely to be raised by the prospective defendants.

- An assessment of the litigation risks, including an order of proof (which will typically be attached to the case recommendation as a separate document), a discussion of likely testimony, a summary of the relative strengths and weaknesses of the evidence supporting the case, and a summary of likely defense evidence and arguments.

- The relief to be obtained and a discussion of potential settlement options.

Although staff's recommendation should cover all elements and aspects of the prospective case, it should emphasize and focus on the areas most in dispute and likely to pose the greatest difficulties for the Division at trial. The recommendation should be balanced and objective in tone.

The recommendation should be accompanied by copies of documents deemed by staff to be the most significant evidence to the critical aspects of the case. Normally, the number of appended documents should be limited so that attention to the most critical ones is not obscured.  When documents accompany a recommendation, the entire document should be provided, rather than excerpts, although relevant portions may be highlighted.  Staff should also include important documents relied on by the parties as well as any white papers or economic analysis they have provided. In addition, staff should attach a draft of the proposed complaint and proposed press release. Any other court papers to be filed with or shortly after the complaint, such as a preliminary injunction (PI) brief, should also be attached.

If settlement is likely, the case recommendation package should include (in addition to the case recommendation memo), a draft complaint, consent decree, stipulation, competitive impact statement, press release, Federal Register notice, and newspaper notice. *See* Chapter IV, Part D (discussing consent decrees). The case recommendation memo should contain the same basic elements as those discussed above for unresolved cases; however, it is usually not necessary to submit an order of proof or detailed discussion of the evidence and trial risks. The case recommendation memo should, however, contain a discussion of why the case is significant, its theory, and an objective analysis of the advantages and disadvantages of the proposed consent decree.

b.    Recommending a Merger Action

Staff should keep the Director of Operations informed as a prospective merger case moves towards settlement or litigation. The procedure for recommending merger cases varies depending upon whether staff has been able to reach what it views as an acceptable resolution with the parties.

In the event that staff is proposing a settlement with the parties, the case recommendation memo should be similar to that described below, except that it need not contain an extensive analysis of the evidence but should include a discussion of how the proposed resolution will adequately resolve the identified competitive problem. The case recommendation package should include (in addition to the case recommendation memo), a draft complaint, consent decree, stipulation, competitive impact statement, press release, Federal Register notice, and newspaper notice. In some cases, the parties may agree to a resolution that eliminates the potential competitive problem before the merger is consummated (i.e., a "fix-it-first" solution). Because such a resolution does not involve a case being filed, no competitive impact statement, Federal Register notice, or newspaper notice is necessary. In such cases, the staff should provide a detailed letter agreement describing all of the terms of the fix-it-first agreement.  As

appropriate, a draft pocket consent decree and stipulation should also be provided.  A recommendation memo and draft press release should still be forwarded along with any documents necessary to understand the proposed resolution (e.g., a completed agreement divesting certain assets, a completed license for certain intellectual property).

In the event that staff and the parties have not reached a resolution, it is likely that the parties will want to meet with the Director of Operations and the appropriate Deputy Assistant Attorney General. The decision-making process with respect to case recommendations will be greatly facilitated if staff delivers to the appropriate Deputy Assistant Attorney General and the Director of Operations, no later than the week before any meeting with opposing parties, a case recommendation memo, an order of proof (of the type described below), any white papers or economic studies submitted by the merging parties, and a draft complaint. Such materials should, in any event, be submitted to the Front Office no later than 48 hours before any meeting with the parties. Immediately following any such meeting with parties, staff should finalize its draft complaint, filing papers, declarations, and exhibits. By the time staff completes these documents, it should be prepared to demonstrate mock closing statements for the government and the defense and mock direct and cross examination of the government's expert economist.

The case recommendation memo should be brief and contain the date by which the Division must file any TRO or PI papers and any other dates that bear on timing; a brief description of the transaction (including the identity of the merging parties, the form of the transaction, and the consideration); a description and justification of the proposed suit (including proposed defendants, the statutes under which the merger is to be challenged, the proposed judicial district, and the relief sought); a discussion of the impact of the transaction (including the relevant product and geographic markets, volume of commerce, market shares, and Herfindahl-Hirschman Index); a discussion of the theory of competitive harm; and a discussion of the weaknesses of the case (including the principal and most troubling contentions of the merging parties). Staff should address unusual factual, evidentiary, equitable, relief, or legal issues or factors with a direct impact on any exercise of prosecutorial discretion on the decision to challenge the merger and any settlement possibilities. The memo should explain why litigation should be pursued and it should clearly set forth staff's recommendation. The chief's recommendation also needs to be communicated to the Front Office, either in the recommendation memo or in a separate memorandum from the chief.

The order of proof should be in outline format (and should be generated over the course of an investigation). The order of proof should follow the elements of the

case, using the Merger Guidelines as a framework, and should include relevant quotations from documents (or attach highlighted key documents) and relevant portions from key transcripts, as well as summarize any quantitative evidence developed by EAG. The order of proof for a merger challenge should identify the key issues in the case, the strength or weaknesses of the evidence by element, contentions of the merging parties, and a summary of how staff will meet those contentions. Time and circumstances permitting, appendices to the recommendation memo and order of proof should include copies of the significant prospective exhibits and other litigation materials.

The recommendation of the economists assigned to the merger should be indicated either in staff's recommendation memo or a separate memo. Normally, the economists assigned to the matter prepare one or more separate memoranda focused on important issues. Legal staff should ensure that the economists have a sufficient opportunity to review the case recommendation memo and order of proof so that they may provide material for insertion or write a complementary memo; similarly, the economists should ensure that the legal staff has an opportunity to review any separate memo that they write.

### c.   Recommending a Criminal Case

If a matter is being conducted before a grand jury, staff should identify the targets of the investigation. "Target" is defined as a person:

> as to whom the prosecutor or the grand jury has substantial evidence linking him/her[/it] to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant. An officer or employee of an organization which is a target is not automatically to be considered as a target even if such officer's or employee's conduct contributed to the commission of the crime by the target organization. The same lack of automatic target status holds true for organizations which employ, or employed, an officer or employee who is a target.

United States Attorney's Manual § 9-11.151.

A "subject" of an investigation, on the other hand, is a person or entity "whose conduct is within the scope of the grand jury's investigation." *Id.*

The Division will follow the Department's practice of informing individuals under certain circumstances that they are targets of the investigation. *See id.* § 9-11.153. In those circumstances where the individual wishes to appear before the grand jury voluntarily, *see id.* § 9-11.152, the target should be informed that he or she will be required to explicitly waive his or her privilege against

self-incrimination and that the Division attorneys may examine the person on all relevant information. Accordingly, the person may not simply read a statement and then leave the grand jury room.

Staff ordinarily will inform defense counsel that the Division is seriously considering recommending indictment. As previously discussed, staff should never inform counsel that the corporations or individuals will be indicted. Rather, counsel should be informed that the Division is seriously considering making such a recommendation to the grand jury. This procedure applies to those corporations and individuals whom staff believes pose close questions, as well as those who may ultimately be recommended for indictment.

Counsel for both corporate and individual defendants should be afforded an opportunity to meet with staff and the section or field office chief regarding the recommendation being considered. Counsel should be encouraged to present all arguments as to why it would be unwise or inappropriate—for factual, legal, or prosecutorial policy reasons—to recommend indictment of their client. If staff, after listening to the views of counsel, believes a case is appropriate, a case recommendation package should be prepared and emailed to the ATR-CRIM-ENF mailbox with a cc:/ to the appropriate senior counsel and special assistant.

Counsel do not have any absolute right to be heard by the Director of Criminal Enforcement or the Criminal DAAG although the Director and the Criminal DAAG will ordinarily give counsel an opportunity to be heard before recommending an indictment to the Assistant Attorney General. Only in very unusual circumstances will counsel be granted a meeting with the Assistant Attorney General. The Criminal DAAG, in his or her discretion, will ordinarily consider the arguments of counsel in making a final recommendation, but only after counsel has already met and discussed the issues with staff. It should be noted that neither the Criminal DAAG nor staff can disclose all relevant factual details to counsel since the secrecy provisions of Rule 6(e) of the Federal Rules of Criminal Procedure apply to the evidence developed before the grand jury.

i.    **Recommending an Indictment**

Prior to recommending an indictment, Division attorneys should familiarize themselves with the Department's Principles of Federal Prosecution, United States Attorney's Manual § 9-27.000 et seq., and Principles of Federal Prosecution of Business Organizations, United States Attorney's Manual §9-28.000 et seq.  Recommendations to indict should be consistent with these Principles

Case recommendation packages for an indictment should be addressed to the Criminal DAAG, through the Director of Criminal Enforcement. When sent forward, the case recommendation memo should be adopted by the chief or accompanied by a chief's cover memorandum. Chiefs must make clear their positions on all staff case recommendations, including each count recommended against each defendant. Chiefs may either work with staff in preparing the case recommendation and sign on to staff's memorandum, or chiefs may submit a separate case memorandum if their positions differ from staff's position. Cover memos, however, should be analytical. Chiefs should not submit pro forma, non-analytical cover memos. The case recommendation packet must also include all pleadings in the matter, a press release (*see* Chapter VII, Part H.1), and a list of counsel who have requested a meeting with the Criminal DAAG. In addition, the MTS "New Matter" form should be sent to the Premerger Notification Unit/FTC Liaison Office by emailing it to the MTS mailbox. *See* Division Directive ATR 2810.1, "Matter Tracking System."

