MARIO N. ALIOTO, ESQ. (56433)
LAUREN C. RUSSELL, ESQ. (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA  94123
Telephone:  (415) 563-7200
Facsimile: (415) 346-0679
E-mail: malioto@tatp.com
          laurenrussell@tatp.com

***Interim Lead Counsel***
***for the Indirect Purchaser Plaintiffs***

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Master File No. CV-07-5944 SC<br><br>MDL No. 1917<br><br>**INDIRECT PURCHASER PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE INDIRECT PURCHASER CONSOLIDATED AMENDED COMPLAINT** |
| **This document relates to:**<br><br>**ALL INDIRECT PURCHASER ACTIONS** )<br>)<br>)<br>)<br>)<br>) | Date: October 5-6, 2009<br>Time: 9:00 a.m.<br>Before: Hon. Charles A. Legge (Ret.)<br><br>The Honorable Samuel Conti |

1

2

## <u>TABLE OF CONTENTS</u>

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 2

DETAILED FACTUAL ALLEGATIONS IN THE INDIRECT PURCHASER
CONSOLIDATED AMENDED COMPLAINT ........................................................................ 7

ARGUMENT ........................................................................................................................... 15

I.    Defendants' Separate Motions To Dismiss Must Be Denied

     A.    The Legal Standard On A Rule 12(b)(6) Motion To Dismiss .............................. 15

     B.    The IP CAC Adequately Alleges A Conspiracy To Fix
        The Prices Of CRT Products ................................................................................. 18

     C.    Defendants Demand A Level Of Specificity In The Pleadings
        That Is Far Beyond What Twombly Requires ....................................................... 20

          1.    Defendants' Authorities Are All Distinguishable Because The
              Complaints At Issue Alleged Far Less Than Plaintiffs Allege Here ........ 22

          2.    Courts Have Found Complaints Alleging Far Less Than The IP
              CAC To State A Claim For Price Fixing Under The Antitrust Laws ...... 26

     D.    When Viewed As A Whole, The IP CAC Sufficiently Alleges
        That Each Defendant Joined The Conspiracy And Committed
        Acts In Furtherance Thereof ................................................................................. 27

          1.    Antitrust Conspiracy Allegations Need Not Be Detailed Defendant
              By Defendant ............................................................................................. 27

          2.    Plaintiffs' References To Corporate Groups Does Not Deprive
              Defendants Of Rule 8 Notice ................................................................... 32

          3.    To The Extent The IP CAC Refers To Corporate Groups, A Review Of
              The Entire Complaint Informs The Reader Which Specific Defendant
              Within That Group Is Referred To ........................................................... 36

              a.    Hitachi ............................................................................................ 38

              b.    LG .................................................................................................. 39

               c.    Panasonic ....................................................................................... 40

               d.    Toshiba .......................................................................................... 40

               e.    Philips ............................................................................................ 41

               f.    Samsung ........................................................................................ 42

               g.    Chunghwa/Tatung ......................................................................... 42

i

h.    BMCC.................................................................. 43

E.    Plaintiffs Have Adequately Pled That Defendants Acted As The
Agents of Each Other ...................................................................... 45

    1.    The IP CAC's Agency Allegations Mirror The Allegations
Approved in TFT-LCD.................................................... 46

    2.    Defendants' Authorities Are Not On Point ............................... 49

F.    The Court Should Disregard Defendants' Attempts To Mischaracterize
Or Offer Innocent Explanations For Plaintiffs' Allegations Against Them.......... 53

    1.    Hitachi ............................................................................. 54

        a.    Hitachi's Decreasing Market Share Does Not Contradict The
Allegations In The IP CAC...........................................54

        b.    Hitachi's Participation In Trade Associations And Joint Ventures
With Admitted Price-Fixers Is Far From
Irrelevant..................................................................55

        c.    Government Investigations Into The CRT Industry And Closely-
Related Industries Are Properly Pleaded To Establish The
Plausibility    Of The Alleged CRT Product
Conspiracy.................................................................57

        d.    The IP CAC Alleges Parallel Conduct By
Defendants.......................... ........................................60

    2.    Toshiba ............................................................................. 60

    3.    Panasonic ......................................................................... 63

    4.    Samsung Electronics ......................................................... 64

G.    The IP CAC Alleges An Economically Plausible Conspiracy To
Fix The Prices Of CRTs And CRT Finished Products ........................................... 67

    1.    A Horizontal Price-Fixing Conspiracy Amongst Vertically Integrated
Manufacturers Of CRTs And CRT Finished Products Makes Perfect
Economic Sense........................................................... 68

    2.    The Question Of Whether Plaintiffs Have Pled An Economically
Plausible Conspiracy Presents Questions Of Fact That Cannot Be
Resolved On A Motion To Dismiss ...................................... 71

H.    Plaintiffs' Claims Are Timely .......................................................... 72

    1.    Fraudulent Concealment Raises Factual Issues Not Ripe For
Decision On A Motion To Dismiss. ........................................ 74

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.      Plaintiffs Have Sufficiently Pled Fraudulent Concealment......................75

        a.      Plaintiffs Have Alleged Defendants' Affirmative Acts
                Designed To Mislead The Public And To Conceal Their
                Conspiracy..................................................................................75

        b.      Plaintiffs Have Alleged Their Inability To Discover The
                True Facts Despite Due Diligence...............................................77

        c.      The TFT-LCD I Court Upheld Similar Fraudulent
                Concealment Allegations...........................................................78

3.      Plaintiffs Have Alleged Fraudulent Concealment by Each
        Defendant Engaged in the Conspiracy .....................................82

4.      The Question Of Whether Defendants Withdrew From The
        Conspiracy Cannot Be Resolved As A Matter of Law...........................83

        a.      Fraudulent Concealment Tolls the Statute of Limitations
                Even As To Defendants Who Withdrew from a Conspiracy ........84

        b.      The Question Of Whether Defendants Effectively Withdrew
                From The Conspiracy Presents Questions Of Fact That
                Cannot Be Resolved On A Motion To Dismiss ............................86

        c.      Defendants' Remaining Authorities Are Also Inapposite.............89

                i.      Hitachi ..................................................................89

                ii.     Toshiba ..................................................................90

                iii.    Philips and LG ........................................................91

I.      The LG Defendants' Rule 12(e) Motion For A More Definite
        Statement Should Also Be Denied .......................................................92

II.     Defendants' Joint Motion To Dismiss Must Be Denied

        A.      Defendants' Arguments For Dismissal Under The FTAIA And
                Under The Commerce And Supremacy Clauses Of The Constitution
                Are Without Merit ...................................................................93

                1.      The FTAIA Does Not Apply Because The Alleged CRT Product
                        Conspiracy Was Carried Out In Part In The United States ....................94

                2.      The FTAIA Does Not Apply Because Defendants' Sale of CRT
                        Products Into the United States Constitutes "Import Commerce" ...........97

                3.      Assuming Arguendo That The FTAIA Applies, The Conduct
                        Alleged In The IP CAC Falls Under the Domestic Effects
                        Exception Of The FTAIA...........................................................99

**INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT AND SEPARATE
MOTIONS TO DISMISS THE INDIRECT PURCHASER CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917**

        a.    The IPCAC Alleges That Defendant's Unlawful Conduct Had A "Direct, Substantial And Reasonably Foreseeable Effect" On U.S. Commerce ........................................................... 99

        b.    The Domestic Effects Of The Defendants' Conduct Give Rise To The Plaintiffs' Claims In This Case .............................. 103

        c.    Defendants' Analysis Of The Domestic Effects Test Mischaracterizes And Ignores The Allegations In The Complaint ................................................................................. 105

    4.    Plaintiffs' State Law Claims Do Not Exceed the Intended Scope Of The FTAIA ................................................................. 108

  B.    The Complaint Cannot Be Dismissed On AGC Grounds ................................. 112

    1.    Indirect Purchaser Standing to Pursue State Antitrust Claims Is A Matter of State Substantive Law ........................................... 113

    2.    The Complaint Alleges Sufficient Facts Satisfying AGC Factors .......... 117

        a.    Plaintiffs Have Adequately Alleged "Antitrust Injury" Under State Law ....................................................................... 117

            i.    Defendants' Proposed  "Antitrust Injury" Standard Is Inconsistent With The Legislative Intent Of The Repealer States ................................................................. 118

            ii.    Numerous Courts Have Rejected Defendants' Proposed "Market Participant" Requirement For State-Law Antitrust Claims ................................................................ 120

            iii.    Even Federal Law Does Not Impose A Bright-Line Requirement That Plaintiffs Be "Participants" In The Same "Market" As Defendants In Order To Suffer An "Antitrust Injury" ...................................................... 123

        b.    Plaintiffs' Allegations Are Sufficient To Satisfy The "Remoteness" Factors of AGC ................................................... 126

            i.    Plaintiffs' Injury Is Sufficiently "Direct" ...................... 127

            ii.    Plaintiffs Sufficiently Alleged That Damages Are Traceable And Thus Apportionable ............................... 130

    3.    Plaintiffs Have Adequately Pled Standing For Their Injunctive Claims Under Section 16 Of The Clayton Act ........... 131

iv

C.  Plaintiffs Can Sue Under The Statutes Of Nebraska And Nevada For Purchases Made Before Those Statutes Were Enacted ...................................... 132

    1.  Nebraska ..................................................................................... 132

    2.  Nevada ........................................................................................ 133

D.  Plaintiffs Have Properly Pled Causes Of Action Under The Consumer Protection Laws of Massachusetts, New York, And Rhode Island .................... 133

    1.  Massachusetts ............................................................................. 133

    2.  New York .................................................................................... 134

    3.  Rhode Island .............................................................................. 136

E.  Plaintiffs' Unjust Enrichment Claims Are Proper ........................................ 138

    1.  The Law Of Michigan, Kansas And New York Does Not Require That Plaintiffs Confer A Direct Benefit On Defendants In Order To State A Claim For Unjust Enrichment ...................................................... 138

        a.  Michigan .......................................................................... 138

        b.  Kansas ............................................................................. 139

        c.  New York ......................................................................... 139

    2.  Plaintiffs' Unjust Enrichment Claims Are Not A "Back Door" To Recover For Barred Antitrust Claims ........................................................ 141

    3.  Plaintiffs May Bring Claims For Unjust Enrichment In Addition To Claims For Compensatory Damages ...................................................... 143

F.  The Complaint Alleges Fraudulent Concealment Sufficient To Toll The Applicable Statute Of Limitations For Plaintiffs' State Law Claims ................. 145

    1.  Plaintiffs Have Alleged Defendants' Affirmative Acts Designed To Mislead The Public And To Conceal Their Conspiracy .......................... 146

    2.  Plaintiffs Have Alleged Their Inability To Discover The True Facts Despite Due Diligence ................................................................. 147

    3.  The Determination Of Whether Plaintiffs Had Constructive Notice Of Defendants' Conspiracy Requires A Fact Intensive Inquiry Not Appropriate At The Motion To Dismiss Stage ...................................... 149

G.  If The Complaint Is Found To Be Insufficient, Plaintiffs Should Be Granted Leave To Amend ................................................................................. 150

III.  CONCLUSION ................................................................................ 150

v

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aktieselskabet AF v. Fame Jeans, Inc.,*
    525 F.3d 8, 15 (D.C. Cir. 2008) ..................................................................................... 17

*Am. Ad Mgmt., Inc. v. General Tel. Co.,*
    190 F. 3d 1051 (9th Cir. Cal 1999) ...................................................... 120,125

*American Needle, Inc. v. New Orleans LA Saints,*
    385 F. Supp. 2d 727 (N.D. Ill. 2005) ............................................................. 124

*Animal Science Products, Inc. v. China Nat'l. Metals & Minerals Import & Export Corp.,*
    596 F. Supp. 2d 842 (D.N.J. 2008) ................................................................ 106

*Arnold Chevrolet LLC v. Tribune Co.,*
    418 F. Supp. 2d 172 (E.D.N.Y. 2006) ............................................................. 51

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ............................................................................... 2,3,7

*Associated General Contractors v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1983) ........................................................................................ 5

*Atlantic Richfield Co. v. USA Petroleum Co.,*
    495 U.S. 328 (1990) ..................................................................................... 117

*Auto. Refinishing Paint Antitrust Litig.,*
    515 F. Supp. 2d 544 (E.D. Pa. 2007) ............................................................. 135

*Banke Assoc., Inc. v. New England Financial Resources, Inc.,*
    1989 U.S. Dist. LEXIS 18313 *19 (D. N.H. Aug. 22, 1989) ........................................ 111

*Barker v. Am. Mobil Power Corp.,*
    64 F.3d 1397 (9th Cir. 1995) .......................................................................... 89

*Beef Industry Antitrust Litig.,*
    600 F.2d 1148 (5th Cir. 1979) ....................................................................... 105

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................ passim

*Beltz Travel Serv, Inc. v. International Air Transport Ass'n,*
    620 F.2d 1360 (9th Cir. 1980) ......................................................................... 29

*Bhan v. NME Hops.,*
    772 F.2d 1467 (9th Cir. 1985) ....................................................................... 118

---

**INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT AND SEPARATE MOTIONS TO DISMISS THE INDIRECT PURCHASER CONSOLIDATED AMENDED COMPLAINT MDL NO. 1917**

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
182 F.3d 1096 (9th Cir. 1999) ................................................................. 125

*Blue Shield of Virginia v. McCready*,
457 U.S. 465 (1982) ............................................................................... 124

*Boston Store of Chicago v. American Graphophone Co.*,
246 U.S. 8 (1918) ..................................................................................... 49

*Bowoto v. Chevron Texaco Corp.*,
312 F. Supp. 2d 1229 (N.D. Cal. 2004) .................................................... 46

*Branch v. Tunnel*,
14 F.3d 449 (9th Cir. 1994) ...................................................................... 88

*Brennan v. Concord EFS, Inc.*,
369 F. Supp. 2d 1127 (N.D. Cal. 2005) .................................................... 31

*Brunson Communications, Inc. v. Arbitron, Inc.*,
239 F. Supp. 2d 550 (E.D. Pa. 2002) ................................................... 70,71

*California v. ARC America Corp.*,
490 U.S. 93 (1989) ........................................................................... 109,130

*Cardizem CD Antitrust Litig.*,
105 F. Supp. 2d 618 (E.D. Mich. 2000) ........................... 126,138,139,142

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
479 U.S. 104 n. 6 (1986) ........................................................................ 131

*Caribbean Broad Sys., Ltd. v. Cable & Wireless PLC*,
148 F.3d 1080 (D.C. Cir. 1998) .......................................................... 100,104

*Carpet Group Int'l v. Oriental Rug Importers Ass'n., Inc.*
227 F.3d 62 (3d Cir. 2000). ................................................................. 97,99

*Chicago Professional Sports Ltd. P'ship v. NBA*,
961 F.2d 667 (7th Cir. 1992) .................................................................. 124

*In re Chocolate Confectionary Antitrust Litig.*,
602 F.Supp.2d 538 n. 61 (M.D. Pa. 2009) ........................................... 136,69

*Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999) ...................................................... 54,55,56,57

*City of Moundridge v. Exxon Mobil Corp.*,
250 F.R.D. 1 (D.D.C. 2008) ..................................................................... 21

*Clemens v. Daimler Chrysler Corp.*,
2006 WL 6022681 (C.D. Cal. Apr. 20, 2006) ..................................... 75, 149

INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT AND SEPARATE
MOTIONS TO DISMISS THE INDIRECT PURCHASER CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917

*Compact Disc Minimum Advertised Price Antitrust Litig.*,
    138 F. Supp. 2d 25 (D. Me 2001) ................................................................................... 77

*Conmar Corp. v. Mitsui & Co., Inc.*,
    858 F.2d 499 (9th Cir. 1988) ................................................................................... passim

*Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.*,
    710 F.2d 752 (11th Cir. 1983) ................................................................................... 124

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ................................................................................... 17,28,56

*Coordinated Pre-Trial Proceedings in Petroleum Products Antitrust Litig.*,
    782 F. Supp. 487 (C.D. Cal. 1991) ................................................................................... passim

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984) ................................................................................... 48,68

*Coupon Clearing Serv., Inc.*,
    113 F.3d 1091 (9th Cir. 1997) ................................................................................... 51

*CSR Ltd. v. Cigna Corp.*,
    405 F.Supp.2d 526 (D.N.J. 2005) ................................................................................... 98,99,106

*Currency Conversion Fee Antitrust Litig.*,
    2006 U.S. Dist. LEXIS 82167 (S.D.N.Y. Nov. 8, 2006) ................................................................................... 19

*D.R. Ward Const. Co. v. Rohm and Haas Co.*,
    470 F.Supp.2d 485 (E.D.Pa.,2006) ................................................................................... passim

*Dee-K Enterprises, Inc. v. Heveafil Sdn. Bhd*,
    299 F.3d 281 (4th Cir. 2002) ................................................................................... 107

*Dimidowich v. Bell & Howell*,
    803 F.2d 1473 (9th Cir. 1986) ................................................................................... 115

*DM Research, Inc. v. Coll. Of Am. Pathologists*,
    170 F.3d 53 (1st Cir. 1999) ................................................................................... 70

*Empagran S.A. v. F. Hoffmann-Laroche*,
    417 F.3d 1267 (D.C. Cir. 2005) ................................................................................... 103

*Erie R. Co. v. Tompkins*,
    304 U.S. 64 (1938) ................................................................................... 113

*Fair Isaac Corp. v. Equifax, Inc.*,
    2008 WL 623120, at *6 (D. Min.. Mar. 4, 208) ................................................................................... 21

*Figone v. LG Electronics*,
    3:07-cv-6331-SC (N.D. Cal. Dec. 13 2007) ................................................................................... 95

**INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT AND SEPARATE
MOTIONS TO DISMISS THE INDIRECT PURCHASER CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917**

*Fine Paper Antitrust Litig.,*
   685 F.2d 810 (3d Cir. 1982) ............................................................ 28,60

*In re Flash Memory Antitrust Litig.,*
   2009 U.S. Dist. LEXIS 38941 (N.D. Cal. Mar 31, 2009) ........................ passim

*Flat Glass Antitrust Litig.,*
   385 F. Supp. 350 (3d Cir. 2004) .................................................. 28,68,69,70

*Frye v. American General Finance, Inc.,*
   307 F. Supp. 2d 836 (S.D. Miss. 2004) ................................................ 145

*George v. George F. Berkander, Inc.,*
   169 A.2d 370 (1961) .......................................................................... 137

*G-Fees Antitrust Litig.,*
   584 F.Supp.2d 26 (D.C. 2008) ................................................... 109, 110

*Gilbert v. Concentra Health Servs., Inc.,*
   No. 03:07-CV-00264-LRH-VPC, 2008 WL 318356, at *2 (D. Nev. Jan. 31, 2008) ....... 47

*Gilley Enterprises, Inc. v. Atlantic Richfield Oil Co.,*
   561 F.3d 1004 (9th Cir. 2008) ......................................................... 17,21

*Glen Holly Entertainment, Inc. v. Tektronix, Inc.,*
   352 F.3d 367 (9th Cir. 2003) ...................................................... 119,125

*In re Graphics Processing Unit (GPU) Antitrust Litig.,*
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) (*"GPU I"*) ............................. passim

*In re Graphics Processing Unit (GPU) Antitrust Litig.,*
   540 F. Supp. 2d 1085 (N.D. Cal. 2007) (*"GPU II"*) ............................ passim

*Greenwald v. Manko,*
   840 F. Supp. 198 (E.D.N.Y. 1993) ....................................................... 89

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) ........................................................... 142

*Hebert v. Fliegel,*
   813 F.2d 999 (9th Cir. 1987) ............................................................. 119

*Hernandez v. Hilltop Financial Mortgage, Inc.,*
   No. C 06-7401 SI, 2007 WL 3101250, at *8 (N.D. Cal. Oct. 22, 2007) ............ 45

*High Fructose Corn Syrup Antitrust Litig.,*
   295 F.3d 651 (7th Cir. 2002) .......................................................... 19,58

*High Tech. Careers v. San Jose Mercury News,*
   996 F.2d 987 (9th Cir. 1993) ............................................................ 118

ix

*Hill v. Morehouse Med. Assocs., Inc.,*
   2003 WL 22019936 (11th Cir. Aug. 15, 2003) ................................................. 44

*Hoffman-LaRoche v. Empagran S.A.,*
   542 U.S. 155 (2004) ................................................................................................. 94

*Horowitz v. Stryker Corp.,*
   2009 WL 436406 * 12 (E.D.N.Y. Feb. 20, 2009) ...................................... 134

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.,*
   253 F.Supp.2d 262 (D. Conn. 2003) ........................................................... 119

*Illinois Brick Co. v. Illinois,*
   431 U.S. 720 (1977) ........................................................................................ 105

*Infant Formula Antitrust Litig.,*
   1992 WL 503465 (N.D. Fla. Jan. 13, 1992) ............................................. 147

*In re Intel Microprocessor Antitrust Litig.,*
   452 F.Supp.2d 555 (D. Del. 2006) ............................................................. 108

*In re Intel Microprocessor Antitrust Litig.,*
   496 F.Supp.2d 404 (D. Del. 2007) ..................................................... 121,128

*Invamed, Inc. v. Barr Labs, Inc.,*
   22 F. Supp. 2d 210 (S.D.N.Y. 1998) ....................................................... 31,32

*Jung v. Ass'n of American Medical Colleges,*
   300 F. Supp. 2d 119 n. 27 (D.D.C. 2004) ............................................... 29,31

*Karahalios v. Nat'l Fed'n of Fed. Employees,*
   489 U.S. 527 (1989) ........................................................................................ 143

*Kendall v. Visa U.S.A., Inc.,*
   518 F.3d 1042 (9th Cir. 2008). ............................................... 7,22,23,24,25

*Knevelbaard Dairies v. Kraft Foods, Inc.,*
   232 F.3d 979 (9th Cir. 2000) ................................................................ passim

*Kruman v. Christie's Int'l PLC,*
   284 F.3d 384 (2d Cir. 2002) ........................................................... 97,100,106

*Late Fee and Overlimit Fee Litig.,*
   528 F. Supp. 2d 953 (N.D. Cal. 2007) ......................................................... 24

*Lin v. Lin,*
   2000 WL 4369771 (D. Hawaii 2008) ....................................................... 145

*Linerboard Antitrust Litig.,*
   305 F .3d 145 (3d Cir. 2002) ....................................................................... 128

x

**INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT AND SEPARATE MOTIONS TO DISMISS THE INDIRECT PURCHASER CONSOLIDATED AMENDED COMPLAINT MDL NO. 1917**

*Live Concert Antitrust Litig.,*
    247 F.R.D. 98 (C.D. Cal. 2007)..........................................................................118

*Lorazepam & Clorazepate Antitrust Litig.,*
    295 F. Supp. 2d 30 (D.D.C. 2003)....................................................................126

*Lorenzo v. Qualcomm Inc.,*
    2009 WL 537522, 603 F.Supp.2d 1291 (S.D.Cal.,2009) ................................129

*Lupron Marketing and Sales Practices Litigation,*
    2004 WL 2070883 (D. Mass. Sept. 16, 2004)..................................................145

*Maley v. Pulte Home Corp.,*
    2006 U.S. Dist. LEXIS 57213 *2 (N.D. Cal. July 31, 2006) ...........................98

*Market-Makers Antitrust Litig.,*
    894 F. Supp. 703 (S.D.N.Y. 1995) ....................................................................29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ..........................................................................................69

*Mercedes-Benz Antitrust Litig.,*
    157 F. Supp. 2d 355 (D.N.J. 2001).........................................................117,126

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
    269 F.Supp.2d 1213 (C.D. Cal. 2003) .............................................................109

*Metz v. Union Bank,*
    416 F. Supp. 2d 568 (N.D. Ohio 2006) .............................................................89

*Meyer v. Qualcomm Inc.,*
    2009 WL 539902 (S.D. Cal. Mar. 3, 2009) .....................................................129

*Microsoft Corp. Antitrust Litig.,*
    2005 WL 1398643 (D. Md. Jun 10, 2005) ......................................................124

*Milk Pros. Antitrust Litig.,*
    84 F. Supp. 2d 1016 (D. Minn. 1997) ...............................................................92

*Miller v. Int'l Bus. Machines Corp. (IBM),*
    No. C02-2118, 2006 WL 2792416, at *9 ..........................................................51

*Moniz v. Bayer Corp.,*
    484 F. Supp. 2d 228 (D. Mass. 2007)..............................................................122

*Morongo Band of Mission Indians v. Rose,*
    893 F.2d 1074 (9th Cir. 1990) ..........................................................................150

*Morton's Market. Inc. v. Gustafson's Dairy, Inc.,*
    198 F.3d 823 (11th Cir. 1999) ...........................................................................83

xi

*Morton's Market. Inc. v. Gustafson's Dairy, Inc.*,
   211 F.3d 1224 (11th Cir. 2000) ................................................................. 85

*Mountain View Pharmacy v. Abbott Labs.*,
   630 F.2d 1383 (10th Cir. 1980) ................................................................. 31

*In re Napster, Inc. Copyright Litigation*,
   354 F. Supp. 2d 1113 (N.D. Cal. 2005)..................................................... 120

*Nasious v. Two Unknown B.I.C.E. Agents*,
   492 F.3d 1158 (10th Cir. 2007) ........................................................... 29,30

*New Motor Vehicles*,
   350 F. Supp. 2d 160 (D. Me. 2004) .................................................... 134,143

*New York Citizens Committee on Cable TV v. Manhattan Cable TV, Inc.*,
   651 F. Supp. 802 (S.D.N.Y. 1986) ................................................... 124, 125

*Orr v. Beamon*,
   77 F.Supp.2d 1208 (D. Kan. 1999) ......................................................... 109

*OSB Antitrust Litig.*,
   2007 WL 2253419, at *3-5 (E.D. Pa. Aug. 3, 2007) ................................. 26

*Ostrofe v. H.S. Crocker Co., Inc.*,
   740 F.2d 739 (9th Cir. 1984) ............................................................. 125,126

*Pace Electronics, Inc. v. Cannon Computer Systems, Inc.*,
   213 F.3d 118 (3d Cir. 2000) ..................................................................... 117

*Petruzzi's IGA v. Darling-Delaware*,
   998 F.2d 1224 (3d Cir. 1993) .................................................................... 70

*Pharm. Indus. Average Wholesale Price Litig.*,
   2007 U.S. Dist. LEXIS 26242 (D. Mass. April 2, 2007)..................... 137,139

*Pharm. Indus. Average Wholesale Price Litig.*,
   233 F.R.D. 229 (D. Mass. 2006) ......................................................... 137,139

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
   1986 WL 957, at *9 (W.D.W.V. May 13, 1986)........................................ 146

*Poller v. Columbia Broad Sys., Inc.*,
   368 U.S. 464 (1962) ................................................................................... 21

*Hospital Bldg. Co. v. Trustees of Rex Hospital*,
   425 U.S. 738 (1976) ................................................................................... 21

*Pressure Sensitive Labelstock Antitrust Litig.*,
   566 F. Supp. 2d 363 (M.D. Pa. 2008)................................................... 15,71

**INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT AND SEPARATE
MOTIONS TO DISMISS THE INDIRECT PURCHASER CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917**

*Pressure Sensitive Labelstock,*
   356 F. Supp. 2d 484 (M.D. Pa. 2005).................................................................71

*Rail Freight Fuel Surcharge Antitrust Litig.,*
   587 F. Supp. 2d 27 (D.D.C. 2008)....................................................................20

*Reisman v. United States,*
   409 F.2d 789 (9th Cir. 1969) ............................................................................90

*Rubber Chemicals Antitrust Litig.,*
   504 F. Supp. 2d 777 (N.D. Cal. 2007)..........................................................75,78

*Rutledge v. Boston Woven Hose and Rubber Co.,*
   756 F.2d 248 (9th Cir. 1978) ............................................................................76

*Safeway Stores v. FTC,*
   366 F.2d 795 (9th Cir. 1966) ..........................................................................2,28

*Sagent Technology, Inc.,*
   278 F. Supp. 2d 1079 (N.D. Cal. 2003)...........................................................29

*SAS v. Puerto Rico Tel. Co.,*
   48 F.3d 39 (1st Cir. 1995) ..............................................................................125

*Schumacher v. Tyson Fresh Meats ,*
   221 F.R.D. 605 (D.S.D. 2004)........................................................................142

*Sherman v. British Leyland Motors, Ltd.,*
   601 F.2d 429 (9th Cir. 1979) ............................................................................51

*In re Southeastern Milk Antitrust Litig.,*
   555 F. Supp. 2d 934 n. 7 (E.D. Tenn. 2008) ..............................................2,28,35

*Spears v. Transcon. Bus. Sys., Inc.,*
   226 F.2d 94 (9th Cir. 1955) ..............................................................................51

*Sprewell v. Golden State Warriors,*
   266 F.3d 979 (9th Cir. 2001) ............................................................................55

*Standard Iron Works v. Arcelormittal,*
   2009 U.S. Dist. LEXIS 49476 (N.D. Ill. June 12, 2009)..................................68

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
   580 F. Supp. 2d 896 (N.D. Cal. 2008).......................................................26,134

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
   2008 WL 2610549 (N.D. Cal. June 27, 2008) ("*SRAM II*") ..........................134

*Steckman v. Hart Brewing, Inc.,*
   143 F.3d 1293 (9th Cir. 1998) ..........................................................................55

**INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT AND SEPARATE
MOTIONS TO DISMISS THE INDIRECT PURCHASER CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917**

*Stickrath v. Globalstar, Inc.*,
 527 F.Supp. 2d 992 (N.D. Cal. 2007) ............................................................................ 34

*Sugar Indus. Antitrust Litig.*,
 579 F.2d 13 (3d Cir. 1978) ........................................................................................ 127

*Summit Health, Ltd. v. Pinhas*,
 500 U.S. 322 (1991) .................................................................................................. 97

*Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.*,
 534 F.Supp.2d 1101 (N.D. Cal. 2007) ................................................................ 100,106

*Supermail Cargo, Inc., v. United States*,
 68 F.3d 1204 (9th Cir. 1995) ..................................................................................... 74

*Tableware Antitrust Litig.*,
 363 F. Supp. 2d 1203 (N.D. Cal. 2005) ...................................................................... 58

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
 586 F.Supp.2d 1109 (N.D. Cal. 2008) ................................................................. passim

*In re TFT-LCD Antitrust Litig.*,
 559 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009) (*TFT-LCD II*") ..................................... passim

*Thorman v. Seafoods Co.*,
 421 F.3d 1090 (9th Cir. 2005) .............................................................................. 75,150

*Todd v. Exxon Corp.*,
 275 F.3d 191 (2d Cir. 2001) ..................................................................................... 56

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
 552 F.3d 430 (6th Cir. 2008) .................................................................................... 24

*In re Travel Agent Comm'n Antitrust Litig.*,
 No. 1:03 CV 30000, 2007 WL 3171675, *3 n. 4 (N.D. Ohio Oct. 29, 2007) ................... 31

*Tucker v. Apple Computer, Inc.*,
 493 F. Supp. 2d 1090 (N.D. Cal. 2006) ..................................................................... 115

*Tugboat Corp. Co. v. Shipowners & Merchants Towboat Co., Ltd.*,
 467 F. Supp. 841 (N.D. Cal. 1979) ............................................................................. 55

*Univac Dental Co. v. Dentsply Int'l, Inc.*,
 2008 WL 2486134, at * 3 (M.D. Pa. June 17, 2008) ...................................................... 21

*Urethane Antitrust Litig.*,
 235 F.R.D. 507 (D. Kan. 2006) .................................................................................. 89

*U.S. ex rel. Giles v. Sardie*,
 191 F.Supp.2d 1117 (C.D. Cal. 2000) ........................................................................ 73

**INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT AND SEPARATE
MOTIONS TO DISMISS THE INDIRECT PURCHASER CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917**

*U.S. v. Ritchie,*
    342 F.3d 903, 907 (9th Cir. 2003) ............................................................ 98

*U.S. Horticultural Supply, Inc. v. The Scotts Co.,*
    2006 WL 1531407 (E.D. Pa. June 1, 2006) ............................................. 71

*United Magazine Co. v. Murdoch Magazines Distribution, Inc.,*
    146 F. Supp. 2d 385 (S.D.N.Y. 2001) .................................................... 71

*United Phosphorous, Ltd. v. Angus Chemical Co.,*
    131 F.Supp.2d 1003 (N.D. Ill. 2001) ..................................................... 107

*United States ex rel. Russell v. Epic Healthcare Mgmt. Group,*
    193 F.3d 304 (5th Cir. 1999) ................................................................... 45

*United States ex rel. Stinson, Lyons, Gerlin & Bustamonte, P.A. v. Blue Cross Blue*
    *Shield of Ga., Inc.,*
    755 F. Supp. 1040 (S.D. Ga. 1990) ........................................................ 45

*United States v. Andreas,*
    216 F.3d 645 (7th Cir. 2000) ................................................................... 57

*United States v. Bestfoods,*
    524 U.S. 51 (1998) .................................................................................. 50

*United States v. Borelli,*
    336 F.2d 376 (2d Cir. 1964) .................................................................... 91

*United States v. Gypsum, Co.,*
    438 U.S. 422 .............................................................................................. 91

*United States v. Hilton Hotels Corp.,*
    467 F.2d 1000 (9th Cir. 1972) ................................................................. 49

*United States v. Lothian,*
    976 U.S. 1257 (9th Cir. 1992) ................................................................. 90

*United States v. LSL Biotechnologies,*
    379 F.3d 672 (9th Cir. 2004) ................................................................... 99

*United States v. Nippon Paper Indus. Co.,*
    62 F. supp. 2d 173 (D. Mass. 1999) ....................................................... 91

*Velasquez, et al. v. HSBC Finance Corp., et al.,*
    2009 U.S. Dist. LEXIS 5428 (N.D. Cal. Jan. 16, 2009) ........................ 15

*In re Vitamins Antitrust Litigation,*
    2006 U.S. App. LEXIS 31401 (D.C. Cir. May 15, 2006) ...................... 145

*Volk v. D.A. Davidson & Co.,*
    816 F.2d 1406 (9th Cir. 1987) ....................................... 74,75,149,150

**INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT AND SEPARATE
MOTIONS TO DISMISS THE INDIRECT PURCHASER CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917**

*Walker v. Armco Steel Corp.*,
446 U.S. 740 (1980) .................................................................................. 73

*Warfarin Sodium Antitrust Litig.*,
214 F.3d 395 (3d Cir. 2000) ........................................................ 127,131,142

*Warfarin Sodium Antitrust Litig.*,
212 F.R.D. 231 (D. Del. 2002) ................................................................ 142

*Watters v. Wachovia Bank, N.A.*,
550 U.S. 1 (2007) ..................................................................................... 111

*Westways World Travel, Inc. v. AMR Corp.*,
218 F.R.D. 223 (C.D. Cal. 2003) ............................................................. 142

*Wilk v. American Medical Ass'n*,
735 F.2d 217 (7th Cir. 1983) ............................................................... 2,28

## STATE CASES

*A & M Supply Co. v. Microsoft Corp.*,
2008 WL 540883 (Mich. App. Feb. 28, 2008) ........................................ 138

*Abbott Labs. Norvir Antitrust Litig.*,
2007 WL 1689899 at *9 (N.D.Cal. June 11, 2007) ................................. 142

*Abraham v. County of Hennepin*,
639 N.W.2d 342 (Minn. 2002) ................................................................ 144

*AG Acceptance Corp. v. Glinz*,
684 N.W.2d 632 (N.D. 2004) ................................................................. 110

*Agron, Inc. v. Lin*,
2004 WL 555377, at *8 (C.D. Cal. Mar. 16, 2004) ................................ 118

*Alaska Airlines, Inc. v. Carey*,
No. C O705711 RBI, 2008 WL 2725796 (W.D. Wash. July 11, 2008) ........................... 52

*Amarel v. Connell*,
202 Cal.App.3d 137 (1998) ........................................................ 109,110,112

*American General Financial Services, Inc. v. Carter*,
184 P.3d 273 (Kans. App. 2008) ............................................................. 144

*American Nat'l. Red Cross v. United Way California Capital Region*,
No. CIV. S-07-1236 WBS DAD, 2007 WL 4522967 (E.D. Cal. Dec. 19, 2007) .............. 52

*Ames v. Oceanside Welding and Towing Co., Inc.*,
    767 A.2d 677 (R.I. 2001) ........................................................................... 136

*Amos v. Oakdale Knitting Co.*,
    416 S.E.2d 166 (N.C. 1992) ...................................................................... 144

*Amundson & Assoc. v. Nat'l Council on Comp. Isn.*,
    988 P.2d 1208 (Kan. Ct. App. 1999) ........................................................ 144

*Arthur v. Microsoft Corp.*,
    676 N.W.2d 29 (Neb. 2004) ............................................................. 109,116

*Automotive Refinishing Paint Antitrust Litig.*,
    229 F.R.D. 482 (E.D. Pa. 2005) .................................................................. 56

*Babcock v. Carrothers Constr. Co.*,
    2005 WL 3527117 at *3 (Kan. App. Dec. 23, 2005) ................................ 139

*Baker v. Beech Air-Craft Corp.*,
    39 Cal. App. 3d 315 (1974) ........................................................................ 145

*Bath and Kitchen Fixtures Antitrust Litig.*,
    No. 05-cv-00510 MAM,, 2006 WL 2038605 (E.D. Pa. July 19, 2006) ........... 92

*Beckler v. Visa U.S.A., Inc.*,
    No. 09-04-C-00030, 2004 WL 2115144 (N.D. Dist. Ct. Aug 23, 2004) ......... 110

*Benjaminov v. Republic Ins. Group*,
    660 N.Y.S.2d 148 (N.Y. App. Div. 1997) ................................................. 134

*Bergstrom v. Noah*,
    266 Kan. 829 (Kan. 1999) ......................................................................... 109

*Berisford v. Jack Eckerd Corp.*,
    667 So. 2d 809 (Fla. Dist. Ct. App. 1995) ............................................... 145

*Bogosian v. All American Concessions*,
    2008 WL 4534036 (E.D.N.Y. Sept. 29, 2008) .......................................... 134

*Bowoto v. Chevron Corp.*,
    C 99-02506 SI, 2007 WL 2349338, (N.D. Cal. Aug. 14, 2007) ................... 73

*Bunker's Glass Co. v. Pilkington*,
    *PLC*, 75 P.3d 99,103 (Ariz. 2003) ................................................... 116,120

*Calhoun v. Calhoun*,
    197 S.E.2d 83 (N.C. Ct. App. 1973) ......................................................... 146

*Cancall PCS v. Omnipoint Corp.*,
    2000 WL 272309 (S.D.N.Y. Mar. 10, 2000) .............................................. 71

xvii

**INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT AND SEPARATE
MOTIONS TO DISMISS THE INDIRECT PURCHASER CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917**

*Cann v. George B. Williams Land & Livestock Co.,*
    48 P.2d 887 (Nev. 1935)...................................................................... 144

*Carmona v. Spanish Broadcasting System, Inc.,*
    No. 08 Civ. 4475, 2009 WL 890054 *6 (S.D.N.Y. March 30, 2009) ..................... 140,141

*Cellular Plus, Inc. v. Sup. Ct. of San Diego, 16 Cal.App.4th 1224 (1993)*
    14 Cal. App. 4th at 1234 (1993) ........................................................... 120

*Chavers v. Fleet Bank (R.I.) N.A.,*
    2001 R.I. Super. LEXIS 71, at *23 (June 29, 2001)........................................ 111

*Christensen v. Lundsten,*
    863 N.Y.S.2d 886 (N.Y. Dist. Ct. 2008) .................................................. 144

*Christy v. Miulli,*
    692 N.W.2d 694 (Iowa 2005) .............................................................. 145

*Comes v. Microsoft Corp.,*
    646 N.W. 2d 440 (Iowa 2002) ............................................................. 116

*Commonwealth v. DeCotis,*
    366 Mass. 234 N.E.2d 748 (1974)......................................................... 111

*County of Stanislaus v. Pacific Gas & Elec. Co.,*
    No. CV-F-93-5866-OWW, 1994 WL 706711 (E.D. Cal. Aug. 25, 1994) ...................... 49

*Cox v. Microsoft Corp.,*
    8 A.D.3d 39 (N.Y. App. Div. 2004) ................................................... 134,139

*Cox v. Microsoft,*
    809 N.Y.S. 2d 480, 2005 WL 3288130 .................................................... 119

*Crump v. City and County of San Francisco,*
    No. C06-07793 MJJ, 2007 WL 2220938 (N.D. Cal. Aug. 1, 2007) ......................... 73

*Dion LLC v. Infotek Wireless, Inc.,*
    No. C 07-1431 SBA, 2007 WL 3231738 (N.D. Cal. Oct. 30, 2007) ..................... 39,45

*E.J. Gallo Winery v. EnCana Energy Servs., Inc.,*
    CV F 03-5412 AWI LJO, 2008 WL 2220396 (E.D. Cal. May 27, 2008) ..................... 51

*Fahmy v. Jay-Z,*
    No. CV 07-5715 CAS (PJWx), 2009 WL 1808450
    (C.D. Cal. June 22, 2009).................................................................. 47

*Freeman Industries, LLC v. Eastman Chem. Co.,*
    172 S.W.3d 512 (Tenn. 2005) ............................................................ 110

*Friends Univ. v. W.R. Grace & Co.,*
    608 P.2d 936 (Kan. 2007)................................................................. 145

**INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT AND SEPARATE MOTIONS TO DISMISS THE INDIRECT PURCHASER CONSOLIDATED AMENDED COMPLAINT MDL NO. 1917**

*Fucile v. Visa U.S.A. Inc.*,
    No. S1560-03 CNC, 2004 WL 3030037 *3 (Vt. Super. Dec. 27 2004).........................110

*Garcia ex. Rel. Garcia v. LaFarge*,
    893 P. 2d 428 (N.M. )..................................................................................................145

*Guy v. Mutual of Omaha Ins. Co.*,
    79 S.W.3d 528 (Tenn. 2002) ......................................................................................144

*Hanna Min. Co. v. InterNorth, Inc.*,
    379 N.W.2d 663 (Minn. Ct. App. 1986) ....................................................................145

*Hansen v. A.H. Robins, Inc.*,
    335 N.W.2d 578 (1983).................................................................................................146

*HAZ-MAT Response, Inc. v. Certified Waste Resources Ltd.*,
    910 P.2d 839 (Kan. 1996)............................................................................................139

*Henderson v. U.S. Fid. & Guar. Co.*,
    488 s.E.2d 234 (N.C. 1997) ........................................................................................111

*Hyland v. Homeservices of America, Inc.*,
    2007 WL 2407233, at *3 (W.D. Ky. Aug. 17, 2007) ...................................................58

*Intel x86 Microprocessors Cases*,
    No. J.C.C.P. No. 4443 (Cal. Super. Ct. May 15, 2008)...............................................122

*Kammer Asphalt Paving Co., Inc. v. East China Tp. Schools*,
    504 N.W. 2d 635 (Mich. 1993) ...................................................................................138

*Kranzush v. Badger State Mut. Cas. Co.*,
    307 NW.2d 256 (Wisc. 1981).......................................................................................144

*Krepcik v. Interstate Transit Lines*,
    153 Neb. 98, 43 N.W.2d 609 (Neb., 1950) ................................................................132

*Lorix v. Crompton Corp.*,
    736 N.W.2d 619 (Minn. 2007) ....................................................................................114

*MacDonald v. Grace Church Seattle*,
    No. C05-0747C, 2006 WL 1009283 (W.D. Wash. Apr. 14, 2006).................................51

*Martin v. Howard*,
    784 A.2d 291 (R.I. 2001).............................................................................................146

*McNaughton v. Rockford State Bank*,
    246 N.W. 84 (Mich. 1933) ..........................................................................................145

xix

*Meyers v. Bayer AG,,*
 735 N.W.2d 448 (Wis. 2007) ........................................................................................ 122

*Moreco Energy, Inc. v. Penberthy-Houdaille, Inc.,*
 No 86 C 20153, 1998 WL 124928 (N.D. Ill. Oct. 21, 1988)........................................... 92

*Morris Pumps v. Centerline Pumping,*
 729 N.W. 2d 898 (Mich. App. 2006) ........................................................................... 138

*Muller v. Thaut,*
 430 N.W.2d 884 (Neb. 1988) ...................................................................................... 145

*Nickel v. Saline County Sch. Dist. No. 163,*
 251 Neb. 762 (Neb. 1997) ............................................................................................ 132

*Paltre v. General Motors Corp.,*
 810 N.Y.S.2d 496 (N.Y. App. Div. 2006) .................................................................... 134

*Park v. Ford Motor Co.,*
 844 A.2d, 687 (R.I. 2004)............................................................................................. 137

*People ex rel. Spitzer v. Applied Card Sys., Inc.,*
 805 N.Y.S.2d 175 (N.Y. App. Div. 2005) .................................................................... 111

*Pooler v. R.J. Reynolds Tobacco Co.,*
 2001 WL 403167 at *1 (Nev. Dist. Ct. Apr. 4, 2001.) ......................................... 133,145

*Richards v. Arteva Specialties S.A.R.L.,*
 66 Mass.App.Ct. 726, 739 n. 13, 850 N.E.2d 1068,
 1079 n. 13 (Mass.App.Ct. 2006) ................................................................................. 133

*Rodrigue v. Valco Enterprises, Inc.,*
 726 A.2d 61 (Vt. 1999) ................................................................................................ 146

*Rose v. Vulcan Mat'ls. Co.,*
 194 S.E.2d 521 (N.C. 1973) ........................................................................................ 110

*Shadrick v. Coker,*
 963 S.W.2d 726 (Tenn. 1998) ..................................................................................... 146

*Sperry v. Crompton Corp.,*
 8 N.Y.3d 204 (N.Y. 2007)............................................................................................ 140

*Sperry v. Crompton Corp.,*
 No.17872/02, slip op. at 4 (N.Y. Sup.Ct. filed Nov. 25, 2003) ...................................... 134

*Sperry v. Crompton,*
 810 N.Y.S.2d 498 (N.Y. App. Div. 2006)..................................................................... 140

*State v. Daicel Chemical Ind.,*
 840 N.Y.S.2d 8, 12 (N.Y. App. Div. 2007) .................................................................. 134

xx

*St Patrick's Home for the Aged and Infirm v. Laticrete Int'l, Inc.,*
   264 A. D. 2d 652 N.Y.S. 2d 117 (1st Dep't 1999)........................................................135

*Strassburg v. Citizens State Bank,*
   581 N.W.2d 510 (S.D. 1998) ..........................................................................................146

*Szukalski v. Crompton Corp.,*
   726 N.W.2d 304 (Wis. Ct. App. 2006) ...........................................................................122

*Taylor v. Phillip Morris Inc.,*
   2001 WL 1710710, *at 4 (Me. Super. Ct. May 29, 2001)...............................................145

*Teague v. Bayer AG,*
   671 S.E.2d 550 (N.C. App. 2009) ...................................................................................114

*Tenn. ex rel. Leech v. Levi Strauss & Co.,*
   No. 79-722-III, 1980 WL 4696 *2n.2 (Tenn. Ch. Ct. Sept. 25, 1980) ...........................110

*Town of Sharon v. Anahma Realty Corp. et. al.,*
   123 A. 192 (Vt. 1924).....................................................................................................144

*Union Carbide Corp. v. Superior Court,*
   36 Cal. 3d 15 (1984) .......................................................................................................119

*Walton v. Mead,*
   No. C03-4921 CRB, 2004 WL 2415037, at *4 (N.D. Cal. Oct. 28, 2004) ......................52

*Watson v. Brown,*
   67 Haw. 252 (Haw. 1984) ...............................................................................................144

*Watts v. Watts,*
   405 N.W.2d 303 (Wis. 1987) ..........................................................................................142

*Weaver v. Cabot* Co.,
   2004 WL 3406119 (N.C. Super. Mar. 26, 2004) ............................................................129

*Wisconsin  v. Amoco Oil Co.,*
   97 Wis. 2d 226 n.3 (1980) ..............................................................................................111

*Zoe G. v. Frederick F.G.,*
   617 N.Y.S. 2d 370 (1994) ...............................................................................................145

## FEDERAL STATUTES AND RULES

Clayton Act
   15 U.S.C. § 26 ...................................................................................................................93

Federal Rule of Civil Procedure ...............................................................................................9

Federal Rule of Civil Procedure 12(b)(6)...............................................................................15

Federal Rule of Civil Procedure 12(e)............................................................................. 94

Federal Rule of Civil Procedure 12(f) ............................................................................. 108

Federal Trade Commission Act,
    15 U.S.C. §§ 45-48 ...................................................................................................112

Foreign Trade Antitrust Improvement Act of 1982
    15 U.S.C. § 6a...................................................................................................passim

Sherman Act
    15 U.S.C. § 1 passim ........................................................................................passim
    15 U.S.C. 15b...................................................................................73

## STATE STATUTES

### *Arizona*

Ariz. Rev. Stat. Ann.
    § 44-1412........................................................................................................111

### *Florida*

Fla. Rev. Stat.
    § 501.202(3.....................................................................................................113

### *Hawaii*

Haw. Rev. Stat.
    § 480-2(b)........................................................................................................113
    § 480-13(d)......................................................................................................145

### *Iowa*

Iowa Code Ann.
    § 553.2.............................................................................................................111

### Kansas

Kan. Stat. Ann.
    § 50-147………........................................................................................145

### *Massachusetts*

Mass. Gen. Laws Ann.
    Ch. 93A § 2(b)………...................................................................................113
    Ch. 93A § 9(3)………...................................................................................135

### *Michigan*

Mich. Comp. Laws Ann.
    § 445.784………..........................................................................................111

### *Minnesota*

Minn. Stat. Ann.
    § 325D.07………........................................................................................145

**INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT AND SEPARATE
MOTIONS TO DISMISS THE INDIRECT PURCHASER CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917**

*Mississippi*

Miss. Code Ann.
  § 15-1-67………………………………………………………………147
  § 75-21-39………………………………………………………………145

*Nebraska*

Neb. Rev. Stat.
  § 59-801 *et seq.* …………………………………………………………134
  § 59-821……………………………………………………………………134
  § 59-829……………………………………………………………………112
  § 59-1602…………………………………………………………………113,134

*Nevada*

Nev. Rev. Stat.
  § 598A.050………………………………………………………………112
  § 598A.250………………………………………………………………145

New Mexico

N.M. Stat. Ann.
  § 57-1-15…………………………………………………………………112
  § 57-12-4…………………………………………………………………113

*New York*

N.Y. Gen. Bus. Law
  § 349……………………………………………………………… 113,135
  § 350(e) ………………………………………………………… 145

*North Carolina*

N.C. Gen. Stat.
  § 75-1.1 *et seq.* …………………………………………………………113

*North Dakota*

N.D. Cent. Code
  § 28-01-24………………………………………………………………147

*Rhoda Island*

R.I. Gen. Laws
  § 6-1.1-1 *et seq.* ………………………………………………………138
  § 6-13.1-1(xii), (xiii)……………………………………………………138
  §6-13.1-3…………………………………………………………………113

*South Dakota*

S.D. Codified Laws
  §31-1-22…………………………………………………………………112

*Vermont*

Vt. Stat. Ann. tit. 9
  § 2451……………………………………………………………………113
  § 2453(b)…………………………………………………………………113
  § 2470(d)…………………………………………………………………145

**INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT AND SEPARATE MOTIONS TO DISMISS THE INDIRECT PURCHASER CONSOLIDATED AMENDED COMPLAINT MDL NO. 1917**

*West Virginia*

W. Va. Code
  § 47-18-16…..................................................................................112
  § 47-18-13…..................................................................................145

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 97-686, 5( 1982),  *reprinted in* 1982 U.S.S.C.A.N. 2490..................................99

**TREATISES AND OTHER AUTHORITIES**

ABA Section of Antitrust Law,
  1 *Antitrust Law Developments* at 550 (5th ed. 2007)…………..............………..127

*Antitrust Grand Jury Manual,*
  Vol. 1, Ch. I.B.1 (1991)…………...............................................................59

*Antitrust Division Manual,*
  Ch. III.C.5.  (4th ed. 2009, rev.) …………................................................…59

Herbert Hovenkamp, The Rationalization of Antitrust,
  116 Harv. L. Rev. 917 (2003)…….........................................…............70

*Industry & Trade Summary Television Picture Tubes and Other*
  *Cathode Ray Tubes,* USITC Publication 2877 (May 1995),..........................…100

Michael V. Gisser, *Indirect Purchaser Suits Under State Antitrust Laws:*
  *A Detour Around The Illinois Brick Wall*, 34 Stan. L. Rev. 203, 204 (1981)
  …………......................................................................121

U.S. DOJ "Corporate Leniency Policy" (1993)……...............................................59

1    The Indirect Purchaser Plaintiffs ("Plaintiffs") submit this memorandum of points and

2  authorities in opposition to Defendants' Joint Motion To Dismiss the Indirect Purchasers'

3  Consolidated Amended Complaint ("Joint Motion"), and the eight separate motions to dismiss

4  (the "Separate Motions") filed by:

5       • Panasonic Corporation and Panasonic Corporation of North America (the

6          "Panasonic Defendants" or "Panasonic");

7       • Samsung Electronics Co., Ltd., and Samsung Electronics America, Inc. (the

8          "Samsung Electronics Defendants" or "Samsung");

9       • Hitachi, Ltd., Hitachi Displays, Ltd., Hitachi Asia, Ltd., Hitachi America, Ltd.,

10         and Hitachi Electronic Devices (USA), Inc. (the "Hitachi Defendants" or

11         "Hitachi");

12      • LG Electronics, Inc., LG Electronics USA, Inc., and LG Electronics Taiwan

13         Taipei Co., Ltd. (the "LG Defendants" or "LG");

14      • Koninklijke Philips Electronics N.V. and Philips Electronics North America

15         Corporation (the "Philips Defendants" or "Philips" [1]);

16      • Toshiba Corporation, Toshiba America, Inc., Toshiba America Information

17         Systems, Inc., Toshiba America Consumer Products, L.L.C., and Toshiba America

18         Electronic Components, Inc. (the "Toshiba Defendants" or "Toshiba");

19      • Beijing Matsushita Color CRT Company, Ltd. ("BMCC"); and

20      • Tatung Company of America, Inc. ("Tatung").

21    The foregoing separately-moving defendants will be collectively referred to herein as the

22  "Separate Defendants."  The defendants who joined in the Joint Motion will be collectively

23  referred to herein as "Defendants" or "Joint Defendants."

---

[1] The motions of Philips Electronics Industries (Taiwan), Ltd., Philips da Amazonia Industria
Electronica Ltda., and Samtel Color, Ltd., which raise jurisdictional and factual issues, have been
deferred by stipulated Order.  The parties are meeting and conferring regarding jurisdictional
discovery.

1

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Most notable about Defendants' 325 pages of briefing in support of their motions to dismiss is that *nowhere* do they argue that the Indirect Purchaser Consolidated Amended Complaint ("IP CAC") fails to state a claim for price-fixing in violation of the antitrust laws. In most antitrust cases the defendants file a *joint* motion to dismiss arguing that the plaintiffs have not pled a plausible conspiracy under *Twombly*.[2] Here, Defendants' Joint Motion makes no such argument. In what is essentially a finger-pointing exercise, the Separate Defendants argue that the Indirect Purchaser Plaintiffs ("Plaintiffs") have failed to plausibly allege *their participation* in the conspiracy. Defendants have therefore conceded that the IP CAC properly pleads the existence of a price-fixing conspiracy under *Twombly*. This is not surprising since at least one of the Defendants has applied for amnesty under the Department of Justice's ("DOJ") Corporate Leniency Policy. Therefore, at least one Defendant has confessed to the existence, scope and extent of the conspiracy. In the Ninth Circuit, "[o]nce the existence of a common scheme is established, very little is required to show that defendant became a party."[3]

Even though they have conceded that Plaintiffs properly plead a price-fixing conspiracy, the Separate Defendants claim that Plaintiffs' "vague," "conclusory," and "boilerplate" allegations fail to provide them with adequate notice of the claims against them. The Separate Defendants' arguments are themselves "conclusory and boilerplate" and amount to merely a "formulaic recitation" of the Supreme Court's holdings in *Twombly* and *Ashcroft v. Iqbal,* 129 S. Ct. 1937 (2009). This will not do.[4] Just as Plaintiffs may not rely upon a "formulaic recitation of

---

[2] *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007).

[3] *Safeway Stores v. FTC,* 366 F.2d 795, 801 (9th Cir. 1966); *see also Wilk v. American Medical Ass'n,* 735 F.2d 217, 219 (7th Cir. 1983).

[4] *See In re Southeastern Milk Antitrust Litig.,* 555 F. Supp. 2d 934, 948 n. 7 (E.D. Tenn. 2008) ("While *Twombly* certainly requires of plaintiffs a degree of pleading that may not be required in other types of cases, it was not intended as a shield to be used by antitrust defendants to defeat

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1   the elements of a cause of action," the Separate Defendants may not simply mischaracterize well-

2   pled, factual allegations as "conclusory and boilerplate" in order to win on a motion to dismiss.

3   *See* Section I. C. and D. *infra.*

4          The fallacy of Defendants' "conclusory and boilerplate" arguments is particularly evident

5   when one considers that twelve defendants have not brought a separate motion to dismiss under

6   *Twombly*.[5]   The IP CAC allegations against these twelve defendants do not differ materially from

7   the allegations against the Separate Defendants.  Yet, these twelve defendants concede that the IP

8   CAC contains sufficient individualized allegations against them, and thus provides notice of the

9   claims against them.  This is because the IP CAC, taken as a whole, adequately alleges each

10  Defendant's involvement in the CRT Product conspiracy.  The IP CAC's well-pled, factual

11  allegations are far from "conclusory and boilerplate" and are entitled to a presumption of truth at

12  this stage.[6]  *See* Section I. A. through E. *infra.*

13         Faced with the robust factual allegations in the IP CAC, the Defendants resort to several

14  improper tactics in their motions to dismiss.  For example, the Separate Defendants attempt to

15  dismember Plaintiffs' Complaint and ask the Court to consider Plaintiffs' allegations in isolation.

16  In so doing, these Separate Defendants ignore the vast majority of Plaintiffs' allegations because

17  they do not specifically name each defendant.  But as more fully explained below, antitrust

18

19

20  even a meritorious claim.  Arguing that plaintiffs have not pleaded sufficient facts appears to

21  have become the mantra of defendants in antitrust cases.")

22  [5] These twelve defendants are IRICO Group Corporation, IRICO Group Electronics Co., Ltd.,
    Chunghwa Picture Tubes, Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., MT Picture

23  Display Co., Ltd., Samsung SDI Co., Ltd., Samsung SDI America, Inc., Samsung SDI Mexico

24  S.A. de C.V., Samsung SDI Brasil Ltda., Shenzhen Samsung SDI Co., Ltd., Tianjin Samsung
    SDI Co., Ltd., and Samsung SDI (Malaysia) Sdn. Bhd.

25

26  [6] *Iqbal*, 129 S. Ct. at 150 ("When there are well-pleaded factual allegations, a court should
    assume their veracity and then determine whether they plausibly give rise to an entitlement to

27  relief.")

                                                  3

28  **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
    **AND JOINT MOTIONS TO DISMISS THE IP CAC**
    **MDL NO. 1917**

1    conspiracies need not be alleged defendant-by-defendant, and the Court must consider Plaintiffs'

2    allegations as a whole.  *See* Section I. D. *infra.*

3         Defendants also attempt to re-write Plaintiffs' allegations to change and eliminate

4    damaging facts, and to provide a basis for the various legal arguments in support of their motions.

5    The primary example is Defendants' contention in the Joint Motion and the Separate Motions

6    that the conspiracy concerns only CRTs, and not finished products containing CRTs.  This is

7    despite numerous allegations in the IP CAC regarding Defendants' conspiracy to fix the prices of

8    "CRT Products."  "CRT Products" is defined to include CRTs and finished products containing

9    CRTs.  *See* Section I. B. *infra.*  For the purpose of addressing Defendants' arguments only, this

10   brief will refer to cathode ray tubes as "CRTs;" finished products containing CRTs, such as

11   televisions and computer monitors, will be referred to as "CRT Finished Products;" and CRTs

12   and CRT Finished Products will be collectively referred to as "CRT Products."

13        The Hitachi, LG, Toshiba and Philips Defendants then rely on this rewrite of the

14   conspiracy to argue that they withdrew from the CRT market and therefore the alleged

15   conspiracy, and that the statute of limitations has run on Plaintiffs' claims against them.  As

16   further described below, this argument fails on many levels.  Plaintiffs have alleged a conspiracy

17   in the *CRT Product* market.  These defendants never withdrew from the *CRT Product* market.

18   Thus, the statute of limitations was never triggered.  Moreover, questions of fact remain as to

19   whether these defendants actually withdrew from the CRT market, whether they effectively

20   withdrew from the conspiracy itself, and if they did withdraw, whether they fraudulently

21   concealed their conduct such that the statute of limitations was tolled.  None of these questions is

22   suitable for resolution on a motion to dismiss.  Accordingly, this argument must be rejected.  *See,*

23   Section I. H *infra.*

24        The argument posited by Samsung, Tatung, and Panasonic Corporation of North America

25   that the conspiracy makes no economic sense must likewise be rejected because it relies on the

26   Defendants' "CRTs only" version of the conspiracy.  Once one considers the *CRT Product*

27

28

4

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

conspiracy as alleged by Plaintiffs and not as re-written by Defendants, it becomes clear that it makes perfect economic sense.  *See* Section I. G *infra.*

The Joint Defendants also rely on their "CRTs only" version of the conspiracy in their Joint Motion to bolster their argument that the Court lacks subject matter jurisdiction over Plaintiffs' claims under the Foreign Trade Antitrust Improvement Act of 1982, 15 U.S.C. § 6a ("FTAIA").  According to Defendants' version of the conspiracy, "Plaintiffs' allegations are aimed at alleged foreign agreements to fix the overseas prices of CRTs sold to foreign purchasers in foreign markets."  Joint Motion at 8.  The Joint Defendants' FTAIA argument fails for the simple reason that this is not what Plaintiffs have alleged.  The FTAIA does not apply to this case because Plaintiffs have alleged a *CRT Product* conspiracy that was carried out both here in the U.S. and abroad, and which involved a substantial amount of import commerce.  Assuming *arguendo* that the FTAIA does apply, Plaintiffs have alleged the requisite "direct, substantial and reasonably foreseeable" effect on domestic commerce.  *See* Section II. A. *infra.*

Similarly, the Joint Defendants argue that Plaintiffs lack antitrust standing under *Associated General Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*") because, according to Defendants' "CRTs only" version of the conspiracy, Plaintiffs are purchasers of a product containing a price-fixed component. *See* Joint Motion at 16.  Again, the Joint Defendants' argument fails at the most basic level because it is premised on a fundamental misreading and mischaracterization of the IP CAC.  The Joint Defendants' *AGC* argument also fails because, as three courts in this district have recently held, *AGC* either does not apply to Plaintiffs' state law claims in the absence of a clear directive from state legislatures or highest courts, or even if it does, the application of *AGC* cannot be resolved at the pleading stage.[7]

_____

[7] *See In re Graphics Processing Unit (GPU) Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007) ("*GPU I*"); *In re Graphics Processing Unit (GPU) Antitrust Litig.,* 540 F. Supp. 2d 1085 (N.D. Cal. 2007) ("*GPU II*"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) ("*TFT-LCD I*"); *In re Flash Memory Antitrust Litig.*, 4:08-cv-00086-SB, 2009 U.S. Dist. LEXIS 38941 (N.D. Cal. Mar. 31, 2009) ("*Flash Memory*").

5

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1    Alternatively, even if the *AGC* factors do apply to a particular state law claim, they weigh

2    strongly in favor of Plaintiffs' standing here.  *See* Section II. B. *infra.*

3          The various attacks on Plaintiffs' state law claims must also be rejected.  Contrary to the

4    Joint Defendants' arguments, the antitrust statutes of Nevada and Nebraska may be applied

5    retroactively.  *See* Section II. C. *infra.*  In addition, Plaintiffs sufficiently allege causes of action

6    for common law unjust enrichment and violations of certain state consumer protection laws.  The

7    Joint Defendants' arguments that the alleged conspiracy does not constitute "deceptive or

8    unconscionable" conduct, or that Plaintiffs must confer a direct benefit on Defendants, are

9    without merit and have been recently rejected by other federal courts.  *See* Section II. D and E

10   *infra.*

11         Finally, Plaintiffs have sufficiently pled fraudulent concealment sufficient to toll the

12   statute of limitations.  In their Joint Motion, Defendants argue that Plaintiffs had constructive

13   notice of the conspiracy through general electronics industry market trends and related industry

14   reports.  Defendants are wrong.  Courts have found that even governmental investigations and

15   publicly-announced settlements are insufficient to put a plaintiff on notice for limitations

16   purposes.[8]  Moreover, whether Plaintiffs had constructive notice is a question of fact that cannot

17   be resolved at the pleadings stage.  *See* Section II. F. *infra.*

18          In short, if Defendants' interpretation of the law was correct, the pleading hurdle in price

19   fixing cases would be so high it would be impossible for plaintiffs to survive a motion to dismiss

20   except in cases where plaintiffs actually attended the meetings of the conspirators.  This is not the

21   law.  Accordingly, Defendants' motions to dismiss should be denied.

22   //

23   //

24

25

26

27   [8] *In re Bulk Extruded Graphite Products Antitrust Litig.,* 2007 WL 1062979, *4 (D.N.J. 2007).

6

28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
     **AND JOINT MOTIONS TO DISMISS THE IP CAC**
     **MDL NO. 1917**

**DETAILED FACTUAL ALLEGATIONS IN THE INDIRECT PURCHASER
CONSOLIDATED AMENDED COMPLAINT**

The IP CAC contains 92 pages of detailed, factual allegations that "plausibly suggest" the existence of a price-fixing conspiracy in the *CRT Product* market by Defendants in violation of federal and state antitrust laws, and various state unfair competition and consumer protection laws.  *See Twombly,* 550 U.S. at 556-557; *Iqbal,* 129 S. Ct. at 149-150.  Plaintiffs' robust factual allegations tell a damning story of wide-spread collusion in the *CRT Product* market, organized at the highest level of the Defendants' organizations, and carried out by both executives and subordinate employees.  These allegations are a far cry from the "bare assertion of conspiracy" found to be insufficient in *Twombly.*  Contrary to the Defendants' assertions, the IP CAC provides answers to "the basic questions, 'who did what, to whom (or with whom), where, and when,'" all of which are entitled to a presumption of truth at this stage.  *Kendall v. Visa,* 518 F.3d 1042, 1048 (9th Cir. 2008).

**Why and How:**  The IP CAC alleges specific facts regarding the structural characteristics of the *CRT Product* market that are conducive to a price-fixing cartel.  These structural characteristics provided a motive and an opportunity for Defendants to collude:

- **High market concentration and consolidation in the CRT Product industry.** IP CAC ¶¶ 122, 125, 126

- **Multiple interrelated business relationships both in the CRT Product business and other related businesses, common trade association memberships, and information sharing.**  *Id.* ¶ 123 ("Because of common membership in trade associations for the *CRT Product* market and related markets (e.g. TFT-LCD), interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.")  (emphasis added); ¶ 124 ("Defendants Chunghwa, Hitachi and Samsung are all members of the Society for Information Display.  Defendants Samsung and LG Electronics, Inc. are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo, LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association."); ¶ 128(a)-(b) (Defendants LG Electronics, Inc. and Koninklijke Philips formed joint ventures in the CRT business and the closely-related TFT-LCD business.  The LCD joint venture, LG Display Co., Ltd.,

7

has pled guilty to price-fixing in the TFT-LCD market ( ¶ 219)); ¶ 128(c)-(g) (Defendant Toshiba has formed cooperative relationships in the CRT market and the closely-related TFT-LCD market.  These include joint ventures, technology transfer agreements, and production agreements with three other defendants— Panasonic Corporation, Daewoo, and Chunghwa.  Notably, Chunghwa's former Chairman C.Y. Lin has been indicted for violations of the U.S. antitrust laws in the CRT market.  (¶¶ 4 & 205)); ¶ 128(h) (Chunghwa also has a joint venture with defendant Samsung Electronics Co., Ltd. for the production of TFT-LCDs, and licenses the technology from defendant Koninklijke Philips.); ¶ 128(i) (Defendants LG Electronics and Hitachi have a joint venture for the manufacture and sale of optical storage products such as DVD drives); ¶ 128(j)-(k) (Defendants Samtel and Samsung formed a joint venture for the production and supply of picture tube glass, and Samtel supplies CRTs to Defendants LG Electronics, Samsung, Royal Philips and Panasonic.)

- **High costs of entry into the CRT industry.**  *Id.* ¶ 129

- **The Maturity of the CRT Product Market.**  *Id.* ¶¶ 130-135 ("The *CRT Product* market is a mature one . . . characterized by slim profit margins, creating a motivation to collude.  Demand for *CRT Products* was declining throughout the Class Period . . . between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent. . . .") (emphasis added)

- **Homogeneity of CRT Products.**  *Id.* ¶¶ 136-137 ("*CRT Products* are commodity-like products which are manufactured in standardized sizes.  Defendants sell and Plaintiffs (and Class members) purchase *CRT Products* primarily on the basis of price.  It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.")

**When and How:**  The IP CAC alleges specific facts regarding when the conspiracy began and how it began.  It goes on to describe, in detail, how the conspiracy developed from informal bilateral meetings into a formal system of multilateral and bilateral meetings, and when those meetings took place:

- **The genesis of the conspiracy.**  *Id.* ¶¶ 138-139 ("The genesis of the CRT conspiracy was in the late 1980s as the *CRT Products* business became more international . . . .  A culture of cooperation developed over the years and these Defendant employees would exchange market information in production, capacity and customers.  In the early 1990s, representatives from Samsung, Daewoo,

8

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC MDL NO. 1917**

Chunghwa and Orion visited each other's factories in S.E. Asia . . . pricing discussions were usually limited, however, to exchanges of the range of prices that each had quoted to specific customers.") (emphasis added)

- **When the conspiracy began and how it developed.** *Id.* ¶¶ 140-143 ("In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis. As more manufacturers formally entered the conspiracy, group meetings became more prevalent. Beginning in 1997, the Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.")

- **When the group meetings, or "Glass Meetings," occurred.** *Id.* ¶¶ 141- 142 ("In the formative years of the conspiracy (1995-1996) . . . Defendants Samsung, Chunghwa, LG, and Daewoo also attended several ad hoc group meetings . . . "); ¶ 143 ("Beginning in 1997, the Defendants began to meet in a more organized fashion . . ."); ¶¶ 146-148 ("Top Meetings . . . occurred less frequently, typically quarterly . . . 'Management meetings' . . . occurred more frequently, typically monthly. 'Working level meetings' . . . occurred on a weekly or monthly basis… The Chinese Glass Meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. Glass meetings also occurred occasionally in various European countries."); ¶ 149 ("Representatives of the Defendants also attended what were known among members of the conspiracy as 'Green Meetings.'")

- **When the bilateral meetings occurred.** *Id.* ¶ 141 ("In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis."); ¶ 158 ("As market conditions worsened in 2005-2007, . . . the group Glass Meetings became less frequent and bilateral meetings again became more prevalent."); ¶ 159 ("Throughout the Class Period, the Glass Meetings were supplemented by bilateral discussions between various Defendants. The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings."); ¶ 164 ("It was often the case that in the few days following a Top or Management Meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers [who didn't normally attend the group meetings] for the purpose of communicating whatever *CRT Product* pricing and/or output agreements had been reached during the meeting.") (emphasis added)

**What:** The IP CAC gives a detailed description of what happened at the meetings, including the specific topics discussed, what specific products were the subject of their

9

agreements, and the specific terms of the anticompetitive agreements entered into by the

Defendants:

- **What happened at the Glass Meetings—including the specific topics discussed.** *Id.* ¶ 141 ("[R]epresentatives from Defendants . . . visited the other Defendant manufacturers . . . to discuss increasing prices for *CRT Products* in general and to specific customers."); ¶ 142 ("The participants at these group meetings also discussed increasing prices for *CRT Products*."); ¶ 146 ("Top Meetings…were focused on longer term agreements and forcing compliance with price fixing agreements.  Because attendees at Top Meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at Top Meetings were also able to resolve disputes because they were decision makers who could make agreements."); ¶ 147 ("Management Meetings…handled implementation of the agreements made at Top Meetings."); ¶ 148 ("Working Level Meetings . . . were mostly limited to the exchange of information and discussing pricing . . . . These lower level employees would then transmit the competitive information up the corporate reporting chain to individuals with pricing authority."); ¶ 148(a) ("The China meetings had the principal purpose of reporting what had been decided at the most recent Glass Meeting to the Chinese manufacturers."); ¶ 151 ("Participants would often exchange competitively sensitive information prior to a Glass Meeting.  This included information on inventories, production, sales, and exports."); ¶ 152 ("The Glass Meetings all followed a fairly typical agenda.  First, the participants exchanged competition information such as proposed future CRT pricing . . . . Each meeting had a rotating, designated "Chairman" who would write information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter . . ."); ¶ 154 ("Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.")

- **What happened at the bilateral meetings, including the specific topics discussed.** *Id.* ¶ 161 ("The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and Europe."); ¶ 162 ("Defendants also used bilateral discussions to coordinate pricing with *CRT Product* manufacturers in Brazil and Mexico, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.") (emphasis added); ¶ 163 ("Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices."); ¶ 164 ("Bilateral discussions were also used to coordinate prices with *CRT Product* manufacturers who did not ordinarily attend the group meetings.") (emphasis added)

10

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

- **What products were the subject of the Defendants' anticompetitive agreements.** *Id.* ¶ 15 ("As used herein, 'CRT Products' includes (a) CRTs; and (b) products containing CRTs, such as televisions sets and computer monitors."); ¶ 1 ("Plaintiffs allege that during the Class Period the Defendants conspired to fix, raise, maintain and stabilize the prices of *CRT Products*.") (emphasis added); ¶ 2 ("[B]eginning in 1995, Defendants Samsung, Philips, Daewoo, LG and Chunghwa met or talked with at least one other Defendant in order to discuss and agree upon *CRT Product* prices and the amount of *CRT Products* each would produce.  Over time, these Defendants reached out to other *CRT Product* manufacturers, including Toshiba, Panasonic, Hitachi, BMCC, IRICO, Thai CRT, and Samtel, who then also met or talked with their competitors for the purpose of fixing the prices of *CRT Products*.  By 1997, a formal system of multilateral and bilateral meetings was in place, involving the highest levels of the Defendant corporations, all with the sole purpose of fixing the prices of *CRT Products* at supracompetitive levels.") (emphasis added); ¶ 3 ("Defendants' conspiracy was effective in moderating the normal downward pressure on prices for *CRT Products* caused by periods of oversupply and competition from new technologies . . .") (emphasis added); ¶ 197 ("A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips, and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells . . ."); ¶ 237 ("Defendants not only knew, but expressly contemplated that prices for *CRT Products* would increase as a direct result of their increasing the prices for CRTs."); ¶ 238 ("many of the Defendants and/or co-conspirators themselves have been and are currently manufacturers of CRT TVs and computer monitors.  Such manufactures include, for example, Samsung, LG, Hitachi, Toshiba, Philips and Panasonic.  Having agreed to fix prices for CRTs, the major components of the end products they were manufacturing, these Defendants intended to pass on the full cost of this component in their finished product, and in fact did so."); *see also* ¶¶ 121, 123, 124, 125, 127, 128, 129, 130, 131, 132, 136, 138, 140, 154, 155, 156, 162, 164, 165, 166-187, 192, 199, 201, 202.

- **The specific terms of the agreements entered into by Defendants.** *Id.* ¶ 152 ("They discussed and agreed upon target prices, price increases, so-called 'bottom' prices, and price ranges for CRTs . . . prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks."); ¶ 156 ("The agreements reached at the Glass Meetings included: (a) agreements on *CRT Product* prices, including establishing target prices, 'bottom' prices, price ranges and price guidelines; (b) placing agreed-upon price differentials on various attributes of *CRT Products*, such as quality or certain technical specifications; (c) agreements on pricing for intra-company *CRT Product* sales to vertically integrated customers; (d) agreements as to what to tell customers about the reason for a price increase;

11

(e) agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing; (f) agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India; (g) agreements to exchange pertinent information regarding shipments, capacity, production, prices, and customer demand; (h) agreements to coordination uniform public statements regarding available capacity and supply; (i) agreements to allocate both overall market shares and share of a particular customer's purchases; (j) agreements to allocate customers; (k) agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and, (l) agreements to keep their meetings secret.") (emphasis added)

**Where:** The IP CAC alleges where the group and bilateral meetings took place.  As further described in Section I. D. 3., these specific allegations regarding the locations of meetings also indicate which of the defendants within a corporate family attended the meetings:

- **Where the group meetings occurred.**  *Id.* ¶ 148 ("The Working Level Meetings also tended to be more regional and often took place near Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on."); ¶ 150 ("During the Class Period, Glass Meeting took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia.")

- **Where the bilateral meetings occurred.**  *Id.* ¶ 139 ("In the early 1990s, representatives from Samsung, Daewoo, Chunghwa and Orion visited each other's factories in S.E. Asia."); ¶ 141 ("In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication . . . . These meetings took places in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore."); ¶ 160 ("During the Class Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and Mexico.")

**Who:** Finally, the IP CAC also alleges with the requisite specificity who participated in the alleged CRT Product price-fixing conspiracy, including how each defendant joined the conspiracy and what its role was.  These allegations also provide details as to how an individual defendant within a corporate family was involved, and which employees of the Defendants attended meetings.

INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917

- **Who were the participants in the CRT Product conspiracy, including when they joined the conspiracy.** *Id.* ¶ 139 ("In the early 1990s, representatives from Samsung, Daewoo, Chunghwa and Orion visited each other's factories in S.E. Asia."); ¶ 141 ("[R]epresentatives from Defendants LG, Samsung and Daewoo visited the other Defendant manufacturers including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic to discuss increasing prices for *CRT Products* . . .") (emphasis added); ¶ 142 ("Defendants Samsung, Chunghwa, LG and Daewoo also attended several ad hoc group meetings during this period."); ¶ 148(a) ("Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa."); ¶ 148(b) ("Attendees at [the European Glass Meetings] included those Defendants which had subsidiaries and/or manufacturing facilities in Europe, including Philips, LG, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), and IRICO."); ¶ 162 ("the Defendants also used bilateral meetings to coordinate pricing with *CRT Product* manufacturers in Brazil and Mexico, such as Philips Brazil, Samsung SDI Brazil, and Samsung SDI Mexico.") (emphasis added); ¶ 164 ("Bilateral discussions were also used to coordinate prices with *CRT Product* manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic, Thai CRT, and Samtel.") (emphasis added); *see also* ¶¶ 166-187 (describing the participation of each defendant within a corporate group).

- **Employees of the Defendants who attended the meetings.** *Id.* ¶ 145 ("Glass meetings were attended by employees at three general levels of the Defendants' corporations."); ¶ 146 ("The first level of these meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents and were known as 'Top Meetings.'"); ¶ 147 ("The second level of meetings were attended by the Defendants' high level sales managers and were known as 'Management Meetings.'"); ¶ 148 ("the third level of meetings were known as 'Working Level Meetings' and were attended by lower level sales and marketing employees.")

- **Conspiratorial relationships between the defendants.** *Id.* ¶ 165 ("Samsung had a relationship with Hitachi and was responsible for communicating *CRT Product* pricing agreements to Hitachi.  LG had a relationship with Toshiba and was responsible for communicating *CRT Product* pricing to Toshiba.  And Thai CRT had a relationship with Samtel and was responsible for communicating *CRT Product* pricing to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG and Thai CRT.  Sometimes Hitachi and Toshiba attended the Glass Meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix the prices of *CRT Products*.") (emphasis added)

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1    In addition to alleging the "who, what, why, when, where and how" of the conspiracy—

2    allegations that go far beyond Rule 8 pleading requirements—the IP CAC further alleges parallel

3    conduct by the Defendants, including "unusual price movements in the *CRT Product* market,"

4    such as "unusually stable pricing and even rising pricing in a very mature, declining market."  IP

5    CAC ¶¶ 3, 192-197 (emphasis added).  The IP CAC gives specific examples of the pretextual

6    justifications of price increases given by Defendants, such as a shortage of the glass used to

7    manufacture CRTs.  *Id.* ¶¶ 200-202.  The IP CAC also provides specific examples of "sudden,

8    coordinated drops in factory utilization by Defendants," including an almost 30 percent drop

9    from the third quarter of 2000 to the first quarter of 2001.  *Id.* ¶¶ 198-199.  These coordinated

10   production cuts were a "result of Defendants' agreements to decrease output in order to stabilize

11   the prices of *CRT Products*."  *Id.*; *see also* ¶¶ 152, 156(k) (emphasis added).

12   All of these allegations are set in the context of government investigations into price

13   fixing activity in the CRT industry by antitrust authorities in the United States, Europe, Japan,

14   South Korea and Hungary.  *Id.* ¶¶ 203-213.  Here in the United States, the DOJ has not only

15   commenced an investigation, a grand jury has been convened.  *Id.* ¶ 205.  Moreover, the grand

16   jury has issued a two-count indictment against C.Y. Lin, the former Chairman and CEO of

17   defendant Chunghwa Picture Tubes, Ltd., for his role in the conspiracy to fix the prices of CRTs.

18   *Id.* ¶¶ 4, 205.  In addition, the DOJ has taken the extraordinary step of intervening in the civil

19   litigation to obtain a complete stay of merits discovery.  *See* Docket No. 320.  In doing so, the

20   DOJ made an *in camera* submission to this Court regarding the conspiracy, relying in part upon

21   information received from the amnesty applicant.  *See* Docket No. 326.

22   The IP CAC also details the guilty pleas and criminal fines that have so far been

23   announced as a result of the parallel investigation in the closely-related TFT-LCD market.  *Id.* ¶¶

24   217-221.  TFT-LCD technology is the new display technology that is rapidly replacing CRTs for

25   use in televisions and computer monitors.  *Id.* ¶¶ 132-133.  There is substantial overlap between

26   those companies accused of price fixing TFT-LCDs and the Defendants in this case.  Defendants

27

28

14

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1   Chunghwa and Hitachi Displays, Ltd. have pled guilty and paid criminal fines for their price-

2   fixing activities in the TFT-LCD industry.  *Id.* ¶¶ 219-220.  LG Display Co., Ltd., an LCD joint

3   venture between Defendants LG Electronics and Koninklijke Philips, has also pled guilty to price

4   fixing of TFT-LCDs.[9] *Id.* ¶ 218.  Defendants Samsung and Toshiba are currently under

5   investigation for price fixing of TFT-LCDs, and news reports have suggested that defendant

6   Samsung Electronics Co., Ltd. is the amnesty applicant in that case.  *Id.* ¶ 218.  Finally,

7   Chunghwa's former Chairman and CEO, C.Y. Lin, was also indicted for his participation in the

8   conspiracy to fix the prices in the closely-related TFT-LCD market.  *Id.* ¶ 205.

9        All of the foregoing allegations make the CRT Product conspiracy and each of the

10  Defendants' participation in it not just plausible, but probable.  Defendants' motions to dismiss

11  should therefore be denied.

12

13  **ARGUMENT**

14  **I.  Defendants' Separate Motions To Dismiss Must Be Denied**

15      **A.  The Legal Standard On A Rule 12(b)(6) Motion To Dismiss**

16       This Court, along with many other courts, has held that "*Twombly* did not alter Rule

17  8(a)'s requirement of a short and plain statement that gives 'the defendant fair notice of what the .

18  . . claim is and the grounds upon which it rests.'"  *Velasquez, et al. v. HSBC Finance Corp., et al.,*

19  2009 U.S. Dist. LEXIS 5428, *5-6 (N.D. Cal. Jan. 16, 2009) (J. Conti), citing *Swierkiewicz v.

20  Sorema N.A.,* 534 U.S. 506, 512 (2002).[10]  Other courts, including the *Twombly* court itself, have

21

22

23  _____

[9] Defendants LG Electronics, Inc. and Koninklijke Philips also formed a joint venture for the
24  manufacture of CRTs, LG.Philips Displays, n/k/a LP Displays International, Ltd.  LP Displays is
    also named as a defendant in this case, but has not responded to the IP CAC because it is in
25  liquidation in Hong Kong.

26  [10] *See also In Re: Pressure Sensitive Labelstock Antitrust Litig.,* 566 F. Supp. 2d 363, 370 (M.D.
    Pa. 2008) ("*Labelstock II*") ("*Twombly* affirmed the general rule that pleading in federal court

15

28  **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
    AND JOINT MOTIONS TO DISMISS THE IP CAC
    MDL NO. 1917**

1   emphasized that antitrust cases are not subject to a heightened pleading standard.  *Twombly,* 550

2   U.S. at 569, n. 14 ("In reaching this conclusion, we do not apply any 'heightened' pleading

3   standard, nor do we seek to broaden the scope of *Federal Rule of Civil Procedure 9*, which can

4   only be accomplished 'by the process of amending the Federal Rules, and not by judicial

5   interpretation.'").[11]  Thus, contrary to Defendants' contentions, a complaint "attacked by a Rule

6   12(b)(6) motion to dismiss does not need detailed factual allegations."  *Twombly,* 550 U.S. at

7   555.[12]  The complaint should not be dismissed if the facts "state a claim to relief that is plausible

8   on its face."  *Id.* at 570.

9        Even though it does not involve an antitrust case, the Supreme Court's recent opinion in

10   *Iqbal* is helpful in so far as it explains the "plausibility standard" enunciated in *Twombly* and

11   provides some guidance to the Court in adjudicating these motions to dismiss:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Id.* at 570.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Id.* at 556.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.*
>
> \*        \*        \*
>
> Two working principles underlie our decision in *Twombly.*  First, the tenet that a court must accept as true all of the allegations contained in a

---

need only comply with Rule 8(a)(2)"); *Iqbal,* 129 S. Ct. at 149 ("As the Court held in *Twombly,* the pleading standard Rule 8 announces does not require 'detailed factual allegations.'")

[11] *See also Labelstock II,* 566 F. Supp. 2d at 370 ("[T]he Court in *Twombly* disavowed the creation of a 'heightened' pleading standard.")

[12] *In re TFT-LCD Antitrust Litig.,* 559 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009) (*TFT-LCD II*') ("Contrary to defendants' suggestion, neither *Twombly* nor the Court's prior order requires elaborate fact pleading."); *In Re Flash Memory Antitrust Litig.,* 2009 U.S. Dist. LEXIS 38941, at \* 5 n. 5 (N.D. Cal. Mar 31, 2009) (*"Flash Memory"*) ("the Supreme Court clarified in *Erickson* that *Twombly* did not signal a switch to fact-pleading in the federal courts.  *Erickson* reaffirmed that under Rule 8 "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" 127 S.Ct. at 2200 (quoting *Twombly*, 550 U.S. at 555)).

16

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1

2

3

> complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  *Id.* at 555.  [citation omitted].  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.  *Id.* at 556.

4

5

6

7

*Iqbal,* 129 S. Ct. at 149-150.  The *Iqbal* Court also emphasized that "[d]etermining whether a complaint states a plausible claim for relief will . . . be a c*ontext-specific task* that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 150 (emphasis added).

8

9

10

11

12

13

14

15

16

17

18

19

20

        Applying the above principles, this Court must decide whether the IP CAC states a plausible claim for relief against each of the Defendants.  In so doing, the Court must construe the complaint "liberally in the plaintiff's favor, and grant plaintiffs the benefit of all inferences that can be derived from the facts alleged."  *Aktieselskabet AF v. Fame Jeans, Inc.,* 525 F.3d 8, 15 (D.C. Cir. 2008).[13]  On a motion to dismiss, the Court assumes that the plaintiff can prove the facts alleged in the complaint.  *Assoc. Gen. Contractors v. Cal. State Council of Carpenters,* 459 U.S. 519, 526 (1983).  Furthermore, "dismissal for failure to state a claim is disfavored in antitrust actions."  *Gilley Enterprises, Inc. v. Atlantic Richfield Oil Co.,* 561 F.3d 1004, 1009 (9th Cir. 2008).  Finally, the Court should consider the totality of the facts in the complaint *as they have been alleged*.  Defendants may not recast or attempt to isolate allegations.  *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962) ("The character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.")

21

22

23

24

25

26

27

---

[13] *See also Twombly,* 550 U.S. at 556 ("And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'")

28

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
**AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1

2

**B. The IP CAC Adequately Alleges A Conspiracy To Fix The Prices Of CRT Products**

3

Ignoring these fundamental principles of pleading, Defendants attempt to re-write the IP

4

CAC to suit their own, self-serving version of the conspiracy.  Defendants contend that the IP

5

CAC only alleges a conspiracy as to CRTs and not as to CRT Finished Products.[14]  Contrary to

6

Defendants' assertions, the IP CAC clearly asserts a conspiracy to fix, raise, maintain and

7

stabilize the prices of *CRT Products*, and that each Defendant group entered into unlawful

8

agreements on the price and capacity of *CRT Products*, which they sold to consumers in the

9

United States at supracompetitive prices.  *See* IP CAC ¶¶ 1-3, 10-12, 121, 123, 124, 125, 127,

10

128, 129, 130, 131, 132, 136, 138, 140, 154, 155, 156, 162, 164, 165, 166-187, 192, 197, 199,

11

201, 202.  In fact, the IP CAC alleges that defendants Samsung (including the Samsung SDI

12

entities and the Samsung Electronics entities), LG, Hitachi, Toshiba, Philips, Panasonic and

13

Chunghwa/Tatung are vertically integrated companies, all of which manufactured, sold and

14

distributed CRTs *and* CRT Finished Products at different times during the Class Period.  *Id.* ¶¶

15

50-108.

16

As alleged, Defendants' price fixing agreements "included agreements on the prices at

17

which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates" that

18

manufactured CRT Finished Products.  *Id.* ¶ 154.  Defendants realized the importance of keeping

19

the internal pricing to their affiliated CRT Finished Product manufacturers at a high enough level

20

_____

21

[14] *See* Joint Motion at 1 ("Plaintiffs' Consolidated Amended Complaint ("IP-CAC," or "Complaint") alleges a nationwide, antitrust class action predicated on allegations of a purported foreign conspiracy to fix the prices of Cathode Ray Tubes ("CRTs"), one component part of finished products such as television sets and computer monitors."); Philips Motion at 4 ("The Alleged Conspiracy Concerns Tubes Alone"); Tatung Motion at 2 ("Plaintiffs' complaints seek to assert a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, based on an alleged "price-fixing conspiracy" among manufacturers of cathode ray tubes ("CRTs").")"; Panasonic Motion at 1 ("MT Picture Display Co., Ltd. ("MTPD")—that is engaged in the manufacturing of cathode ray tubes ("CRTs") [] are the subject of the Complaints' conspiracy claims."); Samsung Electronics Motion at 1 ("The complaints allege a conspiracy to fix the prices of Cathode Ray

22

23

24

25

26

27

28

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1   to support the CRT pricing in the market to other manufacturers of CRT Finished Products.  *Id.*

2   The IP CAC describes how the Defendants also realized that in order to make their agreements

3   on pricing for CRTs stick, they had to increase the prices for CRT Finished Products.  *Id.* ¶ 155.

4   This was a simple matter for these Defendants since their own divisions, subsidiaries, and

5   affiliates manufactured and sold CRT Finished Products.  *Id.* ¶¶ 238, 166-188.  Furthermore, the

6   IP CAC alleges specific examples of Defendants announcing price increases of the CRT Finished

7   Products:

8   > A 2004 article from Techtree.com reports that various computer monitor
    > manufacturers, including LG Electronics, Philips and Samsung, were
9   > raising the price of their monitors in response to increases in CRT prices
    > caused by an alleged shortage of glass shells used to manufacture the
10  > tubes.  Philips is quoted as saying that, "It is expected that by the end of
    > the September this year [2004] there will be a 20% hike in the price of our
11  > CRT monitors.

12  *Id.* ¶ 197.

13

14         Equally unpersuasive is Defendants' argument that the alleged conspiracy is limited to

15  CRTs because the various government investigations relate to CRTs and not CRT Finished

16  Products.[15]  The absence of a government investigation into CRT Finished Products should not

17  lend any weight to Defendants' arguments or limit the scope of Plaintiffs' conspiracy allegations.

18  The government's burden of proof in its criminal case is substantially higher than Plaintiffs'

19  burden in this civil case.  Moreover, there are many instances where conspiracies have been

20  proven without prior government indictments or complaints.  *See, e.g., In re Currency*

21  *Conversion Fee Antitrust Litig.,* 2006 U.S. Dist. LEXIS 82167 (S.D.N.Y. Nov. 8, 2006)

22  (preliminarily approving a $336 million settlement in case where there was no government

23  investigation); *In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 664 (7th Cir. 2002)

24  (reversing grant of summary judgment in favor of defendants, and rejecting defendants' argument

25  _____

26  Tubes ("CRTs" or "Tubes"), components used in the manufacture of televisions and computer
    display monitors.")

27                                                   19

28

1   that the lack of DOJ investigation proved that no price fixing conspiracy existed because the DOJ

2   has "limited resources," and "may also have felt that the antitrust class action bar had both the

3   desire and the resources to prosecute such a suit vigorously.")

4          To summarize, Plaintiffs' allege a multi-faceted conspiracy in which the Defendants, who

5   collectively controlled both the market for CRTs and downstream CRT Finished Products,

6   conspired to fix, raise, maintain and stabilize the prices for these products.  Because "the court

7   must presume [these] factual allegations of the complaint to be true and draw all reasonable

8   inferences in favor of the nonmoving party," *Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d

9   979, 984 (9th Cir. 2000) (citing *Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir. 1987)),

10   the Court should reject Defendants' attempt to supplant Plaintiffs' well-pled allegations to suit

11   their own needs.

12       **C.  Defendants Demand A Level Of Specificity In The Pleadings That Is Far Beyond**

13           **What *Twombly* Requires**

14          Despite the courts' universal rejection of a heightened pleading standard for antitrust

15   cases, the Separate Defendants insist that Plaintiffs must plead the specific dates, times, places

16   and individual persons involved for each and every instance of alleged anticompetitive conduct.[15]

17   The Separate Defendants demand a level of specificity that is far beyond what *Twombly* requires.

18          *Twombly* does not require Plaintiffs to do the impossible: plead the complaint as if they

19   were actual observers of the conspiracy or were present in the room in which the Defendants

20   conspired.  *See, e.g., In Re Rail Freight Fuel Surcharge Antitrust Litig.,* 587 F. Supp. 2d 27, 34

21   (D.D.C. 2008) (finding plaintiffs' allegations of agreements at specific trade association meetings

22   were sufficient to state a claim, and noting that "[s]hort of being in the boardroom at the meeting,

23   it is hard for the Court to imagine how plaintiffs could more fulsomely allege that defendants

---

[15] *See, e.g.,* Samsung Electronics Motion at 4; LG Motion at 5; Philips Motion at 5.

[16] *See, e.g.,* Hitachi Motion at 9-13; Toshiba Motion at 9; Philips Motion, 8:5-6; LG Motion at 17-18; Tatung Motion at 16-18; BMCC Motion at 7-8; Panasonic Motion at 7, 12-14; Samsung Electronics Motion at 22-24.

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC MDL NO. 1917**

1  entered into an agreement at the AAR meetings.")  To "survive a motion to dismiss," plaintiffs

2  need not "plead specific back-room meetings between specific actors at which specific decisions

3  were made."  *GPU I*, 527 F. Supp. 2d at 1024.[17]

4         Nor has *Twombly* changed the long-standing rule that a conspiracy can be alleged solely

5  through circumstantial evidence from which it might plausibly be inferred.  *See In re*

6  *Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 906 F.2d 432, 439 (9th

7  Cir. 1990) (holding that circumstantial evidence alone may be sufficient to prove a price-fixing

8  conspiracy because "direct evidence will rarely be available").[18]  The Supreme Court has

9  recognized that "in complex antitrust litigation," "motive and intent play leading roles," and "the

10  proof is largely in the hands of the alleged conspirators."  *Poller v. Columbia Broad Sys., Inc.,*

11  368 U.S. 464, 473 (1962); *Hospital Bldg. Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 746

12  (1976).  Thus, notwithstanding *Twombly*, dismissal for failure to state a claim is still disfavored

13  in antitrust actions.  *Gilley Enterprises,* 561 F.3d at 1009.  Consequently, an antitrust complaint

14  need not provide a summary of each conspiratorial meeting, or state when particular meetings

15  occurred, where the meetings occurred, which of the defendants' employees attended, or who

16  said what to whom.

17

18

19

_____

20

21  [17] *See also City of Moundridge v. Exxon Mobil Corp.,* 250 F.R.D. 1, 4 (D.D.C. 2008) (alleging
   the years in which conspiratorial agreements were reached is sufficient to satisfy *Twombly's*

22  plausibility requirement); *Univac Dental Co. v. Dentsply Int'l, Inc.,* 2008 WL 2486134, *3 (M.D.
   Pa. June 17, 2008) (denying the defendant's motion to dismiss because it "would impose an

23  obligation on [the plaintiff] to allege the precise timing of every instance of alleged
   anticompetitive conduct. The Federal Rules impose no such burden…."); *Fair Isaac Corp. v.*

24  *Equifax, Inc.,* 2008 WL 623120, *6 (D. Minn. Mar. 4, 2008) (*Twombly* does not require specific
   pleading of the evidentiary details of a conspiracy).

25

26  [18] *See also GPU II,* 540 F. Supp. 2d at 1096 ("[D]irect allegations of conspiracy are not always
   possible given the secret nature of conspiracies.  Nor are direct allegations necessary.")

27
                                            21

28  **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
   **AND JOINT MOTIONS TO DISMISS THE IP CAC**
   **MDL NO. 1917**

1

### 1. Defendants' Authorities Are All Distinguishable Because The Complaints At Issue Alleged Far Less Than Plaintiffs Allege Here

The authorities cited by the Separate Defendants are distinguishable because the complaints at issue alleged far less than Plaintiffs allege here.  The Separate Defendants' comparison of the IP CAC to the complaints dismissed in *Twombly* and *Kendall v. VISA U.S.A., Inc.*, 518 F.3d 1042, is disingenuous at best.[19]  Those complaints were limited to allegations of parallel conduct and nothing more.  The allegations of a price-fixing conspiracy were mere legal conclusions unsubstantiated by any factual support.  *Twombly*, 550 U.S. at 565 n. 11 ("[P]laintiffs' allegations of illegal agreement proceed *exclusively* via allegations of parallel conduct") (emphasis added); *Kendall*, 518 F.3d at 1047-48.  Significantly, the parallel conduct attacked in *Twombly*—geographic division of the intricate telecommunications markets—had previously been authorized by federal law.  *Twombly,* 550 U.S. at 566-68.  Thus, the Court considered it more likely that size, fear of retaliation and simple inertia accounted for the defendants' decisions not to encroach on each other's regions, rather than collusion.  *Id.*

Even with these defects, the *Twombly* Court found these bare-bone conclusory allegations of parallel conduct came close to satisfying the notice pleading requirements of Rule 8.  *Id.* at 557.  ("An allegation of parallel conduct . . . gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility").  But because the *Twombly* complaint failed to "set forth a single fact in a context that suggested an agreement," the Court held the complaint inadequate.  *Id.* at 561-62.  The plaintiffs had not "nudged their claims across the lines from conceivable to plausible." *Id.* at 570.

In *Kendall*, the court affirmed the dismissal of a complaint that "failed to plead *any evidentiary facts* beyond parallel conduct to prove their allegation of a conspiracy."  518 F.3d at 1048 (emphasis added).  The Ninth Circuit also considered the fact that the plaintiffs in *Kendall*

---

[19] *See, e.g.,* LG Motion at 18; Panasonic Motion at 7; Samsung Electronics Motion at 21-24; Hitachi Motion at 12-13; Tatung Motion 16-18; BMCC Motion at 8; Toshiba Motion at 13.

22

1   had been allowed to depose executives of the credit card consortiums prior to filing their

2   amended complaint.  Moreover, the court did not hold that a complaint alleging an

3   anticompetitive conspiracy must allege "who, did what, to whom (or with whom), where, and

4   when[.]"  *Id.* Rather, the court simply observed that the *Kendall* complaint fell far short of

5   alleging any of those things—in fact, there were "*no facts* alleged to support" the complaint's

6   allegations of conspiracy.  *Id.* (emphasis added).

7           In contrast, Plaintiffs here allege facts that go far beyond simple parallel conduct.  And

8   unlike *Kendall,* Plaintiffs have not had the benefit of any merits discovery in pleading these facts.

9   Plaintiffs allege: (1) explicit agreements among the Defendants and co-conspirators to fix prices

10  and control product output for CRT Products (IP CAC ¶¶ 1, 2, 140, 152-156); (2) Defendants'

11  use of an organized system of group meetings (known as "Glass Meetings") and bilateral

12  discussions to fix future CRT Product prices and to control future product output (*Id.* ¶¶ 145-

13  152); (3) when and where the meetings and discussions happened and which Defendants

14  participated in which kinds of meetings (*Id.* ¶¶ 141-143; 148, 150, 160); (4) implementation of

15  the agreed-upon prices by the Defendants (*Id.* ¶¶ 192-197); (5) unusual pricing practices, such as

16  price increases while demand was falling (*Id.* ¶¶ 192-197; 200-202); (6) specific instances of

17  coordinated reductions in capacity as a result of the agreements reached at the meetings (*Id.* ¶¶

18  198-199); (7) multiple interrelated business relationships among the Defendants in both the CRT

19  market and other closely-related markets, providing Defendants both the motive and opportunity

20  to collude (*Id.* ¶¶ 127-128); (8) governmental investigations into this conspiracy in the U.S.,

21  Europe, Japan, South Korea and Hungary based on information from an amnesty applicant (*Id.* ¶¶

22  203-213); (9) the indictment of Defendant Chunghwa's former Chairman and CEO, C.Y. Lin, for

23  his participation in the CRT Product conspiracy and the TFT-LCD conspiracy (*Id.* ¶¶ 4, 205); and

24  (10) government investigations and guilty pleas by some of the Defendants for price-fixing in the

25  closely-related TFT-LCD market (*Id.* ¶¶ 218-221).  Neither *Twombly* nor *Kendall* contained such

26  specific factual allegations.  Thus, the concerns of those courts are inapplicable here.

27

28
                                            23

1    The other cases cited by the Separate Defendants are also inapposite.  Like *Twombly* and

2 *Kendall,* the complaint found deficient in *In re Elevator Antitrust Litig.* alleged solely parallel

3 conduct, conclusory averments of a conspiracy, and a European enforcement action with no

4 connection to elevator markets, marketing or sales practices in the United States.  502 F.3d 47,

5 49-52 (2d Cir. 2007).[20]  Similarly, in *In re Late Fee and Overlimit Fee Litig.,*[21] the complaint

6 alleged nothing more than general market conditions, parallel conduct, and conclusions of

7 conspiracy.  528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) (dismissing the complaint because it

8 provided "no details as to when, where, or by whom th[e] alleged agreement was reached").

9 Indeed, the limited applicability of *In re Late Fee* has already been recognized in *Labelstock II,*

10 which characterized the case as "[l]ike *Twombly*, . . . resting solely on allegations of parallel

11 conduct."  566 F. Supp. 2d at 373 n. 8.[22]

12    The Separate Defendants also cite the Sixth Circuit decision in *Total Benefits Planning*

13 *Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430 (6th Cir. 2008).[23]  This case is

14 similarly unavailing, not least because the court based its holding on the incorrect premise that

15 *Twombly* enunciated a "heightened pleading standard."  *Id.* at 434 n. 2.  As discussed above in

16

17

18 _____

19 [20] Hitachi Motion at 13; Panasonic Motion at 4, 11; Toshiba Motion at 10, 13.

20
21 [21] Toshiba Motion at 13; BMCC Motion at 6; Hitachi Motion at 13, 15; LG Motion at 19; Panasonic Motion at 10.

22
23 [22] *See also Flash Memory,* 2009 U.S. Dist. LEXIS 38941, *45-46 (Judge Armstrong, who decided *In re Late Fee*, distinguished her own opinion because "the complaint was devoid of facts suggesting a preceding agreement, and the scant allegations showed nothing more than
24 parallel conduct").

25 [23] Toshiba Motion at 14; Defendants' Joint Notice of Motion and Motion To Dismiss The Direct Purchaser Consolidated Amended Complaint ("Direct Joint Motion") at 29. Each of the Separate
26 Defendants incorporates the *Twombly* argument in the Direct Joint Motion by reference.

27                                             24
28           **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
                 **AND JOINT MOTIONS TO DISMISS THE IP CAC**
                                    **MDL NO. 1917**

1    Section I. A., the Court in *Twombly* expressly disavowed the creation of a heightened pleading

2    standard.[24]

3        In addition, the court analyzed plaintiffs' conspiracy allegations under the rule-of-reason

4    test because defendants were affiliated companies and were incapable of forming a horizontal

5    conspiracy.  *Total Benefits,* 552 F.3d at 435.  The complaint was dismissed, in part, because it

6    had failed to plead a relevant product market and whether the unlawful acts had an

7    anticompetitive effect in that market.  These considerations do not apply here because Plaintiffs

8    allege a horizontal conspiracy that is *per se* illegal under the antitrust laws.[25]  Finally, like the

9    complaints in *Twombly* and *Kendall*, the complaint in *Total Benefit* "only offer[ed] bare

10   allegations" of the conspiracy without any supporting factual information:

11          [N]owhere did Plaintiffs allege when Defendants joined the Anthem
            conspiracy, where or how this was accomplished, and by whom or for
12          what purpose.  There is no factual description of the substance of the
            statements or who made the statements that 'defamed and libeled,'
13          'coerced and threatened,' and 'blacklisted' Plaintiffs.  The time for the
            conspiracy is generally stated as 'since September 2004,' but Plaintiffs
14          give no explanation of where or when during this multiple-year time frame
            any unlawful agreements or understandings might have occurred.
15

16   *Id.* at 434.

17       In this case, the IP CAC makes every type of allegation that the plaintiffs in *Total Benefit*

18   did not, and more.  As set forth in the detailed summary of the IP CAC's allegations *supra*, the IP

19   CAC alleges *when* the various Defendants joined the conspiracy, *where* the meetings occurred,

20   *how* the conspiracy was accomplished through the group and bilateral meetings, *which*

21   employees from the Defendants attended those meetings, and that the *purpose* of the meetings

22   was to reach agreements on pricing and output for CRT Products.  IP CAC ¶¶ 138-188.  Further,

23   _____

24   [24] *Twombly,* 550 U.S. at 569 n. 14 ("In reaching this conclusion, we do not apply any

25   'heightened' pleading standard, nor do we seek to broaden the scope of *Federal Rule of Civil
     Procedure 9*, which can only be accomplished 'by the process of amending the Federal Rules,

26   and not by judicial interpretation'").

27                                              25

28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
     AND JOINT MOTIONS TO DISMISS THE IP CAC
     MDL NO. 1917**

the IP CAC does not just state generally when the conspiracy began.  It states that during 1995-1996, the meetings occurred on an *ad hoc* basis, but thereafter from 1997 to 2007, so-called "Top Meetings" occurred on a quarterly basis; "Management Meetings" occurred on a monthly basis; and "Working Level Meetings" occurred on a weekly basis.  *Id.* ¶¶ 140-150.  These allegations cannot be characterized as "generic," "vague and conclusory" or "boilerplate," as the Separate Defendants claim.

### 2. Courts Have Found Complaints Alleging Far Less Than The IP CAC To State A Claim For Price Fixing Under The Antitrust Laws

Courts have found complaints with far less heft than the IP CAC sufficient to state a claim for price-fixing.  For example, in *In re Static Random Access Memory (SRAM) Antitrust Litig.,* 580 F. Supp. 2d 896 (N.D. Cal. 2008) ("*SRAM I*"), the court declined to dismiss a complaint that alleged parallel price increases, a market structure conducive to collusion, exchanges of information between competitors and trade association meetings that provided opportunities to conspire.  *Id.* at 902-03.

Plaintiffs' allegations also go far beyond those held to satisfy *Twombly* in *In re OSB Antitrust Litig.,* 2007 WL 2253419, *3-5 (E.D. Pa. Aug. 3, 2007) ("*OSB*").  There, plaintiffs alleged that defendants—nine manufacturers of oriented strand board ("OSB")—"tacitly agreed to raise OSB prices and so revitalize the stagnating OSB market:"

> Defendants took the following concerted actions to reduce the supply of OSB (and so drive up the price): (1) kept OSB from the market through mill shutdowns; (2) delayed or canceled the construction of new OSB mills; (3) bought OSB from competitors instead of manufacturing it themselves (which they could have done at a lower cost); and (4) maintained low operating rates at mills.

In addition, the *OSB* plaintiffs "situate[d] these allegations of parallel conduct in a context that suggests preceding agreement," including a highly concentrated market conducive to

---

[25] *See* Section I.G. and Section I. F. 4. *infra.*

26

1   collusion, a sharp increase in prices after the conspiracy allegedly began, and that

2   defendants had used an industry publication to communicate with each other.

3         So although the complaints in *SRAM I* and *OSB* did not set forth the individual

4   participants at meetings or the precise dates, times and locations of meetings, those courts

5   found the allegations sufficient to plead a price-fixing conspiracy.

6   ### D.  When Viewed As A Whole, The IP CAC Sufficiently Alleges That Each
7   ### Defendant Joined The Conspiracy And Committed Acts In Furtherance Thereof

8         The Separate Defendants contend that the IP CAC does not adequately allege each

9   individual Defendant's role in the conspiracy.[26]  They criticize the IP CAC for "lumping" them

10  together in general allegations referring to "defendants," or corporate family references such as

11  "Hitachi" or "Philips."  These arguments have no merit.  When viewed as a whole, as the

12  Supreme Court requires, the IP CAC sufficiently alleges that each defendant joined the

13  conspiracy and committed acts in furtherance of it.  This is all that *Twombly* requires.

14  ### 1.  Antitrust Conspiracy Allegations Need Not Be Detailed Defendant By
    ### Defendant

15

16        Each of the Separate Defendants essentially complains that the IP CAC does not mention

17  its name often enough, or restate all of the allegations specifically with respect to each and every

18  Defendant.[27]  These arguments ignore a fundamental principle of antitrust law and the law

19  _____

20  [26] BMCC Motion at 4-8; LG Motion at 16-17; Panasonic Motion at 7, 12-14; Hitachi Motion at
21  9-13; Tatung Motion at 16-18; Philips Motion at 8-9; Toshiba Motion at 8-11; Samsung
    Electronics Motion at 21-24.

22  [27] *See, e.g.,* BMCC Motion at 7 ("The IPC specifically names BMCC in only three allegations . .
23  ."); Panasonic Motion at 7 ("The only substantive paragraph in the IP-CAC that relates directly to
    PNA . . ."); Samsung Electronics Motion at 21 ("Both the Direct and Indirect Purchasers'
24  complaints specifically name SEC in only one allegation."); Toshiba Motion at 9 ("[T]he Indirect
    Purchaser Plaintiffs devote a mere five paragraphs to describe, in their view, how the Toshiba
25  entities were involved in the alleged antitrust conspiracy."); Tatung Motion at 16-17 ("Only a
    single paragraph in Plaintiffs' 92-page complaint even comes close to alleging actual conduct by
26  TUS").

27                                        27

28  **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
    AND JOINT MOTIONS TO DISMISS THE IP CAC
    MDL NO. 1917**

1    governing conspiracies in general: "Once a conspiracy is shown, only slight evidence is needed

2    to connect any defendant with the conspiracy." *Safeway Stores v. FTC,* 366 F.2d at 801.[28]

3         Moreover, by focusing only on those allegations that specifically name them, the Separate

4    Defendants improperly ask this Court to isolate and separate these facts from the totality of facts

5    alleged in the Complaint. This is contrary to the Supreme Court's admonition that "[t]he

6    character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and

7    viewing its separate parts, but only by looking at it as a whole." *Continental Ore*, 370 U.S. at

8    698-99.[29]

9         In applying this fundamental rule, many courts have held that antitrust conspiracy

10   allegations *need not* be detailed "defendant by defendant." *See In re Fine Paper Antitrust Litig.,*

11   685 F.2d 810, 822 (3d Cir. 1982) (holding that a district court should not "compartmentalize" a

12   conspiracy claim by conducting "a seriatim examination of the claims against each of the five

13   conspiracy defendants as if they were separate lawsuits").[30] "Rather, an antitrust complaint

14

15   _____

16   [28] *See also Wilk v. American Medical Ass'n,* 735 F.2d at 219 ("[O]nce a conspiracy has been
     established, slight evidence is needed to connect a particular participant."); *In re Bulk Popcorn*
17   *Antitrust Litig.,* 783 F. Supp. 1194, 1197 (D. Minn. 1991) ("Once a conspiracy is shown, only
     slight evidence is needed to link another defendant with it.")

18

19   [29] *See also Labelstock II,* 556 F. Supp. 2d at 373 ("Nothing in *Twombly* . . . contemplates this
     "dismemberment" approach to assessing the sufficiency of a complaint. Rather the district court
20   must consider a complaint in its entirety without isolating each allegation for individualized
     review."); *In re Southeastern Milk,* 555 F. Supp. 2d at 943-944 ("Moreover, defendants attempt
21   to parse and dismember the complaints, contrary to the Supreme Court's admonition that '[t]he
     character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and
22   viewing its separate parts.'"); *In re Flat Glass Antitrust Litig.,* 385 F.3d 350, 369 (3d Cir. 2004)
     (recognizing that in evaluating allegations of conspiracy, a court "must look to the evidence as a
23   whole and consider any single piece of evidence in the context of other evidence.")

24

25   [30] *Accord Flash Memory,* 2009 U.S. Dist. LEXIS 38941, *8 n.7 ("[The defendants'] central point
     of contention appears to be the lack of specific allegations directed at their particular company.
26   This argument fails. For pleading purposes, allegations of antitrust conspiracy need not be
     detailed on a 'defendant by defendant' basis."); *SRAM I,* 580 F. Supp. 2d at 904 ("Although
27   Plaintiffs will need to provide evidence of each Defendants' participation in any conspiracy, they

                                                  28

28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
     **AND JOINT MOTIONS TO DISMISS THE IP CAC**
     **MDL NO. 1917**

1   should be viewed as a whole, and the plaintiff must allege that each individual defendant joined

2   the conspiracy and played some role in it."  *OSB,* 2007 WL 2253419, *5 (citing *Jung v. Ass'n of*

3   *American Medical Colleges,* 300 F. Supp. 2d 119, 164 n. 27 (D.D.C. 2004) (finding that plaintiff

4   must plead that "an individual defendant was a participant in the conspiracy in the first instance,"

5   but "need not allege overt acts committed by each defendant in furtherance of a conspiracy")).[31]

6          Indeed, as a matter of basic conspiracy law, the Ninth Circuit has held that a conspirator is

7   jointly liable for the acts of its co-conspirators.  *Beltz Travel Serv., Inc. v. International Air*

8   *Transport Ass'n,* 620 F.2d 1360, 1367 (9th Cir. 1980).  Thus, it is not necessary to prove, let

9   alone plead that each member of the conspiracy participated in "every detail in the execution of

10  the conspiracy . . . to establish liability, for each conspirator may be performing different tasks to

11  bring about the desired result."  *Id.*  For this reason, the sufficiency of a complaint should not be

12  judged by the number of allegations as to a particular defendant, but by the nature of the

13  allegations that are made.  In *OSB,* the court found "one lone paragraph" concerning a particular

14  defendant sufficed because, when viewed together with the other allegations in the complaint, the

15  complaint alleged that the defendant "joined the conspiracy and committed acts in furtherance of

16  it."  2007 WL 2253419, *5.

17         Neither *In re Sagent Technology, Inc.,* 278 F. Supp. 2d 1079 (N.D. Cal. 2003),[32] nor

18  *Nasious v. Two Unknown B.I.C.E. Agents,* 492 F.3d 1158 (10th Cir. 2007),[33] support Defendants'

19

20  now only need to make allegations that plausibly suggest that each Defendant participated in the

21  alleged conspiracy.")

22  [31] *See also In re NASDAQ Market-Makers Antitrust Litig.,* 894 F. Supp. 703, 712 (S.D.N.Y.

23  1995) ("Plaintiffs in [the Southern District of New York] have not been required to specify
    individual acts of each defendant in an antitrust conspiracy allegation.")

24
25  [32] Samsung Electronics Motion at 12; LG Motion at 17, 20; Hitachi Motion at 10; Panasonic
    Motion at 13; Tatung Motion at 13; BMCC Motion at 6, 8; Direct Joint Motion at 30.

26  [33] Panasonic Motion at 13; Direct Joint Motion at 30.

27
                                              29
28  **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
    AND JOINT MOTIONS TO DISMISS THE IP CAC
    MDL NO. 1917**

1    argument that Plaintiffs must plead each Defendant's role in the conspiracy in specific detail.

2    Neither case involves allegations of a price-fixing conspiracy in violation of the antitrust laws.

3    Therefore, the above-described principles for reviewing an antitrust complaint did not apply.  For

4    example, because the defendants in *Sagent* and *Nasious* were not alleged to be a part of a

5    conspiracy, they could not be jointly liable for the acts of the other defendants.  The reviewing

6    courts had to consider *only* what had been alleged against each specific defendant.  Here, the

7    Court must consider all of Plaintiffs' allegations in the context of the alleged conspiracy, not just

8    those pertaining to a particular Defendant.

9            Further, allegations against "Defendants" in *Sagent* were particularly inappropriate

10   because "[o]f the six sitting members of the board [named as defendants], only two were on the

11   board during the period . . . when the alleged misappropriation/insider trading/waste of corporate

12   assets took place."  278 F. Supp. 2d at 1093.  *Nasious* involved a *pro se* litigant who filed suit

13   against at least 42 individual defendants "as well as scores of John and Jane Doe defendants."

14   492 F.3d at 1160.  The Tenth Circuit described the complaint as "rambling, and sometimes

15   incomprehensible." *Id.* at 1163.  Moreover, the language cited by the Separate Defendants[34] was

16   actually the Tenth Circuit criticizing the district court for failing to explain to the *pro se* litigant,

17   in layman's terms, the types of allegations that would provide sufficient notice to defendants.  *Id.*

18   at 1163.  Finally, this case is further distinguishable from *Sagent* and *Nasious* because as

19   demonstrated in subsections D. 2. and 3. *infra*, the IP CAC does not simply lump the Defendants

20   together in the way the complaints in *Sagent* and *Nasious* did.

21            Other cases cited by the Separate Defendants are distinguishable because they pertain to

22   complaints containing only barebones, conclusory allegations that do not link the defendants to

23   the wrongful conduct alleged—complaints barely including references to the defendants, or

24   merely restating the statutory language.

25   _____

26   [34] Direct Joint Motion at 30.

27

28
                                      30

1    For example, in *Jung v. Ass'n of Am. Med. Colleges,* 300 F. Supp. 2d 119,[35] one of the

2  defendants moved to dismiss on the grounds that plaintiffs' generalized allegations concerning all

3  defendants were conclusory and did not tie it to the conspiracy.  The court granted the motion,

4  noting that the sole reference to the defendant in the plaintiffs' complaint alleged that it was a

5  "governing sponsor."  Because the plaintiffs were relying on a theory of direct participation and

6  not vicarious liability, they had failed to allege that this particular defendant had joined the

7  conspiracy and played a role in it. *Id.* at 162-64. [36] Significantly, however, the *Jung* court stated

8  that a plaintiff "need not allege overt acts committed by each defendant in furtherance of the

9  conspiracy." *Id.* at 164 n. 27.

10

11

_____

12  [35] Tatung Motion at 1; Toshiba Motion at 11; BMCC Motion at 4; Hitachi Motion at 10; LG

13  Motion at 17; Panasonic Motion at 4, 6; Samsung Electronics Motion at 10, 11.

14  [36] Defendants rely on other similarly inapposite cases where no allegations tied the defendant to
   the unlawful conspiracy.  *See, e.g., Invamed, Inc. v. Barr labs, Inc.,* 22 F. Supp. 2d 210, 219, 221

15  (S.D.N.Y. 1998) (complaint "devoid of any allegation" from which anticompetitive conduct on
   defendants' part could be inferred; plaintiff failed to allege "any fact from which this Court could

16  infer that the Affiliates had a 'meeting of the minds' or an agreement . . . to perform an unlawful
   act") (Tatung Motion at 13, 16); *Mountain View Pharmacy v. Abbott Labs.,* 630 F.2d 1383, 1387-

17  88 (10th Cir. 1980) ("blanket statement" that twenty-eight defendants had conspired to fix prices
   deemed inadequate; original bare bones complaint was drafted in the conclusory terms of the

18  statutory language, omitting any specific act by any defendant concerning the plaintiff's injury;
   and amended complaint added very little—it "[did] not identify the offending defendants, the

19  injured parties, the tied products, or the tying products.") (Samsung Motion at 12; Toshiba

20  Motion at 10; LG Motion at 16, 20; Philips Motion at 9; Panasonic Motion at 5, 10; BMCC
   Motion at 5, 8); *In re Travel Agent Comm'n Antitrust Litig.,* No. 1:03 CV 30000, 2007 WL

21  3171675, *3 n. 4 (N.D. Ohio Oct. 29, 2007) (in action alleging parallel conduct to unlawfully

22  reduce and eliminate travel agent commissions, court dismissed holding company that was
   mentioned by name only once in complaint and did not pay commissions to travel agents, finding

23  "there is no factual matter to plausibly suggest" that this defendant participated in an unlawful
   conspiracy) (Samsung Motion at 12; Tatung Motion at14; BMCC Motion at 4); *Brennan v.*

24  *Concord EFS, Inc.,* 369 F. Supp. 2d 1127, 1136 (N.D. Cal. 2005) ("no allegations in the
   complaint specifically connecting Bank One Corp and JP Morgan Chase to the alleged

25  conspiracy that controlled Star") (Samsung Motion at 12; LG Motion at 17; Philips Motion at 9;

26  Panasonic Motion at 5, 10; Tatung Motion at 13).

27

28

31

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1         The allegations in all these cases were deficient because they established no independent

2    basis for the defendants' liability.  *See Invamed*, 22 F. Supp. 2d at 218 (plaintiff, "aside from its

3    conclusory use of the term 'Defendants,' does not allege, let alone establish, that the [defendants]

4    independently engaged in conduct unlawful under the Sherman Act").  By contrast here,

5    Plaintiffs' 92-page complaint contains specific details concerning the nature of the relevant

6    product and market, the alleged conspiracy, the interrelationships among the Defendants

7    involved, and the numerous acts undertaken by Defendants in support of the conspiracy, both in

8    their own capacity and through agent/principal relationships.  *See, e.g.,* IP CAC ¶¶ 117-139, 140-

9    165, 168-187.  As in *TFT- LCD II,* the IP CAC alleges "a complex, multinational price-fixing

10   conspiracy" that, "taken as a whole," sufficiently alleges Defendants' participation.  *TFT- LCD

11   II,* 599 F. Supp. 2d at 1184.

12        **2.  Plaintiffs' References To Corporate Groups Does Not Deprive Defendants Of
     Rule 8 Notice**

13    

14        Defendants Panasonic, Toshiba, LG, Hitachi, Philips, Samsung Electronics and Tatung

15   claim that Plaintiffs' references to corporate groups leaves them with no idea which defendant

16   within their corporate group is alleged to have done what, making it impossible for them to

17   defend themselves.[37]  These claims are disingenuous.  There is no reason why any defendant

18   should be unable to formulate a response to Plaintiffs' claims and prepare a defense.

19        First, the defendants who have not challenged the IP CAC under *Twombly*—IRICO

20   Group Corporation, IRICO Group Electronics Co., Ltd., Chunghwa Picture Tubes, Ltd.,

21   Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., Samsung SDI Co., Ltd., Samsung SDI America,

22   Inc., Samsung SDI Mexico S.A. de C.V., Samsung SDI Brasil Ltda., Shenzhen Samsung SDI

23   Co., Ltd., Tianjin Samsung SDI Co., Ltd., and Samsung SDI (Malaysia) Sdn. Bhd.—are all

24   referred to in the IP CAC by corporate group.  Yet, these defendants do not find themselves

25   _____

26   [37] *See e.g.,* Panasonic Motion at 13; Hitachi Motion at 10-11; Toshiba Motion at 11; Philips
27   Motion at 8-9; LG Motion at 16; Tatung Motion at 16-17; Samsung Electronics Motion at 11.

28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
     AND JOINT MOTIONS TO DISMISS THE IP CAC
     MDL NO. 1917**

1    "clueless as to what *each* did to warrant being named in this action." Hitachi Motion at 2

2    (emphasis in original).

3         Second, the IP CAC specifically alleges what each individual defendant's role was in the

4    conspiracy as a member of its corporate group in paragraphs 166-187. For example, the Hitachi

5    group's participation is alleged as follows:

6              Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd.,
              Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in
7              several Glass Meetings. These meetings were attended by high level sales
              managers from Hitachi. Hitachi also engaged in multiple bilateral
8              discussions with other Defendants, particularly with Samsung. Through
              these discussions, Hitachi agreed on prices and supply levels for CRT
9              Products. Hitachi never effectively withdrew from this conspiracy.

10
              Defendants Hitachi America and HEDUS were represented at those
11            meetings and were a party to the agreements entered at them. To the
              extent Hitachi America and HEDUS sold and/or distributed CRT Products
12            to direct purchasers, they played a significant role in the conspiracy
              because Defendants wished to ensure that the prices for CRT Products paid
13            by direct purchasers would not undercut the pricing agreements reached at
              the Glass Meetings. Thus, Hitachi America and HEDUS were active,
14            knowing participants in the alleged conspiracy.

15

16   *Id.* ¶¶ 179-180. Parallel allegations are made for each of the corporate groups.[38]

17        Moreover, the IP CAC alleges that:

18
              When Plaintiffs refer to a corporate family or companies by a single name
19            in their allegations of participation in the conspiracy, Plaintiffs are alleging
              that one or more employees or agents of entities within the corporate
20            family engaged in conspiratorial meeting on behalf of the company. In
              fact, the individual participants in the conspiratorial meetings and
21            discussions did not always know the corporate affiliation of their
              counterparts, nor did they distinguish between the entities within a
22            corporate family. The individual participants entered into agreements on
              behalf of, and reported these meetings and discussions to, their corporate
23

24   _____

25   [38] Samsung, ¶¶ 166-167; LG, ¶¶ 168-169; Philips, ¶¶ 170-171; LP Displays, ¶ 172; Chunghwa
     and Tatung, ¶¶ 173-174; Daewoo/Orion, ¶¶ 175-176; Toshiba, ¶¶ 177-178; Panasonic, ¶¶ 181-
26   182; MT Picture Display, ¶ 183; BMCC, ¶ 184; IRICO, ¶ 185; Thai CRT Company, Ltd. ¶ 186;
     Samtel, ¶ 187.

27                                                    33

28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
     AND JOINT MOTIONS TO DISMISS THE IP CAC
     MDL NO. 1917**

1

2

> families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

3

IP CAC ¶ 188.

4

5

Third, the IP CAC also alleges that each of the named defendants acted as the agent of

6

each other defendant in the alleged conspiracy.  *Id.* ¶ 113.  In other words, where there is an

7

allegation that a representative of LG, Philips, Hitachi, Samsung, Toshiba, Panasonic, IRICO,

8

Chunghwa, Thai CRT, BMCC, Daewoo or Samtel was in attendance at the Glass Meetings,

9

bilateral meetings or other meetings, that representative was there on behalf of each and every

10

entity in the corporate family named as a defendant, as well as the agent of all of the named

11

defendants.  The Separate Defendants incorrectly argue that Plaintiffs seek to hold the members

12

of each corporate family liable under an agency theory alone.[39]  In fact, the IP CAC alleges facts

13

showing that each corporate defendant was a direct participant in the price-fixing conspiracy.

14

This is sufficient to defeat a motion to dismiss.[40]  The Separate Defendants' agency arguments

are further addressed in Section E *infra.*

15

The foregoing allegations, read together with the allegations described in the summary

16

above, make clear which entities are alleged to have attended the meetings and reported to their

17

subsidiaries and affiliates; when these entities attended meetings; who from these entities

18

attended meetings; and which entities were represented at the meetings and participated in the

19

conspiracy by selling CRTs and CRT Finished Products pursuant to the unlawful agreements

20

reached at the meetings.

21

22

———————————————

23

[39] Samsung Electronics Motion at 15-18; Tatung Motion at 18; LG Motion at 13-14; Toshiba Motion at 11-12; BMCC Motion at 5, 8; Panasonic Motion at 12; Hitachi Motion at 11; Philips Motion at 14-15.

24

25

[40] *See Stickrath v. Globalstar, Inc.*, 527 F. Supp. 2d 992, 1001-02 (N.D. Cal. 2007); *In re Sumitomo Copper Litig.*, 104 F. Supp. 2d 314, 324-25 (S.D.N.Y. 2000); *In re Potash Antitrust Litig.*, 1994 WL 1108312, *12 (D. Minn. Dec. 5, 1994).

26

27

34

28

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC MDL NO. 1917**

1    The Separate Defendants dismiss these allegations as "boilerplate" and "vague and

2    conclusory."[41]  They demand more.  For example, Panasonic Corporation of North America

3    ("PNA") demands to know "*who* represented PNA, *how* PNA knew about this representation, or

4    even *what* this alleged 'representation' meant to PNA."  Panasonic Motion at 7.[42]  But as

5    demonstrated by the case law cited above in subsections C. and D. 1., Plaintiffs need not plead

6    each defendant's role in the elaborate factual detail Defendants demand.  At this stage, Plaintiffs

7    need only "make allegations that *plausibly suggest* that each Defendant participated in the alleged

8    conspiracy."  *SRAM I*, 580 F. Supp. 2d at 904 (emphasis added) (rejecting similar arguments that

9    the plaintiffs did not allege how *each* individual defendant participated in the alleged conspiracy

10    because such arguments "rely upon the standard for a motion for summary judgment").[43]

---

[41]Toshiba Motion at 9 ("These sparse allegations are the epitome of formulaic pleading.");
Tatung Motion at 18 (criticizing the IP CAC as "a textbook example of a nonspecific and
conclusory allegation . . ."); Hitachi Motion at 13 ("Plaintiffs allegations are entirely conclusory,
lacking the factual specificity required to "render plaintiff' entitlement to relief plausible.");
Samsung Electronics Motion at 22 ("Plaintiffs' 'price-fixing claim fails for vagueness."); Philips
Motion at 8 (asserting that Plaintiffs allege the price-fixing conspiracy "in the most conclusory
manner, stating broad generalities without discussing the specifics of any alleged meetings or
overt acts"); LG Motion at 15 ("the Complaints merely recite conclusions unbuttressed by any
facts specific to the LGE Entities").

[42] *See also* Toshiba Motion at 14 ("The Plaintiffs do not identify time of the meeting, where the
meeting occurred, or the parties to the agreements.  Similarly, the Plaintiffs provide no
information as to who supposedly represented TAI, TAIS, TACP, and TAEC at these meetings or
what was the nature of the representation"); LG Motion at 17 ("[T]hose allegations provide no
specifics as to when or where the meetings occurred; which of LGE, LGUSA, or LGETT
attended; which employees attended for their respective company; or what agreements were
supposedly reached at such meetings."); Hitachi Motion at 13 (asserting that Plaintiffs "fail[] to
allege the dates, locations, attendees or topics of the alleged meetings, or the terms or parties to
the alleged agreements"); Tatung Motion at 17 ("[T]he complaint is devoid of allegations as to
who 'represented' TUS or TT and how, and how TUS and TT engaged in conduct whereby they
became parties to the alleged agreements.")

[43] *See also In re Southeastern Milk,* 555 F. Supp. 2d at 948 ("Defendants cannot be faulted for
attacking plaintiffs' complaints on the basis of *Twombly.*  The level of factual pleading they seek,
however, could rarely, if ever, be met by a plaintiff in an antitrust case before discovery.")  The
same is true in this case.

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1    Faced with almost identical "corporate group" arguments from the defendants regarding

2    almost identical allegations in the *TFT-LCD* case, Judge Illston found the complaints alleged

3    more than enough to tie each defendant to the conspiracy:

> The Court finds that the amended consolidated complaints more than
> adequately allege the involvement of each defendant and put defendants on
> notice of the claims against them.  Contrary to defendants' suggestion,
> neither *Twombly* nor the Court's prior order requires elaborate fact
> pleading.
>
>                         *        *        *
>
> As described in the complaints, the alleged conspiracy was organized at
> the highest level of the defendant organizations and carried out by both
> executives and subordinate employees.  The complaints allege that the
> conspiracy was implemented by subsidiaries and distributors within a
> corporate family, and that "individual participants entered into agreements
> on behalf of, and reported these meetings and discussions to, their
> respective corporate families."  Plaintiffs also allege that "the individual
> participants in conspiratorial meetings and discussions did not always
> know the corporate affiliation of their counterparts, nor did they
> distinguish between the entities within a corporate family."  *Id.*  The
> complaints allege a complex, multinational price-fixing conspiracy and,
> taken as a whole, they sufficiently allege each defendant's participation in
> that conspiracy, as well as present a factual basis for the allegations of
> agency.

*TFT-LCD II,* 599 F. Supp. 2d at 1184-1185.[44]

> **3.    To The Extent The IP CAC Refers To Corporate Groups, A Review Of The
> Entire Complaint Informs The Reader Which Specific Defendant Within
> That Group Is Referred To**

To the extent the IP CAC refers to Defendants by corporate groups, a review of the entire

Complaint accurately informs the reader which specific defendant in that group is referred to.

For example, the IP CAC alleges that the Working Level Meetings "tended to be more regional

---

[44] The Separate Defendants incorrectly cite to *TFT-LCD I* as support for their argument that the
IP CAC improperly makes allegations against them as a corporate family.  *See, e.g.,* Philips
Motion at 9.  They fail to mention that in *TFT-LCD II,* Judge Ilston rejected the defendants'
arguments that the complaints still did not differentiate between related corporate entities, as
herein described, because the complaints included allegations as to the overlap among entities
within a corporate family at meetings.  Here, the IP CAC mirrors the allegations found to be
sufficient by the Court in *TFT-LCD II.*  Therefore, the Defendants' argument on this point should
be rejected.

36

1    and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers'

2    employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in

3    China, and so on." IP CAC ¶ 148 (a) and (b).

4           These allegations must be considered in the context of where the various defendants were

5    located (*id.* ¶¶ 50-107), and where the group meetings occurred: "Glass Meetings took place in

6    Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia."  *Id.*

7    ¶ 150.  So, for example, when Glass Meetings took place in Japan, Hitachi, Ltd., Hitachi

8    Displays, Panasonic Corporation, Toshiba Corporation, and after 2002, MT Picture Display Co.,

9    Ltd. attended.  When the meetings took place in South Korea, defendants LG Electronics, Inc.,

10   Samsung SDI Co., Ltd., Samsung Electronics Co., Ltd., Orion Electric Company, and after 2001,

11   the Korean branch of defendant LG.Philips Displays (n/k/a LP Displays International, Ltd.)

12   would attend, and so on.

13          Similarly, the IP CAC alleges that in-person bilateral meetings took place in "Malaysia,

14   Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and

15   Mexico."  *Id.* ¶ 160.  This allegation must be read in conjunction with where the defendants are

16   located, and paragraph 164, which alleges that "in the few days following a Top or Management

17   Meeting, the attendees at these group meetings would meet bilaterally" with those defendants

18   who "did not ordinarily attend the group meetings, such as Hitachi, Toshiba, Panasonic, Thai

19   CRT, and Samtel."

20          Since Hitachi Asia, Ltd. is located in Singapore (*id.* ¶ 91), it does not take a huge leap in

21   logic to infer that Hitachi Asia engaged in bilateral meetings in Singapore.  And further, that it

22   was usually defendant Samsung who visited Hitachi Asia because "Samsung had a relationship

23   with Hitachi and was responsible for communicating CRT Product pricing agreements to

24   Hitachi."  *Id.* ¶ 165.  Defendants Panasonic Corporation, Hitachi Ltd., Hitachi Displays, and

25   Toshiba Corporation, and later, MT Picture Display Co., Ltd. (all located in Japan) attended

26   bilateral meetings in Japan.  And it was usually defendant LG Electronics who visited Toshiba

27

28

37

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1   Corporation "because LG had a relationship with Toshiba and was responsible for

2   communicating CRT Product pricing agreements to Toshiba."  *Id.*

3        The IP CAC also alleges the parent companies in each of the corporate groups of

4   defendants "dominated and controlled the finances, policies, and affairs of [their subsidiaries or

5   affiliates] relating to the antitrust violations alleged in this Complaint."[45]  These allegations must

6   be read together with paragraphs 145 to 149, which describe how "the Glass Meetings were

7   attended by employees at three general levels of the Defendants' corporations" (*id.* ¶ 145), and

8   paragraph 188, which alleges how the corporate groups reported the agreements made at the

9   Glass Meetings to their subsidiaries and affiliates.  "Top Meetings," as they were known by

10  Defendants, were attended by "high level company executives including CEOs, Presidents and

11  Vice Presidents" who had the authority to make binding agreements on price.  *Id.* ¶146.

12       Taken together, these allegations plausibly suggest that quarterly Top Meetings were

13  attended by high level executives including CEOs, Presidents and Vice Presidents of the parent

14  companies in each of the corporate groups.  These high level executives then reported the

15  agreements to their subsidiaries and affiliates and those companies implemented the agreements.

16  Thus, reading the IP CAC as a whole, instead of parsing and dismembering it as the Separate

17  Defendants do, the IP CAC alleges the participation of the individual defendants as follows.

18               **a.  Hitachi**

19       The IP CAC plausibly suggests that high level executives from Hitachi Ltd., and later

20  Hitachi Displays, Ltd.,[46] attended the Top Meetings.  IP CAC ¶¶ 146, 179.  These parent

21

22

23  ───────────────

24  [45] LG, ¶¶ 51-52; Philips, ¶¶ 55-59; Samsung, ¶¶ 63-70; Toshiba, ¶¶ 73-78; Panasonic, ¶¶ 81-83; Hitachi, ¶¶ 88-92; Tatung, ¶¶ 95-98; IRICO, ¶¶ 101-102; Daewoo, ¶¶ 107.

25
26  [46] In 2002, all the departments of planning, development, design, manufacturing, and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays, Ltd. *Id.* ¶ 88.

27                                                   38

28  **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC**
    **MDL NO. 1917**

1  companies then reported the agreements to their subsidiaries and affiliates, Hitachi Shenzhen,[47]

2  Hitachi Asia, Ltd., Hitachi Electronic Devices (USA), Inc. and Hitachi America, Inc., who

3  implemented the pricing and/or output restrictions agreed upon.  *Id.* ¶¶ 180, 188.  Hitachi

4  Shenzhen also attended the Chinese Glass Meetings at the direction of Hitachi Displays.  *Id.* ¶

5  148(a).  Hitachi Shenzhen also engaged in frequent bilateral meetings with nearby competitors,

6  such as Shenzhen Samsung SDI Co., Ltd.  *Id.* ¶¶ 159-160.

7                                    **b.  LG**

8          The IP CAC plausibly suggests that high level executives from LG Electronics, Inc.

9  attended the Top Meetings until 2001.  *Id.* ¶¶ 146, 168.  As the parent company, LG Electronics,

10  Inc. then reported the agreements to its subsidiaries, LG Electronics Taiwan Taipei Co., Ltd. and

11  LG Electronics (USA), Inc., who implemented the pricing and/or output restrictions agreed upon.

12  *Id.* ¶¶ 169, 188.  LG Taiwan also attended Working Level Meetings in Taiwan at the direction of

13  LG Electronics, Inc. (*id.* ¶ 148), and engaged in frequent bilateral meetings with nearby

14  competitors, such as Chunghwa Picture Tubes, Ltd. *Id.* ¶¶ 159-161.  After 2001, LG participated

15  in the CRT Product conspiracy through its joint venture with Philips, LG.Philips Displays (n/k/a

16  LP Displays).  *Id.* ¶ 168.  The high level executives who attended the Glass Meetings on behalf of

17

18  _____

19  [47] The Hitachi Defendants make much of the inclusion of Shenzhen SEG Hitachi Color Display
    Devices, Ltd. ("Hitachi Shenzhen") in the Hitachi corporate group.  Hitachi argues that Plaintiffs

20  have thus created a "fictional" Hitachi because none of the Hitachi entities *currently* has any
    ownership interest in Hitachi Shenzhen.  Yet, the Hitachi Defendants admit that Hitachi Displays,

21  Ltd. owned at least a 25% interest in Hitachi Shenzhen until November 8, 2007 (which was
    coincidentally around the time that the government investigations into the CRT industry began).

22  In other words, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last
    two weeks of the Class Period.  Moreover, Plaintiffs allege that "Hitachi, Ltd. and Hitachi

23  Displays dominated and controlled the finances, policies, and affairs of Hitachi Shenzhen relating
    to the antitrust violations alleged in this Complaint."  This well-pled allegation of control and

24  agency must be accepted as a true on a motion to dismiss.  *Dion LLC v. Infotek Wireless, Inc.*,
    No. C 07-1431 SBA, 2007 WL 3231738, *4 (N.D. Cal. Oct. 30, 2007).  Thus, the fact that none

25  of the Hitachi Defendants is *currently* affiliated with Hitachi Shenzhen does not affect the
    validity of Plaintiffs' allegations that Hitachi Shenzhen engaged in unlawful anticompetitive

26  conduct at the direction of Hitachi Ltd. and Hitachi Displays during the Class Period.

27                                         39

28

1    LG.Philips Displays were often the same executives who had previously attended the meetings

2    on behalf of LG.  *Id.* ¶ 172.

3                                  **c.   Panasonic**

4           The IP CAC plausibly suggests that high level executives from Panasonic Corporation

5    attended the Top Meetings until 2003.  *Id.* ¶¶ 146, 181.  As the parent company, Panasonic

6    Corporation then reported the agreements to its subsidiaries and affiliates, Panasonic Corporation

7    of North America and Matsushita Electronic Corporation (Malaysia) Sdn. Bhd ("Matsushita

8    Malaysia"),[48] who implemented the pricing and/or output restrictions agreed upon.  *Id.* ¶¶ 182,

9    188.  Matsushita Malaysia also attended the Working Level Meetings in Malaysia at the direction

10   of Panasonic Corporation (*id.* ¶¶ 148, 181), and engaged in frequent bilateral meetings with

11   nearby competitors, such as Chunghwa Malaysia and Samsung SDI Malaysia.  *Id.* ¶¶ 159-161.

12   After 2003, Panasonic participated in the conspiracy through its joint venture with Toshiba,

13   MTPD.  *Id.* ¶¶ 181, 183.

14                                 **d.   Toshiba**

15          The IP CAC plausibly suggests that high level executives from Toshiba Corporation

16   attended the Top Meetings until 2003.  *Id.* ¶¶ 146, 177.  As the parent company, Toshiba

17   Corporation then reported the agreements to its subsidiaries, Toshiba America, Inc., Toshiba

18   America Consumer Products, LLC, Toshiba America Consumer Products, Inc., Toshiba America

19   _____

20   [48] Plaintiffs have voluntarily dismissed Matsushita Malaysia without prejudice because it no
     longer exists.  Since the filing of the IP CAC, Plaintiffs have learned that Panasonic Corporation

21   transferred Matsushita Malaysia to the CRT joint venture, MT Picture Display, in 2003. It was re-
     named as MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly-owned subsidiary

22   of MT Picture Display.  In July 2006, MT Picture Display closed this Malaysian subsidiary.  The
     allegations regarding Matsushita Malaysia's conduct remain valid.  Matsushita Malaysia existed

23   for the majority of the class period, and during that time, attended meetings and entered into
     unlawful anticompetitive agreements.  IP CAC ¶¶ 148, 159-161.  Most importantly, in carrying

24   out these antitrust violations, Matsushita Malaysia acted at the direction of its parent company,
     Matsushita Electric Industrial Co., Ltd., n/k/a Panasonic Corporation, which "dominated and

25   controlled the finances, policies, and affairs of Matsushita Malaysia relating to the antitrust
     violations alleged in this Complaint."  *Id.* ¶ 83.

26

27                                          40

28

1    Information Systems, Inc., Toshiba America Electric Components, Inc., and Toshiba Display

2    Devices (Thailand) Company, Ltd. ("Toshiba Thailand"),[49] who implemented the pricing and/or

3    output restrictions agreed upon. *Id.* ¶¶ 178, 188. Toshiba Thailand also attended Working Level

4    Meetings in Thailand at the direction of Toshiba Corporation (*id.* ¶148, 177), and engaged in

5    frequent bilateral meetings with nearby competitors, such as Thai CRT Company, Ltd. *Id.* ¶¶

6    159-161. After 2003, Toshiba participated in the conspiracy through its joint venture with

7    Panasonic, MTPD. *Id.* ¶¶ 177, 183.

8                    **e.  Philips**

9            The IP CAC plausibly suggests that high level executives from Koninklijke Philips

10   Electronics N.V. attended the Top Meetings until 2001. *Id.* ¶¶ 146, 170. As the parent company,

11   Koninklijke Philips then reported the agreements to their subsidiaries, Philips Electronics North

12   America Corporation, Philips Electronics Industries (Taiwan), Ltd., and Philips da Amazonia,

13   who implemented the pricing and/or output restrictions agreed upon. *Id.* ¶¶ 171, 188. Philips

14   Taiwan also attended Working Level Meetings in Taiwan at the direction of Koninklijke Philips

15   (*id.* ¶ 148), and engaged in frequent bilateral discussions with nearby competitors, such as

16   Chunghwa Picture Tubes, Ltd. Philips Brazil also engaged in bilateral discussions with nearby

17   competitors such as Samsung SDI Brasil, Ltda. and Samsung SDI Mexico S.A. de C.V. *Id.* ¶¶

18   159-162. After 2001, Philips participated in the CRT Product conspiracy through its joint

19   _____

20   [49] Plaintiffs have voluntarily dismissed Toshiba Thailand without prejudice because it no longer
     exists. Since the filing of the IP CAC, Plaintiffs have learned that Toshiba Corporation
21   transferred Toshiba Thailand to the CRT joint venture, MT Picture Display, in 2003. It was re-
     named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned subsidiary of
22   MT Picture Display. In October 2007, MT Picture Display closed its Thai subsidiary. The
     allegations regarding Toshiba Thailand's conduct remain valid. Toshiba Thailand existed for the
23   majority of the class period, and during that time, attended meetings and entered into unlawful
     anticompetitive agreements. IP CAC ¶¶ 148; 159-161; 177. Most importantly, in carrying out
24   these antitrust violations, Toshiba Thailand acted at the direction of its parent company, Toshiba
     Corporation, which "dominated and controlled the finances, policies, and affairs of [Toshiba
25   Thailand] relating to the antitrust violations alleged in this Complaint." *Id.* ¶ 78.

26

27                                                    41

28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
     **AND JOINT MOTIONS TO DISMISS THE IP CAC**
     **MDL NO. 1917**

1     venture with LG, LG.Philips Displays (n/k/a LP Displays). *Id.* ¶ 170.  The high level executives

2     who attended the Glass Meetings on behalf of LG.Philips Displays were often the same

3     executives who had previously attended the meetings on behalf of Philips. *Id.* ¶ 172.

### f.   Samsung

5         The IP CAC plausibly suggests that high level executives from Samsung Electronics Co.,

6     Ltd. and Samsung SDI Co., Ltd. attended the Top Meetings. *Id.* ¶¶ 146, 166.  As the parent

7     companies, they then reported the agreements to their subsidiaries, Samsung Electronics

8     America, Inc., Samsung SDI America, Inc., Samsung SDI Mexico S.A. de C.V., Samsung SDI

9     Brasil Ltda., Shenzhen Samsung SDI Co., Ltd., Tianjin Samsung SDI Co., Ltd., and Samsung

10    SDI (Malaysia) Sdn. Bhd., who implemented the pricing and/or output restrictions agreed upon.

11    *Id.* ¶¶ 167, 188.  Samsung Malaysia also attended Working Level Meetings in Malaysia at the

12    direction of Samsung SDI Co., Ltd. and Samsung Electronics Co., Ltd. *(id.* ¶¶ 148, 166), and

13    engaged in frequent bilateral discussions with nearby competitors, including Matsushita Malaysia

14    and Chunghwa Malaysia. *Id.* ¶¶ 159-161.  Samsung SDI Shenzhen and Samsung SDI Tianjin

15    attended the Chinese Glass Meetings at the direction of Samsung SDI Co., Ltd. and Samsung

16    Electronics Co., Ltd. *(id.* ¶ 148(a)), and engaged in frequent bilateral discussions with nearby

17    competitors, such as Hitachi Shenzhen. *Id.* ¶¶ 159-161, 163-165.

### g.   Chunghwa/Tatung

19         The IP CAC plausibly suggests that between high level executives from Chunghwa

20    Picture Tubes, Ltd. attended the Top Meetings. *Id.* ¶¶ 146, 173.  They then reported the

21    agreements to their subsidiaries and affiliates, Chunghwa Picture Tubes (Malaysia) Sdn. Bhd.,

22    Chunghwa Picture Tubes (Fuzhuo), Chunghwa Pictures Tubes (UK), Tatung Company and

23    Tatung Company of America, who then implemented the pricing and/or output restrictions

24

25

26

27

28

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1    agreed upon.[50] *Id.* ¶¶ 174, 188.  Chunghwa Malaysia also attended the Working Level Meetings

2    in Malaysia at the direction of Chungha Picture Tubes, Ltd. and Tatung Company (*id.* ¶¶ 148,

3    173), and engaged in frequent bilateral discussions with nearby competitors, such as Matsushita

4    Malaysia and Samsung SDI Malaysia.  *Id.* ¶¶ 159-161.  Chunghwa Picture Tubes (UK) attended

5    the European Glass Meetings, and Chunghwa Picture Tubes (Fuzhuo) attended the Chinese Glass

6    Meetings (*id.* ¶¶ 148(a)-(b)), also at the direction of Chunghwa Picture Tubes, Ltd. and Tatung

7    Company.

8                    **h.  BMCC**[51]

9            The IP CAC plausibly suggests that high level sales managers from BMCC participated in

10   multiple Chinese Glass Meetings with their Chinese competitors, including, but not limited to the

11   IRICO Defendants,[52] Chunghwa Picture Tubes (Fuzhou),[53] Shenzhen Samsung SDI Co., Ltd.,

12   

13   [50] The IP CAC sufficiently alleges the close corporate affiliation between the Chunghwa
     Defendants, Tatung Company, and Tatung Company of America, Inc.  The IP CAC alleges that
14   both Tatung America and Chunghwa are subsidiaries of Tatung Company.  IP CAC ¶¶ 94-98.
     The Chairman of Chunghwa, Weishan Lin, is also the Chairman and General Manager of Tatung
15   Company.  *Id.*  In addition, seven other members of Chunghwa's Board of Directors are
     executives and/or directors of Tatung Company.  *Id.*  Tatung Company owns a 50 percent share in
16   Tatung America, and the Lin family (who owns and runs Tatung Company and Chunghwa) owns
     the other 50 percent.  *Id.*  Finally, the Indirect Purchaser Plaintiffs hereby incorporate by
17   reference the factual argument of the Direct Purchaser Plaintiffs relating to Tatung and its
     relationship with Chunghwa.  This information is taken from discovery conducted in the *TFT-*
18   *LCD* matter, and has not yet been made available to the Indirect Purchaser Plaintiffs.
     [51] BMCC does not make the same corporate group argument as the other Separate Defendants
19   because it is not part of a corporate group.  BMCC does, however, claim that the IP CAC lumps it
     together in allegations against "Defendants," thereby depriving BMCC of Rule 8 notice.  BMCC
20   only acknowledges those allegations that specifically name it.  As demonstrated above in Section
     I. D.1., antitrust conspiracy allegations need not be detailed defendant by defendant, and a
21   complaint must be reviewed as a whole.  Thus, reviewing the complaint as a whole, it becomes
     apparent that Plaintiffs have alleged that BMCC "joined the conspiracy and played some role in
22   it."  *TFT-LCD I,* 586 F. Supp. 2d at 1117.

23   
24   [52] The IRICO Defendants include IRICO Group Corporation, IRICO Display Devices Co., Ltd.,
     and IRICO Group Electronics Co., Ltd.  IRICO Group Electronics Co., Ltd. has not yet been
25   served and so has not appeared in this case.  The other two IRICO Defendants have not
     challenged the IP CAC under *Twombly*.
26   
27                                          43

1   Tianjin Samsung SDI Co., Ltd. and Hitachi Shenzhen.  IP CAC ¶ 148(a).  None of BMCC's

2   Chinese co-conspirators has challenged the IP CAC under *Twombly*.[54]  The Chinese Glass

3   Meetings occurred on a monthly basis following a Top or Management Level Meeting.  *Id.*

4   BMCC also participated in "multiple bilateral discussions with other Defendants, particularly

5   with the other Chinese CRT manufacturers."  *Id.* ¶ 184.  Most of the Chinese manufacturers were

6   wholly-owned subsidiaries of the companies that attended the Glass Meetings on a regular basis.

7   As described above, the parent companies would report the agreements made at the Top

8   Meetings to their Chinese subsidiaries and affiliates, who would implement the pricing

9   and/output restrictions agreed upon.  *Id.* ¶¶ 166-188.  The principal purpose of the Chinese Glass

10  Meetings and the bilateral discussions among Chinese manufacturers was to report the most

11  recent agreements from the Glass Meetings, and coordinate pricing with other, non-affiliated

12  manufacturers in China, such as BMCC and IRICO.  *Id.* ¶¶ 148(a), 159-165.

13          Finally, this Court should consider that the complete details of Defendants' price-fixing

14  conspiracy rest entirely within the Defendants' knowledge.  Having met and communicated in

15  secret, they are uniquely positioned to know more about the conspiracy than Plaintiffs.  Courts

16  recognize that pleading standards are relaxed where facts are "peculiarly within the defendant's

17  knowledge or control."  *Hill v. Morehouse Med. Assocs., Inc.,* 2003 WL 22019936, *3 (11th Cir.

18  _____

19  [53] Chunghwa Picture Tubes (Fuzhou) is not named as a separate defendant because it is a division
    of Chunghwa Picture Tubes, Ltd.  Representatives from Chunghwa's Fuzhou division attended

20  the Chinese Glass Meetings.  The Chunghwa Defendants have not challenged the IP CAC under

21  *Twombly.*

22  [54] As explained above in footnote 46, Hitachi Displays sold its ownership interest in Hitachi
    Shenzhen in November 2007.  The Hitachi Defendants seek to distance themselves from Hitachi

23  Shenzhen, even going so far as to suggest that Hitachi Shenzhen was the only one involved in the
    conspiracy.  *See* Hitachi Motion at 8 ("Plaintiffs' allegations appear to be based on their

24  erroneous assertion that Shenzhen SEG is a Hitachi entity, as Shenzhen SEG is alleged to be a
    Chinese Company.  DPCAC ¶ 35; IP-CAC ¶ 92.  The notion that Shenzhen SEG is the

25  mysterious 'Hitachi defendant' alleged to have attended the improper meetings, is further

26  buttressed by the fact that Indirect Plaintiffs specifically allege that Shenzhen SEG attended
    'Chinese Glass Meetings.'")

27
                                            44

28

Aug. 15, 2003), *citing United States ex rel. Stinson, Lyons, Gerlin & Bustamonte, P.A. v. Blue Cross Blue Shield of Ga., Inc.,* 755 F. Supp. 1040, 1052 (S.D. Ga. 1990); *accord, United States ex rel. Russell v. Epic Healthcare Mgmt. Group,* 193 F.3d 304, 308 (5th Cir. 1999).  Accordingly, Plaintiffs' allegations of each Defendant's role in the conspiracy, together with the detailed information about conspiratorial acts, more than satisfy the notice requirement of Rule 8.

### E.  Plaintiffs Have Adequately Pled That Defendants Acted As The Agents Of Each Other

The Separate Defendants also urge dismissal on the grounds that Plaintiffs have not sufficiently alleged agency or alter ego theories, particularly among Defendants in intra-corporate families.[55]  Contrary to Defendants' claim, the IP CAC sufficiently describes the agency relationships among Defendants, as well as each Defendant's individual participation in the alleged scheme (as shown above).

On a motion to dismiss, a plaintiff is not required to plead agency elements.  *See Dion LLC v. Infotek Wireless, Inc.*, 2007 WL 3231738, *4 (rejecting defendant's argument that a plaintiff asserting a claim based on agency relationship must plead the elements of agency; plaintiff need only place the defendant on notice that its claim is based on an agency theory).[56]

---

[55] Samsung Electronics Motion at 15-18; Tatung Motion at 18; LG Motion at 13-14; Toshiba Motion at 11-12; BMCC Motion at 5, 8; Panasonic Motion at 12; Hitachi Motion at 11; Philips Motion at 14-15.

[56] *See also Gilbert v. Concentra Health Servs., Inc.,* No. 03:07-CV-00264-LRH-VPC, 2008 WL 318356, *2 (D. Nev. Jan. 31, 2008) ("Because the specific facts will be revealed through discovery, it is not necessary for Plaintiff's amended Complaint to set forth detailed allegations of agency.  Arguments as to whether the evidence supports the allegations are more appropriately considered in a motion for summary judgment."); *Hernandez v. Hilltop Financial Mortgage, Inc.*, No. C 06-7401 SI, 2007 WL 3101250, *8 (N.D. Cal. Oct. 22, 2007) ("Although the plaintiffs do not allege an agency relationship between [the assignee] and the other defendants in their complaint, it is not necessary for a pleading to allege an agency relationship in order to survive a Rule 12(b)(6) motion.")

45

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1    Plaintiffs do not rely upon an alter ego theory of liability.[57]  Defendants' alter ego arguments are

2    therefore irrelevant and should be disregarded.[58]

3               **1.  The IP CAC's Agency Allegations Mirror The Allegations Approved in**
                   ***TFT-LCD***

4

5          As noted above, Plaintiffs need not set forth detailed agency allegations.  *Dion,* 2007 WL

6    3231738, *4.  But even if such allegations were required, the IP CAC more than adequately

7    renders agency relationships within each corporate family plausible.

8          Significantly, in *TFT- LCD II,* Judge Illston approved of agency allegations similar—and

9    in some instances nearly identical—to the agency allegations made here.  *See TFT- LCD II,* 599

10    F. Supp. 2d at 1184.  Like here, the *TFT-LCD* defendants argued that the amended complaints

11    improperly grouped together defendants by corporate families.  The court rejected this argument,

12    finding that the amended allegations were more than sufficient:  The complaints, "taken as a

13    whole, [] sufficiently allege each defendant's participation in that conspiracy, *as well as present a*

14    *factual basis for the allegations of agency.*"  *Id.* at 1185 (emphasis added).  The court described

15    the amended allegations:

16                 Defendants complain that the complaints still do not differentiate between
                related corporate entities.  *As described in the complaints, the alleged*

17                 *conspiracy was organized at the highest level of the defendant*
                *organizations and carried out by both executives and subordinate*

18                 *employees. The complaints allege that the conspiracy was implemented by*
                *subsidiaries and distributors within a corporate family, and that*

19                 *'individual participants entered into agreements on behalf of, and reported*
                *these meetings and discussions to, their respective corporate families.'*

20                 DP-FACC ¶ 130; *see also* IPSACC ¶¶ 96, 100.  Plaintiffs also allege that

21                 *'the individual participants in conspiratorial meetings and discussions did*

22

23    [57]Philips Motion at 10-15; Toshiba Motion at 11; Panasonic Motion at 12-13; Samsung
      Electronics Motion at 17 n. 13; LG Motion at 13-14.

24

25    [58]*Bowoto v. Chevron Texaco Corp.,* 312 F. Supp. 2d 1229, 1237 (N.D. Cal. 2004) ("The test for
      alter ego liability appears almost interchangeable with the veil-piercing test").  Unlike liability

26    under the alter-ego or veil-piercing test, however, agency liability does not require disregard of
      the corporate form.  *Id.* at 1238.  *See also id.* at 1238-40 (discussing differences and rules of

27    agency).

                                           46

28         **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
               **AND JOINT MOTIONS TO DISMISS THE IP CAC**
                            **MDL NO. 1917**

*not always know the corporate affiliation of their counterparts, nor did*
*they distinguish between the entities within a corporate family.'  Id.*

*Id.* at 1184-85 (emphasis added).

The IP CAC contains comparable allegations to those referenced above (DP-FACC ¶ 130 and IPSACC ¶¶ 96 and 100):

| *TFT-LCD II,*<br>**599 F. Supp. 2d at 1184-85**<br><br>**Quoted Allegations** | **IP CAC ALLEGATIONS** |
| --- | --- |
| "The complaints allege that the conspiracy was implemented by subsidiaries and distributors within a corporate family, and that 'individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.'  DP-FACC ¶ 130; *see also* IPSACC ¶¶ 96, 100." | ¶ 188:  "The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate famil[ies were] represented in meetings and discussions by their agents and were parties to the agreements reached in them." |
| "Plaintiffs also allege that 'the individual participants in conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.'  *Id.*" | ¶ 188:  "In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family." |
| *TFT-LCD (FLAT PANEL)*<br>**M 07-1827 SI (Doc. 746)** [59]<br><br>**Allegations in IPSACC** | **IP CAC ALLEGATIONS** |
| ¶ 96:  "Wherever in this complaint a family of defendant-corporate entities is referred to by a common name, it shall be understood that plaintiffs are alleging that one or more officers or employees of one or more of the named related defendant companies participated in the illegal acts alleged herein on behalf of all of the related corporate family entities." | ¶ 188:  "When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family." |

---

[59]Pursuant to Fed. R. Evid. 201, Plaintiffs request that the Court take judicial notice of the Indirect Purchaser Plaintiffs' second consolidated amended complaint filed in *TFT-LCD*, No. M 07-1827 SI.  *See Fahmy v. Jay-Z*, No. CV 07-5715 CAS (PJWx), 2009 WL 1808450, *4 n. 5 (C.D. Cal. June 22, 2009) (taking judicial notice of complaint in another proceeding and describing allegations therein).  A copy of the *TFT-LCD* complaint is attached as Exhibit 26 to the Request for Judicial Notice In Support Of Indirect Purchaser Plaintiffs' Opposition To Defendants' Joint and Separate Motions to Dismiss Consolidated Amended Complaint ("RJN").

47

| | |
|---|---|
| ¶ 100:  "Each of the defendants named herein acted as the agent or joint venturer of or for the other defendants with respect to the acts, violations and common course of conduct alleged herein.  Each defendant that is a wholly-owned subsidary of a foreign parent is the United States agent for its parent company." | ¶ 113:  "Each of the Defendants named herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.  Each Defendant which is a subsidiary of a foreign parent acts as the whole United States agent for CRT products made by its parent company."<br><br>¶ 112:  "Defendants are also liable to acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions." |

Thus, as in *TFT-LCD II*, the IP CAC supplies a sufficient factual basis for Plaintiffs' agency allegations, and plausibly suggests each Defendant's participation in the conspiracy alleged.  Plaintiffs allege a multi-faceted, multinational price-fixing conspiracy organized at the highest level of the Defendant organizations and carried out by both executives and subordinate employees.  *See* IP CAC ¶¶ 121-139; 140-165; 166-187.  It should come as no surprise that in order to establish and effectuate such a scheme, Defendants relied on numerous personnel and entities within vertically-integrated corporate structures. [60]

Indeed, as the IP CAC explains, "to the extent that subsidiaries within the corporate families "sold and/or distributed CRT Products" to direct purchasers, "they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid

---

[60] Plaintiffs also note that the overarching unity of interest between parent and subsidiary discussed in *Copperweld,* while precluding a conspiracy between such entities, renders their joint participation in a conspiracy with *other* entities highly plausible.  The Supreme Court held that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act.  A parent and its wholly owned subsidiary have a complete unity of interest."  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984).  Factors like control over daily operations, or overlap in officers, or the sharing of headquarters "simply describe the manner in which the parent chooses to structure a subunit of itself.  *They cannot overcome the basic fact that the ultimate interests of the subsidiary and the parent are identical, so the parent and the subsidiary must be viewed as a single economic unit.*"  *Id.* at 772 n. 18 (emphasis added).

48

1   by direct purchasers would not undercut the CRT pricing agreements reached at the Glass

2   meetings."  IP CAC ¶¶ 167, 169, 171, 174, 178, 180, 182.

3        As described above, the IP CAC's allegations that high-level executives, including CEOs,

4   Presidents and Vice Presidents, met regularly to discuss prices, support an inference that the

5   parent corporations controlled the conspiracy.  IP CAC ¶ 146.  The allegations of operational and

6   lower-level meetings ("Management Meetings" and "Working Level Meetings") support an

7   inference that the top-level agreements were implemented across the entire corporate family.  *Id.*

8   ¶¶ 147-148.  Further, the IP CAC specifically alleges that the participants in Glass Meetings and

9   bilateral discussions with other Defendants understood that their agreements and acts would be

10   enforced by their respective corporate subsidiaries, so as not to "undercut the CRT pricing

11   agreements reached at the Glass Meetings."  *Id.* ¶¶ 167, 169, 171, 174, 178, 180, 182.

12   **2.  Defendants' Authorities Are Not On Point**

13        "As a general rule a corporation is liable under the Sherman Act for the acts of its agents

14   in the scope of their employment, even though contrary to general corporate policy and express

15   instructions to the agent."  *United States v. Hilton Hotels Corp.*, 467 F.2d 1000, 1007 (9th Cir.

16   1972) (affirming conviction of corporation based on its purchaser agent's participation in an

17   anticompetitive boycott), *cert. denied*, 409 U.S. 1125 (1973).[61]  *See also County of Stanislaus v.*

18   *Pacific Gas & Elec. Co.*, No. CV-F-93-5866-OWW, 1994 WL 706711, *31 (E.D. Cal. Aug. 25,

19   1994) (denying motion to dismiss by defendant corporation that allegedly committed antitrust

20   violations through its subsidiaries, because "an entity can incur antitrust liability for the acts of its

21   employees or agents, when acting within the scope of their apparent authority, despite the agent's

22   desire to benefit only him or herself.").

---

24   [61] The common law doctrine of agency has long been applied to hold liable vertically-integrated
25   companies that engaged in anticompetitive price-fixing.  *See, e.g., Boston Store of Chicago v.*
   *American Graphophone Co.*, 246 U.S. 8, 17, 25 (1918) ("[T]here can be no doubt that the alleged
26   price-fixing contract" between manufacturer of phonographic records and its marketing agent
   "was contrary to the general law and void").

49

28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

Defendants' authorities for the proposition that parent corporations are not generally liable for the acts of their subsidiaries are unavailing. *United States v. Bestfoods,* 524 U.S. 51 (1998),[62] involved neither the standards on a motion to dismiss nor antitrust issues. It stemmed from the review of a judgment on the merits and addressed the extent to which parent corporations may be held liable under CERCLA, on an alter ego theory, for operating facilities ostensibly under the control of their subsidiaries. *Id.* at 60.

Defendants' quotations from *Bestfoods*, taken out of context, pertain not to agency liability but to derivative liability incurred from the piercing of the corporate veil. The case is inapposite. Even so, language in the decision supports Plaintiffs' position. The Court noted that a parent observing corporate formalities (and therefore not liable on a veil-piercing theory) still could not escape direct liability for its own actions or those of its agents:

> The fact that a corporate subsidiary happens to own a polluting facility operated by its parent does nothing, then, to displace the rule that *the parent 'corporation is [itself] responsible for the wrongs committed by its agents in the course of its business*.' . . . If any such act of operating a corporate subsidiary's facility is done *on behalf of a parent corporation*, the existence of the parent-subsidiary relationship under state corporate law is *simply irrelevant* to the issue of direct liability.

*Bestfoods,* 524 U.S. at 65 (emphasis added) (internal citations omitted).

Other cases cited by Defendants were decided in the context of summary judgments or judgments following trial—cases determined on the evidence and thus inapposite as well. *See, e.g., Bowoto,* 312 F. Supp. 2d at 1241[63] ("Whether an agency relationship exists between a parent corporation and its subsidiary is normally a question of fact.") As the *Dion* court acknowledged:

> [Defendant] confuses the federal notice pleading standard with an evidentiary standard; the *Bowoto* decision came in the context of summary judgment, not a 12(b)(6) motion. [Defendant] reinforces the meritless

---

[62] Samsung Electronics Motion at 17; LG Motion at 13, 16; Philips Motion at 10, 12; Hitachi Motion at 11; Tatung Motion at 15, 18.
[63] Samsung Electronics Motion at 17.

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> nature of its argument by blatantly misrepresenting the holding of *Bowoto* in its claim that a "plaintiff asserting a claim based on an agency relationship *must plead* the [three elements of agency]." *Bowoto* stands for no such proposition because the case dealt with a summary judgment motion, not a Rule 12(b)(6) motion. In its pleading, Dion is only required by Rule 8(a) to place [Defendant] "on notice" of its claim for breach of contract based on [Defendants'] agency relationship with Wireless.

2007 WL 3231738, *4 (emphasis in original) (internal citations omitted).[64]

The other authorities cited by Defendants are similarly unavailing because, unlike here, plaintiffs in each of those cases relied entirely on boilerplate, conclusory allegations to hold liable entities *wholly unrelated* to the defendant actually having committed the wrongful acts alleged.

For example, in *Arnold Chevrolet LLC v. Tribune Co.,* 418 F. Supp. 2d 172 (E.D.N.Y. 2006),[65] the court dismissed the plaintiffs' antitrust claims, with leave to amend, because of their

---

[64] Many of the other cases cited by Defendants are distinguishable for the same reason. *See*, *e.g.* *Miller v. Int'l Bus. Machines Corp. (IBM),* No. C02-2118, 2006 WL 2792416, *9 (N.D. Cal. Sept. 26, 2006) (summary judgment case; plaintiff failed to produce sufficient evidence of agency relationship to raise a triable issue of fact) (Tatung Motion at 14); *In re Coupon Clearing Serv., Inc.,* 113 F.3d 1091, 1099 (9th Cir. 1997) (summary judgment case; evidence showed that principal did not exercise requisite degree of control) (Toshiba Motion at 15); *E.J. Gallo Winery v. EnCana Energy Servs., Inc.,* CV F 03-5412 AWI LJO, 2008 WL 2220396, *10 (E.D. Cal. May 27, 2008) (summary adjudication motion: "The determination of whether a principal/agent relationship exists between a parent corporation and its subsidiary involves a fact-intensive inquiry into the extent to which the parent exercises control over the activities of the subsidiary") (Samsung Electronics Motion at 16, 18; LG Motion at 13, 14; Philips Motion at 10, 15; Tatung Motion at 15); *MacDonald v. Grace Church Seattle,* No. C05-0747C, 2006 WL 1009283, *3 (W.D. Wash. Apr. 14, 2006) (summary judgment motion on claim for wrongful discharge; "no evidence" suggested that wrongful actions was taken on behalf of purported principals) (Philips Motion at 15); *Spears v. Transcon. Bus. Sys., Inc.,* 226 F.2d 94, 98 (9th Cir. 1955) (race segregation case involving appeal from judgment following trial; decided on the evidence) (Tatung Motion at 16); *Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429, 441 (9th Cir. 1979) (upholding the dismissal of defendant British Leyland because the evidence was insufficient to sustain liability—Though British Leyland "was a manufacturer, it had not signed the franchise, nor insofar as the record discloses did it have anything to do with the franchise or any of the other contract documents") (Toshiba Motion at 12; LG Motion at 16; Philips Motion 10; Panasonic Motion at 12; Tatung Motion at 15, 18).

[65] LG Motion at 16.

51

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1  "failure to articulate *any* specific allegations" against the defendant.  *Id.* at 178 (emphasis in

2  original).  There were no allegations to "even suggest" that the parent was involved in the

3  subsidiary's actions in any way.  *Id.*

4         In *American Nat'l. Red Cross v. United Way California Capital Region*, No. CIV. S-07-

5  1236 WBS DAD, 2007 WL 4522967 (E.D. Cal. Dec. 19, 2007),[66] a case involving an option to

6  purchase real property, the plaintiff/optionor sued the defendant/optionee for breach of the

7  option.  The plaintiff also named the subsequent purchaser as a defendant, alleging, *inter alia*,

8  that it was the agent of the defendant/optionee.  The complaint, however, did not "allege one fact

9  that suggests such an agency relationship."  *Id.* at *10.

10         *Walton v. Mead,* No. C03-4921 CRB, 2004 WL 2415037 (N.D. Cal. Oct. 28, 2004),[67]

11  concerned an employment discrimination action against an employer.  The plaintiff also argued

12  that Majestic, the employer's workers' compensation insurance carrier, was liable as her

13  employer's agent and the alter ego for the employer's alleged wrongful conduct.  The court

14  rejected plaintiff's theory because she "relie[d] on conclusory assertions."  *Id.* at *4.  She could

15  not cite any authority that Majestic's status as her employer's insurance carrier created an agency

16  relationship for the employer's discriminatory acts in the workplace.  Moreover, she did not

17  contend that if granted leave to amend she could, in good faith, allege facts suggesting that

18  Majestic was acting as her employer.  In contrast to all these cases, Plaintiffs here have alleged

19  that the principals and their subsidiaries all were part of a common scheme.

20         Finally, other cases are distinguishable as a matter of law because they involve claims

21  against individuals for *personal* liability stemming from acts undertaken in an agency capacity.

22  For instance, in *Alaska Airlines, Inc. v. Carey,* No. C O705711 RBI, 2008 WL 2725796 (W.D.

23  Wash. July 11, 2008),[68] the defendants, operators of a travel agency, counter-claimed for antitrust

24  _____

25  [66] Toshiba Motion at 15; LG Motion at 14.

26  [67] Philips Motion at 15; BMCC Motion at 6.

27  [68] Samsung Electronics Motion at 12; LG Motion at 16; BMCC Motion at 4.

52

28

1  violations against an individual officer of Alaska Airlines on the basis of an agency theory.  The

2  officer countered that she had acted as an agent for the airline and that the defendants had not

3  sufficiently alleged facts supporting her personal liability.  The court agreed.  A corporate

4  executive who has not personally participated in a corporation's wrongful conduct cannot be held

5  vicariously liable for the acts of the corporation.  "An allegation of individual liability must be

6  founded on specific acts."  *Id.* at *7; *accord Tugboat Corp. Co. v. Shipowners & Merchants*

7  *Towboat Co., Ltd.,* 467 F. Supp. 841, 852 (N.D. Cal. 1979)[69] ("Courts have, however,

8  consistently stated that a corporate executive will not be held vicariously liable, merely by virtue

9  of his office, for the torts of his corporation. . . .  Personal liability must be founded upon specific

10  acts by the individual director or officer.") (internal citations omitted).  Here, Plaintiffs do not

11  allege personal liability against any of the Defendants' corporate officers or directors, let alone

12  on the basis of an agency relationship.

### F.  The Court Should Disregard Defendants' Attempts To Mischaracterize Or Offer Innocent Explanations For Plaintiffs' Allegations Against Them

15      The Hitachi, Toshiba, Panasonic and Samsung Electronics Defendants also attempt to

16  mischaracterize or offer innocent explanations for Plaintiffs' allegations against them.  These

17  Defendants ignore the fundamental principle that in reviewing a complaint subject to a motion to

18  dismiss, "the court must presume all factual allegations of the complaint to be true and draw all

19  reasonable inferences in favor of the nonmoving party."  *Knevalbaard Dairies,* 232 F.3d at 984.

20  The Court should reject Defendants' improper invitation to draw inferences in their favor at the

21  motion to dismiss stage.

---

26

27  [69] Panasonic Motion at 12.

28

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC MDL NO. 1917**

1

   **1. Hitachi**

2

   **a. Hitachi's Decreasing Market Share Does Not Contradict The Allegations In The IP CAC**

3

4  The Hitachi Defendants contend that Plaintiffs' allegations about their decreasing market

5 share requires dismissal because they contradict a "key component" of the alleged conspiracy

6 (allocation of market share by Defendants), and therefore make it implausible that the Hitachi

7 Defendants joined the conspiracy.[70]  First, nowhere in the IP CAC do Plaintiffs allege that the

8 allocation of market share by Defendants was a "key component" of the conspiracy.  This is a

9 classic example of Hitachi mischaracterizing Plaintiffs' allegations to support their arguments.

10 To the contrary, as described herein, Plaintiffs allege that there were many facets to this complex

11 conspiracy in which Hitachi participated, such as agreeing to fix the prices of CRT Products at

12 the Glass Meetings.  IP CAC ¶¶ 141-157; 159-161; 164-165; 179-180.

13  Second, Hitachi relies on a summary judgment case, *In re Citric Acid Litig.,* 996 F. Supp.

14 951, 961 (N.D. Cal. 1998), *affirmed by In re Citric Acid Litig.,* 191 F.3d 1090 (9th Cir. 1999),

15 where, unlike here, the court had the benefit of full merits discovery in making its decision.  In

16 *Citric Acid*, four defendants had admitted their involvement in the citric acid price fixing

17 conspiracy.  *Id.* at 953.  They had further admitted, and there was direct evidence showing, that

18 the principal method used to achieve their goal of raising prices was the allocation of market

19 shares to within a tenth of a percent.  *Id.*  One defendant moved for summary judgment on the

20 basis that it had not been a member of the conspiracy, and as one of its arguments in support,

21 pointed to its increasing market share during the conspiracy period.  The court agreed that the

22 defendant's market share "had changed so much more than would have been allowed had it been

23 participating in the conspiracy."  *Id.* at 961.

24

25

26

27 [70] Hitachi Motion at 7.

28

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1    *Citric Acid* is distinguishable because Plaintiffs here do not allege that the allocation of

2    market share was an integral part of the CRT Product conspiracy.  Moreover, because we are at

3    the pleadings stage, the Court does not have the benefit of discovery or guilty pleas to analyze

4    whether it is of any import that Hitachi's market share was decreasing.  And more fundamentally,

5    Hitachi's "argument relies on inferences being drawn in *their* favor which, of course, is the

6    antithesis of the standard of review applicable to a motion to dismiss."  *Flash Memory,* 2009 U.S.

7    Dist. LEXIS 38941, *11 (rejecting a similar argument regarding market shares by defendants).

8        Because Hitachi cannot establish that their decreasing market share contradicts Plaintiffs'

9    allegations that they were a member of the conspiracy, *Sprewell v. Golden State Warriors,* 266

10   F.3d 979 (9th Cir. 2001) and *Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293 (9th Cir. 1998) are

11   also inapposite. In both cases, the plaintiff submitted materials with their complaint that directly

12   contradicted a material element of their cause of action.  For example, in *Sprewell,* the plaintiff

13   alleged that his punishments by the NBA and the Warriors were the product of his race in

14   violation of 42 U.S.C. § 1981.  266 F.3d at 988.  The court held that an arbitration award annexed

15   to the complaint "fatally undermined" the Section 1981 claim because the arbitrator had found

16   plaintiff's "punishment was justified by virtue of the 'singularity of his misconduct' and the fact

17   that [plaintiff] attacked his head coach."  *Id.* at 989.  In contrast, Plaintiffs' claims that the Hitachi

18   Defendants were members of the conspiracy are not fatally undermined by their decreasing

19   market share.  In fact, they are not undermined at all.

### b.  Hitachi's Participation In Trade Associations And Joint Ventures With Admitted Price-Fixers Is Far From Irrelevant

22       The Hitachi Defendants also argue that their membership in trade associations and joint

23   ventures in other markets are "irrelevant," and that such activities are presumed legitimate.[71]

24   Generally, there is nothing necessarily improper with participation or membership in industry

---

[71] Hitachi Motion at 9, 15.

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC MDL NO. 1917**

1   trade associations or joint ventures.[72]  That notwithstanding, "acts which are in and of themselves

2   legal lose that character when they become constituent elements of an unlawful scheme."

3   *Continental Ore,* 370 U.S. at 707.  Therefore, courts have recognized that trade association

4   affiliations and attendance at industry events may be alleged, as Plaintiffs do here, to show that

5   putative conspirators had the opportunity and means to develop and/or further their alleged

6   collusive scheme.  *See Todd v. Exxon Corp.,* 275 F.3d 191, 213 (2d Cir. 2001) ("[T]he frequency

7   of the meetings is itself problematic for the same reason that the exchange of current price data is

8   suspect: it tends to facilitate the policing of price conspiracies.").[73]  And while "these allegations

9   cannot alone support Plaintiffs' claims . . . such participation demonstrates *how and when*

10  Defendants had opportunities to exchange information or make agreements."  *SRAM I,* 580 F.

11  Supp. 2d at 903 (emphasis added); *see also OSB,* 2007 WL 2253419, *3.

12          Considering the allegation of Hitachi's trade association membership along with the other

13  allegations in the Complaint, it becomes apparent that it is far from irrelevant.  Plaintiffs allege

14  that Hitachi, along with Defendants Chunghwa and Samsung, are members of the Society for

15  Information Display. *Id.* ¶ 124.  Chunghwa's former Chairman and CEO, C.Y. Lin, has been

16  indicted for his participation in the CRT Product conspiracy. *Id.* ¶¶ 4, 205.  C.Y. Lin has also

17  been indicted for his participation in the TFT-LCD conspiracy. *Id.*  And Chunghwa itself has

18  pled guilty to violations of Section 1 of the Sherman Act and paid a criminal fine for its role in

19  the conspiracy to fix the prices of TFT-LCD panels. *Id.* ¶ 219.  Defendant Samsung is a serial

20  violator of the antitrust laws.  It pled guilty and paid a $300 million fine for participating in a

21  conspiracy to fix the prices of DRAM. *Id.* ¶ 215.  It is currently under investigation for fixing the

22  prices of NAND Flash Memory and TFT-LCDs, and is the suspected amnesty applicant in the

23  ─────────────────

24  [72] *See GPU I,* 527 F. Supp. 2d at 1023*; Citric Acid,* 191 F.3d at 1098.  Hitachi Motion at 15.

25  [73] *See also In re Automotive Refinishing Paint Antitrust Litig.,* 229 F.R.D. 482, 492 (E.D. Pa.
26  2005) ("Evidence of communication and cooperation among defendants through the aegis of a
    trade association may also be relevant to establish the existence of a conspiracy of combination").

27

28

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1    TFT-LCD case.  *Id.* ¶¶ 214-218.  Last, but by no means least, Hitachi Displays, Ltd. has also pled

2    guilty for its role in the conspiracy to fix the prices of TFT-LCD panels.  *Id.* ¶ 220.  Therefore,

3    Hitachi's membership in a trade association with defendants who are admitted price-fixers in the

4    CRT and TFT-LCD markets, as well as Hitachi's own admission of involvement in the TFT-

5    LCD price-fixing conspiracy *with these same defendants,* plausibly suggests that Hitachi

6    participated in the CRT Product conspiracy too.

7            Thus, while Plaintiffs' allegations regarding trade association membership and joint

8    ventures, *standing alone,* may not state a claim under the Sherman Act, they may properly be

9    considered along with the other allegations in the Complaint as discussed above for purposes of

10   the assessing the sufficiency of the Complaint.

11           **c.  Government Investigations Into The CRT Industry And Closely-Related
                 Industries Are Properly Pleaded To Establish The Plausibility Of The
12               Alleged CRT Product Conspiracy**

13           The Hitachi Defendants also try to dismiss the fact that there are government

14   investigations in closely-related markets (TFT-LCD, DRAM, Flash Memory) as irrelevant.[74]

15   They cite no law for this proposition.  This is not surprising since several cases have recognized

16   that evidence concerning a prior conspiracy may be relevant and admissible to show the

17   background and development of a current conspiracy.

18           In *United States v. Andreas,* 216 F.3d 645 (7th Cir. 2000), the court addressed a claim that

19   there was a conspiracy to fix prices and control the output of Lysine, an amino acid.  On appeal,

20   the court rejected defendants' challenge to the admissibility of evidence concerning a similar

21   scheme involving the related market for citric acid.  The court found that there was evidence that

22   the citric acid scheme "provided the blueprint for and motivating force behind the nascent lysine

23   scheme," and thus, was admissible to provide context as to how the lysine conspiracy operated.

---

[74] Hitachi Motion at 15-16.

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1    *Id.* at 665.[75]  Likewise, in *SRAM I*, the district court acknowledged that "[a]lthough the DRAM

2    guilty pleas are not sufficient to support Plaintiffs' clams standing on their own, *they do support*

3    *an inference of a conspiracy in the SRAM industry.*"  580 F. Supp. 2d at 903 (emphasis added).[76]

4          Additionally, the Hitachi Defendants ignore the fact that there are government

5    investigations into the CRT Product market itself, *and* that Chunghwa's C.Y. Lin has been

6    indicted for his role in the conspiracy.  IP CAC ¶¶ 4, 203-213.  The *GPU I* case cited by Hitachi

7    is therefore distinguishable because in that case there were no indictments.  527 F. Supp. 2d at

8    1024.  In addition, it is far from settled that the existence of a grand jury investigation "carries no

9    weight in pleading an antitrust conspiracy claim."  *Id.*  Other courts have found the existence of

10   governmental investigations to be a significant allegation at the pleadings stage.  *See In re*

11   *Tableware Antitrust Litig.,* 363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005) ("plaintiff may surely

12   rely on governmental investigations" to allege a complaint but simply may not do so

13   exclusively); *Hyland v. Homeservices of America, Inc.,* 2007 WL 2407233, *3 (W.D. Ky. Aug.

14   17, 2007) (noting prior government enforcement efforts in denying motion to dismiss).

15         In order for the DOJ to institute a grand jury investigation, the Antitrust Division must

16   believe that a crime has been committed and prepare a detailed memo to that effect.  *See* RJN,

17   Ex. 28, *Antitrust Grand Jury Manual,* Vol. 1, Ch. I.B.1 (1991).  The request for a grand jury must

18   then be approved by the Assistant Attorney General for the Antitrust Division based on the same

19   standard of a crime having been committed.  *Id.*  The DOJ's criminal investigation is relevant to

20   the "plausibility" of the price-fixing allegations in the IP CAC, because the current DOJ policy is

21   to proceed by criminal investigation and prosecution in cases involving horizontal, *per se*

22   unlawful agreements such as, *inter alia*, price fixing, bid rigging and horizontal customer and

23   ───────────────────

24   [75] *See also In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d at 661.

25   [76] *See also Flash Memory,* 2009 U.S. Dist. LEXIS 38941, * 13-14 (finding while the allegations

26   regarding the DRAM guilty pleas "may not *prove* the existence of a conspiracy with respect to

27

28

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1    territorial allocations.  *See* RJN, Ex. 29, *Antitrust Division Manual,* Ch. III.C.5.  (4th ed. 2009,

2    rev.)

3           In addition, the Court should not ignore the fact that at least one Defendant has applied

4    for amnesty under the DOJ's Corporate Leniency Policy, which means that at least one of the

5    Defendants has confessed to the existence, scope and extent of the conspiracy.  *See* RJN, Ex. 30,

6    U.S. DOJ "Corporate Leniency Policy" (1993).  Indeed, the DOJ has taken the extraordinary step

7    of intervening in this case to stay all merits discovery, ostensibly to protect "those witnesses who

8    are most likely cooperating with the government."  *See* Docket No. 321, Memorandum of Points

9    and Authorities In Support Of The United States' Motion for a Limited Stay of Discovery,

10   p.2:14-15.  In doing so, the DOJ made an *in camera* submission to this Court regarding the

11   conspiracy, relying in part, upon information received from the amnesty applicant.  *See* Docket

12   No. 326, Declaration of Jeane Hamilton In Support Of The United States' Motion for a Limited

13   Stay of Discovery, filed under seal.

14          The DOJ's Corporate Leniency Policy applies to "corporations reporting their illegal

15   antitrust activity," and requires applicants "report the wrongdoing with candor and

16   completeness."  RJN Ex. 30, p. 2, 3.  The fact that one or more of the participants have confessed

17   to the antitrust conspiracy alleged by Plaintiffs certainly makes it plausible that a conspiracy

18   exists.  Because an amnesty applicant must admit the existence of the conspiracy and its

19   participation in the conspiracy, allegations that there is an amnesty applicant constitute *direct*

20   evidence of the violation, equivalent to a confession or a video recording.  Where there is direct

21   evidence of a conspiracy, *Twombly* is inapplicable.  There can be no concern that Plaintiffs are

22   relying on ambiguous circumstantial evidence, such as parallel conduct, to prove agreement.

23   Thus, the existence of an amnesty applicant is, in and of itself, a sufficient basis to deny the

24   motions to dismiss.

25   _____

26   NAND flash memory, they are properly pleaded for the purpose of establishing the plausibility
     that such a conspiracy existed.").

27
                                              59
28          **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
            **AND JOINT MOTIONS TO DISMISS THE IP CAC**
            **MDL NO. 1917**

1

### d. The IP CAC Alleges Parallel Conduct By Defendants

2      Finally, the Hitachi Defendants make the wholly incorrect assertion that Plaintiffs have

3  not alleged any parallel conduct.[77]  This argument ignores both the allegations in the Complaint

4  and the applicable law.  Paragraphs 192 through 202 allege several examples of parallel conduct,

5  including coordinated price increases and capacity reductions.  Hitachi ignores these allegations

6  because they do not mention its name.  But as described above in Subsection D, Plaintiffs have

7  sufficiently tied the Hitachi Defendants to the CRT conspiracy.  Therefore, Plaintiffs do not have

8  to repeat Hitachi's name for each and every allegation.[78]  Moreover, unlike many antitrust

9  complaints, Plaintiffs do not need to rely upon extensive allegations of parallel conduct here

10  because the IP CAC contains detailed allegations of collusion among the Defendants.  *See* IP

11  CAC, ¶¶ 138-188.

12      ### 2. Toshiba

13      The Toshiba Defendants make many of the same improper arguments as Hitachi. For

14  example, they argue that the government investigations of the CRT industry and other closely-

15  related industries are irrelevant.[79]  Likewise, they argue that their participation in CRT joint

16  ventures, joint licensing agreements and production agreements with three of the other

17  defendants, including Chunghwa, who's Chairman has been indicted for his role in the CRT

18  conspiracy, should be presumed pro-competitive.[80]  These arguments must be rejected for the

19  same reasons that Hitachi's arguments must be rejected: because they require the Court to draw

20  inferences in Toshiba's favor at the motion to dismiss stage.

21  _____

22  [77] Hitachi Motion at 16.

23  [78] Antitrust conspiracy allegations need not be pled defendant by defendant.  *See In re Fine*
24  *Paper Antitrust Litig.,* 685 F.2d at 822.

25  [79] Toshiba Motion at 2.

26  [80] *Id.* at 17.

27

60

The Toshiba Defendants also try desperately to distinguish themselves from the other Defendants in what essentially amounts to a finger-pointing exercise.[81]  They point to what they characterize as "key aspects" of Plaintiffs' conspiracy allegations and claim that Toshiba is not alleged to have been involved.[82]  This tactic is unavailing for several reasons.  First, Toshiba's argument ignores well-settled legal principles that antitrust conspiracies need not be detailed defendant by defendant; that the Complaint must be read as a whole; and that a conspirator need not participate in every aspect of a conspiracy in order to be jointly liable for the acts of its co-conspirators.  *See* Subsections C and D *supra*.

Second, the Toshiba Defendants completely ignore Plaintiffs' core allegations of their *direct participation* in Glass Meetings and bilateral meetings at which they conspired with their competitors to fix the prices of CRT Products.  *See* IP CAC ¶¶ 2, 141-165, 177-178; *see also* Subsection D. *supra*).  These allegations are sufficient to implicate the Toshiba Defendants in the conspiracy.  Thus, it is of no consequence that the Toshiba Defendants are not alleged to have been oligopolists in the CRT industry, or that they have not been indicted or pled guilty in any government proceeding.[83]

Third, several of the "facts" that the Toshiba Defendants claim distinguishes them from the other Defendants do not distinguish them at all.  Moreover, they rely on "facts" that are not part of the pleadings, contradict the allegations in the IP CAC, and therefore require the Court to resolve issues of fact in their favor at the motion to dismiss stage.  For example, the Toshiba Defendants seek to distinguish themselves on the grounds that "none of the Toshiba entities, nor

---

[81] *Id.* at 1 ("[T]he Toshiba entities are differently situated from other CRT manufacturers and outside the scope of any conspiracy that could be plausibly alleged.")

[82] *Id.* at 1-8.

[83] Toshiba Motion at 4-5.

61

1   anyone affiliated with them, has been indicted in the CRT matter."[84]  But since only C.Y. Lin

2   (the former Chairman of Chunghwa) has been indicted, this does not distinguish the Toshiba

3   Defendants from any of the other Defendants, including those who have not challenged the IP

4   CAC under *Twombly*.  Further, the IP CAC alleges that Toshiba Corporation was affiliated with

5   Chunghwa, in that they entered into a technology transfer agreement for large CRTs in 1995.  IP

6   CAC ¶ 128(g).

7          The Toshiba Defendants also claim they are different from the other Defendants because

8   they have not received a summons or a grand jury subpoena.  They claim "the Department of

9   Justice's only contact with any Toshiba entity has been to ask for assistance in its investigation as

10  a potential victim of an alleged conspiracy (on the basis of its purchases of CRTs)."[85]  These

11  claims contradict paragraph 212 of the IP CAC, which alleges: "In its 2008 Annual Report,

12  Defendant Toshiba reports that '[t]he Group is also being investigated by the [European]

13  Commission and/or the U.S. Department of Justice for potential violations of competition laws

14  with respect to semiconductors, LCD products, *cathode ray tubes (CRT)*, and heavy electrical

15  equipment."  (emphasis added).

16         Finally, Toshiba's claim that "[n]o allegation even remotely suggests that the Toshiba

17  entities had any involvement in the alleged capacity reductions," is just plain wrong.[86]  The IP

18  CAC clearly alleges that Toshiba Corporation and co-defendant Matsushita Electronic Industrial

19  Co., Ltd. (n/k/a Panasonic Corporation) consolidated their CRT businesses in 2002 to form MT

20  Picture Display Co., Ltd. ("MTPD") as a CRT joint venture.  IP CAC ¶¶ 72, 80.  Toshiba tries to

21  divorce itself from MTPD, but the fact remains that "MT" stands for "Matsushita *Toshiba*."

22

23

24  _____

    [84] *Id.* at 2.

25
    [85] Toshiba Motion at 2.
26

27  [86] Toshiba Motion at 6.

                                            62
28  _____
       **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
                **AND JOINT MOTIONS TO DISMISS THE IP CAC**
                            **MDL NO. 1917**

1   Toshiba Corporation owned 35.5 percent of MTPD until April 3, 2007, only a few months before

2   the end of the conspiracy period.  *Id.* ¶ 80.

3          Fairly read, the IP CAC plausibly alleges that the formation of MTPD was in and of itself

4   an overt act in furtherance of the conspiracy.  *See* IP CAC ¶¶ 125, 198 (alleging that Defendants

5   conspired to limit production by "consolidating their manufacturing facilities"); *see also id.* ¶ 177

6   (alleging that "[a]fter 2003, Toshiba participated in the CRT conspiracy through its joint venture

7   with Panasonic, MTPD").  Like here, the plaintiffs in *Flash Memory* alleged that joint ventures

8   and cross licensing agreements were used as a means to maintain and achieve the end result of

9   the conspiracy by controlling supply and thereby permitting price increases for Flash Memory.

10  2009 U.S. Dist. LEXIS 38941, *48.  The *Flash Memory* court found it was plausible to conclude

11  that the formation of a joint venture by two defendants in that case "was itself a conspiratorial act

12  to control prices and supply."  *Id.* at *48-49 n.9.  Notably, MTPD has not challenged the

13  Complaint on *Twombly* grounds.  Furthermore, MTPD was recently fined by the Japanese Fair

14  Trade Commission for its role in the CRT conspiracy.  Accordingly, the Toshiba Defendants'

15  separate motion to dismiss must be denied.

16         **3.  Panasonic**

17         The Panasonic Defendants make the completely false assertion that they "are only alleged

18  to have sold 'CRT Products'—defined in the Complaints to mean finished products such as

19  television sets containing CRTs" and that they are only named "because they are related to

20  MTPD [MT Picture Display Co., Ltd.]."[87]  This is another example of the Defendants

21  mischaracterizing the allegations in Plaintiffs' complaint to suit their argument.

22         CRT Products are defined in the IP CAC to include CRTs *and* CRT Finished Products.

23  IP CAC ¶ 15.  Therefore, Plaintiffs allege that both Panasonic Corporation and PNA

24  manufactured, marketed, sold and distributed both CRTs *and* CRT Finished products.  Further,

_____

[87] Panasonic Motion at 1.

63

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1  Plaintiffs allege in some detail that Panasonic Corporation and PNA manufactured and sold

2  CRTs until 2002, when they transferred their CRT business to MTPD, and that thereafter they

3  continued to manufacture CRT Finished Products.  *Id.* ¶¶ 72, 80, 85.  In other words, the

4  Panasonic Defendants were manufacturing and selling CRTs for the majority of the alleged

5  conspiracy period.  What's worse is that Panasonic Corporation and PNA admit as much in their

6  brief.  *See* Panasonic Motion at 14 ("Panasonic Corp., which turned over its entire CRT

7  manufacturing business to MTPD.")

8        Thus, Panasonic's accusation that they are named "solely because of a transparent desire

9  of Plaintiffs' counsel to name virtually any company with deep pockets that they can identify on

10 the Internet that was related in any way to a company that manufactured and sold CRTs during

11 the claimed conspiracy period"[88] is exposed as false.

12       Plaintiffs also incorporate the above argument that the formation of MTPD as a joint

13 venture between Panasonic Corporation and Toshiba Corporation was an overt act in furtherance

14 of the conspiracy.  IP CAC ¶¶ 125, 198.  MTPD has been a wholly-owned subsidiary of

15 Panasonic Corporation since April 2007.  MTPD has not challenged the IP CAC under *Twombly*

16 and was recently fined by the Japanese Fair Trade Commission for its role in the CRT

17 conspiracy.

18       As set forth above, Plaintiffs have sufficiently alleged that the Panasonic Defendants

19 participated directly in the CRT Product conspiracy.  Therefore, Panasonic's separate motion to

20 dismiss should be denied.

21       **4.  Samsung Electronics**

22       Relying upon the wholly incorrect premise that the conspiracy related to CRTs only, and

23 not CRT Finished Products as Plaintiffs have alleged, the Samsung Electronics Defendants argue

24 that they could not be members of a horizontal conspiracy to fix the price of CRTs because they

25 _____

26 [88] Panasonic Motion at 1.

27

28

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1   did not manufacture CRTs.  They only manufactured CRT Finished Products.[89]   The Samsung

2   Electronics Defendants contend that Plaintiffs are therefore not entitled to a *per se* analysis, and

3   that Plaintiffs have failed to allege facts that would support relief under a rule-of-reason

4   analysis.[90]  This argument has no merit.

5          As set forth extensively in the summary of the IP CAC allegations and Section I. B.

6   *supra*, the conspiracy alleged by Plaintiffs involves *CRT Products*, which is defined to include

7   *both* CRTs and CRT Finished Products.  And as alleged in the IP CAC, the Samsung Electronics

8   Defendants are major manufacturers of CRT Finished Products, while their Samsung SDI

9   subsidiaries manufactured CRTs.  IP CAC ¶¶ 62-71.  The IP CAC alleges that these vertically

10  integrated Samsung entities were direct participants in an antitrust conspiracy in the CRT Product

11  market.  *Id.* ¶¶ 2, 124, 128, 139, 141-165, 166-167, 197.  The IP CAC further alleges that the

12  Samsung Electronics Defendants conspired with other manufacturers of CRT Products to fix,

13  raise, maintain and stabilize the prices of CRT Products.  *Id.*  In the context of these vertically

14  integrated companies that control the vast majority of the upstream and downstream markets, this

15  horizontal conspiracy with vertical aspects is economically plausible.  *See* Subsection G *infra*.

16         Thus, Plaintiffs have sufficiently alleged the existence of a horizontal conspiracy in the

17  CRT Products market in which the Samsung Electronics Defendants directly participated.

18  Plaintiffs' claims are therefore entitled to analysis under the *per se* rule, which does not require

19  Plaintiffs to allege a legally relevant market or effects upon competition in that market.  *See*

20  *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008).

21         The Samsung Electronics Defendants also try to distance themselves from their Samsung

22  SDI subsidiaries, who have not challenged the Complaint under *Twombly*, and who were recently

23  fined by the Japanese Fair Trade Commission for their participation in the CRT conspiracy.

24  _____

25  [89] Samsung Electronics Motion at 1-2, 4-6.

26  [90] *Id.* at 14-15.

27

28
**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1  Samsung Electronics makes much of the fact that they own less than 20% of Samsung SDI's

2  stock, and are represented by separate counsel in this matter.[91]  Samsung Electronics fails to note,

3  however, that it was only very recently that they retained separate counsel from Samsung SDI.[92]

4  In addition, contrary to Samsung Electronic's assertions, a review of Samsung's website confirms

5  Plaintiffs' allegations that the Samsung Electronics and Samsung SDI Defendants are all

6  members of a vertically integrated family, which they themselves refer to as the "Samsung

7  Group."  On its website, Samsung holds itself out as a "multi-faceted family of companies,"[93]

8  with Samsung Electronics touted as "[o]ur  flagship company,"[94] and Samsung SDI as one of the

9  affiliated companies "that make up SAMSUNG."[95]

10      In other words, Samsung Electronics and Samsung SDI are not the separate, independent

11  companies described by the Samsung Electronics Defendants in their motion to dismiss.

12  Moreover, the fact that Samsung Electronics owns a "mere 20%" of Samsung SDI's shares has

13  no bearing on Plaintiffs' well-pled allegations that Samsung Electronics directly participated in

14  the CRT Product price-fixing conspiracy, and "dominated and controlled the finances, policies

15  and affairs of Samsung SDI relating to the antitrust violations alleged."  IP CAC ¶¶ 64-70.  As

16  demonstrated above in Section I. E., Plaintiffs are not required to plead the elements of agency.

17  They need only place Samsung Electronics on notice that their claim is based on an agency

---

[91] Samsung Electronics Motion at 15.

[92] *Compare,* Docket No. 360, *Stipulation Re: Service of Process on Defendant Samsung Electronics Co., Ltd.,* dated August 18, 2008, signed by Sheppard, Mullin, Richter & Hampton, LLP as counsel for Samsung SDI America, Inc., Samsung SDI Co., Ltd., *and Samsung Electronics Co., Ltd.*, *with* Docket No. 452, *Notice of Appearance by Michael F. Tubach* of O'Melveny & Myers, LLP as counsel for Samsung Electronics Co., Ltd., dated May 13, 2009.

[93] *See* http://www.samsung.com/hk_en/aboutsamsung/corporateprofile/index.html.

[94] *See* http://www.samsung.comhk_en/aboutsamsung/index.html.

[95] *See* http://www.samsung.comhk_en/aboutsamsung/corporateprofile/affiliatedcompanies.html.

66

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1    theory.  *See Dion*, 2007 WL 3231738, *4.  Plaintiffs have done this.  Therefore, the Samsung

2    Electronics Defendants' separate motion to dismiss must be denied.

3        **G.  The IP CAC Alleges An Economically Plausible Conspiracy To Fix The Prices
              Of CRTs And CRT Finished Products**

4

5        As described above, Defendants argue that the conspiracy involved only CRTs, and not

6    CRT Finished Products.  As a corollary to this argument, Defendants Samsung Electronics,

7    Tatung Company of America, and Panasonic Corporation of North America assert that it is

8    economically implausible that they would have participated in a conspiracy to fix the price of

9    CRTs because they only manufactured CRT Finished Products and would have been harmed by

10   such a conspiracy.[96]  Once again, Defendants' attempt to re-write the IP CAC to suit their own

11   self-serving theory of Plaintiffs' claim must be rejected.  *See Knevelbaard Dairies,* 232 F.3d at

12   989-91 (holding that defendants may not ignore or re-draft plaintiffs' allegations).

13       As shown above in Section I. B., the IP CAC clearly alleges a conspiracy to fix the prices

14   of "CRT Products," which as defined in the Complaint, includes CRTs and CRT Finished

15   Products.  IP CAC ¶ 15.  Defendants' economic plausibility argument must be rejected for this

16   reason alone.  Moreover, a horizontal conspiracy to fix the price of CRT Products by vertically

17   integrated companies that manufacture both CRTs and CRT Finished Products makes perfect

18   economic sense.  Finally, whether or not the IP CAC states an economically plausible conspiracy

19   is not appropriate for resolution on a motion to dismiss.

20

21

22

---

23   [96] *See* Samsung Electronics Motion at 2 ("If the complaints are to be believed, the SE Defendants
24   conspired to increase the price of their components, which would have decreased their own profit
     margins."); Tatung Motion at 14 ("That TUS sold CRT Products…does not render TUS a
25   'knowing participant in the alleged conspiracy.'  [] Indeed, logically the reverse is true because
     TUS benefits when CRT manufacturers aggressively compete for supply contracts."); Panasonic
26   Motion at 6 ("[A]s a seller of finished televisions containing CRTs, PNA would likely be hurt by
     any such [CRT] conspiracy.").

27

                                              67
28

1

     **1.  A Horizontal Price-Fixing Conspiracy Among Vertically Integrated**
         **Manufacturers Of CRTs And CRT Finished Products Makes Perfect**

2
         **Economic Sense**

3
       Once one considers Plaintiffs' allegations as they have been alleged, and not as re-written

4
by Defendants, it becomes clear that a horizontal conspiracy among vertically integrated

5
manufacturers of CRTs and CRT Finished Products, who collectively control the market for all

6
products, makes perfect economic sense.  In this way, these vertically integrated companies

7
ensured that their affiliated downstream manufacturers of CRT Finished Products, such as the

8
Samsung Electronics Defendants, did not absorb the increased prices for CRTs.  Rather, the

9
overcharge was passed on by the downstream manufacturers to consumers through increased

10
prices for CRT Finished Products.  This allowed these vertically integrated companies to recoup

11
the benefits of their price-fixing at the CRT level and the CRT Finished Product level in the

12
market.  *See Standard Iron Works v. Arcelormittal*, 2009 U.S. Dist. LEXIS 49476, *67-69 (N.D.

13
Ill. June 12, 2009) (rejecting defendants' argument that the alleged conspiracy was practically

14
implausible because it involved both raw steel and downstream steel products because defendants

15
collectively controlled both the component product and the downstream products);  *In re Flat*

16
*Glass*, 385 F.3d at 358 ("[A]n agreement among oligopolists to fix prices at a supra-competitive

17
level, makes perfect economic sense").

18
       Further, as noted previously (*see* n.60, *supra*), the unity of interest between parent and

19
subsidiary discussed in *Copperweld,* while precluding a conspiracy between such entities, renders

20
their joint participation in a conspiracy with *other* entities highly plausible.  *Copperweld*, 467

21
U.S. at 771 n.18 ("[T]he ultimate interests of the subsidiary and the parent are identical, so the

22
parent and the subsidiary must be viewed as a single economic unit.").

23
       In addition, Plaintiffs allege that the CRT Product market was a mature, declining market,

24
where Defendants faced stagnant or decreasing demand with no prospect for market growth.  IP

25
CAC ¶¶ 130-131.  Moreover, CRT televisions and computer monitors were being rapidly

26
replaced by TFT-LCD and Plasma displays.  *Id.* ¶¶ 132-133.  The Defendants were thus facing

27
68

28

1    harsh market realities.  It is plausible that the Defendants would resort to non-competitive means

2    under these circumstances.  As Judge Connor noted in his recent order denying defendants'

3    motions to dismiss in *In re Chocolate Confectionary Products Antitrust Litigation,* "[p]laintiffs'

4    contention that defendants sought to increase revenue through non-competitive means is a

5    plausible reaction to harsh market realities." 602 F. Supp. 2d 538, 577 (M.D. Pa. 2009).

6          The Samsung Electronics Defendants' reliance on the Supreme Court's decision in

7    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) to support their

8    economic plausibility argument is misplaced.[97]  Aside from the fact that *Matsushita* was a

9    summary judgment case, it also involved an alleged predatory pricing scheme as opposed to a

10   price-fixing scheme.  "Inferences about predatory pricing are [] inherently weak because the

11   behavior of firms engaged in predatory pricing would largely mirror how firms in a competitive

12   market act: by cutting prices."  *In re Flat Glass,* 385 F.3d at 358.  Thus, inferring from

13   ambiguous evidence that firms are engaging in predatory pricing could "chill the very conduct

14   the antitrust laws are designed to protect." *Matsushita,* 475 U.S. at 594.

15         As one prominent antitrust commentator has explained:

16         *Matsushita* spoke in the context of a highly improbable twenty-year long
           predatory pricing conspiracy and required high quality evidence to permit
17         such a conspiracy to be presented to a jury. . . .  However, Matsushita itself
           said little about proof requirements in a case where underlying structural
18         evidence indicates that the offense is quite plausible and would be
           profitable for the defendants.
19

20
21   Herbert Hovenkamp, The Rationalization of Antitrust, 116 Harv. L. Rev. 917, 925-926

22   (2003) (reviewing Richard A. Posner, Antitrust Law (2d ed. 2001).

23         Here, in stark contrast to *Matsushita*, Plaintiffs allege that Defendants conspired to fix,

24   raise, maintain and/or stabilize the price of CRT Products through express agreements on price,

25   customer allocation and output restrictions.  IP CAC ¶ 156.  As described above, Plaintiffs'

26
     _____

27   [97] Samsung Electronics Motion at 8.

                                              69
28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
         **AND JOINT MOTIONS TO DISMISS THE IP CAC**
                         **MDL NO. 1917**

1 theory of conspiracy is not implausible; it makes perfect economic sense.  Moreover, unlike in

2 *Matsushita,* these activities could not reasonably be perceived as procompetitive.  Many courts

3 have found that in these circumstances, "more liberal inferences from the evidence should be

4 permitted than in *Matsushita* because the attendant dangers from drawing inferences recognized

5 in *Matsushita* are not present." *Petruzzi's IGA v. Darling-Delaware,* 998 F.2d 1224, 1232 (3d

6 Cir. 1993).[98]

7        The cases applying *Matsushita* at the pleadings stage are similarly inapposite because

8 none of them involved allegations of price fixing.  Rather, they involved alleged conspiracies that

9 were "highly improbable" or made no economic sense.  For example, in *DM Research, Inc. v.*

10 *Coll. Of Am. Pathologists,* 170 F.3d 53 (1st Cir. 1999),[99] the plaintiff alleged that defendants, two

11 non-profit organizations, conspired to set faulty minimum industry standards for reagent water

12 thereby limiting plaintiff's sales.  *Id.* at 54-55.  The court found the alleged conspiracy "highly

13 implausible" since the defendants had nothing to gain from such a scheme.  *Id.* at 56.

14 Significantly, the court distinguished the facts before it to a price-fixing scheme where the

15 economic motive is obvious: "[i]t is easy enough to understand why two manufacturers might

16 agree to charge above-market prices; if taken together they have market power, the agreement

17 can increase their profits." *Id.*

18        In *Brunson Communications, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 563 (E.D. Pa.

19 2002),[100] the plaintiff, a small television station, sued the company that measured television

20 viewership for allegedly conspiring with larger television stations to exclude them from certain

21 tests.  The court dismissed plaintiff's Section 1 claim for failure to allege the requisite concerted

22 conduct "for the simple reason that the supposed conspiracy 'makes no economic sense.'"  *Id.* at

23 _____

24 [98] *Accord In re Flat Glass,* 385 F.3d at 358.

25 [99] Samsung Electronics Motion at 9.

26 [100] Samsung Electronics Motion at 9; Panasonic Motion at 6.

27

28
70

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

564.  The court explained that there was no logical reason why the dominant party in the viewer measurement market would conspire with the larger television stations in the area to exclude plaintiff's station from the defendant's surveys, nor was there a plausible reason why the defendant would compromise the integrity of its measurements.  *Id.*  Here, in contrast, the allegations of the IP CAC describe market conditions that support an inference that collusive conduct was both plausible and in the economic interests of the alleged conspirators.[101]

### 2.  The Question Of Whether Plaintiffs Have Pled An Economically Plausible Conspiracy Presents Questions Of Fact That Cannot Be Resolved On A Motion To Dismiss

The Ninth Circuit has recently reaffirmed that the determination of whether an antitrust complaint states an economically plausible conspiracy presents questions of fact that cannot be resolved on a motion to dismiss:

> At this stage of a motion to dismiss for failure to state a claim, it is not our role to determine the soundness of Plaintiff's economic theory.  Even if we, as a savvy court, view actual proof of the facts pleaded in the [complaint] as improbable and conclude that recovery is remote and unlikely, the complaint should still proceed.

*Gilley Enterprises,* 561 F.3d at 1011 (*citing Twombly*, 550 U.S. at 556).

Apparently for this reason, the LG Defendants have not challenged the relevant product definition because they recognize that this is not the appropriate time to do so.  LG Motion at 2, n. 2 ("The LGE Entities do not concede that plaintiffs have alleged a proper market for antitrust

---

[101] *See In re Pressure Sensitive Labelstock,* 356 F. Supp. 2d 484, 494 (M.D. Pa. 2005) (distinguishing *Brunson* where plaintiffs had alleged an economically plausible price-fixing conspiracy); *see also U.S. Horticultural Supply, Inc. v. The Scotts Co.,* 2006 WL 1531407 (E.D. Pa. June 1, 2006) (same).  Defendants' other authorities are similarly distinguishable.  *United Magazine Co. v. Murdoch Magazines Distribution, Inc.,* 146 F. Supp. 2d 385 (S.D.N.Y. 2001) and *Cancall PCS v. Omnipoint Corp.,* 2000 WL 272309 (S.D.N.Y. Mar. 10, 2000) both involved allegations of predatory pricing by plaintiffs' exclusive suppliers. The courts dismissed the complaints because, as plaintiffs' exclusive supplier, it was entirely unnecessary for the defendants to engage in predatory pricing in order to charge the plaintiffs supracompetitive prices or put them out of business.

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1    purposes, and reserve all rights to contest the market allegations *at the appropriate time.*"

2    (emphasis added)).

3          Accordingly, the Court should reject Defendants' improper invitation to consider the

4    economic plausibility of Plaintiffs' theory that the conspiracy included both CRTs and CRT

5    Finished Products at the pleading stage.

6          **H.      Plaintiffs' Claims Are Timely**

7          The Hitachi, Toshiba, Philips, and LG Defendants contend that they withdrew from the

8    CRT business, and therefore from any alleged conspiracy at a time outside the statute of

9    limitations period.  They therefore seek dismissal on the grounds that the IP CAC fails to plead

10   fraudulent concealment with sufficient specificity.[102]

11         This argument fails at the most basic level because it relies upon Defendants' rewrite of

12   the IP CAC, which attempts to limit the conspiracy to CRTs only, and not CRT Finished

13   Products.  As described *supra* in the detailed summary of the IP CAC's allegations and Section I.

14   B., Plaintiffs allege a conspiracy on *CRT Products*, which is defined to include both CRTs *and*

15   CRT Finished Products.  IP CAC ¶ 15.  Since these Defendants do not (and cannot) argue that

16   they withdrew from the CRT Finished Product business, the statute of limitations was not

17   triggered, and their arguments must be rejected.

18         Plaintiffs also note that Defendants rely exclusively on federal law in support of their

19   arguments.  Plaintiffs have asserted a federal claim for injunctive relief as well as claims under

20   the laws of 22 states.  While federal law applies to the injunctive relief claim, Plaintiffs' state

21   //

22   //

23   //

24   //

25

26   [102]*See* Hitachi Motion at 18; Toshiba Motion at 19; Philips Motion at 16; LG Motion at 8.

27

28

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1    law claims are subject to state law limitations periods.[103]  Defendants' Joint Motion attacks the

2    state-law claims on limitations grounds on a state-by-state basis.[104]  By contrast, Defendants'

3    separate motions, whether by design or neglect, rely exclusively on federal authorities and assert

4    that the federal limitations statute controls.[105]  To the extent these Defendants intend to challenge

5    Plaintiffs' state law claims, they have failed to cite any state law.  Their arguments should

6    therefore be rejected.

7         Nor should the Court consider any arguments relating to state law raised by Defendants

8    for the first time on reply.  *See, e.g., U.S. ex rel. Giles v. Sardie*, 191 F.Supp.2d 1117, 1127 (C.D.

9    Cal. 2000) ("It is improper for a moving party to introduce new facts or different legal arguments

10    in the reply brief than those presented in the moving papers.").  Should the Court consider these

11    arguments, it should grant Plaintiffs leave to file a surreply.  *Bowoto v. Chevron Corp.,* C 99-

12    02506 SI, 2007 WL 2349338, *4 n.3 (N.D. Cal. Aug. 14, 2007) ("Though the Court has granted

13    plaintiffs the opportunity to respond via surreply to this and other late-raised arguments, the

14    Court looks with strong disfavor on legal arguments and facts raised for the first time in reply).[106]

---

[103] In a federal diversity action, claims based on state statutes must be filed within the relevant statute of limitations period applicable to each particular state. *See Walker v. Armco Steel Corp.*, 446 U.S. 740, 745 (1980).

[104] The Joint Defendants' statute of limitations argument in the Joint Motion is addressed separately in Section II. F *infra*.

[105]*See* Toshiba Motion at 19 ("The Plaintiffs' claims are subject to a four-year statute of limitations," citing 15 U.S.C. § 15b); Philips Motion at 16 ("Plaintiffs' *federal* claims are subject to a four year statute of limitations," citing 15 U.S.C. § 15b (emphasis added)); LG Motion at 8 ("Plaintiffs' claims are subject to a four-year statute of limitations," citing 15 U.S.C. § 15b). Hitachi does not expressly refer to the Sherman Act but, like the other three sets of defendants, relies exclusively on federal law and makes no mention whatsoever of the Plaintiffs' state law claims.

[106] *See also Crump v. City and County of San Francisco,* No. C06-07793 MJJ, 2007 WL 2220938, at *2 (N.D. Cal. Aug. 1, 2007) ("Rather than require Defendant to bring an additional motion, the Court granted Plaintiff leave to file a surreply to respond to Defendant's new arguments").

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
**AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1    The Defendants' arguments under federal law should also be rejected.  As a general

2    principle, the fraudulent concealment doctrine raises factual questions inappropriate for

3    resolution at the motion to dismiss stage.[107]   Further, Plaintiffs' allegations are pled with

4    sufficient specificity to withstand Defendants' motions, particularly since proof of the

5    concealment alleged is in the hands of Defendants.  Plaintiffs have pled the elements of

6    fraudulent concealment and the allegations are comparable to allegations deemed adequate by

7    courts in recent, similar proceedings.

8        Lastly, Defendants' withdrawal argument *presumes* withdrawal as a matter of law.  But,

9    as with fraudulent concealment, whether Defendants actually withdrew from the conspiracy

10   presents questions of fact not subject to resolution on a motion to dismiss.

### 1. Fraudulent Concealment Raises Factual Issues Not Ripe For Decision On A Motion To Dismiss.

12        In the Ninth Circuit, to establish fraudulent concealment a plaintiff must plead that: (1)

13   the defendant affirmatively misled it; (2) plaintiff had neither actual nor constructive knowledge

14   of the underlying facts; and (3) it used reasonable diligence to uncover those facts.  *Conmar*

15   *Corp. v. Mitsui & Co., Inc.,* 858 F.2d 499, 502 (9th Cir. 1988).

16        "These are all factual questions."  *In Re Coordinated Pretrial Proceedings in Petroleum*

17   *Products Antitrust Litig.,* 782 F. Supp. 487, 489 (C.D. Cal. 1992) (*citing Volk v. D.A. Davidson &*

18   *Co.,* 816 F.2d 1406, 1417 (9th Cir. 1987)).  Accordingly, a motion to dismiss is not the proper

19   vehicle to resolve the adequacy of fraudulent concealment allegations.  As Judge Illston stated in

20   the pending *TFT-LCD* antitrust proceedings:  "'[I]t is generally inappropriate to resolve the fact-

21   intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly when

22   the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands

---

[107] *See, e.g., Supermail Cargo, Inc., v. United States,* 68 F.3d 1204, 1206 (9th Cir. 1995) (because the applicability of the equitable tolling doctrine often depends on matters outside the pleadings, it "is not generally amenable to resolution on a Rule 12(b)(6) motion").

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1    of the alleged conspirators." *TFT-LCD I,* 586 F. Supp. 2d at 1120.  Many other courts have so

2    held.[108]

3         *Conmar,* upon which Defendants rely, itself addresses the issue in the context of an

4    appeal from summary judgment, as do other Ninth Circuit decisions.[109]  *Conmar,* 858 F.2d at

5    506.  Even at the summary judgment stage—let alone on a motion to dismiss, which requires the

6    court to rule strictly on the basis of the pleadings—"a defendant 'has an extremely difficult

7    burden to show that [fraudulent concealment allegations are] barred as a matter of law.'"  *In Re*

8    *Coordinated Pretrial Proceedings in Petroleum Products,* 782 F. Supp. at 489 (*quoting Volk,* 816

9    F.2d at 1417) (alteration in original).  On this ground alone Defendants' arguments should be

10   rejected.

### 2.  Plaintiffs Have Sufficiently Pled Fraudulent Concealment

12        Plaintiffs' fraudulent concealment allegations are adequate for purposes of a motion to

13   dismiss.  Courts in this District have upheld very similar allegations.

### a.  Plaintiffs Have Alleged Defendants' Affirmative Acts Designed To Mislead The Public And To Conceal Their Conspiracy

16        Plaintiffs have pled not only the content and instances of Defendants' substantive

17   agreements, but also Defendants' agreements to affirmatively mislead the public by concealing

18   their illegal activities.  For example, Plaintiffs have alleged Defendants' agreements "to keep

19   their meetings secret" (*see, e.g.,* IP CAC ¶¶ 140-164, 156(l)), and to conceal their conspiracy

20

---

21   [108] *See, e.g., In re Rubber Chemicals Antitrust Litig.,* 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007)
     ("[M]any courts have noted [this point] in the antitrust conspiracy context"); *Clemens v. Daimler*
22   *Chrysler Corp.,* 2006 WL 6022681, *6 (C.D. Cal. Apr. 20, 2006) ("[T]he Court finds that
     Plaintiffs' allegations with respect to equitable tolling based on fraudulent concealment are
23   sufficient to withstand Defendant's motion and that the issues raised with respect to the statute of
     limitations are more appropriately resolved in a motion for summary judgment.")
24

25   [109] *See, e.g., Thorman v. Seafoods Co.,* 421 F.3d 1090, 1094 (9th Cir. 2005), *Volk v. D.A.*
     *Davidson & Co.,* 816 F.2d at 1409 (both discussing fraudulent concealment on appeals from
26   summary judgments).

27

28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
     AND JOINT MOTIONS TO DISMISS THE IP CAC
     MDL NO. 1917**

1    through numerous specific agreements.  IP CAC ¶ 290(a)-(j).

2         The LG Defendants argue that a mere allegation that a conspiracy is self-concealing is

3    insufficient as a matter of law—that Plaintiffs "must establish that [their] failure to have notice of

4    [their] claim was the result of affirmative conduct by the defendant."  LG Motion at 12, citing

5    *Conmar*.  Plaintiffs have done exactly that.[110]  The IP CAC alleges *specific* concealing acts taken

6    by Defendants to conceal their conspiracy, including:

7         • refraining from taking written notes (IP CAC ¶ 290(d));
8         • giving false reasons for price increases (*Id.* ¶ 290(e));
          • agreeing among themselves on what to tell customers about price changes (*Id.* ¶
9           290(f));
10        • agreeing to quote different prices to give the illusion that prices were not fixed (*Id.*
            ¶ 290(g));
11        • agreeing on the content of public statements on capacity and supply (*Id.* ¶ 290(h));
            and
12        • agreeing to eliminate potentially suspicious references in expense reports (*Id.* ¶
            290(i)).

13

14        In addition, Plaintiffs specifically allege that LGE and LGETT participated in meetings

15   where these agreements to conceal the conspiracy were reached and that LGUSA was

16   represented at these meetings.  *Id.* ¶¶ 168-169.  Indeed, Plaintiffs allege that the "highest-ranking

17   executives from LG" attended a substantial number of these meetings.  *Id.* ¶ 168.

18        Plaintiffs make similar allegations with respect to Royal Philips, Philips Taiwan, PENAC,

19   and Philips Brazil (*Id.* ¶¶ 170-171); Toshiba Corporation, Toshiba Thailand, Toshiba America,

20   TAIP, TACPI, and TAEC (*Id.* ¶ 177-178); and Hitachi Ltd., Hitachi Displays, Hitachi Shenzhen,

21   Hitachi Asia, Hitachi America, and HEDUS.  *Id.* ¶¶ 179-180.

22

23   ───────────────

     [110] For this reason, *Rutledge v. Boston Woven Hose and Rubber Co.,* 756 F.2d 248 (9th Cir. 1978)
24   (LG Motion at 11) is also distinguishable.  Unlike here, in *Rutledge* the plaintiff's complaint
     contained only <u>one</u> averment on fraudulent concealment:  that "'Defendant has fraudulently
25   concealed the existence of the aforesaid price discrimination through the adoption of elaborate
     schemes, resorting to secrecy to avoid detection, and by denying that such discrimination or price
26   differential existed.'"  *Id.* at 250.

27
                                              76
28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
                  **AND JOINT MOTIONS TO DISMISS THE IP CAC**
                                **MDL NO. 1917**

1    Plaintiffs further allege that after 2001, Philips and LG participated in the CRT Product

2    conspiracy through their joint venture, LG.Philips Displays (*Id.* ¶¶ 168, 170), which itself also

3    participated in those meetings.  *Id.* ¶ 172.  Finally, Plaintiffs allege that after 2003 Toshiba

4    participated in the CRT conspiracy "through its joint venture with Panasonic, MTPD" which

5    likewise attended those meetings.  *Id.* ¶ 177.

6        **b.  Plaintiffs Have Alleged Their Inability to Discover the True Facts Despite**
            **Due Diligence**
7

8    Plaintiffs have also pled their inability, despite their reasonable diligence, to discover

9    Defendants' wrongful conduct sooner because of Defendants' fraudulent concealment.  IP CAC ¶

10   289.

11   The LG Defendants' argument that Plaintiffs had constructive knowledge of the

12   conspiracy is unpersuasive.[111]  Defendants focus on allegations of "unusual price movements in

13   the CRT Product market."  IP CAC ¶ 192.  This activity—and other activity described by

14   industry sources—were not of the type to put Plaintiffs on notice.  Even widespread industry

15   publicity of a similar complaint would not have been "*as a matter of law* tantamount to actual or

16   constructive knowledge" of Plaintiffs' claims.  *Conmar*, 858 F.2d at 504 (citation omitted)

17   (emphasis in original).[112]  Further, the question whether Plaintiffs had sufficient notice in any

18   event "involves factual issues" not to be resolved on a motion to dismiss.  *Id.*  ("The leap from

19   the plaintiffs' knowledge of the . . . complaint to actual or constructive knowledge of their cause

20   of action therefore involves factual issues.").

21   _____

22   [111]LG Motion at 12.

23   [112] LG cites to *In re Compact Disc Minimum Advertised Price Antitrust Litig.,* 138 F. Supp. 2d

24   25, 29 (D. Me 2001).  There, the court dismissed the plaintiffs' fraudulent concealment claim
     because the plaintiffs had alleged that "there were news reports concerning [an] FTC

25   investigation and [] private civil antitrust actions" and these should have aroused suspicion.  This
     kind of publicity is in stark contrast to industry reports.  Indeed, Plaintiffs timely filed following

26   publicity of international antitrust investigations into Defendants' dealings.  *See* IP CAC ¶¶ 203-
     221 (allegations of recent investigations).

27

28

77

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
**AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1    Finally, diligence is only meaningful "when facts exist that would excite the inquiry of a

2 reasonable person." *Id.*  Here too, whether the publicly available facts were "sufficient to excite"

3 Plaintiffs' inquiry presents factual questions.  *Id.* at 504-05.

4    *In re Rubber Chemicals* is instructive on this point.  There, like here, the defendants

5 allegedly had "engaged in a self-concealing conspiracy" that included "secret meetings to set

6 prices, agreement not to publicly discuss the nature of the scheme, destruction of documents that

7 might evidence their actions, and pretextual justifications for the inflated prices of rubber

8 chemicals." *In re Rubber Chemicals Antitrust Litig.,* 504 F. Supp. 2d at 788.  Refusing to dismiss

9 the action, Judge Jenkins held:  "Under these circumstances, Plaintiffs' allegation that they could

10 not have discovered the alleged conspiracy 'at an earlier date by the exercise of reasonable due

11 diligence because of the deceptive practices and techniques of secrecy employed by the

12 Defendants and their Co-Conspirators' to conceal the conspiracy [citation omitted] is a sufficient

13 allegation of due diligence." *Id.*  As Judge Jenkins noted:

14    Plaintiffs are not under a duty continually to scout around to uncover
   claims *which they have no reason to suspect they might have*."  (Internal
15    citation omitted.)  "*It is impossible to declare at this [motion to dismiss]
   stage that plaintiffs failed to exercise due diligence* to follow up on that
16    which may or may not have been sufficient to excite their suspicions.

17 *Id.* (citations omitted) (emphasis added).

18    **c.  The *TFT-LCD I* Court Upheld Similar Fraudulent Concealment
19       Allegations**

20    In addition to the cases cited above, Judge Illston found that both the direct and indirect

21 plaintiffs had sufficiently alleged fraudulent concealment on the basis of the very similar, albeit

22 less robust allegations than those contained in the IP CAC.  *TFT-LCD I,* 586 F. Supp. 2d at 1119,

23 1132.  The following chart compares the allegations in *TFT-LCD* and the IP CAC:

24

25

26

27
                                    78
28

| TFT-LCD (FLAT PANEL) I DIRECT AND INDIRECT PURCHASER ALLEGATIONS (586 F. Supp. 2d 1119, 1132) | IP CAC ALLEGATIONS |
|---|---|
| "[D]efendants concealed their price-fixing conspiracy through secret discussions about price and output." *Id.* at 1132.  (Indirect) | ¶ 141:  "The CRT conspiracy was effectuated through a combination of group and bilateral meetings . . . [that] took place on an informal, ad hoc basis."<br>¶ 145:  "The group meetings among the participants in the CRT price-fixing conspiracy were referred to by the participants as 'Glass Meetings' or 'GSM.'"<br>¶ 156:  "The agreements reached at the Glass Meetings included:<br>a. agreements on CRT Product prices, including establishing target prices, 'bottom' prices, price ranges, and price guidelines . . . ;"<br>i. agreements to allocate both overall market shares and share of a particular customer's purchases; . . ."<br>l. agreements to keep their meetings secret."<br>¶ 289:  "Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.  In addition, the conspiracy was by its nature self-concealing." |
| Defendants provided "numerous pretextual and false justifications disseminated to consumers regarding defendants' price increases." *Id.* at 1132.  (Indirect)<br>Defendants provided "numerous specific pretextual reasons for the inflated prices of LCDs (reasons such as undercapitalization leading to insufficient capacity, undersupply due to demand for larger panels, shortages due to late expansion of production lines, and rapid demand growth)." *Id.* at 1119.  (Direct) | ¶ 155:  Because "the market for CRT products was a mature one, and there "were slim profit margins," "Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers."<br>¶ 156:  "The agreements reached at the Glass Meetings [among Defendants] included: . . .<br>d. agreements as to what to tell customers about the reason for a price increase; . . .<br>h. agreements to coordinate uniform public statements regarding available capacity and supply; . . .<br>¶ 290:  "Defendants engaged in a successful, illegal price-fixing conspiracy with respect to CRT Products, which they affirmatively concealed, in at least the following respects:<br>e. By giving false and pretextual reasons for their CRT Product price increases during the relevant period and by describing such |

79

| | pricing falsely as being the result of external costs rather than collusion;<br>f. By agreeing among themselves on what to tell their customers about price changes, and agreeing upon which attendee would communicate the price change to which customer;<br><br>g. By agreeing among themselves to quote higher prices to certain customers than the fixed price in effect to give the appearance that the price was not fixed;<br><br>h. By agreeing among themselves upon the content of public statements regarding capacity and supply;<br><br>i. By agreeing among themselves to eliminate references in expense reports which might reveal the existence of their unlawful meetings. . . ." |
|---|---|
| "[P]laintiffs were unaware of their claims and discovered them as a result of investigations by the DOJ and other antitrust regulators." *Id.* at 1119. (Direct) | ¶ 289:  "Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, that Defendants were violating the law as alleged herein until shortly before this litigation was commenced.  Nor could Plaintiffs and the Class members have discovered the violations earlier than that time because Defendants conducted their conspiracy in secret . . . ." |
| "Defendants engaged in a secret conspiracy that did not give rise to facts that would put plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices for TFT-LCDs." *Id.* at 1119.  (Direct) | ¶ 289:  "Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.  In addition, the conspiracy was by its nature self-concealing." |
| "[D]efendants agreed "not to publicly discuss the nature of the scheme and gave pretextual justifications for the inflated prices of TFT-LCDs in furtherance of the conspiracy." *Id.* at 1119.  (Direct)<br>"[D]efendants concealed their price-fixing conspiracy through . . . an agreement not to discuss publicly the nature of their price-fixing agreement." *Id.* at 1132.  (Indirect) | ¶ 290:  "Defendants engaged in a successful, illegal price-fixing conspiracy with respect to CRT Products, which they affirmatively concealed, in at least the following respects:<br>a. By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme, and by agreeing to expel those who failed to do so;<br>b. By agreeing among themselves to limit the number of representatives from each |

80

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

| | |
|---|---|
| | Defendant attending the meetings so as to avoid detection;<br>c. By agreeing among themselves to refrain from listing the individual representatives of the Defendants in attendance at meetings in any meeting report;<br>d. By agreeing among themselves to refrain from taking meeting minutes or taking any kind of written notes during the meetings;<br>e. By giving false and pretextual reasons for their CRT Product price increases during the relevant period and by describing such pricing falsely as being the result of external costs rather than collusion;<br><br>f. By agreeing among themselves on what to tell their customers about price changes, and agreeing upon which attendee would communicate the price change to which customer;<br><br>g. By agreeing among themselves to quote higher prices to certain customers than the fixed price in effect to give the appearance that the price was not fixed;<br><br>h. By agreeing among themselves upon the content of public statements regarding capacity and supply;<br><br>i. By agreeing among themselves to eliminate references in expense reports which might reveal the existence of their unlawful meetings; and<br><br>j. By agreeing on other means to avoid detection of their illegal conspiracy to fix the prices of CRT Products." |
| In this context, plaintiffs "could not have discovered through the exercise of reasonable diligence" the alleged conspiracy." *Id.* at 1119.  (Direct) | 288:  "Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct against Plaintiffs and the Classes."<br>¶ 289:  "Plaintiffs did not discover, and could not discover through the exercise of reasonable diligence, that Defendants were violating the law as alleged herein until shortly before this litigation was commenced." |

81

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1

2

### 3.  Plaintiffs Have Alleged Fraudulent Concealment by Each Defendant Engaged in the Conspiracy

3

4

Defendants, and the LG Defendants in particular, assert that Plaintiffs must plead that

"each individual defendant actively misled the plaintiffs."[113]  To the contrary, Plaintiffs need

5

only plead allegations specific to each Defendant alleging its role.  They need not plead each

6

Defendant's involvement in "elaborate detail."  *TFT-LCD I*, 586 F. Supp. 2d at 1117.  Plaintiffs

7

have pled with sufficient particularity that each Defendant was implicated in the conspiracy.

8

Indeed, the IP CAC includes specific allegations regarding both the timing of the

9

conspiracy and the role of Defendants.  For example, Plaintiffs allege:

10

11

12

- "Between at least 1996 and 2001, Defendants Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in several Glass Meetings. . . .  Hitachi never effectively withdrew from this conspiracy."  IP CAC ¶ 179.

13

14

15

16

17

18

19

- "Between at least 1995 and 2003, Defendant Toshiba, through Toshiba Corporation and TDDT, participated in several Glass Meetings.  After 2003, Toshiba participated in the CRT conspiracy through its joint venture with Panasonic, MTPD.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRT Products.  Toshiba never effectively withdrew from this conspiracy."  *Id.* ¶ 177.  Toshiba Corporation's alleged wholly-owned subsidiaries, "Toshiba America, TAIP, TACP, TACPI," and TAEC, Toshiba America's alleged wholly-owned subsidiary, "were active, knowing participants in the alleged conspiracy."  *Id. ¶* 178.

20

21

22

23

24

25

- "Between at least 1996 and 2001, Defendant Philips, through Royal Philips, Philips Taiwan, and PEIL participated [in] at least 100 Glass Meetings at all levels.  After 2001, Philips participated in the CRT Product conspiracy through its joint venture with LG, LG Philips Displays (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other defendants.  Through these discussions, Philips agreed on price and supply levels for CRT Products.  Philips never effectively withdrew from this conspiracy."  *Id.* ¶ 170.  PENAC, Philips Brazil, and PCEC were represented at those meetings and were a

26

27

---

[113] LG Motion at 10.

28

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1

2
party to the agreements entered at them . . . [and] were active, knowing participants in the alleged conspiracy." *Id.* ¶ 171.

3

4

5
- "Between at least 2001 and 2006, Defendant LP Displays participated in at least 100 Glass Meetings at all levels.  A substantial number of these meetings were attended by high level executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of defendants LG and Philips."  *Id.* ¶ 172.

6

7

8

9

10

11
- "Between at least 1995 and 2001, Defendant LG through LG Electronics, Inc. and LGETT, participated [in] at least 100 Glass Meetings at all levels.  After 22001, LG participated in the CRT Product conspiracy through its joint venture with Philips, L.G. Philips Displays (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG.  . . .  Through these discussions, LG agreed on prices and supply levels for CRT Products.  LG effectively withdrew from this conspiracy."  *Id.* ¶ 168.  "Defendant LGUSA was represented at those meetings and was a party to the agreements entered at them."  *Id.* ¶ 169.

12

13

14

15
In sum, "[t]he [IP CAC] allege[s] a complex, multinational price-fixing conspiracy and, taken as a whole, [it] sufficiently allege[s] each defendant's participation in that conspiracy, as well as present[s] a factual basis for the allegations of agency."  *TFT-LCD II,* 599 F. Supp. 2d at 1185.

16

17
### 4.  The Question Of Whether Defendants Withdrew From The Conspiracy Cannot Be Resolved As A Matter of Law

18

19

20
Relying on *Morton's Market, Inc. v. Gustafson's Dairy, Inc.,* 198 F.3d 823 (11th Cir. 1999), the Hitachi Defendants, Toshiba Defendants, Philips Defendants, and the LG Defendants all argue that they withdrew from the CRT industry and thereby disassociated from the conspiracy outside of the limitations period.

21

22

23

24

25
This argument is incorrect, both legally and factually.  First, withdrawal from a conspiracy only safeguards a defendant if the statute of limitations has run.  Fraudulent concealment tolls the statute.  Second, whether any of these defendants *actually* abandoned the conspiracy is a question of fact.  Mere withdrawal from the industry is not sufficient as a matter of law to indicate abandonment of the conspiracy.

26

27

28

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC MDL NO. 1917**

### a.  Fraudulent Concealment Tolls the Statute of Limitations Even As To Defendants Who Withdrew From The Conspiracy

*Morton's,* an antitrust case against large Florida dairy producers, involved an appeal from a summary judgment granted on limitations grounds.  The decision discusses fraudulent concealment and the effect of withdrawal from a conspiracy.  In their portrayal of *Morton's,* Defendants omit pivotal language attesting that a defendant who has fraudulently concealed its role in a conspiracy remains liable for all acts furthering the conspiracy prior to withdrawal.

*Morton's* expressly states that withdrawal from a conspiracy alone is not a complete defense—conspirators remain liable for the damages inflicted by their acts in furtherance of the prior unlawful agreement:

> A conspirator who withdraws from the conspiracy is no longer a member of the conspiracy and the subsequent acts of the conspirators usually do not bind him. . . . *The ex-conspirator remains liable, however, for his previous agreement* and all damages inflicted by the acts he committed prior to his withdrawal.  *Withdrawal, therefore, is not a complete defense to the charge of conspiracy.*

*Morton's*, 198 F.3d at 837 (citations omitted) (emphasis added).  A conspirator also remains liable for the subsequent acts of his former co-conspirators when a continuing conspiracy is alleged.  *Id.*

Withdrawal "becomes a complete defense *only* when coupled with the defense of the statute of limitations."  *Id.* (emphasis added).  Defendants argue that, under *Morton's,* a conspirator "cannot be held liable for the acts of the other conspirators after he withdrew because his withdrawal effectively ended his membership in the conspiracy."  *Id.*  The devil is in the details, and Defendants have overlooked a footnote containing an important caveat:  The fraudulent concealment doctrine tolls the statute of limitations, rendering the withdrawing defendant liable "for all damages inflicted by the conspiracy" by acts occurring before withdrawal.  As *Morton's* observed with respect to two defendants in that case:

84

1

2

3

4

> These actions may also be timely-filed against both [defendants who sold their businesses outside the limitations period] under the theory of fraudulent concealment.  Under this theory, they would be liable for all damages inflicted by the conspiracy so long as plaintiffs timely filed after they discovered or should have discovered their claims.

5

6

*Id.* at n.24.  In fact the *Morton's* court went as far as to amend its opinion to clarify this point:

7

8

9

> As to [defendant] Pet, we hold that it effectively withdrew from the conspiracy in 1985 and, as to it, these actions are not timely-filed *unless the statute was equitably tolled by fraudulent concealment.  If so, Pet would be liable for any price-fixing activity prior to its withdrawal.*

10

11

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.,* 211 F.3d 1224 (11th Cir. 2000) (emphasis in original).[114]

12

13

14

15

16

17

Significantly, *In re Rubber Chemicals* relied on the *Morton's* amended opinion to conclude that: "Even if [defendant] Eisenberg could establish at the motion to dismiss stage that he withdrew from the conspiracy at the end of 2001—a question that the Court does not reach— *Plaintiffs' allegations of fraudulent concealment would prevent the statute of limitations as to Eisenberg's conduct from beginning to run* until October 2002."  *In re Rubber Chemicals,* 504 F. Supp. 2d at 790 (emphasis added), citing *Morton's,* 211 F.3d at 1224.

18

19

20

21

22

23

Plaintiffs here allege that they "did not discover, and could not discover through the exercise of reasonable diligence" Defendants' violations until "shortly before this litigation was commenced," because "Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities" as further alleged in the complaint.  IP CAC ¶ 289.  Because Plaintiffs allege fraudulent concealment and timely filed upon discovery of their claims, their action is timely.

24

25

26

27

28

---

[114] Defendants do not cite to this amended opinion.  *See, e.g.,* LG Motion at 9 (quoting the court's conclusion from the original opinion).

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1  Defendants remain liable on a fraudulent concealment theory for their own and their co-

2  conspirators' acts prior to withdrawal.

### b. The Question Of Whether Defendants Effectively Withdrew From The Conspiracy Presents Questions Of Fact That Cannot Be Resolved On A Motion To Dismiss

5  The foregoing discussion assumes *arguendo* that Defendants abandoned the conspiracy.

6  Contrary to Defendants' position, merely exiting a business is not sufficient in itself to establish

7  withdrawal from a conspiracy.  Whether Defendants *actually* withdrew from the conspiracy

8  presents questions of fact that cannot be resolved on these motions to dismiss.[115]

9  As recognized in *Morton's* (as noted, a case all Defendants rely upon), the defense of

10  withdrawal requires that a party not only cease to participate but also affirmatively withdraw, by

11  taking "affirmative steps, inconsistent with the objects of the conspiracy, to *disavow or to defeat*

12  the conspiratorial objectives."  *Morton's,* 198 F.3d at 838 (emphasis in original).  "The law has

13  given effect to a conspirator's abandonment of the conspiracy only where the conspirator can

14  demonstrate that he retired from the business, severed all ties to the business, and deprived the

15  remaining conspirator group of the services which he provided to the conspiracy."  *Id.* at 839.

16  The issue here is not merely whether Defendants withdrew from the CRT industry, as

17  Defendants imply, but also whether: (1) a conspiracy existed; (2) Defendants withdrew from the

18  conspiracy; and (3) did so *affirmatively*—questions of fact that cannot be resolved on this

---

22  [115] Defendants, who would like to see this issue resolved as a matter of law, imply that Plaintiffs
23  have conceded the point. *See, e.g.,* Hitachi Motion at 18 (All claims against Hitachi, Ltd. must be dismissed as time-barred because "Plaintiffs concede that Hitachi, Ltd. 'effectively' withdrew
24  from the industry in 2002") (emphasis added).  Plaintiffs have done no such thing.  Alleging a defendant's withdrawal from the industry is a far cry from a concession that it abandoned the
25  conspiracy alleged.  Indeed, Plaintiffs specifically allege that each of these Defendants *did not*
26  withdraw from the conspiracy.  *See* IP CAC ¶ 168 (LG); ¶ 170 (Philips); ¶ 177 (Toshiba); ¶ 179 (Hitachi).

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1    motion.[116]  As in *Morton's*, here too factual issues exist with respect to whether Defendants

2    "'retired' and totally severed" their ties with the price-fixing conspiracy; continued to "assist or

3    participate in the price-fixing activities" of their alleged co-conspirators; and communicated the

4    fact that they would no longer "lend [their] services to the conspiracy."  *Id.*

5           For example, Plaintiffs here allege that the parents in the four sets of defendant entities

6    continued to control wholly-owned subsidiaries and other related entities that were engaged in

7    the CRT business.[117]  Plaintiffs allege as follows:

8          *Hitachi:*

9          • Hitachi America and Hitachi Asia are wholly-owned and controlled subsidiaries of
             Hitachi, Ltd.  IP CAC ¶¶ 90, 91.  HEDUS is a subsidiary of Hitachi Displays and
10            Hitachi, Ltd. *Id.*¶ 89.  Hitachi Shenzhen was a subsidiary of Hitachi Displays.  *Id.*
             ¶ 92.
11

12         • In 2002, all the departments of planning, development, design, manufacturing and
             sales concerned with the display business of Hitachi, Ltd. were spun off to create a
13            separate company called Hitachi Displays, Ltd.  *Id.* ¶ 88.  Until November 8,
             2007, a mere two weeks before the end of the Class Period, Hitachi Displays
14            owned a 25% share in Hitachi Shenzhen, an entity that manufactured and sold
             CRTs. Hitachi Displays "dominated and controlled the finances, policies and
15            affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this
             Complaint."  *Id.* ¶ 92.
16

17         • Hitachi, Ltd. "dominated and controlled the finances, policies, and affairs," of
             other alleged co-conspirator defendants, including Hitachi Displays (*Id.* ¶ 88),
18            HEDUS (*Id.* ¶ 89), Hitachi America (*Id.* ¶ 90), Hitachi Asia (*Id.* ¶ 91), and Hitachi
             Shenzhen (*Id.* ¶ 92) "relating to the antitrust violations alleged in this Complaint."
19            *Id.* ¶ 88.

20

21

22   ─────────────────────

23   [116] *Morton's*—which, like *Conmar,* was decided on appeal from summary judgment, not
     dismissal pursuant to a Rule 12 (b)(6) motion)—makes this point abundantly clear.  *Morton's,*
24   198 F.3d at 839 (discussing, "Did [defendant] Pet effectively withdraw?").

25   [117] The LG Defendants argue that LGE's purported withdrawal also constituted a withdrawal by
     LGUSA and LGETT since Plaintiffs allege that LGE dominated these companies.  LG Motion at
26   8 n.9.  But the withdrawal of the former would not necessarily compel withdrawal of the latter,
     and in any event presents a question of fact that cannot be resolved on this motion.
27                                              87

*Toshiba:*

- Toshiba America and TDDT are wholly-owned and controlled subsidiaries of Toshiba Corporation (*Id.* ¶¶ 73, 78), and TACP, TACPI, TAIP, and TAEC are wholly-owned and controlled subsidiaries of Toshiba America, and through it of Toshiba Corporation.  *Id.* ¶¶ 74-77.

- Toshiba Corporation "dominated and controlled the finances, policies, and affairs" of defendants Toshiba America, TACP, TACPI, TAIP, and TDDT "relating to the antitrust violations alleged in this Complaint."  *Id.* ¶¶ 73-78.

*Philips:*

- PENAC and Philips Brazil are wholly-owned and controlled subsidiaries of Royal Philips.  *Id.* ¶¶ 55, 59.  PEIL, PCEC, and Philips Electronics Taiwan are subsidiaries of Royal Philips.  *Id.* ¶¶ 56-58.

- Royal Philips "dominated and controlled the finances, policies, and affairs" of defendants PENAC, PEIL, PCEC, Philips Electronics Taiwan, and Philips Brazil "relating to the antitrust violations alleged in this Complaint."  *Id.* ¶¶ 55-59.

*LG:*

- LGEUSA and LGETT are wholly-owned and controlled subsidiaries of LG Electronics.  *Id.* ¶¶ 51-52.

- LG Electronics "dominated and controlled the finances, policies, and affairs" of defendants LGEUSA and LGETT "relating to the antitrust violations alleged in this Complaint."  *Id.* ¶¶ 51-52.

In addition, Plaintiffs allege that Toshiba, LG and Philips established joint ventures *with co-conspirators,* and that *through them* they continued to participate in the CRT conspiracy:

- In 2002, Toshiba Corporation "entered into a joint venture with Defendant Panasonic Corporation called MT Picture Display Co., Ltd. in which the entities consolidated their CRT businesses."  *Id.* ¶ 72.[118]  "After 2003, Toshiba participated in the CRT conspiracy through its joint venture with Panasonic, MTPD."[119]  *Id.* ¶ 177.

---

[118] Toshiba's reference to a press release (Toshiba Motion at 18) is improper.  The press release is neither referenced in the CAC, nor subject to judicial notice under FRE 201.  *See, e.g., Branch v. Tunnel,* 14 F.3d 449, 453 (9th Cir. 1994), *overruled on other grounds* ("Generally, a district may not consider any material beyond the pleading in rule on a Rule 12(b)(6) motion.")

[119] Notably, Panasonic Corporation does not argue that they effectively withdrew from the conspiracy when they exited the CRT business, along with Toshiba Corporation, in 2003.  The

88

1

2        • In 2001, Royal Philips entered into "a 50/50 CRT joint venture with defendant LG

3          Electronics, Inc., forming Defendant LG Philips Displays." *Id.* ¶ 54.  "After 2001,
           Philips participated in the CRT Product conspiracy through its joint venture" with

4          LG, LG.Philips Displays (n/k/a LP Displays)."  *Id.* ¶ 170.

5        • In 2001, LG Electronics "transferred its CRT business to a 50/50 joint venture

6          with LP Displays.  *Id.* ¶ 50.  "After 2001, LG participated in the CRT Product
           conspiracy through its joint venture" with Philips, LG.Philips Displays (n/k/a LP

7          Displays)."  *Id.* ¶ 168.

8        Thus, factual issues exist with respect to Defendants' continuing financial stake in the

9   remaining members of the conspiracy and their continuing role in the conspiracy itself.  These

10  issues cannot be resolved at this stage of the proceedings.

11              **c.  Defendants' Remaining Authorities Are Also Inapposite**

12                   **i.    Hitachi**

13       Hitachi's remaining authorities stand for the proposition that Plaintiffs may not assert

14  fraudulent concealment by one defendant as a means to toll the statute of limitations against other

15  defendants.  *See, e.g, Barker v. Am. Mobil Power Corp.,* 64 F.3d 1397, 1402 (9th Cir. 1995).[120]

16       In *Barker*—yet another summary judgment case—the plaintiffs sought to invoke the

17  fraudulent concealment doctrine against defendants who themselves had not committed acts of

18  fraud or concealment.[121]   *In re Urethane Antitrust Litig.,* 235 F.R.D. 507, 516-18 (D. Kan. 2006)

19  is similarly distinguishable.  Contrary to Hitachi's assertion and as shown above, Plaintiffs have

20

21  only difference between Panasonic Corporation and Toshiba Corporation is that Panasonic
    Corporation owned 64.5% of their joint venture MTPD, and Toshiba owned the other 35.5%.  On

22  April 3, 2007, only a matter of months before the end of the class period, Panasonic Corporation
    purchased Toshiba's 35.5% stake in MTPD, making it a wholly-owned subsidiary of Panasonic

23  Corporation.

24
    [120] Hitachi Motion at 18-19.
25
    [121] *See also* Hitachi's other cited authorities, *Greenwald v. Manko,* 840 F. Supp. 198, 203
26  (E.D.N.Y. 1993) (same); *Metz v. Union Bank,* 416 F. Supp. 2d 568, 579 (N.D. Ohio 2006)
    (same).
27
                                              89
28

1    "adequately set forth the who, what, where, and when of the defendants' allegedly false and

2    pretextual reasons for price increases."  Plaintiffs have also alleged that Hitachi, Ltd. *itself*

3    participated in the concealment—that it was party to the agreement to keep meetings secret

4    reached at the Glass Meetings.  IP CAC ¶ 179 ("Between at least 1996 and 2001, Defendant

5    Hitachi, *through Hitachi, Ltd.,* Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated

6    in several Glass Meetings"); *Id.* ¶ 156(l) ("The agreements reached at the Glass Meetings

7    included: agreements to keep their meetings secret"); *see also id.* ¶¶ 164-165, 179, 290.

8    Again, whether Defendants "effectively withdrew" from the conspiracy is a question of

9    fact not susceptible to resolution at this early stage of these complex proceedings.

10                         **ii.    Toshiba**

11   Toshiba cites to five inapposite criminal cases decided on appeals from convictions for

12   mail fraud or RICO conspiracy.[122]  These cases address withdrawal as a defense to criminal fraud

13   or conspiracy charges, and, unlike here, they involved the presentation of evidence.

14   Even assuming the applicability of these cases, the sole Ninth Circuit authority among

15   them, *United States v. Lothian,* 976 U.S. 1257 (9th Cir. 1992), foreshadows *Morton's* test for

16   withdrawal.  It holds that a defendant abandoning a conspiracy must either "disavow the unlawful

17   goal of the conspiracy, affirmatively act to defeat the purpose of the conspiracy, or take 'definite,

18   decisive, and positive' steps to show that the [defendant's] disassociation from the conspiracy is

19   sufficient."  *Id.* at 1261 (citation omitted).  "[O]nce an overt act has taken place to accomplish the

20   unlawful objective of the agreement, the crime of conspiracy is complete and the defendant is

21   liable despite his later withdrawal."  *Id.* at 1262.

22   Significantly, *Lothian* emphasized that a defendant's continuing financial interest in an

23   illegal venture precludes a finding that it withdrew from the conspiracy.  *Id.* at 1264 (citing

24   *Reisman v. United States,* 409 F.2d 789, 793 (9th Cir. 1969)).  *Reisman* held that a defendant who

25   _____

26   [122] Toshiba Motion at 19.

27

28
**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
**AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1    resigned his positions as president and director of a fraudulent land sale enterprise and ceased to

2    participate in the company's day-to-day business operations, still did not terminate his role in the

3    conspiracy.  The defendant remained a major stockholder and "took no affirmative action to

4    disavow or defeat the promotional activities which he had joined in setting in motion.  We think

5    more was required to terminate his liability for the continuing conduct of his confederates." *Id.*

6                            **iii.    Philips and LG**

7           The Philips and LG Defendants also rely on criminal cases involving convictions for

8    criminal conspiracy under the Sherman Act or the Narcotic Drugs Import and Export Act.[123]

9    Further, these decisions also rested on the presentation of evidence—they were not dismissals on

10   the pleadings.  *See, e.g., United States v. Gypsum, Co.,* 438 U.S. 422, 463-6 (trial court gave

11   erroneous jury instructions); *United States v. Nippon Paper Indus. Co.,* 62 F. Supp. 2d 173, 190

12   (D. Mass. 1999) (discussing "*evidence* that [defendant] Jujo did not follow through as a member

13   of the conspiracy, and surely had withdrawn") (emphasis added); (discussing whether "the

14   *evidence* established as a matter of law that [defendants] withdrew from the conspiracy")

15   (emphasis added); *United States v. Borelli,* 336 F.2d 376, 388 (2d Cir. 1964) (reviewing evidence

16   presented to jury).

17          The LG Defendants also attack the IP CAC on the ground that it does not support alter

18   ego or agency theories.[124]  As discussed above in Section I. E., Plaintiffs do not rely on an alter

19   ego theory of liability, and they have sufficiently alleged agency.  The LG Defendants' remaining

20   authorities are factually distinguishable.  *See, e.g., Suckow Borax Mines Consolid., Inc. v. Mitsui*

21   *& Co. (USA) Inc.,* 185 F.2d 196, 209 (9th Cir. 1950) (on appeal from summary judgment, court

22   held that "appellants' bare allegation of 'fraudulent concealment' [wa]s but a conclusion of law"

23   and "undisputed facts showing the extent of Suckow's knowledge (discussed above) clearly

24   ───────────────────

25   [123]*See* Philips Motion at 16-18; LG Motion at 8-9.

26   [124]LG Motion at 13-15.

27                                    91

28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
     **AND JOINT MOTIONS TO DISMISS THE IP CAC**
     **MDL NO. 1917**

1    dispel[led] the claim of concealment"); *In re Milk Pros. Antitrust Litig.*, 84 F. Supp. 2d 1016,

2    1024 (D. Minn. 1997) (plaintiffs failed to allege acts of concealment and failed to allege their

3    own due diligence, asserting that it was not an element of the claim); *In re Bath and Kitchen*

4    *Fixtures Antitrust Litig.*, No. 05-cv-00510 MAM,, 2006 WL 2038605, *8 (E.D. Pa. July 19,

5    2006) (sole allegation of concerted action was allegation "in the most general terms" that "the

6    defendants conspired to fix the prices of bath and kitchen fixtures and carried out that

7    conspiracy"); *Moreco Energy, Inc. v. Penberthy-Houdaille, Inc.,* No 86 C 20153, 1998 WL

8    124928, *5 (N.D. Ill. Oct. 21, 1988) (counterclaim for fraudulent concealment contained only

9    general allegation of intentional concealment that certain vehicles and equipment were

10   contaminated with PCBS, and contained no details regarding what was concealed, when and by

11   whom.  In contrast, Plaintiffs have made specific allegations of fraudulent concealment here.

12
13   **I.      The LG Defendants' Rule 12(e) Motion For A More Definite Statement
             Should Also Be Denied**

14   As an alternative to their Rule 12(b)(6) motion for failure to state a claim, the LG

15   Defendants also move pursuant to Fed. R. Civ. P. 12(e) for an order requiring Plaintiffs to

16   provide a more definite statement of their claim.[125]  This request should also be denied.  A more

17   definite statement is appropriate only as to a complaint "which is so vague or ambiguous that the

18   party cannot reasonably prepare a response."  Fed. R. Civ. P. 12(e).  The rule, on its face, is

19   designed to strike at *unintelligibility* in a pleading, not a claimed lack of detail.  Neither is it

20   proper to use a motion for a more definite statement as a discovery tool.  Because the IP CAC

21   more than satisfies the notice pleading requirements of Rule 8(a), a more definite statement is

22   unwarranted.  Therefore, LG's motion for a more definite statement should be denied.

23
24
25
26   _____
27   [125]LG Motion at 19-21.

28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
       AND JOINT MOTIONS TO DISMISS THE IP CAC
       MDL NO. 1917**

## II.     Defendants' Joint Motion To Dismiss Must Be Denied

### A.  Defendants' Arguments For Dismissal Under The FTAIA And Under The Commerce And Supremacy Clauses Of The Constitution Are Without Merit

Defendants contend that this Court does not have subject matter jurisdiction over Plaintiffs' federal injunctive relief claim (15 U.S.C. § 26) under the Federal Trade Antitrust Improvement Act ("FTAIA").  The same restraints, they argue, also apply to Plaintiffs' state law claims under the Supremacy Clauses of the Constitution.  Defendants' arguments must be rejected because they are based on a fundamental mischaracterization of the IP CAC.  Plaintiffs allege a *CRT Product* conspiracy that was carried out both here in the U.S. and abroad, involved a substantial amount of import commerce, and targeted and injured U.S. consumers.  Therefore, the FTAIA does not apply.[126]

The FTAIA is a limited exception to the Sherman Act.  The FTAIA provides that (1) conduct involving the U.S. import market is *automatically* encompassed within the reach of the Sherman Act without further inquiry, by operation of the FTAIA's first clause; and (2) foreign conduct (whether involving exports or other commerce with foreign entities) is actionable if the conduct created a "direct, substantial and reasonably foreseeable effect" on U.S. commerce, import commerce, or certain export commerce, and that effect gives rise to a Sherman Act claim ("domestic effects exception").[127]  Both of these limitations on the FTAIA apply to the facts alleged in this case.  Moreover, this federal statute does not preempt nor explicitly modify the state antitrust laws.  At most, it applies a "direct, substantial, and reasonably foreseeable effect" test to state law claims involved foreign commerce.

Unlike *Empagran* and the lower court decisions cited by the Defendants, which involved foreign plaintiffs seeking to invoke the jurisdiction of U.S. courts for injury they sustained

---

[126] The Joint Defendants incorporated by reference their FTAIA argument in the Joint Motion to Dismiss the Direct Purchaser Consolidated Amended Complaint.  Therefore, Plaintiffs incorporate by reference the Direct Purchasers' Opposition to Defendants' FTAIA argument.

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

overseas, this case is brought by U.S. plaintiffs only, and alleges a conspiracy that was carried out in part in the U.S., and that unquestionably targeted and injured U.S. consumers.  *F. Hoffman-LaRoche v. Empagran S.A.,* 542 U.S. 155 (2004).  As the Department of Justice stated: "This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices."  IP CAC ¶ 222.  The FTAIA makes it clear that when consumers *in this country* sustain injury from antitrust violations, the statute does not apply.  15 U.S.C. §6(a)(1).

### 1.   The FTAIA Does Not Apply Because The Alleged CRT Product Conspiracy Was Carried Out In Part In The United States

The Joint Defendants contend that this Court does not have subject matter jurisdiction under the FTAIA because "[t]he IP-CAC . . . is directed at alleged foreign agreements to fix the overseas prices of CRTs sold to foreign purchasers."  Joint Motion at 8.  Defendants seek to limit the alleged conspiracy to CRTs only because the United States-based Defendants *currently* manufacture and sell only CRT Finished Products.  Thus, a "CRTs only" conspiracy enables Defendants to paint a picture of a remote, foreign, price-fixing conspiracy that only tangentially affected the United States market.  For example, Defendants assert that "it is apparently the theory of Plaintiffs that the prices for these finished products in the United States were 'affected' because the CRTs, which were inputs in those end products, allegedly had their prices fixed in overseas sales to overseas purchasers, who, in turn, manufactured finished products and exported some of those products to the United States."  Joint Motion at 9.

Defendants' arguments fail because this self-serving version of the conspiracy and how CRT Products reached U.S. purchasers is not what Plaintiffs have alleged.  Plaintiffs have alleged a conspiracy that encompassed both CRTs and CRT Finished Products (*see* Section I. B. *supra*), which was carried out in part in the U.S. by U.S.-based Defendants.  Moreover, the conspiracy is alleged to have been the proximate cause of economic harm to indirect purchasers *who made*

---

[127]15 U.S.C. § 6a(1).

94

1   *their purchases in the United States. See, e.g.,* IP CAC ¶¶ 250-251.  In ruling on these motions to

2   dismiss, "the court must presume [Plaintiffs'] factual allegations of the complaint to be true and

3   draw all reasonable inferences in favor of the nonmoving party." *Knevelbaard Dairies,* 232 F.3d

4   at 984 (citation omitted).

5          The following Defendants are located in the United States: LG Electronics USA, Inc.,

6   Philips Electronics North America Corporation, Samsung Electronics America, Inc., Samsung

7   SDI America, Inc., Toshiba America, Inc., Toshiba America Consumer Products, LLC, Toshiba

8   America Information Systems, Inc., Toshiba America Electronic Components, Inc., Panasonic

9   Corporation of North America, Hitachi Electronic Devices (USA), Inc., Hitachi America, Ltd.,

10  and Tatung Company of America, Inc.  The IP CAC alleges that all of these U.S.-based

11  Defendants manufactured, marketed, sold and distributed both CRTs and CRT Finished Products

12  to customers in the U.S. during the Class Period.  IP CAC ¶¶ 51, 55, 63, 65, 73, 74, 76, 77, 81,

13  89, 90, 95.

14         Contrary to Defendants' claims, these U.S.-based Defendants are not "named solely

15  because they make and/or sell finished televisions or computer monitors that contained a CRT

16  component."  Joint Motion at 5, n.1.  Although they may not currently manufacture CRTs, many

17  of them did so for the majority of the Class Period.[128]  Moreover, there were many more U.S.-

18  _____

19  [128] For example, the Philips Defendants admit in their separate motion to dismiss that Philips

20  Electronics North America Corporation's "display components division manufactured and sold
    Tubes in the United States prior to June 2001." Philips Motion at 7. In other words, PENAC

21  manufactured and sold CRTs in the United States for the first 6 years of the Class Period.  In
    2001, PENAC transferred its U.S.-based CRT business to its joint venture with LG Electronics,

22  Inc., LG.Philips Displays. From 2001 to 2006 when it entered bankruptcy, LG.Philips Displays
    also manufactured and sold CRTs in the United States. In addition, MTPD had two United

23  States-based subsidiaries that manufactured and sold CRTs in the United States during the Class

24  Period: MT Picture Display Corporation of America (New York) and MT Picture Display
    Corporation of America (Ohio).  These entities were named as defendants in many of the

25  complaints that were consolidated in this action.  *See, e.g., Figone v. LG Electronics, Inc.,* 3:07-
    cv-6331-SC (N.D. Cal. Dec. 13 2007).  They were not named as defendants in the IP CAC

26  because MTPD closed their facilities in 2004.

27                                          95

28          **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
            AND JOINT MOTIONS TO DISMISS THE IP CAC
            MDL NO. 1917**

1   based CRT Product manufacturers during the Class Period.  For the purposes of their FTAIA

2   argument, Defendants exploit the fact that the CRT Product business has changed considerably in

3   recent years, with many U.S.-based CRT manufacturing facilities closing and moving to lower

4   cost venues like China.  IP CAC ¶ 126.[129]

5           The IP CAC further alleges that the U.S.-based Defendants participated in the conspiracy.

6   All of the U.S.-based Defendants, except Tatung, are wholly-owned subsidiaries of foreign

7   parents who were represented at the Glass Meetings and were parties to the agreements reached

8   at them.  *Id.* ¶¶ 167, 169, 171, 174, 180, 182.  The foreign parents "dominated and controlled the

9   finances, policies, and affairs of [the U.S.-based Defendants] relating to the antitrust violations

10  alleged" in the IP CAC. *Id.* ¶¶ 51, 55, 63, 65, 73, 74, 76, 77, 81, 89, 90, 95.  These U.S.-based

11  Defendants participated in the conspiracy at the direction of their parent companies by

12  manufacturing and selling CRTs and CRT Finished Products in the U.S. to customers here in the

13  U.S. pursuant to the agreements reached at the Glass Meetings.  *Id.* ¶¶ 167, 169, 171, 174, 178,

14  180, 182.  Accordingly, these United States manufacturers "played a significant role in the

15  conspiracy" (*see id.*), in that they were tasked with implementing the conspiracy in what was the

16  "largest market for CRT televisions and computer monitors during the Class Period."  *Id.* ¶¶ 162,

17  191.

18          In short, a far greater percentage of CRTs and CRT Finished Products were manufactured

19  and sold in the U.S. during the Class Period than Defendants would have this Court believe.  The

20  Sherman Act clearly reaches this domestic anticompetitive conduct that caused harm to domestic

21  purchasers in the form of higher prices for CRT Products.  Therefore, the FTAIA does not apply.

22

23

24

25  _____

26  [129] Plaintiffs request leave to amend their Complaint to add allegations regarding these additional
    U.S. manufacturers.

27

28
    **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
    AND JOINT MOTIONS TO DISMISS THE IP CAC
    MDL NO. 1917**

1

2

### 2. The FTAIA Does Not Apply Because Defendants' Sale of CRT Products Into the United States Constitutes "Import Commerce"

3

By its express terms, the FTAIA does not apply to import commerce. *See, e.g., Carpet*

4

*Group Int'l v. Oriental Rug Importers Ass'n., Inc.* 227 F.3d 62, 71 (3d Cir. 2000).[130]  To

5

determine whether the foreign transaction at issue involved import trade or commerce, the proper

6

inquiry focuses on the conduct of the defendant.  *Kruman v. Christie's Int'l, PLC,* 284 F.3d 384,

7

395 (2d Cir. 2002), *cert. denied, Christine's Intern, PLC v. Kruman,* 539 U.S. 978 (2003).  In

8

*Kruman,* the Second Circuit specifically rejected construing "conduct" to mean "[t]he precise

9

acts that caused injury," or "the imposition of charges for . . . services at levels determined or

10

affected by the illicit agreement."  *Id.* at 398.  "'Conduct' . . . refers to acts that are illegal under

11

the Sherman Act; . . . a horizontal price agreement is itself illegal regardless of its effect or

12

purpose."  *Id.*  (citation omitted).  Thus, the focus of inquiry is the object of Defendants'

13

agreements to fix prices for CRT Products rather than the overt act performed in furtherance of it.

14

*Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 330 (1991).

15

The IP CAC specifically alleges that Defendants' conspiracy targeted the prices for CRTs

16

and CRT Finished Products that were sold to the U.S. consumer market. IP CAC ¶¶ 1, 9, 10, 11,

17

12.  The foreign Defendants imported CRTs and CRT Finished Products into the U.S. either

18

directly or through their United States wholly-owned subsidiary that acted as their sales and

19

marketing arm.  *See, e.g., id.* ¶¶ 50-52, 54-59, 61-70, 72-78, 80-83, 85-92, 94-95, 97-98, 100-102,

20

104-110, 162.  Defendants and their agents "conducted business" and  "engaged in business"

21

affecting the states named in the IP CAC, and their CRT Products were sold in the U.S. in a

22

continuous and uninterrupted flow of interstate commerce, including through and into this

23

judicial district.  *See, e.g., id.* ¶¶ 9, 10, 50-52, 54-55, 58-59, 61-70, 72-74, 76-77, 80-81, 85-92,

24

94-95, 97-98, 100-102, 104-107, 114-116, 162, 174, 176, 178, 180, 182, 188, 231, 240, 242, 246,

25

248-250, 255-271, 274-283.

26

27

28

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1   The IP CAC further alleges that Defendants took steps to coordinate pricing with the

2 Brazilian and Mexican CRT Product manufacturers, such as Philips Brazil, Samsung SDI Brazil,

3 and Samsung SDI Mexico, because "North America was the largest market for CRT televisions

4 and computer monitors during the Class Period.  In this way, the Defendants ensured that prices

5 of all CRT Products *imported* into the United States were fixed, raised, maintained and/or

6 stabilized at supracompetitive levels."  *Id.* ¶ 162 (emphasis added).  Defendants' conspiracy

7 would not have succeeded without such a primary channel of import trade and commerce to their

8 most important market.

9   In addition to the foregoing allegations of Defendants' import status, source materials on

10 which IP CAC allegations are based provide further support.[131]  For example, the U.S.

11 International Trade Commissions publication, "Industry Trade & Summary" dated May 1995,

12 ("Trade Summary"),[132] states that "[i]n 1993, color television picture tubes accounted for 85

13 percent of total U.S. shipments of products covered by this summary.  The products *imported* in

14 the greatest volume were miscellaneous cathode-ray tubes and deflection coils."[133]  The Trade

15 Summary also contains a discussion of CRT importation to the U.S. and specifically lists several

16 of the Defendants as importers of CRTs into the U.S.[134]

---

[130] *See also CSR Ltd. v. Cigna Corp.*, 405 F. Supp. 2d 526, 537 (D.N.J. 2005).

[131] *See, e.g., Maley v. Pulte Home Corp.*, No. 06-3082 CW, 2006 U.S. Dist. LEXIS 57213, at *2 (N.D. Cal. July 31, 2006) ("courts may consider on a motion to dismiss documents incorporated by reference into a complaint if referred to extensively or if they form the basis for the plaintiff's claim.") (citation omitted).  *See also U.S. v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003).

[132] *See* RJN, Ex. 31, John Kitzmiller, *Industry & Trade Summary Television Picture Tubes and Other Cathode Ray Tubes,* USITC Publication 2877 (May 1995), Office of Industries, U.S. Trade Commission.

[133] *Id.* at 1 (emphasis added).

[134] *Id.* at 4, 11, 12, Table 1.

98

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC MDL NO. 1917**

1      Thus, Plaintiffs have alleged conduct by Defendants that satisfies the import commerce

2   exception.  Contrary to Defendants' version of a wholly foreign conspiracy that "targeted an

3   amorphous world market," the IP CAC alleges that a substantial amount of the CRT Products

4   purchased by Plaintiffs were either manufactured in the U.S. by U.S.-based Defendants, or were

5   imported to the U.S. by Defendants and sold to Plaintiffs through the U.S.-based Defendants.

6   Consequently, the FTAIA limitation on this Court's subject matter jurisdiction, and its

7   requirement of a "direct, substantial and reasonably foreseeable effect" on domestic commerce,

8   are inapplicable.  *See Carpet Group,* 227 F.3d at 72.[135]

9          **3.   Assuming *Arguendo* That The FTAIA Applies, The Conduct Alleged in the IP
               CAC Falls Under the Domestic Effects Exception of the FTAIA**

10

11         **a.   The IP CAC Alleges That Defendants' Unlawful Conduct Had A "Direct,
               Substantial And Reasonably Foreseeable Effect" On U.S. Commerce**

12      The terms "direct, substantial, and reasonably foreseeable" are undefined in the FTAIA.

13   The Ninth Circuit has interpreted a domestic effect as being "direct" if it "follows as an

14   immediate consequence of the defendant's activity."  *United States v. LSL Biotechnologies*, 379

15   F.3d 672, 680 (9th Cir. 2004) (citation omitted).  A domestic effect may be considered

16   "substantial" if it involves a sufficient volume of United States commerce and is not merely a

17   "spillover effect."  *Id.* at 680.  Further, and contrary to Defendants' assertions, the court "must

18   examine the location of the *effects* of Defendants' alleged decisions and actions, rather than the

19   location of the decisions and actions themselves."  *CSR*, 405 F. Supp. 2d at 546.[136]  This is true

20

21   _____

22   [135]Only three out of the thirty-three foreign Defendants named in this action have challenged this
     Court's exercise of personal jurisdiction over them. If Defendants' version of the conspiracy were
23   true, that it involved "foreign agreements to fix overseas prices of CRTs sold to foreign
     purchasers," Plaintiffs would surely have seen far more personal jurisdiction motions.  The fact
24   that there were not strongly indicates that these Defendants sold CRTs and CRT Finished
     Products directly to U.S. purchasers.

25

26   [136] *See also* H.R. Rep. No. 97-686, at 5 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2487, 2490, ("[I]t
     has been relatively clear that it is the situs of the effects, as opposed to the conduct, that
27   determines whether United States antitrust law applies.") (footnote omitted).

99

28

1   even if the entirety of the conduct at issue took place outside of the United States and the

2   defendant or the purchaser (or both) are located outside the United States. *Kruman,* 284 F.3d at

3   395 ("[I]t is the effect and not the location of the conduct that determines whether the antitrust

4   laws apply.").

5         "Payment of artificially high prices by a [U.S.] victim of price-fixing is one way to

6   establish a domestic effect." *Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.,* 534

7   F.Supp.2d 1101, 1113 (N.D. Cal. 2007).  Here, as demonstrated below, the IP CAC is replete

8   with allegations that Defendants' unlawful conduct—both in the U.S. and abroad—led to

9   artificially high prices for CRT Products sold in the U.S.[137]  If these transactions are not

10  considered to have "direct, substantial, and reasonably foreseeable effect" on domestic

11  commerce, then foreign manufacturers would have an easy way to avoid antitrust liability for

12  price-fixing conspiracies—all they would have to do is ensure that they do not sell directly to a

13  domestic entity and that they form their illegal agreements outside the United States.

14        The Joint DOJ and FTC Antitrust Enforcement Guidelines for International Operations

15  (the "Joint International Guidelines"),[138] discuss application of the domestic effects exception as

16  follows:

17          To the extent that conduct in foreign countries does not 'involve' import

18          commerce but does have an 'effect' on either import transactions or commerce
    within the United States, the Agencies apply the 'direct, substantial, and

19          reasonably foreseeable' standard of the FTAIA.  That standard is applied, for
    example, in cases in which a cartel of foreign enterprises, or a foreign monopolist,

20          reaches the U.S. market through any mechanism that goes beyond direct sales,
    such as the use of an unrelated intermediary, as well as in cases in which foreign

21

22

23  [137] *See Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC,* 148 F.3d 1080, 1087 (D.C. Cir.
    1998) (concluding that defendants' foreign anticompetitive conduct "had simultaneous direct

24  foreign and direct domestic effects [and] paying higher prices is certainly a direct harm to
    customers.").

25

26  [138] *See* RJN, Ex. 27, *Antitrust Enforcement Guidelines for International Operations,* Issued by:
    the U.S. Department of Justice and the Federal Trade Commission, §§ 3.12, 3.121 (1995).

27

28  **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
    AND JOINT MOTIONS TO DISMISS THE IP CAC
    MDL NO. 1917**

vertical restrictions or intellectual property licensing arrangements have an anticompetitive effect on U.S. commerce.

Consistent with the Joint International Guidelines, Plaintiffs' allegations satisfy the "direct" and "reasonably foreseeable" requirements of the domestic effects exception.  These allegations demonstrate a clear intent on Defendants' part to affect the U.S. market for CRT Products and cause Plaintiffs to pay artificially-inflated prices in the U.S.:

- During the Class Period, **Defendants collectively controlled the vast majority of the market for CRT Products,** both globally and **in the United States**, and the Complaint details specific statistics concerning CRT Product share of the **North American market**. IP-CAC ¶¶ 115, 122, 134, 135, 190, 191.

- The CRT Product conspiracy was effectuated through a combination of group and bilateral meetings, which included agreements on the prices at which certain **Defendants would sell CRTs to their own domestic** and foreign **subsidiaries and affiliates** that manufactured CRT Products, such as televisions and computer monitors. *Id.* ¶¶ 141-153, 154, 188.  In fact, at some of the meetings, agreements were reached on pricing for intra-company CRT Product Sales to **vertically integrated customers, which would include those in the United States**. *Id.* ¶ 156.

- Coordination of pricing with foreign manufacturers was "particularly important because **they served the North American market for CRT Products** . . . **the largest market for CRT televisions and computer monitors during the Class Period . . .** In this way, the Defendants ensured that **prices of all CRT Products imported into the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels**." *Id.* ¶162.

- Defendants shut down production lines and closed/consolidated manufacturing facilities **abroad and in the United States** to effectuate the conspiracy.  *Id.* ¶¶ 198-199.

- Defendants manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, **to customers in the United States**. *Id.* ¶¶ 1, 8, 50-52, 54-55, 56-59, 61-70, 72-78, 80-83, 85-92, 94-95, 97-98, 100-102, 104-107.

- **A substantial part of the events giving rise to the Plaintiffs' claims occurred in the United States, specifically in California.  Defendants purposefully availed themselves of the laws of the United States, including California and the individual states** listed in the Complaint.  *Id.* ¶¶ 8, 9.

- Defendants' price-fixing conspiracy regarding CRT Products, as well as their restriction of output re: same, is demonstrated by investigations commenced by the Antitrust Division of the United States Department of Justice, and others, as well as indictments concerning a combination and conspiracy to fix CRT prices in the United States.  **The indictment of C.Y. Lin states that the price-fixing conspiracy was carried out, in part, in the Northern District of California**. *Id.* ¶¶ 4, 203-21. "This conspiracy **harmed**

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC MDL NO. 1917**

**countless Americans** who purchased computers and televisions using cathode ray tubes sold at fixed prices." *Id.* ¶ 222.

- Many of the Defendants and/or co-conspirators themselves have been and are currently manufacturers of CRT Finished Products. Having agreed to fix prices for CRTs, the major component of the end products they were manufacturing, these Defendants intended to pass on the full cost of this component in their finished products, and in fact did so. *Id.* ¶ 238.

- Defendants **monitored the prices of CRT Products in the United States** on a regular basis. *Id.* ¶ 223.

- Accordingly, by Defendants' combination and conspiracy to fix, raise and maintain or stabilize the prices of CRT Products sold in the United States, **thereby restraining trade and commerce in the United States**, Plaintiffs were directly harmed by paying artificially inflated prices for CRT Products. (IP-CAC ¶¶ 1, 3, 222, 239, 245-49) Defendants' conspiracy affected every person nationwide and more particularly, consumers in each state. *Id.* ¶ 11.

- The domestic effects of Defendants' conspiracy were certainly foreseeable since Defendants knew that commerce in CRT Products in each of the states identified would be adversely affected by implementing their conspiracy. *Id.* ¶¶ 1,-3, 9, 10, 12, 115, 116, 121-129, 136-188, 192-233, 237-239, 245-250, 255-271, 273, 275-283, 290.

The IP CAC also alleges that Defendants' foreign conduct had a "substantial" effect on domestic commerce. A "sufficient" volume of United States commerce is alleged that cannot be considered a mere "spillover effect." For example, the IP CAC details the Defendants' collective control over the vast majority of the CRT Products market, both globally and specifically in the United States:

- During the Class Period, Defendants collectively controlled the vast majority of the market for CRT Products, both globally and in the United States. IP-CAC ¶ 115.

- During the Class Period, the CRT industry was dominated by relatively few companies. In 2004, defendants . . . together held a collective 78% share of the global CRT market. *Id.* ¶ 122.

- In 1999, CRT monitors accounted for 94 percent of the retail market for computer monitors in North America. By 2002 that figure had dropped to 73 percent; still a substantial share of the market. *Id.* ¶ 134.

- As for CRT televisions, they accounted for 73 percent of the North American television market in 2004 and by the end of 2006, still held a 46 percent market share. CRT televisions continue to dominate the global television market, accounting for 75 percent of the worldwide units in 2006. *Id.* ¶ 135.

102

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1

2

3

4

- During the Class Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North American still consumed around 35 percent of the world's CRT monitor supply. *Id.* ¶ 191.

5

6

7

8

9

10

11

12

- In order to ensure the efficacy of their global conspiracy, the Defendants also used bilateral meetings to coordinate pricing with CRT Product manufacturers in Brazil and Mexico, such as Philips Brazil, Samsung SDI Brazil, and Samsung SDI Mexico.  **These Brazilian and Mexican manufacturers are particularly important because they served the North American market for CRT Products.**  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Class Period.  Because these Brazilian and Mexican manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.  In this way, the Defendants ensured that all prices of all CRT Products imported into the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.  *Id.* ¶ 162. (emphasis added).

13

14

Accordingly, Plaintiffs allegations satisfy the "direct, substantial and reasonably foreseeable effect" requirement of the FTAIA's domestic effects exception.

15

**b.  The Domestic Effects Of The Defendants' Conduct Give Rise To The Plaintiffs' Claims In This Case**

16

17

18

19

20

21

22

23

24

25

26

27

Plaintiffs' allegations also satisfy the second prong of the domestic effects test, in that the domestic effects of the conspiracy "give rise to" their claims.  The Supreme Court in *Empagran* clarified that the "give rise to" element of the FTAIA is satisfied where "the foreign injury was '*inextricably bound up with…domestic restraints of trade,*' and that the plaintiff '*was injured…by reason of an alleged restraint of our domestic trade[.]*'" 542 U.S. at 171-72 (emphasis in original) (citation omitted).  On remand, the D.C. Circuit Court elaborated on the "inextricably bound up with" standard, holding that to qualify for the FTAIA exception, a party must show "a direct causal relationship, that is, *proximate* causation" between the foreign injury and the domestic effects of an antitrust violation. *Empagran S.A. v. F. Hoffmann-Laroche, Ltd.*, 417 F.3d 1267, 1271 (D.C. Cir. 2005) *("Empagran II")* (emphasis added).  Applying the proximate cause standard, the *Empagran II* court found that the foreign appellants failed to establish "that the U.S.

103

28

1  effects of the appellees' conduct—i.e., increased prices in the United States—proximately caused

2  the *foreign* appellants' injuries." *Id.* (emphasis added).  The *Empagran* cases involved foreign

3  purchaser plaintiffs, foreign defendants, foreign transactions and foreign injury.  Unlike

4  *Empagran*, this case concerns foreign *and domestic* Defendants who engaged in unlawful foreign

5  *and domestic* conduct that has caused *domestic* injury to *domestic* Plaintiffs.

6         *Caribbean Broad.* was another case involving a foreign plaintiff, foreign defendants and

7  foreign transactions, but there the court found that it had subject matter jurisdiction.  *Caribbean*

8  *Broad.,* 148 F.3d at 1087.  In that case, the plaintiff broadcaster, Caribbean, which operated an

9  FM radio station based in the British Virgin Islands, filed an antitrust action against a competing

10 FM radio station and its joint venturer.  The plaintiff alleged that the defendants had violated the

11 Sherman Act by preserving the defendant station's radio broadcast monopoly in the eastern

12 Caribbean region through misrepresentations to their advertisers regarding Caribbean's

13 broadcasting reach.  *Id.* at 1082.  The domestic effect the court found was that U.S. advertiser's

14 paid the defendant radio station excessive prices for advertising.  *Id.* at 1087.  The *Empagran II*

15 court affirmed *Caribbean Broad.* and explained why the foreign injury was proximately caused

16 by the domestic effect such that subject matter jurisdiction was appropriate:

17           It was this effect of the defendants' monopolizing conduct—forcing U.S.
             businesses to pay for advertising on the defendant station—that caused
18           Caribbean to lose revenue because it was unable to sell advertising to the
             same U.S. businesses.
19

20 417 F.3d at 1270.  In other words, the plaintiff's foreign antitrust injury was "inextricably bound

21 up with" the domestic antitrust injury to U.S. purchasers.

22         If subject matter jurisdiction was appropriate in *Caribbean Broad.*, it is most certainly

23 appropriate here.  Plaintiffs here are in a similar position to the U.S. purchasers of advertising in

24 *Caribbean Broad*.  If the court granted subject matter jurisdiction over the foreign plaintiff's

25 claim based on the fact that it was inextricably bound up with the domestic injury to U.S.

26 purchasers of advertising, it would surely have found it had subject matter jurisdiction over any

27

28

104

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1   claim brought by the U.S. purchasers.  Plaintiffs here are U.S. purchasers of CRT Products who

2   have suffered a domestic injury in that they have paid more for CRT Products as a direct and

3   proximate result of Defendants' foreign *and domestic* anticompetitive conduct.

4          Specifically, the IP CAC adequately alleges that the purpose of Defendants' conspiratorial

5   conduct was to fix the prices for CRTs and CRT Finished Products, including those sold to the

6   U.S. consumers.  *Id.* ¶ 237.  Defendants not only knew, but expressly contemplated that prices of

7   CRT Finished Products would increase as a result of their increasing the price of CRTs. *Id.*

8   Moreover, to the extent that *Empagran* also requires Plaintiffs to show injury of the type the

9   antitrust laws were meant to redress, *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977) does not

10  bar indirect purchasers from bringing an action for injunctive relief.  *In re Beef Industry Antitrust*

11  *Litig.*, 600 F.2d 1148, 1167 (5th Cir. 1979).

           **c.  Defendants' Analysis Of The Domestic Effects Test Mischaracterizes And**
               **Ignores The Allegations In The Complaint**

14         Defendants' cursory analysis of the domestic effects tests consists of references to the IP-

15  CAC taken out of context, while allegations supporting a United States conspiracy are blatantly

16  ignored.  Defendants begin on a disingenuous note, citing to paragraphs 141 to 144 as

17  exemplifying the broad statement that "[t]he IP-CAC . . . is directed at alleged foreign

18  agreements to fix the overseas prices of CRTs sold to foreign purchasers."  Joint Motion at 8.

19  These four paragraphs are a minute part of an almost one-hundred page complaint and, contrary

20  to Defendants' assertions, there is no mention of fixing "overseas" prices of CRTs or sales to

21  "foreign purchasers."  In fact, paragraph 144 specifically states that Defendants conspired to fix,

22  raise and stabilize CRT Product prices in the U.S.

23         Further, Defendants cite to paragraphs 4, 141-188, 198, 204, 206-213 as examples of the

24  IP CAC being "infused" with statements that Defendants' illegal activities took place in foreign

25  locales and targeted an "amorphous world market."  To the contrary, the IP CAC is replete with

26  allegations that Defendants' illegal conduct targeted the United States market, and specifically

27  consumers of CRT Products.  IP CAC ¶¶ 10-12, 50-52, 54-59, 61-70, 72-78, 80-83, 85-92, 94-95,

105

28  **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
**AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1    97-98, 100-102, 104-107, 109, 134-135, 162, 191, 203, 205, 222-239; 245-283.  Moreover,

2    although the meetings are alleged to have taken place in foreign locales, the IP CAC also alleges

3    that Defendants' U.S. subsidiaries were a party to the anticompetitive agreements made at those

4    meetings and implemented those agreements by selling CRT Products to U.S. purchasers at

5    supracompetitive prices.  *Id.* ¶ 50-109, 166-188.  Finally, it is the location of the effect rather than

6    the location of Defendants' conduct that determines whether the antitrust laws apply.  *CSR*, 405

7    F. Supp. 2d at 546; *Kruman,* 284 F.3d at 395.  By wrenching Plaintiffs' allegations out of the

8    context, Defendants conveniently neglect Plaintiffs' detailed, specific factual allegations that

9    support a claim that prices were fixed for the sale of CRT Products in the U.S.[139]   Because these

10   allegations are mischaracterized by Defendants and are integral to Plaintiffs' antitrust injury, this

11   Court should deny Defendants' Rule 12(f) motion to strike allegations of the IP CAC which

12   concern Defendants' foreign conspiratorial agreements.  Joint Motion at 8.

13           The cases Defendants cite in support of their arguments are also unavailing.  In *Sun*

14   *Microsystems, Inc. v. Hynix Semiconductor, Inc.,* plaintiff Sun alleged a global conspiracy by

15   defendants to fix the prices of DRAM both in the United States and abroad.  2007 WL 1056783,

16   at *5 (N.D. Cal. Apr. 5, 2007).  Sun sought to recover not only for its purchases of DRAM here

17   in the U.S., but also for *foreign* purchases by Sun Microsystem's *foreign* subsidiaries.  This case

18   is distinguishable from *Sun Microsystems* because Plaintiffs purchased their CRT Products

19   *domestically* from one or more of the Defendants or their co-conspirators.  IP-CAC ¶¶ 19-49.

20           In *Animal Science Products, Inc. v. China Nat'l. Metals & Minerals Import & Export*

21   *Corp.*, the Court stressed that Plaintiffs failed to assert facts showing a link between Defendants'

22   alleged illegal actions and United States commerce: "[A]ll that Plaintiffs assert is that world

23   Processed Magnesite prices . . . were rising during the Relevant Period" and that "the alleged

24   defendants' business activity was world-wide, without any focus on the United States . . . ."  596

25   F. Supp. 2d 842, 876 (D.N.J. 2008).  Further, only a small fraction of the product at issue

26   _____

27   [139] For examples of such allegations, *see* Section I. B. *supra*.

106

28

1   implicated the U.S. market.  *Id.*  In contrast, the IP CAC contains numerous allegations about

2   North America being the largest market for CRT Products as well as Defendants' collective

3   control over the vast majority of that market.  The IP CAC further alleges that Defendants

4   specifically targeted the U.S. market.  *See, e.g.*, IP CAC ¶¶ 10-12, 50-52, 54-59, 61-70, 72-78,

5   80-83, 85-92, 94-95, 97-98, 100-102, 104-107, 109, 134-135, 162, 191, 203, 205, 222-239; 245-

6   283.

7        *Dee-K Enterprises, Inc. v. Heveafil Sdn. Bhd*, 299 F.3d 281 (4th Cir. 2002), also fails to

8   support Defendants' arguments.  In that case, the Court stressed that, in determining whether the

9   FTAIA applies, "a court should consider whether the [defendants'] *acts, targets, and effects* . . .

10  are *primarily* foreign or *primarily* domestic.  This inquiry will best accommodate the cases with

11  mixed fact patterns, defying ready categorization as "foreign" or "domestic" conduct, which our

12  increasingly global economy will undoubtedly produce."  *Id.* at 294 (emphasis added).

13  Moreover, *Dee-K Enterprises* was decided after trial.  Therefore, the court's findings that the

14  conspiracy was primarily foreign and that it had not had a substantial effect on U.S. commerce

15  were made after discovery and the presentation of evidence.  Defendants ask this Court to make

16  these factual determinations solely on the basis of the pleadings.  There is no basis for doing so.

17       Defendants also argue that Plaintiffs' allegations of what Defendants characterize as a

18  "downstream" market are incapable of supporting a jurisdictional claim under the FTAIA.  Joint

19  Motion at 9.  First, as described *supra* in subsection 1., Defendants' characterization of Plaintiffs'

20  allegations is incorrect and unsubstantiated by the paragraphs cited in the IP CAC.  Second, the

21  cases cited as support for Defendants' "downstream" market effect are distinguishable from this

22  case.[140]  Finally, the FTAIA text does not have a requirement that a defendant's foreign

23

24  ────────────────

25  [140]In *United Phosphorous, Ltd. v. Angus Chemical Co.*, 131 F.Supp.2d 1003, 1009 (N.D. Ill.
    2001), the district court faced claims by two Indian plaintiffs and an American plaintiff that was
26  once part of a joint venture that wanted to do business with the Indian plaintiffs. The plaintiffs
    alleged that defendants interfered with the Indian companies' plan to produce the prescription
27  drug AB. *Id.* at 1006.  The district court dismissed these claims under the FTAIA after extensive
    discovery because it concluded, on the basis of a full evidentiary record, that: (a) the Indian

                                       107

28  **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
    **AND JOINT MOTIONS TO DISMISS THE IP CAC**
    **MDL NO. 1917**

1    anticompetitive conduct adversely affect the same product or service in the commerce of both the

2    foreign county and the United States.

3         In short, Plaintiffs have alleged claims that arise from the domestic effects of Defendants'

4    illegal conduct, thereby establishing subject matter jurisdiction over Defendants' foreign and

5    domestic conduct and the full injury it has caused in the United States.

6         Finally, the question of whether Defendants' conduct had a direct, substantial, and

7    reasonably foreseeable effect on domestic commerce is not suitable for resolution on the

8    pleadings.  This is a case where "the jurisdictional issue and substantive claims are so intertwined

9    that resolution of the jurisdictional question is dependent on factual issues going to the merits."

10   *Autery v. United States,* 424 F.3d 944 (9th Cir. 2005).  It would therefore be inappropriate to

11   dismiss Plaintiffs' claims for lack of subject matter jurisdiction before discovery.  *Crompton*

12   *Corp. v. Clariant Corp.,* 220 F. Supp. 2d 569, 574 (M.D. La. 2002).

13             **4.   Plaintiffs' State Law Claims Do Not Exceed the Intended Scope Of The**
                     **FTAIA**
14

15        Defendants' arguments regarding the Commerce and Supremacy Clauses are also without

16   merit.  Joint Motion at 10-16.  Applying Plaintiffs' state law claims to the Defendants' alleged

17   foreign conduct would not exceed the intended jurisdictional scope of those laws.  First,

18   Defendants' argument that the FTAIA somehow "preempts" state antitrust laws ignores the

19   _____

20   plaintiffs never had the intention or ability to sell AB in the United States, and (b) the only
     prospective United States-based buyer would not have bought the drug from them. *Id.* at 1010-
21   1014.  In *In re Intel Microprocessor Antitrust Litig.*, 452 F. Supp. 2d 555, 558-59, 561 (D. Del.
     2006), plaintiff AMD's claims were based on lost sales of foreign-manufactured microprocessors
22   to foreign customers.  The "twists and turns" of plaintiff's case (which included seeking recovery
     in several foreign tribunals in addition to the American courts), are not analogous to this case
23   because the alleged harm suffered by the plaintiff in *Intel* was caused by the *foreign* effect of
     Defendants' conduct: lost foreign sales.  The distinctions between this case and the foregoing
24   cases are clearcut.  This case involved United States-based plaintiffs seeking to represent a
     putative class of indirect purchasers of CRT Products in the United States.  The Defendants
25   manufactured, sold and distributed those products in the United States, the purchases were made
     here, and the injury (in the form of supracompetitive prices) was felt here.  This case does not
26   involve foreign plaintiffs using the United States antitrust laws to seek recovery for injuries
     caused by foreign purchases.

27                                          108

28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
     **AND JOINT MOTIONS TO DISMISS THE IP CAC**
     **MDL NO. 1917**

1  specific and narrow text chosen by Congress when enacting the FTAIA.  Congress provided that

2  the FTAIA would be applicable to "Sections 1 to 7 of" the Sherman Act.[141]  Defendants invite

3  this Court to essentially rewrite the statute to strike Congress' limiting language and, instead,

4  broaden the FTAIA to apply to state antitrust laws where Congress did not choose such language.

5      Since the landmark ruling in *California v. ARC America Corp.*, 490 U.S. 93 (1989)

6  ("*ARC America*"), federal courts have recognized that federal and state antitrust law may differ

7  on issues such as the standing of indirect purchasers to pursue state antitrust claims.  Defendants'

8  overly broad reliance upon "harmonization" statutes fails to reflect this distinction.  In fact, the

9  cases dealing with harmonization reflect a trend among the states to complement federal antitrust

10  law, as opposed to being bound by it.  The "harmonization statutes" on which Defendants base

11  their arguments are merely "permissive" and only look to federal antitrust statutes for

12  guidance.[142]  In fact, a majority of the states have expressly refused to preempt state law causes

13

14  [141] 15 U.S.C. §6a.

15
16  [142] *See, e.g.*, **Arizona**:  Ariz. Rev. Stat. Ann. § 44-1412 (2009) ("the courts may use as a *guide*
interpretations given by the federal courts to comparable federal antitrust statutes.") (emphasis

17  added).  *See also In Re: G-Fees Antitrust Litig.*, 584 F.Supp.2d 26, 38 (D.C. 2008) ("Arizona's
[antitrust] statute permits, but does not require, a court enforcing Arizona's antitrust statue to

18  apply federal case law interpreting comparable federal antitrust provisions")  **California:** *Amarel
v. Connell*, 202 Cal.App.3d 137, 150 (1998) (concluding plaintiffs' state law causes of action

19  alleging anticompetitive practices by defendants are not preempted by the Sherman Act).  The
decision cited by Defendants at 14 n.7, *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 269

20  F.Supp.2d 1213, 1223-24 (C.D. Cal. 2003), recognizes that "the  more restrictive definition of
'antitrust injury' under federal law does not apply to [the Cartwright Act]" citing additional cases

21  that support a broader and more liberal reading of the Cartwright Act than federal law.  **Iowa:**
Iowa Code § 553.2 (2009) ("shall be construed to complement and be harmonized with the

22  applied laws of the United States which have the same or similar purpose as this chapter").
**Kansas:** *Bergstrom v. Noah*, 266 Kan. 829, 844 (Kan. 1999) ("Kansas law is similar in some

23  respects to the Sherman Act, but it is not identical.").  *See also* decision cited by Defendants at 15
n.7, *Orr v. Beamon*, 77 F. Supp. 2d 1208, 1211-1212 (D. Kan. 1999), which acknowledges

24  "federal antitrust cases aren't binding" on the court in interpreting Kansas antitrust statutes.

25  **Michigan:** Mich. Comp. Laws § 445.784 (2009) ("the courts shall give due deference to
interpretations given by the federal courts to comparable antitrust statutes.").  **Nebraska:** Neb.

26  Rev. Stat. § 59-829 (2009); *Arthur v. Microsoft Corp.*, 676 N.W.2d 29, 38 (Neb. 2004) (Supreme

27  Court of Nebraska does not interpret § 59-829 as a delegation of state authority to the federal

109

28  **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1    of action by the Sherman Act.  *See, e.g., Amarel v. Connell,* 202 Cal. App. 3d 137, 140, 150 (Cal.

2    Ct. App. 1988) (concluding that congressional action which acknowledged and continued

3    enforcement of state laws rebutted defendants' assertion that the state laws were preempted by

4    the "negative" implications of the Commerce Clause).

5             Defendants' contention that the consumer protection or unfair competition laws of the ten

6    states referenced in the IP CAC should be analyzed under the provisions of the Federal Trade

7    Commission Act ("FTCA"), 15 U.S.C. §§ 45-58, is similarly unpersuasive.  Again, these state

8    statutes are merely permissive in their construction.[143]  Joint Motion at 15.  Defendants ask this

9    _____

10   government, but, rather, as having the purpose to achieve uniform application of the state and
     federal laws regarding monopolistic practices.)  **Nevada:** Nev. Rev. Stat. § 598A.050 (2009)

11   ("[t]he provisions of this chapter shall be construed in harmony with prevailing judicial
     interpretations of the federal antitrust statutes.").  **New Mexico:** N.M. Stat. § 57-1-15 (2008)

12   ("the Antitrust Act shall be construed in harmony with judicial interpretations of the federal
     antitrust laws.").  **North Carolina:** decision relied on by Defendants at 15 n.7, *Rose v. Vulcan*

13   *Mat'ls. Co.*, 194 S.E.2d 521, 530 (N.C. 1973) acknowledges the body of law applying the
     Sherman Act is "not binding" on North Carolina antitrust statue).  **North Dakota:** Neither

14   decision cited by Defendants at 15 n.7, *AG Acceptance Corp. v. Glinz*, 684  N.W.2d 632, 638-40
     (N.D. 2004) nor *Beckler v. Visa U.S.A., Inc.*, No. 09-04-C-00030, 2004 WL 2115144 *3 (N.D.

15   Dist. Ct. Aug 23, 2004) is on point or supports Defendants' position.  **South Dakota:** (which
     Defendants omit from their brief) S.D. Codified Laws § 31-1-22 ("the courts may use as a guide

16   interpretations given by the federal or state courts to comparable antitrust statutes.").  **Tennessee:**
     *Freeman Industries, LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 518-520 (Tenn. 2005)

17   (extending reach of Tennessee antitrust statute beyond Supreme Court's interpretation of the
     Sherman Act).  The decision cited by Defendants at 15 n.7, *Tenn. ex rel. Leech v. Levi Strauss &*

18   *Co.*, No. 79-722-III, 1980 WL 4696 *2 n.2 (Tenn. Ch. Ct. Sept. 25, 1980), merely states that
     Tennessee's state antitrust statute is "similar" to the Sherman Act").  **Vermont:** Decision cited by

19   Defendant at 15 n.7, *Fucile v. Visa U.S.A. Inc.*, No. S1560-03 CNC, 2004 WL 3030037 *3 (Vt.
     Super. Dec. 27 2004), is inapposite and addresses the Vermont Consumer Fraud Act in the

20   context of standing issues.  **West Virginia:** W.Va. Code § 47-18-16 (2008) ("[t]his article shall
     be construed liberally and in harmony with ruling judicial interpretations of comparable federal

21   antitrust statutes.").  **Wisconsin:** *G-Fees*, 584 F.Supp.2d at 39 ("federal cases construing federal
     law are not controlling on Wisconsin courts' interpretations of state statutes so Wisconsin courts

22   only look to federal antitrust decisions for guidance").

23

24   [143]The statutes and decisions cited by Defendants fail to support their argument:  **Florida:** Fla.
     Stat. § 501.202(3) (2009) (states very general purpose of the statute is to have consistency with

25   policies of federal law relating to consumer protection).  **Hawaii:** Haw. Rev. Stat. § 480-2(b)
     (2008) (states courts and the office of consumer protection shall give "due consideration" to the

26

27                                                                110

28

1    Court to evaluate Plaintiffs' state claims under a statute that Congress explicitly chose to apply

2    only to specific provisions of the Sherman Act and FTC Act.  Moreover, "the legislative history

3    of the 1975 amendments to the FTCA indicates that Congress did not intend to occupy the field

4    of consumer protection regulation."[144]  Courts have consistently held that it was not Congress'

5    intention that the FTCA supersede the states' power in the area of unfair competition or deceptive

6    practices.[145]

7            The presumption against preemption applies with particular strength in the area of state

8    regulation of public health and safety.  Consumer protection is quintessentially a "field which the

9    States have traditionally occupied."[146]  To the extent the FTCA does apply, Plaintiffs'

---

Federal Trade Commission's ("FTC") rules, regulations and decisions).  **Massachusetts:** Mass. Gen Laws c. 93A § 2(b) (2009) (states courts will be "guided" by interpretations given by FTC and federal courts to § 5(a)(1) of the FTCA).  **Nebraska:** Defendants cite to Nebraska's antitrust statute rather than the Nebraska Consumer Protection Act (Neb. Rev. Stat. § 59-1602).  **New Mexico:** N.M. Stat. § 57-12-4 (states "to the extent possible" courts will be "guided" by FTC and federal court interpretations).  **New York:** In the slip opinion cited by Defendants at 15 n.8, *People ex rel. Spitzer v. Applied Card Sys., Inc.*, 805 N.Y.S.2d 175, 178 (N.Y. App. Div. 2005), the court states that interpretations of the FTCA are merely "useful" in determining  N.Y. Gen. Bus. Law § 349 violations.  **North Carolina:** North Carolina Gen. Stat. § 75-1.1 *et seq.* (2009), referenced in decision cited by Defendants at 15 n.8, *Henderson v. U.S. Fid. & Guar. Co.*, 488 s.E.2d 234, 239 (N.C. 1997), actually states that the North Carolina statute merely looks to federal case law for "guidance."  **Rhode Island:** *Chavers v. Fleet Bank (R.I.) N.A.*, No 00-5237, 2001 R.I. Super. LEXIS 71, at *23 (June 29, 2001) (court states that mere "consideration" should be given to the FTC Act and FTC regulations in interpreting the R.I. Gen. Laws § 6-13.1-3).  **Vermont:** Vt. Stat. Ann. tit. 9 §§ 2451; 2453(b) (2009):  (these statutes discuss "the purpose of this chapter is to complement the enforcement of federal statutes" and to be "guided by the construction of similar terms" in the FTCA.)

[144] *State of Wisconsin v. Amoco Oil Co.*, 97 Wis. 2d 226, 239 n.3 (1980) (citations omitted).

[145] *Id.* (citations omitted).  *See also Banke Associates, Inc. v. New England Fin. Res.,Inc.,* 1989 U.S. Dist. LEXIS 18313, *19 (D.N.H. Aug. 22, 1989) (*citing Commonwealth v. DeCotis,* 366 Mass. 234, 316 N.E.2d 748, 754 (1974)) ("The existence of unfair acts and practices must be determined from the facts of each case.  We do not now undertake to establish general rules which may be applied in other situations.  The nature of the statute and the development of the law under the comparable Federal statute indicate that such an attempt would be undesirable.").

[146] *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 35-36 (2007) (citation omitted).

---

111

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1   allegations' satisfy its requirements for subject matter jurisdiction because, as set forth above,

2   Defendants' conduct had a direct, substantial and reasonably foreseeable effect on domestic

3   commerce.[147]

4        Based on the foregoing, Plaintiffs respectfully request that the Court exercise subject

5   matter jurisdiction over Plaintiffs' state and federal antitrust claims.

6        **B.  The Complaint Cannot Be Dismissed On *AGC* Grounds**

7        Defendants argue that Plaintiffs lack antitrust standing under *AGC* because, according to

8   Defendants' "CRTs only" version of the conspiracy, Plaintiffs are purchasers of a product

9   containing a price-fixed component.  *See* Joint Motion at 16.  Again, Defendants' argument fails

10  at the most basic level because it is premised on a fundamental misreading and

11  mischaracterization of Plaintiffs' Complaint.  *See* Section I. B. *supra.*

12       Assuming *arguendo* that Plaintiffs allege a "CRTs only" conspiracy, and Plaintiffs are

13  purchasers of a price-fixed component, Defendants' *AGC* argument still fails.  Defendants

14  contend that *AGC*, the standard for determining standing for federal antitrust damage claims, also

15  applies to Plaintiffs' claims under the antitrust laws of fourteen states and the consumer statutes

16  of three states.[148]  A proper analysis, however, must look to state—not federal—law, because

17  state law, which permits suits by indirect purchasers, provides the basis for Plaintiffs' antitrust

18  claims.  Three courts in this district have rejected the same argument made by Defendants.

19  Courts in *GPU*, *LCD*, and *Flash Memory* have considered the same issue and held that *AGC*

20  _____

21  [147] *Amarel,* 202 Cal. App. 3d at 149 (stating that "the most the [FTAIA] does to state law is to
    establish an 'effects' test for application of the state's antitrust and unfair competition laws to
22  export activity. And the nature of the test—'direct, substantial, and reasonably foreseeable
    effect'—does not lend itself to disposition on demurrer").

23
    [148] Defendants seek dismissal on antitrust standing grounds of Plaintiffs' claims under antitrust
24  laws of fourteen states, namely, Arizona, California, Iowa, Kansas, Michigan, Mississippi,
    Nebraska, Nevada, New Mexico, North Dakota, South Dakota, Vermont, West Virginia, and
25  Wisconsin.  Defendants "do not challenge plaintiffs' claims brought in Minnesota, North
    Carolina, and Tennessee with respect to antitrust standing."  In addition, Defendants seek
26  dismissal of Plaintiffs' claims under the consumer protection laws of Nebraska and New York for
    lack of antitrust standing.  Joint Motion at 18 & fn. 12.

27                                        112

28  **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
    AND JOINT MOTIONS TO DISMISS THE IP CAC
    MDL NO. 1917**

1    either does not apply to Plaintiffs' claims under the repealer states' laws in the absence of a clear

2    directive from those states' legislatures or highest courts, or even if does, the application of *AGC*

3    cannot be resolved at the pleading stage.[149]   Likewise, Defendants' argument must be rejected

4    here.  Alternatively, even if the *AGC* factors do apply to the particular state law claims, they

5    strongly weigh in favor of Plaintiffs' standing.

### 1.  Indirect-Purchaser Standing to Pursue State Antitrust Claims Is A Matter of State Substantive Law

8        The *AGC* test is developed under federal Clayton Act to put limits on the reach of the

9    treble damages remedy authorized under Section 4 of the Clayton Act.  The *AGC* factors should

10   not be applied in the manner proposed by Defendants to indirect-purchaser claims under state

11   substantive antitrust laws where the state legislature or judiciary has expressly preserved indirect-

12   purchasers' rights to sue post-*Illinois Brick*.  Because "the concept of standing in the antitrust

13   context is intertwined with the substantive content of and intent behind the particular statute

14   authorizing the cause of action," federal courts sitting in diversity jurisdiction are bound to follow

15   the state law principles of broader standing, not the *AGC* factors.[150]

16        In response to *Illinois Brick*, many states ("repealer states"), including those at issue here,

17   codified the *Illinois Brick* dissent by enacting legislation or interpreting their existing antitrust

18   law to permit indirect purchasers to recover damages.  These states provide a more liberal

19   standing to indirect purchasers under their respective state antitrust and consumer protection

20   laws, and the Supreme Court has held that "[s]tate laws to this effect are consistent with the broad

21   purposes of the federal antitrust laws: deterring anticompetitive conduct and ensuring the

---

[149] *See GPU I,* 527 F. Supp. 2d 1011; *GPU II,* 540 F.Supp.2d 1085; *TFT-LCD I,* 586 F. Supp. 2d 1109; *Flash Memory,* 2009 U.S. Dist. LEXIS 38941.

[150] *Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938); *see also GPU I,* 527 F.Supp.2d 1011, 1025 (N.D.Cal. 2007) ("Standing under each state's antitrust statute is a matter of that state's law.  It would be wrong for a district judge, in *ipse dixit* style, to bypass all state's legislatures and all state appellate courts and to pronounce a blanket and nationwide revision of all state antitrust laws.").

28

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC MDL NO. 1917**

1    compensation of victims of that conduct."  *ARC America*, 490 U.S. at 102 ("Congress intended

2    the federal antitrust laws to supplement, not displace, state antitrust remedies.").  Consistent with

3    the purpose of repealer states' antitrust laws to create effective antitrust remedies for *consumers*,

4    courts have repeatedly held that *AGC* is not controlling in cases based on state—rather than

5    federal—law.[151]

6         In a clear attempt to "federalize" repealer state's standing requirements, Defendants cite

7    cases in which they claim that the courts applied *AGC* to the antitrust claims in nine of the states.

8    Joint Motion at 18 n. 13.  These "favorable citations" and references to the federal antitrust

9    standing are not, however, the same as showing that *AGC* has been adopted as the law of those

10   states.[152]  For example, Defendants rely on *Vinci v. Waste Management, Inc.*, a case addressing

11   whether a shareholder of a corporation had standing to sue for an injury to the corporation.  36

12   Cal. App. 4th 1811, 1815 (1995).  Although the *Vinci* court did list the *AGC* factors, it noted that

13   the defendant "relies almost exclusively" on the antitrust injury factor, and the court did not

14   analyze each factor in determining that the shareholder lacked standing.[153]  *Knevelbaard Dairies,*

15

16

---

17   [151] *See, e.g., Lorix v. Crompton Corp.*, 736 N.W.2d 619, 632 (Minn. 2007) (rejecting application
     of *AGC* as contrary to the "plain language" of the Minnesota repealer statute and the "intent of
18   the legislature."); *D.R. Ward Const. Co. v. Rohm and Haas Co.*, 470 F. Supp. 2d 485, 499 (E.D.
     Pa. 2006) (holding that *AGC* is not appropriate framework for analyzing standing under
19   Tennessee, Arizona, and Vermont antitrust statutes).*Teague v. Bayer AG*, 671 S.E. 2d 550, 556-
     58 (N.C. App. 2009) (holding that *AGC* factors do not apply in determining indirect-purchaser
20   standing in a component case under North Carolina antitrust law).  Federal courts in component
     cases have repeatedly rejected *AGC* arguments similar to those advanced here.  In *GPU I*, the
21   court refused to dismiss claims by indirect purchasers who had bought computers containing
     allegedly price-fixed graphics processing chips, finding that the *AGC* rule advanced by
22   defendants "is a matter for the state policy makers to decide, not for a federal judge to impose by
     fiat."  527 F.Supp.2d at 1026.  Similarly, courts in *TFT-LCD I* and *Flash Memory* rejected
23   application of *AGC* to claims by indirect purchasers who bought finished products containing
     allegedly price-fixed LCD panels and flash memory chips, in the absence of a clear directive
24   from the states' legislatures or highest courts.  *TFT-LCD I*, 586 F.Supp.2d at 1109; *Flash
     Memory*, 2009 U.S. Dist. LEXIS 38941, *64-65.

25   [152] *TFT-LCD I*, 586 F. Supp. 2d at 1123; *GPU I*, 540 F.Supp.2d at 1097.

26
     [153] *Id.* at 1815, n. 2.
27

---

28

114

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1  another case cited by Defendants, makes clear that standing under the Cartwright Act is governed

2  by substantive California law, and that federal antitrust precedent has "limited" value and is "not

3  necessarily decisive" in construing that the Cartwright Act, because "California law affords

4  standing more liberally than does federal law." 232 F.3d at 985, 987.[154]  More fundamentally,

5  neither *Vinci* nor *Knevalbaard* concern indirect-purchaser standing and thus do not support

6  Defendants' argument that *AGC* should apply here.[155]

7         Likewise, the Visa/MasterCard cases (Joint Motion at 18 n. 13) all turn on a unique set of

8  facts that are not present here.  Plaintiffs in those cases were not real "indirect purchasers" of the

9  price-fixed products.  Rather, they purchased consumer goods sold by a merchant who paid

10  supra-competitive credit card fees.  None of these cases involve plaintiffs who purchased a price-

11  fixed item incorporated into the finished goods and resold as a key component in a chain of

12  distribution.  Thus, these cases do not provide a basis for this Court to conclude as a matter of

13  law that the Supreme Courts of each of these states would adopt the *AGC* factors for determining

14  indirect-purchaser standing under the respective state antitrust statutes.

15         Defendants' argument fares no better with respect to other states.  Neither state

16  "harmonization" provisions nor the requirement to interpret a state statute consistent with federal

17  antitrust precedent equate to adoption of *AGC* by the state courts as Defendants suggest.  At least

18  three courts in this district have recently rejected such arguments.[156]  As numerous courts have

19

20  [154] *See, e.g., Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1477 (9th Cir. 1986) (rejecting as
21  untrue parties' stipulation in court below that "California's Cartwright Act is construed in
    accordance with federal law under the Sherman Act"); *Tucker v. Apple Computer, Inc.*, 493 F.
22  Supp. 2d 1090, 1102 (N.D. Cal. 2006) (recognizing that laws regarding Cartwright Act and
    Sherman Act are distinct, and California courts have occasionally rejected federal precedent in
23  construing Cartwright Act).

24  [155] *See Vinci*, 36 Cal. App. 4th at 1816 (denying standing based on the fact that loss of plaintiff's
    job "was not the type of loss the antitrust statute was intended to forestall."); *Knevalbaard*, 232
25  F.3d at 984-85 (involving plaintiffs milk sellers who alleged defendant cheese makers conspired
    to depress milk price by colluding to depress the price of bulk cheese).

26  [156] *See TFT-LCD I*, 586 F. Supp. 2d at 1122; *Flash Memory*, 2009 U.S. Dist. LEXIS 38941, * 64-
27  65; *GPU I*, 540 F. Supp. 2d at 1097.

115

28  **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
    **AND JOINT MOTIONS TO DISMISS THE IP CAC**
    **MDL NO. 1917**

1    recognized, the fact that a state seeks to "harmonize" its antitrust law with federal law does not

2    translate to federal law restrictions on standing.  The goal of harmonizing state and federal

3    antitrust law applies not to the issue of who can sue, but to what conduct violates the law, so that

4    businesses would know what is "acceptable conduct."  *Lorix*, 736 N.W. at 626 (holding "[t]he

5    desire for harmony between federal and state antitrust law relates more to prohibited conduct than

6    to who can bring a lawsuit.).[157]

7           Finally, Defendants attempt to justify their re-writing the repealer states' antitrust laws by

8    claiming that *AGC* standing issues and the *Illinois Brick* bar on indirect-purchaser claims are

9    "analytically distinct."  Joint Motion at 17 n.11.  But *AGC* itself refutes this argument:  "In

10   *Illinois Brick* . . . we held that treble damages could not be recovered by indirect purchasers. . . .

11   The *same concerns* should guide us in determining whether the Union is a proper plaintiff under

12   § 4 of the Clayton Act."  *AGC*, 459 U.S. at 455 (emphasis added).  Thus, as the Minnesota

13   Supreme Court succinctly stated:  "We do not believe that the legislature repudiated *Illinois Brick*

14   and invited indirect purchaser suits only for courts to dismiss those suits on the pleadings based

15   on the very concerns that motivated *Illinois Brick*."  *Lorix*, 736 N.W.2d at 629.

16          Accordingly, this Court should reject Defendants' invitation to read limitations derived

17   from federal law into state indirect-purchaser statutes in the absence of authority from those

18   states' legislatures or highest courts.  But to the extent *AGC* is deemed applicable to any of the

19   state-law claims, the Complaint alleges facts satisfying each of the *AGC* factors.

20

21

22

23

24   [157] *See also Comes v. Microsoft Corp.*, 646 N.W. 2d 440, 446 (Iowa 2002) (goal of harmonization
     is to "apply a uniform standard of conduct. . . . To achieve this uniformity or predictability, we

25   are not required to define who may sue in our state courts in the same way federal courts have
     defined who may maintain an action in federal court."); *see also D.R. Ward*, 470 F. Supp. 2d at

26   500 (same); *Arthur v. Microsoft Corp.*, 676 N.W.2d 29 (Neb. 2004) (same); *Bunker's Glass Co.
     v. Pilkington, PLC*, 75 P.3d 99,103-05 (Ariz. 2003) (same).

27                                            116

28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
     AND JOINT MOTIONS TO DISMISS THE IP CAC
     MDL NO. 1917**

1

### 2.   The Complaint Alleges Sufficient Facts Satisfying *AGC* Factors

2

The *AGC* balancing test requires a sensitivity to the purpose of the antitrust laws and the

3

facts of the case, both of which Defendants completely ignore.  The *AGC* factors apply

4

differently under repealer states' antitrust laws, given that "antitrust standing" analysis is

5

ultimately an exercise of statutory construction and interpreting legislative intent.[158]  Defendants'

6

proposed standing limitations find no support in the history, language, or prior interpretations of

7

the state laws they purport to interpret.

8

### a.   Plaintiffs Have Adequately Alleged "Antitrust Injury" Under State Law

9

"Antitrust injury" is "injury of the type the antitrust laws were intended to prevent and

10

that flows from that which makes defendants' acts unlawful."  *Brunswick Corp. v. Pueblo Bowl-*

11

*O-Mat, Inc.*, 429 U.S. 477, 489 (1977) ("*Brunswick*").  "In applying the antitrust injury

12

requirement, the Supreme Court has inquired whether the injury alleged by the plaintiff

13

'resembles any of the potential dangers' which led the Court to label the defendants' alleged

14

conduct violative of the antitrust laws in the first instance."  *Pace Electronics, Inc. v. Cannon*

15

*Computer Systems, Inc.*, 213 F.3d 118, 120 (3d Cir. 2000) (quoting *Atlantic Richfield Co. v. USA*

16

*Petroleum Co.*, 495 U.S. 328, 344 (1990)).  Here, Plaintiffs have alleged a *per se* antitrust

17

violation (horizontal price-fixing) which caused them to pay "higher prices for CRT Products

18

than they would have paid in the absence of Defendants' conspiracy."  IP CAC ¶ 222.  Plaintiffs'

19

injuries are exactly the type of harm the state antitrust laws were intended to remedy.  "It is

20

difficult to imagine a more formidable demonstration of antitrust injury."  *In re Mercedes-Benz*

21

*Antitrust Litig.*, 157 F. Supp. 2d 355, 364 (D.N.J. 2001).  This is sufficient for Plaintiffs to have

22

standing under the repealer states' antitrust laws.

23

24

_____

25

[158] *D.R. Ward*, 470 F. Supp. 2d at 495-96 (intent of state law controls standing issue); *ARC*

26

*America*, 490 U.S. at 103 (it is inappropriate to consider congressional policies that defined
remedies under federal antitrust law in determining who may recover under state antitrust

27

statutes).

117

28

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
**AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1

### i.   Defendants' Proposed  "Antitrust Injury" Standard Is Inconsistent with the Legislative Intent of the Repealer States

2

3          Defendants argue that Plaintiffs have not demonstrated "antitrust injury" because they are

4   not "participants" in the allegedly restrained CRT market.  Joint Motion at 20, citing *Bhan v.*

5   *NME Hops.*, 772 F.2d 1467, 1470 (9th Cir. 1985).  This narrow definition of antitrust injury runs

6   directly contrary to the purpose of the state indirect purchaser laws.  Regardless, the issue turns

7   on factual questions that cannot be decided on a pleading motion.[159]

8          As an initial matter, Defendants *are* "participants" in the same "market" as Plaintiffs

9   because they not only make CRTs, but they also manufacture and sell CRT televisions and

10  computer monitors.  IP CAC ¶¶ 223, 238.  Moreover, Plaintiffs adequately allege and establish

11  the importance of the CRT Finished Product market in Defendants' conspiracy.  *Id.* ¶¶ 227, 237.

12  These allegations are more than sufficient to satisfy the first factor of *AGC*.[160]  Defendants'

13  argument fails for this reason alone.

14         Defendants' argument also fails because it rests entirely on the false assumption that the

15  *AGC* requirements—created by federal courts construing the scope of the Clayton Act's treble

16  damage provision—should be applied in the same manner to the repealer states' antitrust and/or

17  _____

18  [159] It is well established that when evaluating antitrust standing based on the pleading, "the court cannot determine, at this stage of litigation, whether or not [plaintiff's] allegation regarding the

19  relevant market is accurate.  Rather, it must accept [plaintiff's] allegation as alleged."  *Agron, Inc. v. Lin*, 2004 WL 555377, *8 (C.D. Cal. Mar. 16, 2004); *see also High Tech. Careers v. San Jose*

20  *Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) ("defining the relevant market is a factual inquiry for the jury."); *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 130 (C.D. Cal. 2007)

21  (refusing to resolve dispute over market definition on motion for class certification).

22  [160] Courts in *GPU I, TFT-LCD I*, and *Flash Memory* have uniformly rejected the distinction (as the Defendants try to make here) between the market for the finished product and the market for

23  the components and found these allegations are sufficient to weigh in favor of standing under *AGC* at the pleading stage.  *See GPU I*, 527 F. Supp. 2d at 1098; *TFT-LCD I*, 586 F.Supp.2d at

24  1123; *Flash Memory*, 2009 U.S. Dist. LEXIS 38941, *66-70.  Defendants incorrectly argue that *Flash Memory* is distinguishable because one of the applications of flash memory is as a stand-

25  alone item.  Joint Motion at 22 n. 18.  Notably, defendants in *Flash Memory* only challenged plaintiffs' claims based on purchases of finished products containing flash memory.  Thus, the

26  court's decision does not concern stand-alone items.  *See Flash Memory,* 2009 U.S. Dist. LEXIS 38941, *59 n.13.

27

28  **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC MDL NO. 1917**

1   consumer protection damage statutes.  As noted above, "antitrust injury" is a doctrine of statutory

2   construction.  *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 371 (9th Cir.

3   2003).  "This injury forces the Court to connect the alleged injury to the purposes of the antitrust

4   laws."  *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.,* 253 F. Supp. 2d 262, 272 (D. Conn.

5   2003) (internal quotations omitted).  "Antitrust injury" under *state* law thus depends on the intent

6   of the *state* legislature.

7          The intent of the repealer states' legislatures was to protect the kind of indirect purchasers

8   who are Plaintiffs in this action.  For example, in *Union Carbide Corp. v. Superior Court,* 36 Cal.

9   3d 15, 20 (1984), the California Supreme Court stated:

10
11                   California's 1978 amendment to section 16750 in effect incorporates into
                 the Cartwright Act the view of the dissenting opinion in *Illinois Brick* (431
                 U.S. at 748) that indirect purchasers are persons 'injured' by illegal
12                 overcharges passed on to them in the chain of distribution.

13          In fact, nearly every indirect-purchaser class certified in the last thirty years has involved

14   claims by end-buyers who purchased "component" products through a manufacturing or

15   distribution chain, and who did not participate directly at the same level in which the defendants'

16   overcharges were first imposed.[161]  This comports with the commercial reality that "[t]he typical

17   product passes through a 'chain of distribution'—a series of sales transactions—before reaching

18   its ultimate consumer."  Michael V. Gisser, *Indirect Purchaser Suits Under State Antitrust Laws:*

19   *A Detour Around The Illinois Brick Wall*, 34 Stan. L. Rev. 203, 204 (1981).  Courts in the

20   repealer states have consistently allowed such actions.  Artificial restrictions should not now be

21   imposed by federal courts where none existed before.[162]  A requirement that "indirect"

22

23   ────────────────

24   [161] *See, e.g., Cox v. Microsoft*, 2005 WL 3288130, *5 (July 29, 2005 N.Y. Sup.) (certifying a
     class of indirect purchasers of Microsoft software products used in computers under New York
25   law).  A collection of such cases are attached as Exhibits 1 through 24 to the RJN.

26   [162] *See, e.g., Hebert v. Fliegel*, 813 F.2d 999, 1000-02 (9th Cir. 1987) (adopting the "common
     sense construction placed on [the statute] by the lower courts" in light of prior courts'
27   interpretations for over ten years, and finding it "particularly significant" that Oregon legislature

119

28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
     **AND JOINT MOTIONS TO DISMISS THE IP CAC**
     **MDL NO. 1917**

1    purchasers must be "direct" participants in a defendant's market would run counter to both the

2    plain language and the intent of the repealer states' statutes and their judicial decisions

3    recognizing indirect-purchaser claims.

ii.    **Numerous Courts Have Rejected Defendants' Proposed "Market Participant" Requirement For State-Law Antitrust Claims**

6    Numerous state and federal courts have rejected Defendants' proposed test for antitrust

7    standing for state-law claims. Courts have repeatedly recognized that an indirect-purchaser of

8    goods or services is a "participant" in the relevant market and thus suffers a cognizable antitrust

9    injury. *See, e.g.*, *In re Napster, Inc. Copyright Litigation*, 354 F. Supp. 2d 1113, 1125 (N.D. Cal.

10   2005) ("[U]nder California law, an indirect purchaser of goods or services is deemed to

11   participate as a customer in the relevant market and thus may suffer a cognizable antitrust

12   injury.").[163]

13   Most notably, in *Lorix*, the Minnesota Supreme Court held that an indirect purchaser of

14   rubber chemicals used in the process of manufacturing tires, but not a component part of the tires

15   themselves, sufficiently alleged antitrust standing, even though the purchaser (like the Plaintiffs

16   here) made purchases at a distribution level different from the one in which defendants were

17   selling the price-fixed product. The Court rejected *AGC* as applicable to standing under

18   Minnesota's repealer statute as well as any "rigid market-participant requirement," and held that

19   *AGC* does not "foreclose antitrust claims in Minnesota for indirect purchasers of goods

20   manufactured with price- fixed components." *Lorix,* 736 N.W. 2d at 629-630.

21

---

22   did not choose to amend the statute to signal disagreement with the courts' holdings); *Bunker's
23   Glass Co.*, 75 P.3d at 113; *GPU I*, 527 F. Supp. 2d, at 1025-1026.

24   [163] *See also Cellular Plus, Inc. v. Superior Court of San Diego,* 14 Cal. App. 4th 1224, 1234
     (1993) (holding consumers "clearly" alleged antitrust injury because they were "injured
25   indirectly by the alleged wholesale price fixing"); *American Ad Management, Inc. v. General
     Telephone Co. of California*, 190 F.3d 1051, 1057 (9th Cir. 1999) (listing "indirect purchasers"
26   as an example of those that can suffer antitrust injury and noting "that the antitrust laws are . . .
     intended to preserve competition for the benefit of consumers").

27                                                    120

28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
     AND JOINT MOTIONS TO DISMISS THE IP CAC
     MDL NO. 1917**

1    The Minnesota Supreme Court found: "The injury alleged—overcharge—is exactly the

2    sort that would be expected to flow from the violation" and that as "an end user, Lorix is the

3    party most likely to be injured by an anticompetitive overcharge because she is the only party in

4    the chain of purchase who cannot pass on part or all of that overcharge." *Id*. at 631.  Thus, the

5    Minnesota Supreme Court rejected the market-participant requirement for standing because

6    "none of the *AGC* factors was intended to be determinative," which is exactly what a market-

7    participant rule would do.  This would make Minnesota standing more restrictive than federal

8    standing, and frustrating the legislative intent behind the repealer statute.  *Id.* at 627.

9            Courts in *GPU I, TFT-LCD I,* and *Flash Memory* also soundly rejected Defendants'

10   proposed "market-participant" test.[164]  In *GPU I*, Judge Alsup held that the claims of indirect

11   purchasers of graphic chips could go forward, even though the purchasers (like the Plaintiffs

12   here) bought the price-fixed product (graphics processing units or "GPUs") as a component of

13   another product (such as video games), at a distribution level different from the one in which the

14   defendants sold the price-fixed product.  The court noted that GPUs "are separable components

15   of a computer and that any costs attributable to them are traceable though the chain of

16   distribution."[165]  The courts in *TFT-LCD I* and *Flash Memory* applied similar reasoning in class

17   actions involving LCD products and flash memory products, respectively.[166]  Numerous other

18   courts have found antitrust standing in similar cases without the kind of bright-line "market-

19

20   [164] *See GPU I*, 527 F. Supp. 2d at 1098; *TFT-LCD I*, 586 F. Supp. 2d at 1123; *Flash Memory*,
21   2009 U.S. Dist. LEXIS, at *66-70.

22   [165] 527 F. Supp. 2d at 1098.

23   [166] *See TFT-LCD I*, 586 F. Supp. 2d at 1123; *Flash Memory*, 2009 U.S. Dist. LEXIS, at *66-70.
     *See also D.R. Ward,* 470 F. Supp. 2d at 491, 502-03 (holding that "market-participant"
24   requirement was inappropriate and that plaintiffs who participated in the secondary market for
     products with plastics additives can recover under the repealer states' antitrust laws) ; *In re Intel*
25   *Corp. Microprocessor Antitrust Litig.,* 496 F. Supp. 2d 404, 410 (D. Del. 2007) (claims of
     indirect purchasers of computers containing a monopoly-priced Intel computer chip could go
26   forward because "[i]njury in the form of higher prices to consumers is within the type of injury
     that the antitrust laws are designed to prevent.")

27                                          121

28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
     AND JOINT MOTIONS TO DISMISS THE IP CAC
     MDL NO. 1917**

1   participant" requirement the Defendants urge this Court to adopt.[167]  The same result is mandated

2   here.

3           Defendants' rely heavily on Judge Hamilton's decision in *DRAM I* and *DRAM II*, as

4   support for their bright-line "market participant" standing requirement.  Joint Motion at 21-24.

5   The *DRAM* decisions are contrary to the vast majority of federal and state authorities cited above

6   that have denied motions to dismiss the claims of indirect purchasers of price-fixed components

7   and have certified statewide classes of such purchasers.  Moreover, the continued validity of

8   *DRAM* is questionable.  First, the Ninth Circuit has granted an interlocutory petition for review of

9   the *DRAM* decision under 28 U.S.C. § 1292(b).[168]  The matter is currently being briefed.

10  Second, three courts in this District have refused to follow *DRAM*, recognizing the impropriety of

11  a district court sidestepping state legislatures and state courts and implementing a nationwide

12  revision of repealer state antitrust laws.[169]

13  ────────────────────

14  [167] *Freeman Inds. LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520 (Tenn. 2005) (holding
    indirect-purchasers of products containing price-fixed food additives had standing because the

15  state statutes intended "to protect and afford a remedy to ultimate consumers" and denying
    standing would unfairly "leave such victims of illegal activity with no redress"); *Holder*, 1998

16  WL 1469620, *3 (holding that indirect purchasers of grocery items that contained the price-fixed
    items high fructose corn syrup and citric acid had standing); *Moniz v. Bayer Corp.*, 484 F. Supp.

17  2d 228, 229 (D. Mass. 2007) (holding state legislature did not intend to create a distinction
    between component and non-component products: "as far as [the state law] is concerned, this is

18  a distinction without a difference because the effect is exactly the same:  price-fixing by an up-
    stream manufacturer results in an unfairly inflated price for the consumer product to the

19  plaintiff's detriment."); *Intel x86 Microprocessors Cases*, No. J.C.C.P. No. 4443 (Cal. Super. Ct.
    May 15, 2007) (RJN Ex.14) (refusing to dismiss on *AGC* grounds claims brought by California

20  consumers who purchased computers containing Intel microprocessors allegedly subject to an
    illegal overcharge); *Szukalski v. Crompton Corp.*, 726 N.W.2d 304 (Wis. Ct. App. 2006) (holding

21  purchasers of tires made with price-fixed rubber chemicals adequately alleged standing under
    *AGC*), abrogated on other grounds, *Meyers v. Bayer AG*, 735 N.W.2d 448 (Wis. 2007).

22

23

24  [168] *See* Order in *Petro Computer Systems, Inc. v. Micron Technology, Inc.*, No. 08-80057, D.C.
    No. 02-CV-01486-PJH (Jun. 27, 2008).

25

26  [169] *GPU I*, 527 F.Supp.2d at 1026; *TFT-LCD I*, 586 F.Supp.2d at 1123; *Flash Memory*, 2009 U.S.
    Dist. LEXIS 38941, at *64-65.

27

28                                                122
    **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
    AND JOINT MOTIONS TO DISMISS THE IP CAC
    MDL NO. 1917**

1

2

### iii.   Even Federal Law Does Not Impose A Bright-Line Requirement That Plaintiffs Be "Participants" In The Same "Market" As Defendants In Order To Suffer An "Antitrust Injury"

3

4   Defendants' bright-line "market participant" argument also fails purely as a matter of

5   federal law.  The Supreme Court, courts in this Circuit, and numerous other federal courts have

6   found antitrust standing where plaintiffs were neither competitors nor customers of defendants,

7   and distinct markets were involved, as long as the injury alleged was foreseeable and

"inextricably intertwined" with the injury to competition inflicted by defendants.

8

9   For example, in *Novell, Inc. v. Microsoft Corp.*, the Fourth Circuit rejected the exact rule

10   Defendants ask this Court to adopt. 505 F.3d 302, 311 (4th Cir. 2007).  There, Novell, a

11   competitor in the software application market, brought federal antitrust claims against Microsoft,

12   a participant in the PC operating system market, alleging that Microsoft's monopolistic acts in

13   the latter market harmed competition in the former market.  Microsoft sought dismissal under "a

14   bright-line rule that only consumers or competitors in the relevant market have antitrust standing

15   to bring private treble-damages claims under § 4."  *Id.*  The Fourth Circuit rejected this argument,

16   holding "[t]he Supreme Court has rejected the utility of the very type of bright-line approach on

17   which Microsoft seeks to rely: 'The infinite variety of claims that may arise make it virtually

18   impossible to announce a black-letter rule that will dictate the result in every case."  *Id.* at 311-12

19   (quoting *AGC*).  The Fourth Circuit concluded that even though Novell participated in a market

distinct from Microsoft's, it had nonetheless alleged an "antitrust injury" under *AGC*.  *Id.* at 316.

20

21   *Novell* is just one of many opinions in which courts have recognized that when

22   determining whether an "antitrust injury" exists—defined as "injury of the type that the antitrust

23   laws were designed to prevent" (*Brunswick*, 429 U.S. at 489)—they are not limited to injuries

24   only in the market where a defendant sells the product.  Rather, courts have repeatedly

recognized injuries resulting to plaintiffs in other markets, where these injuries are the

25

26

27

28

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC MDL NO. 1917**

1   foreseeable, intended consequence of the defendants' illegal actions, and flow from that which

2   makes defendants' actions unlawful.[170]

3         Defendants cite several decisions that reference the "relevant market" in their discussion

4   of "antitrust injury."  Joint Motion at 21-22.  But this language does not create a *per se*

5   requirement of participation in the same "market" as defendants.[171]  The Ninth Circuit has held

6   that such "bright line" rules are inappropriate:

7

8         The Supreme Court has never imposed a 'consumer or competitor' test but
          has instead held the antitrust laws are not so limited. The Supreme Court's
          only suggestion of such a restriction is a passing comment in *Associated*

9         *General* that the plaintiff union was 'neither a consumer nor a competitor'
          in the relevant market.  The Court did not find that fact in any way

10        dispositive, however, and concluded the antitrust injury of unions required
          case-by-case consideration. *See id.*  The previous year, in *Blue Shield v.*

11        *McCready* the Court stated § 4 'does not confine its protection to
          consumers, or to purchasers, or to competitors, or to sellers. . . .  The Act

12        is comprehensive in its terms and coverage, protecting all who are made
          victims of the forbidden practices by whomever they may be perpetrated.'

13

14

15

16  _____

    [170] *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 480 (1982) ("*McCready*").  This is

17  especially true where the harm in the other market is experienced by consumers.  *See, e.g.,*
    *American Needle, Inc. v. New Orleans LA Saints*, 385 F. Supp. 2d 727, 731 (N.D. Ill. 2005)

18  (holding the fact that the alleged restriction to competition occurred further up the distribution
    chain "does not preclude the court from considering how the alleged [anticompetitive conduct]

19  affects the consumers of the [end products] – 'the consumers that antitrust laws are supposed to
    protect.'") (quoting *Chicago Professional Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 670 (7th Cir.

20  1992)); *New York Citizens Committee on Cable TV v. Manhattan Cable TV, Inc.*, 651 F. Supp.
    802, 812-13 (S.D.N.Y. 1986) ("The fact that plaintiff is not a participant in the programmers–

21  operators market does not deny it standing where an impact on prices paid by the ultimate
    consumer is clearly foreseeable.")  Other courts have also rejected the bright-line "market

22  participant" test advocated by Defendants.  *See, e.g., In re Microsoft Corp. Antitrust Litig.*, 2005
    WL 1398643, at *2 (D. Md. Jun 10, 2005) (rejecting argument that there is a "black-letter rule

23  that only competitors or consumers in a relevant market have standing to sue for harm caused by
    anti-competitive behavior in that market," and holding that "[t]he Supreme Court has not

24  established a litmus test for antitrust standing based upon a plaintiff s status."); *Construction*
    *Aggregate Transport, Inc. v. Florida Rock Industries, Inc.*, 710 F.2d 752, 764-65 (11th Cir. 1983)

25  (holding foreseeable injury directly caused by defendant in "related market" created antitrust
    injury).

26
    [171] *See Novell*, 505 F .3d at 311-12; *Lorix*, 732 N.W.2d at 630.
27
                                              124
28        **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
                **AND JOINT MOTIONS TO DISMISS THE IP CAC**
                              **MDL NO. 1917**

1  *Am. Ad Mgmt., Inc. v. General Tel. Co.*, 190 F. 3d 1051, 1057-58 (9th Cir. 1999) (internal

2  citations omitted).[172]

3       Moreover, the "relevant market" is not necessarily restricted to the market in which

4  defendants are directly "participating."  Rather, it is the market "where trade is allegedly

5  restrained."  *Glen Holly*, 352 F.3d at 372.  Being a consumer in such a market is sufficient to

6  state an antitrust injury where the result is higher prices.  *Id.* at 372 ("Consumers in the market

7  where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust

8  injury.") (quoting *SAS v. Puerto Rico Tel. Co.*, 48 F.3d 39, 44-45 (1st Cir. 1995) ("[t]he

9  presumptively proper plaintiff is a customer who obtains services in the threatened market.")).

10       Put differently, under federal law, a plaintiff can suffer an "antitrust injury" even if he or

11  she is not a participant in the same "market" as the defendants.  Defendants try to interpret

12  *McCready* and *Ostrofe v. H.S. Crocker Co., Inc.*, 740 F.2d 739, 744-747 (9th Cir. 1984)

13  ("*Ostrofe*") to exclude those injured in downstream distribution of the price-fixed product. They

14  argue that *McCready* and *Ostrofe* concern a "narrow exception to the market participant

15  requirement" that is inapplicable to Plaintiffs.  Joint Motion at 24.  Their argument misses the

16  point.  What matters is whether the harm in the "market" at issue results from the Defendants'

17  antitrust violation, and flows from that which makes the Defendants' antitrust violation illegal.

18  *See, e.g., New York Citizens*, 651 F. Supp. at 812¬83.  Plaintiffs here have alleged this:  that as

19  the direct and foreseeable result of Defendants' horizontal price-fixing conspiracy, they were

20  forced to pay more for CRT Products than they would have otherwise paid.  Numerous federal

21

22

23  [172] *See also Knevelbaard*, 232 F.3d at 987 ("It is not the status as a consumer or competitor that

24  confers antitrust standing, but the relationship between the defendants['] alleged unlawful
conduct and the resulting harm to plaintiff.").  In fact, it is well established that "[m]arket

25  definition generally is not required in per se cases." ABA Section of Antitrust Law, 1 Antitrust
Law Developments at 550 (5th ed. 2007) (collecting cases); *Big Bear Lodging Ass'n v. Snow*

26  *Summit, Inc.*, 182 F.3d 1096, 1104 (9th Cir. 1999) (holding "[e]xcept when alleging a per se
antitrust violation, Plaintiffs must identify the relevant geographic and product markets in which
Plaintiffs and Defendants compete....") (emphasis added).

27

125

28  **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1    courts have held that such injuries to consumers are more than sufficient to establish antitrust

2    injury.[173]

3        Moreover, Plaintiffs' injuries—payment of artificially high prices for CRT Finished

4    Products — flows directly from the alleged conspiracy to fix and raise the price of CRTs.  IP

5    CAC. ¶¶ 222-229, 231-232, 238 (allegations that the cost of CRTs is traceable through the

6    distribution chain).  Plaintiffs are the "necessary means" to carry out the conspiracy, as

7    Defendants' conspiracy would serve no purpose without consumers' purchases of CRTs in

8    televisions and computers.  *Id.* ¶¶ 224, 238; *Ostrofe*, 740 F.2d at 745-46.

9        Inasmuch as there is no bright-line "market participant" requirement under federal (or

10   state) law, Defendants' discussion of the "interchangeability" or "cross-elasticity of demand" of

11   CRTs and televisions or computer monitors is a transparent straw man argument that should be

12   disregarded.  Joint Motion at 21.

13       **b.   Plaintiffs' Allegations Are Sufficient to Satisfy the "Remoteness" Factors**

14       **of *AGC***

15       Application of the additional *AGC* "remoteness" factors also supports Plaintiffs' antitrust

16   standing.  Once again, Defendants ignore the fact that Plaintiffs are indirect purchasers suing for

17   damages only under state laws.  The remoteness analysis Defendants suggest would require the

18   court to use the very nature of an indirect purchase to undermine enforcement of laws intended to

19   authorize damage claims by consumers who did not buy directly from the price-fixers.

20   Defendants' rigid application of *AGC*-remoteness requirement to state antitrust and consumer

21   protection claims must be rejected.

22

23

---

24   [173] *See, e.g., In re Mercedes-Benz*, 157 F. Supp. 2d at 364; *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 39 (D.D.C. 2003) (finding antitrust injury for insurance

25   companies that ultimately paid for purchases of drugs subject of illegal overcharges); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 651 (E.D. Mich. 2000) (holding that

26   plaintiffs' injuries "coincide precisely with the rationale for finding a violation of the antitrust laws in the first place," since "the very purpose of antitrust law is to ensure that the benefits of

27   competition flow to purchasers of goods affected by the violation ....").

126

28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1

### i.    Plaintiffs' Injury Is Sufficiently "Direct"

2       Plaintiffs have included allegations that satisfy the "directness" and "non-speculative"

3   *AGC* factors.  Unlike *AGC*, which involved a plaintiff who could not articulate how it had been

4   injured, here, Plaintiffs have done so in detail.  The Complaint alleges that the cost of CRTs

5   constitute a substantial portion of the cost of a CRT Finished Products (IP CAC ¶ 229); that the

6   CRT costs are traceable in prices of CRT Finished Products (*Id.* ¶ 228); that the distribution chain

7   for CRTs is short: CRT Finished Products are sold either directly to end users by direct

8   purchasers such as OEMs, or though an intermediary retailer (*Id.* ¶ 224); and that CRTs are

9   identifiable physical objects which follow a traceable physical chain from the Defendants to the

10  OEMs to the purchasers of finished products incorporating CRTs (*Id.* ¶ 231).  Such allegations

11  sufficiently satisfy the *AGC* "directness" and "nonspeculative" requirements.[174]

12      Defendants contend that Plaintiffs" claims are "indirect and attenuated" and "speculative"

13  because there are "a variety of different layers" in the distribution channels, and that "a variety of

14  factors" affected the price that the plaintiffs paid for the finished products.  Joint Motion at 25-27.

15  This argument rests on facts that cannot be used to support a 12(b)(6) motion to dismiss, and are

16  directly contradicted by the allegations in the Complaint (which must be taken as true).[175]

17      Additionally, the ability of purchasers to trace overcharges for components through a

18  distribution chain has been repeatedly recognized by federal courts.  *See, e.g., In re Sugar Indus.*

19  *Antitrust Litig.*, 579 F.2d 13, 18 (3d Cir. 1978) (plaintiffs who bought candy containing the price-

20  fixed produce, sugar, had standing because "just as the sugar sweetened the candy, the price-

21

---

22  [174] *See GPU I,* 540 F. Supp. 2d at 1098 (finding that indirect purchasers of components had
satisfied their burden of pleading directness of injury by alleging that the cost of the component
23  was traceable through the product distribution chain); *TFT-LCD I,* 586 F.Supp.2d at 1123 (same);
*Flash Memory*, 2009 U.S. Dist. LEXIS, *71-72 (same).
24

25  [175] *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 398 (3d Cir. 2000) (reversing
district court's finding of no antitrust standing for indirect purchasers, because district court
26  improperly relied upon facts outside the pleadings "gleaned from counsel's argument and its own
experience" such as the "sheer variety" of intermediate purchasers that "most likely absorbed
some or all of [the] overcharge").
27

28

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
**AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1    fixing enhanced the profits of the candy manufacturers.").[176]  In *Knevelbaard*, the Ninth Circuit

2    rejected an argument similar to the one urged by Defendants here: that the milk prices at issue

3    might have been lower due to independent factors other than price fixing of cheese.  *See* 232 F.3d

4    at 991 ("Whether experts will be able to measure the difference between the allegedly restrained

5    price for milk and the price that would have prevailed but for the antitrust violation remains to be

6    seen; in deciding a Rule 12(b)(6) motion we are dealing only with the Complaint's allegations,

7    which in this instance do not make the claim speculative.")

8         Defendants' argument must be rejected for another fundamental reason: they completely

9    ignore that Plaintiffs are indirect purchasers suing for damages under state, not federal law.

10   Repealer states allow these claims based on a policy decision that consumers at the end of

11   manufacturing and distribution chains often "suffer[ ] the greatest, if not the most direct, injury of

12   the price-fixing conspiracy."  *D.R. Ward*, 470 F. Supp. 2d at 503.  Thus, numerous courts have

13   refused to find "remoteness" or "speculativeness" at the pleading stage in cases involving price-

14   fixed components or ingredients of a product.[177]

15        In contrast, Defendants' meager authorities for their "remoteness" and "speculative"

16   arguments are unpersuasive.  Again, Defendants primarily rely on *DRAM*, in which Judge

17

18   _____

19   [176] *See also, In re Linerboard Antitrust Litig.*, 305 F.3d 145, 159 (3d Cir. 2002) (holding
     plaintiffs that purchased corrugated sheets or boxes from defendants that fixed linerboard prices
20   had standing, even though "linerboard was a mere ingredient" in the cardboard boxes purchased
     by plaintiffs).

21
     [177] *See D.R. Ward*, 470 F. Supp. 2d at 503 (holding "the discovery process is necessary to
22   develop an array of factual issues that bear upon the directness of the plaintiffs' injury, such as
     plaintiffs' positioning within the chain of distribution of plastics additives, the structure of the
23   distribution chain, the degree to which the artificially increased portion of the price of plastics
     additives was passed along the distribution chain or absorbed by more direct purchasers, and the
24   impact of intra-and extra-market factors on the price of products containing plastics additives.");
     *Intel*, 496 F. Supp. 2d at 410 (finding that the plaintiffs, who alleged that Intel's anti-competitive
25   acts had resulted in overcharges for a computer chip which was passed on to them when they
     purchased computers, had adequately pleaded "but for" causation, and that it would be
26   inappropriate to decide "complex and intensely factual" injury issues without "a more fully
     developed factual record.")

27                                          128

28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
     **AND JOINT MOTIONS TO DISMISS THE IP CAC**
     **MDL NO. 1917**

1   Hamilton herself recognized that her ruling "is not without controversy or uncertainty, given the

2   state of the law on the issues raised herein with respect to antitrust injury."  *DRAM II,* 536

3   F.Supp.2d at 1142.  As noted above, by order filed by June 26, 2008, the Ninth Circuit granted

4   the indirect plaintiffs permission to appeal.

5         The other cases cited by Defendants are also not instructive.  *A&M Supply Co. v.*

6   *Microsoft Corp.*, involved the appeal of a class certification order and a "battle of the experts,"

7   not a motion to dismiss.  654 N.W.2d 572 (Mich. App. 2002).  The unpublished, uncontrolling,

8   two-paragraph trial court opinion in *Weaver v. Cabot* Co., 2004 WL 3406119 (N.C. Super. Mar.

9   26, 2004) lacks any factual analysis or citation to authority and has been extensively criticized by

10   the California Attorney General.[178]  *Meyer* and *Lorenzo*, [179] which turn on virtually identical sets

11   of facts, are clearly distinguishable.  The defendant in both cases allegedly used its patent rights

12   over wireless technology to obtain and protect its monopoly power in the mobile-phone chipset

13   market, which resulted in end-consumers paying higher prices of cell phones and cellular

14   services.  Unlike this case, neither *Meyer* nor *Lorenzo* involved a *per se* violation of the antitrust

15   laws (horizontal price-fixing).  Neither case involved a price-fixed component that is physically

16   identifiable, discrete, and traceable through the distribution chain.[180]

17

18

19

20

---

21   [178] *See* State of California's *Amicus Brief* at 22-23 submitted in *DRAM* (July 5, 2007), RJN Ex.

22   25.

23   [179] *Meyer v. Qualcomm Inc.,* 2009 WL 539902, at *1-2 (S.D. Cal. Mar. 3, 2009); *Lorenzo v.*

24   *Qualcomm Inc.,* 2009 WL 537522, 603 F.Supp.2d 1291, 1295-97 (S.D.Cal.,2009).

25   [180] Likewise, *Stark*, the Visa/MasterCard case relied upon by Defendants (Joint Motion at 26 n.
23) is also distinguishable on facts.  Plaintiffs in *Stark* did not purchase, directly or indirectly, any

26   product or service provided by or manufactured with components from Visa or MasterCard.  *See*
*Stark,* 2004 WL 1879003.

27

28

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
**AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1

2

### ii.     Plaintiffs Sufficiently Alleged That Damages Are Traceable And Thus Apportionable

3

4

Defendants' arguments on the last two *AGC* factors, the risk of duplicative recovery and

the *complexity* in apportioning damages, are nothing more than a request that this Court overturn

5

the repealer states' statutes and decisional authorities sanctioning indirect purchaser actions.  As

6

discussed above, if federal "remoteness" limitations under *AGC* are applicable to state antitrust

7

and consumer protection laws, they must be applied in the context of repealer laws that provide

8

causes of actions to indirect purchasers.  The risk of duplicative recovery "is inherent in the dual

9

system of private antitrust enforcement created by *Illinois Brick* and *California v. ARC America*

10

*Corp. . . .*," and "such a concern, . . . generally is inapposite in the context of indirect purchaser

11

state law antitrust claims."[181]   Application of federal standing requirements cannot do what *ARC*

12

*America* refused to do and eliminate repealer state antitrust laws.

13

With respect to the "complexity" factor under *AGC*, Defendants make essentially the

14

same arguments that they raised regarding the first two "remoteness" factors: namely that there

15

are multiple levels in the distribution chain and any attempt to distinguish the impact of the

16

allegedly inflated price of CRTs on the purchase price of a finished product would be speculative

17

and excessively complex.  Joint Motion at 27-28.  Plaintiffs have alleged that CRTs, as a

18

substantial component of a television and/or computer monitor remains discrete and traceable to

19

its manufacturer.  IP CAC ¶¶ 223-229, 231-232.  The anticompetitive overcharges are traceable

20

to the injured consumer and thus apportionable.  These allegations are sufficient to satisfy the last

21

two *AGC* factors.[182]

22

23

24

25

[181] *Lorix,* 736 N.W. 2d at 628; *Flash Memory*, 2009 U.S. Dist. LEXIS 38941, *73-74.

26

[182] *TFT-LCD I*, 586 F. Supp. 2d at 1124; *Flash Memory*, 2009 U.S. Dist. LEXIS, *73.

27

130

28

### 3.  Plaintiffs Have Adequately Pled Standing For Their Injunctive Claims Under Section 16 Of The Clayton Act

Defendants erroneously argue that *AGC* applies equally to Plaintiffs' claims for injunctive relief under Section 16 of the Clayton Act.  Joint Motion at 19.  The Supreme Court has made it clear that standing under Section 16 differs from standing under Section 4.  *See, Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111 n. 6 (1986) ("[B]ecause standing under §16 raises no threat of multiple lawsuits or duplicative recovers, some of the factors other than antitrust injury that are appropriate to a determination of standing under §4 are not relevant under §16."). Thus, the requirements for "antitrust standing" for claims for §16 injunctive relief are less restrictive.  With respect to the alleged "injury," the plaintiff need only be "a foreseeable victim of the antitrust violations."  *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d at 399 (citing *McCready*, 457 U.S. at 475).  With respect to its connection to the violation, the loss alleged must be "the type of loss that the claimed violations . . . would be likely to cause."  *Id.*

As demonstrated above, Plaintiffs meet all of the *AGC* requirements.  The fact that Plaintiffs are indirect purchasers cannot matter.  Plaintiffs sufficiently allege that Defendants' conspiracy to fix, raise and maintain the prices of CRTs caused immediate, foreseeable effects on the prices Plaintiffs paid for CRT Products and that these increased prices were necessary for Defendants' conspiracy to succeed.  IP CAC ¶¶ 222-226, 237.  If there were no ultimate consumers of CRT Products, prices charged for CRTs by Defendants would be irrelevant:  they would be useless.  *See Warfarin*, 214 F.3d at 399-401 (similar allegations held sufficient to allege antitrust injury).  Plaintiffs have thus alleged facts sufficient to establish "antitrust injury" under Section 16.

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

### C.  Plaintiffs Can Sue Under The Statutes Of Nebraska And Nevada For Purchases Made Before Those Statutes Were Enacted

The Joint Defendants contend that Plaintiffs may not sue based on CRT Product purchases made before the effective dates of the Nebraska, Nevada and Hawaii statutes.[183]  The law of Nebraska and Nevada allows such claims and Plaintiffs' claims are therefore proper. Plaintiffs will make no claim under the Hawaii statute based on purchases made before that statute was enacted.

### 1.  Nebraska

The purpose of state antitrust laws is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition.  Because of the important remedial purpose for which these statutes were implemented, these remedial statutes are liberally construed in favor of the injured person.  *Krepcik v. Interstate Transit Lines*, 153 Neb. 98, 43 N.W.2d 609 (Neb., 1950).  In order to provide the protection intended for the citizens of these states, courts have afforded retroactive application of these statutes.  In *Arthur v. Microsoft,* the Nebraska Supreme Court allowed an indirect purchaser action commenced in 2001 and arising from conduct occurring in the 1990's, to go forward even though the *Illinois Brick* repealer statute sued upon was enacted in 2002.  676 N.W. 2d 29 (Neb. 2004).

In addition, Nebraska courts have recognized that where a statute does not contain specific language limiting its application to events occurring after the statute's passage, the statute may reach back in time and include events which occurred prior to the statute's effective date.  *See Nickel v. Saline County Sch. Dist. No. 163*, 251 Neb. 762, 769 (Neb. 1997).  Neither Nebraska's Junkin Act (Neb. Rev. Stat. § 59-801, *et seq.*) nor the Consumer Protection Act (*Id.* at § 59-1601, *et seq.*) specifically limits indirect purchasers to bringing suits for violations accruing only after the effective date of the statute.  *See* Neb. Rev. Stat. § 59-821.  Therefore, Plaintiffs

---

[183]Joint Motion at 30.

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1    may bring claims based on purchases of CRT Products made before the effective date of these

2    statutes.

### 2.  Nevada

4    Nevada courts have allowed indirect purchasers to sue under that state's *Illinois Brick*

5    repealer statute for conduct occurring prior to its 1999 enactment.  Defendants overlook a case

6    from a Nevada appellate court which held that Nevada's *Illinois Brick* repealer statute was doing

7    no more than "reaffirming the original legislative intent: any person injured by an alleged

8    violation of the act may sue."  *Pooler v. R.J. Reynolds Tobacco Co.*, 2001 WL 403167, at *1

9    (Nev. Dist. Ct. Apr. 4, 2001.)  In allowing the plaintiffs to pursue a claim based on conduct

10   occurring prior to the statute's enactment in 1999, the court relied on pre-enactment legislative

11   statements that the purpose of the amendment was to repudiate a trial court decision that had

12   followed *Illinois Brick*.  Therefore, the Nevada retroactive indirect purchaser claim based on

13   conduct occurring prior to 1999 is proper.

### D.  Plaintiffs Have Properly Pled Causes Of Action Under The Consumer Protection Laws of Massachusetts, New York, And Rhode Island[184]

### 1.  Massachusetts

17   The Massachusetts Consumer Protection Act is clear that a written demand for relief is

18   not required "if the claim is asserted by way of counterclaim or cross-claim, or *if the prospective*

19   *respondent does not maintain a place of business or does not keep assets within the*

20   *commonwealth*."  M.G.L Chapter 93(a) § 9(3) (emphasis added).  None of the Defendants has

21   demonstrated in its moving papers that it maintains a place of business or keeps assets within the

22   Commonwealth of Massachusetts.  The requirement to send a demand letter is therefore

23   inapplicable here.  *See Richards v. Arteva Specialties S.A.R.L.*, 66 Mass. App. Ct. 726, 739 n. 13

24   (Mass. App. Ct. 2006) (dismissal was error where defendant's motion failed to demonstrate that

25   it had a place of business or kept assets in Massachusetts).

---

[184] Plaintiffs will make no claim under the Hawaii unfair competition statute for business entities.

133

1

## 2.  New York

2    The IP CAC adequately alleges that Defendants' unlawful acts were materially deceptive

3    and consumer-oriented under New York Gen. Bus. Law § 349.  First, the Plaintiffs have alleged

4    specific deceptive conduct by Defendants in carrying out their scheme to fix the prices of CRT

5    Products.  Defendants' deceptive acts include the agreement to conceal the existence of "Glass

6    Meetings," the non-disclosure of the conspiracy itself, and the real reason why CRT Product

7    prices were increasing: price fixing.  *See* IP CAC ¶¶ 156, 280, 290.  These allegations are

8    sufficient to allege that Defendants' conduct was materially deceptive under § 349.

9    The Defendants have cited cases dismissing New York consumer protection claims.

10   These cases are all distinguishable because they did not allege deceptive conduct.[185]  The

11   deceptive acts alleged here are the same as those alleged in cases where the court has denied

12   dismissal of New York consumer protection claims.[186]  Therefore, under these recent authorities,

13   Plaintiffs have sufficiently alleged deceptive conduct by the Defendants.

14

15

16   [185] *See, e.g., Horowitz v. Stryker Corp.*, 2009 WL 436406, * 12 (E.D.N.Y. Feb. 20, 2009) (no
     deceptive conduct alleged); *Bogosian v. All American Concessions*, 2008 WL 4534036 at *4
17   (E.D.N.Y. Sept. 29, 2008) (same); *Benjaminov v. Republic Ins. Group*, 660 N.Y.S.2d 148, 149
     (N.Y. App. Div. 1997) (same); *In re New Motor Vehicles*, 350 F. Supp. 2d 160, 197 (D. Me.
18   2004) (plaintiffs failed to allege that the conspiracy involved deception); *State v. Daicel
     Chemical Ind.*, 840 N.Y.S.2d 8, 12 (N.Y. App. Div. 2007) (no deceptive conduct alleged); *Paltre
19   v. General Motors Corp.*, 810 N.Y.S.2d 496, 498 (N.Y. App. Div. 2006) (no material deceptive
     conduct alleged); *Sperry v. Crompton Corp.*, No.17872/02, slip op. at 4 (N.Y. Sup.Ct. filed Nov.
20   25, 2003) (no deception alleged).

21   [186] *See, e.g., TFT-LCD I*, 586 F. Supp. 2d at 1127-28 (Plaintiffs' claim under New York law
     upheld where plaintiffs alleged that New York consumers paid inflated prices and defendants
22   took efforts to conceal agreements from New York plaintiffs); *GPU I*, 527 F. Supp. 2d at 1030
     ("[Plaintiffs] contend that defendants have engaged in deceptive acts to conceal the alleged
23   agreement to fix prices.  Here, it would seem that such allegations would be sufficient to state a
     claim under such law."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2008 WL
24   2610549, at *2 (N.D. Cal. June 27, 2008) ("*SRAM II*") ("Defendants made public statements
     about the price of SRAM and products containing SRAM that Defendants knew would be seen
25   by New York consumers; such statements either omitted material information that rendered the
     statements that they made materially misleading or affirmatively misrepresented the real cause of
26   price increases for SRAM and products containing SRAM"); *Cox v. Microsoft Corp.*, 8 A.D.3d
     39, 40 (N.Y. App. Div. 2004) (plaintiffs alleged that Microsoft engaged in deceptive
27   monopolistic business practices and secret agreements to inhibit competition).

134

28   **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
     AND JOINT MOTIONS TO DISMISS THE IP CAC
     MDL NO. 1917**

1    Second, Plaintiffs have alleged deceptive conduct that is directed towards New York

2  consumers.  Plaintiffs specifically allege that "Defendants made public statements about the price

3  of CRT Products that Defendants knew would be seen by New York Plaintiff[s]".  IP CAC ¶

4  280(g).  Plaintiffs also allege that Defendants took efforts to conceal their agreements from New

5  York Plaintiffs. *Id.* ¶¶ 280(b), 290.  Plaintiffs further allege that New York plaintiffs were the

6  target of the conspiracy.  *Id.* ¶¶ 154-156, 280(e).  As demonstrated above, allegations like these

7  have routinely been found to sufficiently state a claim under New York consumer protection law.

8    Defendants cite cases where no allegation was made that any deceptive conduct was

9  directed towards the Plaintiffs, and the Plaintiffs were not the target of the conspiracy. [187]  These

10  cases are thus distinguishable.  Here, Plaintiffs allege specifically that they were the target of the

11  conspiracy and that Defendants made false statements that Defendants knew Plaintiffs would see.

12  IP CAC ¶¶ 154-156, 280(e), 280(g).

13    The allegations here are almost identical to those made in the *SRAM* case.  The plaintiffs

14  in *SRAM* alleged that Defendants made false allegations that they knew the Plaintiffs would see.

15  This was sufficient to state a claim under the New York Consumer Protection Law. *SRAM II,*

16  2008 WL 2610549, *2.

17    Defendants argue that any deceptive conduct was only directed at direct purchasers of

18  CRTs and not consumers who purchased CRT Finished Products.  This argument impermissibly

19  contradicts and draws inferences against the allegations of the IP CAC.  Again, Defendants' cases

20  do not involve complaints where plaintiffs specifically alleged, as here, that consumers were

21  targets of the conspiracy.  IP CAC ¶¶ 154-156, 280(e).  As noted, several judges in this district

---

[187] *See e.g., In re Auto. Refinishing Paint Antitrust Litig.*, 515 F. Supp. 2d 544 (E.D. Pa. 2007); *St Patrick's Home for the Aged and Infirm v. Laticrete Int'l, Inc.,* 264 A. D. 2d 652, 696 N.Y.S. 2d 117 (1st Dep't 1999). Defendants also rely on *Flash Memory,* 2009 U.S. Dist. LEXIS 38941,*88-89. This case is distinguishable because even though the plaintiffs alleged that the defendants made false and misleading statements, they failed to allege that these statements were directed at consumers.

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1   have found similar allegations sufficient to state a claim under New York consumer protection

2   law even where the price-fixed product is a component of the consumer product purchased.[188]

3                    **3.   Rhode Island**

4        The Joint Defendants contend that Plaintiffs' claims under Rhode Island Unfair Trade

5   Practices and Consumer Protect Act ("UTPCPA"), R.I. Gen. Laws § 6-1.1-1 *et seq.*, should be

6   dismissed because Plaintiffs failed to plead deceptive acts falling within the Act's nineteen

7   specifically enumerated prohibited practices.  The Defendants read the allegations of the IP CAC

8   too narrowly.[189]

9        The Rhode Island Supreme Court has held that in determining whether a practice is unfair

10  under the provisions of the UTPCPA, the court considers: (1) whether the practice "offends

11  public policy as it has been established by statutes, the common law, or otherwise;" (2) "whether

12  it is immoral, unethical, oppressive, or unscrupulous;" and (3) "whether it causes substantial

13  injury to consumers." *Ames v. Oceanside Welding and Towing Co., Inc.*, 767 A.2d 677, 681 (R.I.

14  2001).  In addition to the twenty specifically enumerated practices that are prohibited by the

15  UTPCPA, the UTPCPA further defines prohibited acts broadly to include "[e]ngaging in any

16  other conduct that similarly creates a likelihood of confusion or of misunderstanding," and

17  "[e]ngaging in any act or practice that is unfair or deceptive to the consumer."  R.I. Gen. Laws

18  § 6-13.1-1(xii), (xiii).  This broad language includes the unfair and deceptive conduct alleged

19  here: Defendants failed to disclose their intentional and purposeful anti-competitive acts,

20  including their acts of collusion to set prices for CRT Products.  IP CAC ¶ 282(c).  *See In Re*

21  *Chocolate Confectionary*, 602 F. Supp. 2d at 586-587 (holding that "consumers subject to

---

[188] *See TFT-LCD I,* 586 F. Supp. 2d at 1127-28; *GPU I*, 527 F. Supp. 2d at 1030; *SRAM II*, 2008 WL 2610549 at *2.

[189] Plaintiffs do not dispute Defendants' assertion that "entities" should not be included in classes under Rhode Island Gen. Laws §6-13.1-1, *et seq*. Plaintiffs ask leave to amend to limit the Rhode Island class to "natural persons" if the Court so requires.

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC MDL NO. 1917**

1   collusive pricing possess a cognizable claim under the RIUTPCPA.") (*citing TFT-LCD I,* 586 F.

2   Supp. 2d. at 1129, and *DRAM II,* 536 F. Supp. 2d. at 1144-45).[190]

3          Defendants cite *ERI Max Entertainment, Inc. v. Streisand*, 690 A.2d 1351 (R.I. 1977) for

4   the proposition that the UTPCPA does not provide a cause of action for antitrust violations.  In

5   *ERI*, the court considered claims under the UTPCPA and for unfair competition under Rhode

6   Island common law.  Addressing the unfair competition claim, the court held that "a finding of

7   unfair competition must be predicated upon conduct . . . that reasonably tended to confuse and

8   mislead the general public into purchasing [the defendant's] product when the actual intent of the

9   purchaser was to buy the product of [another]."  *Id.* at 1354 (quoting *George v. George F.*

10  *Berkander, Inc*., 169 A.2d 370, 371 (1961)).  Contrary to the Defendants' contention, *ERI*

11  imposed no similar restriction on statutory claims under the UTPCPA, which is "intended to

12  declare unlawful a broad variety of activities that are unfair or deceptive." *Park v. Ford Motor*

13  *Co*., 844 A.2d, 687 692 (R.I. 2004).

14         Moreover, the restrictive language in *ERI* regarding unfair competition derives from

15  *George*, which was decided approximately eight years before the enactment of the UTPCPA and

16  addressed a common law unfair competition claim.  *George*, 169 A.2d at 429.  The UTPCPA

17  provides a statutory remedy for such claims. Its reach is not limited to the common law.  *See,*

18  *Park*, 844 A.2d at 692.  Thus, Plaintiffs may invoke the UTPCPA as a basis for the instant claim.

19

20

21

22

23

24  ─────────────────

25  [190] Price fixing meets the test for "unscrupulous" conduct, which injures unwitting consumers in
    Rhode Island and elsewhere.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, 233

26  F.R.D. 229, 230-31 (D. Mass. 2006) (certifying consumer co-payor class for claims under Rhode
    Island General Laws § 6-13.1-1).

27

28
                                                137

1

### E.  Plaintiffs' Unjust Enrichment Claims Are Proper

2

#### 1.  The Law Of Michigan, Kansas And New York Does Not Require That Plaintiffs Confer A Direct Benefit On Defendants In Order To State A Claim For Unjust Enrichment

3

4

##### a.  Michigan

5

Relying solely on a Michigan intermediate appellate court ruling, the Joint Defendants

6

argue that Michigan law requires that indirect purchasers confer a benefit directly on the

7

defendant in order to state a claim for unjust enrichment.  *See* Joint Motion at 36-37, citing *A &*

8

*M Supply Co. v. Microsoft Corp.,* 2008 WL 540883 (Mich. App. Feb. 28, 2008).

9

Michigan imposes no such requirement.  It merely requires that *some* benefit was

10

conferred on the defendant.  *See Kammer Asphalt Paving Co., Inc. v. East China Tp. Schools*,

11

504 N.W. 2d 635, 640-41 (Mich. 1993) (Allowing an unjust enrichment claim to go forward

12

"[e]ven though no contract may exist between two parties," and plaintiff had only "indirectly

13

provided defendant a benefit," because "under the equitable doctrine of unjust enrichment, [a]

14

person who has been unjustly enriched at the expense of another is required to make restitution to

15

the other");  *see also Morris Pumps v. Centerline Pumping*, 729 N.W. 2d 898, 904 (Mich. App.

16

2006) ("The key to any quantum meruit recovery from a non-contracting party is proof that he or

17

she unjustly received and retained an independent benefit from the plaintiff's contractual

18

services.").

19

Other indirect purchaser cases have also held that a plaintiff need not confer a direct

20

benefit on a defendant in order to state a claim for unjust enrichment under Michigan law.  *See In*

21

*re Cardizem CD Antitrust Litig.,* 105 F. Supp. 2d at 671 ("Whether or not the benefit is directly

22

conferred on the defendant is not the critical inquiry; rather, the plaintiff must show that his

23

detriment and the defendant's benefit are related and flow from the challenged conduct."); *TFT-*

24

*LCD II*, 599 F.Supp.2d at 1189-90.

25

26

27

28

138

1

### b.  Kansas

2          Similarly, privity is not a requirement for an unjust enrichment claim under Kansas

3   law.[191]  *See HAZ-MAT Response, Inc. v. Certified Waste Resources Ltd.*, 910 P.2d 839, 847 (Kan.

4   1996) ("*HAZ-MAT")* ("This conclusion is consistent with the theory of quasi-contract and unjust

5   enrichment, which does not depend on privity").

6          Even Defendants' own case, *Babcock v. Carrothers Constr. Co.,* recognizes that privity is

7   not required where the defendant misleads the plaintiff.  2005 WL 3527117 at *3 (Kan. App.

8   Dec. 23, 2005), *citing HAZ-MAT*.  Here, Plaintiffs allege that they were misled by Defendants

9   who, among other things, concealed rising prices through collusion and pretextual explanations

10  of price increases.  IP CAC ¶ 290.  Therefore, Plaintiffs' claim for unjust enrichment under

11  Kansas law is proper.

12

### c.  New York

13         The Joint Defendants also claim, incorrectly, that the common law of New York does not

14  permit Plaintiffs to recover under an unjust enrichment theory unless they directly conferred a

15  benefit upon Defendants.[192]  *See Cox v. Microsoft Corp.*, 8 A.D.3d at 40-41 (finding the

16  directness of the benefit does not matter for an unjust enrichment claim under N.Y. common

17  law).[193]

18

19

20

_____

21  [191] *See* Joint Motion at 37.

22  [192] *See* Joint Motion at 37-38.

23  [193] *See also In re Cardizem*, 105 F. Supp. 2d at 67 (rejecting the need to show plaintiffs directly

24  conferred a benefit on the defendant and denying dismissal of unjust enrichment claims by
    indirect purchasers under the law of ten states, including New York); *In re Pharm. Indus.*

25  *Average Wholesale Price Litig*., 2007 U.S. Dist. LEXIS 26242 at *104-06 (D. Mass. April 2,
    2007) (finding a "substantive connection" between defendants and indirect payer plaintiffs

26  sufficed under New York law to support an unjust enrichment claim).

27                                                    139

28         **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
           **AND JOINT MOTIONS TO DISMISS THE IP CAC**
           **MDL NO. 1917**

1    Defendants' authority is distinguishable.  Indeed, *Sperry v. Crompton Corp.*, 8 N.Y.3d

2    204, 215-216 (N.Y. 2007) actually supports Plaintiffs' position.[194]  In *Sperry*, the plaintiffs

3    alleged that defendant rubber chemical makers had engaged in a price fixing conspiracy.

4    Plaintiffs were purchasers of tires who claimed that because the price of the chemicals used in the

5    rubber-making process was artificially inflated, they had overpaid for the tires.

6    *Sperry* specifically states that "a plaintiff need not be in privity with the defendant to state

7    a claim for unjust enrichment" under New York law. *Id.* at 215.  Nevertheless, the court affirmed

8    the dismissal of plaintiffs' unjust enrichment claim because it found "the connection between the

9    purchaser of tires [plaintiffs] and the producers of chemicals [defendants] used in the rubber-

10   making process is simply too attenuated to support such a claim." *Id.* at 215-16.  Unlike in

11   *Sperry*, where the rubber chemicals became blended in the tires purchased by end consumers,

12   Plaintiffs allege that CRTs are "identifiable, discrete, physical objects that do not change form or

13   become indistinguishable part of the [finished product]."  IP CAC ¶231.  Moreover, Plaintiffs

14   allege that Defendants' conspired to fix the prices of both CRTs and CRT Finished Products.  *See*

15   Section I. B. *supra.*  Therefore, Plaintiffs' claims are not too attenuated to support a claim for

16   unjust enrichment under New York law.

17   The other cases cited by Defendants, *Carmona v. Spanish Broadcasting System, Inc.*, No.

18   08 Civ. 4475, 2009 WL 890054, at *6 (S.D.N.Y. March 30, 2009) and *Reading Int'l, Inc. v.*

19   *Oaktree Capital Mgmt.*, 317 F. Supp. 2d 301, 333-34 (S.D.N.Y. 2003), are also distinguishable.

20   Those cases did not involve any type of meaningful connection between the plaintiffs and

21   defendants.  Here, Plaintiffs paid for CRT Products made by Defendants.  Additionally,

---

[194] Defendants cite to a slip opinion from the appellate division of the N.Y. trial court. *Sperry v. Crompton,* 810 N.Y.S.2d 498 (N.Y. App. Div. 2006). Joint Motion at 37. The appellate division's finding that a plaintiff must be in privity with a defendant to recover damages for unjust enrichment is not good law because the N.Y. Court of Appeal expressly overruled it. *Sperry,* 8 N.Y.3d at 215.  Since the Defendants were obviously aware of the N.Y. Court of Appeals decision (they also cite to it), it is unclear why they invite the Court to rely upon the appellate division opinion.

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

1   Defendants' alleged conspiracy was specifically directed at Plaintiffs.  *See* IP CAC ¶¶ 154-156,

2   280(e).[195]

3       **2.  Plaintiffs' Unjust Enrichment Claims Are Not A "Back Door" To Recover**
        **For Barred Antitrust Claims**
4

5       The Joint Defendants contend that Plaintiffs may not maintain a cause of action for unjust

6   enrichment under Massachusetts and Rhode Island law because those states adhere to *Illinois*

7   *Brick's* ban on indirect purchaser suits.[196]  Defendants' argument fails because, as set forth in

8   Section II. D. 1 and 3. *supra*, Plaintiffs have properly alleged that Defendants' conduct violates

9   the consumer protection laws of Massachusetts and Rhode Island, which permit claims by

10  indirect purchasers.  Plaintiffs' unjust enrichment claims under the common law of

11  Massachusetts and Rhode Island are perfectly consistent with their consumer protection claims.

12  Therefore, the fact that Massachusetts and Rhode Island do not permit indirect purchaser suits

13  under their antitrust laws is of no consequence.

14      Moreover, both the Massachusetts and Rhode Island consumer protection statutes provide

15  for damages.  Thus, Plaintiffs are not trying to recover for barred antitrust claims through the

16  back door.  Instead, Plaintiffs are simply seeking alternative equitable relief (under a theory of

17  unjust enrichment) to the relief at law being sought under the Massachusetts and Rhode Island

18  consumer protection statutes.  The Defendants' cases are inapplicable to this situation where,

19  although the state antitrust claims are not viable, the consumer protection claims are.

20      In addition, Defendants confuse Plaintiffs' "right to recover an equitable remedy under a

21  claim based upon principles of unjust enrichment with [their] right to recover a remedy at law for

22  _____

23  [195] *See Carmona*, 2009 WL 890054, at *6 (radio advertising for product purchased by plaintiffs
    from a third party is not a direct enough relationship for unjust enrichment claim); *Reading*, 317

24  F.Supp.2d at 333 (plaintiffs were competitors of defendants claiming unjust enrichment for lost
    profits because of defendant' anti-competitive conduct; court found that there was not enough of

25  a direct relationship for an unjust enrichment claim).

26  [196] Joint Motion at 38-39.

27                                    141

28

1  an alleged violation of a state's [substantive] laws." *In re Cardizem*, 105 F. Supp.2d at 669.

2  Defendants wrongfully suggest that the success of Plaintiffs' unjust enrichment claim depends

3  upon the success of their other claims.  But courts "often award equitable remedies under

4  common law claims for unjust enrichment in circumstances where claims based upon contract or

5  other state law violations prove unsuccessful." *Id*.  Unjust enrichment claims are "grounded on

6  the moral principle that one who has received a benefit has a duty to make restitution where

7  retaining such a benefit would be unjust." *Watts v. Watts*, 405 N.W.2d 303, 313 (Wis. 1987).[197]

8       Furthermore, federal courts routinely allow *nationwide* class claims by indirect purchasers

9  for unjust enrichment.  In other words, these courts have allowed indirect purchasers to bring

10  unjust enrichment claims under the laws of states that do not provide a right of action to indirect

11  purchasers under their antitrust or consumer protection statutes.[198]  Therefore, the unjust

12  enrichment claims under Massachusetts and Rhode Island common law are proper.

13       Finally, Plaintiffs need not address Defendants' argument that because Plaintiffs lack

14  standing under certain state antitrust statutes, their unjust enrichment claims must also fail.[199]  As

15  demonstrated *supra* in Section II. B., Plaintiffs do not lack standing under any state antitrust

16  statute.

17

18

19

20

---

21  [197] *Accord, Acton Construction Co. v. State*, 383 N.W.2d 416, 417 (Minn. App. 1986); *Paschall's
22  Inc. v. Dozier*, 407 S.W.2d 150, 155-56 (Tenn. 1966).

23  [198] *See, e.g.*, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022-23 (9th Cir. 1998) (certifying
    nationwide class of unjust enrichment claimants); *In re Abbott Labs. Norvir Antitrust Litig.*, 2007
24  WL 1689899 at *9-10 (N.D.Cal. June 11, 2007) (same, with the exception of Indiana and Ohio);
    *Schumacher v. Tyson Fresh Meats* , 221 F.R.D. 605, 613 (D.S.D. 2004) (same); *Westways World
25  Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 240 (C.D. Cal. 2003) (same); *In re Warfarin Sodium
    Antitrust Litig.*, 212 F.R.D. 231, 241, 248 (D. Del. 2002) (court certified settlement class on
26  claims for unjust enrichment based on the laws of 50 states and the District of Columbia); *In re
    Cardizem,* 105 F. Supp. 2d at 670-71 (same).
    [199] Joint Motion at 39-40.

27

28  **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
AND JOINT MOTIONS TO DISMISS THE IP CAC
MDL NO. 1917**

**3.  Plaintiffs May Bring Claims For Unjust Enrichment In Addition To Claims For Compensatory Damages**

The Joint Defendants also argue that Plaintiffs may not bring claims for unjust enrichment in states that have statutes which provide for compensatory damages.[200]  Defendants' reliance on *Karahalios v. Nat'l Fed'n of Fed. Employees*, 489 U.S. 527 (1989) is misplaced.  *Karahalios* considered whether Title VII of the Civil Service Reform Act conferred on federal employees a private cause of action for a union's breach of its statutory duty of fair representation.  It is inapposite because it addressed a comprehensive regulatory scheme which precluded a federal employee from suing his union.  *Id.* at 531-532.  It had nothing to do with whether asserting a state antitrust claim precludes a plaintiff from pleading a separate common law cause of action, which is not expressly excluded by statute, and which existed prior to enactment of the antitrust statute.

Defendants also cite to *New Motor Vehicles* as authority that unjust enrichment is not available in certain states.  First, the quote from the case is dictum.  The court states after the quote cited by Defendants that "[t]he Defendants have not yet made such arguments."  350 F. Supp. 2d at 212.  The court went on to allow claims for unjust enrichment even though the particular state had an antitrust or consumer protection statute.  *Id.*  Furthermore, the passage cited by the Defendants requires that the statute *explicitly* limit relief to compensatory damages. *Id.*  Defendants do not cite to *any* language of *any* state statute that explicitly limits relief to

---

[200] Joint Motion at 40-41.

143

1    compensatory damages.[201]   This is not surprising because most of the statutes cited by the

2    Defendants expressly state that the remedies provided are cumulative of other remedies.[202]

3            Finally, it is clear under the laws of states in question that the enactment of a statute does

4    not abrogate a preexisting common law claim unless the legislature expressly intends that

5    result.[203]   Unjust enrichment existed in the common law well before the passage of any of these

6    state statutes.   Defendants do not point to any authority showing that the state legislatures

7    expressly intended to abrogate the common law claim of unjust enrichment by the enactment of

8    _____

9    [201] *Amundson & Assoc. v. Nat'l Council on Comp. Isn.*, 988 P.2d 1208, 1217 (Kan. Ct. App.
      1999) does not support Defendants' argument that Kansas does not allow a claim of unjust

10   enrichment based on an antitrust violation.  The court in *Admundson* dismissed the plaintiff's
      unjust enrichment claim because the filed rate doctrine applied, not because the plaintiff had a

11   remedy under Kansas's antitrust statute.  *Id.*  In fact, the court dismissed the antitrust claim on the
      same grounds.  *Id.*

12

13   [202] *See, e.g.,* Kan. Stat. Ann. § 50-147; Haw. Rev. Stat. § 480-13(d); Minn. Stat. 325D.07; Miss.
      Code Ann. § 75-21-39; Nev. Rev. Stat. Ann. § 598A.250; N.Y. Gen. Bus. Law § 350(e); Vt. Stat.
      Ann. 9 § 2470(d); W. Va. Code § 47-18-13.

14

15   [203] *See, e.g. American General Financial Services, Inc. v. Carter*, 184 P.3d 273, 277 (Kans. App.
      2008) ("when the legislature has intended to abolish a common-law rule, it has done so in an

16   explicit manner.  In the absence of such an expression of legislative intent, the common law
      remains part of our law."); *Watson v. Brown*, 67 Haw. 252, 256 (Haw. 1984) ("A statutory

17   remedy is, as a rule, merely cumulative and does not abolish an existing common law remedy
      unless so declared in express terms or by necessary implication."); *Abraham v. County of*

18   *Hennepin*, 639 N.W.2d 342, 346-47 (Minn. 2002) ("unless a statute provides that its remedy is
      exclusive, a party should not be prevented from bringing concurrent claims."); *Cann v. George B.*

19   *Williams Land & Livestock Co.*, 48 P.2d 887, 891-92 (Nev. 1935) ("If a statute gives a remedy in
      the affirmative, without containing any express or implied negative, for a matter which was

20   actionable at common law, this does not as a rule take away the common-law remedy, but the
      party may still sue at common law as well as upon the statute."); *Christensen v. Lundsten*, 863

21   N.Y.S.2d 886, 889 (N.Y. Dist. Ct. 2008) ("Statutes arising after the creation of the common law
      are held to abrogate it only to the extent of the "clear import of the language used" and only to

22   the extent the "statute absolutely requires …."); *Amos v. Oakdale Knitting Co.*, 416 S.E.2d 166,
      171 (N.C. 1992) ("if our state legislature has expressed its intent to supplant the common law

23   with exclusive statutory remedies, then common law actions … will be precluded."); *Guy v.*
      *Mutual of Omaha Ins. Co.*, 79 S.W.3d 528, 536 (Tenn. 2002) ("where a common law right exists

24   and a statutory remedy is subsequently created, the statutory remedy is cumulative "absent
      language showing that [it is] intended to be exclusive."); *Town of Sharon v. Anahma Realty Corp.*

25   *et. al.*, 123 A. 192, 194 (Vt. 1924) ("A statute instituting a new remedy for an existing right does
      not take away an existing remedy, unless by express words or necessary implication."); *Kranzush*

26   *v. Badger State Mut. Cas. Co.*, 307 NW.2d 256, 265-66 (Wisc. 1981) ("Statutes are not to be
      construed as changing the common law unless the purpose to effect such change is clearly

27

                                                    144
28          **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
                  **AND JOINT MOTIONS TO DISMISS THE IP CAC**
                                **MDL NO. 1917**

1  their antitrust and consumer protection statutes.  Defendants' motion to dismiss the unjust

2  enrichment claims for those states that provide for statutory compensatory damages must be

3  denied.

4  ### F.  The Complaint Alleges Fraudulent Concealment Sufficient To Toll The Applicable Statute of Limitations For Plaintiffs' State Law Claims

5

6  The Joint Defendants' motion to dismiss on statute of limitations grounds must also be

7  denied.  Under the laws of all the states at issue, fraudulent concealment tolls the statute of

8  limitations until the plaintiff knows, or should have known, of the wrongful conduct that forms

9  the basis for plaintiff's claim.  The CAC alleges numerous acts of fraudulent concealment by

10  Defendants that prevented Plaintiffs from discovering Defendants' conspiracy.  Therefore, the

11  statute of limitations as to each of Plaintiffs' state law claims is tolled.[204]

12

13  expressed therein. To have such effect "the language (of the statute) must be clear, unambiguous and peremptory.").

14  [204]**Arizona:** 2007 WL 5556382 (Ariz. App. Div. 2); **California:** *Baker v. Beech Air-Craft Corp.*,
15  39 Cal. App. 3d 315, 319 (1974) ("Appellants have pleaded facts indicating fraudulent
   concealment of the true facts by [defendant], when the fraud was discovered, the circumstances
16  under which it was discovered by appellants and their lack of means for earlier discovery.");
   **D.C.:** *In re Vitamins Antitrust Litigation*, 183 F. App'x 1 (focus is on whether plaintiff possessed
17  knowledge or through the exercise of due diligence should have acquired information, to put her
   on notice of her claim); **Florida:** *Berisford v. Jack Eckerd Corp.*, 667 So. 2d 809 (Fla. Dist. Ct.
18  App. 1995)"; **Hawaii:** *Lin v. Lin*, 2000 WL 4369771 (D. Hawaii 2008); **Iowa:** *Christy v. Miulli*,
   692 N.W.2d 694, 701-02 (Iowa 2005) (same); **Kansas:** *Friends Univ. v. W.R. Grace & Co.*, 608
19  P.2d 936, 995 (Kan. 2007) (plaintiff must "explain why due diligence did not lead or could not
   have lead to discover of the facts and the cause of action.") (emphasis added); **Maine:** *Taylor v.*
20  *Phillip Morris Inc.*, 2001 WL 1710710, *at 4 (Me. Super. Ct. May 29, 2001) (same);
   **Massachusetts:** *In re Lupron Marketing and Sales Practices Litigation*, 2004 WL 2070883, at
21  *6 (D. Mass. Sept. 16, 2004) (same): **Michigan:** *McNaughton v. Rockford State Bank*, 246 N.W.
   84, 86 (Mich. 1933) ("[I]t must appear that the fraud not only was not discovered, but could not
22  have been discovered with reasonable diligence, until within the statutory period before the
   actions were begun."); **Minnesota:** *Hanna Min. Co. v. InterNorth, Inc.*, 379 N.W.2d 663, 667
23  (Minn. Ct. App. 1986) (same); **Mississippi:** *Frye v. American General Finance, Inc.*, 307 F.
   Supp. 2d 836, 841 (S.D. Miss. 2004) (statutes of limitations "begin to run at the time the fraud is
24  discovered or at such time as the fraudulent concealment 'with reasonable diligence might have
   been first known or discovered.'") (citing Miss. Code. Ann. § 15-1-67); **Nebraska:** *Muller v.*
25  *Thaut*, 430 N.W.2d 884, 892 (Neb. 1988) ("Where there has been fraudulent concealment from a
   plaintiff, the statute is suspended only until his rights are discovered or until they could have been
26  discovered by the exercise of due diligence.") (citation omitted); **Nevada:** *Pooler v. R. J.*
   *Reynolds Tobacco Co.*, 2001 WL 403167, at *2 (Nev. Dist. Ct. April 4, 2001 (same); **New**
27  **Mexico:** *Garcia ex. Rel. Garcia v. LaFarge*, 893 P. 2d 428, 432 (N.M. ) (same) **New York:** *Zoe*
145

28

1

**1.  Plaintiffs Have Alleged Defendants' Affirmative Acts Designed To Mislead The Public And To Conceal Their Conspiracy**

2

3          The Joint Defendants argue that the mere allegation that a conspiracy is self-concealing is

4  insufficient as a matter of law and that Plaintiffs "must allege that Defendants took affirmative

5  action directed at plaintiffs to cover up their conspiratorial conduct in order to prevent Plaintiffs

6  from discovering their cause of action." Joint Motion at 44.  Plaintiffs have done exactly that.

7          Plaintiffs have pled not only the content and instances of Defendants' anticompetitive

8  agreements, but also their agreements to mislead the public by concealing their illegal activities.

9  Plaintiffs allege *specific* acts taken by Defendants to conceal their conspiracy from Plaintiffs,

10  including:

11       • agreeing among themselves not to discuss publicly, or otherwise reveal, the
            nature and substance of the acts and communications in furtherance of their
12          illegal scheme, and by agreeing to expel those who failed to do so (IP CAC
            ¶290(a);
13       • agreeing among themselves to limit the number of representatives from each
            Defendant attending the meeting so as to avoid detection (*Id.* ¶290(b));
14       • agreeing among themselves to refrain from listing the individual representatives
15          of the Defendants in attendance at meetings and any meeting reports (*Id.*
            ¶290(c));
16       • agreeing among themselves to refrain from taking meeting minutes or taking
            any kind of written notes during the meetings (IP CAC ¶ 290(d));
17       • giving false and pretextual reasons for their CRT Product price increases, such
18          as an alleged shortage of glass shells used to manufacture tubes (*Id.* ¶¶ 197,
            290(e));

19

20

---

21  *G. v. Frederick F.G.*, 617 N.Y.S. 2d 370, 371 (1994); **N. Carolina:** *Calhoun v. Calhoun*, 197
    S.E.2d 83, 85 (N.C. Ct. App. 1973) (same); **N. Dakota:** N.D. Cent. Code § 28-01-24 (same);
22  **Rhode Island:** *Martin v. Howard*, 784 A.2d 291, 300 (R.I. 2001) (same); **S. Dakota:** *Strassburg
    v. Citizens State Bank*, 581 N.W.2d 510, 515 (S.D. 1998) ("Statutes of limitations begin to run
23  when plaintiffs first become aware of facts prompting a reasonably prudent person to seek
    information about the problem and its cause."); **Tennessee:** *Shadrick v. Coker*, 963 S.W.2d 726,
24  734 (Tenn. 1998) ("However, we are not persuaded that these facts necessarily compel a
    reasonable person to conclude that [plaintiff] knew or reasonably should have known [of his
25  cause of action]."; **Vermont:** *Rodrigue v. Valco Enterprises, Inc.*, 726 A.2d 61, 64 (Vt. 1999)
    (noting that limitations period is tolled until a plaintiff knows or by the exercise of due diligence
26  could have known, that they may have had a cause of action; **W. Virginia:** *Pocahontas Supreme
    Coal Co. v. Bethlehem Steel Corp.*, 1986 WL 957, at *9 (W.D.W.V. May 13, 1986) (same);
27  **Wisconsin:** *Hansen v. A.H. Robins, Inc.*, 335 N.W.2d 578, 581 (1983) (same).

146

28  **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
    AND JOINT MOTIONS TO DISMISS THE IP CAC
    MDL NO. 1917**

- agreeing among themselves on what to tell customers about price changes (*Id.*¶ 290(f);
- agreeing to quote different prices to give the illusion that prices were not fixed (*Id.* ¶ 290(g);
- agreeing on the content of public statements on capacity and supply (*Id.* ¶ 290(h)); and
- agreeing to eliminate potentially suspicious references in expense reports (*Id.* ¶ 290(i));
- agreeing among themselves to keep their meeting secret (*Id.* ¶156);

"[A] defendant has an extremely difficult burden to show that fraudulent concealment allegations are barred as a matter of law." *In Re Coordinated Pre-Trial Proceedings in Petroleum Products*, 782 F. Supp. at 489 (denying dismissal of fraudulent concealment claims on a motion for summary judgment). Many courts have noted that, in the antitrust context, it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly when the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators and the details of fraudulent concealment cannot be obtained until discovery is undertaken.[205]

### 2.  Plaintiffs Have Alleged Their Inability to Discover the True Facts Despite Due Diligence

The Defendants contend that Plaintiffs were put on notice of their conspiracy by the general electronics industry market trends and related industry reports as early as the 1990s and should have alleged why they should not be charged with this knowledge. This argument is without merit. Plaintiffs have adequately alleged their inability to discover the Defendants' violations earlier because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct, and fraudulently concealed their activities through means and methods designed to avoid detection. IP-CAC ¶289. In addition, the Plaintiffs allege the conspiracy by its nature was self-concealing. *Id.* Further, Plaintiffs specifically allege numerous examples of

---

[205] *See In Re Infant Formula Antitrust Litig.*, 1992 WL 503465 at *2 (N.D. Fla. Jan. 13, 1992); *In Re Rubber Chemicals,* 504 F. Supp. 2d at 789.

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

1    Defendants' affirmative conduct to conceal the conspiracy and actively mislead the Plaintiffs,

2    preventing them from being placed on constructive notice of the conspiracy.  *Id.* ¶ 290.

3         Courts have found much more conspicuous information than that cited by the Defendants

4    inadequate to place a plaintiff on notice of a potential claim.  In *In re Bulk Extruded Graphite*

5    *Products Antitrust Litigation,* the court held that public information relating to antitrust

6    investigations and settlements in the graphite electrode industry were insufficient to put plaintiff

7    on notice of a potential claim against manufacturers of bulk extruded graphite. 2007 WL

8    1062979, *4 (D.N.J. 2007).  Even widespread industry publicity of a similar complaint would not

9    have been "*as a matter of law* tantamount to actual or constructive knowledge" of Plaintiffs'

10   claims.  *Conmar,* 858 F.2d at 504 (emphasis in original).  If government investigations and public

11   settlements do not amount to notice, the facts Defendants point to here certainly do not.

12        Further, the Defendants' contention that Plaintiffs are required to allege that they

13   diligently tried to uncover the pertinent facts underlying the claim is contrary to well-settled law.

14   Any requirement to plead due diligence arises only under circumstances that would put plaintiffs

15   on notice of their claim.  *See Conmar* at 504.

16        In *Rubber Chemicals,* plaintiffs alleged that defendants  had "engaged in a self-concealing

17   conspiracy" that included "secret meetings to set prices, agreement not to publicly discuss the

18   nature of the scheme, destruction of documents that might evidence their actions, and pretextual

19   justifications for the inflated prices of rubber chemicals."[206]  Refusing to dismiss the action,

20   Judge Jenkins found that: "Under these circumstances, Plaintiffs' allegation that they could not

21   have discovered the alleged conspiracy 'at an earlier date by the exercise of reasonable due

22   diligence because of the deceptive practices and techniques of secrecy employed by the

23   Defendants and their Co-Conspirators' to conceal the conspiracy [citation omitted] is a sufficient

24

25

26

27   [206] 504 F. Supp.2d at 788.

148

**INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE**
**AND JOINT MOTIONS TO DISMISS THE IP CAC**
**MDL NO. 1917**

28

1    allegation of due diligence."[207]   As Judge Jenkins noted:

2           Plaintiffs are not under a duty continually to scout around to uncover
       claims which they have no reason to suspect they might have."   (Internal
3       citation omitted.)   "*It is impossible to declare at this [motion to dismiss]
       stage that plaintiffs failed to exercise due diligence* to follow up on that
4       which may or may not have been sufficient to excite their suspicions.

5    *Id.* (citations omitted) (emphasis added).

6
           ### 3.   The Determination Of Whether Plaintiffs Had Constructive Notice Of
7                 Defendants' Conspiracy Requires A Fact Intensive Inquiry Not
                 Appropriate At The Motion To Dismiss Stage
8

9           Finally, the question of whether Plaintiffs had constructive notice of Defendants'

10   conspiracy, thereby triggering an obligation to diligently investigate potential claims, is a fact-

11   intensive inquiry inappropriate at this stage of these proceedings.[208]   A motion to dismiss is not

12   the proper vehicle to resolve the adequacy of fraudulent concealment allegations.   As Judge

13   Illston has stated in the pending parallel *LCD* antitrust proceedings:   "[I]t is generally

14   inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to

15   dismiss stage, particularly when the proof relating to the extent of the fraudulent concealment is

16   alleged to be largely in the hands of the alleged conspirators." *TFT-LCD I*, 586 F. Supp. 2d at

17   1120.   Many other courts have so held.[209]

18           *Conmar*, upon which Defendants rely, itself addresses the issue in the context of an

19

20

21   _____

22   [207] *Id.*
     [208]   *Petroleum Products Antitrust Litig.*, 782 F. Supp. at 489 (citing Volk v. D.A. Davidson & *Co.*,
23   816 F.2d 1406, 1417 (9th Cir. 1987)); *Conmar*, 858 F. 2d at 504-505.

24   [209]   *See, e.g., Rubber Chemicals,* 504 F. Supp. 2d at 789 (observing that "many courts have noted
     [this point] in the antitrust conspiracy context"); *Clemens v. Daimler Chrysler Corp.*, 2006 WL
25   6022681, at *6 (C.D. Cal. Apr. 20, 2006) ("[T]he Court finds that Plaintiffs' allegations with
     respect to equitable tolling based on fraudulent concealment are sufficient to withstand
26   Defendant's motion and that the issues raised with respect to the statute of limitations are more
     appropriately resolved in a motion for summary judgment.")

27                                           149
28           **INDIRECT PURCHASER PLAINTIFFS' MPA IN OPPSN TO DEFENDANTS' SEPARATE
                 AND JOINT MOTIONS TO DISMISS THE IP CAC
                 MDL NO. 1917**

appeal from summary judgment, as do other Ninth Circuit decisions.[210]  Even at the summary judgment stage—let alone on a motion to dismiss, which requires the court to rule strictly on the basis of the pleadings—"'a defendant "has an extremely difficult burden to show that [fraudulent concealment allegations are] barred as a matter of law." *Petroleum Products,* 782 F. Supp. at 489 (*quoting Volk,* 816 F.2d at 1417) (alteration in original).  On this ground alone, the Joint Defendants' arguments should be rejected.

### G. If The Complaint Is Found To Be Insufficient, Plaintiffs Should Be Granted Leave To Amend

If the IP CAC is found to be insufficient in any way, Plaintiffs respectfully request leave to amend.  It is well settled that leave to amend under Rule 15(a) should be granted with "extraordinary liberality." *Morongo Band of Mission Indians v. Rose,* 893 F.2d 1074, 1079 (9th Cir. 1990).

### III.    CONCLUSION

For all of the foregoing reasons, Defendants' separate motions to dismiss and joint motion to dismiss the Indirect Purchaser Plaintiffs' Consolidated Amended Complaint should be denied.

Dated: August 3, 2009             By:     /s/ Mario N. Alioto
                                          Mario N. Alioto (56433)
                                          Lauren C. Russell (241151)
                                          **TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP**
                                          2280 Union Street
                                          San Francisco, CA  94123
                                          Telephone:  (415) 563-7200
                                          Facsimile: (415) 346-0679
                                          malioto@tatp.com
                                          laurenrussell@tatp.com
                                          *Interim Lead Counsel*
                                          *for the Indirect Purchaser Plaintiffs*

---

[210] *See, e.g., Thorman v. Seafoods Co.,* 421 F.3d 1090, 1094 (9th Cir. 2005), *Volk v. D.A. Davidson & Co.,* 816 F.2d 1406, 1409 (9th Cir. 1987) (both discussing fraudulent concealment on appeals from summary judgments).

1

2

**Plaintiffs' Counsel On The Brief:**

3

4

Joseph M. Patane (jpatane@tatp.com)
**LAW OFFICE OF JOSEPH M.
PATANE**
2280 Union Street
San Francisco, CA  94123
Telephone: (415) 563-7200
Facsimile: (415) 346-0679

5

6

7

8

Francis O. Scarpulla (fscarpulla@zelle.com)
Craig C. Corbitt (ccorbitt@zelle.com)
Judith A. Zahid (jzahid@zelle.com)
Qianwei Fu (qfu@zelle.com)
**ZELLE, HOFMANN, VOELBEL,
MASON & GETTE, LLP**
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 693-0700
Facsimile: (415) 693-0770

9

10

11

12

13

14

15

Susan G. Kupfer (skupfer@glancylaw.com)
Sylvie Kern (skern@glancylaw.com)
**GLANCY BINKOW & GOLDBERG LLP**
One Embarcadero Center, Suite 760
San Francisco, CA 94111
Telephone: (415) 972-8160
Facsimile: (415) 972-8166

Christopher Lovell (clovell@lshllp.com)
Gary Jacobsen (gsjacobsen@lshllp.com)
Craig Essenmacher
(cessenmacher@lshllp.com)
Keith Essenmacher
(kessenmacher@lshllp.com)
**LOVELL STEWART HALEBIAN LLP**
500 Fifth Avenue, Floor 58
New York, NY 10110
Telephone: (212) 608-1900
Facsimile: (212) 719-4775

16

17

18

19

20

21

Paul Novak (pnovak@milberg.com)
Elizabeth McKenna
(emckenna@milberg.com)
**MILBERG LLP**
One Pennsylvania Plaza
49th Floor
New York, New York 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

Eric D. Hoaglund (ehoaglund@mhcilaw.com)
**McCALLUM, HOAGLUND, COOK &
IRBY, L.L.P.**
905 Montgomery Highway
Suite 201
Vestavia Hills, Alabama  35216
Telephone:  (205)824-7767
Facsimile:  (205)824-7768

22

23

24

25

Seymour J. Mansfield
(smansfield@mansfieldtanick.com)
**MANSFIELD, TANICK & COHEN, P.A.**
220 South Sixth Street
Minneapolis, MN  55402
Telephone: (612) 339-4295
Facsimile: (612) 339-3161

26

27

28

151