Michael F. Tubach (SBN 145955)
mtubach@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Telephone:  (415) 984-8700
Facsimile:  (415) 984-8701

Ian Simmons (*pro hac vice*)
isimmons@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414

Attorneys For Defendants
**SAMSUNG ELECTRONICS CO., LTD.; and
SAMSUNG ELECTRONICS AMERICA, INC.**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE:  CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No.: 3:07-cv-5944 SC |
| | MDL No. 1917 |
| This Document Relates To: | **REPLY MEMORANDUM IN SUPPORT OF SAMSUNG ELECTRONICS CO., LTD., AND SAMSUNG ELECTRONICS AMERICA, INC.'S MOTION TO DISMISS DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT AND INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT** |
| DIRECT PURCHASER ACTIONS and INDIRECT PURCHASER ACTIONS | |

1

**TABLE OF CONTENTS**

2

Page

3

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

I.       THE COMPLAINTS ALLEGE AT MOST A CONSPIRACY TO FIX THE
         PRICES OF TUBES, NOT FINISHED PRODUCTS ........................................ 2

II.      THE COMPLAINTS FAIL PLAUSIBLY TO ALLEGE THAT THE SE
         DEFENDANTS PARTICIPATED IN ANY ALLEGED PRICE-FIXING
         CONSPIRACY ................................................................................................... 5

         A.       The Complaints Fail Adequately To Allege That SE Defendants Joined
                  The Alleged CRT Price Fixing Conspiracy Because The Alleged
                  Conspiracy Is Economically Senseless And Thus Implausible ........................... 5

         B.       Plaintiffs' Complaint Must Separately Be Dismissed Because They Have
                  Properly Alleged Only A Vertical Conspiracy As To The SE Defendants,
                  Without Pleading The Required Elements Of A Rule-Of-Reason Analysis.......... 7

III.     PLAINTIFFS HAVE FAILED PLAUSIBLY TO ALLEGE THAT THE SE
         DEFENDANTS CAN BE HELD VICARIOUSLY LIABLE THROUGH THE
         ACTIONS OF THE SAMSUNG SDI DEFENDANTS .................................... 10

IV.      THE COMPLAINTS FAIL SUFFICIENTLY TO ALLEGE THAT THE SE
         DEFENDANTS JOINED ANY  CONSPIRACY AS REQUIRED BY *TWOMBLY*
         AND *IQBAL*..................................................................................................... 12

         A.       A Complaint Must Allege That Each Defendant Joined The Alleged
                  Conspiracy, And Generic Corporate Titles Are Insufficient To Provide
                  Adequate Notice.................................................................................................. 12

         B.       The Allegations Against SEC Are Legally Deficient Under *Iqbal* And
                  *Twombly* ............................................................................................................ 14

         C.       The Allegations Against SEAI Are Inadequate Under *Iqbal* And *Twombly* ........ 15

CONCLUSION ............................................................................................................. 15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Nat'l Red Cross v. United Way Cal. Capital Region*,
  No. Civ. S-07-1236, 2007 U.S. Dist. LEXIS 95296 (E.D. Cal. Dec. 18, 2007) ........................ 10

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) ................................................................................................... passim

*Bailey Lumber & Supply Co. v. Georgia-Pacific Corp.*,
  No. 08-1394 LG-JMR, 2009 WL 2872307 (S.D. Miss. Aug. 10, 2009) .................................... 3

*Bauman v. DaimlerChrysler AG*,
  __ F.3d __, 2009 WL 2634795 (9th Cir. Aug. 28, 2009) ....................................................... 12

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................................ passim

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
  182 F.3d 1096 (9th Cir. 1999) ........................................................................................... 7, 8

*Brennan v. Concord EFS, Inc.*,
  369 F. Supp. 2d 1127 (N.D. Cal. 2005) ................................................................................ 11

*Business Elecs. Corp. v. Sharp Elecs. Corp.*,
  485 U.S. 717 (1988) ............................................................................................................. 7

*California v. NRG Energy Inc.*,
  391 F.3d 1011 (9th Cir. 2004) ....................................................................................... 10, 12

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
  532 F.3d 1111 (10th Cir. 2008) ......................................................................................... 7, 8

*Canam Steel Corp. v. Mayo*,
  No. 09-cv-00672, 2009 U.S. Dist. LEXIS 44059 (E.D. Cal. May 22, 2009) .......................... 10

*Car Carriers v. Ford Motor Co.*,
  745 F.2d 1101 (7th Cir. 1984) .............................................................................................. 5

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984) ........................................................................................................ 9, 12

*Dimidowich v. Bell & Howell*,
  803 F.2d 1473 (9th Cir. 1986) ............................................................................................. 7

*Dion LLC v. Infotek Wireless, Inc.*,
  No. C 07-1431 SBA, 2007 WL 3231738 (N.D. Cal. Oct. 30, 2007) ...................................... 11

*Dolter v. Keene's Transfer, Inc.*,
  No. 08-cv-262, 2008 U.S. Dist. LEXIS 59436 (N.D. Ill. Aug. 5, 2008) ................................ 10

*Freeman v. San Diego Ass'n of Realtors*,
  322 F.3d 1133 (9th Cir. 2003) .............................................................................................. 8

*Ill. Brick Co. v. Illinois*,
  431 U.S. 720 (1977) ............................................................................................................. 8

*In re ATM Fee Antitrust Litig.*,
  No. 04-02676, 2009 U.S. Dist. LEXIS 83199 (N.D. Cal. Sept. 4, 2009) ............................... 13

*In re Flat Glass Antitrust Litigation*,
   191 F.R.D. 472 (W.D. Pa. 1999)...................................................................................8

*In re Linerboard Antitrust Litig.*,
   203 F.R.D. 197 (E.D. Pa. 2001) ..................................................................................8

*In re Midwest Milk Monopolization Litig.*,
   730 F.2d 528 (8th Cir. 1984)........................................................................................9

