DAVID M. LISI (SBN 154926)
Email: lisid@howrey.com
HOWREY LLP
1950 University Avenue, 4th Floor
East Palo Alto, CA 94303
Telephone: (650) 798-3530
Facsimile: (650) 798-3600

JOHN M. TALADAY *(pro hac vice)*
RICHARD A. RIPLEY *(pro hac vice)*
Email: taladayj@howrey.com; ripleyr@howrey.com
HOWREY LLP
1299 Pennsylvania Ave NW
Washington, DC 20004
Telephone: (202) 383-6564
Facsimile: (202) 383-6610

ETHAN E. LITWIN *(pro hac vice)*
Email: litwine@howrey.com
HOWREY LLP
601 Lexington Avenue, 54th Floor
Telephone: (212) 896-6500
Facsimile: (212) 896-6501

Attorneys for KONINKLIJKE PHILIPS ELECTRONICS N.V., PHILIPS ELECTRONICS NORTH AMERICA CORPORATION, PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD. AND PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 07-5944-SC<br><br>MDL No. 1917<br><br>**THE PHILIPS DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTIONS TO DISMISS THE DIRECT PURCHASER PLAINTIFFS' AND THE INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINTS**<br><br>Date:   October 5, 2009<br>Time:   9:00 a.m.<br>Before:  The Honorable Charles A. Legge |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT .................................................................................................................................. 2

I. PLAINTIFFS' CLAIMS AGAINST THE PHILIPS DEFENDANTS FAIL *IQBAL'S* TWO-PRONGED ANALYSIS ............................................................................ 2

    A. The Amended Complaints Do Not Allege Sufficient Facts to Plausibly Suggest the Existence of a "CRT Products" Conspiracy ............................... 2

        1. Plaintiffs' Allegations Concerning a "CRT Products" Conspiracy Are Wholly Conclusory ................................................................. 3

        2. The Only Specific Allegations in the Amended Complaints Concern CRTs, Not CRT Products ................................................................. 5

    B. The Amended Complaints Do Not Allege Sufficient Facts to Plausibly Suggest a Theory of Liability against the Philips Defendants .......................................................................................................... 8

        1. Plaintiffs' Veil Piercing Allegations are Wholly Conclusory ............................ 9

        2. Plaintiffs' Allegations of Agency Are Wholly Conclusory .............................. 10

        3. Plaintiffs Fail to Allege Sufficient Facts to Hold the Philips Defendants Vicariously Liable for the Actions of LG.Philips Displays ........................................................................................... 12

II. PLAINTIFFS CLAIMS ARE TIME-BARRED ...................................................................... 13

# TABLE OF AUTHORITIES

**CASES**

*American National Red Cross v. United Way Cal. Capital Region*,
   No. S-07-1236, 2007 U.S. Dist. LEXIS 95296 (E.D. Cal. Dec. 18, 2007) ........................12

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009)...................................................................................................*passim*

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ..............................................................................................................8

*Biggins v. Wells Fargo & Co.*,
   No. 90-01272, 2009 U.S. Dist. LEXIS 64620 (N.D. Cal. July 27, 2009) ..........................12

*Bowoto v. ChevronTexaco Corp.*,
   312 F. Supp. 2d 1229 (N.D. Cal. 2004)...............................................................................11

*California v. NRG Energy Inc.*,
   391 F.3d 1011 (9th Cir. 2004 ..............................................................................................11

*Canam Steel Corp. v. Mayo*,
   No. 2:09-CV-00672, 2009 U.S. Dist. LEXIS 44059 (E.D. Cal. May 22, 2009)................12

*Chicago, M. & S. P. R. Co. v. Minneapolis Civic & Commerce Association*,
   247 U.S. 490 (1918) ............................................................................................................12

*Chubb & Son, Inc. v. Kelleher*,
   No. 92-4484, 1998 U.S. Dist. LEXIS 22542 (E.D.N.Y. Feb. 27, 1998) ............................14

*In re Citric Acid Litigation*,
   191 F.3d 1090 (9th Cir. 1999)................................................................................................4

*In re Currency Conversion Fee Antitrust Litigation*,
   265 F. Supp. 2d 385 (S.D.N.Y. 2003) ...................................................................................9

*E&J Gallo Winery v. Encana Energy Serv.*,
   No. CVF 03-5412, 2008 WL 2220396 (E.D. Cal. May 27, 2008).....................................11

*In re Elevator Antitrust Litigation*,
   502 F.3d 47 (2d Cir. 2007)....................................................................................................4

*In re Flash Memory Antitrust Litigation*,
   Case No. 07-0086, 2009 U.S. Dist. LEXIS 38941 (N.D. Cal. Mar. 31, 2009).....................7

*Fox v. Piche,*
   No.  C 08-1098, 2008 U.S. Dist. LEXIS 79337 (N.D. Cal. Sept. 22, 2008) ......................12

*Hanson v. America W. Airlines, Inc.*,
   544 F. Supp. 2d 1038 (C.D. Cal. 2008) ..............................................................................11

*Hanson v. Shell Oil Co.*,
 541 F.2d 1352 (9th Cir. 1976) ................................................................................................4

*Hillside Drilling Inc. v. Goldman Sachs Group*,
 No. C 09-1896 SI, 2009 WL 2246215 (N.D. Cal. July 27, 2009) ........................................9

*Metz v. Unizan Bank*,
 416 F. Supp. 2d 568 (N.D. Ohio 2006) ...............................................................................13

*Monaco v. Liberty Life Assurance Co.*,
 No. C06-0721, 2007 WL 420139 (N.D. Cal. 2007) ...........................................................12

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.*,
 198 F.3d 823 (11th Cir. 1999) .............................................................................................14

