# EXHIBIT 4

1  FRANCIS O. SCARPULLA (41059)
   CRAIG C. CORBITT (83251)
2  PAMELA E. WOODSIDE (226212)
   QIANWEI FU (242669)
3  ZELLE, HOFMANN, VOELBEL, MASON & GETTE LLP
   44 Montgomery Street, Suite 3400
4  San Francisco, CA 94104
   Telephone:    (415) 693-0700
5  Facsimile:    (415) 693-0770
   fscarpulla@zelle.com
6  ccorbitt@zelle.com

7  *Interim Lead and Liaison Counsel for
   Indirect Purchaser Class*

8

9                    **UNITED STATES DISTRICT COURT**

10                   **NORTHERN DISTRICT OF CALIFORNIA**

11                          **OAKLAND DIVISION**

| 12  IN RE STATIC RANDOM ACCESS | Case No. M:07-CV-01819-CW |
|---|---|
| MEMORY (SRAM) ANTITRUST | |
| 13  LITIGATION | MDL No. 1819 |
| 14 | **FIRST CONSOLIDATED AMENDED** |
| | **CLASS ACTION COMPLAINT FOR** |
| 15 | **VIOLATIONS OF FEDERAL AND STATE** |
| This Document Relates to: | **ANTITRUST LAWS, STATE CONSUMER** |
| 16 | **PROTECTION LAWS AND STATE** |
| ALL INDIRECT PURCHASER ACTIONS | **COMMON LAW OF UNJUST** |
| 17 | **ENRICHMENT** |
| 18 | **JURY TRIAL DEMANDED** |

19

20         Plaintiffs, by their attorneys, bring this civil action for damages and injunctive

21  relief on behalf of themselves and all others similarly situated against the Defendants named

22  herein, and demanding a trial by jury, complain and allege as follows:

23                     **JURISDICTION AND VENUE**

24         1.      This complaint is filed under Section 16 of the Clayton Act, 15 U.S.C.

25  §26, to obtain injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. §1,

26  to recover damages or restitution under state antitrust and consumer protection laws, and to

27  recover the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs

28  ///

1 and all others similarly situated sustained as a result of the Defendants' violations of those
2 laws.

3       2.      The Court has jurisdiction over the federal claim under 28 U.S.C.
4 §§1331 and 1337. The Court has jurisdiction over the state law claims under 28 U.S.C. §1367
5 because those claims are so related to the federal claim that they form part of the same case or
6 controversy. The Court also has jurisdiction over the state law claims under 28 U.S.C. §1332
7 because the amount in controversy for the Class exceeds $5,000,000, and there are members
8 of the Class who are citizens of a different state than the Defendants.

9       3.      Venue is proper in this District under 15 U.S.C. §22 and 28 U.S.C.
10 §1391 because Defendants reside, transact business, or are found within this District, and a
11 substantial part of the events giving rise to the claims arose in this District.

12       4.      The activities of the Defendants and their co-conspirators, as described
13 herein, were within the flow of, were intended to, and did have a substantial effect on the
14 foreign and interstate commerce of the United States. Defendants' conspiracy further
15 substantially affected commerce in California, and accordingly, Defendants and their co-
16 conspirators have purportedly availed themselves of California's laws.

17                                      **DEFINITIONS**

18       5.      As used herein, the term "Static Random Access Memory" ("SRAM")
19 includes all types of static random access memory sold during the Class Period. SRAM is a
20 type of memory that is faster and more reliable than dynamic random access memory
21 ("DRAM"). The term "static" is derived from the fact that SRAM does not need to be
22 refreshed like DRAM. While DRAM supports access times of about 60 nanoseconds, SRAM
23 can give access times of 10 nanoseconds. In addition, its cycle time is much shorter than that
24 of DRAM because it does not need to pause between accesses.

25       6.      As used herein, the term "computer" refers to both desktop and mobile
26 computers (primarily laptop computers), workstations and servers.

27       7.      As used herein, the term "Class Period" means the time period
28 November 1, 1996 through at least December 31, 2006.

-2-

**THE PARTIES**

**A.    The Plaintiffs.**

8.    The following named Plaintiffs, who are residents of the state/commonwealth district or territory listed.  Plaintiff Javier Oyola Alemany is a resident of Puerto Rico who indirectly purchased SRAM manufactured and/or sold by one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

9.    Plaintiff James Allen is a resident of Massachusetts who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.  Pursuant to Mass. Gen. L. 93A, §9, Plaintiff mailed a written demand for relief to Defendants at least 30 days prior to filing his initial complaint.  No Defendant responded with a reasonable tender of settlement.

10.    Plaintiff Justus Austin III is a resident of Michigan who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

11.    Plaintiff Renae Awakuni is a resident of Hawaii who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale and primarily for personal, household, or family purposes, and was injured as a result of Defendants' illegal conduct.  Pursuant to Hawaii Rev. Stat. §480-13.3, Plaintiff filed her initial Complaint under seal and served a copy on Hawaii's Attorney General within seven days.  Following expiration of the statutory review period, the Hawaii Attorney General informed the United States District Court for the District of Hawaii that it would not proceed with the action or file its own action involving the same or similar claims as set forth in Plaintiff's initial Complaint.

12.    Plaintiff Michael Francis Ayers is a resident of Massachusetts who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators

-3-

1 | during the Class Period, for end use and not for resale, and was injured as a result of
2 | Defendants' illegal conduct.

3 | 13. Plaintiff Kenneth Bagwell is a resident of Michigan resident who
4 | indirectly purchased SRAM from one or more of the Defendants or their co-conspirators
5 | during the Class Period, for end use and not for resale, and was injured as a result of
6 | Defendants' illegal conduct.

7 | 14. Plaintiff Michael Baranic is a resident of California who indirectly
8 | purchased SRAM from one or more of the Defendants or their co-conspirators during the
9 | Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
10 | conduct.

11 | 15. Plaintiff James W. Barnes is a resident of California who indirectly
12 | purchased SRAM from one or more of the Defendants or their co-conspirators during the
13 | Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
14 | conduct.

15 | 16. Plaintiff Ronnie Barnes is a resident of Florida who indirectly
16 | purchased SRAM from one or more of the Defendants or their co-conspirators during the
17 | Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
18 | conduct.

19 | 17. Plaintiff Robert C. Bedore, Jr. is a resident of Maine who indirectly
20 | purchased SRAM from one or more of the Defendants or their co-conspirators during the
21 | Class Period, for end use and not for resale and primarily for personal, family, or household
22 | purposes, and was injured as a result of Defendants' illegal conduct.

23 | 18. Plaintiff Joshua A. Belke is a resident of Wisconsin who indirectly
24 | purchased SRAM from one or more of the Defendants or their co-conspirators during the
25 | Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
26 | conduct.

27 | 19. Plaintiff Todd Berg is a California resident who indirectly purchased
28 | SRAM from one or more of the Defendants or their co-conspirators during the Class Period,

1 | for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

2 | 20. Plaintiff Ron Birdsong, individually, and on behalf of Birdsong Air

3 | Conditioning and Heating Services is a resident of Tennessee who indirectly purchased

4 | SRAM from one or more of the Defendants or their co-conspirators during the Class Period,

5 | for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

6 | 21. Plaintiff Terry Bisel is a resident of California who indirectly

7 | purchased SRAM from one or more of the Defendants or their co-conspirators during the

8 | Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

9 | conduct.

10 | 22. Plaintiff Rebecca Bly is a resident of the District of Columbia who

11 | indirectly purchased SRAM from one or more of the Defendants or their co-conspirators

12 | during the Class Period, for end use and not for resale and primarily for personal, family, or

13 | household use, and was injured as a result of Defendants' illegal conduct.

14 | 23. Plaintiff Michael Brooks is a resident of California who indirectly

15 | purchased SRAM from one or more of the Defendants or their co-conspirators during the

16 | Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

17 | conduct.

18 | 24. Plaintiff Reuben Canada is a resident of the District of Columbia who

19 | indirectly purchased SRAM from one or more of the Defendants or their co-conspirators

20 | during the Class Period, for end use and not for resale and primarily for personal, family, or

21 | household use, and was injured as a result of Defendants' illegal conduct.

22 | 25. Plaintiff Carlos R. Carrillo is a resident of Puerto Rico who indirectly

23 | purchased SRAM from one or more of the Defendants or their co-conspirators during the

24 | Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

25 | conduct.

26 | 26. Plaintiff Ward Cater is a resident of North Dakota who indirectly

27 | purchased SRAM from one or more of the Defendants or their co-conspirators during the

28 | ///

1    Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
2    conduct.

3            27.      Plaintiff Scott L. Clarke is a resident of Maine who indirectly
4    purchased SRAM from one or more of the Defendants or their co-conspirators during the
5    Class Period, for end use and not for resale and primarily for personal, family, or household
6    purposes, and was injured as a result of Defendants' illegal conduct.

7            28.      Plaintiff Christopher C. Crawford is a resident of South Dakota who
8    indirectly purchased SRAM from one or more of the Defendants or their co-conspirators
9    during the Class Period, for end use and not for resale, and was injured as a result of
10    Defendants' illegal conduct.

11           29.      Plaintiff Romney Darkins is a resident of California who indirectly
12    purchased SRAM from one or more of the Defendants or their co-conspirators during the
13    Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
14    conduct.

15           30.      Plaintiff Ryan Edwards is a resident of Florida who indirectly
16    purchased SRAM from one or more of the Defendants or their co-conspirators during the
17    Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
18    conduct.

19           31.      Plaintiff Judd Eliasoph is a resident of California who indirectly
20    purchased SRAM from one or more of the Defendants or their co-conspirators during the
21    Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
22    conduct.

23           32.      Plaintiff Fairmont Orthopedics & Sports Medicine, P.A. is a Minnesota
24    company that indirectly purchased SRAM from one or more of the Defendants or their co-
25    conspirators during the Class Period, for end use and not for resale, and was injured as a result
26    of Defendants' illegal conduct.

27           33.      Plaintiff Cristi Ferguson is a resident of Kansas who indirectly
28    purchased SRAM from one or more of the Defendants or their co-conspirators during the

-6-

1 | Class Period, for end use and not for resale and primarily for personal, family, household,
2 | business or agricultural purposes, and was injured as a result of Defendants' illegal conduct.

3 |     34.  Plaintiff Patricia Fitzsimmons is a resident of Minnesota who indirectly
4 | purchased SRAM from one or more of the Defendants or their co-conspirators during the
5 | Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
6 | conduct.

