1   Bruce H. Jackson (State Bar No. 98118)
       (bruce.h.jackson@bakernet.com)
2   Robert W. Tarun (State Bar No. 64881)
       (robert.w.tarun@bakernet.com)
3   **BAKER & MCKENZIE LLP**
    Two Embarcadero Center, 11th Floor
4   San Francisco, CA  94111-3802
    Telephone: +1 415 576 3000
5   Facsimile:  +1 415 576 3099

6   Patrick J. Ahern (*pro hac vice*)
       (patrick.j.ahern@bakernet.com)
7   Roxane C. Busey (*pro hac vice*)
       (roxane.c.busey@bakernet.com)
8   Karen Sewell (*pro hac vice*)
       (karen.sewell@bakernet.com)
9   **BAKER & MCKENZIE LLP**
    130 E. Randolph Dr., Suite 3500
10  Chicago, IL 60601
    Telephone: +1 312 861 8000
11
    Attorneys for Defendant
12  *Tatung Company of America, Inc.*

13                    **UNITED STATES DISTRICT COURT**

14                   **NORTHERN DISTRICT OF CALIFORNIA**

15                        **SAN FRANCISCO DIVISION**

16
    IN RE: CATHODE RAY TUBE (CRT)          Master File No: 07-5944-SC
17  ANTITRUST LITIGATION                    MDL No. 1917

18                                          **DEFENDANT TATUNG COMPANY
                                            OF AMERICA'S REPLY
19  This Document Relates To:               MEMORANDUM IN SUPPORT OF
                                            ITS MOTION TO DISMISS DIRECT
20                                          AND INDIRECT PURCHASER
                  ALL ACTIONS               PLAINTIFFS' CONSOLIDATED
21                                          AMENDED COMPLAINTS**

22                                          **Date:  October 5, 2009
                                            Time:  9:00 a.m.
23                                          Dept:   1
                                            Before the Honorable Charles A. Legge
24                                          Special Master**

25

26

27

28

Baker & McKenzie LLP
Two Embarcadero Center
11th Floor
San Francisco, CA  94111
+1 415 576 3000

                                    1

CASE NO 07-5944-SC                    DEFENDANT TUS's REPLY MEMORANDUM IN SUPPORT OF ITS
                                      MOTION TO DISMISS DP-CAC AND IP-CAC

1

2

## <u>TABLE OF CONTENTS</u>

3

4

<u>Page</u>

5

6

I.      INTRODUCTION ................................................................................. 1

7

II.     PROCEDURAL HISTORY.................................................................... 2

8

III.    PLAINTIFFS DO NOT ADEQUATELY ALLEGE TUS'S PARTICIPATION IN
        THE CONSPIRACY. ........................................................................... 2

9

10

IV.     DIRECT PURCHASER PLAINTIFFS DO NOT SATISFY THE CONTROL
        EXCEPTION TO *ILLINOIS BRICK*. .................................................... 8

11

        A.      The Control Exception to *Illinois Brick* and *Royal Printing* Do Not Set Forth
                An Affirmative Defense Theory of Liability Against TUS. ........................................ 9

12

        B.      Plaintiffs' Reliance on *Royal Printing* Is Misplaced. .................................................. 9

13

14

V.      THE COURT SHOULD RESOLVE FACTUAL ISSUES ON TUS'S RULE 12(B)(1)
        MOTION TO DISMISS. ....................................................................... 13

15

VI.     CONCLUSION.................................................................................... 15

16

17

18

19

20

21

22

23

24

25

26

27

28

Baker & McKenzie LLP
Two Embarcadero Center
11th Floor
San Francisco, CA  94111
+1 415 576 3000

i

1

## <u>TABLE OF AUTHORITIES</u>

2

3
<u>Page</u>

*American Trading & Prod. Corp. v. Fischbach & Moore, Inc.,*
   311 F. Supp. 412 (N.D. Ill. 1970) ...................................................................................6

*Ameritec Corp. v. Ameritech Corp.,*
   230 U.S.P.Q. (BNA) 225, 1986 U.S. Dist. LEXIS 26195 (C.D. Cal. May 6, 1986) .............5, 6

*Aschroft v. Iqbal,*
   129 S. Ct. 1937 (2009) ...................................................................................................5

*Aspen Title & Escrow, Inc. v. Jeld-wen, Inc.,*
   677 F. Supp. 1477 (D. Or. 1987) ...................................................................................8

*Coleman v. Corning Glass Works,*
   619 F. Supp. 950 (W.D.N.Y. 1985) ...............................................................................6

*Copperweld Corp. v. Independence Tube Corp.,*
   467 U.S. 752 (1984)...................................................................................................7, 8

*Delaware Valley Surgical Supply, Inc. v. Niagara Falls Memorial Medical Center,*
   523 F.2d 1116 (9th Cir. 2008) .....................................................................................10

*Fletcher v. Atex, Inc.,*
   68 F.3d 1451 (2d Cir. 1995).............................................................................................6

*Freeman v. San Diego Ass'n of Realtors,*
   322 F.3d 1133 (9th Cir. 2003) ........................................................................................8

*Illinois Brick Co. v. Illinois,*
   431 U.S. 720 (1977)............................................................................................... passim

*In re Air Cargo Shipping Servs. Antitrust Litig.,*
   No. MD 06-1775, 2008 WL 5958061 (E.D.N.Y. Sept. 26, 2008)............................................3

*In re ATM Fee Antitrust Litig.,*
   No. 04-02676, slip op. (N.D. Cal. Sept. 4, 2009) .............................................................5

*In re Cal. Title Ins. Antitrust Litig.,*
   2009 U.S. Dist. LEXIS 43323 (N.D. Cal. May 21, 2009) ...................................................1, 5

