# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: POTASH ANTITRUST LITIGATION | ) ) ) ) ) ) ) | No. 08 C 6910<br><br>MDL No. 1996<br><br>Judge Ruben Castillo |

## MEMORANDUM OPINION AND ORDER

This Multi-District Litigation ("MDL") consists of two class actions. In the first action,

Gage's Fertilizer & Grain, Inc., Kraft Chemical Company, Minn-Chem, Inc., Shannon D. Flinn,

Thomasville Feed & Seed, Inc., and Westside Forestry Services, Inc. (collectively, the "Direct

Purchaser Plaintiffs") bring suit on behalf of themselves and all others who purchased potash

products in the United States directly from Potash Corporation of Saskatchewan Inc. and PCS

Sales (USA), Inc. ("PCS"),[1] Mosaic Company and Mosaic Crop Nutrition LLC ("Mosaic"),[2]

---

[1] Potash Corporation of Saskatchewan Inc. is a Canadian corporation and the world's largest producer of potash. (R. 50, Indirect Purchasers' Am. Consolidated Class Action Compl. ("Indirect Compl.") ¶ 10.) PCS Sales (USA), Inc., a Delaware corporation with its headquarters in Northbrook, Illinois, is a wholly owned subsidiary of Potash Corporation of Saskatchewan Inc. and executes potash marketing on its behalf within the United States. (*Id.* ¶ 11.)

[2] Mosaic Company, is a Delaware corporation. (*Id.* ¶ 13.) The Direct Complaint alleges that it is the world's third largest potash producer, while the Indirect Complaint alleges that it is the second largest producer by capacity. (*Id.*; R. 142, Am. Direct Purchaser Consolidated Class Action Compl. ("Am. Direct Compl.") ¶ 18.) Mosaic Crop Nutrition LLC is a wholly-owned subsidiary of Mosaic Company that markets, sells, and distributes potash throughout the United States. (R. 50, Indirect Compl. ¶ 14.)

Agrium Inc. and Agrium U.S. Inc. ("Agrium"),[3] JSC Uralkali ("Uralkali"),[4] RUE PA Belaruskali

("Belaruskali"),[5] JSC Silvinit ("Silvinit"),[6] JSC Belarusian Potash Company and BPC Chicago

LLC ("BPC Chicago") (collectively, "BPC"),[7] and JSC International Potash Company ("IPC")[8]

(collectively, "Defendants").  (R. 142, Am. Direct Compl.)  In the second action, Kevin Gillespie

("Gillespie"), Gordon Tillman ("Tillman"), Feyh Farms Company ("Feyh Farms"), William H.

Coaker, Jr. ("Coaker"), and David Baier ("Baier") (collectively, the "Indirect Purchaser

Plaintiffs") bring suit on behalf of themselves and all others who purchased potash products in

the United States indirectly from Defendants.[9]  (R. 50, Indirect Compl.)  Both the Direct

---

[3] Agrium Inc. is a Canadian corporation and Agrium U.S. Inc. is its wholly owned subsidiary headquartered in Denver, Colorado. (*Id.* ¶¶ 16, 17.)

[4] Uralkali, a Russian venture with its headquarters in Moscow, Russia, is the fifth largest potash producer in the world. (*Id.* ¶ 19.) Since April 2005, Uralkali has owned a half interest in the JSC Belarusian Potash Company, through which it markets, sells, and distributes potash. (*Id.*)

[5] Belaruskali is a business entity organized under the laws of Belarus with its headquarters in Soigorsk, Republic of Belarus. (*Id.* ¶ 20.) Since April 2005, Belaruskali has owned a half interest in the JSC Belarusian Potash Company, through which it markets, sells, and distributes potash. (*Id.*)

[6] Silvinit is a Russian joint stock company with its headquarters in Solikamsk, Russia, that marketed, sold, and distributed potash throughout the United States. (*Id.* ¶ 21.)

[7] JSC Belarusian Potash Company is a joint venture between Uralkali and Belaruskali headquartered in Minsk, Belarus and BPC Chicago is its wholly operated subsidiary. (*Id.* ¶¶ 22, 23.) BPC is the exclusive worldwide distributor of potash produced by Uralkali and Belaruskali. (*Id.* ¶ 22.)

[8] IPC is a Russian joint stock company headquartered in Moscow, Russia, and the exclusive distributor of potash produced by Silvinit. (*Id.* ¶ 25.)

[9] Feyh Farms is a citizen of Kansas; Gillespie a citizen of Michigan; Tillman, a citizen of Florida; Coaker, a citizen of Mississippi; and Baier a citizen of Iowa. (R. 50, Indirect Compl. ¶ 9.)

Purchaser Plaintiffs and the Indirect Purchaser Plaintiffs (collectively, "Plaintiffs") allege that

Defendants conspired to fix the price of potash in violation of the Sherman Antitrust Act

("Sherman Act"), 15 U.S.C. § 1, and various state laws. (R. 142, Am. Direct Compl.; R. 50,

Indirect Compl.)

Currently before the Court are eight motions to dismiss the Direct and Indirect

Complaints.  (R. 104, BPC Chicago's Mot. to Dismiss the Direct Compl.; R. 105, BPC

Chicago's Mot. to Dismiss the Indirect Compl.; R. 107, Agrium, Mosaic, PCS, and BPC's Mot.

to Dismiss the Direct Compl. ("Certain Defs.' Mot. to Dismiss the Direct Compl."); R. 112,

Agrium, Mosaic, PCS, and BPC's Mot. to Dismiss the Indirect Compl. ("Certain Defs.' Mot. to

Dismiss the Indirect Compl."); R. 126, Silvinit and IPC's Mot. to Dismiss the Indirect Compl.

("JSC Defs.' Mot. to Dismiss the Indirect Compl."); R. 127, Silvinit and IPC's Mot. to Dismiss

the Direct Compl. ("JSC Defs.' Mot. to Dismiss the Direct Compl."); R. 130, Uralkali's Mot. to

Dismiss the Indirect Compl.; R. 135, Uralkali's Mot. to Dismiss the Indirect Compl.)  For the

reasons stated below, the motions are granted in part and denied in part.

## RELEVANT FACTS

Potash refers to mineral and chemical salts that contain potassium and a multitude of

other elements in various combinations that are mined from naturally occurring ore deposits.  (R.

142, Am. Direct Compl. ¶ 48; R. 50, Indirect Compl. ¶ 44.)  Principally, potash is used as an

agricultural fertilizer but is also used in the production of glass, ceramics, soaps, and animal feed

supplements.  (R. 142, Am. Direct Compl. ¶ 48.)  It is a homogeneous product; potash supplied

by one producer is interchangeable with another producer's supply.  (*Id.* ¶ 53.)  As a result, buyers make purchase decisions based largely, if not entirely, on price.  (*Id.*)

Plaintiffs allege that the world's potash reserves are confined to a relatively few areas, with over half of the capacity located in just two regions - Canada and the former Soviet Union (specifically Russia and Belarus).  (R. 50, Indirect Compl. ¶ 46.)  Further, Plaintiffs allege that the potash industry has been dominated by few companies that market, sell, and distribute potash.  (*Id.* ¶ 52.)  As of 2008, Plaintiffs allege that PCS, Mosaic, Agrium, Uralkali, Belaruskali, and Silvinit produced approximately 71% of the world's potash.  (R. 142, Am. Direct Compl. ¶ 57.)  Plaintiffs allege that PCS, Mosaic, Agrium, and BPC are responsible for the vast majority of potash sales in the United States.  (*Id.* ¶ 52.)

Plaintiffs allege that prices for potash are set according to benchmarks established by Defendants based on sales to buyers in China, India, Brazil and elsewhere.  (*Id.*)  Plaintiffs allege that during the 1990's there was an increase in the supply of potash in the market, resulting in substantial price declines and a corresponding decrease in the profits of potash producers around the world.  (*Id.* ¶ 3.)  Beginning in mid-2003, however, Plaintiffs allege that Defendants "instituted a number of price increases resulting in an unprecedented rise in potash prices."  (*Id.* ¶¶ 112-113.)  Plaintiffs' claim that by 2008, potash prices had increased at least 600%.  (*Id.* ¶ 113.)  Plaintiffs allege that this price increase is not commensurate with changes in the cost of potash production or other input costs and cannot be explained by demand factors.  (*Id.* ¶¶ 129-130.)  Further, Plaintiffs claim that although demand for potash and other fertilizers began to

decline in 2008, prices for potash have remained high and have continued to increase while other fertilizer prices have declined. (R. 50, Indirect Compl. ¶ 124.) Plaintiffs allege that based on World Bank statistics, average fertilizer price indices rose from 1.0 to 2.2 and then fell back to 1.0 in 2008, while potash price indices started 2008 at 1.0 and rose to 3.5 by the end of the year. (*Id.*) Plaintiffs claim that these price increases were a result of Defendants "conspir[ing] and combin[ing] to fix, raise, maintain, and stabilize the price" at which potash was sold in order to "increase profitability." (R. 142, Am. Direct Compl. ¶ 3.) Plaintiffs allege that PCS posted first quarter 2008 income figures that were triple the year-earlier figure and that Mosaic's earnings for first quarter 2008 were up more than 10-fold from a year earlier. (R. 50, Indirect Compl. ¶ 126.)

### I. The Potash Market is Conducive to a Cartel

Plaintiffs claim that the potash market makes a "supply restriction cartel attractive to producers." (R. 142, Am. Direct Compl. ¶ 54.) Plaintiffs allege that because the cost of potash is a relatively small part of total crop production costs and there are no ready, cost-effective substitutes for the product, demand for potash is elastic; as potash prices increase, buyers tend to purchase at the higher price, rather than decrease the amount of their purchases. (*Id.*; R. 50, Indirect Compl. ¶ 44.) Plaintiffs further claim that the majority of production costs for potash producers are variable, giving producers less incentive to operate facilities at full capacity. (R. 142, Am. Direct Compl. ¶ 55.) Plaintiffs argue that this allows a potash cartel to boost prices artificially with greater success than it would have if fixed costs were the largest component of production. (*Id.*) Further, Plaintiffs allege that the potash industry has very high barriers to

entry. (*Id.* ¶ 56.) Plaintiffs estimate that a single new mine requires approximately $2.5 billion or more in up-front costs, five to seven years of development time, and additional outlays for associated roads and other infrastructure. (*Id.*) Plaintiffs claim that these barriers protect existing suppliers from competition and perpetuate the high market concentration. (*Id.*)

## II. Coordinated Supply Restrictions

Plaintiffs allege that Defendants implemented their conspiracy "at least in part, through coordinated restrictions in potash output," that are "contrary to the independent economic interests of the individual producers." (*Id.* ¶ 87.) For example, Plaintiffs claim that as the global demand for potash declined in 2005, Defendants "jointly restricted output." (*Id.* ¶ 88.) PCS announced it was shutting down three of its mines in November and December of 2005 for "inventory control purposes," resulting in the removal of 1.34 million tons of potash from the market. (*Id.*; R. 50, Indirect Compl. ¶ 72.) At the same time, Mosaic announced temporary output cuts resulting in the removal of 200,000 tons from the market. (R. 142, Am. Direct Compl. ¶ 89.)

Plaintiffs allege that these "joint reductions" continued into 2006. (*Id.* ¶ 91.) In the first quarter, PCS took 32 mine shutdown weeks reducing output from 2.4 million tons to 1.3 million tons. (*Id.*) At the same time, Uralkali shut down production removing 200,000 tons from the market and Belaruskali cut exports by 50%, removing approximately 250,000 tons. (*Id.* ¶ 92.) In the second quarter of 2006, Silvinit announced mine shutdowns removing approximately 100,000 tons of potash from the market. (*Id.* ¶ 93.) Plaintiffs allege that collectively, Uralkali,

6

Belaruskali, and Silvinit removed over a half a million tons of potash from the market in early

2006 and that other potash suppliers "commended" this action and noted that in the past the

former Soviet Union producers "had undermined efforts to control prices by flooding the market

during low demand periods." (R. 50, Indirect Compl. ¶ 75.) Plaintiffs further allege that Uralkali

and PCS "jointly restricted" supply in an effort to compel China, the largest potash consumer in

the world, to accept a price increase. (R. 142, Am. Direct Compl. ¶ 94.) During the first half of

2006, Uralkali and PCS reduced their capacity utilization rates to 68% and 60%, respectively,

thereby reducing their sales by 23% and 20%. (*Id.* ¶ 95.) Plaintiffs claim that Defendants'

actions led to an increase in price for potash in China, and as Defendants intended, shortly

thereafter, a similar price increase throughout the world. (*Id.*)

In 2007, Plaintiffs allege that Defendants again "jointly restricted" supply in order to

"impose price increases in the potash market." (*Id.* ¶ 98.) On October 25, 2007, Silvinit

announced that it might have to suspend shipments from a mine because of the development of a

sinkhole caused by mine flooding. (*Id.*) Within a day of the announcement, PCS, Uralkali,

Agrium and BPC announced that they would also suspend potash sales because of Silvinit's

shutdown. (*Id.*) Plaintiffs claim that this "joint suspension" makes no economic sense absent a

cartel because if the market was truly competitive, Defendants, "all purportedly competitors" of

Silvinit, would have an incentive to increase, and not suspend, production to take advantage of

Silvinit's reduced output and thus gain market share. (*Id.* ¶ 103.) Further, Plaintiffs allege that

the announcement of PCS's suspension of sales was made, not by PCS, but by its purported

7

competition, Uralkali. (R. 50, Indirect Compl. ¶ 77.) Plaintiffs claim that Uralkali announced that "these decisions could have an upward impact on potash prices . . . ." (*Id.*)

On November 6, 2007, Plaintiffs allege that Silvinit announced that the sinkhole was advancing more slowly than it had previously feared and therefore it would resume sales. (R. 142, Am. Direct Compl. ¶ 101.) Within a day, Uralkali, PCS, and Agrium announced that they too would resume sales. (*Id.*) Plaintiffs allege that "Uralkali refused to explain the reason for resuming sales; however, a BPC official told a reporter that the decision had been made 'after studying the market.'" (R. 50, Indirect Compl. ¶ 82.) Plaintiffs claim that shortly after these announcements that sales would resume, potash prices increased to record highs because of fears of a global shortage. (R. 142, Am. Direct Compl. ¶ 102.)

In May 2008, Plaintiffs allege that Silvinit announced that another expanding sinkhole threatened its potash supply and suggested that it might have to shut down production. (*Id.* ¶ 104.) Within two weeks, however, Silvinit announced that the sinkhole had stopped growing and that the situation could not get any worse. (*Id.*) Nevertheless, as a result of the threatened shutdown, potash prices again increased dramatically. (*Id.* ¶ 105.) On July 8, 2008, PCS announced that prices in the United States would increase by $250 per ton, 48% above the previous price. (*Id.*) Shortly thereafter in August 2008, BPC contracted to supply 30,000 tons of potash to United States purchasers at $1,000 per ton. (*Id.* ¶ 106.)

