# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE AFTERMARKET FILTERS ANTITRUST | ) | |
| LITIGATION | ) | |
| | ) | |
| THIS DOCUMENT RELATED TO: | ) | Lead Case No. 08 C 4883 |
| | ) | MDL Docket No. 1957 |
| All Actions | ) | Judge Robert W. Gettleman |

**MEMORANDUM OPINION AND ORDER**

In this multi-district litigation, several putative plaintiff classes have alleged that

defendants, the leading manufacturers[1] of automobile aftermarket filters,[2] conducted a single

conspiracy to fix filters prices beginning March 1, 1999, and extending to the present. The first

proposed class alleges violations of § 1 of the Sherman Act, 15 U.S.C. § 1, and consists of direct

purchasers from defendants (the " Direct Purchasers" or "Direct Purchaser Plaintiffs"). The

indirect purchaser putative classes consist of a nationwide injunction class (alleging violations of

§ 1 of the Sherman Act), a nationwide class seeking damages for common law unjust

enrichment, and classes asserting claims under the antitrust laws of 28 states and the District of

---

[1]The defendants are Champion Laboratories, Inc., ("Champion"), ArvinMeritor, Inc.,
Cummins Filtration, Inc. ("Cummins"), Donaldson Company, Inc. ("Donaldson"), Honeywell
International, Inc. ("Honeywell"), Purolator Products NA, LLC and Purolator Products
Company, LLC (together, "Purolator"); since 2006 owned as a joint venture between Robert
Bosch LLC ("Bosch") and Mann + Hummel U.S.A., Inc. ("Mann + Hummel"), Affinia Group,
Inc. ("Affinia" or "Affinia/Wix"), Wix Filtration Corp. ("Wix Filtration"), and Baldwin Filters,
Inc. ("Baldwin"). The Indirect (but not the Direct) Purchasers also name Bosch and Mann +
Hummel as defendants. As related to the Direct Purchaser action, defendants will collectively be
referred to as the "Direct Purchaser Defendants," and as to the Indirect Purchaser action they will
be referred to as the "Indirect Purchaser Defendants."

[2]These filters include oil, air and fuel filters sold in the aftermarket for light duty
vehicles, including automobiles and light trucks. As used in the complaints, the term does not
include filters sold to original equipment manufacturers.

Columbia (together referred to as the "Indirect Purchasers" or the "Indirect Purchaser Plaintiffs")[3]

Despite detailed allegations of a number of specific instances of price fixing conversations based on an eyewitness, defendants have moved to dismiss the complaints pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim under the standards set by the Supreme Court in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955 (2007)("Twombly"), as well as asserting a statute of limitations argument. Each of the defendants, with the exception of Champion (which has filed an answer in the direct purchaser case rather than join the motion to dismiss), have advanced separate arguments with respect to the allegations against each of them. The Indirect Purchaser Defendants have joined the Twombly-based motion (the "Twombly Motion") and have also moved to dismiss on a number of other grounds. For the reasons discussed below, the Twombly Motion is denied, and the Indirect Purchaser Defendants' motion is granted in part and denied in part.

---

[3]Two other cases are currently included within this multi-district litigation: 08 C 4792, filed by Gasoline and Automotive Service Dealers of America, Inc. ("GASDA"), an association of Connecticut area gas stations and repair and body shops; and 09 C 2321, filed by the state of Florida. The motion to dismiss the GASDA suit will be addressed by the court in a separate opinion. The Florida action has been stayed by agreement, pending the court's ruling on the instant motions.

2

## I. The Twombly Motion

### (A) The parties and the Complaints[4]

The Direct and Indirect Purchaser Plaintiffs have filed consolidated complaints that include the following material allegations, which the court finds are more than sufficient to withstand the Twombly motion to dismiss:

(1) The alleged Direct Purchaser Plaintiff class includes warehouse and wholesale distributers, jobbers, automotive parts and mass merchandising retailers, and direct and private label purchasers of filters from defendants. The class does not include automobile manufacturers. The Indirect Purchaser Class includes 36 individuals and four business entities.

(2) The named defendants are the leading manufacturers of filters, and four of the defendants (Honeywell, Purolator, Wix and Champion) control more than 80% of the filter market, which collectively have annual U.S. sales of $1.5 billion (as alleged by the Direct Purchasers) or $2.7 billion (as alleged by the Indirect Purchasers).

