1   PETER ROOT (142348)
    DEWEY & LEBOEUF LLP
2   1950 University Avenue
    East Palo Alto, CA 94303
3   Telephone: (650)845-7000
    Facsimile: (650) 845-7333
4   Email: proot@dl.com

5   JEFFREY L. KESSLER (*Admitted Pro Hac Vice*)
    A. PAUL VICTOR (*Admitted Pro Hac Vice*)
6   DEWEY & LEBOEUF LLP
7   1301 Avenue of the Americas
    New York, NY 10019
8   Telephone: (212) 259-8000
    Facsimile: (212) 259-7013
9   Email: jkessler@dl.com

10  STEVEN A. REISS (*Admitted Pro Hac Vice*)
11  DAVID L. YOHAI (*Admitted Pro Hac Vice*)
    WEIL, GOTSHAL & MANGES LLP
12  767 Fifth Avenue
    New York, New York 10153-0119
13  Telephone:  (212) 310-8000
    Facsimile:  (212) 310-8007
14  Email: steven.reiss@weil.com

15  Attorneys for Defendants Panasonic Corporation of North America, MT Picture Display Co.,
16  Ltd., and Panasonic Corporation (f/k/a Matsushita Electric Industrial Co.)

17

18              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**

19

20  IN RE:  CATHODE RAY TUBE (CRT)          )   No. 07-5944-SC
21  ANTITRUST LITIGATION                    )
                                            )   MDL. No. 1917
22  _____     )
                                            )   **DECLARATION OF JEFFREY**
23  This Document Relates to:               )   **KESSLER IN SUPPORT OF**
                                            )   **DEFENDANTS' JOINT OBJECTIONS**
24  DIRECT PURCHASER ACTION                     **TO THE SPECIAL MASTER'S**
                                                **REPORT AND RECOMMENDATIONS**
25                                              **REGARDING DEFENDANTS' JOINT**
                                                **MOTION TO DISMISS THE DIRECT**
26  _____         **PURCHASER PLAINTIFFS**
                                                **CONSOLIDATED AMENDED**
27                                              **COMPLAINTS**

28                                              The Honorable Samuel Conti

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

1

## DECLARATION FO JEFFREY KESSLER

2       I, Jeffrey Kessler, declare as follows:

3       1.      I am an attorney with Dewey & LeBoeuf LLP, attorneys for Defendants

4   Panasonic Corporation of North America, MT Picture Display Co., Ltd., and Panasonic

5   Corporation (f/k/a Matsushita Electric Industrial Co.) in this action.  I am a member of the bar of

6   the State of New York and am admitted to practice before this Court *pro hac vice*.  I make this

7   Declaration in support of Defendants' Joint Objections to the Special Master's Report and

8   Recommendations Regarding Defendants' Joint Motion to Dismiss the Direct Purchaser

9   Plaintiffs Consolidated Amended Complaints.  I have personal knowledge of each of the facts

10  stated herein, and if called to testify, could and would testify completely hereto.

11      2.      Attached hereto as Exhibit 1 is a true and correct copy of the transcript of

12  the hearing conducted by Special Master Charles A. Legge, dated October 5, 2009.

13

14          I declare under penalty of perjury under the laws of the United States of America

15  that the foregoing is true and correct.

16

17  Dated:  February 19, 2010

18

19                                                      /s/ Jeffrey L. Kessler

20                                                      Jeffrey L. Kessler

21

22

23

24

25

26

27

28

---

DECLARATION OF JEFFREY KESSLER                          Case No. 07-5944-SC
                                                        MDL No. 1917

*Dewey & LeBoeuf LLP*
*One Embarcadero Center, Suite 400*
*San Francisco, CA 94111*

# EXHIBIT 1

Page 1

1          JUDICIAL ARBITRATION AND MEDIATION SERVICES

2            Before:  Charles A. Legge, Judge (Ret.)

3                        --oOo--

4

5   IN RE:  CATHODE RAY TUBE (CRT)      No. 07-5944 SC

6   ANTITRUST LITIGATION,               MDL No. 1917

7   _____/    JAMS No. 1100054618

8

9

10

11

12                    MOTION HEARING

13            _____

14                   October 5, 2009

15

16

17

18   REPORTED BY:  WENDY E. ARLEN, CSR #4355, CRR, RMR

19   JOB 423439

20

21

22

23

24

25

MOTION HEARING  October 5, 2009

```
 1                  A P P E A R A N C E S
 2
 3    FOR THE DIRECT PURCHASER PLAINTIFFS:
 4              SAVERI & SAVERI
                Attorneys at Law
 5              GUIDO SAVERI, Esq.
                GEOFFREY C. RUSHING, Esq.
 6              CADIO ZIRPOLI, Esq.
                706 Sansome Street
 7              San Francisco
                415.217.6810
 8              gsaveri@saveri.com
 9                    and
10              PEARSON SIMON WARSHAW PENNY LLP
                Attorneys at Law
11              BRUCE L. SIMON, Esq.
                44 Montgomery Street, Suite 2450
12              San Francisco, California  94104
                415.433.9000
13              bsimon@pswplaw.com
14                    and
15              HAUSFELD LLP
                Attorneys at Law
16              MICHAEL P. LEHMANN, Esq.
                44 Montgomery Street, Suite 3400
17              San Francisco, California  94104
                415.633.1908
18              mlehmann@hausfeldllp.com
19                    and
20              LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                Attorneys at Law
21              ERIC B. FASTIFF, Esq.
                275 Battery Street, 30th Floor
22              San Francisco, California  94111-3339
                415.956.1000
23              efastiff@lcbh.com
24                    and
25
```

MOTION HEARING   October 5, 2009

Page 3

```
 1          A P P E A R A N C E S  (Cont'd)
 2
 3   FOR THE DIRECT PURCHASER PLAINTIFFS:
 4          KAPLAN FOX & KILSHEIMER LLP
            Attorneys at Law
 5          GARY L. SPECKS, Esq.
            423 Sumac Road
 6          Highland Park, Illinois   60035
            847.831.1585
 7          gspecks@kaplanfox.com
 8              and
 9          BERGER & MONTAGUE, P.C.
            Attorneys at Law
10          H. LADDIE MONTAGUE, JR., Esq.
            1622 Locust Street
11          Philadelphia, Pennsylvania   19103-6305
            215.875.3000
12          hlmontague@bm.net
13              and
14          DAMRELL NELSON SCHRIMP PACHER & SILVA
            Attorneys at Law
15          KATHY L. MONDAY, Esq.
            1601 I Street, Fifth Floor
16          Modesto, California   95354
            209.526.3500
17
18   FOR THE INDIRECT PURCHASER PLAINTIFFS:
19          TRUMP ALIOTO TRUMP & PRESCOTT
            Attorneys at Law
20          MARIO ALIOTO, Esq.
            LAUREN C. RUSSELL, Esq.
21          2280 Union Street
            San Francisco, California   94123
22          415.563.7200
            marioalioto@tatp.com
23
                and
24
25
```

MOTION HEARING  October 5, 2009

Page 4

```
1              A P P E A R A N C E S  (Cont'd)
2
3   FOR THE INDIRECT PURCHASER PLAINTIFFS:
4              ZELLE HOFMANN VOELBEL & MASON LLP
               Attorneys at Law
5              CRAIG C. CORBITT, Esq.
               PATRICK B. CLAYTON, Esq.
6              44 Montgomery Street, Suite 3400
               San Francisco, California  94104
7              415.633.1905
               ccorbitt@zelle.com
8
                    and
9
               GLANCY BINKOW & GOLDBERG
10             Attorneys at Law
               SLYVIE K. KERN, Esq.
11             One Embarcadero Center, Suite 760
               San Francisco, California  94111
12             415.972.8160
13                  and
14             JOSEPH M. PATANE
               Attorney at Law
15             2280 Union Street
               San Francisco, California  94123
16             415.447.1651
               jpatane@tatp.com
17
18
    FOR THE DEFENDANTS PANASONIC CORPORATION, PANASONIC
19  NORTH AMERICA, MTPD:
20             DEWEY LeBOEUF
               Attorneys at Law
21             JEFFREY L. KESSLER, Esq.
               EVA W. COLE, Esq.
22             1301 Avenue of the Americas
               New York, New York  10019-6092
23             213.259.8535
               jkessler@dl.com
24
                    and
25
```

MOTION HEARING  October 5, 2009

Page 5

```
 1            A P P E A R A N C E S  (Cont'd)
 2
 3   FOR THE DEFENDANTS PANASONIC CORPORATION, PANASONIC
     NORTH AMERICA, MTPD:
 4
              WEIL, GOTSHAL & MANGES
 5            Attorneys at Law
              DAVID L. YOHAI, Esq.
 6            767 Fifth Avenue
              New York, New York  10153
 7            212.310.8000
 8
     FOR THE DEFENDANTS KONINKLIJKE, PHILLIPS ELECTRONICS,
 9   PHILLIPS ELECTRONICS NORTH AMERICA CORPORATION, PHILLIPS
     ELECTRONICS INDUSTRIES TAIWAN, PHILIPS DA AMAZONIA:
10
              HOWREY LLP
11            Attorneys at Law
              ETHAN E. LITWIN, Esq.
12            601 Lexington Avenue, Floor 54
              New York, New York  10022
13            212.896.6591
              litwine@howrey.com
14
                   and
15
              HOWREY LLP
16            Attorneys at Law
              RICHARD A. RIPLEY, Esq.
17            1299 Pennsylvania Avenue, NW
              Washington, D.C.  20004
18            202.383.6755
              ripleyr@howrey.com
19
20   FOR THE DEFENDANT HITACHI DS:
21            MORGAN LEWIS & BOCKIUS LLP
              Attorneys at Law
22            KENT M. ROGER, Esq.
              MICHELLE PARK CHIU, Esq.
23            One Market, Spear Street Tower
              San Francisco, California  94105
24            415.442.1140
              kroger@morganlewis.com
25
```

MOTION HEARING   October 5, 2009

Page 6

```
 1              A P P E A R A N C E S  (Con'td)
 2
 3   FOR THE DEFENDANT TATUNG COMPANY OF AMERICA:
 4           BAKER & McKENZIE
             Attorneys at Law
 5           PATRICK J. AHERN, Esq.
             One Prudential Plaza
 6           130 East Randolph Drive
             Chicago, Illinois  60601
 7           312.861.8000
             patrick.a.ahern@bakernet.com
 8
 9   FOR THE DEFENDANT SAMSUNG SDI:
10           SHEPPARD MULLIN RICHTER & HAMPTON LLP
             Attorneys at Law
11           MICHAEL W. SCARBOROUGH, Esq.
             TYLER CUNNINGHAM, Esq.
12           Four Embarcadero Center, 17th Floor
             San Francisco, California  94111
13           415.434.9100
             mscarborough@sheppardmullin.com
14
15   FOR THE DEFENDANT LGE, LGUSA, LGETT:
16           SIDLEY AUSTIN LLP
             Attorneys at Law
17           ROBERT B. MARTIN, III, Esq.
             SAMUEL R. MILLER, Esq.
18           MARIE L. FIALA, Esq.
             RYAN M. SANDROCK, Esq.
19           555 California Street
             San Francisco, California  94104
20           415.772.1219
             rmartin@sidley.com
21
22
23
24
25
```

MOTION HEARING  October 5, 2009

Page 7

```
 1              A P P E A R A N C E S  (Cont'd)
 2
 3   FOR THE DEFENDANTS TOSHIBA:
 4           WHITE & CASE
             Attorneys at Law
 5           CHRISTOPHER M. CURRAN, Esq.
             LUCIUS B. LAU, Esq.
 6           701 Thirteenth Street, NW
             Washington, D.C.  20005
 7           202.626.3643
             ccurran@whitecase.com
 8
 9   FOR THE DEFENDANT SAMSUNG ELECTRONICS CORPORATION,
     SAMSUNG ELECTRONICS OF AMERICA:
10
             O'MELVENY & MYERS
11           Attorneys at Law
             IAN SIMMONS, Esq.
12           1625 Eye Street
             Washington, D.C.  20006
13           202.383.5300
             isimmons@omm.com
14
15   FOR THE DEFENDANT BEJING MATSUSHITA COLOR CRT CO. LTD.:
16           FRESHFIELDS BRUCKHAUS DERINGER US LLP
             Attorneys at Law
17           KATE S. McMILLAN, Esq.
             701 Pennsylvania Avenue, NW
18           Washington, D.C.  20004-2692
             202.777.4500
19           kate.mcmillan@freshfields.com
20
21
22
23
24
25
```

```
 1                 San Francisco, California
 2                 Monday, October 5, 2009
 3                       8:57 a.m.
 4                       --oOo--
 5          THE COURT:  For those of you who I haven't met,
 6    I'm Judge Legge, the special master appointed by Judge
 7    Conti in this case, and we're here, as you know, for the
 8    arguments for the motions to dismiss.
 9               I'll go through a few of the procedural matters
10    before we get down to cases.  This will be our hearing
11    room for the day.  If you want breakout rooms, meeting
12    rooms, war rooms, storage rooms, down the hallway on the
13    right are three or four doors with my name on them and
14    you can use those rooms for your meetings and
15    conferences.  There is also some open space over on the
16    left-hand side and a bigger conference room which have a
17    nice view you don't get from the inside.  However, if
18    you don't go into a room with my name on it, at some
19    point later in the day some other hearing may kick you
20    out the door.  So spread around as best you can.
21               Now, by the way of the way we're set up today,
22    I'm going to ask you when you give an argument to stand
23    at the podium and so we can all hear.  The court
24    reporter will be opposite you and I'll be down here.
25    You don't need to do that just to answer questions or
```

1    make a short comment, but if you are actually addressing

2    the motion itself, I'll ask you to stand at the podium,

3    please.

