MOTION HEARING  October 5, 2009

1    tubes, but the finished products because of the

2    vertically integrated nature of the companies.

3            And as an example, paragraph 167 with respect

4    to Samsung talks about the fact that the meetings

5    involved not only the tube manufacturer entities, but

6    also the finish product entities who were represented at

7    the meetings as alleged with respect to Samsung and each

8    of the other defendants.

9            And then finally paragraph 101, which is the

10   paragraph that talks about how important the tube is in

11   terms of the price of the finished product.

12           To dismember this complaint, to dismember this

13   conspiracy, to ignore the totality of the circumstances

14   which show that this is a conspiracy that affects both

15   finished products and tubes would be to ignore reality,

16   and that's what defendants are asking you to do, your

17   Honor, with all due respect.

18           MR. LITWIN:  Your Honor, I just have a few

19   minutes to respond.

20           Interestingly enough, your Honor, Mr. Simon's

21   presentation, I don't believe I heard the words Illinois

22   Brick, not once.  I'll have to check the record, but I

23   think that's right.  I did hear a lot about Associated

24   General Contractors, or AGC.  Mr. Yohai is going to be

25   up here in a minute talking about that case.

1          The policies of AGC are not to be considered on

2     an Illinois Brick motion.  That was made abundantly

3     clear by the Supreme Court in Kansas v. Utilicorp where

4     it says even if some of the economic assumptions that

5     underlie the Illinois Brick ruling are not present in a

6     given case, the Illinois Brick bar still applies.  It is

7     a bright line rule.  You're either an indirect or you're

8     a direct.  And if you're indirect, no federal antitrust

9     claims.

10          Now, Mr. Simon did make reference both today

11     and in his brief that defendants can't cite a case where

12     the courts denied the claims or barred the claims where

13     the plaintiffs purchased from alleged cartel member.

14     Well, I'd like to give you three.  First, implicitly

15     that's exactly what the Third Circuit was saying in In

16     re Sugar.  The Third Circuit said that Borden could

17     defend its case by proving that the candy that it sold

18     to the plaintiff incorporated sugar that was

19     manufactured by a third party defendant.  There would be

20     the same case here, your Honor, where the plaintiffs

21     have alleged that a television or monitor manufacturer

22     who is a defendant in the case purchased a CRT upstream

23     from a coconspirator.  That is, by saying that Borden

24     could raise this issue as a defense, along with defenses

25     that it didn't participate in the conspiracy or that the

1    plaintiffs were not injured by the conspiracy, surely

2    means that the Third Circuit anticipates that where

3    plaintiffs purchased in this manner from a subsidiary of

4    alleged cartel member that the plaintiffs' claims could

5    be barred.

6            The Third Circuit made this further clear in

7    the Midwest Paper case, 596 Fed. 2d. 573, I'll refer to

8    pages 588 to 89.  There the plaintiffs alleged that they

9    had purchased paper products from the Continental Group,

10   who is defendant, their subsidiary Great Plains.

11   Midwest made the determination to sue the Continental

12   Group, the parent entity, but not the subsidiary; and

13   Third Circuit held that Midwest had no standing to sue

14   because, quote, it did not purchase the bags directly

15   from any of the defendants.  They said you can sue Great

16   Plains if it participated in the alleged conspiracy and

17   make that allegation in your complaint or you could

18   maintain your claim for Continental Group but only if,

19   quote, as a consequence of the Continental's domination

20   of the subsidiaries' prices were determined in

21   accordance with the general price fixing conspiracy.

22           So there, again, the Third Circuit is saying

23   that where you've purchased from family -- a related

24   entity where one of their related entities allegedly

25   participated in a cartel, the plaintiffs' indirect

1    claims may be barred.

2            Finally I'd refer you to Dickinson versus

3    Microsoft, 309 Fed. 3d. 193, and I'll refer to pages 214

4    to 15 and this is a Fourth Circuit opinion.   In

5    Dickinson, plaintiffs alleged that Microsoft conspired

6    with OEM computer manufacturers to maintain Microsoft's

7    dominance in operating systems.   The plaintiff purchased

8    computers from defendant OEM's with the Microsoft

9    software installed and claim that they paid too much.

10            The court held that even though the OEM's were

11    alleged to be co-conspirators and affirmatively chose

12    not to sue Microsoft, the plaintiffs' claims were still

13    barred by Illinois Brick because it is a bright line

14    test.

15            Now, incidentally, if plaintiffs want to say

16    the same result applies in LCD that applies here, that's

17    fine with me.   My clients were dismissed from LCD.

18            THE COURT:   Where is the cite in LCD?   I can't

19    find it in your indexes.

20            MR. SIMON:   I've got it right here, your Honor.

21    The one I was citing is the decision on the first motion

22    to dismiss was 586 Fed Supp. 2d. 1109.   And I was

23    reading from page 1118.

24            THE COURT:   Thank you.

25            MR. LITWIN:   Now, on the corporate -- let me

Page 94

1    read my notes here -- Mr. Simon said that the alleged

2    conspiracy in this case was to maintain specific prices

3    of finished products.   That is nowhere in this

4    complaint.   If you look at paragraphs 139, paragraphs

5    144, paragraphs 146, you will not see any allegation

6    that the defendants fixed the price of a finished

7    product, TV monitor -- TV or monitor.

8             The only thing you will see is that the

9    upstream alleged conspiracy considered pricing of

10   downstream products which, of course, is natural in any

11   alleged pricing decision that takes place upstream.   You

12   consider what your downstream customers are going to

13   charge for things.

14            Mr. Simon also said that the tubes comprised 80

15   to 90 percent of the cost of a television or monitor and

16   for that reason you can't separate one from the other.

17   I saw paragraph 101 in his complaint.   No percentage is

18   given.   That is outside the scope of the factual

19   allegations in this case and, as a point of matter, dead

20   wrong.

21            He cited the Knevelbaard case, but once again

22   that's not an Illinois Brick case.   That's an Associated

23   General Contractors case, which is a completely

24   different and separate issue from Illinois Brick.

25            Finally, Mr. Simon in his chart notes that

1   seven of the 12 groups of defendants are, although I

2   hope he would concede were, also vertically integrated,

3   but that does not mean that there was unanimity of

4   corporate structure here.  It is not the case that in

5   each and every case for each and every of the defendant

6   groups on this list that there was an upstream

7   manufacturer of CRT's that's that owned the subsidiary

8   that made televisions and monitors, that sold those

9   CRT's to that controlled subsidiary who then sold those

10  TV's and monitors to plaintiffs.  That is the In re

11  Sugar scenario.  That is not the case here.

12          Here we're dealing with affiliates of holding

13  companies, joint ventures.  The facts are far more

14  complicated and far more diverse than what was

15  considered in the Royal Printing case, in the Illinois

16  Brick case or in the Linerboard case.

17          That's all I have, your Honor.

18          THE COURT:  All right.  What next issue are we

19  going to proceed to?

20          MR. YOHAI:  We have AGC which I'll try to

21  handle it more briefly since we've talked about that

22  already.

23          MR. CORBITT:  Are we still on the direct case?

24          MR. KESSLER:  We're doing all of our direct

25  arguments.

MOTION HEARING  October 5, 2009

Page 96

1          MR. YOHAI:  Your Honor, David Yohai of Weil,
2    Gotshal & Manges for defendants Panasonic.
3          THE COURT:  Let me get my notes organized here.
4          MR. YOHAI:  David Yohai for Panasonic, PNA and
5    MTPD.
6          Your Honor, plaintiffs have the burden of
7    establishing antitrust standing, and even if the court
8    were to find Illinois Brick inapplicable, it is
9    applicable, as co-counsel has indicated, they'd still
10   have to prove separate independent standing under AGC.
11         We've heard already this morning, and I would
12   refer your Honor back to paragraphs 11 through 23 that
13   the complaint alleges the exact same thing for all 13
14   named plaintiffs, that they purchased CRT products.
15   Now, Mr. Simon said a few minutes ago, oh, well, two of
16   them purchased CRT's.  Well, it doesn't say that in the
17   complaint.  It doesn't say which two.  He actually said
18   two -- I think he misspoke.  He said two of them
19   purchased finished products.  That's really the problem.
20   We don't know which ones purchased finished products
21   versus CRT's.
22         But more importantly why are they doing this?
23   Why are they playing games in the complaint by
24   modulating between finished products and CRT's?  They're
25   doing this because they really want to be, in effect,

1   indirect purchasers.  They really want to claim damages

2   on behalf of indirect purchasers because that's what

3   they are.  They're retailers.  They are not people who

4   buy CRT's.  No one would walk into one of their

5   plaintiffs, Arch Electronics, like a Best Buy, no one

6   walks into Best Buy and buys a CRT tube.  It doesn't

7   make any sense.  They buy televisions.  That's what

8   their plaintiffs are, and that's really what they're

9   trying to claim.

10          Well, what's the problem with that?  The

11  problem with that is under AGC you have to, as the first

12  factor, establish antitrust injury.  And that means they

13  have to be a participant, plaintiffs do, in the same

14  market.  They have to purchase in the restrained market.

15          Well, if they purchased televisions, that is

16  not the same market as purchasing CRT's.  He says he

17  understands, Mr. Simon does, how the television market

18  works.  He says, well, it's a conspiracy not only of

19  CRT's, but of the television market.

20          Well, I would ask him this.  Where is Sony in

21  the complaint?  Is he claiming that the television

22  market, there was a conspiracy in television market, but

23  Sony wasn't a participant?  Where is Sharp?  Is he

24  claiming there was a television conspiracy, but Sharp

25  wasn't a participant?

MOTION HEARING  October 5, 2009

1              It doesn't make sense.  Without those companies
2    participating there could not be a television
3    conspiracy, and the attempt that they make in the
4    complaint to allege a television conspiracy falls flat
5    on its face.  They can't do it.  It's out under Twombly,
6    it's not specific enough and the reason is because it
7    doesn't exist.
8              The indirects say that the television market --
9    that there was vigorous competition in the television
10   market.  That's exactly right.  There is vigorous
11   competition in the television market.  So if they're
12   purchasers of television, they're in the television
13   market, not the CRT market, and that's their problem.
14   So to fudge this they say it's a CRT product, and you've
15   heard a lot about this already.  I'm not going to repeat
16   that.  That's their main problem.
17             What else?  LCD.  This is the crux of their
18   position.  Look at the LCD case.  Okay.  Well, if you
19   look hard at Judge Illston's decision, she says the
20   issue is that the plaintiffs purchased from cartel
21   members.  That's the problem.  They're cartel members.
22   He calls them vertically integrated.
23             Okay.  Well, what cartel are we talking about?
24   There's no television cartel.  Like I said, there's no
25   Sony, there's no Sharp.  It's a cartel of CRT's here, if

MOTION HEARING  October 5, 2009

1    that's what they allege.  That's not the market that

2    most of their plaintiffs purchased from.  So you need to

3    carve out all of the plaintiffs who purchased TV's.

4           Maybe we're going to have a case about those

5    who purchased CRT's, the tube itself.  Maybe we could

6    have a case about that.  I doubt it.  There aren't going

7    to be enough to have a case, which is why they've sort

8    of done this to avoid that problem because they don't

9    really want to be here on behalf of actual CRT

10   purchasers.  That's their problem.

11           Now, if they were going to do a television

12   market, what else would have to allege?  They'd to have

13   allege that market is oligopolistic.  They don't.

14   They'd have to allege how many defendants participate in

15   the market for finished products, TV's.  They don't.

16   And they'd have to name all the competitors.  They

17   don't.  That's a problem for them.  It's a problem for

18   them on multiple levels, and it's a problem for them on

19   AGC.

20           Okay.  What else?  He said 80 percent.  This

21   goes to the issue of the injury and it's speculative.

22   80 percent of a TV cost is the CRT.  That's not true.

23   60 percent is what the indirects allege.  Actually, they

24   allege less than that, less than 60 percent.  So you've

25   got other components, you've got speakers, you've got

1    other issues, and that makes sense because the price of

2    the television isn't the same as price of CRT's.  They

3    are different markets, they are different products, you

4    cannot gloss over these distinctions.

5           Also the complexity here.  He takes a simple

6    case of the vertically integrated company and he says,

7    well, they make the tube, they put it in a television

8    and they sell it to you.  Not always.  Sometimes they

9    buy the tube from someone else.  We buy -- Panasonic

10   buys tubes from people, other companies buy tubes from

11   other people.

12          So it's not a direct chain down from maker to

13   seller.  There are all these things in the chain.

14   Sometimes when we purchase a CRT we would be a victim in

15   his world if we bought a CRT.  Clearly that's not the

16   same case as a case where we made the CRT and put it in

17   our television.

