1    subject matter?

2         MR. YOHAI:   Next is AGC as applied to the state

3    laws, and I will try not to duplicate.

4         Your Honor, defendants believe that AGC is the

5    proper test for antitrust standing and 14 of the 17

6    states in which plaintiffs have asserted state antitrust

7    claim.   This is important because under like the

8    directs, the indirects have claimed under state law and

9    they only claim under 17 states.   If 14 of them are

10   barred, they really don't have much left in state law

11   claims.   It's also important for every state that your

12   Honor finds AGC applies, that's obviously less damages.

13   It's significant to us.   It's significant for both

14   parties to understand which states are in and which

15   states are out.

16        Nine of the 14 states that we argue AGC under

17   have expressly an applied AGC.   That's California, Iowa,

18   Kansas, Michigan, Nebraska, North Dakota, South Dakota,

19   Vermont and Wisconsin.   It's very clear the courts in

20   those states have applied AGC.   Then we have five other

21   states, which make up the 14, five other states that

22   have harmonization statutes that say you must construe

23   the state antitrust laws in accordance with federal law,

24   and we contend that that would mean that AGC would also

25   apply.

MOTION HEARING   October 5, 2009

Page 181

1          The DRAM decision at 516 Fed. Supp. 2d. 772

2   which I mentioned earlier today does this exact analysis

3   and applies AGC in those 14 states.  And we think that

4   the DRAM decision is the only decision that carefully

5   considered AGC in this context.

6          Now, plaintiffs will tell you about Judge

7   Alsup's decision in the GPU case and they'll tell you

8   about Judge Illston's decision in the LCD case, but what

9   did those judges do.  Judge Alsup said I'm not going to

10  apply AGC unless it's clear that the highest court in

11  the state would apply AGC.  So he only applied it to a

12  couple of states because the highest court in those

13  states applied it.  So he applied it in Iowa, and he

14  also applied it in -- and he also applied it in

15  Nebraska.

16         But he essentially ignored appellate decisions

17  by courts in the other states that apply it, trial court

18  decisions that apply it, without any discussions as to

19  why.  He just said we're not going to do the

20  back-breaking labor to figure out whether it applies in

21  these various states.  He doesn't explain why he

22  wouldn't do that and he does apply it in two of the

23  states.  In Flash, the judge applied it in four of the

24  states.  In LCD, the judge applied it in three of the

25  states.

1        I would submit to you that if the state laws,
2   if the state courts are applying AGC, there is no basis
3   for a federal judge not to apply AGC absent some
4   decision by a higher court saying we're not going to
5   apply it.  You can't pick and choose and say, oh, we're
6   not going to apply it at all when the only cases
7   discussing actually apply it.
8        That's why we think all 14 it should absolutely
9   be applied.  In addition, it should be applied on the
10  state consumer protection statutes in Nebraska and New
11  York because they have said --
12        THE COURT:  Is that in addition to the 14?
13        MR. YOHAI:  Yes, in addition to the 14.  In
14  Nebraska and New York there are state consumer
15  protection statutes where the state courts have said,
16  and I quote first from Nebraska (As read):  The standing
17  requirements for an antitrust claim under the Consumer
18  Protection Act should be the same as an antitrust claim
19  under the Junkin Act.  And then similarly in New York
20  they apply the same tests.  So for that reason, too,
21  they would apply AGC.
22        So once you have the analysis of as to why AGC
23  should apply to the states, then you go to, well, how
24  does it apply, and that I think has some similarities to
25  what I discussed earlier today.  I'm not going to repeat

1    all of it, but the key, the number one factor is

2    antitrust injury, whether the plaintiffs' injury is of

3    the type that is sought to be redressed by the antitrust

4    laws.  You also have directness of the injury -- these

5    are the AGC factors -- the speculative measure of the

6    harm, the complexity in apportioning damages, and the

7    risk of duplicative recovery.  Those are the factors,

8    the five factors, as set forth by the Ninth Circuit in

9    the Bond case.

10        So I'd like to talk about those factors.

11   Antitrust injury, first factor.  The indirect

12   plaintiffs, unlike the direct plaintiffs, run into a

13   square allegation again them.  They write in paragraph

14   227 that there is vigorous price competition in the TV

15   market.  That's their own allegation.  We didn't tell

16   them to put that there.  It's in their complaint.  If

17   there's vigorous competition in the TV market, they're

18   all purchasers of the TV, they're not purchasers of CRT,

19   the indirects are purchasers of TV.  So if there's

20   vigorous competition in the TV market, that's really the

21   end.  And, again, this is squarely from their complaint.

22        DRAM acknowledged these problems in the DRAM

23   case.  They said, look, in our current environment in

24   the world a lot of markets can be said to be related.

25   Here they try to relate the CRT's and the TV's.  That's

1  not the way we should analyze it.  The question is are
2  they in the same market, not are they in a related
3  market.

4        And the test for whether they're in the same
5  market is are the products reasonably interchangeable
6  and is there cross-elasticity of demand.  Reasonably
7  interchangeable.  TV's and CRT's are not reasonably
8  interchangeable.  You can't watch a CRT tube.  Nothing
9  would happen.  You could set it on a table, but you're
10  not going to watch any TV programs.  They're not
11  reasonable interchangeable and no one would even
12  seriously argue that they are.  The fact that they're in
13  related markets is not relevant.  And that's what DRAM
14  held.

15        Also, let's look at the remoteness factors.
16  The indirect plaintiffs have more problems than the
17  direct problems further down the chain.  They have no
18  direct purchasers, according to the directs they have
19  some direct purchasers.  The indirects have no direct
20  purchasers.  They're all indirect plaintiffs and there's
21  multiple layers, as I was saying earlier today.
22  Somebody, Panasonic can buy a CRT from someone, put it
23  in a Panasonic TV, sell it down the chain, sells it to
24  Best Buy.  They're not even Best Buy.  They're the
25  consumer who buys at Best Buy.  So there's problems

1    figuring out where was the pass-on in all these various

2    layers.  Was it from the original sale of the CRT?

3    Directs say that's the overcharge right there, the

4    original sale.  Okay.  Well, that's the overcharge.  Did

5    that then get passed down to the next layer in the

6    chain?  Did it get passed down to the time when Best Buy

7    bought it?  Maybe, maybe not.  How about when the

8    consumer bought it from Best Buy?  Did it get passed

9    down all the way to the last level, to the consumer

10   level?  Not clear.

11         All these things, all these problems are

12   reasons why courts have found under AGC that there does

13   reach a point where the injury is too remote and you're

14   not going to be able to figure out how much of the

15   overcharge was passed on there through all these various

16   layers.

17         In fact, there's question whether there was

18   injury at all.  It's speculative.  Given the CRT was

19   merely a component of the TV, obviously there are other

20   factors that go into building a TV.  It's not clear.

21   The speculative nature of the damage is important there,

22   too.

23         Finally, you have the issue of duplicativeness.

24   The directs are saying they're entitled to the

25   overcharge.  Well, if the overcharge was at the direct

1   portion of it, a retailer when a retailer bought it, how
2   could it also be when the retailer then sells it to the
3   consumer?  It can't be both.  If you paid too much at
4   the retailer phase, then they should win.  If you paid
5   too much at the next phase, then the indirects, but it
6   can't be both.  So if they're saying the overcharge was
7   when the directs purchased, the indirects should have no
8   claim.

9           Finally, your Honor, the indirects spent pages
10  and pages telling you about the Lorix case in Minnesota
11  and how that applies AGC and why that's important.  But
12  we're not challenging Minnesota.  Minnesota is one of
13  the three states that we are not challenging because
14  there is a high court there that says that AGC does
15  apply.  So that entire discussion, I don't know why it
16  consumes pages and pages of their brief, is irrelevant
17  to the states that we're talking about which I've listed
18  for you.

19          In sum, your Honor, AGC should apply.  There's
20  no reason not to apply it.  The courts in those very
21  states have applied it, and it should apply to bar the
22  indirect claims.

23          MR. CORBITT:  Thank you, your Honor.  Craig
24  Corbitt again for the indirect plaintiffs on this issue.
25          DRAM is another case I happen to know quite a

Page 187

1   bit about from being involved in it quite a bit.  So I'd

2   like to point out the current procedural posture of that

3   case and then get down to what Judge Hamilton actually

4   ended up deciding there.

5        There were two motions.  There was an initial

6   motion to dismiss that was granted.  It actually was a

7   12(b)(3) motion after several years into the case and

8   after quite a bit of discovery had taken place already,

9   not a motion made at the outset like is being made here,

10  and Judge Hamilton granted that motion holding that,

11  first of all, AGC applies to all these various states

12  and that in applying those factors the balance tipped in

13  favor of the defendants.  And I think she held four out

14  of the five of them they went for the defendants.

15       There then was an amended complaint.  We made a

16  motion to amend the complaint which the judge granted,

17  filed an amended complaint which contained at least in

18  terms of antitrust injury and the pass-through factors,

19  and I'll now get to the importance of this vigorous

20  competition allegation in a minute because we've heard

21  about that several times today and how that's supposedly

22  inconsistent with our injury.

23       The second time around Judge Hamilton again

24  granted the motion, however, she said that, and I'll

25  quote here from 536 F. Supp. 2d. 1129.  It's actually on

1    page 1149, I believe.  (As read):

2                    The directness of the injury, the

3                    speculative nature of the harm and the

4                    complexity of apportioning damages, the court

5                    inclined to find that plaintiffs' revised

6                    allegations do sufficiently address the court's

7                    prior concerns and that these factors now tilt

8                    in plaintiffs' favor at the pleading stage.

9                    She dismissed the complaint, however, because

10   she believed that the antitrust injury requirement

11   required the plaintiffs and the defendants to be in the

12   same market and that by definition, I guess, because we

13   are indirect purchasers in that case as well as this

14   case, you can't be in the same market because there are

15   levels of intermediaries in between.

16                    There then was a 1292(d) motion in which the

17   court granted finding that there was a substantial

18   ground for a difference of opinion and that it was not

19   all certain that she was correct.  The case is now on

20   appeal in the Ninth Circuit.  It has been briefed, but

21   no argument date has been set.  The California Attorney

22   General filed an amicus brief supporting the plaintiffs'

23   position in that case and said that Judge Hamilton had

24   gotten the law completely wrong at least with respect to

25   California.

1          Why do I go into DRAM at such length here is

2   because that's really the only case they've got that

3   they rely on.  You know, counsel talks about decisions

4   in all these other states.  The only ones I'm aware of

5   that actually got to an appellate level there was the

6   Minnesota Supreme Court case which said that AGC does

7   not apply, and that was one of the cases arising out of

8   the Visa and MasterCard tying litigation where the

9   allegation was that anyone who went into the store and

10  bought a product, the price of a pack of gum was raised

11  by some incremental amount because the purchaser had to

12  pay a fee to the banks supplying the Visa and MasterCard

13  because they were forced to carry the debit card as well

14  as the credit card.

15          The Fourth Circuit in the Microsoft litigation

16  held that AGC does not apply at least in the courts

17  within that jurisdiction, which includes North Carolina,

18  and I presume that's why they're not moving with respect

19  to North Carolina in this case.

20          So here again, though, as with the FTAIA,

21  although we don't think AGC applies at all, the end

22  result is that it really doesn't matter in terms of the

23  end result because whether or not AGC applies, the fact

24  that AGC does apply or doesn't apply, if your Honor

25  finds that it does for any or all of these states, then

MOTION HEARING   October 5, 2009

1   the question is whether it is appropriate to dismiss the

2   complaint that alleges all these state law allegations

3   at the pleading stage, and we think that Judge Alsup and

4   Judge Illston and Judge Armstrong recently in the Flash

5   Memory case, all of whom reached opposite conclusions

6   from Judge Hamilton, got it right; and Judge Alsup in

7   particular said that it's not appropriate for a federal

8   judge when the law is not clear in these various states

9   to just in an ipsa dixit fashion decide what that law

10   ought to be and make a determination at the outset of

11   the case, that in fact it's going to depend in part on

12   what the proof shows exactly how remote the indirect

13   purchasers claims are and how difficult it to be to

14   prove damages and so forth.

15          Now, the allegation that there is vigorous

16   competition in the OEM market and the retailer market

17   with Best Buys and so forth, yes, we do allege that and

18   that is not all inconsistent with injury to the

19   consumers.  In fact, as a matter of economics, that

20   allegation that there is vigorous price competition at

21   the intermediate level means that there is going to be

22   pass-through of an overcharge from the top level down to

23   the bottom level; and the defendants, I don't know if

24   they have already, but when they retain economists in

25   this case to advise them, their economists will tell

Page 191

1    them because that's in every standard economic textbook

2    that studies these issues, that's how pass-through

3    works.

