1   these are the paragraphs which talk about the fact that

2   they considered what downstream finished product prices

3   would be in entering into an alleged CRT conspiracy.

4          So, for example, at the end of 144, there is

5   this allegation defendants also considered the internal

6   pricing of products containing CRT's and at the end of

7   146, there's the allegation, the analysis often included

8   consideration of downstream prices.  No mention of PNA,

9   no discussion of withdrawal, yet these are the primary

10  paragraphs that they first cited for this.

11          Now, the second thing they rely upon is 103 --

12  sorry, is 163 which is the allegation that PNA which

13  they call PCNA, this is 163, was represented at those

14  meetings and was a party to the agreements entered at

15  them.

16          There is no -- nothing else to indicate how

17  they were represented, who represented them, which

18  meetings were they represented by.  It's simply a bald

19  conclusory allegation.  And then it says to the extent

20  PCNA -- that's PNA -- distributed CRT products to direct

21  purchasers it played a significant role.  That is

22  conclusory.  You know, what role did it play?  It says

23  defendants wish to ensure that the prices for such

24  products paid by direct purchasers would not undercut

25  the pricing agreements, but they don't allege what did

1    PNA do.  This is all conclusory language, and I would

2    submit under no version of Twombly or Iqbal could that

3    kind of allegation be sufficient.

4           That's it.  That's really the entire direct

5    purchaser complaint against PNA.  There's nothing else,

6    other than the fact that they're in there because any

7    mention of a corporate family member gets everybody else

8    in.

9           Now what do the indirect purchasers say about

10   PNA?  They have two substantive references to PNA in the

11   entirety of their --

12           THE COURT:  Hang on a minute.

13           MR. KESSLER:  Okay.

14           THE COURT:  Okay.

15           MR. KESSLER:  First they cite paragraph 182.

16   182 is a similar allegation to the one we read in the

17   direct purchaser case, a conclusory assertion that

18   Panasonic NA were represented at those meetings and were

19   a party to the agreements entered at them.  To the

20   extent -- it's almost identical.  To the extent

21   Panasonic NA and Panasonic Consumer Electronics sold or

22   distributed the CRT products to direct purchasers they

23   played a significant role.  That's the same allegations

24   that's in the direct purchaser complaint, wholly

25   conclusory, no factual assertions to back this up.  Just

1    throwing this -- and by the way, they make this same

2    allegation about every defendant who is a U.S.

3    subsidiary.  This is just a boiler plate conclusory

4    assertion repeated over and over again in the complaint.

5    You see the same thing for Hitachi or the same thing

6    for, you know, for an LG entity.  Just saying, well, you

7    were represented at the meetings and you played an

8    important role.  There is no facts to support those

9    assertions, just what the Supreme Court has cautioned

10   against.  So that's the first one that they have.

11          The second one that they have is the claim that

12   it was reported at the meeting, somehow that things were

13   reported.

14          THE COURT:  Where are you reading from now?

15   What paragraph?

16          MR. KESSLER:  I'm trying to find where they

17   make that allegation.  Actually, they say that in their

18   brief.  I don't know that I have -- I don't know that I

19   have a specific factual reference for that.

20          The next thing they say that they allege in

21   their brief that PNA manufactured and sold CRT's.  Well,

22   they don't allege that in their brief.  What they allege

23   in their brief --

24          THE COURT:  In the brief?

25          MR. KESSLER:  In their brief they allege that.

1   They don't allege that in the complaint.   In the

2   complaint what they allege is paragraph 81, and if you

3   look at paragraph 81, it's just this same allegation,

4   the same one they make for all of them, which is that

5   during the class period Panasonic NA manufactured,

6   marketed, sold and/or distributed CRT products.

7        So you don't know whether they're alleging

8   whether they manufactured or distributed.   They couldn't

9   possibly allege manufacture because they'd have no basis

10   for that.   So even though -- and this is the problem

11   with their briefs.   Their briefs say, oh, we allege they

12   manufactured CRT's, but in fact they couldn't possibly

13   do that, it would be a Rule 11 violation.   So instead

14   they allege this general allegation and/or.   Okay?   And

15   they say CRT products, not CRT's.   So, again, they don't

16   allege anything to link PNA to a CRT product conspiracy.

17   So again we don't see any basis to include them in this

18   complaint.

19        I also note, your Honor, that in the indirect

20   complaint they have dropped their claims against, in 82,

21   Panasonic Consumer Electronics Company, which is not a

22   separate entity, and also their Malaysian company in

23   paragraph 83.   So the indirects have dropped those

24   entities as well.   So they are not an issue in the case

25   any longer.   We have the same three entities in issue at

MOTION HEARING   October 5, 2009

1    both complaints.

2          That brings us to Panasonic Corporation.  First

3    of all, the allegations against Panasonic Corporation,

4    Panasonic Corporation is the Japanese company that owns

5    PNA in Japan.  What they allege about Panasonic

6    Corporation is they claim at paragraph 162 -- this would

7    be first of the direct purchasers' complaint -- in 162

8    they assert that, and I'll just find the specific

9    reference, I'm sorry.  Maybe in the wrong -- I'm not

10   wrong -- I was looking at the indirect.

11         It says Panasonic directly or through

12   Matsushita Malaysia, well, first of all, Panasonic is

13   defined as every Panasonic entity.  So they don't allege

14   this about Panasonic Corp and the reason that's

15   significant is that it just as easily could be MTPD.  We

16   don't know who the Panasonic entity is even that they're

17   alleging here because they don't say Panasonic Corp.

18   Their brief says, oh, that's Panasonic Corp, but the way

19   they structured their complaint, it's just Panasonic,

20   which they define to be everybody.  So we don't know who

21   is there.

22         And then it's completely conclusory.  They go

23   directly or through Matsushita Malaysia.  So we don't

24   know if they're alleging Matsushita Malaysia, who is a

25   defunct entity who has been dropped from the complaint,

Page 275

1   participated or whether Panasonic Corporation

2   participated or whether somebody else participated.

3   They say several dozen meetings.  They don't specify

4   which ones.  Okay.  And then they have general

5   conclusory allegations about these fixing prices

6   without, of course, saying anything about U.S. prices,

7   and the meetings took place apparently in Taiwan,

8   Malaysia and China.

9          Again, these are completely insufficient to

10  bring Panasonic Corporation into this case in terms of

11  this.

12         Then, what they also cite, if you look at the

13  indirect purchasers, the indirect purchasers cite

14  paragraphs 146, 181 and 183.  Well, if you look at 146,

15  what you'll see is that they say the first level of

16  these meetings was attended by high level company

17  executives.  Well, there's no specific reference to

18  Panasonic or which executive attended, but they cited in

19  as somehow showing that Panasonic was at these meetings.

20         There is nothing there.  Then they get to 181

21  and 183 and they go between at least 1996 and 2003,

22  defendant Panasonic through Panasonic Corp in Malaysia

23  participated in several glass meetings.  No identity of

24  which meetings, you don't know whether it was through

25  Matsushita Malaysia or through Panasonic Corporation,

MOTION HEARING   October 5, 2009

Page 276

1    and then after 2003 participated through its joint

2    venture with Toshiba MTPD.   These meetings were attended

3    by high level sales managers.   No names, no dates, no

4    times, nothing linking to the U.S., nothing linking to

5    finished products in terms of that.

6          Again, this is just not the type of specificity

7    that's there.

8          In summation, I'm going to stop, there has

9    never been a case in which just saying that people, that

10   companies attended meetings over a period of years

11   without which meetings with no specificity as to what

12   was said or done in these meetings has passed since

13   Twombly has been involved and that includes LCD, okay.

14         LCD is a very different case with very, very

15   different allegations, and, your Honor, we rest on the

16   allegations in this case.   They are simply not

17   sufficient to link in these two companies.   Thank you.

18         MR. MONTAGUE:  Laddie Montague, your Honor.

19         First of all, there are cases where no

20   participants have been named and no meetings have been

21   specifically identified.   Air cargo is one.

22         THE COURT:  Well, he said after Twombly.

23         MR. MONTAGUE:  But these are after Twombly.

24   And In re Chocolate Confectionary case.

25         THE COURT:  What's the name of the cases again,

MOTION HEARING   October 5, 2009

Page 277

1   please?

2          MR. MONTAGUE:   In re Air Cargo.   I don't have

3   the citation.

4          THE COURT:   Is it in your brief?

5          MR. SPECKS:   Your Honor, the decision reversing

6   the magistrate's decision came out after the briefs.

7          THE COURT:   Someone has to give me a cite.

8   What's the second one?

9          MR. MONTAGUE:   I think it's In re Chocolate

10  Confectionary.

11         THE COURT:   That cited somewhere in your

12  briefing?

13         MR. LITWIN:   I think it is.

14         MS. RUSSELL:   I have it here.

15         MR. MONTAGUE:   It's 2009 WestLaw 2486045,

16  Middle District of Pennsylvania, August 11, 2009.

17         THE COURT:   2486045.

18         MR. MONTAGUE:   2486045, yes.

19         THE COURT:   Okay.   Thank you.

20         MR. MONTAGUE:   These allegations are not

21  inadequate because Mr. Kessler says so.   I don't know of

22  a case where anybody has been required to name the

23  person from the company that attends a meeting or gives

24  an exact date of a meeting.   Look what we say about his

25  client, and he refers to this in 162.   We identify the

1   company through which the meetings were attended,

2   Matsushita Malaysia, and we mention several dozen

3   bilateral and group meetings from '96 to 2003.

4          You know, that's not just an allegation of

5   nothing.  We spend about 15 paragraphs explaining what

6   those meetings were, where they were located, what their

7   purpose was.  I mean, I've never seen a complaint that

8   has this much in it, let alone that they're saying we

9   don't have enough in it.

10         In addition, in paragraph 146 we allege that

11  closing and restricting output was one of the matters

12  that was discussed and agreed upon at the meetings, and

13  then on page 40 of our complaint in the section entitled

14  Effects of Defendants's Alleged Violations we have

15  example of reductions in manufacturing capacity by

16  defendants.  This is reductions, we say, as a result of

17  the conspiracy, and we list in paragraphs 182, 183,

18  which is their joint venture MTPD, and 185, we refer to

19  specific plant closings that were made restricting

20  output.  So we've been very specific as to Panasonic.

21         Lastly, with respect to the Panasonic of North

22  America, they were a necessary chain in the family -- in

23  the corporate family in order for the product to enter

24  commerce.  So, of course, they had to be part of the

25  conspiracy and they were part of the family which we

MOTION HEARING   October 5, 2009

1    talk about in 154, and it's interesting, it's not in our

2    complaint, but in our Footnote 64 of our brief, your

3    Honor, on 105 we cite to their Web site that states (As

4    read):

5                    Panasonic Corporation of North America based

6               in Secaucus, New Jersey, is the principal North

7               American subsidiary of Osaka, Japan-based

8               Panasonic Corporation on the New York Stock

9               Exchange and the hub of its branding,

10              marketing, sales, service, production,

11              development and R&D operations in the U.S. and

12              Canada.

13         So obviously it is a necessary link in this

14    whole conspiracy in order for their product to reach the

15    ultimate market, which is the class in our case.   Thank

16    you.

