GUIDO SAVERI (22349)
  guido@saveri.com
R. ALEXANDER SAVERI (173102)
  rick@saveri.com
GEOFFREY C. RUSHING (126910)
  grushing@saveri.com
CADIO ZIRPOLI (179108)
  cadio@saveri.com
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA  94111
Telephone:  (415) 217-6810
Facsimile:   (415) 217-6813

*Interim Lead Counsel for the Direct Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 3:07-CV-5944 SC |
| | MDL No. 1917 |
| | **CLASS ACTION** |
| This Document Relates to:<br><br>   All Direct Purchaser Actions | **DIRECT PURCHASER PLAINTIFFS' OPPOSITION TO THE DEFENDANTS' JOINT OBJECTIONS TO THE SPECIAL MASTER'S REPORT, RECOMMENDATIONS AND TENTATIVE RULINGS REGARDING DEFENDANTS' MOTIONS TO DISMISS**<br><br>Judge: Honorable Samuel P. Conti<br>Courtroom No. 1, 17th Floor |

DPPS' OPP TO DEFS.' JOINT OBJECTIONS TO THE SPECIAL MASTER'S REPORT
Case No. 3:07-CV-5944 SC

1

## **TABLE OF CONTENTS**

2    I. INTRODUCTION AND STANDARD OF REVIEW. .............................................. 1

3    II. THE SPECIAL MASTER'S REPORT SHOULD BE ADOPTED BECAUSE DPPs
         HAVE ALLEGED A PLAUSIBLE CONSPIRACY THAT SATISFIES THE
4          *TWOMBLY* STANDARD.................................................................................. 3

5    III. DEFENDANTS' FTAIA-BASED OBJECTIONS LACK MERIT. ........................ 8

6    IV. DEFENDANTS' STANDING-BASED ARGUMENTS LACK MERIT. ............................ 10

7    V. DPPs' ALLEGATIONS OF FRAUDULENT CONCEALMENT ARE SUFFICIENT......... 12

8    VI. CONCLUSION. ............................................................................................ 15

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*American Ad Mgmt., Inc. v. General Telephone Co. of California,*

4

190 F.3d 1051 (9th Cir. 1999) ................................................................. 11

5

*Ashcroft v. Iqbal,*

6

129 S. Ct. 1937 (2009) ........................................................................ 7

7

*Associated General Contractors of California, Inc. v. California State Council of Carpenters,*

8

459 U.S. 519 (1983) ......................................................................... 11

9

*Barker v. American Mobil Power Corp.,*

10

64 F.3d 1397 (9th Cir. 1995) ................................................................. 13

11

*Bell Atl. Corp. v. Twombly,*

12

550 U.S. 544 (2007) .......................................................................... 6

13

*Beltz Travel Service, Inc. v. Int'l Air Transport Ass'n,*

14

620 F.2d 1360 (9th Cir. 1980) ................................................................ 13

15

*City of Moundridge v. Exxon Mobil Corp.,*

16

250 F.R.D. 1 (D.D.C. 2008) ................................................................... 7

17

*Conmar Corp. v. Mitsui & Co. (U.S.A.) Inc.,*

18

858 F.2d 499 (9th Cir. 1988) ................................................................. 14

19

*F. Hoffman-LaRoche Ltd. v. Empagran, S.A.,*

20

542 U.S. 155 (2004) ......................................................................... 10

21

*Fidelity Guar. Life Ins. Co. v. Albertson,*

22

2008 WL 4861251 (S.D. Cal. Nov. 10, 2008) ...................................................... 8

23

*Gilbert v. Concentra Health Servs., Inc.,*

24

2008 WL 318356 (D. Nev. Jan. 31, 2008) ........................................................ 8

25

*Greenberg v. Sala,*

26

822 F.2d 882 (9th Cir. 1987) .................................................................. 8

27

*Hernandez v. Hilltop Fin. Mortgage, Inc.,*

28

622 F. Supp. 2d 842 (N.D. Cal. 2007) ........................................................... 8

DPPS' OPP TO DEFS.' JOINT OBJECTIONS TO THE SPECIAL MASTER'S REPORT
Case No. 3:07-CV-5944 SC

*In re Aspartame Antitrust Litig.,*

    No. 2:06-CV-1732, 2007 WL 5215231 (E.D. Pa. Jan. 18, 2007) ............................................. 7

*In re Chocolate Confectionary Antitrust Litig.,*

    602 F. Supp. 2d 538 (M.D. Pa. 2009) ............................................................................................. 7

*In re Flash Memory Antitrust Litig.,*

    643 F. Supp. 2d 1133 (N.D. Cal. 2009) .................................................................................. 3, 6, 7

*In re Flat Glass Antitrust Litig. (II),*

    No. 08-mc-180, 2009 WL 331361 (W.D. Pa. Feb. 11, 2009) ........................................... 7

*In re Graphics Processing Units Antitrust Litig.,*

    540 F. Supp. 2d 1085 (N.D. Cal. 2007) ..................................................................................... 3, 7

*In re Intel Microprocessor Antitrust Litig.,*

    452 F. Supp. 2d 555 (D. Del. 2006) ............................................................................................... 10

*In re Linerboard Antitrust Litig.,*

    305 F.3d 145 (3d Cir. 2002) ............................................................................................................. 12

*In re Mercedes-Benz Antitrust Litig.,*

    157 F. Supp. 2d 355 (D.N.J . 2001) ................................................................................................. 7

*In re OSB Antitrust Litig.,*

    No. 06-826, 2007 WL 2253419 (E.D. Pa., Aug. 3, 2007) ............................................... 7

*In re Potash Antitrust Litig.*

    No. 08 C 6910, 2009 WL 3583107 (N.D. Ill. Nov. 3, 2009) ........................................ 6, 7

*In re Pressure Sensitive Labelstock Antitrust Litig.,*

    566 F. Supp. 2d 363 (M.D. Pa. 2008) ..................................................................................... 6, 14

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*

    587 F. Supp. 2d 27 (D.D.C. 2008) ............................................................................................ 6, 7

*In re Rubber Chems. Antitrust Litig.,*

    504 F. Supp. 2d 777 (N.D. Cal. 2007) ........................................................................................ 10

