MARIO N. ALIOTO, ESQ. (56433)
LAUREN C. RUSSELL, ESQ. (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA  94123
Telephone:  (415) 563-7200
Facsimile: (415) 346-0679
E-mail: malioto@tatp.com
laurenrussell@tatp.com

*Interim Lead Counsel*
*for the Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Master File No. CV-07-5944 SC<br><br>MDL No. 1917<br><br>**INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE DEFENDANTS' JOINT OBJECTIONS TO THE REPORT, RECOMMENDATIONS AND TENTATIVE RULINGS OF THE SPECIAL MASTER REGARDING THE INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT** |
| **This document relates to:** )<br>)<br>**ALL INDIRECT PURCHASER ACTIONS** )<br>)<br>)<br>) | The Honorable Samuel Conti<br>Special Master: Hon. Charles A. Legge (Ret.) |

i

1

**TABLE OF CONTENTS**

2   **INTRODUCTION**   ……….….……….……………………………………   1

3   **ARGUMENT**………………………………………………………………...   2

4   I.   The Special Master Properly Ruled That The Complaint's Well-Pleaded
         Facts Support A Plausible Price-Fixing Conspiracy Of Both CRTs And
5        CRT Finished Products………………………………………………..   2

6        A.  The Special Master's Holding…………………………………   2

7
         B.  The Allegations Sufficiently Allege A Conspiracy
8            Regarding CRT Products………………………………………   3

9        C.  A CRT Products Conspiracy Is Plausible………………………   5

10  II.  The Special Master Correctly Denied The Defendants' Motion To
11       Dismiss Based On The Foreign Trade Antitrust Improvement Act………..   8

12  III. The Special Master Correctly Ruled That Plaintiffs Have Standing………   10

13  IV.  The Special Master Correctly Ruled That Plaintiffs Have Alleged
14       Fraudulent Concealment By Defendants ……………………………..   12

15       A.  Plaintiffs' Fraudulent Concealment Allegations Are Sufficient ………..   12

16       B.  Due Diligence and Constructive Knowledge Present Factual
17           Questions ………………………………………………………   14

18  **CONCLUSION** …………………………………………..……………   15

19

20

21

22

23

24

25

26

27

28

**INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE DEFENDANTS' JOINT OBJECTIONS TO
THE REPORT, RECOMMENDATIONS AND TENTATIVE RULINGS OF THE SPECIAL MASTER**

1

## TABLE OF AUTHORITIES

2

**Cases**

**Page**

3

*In re Aftermarket Filters Antitrust Litig.,*
2009 U.S. Dist. LEXIS 104114 (N.D. Ill. Nov. 5, 2009)…………………………………5, 10, 12

4

5

*Aktieselskabet AF v. Fame Jeans, Inc.,*
 525 F.3d 8, 15 (D.C. Cir. 2008)………………………………………………………………..5

6

*American Ad Mgmt., Inc. v. General Tel. Co. of California,*
 190 F.3d 1051 (9th Cir. 1999)……………………………………………..…………11

7

8

*Ashcroft v. Iqbal,*
 129 S. Ct. 1937 (2009)………………………………………………………………..2, 3

9

*Associated General Contractors of California v. California State Council of Carpenters,*
 459 U.S. 519 (1983)………………………………………………………………...…10

10

11

*Barker v. Am. Mobil Power Corp.,*
 64 F.3d 1397 (9th Cir. 1995)……………………………………………………...…13

12

13

*Bell Atlantic Corp. v. Twombly,*
 550 U.S. 544 (2007)……………………………………………………………*passim*

14

15

*Bhan v. NME Hospitals, Inc.,*
 772 F.2d 1467 (9th Cir. 1985)……………………………………………...……10

16

17

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
 429 U.S. 47 (1977)………………………………………………………………11

18

19

*In re Chocolate Confectionary Products Antitrust Litigation,*
 602 F. Supp. 2d 538 (M.D. Pa. 2009)…………………………………………..7

20

21

*Continental Ore Co. v. Union Carbide & Carbon Corp.,*
 370 U.S. 690 (1962)………………………………………………………....4

22

*Conmar Corp. v. Mitsui & Co., Inc.,*
 858 F.2d 499 (9th Cir. 1988)……………………………………………13, 14

23

24

*Copperweld Corp. v. Independence Tube Corp.,*
 467 U.S. 752 (1984)………………………………………………………6

25

26

*Dee-K Enters., Inc. v. Heveafil Sdn. Bhd,*
 299 F. 3d 281 (4th Cir. 2002)……………………………..……………………10

27

28

*In re DRAM Antitrust Litig.,*
 536 F. Supp. 2d 1129 (N.D. Cal. 2008)……………………………………………11

iii

**INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE DEFENDANTS' JOINT OBJECTIONS TO THE REPORT, RECOMMENDATIONS AND TENTATIVE RULINGS OF THE SPECIAL MASTER**

*Erickson v. Pardus,*
  127 S. Ct. 2197 (2007)………………………………………………………7

*In re Flash Memory Antitrust Litig.,*
  643 F. Supp. 2d 1133 (2009)…………………………………….…………3, 12

*In re Flat Glass Antitrust Litig.,*
  385 F.3d 350 (3d Cir. 2004)……………………………………………………6

*In re Graphics Processing Units Antitrust Litig.,*
  527 F. Supp. 2d 1011 (2007) ……………………………………..……………3

*In re Graphics Processing Units Antitrust Litig.,*
  540 F. Supp. 2d 1085 (2007)………………………………………………3, 12

*In re High Fructose Corn Syrup Antitrust Litig.,*
  295 F.3d 651 (7th Cir. 2002)……………………………………………………5

*In re Intel Corp. Microprocessor Antitrust Litig.,*
  452 F. Supp. 2d 555 (D. Del. 2006)……………………………...……………10

*In re Intel Corp. Microprocessor Antitrust Litig.,*
  476 F. Supp. 2d 452 (D. Del. 2007)……………………………………....…10

*Hospital Bldg. Co. v. Trustees of Rex Hospital,*
  425 U.S. 738 (1976)……………………………………………………………7

*Kendall v. Visa U.S.A., Inc.,*
  518 F.3d 1042 (9th Cir. 2008)………………………………………….7, 8, 13

*Kendall v. Visa U.S.A. Inc,*
  2005 U.S. Dist. LEXIS 21449 (N.D. Cal. July 25, 2005)……………………7

*Knevelbaard Dairies v. Kraft Foods, Inc.,*
  232 F.3d 979 (9th Cir. 2000)…………………………………………………..5

