UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ) <br> ) <br> ANTITRUST LITIGATION ) <br> _____ ) <br> ) <br> This document relates to: ) <br> ) <br> ALL ACTIONS ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> _____ ) | Master File <br> No. CV-07-5944 SC <br><br> MDL No. 1917 <br><br> ORDER APPROVING AND <br> ADOPTING SPECIAL <br> MASTER'S REPORT, <br> RECOMMENDATIONS AND <br> TENTATIVE RULINGS RE: <br> DEFENDANTS' MOTIONS <br> TO DISMISS |

**I.   INTRODUCTION**

On February 5, 2010, the Special Master in the above matter rendered his Report, Recommendations, and Tentative Rulings Regarding Defendants' Motions to Dismiss.  Docket No. 597 ("Report").  Defendants have filed objections, Docket Nos. 605, 607, 608, 610, 611, 612, 613, 614, 616, 617, 618, 619, 620, 622, and Plaintiffs have responded, Docket Nos. 626, 627, 628, 629, 630, 631, 632, 633, 634, 635, 636, 637, 638, 639, 640, 641.  The Court held a hearing on Defendants' objections on March 18, 2010. Having considered the parties' filings and contentions, the Court hereby APPROVES and ADOPTS the Special Master's rulings and recommendations.

**II.   BACKGROUND**

This case concerns alleged conspiracies in the Cathode Ray

United States District Court
For the Northern District of California

Tube ("CRT") industry. On June 16, 2008, the Court appointed the
Honorable Charles A. Legge, United States District Court Judge
(Retired), as a Special Master to assist the Court in this
litigation. Docket No. 302 ("Order Appointing Special Master").
On March 16, 2009, Direct Purchaser Plaintiffs filed a
Consolidated Amended Complaint. Docket No. 436 ("Direct Compl.").
Indirect Purchaser Plaintiffs filed a Consolidated Amended
Complaint on the same day. Docket No. 437 ("Indirect Compl.").
The Special Master reviewed Defendants' joint and individual
motions to dismiss, conducted a hearing on the motions to dismiss
on October 5, 2009, and issued his Report on February 5, 2010.

III. **LEGAL STANDARD**

Federal Rule of Civil Procedure 53 requires that in acting on
a Special Master's Report, "the court must give the parties notice
and an opportunity to be heard." Fed. R. Civ. P. 53(f)(1). The
parties stipulated that the Court would "review findings of fact
made or recommended by the Special Master for clear error" and
"review de novo any conclusions of law." Order Appointing Special
Master ¶ 18 (emphasis in original).

IV. **DISCUSSION**

A. **Standard of Review**

Most of the Special Master's recommendations are conclusions
of law that the Court will review de novo. The first
recommendation appears to rest on a finding of fact; namely, that
the relevant products alleged in the complaints are CRTs and CRT

-2-

Products.  Report at 3-7, 33.  However, out of an abundance of caution, the Court reviews all of Judge Legge's recommendations de novo.

**B.   Relevant Products**

Judge Legge recommends that both the Direct Complaint and the Indirect Complaint allege conspiracies regarding both CRTs and CRT Products.  Report at 3-7.  Having reviewed both complaints, the Court agrees with the Special Master.  Both complaints contain numerous allegations concerning both CRTs and the products into which CRTs are incorporated; namely, televisions and computer monitors.

With regard to the Direct Complaint, there can be no doubt that the Direct Purchaser Plaintiffs are alleging conspiracies regarding both CRTs and CRT Products.  "CRT Products" is defined by the Direct Purchasers as including color display tube products and color picture tube products.  Direct Compl. ¶ 1.  Color display tubes are the CRTs used in computer monitors, and color picture tubes are the CRTs used in televisions.  Id.  Plaintiffs allege they bought CRT Products.  Id. ¶¶ 11-23.  The class allegations encompass CRT Products.  Id. ¶¶ 85-92.  The trade and commerce allegations mention CRT Products.  Id. ¶¶ 96, 97.  The allegations regarding collusive meetings refer to CRT Products.  Id. ¶¶ 134-53.  Indeed, according to the Direct Purchaser Plaintiffs, CRT Products are mentioned 135 times in the Direct Complaint.  Docket No. 633 ("Opposition to Joint Objections") at 8.

The Indirect Complaint is also replete with allegations

-3-

**United States District Court**
For the Northern District of California

1   concerning both CRT and CRT Products.  The very first paragraph

2   alleges that "during the class period the Defendants conspired to

3   fix, raise, maintain, and/or stabilize prices of CRT Products sold

4   in the United States."  Indirect Compl. ¶ 1.  CRT Products are

5   defined by the Indirect Purchasers to include "(a) CRTs; and (b)

6   products containing CRTs, such as television sets and computer

7   monitors."[1]  Id. ¶ 15.  The Indirect Purchaser Plaintiffs allege

8   they purchased CRT Products from one or more of the Defendants.

9   Id. ¶¶ 19-49.  The Indirect Purchaser Plaintiffs allege a

10   relationship between CRTs and the products into which CRTs are

11   incorporated such that Defendants were often able to pass through

12   the higher prices for CRTs to consumers.  Id. ¶¶ 222-39.  The

13   Court concludes that both complaints allege conspiracies regarding

14   both CRTs and the products into which CRTs are incorporated.

