Bruce H. Jackson (State Bar No. 98118)
 (bruce.h.jackson@bakernet.com)
Robert W. Tarun (State Bar No. 64881)
 (robert.w.tarun@bakernet.com)
BAKER & McKENZIE LLP
Two Embarcadero Center, 11th Floor
San Francisco, CA  94111-3802
Telephone:    +1 415 576 3000
Facsimile:    +1 415 576 3099

*Attorneys for Defendant*
*TATUNG COMPANY OF AMERICA, INC.*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE:    CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No.: 3:07-cv-5944 SC |
| | MDL No. 1917 |
| This    Document    Relates    To: | **ANSWER AND AFFIRMATIVE DEFENSES OF TATUNG COMPANY OF AMERICA, INC. TO DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT** |
| DIRECT PURCHASER ACTIONS | |

Defendant TATUNG COMPANY OF AMERICA, INC. ("TUS"), through undersigned counsel, hereby answers the allegations contained in Direct Purchaser Plaintiffs' ("Plaintiffs") Consolidated Amended Complaint ("Complaint").   Except as otherwise stated below, TUS is without sufficient knowledge or information to form a belief concerning the truth of the allegations in the Complaint that are directed toward other Defendants.  TUS denies all allegations contained in the Complaint (including headings and captions) not specifically admitted in this Answer.

1. Plaintiffs bring this action on behalf of themselves individually and on behalf of a Plaintiff class (the "Class") consisting of all persons and entities who directly purchased a Cathode Ray Tube Product, as defined below, in the United States from any Defendant or any subsidiary or affiliate thereof between March 1, 1995 and November 25, 2007 (the "Class Period"). Defendants are among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are cathode ray tubes ("CRTs") used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors). For the purposes of this Consolidated Amended Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products." Also for the purposes of this Consolidated Amended Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products." CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

**ANSWER**:     TUS admits that Plaintiffs purport to bring this action on behalf of themselves individually and on behalf of a class.   The remainder of Paragraph 1 consists of Plaintiffs' characterization of their purported claims and Plaintiffs' explanation of terminology, to which no response is required.   TUS specifically denies Plaintiffs' definition of "CRT Products," because this definition includes products at different levels of the production chain and creates confusion since certain companies, including TUS, do not manufacture cathode ray tubes.   TUS admits that cathode ray tubes are used in a number of products, including, but not limited to, televisions and computer monitors.   To the extent that any remaining allegations in Paragraph 1 are deemed to require a response, they are denied.

2. Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue. During the Class Period, virtually every household in the United States owned at least one CRT Product.

**ANSWER**:     To the extent that the allegations contained in Paragraph 2 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 2 and on that basis denies those allegations.   TUS lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 2 and on that basis denies those allegations.

3. Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry. Plaintiffs are informed and believe, and thereon allege, that in order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants

conspired, combined and contracted to fix, raise, maintain, and stabilize the price at which CRT Products were sold in the United States.

**ANSWER**:     To the extent that the allegations contained in Paragraph 3 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 3 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 3 are directed to TUS, they are denied.

4. As part of and in furtherance of this conspiracy, Defendants or their agents engaged in various collusive practices with respect to CRT Products.

**ANSWER**:     To the extent that the allegations contained in Paragraph 4 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 4 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 4 are directed to TUS, they are denied.

5. With respect to CRT Products, Defendants or their agents agreed, inter alia, to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, inter alia, shipments, prices, production, and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

**ANSWER**:     To the extent that the allegations contained in Paragraph 5 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 5 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 5 are directed to TUS, they are denied.

6. The conspiracy concerning CRT Products commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Class Period. Also beginning in 1995, the co-conspirators began to engage in informal group meetings. By 1997, these group meetings had become more formalized, as described in greater detail below. There were at least 500 meetings during the Class Period, including hundreds of group meetings and hundreds of bilateral meetings. These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K., and Europe. These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

3

**ANSWER**:   To the extent that the allegations contained in Paragraph 6 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 6 are directed to TUS, they are denied.

7. This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities. The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.

**ANSWER**:   To the extent that the allegations contained in Paragraph 7 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 7 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 7 are directed to TUS, they are denied.

8. Plaintiffs bring this action to obtain injunctive relief and to recover damages including treble damages costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

**ANSWER**:   Paragraph 8 consists of Plaintiffs' characterization of their purported claims, to which no response is required.  To the extent the allegations in Paragraph 8 may be deemed to require a response, they are denied.

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(8) and 1367.

**ANSWER**:   The allegations of Paragraph 9 contain conclusions of law to which no response is required.  To the extent that the allegations are deemed to require a response, they are denied.

10. Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), in that at least one of the Defendants resides in this judicial district, is licensed to do business or is doing business in this judicial district.

**ANSWER**:   The allegations of Paragraph 10 contain conclusions of law to which no response is required.  To the extent that the allegations are deemed to require a response, they are denied.

11. Plaintiff Crago, d/b/a Dash Computers, Inc., is a Kansas corporation with its principal place of business in Merriam, Kansas.  During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

4

**ANSWER**:      TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 11 and on that basis denies those allegations.

12. Plaintiff Arch Electronics, Inc., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and has its principal place of business in Philadelphia, Pennsylvania. During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

**ANSWER**:      TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 12 and on that basis denies those allegations.

13. Plaintiff Electronic Design Company, is a corporation with its principle place of business in Shoreview, Minnesota. During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

**ANSWER**:      TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 13 and on that basis denies those allegations.

14. Plaintiff Hawel A. Hawel, d/b/a City Electronics, is a California business with its principal place of business in Modesto, California. During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

**ANSWER**:      TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 14 and on that basis denies those allegations.

15. Plaintiff Meijer, Inc. and Meijer Distribution, Inc., are Michigan corporations with their principal place of business in Grand Rapids, Michigan. During the Class Period, these Plaintiffs purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

**ANSWER**:      TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15 and on that basis denies those allegations.

16. Plaintiff Nathan Muchnick, Inc., was a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and had its principal place of business in Philadelphia, Pennsylvania. During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

5

**ANSWER**:      TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 and on that basis denies those allegations.

17. Plaintiff Orion Home Systems, LLC, is a Minnesota limited liability corporation with its principal place of business in Eagan, Minnesota. During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

**ANSWER**:      TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17 and on that basis denies those allegations.

18. Plaintiff Paula Call d/b/a Poway-Rancho Bernardo TV, is a California business with its principal place of business in San Diego, California. During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

**ANSWER**:      TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 and on that basis denies those allegations.

19. Plaintiff Princeton Display Technologies, Inc., is a New Jersey corporation with its principal place of business in Princeton, New Jersey, During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

**ANSWER**:      TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 and on that basis denies those allegations.

20. Plaintiff Radio & TV Equipment. Inc., is a business headquartered in Fargo, North Dakota. During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

**ANSWER**:      TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 and on that basis denies those allegations.

21. Plaintiff Royal Data Services, Inc., is a Hawaii corporation with its principal place of business in Honolulu, Hawaii. During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

**ANSWER**:      TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21 and on that basis denies those allegations.

22.     Plaintiff Studio Spectrum, Inc., is a California business with its principal place of business in Burbank, California. During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

**ANSWER**:     TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22 and on that basis denies those allegations.

23.     Plaintiff Wettstein & Sons, Inc., d/b/a Wettstein's, is a corporation organized under the laws of the State of Wisconsin with its principal place of business in La Crosse, Wisconsin. During the Class Period, this Plaintiff purchased one or more CRT Products directly from one of the defendants and/or their subsidiaries and suffered injury as a result of defendants' unlawful conduct.

**ANSWER**:     TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 23 and on that basis denies those allegations.

24.  Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan. It was established in 1971 by Tatung Corporation to manufacture CRTs. In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market. Throughout the Class Period, Chunghwa PT was one of the major global CRT manufacturers. During the Class Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

**ANSWER**:     The allegations in Paragraph 24 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24 and on that basis denies those allegations.  To the extent that the allegations in the last sentence of this Paragraph purport to relate to TUS, those allegations are denied.

25.  Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot 1, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. It is a wholly-owned and controlled subsidiary of Chunghwa. Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Class Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

**ANSWER**:     The allegations in Paragraph 25 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to

form a belief as to the truth of the allegations contained in Paragraph 25 and on that basis denies those allegations.  To the extent that the allegations in the last sentence of this Paragraph purport to relate to TUS, those allegations are denied.

26. Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**ANSWER**:     The allegations in Paragraph 26 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26 and on that basis denies those allegations.

27. Defendant Daewoo International Corporation ("Daewoo International") is a corporation organized under the laws of Korea with its principal place of business located at 84-11 Namdaemunno 5-ga, Jung-gu, Seoul, Korea (100-753). Daewoo International is a successor in interest to the Daewoo Group which was dismantled in or around 1999. During the Class Period, Daewoo International manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

**ANSWER**:     The allegations in Paragraph 27 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27 and on that basis denies those allegations.

28. Defendant Daewoo Electronics Corporation f/k/a Daewoo Electronics Company, Ltd. ("Daewoo Electronics") is a corporation organized under the laws of South Korea with its principal place of business located at 686 Ahyeon-dong. Mapagu, Seoul. South Korea. Daewoo Electronics is a subsidiary of Daewoo International. Plaintiffs are informed and believe that Daewoo Electronics was, along with Daewoo Telecom Company. Daewoo Corporation, and Orion Electric Components Company (all of whom were members of what is known as the "Daewoo Group"), a major shareholder of Orion Electric Company ("Orion"), a South Korean corporation that filed for bankruptcy in 2004. During the Class Period, Orion was a major manufacturer of CRT Products. In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products. Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United  States. Defendant Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Societe Anonyme ("DOSA") in France. As of approximately 1996, DOSA produced 1.2 million CRTs annually. Daewoo sold DOSA's CRT business in or around 2004. In December 1995, Orion partnered with Defendant Toshiba Corporation and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. During the Class Period, Daewoo

Electronics manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through its subsidiaries or affiliates (specifically including Orion and DOSA), to customers throughout the United States. Defendants Daewoo International and Daewoo Electronics dominated and controlled the policies and affairs of Orion and DOSA relating to the antitrust violations alleged in this complaint.

**ANSWER**:    The allegations in Paragraph 28 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28 and on that basis denies those allegations.

29. Daewoo International, Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

**ANSWER**:    The allegations in Paragraph 29 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29 and on that basis denies those allegations.

30. Defendant Hitachi, Ltd. is a Japanese company with its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. Hitachi. Ltd. is the parent company for the Hitachi brand of CRT Products. In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Class Period, Hitachi, Ltd. manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

**ANSWER**:    The allegations in Paragraph 30 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30 and on that basis denies those allegations.

31. Defendant Hitachi Displays. Ltd. ("Hitachi Displays") is a Japanese company with 6 its principal place of business located at AKS Building, 3 Kandaneribeicho 3, Chiyoda-ku, Tokyo, 101-0022, Japan. Hitachi Displays, Ltd. was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Class Period, Hitachi Displays sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

**ANSWER**:    The allegations in Paragraph 31 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 31 and on that basis denies those allegations.

32. Defendant Hitachi America. Ltd. ("Hitachi America") is a New York company with its principal place of business at 2000 Sierra Point Parkway, Brisbane, California. Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Class Period, Hitachi America sold and distributed CRT Products either directly (through, *inter alia*, its HED Home Electronics Division) or through its subsidiaries or affiliates (such as Hitachi Home Electronics (America), Inc. or Hitachi Sales Corporation of Hawaii, Inc.) throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

**ANSWER**:    The allegations in Paragraph 32 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32 and on that basis denies those allegations.

33. Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore 049318.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Class Period, Hitachi Asia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

**ANSWER**:    The allegations in Paragraph 33 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26 and on that basis denies those allegations.

34. Defendant Hitachi Electronic Devices (USA) ("HEDUS") is a Delaware corporation with its principal place of business at 575 Mauldin Road Greenville, South Carolina 29607. HEDUS is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Class Period, HEDUS manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

**ANSWER**:    The allegations in Paragraph 34 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 34 and on that basis denies those allegations.

35. Defendant Shenzhen SEG Hitachi Color Display Devices. Ltd. ("Hitachi Shenzhen") is a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District. Shenzhen 518035, China. Hitachi Shenzhen is a wholly-owned and controlled subsidiary of Defendant Hitachi Displays. During the Class Period, Hitachi Shenzhen manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

**ANSWER**:    The allegations in Paragraph 35 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to any truth of the allegations contained in Paragraph 35 and on that basis denies those allegations.

36. Defendants Hitachi Ltd., Hitachi Displays, Hitachi America. Hitachi Asia, Hitachi Shenzhen and HEDUS are collectively referred to herein as "Hitachi." Defendant Hitachi, Ltd., dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

**ANSWER**:    The allegations in Paragraph 36 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 36 and on that basis denies those allegations.

37. Defendant Irico Group Corporation ("IGC") is a Chinese entity located at 1 Hong Rd., Xianyang City, Shaanxi Province 712021. Irico Group Corporation is the parent company for multiple subsidiaries engaged in the manufacture, distribution, and sale of CRT Products.  During the Class Period, Irico Group Corporation manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

**ANSWER**:    The allegations in Paragraph 37 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37 and on that basis denies those allegations.

38. Defendant lrico Group Electronics Co., Ltd. ("IGE") is a Chinese entity located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGE is owned by IGC and engages in the manufacture, distribution, and sale of CRT Products. During the Class Period, IGE manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

**ANSWER**:    The allegations in Paragraph 38 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 38 and on that basis denies those allegations.

39. Irico Display Devices Co., Ltd. ("IDDC") is a Chinese entity located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of Defendant IOC. In 2006, IDDC was China's top CRT maker.  During the Class Period, IDDC manufactured, distributed, and sold CRT Products either directly or through its subsidiaries or affiliates or through other Defendants in the United States.   Defendant IOC dominated and controlled the finances, policies and affairs of IDDC Asia relating to the antitrust violations alleged in this complaint.

**ANSWER**:    The allegations in Paragraph 39 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 39 and on that basis denies those allegations.

40. Defendants IGC, IGE, and IDDC are collectively referred to herein as "Irico."

**ANSWER**:    The allegations in Paragraph 40 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 40 and on that basis denies those allegations.

41. Defendant LG Electronics, Inc. ("LGEI") is a South Korean entity headquartered at LG Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, South Korea 150-721.  In 2001, LGEI entered into a joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays, in which the entities combined their CRT businesses. In 2002, LGEI had a 24.4 percent worldwide CRT market share. On April 1, 2007, LG.Philips Displays became an independent company and changed its name to LP Displays International, Ltd. During the Class Period, LGEI manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as Zenith Electronics Corporation) throughout the United States.

**ANSWER:**   The allegations in Paragraph 41 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 41 and on that basis denies those allegations.

42. Defendant LG Electronics USA. Inc. ("LGEUSA") is a Delaware corporation with its principal place of business at 1000 Sylvan Ave., Englewood Cliffs, N.J. 07632. During the Class Period, LGEUSA manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

**ANSWER**:   The allegations in Paragraph 42 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 42 and on that basis denies those allegations.

43. Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No.47, Lane3, Jihu Road, NeiHu District, Taipei City, Taiwan. LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc. During the Class Period, LGETT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

**ANSWER**:   The allegations in Paragraph 43 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 43 and on that basis denies those allegations.

44. Defendant LP Displays International. Ltd. ("LP Displays") is a Hong Kong company located at 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong. LP Displays is the successor entity to LGPD. During the Class Period, LP Displays manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

**ANSWER**:   The allegations in Paragraph 44 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to

13

form a belief as to the truth of the allegations contained in Paragraph 44 and on that basis denies those allegations.

45. Defendants LGEI, LGEUSA, LGETT, and LP Displays are referred to collectively herein as "LG Electronics."

**ANSWER**:     The allegations in Paragraph 45 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 45 and on that basis denies those allegations.

46. Defendant Panasonic Corporation, f/k/a Matsushita Electric Industrial Co, Ltd. ("MEI"), is a Japanese entity located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. The entity known as MEI operated under that name until October 1, 2008 when it changed its name to Panasonic Corporation. In 2002, MEI entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  MEI was the majority owner with 64.5 percent. On April 3, 2007, MEI purchased the remaining 35.5 percent stake in the joint venture, making H a wholly-owned subsidiary of MEI. Panasonic Corporation is best known for its Panasonic brand, which in 2005 had the highest CRT revenue in Japan. During the Class Period, MEI sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

**ANSWER**:     The allegations in Paragraph 46 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 46 and on that basis denies those allegations.

47. Defendant Matsushita Electronic Corporation. (Malaysia) Sdn Bhd. ("Matsushita Malaysia") is a Malaysian entity located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation (formerly MEI). During the Class Period, Matsushita Malaysia sold and distributed CRT Products manufactured by MEI either directly or through its subsidiaries or affiliates. Defendant Panasonic Corporation (formerly MEI) dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

**ANSWER**:     The allegations in Paragraph 47 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 47 and on that basis denies those allegations.

48. Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey 07094. PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Class Period, PCNA sold and distributed CRT Products either directly or through its subsidiaries or affiliates (such as Panasonic Digital Security & Imaging Co., Panasonic Logistics Co., and Panasonic Broadcast & Television Systems, Co.) or Panasonic Company West of America) throughout the United States. Defendant Panasonic Corporation (f/k/a MEI) dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

**ANSWER**:     The allegations in Paragraph 48 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 48 and on that basis denies those allegations.

49. Defendant Panasonic Consumer Electronics Co. ("PACEC") is a Delaware corporation with its principal place of business at One, Panasonic Way, Secaucus, New Jersey 07094. PACEC is a wholly-owned and controlled subsidiary of Defendant PCNA. During the Class Period, PACEC sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Panasonic Corporation (formerly MEI) dominated and controlled the finances, policies and affairs of PACEC relating to the antitrust violations alleged in this complaint.

**ANSWER**:     The allegations in Paragraph 49 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 49 and on that basis denies those allegations.

50. Defendants Panasonic Corporation (f/k/a MEI), Matsushita Malaysia. PCNA, and PACEC are collectively referred to herein as "Panasonic."

**ANSWER**:     The allegations in Paragraph 50 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 50 and on that basis denies those allegations.

51. Defendant Koninklijke Philips Electronics N.V. ("Royal Philips"), which translates to Royal Philips Electronics, is a Dutch entity with its principal place of business at Breitner Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands. In 2000, Royal Philips was the leading global supplier of CRTs. Royal Philips operated in Asia directly through divisions (such as Philips Components Asia and Philips BGTV) and through wholly-owned and separately incorporated

subsidiaries. In 2001, Royal Philips entered into a joint venture with Defendant LG Electronics called LG.Philips Displays ("LGPD"), in which the entities combined their CRT businesses. LGPD operated in Asia and in Europe through its division LG.Philips Displays Europe Region. On April 1, 2007, LG.Philips Displays became an independent company and changed its name to LP Displays International, Ltd.  During the Class Period, Royal Philips manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

**ANSWER**:      The allegations in Paragraph 51 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 51 and on that basis denies those allegations.

52. Defendant Philips Electronics Industries Ltd. ("PEIL") is a Taiwanese corporation with its principal place of business at 15F, 3-1 Yuanqu St., Nangang District, Taipei 115, Taiwan.  PEIL is a subsidiary of Defendant Royal Philips. During the Class Period, PEIL sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of PEIL relating to the antitrust violations alleged in this complaint.

**ANSWER**:      The allegations in Paragraph 52 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 52 and on that basis denies those allegations.

53. Defendant Philips Electronics North America ("Philips America") is a Delaware corporation with its principal place of business at 1251 A venue of the Americas, New York, New York. 10020. Philips America is a subsidiary of Defendant Royal Philips. During the Class Period, Philips America sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

**ANSWER**:      The allegations of Paragraph 53 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 53 and on that basis denies those allegations.

54. Defendant Philips Consumer Electronics Co. ("PCEC") has its principal place of business at 64 Perimeter Center E, Atlanta, GA 30346-2295. PCEC is a subsidiary of Defendant Royal Philips. During the Class Period, PCEC sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Royal Philips dominated and

controlled the finances, policies and affairs of PCEC relating to the antitrust violations alleged in this complaint.

**ANSWER**:     The allegations in Paragraph 54 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 54 and on that basis denies those allegations.

55. Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at lSF 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Class Period, Philips Taiwan sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

**ANSWER**:     The allegations in Paragraph 55 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 55 and on that basis denies those allegations.

56. Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte I), Aores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Class Period, Philips Brazil sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

**ANSWER**:     The allegations of Paragraph 56 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 56 and on that basis denies those allegations.

57. Defendants Royal Philips, PEIL, PCEC, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips-Samsung Entities."

**ANSWER**:     The allegations of Paragraph 57 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to

17

form a belief as to the truth of the allegations contained in Paragraph 57 and on that basis denies those allegations.

58. Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business at 250, 2-ga, Taepyong-ro, Jung-gu, Seoul 100-742, South Korea. It is South Korea's top electronics company. During the Class Period, SEC manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

**ANSWER**:     The allegations in Paragraph 58 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 58 and on that basis denies those allegations.

59. Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660. SEAI is a wholly-owned and controlled subsidiary of Defendant SEC. During the Class Period, SEAI manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

 **ANSWER**:     The allegations in Paragraph 59 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 59 and on that basis denies those allegations.

60. Defendant Samsung SDI (Malaysia) Sdn Bhd. ("Samsung Malaysia") is a Malaysian corporation with its principal place of business at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia. Samsung Malaysia is a wholly-owned and controlled subsidiary of Defendant SEC. During the Class Period, Samsung Malaysia sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant SEC dominated and controlled the finances, policies and affairs of Samsung Malaysia relating to the antitrust violations alleged in this complaint.

**ANSWER**:     The allegations in Paragraph 60 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 60 and on that basis denies those allegations.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

61. Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business at 15th - 18th Floor, Samsung Life Insurance Building, ISO, 2-ga. Taepyong-ro. Jung-gu, Seoul, 100-716; South Korea. Samsung SDI is a wholly-owned and controlled subsidiary of Defendant SEC. Samsung SDI is one of the largest CRT producers in the world. Samsung SDI was the top manufacturer for CRTs in 2000, with a market share of approximately 20%. During the Class Period, Samsung SDI manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

**ANSWER**:      The allegations in Paragraph 61 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 61 and on that basis denies those allegations.

62. Defendant Samsung SDI America, Inc. ("Samsung America") is a California corporation with its principal place of business at 3333 Michelson Drive, Suite 700, Irvine, California. Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Class Period, Samsung America sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung America relating to the antitrust violations alleged in this complaint.

**ANSWER**:      The allegations in Paragraph 62 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 62 and on that basis denies those allegations.

63. Defendant Samsung SDI Mexico S.A. de, C.Y. ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.21014, Parque Industrial El Florido, Tijuana, B.C. Mexico. Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Class Period, Samsung SDI Mexico sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

**ANSWER**:      The allegations in Paragraph 63 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 63 and on that basis denies those allegations.

