# EXHIBIT 4

**SAVERI & SAVERI, INC.**
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: (415) 217-6810
TELECOPIER: (415) 217-6813

*Trump Alioto Trump & Prescott*
ATTORNEYS LLP
2280 Union Street
San Francisco, California 94123
(415) 563-7200
FAX (415) 346-0679

July 12, 2010

*VIA E-MAIL AND U.S. MAIL*

Diane L. Webb
Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1596

Re: *In re Cathode Ray Tube (CRT) Antitrust Litigation*, MDL No. 1917 (N.D. Cal.),

Dear Diane:

This letter memorializes our meet and confer call on June 23, 2010 regarding Defendants Hitachi, Ltd.'s, Hitachi America, Ltd.'s, Hitachi Asia, Ltd.'s, Hitachi Displays, and Ltd.'s, Hitachi Electronic Devices (USA), Inc.'s (collectively the "Hitachi Defendants") Objections and Responses to Direct Purchaser Plaintiffs' and Indirect Purchaser Plaintiffs' Document Requests and Interrogatories.

At the outset of the call, the parties agreed that it would be most productive to address three overarching objections made by the Hitachi Defendants: (1) the Hitachi Defendants' objections to discovery of documents or information prior to November 13, 2003; (2) the Hitachi Defendants' objections to discovery of documents or information related to the marketing and sale of CRTs and CRT Products outside the United States; and (3) the Hitachi Defendants' objection to the discovery of documents or information concerning CRT Products.

As we stated during our call, Plaintiffs are prepared to work with you in good faith to address the Hitachi Defendants' burden concerns. We believe this can be done in a number of well-established ways, such as limiting the custodians whose documents must be searched or by using search terms.

Diane L. Webb
July 12, 2010
Page 2

However, the Hitachi Defendants' current objections, which place arbitrary limitations on the temporal and geographical scope *and* on the subject matter of discovery is unprecedented. Each these broad objections is based on a fundamental misunderstanding of the relevant legal standard set forth in the Federal Rules of Civil Procedure. Under Fed. R. Civ. P. 26(b) the relevant question is *not* whether the material sought is admissible or even whether it is "relevant." Rather, the question is whether this material is "reasonably calculated to lead to the discovery of admissible evidence." Rule 26(b)(1) "A request for discovery should be allowed 'unless it is clear that the information sought can have no possible bearing' on the claim or defense of a party." *In re Urethane Antitrust Litig.*, 261 F.R.D. 570, 573 (D. Kan. 2009) (citations omitted). Indeed, "in antitrust cases involving allegations of conspiracy, this liberal policy favoring discovery is particularly appropriate." *Id.* "Broad discovery is permitted [in antitrust cases] because direct evidence of an anticompetitive conspiracy is often difficult to obtain, and the existence of a conspiracy frequently can be established only through circumstantial evidence, such as business documents and other records." *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 U.S. Dist. LEXIS 29160, *8 (E.D. Pa. Oct. 29, 2004). Therefore, even if you are correct that some of the information Plaintiffs seek falls outside the strict confines of what is relevant or admissible at trial, we are nonetheless entitled to this information to the extent it is "reasonably calculated" to lead to the discovery of admissible evidence.

## I.   **The Hitachi Defendants' Time Period Objections**

The Direct and Indirect Purchaser Complaints allege a conspiracy beginning at least as early as March 1, 1995 and continuing through November 25, 2007. *See* Docket No. 436 at ¶ 1; Docket No. 716 at ¶ 1. The Court has rejected the Hitachi Defendants' claims that they withdrew from the conspiracy in 2002 and has further sustained Plaintiffs' allegations of fraudulent concealment. Following these rulings, Plaintiffs served the Hitachi Defendants with discovery, which defined the relevant time period to be January 1, 1995 to the present for all information and documents, except for transactional data for which the relevant period is from January 1, 1991 to the present. Under settled law, the temporal scope of this discovery is proper. *See e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, Civil Action No. 08-mdl-1827, Docket No. 618 (N.D. Cal. May 15, 2008) (allowing discovery for the period two years before and two years after the 11 year conspiracy period); *In re SRAM Antitrust Litig.*, Civil Action No. 07-cv-1819, Docket No. 442 (N.D. Cal. May 20, 2008) ("A reasonable discovery period for transactional SRAM data is from 11/1/95 to 12/31/07, which is two years before and two years after the dates set forth in the DOJ subpoena"); *New Park Entertainment, LLC v. Elec. Factory Concerts, Inc.*, 2000 U.S. Dist. LEXIS 531, at *10 (E.D. Pa. Jan. 13, 2000) ("The asserted scope of the conspiracy…provides the temporal boundary for discovery."); *Continental Ore v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (finding the exclusion at trial of evidence of the pre-limitations origins of a continuing conspiracy was reversible error); *Kellam Energy, Inc. v. Duncan*, 616 F. Supp. 215, 218 (D. Del. 1985) ("The cases clearly establish that the temporal scope of discovery in antitrust suits should not be confined to the limitations period of the antitrust statutes") (citing cases).

Diane L. Webb
July 12, 2010
Page 3

You stated during our meet and confer that the Hitachi Defendants have "collected significant documents and data back to 1991." Still, the Hitachi Defendants have objected to the discovery of all documents or information prior to November 13, 2003 on the basis of undue burden and have further objected to individual requests and interrogatories on the basis that "the 'Relevant Time Period' is overly broad and not relevant, rendering the request not reasonably calculated to lead to the discovery of admissible evidence as . . .claims prior to November 26, 2003, are barred by the statute of limitations."

The Hitachi Defendants' objections on the basis of the statute of limitations is directly contrary to the Court's prior ruling in this case, and is not made in good faith. Please confirm that no discovery will be withheld on the basis of this objection.

With respect to the undue burden objection, Plaintiffs requested on the call that the Hitachi Defendants identify this purported undue burden so that the parties could engage in a productive dialogue about how to minimize that burden. *See Johnson & Johnston v. R.E. Serv. Co., Inc.*, 2004 U.S. Dist. LEXIS 26973, at *5 (N.D. Cal. Nov. 2, 2004) ("Given the broad scope of discovery in federal cases, a party objecting to discovery on the basis of vagueness, overbreadth, oppression or burden must state specific facts in support of its objection."). The Hitachi Defendants, however, refused to identify or even describe in broad terms the purported burden that forms the basis for its objection other than to state at one point, paradoxically, that it would be extremely burdensome to even determine what the Hitachi Defendants' burden may be. When pressed further, the Hitachi Defendants stated that they would not discuss this burden on the call – or even describe their discovery efforts to date in broad strokes– but agreed to set forth all of that information in detail in a follow-up letter. Considering the fact that the Hitachi Defendants have been on notice of, and under an obligation to preserve documents relating to, Plaintiffs' allegations for well over two years, your claim that the Hitachi Defendants are not yet prepared to identify any details to support their undue burden objection is simply not credible.

Although there are no colorable grounds for limiting the temporal scope of discovery – and the Hitachi Defendants have certainly not identified any – Plaintiffs are willing to work with the Hitachi Defendants to minimize their purported burden to the extent possible. Thus, as we proposed on the call, once Defendants identify with specificity their purported burden – including, but not limited to, a description of how hard copy and electronic documents are stored, Defendants' back-up policy, the relevant facilities that will need to be searched, and the relevant custodians who had authority over the pricing, marketing, and sales of CRTs and CRT products throughout the time period – Plaintiffs are willing to sit down with the Hitachi Defendants and discuss ways to conduct an efficient search, including conducting searches by custodian and by use of search terms. Plaintiffs are also willing to help craft an appropriate custodian list by sharing with the Hitachi Defendants the names of specific individuals employed by one or more Hitachi entities known to Plaintiffs to have participated in meetings in furtherance of the conspiracy. The Hitachi Defendants stated on the meet and confer call that they would consider this proposal and would respond formally in a follow up letter.

Diane L. Webb
July 12, 2010
Page 4

II.  **The Hitachi Defendants' Objection to Providing Discovery Regarding CRTs and CRT Products Outside the United States**

The Direct and Indirect Purchaser Complaints, which the Court has sustained, allege that defendants, including the Hitachi Defendants, engaged in a "global conspiracy" with respect to CRTs and CRT Products and that illegal cartel meetings occurring in countries all around the world. *See, e.g.*, Docket No. 716 at ¶¶ 4, 112 (alleging a "global conspiracy") and Docket No. 436 at ¶¶ 122-133 (alleging that international antitrust authorities are investigating anticompetitive activities in the CRT and CRT Products industries); ¶¶ 134-153 (alleging that Defendants effectuated their conspiracy through meetings in Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the United Kingdom, and Europe).  Accordingly information related to conduct and sales made outside of the United States is clearly discoverable.  *See, e.g., In re EPDM Antitrust Litig.*, 681 F. Supp. 2d 141, 163 (D. Conn. 2009) (in denying defendants' motion for summary judgment, the court rejected defendants' contention that evidence of anticompetitive conduct in Europe should be excluded, finding that "the existence of a European conspiracy makes it more likely that the defendants engaged in a U.S. EPDM conspiracy"); *In re Plastic Additives Antitrust Litig.*, 2004 WL 2743591, at *14 (E.D. Pa. Nov. 29, 2004) (discovery of foreign markets can "illuminate[] defendants' motive and opportunity for the alleged conspiracy within the United States, the breadth of the conspiracy, and the manner by which defendants fraudulently concealed the conspiracy"); *In re Vitamins Antitrust Litig.*, 2001 WL 1049433, at *11 (D.D.C. June 20, 2001) (finding that foreign discovery "would be relevant to show the breadth of the conspiracy, the role that each defendants' executives played in implementing, expanding, enforcing and concealing the conspiracy, and how the conspiracy was maintained for the length of time alleged" where plaintiffs' claims were limited to U.S. injuries).

Nonetheless, the Hitachi Defendants have objected to all discovery "regarding the Hitachi Defendants' sales outside of the United States and unrelated to United States commerce, as such sales are beyond the scope of this litigation."  The Hitachi Defendants' position is undermined by the pleadings and unsupported by case law.  Moreover, when asked on the call as to how the Hitachi Defendants are distinguishing between documents and information that are unrelated to U.S. sales and commerce, and documents and information that do relate to U.S. sales and commerce, you were unwilling or unable to articulate this distinction, other than to say that your distinction was "layered and nuanced."  You further stated that you would articulate the Hitachi Defendants' position in your follow up letter and cite legal authority supporting your refusal to produce clearly relevant information.

Diane L. Webb
July 12, 2010
Page 5

### III. **The Hitachi Defendants' Objection to Providing Discovery Regarding CRT Products**

You stated that the Hitachi Defendants would provide certain transactional discovery, but refuse to produce any liability discovery, regarding CRT Products. The Court has already determined that both the Direct and Indirect Purchaser Complaints "allege conspiracies regarding both CRTs and the products into which CRTs are incorporated." Thus, there can be no question that Plaintiffs are entitled to discovery of documents and information related to both CRT Products and the conspiracy to fix prices and limit output for CRT Products.

The Hitachi Defendants incorrectly claim, however, that "any discovery as to 'CRT Products' that is not reasonably related to Plaintiffs' claims with respect to an alleged conspiracy involving CRTs is premature and overly burdensome until such time as Plaintiffs establish a reasonable basis for their claims regarding 'CRT Products' to justify the enormous burden that Plaintiffs seek to impose on [the Hitachi Defendants] by pursuing discovery as to all such products." You further stated on the call that interrogatory responses of Chunghwa Picture Tube Co., Ltd. somehow indicate that there was not a conspiracy for CRT Products, and that given Chunghwa's responses, the Hitachi Defendants should not be required to search for and produce documents related to CRT Products unless Plaintiffs produce evidence sufficient to satisfy the Hitachi Defendants that Plaintiffs can prevail on their CRT Products claims.

