**SAVERI & SAVERI, INC.**
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: (415) 217-6810
TELECOPIER: (415) 217-6813

*Trump Alioto Trump & Prescott*
ATTORNEYS LLP
2280 Union Street
San Francisco, California 94123
(415) 563-7200
FAX (415) 346-0679

September 10, 2010

Honorable Charles A. Legge
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111

Re:     *In Re: Cathode Ray Tube (CRT) Antitrust Litigation,* MDL 1917 (N.D.
          Cal.)--Letter Brief On Motion To Compel Discovery of Foreign
          Conduct And Pricing

Your Honor:

Pursuant to the procedure set forth at the August 24, 2010 status conference regarding discovery, and in the Special Master's "Report Regarding Case Management Conference No. 2" (Sept. 8, 2010) (Dkt. No. 754), Direct Purchaser Plaintiffs ("DPPs") and Indirect Purchaser Plaintiffs ("IPPs") (collectively "Plaintiffs") respectfully submit this letter brief motion to compel against Hitachi, Ltd., Hitachi Displays, Ltd., Hitachi Asia, Ltd., Hitachi Electronic Devices (USA), Inc. and Hitachi America, Inc. (collectively the "Hitachi Defendants" or "Hitachi") with respect to their refusal to respond to discovery concerning  foreign anticompetitive activities and sales data. On that issue, Plaintiffs and the Hitachi Defendants have reached an impasse in their negotiations.  This is one of three separate motions to compel that Plaintiffs are filing against Hitachi. The other two relate to the separate issues of discovery of information antedating November of 2003 and discovery with respect to products containing cathode ray tubes ("CRTs"), such as monitors and televisions ("CRT Products").  Each of those other motions will be addressed in separate letter briefs because they are conceptually distinct and involve different arguments.  Plaintiffs have striven not to engage in duplication in these separate motions. All three are supported by the accompanying "Declaration of R. Alexander Saveri" ("Saveri Decl.").

**I.     Factual Background**

Plaintiffs' complaints allege a "global conspiracy" to fix the price of CRTs and CRT products beginning in March 1, 1995 and continuing to November 25, 2007. *See* "Direct Purchaser Plaintiffs' Consolidated Amended Complaint," ¶¶ 1, 122-154 (March 16, 2009) ("DP-CAC") (Dkt. No. 436) (alleging that international antitrust authorities are investigating anticompetitive activities in the CRT and CRT Products industries and that Defendants effectuated their conspiracy through meetings in Taiwan, South Korea,

Hon. Charles Legge
September 10, 2010
Page 2

Indonesia, Thailand, Singapore, Malaysia, China, the United Kingdom, and Europe); "Indirect Purchaser Plaintiffs' Second Consolidated Amended Complaint," ¶¶ 1, 4, 112 (May 10, 2010) (Dkt. No. 716) ("IP-CAC") (alleging a "global conspiracy"). The complaints allege that the Hitachi defendants attended at least fifteen meetings in China and Taiwan at which defendant Chunghwa Picture Tubes ("Chunghwa") was also in attendance. DP-CAC ¶¶ 157-58. *See* IP-CAC ¶174. As a result, Plaintiffs paid artificially inflated prices for CRTs and CRT Products.  *See* IP-CAC ¶¶ 1-3, 12, 217-218, 234); DP-CAC ¶¶ 139, 193, 197-199, 201, 207-208.

Relying on the Foreign Trade and Antitrust Improvements Act of 1982 (15 U.S.C. §6a ("FTAIA")), Hitachi objects that "discovery of documents regarding the Responding Party's sales outside of the United States" are "unrelated to United States commerce" and, therefore, "beyond the scope of this litigation."  *See, e.g.*, Hitachi, Ltd. General Objection No. 14 (Saveri Decl., Ex. 2).  Without citation to authority, Hitachi argues that discovery outside the United States should therefore be limited to documents that "refer" to "(a) sales of CRTs in the United States, including exports; (b) purchasers of CRTs in the United States; (c) specific models of CRTs sold in the United States; or (d) CRT business plans that refer to the United States market."  *See* August 12, 2010 Letter from Diane Webb at 5 ("Webb Ltr.") (Saveri Decl., Ex. 5).

