# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

BEFORE SPECIAL MASTER:

HONORABLE CHARLES A. LEGGE (Ret.)


IN RE CATHODE RAY TUBE (CRT)  ) Case No. C07-5944 SC
ANTITRUST LITIGATION          )
                              ) MDL NO. 1997
                              )
_____)



REPORTER'S TRANSCRIPT OF PROCEEDINGS

_____

Friday, November 12, 2010




REPORTED BY:

Ana M. Dub, RMR, CRR

CSR No. 7445

1

Proceedings

```
1                A P P E A R A N C E S

2

3     FOR THE DIRECT PURCHASER CLASS PLAINTIFFS:

4          SAVERI & SAVERI, INC.
           BY:  GUIDO SAVERI, ATTORNEY AT LAW
5          BY:  R. ALEXANDER SAVERI, ATTORNEY AT LAW
           BY:  GEOFFREY C. RUSHING, ATTORNEY AT LAW
6          BY:  CADIO ZIRPOLI, ATTORNEY AT LAW
           705 Sansome Street
7          San Francisco, California  94111
                Telephone:  (415) 217-6810
8               E-mail:  guido@saveri.com
                E-mail:  rick@saveri.com
9               E-mail:  cadio@saveri.com
                E-mail:  grushing@saveri.com
10
      and
11
           HAUSFELD LLP
12         BY:  MICHAEL P. LEHMANN, ATTORNEY AT LAW
           44 Montgomery Street, Suite 3400
13         San Francisco, California  94104
                Telephone:  (415) 633-1908
14              E-mail:  mlehmann@hausfeldllp.com

15    and

16         PEARSON SIMON WARSHAW PENNY LLP
           BY:  BRUCE L. SIMON, ATTORNEY AT LAW
17         44 Montgomery Street, Suite 2450
           San Francisco, California  94104
18              Telephone:  (415) 433-9000
                E-mail:  bsimon@pswplaw.com
19

20    FOR THE INDIRECT PURCHASER CLASS PLAINTIFFS:

21         ZELLE HOFMANN VOELBEL & MASON LLP
           BY:  DEMETRIUS X. LAMBRINOS, ATTORNEY AT LAW
22         44 Montgomery Street, Suite 3400
           San Francisco, California  94104
23              Telephone:  (415) 693-0770
                E-mail:  dlambrinos@zelle.com
24    and

25
```

2

Proceedings

```
1              A P P E A R A N C E S  (Cont.)

2        SYLVIE K. KERN, ATTORNEY AT LAW
              Telephone:  (415) 221-5763
3             E-mail:  sylviekern@yahoo.com

4     and

5        LOVELL STEWART HALEBIAN & JACOBSON, LLP
         BY:  MERRICK SCOTT RAYLE, ATTORNEY AT LAW
6        1502 South Prairie Avenue, Suite N
         Chicago, Illinois  60605
7             Telephone:  (415) 533-5316
              E-mail:  msrayle@sbcglobal.net
8
      and
9
         COOPER & KIRKHAM, P.C.
10       BY:  JOHN D. BOGDANOV, ATTORNEY AT LAW
         357 Tehama Street, Second Floor
11       San Francisco, California  94103
              Telephone:  (415)788-3030
12            E-mail:  jdb@coopkirk.com

13    and

14       TRUMP, ALIOTO, TRUMP & PRESCOTT
         BY:  MARIO N. ALIOTO, ATTORNEY AT LAW
15       BY:  LAUREN C. RUSSELL, ATTORNEY AT LAW
         2280 Union Street
16       San Francisco, California 94123
              Telephone:  (415) 563-7200
17            E-mail:  malioto@tatp.com
              E-mail:  laurenrussell@tatp.com
18

19    FOR CRAGO, INC., HAWEL A. HAWEL DBA CITY
      ELECTRONICS, ORION HOME SYSTEMS, LLC, PAULA CALL DBA
20    POWAY-RANCHO BERNARDO, PRINCETON DISPLAY
      TECHNOLOGIES, INC., AND THE CLASS (MINNESOTA)
21
         WEIL GOTSHAL & MANGES, LLP
22       BY:  DAVID YOHAI, ATTORNEY AT LAW
         767 Fifth Avenue
23       New York, New York  10153
              Telephone:  (212) 310-8000
24            E-mail:  david.yohai@weil.com

25
```

3

Proceedings

```
 1                A P P E A R A N C E S (Cont.)

 2


 3     FOR CHUNGHWA PICTURE TUBES, LTD.

 4          GIBSON DUNN & CRUTCHER LLP
            BY:  RACHEL S. BRASS, ATTORNEY AT LAW
 5          555 Mission Street, Suite 3000
            San Francisco, California  94105-2933
 6               Telephone:  (415) 393-8200
                 E-mail:  rbrass@gibsondunn.com
 7


 8     FOR SAMSUNG ELECTRONICS AMERICA INC. AND SAMSUNG
       ELECTRONICS CO., LTD.:
 9
            O'MELVENY & MYERS LLP
10          BY:  PATRICK HEIN, ATTORNEY AT LAW
            Two Embarcadero Center, 28th Floor
11          San Francisco, California  94111-3823
                 Telephone:  (415) 984-8951
12               E-mail:  phein@omm.com

13     FOR SAMSUNG ELECTRONICS AMERICA INC., SAMSUNG
       ELECTRONICS CO., LTD., AND SAMSUNG SDI AMERICA,
14     INC.:

15          SHEPPARD MULLIN RICHTER & HAMPTON LLP
            BY:  MICHAEL W. SCARBOROUGH, ATTORNEY AT LAW
16          Four Embarcadero Center, 17th Floor
            San Francisco, California  94111-4109
17               Telephone:  (415) 434-9100
                 E-mail:  mscarborough@sheppardmullin.com
18


19     TELEPHONICALLY FOR TOSHIBA AMERICA ELECTRONIC
       COMPONENTS, TOSHIBA AMERICA INFORMATION SYSTEMS,
20     TOSHIBA AMERICA, INC., TOSHIBA AMERICA CONSUMER
       PRODUCTS AND TOSHIBA CORPORATION:
21
            WHITE & CASE
22          BY:  LUCIUS B. LAU, ATTORNEY AT LAW
            701 - 13th Street N.W.
23          Suite 600 South
            Washington, D.C.  20005
24               Telephone:  (202) 626-3600
                 E-mail:  alau@whitecase.com
25
```

4

Proceedings

```
1              A P P E A R A N C E S (Cont.)

2

    FOR HITACHI AMERICA, LTD., HITACHI ASIA, LTD.,
3   HITACHI DISPLAYS, LTD., AND HITACHI, LTD.:

4        MORGAN, LEWIS & BOCKIUS LLP
         BY:  DIANE L. WEBB, ATTORNEY AT LAW
5        BY:  JASON B. ALLEN, ATTORNEY AT LAW
         One Market Plaza
6        Spear Street Tower
         San Francisco, California  94105-1126
7            Telephone:  (415) 442-1288
             E-mail:  dwebb@morganlewis.com
8            E-mail:  jason.allen@morganlewis.com

9

    FOR LG ELECTRONICS TAIWAN TAIPEI CO., LTD., LG
10  ELECTRONICS U.S.A., INC., AND LG ELECTRONICS, INC.:

11       ARNOLD & PORTER LLP
         BY:  BETH H. PARKER, ATTORNEY AT LAW
12       One Embarcadero Center, 22nd Floor
         San Francisco, California  94111-3711
13           Telephone:  (415) 356-3051
             E-mail:  Beth.Parker@aporter.com
14

15  TELEPHONICALLY FOR MT PICTURE DISPLAY CO., LTD.,
    MT PICTURE DISPLAY CORPORATION OF AMERICA,
16  MATSUSHITA BATTERY CORPORATION OF AMERICA,
    MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., PANASONIC
17  CORPORATION, AND PANASONIC CORPORATION OF NORTH
    AMERICA:
18
         DEWEY & LEBOEUF
19       BY:  JEFFREY L. KESSLER
         1301 Avenue of the Americas
20       New York, New York  10019
             Telephone:  (212) 259-8000
21           E-mail:  jkessler@dbllp.com

22                       --oOo--

23  ALSO PRESENT:

24       Go Fujimoto

25                       --oOo--
```

5

Proceedings

1              Friday, November 12, 2010; 2:03 P.M.

2                    P R O C E E D I N G S

3         SPECIAL MASTER LEGGE:  Just to begin here,

4    we're here for the argument of several motions in

5    the Cathode Ray Tube litigation.

6              We have quite an assemblage of people here

7    in the conference room, and several of you have

8    indicated your appearance by telephone.

9              Just a couple of procedural matters.

10             As you'll note here in the room that the

11   table position has been flipped, and you'll manage

12   to cope adequately with that fantastic change in the

13   case, the reason being that we're having an

14   arbitration conference here tomorrow that's being

15   televised and going out on a direct stream.  So the

16   camera people wanted the camera down there facing

17   this way.  Hence, we changed the space of the table.

18             I think most all of you have been here

19   before.  You know where the coffee room is.  You

20   know where the coffee machine is, I should say.  And

21   you know where the rest rooms are.  So we'll

22   eliminate that.

23             Now, I do have a sign-up sheet to send

24   down each side.  If you have already filled out a

25   sheet before, all we need is your name and who you

                                                        6

**Proceedings**

1    represent.  If you have not filled out a sheet

2    before, then I would like the personal information

3    that's there on that sheet.

4         Okay.  Now, some general observations

5    before we get started here.  I do appreciate the

6    significance of these motions and the issues that

7    they raise to the course and scope of the discovery.

8    So I will do my best to be careful.

9         But also, we're now getting to the point

10   in time where these kind of decisions have to be

11   made.  They cannot all be continuing to be deferred,

12   as we've pretty much been doing up until this point

13   in time.

14        I also appreciate the potential for

15   precedent in this case which today's motions will

16   bring or, I should say, the orders on today's

17   motions will bring, the precedent that this is going

18   to have on other defendants and other motions.

19        So, again, I will be careful in trying to

20   make my rulings to be ones that can be adopted

21   later, while at the same time, some room for

22   differences in the positions of the parties with

23   respect to them.

24        So if, in the course of saying something

25   or talking about something, indicate I'm sweeping

7

Proceedings

1    with too broad a brush and going to be affecting too

2    many people without adequately hearing their side's

3    positions, please let me know.

4            Now, first of all, some old business.  You

5    have posted on Pacer two days ago the proposed order

6    regarding the production of electronically stored

7    information.

8            I compliment you on being able to work

9    this out.  I've not gone through and fly spec'd it.

10   I just know, see several of the usual discovery

11   issues that have been very nicely covered, and I

12   appreciate your cooperation in that regard.

13           Now, this has been posted on Pacer.  You

14   have a signature line for just Judge Conti.  So I'm

15   not going to interject myself into it any further.

16   And we'll just have to waive Judge Conti's signature

17   on that stipulation.  But hopefully the negotiation

18   of that is behind us and implementation is then to

19   come.

20           All right.  Now, I'd like to, first of

21   all, take up the defendants' motion to compel

22   answers to discovery regarding the issues of CRT

23   products.

24           Now, do I understand, Mr. Kessler, you're

25   going to be arguing that motion from here?

8

**Proceedings**

1        MR. KESSLER:  I am, your Honor, if that is

2    acceptable to you.  I'm in New York now.

3        SPECIAL MASTER LEGGE:  Okay.  Let me see

4    if I can pick up the volume on this a little bit.

5    Hang on a minute.

6        Well, I've got as much volume as I can get

7    now.  So would you go ahead, please, Mr. Kessler.

8        MR. KESSLER:  I will.  And if at any time

9    you can't hear me, please let me know.

10        Unfortunately, I have a cold.

11        SPECIAL MASTER LEGGE:  I was just about to

12    comment on that.

13        MR. KESSLER:  Yes.  So that is impeding me

14    somewhat.

15        SPECIAL MASTER LEGGE:  Okay.  Well, don't

16    get too close to the microphone then.

17        MR. KESSLER:  I don't think the microphone

18    is the problem.

19        SPECIAL MASTER LEGGE:  Well, I'll tell you

20    what.  Let me start out with a few thoughts I have

21    on this thing because it might --

22        MR. KESSLER:  Please.

23        SPECIAL MASTER LEGGE:  -- save you some

24    talking and all the rest of it.

25        Now, first of all, it's now been decided,

9

**Proceedings**

```
1    at at least the district court level, that the

2    plaintiffs have adequately pled a conspiracy

3    involving CRT products.

4           At this stage, the defendants are entitled

5    to inquire into what evidence the plaintiffs have of

6    that allegation.

7           So I think our major issue here is really

8    when, is really when plaintiffs have to be

9    forthcoming with that information.

10          MR. KESSLER:  Very good, your Honor.  I

11   will focus on the --

12          SPECIAL MASTER LEGGE:  Let me focus for a

13   moment.  Let me continue here a little monologue,

14   and then I'll tell you when we're ready to hear you,

15   Mr. Kessler.

16          MR. KESSLER:  Okay.

17          SPECIAL MASTER LEGGE:  I think it's quite

18   clear that the requested discovery is relevant to

19   the issue in the case.

20          So, again, I think the question is when

21   the information has to be provided, particularly in

22   relationship to the discovery on the same issue

23   which the plaintiffs are now asking of the

24   defendants.

25          Now, I do want to ask you, Mr. Kessler,
```

10

Proceedings

1    what are you going to do with the information if I

2    order it produced immediately and you get -- your

3    opinion, when you get the results, show that the

4    plaintiffs do not have sufficient evidence to move

5    forward in the case?  You've raised the specter of a

6    possible Rule 11 violation.

7          And I think most important from my point

8    of view and from the point of view of the

9    plaintiffs, also, is:  What are you going to do

10   then?  You get the information.  It looks like

11   they've not got enough.  What are you going to do

12   about it?

13         Is there going to be an immediate motion

14   for summary judgment?  Are you going to make an

15   immediate motion of a possible violation of Rule 11

16   that might give you the equivalent of a summary

17   judgment motion?  Or is it just going to sit there

18   until the rest of the discovery relevant to this

19   issue gets finished?

20         So I would appreciate your responding to

21   your intentions if you do get the information and

22   you think it establishes what you want to establish,

23   and that is, the plaintiffs don't have any evidence

24   of CRT products being part of the case.

25         MR. KESSLER:  Very good, your Honor.

11

1          Let me first say that we believe we're

2     entitled to the information now.  The time is now.

3          And we would not let that information --

4     and let me explain how we would use that information

5     and why I believe it will materially advance the

6     progress of this case as well as substantially

7     inform your Honor in deciding many of the other

8     discovery issues that are pending before you.

9          First of all, under your Honor's

10    hypothetical, which is that the responses indicated

11    that there was not any basis for the allegation of a

12    finished products conspiracy in the complaint -- so

13    I'm accepting that hypothetical, which means that

14    there was no basis -- I could tell you on behalf of

15    Panasonic we would immediately bring a Rule 11

16    motion.

17          By that, your Honor, what it means is we

18    have to send a letter to plaintiffs, as you know

19    under the rule, and ask them if they would not

20    withdraw those allegations within 20 days, then we

21    would file a Rule 11 motion.

22          If we had to file a Rule 11 motion, the

23    relief we would seek would be to strike the

24    allegations.

25          The consequence would be of that, if we

12

**Proceedings**

1   succeeded, which we believe is the proper

2   consequence, is they would no longer be able to

3   argue in discovery that there is some broad,

4   gigantic fishing expedition of discovery they're

5   entitled to over an alleged conspiracy in products

6   which they had no business alleging in the first

7   place.

8              We think this is exactly what Rule 11 was

9   entitled to get at.  We think it is exactly why the

10  decisions we cited repeatedly cite Rule 11 concerns

11  as a reason for ordering that these types of

12  interrogatories be answered at the beginning of a

13  case.

14             It's to prevent this from happening:  a

15  massive expansion of the case based on allegations

16  that should not have been in the case in the first

17  place.

18             So, yes, we would use the information

19  immediately.

20             And this has nothing to do with summary

21  judgment, your Honor, because what Rule 11 says is

22  that if the allegation should not have been made,

23  then there's no basis to seek discovery; there's no

24  basis to open up the entire world and afflict these

25  burdens and even go through a summary judgment

13

**Proceedings**

1    process.  So it really is not summary judgment in

2    any way, shape, or form.

3            But I would like to say, your Honor, let's

4    say your hypothetical is overstated.  Let's say that

5    there's a little bit of evidence of something

6    regarding this.

7            And by the way, I doubt there is.  The

8    reason I doubt there is, is because, number one, the

9    only thing plaintiffs have cited so far are the

10   documents given to the DOJ, without specification,

11   and the foreign authorities.  All those

12   investigations only relate to allegations of a

13   conspiracy in CRT.  As the plaintiffs know, none of

14   them relate to allegations of a finished products

15   conspiracy.

16           And, second, they cite the documents from

17   Chunghwa without specification.  As your Honor

18   knows, the plaintiff now knows, Chunghwa says it has

19   no information about a finished products conspiracy.

20           (Court reporter clarifies.)

21           SPECIAL MASTER LEGGE:  Evidence regarding

22   a CRT products conspiracy.

23           MR. KESSLER:  Yes.  Chunghwa only claims

24   to have evidence involving an alleged tubes

25   conspiracy.

14

Proceedings

```
1              So, therefore, even if there was a little
2     evidence of something -- and I can't imagine what
3     that is, given what we know -- then that, I believe,
4     your Honor, would greatly affect your determination
5     of the balance of how much discovery, how far afield
6     do the defendants have to go in searching for
7     different things involving finished products as
8     opposed to CRTs.
9              In other words, the relevant burden
10    balance, in our view, would be greatly affected, in
11    your Honor's judgment, if there was real evidence of
12    such a conspiracy, no evidence of such a conspiracy,
13    or a tiny bit of something that might arguably
14    suggest something.
15             And it is not at all uncommon for judges,
16    as your Honor knows, to look at those issues in
17    deciding how much discovery to order.
18             And in this case, what we have, as you
19    know, apart from the Hitachi motion -- but it's even
20    more true for some of the other defendants -- we
21    have discovery that they are seeking about finished
22    products that matches the discovery they're seeking
23    about CRTs.
24             So that we're talking about global
25    discovery being sought going back 19 years,
```

15

**Proceedings**

1    involving totally different sales forces, totally

2    different companies in some situations, totally

3    different markets, totally different e-mail

4    custodians, totally different groups of businesses.

5              And the question is:  What basis do they

6    have to do that?

7              And they've taken the position -- and this

8    is what the letter is -- since we survived the

9    motion to dismiss, we're entitled to everything.

10              And, your Honor, we do not believe that's

11    what good case management requires.  And under

12    Rule 11, we think we're entitled to know:  Do they

13    have any basis for sending us on this expedition?

14              SPECIAL MASTER LEGGE:  Okay.  Now --

15              MR. KESSLER:  The next comment, your

16    Honor -- then I will be quiet and see if you have

17    questions -- is that I want to be very clear, even

18    if we totally prevail, including on Rule 11,

19    including on this motion, and there's no basis for

20    this, we, Panasonic, and I believe most of the other

21    defendants, if not all, agree they are entitled to

22    some discovery about finished CRT products.

23              So this is not leading to an issue that no

24    discovery is required.  The reason for that is the

25    indirect purchasers, for example, are entitled to a

16

**Proceedings**

1    certain amount of sales data and pricing data

2    involving finished CRT products because they use

3    that to try to show the issues of pass-on relating

4    to those damages.

5            And we have never contested that type of

6    very limited, narrow discovery.  That's number one.

7    Okay?

8            I also -- so what this has to do, though,

9    is the massive discovery in addition to that which

10   they are seeking.

11           So the other point that's related to this,

12   this is not an argument about standing at this

13   point.  You might hear from plaintiffs about the

14   sugar case and whether, even if there is only a

15   conspiracy on CRTs, not finished products, whether

16   or not they have standing as direct purchasers or

17   not.  This motion, these discovery issues have

18   nothing to do with that.  That is a legal issue that

19   will be decided later on at an appropriate point in

20   the case.

21           So we're not challenging their standing in

22   these motions to bring a case.  What we're saying is

23   they have no basis to put in an allegation, without

24   any support, for a finished CRT products conspiracy

25   and then use that to double, triple, quadruple the

17

**Proceedings**

1    size of their discovery request.

2            And we think that the interrogatories now

3    should be granted now so we can use that information

4    immediately for the purposes of presenting to your

5    Honor a sound way of approaching this case from a

6    case management standpoint.

7            Thank you very much.  At this point, I'm

8    available for your Honor's questions.

9            SPECIAL MASTER LEGGE:  Well, in talking

10   about case management, I assume you're saying that I

11   do not need or should not give the plaintiffs any

12   right to discovery against the defendants on the

13   issue of CRT products until your discovery is

14   completed and you decide whether you're going to

15   make a Rule 11 motion or not.

16           MR. KESSLER:  That's correct, your Honor,

17   other than the types of CRT products discovery that

18   we agree they're entitled to.

19           In other words, I just want to be clear

20   that, again, that things like sales data and, you

21   know, prices, I believe they're entitled to.  We

22   have no objection to that, and we've already made

23   that clear.

24           We're talking about things like going

25   overseas and searching e-mail files on people who

18

1    are involved in the sales of CRT finished products,

2    that type of massive discovery.

3           We agree, your Honor, that the correct

4    order is to first decide this contention motion

5    which is before you now.  And if you order it, let

6    us evaluate what they respond and see if we bring a

7    Rule 11 motion or not.

8           SPECIAL MASTER LEGGE:  Okay.  Now, one

9    other question.  Suppose the plaintiffs were to come

10   up now, say, suppose one of your co-defendants said:

11   "Oh, this isn't worth the battle.  Here's all the

12   information about CRT products that we have."

13          And you would say that I could not use

14   that in evaluating a Rule 11 motion?

15          MR. KESSLER:  It is irrelevant to whether

16   they had a basis for going forward in the first

17   place.

18          SPECIAL MASTER LEGGE:  Yeah.  Okay.

19          MR. KESSLER:  I'm quite confident that

20   under Ninth Circuit law, that you look at the

21   information they had at the time they filed the

22   complaint.

23          SPECIAL MASTER LEGGE:  Yeah.  Okay.

24          MR. KESSLER:  Now, your Honor, I would say

25   if somebody came forward with evidence in the

                                                    19

**Proceedings**

1   future -- okay? -- then, you know, maybe somebody

2   else could file another case.  But there would be no

3   basis -- there'd be no basis for this case claim in

4   this case.

5            SPECIAL MASTER LEGGE:  So the point is,

6   simply stated, you want information about what they

7   knew at the time they filed the complaint.  And if

8   that, in your opinion, is not enough, you'll

9   initiate Rule 11 procedures.

10           MR. KESSLER:  That's right.

11           SPECIAL MASTER LEGGE:  And you hope to get

12   the allegations of CRT products stricken from the

13   complaint, period?

14           MR. KESSLER:  That is correct, your Honor.

15           SPECIAL MASTER LEGGE:  Okay.

16           MR. KESSLER:  And, in fact, that's why

17   there's no burden to them, because they presumably

18   know whatever universe they had at the time they

19   filed their complaint.  I'm not asking them to

20   search for anything else or to supplement it or

21   anything else.  This is a very narrow, focused set

22   of interrogatories we filed.  Just what they had and

23   used and relied upon at the time they made their

24   allegation.

25           SPECIAL MASTER LEGGE:  Okay.  Now, let me

20

**Proceedings**

1       ask you one final -- well, I won't say it's final,

2       but all I have in mind at the moment.

3              The order that you want, you generally

4       define it on page 6 of your September 30th letter,

5       simply that plaintiffs should be compelled to

6       provide immediate and proper responses to

7       defendants' finished CRT products discovery

8       requests.

9              Now, you think that sort of generic thing

10      is good enough to give precision and let the

11      plaintiffs object and/or gives you enough to carry

12      forward a program you want to carry forward?

13             MR. KESSLER:  Well, I guess, your Honor,

14      maybe I do need a little bit more precision because

15      they have, as your Honor knows, filed answers.

16             And the problem I had, the reason why I

17      believe their answers are not proper is because they

18      don't identify anything with specificity.

19             And as your Honor knows, under Rule 33(d),

20      if they're -- they have two choices in answering

21      this interrogatory.

22             They can either give a narrative which

23      mentions the specific pieces of evidence; or if

24      they're alluding to documents, which is what they've

25      done, you know, it is not adequate and proper to

21

**Proceedings**

1    say:  All the documents submitted to the grand jury

2    by defendants, all the documents produced by

3    Chunghwa, or all the documents given to foreign

4    authorities, all of which, as your Honor knows,

5    constitutes tens of thousands of pages of documents

6    which we have no way of sorting through or

7    addressing.

8            They should be required, in their answer,

9    if they're going to use documents, to identify by

10   Bates number the specific --

11           SPECIAL MASTER LEGGE:  Okay.

12           MR. KESSLER:  -- you know, page --

13           SPECIAL MASTER LEGGE:  I'm not --

14           MR. KESSLER:  -- of the document which

15   they think provides information to support this,

16   which would then give us a basis to do a Rule 11

17   assessment and decide if we're pursuing this or not.

18           SPECIAL MASTER LEGGE:  Well, I was just

19   thinking more about this question:  Do we have a

20   definition of CRT products somewhere in the

21   complaint or the answers?

