# Exhibit C

1  Guido Saveri (22349) guido@saveri.com
   R. Alexander Saveri (173102) rick@saveri.com
2  Geoffrey C. Rushing (126910) grushing@saveri.com
   Cadio Zirpoli (179108) cadio@saveri.com
3  SAVERI & SAVERI, INC.
   706 Sansome Street
4  San Francisco, CA 94111
   Telephone:   (415) 217-6810
5  Facsimile:    (415) 217-6813

6  *Interim Lead Counsel for the Direct Purchaser
   Plaintiffs*

7

8

9                    UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                    SAN FRANCISCO DIVISION

12

13  IN RE: CATHODE RAY TUBE (CRT)          MASTER FILE NO. 07-cv-5944 SC
    ANTITRUST LITIGATION
14                                          **DIRECT PURCHASER PLAINTIFFS'**
                                            **SUPPLEMENTAL RESPONSES TO**
15  This Document Relates to:               **DEFENDANT LG ELECTRONICS, INC.'S**
                                            **FIRST SET OF INTERROGATORIES**
16  ALL DIRECT PURCHASER ACTIONS

17

18

19  PROPOUNDING PARTY:        LG ELECTRONICS, INC.

20  RESPONDING PARTY:         DIRECT PURCHASER PLAINTIFFS

21  SET NO.:                  ONE

22

23          Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the Direct purchaser

24  Plaintiffs ("Plaintiffs" or "DPPs"), by their attorneys, object and respond to Defendant LG

25  Electronics, Inc.'s First Set of Interrogatories to the Direct Purchaser Plaintiffs (the

26  "Interrogatories") as follows:

                              **GENERAL OBJECTIONS**
27
            Each of the following objections is incorporated by reference into each of the responses
28

                                                                              MDL NO. 1917

herein:

1.      Plaintiffs generally object to the Interrogatories, including the Instructions and Definitions, to the extent they purport to enlarge, expand or alter in any way the plain meaning and scope of any interrogatory or to impose any obligations on Plaintiffs' responses in excess of those required by the Federal Rules of Civil Procedure.  Plaintiffs will respond to these Interrogatories in accordance with their understanding of the obligations imposed by the Federal Rules of Civil Procedure.

2.      Plaintiffs object to the unduly burdensome and unfair nature of Defendants' Interrogatories to the extent they seek to have counsel for Plaintiffs present evidentiary support of the Direct Purchaser Plaintiffs' Consolidated Amended Complaint" (March 16, 2009) (Dkt. No. 436) ("DP-CAC") without completing discovery.  Defendants' Interrogatories are premature, unduly burdensome and unfair, and serve no other purpose but to harass and delay Plaintiffs in their efforts to prepare their case.

3.      Plaintiffs object to each of Defendant's Interrogatories, Definitions and Instructions to the extent they seek documents or information (i) not relevant to the subject matter of this action; (ii) not relevant to any claim or defense in this action; (iii) not reasonably calculated to lead to the discovery of admissible evidence; (iv) different from, inconsistent with, or in addition to what is required to be produced under the Federal Rules of Civil Procedure, the Civil Local Rules of the United States District Court for the Northern District of California, any existing Court Order in this case, or any other applicable rule or law.

4.      Plaintiffs object to the Interrogatories to the extent that they impose an undue burden on Plaintiffs by, for example, requiring Plaintiffs to search for documents:  (a) the value of which, if any, is substantially outweighed by the burden or cost of searching for them, or (b) that are equally available to Defendant or already in Defendant's possession.

5.      Plaintiffs object to the Interrogatories to the extent they call for information and/or documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection.  This objection includes, but is not limited to, information that

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

1   Defendant seeks regarding communications between Plaintiffs' attorneys and/or between Plaintiffs

2   and their attorneys made during or in anticipation of litigation.  Inadvertent identification or

3   production of any such information in a document shall not constitute a waiver of any such

4   privilege with respect to the document produced or the subject matter thereof, or a waiver of the

5   Plaintiffs' right to object to the use of any such document during trial or any subsequent

6   proceeding.  To the extent that any such protected information is inadvertently produced in

7   response to the Interrogatories, the production of such information shall not constitute a waiver of

8   Plaintiffs' right to assert the applicability of any privilege or immunity to the information, and any

9   such document and all copies or images thereof shall be promptly returned, sequestered or

10  destroyed upon demand pursuant to Fed. R. Civ. P. 26(b)(5)(B).

11          6.      Plaintiffs object to the Interrogatories as premature "contention interrogatories."

12  *See In re Convergent Technologies Securities Litig.*, 108 F.R.D. 328 (N.D. Cal. 1985) ("[t]here is

13  considerable recent authority for the view that the wisest general policy is to defer propounding

14  and answering contention interrogatories until near the end of the discovery period."); *In re Ebay*

15  *Seller Antitrust Litig.*, No. C07-1882 JF (RS), 2008 WL 5212170 (N.D. Cal. Dec. 11, 2008)

16  ("Courts using their Rule 33(a)(2) discretion generally disfavor contention interrogatories asked

17  before discovery is undertaken."). The Interrogatories: (i) call for opinions and contentions

18  relating to fact or application of law to fact that Plaintiffs should not be required to disclose until

19  discovery has been substantially completed; (ii) call for legal conclusions; and (iii) are likely to

20  require supplemental answers, prematurely commit Plaintiff to positions, and artificially narrow

21  issues.  Such information cannot be fairly and practically provided until after the completion of

22  discovery.  The interests of judicial economy and efficiency dictate that contention discovery is

23  more appropriate after a substantial amount of merits discovery has been conducted.  To the extent

24  that Defendant's Interrogatories request the contentions of Plaintiffs in this case, those contentions

25  are set forth in large part in the DP-CAC.  The allegations of the DP-CAC are incorporated by

26  reference in each of the answers to the Interrogatories set forth herein.  In responding to

27  Defendant's contention interrogatories pursuant to Court Order, Plaintiffs reserve their rights to

28

1    supplement these responses at any time prior to the final pre-trial conference herein.

2       7.      Plaintiffs object to the Interrogatories to the extent they purport to require Plaintiffs

3    to disclose information or produce documents concerning any expert or other person or entity

4    retained by counsel to assist in the preparation of the Plaintiffs' case: (a) to the extent any such

5    person or entity will not be designated by the Plaintiffs as a trial witness on the ground that such

6    disclosure is neither relevant nor reasonably calculated to lead to the discovery of admissible

7    evidence; and (b) on the grounds that any such present disclosure is prejudicial to the Plaintiffs'

8    preparation of this case and is not required by the Federal Rules of Civil Procedure.

9       8.      Plaintiffs object to the Interrogatories, including the Instructions and Definitions, to

10   the extent the information sought is protected by the attorney-client privilege, the attorney work

11   product doctrine, or is otherwise privileged and/or immune from discovery.  By responding to

12   these Interrogatories, Plaintiffs do not waive, intentionally or otherwise, any attorney-client

13   privilege, attorney work-product or any other privilege, immunity or other protection that may be

14   asserted to protect any information from disclosure.  Accordingly, any response or production of

15   documents or disclosure of information inconsistent with the foregoing is wholly inadvertent and

16   shall not constitute a waiver of any such privilege, immunity or other applicable protection.

17      9.      Plaintiffs object to the Interrogatories to the extent they fail to state with sufficient

18   particularity the information and categories of information to be provided.

19      10.     Plaintiffs object to the Interrogatories to the extent they request Plaintiffs to

20   produce documents outside their possession, custody, or control.

21      11.     Plaintiffs object to the Interrogatories to the extent they are overly broad and

22   unduly burdensome.

23      12.     Plaintiffs object to the Interrogatories to the extent they are vague or ambiguous.

24      13.     Plaintiffs object to the Interrogatories to the extent they require Plaintiffs to draw

25   legal conclusions.

26      14.     Plaintiffs object to the Interrogatories to the extent the information requested is

27   neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

28

15.     Plaintiffs object to Defendant's Interrogatories on the basis that Plaintiffs have not yet had an opportunity to complete substantial discovery in this action, and no Defendant depositions or other significant depositions have been taken.  Thus, discovery is far from complete.  Under the circumstances, Defendant's Interrogatories are premature, and the responses to the Interrogatories are not complete and are subject to full discovery in the case.  Plaintiffs reserve the right to modify their allegations based on additional discovery, additional analysis of existing discovery, discovery not yet completed and/or expert discovery, and Plaintiffs reserve the right to supplement and/or delete the responses given in light of further evidence and further analysis of present and subsequently acquired evidence.

16.     In addition, in accordance with the Federal Rules of Civil Procedure, Plaintiffs reserve the right to introduce evidence not yet identified herein supporting Plaintiffs' allegations, including evidence that Plaintiffs expect to further develop through the course of discovery and expert analysis.  Plaintiffs reserve the right to supplement or modify any information, contention or analysis herein, including evidentiary materials as a result of expert analysis or discovery in this action.

17.     Plaintiffs' Responses set forth herein are made without in any way waiving: (a) all rights to object to these Interrogatories, the Responses, or the subject matter thereof, as to the competency, relevancy, materiality, privilege, and admissibility as evidence for any purpose, in any proceeding in, or at the trial of, this or any other action; (b) the right to object on any ground to the use of these Responses, or the subject matter thereof, in any proceeding in, or at the trial of, this or any other action; or (c) the right to object  on any ground at any time to requests to admit, Interrogatories, or other discovery procedures involving or relating to the subject matter of these Requests.

18.     Plaintiffs object to each Interrogatory to the extent that the information or facts sought are contained in Plaintiffs' Consolidated Amended Complaint or publicly available sources.

19.     In providing responses to the Interrogatories, Plaintiffs reserve all objections as to competency, relevance, materiality, privilege, or admissibility as evidence in any subsequent proceeding in, or trial of, this or any other action for any purpose whatsoever.

20.     No incidental or implied admissions are intended in these responses.  Plaintiffs' response to all or any part of any Interrogatory should not be taken as an admission that: (a) Plaintiffs accept or admit the existence of any fact(s) set forth or assumed by the Interrogatory; or (b) Plaintiffs' responses constitute admissible evidence.  Plaintiffs' response to all or any part of an Interrogatory also is not intended to be, and shall not be, a waiver by Plaintiffs of all or any part of their objection(s) to that interrogatory.

**RESPONSES**

**INTERROGATORY NO. 1:**

State with specificity the factual basis (including any evidentiary sources) for Your allegation that Defendants conspired, combined and contracted to fix, raise, maintain, and stabilize the price at which computer monitors containing CRTs were sold in the United States, as alleged in, inter alia, Paragraph 3 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 1:**

Subject to the General Objections, Plaintiffs respond as follows:

**I.      INTRODUCTION.**

Pursuant to the Special Master's "Report And Recommendations Regarding Discovery Motions" (Nov. 18, 2010) ("R&R") (Dkt. No. 810), *adopted by the Court in* "Order Adopting Special Master's Report Recommendations And Tentative Rulings Regarding Discovery" (Dec. 8, 2010) (Dkt. No. 826), the following narrative, prepared by counsel for the  Direct Purchaser Plaintiffs ("DPPs"), is intended to respond to the following discovery requests, which include this one: (1) "LGE's First Set of Requests for Production to the Direct Purchaser Plaintiffs" (March 8, 2010); (2) "LGE's First Set of Interrogatories To The Direct Purchaser Plaintiffs" (March 8, 2010); (3) "The First Set of Interrogatories of Defendant MT Picture Display Co., Ltd. To The Direct Purchaser Plaintiffs" (March 8, 2010); and (4) "The First Set of Document Requests of

Defendant MT Picture Display Co., Ltd. To The Direct Purchaser Plaintiffs" (March 8, 2010), which are referred to at pp. 1-2 & n.1 of Defendants' letter brief on their motion to compel answers to interrogatories and document requests to the DPPs concerning Cathode Ray Tube ("CRT") Products ("Defs.' Br.") and are appended as Exhibit A thereto. The DPPs have restated herein and incorporate by reference (to the extent not restated) all the objections to these discovery request contained in:  (1) "Direct Purchaser Plaintiffs' Responses To LGE's First Set of Requests for Production to the Direct Purchaser Plaintiffs" (May 7, 2010); (2) "Direct Purchaser Plaintiffs' Responses To LGE's First Set of Interrogatories To The Direct Purchaser Plaintiffs" (May 7, 2010); (3) "Direct Purchaser Plaintiffs' Responses To The First Set of Interrogatories of Defendant MT Picture Display Co., Ltd. To The Direct Purchaser Plaintiffs" (May 7, 2010); and (4) "Direct Purchaser Plaintiffs' Responses To The First Set of Document Requests of Defendant MT Picture Display Co., Ltd. To The Direct Purchaser Plaintiffs" (May 7, 2010), appended as Exhibit C to Defs.' Br.

Several prefatory comments are required with respect to this narrative response.

*First*, in the R&R, the Special Master made it clear that he was only asking the DPPs to provide information available to them as of  March 16, 2009, the date on which the DP-CAC was filed. As the Special Master stated,

> Nor does this requested discovery impose an undue burden on plaintiffs. They are not being asked to search through voluminous historical files and records. When they prepared their complaints they had necessarily gathered some information with respect to their allegations, and they should have that information available.

R&R, p. 6.

*Second*, this temporal limit has ramifications for how the DPPs respond to the propounded discovery. As of March 16, 2009, the DPPs had received *no* documents from Defendants Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") and Chunghwa Picture Tubes Malaysia Sdn. Bhd (collectively "Chunghwa" or "CGW"). What had been given to them before the filing of the DP-CAC was an *oral proffer* by Chunghwa's counsel at which some documents in Chunghwa's possession were quoted to the DPPs' counsel, but no electronic or hard copies of those documents

1   were given to the latter. Indeed, Chunghwa produced *no* documents to DPPs' counsel until *March*

2   *8, 2010*, when it made a production to all parties in the case. As a result, the DPPs will not be

3   providing citations to documents produced by Chunghwa, because they did not possess them prior

4   to the filing of the DP-CAC.[1] The DPPs believe that documents produced by Chunghwa after the

5   filing of the DP-CAC (as well as documents produced by other Defendants) further support their

6   contentions regarding CRT Products, but the terms of the R&R do not require the DPPs to sort

7   through the voluminous productions and provide that information.

8       *Third*, while this narrative response will refer to various conspiratorial meetings described

9   by Chunghwa's counsel at the oral proffer, the latter made it clear that their proffer was confined

10  to meetings attended by representatives of Chunghwa. It is clear that there were other

11  conspiratorial meetings not attended by such representatives, as reflected, for example, in

12  documents produced by various Samsung entities in September through November of 2010.

13  Again, however, no discussion of these documents is contained in this narrative response.

14      *Fourth*, the Special Master noted that the discovery was relevant "[u]nder any of three

15  scenarios--one conspiracy alleging both CRT Products and CRTs, one conspiracy for CRTs and

16  one for CRT Products, or a conspiracy for CRTs which merely *impacted* the prices for CRT

17  Products....." R&R at 5; emphasis in original. The Special Master is correct that it is not necessary

18  to decide at this juncture which of these three scenarios is applicable here; the DPPs could recover

19  damages under any of them. Moreover, as the DPPs have made clear throughout this case, the DP-

20  CAC is intended to describe the first of these scenarios--a unitary conspiracy that encompasses

21  both CRTs and CRT Products (including finished products, primarily televisions and computer

22  monitors) manufactured and sold by Defendants. *See, e.g.*, Transcript of Hearing of October 5,

23  2009 at 78-89, attached as Exhibit 1 to the "Declaration of Jeffrey A. Kessler" (Feb. 19, 2010)

24  (Dkt. No. 621); Transcript of Hearing of November 12, 2010 at 28-31. In answering these

25  _____

26  [1] To the extent references are made in this response to publicly available materials, the DPPs are
27  providing citations to websites where they may be found.

28

contention interrogatories, the DPPs will respond with respect to the conspiracy that they alleged in the DP-CAC, not the one Defendants seek to define. However, even assuming *arguendo* that the focus of the conspiracy was on CRTs, to the extent that Defendants incorporated the price-fixed component in finished CRT Products that they then sold, they fixed the prices of those products as well. *See* Section III.D, *infra*. To constitute horizontal price-fixing, the agreement among competitors need not directly concern the final or total prices charged to customers; agreements to fix *any* element of price have been held to constitute *per se* unlawful price-fixing of the product or service at issue. *See Catalano, Inc.  v. Target Sales, Inc.*, 446 U.S. 643, 645, 648 (1980); *Northwestern Fruit Co. v. A. Levy & J. Zentner Co.*, 665 F.Supp. 869, 871 (E.D. Cal. 1986). As the United States Supreme Court explained sixty years ago in *United States v. Socony - Vacuum Oil Co.*, 310 U.S. 150, 223-24 (1940) (citations omitted):

> Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se. Where the machinery for price-fixing is an agreement on the prices to be charged or paid for the commodity in the interstate or foreign channels of trade, the power to fix prices exists if the combination has control of a substantial part of the commerce in that commodity. Where the means for price-fixing are purchases or sales of the commodity in a market operation or, as here, purchases of a part of the supply of the commodity for the purpose of keeping it from having a depressive effect on the markets, such power may be found to exist though the combination does not control a substantial part of the commodity. In such a case that power may be established if as a result of market conditions, the resources available to the combinations, the timing and the strategic placement of orders and the like, effective means are at hand to accomplish the desired objective. But there may be effective influence over the market though the group in question does not control it. Price-fixing agreements may have utility to members of the group though the power possessed or exerted falls far short of domination and control. Monopoly power is not the only power which the Act strikes down, as we have said. Proof that a combination was formed for the purpose of fixing prices and that it caused them to be fixed or contributed to that result is proof of the completion of a price-fixing conspiracy under § 1 of the Act.

