# Exhibit E

MARIO N. ALIOTO, ESQ. (56433)
LAUREN C. RUSSELL, ESQ. (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA  94123
Telephone:  (415) 563-7200
Facsimile: (415) 346-0679
E-mail: malioto@tatp.com
laurenrussell@tatp.com

*Interim Lead Counsel for the*
*Indirect Purchaser Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | Master File No. CV-07-5944 SC |
| | MDL No. 1917 |
| This Document Relates To: | **INDIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT** |
| ALL INDIRECT PURCHASER ACTIONS | **SAMSUNG ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES TO THE INDIRECT PURCHASER PLAINTIFFS** |

PROPOUNDING PARTY:        SAMSUNG ELECTRONICS AMERICA, INC.

RESPONDING PARTY:        INDIRECT PURCHASER PLAINTIFFS

SET NO.:                ONE

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the Indirect Purchaser Plaintiffs ("Plaintiffs") hereby respond to defendant Samsung Electronics America, Inc.'s ("Defendant") First Set of Interrogatories ("Interrogatories") to the Indirect Purchaser Plaintiffs as follows:

## GENERAL OBJECTIONS

1.        Plaintiffs have not completed their investigation of the facts pertaining to this action and the discovery process is just commencing.  Pursuant to the Order Adopting Special

1   Master's Report, Recommendations and Tentative Rulings Regarding Discovery Motions

2   entered December 8, 2010, the following responses are based upon information known at the

3   time Plaintiffs filed the Indirect Purchaser Plaintiffs' Consolidated Amended Complaint ("IP

4   CAC") on March 16, 2009, and are given without prejudice to Plaintiffs' right to supplement

5   these responses prior to trial or to produce evidence based on subsequently discovered

6   information.  Plaintiffs' responses are based upon and, therefore are limited by, Plaintiffs'

7   knowledge and recollection as of March 16, 2009, and consequently, Plaintiffs reserve the right

8   to supplement and/or modify any and all of their objections and responses if they become aware

9   of information and/or documents which warrant such action.

10          2.      Plaintiffs object to the unduly burdensome and unfair nature of Defendants'

11  Interrogatories to the extent they seek to have counsel for Plaintiffs present evidentiary support

12  for the allegations in the IP CAC without completing discovery.  Defendants' Interrogatories are

13  premature, unduly burdensome and unfair, and serve no other purpose but to harass and delay

14  Plaintiffs in their efforts to prepare their case.

15          3.      Defendants acknowledged at the November 12, 2010 Hearing before the Special

16  Master that Plaintiffs "are entitled to a certain amount of sales data and pricing data involving

17  finished CRT products because they use that to try to show the issues of pass-on relating to []

18  damages."  (Nov. 12 Tr. 16: 25; 17: 1-4.)  Defendants have not yet produced such information in

19  its entirety.  Plaintiffs accordingly object to being compelled to respond to Interrogatories

20  requesting evidence of "pass-through" unless and until Defendants produce in full the sales,

21  pricing, and related information relevant thereto.  Plaintiffs reserve their right to supplement

22  these responses after their analysis of this information.

23          4.      Plaintiffs object to each of Defendant's Interrogatories on the grounds that

24  Defendants have failed or refused to produce documents related CRT Finished Products, despite

25  the Special Master's ruling that such discovery is not stayed or tolled in any way.  Plaintiffs

26  reserve their rights to supplement these Responses after their review of Defendants' documents

27  is complete.

28

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG**
**ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

5.      Plaintiffs object to each of Defendant's Interrogatories, Definitions and Instructions to the extent they seek documents or information (i) not relevant to the subject matter of this action; (ii) not relevant to any claim or defense in this action; (iii) not reasonably calculated to lead to the discovery of admissible evidence; (iv) different from, inconsistent with, or in addition to what is required to be produced under the Federal Rules of Civil Procedure, the Civil Local Rules of the United States District Court for the Northern District of California, any existing Court Order in this case, or any other applicable rule or law.

6.      Plaintiffs object to the Interrogatories to the extent that they are vague, ambiguous and require speculation to determine their meanings.

7.      Plaintiffs object to the Interrogatories to the extent they seek to discover information and/or documents from persons or entities that are not parties to this action and information or documents that are not now and never have been in the possession, custody or control of the Plaintiffs.

8.      Plaintiffs object to the Interrogatories to the extent that they impose an undue burden on Plaintiffs by, for example, requiring Plaintiffs to search for documents:  (a) the value of which, if any, is substantially outweighed by the burden or cost of searching for them, or (b) that are equally available to Defendant or already in Defendant's possession.

9.      Plaintiffs object to the Interrogatories to the extent they call for information and/or documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection.  This objection includes, but is not limited to, information that Defendant seeks regarding communications between Plaintiffs' attorneys and/or between Plaintiffs and their attorneys made during or in anticipation of litigation.  Inadvertent identification or production, or identification or production pursuant to this Court's Order of December 8, 2010, of any such information in a document shall not constitute a waiver of any such privilege with respect to the document produced or the subject matter thereof, or a waiver of the Plaintiffs' right to object to the use of any such document during trial or any subsequent proceeding.  To the extent that any such protected information is inadvertently produced in

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1   response to the Interrogatories, the production of such information shall not constitute a waiver

2   of Plaintiffs' right to assert the applicability of any privilege or immunity to the information, and

3   any such document and all copies or images thereof shall be promptly returned, sequestered or

4   destroyed upon demand pursuant to Rule 26(b)(5)(B).

