# Exhibit F

MARIO N. ALIOTO, ESQ. (56433)
LAUREN C. RUSSELL, ESQ. (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA  94123
Telephone:  (415) 563-7200
Facsimile: (415) 346-0679
E-mail: malioto@tatp.com
laurenrussell@tatp.com

*Interim Lead Counsel for the
Indirect Purchaser Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | ) ) ) ) ) | Master File No. CV-07-5944 SC <br><br> MDL No. 1917 |
| This Document Relates To: <br><br> ALL INDIRECT PURCHASER ACTIONS | ) ) ) ) ) ) ) ) ) | **INDIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT SAMSUNG SDI AMERICA, INC.'S FIRST SET OF INTERROGATORIES TO THE INDIRECT PURCHASER PLAINTIFFS** |

PROPOUNDING PARTY:        SAMSUNG SDI AMERICA, INC.

RESPONDING PARTY:        INDIRECT PURCHASER PLAINTIFFS

SET NO.:                        ONE

        Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the Indirect

Purchaser Plaintiffs ("Plaintiffs") hereby respond to defendant Samsung SDI America, Inc.'s

("Defendant") First Set of Interrogatories ("Interrogatories") to the Indirect Purchaser

Plaintiffs as follows:

## GENERAL OBJECTIONS

        1.        Plaintiffs have not completed their investigation of the facts pertaining to this

action and the discovery process is just commencing.  Pursuant to the Order Adopting Special

1   Master's Report, Recommendations and Tentative Rulings Regarding Discovery Motions

2   entered December 8, 2010, the following responses are based upon information known at the

3   time Plaintiffs filed the Indirect Purchaser Plaintiffs' Consolidated Amended Complaint ("IP

4   CAC") on March 16, 2009, and are given without prejudice to Plaintiffs' right to supplement

5   these responses prior to trial or to produce evidence based on subsequently discovered

6   information.  Plaintiffs' responses are based upon and, therefore are limited by, Plaintiffs'

7   knowledge and recollection as of March 16, 2009, and consequently, Plaintiffs reserve the

8   right to supplement and/or modify any and all of their objections and responses if they

9   become aware of information and/or documents which warrant such action.

10         2.      Plaintiffs object to the unduly burdensome and unfair nature of Defendants'

11  Interrogatories to the extent they seek to have counsel for Plaintiffs present evidentiary support

12  for the allegations in the IP CAC without completing discovery.  Defendants' Interrogatories are

13  premature, unduly burdensome and unfair, and serve no other purpose but to harass and delay

14  Plaintiffs in their efforts to prepare their case.

15         3.      Defendants acknowledged at the November 12, 2010 Hearing before the Special

16  Master that Plaintiffs "are entitled to a certain amount of sales data and pricing data involving

17  finished CRT products because they use that to try to show the issues of pass-on relating to []

18  damages."  (Nov. 12 Tr. 16: 25; 17: 1-4.)  Defendants have not yet produced such information in

19  its entirety.  Plaintiffs accordingly object to being compelled to respond to Interrogatories

20  requesting evidence of "pass-through" unless and until Defendants produce in full the sales,

21  pricing, and related information relevant thereto.  Plaintiffs reserve their right to supplement

22  these responses after their analysis of this information.

23         4.      Plaintiffs object to each of Defendant's Interrogatories on the grounds that

24  Defendants have failed or refused to produce documents related CRT Finished Products, despite

25  the Special Master's ruling that such discovery is not stayed or tolled in any way.  Plaintiffs

26  reserve their rights to supplement these Responses after their review of Defendants' documents

27  is complete.

28

2

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG SDI
AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

5.      Plaintiffs object to each of Defendant's Interrogatories, Definitions and Instructions to the extent they seek documents or information (i) not relevant to the subject matter of this action; (ii) not relevant to any claim or defense in this action; (iii) not reasonably calculated to lead to the discovery of admissible evidence; (iv) different from, inconsistent with, or in addition to what is required to be produced under the Federal Rules of Civil Procedure, the Civil Local Rules of the United States District Court for the Northern District of California, any existing Court Order in this case, or any other applicable rule or law.

6.      Plaintiffs object to the Interrogatories to the extent that they are vague, ambiguous and require speculation to determine their meanings.

7.      Plaintiffs object to the Interrogatories to the extent they seek to discover information and/or documents from persons or entities that are not parties to this action and information or documents that are not now and never have been in the possession, custody or control of the Plaintiffs.

8.      Plaintiffs object to the Interrogatories to the extent that they impose an undue burden on Plaintiffs by, for example, requiring Plaintiffs to search for documents:  (a) the value of which, if any, is substantially outweighed by the burden or cost of searching for them, or (b) that are equally available to Defendant or already in Defendant's possession.

9.      Plaintiffs object to the Interrogatories to the extent they call for information and/or documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection.  This objection includes, but is not limited to, information that Defendant seeks regarding communications between Plaintiffs' attorneys and/or between Plaintiffs and their attorneys made during or in anticipation of litigation.  Inadvertent identification or production, or identification or production pursuant to this Court's Order of December 8, 2010, of any such information in a document shall not constitute a waiver of any such privilege with respect to the document produced or the subject matter thereof, or a waiver of the Plaintiffs' right to object to the use of any such document during trial or any subsequent proceeding.  To the extent that any such protected information is inadvertently produced in

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG SDI AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1   response to the Interrogatories, the production of such information shall not constitute a waiver

2   of Plaintiffs' right to assert the applicability of any privilege or immunity to the information, and

3   any such document and all copies or images thereof shall be promptly returned, sequestered or

4   destroyed upon demand pursuant to Rule 26(b)(5)(B).