Staff's case recommendation memorandum should generally not exceed thirty (30) pages, except in appropriate circumstances (e.g., multi-count, multi-defendant indictments), and with prior approval of the chief, in consultation with the Director of Criminal Enforcement.

When recommending an indictment, the case recommendation memo should typically contain the following sections:

(a)    Introduction

The first section should briefly summarize the nature of the criminal charge in the proposed indictment (e.g., the name of the defendant, the nature of the conspiracy to be charged in the indictment, the judicial district in which the proposed indictment would be returned) and when staff expects to present the indictment to the grand jury.

(b)    Background of the Investigation

Staff should briefly summarize the background of its grand jury investigation, including when the grand jury investigation was opened, a description of the relevant product or service that is the subject of the investigation, the identity of any dispositions reached with other subject companies or individuals in the investigation, and the status of any plea negotiations with the proposed defendants.

(c)    Proposed Defendants

The proposed corporate defendants should be listed and described. The proposed individual defendants should be listed, together with their company affiliation and the positions each held during the conspiratorial period.

(d)     Summary of the Offense

The purpose of this section should be a high-level, big-picture explanation of the key events giving rise to the criminal charges in the proposed Indictment. Staff, therefore, should avoid reciting excessive evidentiary or background detail in this section. Additionally, this section should be organized chronologically, when possible.

In conspiracy cases, staff should address two related topics: a description of the conspiracy and each proposed defendant's role in that conspiracy. Therefore, this section should include a summary of the following:

- The formation and scope of the conspiracy, including:

  - The events giving rise to the formation of the conspiracy.

  - The identity of the companies that joined the conspiracy.

  - The products or services that were covered by the conspiracy.

  - The geographic scope of the conspiracy.

  - The amount of commerce affected by the conspiracy.

  - The nature of the anticompetitive agreement that resulted from the conspiracy.

- The operation of the conspiracy, including:

  - How the conspirators communicated about the conspiracy during the conspiracy.

  - The extent to which the conspirators attempted to and did, in fact, implement the anticompetitive agreement.

  - The steps taken by the conspirators to police, enforce, and monitor the conspiracy.

  - The steps taken by the conspirators to keep the anticompetitive agreement and their conspiratorial contacts a secret.

- The duration of the conspiracy, including how and when the conspiracy was terminated or ended.

- The role that each proposed defendant played in forming, implementing, and approving the conspiracy.

If the charged offense does not involve conspiratorial activity (e.g., making false statements, obstructing justice), then staff should otherwise provide a chronology of the defendant's conduct and other relevant events that support the proposed criminal charge.

(e)    Summary of the Evidence

This section should be an analytical discussion of the evidence establishing the conspiracy or any other type of criminal conduct to be charged. Staff should begin this section with a legal discussion of the elements necessary to prove the offense, citing the applicable case law from the circuit in which the matter will be litigated. For Sherman Act prosecutions, however, staff need not address the well-established legal elements of such an offense, concentrating instead on how staff intends to prove the existence of a conspiracy and the defendant's role or participation in it. Next, staff should set forth a summary of the evidence establishing the legal elements necessary to prove the crime against each proposed defendant. Staff should organize its discussion of the evidence against each proposed defendant by witness (and by any relevant documents). When appropriate, staff should consider attaching relevant portions of transcripts of crucial grand jury witnesses in addition to copies of important documents.

In preparing this section, staff should make every attempt to analyze and summarize the evidence, not simply recite extended passages from witness testimony or from documentary evidence.

(f)    Persons and Companies Not Recommended for Indictment

In a separate section, the fact case recommendation memorandum should list the persons and companies that were potential targets of the investigation but are not being recommended for indictment. The evidence against each must be summarized, and staff must set forth the reasons why indictment is not recommended. Relevant factors, such as the extent of cooperation, age, state of health, and unusual hardship, should be described. Staff should explain the impact of the decision not to indict on the overall jury appeal of the proposed case.

(g)    Weaknesses and Defenses

Staff should include a candid, detailed analysis of the weaknesses of the case and any anticipated defenses, including those proffered by defense counsel. Matters

to be addressed include witness vulnerability, credibility problems, evidentiary problems, potential for jury nullification, and appeals to prosecutorial discretion or leniency. Likely defense motions should also be addressed.

(h)    Victims of the Violation and Staff Compliance with the Attorney General Guidelines for Victim Witness Assistance

Some of the descriptions in this section may be tentative at the case recommendation stage, but there should be as complete a discussion as possible of who the victims of the violation are, how they have been harmed, and how the Division will fulfill its responsibility to protect their rights as set forth in the Attorney General Guidelines for Victim and Witness Assistance. At a minimum, the memorandum should identify and discuss:

■    The victims' rights issues presented by the violation.

■    What victim services are appropriate under the circumstances (e.g., information/referral, protection from harassment/intimidation, consultation/notice, restitution).

■    How and when those services have been or will be provided.

Questions to be considered in drafting this section include: Has the Division already had, or is the Division likely to have, formal or informal contact with these victims? Have victims received victim notification letters, information pamphlets, and checklists and, if not, will they? If the case involves a large number of victims, will it be necessary to seek an order under 18 U.S.C. § 3771(d)(2) fashioning a reasonable procedure to effectuate victims rights and when will such an order be sought? Will there be an opportunity to consult with victims concerning the filing of charges or the disposition of the case? Have the victims sought the Division's assistance in recovering restitution and, when they have, is restitution appropriate or possible? How will the Division be assisting the victims or the probation office to complete the Victim Impact Statement?

ii.    **Recommending a Plea Agreement**

Prior to recommending a plea agreement, Division attorneys should familiarize themselves with the relevant provisions of the Department's Principles of Federal Prosecution, United States Attorney's Manual §§ 9-27.330-9-27.450 and Principles of Federal Prosecution of Business Organizations, United States Attorney's Manual § 9-28.1300. Recommendations to enter into plea agreements should be consistent with these Principles.

Recommendations to file an information and enter into a plea agreement should be addressed to the Criminal DAAG, through the Director of Criminal

Enforcement if it is the first case to arise from an investigation, or to the Director of Criminal Enforcement if it is not the first case. If staff is able to reach what appears to be a reasonable resolution of the potential criminal charges, staff should prepare a case plea recommendation memorandum setting forth, at a minimum, the following:

- A brief description of the proposed charges.

- A brief summary of the background of the investigation, including any dispositions reached with other subjects of the investigation.

- The factual basis for the proposed guilty plea, including a summary of the illegal conduct and the defendant's role or participation in that conduct.

- A brief description of the key provisions of the proposed plea agreement, including:

  · The proposed charging language, as described in the plea agreement and contained in the information.

  · An explanation of the methodology used to compute the defendant's sentencing range under the United States Federal Sentencing Guidelines.

  · An explanation of how staff arrived at the recommended sentence, either within the applicable Guidelines range (e.g., the lower end of the range) or outside of it (e.g., downward departure for substantial assistance), including the nature of the cooperation, if any, that staff expects the defendant to provide in support of the recommended sentence.

  · Any unique provisions in the plea agreement.

  · Any substantive deviations from the Division's standard plea agreement language, and whether such deviations were previously approved by OCE.

- A description of the potential charges faced by the proposed defendant, had the case proceeded to indictment.

- A discussion of relevant victims' rights issues, including: (i) whether there has been, or will be, an opportunity to consult with the victims of the offense concerning the proposed plea agreement; (ii) whether and how the victims of the violation will be notified of the final resolution of the case and of any public court proceedings; and (iii) if the plea agreement does not provide for restitution to the victims of the offense, why restitution is not necessary, appropriate, or obtainable. This assessment should include whether the defendant has sufficient resources to satisfy any future damage

award to victims of the offense in addition to paying the criminal fine if restitution is not provided. If the defendant has already paid damages to the victims or an agreement to do so has already been reached, that should be noted as well.

The plea recommendation memorandum should generally not exceed fifteen (15) pages, except in appropriate circumstances (e.g., multicount, multidefendant informations), and with prior approval of the chief, in consultation with the Director of Criminal Enforcement.

Just as with a recommendation for an indictment, the plea recommendation memorandum should be forwarded with all appropriate pleadings in the matter (typically, a draft information and plea agreement), a press release (*see* Chapter VII, Part H.1), and the original and two copies of a completed MTS "New Matter" form. *See* Division Directive ATR 2810.1, "Matter Tracking System."

## 3.   Procedures for Review of Case Recommendations

Once staff has made its submission and any meetings with counsel for prospective defendants have been conducted, the Division's reviewers assess the merits of the case with a view towards considering all matters consistently and fairly. At the conclusion of the review process, the Assistant Attorney General makes the final decision as to whether to bring the action or to decline prosecution.