*In re Sugar Indus. Antitrust Litig.*,
   579 F.2d 13 (3d Cir. 1978)...........................................................................................8

*In re TFT-LCD Antitrust Litig.*,
   586 F. Supp. 2d 1109 (N.D. Cal. 2008) ...............................................................12-13

*In re TFT-LCD Antitrust Litig.*,
   599 F. Supp. 2d 1179 (N.D. Cal. 2009) ...............................................................11, 13

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008).................................................................2, 11, 14, 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ...............................................................................................5, 6

*Neilson v. Union Bank of Cal., N.A.*,
   290 F. Supp. 2d 1101 (C.D. Cal. 2003) ....................................................................10

*Neu v. Terminex Int'l et. al*,
   No. C 07-6472, 2008 U.S. Dist. LEXIS 32844 (N.D. Cal. Apr. 8, 2008) .................10

*Nordberg v. Trilegiant Corp.*,
   445 F. Supp. 2d 1082 (N.D. Cal. 2006) ....................................................................11

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
   551 U.S. 224 (2007) ..................................................................................................10

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC*,
   532 F.3d 963 (9th Cir. 2008).......................................................................................2

*Royal Printing Co. v. Kimberly-Clark Corp.*,
   621 F.2d 323 (9th Cir. 1980).......................................................................................8

*United States v. Bestfoods*,
   524 U.S. 51 (1998) .....................................................................................................12

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., Inc.*,
   668 F.2d 1014 (9th Cir. 1981).....................................................................................9

*William O. Gilley Enterprises, Inc. v. Atlantic Richfield Co.*,
   561 F.3d 1004 (2009)...................................................................................................6

**Rules**

FED. R. CIV. P. 8(a)(2) ....................................................................................................12

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

     Defendants Samsung Electronics Co., Ltd. (SEC), and Samsung Electronics America, Inc.

3

(SEAI) (collectively, the SE Defendants) submit this Reply in support of their Motion to Dismiss

4

Direct Purchaser Plaintiffs' Consolidated Amended Complaint and Indirect Purchaser Plaintiffs'

5

Consolidated Amended Complaint.

6

**INTRODUCTION**

7

     The factual allegations in plaintiffs' complaints—the only allegations this Court may

8

accept as true under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129

9

S. Ct. 1937 (2009)—can only be read to allege a conspiracy to fix the prices of Cathode Ray

10

Tubes (CRTs or Tubes).  Despite the length of plaintiffs' oppositions, their papers do not deny

11

that the SE Defendants do not make, manufacture, or sell Tubes.  Rather, they purchase Tubes

12

and incorporate them into products they do make and sell: TV and computer monitors (Finished

13

Products).  The naming of the SE Defendants in this CRT conspiracy therefore invites the central

14

question: why would a manufacturer of Finished Products conspire to increase the price of

15

components it buys but does not sell, thereby increasing its own costs?  In all their hundreds of

16

pages of briefing, plaintiffs provide no plausible answer to this question (much less a plausible

17

answer grounded in alleged facts), instead maintaining that the SE Defendants would participate

18

in an alleged conspiracy of which they would be a victim.  The complaints should be dismissed as

19

to the SE Defendants for that reason alone.

20

     Additionally, because plaintiffs allege a conspiracy to fix the prices of Tubes, a product at

21

a different level of distribution from the one in which the SE Defendants operate, the complaints

22

can only allege a *vertical* conspiracy as to the SE Defendants, which would be subject to rule-of-

23

reason analysis.  Because the complaints do not allege any factors relevant to rule-of-reason

24

analysis, dismissal is required.  Nor have plaintiffs adequately pleaded that the SE Defendants can

25

be held vicariously liable for the actions of Samsung SDI, a publicly traded company that makes

26

Tubes, and in which SEC owns a minority 20% stake.  Finally, the complaints fail to put the SE

27

Defendants on notice of the factual allegations against them, providing only vague, conclusory,

28

and often contradictory descriptions of the object and participants in the alleged conspiracy.

1    *Iqbal* and *Twombly* thus require dismissal.

2

3                            **ARGUMENT**

4    **I.     The Complaints Allege At Most A Conspiracy To Fix The Prices Of Tubes, Not Finished Products**

5          In response to the SE Defendants' (and other defendants') arguments that the complaints

6    allege only a conspiracy to fix the prices of Tubes—which the SE Defendants do not make or sell,

7    but rather *purchase*—plaintiffs respond that they have alleged a broader conspiracy as to "CRT

8    Products," which is defined in the complaints to include both Tubes and Finished Products.[1]  But

9    any "evidentiary" facts alleged in the complaints, *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042,

10   1047-48 (9th Cir. 2008), concern only CRTs (Tubes).  They cannot be read to support any vague

11   and illogical "CRT Products" conspiracy.

12         1. Any reliance on allegations concerning "CRT Products" is inappropriate, obscuring the

13   nature of the alleged conspiracy and making it impossible to assess its alleged object.  A

14   complaint alleging a price-fixing conspiracy must at least allege the "nature of the conspiracy or

15   agreement."  *Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 976 (9th Cir. 2008).

16   Allegations concerning "CRT Products" fail that fundamental requirement, because "CRT

17   Products" is defined to include at least four different types of products.[2]  The use of "CRT

18   Products" is particularly inappropriate because it refers simultaneously to products at different

19   levels of distribution, with different market structures and concentrations.  And it is particularly

20   inappropriate as to the SE Defendants, because they manufacture and sell only one type of "CRT

21   Product" (Finished Products) at one level of distribution, while they *purchase* the other type of

22   "CRT Product" (the Tubes) for use as a component in Finished Products.  Plaintiffs' use of "CRT

23   ─────────────────────

24   [1] *See* Direct Purchaser ("DP") Opp'n Br. 54 ("[T]he DP-CAC clearly and specifically alleges an antitrust conspiracy in the *CRT Products* market, which includes CRT Products such as computer

25   monitors and televisions…."); Indirect Purchaser ("IP") Opp'n Br. 18 ("[T]he IP CAC clearly asserts a conspiracy to fix, raise, maintain and stabilize the prices of *CRT Products*, and that each

26   Defendant group entered into unlawful agreements on the price and capacity of *CRT Products*….").

27   [2] "CRT Products" includes four products: Tubes for computers, Tubes for TVs, computer monitors, and TVs.  Consumer demand, for example, for TVs and computer monitors cannot

28   plausibly be seen as interchangeable, and thus cannot be a single product market.