*In re NBR Antitrust Litigation ("NBR")*,
 No. 03-1898, 10 (W.D. Pa. Sept. 28, 2005) ........................................................................14

*Nordberg v. Trilegiant Corp.*,
 445 F. Supp. 2d 1082 (N.D. Cal. 2006) ..............................................................................12

*Oreck Corp. v. Whirlpool Corp.*,
 639 F.2d 75 (2d Cir.1980) .....................................................................................................4

*Pearson v. Component Technology Corp.*,
 247 F.3d 471 (3rd Cir. 2001) ........................................................................................11, 12

*Reisman v. United States*,
 409 F.2d 789 (9th Cir. 1969) ...............................................................................................14

*Rutledge v. Boston Woven Hose & Rubber Co.*,
 576 F.2d 248 (9th Cir. 1978) ...............................................................................................13

*Satellite Broadcasting Cable, Inc. v. Telefonica de Espana, S.A.*,
 786 F. Supp. 1089 (D.P.R. 1992) ..........................................................................................9

*In re Silicone Gel Breast Implants Prod. Liability Lit.*,
 837 F. Supp. 1128 (N.D. Ala. 1993), ..................................................................................12

*In re Static Random Access Memory (SRAM) Antitrust Litigation*,
 580 F. Supp. 2d 896 (N.D. Cal. 2008) ..................................................................................7

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*,
 608 F. Supp. 2d 1166 (N.D. Cal. 2009) ..............................................................................11

*Synapsis LLC v. Evergreen Data Systems, Inc.*,
 Case No. C 05-01524, 2006 U.S. Dist. LEXIS 1927 (N.D. Cal. Jan. 9, 2006) ..................11

*Texaco Inc. v. Dagher*,
 547 U.S. 1 (2006) ................................................................................................................13

*United States v. Antar*,
 53 F.3d 568 (3d Cir. 1995) ..................................................................................................14

*United States v. Eisen*,
 974 F.2d 246 (2nd Cir. 1992) .......................................................................................................... 14

*United States v. Nippon Paper Industrial Co.*,
 62 F. Supp. 2d 173 (D. Mass. 1999) ............................................................................................... 14

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Koninklijke Philips Electronics N.V. ("KPE"), Philips Electronics North America Corporation ("PENAC"), Philips Electronics Industries (Taiwan), Ltd. ("PEIT") and Philips da Amazonia Industria Electronica Ltda. ("Philips da Amazonia" and, collectively, the "Philips Defendants") submit this Reply Memorandum, along with the Litwin Declaration, in Further Support of their Motion to Dismiss Direct Purchaser Plaintiffs' and Indirect Purchaser Plaintiffs' Consolidated Amended Complaints ("Motion").[1]

## PRELIMINARY STATEMENT

Plaintiffs claim, as their principal objection to the Motion, that the Philips Defendants have improperly re-written their pleadings. DP Opp. at 107. Ironically, Plaintiffs' many assertions about what they have pled in their Amended Complaints fall well short of Plaintiffs' actual allegations. The Amended Complaints fail to plausibly suggest that the Philips Defendants participated in an alleged conspiracy to fix the price of CRTs. Instead of alleging specific factual material against the Philips Defendants, Plaintiffs rely on the same shop-worn conclusory allegations that the Supreme Court has conclusively rejected, most recently in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1951 (2009) (holding that conclusory allegations are not entitled to the presumption of truth). The *Iqbal* Court announced a "two-pronged approach" for testing the legal sufficiency of a complaint. *Id.* First, this court must "identify[] the allegations in the complaint that are not entitled to the assumption of truth" because they are conclusory. *Id.* Only after stripping the Amended Complaints bare of any conclusory allegations should this Court then "consider the [remaining] factual allegations in [the Amended Complaints] to determine if they plausibly suggest an entitlement to relief." *Id.* Under this test, Plaintiffs' fail to plausibly establish their entitlement to relief from the Philips Defendants for the following reasons:

- *First*, Plaintiffs' allegations do not plausibly suggest the existence of a conspiracy to fix the prices of so-called "CRT Products" because Plaintiffs' only specific factual allegations concern CRTs, not CRT Products. Accordingly, under *Iqbal*, Plaintiffs' claims are appropriately restricted to claims regarding CRTs only. Plaintiffs, however,

---

[1] As agreed by the parties, and ordered by this Court, the parties will brief and argue the motions by Philips Electronics Industries (Taiwan), Ltd. and Philips da Amazonia Industria Electronica Ltda. to dismiss for lack of personal jurisdiction at a later date.

allege only that they purchased "CRT Products" from the Philips Defendants. Thus, Plaintiffs have not alleged that they purchased the allegedly price-fixed product from any of the Philips Defendants.

- *Second*, Plaintiffs' fail to allege that any of the Philips Defendants directly participated in any of the alleged cartel meetings. Plaintiffs do not allege sufficient factual material to plausibly suggest that the Philips Defendants should be held either jointly liable under either an alter ego (veil piercing) or agency theory, or otherwise vicariously liable for the acts of an independent entity, LG.Philips Displays.

Furthermore, the claims against the Philips Defendants are time-barred on their face. The Philips Defendants exited the CRT business in June 2001, long before the start of the statute of limitations period. Plaintiffs have provided no reason why their claim against the Philips Defendants should survive in light of the statute of limitations.

Plaintiffs have therefore failed to establish a basis of liability against any of the Philips Defendants, and the Court should dismiss them from this litigation.