7 |     35.  Plaintiff Alicia Foley is a resident of Massachusetts who indirectly
8 | purchased SRAM from one or more of the Defendants or their co-conspirators during the
9 | Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
10 | conduct. Pursuant to Mass. Gen. L. 93A, §9, Plaintiff mailed a written demand for relief to
11 | Defendants at least 30 days prior to filing her initial complaint. No Defendant responded with
12 | a reasonable tender of settlement.

13 |     36.  Plaintiff Craig Friedson is a resident of the District of Columbia who
14 | indirectly purchased SRAM in Maryland from one or more of the Defendants or their co-
15 | conspirators during the Class Period, for end use and not for resale and primarily for personal,
16 | household, or family use, and was injured as a result of Defendants' illegal conduct.

17 |     37.  Plaintiff Scott Friedson is an resident of Arizona who indirectly
18 | purchased SRAM from one or more of the Defendants or their co-conspirators during the
19 | Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
20 | conduct.

21 |     38.  Plaintiff Frank Gertzen is a resident of Pennsylvania who indirectly
22 | purchased SRAM from one or more of the Defendants or their co-conspirators during the
23 | Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
24 | conduct.

25 |     39.  Plaintiff Jacob Greenwell is a resident of California who indirectly
26 | purchased SRAM from one or more of the Defendants or their co-conspirators during the
27 | Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
28 | conduct.

-7-

40.     Plaintiff Janet Hall is a resident of Alaska who indirectly purchased SRAM from one or more of the Defendants and their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

41.     Plaintiffs Thomas and Donna Hark are residents of West Virginia who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and were injured as a result of Defendants' illegal conduct.

42.     Plaintiff Robert S. Harmon is a resident of Arkansas who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

43.     Plaintiff Joseph Hastings is a resident of Mississippi who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

44.     Plaintiff Heather Hawk is a resident of New Mexico who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

45.     Plaintiff Kenneth W. Hebert is a resident of Idaho who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

46.     Plaintiff Paul Hickman is a resident of Montana who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

47.     Plaintiff Penny Hochstein is a South Dakota resident who indirectly

-8-

1  purchased SRAM from one or more of the Defendants or their co-conspirators during the

2  Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

3  conduct.

4  48.  Plaintiff Curtis Hogue is a resident of North Carolina who indirectly

5  purchased SRAM from one or more of the Defendants or their co-conspirators during the

6  Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

7  conduct.

8  49.  Plaintiff Rhonda L. Jacobs is a resident of West Virginia who indirectly

9  purchased SRAM from one or more of the Defendants or their co-conspirators during the

10  Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

11  conduct.

12  50.  Plaintiff Karl Johnson is a resident of West Virginia who indirectly

13  purchased SRAM from one or more of the Defendants or their co-conspirators during the

14  Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

15  conduct.

16  51.  Plaintiff Susan Juliffs is a resident of Iowa who indirectly purchased

17  SRAM from one or more of the Defendants or their co-conspirators during the Class Period,

18  for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

19  52.  Plaintiff Karol Juskiewicz is a resident of California who indirectly

20  purchased SRAM from one or more of the Defendants or their co-conspirators during the

21  Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

22  conduct.

23  53.  Plaintiff Nicolas Kane is a resident of Wisconsin who indirectly

24  purchased SRAM from one or more of the Defendants or their co-conspirators during the

25  Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

26  conduct.

27  54.  Plaintiff Michael Katz is a resident of California who indirectly

28  purchased SRAM from one or more of the Defendants or their co-conspirators during the

-9-

1 | Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
2 | conduct.

3 |       55.     Plaintiff Allen Robert Kelley is a resident of Nevada who indirectly
4 | purchased SRAM from one or more of the Defendants or their co-conspirators during the
5 | Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
6 | conduct.

7 |       56.     Plaintiff Kevin Kicia is a resident of Rhode Island who indirectly
8 | purchased SRAM from one or more of the Defendants or their co-conspirators during the
9 | Class Period, for end use and not for resale and was injured as a result of Defendants' illegal
10 | conduct.

11 |       57.     Plaintiff Chad Klebs is a resident of Minnesota who indirectly
12 | purchased SRAM from one or more of the Defendants or their co-conspirators during the
13 | Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
14 | conduct.

15 |       58.     Plaintiff Sean Koch is a resident of California who indirectly purchased
16 | SRAM from one or more of the Defendants or their co-conspirators during the Class Period,
17 | for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

18 |       59.     Plaintiff Henry Kornegay is a resident of Montana who indirectly
19 | purchased SRAM from one or more of the Defendants or their co-conspirators during the
20 | Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
21 | conduct.

22 |       60.     Plaintiff Ronald A. Kramer is a resident of Maine who indirectly
23 | purchased SRAM from one or more of the Defendants or their co-conspirators during the
24 | Class Period, for end use and not for resale and primarily for personal, family, or household
25 | purposes, and was injured as a result of Defendants' illegal conduct.

26 |       61.     Plaintiff Mark Lambert is a resident of West Virginia who indirectly
27 | purchased SRAM from one or more of the Defendants or their co-conspirators during the
28 | ///

FIRST CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. M:07-CV-1819-CW

1  Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
2  conduct.

3         62.    Plaintiff Paul Lauttamus is a resident of West Virginia who indirectly
4  purchased SRAM from one or more of the Defendants or their co-conspirators during the
5  Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
6  conduct.

7         63.    Plaintiff Alfred Livingston is a resident of Mississippi who indirectly
8  purchased SRAM from one or more of the Defendants or their co-conspirators during the
9  Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
10  conduct.

11         64.    Plaintiff David Loomis is a resident of West Virginia who indirectly
12  purchased SRAM from one or more of the Defendants or their co-conspirators during the
13  Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
14  conduct.

15         65.    Plaintiff Stephanie Luekel is a resident of Massachusetts who indirectly
16  purchased SRAM from one or more of the Defendants or their co-conspirators during the
17  Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
18  conduct.  Pursuant to Mass. Gen. L. 93A, §9, Plaintiff mailed a written demand for relief to
19  Defendants at least 30 days prior to filing her initial complaint.  No Defendant responded with
20  a reasonable tender of settlement.

21         66.    Plaintiff Laura Magnuson is a resident of New York who indirectly
22  purchased SRAM from one or more of the Defendants or their co-conspirators during the
23  Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
24  conduct.

25         67.    Plaintiff Lawrence Markey is a resident of California who indirectly
26  purchased SRAM from one or more of the Defendants or their co-conspirators during the
27  Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
28  conduct.

-11-

68.     Plaintiff Terrence Martin is a resident of Michigan who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

69.     Plaintiff Kym Masters, a California resident, indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

70.     Plaintiff Mark Miles is a resident of Arkansas who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

71.     Plaintiff Roman Muñoz is a resident of California who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

72.     Plaintiff Allen Nassiff is a resident of Vermont who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

73.     Plaintiff Jo Nash is a California resident who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

74.     Plaintiff Blaine Olson is a Montana resident who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

75.     Plaintiff Cade Oyadomori is a resident of Hawaii who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale and primarily for personal, family, or household purposes, and was injured as a result of Defendants' illegal conduct. Pursuant to Hawaii Rev.

-12-

1  Stat. §480-13.3, Plaintiff filed his initial Complaint under seal and served a copy on Hawaii's

2  Attorney General within seven days. Following expiration of the statutory review period, the

3  Hawaii Attorney General informed the United States District Court for the District of Hawaii

4  that it would not proceed with the action or file its own action involving the same or similar

5  claims as set forth in Plaintiff's initial Complaint.

6          76.     Plaintiff Jai Paguirigan is a resident of Wisconsin who indirectly

7  purchased SRAM from one or more of the Defendants or their co-conspirators during the

8  Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

9  conduct.

10         77.     Plaintiff David Perez is a resident of California who indirectly

11 purchased SRAM from one or more of the Defendants or their co-conspirators during the

12 Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

13 conduct.

14         78.     Plaintiff Suzanna Purdy is a resident of Nevada who indirectly

15 purchased SRAM from one or more of the Defendants or their co-conspirators during the

16 Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

17 conduct.

18         79.     Plaintiff Mark Pierce is a New Hampshire resident who indirectly

19 purchased SRAM from one or more of the Defendants or their co-conspirators during the

20 Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

21 conduct.

22         80.     Plaintiff Daniel Price is a resident of California who indirectly

23 purchased SRAM from one or more of the Defendants or their co-conspirators during the

24 Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

25 conduct.

26         81.     Plaintiff Greg Proiette is a resident of California who indirectly

27 purchased SRAM from one or more of the Defendants or their co-conspirators during the

28 ///

1   Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

2   conduct.

3       82.    Plaintiff Reclaim Center, Inc. is a Minnesota corporation that indirectly

4   purchased SRAM from one or more of the Defendants or their co-conspirators during the

5   Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

6   conduct.

7       83.    Plaintiff David Reedy is a resident of California who indirectly

8   purchased SRAM from one or more of the Defendants or their co-conspirators during the

9   Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

10  conduct.

11      84.    Plaintiff Dan Rempe is a resident of Nebraska who indirectly purchased

12  SRAM from one or more of the Defendants or their co-conspirators during the Class Period,

13  for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

14      85.    Plaintiff Richard Romero is a resident of New Mexico who indirectly

15  purchased SRAM from one or more of the Defendants or their co-conspirators during the

16  Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

17  conduct.

18      86.    Plaintiff Candace Rowlette is a resident of Florida who indirectly

19  purchased SRAM from one or more of the Defendants or their co-conspirators during the

20  Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

21  conduct.

22      87.    Plaintiff Frederick Rozo is a resident of California who indirectly

23  purchased SRAM from one or more of the Defendants or their co-conspirators during the

24  Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

25  conduct.

26      88.    Plaintiffs Stacy Salzman and Mitchell Salzman are residents of Florida

27  who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators

28  ///

-14-

1 | during the Class Period, for end use and not for resale, and were injured as a result of
2 | Defendants' illegal conduct.

3 |        89.    Plaintiffs Timothy Show and Nuja Show are residents of Arizona who
4 | indirectly purchased SRAM from one or more of the Defendants or their co-conspirators
5 | during the Class Period, for end use and not for resale, and were injured as a result of
6 | Defendants' illegal conduct.

7 |        90.    Plaintiff Jason Smith is a resident of Pennsylvania who indirectly
8 | purchased SRAM from one or more of the Defendants or their co-conspirators during the
9 | Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
10 | conduct.