*In re Ditropan XL Antitrust Litigation,*
   2007 U.S. Dist. LEXIS 78423 (N.D. Cal. 2007) ...........................................................2, 11

*In re TFT-LCD Antitrust Litig.,*
   599 F. Supp. 2d ...................................................................................................4, 5

i

Baker & McKenzie LLP
Two Embarcadero Center
11th Floor
San Francisco, CA 94111
+1 415 576 3000

CASE NO 07-5944-SC

DEFENDANT TUS's REPLY MEMORANDUM IN SUPPORT OF ITS
MOTION TO DISMISS DP-CAC AND IP-CAC

*Kansas v. Utilicorp United, Inc.*,
    497 U.S. 199 (1990)........................................................................................................11

*Kendall v. VISA U.S.A., Inc.*,
    518 F.2d 1042 (9th Cir. 2008) ......................................................................................10

*Merrill Lynch Inv. Managers v. Optibase, Ltd.*,
    337 F.3d 125 (2d Cir. 2002).........................................................................................6, 7

*Petrol. Co. (Nigeria), Ltd. v. Ashland Oil Co.*,
    456 F. Supp. 831 (D. Del. 1978).......................................................................................6

*Royal Printing v. Kimberly-Clark Corp.*,
    621 F.2d 323 (9th Cir. 1980) ................................................................................. passim

*Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.*,
    608 F. Supp. 2d 1166 (N.D. Cal. 2009) ...............................................................12, 13, 15

*Thornhill Publ'n Co. v. General Tel. & Elecs. Corp.*,
    594 F.2d 730 (9th Cir. 1979) ...................................................................................14, 15

## I.  INTRODUCTION[1]

Both the direct-purchaser and the indirect-purchaser plaintiffs have failed to state a claim against Tatung Company of American ("TUS") upon which relief can be granted.  While not every allegation in the complaints has to name each and every defendant, the threshold issue of whether each defendant joined the conspiracy does have to be alleged specifically as to each one of them.  *In re Cal. Title Ins. Antitrust Litig.*, 2009 U.S. Dist. LEXIS 43323, at *28 (N.D. Cal. May 21, 2009) ("Plaintiffs attempt to show the Parent Corporations directly participated in the conspiracy by making general allegations as to the families of the title insurance companies, without any specific allegations as to what the Parent Corporations did.  Those allegations are insufficient to put the Parent Corporations on notice of the claims asserted against them.").  Here, each of plaintiffs' theories for TUS's supposed participation in the alleged conspiracy falls flat.

TUS's simple sale and distribution of CRT products is insufficient to make it a participant in an antitrust conspiracy.  Likewise, allegations that it was represented at conspiratorial meetings and made party to anti-competitive agreements *in absentia* fails to meet the minimum pleadings standards under *Twombly*.  That Chunghwa Picture Tubes, Ltd. ("CPT ") is alleged to have attended these conspiratorial meetings does not cure this deficiency as the complaints fail to allege that CPT or any other entity or individual acted as TUS's agent at these meetings.  Finally, attempting to link TUS to the alleged conspiracy through a corporate family/single entity argument fails as well.  CPT and TUS are not linked in their organization, operation or finances (nor are they alleged to be) to warrant treating them as a single entity to extend the alleged conduct of CPT to TUS.

Further, based on plaintiffs' allegations and the undisputed facts, the direct-purchaser plaintiffs' claim against TUS is barred under the rule in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728-29 (1977), which precludes indirect purchasers from suing for damages under the federal

---

[1] Defendants' Joint Reply Brief in Support of Their Joint Motions to Dismiss Direct and Indirect Purchaser Plaintiffs' Consolidated Amended Complaints (the "Joint Replies"), which TUS has joined and hereby incorporates by reference, set forth the numerous grounds as to why both complaints should be dismissed against *all* of the Defendants despite the arguments advanced in plaintiffs' opposition briefs.  This separate motion is directed to the failure of the complaints to allege facts sufficient to state a claim for relief specifically with respect to TUS.

Baker & McKenzie LLP
Two Embarcadero Center
11th Floor
San Francisco, CA  94111
+1 415 576 3000

DEFENDANT TUS's REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS DP-CAC AND IP-CAC

antitrust laws.  TUS is not a CRT manufacturer but a purchaser of CRTs.  As a purchaser of CRTs, TUS did not purchase CRTs only from CPT, but from many different manufacturers.  Accordingly, since TUS was itself a direct purchaser (and at times even an indirect purchaser) of CRTs and finished products containing CRTs, then those customers that purchased products from TUS are indirect purchasers, who are barred under *Illinois Brick* from suing TUS or any other entity for damages based on purchases of CRTs and CRT finished products from TUS.  Finally, even if *Illinois Brick* does not apply to bar the actions of those purchasers that purchased from TUS, *Illinois Brick* nevertheless does not provide an affirmative theory or basis of liability against TUS.

For these reasons, and those stated in its motion and supporting memorandum, this Court should grant TUS's motion to dismiss the direct-purchaser plaintiffs' consolidated amended complaint and the indirect-purchaser plaintiffs' consolidated amended complaint.

## II.  PROCEDURAL HISTORY

In its opening brief, in its Rule 12(b)(1) argument under *Illinois Brick*, TUS not only attacked plaintiffs' allegations facially but also with affidavits.  It is well-settled that a challenge to subject matter jurisdiction under Rule 12(b)(1) can be made not only by facially attacking plaintiffs' allegations, but also by submitting evidence outside of the complaint allegations.  *In re Ditropan XL Antitrust Litigation*, 2007 U.S. Dist. LEXIS 78423, *5-7 (N.D. Cal. 2007).  Here, TUS did both, submitting the declarations of Michael Lai and Edward Chen.