A few months later on November 1, 2008, Plaintiffs allege that Uralkali announced that it would cut potash production due to the decrease in potash fertilizers purchased in the global

market. (*Id.* ¶ 107.) In December 2008, PCS and Agrium also announced additional cutbacks. (*Id.*) Specifically, Agrium announced a decrease in production at its North American plants and PCS announced that it would cut production by 2 million tons, representing 15% of its expected capacity for the first quarter of 2009. (*Id.*)

Plaintiffs claim that although "potash suppliers repeatedly attributed dramatic prices [sic] increases to a 'tight supply/demand balance'" during the Class Period,[10] a number of Defendants had excess potash capacity. (R. 50, Indirect Compl. ¶ 90.) Specifically, Plaintiffs claim that PCS only had a utilization rate between 54% and 69% during the Class Period and that the company "could have raised their utilization rate if they had wanted to increase production of potash." (*Id.* ¶ 91.) Similarly, Plaintiffs allege that in December 2007, "Uralkali claimed that it had the 'ability to add significant capacity on the cheapest basis vs. global peers.'" (*Id.* ¶ 92.) Plaintiffs claim that notwithstanding excess capacity, "Defendants jointly coordinated to restrict this capacity to increase prices for potash." (*Id.* ¶ 95.)

### III. High Level of Cooperation and Opportunity for Defendants to Conspire

Finally, Plaintiffs allege that there was a high level of cooperation between Defendants and thus an opportunity for them to conspire to fix the price of potash. (*Id.* ¶¶ 67, 79.) Plaintiffs claim that "[t]he major potash suppliers have joint ventures or overlapping interests that involve competitors in the potash market." (R. 50, Indirect Compl. ¶ 61.) Specifically, PCS, Agrium and

---

[10] Plaintiffs define the "Class Period" as the period between July 1, 2003 and the present. (R. 142, Am. Direct Compl. ¶ 1.; R. 50, Indirect Compl. ¶ 1.)

Mosaic were joint venturers and equal shareholders in Canpotex Ltd. ("Canpotex"), a Canadian corporation that sold, marketed and distributed potash throughout the world with the exception of the United States and Canada. (R. 142, Am. Direct Compl. ¶¶ 31, 68; R. 50, Indirect Compl. ¶ 55.) Plaintiffs allege that Canpotex sales are allocated among the shareholders based on production capacity and if a shareholder cannot satisfy demand, "the remaining shareholders are entitled to satisfy demand." (*Id.* ¶ 56.) Plaintiffs allege that through participation in Canpotex, PCS, Agrium and Mosaic had access to each others' sensitive production capacity and pricing information. (*Id.*) Further, Plaintiffs claim that although Canpotex was initially formed "to coordinate sales of potash produced in Canada," the company has entered into cooperative marketing agreements with producers from the former Soviet Union. (*Id.* ¶ 57.) For example, in January 2001, Plaintiffs allege that Canpotex entered a joint marketing agreement with Uralkali, under which Canpotex agreed to market Uralkali potash outside North America and Europe. (*Id.*)

Further, Plaintiffs allege that producers from the former Soviet Union have also consolidated sales and marketing of potash through a single entity, BPC. (*Id.* ¶ 58.) BPC was formed as a joint venture between Uralkali and Belaruskali in 2005, through which the companies supply 34% of the world's exports of potash. (*Id.*) Plaintiffs allege that Silvinit has been in active negotiations to join BPC and that Dmitry Rybolovlev ("Rybolovlev") is a major owner of both Uralkali and Silvinit. (*Id.* ¶ 59.) Plaintiffs claim that Rybolovlev owns at least 66% of the stock of Uralkali and about 20% of the voting shares of Silvinit. (*Id.*) Plaintiffs

10

allege that these "mutually beneficial" business relationships between Defendants "not only provided the opportunity to conspire, but it also created a financial incentive to do so." (*Id.* ¶ 60.)

Plaintiffs further allege that Defendants routinely held meetings during the Class Period and engaged in an "exchange program" with senior executives visiting each others' plants. (*Id.* ¶ 62; R. 142, Am. Direct Compl. ¶¶ 74, 76.) Plaintiffs allege that these routine meetings provided Defendants "opportunities to conspire and exchange highly sensitive competitive information," including "pricing, capacity utilization, and other important prospective market information." (*Id.* ¶¶ 78, 79.) Specifically, on October 11, 2005, Plaintiffs allege that William Doyle, President and CEO of PCS, Michael Wilson President and CEO of Canpotex, James T. Thompson, Executive Vice President of the Mosaic Company, and Vladislov Baumgertner, General Director, President and CEO of Uralkali, as well as representatives from Belaruskali and Silvinit met in the former Soviet Union and discussed, among other things, "highly sensitive production plans." (*Id.* ¶ 75; R. 50, Indirect Compl. ¶ 63.) Plaintiffs claim that after the meeting: (1) in November and December 2005, PCS and Mosaic announced production shutdowns at certain mines; (2) in January 2006, BPC reduced production; and (3) in the second quarter of 2006, IPC shut down mines. (*Id.*) Similarly, in July 2006, Plaintiffs allege that a delegation from Uralkali visited Mosaic where they learned about Mosaic's "management structure" and toured potash mining operations. (*Id.* ¶ 64.)

Finally, Plaintiffs allege that Defendants are members of and regularly attended conferences sponsored by the International Fertilizer Industry Association ("IFIA") and the Fertilizer Institute ("FI") trade organizations. (R. 142, Am. Direct Compl. ¶¶ 81-86.) Plaintiffs claim that Defendants used these conferences "as a venue to negotiate prices for sales of potash to customers around the world." (*Id.* ¶¶ 81, 83.) Specifically, Plaintiffs claim that representatives from PCS, Mosaic, Agrium, Belaruskali, Canpotex, and BPC attended an IFIA conference in Istanbul, Turkey in May 2007. (R. 50, Indirect Compl. ¶ 68.) Plaintiffs claim that during this conference, they "announced an additional price increase on their potash products." (*Id.*)

## PROCEDURAL HISTORY

On September 15, 2008, Gillespie filed the original class action against Defendants on behalf of all similarly situated indirect potash purchasers. (*Gillespie v. Agrium*, Docket No. 08C5253, R. 1, Compl.) On December 2, 2008, a MDL Panel consolidated related pending actions against Defendants from this District and the District of Minnesota and transferred the consolidated action to this Court. (R. 1, Transfer Order.) On April 3, 2009, Plaintiffs filed consolidated Indirect and Direct Complaints in this Court.[11] (R. 50, Indirect Compl.; R. 51, Direct Compl.) Plaintiffs allege that Defendants "conspired and combined to fix, raise, maintain, and stabilize the prices for potash" by "exchang[ing] sensitive, non-public information about prices, capacity, sales volumes, and demand; allocat[ing] market shares, customers, and volumes

---

[11] On July 27, 2009, the Direct Purchaser Plaintiffs made a minor correction and filed an amended complaint. (R. 142, Am. Direct Compl.)

to be sold; and coordinat[ing] on output, including the limitation of production." (R. 142, Am. Direct Compl. ¶ 3; R. 50, Indirect Compl. ¶ 2.)  The Direct Complaint alleges violations of the Sherman Act and seeks damages thereunder. (R. 142, Am. Direct Compl. ¶¶ 159-165.)  The Indirect Complaint contains five counts:  injunctive relief under the Sherman Act (Count I); violations of twenty-one state antitrust laws (Count II); violations of twenty-three state consumer protection laws (Count III); fifty state law claims of unjust enrichment (Count IV); and a restraint of trade claim under New York law (Count V).[12]  (R. 50, Indirect Compl. ¶¶ 129-202.)

On June 15, 2009, Agrium, Mosaic, PCS, and BPC (collectively, "Certain Defendants") moved to dismiss both the Direct and Indirect Complaints pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (R. 107, Certain Defs.' Mot. to Dismiss the Direct Compl.; R. 112, Certain Defs.' Mot. to Dismiss the Indirect Compl.)  BPC Chicago joined in the aforementioned motions and, in addition, filed separate Rule 12(b)(6) motions to dismiss. (R. 104, BPC Chicago's Mot. to Dismiss the Direct Compl.; R. 105, BPC Chicago's Mot. to Dismiss the Indirect Compl.)  On July 6, 2009, Silvinit and IPC (collectively, "JSC Defendants") moved to dismiss the complaints pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(5) and 12(b)(6). (R. 126, JSC Defs.' Mot. to Dismiss the Indirect Compl.; R. 127, JSC Defs.' Mot. to Dismiss the Direct Compl.)  That same day, Uralkali also moved to dismiss both complaints pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(4), 12(b)(5) and 12(b)(6). (R. 130, Uralkali's Mot. to Dismiss the Indirect Compl.; R. 135, Uralkali's Mot. to Dismiss the Indirect Compl.)

---

[12] Indirect Purchaser Plaintiffs have withdrawn their New York restraint of trade claim. (R. 147, Indirect Pls' Resp. at 29.)

## ANALYSIS

### I. Indirect Purchaser Plaintiff Standing

We begin our analysis with Certain Defendants' contention that the Indirect Purchaser Plaintiffs lack Article III standing to assert claims under the laws of states where no named Plaintiff resides.  (R. 113, Certain Defs.' Indirect Mem. at 9.)  Indirect Purchaser Plaintiffs argue that this standing challenge is premature because "class certification issues under Rule 23 are to be decided prior to issues of standing under Article III."  (R. 147, Indirect Pls' Resp. at 3.)  Two issues must therefore be addressed in resolving Certain Defendants' standing argument: (1) whether this Court should defer ruling on standing issues until after class certification; and (2) whether Indirect Purchaser Plaintiffs have Article III standing for claims brought under the laws of states where no named Plaintiff resides.  This Court addresses each issue in turn.

### A.     Timing of Standing Analysis

Article III standing involves a threshold inquiry into whether a federal court has the power to hear the suit before it.  *Warth v. Seldin*, 422 U.S. 491, 498 (1975) ("In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III.  This is the threshold question in every federal case, determining the power of the court to entertain the suit."); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983); *Simon*, 426 U.S. at 37.  That jurisdiction "be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'"  *Steel Co. v.*

*Citizens for a Better Environment,* 523 U.S. 83, 94 (1998) (citing *Mansfield, C. & L.M.R. Co. v. Swan,* 111 U.S. 379, 382 (1884)).  Without jurisdiction an action in federal court cannot proceed. *See Hay v. Indiana State Bd. of Tax Com'rs,* 312 F.3d 876, 879 (7th Cir. 2002) ("Jurisdiction is the "power to declare law," and without it the federal courts cannot proceed.").

Indirect Purchaser Plaintiffs argue that in this case class certification questions are "logically antecedent" to standing issues and should therefore be treated before this Court's standing analysis.  (R. 147, Indirect Pls' Resp. at 3.)  In support of their contention, they rely heavily upon *Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999), and *Payton v. County of Kane,* 308 F.3d 673 (7th Cir. 2002).  As discussed below, *Ortiz* and *Payton* do not require this Court to postpone the threshold inquiry into Indirect Purchaser Plaintiffs' Article III standing.

To properly understand its scope, it would be fruitful to begin our discussion of *Ortiz* by examining *Amchem Products., Inc. v. Windsor,* 521 U.S. 591 (1997).  In *Amchem,* the Supreme Court considered a challenge to the propriety of certifying a settlement-only class involving persons exposed to asbestos. *See id.* at 591-92.  While its analysis focused on the role settlement may play in determining class certification under Rule 23, the Court also dealt with arguments set forth by objectors stating that certain members of the settlement class lacked standing to sue because they had not sustained a cognizable injury or because their injury was not redressable. *Id.* at 612.  The Court declined to reach the standing arguments because the Rule 23 issues were dispositive. *Id.* at 612.  It held that because the resolution of the class certification issues were

"logically antecedent to the existence of any Article III issues," it was appropriate to reach them first. *Id.*

In sequencing class certification and Article III issues in this manner, the Court expressly followed the rationale used by the Third Circuit below in *Georgine v. Amchem Products, Inc.*, 83 F.3d 610 (3d Cir. 1996). *See id.* at 612-13 ("We therefore follow the path taken by the Court of Appeals, mindful that Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right.'"). In *Georgine*, while recognizing uncertainty regarding both justiciability and subject matter jurisdiction, the Third Circuit first decided the class certification issues because they were dispositive. *Georgine*, 83 F.3d at 623. In doing so, the Third Circuit reasoned that it was "prudent not to decide issues unnecessary to the disposition of the case, especially when many of these issues implicate constitutional questions." *Id.* (citing *Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944) (expressing the rule that courts will avoid constitutional questions when possible). Thus, in deciding class certification issues prior to addressing Article III concerns, the Third Circuit and the Supreme Court were adhering to the "[f]undamental and long-standing principle of judicial restraint [which] requires that courts avoid reaching constitutional questions in advance of necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988).

Approximately two years after *Amchem,* the Court decided *Ortiz,* which involved the "conditions for certifying a mandatory settlement class on a limited fund theory under Federal

Rule of Civil Procedure 23(b)(1)(B)." *Ortiz*, 527 U.S. at 821.  As in *Amchem*, the Court in *Ortiz*

dealt with arguments regarding the Article III standing of certain members of the settlement class

who petitioners alleged had not suffered an injury in fact. *Id.* at 831.  In deciding to address class

certification issues before Article III questions, the Court provided the following rationale:

> Ordinarily, of course, this or any other Article III court must be sure of its own
> jurisdiction before getting to the merits. *Steel Co. v. Citizens for a Better Environment*,
> 523 U.S. 83, 88-89 (1998).  But the class certification issues are, as they were in *Amchem*,
> "logically antecedent" to Article III concerns, 521 U.S. at 612, and themselves pertain to
> statutory standing, which may properly be treated before Article III standing, *see Steel
> Co., supra*, at 92.  Thus the issue about Rule 23 certification should be treated first,
> "mindful that [the Rule's] requirements must be interpreted in keeping with Article III
> constraints . . . ." *Amchem, supra*, at 612-613.

*Id.*

Thus, in both *Ortiz* and *Amchem*, because review of class certification issues rendered any

Article III analysis unnecessary, the requirements of Rule 23 were considered "logically

antecedent" to an examination of standing.  Some district courts have interpreted *Ortiz*'s

"logically antecedent" language as creating a rule requiring examination of class certification

before standing where standing issues would not exist but for the proposed class. *See, e.g., Kuhl

v. Guitar Center*, No. 07C214, 2008 WL 656049, at *3 (N.D. Ill. Mar. 5, 2008) (ruling that

standing challenges are premature before class certification where the class action mechanism

created the standing issues); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538,

579-81 (M.D. Pa. 2009) (deferring Article III standing inquiry until after class certification

proceedings); *In re Grand Theft Auto Video Game Consumer Litig. (No. II)*, No. 06MD1739,

2006 WL 3039993, *1-2 (S.D.N.Y. Oct. 25, 2006) (same); *In re Relafen Antitrust Litig.*, 221

F.R.D. 260, 269 (D. Mass. 2004) (same). This Court, however, does not interpret *Ortiz* as constructing such a rule.

    *Ortiz*, as properly understood within the context of *Georgine* and *Amchem*, does not *require* district courts to postpone the threshold inquiry into Article III standing until after class certification. Rather, *Amchem* and *Ortiz* are examples of the Supreme Court's unwillingness to decide constitutional questions when other grounds of disposition are available. *See Escambia County v. McMillan*, 466 U.S. 48, 51 (1984) (per curium) ("It is a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case."); *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of."). Because in both cases class certification issues proved dispositive, the Court turned to the Rule 23 issues as a preliminary matter. In doing so, the Court did not direct district courts to delay determining whether an actual case or controversy is before them. Indeed, several courts have also recognized that *Ortiz* does not provide such a directive. *See Easter v. Am. West. Fin.*, 381 F.3d 948, 962 (9th Cir. 2004) ("[*Ortiz*] does not require courts to consider class certification before standing."); *Tillman v. U.S. Energy Sav. Corp.*, No. 08C1641, 2008 WL 2754813, at *2 (N.D. Ill. July 14, 2008) (dealing with Article III standing before class certification); *see also Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, No. 08-10446-RGS, 2009 WL 3149775, at *2-

4 (D. Mass. Sept. 30, 2009) (ruling on Article III standing issues prior to class certification); *In re Wellbutrin XL Antitrust Litig.*, No. 08-2433, 2009 WL 2356864, at *6-10 (E.D. Pa. July 30, 2009) (refusing to postpone an inquiry into Article III standing); *Carfagno ex rel. Centerline Holding Co v. Schnitzer*, 591 F. Supp. 2d 630, 633 (S.D.N.Y. 2008) ("[A]djudication of standing must be made prior to determining whether the requirements of class certification have been satisfied."); *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 605-07 (S.D.N.Y. 2006) (same).