(3) The filter market is mature, highly concentrated and difficult to enter. The filters produced by any manufacturer are fungible – they may be easily substituted by those of a competitor, and are often referred to in the industry as "light sweet crude" because of their substitutability. The demand is relatively inelastic because automobile manufacturers strongly recommend that filters be replaced regularly. There is little brand loyalty by consumers, and price is the most important factor considered by consumers.

---

[4]The complaints filed by the Direct and Indirect Purchaser Plaintiffs contain similar allegations concerning the conspiracy claims, which are summarized herein.

3

(4) Plaintiffs base many of the facts alleged in their complaint on the personal knowledge of William Burch ("Burch"), who in 1999 was the national accounts manager at Purolator. Later that year he left Purolator and joined Champion as its national accounts manager. Burch claims that he witnessed several specific meetings and conversations that culminated in the agreement by the named defendants to participate in a horizontal price fixing conspiracy. He first made these allegations to the Federal Bureau of Investigation on January 13, 2006. The following facts are taken from the complaint based upon Burch's account of defendants' activities, and is a summary of a much lengthier factual recitation contained in the complaint.

(5) The complaints generally allege a conspiracy to fix prices of filters among all of the defendants and other unnamed co-conspirators beginning March 1999 and continuing throughout the "class period" (March 1, 1999 through the present), accomplished by secret meetings, discussions and exchanges of information. After these general allegations, the complaints specifically allege two sets of discussions that illustrate the conspiracy.

(6) The first, in March 1999, began when Marlen Silverii ("Silverii"), a senior vice-president at ArvinMeritor, which had recently acquired Purolator, called a meeting of senior Purolator employees, including Burch, and directed them to contact their counterparts at competitors/defendants to arrange a coordinated rise in prices in order to improve Purolator's profit margins without losing market share. "A number" of those present, including Burch, complied with Silverii's directive. Subsequently, conversations occurred between ArvinMeritor personnel and its competitors to implement the plan to

4

fix prices. The complaints describe a series of meetings at a trade show in May 1999, as well as several meetings by Silverii "and at least one other senior Purolator employee" with senior executives from Honeywell and Champion (including a meeting between Silverii and Champion's President, Tom Mallett) to discuss coordinating and fixing filter prices. In June 1999, at Silverii's direction, Purolator faxed a draft price announcement to the Honeywell employee to whom Silverii had "secretly" spoken at the trade show. The draft price announcement, which had not yet been sent to customers, stated that Purolator intended to implement a price increase effective August 15, 1999, and "pretextually" explained that the increase was due to a rise in the cost of labor, health care, freight and materials. On July 14, 1999, Purolator sent the price announcement, back-dated to July 7, 1999, to its customers, followed shortly thereafter by the "agreed-upon price increase by each of the other defendants," all pursuant to the price fixing agreement between them.

(7) Apparently, the next relevant event directly witnessed by Burch, who had left Purolator to join Champion as its national accounts manager, was a meeting in February 2004 convened by John Evans, then Champion's president, of senior Champion employees, at which he directed them to coordinate a new price increase, as had been done in the past, with the other defendants. After contacts were made by Champion employees, including a contact with Silverii, who was still employed by ArvinMeritor, each defendant agreed to participate in a coordinated price increase, which occurred in April 2004. A second price increase in 2004 occurred in September of that year, led again by Champion. The complaint alleges a specific meeting at a trade show between

5

September 26 and September 28, 2004, at which Champion coordinated a price increase

of at least 5% with the other defendants, which they publicly declared to be caused by

rising steel costs, even though the defendants were by then using less steel in the

manufacture of filters. In December 2004, defendants successfully implemented a third

price increase for that year, and in subsequent years defendants continued their unlawful

price fixing conspiracy.

## **(B)    Twombly**

In Twombly, the Supreme Court rejected a complaint that attempted to plead an antitrust

conspiracy in violation of the Sherman Act based primarily on the defendant "Baby Bell"

telephone companies' parallel behavior, consisting of steps to keep out competing start-up

telephone competitors. Unlike the instant case, the Twombly plaintiffs did not plead any facts to

support an actual agreement among the defendants. "[T]he pleadings mentioned no specific

time, place or person involved in the alleged conspiracies . . .[and] proceed[ed] exclusively via

allegations of parallel conduct." Twombly, 550 U.S. at 565, n. 10, 11. The Court concluded

that, despite the liberal notice pleading requirements of Fed. R. Civ. P. 8(a), this was not enough

to plead a Sherman Act violation: "We think nothing contained in the complaint invests either

the action or inaction alleged with a plausible suggestion of conspiracy," as required by Rule 8.