4            I don't know most of you, and rather than go

5    around and ask for appearances for the court reporter,

6    what I'm going to do is send around a couple of sheets

7    here and if you would just by the end of the day make

8    sure that you have signed one of these sheets and all we

9    need is your name and who you represent.

10           When you put your name, would you please either

11   print it or write it in such a way that can be read?

12   Under the column that says position, I just want to know

13   if you are anything other than an attorney, that is, an

14   outside attorney or inside attorney for a client or a

15   client representative other than as an attorney.  If

16   you're simply one of the attorneys who's making an

17   appearance in the case, you need not sign anything

18   further.

19           Now, further by way of facilities, the coffee

20   machine is right outside the door here.  We have a large

21   number of people.  So be advised also there is another

22   coffee machine and a bigger refreshment center up on the

23   15th floor by the reception area.  You can go up there

24   and get the same things, coffee, tea, soft drinks,

25   nibbles and other things.

1          The restrooms, if you go out through the

2     reception door, the restrooms are on the right.  You

3     will need a code to get into the restrooms because this

4     is a semi-private floor we're on here.  Our code is

5     94111.  You should have no trouble remembering that

6     because as you go out the reception door it's plastered

7     on the inside of the door, but you do need that code to

8     get in the restrooms.  Again, if we're overcrowded in

9     the restrooms, there are more up on the 15th floor.

10          We are Wi-Fi'd on this floor.  So you can use

11     your computers and don't need to worry about having to

12     dial up or do things like that.

13          When you speak, I said I'd like you to speak

14     from the podium if you would, please, and then from the

15     podium state your appearances so the court reporter does

16     have the appearance of those of you who spoke.  Those of

17     you who are not going to speak today, the signup roster

18     is good enough for our present purposes.

19          Now, about the order of the hearing, having

20     spent the last few days with your briefs, I've come to

21     the conclusion I think that your lead counsel may be

22     coming to also and that is that these proceedings can be

23     a lot shorter than two days, the reason being is that as

24     I go through the briefs, direct and indirect, individual

25     and direct, there's an awful lot of common issues, and I

1   think once we address the common issues once or twice,

2   they need not be addressed in detail in every one of the

3   arguments.  You may want to add what's individual to

4   your client, and that's fine.  When your turn comes, you

5   can certainly do that.  But I do think that because of

6   the overlapping nature of many of the issues that we

7   probably will not be going beyond today.

8           I am available tomorrow.  I don't mean to cut

9   you off.  If somebody doesn't have an opportunity to

10  talk today, I will be available to hear you tomorrow.

11  Or if there is some person who is not here today who has

12  not arrived because of the copy of my letter indicating

13  that the second day would be devoted to the individuals,

14  I'll be available to hear them, too, but as I said,

15  because of common issues, I think we can proceed here

16  and finish in one day.

17          MR. KESSLER:  Your Honor, could I say something

18  on behalf of the defendants?

19          THE COURT:  Yes.

20          MR. KESSLER:  I guess we at least would ask

21  your Honor to keep an open mind about that, and the

22  reason is even under the common issues, before we get to

23  any individual defendant, we have subject matter

24  jurisdiction, Illinois Brick, AGC, statute of

25  limitations, the individual state arguments and they are

1   not the same for the direct and indirect complaints.

2   They really are different -- there is some overlap, but

3   they are different.

4            THE COURT:  I understand.

5            MR. KESSLER:  So my concern is that there will

6   be very little time left today for any of the individual

7   motions, and I think that each group is entitled to have

8   some hearing as to their individual issue.  So I just

9   ask you to keep an open mind --

10           THE COURT:  You're absolutely right.

11           MR. KESSLER:  -- that we may have to go through

12   tomorrow.  Otherwise, some of the individuals may not

13   get to speak at all.  We would ask for that opportunity.

14           THE COURT:  I'm saying what I'm saying not to

15   cut you off, but to tell you that I see a lot of common

16   issues.

17           MR. KESSLER:  True.

18           THE COURT:  And at some point I may say, "You

19   folks are repeating yourselves."

20           MR. SIMON:  In connection with that, it is the

21   impression of the plaintiffs, at least the direct

22   plaintiffs and the indirect plaintiffs in reading the

23   briefs, that there is a tremendous amount of

24   duplication, and I'm saying this independently of what

25   his Honor said, because of the basic issue, although the

1    briefing schedule was set up by his Honor, some of basic

2    issues in the joint brief that was done, but then when

3    the individual briefs came in, in my opinion, there was

4    a complete repetition of the same Twombly arguments with

5    that appeared.  So I understand what you're saying, but

6    I'd like to keep an open mind, too, that if we could

7    move this along and not have Twombly argued 15 times.

8              THE COURT:  I'll control that.  Be sure that --

9    rest assured.  I should say, that each one of you who

10   wants to speak individually for your client will have an

11   opportunity to do so, but bear in mind by the time we

12   get to the end of the few discussions we may have heard

13   an awful lot about some of these issues.

14             MS. KERN:  Are you saying you prefer to go

15   issue by issue?

16             THE COURT:  No.  You argue your case.  I think

17   I have identified the issues for myself.  I think you

18   will identify them for me again when you speak, but

19   you're representing your client here.  You argue the way

20   you want to argue.  I will cut you off if I think you

21   are getting too repetitive.  Okay?  All right.

22             So we will begin here in just a moment with the

23   joint, and obviously the defendants are the moving

24   parties.  So the defendants will speak first and then

25   we'll have the plaintiffs' reply and we'll have the

MOTION HEARING   October 5, 2009

1    indirect.

2              MR. KESSLER:  Your Honor, what we will do is

3    because there are different issues, we've divided them

4    up among the joint.  So I will start first.

5              THE COURT:  That's fine.

6              MR. KESSLER:  On behalf of --

7              THE COURT:  Wait a minute.  I'm not quite ready

8    for you yet.  No, that's fine.  We can be flexible and

9    we're all intelligent enough around here to keep these

10   things straight, but just let us know who is doing what

11   so we can get our notes ready.  Okay?

12             Now, I want to emphasize that not all of you

13   need to be here all the time.  If you have things you

14   have to do while the argument is going on, you are free

15   to leave, but make sure before you leave if you're not

16   coming back that you do sign one of our sign-in sheets,

17   please.  I do want all of you to have signed in.

18             Now, I want to start out here.  I'm a little

19   confused by the status of three of the defendant groups.

20   First of all, the Phillips group.  Now, I understand the

21   Phillips group, K Phillips -- instead of that lengthy

22   Scandinavian group, I'll just call it K Phillips -- is

23   still in the case.

24             MR. LITWIN:  Correct, your Honor.

25             THE COURT:  But rest of the Phillips is not in

1    the briefing or out of case or tell me what the status

2    is.

3                MR. LITWIN:  That's not it exactly.  There were

4    two defendants that actually were not entities.  If

5    you'll bear with me a moment, your Honor.

6                THE COURT:  Well, they're out of the case?

7                MR. LITWIN:  They're out of the case.  So those

8    are defendant Phillips Electronics Industries, Ltd.,

9    which is the defendant named in paragraph 52.

10               THE COURT:  You don't need -- give me the names

11   please.

12               MR. LITWIN:  And then defendant Phillips

13   Consumer Electronics Co.  Those two defendants are out

14   of the case.

15               THE COURT:  Out of the case.

16               MR. LITWIN:  Out of the case.

17               THE COURT:  Both direct and indirect.

18               MR. LITWIN:  Both direct and indirect.  Then as

19   to Phillips Electronics Industries (Taiwan), Ltd., and

20   defendant Phillips Amazonia Industria, Ltd., they remain

21   in the case, but they have personal jurisdiction

22   defenses that are not being argued today, will be argued

23   at a subsequent date pursuant to agreement of counsel.

24               THE COURT:  Thank you.  Now, what happened to

25   the Samtel Color?  I'm not quite sure where we are with

1    that.  Who is representing Samtel?

2          MS. COLE:  Samtel's counsel is not here, I

3    believe, your Honor, but as I understand it, Samtel has

4    a jurisdictional issue that they're going to be arguing

5    at a later date.

6          THE COURT:  They're not participating in this

7    round of motions even though I got a brief from them.

8          MR. KESSLER:  Well, I guess that they're

9    contesting jurisdiction.  So they've been put off.  If

10   your Honor were to rule on the joint motions, then I

11   think they have joined in on the joint motion.

12         MS. COLE:  That's right.

13         MS. RUSSELL:  Excuse me, your Honor, but I

14   think the stipulation and order that we entered into

15   with Phillips and Samtel said that we were putting off

16   their Rule 12(b)(6) motion for failure to state a claim

17   and their personal jurisdiction motion, not just the

18   personal jurisdiction motion.  So the joint motion, yes.

19         THE COURT:  Tatung, however it's pronounced, I

20   got a dismissal in the indirect cases.  Are they still

21   in the direct cases?

22         MR. AHERN:  Your Honor, Patrick Ahern for

23   Tatung Company of America.  Tatung Company of Taiwan was

24   not named in the direct case and has a dismissal without

25   prejudice in the indirect case.

```
1              THE COURT:  So who do we have still have left?

2              MR. AHERN:  Tatung Company of America, a US

3    subsidiary of the company.

4              THE COURT:  So they are still in the whole

5    thing.

6              MR. AHERN:  Correct.  We have our own 12(b)(1)

7    and 12(b)(6) motion which we will argue.

8              THE COURT:  That's fine.  I saw these, and then

9    I saw a dismissal in the indirect case and I didn't know

10   quite where it was.

11             Okay.  Anything else procedurally here before

12   we get to the substance of the motion?  All right then,

13   we will begin with the defendants' joint motion with

14   respect to the direct case.

15             MR. SAVERI:  If I may ask a question in

16   connection with that, your Honor, there is a joint

17   motion and there are basically four or five issues

18   involved in the joint motion in foreign jurisdiction.

19   Is it the intention of counsel to speak on all four of

20   those?

21             MR. YOHAI:  He's going to do the first issuance

22   and general comments and then there are three others of

23   us who will address the other issues.  Probably we could

24   either go back and forth or together.  Probably make

25   more sense to go back and forth.
```

1           MR. SAVERI:  I just wanted to know what you
2    people planned to do.
3           MR. YOHAI:  So the plan would be he would speak
4    on general issues and the jurisdictional issue on the
5    FTAIA and we'll go from there.
6           THE COURT:  It's going to be up to the defense.
7           MR. YOHAI:  That's the proposal.  We're on the
8    same side.
9           THE COURT:  What I'm saying I'm not certain.
10   So we will take it issue by issue.  So the defense is
11   going to come in and argue in the middle -- I'm sorry --
12   the plaintiff will come in and argue in the middle or
13   let you finish and let the plaintiffs go.  We'll deal
14   with that when it comes up.
15          MR. KESSLER:  What do people think?  Should it
16   be issue by issue?  I think we're happy to have it done
17   issue by issue.
18          THE COURT:  Are plaintiffs comfortable
19   responding that way?
20          MR. SIMON:  We've broken it up that way.
21          MR. KESSLER:  Thank you, your Honor.  My name
22   is Jeffrey Kessler.  I represent the three remaining
23   Panasonic companies that are in the case, which is
24   Panasonic Corporation, Panasonic of North America and
25   MTPD.  Those are the three companies, your Honor.

MOTION HEARING   October 5, 2009

1          But at the moment I'm here to argue the joint

2    motion of all defendants, and I am going to address the

3    subject matter jurisdiction issue because if there is no

4    subject matter jurisdiction, then obviously all other

5    issues fall, the court shouldn't be here if in fact

6    that's the case.

7          In looking at the subject matter jurisdiction

8    argument, the first thing I'd like to point out, which

9    is undisputed, I believe, is, first of all, that the

10   burden of setting forth facts to establish subject

11   matter jurisdiction rests with the plaintiffs.  So the

12   face of the complaint has to have the facts necessary

13   for your Honor to find subject matter jurisdiction.

14   This is clear in the Ninth Circuit in the both the DRAM

15   case and also in the LSL Biotech case as well that we

16   cited in our briefs.

17         The second point that I believe should be

18   undisputed is that the standards of Rule 8 as

19   interpreted by the Supreme Court most recently in Iqbal

20   and Twombly apply to jurisdictional allegations just as

21   they apply to all other allegations in the complaint.

22         So essentially it's not sufficient for the

23   plaintiffs to just have a conclusory assertion that

24   there were effects in the United States or the

25   conspiracy was intended to affect the United States or

MOTION HEARING  October 5, 2009

Page 20

1   anything like that.  When you combine Twombly and Iqbal

2   with the jurisdictional requirements, there has to be

3   facts set forth in the complaint to enable your Honor to

4   find subject matter jurisdiction under their burden.

5           The third point that is clearly undisputed in

6   the Ninth Circuit at least now, although plaintiffs did

7   dispute this in this brief, which is that it's proper to

8   decide the jurisdictional motions on a motion to

9   dismiss.  We know that because DRAM in the Ninth Circuit

10  2008 does that.  We know that because in the United

11  States versus LSL Biotech the Ninth Circuit does that.

12          In both cases, whatever might be the preference

13  for other courts or judges, in the Ninth Circuit you

14  have to scrutinize these jurisdictional allegations at

15  the beginning and decide that.  So those are the basic

16  standards.