18          You can't gloss over these considerations.

19   They should be forced to plead who bought CRT's and who

20   bought finished products and what is this conspiracy and

21   not to blend the two.  I think if you force them to do

22   that there's not going to be a television conspiracy.

23   There isn't one.  And when you're left with who bought

24   CRT's, there's not enough people for that class.

25          So getting back to AGC.  You've got problems

1   that they didn't purchase in the restrained market.

2   That's the first and more important factor.

3        THE COURT:  I'm sorry.  I missed the last few

4   words you said.

5        MR. YOHAI:  Yes.  Getting back to AGC is what I

6   said.  So getting back to AGC, you've got problems

7   because antitrust injury is the first factor.  They have

8   to participate and purchase in a restrained market.

9   They didn't if they bought televisions.

10       Two, it's speculative as to the nature of the

11  injuries because the costs, as I mentioned, are not just

12  the tube.  There are many other costs.

13       Third, you've got this complexity problem of

14  who purchased from who what.  If we bought a CRT from

15  someone else, it's different than if we made the CRT and

16  put it in our own television.

17       And, finally, you've got an issue about

18  duplicativeness.  What are we going to do here?  We've

19  got them saying, oh, well, you should pay us if you win

20  because you overcharged us.  Well, the indirects are

21  saying you should pay us if you win because you

22  overcharged us.  Where are the pass-on allegations if

23  they're retailers here, which they all are?  They

24  purchased from somebody else.  A subsidiary.  So they're

25  claiming we should pay them, the indirects are claiming

1  we should pay them.

2          Where are the pass-on allegations?  That's

3  their burden.  When they are TV purchasers, they have to

4  allege pass-on.  They have to tell us how much were they

5  overcharged because they were not the direct purchaser,

6  they didn't just purchase the CRT, they purchased down

7  the chain.

8          In sum, your Honor, they are trying to shoehorn

9  this in.  They are trying to say, well, let's just put

10  it in one bucket.  It doesn't matter.  We'll figure it

11  out later.  And they're trying to say, well, Judge

12  Illston said that was okay in LCD.  To the extent her

13  opinion could be read to say that, I would say she is

14  wrong on that point; but more importantly, here, here

15  where you've got a television conspiracy which they are

16  alleging and you've got all these issues in terms of who

17  was purchasing from whom, AGC comes out the other way,

18  and I'll have more to say about on the indirect side.

19          In particular, we're going to talk about the

20  DRAM decision when we go to the indirect side, which I

21  think the most important and only careful analysis will

22  show this.  In the DRAM case 516 Fed. Supp. 2d. 1072,

23  and there is further decision at 536 Fed. Supp. 2d.

24  1129.

25          MR. SIMON:  Your Honor, I think you had the

1    gist of the arguments, so let me just talk about points
2    that haven't been discussed already in hopes that we
3    stay within our time limit of trying to get done today,
4    which I think would be reasonable.
5         There is no duplication between the direct and
6    indirect purchaser classes as defined.  Let's just be
7    clear about this.  The class includes somebody who
8    bought directly from a defendant a tube or directly from
9    a defendant a finished product.  They are the first
10   person who buys within the vertically integrated chain
11   of finished products.  So he says why isn't Sony and why
12   isn't Sharp in?  Because Sony and Sharp may in fact buy
13   tubes and may in fact be in the class because they
14   bought directly.
15        THE COURT:  I think he's also arguing how can
16   you allege a conspiracy to fix prices like that with two
17   major manufacturers out of the conspiracy.  I think
18   that's really part of what he's arguing.
19        MR. SIMON:  In you look at paragraph 144 of the
20   complaint, it exactly addresses that situation, your
21   Honor, and let's just turn to it for a second because
22   this is very important.  We allege that they're fixing
23   the price of tubes and because they're fixing the price
24   of tubes, Sony and Sharp are getting a price which is
25   the same as everybody else which is fixed.  Therefore,

Page 104

1    when they say that the finished product market would be

2    competitive and wouldn't reflect the price of the tubes

3    being fixed, that price fixed tube is going to be in

4    Sony's and Sharp's TV's as well.   They're going to have

5    to pass on that cost when they sell it to the indirect

6    purchasers, and that's the claim they're making.   We're

7    not making that claim.

8          So, yes, they can not be in this particular

9    case and there still can be a conspiracy because the

10   conspiracy was defined by the defendants as if we

11   conspire at the tube level, we cannot only effectively

12   fix the price at the tube level, but we can affect the

13   price at the finished product level.   And Sony and

14   Sharp, to the extent they buy from them, they're

15   affected like everybody else.

16         Look at 144 for a second where we spell that

17   out, and it's a very important paragraph in the

18   complaint.   It's based on lots of detailed information

19   that we have that isn't specifically in this complaint.

20   And it's very much like the LCD situation.   It says (As

21   read):

22              Based on this information, defendants agreed

23              on price guidelines, either a range of price

24              increases or a range of price floors known as

25              bottom prices.   The price guideline can serve

MOTION HEARING  October 5, 2009

```
 1              as a floor in declining markets or could serve
 2              as a basis for a price increases in rising
 3              market.  Failure to object indicated assent.
 4              And there's multiple paragraphs, as you know,
 5    in here about the meetings and who participated.
 6                   The agreements encompassed prices in United
 7              States dollars to specific third party
 8              customers and prices reflecting inclusion of
 9              specific features in a CRT, such as certain
10              types of coding or the differing types of is
11              shadow mask.
12              So specifically alleged, the fix was with
13    respect to not only what they would charge through their
14    vertically integrated companies, but also as to third
15    parties, Sony or Sharp.
16                   The agreements encompass not only prices
17              charged to third party customers, but in the
18              case of virtually integrated manufacturers who
19              produce both CRT's and CRT products also
20              encompassed, A, prices charged by the CRT
21              manufacturing arm of such integrated company to
22              the corporate division or subsidiary that
23              manufactured or sold computer monitors,
24              televisions or other similar products.
25              That's saying that when you're Samsung and you
```

1   have a company that also produces the monitors and

2   televisions that that fixed price of that product is

3   going to be translated 100 percent in the price you're

4   going to charge for your finished product (As read):

5                    And, B, price floors on quotations offered

6              by the competitors of the integrated company to

7              such division or subsidiary.  Defendants also

8              considered the internal pricing of products

9              containing CRT's in agreeing upon the prices at

10             which CRT's were set.

11          That is about as detailed an allegation you

12   will see in a complaint about how it worked and it

13   answers multiple questions that are raised by counsel,

14   not only the fact that why are Sharp or Sony not in,

15   because they were fixing the price to third parties and

16   they were fixing the price internally and it affected

17   the price of the finished product.

18          It is alleged -- it's also alleged in paragraph

19   146.  This is an allegation -- I won't read it -- about

20   the fact they restricted production, your Honor, in

21   order to keep the price of tubes up which would have an

22   impact on the finished products.  And they actually

23   policed themselves by visiting each other's plants, as

24   alleged in paragraph 146, an issue that's common to all

25   purchasers.  Defendants based these determinations of

1   what the market would look like after jointly analyzing

2   anticipated supply and demand and they considered --

3   this is the allegation -- the analysis often included

4   consideration of downstream prices for televisions,

5   computer monitors or similar products and how they would

6   affect the price ranges being collusively set.

7        THE COURT:  Is that an allegation that really

8   reads the prices, downstream prices for television,

9   computer monitors, similar products were set?

10       MR. SIMON:  Yes.

11       THE COURT:  That's equivalent to an allegation

12  of conspiracy to fix these prices.

13       MR. SIMON:  That's an equivalent of an

14  allegation just like in Linerboard and in Sugar --

15       THE COURT:  I just wanted an answer.  I got my

16  answer.

17       MR. SIMON:  A conspiracy that impacts the price

18  of both finished products and it's done through the

19  components.  They are inseparable.

20       I would suggest, your Honor, that when you look

21  at the AGC argument, you're going to come down to the

22  basic issue of what are the allegations in the

23  complaint.  I will point out with respect to the direct

24  purchaser claims, they only argue the nature of the

25  plaintiffs' alleged injury, which is, one, the first AGC

factor, and the speculative nature, according to them, of the harm.

I would also point out that reviewing that standard you look at American Ad Management, Inc., which says plaintiffs do not have to establish each factor to have antitrust standing. It said courts balance these factors, giving great weight to the nature of the plaintiffs' alleged injury.

If you find the interrelationship that's alleged in that paragraph and other paragraphs in the complaint which says the fix was on CRT products, then there is nothing speculative about the injury and there is no question that we allege that it impacted both prices.

I would, you know, read for you, even though they are trying to distinguish Sugar in the worst possible way, but Sugar, taking a look at the situation where there's sugar and there's sugar-containing products, that is the equivalent of what would be a finished product here, Third Circuit said (As read):

> To deny recovery in this instance would leave a gaping hole in the administration of the antitrust laws. It would allow the price fixer of a basic commodity to escape the reach of a treble damage penalty simply by

1          incorporating the tainted element into another

2          product.  Illinois Brick did not purport to

3          provide any such escape.  The opinion was at

4          pains to point out that overcharges collected

5          by direct purchasers should be remedied.

6              I would also point out that going to the issue

7  of what they were doing here in this kind of suggestion

8  that we're playing games, we're talking about defendants

9  who conspired overseas so they could try to immunize

10 themselves from the antitrust laws in the United States.

11 Accusing plaintiffs who represent the victims of this

12 particular conduct where it's going to be undisputed

13 that these meetings occurred, 500 of them, but they're

14 accusing us of playing games when they're the ones who

15 met offshore to try to run away from their liability in

16 this case, and we respectfully request that you take

17 that into consideration in weighing the AGC factors in

18 taking our complaint and weighing it in a manner that we

19 think the allegations suggest, your Honor.  Thank you.

20     MR. YOHAI:  Just very quickly, Mr. Simon says

21 that Sony and Sharp aren't here because they also bought

22 price fixed tubes.  Well, there's no record on this, but

23 the notion that Sony doesn't make tubes is, I think,

24 very hard to believe.  Of course, it makes tubes.  Of

25 course, Sharp makes tubes.

1          He also points us to paragraph 144, but the

2     allegations in that paragraph say defendants also

3     considered the internal pricing of products containing

4     CRT's in agreeing upon the prices at which CRT's were

5     set in that paragraph.  It doesn't allege specifically

6     anyway that they considered the television pricing at

7     all points or with all competitors.  So I think he's

8     wrong there, too.

9          The issue about playing games I think really

10    goes more to how they're pleading their complaint.  The

11    issue is this.  If they're talking about televisions,

12    they should be talking about televisions and computer

13    monitors.  If they're talking about CRT's, then talk

14    about CRT's.

15              THE COURT:  Can't they talk about both?

16              MR. YOHAI:  No, I don't think they can.

17              THE COURT:  You can't say we can prove a

18    conspiracy to fix CRT prices and we can prove conspiracy

19    to fix prices on finished products.

20              MR. YOHAI:  Well, with respect to the finished

21    products, your Honor, I don't think they're serious

22    about the television conspiracy.

23              THE COURT:  I'm not saying do they.  I think

24    that's the point.  I think you're arguing they can't do

25    it.

1          MR. YOHAI:  A, I don't think they can.  But, B,

2     more importantly, they haven't.  They haven't pled it

3     sufficiently in their complaint.  If they were really

4     serious about a television conspiracy, they would have

5     to allege specific allegations about the meetings

6     concerning television pricing.  All the meetings they're

7     talking about were about CRT tube pricing.  So when it's

8     convenient to talk about tubes for the actual meetings

9     they refer to, they talk about tubes.  When they want to

10    talk about televisions, because they'd rather have the

11    damages from the televisions, they throw in televisions,

12    but you can't blend them.  It's either one or the other.

13    That's the most important point here.  I think your

14    Honor knows that very well from what we argued.  I'm not

15    going to belabor it.

16          THE COURT:  Wait a minute.  They can't do

17    both?

18          MR. YOHAI:  I said I wasn't going to belabor it

19    because I think your Honor has heard it very well this

20    morning, all the arguments about why they can plead a

21    CRT conspiracy, but at least based upon the facts pled

22    here they haven't pled a television one.

23          MR. KESSLER:  I think their argument is, your

24    Honor, that they pled neither.

25          THE COURT:  I was going beyond can.  Would it

1    be possible for anybody ever to do that?

2            MR. SAVERI:  Who's talking?

3            THE COURT:  Wait a minute.  I'll keep house.

4            MR. KESSLER:  They could clearly, in our view,

5    if they had specific facts plead a television conspiracy

6    and a CRT conspiracy, but what they've done by

7    conflating it is plead neither.

8            MR. SIMON:  I'm honored I'm the first one to be

9    double-teamed.  I must have said something good.