4            We know that there is vigorous competition at

5    that level, and we are not contending that there was any

6    conspiracy among Dell and HP and Best Buy and all those

7    people.  We don't have to prove that.  In fact, if we

8    allege that, it might be inconsistent with what we were

9    saying here, but, in fact, we say there's vigorous price

10   competition because that shows pass-through.

11           THE COURT:  That shows what?

12           MR. CORBITT:  That shows pass-through of an

13   overcharge.  That's the reason of stressing the fact

14   that there's vigorous price competition at the

15   intermediate levels.

16           Now, the defendants' argument really proves way

17   too much if you accept what they're saying.  Indirect

18   purchaser litigation as defined by the various state

19   repealer statutes and in a couple of states decisions of

20   the highest courts of the states that indirect

21   purchasers have a right to sue, those cases, virtually

22   all of them, at least the most significant ones that

23   have been litigated in state court, involve component

24   products.  Two examples of that are the vitamin

25   antitrust litigation and the Microsoft case.

1          In Microsoft, the allegation in California
2    where there was a $1.1 billion recovery and the case
3    went up, on the settlement at least, to the California
4    Supreme Court and was affirmed.  In that case the
5    allegation was that as a result of Microsoft's conduct
6    the people who bought computers that had Windows
7    installed on it and Word and Excel installed on it paid
8    more for their computers than they otherwise would have
9    by virtue of Microsoft's unlawful conduct.
10          And under the defendants' analysis of AGC and
11    what that case should stand for, it would have been
12    impossible and that litigation never would have
13    proceeded off of square one.  And those arguments, you
14    know, frankly, I don't think that the Microsoft would
15    say, which litigates every other issue about as
16    vigorously as anyone can, and their lawyers even thought
17    that they could make that argument with a straight face.
18    But that just would not have happened.
19          The argument that there is going to be some
20    problem with duplicative recovery in this case, well,
21    this is what indirect purchaser litigation is about, and
22    the argument, the same argument was made to the U.S.
23    Supreme Court in the Arc America case that states cannot
24    be allowed to set their own laws and to do something
25    inconsistent with federal law because that might, you

1   know, result in overpayment or mess up the system.

2          And those arguments have been completely

3   rejected because the states are free to make their own

4   laws and enforce their own laws in this area, as

5   recently affirmed by the Yokoyama case in the Ninth

6   Circuit that I talked about when I stood up here a few

7   minutes ago.

8          The way it was historically done in these cases

9   prior to the enactment of the Class Action Fairness Act,

10  which I guess was about four years ago, was that the

11  federal cases, the direct purchasers cases would proceed

12  under the Sherman Act in state court and the indirect

13  cases for the consumers would proceed under the various

14  state courts.  Particularly in California, there were

15  many, many such cases -- your Honor may be familiar with

16  them -- in the California Superior Court with complex

17  litigation with Judge Kramer and Judge Pollack which

18  essentially were just indirect purchasers' allegations

19  of the same complaints that were asserted in federal

20  court.

21         Now, the law has changed in terms of the

22  jurisdiction of the federal courts because CAFA has

23  created federal jurisdiction in diversity over claims

24  that previously would only have been filed in state

25  court.  But that does not mean that the fact that state

1   cases that were in federal court that were in state

2   court and now by virtue of CAFA are in federal court,

3   that all of a sudden the plaintiffs in those cases lose

4   substantive rights that they would have had previously

5   under state law.

6          That is totally contrary to the Erie Railroad

7   versus Tompkins doctrine and to the principles of the

8   federal versus state jurisdiction and comity.  You can't

9   just import and apply federal laws and federal policies

10   to say that state court statutes and state laws can't

11   proceed.

12          I don't know that there have been -- I don't

13   think there has been, although lawyers in this room may

14   know of one.  I don't know of any case yet under CAFA

15   where there has been actually litigated all the way

16   through to the end with judgments and a determination

17   had to be made about how to apportion the damages, but

18   the fact of the matter is under the law as it has

19   existed in this country since Illinois Brick and since

20   the state court repealer statutes were enacted in

21   California in the 1980's, you could have, as I said,

22   these parallel cases proceeding in both courts and it

23   was at least theoretically possible for there to be

24   duplicative recovery, not only by the direct purchasers

25   who were not subject to the pass-through defense because

1    of the handover issue, but also that the indirect

2    purchasers could recover in state courts.

3         It's now been criticized by the Antitrust

4    Modernization Commission and others say we ought to

5    change the law and make it so there is some sort of

6    apportionment process in the federal court, but that

7    hasn't happened and may never happened, but it certainly

8    is not the case now.

9         But the short answer to the question of you

10   would apply AGC in such a way as to bar an indirect

11   purchaser claim because of the possibility of

12   duplicative recovery is just a Catch-22.  It can't be

13   the rule.  Otherwise, AGC would have the effect merely

14   by virtue of a diversity law that brings indirect claims

15   into federal court of barring an otherwise valid state

16   court claim.

17        So for all these reasons, your Honor, Judge

18   Hamilton's opinion, I submit, stands alone.  There is no

19   decision that we've been referred to of the highest

20   court of any state that agrees with her, and those that

21   have decided the issue at all, such as Minnesota, have

22   gone the other way.  The history of indirect purchaser

23   litigation in state courts in the Microsoft cases and

24   otherwise is completely inconsistent with the

25   application of this rule, and we think that the

1    defendants' argument should be rejected.

2            THE COURT:  Rebuttal?

3            MR. YOHAI:  Just quickly, your Honor.  I don't

4    understand this argument about how something different

5    would be going on in federal court than in state court.

6    Our point is that the state courts would bar these

7    claims, too, under AGC whether they were brought in

8    state court or brought in federal court.  Counsel says

9    that he's not aware of any state appeals courts

10   addressing these AGC issues.  We cite them in our brief.

11   The Iowa case from the highest court in Iowa, the

12   Nebraska case from the highest court in Nebraska.  Both

13   supreme courts of those states.  That's laid out in note

14   13 and 14 of our opening brief.

15           Counsel seems to have a problem with the

16   procedural posture of the DRAM.  He said something about

17   12(b)(3) where there was discovery taken or something.

18   I read you from DRAM at 516 Fed. Supp. 2d. 1083.  (As

19   read):

20           The standard applied by the court in

21           treating a motion for judgment on pleadings is

22           the same as that applied by the court in

23           consideration a motion to dismiss under

24           12(b)(6).

25           And it then goes on to apply the standing

MOTION HEARING  October 5, 2009

Page 197

1    analysis under 12(b)(6).  12(b)(6) case, it's a

2    pleadings case.  I don't understand the argument of a

3    procedure posture being an issue.  The subsequent

4    decision was also on the pleadings.

5              Finally, your Honor, counsel says that it's not

6    inconsistent to say there was vigorous competition

7    because there was pass-on.  I would submit to your

8    Honor, well, there there's vigorous competition not only

9    amongst CRT TV's, but amongst TV's, LCD TV's, plasma

10   TV's, and CRT TV's, that whatever the pass-on argument

11   is, the TV pricing if, as they say, it is competitive

12   and all these things are coming to bear, the TV pricing

13   is going to be a competitive market.  So the fix in the

14   CRT market, if there is one, would in a sense be

15   irrelevant to the TV market if there is vigorous

16   competition coming from these other products which have

17   nothing to do with CRT's.  They all compete.  They're

18   interchangeable.

19             So for those reasons and others, I think the

20   AGC argument here is very much a winner for us on

21   various states and that you can't just apply -- we're

22   not federalizing it at all.  We're saying look at the

23   states' laws.  The states themselves would bar these

24   claims.  Thank you.

25             THE COURT:  All right.  Next argument for the

1  moving party defendants.

2       MR. KESSLER:  I think the state law claims

3  would be next.

4       THE COURT:  What issue are you going to talk

5  about?

6       MR. KESSLER:  This is state-by-state value of

7  claims, not AGC, just based on each state's

8  requirements.

9       MR. SCARBOROUGH:  Good afternoon, your Honor.

10  I'm Mike Scarborough with Sheppard Mullin here for the

11  Samsung SDI defendants, and specifically the issues

12  we're going to be talking about are listed in issues

13  three, four and five in the statement of issues to the

14  joint motion to dismiss the indirect complaint and I

15  believe that also tracks in the table of contents in the

16  briefing.

17       The first one we want to talk about the

18  retroactive application of Illinois Brick repealer laws.

19       MR. SAVERI:  Are we talking about the directs

20  now again?

21       THE COURT:  Yes.

22       MR. SCARBOROUGH:  Yes.

23       THE COURT:  So you're going to talk about the

24  insufficiency of the pleadings in each of the states.

25       MR. SCARBOROUGH:  That's right.  We talk about

Page 199

1    the Illinois Brick repealers and then various procedural

2    and substantive defects with the Consumer Protection

3    Act.

4            THE COURT:  That's the portion beginning

5    roughly at page 20 of your opening brief?

6            MR. SCARBOROUGH:  That's right, your Honor.

7    We've been talking today about the Illinois Brick

8    repealer laws that have enabled the indirect plaintiffs

9    to bring their claims, and some of those repealer

10   statutes were passed during the time period that's at

11   issue here going back to the mid '90's.

12           We've looked carefully at those repeater

13   statutes and three of them are real problems for the

14   plaintiffs in that it's very clear under Hawaii,

15   Nebraska, and Nevada law that you can only apply those

16   statutes prospectively.  You can't do it retroactively.

17           In Hawaii there is a Supreme Court case,

18   Supreme Court of Hawaii case that's directly on point

19   and says you can't apply this statute retroactively and,

20   in fact, the plaintiffs have conceded that point.  In

21   Nebraska and Nevada, there is very similar authority.

22           In Nebraska, the Supreme Court of Nebraska has

23   said very clearly that a legislative act operates only

24   prospectively and not retroactively unless the

25   legislative intent and purpose that it should operate

1   retrospectively is clearly disclosed and that's the

2   ConAgra case at 653 Northwest 2d. 655 and 658, and

3   that's from 2002.

4          And there is nothing in any of the authority

5   that plaintiffs have cited to us that would disclose

6   such an intent.  Instead, what we have is a couple of

7   cases that are completely distinguishable.  We've got

8   one where the Nebraska --

9          THE COURT:  I don't want you to go through

10  every one of the cases and argue the cases.  You focus

11  me on what the arguments are and your position, and

12  you've done that here by pointing me to pages 20 to 21.

13  When plaintiffs get up to reply, I just want them to

14  give some citation and case authority.

15         MR. SCARBOROUGH:  I'm happy to move it along.

16         THE COURT:  You don't have to go through this

17  case by case by case.

18         MR. SCARBOROUGH:  Well, my point, your Honor,

19  is simply that we've got a clear mandate from the

20  Nebraska Supreme Court that says you have to have a

21  clear legislative intent to apply retroactively.  We

22  don't have it.  It's the same thing in Nevada.  That

23  case is cited in our brief as well.  We don't have it

24  here.  That takes care of the retroactivity issues.

25         The next issues pertain to plaintiffs' consumer

1    protection claims, and in both Hawaii and Rhode Island

2    there is an issue that broadly pled a class that would

3    apply to both natural persons and to business entities.

4    Both of those statute are clear that the only persons

5    who can make claims are natural persons and all those

6    people have to be making those purchases for personal,

7    family or household use.  So any claims that don't fit

8    into that definition have to be thrown out and the class

9    definitions have to be restructured to eliminate all of

10   those business entity claims.  That's a problem with

11   both Hawaii and Rhode Island.

12          THE COURT:  Okay.

13          MR. SCARBOROUGH:  Okay.  With respect to

14   Massachusetts, we've cited authority that says before

15   you make a Massachusetts consumer protection claim

16   you've got to file a precomplaint written demand that

17   specifically says what the problem is, gives the

18   defendants an opportunity to cure.

19          The plaintiffs haven't disputed that that's a

20   requirement under that claim.  Instead, they've said

21   that we don't -- we're exempt from that because

22   defendants haven't shown that they maintain a place of

23   business or keep assets in the state.

24          Well, what they're trying to do is qualify for

25   an exemption in the statute.  They're trying to throw

Page 202

1    the burden back on the defendants to say you've got to

2    prove that and show that.   Well, those facts are not

3    alleged anywhere in the complaint and in fact what is

4    alleged in the complaint is really the obverse.   They've

5    said that defendants engaged in trade or commerce in

6    Massachusetts and that they sold, distributed or

7    obtained products this Massachusetts, and all of that

8    suggests that at the very least plaintiffs need to

9    replead to show that this exemption somehow applies or

10   they've somehow complied with the written demand

11   requirement.   They haven't done either one of those.

12          With respect to the New York consumer

13   protection claim, there's really two separate problems

14   there.   One is that they've really not alleged deceptive

15   conduct.   We touched on this in context of the statute

16   of limitations argument, some of the other arguments as

17   well.