17         THE COURT:   Indirect plaintiffs want to add

18    anything?

19         MS. RUSSELL:   Your Honor, I just want to cite

20    to you some post Twombly cases that refute the

21    defendants' argument that we must plead each defendant's

22    participation in this conspiracy in elaborate factual

23    detail.   That is not the law.

24         THE COURT:   Okay.

25         MS. RUSSELL:   I will read to you from first of

MOTION HEARING   October 5, 2009

Page 280

1   all --

2           THE COURT:  No, just give me the cites, please,

3   because I've got to read those cases myself.

4           MS. RUSSELL:  The Graphic Processing Units, the

5   case cite is 527 F. Supp. 2d. 1011.  And the quote is

6   (As read):  The plaintiffs need not plead specific back

7   room meetings between specific actors at which specific

8   decisions were made.

9           THE COURT:  What's the date of this?  You say

10  this is after Twombly.

11          MS. RUSSELL:  It was after Twombly.  I believe

12  it was a 2008 decision.  I have to double-check.

13          MR. LEHMANN:  2007.

14          MS. RUSSELL:  From the LCD 1 case, when the

15  court granted the defendant motions in certain instances

16  and granted plaintiffs' leave to replead, the court said

17  (As read):

18              In remanding the complaint, plaintiffs need

19              not plead each defendants' involvement in the

20              alleged conspiracy in elaborate detail, but

21              must simply include allegations specific to

22              each defendant alleging that defendant's role

23              in the alleged conspiracy.

24          Your Honor, we have done that.

25          THE COURT:  What's the date of LCD 1?

MOTION HEARING  October 5, 2009

1          MS. RUSSELL:  Sorry.  LCD was 2007 also, I

2     believe, and LCD was 2008 and that was the case that

3     held that plaintiffs, when they have amended their

4     complaint and included allegations substantively similar

5     to what we have here, the court finds that plaintiffs

6     had alleged each defendant's involvement as to pass

7     Twombly.

8          MR. SIMON:  LCD 1 is 586 Fed. Supp. 2d. 1189,

9     August 5th, 2008, and what we're calling --

10          THE COURT:  586 Fed. Supp 2d. what?

11          MR. SIMON:  1189.  What we're calling LCD 2,

12    which is really just the order on the second round of

13    motions, is 599 Fed. Supp. 2d. 1179.  That's March 3d,

14    2009, your Honor.

15          MS. RUSSELL:  And, your Honor, I would just

16    like to refer you to page 40 of our opposition brief in

17    which we describe read together each of the Panasonic

18    entities was involved in the complaint.  And I'd also

19    like to refer your Honor to Footnote 48 of our

20    opposition brief in which we explain why our allegations

21    against Matsushita Malaysia should still be considered

22    by your Honor in deciding whether Panasonic was involved

23    in this conspiracy because we have specifically alleged

24    that Matsushita Malaysia attended meetings in Malaysia,

25    that they had a relationship with nearby competitors,

1   including Chunghwa Malaysia, who is the amnesty

2   applicant here, and specifically Matsushita Malaysia was

3   engaging in these activities at the direction of

4   Panasonic Corporation.

5          THE COURT:  All right.

6          MS. RUSSELL:  Okay, your Honor.  Thank you.

7          MR. KESSLER:  Very quickly, your Honor.  I

8   don't even have to walk to the podium.  The GPU case was

9   pre-Twombly.

10          THE COURT:  I'm sorry.

11          MR. KESSLER:  The first case she gave you.  The

12   LCD was post Twombly.  Significantly Judge Illston first

13   dismissed their case for failure to plead against

14   individual defendants in LCD 1.  In LCD 2, pre-Iqbal,

15   she did sustain their new allegations, but even Judge

16   Illston made them go back and replead against individual

17   defendants because they didn't do it at all in LCD 1.

18          So neither of those cases is particularly

19   helpful to them in arguing you don't have to plead

20   against individual defendants because Judge Illston

21   ruled that way.

22          With respect to the issue that PNA is a

23   necessary implement of a conspiracy, that makes

24   absolutely no sense.  The mere fact that you're selling

25   into a company the televisions, that doesn't mean

Page 283

1    they're necessary to a CRT conspiracy which we believe

2    again is only conspiracy alleged in the complaint.  PNA

3    has nothing to do with CRT.  They simply sell

4    televisions.

5            THE COURT:  I understand.

6            MR. KESSLER:  And by the way, Best Buy also

7    sells television.  So Best Buy could be a necessary

8    conspirator to them because you can't get to the

9    ultimately consumer until you go through some other

10   channel.  That can't be possibly a basis to say you get

11   locked into the case for that.

12           Finally, the last thing is it's very

13   interesting.  If you look at the indirect purchaser

14   complaint in paragraph 148, for example, which is

15   they're going through the different meetings that take

16   place, so in 148 A they list who attended these

17   meetings, no Panasonic, the Chinese glass meetings.  In

18   148 B, they talk about glass meetings in Europe.  They

19   allege who attended these meetings.  No Panasonic.  When

20   you go on later to where they do talk about Panasonic,

21   they end up not listing it anywhere.

22           So, for example, when you get to paragraph 164,

23   they say (As read):

24               Bilateral discussions were also used to

25               coordinate with CRT product manufacturers that

Page 284

1          did not ordinarily attend the group meetings,

2          such as, among others, Panasonic.

3          Then when you look at where are those meetings,

4     they give one example in 165, and here is an example of

5     the bilaterally meetings they had, guess who's not

6     mentioned, Panasonic.

7          So after having said that Panasonic does not

8     ordinarily attend the group meetings but are in the

9     bilateral, they then give only one example, and the one

10    example they give there's no Panasonic in 165.  So this

11    again is the kind of conclusory pleading.  Whenever you

12    get to a fact, there is no there there.

13          THE COURT:  All right.  We'll take one more

14    here before we take a break.

15          MR. ROGER:  I think for Hitachi, your Honor, we

16    only have a couple, three minutes.  So maybe I'll go.

17          MR. SIMON:  Where does that leave it on the

18    eight?  Half time.

19          MR. ROGER:  I have to take a break also, so

20    this will incent me to be quick, your Honor.

21          With respect to the lumping, nothing more to

22    add to what counsel for Toshiba and Panasonic had to say

23    because the paragraphs in the direct complaint or the

24    indirect complaint deal with so-called Hitachi exactly

25    the same way.

MOTION HEARING   October 5, 2009

Page 285

1          I would just quote, because Hitachi was singled

2     out in LCD, just quote from case wherein Judge Illston

3     held (As read):

4               The court agrees general allegations as to,

5               quote, all defendants, to, quote, Japanese

6               defendants or as a single entity such as,

7               quote, Hitachi is insufficient to put specific

8               defendant on notice from the claims.

9          THE COURT:   That's from LCD.

10         MR. ROGER:   from LCD, yes, your Honor, 586 Fed.

11    Supp. At 1117.

12         Then with respect with respect to actual

13    allegations against the fictional Hitachi, again, the

14    paragraph you ought to look at are in the direct

15    complaint paragraph 157 and 158 and in the indirect

16    complaint, paragraphs 179 and 180.  Again, exactly the

17    same kinds of allegations as against Toshiba and as

18    against the Panasonic entities.  So we would -- we've

19    argued in detail in our papers what's wrong with them.

20    So I won't repeat them here.  I just wanted to have

21    those before your Honor.

22         Finally, with respect to withdrawal, the

23    plaintiffs themselves have conceded that Hitachi Ltd.,

24    that's the parent company, spun off all of its CRT

25    operations in 2002.  That's the direct complaint at

```
 1   paragraph 31 and the indirect complaint at paragraph 88.
 2   We set forth the authorities in our briefs that we
 3   believe stand for the proposition that that is an
 4   effective withdrawal.
 5            THE COURT:  Spun off all what?
 6            MR. ROGER:  All of our CRT operations.  So
 7   paragraph 31 of the direct complaint, for example, says
 8   at line 8 on page 7, paragraph 31, says (As read):
 9                In 2002, all the departments of planning,
10            development, design, manufacturing, and sales
11            concerned with the display business of Hitachi
12            Ltd. were spun off to create a separate company
13            called Hitachi Displays.
14            And Hitachi Displays was added by the
15   plaintiffs as a defendant in this case.  And we've got
16   the same allegations in the indirect purchaser
17   complaint.  That's all I have, your Honor.
18            THE COURT:  Any reply to that?
19            MS. RUSSELL:  Your Honor, can I take a quick
20   break just before I respond?
21            THE COURT:  Let's take a seven-minute recess.
22   Resume as soon as the people are back in the room.  Then
23   we've got four more to go after that.  So we'll be going
24   to about 6:00 o'clock.
25            (Recess taken.)
```

Page 287

```
 1              THE COURT:  All right.  Let's go ahead now,
 2    please.  Ma'am, you wanted to speak?
 3              MS. RUSSELL:  Yes, your Honor.  Again, your
 4    Honor, I'm going to be as brief as possible because I
 5    can tell your patience is wearing thin, but we do not
 6    simply make allegations against a fictional Hitachi.
 7    I'll refer you to pages 32 to 39.
 8              THE COURT:  Wait a second.
 9              MS. RUSSELL:  Page 32.
10              THE COURT:  Wait a minute.  Are you giving me
11    pages of your brief?
12              MS. RUSSELL:  Pages of our brief.
13              THE COURT:  Or allegations in the complaint?
14              MS. RUSSELL:  Pages in the brief which refer
15    expressly to allegations in our complaint which are
16    specific to the Hitachi defendants, each of the Hitachi
17    defendants, I may add, not just Hitachi, as counsel
18    keeps asserting.
19         And it also refers to allegations in the
20    complaint that when read together, as I said previously,
21    plausibly suggest that each of the Hitachi entities was
22    involved in the conspiracy.
23         I feel it's necessary --
24              THE COURT:  What pages are you giving me in the
25    brief?
```

1          MS. RUSSELL:   Pages 32 to 39 of our brief.

2          THE COURT:   32 to 39.

3          MS. RUSSELL:   Right.   I feel it's necessary

4     just to address briefly Hitachi's arguments regarding

5     agency and point out to you that the agency allegations

6     that we have here in our complaint are almost identical

7     to the agency allegations made in LCD 2, and the cite is

8     599 F. Supp. 2d. at 1184, and in that case Judge Illston

9     found that those allegations were sufficient.

10          Taken together with the other allegations in

11     the complaint which allege a conspiracy from the top

12     down organized by the parent corporations, implemented

13     by their subsidiaries and their employees, we allege one

14     other aspect that people keep saying is that we should

15     name specific people within the Hitachi entities or

16     within any of the other defendant entities who attended

17     these meetings.   We allege the types of employees who

18     attended these meetings, and that was expressly held

19     sufficient in the LCD 2 case.