*In re Scrap Metal Antitrust Litig.,*

    527 F.3d 517 (6th Cir. 2008) ........................................................................................................... 13

DPPS' OPP TO DEFS.' JOINT OBJECTIONS TO THE SPECIAL MASTER'S REPORT
Case No. 3:07-CV-5944 SC

*In re Southeastern Milk Antitrust Litig.*,

   555 F. Supp. 2d 934  (E.D. Tenn. 2008) ......................................................................... 6, 7

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,

   580 F. Supp. 2d 896 (N.D. Cal. 2008) ................................................................................ 3, 7

*In re Sugar Industry Antitrust Litig.*,

   579 F.2d 13 (3d Cir. 1978) ......................................................................................... 12

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,

   586 F. Supp. 2d 1109 (N.D. Cal. 2008) ............................................................. 3, 7, 12, 14

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,

   599 F. Supp. 2d 1179 (N.D. Cal. 2009) ........................................................................ 3, 6, 7

*Kendall v. Visa U.S.A., Inc.*,

   518 F.3d 1042 (9th Cir. 2008) ........................................................................................ 7

*Knevelbaard Dairies v. Kraft Foods, Inc.*,

   232 F.3d 979 (9th Cir. 2000) ....................................................................................... 11

*Mathias v. Daily News, L.P.*,

   152 F. Supp. 2d 465 (S.D.N.Y. 2001) ............................................................................ 11

*New York v. Hendrickson Bros., Inc.*,

   840 F.2d 1065 (2d Cir. 1988) ....................................................................................... 13

*Ore Co. v. Union Carbide & Carbon Corp.*,

   370 U.S. 690 (1962) ................................................................................................... 3

*Pacific Gas & Elec. Co. v. Jesse M. Lange Distrib., Inc.*,

   2005 WL 3507968 (E.D. Cal. Dec. 21, 2005) ..................................................................... 8

*Riddell v. Riddell Washington Corp.*,

   866 F.2d 1480 (D.C. Cir. 1989) ................................................................................... 13

*Safe Air for Everyone v. Meyer*,

   373 F.3d 1035 (9th Cir. 2004) ........................................................................................ 3

*See Reiter v. Sonotone Corp.*,

   442 U.S. 330 (1979) .................................................................................................. 11

*Standard Iron Works v. ArcelorMittal,*

    639 F. Supp. 2d 877 (N.D. Ill. 2009) ...................................................................... 6, 7

*Starr v. Sony BMG Music Entertainment,*

    592 F.3d 314 (2d Cir. 2010) ..................................................................................... 7

*U.S. Gypsum Co. v. Indiana Gas. Co., Inc.,*

    350 F.3d 623 (7th Cir. 2003) ................................................................................... 12

*United Phosphorus, Ltd. v. Angus Chem. Co.,*

    131 F. Supp. 2d 1003 (N.D. Ill. 2001) ..................................................................... 10

**Treatises**

5 Charles Allan Wright & Arthur R. Miller, *Federal Practice and Procedure*

    §1281 (Supp. 2009) ................................................................................................. 8, 9

## I. <u>INTRODUCTION AND STANDARD OF REVIEW.</u>

The Court's "Order Appointing Special Master" (June 16, 2009) (Dkt. No. 302) ("Order") sets forth the standards of review applicable to the Special Master's "Report, Recommendations And Tentative Rulings Regarding Defendants' Motions To Dismiss" (Feb. 5, 2010) (Dkt. No. 597) ("Report")  The Special Master's findings of fact are subject to a "clear error" standard of review, his procedural rulings are subject to review for abuse of discretion, and his legal conclusions are subject to *de novo* review. Order ¶18.  In undertaking any *de novo* review, however, the Court should do so in the context of the judicial efficiencies that the appointment of the Special Master was intended to achieve and the extraordinary effort that went into the preparation of the Special Master's Report.

In May of 2009, defendants filed a 32-page joint motion to dismiss the Direct Purchaser Plaintiffs' ("DPP") Consolidated Amended Complaint ("CAC"). Ten individual defendants or groups of defendants filed a total of 165 additional pages of separate briefs seeking to dismiss the CAC as to them; these were often accompanied by extensive declarations and requests for judicial notice ("RJNs"). On August 3, 2009, the DPPs responded to all of these motions with a single 118-page brief (Dkt. No. 531) ("DPPs Memo"), accompanied by an extensive declaration of Guido Saveri (Dkt. No. 530) ("Saveri Decl."). In September of 2009, defendants filed a 25-page joint reply and eight individual defendants or groups of defendants filed separate replies totaling 117 pages, some of which were again accompanied by declarations and RJNs.

As if these hundreds of pages of motion practice were not enough (and the briefing of the motions to dismiss the indirect purchasers' complaint was equally lengthy), the Special Master held a hearing on the motions to dismiss on October 5, 2009 that was a marathon session of argument commencing at 8:57 a.m. and ended at 6:35 p.m. The transcript of the hearing ran a staggering 343 pages.

This deluge of argument did not abate once the hearing ended. From October 9, 2009 through January 15, 2010, the Special Master received a dozen letters from the parties that presented more argument, brought to his attention new authorities, or responded to his questions.

DPPS' OPP TO DEFS.' JOINT OBJECTIONS TO THE SPECIAL MASTER'S REPORT
Case No. 3:07-CV-5944 SC

1    Given this massive record, the Special Master did not rush his recommended decision, but

2    obtained several continuances in order to consider carefully all of the parties' arguments. The 38-

3    page Report he issued on February 5, 2010 was a model of careful, considered analysis. The over

4    50 pages of objections to his Report (again accompanied by various declarations and RJNs)

5    merely rehash and restate arguments that were unsuccessful the first time around.