*Loeb Industries Inc. v. Sumitomo Corp.,*
  306 F.3d 469 (7th Cir. 2002)…………………………………………………11

*Lorix v. Crompton Corp.,*
  736 N.W.2d 619 (Minn. 2007)………………………………………………11

*Low v. SD Vendome,*
  2003 WL 25678880 (C.D. Cal Jan. 7, 2003)…………………………..………13

*Novell, Inc. c. Microsoft Corp.,*
  505 F.3d 302, 311-17 (4th Cir. 2007)………………………………………11

iv

**INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE DEFENDANTS' JOINT OBJECTIONS TO THE REPORT, RECOMMENDATIONS AND TENTATIVE RULINGS OF THE SPECIAL MASTER**

*Poller v. Columbia Broad Sys., Inc.,*
   368 U.S. 464, 473 (1962)……………………………………………………………………….7

*In re Potash Antitrust Litig.,*
   No. 08 C 6910, 2009 U.S. Dist. LEXIS 102623 (N.D. Ill. Nov. 3, 2009)…………..…………12

*In re Rubber Chems. Antitrust Litig.,*
   504 F. Supp. 2d 777 (N.D. Cal. 2007)…………………………………………...……10, 14

*Rutledge v. Boston Woven Hose and Rubber Co.,*
   756 F.2d 248 (9th Cir. 1978)…………………………………………….……………………14

*In re Southeastern Milk Antitrust Ltig.,*
   555 F. Supp. 2d 934 (E. D. Tenn. 2008)………………………………...……………4

*Standard Iron Works v. Arcelormittal,*
   2009 U.S. Dist. LEXIS 49476 (N.D. Ill. June 12, 2009)……………………………………6

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
   580 F. Supp. 2d 896 (N.D. Cal. 2008)…………………………….……………………...3, 14

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
   586 F. Supp. 2d 1109 (N.D. Cal. 2008)………………………………………………3, 12, 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
   599 F. Supp. 2d 1179 (N.D. Cal. 2009)………………………………..……………3, 11

*United Phosphorus, Ltd. v Angus Chem. Co.,*
   131 F. Supp. 2d 1003 (N.D. Ill. 2001)……………………………………………………9

*United States v. LSL Biotechnologies,*
   379 F.3d 672 (9th Cir. 2004)……………………………………………………………9

*William O. Gilley v. Enterprises, Inc. v. Atlantic Richfield Co.,*
   588 F.3d 659 (9th Cir. 2009)……………………………………………………………8

**<u>Statutes</u>**

Foreign Trade Antitrust Improvement Act of 1982
           15 U.S.C. § 6…………………………………………………………………………8

**INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE DEFENDANTS' JOINT OBJECTIONS TO
THE REPORT, RECOMMENDATIONS AND TENTATIVE RULINGS OF THE SPECIAL MASTER**

**INTRODUCTION**

This is an unusual antitrust case.  The proof of these cases is usually in the hands of the defendant co-conspirators.  Here, the Indirect Purchaser Plaintiffs ("Plaintiffs") already have evidence developed in related civil cases.  Plaintiffs have evidence developed in related criminal cases, as well as guilty pleas in some of these criminal cases.  There is a Department of Justice investigation into the very allegations of this case.  There is an amnesty candidate cooperating with the Department of Justice in this investigation.  This amnesty candidate is also cooperating with the Plaintiffs in this case. Plaintiffs have obtained evidence of a worldwide conspiracy to fix the prices of CRT tubes ("CRTs") and CRT televisions and computer monitors ("CRT Finished Products") (collectively "CRT Products"), which lasted from 1995 through 2007.  It harmed millions of consumers in the United States and, like all major price fixing conspiracies, threatened the working of free markets everywhere.

Plaintiffs have alleged this price fixing conspiracy with sufficient particularity.  Special Master Legge has so found.  Special Master Legge reviewed both the Indirect and Direct Purchaser Complaints which totaled 140 pages.  He also reviewed all of the briefs relating to the motions to dismiss which totaled another 700 pages.  He heard almost 9 hours of argument on the matter.  He had the matter under submission for 4 months, during which time he spent many days drafting his Report, Recommendation And Tentative Rulings Regarding Defendants' Motions to Dismiss, D.N. 597 ("Report").

The Defendants have objected to every tentative ruling that went against them.[1]  Special Master Legge also ruled against the Plaintiffs on a number of issues.[2]  Plaintiffs have not objected to any of these rulings against them.

---

[1] Defendants filed Joint Objections to the Report ("Joint Obj.").  Seven Defendant groups also filed separate objections relating to their respective entity or entities.  They include the Panasonic Defendants, the Hitachi Defendants, the Toshiba Defendants, the Samsung Electronics Defendants, the LG Electronics Defendants, and BMCC.  Pursuant to this Court's Order Re: Objections To Special Master's Report, Recommendations and Tentative Rulings, February 8, 2010, D.N. 598, Plaintiffs have responded to each of these separate objections in separate, 3 page briefs.

[2] The Special Master recommends that the Court dismiss Plaintiffs' claims under (1) Nebraska law based on sales made by Defendants prior to July 20, 2002; (2) Nevada law based on sales

1    In considering the Defendants' objections, the Court should review the Complaint in

2    context and in its entirety, and draw on its judicial experience and common sense, as well the

3    judicial experience and common sense of Special Master Legge.  *See Ashcroft v. Iqbal,* 129 S. Ct.

4    1937, 150 (2009) ("Determining whether a complaint states a plausible claim for relief will . . .

5    be a context-specific task that requires the reviewing court to draw on its judicial experience and

6    common sense.")  The Court should overrule the Defendants' objections and adopt Special

7    Master Legge's recommendations in their entirety.

8                                        **ARGUMENT**

9    **I.    The Special Master Properly Ruled That The Complaint's Well-Pleaded Facts
          Support A Plausible Price-Fixing Conspiracy Of Both CRTs And CRT Finished
10         Products**

11    Defendants contend that Special Master Legge's "fundamental error" is that he permits

12    Plaintiffs to "convert" an alleged conspiracy to fix the price of CRTs into a conspiracy claim

13    involving CRT Finished Products, without sufficient facts to make such a conspiracy plausible.

14    *See* Joint Obj. at 1: 9-13.[3]  Defendants contend that Plaintiffs' Consolidated Amended Complaint

15    ("IP CAC") only alleges a conspiracy as to CRTs and not as to CRT Finished Products.

16    Defendants mischaracterize the import of *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007)

17    and *Iqbal*, 129 S.Ct. 1937, as well as the scope of Plaintiffs' allegations.