15       **C.   Objections Based on Pleading Standards**

16       Judge Legge considered whether the complaints contain enough

17   factual allegations to give rise to plausible conspiracy claims

18   regarding both CRTs and CRT Products against these Defendants.

19   Report at 7-11.  Judge Legge recommended that the Court deny the

20   motions to dismiss based on the pleading standards articulated by

21   the Supreme Court in Bell Atlantic Corp. v. Twombly, 550 U.S. 544

22

23       [1] The Court acknowledges that this definition in the Indirect
    Complaint is somewhat vague, since references to "CRT Products"
24   include both CRTs and the finished products into which they are
    incorporated.  Nonetheless, and as explained below, the Court
25   agrees with Judge Legge that the complaints contain sufficient
    allegations of a conspiracy to fix prices of both CRTs and the
26   products into which they are incorporated.  Whether Plaintiffs will
    be able to prove their allegations is a question for a later stage
27   of these proceedings.

28                                    -4-

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

(2007), and <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937 (2009).  The Court agrees with Judge Legge's recommendation.

To survive a motion to dismiss for failure to state a claim, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  <u>Twombly</u>, 550 U.S. at 570.  "Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests."  <u>Erickson v. Pardus</u>, 551 U.S. 89, 93 (2007) (internal quotation marks omitted).  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  <u>Iqbal</u>, 129 S. Ct. at 1950.  In <u>Twombly</u>, an antitrust case, the Supreme Court noted that:

> Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. . . . [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.

550 U.S. at 556.

Here, the Court finds that both complaints contain sufficient factual allegations to give rise to plausible conspiracy claims regarding both CRTs and CRT Products.  Both complaints allege that on February 10, 2009, a federal grand jury indicted C.Y. Lin, former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa"), for participating in a conspiracy to fix the price of CRTs.  Direct Compl. ¶ 126; Indirect Compl. ¶ 205.  When

-5-

United States District Court

For the Northern District of California

1   announcing the indictment, the Acting Assistant Attorney General

2   in charge of the Antitrust Division suggested the conspiracy

3   extended beyond CRTs themselves: "This conspiracy harmed countless

4   Americans who purchased computers and televisions using cathode

5   ray tubes sold at fixed prices."  Id.  Both complaints note that

6   foreign antitrust enforcement authorities are investigating

7   whether there was price-fixing in the CRT market.  Direct Compl.

8   ¶¶ 127-33; Indirect Compl. ¶¶ 206-13.

9        Direct Purchaser Plaintiffs allege that the conspiracy was

10  effectuated through agreements and common understandings reached

11  in at least 500 meeting between 1995 and 2007.  Direct Compl.

12  ¶ 134.  It is alleged that the meetings became more organized in

13  1997, when they became known as "Glass Meetings."  Id. ¶ 137.  The

14  Direct Complaint explains the structure and typical pattern of the

15  meetings, some of which were attended by individuals at the

16  highest level of Defendants' companies, and some of which

17  allegedly occurred on golf courses.  Id. ¶¶ 138-53.  It is alleged

18  that Defendants or their agents agreed to fix prices, exchange

19  information, coordinate public statements regarding capacity and

20  supply, keep meetings secret, allocate market share and customers,

21  and restrict output.  Id. ¶ 138.  The Direct Complaint alleges

22  that:

23            The agreements encompassed not only prices
              charged to third party customers, but, in the
24            case of vertically integrated manufacturers
              who produced both CRTs and CRT Products, also
25            encompassed: (a) prices charged by the CRT
              manufacturing arm of each such integrated
26            company to the corporate division or
              subsidiary that manufactured or sold computer
27            monitors, television or other similar products

28                                  -6-

United States District Court

For the Northern District of California

1      and (b) price floors on quotations offered by
2      the competitors of the integrated company to
    such a division or subsidiary.  Defendants
3      also considered the internal pricing of
    products containing CRTs in agreeing upon the
    prices at which CRTs were set.
4

5  <u>Id.</u> ¶ 144.

6      The Direct Complaint contains allegations supporting the

7  economic plausibility of the alleged conspiracy.  <u>See</u>, <u>e.g.</u>, <u>id.</u>

8  ¶¶ 112-21 (describing market concentration and joint ventures

9  among Defendants), ¶¶ 188-97 (describing stable and increasing

10  prices for CRT Products despite factors that should have caused

11  price declines, such as emergence of flat panel technology).

12      The Indirect Complaint contains similar allegations.  <u>See</u>,

13  <u>e.g.</u>, Indirect Compl., ¶¶ 121-39 (describing structural

14  characteristics of CRT Product market, including barriers to

15  entry, and how the market conducive to collusive activity), ¶¶

16  140-88 (allegations of group and bilateral meetings, "Glass

17  Meetings," and meetings on golf courses, some of which were

18  attended by high-level company executives), ¶¶ 189-202

19  (allegations of unnatural and sustained price stability or unusual

20  upward price movement in the CRT Product market).  The Indirect

21  Purchaser Plaintiffs allege that Defendants:

22      agreed on the prices at which certain Defendants
    would sell CRTs to their own corporate
23      subsidiaries and affiliates that manufactured
    end products, such as televisions and computer
24      monitors. . . . Defendants . . . concluded that
    in order to make their CRT price increases
25      stick, they needed to make the increase high
    enough that their direct customers (CRT TV and
26      monitor makers) would be able to justify a
    corresponding price increase to their customers.
27      In this way, Defendants ensured that price

28  -7-

United States District Court

For the Northern District of California

increases for CRTs were passed on to indirect purchasers of CRT Products.