19

64. Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil. Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Class Period, Samsung SDI Brazil Sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

**ANSWER**:      The allegations in Paragraph 64 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 64 and on that basis denies those allegations.

65. Defendant Shenzhen Samsung SDI Co. Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu.  Shenzhen, China. Samsung 501 Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung During the Class Period, Samsung SDI Shenzhen sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

**ANSWER**:      The allegations in Paragraph 65 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 65 and on that basis denies those allegations.

66. Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County. Tianjin, China. Samsung SDI Tianjin is a Wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Class Period, Samsung SDI Tianjin sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

**ANSWER**:      The allegations in Paragraph 66 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 66 and on that basis denies those allegations.

67. Defendants SEC, Samsung SDI, Samsung America, Samsung SDI Mexico, Samsung SDI Brazil. Samsung SDI Shenzhen. Samsung SDI Tianjin and Samsung Malaysia are collectively referred to herein as "Samsung."

**ANSWER**:     The allegations in Paragraph 67 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 67 and on that basis denies those allegations.

68. Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its principal place of business at 52, Community Centre, New Friends 'Colony, New Delhi-110065. Samtel's market share for CPTs sold in India is approximately 40%, and it is that country's largest exporter of CPT Products. Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CPT Products. During the Class Period, Samtel manufactured, sold, and distributed CPT Products throughout the United States.

**ANSWER**:     The allegations in Paragraph 68 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 68 and on that basis denies those allegations.

69. Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.  Tatung America is a subsidiary of Tatung Company. Currently, Tatung Company owns approximately half of Tatung America. The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's recent death, her share passed to her two children. During the Class Period, Tatung America manufactured, marketed, sold and/or distributed CRT Products manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United States.

 **ANSWER**:     TUS admits the allegation contained in Paragraph 69 that TUS is a California corporation with its principal place of business at 2850 El Presidio Street, Long Beach, California. TUS admits the allegation that Tatung Company of Taiwan owns 50% of TUS.  TUS also admits that Lun Kuan Lin, the former Chairman of TUS, was the daughter of T.S. Lin, Tatung Company's former Chairman.   TUS further states that T.S. Lin is deceased.   TUS denies the remaining allegations contained in Paragraph 69.

70.     Defendant Thai CRT Company. Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement

Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During the Class Period, Thai CRT manufactured, sold, and distributed CRT Products either directly 01' through its subsidiaries or affiliates throughout the United States.

**ANSWER**:     The allegations in Paragraph 70 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 70 and on that basis denies those allegations.

71. Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business at 1-1, Shibaura l-chome, Minato-ku. Tokyo 105-8001, Japan. In 2001, Toshiba held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors. In 2002, TC entered into a joint venture with Defendant MEI (now Panasonic Corporation) called Matsushita Toshiba Picture Display Co., Ltd., in which the entities consolidated their CRT businesses. During the Class Period, TC manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

**ANSWER**:     The allegations in Paragraph 71 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 71 and on that basis denies those allegations.

72. Defendant Toshiba America. Inc. ("Toshiba America") is a Delaware corporation with its principal place of business at 1251 Avenue of the Americas, Suite 4110, New York. NY 10020. Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Class Period, Toshiba America sold and distributed CRT Products either directly or through its subsidiaries or affiliates (such as Toshiba Hawaii, Inc.) throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

**ANSWER**:     The allegations in Paragraph 72 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 72 and on that basis denies those allegations.

73. Defendant Toshiba America Consumer Products LLC ("TACP") is a limited liability company that is headquartered at 82 Totawa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Class Period, TACP sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

1   **ANSWER**:     The allegations in Paragraph 73 are not directed at TUS and therefore no response is

2   required.  To the extent a response is required, TUS lacks knowledge or information sufficient to

3   form a belief as to the truth of the allegations contained in Paragraph 73 and on that basis denies

4   those allegations

5       74. Defendant Toshiba America Consumer Products, Inc. ("TACPI") is a company that is

6   headquartered at 1420-B Toshiba Drive, Lebanon, Tennessee, 37087.  TACPI is a wholly-owned
    and controlled subsidiary of Defendant TC through Toshiba America. During the Class Period,

7   TACP sold and distributed CRT Products either directly or through its subsidiaries or affiliates
    throughout the United States. Defendant TC dominated and controlled the finances, policies and

8   affairs of TACPI relating to the antitrust violations alleged in this complaint.

9   **ANSWER**:     The allegations in Paragraph 74 are not directed at TUS and therefore no response is

10  required.  To the extent a response is required, TUS lacks knowledge or information sufficient to

11  form a belief as to the truth of the allegations contained in Paragraph 74 and on that basis denies

12  those allegations.

13      75. Defendant Toshiba America Electronic Components, Inc. ("TAEP") is headquartered at

14  9740 Irvine Blvd., Irvine, California 92718-1697. TAEP is a wholly-owned and controlled
    subsidiary of Defendant TC through Toshiba America. During the Class Period, TAEP is sold and

15  distributed CRT Products either directly or through its subsidiaries or affiliates, throughout the
    United States. Defendant TC dominated and controlled the finances, policies and affairs of TAEP

16  relating to the antitrust violations alleged in this complaint.

17  **ANSWER**:     The allegations in Paragraph 75 are not directed at TUS and therefore no response is

18  required.  To the extent a response is required, TUS lacks knowledge or information sufficient to

19  form a belief as to the truth of the allegations contained in Paragraph 75 and on that basis denies

20  those allegations.

21      76. Defendant Toshiba America Information Systems, Inc. ("TAIP") is headquartered at

22  9740 Irvine Blvd., Irvine. California 92718-1697. TAIP is a wholly-owned and controlled subsidiary
    of Defendant TC through Toshiba America. During the Class Period, TAIP sold and distributed CRT

23  Products either directly or through its subsidiaries or affiliates throughout the United States.
    Defendant TC dominated and controlled the finances, policies and affairs of TAIP relating to the

24  antitrust violations alleged in this complaint.

25  **ANSWER**:     The allegations in Paragraph 76 are not directed at TUS and therefore no response is

26  required.  To the extent a response is required, TUS lacks knowledge or information sufficient to

27

28

form a belief as to the truth of the allegations contained in Paragraph 76 and on that basis denies those allegations.

77. Toshiba Display Devices (Thailand) Company, Ltd. ("TDDT") is a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani. Thailand 12000. TDDT is a wholly-owned and controlled subsidiary of Defendant TC. During the Class Period, TAIP sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAIP relating to the antitrust violations alleged in this complaint.

**ANSWER**:    The allegations in Paragraph 77 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 77 and on that basis denies those allegations.

78. Defendants TC, Toshiba America, TDDT, TACP, TACPI, TAEP and TAIP are referred to collectively as "Toshiba."

**ANSWER**:    The allegations in Paragraph 78 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 78 and on that basis denies those allegations.

79. Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-1. Saiwai-cho, Takatsuki-shi, Osaka 569-1193, Japan. MTPD was formed as a CRT joint venture between Defendants Panasonic Corporation (f/k/a MEI) and Toshiba. On April 3, 2007, Defendant MEI purchased the remaining stake in MTPD, making it a wholly-owned subsidiary. During the class period, MTPD manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

**ANSWER**:    The allegations in Paragraph 79 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 79 and on that basis denies those allegations.

80. Defendant Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a Chinese company with its principal place of business at No.9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is the second largest producer of CRTs for televisions in China.

During the Class Period, BMCC manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

**ANSWER**:    The allegations in Paragraph 80 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 80 and on that basis denies those allegations.

81. Various persons that are not named as Defendants herein have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof. Plaintiffs reserve the right to name some or all of these persons as Defendants at a later date.

**ANSWER**:    To the extent that the allegations contained in Paragraph 81 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 81 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 81 are directed to TUS, they are denied.

82. Whenever in this complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

**ANSWER**:    Paragraph 82 consists of Plaintiffs' characterization of their Complaint, to which no response is required.  To the extent the allegations in Paragraph 82 may be deemed to require a response, they are denied.

83. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

**ANSWER:**    The allegations of Paragraph 83 contain conclusions of law to which no response is required.  To the extent that the allegations are deemed to require a response, they are denied.

84. Each of the Defendants named herein acted as the agent of, co-conspirator with, or joint venturer of the other Defendants with respect to the acts, violations and common course of conduct alleged herein. Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

**ANSWER:**    To the extent that the allegations contained in Paragraph 84 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the

25

allegations contained in Paragraph 84 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 84 are directed to TUS, they are denied.

85. Plaintiffs bring this action both on behalf of themselves, and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a) and (b)(3), on behalf of the following class (the "Class").

> All persons and entities who, between March 1, 1995 and November 25, 2007, directly purchased a CRT Product in the United States from any defendant or any subsidiary or affiliate thereof, or any co-conspirator. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

**ANSWER**:     TUS denies that the class described in Paragraph 85 is proper.  Paragraph 85 consists of Plaintiffs' characterization of their Complaint, to which no response is required.  To the extent the allegations in Paragraph 85 may be deemed to require a response, they are denied.

86. The Class definition encompasses those who bought a CRT Product directly from a Defendant, even if the CRT contained therein was manufactured by an affiliated entity, principal, agent, or co-conspirator.

**ANSWER**:     Paragraph 86 consists of Plaintiffs' characterization of their Complaint, to which no response is required.   To the extent the allegations in Paragraph 86 may be deemed to require a response, they are denied.

87. Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of Defendants. Plaintiffs believe that, due to the nature of the trade and commerce involved, there are most likely thousands of Class members, geographically dispersed throughout the United States such that joinder of all class members is impracticable.

**ANSWER**:     TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 87 and on that basis denies those allegations.

88. Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs are direct purchasers of CRT Products. All Class members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged herein, and the relief sought is common to the class.

**ANSWER**:     The allegations of Paragraph 88 contain conclusions of law to which no response is required.  To the extent that the allegations are deemed to require a response, they are denied.

89. Numerous questions of law or fact arise from Defendants' anticompetitive conduct· that is common to the Class, including but not limited to:

a. Whether Defendants engaged in a contract, combination, and/or conspiracy to fix, raise, maintain, or stabilize prices of CRT Products sold in the United States;

b. Whether Defendants engaged in a contract, combination, and/or conspiracy to restrict output of CRT Products sold in the United States;

c. Whether Defendants shared non-public information, allocated markets and customers, restricted output of CRT Products sold in the United States and committed other conduct in furtherance of the alleged conspiracy;

d. Whether Defendants' conduct caused the prices of CRT Products sold in the United States to be at artificially high and noncompetitive levels;

e. Whether Plaintiffs; and the other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

f. The scope of any injunctive relief to which Plaintiffs and the other members of the Class are entitled.

**ANSWER**:     The allegations of Paragraph 89 contain conclusions of law to which no response is required.  To the extent that the allegations are deemed to require a response, they are denied.

90. These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

**ANSWER**:     The allegations of Paragraph 90 contain conclusions of law to which no response is required.  To the extent that the allegations are deemed to require a response, they are denied.

91. Plaintiffs' claims are typical of the claims of the Class because Plaintiffs directly purchased CRT Products from one or more of the Defendants.

**ANSWER**:     The allegations of Paragraph 91 contain conclusions of law to which no response is required.  To the extent that the allegations are deemed to require a response, they are denied.

92. Plaintiffs will fairly and adequately represent the interests of the Class in that Plaintiffs are direct purchasers of CRT Products and have no conflict with any other members of the Class. Furthermore, Plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

**ANSWER**:      The allegations of Paragraph 92 contain conclusions of law to which no response is required.  To the extent that the allegations are deemed to require a response, they are denied.

93. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

**ANSWER**:      The allegations of Paragraph 93 contain conclusions of law to which no response is required.  To the extent that the allegations are deemed to require a response, they are denied.

94. This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

**ANSWER**:      The allegations of Paragraph 94 contain conclusions of law to which no response is required.  To the extent that the allegations are deemed to require a response, they are denied.

95. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**ANSWER**:      The allegations of Paragraph 95 contain conclusions of law to which no response is required.  To the extent that the allegations are deemed to require a response, they are denied.

96. During the Class Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

**ANSWER**:      To the extent that the allegations contained in Paragraph 96 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 96 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 96 are directed to TUS, they are denied.

97. During the Class Period, Defendants collectively controlled a majority of the market for CRT Products, both globally and in the United States.

**ANSWER**:      To the extent that the allegations contained in Paragraph 97 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 97 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 97 are directed to TUS, they are denied.

98. The business activities of the Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

**ANSWER**:    To the extent that the allegations contained in Paragraph 98 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 98 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 98 are directed to TUS, they are denied.

99. A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image. A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image. An aperture or shadow mask—a thin screen of perforated metal--is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

**ANSWER**:    TUS admits that Paragraph 99 purports to contain descriptions of CRT technology. TUS denies that Paragraph 99 describes CRT technology completely and accurately.  TUS denies the remaining allegations contained in Paragraph 99.

100. CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers. Since then, CRTs have become the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs. Even large public displays, including many scoreboards at sports arenas, are comprised of thousands of single-color CRTs.

**ANSWER**:    TUS admits that Paragraph 100 purports to contain descriptions of CRT technology. TUS denies that Paragraph 100 describes CRT technology completely and accurately.  TUS denies the remaining allegations contained in Paragraph 100.

101. The quality of a CRT itself determines the quality of the CRT display. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

**ANSWER**:    TUS denies the allegations contained in Paragraph 101.

102. Early CRT televisions displayed only black and white images. CRT technology was revolutionized in 1950 with the advent of the color CRTs. Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and

CRTs with a flat screen, the CRT technology used today is similar to the one that RCA unveiled in 1950.

**ANSWER**:   TUS admits that Paragraph 102 purports to contain descriptions of CRT technology. TUS denies that Paragraph 102 describes CRT technology completely and accurately, and further denies that advancements to CRT technology after the advent of color CRTs were only incremental or insubstantial.  TUS denies the remaining allegations contained in Paragraph 102.

103. CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

**ANSWER**:   TUS admits that Paragraph 103 purports to contain descriptions of CRT technology. TUS denies that Paragraph 103 describes CRT technology completely and accurately.  TUS denies the remaining allegations contained in Paragraph 103.

104. Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Class Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits. The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units sold (millions) | Revenue (Billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | 18.9 | 208 |
| 1999 | 106.3 | 19.2 | 181 |
| 2000 | 119.0 | 28.0 | 235 |

**ANSWER**:   TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 104 and on that basis denies those allegations.

105. CRTs are a declining but still popular technology. CRT televisions typically require a deep cabinet to accommodate the vacuum tube assembly. In the 1998, technological innovations allowed companies to introduce flat panel displays that are slimmer and less bulky than CRT displays. Flat panel displays were introduced in consumer products such as computer monitors and televisions. Before their introduction, CRTs had dominated the market for these applications.

**ANSWER**:    TUS admits that Paragraph 105 purports to contain descriptions of CRT technology. TUS denies that Paragraph 105 describes CRT technology completely and accurately.  TUS denies the remaining allegations contained in Paragraph 105.

106. As the established technology, CRTs had a price advantage over these new technologies. Unlike an emerging industry where participants must invest heavily in research, development, and bringing capacity online, the CRT industry made and recouped such investments well before the start of the Class Period. Thus, CRT manufacturers had very little debt or interest expense on their CRT manufacturing facilities, and the pressure to produce at full capacity (to avoid default) was lessened. This provided an environment in which collusion to fix prices, even at the risk of lower demand was possible.

**ANSWER**:    TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 106 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 106 are directed to TUS, they are denied.

107. The CRT industry faced significant market pressures and reduced profitability during the latter part of the Class Period due in part to the introduction and rise of competing television technologies such as plasma screens and liquid crystal display ("LCD") technology.

**ANSWER**:    TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 107 and on that basis denies those allegations.

108. Nonetheless, this decline took some time to materialize. In 2004 it was estimated that CRT televisions constituted 75% of the North American television market accounting for 19.32 million units. In 2006, the market research firm iSuppli Corp. ("iSuppli") estimated that CRT televisions still accounted for only 46% of all televisions shipped to North American retailers and the global market share for CRTs in that period was approximately 71%.

**ANSWER**:    TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 108 and on that basis denies those allegations.

109. In 2006, iSuppli predicted that sales of LCD televisions in 2007 would, for the first time, surpass sales of CRT televisions. The firm forecasted that sales of CRTs would fall from an estimated 14.4 million units in 2006 to 10.4 million units in 2007.  iSuppli predicted that CRT televisions would account for only 2.1 million of the 44 million televisions sold in 2010.

**ANSWER**:    TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 109 and on that basis denies those allegations.

110. CRTs still remain popular, however. For example, in the weeks leading up to the 2007 Super Bowl, unit sales of CRTs increased 60%, while revenues increased by 46%. At the Consumer

31

Electronics Show ("CES") held in Las Vegas in 2007. Samsung introduced a new line of "slim" CRTs intended to emulate the form factor of flat panel LCD televisions. CRTs also remain popular with visual effects technicians, in schools and in other public areas for their combination of color calibration, price and durability, as well as in developing countries like China. CRT technology is also holding its own in the area of low-cost monitor and smaller size televisions.  According to DisplaySearch Inc. ("DSI"), a Texas based research firm, CRTs will maintain a 65 percent share of 25-inch to 29-inch displays sold in 2009, whereas CRTs will have only a 1 percent share of 35-inch to 39-inch displays sold in 2009.

**ANSWER**:      TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 110 and on that basis denies those allegations.

111. DSI further estimated that the worldwide capacity to manufacture CRTs will fall from over 250 million units in 2006 to less than 150 million units by 2010. At various times during the conspiracy, in order to keep prices high, Defendants colluded to restrain output of CRTs, as alleged below.

**ANSWER**:      TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 111 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 111 are directed to TUS, they are denied.

112. During the Class Period, the CRT industry has been dominated by relatively few companies.  In 2002 for example, three companies - Defendants LP Displays (formerly known as LGPD), Samsung, and Chunghwa - controlled approximately 62 percent of the CRT market, as reflected in the following chart:

| Company | Share |
|---|---|
| LGPD | 27% |
| Samsung SDI | 24% |
| Chunghwa PT | 11% |
| Japanese Producers | 15% |
| Others | 23% |

**ANSWER**:      TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 112 and on that basis denies those allegations.

113. The CRT industry also had significant consolidation during the Class Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and MEI's CRT businesses into MTPD.

**ANSWER**:   TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 113 and on that basis denies those allegations.

114. This concentration of market share facilitated Defendants' ability to implement the conspiracy. Involvement in long-standing joint ventures, both in the CRT market and closely related markets, also gave these supposed competitors continuous opportunities to discuss pricing, capacity utilization, and other important prospective market information. The mutually beneficial nature of the business relations between certain Defendants not only provided the opportunity to conspire; it also created a financial incentive to do so.

**ANSWER**:   TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 114 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 114 are directed to TUS, they are denied.

115. The concentration of the CRT industry was further exacerbated by various types of intercompetition or cooperation.

**ANSWER**:   TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 115 and on that basis denies those allegations.

116. Chunghwa, for example, has a long-standing joint venture with Defendant Samsung's corporate parent for the production of liquid crystal display panels. Defendant Chunghwa now licenses technology from Philips, although this is a recent development that helped resolved a patent infringement suit filed in 2002. Chunghwa also entered into multiple technology transfer agreements with Toshiba, including one entered into in 1995.

**ANSWER**:   The allegations in Paragraph 116 are not directed at TUS, and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 116 and on that basis denies those allegations.

117. Similarly, Samsung's corporate family has a very long-standing relationship with Chinese state-owned picture tube manufacturers, dating back to a 1993 joint venture.

**ANSWER**:   The allegations in Paragraph 117 are not directed at TUS, and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 117 and on that basis denies those allegations.

118. Likewise, LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale, and distribution of optical storage products such as DVD drives.

**ANSWER**:     The allegations in Paragraph 118 are not directed at TUS, and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 118 and on that basis denies those allegations.

119. Samtel also participates in a joint venture, Samcor Glass Limited, with Defendant Samsung's corporate parent and non-Defendant Coming Inc., USA for the production and supply of picture tube glass.

**ANSWER**:     The allegations in Paragraph 119 are not directed at TUS, and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 119 and on that basis denies those allegations.

120. Furthermore, at least four of the competitors obtain picture tubes from the same Indian company. Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips and Panasonic during at least part of the Class Period.

**ANSWER**:     TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 120 and on that basis denies those allegations.

121. Similarly, Orion participates in a joint venture for the manufacture of CRT products with Defendant Toshiba, as well as non-Defendants P.T. Tabung Gambar Indonesia and the Japanese trading company Sumitomo Corporation.

**ANSWER**:     The allegations in Paragraph 121 are not directed at TUS, and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 121 and on that basis denies those allegations.

122. Defendants have been the subject of multiple government investigations for their cartel activity in recent years.  For example, Samsung admitted guilt and paid a $300 million fine following an investigation by the DOJ into price-fixing among manufacturers of dynamic random access memory ("DRAM") computer chips.

**ANSWER**:     To the extent that the allegations contained in Paragraph 122 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 122 and on that basis denies those allegations. To the extent that the allegations contained in Paragraph 122 are directed to TUS, they are denied.

123. More recently, the DOJ and the European Commission ("EC") have commenced investigations of Samsung, Toshiba, LGPD and Hitachi, among others, concerning collusion among manufacturers of thin-film transistor liquid crystal displays ("TFT-LCDs"). Samsung, Toshiba and Hitachi are also being investigated by the DOJ in connection with the price-fixing of flash memory computer chips.

**ANSWER**: To the extent that the allegations contained in Paragraph 123 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 123 and on that basis denies those allegations. To the extent that the allegations contained in Paragraph 123 are directed to TUS, they are denied.

124. In December of 2008, it was announced that LP Display would plead guilty to a DOJ indictment alleging antitrust price-fixing allegations with respect to TFT-LCDs. It has agreed to pay a $400 million fine. Likewise, Chunghwa PT pled guilty to participation in the same conspiracy and was fined $65 million. In January of 2009, it was announced that C.Y. Lin (Chunghwa PT's former Chairman and CEO); Wen Jung Cheng (Assistant Vice-President of Marketing & Sales for Chunghwa PT); Duk Mo Koo (Executive Vice-President & Chief Sales Officer for LG.Philips LCD Co., Ltd.); Chang Suk Chung (Vice-President of Monitor Sales for LG Display, Ltd., the predecessor of LP Display); Chih-Chun Liu (Chunghwa PT's Vice-President of LCD Sales); and Hsueh-Lung Lee (also one of Chunghwa PT's Vice-Presidents of LCD Sales) pled guilty to participation in the TFT-LCD conspiracy. Wen Jung Cheng (Assistant Vice-President of Marketing & Sales for Chunghwa PT) and Duk Mo Koo (Executive Vice-President & Chief Sales Officer for LG.Philips LCD Co., Ltd.) have also been indicted in connection with the DOJ's TFT-LCD investigation. As explained below, Mr. Lin is involved in the conspiracy relating to CRT Products. It is believed that several of the other individuals are involved as well. Most recently, on March 10, 2009, it was announced that Hitachi Displays had pled guilty to participation in the price-fixing conspiracy involving TFT-LCDs and had agreed to pay a $31 million fine.