The Hitachi Defendants refusal to provide discovery as to CRT Products is meritless. "A party does not have to prove a prima facie case to justify a request which appears reasonably calculated to lead to the discoverable of admissible evidence." *In re Urethane Antitrust Litig.*, 261 F.R.D. 570, 573 (D. Kan. 2009) Indeed, the Federal Rules of Civil Procedure do not impose any duty on Plaintiffs to make any threshold evidentiary showing before they are entitled to discovery of evidence that is directly relevant to the well-plead allegations in the sustained complaints. Thus, notwithstanding the fact that we disagree with your characterization of the Chunghwa interrogatory responses, those responses cannot in any way affect the Hitachi Defendants' discovery obligations.

Nonetheless, consistent with Plaintiffs' proposal regarding the temporal scope of the discovery, Plaintiffs are willing to work with the Hitachi Defendants to minimize the purported burden associated with the discovery of CRT products evidence. If Hitachi identifies with specificity its purported burden with respect to this discovery – including, but not limited to, a description of how hard copy and electronic documents are stored, Defedants' back-up policy, the relevant facilities that will need to be searched, and the relevant custodians who had authority over the pricing, marketing, and sales of CRT products – Plaintiffs will sit down with the Hitachi Defendants and discuss ways to conduct an efficient search, including conducting searches by custodian and by use of search terms. If, however, the Hitachi Defendants continue to stand on their baseless objections, Plaintiffs are prepared to raise this issue with the Special Master.

Diane L. Webb
July 12, 2010
Page 6

## IV. Remaining Issues

The Hitachi Defendants have raised numerous additional General and Specific Objections to Plaintiffs' discovery request.  Please let us know when you will be prepared to address these objections on a request by request basis.

Sincerely,

*/s/ R. Alexander Saveri*
    R. Alexander Saveri
Interim Lead Counsel for the Direct Purchaser Plaintiffs


*/s/ Lauren C. Russell*
    Lauren C. Russell
Interim Lead Counsel for the Indirect Purchaser Plaintiffs


cc:    Steven F. Benz
       Jennie Anderson

Hitachi.101

# EXHIBIT 5

Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Tel: 415.442.1000
Fax: 415.442.1001
www.morganlewis.com

# Morgan Lewis
COUNSELORS AT LAW

Diane L. Webb
Partner
415.442.1353
dwebb@morganlewis.com

**VIA U.S. MAIL & E-MAIL**

August 12, 2010

R. Alexander Saveri, Esq.
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, California 94111
*Interim Lead Counsel for Direct Purchaser Plaintiffs*

Lauren C. Russell, Esq.
Trump, Alioto, Trump & Prescott LLP
2280 Union Street
San Francisco, California 94123
*Interim Lead Counsel for Indirect Purchaser Plaintiffs*

Re:     *In Re: Cathode Ray Tube (CRT) Antitrust Litigation*, No. 07-5944 SC, MDL No. 1917

Dear Counsel:

We write in response to your letter of July 12, 2010, on the subject of the June 23, 2010, meet-and-confer teleconference held among counsel for Defendants Hitachi, Ltd. ("HTC"); Hitachi Displays, Ltd. ("HDP"); Hitachi Asia, Ltd. ("HAS"); Hitachi America, Ltd. ("HAL"); and Hitachi Electronic Devices (USA), Inc. ("HED(US)") (collectively, the "Hitachi Defendants") and counsel for the Direct and Indirect Purchaser Plaintiffs ("Plaintiffs").

As discussed during the meet and confer, Plaintiffs have made a significant number of overly broad discovery requests for (1) information and documents dating back to at least 1995 (and in some cases to 1991), (2) information relating to overseas purchases, sales, and production, as well as foreign conduct regardless of whether it is in any way connected to the United States, and (3) information relating to CRTs *and* finished products containing CRTs ("CRT Finished Products"), despite our requests that you provide some support for Plaintiffs' allegations that there was a conspiracy directed at CRT Finished Products.

The Hitachi Defendants maintain that, by broadly defining each of these categories, Plaintiffs are both seeking information that is not reasonably calculated to lead to discovery of admissible

DB2/21866319.1

R. Alexander Saveri, Esq.
Lauren C. Russell, Esq.
Page 2

**Morgan Lewis**
COUNSELORS AT LAW

evidence and imposing an undue burden on the Hitachi Defendants that would far outweigh any benefit of the discovery you seek. Plaintiffs continue to assert they are entitled to engage in a global fishing expedition on the basis that the requested information might be of tangential relevance to their claims or could possibly lead to circumstantial evidence of Plaintiffs' allegations.

This is *not* the standard for conducting discovery. All discovery is subject to the limitations set forth in Rule 26 of the Federal Rules of Civil Procedure. In particular, wide-ranging discovery is *not* permitted where, as here, "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(iii); *see also id.* 26(b)(2)(B) ("A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost."); *In re ATM Fee Antitrust Litig.*, No. C04-0276 CRB, 2007 WL 1827635, at *2 (N.D. Cal. June 25, 2007) ("[T]he Court agrees with Defendants that the tremendous scope of these discovery demands are unduly burdensome. Although the discovery rules entitle Plaintiffs to seek all material 'reasonably calculated to lead to the discovery of admissible evidence,' their theoretical entitlement yields to practical considerations when 'the burden or expense of the proposed discovery outweighs its likely benefit.'") (quoting Fed. R. Civ. P. 26(b)(2)(C)(iii)); *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Bd. of Culinary Workers*, 542 F.2d 1076, 1082 (9th Cir. 1976) ("Particularly in antitrust litigation, the long drawn out process of discovery can be both harassing and expensive.").

During the meet-and-confer teleconference and in Plaintiffs' subsequent follow-up letter, you request the Hitachi Defendants identify specific burdens relating to the collection, review, and production of global information regarding CRTs and CRT products without any further time limitation. Below, we outline the significant burdens that Plaintiffs' over-reaching demands impose in the hopes that the parties ultimately will reach a reasonable compromise on the scope of discovery without the need for court intervention.

## I.    Time Period

*First*, as to the relevant time period, Plaintiffs seek discovery reaching back to at least 1995 and, in many instances, 1991. At its outermost limits, the broad timeframe proposed by Plaintiffs extends twelve years beyond the November 2003 statute of limitations. At the meet and confer, the Hitachi Defendants proposed that discovery extend to the beginning of the statute of limitations period. Without making any counterproposal, Plaintiffs rejected any compromise on this issue and claimed *any* limitation on the time period Plaintiffs selected would be inappropriate.

In recognition of the burdens associated with pre-limitations period discovery in antitrust cases, some courts have barred discovery of events occurring before the limitations period altogether.

R. Alexander Saveri, Esq.
Lauren C. Russell, Esq.
Page 3

**Morgan Lewis**
COUNSELORS AT LAW

See, e.g., American Chiropractic Ass'n v. Trigon Healthcare, 2002 U.S. Dist. LEXIS 11571, at
*2-4 (W.D. Va. June 26, 2002) (barring discovery of documents dating six years prior to the
limitations period in action claiming anti-competitive activities); In re Fertilizer Antitrust Litig.,
1979-2 Trade Cas. (CCH) ¶ 62,894, 1979 WL 1690, at *10 (E.D. Wash. 1979) (rejecting pre-
statute of limitations discovery because "the plaintiffs have not presented sufficient justification
for the burden that would be placed on the defendants and the court by extending the time frames
for discovery"); Professional Adjusting Sys. v. General Adjustment Bureau, 373 F. Supp. 1225,
1228 (S.D.N.Y. 1974).

Even courts that have permitted discovery beyond the limitations period, however, require the
purported benefits of any such discovery to be weighed against the burdens that will be imposed
on each of the Hitachi Defendants if they are forced to search for documents nearly twenty years
old. See In re ATM Fee Antitrust Litig., No. C04-0276 CRB, 2007 WL 1827635, at *2-6 (N.D.
Cal. June 25, 2007) (limiting plaintiffs' overbroad discovery requests and recognizing "the
potential for turning up a needle does not require Defendants to sift through this haystack," and
"the burden of sifting through 700 boxes and the many millions of documents contained
therein"); Carlson Cos. v. Sperry & Hutchinson Co., 374 F. Supp. 1080, 1088 (D. Minn. 1974)
(recognizing in monopolization case "when the requests approach the outer bounds of relevance
and the information requested may only marginally enhance the objectives of providing
information to the parties or narrowing issues, the Court must then weigh that request with the
hardship to the party from whom the discovery is sought. . . .").

Here, given the realities of the CRT-related businesses, Plaintiffs' discovery requests largely
seek documents created prior to the beginning of the statute of limitations period.  Indeed, none
of the Hitachi Defendants were engaged in the CRT business past 2003.  For example, HAS
stopped selling CRT tubes after 2002 and never sold CRTs into the United States.

Obviously, going back in time an additional decade would create a tremendous additional burden
in terms of searching for, processing, reviewing, and producing documents.  As an initial matter,
many such older documents are in hard copy form only, and, as a result, have been sent to
storage.  HTC alone identified approximately 52 boxes containing hard copies of older
documents that could potentially be responsive to Plaintiffs' multi-decade discovery requests.
HDP also identified approximately 52 such boxes containing hard copies of purchase orders and
other documents.  Similarly, HAS also identified approximately 40 boxes of potentially
responsive hard copy documents.  Even before a review could begin, however, the vast majority
of those documents require special copy processing at significant cost because they are printed
on delicate, oversized paper.  The copy costs alone will be considerably expensive, not including
review and production costs.

It is unreasonable and unduly burdensome for the Hitachi Defendants to search fragile,
warehoused documents for barely-legible information that is up to twenty-years-old and likely of
little or no relevance to Plaintiffs' claims.

Morgan Lewis
COUNSELORS AT LAW

R. Alexander Saveri, Esq.
Lauren C. Russell, Esq.
Page 4

Time-intensive review of hard copy documents, however, only skims the surface of the burden
imposed upon the Hitachi Defendants by Plaintiffs' fishing expedition. Indeed, collection and
review of electronically-stored information ("ESI") likewise requires significant manpower.

Again, by way of example, HTC *alone* has approximately 7-8 GB of potentially responsive data
which, depending on the electronic file types, amounts to hundreds of thousands of additional
pages of documents to review. Again, it is unreasonable to force the Hitachi Defendants to sift
through vast swaths of material in search of information that is of marginal or no relevance to
Plaintiffs' claims. The waste of such additional time and cost is further demonstrated in the case
of HAS, which never sold any products that entered the United States nor manufactured finished
products.

These burdens are *not* mitigated by Plaintiffs' proposal that the Hitachi Defendants unilaterally
supply a custodian list identifying the names of all individuals who had authority over CRT
pricing, marketing, or sales. During the meet-and-confer teleconference, Plaintiffs repeatedly
referenced the Chunghwa production as the Holy Grail of this litigation, a veritable treasure
trove of information purportedly supporting Plaintiffs' allegations. Indeed, Plaintiffs went so far
as to assert that they *already* possess a list of document custodians for the Hitachi Defendants
and that Plaintiffs would provide that list to the Hitachi Defendants. In their July 12, 2010 meet-
and-confer letter, Plaintiffs again claim they are "willing to help craft an appropriate custodian
list by sharing . . . the names of specific individuals employed by one or more Hitachi entities
known to Plaintiffs to have participated in meetings in furtherance of the conspiracy." Plaintiffs,
however, have yet to provide the Hitachi Defendants with a custodian list. If Plaintiffs produce a
list of custodians that they believe to be relevant, the Hitachi Defendants are prepared to discuss
that list with Plaintiffs in good faith to further the discovery process.

Moreover, Plaintiffs' suggested custodian-based approach does nothing to alleviate the
previously-discussed burdens and expense that would be imposed on the Hitachi Defendants
from a search for twenty-year-old documents warehoused all around the world. These burdens
*would* be mitigated by agreeing to an initial cut-off date for discovery.