## II.    Argument

Hitachi's argument fails for several reasons. First, nothing in the FTAIA or the cases interpreting it suggests that the statute precludes *discovery* of information relating to foreign commerce.  *Second*, such discovery is highly relevant to the existence and scope of the conspiracy, and to Plaintiffs' claims that foreign conduct resulted in artificially high prices in the United States.  Third, the geographic limitations Hitachi suggests are impermissibly narrow and will exclude highly relevant documents from production. *Finally*, Hitachi has failed to articulate any undue burden whatsoever, let alone one that would outweigh the clear relevance of the foreign discovery Plaintiffs seek.

### A.    The FTAIA Does Not Preclude Discovery Of Documents And Information Relating To Foreign Commerce

While the FTAIA limits claims under the Sherman Act to injuries with a nexus to the United States, "*nothing* in the FTAIA or *Empagran precludes discovery* of documents or information related to foreign commerce that are relevant to antitrust claims alleging a domestic injury." *In re Urethane Antitrust Litig.*, 261 F.R.D. 570, 575 (D. Kan. 2009), citing *F. Hoffmann-La Roche Ltd. v. Empagran S.A.* ("*Empagran*"), 542 U.S. 155 (2004) (emphases added). Indeed, every court to consider the statute's impact on discovery has held that the FTAIA does not limit foreign discovery to the extent it is otherwise relevant to the claims asserted.  For example, in *In re Intel Corp. Microprocessor Antitrust Litig.*, No. 05-1717, 2007 WL 137152, at *11-12 (D. Del. Jan. 12, 2007) ("*Intel*"), the court conducted a thorough review of the legislative history of the FTAIA and found that "the FTAIA does

Hon. Charles Legge
September 10, 2010
Page 3

not prohibit the discovery of information that is otherwise discoverable."  Similarly, the court in *In re Aspartame Antitrust Litig.,* Case No. 2:06-CV-1732 LDD, 2008 WL 2275531, at *2 (E.D. Pa. May 13, 2008) ("*Aspartame*") rejected the defendants' attempts to limit discovery of their foreign anticompetitive behavior based on the FTAIA and *Empagran*: "[t]hough the Supreme Court's decision in *Empagran* clearly places limits on the types of antitrust claims that can be brought under the Sherman Act, this decision does not preclude all foreign discovery in connection with establishing domestic antitrust violations." *See also In re Chocolate Confectionary Antitrust Litig.*, 602 F.Supp.2d 538, 576 n. 44 (M.D. Pa. 2009) (noting that the FTAIA does not foreclose inquiry into a defendant's foreign conduct that is relevant to domestic claims); *In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 U.S. Dist. LEXIS 29160 at *8 (E.D. Pa. Oct. 29, 2004) ("*Auto Paint*") (noting *Empagran* and ordering discovery of information concerning foreign manufacturing, sales, and distribution). Thus, contrary to Hitachi's claims, the FTAIA does not provide a legal basis for them to withhold discovery into their foreign anticompetitive activities.

        The related *TFT-LCD* class action litigation provides a pertinent example. There, since the stay requested by the United States department of Justice ("DOJ"), both merits and (as discussed further below) transactional discovery related to conduct occurring outside the United States has been ongoing for many months. Hitachi Displays, Ltd. ("HDL") (in addition to Hitachi, Ltd., Hitachi America, Ltd. and Hitachi Electronic Devices (USA), Inc.) is one of the defendants in this case and is represented by the same counsel in both the TFT-LCDs and CRTs class actions. In March of 2009, HDL agreed to plead guilty and pay a $31 million fine for its role in a related conspiracy to fix prices in the sale of TFT-LCD panels sold to the United States during the period from April 1, 2001 to at least March 31, 2004.  *See* "Plea Agreement" ¶4 (May 17, 2009) in *United States v. Hitachi Displays, Ltd.*, No. Cr-09-0247 SI (N.D. Cal.) (Saveri Decl., Ex. 13). This guilty plea was again the result of HDL attending bilateral meetings outside the United States, and having conversations and communications in Japan, Korea and elsewhere to discuss fixing prices to U.S. customers, which is exactly the same type of conduct that Hitachi is accused of committing here.  The DOJ also indicted Sakae Someya, an executive of HDL, who participated in these meetings. "Indictment" (March 31, 2009) (Dkt. No. 1) in *United States v. Someya*, Cr 09-00329 PJH (N.D. Cal.) (Saveri Decl., Ex. 14). Plaintiffs' understanding is that Mr. Someya is a fugitive from justice. (Saveri Decl., ¶16). Since the expiration of the stay requested by the DOJ, HDL and its counsel have not made any effort to thwart discovery of foreign conduct and pricing.