22           MR. KESSLER:  Unfortunately, the answer --

23           SPECIAL MASTER LEGGE:  Or is the use --

24           MR. KESSLER:  The answer to that question

25   is yes, but it's not a meaningful definition because

22

**Proceedings**

1     what they did in the complaint is they defined CRT

2     products to include every type of CRT -- so that

3     would be whether it's a CDT for monitors or a CPT

4     for tubes -- and every type of finished product that

5     uses a CDT or a CPT.  So they've lumped them all

6     together in the definition of "CRT products."

7              So I think the way we've defined our

8     discovery, if your Honor looks at it, we were very

9     careful.  And I believe that's the way your Honor's

10    order should read.  Our discovery refers to finished

11    products that incorporate either a CDT or a CPT.

12             Some of our discovery is directed to the

13    finished products that incorporate a CPT, and some

14    of our discovery is requested to the finished

15    products that incorporate a CDT, because we wanted

16    also to get that information divided that way if, in

17    fact, there is any information.

18             MR. SIMON:  Your Honor?

19             SPECIAL MASTER LEGGE:  All right.

20    Plaintiffs?

21             MR. SIMON:  I'm going to make some overall

22    comments on this very point that Mr. Kessler raised.

23             SPECIAL MASTER LEGGE:  Okay.  Why don't

24    you come up here to the podium.

25             MR. SIMON:  Sure.

23

1          SPECIAL MASTER LEGGE:  Then you're a

2    little bit closer to the phone here and, also,

3    everybody can hear you.

4          MR. SIMON:  Other of my colleagues,

5    Mr. Rushing -- Bruce Simon -- are going to make

6    comments on the specific things.

7          Mr. Kessler has made this argument now, as

8    I count, three or four times to you.  And I think

9    Mr. Kessler thinks the more he says it, the more it

10   actually becomes a fact in the case, when, in fact,

11   the very question you asked -- What is the

12   definition of "CRT products"? -- is defined in the

13   complaint, but not the way that Mr. Kessler wants it

14   defined.

15          It's defined the same way as it was

16   defined in LCDs.  It's defined the same way it's

17   here.

18          SPECIAL MASTER LEGGE:  Where is it defined

19   here?

20          MR. SIMON:  It's defined here in the

21   complaint, in the paragraphs that you yourself

22   considered --

23          SPECIAL MASTER LEGGE:  Yeah.  No, I

24   under- --

25          MR. SIMON:  -- in the class definition.

                                                      24

**Proceedings**

1             So it's defined in paragraph 1.  It's

2     defined in paragraphs 144 and 146.  It's defined in

3     the class allegations between paragraphs 85 and 92.

4             But what Mr. Kessler is doing, your Honor,

5     is he's taking the definition and he's dissecting it

6     and dismembering it and splitting it apart and

7     ignoring both the legal and economic reality of what

8     you upheld and what the court affirmed as being

9     upheld on what the definition is.

10            For example, if I could give you an

11    example, we discussed this last time.  I have the

12    transcript from the motion to dismiss hearing.  And

13    you asked the very same questions about what

14    paragraphs in the complaint define CRT products.

15    And I pointed to you, at that time, various

16    paragraphs.

17            Two of the paragraphs, which are two of

18    the paragraphs that Mr. Kessler does not use to

19    define what CRT products are in the complaint, are

20    paragraphs 144 and 146 which explain exactly how the

21    finished products relate and are part of an

22    overarching single conspiracy to fix the price as

23    alleged in the complaint.

24            He cannot pull apart, your Honor, and

25    sustain any type of motion, Rule 11 or otherwise,

25

1    the definition and then ask you to rule upon that

2    because it ignores what we're alleging.

3           SPECIAL MASTER LEGGE:  I'm going to make a

4    ruling for him or against him, for you or against

5    you.  Okay?  I think this is one where I don't have

6    any choice.  I've got to take a step, take a

7    position.

8           Now, in defining what I'm ruling on,

9    instead of using the term "CRT products," where do

10   you think I should get my definition?

11          MR. SIMON:  You should get it from the

12   complaint.

13          SPECIAL MASTER LEGGE:  All right.

14          MR. SIMON:  And we allege it exactly like

15   we allege in the complaint.  And we allege that CRT

16   products are both the tubes, both kinds, as well as

17   the finished products.

18          SPECIAL MASTER LEGGE:  Okay.

19          MR. SIMON:  And that's the definition that

20   was upheld by your Honor on motions to dismiss.

21   That's the definition that was upheld in LCD.

22          SPECIAL MASTER LEGGE:  Okay.

23          MR. SIMON:  And as I argued to you last

24   time, there's three independent reasons why that

25   definition works, both from the legal aspect --

                                                      26

**Proceedings**

```
1          SPECIAL MASTER LEGGE:  Don't bother.

2          MR. SIMON:  Okay.

3          SPECIAL MASTER LEGGE:  This is purely

4     definitional to use in an order, favorable or

5     unfavorable, to say what CRT products is or just use

6     the generic term "CRT."  Okay?

7          MR. SIMON:  Okay.

8          SPECIAL MASTER LEGGE:  Now, what about the

9     substance of this motion?

10          MR. SIMON:  Well, the part I wanted to

11     direct you to is that he's proffering this as some

12     sort of management of discovery, a motion to strike,

13     balancing the burden.  But he's proffering it under

14     Rule 11, which has absolutely no basis here because

15     the way "CRT products" is defined in the complaint,

16     the only way he has a basis for any of those motions

17     is to dissect that definition and pull them apart,

18     which would be both economically and legally

19     improper for him to do.

20          He's asking specifically:  What is it that

21     you have on a separate conspiracy related to CRT

22     finished products?  That's how he sets the question.

23          That's not the question.  The question is,

24     we have alleged one conspiracy where the tube price

25     was set, that the tube price is the major component
```

27

**Proceedings**

 1    in the finished product price and, by virtue of the

 2    way the conspiracy operated, it couldn't operate

 3    without affecting the price of the finished

 4    products.

 5           If he --

 6           SPECIAL MASTER LEGGE:  So you're not

 7    arguing that there was a conspiracy about CRT

 8    products.

 9           MR. SIMON:  We are arguing --

10           SPECIAL MASTER LEGGE:  You are arguing

11    that the conspiracy of CRTs had an impact on the

12    price of CRTs?

13           MR. SIMON:  We are arguing that you could

14    not have a conspiracy on the tubes without having a

15    conspiracy on the finished products.

16           We are not saying there were separate

17    meetings on finished products.  We're not saying

18    that the finished products were separately part of a

19    conspiracy.  It was part of one conspiracy which, by

20    necessity, had to have an impact on the finished

21    products.

22           And if I can refer you for a moment, your

23    Honor, just while you're thinking about that, to the

24    paragraphs in the complaint, which we talked about

25    now three or four times, paragraph 144.

28

1          And these allegations are like the

2    allegations in LCD that were sustained, are the

3    allegations that you relied upon in sustaining this

4    complaint.

5          And at paragraph 144, the relevant part of

6    that says:

7               Defendants also considered the

8               internal pricing of products

9               containing CRTs in agreeing upon the

10              prices at which CRTs were set.

11         And then in paragraph 146, it says:

12              Defendants base these

13              determinations on what the market

14              would look like after jointly

15              analyzing anticipated supply and

16              demand.  The analysis often included

17              consideration of downstream prices

18              for televisions, computer monitors,

19              or similar products and how they

20              would affect the price ranges being

21              collusively set.

22         That is not saying what Mr. Kessler is

23    saying and trying to get you to buy into in terms of

24    an allegation of a separate conspiracy.

25              What that is saying is, as part of the

29

**Proceedings**

1    overall conspiracy, we fixed the price of the tube;

2    and by necessity, we have to take into consideration

3    and consider what the price effect will be on the

4    finished product.

5           And since the tube is the majority of the

6    cost of the finished product, you can't have one

7    without the other.  It can't be dissected.  It can't

8    be separated.

9           And Mr. Kessler, from the beginning of the

10   case, and defendants, from the beginning of the

11   case, have been trying to convince you, without

12   success -- and they've been unsuccessful in every

13   other case -- to take these two things apart.

14          And now he's advanced it to the point of

15   saying:  Well, it could be susceptible to Rule 11.

16   Maybe, depending on what we see.

17          That's not a Rule 11 motion.  That's a

18   summary judgment motion.  We can't possibly dissect

19   the class definition before we get to the point

20   where we know what the discovery record will show in

21   this case.

22          And that is also what Judge Conti said

23   when we went back to him on the motions to dismiss

24   in the last case management conference, where he

25   sustained your Honor's order on the motions to

30

**Proceedings**

1    dismiss.

2           So what Mr. Kessler is trying to do is

3    craft a remedy, which is really not within the rules

4    at all, by combining a Rule 11 motion with some sort

5    of balancing on discovery with a summary judgment

6    motion to strike allegations out of a complaint

7    before we have the discovery to determine whether

8    those allegations can be determined on the merits.

9           He would be striking -- it would be a

10   drive-by striking of allegations without knowing

11   what the merits are.  Exactly what the rules say we

12   shouldn't be doing.  And --

13           SPECIAL MASTER LEGGE:  Are you contending

14   that there is a separate conspiracy as to CRT

15   products?

16           MR. SIMON:  Finished products?

17           SPECIAL MASTER LEGGE:  Finished products.

18           MR. SIMON:  No.  We are talking about one

19   conspiracy as to both.  And the documents in this

20   case, which will be like the documents in LCD, will

21   show that you can't have a conspiracy on the tubes

22   without considering what the impact would be on the

23   finished products.

24           SPECIAL MASTER LEGGE:  I understand the

25   argument you're making.  I understand.  But I just

31

Proceedings

1    want to be clear.

2              You're not claiming there are two

3    conspiracies.

4              MR. SIMON:  We are not.

5              SPECIAL MASTER LEGGE:  You're claiming

6    there's one conspiracy.

7              And the significance of the finished

8    product being mentioned is that a conspiracy on the

9    price of the component tubes will necessarily affect

10   the prices at which the finished products are sold?

11             MR. SIMON:  And was part of the

12   consideration in the meetings that we allege in the

13   complaint.

14             SPECIAL MASTER LEGGE:  All right.  Add

15   that.  Add that.

16             MR. SIMON:  Right.  So, therefore, you

17   can't do one without the other.  And to dissect it

18   at this point, the way Mr. Kessler and defendants

19   are requesting you to do, would be to take the case

20   apart.

21             And we already talked to you at the motion

22   to dismiss about Continental Oar and the cases that

23   say that you don't dismember the complaint at this

24   point in time.

25             So, to summarize, you should rely on the

32

**Proceedings**

1    definition in the complaint, but not as Mr. Kessler

2    frames it, as it's actually framed in the complaint.

3    You should not dissect it at this time.

4              SPECIAL MASTER LEGGE:  Okay.

5              MR. SIMON:  And it should be subject to

6    merits discovery before we get to the point that

7    Mr. Kessler is trying to get you to.

8              SPECIAL MASTER LEGGE:  All right.  What

9    you're saying is, suppose I were to say "You've got

10   to produce everything you know about a" -- "I'll

11   call it a finished products conspiracy or a

12   conspiracy affecting finished products," is that

13   coextensive with all the rest of the discovery that

14   has got to be done?

15             MR. SIMON:  Right.

16             SPECIAL MASTER LEGGE:  All right.  I

17   understand what you're saying.

18             All right.

19             MR. RUSHING:  Well, your Honor --

20             SPECIAL MASTER LEGGE:  Yeah.

21             MR. RUSHING:  -- Jeff Rushing on behalf of

22   the direct purchasers.

23             I'm prepared to address the specifics of

24   the contention interrogatory --

25             MR. KESSLER:  Excuse me?

                                                       33

**Proceedings**

1          MR. RUSHING:  -- issue.

2          SPECIAL MASTER LEGGE:  Talk a little

3    louder, please.

4          MR. RUSHING:  I'm prepared to address -- I

5    mean, Mr. Simon was addressing the sort of

6    overarching question --

7          SPECIAL MASTER LEGGE:  Yes.  All right.

8          MR. RUSHING:  -- about the nature of the

9    conspiracy we are alleging here, and I believe he's

10   done so, which does affect the analysis, we believe.

11         But as far as the nuts and bolts of the

12   contention interrogatory motion, I'm prepared to

13   address those.

14         SPECIAL MASTER LEGGE:  Meaning what?  I

15   don't understand what you mean.

16         MR. RUSHING:  Well, I'd like to respond to

17   Mr. Kessler's argument, some of the other aspects of

18   his argument.

19         SPECIAL MASTER LEGGE:  All right.  Okay.

20   Go ahead.

21         MR. RUSHING:  Would you like me at

22   the . . .

23         SPECIAL MASTER LEGGE:  Well, wherever

24   you -- I think -- can all the rest of you in the

25   room hear him?

34

**Proceedings**

1          MR. RUSHING:  Let me -- I'll come around.

2          MR. KESSLER:  I think he needs to be a

3     little closer to the microphone.

4          SPECIAL MASTER LEGGE:  Yeah, he does.  He

5     is moving to the podium right now.

6          MR. SIMON:  I think what he's going to

7     address, your Honor, is the appropriateness of

8     contention interrogatories at the timing at this

9     point right now.

10          MR. RUSHING:  Yes, your Honor.  I'm here

11     to -- I mean, we agree that the question here is one

12     of --

13          SPECIAL MASTER LEGGE:  Oh, I did it again.

14          (Recess taken from 2:37 P.M. to

15           2:43 P.M.)

16          SPECIAL MASTER LEGGE:  Good afternoon,

17     Counsel.  I'm sorry.  We had a disruption in the

18     telephone service here, partially due to me and

19     partially due to some less-than-perfect equipment.

20     So we're back online now.

21          Are you folks still there?

22          MR. KESSLER:  Your Honor, we're back now.

23     I think we lost contact, at least we did here, just

24     before the second plaintiffs' counsel was about to

25     speak.

                                                          35

Proceedings

```
1              SPECIAL MASTER LEGGE:  Okay.  That's what
2    caused our problem.  I tried to move the speaker
3    here, the microphone closer to the podium, and
4    that's what resulted in our problem.  So you did not
5    miss anything substantively.
6              So, Counsel, would you proceed ahead,
7    please.
8              MR. RUSHING:  Thank you, your Honor.
9              Jeffrey Rushing on behalf of the direct
10   purchaser plaintiffs.
11             Your Honor, the questions you directed at
12   Mr. Kessler at beginning of his argument, let me
13   start there.
14             We agree that this is a question of
15   timing.  We don't take the position that we should
16   not ever have to provide a description of the basis
17   of our allegations to the defendants.
18             We do contend that we shouldn't have to do
19   it now, before discovery has meaningfully
20   progressed, at a time when we are stayed, discovery
21   is stayed and our hands are, to a large degree, tied
22   in terms of our ability to investigate, further
23   investigate the allegations that we have made in the
24   complaint and that, as you noted, have been upheld
25   by you, the Special Master, and the Court against
```

36

**Proceedings**

1    virtually identical attacks that the defendants

2    mount today.

3            Mr. Kessler is correct in that in order

4    for the defendants to prevail on this motion, they

5    must show that requiring early answers, early

6    answers to this contention discovery, as opposed to

7    answers at some later date, after substantial

8    completion of discovery, but that requiring early

9    answers will materially advance the case.

10           The case law is clear.  In general, that

11   is not the case.  In general, contention discovery

12   is disfavored early in the case.  And the reasons

13   it's disfavored is because there's no point to it;

14   it doesn't accomplish anything.

15           As Judge Seeborg said in eBay, a case

16   which we think is very similar to this -- it's an

17   antitrust case in which contention discovery was

18   propounded early in the case as to the big issues in

19   the case.  Judge Seeborg said:

20               Courts using their Rule 33(a)(2)

21           discretion generally disfavor

22           contention interrogatories asked

23           before discovery is undertaken.  In

24           fact, courts tend to deny contention

25           interrogatories filed before

37

1              substantial discovery has taken place

2              but grant them if discovery almost is

3              complete.

4              So that's the issue, is timing.  And we

5    have some other issues with contention discovery

6    and/or -- that has been propounded.  We're focusing

7    on the timing here.

8              We also believe that there are issues of

9    duplication.

10             SPECIAL MASTER LEGGE:  Of what?

11             MR. RUSHING:  Duplication.  I mean, there

12   are approximately, I think, 20 requests at issue

13   today.  There are a number -- there are 15 or 20

14   more that have been propounded in defendants' second

15   round of discovery.  Defendants, no doubt, are ready

16   to propound hundreds more if they get the green

17   light here.

18             And so we will certainly have something to

19   say --

20             SPECIAL MASTER LEGGE:  Well, I thought I

21   was dealing only with the interrogatories that were

22   identified in Footnote 1 of the motion of

23   September 3rd from defendants.

24             MR. RUSHING:  I think that is correct.

25   Those are the motions -- that is the discovery

                                                        38

1    formally at issue today.

2            But I would suggest that there would be a

3    host of additional requests propounded were the

4    Court to green light contention discovery at this

5    point --

6            SPECIAL MASTER LEGGE:  Not on --

7            MR. RUSHING:  -- in the game.

8            SPECIAL MASTER LEGGE:  Not on this issue.

9    I mean, this . . .

10           MR. RUSHING:  Well, I --

11           SPECIAL MASTER LEGGE:  These motions will

12   determine whether there will be, I'll just call it,

13   immediate discovery on the issue of CRT products.

14           MR. RUSHING:  Well --

15           SPECIAL MASTER LEGGE:  So it's going to be

16   yes or no.  If it's yes, they get it, nobody's going

17   to need any more motions.  If it's no, they don't

18   get it, there's not going to be any more motions.

19   So I --

20           MR. RUSHING:  Well, that's what I'm

21   saying.  If that's --

22           SPECIAL MASTER LEGGE:  I think I'm dealing

23   with a finite number here.

24           Okay.  Go ahead.

25           MR. RUSHING:  Well, my point is simply

39

**Proceedings**

1    that to the extent -- yes, we are dealing with 15 or

2    20 interrogatories directed at a single subject

3    today.

4              SPECIAL MASTER LEGGE:  Yeah, right.

5              MR. RUSHING:  These interrogatories,

6    themselves, are duplicative, I would submit.

7              And they are also -- there are some

8    issues -- for example, they call for, quote, all

9    facts in support of a -- of a contention they ask if

10   we are making.  Those, as a matter of form, on their

11   face -- Judge Seeborg has held in eBay and a JAMS

12   colleague of yours, your Honor, Martin Quinn, has

13   recently held that similar contention

14   interrogatories are, on their face, invalid in the

15   LCD case.

16             So leaving aside those kinds of concerns,

17   your Honor, for the moment, the question is timing.

18             And what I principally --

19             SPECIAL MASTER LEGGE:  And your position

20   is --

21             MR. RUSHING:  Our position --

22             SPECIAL MASTER LEGGE:  -- that the

23   information should be produced as a part of the

24   other merits discovery that's going to go on in the

25   case about the alleged conspiracy and its

40

**Proceedings**

1    consequences generally.

2         MR. RUSHING:  Our position -- yes, that we

3    should provide responses to appropriate contention

4    discovery at a time when substantial discovery is

5    complete.

6         SPECIAL MASTER LEGGE:  Okay.

7         MR. RUSHING:  Then -- I mean, the point of

8    such contention discovery is to allow the other side

9    to prepare for trial, to understand the issues at

10   trial, to understand the issues presented for

11   dispositive motions, trial, et cetera.

12        SPECIAL MASTER LEGGE:  I understand.  But

13   the position that the defendants are taking is,

14   where they have one issue that they believe can be

15   isolated and where they can obtain information which

16   will materially impact the remainder of the case,

17   that it's good management and good law to do it now.

18        MR. RUSHING:  Well, and we disagree with

19   that, your Honor.  And Mr. Kessler is wrong on a

20   couple of different points.

21        He focuses -- on the one hand, he admits

22   that their aim in this case is to get a ruling -- in

23   this instance is to get a ruling on the merits,

24   effectively on the merits that removes the finished

25   product issue from the case and to get that ruling

                                                          41

**Proceedings**

1    without providing plaintiffs the benefit of

2    meaningful discovery into their allegations.

3            SPECIAL MASTER LEGGE:  Yes, that's right.

4            MR. RUSHING:  That's his point.

5            SPECIAL MASTER LEGGE:  Well --

6            MR. RUSHING:  And with respect, your

7    Honor, we would submit that that completely turns

8    the litigation process on its head.

9            SPECIAL MASTER LEGGE:  Well, it's an

10   entire focus on Rule 11.

11           MR. RUSHING:  Yes, your Honor.

12           SPECIAL MASTER LEGGE:  That is, if you

13   didn't have information at the time, you had no

14   basis for doing it, you shouldn't have done it and,

15   as a consequence, it should be stricken.

16           MR. RUSHING:  Well, and --

17           SPECIAL MASTER LEGGE:  That's his

18   position.

19           MR. RUSHING:  Yes, that is his position,

20   and he's incorrect, and let me address that.

21           Mr. Kessler is incorrect, first of all, as

22   to the law of Rule 11 in the Ninth Circuit.  And

23   we've cited a case in our brief which Mr. Kessler

24   didn't address.  It's the Keegan case which makes

25   clear that there are two parts to a Rule 11 inquiry.

                                                      42

1           The first part is that the pleading or the

2      contention at issue must be objectively frivolous.

3      And the second -- the second requirement is that

4      there must not have been adequate information at the

5      time of the filing of the complaint, for example, at

6      the time the contention was made.  So it's a two

7      part -- it's a two part question.

8           The discovery that the plaintiffs -- or

9      excuse me -- that the defendants are seeking here,

10     they assert that it goes -- that all they want to

11     know is what we knew at the time the consolidated

12     amended complaints were filed.

13          That, as a matter of law, cannot establish

14     a Rule 11 -- even assuming, even assuming that there

15     isn't -- we did not have an adequate basis for what

16     we said, which is an enormous assumption which we

17     strenuously disagree with, but even assuming, for

18     the sake of argument, that that's the case, simply

19     showing that we did not have the proper basis for

20     our claim at the time it was filed is not enough,

21     under the Keegan case and well established Ninth

22     Circuit authority, to establish a Rule 11 violation.

23          So he can't do -- he won't be able to do

24     what he says he wants to do even if he gets

25     everything he wants from us on this motion because

43

1    the Court would still be required to make a finding

2    that the allegation objectively lacks merit.  And

3    everything's relevant there, your Honor, including

4    any -- any information -- including information

5    obtained after the complaint was filed.

6              That is the holding of the Keegan case.

7    In that case, the Court did find that the

8    attorneys --

9              SPECIAL MASTER LEGGE:  I'm looking at your

10   brief here.  Where is the Keegan case?  You've got a

11   whole bunch of them.

12             MR. LEHMANN:  It's pages 9 and 10, your

13   Honor.

14             SPECIAL MASTER LEGGE:  9 and 10.

15             Okay.  I see it here.  Keegan Management

16   Securities Litigation, bottom of page 9, top of

17   page 10.

18             Okay.  Thank you.

19             MR. RUSHING:  That is a case in which the

20   Court granted summary judgment and then subsequently

21   found that the case had been filed without adequate

22   investigation and then imposed sanctions on the

23   plaintiffs' counsel.

24             The Ninth Circuit reversed that finding

25   because in the course of denying -- in the course of

44

Proceedings

 1    granting summary judgment, the Court noted and found

 2    that, yes, while summary judgment -- it was

 3    appropriate to grant summary judgment, the evidence

 4    that the plaintiffs had produced which they had

 5    obtained in discovery showed that they had a

 6    colorable claim, showed that the claim was not

 7    frivolous.  And the Ninth Circuit said there's no

 8    Rule 11 violation in that circumstance.

 9         So it's a two-part test.  The case has to

10    be objectively frivolous, and it also has to be

11    filed without adequate investigation.

12         So even assuming the hypothetical that you

13    posed -- your Honor posed earlier, even assuming

14    that events played out that way, we still could not

15    have a Rule 11 -- could not find a Rule 11 violation

16    in the short-term here, as Mr. Kessler proposes.

17         SPECIAL MASTER LEGGE:  Okay.

18         MR. RUSHING:  In addition, in addition,

19    the defendants -- this procedure that Mr. Kessler

20    proposes, that everything in this action comes to a

21    screeching halt so that the defendants can conduct a

22    Rule 11 inquiry --

23         SPECIAL MASTER LEGGE:  Well, everything is

24    not going to come to a screeching halt.

25         MR. RUSHING:  Well --

45

Proceedings

```
 1              SPECIAL MASTER LEGGE:  Even I agree with

 2     their motion, it's not going to come to a

 3     screeching --

 4              MR. RUSHING:  Well, your Honor --

 5              SPECIAL MASTER LEGGE:  -- halt.

 6              Discovery is going to proceed ahead.  And

 7     I will rule on these documents matters as soon as I

 8     can, in the next few days.  And you're going to be

 9     producing and they're going to be producing.

10              MR. RUSHING:  Well, your Honor --

11              SPECIAL MASTER LEGGE:  The depositions

12     will start around the 1st of March.  It's not going

13     to come to a screeching halt.

14              MR. RUSHING:  Well, your Honor, I was

15     addressing -- I wasn't addressing something I

16     thought your Honor was inclined to do.  I was

17     addressing the procedure that Mr. Kessler proposes.

18              I mean, your Honor asked Mr. Kessler what

19     would be the sequence of events.  And his answer was

20     discovery would halt on the issue of --

21              SPECIAL MASTER LEGGE:  Well, I don't know

22     whether he said that or not.

23              MR. RUSHING:  Well, I think he did.

24              SPECIAL MASTER LEGGE:  Go ahead.

25              MR. RUSHING:  Maybe he can address that
```

46

Proceedings

1    when I'm finished.  But I believe that's what he

2    said.