In a footnote, the Court went on to explain (*id*. at 224 n.59 (citations omitted):

> In view of these considerations a conspiracy to fix prices violates § 1 of the Act though no overt act is shown, though it is not established that the conspirators had the means available for accomplishment of their objective, and though the conspiracy embraced but a part of the interstate or foreign commerce in the commodity. Whatever may have been the status of price-fixing agreements at common law, the Sherman Act has a broader application to them than the common law prohibitions or sanctions. Price-fixing agreements may or may not be aimed at complete elimination of price competition. The group making those

agreements may or may not have power to control the market. But the fact that the group cannot control the market prices does not necessarily mean that the agreement as to prices has no utility to the members of the combination. The effectiveness of price-fixing agreements is dependent on many factors, such as competitive tactics, position in the industry, the formula underlying price policies. Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy. The existence or exertion of power to accomplish the desired objective  becomes important only in cases where the offense charged is the actual monopolizing of any part of trade or commerce in violation of § 2 of the Act, 15 U.S.C.A. § 2. An intent and a power to produce the result which the law condemns are then necessary. As stated in *Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518, '* * * when that intent and the consequent dangerous probability exist, this statute, like many others, and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result.' But the crime under § 1 is legally distinct from that under §2  though the two sections overlap in the sense that a monopoly under § 2 is a species of restraint of trade under § 1. Only a confusion between the nature of the offenses under those two sections would lead to the conclusion that power to fix prices was necessary for proof of a price-fixing conspiracy under § 1.

## II.    RELEVANT INFORMATION OBTAINED FROM THE ORAL PROFFER BY CHUNGHWA.

The information provided by Chunghwa consisted of an overview of the CRT industry, detailed descriptions of each participant in the alleged conspiracy of which Chunghwa was aware, an explanation of how the alleged conspiracy worked  over time, and a description of the times and places of, and attendees at, various meetings in Asia in which representatives of  Chunghwa participated. As noted above, there were meetings in Asia that Chunghwa did not attend. There were also meetings in geographic regions other than Asia that Chunghwa did not attend, because it had no operations in those regions.

### A.  Scope Of The Alleged Conspiracy.

The unitary conspiracy alleged in the DP-CAC encompassed: (a) color picture tubes ("CPTs"), which are CRTs used in color televisions and similar devices; (b) color display tubes ("CDTs"), which are CRTs used in color computer monitors or similar devices; and (c) electronic devices containing  CPTs (such as televisions)  or CDTs (such as computer monitors).

With respect to CRT Products, Defendants or their agents agreed, *inter alia*, to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, inter alia, shipments, prices, production, and customer demand; (c) coordinate public statements regarding available

1   capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some

2   of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the

3   agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales;

4   (g)  influence and, at times,  coordinate pricing with producers in other geographic areas; (h) limit

5   competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of

6   certain key customers' sales; and (k) restrict output.

7       The conspiracy alleged in the DP-CAC began in 1995 and initially consisted of bilateral

8   meetings between various Defendants.  The first report Chunghwa had of a bilateral meeting was

9   one that occurred on March 3, 1995. The bilateral meetings continued until at least March of 2006.

10  Over 240 such bilateral meetings occurred during the Class Period identified in the DP-CAC

11  (March 1, 1995 through November 25, 2007).  As noted earlier, representatives of Chunghwa did

12  not attend every meeting. The meetings took various forms and were attended by different

13  individuals of the respective Defendant companies or corporate families.  The bilateral meetings

14  encompassed: (1) information exchanges between working level sales or marketing; (2) meetings

15  between the senior sales management or senior company management intended to resolve disputes

16  arising out of a failure to reach agreements or intended to follow up on group meeting discussions;

17  and (3) meetings between the employees of a company who regularly attended group meetings,

18  and employees of a company who did not, for the purpose of coordination.

19      *Ad hoc* multilateral meetings in furtherance of the unitary conspiracy alleged in the DP-

20  CAC commenced in 1995.  There is a report of one such meeting in 1995, and three such meetings

21  in 1996.  Beginning in 1997, more regular and systematic group meetings began occurring. Over

22  260 such meetings occurred during the Class Period. Again, Chunghwa did not attend all of these

23  meetings.  At some point, these meetings became known as "Glass Meetings" or "GSM."  In

24  general, the types of meetings were:

25

26      "**Top Meetings**" – meetings held by individuals at highest level of the company.
        These happened less frequently, typically quarterly and were focused on longer
        term agreements and dispute resolution. Top Meetings occurred in South Korea,

27      Taiwan, and China.

28

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

"**Management Meetings**" – meetings held by high-level sales executives. These meetings occurred more frequently, typically monthly, and handled implementation of agreements made at Top Meetings. Management level meetings occurred in South Korea, Taiwan, China, Indonesia, Japan, and Thailand.

"**Working Level Meetings**" – lower level sale and marketing employees meet to exchange data and discuss pricing. Working level meetings occurred in South Korea, Taiwan, and China.

"**Green Meetings**" – meetings on golf courses. [2]

There were distinct Glass Meetings with respect to CPTs and CDTs, although many of the participants overlapped. Initially, the CPT and CDT meetings were held back to back at the same locations. At meetings held on May 23, 2000, the attendees raised confidentiality concerns about the information discussed at meetings, so the participants agreed that CPT and CDT meetings would be held on separate days and that limits would be placed on the number of attendees, starting after June 2000 meeting. The last CPT group meeting attended by Chunghwa occurred in February of 2007. The group was scheduled to meet again on April 5 and 6, 2007, but Chunghwa did not attend this meeting.

**B.  Participants In The Alleged Conspiracy**

The participants in the unitary conspiracy alleged in the DP-CAC included: Chunghwa (and through it, Tatung Corporation); Thai-CRT Co., Ltd. ("Thai CRT'); the Daewoo Group (partly through its subsidiaries DOSA and Orion Electric Co. ("Orion")) ("collectively "Daewoo"); Beijing Matsushita Color Display Co. ("BMCC"); Matsushita Toshiba Picture Display Co., Ltd. ("MTPD"); Samtel Color, Ltd. ("Samtel"); and entities that are or were part of the Hitachi, Toshiba, Samsung, LG Electronics, Panasonic (formerly Matsushita), Philips, and Irico corporate families. [3] Those Defendants who are part of specific corporate families are referred

---

[2] These meetings also occurred in Europe and Latin America; Chunghwa did not attend the latter, because it had no operations in that region. The meetings in Europe will be referred to herein as "Europe Meetings." These meetings also included multilateral meetings in China that will be referred to herein as "China meetings."

[3] The LG entities included LG. Philips Displays, which later became LP Displays International, L.P. (collectively "LPD").

to collectively in the DP-CAC by the name of that corporate family and those collective references are incorporated in this narrative response. *See* DP-CAC ¶¶ 36, 40, 45, 50, 57, 67, 78.  As explained in the DP-CAC at paragraph 154:

> When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that the Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and was parties to the agreements reached in them. For the various meeting participants identified below, in many instances, their high-ranking executives participated in a significant number of the meetings described.

**Chunghwa** participated in over 240 illegal bilateral and over 260 illegal group meetings between 1995 and 2007 (summarized in the grid below)  in which unlawful agreements as to*, inter alia*, price, output restrictions, and customer and market allocation of CRT Products occurred. These meetings took place in Southeast Asia, China, Europe and Scotland. Among the representatives of Chunghwa who participated in these meetings were C.Y. Lin, C.C. Liu, Michael Du, Tony Cheng, and Christina Hsieh.

**Daewoo** participated in multiple illegal bilateral and at least several dozen group meetings from 1996 to 2004 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products occurred. These included at least four bilateral meetings, 15 Top Meetings, 17 Management Meetings, 57 Glass Meetings, 15 Working Level meetings, 22 China Meetings, five Europe Meetings, one audit and four Green Meetings. These meetings occurred in China, South Korea, Malaysia, Taiwan, Thailand, and the U.K. Among the executives who attended these meetings on behalf of the Daewoo corporate family were H.C. Moon and Karl Min.

**Hitachi** participated in over a dozen  illegal bilateral and group meetings from 1996 through at least 2001 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products  occurred. These included at least two bilateral

meetings, five Management Meetings, two Glass Meetings, one Working Level meeting, and 22 China Meetings. These meetings took place in Taiwan and China.

**Irico** participated in multiple illegal bilateral and at least several dozen illegal group meetings from 1998 to 2006 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products occurred. These included at least eight bilateral meetings, 31 China Meetings, and two Europe Meetings. These meetings took place in China and Europe. Among the executives who attended these meetings on behalf of the Irico corporate family were Ma Jinquan and Chao Wang.

**LG** participated in more than a dozen illegal bilateral and more than a hundred illegal group meetings from 1995 to 2006 ((including its participation through LPD) in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products occurred. These included at least four bilateral meetings, 19 Top Meetings, 33 Management Meetings, 114 Glass Meetings, 17 Working Level meetings, 25 China Meetings, two Europe Meetings, one audit and 17 Green Meetings. These meetings took place in Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, and China. Among the executives who attended these meetings on behalf of the LG corporate family were Jim Smith, K.S. Cho, S.Y. Choi, and C.G. Kim.

**Panasonic** participated in several dozen illegal bilateral and group meetings from 1996 through at least 2006 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products occurred. These included at least 43 bilateral meetings, one Glass Meeting, and one Working Level Meeting. These meetings took place in Taiwan, Malaysia, and China.

**Philips** participated in over 100 illegal bilateral and group meetings from 1996 through 2007 (including its participation through LG. Philips Display Co. (Later LP Display, Inc.) ("LPD")) in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products occurred. These included at least four bilateral meetings, 17 Top Meetings, 32 Management Meetings, 98 Glass Meetings, 19 Working Level meetings, 35

China Meetings, eight Europe Meetings, and 16 Green Meetings. These meetings occurred in South Korea, Taiwan, China, Malaysia, Japan, Singapore, Thailand, Indonesia, Scotland, and various locations in Europe. Among the executives who attended these meetings on behalf of the Philips corporate family were Jim Smith, Jerry Lin, S.Y. Choi, and C.G. Kim.

**Samsung** participated in hundreds of illegal bilateral and illegal group meetings from 1995 through at least 2006 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products (including CDT Products and CPT Products) occurred. These included at least 77 bilateral meetings, 22 Top Meetings, 35 Management Meetings, 121 Glass Meetings, 20 Working Level meetings, 38 China Meetings, three Europe Meetings, four audits and 17 Green Meetings. These meetings occurred in South Korea, Taiwan, China, Malaysia, Japan, Singapore, Thailand, the United Kingdom, and various locations in Europe. Among the Samsung executives who attended these meetings on behalf of the Samsung corporate family were Inn Kim and Deok Yon Kim.

**Thai CRT** participated in over 50 illegal bilateral and group meetings between 1998 and 2006 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CPT Products occurred. These included at least five bilateral meetings, five Management Meetings, 40 Glass Meetings, one Working Level meeting, one China Meeting, and one Green Meeting. These meetings occurred in Taiwan, South Korea, Thailand, Malaysia, Indonesia, Singapore, and China. Among the executives who attended these meetings on behalf of the Thai CRT corporate family were Chaovalit Ekabut and Thamasak Chaiyavech.

**BMCC** participated in at over 20 illegal bilateral group meetings between 1998 and 2007 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products occurred. These included at least one bilateral meeting and 28 China Meetings. These meetings occurred in China.

**MTPD** participated in at several dozen illegal bilateral and group meetings between 2003 and 2006 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CPT Products occurred. These included at least 24 Glass Meetings. These

1  meetings occurred in Malaysia, Thailand, Singapore, Taiwan, and Indonesia.  Among the MTPD

2  executives who attended these meetings on behalf of the Panasonic and Toshiba corporate families

3  was Kazuteru Yasakawa.

4      **Toshiba** participated in over 50 illegal bilateral and group meetings between 1995 and

5  2006 (including its participation through MTPD) in which unlawful agreements as to, *inter alia*,

6  price, output restrictions, and customer and market allocation of CRT Products occurred. These

7  included at least 50 bilateral meetings and four Glass Meetings. These meetings occurred in

8  Taiwan, Thailand, and Indonesia. Among the executives who attended these meetings on behalf of

9  the Toshiba corporate family were Masaru Ohmori and Seiichi (or Shigishi) Fukunaga.

10      **Samtel** participated in two illegal bilateral meetings between 1998 and 2006 in which

11  unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market

12  allocation of CPT Products occurred. These meetings occurred in Malaysia. Sunil Kakria was

13  involved in these meetings on behalf of Samtel.

14      Chunghwa routinely prepared internal reports of the various bilateral and Glass Meetings.

15  After any meeting with customers, competitors, or others outside the company, a junior level

16  employee attending the meeting was responsible for preparing a written report. The resultant

17  document was circulated up the intracorporate chain of authority – first to a direct supervisor, and

18  stopping at a senior sales manager, vice-president, or the president/CEO level.  At each level of

19  the chain of distribution, the reviewer initialed the report.  A reviewer also often wrote comments

20  or directions for subordinates on the face of the report, and those subordinates would receive those

21  communications as the report circulated back down the chain of authority. These reports were later

22  produced by Chunghwa as part of its 2010 document production.

23      Based on these reports, Chunghwa gave DPPs' counsel a summary of the various

24  conspiratorial meetings that occurred for which a report had been prepared. The following grid

25  represents relevant portions of that summary, listing the type of meeting, the date and place of

26  each meeting, and the corporate (and sometimes individual) participants.

27

28

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

| Date | Location | Meeting Type | Business Participants (Defendants) |
|---|---|---|---|
| March 22, 1995 | Malaysia | Bilateral | Samsung; CGW |
| May 29, 1995 | Malaysia | Bilateral | Lucky Goldstar Electronics, which is now LG; CGW |
| June 29, 1995 | Malaysia | Bilateral | Samsung; CGW |
| July 17, 1995 | Unknown | Bilateral | Samsung; CGW |
| Aug. 16, 1995 | Malaysia | Bilateral | Samsung; CGW |
| Aug. 23, 1995 | Taiwan, Taipei | Bilateral | Samsung; CGW |
| Sept 7, 1995 | Taiwan, Taipei | Bilateral | Toshiba; CGW |
| Sept. 18, 1995 | Unknown | Bilateral | Samsung; CGW |
| Sept. 19, 1995 | Malaysia | Bilateral | Samsung (M); CGW |
| Sept. 22, 1995 | Unknown | Bilateral | Toshiba; CGW |
| Oct. 5, 1995 | Taiwan | Glass | Samsung; Goldstar (now LG); CGW |
| Nov. 14, 1995 | Unknown | Bilateral | Sony; CGW |
| Dec. 4, 1995 | Taiwan | Bilateral | Mitsubishi Electric; CGW |
| Dec. 5, 1995 | Unknown | Bilateral | LG; CGW |
| Dec. 6, 1995 | Malaysia | Bilateral | Samsung; CGW |
| Dec. 15, 1995 | Taiwan | Bilateral | Sony Xinji Electronics; CGW |
| Feb. 2, 1996 | Malaysia | Bilateral | Samsung; CGW |
| Feb. 9, 1996 | Thailand | Bilateral | Toshiba; CGW |
| March 4, 1996 | Unknown | Bilateral | Daewoo; CGW |
| March 17-18, 1996 | Korea | Unknown | Samsung; LG; Orion; Philips; CGW |
| March 19, 1996 | Malaysia | Bilateral | Samsung; CGW |
| April 15, 1996 | Taiwan | Bilateral | Samsung; CGW |
| April 18, 1996 | Taiwan, Taipei | Bilateral | Samsung; CGW |
| April 18, 1996 | Taiwan, Taipei | Bilateral | Sony; CGW |
| April 23, 1996 | Malaysia | Bilateral | Matsushita; CGW |
| April 29, 1996 | Unknown | Bilateral | Toshiba; CGW |

17

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

| | | | | |
|---|---|---|---|---|
| 1 | May 6, 1996 | Taiwan | Bilateral | MEC;<br>CGW |
| 2 | May 7, 1996 | By Telephone | Unknown | Samsung, LG;<br>CGW |
| 3 | May 17, 1996 | Malaysia | Bilateral | Samsung;<br>CGW |
| 4 | May 17, 1996 | Unknown | Bilateral | Orion;<br>CGW |
| 5 | May 24, 1996 | Malaysia | Bilateral | Orion;<br>CGW |
| 6 | June 10, 1996 | Malaysia | Bilateral | Samsung;<br>CGW |
| 7 | June 10, 1996 | Unknown | Bilateral | Samsung;<br>CGW |
| 8 | June 12, 1996 | Unknown | Bilateral | Mitsubishi;<br>CGW |
| 9 | June 12, 1996 | Malaysia | Bilateral | LG;<br>CGW |
| 10 | June 17, 1996 | Unknown | Bilateral | Toshiba;<br>CGW |
| 11 | July 17, 1996 | Taiwan | Bilateral | Matsushita;<br>CGW |
| 12 | July 19, 1996 | Unknown | Bilateral | Toshiba;<br>CGW |
| 13 | Aug. 21, 1996 | Unknown | Bilateral | Samsung;<br>CGW |
| 14 | Sept. 4, 1996 | Unknown | Bilateral | Toshiba;<br>CGW |
| 15 | Sept. 11, 1996 | Malaysia | Bilateral | Samsung;<br>CGW |
| 16 | Sept. 23, 1996 | Taiwan<br>Taipei | Bilateral | Hitachi;<br>CGW |
| 17 | Oct. 2, 1996 | Taiwan<br>Taipei | Bilateral | Samsung;<br>CGW |
| 18 | Oct. 3, 1996 | Taiwan | Bilateral | Toshiba;<br>CGW |
| 19 | Oct. 4, 1996 | Unknown | Unknown | Philips;<br>CGW |
| 20 | Oct. 9, 1996 | Taiwan,<br>Taipei | Bilateral | Toshiba;<br>CGW |
| 21 | Oct. 21, 1996 | Malaysia | Bilateral | Samsung;<br>CGW |
| 22 | Oct. 22, 1996 | Taiwan | Bilateral | Philips;<br>CGW |
| 23 | Oct. 22, 1996 | Scotland | Bilateral | Samsung;<br>CGW |
| 24 | Oct. 24, 1996 | Unknown | Bilateral | LG;<br>CGW |
| 25 | Oct. 30, 1996 | Taiwan | Bilateral | Matsushita;<br>CGW |
| 26 | Nov. 14, 1996 | Taiwan | Bilateral | Samsung ;<br>CGW |
| 27 | Nov. 21, 1996 | Taiwan | Bilateral | Hitachi;<br>CGW |
| 28 | | | | |