5         10.    Plaintiffs object to the Interrogatories as premature "contention interrogatories" in

6   that they: (i) call for opinions and contentions relating to fact or application of law to fact that

7   Plaintiffs should not be required to disclose until discovery has been substantially completed; (ii)

8   call for legal conclusions; and (iii) are likely to require supplemental answers, prematurely

9   commit Plaintiff to positions, and artificially narrow issues.  Such information cannot be fairly

10  and practically provided until after the completion of discovery.  The interests of judicial

11  economy and efficiency dictate that contention discovery is more appropriate after a substantial

12  amount of merits discovery has been conducted.  To the extent that Defendant's Interrogatories

13  request the contentions of Plaintiffs in this case, those contentions are set forth in large part in

14  Indirect Purchaser Plaintiffs' Consolidated Amended Complaint (the "Complaint").  The

15  allegations of the Complaint are incorporated by reference in each of the answers to the

16  Interrogatories set forth herein.  In responding to Defendant's contention interrogatories pursuant

17  to Court Order, Plaintiffs reserve their rights to supplement these responses at any time prior to

18  the final pre-trial conference herein.

19        11.    Plaintiffs object to the Interrogatories to the extent they purport to require

20  Plaintiffs to disclose information or produce documents concerning any expert or other person or

21  entity retained by counsel to assist in the preparation of the Plaintiffs' case: (a) to the extent any

22  such person or entity will not be designated by the Plaintiffs as a trial witness on the ground that

23  such disclosure is neither relevant nor reasonably calculated to lead to the discovery of

24  admissible evidence; and (b) on the grounds that any such present disclosure is prejudicial to the

25  Plaintiffs' preparation of this case and is not required by the Federal Rules of Civil Procedure.

26        12.    Plaintiffs object to the Interrogatories to the extent they call for information

27  and/or documents of a confidential and/or proprietary nature.

28

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG
ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

13.     Plaintiffs object to Defendant's definitions of "You," and "Your" as overly broad.

14.     Plaintiffs object to Defendant's definition of "Document" as overly broad to the extent it purports to define the term more broadly than Federal Rule of Civil Procedure 34.

15.     Plaintiffs object to the definition of the term "identify" in the Interrogatories as being overly broad and requesting information that is not reasonably calculated to lead to the discovery of admissible evidence.  Further, the application of this definition will necessarily render any interrogatory vague, ambiguous, and burdensome.

16.     By responding to the Requests, Plaintiffs do not concede to the truth or accuracy of any characterization, allegation, or statement made in the Requests.

17.     Plaintiffs reserve their rights to object on any ground to the use of the Responses to or the subject matter of the Requests in any subsequent proceeding, and at the trial of this action.

18.     Plaintiffs' Responses set forth herein are made without in any way waiving: (a) all rights to object to these Interrogatories, the Responses, or the subject matter thereof, as to the competency, relevancy, materiality, privilege, and admissibility as evidence for any purpose, in any proceeding in, or at the trial of, this or any other action; (b) the right to object on any ground to the use of these Responses, or the subject matter thereof, in any proceeding in, or at the trial of, this or any other action; or (c) the right to object  on any ground at any time to requests to admit, Interrogatories, or other discovery procedures involving or relating to the subject matter of these Requests.

19.     Plaintiffs hereby incorporate by each of the foregoing General Objections into any or all Specific Objections set forth below, whether or not stated separately therein. No Specific Objection is a waiver of any of the General Objections.

20.     Plaintiffs object to the "state with specificity the factual basis" language in the Interrogatories as burdensome, vague, ambiguous, and not reasonably calculated to lead to the discovery of relevant evidence.

21.     Plaintiffs object that, where intent and credibility are at issue, elements of the case may be proved or disproved by combinations of facts that, individually, are not relevant of themselves.

22.     Plaintiffs object to each Interrogatory to the extent that the information or facts sought are contained in Plaintiffs' Consolidated Amended Complaint or publicly available sources.

23.     Plaintiffs reserve their right to try their case as Plaintiffs determine is best at trial. This includes by not using facts stated herein or using facts additional to those stated herein.

24.     Plaintiffs object to, and expressly disclaim, any need or intent to prove <u>any</u> fact listed herein as a prerequisite to proving their claims at trial.

## INTERROGATORIES

### INTERROGATORY NO. 1:

Identify each Person who provided information to answer these Interrogatories.

### RESPONSE TO INTERROGATORY NO. 1:

In conjunction with the aforementioned General Objections, Plaintiffs object to this Interrogatory to the extent it calls for information protected by the attorney work product doctrine.

Subject to and without waiving the foregoing General and specific objections, Plaintiffs respond that the information contained in these Responses was provided by Plaintiffs' Counsel.

### INTERROGATORY NO. 2:

With respect to televisions, as defined in Paragraph 15(b) of the Complaint as "products containing CRTs", please state with specificity the factual basis (including the identification of each Document, Person or other evidentiary source) for the allegation in Paragraph 1 of the Complaint that Defendants "conspired to fix, raise, maintain and/or stabilize prices" of those "CRT Products", namely televisions containing CRTs.