5         10.   Plaintiffs object to the Interrogatories as premature "contention interrogatories"

6   in that they: (i) call for opinions and contentions relating to fact or application of law to fact

7   that Plaintiffs should not be required to disclose until discovery has been substantially

8   completed; (ii) call for legal conclusions; and (iii) are likely to require supplemental answers,

9   prematurely commit Plaintiff to positions, and artificially narrow issues.  Such information

10  cannot be fairly and practically provided until after the completion of discovery.  The interests

11  of judicial economy and efficiency dictate that contention discovery is more appropriate after

12  a substantial amount of merits discovery has been conducted.  To the extent that Defendant's

13  Interrogatories request the contentions of Plaintiffs in this case, those contentions are set forth

14  in large part in Indirect Purchaser Plaintiffs' Consolidated Amended Complaint (the

15  "Complaint").  The allegations of the Complaint are incorporated by reference in each of the

16  answers to the Interrogatories set forth herein.  In responding to Defendant's contention

17  interrogatories pursuant to Court Order, Plaintiffs reserve their rights to supplement these

18  responses at any time prior to the final pre-trial conference herein.

19        11.   Plaintiffs object to the Interrogatories to the extent they purport to require

20  Plaintiffs to disclose information or produce documents concerning any expert or other person

21  or entity retained by counsel to assist in the preparation of the Plaintiffs' case: (a) to the extent

22  any such person or entity will not be designated by the Plaintiffs as a trial witness on the

23  ground that such disclosure is neither relevant nor reasonably calculated to lead to the

24  discovery of admissible evidence; and (b) on the grounds that any such present disclosure is

25  prejudicial to the Plaintiffs' preparation of this case and is not required by the Federal Rules

26  of Civil Procedure.

27

28

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG SDI
AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

12.     Plaintiffs object to the Interrogatories to the extent they call for information and/or documents of a confidential and/or proprietary nature.

13.     Plaintiffs object to Defendant's definitions of "You," and "Your" as overly broad.

14.     Plaintiffs object to Defendant's definition of "Document" as overly broad to the extent it purports to define the term more broadly than Federal Rule of Civil Procedure 34.

15.     Plaintiffs object to the definition of the term "identify" in the Interrogatories as being overly broad and requesting information that is not reasonably calculated to lead to the discovery of admissible evidence.  Further, the application of this definition will necessarily render any interrogatory vague, ambiguous, and burdensome.

16.     By responding to the Requests, Plaintiffs do not concede to the truth or accuracy of any characterization, allegation, or statement made in the Requests.

17.     Plaintiffs reserve their rights to object on any ground to the use of the Responses to or the subject matter of the Requests in any subsequent proceeding, and at the trial of this action.

18.     Plaintiffs' Responses set forth herein are made without in any way waiving: (a) all rights to object to these Interrogatories, the Responses, or the subject matter thereof, as to the competency, relevancy, materiality, privilege, and admissibility as evidence for any purpose, in any proceeding in, or at the trial of, this or any other action; (b) the right to object on any ground to the use of these Responses, or the subject matter thereof, in any proceeding in, or at the trial of, this or any other action; or (c) the right to object  on any ground at any time to requests to admit, Interrogatories, or other discovery procedures involving or relating to the subject matter of these Requests.

19.     Plaintiffs hereby incorporate by each of the foregoing General Objections into any or all Specific Objections set forth below, whether or not stated separately therein. No Specific Objection is a waiver of any of the General Objections.

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG SDI AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

20.     Plaintiffs object to the "state with specificity the factual basis" language in the Interrogatories as burdensome, vague, ambiguous, and not reasonably calculated to lead to the discovery of relevant evidence.

21.     Plaintiffs object that, where intent and credibility are at issue, elements of the case may be proved or disproved by combinations of facts that, individually, are not relevant of themselves.

22.     Plaintiffs object to each Interrogatory to the extent that the information or facts sought are contained in Plaintiffs' Consolidated Amended Complaint or publicly available sources.

23.     Plaintiffs reserve their right to try their case as Plaintiffs determine is best at trial. This includes by not using facts stated herein or using facts additional to those stated herein.

24.     Plaintiffs object to, and expressly disclaim, any need or intent to prove <u>any</u> fact listed herein as a prerequisite to proving their claims at trial.

<u>**INTERROGATORIES**</u>

<u>**INTERROGATORY NO. 1:**</u>

State with specificity the factual basis (including the IDENTITY of each DOCUMENT, PERSON or other evidentiary source upon which YOU rely) for YOUR allegation that DEFENDANTS "conspired to fix, raise, maintain and/or stabilize the prices" of monitors containing CRTs, as alleged in, *inter alia*, Paragraph 1 and 15 of the COMPLAINT.