The Assistant Attorney General will review the staff recommendation along with the recommendation of the reviewing Director of Enforcement and Deputy Assistant Attorney General. In some civil matters, but only rarely in criminal matters, counsel for the potential defendants may also be provided with an additional opportunity to make a presentation to the Assistant Attorney General.

When a final decision is made by the Assistant Attorney General, staff will be informed immediately. If a case is to be filed, the matter will be returned to staff with the approval papers, signed pleadings, and any other information that will be required for filing. At that point, staff will commence litigation of the matter or make its presentment to the grand jury.

In both civil and criminal actions, staff should submit a draft press release well in advance of the filing date so that it may be finalized and approved for release. Immediately after the case has been filed, staff must advise the office of the appropriate Director of Enforcement so that issuance of the press release may be authorized in a timely fashion. At the time the case is filed, staff should follow the procedures set forth in Chapter VII, Part H relating to the Department's Press

Policy. Staff should inform the office of the appropriate Director of the docket number and judge assigned to the case. For procedures following the initiation of litigation, see Chapter IV.

## H.  Other Investigative Functions

### 1.  Business Review Procedures

Under the Antitrust Division's Business Review Procedure, 28 C.F.R. § 50.6, business entities can ascertain the Division's current enforcement intentions with respect to proposed business conduct. All business review letters since 1992 appear on the Division's Internet site. The Division also periodically publishes a digest of these letters, which is indexed by commodity, entity, and date, and is circulated to the sections and field offices. The digests and indices back to 1968 are also available on the Division's Internet site.

#### a.  Origin and Development of Procedure

This procedure had its origin in what were known as "railroad release" letters, the first of which was issued by the Division in 1939. Under the "railroad release" procedure, the Division would review proposed business conduct and state whether it would forego the initiation of criminal proceedings should the proposed conduct be carried out. This was subsequently expanded to include a merger clearance procedure under which the Division would state its present enforcement intentions with respect to a merger or acquisition. In 1968, these practices were formalized as the Business Review Procedure, and regulations describing the procedure were issued at 28 C.F.R. § 50.6. The regulations were issued on February 1, 1968, *see* 33 Fed. Reg. 2,442, and have been revised twice, *see* 38 Fed. Reg. 34,804 (1973); 42 Fed. Reg. 11,831 (1977). The Hart-Scott Rodino Antitrust Improvements Act of 1976 eliminated much of the need for a business review procedure in the merger context. Today, the business review procedure is used to evaluate potential civil nonmerger conduct only; with the exception of a very limited number of health care mergers, the Division as a matter of policy does not conduct business reviews for proposed mergers.

#### b.  Purpose

The Business Review Procedure provides substantial benefits to the Division and to the business community. From the Division's perspective, the procedure is beneficial since it brings to the Division's attention proposed business conduct that may be of questionable legality and provides a mechanism by which a speedy investigation can be carried out. The business community benefits by

having a procedure that enables it to avoid costly litigation and other business problems that may arise when a company is involved in antitrust litigation with the government. *See Green v. Kleindienst*, 378 F. Supp. 1397, 1398-99 (D.D.C. 1974).

c.    Manner of Request

The business review process is initiated by a written request to the Assistant Attorney General. (The initiation of a business review request does not in any way alter the responsibility of a requesting party to comply with the premerger notification provisions of the Hart-Scott-Rodino Antitrust Improvements Act of 1976. *See* 28 C.F.R. § 50.6(7)(b).) At the outset, or at any time it appears appropriate, the Division in its discretion may refuse to consider the request. The Division would refuse a request when it does not qualify for business review treatment. This most frequently involves requests relating to ongoing business conduct, since only proposed business conduct is eligible for consideration. Where the business conduct is subject to approval by a regulatory agency, a business review request may be considered before agency approval has been obtained only where it appears that exceptional or unnecessary burdens might otherwise be imposed on the requesting party or where the agency specifically asks the requesting party to seek a business review letter. In any event, the procedure relates only to enforcement intentions under the federal antitrust laws, not under any other federal or state statute or regulatory scheme. *See* 28 C.F.R. § 50.6(7)(a).

d.    Processing the Request

The Office of Operations logs incoming requests and refers them to the appropriate staff. Staff then follows the normal procedure to obtain preliminary investigation authority. *See* Chapter III, Part B. FTC clearance must be obtained before the review takes place. As with any other investigation, no contacts with parties other than the requesting party (with the exception of other federal government agencies) should be made before preliminary investigation authority is obtained.

e.    Timing of Investigation

Requests for a business review letter should be handled as expeditiously as possible. Absent unusual circumstances, responses to such requests should be made within 90 days of the receipt of all necessary information from the requesting party. Special deadlines govern business reviews concerning export trade and health care. Export-related requests are to be answered within 30 business days from the date that the Division receives all relevant data

concerning the proposed transaction. Business review requests regarding any health care matter addressed in the [Statements of Antitrust Enforcement Policy in Health Care](#) issued by the Department and the Federal Trade Commission, except requests relating to multiprovider networks and hospital mergers outside the Statement 1 safety zone, are to be answered within 90 days after the Division receives all necessary information concerning the proposal. Requests regarding multiprovider networks or other nonmerger health care matters are to be answered within 120 days after the Division receives all necessary information. There is no time deadline for answering any business review request regarding a health care merger other than the 90-day deadline for mergers within the Statement 1 hospital merger safety zone.

In 1992, the Department adopted a pilot procedure to expedite the processing of business review requests for joint ventures and information exchange programs. *See* 58 Fed. Reg. 6132 (1992). Under that procedure, parties can submit with their request certain specified documents and information in order to expedite the investigative process. The types of information listed are those items that are typically requested by the Division after initial review of a request. By submitting these items with their request, parties can help speed the overall process. The Department committed at the time to use its best efforts to respond within 60 to 90 days when all relevant information was submitted with the initial request. Since 1992, many business review requesters have referred to the pilot program for guidance in preparing their initial requests, and Division attorneys have advised those seeking presubmission advice to consult the pilot program to determine what types of information they should send with their request.

### f.    Investigating a Business Review

Under the business review regulations, the requesting parties are under an affirmative obligation to provide the Division with all information and documents in their possession that the Division may need to review the matter. *See* 28 C.F.R. § 50.6(5). The Division may also request additional information from the party or parties seeking review. Staff attorneys should also conduct whatever independent investigation they deem necessary. Staff is encouraged to involve the economist assigned to the matter in their investigation and, where appropriate, may also wish to seek the assistance of the Legal Policy Section.

### g.    Review Procedures

After examining a business review request, the Division may "state its present enforcement intentions with respect to the proposed business conduct; decline to pass on the request; or take such other position or action as it considers appropriate." 28 C.F.R. § 50.6(8). Generally, the Division provides the party

seeking the business review with one of three responses: (a) that the Department of Justice does not at present intend to bring an enforcement action against the proposed conduct; (b) that the Department of Justice declines to state its enforcement intentions; or (c) that the Department cannot state that it would not challenge the proposed conduct if it is implemented. The second response means that the Division may file suit should the proposed conduct be implemented, while the third response indicates that a challenge is probable. Because the Division is reluctant to commit to a lawsuit (which might consume considerable resources) in a business review letter and because the Division cannot be sure that it would initiate an enforcement action absent a full investigation, the Division rarely states in a business review letter that is likely to challenge proposed conduct. Language indicating that the Division "cannot state that it will not challenge" the proposed conduct is widely understood as a "negative" response and as indicating that the Division sees a competitive problem with the proposed conduct.

Generally, each letter sets forth (a) the procedural history of the request; (b) a description of the representations made by the requestor; (c) a statement of the Division's enforcement intentions; and (d) a description of the Division's procedures in making public the information in the business review file. A business review letter must be signed by the Assistant Attorney General or, in his or her absence, by the Acting Assistant Attorney General.

Staff should prepare a memorandum with its recommendations and submit a draft business review letter setting forth the Division's position. The section or field office chief should review staff's recommendation and the business review letter and submit them, together with the chief's recommendation, to the Office of Operations for review. Staff should also submit a draft press release.

At the same time the Division notifies the requesting party of the Division's action on the business review request, a press release is normally issued describing the action and attaching a copy of the Division's letter of response. Also at this time, the letter requesting the business review and the Division's letter in response are posted onto the Division's Internet site and placed in a file in the Division's FOIA Unit, where they are available for public inspection. Thirty days after notification, the information supplied in support of the business review request is also placed in the publicly available file unless the submitter has requested confidential treatment for that information.

The business review regulations provide that information submitted by a requesting party may be withheld from disclosure to the public upon a showing that disclosure would have a detrimental effect on the requesting party's operations or its relations with customers, employees, suppliers, stockholders, or

competitors. *See* 28 C.F.R. § 50.6(10)(c)*.* Since the amendments to the Freedom of Information Act in 1974, no court cases have discussed the status under that Act of materials supplied to the government in connection with a business review request. However, the type of information generally withheld from public disclosure is confidential commercial or financial information. Such information is not subject to compulsory disclosure under the Freedom of Information Act. *See* 5 U.S.C. § 552(b)(4).

h.    Judicial Interpretation and Review

It is important to note that a business review letter states only the enforcement intentions of the Division as of the date of the letter, and the Division remains completely free to bring whatever action or proceeding it subsequently determines is required by the public interest. *See United States v. Grinnell Corp.*, 30 F.R.D. 358, 363 (D.R.I. 1962) (holding that the Department of Justice's statement of a "present intention not to take action" cannot be equated with future immunity); *see also United States v. Associated Gen. Contractors of America, Inc.*, 382 U.S. 17 (1965), *rev'g* 238 F. Supp. 273 (E.D. La. 1965); *United States v. E.I. duPont de Nemours & Co.*, 353 U.S. 586, 597-98 (1957); *United States v. Firestone Tire & Rubber Co.*, 374 F. Supp. 431, 434 n.1 (N.D. Ohio 1974).