                                            2

1    Products" is a smoke screen, masking the lack of any *factual*, non-vague, or non-conclusory

2    allegation to support anything other than a Tubes conspiracy. *Iqbal*, 129 S. Ct. at 1950. This

3    definitional slight of hand should be rejected.[3]

4         2. The only arguably plausible conspiracy the complaints can be read to allege is one to

5    fix the prices of Tubes. As explained in the SE Defendants' opening brief (at 4), both complaints

6    rely on government investigations and indictments involving *only* Tubes. *See, e.g.*, Direct

7    Purchaser Compl. ("DPC") ¶¶ 7, 126; Indirect Purchaser Compl. ("IPC") ¶¶ 4, 203, 205.

8    Moreover, a detailed examination of each complaint demonstrates that the "evidentiary" facts

9    alleged can only be read as to the purported Tubes conspiracy.

10        The Direct Purchasers' complaint alleges that "*CRT makers*" (*i.e.,* makers of Tubes) began

11   to meet in "Glass Meetings" in 1997, DPC ¶ 137, describes the "overall *CRT conspiracy*," and

12   says only that that conspiracy "affected worldwide prices … that Defendants charged for CRT

13   Products," not that prices for "CRT Products" other than Tubes were fixed. *Id.* ¶ 139 (emphasis

14   added). The complaint alleges that agreed upon prices reflected "inclusion of specific features in

15   a CRT." *Id.* ¶ 144. In setting the prices of CRTs, defendants allegedly "*considered* the internal

16   pricing of products containing CRTs *in agreeing upon the prices at which CRTs were set.*" *Id.*

17   (emphasis added). And the "agreements encompassed not only prices charged to third party

18   customers," but also covered "prices *charged by the CRT manufacturing arm* of each such

19   integrated company to the corporate division or subsidiary that manufactured or sold computer

20   monitors, televisions, or similar products . . . ." DPC ¶ 144 (emphasis added). Finally, in

21   allegations about parallel reductions in capacity, the complaint describes only closure of *CRT*

22   plants. *Id.* ¶¶ 182-87.

23        The Indirect Purchasers' complaint provides market concentration allegations only for

24   Tubes, not for Finished Products. IPC ¶ 122. In alleging the consolidation of the industry, the

---

[3] *See, e.g.*, *Bailey Lumber & Supply Co. v. Georgia-Pacific Corp.*, No. 08-1394 LG-JMR, 2009 WL 2872307, at *2-3 (S.D. Miss. Aug. 10, 2009) (refusing to treat the "structural panel" market as one market, when the "OSB and plywood" markets have separate manufacturing plaints, are used in different ways, the defendants had different market shares in the two markets, and only one market had a history of antitrust violations).

3

1   complaint cites two ventures dedicated to Tubes only. *Id.* ¶ 125.  The complaint speaks of the

2   "CRT conspiracy." *Id.* ¶¶ 138, 141, and the "CRT price-fixing conspiracy," *id.* ¶ 145.  In

3   describing the purported "Glass Meetings" between various defendants, the complaint alleges that

4   "participants exchanged competitive information such as proposed future *CRT* pricing, sales,

5   volume"; that those participants "discuss[ed] and agree[d] upon what price each would charge for

6   *CRTs* to be sold in the following month or quarter"; that they "discussed and agreed upon target

7   prices, price increases, so-called 'bottom' prices, and price ranges for *CRTs*"; and that they

8   "discussed and agreed upon prices of *CRTs* that were sold to specific customers…."  *Id.* ¶ 152

9   (emphasis added).  The alleged "conspiracy included agreements on the prices at which certain

10  Defendants would sell *CRTs* to their own corporate subsidiaries and affiliates that manufactured

11  end products, such as televisions and monitors."  IPC ¶ 154 (emphasis added).  Finally,

12  defendants are alleged to have limited production of *Tubes*, not Finished Products.  *Id.* ¶¶ 198-99.

13          Indeed, the factual allegations specifically relating to Finished Products make clear that

14  the complaints do not allege an *agreement* to fix the prices of Finished Products; only that CRT

15  price-fixing affected the prices of Finished Products.  The Direct Purchasers, for example, allege

16  that "[t]he overall *CRT conspiracy* affected worldwide prices … that Defendants charged for CRT

17  Products."  DPC ¶ 139 (emphasis added); *see also id.* ¶ 146 (describing meetings at which prices

18  for CRTs were set, and which "often included *consideration* of downstream prices for televisions,

19  computer monitors, or similar products and how they would *affect the price ranges being*

20  *collusively set*" (emphasis added)).  Similarly, the Indirect Purchasers allege that "[t]he purpose of

21  Defendants' conspiratorial conduct was to fix, raise, maintain and stabilize the price of CRTs and,

22  as a direct and foreseeable result, CRT Products."  IPC ¶ 237. [4]

23

24  _____
    [4] Plaintiffs have failed properly to allege a conspiracy to fix the prices of Finished Products.  The
25  complaints are devoid of evidentiary factual allegations concerning the time, place and manner of
    a Finished Product conspiracy.  Moreover, plaintiffs fail to provide any allegations concerning the
26  concentration of the Finished Products market.  On the contrary, the Indirect Purchasers allege
    that Finished Product manufacturers "are subject to vigorous price competition, whether selling
27  CRT TVs or computer monitors," IPC ¶ 227, and both complaints conspicuously fail to allege
    that many of the major manufacturers of televisions and computer monitors participated in the
28  conspiracy.  Thus, apart from failing to include even a single allegation suggesting that Finished