## ARGUMENT

### I. PLAINTIFFS' CLAIMS AGAINST THE PHILIPS DEFENDANTS FAIL *IQBAL'S* TWO-PRONGED ANALYSIS

#### A. The Amended Complaints Do Not Allege Sufficient Facts to Plausibly Suggest the Existence of a "CRT Products" Conspiracy

As explained more fully in the Joint Reply, Plaintiffs use the term "CRT Products" to obscure the fact that while all their factual allegations concern CRTs (*i.e.*, the tubes) only, Plaintiffs purchased only products *containing* CRTs (*i.e.*, televisions and monitors). Plaintiffs deceptively define "CRT Products" to include **both** CRTs **and** the downstream products that contain them so that they can allege without sanction both that (i) they purchased CRT Products (because televisions and monitors are CRT Products) and (ii) the alleged cartel also concerned CRT Products (because CRTs are also CRT Products). Plaintiffs' claims must therefore be dismissed under *Iqbal* for the simple reason that Plaintiffs do not allege that they purchased the allegedly price-fixed product.

The Amended Complaints create confusion because the Plaintiffs use the single term "CRT Products" to refer to at least two completely different things. In some cases, Plaintiffs use the term "CRT Products" to refer just to televisions, monitors and other finished products. DPC ¶ 86 ("The Class definition encompasses those who bought a ***CRT Product*** directly from a Defendant, even if the

***CRT contained therein*** was manufactured by an affiliated entity, principal, agent or co-conspirator."); DPC ¶ 139 ("The overall ***CRT*** conspiracy affected worldwide prices . . . for ***CRT Products***."); DPC ¶ 144 ("in the case of integrated manufacturers who produced both ***CRTs*** and ***CRT Products***").[2]

In other cases, Plaintiffs use the term CRT Products to refer only to CRTs. DPC ¶ 79 ("MTPD was formed as a ***CRT*** joint venture . . . . MTPD manufactured, sold, and distributed ***CRT Products*** . . ."); DPC ¶ 80 ("BMCC is the second largest producer of ***CRTs*** for televisions in China. During the class period, BMCC manufactured, sold, and distributed ***CRT Products*** . . ."); ¶¶ 189-190 ("In 1996, another industry source noted that 'the price of the ***14" tube*** is at a sustainable USD50 and has been for some years . . ." In reality, consumer prices for ***CRT Products*** never approached $50 in 1997, and were consistently double this price.").

Plaintiffs assert in their Opposition that the Amended Complaints allege "a conspiracy that concerns ***all*** CRT Products (not just tubes)." DP Opp. at 108. That assertion is manifestly false. No such allegation can be found anywhere in either Amended Complaint. Neither Amended Complaint contains the phrase "***all*** CRT Products"; there is no basis to read the word "***all***" into the Amended Complaints. Given that Plaintiffs use CRT Products to mean, alternately, either "CRTs only" or "televisions and monitors only," Plaintiffs' claims regarding an alleged "CRT Products" conspiracy are ambiguous, speculative, and wholly conclusory. They should be dismissed.

### 1. Plaintiffs' Allegations Concerning a "CRT Products" Conspiracy Are Wholly Conclusory

Applying the *Iqbal* "two-pronged analysis" to the Amended Complaints reveals that Plaintiffs have not alleged, contrary to their claims in their Oppositions, sufficient factual material to suggest that the Philips Defendants conspired to fix the price of so-called "CRT Products". DP Opp. at 109-10; IP Opp. at 18-20. Under the "first prong" of the *Iqbal* analysis, this Court should review Plaintiffs allegations concerning the existence of the alleged conspiracy to determine which allegations are conclusory. *See Iqbal,* 129 S. Ct. at 1950. Under this standard, this Court should find that each and every one of Plaintiffs' allegations concerning an alleged "CRT Products" conspiracy is conclusory

---

[2] All emphasis in quotes from the Amended Complaints is added.

and therefore disentitled to any presumption of truth.  *Id.*  For example, Plaintiffs conclusorily allege that the Philips Defendants:

- "conspired, combined and contracted to fix, raise, maintain, and stabilize the price at which CRT Products were sold in the United States." DPC ¶ 3.

- "engaged in various collusive practices with respect to CRT Products." DPC ¶ 4.

- agreed to:  "(a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production, and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output." DPC ¶ 5.

- participated in "unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products occurred."  DPC ¶ 164.[3]

These allegations are no less conclusory than Iqbal's rejected allegations that Ashcroft and Mueller "'knew of, condoned, and willfully and maliciously *agreed* to subject [him]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological reason.'" *Iqbal*, 129 S. Ct. at 1951 (quoting plaintiff's complaint)

---

[3] Plaintiffs' allegations that Defendants regularly met with each other (DPC ¶ 134-75; IPC ¶ 140-187) is an insufficient basis to infer – from the mere existence of those meetings alone – that Defendants engaged in an illegal price-fixing conspiracy.  This is particularly true where, as here, some Defendants enjoyed a customer/supplier relationship.  *See, e.g.*, DPC ¶ 120 (indicating that defendant Samtel supplied CRTs to "LG Electronics, Samsung, Philips, and Panasonic during at least part of the Class Period.").  Indeed, federal courts have routinely held that meetings among competitors, in and of themselves, do not violate the antitrust laws.  *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (holding  as insufficient to state a cause of action allegations that defendants "[p]articipated in meetings . . . to discuss pricing and market divisions"); *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 79 (2d Cir.1980) ("A mere showing of close relations or frequent meetings between the alleged conspirators . . . will not sustain a plaintiff's burden absent evidence which would permit the inference that those close ties led to an illegal agreement."); *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir. 1976) ("evidence of meetings alone is not sufficient; there must also be evidence sufficient to permit the jury to infer illegal agreement"); *In re Citric Acid Litig.*, 191 F.3d 1090, 1103 (9th Cir. 1999) ("[Plaintiff] does not offer any specific details with regard to illegal discussions, but instead merely asks us to infer participation in the conspiracy from the opportunity to do so.  Such meetings, at least in and of themselves, do not tend to exclude the possibility of legitimate activity.").