11 |        91.    Plaintiff Joe Solo is a resident of California who indirectly purchased
12 | SRAM from one or more of the Defendants or their co-conspirators during the Class Period,
13 | for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

14 |        92.    Plaintiff Craig Sparks is a resident of Iowa who indirectly purchased
15 | SRAM from one or more of the Defendants or their co-conspirators during the Class Period,
16 | for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

17 |        93.    Plaintiff Stargate Films is a California corporation that indirectly
18 | purchased SRAM from one or more of the Defendants or their co-conspirators during the
19 | Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
20 | conduct.

21 |        94.    Plaintiff Christopher J. Stawski is a resident of Wisconsin who
22 | indirectly purchased SRAM from one or more of the Defendants or their co-conspirators
23 | during the Class Period, for end use and not for resale, and was injured as a result of
24 | Defendants' illegal conduct.

25 |        95.    Plaintiff Lara Sterenberg is a resident of Arizona who indirectly
26 | purchased SRAM from one or more of the Defendants or their co-conspirators during the
27 | Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal
28 | conduct.

-15-

1            96.     Plaintiff David Takeda is a California resident who indirectly

2 purchased SRAM from one or more of the Defendants or their co-conspirators during the

3 Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

4 conduct.

5            97.     Plaintiff Don Thompson is a resident of California who indirectly

6 purchased SRAM from one or more of the Defendants or their co-conspirators during the

7 Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

8 conduct.

9            98.     Plaintiffs E. Carol Vinson and Robert Vinson are residents of Arizona

10 who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators

11 during the Class Period, for end use and not for resale, and were injured as a result of

12 Defendants' illegal conduct.

13            99.     Plaintiff Robert Schulyer Watson is a resident of Vermont who

14 indirectly purchased SRAM from one or more of the Defendants or their co-conspirators

15 during the Class Period, for end use and not for resale, and was injured as a result of

16 Defendants' illegal conduct.

17            100.     Plaintiff Daniel Yohalem is a resident of New Mexico who indirectly

18 purchased SRAM from one or more of the Defendants or their co-conspirators during the

19 Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

20 conduct.

21            101.     Plaintiff Rachael Zaas is a resident of Michigan who indirectly

22 purchased SRAM from one or more of the Defendants or their co-conspirators during the

23 Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

24 conduct.

25 **B.**     **The Defendants.**

26            102.     Defendant Samsung Electronics Company, Ltd. is a business entity

27 organized under the laws of South Korea, with its principal place of business at Samsung

28 Main Building 250-2 ga, Taepyung-ro Chung-gu, Seoul, Korea. During the time period

1 covered by this Complaint, Defendant Samsung Electronics Company, Ltd. manufactured,
2 sold and distributed SRAM to customers throughout the United States.

3         103.    Defendant Samsung Electronics America, Inc. is a wholly owned and
4 controlled subsidiary of Defendant Samsung Electronic Company, Ltd. with its principal
5 place of business at 105 Challenger Road, Ridgefield Park, New Jersey. During the time
6 period covered by this Complaint, Defendant Samsung Electronics America, Inc. sold SRAM
7 to customers throughout the United States.

8         104.    Defendant Samsung Semiconductor, Inc. is a wholly owned and
9 controlled subsidiary of defendant Samsung Electronics Company, Ltd. with its principal
10 place of business at 3655 North First Street, San Jose, California. During the time period
11 covered by this Complaint, Defendant Samsung Semiconductor, Inc. sold and distributed
12 SRAM to customers throughout the United States. Samsung Electronics Company, Ltd. and
13 Samsung Semiconductor, Inc. are referred to collectively herein as "Samsung."

14         105.    Defendant Hynix Semiconductor, Inc. is a business entity organized
15 under the laws of South Korea, with its principal place of business at SAN 136-1, Ami-Ri
16 Bubal-eub, Ichon-si, Kyongki-do, Korea. During the time period covered by this Complaint,
17 Defendant Hynix Semiconductor, Inc. manufactured, sold and distributed SRAM to customers
18 throughout the United States.

19         106.    Defendant Hynix Semiconductor America, Inc. is a wholly owned and
20 controlled subsidiary of defendant Hynix Semiconductor, Inc. with its principal place of
21 business at 3101 North First Street, San Jose, California. During the time period covered by
22 this Complaint, Defendant Hynix Semiconductor America, Inc. sold and distributed SRAM to
23 customers throughout the United States. Hynix Semiconductor, Inc. and Hynix
24 Semiconductor America, Inc. are referred to collectively herein as "Hynix."

25         107.    Defendant Micron Technology, Inc. is a Delaware Corporation with its
26 principal place of business at 8000 South Federal Way, Boise, Idaho. During the time period
27 covered by this Complaint, Defendant Micron Technology, Inc. manufactured, sold and
28 distributed SRAM throughout the United States.

-17-

108. Defendant Micron Semiconductor Products, Inc. is a wholly owned and controlled subsidiary of defendant Micron Technology, Inc. with its principal place of business at 8000 South Federal Way, Boise, Idaho. During the time period covered by this Complaint, Defendant Micron Semiconductor Products, Inc. sold and distributed SRAM to customers throughout the United States. Micron Technology, Inc. and Micron Semiconductor Products, Inc. are referred to collectively herein as "Micron."

109. Defendant NEC Electronics Corporation is a business entity organized under the laws of Japan, with its principal place of business at 1753 Shimonumabe, Nakahara-Ku, Kawasaki, Kanagawa, Japan. During the time period covered by this Complaint, Defendant NEC Electronics Corporation sold SRAM to customers throughout the United States.

110. Defendant NEC Electronics America, Inc. is a wholly owned and controlled subsidiary of NEC Electronics Corporation, with its principal place of business at 2880 Scott Boulevard, Santa Clara, California and its manufacturing plant in Roseville, California. During the time period covered by this Complaint, Defendant NEC Electronics America, Inc. sold and distributed SRAM to customers throughout the United States

111. Defendant Cypress Semiconductor, Inc. is a business entity organized under the laws of California, with its principal place of business at 3939 North First Street, San Jose, California. During the time period covered by this Complaint, Defendant Cypress Semiconductor, Inc. sold and distributed SRAM to customers throughout the United States.

112. Defendant Mitsubishi Electric Corporation is a business entity organized under the laws of Japan, with its principal place of business at Tokyo Building 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan. During the time period covered by this Complaint, Defendant Mitsubishi Electric Corporation, Inc. manufactured, sold and distributed SRAM to customers throughout the United States.

113. Defendant Mitsubishi Electric & Electronics USA, Inc. is a wholly owned and controlled subsidiary of defendant Mitsubishi Electric Corporation. Defendant Mitsubishi Electric & Electronics USA, Inc. is a business entity organized under the laws of

-18-

1  Delaware, with its principal place of business at 500 Corporate Woods Parkway, Vernon

2  Hills, IL 60061. During the time period covered by this Complaint, Defendant Mitsubishi

3  Electric & Electronics USA, Inc. manufactured, sold and distributed SRAM to customers

4  throughout the United States. Mitsubishi Electric Corporation and Mitsubishi Electric &

5  Electronics USA, Inc. are referred to collectively herein as "Mitsubishi."

6          114.    Defendant Renesas Technology Corporation is a business entity

7  organized under the laws of Japan with its principal place of business at Nippon Bldg., 2-6-2,

8  Ote-machi, Chiyoda-ku, Tokyo 100-0004, Japan. Renesas Technology Corporation was

9  established in April 2003 as a joint venture between Defendants Hitachi, Ltd. and Mitsubishi

10  Electric Corp. During the time period covered by this Complaint, Defendant Renesas

11  Technology Corporation sold SRAM to customers throughout the United States.

12          115.    Defendant Renesas Technology America, Inc. is a wholly owned and

13  controlled subsidiary of Renesas Technology Corporation with its principal place of business

14  at 450 Holger Way, San Jose, California, 95134-1368. During the time period covered by this

15  Complaint, Defendant Renesas Technology America, Inc. sold and distributed SRAM to

16  customers throughout the United States.

17          116.    Defendant Toshiba Corporation is a business entity organized under the

18  laws of Japan, with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku,

19  Tokyo 105-8001, Japan. During the time period covered by this Complaint, Defendant

20  Toshiba Corporation manufactured, sold and distributed SRAM to customers throughout the

21  United States.

22          117.    Defendant Toshiba America, Inc. is a wholly owned and controlled

23  subsidiary of Toshiba Corporation with its principal place of business at 1251 Avenue of the

24  Americas, Suite 4110 New York, NY 10020. During the time period covered by this

25  Complaint, Defendant Toshiba America, Inc. manufactured, sold and distributed SRAM to

26  customers throughout the United States.

27          118.    Defendant Etron Technology America, Inc. is a wholly owned and

28  controlled subsidiary of Etron Technogy, Inc. with its principal place of business at 3375

-19-

1 | Scott Blvd., Suite 128, Santa Clara, California. During the time period covered by this
2 | Complaint, Defendant Etron Technology America, Inc. sold SRAM to customers throughout
3 | the United States.

4 |      119.    Defendant Toshiba America Electronic Components, Inc. is a wholly
5 | owned and controlled subsidiary of Toshiba Corporation with its principal place of business
6 | located at 19900 MacArthur Boulevard, Suite 400, Irvine, CA 92612. During the time
7 | covered by this Complaint, Defendant Toshiba America Electronic Components, Inc. sold and
8 | distributed SRAM to customers throughout the United States. Toshiba Corporation, Toshiba
9 | America Corporation, and Toshiba America Electronic Components, Inc. are referred to
10 | collectively herein as "Toshiba."

11 |      120.    Each of the Defendants named herein acted as the agent or joint
12 | venturer of or for the other Defendants with respect to the acts, violations and common course
13 | of conduct alleged herein. Each Defendant which is a subsidiary of a foreign parent acts as
14 | the sole United States agent for SRAM made by its parent company.

15 | **C.**   **Co-Conspirators.**

16 |      121.    Various other firms, corporations, partnerships and/or individuals,
17 | domestic and/or foreign, who are presently unknown to Plaintiffs, participated as co-
18 | conspirators with the Defendants in the violations of law alleged in this Complaint and have
19 | engaged in conduct and made statements in furtherance thereof.

20 |      122.    The acts charged in this Complaint have been done by some or all of
21 | Defendants and their co-conspirators, or were authorized, ordered or done by their respective
22 | officers, agents, employees or representatives while actively engaged in the management of
23 | each Defendant's business or affairs.