However, plaintiffs did not seek to take the depositions of Messrs. Lai and Chen, nor to take any other discovery relating to the evidence submitted by TUS.  Thus, the evidence presented by TUS is uncontroverted and the Court must take that evidence as true.

## III.  PLAINTIFFS DO NOT ADEQUATELY ALLEGE TUS'S PARTICIPATION IN THE CONSPIRACY.

Merely alleging that TUS sold CRT finished products (DP-CAC ¶¶ 69, 169; IP-CAC ¶¶ 95, 174) is wholly inadequate to state a Sherman Act § 1 claim against TUS.  Plaintiffs themselves would fall into this category.  Other than participating in the CRT market by selling CRT products, the only other conspiracy allegation advanced against TUS is contained in the IP-CAC:  that TUS

was represented at conspiratorial meetings and was a party to agreements entered into at meetings where it was not present (IP-CAC ¶ 174). Neither complaint alleges that TUS actually attended any conspiratorial meeting, or that TUS authorized any other entity or individual to represent it at these meetings[2] or enter into agreements on its behalf, nor do they allege any other act (other than selling the price-fixed product) whereby TUS joined the conspiracy. Alone, these allegations are insufficient to render TUS liable for antitrust conspiracy. *See, In re Air Cargo Shipping Servs. Antitrust Litig.*, No. MD 06-1775, 2008 WL 5958061, *4, *7 (E.D.N.Y. Sept. 26, 2008) (plaintiffs' complaint was insufficient where it alleged merely that meetings were entered into by defendants' representative in various countries). Identifying this deficiency in their pleadings, plaintiffs urge in their opposition memoranda that TUS should be liable, nonetheless, because it is vertically integrated with CPT and because it is part of the same corporate family as CPT. However, these theories also fail to make TUS a participant in the alleged conspiracy.

## A. The Allegations Do Not Plausibly Suggest that CPT and TUS Are Vertically Integrated, and the Undisputed Facts Demonstrate that They Are Not.

Contrary to plaintiffs' assertions in their opposition memoranda, they do not allege in their complaints that CPT and TUS are vertically integrated entities. (DPP Opp. Memo 66, IPP Opp. Memo 18).[3] Even if this Court were to consider plaintiffs' vertical integration theory as argument, and not allegations, the argument should fail because the undisputed facts do not support it. The facts in this case are (a) that Tatung Taiwan ("TT") owns only 50 percent of TUS; (b) that TT does not exert any financial, operational or other control over TUS; (c) that TT owns only 30 percent of CPT; and (d) most importantly, that CPT, the alleged conspirator manufacturer has, no ownership in TUS and exerts no financial, operational or other control over TUS. Also, TT has only two members on the TUS Board out of a total of 6 members, and no officer of TT has been or is an officer of TUS.

More importantly, neither the descendants of T.S. Lin, nor any members or branch of the

---

[2] The IP-CAC does not assert who represented TUS at these meetings. The preceding paragraph discusses CPT's participation in conspiratorial meetings but the paragraph discussing TUS does not state that CPT represented TUS. The failure to make such a basic allegation is fatal to plaintiffs' claim.

[3] This statement appears for the first time in their memoranda and, as such, is not properly before this Court for consideration. *See Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.").

T.S. Lin family, control TT.  T.S. Lin's family members, the family that plaintiffs argue controls TUS, hold only 4.7 percent of TT's shares.  (*Request for Judicial Notice,* Ex. A at 31).[4]  In addition, several investment funds hold significant shareholdings in TT.  Finally, TT, like any public company, is owned by all of its shareholders and is governed by a duly-elected Board of Directors.  Thus, the naked assertion that the family of T.S. Lin controls TT must be rejected.  Finally, TT's Chairman has been CPT's Chairman only since March 30, 2007, after the period of the alleged conspiracy.  Therefore, since the T.S. Lin family is plaintiffs' only link to TT's alleged control of TUS, plaintiffs' control argument with respect to TUS must fail.

Likewise, the family of T.S. Lin's second wife does not control CPT.[5]  They are not in the top ten of CPT's shareholders.  (*Request for Judicial Notice,* Ex. B at 27).  Indeed, CPT, like any public company, is owned by all of its shareholders and is governed by a duty-elected Board of Directors.  Once again, to the extent that the T.S. Lin family is central to plaintiffs' arguments of control and single enterprise, plaintiffs' argument must fail.

Faced with these facts, plaintiffs' conclusory allegations of corporate sameness between TUS and CPT do not pass muster.  Even in cases where the parties were parent and subsidiary, which CPT and TUS are not, bare assertions of corporate sameness have been rejected.[6]  In this case, this Court should reject plaintiffs' similar bare assertions.

In arguing that their corporate family allegations are proper, plaintiffs mistakenly rely on *In re TFT-LCD Antitrust Litig.*, 599 F. Supp. 2d at 1184-85.  That decision is incorrect under *Iqbal* and

---

[4] TUS submitted a list of TT's shareholders from its Annual Report with this Court and has requested that it take judicial notice of this submission.

[5] There are two separate and distinct families, from the founder's two wives, connected to TT and CPT, respectively. (Lai Dep. at 29-30, Ex. A to Decl. of Patrick J. Ahern).

[6] *See MM Ariz. Holdings LLC v. Bonnano*, 2008 U.S. Dist. LEXIS 101540 (S.D.N.Y. Dec. 10, 2008) ("They fail to allege any facts tending to show why the normal presumption of corporate separateness between a parent and its subsidiary should not be respected. All they allege is that plaintiff is a subsidiary of Lehman. Even before *Bell Atlantic v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929(2007), that was far from enough to warrant piercing the corporate veil."); *Mastafa v. Australian Wheat Bd. Ltd.*, 2008 U.S. Dist. LEXIS 73305, 20-21 (S.D.N.Y. Sept. 25, 2008) ("The complaint ascribes conduct generally to "Defendants" and to "AWB," which it defines to include both the Australian parent and the U.S. subsidiary….But such general allegations of AWB USA's role in the alleged acts are insufficient under *Twombly*. There is no indication that, in fact, any of the relevant conduct by the AWB entities was undertaken by the New York subsidiary rather than the Australian parent.").