Indirect Purchaser Plaintiffs also contend that *Payton* requires this Court to defer ruling on Article III standing issues. (R. 147, Indirect Pls' Resp. at 3.) In *Payton*, the Seventh Circuit dealt with a suit brought by former arrestees challenging county bond fees. *Payton*, 308 F.3d at 675. In addition to claiming individual violations of their Eighth and Fourteenth Amendment rights, the named plaintiffs also sought to represent a class that included people from counties in which they did not reside. *See id.* at 676, 677. The Seventh Circuit initiated its analysis of the class representation issues by stating:

> We have begun our analysis with the question of class certification, mindful of the Supreme Court's directive to consider issues of class certification prior to issues of standing. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999): "the class certification issues are . . . logically antecedent to Article III concerns, and themselves pertain to statutory standing, which may properly be treated before Article III standing. Thus the issue about Rule 23 certification should be treated first." *Id.* at 831 (citations omitted).

*Id.* at 680.

Contrary to what Indirect Purchaser Plaintiffs suggest, this language does not compel a district court to delay reviewing Article III standing issues until after class certification. Rather, the

19

directive to which *Payton* refers is *Amchem/Ortiz*'s requirement that an appellate court simultaneously facing both class certification and Article III standing issues must deal with Rule 23 issues first when they are dispositive. Indeed, the limitations of this directive are evidenced by subsequent cases in which the Seventh Circuit has dealt with Article III standing prior to class certification. *See Arreola v. Godinez*, 546 F.3d 788, 794-95 (7th Cir. 2008) (deciding individual standing to pursue injunctive relief prior to evaluating class certification issues) (citing *Payton*). Thus, neither *Ortiz* nor *Payton* compels this Court to postpone an inquiry into the threshold issue of justiciability. Accordingly, this Court now proceeds to determining whether Indirect Purchaser Plaintiffs have standing to assert each of their claims.

**B.    Standing Analysis**

Indirect Purchaser Plaintiffs–residents of Iowa, Kansas, Mississippi, Florida, and Michigan–assert claims under the statutes and common law of forty-three other states, the District of Columbia, and Puerto Rico. (R. 50, Indirect Compl. ¶¶ 129-201.) Certain Defendants ask this Court to dismiss claims brought under the laws of states in which no named Indirect Purchaser Plaintiff resides for failure to satisfy Article III standing requirements.[13] (R. 113, Certain Defs.' Indirect Mem. at 9.) In response, Indirect Purchaser Plaintiffs fail to provide any support establishing their individual standing to assert claims under the laws of states where they neither reside nor have alleged to have suffered injury. (R. 147, Indirect Pls' Resp. at 3.)

___

[13] Certain Defendants do not dispute Indirect Purchaser Plaintiffs' standing to assert claims under the laws of the states where they reside. (R. 113, Certain Defs.' Indirect Mem. at 9.)

Instead, they urge this Court to postpone its inquiry into Article III standing until after class certification. (*Id.*) Having rejected their argument, this Court now proceeds to address Article III standing issues with respect to the Indirect Purchaser Plaintiffs.

An Article III standing inquiry "focuses on whether the plaintiff is the proper party to bring this suit." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (citing *Simon*, 426 U.S. at 38). It is the "burden of the party who seeks the exercise of jurisdiction in his favor clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Spencer v. Kemna*, 523 U.S. 1, 11 (1998) (internal quotations omitted). To satisfy Article III's standing requirement, a party must establish: (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 756 (7th Cir. 2008). At the pleading stage, general factual allegations of injury resulting from defendant's conduct may suffice to establish standing. *See Lujan*, 504 U.S. at 561.

This inquiry remains the same even if the case is proceeding as a class action: "That a suit may be a class action, however, adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Simon*, 426 U.S. at 40 n. 20; *see also Payton*, 308 F.3d at 682 ("[I]t bears repeating that a person cannot predicate standing

21

on injury which he does not share. Standing cannot be acquired through the back door of a class action."). To have standing as a class representative, the plaintiff must be part of the class, "that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." *Keele v. Wexler*, 149 F.3d 589, 592-93 (7th Cir. 1998) (citing *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)).

Here, the Indirect Purchaser Plaintiffs present no allegations that they have suffered an "injury in fact" for each of the asserted claims. *See Lujan*, 504 U.S. at 560 (internal citations and quotation marks omitted) ("an injury in fact–an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical."). Read in its most reasonable light, the Indirect Complaint alleges that an injury–paying "supra-competitive, artificially inflated prices for potash products"–was suffered in their respective states of residence.[14] (R. 50, Indirect Compl. ¶ 157.) The Indirect Complaint does not allege personal injury in any other state, thus, Indirect Purchaser Plaintiffs fail to satisfy their burden of showing Article III standing for states where they do not reside.

Accordingly, this Court dismisses claims based on the antitrust and consumer unfair competition statutes of the following jurisdictions: Arizona, California, District of

---

[14] The Indirect Complaint does not state exactly where the alleged injuries occurred. This Court will infer that the Indirect Purchaser Plaintiffs purchased potash containing products, specifically, fertilizer, in their respective states of residence because at this stage of the litigation a court must "accept all well-pleaded facts as true and draw all reasonable inferences from those facts in favor of the plaintiffs." *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007).

Columbia, Maine, Minnesota, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin. This Court also dismisses claims under the consumer protection and unfair competition statutes of the following jurisdictions: Alaska, Arkansas, California, District of Columbia, Florida, Idaho, Maine, Massachusetts, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Pennsylvania, Rhode Island, Utah, Vermont, West Virginia, and Wisconsin. Finally, for similar reasons, claims under the common law claim of unjust enrichment in the following jurisdictions are also dismissed: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Georgia, Hawaii, Idaho, Illinois, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

**II.    Subject Matter Jurisdiction**

Next, Defendants move to dismiss both the Direct and Indirect Complaints for want of subject matter jurisdiction. (R. 107, Certain Defs.' Mot. to Dismiss the Direct Compl.; R. 112, Certain Defs.' Mot. to Dismiss the Indirect Compl.; R. 126, JSC Defs.' Mot. to Dismiss the Indirect Compl.; R. 127, JSC Defs.' Mot. to Dismiss the Direct Compl.)

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of an action for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Plaintiff, as the party invoking the Court's jurisdiction, has the burden of proving jurisdictional facts by a preponderance of the evidence. *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006). On a facial challenge to subject matter jurisdiction, a district court must only look to the complaint and determine if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction. *Apex Digital, Inc v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009).

**B.      Applicability of the FTAIA to Federal Antitrust Claims**

**1.      The FTAIA**

In 1982, Congress responded to concerns regarding the scope of the broad jurisdictional language of the Sherman Act by enacting the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a.[15] *See* IB Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 272i, at 286-87 (3d ed. 2006) (hereinafter Areeda & Hovenkamp). The FTAIA states:

> Sections 1 to 7 of this title [Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless-
> (1) such conduct has a direct, substantial, and reasonably foreseeable effect-
>
> > (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

---

[15] Plaintiffs assert claims under Section 1 of the Sherman Act, which provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. §1.

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or in commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6a.

In enacting the FTAIA, Congress sought to strip federal courts of jurisdiction over certain types of foreign commercial activity. *See United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 951-52 (7th Cir. 2003) (en banc) (holding that the FTAIA is a jurisdictional and not a substantive limitation on a Sherman Act claim). The FTAIA "initially lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach. It then brings such conduct back within the Sherman Act's reach *provided* that the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the "effect" must "giv[e] rise to a [Sherman Act] claim." *F. Hoffmann-LaRoche Ltd. v. Empagram S.A.*, 542 U.S. 155, 162 (2004). This statute makes clear that the concern of the antitrust laws is the protection of *American* consumers and exporters, not foreign consumers or producers. *Id.* at 161 (citing H.R. Rep. No. 97-686, pp. 1-3, 9-10 (1982)).

Defendants argue that the FTAIA strips this Court's subject matter jurisdiction over Plaintiffs' federal antitrust claims because the complaints allege overseas anticompetitive

behavior that does not have a "direct, substantial, and reasonably foreseeable effect" on American commerce. (R. 108, Certain Defs.' Direct Mem. at 22-30; R. 113, Certain Defs.' Indirect Mem. at 7-9; R. 128, JSC's Mem. at 5-7.) Specifically, they contend that the link between any alleged anticompetitive actions and their effect in the United States is much too attenuated to be considered "direct." (*Id.*) Thus, they conclude that such activity is placed outside of this Court's subject matter jurisdiction by the FTAIA. (*Id.*) Plaintiffs respond by drawing this Court's attention to the FTAIA's introductory language, which contains a parenthetical explicitly excluding "import trade or import commerce" from its reach. (R. 144, Direct Pls.' Resp. at 16-18; R. 147, Indirect Pls.' Resp. at 1-2; R. 154, Direct Pls.' JSC Resp. at 20-22.) They argue that the "FTAIA's 'direct, substantial[,] and reasonably foreseeable effect' test [is] never reached when import trade or import commerce exist because by its terms the statute does not apply." (*Id.*)

### 2.   Conduct involving "import trade or import commerce"

The FTAIA's introductory language "provides that the antitrust law *shall* apply to conduct 'involving import trade or commerce' with foreign nations." *Carpet Group Int'l v. Oriental Rug Imp. Ass'n,, Inc.*, 227 F.3d 62, 69 (3d Cir. 2000). Unfortunately, the FTAIA does not define the "import trade or import commerce" exclusion. *See Turicentro S.A. v. Am. Airlines Inc.*, 303 F.3d 293, 303 (3d Cir. 2002); Areeda & Hovenkamp ¶ 272i, at 290 (2006). The Third Circuit, however, provided the following analysis of the relevant statutory language:

> The [FTAIA] does not define the term "import," but the term generally denotes a product (or perhaps a service) has been brought into the United States from abroad. *See, e.g.*, *Webster's Third New International Dictionary* (1986) (defining an "import" as "something (as an article of merchandise) brought in from an outside source (as a foreign country)"); *Black's Law Dictionary* (6th ed.1990) (defining an "import" as a "product manufactured in a foreign country, and then shipped to and sold in this country").

*Turicentro S.A.*, 303 F.3d at 303. This analysis is consistent with the ordinary meaning of the term, *U.S. v. Berkos*, 543 F.3d 392, 396-97 (7th Cir. 2008) ("We assume that the legislative purpose [of the statute] is expressed by the ordinary meaning of the words used.) (internal quotations omitted), and the FTAIA's general objective of limiting the extraterritorial reach of American antitrust law while preserving protections for American consumers and exporters. Moreover, this interpretation does not render any other portion of the statute "redundant or meaningless." *Id.* This Court will therefore use the Third Circuit's analysis as the foundation for our inquiry into the applicability of the parenthetical exclusion in the instant case.

To be considered "import trade or commerce," the relevant inquiry is whether the "alleged *conduct by the defendants* 'involved' import trade or commerce, not whether the *plaintiff's* conduct, which is not being challenged as violative of the Sherman Act, 'involved' import trade or commerce." *Carpet Group Int'l*, 227 F.3d at 71. Therefore, not just any foreign commercial activity leading to the introduction of goods or services into the United States through "import trade or import commerce" falls under the parenthetical exclusion. Rather, only conduct by the defendant involving the importation of goods or

27

services into the United States is covered by this exclusion to the FTAIA's coverage. *See Turicentro S.A.*, 303 F.3d at 303 (holding that defendants that "did not directly bring items or services into the United States" were not engaged in "import trade or import commerce."). Further, when determining whether the parenthetical exclusion applies the term "involved" must be given a narrow construction. *Id.* at 304 (citing *Carpet Group Int'l*, 227 F.3d at 71) ("Admittedly, the FTAIA differentiates between conduct that 'involves' such [import trade or import commerce], and conduct that 'directly, substantially, and foreseeably' affects such commerce. To give the latter provision meaning, the former must be given a relatively strict construction.").

Defendants fail to properly address the applicability of the parenthetical exclusion. Instead, they attempt to redirect this Court's attention to what they believe is the dispositive question: "whether plaintiffs' allegations regarding sales that *occurred entirely overseas* may be used to support plaintiffs' domestic antitrust claim." (R. 159, Certain Defs.' Direct Reply Mem. at 12; *see also* R. 160, Certain Defs.' Indirect Reply Mem. at 2-3; R. 128, JSC's Mem. at 5-7.) While Defendants are correct in noting that sales occurring entirely overseas are subject to the FTAIA's "direct, substantial, and reasonably foreseeable effect" test, the complaints allege more than mere overseas sales that have an impact on the U.S. markets. Plaintiffs specifically allege that Defendants "sold and distributed potash in the United States, directly or through its affiliates." (R. 142, Am. Direct Compl. ¶¶ 15, 16, 18, 19, 21, 22, 27, 68, 71, 145; R. 50, Indirect Compl. ¶¶ 1, 10, 11, 13, 14, 16, 23, 41.) Further,

Plaintiffs allege that Defendants entered into a conspiracy and combination to "fix, raise, maintain, and stabilize the price at which potash is sold." (R. 142, Am. Direct Compl. ¶ 3; R. 50, Indirect Compl. ¶ 2.) The tight nexus between the alleged illegal conduct and Defendants' import activities leads this Court to conclude that the former "involved" the latter. Thus, Plaintiffs have pleaded enough to fall under the FTAIA's parenthetical "import trade or import commerce" exclusion, rendering any examination of the FTAIA's "direct, substantial, and reasonably foreseeable" effects test unnecessary. *Dee-K Enters. Inc. v. Heveafil Sendirian Berhad*, 299 F.3d 281, 292 (4th Cir. 2002) ("in every case involving direct sales to the United States in which our antitrust laws condemn an activity per se, however foreign the conduct, United States courts would have jurisdiction without any showing whatsoever of an effect on United States commerce."). Accordingly, Direct and Indirect Purchaser Plaintiffs' allegations suffice to preserve this Court's subject matter jurisdiction over their federal antitrust claims.

## C.   Applicability of the FTAIA to State Antitrust Claims

This Court must also reject Defendants' FTAIA arguments with respect to the Indirect Complaint's state antitrust claims. Defendants contend that the FTAIA "establishes a single, uniform national standard for the extraterritorial application of American antitrust laws" that, by virtue of the Supremacy and Commerce Clauses, necessarily preempts "state antitrust laws from applying to anticompetitive agreements in foreign markets that do not have a direct, substantial, and reasonably foreseeable effect in the United States." (R. 113,

Certain Defs.' Indirect Mem. at 7.)  Defendants are correct in noting that there could

potentially be conflict with certain constitutional provisions if state antitrust laws reached

foreign commercial activity that federal laws did not.  That, however, is not the case here

where state antitrust laws, like their federal counterparts, are only reaching conduct

involving "import trade or import commerce."  As discussed above, the FTAIA excludes

such conduct from its reach.  Thus, the concerns Defendants raise are not presently at issue.