Id. at 566. "Without more, parallel conduct does not suggest conspiracy, and a conclusory

allegation of agreement at some unidentified point does not supply facts adequate to show

illegality." Id. at 556-57. Even then, the court acknowledged that the complaint came "close to

stating a claim, but without some further factual enhancement it stopped short of the line

between possibility and plausibility of `entitle[ment] to relief.'" Id. at 557.

6

As described above, the complaint in the instant case, unlike Twombly, alleges an actual

agreement initiated by specified persons, witnessed in its inception and on several later

occasions by an actual participant in the price fixing scheme. Although the series of alleged

price fixing arrangements among defendants was followed by parallel rises in prices, the

complaint does not rely only on the alleged parallel conduct to imply a conspiracy.

Defendants argue that the single conspiracy alleged in the complaint between 1999

through 2004 and beyond is somehow defeated by the fact that Burch did not directly witness a

price fixing conversation between the years 1999 and 2004. Defendants are wrong. The

complaint clearly alleges the inception of the conspiracy by Silverii, the methods that he directed

to accomplish the price fixing scheme, a specific meeting at which the scheme was discussed, the

advance communication of Purolator's price increase to the defendant competitors, and the

agreement by defendants to participate. The complaint thus alleges a single conspiracy

beginning with the March 1999 agreement, running through the 2004 meetings witnessed by

Burch, and continuing to the present. The plausibility of the conspiracy is further buttressed by

the allegations concerning the concentration of the filters industry, the maturity of the market,

the fungibility of the products, the lack of brand loyalty, and the importance of price in

determining consumer purchasing decisions.

Taken as true, as this court must on a motion to dismiss under Rule 12(b)(6), these well

pleaded facts are more than sufficient "to suggest that an agreement was made" that violates § 1

of the Sherman Act, and amply "calls for enough fact to raise a reasonable expectation that

discovery will reveal [more] evidence of an illegal agreement." Id. at 556. Like all complaints,

the court must read the instant complaint in its entirety, and must not "scrutinize each allegation

7

in isolation but [must] assess all of the allegations holistically." See Tellabs, Inc. v. Makor
Issues & Rights, Ltd., 551 U.S. 308, 325 (2007). In other words, as plaintiffs argue, defendants
may not "cherry pick" specific allegations in the complaint that might be insufficient standing
alone. Nothing in Twombly or any other case has diminished the application of these general
standards to a § 1 Sherman Act claim.

To be sure, discovery in this case will be extensive, costly and time-consuming.
Plaintiffs will have to fill in the five year period between the two series of events witnessed by
Burch, and identify the people who acted on behalf of the various defendants. Plaintiffs cannot
be expected to know or allege such details at this early stage in the case; neither Twombly nor
any case decided under that holding suggests otherwise.

Because the instant complaint sufficiently states a claim of a single conspiracy beginning
in 1999 and extending through the present, the Twombly motion is denied.

**Statute of Limitations**

Defendants argue that any claim based on allegations of unlawful conduct prior to
March 31, 2004, are barred by the applicable four year statute of limitations set out in 15 U.S.C.
§ 15b.[5] The court disagrees.

There is no question that plaintiffs' claims are subject to a four year limitations period.
15 U.S.C. § 15b. Generally, an antitrust claim "accrues and the statue begins to run when a
defendant commits an act that injures a plaintiff's business." Zenith Radio Corp. v. Hazeltine
Research, Inc., 401 U.S. 321, 338 (1971). In the context of a continuing conspiracy to violate

---

[5]The initial Direct Purchaser complaint was filed on March 31, 2008. The initial Indirect
Purchaser complaint and the GASDA complaint were filed later.

8

the antitrust laws, each time a plaintiff is injured by an act of the defendant a cause of action accrues to recover the damages caused by that act and, as to those damages, the statute of limitations runs from the commission of the act. Id. As in other areas of the law, however, this rule is qualified by the discovery rule which "postpones the beginning of the limitations period from the date when the plaintiff was wronged to the date when he discovers he has been injured." In re Copper Antitrust Litigation, 436 F.3d 782, 789-90 (7th Cir. 2006).

In the instant case, although plaintiffs may have been injured each time they purchased defendants' filters prior to March 31, 2004, plaintiffs had no knowledge of the wrongful conduct alleged, or any of the facts that would have led them to the discovery of the alleged conduct prior to Burch's statement to the FBI on January 13, 2006. Prior to Burch's revelations, all plaintiffs knew was that defendants began increasing the price of filters based, according to defendants, on increases in the costs of labor, healthcare, freight, and raw materials. Because, based on the allegations in the complaints, January 13, 2006, is the earliest date plaintiffs could have discovered the injury, and the earliest date the cause of action could have accrued, defendants' motion to dismiss any claims based on conduct prior to March 31, 2004, is denied.