17          Looking now what is the jurisdictional issue.

18  Well, the jurisdictional issue is whether or not there

19  is jurisdiction under the Foreign Trade Antitrust

20  Improvements Act what the parties have called the FTIAI,

21  FTAIA.  FTAIA.  Foreign Trade Antitrust Improvements

22  Act.  That statute was passed by Congress in recognition

23  of the fact that we live in a global economy, and we

24  live in a global economy in which different countries

25  have different laws applying to competition and that it

MOTION HEARING  October 5, 2009

Page 21

```
 1   was not the position of the United States Congress that

 2   U.S. antitrust laws are designed to sort of

 3   imperialistically apply around the world to every

 4   antitrust issue that comes up around the world, even

 5   if -- and this is important -- even if this is an effect

 6   in the United States.  That's not enough.  What there

 7   has to be is a direct, substantial and reasonably

 8   foreseeable effect in the United States.

 9           So any effect is not enough, and that's really

10   what your Honor is looking at is whether there are

11   allegations here that would satisfy that test, and I'll

12   talk a little bit about that.

13           And in that connection, one thing that's been

14   made very clear by the Supreme Court is that -- and by

15   the Ninth Circuit as well -- is that foreign price

16   fixing, in other words, the fixing of prices in a

17   foreign market for a foreign sale is not covered by the

18   U.S. antitrust laws.  I don't think plaintiffs contest

19   that notion, I don't think they could contest that

20   notion.  It comes out of the Epigram case in the Supreme

21   Court, and the Ninth Circuit has since applied Epigram

22   in this circuit.

23           So the issue is is this case factually about

24   anything other than the fixing, the alleged fixing of

25   prices on foreign sales outside the United States.
```

MOTION HEARING  October 5, 2009

1          Now, what plaintiffs do in responding to this,

2    and I'm going to go through the complaint allegations,

3    but what they do at the outset is they say, well, we

4    have pled around that issue.  And how do they claim to

5    have pled around that issue?  They said we have defined

6    a new concept of CRT products, and CRT products don't

7    just include the cathode ray tube, whether it's a CDT or

8    CPT.  As your Honor knows, CDT's go in computer

9    monitors, CPT's go into television.

10          THE COURT:  I prefer we call them CRT's.

11          MR. KESSLER:  That's fine.  And the defendants

12   sell televisions in the United States; and, therefore,

13   by putting in allegations that mix everything up

14   together said, we have a pled a U.S. based conspiracy.

15          Your Honor, this is not correct because the

16   standards of Iqbal and Twombly apply to these conclusory

17   allegations.  It's not putting anybody on notice from a

18   jurisdictional standpoint to simply say the conspiracy

19   applies to CRT products without distinguishing whether

20   we're talking about CRT's or finished products.

21          When you look at the actual complaint

22   allegations, as I'm about to do, it's very, very clear

23   that the only specific facts that are pled, the glass

24   meetings, the top level meetings, all of those

25   allegations that are in the complaint, the government

Page 23

```
 1    investigations, the indictment that they cite all have

 2    to do with CRT's; and, frankly, it bordered on the

 3    frivolous and bad faith for them just to say, oh, and

 4    therefore it is CRT products, to try to get a U.S.

 5    handle.

 6              THE COURT:  The words CRT products are all over

 7    the pleadings.

 8              MR. KESSLER:  Yes, it is.  And what they do,

 9    your Honor --

10              THE COURT:  What you're saying is that the

11    standards of Twombly and Iqbal have to be applied --

12              MR. KESSLER:  Correct.

13              THE COURT:  -- to the CRT products allegations

14    as well as to the CRT allegations.

15              MR. KESSLER:  Exactly, your Honor.

16              THE COURT:  Then you're going to go further and

17    tell me that those also have to be applied separately as

18    to each of the defendants.  It's not enough to refer to

19    a defendant family even for pleading purposes.

20              MR. KESSLER:  Absolutely, because you need

21    notice -- the best example --

22              THE COURT:  I'm not saying this because I agree

23    with you or disagree with you.

24              MR. KESSLER:  You've got it 100 percent.

25              THE COURT:  Make sure I've got the issue clear.
```

1          MR. KESSLER:  That's right.  What you find,

2     your Honor, it becomes very clear that they are mixing

3     them together purely to prevent providing the notice

4     because what they should have to say in this complaint

5     is very simple if they can say it.  They should have to

6     say they allege a meeting in which someone fixed the

7     price of CRT's sold in the United States.  There are no

8     allegations like that.  That's a very simple allegation.

9     There is not one allegation like that.

10          Instead, it's all mixed to CRT products and the

11     only locations that are ever identified -- and I will go

12     through this in the complaint -- are either foreign

13     sales and locations or no location specified.  They'll

14     just say in general it was fixed.

15          They match that then with conclusory assertions

16     occasionally, and this fixed prices in the United

17     States, but the conclusory assertions can't meet the

18     Iqbal/Twombly standards.

19          So let's look at the specific paragraphs, if

20     you will, which really illustrate this.  If you take a

21     look, for example, your Honor, on paragraph 126, 126 --

22          THE COURT:  Wait a minute.  What are you

23     pointing at?

24          MR. KESSLER:  I'm looking at the direct

25     purchaser complaint.

1          THE COURT:  Every time the word CRT products

2     appears --

3          MR. KESSLER:  No, I'm not going to do that,

4     your Honor.  I'm not going to do that.  I would be here

5     all day if I did that.

6          THE COURT:  You are trying to point out to me

7     where you think the factual allegations are.

8          MR. KESSLER:  That's correct.

9          THE COURT:  And you're arguing that they're not

10    sufficient.

11         MR. KESSLER:  If you look at 126 -- it really

12    starts at 125 and goes forward.  This is the set of

13    allegations where they point to the various government

14    investigations that have been launched and the

15    indictment, and they obviously incorporated this all by

16    reference.

17          So these are their allegations that are there,

18    and if you look at these allegations, it's very clear

19    we're talking about, if you just look at 126, the first

20    indictment referred to is a conspiracy to fix the price

21    of CRT's, not finished products.

22          And this is going to be clear in all of the

23    government allegations they make.  So, again, if you

24    look at paragraph 127, the DOJ is not acting alone

25    against the manufacturers of CRT's.  That's what the

MOTION HEARING   October 5, 2009

1    government investigations are about, not of CRT

2    products.

3            If you look at paragraph -- they then go on to

4    talk about the other government investigations.  Each

5    and every one of these paragraphs are talking about CRT

6    manufacturers or CRT's.  So, again, if you go back to

7    what's there, we think -- and it's clear what happened

8    is they read about these government investigations,

9    okay, and they said, okay, let's file this case.

10           It's about CRT's, and they can't mix it up by

11   throwing in finished products because, your Honor, I

12   would submit if they had to do a separate allegation

13   that said there was a television conspiracy, they

14   couldn't do that without violating Rule 11 because there

15   has been no government investigation reported or out

16   there about CRT televisions or CRT monitors.  Okay.

17   Chunghwa, who they apparently have settled with, okay,

18   and who we believe has given them information in the

19   complaint, was only a CRT manufacturer.  It was not a

20   television or a monitor manufacturer.

21           And so, again, if you require them -- if you

22   dismiss and say, okay, you can have a shot to replead,

23   see if you can plead facts sufficient under Iqbal to

24   have a television conspiracy, they can't do it under

25   Rule 11 because they don't have any information to give

1    them a basis to go after televisions.

2           I'd also point out, your Honor, that there is a

3    plausibility test here under Twombly, and they don't

4    even allege that many of the most important television

5    manufacturers like Sony, like Sharp, like Sanyo, like

6    Vizio, which is a huge Chinese manufacturer, Taiwanese

7    Chinese manufacturer that supplies Wal-Mart, that any of

8    them are in any television conspiracy.  There could be

9    no conspiracy without those people.

10          When they give you market share statistics, as

11   they do, they'll say here's the market shares of the CRT

12   products.  It's just CRT's.  In other words, by

13   obfuscating it, they're not using the market shares of

14   televisions because they would leave out all these other

15   companies.

16          Same thing on monitors.  The monitor makers are

17   HP, are Dell, are Apple.  None of those are alleged to

18   be in any conspiracy concerning CRT monitors.

19          So this is clearly, we believe, not a basis at

20   all that could be done.  The only time you see that

21   televisions are alluded to at all is they have a few

22   allegations where they will say that in thinking about

23   the alleged CRT conspiracy, the companies took into

24   account what the prices would be for finished products.

25          Well, even if you credit that allegation, there

MOTION HEARING  October 5, 2009

Page 28

1    is no way that could support a conspiracy claim

2    regarding televisions.  It just doesn't hold up, your

3    Honor.  It just is nothing there to support that.

4         THE COURT:  What about this series of

5    allegations in paragraph 134?  They purport to address

6    the antitrust conspiracy involving CRT products.  No

7    mention of CRT's alone, it went on for 12 years and they

8    talk about meetings, contracts, group meetings.

9         MR. KESSLER:  Your Honor is correct, they use

10   the conclusory assertion that the antitrust conspiracy

11   went on involving CRT products for over 12 years.  There

12   is no identification.  Since CRT products include CRT's,

13   what we believe they've done is all of these alleged

14   meetings, the glass meetings, et cetera, all come, we

15   believe, from either the government announcements, which

16   are CRT's, or from Chunghwa, who was only a CRT

17   producer.  And what they have tried to do is if they

18   have an allegation, your Honor, that there were meetings

19   involving finished products, then you should require

20   them to set forth under Rule 11 that allegation so we

21   have notice of it.

22        Right now under Twombly, they deliberately

23   tried to not have to say that because we believe they

24   can't say that, but what they've done is by saying since

25   CRT products includes any one of the four, they can say

1     this based on including any one of the four.

2              THE COURT:  Any one of the four what?

3              MR. KESSLER:  The four are CDT's, CPT's,

4     monitors, televisions.

5              If you look at paragraph 137, this becomes

6     clear.  It says (As read):  Beginning in 1997, CRT

7     makers started to meet in a more organized systematic

8     fashion.  These became known as the glass meetings.

9              Well, the makers of CRT's are not necessarily

10    the makers of televisions.  In fact, they are almost

11    never the makers of televisions.  There are separate

12    companies making televisions, separate companies making

13    monitors.  So it sort of gets revealed in 137 what CRT

14    products means.

15             If you look at paragraph 139, the overall CRT

16    conspiracy, okay, the CRT conspiracy is of the CRT's

17    affected worldwide prices, including in the United

18    States, that defendants charged for CRT products, and

19    I'm going to come to that allegation in a second as to

20    what that means, but it's very clear if you parse this

21    through that there is no separate allegation about

22    finished products.

23             The closest thing they come to, the closest

24    thing is in 144, and this is what they cite.  In 144

25    they talk about the price guidelines, alleged price

1   guidelines, and what they say is that at the very end

2   (As read):  Defendants also considered the internal

3   pricing of products containing CRT's in agreeing upon

4   the prices at which CRT's were set.

5        In other words, the most they say is that in

6   allegedly fixing prices for CRT's, they thought about

7   what would be the prices for the end products because

8   the end product prices have an impact as to how much you

9   can charge for a CRT.

10       That doesn't state any claim regarding the end

11  products.  That's the critical point.  And so -- and,

12  again, in 146 at the end when they're talking about

13  setting CRT prices, the last sentence on line 19, page

14  33 says (As read):

15            The analysis often included consideration of

16            downstream prices for television, computer

17            monitors or similar products and how they would

18            affect the price ranges being collusively set.

19       So what's being collusively set, according to

20  the allegations, are CRT products, not televisions, not

21  monitors, and there is just insufficient pleading under

22  Iqbal or Twombly to satisfy that.

23       So what that brings us to then is have they

24  alleged a domestic conspiracy or a import conspiracy

25  fixing CRT prices sold in the United States, because

1    that's their burden.   In other words, I don't win
2    obviously by having shown there is no finished products.
3    I have to now go -- they could have a case if they could
4    plead it that somebody got in a room and fixed the price
5    of those CRT's that were sold in the United States.   We
6    don't dispute that.   This complaint doesn't allege facts
7    to support that.
8            Instead, what did they allege on the facts of
9    the CRT meetings that took place, the conspiracy?   If
10   you go first to paragraph 6, paragraph 6 talks about the
11   meetings that took place, the 500 meetings.   First of
12   all, what is significant?   The meetings occurred in
13   various locales, Taiwan, South Korea, Indonesia,
14   Thailand, Singapore, Malaysia, China, the UK and Europe.
15           One thing that's not alleged in this
16   complaint -- and when we get to the indirect complaint,
17   it's the same -- that any meeting ever took place
18   anywhere in the United States of America.   So that's an
19   undisputed fact in terms of what's there.
20           Then, if you look at pages -- I'm sorry --
21   paragraphs 154 on, which is their substantive
22   allegations of the defendants' specific participation in
23   the meetings, what you will see is over and over again
24   these are meetings in other markets about the fixing of
25   prices in other markets.