10           THE COURT:  I understand that argument.  It's

11   his use of the word couldn't, if there was something

12   innate in this arrangement.

13           MR. SPECKS:  What we've alleged is a single

14   conspiracy which encompasses both CRT's and electronic

15   devices incorporating CRT's, not two conspiracies.

16           THE COURT:  All right.  And we have another

17   issue.

18           MR. YOHAI:  Yes, the last one is statute of

19   limitations.

20           MR. ROGER:  Good morning, your Honor, Kent

21   Roger, Morgan Lewis & Bockius on behalf of the --

22           THE COURT:  Point of order.

23           MR. SAVERI:  May I ask a question?  We've heard

24   various arguments by Mr. Kessler and other issues.  Now

25   have you people addressed the Twombly issue?

1          THE COURT:  Well, they've mentioned it.

2          MR. KESSLER:  We are addressing it as it

3    applies to a specific allegation.  As we've told you

4    many times, we did not make a general Twombly argument.

5    We made it in the context of specific facts.

6          MR. SAVERI:  I just wanted to know.

7          THE COURT:  Now, you're arguing statute of

8    limitations.

9          MR. ROGER:  Yes, your Honor.  Kent Roger,

10   Morgan Lewis of behalf of the Hitachi defendants,

11   Hitachi Ltd., Hitachi Asia Ltd., Hitachi America Ltd.,

12   Hitachi Electronic Devices USA and Hitachi Displays.

13         The Clayton Act, of course, bars claims for

14   injuries that occurred more than four years prior to the

15   filing of the first complaint.

16         THE COURT:  Which would be in this case?

17         MR. ROGER:  November 26, 2003.  Sales before

18   that would be barred --

19         THE COURT:  Okay.

20         MR. ROGER:  -- under defendants' view that the

21   plaintiffs have not pled with sufficient particularity

22   as required fraudulent concealment.  And, indeed, there

23   is no dispute that Rule 9(b) requires that a party

24   alleging fraud state with particularity the

25   circumstances constituting the fraud or mistake.  The

1     plaintiffs concede that standard.

2          And, thus, that standard for purposes of the

3     statute of limitations is higher even than the Rule 8

4     and Twombly and Iqbal pleading standards that we have

5     been discussing.

6          THE COURT:  You think it's governed by Rule 9.

7          MR. ROGER:  It's governed by Rule 9 and

8     plaintiffs concede it's governed by Rule 9 in their

9     opposition.

10          THE COURT:  How many defendants are we

11     concerned about on the fraudulent concealment issues?

12          MR. ROGER:  Well, there are 48 individual

13     defendants they have named, and it's defendants'

14     position that the plaintiffs have not pled with the

15     required specificity against any of them because unlike

16     even in their conspiracy claims where they lump

17     individual corporate families together, such as Hitachi

18     or Samsung, quotes around them, in connection with the

19     fraudulent concealment allegations, they have lumped all

20     of the defendants together.  And so none of the

21     defendants knows which of the defendants supposedly

22     affirmatively acted, and under the case that we cited

23     both in our opening and reply briefs, Barker versus

24     American Mobile Power in the Ninth Circuit, one cannot

25     plead that acts by one defendant inure to the detriment

1   of other defendants when it comes to fraudulent

2   concealment.

3            THE COURT:  Okay.  Now, what about the

4   withdrawal.  A few defendants have argued they withdrew

5   from the conspiracy.

6            MR. ROGER:  And Hitachi is one of them, and we

7   will be discussing those and I think a handful of those

8   will be discussed in connection with the individual

9   motions.  So I'm raising now the arguments with respect

10  to fraudulent concealment that cut across all of the

11  defendants.

12           THE COURT:  You're not arguing withdrawal.

13           MR. ROGER:  Correct, not in this portion of the

14  argument your Honor.  So we've established that 9(b)

15  requires the particularity, and conclusory statements,

16  of course, are not enough and we cited the Conmar case

17  for that proposition.  The plaintiffs have to plead the

18  identity of the defendant who fraudulently concealed

19  because, again, under Barker you can't attribute to the

20  other defendants the supposed affirmative acts of one

21  defendant.

22           They haven't alleged any acts of fraudulent

23  concealment.  They rely on general allegations, as I

24  say, against defendants.

25           THE COURT:  I want to be sure I got your first

1    point.

2              MR. ROGER:  Yes, your Honor.

3              THE COURT:  Being that to allege fraudulent

4    concealment they've got to discuss each individual

5    defendant.

6              MR. ROGER:  Yes, your Honor, and that's the

7    rule of Barker.

8              THE COURT:  Okay.  Second point?

9              MR. ROGER:  It's also the facts on some of the

10   cases on which they relied which I'll talk about in a

11   second or two.  But what they have done is to allege

12   against all of defendants attendance at various glass

13   meetings and instructions not to take minutes and

14   participations in telephone conversations.  They list

15   all of these at pages 25 and 26 of their opposition.

16             But, one, they don't say who did those things;

17   and, two, those things are exactly the same allegations

18   as they plead in connection with the conspiracy.  So

19   they are not the separate acts of affirmative

20   concealment that is required in order to toll the

21   statute of limitations.  They rely on the EW French &

22   Sons case versus General Portland.  That case I think is

23   illustrative of the problems with their pleading because

24   in that case the issue was whether or not the defendant

25   involved, General Portland, did certain things such as

MOTION HEARING  October 5, 2009

1    explicitly deny price fixing or use plain white

2    envelopes to distribute pricing information.

3            Again, it was just General Portland, and the

4    court appropriately found that the allegations that

5    General Portland did those things were sufficient.

6    Compare that to the allegations that they themselves

7    summarize at pages 25 and 26.  And, again, it's

8    defendants this and defendants that, and no one knows

9    who did what.

10           Likewise, the Conmar case cited by both the

11   plaintiffs and defendants in which Mitsui, not a group

12   of defendants lumped together, filed customs documents

13   falsely reporting prices of the relevant conduct.

14           And, in fact, your Honor, if you take a look on

15   page 25 of their opposition, if you're there, you look

16   at the final bullet point, the thing that comes -- the

17   allegation that comes closest to alleging an affirmative

18   act of concealment is that final bullet point wherein

19   they say when several CRT manufacturers, including

20   defendants Samsung, Phillips and LG Electronics,

21   increased the price of CRT products in 2004, the price

22   hike was blamed on a shortage of glass shells used for

23   manufacturing CRT monitors.  In justifying this price

24   increase, the price increase that's referred to in that

25   prior sentence, a deputy general manager of an LG

1    Electronics distributor in India stated this shortage of

2    glass shells is a global phenomenon and every company

3    has to increase the prices of CRT monitors in due course

4    of time.

5           So that bullet in the plaintiffs' opposition is

6    instructive because, one, it shows that they know how to

7    plead when they want to the required specificity of

8    affirmative concealment, and yet in that one place where

9    they do that, they don't plead it against the defendants

10   generally.  They don't even plead it against a

11   defendant.  It's only against a nondefendant

12   distributor, unidentified, for LG Electronics.  That's

13   the best that they've got in terms of affirmative

14   conduct.

15          Secondly, your Honor, the pleading itself

16   discloses that the plaintiffs had constructive knowledge

17   of their claims throughout the conspiracy period.  They

18   say in their opposition that what they were on notice of

19   were only apparently market events, and they say that at

20   their opposition on page 31, and yet their complaint is

21   replete with statements that they then characterize in

22   an original version of their complaint as fundamentally

23   inconsistent with a competitive market, and that is the

24   Arch Electronics case that was filed prior to this case

25   being assigned as an MDL.

Page 119

1          But what are the kinds of things that they

2    allege at pages 24 and 25 as we summarize in 24 and 25

3    of our opening brief.  They say that the CRT industry

4    was oligopolistic in nature, it was conducive to

5    collusion.  There was consolidation, high cooperation,

6    joint ventures, trade associations.

7          THE COURT:  I'm sorry.  Where are you reading

8    from?

9          MR. ROGER:  There's a list in pages 24 and 25

10   of our opening brief, your Honor, with the citations.

11         THE COURT:  Your opening brief.

12         MR. ROGER:  Of our opening brief where we list

13   and cite --

14         THE COURT:  24-25.

15         MR. ROGER:  Right.

16         THE COURT:  Okay.  This is all dealing with

17   fraudulent concealment, not the --

18         MR. ROGER:  This is dealing with whether or not

19   the plaintiffs had constructive knowledge of the

20   conspiracy during the time of the conspiracy.  So I

21   won't belabor that listing, but we have cited chapter

22   and verse to the direct purchaser complaint with respect

23   to those matters that we believe would have given the

24   plaintiffs constructive knowledge of the conspiracy

25   period.

1           Highlighting just briefly on page 25, your

2    Honor, the bullet point that refers to paragraph 196 of

3    the plaintiffs' complaint, that would be the bullet

4    right before output production alleged to evidence

5    collusion, but it says in their complaint (As read):

6               Over the course of the conspiracy period,

7           the prices of CRT's remained stable and in some

8           instances went up in an unexplained manner

9           despite the natural trend in most technology

10          products to go down over time.

11          So what we have in the complaint is a litany of

12   acts and observations and phenomena that they plead

13   themselves and yet don't explain why that not be

14   constructive knowledge of acts of conspiracy which

15   should excite the reasonable mind to inquire, and that's

16   the third point of our statute of limitations fraudulent

17   concealment argument, your Honor, first being they

18   haven't alleged affirmative conduct; secondly, they were

19   on constructive notice of all the bad things that they

20   were alleging in their complaint; and, third, having

21   been on constructive notice, they do not plead the

22   required due diligence, and that's the Rutledge case

23   that we cited in our opening and closing brief.

24          What they do say at paragraph 203 is, well, we

25   didn't do due diligence, but we didn't have to do due

1    diligence because the nature of the conspiracy was

2    inherently self-concealing.  But that's not good enough

3    in the Ninth Circuit, and that's the Conmar case in

4    which the plaintiffs also said that the nature of the

5    conspiracy was inherently self concealing and the Ninth

6    Circuit said, no, we require more.

7            And in the Rutledge case, the pleading was that

8    the defendants have fraudulently concealed the existence

9    of the aforesaid price discrimination through the

10   adoption of elaborate schemes, resorting to secrecy to

11   avoid detection and by denying that such discrimination

12   existed, much like what the plaintiffs have done here.

13   But the Ninth Circuit said you can't rely on conclusory

14   statements.  The plaintiffs have to plead with

15   particularity the facts showing their due diligence in

16   trying to uncover the facts.

17            So having conceded in their opposition that a

18   plaintiff must plead facts alleging its due diligence,

19   that is what did the plaintiffs do in response to facts

20   that would excite the inquiry of a reasonable person,

21   the plaintiffs just say there was nothing they could do

22   because of the inherently self-concealing nature of the

23   conspiracy.  That doesn't work in the Ninth Circuit

24   under Conmar.

25            THE COURT:  What's the cite to Conmar?

1          MR. ROGER:  One moment, your Honor.  That's 858

2     F. 2d. 499, and we cite that beginning at pages 21 of

3     our reply.

4          So in sum, your Honor, they haven't pled

5     affirmative conduct both because they haven't identified

6     which defendants did anything.  Secondly, they haven't

7     pled affirmative conduct because they haven't alleged

8     with particularity under Rule 9, a higher standard than

9     Rule 8, Twombly and Iqbal, exactly what was done by whom

10    when and to whom.

11         Their complaint is replete with facts which

12    they themselves have alleged that would have given them

13    constructive notice of their claims, and they concede

14    they haven't pled the due diligence, relying only on an

15    allegation that it was inherently self-concealing, which

16    does not meet the standard in the Ninth Circuit.  As a

17    result, we believe that their claims after November --

18         THE COURT:  Before.

19         MR. ROGER:  Yeah, before November 26th of 2003

20    are barred.

21         THE COURT:  Thank you.  Is there a reply?

22         MR. RUSHING:  Your Honor, Geoffrey Rushing of

23    Saveri & Saveri on behalf of the direct plaintiffs.

24         I would just point out a housekeeping matter.

25    The way we decided the argument, we had Mr. Montague

Page 123

1    slated to address many of the Twombly issues raised

2    earlier.  So he will speak after me, if that's

3    acceptable.

4           THE COURT:  I'll tell you what.  Let me hold

5    off on that.  I will note that you have not had an

6    opportunity to address Twombly and, I guess, Iqbal at

7    the same time, but let me hear the rest first because

8    the Twombly issue are part of a lot of substantive

9    things that are being argued, what's the standard for

10   pleading, how specific do you have to be to plead that

11   particular issue.  So it's being subsumed within the

12   other discussion.  If you want a discussion alone of

13   Twombly and Iqbal, I think that's fine, but I'd like to

14   get the rest of the arguments to see whether we really

15   need that.