18          Very briefly, the case law which I encourage

19   your Honor to review, we've cited quite a few different

20   cases, including many from New York, that talk about

21   price fixing, talk about the mere fact that you had a

22   price fixing case does not inherently mean that it's

23   deceptive, and the fact that you've concealed the

24   existence of the conspiracy from the plaintiffs does not

25   equal deceptive conduct.

1           There is really nothing more than that alleged
2      here than that there was a conspiracy and defendants
3      didn't tell us about it.  So that's one of the problems
4      with their New York consumer protection claim.
5           The other is that they have not alleged that
6      this so-called deceptive conduct was directed at New
7      York consumers.  We have one very vague statement on
8      which the plaintiffs rely and they quote in their brief
9      that says (As read):  Defendants collectively made
10     public statements about the price of CRT products that
11     defendants knew would be seen by the New York
12     plaintiffs.
13          Number one, that doesn't say that it was
14     directed at the New York plaintiff, which is required
15     under the law.  The second part is it's completely vague
16     as to what that statement was.  If it's a specific
17     statement that it's reasonable to believe a New York
18     plaintiff would have seen, what is it?  What's the
19     context of it?  At least a general description of in the
20     world they're talking about.  We don't have any of that.
21          Finally, on the consumer protection claims,
22     Rhode Island has a very specific statute that lists
23     certain practices that are proscribed by it, and if you
24     don't fit within -- there's about 19 different specific
25     practices.  If you don't fit in any of these buckets,

Page 204

1    you don't have a claim.  And we cited a case from the

2    Rhode Island Supreme Court that says these types of

3    claim, an antitrust conspiracy claim, does not fit in

4    the bucket; and, therefore, it doesn't -- it is not an

5    actionable claim under the statute.

6              Moving on to the unjust enrichment claims.

7              THE COURT:  Hang on one minute.  All right.

8              MR. SCARBOROUGH:  And that Rhode Island case is

9    the Barbra Streisand case, ERA Max.  Moving on to the

10   unjust enrichment claims, in three of the states we've

11   cited authority to your Honor that say you have to show

12   that plaintiffs conferred a direct benefit on defendants

13   and those states are Michigan, Kansas and New York.

14   And, again, this is the common law of unjust enrichment

15   in those states.

16             So we cited cases to that effect, and what we

17   got in return from plaintiffs in their opposition was a

18   citation to lots of different cases that say you don't

19   need privity of contract for an unjust enrichment claim;

20   and that's not something we disagree with them with.

21   That is in fact the law in those states, and that's

22   fine.

23             We're making a different point.  We're saying

24   you have to confer a direct benefit on the defendants.

25   Otherwise, you have no claims.

1       And the context of the types of cases that

2  plaintiffs cited back to us were, they're all basically

3  subcontractor cases where a subcontractor didn't have a

4  contract with the homeowner but nonetheless they were

5  able to state a claim because they had conferred a

6  benefit directly on the homeowner, whoever owned the

7  property.  And that was simply a recognition that you

8  don't need privity of contract, but you do need a direct

9  benefit conferred.  So that's in effect with respect to

10  Michigan, Kansas and New York.  Okay?

11       THE COURT:  Uh-huh.

12       MR. SCARBOROUGH:  A more fundamental problem

13  with some of the unjust enrichment claims in

14  specifically Massachusetts and Rhode Island is what the

15  plaintiffs are trying to do is they're trying to get

16  around those facts haven't passed Illinois Brick

17  repealers.  They're trying to do an end run around

18  Illinois Brick.  We cited legion cases saying that you

19  can't do this.  Those include the Terazosin case, the

20  Microsoft case LCD, we just went through this, GPU, New

21  Motor Vehicles, Kaydour.  In all those cases they said

22  you can't replead what is fundamentally an antitrust

23  price fixing claim, dress it up as unjust enrichment

24  claim and bring it an indirect purchaser in court in a

25  state wherein direct purchasers are barred.  That's the

1   claim under Massachusetts and Rhode Island law.

2           And really that same principle should apply

3   with respect to the AGC argument that Mr. Yohai was just

4   talking about.  To the extent that your Honor finds that

5   the antitrust and consumer protection claims under the

6   states that he had identified, that those claims have to

7   fall, then you can't allow an unjust enrichment claim

8   that is fundamentally the same to proceed when those

9   states have decided you can't go forward, these

10  consumers don't have standing to pursue a claim.  It's

11  the same principle that applies with respect Illinois

12  Brick.

13          And then finally my last point, your Honor, is

14  that we cited a U.S. Supreme Court case, the Carol

15  Hollius (ph) case that says when you have a statute that

16  provides an express remedy that you've got to be really

17  careful before allowing additional remedies under common

18  law, and that really those express remedies should be it

19  absent some sort of extra intent to provide additional

20  remedies.

21          And what plaintiffs said in response to that is

22  they gave us a string cite of cases that said under the

23  laws that we're suing under these remedies cumulative,

24  but if you look at -- if you actually go and look at

25  those citations, that's not what they say at all.  They

1   say things like the remedies provided in this section,

2   under this consumer protection law are cumulative within

3   that section.   They don't say they're cumulative of any

4   other remedies that may be out there under any other

5   laws, and I can go through them.

6          That's the case with Hawaii, and Kansas and

7   Nevada and West Virginia, and that's generally the types

8   of citations they've provided to your Honor.   I point

9   also out they haven't provided any citation at all for

10  Nebraska, North Carolina or Wisconsin claims.

11         So I'll leave it at that for you, your Honor.

12         THE COURT:   Thank you.

13         MR. ALIOTO:   Mario Alioto.   I'll be responding.

14  I wonder if we could take a short break, just two or

15  three minutes.

16         THE COURT:   All right.   Bio break.   3:00

17  o'clock, please.

18         (Recess taken.)

19         THE COURT:   Okay, Mr. Alioto.   Let's go.

20         MR. ALIOTO:   Thank you, your Honor.   I'll be

21  responding on the state law claims and summarizing our

22  arguments only, your Honor.   I'm not going to reargue

23  what's in the brief.

24         THE COURT:   Thank you.

25         MR. ALIOTO:   Three states we have a

Page 208

1    retroactivity issue.  We've actually narrowed this down

2    to two states.  Hawaii, we have stated in our papers

3    that we concede that there is no retroactivity in that

4    statute.  We're not going to be making any claim for

5    retroactivity under the Hawaii statute.

6              Two remaining states, Nebraska and Nevada, we

7    are claiming retroactivity.  The argument under -- with

8    respect to the Nevada statute is simple.  We rely on the

9    Pooler case, P-o-o-l-e-r, cited and discussed in our

10   brief.  Right on point.  It's the last pronouncement on

11   the subject, and that's the basis for our argument that

12   it's retroactive.

13             With respect to Nebraska, counsel posed that as

14   an issue of statutory interpretation.  Retroactivity.

15   It's a little slightly different than that, your Honor.

16   It involves a chronology, an understanding of chronology

17   and here's the important points.

18             You have two statutes, two Nebraska statutes

19   that we have sued under.  Those statutes provided relief

20   to indirect purchasers.  They've been on the books in

21   that state for quite some time.  One dates back to the

22   1900's.  The other dates back many, many years as well.

23   They provided for relief for indirect purchasers.

24             The law changed in Nebraska not because of any

25   pronouncement by the Nebraska legislature but because of

Page 209

1    the Illinois Brick decision.  That happened in 1977, I

2    believe.  1977.  So that was the change in the law.  Had

3    nothing to do with Nebraska passing any enactment.  Had

4    to do with that Supreme Court case.

5         Some years later Nebraska passed a repealer.

6    They said, no, we want to go back to the law as it was.

7    We want to give indirect purchasers the right to sue

8    under these statutes.  So that repealer, it's not really

9    a new statute, your Honor.  It's not really giving a

10   cause of action.  It's reinstating something that

11   existed under those statutes in the past.

12        If you look at these arguments in terms of that

13   chronology, I think we'll get to the right result there.

14   These claims are made in these types of cases, this

15   Nebraska claim retroactivity going back all the way to

16   1996.  This is being raised in the SRAM case.  It's a

17   live claim in that case, it survived and it should

18   survive in this case.

19        With respect to consumer protection statutes,

20   there are three at issue, Massachusetts, New York and

21   Rhode Island.  The Massachusetts challenge is just a

22   simple technical requirement that a demand must be made

23   upon the defendant as a condition precedent to bringing

24   the suit.  The statute itself recites that there is no

25   need to make that demand if the defendant does not

1    maintain an office or hold assets in the state.  So the
2    whole question here revolves around whose burden is it
3    to show that.
4            We contend, and we have case authority that
5    supports the proposition, the defendant has to show
6    that.  They have to show that.  That's information
7    within their knowledge and that's their burden to show
8    it.  If they show it, we would have to do a demand.
9    There is no evidence of that anywhere in the complaint.
10   We don't have to make a demand.  The claim is fine as
11   stated.
12           The respect to New York, I'm not going to go
13   into the cases.  I'm just going to tell you, your Honor,
14   that those cases have been cited in three courts, four
15   courts.  Your Honor has heard during the course of this
16   argument there's cases pending in the Northern District,
17   all component cases, the LCD case, of course, the LCD 2
18   and the LCD TV, there's also the SRAM, static random
19   access memory chips, and computers, graphic processing
20   units, the units that give pictures in computers and
21   whatnot, the flash memory case.  These are all four
22   cases pending in this district, all very similar to
23   this.
24           The New York consumer protection claim has been
25   sustained in all of those cases.  To make this just a

Page 211

1    little clearer, a little more precise, it's been raised,

2    the challenge has been raised in some of those cases and

3    not raised on other of those cases.  The point being

4    it's a live claim in LCD, SRAM, GPU, and Flash.

5              There have been dispositions on this issue very

6    recently in those four cases, and we took our

7    allegations obviously from the allegations in those

8    cases.  The theory is if they passed muster there, they

9    should pass muster here.

10             Rhode Island, two issues, there is language in

11   the statute there that it only applies to natural

12   persons.  That's conceded by us, your Honor.  There is

13   no challenge on that.  We're not going to be making any

14   claim for anyone other than a natural person.

15             Again, that battle has been fought.  The briefs

16   are very similar to the briefs that have been filed

17   here, almost exactly the same authorities in LCD, SRAM

18   and one other very current recent case outside of this

19   district, the chocolate litigation, In re Chocolate

20   Confectionary case.  All of those cases have sustained

21   the claim.

22             The three states having to do with a direct

23   benefit and privity, Michigan, Kansas and New York.

24   Michigan again sustained in LCD and Cardizem.  Kansas we

25   rely on the Babcock case.  It's a case that says where

1   there is an element of misrepresentation, which we've
2   alleged here, that there need not be any direct contact
3   or direct benefit or privity.
4          And finally New York, again been briefed, the
5   issue whether you can bring an unjust enrichment claim
6   under the law of New York has been briefed and claims
7   have survived in the following cases, LCD in this
8   district, Flash Memory and SRAM.
9          Finally, unjust enrichment.  The argument by
10  the defendant is under the antitrust statutes of
11  Massachusetts and Rhode Island, there is no claim for an
12  indirect purchaser.  They have not enacted an Illinois
13  Brick repealer.  So as the defendant argument goes,
14  since there is no claim under those antitrust statutes,
15  you can't backdoor it and go and try and get the same
16  thing by bringing an unjust enrichment type claim.
17         The flaw in the argument is that the law of
18  those two states recognized consumer protection claims
19  under the consumer protection statutes of those states.
20  So in that sense we're not backdooring anything.  We're
21  doing something perfectly consistent with the laws of
22  the state  -- with the consumer protection laws of the
23  states of Massachusetts and Rhode Island.
24         Finally, unjust enrichment, the defendants
25  argue that to the extent there are statutory remedies in

MOTION HEARING   October 5, 2009

Page 213

1    a number of states, I think they cited to 12 states in
2    their brief, to the extent there are statutory remedies,
3    those remedies are exclusive; and, therefore, you cannot
4    bring an unjust enrichment claim.

5             Well, that's just contrary to the way things
6    have been pled since time immemorial.  The unjust
7    enrichment claim is an alternate theory.  It's a
8    different theory of recovery.  It existed in common law.
9    The enactment of statutes that provide statutory relief
10   and statutory remedies don't abrogate that whole body of
11   common law, and we've cited cases that make that very
12   clear.

13            The main case cited by the defendant, a Supreme
14   Court case, is a Title VII case.  It had to do with
15   relief under Title VII which is vested in the
16   government, and the plaintiff tried to seek relief under
17   that act, a private right of action under Title VII that
18   provided for governmental enforcement.

19            The court said we're not going to carve out or
20   create new private rights of action.  If statute says
21   what it says and no private rights of action.  It has
22   nothing to do with the interplay between common law
23   right to unjust enrichment and the statutory remedy for
24   the same thing.  There are two different remedies.
25   We've pled them in the alternative.  They go side by

1   side, and they're in all of these major recent cases as

2   well, your Honor.