20          Moreover, your Honor, I think there has been

21     some suggestion by defendants that LCD 2 has been

22     overruled by Iqbal in that regard.   The California Title

23     Insurance case which the defendants cite in their brief

24     and which could somebody please get me a cite for?   The

25     California Title Insurance case is a post Iqbal case

Page 289

1  which cites first to LCD 2 with approval in regards to

2  their finding that it was sufficient just to name the

3  types of employees who were involved in the meetings.

4  And in addition, the California Title Insurance case

5  also discusses LCD's holdings --

6          THE COURT:  What is the cite in California

7  Title?

8          MS. RUSSELL:  2009 WestLaw 145802.

9          THE COURT:  I'm sorry.  145 what?

10         MS. RUSSELL:  Eight.  I'm sorry.  Your Honor, I

11  have an accent.  It comes out when I say certain words.

12         MR. SAVERI:  Thank God it's not Canadian.

13         THE COURT:  145.

14         MS. RUSSELL:  8025.

15         MR. ROGER:  Do you have a date on that?

16         MS. RUSSELL:  That was May 21st, 2009.

17         THE COURT:  All right.

18         MS. RUSSELL:  And just I think there has also

19  been some criticism of lifting our allegations, I think

20  the defendants say lifting allegations from the LCD case

21  and using them in this case, and what the defendants are

22  completely ignoring is the substantial overlap between

23  the LCD case and this case.

24         We have numerous defendants that are in the LCD

25  case and are also in this case.  Chunghwa, the two

Page 290

1    Chunghwa executives who have been indicted in CRT were

2    also indicted in LCD.  Hitachi Displays, which they, of

3    course, would rather you not hear, has also pled guilty

4    in LCD.  Hitachi Displays or the Hitachi entities are

5    members of the trade associations with Samsung,

6    Chunghwa, several of the other -- excuse me.  I can't

7    remember which other defendants.  But several of the

8    other defendants in this case.

9           All of these allegations set the context that

10   the Supreme Court in Iqbal said you, as the judge

11   deciding this motion to dismiss, must consider whenever

12   you are looking at our complaints and deciding whether

13   we have alleged a plausible claim for relief.

14          Thank you, your Honor.

15          THE COURT:  All right.  Next defendant.

16          MR. LEHMANN:  Well, your Honor the direct

17   purchasers.

18          THE COURT:  I thought you passed.

19          MR. LEHMANN:  No, we didn't pass.  She went

20   first.  I'll try to be brief.

21          THE COURT:  We're going to be here till about

22   7:00 o'clock the way we're going.

23          MR. LEHMANN:  I'll try to be brief.  The full

24   argument of Hitachi is found at pages 83 to 92 of our

25   opposition brief.

```
 1              THE COURT:  Wait a minute.  You're talking
 2     about your brief again.
 3              MR. LEHMANN:  83 to 92 of opposition brief is
 4     where we fully describe our arguments with respect to
 5     Hitachi.
 6              With respect to the complaint, what we allege
 7     is we have these corporate family allegations that
 8     applied to Hitachi as well as to the other defendants.
 9     They're in paragraph 154.  We describe these various
10     types of meetings by category and by category of
11     attendee, they're at 134 through 153 of the complaint.
12              Then with respect to the Hitachi corporate
13     family's participation in those meetings, we allege in
14     157 that they participated in over a dozen illegal
15     bilateral and group meetings from '96 to 2001 that took
16     place in Taiwan and China.  We described the role,
17     that's at paragraph 157.  And at paragraph 158 we
18     describe the role that the American subsidiaries of
19     Hitachi played in connection with the conspiracy.  Both
20     paragraphs relate to the CRT product conspiracy.  We
21     also allege in paragraph 124 the $31 million fine that
22     Hitachi Displays paid.
23              THE COURT:  I'm sorry.  What paragraph?
24              MR. LEHMANN:  Paragraph 124.  The $31 million
25     that Hitachi Displays had to pay as part of its pleading
```

1    guilty to participation in the LCD's conspiracy, and

2    your Honor may remember we pointed this out in our

3    brief, there are cases in this district, SRAM and Flash

4    Memory that have said in terms of evaluating the

5    plausibility of the complaint before you, you can look

6    at guilty pleas by the same defendant in related

7    industries.  So that's a factor to consider here.

8         I'd like to clear up one quick thing and it was

9    alluded to by Lauren.  There are two LCD opinions.  The

10   first one Judge Illston did indeed require the

11   plaintiffs to replead.  The second one the plaintiffs

12   did replead, and they allege the same type of thing

13   here, but not only in terms of the family of the

14   corporation, but also in terms of the meetings.  They

15   didn't allege who in particular attended.  They didn't

16   allege the exact time.  They had a description of

17   hundreds of types of meetings and the participation of a

18   family of corporations in those meetings.

19        Judge Illston held, and I think this is kind of

20   important to note, 599 Fed. Supp. 2d. at page 1185.  She

21   said (As read):

22            The complaints allege a complex

23            multinational price fixing conspiracy and taken

24            as a whole they sufficiently allege each

25            defendant's participation in that conspiracy as

MOTION HEARING  October 5, 2009

Page 293

1          well as present a factual basis for the

2          allegations of agency.

3          Exhibit 3 to the Saveri declaration submitted

4     in support of our opposition brief has a side-by-side

5     comparison.  That's instructive in terms of the adequacy

6     of this complaint.  I also think in terms of the agency

7     allegations if you look at Weinstein versus Saturn

8     Corporation, 303 Federal Appendix 424, Ninth Circuit,

9     2008, and Dion LLC versus Infotech, 2007 WestLaw

10    3231738, there is a support that fairly conclusory

11    agency allegations will suffice for purposes of notice

12    pleadings in all of these.

13         When you see the defendants respond to this

14    argument on agency, you see them rely on lot on summary

15    judgment cases.  We're at the pleading stage here.  The

16    summary judgment cases are inapposite.

17         Thank you, your Honor.

18         MR. MILLER:  Sam Miller, Sidley Austin on

19    behalf of LG Electronics, and I'm going to give you a

20    chart so you can figure out who's who with respect to

21    the LG Electronics.  One for the judge, one for direct

22    purchasers.  I don't have one for everyone.  One for

23    Mario.

24         So, your Honor, I direct you first to the

25    indirect purchaser complaint because it identifies the

1   LG entities and then explains why we should be dismissed

2   out of this case.  If you look at paragraph 50, 50, 5-0.

3            THE COURT:  Just a second.  So we're going to

4   indirect.

5            MR. MILLER:  Paragraph 50.

6            THE COURT:  This is not the brief.  It's the

7   complaint.

8            MR. MILLER:  It's the complaint.  So it's page

9   9, paragraph 50.

10            THE COURT:  All right.

11            MR. MILLER:  So LG Electronics is a Korean

12   corporation.  It's based in Seoul, Korea.  And if you

13   look at the top right-hand corner of my chart, it's LG

14   Electronics and we refer to LGE.

15            Paragraph 51 talks about LG Electronics U.S.A.,

16   which is here on my chart is a subsidiary of LG

17   Electronics.  As you've heard from others, it's a

18   marketing subsidiary.  It doesn't make anything.  It

19   markets its products in the United States.  That's a

20   defendant.

21            And also the plaintiffs have named a separate

22   subsidiary of LG based in Taiwan.  That's paragraph 52.

23   And that's LG Taiwan Taipei which they refer to as LGTT.

24   LGTT has never sold anything in the United States, and

25   it is the marketing arm in Taiwan, but those two are

1   wholly owned subsidiaries of the parent LG Electronics.

2        Look at line 12 of paragraph 50 in the

3   complaint and it says (As read):  In 2001, LG

4   Electronics transferred its CRT business to a 50/50 CRT

5   joint venture with defendant Phillips.

6        All right?  So that allegation makes clear that

7   LG Electronics spun off and sold its CRT tube

8   manufacturing business to a totally separate entity in

9   which, according to this allegation, it's a 50 percent

10  shareholder.  For these purposes, we'll take that.  But

11  it's a totally separate entity, and if you look up on

12  the top right of my chart, that's what we call LP

13  Display.

14       If you go to paragraph 61 of the joint -- of

15  the indirect purchaser complaint, you see that LP

16  Display is properly regarded as separate from the LG

17  family of entities.  It is a separate entity and it is

18  alleged as such in the indirect complaint.  It is the

19  manufacturer of tubes, and since --

20       THE COURT:  Okay.  Manufacturing and sells

21  tube.

22       MR. MILLER:  And there is no dispute.  I think

23  everyone will agree.  It is a manufacturer of CRT tubes,

24  and it sold tubes to a number of different companies,

25  including LG Electronics and others.  All right?

1        LG Electronics is clearly alleged post 2001 to

2   be a buyer of tubes, not a seller.  If you look at

3   paragraph 128 K of the indirect complaint, you will see

4   that there are allegations that LG was a buyer of CRT

5   tubes not only from LP Display, the joint venture, but

6   also from Samtel, which is a totally separate company.

7        The basic point, your Honor, is that the

8   complaint on its face makes clear that post 2001, six

9   years before the first complaint was filed, LG

10  Electronics was a buyer of tubes, not a seller.

11       You heard Mr. Simon explain why Sony and Sharp

12  are not named as defendants.  What did he say?  He said

13  they were buyers of tubes.  They were victims of this

14  conspiracy.  Post 2001, LG Electronics and its two

15  subsidiaries are in exactly the same place.

16       The indirect purchaser complaint, as we have

17  talked about before, makes clear in paragraph 227 that

18  the purchasers -- I'm sorry -- the manufacturers of

19  finished products, the manufacturers of the CRT finished

20  products, the monitors and the TV's are subject to

21  vigorous price competition.  So they're in a highly

22  competitive market.  That's paragraph 227.  That

23  includes LG Electronics as a seller of finished TV's and

24  monitors.

25       Interestingly, I think this is significant, in

1    paragraph 225 of the indirect purchaser complaint, the

2    indirect purchasers actually identify who are the direct

3    purchasers, and what do they say?  In paragraph 225,

4    they say the direct purchasers are the CRT TV and

5    monitor manufacturers.

6            We agree with that.  Those are the proper

7    direct purchasers, not the retailers.  The only properly

8    alleged conspiracy, if there is one at all as we've

9    discussed, has to do with a tube conspiracy.  The direct

10   purchasers of that conspiracy are my client.  So my

11   client should be a victim, not a defendant in this case.

12   And when I say my client, I'm talking about LG

13   Electronics and its two marketing subsidiaries.

14           We've talked a little bit about the impact or

15   actually a lot about Iqbal, but I would say this.  In

16   the old days when you were on the district court

17   under --

18           THE COURT:  Don't make me sound that ancient.

19           MR. MILLER:  But under Conley versus Gibson,

20   the plaintiffs could shoot first and ask questions

21   later, and that's how things proceeded.  The complaints

22   went forward and the judges thought I'll let it go,

23   we'll sort it out later through summary judgment or

24   settlement, and as you know, most cases got settled.