6    It must also be noted that the subject of this massive briefing process – DPPs' CAC – is

7    extraordinary. Unlike many other antitrust conspiracy complaints filed in federal court, it is not

8    premised merely on averments of circumstantial evidence of conspiracy.  Instead, it alleges

9    *hundreds* of bilateral and group meetings, conducted over the course of many years, at which

10    agreements to fix prices, restrict output and allocate customers were discussed, reached and

11    implemented.  The locations of, participants in, subjects discussed in, and organizational

12    structure of, these meetings are set forth in extensive detail.  The only antitrust conspiracy

13    complaint on file in this district containing a similar wealth of detail is that filed in the TFT-LCD

14    antitrust litigation, which survived motions to dismiss. *See* Saveri Decl., Exh. 3 (chart comparing

15    allegations here and those deemed sufficient in the TFT-LCDs antitrust litigation). Indeed, many

16    of the same companies are named as defendants in both cases.  Moreover, in both cases, the

17    detailed information reflected in the CAC came from the same cooperating defendant, who is an

18    amnesty applicant to the United States Department of Justice ("DOJ").  This informant possesses,

19    and will eventually produce in discovery, detailed notes of these conspiratorial meetings.

20    In light of all of the foregoing, the Court need not repeat the painstaking review

21    conducted by the Special Master. His factual determination that the CAC alleged a conspiracy

22    involving Cathode Ray Tube ("CRT") Products (Report, pp. 3-7) is fully supported by the

23    allegations of the CAC and certainly is not clearly erroneous. His refusal to consider evidence

24    outside the CAC on a motion to dismiss (*id.* at 26) is not an abuse of discretion. And his legal

25    conclusions with respect to the DPPs' arguments (*id.* at 7-27) are not only sound, given the

26

27

28

2

1  standards applicable to a motion to dismiss under Rule 12(b)(6),[1] but, as he pointed out, are also

2  consistent with a number of recent cases from this district denying motions to dismiss complaints

3  alleging conspiracies to fix prices on various electronics products, some of which involved the

4  same defendants named here.[2]

5  ## II. THE SPECIAL MASTER'S REPORT SHOULD BE ADOPTED BECAUSE DPPs HAVE ALLEGED A PLAUSIBLE CONSPIRACY THAT SATISFIES THE *TWOMBLY* STANDARD.

6

7  Consistent with Judge Legge's findings, the DPPs have alleged a plausible antitrust

8  conspiracy concerning CRT Products.  Viewed as a whole, the DPPs' CAC sets forth extensive

9  factual allegations regarding meetings among defendants and the resulting agreements to fix

10  prices and reduce production levels for CRT Products.  These detailed allegations describing the

11  operation of the conspiracy are bolstered by allegations demonstrating that the market conditions

12  in the CRT Products industry were conducive to price fixing and that defendants' pricing

13  exhibited periods of unnatural and sustained price stability, as well as periods of inexplicable

14  price increases that were unusual in light of the declining state of the CRT Products market in the

15  face of increasing market penetration by a new generation of competing technologies.[3]  The

16

17

---

[1] These include the propositions that the allegations of the complaint are to be read as true, all disputed issues of fact are resolved in favor of the non-moving party, and the allegations of the complaint should be read as a whole. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

[2] *See, e.g., In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009) ("*Flash Memory*"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179 (N.D. Cal. 2009) ("*TFT-LCD II*"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) ("*TFT-LCD I*") *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896 (N.D. Cal. 2008) ("*SRAM*"); *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085 (N.D. Cal. 2007) ("*GPUs II*").

[3] These allegations include:  The CRT industry is an oligopoly dominated by a small number of sellers, the effects of which were amplified by consolidation through joint ventures and mergers during the relevant period (CAC ¶¶112-13); the concentrated market share and corporate interrelationships between Defendants facilitated Defendants' ability to implement the conspiracy (CAC ¶114); and that, because CRT was an established technology, CRT manufacturers had very little debt on their manufacturing facilities, and the pressure to produce at full capacity was lessened; all of which created an environment conducive to collusion to fix prices and restrict output, particularly when coupled with the emergence of a new generation technology (CAC ¶¶106-07).  Indeed, despite declining production costs and declining demand for CRT Products due to the emergence of flat panel technology, prices of CRT Products resisted downward price

3

1    DPPs' conspiracy allegations clearly encompass both CRTs and products containing CRTs, and

2    the CAC contains sufficient detail regarding defendants' participation in the conspiracy to

3    provide all defendants with notice of the claims against them.

4            There is little dispute that the DPPs alleged a plausible conspiracy among defendants with

5    respect to CRTs.  This was not some complaint alleging merely parallel conduct and

6    circumstantial evidence of collusion. After reviewing the CAC "paragraph by paragraph," Judge

7    Legge concluded that its "allegations are not merely *suggestive* of a conspiracy, rather they

8    directly charge one."  Report, p. 6, 10 (emphasis in original)).[4]  Indeed, the CAC alleges with

9    sufficient detail that:

- The defendants over a 12-year period held over 500 meetings, either bilateral or multilateral, in various named countries in Asia, the United Kingdom, and Europe. (CAC ¶ 134).

- The meetings occurred at three management levels and each management level dealt with different details relating to the conspiracy.  (CAC ¶141).

- Defendants exchanged, updated, and discussed sensitive information relating to, *inter alia*, prices and demand forecasts.  (CAC ¶¶143, 147).

- Defendants agreed on price guidelines (range of price increases or price floors). The agreements were expressed in U.S. dollars relating to specific third-party customers.  (CAC ¶144).

- Defendants agreed to allocations of markets and customers, output restrictions and production shut downs, and how to communicate with customers about price increases and output restrictions.  (CAC ¶¶145, 146, 148).

- On February 10, 2009, the DOJ announced that it indicted C.Y. Lin of Defendant Chunghwa Picture Tubes, Ltd. for participating in a conspiracy to fix the prices of CRTs, finding that the CRT conspiracy "harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices." (CAC ¶¶125-26).

- Defendants kept non-attendees aware of agreements so they would comply.  (CAC ¶¶150, 152).

---

pressure, experienced periods of unnatural price stability, and even occasionally increased during the relevant period.  CAC ¶¶188-97.

[4] The Toshiba Defendants concede that Judge Legge is correct that the CAC contains "allegations of specific facts, and not just labels or generalities" as to the *other* Defendants; just not as to them.  (Toshiba Defendants' Objections p. 3 (Dkt. No. 607) (quoting Report, p. 10)).