18         **A.    The Special Master's Holding**

19    The standard for pleading a conspiracy under *Twombly* and *Iqbal*, as stated in the Report,

20    is whether the complaint gives fair notice to the defendant of the claim alleged against him.  The

21    complaint must state a facially plausible claim, *i.e.,* one allowing the court to "draw the

22    _____

23    made by Defendants prior to 1999; (3) Massachusetts' Consumer Protection Act; (4) Rhode
      Island's Unfair Trade Practices and Consumer Protection Act; and (5) Kansas's common law of
24    unjust enrichment.

25    [3] Defendants reiterate arguments made in their Joint Motion to Dismiss.  Plaintiffs fully
      responded to those arguments.  *See* Indirect Purchaser Plaintiffs' MPA In Opp. To Defendants'
26    Motions To Dismiss, D.N. 536 ("IP Opp."), at 7-15 (describing the detailed allegations in the IP
      CAC); 18-20 (demonstrating that the IP CAC alleges a conspiracy to fix the prices of CRT
27    Products); and 67-72 (demonstrating that a conspiracy to fix the price of CRT Products is
      economically plausible).

28                                              2
      **INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE DEFENDANTS' JOINT OBJECTIONS TO
      THE REPORT, RECOMMENDATIONS AND TENTATIVE RULINGS OF THE SPECIAL MASTER**

1    reasonable inference that the defendant is liable for the misconduct alleged."  Report at 7, citing

2    *Iqbal,* 129 S.Ct at 1949.  The Report examined recent antitrust decisions in this district

3    interpreting *Twombly* and *Iqbal*[4] and held that these decisions, all of which upheld complaints

4    under *Twombly,* support the conclusion that Plaintiffs adequately plead a CRT Product

5    conspiracy.  *See* Report at 9.

6        As the Report notes, unlike the complaint in *Twombly,* which merely alleged parallel

7    conduct, here the complaint alleges "extensive allegations of meetings, communications, and

8    agreements to fix prices and production levels"; "the structure of the CRT product market and its

9    susceptibility to price-fixing arrangements"; and "specific agreements and actions by the

10   defendants to fix prices and production levels."  Report at 9, 10.  The Report expressly addressed,

11   and rejected, Defendants' contention that the complaints allege only CRTs and not CRT

12   Products.  *Id.* at 5-6.  "*There can be no doubt* from the multiple allegations stating 'CRT

13   Products' that those products, and not just the CRTs alone, are the products alleged by plaintiffs

14   to be subject to the conspiracy charged in both complaints.  And, there is nothing legally wrong

15   with plaintiffs defining their product market that way.*"  Id.* at 5 (emphasis added).[5]  The Report

16   held that "the alleged facts, if true, certainly lead to a plausible claim of antitrust violations . . .

17   [a]nd the allegations comply with the requirements of Rule 8 that defendants be given adequate

18   notice of the charges against them."  *Id.* at 10-11:

19       **B.     The Allegations Sufficiently Allege A Conspiracy Regarding CRT Products**

20       Against this backdrop, Defendants' argument that the IP CAC fails to state a claim as to

21   CRT Products finds no support.  It "ignores the repeated allegations in the complaints regarding

22

23

24   [4] Report at 8-9 (citing *In re TFT-LCD Antitrust Litig.,* 586 F. Supp. 2d 1109 (N.D. Cal. 2008)
     ("*TFT-LCD I*") and 599 F. Supp. 2d 1179 (N.D. Cal. 2009) ("*TFT-LCD II*"); *In re Static Random
     Access Memory (SRAM) Antitrust Litig.,* 580 F.Supp.2d 896 (N.D. Cal. 2008); *In re Rubber
     Chems. Antitrust Litig.,* 504 F. Supp. 2d 777, 784 (N.D. Cal. 2007); ); *In re Flash Memory
     Antitrust Litig.,* 643 F. Supp. 2d 1133 (2009); *In re Graphics Processing Units Antitrust Litig.,*
26   527 F. Supp. 2d 1011 (2007); and *In re GPU,* 540 F. Supp. 2d 1085 (2007) ("*GPU II*").

27   [5] "Defendants attempt to construe plaintiffs' complaints as alleging only an <u>effect</u> on the prices of
     the finished products in the United States.  But that contention ignores the repeated allegations in
     the complaint regarding 'CRT Products' being a subject of the conspiracy."  Report at 6.

28

**INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE DEFENDANTS' JOINT OBJECTIONS TO
THE REPORT, RECOMMENDATIONS AND TENTATIVE RULINGS OF THE SPECIAL MASTER**

1    'CRT Products' being a subject of the conspiracy. . . .  That is an incorrect reading of the

2    obviously intended scope of the [Complaint]."  Report at 6.  Indeed, among other things,

3    Plaintiffs allege:

4    ▪    The subject of the conspiracy includes both CRTs and CRT Finished Products.  IP CAC
          ¶¶14-15.
5

6    ▪    The commerce affected by Defendants' conduct is sale and purchase of CRT Products in
          the United States and each of the states.  *Id.* at ¶¶10-12.
7

8    ▪    The structural characteristics of the CRT Product market are conducive to the type of
          collusive activity alleged in the Complaint.  *Id.* at ¶¶ 121, 123-125, 127-132, 136, 138.

9
     ▪    Actual anticompetitive agreements were reached among Defendants with respect to CRT
10        Products.  *Id.* at ¶¶ 140-188.  Significantly, these agreements included agreements on
          intra-company sales to vertically integrated customers, as a means to insure that price
11        increases for CRTs were passed on to CRT Finished Products.  *Id.* at  ¶¶ 154-156

12   ▪    The effectiveness of the conspiracy was evidenced by unnatural and sustained price
          stability or unusual upward price movement in the CRT Product market.  *Id.* at ¶¶192,
13        197, 199, 201, 202.

14   *See also* Report at 5, noting specific examples of Plaintiffs' allegations as to CRT Products.

15           Plaintiffs' specific, factual allegations about CRT Products rise far above the "labels and

16   conclusions, and a formulaic recitation of the elements of a cause of action" criticized in

17   *Twombly*, where the plaintiffs' allegations were limited solely to an "allegation of parallel

18   conduct and a bare assertion of a conspiracy."  *Twombly,* 550 U.S. at 556.

19           Defendants cherry-pick certain language from the IP CAC and attempt to rewrite

20   Plaintiffs' allegations to suit their own, self-serving version of the conspiracy.  Joint Obj. at 5-6

21   (citing paragraphs which refer to CRTs only).  Such efforts have been consistently rejected by

22   courts.  As the Report states: "'The character and effect of a [Sherman Act] conspiracy are not to

23   be judged by dismembering it and viewing its separate parts, but only by looking at it as a

24   whole.'"  Report at 13, citing *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S.