Id. ¶¶ 154-55.  The Indirect Purchaser Plaintiffs allege that manufacturers where raising the price of monitors in 2004.  Id. ¶ 197.

Many of Defendants' objections rely on Kendall v. VISA U.S.A. Inc., 518 F.3d 1042 (9th Cir. 2008).  The case is distinguishable. The Ninth Circuit panel affirmed the district court's dismissal of an antitrust action where, after conducting discovery, plaintiffs were unable to amend their complaint to plead evidentiary facts showing banks entered into agreements to restrain trade.  Id. at 1048.  Here, the complaints allege a governmental investigation, hundreds of meetings between 1995 and 2007, and detailed allegations concerning the structure and typical pattern of those meetings.

For the most part, Defendants' objections re-hash arguments that have been considered and rejected by courts in this district. See, e.g., In re Flash Memory Antitrust Litiq., 643 F. Supp. 2d 1133, 1142, 1150 (N.D. Cal. 2009)(finding direct and indirect purchasers' allegations sufficient to state antitrust claims against manufacturers, sellers and distributors of flash memory); In re TFT-LCD (Flat Panel) Antitrust Litiq., 559 F. Supp. 2d 1179, 1184-85 (N.D. Cal. 2009)(finding direct and indirect purchasers' allegations sufficient to state antitrust claims against manufacturers, distributors, and sellers of thin film transistor liquid crystal display panels and products).

Indeed, the complaints here are very similar to the

-8-

**United States District Court**
For the Northern District of California

1  complaints Judge Illston considered in <u>In re TFT-LCD (Flat Panel)</u>

2  <u>Antitrust Litigation</u>.   In that case, the complaints alleged

3  numerous conspiratorial communications, governmental

4  investigations, specific information concerning the structure and

5  content of meetings, allegations that the conspiracy was organized

6  at the highest level of the defendant organizations, and

7  allegations that it was implemented by related companies within a

8  corporate family.   <u>Id.</u> at 1184.   Here, as outlined above, the

9  complaints contain similar factual allegations.   Drawing on its

10 judicial experience, this Court concludes the allegations

11 contained in the Direct Complaint and the Indirect Complaint meet

12 the pleading standards articulated by the Supreme Court in <u>Twombly</u>

13 and <u>Iqbal</u>.

14      **D.   <u>Objections Based on Failure to Adequately Plead Against</u>**
          **<u>Each Defendant</u>**

15

16      The Special Master recommends that the complaints should not

17 be dismissed based on a failure to adequately plead against each

18 defendant.   Report at 11-16.   Courts in this district do not

19 require plaintiffs in complex, multinational, antitrust cases to

20 plead detailed, defendant-by-defendant allegations; instead they

21 require plaintiffs "to make allegations that plausibly suggest

22 that each Defendant participated in the alleged conspiracy." <u>In</u>

23 <u>re TFT-LCD (Flat Panel) Antitrust Litig.</u>, 559 F. Supp. 2d at 1185

24 (quoting <u>In re Static Random Access Memory (SRAM) Antitrust</u>

25 <u>Litig.</u>, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008)).   In complex,

26 multinational, conspiracy cases, courts in this district review

27 specific allegations in the context of the complaint taken as a

28                                         -9-

United States District Court

For the Northern District of California

1   whole.   In re Flash Memory Antitrust Litig., 643 F. Supp. 2d at

2   1144, 1147, 1148; In re TFT-LCD (Flat Panel) Antitrust Litig., 559

3   F. Supp. 2d at 1185.   Although not a pleading standards case, this

4   approach is consistent with the Supreme Court's admonition in

5   Continental Ore Company v. Union Carbide and Carbon Corporation

6   that the "character and effect of a conspiracy are not to be

7   judged by dismembering it and viewing its separate parts, but only

8   by looking at it as a whole."   370 U.S. 690, 699 (1962).

9        Having reviewed the complaints as a whole, the Court

10   determines that the factual allegations plausibly suggest that

11   each Defendant participated in the alleged conspiracy.   As well as

12   the factual allegations described above, see Part IV(B-C), supra,

13   both complaints contain allegations concerning specific

14   Defendants' participation in the alleged unlawful meetings and

15   agreements.   Direct Compl. ¶¶ 154-75; Indirect Compl. ¶¶ 166-88.

16   Although Plaintiffs often refer to a corporate family by a single

17   name, they allege that employees engaged in conspiratorial

18   meetings on behalf of members of their corporate families, that

19   participants did not always know the corporate affiliation of

20   their counterparts and did not distinguish between the entities

21   within a corporate family, and that participants "entered into

22   agreements on behalf of, and reported these meetings and

23   discussions to, their respective corporate families.   As a result,

24   the entire corporate family was represented in meetings and

25   discussions by their agents and was a party to the agreements

26   reached in them."   Direct Compl. ¶ 154; Indirect Compl. ¶ 188.