**ANSWER**: To the extent that the allegations contained in Paragraph 124 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 124 and on that basis denies those allegations. To the extent that the allegations contained in Paragraph 124 are directed to TUS, they are denied.

125. Many of the Defendants are currently under investigation by government authorities around the world for anticompetitive conduct in connection with the CRT industry. The United States investigation of the CRT conspiracy is being conducted by the DOJ's Antitrust Division's office in the Northern District of California.

1    **ANSWER**:    To the extent that the allegations contained in Paragraph 125 are directed to other

2    defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the

3    allegations contained in Paragraph 125 and on that basis denies those allegations.  To the extent that

4    the allegations contained in Paragraph 125 are directed to TUS, they are denied.

5        126. On February 10, 2009, C.Y. Lin of Chunghwa PT was indicted for participating in a
6    conspiracy to fix the prices of CRTs. The DOJ's announcement of the indictment explained it as
     follows:

7            The indictment, filed today in U.S. District Court in San Francisco,
             charges Cheng Yuan Lin. aka C.Y. Lin, a resident of Taiwan. with
8            conspiring with others to suppress and eliminate competition by fixing
             prices, reducing output and allocating market shares of color display
9            tubes (CDTs) to be sold in the U.S. and elsewhere, beginning at least
             as early as Jan. 28, 1997, until at least as late as April 7, 2003. The
10           indictment also charges C.Y. Lin with conspiring with others to
             suppress and eliminate competition by fixing prices for color picture
11           tubes (CPTs) to be sold in the U.S. and elsewhere, beginning at least as
             early as March 12, 1997, until at least as late as April 7. 2003.
12

13           CRTs consist of evacuated glass envelopes that contain an electron
             gun and a phosphorescent screen. When electrons strike the screen,
14           light is emitted, creating an image on the screen. CDTs and CPTs are
             each types of CRTs. CDTs are used in computer monitors and other
15           specialized applications, while CPTs are used in color televisions. The
             worldwide market for CRTs, including CPTs and CDTs, in 1997, at
16           the start of the conspiracies has been estimated as approximately $26
             billion.
17

18           "This conspiracy harmed countless Americans who purchased
             computers and televisions using cathode ray tubes sold at fixed
19           prices," said Scott D. Hammond, Acting Assistant Attorney General in
             charge of the Antitrust Division. "The Antitrust Division will continue
20           to prosecute individuals, wherever they are located and however high
             their position on the corporate ladder, who engage in price fixing
21           aimed at U.S. businesses and consumers."

22           According to the charges, C. Y. Lin and co-conspirators carried out the
             CDT conspiracy by, among other things:
23
             --Attending meetings and engaging in conversations and
24           communications

25           in Taiwan, Korea, Malaysia, China and elsewhere to discuss the prices,
             output and market shares of CDTs;
26
             --Agreeing during those meetings, conversations and communications
27           to charge prices of CDTs at certain target levels or ranges;

28

--Agreeing during those meetings, conversations and communications to reduce output of CDTs by shutting down CDT production lines for certain periods of time;

--Agreeing during those meetings, conversations and communications to allocate target market shares for the CDT market overall and for certain CDT customers;

--Exchanging CDT sales, production, market share and pricing information for the purpose of implementing, monitoring and enforcing adherence to the agreed-upon prices, output reduction and market share allocation;

--Implementing an auditing system that permitted co-conspirators to visit each other's production facilities to verify that CDT production lines had been shut down as agreed;

--Authorizing and approving the participation of subordinate employees in the conspiracy;

--Issuing price quotations and reducing output in accordance with the agreements reached; and

--Taking steps to conceal the conspiracy and conspiratorial contacts through various means.

C.Y. Lin is charged with carrying out the CPT conspiracy with his co-conspirators by, among other things:

--Attending meetings and engaging in conversations and communications in Taiwan, Korea, Malaysia, China, Thailand, Indonesia and elsewhere to discuss the prices of CPTs;

--Agreeing during those meetings, conversations and communications to charge prices of CPTs at certain target levels or ranges;

--Exchanging CPT pricing information for the purpose of implementing,

--Authorizing and approving the participation of subordinate employees in the conspiracy;

-Issuing price quotations in accordance with the agreements reached; and

.--Taking steps to conceal the conspiracy and conspiratorial contacts through various means.

**ANSWER**:     To the extent that the allegations contained in Paragraph 126 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 126 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 126 are directed to TUS, they are denied.

1

2        127. The DOJ is not acting alone against the manufacturers of CRTs. Multiple foreign
antitrust enforcement authorities are also investigating the CRT cartel.

3    **ANSWER**:     To the extent that the allegations contained in Paragraph 127 are directed to other

4    defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the

5    allegations contained in Paragraph 127 and on that basis denies those allegations.  To the extent that

6    the allegations contained in Paragraph 127 are directed to TUS, they are denied.

7
         128. On November 8, 2007, it was reported that EC officials carried out unannounced raids
8    on manufacturers of CRTs based on suspected anticompetitive conduct. That same day the EC
     issued a press release stating that, "[t]he commission has reason to believe that the companies
9    concerned may have violated EU rules against price-fixing, sharing markets or exchanging market
     information."
10
     **ANSWER**:     To the extent that the allegations contained in Paragraph 128 are directed to other
11
     defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the
12
     allegations contained in Paragraph 128 and on that basis denies those allegations.  To the extent that
13
     the allegations contained in Paragraph 128 are directed to TUS, they are denied.
14

15       129. On November 9, 2007, MEI (now known as Panasonic Corporation) and Samsung
     reported that they were cooperating with the Japanese Fair Trade Commission ("JFTC"), which
16   raided the companies' CRT production facilities on suspicion of anticompetitive conduct.

17   **ANSWER**:     To the extent that the allegations contained in Paragraph 129 are directed to other

18   defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the

19   allegations contained in Paragraph 129 and on that basis denies those allegations.  To the extent that

20   the allegations contained in Paragraph 129 are directed to TUS, they are denied.

21       130. On that same day, a Samsung spokesperson announced that its CRT subsidiary in South
     Korea was being investigated by the Korean Fair Trade Commission "KFTC") as "part of an
22   international probe into alleged price-fixing."

23   **ANSWER**:     To the extent that the allegations contained in Paragraph 130 are directed to other

24   defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the

25   allegations contained in Paragraph 130 and on that basis denies those allegations.  To the extent that

26   the allegations contained in Paragraph 130 are directed to TUS, they are denied.

27

28

131. On November 12. 2007, Chunghwa announced that it had received a summons from the DOJ with respect to involvement in a CRT price-fixing cartel.

**ANSWER**:    To the extent that the allegations contained in Paragraph 131 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 131 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 131 are directed to TUS, they are denied.

132. And on November 21, 2007, Defendant Philips acknowledged that it was being investigated as well. The International Herald Tribune reported that "competition authorities in several jurisdictions had started investigations," and that the company "would assist regulators."

**ANSWER**:    To the extent that the allegations contained in Paragraph 132 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 132 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 132 are directed to TUS, they are denied.

133. On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel. The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasagi Versenyhivatal - GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co. Ltd, Samsung SDI Germany GmbH, Samsung SDI Magyarorszag Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays. Chunghwa Pictures Tubes (UK) Ltd. Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ. Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the

European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarorszag was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

**ANSWER**:   To the extent that the allegations contained in Paragraph 133 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 133 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 133 are directed to TUS, they are denied.

134. The antitrust conspiracy involving CRT Products went on for over twelve years  (1995-2007), involved the various Defendant companies, and was effectuated through agreements and common understandings reached in at least 500 bilateral or multilateral meetings that occurred in Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K., and Europe.

**ANSWER**:   To the extent that the allegations contained in Paragraph 134 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 134 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 134 are directed to TUS, they are denied.

135. Bilateral contacts and communications among Defendants commenced in the late 1980s-early 1990s on an ad hoc basis. Competitively sensitive information on pricing, production capacity, product mix and customer information was exchanged. In 1995, these bilateral meetings began to increase in frequency. There were more than a dozen such meetings in 1995 and several dozen such meetings in 1996 alone. The meetings continued throughout the Class Period. Bilateral contacts and communications were conducted in person, by telephone or bye-mail.

**ANSWER**:   To the extent that the allegations contained in Paragraph 135 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 135 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 135 are directed to TUS, they are denied.

136. During 1995-96, certain of the Defendants commenced participation in informal group meetings. There were several such meetings in 1995 and over a dozen more in 1996. As time went on, bilateral meetings encompassed specific intercompany agreements or followed up on agreements reached at group meetings. Bilateral meetings were conducted in person, by telephone or by e-mail.

**ANSWER**:   To the extent that the allegations contained in Paragraph 136 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 136 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 136 are directed to TUS, they are denied.

137. Beginning in 1997, CRT makers started to meet in a more organized, systematic fashion. At some point, these meetings became known as "Glass Meetings" or "GSM." Until June of 2000, "Glass Meetings" involving COT Products and CPT Products were typically held back to back at the same venue. Thereafter, in order to limit detection, they were held separately at different venues.

**ANSWER**:   To the extent that the allegations contained in Paragraph 137 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 137 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 137 are directed to TUS, they are denied.

138. With respect to CRT Products, Defendants or their agents agreed to, *inter alia*: (a) fix target prices and price guidelines; (b) exchange pertinent information on, inter alia, shipments, prices, production, and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the  agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales;  (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

**ANSWER**:   To the extent that the allegations contained in Paragraph 138 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 138 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 138 are directed to TUS, they are denied.

139. The overall CRT conspiracy affected worldwide prices (including prices in the United States) that Defendants charged for CRT Products.

**ANSWER**:   To the extent that the allegations contained in Paragraph 139 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 139 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 139 are directed to TUS, they are denied.

140. Agreements as to CRT Products were conducted through bilateral meetings as described above, through informal multilateral meetings as described above, and through more formal "Glass Meetings."

**ANSWER**:     To the extent that the allegations contained in Paragraph 140 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 140 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 140 are directed to TUS, they are denied.

141. The "Glass Meetings" conducted with respect to CRT Products fell into several categories:

a. "Top Meetings" - meetings held by individuals at the highest level of the Defendant companies. These happened less frequently, typically on a quarterly basis, and were focused on longer term agreements and dispute resolution. Top Meetings occurred in South Korea, Taiwan, and China.

b. "Management Meetings" - meetings held by high-level sales executives.  These meetings occurred more frequently, typically on a monthly basis, and handled implementation of agreements made at "Top Meetings." Management level meetings occurred in South Korea, Taiwan, China, Indonesia, Japan, and Thailand.

c. "Working Level Meetings" - meetings of lower level sale and marketing employees to excha

nge data and discuss pricing. Working level meetings occurred in South Korea, Taiwan, and China.

d. "Green Meetings" - meetings on golf courses.

**ANSWER**:     To the extent that the allegations contained in Paragraph 141 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 141 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 141 are directed to TUS, they are denied.

142. Attending Defendants would often exchange competitively sensitive information prior to a Glass Meeting. This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

**ANSWER**:     To the extent that the allegations contained in Paragraph 142 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 142 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 142 are directed to TUS, they are denied.