## II.    Geographical Scope

*Second*, as to the applicable geographical scope, Plaintiffs contend that discovery should be
international in breadth without geographic limitation. During the meet-and-confer
teleconference, the Hitachi Defendants stated that discovery should extend only to documents
that relate to direct sales in or into the United States. Plaintiffs dismissed this proposal, arguing
that all documents around the world are relevant as "opportunity evidence" even if the
information they contain in no way relates to the United States.

Plaintiffs are not, however, entitled to discovery from around the world on the basis that such
discovery could possibly reveal circumstantial evidence of their claims. Such a broad approach
must take into account the immense logistical burdens that would make unlimited global

R. Alexander Saveri, Esq.
Lauren C. Russell, Esq.
Page 5

**Morgan Lewis**
COUNSELORS AT LAW

discovery inordinately time-consuming and costly.  *See In re ATM Fee Antitrust Litig.*, No. C04-0276 CRB, 2007 WL 1827635, at *3 (N.D. Cal. June 25, 2007) (denying production of foreign ATM transactions because "[t]he usefulness of this information . . . pales in comparison to the burden of requiring an antitrust defendant to provide any and all information about its global industry and its competitors, as opposed to the anticompetitive practice alleged. . . ."); *Rebel Oil Co. v. Atlantic Richfield Co.*, 133 F.R.D. 41, 45 (D. Nev. 1990) (limiting geographical scope when only local markets are involved).

Rather, the Hitachi Defendants propose that a document would properly fall within the scope of discovery in this matter, subject to the Hitachi Defendants' stated objections, if it refers to (1) sales of CRTs in the United States (including exports to the United States), (2) purchasers of CRTs in the United States, (3) specific models of CRTs sold in the United States, or (4) CRT business plans that refer to the United States market.  If discovery is not limited accordingly, Plaintiffs would be sending the Hitachi Defendants on a worldwide fishing expedition regardless of any relevance to the United States.

## III.    Relevant Products

*Third*, as to the relevant products, Plaintiffs seek discovery on both CRTs and CRT Finished Products (CRT-TVs and computer monitors).  Indeed, Plaintiffs make no attempt in their discovery requests to differentiate between information relating to CRTs and information relating to CRT Finished Products.  Instead, the discovery requests – regardless of the specific topic on which information is requested – calls for information and documents for both CRTs and CRT Finished Products.

In an exercise of good faith during the June 23, 2010 meet and confer, the Hitachi Defendants offered to provide the indirect purchaser plaintiffs ("IPPs") with pass-through transactional data.  Plaintiffs, however, made no concessions and continued to maintain entitlement to all CRT Finished Products discovery.

While Plaintiffs survived motions to dismiss, the recent Chunghwa discovery responses necessitate a fresh look at the allegations and whether the scope of discovery that Plaintiffs request is truly warranted.  As you know, subsequent to the allegations in Plaintiffs' complaints regarding a "finished products conspiracy," Chunghwa – upon which Plaintiffs rely so heavily – stated in its discovery responses that it was unaware of *any* CRT Finished Products conspiracy.  *See* Defendant Chunghwa Picture Tubes, Ltd.'s Responses and Objections to Defendant LG Electronics USA, Inc.'s First Set of Requests for Admission.  In light of Chunghwa's discovery responses and Plaintiffs' continual reliance on the Chunghwa grand jury production, we asked Plaintiffs to provide specific evidence, including Bates numbers of documents from the Chunghwa production, that show any Hitachi Defendant engaged in a price-fixing conspiracy with respect to CRT Finished Products.

Plaintiffs refused to comply with the Hitachi Defendants' simple request and claimed it was an

R. Alexander Saveri, Esq.
Lauren C. Russell, Esq.
Page 6

**Morgan Lewis**
COUNSELORS AT LAW

improper attempt to force Plaintiffs to make a prima facie case before obtaining discovery. Trial
courts, however, have "broad discretion" in managing discovery for the purpose of "sifting the
issues in order that the suit will go to trial only on questions involving honest disputes of fact or
law." *Delta Sys., Inc. v. TRW*, 1989 WL 41706, at *6 (9th Cir. Apr. 21, 1989) (quotations
omitted). Moreover, courts have exercised such discretion to place initial limits on discovery
pending plaintiffs' ability to make some evidentiary showing that establishes a reasonable basis
to allow further, more wide-ranging discovery to proceed. *See, e.g., Rebel Oil Co. v. Atlantic
Richfield Co.*, 133 F.R.D. 41, 45 (D. Nev. 1990) (granting responding party's motion for
protective order and deferring expansive discovery pending propounding party's threshold
showing).

Additionally, consistent with Federal Rule 11, the signatures of Plaintiffs' counsel on the
complaints in this litigation serve as representations that "the factual contentions have
evidentiary support or, if specifically so identified, will likely have evidentiary support after a
reasonable opportunity for further investigation or discovery . . . ." Fed. R. Civ. P. 11(b)(3).
Plaintiffs' refusal to provide even a scintilla of evidence supporting their CRT Finished Products
price-fixing conspiracy allegations indicates the allegations have no merit. *See* Fed. R. Civ. P.
11(c); *Battles v. City of Ft. Myers*, 127 F.3d 1298, 1300 (11th Cir. 1997) (finding attorney
subject to Rule 11 sanctions for going to trial without making sufficient investigation to ensure
he could procure evidence to support client's claims).

Accordingly, the Hitachi Defendants again reiterate their request for Bates numbers of any
documents evidencing a CRT price-fixing conspiracy by any Hitachi Defendant. It is
paradoxical that, despite Plaintiffs' aggressive invocation of the Chunghwa production in every
other context, Plaintiffs decline to offer any foundation for their CRT Finished Products
conspiracy allegations when pressed for substance. The fact that discovery is in its infancy is
irrelevant: Plaintiffs' counsel was required by law to conduct a reasonable inquiry and possess a
good faith belief that the finished products factual contentions had evidentiary support *before* the
filing of the complaints and *before* discovery ever began.

The Hitachi Defendants will not go on a global fishing expedition for CRT Finished Products
discovery without some factual basis warranting the imposition of such an enormous burden.

**IV.    Other Issues**

Plaintiffs conclude their July 12, 2010 letter by vaguely alluding to additional general and
specific objections by the Hitachi Defendants to Plaintiffs' discovery requests. The Hitachi
Defendants ask that Plaintiffs provide a detailed list identifying the disputed requests and
objections on which Plaintiffs wish to meet and confer. Once the Hitachi Defendants have been
given adequate notice of Plaintiffs' concerns, the Hitachi Defendants will be amenable to
addressing the objections on a request-by-request basis.

Additionally, as requested during the June 23, 2010 meet-and-confer teleconference, please

R. Alexander Saveri, Esq.
Lauren C. Russell, Esq.
Page 7

**Morgan Lewis**
COUNSELORS AT LAW

provide the Hitachi Defendants with an update regarding Plaintiffs' document productions in response to discovery propounded by the Hitachi Defendants on March 8, 2010.

We look forward to working with you to resolve these issues. Please let us know your thoughts on the above.

Very truly yours,

Diane L. Webb

cc:     Guido Saveri, Esq. (via e-mail)
        Mario Alioto, Esq. (via e-mail)

# EXHIBIT 6

Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Tel: 415.442.1000
Fax: 415.442.1001
www.morganlewis.com

# Morgan Lewis
COUNSELORS AT LAW

**Diane L. Webb**
Partner
415.442.1353
dwebb@morganlewis.com

## VIA U.S. MAIL & E-MAIL

August 27, 2010

R. Alexander Saveri, Esq.
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, California 94111
*Interim Lead Counsel for Direct Purchaser Plaintiffs*

Lauren C. Russell, Esq.
Trump, Alioto, Trump & Prescott LLP
2280 Union Street
San Francisco, California 94123
*Interim Lead Counsel for Indirect Purchaser Plaintiffs*

Re:     *In Re: Cathode Ray Tube (CRT) Antitrust Litigation,* No. 07-5944 SC, MDL No. 1917

Dear Rick and Lauren:

We write on behalf of defendants Hitachi, Ltd. ("HTC"); Hitachi Displays, Ltd. ("HDP");
Hitachi Asia, Ltd. ("HAS"); Hitachi America, Ltd. ("HAL"); and Hitachi Electronic Devices
(USA), Inc. ("HED(US)") (collectively, the "Hitachi Defendants") in response to two statements
made by counsel for the Direct and Indirect Purchaser Plaintiffs ("Plaintiffs") at the case
management conference ("CMC") held on August 24, 2010, in the above-referenced action.

Specifically, Plaintiffs asserted that some defendants: (1) refuse to produce *any* discovery related
to CRT Finished Products; and (2) refuse to produce documents created prior to the November
2003 statute of limitations.  Plaintiffs, however, declined to identify which defendant(s)
purportedly maintain these positions.

To the extent that Plaintiffs' counsel is referring to any of the Hitachi Defendants, which would
come as a surprise, we remind you that we continue to await a response to our detailed meet-and-
confer letter sent on August 12, 2010.  In the meantime, we write to clarify the positions of the
Hitachi Defendants in light of Plaintiffs' statements at the CMC.

DB2/21886450.2

R. Alexander Saveri, Esq.
Lauren C. Russell, Esq.
Page 2

**Morgan Lewis**
COUNSELORS AT LAW

*First*, the Hitachi Defendants have not refused to produce any discovery related to CRT Finished Products. In fact, the Hitachi Defendants previously produced transactional information related to CRT Finished Products.

*Second*, the Hitachi Defendants continue to be willing to work with Plaintiffs regarding the temporal scope of discovery. At Plaintiffs' suggestion, and in a good faith effort to make progress, we expressed our willingness to work with Plaintiffs to develop a custodian list and asked that Plaintiffs provide a proposed list of custodians. We have yet to receive a response.

We look forward to your response to this letter and to our letter of August 12, 2010.

Very truly yours,

Diane L. Webb

cc:   Guido Saveri, Esq. (via e-mail)
      Mario Alioto, Esq. (via e-mail)
      Jennie Anderson, Esq. (via e-mail)
      Steven Benz, Esq. (via e-mail)

DB2/21886450.2

# EXHIBIT 7

**SAVERI & SAVERI, INC.**
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: (415) 217-6810
TELECOPIER: (415) 217-6813

*Trump Alioto Trump & Prescott*
ATTORNEYS LLP
2280 Union Street
San Francisco, California 94123
(415) 563-7200
FAX (415) 346-0679

September 10, 2010

**VIA ELECTRONIC MAIL**

Diane L. Webb
MORGAN LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94015

Re:   *In Re: Cathode Ray Tube (CRT) Antitrust Litig.*, **MDL No. 1917**

Dear Diane:

We write in response to your letter of August 27, 2010 regarding the statements made by counsel for the Direct and Indirect Purchaser Plaintiffs ("Plaintiffs") at the August 24 Case Management Conference about certain defendants' refusal to respond to Plaintiffs' discovery requests.

Your August 27 letter completely mischaracterizes the positions taken by the Hitachi Defendants during the June 23, 2010 meet and confer and in your letter of August 12, 2010. In your August 27 letter, you state that "the Hitachi Defendants have not refused to produce any discovery related to CRT Finished Products" and cite the fact that they produced some transactional data. Ltr. from Diane Webb to R. Alexander Saveri & Lauren Russell, p.2 (Aug. 27, 2010). You also state that the Hitachi Defendants "continue to be willing to work with Plaintiffs regarding the temporal scope of discovery"; you claim that the Hitachi Defendants "expressed our willingness to work with Plaintiffs to develop a custodian list and asked that Plaintiffs provide a proposed list of custodians." *Id* . These assertions imply that you want to have an ongoing dialogue when your previously-expressed positions reflect the incontestable fact that Plaintiffs and the Hitachi defendants have reached impasses on multiple discovery issues that make any further dialogue unproductive.