Hon. Charles Legge
September 10, 2010
Page 4

> **B.    Documents And Information Relating To Matters Outside Of The**
>          **United States Are Highly Relevant To Plaintiffs' Claims**
>
> > **1.    Federal Courts Consistently Order Defendants To Provide**
> >         **Discovery Concerning Their Anticompetitive Activities Outside The**
> >         **United States**

Federal courts consistently order defendants to provide discovery concerning their anticompetitive activities outside the United States in cases (such as this one) involving allegations of an international antitrust conspiracy.  *See, e.g., In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 163 (D. Conn. 2009) (in denying defendants' motion for summary judgment, the court rejected defendants' contention that evidence of anticompetitive conduct in Europe should be excluded, finding that "the existence of a European conspiracy makes it more likely that the defendants engaged in a U.S. EPDM conspiracy"); *In re Urethane Antitrust Litig.*, 261 F.R.D. 570, 574 (D. Kan. 2009) ("*Urethane*") ("[t]his liberal discovery approach to documents discussing purely foreign activities has been followed by a number of other courts that have addressed the issue in the domestic antitrust context. Indeed, defendants have cited no authority to the contrary"); *Aspartame*, 2008 WL 227531, at *2 ("[i]nitially, the Court finds that the discovery requested by Plaintiffs, without geographic limits, is relevant to their claims. Specifically, the Court finds the information and documents that relate, to among other things, the non-U.S. manufacture, sale and distribution of aspartame may prove relevant to establishing the existence of a global conspiracy to allocate the market for aspartame, the ability of market participants to engage in domestic price fixing and the mechanisms employed by market participants in price fixing."); *Intel*, 2007 WL 137152, at *7-*11 (compelling discovery of defendant's conduct in foreign markets, despite dismissal of plaintiff's foreign claims, because foreign conduct was also relevant to plaintiff's domestic claims); *SmithKline Beecham Corp. v. Apotex Corp.*, Civ. A. No. 99-CV-4304, 2006 WL 279073 at *3 (E.D. Pa. Jan. 31, 2006) ("[t]he fact that the United States is the relevant market in [a] case does not necessarily limit discovery to the United States'" discovery of foreign activities compelled); *In re Plastics Additives Antitrust Litig.*, No. Civ. A. No. 03-2038, 2004 WL 2743591, at *14 (E.D. Pa. Nov. 29, 2004) (ordering production to United States plaintiffs of all documents produced to foreign antitrust enforcement authorities, regardless of whether they relate to US markets); *Auto Paint*, 2004 U.S. Dist. LEXIS 29160 at *16 ("evidence of foreign price-fixing activities is relevant in determining the nature and scope of an alleged international conspiracy"); *In re Vitamins Antitrust Litig.*, No. 99-197 TFH, 2001 WL 1049433, at *11 (D.D.C. June 20, 2001) ("*Vitamins*") ("[a]lthough [foreign] actions may not be admissible to establish damages . . . the information would be relevant to show the breadth of the conspiracy, the role that each defendants' executives played in implementing, expanding, enforcing and concealing the conspiracy, and how the conspiracy was maintained for the length of time alleged"); *United States v. Dentsply Int'l, Inc.*, No. 99-5, 2000 WL 654286 (D. Del. May 10, 2000) (permitting discovery of foreign market data as relevant to Sherman Act claims arising from injury in the United States market).

Hon. Charles Legge
September 10, 2010
Page 5


**2.  Hitachi's Proposed Limitations Will Exclude Highly Relevant Documents From Production**

Hitachi's proposed limitations on the geographic scope of discovery will exclude highly relevant, and indeed crucial, documents from their production.  Plaintiffs here have made detailed allegations regarding the Hitachi Defendants' attendance at price-fixing meetings all over the world – allegations that have been sustained by this Court.  Indeed, the Court has found Plaintiffs' claims to fall squarely within the "import" and "domestic injury" exceptions to the FTAIA.[1]  In rejecting Defendants' argument that the FTAIA bars Plaintiffs' claims, the Court noted that "when announcing the indictment of C.Y. Lin, the Acting Assistant Attorney General suggested the alleged CRT *conspiracy does have effects in the United States*: 'This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes at fixed prices.'"  "Order Approving and Adopting Special Master's Report, Recommendations and Tentative Rulings re Defendants' Motions to Dismiss," p. 17 (March 30, 2010) (Dkt. No. 665) ("Approval Order") (emphases added).