3            SPECIAL MASTER LEGGE:  I'm not going to

4    stop everything, believe me.

5            MR. RUSHING:  All right.  And to finish

6    the point, to the extent that's their contention,

7    they have cited no authority in their papers and --

8            SPECIAL MASTER LEGGE:  I told you --

9            MR. RUSHING:  -- to say that that's a

10   proper procedure.

11           SPECIAL MASTER LEGGE:  -- I'm not going to

12   stop everything.  So you don't need to argue about

13   it anymore.

14           MR. RUSHING:  Okay.  All right.  Now, let

15   me just -- just a couple more things here, your

16   Honor.

17           Mr. Kessler also focuses on discovery, and

18   he says it's important for us to respond to this

19   discovery so that your Honor and others, I

20   suppose -- because it will inform the question of

21   how much discovery into finished products do we get.

22           And, I mean, the arguments in our brief, I

23   think, are apt.  That presupposes that we have to

24   make some sort of showing, a threshold showing

25   before we're entitled to discovery into the

47

Proceedings

1    allegations of our complaint.

2           That is not the law, and we set forth in

3    our brief plainly that that's simply not the law.

4    And we're going to hear more about that, I think, on

5    some of these Hitachi briefs.

6           But an additional point here that I think

7    is very important, the events on the ground have

8    outstripped this motion, your Honor.  We are engaged

9    in meeting -- pursuant to your Honor's orders,

10   meet-and-confer conferences and discussions with

11   defendants on this.

12          And, in general -- there are some

13   exceptions, Hitachi being one -- but, in general, we

14   are making significant progress towards resolving

15   the very issue of the scope of finished product

16   discovery on the basis of, as we've said earlier,

17   identifying custodians and narrowing the search and

18   the scope of defendants' search, based on this

19   custodian-based approach.  We're well down the road

20   on this with most defendants.

21          We have not reached a final agreement, I

22   don't believe, with any defendants; but -- and it

23   may be that we do not reach agreements with some;

24   but I would predict, without knowing the future,

25   that this process will bear fruit and that the

48

**Proceedings**

1   parties, at least most of them will be able to

2   resolve their --

3           SPECIAL MASTER LEGGE:  What you're talking

4   about is, you're negotiating about their production

5   of documents to you?

6           MR. RUSHING:  Yes.

7           SPECIAL MASTER LEGGE:  Well, this motion

8   is dealing with your obligation to provide documents

9   to them.

10          MR. RUSHING:  Yes.  But he is saying that

11  the reason we should -- your Honor, let me step

12  back.

13          You said our obligation to provide

14  documents to them.  First of all, there may be a

15  misunderstanding here.  We are not withholding

16  documents from the defendants.

17          SPECIAL MASTER LEGGE:  Well, I'm just

18  trying to shorten it.  Produce discovery.

19          MR. RUSHING:  No, no.  They're asking --

20  no.  What they're asking for are responses to

21  contention interrogatories that set forth --

22          SPECIAL MASTER LEGGE:  All right.  Answer

23  interrogatories.

24          MR. RUSHING:  -- that set forth at length

25  the basis, all facts supporting the allegations of

49

**Proceedings**

1    our complaint.

2            SPECIAL MASTER LEGGE:  And documents that

3    support it.

4            I'm sorry.

5            MR. RUSHING:  Well, they want us to --

6            SPECIAL MASTER LEGGE:  I'm really trying

7    not to use so many words.

8            MR. RUSHING:  Okay.

9            SPECIAL MASTER LEGGE:  What I'm trying to

10   say is, what you're now arguing is meet-and-confers

11   that concern your request for discovery from them on

12   CRT products, when the issue here is, one, the

13   defendants' request to you for discovery on CRT

14   products.

15           MR. RUSHING:  Well, your Honor --

16           MR. SIMON:  Your Honor, I think what

17   Mr. Rushing might be saying is that the issue

18   crosses both motions, because Mr. Kessler and

19   Hitachi and defendants want to draw the line down

20   the middle of our class definition, and it affects

21   both.

22           And that's why I think he's saying that

23   somehow all discovery would stop, because if you

24   rule a certain way --

25           SPECIAL MASTER LEGGE:  It's not going to

**US LEGAL SUPPORT**
**888-575-3376**

1    stop.

2            MR. SIMON:  Yeah, I understand.  But

3    Mr. Kessler is suggesting if you rule a certain way

4    on his motion to compel, it's going to apply equally

5    on the other side.

6            SPECIAL MASTER LEGGE:  I don't know

7    whether it will or not.

8            MR. RUSHING:  Well, your Honor --

9            SPECIAL MASTER LEGGE:  The burdens are

10   different.  Burdens are different.

11           MR. RUSHING:  Your Honor --

12           SPECIAL MASTER LEGGE:  The burden in this

13   situation is much different.

14           MR. RUSHING:  Your Honor --

15           SPECIAL MASTER LEGGE:  That is, if I make

16   you answer a question, your information to answer it

17   should be within your grasp.

18           You had information in front of you before

19   you drafted the complaint.  You gathered what

20   information you had.  It may be sufficient; it may

21   be insufficient.  But you gathered it.

22           In their case, they've got to go out

23   searching for it worldwide.

24           MR. SIMON:  Well --

25           SPECIAL MASTER LEGGE:  That burden is a

51

Proceedings

1    heck of a different burden.

2              MR. RUSHING:  Your Honor --

3              MR. SIMON:  Hold on a second, Jeff.

4              Couple things.  Just going back to the LCD

5    case --

6              SPECIAL MASTER LEGGE:  No.  No, I don't

7    want to go back to another case.  I'm talking about

8    this case.

9              MR. SIMON:  But here's the point.  The

10   point is where we are in the case.

11             In that particular case, it was three and

12   a half years after depositions and documents

13   produced that the contention interrogatories were

14   filed by some of the same counsel.

15             SPECIAL MASTER LEGGE:  I understand that

16   argument, and it's a valid argument.  Whether it

17   carries the day or not, I haven't decided.  But I

18   understand that argument.

19             MR. SIMON:  And the other thing --

20             SPECIAL MASTER LEGGE:  But you don't need

21   to restate it again.

22             MR. SIMON:  But the other thing I just,

23   you know, would like to make clear is, is that

24   there's somehow this insinuation, if not explicit

25   statement by defendants, that there's nothing behind

52

**Proceedings**

1    this complaint.

2            As we told you on the motion to dismiss

3    and in the moving papers, the amnesty applicant in

4    this case provided us --

5            SPECIAL MASTER LEGGE:  I understand.

6            MR. SIMON:  -- with all this information.

7            SPECIAL MASTER LEGGE:  I understand.

8            MR. SIMON:  And --

9            SPECIAL MASTER LEGGE:  It may be that he

10   wasn't there at the times the discussions were going

11   on.  I don't know what he's going to say.  I'm not

12   attributing too much to that.

13           MR. SIMON:  Okay.

14           SPECIAL MASTER LEGGE:  All right?

15           MR. SIMON:  But the point is very much

16   that, is that the whole record is not complete at

17   this point in time for Mr. Kessler to do the --

18           SPECIAL MASTER LEGGE:  But then the --

19           MR. SIMON:  -- procedure he's saying.

20           SPECIAL MASTER LEGGE:  But then the

21   question is whether it was complete enough for you

22   to be able to meet the requirements of Rule 11 when

23   you filed your complaint.

24           All we're doing is restating, I think,

25   what was said 20 minutes ago.

53

Proceedings

1          MR. RUSHING:  Well, let me just, your

2     Honor, with your guys' forbearance, quickly.

3          The law with regard to contention

4     discovery says you don't get it early in --

5          SPECIAL MASTER LEGGE:  Now wait a minute.

6     This is all management stuff.

7          I don't like contention -- I think I told

8     you this in the prior hearing, as I recall.

9          If you take a complaint and the defendants

10    then go down every allegation and say "What

11    information do you have on this?  What information

12    do you have on that?  What information do you have

13    on the next one?" those are highly improper and

14    shouldn't be done.

15          But what they're doing here is taking one

16    issue -- one issue, okay? -- and saying:  We think

17    this is going to make a difference to the management

18    of the case.  Whether they're right or wrong is my

19    call, but that's what they're saying.

20          So it's not the same thing as just lumping

21    the whole thing under the category of contention

22    interrogatories and some judge who said in a

23    particular case "Contention interrogatories here are

24    improper."  Okay?

25          MR. RUSHING:  I understand that, your

54

**Proceedings**

1    Honor.  The reason I was addressing the discovery

2    issue and the linkage that Mr. Kessler had made

3    between our answers to this discovery and their

4    responses to the finished product discovery is that

5    under the cases we've been relying on, he's got to

6    make a showing that there's something that this

7    will -- that our answers will allow him to

8    accomplish.

9            And my point is that when he says it will

10   allow them to -- essentially allow the Court or the

11   parties to resolve discovery issues about the scope

12   of finished product discovery, my point is that the

13   parties are well along the way to resolving those

14   discovery issues by themselves.

15           So that when he says it's necessary to do

16   that --

17           SPECIAL MASTER LEGGE:  Well, are your

18   meet --

19           MR. RUSHING:  -- I'm saying it's not.

20           SPECIAL MASTER LEGGE:  -- and confers even

21   dealing with the subject matter of what discovery

22   you have to provide to them about products?

23           MR. RUSHING:  No.  They are dealing

24   with --

25           SPECIAL MASTER LEGGE:  No.  So it isn't

55

Proceedings

1    going to do the job.

2            MR. RUSHING:  All right.  Your Honor, I

3    think that's --

4            SPECIAL MASTER LEGGE:  Okay.

5            MR. RUSHING:  -- all I have.

6            SPECIAL MASTER LEGGE:  I'm sorry --

7            MR. RUSHING:  If you're interested in

8    having --

9            SPECIAL MASTER LEGGE:  I'm sorry to be

10   short with you, but you know, having read the briefs

11   and hearing what I'm hearing, I'm hearing a few new

12   things.  Okay.  But a lot of it is just repetition.

13   I don't need the repetition.

14           MR. RUSHING:  Let me make one last point.

15           SPECIAL MASTER LEGGE:  Okay.

16           MR. RUSHING:  The point that your Honor

17   just made, that they are and that Mr. Kessler has

18   been trying to make, apparently, that they are

19   focusing on just one small aspect of the case and

20   that all they want to talk about is the finished

21   products conspiracy, this is the point Mr. Simon was

22   making.  It's -- we haven't -- our case isn't

23   alleged that way.

24           There's one conspiracy.  It embraces both

25   products.  If you set the prices of CRT -- if you

56

Proceedings

1    fix the prices of CRTs, you necessarily determine

2    the prices of the finished products.  The parties

3    knew that.  The conspirators knew that and intended

4    that.  It's one conspiracy.

5            And so when they say "We're just asking

6    for support for a small part of it," that's -- it

7    doesn't work that way.  We're going to have -- this

8    answer -- this request effectively asks us for the

9    support for the entire case.

10           And that's the point.  It's not --

11           SPECIAL MASTER LEGGE:  No, it doesn't.

12           MR. RUSHING:  It's not a small, discreet

13   area.

14           SPECIAL MASTER LEGGE:  I understand.

15           MR. RUSHING:  It's the support for the

16   entire case.

17           SPECIAL MASTER LEGGE:  I understand.

18           MR. KESSLER:  Your Honor, is it my turn

19   yet?

20           SPECIAL MASTER LEGGE:  Yes, yes.  I'm

21   sorry.  I was making a note or two.

22           Go ahead, Counsel.

23           MR. ALIOTO:  Your Honor, excuse me.

24   Before Mr. Kessler replies, may I make one point for

25   the --

57

Proceedings

```
1              SPECIAL MASTER LEGGE:  Yeah, sure.

2              MR. ALIOTO:  -- indirect purchasers.  It's

3   very, very --

4              SPECIAL MASTER LEGGE:  Can you just do it

5   right here?

6              MR. ALIOTO:  I'll do it right here.

7              It's brief, but it's somewhat new here,

8   just to put this in perspective.

9              Mario Alioto on behalf of the indirect

10  purchasers.

11             As your Honor noted, you're confronted

12  here with motions to compel as to, I think, the

13  discovery of five defendants.

14             SPECIAL MASTER LEGGE:  Five?  I didn't

15  count the number.

16             MR. ALIOTO:  Or five discovery requests.

17             SPECIAL MASTER LEGGE:  Well, let's see

18  what it is.

19             MR. ALIOTO:  There are requests pertaining

20  to the direct purchasers, and there are requests

21  pertaining to the indirect purchasers.

22             SPECIAL MASTER LEGGE:  Yeah.  Well,

23  there's -- I didn't actually count the number, but

24  they're listed here in Footnote 1.

25             MR. ALIOTO:  But to follow up with what
```

58

1    your Honor said earlier about these contention

2    interrogatories that go down the complaint with

3    respect to every allegation and say "Give me

4    everything you know about A, B, C, D, E, F, G," that

5    is this case, because in the wings are further

6    contention interrogatories.  Not before your Honor

7    today, but they're going to be here, depending on

8    what happens.

9         We had a demand letter about a week ago

10   that we're going to go see the judge on this, and

11   we're going to move on contention interrogatories.

12        These are contention interrogatories

13   about:  Give us everything you know about CRT

14   products.  These are contention interrogatories

15   about:  Give us everything you know about pass-on of

16   the overcharge.  That's what's before you today.

17        What's out there in the wings is:  Give us

18   everything you know on the conspiracy.  Give us

19   everything you know on why common issues predominate

20   in the indirect purchaser case.

21        And after that wave gets settled, we're

22   going to get more.

23        So the problem is larger than what is

24   before your Honor today.  And I submit it is

25   precisely -- your Honor made the argument for me.

59

Proceedings

1    We are faced with -- at the end of the day, if this

2    floodgate is opened, we are going to be answering

3    multiple sets of contention interrogatories on every

4    single allegation in the complaint.

5            And I have no problem doing that at the

6    close of discovery, but not now and not before

7    summary judgment and not after summary judgment and

8    not before the case is tried.  That's the problem,

9    your Honor.

10           And I submit it is precisely what your

11   Honor identified.  We are going to be giving

12   contention discovery.  And it's not:  Give us the

13   documents and give us the numbers.  That part, you

14   know, that's a little less onerous.  But it's:

15   Describe in narrative form your proof as to all of

16   these allegations.

17           And this is not a, you know, slip-and-fall

18   in the local market, your Honor.  This is a

19   complicated worldwide --

20           SPECIAL MASTER LEGGE:  I understand.

21           MR. ALIOTO:  -- conspiracy.

22           And I submit to you, your Honor, this

23   is -- your Honor alluded to this earlier.  Your

24   rulings have far-reaching consequences.  And this

25   would be a very, very onerous burden on the

60

**Proceedings**

1    plaintiffs, which -- you know, we bring these cases.

2              SPECIAL MASTER LEGGE:  I don't --

3              MR. ALIOTO:  They're not easy cases, and

4    we bring them, and we're ready to meet the burdens.

5    The problem is not now, your Honor.  Down the road.

6              Thank you.

7              SPECIAL MASTER LEGGE:  I don't totally

8    absorb your in terrorem argument, because if I

9    rule -- suppose I rule against you.  I'm ruling on

10   one contention interrogatory.

11             It's a different matter if I'm confronted

12   with a whole mass of others and I see the defendants

13   are simply using contention interrogatories to

14   dredge everything they can because they don't want

15   to have to draft the interrogatories on what they

16   really want.

17             And I don't think it's going to -- any

18   decision I make on this isn't going to have that

19   kind of --

20             MR. ALIOTO:  All I can tell you is the --

21             SPECIAL MASTER LEGGE:  In fact, if I ruled

22   for you, it is not going to be a ruling against the

23   defendants that they can't, in certain

24   circumstances, ask a contention interrogatory.

25             MR. ALIOTO:  Very well, your Honor.  I

                                                           61

**Proceedings**

1    just wanted to alert you, though, that the issue is

2    larger than the motions before you.

3              SPECIAL MASTER LEGGE:  I understand.  I

4    appreciate your pointing that out.

5              As I said before, only having certain

6    motions in front of me, I have to be a little bit

7    careful about what may be standing in the wings, the

8    decisions that it could impact.

9              MR. GUIDO SAVERI:  May I make one comment,

10   your Honor?

11             SPECIAL MASTER LEGGE:  Yes, sure.

12             MR. GUIDO SAVERI:  And this will be very

13   short.

14             SPECIAL MASTER LEGGE:  Okay.

15             MR. GUIDO SAVERI:  Okay?

16             Really, this gets down to two basic issues

17   and is what Mr. Simon mentioned at the beginning.

18             What Mr. Kessler is trying to do is draft

19   a complaint the way he wants it.  This could take

20   less than two, three minutes.  He wants us to draft

21   a complaint the way he wants it, and he wants us to

22   split it up into two conspiracies, one finished

23   products and one with the tubes themselves.

24             We have not alleged that, as we said many

25   times.  There's one conspiracy.  And the evidence

                                                          62

**Proceedings**

1    that we want will develop that there was a

2    conspiracy on CRT products, one conspiracy where the

3    price was fixed for both the tube and the finished

4    products.

5              Now, these contention interrogatories that

6    he's setting up is trying to accomplish just that,

7    to split it up.

8              And the cases that Mr. Rushing cited, that

9    even if he is successful, you'll have to wait until

10   the end of the summary judgment motions to see if at

11   any time we had a colorable claim because that would

12   defeat any Rule 11 motion.

13             These contention interrogatories, with all

14   due respect -- I've been around a few years, and

15   I've faced them in many, many cases -- and they've

16   been rejected with the Convergent case, Judge Patel,

17   and also the most recent case.  And what they're

18   trying to do is split it up.

19             We will eventually tell them what we have.

20   And why don't we just proceed.  What do we need

21   contention interrogatories at this time?  They serve

22   no purpose.  The only purpose they serve is a

23   harassing deal to put us to a lot of work that is

24   not necessary at this time.

25             And as Mr. Rushing said, we've been

63

**Proceedings**

1   talking about custodians.  They're going to cut this

2   right down.  What custodians are the people who had

3   pricing authority?  They know who they are, and we

4   have some names we can give them, and it'll get down

5   to that limited group.

6           That's what we intend to do in this case,

7   and not be here for a million years, like

8   Mr. Kessler wants to do and like Mr. Kessler is

9   doing in the ODD case in front of Judge Walker and

10  as he did it in front -- as the group has done it in

11  front of Illston in LCD.

12          Past is prologue.  And that's what's

13  happening in this case.

14          SPECIAL MASTER LEGGE:  All right.  Okay.

15          Mr. Kessler?

16          MR. KESSLER:  Thank you, your Honor.  I'll

17  try to address these in some sensible order.

18          First of all --

19          SPECIAL MASTER LEGGE:  Can you talk a

20  little bit louder, notwithstanding your cold?

21          MR. KESSLER:  I will try.

22          SPECIAL MASTER LEGGE:  Our court

23  reporter's having a hard time hearing you.  Let me

24  be sure I've got this on full volume.

25          MR. KESSLER:  Okay.

                                                    64

**Proceedings**

1          SPECIAL MASTER LEGGE:  I've got it on

2     full -- I turned it up a little.  So this is as full

3     as I can get the volume, so go ahead.

4          MR. KESSLER:  Okay.  First of all, your

5     Honor, I was mesmerized by Mr. Simon's argument.

6          And the reason I say that is that at least

7     several times I'm sure I heard him say -- I'll go

8     look back on the transcript -- that they are not

9     alleging a conspiracy to fix prices regarding

10    finished CRT products and that what they are

11    alleging is a tubes conspiracy that they believe

12    necessarily has an impact on finished CRT products.

13          If that is what Mr. Simon is alleging, I

14    want a stipulation to that effect.  It will

15    drastically limit the discovery in this case because

16    it would mean that, for example, we wouldn't be

17    getting massive discovery requests asking every time

18    someone who sold televisions went to a trade

19    association meeting with somebody else who sold

20    televisions and zillions of e-mails that might

21    relate to that.  So this is a critical distinction.

22          However, I also heard Mr. Simon and

23    Mr. Saveri and others then kind of fudge and say,

24    "Well, it's really a conspiracy that involves both

25    products."

                                                          65

Proceedings

1           And there we are again.  What we're

2    entitled to, your Honor, in this discovery is that

3    if they want to stipulate now on the record, and

4    your Honor so orders, that the conspiracy they're

5    alleging is a conspiracy regarding tubes in which

6    they're contending the impact was necessarily on CRT

7    finished product prices, that's fine and that would

8    resolve this issue.

9           But unless they're willing to do that,

10   then we are entitled to know what is the basis of

11   what they said in the complaint.

12          And frankly, your Honor, what they said to

13   you in oral arguments, what they said in their

14   briefs on the motion to dismiss, what they said to

15   Judge Conti on the motion to dismiss, which is that

16   when this issue came up and your Honor relied upon

17   this, they said, unequivocally, they were alleging a

18   separate conspiracy involving finished CRT products.

19          That is the basis upon which the motion to

20   dismiss was decided, and that is why they are

21   propounding to us these enormous discovery requests.

22          And in that regard, I would say I don't

23   know who they think they resolved this issue with on

24   discovery or are close to resolving it with, but it

25   is not with any of the Panasonic companies.  And I

66

Proceedings

1  would welcome other defendants to speak up on that

2  after I am done.

3          But I can tell you they are continuing to

4  insist and we are continuing to object to produce

5  any finished products discovery that is not related

6  to impact, period.

7          And this has nothing to do with the

8  custodian's point which has to do with the time

9  period.  This has nothing to do with the custodian's

10 point which has to do with geographic scope.

11         We have not moved at all on this

12 impenetrable disagreement, which I think you're

13 going to hear, in part, in the Hitachi motion, at

14 least in one case, that they are not entitled to,

15 without a basis, getting discovery that relates to

16 an alleged finished products conspiracy.

17         So -- am I going too fast now?  Is that

18 the problem?

19         SPECIAL MASTER LEGGE:  Well, you started

20 talking a little fast, and then there's a little

21 breakup in the transmission here.  But go ahead,

22 please.

23         MR. KESSLER:  Okay.

24         SPECIAL MASTER LEGGE:  It would help me, I

25 think, Mr. Kessler, if you'd slow down just a little

**Proceedings**

 1    bit.

 2              MR. KESSLER:  Okay.  I will slow down,

 3    your Honor.  I think in getting louder, I got

 4    faster.  That's wasn't my intention.

 5              SPECIAL MASTER LEGGE:  Okay.

 6              MR. KESSLER:  So let me go back to where I

 7    was.

 8              So now you get to the issue of timing.

 9              UNIDENTIFIED VOICE:  I know you want it.

10              SPECIAL MASTER LEGGE:  Somebody else seems

11    to be on the line.

12              MR. KESSLER:  Yeah, somebody needs to mute

13    their line if they're listening in.

14              So --

15              SPECIAL MASTER LEGGE:  Maybe that was just

16    it.  Go ahead.

17              MR. KESSLER:  Maybe that was the

18    interruption.

19              SPECIAL MASTER LEGGE:  Yeah, I think so.

20              MR. KESSLER:  Okay.

21              So with respect to the issue of timing,

22    your Honor had this exactly right.  We are only

23    seeking the information they readily have at hand.

24              This has nothing to do with future

25    discovery.  It has nothing to do with contention

Proceedings

1   interrogatories at the close of discovery.  It has

2   nothing do with any contention interrogatory other

3   than the very few before your Honor as you noted in

4   this motion.  That's all we're asking to be decided.

5        We believe that, again, unless they are

6   willing to stipulate now that the only conspiracy is

7   about tubes with what they call a necessary impact

8   on finished products, then we are entitled to these

9   answers now.

10        Now, I also want to make a comment about

11   Rule 11 since he raised it.  We do not agree at all

12   with his analysis about the Keegan case and what

13   that means, but that's not before your Honor right

14   now.

15        If and when we get our answers to the

16   contention interrogatories, and if and when we think

17   a Rule 11 motion is required and then we get to it,

18   then we'll argue that.

19        But since he raised the issue, the

20   difference is in the Keegan case they were seeking

21   to dismiss the entire complaint and get sanctions

22   for that after evidence had developed that there was

23   a cause of action.

24        This is a different aspect of Rule 11

25   which has to do with that they've inserted an

69

**Proceedings**

1    extraneous, completely extraneous matter in the

2    case, we believe, without any basis for doing so.

3    We believe the Ninth Circuit case law here would say

4    if they didn't have a factual basis for that, that

5    alone triggers Rule 11.

6            And I'm happy to brief that if and when we

7    ever get to a Rule 11 motion.  I just didn't want

8    your Honor to think we accept their version of the

9    case law there.

10           Now, finally, I want to get to Mr. Simon's

11   discussion about definition.  You can't define your

12   way out of Rule 11.  And let me explain what I mean

13   by that.

14           Let's say I had a complaint --

15           SPECIAL MASTER LEGGE:  Well, wait a

16   minute.  Wait a minute.  Wait a minute.  Wait a

17   minute.  Wait a minute.

18           Let me just ask you what I think I need to

19   know.

20           MR. KESSLER:  Yes.

21           SPECIAL MASTER LEGGE:  And that is, in

22   drafting an order for you or against you, do you

23   think I need to define what "CRT products" are, or

24   do you think they're adequately defined in the

25   complaint?