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

| Nov. 21, 1996 | Unknown | Bilateral | Mitsubishi Electric; CGW |
|---|---|---|---|
| Nov. 23, 1996 | Unknown | Top Level | <u>Samsung</u>:  CEO Sun<br><br><u>Orion</u>: CEO Yan<br><br><u>CGW</u>:<br>Chieng – Yuan ("C.Y.") Lin;<br>Chih – Chun ("C.C.") Liu;<br>Jing – Song ("Jason") Lu;<br>President Fang |
| Nov. 25, 1996 | Unknown | Management | Hitachi; Samsung; CGW |
| Nov. 26, 1996 | Unknown | Bilateral | Samsung; CGW |
| Nov. 27, 1996 | By telephone | Bilateral | Samsung; CGW |
| Dec. 2, 1996 | Malaysia | Bilateral | Samsung; CGW |
| Dec. 18, 1996 | Unknown | Bilateral | Samsung; CGW |
| Jan. 8, 1997 | Taiwan | Bilateral | Samsung; CGW |
| Jan. 9, 1997 | Taiwan | Bilateral | Matsushita; CGW |
| Jan. 10, 1997 | Taiwan | Bilateral | Hitachi; CGW |
| Jan. 10, 1997 | Taiwan | Bilateral | Toshiba; CGW |
| Jan. 15, 1997 | Taiwan Taipei | Bilateral | LG; CGW |
| Jan. 28, 1997 | Unknown | Top Level | <u>Samsung</u>:<br>Mr. Na;<br>Mr. Ha;<br>Mr. Lee<br><br><u>Philips</u>:  President Yu<br><br><u>Orion</u>:<br>Mr. Moon;<br>Mr. Hee Kil Moon<br><br><u>CGW</u> :<br>C.Y. Lin; C.C. Liu;<br>Wen – Chun (Tony) Cheng;<br>Ching-Yuan (Michael) Du |
| Feb. 24, 1997 | Taiwan | Bilateral | Samsung; CGW |
| Feb. 24, 1997 | Taiwan Taipei | Bilateral | LG, maybe Samsung; CGW |
| Feb. 25, 1997 | Unknown | Top Level | <u>Samsung</u><br>Ming-Pei Song;<br>Mr. Yoon;<br>Mr. Na |

|  |  |  | LG<br>Taipei President Lin<br>Philips<br>Market Sales Senior Manager Tseng;<br><br>CGW<br>C.Y. Lin.<br>C.C. Liu,<br>Tony Cheng,<br>Michael Du,<br>Plant Manager Chen |
|---|---|---|---|
| Feb. 27, 1997 | Unknown | Bilateral | Toshiba;<br>CGW |
| Feb. 27, 1997 | Unknown | Bilateral | Daewoo;<br>CGW |
| March 4, 1997 | Taiwan | Bilateral | Matsushita:<br>CGW |
| March 12, 1997 | Unknown | Working Level | Samsung, Hitachi, LG, Orion, MEC, Philips;<br>CGW |
| March 12, 1997 | Unknown | Unknown | Samsung, LG, Toshiba, Daewoo, and Thai CRT;<br>CGW |
| March 12, 1997 | Unknown | Glass | Samsung, LG, Daewoo, Philips, Hitachi, and Matsushita:<br>CGW |
| March 19, 1997 | Unknown | Working | Samsung, Philips, Orion, LG:<br>CGW |
| March 26, 1997 | Unknown | Glass | Samsung, Philips;<br>CGW |
| April 7, 1997 | Taiwan Taipei | Bilateral Toshiba: | CGW |
| April 8, 1997 | Unknown | Bilateral | Samsung;<br>CGW |
| April 9, 1997 | Taiwan | Bilateral | Matsushita Electronics;<br>CGW |
| April 23, 1997 | Unknown | Glass | Samsung, Philips, Orion;<br>CGW |
| April 23, 1997 | Unknown | Bilateral Matsushita; | CGW |
| April 29, 1997 | Taiwan | Bilateral | Hitachi;<br>CGW |
| May 2, 1997 | Unknown | Bilateral | Samsung;<br>CGW |
| May 9, 1997 | Unknown | Working Level | Samsung, LG, Orion, and Philips;<br>CGW |
| May 16, 1997 | Unknown | Glass | Samsung, LG;<br>CGW |
| May 20, 1997 | Taiwan | Glass | Samsung, Philips, LG;<br>CGW |
| May 20, 1997 | Malaysia | Bilateral | Samsung:<br>CGW |
| May 20, 1997 | Unknown | Bilateral | Orion; |

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

| | | | | CGW |
|---|---|---|---|---|
| May 23, 1997 | Malaysia | Bilateral | Matsushita; CGW |
| May 27, 1997 | Taiwan Taipei | Bilateral | Toshiba; CGW |
| June 4, 1997 | Unknown | Bilateral | Samsung; CGW |
| June 5, 1997 | Unknown | Bilateral | Samsung: CGW |
| June 9, 1997 | Korea | Top Level | Orion (Director Wen), Samsung (Director Luo); CGW (C.Y. Lin, C.C. Liu) |
| June 16, 1997 | Taiwan | Bilateral | Orion (Taipei); CGW |
| July 2, 1997 | Unknown | Bilateral | Samsung; CGW |
| July 4, 1997 | Unknown | Bilateral | Toshiba; CGW |
| July 8, 1997 | Unknown | Bilateral | Samsung; CGW |
| July 9, 1997 | Taiwan Taipei | Bilateral | Matsushita Electric Co.; CGW |
| July 16, 1997 | Unknown | Bilateral | Toshiba; CGW |
| July 18, 1997 | Unknown | Bilateral | Samsung; CGW |
| Aug. 1, 1997 | Unknown | Bilateral Meeting | Samsung; CGW |
| Aug. 18, 1997 | Unknown | Bilateral | Samsung; CGW |
| Aug. 29, 1997 | Unknown | Bilateral | Toshiba; CGW |
| Sept. 8, 1997 | By telephone | Bilateral | Samsung; CGW |
| Sept. 9, 1997 | Malaysia | Bilateral | Samsung; CGW |
| Sept. 12, 1997 | Bilateral | Taiwan | Matsushita; CGW |
| Sept. 22, 1997 | Singapore | Bilateral | LG; CGW |
| Sept. 29, 1997 | Unknown Bilateral | Toshiba; | CGW |
| Oct. 6, 1997 | Taiwan | Bilateral | Toshiba; CGW |
| Oct. 9, 1997 | Taiwan | Glass | Samsung, Philips; CGW |
| Oct. 13, 1997 | Unknown | Bilateral | MEC; CGW |
| Oct. 15, 1997 | Malaysia | Bilateral | MEC; CGW |
| Oct. 20, 1997 | Unknown | Bilateral | Samsung; CGW |
| Oct. 30, 1997 | Taiwan | Glass | Samsung, Philips; CGW |

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

| # | Date | Location | Type | Attendees |
|---|------|----------|------|-----------|
| 1 | Nov. 4, 1997 | Malaysia | Bilateral | Samsung; CGW |
| 2 | Nov. 6, 1997 | By telephone | Bilateral | Orion; CGW |
| 3 | Nov. 7, 1997 | Taiwan Taipei | Bilateral | Matsushita; CGW |
| 4 | Nov. 11, 1997 | Unknown | Bilateral | Samsung; CGW |
| 5 | Nov. 21, 1997 | Taiwan | Glass | Samsung, Philips, LG; CGW |
| 6 | Nov. 24, 1997 | Unknown | Bilateral | Thai – CRT; CGW |
| 7 | Dec. 8, 1997 | Malaysia | Bilateral | Samsung; CGW |
| 8 | Dec. 9, 1997 | Taiwan | Glass | Samsung, Orion; CGW |
| 9 | Dec. 24, 1997 | Taiwan | Bilateral | Matsushita; CGW |
| 10 | Jan. 5, 1998 | Unknown | Bilateral | Samsung; CGW |
| 11 | Jan. 14, 1998 | Taiwan | Bilateral | Samsung; CGW |
| 12 | Jan. 14, 1998 | Unknown | Bilateral | Toshiba; CGW |
| 13 | Jan. 16, 1998 | Taiwan Taipei | Bilateral | Matsushita; CGW |
| 14 | Jan. 19, 1998 | Unknown | Bilateral | Samsung; CGW |
| 15 | Jan. 19, 1998 | Unknown | Bilateral | Matsushita; CGW |
| 16 | Jan. 20, 1998 | Taiwan | Bilateral | Toshiba; CGW |
| 17 | Feb. 11, 1998 | Taiwan, Taipei | Bilateral | Matsushita; CGW |
| 18 | Feb. 12, 1998 | Unknown | Bilateral | Samsung; CGW |
| 19 | Feb. 18, 1998 | Taiwan, Taipei | Bilateral | LG; CGW |
| 20 | Feb. 19, 1998 | Taiwan | Bilateral | Samsung; CGW |
| 21 | Feb. 20, 1998 | Taiwan | Bilateral | Orion; CGW |
| 22 | Feb. 24, 1998 | Taiwan | Bilateral | Samsung; CGW |
| 23 | March 4, 1998 | Unknown | Glass | Samsung, Philips, Orion; CGW |
| 24 | March 4, 1998 | Unknown | Bilateral | LG; CGW |
| 25 | March 11, 1998 | Taiwan | Bilateral | Toshiba; CGW |
| 26 | March 20, 1998 | Taiwan Taipei | Bilateral | Matsushita; CGW |
| 27 | March 25, 1998 | Taiwan | Bilateral | Samsung |
| 28 | March 30, 1998 | Taiwan | Glass | Samsung, LG, Orion; |

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

| | | | | |
|---|---|---|---|---|
| | Taipei CGW | | | |
| April 1998 (no date available) | China Bilateral | | | Nanjing Huafei (part of LPD group); CGW |
| April 9, 1998 | Taiwan | Bilateral | | Samsung; CGW |
| April 14, 1998 | Unknown | Bilateral | | Samsung; CGW |
| April 14, 1998 | Taiwan | Bilateral | | Toshiba; CGW |
| April 15, 1998 | Taiwan | Bilateral | | Samsung; CGW |
| April 15, 1998 | Taiwan | Bilateral Matsushita; | | CGW |
| April 21, 1998 | Taiwan, Taipei | Bilateral LG; | | CGW |
| April 23, 1998 | Unknown | Bilateral | | Sony; CGW |
| April 24, 1998 | Malaysia | Bilateral | | Samsung; CGW |
| April 28, 1998 | Taiwan | Bilateral | | Samsung; CGW |
| May 5, 1998 | Malaysia | Glass | | Samsung, and LG; CGW |
| Mary 13, 1998 | Unknown | Bilateral | | LG; CGW |
| May 18, 1998 | Unknown | Bilateral | | Orion; CGW |
| May 18, 1998 | Unknown Bilateral | | | Toshiba; CGW |
| May 27, 1998 | Taiwan Taipei | Bilateral | | Matsushita; CGW |
| June 1, 1998 | Korea | GLASS | | Samsung; Orion; CGW |
| June 10, 1998 | Taiwan Taipei | Bilateral | | Samsung; CGW |
| June 29, 1998 | Unknown Bilateral | | | Orion; CGW |
| July 3, 1998 | Taiwan Bilate | ral | | Toshiba CGW |
| July 3, 1998 | Taiwan Bilate | ral | | Matsushita; CGW |
| July 8, 1998 | Malaysia Bilate | ral | | LG; CGW |
| July 9, 1998 | Unknown Bilateral | | | LG; CGW |
| July 14, 1998 | Malaysia Bilateral | | | Samsung; CGW |
| July 28, 1998 | Malaysia Bilateral | | | Samsung; CGW |
| Aug. 5, 1998 | China | China meeting | | Samsung; Philips; BMCC; Irico; CGW |
| Aug. 20, 1998 | Unknown Bilateral | | | Toshiba; CGW |
| Aug. 21, 1998 | Unknown | Bilateral | | Hitachi; |

| | | | |
|---|---|---|---|
| CGW | | | |
| Aug. 25, 1998 | Malaysia | Working-level | Samsung, LG; CGW |
| Aug. 25, 1998 | Taiwan Taipei | Bilateral | Matsushita; CGW |
| Sept. 4, 1998 | China (Nanjing) | China meeting | Philips; Samsung; Irico; BMCC; Orion; LG; CGW |
| Sept. 7, 1998 | Unknown | Glass | Samsung, LG, Orion; Thai CRT; CGW |
| Sept. 15, 1998 | Unknown | Bilateral | Panasonic; CGW |
| Sept. 26, 1998 | Unknown | Glass | Samsung; LG; Orion; Thai CRT; CGW |
| Sept. 26, 1998 | Unknown | Bilateral | Matsushita; CGW |
| Oct. 9, 1998 | China (Fuzhou) | China meeting | Samsung; Philips; Orion; LG; Irico; CGW |
| Oct. 14, 1998 | Unknown | Bilateral meeting | Samsung; CGW |
| Oct. 15, 1998 | Taiwan | Bilateral meeting | Toshiba; CGW |
| Oct. 15, 1998 | Taiwan | Bilateral meeting | Matsushita; CGW |
| Oct. 28, 1998 | Unknown Europe | Glass meeting | LG; Orion; Samsung; Philips; CGW |
| Nov. 6, 1998 | China (Xi'an) | China meeting | Philips; Samsung; Orion; Irico; BMCC; CGW |
| Nov. 20, 1998 | Unknown | Bilateral meeting | Hitachi; CGW |
| Nov. 27, 1998 | Unknown | Glass meeting | Samsung; LG; Orion; Thai CRT; CGW |
| Dec. 8-10, 1998 | China (Beijing) | China meeting | Philips; Samsung; LG; Orion; Irico; BMCC; CGW |
| Dec. 11, 1998 | Unknown | Bilateral meeting | Matsushita; CGW |
| Dec. 16, 1998 | Taiwan | Bilateral meeting | Toshiba; CGW |
| Dec. 17, 1998 | Unknown | Bilateral meeting | LG; CGW |
| Dec. 18, 1998 | Unknown | Bilateral meeting | Mitsubishi; CGW |
| Dec. 28, 1998 | China (Xiamen) | China meeting | Philips; Samsung; Orion; Irico; CGW |
| Jan. 8, 1999 | China (Xiamen) | China meeting | Samsung; Huafei; Orion; Irico; Philips; CGW |
| Jan. 13, 1999 | Unknown | Glass meeting | Samsung; Philips; Orion; LG; CGW |
| Jan. 18, 1999 | Taiwan | Top-level meeting | Samsung: Mr. Inn Kim, Mr. D.Y. Kim, Mr. Na, Mr. Ha, Mr. J.I. Lee |

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

| | | | LG: S.Y. Choi, C.S. Jeon, Mr. K.Y. Ko, J.M. Park<br><br>Orion: H.C. Moon, K.H. Kang, J.H. Moon<br><br>Philips: David Chang, Jerry Lin, Mr. Rosa Hu<br><br>CGW: C.Y. Lin, C.C. Liu, Tony Cheng, Sheng – Jen (S.J.) Yang, Michael Du, Chun-Mei (Christina) Hsieh |
|---|---|---|---|
| Jan. 22, 1999 | Unknown | Bilateral meeting | Toshiba;<br>CGW |
| Jan. 30, 1999 | Unknown | Bilateral meeting | Panasonic;<br>CGW |
| Feb. 2, 1999 | China (Shenzhen) | China meeting | Philips; Samsung; LG; Orion; Irico; BMCC;<br>CGW |
| Feb. 10, 1999 | Unknown | Glass meeting | Samsung; Philips; Orion; LG;<br>CGW |
| Feb. 16, 1999 | Unknown | Glass meeting | Samsung; Philips; Orion; LG;<br>CGW |
| Feb. 23, 1999 | Taiwan | Bilateral meeting | Toshiba;<br>CGW |
| March 1, 1999 | Unknown | Working-level meeting | Samsung; Philips; LG; Orion;<br>CGW |
| March 5, 1999 | Malaysia | Glass meeting | Orion; Samsung; Philips; LG;<br>CGW |
| March 6, 1999 | Malaysia | Green meeting | Orion; Samsung; Philips; LG;<br>CGW |
| March 7, 1999 | Malaysia | Glass meeting | Samsung; LG; Orion; Thai CRT;<br>CGW |
| March 11, 1999 | Telephonic | Bilateral meeting | Samsung;<br>CGW |
| March 15, 1999 | Unknown | Working-level meeting | Samsung; LG; Orion; Philips;<br>CGW |
| March 24, 1999 | Taiwan Taipei | Bilateral meeting | Orion;<br>CGW |
| April 2, 1999 | China (Nanjing) | China meeting | Samsung; Philips; Orion; Irico; BMCC;<br>CGW |
| April 9, 1999 | Indonesia | Glass meeting | Samsung; LG;<br>CGW |
| April 14, 1999 | Unknown | Top-level meeting | Samsung:  In Kim, D.Y. Kim, Mr. Lee Jae In<br><br>LG:  Mr. K.S. Cho, Mr. C.S. Jeon, Mr. K.Y. Ko<br><br>Orion:  Mr. H.C. Moon, Mr. K.H. Kang, Mr. S. Y. Byun, Mr. Jimmy |