### RESPONSE TO INTERROGATORY NO. 2:

Subject to and without waiver of any General or Specific Objection, and reserving their right to supplement this Response, Plaintiffs respond as follows:

6

1        In making the allegations in the IP CAC that the Defendants conspired to fix the prices of

2    CRT Finished Products as part of a single conspiracy to fix the prices of CRTs and CRT Finished

3    Products, Plaintiffs relied upon the following categories of evidence: (1) evidence regarding the

4    conspiracy provided by Chunghwa; (2) publicly available facts regarding the vertically integrated

5    nature of defendants' CRT and CRT Finished Product businesses; (3) the fact that the markets for

6    CRTs and CRT Finished Products are inextricably intertwined; and (4) facts drawn from related

7    proceedings.

8        **1.   Evidence Regarding The Conspiracy Provided By Chunghwa**

9        Prior to filing the CAC, Plaintiffs had various discussions with Chunghwa pursuant to the

10   settlement agreement.  During these discussions, Chunghwa provided details of the conspiracy

11   and Chunghwa's involvement in it.  Chunghwa also provided the date, location, meeting type and

12   participants in the various meetings of which it is aware.  Chunghwa further noted that it was

13   aware of meetings between the other Defendants that representatives of Chunghwa did not attend.

14   Thus, Plaintiffs believed that there was additional evidence of the conspiracy in the hands of the

15   other Defendants.  Chunghwa did not produce any documents as part of these discussions

16   pursuant to the settlement agreement.

17       The participants in the conspiracy and the various corporate families involved are as

18   alleged in the IP CAC at Paragraphs 50 to 108 and Paragraphs 166-187.  Those Defendants who

19   are part of specific corporate families are referred to in this Response by the name of that

20   corporate family.  *See id;* ¶ 188.

21       This information was compiled by Chunghwa based upon reports prepared by Chunghwa

22   employees at or near the time of the meetings.  Chunghwa routinely prepared internal reports of

23   the various bilateral and Glass Meetings.  The reports were prepared by junior level employees

24   who attended the meetings, and then passed up the chain of authority at Chunghwa for review.

25   The reviewer initialed the report and often wrote comments or directions for subordinates on it.

26   The report then passed back down the chain of authority.  After the filing of the CAC, Chunghwa

27

28

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG
ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1    produced these reports as part of its document production when the DOJ stay expired on March 8,

2    2010.

3          In addition, counsel for Chunghwa read to Plaintiffs' counsel excerpts of certain meeting

4    reports.  The following excerpts support Plaintiffs' allegations that Defendants conspired to fix

5    the prices of both CRTs and CRT Finished Products as part of a single conspiracy:

6          1.      A Report of a May 29, 1995 bilateral meeting between Chunghwa and LG

7    (also known as "Goldstar" or "Lucky Goldstar"), states:



          2.      An October 24, 1996 report of a bilateral meeting between Chunghwa and

LG 

INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG
ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES

3.      A March 19, 1997 report of a Management Meeting among Samsung, Philips, Orion, LG, and Chunghwa states:

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████

4.      A June 23, 1999 Report from a Top Meeting in Korea attended by Samsung, Philips, Orion, and Chunghwa, ██████████████████████████████
████████

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

5.      A June 28, 2000 report of a Working Level Meeting among Samsung, LG, Orion, Philips and Chunghwa states that: ████████████████████████
████████████████████████████████████████████████████
████████████████████████████

6.      A report from a September 21, 2000 Top Meeting between Samsung, LG, Orion, Philips and Chunghwa ████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG
ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES

1

2



7.      A report from a February 22, 2002, Management Meeting among Samsung, LPD, Orion and Chunghwa, notes:

8.      A Report from a March 25-27, 2004 Management Meeting between Samsung, LPD and Chunghwa, states:

9.      An internal Chunghwa memorandum dated July 2, 2004,

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

On March 8, 2010, Chunghwa produced the translated meeting reports to Plaintiffs. The following are examples of meeting reports which further substantiate Plaintiffs' allegations of a single conspiracy involving both CRTs and CRT Finished Products:

1.      A September 18, 1995 report of a meeting with between Chunghwa and Samsung beginning at CHU00028865.01E, states at CHU00028867E:

2.      CHU00028670E is a December 9, 1997 report of a meeting between Samsung, Orion and Chunghwa.  At CHU00028671E, the report states:

3.      CHU00030701.01E is a January 18, 1999 report of a Top Meeting attended by Samsung, LG, Orion, Philips and Chunghwa.  At CHU00030702.01E, it states:

4.      In CHU00030731.01E, a March 15, 1999 report of a Working Level Meeting attended by Samsung, LG, Orion, Philips and Chunghwa, it states at CHU00030731.02E:

11

1

2

3

4

5

6

7        5.      In CHU00030757.01E, a May 12, 1999 report from a Working Level Meeting

8 attended by Samsung, Philips, Orion and Chunghwa, it states at CHU00030760E:

9

10

11

12

13

14        6.      CHU00030512.01E is a report from a September 17, 2004 Glass Meeting

15 attended by MT Picture Display Co., Ltd., Samsung, LPD, Thai CRT and Chunghwa,

16

17

18

19

20

21

22

23        7.      CHU00006009.01E is an April 26, 2005 report of a bilateral meeting between

24 Samsung Electronics (which manufactured only CRT Finished Products) and Chunghwa

25

26

27

28

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG
ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1

2

███████████████████████████████████████

8.    In CHU00014227.01E, a report of a November 21, 2005 Glass Meeting

attended by Samsung, LPD and Chunghwa ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ (CHU00014228E)

**2.    The Vertical Integration Of Certain Defendants**

Defendants Thai CRT Company, Ltd., Samtel Color, Ltd. and the IRICO entities, are

the only Defendants that were not members of a corporate family in which vertically

integrated companies manufactured and sold both CRTs and CRT Finished Products.  More

specifically, during the Class Period, the Samsung, Hitachi, LG, Philips,[1] Toshiba, Panasonic

(formerly Matsushita),[2] Daewoo and Chunghwa/Tatung entities, were part of vertically

integrated operations that manufactured CRTs and sold them to their affiliated companies,

which then incorporated the CRTs into CRT Finished Products.