<u>**RESPONSE TO INTERROGATORY NO. 1:**</u>

Subject to and without waiver of any General or Specific Objection, and reserving their right to supplement this Response, Plaintiffs respond as follows:

In making the allegations in the IP CAC that the Defendants conspired to fix the prices of CRT Finished Products as part of a single conspiracy to fix the prices of CRTs and CRT Finished Products, Plaintiffs relied upon the following categories of evidence: (1) evidence regarding the conspiracy provided by Chunghwa; (2) publicly available facts regarding the vertically integrated nature of defendants' CRT and CRT Finished Product businesses; (3) the

1  fact that the markets for CRTs and CRT Finished Products are inextricably intertwined; and (4)

2  facts drawn from related proceedings.

### 1.   Evidence Regarding The Conspiracy Provided By Chunghwa

4      Prior to filing the CAC, Plaintiffs had various discussions with Chunghwa pursuant to the

5  settlement agreement.  During these discussions, Chunghwa provided details of the conspiracy

6  and Chunghwa's involvement in it.  Chunghwa also provided the date, location, meeting type

7  and participants in the various meetings of which it is aware.  Chunghwa further noted that it was

8  aware of meetings between the other Defendants that representatives of Chunghwa did not

9  attend.  Thus, Plaintiffs believed that there was additional evidence of the conspiracy in the

10  hands of the other Defendants.  Chunghwa did not produce any documents as part of these

11  discussions pursuant to the settlement agreement.

12      The participants in the conspiracy and the various corporate families involved are as

13  alleged in the IP CAC at Paragraphs 50 to 108 and Paragraphs 166-187.  Those Defendants who

14  are part of specific corporate families are referred to in this Response by the name of that

15  corporate family.  *See id;* ¶ 188.

16      This information was compiled by Chunghwa based upon reports prepared by Chunghwa

17  employees at or near the time of the meetings.  Chunghwa routinely prepared internal reports of

18  the various bilateral and Glass Meetings.  The reports were prepared by junior level employees

19  who attended the meetings, and then passed up the chain of authority at Chunghwa for review.

20  The reviewer initialed the report and often wrote comments or directions for subordinates on it.

21  The report then passed back down the chain of authority.  After the filing of the CAC, Chunghwa

22  produced these reports as part of its document production when the DOJ stay expired on March

23  8, 2010.

24      In addition, counsel for Chunghwa read to Plaintiffs' counsel excerpts of certain meeting

25  reports.  The following excerpts support Plaintiffs' allegations that Defendants conspired to fix

26  the prices of both CRTs and CRT Finished Products as part of a single conspiracy:

27

28

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG SDI
AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1.    A Report of a May 29, 1995 bilateral meeting between Chunghwa and LG (also known as "Goldstar" or "Lucky Goldstar"), states:

2.    An October 24, 1996 report of a bilateral meeting between Chunghwa and LG

3.    A March 19, 1997 report of a Management Meeting among Samsung, Philips, Orion, LG, and Chunghwa states:

1
2
    4.  A June 23, 1999 Report from a Top Meeting in Korea attended by
3
Samsung, Philips, Orion, and Chunghwa,
4
5
6
7
8
9
10
    5.  A June 28, 2000 report of a Working Level Meeting among Samsung, LG, Orion,
11
Philips and Chunghwa states that:
12
13
14
    6.  A report from a September 21, 2000 Top Meeting between Samsung, LG, Orion,
15
Philips and Chunghwa
16
17
18
19
20
21
22
23
24
25
26
27
28

9

1

2

3

4

5

6

7

8

9        7.      A report from a February 22, 2002, Management Meeting among Samsung, LPD,

10   Orion and Chunghwa, notes:

11

12

13

14

15

16        8.      A Report from a March 25-27, 2004 Management Meeting between Samsung,

17   LPD and Chunghwa, states:

18

19

20

21        9.      An internal Chunghwa memorandum dated July 2, 2004,

22

23

24

25

26

27        On March 8, 2010, Chunghwa produced the translated meeting reports to

28   Plaintiffs.  The following are examples of meeting reports which further substantiate

10

Plaintiffs' allegations of a single conspiracy involving both CRTs and CRT Finished Products:

1.    A September 18, 1995 report of a meeting with between Chunghwa and Samsung beginning at CHU00028865.01E, states at CHU00028867E:

2.    CHU00028670E is a December 9, 1997 report of a meeting between Samsung, Orion and Chunghwa.  At CHU00028671E, the report states:

3.    CHU00030701.01E is a January 18, 1999 report of a Top Meeting attended by Samsung, LG, Orion, Philips and Chunghwa.  At CHU00030702.01E, it states:

4.    In CHU00030731.01E, a March 15, 1999 report of a Working Level Meeting attended by Samsung, LG, Orion, Philips and Chunghwa, it states at CHU00030731.02E:

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG SDI AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1

2

3

4

5          5.      In CHU00030757.01E, a May 12, 1999 report from a Working Level

6    Meeting attended by Samsung, Philips, Orion and Chunghwa, it states at

7    CHU00030760E:

8

9

10

11

12          6.      CHU00030512.01E is a report from a September 17, 2004 Glass Meeting

13    attended by MT Picture Display Co., Ltd., Samsung, LPD, Thai CRT and Chunghwa,

14

15

16

17

18

19

20

21

22          7.      CHU00006009.01E is an April 26, 2005 report of a bilateral meeting

23    between Samsung Electronics (which manufactured only CRT Finished Products) and

24    Chunghwa,

25

26

27

28

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG SDI
AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

[REDACTED]

8.      In CHU00014227.01E, a report of a November 21, 2005 Glass Meeting attended by Samsung, LPD and Chunghwa, [REDACTED]

[REDACTED]

(CHU00014228E)

### 2.  The Vertical Integration Of Certain Defendants

Defendants Thai CRT Company, Ltd., Samtel Color, Ltd. and the IRICO entities, are the only Defendants that were not members of a corporate family in which vertically integrated companies manufactured and sold both CRTs and CRT Finished Products. More specifically, during the Class Period, the Samsung, Hitachi, LG, Philips,[1] Toshiba, Panasonic (formerly Matsushita),[2] Daewoo and Chunghwa/Tatung entities, were part of vertically integrated operations that manufactured CRTs and sold them to their affiliated companies, which then incorporated the CRTs into CRT Finished Products.