Where the Division has stated a present intention not to bring suit, the Division has never subsequently exercised its prosecutorial discretion to bring a criminal action if there was full disclosure at the time the business review request was presented to the Division. *See* 28 C.F.R. § 50.6(9).

On only one occasion has judicial review been sought of the Division's statement of its present enforcement intentions in a business review letter. This occurred in *Holly Farms Poultry Indus., Inc. v. Kleindienst*, 1973-1 Trade Cas. (CCH) ¶ 74,535 (M.D.N.C. 1973), where the Division had declined to state a present enforcement intention not to bring an antitrust action against Holly Farms should it become a member of the National Broiler Marketing Association. Holly Farms sought judicial review of this decision, claiming jurisdiction under the Administrative Procedure Act, 5 U.S.C. §§ 701 - 06. The court, relying on 5 U.S.C. § 701(a)(2), dismissed the suit, holding that the decision of whether or not to bring an action for violation of the antitrust laws is sufficiently committed to the discretion of the Attorney General to remove it from the group of judicially reviewable actions. *See* 1973-1 Trade Cas. ¶ 74,535, at 94,382. In reaching its decision, the court relied in part on the fact that Holly Farms' inquiry concerned a proposed course of conduct. In dicta, the court suggested that there might be a different result where there was reliance on an earlier ruling and actual present conduct subjecting the inquirer to prosecution. *See id.* at 94,383. *See also*

*Greenbrier Cinemas, Inc. v. Atty. Gen. of the United States*, 511 F. Supp. 1046
(W.D. Va. 1981) (holding DOJ press release threatening legal action was
judicially reviewable under the Administrative Procedure Act. It was emphasized
in the press release that this represented a change in the Department's position.)
Of course, an inquiry concerning actual present conduct would not qualify for
treatment under the business review procedure.

## 2.   National Cooperative Research and Production Act of 1993

The National Cooperative Production Amendments of 1993, Pub. L. No. 103-42,
amended the National Cooperative Research Act of 1984, Pub L. No. 98-462,
renamed it the National Cooperative Research and Production Act of 1993, and
extended its provisions to joint ventures for production. The Standards
Development Organization Advancement Act of 2004, Pub. L. No. 108-237,
extended the provisions of the NCRPA to standards development organizations.

### a.   Purpose and Policy

The National Cooperative Research and Production Act of 1993 (NCRPA or
Act), 15 U.S.C. §§ 4301-06, is designed to promote innovation, facilitate trade,
and strengthen the competitiveness of the United States in world markets by (1)
clarifying the applicability of the rule of reason standard to the antitrust analysis
of joint ventures and standards development organizations (SDOs) while engaged
in a standards development activity, (2) providing for the possible recovery of
attorneys fees by joint ventures and SDOs that are prevailing parties in damage
actions brought against them under the antitrust laws, and (3) establishing a
procedure under which joint ventures and SDOs that notify the Department of
Justice and FTC of their cooperative ventures and standards development
activities are liable for actual, rather than treble, antitrust damages. However, this
damage limitation provision does not apply to a joint venture's production of a
product, process, or service unless "(1) the principal facilities for such production
are located in the United States or its territories, and (2) each person who controls
any party to such venture (including such party itself) is a United States person,
or a foreign person from a country whose law accords antitrust treatment no less
favorable to United States persons than to such country's domestic persons with
respect to participation in joint ventures for production." 15 U.S.C. § 4306.

The legislative history of the NCRPA indicates that "[t]he phrase 'whose law' . .
. is intended to include not only a country's domestic antitrust law but also all
international agreements and other binding obligations to which that country and
the United States are parties." H.R. Rep. No. 103-94, at 20 (1993). Thus, a
country that is a party to certain international agreements with the United States
such as treaties of Friendship, Commerce and Navigation, Bilateral Investment

Treaties, Free Trade Agreements, and various OECD instruments, satisfies the requirements of the Act. *See id.* This includes most countries.

**b.    Notification to DOJ and FTC**

The rule-of-reason and attorneys' fees provisions of the NCRPA automatically apply to all joint ventures and SDOs covered by the Act. However, eligibility for the Act's detrebling provision depends on the filing of a notification with the federal antitrust enforcement agencies. In order to obtain damage protection, any party to a joint venture covered by the Act may, not later than 90 days after entering into a written agreement to form the venture, file simultaneously with the Department of Justice and the Federal Trade Commission a written notification disclosing the identities of all parties to the venture and the nature and objectives of the venture. In the case of a joint venture one of whose purposes is the production of a product, process, or service, the notification must contain additional information: the nationality of all parties and the identity and nationality of all persons who control any party to the venture, whether separately or with one or more other persons acting as a group for the purpose of controlling such party. Notifications by SDOs must be filed within 90 days after commencing a standards development activity engaged in for the purpose of developing or promulgating a voluntary consensus standard and must disclose the name and principal place of business of the SDO as well as documents showing the nature and scope of its standards development activity. An original and one copy of the notification, along with copies of a proposed Federal Register notice, must be filed with the Department, and one copy must be filed with the FTC. Such additional notifications as are appropriate to extend the Act's protection to new or different activities undertaken by a joint venture or SDO, or to disclose changes in membership of a joint venture, also must be filed. In order to maintain the protection of the Act, such supplemental notifications must be filed within 90 days of the change prompting the notification.

Notifications filed under the Act by joint ventures should make clear the identity of all parties to the venture. The list of parties should include "the real parties in interest." Joint Explanatory Statement of the Committee of Conference on S. 1841, H.R. Rep. No. 98-1044, at 19 (1984). Notifications should also include a description of the nature and objectives of the venture, including a concise statement of its purposes. Parties filing notifications of joint ventures for production should state clearly that a purpose of their venture is production. They should also provide the nationality of all parties and the identity and nationality of all persons controlling such parties. The meaning of "control" of any party is intended to mean having the power to direct the management or policies of a person. This controlling influence may be exercised either directly or indirectly and the means used can vary. For example, it may be exercised through the

ownership of voting securities, through a contractual right, or through participation on the board of directors. *See* H.R. Rep. No. 103-94, at 19 (1993); S. Rep. No. 103-51, at 11 (1993). In the case of a corporation, parties should provide the name, place of incorporation, and location of principal executive offices. In the case of an unincorporated firm, comparable identifying information should be provided. *See* S. Rep. No. 103-51, at 13 (1993). Notifications filed by SDOs should provide the name and principal place of business of the organization and should include documents showing the nature and scope of the standards development activities for which protection is being sought.

In general, the manner and extent of the notification is left to the submitting entities; they are to exercise their own discretion in determining the quantity and form of the information required adequately to describe the nature and objectives of their venture, *see* H.R. Rep. No. 98-1044, at 18-19 (1984), or the nature and scope of their standards development activities. Parties should be aware, however, that the damage protection of the Act is dependent on the adequacy of their notification. All written notifications filed pursuant to the Act should be delivered to each of the following offices:

- U.S. Department of Justice (2 copies)
  Antitrust Division
  Premerger Notification Unit
  950 Pennsylvania Ave., N.W., Room 3335
  Washington, DC 20530
  (For overnight delivery, use ZIP Code 20004.)
  Phone: 202-514-2558

- Federal Trade Commission (1 copy)
  Office of Policy and Evaluation
  6th & Pennsylvania Ave., N.W., Room 392
  Washington, DC 20580

c.    Review by Section

The Division has certain responsibilities under the NCRPA, including receipt of parties' original and supplemental notifications of their joint venture and standards development activities and publication of Federal Register notices describing joint ventures and SDOs that elect to file notifications under section 6 of the Act.

Once a party submits a notification under the Act, it is date-stamped and recorded. A copy of the notice is then forwarded to the appropriate section for

immediate review. NCRPA notifications are reviewed for two purposes. The first is to determine whether the notification discloses information of antitrust concern that merits the opening of a preliminary investigation into the activities of the joint venture or SDO. The second purpose is to permit the preparation of a Federal Register notice that will provide the joint venture or SDO protection from treble damages. (The preparation and publication of the Federal Register notice proceeds regardless of whether a preliminary investigation is begun.) For this latter purpose, the section reviews the notification expeditiously to determine whether it adequately identifies, for a joint venture, the parties to the venture and the venture's nature and objectives or, for a SDO, the name and principal place of business of the organization and the nature an scope of its activities. Although the legislative history indicates that the extent of the disclosure in the notification is largely up to the joint venture or SDO, sufficient information must be provided to enable the Department to publish the Federal Register notice described below. If there is doubt as to the adequacy of the notification, the section staff should promptly contact the Premerger Notification Unit. Because only conduct that is within the scope of a notification that has been filed under section 6(a) of the Act, 15 U.S.C. § 4305(a), receives protection from treble-damage liability, *see* 15 U.S.C. § 4303(a), persons providing information to the antitrust enforcement agencies for the purpose of obtaining or extending the protections of the NCRPA should always do so in accordance with the statutory requirements.