                                                    4

1

2

**II.     The Complaints Fail Plausibly To Allege That The SE Defendants Participated In Any Alleged Price-Fixing Conspiracy**

3

4

> **A.     The Complaints Fail Adequately To Allege That SE Defendants Joined The Alleged CRT Price Fixing Conspiracy Because The Alleged Conspiracy Is Economically Senseless And Thus Implausible**

5

6

7

8

9

10

1. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 129 S. Ct. at 1950.  Here, it is uncontested that the SE Defendants did not manufacture or sell CRTs.  Rather, they only manufactured Finished Products; Tubes (which the SE Defendants purchased) are a component in those Finished Products.  And because, as explained above, the factual allegations in the complaints can only be read to demonstrate a conspiracy to fix the price of Tubes, the complaints must be dismissed as to the SE Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

A complaint states an implausible claim for relief if the conspiracy it alleges "makes no economic sense." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). *See* SE Defendants' Mot. to Dismiss 8-10.  The alleged conspiracy is plainly economically senseless from the SE Defendants' point of view because the SE Defendants would be *victims* of the alleged conspiracy.  Like other computer and television monitor manufacturers—such as Dell and Sharp (IPC ¶ 224)—the alleged Tubes conspiracy would require the SE Defendants to pay more for components, thus decreasing their profit margins.  Plaintiffs' allegations that the SE Defendants "conspired to injure [themselves]" are "inherently implausible." *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir. 1984).  And while the alleged conspiracy would be senseless for any manufacturer of Finished Products, it is outlandishly so for the SE Defendants; the SDI Defendants, which manufacture Tubes, are a separate, publicly traded entity in which SEC owns a minority equity stake, and the SE Defendants are in any event alleged also to have purchased Tubes from *other* manufacturers, in which they have no stake whatever. *See* DPC ¶ 120.  For this reason, the complaints against the SE Defendants should be dismissed.

25

26

2. Plaintiffs' principal response is that the alleged conspiracy makes sense from the SE Defendants' point of view because they marked up the prices of their Finished Products by the

27

28

Product prices were fixed, plaintiffs provide no allegations that could plausibly explain *how* the prices for Finished Products could have been fixed.

5

1   amount of the overcharge for the Tubes.  DP Opp'n Br. 57; IP Opp'n Br. 68.[5]  That argument is

2   implausible for at least two reasons.  First, the argument itself renders plaintiffs' theory of the

3   conspiracy senseless.  If the SE Defendants had the power to increase the price of Finished

4   Products, there is no reason whatever for them to have engaged in the machination of price-fixing

5   *Tubes*; they could simply have conspired to increase the prices of Finished Products.

6        Second, the sparse factual allegations belie any possibility that the SE Defendants could

7   increase the price of Finished Products such that a Tubes conspiracy would be anything other than

8   a harmful endeavor.  The Direct Purchasers' complaint contains no allegation suggesting that the

9   defendants passed on the full amount of the alleged CRT overcharge to their customers.  The only

10  relevant allegation states that the "overall CRT conspiracy affected worldwide prices … that

11  Defendants charged for CRT Products," which presumably means Finished Products.  DPC ¶ 139.

12  For its part, the Indirect Purchasers' complaint provides a conclusory allegation that the

13  defendants passed on the full amount of the increase in CRTs in their sales of Finished Products.

14  IPC ¶ 223.  But, as explained above, any allegation that the SE Defendants engaged in a

15  conspiracy to fix the prices of Finished Products is implausible because the complaint fails to

16  provide any factual allegation describing the time, place and manner of that purported conspiracy,

17  or allegations of market concentration that would have made such a conspiracy remotely

18  plausible.  Indeed, to the contrary, the complaint alleges that the Finished Products market was

19  subject to severe competitive pressures, and it fails to name numerous major Finished Products

20  manufacturers as participants.  *See supra* note 4.  The complaints therefore come nowhere close

21  to "the line between possibility and plausibility" concerning the SE Defendants' ability to

22  _____

23  [5] The Indirect Purchasers also cite the Ninth Circuit's decision in *William O. Gilley Enterprises, Inc. v. Atlantic Richfield Co.*, 561 F.3d 1004, 1011 (2009), for the proposition that "the

24  determination of whether an antitrust complaint states an economically plausible conspiracy presents questions of fact that cannot be resolved on a motion to dismiss."  IP Opp'n Br. 71.  In

25  that case, however, the defendants did not argue for dismissal based on an economically senseless conspiracy under *Matsushita*, but rather challenged whether the plaintiffs had adequately alleged

26  market power under a rule-of-reason analysis as a matter of law.  561 F.3d at 1010-11.  Here, the SE Defendants argue that even if all the facts alleged in the complaint are borne out through

27  discovery, the SE Defendants will be entitled to summary judgment under the legal standard announced in *Matsushita*.  That type of claim *is* appropriately considered at the pleading stage.

28  *See Twombly*, 550 U.S. at 553-54.

1   increase the price of Finished Products to pass on the full costs of the alleged CRT conspiracy to

2   their customers.  *Twombly*, 550 U.S. at 557.

3          In short, plaintiffs have failed to answer the conundrum raised by their decision to name

4   the SE entities as defendants in their complaints: why would the SE Defendants—which

5   manufacture Finished Products, purchase Tubes as a component, and own only a minority equity

6   stake in a separate, publicly traded Tubes-manufacturing entity—conspire to increase the price of

7   their own components, and therefore subject themselves to increased margin pressures?  Because

8   plaintiffs provide no adequate answer to that question—much less an answer based on pleaded

9   facts—the complaints must be dismissed.

10         **B.     Plaintiffs' Complaint Must Separately Be Dismissed Because They Have
                   Properly Alleged Only A Vertical Conspiracy As To The SE Defendants,
11                 Without Pleading The Required Elements Of A Rule-Of-Reason Analysis**

12         1.  "Restraints imposed by agreement between competitors have traditionally been

13   denominated as horizontal restraints, and those imposed by agreement between firms at different

14   levels of distribution as vertical restraints."  *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S.