(emphasis added). As the Supreme Court observed, these sorts of "bare assertions, much like the pleading of a conspiracy in *Twombly*, amount to nothing more than a 'formulaic recitation of the elements'" of a Clayton Act claim. *Id.* In the end, "it [was] the conclusory nature of [Plaintiffs'] allegations, rather than their extravagantly fanciful nature, that disentitle[d] them to the presumption of truth." *Id.* This Court should give no greater credence to Plaintiffs' conclusory allegations than the Supreme Court gave to Iqbal's.

### 2. The Only Specific Allegations in the Amended Complaints Concern CRTs, Not CRT Products

Under the second prong of the *Iqbal* analysis, this Court should, after stripping all of the conclusory allegations from the Amended Complaints, consider whether Plaintiffs' remaining allegations sufficiently plead the existence of a conspiracy. *Iqbal*, 129 S. Ct. at 1951. Although it is far from clear that Plaintiffs have sufficiently pled the existence of any conspiracy, what is clear that ***all*** of the remaining allegations concern CRTs specifically, as opposed to "CRT Products". For example, Plaintiffs plead specific facts regarding market conditions that made the ***CRT market*** susceptible to collusive behavior:

- "***CRT manufacturers*** had very little debt or interest expense on their ***CRT manufacturing facilities***, and the pressure to produce at full capacity (to avoid default) was lessened. This provided an environment in which collusion to fix prices, even at the risk of lower demand, was possible." DPC ¶ 106.

- "[T]he ***CRT industry*** has been dominated by relatively few companies. In 2002 for example, three companies – Defendants LP Displays (formerly known as LGPD), Samsung and Chunghwa – controlled approximately 62% of the ***CRT market*** . . ." DPC ¶ 112.

- "The ***CRT industry*** also had significant consolidation during the Class Period, including but not limited to: (a) the creation of LGPD in 2001 . . .[and that] [t]his concentration of market share facilitated [the remaining competitors'] ability to implement the conspiracy." DPC ¶¶ 113-114.

The Amended Complaints lack any similar factual allegations about any market for "CRT Products." Likewise, Plaintiffs' only allegations regarding parallel pricing are specific to the ***prices of CRTs***:

- "Defendants' collusion is evidenced by ***unusual price movements in the CRT market***. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize. For example, in 1992, an analyst for Market

> Intelligence Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Despite such predictions, and the existence of economic conditions warranting a drop in prices, *CRT prices* nonetheless remained stable." DPC ¶ 188; IPC ¶ 192.

- "In early 1999, despite declining production costs and the rapid entry of flat panel display products, the *price of large-sized color CRTs* actually rose." DPC ¶ 193; IPC ¶ 194.

- "After experiencing an oversupply of 17-inch CRTs in the second half of 1999, the *average selling price of CRTs* roles again in early 2000." DPC ¶ 194; IPC ¶ 195.

- "Over the course of the conspiracy period, the *price of CRTs* remained stable, and in some instances went up in unexplained manner, despite the natural trend in most technology products to go down over time." DPC ¶ 196.

- "Indeed, *CRT prices* resisted downward price pressures and remained stable over a period of many years. . . . The stability of the *price of CRTs* was accomplished by the collusive activities alleged herein." DPC ¶ 197.

By comparison, Plaintiffs' allegations concerning the pricing of televisions and monitors do not evince parallel behavior at all. *See, e.g.,* DPC ¶¶ 195 (alleging that LG Electronics raised the price of its 15 and 17 inch CRT monitors without alleging that any other Defendant did likewise). As the foregoing would suggest, and as Plaintiffs concede, all pending regulatory investigations cited in the Amended Complaints specifically concern the *CRT industry*:

- **U.S.:** "On February 10, 2009, C.Y. Lin of Chunghwa PT was indicted for participating in a *conspiracy to fix the prices of CRTs*." DPC ¶ 126; *see also* IPC ¶ 4 (same). "On November 12, 2007, Chunghwa announced that it had received a summons from the DOJ with respect to its involvement in a *CRT price-fixing cartel*." DPC ¶ 131.

- **E.U.:** "On November 8, 2007, it was reported that EC officials carried out unannounced raids on *manufacturers of CRTs*…" DPC ¶ 128.

- **Japan:** The Japanese Fair Trade Commission had raided Panasonic and Samsung's "*CRT production facilities*." DPC ¶ 129.

- **Korea:** "[A] Samsung spokesperson announced that its *CRT subsidiary* in South Korea was being investigated by the Korean Fair Trade Commission." DPC ¶ 130.

- **Hungary:** "On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the *CRT cartel*." DPC ¶ 133.

The Amended Complaints are devoid of allegations regarding regulatory investigations into downstream manufacturers of either televisions or monitors for alleged price fixing of those products.

Indeed, other than the conclusory allegations cited above, the Amended Complaints do not allege any illegal agreements regarding "CRT Products"; rather, Plaintiffs' only allege that the alleged CRT conspiracy *affected* or *impacted* the prices of downstream products or that the alleged conspirators *considered* or *monitored* downstream pricing.  DPC ¶ 139 ("The overall CRT conspiracy *affected* worldwide prices . . . for CRT Products."); DPC ¶ 144 ("Defendants also *considered* the internal pricing of products containing CRTs in agreeing upon the prices at which CRTs were set."); IPC ¶ 155 ("Each of the participants in these meetings knew, and in fact discussed, the *significant impact* that the price of CRTs had on the cost of the finished products into which they were placed"); IPC ¶ 223 ("The Defendants . . . *monitored* the prices of televisions and computer monitors . . . on a regular basis"). None of these allegations amount to an allegation of a price-fixing conspiracy.