24 |      123.    Defendants are also liable for acts done in furtherance of the alleged
25 | conspiracy by companies they acquired through merger or acquisition.

26 | **EFFECTS ON INTERSTATE AND INTRASTATE COMMERCE**

27 |      124.    Defendants conduct business throughout the United States, including in
28 | the State of California, and they have purposefully availed themselves of the laws of the

1   United States. Defendants' products are sold in the flow of interstate commerce and

2   Defendants' activities had a direct, substantial and reasonably foreseeable effect on such

3   commerce.

4         125.   Defendants' conspiracy further substantially affected commerce in each

5   of the states identified herein. Defendants have purposefully availed themselves of the laws

6   of each of the states identified herein in connection with their activities relating to the pricing

7   of SRAM. Defendants produced, promoted, sold, marketed, and/or distributed SRAM in each

8   of the states identified herein, thereby purposefully profiting from access to indirect

9   purchasers in each such state. As a result of the activities described herein, Defendants:

10        a.    Caused tortious damage to the residents of the states identified herein;

11        b.    Caused tortious damage in each of the states identified herein by acts or

12              omissions committed outside each such state by regularly doing or

13              soliciting business in each such state;

14        c.    Engaged in persistent courses of conduct within each such state and/or

15              derived substantial revenue from the marketing of SRAM in each such

16              state (and services relating to such marketing); and

17        d.    Committed acts or omissions that they knew or should have known

18              would cause damage (and did, in fact, cause such damage) in each such

19              state while regularly doing or soliciting business in each such state,

20              engaging in other persistent courses of conduct in each such state

21              and/or deriving substantial revenue from the marketing of SRAM (and

22              services relating to such marketing) in each such state.

23        126.   The conspiracy described herein affected adversely every person in

24  each of the states identified in this Complaint who indirectly bought SRAM for end use and

25  not for resale. Defendants' conspiracy has lasted for many years and resulted in monetary

26  damages to purchasers in each state identified herein.

27        127.   Prices of SRAM in each state can be manipulated by conspirators

28  within that state, outside of it, or both. Without enforcing the antitrust and/or consumer

-21-

1    protection laws of each of the states identified herein, companies that break the law will go

2    unpunished. Defendants knew that commerce in each of the states identified herein would

3    have to be adversely affected in order to implement their conspiracy.

4

## CLASS ACTION ALLEGATIONS

5         128.    Plaintiffs bring this suit as a class action pursuant to Rules 23(b)(2) and

6    23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and a Plaintiff Class

7    ("the Class") composed of and defined as follows:

8         All persons and entities residing in the United States who, from
          November 1, 1996 through at least December 31, 2006, purchased
9         SRAM in the United States indirectly from the Defendants for their
          own use and not for resale. Specifically excluded from this Class are
10        the Defendants; the officers, directors or employees of any Defendant;
          any entity in which any Defendant has a controlling interest; and any
11        affiliate, legal representative, heir or assign of any Defendant. Also
          excluded are any federal, state or local governmental entities, any
12        judicial officer presiding over this action and the members of his/her
          immediate family and judicial staff, and any juror assigned to this
13        action.

14         129.    This action has been brought and may be properly maintained as a class

15    action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

16         a.      The Class is ascertainable and there is a well-defined community of

17             interest among the members of the Class;

18         b.      Based upon the nature of the trade and commerce involved and the

19             number of indirect purchasers of SRAM, Plaintiffs believe that the

20             members of the Class number in the thousands, and therefore is

21             sufficiently numerous that joinder of all Class members is not

22             practicable;

23         c.      Plaintiffs' claims are typical of the claims of the members of the Class

24             because Plaintiffs indirectly purchased SRAM from one or more of the

25             Defendants or their co-conspirators, and therefore Plaintiffs' claims

26             arise from the same common course of conduct giving rise to the

27             claims of the members of the Class and the relief sought is common to

28             the Class,

d.   The following common questions of law or fact, among others, exist as
     to the members of the Class.

     i.    whether Defendants formed and operated a combination or
           conspiracy to fix, raise, maintain or stabilize the prices of, or
           allocate the market for, SRAM;

     ii.   whether the combination or conspiracy caused SRAM prices to
           be higher than they would have been in the absence of
           Defendants' conduct;

     iii.  the operative time period of Defendants' combination or
           conspiracy,

     iv.   whether Defendants' conduct caused injury to the business or
           property of Plaintiffs and the members of the Class;

     v.    the appropriate measure of the amount of damages suffered by
           the Class;

     vi.   whether Defendants' conduct violates Section 1 of the Sherman
           Act,

     vii.  whether Defendants' conduct violates Sections 16720 and
           17200 of the California Business and Professions Code;

     viii. whether Defendants' conduct violates the antitrust, unfair
           competition, and consumer protection laws of the other states as
           alleged below; and

     ix.   the appropriate nature of class-wide equitable relief.

e.   These and other questions of law or fact which are common to the
     members of the Class predominate over any questions affecting only
     individual members of the Class;

f.   After determination of the predominate common issues identified
     above, if necessary or appropriate, the Class can be divided into logical
     and manageable subclasses;

-23-

g.     Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs have no interests that are antagonistic to other members of the Class and have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class;

h.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all damaged Class Members is impractical; the damages suffered by individual Class Members are relatively small, thus, absent the availability of class action procedures, it would not be feasible for Class Members to redress the wrongs done to them;

i.     Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole; and

j.     In the absence of a class action, Defendants would be unjustly enriched because they would be able to retain the benefits and fruits of their wrongful conduct.

130.     The Claims in this case are also properly certifiable under the laws of the State of California, and of the other individual states identified below in the Fourth and Fifth Claims for Relief.

## NATURE OF THE MARKET

131.     Throughout the period of time covered by this Complaint, Defendants and their co-conspirators engaged in the business of manufacturing, marketing and selling SRAM throughout the United States. The sale of SRAM constituted a multi-billion dollar business on an annual basis. For example, worldwide SRAM sales were estimated at approximately \$3.3 billion in 2003, and at approximately \$4.1 billion in 2004, 50% of which were in the United States.

132.     In 1998, the top six manufacturers accounted for approximately 63% of

-24-

1 | SRAM sales, and the top nine manufacturers accounted for approximately 79% of such sales.
2 | In both 2003 and 2004, the top six manufacturers accounted for approximately 75% of SRAM
3 | sales; the top eight manufacturers accounted for approximately 82% of SRAM sales. In 2004,
4 | the top nine manufacturers sold approximately 84% of all SRAM. The Defendants are the
5 | largest manufacturers and sellers of SRAM in the United States.

6 |       133. The shares of the leading SRAM manufacturers in 2003 were as
7 | follows: Samsung: 32.5%; Renesas 15.0%; Cypress 11.6%; Toshiba 7.9%; NEC 7.2%;
8 | Hynix 3.7%.

9 |       134. The SRAM industry has been subject to consolidation during the Class
10 | Period. For example, on December 26, 2002, Hitachi, Ltd. and Mitsubishi Electric
11 | Corporation announced an agreement to combine their semiconductor operations into a new
12 | company, Renesas Technology Corp., by April 1, 2003. In the Spring of 2003, Micron
13 | announced that it was exiting the SRAM market and agreed to sell its synchronous SRAM
14 | product inventory to Cypress.

15 |       135. Defendants operate manufacturing factories called fabrication plants or
16 | "fabs." These fabrication plants make "wafers" that are cut into individual chips, called
17 | "dies." Once the dies have electronics printed on them, the chip is complete.

18 |       136. SRAM has no free-standing use; it must be inserted into a device, such
19 | as a computer, to serve any function. Because SRAM has no independent utility, the value of,
20 | and thus demand for, SRAM is derived through its storage capabilities for products that need
21 | volatile memory.

22 |       137. SRAM is a commodity, with commodity margins. The SRAM market
23 | is characterized by price inelasticity. In fact, Defendants refer to "commodity SRAM" to
24 | mean a common memory type of SRAM.

25 |       138. When SRAM is purchased by consumers as part of an electronic
26 | device, it is a distinct, physically-discrete, hardware element of the end-use product and is
27 | traceable throughout the chain of distribution to the end user. SRAM does not undergo any
28 | alterations in its moves through the chain of distribution. SRAM is identifiable by a part

1  number, and bears a unique serial number that would permit tracing. Manufacturers such as
2  Cypress, Hynix, Micron, NEC, Renesas, Samsung, and Toshiba manufacture SRAM that is
3  clearly identifiable by a specific, discrete part or model number, and that bears a unique serial
4  number that is directly traceable to the specific manufacturing defendant. Photos of samples
5  of SRAM from Samsung, NEC and Micron are depicted below.







25      139.    The SRAM manufacturing market is dominated by a handful of leading
26  manufacturers – the Defendants in this case. The market for the manufacture and sale of
27  SRAM is subject to high manufacturing and technological barriers to entry. Efficient
28  fabrication plants are large and costly.

-26-

1    140.    Defendants' direct-purchaser customers include the world's largest

2    computer manufacturers, such as Hewlett Packard, IBM, Apple, Dell and Sun Microsystems;

3    microprocessor manufacturers, such as Intel; computer equipment manufacturers such as

4    Cisco; and cellular phone manufacturers such as Motorola and Ericsson.

5    141.    During the Class Period, the markets for the manufacture of the end-use

6    products in which SRAM is incorporated were subject to vigorous price competition. The

7    SRAM and end-use markets are therefore inextricably linked, and cannot be considered

8    separately. Participants in the SRAM industry were well aware of this intimate relationship,

9    and utilized end-use industry forecasts to predict sales of their own products.

10    142.    The end-use industries were all subject to vigorous price competition

11    during the Class Period. The SRAM direct purchasers had very thin net margins. They were

12    therefore at the mercy of their component costs, so that increases in component costs, such as

13    the price of SRAM, lead to quick, corresponding price increases in the end-use products.

14    143.    SRAM is a significant cost component of end-use electronic products

15    using memory chips. Because of the thin margins for those products, the original equipment

16    manufacturers ("OEM") could not absorb any part of the increased cost of SRAM.

17    144.    The cost of memory chips, including SRAM, to direct-purchaser OEMs

18    is an important component in the selling price of that OEM's electronic products. If the cost

19    that an OEM pays for SRAM increases, that directly affects the prices of the products sold by

20    the OEM.