4

*Twombly*;[7] lumping two separate entities into one does not meet the requirement of pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Aschroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (emphasis added).  Indeed, later decisions have wholly rejected that approach.  As explained two months after *TFT-LCD* was decided: "Plaintiffs attempt to show the Parent Corporations directly participated in the conspiracy by making general allegations as to the families of the title insurance companies, without any specific allegations as to what the Parent Corporations did.  Those allegations are insufficient to put the Parent Corporations on notice of the claims asserted against them." *In re Cal. Title Ins. Antitrust Litig.*, 2009 U.S. Dist. LEXIS 43323, at *28.  More recently, Judge Breyer dismissed a complaint as to a set of corporate parent defendants when the complaint "merely lump[ed] together allegations against the holding company and its subsidiary," e.g., a parent and subsidiary collectively referred to as "Bank of America," because there were "no allegations in the complaint that tie the holding companies to the alleged conspiracy."  *In re ATM Fee Antitrust Litig.*, No. 04-02676, slip op. at 25 (N.D. Cal. Sept. 4, 2009).  As such the *TFT-LCD* decision does not relieve plaintiffs of the duty to allege how TUS joined the alleged conspiracy beyond having some corporate affiliation to another defendant for which specific anti-competitive conduct has been alleged.

In spite of the above, plaintiffs claim that TUS should be party to their lawsuit because TUS "admits" that it is vertically integrated with CPT through certain marketing documents.  (DPP Opp. Memo 71; IPP Opp. Memo. 43 n. 50.)  Plaintiffs base this claim on ambiguous statements—culled from tens of thousands of documents released during discovery in the LCD case – describing TUS as a TT "subsidiary" or as a CPT "sister" or that suggested to "potential customers" that the three companies were part of an "integrated" family. (DPP Opp. Memo 70-72; IPP Opp. Memo. 43 n. 50.)

However, such statements do not dissolve the corporate form or otherwise bring TUS properly within plaintiffs' lawsuit.  *See Ameritec Corp. v. Ameritech Corp.*, 230 U.S.P.Q. (BNA) 225, 1986 U.S. Dist. LEXIS 26195, *8 (C.D. Cal. May 6, 1986).  In *Ameritec*, the court granted a motion to dismiss for lack of personal jurisdiction despite advertisements and publications referring

---

[7] TUS intends to file a motion for reconsideration of the *TFT-LCD* motion to dismiss decision.

to the "Ameritech Family of Companies" and the subsidiary's advertisements using the pronoun "we" in reference to regional branches. *Id.*  As the court explained, "[d]espite suggestive advertisements which could be inferred to imply that the moving defendants are a unitary business, if the operations of the corporations are kept distinct and separate, the court may decline jurisdiction over the matter." *Id.* at *11.  The court rejected plaintiffs' alter ego theory, as it failed to show "that the corporate entities [were] set up with fraudulent intent or in bad faith." *Id.* at *14.

Likewise, numerous courts have consistently recognized that loose language similar to that quoted by plaintiffs does not support piercing the corporate veil.  In *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1460 (2d Cir. 1995), the court affirmed the district court's rejection of the plaintiff's argument, based on statements of corporate identity, that the veil should be pierced.  The subsidiary had "frequently" used the parent's logo on its paperwork and packaging and had described itself as a business unit or division of the parent in promotional literature; for its part, the parent had, in its annual reports, characterized the subsidiary as a subsidiary. *Id.*   Like several other courts, the court reasoned that corporate promotion through a family identity is merely a form of puffery that in no way blurs the reality of corporate distinctiveness:

> Viewed in the light most favorable to the plaintiffs, these statements and the use of the [parent's] logo are not evidence that the two companies operated as a "single economic entity." *See Coleman v. Corning Glass Works*, 619 F. Supp. 950, 956 (W.D.N.Y. 1985) (upholding corporate form despite "loose language" in annual report about "merger" and parent's reference to subsidiary as a "division"), *aff'd*, 818 F.2d 874 (1987); *Japan [Petrol. Co. (Nigeria), Ltd. v. Ashland Oil Co.*, 456 F. Supp. 831, 846 (D. Del. 1978)] (noting that representations made by parent in its annual reports that subsidiary serves as an agent "may result from public relations motives or an attempt at simplification"); *American Trading & Prod. Corp. v. Fischbach & Moore, Inc.,* 311 F. Supp. 412, 416 (N.D. Ill. 1970) ("boastful" advertising and consideration of subsidiaries as "family" do not prove that corporate identities were ignored).

*Fletcher*, 68 F.3d at 1460-61.  Later, in *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 130 (2d Cir. 2002), the court rejected the plaintiff's contention that two subsidiaries of a common parent were agents of one another for the purposes of enforcing against both of them an arbitration agreement signed by only one.  Upholding an order of injunction issued by the district court, the court held that the subsidiaries were not mutual agents, even where one subsidiary had "market[ed] the services of the entire Merrill Lynch family of companies to clients; and … the Merrill Lynch

companies present[ed] to the public the image of a single, integrated firm." *Id.*[8]

The wayward examples cited by plaintiffs that allegedly convey that TUS, TT, and CPT were or considered themselves to be parts of an integrated family are no more egregious than the wide array of examples rejected in the cases cited above.  Even if true and admissible, the isolated use of the family of companies in advertising cannot justify disregarding the corporate form for the purposes of continuing to keep TUS in this lawsuit.  Neither TUS, TT, nor CPT has ever denied TUS's existence as a separately incorporated entity, and plaintiffs have not alleged an intermingling of corporate funds or a failure to adhere to corporate formalities.  Therefore, even if the Court considers the stray statements contained in marketing materials set forth by plaintiffs, these statements, as a matter of law, are insufficient to provide the basis for a claim against TUS.