Accordingly, this Court finds that the FTAIA does not remove federal subject matter

jurisdiction over the state antitrust claims.

## III.  Insufficient Service

Rules 12(b)(4) and 12(b)(5) provide for dismissal based on insufficient process.  Fed.

R. Civ. P. 12(b)(4), 12(b)(5).  A 12(b)(5) motion tests the sufficiency of service of process,

while Rule 12(b)(4) is concerned with the form of the summons.  *Id.*; *see also Bilal v. Rotec

Indus.*, No. 03C9220, 2004 U.S. Dist. LEXIS 15488 (N.D. Ill. Aug. 5, 2004).  When a

defendant challenges the sufficiency of service, the burden is on the plaintiff to affirmatively

demonstrate otherwise.  *Robinson Eng'g Co. Pension Plan & Trust v. George*, 223 F.3d 445,

453 (7th Cir. 2000).

On March 18, 2009, Plaintiffs moved for the Court to allow alternative service on

Defendants Uralkali, Silvinit, and IPC (collectively, "the Russian Defendants") pursuant to

Federal Rule of Civil Procedure 4(f)(3).  (R. 40, Pls.' Mot. to Allow Alternative Service at

1.)  Plaintiffs sought alternative service means because they were unable to serve the

Russian Defendants through normal procedures under the Hague Convention on the Service

Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague

Convention"), *opened for signature* Nov. 15, 1965, 20 U.S.T. 361 (appended to Fed. R. Civ.

P. 4).[16]  (*Id.*)  On April 23, 2009, this Court granted Plaintiffs' motion and approved

alternative service for the Russian Defendants by four alternative methods: (1) email to

corporate headquarters; (2) fax to corporate headquarters; (3) delivery to BPC Chicago; and

(4) delivery to Dewey & LeBoeuf LLP ("D&L").[17]  (R. 64, Minute Entry.)  Accordingly, in

June 2009, Plaintiffs served the Russian Defendants via the alternative service methods.  (R.

151, Kay Pulido ("Pulido") Decl.)

Now, the Russian Defendants move to dismiss both complaints based on insufficient

service grounds.  (R. 130, Uralkali's Mot. to Dismiss the Indirect Compl.; R. 135, Uralkali's

Mot. to Dismiss the Indirect Compl.; R. 128, JSC'S Mem. in Support of their Mot. to

Dismiss Pls.' Compls. ("JSC's Mem.") at 9.)  The Russian Defendants argue that the

complaints should be dismissed pursuant to Rule 12(b)(5) because: (1) Plaintiffs failed to

comply with the mandatory service procedures of the Hague Convention; (2) Plaintiffs'

efforts of service via fax and email did not comport with Russian law; and (3) Plaintiffs'

---

[16]  On April 7, 2009, the Indirect Purchaser Plaintiffs joined the Direct Purchaser
Plaintiffs' motion for alternative service.  (R. 52, Indirect Pls.' Joinder to Mot. for Alternative
Service.)

[17]  The Court granted the motion for alternative service despite BPC Chicago's limited
objection arguing that Plaintiffs could not serve Uralkali through BPC Chicago its purported
agent.  (R. 53, BPC Chicago's Limited Objection to Pls.' Mot. for Alternative Service.)

efforts of service through purported agents in the United States were insufficient.[18]  (R. 139, Uralkali's Direct Mem. at 2-11.)

Federal Rule of Civil Procedure 4(f) governs service of process upon individuals in foreign countries, and provides that service may be accomplished "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention . . . ." Fed. R. Civ. P. 4(f)(1).  In addition to this provision, Rule 4(f)(3) also allows service "by other means not prohibited by international agreement, as the court orders." *Id.* at 4(f)(3).  Both the United States and the Russian Federation are parties to the Hague Convention.  (R. 41-2, Decl. of Austin Cohen ("Cohen") ¶ 2; R. 41-3, Ex. A., U.S. Dept. of State Russia Judicial Assistance Circular.)  The Russian Defendants argue that Plaintiffs did not follow the provisions of the Hague Convention to effect service, and therefore service was improper.  (R. 139, Uralkali's Direct Mem. at 4.)  In addition, the Russian Defendants contend that although Rule 4(f)(3) allows a court to approve alternative means of service on a foreign defendant, the plaintiff must first attempt service by the Hague Convention.  (*Id.*)

---

[18]  In addition, the Russian Defendants argue that dismissal is also required for insufficient process pursuant to Rule 12(b)(4) because Plaintiffs did not fax copies of the original summons and complaint.  (R. 139, Uralkali's Direct Mem. at 8 n.2.)  The record, however, indicates that after a series of unsuccessful attempts at faxing Uralkali, on June 2, 2009, Plaintiffs faxed both English and Russian translations of: (1) a cover letter briefly summarizing the case and the alternative service; (2) this Court's order granting Plaintiffs' Motion to Allow Alternative Service; (3) a Summons; (4) the Direct Complaint; and (5) the Amended Direct Complaint.  (R. 156, Decl. of Heather Potteiger ¶¶ 2-5.)  These documents were also emailed to Uralkali on May 27, 2009.  (*Id.* at ¶ 6.)  Accordingly, the Russian Defendants' motion to dismiss on this basis is denied.

The Hague Convention was formulated to provide a simpler way to serve process abroad. *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698 (1998). The primary means of service under the Hague Convention is through a receiving country's "Central Authority," which receives requests for service, arranges for service, and returns proofs of service. *Id.* at 698-99. "[C]ompliance with the [Hague] Convention is mandatory in all cases to which it applies . . . ." *Id.* at 699; *see also George*, 223 F.3d at 449 n.2. Since July 2003, however, Russia has unilaterally suspended all judicial cooperation with the United States in civil proceedings and all service requests are returned unexecuted.[19] (R. 41-2, Decl. of Cohen ¶ 4; R. 41-3, Ex. A., U.S. Dept. of State Russia Judicial Assistance Circular.) Accordingly, the U.S. Department of State advises litigants to seek "alternative methods of service" for defendants in Russia.[20] (*Id.*)

"The decision whether to allow alternate methods of serving process under Rule 4(f)(3) is committed to the 'sound discretion of the district court.'" *Brockmeyer v. May*, 383

---

[19] Russia's policy in these matters is purportedly based on objections to a fee imposed by the United States for all requests for service from any foreign country. (R. 41-3, Ex. A., U.S. Dept. of State Russia Judicial Assistance Circular.) This fee was designed to cover the cost incurred to administer the United States Central Authority. (*Id.*)

[20] Plaintiffs offer additional evidence to support the fact that the Russian Central Authority denies all service requests from the United States. *See* (R. 41-2, Cohen Decl. ¶ 5 (documenting conversations with the U.S. Department of State's Legal Affairs office, confirming that there had been no change with regard to Russia's refusal to provide judicial assistance to United States litigants); & ¶ 6 (documenting conversations with Civil Action Group Ltd., a legal support services company with expertise in international service of process, that informed Plaintiffs that it was unable to arrange service in Russia due to the country's rejection of the Hague Convention).)

33

F.3d 798, 804 (9th Cir. 2004) (citations omitted); *see also Hinsey v. Better Built Dry Kilns, Inc.*, No. 08C114, 2009 U.S. Dist. LEXIS 52557, *6 (N.D. Ind. June 22, 2009) ("Rule 4(f)(3) provides the Court with flexibility and discretion empowering courts to fit the manner of service utilized to the facts and circumstances of the particular case."). Court-directed service pursuant to Rule 4(f)(3) is particularly appropriate where a signatory to the Hague Convention has "refused to cooperate for substantive reasons." Fed. R. Civ. P. 4(f)(1) advisory committee's note (1993 Amendments). Under such circumstances, plaintiffs are not required to first attempt service through the Hague Convention. *See id.* ("Use of the [Hague] Convention procedures, *when available*, is mandatory if the documents must be transmitted abroad to effect service." (emphasis added)); *see also In re LDK Solar Secs. Litig.*, No. C 07-5182, 2008 U.S. Dist. LEXIS 90702, *6 (N.D. Cal. Jun. 12, 2008) (authorizing an alternative means of service on Chinese defendants without first attempting "potentially fruitless" service through the Hague Convention's Chinese Central Authority); *Arista v. Media Services LLC*, No. 06 Civ. 15319, 2008 U.S. Dist. LEXIS 16485 (S.D.N.Y. Feb. 25, 2008).[21]

---

[21] *Arista* is particularly instructive, as it addressed service on a defendant in the Russian Federation. *See id.* The defendant in *Arista* argued that the district court could not exercise its discretion to authorize service pursuant to Rule 4(f)(3) unless plaintiff first attempted service through the Hague Convention. *Id.* at *4. The court recognized that Russia had suspended judicial cooperation with the United States, and noted that plaintiffs need not be burdened with the "sisyphean task of attempting service through the Hague Convention procedures" when the Russian Federation had "categorically refused" service. *Id.* at *6 n.4 & *7. The *Arista* court determined that there was no reason to believe that service would be effective if plaintiffs were to serve defendant in accordance with the Hague Convention, therefore Rule 4(f)(1) service was not required under these circumstances and service pursuant to Rule 4(f)(3) was appropriate. *Id.* at

Accordingly, on April 23, 2009, this Court granted Plaintiffs' motion to use alternative service to serve the Russian Defendants. (R. 64, Minute Entry.)  At that time, the Court recognized that this was "an exceptional case" that warranted service pursuant to Rule 4(f)(3). (Tr. of April 23, 2009 Proceedings at 5:4-20.)  The Court concluded that if we did not allow alternative service, "it would basically thwart [the Russian Defendants] from ever being served in this case and would stall litigation." (*Id.*)  The Court finds no reason to alter our decision now.  Plaintiffs could not serve the Russian Defendants under the Hague Convention; therefore service under Rule 4(f)(3) was appropriate.

Next, the Russian Defendants argue that even if service by alternative means under Rule 4(f)(3) was appropriate, "Plaintiffs' efforts to serve [the Russian Defendants] by facsimile and email did not comport with Russian law." (R. 139, Uralkali's Direct Mem. at 6-8.)  Again, Rule 4(f)(3) gives this Court discretion to customize service to the facts and circumstances of a particular case. *Hinsey*, 2009 U.S. Dist. LEXIS 52557 at *6.  When exercising this discretion, "an earnest effort should be made to devise a method of communication that is consistent with due process and minimizes offense to foreign law." Fed. R. Civ. P. 4(f)(3) advisory committee's note (1993 Amendments); *see also United States CFTC v. Lake Shore Asset Mgmt.*, No. 07C3598, 2008 U.S. Dist. LEXIS 85084, *12 (N.D. Ill. Sept. 17, 2008) (Rule 4(f)(3) permits service by any means not prohibited by international agreement, as long as the method of service comports with constitutional

---

*7-8.

notions of due process.).  Courts have found that service via email and fax are reasonable

under Rule 4(f)(3).  *Maclean-Fogg Co. v. Ningbo Fastlink Equip. Co.*, No. 08C2593, 2008

U.S. Dist. LEXIS 97241, *2 (N.D. Ill. Dec. 1, 2008) (concluding that service of process via

email and fax comports with constitutional notions of due process and may be authorized

under Rule 4(f)(3)); *see also Rio Props. v. Rio Int'l Interlink*, 284 F.3d 1007, 1018 (9th Cir.

2002) (determining that email service was properly ordered by the district court using its

discretion under Rule 4(f)(3)); *Bank Julius Baer & Co. Ltd. v. WikiLeaks*, No. C 08 824,

2008 U.S. Dist. LEXIS 14758, *6 (N.D. Cal. Feb. 13, 2008) (authorizing service by email

under Rule 4(f)(3)); *Williams v. Adver. Sex LLC*, 231 F.R.D. 483, 488 (N.D. W.Va. Oct. 25,

2005) (same).

Although, the Russian Defendants admit that service of judicial documents by fax or

email is permissible under Russian law, they argue that such service is available only in

urgent circumstances or "in cases not allowing any delay," and that the instant case does not

qualify.  (R. 139, Uralkali's Direct Mem. at 7.)  The Russian Defendants rely on the

declaration of Eleonora Sergeeva ("Sergeeva"), a member and co-founder of the Russian law

firm Pavda and Partners.  (*Id.*; R. 131, Sergeeva Decl.)  Referencing the Arbitration

Procedural Code of the Russian Federation, Sergeeva opines that in her "many years of

experience practicing law before courts of the Russian Federation," courts will only

authorize service by fax or email in cases "not allowing any delay."  (*Id.* at ¶ 9.)  Sergeeva,

however, goes on to explain that "the law does not define factors for identifying cases 'not

36

allowing any delay,'" but instead this must be determined "on a case by case basis . . . ."
(*Id.*) Accordingly, Russian law, like Rule 4(f)(3), allows flexibility and empowers the Court
to customize the manner of service utilized to the facts and circumstances of a particular
case. *See Hinsey*, 2009 U.S. Dist. LEXIS 52557 at *6. Therefore, service via email and fax
did comply with Russian law and, as this Court previously determined, was appropriate in
this case.

Finally, Uralkali argues that Plaintiffs' efforts to serve the company through BPC
Chicago and D&L, its "purported 'agents,'" were also insufficient. (R. 139, Uralkali's
Direct Mem. at 8.) Although the Seventh Circuit has not addressed this particular issue,
contrary to Uralkali's assertion, other circuits have found that substituted service may be
effected on U.S. based agents or affiliates of foreign defendants under Rule 4(f)(3) as long as
the service satisfies notions of due process. *See e.g. Rio Props.*, 284 F.3d at 1017
(approving service of process on U.S. based affiliate and counsel of foreign defendant under
Rule 4(f)(3)); *1st Tech. LLC v. Digital Gaming Solution*, No. 4:08CV586, 2008 U.S. Dist.
LEXIS 88341, *22-23 (E.D. Mo. Oct. 31, 2008) (authorizing service of foreign defendant
through local counsel pursuant to Rule 4(f)(3)); *In re LDK Solar Secs. Lit.*, 2008 U.S. Dist.
LEXIS 90702, at *10-11 (ordering substituted service through the domestic subsidiary of
foreign defendant under Rule 4(f)(3)); *Brookshire Bros. Ltd. v. Chiquita Brands Int'l*, No.
05CIV21962, 2007 U.S. Dist. LEXIS 39495, (S.D. Fla. May 31, 2007) (authorizing service
of foreign defendant through local counsel pursuant to Rule 4(f)(3)). Due process simply

37

requires that service provides "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Volkswagenwerk Aktiengesellschaft*, 486 U.S. at 707.

Plaintiffs allege that BPC Chicago is a subsidiary of Uralkali, with Uralkali owning a half interest in BPC, and that "[m]uch, if not all" of Uralkali's potash sales in the United States are handled by BPC Chicago. (R. 41, Pls.' Mem. in Supp. of Mot. to Allow Alternative Service.) Given this commercial relationship between Uralkali and BPC Chicago, the Court finds that service was "reasonably calculated" to apprise Uralkali of the pendency of this action. *See Rio Props.*, 284 F.3d at 1017 (determining that U.S. based subsidiary "could effectively pass information" to foreign defendant because the defendant relied on the subsidiary to operate its business in the U.S.). Further, although D&L was not "authorized" to accept service on behalf of Uralkali in this matter, it was clear that the law firm has been retained by Uralkali and was in contact with the company. (*See* R. 41-2, Decl. of Cohen ¶ 14.) Therefore, service was appropriate. *See Rio Props.*, 284 F.3d at 1013 & 1017 (affirming service upon foreign defendant's U.S. counsel even though counsel declined to accept service).