## II.      Defendants' Motion to Dismiss the Indirect Purchasers' Complaint

The Indirect Purchasers have brought a four count consolidated indirect purchaser complaint alleging violations of § 1 of the Sherman Act (Count I); unjust enrichment (Count II); violations of certain states' antitrust laws (Count III); and violations of certain states' consumer protection and unfair competition laws (Count IV). The Indirect Purchaser Defendants (referred to in this section as "defendants") have moved to dismiss parts or all of Counts II, III and IV

9

raising issues related to standing. As explained below, defendants' motion is granted in part and denied in part.

**(A) Claims under the laws of states in which no plaintiff resides**

Defendants first argue that plaintiffs lack standing to bring claims under either the antitrust laws (Count III) or the consumer protection statutes (Count IV) of Maine, New Hampshire, North Carolina, Puerto Rico, Rhode Island, and Wyoming because none of the named plaintiffs reside in those states, and no plaintiff has suffered an injury under the laws of those states. See In re: Graphics Processing Units Antitrust Litigation , 527 F. Supp.2d 1011, 1026 (N.D. Cal. 2007) (holding that a class cannot assert a claim on behalf of an individual it cannot represent, and that under Ninth Circuit law standing can be addressed prior to class certification when the court is not considering a global class settlement).

Relying on the Supreme Court's decision in Ortiz v. Fireboard Corp., 527 U.S. 815, 831 (1999), plaintiffs argue that the issue should be postponed until the court rules on class certification. Ortiz held that courts may evaluate class certification issues before Article III standing if the former are "logically antecedent" to the latter. Id.

Ortiz created an exception, limited to class actions, to the general rule that courts address standing as a threshold matter. The Seventh Circuit interprets Ortiz "to rest on the long-standing rule that, once a class is properly certified, statutory and Article III standing requirements must be addressed with reference to the class as a whole, not simply with reference to the individually named plaintiffs. The certification of a class changes the standing aspects of a suit, because a 'properly certified class has a legal status separate from and independent of the interests asserted

by the [named] plaintiff.'" Payton v. County of Kane, 308 F.3d 673, 680 (7th Cir. 2002) (quoting

Whitlock v. Johnson, 153 F.3d 380, 384 (7th Cir. 1998)).

In the instant case, all of the plaintiffs, named and unnamed, have Article III standing to

sue defendants. All plaintiffs have allegedly suffered identical injuries caused by several parties

related by a conspiracy to fix prices. Payton, 308 F.3d at 679. Therefore, the name plaintiffs'

capacity to represent individuals from other states depends upon obtaining class certification,

and the standing issue would not exist but for their assertion of state law claims on behalf of

class members in those states. In re: Chocolate Confectionary Antitrust Litigation, 602 F.

Supp.2d 538, 579-80 (N.D. Pa. 2009). Thus, any "standing" issues arise from plaintiffs'

attempts to represent the proposed classes. These are class certification issues "logically

antecedent" to the standing concerns. Therefore, defendants' motion to dismiss the claims in

Counts III and IV based on lack of standing with respect to Maine, New Hampshire, North

Carolina, Puerto Rico, Rhode Island and Wyoming is denied.

**(B)     Individual state antitrust laws**

In Illinois Brick Company v. Illinois, 431 U.S. 720, 730 (1977), the Supreme Court held

that indirect purchasers may not sue for money damages under Section 4 of the Clayton Act. In

response to Illinois Brick, a number of states passed what are commonly called "Repealer"

statutes, which expressly allow indirect purchasers to recover damages for antitrust violations

under state antitrust laws. See, e.g., California Cartwright Act, Cal. Bus. & Prof. Code § 16720.

In Count III, the Indirect Purchaser Plaintiffs assert claims under the antitrust laws of 22 separate

states and the District of Columbia and Puerto Rico. Defendants have challenged that count on a

variety of standing grounds.