MOTION HEARING  October 5, 2009

1          For example, look at 155.  155 talks about

2     Chunghwa, and Chunghwa, we believe, is cooperating with

3     them; and, therefore, this is probably their strongest

4     allegation.  It says (As read):

5               These included hundreds of bilateral

6               meetings and hundreds of group meetings of all

7               the types described herein that took place in

8               Southeast Asia, China, Europe and Scotland.

9               Nothing about the United States.

10         The same thing if you go to 156.  156 alleges

11    meeting in China, South Korea, et cetera, everywhere but

12    the United States.

13         If you look at 160 and 162, again, when they go

14    to specific companies, it's always meetings that are in

15    other parts of the world, not in the United States.

16         Now, it could be that they had meetings outside

17    the United States that fixed prices in the United

18    States.  Okay.  We don't deny you can make such a

19    specific factual allegation if you had such facts and

20    could put them in a complaint.

21         There are no such allegations in this case.

22    Instead, they deliberately leave it unsaid.  There is no

23    specific fact that at these glass meetings U.S. prices

24    were fixed.  Instead, what they say is, oh, guideline

25    prices were set, general prices were fixed.  In other

1    words, they don't distinguish the market, and the reason

2    they don't distinguish the market is because there's

3    nothing they can allege about the United States

4    specifically consistent with Rule 11 other than the

5    conclusory assertion, they put in conclusory assertions,

6    and the Iqbal case is very good on assertions.  Justice

7    Kennedy was very strong on this.  Merely stating in the

8    end, and this fixed prices in the United States, doesn't

9    do it for them under the pleading standards.

10           So what are they left with?  What they're left

11   with is their real claim here is the following, and this

12   becomes very important, your Honor.  As you know, the

13   direct purchasers are unusual direct purchasers.  They

14   do not claim that they purchased a CRT, which we believe

15   is the alleged product.  They claim they purchased a CRT

16   product.  We believe they're all purchases of

17   televisions or monitors because none of them appear to

18   be TV manufacturers or monitors.  If they are, it's not

19   pled.  You know, it's their burden to plead it.  If they

20   could find a television manufacturer or monitor maker to

21   say, "I bought a CRT in the United States," they should

22   have to plead that, and they haven't pled that.

23           Instead, these appear to be mostly retailers

24   who bought televisions or bought monitors to sell to

25   consumers.  That what it appears to be all their

1    plaintiffs are, and that's how they defined their class.

2          So this is an unusual case in that it's not the

3    price fixed product.  It's a product that claims

4    incorporates it.  And there are only two decisions that

5    I'm aware of in the whole history that discuss under the

6    FTAIA specifically whether or not you can state

7    jurisdiction where you have alleged price fixing

8    overseas of a component, okay, that component goes into

9    a finished product overseas and then that finished

10   product comes into the United States to be sold

11   allegedly affected in some way by the component prices

12   having been fixed, only two cases.

13         One is the Intel 2 case, and that's the one,

14   your Honor, if you were going to read one case on this,

15   judges often ask me, they say, "What's the one case I

16   should read?"  If you could read one case on this issue,

17   you should read the Intel case on March 7th, 2007, which

18   we've identified as Intel 2.  Intel 2 was very similar

19   because it was a class of plaintiffs, and I'm looking,

20   your Honor, specifically on page 4.  Page 456.

21         THE COURT:  Hang on.  I'm not even on the cite

22   yet.

23         MR. KESSLER:  It's 476.

24         THE COURT:  Hang on.  Let me pick it up.

25         MR. KESSLER:  I can read it to your Honor if

MOTION HEARING   October 5, 2009

1   you need it.

2            THE COURT:  I don't find it in your table of

3   authorities.

4            MR. KESSLER:  Yes, it is.  It's 476 F. Supp.

5   2d. 452.

6            THE COURT:  Intel 2 which is 4 what?

7            MR. KESSLER:  It's 476 F. Supp. 2d. 452.

8            THE COURT:  What court is that?

9            MR. KESSLER:  This is in the District Court of

10  Delaware.  There is, by the way, no Ninth Circuit case

11  directly addressing this issue.  One thing they like to

12  say is they say, well, what about LCD?  LCD doesn't

13  discuss the FTAIA at all.  In other words, I don't know

14  whether the issue was raised or not raised, but there is

15  no discussion at all of the FTAIA.  So it's not relevant

16  at all to this.  To our knowledge, there is no other

17  court that's ruled precisely on this issue of components

18  other than this case and United Phosphorus, which I will

19  talk about also.

20           THE COURT:  Can I have the cite for United

21  Phosphorous?

22           MR. KESSLER:  United Phosphorus is 131 F. Supp.

23  2d. 1003 and that's the Northern District of Illinois,

24  was affirmed by the Seventh Circuit.

25           What I'm reading here is from this Intel case

MOTION HEARING   October 5, 2009

Page 36

1    because it's so on point because it sounds so similar to

2    this.   This is from Intel.   Here class plaintiffs make

3    the same allegations as AMD.   AMD was a maker of the

4    chips that went in here and the class members are people

5    who bought the computers that had the chips in them.

6    And, therefore, class plaintiffs' allegations have the

7    same twist and turns that the court noted with respect

8    to AMD's allegations, plus additional forks in the road

9    concerning whether the weakened conditions of rivals

10   like AMD ultimately led Intel to charge higher prices

11   for its microprocessors which in turn caused original

12   equipment manufacturers to charge retailers higher

13   wholesale prices for PC's which they then bought as the

14   retailer.   So they were the retailers buying this.

15           And here is what they said.   That this

16   speculative chain of events is insufficient to create

17   the direct substantial and foreseeable effects on

18   commerce required by the FTAIA has been confirmed by

19   other courts who have considered similar allegations

20   concerning the downstream effects on commerce of

21   component products.   And then the case that's cited is

22   United Phosphorus, Ltd., that I just went through.

23           The FTAIA explicitly bars antitrust actions

24   alleging restraints in foreign markets for inputs that

25   are used abroad to manufacture downstream products that

1  may later be imported into the United States.  Clearly

2  the domestic effects in such a case, if any, would

3  obviously not be direct, much less substantial and

4  reasonably foreseeable.

5       So that is the case law, that in Phosphorus

6  which comes out exactly the same way.  What they have

7  here, your Honor, is simply a claim that this foreign

8  price fixing would have affected TV prices, they came

9  into the United States, we ultimately bought them.

10      Now, that may be a very good claim if it

11  happened in some foreign jurisdiction, but Congress has

12  indicated that you don't get jurisdiction here, and in

13  that regard I would ask your Honor to take a look at the

14  Ninth Circuit's DRAM case, because DRAM says the Ninth

15  Circuit standard is proximate causation, which is now

16  the majority rule in the circuits.

17      In other words, for the effect to be direct,

18  substantial, and reasonably foreseeable, it also has to

19  be a proximate effect.  It can't just be a but for

20  effect.  They can't come in and say, oh, well, if a

21  price fix was made of a component overseas and if it

22  came into a set, that would have had some effect and

23  therefore I get jurisdiction.

24      The Ninth Circuit has made it clear in DRAM

25  that's not sufficient to connect the foreign activity to

1    the U.S. sales, and this is a matter of comity at well.

2    The Supreme Court in Hartford Fire said what is going on

3    here is we don't rule the world.  So if you allow their

4    theory to abide, any time you -- let's say you had a

5    price fixing agreement in Southeast Asia and you fixed

6    CRT's and there was laws in those country which

7    prohibited that.  You would have illegality there and

8    then every place a set was sold around the world you

9    would have -- okay.

10            THE COURT:  They'll, of course, speak for

11   themselves.  Reading the briefs, what I really get is

12   that they're really arguing your point.  If you had a

13   price fixed component and that's all you had, there

14   isn't necessarily enough effect on the United States.

15   Seems to me they're saying, no, our allegation of

16   product, the sale of the finished product being a part

17   of conspiracy solves our problem for us.

18            MR. KESSLER:  I understand that, your Honor.

19   My first part of my argument was designed to show they

20   haven't solved their problem because they have no

21   conspiracy in the first one.

22            THE COURT:  I understand that.

23            MR. KESSLER:  I have to recognize, though, your

24   Honor, there are some CRT's sold in the United States.

25   So if they had a specific allegation of a meeting to fix

1   components in the United States and if somebody --

2           THE COURT:  There are CRT's that go into

3   computer production.

4           MR. KESSLER:  There were some.  They are

5   relatively small quantities.  There were some CRT

6   manufacturers in the United States during this period,

7   there were some purchases.  They haven't alleged that.

8   That's really the point of my saying that.  They haven't

9   put facts forward.  They've alleged in conclusory

10  assertions, but not in facts that support this.

11          THE COURT:  I understand that.

12          MR. KESSLER:  My last point, your Honor, and

13  then I'm going to wrap up, is the other cases I suggest

14  your Honor look at is the DK Enterprises case in the

15  Fourth Circuit which we cited in our brief and the

16  Animal Science Products case in the District of New

17  Jersey.

18          Both of those cases stand for the proposition

19  that mere ripple effects are not enough.  It sort of

20  affirms the component issue, which is that the mere fact

21  that there may be some effects, even price raising

22  effects, is not enough to confer U.S. antitrust

23  jurisdiction.

24          My conclusion, your Honor, is as follows, is

25  that we believe that there is no subject matter

1   jurisdiction here.  You can let them try to replead

2   under Rule 11.  We don't think they can plead either a

3   specific price fixing conspiracy either directed at

4   finished products in the United States or a conspiracy

5   fixing the prices of CRT's in the United States.  But if

6   your Honor wants to give them another shot, they can

7   take another shot.  We don't think they can do that

8   under Rule 11.

9           But even if your Honor were to find that, well,

10   maybe they have alleged one paragraph that says, oh,

11   maybe this is enough to say a CRT in the United States

12   was price fixed, I direct your Honor there to In Re

13   Rubber Chemicals, Judge Jenkins' decision in this court

14   in the Northern District of California.  What In Re

15   Rubber Chemicals says is that at a minimum your Honor

16   should rule that there are no claims in this case.  They

17   are dismissed or stricken, whatever your Honor wants to

18   use, regarding allegations of fixing prices overseas

19   even if they came into U.S. sets as components and only

20   allow this case to go forward if they have an allegation

21   to fix the price of a CRT or a television in the United

22   States.

23           What Judge Jenkins did is said the FTAIA

24   basically says you have to parse the claims.  In that

25   case it involved people who bought products overseas and

1    in the United States, and he said the claims of those

2    plaintiffs for overseas purchases are out.  There is no

3    FTAIA jurisdiction.  They did allege some specific

4    purchases in the United States and he allowed that to go

5    forward.

6            Now, in that case you'll see very specific

7    allegations of U.S. illegal conduct, not like in this

8    case.  So I don't think they get there, but at a

9    minimum, your Honor, a ruling should be made that all of

10   the foreign stuff is out.

11           Having said that, we believe the best approach

12   is to dismiss the entire case because there really are

13   no facts about any alleged U.S. price fixing.

14           Finally, your Honor, on the importer question,

15   one of the things they argued is that, well, they are

16   importers or that there are allegations of importing.

17   Your Honor, there is no allegation in the entire

18   complaint, it's only in their brief, that there was any

19   conspiracy directed at importing CRT's or importing

20   televisions.  There is nothing there.  There is no

21   specific fact alleged, there is no claim that's made.

22           So the importer exception to the FTAIA cannot

23   possibly apply.  It can't apply just because in their

24   brief they argue, well, we're really talking about

25   imports.  Nor, your Honor, could they apply because they

1  would have to have a specific fact.  They don't even

2  allege who was an importer.  There is not one allegation

3  that any defendant is an importer of CRT's or anything.

4          Now, maybe they can make such allegations, but

5  it's not in this complaint.  There is nothing there

6  about importing at all.

7          The last point on importing -- this confuses

8  me, so I'm going to say this, maybe others are confused

9  besides me.  Even if there is an import allegation and

10  you're not in the FTAIA, you still have to satisfy

11  Hartford Fire Insurance.  The Supreme Court's case in

12  Hartford Fire Insurance was not an FTAIA case.  It was

13  an importing case.  It was alleging there was a boycott

14  of insurance in United States or policies in effect that

15  were being imported, and even there it still has to be

16  both an intention and a direct and substantial effect,

17  and the lower courts have made that clear.

18          You know, in particular if you look at the DK

19  case that I mentioned talks about this confusing issue,

20  which is that even when it's just imports, you still

21  have the Sherman Act test as interpreted by the courts

22  in the Supreme Court which doesn't apply willy-nilly.

23  It still is limited by a direct effect, a substantial

24  effect, and in fact the test that's used in DK is

25  whether it's primarily a domestic U.S. commerce case or

Page 43

1  a foreign commerce case.  So even the importing

2  exception does not get them out on that basis.

3      Unless your Honor has some other questions, I

4  think that's all I've got.

5      THE COURT:  Thank you.  All right.  Who do we

6  turn to now?  Are we going to have the plaintiffs'

7  response to the subject matter jurisdiction?  Everybody

8  agree?

9      MR. LEHMANN:  Michael Lehmann of Hausfeld LLP

10  appearing on behalf of the direct purchasers.

11      In its essence, the defendants' position is

12  that if there is a global price fixing conspiracy

13  implemented through overt acts undertaken in foreign

14  countries and in the United States that causes U.S.

15  plaintiffs of price fixed products to pay overcharges

16  for purchases made in the United States, that's not

17  redressable under U.S. antitrust law.