16          MR. RUSHING:  Well, your Honor, we understood

17   that they were going to be issue by issue and we

18   understood that Twombly to be an issue.

19          THE COURT:  It is an issue, but in their

20   presentation it's been subsumed in their other challenge

21   to your allegations.

22          MR. SAVERI:  But in that connection, your

23   Honor, when there were four specific issues in the joint

24   brief that we had, we are proceeding as if -- as far as

25   we're concerned that there is going to be an argument

MOTION HEARING   October 5, 2009

Page 124

1    overall on the Twombly issues, on what we're supposed to

2    plead to get by Twombly and Iqbal, and we are prepared

3    to argue that in detail because that's very important;

4    and we thought that the defendants were going to do it,

5    but they made it as part of various different arguments.

6              THE COURT:  So I will give you the opportunity

7    to do that, but I want to hear all the other arguments

8    first to see where it's really necessary.

9              Go ahead, Mr. Rushing.

10             MR. RUSHING:  Your Honor, I'm going to address

11   the statute of limitations fraudulent concealment

12   argument.

13             THE COURT:  Will you agree with the operative

14   date of the statute assuming there is no tolling?

15             MR. RUSHING:  I believe so, your Honor.  Your

16   Honor, I didn't check the date, but I think that's

17   correct.

18             As you've heard already today, your Honor, in

19   general our position here is defendants -- they misread

20   the complaint, they ignore important allegations and

21   they ignore recent cases in this district that decided

22   virtually identical issues, namely LCD, Rubber

23   Chemicals, the SRAM case.  In short, plaintiffs have

24   alleged many affirmative acts of concealment under the

25   various cases cited in our brief.

1           We have done so with appropriate level of

2    specificity, and we don't have -- and we have adequately

3    pled that we were not on notice of these claims; and,

4    therefore, it is plain under Conmar and other cases that

5    we're not required to plead any affirmative acts of

6    diligence in order to adequately plead fraudulent

7    concealment.

8           So first the complaint contains hundreds of

9    acts, of affirmative acts of concealment.  It alleges

10   that virtually every meeting, at least those after June

11   of 2000, contain what cases in this district and

12   elsewhere cited in our brief have determined do

13   constitute affirmative acts of concealment.

14          So in paragraphs 137 and 205, the plaintiffs

15   allege that the location and the organization of the

16   meetings themselves were orchestrated so as to maximize

17   the secrecy and minimize the chance of detection.  Prior

18   to that time, the CDT products and the CPT products

19   meetings were held back to back in the same location.

20   It was determined that that was too suspicious and so

21   they changed their procedures.

22          Participants were told not to take notes.

23   That's paragraph 204.  The defendants affirmatively took

24   steps to reduce the number of attendees attending the

25   meetings to again to increase the secrecy, to decrease

1  the likelihood of detection, and that, too, is an

2  affirmative act of concealment, and that's paragraph 205

3  and also paragraph 154, which explains that the

4  attendees attended on behalf entire corporate families

5  so that each -- the representative from each member of

6  the integrated group did not need to attend.

7          They agreed to keep meetings and agreements

8  secret.  That's paragraphs 138 and 204 and 201.  They

9  had discussions about how to evade antitrust laws and

10  concealing the existence and nature of their competitive

11  pricing discussions from nonconspirators.  That's also

12  paragraph 204.

13          And then in paragraph 148, as part of these

14  meetings, the defendants would also agree on what to say

15  about price changes or output restrictions to their

16  customers in order to conceal their conspiracy.  Often

17  one co-conspirator was chosen to make the first price

18  announcement with the others following on an agreed upon

19  schedule.

20          And 153 has very similar allegations, 206 very

21  similar.  Again, defendants also agreed at glass

22  meetings and bilateral meetings to give pretextural

23  reasons for price increases and output reductions to

24  their customers.

25          And the paragraph 126 detailing the indictment

MOTION HEARING   October 5, 2009

Page 127

1    also notes that the X charge works were actions of

2    concealment.

3            Defendants' argument that these kinds of

4    allegations do not constitute affirmative acts is

5    incorrect.  And, again, they ignore important recent

6    cases in this district.  I'll read to you from the TFT

7    LCD case, 586 F. Supp. 2d. at 1119 to 20.  (As read):

8                The complaint also alleges that plaintiffs

9                were unaware of their claims and discovered

10               them as a result of investigations by the DOJ

11               and other antitrust regulators in

12               December 2006.  In addition, the complaint

13               alleges that defendants engaged in a secret

14               conspiracy that did not give rise to facts that

15               would put plaintiffs or the class on inquiry

16               notice that there was a conspiracy to fix

17               prices for TFT LCD's and that the defendants

18               agreed not to publicly discuss the nature of

19               the scheme and gave pretextual justifications

20               for the inflated price of TFT LCD's in

21               furtherance of the conspiracy.  The plaintiffs

22               allege that in this context they could not have

23               discovered through the exercise of reasonable

24               diligence the alleged conspiracy.  The court

25               finds that plaintiffs have sufficiently alleged

1          fraudulent concealment and that it would be

2          inappropriate to dismiss any claims as time

3          barred at this stage of the litigation.

4          So in that case, Rubber Chemicals also refers

5     to secret meetings and agreement not to discuss publicly

6     the nature of the scheme, defendants' actions that might

7     evidence their action and pretextual justifications for

8     the inflated prices, the same kinds of conduct we

9     alleged that were discussed and put into action

10    affirmatively at each and every meeting.  So it's not

11    correct to say that we haven't alleged any.  We've

12    alleged hundreds.

13         Now, in addition, we have -- the complaint

14    alleges numerous accounts of affirmative statements

15    about misleading statements about the reasons for

16    pricing situations as well as plant closures.  There is

17    no question that these are -- constitute affirmative

18    acts in the case law, and I don't think the defendants

19    argue otherwise, but again at paragraphs -- well, in

20    general, 210, 207, 209, 195, and 211, and those all have

21    to do with pricing.  The complaint also alleges that

22    output restrictions were an integral part of the

23    conspiracy and that at these meetings defendants would

24    agree on what to say about price changes or output

25    restriction to their customers in order to conceal their

1  conspiracy, and the complaint contains several

2  allegations about plant closures and the reasons given

3  therefor.

4        Thus, in paragraph 183, it reads as follows (As

5  read):

6              In December of 2004, MTPD closed its

7              American subsidiary's operations in Horseheads,

8              New York, citing price and market erosion.

9              Panasonic announced that the closing was part

10             of the company's global restructuring

11             intuitives in the CRT business.

12        That's a quotation of Panasonic's announcement.

13             The company further stated that in the

14             future CRT's for the North American market will

15             be supplied by other manufacturing locations in

16             order to establish an optimum CRT manufacturing

17             structure.

18        Paragraph 184 (As read):  In July of 2005, LGPD

19  ceased CRT production at its Durham, England facility,

20  citing a shift in demand from Europe to Asia.

21        185 (As read):

22             In December of 2005, MTPD announced that it

23             would close its American subsidiary's

24             operations in Ohio as well as operations in

25             Germany by 2006, as LG Phillips, the company,

MOTION HEARING  October 5, 2009

1          explained that it was shifting its CRT

2          operations to Asian and Chinese markets.

3              So, again, these are alleged as pretexts and in

4     statements designed to conceal the effects of their

5     conspiracy of which again there is no question output

6     restrictions were an integral part.  So there is also

7     allegations, as we explained in our brief, about the use

8     of trade associations to conceal their conspiratorial --

9              THE COURT:  Do you think you have to make

10    allegations as to each defendant, as something each

11    defendant did?

12             MR. RUSHING:  The answer is no, your Honor.  I

13    was going to get to that.  I can address it now.  I was

14    going to say his first argument --

15             THE COURT:  Address it when you want.  Go

16    ahead.

17             MR. RUSHING:  -- is that we haven't alleged

18    these affirmative acts in sufficient detail, but I would

19    say, I mean, we disagree.  In particular, the

20    allegations I just read about the closures of plants and

21    several of the --

22             THE COURT:  There is some individuality in

23    those.

24             MR. RUSHING:  Yeah, they do allege, even though

25    the case law doesn't require it, those allegations do

MOTION HEARING  October 5, 2009

1   allege who, what, when.  In some cases, as I noted, they

2   quote the precise language used by the identified

3   defendant.  So they're just wrong when they say there

4   are not allegations, specific allegations in the

5   complaint.

6          Secondly, I think the standard is not as they

7   say.  They are trying to argue that there is this

8   absolutely rigid and strict standard of who, what, when

9   and where and that's not the case.  The standard is

10  flexible.  It requires enough particularity to allow the

11  defendant to answer, and that is consistent with the

12  standard again that was applied in the recent cases in

13  this district in TFT LCD and by Judge Jenkins in Rubber

14  Chemicals and in SRAM.

15         So we do allege them with sufficient

16  particularity and we allege far more than is necessary.

17  The cases are clear again that you only need a very few

18  such allegations to meet the requirements and that

19  it's -- I mean, you don't need a whole lot, and for the

20  fundamental and sensible reason that in these kinds of

21  situations the proof is largely in the hands of the

22  defendants.  It is unreasonable to expect the kind of

23  detail that they're asking for when -- given the fact

24  that the proof is in their hands.

25         As the court stated in Rubber Chemicals (As

```
 1   read):
 2                As many courts have noted, in the antitrust
 3             conspiracy context it is generally
 4             inappropriate to resolve the fact-intensive
 5             allegations of fraudulent concealment at the
 6             motion to dismiss stage, particularly when the
 7             proof relating to the extent the fraudulent
 8             concealment is alleged to be in the hands of
 9             the alleged conspirators.
10             With regard to the secrecy protocols that the
11   defendants engaged at the meetings, I mean, this is
12   particularly apt.  First of all, given the number of
13   meetings and time frames of the conspiracy, to allege
14   the detail that they asked for, the complaint would be
15   500 pages long.  And it's also unreasonable for us to
16   know -- I mean, the facts that they claim that we should
17   know as to those.
18             So, again, those claims, I think, are adequate
19   under the language I read from LCD, also under the
20   Rubber Chemicals decision, and in addition, the
21   complaint does contain several allegations specific
22   date, time and what was said.
23             Now, the question of acts attributable to each
24   defendant, our answer about that is that it is not
25   necessary, but we have done it.  First, it is not
```

MOTION HEARING  October 5, 2009

Page 133

1    necessary.  The defendants fail to cite a single case

2    for the proposition that in a price fixing case, in a

3    conspiracy case that that standard is the standard.

4    They cite the milk case out of Minnesota, which is an

5    antitrust case.  It doesn't address the proposition or

6    stand for the proposition.

7          Every other case, the Barker case, it's not a

8    conspiracy case, it's not an antitrust case, and that

9    makes sense.  As the language from Beltz that we cited,

10   your Honor, it is fundamental in a conspiracy that one

11   member is responsible for the actions of another member.

12   In fact, we have alleged it in the complaint, that there

13   was a division of labor and coordination in connection

14   with secrecy, in particular the pretextual reasons given

15   for price increases, plant closures, et cetera.

16         So it just -- the rule they suggest makes no

17   sense, and they haven't cited to the court a single case

18   in the context of this case that so holds.  And so what

19   they are asking your Honor to do is to make new law on

20   that subject.

21         As I said, that rule that they're asking your

22   Honor to adopt is inconsistent with the fundamental

23   nature of a conspiracy as well as inconsistent again

24   with the notion that in situations where the proof is in

25   the hands of the defendants you shouldn't resolve things

MOTION HEARING   October 5, 2009

1    on a motion to dismiss.  You should resolve them on a

2    fuller factual record after the parties have had the

3    chance to conduct some discovery.

4         As to the acts attributable to each defendant,

5    again, we have alleged it.  We have alleged what

6    occurred at the meetings and we've alleged with regard

7    to each defendant that they attended these meetings in

8    the various degrees that they have alleged in the

9    complaint.

10        In addition, the specific allegations about

11   reasons given for price increases, et cetera, we name

12   specific defendants in those allegations, similarly in

13   the allegations relating to plant closures, specific

14   defendants are identified.

15        Again, Barker is not an antitrust case and does

16   not a rise in a situation where the acts of one party

17   can be attributed to the act of another.  That's a

18   crucial distinction here.  In none of the cases that

19   they cite stand for that proposition.

20        I would add one more thing.  This rule that

21   they propose was not applied in the recent cases and in

22   particular in Conmar which counsel made a point to cite.

23   It is true that in Conmar the court focused on the

24   representations of one defendant, Mitsui, but it is not

25   true that Mitsui was the only defendant in that case.

1   At page 500, 858 F. 2d. 500, there were defendants

2   Mitsui and Mitsui Bussan Kabushiki Kaisha, they were the

3   importers.   There was the defendant Shinko Wire Company

4   that manufactured the product at issue, PC strand, and

5   there was defendant VSL Corp that purchased the strand.