3        Thank you.

4        THE COURT:  Any rebuttal?

5        MR. SCARBOROUGH:  Very briefly, your Honor.  On

6   the retroactivity point, you know, it's a nice theory

7   that was espoused as to Nebraska and Nevada, really sort

8   of a policy argument looking back at the chronology of

9   those states, but there is zero legislative history to

10  support that.  Defendants cited legislative history.  We

11  cited the Supreme Court cases from those states that

12  says that's exactly what's required.  It needs to be

13  unambiguous.  Otherwise, statutes are going to be

14  applied prospectively only, and we don't have anything

15  from the plaintiffs that fits that bill.

16       On the consumer protection claims, plaintiff

17  say that they've got a Massachusetts case that shows

18  that it's defendants' burden to show that exception to

19  the demand requirement.  There is no case to that

20  effect.  The case that they cited doesn't say that at

21  all.  In fact, the trial court said they didn't think

22  that the demand letter was specific enough and the

23  appellate court disagreed.  There is no discussion of

24  whose burden it is to show that whether or not the

25  exemption applies, and we think by all logic plaintiffs

Page 215

1   have got to have that in their complaint if they want to

2   show they're free from an explicit requirement of the

3   statute.

4         And then finally with respect to unjust

5   enrichment, plaintiffs have cited nowhere in their

6   opposition or today any Massachusetts or Rhode Island

7   price fixing indirect purchaser claims, and they haven't

8   because there aren't any and they routinely have been

9   not allowed.  There are many, many cases that we cited

10  that have thrown out those claims in those states and

11  other states wherein direct purchasers are not allowed

12  to sue.

13        Thank you, your Honor.

14        THE COURT:  All right.  I think you have one

15  more, do you not?

16        MR. KESSLER:  The last joint issue is the

17  statute of limitations on the indirect.

18        THE COURT:  I'm not going to hear oral

19  argument.  I've heard the same argument, same principles

20  with respect to the direct cases and you have addressed

21  it in your briefs.

22        MS. KERN:  Your Honor, if I could just be very

23  briefly, I have some comments that.

24        THE COURT:  On what issue?

25        MS. KERN:  On fraudulent concealment.

Page 216

```
 1              THE COURT:  And it's not contained in your
 2   brief?
 3              MS. KERN:  No.
 4              THE COURT:  In fairness I have to let you go,
 5   too.
 6              MS. KERN:  Thank you.
 7              THE COURT:  Let me finish what I was going to
 8   say.  You have discussed the principles already of the
 9   sufficiency of affirmative acts to allege fraudulent,
10   we're already discussed the inability to discover or
11   whether there was ability to discover the true facts,
12   due diligence and you also reviewed principles of
13   constructive notice.  We've already heard those already.
14   So I was going to take my fix on this case, the indirect
15   cases from your three briefs.
16              MR. ROGER:  Perhaps if counsel would actually
17   like to start, and I can reply to whatever new material.
18              MS. KERN:  Thank you, your Honor.  I'll try to
19   be brief.  I just have some slightly different points
20   than the ones made.  Silvie Kern from Glancy Binkow &
21   Goldberg.
22              First of all, I want to raise two points that
23   the defendants have not addressed in their briefs.  One
24   is that fraudulent consumer is a factual issue, and it's
25   inappropriate to dismiss fraudulent consumer claims on a
```

1    motion to dismiss and a lot of cases state that we cited

2    to those in our brief, Rubber Chemicals and so forth.

3    There is no response from the defendants in their entire

4    discussion on fraudulent concealment on that point.

5          The second point, equally important is there is

6    not one mention of the LCD case in the fraudulent

7    concealment discussion of the defendants, and the reason

8    that that's important is the silence is very telling.

9    In the LCD which, as the court has heard, involves a

10   related industry and a lot of similar players and a lot

11   of similar allegations, in LCD 1, because there were two

12   opinions, in LCD 1, Judge Illston held that the -- well,

13   let me backtrack.

14         Judge Illston had occasion to rule on the

15   fraudulent concealment allegations of the indirect

16   purchasers with respect to the state claims that they

17   were making, and Judge Illston ruled that on a motion to

18   dismiss that the plaintiffs had adequately alleged their

19   fraudulent concealment claim, and she did so with

20   respect to every single jurisdiction that's at issue

21   here, and I will cite the specific parts of that.  It's

22   LCD 1, 586 Fed. Supp. 2d. at 1131 at notes 10 and 11.

23   And those cite all the allegations -- I'm sorry -- all

24   of the jurisdictions that we are -- under whose laws we

25   are suing.

1        And Judge Illston specifically found that the

2    plaintiffs had sufficiently alleged fraudulent

3    concealment through allegations that the defendant had

4    concealed through secret discussions through an

5    agreement not to discuss publicly the nature of their

6    agreement of price fixing and also, quote/unquote,

7    numerous pretextual and false justifications

8    disseminated to consumers regarding defendants' price

9    increases.

10        Defendants don't raise any of this.  By the

11   way, in case there is any doubt, I want to point out to

12   the court that LCD, both LCD 1, which is the case I've

13   been referring to, and LCD 2, which dealt with a motion

14   to dismiss after amendment and included discussion, both

15   of those cases have been cited after Iqbal.  So they are

16   still good law.  They were cited in In re Title

17   Insurance Antitrust Litigation in May 2009 opinion.

18   It's a case that the LG defendants have actually cited.

19   And it's 2009 WestLaw 1458025.

20        Now, I want to briefly respond to the points

21   that the defendants do make.  First of all, the

22   defendants cite to cases involving evidence.  We're on

23   the motion to dismiss here.  Conmar, decided on appeal

24   from summary judgment.  Barker, decided on summary

25   judgment.  Coordinated pretrial proceedings in the

MOTION HEARING   October 5, 2009

Page 219

1   petroleum products case, decided on summary judgment;

2   and particular to that case I want to make a couple of

3   points because the defendants have mischaracterized that

4   case.  They state in their brief that the court there

5   found, quote/unquote, adequate allegations of fraudulent

6   concealment where the plaintiffs identified by name

7   specific employees who instructed others on how to avoid

8   detection, and they also say these allegations are

9   precisely the kind of facts not pled by plaintiffs.

10  That's joint reply at 209.

11         Well, that's an incorrect statement because

12  that case was decided again on a motion for summary

13  judgment, and the court did not rule on the basis of the

14  allegations and it did not make that statement that I

15  just read on the basis of the allegations.  It was based

16  on evidence including introduction of deposition

17  testimony.  And, further, that court, as I think we

18  mentioned in our brief, that court held that a defendant

19  has an extremely difficult burden to show that

20  fraudulent concealment allegations are barred as a

21  matter of law.

22         Now, the next one I want to make --

23         THE COURT:  Didn't you cover that in your

24  brief?

25         MS. KERN:  I just want to distinguish a couple

eq

1    of cases.

2           THE COURT:  No, I've heard the standards, I'll

3    reread your briefs.  Don't worry about that.  So I just

4    don't want to take it any further about that.

5           MS. KERN:  One point about Barker that they

6    cited on their reply brief.

7           THE COURT:  All right.

8           MS. KERN:  Thank you.  Thank you.  The

9    defendants cite Barker in their joint reply in Footnote

10   32, they say that the plaintiffs may not generally use

11   fraudulent concealment by one defendant as a means to

12   toll the statute of limitations, and I want to just

13   briefly mention to the court that first that was a

14   summary judgment case; second, in that case the

15   defendants were defendants who were acting independently

16   of one another, unlike here where the plaintiffs are

17   alleging that there was an interconnection among the

18   defendants.

19          And what I particularly want to point the court

20   to is a case in which Barker has been distinguished on

21   that basis, and that is Low versus SG Vendome, 2003

22   WestLaw 2567880 at star seven.  And in that case this

23   was a case that was brought by the Commissioner of

24   Insurance involving the transfer of a junk bond

25   portfolio, and the court held that the commissioner had

Page 221

1    sufficiently invoked a fraudulent concealment doctrine

2    as to certain defendants and it distinguished Barker,

3    and it says in Barker the various defendants all were

4    individuals with independent identities and

5    responsibilities and none was alleged to have been

6    acting on behalf of any of the others.

7         By contrast in Low, the plaintiff had alleged

8    that the corporate defendants were under the control of

9    one of the defendants.

10        So I raise that because that was a case that

11   was cited by Mr. Roger and also in their reply briefs.

12   So thank you for humoring me, your Honor.

13        THE COURT:  Do you wish to reply?

14        MR. ROGER:  Just very briefly, your Honor.

15   Your Honor, the assertion is that fraudulent concealment

16   should not be decided on a motion to dismiss and that we

17   did not cite any cases for the opposite proposition.  As

18   I did note in my earlier remarks and as we've also cited

19   in our reply brief, we've got the Rutledge case, which

20   is a Ninth Circuit case, it is 576 F. 2d. 248, in which

21   the Ninth Circuit affirmed the dismissal of a complaint

22   based on inappropriate or insufficient pleading of

23   fraudulent concealment.

24        So these are cases that can and should under

25   the proper circumstances be dealt with on the pleadings

Page 222

1    and the question is is this the proper circumstance.

2              Ms. Kern says, well, they didn't talk about the

3    LCD case.  Well, the LCD case is pre-Iqbal, and just

4    because Judge Illston decided something in the LCD case

5    doesn't mean for all time immemorial every plaintiffs'

6    defendant in an antitrust case in the Northern District

7    will survive examination.  You've got to take a look at

8    what the pleadings actually say.

9              And I would just commend to your Honor

10   paragraph 290 of the indirect purchasers' complaint

11   because it is there that they list the entirety of the

12   fraudulent concealment allegations.  That's the only

13   place it is.

14             THE COURT:  Again, please?

15             MR. ROGER:  Paragraph 290.

16             THE COURT:  What page is that?

17             MR. ROGER:  That would be page 89, your Honor.

18   So they say (As read):  Defendants engaged in a

19   successful illegal price fixing conspiracy which they

20   affirmatively concealed in at least the following

21   respects.  And they've got a list of from A to J.

22             Well, I submit, your Honor, that is a

23   checklist.  That is not fact pleading sufficient even

24   under Twombly and Iqbal, let alone Rule 9(b).  This is

25   the kind of list that you would give an associate who

Page 223

1  you wanted to actually come up with a pleading and you

2  say, okay, make sure that you cover all these bases, get

3  me some facts that will survive examination, but that's

4  not what we have in the complaint.  We've got just the

5  checklist.  That's insufficient under 9, that's

6  insufficient under Twombly.

7       And finally with respect to the Barker case,

8  yeah, it's a summary judgment case, but so what?  The

9  court in Barker laid down the law as to when, whether

10  for pleading purposes or for legal purposes or whether

11  it's for jury verdict purposes when the actions of one

12  defendant will be binding on the actions of another

13  defendant, and the court specifically said that in

14  fraudulent concealment circumstances the doctrine of

15  fraudulent concealment tolls the statute of limitations

16  only as to those defendants who committed the

17  concealment.  Plaintiffs may not generally use the

18  fraudulent concealment by one defendant as a means to

19  toll the statue of limitations against the other

20  defendants.

21       THE COURT:  You're using it as a statement of

22  law.  There are more cases that could be ruling on

23  motion to dismiss.

24       MR. ROGER:  Again, your Honor, we commend both

25  in the case of the direct complaint and indirect

1   complaint what are the facts that the plaintiffs have

2   alleged here.  With that, I'll submit, your Honor.

3          THE COURT:  All right.  That will conclude the

4   argument on the indirect cases.  Let me ask how many

5   people are present who want to speak on some aspect of

6   the individual cases?  All right.  We're going to go

7   into that.  You will have at least a couple of hours to

8   do that.

9          MR. MONTAGUE:  As I mentioned earlier, I have

10  some general remarks when the plaintiffs' turn is

11  appropriate for the individuals.

12         THE COURT:  How long do you think that will

13  take?

14         MR. MONTAGUE:  15 minutes.

15         THE COURT:  All right.  You may have

16  15 minutes.  I understand you're going to argue the

17  general principles of Twombly and Iqbal.

18         MR. MONTAGUE:  And the general outline of the

19  individual plaintiffs as they -- individual defendants

20  as they relate to that, yes.

21         MR. CORBITT:  We're moving parties.

22         MR. LEHMANN:  If you do that, you're going to

23  hear Twombly argument eight times, wasting your time and

24  ours.

25         MR. KESSLER:  I would think at least what the

MOTION HEARING  October 5, 2009

1   individual defendants are prepared to do is not to argue

2   the legal standards of Twombly but to argue why there

3   aren't particular facts relating to those individual

4   defendants that are unique to them in these complaints

5   that apply.

6          If you want to do a Twombly summary at the end,

7   that's fine.

8          MR. MONTAGUE:  The problem is you can't argue

9   that without looking at the complaint as a whole.