25           I think that the Supreme Court in recent cases,

1    Twombly, Iqbal, even the Trinko case makes clear that
2    antitrust cases should be weeded out earlier.  Not that
3    there's a heightened pleading standard, but it's your
4    role as the judge not to wait till later and hope it
5    gets sorted out, but to figure out what is the proper
6    claim, what's the scope of the proper claim, who are the
7    right defendants, who should be out of the case and to
8    do it now, not say, I'll deal with that later.
9              If you did that, then whoever would be in the
10   complaint, and the plaintiffs have said Chunghwa for
11   sure because they're the cooperator, you should sort out
12   and say there are 50 defendants named, but really there
13   are plausible allegations only as to some, not all.  And
14   it doesn't make sense that LG Electronics that was a
15   buyer since 2001 would be on the other side of the V
16   here because we are a victim.
17             So where does the statute limitations or
18   fraudulent concealment come in?  If you -- this is not a
19   case where if you accept our argument that the
20   plaintiffs have not sufficiently alleged fraudulent
21   concealment, the case goes away or it gets thrown out.
22   The practical effect is that the damage period is
23   limited to the 2003 to 2007 and that is appropriate
24   given the lack of proper and sufficient fraudulent
25   concealment allegations here.

1        So, in other words, if you agree with us that

2    fraudulent concealment is not properly pled, it doesn't

3    mean the plaintiffs doesn't have a claim.  It means that

4    the damage period is 2003 to 2007, and as you know, your

5    Honor, that's going to be to make a big difference and

6    make a lot easier in case management, in class

7    certification, in resolution of this as we go forward.

8        We've talked about the Barker case, and I want

9    to say one thing because I am not -- my client LG

10    Electronics is not in the LCD case.  We're not in SRAM,

11    we're not in Flash Memory.  So far we're stuck in this

12    one and I hope you'll let us out.

13        But we went back and looked at the briefs and I

14    have to take credit, but my team here found the Barker

15    case.  It's dispositive controlling Ninth Circuit

16    precedent on the issue of whether the issue of

17    fraudulent concealment must be alleged defendant by

18    defendant.  We went back to look, and I don't believe it

19    was even cited to Judge Illston in the LCD case on the

20    issue of fraudulent concealment.  So she found

21    fraudulent concealment by one can apply to all.

22        She is just wrong.  Certainly it's not cited or

23    distinguished in her decision on this which has been

24    cited to you a million times.

25        Now, the plaintiffs, Mr. Rushing, who used to

1    work with me a long time ago, said, Well, Barker doesn't

2    apply because it doesn't apply to conspiracy cases.  It

3    is an ERISA case, it's not an antitrust case; but as you

4    know, there are a lot of cases that actually interpret

5    ERISA with antitrust and vice versa.  But,

6    interestingly, if you look at the cases that are cited

7    in Barker, they include Gibson, which is a civil rights

8    conspiracy case, Griffin, a RICO conspiracy case, and

9    O'Brien, a RICO and securities case.

10            THE COURT:  Tell me again what Barker stands

11   for?

12            MR. MILLER:  Barker stands for the proposition

13   that fraudulent concealment allegations must be specific

14   to each defendant.  You can't say, well, there was

15   generalized fraudulent concealment.  You have to look

16   and see whether --

17            THE COURT:  This is even before Twombly.

18            MR. MILLER:  This is before Twombly.  This is

19   an old case.  We found it, and I don't believe it was

20   cited to Judge Illston and it's not in her opinion and I

21   think it's controlling.  And what that case says is you

22   have to have specific concrete allegations satisfying

23   Rule 9(b) to go back more than four years.

24            Again, that's the consequence here.  So we're

25   not saying there isn't a claim.  We're saying the claim

Page 301

1   here should be limited 2003 forward, and unless the

2   plaintiffs can satisfy specific allegations as to a

3   particular defendant, then they can't assert a class and

4   you shouldn't let damages go forward back to 1995, which

5   is what the plaintiffs are asserting here.

6           And Barker relies on conspiracy cases and I

7   think it is the controlling rule in the Ninth Circuit,

8   and as I said, it relies on the O'Brien case which

9   specifically says (As read):  The failure of plaintiffs

10  to identify specifically which of the defendants

11  committed any of the above enumerated acts of

12  concealment is fatal.  Fatal.  That's the word used.

13          So if you apply Barker --

14          THE COURT:  I understand.

15          MR. MILLER:  Then I think the plaintiffs have

16  conceded they haven't tried to allege fraudulent

17  concealment defendant by defendant because they said

18  they didn't have to, and I'm saying they have to and

19  they failed; and, therefore, we shouldn't -- we should

20  only go forward if there's any claim 2003 forward.

21          Now, I told we became a buyer in 2001, and I

22  contend that as a matter of law that that means we

23  withdrew from this conspiracy because there are cases,

24  and they are cited in some of the briefs, the car

25  carrier case, Toyota case that say it makes no sense for

1    you to conspire to increase the price of an input.  It

2    makes no sense.  It's not plausible, and you heard -- I

3    don't want to repeat the argument.  It's been made

4    before.

5              So let me just give you what I think are the

6    controlling cases on why we withdrew as a matter of law.

7    One is Lothian, L-o-t-h-i-a-n, which both sides have

8    cited, and that says -- that involved a defendant who

9    was in a conspiracy for a while, left and went off

10   somewhere else and then actually came back, and the

11   issue was could he be sentenced for all the counts

12   where -- and the Ninth Circuit actually reversed his

13   conviction as to the substantive counts of mailing -- I

14   think it was a mail fraud when he went there.  He had

15   left, went off to Australia and they said if you cease

16   participating in the scheme, and here it's the price

17   fixing on tubes, then you're out of it.  And that is

18   withdrawal.

19             So that's one case that supports.  Becoming a

20   buyer -- becoming a buyer of tubes, not a seller, should

21   constitute withdrawal as a matter of law.  So we did

22   three things.  We spun off the business, we ceased

23   making tubes and we became a buyer.

24             I don't believe of all the meetings that the

25   plaintiffs talk about that LG was there post 2001.  If

Page 303

1  they have evidence, they haven't put it in the

2  complaint.  And I would say this, your Honor, again as a

3  practical matter when you're judging this, this is an

4  unusual case because the plaintiffs, they say it right

5  out in their brief, they have the -- they have

6  everything.  They have a cooperating witness who has

7  told them everything about this.  So this isn't a case

8  where they say, well, we have to wait for discovery

9  because they know more than I do, and I've told that

10  Guido and Bruce Simon here, but this is a unique

11  situation where they have every detail.

12          MR. SAVERI:  But I asked you to check with your

13  clients and you didn't.  Okay?  Why don't you tell him

14  that, tell him I asked to check with your clients and

15  file a verified complaint and you didn't.  Don't give me

16  that baloney.

17          MR. MILLER:  If they had specific allegations

18  that LG was there as opposed to this other entity that

19  they're trying to -- they're trying to attribute acts of

20  the joint venture to us post 2001, and my point is under

21  principle they gave up on alter ego.

22          THE COURT:  I understand.

23          MR. MILLER:  That's why I'm out if you look at

24  Nippon Paper case, Morton's Market, Lothian, as a matter

25  of law, we should be out and there is no fraudulent

MOTION HEARING  October 5, 2009

1    concealment.

2              MR. SIMON:  Can I say one thing for full

3    disclosure on the record?  It's not an important point.

4    Because Mr. Fastiff and Luke Fraser and myself are

5    co-lead counsel in LCD; I believe we entered into a

6    tolling agreement with your client in LCD.  So you're

7    not out just yet.

8              MR. MILLER:  They dismissed us.

9              THE COURT:  Make him an offer.

10             MR. MILLER:  They know we are not in that case,

11   you know.  We have not received a grand jury subpoena,

12   we have not received a grand jury subpoena in this case.

13   And we are dismissed out of that case.

14             MR. SAVERI:  But you've got a tolling

15   agreement.

16             MR. SIMON:  Keep talking.  You may never get

17   out.

18             MR. MILLER:  All right.  I'll sit down.

19             MR. SPECKS:  Your Honor Gary Specks, Kaplan Fox

20   on behalf of the direct plaintiffs.

21             First of all, the LG defendants' reliance on

22   the Barker case is misplaced because it's not a

23   conspiracy case.  It was an ERISA case.  We cite three

24   appellate decisions in our brief which hold that acts of

25   concealment of one defendant co-conspirator undertaken

MOTION HEARING   October 5, 2009

Page 305

1    during the course of and furtherance of a conspiracy are

2    attributable legally to all codefendant co-conspirators

3    under principles of substantive conspiracy law which

4    have been in effect for probably a hundred years.

5              THE COURT:  That still apply.

6              MR. SPECKS:  Absolutely still apply.

7              THE COURT:  After Iqbal?

8              MR. SPECKS:  There's nothing in Iqbal or

9    Twombly or any of the cases that defendants cite that

10   abolished settled substantive principles of conspiracy

11   law.  We cite those cases, those appellate decisions, on

12   page 28 and 29 of our joint opposition.

13             Now, even if we assume that we had to make some

14   type of specific allegation as to LG, I would refer your

15   Honor to paragraph 210 of our complaint which does make

16   a specific allegation.  It says (As read): Manufacturers

17   such as LG Electronics periodically issued press

18   statements falsely asserting that CRT prices were being

19   driven lower by intense competition.

20             That's pretty specific.  Even though we didn't

21   have to make a specific allegation as to every

22   defendant, that's pretty specific.  It's pretty

23   understandable.  I think it would be enough for him to

24   check with his client to see if that occurred.

25   Certainly gives him notice of what we're claiming.

MOTION HEARING  October 5, 2009

Page 306

1          Second allegation that they make or contention
2   that they have is that they withdrew from the conspiracy
3   in 2001, and the sole basis for that allegation is their
4   assertion that in 2001 they formed a joint venture with
5   one of defendant co-defendant co-conspirators, Royal
6   Phillips called LG Phillips Display, which later changed
7   its name to LP Displays.  And this joint venture was
8   also a named defendant conspirator in the case, and that
9   they combined their CRT businesses into this joint
10  venture.  It was a 50/50 joint venture, 50 percent owned
11  by Royal Phillips, 50 percent by LGEI, and that they
12  continued to sell CRT tubes through this joint venture
13  into 2007 when they sold it and it became an independent
14  company in 2007.  Until 2007, it was jointly owned by
15  Royal Phillips and by LGEI, they were refer to it as
16  LGE, LG Electronics.
17          That's hardly the stuff of which withdrawal is
18  made.  There is no complaint allegation indicating LG
19  Electronics disavowed the goal or purpose of the
20  conspiracy or that it affirmatively acted to defeat the
21  conspiracy or that it took definite decisive positive
22  steps to disassociate itself from the conspiracy or its
23  co-conspirators.  That's what the Ninth Circuit says is
24  required to establish withdrawal.
25          In point of fact, the formation and operation

1    of this joint venture with its defendant co-conspirator

2    Royal Phillips furthered the purposes of the conspiracy

3    and certainly couldn't have constituted a withdrawal.