4

DPPS' OPP TO DEFS.' JOINT OBJECTIONS TO THE SPECIAL MASTER'S REPORT
Case No. 3:07-CV-5944 SC

1      Defendants' attack centers on whether the DPPs' allegations of conspiracy are plausible

2  as to CRT finished products, that is, products containing CRTs such as televisions and computer

3  monitors. As noted above, apart from identifying CRT Products as such, (CAC ¶1; *see also*,

4  Report at p. 4 – describing the Complaint as "replete with allegations regarding both product

5  lines"),[5] the DPPs allege specifically that the agreements reached at the meetings included

6  provisions for vertically integrated manufacturers who produced both CRTs and CRT Products as

7  to the prices to be charged by the CRT manufacturing arm of each such integrated company to

8  the corporate division or subsidiary that manufactured or sold the products integrating the CRTs

9  and the price floor quotations to be offered by the competitors or the integrated company to such

10  a division or subsidiary. CAC ¶144. Defendants also considered the internal pricing of products

11  containing CRTs in agreeing upon the prices at which CRTs were set. *Id*; *see also* CAC ¶¶5(d),

12  138(d) (alleging that Defendants agreed to "resolve issues created by asymmetrical vertical

13  integration among some of the co-conspirators."). Defendants even utilized their consideration

14  of these downstream prices when reaching their agreements on output restrictions: "The analysis

15  often included consideration of downstream prices for televisions, computer monitors, or similar

16  products and how they would affect the price ranges being collusively set." CAC ¶146.

17      The DPPs also allege that the members of each defendant's corporate family that

18  distributed finished CRT Products to direct purchasers played a significant role in the conspiracy

19  because Defendants wished to ensure that the prices for such products paid by direct purchasers

20  would not undercut the pricing agreements reached at the conspiratorial meetings. CAC ¶¶158,

21  161, 163, 165, 167, 169, 172. As defendants incorporate many of their own CRTs into TVs and

22  monitors manufactured by their affiliated companies, it makes little economic sense to fix the

23  price of CRTs and not assure themselves that the fruits of their fixed price is realized down the

24

25

26

---

27  [5] In rejecting defendants' contention that the CAC does not allege a conspiracy with respect to CRT Products because some paragraphs refer only to CRTs, Judge Legge correctly noted that

28  "not every paragraph of such lengthy complaints need repeat the same words." Report, p. 6.

DPPS' OPP TO DEFS.' JOINT OBJECTIONS TO THE SPECIAL MASTER'S REPORT
Case No. 3:07-CV-5944 SC

1    line.  It would be implausible for defendants to fix the price of CRTs and not fix the price of their

2    finished products which incorporate their CRTs.[6]

3        The Complaint provides adequate notice to all Defendants of the claims against them.  As

4    Judge Legge held, "[o]ne cannot read the [CAC] without concluding that each defendant, or at

5    least each defendant group and many of the individual companies within each group, has

6    adequate knowledge" of the conduct it is being charged with.  Report, p. 16.  The CAC contains

7    specific allegations concerning approximately how many meetings each Defendant and its

8    affiliates participated in, and the time period during which and the locations in which those

9    meetings occurred.  CAC ¶¶155-57, 159-60, 162, 164, 166, 168, 170-71, 173-75.  The CAC also

10   makes clear that the individual participants in the conspiratorial meetings and discussions did not

11   always know the corporate affiliations of their counterparts, nor did they distinguish between the

12   entities within a corporate family.  The individual participants entered into agreements on behalf

13   of, and reported these meetings and discussions to, their respective corporate families.  CAC

14   ¶154.

15       After *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ("*Twombly*") as before, the

16   allegations in a complaint are to be judged as a whole rather than on a piecemeal basis[7] (Report at

17   12), something the Defendants totally ignore.  The test is whether the allegations, as a whole,

18   raise the claims asserted "above the speculative level."  *Twombly*, 550 U.S. at 555.  This test is

19   _____

20   [6] While Defendants make much ado about the presence of non-defendant manufacturers of
     finished products, since Defendants have approximately 80% of the CRT market (CAC ¶112),
21   the non-defendant manufacturers of TVs and monitors must buy most, if not all of their CRTs
     from Defendants.  As such, their finished products would reflect the artificially and collusively
22   inflated prices for this key component part manufactured by the Defendants.

23   [7] *See Flash Memory*, 643 F. Supp. 2d at 1147, 1148; *Standard Iron Works v. ArcelorMittal*,  639
     F. Supp. 2d 877, 894 (N.D. Ill. 2009) ("*Standard Iron Works*"); *TFT-LCD II.*, 599 F. Supp. 2d at
24   1185.  *Accord In re Potash Antitrust Litig.*, No. 08 C 6910, 2009 WL 3583107, at *20 (N.D. Ill.
     Nov. 3, 2009); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 33 n.4
25   (D.D.C. 2008) ("*Rail Freight*"); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp.
     2d 363, 373 (M.D. Pa. 2008);  *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943-
26   44  (E.D. Tenn. 2008) ("*Southeastern Milk*").  *Cf.* Report, p. 13 ("[t]he Special Master concludes
     from the cases in this district that 'each defendant' pleading is not a rule requiring detailed
27   recitation, but is to be evaluated under the principle of the adequacy of fair notice to the
     defendants. With that as the guide, it is of course possible that a complaint, even if lacking
28   repetitive allegations naming each defendant, might *as a whole* supply the requisite notice.").

DPPS' OPP TO DEFS.' JOINT OBJECTIONS TO THE SPECIAL MASTER'S REPORT
Case No. 3:07-CV-5944 SC

1   easily met here, as it has been in numerous cases with comparable, if not far less detailed factual

2   allegations.[8]  As to each defendant, a complaint is only required to put them on notice of the

3   conspiracy in which they are alleged to have participated, as courts have routinely recognized in

4   rejecting defendants' demands for detailed defendant-by-defendant or affiliate-by-affiliate

5   pleading.[9]  Report at 11-13, 15-16.  As these cases hold, especially *see TFT-LCD II*, 599 F. Supp.