25   690, 698-99 (1962).[6]  Nothing in *Twombly* or its progeny has diminished the application of this

26   _____

27   [6] *See also, e.g., In re Southeastern Milk Antitrust Ltig.,* 555 F. Supp. 2d 934, 943-44 (E. D. Tenn.
28   2008) ("the character and effect of a [Sherman Act] conspiracy are not to be judged by

                                              4
     _____
     **INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE DEFENDANTS' JOINT OBJECTIONS TO
     THE REPORT, RECOMMENDATIONS AND TENTATIVE RULINGS OF THE SPECIAL MASTER**

1    fundamental pleading principle.  *See Aktieselskabet AF v. Fame Jeans, Inc.*, 525 F.3d 8, 15 (D.C.

2    Cir. 2008) ("We conclude that *Twombly* leaves the long-standing fundamentals of notice pleading

3    intact.")

4           Finally, Defendants ignore the well-established pleading rule that in ruling on these

5    motions to dismiss, "the court must presume the factual allegations of the complaint to be true

6    and draw all reasonable inferences in favor of the nonmoving party."  *Knevelbaard Dairies v.*

7    *Kraft Foods, Inc.,* 232 F.3d 979, 984 (9th Cir. 2000) (citation omitted); *Fame Jeans,* 525 F.3d at

8    15.  Defendants instead ask the Court to draw inferences in their favor.  For example, Defendants

9    argue that Plaintiffs' claims should be limited to CRTs because the various government

10   investigations relate to CRTs and not CRT Finished Products.  *See* Joint Obj. at 6.  The DOJ has

11   not yet indicated the scope of its investigation.  And even if the investigation is limited to CRTs,

12   the absence of a government investigation into CRT Finished Products should not lend any

13   weight to Defendants' arguments or limit the scope of Plaintiffs' conspiracy allegations.  The

14   government's burden of proof in its criminal case is substantially higher than Plaintiffs' burden in

15   this civil case.  Moreover, there are many instances where conspiracies have been proven without

16   prior government indictments or complaints.[7]

17          **C.    A CRT Products Conspiracy Is Plausible**

18          Equally unpersuasive is Defendants' argument that a CRT Product conspiracy is

19   economically implausible.  Once one considers Plaintiffs' allegations as they have been alleged

20   (and not as re-written by Defendants), it becomes clear that a horizontal conspiracy among

21   vertically integrated manufacturers of CRTs and CRT Finished Products, who collectively

22

23

24   dismembering it and viewing its separate parts"); *In re Aftermarket Filters Antitrust Litig.,* 2009
     U.S. Dist. LEXIS 104114, *20 (N. D. Ill. Nov. 5, 2009) ("[D]efendants may not 'cherry pick'
25   specific allegations in the complaint that might be insufficient standing alone.").

26   [7] *See, e.g., In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 664 (7th Cir. 2002)
     (rejecting defendants' argument that the lack of DOJ investigation prove that no price fixing
27   conspiracy existed because the DOJ has "limited resources," and "may also have felt that the
     antitrust class action bar had both the desire and resources to prosecute such a suit vigorously.");
28   *See* IP Opp. at 19-20 (citing additional cases).

**INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE DEFENDANTS' JOINT OBJECTIONS TO
THE REPORT, RECOMMENDATIONS AND TENTATIVE RULINGS OF THE SPECIAL MASTER**

1    control the market for all products,[8] makes perfect economic sense.[9]  By conspiring to increase

2    the prices at both levels of the distribution chain, these vertically integrated companies ensured

3    that their affiliated downstream manufacturers of CRT Finished Products did not absorb the

4    increased prices for CRTs.  IP CAC ¶¶ 154-155.  Rather, the overcharge was passed on by the

5    downstream manufacturers to consumers through increased prices for CRT Finished Products.

6    *Id.* ¶ 222.  This allowed these vertically integrated companies to recoup the benefits of their

7    price-fixing at the CRT level and the CRT Finished Product level in the market.[10]  Defendants

8    dispute the truth of these claims.  But this is not the issue on a motion to dismiss.

9           Plaintiffs' allegation of vigorous price competition at the OEM and retailer levels of

10   distribution is not, as Defendants claim, inconsistent with the conspiracy to fix prices of CRT

11   Products among vertically integrated Defendants.  This allegation supports the allegations of

12   pass-through of the overcharge from intermediate levels of the distribution chain to consumers.

13   *See* IP CAC ¶ 227 ("The demand for CRTs is ultimately determined by purchasers of products

14   containing such products.  The market for CRTs and the market for CRT Products are therefore

15   inextricably linked and cannot be considered separately.")

16          Further, the unity of interest between parent and subsidiary discussed in *Copperweld*

17   *Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984)*, while precluding a conspiracy

18   between such entities, renders their joint participation in a conspiracy with *other* entities highly

19   plausible.  467 U.S. at 771 n.18 ("[T]he ultimate interests of the subsidiary and the parent are

20   identical, so the parent and the subsidiary must be viewed as a single economic unit.").

21          Finally, Plaintiffs allege that the CRT Product market was a mature, declining market,

22   where Defendants faced stagnant or decreasing demand with no prospect for market growth.  IP

23   _____

24   [8] IP CAC ¶¶ 115, 166-188, 238.

25   [9] *In re Flat Glass Antitrust Litig.,* 385 F.3d 350, 358 (3d Cir. 2004) ("[A]n agreement among
     oligopolists to fix prices at a supra-competitive level, makes perfect economic sense").

26   [10] *See Standard Iron Works v. Arcelormittal*, 2009 U.S. Dist. LEXIS 49476, *67-69 (N.D. Ill.

27   June 12, 2009) (rejecting defendants' argument that the alleged conspiracy was practically
     implausible because it involved both raw steel and downstream steel products because defendants

28   collectively controlled both the component product and the downstream products).

**INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE DEFENDANTS' JOINT OBJECTIONS TO
THE REPORT, RECOMMENDATIONS AND TENTATIVE RULINGS OF THE SPECIAL MASTER**

1  CAC ¶¶ 130-131.  CRT televisions and computer monitors were being rapidly replaced by TFT-

2  LCD and Plasma displays.  *Id.* ¶¶ 132-133.  The Defendants were thus facing harsh market

3  realities.  It is plausible that the Defendants would resort to non-competitive means under these

4  circumstances.  *See In re Chocolate Confectionary Products Antitrust Litigation,* 602 F. Supp. 2d

5  538, 577 (M.D. Pa. 2009) ("Plaintiffs' contention that defendants sought to increase revenue

6  through non-competitive means is a plausible reaction to harsh market realities.")