27        Samsung Electronic Co., Ltd. ("SEC") and Samsung Electronics

28                                  -10-

**United States District Court**
For the Northern District of California

America, Inc. ("SEAI") object based on the fact that they do not manufacture CRTs; instead, they sell finished products.  See Docket Nos. 616 ("Samsung Objections re: Direct Complaint"), 617 ("Samsung Objections re: Indirect Complaint").  However, both complaints describe the relationship between the Samsung Defendants.  Direct Compl. ¶¶ 58-66; Indirect Compl. ¶¶ 62-71.  It is alleged that SEC dominated and controlled the finances, policies, and affairs of SEAI, and the other Samsung SDI entities, relating to the alleged antitrust violations.  Id.

Both complaints allege that "Samsung, through SEC, Samsung SDI, Samsung Malaysia, Samsung SDI Shenzhen, and Samsung SD Tianjin" participated in hundreds of meetings between 1995 and 2006 where agreements were made regarding price, output restrictions, and customer and market allocation of CRT Products. Direct Compl. ¶ 166; Indirect Compl. ¶ 166.  The complaints allege that SEAI was represented at the meetings, and that it wished to ensure that the prices paid for CRT products did not undercut the CRT pricing agreements reached at the meetings.  Direct Compl. ¶ 167; Indirect Compl. ¶ 167.  SEC acknowledges that it has a financial stake in Samsung SDI, a company that sells CRTs.  See Samsung Objections re: Direct Complaint at 1.  Indeed, Samsung SDI is alleged to have controlled twenty-four per cent of the CRT market in 2002.  Direct Compl. ¶ 112.  It is economically plausible that affiliated companies would wish to see any price increases in CRTs passed through to the purchasers of CRT Products.

Panasonic Corporation of North America ("PNA") and Panasonic

-11-

**United States District Court**
For the Northern District of California

Corporation ("Panasonic Corp.") also object based on the fact that they sell finished products. <u>See</u> Docket Nos. 605 ("Panasonic Objections re: Direct Complaint"), 608 ("Panasonic Objections re: Indirect Complaint"). However, it is alleged that Panasonic Corp., a Japanese company, dominated and controlled the finances, policies and affairs of the other Panasonic entities relating to the alleged antitrust violations. Direct Compl. ¶¶ 46-50, Indirect Compl. ¶¶ 80-86.

The Direct Purchaser Plaintiffs allege that "Panasonic, directly or through Matsushita Malaysia, participated in several dozen bilateral and group meetings from 1996 through at least 2003 in which unlawful agreements as to . . . price, output restrictions, and customer and market allocation of CRT Products occurred." Direct Compl. ¶ 162. The Indirect Purchaser Plaintiffs allege that between 1996 and 2003, Panasonic Corp. participated in several Glass Meetings. Indirect Compl. ¶ 181. They allege that after 2003, Panasonic participated through its joint venture with Toshiba, MT Picture Display Co., Ltd. ("MTPD"). <u>Id.</u> High-level sales managers from Panasonic and MTPD allegedly participated. <u>Id.</u> Indeed, MTPD is alleged to have led many of the Glass Meetings. <u>Id.</u> ¶ 183. It is alleged that Panasonic engaged in bilateral meetings with other Defendants, and that during these meetings, agreements were reached regarding prices and supply levels for CRT Products. <u>Id.</u> ¶ 181. Both complaints allege that PNA wished to ensure prices paid by purchasers of CRT products would not undercut the pricing agreements reached at the Glass Meetings. Direct Compl. ¶ 163; Indirect Compl. ¶ 182. Such

-12-

United States District Court
For the Northern District of California

allegations make economic sense to the Court, especially given that MTPD was engaged in the manufacture of CRTs, and is a Panasonic-related entity. See Panasonic Objections re: Direct Complaint at 2 n.1.

For similar reasons, the Court finds that the allegations in the Direct Complaint and the Indirect Complaint are sufficient to state a claim as to each of the Toshiba, LG Electronics, Hitachi, and Philips entities. Both complaints describe the relationships between the Toshiba entities, and it is alleged that Toshiba Corporation dominated and controlled the other Toshiba entities in relation to the alleged antitrust violations. Direct Compl. ¶¶ 71-78; Indirect Compl. ¶¶ 72-78. Representatives of the Toshiba entities are alleged to have participated in over fifty bilateral and group meetings between 1995 and 2003. Direct Compl. ¶ 171; Indirect Compl. ¶ 177. The Indirect Purchaser Plaintiffs allege that Toshiba had a technology transfer agreement in 1995 with Chunghwa, the company whose CEO was indicted by the Department of Justice. Indirect Compl. ¶ 128(g). The Indirect Complaint quotes from Toshiba's 2008 Annual Report, which states that the group was being investigated by the European Commission and/or the U.S. Department of Justice for violations of competition laws with respect to CRTs. Id. ¶ 212. The Indirect Complaint alleges that Toshiba and Panasonic formed MTPD in 2002 in order to consolidate their CRT manufacturing facilities and limit production of CRTs. Indirect Compl. ¶¶ 72, 80, 125, 177, 198. Taken together with the other allegations in the complaints, and the allegations that participants in meetings entered into

-13-

United States District Court
For the Northern District of California

agreements on behalf of their corporate families, these factual allegations plausibly suggest that each Toshiba Defendant participated in the alleged conspiracy.