143.  The meetings themselves followed a typical pattern.  First, attending Defendants exchanged information regarding pricing subjects, such as pricing and anticipated future demand  for the upcoming quarter.  The chairman of these meetings, who was selected on a rotating basis from among the attending Defendants (although, with respect to meetings on CPT Products, one  person typically served as chair after 2002), displayed this information on a whiteboard or  projector.  Each attending Defendant was given the opportunity to update the information it had previously provided.  Attending Defendants often computed overall production for each product and compared that to estimated demand.

**ANSWER**:    To the extent that the allegations contained in Paragraph 143 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 143 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 143 are directed to TUS, they are denied.

144.  Based on this information, Defendants agreed on price guidelines, either a range of price increases or a range of price floors (known as "bottom prices").  The price guideline could serve as a floor in declining markets or could serve as a basis for a price increases in rising markets.  Failure to object indicated assent.  The agreements encompassed prices in United States dollars to specific third party customers, and prices reflecting inclusion of specific features in a CRT (such as certain types of coating or the differing types of shadow mask).  The agreements  encompassed not only prices charged to third party customers, but, in the case of vertically  integrated manufacturers who produced both CRTs and CRT Products, also encompassed: (a)  prices charged by the CRT manufacturing arm of each such integrated company to the corporate  division or subsidiary that manufactured or sold computer monitors, televisions or other similar  products and (b) price floors on quotations offered by the competitors of the integrated company  to such a division or subsidiary.  Defendants also considered the internal pricing of products containing CRTs in agreeing upon the prices at which CRTs were set.

**ANSWER**:    To the extent that the allegations contained in Paragraph 144 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 144 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 144 are directed to TUS, they are denied.

145.  In addition to agreements about price, Defendants at Glass Meetings often also made agreements related to both overall market share and the share of a particular customer's purchases.  As part of the latter type of agreement, respective Defendants; were designated as the "major supplier" to certain customers.  This designation was based on the historical relationships that were already in place between the suppliers and customers.

43

**ANSWER**:     To the extent that the allegations contained in Paragraph 145 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 145 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 145 are directed to TUS, they are denied.

146. In addition to agreements on market shares, the Defendants often also agreed and implemented coordinated output restrictions. These output agreements began as agreements to shut down production lines for a certain number of days. As time went on, they changed to agreements to shut down entire production lines. To police this aspect of the conspiracy, there were in-person follow-up audits, in which a designated co-conspirator would visit the facilities of another co-conspirator in order to ensure that output restrictions were being implemented.   Sometimes, they also discussed plans related to future capacity expansion. Defendants based these determinations on what the market would look like, after jointly analyzing anticipated supply and demand. The analysis often included consideration of downstream prices for televisions, computer monitors, or similar products and how they would affect the price ranges being collusively set.

**ANSWER**:     To the extent that the allegations contained in Paragraph 146 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 146 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 146 are directed to TUS, they are denied.

147. Each attending Defendant at Glass Meetings gave a report with price and projected future output. The information reported included new capacity, new product lines, and other relevant information. Each of the other attending Defendants then had the opportunity to challenge the presenter on information being presenting, thus reflecting monitoring of the conspiracy.

**ANSWER**:     To the extent that the allegations contained in Paragraph 147 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 147 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 147 are directed to TUS, they are denied.

148. Defendants would also agree on what to say about price changes or output restrictions to their customers in order to conceal their conspiracy. Often, one co-conspirator was chosen to make the first price announcement, with the others following on an agreed-upon schedule.

**ANSWER**:     To the extent that the allegations contained in Paragraph 148 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 148 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 148 are directed to TUS, they are denied.

149. Finally, the attending Defendants would organize the next upcoming meeting.

**ANSWER**:     To the extent that the allegations contained in Paragraph 149 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 149 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 149 are directed to TUS, they are denied.

150.  During the course of these meetings, attending Defendants would be assigned the task of contacting non-attendees in order to secure their consent to the agreements reached.

**ANSWER**:     To the extent that the allegations contained in Paragraph 150 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 150 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 150 are directed to TUS, they are denied.

151. In contrast to Top or Management Meetings, Working Level Meetings were attended by more junior level executives or sale employees and regional level managers. At these meetings, attending Defendants exchanged sales, shipment, and price information. The meetings also included agreements on pricing. The Working Level Meetings occurred at various locations, including Malaysia, Thailand, Indonesia, Taiwan, South Korea, Singapore, Europe, and China.

**ANSWER**:     To the extent that the allegations contained in Paragraph 151 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 151 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 151 are directed to TUS, they are denied.

152. The attending Defendants at these meetings also often agreed to follow up with non-attending Defendants in order to communicate the agreements reached at these meetings and secure adherence to them. These efforts were successful.

**ANSWER**:     To the extent that the allegations contained in Paragraph 152 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 152 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 152 are directed to TUS, they are denied.

153. Agreements at these meetings were also reached to: (a) coordinate in giving customers pretextual reasons for the implementation of the price guidelines agreed upon, (b) expose and eliminate any cheating on the agreements reached, and (c) with respect to CPT Products, coordinate pricing and supply by CPT producers located in India, Europe, and Brazil.

**ANSWER**:    To the extent that the allegations contained in Paragraph 153 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 153 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 153 are directed to TUS, they are denied.

154. When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that the Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and was a party to the agreements reached in them. For the various meeting participants identified below, in many instances, their high-ranking executives participated in a significant number of the meetings described.

**ANSWER**:    The first sentence of Paragraph 154 consists of Plaintiffs' characterization of their Complaint, to which no response is required.  To the extent a response is required, TUS denies those allegations.  To the extent that the remainder of the allegations contained in Paragraph 154 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 154 and on that basis denies those allegations.  To the extent that the remainder of the allegations contained in Paragraph 154 are directed to TUS, they are denied.

155. Chunghwa, through Chunghwa PT and Chunghwa Malaysia, participated in hundreds of illegal bilateral and group meetings from 1995 to 2007 in which unlawful agreements as to, inter alia, price, output restrictions, and customer and market allocation of CRT Products occurred. These included hundreds of bilateral meetings and hundreds of group meetings of all the types described herein that took place in Southeast Asia, China, Europe and Scotland. The representatives of Chunghwa who participated in some of these meetings included its highest executives, such as the former Chairman and CEO of Chunghwa PT, C.Y. Lin.

**ANSWER**:    The allegations in Paragraph 155 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to

form a belief as to the truth of the allegations contained in Paragraph 155 and on that basis denies those allegations.   To the extent that the remainder of the allegations contained in Paragraph 154 could be construed to be or purport to be directed to TUS, they are denied.

156. Daewoo International. either directly or through Daewoo Electronics or Orion, participated in multiple illegal bilateral and at least several dozen group meetings from 1996 to 2004 in which unlawful agreements as to, inter alia, price, output restrictions, and customer and market allocation of CRT Products occurred. These meetings occurred in China, South Korea, Malaysia, Taiwan, Thailand, and the U.K. Daewoo never effectively withdrew from this conspiracy.

**ANSWER**:   The allegations in Paragraph 156 are not directed at TUS and therefore no response is required.   To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 156 and on that basis denies those allegations.

157. Hitachi, through Hitachi Ltd., Hitachi Shenzhen, Hitachi Displays, and Hitachi Asia, participated in over a dozen illegal bilateral and group meetings from 1996 through at least 2001 in which unlawful agreements as to, inter alia, price, output restrictions, and customer and market allocation of CRT Products occurred. These included more than ten bilateral meetings and more than five group meetings of the types described herein, which took place in Taiwan and China. Hitachi never effectively withdrew from this conspiracy.

**ANSWER**:   The allegations in Paragraph 157 are not directed at TUS and therefore no response is required.   To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 157 and on that basis denies those allegations.

158. Hitachi America and HEDUS were represented at those meetings and were parties to the agreements entered at them. Further to the extent Hitachi America and HEDUS distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings. Thus, Hitachi America and HEDUS were active, knowing participants in this conspiracy.

**ANSWER**:   The allegations in Paragraph 158 are not directed at TUS and therefore no response is required.   To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 158 and on that basis denies those allegations.

1

2

159. Irico, through IGC, IGE, and IDDC, participated in multiple illegal bilateral and at least several dozen illegal group meetings from 1998 to 2006 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products occurred. These meetings took place in China. Irico never effectively withdrew from this conspiracy.  None of Irico's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government; Irico was acting to further its independent private interests in participating in this conspiracy.

3

4

5

**ANSWER**:    The allegations in Paragraph 159 are not directed at TUS and therefore no response is

6

required.  To the extent a response is required, TUS lacks knowledge or information sufficient to

7

form a belief as to the truth of the allegations contained in Paragraph 159 and on that basis denies

8

those allegations.

9

160. LG Electronics participated through LGPD, LP Displays. LGEI, and LGEIT, in more than a dozen illegal bilateral and more than a hundred illegal group meetings from 1995 to 2006 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products occurred. These meetings took place in Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, and China. LG Electronics never effectively withdrew from this conspiracy.

10

11

12

13

**ANSWER**:    The allegations in Paragraph 160 are not directed at TUS and therefore no response is

14

required.  To the extent a response is required, TUS lacks knowledge or information sufficient to

15

form a belief as to the truth of the allegations contained in Paragraph 160 and on that basis denies

16

those allegations.

17

161. LGEUSA was represented at these meetings and was a party to the agreements entered at them. To the extent LGEUSA distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings. Thus, LGEUSA was an active, knowing participant in this conspiracy.

18

19

20

**ANSWER**:    The allegations in Paragraph 161 are not directed at TUS and therefore no response is

21

required.  To the extent a response is required, TUS lacks knowledge or information sufficient to

22

form a belief as to the truth of the allegations contained in Paragraph 161 and on that basis denies

23

those allegations.

24

25

162. Panasonic, directly or through Matsushita Malaysia, participated in several dozen illegal bilateral and group meetings from 1996 through at least 2003 in which unlawful agreements as to, inter alia, price, output restrictions, and customer and market allocation of CRT Products occurred. These included bilateral meetings and group meetings of the types described herein. These meetings took place in Taiwan, Malaysia, and China. Panasonic never effectively withdrew from this conspiracy.

26

27

28

**ANSWER**:     The allegations in Paragraph 162 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 162 and on that basis denies those allegations.

163. PCNA and PACEC were represented at those meetings and was a party to the agreements entered at them. To the extent PCNA and PACEC distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings. Thus, PCNA and PACEC were active, knowing participants in the alleged conspiracy.

**ANSWER**:     The allegations in Paragraph 163 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 163 and on that basis denies those allegations.

164. Philips, through Royal Philips, Philips Taiwan, PEIL, LGPD, and LP Displays, participated in over 100 illegal bilateral and group meetings from 1996 through 2007 in which unlawful agreements as to, inter alia, price, output restrictions, and customer and market allocation of CRT Products occurred. These included several bilateral meetings and over 100 group meetings of the types described herein. These meetings occurred in Korea, Taiwan, China, Malaysia, Scotland, the U.K., and various locations in Europe. Philips participated through Royal Philips or its subsidiaries into 2001 and participated thereafter through LGPD. Philips never effectively withdrew from this conspiracy.

**ANSWER**:     The allegations in Paragraph 164 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 164 and on that basis denies those allegations.

165. Philips America, Philips Brazil, and PCEC were represented at those meetings and were a party to the agreements entered at them. To the extent Philips America, Philips Brazil, and PCEC distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings. Thus, Philips America, Philips Brazil, and PCEC were active, knowing participants in this conspiracy.

**ANSWER**:     The allegations in Paragraph 165 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to

49

form a belief as to the truth of the allegations contained in Paragraph 165 and on that basis denies those allegations.