In your August 12 letter, you identified three discovery areas--requests for information going back to 1995 (or in some cases, 1991); information relating to overseas production, sales and purchases; and information relating to CRT Finished Products-- that were "not reasonably calculated to lead to discovery of admissible evidence and impos[e] an undue burden on the Hitachi Defendants that would far outweigh any benefit of discovery you seek." Ltr. from Diane Webb to R. Alexander Saveri & Lauren Russell, pp.1-2 (Aug. 12, 2010).

Diane L. Webb
September 10, 2010
Page 2

With respect to the relevant time period for discovery, your position was unequivocal and intransigent. You said that with respect to hard copy documents, "[i]t is unreasonable and unduly burdensome for the Hitachi Defendants to search fragile, warehoused documents for barely-legible information that is up to twenty-years-old and likely of little or no relevance to Plaintiffs' claims" *Id.* at 2. With respect to ESI, you said "it is unreasonable to force the Hitachi Defendants to sift through vast swaths of material in search of information that is of marginal or no relevance to Plaintiffs' claims." *Id.* These are not positions that permitted for any compromise.

Your claim that you "expressed [the Hitachi Defendants'] willingness to work with Plaintiffs to develop a custodian list" is also at odds with your statements during the June 23 meet and confer and your August 12 letter, which rejected Plaintiffs' proposed custodian-based approach: "Plaintiffs' suggested custodian-based approach does nothing to alleviate the previously-discussed burdens and expense that would be imposed on the Hitachi Defendants. . . . These burdens *would* be mitigated by an initial cut-off date for discovery." *Id.* [Emphasis in original]. For the reasons stated in Plaintiffs' July 12, 2010 letter, we do not agree that a temporal limit on discovery is appropriate. Moreover, Plaintiffs offered to provide a list of custodians only *after* the Hitachi Defendants first provided, among other things, "a description of how hard copy and electronic documents are stored, Defendants' back-up policy, the relevant facilities that will need to be searched, and the relevant custodians who had authority over pricing, marketing, and sales of CRTs and CRT products throughout the time period." The Hitachi Defendants failed to provide this information. Therefore, the parties are at an impasse and this issue is ripe for Judge Legge to decide.

With respect to the geographical scope of discovery, you said "Plaintiffs are not...entitled to discovery from around the world on the basis that such discovery could reveal circumstantial evidence of their claims." *Id.* at 4. You proposed limiting discovery to four narrow categories of documents: (1) those that refer to CRT sales in the United States, (2) those that refer to CRT purchases in the United States, (3) those that refer to specific models of CRTs sold in the United States, and (4) CRT business plans that refer to the United States markets. Anything more, you said, "would be sending the Hitachi defendants on a worldwide fishing expedition regardless of any relevance to the United States." *Id.* at 5. Plaintiffs do not agree with your characterization and cannot agree to your proposed limitations. Therefore, the parties are at an impasse on this issue as well and, once again, Judge Legge needs to resolve our differences.

With respect to CRT Finished products, all you have offered to provide is some pass-through transactional data to the indirect purchaser plaintiffs. *Id.* at 5. That is insufficient; the Hitachi Defendants would be required to produce this data to the indirect plaintiffs even if a CRT-only conspiracy had been alleged. You took the further position that no further information on CRT Finished Products would be supplied by the Hitachi Defendants unless Plaintiffs first provided specific evidence that the Hitachi Defendants engaged in a price-fixing conspiracy as to such products. *Id.* at 5-6. As you put it, "[t]he

Diane L. Webb
September 10, 2010
Page 3

Hitachi Defendants will not go on a global fishing expedition for CRT Finished products
discovery without some factual basis warranting the imposition of such an enormous
burden." *Id.* at 6. For the reasons stated in Plaintiffs' July 12 letter and the July 14, 2010
to Mr. Kessler, Plaintiffs do not agree that they must make an evidentiary showing or
respond to contention discovery before Defendants are required to respond to discovery
regarding CRT Finished Products.  Therefore this issue as well is ripe for resolution by
Judge Legge.

        In short, we offered to work with you during the meet and confer on June 23,
2010 – an offer that was memorialized in our July 12 letter.  It took you a month to
respond to us and in that response, you did not provide us with the information we
requested and rejected our proposals to address the Hitachi Defendants' burden while at
the same time getting the documents and information Plaintiffs need to prove their case.

        In addition, despite the fact that Judge Conti has ordered the parties "to begin the
production of documents which they have agreed to produce by June 18, 2010" (June 3,
2010 Order, Docket No. 724 at page 3, ¶2), the Hitachi Defendants have so far produced
a grand total of 457 pages.  This is in stark contrast to some of the other defendant
groups, which have so far produced tens of thousands of pages.  Accordingly, Plaintiffs
intend to seek Judge Legge's guidance to resolve the Hitachi Defendants' three broad
discovery objections.

                        Yours sincerely,

                        *R. Alexander Saveri*_____
                        R. Alexander Saveri
                        Interim Lead Counsel for the Direct Purchaser
                        Plaintiffs

                        *Lauren C. Russell*_____
                        Lauren C. Russell
                        Interim Lead Counsel for the Indirect Purchaser
                        Plaintiffs

Hitachi.102

# EXHIBIT 8

1 | LIDIA MAHER (CSBN 222253)
BARBARA J. NELSON (CSBN 87952)
2 | JEANE M. HAMILTON (CSBN 157834)
ANNA TRYON PLETCHER (CSBN 239730)
3 | MAY LEE HEYE (CSBN 209366)
Antitrust Division
4 | U.S. Department of Justice
450 Golden Gate Avenue
5 | Box 36046, Room 10-0101
San Francisco, CA 94102
6 | Telephone: (415) 436-6660

7 | Attorneys for the United States

8

9 | UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10 | SAN FRANCISCO DIVISION                    **WHA**

11

12 | UNITED STATES OF AMERICA          )      No. **CR 09        0131**
13 |                    v.            )      INDICTMENT
14 | CHENG YUAN LIN, a.k.a. C.Y. LIN, )      VIOLATIONS:
                                      )      Title 15, United States Code,
15 |                                  )      Section 1 (Conspiracy in Restraint of Trade)
16 |                Defendant.        )      San Francisco Venue
17

18 | The Grand Jury charges:

19 | COUNT ONE: 15 U.S.C. § 1 (Conspiracy in Restraint of Trade)

20 |                                    I.

21 |                    DESCRIPTION OF THE OFFENSE

22 |        1.       CHENG YUAN LIN, a.k.a. C.Y. LIN, is hereby indicted and made a defendant on

23 | the charge stated below.

24 |        2.       Beginning at least as early as January 28, 1997, until at least as late as April 7,

25 | 2003, the exact dates being unknown to the Grand Jury, the defendant CHENG YUAN LIN and

26 | coconspirators joined, entered into, and engaged in a combination and conspiracy to suppress and

27 | eliminate competition by fixing prices, reducing output, and allocating market shares of color

28 | display tubes ("CDTs") to be sold in the United States and elsewhere. The combination and

INDICTMENT – PAGE 1

1   conspiracy engaged in by the defendant and coconspirators was in unreasonable restraint of

2   interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15

3   U.S.C. § 1).

4        3.        The charged combination and conspiracy consisted of a continuing agreement,

5   understanding, and concert of action among the defendant and coconspirators, the substantial

6   terms of which were to agree to fix prices, reduce output, and allocate market shares of CDTs to

7   be sold in the United States and elsewhere for use in computer monitors and other products with

8   similar technological requirements.

9                                            II.

10                    MEANS AND METHODS OF THE CONSPIRACY

11       4.        For the purpose of forming and carrying out the charged combination and

12  conspiracy, the defendant and coconspirators did those things that they combined and conspired

13  to do, including, among other things:

14              (a)    attended meetings and engaged in conversations and communications in

15                     Taiwan, Korea, Malaysia, China, and elsewhere to discuss the prices,

16                     output, and market shares of CDTs;

17              (b)    agreed during those meetings, conversations, and communications to

18                     charge prices of CDTs at certain target levels or ranges;

19              (c)    agreed during those meetings, conversations, and communications to

20                     reduce output of CDTs by shutting down CDT production lines for certain

21                     periods of time;

22              (d)    agreed during those meetings, conversations, and communications to

23                     allocate target market shares for the CDT market overall and for certain

24                     CDT customers;

25              (e)    exchanged CDT sales, production, market share, and pricing

26                     information for the purpose of implementing, monitoring, and enforcing

27                     adherence to the agreed-upon prices, output reduction, and market share

28                     allocation;

INDICTMENT – PAGE 2

      (f)      implemented an auditing system that permitted coconspirators to visit each other's production facilities to verify that CDT production lines had been shut down as agreed;

      (g)      authorized and approved the participation of subordinate employees in the conspiracy;

      (h)      issued price quotations and reduced output in accordance with the agreements reached; and

      (i)      took steps to conceal the conspiracy and conspiratorial contacts through various means.

III.

## DEFENDANT AND COCONSPIRATORS

5.    Defendant CHENG YUAN LIN is a resident of Taiwan, Republic of China. During the period covered by this Indictment, CHENG YUAN LIN was Chairman and Chief Executive Officer of Chunghwa Picture Tubes, Ltd. ("Chunghwa"). During the period covered by this Indictment, Chunghwa was a Taiwanese company engaged in the business of producing and selling, among other things, CDTs to customers in the United States and elsewhere.

6.    Various corporations and individuals not made defendants in Count One of this Indictment participated as coconspirators in the offenses charged in Count One of this Indictment and performed acts and made statements in furtherance of it.

7.    Whenever in this Indictment reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, employees, agents, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

IV.

## TRADE AND COMMERCE

8.    CDTs are a type of cathode ray tube. Cathode ray tubes consist of evacuated glass envelopes that contain an electron gun and a phosphorescent screen. When electrons strike the screen, light is emitted, creating an image on the screen. CDTs are the specialized cathode ray

INDICTMENT – PAGE 3

1 tubes manufactured for use in computer monitors and other products with similar technological

2 requirements.

3      9.     During the period covered by Count One of this Indictment, the defendant and

4 coconspirators sold and distributed substantial quantities of CDTs in a continuous and

5 uninterrupted flow of interstate and foreign trade and commerce to customers located in states or

6 countries other than the states or countries in which the defendant and coconspirators produced

7 CDTs. In addition, payments for CDTs traveled in interstate and foreign trade and commerce.

8      10.     During the period covered by Count One of this Indictment, the business activities

9 of the defendant and coconspirators that are the subject of Count One of this Indictment were

10 within the flow of, and substantially affected, interstate and foreign trade and commerce.

11 V.

12 JURISDICTION AND VENUE

13      11.     The combination and conspiracy charged in Count One of this Indictment was

14 carried out, in part, in the Northern District of California, within the five years preceding the filing

15 of this Indictment, excluding the period during which the running of the statute of limitations was

16 suspended pursuant to agreement with defendant CHENG YUAN LIN.

17 COUNT TWO: 15 U.S.C. § 1 (Conspiracy in Restraint of Trade)

18 VI.

19 DESCRIPTION OF THE OFFENSE

20      12.     CHENG YUAN LIN, a.k.a. C.Y. LIN, is hereby indicted and made a defendant on

21 the charge stated below.

22      13.     Beginning at least as early as March 12, 1997, until at least as late as April 7, 2003,

23 the exact dates being unknown to the Grand Jury, the defendant CHENG YUAN LIN and

24 coconspirators joined, entered into, and engaged in a combination and conspiracy to suppress and

25 eliminate competition by fixing the prices of color picture tubes ("CPTs") to be sold in the United

26 States and elsewhere. The combination and conspiracy engaged in by the defendant and

27 coconspirators was in unreasonable restraint of interstate and foreign trade and commerce in

28 violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

INDICTMENT – PAGE 4

14.     The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendant and coconspirators, the substantial terms of which were to agree to fix the prices of CPTs to be sold in the United States and elsewhere for use in television sets.