Moreover, Defendants (including Hitachi) have indicated that they intend to challenge this Court's subject matter jurisdiction under the FTAIA again by a motion for summary judgment.  Yet, by refusing to produce any documents or information relating to foreign commerce, Hitachi is denying Plaintiffs the evidence they need to oppose the summary judgment motion and show that defendants' unlawful foreign activities had the requisite effect here in the United States.  Hitachi's position is untenable.  While the Hitachi Defendants are free to argue that their conduct is not actionable under U.S. law, they must respond to discovery bearing on that question.  Plaintiffs must be allowed to discover the facts necessary to prove their case.

In addition, the DOJ's indictments of Chunghwa's C.Y. Lin, Wen Jung Cheng and Alex Yeh refer to a conspiracy "in the United States and elsewhere."  "Indictment" ¶2 (Feb. 10, 2009) (Dkt. No. 1) in *United States v. Lin*, No. CR 09-0131 WHA (N.D. Cal.) (Ex. 8 to Saveri Decl.); "Indictment" ¶2 (Aug. 18, 2009) (Dkt. No. 1) in *United States v. Cheng*, No. Cr 09-836 PJH (N.D. Cal.) (Saveri Decl., Ex. 9); "Indictment" ¶2 (March 30, 2010) (Dkt. No. 1) in *United States v. Yeh*, No. Cr 10-0321 (N.D. Cal.) (Saveri Decl., Ex. 10).

---

[1] The "import commerce exception" to the FTAIA grants courts with jurisdiction over international transactions where, as here, defendants sold price fixed foreign products into the United States market or where the anticompetitive conduct was directed at the United States.  *See, e.g., Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 71-72 (3d Cir. 2000).  The "domestic injury exception" provides courts with jurisdiction over foreign transactions if the conduct is shown to have had a "'direct, substantial and reasonably foreseeable effect' on domestic commerce," and the domestic effect "gives rise to a [Sherman Act] claim."  *See F. Hoffmann-La Roche Ltd. v. Empagran S.A.* ("*Empagran*"), 542 U.S. 155 (2004).

Hon. Charles Legge
September 10, 2010
Page 6


Significantly, as the DOJ said just recently in another case involving allegations of an Asian cartel that fixed prices globally for electronics products, "*[g]iven the nature of international cartel cases, evidence located outside the United States is often more important than evidence located within the United States*." "United States' Reply To Plaintiffs' Opposition To Motion For A Limited Stay of Discovery," p. 8 (June 10, 2010) in *In re Optical Disk Drives Prods. Litig.*, No. M:10-2143 VRW (N.D. Cal.) (emphases added) (Saveri Decl., Ex. 15)

Accordingly, Hitachi cannot seriously dispute that evidence of anticompetitive conduct in the market for CRTs and CRT Products sold outside the United States is highly relevant to Plaintiffs' claims. *See Vitamins*, 2001 WL 1049433, at *11 ("[h]ere, plaintiffs have alleged a *global conspiracy* involving substantial fraudulent concealment. . . given the nature of this case, the Court finds good cause for allowing discovery with respect to even the foreign actions that were taken in furtherance of this conspiracy." (Emphases added). To deny Plaintiffs discovery of Hitachi's foreign price-fixing activities would be to deny Plaintiffs the full benefit of their proof. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 702-703 (1962). ("plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each . . . . [T]he character and effect of the conspiracy are not to be judged by dismembering it and viewing it in separate parts, but only by looking at it as a whole.").[2]  Indeed, it would be to deny Plaintiffs evidence that is crucial to their case.

---

[2] Courts in other antitrust cases have rejected imposing the types of discovery limitations suggested by Hitachi.  *See Urethane*, 261 F.R.D. at 572-573 (refusing to limit discovery to documents that "reflect U.S. commerce or global commerce that might include U.S. commerce" because documents relevant to "the existence of the conspiracy", "who was involved in the alleged conspiracy and the dates of that involvement, or the identity and location of persons having knowledge of discoverable information" would be improperly excluded); *Vitamins*, 2001 WL 1049433, at *11 (rejecting the special master's proposal to narrow the geographic scope of discovery to documents "concerning or discussing the United States or a portion of the United States, the world as a whole or any geographic region of which the United States or a portion of the United States is a part…" as unduly narrow).