Proceedings

1          MR. KESSLER:  I don't --

2          SPECIAL MASTER LEGGE:  Or just a generic

3    term "CRT products" -- somebody said here a moment

4    ago and I wrote it down.  I've lost it.  Where did I

5    put it?  Finished products that incorporate a CRT.

6          MR. KESSLER:  Yes, your Honor.  That is

7    the definition we believe is relevant to what we're

8    seeking in this motion.

9          SPECIAL MASTER LEGGE:  Where did that

10   definition come from?

11         MR. KESSLER:  We have proposed it in part

12   of what our contention interrogatories are asking

13   about.

14         SPECIAL MASTER LEGGE:  Okay.

15         MR. KESSLER:  In other words, we're not

16   seeking to have them -- and I'll be very clear so

17   they won't think it's an enormous burden.

18         We don't want them to identify any

19   evidence that has to do only with tubes.  Okay?  We

20   are only looking for any evidence they have for the

21   part of their allegation that says there's a

22   conspiracy relating to a finished product that

23   contains a CRT, whether it's a CPT or a CDT.

24         We just broke it up.  Some of our

25   questions go to CPTs, which go in televisions; and

71

1    some go to CDTs, which go into monitors.  Two

2    different types of finished products.

3           That's why they said they're duplicative.

4    There's no duplication.  We just broke it up by the

5    product.  Your Honor, there's no duplication.  And

6    we asked the directs separately from the indirects,

7    which obviously we want separate answers.  But

8    there's no duplication in our -- in our

9    interrogatories.

10          But what I wanted to say about Mr. Simon,

11   wholly differently, is that he says we're trying to

12   break up his case.

13          And here is the problem, your Honor.

14   Let's say I had a complaint, and I said I'm alleging

15   a price-fixing conspiracy involving household

16   products, and I define that to be every item you can

17   find in a house -- a bed, a couch, a sofa, a seat, a

18   can of soda, a steak, any item there.  I'm alleging

19   a household products conspiracy.  But what I really

20   meant about that is I have evidence alleging a

21   conspiracy about dog food, and that's the only thing

22   I have conspiracy about.

23          I cannot use that pleading device to say I

24   define it as household products because I know I've

25   got a dog food conspiracy and then use that to say I

72

**Proceedings**

 1    would now like discovery about beds and sofas and

 2    refrigerators and bicycles and anything else because

 3    they're all household products.

 4            That's what they're trying to do here in

 5    terms of the expansion of this case.  And the reason

 6    they're trying to do it is because they know the

 7    backbreaking gigantic burden this places on

 8    defendants.

 9            So all we're trying to do, your Honor, is

10    to find out now, as a case management matter, at an

11    appropriate time in this case, whether or not this

12    case involves -- and there are really only two

13    alternatives -- either a conspiracy that involves

14    fixing prices and dividing markets involving

15    finished CRT products or a conspiracy that only

16    involves CRTs but we understand they claim the

17    necessary impact is on the finished products.

18            That, we don't have a problem with because

19    that's very different discovery, much more narrow

20    tailored discovery that's appropriate to the latter

21    claim that it wouldn't be if they're alleging and

22    they have a basis to allege a conspiracy that would

23    involve the finished products.  And that's what

24    we're entitled to.

25            SPECIAL MASTER LEGGE:  What would you say

                                                              73

**Proceedings**

1    if they defined their conspiracy, as I think

2    somebody -- one of them said a little while ago,

3    that one conspiracy but the finished products were

4    also a part of that one conspiracy as well as CRTs

5    being a part of that one conspiracy.

6           MR. KESSLER:  That's their fudge, your

7    Honor.  And if that's what they want, then I want to

8    get produced in contention interrogatories a basis

9    for them saying that finished CRT products are part

10   of that conspiracy other than through impact.  Okay?

11          And then I will tell you right now, your

12   Honor, I do not believe they have a Rule 11 basis

13   for anything other than through impact.  Okay?

14          And so they can't hedge it by saying,

15   well, it's all part of it.  And when you hear this

16   assignment -- half the time he's very clear, he's

17   talking impact; and then because he wants all the

18   discovery and he says, therefore, it's all one

19   discovery; it involves both products.  And that,

20   your Honor, is what we're entitled to see what the

21   basis of, other than through impact.

22          So, again, if you want to refine and

23   narrow our request to be clear, what we would like

24   them to be ordered to produce is any information

25   they had at the time of the complaint that showed

74

1  there was a conspiracy involving finished products,

2  including CRTs -- okay? -- other than through the

3  impact which a CDT-alleged conspiracy had on those

4  finished products.

5        SPECIAL MASTER LEGGE:  Okay.

6        MR. SIMON:  Your Honor, I promise, two

7  quick points --

8        SPECIAL MASTER LEGGE:  All right.

9        MR. SIMON:  -- just for you to consider.

10        SPECIAL MASTER LEGGE:  Mr. Simon is going

11  to reply very quickly here, but I will pick you

12  up -- pick up on your suggestion requesting a

13  stipulation, because if he were to accept it, it

14  would save me a lot of work.

15        Mr. Simon, will you accept the

16  stipulation --

17        MR. SIMON:  I'm not going to accept the

18  stipulation --

19        SPECIAL MASTER LEGGE:  -- that your

20  complaint alleges, with respect to a conspiracy,

21  only one conspiracy of fixing prices of CRTs but

22  with an impact on the prices of finished products?

23        MR. SIMON:  No.

24        SPECIAL MASTER LEGGE:  No.  Okay.

25        MR. SIMON:  So, Mr. Kessler -- you know,

75

<b>Proceedings</b>

1  the reason I wouldn't accept the stipulation is

2  because he's making it up as he goes along.  And one

3  of the things he's making up is that somehow we've

4  changed our argument.

5          And, your Honor, it's very important for

6  you to read the transcript from the motion to

7  dismiss hearing on October 5th, 2009, at Document

8  No. 621, page 79 through page 89, where I made this

9  very argument.

10          SPECIAL MASTER LEGGE:  What's the --

11          MR. SIMON:  This is Document No. 621, and

12  this is the hearing transcript from the motions to

13  dismiss.

14          SPECIAL MASTER LEGGE:  Of October the 5th?

15          MR. SIMON:  October the 5th, 2009.

16          And I have a copy of it for your Honor,

17  and it will unequivocally show what Mr. Kessler is

18  saying about us changing our argument is untrue.

19          And I'm not going to burden the record

20  right now to read you the parts of that which are

21  exactly identical to what I said here today.  He's

22  trying to recast what I said.  He's trying to recast

23  our complaint.  And I'll leave it to you to read

24  that and figure it out.

25          And then one last point.

76

Proceedings

1            SPECIAL MASTER LEGGE:  Yeah.

2            MR. SIMON:  Convergent Technologies is the

3    law in this district.

4            And his entire premise to manage this case

5    is to bring a Rule 11 motion.  Let me read you his

6    burden.  He has to show that answers to these

7    interrogatories are likely to expose a substantial

8    basis for a motion under Rule 11 or Rule 56.

9                A party seeking early answers to

10               contention interrogatories cannot

11               meet its burden of justification by

12               vague or speculative statements about

13               what might happen if the

14               interrogatories were answered.

15               Rather, the propounding party must

16               present specific plausible grounds

17               for believing that securing early

18               answers to its contention questions

19               will materially advance the goals of

20               the Federal Rules of Civil Procedure.

21           Mr. Kessler has not met his burden.  He

22    can never meet his burden.  It's all speculation,

23    what he's talking about.  It's hypothetical.  And

24    his motion should be denied.

25           MR. RUSHING:  May I also just say --

77

Proceedings

```
 1              SPECIAL MASTER LEGGE:  Yes.

 2              MR. RUSHING:  Let me just say, with regard

 3    to the status of discovery, Mr. Kessler --

 4    specifically with Mr. Kessler's clients -- this is

 5    Jeff Rushing -- I have participated in the last

 6    couple of meetings; Mr. Kessler has not.

 7              And Mr. Kessler has got it dead wrong

 8    unless I've completely misunderstood the

 9    representations that his colleagues have been making

10    in what I took to be rather productive meetings.

11              Mr. Kessler's statement that they have not

12    given an inch on this sort of discovery is simply

13    wrong.  And my statement that we are making progress

14    and I had thought, heretofore at least, are likely

15    to resolve those questions, that is completely at

16    odds with what has been occurring at those meetings.

17              MR. YOHAI:  Excuse me, Judge Legge.  This

18    is Mr. Yohai, Mr. Kessler's colleague, who did

19    participate in those meetings.

20              And I don't agree with what Mr. Rushing is

21    saying.  All of those discussions -- in all of those

22    discussions, all of our rights had been reserved

23    with respect to these motions.  That's been very

24    clear since Day One.

25              And in particular, the issue of the
```

78

**Proceedings**

```
 1    discovery that we're seeking from them was not at

 2    all an issue in those discussions since we were

 3    meeting and conferring on the discovery they were

 4    seeking from us, which, by the way, includes their

 5    seeking almost 100 custodians.

 6            They will not have 100 custodians if your

 7    Honor sees fit to have them answer these

 8    interrogatories, which I have no doubt will lead to

 9    a Rule 11 motion by us.

10            SPECIAL MASTER LEGGE:  Okay.

11            MR. KESSLER:  Your Honor, this is -- just

12    one final comment.

13            I don't know what Mr. Simon handed out to

14    in terms of citation.

15            SPECIAL MASTER LEGGE:  Well, I can tell

16    you.  It's right here.  Hang on a minute.

17            MR. KESSLER:  That's all right, your

18    Honor.

19            I just wanted to say, I remember those

20    arguments very well.  I remember the briefs very

21    well.  I am quite confident that Mr. Simon said

22    exactly what he said today previously.

23            I am also quite confident that Mr. Simon

24    and others on the plaintiffs' side said exactly the

25    opposite in the course of those motions.  And if
```

                                                                79

**Proceedings**

1    this becomes an issue, we can demonstrate that.

2              The whole problem has been the constant

3    shifting back and forth on this position, including

4    today.

5              And as you saw by Mr. Simon's refusal to

6    agree to the stipulation which your Honor

7    articulated, he still is shifting.

8              SPECIAL MASTER LEGGE:  Now, the citation

9    that he has given me is a motion hearing of

10   October 5th, 2009, pages 78 through 90, without

11   marking.  Okay?

12             MR. KESSLER:  Thank you, your Honor.

13             SPECIAL MASTER LEGGE:  All right.  I'm

14   concluding the oral argument of this motion.

15             And the next motion for consideration will

16   be the motion also dealing with CRT products by the

17   plaintiffs against the Hitachi defendants.

18             Before I get there, let's take a

19   ten-minute recess, and -- well, let's resume in ten

20   minutes.  So that would make it quarter to 4:00

21   San Francisco time, quarter to 7:00 New York time.

22             So I'm just going to leave this line open

23   and hope that nobody trips on the cord and

24   disconnects it again.  Pick up in ten minutes.

25             (Recess taken.)

                                                         80

Proceedings

1          SPECIAL MASTER LEGGE:  Let's resume here

2     if we still have people on the line.

3          The next motion will be the motion by

4     plaintiffs for discovery against the Hitachi

5     defendants regarding CRT products.

6          Now, let me make just a few comments or

7     observations before turning it over to you.

8          First of all, during the course of this

9     discussion, I hope that you'll fill me in a little

10    bit more completely on which of the -- one, two,

11    three, four -- five Hitachi companies do what kind

12    of business.

13          In trying to piece it together from your

14    briefs and your record, I'm having a hard time

15    coming up with what company is actually doing what.

16    I mean, who is in the CRT business?  Who is in the

17    business of manufacturing television sets?

18          And I think that can make a difference to

19    this interrogatory, at least in the sense of

20    identifying where the likely sources of information

21    are and where they are not, although that may be in

22    this other subject that you have covered in your

23    meet-and-confer.

24          However, if what I heard is correct, that

25    plaintiffs are talking about some 100 sources of

81

Proceedings

1    documents from the Hitachi defendants, but maybe I

2    picked up the wrong information.

3        But as I said, I'm just confused on the --

4    one, two, three, four -- five Hitachi companies,

5    which ones were in what business doing what.

6        MS. WEBB:  Yes, your Honor.

7        SPECIAL MASTER LEGGE:  Now, but as I said,

8    the Hitachi companies are apparently separate, and

9    so, I assume, their recordkeeping would be.

10        Now, what Hitachi has said here, I

11   believe, is that two of the companies, HAS, which I

12   am identifying as the Hitachi Asia Limited, and HED

13   U.S. have never manufactured or sold CRTs, and that

14   the company HAL, Hitachi America Limited, has

15   searched for but hasn't found any responsive

16   documents.

17        So I'll let the plaintiffs go ahead here,

18   since it's their motion.  But I'm just displaying to

19   you my uncertainty about which company did what and

20   hope clarification of that might narrow down who's

21   obliged to do something and who's not.

22        Mr. Simon, do you want to argue from the

23   podium here, please?

24        MR. SIMON:  Sure, your Honor.

25        SPECIAL MASTER LEGGE:  So you're closer to

82

Proceedings

1    the telephone.

2              MR. SIMON:   Yeah.

3              With respect to the motion to compel, as

4    you've already heard, this is the flip side of the

5    argument you already heard.  But this is more a

6    discovery and balancing argument than the previous

7    argument.  And the question becomes two things, your

8    Honor, in general.

9              And maybe one of my other colleagues can

10   address the question you have about the companies.

11   We addressed it in our letter a little bit, to the

12   extent that there's information on the Internet that

13   the companies do make and distribute certain

14   products.  And I'll try to address that a little

15   bit, but Mr. Saveri also can give you a little bit

16   more detail about that as well, I'm sure, as defense

17   counsel.

18             But the basic position of Hitachi in the

19   meet-and-confers and in these motions is:  Before we

20   come forward with some proof that there is a

21   conspiracy that affects finished products, they

22   shouldn't have to give us any discovery.  And that

23   flips the burden on its head.

24             The relevancy standard for discovery, as

25   your Honor is very familiar with, would allow us to

83

Proceedings

1    get into areas that are potentially relevant, even

2    if not specifically alleged in the complaint.

3           And the finished products, under even the

4    wildest circumstances, do, as Mr. Kessler argued

5    before, pertain from a relevancy standpoint even if

6    it's limited to impact, even if it's limited to how

7    those interact with each other.

8           And that's particularly true with

9    vertically integrated companies, which Hitachi is,

10   that there is a manufacturer of the tubes, the CRTs

11   and the CDTs, which go into finished products which

12   they sell into the United States.  And that chain of

13   distribution and how they charge each other and what

14   they charge each other for the components in the

15   finished products all is relevant under the

16   standards that we have here.

17          So the question then becomes:  How do you

18   do this so that you don't have a gigantic burden to

19   go to every little office and every country around

20   the world?  That's really the question on the table.

21          And the answer to that, which we talked

22   about last time but, as I understand it, Hitachi

23   disagrees with, is you identify those people who

24   were in a principal position of making the decisions

25   about the sales and marketing of the CRTs and the

84

Proceedings

1    CRT products, finished products, you identify

2    custodians, you search the documents by those

3    custodians, and you develop terms for searches so

4    that you can get a finite set of documents.

5            We start there.  If that group of

6    documents satisfies us, we move on to the next

7    thing.  If that group of documents doesn't satisfy

8    us, then we come back for more searches.  Or if we

9    can't agree on what those searches and those

10   custodians are, then we come back to you and say we

11   have a scope dispute as opposed to --

12           SPECIAL MASTER LEGGE:  Well, okay.

13           MR. SIMON:  -- a dispute about just not

14   giving us the discovery at all.

15           SPECIAL MASTER LEGGE:  Okay.  Well, now,

16   wait a minute.  Can we bunch some of these things

17   together and address the Hitachi companies?

18           Now, if what I'm reading from Hitachi is

19   correct, they contend that HAS and HED have never

20   manufactured or sold CRTs.  Now, wouldn't that

21   pretty well eliminate them from having to search for

22   them?

23           MR. SIMON:  Well, but that's the whole

24   point, your Honor.  If our discovery is such that

25   we're asking for CRT products and we were not

85

**Proceedings**

1    fighting about the scope of what the definition is

2    and they never made any of those products, then

3    they're not going to provide any documents.

4              SPECIAL MASTER LEGGE:  Well, that's what I

5    mean.

6              MR. SIMON:  Yeah.  So, I mean, so where is

7    the burden?  So --

8              SPECIAL MASTER LEGGE:  I'm saying, if I

9    order them to produce something, can't I just

10   eliminate HAS and HED U.S. from the requirement?

11             MR. SIMON:  The only thing I would say to

12   you is, if we don't have the discovery -- and we did

13   find some things on the Internet that suggested that

14   they were in the business of selling certain types

15   of these products --

16             SPECIAL MASTER LEGGE:  No.  What you gave

17   me off the Internet was a showing that they have

18   a -- they're an affiliate of their parent company.

19   And I'm not eliminating the parent company from

20   this.

21             MR. SIMON:  Right.

22             SPECIAL MASTER LEGGE:  It's these specific

23   entities.

24             And the same way with HAL.  Which is HAL?

25   Hitachi America Limited.  Now, you've objected to

                                                    86

Proceedings

```
1    their -- the strength of their showing that they
2    don't have anything.  And I think they do owe you
3    more there.
4           MR. SIMON:  Right.
5           SPECIAL MASTER LEGGE:  They owe you a
6    definition by somebody as to what they did to look
7    for things and the sufficiency of the search.
8           But if you still come up with the
9    conclusion there isn't anything, then, okay, you
10   have to accept that.
11          MR. SIMON:  If there is a conclusion that
12   there isn't anything in good faith with, you know,
13   evidence produced to us that there isn't anything,
14   then there isn't anything.  We can't create
15   something from "There isn't anything."
16          SPECIAL MASTER LEGGE:  That's what I mean.
17   You're entitled to a declaration that shows you an
18   adequate search was made.
19          MR. SIMON:  But I did want to point out,
20   on the vertically integrated company aspect of it --
21          SPECIAL MASTER LEGGE:  Yeah.
22          MR. SIMON:  -- there's the whole aspect of
23   factually, how do those products flow through the
24   chain of distribution to the direct purchaser and
25   whether any of those products flowed through the
```

87

Proceedings

1    entities they say that didn't sell those products.

2         If they got those products in the chain of

3    distribution, we still don't have the information

4    from that, even if they weren't the ultimate seller.

5         And then the other --

6         SPECIAL MASTER LEGGE:  Wait a minute.

7    Wait a minute.

8         As I understand what HAS is saying, they

9    were never in the CRT product business.

10        MR. SIMON:  But that's not --

11        SPECIAL MASTER LEGGE:  They never sold

12   CRTs in the United States, and they never

13   manufactured CRT products.

14        MR. SIMON:  Well, I'm not hearing that

15   saying that they were not in the chain of

16   distribution for some part of the CRT products.

17        That's saying that -- it's distinguishing

18   three areas.  And maybe I don't know the answer

19   completely, but that's why we propound the

20   discovery.

21        And the way it's alleged in the complaint,

22   at least, which focuses what the discovery should

23   be, is that those entities, vertically integrated,

24   affiliated with each other, either wholly owned

25   subsidiaries or affiliates of each other,

88

**Proceedings**

1  participated together for the distribution of CRT

2  products.  And --

3         SPECIAL MASTER LEGGE:  Well, that's a

4  legal conclusion.  I'm trying to ask now what it is

5  that these companies did so we may be able to

6  eliminate some sources of repositories because, in

7  fact, they didn't do the kind of business that would

8  have those records.  That's what I'm trying to do.

9         MR. SIMON:  I understand.  And that's not

10  a -- that's the way we would like to handle it, but

11  we're getting basically:  You don't get anything.

12         SPECIAL MASTER LEGGE:  Well, from those

13  companies, that's right.

14         MR. SIMON:  But we have to have some

15  showing as to why we wouldn't get anything from

16  those companies.  And as you just said --

17         SPECIAL MASTER LEGGE:  If they haven't

18  been in the business.

19         MR. SIMON:  Well, then they should be able

20  to say what business they're in and why they're

21  associ- --

22         SPECIAL MASTER LEGGE:  That's what I'm

23  having trouble with.

24         MR. SIMON:  Yeah.

25         SPECIAL MASTER LEGGE:  I'm having trouble

89

Proceedings

1   defining what business it is.

2            MR. SIMON:  I just want to mention two

3   other points.

4            As you may recall from the motions --

5            SPECIAL MASTER LEGGE:  All I'm saying is,

6   Mr. Simon, I think your argument about the flow and

7   they're an integrated company only goes so far.

8            They can be legally responsible for

9   various things because they use this form of

10  business model, but we're trying now to focus where

11  information is located.  I don't think it answers

12  anything to say:  Well, it's an integrated company

13  and they all have something to do with the flow of

14  product.

15           MR. SIMON:  Well, can I give you an

16  example?

17           SPECIAL MASTER LEGGE:  Yeah, sure.

18           MR. SIMON:  I'm not making this up.  This

19  is experience from other cases.

20           You always have groups of companies in

21  these cases because they all operate together.  And,

22  typically, the companies that are lower down on the

23  food chain, they look to the higher-up companies to

24  dictate not only pricing, but marketing and other

25  things.

90

Proceedings

1          SPECIAL MASTER LEGGE:  Sure.

2          MR. SIMON:  We don't have that information

3    as to what the interrelationship is there, what

4    control they exert over the other companies.

5          You know, and to the degree we don't have

6    that information, maybe we start by getting that

7    information for Hitachi; and then we can move to the

8    next step of whether they are, quote/unquote, in the

9    business or not.

10          But all we have right now is their

11    assertion that they're not in the business.  And

12    from a discovery standpoint, that assertion, without

13    some showing, we're saying is not sufficient.

14          I mean, there's always a guy up at the

15    parent company that says, "I'm in charge of" --

16          SPECIAL MASTER LEGGE:  I am not in any way

17    talking about --

18          MR. SIMON:  No, I understand.

19          SPECIAL MASTER LEGGE:  -- cutting out

20    discovery directed at the parent company on this

21    subject.  Okay?  I'm not talking about that at all

22    because I realize that.

23          What I'm talking about, I don't know where

24    the facilities of HAS or the facilities of HED would

25    be to search; but if they haven't been in those

91

Proceedings

1    businesses, the prospect and burden of going to

2    those companies and their various custodians to

3    search things seems to me minimally worthwhile.

4            MR. SIMON:  There could be people

5    potentially -- and we don't have the concrete answer

6    to this, but -- there could be people potentially at

7    some of those companies that worked at other of the

8    companies that came to those companies with

9    knowledge which have documents that relate to their

10   prior role in the other companies.

11           And these are all the subtleties that I

12   don't think you can just use a meat cleaver and just

13   say:  You can't get into this before we get some

14   evidence in this regard.

15           SPECIAL MASTER LEGGE:  Well, I'm not

16   trying to use a meat cleaver.  I'm trying to use a

17   surgical scalpel.

18           MR. SIMON:  I understand.

19           SPECIAL MASTER LEGGE:  What I'm trying to

20   do is to dissect out those things that appear to be

21   kind of unnecessary.

22           I'm making my point, so let's just talk

23   about it.

24           So as to HAL, I think it's quite clear

25   that you're entitled to an adequate showing by a

92

Proceedings

```
1    document custodian as to what search was made and

2    what limitations there were on the search or were

3    there any limitations on the search or how it was

4    directed, whatever answers the question.  I think

5    you're clear about that.

6              MR. SIMON:  Okay.

7              SPECIAL MASTER LEGGE:  I agree with you on

8    the argument you've made that we're hearing from

9    counsel here that I don't think that in a discovery

10   setting, they are required to make to you a prima

11   facie case before -- or that you have to make to

12   them -- I beg your pardon -- that you have to make

13   to them a prima facie case in order to get relevant

14   discovery.

15             If it is relevant under the pleadings and

16   assessments of the burdens of the discovery, you're

17   entitled to it.  I don't think they, as a condition,

18   have to make a prima facie -- or you have to a make

19   a prima facie case to them to get the discovery.

20             But I'm just struggling here to make some

21   practical sense out of what is left to perhaps

22   search.

23             My conclusion is that maybe it's with HTL,

24   which is the parent company, as I understand it, and

25   with HDP, Hitachi Displays Limited.  I understand
```

93

**Proceedings**

```
1    from those companies that they were in the CRT

2    business, they say, at least until 2003.  Okay?

3            MR. SIMON:  And if you're in the business

4    during any of the period, you're in for the whole

5    period.

6            SPECIAL MASTER LEGGE:  I understand.  I'm

7    just trying to say that it seems to me those

8    companies and the depositories within them, the

9    people within them, are the ones who are more likely

10   to have knowledge of this than anything else.

11           MR. R. ALEXANDER SAVERI:  Can I just add a

12   few points, your Honor, which may fill out a little

13   bit on this?

14           SPECIAL MASTER LEGGE:  Yeah, sure.

15           MR. R. ALEXANDER SAVERI:  And let's

16   address Hitachi Asia Limited.  That's the HAS.

17           SPECIAL MASTER LEGGE:  That's HAS.

18           MR. R. ALEXANDER SAVERI:  Okay?

19           SPECIAL MASTER LEGGE:  Okay.

20           MR. R. ALEXANDER SAVERI:  They're in the

21   tube business until 2002.

22           SPECIAL MASTER LEGGE:  Wait a minute.

23   Wait a minute.  Wait a minute.

24           MR. SIMON:  HAL.

25           MR. R. ALEXANDER SAVERI:  No.  HAS.
```

94

Proceedings

1            MR. SIMON:  HAS.

2            MR. R. ALEXANDER SAVERI:  Hitachi --

3            SPECIAL MASTER LEGGE:  HAS?

4            MR. R. ALEXANDER SAVERI:  -- Asia.

5     Hitachi Asia.

6            SPECIAL MASTER LEGGE:  See, I don't have

7     that.  What were they in?