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

| | | | Kim |
|---|---|---|---|
| | | | <u>Philips</u>: Mr. David Chang, Mr. Jerry Lin |
| | | | <u>CGW</u>: C.Y. Lin, C.C. Liu, Michael Du |
| April 15, 1999 | Korea | Management meeting | Samsung; Orion; LG; CGW |
| April 28, 1999 | Unknown | Glass meeting | Samsung; LG; Orion; Philips; CGW |
| May 6, 1999 | China (Xi'an) | China meeting | Philips; Samsung; Orion; Irico; CGW |
| May 6, 1999 | Unknown | Bilateral meeting | Toshiba; CGW |
| May 7, 1999 | China (Xi'an Xianying) | Bilateral meeting | Irico; CGW |
| May 10, 1999 | Korea Seoul | Glass meeting | Samsung; LG; Orion; Thai CRT; CGW |
| May 12, 1999 | Unknown | Working-level meeting | Samsung; Philips; Orion; CGW |
| May 12, 1999 | Unknown | Working-level meeting | Samsung; Philips; Orion; LG; CGW |
| May 20, 1999 | Unknown | Top-level meeting | <u>Samsung</u>:  Mr. Inn Kim, Michael Son, Mr. Ha<br><br><u>Orion</u>:  Mr. H.C. Moon, Mr. J.W. Moon, Mr. Karl Min, Mr. J.H. Moon<br><br><u>LG</u>:  Mr. S.Y. Choi, Mr. G.I. Choi, Mr. S.H. Jo, Mr. S.M. Ahn<br><br><u>CGW</u>:  C.Y. Lin, C.C. Liu, Michael Du, Christina Hsieh |
| May 21, 1999 | China | Management meeting | Philips; Samsung; LG; Orion; CGW |
| May 24, 1999 | Telephonic | Bilateral meeting | Irico; CGW |
| June 1, 1999 | Taiwan | Management meeting | Orion; Samsung; LG; Thai CRT; CGW |
| June 4, 1999 | China (Shenzhen) | China meeting | Samsung; Philips; Orion; Irico; BMCC; CGW |
| June 21, 1999 | Unknown | Glass meeting | Samsung; LG; Orion; Thai CRT; CGW |
| June 21, 1999 | Unknown | Glass | Samsung, LG, Orion, and Thai CRT; CGW |
| June 22, 1999 | Unknown | Glass | Orion, Irico; CGW |
| June 23, 1999 | Korea | Top | <u>Samsung</u> (Mr. Inn Kim, D.Y. Kim, Mr. J.I. Lee, Mr. Ha)<br><br><u>Philips</u> (David Chang, Jerry Lin, Ms. |

MDL NO. 1917

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

| | | | |
|---|---|---|---|
| | | | Rosa Hsu) |
| | | | Orion (Mr. H.C. Moon, Mr. K.H. Kang, Mr. J.H. Moon, Mr. Jimmy Kim), and LG (Mr. K.S. Cho, Mr. C.S. Jeon, Mr. J.M. Park, Mr. K.Y. Ko); |
| | | | CGW (C.Y. Lin, Tony Cheng, Michael Du, Christina Hsieh) |
| June 28, 1999 | Unknown | Bilateral | Matsushita; CGW |
| July 6, 1999 | Taiwan Taipei | Bilateral LG; | CGW |
| July 7, 1999 | Unknown | Bilateral | Samsung; CGW |
| July 9, 1999 | China (Fuzhou) | China | Orion, Philips, and Irico; CGW |
| July 13, 1999 | China (Tianjin) | Bilateral Sa | msung; CGW |
| July 20, 1999 | Unknown | Bilateral Matsushita | |
| July 23, 1999 | Taiwan | Top Level | Samsung (Mr. In Kim, Mr. D.Y. Kim, Mr. Lee Jae In, Mr. Ha) |
| | | | LG (Mr. S.Y. Choi, Mr. C.S. Jeon, Mr. Johnny Song, Mr. K.Y. Ko) |
| | | | Orion (Mr. H.C. Moon, Mr. J.H. Moon, Mr. K.H. Kang, Mr. D.W. Yoon) |
| | | | Philips (Mr. David Chang, Mr. Jerry Lin, Mr. Rosa Hu) |
| | | | CGW (C.Y. Lin, C.C. Liu, Tony Cheng, Michael Du) |
| July 28, 1999 | Unknown | Glass | Samsung, LG, Orion, and Philips; CGW |
| July 28, 1999 | Taiwan Taipei | Bilateral Toshiba; | CGW |
| July 29, 1999 | Malaysia | Bilateral Matsushita | |
| Aug. 4, 1999 | Unknown | Working | Samsung, Philips, Orion, and LG; CGW |
| Aug. 4, 1999 | Malaysia | Bilateral | Samsung; CGW |
| Aug. 5, 1999 | Unknown | Glass | Irico and Orion; CGW |
| Aug. 5, 1999 | China (Nanjing) | China meetings | Samsung, BMCC, Orion, Irico, Philips; CGW |
| Aug. 5, 1999 | China | China | Samsung, BMCC, Huafei, and Irico; CGW |
| Aug. 10, 1999 | Unknown | Glass | Samsung, LG, Orion, and Philips; CGW |

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

| Aug. 20, 1999 | Korea | Green | Unknown; CGW |
|---|---|---|---|
| Aug. 20, 1999 | Korea | Top | Samsung (Mr. In Kim, Mr. D.Y. Kim, Mr. Ha, Mr. Lee Jae In), LG (S.Y. Cho, Mr. C.S. Jeon, Mr. K.Y. Ko)<br><br>Orion (Mr. H.C. Moon, Mr. Han-Koo Cho, Mr. K.H. Kang, Mr. Kim)<br><br>Philips (Mr. David Chang, Mr. J.M. Smith, Mr. Jerry Lin, Mr. J.H. Pei); CGW (C.Y. Lin, C.C. Liu, Michael Du) |
| Aug. 22, 1999 | Korea | Audits | LG, Samsung, Orion; CGW |
| Aug. 23, 1999 | Unknown | Glass | Samsung, LG, Orion, and Thai CRT; CGW |
| Sept. 1, 1999 | China (Shenzhen) | Bilateral Sa | msung; CGW |
| Sept. 2, 1999 | China (Xian) | China | Samsung, Irico, Orion, and Philips; CGW |
| Sept. 2, 1999 | Taiwan | Mangmt Level | Samsung, Philips, Orion, and LG; CGW |
| Sept. 7, 1999 | Malaysia | Bilateral Matsushita; | CGW |
| Sept. 13, 1999 | Malaysia | Management Level | Samsung, LG, Orion, Thai CRT; CGW |
| Sept. 14, 1999 | Malaysia | Bilateral Matsushita; | CGW |
| Sept. 15, 1999 | Taiwan | Bilateral Matsushita | Taiwan; CGW |
| Sept. 15, 1999 | Taiwan | Bilateral | Toshiba; CGW |
| Sept. 20, 1999 | Taiwan (Taoyuan) | Top Level | Samsung:  Mr. In Kim, Mr. D.Y. Kim, Mr. Lee Jae In, Mr. Ha<br><br>LG: Mr. S.Y. Choi, Mr. C.S. Jeon, Mr. Lim, Mr. K.Y. Ko<br><br>Orion:  Mr. Han – Koo Cho, Mr. Jimmy Kim, Mr. K.H. Kang, Mr. Moon<br><br>Philips:  Mr. Jim Smith, Mr. Jerry Lin, Ms. Rosa Hu<br><br>CGW:  C.Y. Lin, C.C. Liu, Tony Cheng, S.J. Yang, Michael Du |
| Sept. 21, 1999 | Taiwan (Taoyuan) | Management | Samsung, LG, Orion, Philips; CGW |
| Sept. 28, 1999 | Unknown | Glass | Samsung, Philips, Orion, LG; CGW |
| Sept. 29, 1999 | Unknown | Bilateral | Toshiba; CGW |

| | | | |
|---|---|---|---|
| Oct. 1, 1999 | Malaysia | Bilateral | Matsushita;<br>CGW |
| Oct. 2, 1999 | Unknown | Glass | Daewoo, Philips;<br>CGW |
| Oct. 4, 1999 | Taiwan, Taipei | Bilateral | Samsung;<br>CGW |
| Oct. 5, 1999 | Taiwan, Taipei | Bilateral | LG;<br>CGW |
| Oct. 6, 1999 | China | Bilateral | Samsung;<br>CGW |
| Oct. 11, 1999 | Unknown | Europe Glass | Irico, Philips;<br>CGW |
| Oct. 12, 1999 | China (Tianjin) | China | Irico, Samsung, BMCC, and Philips;<br>CGW |
| Oct. 13, 1999 | Taiwan | Top Level | <u>Samsung</u>:  Mr. Lee<br><br><u>Philips</u>: Mr. Jerry Lin, Ms. Limay Liu<br><u>Orion</u>:  Mr. Moon<br><br><u>LG</u>:  Mr. Lin, Mr. Charles Lu<br><br><u>CGW</u>:  C.Y. Lin, C.C. Liu, Michael Du, Christina Hseih |
| Oct. 20, 1999 | Taiwan | Glass | Samsung, Philips, LG;<br>CGW |
| Oct. 20, 1999 | Unknown | Bilateral | Toshiba;<br>CGW |
| Oct. 20, 1999 | Taiwan | Bilateral | Sony;<br>CGW |
| Oct. 20, 1999 | Scotland, Glasgow | Europe glass | Philips, Daewoo;<br>CGW |
| Oct. 27, 1999 | Thailand | Glass Meeting | Samsung, Orion, and Thai CRT;<br>CGW |
| Nov. 3, 1999 | Unknown | Glass | Samsung, LG, and Philips;<br>CGW |
| Nov. 5, 1999 | China | China | Philips, Samsung, Orion;<br>CGW |
| Nov. 5, 1999 | Taiwan | Bilateral | Toshiba;<br>CGW |
| Nov. 9, 1999 | Korea, Seoul | Glass | Samsung, LG, and Orion;<br>CGW |
| Nov. 9, 1999 | Unknown | Glass | Samsung, LG, and Philips;<br>CGW |
| Nov. 10, 1999 | Taiwan | Bilateral | Matsushita;<br>CGW |
| Nov. 11, 1999 | Unknown | Europe Glass | Philips, Orion, Samsung, and LG;<br>CGW |
| Nov. 12, 1999 | Europe | Bilateral | Philips;<br>CGW |
| Nov. 16, 1999 | Unknown | Working | Samsung, LG, Orion, Philips;<br>CGW |
| Nov. 25, 1999 | Taiwan (Taoyuan) | Management Level | Samsung, Philips, Orion, Thai CRT;<br>CGW |
| Nov. 26, 1999 | Taiwan | Glass | LG, Orion, Samsung, Philips; |

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

| | | | |
|---|---|---|---|
| | (Taoyuan) CGW | | |
| Nov. 26, 1999 | Taiwan (Taoyuan) | Green | LG, Orion, Samsung, Philips; CGW |
| Nov. 30, 1999 | Unknown | Glass | Samsung, LG, Philips, and Orion; CGW |
| Dec. 9, 1999 | China (Suzhou) | China | Irico, BMCC, Samsung, and Philips; CGW |
| Dec 13, 1999 | Unknown | Bilateral Matsushita; CGW | |
| Dec. 15, 1999 | Unknown | Europe Glass | Philips and Irico; CGW |
| Dec. 22, 1999 | Unknown | Working level | Samsung, Philips, Orion, LG; CGW |
| Dec. 31, 1999 | Unknown | Bilateral | Toshiba; CGW |
| Jan. 12, 2000 | Unknown | Glass | Samsung, LG, Philips, Orion; CGW |
| Jan. 13, 2000 | China (Xian) | China | Samsung, Irico, Philips; CGW |
| Jan. 18, 2000 | Unknown | Glass | Samsung, LG, Orion, Thai CRT; CGW |
| Jan. 24, 2000 | Unknown | Top | Samsung:  Mr. In Kim, Mr. D.Y. Kim, Mr. Ha, Mr. Lee Jae In<br><br>LG:  Mr. S.Y. Choi, Mr. S.K. Lee, Mr. K. Y. Ko, Mr. Lim<br><br>OEC (Orion):  Mr. Han-Koo Cho, Mr. H.S. Lee, Mr. J.H. Moon, Mr. S.G. Oh<br><br>Philips:  Mr. Jim Smith, Mr. Jerry Lin, Ms. Limay Liu<br><br>CGW: C.Y. Lin, C.C. Liu, Tony Cheng, Michael Du |
| Jan. 24, 2000 | Unknown | Management | Samsung, LG, Orion, Thai CRT, Philips; CGW |
| Jan. 25-28, 2000 | Unknown Green | | Unknown; CGW |
| Feb. 22, 2000 | Taiwan | Bilateral | Hitachi; CGW |
| Feb. 24, 2000 | Korea | Glass | Samsung, LG, Orion, and Philips; CGW |
| March 2, 2000 | Tiawan | Bilateral | Toshiba; CGW |
| March 3, 2000 | Taiwan | Bilateral | Samsung; CGW |
| March 6, 200 | China (Shenzen) | China | Samsung, Irico, Philips; CGW |
| March 6, 2000 | Indonesia | Bilateral | Toshiba; CGW |
| March 7-8, 2000 | Unknown | Green | Samsung, LG, Orion, Thai CRT and Philips; |

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

| | | | CGW |
|---|---|---|---|
| March 10, 2000 | Thailand | Bilateral | Toshiba; CGW |
| March 21, 2000 | Taiwan | Bilateral | Toshiba; CGW |
| March 23, 2000 | Taiwan | Bilateral | Matsushita; CGW |
| March 24, 2000 | Korea Seoul | Glass | Samsung, LG, Orion, Thai CRT, Philips; CGW |
| March 25, 2000 | Korea Seol | Green | LG, Orion, Philips, and Samsung; CGW |
| March 25, 2000 | Korea, Seoul | Management | LG, Orion, Philips, and Samsung; CGW |
| April 6, 2000 | China (Xiamen) | China | Samsung, Irico, BMCC, LG, Philips, Orion; CGW |
| April 9-10, 2000 | Various Audit | | Samsung; CGW |
| April 11, 2000 | Taiwan, Taipei | Bilateral | Hitachi; CGW |
| April 11, 2000 | Taiwan, Taipei | Bilateral | Sony; CGW |
| April 14, 2000 | Korea, Seoul | Management | Samsung, LG, Orion, Philips; CGW |
| May 2, 2000 | Unknown | Bilateral | MEC; CGW |
| May 4, 2000 | Taiwan | Bilateral | Toshiba; CGW |
| May 9, 2000 | China, Nanjing | China | Samsung, Irico, BMCC, LG, Philips, Orion; CGW |
| May 25, 2000 | China Shanghai | Management | Samsung, LG, Orion, and Philips; CGW |
| May 26, 2000 | Unknown | Glass | Samsung, LG, Orion, Philips; CGW |
| May 31, 2000 | China | Bilateral | Haufei; CGW |
| June 6, 2000 | China | Audit | Samsung; CGW |
| June 8, 2000 | Taiwan, Taipei | Bilateral | Matsushita; CGW |
| June 9, 2000 | China, Beijing | China | Irico, Samsung, BMCC, LG, Philips, Orion; CGW |
| June 9, 2000 | Taiwan | Bilateral | Toshiba; CGW |
| June 16, 2000 | Taiwan Taipei | Bilateral | Hitachi; CGW |
| June 20, 2000 | Malaysia | Glass | Samsung, LG, Orion, Philips; CGW |
| June 20, 2000 | Malaysia | Green | Samsung, Orion, LG, Philips; CGW |
| June 20, 2000 | Unknown | Glass | Samsung, LG, Orion, Philips, Thai |