According to Chunghwa, the fact that many of the Defendants were vertically integrated

was frequently discussed at the meetings.  The conspirators fixed the prices on CRTs to be

applied "internally" within the vertically integrated Defendants that manufactured televisions or

---

[1] LG.Philips Displays ("LPD") was a CRT joint venture between LG and Philips and sold
CRTs primarily to their parent companies, which manufactured and sold CRT Finished
Products.  LPD is therefore a member of the LG and Philips corporate families.

[2] MT Picture Display Co., Ltd. ("MTPD") was also a CRT joint venture between Panasonic
and Toshiba, and which is now wholly-owned by Panasonic.  MTPD sold CRTs to
Panasonic and Toshiba which manufactured CRT Finished Products.  Plaintiffs consider
MTPD a member of the Panasonic and Toshiba corporate families.  Beijing Matsushita
Color CRT Company, Ltd. ("BMCC") is also a joint venture company, 50% of which is held
by MTPD, and which was formerly held by Panasonic.  The other 50% is held by Beijing
Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing
Company (a China state-owned enterprise), and Beijing Yayunchun Branch of the Industrial
and Commercial Bank of China, Ltd. (a China state-owned enterprise).  BMCC is also
properly considered a member of the Panasonic corporate family.

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG
ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1    computer monitors.  Such "internal" transactions accounted for many of CRTs produced by the

2    tube divisions or subsidiaries of the vertically integrated Defendants.

3          For example, a report of a January 4, 2002 meeting report for a CDT meeting attended by

4    Samsung, LPD, Orion and Chunghwa stated that, ███████████████████████████████

5    ████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████

7    ████████████████████████

8          Likewise, South Korean attendees at conspiratorial meetings sought to address

9    competition for their vertically integrated customers by telling their co-conspirators to increase

10   the prices charged to the Korean entities' own sister or affiliated companies for CRTs.  For

11   example, at a July 13, 2000 meeting, ████████████████████████████████████████

12   ██████████████████████████████████

13   ██████████████████████████████████████████████████████████

14   ██████████████████████████████████████████████████████████

15   ████████████████████

16          In addition, Chunghwa informed Plaintiffs of at least sixty-five (65) meetings which were

17   attended by two or more of the vertically-integrated Defendants.  Even more compelling is the

18   evidence that Chunghwa informed Plaintiffs that SEC, who manufactured only CRT Finished

19   Products, attended some of the meetings.  *See, e.g.,* CHU00006009.01E.  As demonstrated herein,

20   at many of these meetings, ████████████████████████████████████████████████

21   ██████████████████████████████████████████████████████████████████

22   ███████████████████████████████████████████████████████████

23   ████████████████████████████████████

24          Plaintiffs further relied upon publicly available sources in making the allegations in

25   the CAC regarding vertical integration, including the Defendants' websites, academic

26   articles and treatises, and industry/market reports, some of which were produced to Plaintiffs

27

28
                                                    14

1   in November 2008 pursuant to Paragraph 4 of the Stipulation And Order Re: Limited Stay of

2   Discovery, dated September 12, 2008.

3           For example, SEC and propounding party SEAI manufacture and sell CRT Finished

4   Products.  Their Samsung SDI subsidiaries manufacture CRTs.  On its web site, Samsung

5   describes itself as a "multi-faceted family of companies," with Samsung Electronics touted

6   as "[o]ur flagship company," and Samsung SDI as one of the affiliated companies "that

7   make up SAMSUNG."[3] An article entitled, "Capability of the Samsung Group in Project

8   Execution and Vertical Integration: Creating in Korea and Replicating in China," dated July

9   2006, further describes the vertical integration of the Samsung entities at p.11:

10          In  display  manufacturing  business,  SEC  is  closely  interlinked  with
            Samsung SDI, a manufacturer of television tubes, which in turn relies on
11          Samsung Corning, which produces glass bulbs for the tubes, as indicated
            by  the  fact  that  61%  of  its  total  revenue  comes  from  Samsung  SDI.
12          Samsung  SDI,  in  turn,  supplies  52%  of  its  products  to  Samsung
            Electronics.
13                                          * * *

14          The  vertical  integration  among  them  produces  a  synergy  effect  and
            competitive  spirit  that  inspires  each  product  group  to  develop  new  and
15          innovative creations.