According to Chunghwa, the fact that many of the Defendants were vertically integrated was frequently discussed at the meetings.  The conspirators fixed the prices on

[1] LG.Philips Displays ("LPD") was a CRT joint venture between LG and Philips and sold CRTs primarily to their parent companies, which manufactured and sold CRT Finished Products.  LPD is therefore a member of the LG and Philips corporate families.

[2] MT Picture Display Co., Ltd. ("MTPD") was also a CRT joint venture between Panasonic and Toshiba, and which is now wholly-owned by Panasonic.  MTPD sold CRTs to Panasonic and Toshiba which manufactured CRT Finished Products.  Plaintiffs consider MTPD a member of the Panasonic and Toshiba corporate families.  Beijing Matsushita Color CRT Company, Ltd. ("BMCC") is also a joint venture company, 50% of which is held by MTPD, and which was formerly held by Panasonic.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Branch of the Industrial and Commercial Bank of China, Ltd. (a China state-owned enterprise).  BMCC is also properly considered a member of the Panasonic corporate family.

13

1  CRTs to be applied "internally" within the vertically integrated Defendants that manufactured

2  televisions or computer monitors.  Such "internal" transactions accounted for many of CRTs

3  produced by the tube divisions or subsidiaries of the vertically integrated Defendants.

4        For example, a report of a January 4, 2002 meeting report for a CDT meeting attended

5  by Samsung, LPD, Orion and Chunghwa stated that, ████████████████████████

6  ████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ██████████████████████████

9        Likewise, South Korean attendees at conspiratorial meetings sought to address

10  competition for their vertically integrated customers by telling their co-conspirators to

11  increase the prices charged to the Korean entities' own sister or affiliated companies for

12  CRTs.  For example, at a July 13, 2000 meeting, ████████████████████████

13  ████████████████████████████████████████████

14  ██████████████████████████████████████

15

16  ██████████████

17        In addition, Chunghwa informed Plaintiffs of at least sixty-five (65) meetings which

18  were attended by two or more of the vertically-integrated Defendants.  Even more compelling

19  is the evidence that Chunghwa informed Plaintiffs that SEC, who manufactured only CRT

20  Finished Products, attended some of the meetings.  *See, e.g.,* CHU00006009.01E.  As

21  demonstrated herein, at many of these meetings, ████████████████████████

22  ████████████████████████████████████████████████████████

23  ████████████████████████████████████████████

24  ████████████████████████████████████████████

25        Plaintiffs further relied upon publicly available sources in making the allegations

26  in the CAC regarding vertical integration, including the Defendants' websites, academic

27  articles and treatises, and industry/market reports, some of which were produced to

28

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG SDI
AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1   Plaintiffs in November 2008 pursuant to Paragraph 4 of the Stipulation And Order Re:

2   Limited Stay of Discovery, dated September 12, 2008.

3          For example, SEC and propounding party SEAI manufacture and sell CRT

4   Finished Products.  Their Samsung SDI subsidiaries manufacture CRTs.  On its web site,

5   Samsung describes itself as a "multi-faceted family of companies," with Samsung

6   Electronics touted as "[o]ur flagship company," and Samsung SDI as one of the affiliated

7   companies "that make up SAMSUNG."[3] An article entitled, "Capability of the Samsung

8   Group in Project Execution and Vertical Integration: Creating in Korea and Replicating in

9   China," dated July 2006, further describes the vertical integration of the Samsung entities

10  at p.11:

11          In display manufacturing business, SEC is closely interlinked with
            Samsung SDI, a manufacturer of television tubes, which in turn relies on
12          Samsung Corning, which produces glass bulbs for the tubes, as indicated
            by the fact that 61% of its total revenue comes from Samsung SDI.
13          Samsung SDI, in turn, supplies 52% of its products to Samsung
            Electronics.
14
                                        *  *  *
15          The vertical integration among them produces a synergy effect and
            competitive spirit that inspires each product group to develop new and
16          innovative creations.

17          The LG entities provide an even more striking example.  From 1995 to 2001, when LG

18  spun off its CRT business to LPD, the LG entities that manufactured CRTs and CRT Products

19  were not even separately incorporated entities.  They were merely divisions of the parent

20  company, LG Electronics, Inc.  In LG Electronics' 1999 Annual Report (available at

21  http://www.lg.com/global/ir/reports/annual-reports.jsp), it states that the company was divided

22  into three separate product companies: Digital Display, Digital Appliance and Digital Media.

23  The Digital Display division manufactured both CRTs and CRT Finished Products,

24  "conduct[ing] R&D and manufacturing in digital display products and their core components.