All information and documentary material submitted as part of a notification filed under the Act, as well as all other information obtained by the Division or FTC in the course of any investigation, administrative proceeding, or case with respect to a potential violation of the antitrust laws by a joint venture or SDO with respect to which such notification was filed, is exempt from disclosure under the Freedom of Information Act and may not be made publicly available except in a judicial or administrative proceeding in which such information and material is subject to a protective order. *See* 15 U.S.C. § 4305(d). Thus, all notifications should be held strictly confidential.

i.    **Original Notifications**

Notifications filed under the NCRPA by joint ventures must include the identities of all parties to the venture and a description of the nature and objectives of the venture, including a concise statement of its purpose. Organizations that are parties to joint ventures for research and development only should be identified by name and the location of their principal executive offices (city and state). Notifications concerning joint ventures for production should state clearly that a purpose of their venture is production and must also provide the nationality of all parties and the identity and nationality of all persons controlling such parties. Organizations that are parties (or persons controlling parties) to joint ventures

involving production should be identified, in the case of a corporation, by providing the name, place of incorporation (the state of incorporation if the corporation is domestic and the country of incorporation if the corporation is foreign), and location of principal executive offices. In the case of an unincorporated firm, comparable identifying information must be provided. Notifications submitted by SDOs must disclose the name and principal place of business of the SDO and provide documents showing the nature and scope of the organizations standards development activities. If, after consulting with the Premerger Notification Unit, a determination is made that the required information has not been submitted, filers should be informed as promptly as possible that their notification is not sufficient to qualify for the protections of the Act and that a Federal Register notice will not be published until a proper notification has been submitted.

ii.   **Supplemental Notifications**

Notifications may also be filed to preserve or extend the protections of the NCRPA to existing ventures or SDOs whose activities have changed or, with respect to joint ventures, whose membership has changed, since the original notification. Supplemental notifications need only reflect the changes to the venture or SDO being disclosed (e.g., identify the parties being added to or dropped from a joint venture) and need not repeat information that has been disclosed in prior notifications. Thus, supplemental notifications should be reviewed in conjunction with previous filings to ensure that changes to either the parties or purposes disclosed in prior notifications do not now raise antitrust concerns. Federal Register notices are prepared for supplemental notifications in the same manner as for original notifications.

d.   **Preparation of the Federal Register Notice**

The Act provides that the Department of Justice or the FTC shall, not later than 30 days after receiving a notification, publish in the Federal Register a notice that identifies the parties to a joint venture and describes in general terms the venture's area of planned activity (*see* sample joint venture notice), or that identifies a SDO engaged in standards development activity and describes such activity in general terms (*see* sample SDO notice). *See* 15 U.S.C. § 4305(b). The Division has assumed the responsibility of publishing notices in the Federal Register for all notifications filed under the NCRPA. Parties filing notifications should submit a draft Federal Register notice along with their notification. Regardless of whether the parties have done so, it is the responsibility of staff to prepare the actual Federal Register notice. Prompt preparation and publication of the notice is required. Staff must keep in mind that both the provisions of the NCRPA and its legislative history indicate concern that competitors not have

access to confidential details that a party may wish to provide in its notification, but that need not be made public in order to describe the activities of a joint venture or SDO.

e.   Notice to Parties

The Act requires that the proposed Federal Register notice be made available to the parties to a venture, or to a standards development organization, as the case may be, for review prior to its publication. Thus, after the notice is prepared, it should be sent to the parties or organization for review as expeditiously as possible. This must be done in writing (*see* sample transmittal letter), and appropriate records kept. It is acceptable to fax the notice to the parties or to the organization.

Any party filing a notification on behalf of a joint venture is invited to include a statement to the effect that it has been authorized to review the Federal Register notice on behalf of all venturers, along with the name and contact information for the person so authorized. Otherwise, the notification must include the names and contact information for all parties to whom the notice should be made available for review. A notification on behalf of a SDO should provide the name and contact information of an individual who is authorized to review the Federal Register notice on behalf of the organization.

In view of the fact that the Federal Register notice must be published within 30 days of the Division's receipt of notification, parties are asked to express any objections they have to the proposed notice no later than two working days after receiving it. An effort should be made to resolve any such objections, keeping in mind the requirements of the Act and the purpose of the notice. If the Division and the parties are unable to agree on the contents of the Federal Register notice, the parties have the option of withdrawing their notification but must do so before publication of the notice.

f.   Review and Publication of Notice

After the Federal Register notice has been prepared and reviewed by the parties or SDO, they should forward it to the Premerger Notification Unit along with a memorandum setting forth the date on which the notification was received by the Division, a copy of the letter or letters making the notice available to the parties or SDO, and a description of any problems or objections regarding contents. The notice and memorandum should then be forwarded as soon as possible, but no more than 14 calendar days after the section has received the notification from the Premerger Notification Unit. After review and approval by the Office of Operations, the Premerger Notification Unit forwards the notice to the Federal

Register for publication and arranges for permanent records of the notifications and Federal Register notices to be maintained.

## 3.   Export Trade Certificates

### a.   Overview of the ETC Act

The Export Trading Company Act of 1982, Pub. L. No. 97-290, 96 Stat. 1233, ("the ETC Act") is designed to increase U.S. exports of goods and services. Title III of the ETC Act, 15 U.S.C. §§ 4011-4021, reduces uncertainty concerning the application of the U.S. antitrust laws to export trade through the creation of a procedure by which persons engaged in U.S. export trade may obtain an export trade certificate of review (ETCR).

ETCRs are issued by the Secretary of Commerce with the concurrence of the Attorney General. Persons named in the ETCR obtain limited immunity from suit under both federal and state antitrust laws for activities that are specified in the certificate and that comply with the terms of the certificate. In order to obtain an ETCR, an applicant must show that proposed export conduct will:

- Result in neither a substantial lessening of competition or restraint of trade within the United States nor a substantial restraint of the export trade of any competitor of the applicant.

- Not unreasonably enhance, stabilize, or depress prices in the United States of the class of goods and services covered by the application.

- Not constitute unfair methods of competition against competitors engaged in the export of the class of goods or services exported by the applicant.

- Not include any act that may reasonably be expected to result in the sale for consumption or resale in the United States of such goods or services.

15 U.S.C. §4013(a). Congress intended that these standards encompass the full range of the antitrust laws, as defined in the ETC Act.

Although an ETCR provides significant protection under the antitrust laws, it has certain limitations. First, conduct that falls outside the scope of a certificate remains fully subject to private and governmental enforcement actions. Second, an ETCR that is obtained by fraud is void from the outset and thus offers no protection from the antitrust laws. Third, any person that has been injured by certified conduct may recover actual (though not treble) damages if that conduct is found to violate any of the statutory criteria described above. In any such action, certified conduct enjoys a presumption of legality, and the prevailing party is entitled to recover costs and attorneys' fees. Fourth, an ETCR does not

constitute, explicitly or implicitly, an endorsement or opinion by the Secretary of Commerce or by the Attorney General concerning the legality of such business plans under the laws of any foreign country.

The Secretary of Commerce may revoke or modify an ETCR if the Secretary or the Attorney General determines that the applicant's export activities have ceased to comply with the statutory criteria for obtaining a certificate. The Attorney General may also bring suit under Section 15 of the Clayton Act, 15 U.S.C. § 25, to enjoin conduct that threatens "a clear and irreparable harm to the national interest," even if the conduct has been approved as part of an ETCR. 15 U.S.C. § 4016.

The Commerce Department, in consultation with the Department, has issued regulations for issuing ETCRs, see 15 C.F.R. §§ 325.1 et seq., and guidelines setting forth the standards used in reviewing ETCR applications, see 50 Fed. Reg. 1786 (1985). The ETC Guidelines contain examples illustrating application of the certification standards to specific export trade conduct, including the use of vertical and horizontal restraints and technology licensing arrangements. In addition, the Commerce Department's Export Trading Company Guidebook provides information on the functions and advantages of establishing or using an export trading company, including factors to consider in applying for an ETCR. The Commerce Department's Office of Export Trading Company Affairs provides advice and information on the formation of export trading companies and facilitates contacts between producers of exportable goods and services and firms offering export trade services.

b.   Initial Processing of an Application

Once a complete ETCR application is submitted to the Commerce Department, a determination generally must be made within 90 days. If the Commerce Department proposes to issue a certificate, and the Division does not object within the time provided in the regulations, the certificate may be issued, and the immunity granted, without our express concurrence. Accordingly, it is extremely important that Division attorneys meet the deadlines set forth herein.

All ETCR applications are filed with the Commerce Department, which reviews them to determine if they are complete. The Commerce Department must make its determination within five working days; when the application is complete, it is "deemed submitted" and the statutory 90-day period begins to run. A copy of the application must be given to the Division within seven days after it is deemed submitted. The Division has no role in determining whether an application is complete. If an application has been accepted that, in staff's view, does not

contain important information, staff should contact the Foreign Commerce Section.