15   717, 730 (1988).  Only "horizontal" conspiracies—those between competitors at the same level of

16   distribution—are per se violations of the antitrust laws.  *See, e.g.*, *Campfield v. State Farm Mut.*

17   *Auto. Ins. Co.*, 532 F.3d 1111, 1119-20 (10th Cir. 2008).  In contrast, when an antitrust

18   conspiracy is alleged as "between entities at different levels of the same distribution chain[,]

19   [courts] apply the rule of reason."  *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1480 (9th Cir.

20   1986).  And prevailing in a rule-of-reason case "requires a claimant to prove the relevant market

21   and to show the effects upon competition within that market."  *Big Bear Lodging Ass'n v. Snow*

22   *Summit, Inc.*, 182 F.3d 1096, 1101 (9th Cir. 1999) (internal quotation omitted).

23         Here, there is no dispute that the SE Defendants only make Finished Products, or that

24   Samsung SDI is a publicly traded entity in which the SE Defendants hold a minority 20% equity

25   stake.  Moreover, as explained above, the only conspiracy for which facts arguably are alleged is

26   an agreement to fix the prices of *Tubes*, a product at a different level of the distribution chain than

27   the SE Defendants.  Thus, the complaints *only* could be alleging a vertical conspiracy as to the SE

28

7

1    Defendants.  But the complaints fail to allege any legally relevant market, let alone "to show the

2    effects upon competition within that market."  *Big Bear Lodging Ass'n*, 182 F.3d at 1101.

3    "Because [the SE Defendants] and [CRT manufacturers] are not competitors—they do not

4    operate at the same market level—their cooperation cannot constitute a price fixing, group

5    boycott, or exclusive dealing arrangement sufficient for a per se violation of the Sherman Act.

6    Therefore the rule of reason applies, and [Plaintiffs'] failure to allege a legally relevant market

7    requires dismissal of [their] claims."  *Campfield*, 532 F.3d at 1120.

8              2.  Plaintiffs argue that they have alleged a "horizontal conspiracy with vertical aspects"

9    because "Samsung" is a vertically integrated entity.  That argument is legally deficient, for

10   plaintiffs do not contend with the fact that SDI is a wholly separate, publicly traded corporation in

11   which SEC owns only a minority 20% stake.  Rather, plaintiffs' allegations as to the SE

12   Defendants amount to a simple vertical conspiracy.

13             The Direct Purchasers' reliance (at 55) on *Freeman v. San Diego Ass'n of Realtors*, 322

14   F.3d 1133 (9th Cir. 2003), and *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323 (9th

15   Cir. 1980), is unavailing.  Those cases are about whether and under what circumstances

16   purchasers of downstream products may sue *upstream* sellers without running afoul of *Ill. Brick

17   Co. v. Illinois*, 431 U.S. 720 (1977).  *See Freeman*, 322 F.3d at 1145-46; *Royal Printing*, 621 F.2d

18   at 326.  The question here—having nothing to do with *Illinois Brick*—is a wholly separate one:

19   whether an antitrust plaintiff may properly allege a horizontal conspiracy against the seller of a

20   *downstream* product (Finished Products) when it is the upstream product (Tubes) that is allegedly

21   being price-fixed.   The Direct Purchasers also rely on several cases that they believe demonstrate

22   "situations where Plaintiffs directly purchased downstream 'finished' goods from a cartel of

23   manufacturers who also made and fixed the price of 'upstream' components of those goods."  DP

24   Opp'n Br. 58.  But as the Direct Purchasers' own description indicates, those cases all involve

25   defendants that wholly own both upstream production and downstream distribution units, and are

26   therefore truly vertically integrated.  *See In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13, 16, 18-

27   19 & n.8 (3d Cir. 1978); *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 201 n.1 (E.D. Pa.

28   2001); *In re Flat Glass Antitrust Litigation*, 191 F.R.D. 472, 475-76 (W.D. Pa. 1999).  None of

8

1  those cases consider or suggest that a seller of a finished product may be held liable for a

2  horizontal conspiracy when the allegedly price-fixed component product is made and sold by a

3  separate, independent, and publicly traded entity in which the seller of finished products owns

4  only a minority equity stake.  The only exception in the cases plaintiffs cite—*In re Midwest Milk*

5  *Monopolization Litig.*, 730 F.2d 528 (8th Cir. 1984)—proves the point.  There, plaintiffs were

6  purchasers of milk who principally alleged that the price of *raw* milk—a component that

7  plaintiffs had not purchased—was price-fixed by raw milk sellers.  The court differentiated

8  between that alleged horizontal conspiracy, and plaintiffs' apparent additional theory that milk

9  dealers—from whom plaintiffs purchased milk—were involved in the conspiracy to fix the price

10  of raw milk.  *That* type of conspiracy, the court explained, was a *vertical* one.  *Id.* at 529.

11      The Indirect Purchasers similarly argue that they have properly alleged a "horizontal

12  conspiracy with vertical aspects."  IP Opp'n Br. 65.  Apart from relying on some of the same

13  inapposite cases as the Direct Purchasers (*id.* at 68), the Indirect Purchasers argue that they have

14  properly alleged a horizontal conspiracy based on *Copperweld Corp. v. Independence Tube*

15  *Corp.*, 467 U.S. 752, 772 n.18 (1984), quoting that case for the proposition "that the ultimate

16  interests of the subsidiary and the parent are identical, so the parent and the subsidiary must be

17  viewed as a single economic unit."  The Indirect Purchasers fail to note that the Supreme Court

18  was describing a situation in which "a subsidiary is wholly owned."  *Id.*  Here, however, it is

19  undisputed that Samsung SDI is not wholly owned by the SE Defendants; the two are separate,

20  publicly traded entities, each operating at different levels of the distribution chain.  Thus, the *only*

21  type of conspiracy concerning Tubes in which the SE Defendants could have participated is a

22  vertical one.  *See, e.g.*, *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., Inc.*, 668 F.2d

23  1014, 1052-54 (9th Cir. 1981) (describing an alleged agreement between parent and subsidiary,

24  when the two are "separate economic units" capable of conspiring with each other, a "vertical"

25  conspiracy).  That is true *a fortiori* as to any allegation that the SE Defendants conspired with

26  *other* defendants respecting a conspiracy to fix the prices of CRTs.