In addition, and contrary to Plaintiffs' assertions in their Oppositions, the Amended Complaints here are materially and fatally different from pleadings in recent antitrust class action cases in this District. For example, in each of *TFT-LCD, SRAM, Flash Memory,* and *DRAM*, plaintiffs pled specific examples of exchanges of pricing and other competitively sensitive information.[4]  Moreover, the pleadings in *TFT-LCD*, *Flash Memory*, and *SRAM* also contain allegations that these specific examples of exchanges of competitively sensitive information occurred contemporaneously with parallel

---

[4] *See In re Flash Memory Antitrust Litig.*, Case No. 07-0086, 2009 U.S. Dist. LEXIS 38941, at *32 (N.D. Cal. Mar. 31, 2009) (finding that Plaintiffs had alleged specific facts pertaining to the coordination of production as a means to control pricing, including allegations of specific instances where output was reduced following meetings by Defendants that, in turn, led to "implausible" price increases) (Direct Purchasers' Consolidated Complaint, *In re Flash Memory Antitrust Litig.*, Case No. 07-0086, ¶¶ 78-114 (N.D. Cal. Feb. 7, 2008)) (hereinafter "*Flash Memory* DPC") (Ex. 3 to Litwin Decl.); First Amended Direct Purchaser Plaintiffs' Consolidated Complaint, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, Case No. 07-1827, ¶¶ 147-96 (N.D. Cal. Dec. 5, 2008) (Ex. 4 to Saveri Decl.) (hereinafter "*TFT-LCD* DPC") (plaintiffs pled year by year analysis of defendants' participation in the alleged cartel and the effect on price and/or supply depending on the cartel's cohesiveness); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 901-02 (N.D. Cal. 2008) (amended complaints included, *inter alia*, specific allegations of communication between the defendants suggesting repeated exchanges of "highly confidential" price and demand information, as well as allegations of other exchanges of information consistent with conspiracy); Third Amended Complaint, *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, Case No. 02-1486, ¶¶ 149, 152, 154, 160-61; 163; 173 (N.D. Cal. Feb. 27, 2008) (Ex. 2 to Litwin Decl.) (alleging details regarding the systematic exchange of pricing and marketing information of sales personnel via exchanges of pricing spreadsheets, emails containing pricing and marketing information, and internal emails summarizing telephone conversations with competitors.).

behavior by defendants in the marketplace.[5]  Putting aside the question of whether these complaints satisfy *Iqbal*, the Amended Complaints here are entirely devoid of similarly detailed allegations.  To "nudge" their claims over the line from conceivable to plausible, Plaintiffs must do more here than simply conclude that the purpose of the alleged meetings was to "fix prices", "restrict output" or "allocate customers."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007) ("naked assertion[s] of conspiracy . . . gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief").

### B.  The Amended Complaints Do Not Allege Sufficient Facts to Plausibly Suggest a Theory of Liability against the Philips Defendants

Plaintiffs claim to have sufficiently alleged facts that plausibly suggest that each of the Philips Defendants joined and participated in the alleged conspiracy.  DP Opp. at 111 (citing ¶¶ 51-53, 56-57, 154, 164-165 and 175 in support).  As explained in greater detail in the Philips Defendants' Memorandum, Plaintiffs have not alleged that any of the Philips Defendants attended any of the alleged cartel meetings.[6]  Motion at 8-9.  Indeed, Plaintiffs do not assert that they may hold any of the Philips Defendants directly liable for their claimed damages; to the contrary, Plaintiffs' case against the Philips Defendants rests entirely on theories of vicarious liability.

---

[5] *See, e.g.*, *TFT-LCD* DPC ¶ 157 (graphing prices of LCD monitors and notebooks), ¶ 170 (graphing the prices of LCD TVs), ¶ 192 (graphing diminishing price dispersion for LCD monitors over time); *Flash Memory* DPC ¶¶ 95, 97, 100, 108 (graphing prices of flash memory products); Indirect Purchasers' Consolidated Amended Class Action Complaint, *In re Static Random Access Memory (SRAM) Antitrust Litig.*, Case No. 07-01819 ¶ 146 (N.D. Cal. Sept. 17, 2007) ( Ex. 4 to Litwin Decl.) (alleging that "[b]eginning in 1998 and continuing through much of 2001, SRAM prices rose, due to the effects of the industry-wide collusion alleged herein and which is being investigated by the DOJ.  During 2000 alone, the average selling price of SRAM in the United States increased by 35%-- from $3.93 in 1999 to approximately $5.31 in 2000.  SRAM prices experienced an increase in 2002, and again in 2003 and subsequent years, which was the result of the Defendants' and their co-conspirators' price-fixing conspiracy.").

[6] Plaintiffs do not allege that KPE or PEIT directly participated in any alleged cartel meetings.  DPC ¶ 164; IPC ¶ 170 ("Philips participated through [KPE] *or* its subsidiaries into 2001 and participated thereafter through [LG.Philips Displays].").  Plaintiffs' equivocal pleading is insufficient to plausibly suggest that either KPE or PEIT attended alleged cartel meetings prior to 2001.  As regards PENAC and Philips da Amazonia, Plaintiffs concede that neither entity directly attended any alleged cartel meetings.  DPC ¶ 165; IPC ¶ 171 (alleging that PENAC and Philips da Amazonia were "represented" at those meetings).

Plaintiffs do not allege any, let alone sufficient, factual material to plausibly suggest that the doctrine of corporate separateness, the bedrock principle of U.S. corporate law, should be violated and the corporate veil pierced so as to treat the Philips Defendants as one entity. Likewise, Plaintiffs do not come close to alleging sufficient factual material to plausibly suggest that any one Philips Defendant was acting as the agent for any other.