21    145.    As the market for computers, system servers, and other electronic

22    devices was highly competitive during the Class Period, whenever an OEM paid more for

23    memory chips, including SRAM, that OEM passed on 100% of that increased cost to its

24    customers, who, in turn, passed on at least 100% of the increased SRAM costs to the end-user

25    consumer.

26    146.    Beginning in 1998 and continuing through much of 2001, SRAM

27    prices rose, due to the effects of the industry-wide collusion alleged herein and which is being

28    investigated by the DOJ. During 2000 alone, the average selling price of SRAM in the United

-27-

1  States increased by 35%—from \$3.93 in 1999 to approximately \$5.31 in 2000. SRAM prices

2  experienced an increase in 2002, and again in 2003 and subsequent years, which was the

3  result of the Defendants' and their co-conspirators' price-fixing conspiracy.

4       147. California is the largest market in the world for SRAM and is the

5  world-wide center of the computer industry and other industries that depend upon the SRAM

6  markets. Statements concerning the prices and market conditions for SRAM were

7  disseminated by Defendants from and into California on a regular and continuous basis.

8  **DEFENDANTS' ILLEGAL CONDUCT**

9       148. In October of 2006, the DOJ subpoened several companies in

10  connection with an investigation of cartel activity in the SRAM industry, which included:

11  Samsung, Cypress, Hynix, Micron, Mitsubishi, NEC, Renesas, and Toshiba. Several of the

12  companies being investigated—Hynix, Micron and Samsung—pled guilty to price-fixing in

13  the DRAM industry and paid substantial fines to the DOJ for those unlawful activities (\$300

14  million for Samsung and \$185 million for Hynix). Micron, another major SRAM

15  manufacturer, was the amnesty applicant in the DRAM price-fixing investigation and paid a

16  substantial fine.

17       149. The DOJ's SRAM investigation is a criminal one. This fact is

18  significant because, according to Chapter III, Section C.5 of the DOJ's Antitrust Division

19  Manual, "[c]urrent Division policy is to proceed by criminal investigation and prosecution in

20  cases involving horizontal, per se unlawful agreements such as price-fixing, bid rigging and

21  horizontal customer and territorial allocations."

22       150. Several of the individuals employed by Defendants who pled guilty to

23  criminal felonies in the DRAM criminal case investigation also had pricing responsibility for

24  SRAM. For Defendant Samsung, these include: (1) Tom Quinn, Vice-President of

25  Marketing for Memory Products; (2) Y. H. Park, Vice-President of Sales who had

26  responsibility for U.S. memory pricing; and (3) I. U. Kim, Vice-President of Marketing.

27  Those from Defendant Hynix who pled guilty to felony price-fixing violations in DRAM and

28  who also had responsibility for SRAM pricing included its Senior Vice President and General

1   Manager of Worldwide Sales and Marketing, D.S. Kim; its Director of Global Strategic

2   Accounts, C.K. Chung; and its Senior Manager and Vice President for Product Marketing and

3   Vice President for Operations, C.Y. Choi.

4           151.    Beginning at a date unknown to the Plaintiffs, but at least as early as

5   November 1, 1996, and continuing thereafter to at least October 15, 2006, Defendants and

6   their co-conspirators engaged in a contract, combination, or conspiracy, the effect of which

7   was to raise the prices at which they sold SRAM to artificially-inflated and supra-competitive

8   levels.

9           152.    Defendants, through their officers, directors and employees, effectuated

10  the aforesaid contract, combination, or conspiracy between themselves and their co-

11  conspirators by, among other things:

12          a.      participating in meetings and conversations, including through various

13                  trade associations consortiums, and working groups, to discuss the

14                  prices of SRAM in the United States;

15          b.      agreeing, during those meetings and conversations, to charge prices at

16                  specified levels and otherwise to increase and maintain prices of

17                  SRAM sold in the United States;

18          c.      issuing price announcements and quotations in accordance with the

19                  agreements reached; and

20          d.      selling SRAM in the United States at non-competitive prices.

21          153.    In furtherance of this conspiracy to fix prices, the SRAM manufacturers

22  engaged in a systematic and continuous exchange of confidential pricing, quantity and other

23  business information. Defendants and their co-conspirators communicated extensively with

24  one another to discuss and exchange information about SRAM, including the market and

25  prices for SRAM in general, as well as related to specific OEMs.

26          154.    Throughout the class period, representatives of the defendants

27  communicated personally or over the telephone or in writing in the United States to discuss

28  SRAM business, including SRAM pricing. Such communications occurred in or about:

-29-

March 1997; May 1998; December 1998; August 1999; October 1999; November 1999;

December 1999; March 2000; April 2000; July 2000; August 2000; October 2000; November

2000; March 2001; April 2001; May 2001; June 2001; July 2001; October 2001; November

2001; January 2002; February 2002; March 2002; April 2002; June 2002; July 2002;

November 2002; February 2003; April 2003; May 2003; June 2003; July 2003; December

2003; during 2004 (the exact months being unknown to Plaintiffs) and September 2005.

      155.  More specifically, representatives of one or more Defendants communicated on the following dates about the subjects stated:

    a.  Ken Yap of Samsung had direct contact with Cypress. In a May 1998 email to his colleague, he asked, "I wonder if you have a wish list as we discussed in the previous meeting. I'll have lunch with my buddy at Cypress on Thursday." Il Ung Kim responds, "I am open to talk about anything related to SRAM business. One curious topic could be mini-BGA cost, capacity and ramp-up plan."

    b.  In September 1999, CK Chung sent an e-mail to Gary Swanson and others at Hynix regarding October pricing for Strategic Accounts and stated that he had "chatted with Samsung guys this morning" and learned about Samsung's memory prices to certain OEMs. Regarding the price increases contemplated by the e-mail, he says, "Hopefully [sic] this price increases have our strategic customers reduce their purchases, we can move more products in the spot, spot market price down reducing the gap with contract price, etc, etc. Let's hope the best."

    c.  John Bugee of Samsung had direct contact with Cypress as well. He sent an e-mail to his colleagues in October 1999 which contained LPSRAM pricing to Intel he received from Cypress. He spoke to Cypress again and in March 13, 2000 reported on information, including pricing, he learned when he "spoke to Cypress today

-30-

1      regarding their LPSRAM program with Intel." He spoke to Cypress

2      again on April 28, 2000 and reported that he "encouraged Cypress to

3      significantly increase (not decrease) their price" to Intel. Bugee also

4      shared pricing information he received concerning Micron, NEC, and

5      Toshiba. Mr. Bugee again spoke to Cypress on October 2, 1999

6      regarding pricing to Intel, and reported back to Samsung that Cypress

7      "[c]urrent pricing is in the $6.00 range." On October 21, 1999, Mr.

8      Bugee again spoke to Cypress, and reported to Samsung that "Cypress

9      has quoted Y2K pricing of: 2M: Presently very low $3.00 range, and

10     sub-$2.00 in Q400. 4M: $6.00." Mr. Bugee further reported that

11     "Cypress acknowledged that the market is tightening, and that

12     customers are requesting upsides. This might cause them to re-adjust

13     their forward pricing upwards, as well as continue to minimize capacity

14     commitments to Intel." Bugee also spoke directly to Cypress in August

15     2000 about prices to Intel and others. His direct communications

16     continued into 2001. In March 2001, HD Park asked Bugee and Steve

17     Wienger to let him know how much the competition sold in January

18     and February since they had "whole competition information."

19   d.  In November 1999, a new Samsung employee traveled to the United

20      States and met with representatives of Micron and Cypress. J.H. Ko,

21      wrote that he met to discuss the Sync SRAM market."

22   e.  Bugee spoke directly to his contacts at Etron in December 1999

23      regarding LPSRAM pricing. He spoke to his contacts again in July

24      2000, when he e-mailed, "I spoke to Etron this morning. I am pleased

25      to report the following ..." and provided intelligence about Etron's

26      LPSRAM products and pricing to Intel. Bugee spoke again to his

27      contact at Etron in October of that year. Bugee spoke to his Etron

28      contact in November 2000, regarding among other things, prices to

-31-

| | | |
|---|---|---|
| 1 | | Intel. Based on the information he received directly from Etron about |
| 2 | | pricing to Intel, he suggests that the Etron "price" that Intel will try to |
| 3 | | use to get Samsung to move its price is meaningless and that Samsung |
| 4 | | should stay firm at its higher price. Bugee's communications continued |
| 5 | | to 2001. In addition, Woung Moo Lee, Senior Manager, Worldwide |
| 6 | | SRAM Marketing, also had direct communications with Etron |
| 7 | | regarding pricing. |
| 8 | f. | In July 2000, Bagbee of Samsung sent around competitive information. |
| 9 | | Upon receiving it, his colleague, H.D. Park, Manager SRAM |
| 10 | | Marketing, replied, "can we share this kind of competitive info, with |
| 11 | | price info, once per month at least!!!" |
| 12 | g. | Mike Black of Micron Marketing had good friends at all of Micron's |
| 13 | | so-called competitors. For example, in May 2001, Micron was looking |
| 14 | | for information on Samsung and Cypress' datasheets for various |
| 15 | | SRAM. Mike Black was asked to get some information by Tom |
| 16 | | Pawlowski, another Micron employee. Another of Black's co-workers |
| 17 | | reported that Black was "pinging his contacts for information" but it |
| 18 | | was not being received quickly enough for Pawlowski, who directed |
| 19 | | Black to "please get the Cypress and Samsung info directly from our |
| 20 | | contacts there? Looks like this is a real hot potato now." On October |
| 21 | | 26, 2001, Micron's Black reported to Micron and David Carr of Silicon |
| 22 | | Access regarding discussions with Samsung, and wrote that "[m]y |
| 23 | | conversations with them would put their road map similar to ours. |
| 24 | | Pricing for 18M parts out in 2004 around $20 for a 400MHz and in |
| 25 | | 2005 would move to $15 range..." [ellipsis in original]. |
| 26 | h. | On June 15, 2001, Hee Sang Yoon, a Hynix employee in charge of |
| 27 | | SRAM Strategic Marketing, sent an e-mail to SRAM Manufacturers, |
| 28 | | including among others, Micron, suggesting that they meet for an |

1     "SRAM Manufacturer Meeting" on a regular basis. Hynix states that

2     "suppliers can control the market situation if they have accurate

3     information on customer and market demand in general." According to

4     Hynix, it "would be a golden opportunity for us (SRAM vendors) since

5     we could discuss how we could manage the ever changing market

6     situation by exchanging our views on Today's SRAM Market." The

7     proposed meeting agenda included: SRAM Market Analysis by

8     Application, Sales Performance and Forecast, Production Volume by

9     Density, world wide supply forecasts by manufacturer and product

10    roadmaps.