### B.   Plaintiffs' Reliance on *Copperweld* Is Misplaced.

Alternatively, plaintiffs argue that TUS and CPT are a single entity and, thus, specific allegations as to TUS are unnecessary in light of the CPT allegations.  (DPP Opp. Memo 61, n. 2; IPP Opp. Memo. 48 n. 60.), relying on *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 772 n.18 (1984), and quoting that case for the proposition "that the ultimate interests of the subsidiary and the parent are identical, so the parent and the subsidiary must be viewed as a single economic unit."  However, plaintiffs' citation to and reliance on *Copperweld* is based on a reading of

---

[8] Numerous U.S. district courts have refused to pierce the veil based on conditions like those advanced here by the plaintiffs.  *See, e.g.*, *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, (S.D.N.Y. 2005) (declining to deem related entities alter egos despite marketing materials indicating a "close relationship" and the existence of "overlapping executives," as complaint did not indicate an intermingling of funds or a failure to adhere to corporate formalities); *In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp.2d 152, 170 (D. Mass. 2002) (web page suggesting that KPMG International marketed itself as a single entity could not support its being held vicariously liable for acts of KPMG UK based on apparent authority); *Total Comms. Svcs., Inc. v. Seiscor Technols., Inc.*, 1990 U.S. Dist. LEXIS 13337, *15-16 (N.D. Ill. Oct. 9, 1990) (subsidiary's use of parent Raytheon's logo and motto "A Raytheon company" and statement by Raytheon chairman that such use was required and intended to convey "a unity of purpose and quality of business integrity that are unexcelled" could not support piercing); *In re Acushnet River & New Bedford Harbor*, 675 F. Supp. 22, 34-35 (D. Mass. 1987), *rev'd in part on other grounds*, *Lumbermens Mut. Cas. Co. v. Belleville Indus.*, 938 F.2d 1423, 1991 U.S. App. LEXIS 15258, 33 Env't Rep. Cas. (BNA) 1536, 22 Envt'l. L. Rep. 20101 (1st Cir. Mass. 1991) ("The practice of identifying a subsidiary's products with the name of the parent is a frequently used marketing strategy which, given the understandings of the marketplace, does not imply a disrespect for separateness."); *Wiedemann v. Cunard Line, Ltd.*, 380 N.E.2d 932, 938-39 (App. Ct. Ill. 1978) ("[U]se of the name 'Cunard' by not only defendant Cunard Line Ltd. but also by other subsidiaries of the parent company for advertising purposes, while it might lead to confusion in the minds of the public as noted by the trial court, does not make Cunard liable for the torts of the other subsidiary").

that case taken completely out of context.  That case held that parent and subsidiary corporations are to be considered a single collective entity for purposes of conspiracy liability under Section 1 of the Sherman Act, and cannot be found liable for conspiracy with each other under the Act.  The doctrine expressly deals with the question whether a parent and a wholly-owned subsidiary corporation may be charged with conspiring with each other, and not, as is the case here, with whether those two entities may be treated as a single entity for purposes of vicarious liability.  Nor has any other case relied on by plaintiff so extended the single entity doctrine announced in *Copperweld*.  Even if *Copperweld* applied here, courts have required significantly more than 50 percent ownership for companies to be covered by the *Copperweld* doctrine.  *See, e.g.*, *Aspen Title & Escrow, Inc. v. Jeld-wen, Inc.*, 677 F. Supp. 1477, 1486 (D. Or. 1987) ("only corporations which are owned 100 percent in common, or a *de minimis* amount less than 100 percent, are covered by the *Copperweld* rule").[9]

Plaintiffs' reliance on *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003), is also misplaced because it reaches a result contrary to plaintiffs' contention here.  There, the court rejected the contention that the defendants were a single enterprise based on the finding that, among other things, they were not a single economic unit, did not share in profits and losses and could potentially be competitors.  *Freeman* illustrates how difficult it is for entities to be treated as a single firm under the antitrust laws, precisely because such a finding operates as a grant of immunity.  Plaintiffs here have not alleged even a portion of the facts alleged in *Freeman* to attempt to establish that the defendants operated as a single entity.  If the attempt failed in *Freeman*, it must also fail here.  TUS and CPT do not share profits or losses or share a common business strategy, as illustrated above.  Therefore, they cannot be deemed a single entity.

## IV.   DIRECT PURCHASER PLAINTIFFS DO NOT SATISFY THE CONTROL EXCEPTION TO *ILLINOIS BRICK*.

Plaintiffs cannot state a claim against TUS under the control exception to *Illinois Brick Co. v.*

---

[9] *Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*, 201 F. Supp. 236 (S.D.N.Y. 2002) (finding that two companies owned 62 percent and 75 percent by the same individual were capable of conspiring because the companies dealt with each other at arm's length, one was not aware that the same individual controlled both, and individual did not actually use his ownership interest to exercise control over one of the companies).

*Illinois*, 431 U.S. 720 (1977), or under *Royal Printing v. Kimberly-Clark Corp.*, 621 F.2d 323 (9th Cir. 1980), because neither represents an affirmative theory of liability against middleman TUS. Instead, at best, the control exception to *Illinois Brick* – if established – and the decision in *Royal Printing* merely provide that the purchasers from TUS can bring an action against the manufacturer(s) of CRTs.  Absent any allegations that TUS knew of and participated in the alleged conspiracy, plaintiffs cannot state a claim against TUS.

### A.   The Control Exception to *Illinois Brick* and *Royal Printing* Do Not Set Forth An Affirmative Defense Theory of Liability Against TUS.