In summary, the Court finds that Plaintiffs have affirmatively demonstrated that service on the Russian Defendants was sufficient in this case. Therefore, the Russian Defendants' motions to dismiss on this basis are denied.

**IV. Failure to State a Claim**

Finally, Defendants argue that both the Direct and Indirect Complaints fail to state a claim for relief. (R. 104, BPC Chicago's Mot. to Dismiss the Direct Compl; R. 105, BPC Chicago's Mot. to Dismiss the Indirect Compl.; R. 107, Certain Defs.' Mot. to Dismiss the Direct Compl.; R. 112, Certain Defs.' Mot. to Dismiss the Indirect Compl.; R. 126, JSC Defs.' Mot. to Dismiss the Indirect Compl.; R. 127, JSC Defs.' Mot. to Dismiss the Direct Compl.) Rule 12(b)(6) provides for dismissal where a party has failed to state a claim. Fed. R. Civ. P. 12(b)(6). In ruling on a motion to dismiss brought pursuant to Rule 12(b)(6), the Court assumes all well-pleaded allegations in the complaint to be true and draws all inferences in the light most favorable to the plaintiff. *Killingsworth v. HSBC Bank*, 507 F.3d 614, 618 (7th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

### A. Federal Sherman Act Claims

#### 1. *Twombly* Analysis

To state a claim under Section 1 of the Sherman Act, a plaintiff must plead not just ultimate facts (such as conspiracy), but evidentiary facts which, if true, illustrate: (1) a contract, combination or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury. *MCM Partners v. Andrews-Bartlett & Assocs.*, 161 F.3d 443, 448 (7th Cir. 1998); *see also Twombly*, 550 U.S. at 554-56. Allegations of conspiracy under the Sherman Act "must adequately allege the involvement of each defendant and put defendants on notice of the claims against them." *In re TFT-LCD Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009); *see also In re OSB Antitrust*

*Litig.*, No. 06-826, 2007 U.S. Dist. LEXIS 56573, *13 (E.D. Pa. Aug. 3, 2007) (citations omitted) ("Antitrust conspiracies need not be detailed defendant by defendant. Rather, an antitrust complaint should be viewed as a whole, and the plaintiff must allege that each individual defendant joined the conspiracy and played some role in it.").

In *Twombly* the Supreme Court specifically addressed the pleading standard for antitrust conspiracies and determined that plaintiffs failed to state a claim because their allegations did not *plausibly* suggest an anticompetitive agreement. *Twombly*, 550 U.S. at 549-50. Despite endorsing the plausibility standard, the Court reiterated that allegations of conspiracy are governed by Rule 8, not the heightened pleading standard of Rule 9(b). *Id.* at 569 n.14; *see also id.* at 556 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."). In dismissing the plaintiffs' complaint, the Court in *Twombly* found that the alleged facts showed parallel conduct, but did not plausibly suggest that the parallel conduct was caused by unlawful agreement, as opposed to rational independent business decisions. *Twombly*, 550 U.S. at 566. The Court found that plaintiffs failed to allege facts which showed an agreement, and instead merely asserted an agreement as a "legal conclusion resting on the prior allegations." *Id.* at 564.

The Court noted that "proceeding to antitrust discovery can be expensive," and that "a district court must retain the power to insist upon some specificity in pleading before

40

allowing a potentially massive factual controversy to proceed." *Id.* at 558; *see also*

*Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803-804 (7th Cir. 2008) (in a

"complex antitrust" case, where "discovery is likely to be more than usually costly," a fuller

set of factual allegations, which show that the plaintiff has a "plausible" claim, "may be

necessary to show that the plaintiff's claim is not 'largely groundless.'") (citations omitted).

Accordingly, "when allegations of parallel conduct are set out to make a § 1 claim,

they must be placed in a context that raises a suggestion of a preceding agreement, not

merely conduct that could just as well be independent action." *Twombly*, 550 U.S. at 564.

The Court explained that "[a]n allegation of parallel conduct is thus much like a naked

assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but

without some further factual enhancement it stops short of the line between possibility and

plausibility of 'entitlement to relief.'" *Id.* (citations omitted.) Recently, the Supreme Court

went on to explain that a plaintiff must plead "factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

*Iqbal*, 129 S. Ct. 1937, 1949 (2009). "Where a complaint pleads facts that are 'merely

consistent with' a defendant's liability, it 'stops short of a line between possibility and

plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Further, the

Court has suggested that "complex and historically unprecedented changes in pricing

structure made at the very same time by multiple competitors, and made for no other

41

discernable reason," would support a plausible inference of conspiracy. *Twombly*, 550 U.S.
at 557 n.4.

In this case, Defendants argue that "Plaintiffs have not pleaded facts plausibly
supporting an inference of an agreement regarding potash prices or output," and therefore
the complaints "cannot survive application of the *Twombly* standard." (R. 108, Cert. Defs.'
Mem. at 12.)  Plaintiffs, however, argue that the complaints allege sufficient facts of parallel
"price increases," "supply restrictions" and "concerted shutdowns," which "readily allow
this Court to draw a reasonable inference" that Defendants conspired to artificially inflate
potash prices for customers in the United States. (R. 144, Direct Pls.' Resp. at 9-12.)  In
addition, Plaintiffs claim that the potash market is generally "conducive to a conspiracy" and
specifically, that there was a "high level of cooperation" and "opportunities to conspire"
amongst Defendants. (*Id.* at 12-13.)

Plaintiffs claim that the approximately 600% increase in the price of potash between
2003 and 2006 cannot be explained by increases in demand or changes in the costs of
production and can only be attributed to a "collective agreement" among Defendants to
restrict supply. (R. 144, Direct Pls.' Resp. at 9.)  In support of their allegation of a
"collective agreement," Plaintiffs allege that in 2005, PCS announced that it was shutting
down three mines resulting in the removal of 1.34 million tons of potash from the market.
(R. 142, Am. Direct Compl. ¶ 88.)  At the same time, Mosaic announced temporary output
cuts resulting in the removal of 200,000 tons. (*Id.* ¶ 89.)  Plaintiffs allege that in 2006 the

42

"coordinated restrictions" continued:  PCS took 32 mine shutdown weeks reducing output

from 2.4 million tons to 1.3 million tons; Uralkali shut down production removing 200,000

tons from the market; Belaruskali cut exports by 50% removing approximately 250,000

tons; and Silvinit announced mine shutdowns removing approximately 100,000 tons of

potash from the market. (*Id.* ¶¶ 91-93.) Plaintiffs further allege that Uralkali and PCS

"jointly restricted" supply in an effort to compel China, the largest potash consumer in the

world, to accept a price increase by reducing their capacity utilization rates to 68% and 60%

and their sales by 23% and 20%, respectively.  (*Id.* ¶¶ 94-95.) Defendants respond that these

output decisions were simply "in response to industry developments - including substantial

declines in global demand." (R. 108, Cert. Defs.' Mem. at 17.)

"Allegations of facts that could just as easily suggest rational, legal business

behavior by the defendants as they could suggest an illegal conspiracy are insufficient to

plead a violation of the antitrust laws." *Kendall v. VISA U.S.A., Inc.,* 518 F.3d 1042, 1049

(9th Cir. 2008) (citing *Twombly,* 550 U.S. at 554-55 & n.5). Accordingly, Plaintiffs'

allegations of parallel conduct, even if consciously undertaken, "needs some setting"

suggestive of an anticompetitive agreement. *Twombly,* 550 U.S. at 557.  Without some

"further circumstance pointing toward a meeting of the minds," Defendants' "commercial

efforts stays in neutral territory." *Id.*

The Seventh Circuit has yet to provide post-*Twombly* guidance as to the "factual

enhancement" that would support a claim under Section 1 of the Sherman Act.  Other

circuits and courts in this district and around the country, however, have provided post-*Twombly* insight. *See e.g., In re: Travel Agent Comm'n Antitrust Litig.*, No. 07-4464, 2009 U.S. App. LEXIS 21638 (6th Cir. Oct. 2, 2009); *St. Clair v. Citizens Fin. Group*, No. 08-4870, 2009 U.S. App. LEXIS 16465 (3d Cir. July 23, 2009); *Kendall*, 518 F.3d 1042; *Standard Iron Works v. Arcelormittal*, No. 08C5214, 2009 U.S. Dist. LEXIS 49476 (N.D. Ill. June 12, 2009); *Hackman v. Dickerson Realtors*, 595 F. Supp. 2d 875 (N.D. Ill. 2009); *In re LTL Shipping Servs. Antitrust Litig.*, No. 08MD01895, 2009 U.S. Dist. LEXIS 14276 (N.D. Ga. Jan. 29, 2009); *Babyage.com Inc., v. Toys R Us, Inc.*, 558 F. Supp. 2d 575 (E.D. Pa. 2008); *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934 (E.D. Tenn. 2008).

In determining whether the complaint satisfies the plausibility threshold required by *Twombly*, the allegations must be evaluated as a whole. *Standard Iron Works*, 2009 U.S. Dist. LEXIS 49476 at *54. Courts have found that the complaint "must include allegations such as the specific time, place, and persons involved in the conspiracy alleged." *In re LTL Shipping Servs.*, 2009 U.S. Dist. LEXIS 14276 at *45; *see also In re: Travel Agent Comm'n Antitrust Litig.*, 2009 U.S. App. LEXIS 21638 at *21-22 (finding that the district court properly dismissed § 1 claim where plaintiffs did not specify defendants' involvement in the alleged conspiracy). In addition, allegations which demonstrate that defendants acted against self-interest enhance the plausibility of the conspiracy. *See Standard Iron Works*, 2009 U.S. Dist. LEXIS 49476 at *61-62 (finding that allegations that defendants gave up market share and profits "at least plausibly" inferred agreement); *Babyage.com Inc.*, 558 F.

Supp. 2d at 582-83 (conduct against defendant's "economic self-interest" constitutes a "plus

factor[]" in favor of conspiracy).

In attempting to reach the plausibility threshold, Plaintiffs first argue that restricting

supply represented a "radical change" in Defendants' behavior.[22] (R. 144, Direct Pls.' Resp.

at 10.) Such a change in behavior could support an inference of conspiracy. *See Twombly*,

550 U.S. at 557 n.4; *Standard Iron Works*, 2009 U.S. Dist. LEXIS 49476 at *72-73

("[D]istinct differences in Defendants' behavior before and during the alleged conspiracy. . .

support the plausible conclusion that the cause of the turnaround was something other than

consolidation."). Plaintiffs allege that after the Russian Defendants decreased production in

2006, other potash suppliers "commended" their change in behavior, noting that previously

the Russian Defendants "had undermined efforts to control prices by flooding the market

during low demand periods." (R. 50, Indirect Compl. ¶ 75.)

Plaintiffs take their allegations even further towards the plausibility threshold by

arguing that "there was a high level of cooperation" and "opportunities to conspire" amongst

Defendants. (R. 144, Direct Pls.' Resp. at 12-14.) Plaintiffs allege that Defendants

routinely held meetings during the Class Period which provided "opportunities to conspire

and exchange highly sensitive competitive information," including "pricing, capacity

---

[22] Plaintiffs limit this argument to the Russian Defendants, who they allege had
previously reduced price to maintain volume during periods of weakening demand. (R. 144,
Direct Pls.' Resp. at 10; R. 142, Am. Direct Compl. ¶¶ 93, 136-37.) Parallel conduct, however,
was not generally "unprecedented" in the potash industry. *See Blomkest Fertilizer v. PCS*, 203
F.3d 1028 (8th Cir. 2000) (where several potash producers, including PCS, prevailed in a
antitrust suit with similar allegations of price collusion.).

utilization, and other important prospective market information." (R. 50, Indirect Compl. ¶ 62; R. 142, Am. Direct Compl. ¶¶ 74, 76, 78-79.)  Proof of an opportunity to conspire, by itself, does not necessarily support an inference of illegal agreement.  *See Twombly,* 550 U.S. at 567 n.12; *In re: Travel Agent Comm'n Antitrust Litig.,* 2009 U.S. App. LEXIS 21638 at *20.  The allegations must also contain "substance" which would, "if, presumed true, plausibly support an inference of [] an anticompetitive scheme." *Hackman,* 595 F. Supp. 2d at 879.  Allegations of specific meetings that occur "on the heels" of defendants' parallel conduct could support an inference of concerted action. *Standard Iron Works,* 2009 U.S. Dist. LEXIS 49476 at *64.

Here, Plaintiffs allege that on October 11, 2005, Defendants' executives met and discussed, among other things, "highly sensitive production plans." (R. 142, Am. Direct Compl. ¶ 75; R. 50, Indirect Compl. ¶ 63.)  Further, Plaintiffs allege that "[s]hortly following the meeting," in November and December 2005, PCS and Mosaic announced production shutdowns at certain mines; BPC reduced production; and IPC shut down mines. (*Id.*)  In addition, Plaintiffs claim that in May 2007, Defendants' representatives attended an IFIA conference during which they "announced an additional price increase on their potash products." (*Id.* ¶ 68.)  Moreover, Plaintiffs allege that "[t]he major potash suppliers have joint ventures or overlapping interests that involve competitors in the potash market." (R. 50, Indirect Compl. ¶ 61.)  Plaintiffs claim that these "mutually beneficial" business

relationships between Defendants "not only provided the opportunity to conspire, but it also created a financial incentive to do so." (*Id.* ¶ 60.)

Finally, Plaintiffs argue that the events of October 25 through November 7, 2007, are "completely inexplicable absent an agreement among the Defendants." (R. 144, Direct Pls.' Resp. at 10-12.) Plaintiffs allege that on October 25, 2007, Silvinit announced that due to the development of a sinkhole, it might have to suspend shipments from one of its mines. (R. 142, Am. Direct Compl. ¶ 98.) Within a day of the announcement, PCS, Uralkali, Agrium and BPC announced that they would also suspend potash sales. (*Id.* at ¶ 99.) Plaintiffs argue that this "joint suspension of sales" was contrary to Defendants' "independent economic interests" and that if the market was truly competitive, Defendants, "all purportedly competitors" of Silvinit, would have an incentive to increase, or at least not suspend, sales to take advantage of Silvinit's reduced output and thus gain market share. (*Id.* ¶ 103; R. 144, Direct Pls.' Resp. at 10-11.)

The *Twombly* Court cautioned that "firms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets." *Twombly*, 550 U.S. at 569. Nevertheless, the fact that several Defendants collectively suspended sales and gave up an opportunity to gain market share, begins to suggest that there was an agreement amongst Defendants to do so.[23] *See Standard*

---

[23] The Court acknowledges that Mosaic, the world's second (or third) largest potash producer, is not alleged to have suspended sales during the period of the sinkhole. (*See* R. 142, Am. Direct Compl. ¶¶ 18, 99; R. 50, Indirect Compl. ¶ 13.)

*Iron Works*, 2009 U.S. Dist. LEXIS 49476 at *62 ("It is certainly plausible that absent

coordination and agreement by each producer to give its 'pint of blood,' no Defendant

would have sacrificed profitable production."); *Babyage.com Inc.*, 558 F. Supp. 2d at 583

(allegations that defendants acted against self interest, "tends to suggest - - and is more than

merely 'consistent with' - - the absence of unilateral agreement.")