11

## (1) Nebraska, New Hampshire, Utah and Wyoming

Defendants have moved to dismiss the Indirect Purchaser Plaintiffs' claims under the

antitrust laws of Nebraska, New Hampshire, Utah and Wyoming because the conduct alleged in

the consolidated indirect complaint pre-dates the enactment of each of these states' statute. As a

general rule none of the states apply statutes retroactively absent clear legislative intent. See

Soukop v. ConAgra, Inc., 653 N.W. 2d 655, 657 (Neb. 2002); In re: Silk, 937 A. 2d 900, 904

(N.H. 2007); Goebel v. Salt Lake City Southern R.R. Co., 104 P. 3d 1185, 1197-98 (Utah 2008);

BP America Production Co. v. Dep't of Revenue, 130 P.3d 438, 451 (Wyo. 2006).

Plaintiffs' response is an unsupported argument that because the antitrust laws are

remedial they should be construed broadly. They cite no authority, however, which suggests that

a broad construction would include retroactive application. Plaintiffs also argue, without

authority, that at the very least they can bring claims for conduct predating enactment so long as

the suit is brought post-enactment and within the statute of limitations.

The court agrees with defendants that absent some indication otherwise from the

legislatures, the statutes cannot be applied retroactively to conduct occurring before enactment.

Accordingly, defendants' motion to dismiss the claims under the antitrust laws of Nebraska, New

Hampshire, Utah, and Wyoming is granted with respect to any conduct occurring prior to the

effective date of each state statute.

## (2) Hawaii

Defendants argue that plaintiffs' claims under the Hawaii antitrust laws should be

dismissed for failure to comply with certain statutory notice requirements. In particular, Haw.

Rev. Stat. § 480-13.3(a) requires that plaintiffs serve a copy of the filed indirect complaint on the

12

Attorney General of Hawaii, who has a right of first refusal. The original complaint is to be filed in camera and is not to be served until the court so orders. The complaint is to remain under seal for 60 days while the Attorney General determines whether the state will proceed with the action, file his or her own action, or decline to proceed.

Plaintiffs do not dispute that they failed to comply with § 480-13.3(a) prior to filing the instant complaint. They correctly argue, however, that the statute does not provide for dismissal of the action for failure to comply, and that dismissal is inconsistent with the remedial purposes of the statute. Plaintiffs are correct that nothing in the statutory scheme suggests that defendants may use the statute as a shield to avoid answering for alleged anti-competitive behavior. Accordingly, defendants' motion to dismiss the claims under the Hawaii antitrust statute is denied.

### (3) The Do-It For Me plaintiffs

The Indirect Purchaser Plaintiffs consist of two types of indirect filter purchasers. The first are retail consumers who buy and install filters themselves (the Do-It Yourself or "DIY", plaintiffs). The second are those who purchase maintenance services that include changing the filter (the Do-It For Me or "DIFM" plaintiffs). Defendants argue that the DIFM plaintiffs do not have injuries "fairly traceable to the alleged indirect antitrust offense," and thus under the Supreme Court's decision in Associated General Contractors of Calif., Inc. ("AGC") v. California State Council, 459 U.S. 519, 535 n.31 (1983), are not proper parties to bring a private antitrust action, even in repealer states. According to defendants, the DIFM plaintiffs participate in a market (automotive services market) that is separate and distinct from the market in which defendants sold their stand alone product (retail filters market). Because the object of the alleged

13

price fix, filters, was sold in a market separate from the one in which the putative DIFM plaintiff class purchased filters, defendants argue that the DIFM plaintiffs' claims are too remote and attenuated to give them prudential standing.

In AGC, the Supreme Court articulated a number of factors that courts should consider in analyzing the link between a plaintiff's harm and a defendant's wrongdoing: (1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicate recovery or complex damage apportionment. AGC, 459 U.S. at 537-45. Although AGC addressed federal antitrust "standing," defendants argue that at least 19 of the 24 jurisdictions under which the DIFM purchasers assert state antitrust claims apply AGC either by judicial fiat or pursuant to state harmonization statutes.

The parties have spent a great deal of effort briefing whether AGC applies to claims brought under the state antitrust statutes, and have addressed the matter both generally and on a state by state basis. Most district courts that have reached the issue have concluded that whether the AGC standards can be applied must be determined on a state by state basis. See e.g., In re: TFT-LCD (Flat Panel) Antitrust Litigation, 586 F. Supp.2d 1109, 1121-24 (N.D. Cal. 2008).

The court agrees that any decision on whether a state has adopted the use of federal precedent in general, and the AGC factors in particular, to determine antitrust standing must be made on a state by state basis. In the instant case, however, because the court rejects defendants' basic premise that the DIFM purchasers participate in a market separate from the other Direct and Indirect Purchasers, AGC is inapplicable.