18      Your Honor, that's never been the law, before

19  Iqbal, after Iqbal, before the FTAIA, after the FTAIA.

20      Consider some of the cases that defendants have

21  relied on to establish this remarkable principle.  The

22  Ninth Circuit's opinion in DRAM.

23      THE COURT:  In what?

24      MR. LEHMANN:  The Ninth Circuit's opinion in

25  DRAM is one case that was cited by the defendants.

MOTION HEARING   October 5, 2009

Page 44

1    There you had Centerprise, a British plaintiff, seeking

2    to claim damages caused by foreign purchases of DRAM.

3    The Ninth Circuit indicated that its case was barred by

4    the FTAIA but distinguished situations where there was

5    pled direct participation in domestic commerce.

6         Unlike Centerprise, whose amended complaint

7    concerns only wholly foreign transactions, consider

8    another case that we've cited and talked about in the

9    brief, the Rubber Chemicals case decided by Judge

10   Jenkins.  There plaintiffs alleged a conspiracy to fix

11   prices in both foreign and domestic markets and sought

12   damages not only on behalf of themselves, but on behalf

13   of subsidiaries and affiliates of each named plaintiff

14   who purchased products from Rubber Chemicals from

15   defendants in various locations around the world.

16        Judge Jenkins dismisses, and I'm quoting here

17   from his opinion (As read:)

18             ...plaintiff Sherman Act claims against all

19        defendants to the extent they seek to recover

20        damages for foreign injury, i.e., the purchase

21        of rubber chemicals at allegedly inflated

22        prices in foreign markets for use outside of

23        the United States.  Plaintiffs may proceed with

24        their Sherman Act claims to the extent they

25        seek to recover damages for domestic injuries,

Page 45

1            i.e., the purchase of rubber chemicals at

2            allegedly inflated prices in the domestic

3            market or for use within the United States.

4            2007 opinion.

5            Intel is similar.  There the court in its

6    opinion on the class case incorporated by reference its

7    analysis of the dismissal of Advanced Micro Devices'

8    claims under the FTAIA and it pointed out AMD was

9    asserting claims under U.S. antitrust law for in losses

10   in foreign countries caused by Intel's conduct in those

11   countries.

12            The court dismissed those claims, noting that

13   the injuries suffered as a result of Intel's foreign

14   conduct are foreign injuries that occurred in foreign

15   markets.

16            United Phosphorus, an opinion that was cited

17   here.  Well, there you had two Indian companies and an

18   American who wanted to joint venture with them to

19   produce a drug in India.  There was extensive discovery

20   done.  It wasn't decided on the pleadings.  It was

21   decided on a full evidentiary record.

22            The court held, well, the Indian plaintiffs

23   never established they had the ability to manufacture a

24   drug that would be sold in the United States and the

25   only prospective U.S. purchaser that was identified

MOTION HEARING  October 5, 2009

Page 46

1   wouldn't buy from them even if they could produce it.

2   Not a case involving any domestic effects.

3        DK Enterprises, the Fourth Circuit opinion that

4   was cited here, occurred after an eight-day trial, not

5   on the pleadings.  And there the court said because this

6   case involves importation of foreign made goods,

7   however, conduct expressly exempted from FTAIA coverage

8   as involving import trade or import commerce with

9   foreign nations, the FTAIA standard obviously does not

10  directly govern this case.  Pretty inapposite, in my

11  view.

12       So what have you got here?  Well, I think you

13  go back to the opinion rendered by the United States

14  Supreme Court in 2004 in Hoffman LaRoche versus Epigram.

15  Our courts, quoting from that opinion, have long held

16  that application of our antitrust laws to foreign

17  anticompetitive conduct is nonetheless reasonable and

18  hence consistent with the principles of prospective

19  comity insofar as they reflect a legislative effort to

20  redress domestic antitrust injury that foreign

21  anticompetitive conduct has caused.

22       That's the law of the highest court in this

23  land, and it should be followed here.

24       So what do the plaintiffs allege in this case?

25  Well, in the first place, they allege a U.S. class.  The

MOTION HEARING  October 5, 2009

Page 47

1    class of people, entities who purchased a CRT product in

2    the United States from any defendant or subsidiary or

3    affiliation thereof.  Not foreign purchases, not

4    purchases by foreign subsidiaries.  People in the United

5    States.

6           The named plaintiffs alleged to be members of

7    this class are all United States based companies and

8    it's claimed in the complaint that they purchased CRT

9    products, but I'll have you know, since the issue was

10   raised, some of them purchased CRT tubes.  It isn't a

11   situation where they all purchased downstream products.

12   So we've got plaintiffs, even if you take their narrower

13   view of the conspiracy, who have standing to raise these

14   claims.  There is no question that such purchasers,

15   whether they were purchasers CRT tubes or purchasers of

16   CRT products containing such tubes, were harmed by the

17   conspiracy.

18           You don't have to take the plaintiffs' word for

19   it.  Scott Hammond of the Department of Justice said (As

20   read):  This conspiracy harms countless of Americans who

21   purchase computers and television using cathode ray

22   tubes sold at fixed prices.

23           In the indictment against CY Lin of Chunghwa,

24   it explicitly states that, quote (As read):  Actions in

25   furtherance of a conspiracy to fix prices for CPT's and

```
 1    CPD's occurred in the United States and specifically
 2    within this district.
 3             So you've got the government saying that the
 4    conspiracy was furthered by overt acts in this country
 5    and in this district.
 6             THE COURT:  Which are the paragraphs that
 7    allege what your clients bought?
 8             MR. LEHMANN:  The paragraphs that identify the
 9    plaintiffs' --
10             MR. SIMON:  Are paragraphs 11 through 23, your
11    Honor.
12             MR. LEHMANN:  They allege that the plaintiffs
13    bought CRT products, which are defined to include either
14    CRT tubes or products containing CRT tubes.
15             THE COURT:  And you are stating here in your
16    oral argument additionally there were some direct
17    purchases.
18             MR. LEHMANN:  There were some.
19             THE COURT:  Tubes as well as finished products.
20             MR. LEHMANN:  There were some who bought tubes,
21    there were others who only bought the finished products,
22    but there are certainly some who bought tubes as well.
23             Let's go through this complaint because we've
24    heard a lot about how it doesn't allege a conspiracy
25    that had any --
```

1          THE COURT:   Paragraphs 11 through what?

2          MR. SIMON:   11 through 23, your Honor.

3          MR. LEHMANN:   -- domestic effects.  First of

4    all, throughout this complaint in a number of paragraphs

5    the allegations of the objectives and aims of the

6    conspiracy are detailed in some length, looking at

7    paragraphs 5, 138, 217, and these objective and aims are

8    identified with respect to a CRT conspiracy.

9          Secondly, paragraphs 134 through 153 there are

10   detailed the various types of meetings that occurred in

11   furtherance of the conspiracy, and all of these are

12   identified as meetings in furtherance of the CRT

13   products conspiracy.  So to the extent further detailing

14   is required after Twombly and Iqbal, it's there on the

15   face of the complaint.

16         Paragraph 154 through 175 detail the

17   participation by the various defendants in these

18   meetings in furtherance of the CRT products conspiracy,

19   and at various points throughout those paragraphs it's

20   noted that the U.S. subsidiaries who sold CRT products

21   or CRT in the United States played a very important role

22   in maintaining that conspiracy.

23         Paragraphs 188 through 197 describe pricing

24   activity in the United States that included pricing of

25   CRT monitors, not just the tubes themselves.

1          We also have allegations in the complaint about

2     the fact that the U.S. based defendants were represented

3     at the collusive meetings held abroad and were parties

4     to the agreements reached.  We have allegations in the

5     complaint about various other activity that occurred in

6     the United States, including the activities of the

7     United States display consortium, manufacturing plant

8     closures in New York, Ohio and Indiana alleged to be in

9     furtherance of the CRT products conspiracies.  The fact

10    that the foreign meetings stated price agreements in

11    U.S. dollars with an eye specifically toward targeting

12    the U.S. market and the consolidated amended complaint

13    explicitly alleges that all these price effects

14    restrained competition in the United States, stabilized

15    products at artificially high and noncompetitive levels

16    throughout the United States and deprived the direct

17    purchasers in the United States of the benefits of free

18    and open competition.

19          THE COURT:  Those last things you've mentioned,

20    aren't they the kind of things that Iqbal is saying that

21    I shouldn't pay much attention to, that you would have

22    to allege facts you imported X number of units, the

23    meetings were held somewhere and so and on, that the

24    impact was to increase the prices by X percent or Y

25    dollars?  Isn't that what kind of the generalized things

MOTION HEARING  October 5, 2009

1    that Iqbal doesn't like?

2            MR. LEHMANN:  Your Honor, I think the influence

3    of the Iqbal decision and its significance has been

4    wildly overstated by the defendants in this case.  I'll

5    cite to you a decision, since we only saw this Iqbal

6    argument in their reply briefs, that is not in our

7    briefs.  It's a case called Al-Kidd versus Ashcroft 2009

8    WestLaw 2836448, Ninth Circuit, September 4th, 2009.

9            THE COURT:  Al-Kidd versus what?

10           MR. LEHMANN:  Ashcroft.

11           THE COURT:  Oh, another one of those.

12           MR. LEHMANN:  Another one of those.  At page

13   star 11 the Ninth Circuit noted that Iqbal effected no

14   sea change in the law and that even before Twombly and

15   Iqbal this circuit has said that you can't just rely

16   solely on conclusory allegations.  The court went on to

17   say but Twombly and Iqbal do not require that the

18   complaint include all facts necessary to carry the

19   plaintiffs' burden.  Asking for plausible grounds to

20   infer the existence of a claim for relief does not

21   impose a probability requirement at the pleading stage.

22   It simply calls for enough fact to raise a reasonable

23   expectation that discovery will reveal evidence to prove

24   that claim.  That's on the page star 24 of the Ninth

25   Circuit's opinion.

1          And we think we've done that in this complaint.

2     And, you know, I think that the defendants have not

3     demonstrated otherwise.

4          We've also alleged here import commerce as an

5     exception to the FTAIA.  The contention there is that

6     even if the FTAIA --

7          THE COURT:  I'm sorry.  May I have a cite to

8     that Al-Kidd case again?

9          MR. LEHMANN:  2009 WestLaw 2836448, decided by

10    the Ninth Circuit on September 4th.

11         THE COURT:  All right.  Thank you.

12         MR. LEHMANN:  We've also alleged that the

13    import commerce exception to the FTAIA applies here.

14    The FTAIA states that the Sherman Act does not apply to

15    conduct involving trade or commerce other than import

16    trade or import commerce with foreign nations.

17         Now, this term import has been defined to note

18    a product or service brought into the United States from

19    abroad.  CRT's manufactured abroad and sold into the

20    United States, televisions and monitors containing such

21    CRT's, all of those would fall within the definition of

22    import.

23         The applicability of this exception based on

24    import trade or commerce turns not on the plaintiff's

25    status whether or not they're importers, but on

MOTION HEARING  October 5, 2009

Page 53

1   defendant' conduct.

2           Now, defendants note that the exception applies

3   only if defendants directly brought goods or services

4   into the U.S. or directly increased or decreased U.S.

5   imports.

6           Well, what we've alleged here is that the

7   defendants have sold or their subsidiaries have sold

8   into the U.S. product import, you know, these CRT

9   products and that the manufactures were overcharged for

10  them when they purchased them in the United States.  We

11  think that's a sufficient allegation to call the

12  exception into play.

13          We've also alleged that by closing United

14  States CRT product manufacturing facilities as alleged

15  in the consolidated amended complaint there were --

16  defendants directly caused United States imports of CRT

17  products to increase because they cut down the U.S.

18  production supply.

19          THE COURT:  Are you quoting from specific

20  paragraphs of your complaint?

21          MR. LEHMANN:  Yes, I am.

22          THE COURT:  Could I have the cites, please?

23          MR. LEHMANN:  183, 185 and 187.  And then the

24  defendants have raised this domestic effects exception

25  to the FTAIA which requires that if you're going to go

1    after foreign conduct and treat it subject to the

2    Sherman Act's breach where the transaction is solely in

3    foreign commerce, you've got to sufficiently allege that

4    American commerce, i.e., that has a direct, substantial

5    and reasonably foreseeable effect on American domestic

6    import or export commerce and has an effect of the kind

7    that the antitrust laws consider harmful and must give

8    rise to a Sherman Act claim.

9           Again, we believe that the consolidated amended

10   complaint does exactly that.  It alleges proximate

11   causation between defendants' conduct in foreign

12   countries and the injuries suffered in the United States

13   by United States purchasers with respect to transactions

14   that occurred in this country.

15          The defendants again basically say they take a

16   different view of the complaint and are disputing the

17   underlying facts.  We think it's entirely appropriate

18   under these circumstances to hold that the court should

19   find that this is one where the factual and

20   jurisdictional issues are completely intermeshed and it

21   would be inappropriate to decide this issue on a summary

22   basis without taking more jurisdictional discovery.

23          And we pointed out to your Honor that in the

24   context of jurisdictional discovery claims under Rule

25   12(b)(1) the Ninth Circuit in a series of decisions that

1  are cited in our brief have held that discovery ought

2  normally to be permitted before a complaint is to be

3  dismissed.  We quoted to you the Ninth Circuit's

4  decision in Autery versus United States, 424 Fed. 3d.