6          The court reversed the Conmar.   The court

7   reversed.   Based on the affirmative conduct of Mitsui

8   alone, the court reversed the judgment as to all of the

9   defendants.   So I don't say that it directly addresses

10  the issue.   I do say it contradicts what the defendants

11  are telling the court.

12          And in our brief, again, your Honor at page 28

13  we cite in addition to the Beltz case some cases at 28

14  and 29 In re Strap Metal, the Rudel case and New York v.

15  Hendrickson for the proposition that it is well settled

16  that affirmative acts of one defendant co-conspirator

17  undertaken during the course and in furtherance of a

18  conspiracy are legally attributable to all co-defendant

19  co-conspirators under principles of substantive

20  conspiracy and joint and several liability.

21          So that's the law and that is also consistent

22  with our allegations in the case that again they

23  coordinated on these matters.

24          Finally, diligence.   Conmar is clear that we do

25  not need to allege affirmative acts of diligence if we

1    were not on notice of the action.   The complaint

2    adequately plainly alleges the same kinds of allegations

3    accepted in the LCD case, in the Rubber Chemicals case

4    that the plaintiffs were not aware of the cause of

5    action until the Justice Department acted against the

6    defendants.   That's imminently plausible.   It explains

7    how and why the plaintiffs became aware of their cause

8    of action, and that is more than need be alleged in

9    these kinds of cases.

10           The complaint also alleges that plaintiffs were

11   unaware of their cause of action before that time.

12   That's an allegation as to their own mental state.   I

13   think that counsel's argument that we have to allege

14   affirmative acts of not knowing about the conspiracy

15   doesn't make any sense.   If we are on notice, then there

16   is an obligation to plead diligence, but that is -- but

17   only if we are on notice of the cause of action.

18           And not only that, as Conmar makes clear, the

19   complaint must show as a matter of law that plaintiffs

20   are on notice and to suggest that things like -- that

21   knowing that there was -- if a class member even had an

22   idea before 2003 that there was an oligopoly amongst

23   defendants or that there had been consolidation or that

24   it was a mature industry that had already recouped its

25   capital investments, as they suggest in their brief,

1    it's an absurd suggestion to say that that would put us

2    on notice as a matter of law of our claims and thereby

3    trigger a need to do due diligence.  It just doesn't,

4    and many cases cited in our brief so hold, and I'll

5    point out just one of them to you, your Honor.

6          In the SRAM case, the plaintiffs relied heavily

7    on the existence of a conspiracy in a similar product

8    entered into by the similar -- excuse me -- in a similar

9    product also manufactured by many of the same defendants

10   and that was the DRAM case.  And in DRAM there was a

11   large litigation, as everyone in the room is aware,

12   there were guilty pleas and indictments, et cetera.  And

13   the plaintiffs argued that because there had been a

14   conspiracy in DRAM, which was a very similar product,

15   involved many of the same people as SRAM, it was

16   reasonable to infer the existence of the conspiracy from

17   the other conspiracy.

18         The defendants in SRAM argued, well, then, of

19   course, if that's the case, if that's the case, then you

20   must have been on notice of your claim in SRAM when you

21   found out about DRAM, and Judge Illston said no, while

22   the existence of the other conspiracy may support and

23   does support her eventual finding that plaintiffs had

24   stated a claim in that case under Twombly, it was not

25   sufficient as a matter of law certainly to put the

1   plaintiffs on notice of their claim and thereby require

2   or trigger a pleading of due diligence.

3            And that is 580 F. Supp. 2d. At 90405.  And the

4   SRAM complaint also contained allegations of market

5   concentration and trade association, attendance, et

6   cetera, as did the complaints certainly in LCD as well.

7            So, your Honor, I think that's all I have to

8   say in response to the arguments.

9            THE COURT:  Rebuttal.

10           MR. ROGER:  Just very briefly, your Honor.

11   Your Honor, in terms of the affirmative acts, what we're

12   talking about here is coverup, distinguishing the facts

13   alleged in connection with the conspiracy itself on the

14   one hand and the defendants' attempt to affirmatively

15   conceal that conspiracy such that the statute of

16   limitations which otherwise would be ticking should be

17   tolled.  And in the number of references that counsel

18   made to supposed acts of affirmative concealment, in

19   fact, what they are are the conspiracy itself.

20           THE COURT:  There can be some identity of those

21   things.

22           MR. ROGER:  I'm sorry, your Honor?

23           THE COURT:  There can be some identity.  If I

24   say, Let's you and I go out on the alley and fix the

25   price of paper used in antitrust cases, we can do that

MOTION HEARING  October 5, 2009

1   and we can say to one another at the same time, now,

2   let's keep this secret by not keeping any minutes of

3   what we've done and going back and not telling anybody

4   about it which is between the two of us.

5          MR. ROGER:  But the importance of

6   distinguishing between fact of the conspiracy and

7   coverup is that were it otherwise, then there would be

8   no statute of limitations.  It would always be tolled

9   because if the defendants didn't go out there and

10  publicize that they were conspiring then someone would

11  say, well, you're obviously concealing the thing, so my

12  statute of limitations doesn't begin to run.

13         THE COURT:  You can't put every act in one

14  column or the other.  Some belong in both columns.

15         MR. ROGER:  And so the question that we ask

16  your Honor to decide is whether or not the complaint

17  sufficiently does that.

18         THE COURT:  That's the issue.

19         MR. ROGER:  The plaintiffs themselves

20  distinguish between those contemporaneous actions that

21  were part and parcel of the conspiracy on the one hand

22  and pretexts to cover it up.

23         I notice that counsel did not speak to the

24  apparent LG distributor, who actually is alleged to have

25  made a pretextual coverup kind of statement in 209.  So

1    that goes unanswered.  But in the vein of coverup, what

2    counsel did cite to are a number of allegations, I think

3    beginning at paragraphs 183 and following, which again

4    interestingly are under a heading on page 40 of their

5    complaint of effects of defendants' antitrust

6    violations, examples of reductions in manufacturing

7    capacity by defendants.

8            So, again, those aren't pretextual coverup

9    kinds of affirmative conduct that the plaintiffs were

10   alleging in this part of the complaint.  They were

11   saying there was a conspiracy and look what happened as

12   a result of the conspiracy.

13           I think it's for that reason that although they

14   do cite a number of instances in which certain

15   defendants, again without tarring all of the defendants

16   with a particular brush with respect to an MTPD closing,

17   right, what they say is this party closed, that party

18   closed, this party closed citing a shift in demand,

19   saying this or saying that.

20           With respect to those particular allegations,

21   they don't allege that the reason given by the

22   particular defendant for the closure was false.  So,

23   again, the distinction between the conspiracy and the

24   effect of the conspiracy on the one hand, the plaintiffs

25   agreed to close and they closed -- I mean, the

MOTION HEARING  October 5, 2009

1   defendants agreed to close and they closed, on the one

2   hand, and a defendant announcing here's the reason, but

3   you know what, that reason was false and it was an

4   attempt to conceal the conspiracy.  It was an attempt at

5   a coverup.  That the plaintiffs haven't done.

6          But, moreover, they really have not answered

7   the question about Barker, and so in respect of, say,

8   182 and 183 and 184 and 185 where they name four or five

9   out of 48 defendants, they don't meet the point that we

10  have 48 defendants and why should the statements, even

11  if they are ultimately decided by the court to be

12  sufficient, inure to the prejudice of the other

13  defendants.

14          Well, what they're saying is, well, Barker

15  isn't an antitrust case and it kind of stands to reason

16  because in antitrust cases you've got the rule of joint

17  and several liability and the conspirators are bound by

18  the acts of their co-conspirators.  But wait a minute.

19  Wait a minute.  We've a Rule 9(b) pleading standard here

20  which is pleading fraud with particularity.

21          What counsel is telling you is that there is an

22  antitrust rule which ought to be less stringent and

23  shouldn't even be as stringent as the Rule 8, Twombly,

24  Iqbal and Kendall say it needs to be in that context

25  where you need to plead who said what to whom and when.

1          THE COURT:   Has Twombly and Iqbal totally

2     tossed out the usual conspiracy shibboleths that most

3     have us grown up with that if there is a conspiracy, the

4     act of one conspirator binds everybody?

5          MR. ROGER:   Not at all, your Honor.   What

6     Twombly and Iqbal and Kendall in the Ninth Circuit say

7     is that you need to plead the facts of who did what to

8     whom and each defendant's role in the conspiracy.

9     That's under Rule 8.

10          Under Rule 9, you have a heightened standard

11     for pleading fraudulent concealment.   And so the

12     plaintiffs here are saying, well, we can rely on the

13     lessons of Twombly and Iqbal and Rule 8 to say that they

14     essentially gut Rule 9, and clearly, clearly Iqbal and

15     Twombly don't do that.   If anything, what they say is

16     that you need to show -- you need to have a greater

17     specificity of fact pleading even under Rule 8.   And

18     clearly if it doesn't pass muster under Rule 8, it

19     certainly doesn't pass muster under Rule 9; and that's

20     why the Barker case, we believe, actually is good law in

21     connection with pleading fraudulent concealment under

22     Rule 9, and the fact that one defendant fraudulently

23     concealed is not to be visited on the other defendants

24     unless there is an allegation showing what that

25     defendant -- what those other defendants did.

MOTION HEARING  October 5, 2009

1          And, again, the plaintiffs here don't even lump

2     the corporate families together, the Hitachis and the

3     Samsungs.  They just paint broad brush and say all of

4     the defendants, and we contend that that's just not good

5     enough.

6          MR. RUSHING:  Your Honor, may I have another

7     minute?

8          THE COURT:  No, we're going on too long here.

9          MR. ROGER:  Finally, with respect to the

10    constructive notice due diligence again, plaintiffs'

11    counsel says, well, geez, we weren't really on

12    constructive notice.  I would ask the court to look at

13    the laundry list of phenomena that they cite in their

14    own complaint as to facts that were fundamentally

15    inconsistent with a competitive market, to and including

16    that over the course of the conspiracy period, over the

17    course of the conspiracy period prices remained stable

18    and in some instances went up in an unexplained manner.

19    And their obligation is that when a duty of reasonable

20    inquiry by a reasonable mind has been excited that they

21    then have to plead what they did in order to uncover

22    that.  They concede they haven't pleaded it at all.

23    Thank you, your Honor.

24          THE COURT:  Now, that will be the end of the

25    arguments on the direct cases with the exception of

1    perhaps returning to a more general discussion of

2    Twombly and Iqbal at a later time.

3             Let us take a short luncheon break, if you want

4    to call it lunch, 1:00 o'clock.

5             I'm not criticizing but overall I think the

6    arguments have been a bit too long.  I think you can

7    make your points short and terse and simple.  You can

8    perhaps tell I read the briefs and I have now been

9    educated by listening to the direct case.  So perhaps

10   the argument on the indirect can be a bit shorter.  I'm

11   not telling you how to argue your case, but I think you

12   can make the shorter.  Okay?  1:00 o'clock resumption

13   please.

14            (Recess taken.)

15            THE COURT:  Is there anybody who has not signed

16   our signup sheet?  I'm going to send the court reporter

17   the final roster and I'd appreciate having a copy of

18   this when you have time to make one.

19            All right.  Argument in the indirect cases, who

20   is going to be?

21            MR. KESSLER:  I'll do subject jurisdiction

22   first, your Honor.

23            THE COURT:  Counsel, whenever you're ready.

24            MR. KESSLER:  Your Honor, I'm going to address

25   the issue of subject matter jurisdiction under the

MOTION HEARING  October 5, 2009

Page 145

 1    indirect complaint and what I would start off by saying

 2    is that these concepts of the FTAIA apply not just to

 3    the federal cause of action, which is an indirect

 4    complaint, we have one federal cause of action under

 5    Section 16 of the Clayton Act which is seeking

 6    injunctive relief under the Sherman Act.  There is no

 7    question that the FTAIA applies to that federal claim,

 8    but it also applies to the Commerce Clause, the

 9    Supremacy Clause and state harmonization laws to the

10    state claims, and specifically I'll address each of

11    those three different ways in which it applies.

12              It applies to the Commerce Clause because of

13    the clear need for national uniformity in foreign

14    commerce and issues of foreign relations and comity of

15    this nature.  Ironically, one of the leading case on

16    this is the Supreme Court baseball case Flood versus

17    Kuhn which dealt with even though we allow state

18    antitrust laws, they are not completely preemptive.  We

19    don't argue that.  Even though we allow them in general,

20    we don't allow them to apply where they are going to

21    conflict with a federal need for uniformity, and in the

22    baseball case they ruled out to strike down all the

23    state antitrust laws to baseball because since there was

24    a federal exemption for baseball, they said there had to

25    be one standard.