10   That's been the whole problem today.  All these

11   arguments have been totally disjointed from the

12   complaint as a whole.  We'd like to bring that all into

13   context.

14          MR. SPECKS:  One of the main arguments on the

15   individual defendants' arguments is that we haven't

16   satisfied Twombly.  We really haven't had a chance to

17   address that.

18          THE COURT:  I'm going to do what I said I'd do.

19   You may have 15 minutes to talk about Twombly and then

20   we'll go to the other defendants, the defendants'

21   individual arguments.

22          MR. MONTAGUE:  May I do that now?

23          THE COURT:  Yes.

24          MR. MONTAGUE:  Thank you, your Honor.

25          Mr. Corbitt actually set forth exactly what the

1   plausibility tests are when he was talking about, and

2   that's what we're talking about now, sir, whether our

3   allegations are plausible to satisfy, A, general

4   conspiracy issues and the involvement of each defendant.

5           And what Twombly or Iqbal did not do was change

6   the basic tenets of pleading, and that is all of the

7   facts, the facts are to be taken as true, all of our

8   factual allegations are to be taken as true, not our

9   legal conclusions and not our bare allegations, but

10  factual allegations, which we have lots of.

11          All of the inferences are in our favor, but

12  they don't seem -- defendants have not realized that.

13  There is no heightened pleading standard and the

14  allegations are to be looked at in their entirety.

15  That's the point I'd like to make here, and I'd just

16  like to set forth very briefly how we've laid out this

17  case in allegations.

18          The first thing we did was we set forth the

19  economic and industry structural standards that support

20  the feasibility of a conspiracy and the defendants'

21  motive.  We set forth that it was a concentrated

22  industry --

23          THE COURT:  Well, you don't need to give me

24  paragraph by paragraph.

25          MR. MONTAGUE:  I'm not.

1          THE COURT:  Focus me on the sections, would

2     you, please?

3          MR. MONTAGUE:  Actually, it's the one section I

4     didn't write down the paragraphs.

5          THE COURT:  You don't have to have the

6     paragraphs.

7          MR. LEHMANN:  There's the table of contents.

8          THE COURT:  What section of the complaint

9     should I read with particular attention?

10          MR. MONTAGUE:  Actually, I do have it.  I can

11     give you the paragraphs that set this forth.  It's

12     paragraph 2 -- there are a lot of them.  2, 3, 105, 107,

13     108, 111, 112, 188, 189-90, 191 through 197.

14          THE COURT:  That's the structure of the

15     industry.

16          MR. MONTAGUE:  That's the economics and the

17     structure of the industry to show that, A, it is an

18     industry that is conducive to price fixing and, two,

19     that the defendants had a motive to price fix, and that

20     goes not only to make sure that the prices were fixed

21     and stabilized with respect to CRT, but for CRT

22     products.

23          And I think that the best place on that,

24     frankly, is the flat glass case in the Third Circuit,

25     385 F. 3d. 350 at page 361 where it says (As read):

Page 228

1          Importantly, the demand for flat glass was

2              in decline and the particular defendant and its

3              competitors had excess capacity.  Normally

4              reduced demand and excess supply are economic

5              conditions that favor price cuts rather than

6              price increases.

7          THE COURT:  Just go ahead with your complaint.

8          MR. MONTAGUE:  Thank you.  Then starting at

9     paragraph 134, your Honor, we set forth factual

10    allegations about the meetings and how the conspiracy

11    operated, and these are clearly not conclusory bare

12    facts.  These are factual allegations about the 500

13    meetings, about when they began, they began informally

14    and became formal meetings, that they were, quote, glass

15    meetings and they had different levels of people that

16    attended them, top management, management meetings,

17    working --

18          THE COURT:  Would you give me the paragraphs,

19    please, so you don't have to read them all?

20          MR. MONTAGUE:  It begins with 134, but the

21    specific paragraphs when they began is 137, describing

22    where they were held is 139, describing the different

23    levels of management is 141 A, B, C, and D.  We allege

24    the type of information that the defendants exchanged,

25    that's 142, we allege how the meetings were run.  That's

Page 229

1    143.   We allege that they agreed what -- we allege what

2    they agreed to at the meetings, including price

3    guidelines, price ranges, price floors, known as bottom

4    prices, both for CRT's and CRT products.

5            We cite 146 that they agreed upon outputs, 147

6    we allege that the participants were given price on

7    projects and projected future output, new capacity and

8    product lines.

9            We allege that, the next paragraph, what they

10    said, what they agreed to say that their customers about

11    their price increases; and in 151 and 152 we talked

12    about their assignments to contact nonattendees.

13            And then in paragraph 153 we talk about how

14    they monitored their prices down the chain line, how

15    they monitored output restrictions.  In paragraph 156,

16    we allege how they gave pretextual reasons for their

17    price increases.  191, 193, 195 and 153.  And we allege

18    that they had further opportunities to further conspire

19    at trade associations and joint ventures.

20            We set forth that they had guilty pleas, that

21    the same people who were indicted in CRT were indicted

22    in LCD and gave guilty pleas, the identical people for

23    Chunghwa, and they have both been held to be important

24    factors in determining the plausibility.

25            We take all of these allegations of fact in the

1  complaint as true, your Honor, and making all of the

2  inferences in our favor and viewing those allegations as

3  a whole, the amended complaint satisfies the necessary

4  pleadings standards with respect to conspiracy.

5          Now, a lot has been made about the CRT

6  products, the television and the monitors.  I just would

7  like to call your attention, your Honor, to show that we

8  did in fact allege a basis for that.  We alleged a basis

9  for that conspiracy.  Their conspiracy did involve the

10 prices of the televisions.

11         THE COURT:  You allege that.  I think it's

12 clear.  You wrote it in the complaint.

13         MR. MONTAGUE:  We're discussing the meetings,

14 and the point is that some of these paragraphs that were

15 discussed were not discussed in the context that they're

16 made as what was discussed at the meetings.  And in 144

17 we say at the end (As read):  Defendants also considered

18 the internal pricing of products containing CRT's and

19 agreement upon the prices at which CRT's are set.

20         At 146 we end up saying (As read):

21             The analysis of prices for CRT's often

22             included consideration of downstream prices for

23             television, monitors and similar products and

24             how they would affect the price ranges being

25             collusively set.

1       So the idea is in the meetings they discussed

2  both prices and how they affected each other.  And then

3  in paragraph 217 we said in conclusion (As read):

4               Based on those particular factual

5          allegations with respect to CRT products,

6          defendants and their agents agreed inter alia,

7          A, to fix target prices and price guidelines

8          that related to CRT products.

9          And the last thing we did, and this will come

10  up in each individual defendant's allegations where that

11  individual defendant has a television or a monitor or a

12  computer monitoring manufacturing facility, we say that

13  those subsidiaries that did the manufacturing of TV's

14  and monitors, they played a significant role in the

15  conspiracy.

16          THE COURT:  What are you reading from now?

17          MR. MONTAGUE:  I'm reading from paragraph 158.

18          THE COURT:  158?

19          MR. MONTAGUE:  But this is just a sample.  This

20  is included and repeated in almost every paragraph where

21  we talk about an individual defendant who manufactures

22  television and monitors.  We say they played a

23  significant role in the conspiracy because defendants

24  wished to ensure that the prices for such products paid

25  by direct purchasers would not undercut pricing

1   agreements reached at the various meetings.

2          So we've clearly showed and tied in a basis for

3   saying why the prices of monitors and TV's CRT products

4   were part of the conspiracy that also set the prices for

5   CRT's.  One could not work without the other, as

6   Mr. Simon said.

7          THE COURT:  What's your argument?  These facts

8   and applying the standard of Twombly and the standard of

9   Iqbal, these are sufficient allegations?

10         MR. MONTAGUE:  For the general conspiracy.

11  Now, it's in this context that we now turn to the

12  individual defendants.  They can't just be looked -- you

13  just can't look at the allegations for an individual

14  defendant without looking at all of these particular

15  allegations, because the first thing we do with each

16  defendant is identify the number of meetings that they

17  went to, and we do refer to them as family corporations

18  because, and Mr. Kessler referred to paragraph 154, but

19  he stopped reading.

20         He read the part where we said a representative

21  of a family corporation went to the meeting, but not

22  everybody from that family went, but he stopped reading

23  where it says, starting in line 25 of paragraph 154.  It

24  says (As read):

25                 The individual participants entered into

MOTION HEARING   October 5, 2009

1            agreements on behalf of, and reported these

2            meetings and discussions to, their respective

3            corporate families.

4            That ties in everybody, everybody in the

5    corporate family, and it makes sense because otherwise

6    the totality of the conspiracy could not have worked.

7            Now, this district probably more than any other

8    in the country has given us instructions on what

9    pleadings are required for linking each defendant to a

10   conspiracy, and I must say that after reading the Iqbal

11   case carefully, that has nothing to do with this issue

12   for this type of a conspiracy.  The Iqbal case involved

13   specific violations of a specific individual, not acting

14   in concert with others.  I'll get to that after we go

15   through this.

16           The first case was the SRAM case which at 580

17   F. Supp. 2d. at 904, the court said that the defendants,

18   quote (As read):  Now only need to make allegations that

19   plausibly suggest that each defendant participated in

20   the alleged conspiracy.

21           And then in LCD 1, 586 F. Supp. 2d. at 1117,

22   after the judge required -- Judge Illston required

23   further amending, she said what the plaintiffs had to

24   do.  (As read):

25               Plaintiffs need not plead each defendants'

Page 234

1           involving in the alleged conspiracy in

2           elaborate detail, but must simply include

3           allegations specific to each defendant alleging

4           the defendant's role in the conspiracy.

5           And then after the amended complaint was filed

6    she found that pleading -- allegations which are almost

7    identical to those here, and it makes sense because

8    these are related companies and the same people were

9    involved, she found that to be perfectly satisfactory,

10   and that was 599 F. Supp. 2d. at 1184.

11          And I think, your Honor, in Mr. Saveri's

12   declaration he had an Exhibit 3 which compared the

13   allegations in LCD to the allegations here.  It may be

14   very helpful to your Honor.

15          And by the way, the exact same allegation with

16   respect to corporate families that I referred to at

17   paragraph 154 was involved in the LCD decision and was

18   accepted by Judge Illston as satisfactory.  I'm not

19   going to get into the individual allegations for each

20   defendant.

21          THE COURT:  No, they're here.  I'm sure we'll

22   hear about those in a moment.

23          MR. MONTAGUE:  But if you take what we allege

24   about each individual and put it in this setting, it is

25   certainly plausible that this court, as the court said

Page 235

1    in Iqbal -- as the court said in Iqbal (As read):

2                    The claim has facial plausibility when the

3              plaintiff pleads factual content that allows

4              the court to draw a reasonable inference that

5              the defendant is liable for the misconduct

6              alleged.

7         And Iqbal does nothing more than that.  For the

8    defendants to take any position that it has any effect

9    on what -- there has to be greater pleading other than

10   plausibility to connect a defendant is wrong because the

11   detail that Iqbal required for the individual defendant

12   here was not to link them to a conspiracy but because,

13   as the court said, the respondent must plead sufficient

14   factual matter to show that the petitioners adopted and

15   implemented the detention policies at issue, not for

16   neutral investigative reason, but for the purpose of

17   discriminating on account of race, religion or national

18   origin.  So each defendant they basically had to allege

19   a specific violation of the Constitution.

20             THE COURT:  Okay.  Sir, thank you.

21             MR. KESSLER:  Your Honor, I'd just like to

22   start with three minutes.

23             MR. SIMMONS:  I think we should go to the

24   individual motions.

25             MR. SAVERI:  You finished, didn't you?

Page 236

1          MR. KESSLER:  But we just had an argument.

2          THE COURT:  I know we did.  I know what you're

3    going to say.  You've said it at least twice already.

4    You're going to talk about that there has to be factual

5    allegations and we can't go on the basis of the general

6    allegation of a conspiracy.  You're going to say there

7    has to be individual arguments made against the

8    individual allegations made against each of the

9    defendants.  That's a start.  So I think I know what

10   you're going to say.

11         MR. KESSLER:  That's much what I going to say,

12   but I'll save the rest.  That's okay.

13         THE COURT:  All right.  Save the rest.  Now,

14   how many people do we have, eight?

15         MR. KESSLER:  We submitted -- I don't know what

16   you want to do.  They submitted a proposed order.  We

17   submitted a proposed order.

18         THE COURT:  This is your motion.  You decide,

19   you decide who's going to go.

20         MR. SIMON:  Should we set some time limits?

21         THE COURT:  That's what I want to do.  I'm

22   going to say 15 minutes per case.

23         MR. SIMON:  Both sides.

24         THE COURT:  Both sides 15 minutes.

25         MR. SAVERI:  May I make an observation?  In one

Page 237

1    respect, all of these individual motions are coming up

2    there is one argument that's going to cut across

3    withdrawal from the conspiracy.  That is an issue we

4    want to address.