4           Now, nowhere in any of their papers or anything

5    they've filed do they contend that they exited the

6    business of manufacturing and selling products

7    containing CRT's.  So there wasn't some complete

8    withdrawal from the business of manufacturing and

9    selling all the products which we allege were the

10   subject of the conspiracy.  So there was no complete

11   disassociation from the conspiracy, from the

12   co-conspirators, there was no complete withdrawal.

13   That's my next point.

14          With respect to the specific allegations

15   regarding the LG defendants, those allegations appear at

16   160 to 161 and 154 of our complaints.

17          THE COURT:  Just a moment, please.

18          MR. SPECKS:  That's 160 to 61 and the 154 is

19   the representation agency allegation.  It alleges that

20   they participated in more than 12 bilateral and more

21   than 100 group meetings from 1995 through 2006.  Now,

22   how is that consistent with their contention that they

23   withdrew in 2001.  We have specifically alleged that

24   they participated in the conspiracy '95 through 2006.

25          In the procedural context in which their

1  contention of withdrawal arises, they have to show that

2  the face of the complaint we filed establishes there are

3  withdrawal as a matter of law.  Well, our complaint

4  allegations are obviously inconsistent with any

5  contention that that they withdrew in 2001 since we're

6  asserting that they participated through 2006.

7        Now, we describe these meetings that they

8  attended in 19 paragraphs of the complaint, paragraphs

9  134 to 153.  We don't stop there, your Honor.  We allege

10  more.  We allege that they also participated and were

11  represented at trade association related meetings where

12  there was an exchange of competitively sensitive and

13  proprietary information which was used to implement and

14  maintain the conspiracy.  That's paragraphs 176 to 180.

15        They were asking for names, your Honor.  Look

16  at 178.  We gave them names.  Maybe now they'll want the

17  shoe sizes of people who attended the meeting.

18        THE COURT:  I'm sorry.  It's too late in the

19  day for attempted humor.  Stick with telling me what I

20  need to know.

21        MR. SPECKS:  I apologize, your Honor.  In any

22  event, I think those allegations are certainly more than

23  specific enough to inform them of what they're charged

24  with and more than specific enough to tie them to the

25  conspiracy that we allege.

MOTION HEARING  October 5, 2009

1          Now, again, I would again refer your Honor to

2     the Reisman decision because the Reisman decision

3     basically says that the fact that they didn't completely

4     disassociate themselves from the conspiracy and

5     continued to have a stockholder interest in one of the

6     conspirator defendants until 2007 precludes any kind of

7     a finding that they withdrew from the conspiracy under

8     Reisman, and that's 409 F. 2d. 789.

9          Your Honor, I have nothing further unless your

10    Honor has some questions.

11          MS. RUSSELL:  30 seconds, your Honor, on LG.

12          THE COURT:  Indirect plaintiffs?

13          MS. RUSSELL:  I just want to direct your Honor

14    to the paragraphs in our complaint which I believe

15    allege that the formation of LG Phillips displays or

16    LPD, as it was referred to, was an overt act in

17    furtherance of the conspiracy by LG and Phillips, and

18    those paragraphs are 125, 126, 127, 128, 168 and 169 and

19    172.

20          And in particular I want to point out in

21    paragraph 162 we allege that it was the same --

22          THE COURT:  162 or 172?

23          MS. RUSSELL:  Sorry.  172.  In 172, we allege

24    that it was the same executives from LG who attended the

25    meetings and then attended, you know, before 2001, and

Page 310

1    then those same employees attended the meetings after

2    2001 on behalf of the joint venture, LP Displays.  I

3    think that shows you that there was a continued

4    participation and control by LG and Phillips in the CRT

5    conspiracy after 2001 and that should dispose of their

6    argument that they withdrew from this conspiracy.

7              Thank you, your Honor.

8              THE COURT:  All right.  Number six.  Whoever

9    that is.

10             MR. RIPLEY:  Good afternoon, your Honor.

11   Richard Ripley on behalf of -- I'll use the plaintiffs'

12   terms -- Royal Phillips, Phillips America, Phillips

13   Electronics Taiwan and what we call Phillips Brazil, and

14   because of the stipulation, your Honor, we're not going

15   to be talking about the allegations with respect to

16   Phillips Taiwan or Phillips Brazil.  Those two entities

17   have pending personal jurisdiction motions.  So my brief

18   time before you this afternoon will focus on Royal

19   Phillips and Phillips America.

20             THE COURT:  I'm sorry.  My notes.  I thought

21   there was only one still left.  Royal Phillips

22   Electronics.

23             MR. RIPLEY:  I'm sorry.  The door.  I couldn't

24   hear you.

25             THE COURT:  You say -- what's the other

MOTION HEARING   October 5, 2009

1   Phillips that's still in here?

2          MR. RIPLEY:  There's K. Phillips or Phillips

3   America, we call it PENAC, P-E-N-A-C.  Some of the

4   plaintiffs refer to them as Phillips America.  Okay?

5          And our brief, just for the record and for your

6   Honor, is document 476 on the docket if you want an easy

7   reference to it.  That is our motion to dismiss.  476.

8          I'd like to start with Phillips America, your

9   Honor.  There is one allegation in the complaints, one

10  allegation in the direct purchasers' complaint, one

11  allegation in the indirect purchasers' complaint with

12  respect to Phillips America.  And that the allegation

13  that Phillips America was represented at meetings and a

14  party to the agreements entered at those meetings.

15         THE COURT:  Okay.  Would you give me a

16  paragraph number, please?

17         MR. RIPLEY:  Sure.  In the direct purchasers'

18  complaint it is paragraph 165 and in the indirect

19  purchasers' complaint it is paragraph 171.

20         THE COURT:  All right.

21         MR. RIPLEY:  All right?  That is the only

22  allegation as to Phillips America, that they were

23  represented at the meeting.  There is no allegation that

24  Phillips America attended a single meeting and there is

25  no allegations that they participated in the conspiracy

MOTION HEARING   October 5, 2009

1    aside from this single statement.

2            So it's clear that both the direct and indirect

3    purchasers are attempting to bring in Phillips America

4    by claiming that they had somehow authorized someone at

5    the meeting, at these meetings to speak on their behalf

6    or to somehow bind them, but there is no facts stated

7    that would allow this court to infer such an agency

8    position, none.

9            With respect to what you, your Honor, referred

10   to as K Phillips, there is only the allegations that

11   have been stated to you which is paragraph 164 in the

12   direct purchasers' complaint, and 170 in the indirect

13   purchasers' complaints.

14           THE COURT:  154 in direct.

15           MR. LITWIN:  164, your Honor.

16           MR. RIPLEY:  164 in the direct purchasers and

17   one 70 in the indirect purchasers.

18           And that's the one where they identify K

19   Phillips as attending at least a hundred meetings.

20   Again, this is what Iqbal calls a bare assertion and

21   Iqbal says that with a bare assertion it's not entitled

22   to the -- it's not entitled to the presumption of truth.

23           And in fact, the paragraphs that have been

24   recited time and again by the plaintiffs, by the direct

25   plaintiffs, that are sufficient to meet the minimum

1    standard talk about this phrase attending defendants,

2    the attending defendants did this, the attending

3    defendants did that, and that's in paragraphs 142 to 149

4    of their complaint.  But they don't say who the

5    defendants are.  They just say the attending defendants.

6    And that again is a bare assertion.  Who are the

7    defendants?  They don't identify them.

8              So based on that and with respect to the post

9    2001, I'm not going to repeat what my co-counsel has

10   stated about for LG.  I'm not to go in and go through

11   that again because it's getting late in the day.

12             THE COURT:  When was it you withdrew?

13             MR. RIPLEY:  Well, we sold in 2001.  And you

14   just heard counsel --

15             THE COURT:  No, I understand.

16             MR. RIPLEY:  So I won't need to go through that

17   again.

18             THE COURT:  I forgot the date on which you said

19   you divested.

20             MR. RIPLEY:  What we have with respect to these

21   two, K. Phillips and Phillips America, with the Phillips

22   America we have a single allegation they were

23   represented at the meeting.  That's a bare assertion.

24   They aren't alleged to have attended any of the

25   meetings.

1          It's one of these things where I remember my
2     tort professor telling us that you assume all, let them
3     sort it out.  Unfortunately, that falls -- the sorting
4     out falls to your Honor, and based on the allegations,
5     the single allegation with respect to Phillips America,
6     it doesn't give any -- give you any facts that would
7     allow you to infer participation by that corporation.
8          Before I sit down, I want to just encourage
9     your Honor to read the title insurance case that
10    Ms. Russell cited to you that she said was a post
11    Twombly case.
12          MS. RUSSELL:  Sorry.  It was post Iqbal.
13          MR. RIPLEY:  Well, post Twombly, post Iqbal.
14    It's a 2009 case.
15          THE COURT:  Do I get a cite to that?
16          MR. RIPLEY:  Yes, you do, your Honor, but the
17    cite was a WestLaw cite.  I unfortunately --
18          THE COURT:  Here it is.  2009 WestLaw.
19          MR. RIPLEY:  I'm reading from the Lexus
20    version, but it's the same opinion, right?  And they
21    state that there the plaintiffs argue that they need not
22    assert overt acts and that the plaintiffs' attempt to
23    show that the corporations directly participated in the
24    conspiracy by making general allegations as to families
25    of companies without any specific allegations as to what

Page 315

1    particular corporations in the families did.

2           And there they say those allegations are

3    insufficient to put those corporations on notice as of

4    the claim.  So I encourage you to read that case, your

5    Honor.  And although it cites the LCD 2 opinion, it says

6    that you need to allege facts that show that the

7    corporations knew what -- that the parent corporations

8    knew what the subsidiary corporations were doing, and

9    then they cite to the LCD 2 and they say where you don't

10   show specific facts that demonstrate that a parent

11   corporation, in this case K. Phillips, knew what the

12   plaintiffs were doing, that you don't satisfy Iqbal and

13   Twombly.

14          THE COURT:  Thank you.  Reply by direct

15   plaintiffs?

16          MR. LEHMANN:  Michael Lehmann again, your

17   Honor.  I will be brief.

18          With respect to Phillips America, counsel has

19   identified the correct paragraph, 165 of the direct

20   purchaser complaint.  That has to be read in the context

21   of the preceding paragraph 154 that describes the family

22   of corporations which are applicable to Phillips, and as

23   I've set forth before, that's sufficient for agency

24   purposes under TFT LCD's.