6   2d at 1184-85 (which involved very similar allegations, as reflected in Exhibit 3 to the Saveri

7   Decl.), it is sufficient to allege that meeting attendees participated as representatives of entire

8   corporate families, where the conspiracy was organized at high corporate levels.  Report at 13.  In

9   addition to Judge Legge's findings that the CAC supplies fair notice of each defendant's

10  participation in the conspiracy, he recognized that the CAC also made sufficient allegations of

11  corporate agency and control to sustain the claims.[10]  *See TFT-LCD II*, 599 F. Supp. 2d at 1184-

12  85.

---

15  [8] *See, e.g., Flash Memory*, 643 F. Supp. 2d at 1142-50; *TFT-LCD II*, 599 F. Supp. 2d at 1184-85; *TFT-LCD I*, 586 F. Supp. 2d at 1115-16; *SRAM*, 580 F. Supp. 2d at 901-03; *GPUs II*, 540 F.

16  Supp. 2d at 1096.  *Accord Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 321-325, 327 (2d Cir. 2010) ("*Starr*"); *In re Potash Antitrust Litig.*, 2009 WL 3583107, at *18-*23; *Standard*

17  *Iron Works*, 639 F. Supp. 2d at 893-903; *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 576-77 (M.D. Pa. 2009); *Rail Freight*, 587 F. Supp. 2d at 32-36; *Southeastern*

18  *Milk*, 555 F. Supp. 2d at 943; *City of Moundridge v. Exxon Mobil Corp.*, 250 F.R.D. 1, 4 (D.D.C. 2008); *In re Flat Glass Antitrust Litig. (II)*, No. 08-mc-180, 2009 WL 331361, at *2-*3 (W.D.

19  Pa. Feb. 11, 2009); *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253419, at *2, *5 (E.D. Pa., Aug. 3, 2007)("*OSB*").

20

21  [9] *See Flash Memory*, 643 F. Supp. 2d at 1142 n.7; *SRAM*, 580 F. Supp. 2d at 903-907; *TFT-LCD II*, 599 F. Supp. 2d at 1184-85; *TFT-LCD I*, 586 F. Supp. 2d at 1115-17.  *Accord OSB*, 2007 WL

22  2253419 at *5; *In re Aspartame Antitrust Litig.*, No. 2:06-CV-1732, 2007 WL 5215231 at *9-*10 (E.D. Pa. Jan. 18, 2007); *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 375 (D.N.J .

23  2001).  The concern in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ("*Iqbal*"), a *Bivens* action, for detailed pleading regarding each defendant's state of mind, is inapplicable here.  As the *Iqbal*

24  court expressly observed, in a *Bivens* action, defendants "cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic." *Id.* at 1952.  The *Iqbal*

25  complaint did "not contain any factual allegation sufficient to plausibly suggest petitioners' discriminatory state of mind." *Id.*  The defendant-specific state-of-mind requirements for stating

26  a *Bivens* claim are simply inapplicable to antitrust actions.  The case of *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) is also inapposite and has been distinguished on the ground

27  that it involved bare allegations of a conspiracy with no supporting facts.  *See Starr*, 592 F.3d at 324.

28  [10] Judge Legge's ruling on agency and control is also well supported by the case law of this Circuit.  In addition to the caselaw he cited, other decisions and treatises support the view that

7

1    **III.   DEFENDANTS' FTAIA-BASED OBJECTIONS LACK MERIT.**

2          As with much of their arguments, defendants' objections based on the Foreign Antitrust

3    Improvements Act of 1982 (15 U.S.C. §6a) ("FTAIA") (which states that the Sherman Act "shall

4    not apply to conduct involving trade or commerce ... with foreign nations") are premised on the

5    notion that the DPPs' CAC only states a claim as to CRTs, not CRT Products.

6          The Special Master made a factual *finding* that the DPPs' CAC (and the indirect

7    purchasers' complaint) alleged a conspiracy as to CRT Products, which include CRTs and

8    products containing them.  Report, p. 6.  This is subject to review for clear error and defendants

9    have shown none.

10         As the Special Master found (*id.* at 4-5), the CAC clearly and repeatedly alleges a

11   conspiracy as to *CRT Products*.  CAC ¶¶1, 5-7, 134, 138, 139, 141, 215-21.  The term is used

12   135 times in the CAC.  Indeed, the CAC notes that in setting prices for CRTs, defendants also

13   had to ensure that the prices for products containing them were kept at specified levels.  CAC

14   ¶¶144, 146, 154-75.  As the Special Master noted, the Plaintiffs are the masters of their own

15   complaint, not the defendants.  Report, p. 4.

16   ───────────────────────────────────────────────

17   agency either need not be pleaded or need not be pleaded with any particularity.  *See, e.g.,*
     *Greenberg v. Sala,* 822 F.2d 882, 886 (9th Cir. 1987) ("as a matter of law, allegations of agency,
18   vicarious liability, and/or *respondeat superior* are not required. A person legally responsible for
     an act may be alleged to have committed it without going into the theories which support that
19   ultimate fact"); *Hernandez v. Hilltop Fin. Mortgage, Inc.,* 622 F. Supp. 2d 842, 852 (N.D. Cal.
     2007) (("[a]lthough the plaintiffs do not allege an agency relationship between [the assignee] and
20   the other defendants in their complaint, it is not necessary for a pleading to allege an agency
     relationship in order to survive a Rule 12(b)(6) motion");  *Gilbert v. Concentra Health Servs.,*
21   *Inc.,* 2008 WL 318356, at *2 (D. Nev. Jan. 31, 2008) ("[b]ecause the specific facts will be
     revealed through discovery, it is not necessary for Plaintiff's amended Complaint to set forth
22   detailed allegations of agency. Arguments as to whether the evidence supports the allegations are
     more appropriately considered in a motion for summary judgment"); *Pacific Gas & Elec. Co. v.*
23   *Jesse M. Lange Distrib., Inc.,* 2005 WL 3507968, at *3 (E.D. Cal. Dec. 21, 2005) (" 'Rule 8(a)'s
     simplified pleading standard applies to all civil actions,' except for those stated in Rule 9(b). ...
24   Rule 9(b) 'provides for greater particularity in all averments of fraud or mistake'.... The Supreme
     Court has declined to recognize or create any other exceptions....Rule 9(b) makes no mention of
25   alter-ego or agency theories")(citation omitted); *Fidelity Guar. Life Ins. Co. v. Albertson,* 2008
     WL 4861251, at *2 (S.D. Cal. Nov. 10, 2008) ("detailed facts proving dual agency are not
26   required at the pleading stage. By alleging dual agency, Albertson has established a basis for his
     negligence claim."); 5 Charles Allan Wright & Arthur R. Miller, *Federal Practice and Procedure*
27   §1281 (Supp. 2009) ("it is sufficient simply to assert the existence of an agency relationship
     without setting forth the contract of agency or details about the relationship in the pleadings,
28