7       Further evidentiary detail regarding the mechanics and effects of the alleged CRT Product

8  conspiracy is simply not required at the pleading stage.  "Specific facts are not necessary; the

9  statement need only 'give the defendant fair notice of what the . . . claim is and the ground upon

10  which it rests." *Erickson v. Pardus,* 127 S. Ct. 2197, 2200 (2007) (quoting *Twombly*, 550 U.S. at

11  555).  Plaintiffs cannot be expected to know or allege every detail of a multi-faceted conspiracy

12  at the pleading stage.[11]  *Twombly* "simply calls for enough fact to raise a reasonable expectation

13  that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.

14       The cases Defendants cite do not require a different conclusion.  In *Kendall v. Visa*

15  *U.S.A., Inc*., 518 F.3d 1042 (9th Cir. 2008), the Court of Appeals affirmed the district court's

16  dismissal of plaintiffs' complaint after repeated amendments and an opportunity to take

17  discovery.  *Id.*[12]  Just as in *Twombly*, the *Kendall* complaint merely alleged parallel conduct with

18  nothing more than conclusory statements about how that conduct should be interpreted.

19  Applying *Twombly*, the Ninth Circuit found this inadequate.  *Id.* at 1048 ("Appellants failed to

20  plead *any* evidentiary facts beyond parallel conduct to prove their allegation of a conspiracy.")

21  (emphasis added).

22

23

24  _____

25  [11] The Supreme Court has recognized that "in complex antitrust litigation," "motive and intent play leading roles," and "the proof is largely in the hands of the alleged conspirators."  *Poller v. Columbia Broad Sys., Inc.,* 368 U.S. 464, 473 (1962); *Hospital Bldg. Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 746 (1976).

26

27  [12] *See also Kendall v. Visa U.S. A. Inc,* 2005 U.S. Dist. LEXIS 21449, *9 (N.D. Cal. July 25, 2005) (noting plaintiffs' complaint "represents the fifth attempt to allege sufficient facts to support claim against the Defendant Banks").

28

7

1    Plaintiffs' allegations here go well beyond those held inadequate in *Kendall*.  The IP CAC

2    "allege[s] meetings, locations, dates, types of meetings, specific agreements reached at the

3    meetings, and the participation of specific defendants."  Report at 10.  "More specifically,

4    paragraphs 140 through 188 state that allegedly illegal agreements were entered into by the

5    defendants with respect to CRT Products."  *Id.* at 5.  These allegations, taken as a whole, put

6    Plaintiffs' claim far "across the line from conceivable to plausible."  *Twombly,* 550 U.S. at 570.

7         *William O. Gilley v. Enterprises, Inc. v. Atlantic Richfield Co.* is likewise inapposite.

8    There, as in *Kendall*, the Ninth Circuit upheld dismissal only after the plaintiff had repeatedly

9    failed to file an adequate complaint.  *Gilley*, 588 F.3d 659, 662 (9th Cir. 2009).  Moreover, the

10   allegations of the complaint were "plainly similar" to those alleged in a prior California state

11   court class-action suit dismissed on summary judgment, and were therefore precluded.  *Id.* at 661,

12   669.  None of these facts is present in this case.

13        In short, Plaintiffs have adequately alleged a plausible conspiracy to fix the prices of CRT

14   Products.  The Court should therefore reject the Defendants' objection and adopt the Special

15   Master's tentative ruling.

16   **II.    The Special Master Correctly Denied Defendants' Motion To Dismiss Based On The**

17   **Foreign Trade Antitrust Improvement Act**

18        The cornerstone of Defendants' argument that the Federal Trade Antitrust Improvement

19   Act ("FTAIA") deprives this Court of subject matter jurisdiction is the premise that the IP CAC

20   fails to state a claim as to CRT Products.[13]  As discussed above, the Special Master rejected this

21   faulty premise.  "[T]hese two complaints do allege antitrust violations regarding CRT Products as

22   well as CRTs themselves."  Report 17.[14]

23   _____

24   [13] By its terms, the FTAIA applies only to the Sherman Act and the Clayton Act.  Nowhere in the
     text of the statute, or in its legislative history, is there an indication that it applies to state antitrust
25   statutes--much less state consumer protection statutes.  *See further* IP Opp. 108-112.

26   [14] Indeed, Plaintiffs have alleged a conspiracy encompassing both CRTs and CRT Finished
     Products that was carried out both in the United States, and abroad, which involved a substantial
27   amount of import and domestic commerce, and which targeted and injured American consumers,
     who comprised the largest market for CRT Finished Products in the world.  *See* IP CAC, ¶¶ 1, 9,
28   10, 11, 12, 50-52, 54-59, 61-70, 72-78, 80-83, 85-92, 94-95, 97-98, 100-102, 104-110, 114-116,

8

1    The FTAIA seeks to bar claims arising from purely foreign activity.  Because Plaintiffs'

2    claims seek relief on behalf of entities and individuals who purchased in the United States, and

3    not in foreign commerce, the FTAIA does not preclude Plaintiffs' action:

> Both complaints allege claims for purchases of CRT Products in
> the United States, at prices artificially inflated by defendants, and
> with an impact on United States prices for those products.  And the
> alleged classes are limited to entities that purchased CRT Products
> in the United States.  And indeed, the complaints contain numerous
> allegations about conduct <u>in the United States facilitating the
> conspiracy.</u>  These are not cases of foreign plaintiffs attempting to
> use United States courts and United States antitrust laws to seek
> redress for injuries brought about by foreign commerce.

10   *Id.* at 17-18 (emphasis added).[15]

11   Plaintiffs have alleged a conspiracy encompassing <u>both</u> CRTs and CRT Finished

12   Products, carried out in part in the United States by U.S.-based Defendants, and proximately

13   causing harm to indirect purchasers of those products in the United States.  *See* IP Opp Brief at

14   94-95.  Defendants' authorities are inapposite.[16]  The Special Master's recommendation

15   regarding the Defendants' FTAIA arguments should be adopted.

16

17   162, 167, 169, 171, 174, 176, 178, 180, 182, 188, 231, 240, 242, 246, 248-250, 255-271 and 274-
283; IP Opp. at 19-20, 93-112.  Defendants ignore the fact that, although many of the numerous
18   U.S.-based Defendants may not currently manufacture CRTs in the United States, they did so for
the majority of the Class Period when they were participating in the conspiracy.  IP CAC ¶¶ 51,
19   55, 63, 65, 73, 74, 76, 77, 81, 89, 90, 95; IP Opp. at 95-96.  The Special Master's statement to the
effect that CRTs and CRT Finished Products are manufactured and sold abroad before being sold
20   into the United States (Report at 4) is *dictum* and contradicts the factual allegations in the
Complaint, which must be taken as true.