Both complaints describe the relationships between the LG Electronics entities. Direct Compl. ¶¶ 41-45; Indirect Compl. ¶¶ 50-53. LG Electronics, Inc. is alleged to have dominated and controlled the finances, policies, and affairs of LG Electronics USA, Inc., and LG Electronics Taiwan Taipei Co., Ltd., in relation to the alleged violations. Direct Compl. ¶¶ 42, 43; Indirect Compl. ¶¶ 51, 52. The LG Electronics Defendants are alleged to have participated in a dozen bilateral meetings and over a hundred group meetings between 1995 and 2006. Direct Compl. ¶¶ 160, 175. To the extent that LG Electronics USA, Inc. distributed products in the United States, the complaints allege it wished to ensure prices for products would not undercut pricing agreements regarding CRTs. Direct Compl. ¶ 161. There are also allegations that the LG Electronics entities participated in meetings at trade associations and trade events that were used to further the conspiracy. Direct Compl. ¶¶ 176-80.

Both complaints describe the relationships between the Hitachi entities. Direct Compl. ¶¶ 30-36; Indirect Compl. ¶¶ 87-93. The complaints allege that Hitachi, Ltd., a Japanese company, dominated and controlled the finances, policies, and affairs of Hitachi America, Ltd., Hitachi Asia, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc., relating to the antitrust violations alleged. Id. The Direct Purchaser Plaintiffs allege that the Hitachi entities participated in over a

-14-

United States District Court

For the Northern District of California

dozen illegal bilateral and group meetings from 1996 through at least 2001.  Direct Compl. ¶ 157.  They allege that Hitachi America, Ltd., and Hitachi Electronic Devices (USA), Inc. were represented at the meetings and were parties to the agreements entered at them.  Id. ¶ 158.  They allege that these distributors of CRT Products wished to ensure the prices paid by consumers did not undercut the pricing agreements regarding CRTs.  Id.  The Indirect Purchaser Plaintiffs allege that the Hitachi entities participated in several Glass Meetings, and that the meetings were attended by high-level sales managers from Hitachi.  Indirect Compl. ¶ 179.

Both complaints describe the relationships between the Philips entities.  Direct Compl. ¶¶ 51-56; Indirect Compl. ¶¶ 54-60.  The complaints allege that Koninklijke Philips Electronics N.V. ("Royal Philips"), a Dutch entity, dominated and controlled the finances, policies, and affairs of Philips Electronics North America Corporation, Philips Electronics Industries (Taiwan), Ltd., and Philips da Amazonia Industria Electronica Ltda., relating to the antitrust violations alleged.  Id.  The Direct Purchaser Plaintiffs allege that the Philips entities participated in over 100 illegal meetings from 1996 to 2007.  Direct Compl. ¶¶ 164-65.  The Indirect Purchaser Plaintiffs allege that the Philips entities participated in at least 100 Glass Meetings between 1996 and 2001, and that after 2001, they participated through a joint venture with LG Electronics.  Indirect Compl. ¶ 170.

Beijing Matsushita Color CRT Co., Ltd.("BMCC"), is alleged to

-15-

1   have participated in over twenty illegal bilateral meetings.

2   Direct Compl. ¶¶ 80, 173.  The Indirect Purchaser Plaintiffs

3   allege that high-level sales managers from BMCC participated in

4   multiple Glass Meetings.  Indirect Compl. ¶¶ 2, 148, 184.  BMCC

5   objects based on the fact that it makes CRTs only.  <u>See</u> Docket No.

6   618 ("BMCC Objections re: Direct Compl.") at 3, No. 619 ("BMCC

7   Objections re: Indirect Compl.") at 1.  BMCC is the only Defendant

8   to object on this basis, but it is clear to the Court that the

9   complaints do allege sufficient facts to state a plausible

10  conspiracy regarding CRTs, especially given the Department of

11  Justice investigation.  <u>See</u> Part IV(C), <u>supra</u>.  The Court

12  therefore overrules this objection, and also grants Plaintiffs'

13  request to amend paragraph 173 of the Direct Complaint, with

14  respect to the allegations against BMCC, to change the year "2001"

15  to "2007."

16      Whether Plaintiffs will be able to prove these allegations

17  against each Defendant is another matter entirely.  In general,

18  Defendants' arguments for dismissal based on a failure to

19  adequately plead against each Defendant rely upon arguments more

20  appropriate at the summary-judgment stage of these proceedings

21  when Defendants can put Plaintiffs to their burden of proof.

22  Taken as a whole, the Court finds that both the Direct Complaint

23  and the Indirect Complaint plausibly suggest that each Defendant

24  participated in the alleged conspiracies.  Therefore, it would be

25  inappropriate to dismiss any of the Defendants from this action

26  without the benefit of discovery.