166. Samsung, through SEC, Samsung SDI, Samsung Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin, participated in hundreds of illegal bilateral and illegal group meetings from 1995 through at least 2006 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products (including COT Products and CPT Products) occurred. These included dozens of bilateral meetings and several hundred group meetings of the types described herein. These meetings occurred in South Korea, Taiwan, China, Malaysia, Japan, Singapore, Thailand, the United Kingdom, and various locations in Europe. Samsung never effectively withdrew from this conspiracy.

**ANSWER**:    The allegations in Paragraph 166 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 166 and on that basis denies those allegations.

167. Samsung America, SEAI Samsung SDI Brazil, and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them. To the extent Samsung America, SEAI and Samsung SDI Mexico distributed CRT Products to direct purchasers, they played a Significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings. Thus, Samsung America, SEAI, and Samsung SDI Mexico were active, knowing participants in this conspiracy.

**ANSWER**:    The allegations in Paragraph 167 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 167 and on that basis denies those allegations.

168. Samtel participated in multiple illegal bilateral meetings between 1998 and 2006 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CPT Products occurred. These meetings occurred in Malaysia. Samtel never effectively withdrew from this conspiracy.

**ANSWER**:    The allegations in Paragraph 168 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 168 and on that basis denies those allegations.

169. To the extent Tatung America distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings. Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

**ANSWER**:      TUS denies the allegations contained in Paragraph 169.

170. Thai CRT participated in over 50 illegal bilateral and group meetings between 1998 and 2006 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CPT Products occurred. These meetings occurred in Taiwan, South Korea, Thailand, Malaysia, Indonesia, Singapore, and China. Thai CRT never effectively withdrew from this conspiracy.

**ANSWER**:      The allegations in Paragraph 170 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 170 and on that basis denies those allegations.

171. Toshiba, through TC and TDDT, participated in over 50 illegal bilateral and group meetings between 1995 and 2003 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products occurred. These meetings occurred in Taiwan, Thailand, and Indonesia. Toshiba never effectively withdrew from this conspiracy.

**ANSWER**:      The allegations in Paragraph 171 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 171 and on that basis denies those allegations.

172. Toshiba America, TAIP, TACP, TACPI, and TAEP were represented at those meetings and were a party to the agreements entered at them. To the extent Toshiba America, TAIP, TACP, and TAEP distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings.  Thus, Toshiba America, TAIP, TACP, and TAEP were active, knowing participants in this conspiracy.

**ANSWER**:      The allegations in Paragraph 172 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 172 and on that basis denies those allegations.

173.  BMCC participated in at over 20 illegal bilateral group meetings between 1998 and 2001 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products (including COT Products and CPT Products) occurred. These meetings occurred in China. BMCC never effectively withdrew from this conspiracy. None of BMCC's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government; BMCC was acting to further its independent ·private interests in participating in this conspiracy.

**ANSWER**:      The allegations in Paragraph 173 are not directed at TUS and therefore no response is

required.  To the extent a response is required, TUS lacks knowledge or information sufficient to

form a belief as to the truth of the allegations contained in Paragraph 173 and on that basis denies

those allegations.

174. MTPD participated in at several dozen illegal bilateral and group meetings between 1998 and 2001 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CPT Products occurred. These meetings occurred in Malaysia, Thailand, Singapore, Taiwan, and Indonesia. MTPD never effectively withdrew from this conspiracy.

**ANSWER**:      The allegations in Paragraph 174 are not directed at TUS and therefore no response is

required.  To the extent a response is required, TUS lacks knowledge or information sufficient to

form a belief as to the truth of the allegations contained in Paragraph 174 and on that basis denies

those allegations.

175. LP Display and its predecessor entity LGPD participated in over 100 illegal bilateral and group meetings between 2001 and 2006 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products (including CDT Products and CPT Products) occurred. These meetings occurred in Taiwan, South Korea, Japan, Malaysia, Thailand, Singapore, Indonesia, and China. Neither LP Display nor LGPD ever effectively withdrew from this conspiracy.

**ANSWER**:      The allegations in Paragraph 175 are not directed at TUS and therefore no response is

required.  To the extent a response is required, TUS lacks knowledge or information sufficient to

form a belief as to the truth of the allegations contained in Paragraph 175 and on that basis denies

those allegations.

176. Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information. One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry,

including manufacturers and suppliers. Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea. EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC"). In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

**ANSWER**:     To the extent that the allegations contained in Paragraph 176 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 176 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 176 are directed to TUS, they are denied.

177. Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

**ANSWER**:     To the extent that the allegations contained in Paragraph 177 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 177 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 177 are directed to TUS, they are denied.

178. The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24,2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007. Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

**ANSWER**:     To the extent that the allegations contained in Paragraph 178 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 178 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 178 are directed to TUS, they are denied.

179. Other opportunities to collude among the Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan); the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

**ANSWER**:     To the extent that the allegations contained in Paragraph 179 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 179 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 179 are directed to TUS, they are denied.

180. Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information. This exchange of information was used to implement and monitor the conspiracy.

**ANSWER**:     To the extent that the allegations contained in Paragraph 180 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 180 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 180 are directed to TUS, they are denied.

181.   As explained above, during the Class Period. the Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

**ANSWER**:     To the extent that the allegations contained in Paragraph 181 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 181 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 181 are directed to TUS, they are denied.

182. On July 15, 2003, Mitsubishi Electric closed a CRT plant in northern Mexico, just five years after the plant was opened. The plant's closure resulted in a loss of capacity to manufacture 2.7 million CRTs a year for 17-inch computer monitors. This was one of the principal applications for CRTs during this time period.

**ANSWER**:     The allegations in Paragraph 182 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 182 and on that basis denies those allegations.

183.   In December of 2004, MTPD closed its American subsidiary's operations in Horeseheads, New York citing price and market erosion. Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business." The company further

54

stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

**ANSWER**:     The allegations in Paragraph 183 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 183 and on that basis denies those allegations.

184. In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

**ANSWER**:     The allegations in Paragraph 184 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 184 and on that basis denies those allegations.

185. In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

**ANSWER**:     The allegations in Paragraph 185 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 185 and on that basis denies those allegations.

186. In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

**ANSWER**:     The allegations in Paragraph 186 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 186 and on that basis denies those allegations.

187.  In July of 2006, Orion America shut down a CRT manufacturing plant in Princeton. Indiana. The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

**ANSWER**:      The allegations in Paragraph 187 are not directed at TUS and therefore no response is required.  To the extent a response is required, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 187 and on that basis denies those allegations.

188. Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

**ANSWER**:      To the extent that the allegations contained in Paragraph 188 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 188 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 188 are directed to TUS, they are denied.

189.  In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years ...."

**ANSWER**:      TUS lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 189 and on that basis denies those allegations.

190.  In reality, consumer prices for CRT Products never approached $50 in 1997, and were consistently more than double this price.

**ANSWER**:      TUS lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 190 and on that basis denies those allegations.

191. Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a CNET News.com article. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to conceal the conspiracy.

**ANSWER**:      To the extent that the allegations contained in Paragraph 191 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 191 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 191 are directed to TUS, they are denied.

192. Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple' scale up of production volume.

**ANSWER**:   TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 192 and on that basis denies those allegations.

193. In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

**ANSWER**:   To the extent that the allegations contained in Paragraph 193 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 193 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 193 are directed to TUS, they are denied.

194. After experiencing an oversupply of 17-inch CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

**ANSWER**:   TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 194 and on that basis denies those allegations.

195. On June 1, 2004, LG Electronics raised the prices of its 15-inch and 17-inch CRT monitors in India. This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

**ANSWER**:   TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 195 and on that basis denies those allegations.

196. Over the course of the conspiracy period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time. CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies. As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

**ANSWER**:     To the extent that the allegations contained in Paragraph 196 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 196 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 196 are directed to TUS, they are denied.

197. Indeed, CRT prices resisted downward price pressures and remained stable over a period of many years. Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy. The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**ANSWER**:     To the extent that the allegations contained in Paragraph 197 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 197 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 197 are directed to TUS, they are denied.

198. The above combination and conspiracy has had the following effects among others:

a.     Price competition in the sale of CRT Products by Defendants and their coconspirators has been restrained, suppressed and eliminated throughout the United States;

b.     Prices for CRT Products sold by Defendants has been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.     Direct purchasers of CRT Products from Defendants have been deprived of the benefit of free and open competition in the purchase of CRT Products.

**ANSWER**:     To the extent that the allegations contained in Paragraph 198 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 198 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 198 are directed to TUS, they are denied.

199. As a direct and proximate result of the unlawful conduct of Defendants. Plaintiffs and other members of the class have been injured in their business and property in that they paid more for CRT Products than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

**ANSWER**:     To the extent that the allegations contained in Paragraph 199 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 199 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 199 are directed to TUS, they are denied.

200. Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claim for relief despite diligence in trying to discover the pertinent facts. Plaintiffs and members of the Class did not discover, and could not have discovered though the exercise of reasonable diligence, the existence of the conspiracy alleged herein until November of 2007, when the governmental investigations described above became public. Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices for CRT Products.

**ANSWER**:   TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 200 and on that basis denies those allegations.  To the extent that the allegations contained in the last sentence of Paragraph 200 are directed to TUS, they are denied.

201. Because the Defendants' agreement, understanding and conspiracy was kept secret, Plaintiffs and Class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRT Products.

**ANSWER**:   To the extent that the allegations contained in Paragraph 201 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 201 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 201 are directed to TUS, they are denied.

202. The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized Glass Meetings to avoid detection, conducted bilateral meetings in secret and agreed at Glass Meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions. Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

**ANSWER**:   To the extent that the allegations contained in Paragraph 202 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 202 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 202 are directed to TUS, they are denied.

203. By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

**ANSWER**:    To the extent that the allegations contained in Paragraph 203 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 203 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 203 are directed to TUS, they are denied.

204. Plaintiffs and the Class members could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination. The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between the Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

**ANSWER**:    To the extent that the allegations contained in Paragraph 204 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 204 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 204 are directed to TUS, they are denied.

205. As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection. Participants at Glass Meetings were also told not to take minutes. Attending companies also reduced the number of their respective attendees to maintain secrecy.

**ANSWER**:    To the extent that the allegations contained in Paragraph 205 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 205 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 205 are directed to TUS, they are denied.

206. Defendants also agreed at Glass Meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

**ANSWER**:    To the extent that the allegations contained in Paragraph 206 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 206 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 206 are directed to TUS, they are denied.

207.   As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large· sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

**ANSWER**:   To the extent that the allegations contained in Paragraph 207 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 207 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 207 are directed to TUS, they are denied.

208.   As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

**ANSWER**:   To the extent that the allegations contained in Paragraph 208 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 208 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 208 are directed to TUS, they are denied.

209.   In addition, when several CRT manufacturers, including Defendants Samsung, Philips, and LG Electronics, increased the price of CRT Products in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors. In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

**ANSWER**:   To the extent that the allegations contained in Paragraph 209 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 209 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 209 are directed to TUS, they are denied.

210.   Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

**ANSWER**:   To the extent that the allegations contained in Paragraph 210 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 210 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 210 are directed to TUS, they are denied.

211. Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRT Products were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

**ANSWER**:     To the extent that the allegations contained in Paragraph 211 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 211 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 211 are directed to TUS, they are denied.

212. As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the Class members have as a result of the anticompetitive conduct alleged in this complaint.

**ANSWER**:     The allegations of Paragraph 212 contain conclusions of law to which no response is required.  To the extent that the allegations are deemed to require a response, they are denied.

## COUNT I

213. Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

**ANSWER**:     TUS hereby incorporate by reference their responses to the above allegations as set forth above.

214. From March 1, 1995, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

**ANSWER**:     To the extent that the allegations contained in Paragraph 214 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 214 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 214 are directed to TUS, they are denied.