VII.

## MEANS AND METHODS OF THE CONSPIRACY

15.     For the purpose of forming and carrying out the charged combination and conspiracy, the defendant and coconspirators did those things that they combined and conspired to do, including, among other things:

  (a) attended meetings and engaged in conversations and communications in Taiwan, Korea, Malaysia, China, Thailand, Indonesia, and elsewhere to discuss the prices of CPTs;

  (b) agreed during those meetings, conversations, and communications to charge prices of CPTs at certain target levels or ranges;

  (c) exchanged CPT pricing information for the purpose of implementing, monitoring, and enforcing adherence to the agreed-upon prices;

  (d) authorized and approved the participation of subordinate employees in the conspiracy;

  (e) issued price quotations in accordance with the agreements reached; and

  (f) took steps to conceal the conspiracy and conspiratorial contacts through various means.

VIII.

## DEFENDANT AND COCONSPIRATORS

16.     Defendant CHENG YUAN LIN is a resident of Taiwan, Republic of China. During the period covered by this Indictment, CHENG YUAN LIN was Chairman and Chief Executive Officer of Chunghwa. During the period covered by this Indictment, Chunghwa was a Taiwanese company engaged in the business of producing and selling, among other things, CPTs to customers in the United States and elsewhere.

INDICTMENT – PAGE 5

1    17.    Various corporations and individuals not made defendants in Count Two of this

2  Indictment participated as coconspirators in the offenses charged in Count Two of this Indictment

3  and performed acts and made statements in furtherance of it.

4    18.    Whenever in this Indictment reference is made to any act, deed, or transaction of

5  any corporation, the allegation means that the corporation engaged in the act, deed, or transaction

6  by or through its officers, directors, employees, agents, or other representatives while they were

7  actively engaged in the management, direction, control, or transaction of its business or affairs.

8                                              IX.

9                              TRADE AND COMMERCE

10    19.    CPTs are a type of cathode ray tube.  Cathode ray tubes consist of evacuated glass

11  envelopes that contain an electron gun and a phosphorescent screen.  When electrons strike the

12  screen, light is emitted, creating an image on the screen.  CPTs are the specialized cathode ray

13  tubes manufactured for use in television sets.

14    20.    During the period covered by Count Two of this Indictment, the defendant and

15  coconspirators sold and distributed substantial quantities of CPTs in a continuous and

16  uninterrupted flow of interstate and foreign trade and commerce to customers located in states or

17  countries other than the states or countries in which the defendant and coconspirators produced

18  CPTs.  In addition, payments for CPTs traveled in interstate and foreign trade and commerce.

19    21.    During the period covered by Count Two of this Indictment, the business activities

20  of the defendant and coconspirators that are the subject of Count Two of this Indictment were

21  within the flow of, and substantially affected, interstate and foreign trade and commerce.

22                                              X.

23                              JURISDICTION AND VENUE

24    22.    The combination and conspiracy charged in Count Two of this Indictment was

25  carried out, in part, in the Northern District of California, within the five years preceding the filing

26  of this Indictment, excluding the period during which the running of the statute of limitations was

27  suspended pursuant to agreement with defendant CHENG YUAN LIN.

28  ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

INDICTMENT – PAGE 6

1   DATED:        2/10/09                    A TRUE BILL

2

3   _____             _____
    Scott D. Hammond                        FOREPERSON
4   Acting Assistant Attorney General

5

6   _____             _____
    Marc Siegel                             Phillip H. Warren
    Director of Criminal Enforcement        Chief, San Francisco Office
7

8   United States Department of Justice     _____
    Antitrust Division                      Niall E. Lynch
9                                           Assistant Chief, San Francisco Office

10

11  _____             _____
    Joseph P. Russoniello    For JPR        Lidia Maher
    United States Attorney                   Barbara J. Nelson
12  Northern District of California          Jeane M. Hamilton
                                            Anna Tryon Pletcher
13                                          May Lee Heye
                                            Attorneys
14                                          United States Department of Justice
                                            Antitrust Division
15                                          450 Golden Gate Avenue
                                            Box 36046, Room 10-0101
16                                          San Francisco, CA 94102
                                            (415) 436-6660
17

18

19

20

21

22

23

24

25

26

27

28

    INDICTMENT – PAGE 7

# EXHIBIT 9



LIDIA MAHER (CSBN 222253)
*ANNA TRYON PLETCHER (CSBN 239730)*
MAY LEE HEYE (CSBN 209366)
Antitrust Division
U.S. Department of Justice
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA  94102
Telephone: (415) 436-6660

Attorneys for the United States

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

**PJH**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | **CR 09     0836** |
| v. ) | **INDICTMENT** |
| ) | |
| WEN JUN CHENG, a.k.a. TONY CHENG ) | VIOLATION: |
| ) | Title 15, United States Code, |
| ) | Section 1 (Conspiracy in Restraint of Trade) |
| Defendant. ) | |
| | San Francisco Venue |

The Grand Jury charges that:

### I.

### DESCRIPTION OF THE OFFENSE

1.     The following individual is hereby indicted and made a defendant on the charge stated below:  WEN JUN CHENG, a.k.a. TONY CHENG.

2.     Beginning at least as early as January 1997, until at least as late as March 2006, the exact dates being unknown to the Grand Jury, coconspirators of the defendant joined, entered into, and engaged in a combination and conspiracy to suppress and eliminate competition by fixing prices, reducing output, and allocating market shares of color display tubes ("CDTs") to be sold in the United States and elsewhere.  The combination and conspiracy engaged in by the defendant and coconspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

INDICTMENT – PAGE 1

1    3.    Defendant WEN JUN CHENG joined and participated in the conspiracy from at

2  least as early as January 1999 and continuing until at least September 2004.

3    4.    The charged combination and conspiracy consisted of a continuing agreement,

4  understanding, and concert of action among the defendant and coconspirators, the substantial

5  terms of which were to agree to fix prices, reduce output, and allocate market shares of CDTs to

6  be sold in the United States and elsewhere for use in computer monitors and other products with

7  similar technological requirements.

8                                              II.

9                        MEANS AND METHODS OF THE CONSPIRACY

10    5.    For the purpose of forming and carrying out the charged combination and

11  conspiracy, the defendant and coconspirators did those things that they combined and conspired

12  to do, including, among other things:

13         (a)    attending meetings and engaging in conversations and communications in

14                Taiwan, Korea, Malaysia, China, and elsewhere to discuss the prices,

15                output, and market shares of CDTs;

16         (b)    agreeing during those meetings, conversations, and communications to

17                charge prices of CDTs at certain target levels or ranges;

18         (c)    agreeing during those meetings, conversations, and communications to

19                reduce output of CDTs by shutting down CDT production lines for certain

20                periods of time;

21         (d)    agreeing during those meetings, conversations, and communications to

22                allocate target market shares for the CDT market overall and for certain

23                CDT customers;

24         (e)    exchanging CDT sales, production, market share, and pricing

25                information for the purpose of implementing, monitoring, and enforcing

26                adherence to the agreed-upon prices, output reduction, and market share

27                allocation;

28         (f)    implementing an auditing system that permitted coconspirators to visit each

INDICTMENT – PAGE 2

1         other's production facilities to verify that CDT production lines had been

2         shut down as agreed;

3     (g)    authorizing and approving the participation of subordinate employees in the

4         conspiracy;

5     (h)    issuing price quotations and reducing output in accordance with the

6         agreements reached; and

7     (i)    taking steps to conceal the conspiracy and conspiratorial contacts through

8         various means.

9         III.

10     DEFENDANT AND COCONSPIRATORS

11     6.    Defendant WEN JUN CHENG is a resident of Taiwan, Republic of China. From

12 at least as early as January 1999 and continuing until at least September 2004, WEN JUN

13 CHENG was employed by Company A and, beginning in March 2002, was Assistant Vice

14 President of Sales and Marketing for Company A. During the period covered by this Indictment,

15 Company A was a Taiwanese company engaged in the business of producing and selling, among

16 other things, CDTs to customers in the United States and elsewhere.

17     7.    Various corporations and individuals not made defendants in this Indictment

18 participated as coconspirators in the offense charged in this Indictment and performed acts and

19 made statements in furtherance of it.

20     8.    Whenever in this Indictment reference is made to any act, deed, or transaction of

21 any corporation, the allegation means that the corporation engaged in the act, deed, or transaction

22 by or through its officers, directors, employees, agents, or other representatives while they were

23 actively engaged in the management, direction, control, or transaction of its business or affairs.

24         IV.

25     TRADE AND COMMERCE

26     9.    CDTs are a type of cathode ray tube. Cathode ray tubes consist of evacuated glass

27 envelopes that contain an electron gun and a phosphorescent screen. When electrons strike the

28 screen, light is emitted, creating an image on the screen. CDTs are the specialized cathode ray

INDICTMENT – PAGE 3

1 | tubes manufactured for use in computer monitors and other products with similar technological

2 | requirements.

3 |      10.    During the period covered by this Indictment, Company A and coconspirators sold

4 | and distributed substantial quantities of CDTs in a continuous and uninterrupted flow of interstate

5 | and foreign trade and commerce to customers located in states or countries other than the states or

6 | countries in which Company A and coconspirators produced CDTs. In addition, payments for

7 | CDTs traveled in interstate and foreign trade and commerce.

8 |      11.    During the period covered by this Indictment, the business activities of the

9 | defendant and coconspirators related to the sale and distribution of CDTs that are the subject of

10 | this Indictment were within the flow of, and substantially affected, interstate and foreign trade and

11 | commerce.

12 | V.

13 | JURISDICTION AND VENUE

14 |      12.    The combination and conspiracy charged in this Indictment was carried out, in

15 | part, in the Northern District of California, within the five years preceding the filing of this

16 | Indictment.

17 | ///

18 | ///

19 | ///

20 | ///

21 | ///

22 | ///

23 | ///

24 | ///

25 | ///

26 | ///

27 | ///

28 | ///

INDICTMENT – PAGE 4

1    ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

2    DATED:                    8/18/09                    A TRUE BILL

3

4    _____
     Christine A. Varney
5    Assistant Attorney General

6

7    _____                          _____
     Scott D. Hammond                                   Phillip H. Warren
8    Deputy Assistant Attorney General                  Chief, San Francisco Office

9

10   _____                          _____
     Marc Siegel                                        Lidia Maher
11   Director of Criminal Enforcement                   Anna Tryon Pletcher
                                                        May Lee Heye
12   United States Department of Justice                Attorneys
     Antitrust Division                                 U.S. Dept. of Justice, Antitrust Division
13                                                       450 Golden Gate Avenue
                                                        Box 36046, Room 10-0101
14   _____                          San Francisco, CA 94102
     Joseph P. Russoniello                              (415) 436-6660
15   United States Attorney
     Northern District of California

16

17

18

19

20

21

22

23

24

25

26

27

28

     INDICTMENT – PAGE 5

# EXHIBIT 10

1  LIDIA MAHER (CSBN 222253)
   MAY LEE HEYE (CSBN 209366)
2  TAI S. MILDER (CSBN 267070)
   Antitrust Division
3  U.S. Department of Justice
   450 Golden Gate Avenue
4  Box 36046, Room 10-0101
   San Francisco, CA 94102
5  Telephone: (415) 436-6660

6  Attorneys for the United States

7

8                  UNITED STATES DISTRICT COURT

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11  UNITED STATES OF AMERICA            )   No.  CR 10   0231
                                        )
12                v.                    )   INDICTMENT           JSW
                                        )
13  CHUNG CHENG YEH, a.k.a. ALEX YEH,   )
                                        )   VIOLATION:
14                                      )   Title 15, United States Code,
              Defendant.                )   Section 1 (Conspiracy in Restraint of Trade)
15                                      )
                                        )   San Francisco Venue
16  ─────────────────────────────────

17       The Grand Jury charges that:

18                              I.

19                DESCRIPTION OF THE OFFENSE

20       1.      The following individual is hereby indicted and made defendant on the charge

21  stated below: CHUNG CHENG YEH, a.k.a. ALEX YEH.