Hon. Charles Legge
September 10, 2010
Page 7

### 3.   Non-U.S. Transactional Data Is Highly Relevant To Common Impact And Pass-Through Analyses For Class Certification

Hitachi also refuses to produce any non-U.S. transactional sales data.[3]  This data is important to the DPPs for class certification purposes and is particularly important for the IPPs' analysis of common impact and pass-through for class certification.  The IPPs bought CRT Products (televisions and computer monitors) many of which were manufactured and sold abroad before being imported to the U.S.  For example, a large proportion of CRTs destined for the U.S. market were sold initially to CRT television and computer monitor manufacturers in Mexico or South America before being imported to the U.S and sold to indirect purchaser class members.[4]  Thus, if Hitachi produces only its U.S. sales data, it will not include a large amount of sales to direct purchasers of CRTs and CRT Products abroad that were then sold to direct and indirect purchaser class members in the U.S.

The IPPs have the right to prove their case, and demonstrate the Rule 23 requirements, with economic analyses that start with the prices charged by Defendant-manufacturers abroad and finish with the prices paid by Indirect Purchaser Plaintiffs here in the U.S.  Hitachi's non-U.S. sales data is highly relevant to these analyses because it will evidence the initial impact of Defendants' unlawful overcharges.  This is an important step in showing common impact to direct purchasers and ultimately pass-through and common impact to indirect purchasers.

Courts have recognized that global transactional data is independently relevant to, *inter alia,* the prices plaintiffs would have paid "but for" the conspiracy, the timing of the conspiracy, and the concealment of the conspiracy.  *See Vitamins,* 2001 WL 1049433, at *12 (overruling Special Master and ordering production of "transactional and financial data" relevant to the conspiracy without geographic location).  In the related *TFT-LCD*

---

[3] *See* Plaintiffs' Request No. 5 of the Second Set of Requests for Production, which seeks documents reflecting all sales (in transaction-level detail) of CRTs and CRT Products, regardless of geographic location.

[4] According to a report by the Economic Commission for Latin America and the Caribbean (ECLAC) from 2000, "Mexico has become the leading global site for colour TV production (Carillo, Mortimore and Estrada, 1999), with many Japanese TV manufacturers transferring plants there from Asia during 1994-1997 (Hosono, 2000, p.18): Mitsubishi and *Hitachi moved facilities from Malaysia*, JVC from Thailand, Sanyo from Indonesia, and Toshiba from Singapore.  In 1998 Mexico supplied 25.4 million of the 25.7 million units produced in North America (Canada and the United States), and it is expected to produce 34.8 out of 35.2 million TVs forecast for 2003." [Emphasis added] *See* Foreign Investment in Latin America and the Caribbean, 2000 Report, ECLAC - Unit on Investment and Corporate Strategies of the Division of Production, Productivity and Management, available at http://www.eclac.org/cgi-bin/getProd.asp?xml=/publicaciones/xml/0/6540/P6540.xml&xsl=/ddpe/tpl-i/p9f.xsl&base=/tpl-i/top-bottom.xslt.

Hon. Charles Legge
September 10, 2010
Page 8

antitrust litigation, Special Master Fern Smith also ordered that defendants produce non-United States transactional data. She ruled:

> The weight of authority, including from the United States Supreme Court, is that Defendants should produce transactional data for TFT-LCD sales outside the U.S. for the following reasons:
>
> > a. the information is relevant to both claims and damages;
> > b. Discovery should be liberally granted in anti-trust cases;
> > c. The FTAIA Domestic Injury exception applies where the conduct has a direct, substantial and reasonably foreseeable effect on domestic commerce.

 "Order Clarifying Discovery Limits Allowed Under Court's Stay Order," p. 2 (May 15, 2008) in *In re TFT-LCD (Flat Panel) Antitrust Litig.*, Civil Action No. 07-MDL-1827 (N.D. Cal.) (Dkt. No. 618) (Saveri Decl., Ex. 11). Since the issuance of that order, the defendants have actually provided foreign transactional data on a disaggregated basis. (Saveri Decl., ¶13).

The Special Master should follow the practice applied in *TFT-LCDs* and order Hitachi to produce non-U.S., transactional-level sales data in this case.