8            MR. R. ALEXANDER SAVERI:  Hitachi Asia

9     Limited, which is defined as HAS.

10            SPECIAL MASTER LEGGE:  Yes, right.

11            MR. R. ALEXANDER SAVERI:  And they have

12     said:  We should produce no documents from Hitachi

13     Asia Limited.

14            What I would like to say is, they have

15     been identified as being in the tube business until

16     2002.

17            And here's what's important, your Honor.

18     They are using the objection of alleged not to have

19     sold CRTs in the U.S.  It's the FTAIA objection,

20     which is the Foreign Trade Antitrust Improvement

21     Act.

22            In other words --

23            SPECIAL MASTER LEGGE:  Well, we're going

24     to discuss that later.

25            MR. R. ALEXANDER SAVERI:  But that's with

95

**Proceedings**

1    this.  That's why they're saying:  We shouldn't have

2    to produce anything because we didn't sell anything

3    into the U.S.

4              SPECIAL MASTER LEGGE:  No.  I know.  That

5    may be.  But I'm just taking what I see about this

6    company.

7              MR. R. ALEXANDER SAVERI:  That's correct,

8    your Honor.

9              SPECIAL MASTER LEGGE:  But what I'm saying

10   about the company is not right, you're telling me.

11             They were in the tube business.

12             MR. R. ALEXANDER SAVERI:  Correct.

13             SPECIAL MASTER LEGGE:  Until?

14             MR. R. ALEXANDER SAVERI:  They were in the

15   tube business, your Honor, and they have been

16   identified as the executives from that company

17   attending the meetings with Chunghwa.  So they were

18   at the conspiracy meetings.

19             The discovery from Hitachi Asia is

20   critical, your Honor.

21             MS. WEBB:  Your Honor, Diane Webb on

22   behalf of Hitachi.

23             I think we're mixing apples and oranges

24   now because that was with respect to tubes.  This

25   motion is with respect to finished products.

96

**Proceedings**

1          SPECIAL MASTER LEGGE:  Yeah.  The motion

2     does deal --

3          MS. WEBB:  Right.

4          SPECIAL MASTER LEGGE:  Wait a minute.

5          MS. WEBB:  So --

6          SPECIAL MASTER LEGGE:  Wait a minute.

7     Wait a minute.  Where is the interrogatory?  I have

8     to keep my eye on that.

9          Okay.  What is it precisely the plaintiffs

10    want me to order?  Plaintiffs' September 10th

11    letter, page 6, simply says that their motion to

12    compel discovery with respect to CRT products should

13    be granted.  That's the only definition I have.

14          MS. WEBB:  Yes.

15          MR. SIMON:  And that's the same definition

16    that we're using from the complaint.

17          MR. R. ALEXANDER SAVERI:  Yeah, that's

18    right, your Honor.  But the point is --

19          SPECIAL MASTER LEGGE:  Hang on a minute.

20    Hang on a minute.

21          So motion to compel discovery with respect

22    to CRT products as defined in the complaint.

23          MR. SIMON:  Correct.

24          SPECIAL MASTER LEGGE:  All right.

25          MS. WEBB:  Okay.  And, your Honor, here is

97

1    the complaint, the allegation that defines CRT

2    products.  This is from the direct purchasers.  We

3    also have the indirect purchasers.  And --

4            SPECIAL MASTER LEGGE:  Well, wait a

5    minute.  Wait a minute.  You've gone so fast, I

6    didn't see what you were focusing on.

7            MS. WEBB:  Sure.  So this is --

8            SPECIAL MASTER LEGGE:  Bring it over here.

9            MS. WEBB:  Of course.

10           SPECIAL MASTER LEGGE:  That is from what?

11   Paragraph what?  It doesn't say there.

12           MS. WEBB:  This is --

13           SPECIAL MASTER LEGGE:  For the purposes

14   of --

15           MR. SIMON:  It's referenced in a couple of

16   points.  Paragraph 1 is the paragraph you relied on

17   in the motion to dismiss to accept that.

18           MS. WEBB:  Right.

19           SPECIAL MASTER LEGGE:  All sizes and

20   products containing them shall be referred to . . .

21           Okay.

22           MS. WEBB:  Okay.  So what we have are, we

23   have, at least generally speaking, four products

24   that are at issue here, your Honor.  We have tubes,

25   the large CRT tubes.

98

Proceedings

```
 1                    SPECIAL MASTER LEGGE:  Yeah.

 2                    MS. WEBB:  -- that plaintiffs define as

 3        being CDTs and CPTs.

 4                    SPECIAL MASTER LEGGE:  Yeah.

 5                    MS. WEBB:  And those, your Honor, are the

 6        televisions that we bought in the 1980s --

 7                    SPECIAL MASTER LEGGE:  I know what they

 8        are.

 9                    MS. WEBB:  -- 1990s.  Okay?

10                    So in the television context, it's a CPT.

11        That's a CRT picture tube.

12                    SPECIAL MASTER LEGGE:  Yes, I understand.

13                    MS. WEBB:  And in the computer context,

14        it's a CDT.  That's a CRT display tube for a

15        computer monitor.

16                    Then we also have two categories of

17        finished products that contain CRTs, either --

18                    SPECIAL MASTER LEGGE:  TV tubes.

19                    MS. WEBB:  -- CPTs or CDTs.  Correct.

20                    SPECIAL MASTER LEGGE:  Television sets

21        or --

22                    MS. WEBB:  Computers.

23                    SPECIAL MASTER LEGGE:  -- computers.

24                    MS. WEBB:  Right.

25                    And what HAS is saying is they weren't in
```

99

**Proceedings**

1    the CRT finished products business.  Not in the CRT

2    manufacturing business, but the CRT finished

3    products.

4            And this motion, as I read it, has to do

5    with CRT finished products.

6            MR. R. ALEXANDER SAVERI:  Your Honor, if

7    that is true, your Honor, for the entire period of

8    time back to 1995, and it's not standing on the

9    objection of the FTAIA into the U.S. of how they've

10   defined it --

11           SPECIAL MASTER LEGGE:  I think that's a

12   different issue, and we'll --

13           MR. R. ALEXANDER SAVERI:  But -- but --

14           SPECIAL MASTER LEGGE:  It's been raised.

15           MR. R. ALEXANDER SAVERI:  Correct.

16           SPECIAL MASTER LEGGE:  But I'll address it

17   separately.

18           MR. R. ALEXANDER SAVERI:  But the point, I

19   think, is that -- and if that's true, to the sense

20   that they've not made finished products, TVs or

21   monitors, regardless of where it's sold, not into

22   the U.S. as they're defining it, that's the issue.

23           And if the fact is, if the fact that they

24   didn't make any finished products, then the answers

25   to the discovery is:  There are no documents because

100

**Proceedings**

1   we didn't make any finished products.  But not an

2   objection that we will not produce any finished

3   product information.  That's the point, your Honor.

4            MR. SIMON:  And I think, just to put

5   another point on it, and counsel can express herself

6   on this point, is that if they're standing on the

7   objection procedurally that they shouldn't give us

8   anything until we make some showing --

9            SPECIAL MASTER LEGGE:  I understand.

10            MR. SIMON:  -- then we need to know that

11   too.

12            So if we pass those two and it's simply a

13   matter of discovery and ability to show us by

14   declaration or even we would take counsel's proffer

15   what evidence shows that, then we probably can work

16   that out.

17            But right now we're not at that point.

18   And that's why we had to bring the motion.

19            And I wasn't involved in the

20   meet-and-confer discussions, but it got to an

21   impasse with respect to those issues, whereas with

22   others, we're able to get beyond that point.  And

23   that's why we brought the Hitachi motion first.

24            MR. R. ALEXANDER SAVERI:  And if I --

25            MS. WEBB:  Your Honor --

101

**Proceedings**

1           MR. R. ALEXANDER SAVERI:  -- could address

2    how -- maybe if I do that, then we can pick that up,

3    which is the other entity, which is Hitachi America

4    Limited.

5           SPECIAL MASTER LEGGE:  Wait a minute.

6    Wait a minute.  Stay with HAS for a moment.

7           MR. R. ALEXANDER SAVERI:  Sure.

8           MS. WEBB:  HAS --

9           SPECIAL MASTER LEGGE:  You say they were

10   in the tube business --

11          MS. WEBB:  Yes, your Honor.

12          SPECIAL MASTER LEGGE:  -- until

13   sometime -- I've forgotten the date.  What was the

14   date?

15          MR. R. ALEXANDER SAVERI:  2002, your

16   Honor.

17          SPECIAL MASTER LEGGE:  Okay.  But that

18   they were never in the products, the CRT products.

19          MS. WEBB:  Correct, your Honor.  Finished

20   products business.

21          MR. R. ALEXANDER SAVERI:  Anywhere in the

22   globe?

23          MS. WEBB:  That's my understanding.

24          MR. R. ALEXANDER SAVERI:  Well, there's

25   been no showing of that, your Honor.

                                                    102

**Proceedings**

1              MS. WEBB:  Well, I understand.  And I

2      think this begs the question of why the

3      meet-and-confer wasn't allowed to continue, because

4      we produced information back in 2008 that showed

5      which of the entities were involved in which of the

6      businesses at what period of time.

7              And we raised that again in our

8      meet-and-confer letter in response to --

9              SPECIAL MASTER LEGGE:  I don't have that,

10     do I?

11             MS. WEBB:  -- plaintiffs' meet-and-confer

12     letter.

13             No, I don't.

14             SPECIAL MASTER LEGGE:  I searched through

15     this to try to answer my own question about which

16     companies made them.  I didn't come across anything.

17             MS. WEBB:  But my point is, your Honor, if

18     we had been allowed to continue this meet-and-confer

19     process and these were questions that were being

20     raised, rather than raising them on reply in a

21     motion to dismiss, we could have dealt with this in

22     the meet-and-confer.

23             And I believe that what should happen here

24     is we should be ordered to go back and

25     meet-and-confer.

                                                      103

**Proceedings**

1          To the extent that there are questions

2     about which entities were involved in which

3     businesses when, we can answer those.  To the extent

4     that proffers are necessary, we can provide those.

5          And that is necessarily going to guide all

6     of this discovery in terms of who did what when, who

7     has documents, who doesn't have documents.

8          MR. SIMON:  Can I make one point, just a

9     practical point, if I may, your Honor?

10          SPECIAL MASTER LEGGE:  Yeah, sure.

11          MR. SIMON:  And again, I'll harken back to

12     another case, LCD, because I happen to know a lot

13     about it.

14          What we did there to sort this out -- and

15     I think what we suggested to you at one point, and

16     we never got to the point of actually implementing

17     it -- if there was a defendant in that case that

18     said they were not properly named because they

19     weren't in the business at all, they had no

20     connection to the business whatsoever, there was an

21     order that said that the defendants had the burden

22     to tell us that and make a showing that that was the

23     case.

24          If we didn't believe that or it was

25     contentious, then we did a 30(b)(6) deposition,

Proceedings

1    which we can't do here yet, to talk to the person

2    most knowledgeable about what that person's business

3    was, that company's business.

4              SPECIAL MASTER LEGGE:  Didn't you take a

5    deposition like that?

6              MR. SIMON:  In this case?  Not in this

7    case.  We're stayed.

8              SPECIAL MASTER LEGGE:  I know, but how

9    would the language of the stay -- well, never mind.

10             MR. SIMON:  Well, we interpret the

11   language of the stay to say we couldn't do that.

12   Maybe the way to resolve this is by taking a

13   30(b)(6) deposition.

14             MR. R. ALEXANDER SAVERI:  Your Honor, if I

15   may, just as it relates to Hitachi, as it relates to

16   the finished product issue, the position was clearly

17   taken not until our contention interrogatories were

18   answered and not until a Rule 11 procedure would we

19   go forward at all with finished products.

20             SPECIAL MASTER LEGGE:  All right.

21             MR. R. ALEXANDER SAVERI:  And so we have

22   to go --

23             SPECIAL MASTER LEGGE:  Okay, all right.

24             MR. R. ALEXANDER SAVERI:  -- past that,

25   your Honor.  And I think the key --

105

1           MS. WEBB:  Your Honor --

2           MR. R. ALEXANDER SAVERI:  Wait.  Let me

3    finish, please.

4           MS. WEBB:  -- I need to correct that.

5           MR. R. ALEXANDER SAVERI:  Let me finish,

6    please.

7           And the other point is, what are the

8    objections that they are standing on; in other

9    words, that we've got to go back to 1995 and the

10   scope of the foreign discovery with the FTAIA,

11   because that's what couching whether we'll look

12   here.

13          SPECIAL MASTER LEGGE:  Well, that's

14   getting into --

15          MS. WEBB:  Your Honor, that is --

16          SPECIAL MASTER LEGGE:  -- two other issues

17   we've got here.

18          MS. WEBB:  That is a separate issue, your

19   Honor.

20          But if I may, the position of the Hitachi

21   defendants has never been that it would not produce

22   any finished products discovery.  We said that

23   during our telephonic meet-and-confers.  We said

24   that in our letter.

25          To the extent that there is sales data

106

Proceedings

1    that shows impact, that will be produced.  So

2    finished products data will be produced,

3    transactional data.

4           To the extent that plaintiffs are asking

5    for finished products conspiracy documents, which is

6    what Mr. Kessler was just arguing, we have taken the

7    position, your Honor, that a primary preliminary

8    showing should be made, some evidence that there is

9    a separate or a continuing conspiracy, if you want

10   to use plaintiffs' terminology, of both a tubes

11   conspiracy and a finished products conspiracy.

12          And I'm not going to re-argue all the

13   points that Mr. Kessler made, but I just want to say

14   we have never taken the position:  No finished

15   products discovery for any entity.  That's not what

16   we said.  That's not what we're willing to do.

17          SPECIAL MASTER LEGGE:  I think what you've

18   agreed to do, that as to your companies, HTL, which

19   is the parent, and HDP, which is Hitachi Display,

20   that you will produce transactional and damages

21   discovery re CRT products.

22          MS. WEBB:  Correct.

23          SPECIAL MASTER LEGGE:  All right.  Now

24   that seems to be --

25          MS. WEBB:  That relates --

107

Proceedings

```
 1              SPECIAL MASTER LEGGE:  It's quite a lot.

 2              MS. WEBB:  That relates, your Honor, to

 3    sales into the United States or sales --

 4              SPECIAL MASTER LEGGE:  Well, I realize

 5    you've got -- I realize we have that to consider.

 6              MS. WEBB:  Yes.

 7              SPECIAL MASTER LEGGE:  The definition of

 8    "what."

 9              MS. WEBB:  Yes.

10              SPECIAL MASTER LEGGE:  All right.

11              MS. WEBB:  That is the "what," yes.

12              SPECIAL MASTER LEGGE:  All right.  That's

13    the "what."

14              MS. WEBB:  Then we can work on the

15    parameters of the "what."

16              SPECIAL MASTER LEGGE:  Okay.  Now, that

17    seems to me:  What are you doing?

18              You're saying:  Okay, you can have all the

19    information on manufacturing and sales and pricing

20    and all the stuff that's in the accounting

21    department.

22              But as far as conspiracy documents --

23    which will be what?  Going to files, and asking

24    about meetings that the executives have attended, or

25    interoffice memoranda?
```

108

Proceedings

```
 1              MS. WEBB:  E-mails.

 2              SPECIAL MASTER LEGGE:  Or e-mails or that

 3    kind of thing, you don't want to have to do that.

 4              MS. WEBB:  And that's based on the burden

 5    and the scope of that discovery.

 6              SPECIAL MASTER LEGGE:  So just focusing on

 7    that, HAS -- I beg your pardon.  Where am I?

 8              MS. WEBB:  I think we're on HDL and HDT,

 9    your Honor.

10              SPECIAL MASTER LEGGE:  Yes, we are.

11              MR. R. ALEXANDER SAVERI:  And, your Honor,

12    there would be one other company, which is Hitachi

13    Electronics Devices U.S.A., HED U.S.  There's five

14    companies, just so we're clear.

15              SPECIAL MASTER LEGGE:  Yeah, okay.  They

16    say -- this is my understanding, that Mr. Kaiser's

17    declaration said that they have never manufactured

18    or sold CRT products.

19              MS. WEBB:  Finished products.

20              SPECIAL MASTER LEGGE:  And as to CRTs,

21    they ceased that business in 2003.

22              MR. R. ALEXANDER SAVERI:  Subject to the

23    scope objection, your Honor.  But if it is anywhere

24    in the globe -- and I believe that's to Hitachi

25    Asia.  And Hitachi Asia executives have been
```

                                                          109

**Proceedings**

1    identified as going to the conspiracy meetings.

2    They've been going to the meetings.  They're there

3    for Hitachi.  They've attended the meetings.

4    They've attended the glass meetings, your Honor,

5    Hitachi Asia executives.

6            So if they are standing on the objection

7    that they never made CRT finished products anywhere

8    in the globe but they're objecting on that, saying

9    we're only talking about to the U.S., and if it's --

10           SPECIAL MASTER LEGGE:  Well, wait a

11   minute.  Wait a minute.

12           MS. WEBB:  We're only talking about

13   finished products with respect to products.

14           MR. R. ALEXANDER SAVERI:  On the finished

15   products.

16           Then the answer to the discovery, if you

17   never made it anywhere, finished products, is

18   simply:  We didn't make it.

19           But they haven't.  They objected to it,

20   your Honor, saying:  We're not going to produce

21   anything.

22           If there's nothing to produce, there

23   should be no objection.

24           MR. SIMON:  And if there's nothing to

25   produce, then --

                                                      110

Proceedings

```
1              MR. GUIDO SAVERI:  Then what are they

2     doing at the meetings?

3              MR. SIMON:  -- the offer to provide the

4     transactional --

5              MR. R. ALEXANDER SAVERI:  Right.

6              MR. SIMON:  -- data on impact --

7              MR. GUIDO SAVERI:  What are they doing at

8     the meetings?

9              MR. SIMON:  -- there would be no

10    documents.

11             MR. R. ALEXANDER SAVERI:  There's no

12    burden because there's nothing to produce.

13             MS. WEBB:  Right.

14             MR. R. ALEXANDER SAVERI:  They were

15    standing on objections.

16             Their objection has been, not until we

17    make a prima facie showing will we get anything

18    related to conspiracy.

19             MR. SIMON:  And if I can give you another

20    concrete example, you could have somebody who works

21    at one of the companies that doesn't make the

22    products as represented, and they could have

23    information from somebody at one of the companies

24    that is involved in the business that was involved

25    in the conspiratorial meetings.
```

111

**Proceedings**

1          And the key would be to identify which

2    people had contact with those who were at the

3    meeting, coming up with a list.  And I recognize, I

4    think we all recognize that we have to come up with

5    a reasonable list.

6          But we haven't gotten to that point

7    because we haven't been able to get over the first

8    hurdles on just the arguments saying that they

9    shouldn't have to do it in the first place.

10          And we're not trying to make them give us

11    something they don't have.  We're just trying to

12    make sure that we understand that they're saying

13    they don't have it as opposed to they object to

14    giving it to us.

15          MS. WEBB:  Well, your Honor, I can tell

16    you that HAL served discovery responses that said --

17          SPECIAL MASTER LEGGE:  I'm sorry?  What?

18          MS. WEBB:  HAL, which is the Hitachi

19    America entity, served discovery responses that

20    said:  We don't have anything.  And yet --

21          SPECIAL MASTER LEGGE:  No, I realize you

22    have.  I realize you have done that.

23          MS. WEBB:  And yet we got a motion to

24    compel.

25          So I'm a little unsure about what the

112

**Proceedings**

```
1    position here is, because I'm hearing if we say we

2    don't have anything, then there won't be any motion

3    to compel; but in the case that we did say we don't

4    have anything, there was a motion to compel.

5            SPECIAL MASTER LEGGE:  Well, but they were

6    quibbling about -- I shouldn't say "quibbling."

7            They were complaining about your lack of

8    specificity of the certificate verifying that a

9    search had been made, that an adequate search had

10   been made.

11           MR. R. ALEXANDER SAVERI:  And also, your

12   Honor, it's also standing on the objections.

13   They've made the objections of the FTAIA, that it

14   would relate only to the U.S., and on the time

15   period.

16           SPECIAL MASTER LEGGE:  We'll deal with

17   that when we get to that.

18           MR. R. ALEXANDER SAVERI:  Right.

19           MR. SIMON:  I think that, if I may, taking

20   a deposition of the person most knowledgeable on

21   this topic would cut to the chase.

22           SPECIAL MASTER LEGGE:  Which person?

23           MR. SIMON:  The person most knowledgeable

24   about the business of the entities that they say

25   were not in the business.
```

113

**Proceedings**

1            And we took multiple depositions in

2    another case, in LCD, for example, and people would

3    say "We're not in that business," and when we took

4    the 30(b)(6) deposition, there were certain aspects

5    of the business that they were in.

6            And I know we can't take depositions right

7    now, but that would be --

8            SPECIAL MASTER LEGGE:  Well, I don't know.

9            MR. SIMON:  -- an alternative.

10           SPECIAL MASTER LEGGE:  I have the order,

11   the stay order in here, but I'm afraid to lift the

12   speaker phone.

13           MR. SIMON:  No, don't do that.

14           MR. R. ALEXANDER SAVERI:  Don't do that.

15   We'll lose a few people.

16           SPECIAL MASTER LEGGE:  Does anybody have a

17   copy of the stay order?

18           MR. SIMON:  I guess as Mr. Kessler asked

19   me to stipulate, maybe I would ask counsel to

20   stipulate, let us take a 30(b)(6) deposition on the

21   discrete topic of what business they actually were

22   in during the class period.  And it would be a

23   fairly straightforward deposition, and then we

24   wouldn't have this issue.

25           If that deposition shows that that

114

**Proceedings**

```
1    company, in fact, was as represented --

2              SPECIAL MASTER LEGGE:  Well, we can't --

3              MR. SIMON:  -- then that's the answer.

4              SPECIAL MASTER LEGGE:  -- violate the stay

5    order --

6              MS. WEBB:  That's correct, your Honor.

7              SPECIAL MASTER LEGGE:  -- if the language

8    of the stay order bars that.

9              MS. WEBB:  It does, your Honor.

10             SPECIAL MASTER LEGGE:  I am questioning

11   whether it does or does not.

12             MS. WEBB:  It does bar that.

13             And I think fundamentally there's a

14   problem with containing that kind of deposition to

15   be --

16             SPECIAL MASTER LEGGE:  No.  I agree with

17   you.

18             MS. WEBB:  -- just the custodian of

19   records.

20             SPECIAL MASTER LEGGE:  I agree with you.

21             MS. WEBB:  Not only does it violate the

22   stay order, it's a sort of unwieldy deposition to

23   keep on track for limited topics.

24             But the issue of a proffer on some of the

25   defendants that say they have no documents or they
```

115

Proceedings

1    weren't in the business I think would be acceptable.

2           For example, how --

3           SPECIAL MASTER LEGGE:  I'm sorry?  What?

4           MS. WEBB:  Would be acceptable.

5           SPECIAL MASTER LEGGE:  What would be

6    acceptable?

7           MS. WEBB:  A proffer.

8           MR. SIMON:  An evidentiary proffer.

9           SPECIAL MASTER LEGGE:  On your part?

10          MS. WEBB:  An evidentiary proffer on --

11          SPECIAL MASTER LEGGE:  On your part?

12          MS. WEBB:  Yes, on which entity was in

13   which business at which particular time, because,

14   for example, with respect to HAL, HAL was a

15   purchaser of tubes.  HAL is actually a plaintiff in

16   this action.  HAL shouldn't be a defendant in this

17   action.

18          MR. GUIDO SAVERI:  May I make one

19   observation?  And correct me if I'm wrong.

20          I think Mr. Saveri said that there were

21   representatives of you -- your representatives at

22   some of these meetings that we have discussed.

23          Now, if your client isn't making the

24   product, what's he doing at the meeting where

25   they're fixing prices?

116

1          MS. WEBB:  I don't know exactly what

2     you're talking about in terms of meetings.

3          MR. GUIDO SAVERI:  Well, apparently, these

4     meetings that we alleged in our complaint, set out

5     certain dates, and we understand that some of these

6     people that you say of this company that is not

7     making tubes were at these meetings where they were

8     fixing prices.

9          Now, what were they doing at the meetings?

10    Watching a Giants ballgame?

11         MS. WEBB:  Really?

12         MR. GUIDO SAVERI:  What were they doing at

13    the meeting?

14         MS. WEBB:  I don't think this is

15    productive.

16         MR. SIMON:  Your Honor, maybe --

17         SPECIAL MASTER LEGGE:  I want to advance

18    the ball here.

19         MR. SIMON:  Not to put any more burden in

20    your court, but if we can't do depositions, which

21    I'm sure we could get a stipulation from DOJ and

22    everybody else to do a 30(b)(6) deposition, but if

23    we didn't want to go that route --

24         SPECIAL MASTER LEGGE:  I just don't think

25    we can.