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

| | | | | CRT;<br>CGW |
|---|---|---|---|---|
| June 21, 2000 | Malaysia | Bilateral | | Matsushita MMEC;<br>CGW |
| June 23, 25 2000 | Europe Unknown | | | Philips, Irico;<br>CGW |
| June 28, 2000 | Unknown | Working | | Samsung, LG, Orion, Philips;<br>CGW |
| July 4, 2000 | Unknown | Bilateral | | Philips;<br>CGW |
| July 6, 2000 | Taiwan Taipei | Bilateral Toshiba; | | CGW |
| July 10, 2000 | China (Xian) | China | | Orion, Samsung, Philips, Irico, and LG;<br>CGW |
| July 13, 2000 | Korea Seoul | Glass | | Samsung, LG, Orion, Philips;<br>CGW |
| July 18, 2000 | Taiwan | Bilateral | | Hitachi;<br>CGW |
| August 2, 2000 | Taiwan | Bilateral | | Toshiba;<br>CGW |
| Aug. 11, 2000 | China Tianjin | China | | Irico, Samsung, BMCC, LG, Philips, and Orion;<br>CGW |
| Aug. 22, 2000 | Taiwan Taoyuan | Top Sa | | ___msung:  Mr. Inn Kim, Mr. S.K. Park, Mr. Michael Son, Mr. Ha<br><br>LG:  Mr. S.Y. Choi, Mr. G.I. Choi, Mr. Johnny Son<br><br>Orion:  Mr. H.K. Cho, Mr. Lee, Mr. Karl Min, Mr. Kang<br><br>Philips:  Mr. Jim Smith, Mr. Jerry Lim, Ms. Rosa Hu<br><br>CGW: C.C. Liu, S.J. Yang, Michael Du |
| Sept. 13-20, 2000 | United Kingdom (CPT UK) – Chunghwa's UK facility | Europe Glass | | Philips, DOSA (Orion), Samsung;<br>CGW |
| Sept. 14, 2000 | China Changsha | China | | Irico, Samsung, BMCC, LG, Philips, Orion;<br>CGW |
| Sept. 21, 2000 | Taiwan Taipei | Top Sa | | ___msung: Mr. In Kim, Mr. D.Y. Kim, Mr. Lee Jae In, Mr. Ha<br><br>LG:  S.Y. Choi, Mr. S.K. Lee, Mr. Lim, Mr. K.Y. Ko<br><br>Orion:  Mr. Cho, Mr. J.H. Moon, Mr. Jimmy Kim, Mr. Kang |

MDL NO. 1917
DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

| | | | |
|---|---|---|---|
| | | | Philips:  Mr. Jerry Lin |
| | | | CGW:  C.C. Liu, Tony Cheng, S.J. Yang, Michael Du |
| Sept. 21, 2000 | Taiwan, Taipei | Top Sa | ___msung:  Mr. In Kim, Mr. D.E. Lee, Mr. S.K. Park, Mr. Michael Son |
| | | | LG:  Mr. S.Y. Choi, Mr. K.J. Park, Mr. K.Y. Ko |
| | | | Orion:  Mr. Cho, Mr. Lee, Mr. Karl Min, Mr. Kang |
| | | | Philips:  Mr. Jim Smith, Mr. Jerry Lin, Ms. Rosa Hu |
| | | | CGW:  C.C. Liu, Tony Cheng, S.J. Yang, Michael Du |
| Sept. 27, 2000 | Unknown | Working | Samsung, LG, Orion, Philips; CGW |
| Sept. 28, 2000 | Taiwan Taipei | Bilateral | Toshiba; CGW |
| Oct. 12, 2000 | China Fuzhou | China | Irico, Samsung, LG, Orion, Philips; CGW |
| Oct. 25, 2000 | Korea Seoul | Management | Samsung, LG, Orion, Philips, Thai CRT; CGW |
| Oct. 25, 2000 | Korea Seoul | Management | Samsung, LG, Orion, Philips; CGW |
| Oct. 26, 2000 | Korea Seoul | Green | Unknown; CGW |
| Nov. 3, 2000 | Unknown | Bilateral | Hitachi; CGW |
| Nov. 9, 2000 | China Nanjing | China | Irico, Samsung, LG, Orion, Philips, BMCC; CGW |
| Dec. 7, 2000 | China Xian | China | Philips, Irico, Samsung, LG; CGW |
| Dec. 13, 2000 | Unknown | Working | Samsung, Philips, LG, Orion; CGW |
| Jan. 12, 2001 | Unknown | Bilateral | Toshiba; CGW |
| Jan. 31, 2001 | Unknown | Europe Glass | Philips, Orion; CGW |
| Feb. 15, 2001 | China | Bilateral | Irico; CGW |
| Feb. 22, 2001 | China | China | Samsung, LG, Philips, BMCC, Irico; CGW |
| March 5, 2001 | Taiwan | Bilateral | Toshiba; CGW |
| March 19, 2001 | Unknown | Glass | Samsung, LG, Orion, Philips; CGW |
| March 20, 2001 | Unknown | Management | Samsung, LG, Orion, Philips; |

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

| | | | CGW |
|---|---|---|---|
| March 28, 2001 | Unknown | Glass | Samsung, Philips, LG, and Orion; CGW |
| April 3, 2001 | China Shenzhin | Audit Sa | msung; CGW |
| April 11, 2001 | China | Bilateral | Samsung; CGW |
| April 12, 2001 | Taiwan | Glass | Samsung, Philips, LG, Orion; CGW |
| April 18-19, 2001 | China Shanghai | Management | Samsung, LG, Orion, Philips, Thai CRT; CGW |
| A[ril 18, 2001 | China Shanghai | Management | Samsung, LG, Orion, Philips; CGW |
| April 20, 2001 | China Shanghai | Green Unknown; | CGW |
| April 20, 2001 | Unknown | Bilateral | Toshiba; CGW |
| April 27, 20001 | China | Bilateral | Samsung; CGW |
| May 17, 2001 | China Fuzhou | China | Philips, Samsung, LG; CGW |
| May 21, 2001 | China | Bilateral | Samsung; CGW |
| May 31, 2001 | Unknown | Bilateral | Thomson; CGW |
| June 6, 2001 | China | Bilateral | Matsushita; CGW |
| June 7, 2001 | China | Bilateral | Samsung; CGW |
| June 12, 2001 | China | Bilateral | BMCC; CGW |
| June 19, 2001 | Malaysia | Bilateral | Samsung; CGW |
| June 26, 2001 | Unknown | Glass | Samsung, LG, Orion; CGW |
| June 27, 2001 | Unknown | Glass | Samsung, LG, Orion; CGW |
| July 1, 2001 | Unknown | Unknown | Philips, LG, Samsung, Orion; CGW |
| July 17, 2001 | Unknown | Working | Samsung, LPD; CGW |
| July 24, 2001 | Taiwan Taipei | Glass | Samsung, LG, Orion; CGW |
| July 24, 2001 | Taiwan Taipei | Glass | Samsung, LG, Orion, Thai CRT; CGW |
| July 26, 2001 | China | China | Samsung, LG Philips; CGW |
| July 26, 2001 | Taiwan | Bilateral | Toshiba; CGW |
| Aug. 2, 2001 | Taiwan | Bilateral | Mitsubishi Electronics; CGW |
| Aug. 13, 2001 | Unknown | Management | Samsung, LPD, Orion; CGW |

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

| Aug. 21, 2001 | Korea Seoul | Glass | Samsung, LG, Orion, Thai CRT; CGW |
| Spet. 26, 2001 | China | China | Samsung, LG Philips; CGW |
| Sept. 28, 2001 | Unknown | Green | Unknown; CGW |
| Oct. 23, 2001 | Unknown | Top | <u>Samsung</u>:  Director Kim In, Kim Doek-Yoen, Park Sang-Kyu<br><br><u>LPD</u>:  Director Joe, Lee Seung-Kyu<br><br><u>CGW</u>:  C.Y. Lin, Tony Cheng |
| Nov. 20, 2001 | Unknown | Glass | Samsung, LPD, Orion; CGW |
| Nov. 23, 2001 | China (Fuzhou) | China | Samsung, LG, and Philips; CGW |
| Dec. 17, 2001 | Unknown | Management | Samsung, LPD, Orion; CGW |
| Dec. 21, 2001 | Unknown | Glass | Samsung, LG, Orion; CGW |
| Dec. 28, 2001 | Unknown | Top | <u>Samsung</u>:  Mr. D.Y. Kim, Mr. Park<br><br><u>LPD</u>:  Mr. K.S. Cho, Mr. S.Y. Choi, Mr. S.K. Lee<br><br><u>CGW</u>:  C.Y. Lin, C.C. Liu, Ling-Yun (Edward) Cheng |
| Jan. 4, 2002 | Unknown | Glass | Samsung, LPD, and OEC; CGW |
| Jan. 11, 2002 | Taiwan | Glass | Samsung, Orion, and LPD: CGW |
| Jan.18, 2002 | Unknown | Glass | Samsung, LPD, Orion; CGW |
| Jan. 18, 2002 | Unknown | Glass | Samsung, LPD, Orion; CGW |
| Jan. 23, 2002 | Taiwan | Glass | Samsung, Orion, LPD; CGW |
| Jan. 30, 2002 | Taiwan | Bilateral | LPD; CGW |
| Feb. 22, 2002 | Taiwan, Taoyuan | Glass | Samsung, LPD, and Orion; CGW |
| Feb. 22, 2002 | Unknown | Working | Samsung, LPD, Orion; CGW |
| March 5, 2002 | Unknown | Glass | Samsung, LPD; CGW |
| March 6, 2002 | Scotland Glasgow | Europe glass | Unknown; CGW |
| March 20, 2002 | Unknown | Glass | Samsung, Orion, LPD; CGW |
| March 20, 2002 | Unknown | Glass | Samsung, LPD, Orion; CGW |
| April 22, 2002 | Thailand | Glass | Samsung, Orion, LPD; CGW |
| May 28, 2002 | Unknown | Glass | Samsung, LPD, Orion; |

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

| | | | CGW |
|---|---|---|---|
| June 21, 2002 | Unknown | Glass | LPD and DOSA (Orion); CGW |
| Sept. 13, 2002 | Unknown | Glass | Thai CRT, Toshiba, LPD, Samsung; CGW |
| Oct. 17, 2002 | Malaysia | Glass | Thai CRT, Toshiba, LPD, Samsung, Orion; CGW |
| Dec. 12, 2002 | Unknown | Glass | Samsung, LPD; CGW |
| Dec. 17, 2002 | Singapore | Glass | Thai CRT, Toshiba, LPD, Samsung; CGW |
| Jan. 2003 (no exact date known) | Unknown | Glass | LPD, Samsung; CGW |
| Jan. 1, 2003 | Unknown | Working | Samsung, LPD; CGW |
| Feb. 2003 (approx.) | Unknown | Glass | LPD, Samsung; CGW |
| Feb. 14, 2003 | China | Bilateral | Irico; CGW |
| Feb. 21, 2003 | Singapore | Glass | Thai CRT, Toshiba , LPD ; CGW |
| Feb. 26-28, 2003 | Unknown | Bilateral (meeting on each date) | Matsushita, Thai CRT, Toshiba CGW |
| March 20, 2003 | Unknown | Glass | Unknown; CGW |
| March 21, 2003 | Unknown | Unknown | Samsung, LPD; CGW |
| March 27, 2003 | China (Shenzhen) | Marketing | Samsung, LPD; CGW |
| April 22, 2003 | Unknown | Glass | Unknown; CGW |
| April 22, 2003 | Unknown | Glass | Unknown; CGW |
| April 29, 2003 | China (Xiamen) | Unknown | Samsung , LPD; CGW |
| April 30, 2003 | Unknown | Glass | Samsung, LPD; CGW |
| May 2003 (approx.) | Unknown | Glass | LPD, Samsung; CGW |
| May 8, 2003 | By telephone | Bilateral | Samsung; CGW |
| May 22, 2003 | Singapore | Glass | MTPD, Samsung, LPD, Thai CRT; CGW |
| May 30, 2003 | Unknown | Unknown | Samsung, LPD; CGW |
| June 2003 (approx.) | Unknown | Glass | Samsung, LPD; CGW |
| June 2, 2003 | Unknown | Glass | LPD, Samsung; CGW |

| June 17, 2003 | Malaysia | Top | LPD:  C.S.O. Mr. Kim, Mr. Yang<br><br>Samsung:  E.V.P. Mr. Kim, Mr. Kim,<br><br>CGW:  Unknown |
|---|---|---|---|
| June 17, 2003 | Malaysia | Green | LPD, Samsung;<br>CGW |
| June 18, 2003 | Malaysia | Green | Samsung, LPD;<br>CGW |
| July 4, 2003 | Unknown | Glass | Samsung, LPD;<br>CGW |
| July 21, 2003 | Unknown | Working | Samsung, LPD;<br>CGW |
| July 29, 2003 | Unknown | Glass | LPD, Samsung;<br>CGW |
| Aug. 4, 2003 | Unknown | Bilateral | Thai CRT;<br>CGW |
| Aug. 20, 2003 | China | Bilateral | Irico;<br>CGW |
| Aug. 28, 2003 | Unknown | Unknown | Samsung, LPD;<br>CGW |
| Sept. 2003 (approx.) | Unknown Glass | | LPD, Samsung;<br>CGW |
| Sept. 2003 (approx.) | Unknown Glass | | Samsung, LPD;<br>CGW |
| Sept. 2003 (approx) | Unknown Glass | | LPD, Samsung;<br>CGW |
| Sept. 5, 2003 | Unknown | Glass | MTPD, Samsung, LPD, Thai CRT;<br>CGW |
| Sept. 24, 2003 | Unknown | Working | Samsung, LPD;<br>CGW |
| Oct. 28, 2003 | Unknown | Management | Samsung, LPD;<br>CGW |
| Oct. 28, 2003 | Unknown | Green | Samsung, LPD;<br>CGW |
| Oct. 29, 2003 | Unknown | Glass | LPD, Samsung;<br>CGW |
| Nov. 7, 2003 | Malaysia | Glass | MTPD, Samsung, LPD, and Thai CRT;<br>CGW |
| Nov. 12, 2003 | Unknown | Glass | MTPD, Samsung, LPD, and Thai CRT;<br>CGW |
| Nov. 12, 2003 | Taiwan | Management | Samsung, LPD;<br>CGW |
| Nov. 26, 2003 | Korea | Top | Samsung, LPD;<br>CGW |
| Nov. 26, 2003 | Korea | Green | Samsung, LPD;<br>CGW |
| Nov. 27, 2003 | Korea, (Jesu Island) | Green LPD, | Samsung;<br>CGW |
| Dec. 2, 2003 | Unknown | Glass | Samsung, LPD; |

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

| | | | CGW |
|---|---|---|---|
| Dec. 18, 2003 | Singapore | Bilateral | Samsung (M); CGW |
| Dec. 23, 2003 | China (Shenzhen) | Management | Samsung, LPD; CGW |
| Dec. 31, 2003 | China (Shenzhen) | Bilateral | Irico; CGW |
| Jan. 27, 2004 | China (Xiaman) | Management | LPD, Samsung; CGW |
| Feb. 16-17, 2004 | Unknown | Glass | MTPD, Samsung, LPD, Thai CRT; CGW |
| March 1, 2004 | Unknown | Bilateral | Novel; CGW |
| March 3, 2004 | China (Shenzhen) | Bilateral | Orion; CGW |
| March 3, 2004 | Unknown | Green | Unknown; CGW |
| March 4, 2004 | Taiwan, Taipei | Management | LPD, Samsung; CGW |
| March 16, 2004 | Singapore | Glass | MTPD, Samsung, LPD, and Thai CRT; CGW |
| March 25-27, 2004 | Korea | Glass | LPD, Samsung; CGW |
| April 23, 2004 | Thailand | Glass | MTPD, Samsung, LPD, Thai CRT; CGW |
| April 26, 2004 | China Shanghai | Top | Samsung, LPD; CGW |
| April 27, 2004 | China Shanghai | Green | Samsung, LPD; CGW |
| May 10, 2004 | Unknown | Glass | Samsung, LPD; CGW |
| May 18, 2004 | Malaysia | Glass | MTPD, Samsung, LPD, and Thai CRT; CGW |
| May 26, 2004 | Unknown | Management | LPD, Samsung; CGW |
| June 2, 2004 | Unknown | Glass | Samsung, LPD; CGW |
| June 18, 2004 | Thailand | Glass | MTPD, Samsung, LPD, Thai CRT; CGW |
| June 28, 2004 | Unknown | Management | Samsung, LPD; CGW |
| June 29, 2004 | Unknown | Green | Samsung, LPD; CGW |
| June 30, 2004 | Unknown | Glass | LPD, Samsung; CGW |
| July 13, 2004 – approx | Unknown | Bilateral | Thomson; CGW |
| July 22, 2004 | Singapore | Glass | MTPD, Samsung, LPD, Thai CRT; CGW |
| July 26, 2004 | China Shanghai | Management | Samsung, LPD; CGW |
| July 26, 2004 | China | Management | LPD, Samsung; |