16          The LG entities provide an even more striking example.  From 1995 to 2001, when LG

17  spun off its CRT business to LPD, the LG entities that manufactured CRTs and CRT Products

18  were not even separately incorporated entities.  They were merely divisions of the parent

19  company, LG Electronics, Inc.  In LG Electronics' 1999 Annual Report (available at

20  http://www.lg.com/global/ir/reports/annual-reports.jsp), it states that the company was divided

21  into three separate product companies: Digital Display, Digital Appliance and Digital Media.  The

22  Digital Display division manufactured both CRTs and CRT Finished Products, "conduct[ing]

23  R&D and manufacturing in digital display products and their core components.  It has 7,500

24  employees at its four domestic operations and 20 overseas subsidiaries.  Besides its Display

25

26  _____

27  [3] *See* http://www.samsung.com/hk_en/aboutsamsung/corporateprofile/index.html;
    http://www.samsung.comhk_en/aboutsamsung/index.html; and
28  http://www.samsung.comhk_en/aboutsamsung/corporateprofile/affiliatedcompanies.html.

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG
ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1    Device Research Lab., it has other research centers and a marketing network at home and

2    abroad."  These included the Zenith Electronics Corporation in the United States, which

3    manufactured CRT televisions.  The same annual report further explained: "[t]he Company has a

4    centralized supporting division to provide general and administrative, marketing and sales and

5    research and development services to each business division."

6        Similarly, the Philips' entities that manufactured CRTs and CRT Finished Products were

7    often merely divisions of the same corporate entity.  For example, Philips Display Components

8    Company, which manufactured tubes in the United States until 2001 when it was transferred to

9    LPD, was a division of defendant Philips Electronics North America, Inc. ("PENAC"), which

10   manufactured CRT televisions.  The same was true for other Philips Display Components

11   companies around the world, all of which were divisions of the parent company, Koninklijke

12   Philips Electronics B.V. *See also* Robert M. Grant, Contemporary Strategy Analysis at 393 (5th

13   ed. 2005), which notes how Philips was buying much of its CPTs internally for use in its branded

14   televisions.

15       In 2001, LG and Philips formed LPD, a CRT joint venture.  A meeting on February 22,

16   2001 ███████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████████████████████

20   ███████████████████████████████████████████████

21   ███████████████████████████

22       The Defendants' vertical integration, as described above, enabled them to dominate the

23   markets for both CRTs and CRT Finished Products.  For example, during the relevant period,

24   SEC held the largest worldwide market share for sales of CRT monitors.[4]  Vertically-integrated

25   _____

26   [4] *See, e.g.,* CHWA00062147: Quarterly Desktop Monitor Shipment and Forecast Report
27   (Q4'03), at CHWA00062167 and CHWA00062429; CHWA 00253814: IDC Market
     Analysis, "Worldwide PC Monitor 2004-2008 Forecast Update" (10/1/04), at
28   CHWA00253825 and CHWA00253829; CHWA00230421: Quarterly Desktop Monitor

16

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG
ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1   Defendants LG and Philips were also in the top 5, along with Dell and HP.  *Id.*  The Quarterly

2   Desktop Monitor Shipment & Forecast Report (Q2'05) (CHWA00221536) at p.11, provides the

3   Q1'05 market share results for CRT Monitors.  The Report notes that, "Samsung remained #1 in

4   terms of WW branded shipments," and that "[o]ver 57% of the market was owned by #1

5   Samsung, #2 LGE, #3 HP and #4 Dell."  The Report further notes that, "the most dominant

6   players remained the vertically integrated companies such as Samsung and LGE (as well as

7   Philips) along with the system bundlers (Dell and HP)."[5]  Dell and HP are referred to as "system

8   bundlers" because they did not manufacture their own monitors.  Plaintiffs are informed and

9   believe that Dell and HP purchased monitors primarily from SEC, LG and Philips.  In other

10  words, these three vertically integrated defendants accounted for a very large share of the market

11  for CRT monitors.

12        At the same time as SEC, LG and Philips controlled the market for CRT monitors, their

13  upstream affiliates, Samsung SDI and LPD, controlled the market for CRTs.  In

14  CHWA00129231, a CPT Research Analyst Presentation dated April 2002, a pie chart at

15  CHWA00129250 shows that as of 2001, Samsung SDI held a 28% market share, LPD held 24%

16  and Chunghwa held 21%.  The Presentation further states at CHWA00129299: "The CRT

17  industry is dominated by three major players, which together control nearly 75% of the total

18  market . . . with relatively equal share of the market among the industry leaders, pricing in the

19  industry is stable and the outlook is positive."  *See also* CHWA00221827, Q2'05 Quarterly

20  Display Search Desktop Monitor Shipment and Forecast Report, which shows Samsung SDI as

21  "the top CDT producer with 40.6% of the tubes for desktop CRT monitors being produced by

22

23  ―――――――――――――――――――――――――――――

24  Shipment and Forecast Report (Q2'06), at CHWA00230444 ("the top five players all
    remained in their respective market positions with Samsung remaining in the top position
25  but LGE gaining the most share Q/Q.").

26  [5] *See also* CHWA00230421: Quarterly Desktop Monitor Shipment and Forecast Report
    (Q2'06), at at CHWA00230747 ("[W]hile Samsung alone accounted for almost 24% of the
27  WW revenues for CRT displays, when combined with LGE's revenues, these two vertically
    integrated companies accounted for almost 40% of the WW revenues for the category in the
28  quarter.")

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG
ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1   them in Q1'05."  During that same time period, LPD held a 36.6% share and Chunghwa a 19.7%

2   share, meaning that these three manufacturers held a combined market share of 96.9%.