25

26  _____

27  [3] *See* http://www.samsung.com/hk_en/aboutsamsung/corporateprofile/index.html;
    http://www.samsung.comhk_en/aboutsamsung/index.html; and
28  http://www.samsung.comhk_en/aboutsamsung/corporateprofile/affiliatedcompanies.html.

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG SDI
AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1  It has 7,500 employees at its four domestic operations and 20 overseas subsidiaries.  Besides its

2  Display Device Research Lab., it has other research centers and a marketing network at home

3  and abroad."  These included the Zenith Electronics Corporation in the United States, which

4  manufactured CRT televisions.  The same annual report further explained: "[t]he Company has

5  a centralized supporting division to provide general and administrative, marketing and sales

6  and research and development services to each business division."

7     Similarly, the Philips' entities that manufactured CRTs and CRT Finished Products

8  were often merely divisions of the same corporate entity.  For example, Philips Display

9  Components Company, which manufactured tubes in the United States until 2001 when it was

10  transferred to LPD, was a division of defendant Philips Electronics North America, Inc.

11  ("PENAC"), which manufactured CRT televisions.  The same was true for other Philips

12  Display Components companies around the world, all of which were divisions of the parent

13  company, Koninklijke Philips Electronics B.V.  *See also* Robert M. Grant, Contemporary

14  Strategy Analysis at 393 (5th ed. 2005), which notes how Philips was buying much of its CPTs

15  internally for use in its branded televisions.

16     In 2001, LG and Philips formed LPD, a CRT joint venture.  A meeting on February 22,

17  2001 ███████████████████████████████████████████████████████████

18  █████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████

20  █████████████████████████████████████████████████████████████████

21  █████████████████████████████████████████████████████████████████

22  ███████████████████████████████████████████

23     The Defendants' vertical integration, as described above, enabled them to dominate the

24  markets for both CRTs and CRT Finished Products.  For example, during the relevant period,

25  SEC held the largest worldwide market share for sales of CRT monitors.[4]  Vertically-integrated

26

27  ―――――――――――――――――

28  [4] *See, e.g.,* CHWA00062147: Quarterly Desktop Monitor Shipment and Forecast Report
   (Q4'03), at CHWA00062167 and CHWA00062429; CHWA 00253814: IDC Market

16

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG SDI
AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1    Defendants LG and Philips were also in the top 5, along with Dell and HP.  *Id.*  The Quarterly

2    Desktop Monitor Shipment & Forecast Report (Q2'05) (CHWA00221536) at p.11, provides

3    the Q1'05 market share results for CRT Monitors.  The Report notes that, "Samsung remained

4    #1 in terms of WW branded shipments," and that "[o]ver 57% of the market was owned by #1

5    Samsung, #2 LGE, #3 HP and #4 Dell."  The Report further notes that, "the most dominant

6    players remained the vertically integrated companies such as Samsung and LGE (as well as

7    Philips) along with the system bundlers (Dell and HP)."[5]  Dell and HP are referred to as

8    "system bundlers" because they did not manufacture their own monitors.  Plaintiffs are

9    informed and believe that Dell and HP purchased monitors primarily from SEC, LG and

10   Philips.  In other words, these three vertically integrated defendants accounted for a very large

11   share of the market for CRT monitors.

12        At the same time as SEC, LG and Philips controlled the market for CRT monitors, their

13   upstream affiliates, Samsung SDI and LPD, controlled the market for CRTs.  In

14   CHWA00129231, a CPT Research Analyst Presentation dated April 2002, a pie chart at

15   CHWA00129250 shows that as of 2001, Samsung SDI held a 28% market share, LPD held

16   24% and Chunghwa held 21%.  The Presentation further states at CHWA00129299: "The CRT

17   industry is dominated by three major players, which together control nearly 75% of the total

18   market . . . with relatively equal share of the market among the industry leaders, pricing in the

19   industry is stable and the outlook is positive."  *See also* CHWA00221827, Q2'05 Quarterly

20   Display Search Desktop Monitor Shipment and Forecast Report, which shows Samsung SDI as

21   "the top CDT producer with 40.6% of the tubes for desktop CRT monitors being produced by

22   ────────────────────────────────────────────

23   Analysis, "Worldwide PC Monitor 2004-2008 Forecast Update" (10/1/04), at
     CHWA00253825 and CHWA00253829; CHWA00230421: Quarterly Desktop Monitor
24   Shipment and Forecast Report (Q2'06), at CHWA00230444 ("the top five players all
     remained in their respective market positions with Samsung remaining in the top position
25   but LGE gaining the most share Q/Q.").

26   [5] *See also* CHWA00230421: Quarterly Desktop Monitor Shipment and Forecast Report
     (Q2'06), at CHWA00230747 ("[W]hile Samsung alone accounted for almost 24% of
27   the WW revenues for CRT displays, when combined with LGE's revenues, these two
     vertically integrated companies accounted for almost 40% of the WW revenues for the
28   category in the quarter.")

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG SDI
AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1  them in Q1'05." During that same time period, LPD held a 36.6% share and Chunghwa a

2  19.7% share, meaning that these three manufacturers held a combined market share of 96.9%.

3       Moreover, some of the Chunghwa documents that Plaintiffs have uncovered in their

4  review to date show tha ██████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████████

7  ████████████████  *See, e.g.,* CHU00647941.