The Foreign Commerce Section is responsible for receiving, logging, copying, assigning, and circulating applications to the civil litigating components for review, generally making assignments on the basis of industry or regulatory expertise. The Premerger Notification Unit notifies the FTC of pending applications, and determines if the FTC has any pending matters or particular expertise related to the application. The FTC, however, has no role in determining whether a certificate should be issued, so this clearance process differs from the formal clearance process the Division normally employ in other types of investigations.

Once an application is assigned to a section or field office, no preliminary investigation authority is needed in order to contact third parties to obtain industry information or other information useful in processing an application. The Foreign Commerce Section is responsible for coordinating all ETC activities in order to maintain consistent Division policy and procedure. Accordingly, copies of all memoranda and correspondence should be sent to the Foreign Commerce Section throughout the review process.

c.    Requests for Supplemental Information

i.    **Informal Requests**

Formal requests for information are permitted by the ETC Act and regulations. Although such requests can be useful, they are not the exclusive means of obtaining information and ordinarily should not be used in the first instance. Rather, the most useful way to obtain information is to arrange very early in the review process for a meeting or telephone conference call with the Commerce Department attorney assigned to the matter and the applicant. During this informal interview, most questions can be answered. This is, therefore, usually the quickest and most efficient means of obtaining supplemental information. If it is necessary to clarify specific information obtained in such an interview, staff should consider whether to send a letter to the applicant confirming the conversation (coordinating with the Commerce Department) or whether to rely on a file memorandum of the interview. If there are questions remaining after an informal interview, the attorney should consider whether to proceed by means of a formal request for information.

ii.    **Formal Requests**

The Commerce Department may seek additional information "necessary to make a determination on the application," and must do so if the Division so requests. 15 C.F.R. § 325.3(g). A formal Request for Supplemental Information may be used to obtain documents or answers to questions, and the rule is arguably broad enough to encompass a request for an interview. The reviewing component, in consultation with the assigned economist and Foreign Commerce, should determine whether such a request is necessary in order to determine if the application meets the standards of the ETC Act. If they conclude that a request is necessary, the reviewing component should submit the proposed request to the Director of Operations, through the Foreign Commerce Section, ordinarily by the 20th day of an application's review. The reviewing component should also notify the Commerce Department that it intends to submit a request prior to doing so.

If the applicant agrees to submit the requested information, the 90-day period is tolled from the date the request is sent to the applicant by the Commerce Department until the date when the information is received by Commerce and is considered complete by Commerce (and by the Division, if Division staff prepared the Request). *See* 15 C.F.R. § 325.3(g). The Commerce Department will notify the Division if the applicant has agreed to supply the information. If the applicant does not agree, the Division may notify the Commerce Department by letter from the Director of Operations that the information in the Division's possession is inadequate to make a determination. The Secretary of Commerce is then required to deny the application if it is not withdrawn.

If the Commerce Department makes a request, the information will be provided to the Division when it is received. However, unless the Division has also requested the information, the Commerce Department has sole authority to decide whether the information submitted in response to the request is complete.

When the information is received, the reviewing component should review it promptly (i.e., within five days) to determine if it is complete. Written confirmation that it is a complete response should be sent by the chief to the Commerce Department. The Foreign Commerce Section should also receive a copy of the letter for purposes of recalculating the statutory deadlines. If the response is not complete, the reviewing component should informally contact the Commerce Department to attempt to obtain a complete response from the applicant. The reviewing component should carefully consider whether a determination whether the application should be granted can be made on the basis of the available information or whether the application must be denied because the applicant has not met its burden. In the former case, the reviewing chief should send a letter to the Commerce Department withdrawing the unanswered requests, thus restarting the statutory clock. In the latter case, the reviewing component should prepare a letter for the signature of the Director of

Operations or relevant Deputy Assistant Attorney General setting forth the deficiencies in the response and stating that the information in the Division's possession is insufficient to make the determination. The applicant must then withdraw the application or have its application denied.

Except in extraordinary circumstances, only one request will be sent during the review of any application. Accordingly, requests should include all documents and information reasonably necessary to decide whether the proposed activities should be certified but should also be drafted as specifically and narrowly as possible to avoid unnecessary burden and delay. Since only one request will be sent, it is important to ensure, before certifying the response as complete, that all of the requested documents and information that are reasonably necessary have been received. Technical but unimportant deficiencies will not be asserted as a reason for declining to certify the response as complete.

### d.    Confidentiality of Information

The ETC Act establishes the conditions under which information submitted by any person "in connection with the issuance, amendment, or revocation of a certificate" must be kept confidential and is exempt from disclosure under the Freedom of Information Act. *See* 15 U.S.C. § 4019(a).

In addition, the Division and the Commerce Department are prohibited from disclosing commercial or financial information that is privileged or confidential if disclosure would harm the person who submitted it, except in certain circumstances that are identified in the ETC Act, *see* 15 U.S.C. § 4019(b), and in the regulations, *see* 15 C.F.R. § 325.16(b)(3). (The person that submitted the information may designate it as privileged or confidential, but such designation is not dispositive of whether it falls into that category.) If disclosure is sought in connection with a judicial or administrative proceeding (one of the enumerated exceptions), the Division is required to attempt to notify the person who submitted the information. *See* 15 C.F.R. § 325.16(c).

### e.    Analysis of the Application

The first step in analyzing an application is to determine whether the applicant and conduct sought to be certified are eligible for certification. An applicant must be a "person" as defined in 15 U.S.C. § 4021(5). The ETC Guidelines § III.A provide additional information about the meaning of "person." In addition, conduct must be "limited to export trade," 15 U.S.C. § 4012(a)(1), as that term is defined in 15 U.S.C. § 4021(1). The meaning of export trade activity is discussed in the ETC Guidelines § III.B.

The next step is to determine whether the applicant meets the statutory standards for obtaining a certificate, which are set out above. *See* 15 U.S.C. § 4013(a). As noted above, the statutory standards are intended to encompass the full range of the antitrust laws. The ETC Guidelines § IV provide a detailed discussion of these standards and their application to hypothetical situations. Finally, the reviewing component must determine that the language in the proposed certificate is neither imprecise nor vague. Such language may result in an overbroad grant of antitrust immunity or may subject the certificate holder to liability for conduct it incorrectly assumed was covered by the certificate.

By informal agreement, the Commerce Department and the Division are committed to notifying each other as soon as either agency believes there to be a problem with a certificate. This practice will allow maximum time to resolve any issues without either denying the application or requesting the applicant's consent to a 30-day extension of the 90-day statutory period. *See* 15 C.F.R. § 325.5(a). In particular, the reviewing component should attempt to have the Commerce Department place in the draft certificate any conditions or modifications the Division believes will be required.

If the Attorney General or the Secretary of Commerce considers it necessary, and the applicant agrees, the deadline for decision may be extended by 30 days. *See* 15 C.F.R. § 325.5(a). Such extensions are sought only in unusual circumstances and are arranged in consultation with the Commerce Department and the applicant.

### f.    Recommendation and Review

The reviewing section or field office will prepare a written recommendation of what action should be taken on the application. Legal and economic staff are responsible for coordinating their review to ensure appropriate EAG input into the analysis leading to the recommendation. The recommendation package must include the following:

- A memorandum from the chief to the Director of Operations explaining the recommendation and the reasons for it. The first page must state clearly the applicable deadline for decision and communication of the Division's decision to the Commerce Department.

- The proposed certificate submitted by the Commerce Department. (Commerce must provide the proposed certificate to the Division no later than the 60th day of the review period.)

- A proposed letter from the Assistant Attorney General to the General Counsel of the Commerce Department stating the Department of Justice's

decision on the application. If the recommendation is to decline to concur, the letter must explain the reason for the nonconcurrence.

- If the proposed conduct could be certified in whole or in part, but not on the basis of the language in the Commerce Department's proposed certificate, a proposed revised certificate must be enclosed with the proposed Assistant Attorney General letter.

The original and one copy of the recommendation must be given to the Foreign Commerce Section for forwarding to the Director of Operations no later than the 70th day of the review process. (This date will be specified in the cover memorandum from the Foreign Commerce Section making the initial assignment.) Any separate recommendation from EAG must be sent forward on the same day.

The Director of Operations will review the recommendation and forward it to the relevant Deputy Assistant Attorney General and the Assistant Attorney General for a determination as to whether to concur in the issuance of the proposed certificate. The Assistant Attorney General's decision must be made and sent to the Commerce Department by no later than the 80th day (i.e., ten days prior to the expiration of the statutory deadline).