27      Plaintiffs cite no authority for the unfounded proposition that a manufacturer of a finished

28  product engages in a "horizontal" conspiracy in price-fixing a component that it does not make

9

1   but rather uses in an end product.  That conspiracy can only be a vertical one, and the complaints

2   must be dismissed as to the SE Defendants because they lack any allegations required for rule-of-

3   reason analysis.

4   **III.   Plaintiffs Have Failed Plausibly To Allege That The SE Defendants Can Be Held**
   **Vicariously Liable Through The Actions Of The Samsung SDI Defendants**

5

6       1.  The Direct Purchasers state that "the basis of the SE Defendants' inclusion in the

7   Complaint is predicated on their *own* illegal conduct, and not on a theory of vicarious liability."

8   DP Opp'n Br. 63.  As explained above, that complaint fails plausibly to allege that the SE

9   Defendants joined the alleged conspiracy, and must therefore be dismissed.

10      The Indirect Purchasers do purport to press an agency theory of liability.  Plaintiffs'

11  allegation of agency between the SE Defendants and the SDI Defendants is limited to the

12  assertion: "Defendant SEC dominated and controlled the finances, policies, and affairs of

13  Samsung SDI relating to the antitrust violations alleged in this complaint," DPC ¶ 61; IPC ¶ 64,

14  and that SEC and Samsung SDI "dominated and controlled" the SDI subsidiaries.  That

15  conclusory allegation is inadequate on its face to survive a motion to dismiss.

16      Pleadings that "are no more than conclusions … are not entitled to the assumption of

17  truth." *Iqbal*, 129 S. Ct. at 1950.  That is particularly true in the context of allegations of agency,

18  where "[i]ndependence is to be **presumed**."  *California v. NRG Energy Inc.*, 391 F.3d 1011, 1024

19  (9th Cir. 2004), *rev'd on other grounds*, *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S.

20  224 (2007) (emphasis added).  Thus, as numerous cases have explained, a plaintiff must "plead

21  specific facts" demonstrating an agency relationship.  *Neilson v. Union Bank of Cal., N.A.*, 290 F.

22  Supp. 2d 1101, 1116 (C.D. Cal. 2003).[6]

---

23  [6] *See, e.g.*, *Canam Steel Corp. v. Mayo*, No. 09-cv-00672, 2009 U.S. Dist. LEXIS 44059, at *6–8
24  (E.D. Cal. May 22, 2009) (failure to allege any facts establishing an agency relationship is fatal to
    a claim against a putative principal); *Dolter v. Keene's Transfer, Inc.*, No. 08-cv-262, 2008 U.S.
25  Dist. LEXIS 59436, at *7–8 (N.D. Ill. Aug. 5, 2008) (rejecting plaintiffs' allegations of agency
    because they included only "labels and conclusions"); *Neu v. Terminex Int'l et. al*, No. C 07-
26  6472, 2008 U.S. Dist. LEXIS 32844, * 18-19 (N.D. Cal. Apr. 8, 2008) (dismissing claims against
    parent company based on conclusory allegations of control); *Am. Nat'l Red Cross v. United Way*
27  *Cal. Capital Region*, No. Civ. S-07-1236, 2007 U.S. Dist. LEXIS 95296, at *30 (E.D. Cal. Dec.
    18, 2007) (rejecting complaint that did not "allege one fact that suggests such an agency
28  relationship.  This bare legal conclusion is not sufficient to withstand a motion to dismiss.");

10

1  Plaintiffs' allegation that SEC "dominated and controlled" Samsung SDI and its

2 subsidiaries is plainly a legal conclusion, not an "evidentiary" factual allegation of the sort

3 required at the pleadings stage. *Kendall*, 518 F.3d at 1047-48. That conclusory allegation does

4 not qualify for the assumption of truth under *Iqbal*. And because that is the *only* allegation that

5 could plausibly support an agency theory, that theory cannot progress on these pleadings.

6  2. Plaintiffs nevertheless argue that they need not provide factual allegations of agency in

7 order to proceed past the pleadings stage. Plaintiffs' cited authority does not support that

8 unfounded proposition. Plaintiffs cite *Dion LLC v. Infotek Wireless, Inc.*, No. C 07-1431 SBA,

9 2007 WL 3231738 (N.D. Cal. Oct. 30, 2007), for the proposition that they are "not required to

10 plead agency elements." IP Opp'n Br. 45. Here, however, the question is not whether plaintiffs

11 must plead "agency elements," but whether they must plead *facts* that, if true, would support the

12 existence of an agency relationship. There is no ambiguity in the precedent on that question, *see*

13 *supra* note 6, and the detailed factual allegations of agency and alter ego present in *Dion* explain

14 why that complaint was allowed to move forward. *See* 2007 WL 3231738, at *3–4.[7] Nor does *In*

15 *re TFT-LCD Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184–85 (N.D. Cal. 2009), support plaintiffs'

16 argument. First, that case was decided before *Iqbal*, which held that *all* allegations in *any*

17 complaint, not just allegations of antitrust conspiracy, are subject to the "plausibility" standard

18 announced in *Twombly*. *See Iqbal*, 129 S. Ct. at 1953. In any event, *TFT-LCD*—whatever its

19 merits—involved full subsidiaries, not separate entities like the SE Defendants and the SDI

20 Defendants.[8]

21 ───────────────

*Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1103 (N.D. Cal. 2006) (rejecting conclusory

22 agency and alter ego allegations because they lacked any "specific factual allegations" against the
defendant); *Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1136 (N.D. Cal. 2005) (holding

23 that the allegation that "Bank One exercised such dominion and control over Bank One, NA and
Bank One Arizona that it [was] liable according to the law for the acts of Bank One," was an

24 inadequate legal conclusion, and granting the defendants' motion to dismiss).