### 1. Plaintiffs' Veil Piercing Allegations are Wholly Conclusory

In support of their argument that this Court should ignore the doctrine of corporate separateness and pierce the corporate veil between KPE and its subsidiaries, Plaintiffs cite only their boilerplate conclusory allegations that KPE "dominated and controlled the finances, policies and affairs" of the other Philips Defendants. DP Opp. at 112 fn. 70. Federal courts have routinely refused to pierce the corporate veil on such flimsy and conclusory allegations, even before *Iqbal* was decided. *See, e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 426 (S.D.N.Y. 2003) (dismissing purely conclusory allegations that parent "exercised such dominion and control over its subsidiaries . . . that it is liable according to the law for the acts of such subsidiaries under the facts alleged in this Complaint" because "[t]hese purely conclusory allegations cannot suffice to state a claim based on veil-piercing or alter-ego liability."). Consistent with the deeply ingrained presumption of corporate independence, courts have even refused to pierce the corporate veil even when faced with allegations of ownership of all of the stock of a subsidiary, interlocking directorates, common shareholders and similar names. *See, e.g., Satellite Broadcasting Cable, Inc. v. Telefonica de Espana, S.A.*, 786 F. Supp. 1089, 1100 (D.P.R. 1992) ("Ownership of all of the stock of the subsidiary . . ., interlocking directorates, common shareholders and similar names . . ., will not suffice, by itself, to pierce a corporate veil."). Plaintiffs have alleged no facts whatsoever to justify the "drastic" decision to ignore the presumed corporate separateness of the Philips Defendants. *See, e.g., Hillside Drilling Inc. v. Goldman Sachs Group*, No. C 09-1896 SI, 2009 WL 2246215, *4 (N.D. Cal. July 27, 2009) (noting that "courts generally treat the alter ego doctrine as a drastic remedy and disregard the corporate form only reluctantly and cautiously").

## 2. Plaintiffs' Allegations of Agency Are Wholly Conclusory

Recognizing the futility of pursuing a veil piercing theory on the facts alleged in their Amended Complaints, Plaintiffs now claim that even if they cannot treat the entire Philips family as a single legal entity, they may nonetheless "hold the Philips Defendants accountable for each others' wrongful acts" under an agency theory of liability. DP Opp. at 113 (citing DPC ¶¶ 6, 51-57, 82-84, 138, 154 and 164-165). Once the conclusory allegations in these paragraphs are eliminated, as the Supreme Court instructs in *Iqbal*, it is clear that Plaintiffs have not alleged sufficient factual material to plausibly suggest that any one Philips Defendant acted as an agent of the other. To support their agency theory of liability, Plaintiffs plead that:

- PENAC, PEIT, and Philips da Amazonia were each "dominated and controlled" by KPE. DPC ¶¶ 54-56.

- Each of the Philips Defendants "acted as the as the agent of, co-conspirator with, or joint venturer of the other Defendants with respect to the acts, violations and common course of conduct alleged herein." DPC ¶ 84.

- PENAC, PEIT, and Philips da Amazonia each "acts as the United States agent for CRT and/or CRT Products made by its parent company." DPC ¶ 84.

- "Philips", through KPE and PEIT, as well as through LG Philips Displays and its successor company LP Displays, participated in the alleged cartel meetings alleged in the Amended Complaints. DPC ¶ 164.

- "Philips participated [in the meetings] through [KPE *or* its subsidiaries into 2001 and participated thereafter through [the LG.Philips Displays joint venture]." DPC ¶ 164.

- PENAC and Philips da Amazonia "were represented at those meetings and were a party to the agreements entered at them" and "were active, knowing participants in this conspiracy." DCP ¶ 165.

Each one of the foregoing allegations is of the same conclusory nature as the allegations that the Supreme Court decisively rejected in *Iqbal*:

- That Defendants "knew of, condoned, and willfully and maliciously agreed to subject [Plaintiff] to harsh conditions of confinement as a matter of policy, solely on the account of [Plaintiff's] religion, race, and/or national origin and for no legitimate penological interest." *Iqbal*, 129 S. Ct. at 1951.

- That Defendant (then-Attorney General) John Ashcroft "was the principal architect of this invidious policy." *Id.*

- That Defendant (then-FBI Director) Robert Mueller "was 'instrumental' in adopting and executing [the policy]." *Id.*

The Supreme Court rejected each of the foregoing allegations as conclusory, amounting to "nothing more than a formulaic recitation of the elements" of Iqbal's *Bivens* claim. The same is true here. Plaintiffs' allegations concerning agency amount to nothing more than a bald conclusion that each Philips Defendant acted as each others' agent.[7] Plaintiffs' allegations do not even rise to the "formulaic recitation of the elements" that was rejected in *Iqbal*: nowhere in this string of conclusions do Plaintiffs allege even the bare elements of an agency relationship, namely that (i) a manifestation by the principal that the agent shall act for him, (ii) that the agent has accepted the undertaking, and, (iii) that there is an understanding between the parties that the principal is to be in control of the undertaking. *See Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1187-88 (N.D. Cal. 2009); *E&J Gallo Winery v. Encana Energy Serv.*, No. CVF 03-5412, 2008 WL 2220396, at *6 (E.D. Cal. May 27, 2008).