11    i.    Tom Pawlowski of Micron sent a Hynix e-mail to Jerry Johnson and

12          Mike Black with the following note. "Hmmm. Interesting", Black's

13          response to the request to have an official meeting to discuss SRAM

14          prices was "Wow".

15    j.    Tom Pawlowski must have replied to Yoon at Hynix, who sent

16          Pawlowski an e-mail on June 25, 2001, "I think we can make good time

17          to get suppliers' status which you wanted it. In my mind, someone

18          who is in charge of marketing, they need two information one is

19          demand forecast and the other one is supplier forecast..." He suggests

20          that Hynix can get "a lot of demand information" and proposes a

21          private SRAM meeting between the two companies. The next day,

22          June 26, Pawlowski responds to Hee Sang suggesting that he contact

23          Mike Black. On June 27, 2001, Micron's Black confirmed to Hynix'

24          Yoon that "I would like to have an opportunity to meet with you and

25          discuss this SRAM market." That same day, Yoon wrote back and

26          suggested that they meet in Korea.

27    ///

28    ///

-33-

k. In October 2001, J. M. Sung of Hynix met with a Cypress employee, Mario Martinez in California about "SRAM product development & Market."

l. Similarly, Mike Black sent an email in January 2002 to Jerry Johnson of Micron containing information that he had received on Samsung's worldwide synchronous SRAM sales and promised to send the Cypress data and GSI information "when they get back from Japan ..." Jerry Johnson asked Black to put the information into a chart and Black replied, "1 will, but 1 want to wait until my Samsung buddy gets back, he has the numbers for everybody!"

m. On January 17, 2002, Mike Black (Micron Marketing) provided detailed information regarding Samsung's "worldwide sync SRAM sales" to Jerry Nalywajko (Micron Tactical Marketing Mgr.) and other Micron employees.

n. Jack Truong of Samsung wrote to Mark D'Arcangelo, Product Marketing Manager for SRAM at Hitachi, in February 2002 providing Samsung's SRAM revenue numbers for low power, async fast and sync, and asking for Hitachi's revenue numbers. In response, D'Arcangelo asked why Samsung's async number was down from previous month and the sync number doubled and Truong provided an explanation involving who the buyer was and other information. D'Arcangelo responded with Hitachi's numbers, and again asked Truong about the Samsung numbers. Truong provided additional explanations. They also asked one another about exchanging the competitors' latest roadmaps, which, they both did. On June 18, 2002, Hitachi's D'Arcangelo emailed Hitachi's "SRAM numbers" to Truong as follows: "Low Power: $435k Async: $628k Sync: $17k * Sun problem." On September 6, 2002, Hitachi's Toshihiko Seki wrote to

-34-

Samsung's Truong regarding Low Power SRAM, and asked "Are you able to share with me some of the low power SRAM revenue number?" and "Can you share some data?" and shared that "we do roughly 7M$/mo in worldwide right now and wafer business is about 2M$ . . . "

o.   David Bagby, Samsung's Director of SRAM Sales, had lunch with "the NEC America guys" in March 2002 regarding, among other things, the SRAM prices to Intel. Bagby provided "key" information from the lunch to his colleague Woung Moo Lee (Senior Manager, Worldwide SRAM and MCP Marketing, Semiconductor Sales Division, Samsung Electronics Company, Ltd.), who thanked him for the "valuable" information. After his conversation with the "NEC guys," Bagby was able to tell Lee that with respect to 2M low power SRAM, "I think we have a chance to raise this price come April 1. My feeling [is] a small increase will trigger the thought that maybe things will get tight and they better be careful." NEC also reported to Bagby in that conversation that NEC had excess 4M low power SRAM that Intel did not want, and the parties discussed the TAM. Bagby concluded "Keep price at $1.80." On April 17, 2002, Samsung's Bagby wrote to Takahiro Kambe of Hitachi and stated "I would like to give you WW [world-wide] data on SRAM from all competitors would you like that."

p.   In April 2002, Micron's Jerry Nalywajko sent an e-mail around Micron with SRAM competitor ASP ("average selling price") and other data as well as data on the low power SRAM market. He told his colleagues that while the data seemed reliable, "Mike Black will double ck on this with his sources."

q.   In July 2002, Black reached out to Mike Pearson at Samsung to see whether Samsung would answer a number of questions about its SRAM manufacturing processes and told Pearson that "this may seem

-35-

| | | |
|---|---|---|
| 1 | | too sensitive, but we would be willing to exchange this level of |
| 2 | | information." At first, Samsung "politely decline[d] ... [the] offer to |
| 3 | | share data" but two days later had a "change of heart" and let Black |
| 4 | | know that he would have his competitor's sensitive data in a few days. |
| 5 | r. | In a November 21, 2002 e-mail to Jan Dupreez (Micron), Mike Black |
| 6 | | (Micron) provided comparative SSRAM specifications for Micron's |
| 7 | | top two competitors, Samsung and Cypress. |
| 8 | s. | In February 2003, Truong (Samsung) sent an e-mail to Goto at NEC |
| 9 | | thanking him for their conversation and attaching PSRAM roadmaps. |
| 10 | | Goto responded in kind with NEC's latest roadmaps. Both asked the |
| 11 | | other to keep the information confidential. On May 1, 2003, |
| 12 | | Samsung's Truong asked NEC's Goto "Would you like to exchange |
| 13 | | sync SRAM & Low power SRAM presentation between NEC and |
| 14 | | Samsung," and NEC's Goto responded that same day that "I have |
| 15 | | absolutely no problem to exchange an [updated] roadmap ... " |
| 16 | t. | Samsung's Jack Truong met with Rob Sloan of Cypress on June 11, |
| 17 | | 2003 regarding SRAM. After that meeting, Sloan sent an e-mail to |
| 18 | | Truong attaching Cypress's current SRAM presentation and requesting |
| 19 | | that Truong forward Samsung's to him. |
| 20 | u. | In September 2005, Y. S. Lee of Samsung wrote to Hiroyuki Goto of |
| 21 | | NEC and Clint Min of Renesas following up on their conversation |
| 22 | | during a "cigarette break" at a trade association meeting earlier in the |
| 23 | | day, and seeking a private dinner to discuss QDR II (SRAM). The |
| 24 | | dinner was set up for September 23, 2005. Before the dinner, Goto of |
| 25 | | NEC e-mailed his colleague at NEC to see what specific information |
| 26 | | was needed from Renesas, "I am having informal dinner with John and |
| 27 | | Clint tonight. Is there anything you want me to hear from them?" S. J. |
| 28 | | Han of NEC asked Goto to get some information about Samsung and |

1                           Renesas SRAM QDR II+ and S3 and "run rates."

2             156.    In addition to the communications listed above, defendant met various

3 trade associations at which meetings they discussed SRAM pricing with the purpose and

4 effect of raising, fixing and stabilizing SRAM prices. Such meetings occurred at the

5 following trade associations:

6             a.     Joint Electron Device Engineering Council Solid State Technology

7                  Association ("JEDEC");

8             b.     Quad Data Rate Consortium ("QDRC");

9             c.     SigmaRAM Consortium ("SigmaRAM");

10             d.     Common Specifications for Mobile RAM Group ("COSMORAM");

11             e.     CellularRAM Working Group ("CWG");

12             f.     Die Products Consortium ("DPC");

13             g.     Multi-Chip Package Consortium ("MCP");

14             h.     Council on Computing Power ("CoCP"); and

15             i.     MultiMediaCard Association ("MMCA").

16             157.    The conduct of the "business" of these organizations gave Defendants

17 and their co-conspirators the cover needed to contact one another with impunity and to

18 communicate competitive information, including SRAM pricing. For example, after a QDRC

19 meeting in 2001, as the Defendants began to exchange competitive information, including

20 pricing information, they designated the documents "QDR" as opposed to specific company

21 names, in order to hide the identity of the company providing that information so that their

22 price-fixing activities would not disclose the participants. These "consortium" meetings

23 often led to separate and more private meetings at which SRAM prices and markets were

24 discussed. This is exemplified by an e-mail sent by NEC to Micron seeking "the opportunity

25 to shoot the breeze with you guys outside of the [February 8, 2002] consortium meeting."

26             158.    In a January 11, 2001 e-mail regarding the provision of pricing

27 information on QDRC presentation materials, Jerry Johnson (Micron) states "now that we've

28 beaten Sigma the pricing is going up."

1    159.    Defendants' contract, combination, or conspiracy was centered in,

2  carried out, effectuated and perfected mainly in the State of California. Therefore, all

3  members of the Class, whether or not California residents, are entitled to recover under

4  California law, as well as the laws of their own states.

## ACTIVE CONCEALMENT

6    160.    Throughout and beyond the conspiracy, Defendants and their co-

7  conspirators affirmatively and actively concealed their unlawful conduct from Plaintiffs.

8  Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly

9  within the confines of their higher-level executives.  Defendants and their co-conspirators

10  publicly provided pre-textual and false justifications regarding their price increases.

11  Defendants and their co-conspirators conducted their conspiracy in secret, concealed the true

12  nature of their unlawful conduct and acts in furtherance thereof, and actively concealed their

13  activities through various other means and methods to avoid detection.  Plaintiffs did not

14  discover, and could not have discovered through the exercise of reasonable diligence, that

15  Defendants and their co-conspirators were violating the antitrust laws as alleged herein until

16  shortly before this class action litigation was commenced.

17    161.    As a result of the active concealment of the conspiracy by Defendants

18  and their co-conspirators, any and all applicable statutes of limitations otherwise applicable to

19  the allegations herein have been tolled.

## PLAINTIFFS' INJURIES

21    162.    Plaintiffs and the Class members as defined below have been damaged

22  as a direct, foreseeable, and proximate result of Defendants' misconduct.  Plaintiffs and the

23  Class members participate in the market for the sale of SRAM.  To the extent Plaintiffs and

24  Class members purchase SRAM as part of a computer or other equipment purchase,

25  Defendants' unlawful conspiracy and unfair, deceptive and unconscionable practices have

26  caused the prices at which OEMs sell such SRAM to increase to supra-competitive levels.