The control exception to *Illinois Brick* and *Royal Printing* do not set forth an affirmative theory of liability pursuant to which a middleman can be sued for claims arising out of an alleged antitrust conspiracy.  They only provide that purchasers from the middleman can bring an action against the alleged conspirator manufacturers.  It is undisputed that TUS is not and has never been a manufacturer of CRTs.  Viewed in this proper light, neither the control exception in *Illinois Brick* nor *Royal Printing* support a claim against TUS.

The facts in *Royal Printing* support the contention that it does not provide that the middleman can be sued for claims arising out of an antitrust conspiracy.  In that case, only the manufacturers alleged to have conspired were sued, and plaintiffs were seeking to recover for their purchases from the wholesaling divisions or wholly-owned subsidiaries of those manufacturers. *Royal Printing*, 621 F.2d at 324.  The plaintiffs were not, however, seeking to recover from the middlemen themselves – the wholesaling divisions and the wholly-owned subsidiaries – only from the alleged conspirator manufacturers.

### B.   Plaintiffs' Reliance on *Royal Printing* Is Misplaced.

Against such a compelling case for the application of *Illinois Brick* set forth in TUS's opening brief, plaintiffs rely on an overly broad and analytically incorrect interpretation of *Royal Printing*.  The control exception and *Royal Printing*, properly read, are limited to situations in which the subsidiary is wholly owned or controlled by the alleged conspirator parent, much less a separate corporate entity here, CPT, which has no shareholding in TUS, and is not wholly owned by TT.

9

Thus, *Royal Printing* does not apply to allow plaintiffs' claim against TUS here.

Moreover, the actual facts of *Royal Printing* do not support plaintiffs' expansive interpretation and stretched application here. In *Royal Printing*, the Ninth Circuit was presented only with a situation involving a wholly owned subsidiary of an alleged conspirator parent. Thus, the Court stated: "The manufacturers sell their paper products at the wholesale level through their wholesaling divisions or wholly-owned subsidiaries, as well as through independent wholesalers." 621 F.2d at 324. Therefore, any attempt to read *Royal Printing* as applying to subsidiaries that are not wholly-owned or controlled is outside the facts of that case.

In addition, this limitation makes sense because, if a subsidiary is not wholly-owned and not even majority-owned, as TUS is here in relation to TT (and certainly in relation to CPT), there can be no presumption that the parent controls the decision as to whether the subsidiary will sue the parent or otherwise make a claim arising out of its purchases from the parent and the other alleged conspirators. In addition, the Supreme Court has said that two exceptions to *Illinois Brick* – the control exception and the cost-plus exception – must be narrowly construed. In addition, the Supreme Court, in the language that gave birth to the control exception, referred to a situation "where the direct purchaser is owned or controlled by its customer." 431 U.S. at 321 n.16. Therefore, it is consistent with the interpretation and application of the control exception to apply it only to subsidiaries wholly-owned or controlled by the alleged conspirator parent. Consistent with this interpretation, the control exception and *Royal Printing* do not apply to TUS here.

Moreover, this narrower interpretation of the control exception and *Royal Printing* is consistent with the decisions of the Ninth Circuit and other courts after *Royal Printing*. *See e.g., Delaware Valley Surgical Supply, Inc. v. Niagara Falls Memorial Medical Center*, 523 F.2d 1116, 1121 (9th Cir. 2008) (interpreting *Royal Printing* as barring purchases through "independent wholesalers that were not owned or controlled by any defendant"); *Kendall v. VISA U.S.A., Inc.*, 518 F.2d 1042, 1050 (9th Cir. 2008) (barring a claim under *Illinois Brick* where plaintiffs did not allege "any facts showing that the Consortiums have any direct control over the merchant discount fee"); *In re Ditropan XL Antitrust Litigation*, 2007 U.S. Dist. LEXIS 78423 (N.D. Cal. 2007) (referring to

10

*Royal Printing* as "applying the ownership or control exception to allow indirect purchaser's suit"). A narrow interpretation of the control exception is apt where, as here, not only did TUS purchase from companies other than its own alleged (in plaintiffs' contention) conspirator parent (CPT), but also did so based on arms-length transactions. (Chen Decl. ¶¶ 4-5). Such arms-length transactions are inconsistent with the type of control embodied in the control exception.

Second, contrary to plaintiffs' contention, *Royal Printing* does not create a new "likely not to sue" requirement. Indeed, not only is *Royal Printing* properly read as a control exception case, but also any expansive reading of *Royal Printing* to create a new exception is prohibited by the Supreme Court's admonition that the two exceptions to the indirect purchaser rule that the Court mentioned must be strictly and narrowed construed. *See Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 216-17 (1990); *see also In re Ditropan XL Antitrust Litig.*, 2007 U.S. Dist. LEXIS 78423, at *11 ("The Supreme Court … clarified that these exceptions should be read narrowly and not expanded").

Another difficulty with interpreting *Royal Printing* as creating a new "likely not to sue" exception is that there is simply no rationale under *Illinois Brick* for doing so. In fact, the rationale stated by the Supreme Court is distinctly different from any rationale underpinning a new "likely not to sue" exception. Its rationale related to the conspirator manufacturer's ability to set the direct purchaser middleman's prices, and thus avoid having to trace the illegal overcharge passed on. The rationale for the control exception was not stated by the Supreme Court to be whether or not the direct purchaser middleman would sue and, therefore, other more remote purchasers could sue because there was no threat of duplicative recovery.

Finally, the difficulty with any new "likely not to sue" exception is that a direct purchaser may have numerous reasons not to sue its suppliers, with none of them having anything to do with questions of control. Indeed, the Supreme Court even recognized, when it adopted the indirect purchaser rule, that some direct purchaser middlemen might not sue. *Illinois Brick*, 431 U.S. 736, n. 16 ("Another situation in which market forces have been superseded and the pass-on defense might be permitted is where the direct purchaser is owned or controlled by its customer."). Notwithstanding that possibility, the Supreme Court still adopted the bar against indirect purchasers.