Even Defendants acknowledge that an interruption in a competitor's supply presents

an opportunity "to raise prices or poach customers." (*See* R. 159, Cert. Defs.' Direct Reply

at 6-7.) Defendants, however, contend that they exercised "*independent* business

judgment," and decided "to suspend sales until they [knew] whether the market conditions

*really* [had] changed in a way that [would] support a price increase on *all* sales."[24]  (*Id.*)

(emphasis in original). The Court, however, finds the allegations that these suspensions all

took place over the same twelve-day period and that the announcement of PCS's suspension

was made by Uralkali, its purported competitor (*see* R. 50, Indirect Compl. ¶ 81; R. 142,

Am. Direct Compl. ¶ 99), are more suggestive of concerted action than "independent

business judgment." *See In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d at 944 ("the fact

that multiple instances of parallel conduct are alleged makes it far less likely that a business

justification exists for all of the acts taken in total."). Nevertheless, even if Defendants were

merely uniformly following a valid alternative business strategy, Plaintiffs are not required

---

[24]  Defendants argue that an immediate price increase was unsustainable in this case and
would have been "problematic" to their long-term market positions because Silvinit resumed
sales less than two weeks after its purported suspension. (R. 159, Cert. Defs.' Direct Reply at 6.)

"to exclude every plausible interpretation of the facts that does not support their theory of liability." *Hackman*, 595 F. Supp. 2d at 879.  At this stage, Plaintiffs need only assert "plausible grounds to infer" that an illegal agreement was made. *Twombly*, 550 U.S. at 556.

In summary, Plaintiffs allege parallel production cuts which at least for some Defendants represented a "radical change" in behavior; overlapping business ventures; specific meetings attended by Defendants which precipitated production cuts and price increases; and a "joint sales suspension" that was contrary to Defendants' economic interests.  (R. 144, Direct Pls.' Resp. at 10; R. 142, Am. Direct Compl. ¶¶ 75, 93, 98-99, 103, 136-37; R. 50, Indirect Compl. ¶¶ 60-61, 63)  Reading these allegations as a whole, the Court finds that Plaintiffs have satisfied the *Twombly* standard; the allegations propel Defendants' conduct out of "neutral territory" to plausibly suggest entitlement to relief. *Twombly*, 550 U.S. at 557.  Moreover, Plaintiffs have sufficiently alleged the involvement of each Defendant and put them on notice as to the claims against them.[25]  *See In re TFT-LCD Antitrust Litig.*, 599 F. Supp. 2d at 1184-85.

---

[25]  The Court is not persuaded by BPC Chicago's argument that the "allegations cannot plausibly refer to the U.S. subsidiary." (R. 149, BPC Chicago's Reply at 11.)  The complaints allege that the during the Class Period, BPC Chicago "marketed, sold, and distributed potash throughout the United States." (R. 50, Indirect Compl. ¶23; R. 142, Am. Direct Compl. ¶ 27.)  Specifically, Plaintiffs allege that the company was involved in parallel price increases and suspended sales during the sinkhole events. (*Id.* ¶¶ 102, 103, 106, 128.)  At this stage, these allegations sufficiently set forth facts which show that BPC Chicago plausibly played some role in the alleged conspiracy. *See In re OSB Antitrust Litig.*, 2007 U.S. Dist. LEXIS 56573 at *13 ("Antitrust conspiracies need not be detailed defendant by defendant.").

Accordingly, Defendants' motions to dismiss the Sherman Act claims as insufficient under *Twombly* are denied.[26] This Court, however, recognizes that the facts of this case present a difficult question under *Twombly*. As such, in making this ruling, the Court will consider, if asked, certifying this issue for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

### 2. Antitrust Injury and Antitrust Standing

Next, Defendants argue that Indirect Purchaser Plaintiffs fail to sufficiently allege antitrust injury and antitrust standing. (R. 113, Certain Defs.' Indirect Mem. at 12-21.) The Indirect Complaint seeks injunctive relief for alleged violations of the Sherman Act under Section 16 of the Clayton Act.[27] (R. 50, Indirect Compl. ¶¶ 129-32.) Two limitations have

---

[26] Furthermore, the Russian Defendants motions to dismiss for lack of personal jurisdiction are also denied. (R. 126, JSC Defs.' Mot. to Dismiss the Indirect Compl.; R. 127, JSC Defs.' Mot. to Dismiss the Direct Compl.; R. 130, Uralkali's Mot. to Dismiss the Indirect Compl.; R. 135, Uralkali's Mot. to Dismiss the Indirect Compl.) Plaintiffs assert jurisdiction over the Russian Defendants based on a conspiracy theory. (*See* R. 50, Indirect Compl. ¶ 20; R. 150, Pls.' Resp. to Russian Defs.' Mots. at 15; *see also Stauffacher v. Bennett*, 969 F.2d 455, 459 (7th Cir. 1992) ("If through one of its members a conspiracy inflicts an actionable wrong in one jurisdiction, the other members should not be allowed to escape being sued by hiding in another jurisdiction.").) To establish jurisdiction through a conspiracy theory, "a plaintiff must allege both an actionable conspiracy and a substantial act in furtherance of the conspiracy performed in the forum state." *Olson v. Jenkens & Gilchrist*, 461 F. Supp. 2d 710, 725 (N.D. Ill. 2006)(citing *Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1392 (7th Cir. 1983). Consistent with our previous discussion, the Court finds that Plaintiffs have set forth allegations which illustrate that the Russian Defendants' plausibly participated in the alleged conspiracy and that some acts in furtherance of the alleged conspiracy took place in Illinois. As such, Plaintiffs have made out a *prima facie* showing of personal jurisdiction and the Russian Defendants' motion to dismiss on this basis is denied.

[27] Section 16 provides: "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the

50

been placed on the scope of antitrust liability and, thus, the availability of injunctive relief
under Section 16.  To maintain an antitrust action, plaintiffs must establish that they: (1)
have suffered an antitrust injury; and (2) are the proper plaintiffs to maintain an antitrust
action with respect to the relevant markets, or, in other words, possess antitrust standing.
*See Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 715-16 (7th Cir. 2006);
*Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596-97 (7th Cir. 1995); *see also Cargill, Inc. v.
Monfort of Colo., Inc.*, 479 U.S. 104, 110-11 (1986) (requiring a party seeking injunctive
relief under Section 16 to show antitrust injury and antitrust standing).

    To satisfy the antitrust injury requirement, plaintiffs must allege that their "claimed
injuries are 'of the type the antitrust laws were intended to prevent' and 'reflect the
anticompetitive effect of either the violation or of anticompetitive acts made possible by the
violation.'" *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150*, 433 F.3d 1024,
1031 (7th Cir. 2006) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477,
489 (1977)).  Further, the court must determine whether plaintiffs are consumers or
competitors in the market in which trade was restrained. *Assoc. Gen. Contractors of Cal.,
Inc v. Cal. State Council of Carpenters*, 459 U.S. 519, 538-39 (1983).

    Antitrust standing "examines the connection between the asserted wrongdoing and
the claimed injury to limit the class of potential plaintiffs to those who are in the best
position to vindicate the antitrust infraction." *Greater Rockford Energy & Tech. Corp. v.*

---

parties, against threatened loss or damage by a violation of the antitrust laws[.]" 15 U.S.C. § 26.

*Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993) (citing *Cargill*, 479 U.S. at 111 n.6).  In

*Associated General Contractors of California* ("*AGC*"), the Supreme Court outlined a series

of factors to be evaluated to determine whether a plaintiff has standing to bring an antitrust

action.  459 U.S. at 537-45.  These factors are: (1) the causal connection between the alleged

antitrust violation and the harm to the plaintiff; (2) the presence of improper motive; (3) the

directness between the injury and the market restraint; (4) the speculative nature of the

damages; and (5) the risk of duplicate recoveries or complex damages apportionment.[28]  *See*

*Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 484 (7th Cir. 2002) (citing *AGC*, 459

U.S. at 537-45).  When solely injunctive relief is at issue, however, some factors, namely the

speculative nature of the damages and the risk of duplicate recoveries or complex damages

apportionment, are inapplicable to the antitrust standing analysis.  *See Cargill*, 479 U.S. at

111 n.6 ("Standing analysis under § 16 will not always be identical to standing analysis

under § 4.").

Here, Indirect Purchaser Plaintiffs allege they "have been injured and will continue

to be injured in their business and property by paying more for potash products purchased

---

[28]  In *AGC*, the Supreme Court also held that courts examining antitrust standing are to
consider the type of injury and whether it is "of the type that the antitrust statute was intended to
forestall."  459 U.S. at 538-39 (citing *Brunswick*, 429 U.S. at 487-488).  This Court will consider
this factor under the rubric of antitrust injury, as the Seventh Circuit has structured its analysis of
antitrust injury and antitrust standing in this manner.  *See Kochert*, 463 F.3d at 715-719
(analyzing antitrust injury prior to the antitrust standing factors set out in *AGC*); *Serfecz*, 67 F.3d
at 596-97 (examining antitrust injury and antitrust standing separately); *Local Beauty Supply, Inc
v. Lamaur Inc.*, 787 F.2d 1197, 1201 (7th Cir. 1986) (distinguishing between the requirements of
antitrust injury and antitrust standing).

indirectly from Defendants and their co-conspirators than they would have paid and will pay

absent the combination and conspiracy." (R. 50, Indirect Compl. ¶ 132.)  This alleged injury

is "of the type the antitrust laws were intended to prevent" because, as the Seventh Circuit

has observed, "the principal purpose of the antitrust laws is to prevent overcharges to

consumers." *Kochert*, 463 F.3d at 715 (quoting *Premier Elec. Constr. Co. v. Nat'l Elec.*

*Contractors Ass'n, Inc.*, 814 F.2d 358, 368 (7th Cir. 1987)).

   In addition to alleging an injury "of the type the antitrust laws were intended to

prevent," Indirect Purchaser Plaintiffs must also allege that they are participants in the

relevant market. *See AGC*, 459 U.S. at 538-39.  Certain Defendants argue that Indirect

Purchaser Plaintiffs do not satisfy this requirement because they "fail to allege . . . that they

are part of the market in which the alleged antitrust violation occurred – the market for

potash – versus an undefined fertilizer market with many competitive products, none of

which is alleged to be potash, but some of which allegedly 'contain' potash." (R. 113,

Certain Defs.' Indirect Mem. at 14.)  Indirect Purchaser Plaintiffs contend they should be

treated as participants in the potash market because their injury–paying higher prices for

fertilizer–was a "foreseeable, intended consequence of the defendants' illegal actions, and

flow from that which makes the defendants' actions unlawful." (R. 147, Indirect Pls' Resp.

at 14.)

   In support of their position, Indirect Purchaser Plaintiffs rely upon *Blue Shield of*

*Virginia v. McCready*, 457 U.S. 465 (1982).  In *McCready*, the Supreme Court addressed

whether a patient who employed the services of a psychologist had standing to maintain a

Sherman Act claim predicated on her health care plan's refusal to provide reimbursement for

the services rendered by the psychologist. *Id.* at 467. The patient's Sherman Act claim was

based on the allegation that the health care plan conspired with a group of psychiatrists to

exclude psychologists from receiving compensation under the plan with the intent of

excluding the latter from the psychotherapy market. *Id.* at 469-71. The defendants argued

that the patient lacked standing to bring a Sherman Act claim because her injury was too

"remote" as a result of her not being a competitor in the relevant market. *Id.* at 478-79. The

Court rejected this argument and held that because the denial of reimbursement was the

"very means by which it is alleged that [the defendant] sought to achieve its illegal ends,"

the injury to the plaintiff was a "necessary step in effecting the ends of the alleged

conspiracy." *Id.*

Indirect Purchaser Plaintiffs argue that, like the plaintiff in *McCready*, their injury is

not remote because it is also tightly linked to the alleged anticompetitive activity in the

relevant market. (*See* R. 147, Indirect Pls' Resp. at 14.) This Court disagrees with the

comparison. Unlike the plaintiff in *McCready*, the injury suffered by Indirect Purchaser

Plaintiffs is not alleged to be an integral part of the alleged price-fixing conspiracy. At most,

Indirect Purchaser Plaintiffs allege a general causal relationship between their injury and the

alleged anticompetitive activity. Any injury they have suffered in the fertilizer market is not

alleged to be a necessary step in furthering the ends of the conspiracy involving the potash

market itself. Thus, Indirect Purchaser Plaintiffs have failed to show they are participants in the relevant market, and, as a result, have not satisfied the antitrust injury requirement.

Even if a court finds that a complaint alleges an antitrust injury, a plaintiff seeking relief must also be the proper party to bring the antitrust action. *Local Beauty Supply, Inc.,* 787 F.2d at 1201. As such, the court must determine whether the plaintiff has antitrust standing. Certain Defendants contend that Indirect Purchaser Plaintiffs' alleged injury is "too indirect and attenuated to confer antitrust standing." (R. 113, Certain Defs.' Indirect Mem. at 14.)

In determining whether a plaintiff has antitrust standing, a court must look at "the directness between the injury and the market restraint." *See Loeb,* 306 F.3d at 484. Because the concept of antitrust standing was developed with common law proximate causation standards in mind, directness is a particularly important factor in this Court's analysis. *See Greater Rockford,* 998 F.2d at 395 (noting that antitrust standing serves the same function as the common law proximate cause requirement) (citing *AGC,* 459 U.S. at 533). In establishing directness as a factor in the antitrust standing analysis, the Court in *AGC* examined two separate considerations: (1) the chain of causation alleged by the plaintiffs; and (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement. *AGC,* 459 U.S. at 540-42.

55

In *AGC*, the Court found that a Union's claim of injury to their "business activities" was not direct enough to weigh in favor of antitrust standing because the "the chain of causation between the Union's injury and the alleged restraint in the market for construction subcontracts contain[ed] several somewhat vaguely defined links." *Id.* at 540. This Court finds that Indirect Purchaser Plaintiffs' claim of injury is similarly deficient. In their complaint, Indirect Purchaser Plaintiffs allege that prices for potash containing products have been "raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States" and that they have been "deprived of the benefit of free and open competition in the purchase of potash." (R. 50, Indirect Compl. ¶ 127.) What they fail to allege, however, is a chain of causation between the alleged restraint in the market–an illicit agreement to fix the price of potash–and their injury–paying higher prices for potash-containing products, specifically, fertilizer. Indirect Purchaser Plaintiffs contend that their complaint satisfies this requirement by alleging "that Plaintiffs, as consumers, have been forced to pay higher prices for potash products as a result of defendants' price-fixing scheme," (R. 147, Indirect Pls' Resp. at 14.), but the portions of the complaint they point to fail to allege the necessary links between the anticompetitive activity and their injury. (*See* R. 50, Indirect Compl. ¶ 114-128.) Of particular importance is the absence of any allegation regarding whether the parties from whom Indirect Purchaser Plaintiffs purchased fertilizer actually passed on any overcharges they may have paid from parties further up the supply chain resulting from the alleged price-fixing agreement among Defendants. While on

56

a motion to dismiss a court must construe all "well-pleaded allegations in the complaint to be true and draw[] all inferences in the light most favorable to the plaintiff," *Killingsworth*, 507 F.3d at 618, when evaluating the directness factor under the *AGC* test, a court must examine the alleged "chain of causation between the harm [the plaintiff] has suffered and the defendant's wrongful acts." *Loeb*, 306 F.3d at 484. *See O'Neill v. Coca-Cola Co.*, 669 F. Supp 217, 224 (N.D. Ill. 1987) (finding that plaintiff lacked antitrust standing because she failed to allege the causal links between the alleged anticompetitive activity and her "pocketbook injury"). The absence of a critical link in the chain of causation alleged by Indirect Purchaser Plaintiffs weighs against finding that they have antitrust standing to pursue this claim.