14

Unlike the instant, case AGC did not involve horizontal price fixing and Direct and Indirect Purchasers down a chain of supply. In AGC, a labor union sued a contractor's association with which it had entered into a bargaining agreement, certain association members and others, charging them with conspiring to coerce third parties and other association members to enter into business relationships with non-union contractors and subcontractors, thereby adversely affecting the trade of certain unionized firms and restraining the union's business activities. Id. After applying the now familiar factors, the Court held that the union may have had a claim for "breach of contract, and unfair labor practice, or perhaps even a common-law fraud or deceit, but in the context of the bargaining relationship between the parties to this litigation, such activities are plainly not subject to review under federal antitrust laws." Id. at 527.

AGC was obviously never intended to apply to the instant situation involving claims of price fixing down a chain of distribution, because in the federal context such claims were already barred by Illinois Brick. AGC has been applied, however, in federal cases where the defendants' conduct causes damage in two separate but related markets. See Loeb Industries Inc. v. Sumitomo Corp., 306 F.3d 469, 481-85 (7th Cir. 2002). Recognizing that AGC has no application to actions brought by Direct and Indirect Purchasers alleging a conspiracy to fix prices in an entire physical market, defendants argue that the DIFM purchasers participate in a separate automotive services market, requiring application of the AGC factors to determine whether plaintiffs' injuries are too remote from the alleged unlawful conduct to constitute antitrust injury.

15

The court disagrees with defendants' position that the DIFM purchasers participate in a market separate from the physical filter market. Although these plaintiffs purchase the filters as part of a service package, as alleged in the complaint they nonetheless must purchase the filter (and pay sales tax) to have it installed. Thus, the DIFM purchasers are just one more step, or perhaps a half-step, down the distribution chain from the DIY purchasers. For example, a DIY purchaser may go to a "Pep Boys" to purchase an oil filter and pay an inflated price as a result of the alleged unlawful conduct. A DIFM purchaser may go to that same Pep Boys, order an oil change and, as part of the service, purchase that same oil filter and pay the same inflated price. There is no dispute that under such circumstances the actual product installed as part of the service is separately itemized and taxed. The injury to the DIFM purchaser is the same injury as suffered by the DIY purchaser and is caused by the same unlawful conduct – the alleged price fixing of the physical product.

Because the DIFM purchasers actually purchase the product that is the subject of the price fixing conspiracy, defendants' reliance on the line of cases called the Visa cases unpersuasive. In the Visa cases, merchants were required to accept Visa and Mastercard debit cards if they accepted Visa or Mastercard's credit cards. Visa and Mastercard then charged the merchants supra-competitive prices for debit card transactions. The merchants, in turn, increased prices on goods or services purchased by customers, regardless of whether the customer used credit or debit cards to make payments. Merchant customers brought suit against Visa and Mastercard claiming that the prices of all products sold by the merchants had been raised to offset the Visa and Mastercard overcharge. The alleged injured class consisted of every customer, including those who paid by cash or check, not just those customers who paid by Visa

16

or Mastercard. See e.g. Knowles v. Visa U.S.A. Inc, 2004 WL 2475284 (Me. Super. Ct. 2004).
Most courts that have dealt with these specific cases have applied the AGC standards to
conclude that the plaintiffs did not have antitrust "standing" because they were not end users of
the defendants' products, See Stark v. Visa U.S.A., Inc., 2004 WL 1879003 at *4 (Mich. Cir. Ct.
2004), or because of the difficulty in determining damages. Knowles, 2004 WL 2475284 at *6-7

        None of the concerns expressed by the Visa courts exist in the instant case. All plaintiffs,
including DIFM purchasers, are end users of defendants' products, and all are in the chain of
distribution. Thus, the instant case is precisely the kind of case the repealer states envisioned
when they enacted the state antitrust laws. Accordingly, the court rejects defendants' argument
that the DIFM plaintiffs lack antitrust standing.

### (C) Individual state consumer protection laws

        Defendants have moved to dismiss the claims brought under the consumer protection
laws of Arkansas, the District of Columbia, Kansas, New Mexico, Utah, Maine, and West
Virginia, arguing that the Indirect Purchaser Plaintiffs have not properly pled that defendant
engaged in "unconscionable conduct under the state statute." According to defendants,
"pleading unconscionability requires something more than merely alleging that the price of a
product was unfairly high." In re: Graphics Processing, 527 F. Supp.2d at 1029.