5  944 where(As read):

6            As is the case here, the jurisdictional

7            issue and substantive claims are so intertwined

8            that resolution of the jurisdictional question

9            is depending on factual issues going to the

10           merits, the district court should employ the

11           standard applicable for a motion for summary

12           judgment.

13           And here the merits are directly implicated.

14  Defendants say we can't establish the FTAIA because we

15  haven't shown a conspiracy as to CRT products as opposed

16  to CRT tubes.  Your Honor, that's an ultimate factual

17  question.  You can't decide this on the basis of that

18  record.  I mean, they're not disputing that there is a

19  conspiracy here as to CRT tubes.  They're saying they

20  have an argument about the scope of the conspiracy and

21  whether it extends to CRT products.  And, your Honor, I

22  don't think the scope of the conspiracy is something you

23  can resolve on the pleadings in the complaint.

24           We've alleged these meetings and the

25  participation in those meetings and the activities, the

1  overt acts in furtherance of that conspiracy in the

2  United States all furthered a conspiracy with respect to

3  CRT products.  And we've alleged specific details in

4  connection with those allegations.  We think that's

5  enough to satisfy Twombly and Iqbal and enough to

6  establish that the FTAIA either does not apply to or is

7  subject to exceptions that are applicable to this case.

8          THE COURT:  So bottom line you are relying on

9  the allegations in your complaint of the conspiracy to

10  fix the prices of the finished CRT products.

11          MR. LEHMANN:  Yes, your Honor.

12          THE COURT:  Now, what do we do now?  Do you

13  want to hear from the indirect?

14          MR. KESSLER:  Your Honor, I'd like two minutes.

15          THE COURT:  Are we going to hear from the

16  indirect plaintiffs first?

17          MR. KESSLER:  No, we have a separate motion

18  regarding jurisdiction on the indirect plaintiffs.  The

19  motion will be different.

20          MR. SIMON:  Can I mention one thing, your

21  Honor?  Mr. Kessler got up and mentioned a number of

22  things that are kind of cross-overs to others on the

23  merits.

24          THE COURT:  I understand.

25          MR. SIMON:  When we get to the point where the

1    rest of us are addressing those issues, we'll reserve

2    our comments on that till then.

3            THE COURT:  I'm trying to be a traffic cop here

4    and say who goes next and what direction to go in.

5            MR. KESSLER:  If it's all right, I would spend

6    less than five minutes and reply then move on to the

7    indirect motion.  Actually, I'll sit down and then we'll

8    move to the next issue.  I'll have less than five

9    minutes on reply.

10           Your Honor, I believe the difference between

11   the position the defendants and the position of

12   plaintiffs simply come down to what do the allegations

13   state, and your Honor will be the best judge of that.

14   What I can say is the following.  All of the assertions

15   that counsel made, general assertions about finished

16   products conspiracy, effect in the United States, all of

17   that, those are the same type of conclusory assertions

18   that are in the complaint.  They are not permitted under

19   Iqbal, they are not permitted under Twombly and they

20   frankly weren't permitted in the Ninth Circuit pre-Iqbal

21   and Twombly, which is all that the most recent case he

22   quoted to you seems to be saying, at least that Ninth

23   Circuit panel says we've already required more than

24   conclusory assertions.

25           THE COURT:  Have you seen this Al-Kidd case?

1        MR. KESSLER:  I have not, but I heard the quote

2   he raised, and the quote he mentioned said this has

3   always been the law in the Ninth Circuit.  So the Ninth

4   Circuit believes they've always followed Iqbal.  That's

5   fine.  We'll certainly look at that case later today.

6   We're trying to have someone pull it now.  They just

7   raised it for the first time now.

8        With respect to their idea they're U.S.

9   purchasers, that's irrelevant.  Intel 2 were U.S.

10  purchasers.  It was the same class.  The point is if

11  they are U.S. purchasers of finished products, and he

12  said he's resting on that, and if the only claims are

13  the overseas foreign price fixing, they don't have

14  jurisdiction.

15       So it's all going to come down to in the end,

16  your Honor, I believe, is there evidence sufficiently

17  stated here of a finished product price fixing

18  conspiracy in the United States.

19       THE COURT:  You say evidence.

20       MR. KESSLER:  No, sorry.  Misstate.

21  Allegations of facts.  Completely wrong with evidence.

22  Not evidence.  Allegations of facts.

23       And when you look at the complaint, what you

24  will find is there is not one allegation of any meaning

25  in which the plaintiffs say the prices of a finished

1    product in the United States was ever discussed, fixed,

2    stabilized.

3            What they do is they bury it in this CRT

4    products category.  If your Honor requires them, and I

5    have no problem with this, you could require them to

6    give them a chance to replead and see if they can plead

7    specific meetings as Iqbal requires, as your Honor

8    noted, in which U.S. finished products were the subject

9    of a price fixing agreement on sales in the United

10   States, then they'd have subject matter jurisdiction;

11   but what they can't do is they can't bury it by saying,

12   well, we used the words CRT products, when it is very

13   clear from the other paragraphs of their complaint, as

14   we pointed out in my argument, that they're really using

15   meetings about -- alleged meetings about CRT's and then

16   saying, well, we include it all in CRT products.  That

17   can't carry them over the jurisdictional threshold under

18   any way shape or form.

19           And, finally, I'd say, your Honor, again, they

20   have no response at all to the fact that there is no

21   specific allegation that anybody's an importer.  You

22   heard them argue that.  It's not in their complaint.

23   You have to have complaint allegations.  You can't have

24   argument of counsel.

25           He argued that, well, we know they imported it.

MOTION HEARING   October 5, 2009

Page 60

1    Well, where's the Rule 11 complaint allegation, who

2    imported which products, what are we talking about?  We

3    know, for example, that they admit that many of the

4    defendants don't make CRT's, many of the defendants

5    don't make finished products.  They're all going to be

6    different.  They can't lump this all together in

7    argument and use that as a substitute.

8          Here's another example.  They said, well, we

9    have complaint allegations of closing U.S. plants.

10   Those U.S. plants that were closed were CRT plants, not

11   finished product plants.  So, again, they just conflate

12   everything together.  You know, they don't have a -- I'd

13   be very comfortable if your Honor goes through the

14   difficult task of reading the specific paragraphs they

15   cite.

16         THE COURT:  I'm going to have to.  You're both

17   giving me that burden.

18         MR. KESSLER:  But the final one, your Honor, is

19   you asked them where is the allegation that anyone

20   bought a CRT tube.  The answer is nowhere.  The only

21   allegation in the complaint is that every plaintiff

22   bought a CRT product without identifying what product

23   that is.  That's the whole problem.

24         We don't know if none of the plaintiffs bought

25   tubes.  We heard counsel say it.  That's not a complaint

1  allegation.  So at a minimum, your Honor, it seems to me

2  if this is going to be a case about tubes and two of

3  those plaintiffs bought tubes, then they're the only two

4  plaintiffs frankly who could ever be a class

5  representative anyway.

6          They have to plead the facts, and there may be

7  none because right now all we've heard is counsel, not a

8  complaint allegation.  That's all I have, your Honor.

9          THE COURT:  Let me ask you a question.  Is your

10  argument in this respect meant to encompass the issue of

11  the adequacy of their pleading to address each defendant

12  rather than the defendant groups?  Or is somebody else

13  going to talk about that?

14          MR. KESSLER:  Well, we were going to do that

15  separately, your Honor, but I would say that we believe

16  it's clear after Iqbal and Twombly it has to be

17  individual defendant.  I think I've used up so much time

18  I prefer to hand over the podium to the next argument at

19  this point.

20          THE COURT:  I've lost where we're going.

21          MR. KESSLER:  Illinois Brick, your Honor.

22          THE COURT:  We're not just going to the

23  indirect.

24          MR. KESSLER:  I think we should get through all

25  the direct and then do the indirect.

Page 62

1          MR. SAVERI:  Are we going to do now -- you have

2     a motion directed to the indirects, don't you?

3          THE COURT:  That's what I was asking.

4          MR. SAVERI:  Aren't we going to finish with

5     your motion with reference to the indirects?

6          MR. KESSLER:  It's up your Honor.  Whatever you

7     find to be easier.

8          THE COURT:  Let's do it by issues.  It's not

9     going to be complex to take hold of.  But let's not

10    forget the fact that the indirects are going to have

11    something to say.

12         Could you pause just a moment, please, and let

13    me note taking catch up with where I want to be.

14         Time for a bio break?  Ten minutes.

15         (Recess taken.)

16         THE COURT:  Are there some of you who have not

17    signed the sign up sheets yet?

18         May we resume, please.

19         MR. LITWIN:  Good morning.  My name is Ethan

20    Litwin.  I represent the four Phillips entities

21    remaining in this case:  Koninklijke, Phillips

22    Electronics, Phillips Electronics North America

23    Corporation, Phillips Electronics Industries Taiwan and

24    Philips da Amazonia.

25         At the start, your Honor, I'd like to ask your

Page 63

1    indulgence.   I'm going to be talking about chains of

2    distribution.   It would be helpful to sketch those out

3    as I refer to them.

4              THE COURT:   That's fine.   If that's what you

5    want to do.   I'm being very oversimplified, but doesn't

6    your point essentially follow from my decision on his

7    point, and that is if we have a CRT product conspiracy,

8    these people are alleged to have purchased the CRT

9    product and that's the end of the argument?

10             MR. LITWIN:   That is indeed, your Honor.

11             THE COURT:   If, however, the conspiracy is only

12   to fix the prices on the CRT components, then they're

13   indirect purchasers.   Isn't that where we are on that?

14             MR. LITWIN:   That is essentially the threshold

15   issue.   And on that note, your Honor, I'd like to note

16   that although the plaintiffs define CRT products to

17   include four discrete products, as Mr. Kessler

18   mentioned, plaintiffs use the term CRT products to mean

19   completely different things in both their complaint and

20   if their opposition.

21             I would refer your Honor to paragraphs 189 and

22   199 of the direct purchasers' consolidated amended

23   complaint where clearly the term CRT products means only

24   CRT's.

25             THE COURT:   189?

MOTION HEARING  October 5, 2009

1          MR. LITWIN:  189.  And what the direct

2   purchasers allege at paragraph 189, your Honor, is that

3   there was an industry source that noted that (As read):

4   The price of the 14-inch tube, that is to say the CRT,

5   is at a sustainable $50 and has been for some years.

6          And then if you look at the next paragraph,

7   paragraph 190, they allege:  In reality, consumer prices

8   for CRT products never approached $50.

9          So clearly in paragraph 190 the direct

10   purchaser plaintiffs used the term CRT products to mean

11   only CRT's.  The converse is also true, your Honor.  In

12   several instances, the direct purchaser plaintiffs used

13   the term CRT products to mean only finished products

14   such as televisions and monitors.

15          So, for example, I'd refer your Honor to

16   allegation 86 which is a very critical allegation

17   because it forms part of their class allegation.

18          THE COURT:  Okay.

19          MR. LITWIN:  Are you there, your Honor?

20          THE COURT:  Yeah, page 19?

21          MR. LITWIN:  Yep.  And the direct purchaser

22   plaintiffs there allege there the class composition

23   encompasses those who bought a CRT product directly from

24   a defendant even if the CRT contained therein, that is

25   to say a CRT contained within a CRT product.  So

1   obviously CRT product as used in that paragraph as

2   opposed to paragraph 190 means a completely different

3   thing, only finished products.

4         The same is true at paragraphs 139 and

5   paragraphs 144 which are relied extensively on by the

6   direct purchaser plaintiffs in their opposition.  In

7   paragraph 139 the plaintiffs allege the overall CRT

8   conspiracy affected worldwide prices for CRT products,

9   and at 144 they allege in the case of integrated

10  manufacturers who produced both CRT's and CRT products.

11  Now, clearly they're not saying you produced tubes and

12  tubes.  They're saying you produced both tubes and

13  finished products.

14        So I think the big question, your Honor, I know

15  you pointed out the paragraphs that begin at paragraph

16  134 of the direct purchaser consolidated amended

17  complaint, is in those paragraphs 134 through 143 or

18  thereabouts when the direct purchaser plaintiffs make

19  allegations regarding CRT products, what are they

20  referring to?  Are they referring to tubes?  CRT's?  Or

21  are they referring to televisions and monitors?  Or are

22  they referring to some combination of those four things?

23        Now, I think what the indirect purchasers have

24  alleged regarding the glass meetings that are featured

25  at paragraphs 141 to 143 --

```
 1              THE COURT:   In their complaint?
 2              MR. LITWIN:   This is the direct purchaser
 3     complaint paragraphs 141 to 143.
 4              THE COURT:   I thought you said indirect.
 5              MR. LITWIN:   And I'm going to quote from the
 6     indirect purchasers at 152 and 154.
 7              MR. SAVERI:   With all due respect, it's rather
 8     confusing.   Could you repeat whether you're referring to
 9     the indirect purchasers' complaint or direct purchasers'
10     complaint so we can understand what you're saying?
11              MR. LITWIN:   Of course.   I'm referring to
12     paragraphs 141 through 143 of the direct purchaser
13     complaint and comparing what's alleged therein to
14     paragraphs 152 and 154 of the indirect purchaser
15     complaint.
16              Paragraphs 141 through 143 of the direct
17     purchaser complaint, as your Honor noted, speak about
18     CRT products; but as the direct purchase plaintiffs use
19     CRT products to mean alternatively CRT's alone or
20     finished products alone, it's unclear what they mean
21     here.   But if you -- but the paragraphs 141 to 143
22     discuss the glass meetings themselves, and the
23     allegations in the indirect purchaser complaint about
24     the glass meeting is a lot more precise.   Quote,
25     paragraph 152 of the indirect purchaser complaint (As
```

1    read):

2                    The glass meetings at all levels followed a

3                fairly typical agenda.  First the participants

4                exchanged competitive information, such as

5                proposed future CRT pricing, sales volume,

6                inventory levels, production capacity, et

7                cetera.  The meeting participants then used

8                this information to discuss and agree --

9                    And there you have the alleged agreement, your

10   Honor.

11                   -- upon what price each would charge for

12               CRT's to be sold in the following month or

13               quarter.  They discussed and agreed upon target

14               prices, price increases, so-called bottom

15               prices and price ranges again just for CRT's.