1          Similarly in the case of foreign scope of

2    jurisdiction, when Congress has now ruled that the U.S.

3    antitrust laws will not apply to foreign sales, foreign

4    price fixing, foreign conduct that doesn't have the

5    requisite effects in the United States, that same need

6    for one uniform national policy compels the conclusion

7    that the state laws cannot apply there either.  They

8    are, in effect, displaced by the Commerce Clause.

9          The leading case on this, your Honor, once

10   again the one case I asked you to read is the 2007 Intel

11   case, deals directly with this, and that Intel decision

12   states that both the Commerce Clause and the Supremacy

13   Clause have a combined effect of displacing any state

14   antitrust laws to apply to overseas foreign

15   anticompetitive conduct.

16         The way in which the Supremacy Clause applies

17   is even though there is not what we call complete

18   preemption by the federal antitrust laws, we know that

19   from the Arco case state antitrust laws can exist.

20   There is not complete preemption.  There is still a

21   preemption when there is a conflict between state and

22   federal law, and Intel talks about this as well, and

23   also the Crosby case in Supreme Court that we cited in

24   our brief talks about this idea -- that's Crosby in the

25   Supreme Court talks about the idea that when there is a

MOTION HEARING  October 5, 2009

1   conflict between federal and state law in an area where

2   the federal government has to have priority, then there

3   is preemption there as well that to limited degree.

4        So to be clear, we're not arguing that the

5   state laws don't apply to domestic effects CRT price

6   fixing claims.  We're arguing that just like the federal

7   claims can't apply to overseas conduct, the state claims

8   cannot either and again Intel is the case most closely

9   on point.

10       Finally, we demonstrate in our brief, and I

11   will not repeat it here in light of the time, but each

12   of the state antitrust laws they cited, I believe it's

13   17 states, have a harmonization rule either by statute

14   which says that the state laws can be construed in

15   conformity with the federal antitrust laws or by

16   judicial decision; and each of those states provide

17   therefore further support for the notion that if the

18   federal antitrust laws can't apply, the state antitrust

19   laws can't apply.

20       Further, also cited in our brief are the

21   consumer protection laws because some of the state laws

22   that they asserted here are not antitrust laws, they are

23   consumer protection laws or consumer fraud laws, laws of

24   that nature.  There again the Intel case is the best

25   analysis of this.

1          There are harmonization rules in those states

2     between what they call their little FTC acts, their

3     state consumer protection laws and the Federal Trade

4     Commission Act, the big FTC act.  And the Federal Trade

5     Commission Act has the same limitation not to apply to

6     foreign sales, foreign price fixing, as the Sherman Act

7     does.  So when you are going to conform the consumer

8     protection laws of the states, you come up in exactly

9     the same place as the federal statute.

10          So my basic point here is that the standards

11     are exactly the same for the state laws claims as they

12     are for the federal law claims.

13          Now, what I'd like to devote the rest of my

14     argument to is to demonstrate that the indirect

15     complaint actually if it is possible presents an even

16     more compelling case for lack of subject matter

17     jurisdiction than does the direct purchaser complaint,

18     and the reason for that is twofold.

19          First of all, there can be no question at all

20     in the indirect complaint that they do not allege a

21     price fixing conspiracy with regard to finished

22     products.  Quite the opposite.  The indirect purchasers

23     make it clear in many, many paragraphs that they are

24     alleging a price fixing involving CRT's which was then

25     passed on, and they have many paragraphs to make that

MOTION HEARING  October 5, 2009

Page 149

1    clear, but I would start with paragraph 227, and this is

2    virtually dispositive on this issue, 227 of the indirect

3    purchaser complaint reads as follows (As read):

4    Computer and TV OEM's and retailers of CRT products are

5    all subject to vigorous price competition whether

6    selling CRTV's or computer monitors.

7         So this is the exact opposite of a conspiracy

8    allegation in the finished products market.  This is an

9    allegation that there is vigorous price competition in

10   that market.  This is the market that that is Sony, that

11   has Sharp, that has Sanyo, that has Vizio, that has HP,

12   that has Dell.  This market clearly the indirects are

13   saying is subject to vigorous price competition, and

14   that alone means they cannot allege a finished products

15   conspiracy.

16        If there was any doubt about this, though, we

17   could see this equally clearly from some of the other

18   allegations that they make, and in particular their

19   allegations about pass-on.  If you take a look -- for

20   example, they're pretty clear about this.  On paragraph

21   237, what they say is the purpose of the defendants'

22   conspiratorial conduct was to fix, raise, maintain and

23   stabilize the price of CRT's.  Not CRT products.  What

24   they then argue in conclusory fashion is, and, as a

25   direct and foreseeable result, CRT products.

1          So they make it very, very clear, very clear

2     that they are distinguishing between the alleged

3     agreement to set prices for CRT's.  You asked a question

4     at the end of the direct purchaser plaintiffs, is this

5     your allegation of the conspiracy to fix finished

6     products prices, but I think the response you got was

7     yes, even though there was nothing in the direct

8     purchaser paragraph to say that, there was nothing.  I

9     heard the argument, but there was nothing there to say

10    that in paragraph 144.

11          But having said that, the indirects are even

12    more candid about that issue.  So there could be no

13    doubt about that, that this is a CRT conspiracy which

14    they're just alleging has an effect, has an effect on

15    the finished products.  And for that issue, your Honor,

16    I am going to -- and I'll get to this now, we are back

17    to the Intel case that we discussed again where the mere

18    fact that components had fixed overseas prices are not

19    going to give them a claim because the televisions that

20    came in or the monitors that came in contained those

21    components.  It just doesn't work on the subject matter

22    jurisdiction principles.

23          Now, the indirects are also very clear the

24    conspiracy they're talking about involves foreign sales.

25    Take a look, for example, in paragraphs 203 of the

1  indirect complaint all the way really to 221.  And what

2  you will see is all of these claims are going to be

3  first about CRT's, not CRT products, okay, and second of

4  all, they relate to foreign CRT sales.

5          So to give you an example, in 204, it says on

6  November 8, 2007, antitrust authorities in Europe, Japan

7  and South Korea raided the offices of manufacturers of

8  CRT's, not CRT products, with respect to that.

9          Similarly, I would call your attention to

10 paragraph 208 which incorporates by reference a report

11 in the Kyoto news.  And, again, they say they don't want

12 to be bound by the government investigations, they don't

13 want to be bound by what they quote.  They chose to

14 incorporate these claims in their complaint; and,

15 therefore, it defines their allegations.

16          What is it the Kyoto news say (As read):

17              Officials of these three companies are

18              believed to have at least ten meetings since

19              2005 in major Asian cities to coordinate target

20              prices when delivering their products to TV

21              manufacturers in Japan and South Korea.

22          That's what's wrong with their complaint

23 jurisdictionally.  That's what's wrong.  The complaint

24 is dependent entirely -- whenever it is specific, it is

25 specific only with respect to foreign meetings involving

1   the foreign sale and fixing of CRT products to foreign

2   TV manufacturers.  When it is general, conclusory, then

3   it throws into the United States or it throws in all CRT

4   products together.

5          We were talking about the meaning of Iqbal in

6   terms of this and what the Ninth Circuit said in the

7   Kidd case.  I managed to pick up a copy of the Kidd case

8   since they raised.

9          THE COURT:  Do you have a cite?

10         MR. KESSLER:  Actually, my cite is a WestLaw

11   site if you prefer that.

12         THE COURT:  No, that's all right.

13         MR. KESSLER:  But this came out on September 4,

14   2009.  And in the Kidd case what they go on to say is

15   they -- first of all, they specifically state, they

16   specifically state that Iqbal now increases and

17   heightens the pleading standard, doesn't reduce it.

18   That's unequivocal.  But the reason they didn't dismiss

19   in that case is because they found, and I'm reading from

20   page 22 of the citation, it says (As read):  Here,

21   unlike Iqbal's allegations, Al-Kidd's complaint

22   plausibly suggests unlawful conduct and does more than

23   contain bare allegations of an impermissible policy.

24         And then it goes on for one, two, three, four

25   pages detailing very specific factual evidentiary

1    allegations made as to why this complaint survived as

2    opposed to the Iqbal complaint.  So this doesn't

3    indicate that you don't have to plead this.

4         What I would suggest what Iqbal has to mean is

5    the following.  You take the complaint and you eliminate

6    all the conclusory assertions and then you say what's

7    left.  And if you do that to the indirect complaint, the

8    same if you did it to the direct complaint, if you

9    eliminate the conclusory assertions and say where are

10   the evidentiary facts pled, there is no way that you can

11   find either, either any conspiracy about finished

12   television products or monitors or any U.S. conspiracy

13   of CRT's.

14        They may in fact have pled, and we're not

15   challenging that they've pled a foreign conspiracy

16   involving CRT's.  We're not challenging that.  But

17   there's no jurisdiction over those claims.  But they in

18   fact have -- we do not challenge that they pled a

19   foreign conspiracy involving CRT's, and that's the glass

20   meetings and the top meetings and the working meetings

21   and all that they say about that in general, but that

22   does not give them subject matter jurisdiction with

23   respect to the United States on that.

24        I'd also then ask you to take a look in terms

25   of their specific claims on paragraph 222 on.  Again,

MOTION HEARING  October 5, 2009

Page 154

1    this makes it clear -- this make it clear that they're

2    claiming an indirect effect, and take a look at 223.

3    This is, I think, the clearest statement they have.

4    (As read):

5                    The defendants identified above that

6                attended the glass meetings monitored the

7                prices of televisions and computer monitors

8                sold in the U.S. and elsewhere on a regular

9                basis.

10                   Note, there is no agreements.  They just say

11   they monitored what those prices were.  Very, very

12   different from an agreement.

13                   It says (As read):

14                   The purpose and effect of investigating such

15               retail market data was at least threefold.

16               First, it permitted defendants such as

17               Chunghwa, which did not manufacture CRT

18               televisions or computer monitors the way that

19               Samsung, LG, Daiwa, Panasonic, Toshiba,

20               Phillips and Hitachi did, to police the

21               agreement to make sure that interdependent CRT

22               sales were kept at super competitive levels.

23                   That only has to do with fixing the prices of

24   CRT's.  They're saying by looking at end product prices

25   it helps us monitor the CRT conspiracy, not fix prices

1    of finished products.  (As read):

2              And, secondly, it permitted all defendants

3         to police their price fixing agreements to

4         independent OEM's who would reduce prices for

5         finished goods if there was a corresponding

6         reduction in CRT prices.

7         What does that mean?  It says you're going to

8    police the sales of prices of CRT's to independent

9    OEM's.  It doesn't say there's any agreement to fix the

10   price of the finished product.  So their second reason

11   is all about CRT price fixing.  (As read):

12             Finally, as discussed above, defendants used

13        the prices of finished products to analyze

14        whether they could increase prices or should

15        agree to a bottom price instead.

16        That's of CRT's.  Every one of the reasons they

17   cite for looking at finished products, every one is all

18   about having a CRT price fixing conspiracy.  There is no

19   question about that.

20             And then on 224, they go (As read):

21             The indirect purchaser consumers buyers CRT

22        products from either a computer or TV OEM such

23        as Dell or Sharp or resellers such as Best Buy.

24        Well, that just hammers home what they're

25   talking about here are people who are claiming effects

1    as a result of buying finished products from retailers

2    like Best Buy or a company like Sharp, who they say is

3    not part of the conspiracy, okay, and claiming that

4    effect comes from the overseas price fixing of CRS's.

5         And what I would say, that is inherently

6    indirect, not a direct fact.  And what the FTAIA

7    requires is a direct, substantial, reasonably

8    foreseeable effect.  So there is no way for them to do

9    this.  What they would have to show, again like the

10   directs, one allegation of saying this is a meeting

11   these defendants went to and they fixed the prices of

12   CRT's in the United States.  Or they fixed the prices of

13   televisions in the United States.

14        There is no such allegation.  And what I would

15   suggest, your Honor, is rather than asking them, well,

16   is this allegation which doesn't really say anything

17   about television price fixing or doesn't say anything

18   about the United States, is this your allegation of

19   proof, I think what you should be doing is saying, no,

20   you have to plead this.

21        Now, if you can plead it under Rule 11, then

22   the appropriate thing is to do is dismiss and let them

23   replead.  If they can't plead it under Rule 11, then

24   they can't by oral argument convert plain words of the

25   English language that don't say what they're claiming it

1    says and argue that somehow these allegations are

2    sufficient.