5            THE COURT:  You'll get a chance.  Go ahead,

6    sir.

7            MR. SIMMONS:  I appreciate it, your Honor,

8    Judge Legge.  I know it's been a long day.  I have just

9    a few slides I'd like to walk the court through and

10   counsel here.

11           My name is Ian Simmons.  I represent Samsung

12   Electronics Corporation, Samsung Electronics of America.

13   I'm a partner with O'Melveny & Myers.

14           Your Honor, in the first slide I have, there

15   has been a lot of discussion about Iqbal today, and I

16   think what I would urge to the court and I think what my

17   colleagues have urged, co-counsel, is I would ask you to

18   reject two pleading obfuscations that are apparent on

19   the face of this complaint.

20           What are the two obfuscations?  One is the

21   retreating to CRT products.  You've heard a lot about

22   that.  I'm not going to spend a lot of time on it.  I do

23   have a slide.  That is plainly improper under Iqbal and

24   Twombly.

25           What is the other obfuscation?

Page 238

1          THE COURT:  Why is it?

2          MR. SIMMONS:  Well, your Honor, if you turn to

3     the second slide right before you, CRT products

4     encompasses at least four products.  One is tubes, tubes

5     used for televisions, tubes used for color monitors,

6     televisions and computer monitors.  That's four

7     products.  Not every defendant manufactured all four of

8     those products or even most of them.  For example,

9     Samsung Electronics, my clients, did not manufacture

10    tubes.

11         THE COURT:  What you're saying they've got to

12    plead what defendant made what product.

13         MR. SIMMONS:  That's right.  Let me quote from

14    Iqbal.  It's quite clear on this, and I'm reading from

15    129 Supreme Court at 1949.  There must be enough, quote

16    (As read):  ...actual content allows the court to draw

17    reasonable inference that the defendant is liable for

18    the misconduct alleged, close quote.

19         We represent specific entities, and they are

20    entitled to notice of who they conspired with when and

21    with respect to what product.  Retreating, generalizing

22    up to the stratosphere at a level called CRT products,

23    one of four things, is plainly improper.  It's not

24    noticed.

25         Let me direct your attention, your Honor, to --

MOTION HEARING   October 5, 2009

Page 239

1   I believe it's the fourth slide of the papers you have

2   before you.  There's no dispute in this litigation and

3   the court will not find in either of complaints any

4   allegation that the Samsung Electronics entities made

5   CRT's or made tubes, because we didn't.  We don't.

6          THE COURT:  I have to look at the complaint

7   here to see what it says against you.  I can't carry

8   that in my head.

9          MR. SIMMONS:  I understand that.  I'm just

10   writing down propositions for you that when you go back

11   and look at the complaint and when you reread the

12   briefs, one our principal points is the reason the CRT

13   product obfuscation is significant is because my clients

14   never made and do not make and have not made tubes.

15          If you flip over the prior two slides, I won't

16   walk you through it and on and on about it, but the only

17   arguably factual averments in this complaint, and I

18   agree with Mr. Montague, take the complaint in its

19   entirety absolutely, because when you go through that

20   complaint, you will see the plaintiffs saying there are

21   glass meetings.  They're talking about tubes there.

22   There is this meeting.  They're talking about tubes.

23   They quote the Scott Hammond, Department of Justice

24   press release.  He's talking tubes.  They talk about

25   indictment.  He's talking about tubes.

Page 240

1    These defendants that I represent do not make
2  and never have made tubes.  How can we be dragged in?
3  They try to drag it in by the first obfuscation CRT
4  products all generalized upwards -- Mr. Kessler's fruit
5  example -- and they'll also obfuscate it by just
6  referring to everyone as Samsung.
7    Well, there is no dispute -- in fact the
8  indirect plaintiffs in their paragraph 64 admit that
9  Samsung Electronics only owns about 19.6 percent of SDI.
10  SDI is an entity that made tubes.  The United States
11  Supreme Court in the Best Foods case, which we cite,
12  says defendants are entitled to a presumption of
13  independence.  When you take that point and you couple
14  it with Twombly and Iqbal, I respectfully submit to you,
15  your Honor, that they have breached that presumption of
16  independence and they don't get to do it by generalizing
17  upwards and saying CRT products and generalizing upwards
18  and saying, well, it's a family, it's a family of
19  entities, Samsung.
20    Let's take paragraph 154, Mr. Montague -- I
21  thought it was sort of interesting.  Mr. Montague
22  directs your attention to 154.
23    MR. SIMON:  It's Montague.
24    MR. SIMMONS: Montague.  Sorry.  Pardon me.
25  I'm from Canada.  So I went to school in French Canada.

Page 241

1    We would have pronounced that Montague.

2              MR. SAVERI:  Well, we feel sorry for you.

3              MR. SIMMONS:  Look at 154.  When plaintiffs

4    refer to a corporate family, it is to be understood that

5    they are all engaged.  Now, map that up against the

6    allegations that Justice Kennedy and Supreme Court

7    rejected in Iqbal, the allegations that Director Muller

8    of the FBI, Attorney General Ashcroft knew about and

9    directed.  Those are plainly no go after Iqbal.  Iqbal

10   and Twombly are quite clear.

11             There are two sorts of things that should alert

12   the court that are not entitled to any presumption of

13   truth.  One is legal conclusions posing as facts.  You

14   directed, you controlled.  That's just -- direction and

15   control is a legal point they're trying to make that

16   somehow SEC controlled SDI when they don't have facts

17   going to that point.

18             What is the other thing that's not entitled to

19   an assumption of truth?  Well, the other thing is the

20   mere assertion.  When I say a family, I mean a family is

21   everybody.  That is the exact opposite of what the

22   Supreme Court and Twombly and Iqbal are saying.

23             It's interesting.  Prior to Iqbal, we used to

24   hear it said in the bar, well, Twombly only applies to

25   parallel pricing, a narrow set of antitrust cases.

Page 242

1    Where Iqbal came around and said, wait, wait, wait, not

2    at all.  It's a Rule 8 case.  Each defendant needs to be

3    shown.  Remember Rule 8 uses the word show.

4              THE COURT:  I hear your words.  You're making

5    the same points that have been made before, and that is,

6    the plaintiffs, according to you, the plaintiffs must

7    allege what manufacturer manufactured, must allege what

8    each defendant did, not a corporate family, we don't pay

9    any attention to legal conclusions.

10             MR. SIMMONS:  Your Honor, let's turn to page 5.

11             THE COURT:  I've heard it.

12             MR. SIMMONS:  No, no, let's turn to page 5.

13   There's a twist that I want to amplify.  There's another

14   twist which is the claims have to be plausible, and they

15   have to be plausible as to each defendant.

16             THE COURT:  That was apparent.

17             MR. SIMMONS:  Well, no, SEC and SEA do not make

18   tubes and haven't made them.  So we've heard it said,

19   well, someone conspired as to tubes to get the price of

20   televisions up.  I think when you go through the

21   complaint you will not see -- I think Mr. Kessler is

22   quite right and I won't repeat his very good arguments

23   -- you will not see allegations saying anyone who made

24   and sold televisions met to fix the price of

25   televisions.

1      So then the theory is, well, tube makers.

2    We're not tube makers.  My defendants, my clients are

3    not tube makers, but tube makers met to sort of get the

4    price of televisions up.  Well, if SEC wanted to -- SEC

5    buys tubes.  Is it plausible for us to consent to a

6    conspiracy to charge my clients more just so I can jack

7    up the price of televisions?  I'd want my input lower

8    and jack up the price of my televisions so I make more

9    money, not less.  Why would I go through the

10   machinations of sort of controlling SDI to have them get

11   the tubes up so I can charge for my televisions?

12      It's not plausible.  It's facially illogical.

13   I would want to do the reverse, and why wouldn't SDI

14   just charge more for the Sonys of the world for their

15   tubes and charge me less so I don't have to get the hit

16   on the margin.  The complaint alleges the opposite, and

17   it's not plausible.

18      The Brennan and TFT case, Judge Illston is

19   quite clear -- you even heard Mr. Montague say it.

20   Judge Illston said there does have to be specific

21   allegations as to each defendant, and the Brennan case

22   is quite clear on that as well.

23      The final point I would sit down with, your

24   Honor, absent any rebuttal, is that we have to take the

25   presumption of independence seriously.  It is the

1    plaintiffs' burden to allege.

2              THE COURT:  I've heard it, I've heard it, I've

3    heard it several times.

4              MR. SIMMONS:  And the final point I will make,

5    your Honor, is that if you look on the docket, SDI

6    America certification of interested entities of persons

7    pursuant to Local Rule 316, SDI has certified that

8    Samsung Electronics owns not more than 20 percent of SDI

9    stock.  This whole concept, someone throws around a

10   slide and says they're vertically integrated.  Equity

11   ownership --

12             THE COURT:  Sir, I'd be willing to sit here and

13   listen forever if you were to first person making these

14   points and even if you were the second person.

15             MR. SIMMONS:  Well, I think -- fair enough.

16             MR. SIMON:  Your Honor, let me start.  I'm only

17   going to make the points I think haven't been made yet

18   with the last point.  Counsel says somehow SEC

19   controlled SDI without any facts and what's on the

20   docket is they had no control.  I'd like to hand up to

21   the court Samsung Electronics, that's SEC, one of the

22   moving parties, 2008 public report which is publicly

23   available to anybody who can get on the Internet, and

24   what I'd like to direct your attention to is the fact

25   that on the second page of this under equity method

Page 245

1    investments, it says:  Investments in business entities

2    in which the company has the ability --

3            THE COURT:  Page 2.

4            MR. SIMON:  Second page right-hand column at

5    the very bottom.

6            THE COURT:  Yes.

7            MR. SIMON:  It says (As read):

8                Equity method investments.  Investments in

9                business entities in which the company has the

10               ability to exercise significant influence over

11               the operating and financial policies that are

12               accounted for using the equity method of

13               accounting.

14           And then if you flip to that two more pages

15    back, you will find under Footnote 10 to their

16    consolidated audited financial statements contained in

17    their disclosures to the securities regulators, the

18    first company listed there that they use equity method

19    investments to account for is Samsung SDI, the one

20    they're saying they have no control over.  SEC says in

21    their audited financial statements, in fact, they do

22    control and have substantial influence over Samsung SDI,

23    the tube manufacturer.

24           We have been accused of dissembling and saying

25    things and playing games, but the fact of the matter is

1   counsel never told you that in his papers and it is

2   right here in black and white, and that's their

3   accounting principles unless they'd like to submit

4   themselves to securities fraud allegations by somebody

5   else.

6           Secondly, I think it is very important to tell

7   you that there are nine Samsung defendants.  Only two

8   have moved, Samsung Electronics Corporation and SDI.

9   Those are the only two that moved.  Nobody else moved.

10          Number three, Samsung is the common denominator

11  in all these cases.  They are in DRAM, they are in SRAM,

12  they are in every case in this district that involves a

13  price fix in a high technology market, and they are the

14  common denominator.  And if Samsung can stand up here

15  with a straight face and try to argue that somehow that

16  this is not a plausible conspiracy that's been alleged,

17  it's very doubtful that they would have any remaining

18  credibility because why would any of these defendants go

19  to meetings over the course of many years, submit

20  themselves to potential criminal liability and

21  prosecution if they in fact didn't intend to do

22  something by meeting, and they did intend to do

23  something, which is to fix the prices both of tubes and

24  finished products.  It would be irrational economically

25  to say that the meetings occurred with no intent to do

Page 247

1    what the meetings intended to do.

2            And lastly I will say that there is a number of

3    times in the briefs that Samsung SDI defendants

4    submitted where they say that somehow we have to define

5    a market in this particular case.  I would prefer you to

6    Knevelbaard versus Kraft, the Ninth Circuit case I

7    mentioned before, your Honor, 232 Fed. 3d. 979.  (As

8    read):

9            When a per se violation such as horizontal

10           price fixing has occurred, there is no need to

11           define a relevant market or to show that

12           defendants have power within that market.

13           Citing the FTC versus Superior Court Trial

14    Lawyers Association, 1990, 493 U.S. 411.

15           If there is one defendant in this case that

16    needs to stay in this case and that needs to compensate

17    the victims of this price fix, it is Samsung for sure;

18    and their arguments to the contrary should be to no

19    avail, and they shouldn't be heard to telling you things

20    about control and dominance which are simply false on

21    the face of the record.

22           THE COURT:  All right.  One minute.

23           MR. SIMMONS:  Thank you, your Honor.  I'm

24    frankly stunned to hear counsel say two things.  First,

25    that SEC -- other than SEC and SDI, no other Samsung

Page 248

1    entity has moved.  He's incorrect.  SEC has moved and

2    Samsung Electronics of America have moved.  SDI has not

3    moved.