25          With respect to.

1          Phillips K, I would contend base assertion that
2  wouldn't survive under Iqbal would be this.  Phillips K
3  attended meetings at which it conspired with other
4  defendants to fix prices for CRT products.  That clearly
5  wouldn't do what paragraph 164 says (As read):
6          Phillips through Royal Phillips, these
7          various other entities and the LGPD joint
8          venture entities participated in over 100
9          illegal bilateral group meetings from 1996 to
10         2007 in which unlawful agreements as to inter
11         alia price output restrictions and customer and
12         market allocation of CRT products occurred.
13         These included several bilateral meetings and
14         over 100 group meetings of the types described
15         herein.
16      And that's the reference to the 19 paragraphs
17  that preceded it that described what happened.
18         And these meetings occurred in Korea,
19         Taiwan, Malaysia, China, Scotland, the UK and
20         various locations in Europe.  Phillips
21         participated through Royal Phillips or its
22         subsidiaries in 2001 and participated
23         thereafter through LGPD.  Phillips never
24         effectively withdrew from this conspiracy.
25         That, I submit, provides more facts and

1  provides sufficient notice after Twombly and after

2  Iqbal, and that's pretty much identical to what was

3  deemed sufficient in the one case that's closest to this

4  one, LCD's.

5       With respect to the argument that the Phillips

6  defendants withdrew from the conspiracy, Mr. Specks has

7  already laid that out.  I'm not going to repeat it.

8       THE COURT:  Anything from indirect?

9       MS. RUSSELL:  Your Honor, we have nothing

10  further.  It's in our briefs.  I just refer to our

11  opposition brief at page 41.  That discusses the various

12  Phillips entities' participation.

13       THE COURT:  Page what?  Page 41?

14       MS. RUSSELL:  Page 41, yes, sir.

15       THE COURT:  All right.  Who is next, please?

16       MS. McMILLAN:  Good afternoon.  I'm Kate

17  McMillan for Beijing Matsushita Color Company, BMCC.

18       THE COURT:  Beijing Matsushita.  Okay.

19       MS. McMILLAN:  As you know, BMCC has joined in

20  the joint motion to dismiss and it's also filed its own

21  individual motion raising particular deficiency in the

22  complaint as to BMCC.  I'd like to highlight --

23       THE COURT:  I want to get this BMCC defined

24  again, please.

25       MS. McMILLAN:  Beijing Matsushita Color CRT

Page 318

1   Company.

2          THE COURT:  That's what you're calling MCC.

3          MS. McMILLAN:  BMCC.  Yeah, it's a little bit

4   easier.

5          THE COURT:  All right.

6          MS. McMILLAN:  Your Honor may not be as

7   familiar with BMCC as with many of the other defendants

8   in this case.

9          THE COURT:  No, I don't think I've heard about

10  them in the marketplace.

11         MS. McMILLAN:  And that's not surprising.  They

12  haven't come up at all in today's argument and it's not

13  a household name and, indeed, their mentioned very

14  rarely in the complaints.

15         Both sets of plaintiffs recognize that BMCC is

16  a Chinese CRT manufacturer.  That is, they only

17  manufacture the tubes, they don't manufacture any

18  televisions, any computer screens, any finished

19  products.

20         Now, both sets of plaintiffs allege or assert

21  that BMCC manufactured, sold, or distributed CRT

22  products throughout the U.S.

23         THE COURT:  Products.

24         MS. McMILLAN:  Products.  That's wrong all the

25  way around.  As I mentioned, BMCC is solely a CRT

MOTION HEARING   October 5, 2009

Page 319

1   manufacturer, not a finished product manufacturer.

2   Further, those tubes are only manufactured in China.

3   It's a domestic Chinese company.  They have no U.S.

4   offices, no U.S. sales force, no U.S. presence.  So it's

5   not surprising that plaintiffs have had a hard time

6   alleging that BMCC participated in any plausible

7   conspiracy, let alone one actionable under U.S. law.

8           Moving on to the specifics of the complaints,

9   BMCC -- well, we believe that both complaints consist

10  largely of legal conclusions rather than facts, and I

11  won't repeat the arguments there, but even if one were

12  to accept the conclusions as facts, the complaints do

13  not allege sufficient facts as to BMCC.

14          Direct purchasers' complaint alleges facts

15  relating to BMCC's participation in meetings in only one

16  paragraph, and that's paragraph number 173.  Indirect

17  purchasers make similarly brief assertions in three

18  paragraphs, and I'll get into those in a moment, but

19  those are paragraphs 1, 148 A and 184.

20          So turning first to the direct purchasers'

21  complaint, and to paragraph 173 in particular, it states

22  that -- I'll just recite part of it for you.  (As read):

23          BMCC participated in over 20 illegal

24          bilateral group meetings between 1998 and 2001

25          in which unlawful agreements as to CRT products

1        occurred.  These meetings occurred in China.

2             And that's it, your Honor.  That's all we have.

3   That's all we know.  That's the only paragraph that's

4   specific to BMCC in all of direct purchasers' paragraphs

5   attempting to allege facts regarding the defendants.

6   They today and in their opposition have urged the court

7   to look at the complaint as a whole.  So we have

8   attempted to do that.  In looking at the complaint as a

9   whole, we don't see any additional facts as to BMCC.

10            In fact, there are four sections that

11  plaintiffs have talked to you about today in the direct

12  purchaser complaint that allege facts regarding

13  defendants generally.  There is the section in part 7 C

14  of their complaint talking about international antitrust

15  investigations, and that's the section where we walk

16  through various allegations in jurisdictions worldwide

17  and they point out specific companies and individuals

18  that are alleged to be targets of the investigation.

19  They don't name BMCC at all, and that's not surprising

20  because BMCC is not a subject of the DOJ investigation,

21  has not received a grand jury subpoena and does not

22  appear at all in that section.  So there are no

23  additional facts as to BMCC in that part of the

24  complaint.

25            Again, trying to read the complaint as a whole,

1    one might look to the general section in part 7 D of

2    direct purchasers' complaint.  That section goes to

3    collusive contracts, meetings and agreements generally.

4    They again attempt to obfuscate what products are at

5    issue by calling everything CRT products.  This doesn't

6    help as to BMCC.  Not only has BMCC never manufactured

7    finished products, but it doesn't have any subsidiaries

8    that manufacture finished products.  So to the extent

9    that plaintiffs point to, you know, a parent company

10   that manufactures the tubes and then controls a

11   subsidiary that produces televisions or computer

12   monitors, that's simply not the case for my client.

13          The next section of the complaint which

14   plaintiffs have touted as the trade associations and

15   events section, again that doesn't mention BMCC once.

16   Not a single time.

17          Moving on to the specific defendant

18   participation section, that's paragraph 173 again, here

19   we have something a little bit unusual and unique to our

20   client, and that is that in direct purchaser plaintiffs'

21   opposition they've alleged that there is a typographical

22   error in that paragraph and that 2001 should actually

23   read 2007.

24          We didn't realize that that was the case and,

25   of course, nor could we have because if you read the

Page 322

1   complaint as a whole, there is no clue as to whether

2   BMCC participated in meetings in 2001, in 2007, in 2003

3   or '4 or any other year; and the direct purchaser

4   plaintiffs admit this when they say in their opposition

5   that the complaint erroneously does not identify any

6   conspiratorial conduct by BMCC after 2001.

7        While I'm on the topic of the typographical

8   error, I'll just briefly address our statute of

9   limitations argument.  That is that on its face the

10  claim should be dismissed under the statute of

11  limitations unless the direct purchasers can show that

12  the limitations period should be tolled.

13       THE COURT:  That's based upon the allegation of

14  2001, wasn't it?

15       MS. McMILLAN:  That's right.  That's based on

16  the complaint as it reads now.  Even if they were to

17  amend their complaint to read 2007, the direct

18  purchasers still failed to meet the fraudulent

19  concealment standard and as to injuries related to sales

20  more than four years prior to the filing of the first

21  complaint, those claims should be dismissed.

22       I would like to also point that neither the

23  direct purchasers nor the indirect purchasers have

24  alleged a single act or statement of fraudulent

25  concealment as to BMCC.

Page 323

1          So to recap, as to the direct purchaser
2   complaint, there is one paragraph.  It's vague,
3   conclusory and certainly does not allege that BMCC
4   joined a conspiracy or played some role in it that would
5   be sufficient under the case law that we've heard argued
6   today.

7          Turning to the indirect purchaser complaint, it
8   suffers from many of the same flaws as that of the
9   direct purchasers.  As I mentioned, there are a total of
10  three paragraphs mentioning BMCC in relation to meetings
11  or allegations.  The first one, paragraph 2, merely says
12  that over time some defendants reached out to others,
13  including BMCC.  The indirect purchasers then assert
14  that participants at some of the Chinese glass meetings
15  included manufacturers in China such as BMCC, and
16  finally in paragraph 184 that BMCC participated in
17  meetings and discussions.

18          Again, recognizing the weakness of these
19  paragraphs indirect purchasers direct us to the
20  complaint as a whole.  Reading the complaint as a whole
21  doesn't add anything as to BMCC because, again, indirect
22  purchasers have relied on the antitrust investigations
23  which BMCC is not a target, the trade associations and
24  relationships which BMCC is not alleged to have
25  participated in.

1          Neither set of plaintiffs ever alleged to have

2    purchased CRT's coming from BMCC, and as I mentioned

3    BMCC doesn't have any subsidiaries that make the

4    finished products.

5          So for those reasons and the reasons in the

6    joint motions to dismiss we respectfully submit that

7    both complaints should be dismissed as to BMCC.  I'd be

8    happy to answer any further questions.

9          THE COURT:  Thank you.

10          MR. RUSHING:  Your Honor, Jeff Rushing again on

11    behalf of the direct plaintiffs.

12          First, counsel is right when she referenced

13    paragraph 173.  That is the paragraph referring to BMCC.

14    I didn't think she read it -- the paragraph she read --

15    I don't think she read the right one.  It does have a

16    typo in it which I'll explain in a minute.

17          THE COURT:  It does have a what, a typo in?

18          MR. RUSHING:  The paragraph reads BMCC

19    participated -- it should read (As read):

20               BMCC participated in at over 20 illegal

21               bilateral group meetings between 1998 and 2001

22               in which unlawful agreements as to inter alia

23               price, output restrictions and customer and

24               market allocation of CRT products, including

25               CDT products and CPT products, occurred.  These

1          meetings occurred in China.  BMCC never

2          effectively withdrew from this conspiracy.

3          None of BMCC's conspiratorial conduct was

4          mandated by the Chinese government.  BMCC was

5          acting to further its independent private

6          interests in participating.

7          The allegation is very much like referring to

8    the other defendants, your Honor.  It does has a typo.

9    In the first line "at" should not be there.  It should

10   say "bilateral and group meetings" and it should say

11   "between 1998 and 2007."

12         THE COURT:  Have you made any attempt with the

13   court to correct that typographical error?