───────────────────────────────────────────────

8

1    The CAC also alleges a conspiracy that was implemented partially in, and impacted

2    adversely sales in, the United States.  The Special Master found that this fact renders the FTAIA

3    inapplicable (Report, pp. 16-18), and he is manifestly correct.  The CAC asserts that, during the

4    relevant class period, every defendant manufactured, sold or distributed CRT Products in the

5    United States, either directly or through its subsidiaries or affiliated companies.  CAC ¶¶24-80.

6    The proposed class is clearly limited to purchases in the United States, not foreign purchases.

7    CAC ¶85.  The named plaintiffs, alleged to be members of this putative class, are all United

8    States-based companies.  CAC ¶¶11-23.

9    As the CAC also makes clear, in announcing the prosecution of C.Y. Lin of Chunghwa

10   Picture Tubes, Ltd., the United States Department of Justice stated that customers in the United

11   States were harmed, including "countless Americans who purchased computers and televisions

12   using cathode ray tubes."  CAC ¶126.

13   The discussion of the conspiracy in the CAC identifies numerous United States-based

14   defendants who were represented at collusive meetings held abroad and were parties to the

15   agreements reached at them.  CAC ¶¶158, 161, 163, 167, 169, 172.  It is further asserted in each

16   of these paragraphs that the entities identified, to the extent they "distributed CRT Products to

17   direct purchasers, … played a significant role in the conspiracy because Defendants wished to

18   ensure that the prices for such products paid by direct purchasers would not undercut the pricing

19   agreements reached at these various meetings."

20   The CAC also contains numerous allegations of conduct in the United States that

21   facilitated or furthered the alleged conspiracy.  For example, the facilitating role of the United

22   States Display Consortium is mentioned.  CAC ¶126.  Manufacturing plant closures in New York,

23   Ohio and Indiana alleged to be in furtherance of the claimed conspiracy are also discussed.  CAC

24   ¶¶183, 185, 187.  Prices in the United States for CRT Products are also discussed.  CAC ¶¶188-

25   97.  Price agreements were stated in United States dollars, reflecting the importance of the United

26

27   ─────────────────────────

28   inasmuch as the terms of the agency are evidentiary in nature and can be developed in later stages
     of the litigation").

9

1   States market.  *See* CAC ¶144.  And the CAC explicitly alleges adverse price effects in the

2   United States proximately caused by defendants' claimed unlawful activities.  CAC ¶¶188-89.

3          Thus, as is readily apparent from the face of the CAC, it alleges both foreign and United

4   States-based conspiratorial conduct conducted by defendants, many of which are United States-

5   based.  The alleged conspiracy is claimed to have been the proximate cause of economic harm to

6   a class of direct purchasers who made their purchases in the United States.  As the Special Master

7   rightly found, the FTAIA is therefore inapplicable.  *See F. Hoffman-LaRoche Ltd. v. Empagran,*

8   *S.A.*, 542 U.S. 155, 165 (2004) ("[b]ut our courts have long held that application of our antitrust

9   laws to foreign anticompetitive conduct is nonetheless reasonable, and hence consistent with

10  principles of prescriptive comity, insofar as they reflect a legislative effort to redress *domestic*

11  antitrust injury that foreign anticompetitive conduct has caused").[11]

12  **IV.   DEFENDANTS' STANDING-BASED ARGUMENTS LACK MERIT.**

13         Defendants contend that the DPPs lack antitrust standing because they do not allege

14  having purchased a CRT.  This argument is premised on defendants' improper recasting of the

---

[11] Defendants' authorities are inapposite. For example, in *United Phosphorus, Ltd. v. Angus Chem. Co.*, 131 F. Supp. 2d 1003 (N.D. Ill. 2001), *aff'd*, 322 F.3d 942 (7th Cir. 2002), *cert. denied*, 540 U.S. 1003 (2003), the district court was dealing with claims by two Indian plaintiffs and an American plaintiff that was once part of a joint venture. The American wanted to do business with the Indians who asserted that defendants interfered with the Indian companies' plan to produce the prescription drug AB. 131 F. Supp. 2d at 1006. The district court dismissed these claims under the FTAIA after extensive discovery, because it concluded, on the basis of a full evidentiary record, that: (a) the Indian plaintiffs never had the intention or ability to sell AB in the United States and (b) the only prospective United States-based buyer would not have bought the drug from them. *Id.* at 1010-14. Likewise, in *In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777 (N.D. Cal. 2007) ("*Rubber Chemicals*"), the plaintiffs, *inter alia*, "demanded damages for injuries allegedly suffered in foreign commerce under the Sherman and Clayton Acts." *Id.* at 779. The district court dismissed those claims pursuant to the FTAIA. In doing so, however, it noted that "[p]laintiffs may proceed with their Sherman Act claims to the extent they seek to recover damages for domestic injury, *i.e.*, the purchase of rubber chemicals at allegedly inflated prices in the domestic market or for use within the United States." *Id.* at 790. Similarly, in *In re Intel Microprocessor Antitrust Litig.*, 452 F. Supp. 2d 555 (D. Del. 2006), plaintiff AMD was raising, *inter alia*, claims "based upon the foreign effect of Intel's alleged conduct." *Id.* at 557.  The district court granted dismissal, but limited its ruling to claims "based on alleged lost sales of AMD's microprocessors to foreign customers." *Id.* at 563.