21
22   [15] Defendants take the following excerpt from the Report completely out of context: "Apart from
the CRTs being contained in the assembled products, there is apparently no separate market for
23   CRTs in the United States."  Defs' Brief at 10 quoting Report at 4:1-7.  Inferring that foreign
sales are involved here, Defendants rely on *United States v. LSL Biotechnologies*, 379 F.3d 672,
24   680 (9th Cir. 2004) to argue that the FTAIA bars jurisdiction over foreign sales.  But the Special
Master has found that this case does not involve foreign sales ("These are not cases of foreign
25   plaintiffs attempting to use United States courts and United States antitrust laws to seek redress
for injuries brought about by foreign commerce.")  Report at 18:3-5.  *See also* Report at 4:7-13,
26   5:15-17, 6:1-22, 17:13-21.

27   [16] In *United Phosphorus, Ltd. v Angus Chem. Co.*, 131 F. Supp. 2d 1003, 1014 (N.D. Ill. 2001)
*aff'd*, 322 F.3d 942 (7th Cir. 2003), the district court dismissed claims under the FTAIA after
28   extensive discovery and on basis of a full evidentiary record, because plaintiffs never had

9

**III.    The Special Master Correctly Ruled That Plaintiffs Have Antitrust Standing**

As the Special Master noted, Defendants' argument that Plaintiffs have no standing assumes that the complaint alleges a conspiracy only as to CRTs.  The Special Master, however, rejected this view ("the Special Master interprets the complaints as alleging a conspiracy as to CRT Products as well").  Report at 18:18-19.  The Special Master further held that Plaintiffs have alleged the elements of standing under *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519 (1983), that they "have suffered antitrust injuries and their claim injuries are not remote," and that their standing under state laws is measured by the scope of state repealer statutes.  *See id.,* 18-22-19:2.  To the extent *AGC* is deemed applicable to any of the state-law claims,[17] the Complaint alleges facts sufficient to satisfy the *AGC* balancing test.  *See* IP Opp. at 117-130.

Citing *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470-71 (9th Cir. 1985), Defendants argue that market participation under *AGC* requires that the product at issue be "reasonably

---

intention or ability to sell the drug at issue in the United States and the only prospective U.S.-based buyer would not have bought the drug from them.  *See* IP Opp at 107-08 n.140.  In *In re Intel Corp. Microprocessor Antitrust Litig.*, 452 F. Supp. 2d 555 (D. Del. 2006) plaintiffs sought recovery in several foreign tribunals in addition to American courts and the alleged harm suffered was caused by the *foreign* effect of Defendants' conduct: lost *foreign* sales.  *See* IP Opp Brief at 107-08 n.140.  The court's analysis of the FTAIA argument in the later *Intel* case, *In re Intel Corp. Microprocessor Antitrust Litig.*, 476 F. Supp. 2d 452 (D. Del. 2007) (argued for the proposition that a "downstream" market is incapable of supporting a jurisdictional claim under the FTAIA), is based on the same allegations.  476 F. Supp. 2d at 456.  *Dee-K Enters., Inc. v. Heveafil Sdn. Bhd*, 299 F. 3d 281, 294-95 (4th Cir. 2002), was decided after trial.  *See* IP Opp Brief at 107.  The court's findings that the conspiracy was primarily foreign and did not have a substantial effect on U.S. commerce was made after discovery and presentation of evidence, not on the basis of the pleadings.  In *In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 784 (N.D. Cal. 2007), plaintiffs "demanded damages for injuries allegedly suffered in foreign commerce under the Sherman and Clayton Acts."  The district court dismissed those claims under the FTAIA, but noted that "[p]laintiffs may proceed with their Sherman Act claims to the extent they seek to recover damages for domestic injury, *i.e.*, the purchase of rubber chemicals, at allegedly inflated prices in the domestic market or for use within the United States."  504 F. Supp. 2d at 779, 790.  *See* IP Opp Brief at 94-96.  This case does not involve foreign plaintiffs using the United States antitrust laws to seek recovery for injuries caused by foreign purchases.  *See* Report at 18.

[17] *See In re Aftermarket Filters Antitrust Litig.*, 2009 U.S. Dist. LEXIS 104114, *31 ("*AGC* was obviously never intended to apply to [an indirect-purchaser case] involving claims of price fixing down a chain of distribution, because in the federal context such claims were already barred by *Illinois Brick*.")

1   interchangeable" or have "cross-elasticity of demand."  Defendants contend that Plaintiffs do not

2   allege that these factors exist between CRTs and CRT Finished Products.  *See* Joint Obj. at 13.

3   As federal courts in this District have noted, however, there is "no subsequent Ninth Circuit

4   authority that affirmatively endorses a general rule applying *Bhan*'s reasonably interchangeable

5   and cross-elastic requirements to the market participant inquiry in section 1 cases."  *In re DRAM*

6   *Antitrust Litig.*, 536 F. Supp. 2d 1129, 1138 (N.D. Cal. 2008) ("*DRAM II*"); *TFT-LCD I.*, 586 F.

7   Supp. 2d at 1117-18 (citing *DRAM II*).

8          To the contrary, numerous federal courts have found antitrust standing where the

9   plaintiffs were neither competitors nor customers of the defendants and distinct markets were

10  involved, when the injury alleged was foreseeable and "inextricably intertwined" with the injury

11  to competition inflicted by defendants.[18]  As for the repealer states, nothing in their substantive

12  laws—and Defendants point to nothing— indicates that those states would apply a "market

13  participation" requirement to deny standing in an indirect-purchaser component case.  *See, e.g.,*

14  *Lorix v. Crompton Corp.,* 736 N.W.2d 619, 629-30 (Minn. 2007) (expressly rejecting market-

15  participant requirement).