27  ///

28                              -16-

United States District Court

For the Northern District of California

### E.   <u>Subject Matter Jurisdiction</u>

The Special Master recommends that the complaints should not be dismissed for lack of subject matter jurisdiction under the Foreign Trade Antitrust Improvements Act ("FTAIA").  Report at 16-18.  The FTAIA provides that the Sherman Act does not apply to conspiracies involving trade or commerce with foreign nations, unless such conduct has direct, substantial, and reasonably foreseeable effects on United States commerce.  15 U.S.C. § 6a.

The Court agrees with Judge Legge that these complaints should not be dismissed based on the FTAIA.  When announcing the indictment of C.Y. Lin, the Acting Assistant Attorney General suggested the alleged CRT conspiracy does have effects in the United States: "This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes at fixed prices."  Direct Compl. ¶ 126; Indirect Compl. ¶ 205.

The Direct Complaint alleges that Defendants manufactured, sold, or distributed CRT products throughout the United States, either directly or through subsidiaries or affiliated companies.  Direct Compl. ¶¶ 24-80.  The Direct Complaint alleges plant closures in New York, Ohio, and Indiana in furtherance of the claimed conspiracy to reduce manufacturing capacity of CRTs.  <u>Id.</u> ¶¶ 183, 185, 187.  The Direct Complaint alleges adverse price effects in the United States due to Defendants' unlawful activities.  <u>Id.</u> ¶¶ 188-89.

Similarly, the Indirect Purchaser Plaintiffs have alleged a conspiracy encompassing both CRTs and CRT Products that was carried out both in the United States, and abroad, which involved

-17-

a substantial amount of import and domestic commerce, and which targeted and injured American consumers.  <u>See</u>, <u>e.g.</u>, Indirect Compl. ¶¶ 1, 9, 10, 11, 12, 50-52, 54-59, 61-70, 72-78, 80-83, 85-92, 94-95, 97-98, 100-02, 104-08, 114-16, 162, 167, 169, 171, 174, 176, 178, 180, 182, 188, 240, 242, 246, 248-50, 255-71 and 274-283.  At this stage of the proceedings, these allegations are sufficient to withstand motions to dismiss for lack of subject matter jurisdiction.

### F.  <u>Antitrust Standing</u>

The Special Master recommends denial of the motions to dismiss based on Plaintiffs' supposed lack of standing.  In deciding whether there is antitrust standing, courts consider: (1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages.  <u>Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters</u>, 459 U.S. 519, 535-44 (1983) ("AGC").  No single factor is decisive; courts are to balance the factors, giving "great weight to the nature of the plaintiff's alleged injury."  <u>American Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.</u>, 190 F.3d 1051, 1055 (9th Cir. 1999).

Here, the Direct Purchaser Plaintiffs allege they purchased CRTs or CRT Products from Defendants or their subsidiaries at inflated prices due to Defendants' unlawful conduct.  Direct Compl. ¶¶ 11-23.  This is the type of injury the antitrust laws were intended to address.  Furthermore, courts have found

-18-

**United States District Court**
For the Northern District of California

1   antitrust standing where plaintiffs purchased downstream goods

2   from manufacturers who made, and allegedly fixed the price of, a

3   component of those goods.  <u>See</u>, <u>e.g.</u>, <u>In re Linerboard Antitrust</u>

4   <u>Litig.</u>, 305 F.3d 145, 159-60 (3d Cir. 2002)(in alleged conspiracy

5   to fix prices of linerboard, plaintiffs who purchased corrugated

6   sheets or boxes containing linerboard from defendants had

7   standing).

8       In <u>Illinois Brick Company v. Illinois</u>, the Supreme Court held

9   that indirect purchasers generally may not sue for money damages

10  under Section 4 of the Clayton Act.  431 U.S. 720, 730 (1977).  In

11  response, a number of states passed "repealer" statutes which

12  expressly allow indirect purchasers to recover money damages for

13  antitrust violations under state law.  <u>See California v. ARC Am.</u>

14  <u>Corp.</u>, 490 U.S. 93, 97-98( 1989).  In the present case, the

15  Indirect Purchaser Plaintiffs' second claim for relief for state

16  antitrust violations is predicated on the repealer statutes of

17  Arizona, California, Iowa, Kansas, Michigan, Minnesota,

18  Mississippi, Nebraska, Nevada, New Mexico, North Carolina, North

19  Dakota, South Dakota, Tennessee, Vermont, West Virginia,

20  Wisconsin.  Indirect Compl. ¶¶ 255-71.  The AGC factors apply to

21  establish standing under Iowa, Nebraska, and California antitrust

22  laws.  <u>In re Flash Memory Antitrust Litigation</u>, 643 F. Supp. 2d at

23  1151.