215. In particular, Defendants have combined and conspired to raise, fix, maintain or stabilize the prices of CRT Products sold in the United States.

**ANSWER**:      To the extent that the allegations contained in Paragraph 215 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 215 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 215 are directed to TUS, they are denied.

216. As part of and in furtherance of this conspiracy, Defendants or their agents engaged in various collusive practices with respect to CRT Products.

**ANSWER**:      To the extent that the allegations contained in Paragraph 216 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 216 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 216 are directed to TUS, they are denied.

217. With respect to CRT Products, Defendants or their agents agreed, inter alia, to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, inter alia, shipments, prices. production, and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co--conspirators; (e) keep their collusive meetings secret; (1) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic markets; (h) limit competition for certain key customers; (i) allocate customers; 0) allocate each producer's share of certain key customers' sales; and (k) restrict output.

**ANSWER**:      To the extent that the allegations contained in Paragraph 217 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 217 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 217 are directed to TUS, they are denied.

218. As a result of Defendants' unlawful conduct, prices for CRT Products were raised, fixed, maintained and stabilized in the United States.

**ANSWER**:      To the extent that the allegations contained in Paragraph 218 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 218 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 218 are directed to TUS, they are denied.

219. The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their coconspirators.

**ANSWER**:    To the extent that the allegations contained in Paragraph 219 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 219 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 219 are directed to TUS, they are denied.

220. For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.    Participating in meetings and conversations to discuss and agree upon the prices and supply of CRT Products;

b.    Communicating in writing and orally to fix prices, allocate customers, and restrict output;

c.    Agreeing to manipulate prices and supply of CRT Products sold in the United States, and to allocate customers of such products, in a manner that deprived direct purchasers of free and open competition;

d.    Issuing price announcements and price quotations in accordance with the agreements reached;

e.    Selling CRT Products to customers in the United States at non-competitive prices; and

f.    Providing false statements to the public to explain increased prices for CRT Products.

**ANSWER**:    To the extent that the allegations contained in Paragraph 220 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 220 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 220 are directed to TUS, they are denied.

221. As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their businesses and property in that they have paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**ANSWER**:    To the extent that the allegations contained in Paragraph 221 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 221 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 221 are directed to TUS, they are denied.

222. During the Class Period, Plaintiffs and the other members of the Class purchased CRT Products directly from Defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of the antitrust violations herein alleged, paid more for such products than they would have paid in the absence of such antitrust violations. As a result, Plaintiffs and the other members of the Class have sustained damages to their business and property in an amount to be determined at trial.

**ANSWER**:    To the extent that the allegations contained in Paragraph 222 are directed to other defendants, TUS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 222 and on that basis denies those allegations.  To the extent that the allegations contained in Paragraph 222 are directed to TUS, they are denied.

## RESPONSE TO PRAYER FOR RELIEF AND JURY DEMAND

The paragraphs of the Complaint following the headers "Prayer for Relief" and "Jury Trial Demanded" do not require a response.  To the extent that those paragraphs require a response, TUS denies that Plaintiffs are entitled to any of the demands made in the Prayer for Relief.

## DEFENSES AND AFFIRMATIVE DEFENSES

Without conceding that it bears the burden of proof as to any of these defenses, TUS alleges the following affirmative defenses to the allegations set forth in the Complaint:

FIRST DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

SECOND DEFENSE

The claims set forth in the Complaint are barred by the statute of limitations.

THIRD DEFENSE

Plaintiffs' claims are barred because Plaintiffs have failed to state a claim for injunctive relief insofar as Plaintiffs seek to enjoin alleged events that have already transpired without the requisite showing of threatened harm or continuing harm.

FOURTH DEFENSE

The conduct alleged by Plaintiffs in the Complaint to form the basis of certain of Plaintiffs' claims has not had a direct, substantial, and reasonably foreseeable effect on trade or commerce with the United States.  The Court therefore lacks subject matter jurisdiction.

FIFTH DEFENSE

The claims of any putative direct purchaser class member who did not buy CRT tubes and/or finished products directly from defendants are barred because such putative plaintiffs are indirect purchasers.

SIXTH DEFENSE

Plaintiffs and any putative class members are barred from recovery of any damages because of and to the extent of their failure to mitigate damages.

SEVENTH DEFENSE

Plaintiffs' claims and the claims of any putative class members for damages are barred because Plaintiffs have suffered no injury or damages as a result of the matters alleged in the Complaint.

EIGHTH DEFENSE

Plaintiffs' claims and the claims of any putative class members for damages are barred because the alleged damages, if any, are speculative and because of the impossibility of ascertaining and allocating those alleged damages.

NINTH DEFENSE

Any injuries or damages Plaintiffs and any putative class members may have suffered were caused solely and proximately by the acts and omissions of others.  The acts of others constitute intervening or superseding causes of harm, if any, suffered by Plaintiffs.

TENTH DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred by the doctrines of waiver, estoppel, unclean hands, unjust enrichment and/or laches.

ELEVENTH DEFENSE

1    To the extent that any actionable conduct occurred, Plaintiffs' claims and claims of any

2  putative class members against TUS are barred because all such conduct would have been

3  committed by individuals acting *ultra vires*.

4  <u>TWELFTH DEFENSE</u>

5    Plaintiffs' claims and the claims of any putative class members against TUS are barred to the

6  extent that they have agreed to arbitration or chosen a different forum for the resolution of their

7  claims.

8  <u>THIRTEENTH DEFENSE</u>

9    Plaintiffs' claims and the claims of any putative class members are barred, in whole or in

10 part, because they cannot be maintained as a class action.

11 <u>FOURTEENTH DEFENSE</u>

12   The relief sought by Plaintiffs is barred because the named plaintiffs are not proper class

13 representatives.

14 <u>FIFTEENTH DEFENSE</u>

15   Plaintiffs' claims are barred to because Plaintiffs have not suffered actual, cognizable injury

16 of the type antitrust laws are intended to remedy.

17 <u>SIXTEENTH DEFENSE</u>

18   Plaintiffs' claims are barred, in whole or in part, because any action taken by or on behalf of

19 TUS was justified, constituted bona fide business competition and was taken in pursuit of its own

20 legitimate business and economic interests.

21 <u>SEVENTEENTH DEFENSE</u>

22   Plaintiffs' claims are barred, in whole or in part, for failure to join indispensable parties.

23 <u>EIGHTEENTH DEFENSE</u>

24   Plaintiffs' claims are barred because Plaintiffs lack standing to sue for the injuries alleged in

25 the Complaint, including without limitation, Plaintiffs' assertion of claims beyond those expressly

26 assigned to them.

27 <u>NINETEENTH DEFENSE</u>

28

Plaintiffs' claims are barred because the actions of TUS did not lessen competition in the relevant market.

TWENTIETH DEFENSE

Plaintiffs' claims are barred because any claimed injury or damage has been offset by benefits received by Plaintiffs with respect to the challenged conduct.

TWENTY-FIRST DEFENSE

Plaintiffs' claims are barred because Plaintiffs have failed to alleged fraud or fraudulent concealment with sufficient particularity.

TWENTY-SECOND DEFENSE

Plaintiffs' claims are barred because Plaintiffs did not detrimentally rely on any alleged deceptive trade conduct as alleged in the Complaint.

TWENTY-THIRD DEFENSE

Without admitting that Plaintiffs are entitled to recover damages in this matter, TUS is entitled to set off from any recovery Plaintiffs may obtain against TUS by any other Defendants who have settled, or do settle, Plaintiffs' claims in this matter.

TWENTY-FOURTH DEFENSE

Plaintiffs' claims are barred because any alleged conduct of TUS occurred outside the jurisdiction of the Court.

TWENTY- FIFTH DEFENSE

Any award of attorneys' fees, based upon the conduct alleged in the Complaint, is not allowed under applicable federal or state law.

TWENTY-SIXTH DEFENSE

Plaintiffs' claims for any foreign purchases, if any, are barred because Plaintiffs have failed to allege facts sufficient to support a claim under the Foreign Trade Antitrust Improvement Act, 15 U.S.C. §6a and/or *Hartford Fire*.

TWENTY-SEVENTH DEFENSE

1    Plaintiffs' claims for injunctive relief are barred because plaintiffs have available an adequate

2    remedy at law.

3    TWENTY-EIGHTH DEFENSE

4    Plaintiffs' claims are barred to the extent injuries alleged in the Complaint, which TUS

5    denies, were contributed to by the statements, acts, and/or omissions of Plaintiffs and/or third parties

6    or entities, other than TUS.

7    TWENTY-NINTH DEFENSE

8    TUS is a separate and autonomous company from Chunghwa PT and any of the other

9    defendants, and thus is not liable for Plaintiffs' damages resulting from their actions.

10   THIRTIETH DEFENSE

11   Plaintiffs' claims are barred to the extent their purported injuries were not caused by TUS'

12   allegedly unlawful actions.

13   THIRTY-FIRST DEFENSE

14    Plaintiffs' claims are barred to the extent their purported injuries were not proximately

15   caused by TUS' allegedly unlawful actions.

16   THIRTY-SECOND DEFENSE

17   Plaintiffs' claims are barred to the extent that they are based on conduct beyond the territorial

18   reach of the laws or courts of the United States.

19

20   **RESERVATION OF DEFENSES AND AFFIRMATIVE DEFENSES**

21   TUS adopts by reference any additional applicable defenses pleaded by any other Defendant

22   in this action.  TUS has not knowingly or intentionally waived any applicable defenses and explicitly

23   reserves the right to assert any additional defenses and affirmative defenses as this action proceeds.

24   TUS further reserves the right to amend its Answer and/or defenses accordingly, and/or to delete

25   defenses that it determines are not applicable as this action proceeds.

26

27   WHEREFORE, TUS prays as follows:

28

1        1.      That the Plaintiffs take nothing by way of the Complaint, and the action be dismissed

2   with prejudice;

3        2.      That judgment be entered in favor of TUS and against Plaintiffs with respect to all

4   causes of action in the Complaint.

5        3.      That the Court award TUS its attorneys' fees and all other costs reasonably incurred

6   in defense of this action; and

7        4.      That the Court award such other relief as it may deem just and proper.

8

9   DATED:  June 4, 2010

10                           BAKER & McKENZIE, LLP

11

12                  By      /s/ *Patrick J. Ahern*

13                           PATRICK J. AHERN

14                           Attorneys         for         Defendant
                             TATUNG COMPANY OF AMERICA, INC.

15

16      Bruce H. Jackson (State Bar No. 98118)
        Robert W. Tarun (State Bar No. 64881)

17      Baker & McKenzie, LLP
        Two Embarcadero Center, 11th Floor

18      San Francisco, CA  94111-3802
        P:  415-576-3000

19      F:  415-576-3099

20      Patrick J. Ahern (admitted *pro hac vice*)
        Roxane C. Busey (admitted *pro hac vice*)

21      Karen Sewell (admitted *pro hac vice*)

22      Baker & McKenzie, LLP
        One Prudential Plaza

23      130 E. Randolph
        Chicago, IL 60601

24      P:  312-861-8000
        F:  312-861-2899

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I, Patrick J. Ahern, certify that on June 4, 2010, a true and correct copy of the forgoing ANSWER AND AFFIRMATIVE DEFENSES OF TATUNG COMPANY OF AMERICA, INC. TO DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT was served upon all counsel of record.

/s/ *Patrick J. Ahern*
One of the Attorneys for Defendant
Tatung Company of America, Inc.

CHIDMS1/2793045.1