22       2.      Beginning at least as early as January 1997, until at least as late as March 2006,

23  the exact dates being unknown to the Grand Jury, coconspirators of the defendant joined, entered

24  into, and engaged in a combination and conspiracy to suppress and eliminate competition by

25  fixing prices, reducing output, and allocating market shares of color display tubes ("CDTs") to be

26  sold in the United States and elsewhere. The combination and conspiracy engaged in by the

27  defendant and coconspirators was in unreasonable restraint of interstate and foreign trade and

28  commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

INDICTMENT – PAGE 1

1       3.      Defendant CHUNG CHENG YEH joined and participated in the conspiracy from

2   at least as early as May 1999 and continuing until at least March 2005.

3       4.      The charged combination and conspiracy consisted of a continuing agreement,

4   understanding, and concert of action among the defendant and coconspirators, the substantial

5   terms of which were to agree to fix prices, reduce output, and allocate market shares of CDTs to

6   be sold in the United States and elsewhere for use in computer monitors and other products with

7   similar technological requirements.

8                         II.

9           <u>MEANS AND METHODS OF THE CONSPIRACY</u>

10      5.      For the purpose of forming and carrying out the charged combination and

11  conspiracy, the defendant and coconspirators did those things that they combined and conspired

12  to do, including, among other things:

13             (a)     attending meetings and engaging in conversations and communications in

14                     Taiwan, Korea, Malaysia, China, and elsewhere to discuss the prices,

15                     output, and market shares of CDTs;

16             (b)     agreeing during those meetings, conversations, and communications to

17                     charge prices of CDTs at certain target levels or ranges;

18             (c)     agreeing during those meetings, conversations, and communications to

19                     reduce output of CDTs by shutting down CDT production lines for certain

20                     periods of time;

21             (d)     agreeing during those meetings, conversations, and communications to

22                     allocate target market shares for the CDT market overall and for certain

23                     CDT customers;

24             (e)     exchanging CDT sales, production, market share, and pricing

25                     information for the purpose of implementing, monitoring, and enforcing

26                     adherence to the agreed-upon prices, output reduction, and market share

27                     allocation;

28             (f)     implementing an auditing system that permitted coconspirators to visit each

INDICTMENT – PAGE 2

1   other's production facilities to verify that CDT production lines had been

2   shut down as agreed;

3   (g)   authorizing and approving the participation of subordinate employees in the

4   conspiracy;

5   (h)   issuing price quotations and reducing output in accordance with the

6   agreements reached; and

7   (i)   taking steps to conceal the conspiracy and conspiratorial contacts through

8   various means.

9   III.

10   DEFENDANT AND COCONSPIRATORS

11   6.   Defendant CHUNG CHENG YEH is a resident of Taiwan, Republic of China.

12   From at least as early as May 1999 and continuing until at least March 2005, CHUNG CHENG

13   YEH was employed by Company A and, beginning in March 2002, was Director of Sales for

14   Company A.  During the period covered by this Indictment, Company A was a Taiwanese

15   company engaged in the business of producing and selling, among other things, CDTs to

16   customers in the United States and elsewhere.

17   7.   Various corporations and individuals not made defendants in this Indictment

18   participated as coconspirators in the offense charged in this Indictment and performed acts and

19   made statements in furtherance of it.

20   8.   Whenever in this Indictment reference is made to any act, deed, or transaction of

21   any corporation, the allegation means that the corporation engaged in the act, deed, or transaction

22   by or through its officers, directors, employees, agents, or other representatives while they were

23   actively engaged in the management, direction, control, or transaction of its business or affairs.

24   IV.

25   TRADE AND COMMERCE

26   9.   CDTs are a type of cathode ray tube.  Cathode ray tubes consist of evacuated glass

27   envelopes that contain an electron gun and a phosphorescent screen.  When electrons strike the

28   screen, light is emitted, creating an image on the screen.  CDTs are the specialized cathode ray

INDICTMENT – PAGE 3

1   tubes manufactured for use in computer monitors and other products with similar technological

2   requirements.

3         10.    During the period covered by this Indictment, Company A and coconspirators sold

4   and distributed substantial quantities of CDTs in a continuous and uninterrupted flow of interstate

5   and foreign trade and commerce to customers located in states or countries other than the states or

6   countries in which Company A and coconspirators produced CDTs.  In addition, payments for

7   CDTs traveled in interstate and foreign trade and commerce.

8         11.    During the period covered by this Indictment, the business activities of the

9   defendant and coconspirators related to the sale and distribution of CDTs that are the subject of

10   this Indictment were within the flow of, and substantially affected, interstate and foreign trade and

11   commerce.

12                                        V.

13                        JURISDICTION AND VENUE

14         12.    The combination and conspiracy charged in this Indictment was carried out, in

15   part, in the Northern District of California, within the five years preceding the filing of this

16   Indictment.

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

INDICTMENT – PAGE 4

1  ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

2  DATED:   30 March 2010                    A TRUE BILL

3

4  _____                   _____

5  Christine A. Varney                       FOREPERSON
   Assistant Attorney General

6                                            _____
7  _____                  Phillip H. Warren
   Scott D. Hammond                          Chief, San Francisco Office
8  Deputy Assistant Attorney General

9  _____                  _____
   Marc Siegel                               Lidia Maher
10 Director of Criminal Enforcement          May Lee Heye
                                             Tai S. Milder
11 United States Department of Justice       Attorneys
   Antitrust Division                        U.S. Dept. of Justice, Antitrust Division
12                                           450 Golden Gate Avenue
                                             Box 36046, Room 10-0101
13 _____                  San Francisco, CA 94102
   Joseph P. Russoniello                     (415) 436-6660
14 United States Attorney
   Northern District of California

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INDICTMENT – PAGE 5

# EXHIBIT 11

Hon. Fern M. Smith (Ret.)
JAMS Inc.
Two Embarcadero Center, Suite 1500
San Francisco, California 94111
(415) 774-2649
(415) 982-5267 (fax)

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

|  |  |
|---|---|
| In Re: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | Case No. M 07-1827 SI |
|  | **ORDER CLARIFYING DISCOVERY LIMITS ALLOWED UNDER COURT'S STAY ORDER, DATED SEPTEMBER 25, 2007.** |

Plaintiffs and Defendants have held various Meet and Confers as well as conferences, both telephonic and in person with the Special Master, attempting to resolve conflicting interpretations of the limits on document discovery set forth in Judge Illston's Stay Order of September 25, 2007. Because the parties, despite good faith attempts, have been unable to reach any agreement on various terms, the Special Master issues this Order further defining the disputed terms.

In summary, the following questions were at issue:

1) For what period of time must Defendants produce transactional sales data;
2) Are Defendants required to produce non-U.S. transactional sales data;
3) Do the depositions of "customers or suppliers, or their employees include people employed by subsidiaries, parents, or divisions of defendants;
4) Is the term "channels as used in Paragraph 3(c) ambiguous and must defendants produce any information other than what is specified in the Stay Order;

The Special Master has considered the briefs and arguments of all parties, as well as the authorities submitted. It should also be noted that before issuing this Order the Special Master has consulted with Judge Illston, with the permission of all parties, to ensure that this Order complies with the Court's intent. The Special Master now Orders the following:

I.    A reasonable discovery period for transactional TFT-LCD data is two years before and two years after the dates set forth in the DOJ subpoena;

II.   The weight of authority, including from the United States Supreme Court, is that Defendants should produce transactional data for TFT-LCD sales outside the U.S. for the following reasons:

   a. the information is relevant to both claims and damages;
   b. Discovery should be liberally granted in anti-trust cases;
   c. The FTAIA Domestic Injury exception applies where the conduct has a direct, substantial and reasonably foreseeable effect on domestic commerce.

III.  The term "channels is not ambiguous, but a common term used in the industry. However, Defendants are required to produce only the following: a) monthly, quarterly and yearly statistical data;  b) Identification of types of products sold by the responding Defendant (which covers finished products for Indirect Plaintiffs, only); and c) Identification of sales, marketing or distribution channels, limited to the specific information specified in Par. 3(c);

Order Clarifying Discovery Limits Allowed Under Court's Stay Order, Dated September 25, 2007.
CASE NO.  M 07-1827 SI

IV. "Customers, or suppliers or their employees is limited to independent third parties;

The Special Master is aware that the discovery period specified covers many years and that some data may no longer be reasonably accessible. If any Defendants believe that this Order subjects them to an undue burden, e.g. production of information available only on back-up tapes, etc., those Defendants may seek appropriate relief from the Special Master, e.g. altering the existing time period, cost shifting, etc. The burden of such relief will be on the requesting party.

Dated: May 15, 2008

Hon. Fern M. Smith (Ret.)
Special Master

Order Clarifying Discovery Limits Allowed Under Court's Stay Order, Dated September 25, 2007.
CASE NO. M 07-1827 SI

# EXHIBIT 12

1 Hon. Fern M. Smith (Ret.)
  JAMS
2 Two Embarcadero Center, Suite 1500
3 San Francisco, CA 94111
  Telephone: (415) 982-5267
4 Fax: (415) 982-5287

5

UNITED STATES DISTRICT COURT

6

NORTHERN DISTRICT OF CALIFORNIA

7

8  | **IN RE STATIC RANDOM ACCESS** | Master Docket File: M:07-CV-01819-CW
9  | **MEMORY (SRAM) ANTITRUST** |
   | **LITIGATION** | MDL No. 1819
10

11 **This Document Relates to:** | SRAM DISCOVERY ORDER RE:
   | LIMITS ON PRODUCTION OF
12 **ALL ACTIONS** | TRANSACTIONAL DATA

13

14

15     Plaintiffs and Defendants have recently filed a joint letter brief before the Special Master,

16 seeking clarification on the limits of transactional data that Defendants are obligated to

17 produce within the constraints of the Stay Order now in effect.

18
     In summary, three questions were at issue:
19

20     1)    For what period of time must Defendants produce transactional sales data;

21     2)    Are Defendants required to produce non-U.S. transactional sales data;

22     3)    Is it premature for Defendants to produce PSRAM transactional data

23
   The letter brief fully set forth both sides' positions, and numerous case authorities were
24
   presented on behalf of each side. Having considered the briefs and accompanying
25
   authorities, the Special Master now rules as follows:
26

27

28

I.   A reasonable discovery period for transactional SRAM data is from 11/1/95 to 12/31/07, which is two years before and two years after the dates set forth in the DOJ subpoena;

II.  The weight of authority, including from the United States Supreme Court, is that Defendants should produce transactional data for SRAM sales outside the U.S. for the following reasons:

a.   the information is relevant to both claims and damages;

b.   Discovery should be liberally granted in anti-trust cases;

c.   The FTAIA Domestic Injury exception applies where the conduct has a direct, substantial and reasonably foreseeable effect on domestic commerce.

III. Plaintiffs are premature in seeking discovery of PSRAM data, absent a finding that PSRAM does in fact qualify as SRAM, rather than DRAM.  The Special Master is aware that the discovery period specified covers 12 years and that some data may no longer be reasonably accessible. If any Defendants believe that this Order subjects them to an undue burden, e.g. production of information available only on back-up tapes, etc., those Defendants may seek appropriate relief from the Special Master, e.g. altering the existing time period, cost shifting, etc. The burden of such relief will be on the requesting party.