## C.   Hitachi Has Failed To Articulate Any Undue Burden

Finally, Hitachi has altogether failed to substantiate its purported undue burden. Despite repeated requests from Plaintiffs, during the telephonic meet and confer on June 23, 2010 and in their letter of July 12, 2010, Hitachi has steadfastly refused to provide any information describing how hard copy and electronic documents and data are stored, their data back-up policy, the relevant facilities that will need to be searched, or why it is difficult to gather information outside the United States.  Hitachi merely contends that discovery relating to matters outside the United States presents "immense logistical burdens" and would be "inordinately time-consuming and costly."  Webb Ltr. at. 4-5.

Of course, such conclusory claims of burden are insufficient.  At a minimum, a defendant claiming burden must "identify, by category or type, the sources containing potentially responsive information" that it claims are not "reasonably accessible."  William W. Schwarzer, *et al.,* CIVIL PROCEDURE BEFORE TRIAL, [11:1854.5] (Rutter Group 2008) (citing Adv. Comm. Note to 2006 Amendment to Fed. R. Civ. P. 26(b)(2)(B)).  "Enough detail should be provided to enable the requesting party to evaluate the burdens and costs of providing the discovery and the likelihood of finding responsive information on the identified sources."  *Id.*  These common-sense rules were developed to prevent responding parties from asserting "undue burden" where none exists.  *See Waddell & Reed Financial, Inc. v. Torchmark Corp.*, 222 F.R.D. 450, 454 (D. Kan. 2004).

Hon. Charles Legge
September 10, 2010
Page 9

Moreover, Hitachi's bare claims of burden are belied by the fact that its proposed criteria for limiting the geographic scope of discovery will require substantial *additional* time and effort to conduct a detailed review of their documents and withhold those allegedly relating exclusively to non-U.S. commerce.  Indeed, previous experience dictates that it is highly unlikely that Hitachi has separate transactional databases for products "sold to" or "shipped to" the U.S. versus other geographic areas.  Thus, the claim that it is more difficult for them to gather foreign data is likely to be patently untrue.  The inescapable conclusion, therefore, is that the true motivation for Hitachi's proposed limitations on the geographic scope of discovery is to cause additional delay and expense to Plaintiffs and deny them the evidence needed to prove their case.

Furthermore, as noted above, Hitachi, Ltd., HDL, Hitachi America, Ltd. and Hitachi Electronic Devices (USA), Inc. are defendants in the parallel *TFT-LCD* case, where, as discussed above, they were ordered to produce worldwide, transactional-level sales data. This strongly indicates that the burden to produce non-U.S. transactional data for their display business is not what Hitachi claims.  And at the very least, any burden here will have been substantially lessened by what Hitachi learned from the *TFT-LCD* production.

Finally, even assuming that Hitachi has demonstrated burden (which they have not), the Court may nonetheless order discovery if the Plaintiffs show good cause.  *See* Fed. R. Civ. P. 26(b)(2).  As discussed above, evidence of Hitachi's price-fixing activities outside the U.S. and non-U.S. transactional data is highly relevant to the Plaintiffs' claims. Furthermore, as the Chunghwa meeting reports discussed herein clearly demonstrate, Plaintiffs are not "sending the Hitachi Defendants on a worldwide fishing expedition."  *See* Webb Letter, p.5.  When dealing with discovery of such crucial and basic significance to a case, courts have held that the information sought is discoverable even if its production is burdensome and expensive.  *See, e.g., In re Folding Carton Antitrust Litig.*, 83 F.R.D. 260, 265 (N.D. Ill 1979) (stating that "the information sought by the interrogatories about purchasing practices is relevant to proof of conspiracy, impact, and class certification. Because the interrogatories themselves are relevant, the fact that answers to them will be burdensome and expensive 'is not in itself a reason for refusing to order discovery which is otherwise appropriate.'") (quoting 4A Moore's Federal Practice § 34.19(2), at 34-106). *See also W.E. Aubuchon Co., Inc. v. BeneFirst*, LLC, 245 F.R.D. 38, 43-45 (D. Mass. 2007); *Vitamins*, 2001 WL 1049433, at *13.

Hon. Charles Legge
September 10, 2010
Page 10

### III.    Conclusion

For all of the foregoing reasons, Plaintiffs' motion to compel discovery of foreign conduct and pricing should be granted.

Yours sincerely,

/s/ *Guido Saveri*_____
Guido Saveri
Interim Lead Counsel for the
Direct Purchaser Plaintiffs

/s/ *Mario Alioto*_____
Mario Alioto
Interim Lead Counsel for the
Indirect Purchaser Plaintiffs

cc: All Counsel via ECF
crt.307