                                                      117

**Proceedings**

1          MR. SIMON:  But if we can't go that route,

2     then maybe we should take counsel up on her offer

3     and maybe you should attend that proffer so that we

4     can ask questions exactly on these topics; you can

5     hear the answers so it's not the attorneys telling

6     you the interpretation of the answers; and then that

7     would be the further step that we would need to make

8     a final decision on the motion to compel.

9          MS. WEBB:  Your Honor --

10          SPECIAL MASTER LEGGE:  Do we need --

11          MS. WEBB:  -- I'm talking about making a

12     written proffer.

13          SPECIAL MASTER LEGGE:  Yeah, I understand.

14          MR. SIMON:  Well --

15          SPECIAL MASTER LEGGE:  I don't think so.

16          MR. SIMON:  -- it depends what the written

17     proffer says.  We've seen good written proffers, and

18     we've seen written proffers that don't tell us

19     anything.  So . . .

20          MS. WEBB:  Well, I certainly think that --

21          MR. SIMON:  What would you propose would

22     be in the written proffer?

23          MS. WEBB:  Describing the entity and what

24     business they were in during what periods of time.

25          MR. GUIDO SAVERI:  Take the deposition.

                                                              118

**Proceedings**

```
1              MR. R. ALEXANDER SAVERI:  Without any --

2      subject to objections on the FTAIA, global scope,

3      and the time period --

4              MS. WEBB:  We're not waiving our

5      objections on discovery.

6              MR. R. ALEXANDER SAVERI:  There you are.

7              MS. WEBB:  But I think what it does is it

8      gets us down to which entities are in play here and

9      which entities aren't in play.

10             SPECIAL MASTER LEGGE:  Well, didn't you

11     get into this discussion in your meet-and-confers?

12             MS. WEBB:  We did.  And it was in our

13     meet-and-confer letter, your Honor; but nonetheless,

14     we got a motion to compel against all.

15             MR. R. ALEXANDER SAVERI:  Your Honor,

16     that's not true.  They stood on the objection that

17     we get no evidence until the contention

18     interrogatories.

19             SPECIAL MASTER LEGGE:  All right.

20             MR. LEHMANN:  Your Honor, Michael Lehmann.

21     We have some declarations in here, Tilly, Lim, and

22     Heiser --

23             SPECIAL MASTER LEGGE:  I know we do.

24             MR. LEHMANN:  -- that describe the

25     limitations on what HAL and HED U.S. did.
```

119

**Proceedings**

1           We put in our reply letter brief Internet

2    research that we did that called into question some

3    of the specific factual assertions there.

4           SPECIAL MASTER LEGGE:  Well, as I recall,

5    that was simply a reflection that there was a parent

6    company.

7           MR. LEHMANN:  No.  There was also a

8    question, for example, about whether HED U.S.'s

9    selling, manufacturing CRTs.

10          I mean, we pointed out, for example, in

11   the brief that there seemed to be some question, for

12   example, about whether HAL is continuing to sell CRT

13   products up to the present and what exactly the

14   product mix that these companies are selling is

15   currently.

16          MS. WEBB:  And I really think that's

17   something that should be addressed, your Honor,

18   because the product that plaintiffs are relying on

19   to try to call into question the veracity of the

20   Hitachi defendants' declarations are not CDT or CPT

21   products.  They are flat-screen TVs that incorporate

22   a completely different technology called PRT.

23          So those are the kinds of issues that

24   should have been vetted before we got to this motion

25   to dismiss stage so that plaintiffs understood which

                                                      120

**Proceedings**

1    entity did what, plaintiffs understood which

2    products they've alleged are at issue and not at

3    issue, and not try to raise the specter that the

4    Hitachi defendants are not being truthful based on

5    some product that isn't even contained within the

6    complaint and isn't at issue here.

7            MR. SIMON:  So we could advance the ball

8    by doing the following, I would propose:

9            Since there's no question about those

10   entities that are in the business, the parent

11   companies, as you've been calling them, you could

12   order that information all be turned over.

13           We could have an additional proffer,

14   evidentially written or however is most convenient,

15   on the other entities.  We could have a further

16   meet-and-confer if we think we need to challenge

17   that.  And then we could come back on those entities

18   to your Honor.

19           But the one thing I would say is, if we do

20   the proffer without waiving your argument, you know,

21   for future, the proffer should be made without the

22   FTAIA objection for the proffer purposes to convince

23   us that those entities shouldn't be in and without

24   making --

25           SPECIAL MASTER LEGGE:  By the time you go

121

**Proceedings**

```
1    back to work on this, I will probably have given you

2    a decision on the foreign entity arguments and the

3    time frame.  So you shouldn't have to leave that up

4    in the air.

5              MS. WEBB:  So if what I'm understanding is

6    that the proffer would be made without a waiver of

7    any of the objections that we've made in terms of

8    what would actually be produced, that's fine.  I

9    think it will --

10             MR. SIMON:  But without holding anything

11   based on those objections.  In other words, you're

12   not waiving the argument that you can say:  You

13   can't consider this in the future.  It's not part of

14   the case.  But you're not keeping any information

15   from us on the basis of those objections to explain

16   the business of the company you're proffering on.

17             MS. WEBB:  For the purposes of the

18   proffer.

19             MR. SIMON:  Right.

20             MS. WEBB:  But preserving the objections

21   for the purposes of the production of discovery.

22             MR. SIMON:  Yeah.  That would be staging

23   it, and maybe that's more complicated than it needs

24   to be, but it seems like a reasonable solution.

25             MS. WEBB:  I mean, I believe this is what
```

122

**Proceedings**

1     we were trying to do in our letters in terms of

2     explaining to you, to plaintiffs what business each

3     entity was in at what particular time.

4               Now, we seem to have some confusion, given

5     that technology that is a later technology than is

6     alleged in your complaint has come in, a motion to

7     dismiss against an entity that said "We don't have

8     any documents" has been brought.

9               So if we can do a written proffer on the

10    businesses, what they did, what they manufactured or

11    didn't manufacture during a particular time without

12    waiving the objections that we raised in the

13    discovery to the actual production, that's something

14    we could agree to do as an initial step in order to

15    be able to figure out where we go from there.

16               MR. SIMON:  So we just did the

17    meet-and-confer in front of you.

18               SPECIAL MASTER LEGGE:  I guess that's

19    right.

20               MR. SIMON:  We'll look at --

21               MR. R. ALEXANDER SAVERI:  I mean, that's

22    fine.  Then this is all as to finished products,

23    your Honor.

24               SPECIAL MASTER LEGGE:  Pardon me?

25               MR. R. ALEXANDER SAVERI:  This is all as

123

**Proceedings**

1    to finished products, not tubes.

2          SPECIAL MASTER LEGGE:  Well, no.  I think

3    the definition of the business has got to include --

4          MR. R. ALEXANDER SAVERI:  All of it.

5          SPECIAL MASTER LEGGE:  -- all of it.

6          MR. R. ALEXANDER SAVERI:  Yeah, I agree.

7    That's great, your Honor.

8          MS. WEBB:  So for the defendants that are

9    at issue here, we will submit a proffer that

10   contains the name of the defendant, the type of

11   product that it produced, and the time period by

12   which that was produced, and the locale that it was

13   produced in.

14         SPECIAL MASTER LEGGE:  Okay.  And some of

15   that may have to have time frames.

16         MS. WEBB:  Yes, the time period in which

17   certain products were produced.

18         SPECIAL MASTER LEGGE:  Okay.  All right.

19         MR. SIMON:  I think there should be --

20         SPECIAL MASTER LEGGE:  And I think also

21   you should say, since we're dealing with this

22   specifically, were they ever in the business of CRT

23   tubes?  Were they ever in the business of CRT

24   products?

25         MS. WEBB:  Absolutely.

                                                      124

**Proceedings**

```
 1              SPECIAL MASTER LEGGE:  State the negative

 2    as well as the positive.

 3              MS. WEBB:  Sure.  For example, somebody

 4    produced CDT tubes but did not, likewise, produce

 5    computer monitors.

 6              MR. SIMON:  I think it would be helpful

 7    for us to have a short narrative on, you know, what

 8    the business of that company is, which should be

 9    pretty easy, and how it fits into the chain of

10    distribution of the other companies and what the

11    relationship is to those other companies.

12              So if it's a wholly owned subsidiary, for

13    example, that we just understand that and who

14    controls what entity.

15              Because we're not waiving our arguments --

16    we would not be waiving our arguments either to

17    argue --

18              SPECIAL MASTER LEGGE:  I'm not asking you

19    to waive.

20              MR. SIMON:  Yeah.  We would be able to

21    argue Royal Printing or, you know, anything else

22    down the line on control over various entities.

23              MS. WEBB:  I understand.  And we are not

24    waiving the argument on the other side about the

25    control of entities and what needs to be produced or
```

125

**Proceedings**

1    not produced.

2           SPECIAL MASTER LEGGE:  Now, how long do

3    you think it will take you to do that?

4           MS. WEBB:  Dealing with Asian companies

5    can be a little time-consuming, but I imagine we

6    could have this to you within -- to plaintiffs

7    within 14 days.

8           SPECIAL MASTER LEGGE:  Not available at

9    one corporate position?

10          MS. WEBB:  No.  No, your Honor.

11          SPECIAL MASTER LEGGE:  You can't go to the

12   corporate secretary?

13          MS. WEBB:  Unfortunately, no.

14          SPECIAL MASTER LEGGE:  Okay.  By

15   November -- today is the 12th.  So it'd be

16   November 26th.  What day of the week is that?

17          I've got my calendar here.  Oh, I've got

18   it here.

19          MR. SCARBOROUGH:  It's a Friday.  It's the

20   day after Thanksgiving.

21          SPECIAL MASTER LEGGE:  Okay.  Let's make

22   it the following Monday, November 29.

23          MS. WEBB:  I'm sorry, your Honor.  Could

24   we make it November 30th?  Because I'm actually

25   going to be out of town on the 29th.

                                                      126

**Proceedings**

```
 1          SPECIAL MASTER LEGGE:  All right.

 2   November 30th.

 3          Okay.  Then what happens?  What are you

 4   folks going to do then?

 5          MR. R. ALEXANDER SAVERI:  Well, your

 6   Honor, we would see what they provide.  And then the

 7   question would be whether there are would be

 8   custodians subject to what they tell us that would

 9   have relevant --

10          SPECIAL MASTER LEGGE:  Well, what are you

11   going to do?  Meet and confer?

12          MR. R. ALEXANDER SAVERI:  Yeah, we'll meet

13   and confer after that, your Honor.

14          SPECIAL MASTER LEGGE:  Are you going to

15   schedule a hearing right back in front of me?

16          MR. R. ALEXANDER SAVERI:  I think we'll

17   have a meet-and-confer within a week after we get

18   it.

19          MS. WEBB:  Yes, I think that's great.  I

20   think the plaintiffs have identified some Hitachi

21   custodians.  We can start to meet and confer on the

22   custodian basis and see where that gets us.

23          SPECIAL MASTER LEGGE:  Okay.

24   Whereby . . .

25          MR. R. ALEXANDER SAVERI:  I'll get to
```

127

Proceedings

1  that.  We'll talk about the custodians in a minute,

2  your Honor.

3           SPECIAL MASTER LEGGE:  By December 7th.

4           And then report to me by -- well, how long

5  do you think?  December 10?

6           MR. R. ALEXANDER SAVERI:  Sure.  Is

7  that --

8           SPECIAL MASTER LEGGE:  Soon enough?

9           MR. R. ALEXANDER SAVERI:  The 10th, that's

10  about ten days later?  That'd be fine.

11           SPECIAL MASTER LEGGE:  No.  That's seven

12  days later --

13           MR. R. ALEXANDER SAVERI:  That'd be fine.

14           SPECIAL MASTER LEGGE:  -- after your

15  meet-and-confer.

16           MR. R. ALEXANDER SAVERI:  Sure.

17           SPECIAL MASTER LEGGE:  Three days after

18  your meet-and-confer.

19           MS. WEBB:  No.  I think we need more time.

20           MR. R. ALEXANDER SAVERI:  One week.  Why

21  don't we go a week and a week.

22           MS. WEBB:  Plaintiffs will provide a

23  custodian list, and then --

24           MR. R. ALEXANDER SAVERI:  Well, that's --

25  we don't want to -- no, we're not going -- I'd like

128

**Proceedings**

1    to talk about that.

2              SPECIAL MASTER LEGGE:  Report to me by

3    December 1st.

4              MR. R. ALEXANDER SAVERI:  We don't agree

5    that we're going to provide a custodian list.  If

6    we're going to go custodians, we want mutual

7    custodians.

8              MS. WEBB:  All right.  We can talk about

9    that.

10             MR. R. ALEXANDER SAVERI:  There we are.

11             SPECIAL MASTER LEGGE:  Now, I suppose -- I

12   suppose we are all of us, plaintiffs, defendants,

13   and I, are sort of agreeing that in order to soften

14   the burden of producing whatever has to be produced,

15   that trying to identify where it might come from and

16   where it might not exist is a useful process.

17             MR. R. ALEXANDER SAVERI:  Yes.

18             MS. WEBB:  Yes, your Honor.

19             SPECIAL MASTER LEGGE:  Even with

20   Mr. Simon's suspicious mind that if it exists over

21   here, then it's got to have permutations throughout

22   the entire structure of the defendant.

23             MR. SIMON:  That's why I'm shifty and

24   mesmerizing.

25             SPECIAL MASTER LEGGE:  Okay.  All right.

                                                      129

Proceedings

1    So that will be the schedule with respect to that

2    particular motion.

3              MR. ALIOTO:  Your Honor, before we move

4    on.

5              SPECIAL MASTER LEGGE:  Yes.

6              MR. ALIOTO:  Mario Alioto on behalf of the

7    indirects.

8              SPECIAL MASTER LEGGE:  Yes.

9              MR. ALIOTO:  That doesn't moot that

10   question that your Honor alluded to.  I mean, we

11   have this very fundamental issue here about whether

12   we have to make some prima facie showing.

13             SPECIAL MASTER LEGGE:  No.  I understand

14   that.

15             MR. ALIOTO:  That ought to get ruled upon,

16   in our view, at this point.

17             SPECIAL MASTER LEGGE:  Well, I can hold

18   it, but I can also say I've given a verbal ruling of

19   no necessity for prima facie case by the plaintiffs.

20   I'll just put that in my notes.

21             All right.  Now, next we have the motion,

22   related motion, concerning the foreign discovery.

23   Now, a few thoughts on that.

24             You know, it's obvious from the complaint

25   that there's a lot of foreign activity.  I think it

130

**Proceedings**

1   also seems obvious from the venue location of the

2   defendants in the foreign countries that most of

3   their business activities and most of the

4   information is going to come from some foreign

5   depository.  So what foreign -- quote, foreign

6   discovery is relevant and required to be produced?

7            Now, as I understand Hitachi's position,

8   they're saying that they will produce documents if

9   they have a relationship to U.S. commerce, wherever

10  those documents may be located.

11           And they appear to state that their only

12  objection is to information that relates to

13  foreign -- to purely foreign sales or commerce,

14  which I gather means a product manufactured in a

15  foreign country, sold to somebody else in a foreign

16  country that stayed in the foreign country.  There's

17  a little waffling on that on page 7 of their

18  October 7th letter, but I think they're really

19  agreeing to do that.

20           So now what the plaintiffs want here is,

21  again, a very general thing that says in their

22  letter of September 10:  A motion to compel

23  discovery of foreign conduct and pricing issues be

24  granted.

25           However, in describing in their

131

**Proceedings**

1    October 21st letter what they're looking for, they

2    refer to what they got in the HDL case, and they're

3    saying that it's conversations, communications in

4    the world to discuss fixing prices of U.S.

5    customers.

6              So I think, I think we're all agreed that

7    in order for the information, foreign information to

8    be relevant, it's got to have something of a show --

9    there's got to be a showing of some impact on United

10   States commerce.

11             Now, how do we define that?  What do we

12   say about that?  Again, I go back to the fact that

13   these multiple companies having some definition of

14   what their businesses were is important.  So I think

15   it is still important to have some proffer there.

16             And also, just give me a little background

17   education here.  I'm not going to make any decisions

18   based upon what you tell me.  But, you know, I had

19   the general impression that there were no longer any

20   television sets manufactured in the United States.

21             Is that correct?

22             MR. LEHMANN:  Why don't I go to the

23   podium.

24             SPECIAL MASTER LEGGE:  No.  You can answer

25   from right there.

                                                      132

**Proceedings**

1           MR. LEHMANN:  Your Honor, I think

2    currently within the United States there are no CRT

3    sets manufactured; but during the entirety of the

4    class period, there were.

5           SPECIAL MASTER LEGGE:  There were.

6           Now, where are computers manufactured?

7    Are they manufactured in the United States?

8           MR. R. ALEXANDER SAVERI:  All over.

9           MR. LEHMANN:  I believe that they're

10   manufactured at various locations all over the

11   world.

12          SPECIAL MASTER LEGGE:  In the United

13   States?

14          MR. R. ALEXANDER SAVERI:  Your Honor, with

15   that, it depends on the company, for example.

16          SPECIAL MASTER LEGGE:  Well, I'm saying,

17   where are they manufactured?

18          MR. R. ALEXANDER SAVERI:  Some are

19   manufactured in the U.S.

20          SPECIAL MASTER LEGGE:  Okay.

21          MR. R. ALEXANDER SAVERI:  Some are

22   manufactured in maquiladora factories on the border

23   of Mexico and then sent into the U.S., your Honor,

24   and abroad.

25          SPECIAL MASTER LEGGE:  Well, what about

133

**Proceedings**

1    the manufacturers of the CRTs?  Is that all

2    occurring abroad?  To the extent it's occurring at

3    all anymore.

4         MR. R. ALEXANDER SAVERI:  Yes.  But I

5    think during the period of time of the conspiracy

6    here, during our relevant period, some were

7    manufactured here, some were manufactured abroad,

8    some were then transferred here and put into the

9    so-called finished product within the integrated

10   companies and sold into the U.S.

11        So it's both, your Honor.  It's

12   manufactured all over.

13        MR. LEHMANN:  Your Honor, can I pinpoint

14   what I think are the issues relating to the --

15        SPECIAL MASTER LEGGE:  No.  Let me thrash

16   around here a little bit in the generalities before

17   we get to the specifics.

18        What about Hitachi defendants?  Are all of

19   the CRTs made by your manufacturing subsidiaries,

20   were they all sold to Hitachi-related companies or

21   did they sell CRTs to other entities, competing

22   entities?

23        MS. WEBB:  They sold both, your Honor.

24        SPECIAL MASTER LEGGE:  Both.  Sure mushes

25   it all up, doesn't it?

                                                  134

**Proceedings**

1          MS. WEBB:  Yes.

2          SPECIAL MASTER LEGGE:  Sure mushes it all

3    up.  Okay.

4          MS. WEBB:  And they purchased CRTs too.

5          SPECIAL MASTER LEGGE:  They did?

6          MS. WEBB:  Some of them.

7          MR. LEHMANN:  And we believe that they

8    might have sold CRTs to fellow defendants, who then

9    incorporated them --

10          SPECIAL MASTER LEGGE:  Well, that's --

11          MR. LEHMANN:  Yeah.

12          SPECIAL MASTER LEGGE:  -- convoluted.

13          I didn't think it would be -- I hoped it

14    might be as neat and clean as Hitachi sold only to

15    Hitachi, but that's obviously not . . .

16          Okay.  So a great deal of what I was going

17    to ask about in connection to this case is broadly

18    noted.

19          So I guess we get back to the basic point

20    of, I think you all agree that under the statutes,

21    under the cases, that in order to be relevant, it's

22    got to have some impact on the United States.

23          Now, in order to send them off searching

24    for things that might have an impact, how do we

25    define it?  How do we define that impact?

135

Proceedings

1          MR. LEHMANN:  Your Honor?

2          SPECIAL MASTER LEGGE:  Yeah.

3          MR. LEHMANN:  We tried to narrow it or we

4    were prepared to narrow it by custodians, and

5    particularly custodians who were involved in these

6    class meetings overseas that are referenced in both

7    our complaint and the various DOJ indictments.

8          The issues that we have with what Hitachi

9    had to say in its opposition letter are, I think,

10   twofold.  I mean, they made the point in one of the

11   meet-and-confer letters that they were prepared to

12   give over documents that refer to U.S. sales, refer

13   to U.S. purchasers, refer to models sold in the

14   U.S., and refer to -- or business plans that refer

15   to the U.S. market.  All well and fine.  We agree on

16   that.

17          In their opposition letter, they also said

18   that they would agree to produce documents where

19   it's ambiguous but that the subject of the document

20   is foreign or U.S. commerce.

21          And I think that raises some practical

22   issues, like:  Who decides, at the first instance,

23   whether it's ambiguous or not ambiguous?

24          SPECIAL MASTER LEGGE:  Usually it's the

25   producing party that has to make the first cut.

                                                      136

**Proceedings**

```
1                MR. LEHMANN:  That's right.

2                SPECIAL MASTER LEGGE:  And we all --

3                MR. LEHMANN:  And for those documents

4      withheld on the grounds that they felt it's not

5      ambiguous, is there going to be any mechanism where

6      we can dispute that determination and take it to

7      you?

8                SPECIAL MASTER LEGGE:  I don't know what

9      it would be.

10               MR. LEHMANN:  Well, we think that -- we

11     think that under the case --

12               SPECIAL MASTER LEGGE:  Usually, if the

13     parties don't agree on what the subject matter is to

14     be searched for or can't identify the documents,

15     it's usually the judicial tribunal that says:

16     Here's what you go look for.

17               Once that's defined, then the first cut is

18     always made by the party who has the documents.  And

19     usually the other side can't challenge that unless

20     you get some suspicion somewhere, somehow that it's

21     been fudged.

22               MR. LEHMANN:  And one answer --

23               SPECIAL MASTER LEGGE:  That's what we live

24     with.  We live with that in discovery.

25               MR. LEHMANN:  One answer that's given to
```

137

**Proceedings**

```
 1    that conundrum is the decision in Aspartame, where

 2    there the defendant said that discovery ought to be

 3    limited to those foreign materials that the

 4    defendants determined had a substantial effect on

 5    U.S. commerce.

 6            And the Court said:  No, we're not doing

 7    it that way.  That vests too much discretion in the

 8    defendant.

 9            And the Court said:

10            "Though conduct usually plays a

11            vital" --

12            "Though counsel usually plays a

13            vital role in discovering [sic] the

14            relevancy of documents to be produced

15            in response to a discovery request,

16            the standard proposed by defendants

17            is inappropriate.

18            MR. SIMON:  Mr. Kessler just took off in

19    his jet airplane.

20            SPECIAL MASTER LEGGE:  Or a toilet just

21    flushed.

22            I think we're getting some background

23    noise over the phone.  Could you mute your cell

24    phones, please.  Thank you.

25            I'm sorry.
```

138

Proceedings

```
1              MR. LEHMANN:  So we think --

2              SPECIAL MASTER LEGGE:  I did not hear --

3     you were quoting from this, and I did not hear the

4     end of it.

5              MR. LEHMANN:  Let me quote what Aspartame

6     said.

7                  "Defendants' suggestion that

8              discovery be limited to only those

9              foreign materials that defendants

10             determined have a substantial effect

11             on U.S. commerce is not acceptable.

12             Though counsel usually plays a vital

13             role in deciding the relevancy of

14             documents to be produced in response

15             to a discovery request, the standard

16             proposed by defendants is

17             inappropriate."

18             And we think it's inappropriate here as

19     well.

20             SPECIAL MASTER LEGGE:  What do you think

21     we should do?

22             MR. LEHMANN:  I think if it's a situation

23     where -- yeah, I don't know that you could come up

24     with any criteria that we and Hitachi would agree on

25     as to what constitutes ambiguity in this instance.
```

139

**Proceedings**

1              And I think if it's a situation where it

2      relates to the subject matter of the alleged

3      conspiracy, it ought to be produced.  We can argue

4      over the weight --

5              SPECIAL MASTER LEGGE:  Well, then you're

6      ignoring the foreign limitation that's applied by

7      the statute and by the courts.

8              THE WITNESS:  Well, the FTAIA applies no

9      limitation because it's not a discovery statute.

10             SPECIAL MASTER LEGGE:  I understand.

11             MR. LEHMANN:  We've cited the case law

12     that deals with it.  And we've also cited

13     post-Empagran and post-2000 cases, like Aspartame,

14     Auto Paint, and Urethanes.

15             SPECIAL MASTER LEGGE:  What do you want me

16     to say?

17             MR. LEHMANN:  What I want you to --

18             SPECIAL MASTER LEGGE:  If I grant your

19     motion after we've identified what and where, this

20     gets down to foreign.

21             MR. LEHMANN:  What I want you to say --

22             SPECIAL MASTER LEGGE:  What do I say about

23     foreign?

24             MR. LEHMANN:  What I want you to say is

25     that within the defined topics we have and the

                                                    140

**Proceedings**

1    defined custodians, we get the documents relevant to

2    the claimed conspiracy.

3         We're not asking for them to search every

4    corner of their foreign corporations.

5         SPECIAL MASTER LEGGE:  So you're just

6    saying ignore the requirement of impact on U.S.

7    commerce?

8         MR. LEHMANN:  No.  What I'm saying is that

9    it may be difficult to tell, for a particular

10   document, whether it has an impact.  And under those

11   circumstances, the plaintiffs ought to be given the

12   benefit of the doubt.