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

|  | | Shanghai CGW | | |
|---|---|---|---|---|
| 1 | July 27, 2004 | China Shanghai | Green Sa | msung, LPD; CGW |
| 2 | Aug. 17-18, 2004 | Japan Glass | | Samsung, LPD; CGW |
| 3, 4 | Aug. 17, 2004 | China Kunming | Top Sa | msung, LPD; CGW |
| 5 | Aug. 18, 2004 | China Kunming | Green Sa | msung, LPD; CGW |
| 6, 7 | Sept. 17, 2004 | Taiwan | Glass | MTPD, Samsung, LPD, and Thai CRT; CGW |
| 8 | Sept. 20, 2004 | Korea | Management | LPD, Samsung; CGW |
| 9 | Sept 20-21, 2004 | Korea Green | | Unknown; CGW |
| 10 | Oct. 26, 2004 | Unknown | Working | Samsung, LG Philips (LPD); CGW |
| 11 | Nov. 2004 (approx.) | Unknown Glass | | Samsung, LPD; CGW |
| 12 | Nov. 2, 2004 | China | Bilateral | Samsung; CGW |
| 13 | Nov. 5, 2004 | Malaysia | Glass | MTPD, Samsung, LPD, Thai CRT; CGW |
| 14 | Nov. 15, 2004 | Unknown | Marketing | LPD, Samsung; CGW |
| 15 | Nov. 24, 2004 | Unknown | Unknown | Samsung; CGW |
| 16 | Nov. 29, 2004 | Korea | Glass | Samsung, LPD; CGW |
| 17 | Dec. 1, 2004 | China Shenzhen | Bilateral Irico | ; CGW |
| 18 | Dec. 28, 2004 | Malaysia | Glass | MTPD, Samsung, LPD, Thai CRT; CGW |
| 19 | Dec. 29, 2004 | Unknown | Unknown | Samsung, LPD; CGW |
| 20 | Jan. 19, 2005 | Taiwan Taipei | Management Sa | msung, LPD; CGW |
| 21 | Feb. 24, 2005 | Taiwan | Management | LPD, Samsung; CGW |
| 22 | Feb. 24, 2005 | Malaysia | Green | Unknown; CGW |
| 23, 24 | Feb. 25, 2005 | Malaysia | Glass | MTPD, Samsung, LPD, and Thai CRT; CGW |
| 25 | March 29, 2005 | Unknown | Management | LPD, Samsung; CGW |
| 26 | March 30, 2005 | Unknown | Green | Unknown; CGW |
| 27 | April 11, 2005 | China | Bilateral | Kitamatsu; CGW |
| 28 | April 13, 2005 | China | Unknown | Samsung, LPD; |

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

|  |  |  | CGW |
|---|---|---|---|
| April 20, 2005 | China | Bilateral | Irico;<br>CGW |
| April 26, 2005 | Korea Seoul | Glass | Samsung, LPD;<br>CGW |
| April 26, 2005 | Unknown | Management | LPD, Samsung;<br>CGW |
| April 26, 2005 | Korea | Green | Unknown;<br>CGW |
| April 29, 2005 | Indonesia | Glass | MTPD, Samsung, LPD, Thai CRT;<br>CGW |
| May 19, 2005 | Thailand | Bilateral | Thai CRT;<br>CGW |
| May 24, 2005 | Taiwan Taipei | Management | LPD, Samsung;<br>CGW |
| May 24, 2005 | Taiwan Taipei | Unknown | Samsung, LPD;<br>CGW |
| June 9, 2005 | Malaysia | Glass | MTPD, Samsung, LPD, Thai CRT;<br>CGW |
| June 28, 2005 | Unknown | Management | LPD, Samsung;<br>CGW |
| Aug. 26, 2005 | Taiwan (Linkou) | Bilateral | Samsung;<br>CGW |
| Sept. 22, 2005 | Indonesia, Jakarta | Glass | MTPD, Samsung, LPD, Thai CRT;<br>CGW |
| Sept. 28, 2005 | Taiwan Taoyuan | Management | Samsung, LPD;<br>CGW |
| Sept. 28, 2005 | Taiwan Taoyuan | Green | Samsung and LPD;<br>CGW |
| Oct. 21, 2005 | Taiwan | Glass | MTPD, Samsung SDI, LPD and Thai CRT;<br>CGW |
| Nov. 2, 2005 | Taiwan | Glass | Samsung, LPD;<br>CGW |
| Nov. 18, 2005 | China | Bilateral | Samsung;<br>CGW |
| Nov. 21, 2005 | Unknown | Glass | Samsung, LPD;<br>CGW |
| Dec. 6, 2005 | Malaysia | Glass | MTPD, Samsung, LPD, and Thai CRT;<br>CGW |
| Dec. 20, 2005 | Taiwan (Taoyuan) | Management | LPD, Samsung;<br>CGW |
| Dec. 21, 2005 | Taiwan (Taoyuan) | Green | Samsung , LPD;<br>CGW |
| Feb. 10, 2006 | Thailand | Bilateral | Thai CRT;<br>CGW |
| March 09, 2006 | Unknown | Glass | MTPD, Samsung, LPD, and Thai CRT;<br>CGW |
| March 14, 2006 | Korea Seoul | Glass | Samsung, LPD;<br>CGW |
| April 24, 2006 | Indonesia | Glass | MTPD (M), Samsung (M);<br>CGW |

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

| May 25, 2006 | Malaysia | Bilateral | Samtel; CGW |
|---|---|---|---|
| Sept. 5, 2006 | Malaysia | Glass | MTPD, Samsung, LPD, Thai CRT; CGW |
| Oct. 12, 2006 | Malaysia | Bilateral | Samtel; CGW |
| Nov. 9, 2006 | Thailand | Glass | MTPD, Samsung, LPD, and Thai CRT; CGW |
| Nov. 12, 2006 | Unknown | Glass | Unknown; CGW |
| Nov. 21, 2006 | China Shanghai | China Eight Maker Meeting | BMCC, Irico (Xianyang), SEG Hitachi, Changsha Shuguang, LPD, Nanjing Huafei, Nobel, Samsung, Thomson, Xin Jun; CGW |
| Jan. 23, 2007 | China (Shannxi Xi'an) | China Eight Maker Meeting | Irico (Xianyang), Samsung, SEG Hitachi, Changsha LG, Nanjin Huafei, Thomson, BMCC; CGW |
| Feb. 2, 2007 | Thailand | Glass | MTPD, Samsung, LPD; CGW |
| Feb. 8, 2007 | Thailand | Green | Unknown; CGW |
| March 15-16, 2007 | China (Fujian) | China Eight Maker | Samsung, BMCC, LPD, Hitachi, Irico; CGW |

**C.**     **Examples Of Meeting Discussions Relating To CPTs, CDTs and CRT Products.**

**1. CPTs.**

During the oral proffer, Chunghwa offered some specific examples of agreements among Defendants with respect to CPTs. These include the following.

**The agenda for a September 8, 1998 Management Meeting** attended by Samsung, LG, Orion, Thai CRT, and CGW contains the following items: ███████████████████

████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████

1    In a **May 18, 2004 meeting** (attended by representatives of MTPD, Samsung, LPD, and

2  Thai CRT), 

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    2.    **CDTs.**

23    During the oral proffer, Chunghwa offered some specific examples as to agreements

24  among Defendants with respect to CDTs. These include the following.

25  ───────────────

26  [4] The "Orion" referred to in the chart below is a Japanese buyer of CPTs, not the Defendant named

27  in this case.

28

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

1    **At a bilateral meeting between Samsung and Chunghwa on November 26, 1996,** █



23    **A report on a January 28, 1997 Top Meeting** indicates that the attendees from Samsung,

24    Philips, Orion, and Chunghwa ████████████████████

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16   **At a February 25, 1997 meeting** attended by top level employees of Samsung, LG,

17   Chunghwa, and Philips,

18

19

20

21

22   **A report on a March 26, 1997 Working Level Meeting** among Samsung, Philips, and

23   Chunghwa

24

25

26

27

28



DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

**A June 23, 1999 Top Meeting report** quoted a Philips representative as follows:

various makers have coordinated very well on 17 inch capacity control in the past

Similarly, a **May 26, 2000 report of a Management Meeting** attended by Samsung, LG, Orion, Philips, and Chunghwa states:

And a **March 19, 2001 report of a Management Meeting** attended by same five companies states:

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

█████████████████████████████████████████
███████████████████████████████████████████
██████████████████

Participants at CDT meetings organized a process to audit compliance with the agreed upon output restrictions.  The audit process included visits to factories to ensure compliance with agreed upon shutdowns.

███████████████████████████████████████████
████████████████████████████  A **report of a December 29, 2004 Management Meeting** states:



### 3.      Products Containing CDTs and CPTs.

With respect to products containing CDTs and CPTs, the DPPs learned various types of information from the Chunghwa proffer that caused them to believe that the alleged conspiracy encompassed products containing CDTs and CPTs manufactured and sold by Defendants, including televisions and computer monitors.

*First*, the conspirators fixed the prices on CPTs and CDTs to be applied "internally" within the vertically integrated Defendants that manufactured televisions or computer monitors. Such "internal" transactions accounted for many of CPTs and CDTs produced by the tube divisions or subsidiaries of the vertically integrated Defendants.

During the Chunghwa proffer, documents demonstrating this aspect of the conspiracy were read to DPPs.  For example, a report of a January 4, 2002 CDT meeting report for a CDT meeting attended by Samsung, LPD, Orion and Chunghwa ████████████████████████████████
█████████████████████████████████████████████████████████

1

2

3

4

5

6

7

8

9

10



11

12     *Second,* quotations from documents that were read to the DPPs' counsel during

13  Chunghwa's proffer led them to believe in good faith that the unitary conspiracy alleged in the

    DP-CAC encompassed prices for Defendants' televisions and computer monitors. Some examples

14  follow.

15     **A report of a May 29, 1995 bilateral meeting** between Chunghwa and LG (also known

16  as "Goldstar") states:

17

18

19



20

21

22

23

24

25

26

27

28

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

1

An **October 24, 1996 report** of a bilateral meeting between Chunghwa and LG ███

2

███████████████████████████████████████████████████████████████

3

██████████████

4

5

6

7

8

9

10

11

     **A March 19, 1997 Report** of a Management Meeting among Samsung, Philips, Orion,

12

LG, and Chunghwa states:

13

14

15

16

17

18

     **An April 13, 1999 Report of a Top Meeting** among Samsung, LG, Orion, Philips, and

19

Chunghwa contains the following report from Samsung:

20

21

22

23

24

25

26

27

28

48

MDL NO. 1917



**A June 23, 1999 Top Meeting report**

**A report of a June 28, 2000 Working Level Meeting** attended by Samsung, LG, Orion, Philips, and Chunghwa

**A September 21, 2000 Report of a Top Meeting** among Samsung, LG, Orion, Philips, and Chunghwa

49



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15      **A report of a February 22, 2002 Management Meeting** involving a meeting among

16 Samsung, LPD, Orion, and Chunghwa notes:

17

18

19

20

21      **A report of a March 25-27, 2004 Management Meeting** among Samsung, LPD, and

22 Chunghwa states:

23

24

25

26      An internal **Chunghwa memorandum dated July 2, 2004,**

27

28

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

█████████████

████████████████████████████████████

### 4.   Discussions of Secrecy

Across all three product groups, the Defendants were concerned about maintaining the secrecy of their conspiracy. A few representative examples read to DPPs' counsel during the Chunghwa proffer include the following.

**A report of a May 23, 2003 Management Meeting** states:



**An August 17, 2004 meeting agenda** contains the following subheadings:



## III.   INFORMATION OBTAINED FROM OTHER SOURCES.

### A. Vertical Integration Of Certain Defendants.

Prior to the filing of the DP-CAC, the DPPs also examined  whether market conditions supported the existence of a price-fixing conspiracy.  The following facts supported the existence of a cartel in the United States relating to CRTs and finished products containing CRTs:

- ■ the existence of a highly concentrated industry (*see* DP-CAC ¶112 ),
- ■ the history of consolidation and joint ventures within the industry (*see id.* ¶¶113-21 )
- ■ significant barriers to entry with no competitive fringe,
- ■ a standardized product with competition primarily on the basis of price,

1    ■ declining demand (*see id.* ¶¶105-09 ),

2    ■ a record of antitrust inquiry, as discussed in further detail below,

3    ■ the fact that  a CRT is the major and most expensive part of a display, as discussed in further

4        detail below,

5    ■ vertical integration of many of the manufacturers of both CRTs and products containing

6        CRTs, as discussed in further detail below, and

7    ■ upward movement in, or stabilization of,  prices for CRTs and products containing CRTs,

8        despite declining demand (*see id.* ¶¶105-09),

9        In addition to the documents or websites discussed below, sources for this examination

10   included: (a) DisplaySearch's "Quarterly Global TV Shipment & Forecast Reports" (*see*

11   http://www.displaysearch.com/cps/rde/xchg/displaysearch/hs.xsl/quarterly_global_tv_shipment_a

12   nd_forecast_report.asp ); (b) an article in *EE Times* (http://www.eetimes.com/electronics-

13   products/other/4084718/Analysts-LCDs-to-finally-dethrone-CRTs ); (c) the Freedonia Group's

14   "Flat Panel & CRT Display Materials: World Markets to 2008" (*see*

15   http://www.freedoniagroup.com/Flat-Panel-And-Crt-Display-Materials--World-Markets.html); (d)

16   various articles or reports on individual companies from sources such as their respective websites,

17   *BusinessWeek* online, and Institutional Shareholder Services; (e) the European Display Industry

18   Association's 2005 report on the CRT market (http://www.eeca.eu/data/File/EDIA/05%20EDIA-

19   Market-Development-2005.pdf);  (e) the Environmental Protection Agency's September 1995

20   "Profile of the Electronics & Computer Industry"

21   (http://www.epa.gov/compliance/resources/publications/assistance/sectors/notebooks/elecmpsn.pd

22   f); and  (f) the State of Oregon's Department of Environmental Quality's product profile on CRT

23   televisions (http://www.deq.state.or.us/lq/pubs/docs/sw/ProductProfileTVs.pdf). Certain

24   Defendants named in the DP-CAC, particularly Hitachi, LG, Panasonic (formerly Matsushita),

25   Philips, Samsung, Tatung/Chunghwa and Toshiba entities, were part of vertically-integrated

26   operations that manufactured CRTs for use in each entity group's televisions or computer

27   monitors that were then sold in the United States. This fact is significant for defining the scope of

28

1    the alleged conspiracy. These companies fixed the prices of CPTs and CDTs and had an interest in

2    ensuring that their finished products in which these tubes were incorporated would not be sold at

3    price levels that would undercut the conspiracy with respect to CDTs and CPTs.[5] As noted above,

4    the defendants monitored finished product prices for this purpose. Thus, of necessity, the

5    vertically integrated entities had to ensure that their CRT finished products would be sold at price

6    ranges consistent with the goals of the alleged conspiracy; it would not be economically plausible

7    for them to do otherwise. At each of these vertically integrated companies, the entire corporate

8    enterprise was managed in a centralized "top-down" manner that ensured the conspiracy would

9    function as to both CDTs and CPTs and the finished products of each company that contained

10   them. What follows is a recitation of the publicly-available information from each of the

11   aforementioned entity groups that supported this view of the vertically integrated nature of them.

12              1.      **Samsung Entities.**

13            Publicly available sources that existed prior to March of 2009 emphasized the highly

14   vertically integrated operation of Samsung's subsidiaries and affiliated companies. One scholarly

15   article published in 1997 noted that:

16            But even as they try to exploit local markets, Samsung's Asian affiliates are part
         of a global production network, supplying a considerable number of components
17       to Samsung affiliates in Europe and America. Examples include: SEM [Samsung
         Electro-Mechanics Co.] -Thailand which has supplied parts to SEC in Europe,
18       Brazil and Korea; SED [Samsung Electron Devices Co.] has exported 14-inch
         CRTs to Mexico; SEC-Indonesia has assembled PCBs for a Portugal based VCR
19       plant; and SED-Malaysia has been supplying electron-guns for CRTs to SED-
         Germany, and SED-Mexico.

20

21

22   _____

23   [5] The DPPs reasonably relied on *Royal Printing Company v. Kimberly-Clark Corp.*, 621 F.2d 323
     (9th Cir.1980) ("*Royal Printing*"), in which the Ninth Circuit held that "*Illinois Brick* [*Co. v.
24   *Illinois*, 431 U.S. 270 (1977) ("*Illinois Brick*")] does not bar an indirect purchaser's suit where the
     direct purchaser is a division or subsidiary of a co-conspirator." 621 F.2d at 326.The Ninth Circuit
25   explained that *Illinois Brick*'s rationale of preventing potentially duplicative recoveries from both
     direct and indirect purchasers does not apply where the direct purchaser is an affiliate of the
26   corporation accused of an antitrust violation. *Id. See In re TFT-LCD Antitrust Litig.*, No. M 07-
     1827 SI, 2009 WL  533130 at *1 (N.D. Cal. March 3, 2009) ("TFT-LCD Tatung Opinion") (so
27   interpreting *Royal Printing* and denying motion by Tatung Corporation, the parent of Chunghwa,
     to dismiss the direct purchasers' amended complaint).

28

                 DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
              DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

Youngsoo Kim, "Technological Capabilities And Samsung Electronics' International Production

Network In Asia" (Nov. 1997) (available at http://brie.berkeley.edu/publications/WP106.pdf) at

31.

Similarly, in a 2006 scholarly article, it was noted that:

> For the vertical integration and promotion of R&D capability, Samsung relied on
> foreign companies, mostly Japanese companies. Within a year period from the
> establishment of the SEC, Samsung established two companies to produce
> electronic parts, namely the Samsung-Sanyo (December 1969: later merged with
> the SEC) and Samsung-NEC (January 1970; later to be the Samsung SDI). In
> 1973, Samsung established two more affiliates, namely Samsung-Sanyo Parts
> (later to be Samsung Electro-Mechanics: SEM) and Samsung Corning. With this,
> within 4 year period, a system of vertical integration in electronics industry was
> formed with all in one location of Suwon city which is still the main hub of
> Samsung's electronics business. Division of labor among them is such that the
> SEC (with acquisition of the Samsung Sanyo) play the role of the final assembler
> and three others supplying key parts and components to the SEC, with Samsung
> SDI (Vacuum Tubes, Black & White CRTs and later color CRTs to SEC) and the
> SEM (all kinds of electronic parts, such as deflection yokes, transformers and
> condensers) at the middle and finally Samsung Corning at the bottom (glass bulbs
> for CRTs).

> Related to the development of R&D capability is to be noted the fact that in all of
> these new affiliates, Samsung had at least half of the equity ownership and
> gradually bought out the foreign equity shares. Thus, apart from the first three
> years of the venture with Corning, all ventures were under Samsung's
> management control (SC, 1994).