3          Moreover, some of the Chunghwa documents that Plaintiffs have uncovered in their

4   review to date show that ███████████████████████████████████████████

5   ███████████████████████████████████████████████████████████████████

6   ███████████████████████████████████████████████████████████

7   ████████    *See, e.g.,* CHU00647941.

8          Thus, the vertically integrated Defendant-manufacturers of CRTs and CRT Finished

9   Products collectively controlled the inseparable markets for CRTs and CRT Finished Products.

10  They set the prices of CRTs and marked up the prices of their CRT Finished Products through

11  their affiliated entities who assembled and sold CRT Finished Products to Plaintiffs.  Simply put,

12  all of the vertically integrated Defendants were motivated to ensure that their downstream

13  manufacturers of CRT Finished Products did not absorb the increased (supracompetitive) prices

14  for CRTs.  They agreed among themselves to raise the prices of finished products in conjunction

15  with their increase in the prices of tubes.  The increase was passed on by the downstream

16  manufacturers to consumers through increased prices for CRT Finished Products.  The vertically

17  integrated Defendants thereby recouped the benefits of their price-fixing at the CRT and CRT

18  Finished Product levels of the market.

19      **3.  The CRT And CRT Finished Product Markets Are Inextricably Intertwined**

20         Considered together with the vertical integration of most Defendants, as described above,

21  Plaintiffs drew further support for their allegations of a single conspiracy involving both CRTs

22  and CRT Finished Products from the fact that the CRT and CRT Finished Product markets are

23  inextricably intertwined.  CRTs have no independent utility.  Their only value is as components of

24  finished products such as televisions, computer monitors, and other specialized applications.  The

25  demand for CRTs comes solely from the demand for CRT Finished products such that the

26  demand for CRTs would not exist without the finished products purchased by Plaintiffs.  The

27  CRT is the most expensive component in the finished products into which they are incorporated,

28

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG
ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1  in unchanged form, and sold to consumers.  For example, the cost of the CRT typically represents

2  approximately 60% of the total cost to manufacture the computer monitor.  Hence, the market for

3  CRTs and the market for the products into which they are placed are inextricably intertwined

4  because the CRT market exists to serve the CRT Finished Products market.  Indeed, one could not

5  exist without the other and so may not be separated.

6       **4. Information Obtained From Related Proceedings**

7       At the time Plaintiffs filed the IP CAC, there were a number of governmental and private

8  proceedings pending which raised claims related to the claims in this case and which gave support

9  to the claims raised in this case.  For example:

10  • Claims made by the U.S. Department of Justice ("DOJ") and private plaintiffs against

11    many of the same defendants in this case for fixing the prices of TFT-LCD panels and

12    finished products.  There have been a number of guilty pleas in the DOJ case.

13  • A consent decree of the Japanese Fair Trade Commission banning retail price

14    maintenance by certain affiliates of defendants in this case.  1993 WLNR 1116859.

15    Although this case involved misconduct before the period alleged in this case, it

16    demonstrates the Defendants' ability to fix the prices of CRT Finished Products.

17  • The indictment of C.Y. Lin, the former President of Chunghwa Picture Tubes, Ltd.

18    ("Chunghwa") by the DOJ in connection with a conspiracy to fix the prices of CPTs

19    (television tubes) and CDTs (monitor tubes).  The DOJ's press release announcing the

20    indictment stated: "This conspiracy harmed countless Americans *who purchased*

21    *computers and televisions* using cathode ray tubes sold at fixed prices."  [Emphasis

22    added]

23  • A raid by the European Commission in or around November 2007 on certain

24    manufacturers of CRTs based on suspected price fixing, sharing markets, or

25    exchanging market information.  *See*

26    http://europa.eu/rapid/pressReleasesAction.do?reference_MEMO/07/453.

27

28

19

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG
ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

- A raid by the Japanese Fair Trade Commission of defendants Matsushita (n/k/a Panasonic) and Samsung on suspicion of anticompetitive conduct.
- An investigation by the Hungarian Competition Authority into the CRT cartel that targeted entities that manufactured or controlled the manufacture of CRT Finished Products.
- An investigation of Samsung and Matsushita affiliates by the Korean Fair Trade Commission as part of an international probe into alleged price fixing.
- An investigation of Philips by competition authorities in several jurisdictions as reported by the International Herald Tribune. *See* http://www.itworld.com/071121philipscrt.

**INTERROGATORY NO. 3:**

With respect to products other than televisions and monitors, as defined in Paragraph 15(b) of the Complaint as "products containing CRTs", please state with specificity the factual basis (including the identification of each Document, Person or other evidentiary source) for the allegation in Paragraph 1 of the Complaint that Defendants "conspired to fix, raise, maintain and/or stabilize prices" of those "CRT Products", namely products other than televisions or monitors containing CRTs.

**RESPONSE TO INTERROGATORY NO. 3:**

Subject to and without waiver of any General or Specific Objection, and reserving their right to supplement this Response, Plaintiffs respond as follows:

*See* Plaintiffs' Response To Interrogatory No. 2 above.

**INTERROGATORY NO. 4:**

With respect to the allegation in Paragraph 238 of the Complaint that "Defendants intended to pass on the full cost of" CRTs in their televisions containing CRTs and "in fact did so", please state with specificity the factual basis (including the identification of each Document, Person or other evidentiary source) for this allegation.