8       Thus, the vertically integrated Defendant-manufacturers of CRTs and CRT Finished

9  Products collectively controlled the inseparable markets for CRTs and CRT Finished Products.

10  They set the prices of CRTs and marked up the prices of their CRT Finished Products through

11  their affiliated entities who assembled and sold CRT Finished Products to Plaintiffs. Simply

12  put, all of the vertically integrated Defendants were motivated to ensure that their downstream

13  manufacturers of CRT Finished Products did not absorb the increased (supracompetitive)

14  prices for CRTs. They agreed among themselves to raise the prices of finished products in

15  conjunction with their increase in the prices of tubes. The increase was passed on by the

16  downstream manufacturers to consumers through increased prices for CRT Finished Products.

17  The vertically integrated Defendants thereby recouped the benefits of their price-fixing at the

18  CRT and CRT Finished Product levels of the market.

19       **3.  The CRT And CRT Finished Product Markets Are Inextricably
20          Intertwined**

21       Considered together with the vertical integration of most Defendants, as described

22  above, Plaintiffs drew further support for their allegations of a single conspiracy involving both

23  CRTs and CRT Finished Products from the fact that the CRT and CRT Finished Product

24  markets are inextricably intertwined. CRTs have no independent utility. Their only value is as

25  components of finished products such as televisions, computer monitors, and other specialized

26  applications. The demand for CRTs comes solely from the demand for CRT Finished products

27  such that the demand for CRTs would not exist without the finished products purchased by

28  Plaintiffs. The CRT is the most expensive component in the finished products into which they

18

1  are incorporated, in unchanged form, and sold to consumers.  For example, the cost of the CRT

2  typically represents approximately 60% of the total cost to manufacture the computer monitor.

3  Hence, the market for CRTs and the market for the products into which they are placed are

4  inextricably intertwined because the CRT market exists to serve the CRT Finished Products

5  market.  Indeed, one could not exist without the other and so may not be separated.

6      **4. Information Obtained From Related Proceedings**

7      At the time Plaintiffs filed the IP CAC, there were a number of governmental and

8  private proceedings pending which raised claims related to the claims in this case and which

9  gave support to the claims raised in this case.  For example:

10  •    Claims made by the U.S. Department of Justice ("DOJ") and private plaintiffs

11      against many of the same defendants in this case for fixing the prices of TFT-LCD

12      panels and finished products.  There have been a number of guilty pleas in the DOJ

13      case.

14  •    A consent decree of the Japanese Fair Trade Commission banning retail price

15      maintenance by certain affiliates of defendants in this case.  1993 WLNR 1116859.

16      Although this case involved misconduct before the period alleged in this case, it

17      demonstrates the Defendants' ability to fix the prices of CRT Finished Products.

18  •    The indictment of C.Y. Lin, the former President of Chunghwa Picture Tubes, Ltd.

19      ("Chunghwa") by the DOJ in connection with a conspiracy to fix the prices of CPTs

20      (television tubes) and CDTs (monitor tubes).  The DOJ's press release announcing

21      the indictment stated: "This conspiracy harmed countless Americans *who*

22      *purchased computers and televisions* using cathode ray tubes sold at fixed prices."

23      [Emphasis added]

24  •    A raid by the European Commission in or around November 2007 on certain

25      manufacturers of CRTs based on suspected price fixing, sharing markets, or

26      exchanging market information.  *See*

27      http://europa.eu/rapid/pressReleasesAction.do?reference_MEMO/07/453.

28

19

- A raid by the Japanese Fair Trade Commission of defendants Matsushita (n/k/a Panasonic) and Samsung on suspicion of anticompetitive conduct.
- An investigation by the Hungarian Competition Authority into the CRT cartel that targeted entities that manufactured or controlled the manufacture of CRT Finished Products.
- An investigation of Samsung and Matsushita affiliates by the Korean Fair Trade Commission as part of an international probe into alleged price fixing.
- An investigation of Philips by competition authorities in several jurisdictions as reported by the International Herald Tribune.  *See* http://www.itworld.com/071121philipscrt.

## INTERROGATORY NO. 2:

State with specificity the factual basis (including the IDENTITY of each DOCUMENT, PERSON, or other evidentiary source upon which you rely) for YOUR allegation that DEFENDANTS intended to and did "pass on the full cost" CRTs in their sales of monitors containing CRTs, as alleged in, *inter alia*, Paragraph 238 of the Complaint.

## RESPONSE TO INTERROGATORY NO. 2:

Plaintiffs object to this Interrogatory as premature and more properly the subject of expert discovery at class certification, and on the grounds that any such present disclosure regarding "pass-through" is prejudicial to the Plaintiffs' preparation of this case and is not required by the Federal Rules of Civil Procedure.  Indeed, it is widely accepted in indirect purchaser antitrust class actions that a plaintiff's evidence in support of "pass-through" of the unlawful overcharge is presented in the form of an expert report filed with the motion for class certification.  In this case, a schedule for filing the motion for class certification has not even been entered.

Moreover, Defendants have so far failed or refused to produce documents and information that Plaintiffs will also use to show that Defendants "intended to pass on the cost" of their CRT Finished Products and "in fact did so."  Despite the fact that this case was pending for

20

1   almost a year and a half before the Consolidated Amended Complaint ("CAC") was filed, most

2   Defendants refused to respond to discovery unless and until the CAC survived their Fed. R. Civ.

3   P. 12(b)(6) motions to dismiss pursuant to *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007).

4   At the November 12, 2010 Hearing before the Special Master, Defendants acknowledged that

5   Plaintiffs "are entitled to a certain amount of sales data and pricing data involving finished CRT

6   products because they use that to try to show the issues of pass-on relating to [] damages."  (Nov.