Time may be very short between the receipt of the proposed certificate from the Commerce Department and the time by which the Assistant Attorney General must make a decision on the application. Ordinarily, the Commerce Department and staff will have discussed the proposed certificate well in advance of its formal submission. However, the Division cannot be certain about the terms contained in the proposed certificate until the Commerce Department sends it to the Division 20 days before the expiration of the Division's deadline. Accordingly, staff should endeavor to obtain Commerce Department agreement to any necessary changes before submitting its recommendation to the Director of Operations.

g.    Decision by the Assistant Attorney General

The Assistant Attorney General must decide whether to concur in the Commerce-proposed certificate and communicate that decision to Commerce no later than ten days prior to the end of the statutory time period for final determination. *See* 15 C.F.R. § 325.5(c)(2). This decision will be communicated to the Commerce Department by letter, with the proposed certificate attached. If the decision is not to concur in the issuance of the certificate, the Assistant Attorney General must "state the reasons for the disagreement" with the proposed certificate. *Id.* Thus, the letter prepared for the Assistant Attorney General by the reviewing section or field office must be adequate in this regard. If the Assistant

Attorney General does not communicate a decision to the Commerce Department by the 80-day deadline, the Division is deemed to have concurred in the proposed certificate. *See* 15 C.F.R. § 325.5(c)(3).

If the Assistant Attorney General disagrees with the proposed certificate, the Commerce Department may choose to revise the proposed certificate to respond to the Division's concerns. The certificate may not be issued unless the Assistant Attorney General concurs in the revision. *See* 15 C.F.R. § 325.5(c)(2). The Commerce Department must consult with the applicant before issuing any certificate different from that proposed by the applicant. *See* 15 C.F.R. § 325.5(d). If the matter cannot be resolved before the statutory deadline, the Assistant Attorney General or the Commerce Department may take up to an additional 30 days to make a decision, if one or both agencies considers it necessary and the applicant consents. The request for an extension ordinarily will be made by the Commerce Department.

## h.    ETC Notebook

Each of the Division's civil litigating components should have a copy of the ETC Notebook, which is prepared and periodically updated by the Foreign Commerce Section. The Notebook outlines other procedural aspects of the ETC process, including handling of requests for expedited treatment, requests for reconsideration, and revocation and modification procedures. In addition, the Notebook contains the ETC Act, implementing regulations, ETC Guidelines, excerpts from the ETC Act's legislative history, and sample letters and exemplars.

# 4.    Judgment Monitoring, the JTS System, and Judgment Enforcement

## a.    Judgment Monitoring

In May 1984, the Division lodged in its litigating sections and field offices direct responsibility for all outstanding judgments. At that time, every decree was assigned to an attorney who became responsible for monitoring compliance, initiating any appropriate enforcement actions, and considering whether the decree was a candidate for modification or termination or being placed in a "no monitoring required" status.

The specific steps necessary to ensure compliance with a decree will vary depending on the nature of the decree. Where a judgment requires affirmative acts (e.g., divestiture, submission of periodic reports), it will be necessary to determine whether the required acts have occurred and to evaluate the sufficiency of compliance. With respect to judgments that prohibit certain actions, it may

also be necessary to conduct periodic inquiries to determine whether defendants are observing the prohibitions. Such inquiries should be scheduled when and as appropriate.

When periodic inquiries fall due, they should be conducted in a manner that maximizes the likelihood of detecting behavior violative of the decree and yet minimizes the investigative effort. The first stage should be limited to informal contact with the defendants and an analysis of publicly available information. Review of such information may be sufficient to demonstrate that a firm has not violated a decree provision. If an informal inquiry leads the assigned attorney to believe that there may be a violation, then preliminary investigation authority must be requested. As with all investigations, FTC clearance must also be obtained, as a means of notifying the FTC that the Division will be conducting an investigation.

b.    JTS and Reporting Requirements

The decentralization of the Division's judgment monitoring and enforcement responsibilities has made it necessary to establish the Judgment Tracking System (JTS, formerly known as the Judgment Enforcement Management Information System or JEMIS), a computer-supported system designed to catalog and track compliance with the Division's decrees. JTS is monitored by the Office of Operations. All of the Division's civil decrees have been coded and placed in the JTS system. The paralegals in the Office of Operations are responsible for working with the Premerger Office to ensure that all new judgments are recorded in the database.

The JTS program displays, for each judgment, a few matter-level descriptive fields, including DOJ file number and matter description, and prompts users to update monitoring section and attorney and the monitoring status, enter section notes, and record judgment terminations, modifications, and reporting requirements.

Each civil section has a judgments coordinator that is responsible for updating JTS whenever a change has occurred in a judgment. The attorney assigned to a particular judgment is responsible for reporting, through the coordinator, any changes that have occurred with respect to a judgment since its entry. Information commonly reportable includes changes in corporate name, date of entry of the decree, decree terminations or modifications, receipt of compliance reports, dates on which other affirmative acts (such as divestiture) occurred, changes in corporate status, such as bankruptcy, and information relating to successors, acquisitions and mergers.

c.    Judgment Enforcement

If, as a result of a preliminary investigation, staff concludes that the final judgment may have been violated, consideration should be given to instituting an enforcement action. There are two types of contempt proceedings, civil and criminal, and either or both may be used. Attorneys should consult United States Attorney's Manual § 9-39.000 for additional information about contempt proceedings.

Civil contempt has a remedial purpose: compelling obedience to an order of the court for the purpose of enforcing the government's rights or obtaining other relief. *See Int'l Bus. Mach. v. United States*, 493 F.2d 112, 115 (2d Cir. 1973); *Bradley v. Amer. Household, Inc.*, 378 F.3d 373, 378 (4th Cir. 2004). In designing an appropriate remedy, staff should consider seeking both additional injunctive relief and fines that accumulate on a daily basis until compliance is achieved. *See United States v. Work Wear Corp.*, 602 F.2d 110 (6th Cir. 1979). Civil contempt is established by "clear and convincing" proof that there is a lawful order and that the order was violated. *See Kan. City Power & Light Co. v. NLRB*, 137 F.2d 77, 79 (8th Cir. 1943); *Cromer v. Kraft Foods North Am., Inc.*, 390 F.3d 812, 821 (4th Cir. 2004). Willfulness need not be shown, and good faith is not a defense. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *Al C. Rinaldo, Inc. v. Bach to Rock Music School, Inc.*, 279 F. Supp. 2d 624, 628 (E.D. Pa. 2003).

Criminal contempt is not remedial; its purpose is to punish the violation, to vindicate the authority of the court, and to deter others from engaging in similar conduct in the future. Criminal contempt is established under 18 U.S.C. § 401(3) by proving beyond a reasonable doubt that there is a clear and definite order, applicable to the contemnor, which was knowingly and willfully disobeyed. *See Chapman v. Pac. Tel. & Tel. Co.*, 613 F.2d 193, 195 (9th Cir. 1979); *Yancheng Baolong Biochemical Prods. Co., Ltd. v. United States*, 406 F.3d 1377, 1381 (Fed. Cir. 2005). Willfulness may be inferred from the facts and circumstances, *see United States v. Greyhound Corp.*, 508 F.2d 529, 532 (7th Cir. 1974), and from a reckless disregard of obligations to the court, *see In re Allis*, 531 F.2d 1391, 1392 (9th Cir.), *cert. denied*, 429 U.S. 900 (1976); *United States v. Metro. Disposal*, 622 F. Supp. 1262, 1264-65. The penalty may be a fine, imprisonment, or both.

Jurisdiction and venue for contempt proceedings rest with the court whose order has been disobeyed. *See Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448 (1932). Both civil and criminal contempt may be instituted by a petition for an order to show cause why the respondent should not be held in contempt. *See Fed. R. Crim. P. 42*. A criminal contempt proceeding may also be instituted by

indictment, *see United States v. Snyder*, 428 F.2d 520, 522 (9th Cir.), *cert. denied*, 400 U.S. 903 (1970), or by petition following a grand jury investigation, *see United States v. Gen. Dynamics Corp.*, 196 F. Supp. 611 (E.D.N.Y. 1961). If the proceeding is handled by indictment, the notice requirements of Rule 42 must be satisfied.

The Division has instituted a number of contempt proceedings to enforce its judgments. *See*, *e.g.*, *United States v. Work Wear Corp.*, 602 F.2d 110 (6th Cir. 1979); *United States v. Greyhound Corp.*, 508 F.2d 529 (7th Cir. 1974); *United States v. N. Suburban Multi-List, Inc.*, 516 F. Supp. 640 (W.D. Pa. 1981); *United States v. NYNEX Corp.*, 814 F. Supp. 133 (D.D.C.), *rev'd and vacated*, 8 F.3d 52 (D.C.Cir. 1993); *United States v. Twentieth Century-Fox Film Corp.*, 700 F. Supp. 1246 (S.D.N.Y. 1988), *modified*, 882 F.2d 656 (2d Cir. 1989), *cert. denied*, 493 U.S. 1021 (1990). Additional information may be obtained from OCE.

In some situations, rather than seeking sanctions for contempt where the correct interpretation of a judgment is disputed, it may be appropriate simply to obtain a court order compelling compliance with the judgment. *See*, *e.g.*, *United States v. CBS Inc.*, 1981-2 Trade Cas. (CCH) ¶ 64,227 (C.D. Cal. 1981).

## 5.   Judgment Modifications and Terminations

Attorneys assigned to decrees for enforcement purposes should also always consider whether the decree is or has become anticompetitive or otherwise undesirable. If so, consideration should be given to a modification or termination proceeding, consistent with the Division's resource availability. Decree provisions that were perfectly sensible when entered can become inappropriate over time. Also, certain provisions of a decree may reflect economic theories no longer accepted (e.g., that non-price vertical restraints should be treated as *per se* unlawful).