[7] The plaintiff in *Dion* alleged, inter alia, that "[t]he unity of interest and ownership between

25 Wireless and Associates . . . prevented the two from functioning as separate entities . . . . [The

26 two companies] conduct the same type of business, shared the same office space, used the same
business address, and had the same bookkeeper, lawyers and CPA." 2007 WL 3231738, at *3

27 (internal quotation omitted; alterations in original).

[8] To the extent *TFT-LCD* accepted allegations of agency *only* because of a parent-subsidiary

28 relationship, it is plainly wrong. Even a wholly owned subsidiary is not presumed to be an agent

11

Plaintiffs' citation of *Copperweld* also is unavailing.  Plaintiffs cite *Copperweld* (IP Opp'n Br. 48 n. 60) for the proposition that "a parent and its *wholly owned subsidiary* have a complete unity of interest." *Copperweld*, 467 U.S. at 771 (emphasis added).  Even if *Copperweld* were an agency case, it is undisputed that Samsung SDI is not a "wholly owned subsidiary" of SEC.

Plaintiffs have not pleaded "evidentiary" facts from which an agency relationship between Samsung SDI and the SE Defendants can be inferred.  All they have pleaded is a legal conclusion not entitled to an assumption of truth. *Iqbal*, 129 S. Ct. at 1950.  Moreover, plaintiffs have not explained *why* the SE Defendants would ever instruct SDI to seek to *increase* the price of the former's components.  SE Defendants' Mot. to Dismiss 19-20.  The complaints fail plausibly to allege that the SE Defendants are vicariously liable for the alleged actions of Samsung SDI.

## IV.  The Complaints Fail Sufficiently To Allege That The SE Defendants Joined Any Conspiracy As Required By *Twombly* And *Iqbal*

Even if the complaints can be said to plead a legally valid theory of antitrust conspiracy, they must nevertheless be dismissed as to the SE Defendants for failure to plead with sufficient particularity to "show[] that [they are] entitled to relief." Fed. R. Civ. P. 8(a)(2).

### A.  A Complaint Must Allege That Each Defendant Joined The Alleged Conspiracy, And Generic Corporate Titles Are Insufficient To Provide Adequate Notice

Although plaintiffs are correct that they need not allege in detail each overt act on the part of each defendant, it is undisputed that the complaints "must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." *In re TFT-LCD (Flat Panel)*

of its parent. *See, e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 61-62, (1998); *Bauman v. DaimlerChrysler AG*, __ F.3d __, 2009 WL 2634795, at *5 (9th Cir. Aug. 28, 2009) (finding a lack of agency on the pleadings, and explaining that "the parent must exert control that is so pervasive and continual that the subsidiary may be considered an agent or instrumentality of the parent, notwithstanding the maintenance of corporate formalities.  Control must be over and above that to be expected as an incident of ownership"); *NRG Energy, Inc.*, 391 F.3d at 1025 ("The presumption of independence is defeated only where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created").  That is, of course, true *a fortiori* when the "subsidiary" is a separate, publicly traded company—and, thus, with fiduciary duties to *all* its shareholders—and when the "parent" holds only a 20% minority stake.

12

1    *Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (internal quotation omitted).[9]

2          The point of contention is whether plaintiffs properly may assert allegations against a

3    generic corporate entity, "Samsung," rather than making separate, specific allegations as to the

4    SE Defendants and the SDI Defendants.  In defending their pleading, plaintiffs rely heavily on *In*

5    *re TFT-LCD Antitrust Litig.*, 599 F. Supp. 2d at 1184-85.  That reliance is misplaced for several

6    reasons.  First, that decision is incorrect under *Iqbal* and *Twombly*; lumping two separate entities

7    into one does not meet the requirement of pleading "factual content that allows the court to draw

8    the reasonable inference that *the defendant* is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct.

9    at 1949 (emphasis added).  Second, later cases have wholly rejected that approach.  For instance,

10   Judge Breyer recently dismissed a complaint as to a set of corporate parent defendants when the

11   complaint "merely lump[ed] together allegations against the holding company and its subsidiary,"

12   *e.g.*, a parent and subsidiary collectively referred to as "Bank of America," because there were

13   "no allegations in the complaint that tie the holding companies to the alleged conspiracy."  *In re*

14   *ATM Fee Antitrust Litig.*, No. 04-02676, 2009 U.S. Dist. LEXIS 83199, at *55-56 (N.D. Cal.

15   Sept. 4, 2009).  Finally, even if the *TFT-LCD* case was correct as a general matter, it has no

16   application to allegations as to "Samsung."  As explained, "Samsung" is not one consolidated

17   entity, but two different sets of entities: the SE Defendants, which make and sell Finished

18   Products, and Samsung SDI, a publicly traded company which makes and sells Tubes (and other

19   products), and in which SEC owns a 20% minority stake.  Thus, any allegation as to "Samsung"

20   fails to provide any notice as to the nature of the alleged action.

21         Moreover, allegations as to "Samsung" are particularly inappropriate in a complaint

22   replete with allegations concerning "CRT Products," which includes both Tubes and Finished

23   Products.  This is the hallmark of allegation by obfuscation that *Iqbal* and *Twombly* reject.  An

24   allegation that "Samsung" agreed to fix the prices of "CRT Products" could mean, for example,

25   that i) the SE Defendants agreed with non-"Samsung" entities to fix the prices of Tubes; ii) that

26

27   _____

[9] *See* DP Opp'n Br. 40 ("[A]n antitrust complaint should be viewed as a whole, *and the plaintiff*
28   *must allege that each individual defendant joined the conspiracy and played some role in it.*"
     (citation omitted; emphasis added)); IP Opp Br. 28-29 (same).