Absent specific factual allegations to the contrary, courts in this Circuit presume the independence of corporate entities. *See California v. NRG Energy Inc.*, 391 F.3d 1011, 1024-25 (9th Cir. 2004), *rev'd on other grounds*, *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224 (2007). It is a bedrock principle of American corporate law that the same rule holds true even where those entities are somehow related. *See, e.g., Bowoto v. ChevronTexaco Corp.*, 312 F. Supp. 2d 1229, 1234 (N.D. Cal. 2004) (mere ownership of a subsidiary does not justify holding parent corporation liable for the acts of its subsidiary); *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3rd Cir. 2001) (same). The test for establishing an agency relationship is therefore no different when applied to

---

[7] In this regard, Plaintiffs own allegations would appear to contradict their agency argument. To state a claim based on an agency theory of liability, Plaintiffs must plead that the alleged agent was acting under either actual or apparent authority. *See E&J Gallo Winery*, 2008 WL 2220396, at *6. Plaintiffs do not plead that any Philips Defendant was given the actual authority to bind any other Philips Defendant to any agreement or contract. Moreover, as Plaintiffs concede that "the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts", (DPC ¶ 154), Plaintiffs admit that none of the participants in the alleged cartel meetings acted with apparent authority either. *See Hanson v. Am. W. Airlines, Inc.*, 544 F. Supp. 2d 1038, 1043 (C.D. Cal. 2008) ("Apparent authority results when the principal does something or permits the agent to do something which reasonably leads another to believe that the agent had the authority he purported to have."); *see also Synapsis LLC v. Evergreen Data Systems, Inc.*, Case No. C 05-01524, 2006 U.S. Dist. LEXIS 1927, at *14 (N.D. Cal. Jan. 9, 2006) (to plead apparent authority, plaintiff "must plead representation by the principal . . ., justifiable reliance on the representation, and a change in position or injury resulting from such reliance.").

companies in the same corporate family. *See id.* Plaintiffs cannot overcome this presumption of corporate separateness without pleading specific facts demonstrating an agency relationship.[8]

### 3. Plaintiffs Fail to Allege Sufficient Facts to Hold the Philips Defendants Vicariously Liable for the Actions of LG.Philips Displays

Plaintiffs concede that LG.Philips Displays was not part of the Philips corporate family. DPC ¶ 57 (LG.Philips Displays not defined as part of "Philips"). Rather, Plaintiffs assert that LG.Philips Displays acted as an agent of the Philips Defendants following their exit from the CRT industry in June 2001. DPC ¶ 164; IPC ¶ 170; DP Opp. at 115; IP Opp at 88-89. Plaintiffs' conclusory allegations of agency are equally inapplicable here: parent corporations and their joint ventures are legally distinct entities and that the actions of a joint venture cannot be treated as that of its shareholders. *See, e.g., Chicago, M. & S. P. R. Co. v. Minneapolis Civic & Commerce Ass'n*, 247 U.S. 490, 501 (1918) (parent corporations liable for acts of a joint venture only where the joint venture was "completely controlled" by the parents); *In re Silicone Gel Breast Implants Prod. Liab. Lit.*, 837 F. Supp. 1128, 1138 (N.D. Ala. 1993), *vacated in part for other reasons*, 887 F. Supp. 1455 (N.D. Ala.

---

[8] Plaintiffs' reliance on Judge Illston's decision in the *TFT-LCD* litigation is misplaced. Prior to *Iqbal*, some courts in this Circuit applied *Twombly* only to antitrust claims. *See, e.g., Fox v. Piche*, No. C 08-1098, 2008 U.S. Dist. LEXIS 79337, at *7 (N.D. Cal. September 22, 2008) (applying *Twombly* to antitrust claims and explaining that "the traditional pleading standard under Rule 8" applies to remaining claims). The Supreme Court in *Iqbal* extended the application of the pleading standard articulated in *Twombly* to all allegations in a complaint, not just those concerning a violation of the Sherman Act. *Iqbal,* 129 S. Ct. at 1953. Thus, while Judge Illston's reliance on Plaintiffs' admittedly conclusory allegations of agency may have been justified in a pre-*Iqbal* world, it is clear that Plaintiffs' agency allegations here, which Plaintiffs admit were plagiarized word for word from the *TFT-LCD* pleadings (DP Opp. at 43), are disentitled to the presumption of truth and cannot support their agency theory of liability. *Iqbal*, 129 S. Ct. at 1950. Indeed, even before *Iqbal*, courts in this Circuit have routinely dismissed claims where plaintiffs simply allege an agency relationship without also alleging specific facts supporting their claims. *See Biggins v. Wells Fargo & Co.*, No. 90-01272, 2009 U.S. Dist. LEXIS 64620, at *34 (N.D. Cal. July 27, 2009) (rejecting allegation that one company is the "agent, subsidiary, parent" of another because such allegations "are nothing more than bare legal conclusions" which must be rejected under *Twombly*); *Canam Steel Corp. v. Mayo*, No. 2:09-CV-00672, 2009 U.S. Dist. LEXIS 44059, at *6–8 (E.D. Cal. May 22, 2009) (failure to allege any facts establishing an agency relationship is fatal to a claim against a putative principal); *Monaco v. Liberty Life Assurance Co.*, No. C06-0721, 2007 WL 420139, at *6 (N.D. Cal. 2007) (rejecting bare allegations of agency as nothing more than legal conclusions and granting motions to dismiss); *Am. Nat'l Red Cross v. United Way Cal. Capital Region*, No. S-07-1236, 2007 U.S. Dist. LEXIS 95296, at *30 (E.D. Cal. Dec. 18, 2007) (rejecting complaint that did not "allege one fact that suggests such an agency relationship. This bare legal conclusion is not sufficient to withstand a motion to dismiss."); *Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1102-03 (N.D. Cal. 2006) (rejecting conclusory agency and alter ego allegations because they lacked any "specific factual allegations" against the defendant).

1995) (declining to hold parent corporations liable for actions of their joint venture).