27    163.    Defendants have extinguished the market forces of competition to their

28  mutual benefit.  Consumers, including Plaintiffs and Class members, are injured by paying

-38-

1  supra-competitive prices for SRAM.

2        164.   Because Defendants control the market for SRAM, there are virtually
3  no choices for consumers who require such a memory product other than buying one from
4  entities that pay supra-competitive prices to Defendants because of Defendants' unlawful
5  agreement alleged herein.

6        165.   The market for SRAM and the markets for Computers and mobile
7  phones are intertwined because the SRAM market exists to serve the Computer and mobile
8  phone markets.  SRAM and Computer and mobile phone markets are united in that one
9  cannot exist without the other.

10        166.   The conspiratorial conduct of the Defendants and their co-conspirators,
11  the purpose of which is to raise the price of SRAM, would, on information and belief, directly
12  increase the price of the Computers and mobile telecommunications devices.  Where as here,
13  there are few products whose price is dependent on only one factor or variable, economists
14  have developed techniques to isolate and understand the relationship between one
15  "explanatory" variable and a "dependent" variable in those cases when the dependent variable
16  is explained by a multitude of variables—when all such variables may be changing
17  simultaneously.  That analysis—called regression analysis—is commonly used in the real
18  world and in litigation to determine the impact of a price increase on one cost in a product (or
19  service) that is an assemblage of costs.  Thus, it will be possible to isolate and identify the
20  impact of increases in the price of SRAM on computer and mobile telecommunication
21  equipment prices even though these products contain a numbers of other components whose
22  prices may be changing over time.

23        167.   During the Class Period, Plaintiffs and the Class Members paid supra-
24  competitive prices for SRAM.  These inflated prices have been passed on to them by
25  manufacturers, distributors, and retailers.  Those overcharges have unjustly enriched
26  Defendants.

27  ///

28  ///

## VIOLATIONS ALLEGED

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

168. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

169. Beginning at a time presently unknown to Plaintiffs, but at least as early as January 1, 1998 and continuing through at least October 15, 2006, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for SRAM in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

170. In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

  a. To fix, raise, maintain and stabilize the price of SRAM;

  b. To allocate markets for SRAM among themselves;

  c. To submit rigged bids for the award and performance of certain SRAM contracts; and

  d. To allocate among themselves the production of SRAM.

171. The combination and conspiracy alleged herein has had the following effects, among others:

  a. Price competition in the sale of SRAM has been restrained, suppressed, and/or eliminated in the United States;

  b. Prices for SRAM sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

  c. Those who purchased SRAM directly or indirectly from Defendants

-40-

1    and their co-conspirators have been deprived of the benefits of free and
2    open competition.

3        172.   Plaintiffs have been injured and will continue to be injured in their
4    business and property by paying more for SRAM purchased indirectly from the Defendants
5    and their co-conspirators than they would have paid and will pay in the absence of the
6    combination and conspiracy, including paying more for personal computers and other
7    products in which SRAM is a component as a result of higher prices paid for SRAM by the
8    manufacturers of those products.

9        173.   Plaintiffs and the class are entitled to an injunction against Defendants,
10   preventing and restraining the violations alleged herein.

11   **<u>Second Claim for Relief</u>**

12   **(Violation of the California Cartwright Act)**

13       174.   Plaintiffs incorporate and reallege, as though fully set forth herein, each
14   and every allegation set forth in the preceding paragraphs of this Complaint.

15       175.   Defendants' contract, combination, trust or conspiracy was centered in,
16   carried out, effectuated and perfected mainly within the State of California, and Defendant's
17   conduct within California injured all members of the Class throughout the United States.
18   Therefore, this claim for relief under California law is brought on behalf of all members of the
19   Class, whether or not they are California residents.

20       176.   Beginning at a time presently unknown to Plaintiffs, but at least as
21   early as January 1, 1998, and continuing thereafter at least up to and including at least
22   October 15, 2006, Defendants and their co-conspirators entered into and engaged in a
23   continuing unlawful trust in restraint of the trade and commerce described above in violation
24   of Section 16720, California Business and Professional Code. Defendants, and each of them,
25   have acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and
26   allocate markets for, SRAM at supra-competitive levels.

27       177.   The aforesaid violations of Section 16720, California Business and
28   Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of

-41-

action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, SRAM.

178.    For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

a.    to fix, raise, maintain and stabilize the price of SRAM;

b.    to allocate markets for SRAM amongst themselves;

c.    to submit rigged bids for the award and performance of certain SRAM contracts, and

d.    to allocate among themselves the production of SRAM.

179.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

a.    price competition in the sale of SRAM has been restrained, suppressed and/or eliminated in the State of California and throughout the United States;

b.    prices for SRAM sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California and throughout the United States; and

c.    those who purchased SRAM from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

180.    Plaintiffs and the other members of the Class paid supra-competitive, artificially inflated prices for SRAM.

181.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business and property in that they paid more for SRAM than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the

-42-

California Business and Professions Code, Plaintiffs seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of the California Unfair Competition Law)

182.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

183.    Defendants' business acts and practices were centered in, carried out, effectuated and perfected mainly within the State of California, and Defendant's conduct within California injured all members of the Class throughout the United States. Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

184.    Beginning on a date unknown to Plaintiffs, but at least as early as January 1, 1998, and continuing thereafter at least up through and including October 15, 2006, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

185.    This Claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

186.    The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following:

///

1          a.    The violations of Section 1 of the Sherman Act, as set forth above;

2          b.    The violations of Section 16720, *et seq.*, of the California Business and

3                Professions Code, set above;

4          c.    Defendants' acts, omissions, misrepresentations, practices and non-

5                disclosures, as described above, whether or not in violation of Section

6                16720, *et seq.* of the California Business and Professions Code, and

7                whether or not concerted or independent acts, are otherwise unfair,

8                unconscionable, unlawful or fraudulent;

9          d.    Defendants' act and practices are unfair to consumers of SRAM in the

10               State of California and throughout the United States, within the

11               meaning of Section 17200, California Business and Professions Code;

12               and

13         e.    Defendants' acts and practices are fraudulent or deceptive within the

14               meaning of Section 17200 of the California Business and Professions

15               Code.

16         187.  Plaintiffs and each of the Class members are entitled to full restitution

17   and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may

18   have been obtained by Defendants as a result of such business acts or practices.

19         188.  The illegal conduct alleged herein is continuing and there is no

20   indication that Defendants will not continue such activity into the future.

21         189.  The unlawful and unfair business practices of Defendants, and each of

22   them, as described above, have caused and continue to cause Plaintiffs and the members of

23   the Class to pay supra-competitive and artificially-inflated prices for SRAM. Plaintiffs and

24   the members of the class suffered injury in fact and lost money or property as a result of such

25   unfair competition.

26         190.  The conduct of Defendants as alleged in this Complaint violates

27   Section 17200 of the California Business and Professions Code.

28         191.  As alleged in this Complaint, Defendants and their co-conspirators

1   have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair

2   competition. Plaintiff and the members of the Class are accordingly entitled to equitable

3   relief including restitution and/or disgorgement of all revenues, earnings, profits,

4   compensation and benefits which may have been obtained by Defendants as a result of such

5   business practices, pursuant to the California Business and Professions Code, Sections 17203

6   and 17204.

7                          **Fourth Claim for Relief**

8              **(Violation of State Antitrust and Unfair Competition Laws)**

9              192.    Plaintiffs incorporate and reallege, as though fully set forth herein, each

10  and every allegation set forth in the preceding paragraphs of this Complaint.

11             193.    By reason of the foregoing, Defendants have entered into agreements in

12  restraint of trade in violation of Arizona Revised Stat. §§44-1401 *et seq.*

13             194.    By reason of the foregoing, Defendants have entered into agreements in

14  restraint of trade in violation of California Bus. & Prof. Code §§16700 *et seq.* and Cal. Bus. &

15  Prof. Code §§17200 *et seq.*

16             195.    By reason of the foregoing, Defendants have entered into agreements in

17  restraint of trade in violation of District of Columbia Code Ann. §§28-4503 *et seq.*

18             196.    By reason of the foregoing, Defendants have entered into agreements in

19  restraint of trade in violation of Hawaii Code, H.R.S. §§ 480-1, *et seq.*

20             197.    By reason of the foregoing, Defendants have entered into agreements in

21  restraint of trade in violation of Iowa Code §§553.1 *et seq.*

22             198.    By reason of the foregoing, Defendants have entered into agreements in

23  restraint of trade in violation of Kansas Stat. Ann. §§50-101 *et seq.*

24             199.    By reason of the foregoing, Defendants have entered into agreements in

25  restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

26             200.    By reason of the foregoing, Defendants have entered into agreements in

27  restraint of trade in violation of Michigan Comp. Laws. Ann. §§445.773 *et seq.*

28             201.    By reason of the foregoing, Defendants have entered into agreements in

-45-

1    restraint of trade in violation of Minnesota Stat. §§325D.52 *et seq.*

2            202.    By reason of the foregoing, Defendants have entered into agreements in

3    restraint of trade in violation of Mississippi Code Ann. §75-21-1 *et seq.*

4            203.    By reason of the foregoing, Defendants have entered into agreements in

5    restraint of trade in violation of Nebraska Rev. Stat. §§59-801 *et seq.*

6            204.    By reason of the foregoing, Defendants have entered into agreements in

7    restraint of trade in violation of Nevada Rev. Stat. Ann. §§598A *et seq.*

8            205.    By reason of the foregoing, Defendants have entered into agreements in

9    restraint of trade in violation of New Mexico Stat. Ann. §§57-1-1 *et seq.*

10           206.    By reason of the foregoing, Defendants have entered into agreements in

11    restraint of trade in violation of North Carolina Gen. Stat. §75-1 *et seq.*

12           207.    By reason of the foregoing, Defendants have entered into agreements in

13    restraint of trade in violation of North Dakota Cent. Code §§51-08.1-01 *et seq.*

14           208.    By reason of the foregoing, Defendants have entered into agreements in

15    restraint of trade in violation of the Pennsylvania common law.

16           209.    By reason of the foregoing, Defendants have entered into agreements in

17    restraint of trade in violation of South Dakota Codified Laws Ann. §§37-1 *et seq.*

18           210.    By reason of the foregoing, Defendants have entered into agreements in

19    restraint of trade in violation of the Puerto Rico Code 10 LPRA §251, *et seq.* and 31 LPRA

20    §5141.