So too, here, who can say whether TUS, which is not owned at all by CPT, deals with CPT and other suppliers in arms-length transactions, and is not wholly or majority-owned by TT, would or would not sue CPT and the other manufacturers.  It is this type of second-guessing about whether a direct purchaser middleman would sue that the Supreme Court has explicitly taken out of the equation, opting to deal with the situation in a more bright-line approach – if the direct purchaser middleman is controlled by the conspirator manufacturer, then the indirect purchaser rule does not apply.  Here, as shown above, the facts show that TUS was not controlled by CPT (or TT as well).

However, even if this Court should see fit to apply a "not likely to sue" exception to *Illinois Brick*, TUS has stated in a sworn statement by its CFO, Michael Lai, that it intends to submit a claim if the purported class is certified and if there is any recovery for the class. (Lai Reply Decl. ¶ 2.)  This intention is entirely consistent with TUS's position from the very beginning of this case that it is a direct purchaser (not a manufacturer) of CRTs and LCD products containing CRTs.  This stated sworn intention should suffice to bar plaintiffs' claim against TUS even under the most expansive reading of *Royal Printing*.  Indeed, Judge Hamilton so held recently in *Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.*, 608 F. Supp. 2d 1166 (N.D. Cal. 2009).  In that case, she held that, to the extent that middlemen retained and exercised their right to sue the alleged conspirator manufacturers, including submitting claim forms as part of the MDL class action, such conduct supported the application of *Illinois Brick*.  Thus, the court stated:

> It is worth noting, furthermore, that to the extent that the external manufacturers retain, and have exercised, their right to sue defendants, this further confirms that market forces have not been superseded in the traditional sense contemplated by the control exception, and that the policy reasons behind the Illinois Brick decision remain intact. Indeed, as defendants point out, at least two external manufacturers -- Celestica and Solectron -- have submitted direct purchaser claim forms as part of the direct purchaser MDL proceedings in the In re DRAM litigation before the court. See Moore Decl. Re EMs, Ex. 13 at 41-43; Exs. 17-19.

*Id.* at 1182.  Based on Mr. Lai's reply declaration, the same rationale and result as in *Sun Microsystems* should apply here.

Moreover, *Royal Printing* and the other cases cited by plaintiffs recognize that suits against intermediaries, like TUS is alleged to be, are barred because allowing them to proceed would

impermissibly heighten the risk of multiple recovery and thwart the policy rationale behind *Illinois Brick*.  The plaintiffs here, if at all entitled to sue as direct purchasers, would be in a position to recover the entire alleged overcharge by suing only the manufacturers, including CPT.  By giving Direct Plaintiffs the opportunity to sue the alleged "middleman" TUS, the risk of multiple recovery rises to an intolerable level under *Illinois Brick*.  *See Royal Printing*, 621 F. 3d at 327 n.8 ("The *Illinois Brick* Court considered and rejected the arguments that 'it is better for the defendant to pay sixfold or more damages than for an injured party to go uncompensated….".).  Thus, even if Direct Plaintiffs' allegations were deemed sufficient to treat CPT and TUS as a single entity (which they are not), *Illinois Brick* would still bar any claim against TUS because it would create an intolerable risk of multiple recoveries from TUS, on the one hand, and from the manufacturers, on the other hand, for the same purchases.  Unraveling these transactions to determine which ones should not be double and triple-counted are exactly the type of complexity and speculation that *Illinois Brick* forecloses.  431 U.S. at 730-71.

*Royal Printing* is also inapplicable to defendants, such as TUS, that manufacture and sell downstream finished products.  The question in *Royal Printing* was whether *Illinois Brick* barred plaintiffs' suit where they directly purchased the price-fixed product itself from a subsidiary of an alleged co-conspirator.  *Royal Printing*, therefore, has no relevance whatever to allegations here, where Plaintiffs do not allege that they directly purchased the allegedly price-fixed product (CRTs) itself but rather downstream finished products that incorporated the allegedly price-fixed component.

Because direct purchaser plaintiffs cannot satisfy the control exception to *Illinois Brick* with respect to TUS, their claims must be dismissed.

## V.    THE COURT SHOULD RESOLVE FACTUAL ISSUES ON TUS'S RULE 12(B)(1) MOTION TO DISMISS.

Finally, that plaintiffs have offered supposed evidence of control – their family argument and the marketing statements, neither of which, as seen above, are sufficient as a matter of law – does not automatically mean that plaintiffs are entitled to further discovery, as they contend, or that TUS's motion should be denied because there is a factual issue.  Even if plaintiffs' supposed

evidence does not fail as a matter of law to support an assertion of control, it is proper and appropriate for the Court to resolve factual issues on a motion to dismiss brought under Rule 12(b)(1). *See Thornhill Publ'n Co. v. General Tel. & Elecs. Corp.*, 594 F.2d 730 (9th Cir. 1979). Plaintiffs' assertion that CPT somehow controlled TUS through TT is impossible because TT itself did not and does not control TUS. In addition to the unrefuted evidence that neither TT nor CPT controlled TUS, which was presented in the depositions of Michael Lai and Edward Chen, the family that plaintiffs argue controls TUS does not control TT. This fact is the death knell for plaintiffs' control argument. TT is a public company and the family that plaintiffs argue controls TUS owns only 4.7 percent of TT. (*Request for Judicial Notice,* Ex. A at 31.) Therefore, plaintiffs' control argument must fail.