Analyzing the directness factor of antitrust standing, this Court must also consider whether there exists an identifiable class of persons who would have the necessary incentives to vindicate the public interest by pursuing this antitrust claim. *AGC*, 459 U.S. at 542. In *AGC*, the Court reasoned that the existence of such a class diminished the justification for allowing a more remote party to enforce the antitrust laws because the failure to provide a remedy to said party was "not likely to leave a significant antitrust violation undetected or unremedied." *Id.* Here, such an "identifiable class of persons" exists– direct purchasers of potash. Indeed, this very class is also seeking to enjoin Defendants' alleged illegal activities. (R. 142, Am. Direct Compl. at 39.) As a result, this

consideration also weighs against finding that Indirect Purchaser Plaintiffs have antitrust

standing to pursue injunctive relief.

Consideration of the *AGC* factors leads this Court to find that Indirect Purchaser

Plaintiffs do not have antitrust standing to pursue injunctive relief against Defendants.  This

finding, combined with their lack of antitrust injury, requires this Court to dismiss Indirect

Purchaser Plaintiffs' Sherman Act claim under Rule 12(b)(6).

## B. State Law Claims

Next, this Court must determine whether Indirect Purchaser Plaintiffs' additional

state antitrust, consumer protection, and unjust enrichment claims survive Defendants'

motions to dismiss under Rule 12(b)(6).

### 1. Antitrust Claims

The state antitrust claims involve statutes that mirror the salient portions of Section 1

of the Sherman Act.   Like their federal counterpart, these statutes predicate liability on the

existence of an agreement in restraint of trade.  *See* Mich. Comp. Laws Ann. § 445.772 ("A

contract, combination, or conspiracy between 2 or more persons in restraint of, or to

monopolize, trade or commerce in a relevant market is unlawful.");[29] Kan. Stat. Ann. § 50-

112 ("[A]ll arrangements, contracts, agreements, trusts or combinations between persons,

---

[29] Plaintiffs indicate Section 445.773 as the provision that has been violated by
Defendants' alleged conduct. (R. 50, Indirect Compl. ¶ 142.)  That provision, however, relates
not to agreements in restraint of trade, but rather to monopolies.  *See* Mich. Comp. Laws Ann. §
445.773.  Considering the crux of the Indirect Complaint involves allegations of an illicit
agreement to fix potash prices, the Court will use Section 445.772 for purposes of its analysis.

designed or which tend to advance, reduce or control the price or the cost to the producer or

to the consumer of any such products or articles . . . are hereby declared to be against public

policy, unlawful and void.");[30] Miss. Code Ann. § 75-21-1, *et seq.* ("A trust or combine is a

combination, contract, understanding or agreement, expressed or implied, between two or

more persons, corporations or firms or association of persons or between any one or more of

either with one or more of the others, when inimical to public welfare and the effect of

which would be . . . (b) [t]o limit, increase or reduce the price of a commodity."); Iowa Code

Ann. § 553.5 ("A contract, combination, or conspiracy between two or more persons shall

not restrain or monopolize trade or commerce in a relevant market.").[31]

### a. *Twombly* Analysis

Defendants first argue that the state antitrust claims are insufficient to state a claim

under *Twombly.* (R. 113, Certain Defs.' Indirect Mem. at 4-7.) "It is well settled that a

federal court sitting in diversity applies federal pleading requirements 'even when the claim

pleaded arises under state rather than federal law.'" *Windy City Metal Fabricators & Supply,*

---

[30]  Rather than properly citing Section 50-112, which prohibits the conduct alleged in the
Indirect Complaint, Plaintiffs cite Section 50-101, (*See* R. 50, Indirect Compl. ¶ 140.), which
defines trusts and declares them unlawful. *Compare* Kan. Stat. Ann. § 50-112 *with* Kan. Stat.
Ann. § 50-101.  The Court will use the former in its evaluation of the Kansas antitrust claim.

[31]  Plaintiffs cite Iowa Code Section 553.5 as the statutory basis for their Iowa antitrust
claim.  (R. 50, Indirect Compl. ¶ 139.)  Again, the core of the allegations contained in the Indirect
Complaint do not involve monopolies.  Rather, the conduct relates to an alleged agreement by
Defendants to "artificially raise, fix, maintain, and/or stabilize prices for potash products in the
United States." (R. 50, Indirect Compl. ¶ 130.)  Thus, this Court will use the more appropriate
Section 553.4 in its analysis.

*Inc. v. CIT Technical*, 536 F.3d 663, 670 (7th Cir. 2008). As previously discussed, Plaintiffs' allegations are sufficient to establish a plausible agreement violative of Section 1 of the Sherman Act. Applying the same federal pleading standard, this Court finds that Indirect Purchaser Plaintiffs' allegations are similarly sufficient to push their state antitrust claims across the "line between possibility and plausibility." *Iqbal*, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 557). Accordingly, Defendants' motions to dismiss the state law antitrust claims under *Twombly* are denied.

### b. Antitrust Standing

In *Illinois Brick Company v. Illinois*, 431 U.S. 720 (1977), the Supreme Court held that only overcharged direct purchasers, and not subsequent indirect purchasers, may sue for money damages under Section 4 of the Clayton Act. Many states, however, allow indirect purchasers to recover monetary damages for violations of state antitrust law. *See, e.g.*, Cal. Bus. & Prof. Code Ann. § 16750(a) (allowing recovery "regardless of whether such injured person dealt directly or indirectly with the defendant"); Minn. Stat. § 325D.57 (allowing recovery by any person "injured directly or indirectly"); Mich. Comp. Laws Ann. § 445.778 (allowing any "person threatened with injury or injured directly or indirectly in his or her business or property" to sue for relief). Like the federal antitrust regime, some of these states have adopted the concept of antitrust standing set out in *AGC* to limit the range of individuals who can bring an antitrust action. Since determining who is a proper plaintiff to bring a state antitrust claim is a matter of state law, this Court will examine the remaining

Michigan, Kansas, Mississippi, and Iowa claims under the applicable state statutes and judicial precedent. In doing so, this Court is bound by the decisions of state supreme courts applying their own law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Jean v. Dugan*, 20 F.3d 255, 260 (7th Cir. 1994). Where the state supreme courts have not ruled on an issue, decisions of state appellate courts control. *See Allen v. Transamerica Ins. Co.*, 128 F.3d 462, 466 (7th Cir. 1997); *Sobilo v. Manassa*, 479 F. Supp. 2d 805, 815 (N.D. Ill. 2007). However, if there is a conflict among the state appellate courts or other persuasive indications that the state supreme court would not follow the rulings of the state appellate courts, we must attempt to predict how the state supreme court would decide the issue. *Id.*

## I.    Michigan

Michigan provides a damages remedy to persons directly or indirectly injured by a violation of state antitrust law.[32] *See* Mich. Comp. Law. Ann. § 445.778(2). Certain Defendants ask this Court to apply *AGC* to Indirect Purchaser Plaintiffs' Michigan antitrust claim and to dismiss their claim for lack of antitrust standing. (R. 113, Certain Defs.' Indirect Mem. at 12-21; App. 2.) Indirect Purchaser Plaintiffs contend that their Michigan claim cannot be dismissed on these grounds as Michigan has not adopted the *AGC* test into

---

[32]   In pertinent part, the relevant statutory provision provides: "Any other person threatened with injury or injured directly or indirectly in his or her business or property by a violation of this act may bring an action for appropriate injunctive or other equitable relief against immediate irreparable harm, actual damages sustained by reason of a violation of this act[.]" Mich. Comp. Law. Ann. § 445.778(2).

61

its state substantive law. (R. 147, Certain Defs.' Indirect Mem. at 4-14; App. 2.)

Alternatively, they argue the Indirect Complaint alleges enough to satisfy *AGC*. (*Id.*)

In support of their position, Certain Defendants rely upon *Stark v. Visa U.S.A., Inc.*,

No. 03-055030, 2004 WL 1879003 (Mich. Cir. Ct. July 23, 2004). In *Stark*, a Michigan

circuit court applied *AGC* in finding that consumers who purchased products from

merchants subjected to an alleged tying arrangement did not have antitrust standing to

pursue a claim against the defendant credit card companies. *Id.* Certain Defendants argue

that this Court, like the circuit court in *Stark*, should apply the federal *AGC* test to Indirect

Purchaser Plaintiffs' Michigan antitrust claim. (*See* R. 113, Certain Defs.' Indirect Mem. at

12-21; App. 2.) To buttress this argument, they point to Michigan's harmonization

provision, which states that "it is the intent of the legislature that in construing all sections of

[the Michigan Antitrust Reform Act], the courts shall give due deference to interpretations

given by the federal courts to comparable antitrust statutes, including, without limitation, the

doctrine of per se violations and the rule of reason." Mich. Comp. Law. Ann. § 445.784.

Absent any ruling or indication by the state supreme court or state appellate courts,

this Court is reluctant to apply the federal *AGC* test to Indirect Purchaser Plaintiffs'

Michigan antitrust claim. Although federal courts applying state law are to predict how the

state's highest court would rule on the identical issue, this Court has very little upon which

to make a reasonable prediction. While we take note of the *Stark* decision and the state

harmonization provision, this Court is hesitant to decide who may be a proper plaintiff under

Michigan's antitrust laws without any signal from an authoritative judicial or legislative source. Other similarly situated courts have shared our sentiment. *See In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2009 WL 1096602, at *15 (N.D. Cal. Mar. 31, 2009) ("This Court, however, is reticent to adopt an across-the-board rule that a state's harmonization provision, whether created by statute or common law, is an appropriate means of predicting how a state's highest court would rule regarding the applicability of *AGC* to state law antitrust claims."); *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp 2d 1085, 1097 (N.D. Cal. 2007) (finding that a harmonization provision and decisions from state intermediate courts applying the *AGC* test are not enough to show that "*AGC* has been adopted as the law of those states."). This Court therefore refuses to apply the federal *AGC* antitrust standing test to Indirect Purchaser Plaintiffs' Michigan antitrust claim. Accordingly, Certain Defendants' motion to dismiss on this basis is denied.

### ii.   Kansas

Certain Defendants also argue that an application of the *AGC* test requires this Court to dismiss Indirect Purchaser Plaintiffs' Kansas antitrust claim.[33] (R. 113, Certain Defs.' Indirect Mem. at 12-21; App. 2.) The authorities Certain Defendants rely upon, however,

---

[33] Indirect Purchaser Plaintiffs' claim for damages under Kansas law is based on the following statutory provision: "Except as provided in K.S.A. 12-205, and amendments thereto, any person injured or damaged by any such arrangement, contract, agreement, trust or combination, described in K.S.A. 50-112 and 50-113, and amendments thereto, may sue for and recover in any court of competent jurisdiction in this state, of any person, the full consideration or sum paid by such person for any goods, wares, merchandise and articles included in or advanced or controlled in price by such combination, or the full amount of money borrowed." Kan. Stat. Ann. § 50-115.

fail to provide this Court with any persuasive indication that *AGC* has been adopted by Kansas. *Shephard v. Boeing Co.*, Slip Copy, No. 07-2208-CM, 2008 WL 360580 (D. Kan. Feb. 8, 2008), a case they cite to support their argument, involves a federal antitrust claim, and is thus not useful in determining whether Kansas antitrust law has adopted *AGC*. *See id.* at *1. *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072 (N.D. Cal. 2007), is similarly unpersuasive. In *DRAM*, the court relied upon two cases to support its conclusion of applying *AGC* to a Kansas antitrust claim. *DRAM*, 516 F. Supp. 2d at 1094. This Court finds both cases are insufficient to compel a similar application of *AGC*. The first case *DRAM* relies upon, *Wrobel v. A Very Dennison Corp., et al.*, No. 05-CV-1296 (Ks. Dist. Ct., Feb. 1, 2006), an unpublished state district court opinion, does not provide this Court with a solid basis upon which to reasonably conclude that *AGC* is a part of Kansas antitrust law. *DRAM's* reliance on *Orr v. Beamon*, 77 F. Supp. 2d 1208 (D. Kan. 1999) is also questionable. In *Orr*, a federal district court applied *AGC* to a state antitrust claim because it found federal cases interpreting the Sherman and Clayton Act "sufficiently persuasive to guide its decision with regard to standing under Kansas law." *Id.* at 1211-12. This Court finds *Orr* unpersuasive as it does not engage in the proper examination of relevant state law authorities in determining whether Kansas has adopted *AGC*.

Again, without an authoritative judicial decision or a legislative directive signaling the adopting of the *AGC* test, this Court declines to find that *AGC* is a part of Kansas law.

Accordingly, Certain Defendants' motion to dismiss the Kansas antitrust claim for lack of antitrust standing is also denied.

### iii.    Mississippi

Similarly, Certain Defendants move to dismiss Indirect Purchaser Plaintiffs' Mississippi antitrust claim for failing to satisfy the *AGC* standing test.[34] (R. 113, Certain Defs.' Indirect Mem. at 12-21; App. 2.)  This Court's review of state antitrust cases reveals that while Mississippi has not provided a clear indication as to the adoption of *AGC*, it has signaled its acceptance of the concept of antitrust injury as defined by federal law.  In *Owens Corning v. RJ Reynolds Tobacco Co.*, 868 So. 2d 331 (Miss. 2004), the Mississippi Supreme Court held that an asbestos producer whose claimed injury consisted of paying inflated damages resulting from defendants' allegedly anticompetitive activity had not suffered antitrust injury. *Id.* at 343-44.  Citing *Brunswick*, it held that antitrust injury "is injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* (internal quotations omitted).  It further held that antitrust injury "is narrowly defined by the legislative purpose of preventing anticompetitive

---

[34] Indirect Purchaser Plaintiffs' claim for damages under Mississippi law is based on the following statutory provision: "Any person, natural or artificial, injured or damaged by a trust and combine as herein defined, or by its effects direct or indirect, may recover all damages of every kind sustained by him or it and in addition a penalty of five hundred dollars ($500.00), by suit in any court of competent jurisdiction.  Said suit may be brought against one or more of the parties to the trust or combine and one or more of the officers and representatives of any corporation a party to the same, or one or more of either.  Such penalty may be recovered in each instance of injury.  All recoveries herein provided for may be sued for in one suit." Miss. Code. Ann. § 75-21-9.

conduct-i.e., conduct that restrains the trade of buyers or sellers within a particular market." *Id.* Such an express application of federal standards provides this Court with sufficient reason to believe that Mississippi has adopted the antitrust injury requirement as articulated in *Brunswick* and its progeny. Applying this requirement as we predict a Mississippi court would be bound to apply it, this Court finds that Indirect Purchaser Plaintiffs have not alleged an antitrust injury under Mississippi law. As described above with respect to their federal antitrust claim, Indirect Purchasers have failed to allege participation in the relevant market. Accordingly, Certain Defendants' motion is granted on this basis and the Mississippi claim is dismissed.

### iv.    Iowa

Indirect Purchaser Plaintiffs' final remaining antitrust claim is under Iowa law.[35] While Iowa does allow indirect purchasers to sue under the Iowa Competition Law, *see* Iowa Code Ann. § 553.12, this Court must determine whether it has adopted a limitation on the range of individuals who can be proper plaintiffs in an antitrust action. In doing so, again this Court must decide whether the state has adopted *AGC*.