#### (1) Arkansas

        The Arkansas Deceptive Trade Practices Act ("ADTPA") prohibits any unconscionable
trade conduct as well as a false or deceptive action or practice in business, commerce, or trade.
Ark. Code Ann. § 4-88-107(a)(10). "Unconscionable" is not defined, but the Supreme Court of
Arkansas has stated that a liberal construction is appropriate. State Ex. Rel. Bryant v. R & A

17

Inv. Co., 336 Ark. 289 (1999). Contrary to defendants' position, a number of courts have concluded that claims of price fixing are cognizable under the Act. See In re: Chocolate, 602 F. Supp.2d at 583 (N.D. Pa. 2009) (and cases cited therein). Accordingly, defendants' motion to dismiss plaintiffs' claims under the ADTPA is denied.

**(2) District of Columbia**

The same is true for claims under the District of Columbia Consumer Protection Act ("DCCPA"), which does not require a showing of concealment or deception to support a claim. Id. (The "DCCPA subsumes a Sherman Act Claim and creates an Indirect Purchaser cause of action for conspiratorial price fixing regardless of whether defendants have engaged in deceptive conduct."). Accordingly defendants' motion to dismiss plaintiffs' claims under the District of Columbia Act is denied.

**(3) Kansas**

The Supreme Court of Kansas, in contrast, has distinguished between consumer harms redressible under the Kansas Consumer Protection Act and pricing harms governed by the Kansas antitrust statute. Thus, courts have held that the statute is inapplicable to price fixing claims such as those presented by the instant plaintiffs. Id. (and cases cited therein). Accordingly, defendants' motion to dismiss plaintiffs' claims under the Kansas Consumer Protection Act is granted.

**(4) New Mexico**

In New Mexico, "unconscionable trade practices" include all sales that either take advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree, or result in a gross disparity between the value received and the price paid. N.M.

18

Stat. § 57-12-2(E). Federal courts have generally permitted claims under the New Mexico
Unfair Practices Act in price fixing cases if the plaintiff alleges a gross disparity between the
price paid for the product and the value received. In re: Chocolate, 602 F. Supp.2d at 585-86. In
the instant case plaintiffs plead that they paid "supra-competitive" prices for the filters they
received. This allegation is sufficient to allege gross disparity. Accordingly, defendants' motion
to dismiss plaintiffs' claims under the New Mexico Unfair Practices Act is denied.

### (5) Utah

Like New Mexico, Utah's Consumer Sales Practices Act, Utah Code Ann. § 13-11-2,
prohibits "deceptive or unconscionable acts or practices," Carlie v. Morgan, 922 P.2d 1, 5 (Utah
1996), which includes sales that result in a gross disparity between the value received and the
price paid. Plaintiffs have pled that they have paid supra-competitive prices for the filters.
Again, this is sufficient to allege such a gross disparity. Accordingly, defendants' motion to
dismiss the claims under the Utah Consumer Sales Practices Act is denied.

### (6) Maine

The Maine Unfair Practices Act ("MUTPA") prohibits "unfair methods of competition"
and unfair or deceptive acts or practices in the conduct of any trade of commerce. M.E. Rev.
Stat. Ann. Tit. 5 § 207. In pricing cases the allegedly unfair conduct must also induce the
consumer to acquire something he would not otherwise have purchased. Because higher prices
do not induce someone to purchase something he or she would not otherwise have purchased, the
MUTPA creates no remedy in a case such as the instant case, involving collusive pricing. In re:
Chocolate, 602 F. Supp.2d at 584-85. Accordingly, defendants' motion to dismiss the claims
under MUTPA is granted.

19

### (7) West Virginia

West Virginia's Consumer Credit and Protection Statute lists a number of "unfair methods of competition and unfair or deceptive acts or practices." W. Va. Code § 46A-6-102(7). Price fixing is not among them, and nothing in the list targets traditional antitrust-type conduct. Instead, the list is aimed at conduct that creates a likelihood of confusion or misunderstanding with respect to goods, services or business, or involves deceptive, false or misleading statements and representations in connection with goods, services and businesses. In re: TFT-LCD , 586 F. Supp.2d at 1130-31. The statute is aimed at conduct different than the price fixing alleged in the instant case. Accordingly, defendants' motion to dismiss the claims under the West Virginia Consumer Credit and Protection Statute is granted.