16               They also discussed and agreed upon prices of

17               CRT's that were to be sold to specific

18               customers.

19                   The indirect purchasers' allegations at 154 are

20   the same.  Defendants' conspiracy included agreements on

21   the prices at which certain defendants could sell CRT's

22   to their own corporate subsidiaries and affiliates.  Not

23   finished products, just CRT's.

24                   Compare that to what the direct purchasers

25   plaintiffs say about CRT products when it's clear that

1    they're talking only about finished products.  Again,

2    paragraphs 139 and 134 of the direct purchaser complaint

3    (As read):

4              The overall CRT conspiracy only affected

5         prices for CRT products.  Defendants also

6         considered internal pricing of products

7         containing CRT's in agreeing upon the prices at

8         which CRT's were set.

9         The indirect purchasers have similar

10   allegations at paragraphs 155 and 223 of their

11   complaint.  155 of the indirect purchaser complaint

12   states (As read):

13             Each of the participants at these meetings

14        knew and in fact discussed the significant

15        impact that the price of CRT's had on the cost

16        of the finished products.

17        And at 223 the indirect purchasers allege (As

18   read):  The defendants monitored prices of televisions

19   and computer monitors.

20        When the direct purchasers are talking about

21   CRT products when they mean finished products only or

22   where the plaintiffs in general talk about finished

23   products specifically, all of the allegations without

24   exception stop well short of alleging an actual

25   agreement.

1        If your Honor does a search of every time the

2    plaintiffs make a specific allegation as to what was

3    agreed, you will find that they only talk about CRT's or

4    it is a vague, ambiguous, conclusory sentence where you

5    don't know what they mean by CRT products.

6        For that reason, your Honor, the best reading

7    of what the direct purchasers have alleged here is that

8    they have alleged a CRT-only conspiracy for these

9    reasons and the reasons cited by Mr. Kessler.  And as

10   your Honor noted, if the direct purchasers' claims stem

11   from the fact that there was an alleged CRT conspiracy,

12   their purchases are indirect.

13       This is made plain again by the indirect

14   purchasers, your Honor, who identify at paragraphs 155

15   and 223 of the indirect purchaser complaint who exactly

16   the direct customers are of CRT's and who the indirect

17   customers are of CRT's.  And I'll quote, your Honor,

18   from paragraph 223 of the indirect purchaser complaint.

19       They quote there, your Honor (As read):

20           The defendants concluded that in order to

21       make their CRT pricing stick, they needed to

22       make the increase high enough so that their

23       direct customers CRT, TV and monitor makers --

24       Now, those are the defendants in the case your

25   Honor.

MOTION HEARING   October 5, 2009

1                    -- would be able to justify a corresponding

2             price increase to their customers, for example,

3             retailers and computer OEM's.

4             Now, a simple Internet search of all of the 13

5    named plaintiffs in this case show that they are

6    retailers, resellers of televisions and monitors.

7             This is also conceded, your Honor, that the

8    direct purchasers are really indirect purchasers by the

9    direct purchasers themselves in their opposition because

10   they expressly rely on cases where the court found that

11   indirect purchasers had standing to pursue their claims,

12   and I would direct your Honor to page 55 of the direct

13   purchasers' opposition to the motions to dismiss.

14            You'll see, your Honor on page 55 that the

15   plaintiffs cite two, quote (As read):

16            A longstanding principle of antitrust law

17            holding that direct purchaser damage claims are

18            not reduced or cut off by transactions through

19            corporate affiliates.

20            Now, what your Honor will notice is after that

21   the plaintiffs cite two cases to support that

22   proposition, but both of those cases expressly uphold

23   the claims of indirect purchasers, not direct

24   purchasers.  So here, your Honor, the direct purchaser

25   plaintiffs themselves concede that they are in fact

MOTION HEARING  October 5, 2009

1    indirect purchasers.

2            Now, there is no debate that indirect purchaser

3    claims are strictly barred by the rule of Illinois Brick

4    save for two limited and narrow exceptions that were

5    expressly noted in that case.  Neither of those

6    exceptions apply here.

7            In the first instance, plaintiffs do not plead

8    that they purchased any products from defendants

9    subjected to a cost plus contract.  Second, and I refer

10   to the famous Footnote 16 of the Illinois Brick opinion,

11   plaintiffs do not plead that they -- that the direct

12   purchasers CRT's, which the indirect purchasers, your

13   Honor, clearly note are the TV and monitor

14   manufacturers, were controlled by the CRT manufacturer

15   that had sold them the CRT.  Thus, because plaintiffs'

16   claims largely, if not entirely, rest on price fixing of

17   CRT's, these indirect claims are barred by Illinois

18   Brick and should be dismissed.

19           Now, turning to the plaintiffs' arguments, your

20   Honor, the plaintiffs contend that they are exempt from

21   the Illinois Brick indirect purchaser bar because they

22   purchased products that allegedly incorporated price

23   fixed CRT's.  Again, I'll refer your Honor to the direct

24   purchasers' opposition at page 55.

25           THE COURT:  Got it.

MOTION HEARING  October 5, 2009

1            MR. LITWIN:   There, your Honor, the direct

2    purchasers write (As read):  So even if the SE

3    defendants may not have made CRT's, they did manufacture

4    and sell marked up CRT products with price fixed CRT's.

5            So, in other words, the direct purchaser

6    plaintiffs are seeking to recover in this case for

7    televisions and monitors that incorporated a price fixed

8    CRT.

9            Now, plaintiffs argue in this regard that their

10   claims are supported by the Third Circuit's opinion in

11   In re Sugar, but the plaintiffs' position is wrong for

12   two reasons.  First, as a threshold matter, the In re

13   Sugar holding, which extended the control exception from

14   Footnote 16 of the Illinois Brick case to cases where

15   the plaintiff purchased the product that incorporated an

16   allegedly price fixed ingredient, did not survive the

17   Supreme Court's admonition in Kansas versus Utilicorp

18   not to create additional exceptions to the Illinois

19   Brick indirect purchaser bar, and I would refer your

20   Honor to the Kansas v. Utilicorp case 497 U.S. 199 and

21   I'll quote from pages 216 to 217 which speak directly to

22   what we've heard here already your Honor.

23           There the Supreme Court wrote (As read):

24              The rationales underlying Hanover Shoe and

25              Illinois Brick will not apply with equal force

1          in all cases.  We nonetheless believe that

2          ample justification exists for a stated

3          decision not to carve out exceptions to the

4          direct purchaser rule for particular types of

5          markets.  The possibility of allowing an

6          exception, even in rather meritorious

7          circumstances, would undermine the rule.  In

8          sum, even assuming that any economic

9          assumptions underlying the Illinois Brick rule

10         might be disproved in a specific case, we think

11         it an unwarranted and counterproductive

12         exercise to litigate a series of exceptions.

13         Now plaintiffs' counsel has referred already

14    today to Scott Hammond's quote about the indictment of

15    CY Lin and there noted that U.S. consumers may have been

16    harmed through purchases of downstream televisions and

17    monitors.  What the Supreme Court said in Kansas v.

18    Utilicorp is, yes, there may be some downstream

19    consumers who are harmed by this conspiracy, but we are

20    not going to provide them a cause of action under

21    Section 4 of the Clayton Act.

22         Now, even assuming, your Honor, that Sugar

23    survived Kansas v. Utilicorp, which we believe it did

24    not, the plaintiffs 'claims here are far broader than

25    the narrow holding in the Sugar case.  In the Sugar

MOTION HEARING  October 5, 2009

Page 74

1    case, the plaintiffs alleged that the defendants fixed

2    the price of sugar, but the plaintiffs didn't buy sugar.

3    They bought candy from the defendants that incorporated

4    sugar as an ingredient.

5         The Third Circuit allowed these claims to

6    proceed but on very limited grounds.  I'll refer your

7    Honor to 579 Fed. 2d. at pages 19 through 20 which

8    discusses one of the defendants in the case, Borden, who

9    made a motion for rehearing.  And in that motion Borden

10   argued that the candy that it had sold to the plaintiffs

11   did not incorporate sugar that Borden itself had

12   refined.

13        Now, the court didn't decide the issue but,

14   rather, instructed Borden to raise the issue on remand

15   as a defense along with other defenses, such as that it

16   did not engage in price fixing or that the plaintiff had

17   suffered no damage.

18        So if I can just briefly sketch out, your

19   Honor, what was alleged in that case, this is the very

20   narrow issue where the Third Circuit held that

21   plaintiffs could proceed.  Here you have the upstream

22   manufacturer of sugar, and I'll use a solid line to

23   refer to a sale and a dotted line to refer to control,

24   because we're operating here under Footnote 16, the

25   control exception to Illinois Brick.

MOTION HEARING   October 5, 2009

1      Here the defendant manufacturer of sugar sold
2  that sugar to a controlled subsidiary who incorporated
3  the sugar into candy that was then sold to the
4  plaintiff.  The Third Circuit said that was okay.  But
5  Borden said that's not what happened at all, your Honor.
6  What happened is that although we're owned, our
7  subsidiary -- we own a subsidiary that sold candy to the
8  plaintiff.  There was a third party defendant who was
9  actually the source of the sugar.
10      And the Third Circuit said this scenario where
11  the candy manufacturer purchased sugar from a third
12  party was not covered by their rule in that case.  In
13  fact, they went on to expressly state that they didn't
14  reach the precise legal arguments that the plaintiffs
15  are raising here, that is, that plaintiffs could recover
16  for purchases of candy made with sugar received from
17  another coconspirator.  The Third Circuit expressly
18  carved that issue out of the Sugar case and has not
19  decided it to this day.
20      Thus, even under the Sugar case which we do not
21  believe survives Utilicorp, Sugar would allow the
22  plaintiffs to pursue federal antitrust claims only where
23  the plaintiffs purchased monitors from a defendant whose
24  corporate parent manufactured the incorporated CRT.
25      The plaintiffs also, your Honor, rely on two

1   other cases which I'll briefly discuss, Royal Printing

2   and Linerboard.  The Royal Printing case is 621 Fed. 2d.

3   323.  Linerboard is a Third Circuit case, 305 Fed. 3d.

4   145.

5         The issue in Royal Printing is different.  In

6   Royal Printing there was no incorporated products.  The

7   plaintiffs alleged that they purchased paper goods from

8   a subsidiary of one of the co-defendant manufacturers of

9   paper goods.  Now, in this case, your Honor, this is

10   easily distinguished from the case at hand because

11   upstream you have -- well, it's not upstream at all.

12   It's the same market between the supplier to the

13   intermediary and between the intermediary and the

14   plaintiff is the same paper product that's being sold.

15         So this case is completely factually different

16   from the case here where you're talking about an

17   incorporated product into a downstream market that, as

18   Mr. Kessler rightly points out, was economically

19   dissimilar in the fact that leading television

20   manufacturers such as Sharp and Sony and Sanyo and Vizio

21   were not present in the alleged conspiracy, nor were OEM

22   manufacturers of computer monitors such as HP, Dell and

23   Apple.

24         The Linerboard case is even more dissimilar

25   because there the allegations and what the court found

MOTION HEARING  October 5, 2009

1   was that the same entity that sold the corrugated boxes

2   to the plaintiffs was the same entity that manufactured

3   the linerboard that was the ingredient.

4          So in all of these cases is very dissimilar

5   from the case here, and, your Honor, again I'd refer to

6   paragraph 86 of the direct purchaser complaint because

7   there the plaintiffs make clear that they are seeking

8   recovery here for plaintiffs who bought a CRT product, a

9   finished product directly from a defendant even if the

10  CRT contained therein was manufactured by an affiliated

11  entity, a principal, an agent or a coconspirator.  None

12  of those scenarios are the scenarios envisioned in

13  Sugar, in Royal Printing or in Linerboard.

14          In conclusion, your Honor, the direct

15  purchasers' consolidated amended complaint should be

16  dismissed because none of the 13 plaintiffs is alleged

17  to be a direct purchaser of a CRT.  In fact, the

18  allegations at paragraphs 11 to 23 of the direct

19  purchasers' consolidated amended complaints only allege

20  that they purchased one or more CRT products, and as

21  we've seen, we have no idea what that means.  We don't

22  know if it means a TV, we don't know if it means a

23  monitor, we don't know if it means a tube.  All we have

24  is counsel's representations here today which are

25  outside the scope of what can be considered on a motion

1    to dismiss.

2           Moreover, plaintiffs' claims are not the kind

3    that were specifically preserved by Sugar.  Plaintiffs

4    do not allege that they purchased TV's or monitors that

5    incorporated a CRT that was manufactured by the sellers'

6    corporate parent, and that is the only factual situation

7    controlled by Sugar.