3           They have the same problem as the directs do

4    with CRT products.  It's a little bit like arguing that

5    there are three different things.  Let's say you were

6    dealing with three different fruits, apples, oranges and

7    pears, and I'll define it as the fruit products.  Now, I

8    have allegations that pears are being price fixed but

9    not apples and oranges.  So I put an allegation that's

10   saying fruit products are being fixed, including all

11   three.  So even if I have only allegations of one, I'm

12   now arguing to the court that covers all three.  It

13   doesn't.  That's the point.  It doesn't.  It doesn't

14   cover any of them unless they specify which one it is.

15          That's the teaching, we believe, of Iqbal and

16   Twombly in this context.  It has to be defendant by

17   defendant and it has to be product by product because

18   they're not in the same product market.  Televisions

19   compete, by the way, not just against CRT television,

20   but against plasma televisions, against LCD televisions,

21   against many televisions.  If you have a price fixing

22   conspiracy in that market, you'd have to look at all

23   products and competitors in that market.  CRT's are in a

24   totally separately market.  That's why they can't just

25   lump them together this way from that standpoint.

1          I'd also say, your Honor, the directs gave you

2     a chart, and the indirects do the same thing --

3          MR. SIMON:  Could I raise a point of order?  I

4     mean, this is supposed to be the indirect argument.

5     It's the fourth argument made against the directs.  We

6     have no chance to respond.  We're going to go for three

7     days at this rate.

8          THE COURT:  There was a reference to it, but I

9     don't think it's that far.

10         MR. KESSLER:  I'll limit it to the indirects.

11    You can't come up with a chart and say, oh, these are

12    vertically integrated companies, therefore they're all

13    the same.

14         THE COURT:  Now, you are arguing against him.

15         MR. KESSLER:  No, but indirects do the same

16    thing.  They don't have a chart, but they have the same

17    thing in their complaint.  The point I'm making here,

18    your Honor, is to look at the indirect complaint for

19    this is that each of the groups are different.

20    Panasonic, for example, MTPD, happens to be my client,

21    they say, well, you're integrated.  Says, well, the

22    company that made CRT's during the statute of

23    limitations period was a joint venture of two companies.

24    It wasn't integrated.  There were two different owners

25    to the company.  There are other companies like LPDD who

1    they're saying is part of the LG group.  It was
2    completely independent of LG for most of this period.
3            So, again, there has to be allegations in the
4    complaint, factual evidentiary allegations.  They just
5    can't come up and tell to your Honor well, they're all
6    in one group or say to your Honor that, well, each
7    defendant represented each one.
8            They do allege that says every single group
9    represented everyone in the group.  That doesn't stand
10   up under Iqbal.  They have to have a fact to show that.
11   They can't just make conclusory assertions to avoid
12   their pleading burdens.
13           Almost done.  Again, when you look at
14   paragraphs in the complaint, you will see this is all
15   about foreign allegations.  All right.  My last point.
16   My last point again, your Honor, is that even if you
17   were to conclude there was one allegation, two
18   allegations, or they could replead about a price fixing
19   agreement of CRT's in the United States or televisions
20   in the United States, your Honor should make it clear,
21   absolutely clear under the rubber products case that
22   under no circumstances can all these claims in the
23   complaint about foreign CRT sales or foreign CRT price
24   fixing be actionable under United States law.
25           So again the FTAIA is a statute that requires

Page 160

1    each of the claims to be analyzed separately, and if

2    they have not stated a sufficient claim under Iqbal and

3    Twombly, then jurisdictions should be dismissed.

4              And one final, final, I know I said final twice

5    already.  Continental Ore your Honor raised.

6              MR. SIMON:  I raised it.  He's responding to me

7    again.

8              MR. KESSLER:  Your Honor -- I won't mentioned

9    Continental Ore.  Your Honor raised a question that what

10   about the old rule in conspiracy law that each company

11   is liable for the acts of the co-conspirators if it's in

12   furtherance of the complaint.  That's good law.  Twombly

13   and Iqbal doesn't change that, but there's a predicate

14   to that rule.  The predicate to that rule is there first

15   has to be independent evidence to establish that you are

16   a participant in the conspiracy.  Then if you are proven

17   to be a participant in the conspiracy, then the acts of

18   your co-conspirators within this scope will bind you.

19             What the pleading equivalent is is that you

20   have to independently plead under Iqbal defendant by

21   defendant what are the acts that constitute your

22   participation in the conspiracy or what are the acts

23   that show you are in a television price fixing

24   conspiracy as opposed to a CRT price fixing conspiracy.

25             That's what has to be done independently under

1   Iqbal, and there is nothing contrary, in fact, with

2   respect to the decision in LCD, LCD, I would make two

3   comments about in that regard.

4          One is that decision was pre-Iqbal.  Second,

5   that decision states in the first LCD opinion it has to

6   be defendant by defendant.  Now, in the second opinion

7   it found that that specific complaint was sufficient.

8   But that's that complaint.  This is this complaint, and

9   what your Honor has to do is look at the factual

10  allegations here because an application of Twombly is

11  not precedential.  In other words, the fact that within

12  complaint is good or bad doesn't mean the next complaint

13  is good or bad.  It depends on the specific factual

14  allegations.

15         So you can easily find that the plaintiffs here

16  have not met their burdens of proving these facts -- not

17  proving -- of asserting these facts with sufficient

18  particularity to meet the Twombly pleading standard

19  without in any way departing from the rule in LCD.  This

20  is a separate case that stands on its own.

21         So, your Honor, again, I would conclude by

22  saying we think that the entire case should be dismissed

23  for lack of subject jurisdiction even more so than the

24  direct purchaser complaint, if that's possible, because

25  they are completely candid in saying there's vigorous

1   price competition in the finished products market.  So

2   they can't allege a conspiracy that's plausible in that

3   market.  Thank you, your Honor.

4            THE COURT:  Indirect plaintiffs, please.

5            MR. CORBITT:  Thank you, your Honor.  Craig

6   Corbitt, Zelle Hoffman for the indirect plaintiffs.  I

7   think we heard a lot of heat there but not a lot of

8   light.  So let me see if I can put this argument into

9   context of what we actually allege and what we actually

10  need to prove.

11            First of all, since these cases have been

12  mentioned quite a bit, not only this morning, but just

13  now by counsel about what needs to be alleged

14  sufficiently under Iqbal and Twombly, I'd like to just

15  quote briefly from those decisions and what they

16  actually say instead of relying on defendants' wish of

17  what they might say.

18            What Iqbal actually does say -- and recall that

19  this was a case about a Muslim --

20            THE COURT:  I know what it's about.  I read the

21  case.

22            MR. CORBITT:  Obviously not an antitrust case.

23  Here's what it says (As read):  The pleading standard

24  does not require detailed factual allegations.  It

25  demands more than an unadorned the defendant unlawfully

1    harmed me accusation.

2              THE COURT:  Where are you reading from?

3              MR. CORBITT:  I'm reading from Iqbal case, 129

4    Supreme Court at page 1949.  I don't have the U.S. cite.

5              And the same page (As read):

6                   Nor does the complaint suffice if it tenders

7              naked assertions devoid of further factual

8              enhancement.  The claim has facial plausibility

9              when the plaintiff pleads factual content that

10             allows the court to draw the reasonable

11             inference that the defendant is liable for the

12             misconduct alleged.  The probability standard

13             is not akin --

14             MR. SCARBOROUGH:  Plausibility.

15             MR. CORBITT:  (As read):

16                  The plausibility standard is not akin to a

17             probability requirement but asks for more than

18             a sheer possibility that defendants have acted

19             unlawfully.

20             Similarly in Twombly, which was, of course, the

21   predecessor case, and here I'm quoting from 127 Supreme

22   Court at page 1965, the court said (As read):

23                  Asking for plausible grounds to infer an

24             agreement does not impose a probability

25             requirement at the pleadings stage.  It simply

Page 164

1    calls for enough fact to raise a reasonable

2    expectation that discovery will reveal evidence

3    of illegal agreement.  And, of course, a

4    well-pleaded complaint may proceed even if it

5    strikes a savvy judge that actual proof of

6    these facts is improbable and that a recovery

7    is very remote and unlikely.

8        So that's what these cases actually say, your

9    Honor, and in that context I would submit that I doubt

10   there have been many complaints in the history of

11   private antitrust litigation, either of these

12   complaints, that were as detailed and alleged as much

13   with specificity, 500 meetings and various things that

14   the defendants actually did at these meetings and

15   agreements that they reached.

16       I am not personally aware of any of them, and

17   I've been practicing for a long time, the only one that

18   maybe comes close is LCD's, but there's even more

19   meetings and more explosive facts in this case than

20   there were alleged in that case.

21       Now, it's also important to note, and I know

22   your Honor has in mind that these are state law claims

23   we're dealing with on damages.  So discussions about

24   Illinois Brick and discussions about, you know, other

25   federal law and federal cases, Illinois Brick really has

Page 165

1  no application to what we're doing here, and even under

2  the FTAIA, the only case that I am aware of that has

3  expressly applied the FTAIA to state laws is the Intel

4  case that counsel says is the one case you should read,

5  and, of course, I'm happy to have you do that.  I'm

6  actually co-lead counsel along with Mr. Saveri and some

7  other people in that case, so I know a bit about it.

8       Counsel, I'm sure, misspoke when he said that

9  the Intel case said that you can't -- or stands for the

10  proposition that you can't make a claim about a price

11  fixed component being incorporated in an overseas

12  product or in an overseas conspiracy.  That's not what

13  that case is about at all.

14       Intel was a monopolization case.  AMD is

15  Intel's principal competitor, to the extent that it has

16  any, and the allegation that AMD made and that the class

17  parroted, for lack of a better word, in its complaint

18  was that Intel, as a result of conduct against companies

19  in Japan and elsewhere in Asia foreclosed AMD from

20  portions of the market and, in turn, that that caused

21  injury and damages to AMD.

22       There were two Intel opinions.  In the first

23  opinion the court said AMD cannot base liability on

24  something that occurred in Japan as a basis for saying

25  that it lost profits on sales that it made or was

damaged generally in its business.

As for the class, in the subsequent opinion, the court said, and it's expressly relying on that, that it's too attenuated to say that the fact that Intel may have harmed AMD based on conduct that occurred in Japan or in some other foreign country in turn caused Intel -- resulted in Intel to have increased monopoly power which in turn meant that Intel sold chips or more to companies in the United States, such as Dell and HP, which then incorporated them into products which the class members purchased.

Obviously we disagree with that decision, but that is a very different circumstance than a direct price fixing conspiracy that occurred partially in foreign countries and partially in this country, which I'll get to in a minute, which had the purpose and effect and the defendants all understood was going to have the effect and did have the effect of increasing the prices of products sold in the United States.

Now, the plaintiffs allege -- and I just will stick to the indirect complaint. Obviously there is something of a straw man argument being made here, and I understand why they wanted to push this point so hard in the direct case because the circumstances are perhaps a little different.

MOTION HEARING   October 5, 2009

1           We are indirect purchasers.  So to say, yeah,
2   we're alleging an indirect effect, of course.
3   Everything we're alleging is an indirect effect because
4   we are indirect purchasers.  There is no doubt about
5   that.  But we are not saying that in order for our claim
6   to survive and in order for us to recover damages in the
7   United States that it is necessary that we establish
8   either a separate or a combined conspiracy that includes
9   both panels and products.
10          We have alleged that, yes, because the facts
11  show based on what we know that is true and that the
12  defendants in this case in their -- in their meetings
13  that they had, in their 500 meetings, especially at the
14  CEO level, were very concerned about and wanted to know
15  what was going to happen to the prices of products sold
16  in the United States because in order for the conspiracy
17  to make any sense and to be effective, those product
18  prices were going to have to go up.  The cathode ray
19  tube is just a paper weight and doesn't have any use
20  unless it's incorporated in something like a television
21  or a monitor.  So they clearly agreed on that.
22          Now, we have not just, though, relied on
23  allegations of meetings that occurred in Taiwan or Seoul
24  or Tokyo or wherever they happen to occur.  We have made
25  direct allegations of conduct that occurred in the

1    United States.  Of course, in saying that we've done no

2    more than say exactly what the Justice Department says,

3    which is actions in furtherance of the conspiracy were

4    carried out in the Northern District of California.

5            But beyond that, just in the LCD case where

6    Judge Illston said, and I'd like to quote 599 F. Supp.

7    2d. 1504, she relies on the fact that -- she says, quote

8    (As read):

9            Defendants complain that the complaints

10           still do not differentiate between related

11           corporate entities.  As described in the

12           complaint, the alleged conspiracy was organized

13           at the highest level of defendant organizations

14           and carried out by both executives and

15           subordinate employees.  The complaints allege

16           that the conspiracy was implemented by

17           subsidiaries and distributors within a

18           corporate family and that individual

19           participants entered into agreements on behalf

20           of, and reported these meetings and discussions

21           to, their respective corporate families.