4            THE COURT:  That's just what I'm looking for in

5    your motion where you identified where are the moving

6    parties identified here.

7            MR. SIMMONS:  Right on the cover, your Honor

8    it's Samsung Electronics Co. Ltd. and Samsung

9    Electronics America Inc.'s notice of motion and motion.

10           MR. SIMON:  I said two out of nine.  If I was

11   mistaken about the entity, then I'm corrected.

12           MR. SIMMONS:  You're accusing someone of

13   falsehood.  We can have just one person speak at a time.

14           THE COURT:  What are you referring to, the

15   individual motion?

16           MR. SIMMONS:  Your Honor, the first statement

17   Mr. Simon said is just flat wrong.  He's accusing people

18   of misrepresentation.

19           THE COURT:  There are of your defendant

20   entities, two who are moving.

21           MR. SIMMONS:  Well, I don't represent the

22   Samsung SDI.  Sheppard Mullin does.

23           MR. SCARBOROUGH:  I represent all of the

24   Samsung SDI entities, your Honor, and none of those

25   Samsung SDI those have made an individual motion to

Page 249

1    dismiss.  We've joined in the joint motions.

2             MR. SIMMONS:  And as our motions have shown

3    that the complaints corroborate, your Honor, Samsung SDI

4    entities made tubes, Samsung Electronics entities,

5    Samsung Electronics Corporation, Samsung Electronics

6    Corporation of America do not.  So when he says, so

7    forget Samsung Electronics of America, I think it's

8    important because he's accusing of people not trying to

9    be precise.  So I know he wants to be precise.  So I

10   correct that.

11            Second point, your Honor.  It's interesting.

12   He cites the SEC.  This simply shows that we have an

13   equity ownership interest.  That's correct.

14   19.68 percent.  This SEC filing is referred to and

15   discussed in our briefing.  We've put that before the

16   court.  An ownership interest is not sufficient under

17   Twombly and Iqbal to drag us in by using the

18   machinations of CRT products and Samsung.  It doesn't

19   cut the mustard, and I ask the court to reject it and

20   dismiss the SEC entities.

21            If you want to give them leave to amend so they

22   can pass Rule 11 to try to bring us in, they can do

23   that.

24            Thank you, your Honor, for your indulgence.

25            THE COURT:  Where do I find the SEC entities

Page 250

```
 1    identified?  Where do I find the SEC entities?
 2              MR. SIMMONS:  They're identified in our
 3    briefing.
 4              THE COURT:  Okay.  Which one?
 5              MR. SIMMONS:  In the opening brief, your Honor
 6    and in the reply.
 7              THE COURT:  Your individual brief.
 8              MR. SIMMONS:  Yes, our individual motions, your
 9    Honor.  It is Samsung Electronics Corporation Ltd.,
10    which is a Korean entity, and Samsung Electronics
11    America, Inc., which is a United States entity.
12              MR. KESSLER:  Those are paragraph 58 and 59 of
13    the direct complaint, your Honor.  Those are the two.
14    Those are the two entities.
15              THE COURT:  Okay.
16              MR. SIMMONS:  If you don't have any further
17    questions, I will relieve you of my voice.
18              THE COURT:  All right.  Who's next?
19              MR. ALIOTO:  On the indirect side, your Honor,
20    with respect to Samsung, we have nothing to add.  It's
21    all in our brief.  The allegations as to Samsung are
22    summarized at page 42 of our brief.  We have nothing to
23    add other than that.
24              MR. SIMMONS:  And just to clarify, your Honor,
25    our brief covered both direct and indirect.
```

1          THE COURT:  I know they did.

2          MR. SIMMONS:  Thank you.

3          MR. SIMON:  Your Honor, if you want to look at

4   all the capacity paragraphs for the Samsung entities in

5   the direct purchaser complaint, they appear between

6   paragraph 58 and 62, as well as 63 through 66.

7          THE COURT:  Okay.

8          MR. CURRAN:  Judge Legge, my name is the

9   Christopher Curran.  I'm with the firm of White & Case,

10  and we represent the Toshiba entities.

11         I'd like to make three brief points

12  underscoring some of the arguments we've made in our

13  individual briefs.

14         THE COURT:  Let me hang on a minute.  I'm

15  getting my paper mixed up here.

16         MR. SIMON:  Let me give it to you again.  In

17  our direct complaint, the Samsung allegations with

18  respect to each of the entities are between paragraph 58

19  and 66.

20         THE COURT:  All right.  Go ahead.

21         MR. CURRAN:  Your Honor, moving from Samsung to

22  Toshiba.

23         THE COURT:  I understand.  Shift made.

24         MR. CURRAN:  All right.  Thank you.  Three

25  brief points.  They correspond to the Roman numeral

Page 252

1    heading in our briefs, both our moving papers and our

2    reply briefs.

3          First point, when we analyzed the complaints,

4    both the direct purchaser consolidated amended complaint

5    and the indirect purchaser consolidated amended

6    complaint, first we looked at the generalized

7    allegations against the defendants and we observed and

8    we pointed out in our briefs to you that many of those

9    allegations have simply no bearing upon Toshiba.  Let me

10   give you some examples.  You can see them recited in

11   full in the briefs.

12         The plaintiffs in both complaints allege that

13   certain defendants have been investigated by the

14   government in this matter and at least one defendant has

15   had executives who have pleaded guilty.  Those

16   observations in the complaints have no bearing on

17   Toshiba.  Toshiba, no one has been indicted from

18   Toshiba, no one has pleaded guilty, and, in fact, we

19   haven't even received a grand jury subpoena from the

20   Department of Justice.

21         Now, I think a few moments ago one of the

22   counsel for the plaintiffs said it was very important to

23   make observations about who's been indicted, who's been

24   investigated and even allegations about other cases.

25         All of those allegations in the complaint have

Page 253

1   no bearing on Toshiba.   Toshiba has not itself, nor any

2   of its executives, been indicted or pleaded guilty in

3   any of the others matters, DRAM, SRAM, Flash, et cetera,

4   et cetera.

5          Interestingly perhaps, the only communication

6   that the Toshiba entities have received from the

7   Department of Justice in this matter is for information

8   as a potential victim because Toshiba entities were

9   purchasers of CRT's.

10          So a lot of what your Honor heard today about

11   how the Department of Justice's public statements,

12   including statements by Scott Hammond, the Deputy

13   Assistant Attorney General for criminal enforcement, his

14   statement about damage on U.S. customers and so forth,

15   none of that has any bearing on Toshiba.

16          Other generalized allegations in the complaints

17   that have no bearing.   There is allegations with a

18   oligopoly and how that industry is ripe for price fixing

19   and that kind of thing.   Interestingly, in the

20   indentification of the oligopolists in that oligopoly in

21   the complaint, Toshiba is not listed.   Its market share

22   is too small to be in that company.

23          There are also allegations about participation

24   in trade association meetings and so forth.   Again,

25   there are no allegations that Toshiba entities or their

Page 254

1   executives participated in these trade associations.

2           So we see no linkage between those generalized

3   sweeping allegations and the Toshiba entities.  So what

4   we did beyond that, your Honor -- and this is moving to

5   the second point I'd like to make -- we then looked at

6   the specific allegations naming the Toshiba entities,

7   and as you may know, in today's computerized world it's

8   fairly simple to do a search, put in Toshiba and do a

9   search and see the paragraphs that come up.  We did

10  that.

11          THE COURT:  I wish I had that.

12          MR. CURRAN:  You do.  I'm sure you do, your

13  Honor.  If fact, if you'd like we could provide you with

14  the excerpts.

15          THE COURT:  I'll give that burden to my case

16  manager.

17          MR. CURRAN:  I recommend it, your Honor.  And

18  what we saw was certainly there are allegations

19  identifying who the defendants are and certain other

20  allegations identifying benign activities taken over the

21  years, but I think I'm fair to say -- and if I'm wrong,

22  I'm sure the plaintiff counsel can clarify this when

23  they rebut my comments -- but I think there are only two

24  paragraphs in each of the complaints that have

25  substantive allegations again the Toshiba entities, and

1    I'll identify those for you, your Honor.

2           In the direct purchase plaintiffs' consolidated

3    amended complaint, paragraphs 171 and 172.  And your

4    Honor, of course, can look at those.  I'll make a couple

5    observations about them.  Again, I'm starting with the

6    direct.  It's paragraph 171 and 172.

7           I don't want to belabor this, but let's take a

8    quick look at those paragraphs and then we'll consider

9    briefly whether they satisfy Twombly, Iqbal and Kendall.

10   Paragraph 171, Toshiba through TC and TDT participated

11   in over 50 bilateral and group meetings between 1995 and

12   2003 in which unlawful agreements as to inter alia price

13   output restrictions and customer and market allocation

14   of CRT products occurred.

15          Okay.  A couple of observations because, your

16   Honor, frankly, I think that sounds an awful like the

17   allegation in Twombly.  It's got a broad period here, an

18   eight-year period.  It's not identifying people, not

19   identifying times of specific meetings.  It's just very

20   generalized, conclusory language.

21          Now, it does have 50, and I think we've heard a

22   lot today about the plaintiffs talking about how their

23   complaints are so impressive because they identify the

24   number of meetings.  Well, that's kind of an empty

25   argument when they don't identify more specifics about

Page 256

1   that number.  But we have no idea who's alleged to have

2   gone from the Toshiba entities, what's alleged to have

3   occurred; and, frankly, we are a little baffled by the

4   repeated use of the passive voice here, that the Toshiba

5   entities participated in meetings in which unlawful

6   agreements were reached.

7          That's an odd way to make an allegation of

8   price fixing, particularly when Twombly in 2007 has said

9   that in an antitrust conspiracy case, the most important

10  thing is the agreement, an allegation showing that the

11  defendant in question participated and was a party to

12  the agreement.  So we just think that's an odd way to

13  turn a phrase in a price fixing case.

14         That paragraph continues:  These meetings

15  occurred in Taiwan, Thailand and Indonesia.  Again, I

16  guess the plaintiffs think that that's terrific

17  specificity, but our view is without identifying who

18  went where when and other details that's kind of empty

19  specificity.  And then they go on to say Toshiba never

20  effectively withdrew from this conspiracy.

21         Again, 172 isn't much better.  There it just

22  identifies the other Toshiba entities and it says that

23  they were, and again passive voice, they were

24  represented at those meetings.

25         We don't think that's enough notice to us to

Page 257

1   know how to go about defending ourselves.  We don't they

2   identifies the grounds and we don't think that kind of

3   bare factual assertion gives rise to a plausible claim

4   against Toshiba.

5          I won't belabor this, but you'll see there's a

6   couple further sentences in 172.

7          THE COURT:  I see.

8          MR. CURRAN:  And then in the indirect purchaser

9   plaintiffs' complaint there are very similar allegations

10  in paragraph 177 and 178.  There instead of saying a

11  specific number, 50, they say several glass meetings and

12  multiple bilateral discussions.  Okay.  Again, we don't

13  think that's a specific number under Twombly, Iqbal, or

14  Kendall.  In fact, we think those allegations are

15  exactly what those cases were condemning because they

16  are formulaic recitations.  They're conclusions.  And

17  they don't have sufficient factual information for us to

18  begin to prepare a defense.

19         And, your Honor, there hasn't been enough focus

20  on this yet today.  Iqbal and, before that, Twombly,

21  they're not merely pleading standard cases.  They are

22  pleading standard cases, and I think it's clear Conley

23  versus Gibson is now retired, but what's so important

24  about those cases is, and they talked about it

25  expressly, they are imposing on district judges and

Page 258

1    those who operated with the delegation of district

2    judges a gatekeeper role on discovery.   Twombly is

3    express about it.

4          THE COURT:   I know.

5          MR. CURRAN:   It says the doors to discovery are

6    not open until the pleading standards of those cases are

7    met, and our position, of course, is that with respect

8    to these meager allegations against the Toshiba entities

9    they're not satisfied.

10          Now, the third point and the third Roman

11   heading in our briefs deals with withdrawal.   Both

12   complaints here expressly allege that Toshiba entered

13   into a transaction in 2003, 2002 and 2003, which was

14   consummated prior to that magic date of November 26,

15   2003.   And the specific allegation is that the Toshiba

16   entities transferred their entire CRT business into a

17   new corporation, MTPD, which at least its original name

18   was Matsushita Toshiba Picture Display.   I believe the

19   name has been subsequently changed as Toshiba's

20   interests completely dissolved.

21          So our contention, your Honor, is that that

22   transaction by which the Toshiba entities exited the CRT

23   industry constitutes as a legal matter withdrawal and

24   abandonment of any conspiracy they were possibly in with

25   respect to CRT business.