14         MR. RUSHING:  We discovered it in the briefs

15   and we mentioned it to the briefs and mentioned to the

16   court with the briefs.

17         THE COURT:  Have you filed anything with the

18   court seeking to correct it?

19         MR. RUSHING:  We put a footnote in the brief

20   asking for leave to amend it as necessary.  As a

21   practical matter, for purposes of this motion, your

22   Honor, I don't believe it matters because if the --

23   first of all, the fraudulent concealment allegations we

24   have, which you've heard about already, if you accept

25   our version of the allegations and the law as to those,

1   then BMCC's motion should be denied.

2          As to the Twombly issue, again, it's a very

3   similar allegation to the other defendants and the

4   change I think is not material there.  If it is

5   material, we can change it.

6          And I will just say one thing further on the

7   withdrawal argument.  Again, it's based on a typo, as

8   she said.  But even so they asked the court essentially

9   to infer from the fact that no attendance at meetings

10  after 2001 is not alleged in the complaint, they ask the

11  court to infer from that fact that they have withdrawn

12  from the conspiracy.

13         As you've heard from Mr. Specks and others,

14  withdrawal is an affirmative defense.  It must appear as

15  a matter of law on the face of the complaint; and,

16  therefore, just the notion of drawing an inference in

17  their favor on that is against the rules on motion to

18  dismiss, and the simple fact that the complaint doesn't

19  allege attendance at a meeting after 2001 I think in no

20  way shows affirmatively that they disavowed the unlawful

21  goal of the conspiracy, affirmatively acted to defeat

22  the purpose of the conspiracy, or take definitive,

23  decisive and positive steps to show its disassociation

24  from the conspiracy.  So, again, notwithstanding the

25  typo, I think your Honor can deny the motion on that

1    ground as well.

2              MR. SAVERI:  I think the record should show

3    that the indirect case has the right date, doesn't it?

4              MR. RUSHING:  The indirect case does have the

5    correct date.  So there is no issue of notice.

6              THE COURT:  Anything from the indirect

7    plaintiffs?

8              MS. RUSSELL:  Just very briefly I'll refer you

9    to pages 43 and 44 of our opposition brief which

10   discusses BMCC's participation in the conspiracy.

11   Specifically paragraph 148 alleges that BMCC attended

12   the class --

13             THE COURT:  You're not referring to your

14   complaint.

15             MS. RUSSELL:  Right.  Sorry.  Paragraph 148 A

16   specifically alleges that BMCC attended the Chinese

17   glass meetings and it specifically alleges who they

18   attended the Chinese glass meetings with, and finally I

19   would note that none of the other Chinese

20   co-conspirators with whom BMCC is alleged to have

21   conspired with challenged the complaint under Twombly.

22   Therefore, it's unclear to me why BMCC has done it.

23             Thank you, your Honor.

24             MS. McMILLAN:  Ever so briefly, your Honor, if

25   I may.

Page 328

1          THE COURT:  Yeah, sure.

2          MS. McMILLAN:  Ever so briefly, we've responded

3    to most of those points in our briefs.  I just wanted to

4    say very quickly as to the typographical error, it is at

5    the heart of the matter.  It's not a harmless error.

6    It's very much material.  It changes the other

7    defendants with whom BMCC could have been alleged to

8    have attended meetings.  It's not a ticky-tacky

9    typographical change as the in at over would be.  This

10   is actually very much at the heart of the complaint and

11   at the very least plaintiffs should be required to

12   replead and allow BMCC the chance to reply in due

13   course.

14         THE COURT:  Okay.  Thank you.

15         MR. SAVERI:  In other words, as I understand

16   it, you will not stipulate that we can change it without

17   filing a motion; is that correct?

18         MS. McMILLAN:  That's -- that's our position at

19   this time.

20         MR. SAVERI:  Okay.  I just want to understand.

21   So the answer is yes, you want us to amend.

22         THE COURT:  Yeah, she's standing on her

23   pleadings.  All right.  I believe the last one is which

24   company?

25         MR. AHERN:  Tatung Company of America, your

1    Honor.

2           Well, I know your Honor has never heard this

3    before, but we are different, and there are two

4    important points about this.  Our facts are different

5    and the reason that we can talk about facts is because

6    our procedural posture is different.

7           We brought a Rule 12(b)(1) motion under

8    Illinois Brick and we attached sworn affidavits of two

9    employees, Mr. Lai, L-a-i, and Mr. Chen.

10          THE COURT:  Wait a minute.  Go ahead.  I'm

11   sorry.

12          MR. AHERN:  We have also brought a Rule

13   12(b)(6) motion challenging the sufficiency of

14   plaintiffs' allegations with respect to Tatung Company

15   of America's, which I'll call TUS, TUS's participation

16   in the alleged conspiracy.

17          In response, the plaintiffs did not seek to

18   take the depositions of Mr. Lai and Mr. Chen in this

19   case.

20          THE COURT:  Who did you file the first motion

21   on behalf of?

22          MR. AHERN:  Tatung Company of America.

23          THE COURT:  Same one.  I thought you were

24   talking about two companies here.

25          MR. AHERN:  No.  No.  Tatung Company of America

Page 330

1    I refer to as TUS.  And in response to our motion where

2    we attach the sworn declarations of Mr. Lai and

3    Mr. Chen --

4              THE COURT:  Now, I understand you are out of

5    the indirect case.

6              MR. AHERN:  No, we're in both.  Tatung Company

7    of Taiwan is out of the indirect case.  And I'll try to

8    use the white board very briefly to show what the

9    plaintiffs are trying to assert here.  Okay?

10             THE COURT:  I don't think you need to.

11             MR. AHERN:  Oh, I think we do.  So the

12   plaintiffs did not seek to take the depositions of

13   Mr. Lai and Mr. Chen.  Okay?  So the factual statements

14   contained in those declarations are undisputed based on

15   the record before your Honor.  They do attempt to rely

16   on depositions taken in the LCD case.  I'll let them

17   talk about that.  Okay?  But it will important, as

18   demonstrated later, that many of the facts in the sworn

19   declarations are basically at this point in the record

20   before your Honor uncontroverted.

21             THE COURT:  This is an affidavit of Mr. Lai.

22             MR. AHERN:  And Mr. Chen.  Mr. Lai is the

23   financial person responsible, Mr. Chen is the

24   operational person.

25             THE COURT:  And they were filed in connection

1    with this motion.

2            MR. AHERN:   Correct.   Now, with respect to your

3    factual situation a few quick important facts.   TUS does

4    not manufacture CRT's and never has.   TUS buys CRT's

5    from companies including Chunghwa and others.   Not

6    exclusively Chunghwa.   TUS is not owned in any way by

7    Chunghwa.   In fact, TUS is a purchaser in this case and,

8    in our view, is a victim in this case; and we have

9    submitted a declaration in connection with our reply,

10   Mr. Lie's reply declaration, which indicates that we

11   will participate in the class if there is a class.

12           Now, very briefly, the plaintiffs have utterly

13   failed to allege that TUS participated in the alleged

14   conspiracy, didn't attend any meetings, no

15   communications with any competitors.   Okay?

16           One of previous defense counsel referred to the

17   portion of the California Title Insurance litigation

18   decision which was in May of 2009 in which Judge White

19   specifically rejected general allegations as to families

20   of companies.

21           So without any allegations with respect to

22   specific TUS participation in the alleged conspiracy,

23   with the family allegation out, then what is it that the

24   plaintiffs can rely on here?

25           Well, I was very happy that Mr. Simon's chart

1    of the seven of the 12 groups of the defendants that are
2    integrated didn't have us on it or Chunghwa.  Thanks,
3    Bruce.  Appreciate that.  Maybe the reason is that
4    Chunghwa doesn't control TUS.  Maybe the reason is that
5    Chunghwa has settled and TUS has no independent
6    liability.
7             THE COURT:  What was the relationship between?
8    Buyer?  Seller?  Was there a corporate relationship?
9             MR. AHERN:  May I approach the white board?
10             THE COURT:  You can't just tell me.
11             MR. SIMON:  We have to go through the family
12    history of the owners.
13             MR. AHERN:  Your Honor, the details usually
14    benefit the defendants.  But in any event we have
15    Chunghwa and we have Tatung Taiwan and then we have
16    Tatung US -- that sometimes known as CPT -- is the only
17    manufacturer of CRT's.  Okay?  Tatung Taiwan owns
18    30 percent of Chunghwa.  Tatung Taiwan owns 50 percent
19    of TUS.
20             THE COURT:  So it was the parent corporation,
21    at least the upstream, an upstream stockholder.
22             MR. AHERN:  That's right.  But there's no
23    ownership here, and as far as we have said, based on the
24    facts in the Chen and Lai declarations, there is also no
25    financial control, no operational control and no control

1   overpricing, maybe most importantly.  Okay?

2            And the same thing here.  No financial control,

3   no operational control, no control over pricing.  All

4   right?

5            Now, the plaintiffs make a big deal about the

6   fact that Tatung Taiwan --

7            THE COURT:  Did Tatung U.S.A. buy CRT's.

8            MR. AHERN:  It does buy CRT from Chunghwa.  The

9   declaration say these are arm's length transactions.

10            THE COURT:  And it's a sister company.

11            MR. AHERN:  It's a sister company, but arm's

12   length transactions.  But the mere fact that it's a

13   sister company doesn't mean anything with respect to the

14   control exception to Illinois Brick.  This is what we're

15   talking about, the control exception to Illinois Brick,

16   and we're also talking about a possible application of a

17   single enterprise theory.  But none of that would apply

18   here because Chunghwa has no ownership in Tatung U.S.

19   and has no control over Tatung U.S.

20            Now, the only control that really the

21   plaintiffs try to argue is that the same family that

22   started Tatung Taiwan, the Lin family, also controls

23   Tatung U.S., owns the remaining 50 percent of Tatung

24   U.S.

25            Well, that has been dispersed, but the more

1   important issue here is the Lin family doesn't control

2   Tatung Taiwan.  So Tatung Taiwan is a public company on

3   the Taipei stock exchange.  The Lin family owns

4   4.2 percent of it, and there are significant larger

5   purchasers, but it's a public company.  So this is the

6   death knell for their argument reliance on the Lin

7   family.  Lin family doesn't control Tatung Taiwan.  So

8   it doesn't make any difference whether or not some

9   members of the Lin family own the additional 50 percent.

10          Let me just while I'm here talk about Royal

11   Printing.  Okay?

12          THE COURT:  Talk about what?

13          MR. AHERN:  Royal Printing, the Ninth Circuit

14   case.  Royal Printing is, pure and simple, a control

15   exception case.  All right?  And the Ninth Circuit in

16   Delaware Valley said so and the plaintiffs have tried to

17   expand Royal Printing beyond being a pure control

18   exception case.