---

10

1    DPPs' allegations.[12]  As discussed above, the CAC properly alleges a conspiracy to fix the prices

2    of both CRTs and CRT Products.  Defendants cannot ignore these allegations.  *See Knevelbaard*

3    *Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 989-91 (9th Cir. 2000) ("*Knevelbaard*") (on a motion

4    to dismiss, complaint's allegations that plaintiffs and defendants participated in the same market

5    must be accepted as true).  Because the DPPs have alleged a conspiracy to fix the prices of CRT

6    Products, and DPPs purchased such CRT Products, they have antitrust standing.

7          The Supreme Court articulated several factors for determining whether a plaintiff has

8    antitrust injury in *Associated General Contractors of California, Inc. v. California State Council*

9    *of Carpenters*, 459 U.S. 519 (1983) ("*AGC*").  Pursuant to *AGC*, courts consider the following

10   factors: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the

11   antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative

12   measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning

13   damages."  *American Ad Mgmt., Inc. v. General Telephone Co. of California*, 190 F.3d 1051,

14   1054 (9th Cir. 1999).  A plaintiff does not have to establish each factor to have antitrust standing.

15   *Id.* at 1055.  Instead, courts balance these factors, giving "great weight to the nature of plaintiff's

16   alleged injury."  *Id.*

17         Here, the DPPs allege that they purchased CRT Products directly from a defendant and

18   that defendants conspired to fix the prices of such CRT Products.  This is a classic example of

19   antitrust injury and establishes standing under the *AGC* factors.[13]  The requirement of antitrust

20   injury was not intended to preclude claims like the ones asserted by the DPPs, but instead "to

21   filter out complaints by competitors and others who may be hurt by productive efficiencies,

22

23   _____

[12] Defendants tacitly acknowledge that the Special Master's finding of antitrust standing is
24   unassailable if the Complaint is deemed to allege a conspiracy to price fix finished products.  *See*
     Joint Objection, 14.

25
[13] *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979) ("where petitioner alleges a wrongful
26   deprivation of her money because the price of the hearing aid she bought was artificially inflated
     by reason of respondents' anticompetitive conduct, she has alleged an injury..."); *Knevelbaard*,
27   232 F.3d at 988 ("antitrust injury . . . is seen most often in claims by overcharged buyers");
     *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 478 (S.D.N.Y. 2001) ("the prototypical
28   example of antitrust injury is an allegation by consumers that they have had to pay higher prices
     … as a result of a defendant's anticompetitive conduct").

11

1   higher output, and lower prices, all of which the antitrust laws are designed to encourage." *U.S.*

2   *Gypsum Co. v. Indiana Gas. Co., Inc.*, 350 F.3d 623, 626-27 (7th Cir. 2003).

3          Defendants have not cited any case, and there is no such case, where antitrust standing

4   was denied to a plaintiff who purchased a price-fixed product directly from the cartel.  In fact,

5   courts have extended antitrust standing to include "plaintiffs [who] purchased downstream goods

6   from a cartel of manufacturers who made, and fixed the price of, a component of those goods."

7   *TFT-LCD I*, 586 F. Supp. 2d at 1118, citing *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 159-

8   60 (3d Cir. 2002) and *In re Sugar Industry Antitrust Litig.*, 579 F.2d 13, 17 (3d Cir. 1978)

9   ("*Sugar*").  The Third Circuit in *Sugar* explained the reasoning for such decisions as follows:

10          We are also influenced by the realization that to deny recovery in this instance would
            leave a gaping hole in the administration of the antitrust laws.  It would allow the price-
11          fixer of a basic commodity to escape the reach of a treble-damage penalty simply by
            incorporating the tainted element into another product.
12

13   *Id.* at 18.  Accordingly, defendants' argument that the DPPs cannot have antitrust standing unless

14   they purchased cathode ray tubes is wrong.  The Special Master's finding that the DPPs have

15   antitrust standing is sound and should be adopted.

16   **V.   DPPs' ALLEGATIONS OF FRAUDULENT CONCEALMENT ARE
           SUFFICIENT.**

17

18          Again, defendants' objections to the Report with regard to DPPs' allegations of fraudulent

19   concealment do not present a fair picture of the Special Master's ruling, the DPPs' allegations, or

20   applicable law.  It is plain that the Special Master thoroughly considered and correctly resolved

21   the issues raised by defendants.

22          First, defendants' assertions that the Report "neglects to address Plaintiffs' failure to

23   allege specific facts regarding fraudulent concealment," (Joint Objection, p. 15) and that the CAC

24   "contains not a single allegation concerning specific acts by any Defendant to conceal an alleged

25   conspiracy" (*id.*) are not grounded in reality.  Citing 19 separate paragraphs of the CAC, Judge

26   Legge expressly found that "Plaintiffs have alleged that the acts of the defendants were

27   wrongfully concealed and carried out in a matter that precluded detection." Report, p. 22.

28   Examination of those 19 paragraphs discloses that they allege myriad affirmative acts of

                                                   12

1    concealment.  Thus, for example, the CAC alleges that defendants gave pretextual reasons for

2    price increases, and coordinated their misleading announcements.  CAC ¶¶ 148, 153, 206.

3    Defendants also established and followed various secrecy protocols, including varying meeting

4    locations, limiting meeting attendees, avoiding note taking and other record keeping of

5    communications, and agreeing to maintain the secrecy of meetings.  CAC ¶¶ 137, 138, 201, 204,

6    205, 154.  Moreover, again contrary to defendants' assertions, many of these acts are described in

7    detail and attributed to specific defendants.  Thus, defendants LG Electronics, LGPD, Samsung,

8    Philips, MTPD and Panasonic are alleged to have made specific pretextual statements at specific

9    times both as to conspiratorial price increases and plant closures.  CAC ¶¶ 183, 184, 185, 195,

10   209, 210.

11           These allegations are plainly sufficient.  The law requires only a few alleged acts of

12   fraudulent concealment.  DPPs' Memo. at 24.  Moreover, *TFT-LCD I*, *Rubber Chemicals*, and

13   *SRAM* – which defendants steadfastly refuse to acknowledge – upheld similar allegations against

14   motions to dismiss.  DPPs' Memo. at 24.