16         The fundamental question for standing is whether the harm in the "market" at issue results

17  from the Defendants' antitrust violation, and flows from that which makes the Defendants'

18  antitrust violation illegal.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489

19  (1977).  Here, even under Defendants' "CRT-only" version of the conspiracy, Plaintiffs have

20  established the importance of the CRT Finished Product market in Defendants' price-fixing

21  conspiracy.  Plaintiffs have adequately alleged that as the direct and foreseeable result of

---

23  [18] *See, e.g., American Ad Mgmt., Inc. v. General Tel. Co. of California,* 190 F.3d 1051, 1058 (9th
24  Cir. 1999) ("[I]t is not the status as a consumer or competitor that confers antitrust standing, but
    the relationship between the defendant's unlawful conduct and the resulting harm to the
25  plaintiff."); *Loeb Industries Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002) ("different
    injuries in distinct markets may be inflicted by a single antitrust conspiracy, and thus that
26  differently situated plaintiffs might be able to raise claims"); *Novell, Inc. v. Microsoft Corp.,* 505
    F.3d 302, 311-17, 320 (4th Cir. 2007), *cert. denied*, 128 S. Ct. 1659 (2008) (rejecting "bright-
27  line" same-market rule and holding that plaintiff had antitrust standing under *AGC*, "even though
    . . . outside the restrained PC operating-system market" because Microsoft's anticompetitive
28  conduct excluded it from portions of the software market).

**INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE DEFENDANTS' JOINT OBJECTIONS TO
THE REPORT, RECOMMENDATIONS AND TENTATIVE RULINGS OF THE SPECIAL MASTER**

1  Defendants' conspiracy, they were forced to pay more for CRT Finished Products than they

2  would have otherwise paid.  IP-CAC ¶¶ 222-239.  Plaintiffs' injuries are precisely the type of

3  harm that the "repealer states" envisioned to remedy.  *See In re Aftermarket Filters,* 2009 U.S.

4  Dist. LEXIS 104114, *28-34 (holding that indirect purchasers who bought the price-fixed filters

5  as part of a maintenance service package down a chain of distribution have antitrust standing

6  under the "repealer state" laws).

7       *DRAM I* and *DRAM II* are the only decisions in an indirect-purchaser component case that

8  Defendants can rely upon to support their "market participant" standing requirement.  *See* Joint

9  Obj. at 13.  *DRAM* has been highly criticized and its continued validity is questionable.  *See In re*

10  *Potash Antitrust Litig.,* No. 08 C 6910, 2009 U.S. Dist. LEXIS 102623, *99 (N.D. Ill. Nov. 3,

11  2009) (expressly rejecting the holding in *DRAM I* and finding it "questionable" and

12  "unpersuasive").  Three courts in this District have since rejected the *AGC* holdings in *DRAM*

13  and the "market-participant" test in particular.  *See GPU II*, 540 F. Supp. 2d at 1098; *TFT-LCD I,*

14  586 F. Supp. 2d at 1123; *Flash Memory,* 643 F. Supp. 2d at 1154.  Plaintiffs have set forth

15  similar allegations as those upheld in these cases and thus satisfy *AGC*.[19]

16  **IV.   The Special Master Correctly Ruled That Plaintiffs Have Alleged Fraudulent**
17         **Concealment By Defendants**

18      **A.   Plaintiffs' Fraudulent Concealment Allegations Are Sufficient**

19       Defendants claim that Plaintiffs have a duty to specify which defendant engaged in which

20  acts of concealment.[20]  That is not the standard.  As the Report observes, such a requirement

21  "would be contrary to a general principle of conspiracy law that once a party becomes a member

22

23

24  _____

25  [19] Because Plaintiffs have adequately pled that they suffered an antitrust injury, their claim under
Section 16 of the Clayton Act is likewise viable.  *See* Report at 19:3-7.

26  [20] Joint Defendants improperly attempt to incorporate by reference their arguments regarding the
27  DP CAC.  *See* Joint Obj. at 14 n. 14.  Plaintiffs object to this attempt to circumvent page
limitations.  If the Court decides to consider those arguments, Plaintiffs respectfully request the
28  opportunity to respond.

**INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE DEFENDANTS' JOINT OBJECTIONS TO
THE REPORT, RECOMMENDATIONS AND TENTATIVE RULINGS OF THE SPECIAL MASTER**

1    of a conspiracy he is bound by all of the acts of the other conspirators."  Report at 21.[21]  Judge

2    Illston found allegations very similar to those of the IP CAC sufficient as a matter of law in *TFT-*

3    *LCD I,* 586 F. Supp. 2d at 1119, 1132—a fact conspicuously omitted from Joint Defendants'

4    brief.[22]

5         Defendants' cited authorities are easily distinguished.  In *Barker v. Am. Mobil Power*

6    *Corp.,* 64 F.3d 1397 (9th Cir. 1995), the plaintiffs alleged fraudulent concealment against

7    defendants who themselves had not committed acts of concealment.  *Id.* at 1402.  That is not the

8    case here.[23]  Also, the *Barker* defendants were independent of one another; *Barker* has been

9    distinguished on that basis.  *See Low v. SD Vendome,* 2003 WL 25678880 at * 7 (C.D. Cal Jan. 7,

10   2003) (the *Barker* defendants "all were individuals with independent identities and

11   responsibilities, and none was alleged to have been acting on behalf of any of the others").  By

12   contrast here, Plaintiffs allege fraudulent concealment against defendants who were parties both

13   to the underlying conspiracy alleged and to agreements "to keep their meetings secret."  IP CAC

14   ¶ 156(l).

15        Under *Conmar Corp. v. Mitsui & Co., Inc.,* 858 F.2d 499, 502 (9th Cir. 1988), a plaintiff

16   must plead facts showing that the defendant affirmatively misled it.  Plaintiffs have done so.[24]  In

---

18   [21] As the Report also recognizes (Report at 21), the IP CAC contains well-pleaded allegations
19   answering "the basic questions, 'who, did what, to whom (or with whom), where, and when.'"
     *Kendall,* 518 F.3d at 1048.  *Kendall* affirmed the dismissal of a complaint that, unlike here,
20   "failed to plead *any evidentiary facts* beyond parallel conduct to prove their allegation of a
     conspiracy."  *Id.* (emphasis added).

21   [22] *See* IP Opp. at 78-87 (comparing the allegations in this case to the allegations found sufficient
22   in *TFT-LCD I.*)

23   [23] Plaintiffs allege that Defendants both engaged in the conspiracy and sought to conceal it.  *See*
     IP CAC ¶ 168 ("Between at least 1995 and 2001, Defendant LG, through LG Electronics, Inc.
24   and LGETT, participated in at least 100 Glass Meetings at all levels.  After 2001, LG participated
     in the CRT Product conspiracy through its joint venture" with LP Displays); *id.* ¶ 172 ("Certain
25   [LP Displays] high-level executives had previously attended meetings on behalf of defendants
     LG and Philips"; ¶ 156(l) ("The agreements reached at the Glass Meetings included: agreements
26   to keep their meetings secret").  The IPCAC also contains numerous examples of specific acts of
     affirmative concealment taken at these Glass Meetings by the defendants.  *See id.* ¶ 290 & Report
     at 23-24.