24      Defendants argue that the Indirect Purchaser Plaintiffs have

25  not alleged that they participate in the same market as

26  Defendants, and as such, their alleged injury is too remote,

27  speculative, unmanageably complex, or duplicative.  Docket No. 614

28                                    -19-

United States District Court
For the Northern District of California

("Joint Objections re: Indirect Compl.") at 12-13.  However, the
Indirect Complaint alleges that Plaintiffs paid "higher prices for
CRT Products than they would have paid in the absence of
Defendants' conspiracy."  Indirect Compl. ¶ 222.  It alleges that
the "price of CRT Products is directly correlated to the price of
CRTs."  Id. ¶ 226.  It alleges that the "market for CRTs and the
market for CRT Products are . . . inextricably linked and cannot
be considered separately."  Id. ¶ 227.  Indirect Purchaser
Plaintiffs allege that Defendants monitored the prices of
televisions and computer monitors in order to police their price
fixing agreement related to CRTs.  Id. ¶ 223.  They point out that
CRTs account for approximately sixty per cent of the cost of
manufacturing a computer monitor, and a slightly smaller
percentage of the cost of manufacturing a television, and as such
it is easier to determine how much money was being passed through
to purchasers of the finished products.  Id. ¶ 228-30.  CRTs are
discrete components that can easily be traced.  Id. ¶ 231.  These
allegations are sufficient to find the injury alleged in the
Indirect Complaint is the kind antitrust laws were designed to
rectify.

The Court also agrees with the Special Master that Plaintiffs
have adequately pled standing to seek injunctive relief under
Section 16 of the Clayton Act.  See Report at 19; see also In re
Warfarin Sodium Antitrust Litig., 214 F.3d 395, 399 (3d Cir. 2000)
("[I]njunctive relief under section 16 only requires a threat of
loss" and section 16 is not as demanding as section 4 of Clayton
Act).

-20-

United States District Court

For the Northern District of California

### G.   Allegations of Fraudulent Concealment

The Special Master recommends that the motions to dismiss claims accruing more than four years before the complaints were filed should be denied.  Report at 19-24.  The Special Master also recommends that the challenges to the sufficiency of the fraudulent concealment allegations should be denied.  Id.  The Court agrees with the Special Master's recommendations.

The Court notes that "it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly when the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators."  In re Rubber Chemicals Antitrust Litig., 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007).  The Court further notes that Defendants' reliance on Barker v. American Mobil Power Corp., 64 F.3d 1397 (9th Cir. 1995) is misplaced.  In that case, the Ninth Circuit panel was reviewing an order on motions for summary judgment.  Id. at 1400.  After an opportunity for discovery, plaintiffs were unable to produce specific evidence of fraudulent activity or concealment on the part of two of the defendants.  Id. at 1401.  Here, on the other hand, discovery is in its early stages, and motions for summary judgment have not been filed.

The Direct Complaint contains allegations of fraudulent concealment.  Direct Purchaser Plaintiffs allege that Defendants gave pretextual reasons for price increases, and coordinated their misleading announcements.  Direct Compl. ¶¶ 148, 153, 206.  Direct Purchaser Plaintiffs allege Defendants took steps to keep their

-21-

United States District Court
For the Northern District of California

meetings secret, such as varying meeting locations, limiting meeting attendees, avoiding note-taking, and agreeing to maintain the secrecy of meetings.  Id. ¶¶ 137, 138, 154, 201, 204, 205. Plaintiffs allege that CRT manufacturers, including companies affiliated with Samsung, Philips, and LG Electronics, blamed price increases in 2004 on a shortage of glass shells.  Id. ¶ 209.

The Indirect Complaint also contains allegations of fraudulent concealment.  Indirect Purchaser Plaintiffs allege that the agreements reached at Glass meetings included agreements to keep their meetings secret.  Indirect Compl. ¶ 156(l).  Indirect Purchaser Plaintiffs allege Defendants agreed: "not to discuss publicly, or otherwise reveal, the nature and substance" of their dealings, and "to expel those who failed to do so"; "to limit the number of representatives from each Defendant attending their meetings so as to avoid detection"; "to refrain from listing the individual representatives of the Defendants in attendance at meeting in any meeting report"; "to refrain from taking meeting minutes or taking any kind of written notes during the meetings"; and to give "false and pretextual reasons for CRT Product price increases."  Indirect Compl. ¶ 290.  Defendants also allegedly agreed "on what to tell customers about price changes"; agreed "upon the content of public statements regarding capacity and supply"; and agreed "to eliminate references in expense reports that might reveal the existence of their unlawful meetings."  Id. When viewed in conjunction with the Court's earlier determination that the factual allegations in the complaints plausibly suggest that each Defendant participated in the conspiracy, these

-22-

United States District Court
For the Northern District of California

1   allegations of fraudulent concealment are sufficient to deny

2   Defendants' efforts to dismiss claims that accrued before Nov. 26,

3   2003, based on the four-year statute of limitations.[2]

4   **H.   <u>Withdrawal Claims</u>**

5   With regard to those Defendants who moved to dismiss based on

6   claims that they withdrew from the alleged conspiracy in 2001 or

7   2002, the Court agrees with the Special Master that this issue

8   raises factual questions inappropriate for resolution at the

9   motion-to-dismiss stage.  <u>See</u> Report at 25.  For example, how can

10  the Court know at this stage of the proceedings whether the

11  withdrawing Defendants maintained financial interests in the

12  entities being sold or transferred?  It would have been

13  inappropriate for the Special Master to grant the motions to

14  dismiss filed by the Philips Defendants, the Toshiba Defendants,

15  the Hitachi Defendants, the LG Electronics Defendants, and BMCC,

16  on these grounds.