DATED:___May 20, 2008_____

_____
Honorable Fern M. Smith
Special Master

SRAM DISCOVERY ORDER RE: LIMITS ON PRODUCTION OF TRANSACTIONAL DATA

# EXHIBIT 13

This document is available in two formats: this web page (for browsing content) and PDF (comparable to original document formatting). To view the PDF you will need Acrobat Reader, which may be downloaded from the Adobe site. For an official signed copy, please contact the Antitrust Documents Group.

NIALL E. LYNCH (State Bar No. 157959)
MICHAEL L. SCOTT (State Bar No. 165452)
DAVID J. WARD (State Bar No. 239504)
HEATHER S. TEWKSBURY (State Bar No. 222202)
ALEXANDRA J. SHEPARD (State Bar No. 205143)
Antitrust Division
U.S. Department of Justice
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
Telephone: (415) 436-6660

Attorneys for the United States

**FILED**

**MAY 22 2009**

**RICHARD W. WIEKING
CLERK, U.S. DISTRICT
COURT
NORTHERN DISTRICT OF
CALIFORNIA**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No. CR 09-0247 SI |
| HITACHI DISPLAYS LTD., | Date Filed: 05/26/2009 |
| Defendant. | |

## PLEA AGREEMENT

The United States of America and HITACHI DISPLAYS LTD. ("defendant"), a corporation organized and existing under the laws of Japan, hereby enter into the following Plea Agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P."):

## RIGHTS OF DEFENDANT

1. The defendant understands its rights:

    a. to be represented by an attorney;

b.  to be charged by Indictment;

c.  as a corporation organized and existing under the laws of Japan to decline to accept service of the Summons in this case, and to contest the jurisdiction of the United States to prosecute this case against it in the United States District Court for the Northern District of California;

d.  to plead not guilty to any criminal charge brought against it;

e.  to have a trial by jury, at which it would be presumed not guilty of the charge and the United States would have to prove every essential element of the charged offense beyond a reasonable doubt for it to be found guilty;

f.  to confront and cross-examine witnesses against it and to subpoena witnesses in its defense at trial;

g.  to appeal its conviction if it is found guilty; and

h.  to appeal the imposition of sentence against it.

## AGREEMENT TO PLEAD GUILTY
## AND WAIVE CERTAIN RIGHTS

2. The defendant knowingly and voluntarily waives the rights set out in Paragraph 1(b)-(g) above, including all jurisdictional defenses to the prosecution of this case, and agrees voluntarily to consent to the jurisdiction of the United States to prosecute this case against it in the United States District Court for the Northern District of California. The defendant also knowingly and voluntarily waives the right to file any appeal, any collateral attack, or any other writ or motion, including but not limited to an appeal under 18 U.S.C. § 3742, that challenges the sentence imposed by the Court if that sentence is consistent with or below the recommended sentence in Paragraph 8 of this Plea Agreement, regardless of how the sentence is determined by the Court. This agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b) and (c). Nothing in this paragraph, however, shall act as a bar to the defendant perfecting any legal remedies it may otherwise have on appeal or collateral attack respecting claims of ineffective assistance of counsel or prosecutorial misconduct. Pursuant to Fed. R. Crim. P. 7(b), the defendant will waive indictment and plead guilty at arraignment to a one-count Information to be filed in the United States District Court for the Northern District of California. The Information will charge the defendant with participating in a conspiracy to suppress and eliminate competition by fixing the prices of thin-film transistor liquid crystal display panels ("TFT-LCD") sold to Dell Inc. or its subsidiaries ("Dell") for use in desktop monitors and notebook computers, from on or about April 1, 2001 to on or about March 31, 2004, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

3. The defendant, pursuant to the terms of this Plea Agreement, will plead guilty to the criminal charge described in Paragraph 2 above and will make a factual admission of guilt to the Court in accordance with Fed. R. Crim. P. 11, as set forth in Paragraph 4 below.

## FACTUAL BASIS FOR OFFENSE CHARGED

4. Had this case gone to trial, the United States would have presented evidence sufficient to prove the following facts:

    a. For purposes of this Plea Agreement, the "relevant period" is that period from on or about April 1, 2001 to on or about March 31, 2004. During the relevant period, Hitachi Displays Ltd. ("Hitachi") was a corporation organized and existing under the laws of Japan. Prior to 2002, the defendant was a division of Hitachi Ltd. The defendant has its headquarters and principal place of business in Chiba, Japan. During the relevant period, the defendant was a producer of TFT-LCD, was engaged in the sale of TFT-LCD in the United States and elsewhere, and employed between 1,000 and 5,000 individuals.

    b. TFT-LCD are glass panels composed of an array of tiny pixels that are electronically manipulated in order to display images. TFT-LCD are manufactured in a broad range of sizes and specifications for use in televisions, notebook computers, desktop monitors, mobile devices, and other applications.

    c. From on or about April 1, 2001 to on or about March 31, 2004, the defendant, through its officers and employees, participated in a conspiracy with other major TFT-LCD producers, the primary purpose of which was to fix the price of TFT-LCD sold to Dell for use in notebook computers. In furtherance of the conspiracy, the defendant, through its officers and employees, engaged in telephone discussions and attended bilateral meetings with representatives of other major TFT-LCD producers. During these discussions and meetings, agreements were reached to fix the price of TFT-LCD sold to Dell for use in notebook computers.

    d. During the relevant period, TFT-LCD sold by one or more of the conspirator firms, and equipment and supplies necessary to the production and distribution of TFT-LCD, as well as payments for TFT-LCD, traveled in interstate and foreign trade and commerce. The business activities of the defendant and its coconspirators in connection with the production and sale of TFT-LCD affected by this conspiracy were within the flow of, and substantially affected, interstate and foreign trade and commerce.

    e. Acts in furtherance of this conspiracy were carried out within the Northern District of California. TFT-LCD affected by this conspiracy were sold by one or more of the conspirators to customers in this District.

## POSSIBLE MAXIMUM SENTENCE

5. The defendant understands that the statutory maximum penalty that may be imposed against it upon conviction for a violation of Section One of the Sherman Antitrust Act is a fine in an amount equal to the greatest of:

    a. $10 million (15 U.S.C. § 1);

    b. twice the gross pecuniary gain the conspirators derived from the crime (18 U.S.C. § 3571(c) and (d)); or

    c. twice the gross pecuniary loss caused to the victims of the crime by the conspirators

(18 U.S.C. § 3571(c) and (d)).

6. In addition, the defendant understands that:

    a.  pursuant to 18 U.S.C. § 3561(c)(1), the Court may impose a term of probation of at least one year, but not more than five years;

    b.  pursuant to § 8B1.1 of the United States Sentencing Guidelines ("U.S.S.G.," "Sentencing Guidelines," or "Guidelines") or 18 U.S.C. § 3563(b)(2) or 3663(a)(3), the Court may order it to pay restitution to the victims of the offense; and

    c.  pursuant to 18 U.S.C. § 3013(a)(2)(B), the Court is required to order the defendant to pay a $400 special assessment upon conviction for the charged crime.

## SENTENCING GUIDELINES

7. The defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in effect on the day of sentencing, along with the other factors set forth in 18 U.S.C. § 3553(a), in determining and imposing sentence. The defendant understands that the Guidelines determinations will be made by the Court by a preponderance-of-the-evidence standard. The defendant understands that although the Court is not ultimately bound to impose a sentence within the applicable Guidelines range, its sentence must be reasonable based upon consideration of all relevant sentencing factors set forth in 18 U.S.C. § 3553(a). Under U.S.S.G. § 1B1.8, the United States agrees that self-incriminating information that the defendant provides to the United States under this Plea Agreement will not be used to increase the volume of affected commerce attributable to the defendant or in determining the defendant's applicable Guidelines range, except to the extent provided in U.S.S.G. § 1B1.8(b).

## SENTENCING AGREEMENT

8. Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the defendant agree that the appropriate disposition of this case is, and agree to recommend jointly that the Court impose, a sentence requiring the defendant to pay to the United States a criminal fine of $31 million, pursuant to 18 U.S.C. § 3571(d) ("the recommended sentence"), payable in full before the fifteenth (15th) day after the date of judgment. The parties agree that there exists no aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the U.S. Sentencing Commission in formulating the Sentencing Guidelines justifying a departure pursuant to U.S.S.G. § 5K2.0. The parties agree not to seek or support any sentence outside of the Guidelines range nor any Guidelines adjustment for any reason that is not set forth in this Plea Agreement. The parties further agree that the recommended sentence set forth in this Plea Agreement is reasonable.

    a.  The defendant understands that the Court will order it to pay a $400 special assessment, pursuant to 18 U.S.C. § 3013(a)(2)(B), in addition to any fine imposed.

    b.  Both parties will recommend that no term of probation be imposed, but the defendant understands that the Court's denial of this request will not void this Plea Agreement.

    c.   The United States and the defendant jointly submit that this Plea Agreement, together with the record that will be created by the United States and the defendant at the plea and sentencing hearings, and the further disclosure described in Paragraph 10, will provide sufficient information concerning the defendant, the crime charged in this case, and the defendant's role in the crime to enable the meaningful exercise of sentencing authority by the Court under 18 U.S.C. § 3553. The United States and the defendant agree to request jointly that the Court accept the defendant's guilty plea and impose sentence on an expedited schedule as early as the date of arraignment, based upon the record provided by the defendant and the United States, under the provisions of Fed. R. Crim. P. 32(c)(1)(A)(ii), U.S.S.G. § 6A1.1, and Rule 32-1(b) of the U.S.D.C. N.D. California Criminal Local Rules. The Court's denial of the request to impose sentence on an expedited schedule will not void this Plea Agreement.

9. The United States and the defendant agree that the applicable Guidelines fine range exceeds the fine contained in the recommended sentence set out in Paragraph 8 above. Subject to the full and continuing cooperation of the defendant, as described in Paragraph 13 of this Plea Agreement, and prior to sentencing in this case, the United States agrees that it will make a motion, pursuant to U.S.S.G. § 8C4.1, for a downward departure from the Guidelines fine range and will request that the Court impose the recommended sentence set out in Paragraph 8 of this Plea Agreement because of the defendant's substantial assistance in the government's investigation and prosecutions of violations of federal criminal law in the TFT-LCD industry.

10. Subject to the ongoing, full, and truthful cooperation of the defendant described in Paragraph 13 of this Plea Agreement, and before sentencing in the case, the United States will fully advise the Court and the Probation Office of the fact, manner, and extent of the defendant's cooperation and its commitment to prospective cooperation with the United States' investigation and prosecutions, all material facts relating to the defendant's involvement in the charged offense, and all other relevant conduct.

11. The United States and the defendant understand that the Court retains complete discretion to accept or reject the recommended sentence provided for in Paragraph 8 of this Plea Agreement.

    a.   If the Court does not accept the recommended sentence, the United States and the defendant agree that this Plea Agreement, except for Paragraph 11(b) below, shall be rendered void.

    b.   If the Court does not accept the recommended sentence, the defendant will be free to withdraw its guilty plea (Fed. R. Crim. P. 11(c)(5) and (d)). If the defendant withdraws its plea of guilty, this Plea Agreement, the guilty plea, and any statement made in the course of any proceedings under Fed. R. Crim. P. 11 regarding the guilty plea or this Plea Agreement or made in the course of plea discussions with an attorney for the government shall not be admissible against the defendant in any criminal or civil proceeding, except as otherwise provided in Fed. R. Evid. 410. In addition, the defendant agrees that, if it withdraws its guilty plea pursuant to this subparagraph of the Plea Agreement, the statute of limitations period for any offense referred to in Paragraph 15 of this Plea Agreement will be tolled for the period between the date of the signing of the Plea Agreement and the date the

defendant withdrew its guilty plea or for a period of sixty (60) days after the date of the signing of the Plea Agreement, whichever period is greater.