13        Let me give you an example.  We've alleged

14   curtailment of plant production across the world,

15   United States, ex-United States.

16        If they curtailed CRT production in

17   Malaysia, we would contend that's part of the

18   conspiracy to limit global output and raise prices.

19   But if that document reflecting their curtailment of

20   production makes no mention of the United States,

21   should that be a reason we don't get it?

22        SPECIAL MASTER LEGGE:  We'll get to trial.

23   When we get to trial, you want to introduce that

24   document, and they say:  Well, this has nothing to

25   do with U.S. commerce.  Is that going to get in?

141

1          MR. LEHMANN:  Sure.

2          MR. GUIDO SAVERI:  Yes, absolutely.

3          MR. LEHMANN:  They would.

4          SPECIAL MASTER LEGGE:  At what point in

5    the case, then, do we apply the requirement that

6    it's got to have an impact on U.S. commerce?

7          MR. SIMON:  I can answer that question, I

8    think, your Honor, because if there's a split of

9    authority on that, defendants often argue that you

10   can decide the FTAIA issue on a motion to dismiss,

11   even a 12(b)(1) motion.

12          And some courts say that you don't even

13   get to that until the merits are determined because

14   the domestic commerce impact is part of the merits

15   claim that has to be proven as part of the Sherman 1

16   claim.

17          SPECIAL MASTER LEGGE:  So we roll it up

18   and give the jury an instruction?

19          MR. SIMON:  Yep.

20          SPECIAL MASTER LEGGE:  Wonderful.

21          MR. LEHMANN:  I'll give you another

22   perfect example.

23          SPECIAL MASTER LEGGE:  Wonderful.

24          MR. LEHMANN:  These glass meetings that we

25   claim occurred in foreign countries at which the

                                                    142

**Proceedings**

1    conspiracy is hatched, what if you've got a record

2    of that glass meeting where the U.S. purchasers and

3    products aren't mentioned; there are just references

4    generally to 14-inch, 21-inch tubes with no

5    indication which models they are.  The U.S. doesn't

6    appear in name in the course of that meeting, but it

7    clearly is one at which the prices are fixed.  I

8    think that's a document that we should get --

9            MS. WEBB:  And, your Honor --

10           MR. LEHMANN:  -- even though there's no

11   clear reference to U.S. commerce.

12           SPECIAL MASTER LEGGE:  I hear what you're

13   saying.  Well, so what you would say -- I think what

14   you're telling me is that in an order compelling

15   them to produce documents, that there be no

16   limitation in that defined document order, defined

17   discovery order, making any reference at all to the

18   necessity for impacting the United States.

19           MR. LEHMANN:  Yes.  And I have examples

20   for that.

21           The perfect one is, again, Urethanes.

22   Court makes the point.  You could have a document

23   discussing the fixing of prices in Africa.  No

24   mention of the United States.  But that's an

25   appropriate topic for discussion in connection with

                                                      143

**Proceedings**

```
 1    the global conspiracy to fix the prices of

 2    urethanes.

 3             Auto refinishing paint.  You could have

 4    minutes of a meeting of the European Council of the

 5    Paint Printing & Ink --

 6             SPECIAL MASTER LEGGE:  And so the

 7    requirements of impact on U.S. commerce would not be

 8    resolved till the issue is submitted to a jury with

 9    a jury instruction.

10             MR. LEHMANN:  To the jury.  Potentially

11    it's summary judgment.  But, you know, we feel -- I

12    mean, this is discovery, your Honor.

13             SPECIAL MASTER LEGGE:  I know.  I know.

14    I'm just saying how this plays out.

15             MR. SCARBOROUGH:  Your Honor, this is Mike

16    Scarborough for the Samsung, SDI defendants.

17             Having just recently argued one of those

18    motions, that is --

19             SPECIAL MASTER LEGGE:  I'm sorry.  Which

20    motion?

21             MR. SCARBOROUGH:  A motion under the

22    FTAIA.  A dispositive motion --

23             SPECIAL MASTER LEGGE:  For what?  A motion

24    for summary judgment or a discovery order or what?

25             MR. SCARBOROUGH:  It's a little bit of a
```

144

1    strange animal.  The motion actually I just argued

2    was called a -- you can make either a facial or a

3    factual challenge to the Court's subject matter

4    jurisdiction.

5            But that's what the FTAIA is.  It's a

6    substantive limit on what the Court can hear and

7    what it can't hear.

8            And what we've just heard described by the

9    plaintiffs is a very novel -- and so far, no court

10   has really bought into it -- view of the FTAIA as

11   part of an element of a claim.

12           The overwhelming -- let me finish, Bruce.

13           The overwhelming authority on the FTAIA

14   says it's a jurisdictional statute.  And defendants

15   can challenge that by a facial or a factual

16   challenge to subject matter jurisdiction.

17           And there's just -- there's no way that --

18           SPECIAL MASTER LEGGE:  How does that play

19   into discovery?

20           MR. SIMON:  It doesn't.  It doesn't affect

21   discovery.

22           SPECIAL MASTER LEGGE:  I'm asking him the

23   question.

24           MR. SCARBOROUGH:  How it plays into

25   discovery, your Honor, let me give you a little bit

145

Proceedings

1    more -- you asked some basic questions about how

2    some of these markets work.

3            I think it is useful to look at the

4    differences, let's say, between the tubes that go

5    into TVs and the tubes that go into monitors.  The

6    markets there, just to really oversimplify things,

7    are somewhat different.

8            Generally, on a very general basis, the

9    markets for monitors are much more international in

10   nature, basically because they're much smaller,

11   generally, they're easier to ship and, generally,

12   there are fewer tariffs that are associated with

13   that; whereas the markets for the tubes that go into

14   TVs are much more regional.

15           And generally, where -- because they're

16   generally bigger tubes and the end product is much

17   bigger, it's not as efficient to ship them.  The

18   tariffs are much higher.  And so, generally, you

19   have very regional markets for those.

20           So let's say, for instance, in Europe, a

21   variety of defendants had manufacturing plants for

22   the tubes that went into TVs in Europe themselves.

23   Then, to the extent those were turned into finished

24   products, that was done in Europe, and those

25   products all stayed within Europe.  So we know that

146

**Proceedings**

1    for those types of products, they never, ever came

2    anywhere close to the U.S.  That was a regional

3    market for those types of tubes.

4            We have no business turning over those

5    offices, looking into all of those custodians, doing

6    the kind of unlimited discovery that the plaintiffs

7    are asking for with respect to those markets.  We

8    know up-front this has nothing to do with the U.S.

9            And they're asking you to have literally a

10   completely limitless standard for completely

11   worldwide discovery.

12           SPECIAL MASTER LEGGE:  All right.  Well,

13   let me ask you the question.  Okay.  Suppose I say,

14   okay, I'm going to issue an order that compels you

15   to make some productions here but I agree with you

16   that you shouldn't have to produce anything that

17   doesn't impact U.S. commerce.  What do I say?

18           MS. WEBB:  Well, your Honor, to the

19   extent -- and this is a motion against Hitachi.

20           To the extent we are reviewing documents

21   and identifying documents that have to do with

22   sales -- let's take the example of HAS.  And HAS

23   never sold into the United States -- that has to do

24   with a tube or finished product that was

25   manufactured in Asia, that can be ascertainably

147

**Proceedings**

1    traced to having stayed in Asia, being sold into the

2    Asian market, that shouldn't be produced.

3         To use the example of the purported

4    conspiracy price-fixing meeting, if the document

5    doesn't say "We're talking about Asia prices" or

6    "We're talking about U.S. prices," as we offered in

7    our letter brief, we'll produce it.  It's ambiguous.

8    So of course they get that document.

9         Likewise, sales and transactional data

10   that can't be identified as being tied to a

11   particular non-U.S. market or a non-U.S. purchaser

12   will be produced.

13        And that's a lot of information, your

14   Honor.

15        MR. GUIDO SAVERI:  But I think, your

16   Honor, if I may make an observation about what

17   Mr. Scarborough said -- and I know what he's talking

18   about because we're in the same case in front of

19   Wilkins, and that's what he's talking about.

20        There's a difference between evidence of a

21   conspiracy.  What is the conspiracy?  Evidence of

22   the conspiracy, that should be produced.  And even

23   though it may relate to some foreign company, at

24   least it may be relevant to get in.

25        There's a different problem on whether the

148

**Proceedings**

1    sales -- not the evidence of the conspiracy.  That

2    should be produced -- but whether the sales are

3    within the jurisdiction of the Court for damage

4    purposes.

5              SPECIAL MASTER LEGGE:  Or are actionable.

6              MR. GUIDO SAVERI:  Maybe -- right.  If

7    this bottle is foreign, I don't get damages on it

8    under the FTAIA if that's it.

9              But if there's an evidence of a conspiracy

10   that involves everything, even though it might

11   involve a worldwide conspiracy, I'm entitled to show

12   that.  I may not get damages, but I'm entitled to

13   show that conspiracy.  Otherwise, I'm being

14   precluded.

15             And Continental Oar goes back, that we

16   went back I don't know how many years to get

17   evidence that is relevant to the conspiracy.

18             So there's a distinction between that.

19   And when you look at -- Mr. Lehmann will talk about

20   what the indictments that came out about the

21   meetings that the government alleges about the

22   meetings in Korea and Taiwan and Malaysia and China

23   and elsewhere to discuss the prices.

24             SPECIAL MASTER LEGGE:  Are you talking

25   about the copy you sent me yesterday?

149

Proceedings

1              MR. LEHMANN:  Yeah.  They refer to

2      meetings, communications, conversations in Taiwan,

3      Korea, Asia, Malaysia, China, across the world

4      relevant to this overall international conspiracy.

5      And we certainly think we ought to be able to get

6      the evidence relating to all of those.

7              There's another issue here, though, your

8      Honor, that I think we need to address.  There are

9      defenses to the FTAIA, even assuming arguendo that

10     it's applicable in this case.

11             One of them is the domestic effects

12     exception, which turns on the issue of the

13     interrelationship between the foreign conduct and

14     effects in the U.S.

15             And how are we able to mount that defense

16     if we're going to be denied any discovery with

17     respect to the foreign conduct that they claim has

18     no impact?

19             I think the way the courts typically do

20     this in the context of international antitrust

21     cartels is they err on the side of liberality and

22     they give the plaintiff extensive discovery.

23             Now, I agree with you.  We want to do this

24     in a way that's justifiable.  So what we're

25     proposing to do is to limit it by custodian and to

                                                      150

Proceedings

1    focus on the meetings, bilateral and multilateral

2    meetings that occurred in these foreign countries

3    and the activities that flowed out of them.

4          That's how we plan to do it with the

5    custodians.  That's how we plan to try to limit the

6    burden that has been described here.  And I think,

7    your Honor, that that's a reasonable alternative

8    approach, a compromise here that solves it.

9          And the other point I would make, your

10   Honor, is you've seen their discussion of how many

11   documents that are at issue.  They obviously view it

12   as a significant number.

13         In the context of other cases and in the

14   context of what typically happens in antitrust cases

15   and in the context of the 1.2 million documents that

16   Hitachi entities produced in LCDs, we're not talking

17   about a huge number of documents here.  This is

18   manageable.

19         MS. WEBB:  Your Honor, we would be more

20   than happy to sit down and talk about if we can

21   reach a compromise on a list of custodians.

22         That's actually what I thought we were

23   going to do at some point in the meet-and-confer.

24         SPECIAL MASTER LEGGE:  Even as to this

25   foreign issue?

151

**Proceedings**

```
 1              MS. WEBB:  Yes, your Honor.  We proposed

 2    some ways in which to make determinations about

 3    documents.  Custodians is one way.

 4              But continuing the meet-and-confer

 5    process, I think, is probably the most fruitful way

 6    for both parties to get a handle on this and figure

 7    out if they can reach an agreement.

 8              MR. SCARBOROUGH:  And, your Honor, if I

 9    can just add.  If you issue an order on a motion to

10    compel that says everything around the world is in,

11    it counts, there's really no incentive on the

12    plaintiffs' side to cut down the number of

13    custodians they want.  They're working from a

14    position of complete strength.  They can insist on

15    custodians all over the world.  We've got nothing to

16    bargain with in terms of appropriate number of

17    custodians.

18              SPECIAL MASTER LEGGE:  No, I understand

19    what you're saying.

20              MR. LEHMANN:  There's actually one

21    incentive, your Honor.  It's going to cost us.

22    We're going to make a judicial use of our

23    resources -- judicious use of our resources here,

24    and we're not going to ask for 5,000 custodians

25    across the world.
```

152

**Proceedings**

```
 1              SPECIAL MASTER LEGGE:  I have a motion in

 2      front of me.  Unless you two sides agree to continue

 3      or defer the motion while you talk about the

 4      custodian process, I've got to ignore what you're

 5      telling me about it and go ahead and rule on the

 6      motion.

 7              MR. SIMON:  Can I make one point in

 8      response to what Mr. Scarborough said?

 9              As you pointed out at the very beginning

10      here, some of these things you're deciding today

11      could have --

12              SPECIAL MASTER LEGGE:  I understand.

13              MR. SIMON:  -- overall chain effects.

14              SPECIAL MASTER LEGGE:  This one is very

15      significant to a lot of international companies, and

16      I don't know anything about their burdens.  I'm

17      having a hard time coming to, getting to the ground

18      of Hitachi's burdens.

19              MR. SIMON:  And I just argued a case this

20      year too in front of the Seventh Circuit Court of

21      Appeals on this very issue.  And they have an

22      opinion there called United Phosphorus which

23      supports what Mr. Scarborough was saying.

24              But the first question from the panel to

25      me when I stood up was:  Should we reconsider our
```

153

**Proceedings**

```
 1    position in United Phosphorus because the element of

 2    the Sherman claim that requires you to prove

 3    domestic effect is there, and you can only prove

 4    that based on the merits.

 5           There's a case called Hartford Fire which

 6    says that, that it's an element of the Sherman claim

 7    and that the FTAIA hasn't changed the elements of

 8    the Sherman 1 claim and, therefore, it's a matter of

 9    timing.

10           Don't allow a drive-by jurisdictional

11    decision decided on the merits and cut it out when

12    you have the full discovery record.  And that's the

13    opposite side of what Mr. Scarborough argues, and

14    we're on opposite sides of that.

15           But that's a very important decisions in

16    that cases go both ways.

17           SPECIAL MASTER LEGGE:  If you both tell me

18    that you want to continue discussing it, that's what

19    you're doing, or resume discussions based upon a

20    custodian-based approach, I'll defer.  But if you

21    don't agree on that, doing that, then I've got to go

22    ahead and rule on a motion.

23           MR. R. ALEXANDER SAVERI:  Your Honor,

24    custodians is one thing.  In other words, who are

25    the people that are producing the documents?
```

154

**Proceedings**

```
1              SPECIAL MASTER LEGGE:  That's right.

2              MR. R. ALEXANDER SAVERI:  But then once

3   they get the document, that's where we need the

4   guidelines.  Is it in or is it out?  And that's

5   what --

6              SPECIAL MASTER LEGGE:  No.

7              MR. R. ALEXANDER SAVERI:  -- this FTAIA

8   deals with.

9              SPECIAL MASTER LEGGE:  That's right.  But

10  if you agree on custodians, you are postponing any

11  necessity for anybody deciding what to do with the

12  Act.  Okay?

13             I may have to -- Conti may have to deal

14  with it on summary judgment motion, maybe get a

15  motion from them on jurisdiction.  I don't know what

16  you're going to get.

17             It doesn't have to be ruled upon if you

18  folks agree that we're going to go to these

19  custodians and everything they've got that's

20  relevant to the subject matter gets produced.

21             Then the issue gets swept under the rug

22  until the next time it has to be decided.

23             MR. R. ALEXANDER SAVERI:  But is that

24  regardless of whether it impacts the U.S. or not?

25             SPECIAL MASTER LEGGE:  Yes.
```

155

**Proceedings**

1          MR. R. ALEXANDER SAVERI:  If they agree.

2     But they won't agree to that.

3          SPECIAL MASTER LEGGE:  Well, I don't know.

4          MS. WEBB:  Well, I don't know.  We haven't

5     even discussed custodians.

6          MR. GUIDO SAVERI:  Well, what is there to

7     discuss?  He just said it.  Will you agree, if it

8     doesn't affect the impact, that you will give it to

9     us?

10          MS. WEBB:  Well, if you're going to

11     want --

12          MR. GUIDO SAVERI:  What's the big deal?

13          MS. WEBB:  -- 300 custodians --

14          MR. R. ALEXANDER SAVERI:  But the numbers,

15     we can come back to court on.

16          MS. WEBB:  -- no, I'm not going to waive

17     these objections because that isn't a narrowing of

18     the discovery.

19          If it's a reasonable number of custodians

20     and it's going to -- we're going to be able to

21     identify them and collect documents from them, then,

22     absolutely, we would do that.

23          But the slicing and dicing about, you

24     know, conspiratorial meetings versus transactional

25     data, I think that has very important ramifications

                                                    156

**Proceedings**

1    because, you know, relevant discovery is twofold.

2    It's relevant to the allegations, and it also has to

3    lead to admissible evidence.

4             We are willing to meet and confer on a

5    custodian basis.

6             MR. GUIDO SAVERI:  Whether it's admissible

7    or not is for the Court at the time of the trial.

8    But it is discoverable if it is relevant or may be

9    relevant.  Whether it gets in or not is not the

10   issue.

11            SPECIAL MASTER LEGGE:  Hang on a minute.

12            In a minute here, I'm going to defer -- or

13   adjourn just for five minutes and let you folks do a

14   little talking about it.

15            MR. KESSLER:  Your Honor, this is

16   Mr. Kessler.  If I could just say one minute on

17   something in case you have to reach this issue --

18            SPECIAL MASTER LEGGE:  Yes.

19            MR. KESSLER:  -- which is that with the

20   standpoint of the other defendants, I would just ask

21   that the issue for Hitachi also be decided in the

22   context of the specific burdens and issues that

23   they've raised, because other defendants could be in

24   very different situations, including with respect to

25   the custodian issue.

157

**Proceedings**

```
 1              To give you an example, to me the issue is

 2      the following:  If, for example, there's a business

 3      that only sells televisions in Europe and that's

 4      what they do and that's the only jurisdiction of the

 5      custodians, then the issue becomes:  What is the

 6      burden of having those types of people required to

 7      do document searches versus the likelihood they're

 8      going to find anything of the type of documents that

 9      plaintiffs are talking about?

10              So I guess however your Honor rules, it

11      has to leave room for that type of negotiation and

12      issues to be addressed, because I think everybody

13      agrees that if a document is relevant and

14      responsive, then wherever it is, it should be

15      produced.

16              But there's another argument about where

17      is it reasonable to search for these documents,

18      given the fact if you have a lot of people who have

19      no involvement in selling products to the United

20      States or discussing the United States or being

21      involved in global sales, but solely are involved in

22      local markets, whether it makes any sense to put the

23      burden on defendants to search there.

24              And I think that's just a point I wanted

25      to make so you can be sensitive to that if you have
```

158

**Proceedings**

1    to write about this.

2              SPECIAL MASTER LEGGE:  Okay.  Well, as I

3    understand, just to state it my way, you're pointing

4    out to me that different defendants can have

5    different considerations about different burdens.

6    And so this is one area, if I make a ruling, I've

7    got to be sure I'm ruling as to what's in front of

8    me with respect to Hitachi and not something that is

9    going to be applied to all the other defendants

10   without their opportunity to be able to discuss

11   burden.

12             MR. KESSLER:  Thank you, your Honor.

13   That's my point.

14             SPECIAL MASTER LEGGE:  Okay.  Now let me

15   get back to what I do have.

16             I'm going to break here for a few minutes

17   in just a minute to let you two talk to see if you

18   want to continue discussions of this issue in a

19   meet-and-confer.

20             But before I do that, I want to frame what

21   you want me to do.  Now, with respect to the

22   plaintiffs, I understand you want a discovery order

23   that does not refer to impact being an issue at all.

24   Okay?  That's my understanding.

25             MR. R. ALEXANDER SAVERI:  Correct, your

159

**Proceedings**

1    Honor.

2              SPECIAL MASTER LEGGE:  Oversimplification,

3    but I think it's . . .

4              Defendant, if I enter an order, what do

5    you want the order to say?  How do you want it to be

6    phrased?

7              MS. WEBB:  We want the order to narrow the

8    scope of discovery such that it would only relate to

9    those documents that have an impact on U.S. commerce

10   and affect U.S. commerce.

11             And to articulate that and put a little

12   flavor on that, your Honor, it would be along the

13   lines of those sales that were direct into the

14   United States and into U.S. purchasers.

15             Now, that refers to transactional and

16   sales documents.

17             With respect to --

18             SPECIAL MASTER LEGGE:  Just a second.

19             MS. WEBB:  Sure.

20             SPECIAL MASTER LEGGE:  Okay.

21             MS. WEBB:  With respect to plaintiffs'

22   requests that have to go -- that go to the issue of

23   competitor meetings, I think as a practical matter,

24   your Honor, competitor meetings are going to be

25   produced in this litigation regardless of where the

160

**Proceedings**

1    meeting took place or regardless of the discussions,

2    because I don't think, to the extent that they

3    exist, that there's going to be the ability to

4    differentiate.

5                    SPECIAL MASTER LEGGE:  Yeah.

6                    Okay.  Now let me take a five-minute

7    recess.

8                    Question for you guys:  Do you want me to

9    rule, or do you agree to continue this issue for

10   more meet-and-confer?  That's your question.

11                   MS. WEBB:  Okay.  Thank you, your Honor.

12                   MR. SIMON:  Your Honor, can we ask you a

13   question?

14                   SPECIAL MASTER LEGGE:  Yes.

15                   MR. SIMON:  Do you think you want to go

16   much past 5:30, or do you think we can wrap up

17   everything else in a half an hour?

18                   SPECIAL MASTER LEGGE:  Well, we have the

19   time period question.  I want a little discussion on

20   that.

21                   On the question of the translations, I

22   don't know what more you have to say that hasn't

23   already been reached.

24                   So I would guess the whole thing would be

25   another half-hour, no later than another hour.  But

                                                              161

1    that's just my guess.

2              MR. LEHMANN:  Actually, your Honor, can we

3    get ten minutes?

4              SPECIAL MASTER LEGGE:  Ten minutes.

5    Ten-minute recess.

6              (Recess taken.)

7              SPECIAL MASTER LEGGE:  Let's go back on

8    the record.

9              Now, the question before the house is

10   whether counsel for the plaintiffs and counsel for

11   Hitachi want to continue or -- whatever the status

12   is -- continue or begin to meet and confer with

13   respect to this issue of foreign sales information.

14             MR. R. ALEXANDER SAVERI:  Your Honor, if I

15   may --

16             SPECIAL MASTER LEGGE:  Or do you wish to

17   submit the matter to me now for decision?

18             MR. R. ALEXANDER SAVERI:  Thank you, your

19   Honor.  Rick Saveri on behalf of the direct

20   purchaser plaintiffs.

21             If I may, we've met and conferred right

22   now in the hallway with counsel for Hitachi, and I

23   think we've generally reached an understanding of

24   how to proceed here and where we're going.

25             As far as the FTAIA issue, this foreign

162

1    conduct issue, we will agree to push this off to

2    another date and work out a custodian-based approach

3    to get at documents.

4            And with the custodian-based approach,

5    your Honor, that would be that we would get from the

6    defendants, the Hitachi defendants, which we haven't

7    gotten to date, which are organizational charts --

8    this is what --

9            SPECIAL MASTER LEGGE:  Is that the same

10   organizational chart they'd give you in the

11   meet-and-confer with respect to the prior motion?

12           MS. BRASS:  It overlaps, your Honor.

13           MR. R. ALEXANDER SAVERI:  It could

14   overlap.  That's a proffer.

15           We're talking about corporate

16   organizational charts that most companies -- all the

17   other defendants have been producing to us.

18           And what we're doing with the other

19   defendants is that we get the defendants'

20   organizational charts back to 1995 and that they

21   also identify -- and this is what's key, your

22   Honor -- that they identify the people with pricing,

23   marketing, and sale authority.  And that is

24   Interrogatory No. 2.

25           And the Hitachi defendants so far have

                                                        163

**Proceedings**

1    objected to that interrogatory and not identified

2    one person, not only back to '95, but even during

3    the four-year statute period.  So we haven't been

4    identified anybody who has pricing, marketing, or

5    sales authority.

6            They will agree --

7            SPECIAL MASTER LEGGE:  Wait a minute.  I

8    don't have your interrogatories.

9            MR. R. ALEXANDER SAVERI:  Let me get them.

10   We attached them --

11           SPECIAL MASTER LEGGE:  So I don't know how

12   to put this into an order.

13           MR. R. ALEXANDER SAVERI:  I did attach --

14           SPECIAL MASTER LEGGE:  If you agree, if

15   you agree.

16           MR. R. ALEXANDER SAVERI:  Well, if I may,

17   your Honor, the interrogatory is attached to my

18   declaration, but I can give you another set right

19   now before we leave.

20           SPECIAL MASTER LEGGE:  Oh, it's in here?

21           MR. R. ALEXANDER SAVERI:  Yes, but I have

22   a complete set of them right here, your Honor.  I'm

23   happy to give them to you.

24           SPECIAL MASTER LEGGE:  Well, let's go

25   ahead verbally here.