Keun Lee & Xiyou Hee, "Capability of the Samsung Group in Project Execution and Vertical

Integration: Creating in Korea And Replicating In China" (Nov. 2006) (available at

http://eab.rutgers.edu/samsung-bg-6.pdf) at 13.

The DPPs made a similar point in their opposition to Defendants' motions to dismiss:

> Samsung SDI is part of what Samsung itself calls the "Samsung Group."
> http://www.samsung.com/hk_en/aboutsamsung/samsunggroup/affiliatedcompanie
> s/SAMSUNGGroup_AffiliatedCompanies.html. The companies within this group
> are closely interrelated and operate interactively. Indeed, Samsung's own website
> goes on to state:

> SAMSUNG electronics subsidiaries include SAMSUNG Electronics, SAMSUNG
> Electro-Mechanics, SAMSUNG SDI, SAMSUNG Corning, SAMSUNG SDS,
> SAMSUNG Networks and SAMSUNG Corning Precision Glass. These affiliates
> produce, market, and sell a wide variety of electronic parts and components such
> as next generation memory chips, computer and telecommunications equipment,
> color TV picture tubes, and glass bulbs. They also develop computer systems and
> produce general electronics and precision machines.

All these companies share the same goal of becoming world-class, high-tech companies at the beginning of the 21st century and are concentrating their investments into promising future fields to achieve that target. Despite being independent, systematic cooperation takes place between the companies that enable the development of state-of-the-art electronic products. http://www.samsung.com/hk_en/aboutsamsung/samsunggroup/affiliatedcompanies/SAMSUNGGroup_ElectronicIndustries.html.

This was equally true in earlier years. As one scholar has noted in a 2003 publication:

"Samsung Electronics is closely interlinked with Samsung SDI, a manufacturer of television tubes, which in turn relies on Samsung Corning, which produces glass bulbs for the tubes, as indicated by the fact that 61% of its total revenue comes from Samsung SDI. Samsung SDI, in turn, supplies 52% of its products to Samsung Electronics."

Sea-Jin Chang, Financial Crisis And Transformation of Korean Business Groups at 118-20 (Cambridge University Press, 2003).

"Direct Purchaser Plaintiffs' Combined Opposition To Defendants' Motion To Dismiss," pp. 62-63 (Aug. 3, 2009) (Dkt. No. 531).

Samsung's own annual reports (available at http://www.samsung.com/us/aboutsamsung/ir/financialinformation/annualreport/) underscore this close integration. Its 2001 Annual Report, for example, discusses at pages 38, 39 and 40 the success of its global Enterprise Resource Planning ("ERP") system, which began in 1995:

In 2001, we completed a global ERP [system spanning 25 production facilities and 31 sales subsidiaries in 47 countries. This global IT infrastructure provides a solid, extensible platform for business process solutions spanning the entire supply chain, revolutionizing the way we relate to and work with partners, suppliers, and customers.

****
In August 2001, we took a major step forward in this area as we wrapped up a six-year, 700 billion won project to implement a global ERP system as the backbone of our e-business infrastructure. Connecting us with our 56 production and sales subsidiaries outside of Korea, our global SAP R/3 system gives us access to real-time information on production, sales, logistics, and inventory, enabling us to manage our resources on a truly worldwide basis, a capability that few other firms have.

****
We started by upgrading our global ERP system with an APS solution to support a weekly planning cycle for demand forecasting, resource management, and production planning functions for our entire global network of 32 production

facilities and 49 sales subsidiaries. This upgrade is enabling us to better synchronize production and sales, a capability we expect to boost on-time delivery performance by more than 10% in 2002. We also added a number of advanced tools to facilitate integration with our partners, suppliers, and customers. For our partners, we implemented a collaborative product commerce solution that is providing a synergistic collaborative framework to lower costs, foster innovative design, and dramatically shorten time to market. For our suppliers, we began implementation of a supplier relationship management solution that will enable us to create, execute, and sustain global sourcing strategies as we build win-win relationships.

The same report notes at pages 66-67 the existence of Samsung's "Global Network."

Samsung's 2006 Annual Report at page 74 notes the following control exercised by the parent company over its subsidiaries:

The consolidated financial statements include the accounts of SEC [Samsung Electronics Corp.] and its controlled subsidiaries (collectively referred to as "the Company"). Controlled subsidiaries include majority-owned entities and entities in which SEC owns more than 30% of the total outstanding voting stock and is the largest shareholder. Percentage of ownership is the sum of the percentage of direct and indirect ownership.

The same report notes the following at page 82 with respect to companies in which SEC has less than a 30% stake:

In the consolidated financial statements of the Company, investments in business entities in which the Company has the ability to exercise a significant influence over the operating and financial policies are accounted for using the equity method of accounting.

Various Samsung SDI entities, including those named as Defendants here, fall in this latter category.

Likewise, an SEC 2005 Analyst Day presentation (available at http://www.samsung.com/us/aboutsamsung/ir/ireventpresentations/analystday/downloads/analyst_20051103_1500.pdf) refers to CRTs (*id.* at 24-25), describes its global manufacturing network (*id.* at 42), and refers to its "Global Supply Chain Planning in Partnership with Retail Channel" (*id.* at 43).

Thus, the Samsung entities were well-situated to carry out the overarching conspiracy with respect to CRT Products, as defined in the DP-CAC.

2.      **Hitachi Entities.**

The same is true with respect to the Hitachi family of companies.

In Hitachi, Ltd.'s 2000 Form 20-F filed with the Securities & Exchange Commission (available at http://www.hitachi.com/IR-e/library/20F/2000/index.html), it explained at page 3 that in April of 1999, it implemented "fundamental management reforms" by creating a new company officer system, reorganizing business units, simplifying its head office, and creating an Advisory Board. In November of 1999, Hitachi, Ltd. rationalized its global business into five centrally-controlled segments: (1) Information Systems & Electronics; (2) Power & Industrial Systems; (3) Consumer Products; (4) Materials; and (5) Systems & Others.

Hitachi Ltd.'s 2001 Form 20-F (available at http://www.hitachi.com/IR-e/library/20F/2001/index.html) further explained this centrally-controlled business segmentation (*id*. at 11):

> Hitachi conducts a broad and diverse range of businesses. Hitachi divides its operations into five segments that group products mainly on the basis of similarity of products and services in type, use, production method and marketing method. The five segments are Information Systems & Electronics, Power & Industrial Systems, Digital Media & Consumer Products, Materials and Services & Other. Each segment includes the Company's subsidiaries and affiliates engaged in related production, marketing and service activities.

The company's CDT business was part of its Information Systems & Electronics segment, which also included computers (*id*. at 8); "[t]his segment groups products with many common technological aspects, facilitating operations management.  Computers and semiconductors form the nucleus of the segment" (*id*. at 12).[6]

_____

[6] Hitachi Ltd.'s 2007 Business Plan (available at http://www.hitachi.com/IR-e/library/presentation/070418/070418.pdf), which focused on Thin-Film Transistor Liquid Crystal Display ("TFT-LCD") screens, refers to "[q]uickly captur[ing] benefits from vertical integration" and "[c]aptur[ing] synergies in the Hitachi Group (Materials, components, finished products)" and "collaborative cooperation" with Matsushita on plasma. There is no reason to believe that Hitachi Ltd. viewed its CRT Products business any differently.

1

        **3.     Toshiba Entities.**

2        The same is true with respect to the Toshiba entities, as reflected in Toshiba Corporation's

3 ("TC") annual reports (available at http://www.toshiba.co.jp/about/ir/en/library/ar/ar2010.htm).

4 Toshiba Corporation's 2002 Annual Report states at page 27 that:

5        Toshiba Group consists of Toshiba Corporation and 315 consolidated subsidiaries
        (201 domestic companies and 114 foreign companies) as well as 52 companies
6        reflected under the equity method (consisting of 28 domestic and 24 foreign
        companies). The net number of consolidated subsidiaries for the period under
7        review was 14 companies less than the previous year. The number of newly
        consolidated subsidiaries, including our strategic joint venture with Matsushita
8        Electric Industrial in the LCD and liquid crystal business—Toshiba Matsushita
        Display Technology—increased by 31 companies during the year. However, as
9        the result of restructuring efforts, we also consolidated, rationalized and sold-off
        some 45 subsidiaries.

10

11        The degree of integration did not lessen appreciably after the creation of MTPD. Toshiba's

12 2003 report listed MTPD at page 40 as an "affiliated company." A contemporaneous Matsushita

13 press release (available at  http://www.panasonic.net/ir/relevant/en030129-6/en030129-6.html)

14 indicated that the following personnel from Toshiba Corporation became officers or directors of

15 MTPD: Eisaburo Hamano (became Senior Executive Vice-President of MTPD), Kazumasa

16 Uchida (became Corporate Auditor of MTPD), Taketoshi Shimoma (became a Director of

17 MTPD), Hisashi Matsuda (became a Director of MTPD), and Tadashi Matsumoto (became a

18 Director of MTPD). TC's website still has a listing for Toshiba Display Devices, Inc. ("TDD"),

19 which manufactured CRTs for TC. *See* http://www.toshiba.com/tdd/. Bloomberg still lists TDD as

20 a subsidiary of Defendant Toshiba America Electronics Corporation.

21 http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=952637.

22        **4.     Panasonic/Matsushita Entities.**

23        Panasonic (formerly Matsushita) also has highly integrated operations with respect to CRT

24 Products.  In its 2000 Annual Report (available at http://panasonic.net/ir/annual/index.html),

25 Panasonic stated the following at pages 3, 4, 7-8 and 19:

26        As part of the Progress 2000 Plan launched in 1997 to provide a solid foundation
        for future growth, Matsushita implemented a number of business reforms,
27        including the introduction of the internal divisional company system and the
        selection and strengthening of strategic areas, such as our five key businesses, to

28

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

concentrate resources. As a result, Matsushita's five key businesses now play an
essential role in the operations of the Company as a whole.
****

To adapt to changing market needs and maximize growth, Matsushita has
reclassified its business segments and implemented a number of related strategies.
Particularly in the areas of AV equipment and information and communications
equipment, where broadcasting and communications are rapidly converging,
Matsushita is committed to building a unified strategy to take full advantage of its
combined Groupwide strengths. As a result, from April 2001 the Company
established four new business segments: AVC Networks, Home Appliances,
Industrial Equipment, and Components and Devices. These replace the traditional
Consumer Products, Industrial Products and Components segments. The four new
segments will facilitate strategic development of business activities.
****

To implement better strategic operational management in semiconductors and
display devices—areas involving huge investments—the Company absorbed
Matsushita Electronics Corporation (MEC), effective April 2001. By establishing
new internal divisional companies within the parent Company, namely the
Semiconductor, Display Device and Lighting companies, the development,
manufacturing and sales functions that were previously performed by both
Matsushita and MEC for each of these strategic businesses have been integrated.
****

Regarding the domestic consumer sales structure, Matsushita replaced what were
the corporate consumer products sales divisions, sales functions within individual
product divisions and the Advertising Division with two new divisions for our
major brands, the Corporate Panasonic Marketing Division and Corporate
National Marketing Division. Concerning distribution reforms, Matsushita plans
to consolidate its 22 regional consumer sales companies
into a single company. Further reforms will include the consolidation of several
logistics companies into a single company, as well as a similar integration of
credit sales and leasing subsidiaries. By implementing these reforms and
reevaluating domestic consumer sales and distribution operations, Matsushita will
create a highly efficient structure that ensures speedy response to customer needs,
and will benefit from a significant reduction in distribution costs with an
increased market share. Another important aspect of these reforms is the
reallocation of a large number of employees to high-growth and new
service-related businesses, thereby optimizing human resources.
****

Similarly, operations for CRTs, LCD devices and PDPs, formerly divided
between Matsushita and MEC,were consolidated under a new display devices
divisional company within Matsushita, thus facilitating overall management
decision making and optimal resource allocation among the three product lines.

A September 26, 2002 press release available at Panasonic's website

(http://panasonic.net/ir/relevant/en020926-13/en020926-13.html) noted that this integration

continued after the creation of MTPD:

Matsushita and Toshiba plan to integrate their CRT business operations, including
research and development, manufacturing, and sales. The integration will cover

both companies' manufacturing operations worldwide, except for those in Japan
where the parent companies will continue to run their respective factories. They
include Matsushita's factories in China, the United States, Germany, and
Malaysia, and Toshiba's factories in the United States, Thailand, and Indonesia.
The new company will also take over as its wholly owned subsidiary MT Display
Procurement Co., Ltd., a joint procurement company established with equal
ownership by the two parent companies on April 15, 2002.

### 5.    Philips Entities.

The Philips 2001 Form 20-F filed with the Securities & Exchange Commission (available

at http://www.sec.gov/cgi-bin/browse-

edgar?company=&CIK=0000313216&filenum=&State=&SIC=&owner=include&action=getcom

pany) sets forth at pages 10 and 20 the high degree of vertical integration within its family of

companies:

In addition to streamlining its portfolio of businesses and management,
Philips engaged in a comprehensive review of its strategy and portfolio,
involving the focus on high growth technology businesses. In consequence, as of
January 1, 2000, Philips has grouped together the relevant operations of Sound &
Vision, Philips Consumer Communications and Business Electronics into a single
Consumer Electronics organization. Given that the technologies of TV, audio,
telecommunications and computing are increasingly converging, these
combinations are appropriate. It is expected that they will capitalize on the
strength of the Philips brand and make new business generation easier, market
intelligence more coordinated and time-to-market shorter.

Besides Consumer Electronics, there are other very important building
blocks that make up the Company. The Semiconductors and Components
divisions play a crucial role, both as internal suppliers and through their leading
positions in the external market. The capital expenditures required in this
field place considerable demands on management in terms of ensuring adequate
returns by means of flexible and cost-effective operations.

****

Philips and LG Electronics of South Korea announced in November 2000
the signing of a letter of intent pursuant to which the companies expect to
merge their respective cathode ray tube (CRT) businesses into a new 50-50 joint
venture company. The transaction is expected to close in 2001 and is subject to
customary regulatory approvals. Upon the closing of the transaction, LG will
receive USD 1.1 billion from the new company to address the difference in the
valuation of the contributed businesses.

 Under the terms of the letter of intent, LG and Philips will share equal control of
the joint venture.

1      A scholarly treatise also noted how Philips was buying much of its CPTs internally for use

2  in its branded televisions. Robert M. Grant, Contemporary Strategy Analysis at 393 (5th ed. 2005).

3      The situation did not change appreciably once LPD was created. In a 2005 press release

4  available from its website, LGPD was crowing about providing a SuperSlim CRT to LG

5  Electronics for its televisions. A 2002 LG Electronics presentation (available at

6  http://www.lg.com/global/download/pdf/lehman-brothers-conference.pdf) also referred to

7  "Vertical integration-Ability to leverage product development of Display and Media Tech

8  divisions."

9          6.    **LG Entities**

10      As reflected in LG Electronics' 1999 Annual Report (available at

11  http://www.lg.com/global/ir/reports/annual-reports.jsp), the company was divided into three

12  separate product companies: Digital Display, Digital Appliance and Digital Media. The first of

13  these, which encompassed the manufacture of CRT Products, "conducts R&D and manufacturing

14  in digital display products and their core components. It has 7,500 employees at its four domestic

15  operations and 20 overseas subsidiaries. Besides its Display Device Research Lab., it has other

16  research centers and a marketing network at home and abroad." These included the Zenith

17  Electronics Corporation in the United States, which manufactured CRT televisions. The same

18  annual report further explained: "[t]he Company has organized three reportable business divisions

19  : Display division, Home Appliances division and Multimedia division. Additionally,

20  the Company has a centralized supporting division to provide general and administrative,

21  marketing and sales and research and development services to each business division."

22          7.    **Tatung and Chunghwa**

23      As Judge Illston explained in the TFT-LCD Tatung Opinion,

24      Here, plaintiffs have submitted evidence showing that Tatung Taiwan owns and
        controls both TUS [Tatung U.S.] and CPT [Chunghwa] and that the three firms
25      have intertwined economic interests; that TUS has described itself as a subsidiary
        of Tatung Taiwan, represented that it owns its own TFT-LCD panel factory (which
26      is CPT's factory), and stated that it runs a vertically-integrated TFT-LCD business;
        CPT and other defendants supply TFT-LCD panels to TUS; and TUS has never
27      sued Tatung Taiwan or CPT. TUS disputes this evidence, or at least disputes
        plaintiffs' characterization of the evidence. For example, TUS asserts that it has

28

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

never purchased more than 50% of its LCD panels from CPT in any given year, and that TUS engages in arms-length negotiations with all of its suppliers of LCD panels, including CPT. TUS also argues that the testimony of TUS executives Edward Chen and Michael Lai demonstrates that neither CPT nor Tatung Taiwan exercises financial or operational control over TUS.

The Court finds that the complaint sufficiently alleges a basis for TUS's liability. The factual record is disputed as to the relationship between TUS, CPT, and Tatung Taiwan, as well whether TUS's purchases of LCDs and finished products containing LCDs was truly arms-length or in furtherance of the alleged conspiracy. On this record, TUS has not shown that it is not a proper defendant under *Royal Printing* and *Freeman* [*v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1144 (9th Cir. 2003).] Upon a fuller factual record, TUS may renew its arguments in a motion for summary judgment.