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiffs object to this Interrogatory as premature and more properly the subject of expert discovery at class certification, and on the grounds that any such present disclosure regarding "pass-through" is prejudicial to the Plaintiffs' preparation of this case and is not required by the Federal Rules of Civil Procedure.  Indeed, it is widely accepted in indirect purchaser antitrust class actions that a plaintiff's evidence in support of "pass-through" of the unlawful overcharge is presented in the form of an expert report filed with the motion for class certification.  In this case, a schedule for filing the motion for class certification has not even been entered.

Moreover, Defendants have so far failed or refused to produce documents and information that Plaintiffs will also use to show that Defendants "intended to pass on the cost" of their CRT Finished Products and "in fact did so."  Despite the fact that this case was pending for almost a year and a half before the Consolidated Amended Complaint ("CAC") was filed, most Defendants refused to respond to discovery unless and until the CAC survived their Fed. R. Civ. P. 12(b)(6) motions to dismiss pursuant to *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007).  At the November 12, 2010 Hearing before the Special Master, Defendants acknowledged that Plaintiffs "are entitled to a certain amount of sales data and pricing data involving finished CRT products because they use that to try to show the issues of pass-on relating to [] damages."  (Nov. 12 Tr. 16: 25; 17: 1-4.)  Yet most Defendants have produced absolutely nothing in this regard.

In addition, Plaintiffs have subpoenaed certain transactional data from approximately fifty (50) third party manufacturers, distributors and retailers of CRTs and CRT Finished Products.  Plaintiffs are still negotiating these subpoenas with many of the third parties and so the process of gathering the data is not yet complete.  Plaintiffs will use this data to show that Defendants "intended to pass on the full cost" of the CRT in their CRT Finished Products and "in fact did so," as alleged in Paragraph 238 of the CAC.

Subject to and without waiving the foregoing objections, Plaintiffs respond that they relied upon the following categories of evidence in making the allegations in Paragraph 238: (1) evidence provided by Chunghwa; (2) publicly available market and analyst reports; (3) treatises authored by respected economists; and (4) newspapers publications.

**1. Examples Of Meetings At Which Defendants Discussed The Need To Pass On The Cost Of CRTs In CRT Finished Products**

**a.** During the discussions with Chunghwa, counsel for Chunghwa read excerpts of certain meeting reports.  The following excerpts support Plaintiffs' allegations in Paragraph 238 of the CAC:

A report of a May 29, 1995 bilateral meeting between Chunghwa and LG (also known as "Goldstar" or "Lucky Goldstar") states:



An October 24, 1996 report of a bilateral meeting between Chunghwa and LG



**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

[REDACTED]

A March 19, 1997 report of a Management Meeting among Samsung, Philips, Orion, LG, and Chunghwa states:

[REDACTED]

A June 23, 1999 report from a Top Meeting in Korea attended by Samsung, Philips, Orion, and Chunghwa, [REDACTED]

[REDACTED]

A June 28, 2000 report of a Working Level Meeting among Samsung, LG, Orion, Philips and Chunghwa states that: [REDACTED]

[REDACTED]

A report from a September 21, 2000 Top Meeting between Samsung, LG, Orion, Philips and Chunghwa [REDACTED]

[REDACTED]

23



A report from a February 22, 2002, Management Meeting among Samsung, LPD, Orion and Chunghwa, notes:

A Report from a March 25-27, 2004 Management Meeting between Samsung, LPD and Chunghwa states:

INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG
ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES

An internal Chunghwa memorandum dated July 2, 2004, ███████████████

███████████████████████████████████████████

███████████████████

███████████████████████████████████████

**b.**  On March 8, 2010, Chunghwa produced the translated meeting reports to Plaintiffs.  The following are examples of meeting reports that Plaintiffs which further substantiate Plaintiffs' allegations in Paragraph 238:

A September 18, 1995 report of a meeting with between Chunghwa and Samsung beginning at CHU00028865.01E, states at CHU00028867E:

███████████████████████████████████████████

CHU00028670E is a December 9, 1997 report of a meeting between Samsung, Orion and Chunghwa.  At CHU00028671E, the report states:

███████████████████████████████████████████

CHU00030701.01E is a January 18, 1999 report of a Top Meeting attended by Samsung, LG, Orion, Philips and Chunghwa.  At CHU00030702.01E, it states:

███████████████████████████████████████████

1    In CHU00030731.01E, a March 15, 1999 report of a Working Level Meeting

2    attended by Samsung, LG, Orion, Philips and Chunghwa, it states at CHU00030731.02E:

3

4

5

6

7

8

9

10    In CHU00030757.01E, a May 12, 1999 report from a Working Level Meeting

11    attended by Samsung, Philips, Orion and Chunghwa, at CHU00030760E it states:

12

13

14

15

16    CHU00030512.01E is a report from a September 17, 2004 Glass Meeting attended

17    by MT Picture Display Co., Ltd., Samsung, LPD, Thai CRT and Chunghwa,

18

19

20

21

22

23

24

25    CHU00006009.01E is an April 26, 2005 report of a bilateral meeting between

26    Samsung Electronics (which manufactured only CRT Finished Products) and Chunghwa,

27

28

INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG
ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES

1  ██████████████████████████████████████████████████

2  ████████████████

3  ████████████████████████████████████████████████

4  ██████████████████████████████████████████

5

6      In CHU00014227.01E, a report of a November 21, 2005 Glass Meeting attended by

7  Samsung, LPD and Chunghwa, ████████████████████████████████████

8  ████████████████████████████████████████████████

9  ██████████████████████████████████████████████████

10 ██████████████████████████████████████████████████

11 ████████████████████████  (CHU00014228E)

**2.  Examples Of Publicly Available Industry Or Analyst Reports That Support
    Plaintiffs' Allegations In Paragraph 238**

In November 2008, certain Defendants produced publicly available industry or

analyst reports pursuant to Paragraph 4 of the Stipulation And Order For A Limited Stay Of

Discovery, dated September 12, 2008.  Plaintiffs reasonably relied on some of the market

information found in these reports to make the allegations in Paragraph 238.  An example

includes CHWA00107072, the Quarterly Global TV Shipment and Forecast Report dated

March 31, 2006, it states at CHWA00107144 (p.73): "to calculate the CRT TV price, we

used the previous quarter's tube prices to determine the current quarter's CRT TV street

prices due to the lag between tube shipment and TV shipment.  Thus, the tube price

reductions are reflected in street prices one quarter later.  This delay is due to tube and TV

inventories, assembly time, shipping, etc."

**3.  Examples Of Treatises By Respected Economists That Support Plaintiffs'
    Allegations In Paragraph 238**

Economic and legal literature recognizes that unlawful overcharges in a component

generally result in higher prices for products containing that price-fixed component.  As

27

1   Professor Herbert Hovenkamp, a noted antitrust scholar, has stated in his treatise, Federal

2   Antitrust Policy, The Law Of Competition And Its Practice (1994), at 624:

3

4        A monopoly charge at the top of the distribution chain generally results in
     higher prices at every level below.  For example, if production of aluminum

5        is monopolized or cartelized, fabricators of aluminum cookware will pay
     higher prices for aluminum.  In most cases they will absorb part of these

6        increased costs themselves and will pass part along to cookware wholesalers.

7        The wholesalers will charge higher prices to the retail stores, and the stores
     will do it once again to retail consumers.  Every person at every stage in the

8        chain will be poorer as a result of the monopoly price at the top.
     Theoretically, one can calculate the percentage of any overcharge that a firm

9        at one distributional level will pass on to those at the next level.

10

11        Similarly, two other antitrust scholars   Professors Robert G. Harris (Professor

12   Emeritus and former Chair of the Business and Public Policy Group at the Hass School of

13   Business at the University of California at Berkeley) and the late Lawrence A. Sullivan

14   (Professor of Law Emeritus at Southwestern School of Law and author of the Handbook of

15   the Law of Antitrust)   have observed that "in a multiple-level chain of distribution, passing

16   on monopoly overcharges is not the exception; it is the rule."  Robert Harris & Lawrence

17   Sullivan, *Passing On the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U.

18   PA. L. REV. 269, 275 (1979).

19

20        Professor Jeffrey McKie-Mason (Arthur W. Burks Professor for Information and

21   Computer Science, Professor of Economics and Public Policy, and Associate Dean for

22   Academic Affairs in the School of Information at the University of Michigan), an expert

23   who presented evidence in a number of the indirect purchaser cases involving Microsoft

24   Corporation, stated (in a passage quoted in a judicial decision in that case granting class

25   certification):

26

27        As is well known in economic theory and practice, at least some of the
     overcharge will be passed on by distributors to end consumers.  When the

28

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG
ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers. . . .  Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through and how it works in competitive markets.   This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

### 4.   Examples Of News Reports That Support Plaintiffs' Allegations In Paragraph 238

A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG, Philips, and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be 20% hike in the price of our CRT monitors."

### INTERROGATORY NO. 5:

With respect to the allegation in Paragraph 238 of the Complaint that "Defendants intended to pass on the full cost of" CRTs in their finished products containing CRTs, other than televisions and computer monitors, and "in fact did so", please state with specificity the factual basis (including the identification of each Document, Person or other evidentiary source) for this allegation.

### RESPONSE TO INTERROGATORY NO. 5:

*See* Plaintiffs' Response To Interrogatory No. 4 above.

### INTERROGATORY NO. 6:

For each Defendant (regardless of its purported affiliation with any other Defendant), state with specificity the factual basis (including any Documents, Persons or other evidentiary sources) for Your allegations that it conspired, combined, and contracted with any of the other Defendants "to fix, raise, maintain and/or stabilize the prices of CRT Products sold in the United States," as alleged in, *inter alia*, Paragraph 1 of the Complaint.

### RESPONSE TO INTERROGATORY NO. 6:

*See* Plaintiffs' Response To Interrogatory No. 2 above.

1   Dated: January 31, 2011                    **TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP**

2                                   By:     /s/ Mario N. Alioto
                                            Mario N. Alioto (56433)
3                                           Lauren C. Russell (241151)
                                            2280 Union Street
4                                           San Francisco, California 94123
                                            Telephone: (415) 563-7200
5                                           Facsimile: (415) 346-0679
6                                           E-mail: malioto@tatp.com
                                            laurenrussell@tatp.com
7
8                                           *Interim Lead Counsel*
                                            *for the Indirect Purchaser Plaintiffs*
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

30

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG
ELECTRONICS AMERICA, INC.'S FIRST SET OF INTERROGATORIES**