7   12 Tr. 16: 25; 17: 1-4.)  Yet most Defendants have produced absolutely nothing in this regard.

8        In addition, Plaintiffs have subpoenaed certain transactional data from approximately

9   fifty (50) third party manufacturers, distributors and retailers of CRTs and CRT Finished

10  Products.  Plaintiffs are still negotiating these subpoenas with many of the third parties and so

11  the process of gathering the data is not yet complete.  Plaintiffs will use this data to show that

12  Defendants "intended to pass on the full cost" of the CRT in their CRT Finished Products and

13  "in fact did so," as alleged in Paragraph 238 of the CAC.

14       Subject to and without waiving the foregoing objections, Plaintiffs respond that they

15  relied upon the following categories of evidence in making the allegations in Paragraph 238: (1)

16  evidence provided by Chunghwa; (2) publicly available market and analyst reports; (3) treatises

17  authored by respected economists; and (4) newspapers publications.

18      **1.  Examples Of Meetings At Which Defendants Discussed The Need To Pass
        On The Cost Of CRTs In CRT Finished Products**

19

20      **a.**  During the discussions with Chunghwa, counsel for Chunghwa read excerpts of

21  certain meeting reports.  The following excerpts support Plaintiffs' allegations in Paragraph 238

22  of the CAC:

23      A report of a May 29, 1995 bilateral meeting between Chunghwa and LG (also known as

24  "Goldstar" or "Lucky Goldstar") states:

25

26

27

28

21

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG SDI
AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1

2

3

4

5

6

7    An October 24, 1996 report of a bilateral meeting between Chunghwa and LG

8

9

10

11

12

13

14

15

16

17    A March 19, 1997 report of a Management Meeting among Samsung, Philips, Orion, LG,

18    and Chunghwa states:

19

20

21

22

23    A June 23, 1999 report from a Top Meeting in Korea attended by Samsung, Philips,

24    Orion, and Chunghwa,

25

26

27

28

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG SDI
AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1

2

3

4    A June 28, 2000 report of a Working Level Meeting among Samsung, LG, Orion, Philips

5  and Chunghwa states that

6

7

8                         Top Meeting between Samsung, LG, Orion, Philips

9  and Chunghwa

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG SDI
AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1

2      A report from a February 22, 2002, Management Meeting among Samsung, LPD, Orion

3   and Chunghwa, notes:

4

5

6

7

8

9      A Report from a March 25-27, 2004 Management Meeting between Samsung, LPD and

10  Chunghwa states:

11

12

13

14  An internal Chunghwa memorandum dated July 2, 2004,

15

16

17

18

19

20      **b.**  On March 8, 2010, Chunghwa produced the translated meeting reports to

21  Plaintiffs.  The following are examples of meeting reports that Plaintiffs which further

22  substantiate Plaintiffs' allegations in Paragraph 238:

23

24      A September 18, 1995 report of a meeting with between Chunghwa and Samsung

25  beginning at CHU00028865.01E, states at CHU00028867E:

26

27

28

24

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG SDI**
**AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1

2

3    CHU00028670E is a December 9, 1997 report of a meeting between Samsung, Orion and

4    Chunghwa.  At CHU00028671E, the report states:

5

6

7

8    CHU00030701.01E is a January 18, 1999 report of a Top Meeting attended by Samsung,

9    LG, Orion, Philips and Chunghwa.  At CHU00030702.01E, it states:

10

11

12

13

14

15    In CHU00030731.01E, a March 15, 1999 report of a Working Level Meeting attended

16    by Samsung, LG, Orion, Philips and Chunghwa, it states at CHU00030731.02E:

17

18

19

20

21

22

23

24    In CHU00030757.01E, a May 12, 1999 report from a Working Level Meeting attended

25    by Samsung, Philips, Orion and Chunghwa, at CHU00030760E it states:

26

27

28

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG SDI
AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1

2

[REDACTED]

3   CHU00030512.01E is a report from a September 17, 2004 Glass Meeting attended by

4   MT Picture Display Co., Ltd., Samsung, LPD, Thai CRT and Chunghwa, [REDACTED]

5   [REDACTED]

6

7

8

9

10

11

12

[REDACTED]

13   CHU00006009.01E is an April 26, 2005 report of a bilateral meeting between Samsung

14   Electronics (which manufactured only CRT Finished Products) and Chunghwa, [REDACTED]

15   [REDACTED]

16   [REDACTED]

17

18

19

[REDACTED]

20   In CHU00014227.01E, a report of a November 21, 2005 Glass Meeting attended by

21   Samsung, LPD and Chunghwa, [REDACTED]

22   [REDACTED]

23   [REDACTED]

24   [REDACTED]

25   [REDACTED] (CHU00014228E)

26   **2. Examples Of Publicly Available Industry Or Analyst Reports That Support**

27   **Plaintiffs' Allegations In Paragraph 238**

28

1    In November 2008, certain Defendants produced publicly available industry or analyst

2    reports pursuant to Paragraph 4 of the Stipulation And Order For A Limited Stay Of Discovery,

3    dated September 12, 2008.  Plaintiffs reasonably relied on some of the market information found

4    in these reports to make the allegations in Paragraph 238.  An example includes

5    CHWA00107072, the Quarterly Global TV Shipment and Forecast Report dated March 31,

6    2006, it states at CHWA00107144 (p.73): "to calculate the CRT TV price, we used the previous

7    quarter's tube prices to determine the current quarter's CRT TV street prices due to the lag

8    between tube shipment and TV shipment.  Thus, the tube price reductions are reflected in street

9    prices one quarter later.  This delay is due to tube and TV inventories, assembly time, shipping,

10   etc."