### a.   Phase One: Obtaining Approval to Consent to Modification or Termination

#### i.   Initiation of the Process

When a judgment is identified by staff as a candidate for possible modification or termination, or when a judgment defendant initiates a request to terminate or modify its decree, the section or field office should promptly request from each judgment defendant:

1.   A detailed explanation as to (a) why the judgment should be vacated or modified, including information as to changes in circumstances or law that

make the judgment inequitable or obsolete, and (b) the actual anticompetitive or other harmful effects of the judgment.

2.    A statement of the changes, if any, in its method of operations or doing business that the defendant contemplates in the event that the judgment is vacated.

3.    A commitment to pay the costs of appropriate public notices in the trade press and The Wall Street Journal, or as may otherwise be required by the Division, in connection with the proposed termination or modification of the judgment.

In very exceptional circumstances, the Division may be willing to bear the costs of public notices (e.g., if the harmful effects of the judgment are being borne principally by third parties rather than by the defendant).

After receipt of a satisfactory response to the request, staff should submit a brief memorandum requesting preliminary investigation authority. As soon as preliminary investigation authority is received and the Division has clearance from the FTC, an investigation may be commenced to determine whether termination or modification is in the public interest.

The Division has an expedited review process for parties seeking to terminate or modify consent decrees that do not contain an automatic termination provision. *See* Press Release, Department of Justice, Department of Justice Announces New Protocol to Expedite Review Process for Terminating or Modifying Older Antitrust Decrees (April 13, 1999). Most consent decrees entered into before 1980 do not automatically terminate. Under the protocol, the party seeking termination or modification provides with its request information that the Division would normally gather during its review, as specified in the attachment to the press release. The requesting party also must inform other defendants bound by the decree that it is seeking termination or modification. Finally, at the start of the Division's review, the requesting party must publish at its own expense notice of its intent to seek termination or modification and invite interested parties to provide the Division with relevant information. This notice does not replace the notice and comment period that occurs after the motion to terminate or modify is filed with the court.

**ii.    Recommendation, Review, and Applicable Standards**

At the conclusion of the investigation, staff should prepare a memorandum for the Director of Operations setting forth its recommendation whether the Division should consent to terminate or modify the decree. The Division will usually give its consent when changed circumstances in the industry render previously neutral

provisions anticompetitive. However, a demonstration of change is not essential, nor is it a prerequisite to termination that the decree actually has had anticompetitive effects. For example, the Division is likely to consent to modification or termination of a decree that prohibits the defendant from using efficient marketing techniques that (1) are available to other firms in the market, (2) would ordinarily be tested under the rule of reason, and (3) would not today restrain competition.

More specifically, if a decree predates the decision in *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977), and contains absolute prohibitions on nonprice vertical restraints, the Division is usually willing to vacate the decree on the grounds that such conduct is today judged under the rule of reason and the prohibition may inhibit procompetitive conduct. The Division is also inclined to vacate older decrees that only prohibit *per se* illegal conduct on the ground that such decrees merely duplicate existing law and are no longer needed for deterrence now that criminal Sherman Act abuses are felonies. Whether the Division will consent to terminate decrees that perpetually enjoin horizontal restraints will depend on the particular firms and industry. The Division would be inclined to oppose the termination of *per se* decrees against firms and industries that have a history of price fixing, particularly if the structure of the market remains conducive to cartel behavior. On the other hand, if the character of the industry or its firms has changed over the years and is no longer conducive to cartel behavior, the Division would be inclined to approve termination.

The Division is less likely to support termination of a decree if there are recent decree violations; ongoing violations militate even more strongly against Division support for termination.

b.   **Phase Two: Procedures for Termination or Modification**

i.   **Necessary Papers**

If staff's recommendation is to modify or terminate a decree, its recommendation should be accompanied by the following papers:

■   A stipulation package, consisting of the government's tentative consent to termination of the decree (prepared for the signatures of staff, the chief, the Director of Operations, the appropriate Deputy Assistant Attorney General, the Assistant Attorney General, and the defendants) and the following attachments:

a.   A form of notice to be printed in newspapers and periodicals (designated as Exhibit A).

    b.    An order directing publication of the notice (designated as Exhibit B).

    c.    An order terminating the decree (designated as Exhibit C).

    (In some jurisdictions the stipulation and order may be combined in one pleading, depending upon the local rules.)

- A government memorandum of points and authorities.

- A Department press release.

- A Federal Register notice.

- A memorandum describing the original complaint, the judgment, and relevant circumstances today.

Samples of each of these documents are available from the FOIA Unit and are available on ATRnet. Since these exemplars are subject to continual revision, particularly the government's memorandum, staff should obtain recent exemplars before preparing the necessary papers.

The defendant should likewise prepare its motion. Further, where the Division is not aware of any violation of the decree, and the defendant asserts that it has always complied with the judgment, an officer of the defendant must attest to that effect. Sample motions and affidavits are also available from FOIA Unit. (They, along with the Division's exemplar papers, are considered matters of public record and may be made available to the moving defendants.)

### ii.    Notice, Publication Costs, and Multiple Defendants

As a matter of policy, the notice requesting public comment should generally appear in two consecutive issues of (1) the national edition of The Wall Street Journal, and (2) the principal trade periodical serving the industry to which the decree relates. If the decree affects more than one industry, the notice should appear in the principal journal for each of the industries involved.

The publication costs for such notices are borne by the defendant and are not trivial. From time to time, a defendant will ask to be excused from The Wall Street Journal publication on the grounds of expense. Division policy is not to accede to such requests except in rare instances where (1) The Wall Street Journal publication costs would impose an extraordinarily harsh burden on the defendant, given its financial condition, or The Wall Street Journal publication would clearly be wasteful and unnecessary; (2) publication is planned for other periodicals whose audience includes those likely to be interested in the decree

(e.g., the defendant's competitors, suppliers, customers); and (3) there is no prospect of cost-sharing with other defendants in the case.

In addition to the defendant's notice publication, the Division also voluntarily publishes in the Federal Register a brief notice of the motion to modify or terminate. The notice should summarize the complaint and judgment, set out the procedures for inspecting and copying relevant papers, and invite comments. If possible, the length of this notice should not exceed two double-spaced typed pages (approximately one column in the Federal Register). The papers presented to the court should not order publication of the Federal Register notice, however.

In cases that involve multiple defendants, one defendant may be more enthusiastic about terminating the decree than the others and thus be willing to bear the full cost of doing so. In this situation, it is Division policy to request the other defendants to provide the Division with affidavits similar to that prepared by the volunteer defendant (including the sworn statement of compliance with the decree), and if they do so, to insist that the notice published by the volunteer recite the Division's consent to termination of the decree as to the other defendants.

### iii.    Review, Filing, and Other Procedural Aspects

The necessary papers should be sent to the appropriate Director of Operations for review. As a rule, the stipulation should already be signed by the defendants when the package is forwarded. After review, the Director will transmit the papers to the appropriate Deputy Assistant Attorney General and Assistant Attorney General for signature and then return them to staff.

Staff must notify the Director's office 24 hours in advance of filing the papers so that the Office of Public Affairs has sufficient lead time to finalize a press release if it wishes to issue one. The actual filing process will vary depending on the jurisdiction. In some areas, on the day the parties file their papers, counsel for the government and the defendant appear before the appropriate judge to advise the court concerning the proposed public comment process and to request entry of the order directing the defendant's publication of notice. In other jurisdictions, filing and entry of the public notice may be accomplished through the mails. Whichever procedure is used, the judge should be advised that any public comments received by the Department will be filed with the court as they are received.

Immediately after the papers are filed, staff must notify the Director of Operations (whether or not the publication notice has been entered) so that the press release can be issued and the notice published in the Federal Register.

Shortly thereafter staff should check to confirm whether a press release was issued. If any comments are received, they should be filed promptly with the court. Then, during the 10-day period after the comment deadline, staff should notify the court whether the Department intends to file a response. If a response is appropriate (as is generally the case) and staff needs additional time to prepare it, the government will seek the defendant's consent to an extension of time, or (if the defendant objects) request an extension from the court. Responses to comments are to be sent to the Director of Operations for review.

A copy of the response filed in court is usually sent to all commentors at the time of filing. Note that unlike the procedures under the APPA for entry of consent decrees, the response and comments for judgment terminations and modifications are not published in the Federal Register.

Once the notices have been published, the defendant should file a certificate attesting to that fact. The Division will also file a certificate when the time is proper for entry of the modification or termination order, assuming the Division has not withdrawn its consent. Exemplars of both defendant and Division certificates are available from the FOIA Unit and on ATRnet. Staff also should send an accompanying letter to the court explaining the significance of the certificate, and a clean copy of the decree termination order should be provided to the judge.

As a rule, the Division will not recommend that a hearing be held on the termination motion, unless there are compelling reasons why one is necessary. Further, although the Division will not object if interested persons apply to appear as amici curiae, it will generally object vigorously if they attempt to intervene as parties.