1   the SDI Defendants agreed with non-"Samsung" entities to fix the prices of Tubes; iii) that the SE

2   Defendants agreed with non-"Samsung" entities to fix the prices of Finished Products; or iv) that

3   the SE Defendants agreed with the SDI Defendants to fix the prices of Tubes.  These allegations,

4   even if they were supported by factual averments (which they are not) give the SE Defendants no

5   notice as to the scope or nature of the allegations against them.

6   **B.     The Allegations Against SEC Are Legally Deficient Under *Iqbal* And *Twombly***

7   In order to provide the "plausible" grounds for relief required by *Iqbal* and *Twombly*, a

8   complaint must answer as to each defendant "the basic questions: who, did what, to whom (or

9   with whom), where, and when?"  *Kendall*, 518 F.3d at 1048.  These complaints fail this test.

10   1.  *What*.  These complaints fail the most basic requirement—identifying the object of the

11   conspiracy—because they allege only that SEC conspired to fix the prices of "CRT Products."

12   DPC ¶ 166; IPC ¶ 166.  As explained, that term is defined to include two types of products at two

13   levels of distribution, although—to make matters worse—it is sometimes used to mean *only*

14   Finished Products,[10] and sometimes to mean *only* Tubes.[11]  The complaints fail completely to

15   provide any notice as to the object of the alleged conspiracy.  *See also supra* Parts I & IV.A.

16   The Direct Purchasers' complaint also is deficient because it contains no allegation that

17   *SEC* agreed to fix prices, but only that SEC, along with Samsung SDI and its subsidiaries,

18   "participated" in "illegal" meetings "in which unlawful agreements as to, *inter alia*, price, output

19   restrictions, and customer and market allocation of CRT Products . . . occurred."  DPC ¶ 166.

20   This is a legal conclusion posing as a fact, a form of pleading rejected by *Twombly* and *Iqbal*.  *See*

21   *Iqbal*, 129 S. Ct. at 1950; *Twombly*, 550 U.S. at 555.

22   2.  *Who*.  The Indirect Purchasers' complaint also fails to allege that *SEC* agreed to fix

23   prices.  Rather, it alleges that "Samsung, through SEC," as well as through SDI Defendants,

24   attended various meetings, and then alleges that "*Samsung* agreed on prices and supply levels for

---

[10] *See, e.g.*, DPC ¶ 144 ("… in the case of vertically integrated manufacturers who produced both CRTs and CRT Products …"); IPC ¶ 155 ("Like CRTs themselves, the market for CRT Products was a mature one ….").

[11] IPC ¶ 156(c) ("… agreements on pricing for intra-company CRT Product sales to vertically integrated customers …").

14

1    CRT Products." IPC ¶ 166 (emphasis added). That complaint therefore fails to allege that SEC

2    entered into the conspiracy—only that "Samsung" did—which is enough to require dismissal.

3         Moreover, both complaints fail to identify any individuals who actively participated in the

4    alleged conspiracy, and thus fail to "allege facts such as a 'specific time, place, *or person*

5    involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a

6    conspiracy an idea of where to begin," *Kendall*, 518 F.3d at 1047 (quotation omitted) (emphasis

7    added), a particularly problematic omission when, as here, "the defendants are large institutions

8    with hundreds of employees entering into contracts and agreements daily." *Id.*

9         3. *When*. In *Twombly*, the Court explained that the complaint was deficient in part

10   because it identified a "seven-year span in which the § 1 violations were supposed to have

11   occurred," but failed to mention any "specific time." 550 U.S. at 565 n.10. An even greater

12   deficiency is amply evident here, with both complaints alleging a time-span of between 11 and 12

13   years as to SEC without any accompanying detail. *See* DPC ¶ 166; IPC ¶ 166.

14        **C.      The Allegations Against SEAI Are Inadequate Under *Iqbal* And *Twombly***

15        The only specific allegation as to SEAI is that it was "represented at [the 'illegal']

16   meetings," presumably by SEC, "and [was] a party to the agreements entered at them." DPC

17   ¶ 167; *see also* IPC ¶ 167. On top of the reasons given above as to the allegations against SEC,

18   the complaints are inadequate against SEAI because they contain no allegation that SEAI agreed

19   to fix the price of *any* CRT Product. The complaints say that SEAI was "represented" at illegal

20   meetings and allege that SEAI "played a significant role in the conspiracy." Even that conclusory

21   allegation is tempered by noting that SEAI's role in the alleged conspiracy was "significant" only

22   "[t]o the extent . . . SEAI . . . distributed CRT Products . . . ." DPC ¶ 167; IPC ¶ 167. On top of

23   all the inadequacies of the complaints as to SEC, the complaints are further insufficient as to

24   SEAI because they nowhere allege that SEAI actually agreed to fix prices.

25                                    **CONCLUSION**

26        For the foregoing reasons, the complaints should be dismissed as to the SE Defendants.

27

28

1    Dated: September 24, 2009

2
                                            Respectfully submitted,
3                                           O'MELVENY & MYERS LLP

4
                                            By: /s/ Ian Simmons_____
5                                               Ian Simmons (*pro hac vice*)

6                                           1625 Eye Street NW
                                            Washington, DC 20006
7                                           Telephone:  (202) 383-5300
                                            Facsimile:  (202) 383-5414
8                                           Email: isimmons@omm.com

9                                           *Attorneys for Defendants Samsung
                                            Electronics Co., Ltd., and Samsung
10                                          Electronics America, Inc.*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16

1

## <u>CERTIFICATE OF SERVICE</u>

2

3    I hereby certify that on September 24, 2009, I electronically filed the foregoing with the

4    Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

counsel of record in this matter who are registered on the CM/ECF system.

5

6

7

8                                                          /s/ Ian Simmons
                                                           Ian Simmons

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28