The Amended Complaints are entirely devoid of any facts suggesting that LG.Philips Displays acted as the agent of any of the Philips Defendants. Rather, Plaintiffs presume, with no factual allegations or case law to support their argument, that the fact of LG.Philips Displays' formation as a joint venture is in itself sufficient to establish an agency relationship with its shareholders. This unwarranted presumption has no basis in law. "When 'persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit . . . such joint ventures [are] regarded as a single firm competing with other sellers in the market.'" *Texaco Inc. v. Dagher*, 547 U.S. 1, 6 (2006) (citation omitted). Simply put, a lawful, economically integrated joint venture is to be treated like any other independent firm. *See id.* at 6-7. As the European Commission determined at the time of its formation, that LG.Philips Displays was an "autonomous economic entity." *See* Case No. Comp/M. 2263 – *Philips / LG Electronics/ JV* (2001) at 2 (¶ 7) (attached to the Litwin Decl. as Ex. 1). It is also worth noting that the European Commission specifically found as a result of its investigation, and contrary to Plaintiffs' baseless accusations, that the LG.Philips Displays joint venture would not inhibit competition in the marketplace. *Id.* at ¶¶ 2, 26, and 32. Plaintiffs give this Court no reason to disregard the well-reasoned conclusion of this neutral arbiter.

## II. PLAINTIFFS CLAIMS ARE TIME-BARRED

In contrast to the Plaintiffs' argument that Philips participated in the alleged CRT cartel up to 2007, Plaintiffs own allegations in their Amended Complaints suggest otherwise. Plaintiffs admit that the Philips Defendants divested the entirety of the CRT business to LG.Philips Displays in June 2001, more than six years before the first complaint was filed in this case and more than two years before the statute of limitations period began to run.[9] DPC ¶ 51; IPC ¶ 54. Moreover, Plaintiffs concede that

---

[9] There are no facts alleged in the Amended Complaints to justify tolling the statute of limitations as to the Philips Defendants. Plaintiffs' boilerplate allegations of fraudulent concealment as to *all defendants generally* (DPC ¶¶ 200-212; IPC ¶¶ 288-291) violates this Circuit's rule that fraudulent concealment must be pled with particularity pursuant to Federal Rule of Civil Procedure 9(b). *See Rutledge v. Boston Woven Hose & Rubber Co.,* 576 F.2d 248, 250 (9th Cir. 1978). Consistent with this requirement, courts have routinely rejected fraudulent concealment claims that were not alleged against an *individual defendant specifically* as failing for lack of particularity. *See Metz v. Unizan Bank*, 416 F. Supp. 2d 568, 579 (N.D. Ohio 2006) ("The Plaintiff must affirmatively plead facts
(Continued...)

none of the Philips Defendants attended any of the alleged cartel meetings following June 2001. DPC ¶ 164-165 and IPC ¶ 170-171. Plaintiffs also concede that the Philips Defendants continued to manufacturer televisions and monitors after the divestiture (DP Opp. at 115; IP Opp. at 72), while at the same time alleging that the CRT conspiracy at the time comprised virtually every CRT manufacturer on earth. DPC ¶ 96; IPC ¶115. Accordingly, Plaintiffs must admit that, post-June 2001, the Philips Defendants necessarily had to purchase CRTs from an alleged conspirator in order to continue manufacturing televisions and monitors. DPC ¶ 120 (alleging that "Philips" purchased CRTs from Samtel).[10] As such, to the extent that the prices of CRTs were fixed, the Philips Defendants were overcharged for the CRTs they purchased. The Philips Defendants' divestiture of the CRT business combined with its arms-length purchases of CRTs post-June 2001 were sufficient acts to constitute a withdrawal from the alleged conspiracy. *See Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823 (11th Cir. 1999) (divestiture by alleged cartel member to third party sufficient to effectively withdraw from price-fixing conspiracy); *see also United States v. Nippon Paper Indus. Co.*, 62 F. Supp. 2d 173, 190 (D. Mass. 1999) (the "'resumption of competitive behavior . . . [is] sufficient to communicate withdrawal or general abandonment of a price-fixing conspiracy'") (quoting *United States v. Gypsum Co.*, 438 U.S., 442, 464-65 (1978)).[11]

---

(...Continued)
supporting a claim for fraudulent concealment against each specific Defendant who allegedly participated in the concealment in order to state a claim against that Defendant which would survive an otherwise expired statute of limitations."); *Chubb & Son, Inc. v. Kelleher*, No. 92-4484 CBA, 1998 U.S. Dist. LEXIS 22542, at *21 (E.D.N.Y. Feb. 27, 1998) ("a plaintiff must plead fraudulent concealment as to each individual defendant and specify which defendant committed the alleged acts of concealment.").

[10] PENAC, for example, purchased CRTs from Hitachi, Orion, Panasonic, Samsung, Thomson, Toshiba, and the MTPD joint venture, as well as from LG Philips Displays.

[11] The cases cited by the Plaintiffs are easily distinguished. *See United States v. Antar*, 53 F.3d 568, 583 (3d Cir. 1995) (defendant took no steps inconsistent with the goals of the conspiracy); *Reisman v. United States*, 409 F.2d 789, 793 (9th Cir. 1969) (same); *United States v. Eisen*, 974 F.2d 246, 269 (2nd Cir. 1992) (defendant took "acts or statements designed to conceal [the] ongoing conspiracy" during the statute of limitations period); *In re NBR Antitrust Litigation ("NBR")*, No. 03-1898, *10 (W.D. Pa. Sept. 28, 2005) (defendant continued production of allegedly price-fixed good). In all respects, the Philips Defendants acted to the contrary.

**CONCLUSION**

For the foregoing reasons, the complaints should be dismissed as to the Philips Defendants.

Dated: September 24, 2009

Respectfully submitted,
HOWREY LLP

 /s/ **Ethan E. Litwin**
Ethan E. Litwin

601 Lexington Avenue, 54th Floor
Telephone: (212) 896-6500
Facsimile: (212) 896-6501
Email: LitwinE@howrey.com

*Attorneys for Defendants Koninklijke Philips Electronics N.V., Philips Electronics North America Corporation, Philips Electronics Industries (Taiwan), Ltd. and Philips da Amazonia Industria Electronica Ltda.*