21           211.    By reason of the foregoing, Defendants have entered into agreements in

22    restraint of trade in violation of Tennessee Code Ann. §§47-25-101 *et seq.*

23           212.    By reason of the foregoing, Defendants have entered into agreements in

24    restraint of trade in violation of Vermont Stat. Ann. 9 §§2453 *et seq*

25           213.    By reason of the foregoing, Defendants have entered into agreements in

26    restraint of trade in violation of West Virginia §§47-18-1 *et seq.*

27           214.    By reason of the foregoing, Defendants have entered into agreements in

28    restraint of trade in violation of Wisconsin Stat. §§133.01 *et seq.*

1           215.    By reason of the foregoing, defendants have entered into agreements in

2 restraint of trade in violation of Wyoming Stat. §40-12-105.

3           216.    Class Members in each of the states listed above paid supra-

4 competitive, artificially inflated prices for SRAM. As a direct and proximate result of

5 Defendants' unlawful conduct, such members of the Class have been injured in their business

6 and property in that they paid more for SRAM than they otherwise would have paid in the

7 absence of Defendants' unlawful conduct.

8           217.    As a result of Defendants' violations of the statutes set forth, Class

9 members seek damages and costs of suit, including reasonable attorneys' fees.

10                               **Fifth Claim for Relief**

11    **(Violation of State Consumer Protection and Unfair Competition Laws)**

12           218.    Plaintiffs incorporate and reallege, as though fully set forth herein, each

13 and every allegation set forth in the preceding paragraphs of this Complaint.

14           219.    Defendants engaged in unfair competition or unfair, unconscionable,

15 deceptive or fraudulent acts or practices in violation of the state consumer protection and

16 unfair competition statutes listed below.

17           220.    Defendants have engaged in unfair competition or unconscionable,

18 unfair or deceptive acts or practices in violation of Alaska Statutes §45.50.471 *et seq.*

19           221.    Defendants have engaged in unfair competition or unconscionable,

20 unfair or deceptive acts or practices in violation of Arkansas Code §4-88-101 *et seq.*

21           222.    Defendants have engaged in unfair competition or unfair or deceptive

22 acts or practices in violation of California Bus. & Prof. Code §17200 *et seq.*

23           223.    Defendants have engaged in unfair competition or unconscionable,

24 unfair or deceptive acts or practices in violation of District of Columbia Code §28-3901 *et*

25 *seq.*

26           224.    Defendants have engaged in unfair competition or unconscionable,

27 unfair or deceptive acts or practices in violation of Florida Stat. §501.201 *et seq.*

28           225.    Defendants have engaged in unfair competition or unfair or deceptive

1 | acts or practices in violation of Idaho Code §48-601 *et seq.*.

2 | 226. Defendants have engaged in unfair competition or unfair or deceptive
3 | acts or practices in violation of Kansas Stat. §50-623 *et seq.*

4 | 227. Defendants have engaged in unfair competition or unfair or deceptive
5 | acts or practices that were indirectly purchased primarily for personal, family, or household
6 | purposes in violation of 5 Maine Rev. Stat. §207 *et seq.*

7 | 228. Defendants have engaged in unfair competition or unfair or deceptive
8 | acts or practices in violation of Massachusetts General Laws, Chapter 93A, §1 *et seq.*

9 | 229. Defendants have engaged in unfair competition or unfair or deceptive
10 | acts or practices in violation of Montana Code § 30-14-101 *et seq.*

11 | 230. Defendants have engaged in unfair competition or unfair or deceptive
12 | acts or practices in violation of Nebraska Rev. Stat. §59-1601 *et seq.*

13 | 231. Defendants have engaged in unfair competition or unconscionable,
14 | unfair or deceptive acts or practices in violation of New Mexico Stat. §57-12-1 *et seq.*

15 | 232. Defendants have engaged in unfair competition or unfair or deceptive
16 | acts or practices in violation of New York Gen. Bus. Law §349 *et seq.* Specifically:

17 |     a. Defendants engaged in commerce in New York;

18 |     b. Defendants and their co-conspirators secretly agreed to raise prices by
19 |     direct agreement on bids to customers located in New York and
20 |     through artificial supply restraints on the entire SRAM market;

21 |     c. New York consumers were targets of the conspiracy;

22 |     d. The secret agreements were not known to New York consumers;

23 |     e. Defendants omitted material information that made the statements
24 |     which they mad materially misleading, and also made materially
25 |     misleading affirmative statements about the real cause of price
26 |     increases;

27 |     f. Because of Defendants' unlawful trade practices in the State of New
28 |     York, Plaintiffs and other class members who indirectly purchased

-48-

1           SRAM have been injured because they have paid more for SRAM than

2           they would have paid in the absence of Defendants' unlawful trade acts

3           and practices.

4        233.    Defendants have engaged in unfair competition or unconscionable,

5 unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. §75-1 *et seq.*

6        234.    Defendants have engaged in unfair competition or unfair or deceptive

7 acts or practices in violation of the Pennsylvania Unfair Trade Practices and Consumer

8 Protection Law, 73 P.S. Section 201-1 *et seq.*

9        235.    Defendants have engaged in unfair competition or unfair or deceptive

10 acts or practices that were indirectly purchased primarily for personal, family, or household

11 purposes in violation in violation of Rhode Island Gen. Laws. §6-13.1-1 *et seq.* Specifically:

12        a.     Defendants engaged in commerce in Rhode Island;

13        b.     As alleged herein, Defendants engaged in acts or practices that were

14              unfair or deceptive to natural persons purchasing SRAM for personal,

15              family or household purposes;

16        c.     As alleged herein, Defendants used methods, acts or practices which

17              mislead or deceive members of the public in a material respect about

18              the true reasons for the price of SRAM;

19        d.     Rhode Island consumers were injured by Defendants' actions.

20        236.    Defendants have engaged in unfair competition or unfair or deceptive

21 acts or practices in violation of 9 Vermont §2451 *et seq.*

22        237.    Defendants have engaged in unfair competition or unfair or deceptive

23 acts or practices in violation of Wyoming Stat. §40-12-105.

24        238.    Class Members in the states listed above paid supra-competitive,

25 artificially inflated prices for SRAM. As a direct and proximate result of Defendants'

26 unlawful conduct, Plaintiffs and the members of the Class have been injured in their business

27 and property in that they paid more for SRAM than they otherwise would have paid in the

28 absence of Defendants' unlawful conduct.

-49-

239. As a result of Defendants' violations of the laws listed above, the members of the Class in the states listed above are entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business practices, including compensable damages under New York law, and damages wherever else allowed by law.

## Sixth Claim for Relief

### (Unjust Enrichment and Disgorgement of Profits)

240. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

241. Defendants have been unjustly enriched through overpayments by Plaintiffs and Class members and the resulting profits enjoyed by Defendants as a direct result of such overpayments. Plaintiffs' detriment and Defendants' enrichment were related to and flowed from the conduct challenged in this Complaint.

242. Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred via overpayments by Plaintiffs and Class members.

243. Plaintiffs seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

A. That the Court determine that the claims alleged herein under the Sherman Act, state antitrust laws, and state consumer protection and/or unfair competition laws may be maintained as a Class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B. That the unlawful agreement, conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

///

-50-

1              1.     A restraint of trade or commerce in violation of Section 1 of the

2                      Sherman Act, as alleged in the First Claim for Relief;

3              2.     An unlawful combination, trust, agreement, understanding, and/or

4                      concert of action in violation of the state antitrust laws identified in the

5                      Second and Fourth Claims for Relief herein;

6              3.     Violations of the state consumer protection and unfair competition laws

7                      identified in the Third and Fifth Claims for Relief herein; and

8              4.     Acts of unjust enrichment as set forth in the Sixth Claim for Relief

9                      herein.

10          C.     That Plaintiffs and the Class members recover damages, as provided by

11 federal and state antitrust laws, and that a judgment be entered in favor of Plaintiffs and the

12 relevant Class members against the Defendants, jointly and severally, in an amount to be

13 trebled in accordance with such laws (except as to New York Gen. Bus. Law §349 *et seq.* for

14 which Plaintiffs do not seek discretionary trebling).

15          D.     That Plaintiffs and the relevant Class members obtain any penalties,

16 punitive or exemplary damages, and/or full consideration, where the laws of the respective

17 states identified herein so permit;

18          E.     That Plaintiffs and the relevant Class members recover damages and/or

19 all other available monetary and equitable remedies under the state unfair competition laws

20 identified above;

21          F.     That Defendants, their affiliates, successors, transferees, assignees, and

22 the officers, directors, partners, agents, and employees thereof, and all other persons acting or

23 claiming to act on their behalf, be permanently enjoined and restrained from in any manner

24 continuing, maintaining, or renewing the conduct, contract, conspiracy or combination

25 alleged herein, or from entering into any other conspiracy alleged herein, or from entering

26 into any other contract, conspiracy or combination having a similar purpose or effect, and

27 from adopting or following any practice, plan, program, or device having a similar purpose

28 or effect;

1          G.      That Plaintiffs and members of the Class be awarded restitution,

2 including disgorgement of profits obtained by Defendants as a result of their acts of unfair

3 competition and acts of unjust enrichment;

4          H.      That Plaintiffs and members of the Class be awarded pre- and post-

5 judgment interest, and that that interest be awarded at the highest legal rate from and after the

6 date of service of the initial complaint in this action;

7          I.      That Plaintiffs and members of the Class recover their costs of this suit,

8 including reasonable attorneys' fees as provided by law; and

9          J.      That Plaintiffs and members of the Class have such other, further, and

10 different relief as the case may require and the Court may deem just and proper under the

11 circumstances.

12 Dated: August 30, 2007              Respectfully submitted

13                                     ,      */s/ Craig C. Corbitt*
                                             Craig C. Corbitt

14

15                                 Francis O. Scarpulla (41059)
                                Craig C. Corbitt (83251)

16                                 Pamela E. Woodside (226212)
                                Qianwei Fu (242669)

17                                 ZELLE, HOFMANN, VOELBEL, MASON &
                                GETTE, LLP

18                                 44 Montgomery Street, Suite 3400
                                San Francisco, CA 94104

19                                 Telephone:    (415)639-0700
                                Facsimile:      (415) 693-0770

20                                 fscarpulla@zelle.com
                                ccorbitt@zelle.com

21                                 *Interim Lead and Liaison Counsel for Indirect-*
                                *Purchaser Class*

22

23 3170284v1

24

25

26

27

28

FIRST CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. M:07-CV-1819-CW