Moreover, even if plaintiffs present supposed evidence to refute TUS's facts – and TUS submits that none of the supposed facts submitted by plaintiffs are sufficient as a matter of law to justify the denial of TUS's motion – the Court can and should resolve any factual disputes between TUS's and plaintiffs' submissions, on TUS's 12(b)(1) motion. This is the instruction of the Ninth Circuit in *Thornhill*, while stated that a court may consider the evidence presented with respect to the jurisdictional issue, resolving factual disputes if necessary. 594 F.2d at 733. Thus, the Court stated:

> Where the jurisdictional issue is separable from the merits of the case, the judge may consider the evidence presented with respect to the jurisdictional issue and rule on that issue, resolving factual disputes if necessary.

*Id.* (citations omitted). The Court distinguished the standard for a Rule 12(b)(1) motion based on a factual attack from the standard for a Rule 56 motion for summary judgment:

> The standards applicable to a Rule 12(b)(1) speaking motion differ greatly from the standards for ruling on a motion for summary judgment. Faced with a factual attack on subject matter jurisdiction, "the trial court may proceed as it never could under Rule 12(b)(6) or Fed. R. Civ. P. 56. … No presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist."

*Id.* (citation omitted). Since the jurisdictional issue raised here is not intertwined with the merits, the court may resolve any factual dispute. Indeed, lack of standing under *Illinois Brick* is not intertwined with the merits of plaintiffs' claim because there is no part of the consideration of

14

*Illinois Brick*'s application that impacts an element that plaintiffs need to prove in order to prove their claim under Section 1 of the Sherman Act.

On this point, the recent decision in *Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.*, 608 F.Supp. 2d 1166 (N.D. Cal. 2009), is instructive.  In that case, Judge Hamilton held that, under *Thornhill*, the proper standard to be applied to the Rule 12(b)(1) motion before her was not the Rule 56 standard, but rather the Rule 12(b)(1) standard that allowed her to make factual findings.  In so holding, she noted that the issue raised by the Rule 12(b)(1) motion was not so enmeshed with the substantive issues of plaintiffs' Section 1 Sherman Act claim.  Thus, she wrote:

> [A]s applied here, *Thornhill* is best read as suggesting that the 12(b)(1) standard, rather than a Rule 56 standard, is appropriate.  The jurisdictional issues in the case – while factual in nature – do not appear to be so "enmeshed" with the substantive issues of plaintiff's Sherman Act claim such as to require Rule 56 treatment.  As the *Thornhill* court contemplated, the jurisdictional issue in Sun's Sherman Act and Cartwright Act claims (insofar as the foreign purchase based claims are concerned) is whether defendants' conduct had a sufficient relationship with the domestic effects of that conduct and plaintiff's injury, so as to be subject to regulations under the FTAIA.  The substantive issues of plaintiff's claims, however, are whether defendants participated in anti-competitive conduct by conspiring to fix prices.  Since the two issues are distinct, analysis pursuant to 12(b)(1) standards is appropriate.  Accordingly, the court shall consider the factual evidence presented and resolve factual disputes as necessary to determine the existence of jurisdiction as a matter of law.

*Id.* at 1185.  Based on *Thornhill* and *Sun Microsystems*, this Court should, if necessary, make factual findings that TUS was not controlled by CPT at all and in any event not to the extent necessary to establish either a single enterprise or the control exception to *Illinois Brick.*

## VI.    CONCLUSION

For the reasons stated above and in TUS's motion to dismiss and supporting memorandum, the direct-purchaser plaintiffs' claim against TUS should be dismissed because this Court lacks subject matter jurisdiction over plaintiffs' claim against TUS in this action, or, alternatively, because the complaint fails to state a claim upon which relief can be granted.  The indirect-purchaser plaintiffs' claim with respect to TUS should be dismissed because the complaint fails to state a claim upon which relief can be granted.

1

2  Dated:   September 24, 2009

3

4

5

6  Bruce H. Jackson (State Bar No. 98118)
     (bruce.h.jackson@bakernet.com)
7  Robert W. Tarun (State Bar No. 64881)
     (robert.w.tarun@bakernet.com)
8  **BAKER & MCKENZIE LLP**
   Two Embarcadero Center, 11th Floor
9  San Francisco, CA  94111-3802
   Telephone: +1 415 576 3000
10 Facsimile:   +1 415 576 3099

11

   Of Counsel:
12

   Patrick J. Ahern
13   (patrick.j.ahern@bakernet.com)
   Roxane C. Busey
14   (roxane.c.busey@bakernet.com)
   Karen Sewell
15   (karen.sewell@bakernet.com)
   **BAKER & MCKENZIE LLP**
16 One Prudential Plaza
   130 East Randolph Drive
17 Chicago, IL  60601
   Telephone: +1 312 861 8000
18 Facsimile:  +1 312 861 2899

19 Attorneys for Defendant
   TATUNG COMPANY OF AMERICA

20

21

22

23

24

25

26

27

28

BAKER & McKENZIE LLP

By:   __/s/ Patrick J. Ahern_____
        Patrick J. Ahern
        Attorneys for Defendant
        TATUNG COMPANY OF AMERICA

1

2

**CERTIFICATE OF SERVICE**

3

The undersigned counsel hereby certifies that a true and correct copy of the foregoing

4
document was served upon the parties and counsel of record, through the Court's ECF system, on
September 24, 2009.

5

6

_/s/ Patrick J. Ahern_____

7
Patrick J. Ahern

8
One of the Attorneys for Defendant
Tatung Company of America

9
CHIDMS1/2732639.2

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Baker & McKenzie LLP
Two Embarcadero Center
11th Floor
San Francisco, CA  94111
+1 415 576 3000

CASE NO 07-5944-SC

DEFENDANT TUS's REPLY MEMORANDUM IN SUPPORT OF ITS
MOTION TO DISMISS DP-CAC AND IP-CAC