---

[35] In relevant part, Indirect Purchaser Plaintiffs claim for damages under Iowa law is based on the following provision: "The state or a person who is injured or threatened with injury by conduct prohibited under this chapter may bring suit to . . . [r]ecover actual damages resulting from conduct prohibited under [the Iowa Competition Law]." Iowa Code Ann. § 553.12. In *Comes v. Microsoft Corp.*, 646 N.W.2d 440 (Iowa 2002), the Iowa Supreme Court held that indirect purchasers may bring suit under the Iowa Competition Law. *Id.* at 445 ("Given the clear, broad language of the state antitrust law, we conclude the Iowa Competition Law creates a cause of action for all consumers, regardless of one's technical status as a direct or indirect purchaser.").

In *Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192 (Iowa 2007), the Iowa Supreme

Court applied *AGC* and held that a group of consumers who claimed injury resulting from an

alleged illicit tying arrangement did not have antitrust standing and, thus, were not proper

plaintiffs under Iowa antitrust law. *Id.* at 198-99. After an examination of five factors set

out in *AGC*, the court affirmed the lower court's determination that the "plaintiffs' injuries

were too remote to be compensable under Iowa's competition law." *Id. Southard* provides

this Court with sufficient reason to conclude that *AGC* is the law in Iowa. A weighing of the

*AGC* factors leads this Court to find that Indirect Purchaser Plaintiffs do not have antitrust

standing to sue under Iowa antitrust law. As previously discussed with respect to their

federal claim, this Court finds that Indirect Purchaser Plaintiffs have failed to allege both an

antitrust injury and a direct connection between their injury and the alleged wrongdoing by

Certain Defendants.[36] These two factors weigh heavily against finding antitrust standing in

this case. Accordingly, this Court dismisses Indirect Purchaser Plaintiffs' Iowa antitrust

claim.

### 2. Consumer Protection Claims

---

[36] The *Southard* court considered antitrust injury under its antitrust standing analysis.
*See Southard*, 734 N.W.2d at 198-199. While under Seventh Circuit law the concepts are
generally examined separately, *see Kochert*, 463 F.3d at 715-719 (analyzing antitrust injury prior
to the antitrust standing factors set out in *AGC*); *Serfecz*, 67 F.3d at 596-97 (examining antitrust
injury and antitrust standing separately); *Local Beauty Supply, Inc.*, 787 F.2d at 1201
(distinguishing between the requirements of antitrust injury and antitrust standing), this Court
must structure its analysis according to Iowa law. Accordingly, this Court's examination of
antitrust standing also considers antitrust injury.

In Count III of their complaint, Indirect Purchaser Plaintiffs assert claims under the consumer protection statutes of various states. (R. 50, Indirect Compl. ¶¶ 160-189.) Only the Florida and Kansas claims, however, remain for this Court's review.[37] Certain Defendants move to dismiss these claims for failure to plead with the requisite particularity under Rule 9(b).

As a preliminary matter, this Court must determine the applicable pleading standard for these claims. In *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502 (7th Cir. 2007), the Seventh Circuit held that a "claim that 'sounds in fraud'-in other words, one that is premised upon a course of fraudulent conduct-can implicate Rule 9(b)'s heightened pleading requirements." *Id.* at 507. Similarly, courts interpreting the FDUTPA have found that a claim sounding in fraud triggers Rule 9(b)'s pleading requirements. *See, e.g., Sunoptic Tech., LLC v. Integra Luxtec, Inc.*, No. 3:08-cv-878-J-16JRK, 2009 WL 722320, at *2 (M.D. Fla. Mar. 18, 2009) (applying Rule 9(b) to a FDUTPA claim sounding in fraud); *Siever v. BWGaskets, Inc.*, No. 6:08-CV-1388-Orl-19GJK, 2009 WL 528624, at *3 n. 1 (M.D. Fla. Mar. 2, 2009) (stating that Rule 9(b) applies to FDUTPA claims "grounded in fraud"); *Stires v. Carnival Corp.*, 243 F. Supp. 2d 1313, 1322 (M.D. Fla. 2002) (finding that

---

[37] The Florida claim is brought under the Florida Deceptive and Unfair Trade Practice Act ("FDUTPA"). (R. 50, Indirect Compl. ¶ 167.) In relevant part, this provision states that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Fla. Stat. Ann. § 501.204 (1). Indirect Purchaser Plaintiffs also assert a claim under the Kansas Consumer Protection Act ("KCPA"). (R. 50, Indirect Compl. ¶ 169.) This Act proscribes deceptive or unconscionable acts and practices in connection with a consumer transaction. *See* Kan. Stat. §§ 50-626, 627.

allegations of fraud involving a FDUTPA claim trigger heightened pleading standards under Rule 9(b)).  Courts interpreting the KCPA have also found that Rule 9(b) pleading standards apply to claims sounding in fraud.  *See, e.g., Thompson v. Jiffy Lube Intern., Inc.*, 505 F. Supp. 2d 907, 932 (D. Kan. 2007) (evaluating a KCPA claim sounding in fraud under Rule 9(b)); *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 300 F. Supp. 2d 1107, 1150 (D. Kan. 2003) (applying Rule 9(b) to a deceptive trade practices claim under the KCPA); *Burton v. R.J. Reynolds Tobacco Co.*, 884 F. Supp. 1515, 1524 (D. Kan. 1995) (stating that "claims which are not precisely actions for fraud, but are based on fraud, are required to be pled with particularity.").

Plaintiffs allege that "Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices." (R. 50, Indirect Compl ¶ 161.) In the next paragraph, they make a similar allegation. (*Id.* ¶ 162.)  Moreover, for purposes of the complaint and class definition, Indirect Purchaser Plaintiffs label Florida and Kansas as "Consumer Fraud States." (*Id.* ¶ 31.)  Other portions of the Indirect Complaint are similarly peppered with references to fraud. (*Id.* ¶¶ 2, 40, 43.)  Indirect Purchasers repeated averments of fraud with respect to their consumer protection claims leads this Court to find that these claims sound in fraud.  *See, e.g., Borsellino*, 477 F.3d at 507-08 (holding that repeated averments of fraud in the complaint and in appellants' opening brief triggered Rule 9(b)); *Gavin v. AT&T Corp.*, 543 F. Supp. 2d 885, 896 (N.D. Ill. 2008) (finding that complaint "peppered with references to fraudulent and deceptive conduct" by defendants

triggered Rule 9(b)). Thus, by alleging consumer protection claims premised on fraudulent

conduct, Indirect Purchaser Plaintiffs have triggered Rule 9(b).

To satisfy Rule 9(b), a plaintiff must allege "with particularity the circumstances

constituting fraud or mistake." Fed. R. Civ. P. 9(b). The circumstances of fraud or mistake

include "the identity of the person who made the misrepresentation, the time, place and

content of the misrepresentation, and the method by which the misrepresentation was

communicated to the plaintiff." *Windy City*, 536 F.3d at 668 (internal quotations omitted).

Put simply, plaintiffs must provide the "who, what, when, where, and how" of the alleged

fraud. *Borsellino*, 477 F.3d at 507. In a case involving multiple defendants, the complaint

should inform each defendant of the nature of their alleged participation in the fraud.

*Vicom, Inc. v. Harbridge Merchant Servs.*, 20 F.3d 771, 778 (7th Cir. 1994); *Shair v. Qatar

Islamic Bank*, No. 08 C 1060, 2009 WL 691249, at *1 (N.D. Ill. Mar. 16, 2009).

This Court finds that the allegations in the Indirect Complaint are insufficient to

satisfy Rule 9(b)'s particularity requirements. Although when details of the fraud "are

within the defendant's exclusive knowledge," specificity requirements are less stringent, a

complaint that is "completely wanting in the details that Rule 9(b) mandates" will not

survive a motion to dismiss. *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir.

1994) (finding that when details of the fraud "are within the defendant's exclusive

knowledge," specificity requirements are less stringent). Here, the Indirect Complaint lacks

an essential component of a fraud claim—an allegation of a misrepresentation with respect to

the FDUTPA or KCPA claims. (*See* R. 150, Indirect Compl. ¶¶ 1-169.)  The Indirect

Complaint alleges that Defendants "affirmatively misrepresented" or "affirmatively

deceived" New York and Rhode Island residents as to " the real cause of price increases for

potash products." (R. 50, Indirect Compl. ¶¶ 178, 181.)  These isolated allegations,

however, are not enough to satisfy Rule 9(b).  *See Windy City*, 536 F.3d at 668 (holding that

the circumstances of fraud include "the identity of the person who made the

misrepresentation, the time, place and content of the misrepresentation").  Further, Indirect

Purchaser Plaintiffs merely assert allegations against "Defendants" generally, and do not

differentiate the levels of involvement of each in the alleged fraud.[38]  *See Vicom*, 20 F.3d at

778.  Thus, Indirect Purchaser Plaintiffs have not satisfied the heightened pleading

requirements of Rule 9(b).  Accordingly, this Court dismisses their FDUTPA and KPCA

claims under Rule 12(b)(6).

### 3. Unjust Enrichment Claims

Finally, Certain Defendants argue that Count IV, the Indirect Purchaser Plaintiffs'

unjust enrichment claims, must also be dismissed. (R. 112, Certain Defs.' Mot. to Dismiss

the Indirect Compl.)  As an initial matter, "[u]nder Mississippi law, unjust enrichment is not

an independent theory of recovery." *Cole v. Chevron USA*, 554 F. Supp. 2d 655, 671-73

(S.D. Miss. 2007).  Such a claim "depends upon a showing of some legally cognizable

---

[38] Although the Indirect Complaint alleges that Mosaic released a report that "falsely
attributed" the tight supply in the potash market, (R. 50, Indirect Compl. ¶ 93), this allegation, by
itself, is not enough for Rule 9(b) purposes to support an allegation of fraud against all
Defendants. *See Vicom*, 20 F.3d at 778.

wrong." *Id.* at 673 (citing *Estate of Johnson v. Adkins*, 513 So. 2d 922, 926 (Miss. 1987)).

As previously discussed, Indirect Purchaser Plaintiffs have failed to allege a legally

cognizable Mississippi claim, therefore they cannot claim unjust enrichment under

Mississippi law. *See id.*

     As for the remaining states-Michigan, Florida, Kansas and Iowa-the elements for a

unjust enrichment claim are essentially the same; plaintiff must establish that: (1) plaintiff

conferred a benefit on the defendant; (2) defendant knew and received a benefit; and (3)

defendant retained the benefit under circumstances that make it unjust. *In re Estate of*

*Sauder*, 156 P.3d 1204, 1220 (Kan. 2007); *see also Fla. Power Corp. v. City of Winter Park*,

887 So. 2d 1237, 1242 n.4 (Fla. 2004); *Hudson v. Mathers*, 770 N.W.2d 883, 887 (Mich.

App. Ct. 2009); *State ex. rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 154-55 (Iowa 2001).

Here, Indirect Purchaser Plaintiffs allege that they purchased potash "indirectly," i.e. not

from Defendants, but by purchasing potash containing fertilizer from third party "retailers".

(*See R.* 50, Indirect Compl. ¶¶ 9, 33.) Further, they claim that Defendants have been

"unjustly enriched" by way of their "overpayments" and that they "are entitled to a

disgorgement of all profits resulting from such payments . . . ." (*Id.* ¶¶ 191-92.) These

allegations of "indirect" purchases, and Defendants subsequent alleged "indirect"

enrichment, however, will not support an unjust enrichment claim under Michigan, Florida

or Kansas law. *See Spires v. Adams*, 289 Fed. Appx. 269, 273 (10th Cir. 2008) (noting that

Kansas law does not support an "indirect unjust enrichment claim"); *Extraordinary Title*

72

*Servs. v. Fla. Power & Light Co.*, 1 So. 3d 400, 404 (Fla. Dist. Ct. App. 2009) (affirming

dismissal of unjust enrichment claim where plaintiff could not "allege or establish that it

conferred a direct benefit" upon defendant); *A&M Supply v. Microsoft Corp.*, 2008 Mich.

App. LEXIS 433, *6-7 (Mich. App. Ct. 2008) (concluding that the unjust enrichment

doctrine requires "direct receipt" of a benefit, and was therefore inapplicable to "indirect

purchasers"); *see also New Dimension Dev. v. Orchard*, 2005 Mich. App. LEXIS 2667, *18-

19 (Mich. App. Ct. Oct. 27, 2005) (quoting *Kammer Asphalt Paving Co., Inc. v. East China

Twp Schs.*, 504 N.W.2d 635 (Mich. 1993) ("any indirect benefit defendant derived from

plaintiffs was too attenuated to warrant imposing the equitable doctrine of unjust

enrichment, which must be 'employed . . . with caution,' because it 'vitiates normal contract

principles.'").

　　　Indirect Purchaser Plaintiffs' "indirect" unjust enrichment claim, however, is not

precluded under Iowa law.  Unlike the Michigan, Florida, and Kansas courts, the Iowa

Supreme Court interprets unjust enrichment as a "broad principle with few limitations."

*Unisys Corp.*, 637 N.W.2d at 155.  Under Iowa law, benefits are not required to be conferred

directly from plaintiff; "benefits can be direct or indirect" and can by "conferred by third

parties." *Id.*  "The critical inquiry is that the benefit received be at the expense of the

plaintiff." *Id.*  As such, this Court finds that Indirect Purchaser Plaintiffs have sufficiently

pleaded an unjust enrichment claim under Iowa law.[39]  (*See* R. 50, Indirect Compl. ¶ 9(c).)

---

　　　[39] The Court notes that in the previously discussed *Southard* case, the Iowa Supreme
Court did impose "limitations" on an unjust enrichment claim by concluding that plaintiffs'

Accordingly, Certain Defendants' motion to dismiss is granted in part and denied in part. The Mississippi, Kansas, Florida and Michigan unjust enrichment claims are dismissed and the Iowa claim remains.

## CONCLUSION

For the reasons stated herein, Defendants' motions to dismiss (R. 104, R. 105, R. 107, R. 112, R. 126, R. 127, R. 130, R. 135) are GRANTED in part and DENIED in part. The motions to dismiss the Direct Complaint (R. 142) are DENIED. As for the Indirect Complaint (R. 50), the motions to dismiss Count I and Count III are GRANTED. The motions to dismiss Count II and Count IV are GRANTED in part and DENIED in part. In Count II, the motions to dismiss are GRANTED except for the Michigan and Kansas claims. In Count IV, the motions to dismiss are GRANTED except for the Iowa claim. The motions to dismiss are DENIED in all other respects.[40]

The Court is mindful that discovery in this case has the potential to be extremely labor intensive and expensive. Nevertheless, this Court believes that Plaintiffs must be given a fair opportunity to prove the critical allegations outlined herein. Therefore, the Court will structure discovery proceedings to concentrate on the alleged coordinated supply restrictions. No general background discovery will be allowed. This initial, structured

---

claim was not actionable because the injuries were "too remote to recover." *Southard*, 734 N.W.2d at 199. In contrast to this case, however, the injuries alleged by the plaintiffs in *Southard* were "not even indirect, as the plaintiffs [were] not in the chain of distribution." *Id.*

[40] The Court will consider Belaruskali's motion to dismiss (R. 190) in a subsequent opinion, once the issues have been fully briefed.

discovery must be completed by April 30, 2010.  The Court will thereafter allow Defendants

an opportunity to file expedited summary judgment motions, which will allow this Court to

apply a different standard to judge the merits of Plaintiffs' allegations.

Finally, the parties are directed to reevaluate their settlement positions in light of this

opinion and to exhaust all efforts to settle this case.  The parties shall appear for a status on

November 17, 2009 at 9:45 a.m.

Entered:

**Judge Ruben Castillo**
**United States District Court**

**Dated:   November 3, 2009**

75