### (8) Wisconsin

There is no private right of action under the Wisconsin Trade Practice Statute, Wis. Stat. § 100.20, except to remedy a violation of an order issued by the Wisconsin Department of Agriculture, Trade and Consumer Protection. See Emergency One, Inc. v. Waterous Co., 23 F. Supp.2d 959, 972 (Ed. Wis. 1998). Plaintiffs have alleged no such violation of any order. Accordingly, defendants' motion to dismiss plaintiffs' claims under the Wisconsin Trade Practice Statute is granted.

### (9) New York

Defendants' last argument with respect to individual state consumer protection laws is that the Indirect Purchaser Plaintiffs lack standing to bring claims in New York and Rhode Island. The court agrees.

20

New York's Consumer Protection Act, N.Y. Gen. Bus. Law § 349, "provides a private right of action for consumer fraud." In re: Automotive Finishing Paint Antitrust Lit., 515 F. Supp.2d 544, 551-52 (E.D. Pa. 2007). To state a claim under § 349 plaintiffs must "charge conduct of the defendant that is consumer orientated." Id. Consumers are "those who purchase goods and services for personal, family or household use." Id. Fraudulent transactions between businesses, such as alleged in the instant case, are not consumer oriented even if consumers were the ultimate end users. Id.

Nor have plaintiffs alleged that defendants engaged in acts or practices that were deceptive or misleading and that plaintiffs have been injured as a result. Absent something more, § 349 does not cover price fixing or other antitrust violations. Anti-competitive conduct alone does not constitute deceptive conduct under § 349. Id.

Acknowledging this, plaintiffs have alleged that defendants made public statements about the price of filters that omitted material information making the statements misleading and as a result New York class members overpaid for filters. The complaint fails to identify any such statement or that any plaintiff saw, heard or relied on the statement in making a decision to purchase a filter. Therefore, defendants' motion to dismiss claims under the New York Consumer Protection Act is granted.

### (10) Rhode Island

These deficiencies also require the dismissal of plaintiffs' claims under the Rhode Island Deceptive Trade Practices Act. R.I. Gen. Law § 6-13.1-2, which also requires that defendants' conduct reasonably intended to confuse and mislead the general public into purchasing defendants' product when the actual intent was to buy someone else's product. ERI Max

Entertainment, Inc. v. Streisand, 690 A. 2d 1351, 1353-54 (R.I. 1997). This statute grants a
private right of action to persons who have suffered a loss as a result of the alleged misconduct.
R.I. Gen. Laws § 6-13.1-5.2. Plaintiffs' general allegations of public statements by defendants,
without identifying who made the statement, when it was made and whether any plaintiff
actually saw it or heard is insufficient to sustain a claim under this act. Accordingly, defendants'
motion to dismiss plaintiffs' claims under the Rhode Island Act is granted.

**D. Unjust enrichment**

Finally, in Count II plaintiffs attempt to bring a national unjust enrichment claim, based
on the laws of all 50 states excluding Ohio and Indiana, but including Puerto Rico and the
District of Columbia. Given the admitted differences in the states' legal theories of unjust
enrichment, it is impossible for this claim to be brought as a nationwide class. See In re:
Bridgestone/Firestone, Inc., 288 F.3d 1012, 1015 (7th Cir. 2002) ("No class action is proper
unless all litigants are governed by the same legal rules."). Therefore, claims must be brought
under the specific laws of each state. The complaint fails to plead the required factual basis of
an unjust enrichment claim on a state by state basis. Accordingly, Count II is dismissed.

## CONCLUSION

For the reasons set forth above, defendants' joint motion to dismiss the Indirect Purchaser
Plaintiffs' Consolidated Amended Complaint, Direct Purchaser Plaintiffs' Consolidated
Amended Complaint and the GASDA complaint (Docket No. 208) is denied. Defendants'
motions to dismiss the Indirect Purchasers' Consolidated Amended Complaint (Docket No. 195)
is granted as to: (1) claims based on conduct occurring prior to the effective dates of Nebraska,
New Hampshire, Utah and Wyoming's state antitrust laws; (2) claims under Kansas, Maine,

22

West Virginia, New York and Rhode Island consumer protection laws; and (3) all state unjust

enrichment laws.  The motion to dismiss is denied in all other respects.  The Indirect Purchaser

Plaintiffs are directed to file an amended complaint conforming to this opinion on or before

November 30, 2009.  That amended complaint should demonstrate compliance with Hawaii Rev.

Stat. § 480-13.3.  All defendants are ordered to answer the appropriate complaints on or before

December 28, 2009.  This case is set for a report on status on January 13, 2009, at 10:00 a.m.

**ENTER:**      **November 5, 2009**

**Robert W. Gettleman**
**United States District Judge**

23