8           Alternatively, to the extent that the court

9    sustains some of plaintiffs' claims, they should be

10   limited to the following:  direct purchases of CRT's --

11   that's the Royal Printing case -- direct purchasers of

12   TV's or monitors where those TV's or monitors

13   incorporated a CRT that was manufactured by the same

14   entity that sold the TV or monitor to the plaintiff --

15   that's the Linerboard case -- and, finally, purchases of

16   TV or monitors where those TV's and monitors

17   incorporated a CRT that was manufactured by the

18   intermediary's corporate parent.  That's the Sugar case.

19          Thank you, your Honor.

20          MR. SIMON:  Your Honor, Bruce Simon on behalf

21   of the direct purchasers.  I find myself in the position

22   of quoting Continental Ore in two hearings in a row now.

23   I just argued the LCD class certification hearing.  And,

24   by the way, one of the cases he didn't mention to you

25   was Judge Illston's decision in that case which

MOTION HEARING  October 5, 2009

Page 79

1  presented exactly the same issues as are presented here

2  under these indirect purchaser claims and she decided

3  against defendants down the line in that case.  He

4  didn't mention that case.

5       But the case I'm going to mention is

6  Continental Ore, a U.S. Supreme Court case, and what the

7  defendants are trying to do here is dismember this

8  conspiracy into the parts that they like and ignore the

9  parts that support the claims that we make here.

10      I'd like to take us back for a moment to

11  reality of this case, and the reality of this case is is

12  that -- and I have a little chart for your Honor to show

13  this -- is that of the 12 groups of defendants that are

14  in this case, seven of the 12 are vertically integrated

15  companies that make both tubes and finished products,

16  and as alleged in the complaint at paragraph 112, in

17  2002, of those defendant's, LP Displays, formerly known

18  as LGP, part of the LG Electronics Group, Samsung,

19  Hitachi and Toshiba, controlled approximately 66 percent

20  of the CRT market.

21      This conspiracy as alleged in the complaint

22  could not have operated without the conspiracy involving

23  finished products.  Here is the reason for that.  It's

24  not only economically plausible, it is absolutely the

25  way it worked from the information that's in the

1    complaint.

2            If this group of vertically integrated

3    companies and some of the others who aren't vertically

4    integrated didn't follow the price of the finished

5    product, didn't assess how the price of the fixed tubes

6    affected the price of the finished product and didn't

7    maintain a specific price on the finished product, the

8    conspiracy couldn't work because all these vertically

9    integrated companies could undermine not only themselves

10   but those that are not vertically integrated in the

11   conspiracy by making up the difference from the

12   conspiracy in the finished products.  It had to, it did,

13   it's alleged in the complaint that finished products

14   were part of this.

15           And the cases that counsel refers to all

16   recognize where the two products are inseparable, which

17   they are here, and that's the Bond case, which is one of

18   the cases that defendants rely on, as well as the

19   Freeman case, 322 Fed. 3d. 1133, a Ninth Circuit case of

20   2003, where the products are inseparable as they are

21   here, then you can't artificially separate them as

22   defendants would like to do in order to make the

23   argument that they're making.

24           They want you to ignore what's pled in the

25   complaint, and we specifically plead in numerous places,

MOTION HEARING  October 5, 2009

 1   and specifically at paragraphs 146 and 144, that the

 2   conspiracy involves not only the tubes, but the finished

 3   products.  And, again, it could only operate that way if

 4   I'm a vertically integrated company like Samsung, for

 5   example, or Hitachi, if I am conspiring, as is alleged,

 6   with my other defendants but I can go behind the

 7   conspiracy on the finished products and set my price

 8   wherever I want to to undermine the conspiracy, the

 9   conspiracy cannot work.

10         This is exactly the same thing that was alleged

11   in LCD.  This is exactly what the court upheld in two

12   motions to dismiss in LCD and it's the exact same

13   situation here.  By the way, we have several of the

14   companies that were in LCD and even some of the

15   individual employees who were in LCD.  Same people.

16         So when the court in LCD says, your Honor,

17   Judge Illston, a case that counsel didn't mention, here

18   in the complaint -- this is in LCD 586 Fed. 2d. 1109 at

19   page 1118 -- here the complaint alleges that the direct

20   purchaser plaintiffs purchased TFT LCD products directly

21   from cartel members at super competitive prices as a

22   result of conspiracy to fix prices.  Defendants do not

23   cite any case holding that a plaintiff who purchases

24   directly from an alleged cartel does not have standing.

25   In contrast, courts have found antitrust standing where

Page 82

1    plaintiffs purchased downstream goods from a cartel or

2    manufacturers who made and fixed the price of a

3    component of those goods, citing Linerboard and citing

4    Sugar.

5              The Sugar case which counsel attempts to

6    distinguish, I would say, your Honor, is not

7    distinguishable at all, nor is Linerboard.  In

8    Linerboard, for example, you had the linerboard, the

9    cardboard, and you had the finished products.  It was

10   determined to be a single market because they were

11   inseparable.  The price of one impacted the other.

12             The same is a true in a case which counsel

13   didn't mention to you as well, which is a case we have

14   in our briefs, which is Knevelbaard Dairies, which is

15   232 Fed. 3d. 979.  That was a case where it was milk and

16   cheese, and because the cheese manufacturers got

17   together to suppress the price of milk, a lawsuit was

18   brought for purpose of the milk prices being affected by

19   the milk producers.  And for purposes of that case,

20   since the products were inseparable, you couldn't

21   separate the milk from the cheese, you can't separate

22   the cardboard from the linerboard, you can't separate

23   the sugar from the candy, you can't separate the TV

24   monitor from the tube, which represents in most cases 80

25   or 90 percent of the value of that finished product.

MOTION HEARING  October 5, 2009

1    They are not separable.

2           In each of those cases, which are absolutely on

3    point with this case, the court found that it was one

4    market and one conspiracy applying to both because the

5    impact of the component on the finished price of the

6    finished product was there and as alleged in the

7    complaint here is there.

8           So there is really no argument here, and your

9    Honor put your finger on the point, that if in fact you

10   define the products as the class definition defines it,

11   as the multiple allegations in the complaint you've been

12   referred to define it, as products that are related to

13   each other and inseparable, so much tied to each other

14   that they can't be separated, then in fact the complaint

15   has to be upheld, the AGC argument has to be thrown out

16   and in fact there is no AGC argument.  And I would

17   suggest, your Honor, that there is no AGC argument in

18   this case.

19          Let me make a couple points with respect to

20   some of the things that were said by counsel.  One thing

21   is that that we've heard from Mr. Kessler and counsel

22   that the government did this and the government did

23   that.  The government pleas are not binding on the scope

24   of the class nor the conspiracy alleged in this case.

25   That's black letter law.  I don't think defendants would

1    contest that.  They can be affirmatively used to show

2    what defendants did in terms of conduct, but they don't

3    limit the scope of what we allege in the complaint.  So,

4    therefore, it's irrelevant that the class definition and

5    the allegations of the complaint are different from what

6    the government pled.

7          Secondly, it matters not what the direct

8    purchaser complaint says versus the indirect purchaser

9    complaint.  There's lots of differences between the

10   complaints, but this is not a game of comparing one to

11   the other to decide who's right or who's wrong.  Each

12   stand on their own two feet and have to be judged in

13   terms of what they say, not what the other says.  If you

14   did that -- and there is no case that I know of that

15   says you go and look at the indirect complaint and the

16   direct complaint, you compare the two and you decide if

17   they're inconsistent one or the other gets thrown out.

18   By the nature of indirect claims and direct claims,

19   they're going to be somewhat inconsistent.  In this

20   particular case, they are amazingly consistent on that

21   point.

22         The other thing I want to point is is that this

23   argument is about a case called AGC, and one thing that

24   these charts that disappeared, you know, point out that

25   is in each one of those charts, as is the case here

1    where you have vertically integrated companies, Samsung

2    makes the tube, Samsung has the tube go down to its

3    finished product manufacturer who sells it to the direct

4    purchaser.  In each one of these cases, the link to the

5    direct purchase, the link to the plaintiffs is a

6    subsidiary in the vertically integrated chain of

7    companies.

8            AGC recognizes, and there is language right in

9    there, that that company is never going to sue their

10   parent company or affiliate companies for the wrongs.

11   So it finds as a matter of policy, because the antitrust

12   laws are trying to protect competition and the Supreme

13   Court says they should be liberally construed,

14   irrespective of Twombly and Iqbal and everything else,

15   to protect competition, since those subsidiaries are

16   never going to sue seven of the 12 defendants

17   representing 66 percent of the market to remedy the

18   price fix, then the direct purchaser is in fact the

19   first person who buys from that entity at the bottom of

20   that vertically integrated chain.

21           They were competing against each other as

22   vertically integrated companies, your Honor.  They were

23   meeting together as vertically integrated companies.

24   They were conspiring as vertically integrated companies,

25   unified in their approach as to fixing the price of

1    tubes and how that impacted the price of finished

2    products.   To dismember them, to separate them, to parse

3    them, to explain them, to try to argue away what the

4    complaint says is not the purpose of a motion to

5    dismiss.

6            The only other thing I would say, your Honor,

7    is that there are some arguments about, you know, how

8    you do this and who the plaintiffs are.   There are

9    plaintiffs within our group who bought tubes and CRT's.

10   That is the case.   If the complaint -- the complaint

11   alleges that it's CRT products and we went with the

12   definition of CRT products and it should be read in the

13   context of the entirety of the complaint, but there are

14   tube purchasers and there are finished product

15   purchasers just like in LCD, and they are both.

16           I would go back to the point also that when

17   you're talking about the products in this case, they

18   make a lot about the fact that there's supposedly, you

19   know, any number of products.   The number of products in

20   this case is far less than the number of products in

21   LCD.   You basically have tubes which go into TV's and

22   monitors.   There's kind of four varieties of products in

23   this case.   So we're not dealing with an enormous amount

24   of products.   And the facilities, the technology, and

25   the component parts, the raw materials are basically all

1   the same, and you also don't have -- you have a

2   situation where, as I mentioned, which is very

3   important, is these tubes are the main cost of the

4   finished product.

5          Let me tell you something that comes up.  I'll

6   use Samsung because I'm going to be arguing that later,

7   too, as an example, although it's not exclusive to them.

8   When Samsung, the parent company, makes business

9   decisions for all its entities, it's determining what

10  the price should be throughout its vertically integrated

11  chain looking at all components of that, and whatever

12  money comes in at the finished product level or at any

13  other level rolls back up into the consolidated

14  financial statements of the big company.

15         THE COURT:  Are you saying that when tracing

16  the adequacy of the allegations I do not have to

17  distinguish amongst the companies in each family, that I

18  can view them each as a family?

19         MR. SIMON:  Yes, because they're vertically

20  integrated, number one, and, number two, for the reasons

21  expressed by Judge Illston in LCD that because they

22  didn't distinguish themselves in the meetings, they were

23  there representing Samsung in general or Hitachi in

24  general, that you don't have to do that, but more

25  importantly, because of the way they operate.

1          What happens here, your Honor, is is Samsung,
2     the parent company, and the tube manufacturing part of
3     Samsung makes the tube.  It costs a certain amount.  It
4     determines a price.  The complaint alleges that that
5     price is fixed not only for sale to third parties, but
6     within these vertically integrated companies.  There is
7     a price fixed tube.  Let's say it's ten percent more
8     than it should have been because it's price fixed.
9          Samsung transfers that to its final product
10    manufacturer for a transfer price.  100 percent of that
11    fixed price, which represents the majority of the
12    finished product price, goes into that finished product.
13    Therefore, by common sense by the way these companies
14    operate and by virtue of what we allege in the
15    complaint, 100 percent of the price fixed tube will show
16    up in the finished products.
17          And, by the way, when we get to the point in
18    this case where the economists start to talk to you, the
19    economists say and will admit, as they have to, that
20    nobody is going to price their finished product below
21    the cost of the finished product.  So, therefore, you
22    don't have to differentiate between finished product and
23    the tubes for the purposes of the way this conspiracy
24    operated and the way the conspiracy operated in LCD.
25    And it's apparent from the complaint, and if we do

1   separate it out, your Honor, we'd be going against not

2   only the allegations of the complaint, you'd be

3   interpreting the complaint and parsing things and

4   disregarding other things that are in there.

5           And I think most of the paragraphs have been

6   pointed out to you, but there are multiple paragraphs.

7   I'll just say the ones that I focused on.  Paragraph

8   139, which alleges prices of all CRT products affected

9   worldwide and in the United States.  Paragraph 144,

10  which has a detailed allegation of what prices are fixed

11  and how they're fixed.  Paragraphs 188 through --

12          THE COURT:  I'm sorry.  What came after 139?

13          MR. SIMON:  139 was 144.  Paragraphs 188

14  through 197, which talk about how unusual the price

15  movements were for the products.

16          MR. LITWIN:  What were those?

17          MR. SIMON:  188 through 197.  198 through 199

18  summarizes the impact of the conspiracy.  Paragraph 221,

19  which is at the end of the cause of action, which talks

20  about how prices were increased for these products.  And

21  paragraph 222 as well.  And, of course, the paragraphs

22  that we've already talked about, 146, which talks about

23  tubes and finished prices being collectively affected

24  and paragraphs 144 which alleges that part of the

25  conspiracy was to change the price not only of the