22           Now, we have the same allegations here in

23   paragraphs 188 of our complaint, 113, 112.  And why is

24   that important?  It's because we further allege that and

25   have sued a number of defendants who are located in the

MOTION HEARING   October 5, 2009

1   United States, subsidiaries of LG, Phillips, Samsung,

2   Toshiba, Panasonic, Hitachi, Tatung, et cetera, I guess

3   it's Mr. Simon's chart basically, and these entities

4   have all been named.  And during the class period, we

5   allege and we believe to be true that all of these U.S.

6   based defendants manufactured, marketed, sold and

7   distributed both CRT's and CRT finished products to

8   customers in the United States.  And that's in the

9   charging paragraphs 51, 55, 63, 65.

10          Actually, in the interest of time, I'll just

11  refer your Honor to pages 94 and 95 of our opposition

12  brief where this is laid out in much more detail.

13          And, in fact, one of the defendants, Phillips,

14  says in their separate motion to dismiss that Phillips

15  Electronics North America Corporation's display

16  components division manufactured and sold tubes in the

17  United States prior to June 2001.

18          So if you just listen to the presentations of

19  the defendants and read their briefs, you would get the

20  idea that the only thing we're talking about here is a

21  series of hundreds of meetings that took place all

22  overseas in order to fix a product, fix panels that are

23  made entirely overseas and then through some convoluted

24  process eventually get sent to the United States and

25  that that's all we're talking about.

1        That's just not true, your Honor.  We have

2   alleged in much more detail than that specific facts

3   that these companies met and that as part of the

4   meetings that they had they agreed to fix the products

5   that were sold in the United States, the panels that

6   were sold in the United States, and that each of them

7   that were there were there with all representing from

8   their various subsidiaries and affiliates.

9        Now, let me talk about the pleading standards

10  again for a minute.  I think that the defendants

11  really -- I don't even know if they pay lip service, but

12  they certainly don't follow the rule that survives

13  Twombly and Iqbal that the complaint should be read as a

14  whole, not parsed out and that reasonable inferences

15  should be drawn in the plaintiffs' favor, not the way

16  the defendants would like to have it.

17       The Department of Justice said directly that

18  this conspiracy harmed countless Americans who purchased

19  computers and televisions using cathode ray tubes sold

20  at fixed price.

21       Now, there is no doubt not just based on that

22  statement, but based upon the allegations that we make

23  in our complaint that the defendants' conduct was aimed

24  at, directed at and harmed citizens of this country,

25  consumers in this country who are the people that we

1    represent.

2           We allege in the complaint at paragraph 223 the

3    defendants that attended the glass meetings, monitored

4    the prices of televisions and computer monitors sold in

5    the U.S. and elsewhere on a regular basis.  The purposes

6    and effect of investigating such retail market data was

7    threefold.  First, it permitted defendants to police the

8    price fixing agreement, to make sure that

9    intra-defendant CRT sales were kept at super competitive

10   levels.  Secondly, it permitted all defendants to police

11   their price fixing agreement to independent OEM's.

12   Finally, defendants used the prices of products to

13   analyze whether they could increase prices or should

14   agree to a bottom price instead.

15          The law is clear, your Honor, that -- and I

16   quote here from the Kruman case 284 F. 2d. at 395.  It

17   is the effect and not the location of the conduct that

18   determines whether the antitrust laws apply.  So what is

19   important in this case is not where the particular

20   defendants happen to hold meetings.  If that were

21   dispositive, it would be quite simple for executives in

22   this country to just get on a plane and fly over to

23   Taipei and fix prices there and say, Our agreement was

24   over there so you can't get it because what we did was

25   legal there.

Page 172

1          That's not the way the law works.  The law is
2     how was it implemented and was there an effect in this
3     country, and clearly that was the case.
4          As far as the uniformity argument that counsel
5     made, I would point out that it's not correct that all
6     of the state laws are just read to be mirror images of
7     the federal laws.  As the Arc America case said, the
8     Supreme Court case, states are free to make their own
9     rules regardless of federal antitrust laws.  And, in
10    fact, there was a recent Ninth Circuit decision in a
11    case called Yokoyama 2009 WestLaw 2634770 -- it was just
12    decided about a month ago in the Ninth Circuit -- a
13    little procedurally different, but an interesting case
14    where the Ninth Circuit reversed a district judge in
15    Hawaii who had denied a motion for class certification
16    on the basis that the Hawaii plaintiffs did not meet
17    what he perceived to be the standards for certification
18    under Rule 23, and this was a consumer protection case.
19    And the Ninth Circuit said you have to apply -- this is
20    consistent with the Erie doctrine and consistent with
21    principles of federalism, federal courts have to apply
22    the policy directives of the state.
23          So, therefore, since Hawaii had a very clear
24    mandate that they were going to read their laws
25    expansively to protect consumers, same sort mandate, of

Page 173

1    course, that exists in California and the other states

2    where we are alleging damage claims here, that means

3    that the court was in error in denying class

4    certification by failing to account for the independent

5    state policies that the states were free to impose, and

6    the same principle applies here.

7           The preemption argument I'd refer the Court to

8    the case of Waters v. Wachovia Bank 550 U.S. 1 at pages

9    35 to 36.  The defendants are arguing that the FTAIA and

10   the scope of that should preempt state laws that may be

11   to the contrary.  In the Waters case, the court said the

12   protection of consumers in deceptive and anticompetitive

13   business practices is a traditional exercise of state

14   power.  The presumption against preemption applies with

15   particular force in such circumstances.

16          Now, we agree, I think one thing I did agree on

17   in counsel's presentation, we agree that the FTAIA

18   standard does apply to our Clayton injunction claim,

19   which is a claim based in federal law.  We don't agree

20   that it applies to the claims based on state law.

21   However, because of the evidence that I've been

22   summarizing here of the conduct that occurred in the

23   United States, because beyond that there was significant

24   import commerce that is at issue in this case which the

25   FTAIA doesn't reach and because clearly this was an

MOTION HEARING  October 5, 2009

Page 174

1   increase in prices of the consumer products was a

2   direct, substantial and foreseeable effect of the

3   defendant' activity, that even if the FTAIA is held to

4   apply to the state damage claims, it's clear that our

5   allegations are not barred by the effect of those

6   claims.

7           Thank you, your Honor.

8           THE COURT:  Rebuttal?

9           MR. KESSLER:  I will try to be very efficient,

10  your Honor.  First, I agree that in looking as to

11  whether or not the state harmonization laws apply or not

12  to apply the FTAIA to the state laws as a matter of

13  state policy, you should look to the state

14  pronouncements.  He's quite correct about that.

15          In Footnote 7 on page 14 of the joint motion on

16  the indirect purchaser brief, we listed every single

17  state statute and decision which states that the state

18  antitrust laws of these specific states must be

19  harmonized with the federal rule.  They've given nothing

20  in response.  You've heard nothing in this argument in

21  response and their brief has nothing to dispute those

22  authorities.

23          In Footnote 8 on page 15 of our brief, we went

24  through all the specific state statutes and cases that

25  say their consumer protection laws must be harmonized

1   with the Federal Trade Commission Act in that regard.

2   They've done nothing to do that.  It is true that under

3   Erie you have to do a state-by-state analysis, but the

4   state-by-state analysis is completely in our favor in

5   every single state that they have relied on for either

6   the antitrust or the consumer protection, and I welcome

7   your Honor to examine those authorities in Footnote 7

8   and Footnote 8.

9         Even if they had been contrary, we believe we

10   clearly are correct, as Intel states, that contrary

11   state law would be prohibited under the Commerce Clause

12   and the Supremacy Clause.  On the Supremacy Clause

13   issues, I mentioned the Crosby case in the Supreme

14   Court, which is 120 Supreme Court 2288.  In that case it

15   specifically stated, and I'm quoting from the case at

16   2294 (As read):  And even if Congress has not occupied

17   the field -- which we agree in antitrust Congress has

18   not completely occupied the field -- state law is

19   naturally preempted to the extent of any conflict with

20   the federal statute.  That's the Supreme Court.

21         So there is preemption to the extent that the

22   states would even try to say they could cover overseas

23   foreign sales.  So I don't think that should be an

24   issue.

25         What we come down to then is what does the

MOTION HEARING  October 5, 2009

Page 176

1    complaint say, and on this point I go with what the

2    complaint allegations say, not with counsel's argument.

3    So, for example, you heard counsel tell you that they

4    have alleged that every defendant attended meetings.

5    They mentioned U.S. subsidiaries all attended meetings

6    to go to fix prices for either CRT's or televisions,

7    take your pick.

8             There is no such allegations in this complaint.

9    What they allege is very specifically, they allege

10   specifics about certain foreign companies who attended

11   foreign meetings and then in paragraph 188 they say the

12   following (As read):

13            When plaintiffs refer to a corporate family

14            or companies by a single name in their

15            allegations of participation in the conspiracy,

16            plaintiffs are alleging that one or more

17            employees or agents of entities within the

18            corporate family engaged in conspiratorial

19            meetings on behalf of every company in that

20            family.

21            So this is a sleight of hand, your Honor.  I

22   could tell you, for example, and you'll hear this when

23   we do the individual briefly, I represent PNA, a company

24   that does not manufacture CRT's.  It's a sales company.

25   There is no allegation in this complaint that it ever

1    attended any meeting with any competitor about any

2    product in this case, but you had counsel get up here

3    and say, oh, no, they're all in this.  Well, they're in

4    this through this totally conclusory paragraph which

5    does not meet any pleadings standards under Iqbal or

6    Twombly with respect to that.

7            Similarly, he read to you paragraph 223.

8    That's the same paragraph I read.  I rest on your Honor

9    reading that paragraph.  There is nothing in that

10   paragraph about any conspiracy regarding finished

11   products.  There are no agreements alleged.  There's

12   monitoring alleged, and it states why the monitoring was

13   done.  It all relates to an alleged CRT conspiracy.  I

14   stand by the words of paragraph 223.  So he liked to

15   rest on it, I'd like to rest on it.

16           Second, there is nothing in paragraph 223 about

17   the United States except monitoring United States

18   prices.  There's nothing about United States CRT sales.

19   What they state in that paragraph is that they are

20   looking at prices for finished products in the United

21   States.  For CRT's, it says nothing about U.S. prices or

22   price fixing for CRT's and there is nothing in the

23   entire complaint.  Again, how hard would it be if they

24   had a basis to have one allegation to say at this

25   meeting these defendants met and fixed prices of USC

MOTION HEARING  October 5, 2009

Page 178

1    RT's sold in the United States?  They have not one
2    allegation about that.
3            Finally, with respect to paragraph 63, 65, 51,
4    55, he gave you all these things saying we allege that
5    they all produced, manufactured, sold, distributed CRT's
6    and products.  That's not what they allege.  This is the
7    language they use every time.  Take 51 as an example.
8    They lump everything together and they'll say -- so
9    looking at 51 (As read):  During the class period LG
10   Electronics U.S.A., Inc., manufactured, marketed,
11   sold -- and the lawyers -- and/or distributed CRT
12   products.  So what does that mean?  We don't know from
13   that allegation do they manufacture it, market, sell it
14   or distribute it.  It's all different.  A CRT product.
15   Is it a television, is it a monitor, is it a tube.
16   There is no way to tell.
17           This is how they do every single allegation.
18   They don't allege that the companies did it all.  They
19   let you guess and say it did one of these things between
20   one of these products.  You figure it out.  That has
21   never been the proper standard of pleading.  It's
22   certainly not the proper standard of pleading after
23   Twombly and Iqbal.
24           Your Honor, this case does not have state facts
25   for subject matter jurisdiction and at a minimum, at a

MOTION HEARING  October 5, 2009

1   minimum, to cut this case down we implore you to write

2   an opinion that says since they don't disagree with us

3   that there is no basis for them to assert any claims as

4   indirect purchasers of televisions which involve alleged

5   price fixing of CRT's overseas just because they came

6   in.

7           I should say this.  He said Intel didn't hold

8   that.  I don't know what he's reading in Intel, and he

9   was in Intel, so I don't know what he's looking at, but

10  what Intel says is exactly what I quote as follows (As

11  read):

12           The FTAIA --

13           And they're actually quoting Phosphorus.

14           -- explicitly bars antitrust actions

15           alleging restraints in foreign markets for

16           imports that are used abroad to manufacture

17           downstream products that may later be imported

18           into the United States.  Clearly the domestic

19           effects of such a case, if any, would obviously

20           not be direct, much less substantial or

21           reasonably foreseeable.

22           That is dispositive of the indirect purchaser

23  complaint as well as the direct purchaser complaint.

24  I'm sorry, I couldn't resist that.

25           THE COURT:  All right.  What is the next