MOTION HEARING   October 5, 2009

1    Now, in the opposition briefs that your Honor
2    received, I don't think there was a broad-based attack
3    on that proposition, but instead the plaintiffs pointed
4    out that -- they questioned whether it was withdrawal
5    and abandonment given that Toshiba retained an ownership
6    interest in that new corporation, okay, because you see
7    Matsushita and Toshiba contributed their CRT businesses
8    into a new company and they retained shareholder
9    ownership.  So Toshiba was a minority shareholder,
10   33 percent in the new entity.  So the plaintiffs are
11   taking the position, ah ha, that shows it's not
12   withdrawal and abandonment.
13       Our position is the plaintiffs are mistaken on
14   that point because under Ninth Circuit precedent and
15   specifically the Lothian case, which is cited in both
16   parties' briefs, we believe the proper test is whether
17   or not the company in question contending it abandoned
18   and withdrew from a conspiracy continued to have control
19   and operational management over the business in
20   question.  And we believe that Toshiba, as the minority
21   shareholder, and with respect to complaints where there
22   is no allegation whatsoever that Toshiba had any
23   continuing role in the operation of the business, that
24   those facts establish as a legal matter withdrawal and
25   abandonment of any conspiracy they may have been in.

Page 260

1          I hasten to add, of course, we deny any

2     participation in any conspiracy whatsoever, but

3     nonetheless that's a legal argument.

4          Thank you, your Honor.

5          MR. SPECKS:  Your Honor, Gary Specks with

6     Kaplan Fox on behalf of the direct purchasers.

7          Toshiba spends innumerable pages of its briefs

8     trying to distinguish plaintiffs' allegations from the

9     allegations that we make against other defendants.  The

10    problem is that they are attempting to draw these

11    distinctions that are utterly irrelevant to the

12    questions as to whether or not our complaint states a

13    claim against them.

14         For example, they argue that they weren't

15    indicted, they were never subpoenaed, they haven't pled

16    guilty, there is no criminal investigation against them.

17         THE COURT:  Get to where you're making the

18    charges against them.

19         MR. SPECKS:  I don't have their briefs in front

20    of me.

21         THE COURT:  Your briefs.  Where are your

22    allegations against the Toshiba entities?

23         MR. SPECKS:  We haven't alleged that.  They are

24    alleging that we make that allegation against other

25    defendants, but we haven't made it against them.

MOTION HEARING   October 5, 2009

Page 261

1          THE COURT:   I'm bypassing your entire point.

2          MR. SPECKS:   Pardon me?

3          THE COURT:   I'm bypassing your entire point.

4          MR. SPECKS:   Okay.   I understand.   Paragraph

5     154, 171 and 172 are the specific allegations against

6     Toshiba which alleges their participation and

7     representation at the conspiratorial meetings.   The

8     conspiratorial meetings that they attended are described

9     in 19 paragraphs of our complaint, paragraphs 134 to

10    153.   Those paragraphs describe the nature, the

11    organization, the attendees, the locations and the

12    substance of the conspiratorial meetings they attended.

13          THE COURT:   Okay.   I'll read them.

14          MR. SPECKS:   Now --

15          THE COURT:   What about withdrawal?

16          MR. SPECKS:   With respect to withdrawal, the

17    Ninth Circuit has said that in order to establish

18    withdrawal from a conspiracy the defendant must either

19    disavow the unlawful goal of the conspiracy,

20    affirmatively act to defeat the purpose of the

21    conspiracy, or take definitive, decisive and positive

22    steps to show its disassociation from the conspiracy.

23          Now, Toshiba argues that simply because it

24    formed this joint venture with one of its

25    co-conspirators, the joint venture also being a named

Page 262

1    defendant and co-conspirator in the case, that somehow

2    that constituted a withdrawal from the conspiracy.

3            The joint venture, first of all, concerned only

4    CRT's.  There is no contention by Toshiba that they ever

5    withdrew from the business of manufacturing products

6    containing CRT's, electronic products containing CRT's.

7    So to the extent they're suggesting to the court that

8    they somehow withdrew from the manufacture and sale of

9    all the products that were the subject of the conspiracy

10   we allege in this case, it's simply not so.  So in that

11   sense they certainly can't contend that they withdrew

12   from the conspiracy by retiring from the business.

13           They also maintained a shareholder interest in

14   this company, this joint venture company which was in

15   the business of manufacturing and selling CRT's.  Under

16   the Reisman decision in the Ninth Circuit, that alone is

17   enough to defeat their claim of withdrawal even assuming

18   this were only a CRT conspiracy.  So their withdrawal

19   contention really has little, little merit.

20           Now, I would refer your Honor, rather than

21   going into detail on the law which holds that the mere

22   sale or resignation, the mere sale of a business or

23   resignation from a business is not enough alone to

24   establish withdrawal as a matter of law, I would refer

25   your Honor to the case law that we discussed at pages 49

Page 263

1    to 53 of our joint opposition.  I'm not going to waste

2    the court's time by repeating what's in there.

3         I would also like to point in a procedural

4    context of a motion to dismiss Toshiba is the one who

5    has the burden of demonstrating that the allegations of

6    the complaint, in other words, the face of the

7    complaint, established their withdrawal as a matter of

8    law.  The fact of the matter is that withdrawal is a

9    very fact-intensive issue which can rarely be determined

10   on the face of the pleadings, and there is certainly

11   nothing that we allege on the face of our complaint that

12   establishes Toshiba's withdrawal as a matter of law.

13        If your Honor has any questions, I'd be happy

14   to answer.

15        THE COURT:  No.  Mr. Alioto, do you want to say

16   anything for the indirect?

17        MS. RUSSELL:  Your Honor, Lauren Russell

18   appearing for the indirect plaintiffs.

19        Your Honor, there seems to be an inconsistency

20   running through the defendants' presentations here.  On

21   one hand, they say that Continental Ore is still good

22   law and the complaint should be read as a whole.  On the

23   other hand, we have Toshiba saying that you should only

24   look at two paragraphs of our complaint as to the

25   allegations against them.

1          That is not the law.  Iqbal and Twombly do not

2    hold that.  Iqbal and Twombly are pleading cases.  They

3    say that you can -- you may disregard conclusory

4    allegations.

5          We have pled far more than conclusory

6    allegations here.  We have allegations regarding the

7    detail of the glass meetings, the different levels of

8    glass meetings and who attended.  And when you read all

9    of that together, as we describe in --

10          THE COURT:  Could you give me the paragraphs?

11          MS. RUSSELL:  The two paragraphs of our

12    complaint are 177 and 178.  Those are the two paragraphs

13    that Toshiba refers to, but Toshiba refers ignores many

14    of paragraphs in our complaint.

15          THE COURT:  What paragraphs do you want us to

16    read?

17          MS. RUSSELL:  We describe those in pages 40 to

18    41 of our brief.  Specifically our allegations that the

19    top level meetings --

20          THE COURT:  Give me paragraphs of your

21    complaint to read because that's what I have to measure

22    this against.

23          MS. RUSSELL:  Okay.  So the allegations

24    regarding the top meetings are in paragraph 146 of our

25    complaint and read together with paragraph 177, as

MOTION HEARING  October 5, 2009

Page 265

1    Continental Ore requires, we believe that a reasonable
2    inference you may draw therefrom is that Toshiba
3    Corporation as the parent company attended those top
4    meetings.
5             THE COURT:  Okay.  146, 147, 77, 78.  That's
6    all I need.  I'll read it.
7             MS. RUSSELL:  All right.  Thank you, your
8    Honor.
9             MR. KESSLER:  I think Panasonic is next.
10            MS. KERN:  Can I be heard for 30 seconds, your
11   Honor, just on the withdrawal issue?
12            THE COURT:  On the what?
13            MS. KERN:  On the withdrawal issue.  I'll be
14   mercifully brief.
15            One, withdrawal from the industry is not the
16   same as withdrawal from the conspiracy.  Withdrawal is
17   subject to tolling because of the fraudulent
18   concealment, and that's that Morton's case that we
19   discussed in our brief.  And, finally, even assuming
20   withdrawal, the defendants who withdrew would still be
21   liable for the acts of their co-conspirators before
22   withdrawal, and that's also Morton's.
23            And other than that, I'll stand on our briefs.
24   Everything is discussed in there, including the Lothian
25   case and the Reisman case.  Just briefly on Lothian, the

Page 266

1    issue here is whether the defendant maintained a

2    financial interest, and that's certainly a question of

3    fact.  Thank you.

4            THE COURT:  Okay.

5            MR. CURRAN:  Your Honor, with just two

6    rebuttals, with two, I wasn't going to get up, but with

7    three I figure I will.

8            Very briefly, first of all, all the other

9    allegations that were referred as supporting the claims

10    against Toshiba, they don't even mention Toshiba.  Those

11    are generalized allegations that defendants did such and

12    such.

13            THE COURT:  I'll read it.

14            MR. CURRAN:  With respect to withdrawal and

15    abandonment, the Reisman decision from 1969 predates

16    modern law on antitrust withdrawal.  It predates U.S.

17    Gypsum by the U.S. Supreme Court and it predates by a

18    couple decades the Lothian case I referred to.

19            This association is sufficient for withdrawal

20    or abandonment.  You don't have to defeat or disavow the

21    conspiracy.

22            MR. SIMON:  Your Honor, before Mr. Kessler gets

23    up, I gave you the capacity paragraphs on the Samsung

24    entities because I thought that was the question.  I

25    didn't give you the charging paragraphs.  Do you mind if

Page 267

1  you just go back and I'll give you those real quickly so

2  when you read them you can read them all together?  This

3  is on direct purchaser complaint on Samsung.

4          THE COURT:  Yes, I understand.

5          MR. SIMON:  Paragraph 130, paragraph 186,

6  paragraph 154, paragraph 166, paragraph 167 and

7  paragraph 112 along with the ones I gave you.  We were

8  going so fast there, I forgot to give you those.

9          THE COURT:  All right.  Who's next?

10          MR. KESSLER:  I am, your Honor.  Your Honor,

11  there are currently three Panasonic entities left in the

12  case.  We're moving individually on behalf of only two

13  of them, which is Panasonic of North America and

14  Panasonic Corporation.  We are not moving on behalf of

15  MTPD.

16          THE COURT:  I'm sorry.  Panasonic of North

17  American and Panasonic.

18          MR. KESSLER:  Corporation.  We are not moving

19  on behalf of MTPD.  MTPD is the company you heard that

20  was the joint venture formed by Toshiba and Panasonic in

21  which both companies put their CRT business and

22  eventually Panasonic Corporation bought a hundred

23  percent of the stock of MTPD later on in 2006 in terms

24  of that.  So that entity we're not moving on behalf of

25  except as part of the joint motion.

1     There are other Panasonic entities listed, but

2  they've been dismissed, even though they're still in the

3  complaint.   Just so your Honor knows, for example, the

4  direct complaint, paragraph 49, PACEC is not a separate

5  company and it's been dismissed from the complaint.

6  That's in the direct complaint, paragraph 49.   And also

7  defendant Matsushita Electronic Corporation Malaysia in

8  47 is out of the complaint.   That's a defunct entity.

9     MR. SAVERI:   Those were dismissed pursuant to

10  stipulation; is that correct?

11     MR. KESSLER:   Yes.

12     THE COURT:   Let me have their names again?

13     MR. KESSLER:   The entity in 49, PACEC.   This is

14  in the direct complaint.   And the entity in paragraph 47

15  Matsushita Electronic Corporation Malaysia.   They have

16  been dismissed from the complaint pursuant to

17  stipulation.

18     THE COURT:   Okay.

19     MR. KESSLER:   So focusing then on the two

20  entities that we are moving on.   The first one is

21  Panasonic North America.   Panasonic North America is

22  simply a sales company.   So it neither manufacturers

23  CRT's or manufactures televisions.   It buys televisions,

24  for example, and then resells them to retailers.   Okay?

25     There are virtually no allegations about

Page 269

1   Panasonic North America in either the direct complaint

2   or the indirect complaint other than identify it in the

3   paragraph that identifies it as a party.  Instead, what

4   they try to do is use that paragraph which exists in

5   each complaint saying every member of the corporate

6   family is represented by anybody.  So when they make

7   allegations about other Panasonic attending meetings,

8   they say, oh, well that pulls in PNA because you were a

9   member of the corporate family.

10          For reasons your Honor is aware of, that tells

11  PNA nothing, it gives us no notice of any specific

12  participation by PNA, nor does it make any sense that

13  PNA would participate in such a conspiracy because all

14  it did is buy televisions and resell televisions.  It

15  could not benefit in any way from the alleged CRT

16  conspiracy, and for the reasons which I won't repeat

17  again, there is nothing to indicate a television

18  conspiracy in which PNA or anyone else participated and

19  there is no allegation of that as a factual matter in

20  the complaint.

21          Now, what do they say about that?  Well, what

22  the direct purchaser plaintiffs say is they first point

23  to paragraph 144 and 146.  That's the first thing they

24  say.  The first point to note about 144, 146 is PNA is

25  not mentioned in either of those paragraphs.  Instead,