19          Now, remember the reason for the control

20   exception is that when you have the manufacturer coming

21   down to the subsidiary, coming down to the purchaser

22   that the court in Illinois Brick said what we're not

23   going to do is we're not going to explore pricing at

24   both the manufacturer level, pricing decisions at both

25   the manufacturer level and at the subsidiary level.  If

Page 335

1    you control the subsidiary, we're going to assume that

2    you're controlling the pricing, Mr. Manufacturer.  Okay?

3            In this particular case, we have no suggestion

4    of any control over pricing.  So if -- so what happens

5    if you leave us in in this case?  Who are the plaintiffs

6    going to be able to recover from?  Well, they're going

7    to be able to recover from Chunghwa.  They already

8    settled in the direct purchasers' case.  They're going

9    to be able to theoretically recover from us.  That looks

10   a little bit like duplicative recovery to me.

11           Well, what if it's not duplicative recovery?

12   If it's not duplicative recovery, then it's pass-on.

13   Either one of them, the Supreme Court says, you can't

14   have.

15           That was good because I just went through about

16   20 pages here.

17           The plaintiffs do attempt to rely on some

18   statements that are -- some marketing statements that

19   have been uncovered in the LCD case which they say that

20   show that we're all big one single enterprise and also

21   say that show control.  Okay?  Referring to the Tatung

22   group and including Chunghwa in that.

23           We cited numerous cases which have said that

24   those types of statements are, number one, commonplace

25   in business and are not to be taken as trumping the

1    objective facts of whether there's operational control

2    or financial control, and those cases are cited in our

3    brief.

4            With respect to the issue of once again going

5    back to Royal Printing, Mr. Simon said with respect to

6    Sugar that, well, you can't -- one of the things that

7    the court cited in the Third Circuit was that there

8    would be a gaping hole in enforcement, but Illinois

9    Brick, the Supreme Court said that they are adopting a

10   bright line test and if that meant that certain people

11   who were injured went without redress that that was okay

12   with the Supreme Court.

13           So the idea that there is some sort of likely

14   not to sue standard that is now under Royal Printing I

15   think should be rejected based on a proper reading of

16   Illinois Brick, and Judge Hamilton in the Sun

17   Microsystems decision also said that where a company

18   like Tatung U.S.A. retains its right and even indicates

19   that it's going to exercise its right to pursue a claim,

20   that that is sufficient under Illinois Brick to defeat

21   essentially a control exception argument.

22           So I would recommend to your Honor Judge

23   Hamilton's decision in Sun Microsystems case at page --

24   which is cited at page 12 of our reply brief.

25           With respect to the standard that this court

1    should apply, there was some reference to -- earlier on

2    this morning there was some reference to the fact that

3    if the -- if the issues are intertwined between Illinois

4    Brick and the merits that the practice standard is Rule

5    56 standard.  That is actually -- that argument is

6    actually incorrect.  Once again Judge Hamilton in the

7    Sun Microsystems decision at page 15 of our reply brief

8    goes through this and says that in fact where you have a

9    factual attack on a complaint under 12(b)(1), the proper

10   stand -- and where the issue is not intertwined, and in

11   that case she found that the FTAIA issue was not

12   intertwined with the merits, that you apply the 12(b)(1)

13   standard, and the 12(b)(1) standard allows your Honor to

14   make factual determinations.

15        Now, with respect to the situation here, the

16   issue of whether TUS is a purchaser as opposed to being

17   controlled by Chunghwa is not intertwined with the

18   merits.  There is nothing that the plaintiffs need to

19   prove with respect to their Sherman Act Section 1 claim

20   that they would need to prove in order to establish that

21   Chunghwa controls TUS.

22        Plaintiffs invoke Copper Weld.  I'll just refer

23   your Honor once again to Judge Hamilton's decision where

24   she rejects at 608 Fed. Supp. 2d -- it's at 1185-1186

25   where she rejected a similar argument that Copper Weld

1    provides any basis for the plaintiffs here to pursue

2    either a control exception or a single enterprise theory

3    here.

4            Finally, as mentioned with respect to LG

5    Electronics, as also mentioned by Mr. Simon with respect

6    to Sony and others, TUS here is a purchaser, we're a

7    victim, we're not a target, we didn't get a grand jury

8    subpoena, and according to the plaintiffs, we operate in

9    a competitive market.  So as such, we should be

10   dismissed.

11           MR. FASTIFF:  Eric Fastiff from Lieff,

12   Cabraser, Heimann & Bernstein on behalf of the direct

13   purchaser plaintiffs.

14           Just a few quick ones, your Honor.  First of

15   all, this really is an improper 12(b)(1) motion.  It's a

16   12(b)(6) motion.  The claim here is a Sherman Act claim.

17   That, of course, is a federal original jurisdiction

18   claim.  So you should look at this under this under

19   12(b)(6) standard.  All inferences should be directed in

20   favor of the plaintiffs.  If your Honor looks at it as a

21   12(b)(1) motion, taking into account the evidence that

22   Mr. Ahern referenced, that evidence is entitled to

23   little weight.  The declarations have no time, they are

24   qualifications as to when various actions were supposed

25   to have taken place.  Often statements talk about things

1  currently.  We're not talking about what happened

2  currently.  We're talking about what happened in the

3  past.  So that evidentiary weight is very little.  It's

4  also rebutted by the Saveri declaration, Exhibit 6,

5  which incorporates the evidence supplied in the LCD

6  case.

7          And what's crucial is that what Mr. Ahern

8  didn't tell you and what he did not cite in his opening

9  brief is 100 percent of his arguments were rejected by

10  Judge Illston in the LCD case in a two-page opinion.  He

11  never cited it.  We did.  It's 2009 WestLaw 533130.

12          THE COURT:  Wait a minute.  2009 WestLaw what?

13          MR. FASTIFF:  533130.  It's a two-page

14  decision.  It decides 100 percent of the exact same

15  issues on the exact same evidentiary record.  So I'm not

16  going to go through and rebut everything he said because

17  I commend the decision to you.

18          I will respond just two quick points.  About

19  the control of Tatung Taiwan over Tatung U.S., Mr. Ahern

20  didn't tell you that the chairman of Tatung Taiwan is

21  also the chair of the board of Tatung U.S.  His sister

22  and his nephew are also on that board, as is one of his

23  employees and a former employee.  Clearly the chair of

24  the subsidiary is not going to sue the parent, and his

25  family members are going to go along with that decision.

1          Finally, I just want to point out the Ninth

2    Circuit authority here is clear.  Because Tatung U.S. is

3    not going to sue Tatung Taiwan, the Ninth Circuit says

4    in Freeman, the Freeman case, 322 F. 3d. 1133, that an

5    indirect purchaser may sue the direct purchaser if it's

6    not going to sue its supplier, and it then cites Royal

7    Printing; and Royal Printing holds where a subsidary is

8    controlled by a parent, and here it is considered as

9    one, then Chunghwa and Tatung U.S. are corporate

10   affiliates and Royal Printing says Illinois Brick does

11   not apply to this affiliate situation and that's what

12   Judge Illston found in the LCD case.  Two pages.  A

13   hundred percent of the same arguments, a hundred percent

14   of the same arguments.  The ruling should be 100 percent

15   the same.  Thank you.

16          THE COURT:  Anything from indirect?

17          MS. RUSSELL:  Just two seconds, your Honor.

18   Again, just to clarify, the Rule 12(b)(1) motion is not

19   directed at the indirect purchaser plaintiffs.  As to

20   the Rule 12(b)(6) motion by Tatung U.S., again I'll

21   refer you to our brief which I feel is sufficient on

22   this issue.  Pages 42 and 43 of our brief describes

23   Tatung's participation in the conspiracy, and we'll

24   refer you -- in the brief it refers you to the specific

25   paragraphs in our complaint.

MOTION HEARING  October 5, 2009

1          Thank you, your Honor.

2          MR. AHERN:  Your Honor, following up that last

3    point, the allegations with respect to our participation

4    is that we sold CRT finished products.  That's it.  So

5    we're in the same position as the plaintiffs here.  That

6    obviously can't be enough.

7          With respect to this not being a proper

8    12(b)(1) as relates to the direct purchaser complaint

9    raising Illinois Brick, well, we cited In re Ditropan,

10   which is 2007 Lexus 78423, in support of that, and that

11   holds that an Illinois Brick is properly -- Illinois

12   Brick argument is properly brought on a 12(b)(1).

13         With respect to Judge Illston's decision, she

14   made basically no attempt to address the case law that

15   we cited to her with respect to the limited effect of

16   the marketing materials and she based basically her

17   entire decision on that.  So I would encourage your

18   Honor to delve into the cases which say that with

19   respect to those marketing materials, they do not trump

20   whatever evidence there is, and there is none here, with

21   respect to operational control and financial control.

22   Thank you.

23         THE COURT:  All right.  Gentlemen and ladies,

24   excellent job.  Handled a lot of material and a very

25   lucid fashion and understandable fashion.  I'm taking it

1    under submission.  As you know, my so-called decision is

2    going to be in the form of a recommendation to -- a

3    report and recommendation to Judge Conti.

4            Now, how long it's going to take me to do this

5    I don't know.  I'm sure you can appreciate that I've got

6    a lot of stuff to sift through and organize here.

7            What's going on in the cases?  As I recall, the

8    stay is still in effect until sometime in January.

9            MR. KESSLER:  We actually have a stipulation.

10           MR. SAVERI:  The stipulation is simple.  It

11   says that nothing will happen until you rule, period;

12   isn't that right?

13           MR. KESSLER:  Till Judge Conti rules on your

14   recommendation.  It's till the decision by the court on

15   the motion to dismiss.  So we're all stayed right now by

16   stipulation.

17           THE COURT:  What about the stay with the

18   government?

19           MR. KESSLER:  The DOJ stay has its own life,

20   but we have an independent stay that sort of supersedes

21   that.  So the DOJ stay partially expires in January, but

22   our stay is with all the parties in terms of discovery

23   would apply until the court rules.

24           MR. SAVERI:  We can write what the stipulation

25   is, but as of now there is a stay until you rule and

Page 343

1    then there is a cutoff date in January, but I think that

2    would be continued depending subject to your ruling.

3           THE COURT:  What's going on with me then?  Are

4    you doing anything?

5           MR. KESSLER:  No.

6           THE COURT:  Right now you're going to wait for

7    me to recommend and Conti to decide.

8           MR. KESSLER:  Correct.

9           THE COURT:  Get to it as quickly as I can.

10          (Whereupon the hearing adjourned at 6:35 p.m.)

11                      --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 344

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

1

2

3     I, WENDY E. ARLEN, hereby certify that I am a

4 Certified Shorthand Reporter; that I reported in

5 shorthand writing the foregoing matter at the time and

6 place therein stated; that the foregoing pages are a

7 full, true and complete transcript of my said shorthand

8 notes and is a full, true and correct record of the

9 proceedings had in said matter at said time and place.

10

11

12     Dated:_____

13

14

15

16

17              _____

18              WENDY E. ARLEN

19              Certified Shorthand Reporter

20              California License #4355

21

22

23

24

25