15           Second, Judge Legge was also correct to reject defendants' novel assertion that the law

16   requires plaintiffs to plead (and prove) affirmative acts of concealment by each defendant in

17   order to toll the statute of limitations, despite the fact that they are alleged to be co-conspirators.

18   It is well settled that affirmative acts of concealment of one defendant co-conspirator, undertaken

19   during the course and in furtherance of a conspiracy, are legally attributable to all co-defendant

20   co-conspirators under principles of substantive conspiracy law and joint and several liability.[14]

21   *Barker v. American Mobil Power Corp.*, 64 F.3d 1397, 1402 (9th Cir. 1995) is not to the

22   contrary.  It is not a conspiracy case, and, therefore, did not address the issue before the Court.

23

24   ───────────────────

25   [14] *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 537 (6th Cir. 2008), *cert. denied*, 129 S.
     Ct. 1673 (2009): *Riddell v. Riddell Washington Corp.,* , 866 F.2d 1480, 1493 (D.C. Cir. 1989);
26   *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083-86 (2d Cir. 1988), *cert. denied*, 488
     U.S. 848 (1988); *see also Beltz Travel Service, Inc. v. Int'l Air Transport Ass'n*, 620 F.2d 1360,
27   1367 (9th Cir. 1980) ("[p]articipation by each conspirator in every detail in the execution of the
     conspiracy is unnecessary to establish liability, for each conspirator may be performing different
28   tasks to bring about the desired result.").

                                                         13

1   *Id.* Moreover, as noted, the CAC alleges that all defendants participated in affirmative acts of

2   fraudulent concealment, including acts by specifically named defendants.

3           Third, defendants' assertion that Judge Legge failed to "consider plaintiffs' self-

4   acknowledged failure to plead any due diligence, which is fatal to a fraudulent concealment

5   claim" is also incorrect.  Joint Objection, p. 16.  Due diligence is required only if a plaintiff has

6   knowledge of facts "that would excite the inquiry of a reasonable person."  *Conmar Corp. v.*

7   *Mitsui & Co. (U.S.A.) Inc.,* 858 F.2d 499, 504 (9th Cir. 1988), *cert. denied sub nom. VSL Corp.,*

8   *Inc. v. Conmar Corp.,* 488 U.S. 1010 (1989).  The CAC alleges that the DPPs lacked knowledge

9   of the conspiracy, and discovered its existence only when the DOJ investigation was disclosed.

10  CAC ¶¶200-01.  Defendants concede these allegations, but argue that Plaintiffs were on inquiry

11  notice of the conspiracy because they rely on some public information in the CAC – namely

12  consolidation in the CRT Products industry and market conditions conducive to conspiracy.

13  Joint Objection, p. 16.

14          At the pleading stage, however, constructive notice must be shown *as a matter of law,*

15  and dismissal on that basis is generally improper even where a complaint relies on public

16  information available before the limitations period.[15]  Common sense, as well as case law,

17  dictates that a plaintiff may not be charged with knowledge of a conspiracy based only on market

18  conditions that, with the benefit of hindsight, support a conclusion of conspiracy, but that,

19  contemporaneously, offer no insight into defendants' secret conduct.  Many cases hold that the

20  inclusion of public market facts in a complaint does not conclusively establish constructive

21  knowledge.  *See* DPPs' Memo. pp. 30-31.  Judge Legge's decision in this regard is also plainly

22  correct and should be adopted.

23

24

-------------------------------------------------

25  [15] *See, e.g., TFT-LCD I,* 586 F. Supp. 2d at 1132  (constructive notice is a "fact intensive
    inquir[y] inappropriate for resolution" on a motion to dismiss); *In re Pressure Sensitive*

26  *Labelstock Antitrust Litig.,* No. 3:03-MDL-1556, 2006 WL 433891, at *4 (M.D. Pa., Jan. 3,
    2006) ("[d]ismissal for lack of due diligence…is appropriate only 'when the facts from which

27  knowledge may be imputed are clear from the pleadings'…As a general rule, rejection of a
    fraudulent concealment claim on the pleadings for failure to allege due diligence is not

28  appropriate."(citation omitted)).

DPPS' OPP TO DEFS.' JOINT OBJECTIONS TO THE SPECIAL MASTER'S REPORT
Case No. 3:07-CV-5944 SC

## VI. **CONCLUSION.**

For the foregoing reasons, as well as their arguments submitted to Judge Legge, DPPs respectfully submit that the Court should adopt Judge Legge's rulings and recommendations as to the DPP CAC in full.[16]

Dated: February 26, 2010                 Respectfully Submitted,
        San Francisco, California

By ___/s/ Guido Saveri_____

Guido Saveri
R. Alexander Saveri
Geoffrey C. Rushing
Cadio Zirpoli
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco CA  94111
Telephone:  (415) 217-6810
Facsimile:   (415) 217-6813

*Interim Lead Counsel for Direct Purchaser Plaintiffs*

Bruce L. Simon
Esther L. Klisura
PEARSON, SIMON, SOTER,
    WARSHAW & PENNY LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone:  (415) 433-9000
Facsimile:  (415) 433-9008

H. Laddie Montague, Jr.
Ruthanne Gordon
Charles P. Goodwin
Candice Enders
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (800) 424-6690
Facsimile: (215) 875-4604

---

[16] The DPPs do not believe that oral argument is necessary in light of the exhaustive briefing and oral argument already in the record.

15

DPPS' OPP TO DEFS.' JOINT OBJECTIONS TO THE SPECIAL MASTER'S REPORT
Case No. 3:07-CV-5944 SC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Michael P. Lehmann
HAUSFELD LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone:  (415) 633-1908
Facsimile:  (415) 358-4980

Gary Specks
KAPLAN FOX
423 Sumac Road
Highland Park, IL 60035
Telephone: (847) 831-1585
Facsimile: (847) 831-1580

*On the Brief*

crt.240

DPPS' OPP TO DEFS.' JOINT OBJECTIONS TO THE SPECIAL MASTER'S REPORT
Case No. 3:07-CV-5944 SC