27   [24] *See* Report at 23-24.  For example, Plaintiffs allege that Defendants agreed: "not to discuss
28   publicly, or otherwise reveal, the nature and substance" of their dealings in furtherance of the

13

**INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE DEFENDANTS' JOINT OBJECTIONS TO
THE REPORT, RECOMMENDATIONS AND TENTATIVE RULINGS OF THE SPECIAL MASTER**

1    *Rutledge v. Boston Woven Hose and Rubber Co.,* 756 F.2d 248 (9th Cir. 1978), unlike here, the

2    plaintiff's complaint contained only <u>one</u>, bare-boned averment on fraudulent concealment—that

3    "'Defendant has fraudulently concealed the existence of the aforesaid price discrimination

4    through the adoption of elaborate schemes, resorting to secrecy to avoid detection, and by

5    denying that such discrimination or price differential existed.'"  *Id.* at 250.

6          **B.**      **Due Diligence and Constructive Knowledge Present Factual Questions**

7          The Report also correctly concludes that lack of diligence and constructive knowledge are

8    factual issues inappropriate for resolution on a motion to dismiss.  *See Conmar,* 858 F.2d at 504

9    ("The leap from the plaintiffs' knowledge of the . . . complaint to actual or constructive

10   knowledge of their cause of action therefore involves factual issues").  Diligence is only

11   meaningful "when facts exist that would excite the inquiry of a reasonable person."  *Id.*  Here too,

12   whether the publicly available facts were "sufficient to excite" Plaintiffs' inquiry presents factual

13   questions.  *Id.* at 504-05; *see also In re Rubber Chemicals*, 504 F. Supp. 2d at 788 (Plaintiffs'

14   allegation that they could not have discovered the alleged conspiracy 'at an earlier date by the

15   exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy

16   employed by the Defendants and their Co-Conspirators' to conceal the conspiracy [citation

17   omitted] is a sufficient allegation of due diligence. . . .  It is impossible to declare at this [motion

18   to dismiss] stage that plaintiffs failed to exercise due diligence to follow up on that which may or

19   may not have been sufficient to excite their suspicions").[25]  The Report's Recommendations on

20   fraudulent concealment are proper and should be adopted.

21

22   _____

23   conspiracy, and "to expel those who failed to do so"; "to limit the number of representatives from
each Defendant attending their meetings so as to avoid detection"; "to refrain from listing the

24   individual representatives of the Defendants in attendance at meeting in any meeting report"; "to
refrain from taking meeting minutes or taking any kind of written notes during the meetings;" to

25   give "false and pretextual reasons for CRT Product price increases"; agreed "on what to tell
customers about price changes"; agreed "upon the content of public statements regarding

26   capacity and supply"; and agreed "to eliminate references in expense reports that might reveal the
existence of their unlawful meetings."  IP CAC ¶ 290.

27   [25] As *SRAM,* cited by Defendants, observes, dismissal on a motion to dismiss is appropriate *only*

28   "if the time bar 'is apparent on the face of the complaint.'"  *In re SRAM,* 580 F. Supp. 2d at 904.

                        14

1

**CONCLUSION**

2       For all the foregoing reasons, Plaintiffs respectfully request that the Court adopt the

3  Special Master's tentative rulings in their entirety and deny the Defendants' Joint Motion To

4  Dismiss The Indirect Purchaser Plaintiffs' Consolidated Amended Complaint.  In light of the

5  exhaustive prior proceedings on this matter, Plaintiffs do not believe further oral argument is

6  necessary.

7  Dated: February 26, 2010                 Respectfully submitted,

8                                           **TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP**

9                                           By:    /s/ Mario N. Alioto
10                                                 Mario N. Alioto (56433)
                                                   Lauren C. Russell (241151)
11                                                 2280 Union Street
                                                   San Francisco, California 94123
12                                                 Telephone: (415) 563-7200
                                                   Facsimile: (415) 346-0679
13                                                 E-mail: malioto@tatp.com
                                                   laurenrussell@tatp.com
14

15                                          *Interim Lead Counsel*
                                            *for the Indirect Purchaser Plaintiffs*
16

17

18 **Plaintiffs' Counsel On The Brief:**

19   Joseph M. Patane (jpatane@tatp.com)       Susan G. Kupfer (skupfer@glancylaw.com)
     **LAW OFFICE OF JOSEPH M.**               Sylvie Kern (skern@glancylaw.com)
20   **PATANE**                                **GLANCY BINKOW & GOLDBERG LLP**
     2280 Union Street                         One Embarcadero Center, Suite 760
21   San Francisco, CA  94123                  San Francisco, CA 94111
     Telephone: (415) 563-7200                 Telephone: (415) 972-8160
22   Facsimile: (415) 346-0679                 Facsimile: (415) 972-8166

23

24

25

26

---

27   That is not the case here since Plaintiffs allege fraudulent concealment.  *See id.* at 905.  *Rutledge*

28

**INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE DEFENDANTS' JOINT OBJECTIONS TO
THE REPORT, RECOMMENDATIONS AND TENTATIVE RULINGS OF THE SPECIAL MASTER**

1    Francis O. Scarpulla (fscarpulla@zelle.com)    Christopher Lovell (clovell@lshllp.com)

2    Craig C. Corbitt (ccorbitt@zelle.com)    Gary Jacobsen (gsjacobsen@lshllp.com)

Qianwei Fu (qfu@zelle.com)    Craig Essenmacher

3    **ZELLE, HOFMANN, VOELBEL,**    (cessenmacher@lshllp.com)

**MASON & GETTE, LLP**    **LOVELL STEWART HALEBIAN LLP**

4    44 Montgomery Street, Suite 3400    500 Fifth Avenue, Floor 58

San Francisco, CA 94104    New York, NY 10110

5    Telephone: (415) 693-0700    Telephone: (212) 608-1900

Facsimile: (415) 693-0770    Facsimile: (212) 719-4775

6

7    Paul Novak (pnovak@milberg.com)

8    Elizabeth McKenna

(emckenna@milberg.com)

9    **MILBERG LLP**

One Pennsylvania Plaza

10    49th Floor

New York, New York 10119

11    Telephone: (212) 594-5300

12    Facsimile: (212) 868-1229

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    is distinguishable for the reasons stated above in Section IV. A.

28

**INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE DEFENDANTS' JOINT OBJECTIONS TO THE REPORT, RECOMMENDATIONS AND TENTATIVE RULINGS OF THE SPECIAL MASTER**