17  **I.   <u>State Law Claims</u>**

18  The Special Master recommends that a number of the state law

19  claims in the Indirect Complaint should be dismissed.  Report at

20  27-31.  The Indirect Purchaser Plaintiffs do not object to these

21

22      [2]  The Court is concerned about the temporal scope of the
    alleged conspiracies in this case.  As directed by the Court at the
23  March 18, 2010 hearing, the parties met and conferred, but appear
    unable to reach a mutually acceptable proposal to present to the
24  Court.  <u>See</u> Docket Nos. 660, 661, and 662.  The Court acknowledges
    that allegations of fraudulent concealment are fact-intensive.  The
25  Court encourages the parties to work with the Special Master on
    ways to streamline and efficiently manage discovery in this case.
26  After discovery, the Court invites the parties to consider whether
    motions should be filed to determine the statute of limitations, or
27  whether the matter should be left as a question for the jury.

28                                  -23-

United States District Court
For the Northern District of California

1    rulings against them.  Docket No. 641 ("Response to Joint

2    Objections") at 1.  The Court therefore adopts the recommendation

3    of the Special Master, and DISMISSES the claims under Nebraska law

4    based on sales made prior to July 20, 2002; the claims under

5    Nevada law based on sales made prior to 1999; the claims under the

6    Massachusetts Consumer Protection Act, with leave to amend; the

7    claims under the Rhode Island Unfair Trade Practices and Consumer

8    Protection Act; and the claims made under Kansas' common law of

9    unjust enrichment.

10        The Special Master also recommends that a number of the state

11   law claims should not be dismissed.  Report at 30-33.  Defendants'

12   objections contains no specific discussion of these

13   recommendations.  Accordingly, the Court adopts the Special

14   Master's recommendations, and DENIES the motions to dismiss

15   Plaintiffs' claims under New York General Business Law Section

16   349; the claims under Michigan common law of unjust enrichment;

17   the claims of unjust enrichment under New York common law; and the

18   unjust enrichment claims of several states based upon other

19   statutes in those states.

20

21   **V.   <u>CONCLUSION</u>**

22        For the foregoing reasons, the Court APPROVES and ADOPTS the

23   Special Master's tentative rulings and recommendations in the

24   following particulars:

25        1.  The Court finds that the relevant products alleged in the

26   complaints are Cathode Ray Tubes ("CRTs") and CRT Products;

27        2.  The Court DENIES Defendants' motions to dismiss based

28                                  -24-

**United States District Court**
For the Northern District of California

1    upon Twombly and Iqbal;

2        3.   The Court DENIES Defendants' motions to dismiss based

3    upon an alleged failure to adequately plead against "each

4    defendant";

5        4.   The Court DENIES Defendants' motions to dismiss based

6    upon the Foreign Trade Antitrust Improvements Act, the Supremacy

7    Clause, and the Commerce Clause;

8        5.   The Court DENIES Defendants' motion to dismiss based upon

9    Plaintiffs' alleged lack of standing;

10       6.   The Court FINDS that the allegations of the direct and

11   indirect complaints regarding fraudulent concealment are adequate

12   to toll the statutes of limitations;

13       7.   The Court DENIES Defendants' motions to dismiss both the

14   direct and indirect complaints on the grounds of the statutes of

15   limitations;

16       8.   The Court GRANTS Plaintiffs' motion to amend paragraph

17   173 of the Direct Complaint, with respect to the allegations

18   against BMCC to change the year "2001" to "2007";

19       9.   The Court DENIES the motions of several Defendants for

20   dismissal based on their alleged withdrawal from the conspiracy;

21       10.  The Court DISMISSES the claims under Nebraska law based

22   on sales made prior to July 20, 2002;

23       11.  The Court DISMISSES the claims under Nevada law based on

24   sales made prior to the 1999 date of Nevada's repealer statute;

25       12.  The Court DISMISSES the claims under the Massachusetts

26   Consumer Protection Act, with leave to amend;

27       13.  The Court DENIES the motions to dismiss Plaintiffs'

28                                    -25-

**United States District Court**
For the Northern District of California

1   claims under New York General Business Law Section 349;

2       14. The Court DISMISSES the allegations under the Rhode

3   Island Unfair Trade Practices and Consumer Protection Act;

4       15. The Court DENIES the motion to dismiss the claims under

5   Michigan common law of unjust enrichment;

6       16. The Court DISMISSES the claims under the Kansas' common

7   law of unjust enrichment;

8       17. The Court DENIES Defendants' motion to dismiss the claims

9   of unjust enrichment under New York common law;

10      18. The Court DENIES, without prejudice, Defendants' motions

11  to dismiss the unjust enrichment claims of several states based

12  upon other statutes in those states;

13      19. The Court requires Defendants to file answers within

14  thirty (30) days from the date of this Order;

15      20. The Court respectfully directs the Special Master to set

16  a date for a Case Management Conference to schedule further

17  proceedings in this case.

18

19      IT IS SO ORDERED.

20

21      Dated: March 30, 2010

22      UNITED STATES DISTRICT JUDGE

-26-