12. In light of the civil class action cases filed against the defendant, including *In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. M:07-1827 SI, MDL No. 1827, in the United States District Court, Northern District of California, which potentially provide for a recovery of a multiple of actual damages, the United States agrees that it will not seek a restitution order for the offense charged in the Information.

## DEFENDANT'S COOPERATION

13. The defendant, Hitachi Displays Ltd., Hitachi Ltd., and any Hitachi Ltd. subsidiary engaged in the sale or production of TFT-LCD (collectively, "related entities") will cooperate fully and truthfully with the United States in the prosecution of this case, the conduct of the current federal investigation of violations of federal antitrust and related criminal laws involving the manufacture or sale of TFT-LCD in the United States and elsewhere, and any litigation or other proceedings arising or resulting from any such investigation to which the United States is a party ("Federal Proceeding"). The ongoing, full, and truthful cooperation of the defendant shall include, but not be limited to:

   a. producing to the United States all non-privileged documents, information, and other materials, wherever located, in the possession, custody, or control of the defendant or any of its related entities, requested by the United States in connection with any Federal Proceeding; and

   b. using its best efforts to secure the ongoing, full, and truthful cooperation, as defined in Paragraph 14 of this Plea Agreement, of the current and former directors, officers, and employees of the defendant or any of its related entities, as may be requested by the United States  but excluding Hajime Wakabayashi and Sakae Someya  including making these persons available in the United States and at other mutually agreed-upon locations, at the defendant's expense, for interviews and the provision of testimony in grand jury, trial, and other judicial proceedings in connection with any Federal Proceeding.

14. The ongoing, full, and truthful cooperation of each person described in Paragraph 13 (b) above will be subject to the procedures and protections of this paragraph, and shall include, but not be limited to:

   a. producing in the United States and at other mutually agreed-upon locations all non-privileged documents, including claimed personal documents, and other materials, wherever located, requested by attorneys and agents of the United States;

   b. making himself or herself available for interviews in the United States and at other mutually agreed-upon locations, not at the expense of the United States, upon the request of attorneys and agents of the United States;

   c. responding fully and truthfully to all inquiries of the United States in connection with any Federal Proceeding, without falsely implicating any person or intentionally withholding any information, subject to the penalties of making false statements (18 U.S.C. § 1001) and obstruction of justice (18 U.S.C. § 1503, *et seq.*);

   d.  otherwise voluntarily providing the United States with any non-privileged material
       or information not requested in (a) - (c) of this paragraph that he or she may have
       that is related to any Federal Proceeding;

   e.  when called upon to do so by the United States in connection with any Federal
       Proceeding, testifying in grand jury, trial, and other judicial proceedings in the
       United States fully, truthfully, and under oath, subject to the penalties of perjury (18
       U.S.C. § 1621), making false statements or declarations in grand jury or court
       proceedings (18 U.S.C. § 1623), contempt (18 U.S.C. §§ 401-402), and obstruction
       of justice (18 U.S.C. § 1503, et seq.); and

   f.  agreeing that, if the agreement not to prosecute him or her in this Plea Agreement is
       rendered void under Paragraph 16(c), the statute of limitations period for any
       Relevant Offense as defined in Paragraph 16(a) will be tolled as to him or her for
       the period between the date of the signing of this Plea Agreement and six (6)
       months after the date that the United States gave notice of its intent to void its
       obligations to that person under the Plea Agreement.

### GOVERNMENT'S AGREEMENT

15. Upon acceptance of the guilty plea called for by this Plea Agreement and the
imposition of the recommended sentence, and subject to the cooperation requirements of
Paragraph 13 of this Plea Agreement, the United States agrees that it will not bring further
criminal charges against the defendant or any of its related entities for any act or offense
committed before the date of this Plea Agreement that was undertaken in furtherance of
an antitrust conspiracy involving the manufacture or sale of TFT-LCD in the United
States and elsewhere. The nonprosecution terms of this paragraph do not apply to civil
matters of any kind, to any violation of the federal tax or securities laws, or to any crime
of violence.

16. The United States agrees to the following:

   a.  Upon the Court's acceptance of the guilty plea called for by this Plea Agreement
       and the imposition of the recommended sentence and subject to the exceptions
       noted in Paragraph 16(c), the United States will not bring criminal charges against
       any current or former director, officer, or employee of the defendant or its related
       entities for any act or offense committed before the date of this Plea Agreement and
       while that person was acting as a director, officer, or employee of the defendant or
       its related entities that was undertaken in furtherance of an antitrust conspiracy
       involving the manufacture or sale of TFT-LCD in the United States and elsewhere
       ("Relevant Offense"), except that the protections granted in this paragraph shall not
       apply to Hajime Wakabayashi and Sakae Someya.

   b.  Should the United States determine that any current or former director, officer, or
       employee of the defendant or its related entities may have information relevant to
       any Federal Proceeding, the United States may request that person's cooperation
       under the terms of this Plea Agreement by written request delivered to counsel for
       the individual (with a copy to the undersigned counsel for the defendant) or, if the
       individual is not known by the United States to be represented, to the undersigned
       counsel for the defendant.

c. If any person requested to provide cooperation under Paragraph 16(b) fails to comply with his or her obligations under Paragraph 14, then the terms of this Plea Agreement as they pertain to that person, and the agreement not to prosecute that person granted in this Plea Agreement, shall be rendered void.

d. Except as provided in Paragraph 16(e), information provided by a person described in Paragraph 16(b) to the United States under the terms of this Plea Agreement pertaining to any Relevant Offense, or any information directly or indirectly derived from that information, may not be used against that person in a criminal case, except in a prosecution for perjury (18 U.S.C. § 1621), making a false statement or declaration (18 U.S.C. §§ 1001, 1623), or obstruction of justice (18 U.S.C. § 1503, *et seq.*).

e. If any person who provides information to the United States under this Plea Agreement fails to comply fully with his or her obligations under Paragraph 14 of this Plea Agreement, the agreement in Paragraph 16(d) not to use that information or any information directly or indirectly derived from it against that person in a criminal case shall be rendered void.

f. The nonprosecution terms of this paragraph do not apply to civil matters of any kind, to any violation of the federal tax or securities laws, or to any crime of violence.

g. Documents provided under Paragraphs 13(a) and 14(a) shall be deemed responsive to outstanding grand jury subpoenas issued to the defendant or any of its related entities.

17. The United States agrees that when any person travels to the United States for interviews, grand jury appearances, or court appearances pursuant to this Plea Agreement, or for meetings with counsel in preparation therefor, the United States will take no action, based upon any Relevant Offense, to subject such person to arrest, detention, or service of process, or to prevent such person from departing the United States. This paragraph does not apply to an individual's commission of perjury (18 U.S.C. § 1621), making false statements (18 U.S.C. § 1001), making false statements or declarations in grand jury or court proceedings (18 U.S.C. § 1623), obstruction of justice (18 U.S.C. § 1503, *et seq.*), or contempt (18 U.S.C. §§ 401-402) in connection with any testimony or information provided or requested in any Federal Proceeding.

18. The defendant understands that it may be subject to administrative action by federal or state agencies other than the United States Department of Justice, Antitrust Division, based upon the conviction resulting from this Plea Agreement, and that this Plea Agreement in no way controls whatever action, if any, other agencies may take. However, the United States agrees that, if requested, it will advise the appropriate officials of any governmental agency considering such administrative action of the fact, manner, and extent of the cooperation of the defendant and its related entities as a matter for that agency to consider before determining what administrative action, if any, to take.

## REPRESENTATION BY COUNSEL

19. The defendant has been represented by counsel and is fully satisfied that its attorneys

have provided competent legal representation. The defendant has thoroughly reviewed this Plea Agreement and acknowledges that counsel has advised it of the nature of the charge, any possible defenses to the charge, and the nature and range of possible sentences.

## VOLUNTARY PLEA

20. The defendant's decision to enter into this Plea Agreement and to tender a plea of guilty is freely and voluntarily made and is not the result of force, threats, assurances, promises, or representations other than the representations contained in this Plea Agreement. The United States has made no promises or representations to the defendant as to whether the Court will accept or reject the recommendations contained within this Plea Agreement.

## VIOLATION OF PLEA AGREEMENT

21. The defendant agrees that, should the United States determine in good faith, during the period that any Federal Proceeding is pending, that the defendant or any of its related entities have failed to provide full and truthful cooperation, as described in Paragraph 13 of this Plea Agreement, or has otherwise violated any provision of this Plea Agreement, the United States will notify counsel for the defendant in writing by personal or overnight delivery or facsimile transmission, and may also notify counsel by telephone, of its intention to void any of its obligations under this Plea Agreement (except its obligations under this paragraph), and the defendant and its related entities shall be subject to prosecution for any federal crime of which the United States has knowledge, including, but not limited to, the substantive offenses relating to the investigation resulting in this Plea Agreement. The defendant may seek Court review of any determination made by the United States under this Paragraph to void any of its obligations under the Plea Agreement. The defendant and its related entities agree that, in the event that the United States is released from its obligations under this Plea Agreement and brings criminal charges against the defendant or its related entities for any offense referred to in Paragraph 15 of this Plea Agreement, the statute of limitations period for such offense will be tolled for the period between the date of the signing of this Plea Agreement and six (6) months after the date the United States gave notice of its intent to void its obligations under this Plea Agreement.

22. The defendant understands and agrees that in any further prosecution of it or its related entities resulting from the release of the United States from its obligations under this Plea Agreement, because of the defendant's or its related entities' violation of the Plea Agreement, any documents, statements, information, testimony, or evidence provided by it or its related entities, or current or former directors, officers, or employees of it or its related entities to attorneys or agents of the United States, federal grand juries, or courts, and any leads derived therefrom, may be used against it or its related entities in any such further prosecution. In addition, the defendant unconditionally waives its right to challenge the use of such evidence in any such further prosecution, notwithstanding the protections of Fed. R. Evid. 410.

## ENTIRETY OF AGREEMENT

23. This Plea Agreement constitutes the entire agreement between the United States and

the defendant concerning the disposition of the criminal charge in this case. This Plea Agreement cannot be modified except in writing, signed by the United States and the defendant.

24. The undersigned is authorized to enter this Plea Agreement on behalf of the defendant as evidenced by the Resolution of the Board of Directors of the defendant, attached to, and incorporated by reference in, this Plea Agreement.

25. The undersigned attorneys for the United States have been authorized by the Attorney General of the United States to enter this Plea Agreement on behalf of the United States.

26. A facsimile signature shall be deemed an original signature for the purpose of executing this Plea Agreement. Multiple signature pages are authorized for the purpose of executing this Plea Agreement.

AGREED

BY: _____/s/_____      BY: _____/s/_____
Yoshiyuki Imoto                 Niall E. Lynch, CA No. 157959
President and Chief Executive Officer   Michael L. Scott, CA No. 165452
Hitachi Displays Ltd.           David J. Ward, CA No. 239504
3300, Hayano, Mobara-shi        Heather S. Tewksbury, CA No. 222202
Chiba-ken, 297-8622, Japan      Alexandra J. Shepard, CA No. 205143
                                Trial Attorneys
DATED: March 5, 2009            U.S. Department of Justice
                                Antitrust Division
BY: _____/s/_____       450 Golden Gate Avenue
John H. Hemann                  Box 36046, Room 10-0101
Lisa Tenorio-Kutzkey            San Francisco, CA 94102
Rebecca A. Falk                 Tel: (415) 436-6660
Courtney L. Landis              Fax: (415) 436-6687
Michelle M. Kim
Morgan Lewis & Bockius LLP      DATED: May 22, 2009
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Tel: (415) 442-1000
Fax: (415) 442-1001

Counsel for Hitachi Displays Ltd.

DATED: May 22, 2009