164

```
 1            MR. R. ALEXANDER SAVERI:  Okay.  And so

 2    what we propose, your Honor, is in two weeks that

 3    the Hitachi entities, all Hitachi defendants --

 4    that's all five entities -- provide us their

 5    organizational charts back to 1995; they also

 6    identify the individuals at those companies who had

 7    pricing, marketing, and sale authority back to 1995.

 8            SPECIAL MASTER LEGGE:  Wait a minute.

 9    Pricing?  Sales?

10            MR. R. ALEXANDER SAVERI:  Sales and

11    marketing.

12            SPECIAL MASTER LEGGE:  And marketing

13    authority.  Okay.

14            MR. R. ALEXANDER SAVERI:  Yes.

15            SPECIAL MASTER LEGGE:  Okay.

16            MR. R. ALEXANDER SAVERI:  And then they

17    provide us that information in two weeks, your

18    Honor.

19            One week after that, the Hitachi entities,

20    they go back, they talk to their clients, and they

21    come up with a list of custodians.

22            We will also come up with a list of

23    custodians, and we will mutually exchange them.

24            This is what we are doing with the other

25    defendants, and it's been very successful, your
```

165

1    Honor.

2            And then once we get the lists, we sit

3    down and meet and confer, and we say:  Why is

4    Mr. Smith on the list?  Oh, you don't want him.

5            And then we come up with an agreed list,

6    after reviewing their production of names and they

7    get our production of names.

8            What I understand is that the Hitachi

9    entities will not provide a list and they haven't

10   provided a list and they've objected unless they get

11   an order from your Honor.

12           MS. WEBB:  Well, actually, it was until

13   plaintiffs produced the list that they said they

14   were going to produce.  But, yes, your Honor, that's

15   pretty much.

16           My situation is I could not agree to do

17   that, your Honor.

18           SPECIAL MASTER LEGGE:  Do what?

19           MS. WEBB:  To provide a custodian list of

20   potential relevant custodians voluntarily to the

21   plaintiffs at this point.

22           SPECIAL MASTER LEGGE:  At this point --

23           MS. WEBB:  At this point.

24           SPECIAL MASTER LEGGE:  -- you cannot do

25   that?

                                                        166

**Proceedings**

1          MS. WEBB:  I don't have authority from my

2     client to do that, your Honor.

3          MR. R. ALEXANDER SAVERI:  But if your

4     Honor orders it, we will exchange lists mutually, at

5     the same time.

6          Hitachi will come forward saying:  Here

7     are the people that we know that have relevant

8     material.  We'll come forward with our list and say:

9     Here are the people that we understand have relevant

10    material.  And then we'll sit down and come up with

11    an appropriate list.

12         SPECIAL MASTER LEGGE:  Does my doing that

13    as an order take you off the hook?

14         MS. WEBB:  It will get done, your Honor.

15         SPECIAL MASTER LEGGE:  All right.

16         MR. R. ALEXANDER SAVERI:  That's been the

17    big impasse, your Honor.

18         MS. WEBB:  But I would add, in terms of

19    answering interrogatories, I think we're going to

20    need four weeks, given --

21         MR. R. ALEXANDER SAVERI:  That's fine.

22         MS. WEBB:  -- there are five entities

23    and --

24         SPECIAL MASTER LEGGE:  What?

25         MS. WEBB:  We would need three weeks in

167

Proceedings

1    order to provide information pursuant to

2    interrogatory No. 2.

3              MR. R. ALEXANDER SAVERI:  That's the

4    pricing, marketing, and sale people, your Honor.

5              SPECIAL MASTER LEGGE:  Three weeks.

6              MR. R. ALEXANDER SAVERI:  Yeah.  That's

7    agreeable with us, your Honor.

8              SPECIAL MASTER LEGGE:  Then one week after

9    that, mutual exchange of the list of custodians?

10             MR. R. ALEXANDER SAVERI:  Correct.

11             SPECIAL MASTER LEGGE:  One week after

12   that, meet and confer.  Right?  Is that what you

13   said?

14             MR. R. ALEXANDER SAVERI:  Yes, your Honor.

15   There we are, and that would be it.

16             MS. WEBB:  But this is all being done in

17   the context of not waiving any of the objections

18   that we've raised in our discovery.

19             SPECIAL MASTER LEGGE:  No, because, you

20   see, you put me in a position where in order to make

21   it work, I have to make it an order.

22             MS. WEBB:  Well, no, no, no.  I under- --

23             SPECIAL MASTER LEGGE:  So it's an order,

24   and certainly you're not waiving a single thing.

25             MS. WEBB:  Right.  Nor are plaintiffs

168

1    waiving any of their arguments in terms of -- you

2    know, we're going to work out, I hope, the scope of

3    what's going to be produced by this mechanism.

4            SPECIAL MASTER LEGGE:  Then after that,

5    one week report to me.

6            MR. R. ALEXANDER SAVERI:  That'd be

7    perfect, your Honor.

8            SPECIAL MASTER LEGGE:  All right.

9            MR. R. ALEXANDER SAVERI:  And I think that

10   would then take care of both the time period motion

11   that we filed as well as the foreign --

12           SPECIAL MASTER LEGGE:  I was just going to

13   ask you that.

14           MR. R. ALEXANDER SAVERI:  Yes, it would, I

15   think.

16           MS. WEBB:  I believe it would, your Honor.

17           MR. R. ALEXANDER SAVERI:  Because that was

18   the dispute, your Honor, to get the org charts, the

19   identification of pricing people, and then a mutual

20   exchange.  So we've agreed to that.

21           SPECIAL MASTER LEGGE:  Okay.  All right.

22           Now, so I understand this, as to 5 and 6,

23   I will prepare an order.  I guess all I need to do

24   is direct that within three weeks, defendant Hitachi

25   produces organizational charts and identify the

169

**Proceedings**

1   people with authority, and the companies, for

2   pricing, sales, and marketing.

3           MR. R. ALEXANDER SAVERI:  And that would

4   be Interrogatory No. 2, your Honor.

5           SPECIAL MASTER LEGGE:  Back to 1995.

6           MR. R. ALEXANDER SAVERI:  That's correct,

7   1995.

8           SPECIAL MASTER LEGGE:  All right.  Three

9   weeks, whatever that date is.

10          One week later, a mutual exchange of lists

11  of custodians.

12          One week after that, a meet-and-confer for

13  it to discuss possible agreement on production by

14  custodians.

15          MR. R. ALEXANDER SAVERI:  That's right,

16  your Honor.

17          SPECIAL MASTER LEGGE:  One week after

18  that, report to me.

19          MS. WEBB:  Including the scope of what the

20  production would be.

21          SPECIAL MASTER LEGGE:  Pardon me?

22          MS. WEBB:  The number of custodians, your

23  Honor, and the scope of the production.

24          SPECIAL MASTER LEGGE:  Okay.

25          MR. R. ALEXANDER SAVERI:  And just so

170

**Proceedings**

1    we're clear, the indirects, are you on with that

2    agreement?

3              MR. ALIOTO:  Yeah.

4              Your Honor, I don't know if you want to

5    make note of this in your -- Mario Alioto for the

6    indirects.

7              I don't know if you want to note this in

8    your order or not, but maybe I ought to just get it

9    on the record.

10             The indirects also have an interest in

11   discussing this transaction data.  We have a little

12   special wrinkle in our case where we're dealing with

13   finished products.  So I assume that's going to be

14   part of our discussions as well.

15             MS. WEBB:  Well, we had already agreed to

16   produce finished products data, but we can continue

17   that discussion.

18             MR. ALIOTO:  If you say on the record that

19   we're going to discuss that as part of this

20   meet-and-confer, that's all I'm asking.

21             MS. WEBB:  Right.

22             MS. RUSSELL:  Sorry.  If I may just,

23   there's an additional issue -- sorry.  Lauren

24   Russell an behalf of the indirect purchaser

25   plaintiffs.

                                                    171

**Proceedings**

1           There's the issue on finished product

2     data, but there's also the issue on foreign data for

3     both finished products and CRT tubes.

4           And the indirect purchaser plaintiffs, we

5     have asked for, and so far Hitachi has refused to

6     produce, worldwide transactional data for CRTs and

7     finished products.

8           And maybe we are going to continue to talk

9     about that, or --

10          MS. WEBB:  I think we should continue to

11    talk about that to see, first, if we can work out

12    this custodian list and then what's left over.

13          MR. R. ALEXANDER SAVERI:  I really think,

14    Diane, we will be able to work that out.

15          SPECIAL MASTER LEGGE:  Yeah, don't you

16    think the custodian list will subsume that?

17          MS. RUSSELL:  Well, no.  Generally

18    speaking, transactional data is stored in a more

19    central location.  It's not -- you know, it wouldn't

20    be in a particular custodian's files necessarily.

21    Certainly not a complete, you know, transact- -- you

22    know, companies tend to have databases that they

23    store this stuff in.

24          MR. R. ALEXANDER SAVERI:  That's really an

25    accounting, database issue, your Honor.

                                                     172

**Proceedings**

1          MS. RUSSELL:  Yeah.

2          SPECIAL MASTER LEGGE:  Okay.

3          MS. RUSSELL:  It's a slightly separate

4     issue.

5          SPECIAL MASTER LEGGE:  Well, then my order

6     will not include any of the notes I've made on our

7     prior discussion on the document dealing with -- on

8     the motion dealing with the foreign matters.

9          MR. R. ALEXANDER SAVERI:  That's correct.

10         SPECIAL MASTER LEGGE:  I've made some

11    notes as I went along.  But I'm bypassing all this

12    and just issuing this order.

13         MR. R. ALEXANDER SAVERI:  That would be

14    correct, your Honor.

15         SPECIAL MASTER LEGGE:  All right.  I may

16    do that as a separate order while I'm thinking about

17    the other motions.

18         MR. R. ALEXANDER SAVERI:  That might be

19    best, your Honor.  Then also counsel for Hitachi can

20    get that back to her client.

21         SPECIAL MASTER LEGGE:  Yeah.  Okay.  All

22    right.

23         MS. WEBB:  That's fine, your Honor.  So if

24    we could have this run from three weeks --

25         MR. R. ALEXANDER SAVERI:  From the

173

**Proceedings**

1    issuance of the order, please.

2           MS. WEBB:  -- from the date of your order,

3    please.

4           SPECIAL MASTER LEGGE:  Yes.  Oh, yes, yes.

5    So I'll prepare a separate order on this one.

6           Okay.

7           MR. R. ALEXANDER SAVERI:  Thank you, your

8    Honor.

9           MS. WEBB:  Thank you very much, your

10   Honor.

11          SPECIAL MASTER LEGGE:  All right.  So you

12   believe that will take care -- at least this will --

13   you will continue discussions on the motions dealing

14   with foreign information, that is, foreign sales

15   information, and dealing with --

16          MS. WEBB:  The temporal scope.

17          SPECIAL MASTER LEGGE:  -- timeline.

18          MS. WEBB:  Yes, sir.

19          SPECIAL MASTER LEGGE:  Let me make sure,

20   pass on this quickly.

21          MR. R. ALEXANDER SAVERI:  Yes.

22          SPECIAL MASTER LEGGE:  On the timeline, I

23   want to be sure we're all agreed on what dates are

24   which.

25          As I understand it, the first complaint in

174

1    this series was filed on November 25th of 2007.

2              MR. R. ALEXANDER SAVERI:  Yes.

3              SPECIAL MASTER LEGGE:  So the statute of

4    limitations, absent all other considerations, would

5    be November 23rd, 2003.

6              MS. WEBB:  Correct, your Honor.

7              SPECIAL MASTER LEGGE:  The conspiracy

8    you're alleging in your complaint is March 1st of

9    1995.

10             MR. R. ALEXANDER SAVERI:  Correct, your

11   Honor.

12             SPECIAL MASTER LEGGE:  You want discovery

13   to start, that is, to go back as far as January 1st

14   of 1995.  But then with respect to transactional

15   data, back to January of 1991.

16             MR. R. ALEXANDER SAVERI:  That's correct,

17   your Honor.  And if I may just put a little

18   information on that.

19             SPECIAL MASTER LEGGE:  Yeah.  I guess

20   transactional data means sales, pricing, shipping.

21             MR. R. ALEXANDER SAVERI:  Exactly, your

22   Honor.

23             SPECIAL MASTER LEGGE:  All that stuff

24   that's in the accounting department?

25             MR. R. ALEXANDER SAVERI:  Right.  And that

                                                      175

**Proceedings**

1    information, your Honor, goes to the economists and

2    the experts which we proffer for impact and damages.

3           And the reason that the courts award the

4    transactional data --

5           SPECIAL MASTER LEGGE:  You have to have

6    data on a pre-conspiracy --

7           MR. R. ALEXANDER SAVERI:  There you are.

8           SPECIAL MASTER LEGGE:  Okay.

9           MR. R. ALEXANDER SAVERI:  The pre-data of

10   what is the competitive benchmark.  And then you

11   compare it to the conspiratorial prices, and you get

12   a damage.  You get the area under the curve and you

13   get a damage.

14          SPECIAL MASTER LEGGE:  All right.  Now,

15   the final motion is the motion to compel Chunghwa to

16   produce all document translations it has provided to

17   the plaintiffs.

18          Now, first of all, I should tell you, the

19   Antitrust Division called me on November 2nd -- this

20   was back before our hearing was deferred by the more

21   important Giants game -- and told me that they were

22   taking no position in the matter, no position.

23          I believe that the position being taken by

24   Chunghwa is set forth in their letter to me of

25   October 15th, which indicates that because the

176

**Proceedings**

1    plaintiffs asserted a work product privilege, that

2    Chunghwa has informed the parties it does not intend

3    to produce translations unless there is an agreement

4    between counsel for the direct and indirect

5    purchaser plaintiffs and Samsung or a ruling

6    resolving the order, which, flip side, if you agree,

7    they'll produce; if I rule, they'll produce.  Okay?

8            Okay.  Now, I received your letters.  I

9    think I understand everything that's in them.  So do

10   you want to add anything further to those letters,

11   or do you just want to submit them?

12           MR. ALIOTO:  On behalf of -- we want to

13   submit two motions.  There's a request for

14   affirmative relief there.

15           SPECIAL MASTER LEGGE:  Yes, I understand.

16           MR. ALIOTO:  In the event your Honor makes

17   a certain ruling, that we believe the reasoning

18   would apply the other way around.

19           SPECIAL MASTER LEGGE:  Okay.

20           MR. SCARBOROUGH:  Well, your Honor, Mike

21   Scarborough for the Samsung, SDI defendants, and all

22   defendants on this motion.

23           In terms of the motion to get the Chunghwa

24   translations, I think the papers speak to that.

25   Plaintiffs have no ability to assert a work product

177

1    objection there.  We explained why.  There's

2    multiple waivers.

3              SPECIAL MASTER LEGGE:  No, don't argue it.

4              MR. SCARBOROUGH:  Right.

5              SPECIAL MASTER LEGGE:  Please don't.

6              MR. SCARBOROUGH:  In terms of the

7    cross-motion, it's not a cross-motion at all.

8              SPECIAL MASTER LEGGE:  You've already

9    taken -- you've taken a position on that too.

10             MR. SCARBOROUGH:  Right.  So we don't

11   think there's any basis to rule on anything.  But if

12   your Honor were inclined to let them pursue this

13   cross-motion, we could, of course, put in

14   declarations saying any translations we have are

15   work product.  But frankly, a two-line throw-away at

16   the end of an opposition brief saying:  Oh, I

17   cross --

18             SPECIAL MASTER LEGGE:  You're arguing it

19   now.  Okay?  You've already said it.  So I'll submit

20   it.

21             MR. RUSHING:  Your Honor, I would just add

22   one thing.

23             You have everything in our brief, but with

24   regard to -- we asked for a document protocol, and I

25   don't believe that you have all of that.

178

Proceedings

```
1              To the extent you are inclined to order
2     the production of the translations, we would ask for
3     an order that, as we just discussed, requires the
4     defendants to give us their translations and,
5     secondly, to establish a procedure that as the
6     translations are used by each party, that there
7     would be a procedure that after an appropriate --
8     giving each side an appropriate amount of time to
9     review the translations as they are used, object to
10    them.  And to the extent they object to them or
11    not -- to the extent they object to them, provide an
12    explanation of the objection and a competing kind of
13    version of the document.
14              SPECIAL MASTER LEGGE:  That's new.  I
15    don't remember reading anything like that.
16              MR. RUSHING:  That's what I'm saying.
17    That's why I talked about the protocol, and that is
18    new.
19              The problem that we had -- and if we want
20    to get into it -- is that we need to establish a
21    procedure to determine the extent to which the
22    translations can be used in the case because --
23              SPECIAL MASTER LEGGE:  That's got nothing
24    to do with whether they have to be produced or not
25    to the defendants, the Chunghwa documents.
```

179

**Proceedings**

1          MR. RUSHING:  Well, no, your Honor.

2          SPECIAL MASTER LEGGE:  Production is one

3     thing.  Use it's going to be made of is another

4     issue.

5          MR. RUSHING:  Well, your Honor, I mean,

6     it's our position that if they want -- they're

7     asking for the benefit of our translations.

8          SPECIAL MASTER LEGGE:  Right.

9          MR. RUSHING:  They ought to be required --

10    and we have attempted to engage them in discussions

11    about this, a protocol about how translations, in

12    general, will be used.

13         SPECIAL MASTER LEGGE:  I understand that.

14    It's a good idea.  But I can't see how in any way

15    that's contingent upon Chunghwa producing to them,

16    if that's what I'm going to order, producing the

17    documents.

18         MR. RUSHING:  Well, I'll leave it at that,

19    your Honor.

20         SPECIAL MASTER LEGGE:  I agree with you.

21         MR. GUIDO SAVERI:  I think what

22    Mr. Rushing is trying to say is this, though he said

23    it very well.

24         I negotiated the settlement agreement with

25    Chunghwa.  Okay?  And part of that deal was our

                                                         180

**Proceedings**

```
1    getting the documents.  That's what I paid for in

2    getting my $10 million.  I paid for that.  And

3    there's a privilege there, and I don't think that

4    Chunghwa can waive it.  You've seen our papers.  And

5    they shouldn't.  We paid for that, and we don't see

6    why we should turn it over to the defendants.

7                SPECIAL MASTER LEGGE:  I understand that

8    position.

9                MR. GUIDO SAVERI:  Okay.  The other thing,

10   though, and I'm not saying this in a way that would

11   cause you to rule one way or the other because I

12   think we don't have to turn over the documents.

13   They have the documents.  Whatever documents we

14   have, they have.  The documents --

15               SPECIAL MASTER LEGGE:  You mean the

16   Chinese ones?

17               MR. GUIDO SAVERI:  Yes.  They have them.

18   They have all the documents.  They have all the

19   documents that were turned over by Chunghwa.  They

20   have everything.

21               SPECIAL MASTER LEGGE:  No.  They --

22               MR. GUIDO SAVERI:  Except that they're

23   not -- except that they're not --

24               SPECIAL MASTER LEGGE:  They turned over

25   translations to you.
```

181

Proceedings

1          MR. GUIDO SAVERI:  Well, they can

2    translate them themselves.  They've got all the

3    documents.  They've got more than we have.

4          So if they have, let's say, 1000 documents

5    and we have 500 and we translated them, they have

6    the same documents.  Let them translate them.

7          SPECIAL MASTER LEGGE:  And don't we then

8    get into a hassle about the accuracy of the two

9    translations?

10         MR. GUIDO SAVERI:  Yeah, but that's --

11         MR. R. ALEXANDER SAVERI:  We're going to

12   have that anyway, your Honor.

13         MR. GUIDO SAVERI:  They have that anyway.

14   But at least they have that stuff, and we can work

15   that down in the future.

16         But why should we give them the

17   translations that I paid for when they already have

18   the documents and they probably translated them

19   already.

20         They've got all those documents.  They

21   translated them.  If not, they should be sued for

22   malpractice.  They've got every document that we

23   have, and they've translated them.

24         And again, I'm saying, down the line we're

25   going to have to work -- no matter how the ruling

182

1    is, we're going to have to work out some kind of a

2    deal on how those translations ought to be used.

3    Because that's the problem that we're having in LCD.

4              SPECIAL MASTER LEGGE:  Yeah, but that's

5    not my --

6              MR. GUIDO SAVERI:  No, I understand that.

7              SPECIAL MASTER LEGGE:  -- part of the

8    decision on whether --

9              MR. GUIDO SAVERI:  Right.

10             SPECIAL MASTER LEGGE:  -- you get theirs

11   or not.

12             MR. GUIDO SAVERI:  I understand that.

13             SPECIAL MASTER LEGGE:  They get yours or

14   not.

15             MR. GUIDO SAVERI:  I understand that.  But

16   at least it's background information --

17             SPECIAL MASTER LEGGE:  No, I understand.

18             MR. GUIDO SAVERI:  -- to know what's going

19   to come up.

20             SPECIAL MASTER LEGGE:  I've dealt with

21   translations in the court a lot.

22             MR. GUIDO SAVERI:  Not the way it's

23   developed in LCD.  It's a morass that's developed.

24   And what's going on with -- you know, we have a

25   document.  They don't agree with it.  We don't agree

183

1    with it.  We'll set up a protocol and eliminate all

2    that.

3              But on these documents -- I should reduce

4    my voice.  This is very important to me.  I paid for

5    this.  And if I didn't get it, I would not have

6    taken 10 million bucks.  I would have taken more.

7    So I bought that.  That belongs to me.  And I don't

8    have to give it to them at my expense.

9              And I think that Chunghwa, they're not

10   asserting, the fact they can't waive that privilege.

11   We have the common interest, a brief that made

12   clear, we shouldn't be giving -- they have all those

13   documents.  They can translate them themselves.

14             And when we use a document, if there's a

15   problem with it, well, we'll see what document

16   complies.

17             But again, I repeat, I'll repeat it three

18   times, no reason I should turn these over.  I bought

19   it and paid for it.  And we haven't waived any

20   problem, we haven't waived any privilege or

21   anything.

22             SPECIAL MASTER LEGGE:  Okay.  Submitted.

23             MR. GUIDO SAVERI:  And they've got them

24   all.

25             SPECIAL MASTER LEGGE:  Submitted.  But I'm

184

**Proceedings**

1    not going to deal with how to smooth out translation

2    problems in this order because, first of all, we

3    don't know if there are any translation problems.

4    We don't know how they're going to arise.

5          If we end up with two sets of

6    translations, there's bound to be some disputes.

7    Even with only one set of translations, some

8    document is going to come up -- it's inevitable --

9    where one side or the other says:  That was not an

10   accurate translation.  It's just inherent.

11         MR. GUIDO SAVERI:  But we hope to avoid

12   that, your Honor.

13         SPECIAL MASTER LEGGE:  I know.

14         MR. GUIDO SAVERI:  I think we have --

15         SPECIAL MASTER LEGGE:  I appreciate that.

16         MR. GUIDO SAVERI:  -- a procedure whereby

17   we can avoid it.

18         SPECIAL MASTER LEGGE:  I appreciate that.

19         MR. GUIDO SAVERI:  Part of arriving at

20   that procedure to avoid it is that we don't give

21   them our documents because they have them already.

22         SPECIAL MASTER LEGGE:  All right.  I

23   understand your position on the motion.  You have

24   articulated it very well.  And I think Mr. Alioto's

25   the one who wrote the brief on that.  So it's all

US LEGAL SUPPORT
888-575-3376

Proceedings

1    set up.

2            Now, one final matter, at least final on

3    my agenda, I had set a tentative date for a case

4    management conference for November the 29th.

5            I don't see much purpose in that,

6    particularly since you're going to be going through

7    some meet-and-confer and particularly since now the

8    stay order has been continued until March.  I just

9    don't know -- don't see any point, unless you folks

10   can see some reason why we need to get together for

11   case management matters as early as November 29th.

12           MR. KESSLER:  I think, defendants, your

13   Honor, agree with you that that date should be

14   adjourned.

15           MR. R. ALEXANDER SAVERI:  Your Honor, on

16   behalf of plaintiffs, we agreed.

17           SPECIAL MASTER LEGGE:  Okay.

18           MR. R. ALEXANDER SAVERI:  We can continue

19   that down the road and maybe get with your clerk and

20   get an appropriate date later on, giving the

21   continuance of the stay.

22           SPECIAL MASTER LEGGE:  Okay.  All right.

23           All right, then.  Anything else for the

24   good of the order?

25           MR. R. ALEXANDER SAVERI:  Nothing further

186

**Proceedings**

1     from the plaintiffs, your Honor.

2              SPECIAL MASTER LEGGE:  All right.  Thank

3     you very much.  The meeting is now adjourned.

4              (Whereupon the proceedings were

5              adjourned at 5:38 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

187

Proceedings

1              CERTIFICATE OF REPORTER

2

3        I, ANA M. DUB, a Certified Shorthand Reporter,

4   Registered Merit Reporter, and Certified Realtime

5   Reporter, hereby certify that the foregoing

6   proceedings were taken in shorthand by me, at the

7   time and place therein stated, and that the said

8   proceedings were thereafter reduced to typewriting,

9   by computer, under my direction and supervision;

10       I further certify that I am not of counsel or

11   attorney for either or any of the parties nor in any

12   way interested in the event of this cause, and that

13   I am not related to any of the parties thereto.

14

15            Dated:  November 29, 2010.

16            _____

17            ANA M. DUB, RMR, CRR, CSR NO. 7445

18

19

20

21

22

23

24

25

                                                    188