2009 WL 533130 at *4 (footnote omitted).

In sum, the vertically integrated Defendants necessarily had to capture the overcharge in the prices of the finished products that they sold to putative class members.[7]

―――――――――――――

[7] That is not to say that non-integrated entities, who supplied CDTs or CPTs to other co-conspirators, but did not make finished products, can avoid antitrust liability. As said in *Florida Power Corp. v. Granlund*, 78 F.R.D. 4412, 443-44 (M.D. Fla. 1978):

But the Section 4 claim does not exhibit a total lack of merit. The Court is of the opinion that the Supreme Court's opinion in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), does not foreclose the State from bringing a complaint against Florida Power. Florida Power characterizes the holding of Illinois Brick as follows:

. . . the direct purchaser of a price-fixed product is the only proper party to recover for the overcharges on that product. Plaintiff's Reply Memorandum at 2.

Closely examined, the proposition proves too much. It would immunize from antitrust liability any manufacturer who conspired with his suppliers to fix the price of the supplied raw material. Illinois Brick does not mention, let alone discuss, such a situation. The Supreme Court's obvious concern for the efficacious enforcement of the antitrust laws, which so informed its decision (*id.* 431 U.S. 720, 97 S.Ct. at 2074-75), further sufficiently indicates the lack of any intention so to immunize such a manufacturer. The mere fact that the allegedly price-fixed product is only a partial constituent of the ultimate product purchased by the intervening plaintiff as alleged here, where the oil is converted to electricity should not bar recovery, where there is an allegation of privity between suppliers of the raw material and the manufacturer. *See* Note, Scaling the Illinois Brick Wall: The Future of Indirect Purchasers in Antitrust Litigation, 63 Cornell L.Rev. 309, 331-32 (1978). The result would be a loophole in the antitrust laws that would provide immunity for any price-fixing manufacturer which, for whatever reasons, finds it useful to conspire to fix prices with its suppliers. The Court cannot believe that the Supreme Court intended such a result without discussing it.

(footnote continued)

1          **B.      Involvement Of Certain Defendants In Related Conspiracies.**

2          Prior to the filing of the DP-CAC, the DPPs were aware that certain of the Defendants here

3   had pled guilty to a conspiracy involving the global fixing of prices for TFT-LCDs. On November

4   12, 2008, the United States Department of Justice ("DOJ") announced that LG Display, an alleged

5   wrongdoer in this case, had pled guilty to an information alleging antitrust price-fixing allegations

6   with respect to TFT-LCDs and had agreed to pay a $400 million.  *See*

7   http://www.justice.gov/atr/public/press_releases/2008/239396.pdf.  In January and February of

8   2009, it was announced that C.Y. Lin (Chunghwa PT's former Chairman and CEO); Wen Jung

9   Cheng (Assistant Vice-President of Marketing & Sales for Chunghwa PT); Duk Mo Koo

10  (Executive Vice-President & Chief Sales Officer for LG.Philips LCD Co., Ltd.); Chang Suk

11  Chung (Vice-President of Monitor Sales for LG Display, Ltd., the predecessor of LP Display);

12  Chih-Chun Liu (Chunghwa PT's Vice-President of LCD Sales); and Hsueh-Lung Lee (also one of

13  Chunghwa PT's Vice-Presidents of LCD Sales) pled guilty to participation in the TFT-LCD

14  conspiracy; Wen Jung Cheng (Assistant Vice-President of Marketing & Sales for Chunghwa PT)

15  and Duk Mo Koo (Executive Vice-President & Chief Sales Officer for LG.Philips LCD Co., Ltd.)

16  have also been indicted in connection with the DOJ's TFT-LCD investigation. *See*

17  http://www.justice.gov/opa/pr/2009/February/09-at-092.html. On March 10, 2009, the DOJ

18  announced that Hitachi Displays, Ltd., another Defendant in this case, had pled guilty to

19  participation in the price-fixing conspiracy involving TFT-LCDs and had agreed to pay a $31

20  million fine. *See*  http://www.justice.gov/atr/public/press_releases/2009/243414.pdf. As reflected

21  in the discussion above of materials such as the September 21, 2000 Top Meeting report, CRT

22  finished product prices were sometimes conspiratorially pegged off of collusively set TFT-LCD

23  Product prices. Indeed, the district court in the TFT-LCD civil class case had refused to dismiss

24  antitrust claims based on purchases of products containing TFT-LCD panels in an opinion issued

25

26  _____

27

28

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

on August 25, 2008. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F.Supp.2d 1109, 1117-19 (N.D. Cal. 2008) ("*LCDs*").

The DPPs also had available to them a consent decree of the Japanese Fair Trade Commission ("JFTC"), reported at 1993 WLNR 1116859. That report reads as follows:

> The Fair Trade Commission Wednesday ordered four sales subsidiaries of the country's four major home electronics appliance makers to stop the price-fixing practice of illegally restricting the amount of discounts displayed on their products by large discount stores.
>
> This is the first time that the FTC has charged home appliance makers with suspicion of violating the Antimonopoly Law.
>
> The FTC's decision is expected to draw much attention not only in Japan but overseas, because of the exclusive business practices among Japanese home appliance makers and their unclear way of setting retail prices.
>
> These practices came under criticism during in the Structural Impediments Initiative (SII) talks between Japan and the United States.
>
> The four subsidiaries are: Matsushita Electronics, a 100 percent holding company of Matsushita Electric Industrial Co.; Hitachi Sales Corp., Sony Network Sales Co., and Toshiba East Japan Life Electronic Co.
>
> According to the FTC's investigation, the four sales subsidiaries requested large discount stores in the Akihabara district in Tokyo and the Nipponbashi shopping district in Osaka not to display discount rates larger than 10 percent of the maker's recommended retail prices on price tags at stores and in their handbills.
>
> They reportedly forced the stores to comply with their demand by threatening to stop shipment of products.
>
> As a result, the offering prices of color TVs, refrigerators and word processors on their handbills and price tags became exactly the same, which the FTC has ruled violates a provision of the Antimonopoly Law banning the illegal restriction of retailers' sales methods.
>
> The FTC noted that large discount stores were actually offering discount rates bigger than the ones they displayed on the price tags.
>
> But emphasizing that the prices listed on the price tags and handbills served as important sources of information for consumers, the FTC said there is concern that the retail prices may be maintained at high levels by the restriction on the display of selling prices, which gives damage to the public.
>
> The home appliance industry has been hard-hit by the recession, and the profits of manufacturers and their licensed retail stores as well as large discount stores have been dropping.

The FTC suspects that the restriction of the displayed selling prices had also helped the retail stores keep selling prices at a high level, and contributed to the escalating price-cutting competition among discount shops, it added.

In 1988, the FTC instructed the two major industry associations, including the Japan Electronics Industry Association, to stop the practice. But when there was no visible improvement in the situation, the FTC started to search the sales subsidiaries of the four major home appliance makers to collect evidence beginning in March last year.

All the four sales subsidiaries have voluntarily lifted the restriction on the displayed selling prices after the FTC's investigation.

Domestic sales of home appliances is estimated at 5 yen to 6 trillion yen a year, and about 60 percent of home appliances manufactured in Japan are shipped to large discount stores.

The combined total of the four major makers' sales to large discount stores amounted to about 800 billion yen.

The last time that the home appliance industry was ordered to stop price-fixing by the FTC was in 1971, when Matsushita Electric Industrial Co. was found trying to force retailers to sell its products at its recommended prices.

While this misconduct involved vertical price-fixing of televisions in Japan prior to the class period in this case, it is relevant to the pleading of the alleged wrongdoing here, which is also based on a horizontal agreement, implemented in part through the efforts of the vertically integrated Defendants with respect to CRT Products, including televisions.

**C.      Antitrust Investigations Or Prosecutions With Respect To CRT Products.**

On February 10, 2009, prior to the filing of the DP-CAC, the DOJ announced the indictment of the aforementioned C.Y. Lin of Chunghwa PT in connection with a conspiracy to fix the prices of CDTs and CPTs. (Chunghwa, it will be remembered, did not manufacture finished products containing CRTs). The agency's press release making that announcement (available at http://www.justice.gov/opa/pr/2009/February/09-at-110.html) stated that customers in the United States were harmed:

*"This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices," said Scott D. Hammond, Acting Assistant Attorney General in charge of the Antitrust Division.* "The Antitrust Division will continue to prosecute individuals, wherever they are located and however high their position on the corporate ladder, who engage in price fixing aimed at U.S. businesses and consumers." (Emphasis added).

1  The DPPs reasonably interpreted that press release as indicating that the overarching conspiracy

2  involving CRT Products encompassed televisions and computer monitors sold in the United

3  States. The district court in this case also read it in a similar manner. *In re Cathode Ray Tube*

4  *(CRT) Antitrust Litig.*, No. CV 07-5944 SC, 2010 WL 3632775 at *8 (N.D. Cal. March 30, 2010).

5       Prior to the filing of the DP-CAC, the DPPs also had information on investigations by

6  competition authorities other than the DOJ. On November 8, 2007, it was reported that EC

7  officials carried out unannounced raids on manufacturers of CRTs based on suspected

8  anticompetitive conduct.  That same day, the EC issued a press release stating that, "[t]he

9  commission has reason to believe that the companies concerned may have violated EU rules

10 against price-fixing, sharing markets or exchanging market information."

11 http://europa.eu/rapid/pressReleasesAction.do?reference=MEMO/07/453.

12      On November 9, 2007, Matsushita (now Panasonic) and Samsung reported that they were

13 cooperating with the JFTC, which raided the companies' CRT production facilities on suspicion of

14 anticompetitive conduct.

15      On that same day, a Samsung spokesperson announced that its CRT subsidiary in South

16 Korea was being investigated by the Korean Fair Trade Commission ("KFTC") as "part of an

17 international probe into alleged price-fixing."

18      And on November 21, 2007, Philips acknowledged that it was being investigated as well.

19 http://www.itworld.com/071121philipscrt.  The *International Herald Tribune* reported that

20 "competition authorities in several jurisdictions had started investigations," and that the company

21 "would assist regulators."

22      On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own

23 investigation into the CRT cartel. http://www.jogiforum.hu/hirek/17724#axzz16n0dDfHD. The

24 HCA described the cartel as follows and included among its targets entities that manufactured (or

25 controlled the manufacture of) finished CRT Products:

26

27      The Hungarian Competition Authority (Gazdasági Versenyhivatal - GVH)
       initiated a competition supervision proceeding against the following undertakings:
       Samsung SDI Co. Ltd, Samsung SDI Germany GmbH, Samsung SDI

28

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech
Republic s.r.o., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa
Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ,
Daewoo Electronics European HQ, MT Picture Display Germany GmbH,
Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their
practice regarding the manufacturing and distribution of cathode-ray tubes
(including coloured pictures tubes and coloured screen tubes) on the European
market between 1995 and 2007. The anti-competitive behavior may have
concerned the exchange of sensitive market information (about prices, volumes
sold, demand and the extent to which capacities were exploited), price-fixing, the
allocation of market shares, consumers and volumes to be sold, the limitation of
output and coordination concerning the production. The undertakings evolved a
structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of
European and Asian undertakings regarding to the European market also included
Hungary from 1995 to 2007. The coordination concerning the Hungarian market
allegedly formed part of the European coordination. Samsung SDI Magyarország.
was called into the proceeding since it manufactured and sold cathode-ray tubes in
Hungary in the examined period, and it allegedly participated in the coordination
between its parent companies.

### D.     A Conspiracy As To CRTs Is Equivalent To A Conspiracy As To Finished CRT Products.

In addition, Class Plaintiffs were well aware prior to the filing of the DP-CAC how the

costs of a CRT would affect the price of a finished CRT Product, like a television. They knew this

from aspects of the Chunghwa proffer discussed above. They also knew it independently through

published sources, such as DisplaySsearch's "Quarterly Global TV Shipment & Forecast Report"

dated March 17, 2007, which (at page 20) calculated prices for CRT televisions by using the prices

for CRTs: "[t]o calculate the CRT TV price, we used the previous quarter's tube prices to

determine the current quarter's CRT TV street prices due to the lag between tube shipment and TV

shipment. Thus, tube price reductions are reflected in street prices one quarter later." (As noted

above, these reports are available at

http://www.displaysearch.com/cps/rde/xchg/displaysearch/hs.xsl/quarterly_global_tv_shipment_a

nd_forecast_report.asp).

As pointed out above, Class Plaintiffs also knew from *LCDs* that where a defendant sells a

finished product containing a price-fixed component, it can be held liable with respect to the sale

of that finished product to the first entity outside the conspiracy.  As Judge Illston explained in

*LCDs*:

> Here, the complaint alleges that the direct purchaser plaintiffs purchased TFT-LCD products directly from cartel members at supra-competitive prices as the result of a conspiracy to fix prices. ... Defendants do not cite any case holding that a plaintiff who purchases directly from an alleged cartel does not have standing. In contrast, courts have found antitrust standing where plaintiffs purchased downstream goods from a cartel of manufacturers who made, and fixed the price of, a component of those goods. See, e.g., *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 159-60 (3d Cir.2002) (" *Linerboard I* ") (in alleged conspiracy to fix prices of linerboard, plaintiffs who purchased corrugated sheets or boxes containing linerboard directly from defendants had standing). To the extent that defendants raise questions about the scope of the market, or contend that damages will be difficult to ascertain, the Court finds that these are factual questions that are better addressed on a fuller record, and not at the pleadings stage. *See In re Sugar Industry Antitrust Litig.,* 579 F.2d 13, 17 (3d Cir.1978) ["*Sugar*"] ("As the defendants here point out, the product which plaintiff purchased competes not with sugar, but with other candy, and more than one ingredient determines the price. To this extent, there will be some additional complications underlying the damage claims. However, this must not be allowed to obscure the fact that the plaintiff did purchase directly from the alleged violator.").

586 F.Supp.2d at 1118-19. *See Sugar*, 579 F.2d at 18 ("[p]laintiff is a direct purchaser and,

therefore, entitled to recover the full extent of the overcharge"); *In re Linerboard Antitrust Litig.*,

203 F.R.D. 97, 216 (E.D. Pa. 2001), *aff'd*, 305 F.3d 145, 161-62 (3d Cir. 2002), *cert. denied sub*

*nom. Gaylord Container Corp. v. Garrett Paper Co.*, 538 U.S. 977 (2003) ("[l]ike the candy in *In*

*re Sugar Industries* which contained allegedly price fixed sugar, the corrugated sheets and boxes

contain linerboard that was subject to an agreement on output, which is equivalent to a price-fixing

agreement. … The plaintiffs are direct purchasers and, therefore, are entitled to recover the full

amount of any overcharge"); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 480

(W.D.Pa.1999) ("[a]s an initial matter, we note that defendants' reliance on *Illinois Brick* is

misplaced, as plaintiffs' claims are limited to those persons who purchased fabricated products

*directly* from defendants or their parents, subsidiaries or affiliates. Moreover, the Court of Appeals

[in *Sugar*] has held that, although *Illinois Brick* bars Clayton Act suits by persons who are not

direct purchasers from an antitrust defendant, the decision does not preclude a suit by a plaintiff

1 who purchases directly from the alleged offender, as did plaintiffs, but buys a product which

2 incorporates the price-fixed product as one of its ingredients") (emphasis in original).

3 **INTERROGATORY NO. 2:**

4      State with specificity the factual basis (including any evidentiary sources) for Your

5 allegation that Defendants agreed to allocate market shares and customers of sales of computer

6 monitors containing CRTs, as alleged in, inter alia, Paragraphs 5 and 138 of the Complaint.

7 **RESPONSE TO INTERROGATORY NO. 2:**

8      Subject to the General Objections, plaintiffs respond as follows:

9      See answer to Interrogatory Number 1 above.

10 **INTERROGATORY NO. 3:**

11      For each separate defendant (regardless of its affiliation with any other defendant), state

12 with specificity the factual basis (including any Documents, Persons, or other evidentiary sources)

13 for Your allegations that it conspired, combined, and contracted with any of the other Defendants

14 to fix, raise, maintain and/or stabilize the prices of computer monitors containing CRTs sold in the

15 United States, as alleged in, inter alia, Paragraph 3 of the Complaint.

16 **RESPONSE TO INTERROGATORY NO. 3:**

17      Subject to the General Objections, plaintiffs respond as follows:

18      See answer to Interrogatory Number 1 above.

19 **INTERROGATORY NO. 4:**

20      For each separate defendant (regardless of its affiliation with any other defendant), state

21 with specificity the factual basis (including any Documents, persons, or other evidentiary sources)

22 for Your allegations that it agreed to allocate market shares and customers of sales of computer

23 monitors containing CRTs, as alleged in, inter alia, Paragraphs 5 and 138 of the Complaint.

24 **RESPONSE TO INTERROGATORY NO. 4:**

25      Subject to the General Objections, plaintiffs respond as follows:

26      See answer to Interrogatory Number 1 above.

27 **INTERROGATORY NO. 5:**

28

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES

1         Identify each Person who provided information to answer these Interrogatories.

2    **RESPONSE TOINTERROGATORY NO. 5:**

3         Subject to the General Objections, plaintiffs respond as follows:

4         Counsel for plaintiffs.

5

6    DATED:  January 31, 2011           By:      <u>   /s/ Guido Saveri     </u>
                                           SAVERI & SAVERI, INC.

7                                               706 Sansome Street
                                         San Francisco, CA 94111

8                                               Telephone:     (415) 217-6810
                                         Facsimile: (415)     217-6813

9                                               *Interim Lead Counsel for the Direct*

10                                             *Purchaser Plaintiffs*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                            MDL NO. 1917

DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT LG ELECTRONICS, INC.'S FIRST SET OF INTERROGATORIES