11

12   **3.   Examples Of Treatises By Respected Economists That Support Plaintiffs'**

13   **Allegations In Paragraph 238**

14   Economic and legal literature recognizes that unlawful overcharges in a component

15   generally result in higher prices for products containing that price-fixed component.  As

16   Professor Herbert Hovenkamp, a noted antitrust scholar, has stated in his treatise, Federal

17   Antitrust Policy, The Law Of Competition And Its Practice (1994), at 624:

18

19   A monopoly charge at the top of the distribution chain generally results in
20   higher prices at every level below.  For example, if production of
     aluminum is monopolized or cartelized, fabricators of aluminum cookware
21   will pay higher prices for aluminum.  In most cases they will absorb part of
     these increased costs themselves and will pass part along to cookware
22   wholesalers.  The wholesalers will charge higher prices to the retail stores,
     and the stores will do it once again to retail consumers.  Every person at
23   every stage in the chain will be poorer as a result of the monopoly price at
     the top.  Theoretically, one can calculate the percentage of any overcharge
24   that a firm at one distributional level will pass on to those at the next level.

25

26   Similarly, two other antitrust scholars    Professors Robert G. Harris (Professor Emeritus

27   and former Chair of the Business and Public Policy Group at the Hass School of Business at the

28

27

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG SDI**
**AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern School of Law and author of the Handbook of the Law of Antitrust) have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception; it is the rule."  Robert Harris & Lawrence Sullivan, *Passing On the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. PA. L. REV. 269, 275 (1979).

Professor Jeffrey McKie-Mason (Arthur W. Burks Professor for Information and Computer Science, Professor of Economics and Public Policy, and Associate Dean for Academic Affairs in the School of Information at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, stated (in a passage quoted in a judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers.  When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers. . . . Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through and how it works in competitive markets.  This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

### 4. Examples Of News Reports That Support Plaintiffs' Allegations In Paragraph 238

A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG, Philips, and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be 20% hike in the price of our CRT monitors."

### INTERROGATORY NO. 3:

For each separate DEFENDANT (regardless of its affiliation with any other DEFENDANT) state with specificity the factual basis (including the IDENTITY of each

28

**INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO SAMSUNG SDI AMERICA, INC.'S FIRST SET OF INTERROGATORIES**

1  DOCUMENT, PERSON, or other evidentiary source upon which YOU rely) for YOUR

2  allegation that it "conspired to fix, raise, maintain and/or stabilize prices" at which products

3  containing CRTs were sold in the United States, as alleged in, *inter alia*, Paragraph 1 of the

4  COMPLAINT.

5  **RESPONSE TO INTERROGATORY NO. 3:**

6      Subject to and without waiver of any General or Specific Objection, and reserving

7  their right to supplement this Response, Plaintiffs respond as follows:

8      *See* Plaintiffs' Response To Interrogatory No. 1 above.

9  **INTERROGATORY NO. 4:**

10      For each separate DEFENDANT (regardless of its affiliation with any other

11  DEFENDANT) state with specificity the factual basis (including the IDENTITY of each

12  DOCUMENT, PERSON, or other evidentiary source upon which YOU rely) for YOUR

13  allegation that it agreed to allocate market shares and customers of sales of products containing

14  CRTs, as alleged in, *inter alia*, Paragraphs 156(i) and (j) of the COMPLAINT.

15  **RESPONSE TO INTERROGATORY NO. 4:**

16      Subject to and without waiver of any General or Specific Objection, and reserving

17  their right to supplement this Response, Plaintiffs respond as follows:

18      *See* Plaintiffs' Response To Interrogatory No. 1 above.

19  **INTERROGATORY NO. 5:**

20      IDENTIFY each PERSON who provided information to answer these Interrogatories.

21  **RESPONSE TO INTERROGATORY NO. 5:**

22      In conjunction with the aforementioned General Objections, Plaintiffs object to this

23  Interrogatory to the extent it calls for information protected by the attorney work product

24  doctrine.

25      Subject to and without waiving the foregoing General and specific objections, Plaintiffs

26  respond that the information contained in these Responses was provided by Plaintiffs' Counsel.

27  //

28

29

1   Dated: January 31, 2011              **TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP**

2                                        By:     /s/ Mario N. Alioto
                                                 Mario N. Alioto (56433)
3                                                Lauren C. Russell (241151)
                                                 2280 Union Street
4                                                San Francisco, California 94123
                                                 Telephone: (415) 563-7200
5                                                Facsimile: (415) 346-0679
6                                                E-mail: malioto@tatp.com
                                                 laurenrussell@tatp.com
7
8                                                ***Interim Lead Counsel***
                                                 ***for the Indirect Purchaser Plaintiffs***
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                        30