Guido Saveri (22349) guido@saveri.com
R. Alexander Saveri (173102) rick@saveri.com
Geoffrey C. Rushing (126910) grushing@saveri.com
Cadio Zirpoli (179108) cadio@saveri.com
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone:   (415) 217-6810
Facsimile:   (415) 217-6813

*Interim Lead Counsel for the Direct Purchaser
Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | MASTER FILE NO. 07-cv-5944 SC |
| | MDL NO. 1917 |
| This Document Relates to: | **DECLARATION OF GUIDO SAVERI IN SUPPORT OF PLAINTIFFS' OPPOSITION TO CERTAIN DEFENDANTS' MOTION FOR RULE 11 SANCTIONS** |
| ALL ACTIONS | |
| | The Honorable Charles A. Legge |
| | Court:   JAMS |
| | Date:    May 26, 2011 |
| | Time:    10:00 a.m. |

I, GUIDO SAVERI, declare:

1.    I am an attorney duly licensed by the State of California and am admitted to practice before this Court.  I am a partner at Saveri & Saveri, Inc. and have been appointed interim lead counsel for the Direct Purchaser Plaintiffs in this litigation.  I make this declaration in support of Plaintiffs' Memorandum of Points and Authorities in Opposition to Certain Defendants' Motion for Rule 11 Sanctions.  Except as stated otherwise, the matters set forth herein are of my own personal knowledge, and if called and sworn as a witness, I could and would competently testify regarding them.

2.    Attached hereto as Exhibit A is a true and correct copy of an Order Denying All Post-Trial Motions, entered in *Parrish v. National Football League Players Assoc.*, No. C 07-00943 WHA (Jan. 13, 2009 N.D. Cal.) which I understand was obtained from the public court files in that action.

3.    Attached hereto as Exhibit B is a true and correct copy of the United States Department of Justice ("DOJ") press release announcing the indictment of C.Y Lin of Chunghwa Picture Tubes, Ltd. which I understand was obtained from the public website of the DOJ.

4.    Attached hereto as Exhibit C is a true and correct copy of United States' and Samsung SDI Co.'s Joint Sentencing Memorandum and Request for Expedited Sentencing Under L.R. 32-1(b), entered in *U.S.A. v. Samsung SDI Co., Ltd.*, No. CR 11-0162 WHA (April 4, 2011 N.D. Cal.).  A copy of this document was forwarded to me by the DOJ in a letter dated April 6, 2011.

5.    Attached hereto as Exhibit D is a true and correct copy of the First Amended Complaint, filed in *Electrograph Systems, Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-CV-0831 (JS)(AKT) (March 10, 2011 E.D.N.Y.).  I am informed and believe that this action has been made a part of this MDL proceeding.

6.    It is my understanding, based on publicly available indictments, that the following defendants, or their employees, have been indicted by the United States Grand Jury for their participation in the CRT conspiracy: Chunghwa, LGE, and LP Displays (the joint venture between defendants LGE and Philips).  It has been publicly reported that MT Picture Display, Ltd. (the

1

Decl. of Guido Saveri ISO Plaintiffs' Opposition to Motion for Rule 11 Sanctions;
MDL No. 1917; Master File No. 07-cv-5944 SC

1  joint venture between defendants Panasonic and Toshiba) was accused of price fixing in the CRT

2  market by the Japan Fair Trade Commission.

3      7.      Prior to the filing of Plaintiffs' Consolidated Amended Complaint herein, Plaintiffs

4  consulted with an expert economist. The economist examined the structure and history of the

5  CRT Products market and provided Plaintiffs with his opinion that there was evidence supporting

6  the existence of a conspiracy encompassing both CRTs and Finished Products.

7      8.      On February 25, 2011, Moving Defendants emailed Plaintiffs a copy of their

8  motion for Rule 11 sanctions.   They did not provide a copy of the supporting declaration of

9  Jeffrey Kessler or the proposed order which they ultimately filed.

10     9.      I am one of the attorneys of record in the *In re TFT-LCD (Flat panel) Antitrust*

11 *Litigation*, C-07-1827 SI (N.D. Cal.), and am familiar with the proceedings therein.  The following

12 defendants in this action were also named in that action: SEC, Samsung Electronics America, Inc.

13 Hitachi, Ltd., Hitachi Displays, Ltd., Hitachi Electronic Devices (USA), Toshiba Corporation,

14 Toshiba America Electronic Components, Inc., Toshiba America Information Systems, Inc.,

15 Chunghwa Picture Tube Company, Ltd., and Tatung Company of America, Inc.  Various LG

16 subsidiaries, and other Samsung entities, were also named.

17     10.     The direct purchaser complaint in the *In re TFT-LCD (Flat panel) Antitrust*

18 *Litigation* was informed by inside information from Chunghwa.

19     11.     The conspiracy alleged in the *In re TFT-LCD (Flat panel) Antitrust Litigation*

20 includes finished products.  Those allegations had survived motions to dismiss prior to the filing

21 of the CAC in this action.  Judge Illston has since certified a direct purchaser finished product

22 class.

23     12.     I was aware, at the time the CAC was filed in this action, that Defendant Hitachi

24 Displays, Ltd., a wholly owned subsidiary of defendant Hitachi, Ltd., had been indicted for price

25 fixing in the TFT-LCD case.  Defendants Hitachi Displays, Ltd. later pleaded guilty for price

26 fixing, including for a time period when it was a division of defendant Hitachi, Ltd.   Defendant

27 Chunghwa had also pleaded guilty in the TFT-LCD case at that time.

28     13.     The scope of conspiracies pleaded in civil antitrust cases often exceeds the scope of

2

Decl. of Guido Saveri ISO Plaintiffs' Opposition to Motion for Rule 11 Sanctions;
MDL No. 1917; Master File No. 07-cv-5944 SC

1   indictments or negotiated plea agreements in criminal cases. This was true in the TFT-LCD case,

2   where the indictments do not identify finished products, and were initially limited to sales to

3   certain third parties. Attached hereto as <u>Exhibit E</u> is a true and correct copy of the Information

4   filed against Hitachi Displays, Ltd. by the DOJ on March 5, 2009, which identifies only a

5   conspiracy with regard to sales to Dell.

6         14.   It was also true in *In Re Dynamic Random Access Memory (Dram) Antitrust Litig.*,

7   C-02-1486 PJH (N.D. Cal.), in which I was one of the co-lead counsel for the Direct Purchaser

8   class. The criminal plea agreements in that case identified a conspiracy to fix prices only to

9   "certain" original equipment manufacturers ("OEMs"). However, Judge Hamilton certified a class

10   consisting of all direct purchasers, not just OEMs.

11         15.   I understand that Defendant Samsung Electronics Co., Ltd. ("SEC") is the amnesty

12   applicant in the TFT-LCD case. SEC also pleaded guilty, along with its subsidiary Samsung

13   Semiconductor, Inc., to price-fixing in the DRAM market. I also understand, by virtue of my

14   participation in civil cases alleging price-fixing in those products, that SEC was the amnesty

15   applicant in the SRAM and Flash Memory DOJ investigations.

16

17       I declare under penalty of perjury under the laws of the United States that the foregoing is

18   true and correct. Executed this 20th day of April, 2011 at San Francisco, California.

19

20                       */s/ Guido Saveri*

                           Guido Saveri

21

  Crt.390

22

23

24

25

26

27

28

Decl. of Guido Saveri ISO Plaintiffs' Opposition to Motion for Rule 11 Sanctions;
MDL No. 1917; Master File No. 07-cv-5944 SC

# EXHIBIT A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BERNARD PAUL PARRISH, HERBERT
ANTHONY ADDERLEY, WALTER
ROBERTS III, on behalf of themselves
and all others similarly situated,

      Plaintiffs,

  v.

NATIONAL FOOTBALL LEAGUE
PLAYERS INCORPORATED, et al.,

      Defendants.
_____/

No. C 07-00943 WHA

**ORDER DENYING ALL
POST-TRIAL MOTIONS**

    The jury returned a verdict for the plaintiff class of retired NFL players who had signed

a "Retired Player Group License Agreement" during the class period, finding that defendants

had breached a duty to market their likeness and names. The verdict was for $7.1 million in

compensatory damages and $21 million in exemplary damages. Defendants have now moved

for judgment in their favor. A hearing has been held. Briefing before and after the hearing

have been considered.

    The Court is satisfied that the jury instructions were correct and fairly covered the issues

submitted to the jury (or that any problem with them was not preserved). So much has already

been said on the record as to the reasons for the instructions that more is unnecessary, although

it is worth adding that on a majority of legal issues, the instructions favored the defense view of

the law. The punitive damage instruction, for example, was exactly as requested by the defense.

**United States District Court**
For the Northern District of California

1       The only other question is whether under the law as stated in the instructions, the trial

2 evidence was sufficient to support the verdict. No doubt, defense counsel made a fine closing

3 to the jury. Had the verdict been the other way, it would have been supported. But that is not

4 the test. Given the deference we must accord jury verdicts, the test is whether the verdict as

5 rendered was supportable. The answer is yes. Nor was the verdict so far against the weight

6 of the evidence as to warrant a new trial.

7       The jury could reasonably have accepted the view of the evidence that defendants

8 undertook a fiduciary duty to promote and to market all retired players who had signed

9 RPGLAs — yet made no effort to do so — and that defendants' true commercial motive was

10 to create an illusion of representation so that no one else would seek to sign up the RPGLA

11 class and to market them. While defendants offered vague verbal testimony of passing

12 attempts to market the RPGLA group as a whole, the jury could have easily rejected those

13 snippets as self-serving "double talk." Not a single offer to market the entire group was ever

14 in writing; nor was there ever any documentary corroboration of any such verbal group offer.

15 To the contrary, the only writings showed the opposite of marketing — for example, that

16 defendants told Electronic Arts to "scramble" the identities of retired players in the lucrative

17 Madden vintage-team game. This game would have been a golden opportunity for defendants

18 to have offered to license the entire group of RPGLA members but, significantly, no such

19 offer was made — or so the jury could reasonably have found. Instead, defendants told EA

20 to "scramble" the names and identities of retired players and the class received zero from this

21 potential bonanza. What is more, the Hall of Fame evidence showed that defendants were

22 willing to "sell out" the RPGLA class members in order to curry favor with EA (by keeping

23 a competitor of EA out of the market) — or so the jury could have reasonably concluded.

24 And, the "escrow account" referenced in the RPGLA (supposedly to be set up to hold revenues

25 for class members) was never even established by defendants, from which it could reasonably

26 have been inferred that the escrow account was never intended to be anything more than an

27 illusion.

28

**United States District Court**
For the Northern District of California

1     The multi-factor test for the existence of a fiduciary duty arguably favored defendants

2   on some points but overall there was sufficient evidence that defendants took on a fiduciary

3   duty to market the RPGLA class as a group.  For example, defendants' own website (TX 5)

4   held themselves out as "representing" both active and retired players with respect to their

5   images and identities, saying that Players, Inc., was formed "to generate revenue for the

6   players . . ." and that it had been "aggressive in its efforts to expand player marketing

7   opportunities."  Other such supportive evidence is cited in plaintiff's memorandum.

8     A monumental fact was never adequately explained by defendants — how could it

9   have been that defendants lobbied thousands of retired players for fourteen years to sign up

10   for defendants' RPGLA "program," yet never paid one cent to any retired player under the

11   program?  Put differently, if retired players' images and identities were really the undesirable

12   "dog food" contended by the defense, then why did they try so hard to sign up the RPGLA class

13   members for so long — only to never pay a penny?  Given the golden opportunity presented

14   by the Madden vintage-team game, the jury could reasonably have concluded that the true

15   motive was to deter or to head off any competing effort by any third-party promoter (or by

16   the retired players themselves) to license them as a group and to lull the retired players into

17   misbelieving that defendants were out on the hustings trying to generate revenue for them.

18   Instead, defendants gave complete priority in their *group* efforts to marketing *active* players.

19   Defendants got to keep a large share of the *active* player group money (and very little of any

20   retired player group money) so the incentives were skewed to favor marketing the *active* players

21   to the exclusion of the *retired* players.

22     It is, of course, true that one can acquire a license to use a name and likeness without

23   also undertaking to be a marketing agent.  Put differently, a bare licensee may use or *not* use

24   the rights as it wishes — even to the point of ignoring them.  A marketing agent, by contrast,

25   takes on an affirmative duty to promote the name and likeness.  This distinction was carefully

26   explained in the final charge to the jury.  The jury plainly decided that defendants were more

27   than bare licensees and, indeed, had undertaken to be marketing agents under its "program" for

28   RPGLA class members.  The evidence supported this conclusion.  Again, defendants' website

**United States District Court**
For the Northern District of California

1    (TX 5) specifically boasted that defendants "represented" thousands of *retired* football players

2    with respect to their names and likenesses. In context, this meant that defendants were publicly

3    acknowledging their role as marketing agents for retired players. We must also remember that

4    defendants paid nothing for the RPGLAs, so retired players could have received compensation

5    only if defendants made an effort to market the rights. The players could reasonably have

6    expected that defendants would do so. This was thus unlike the situation where an investor

7    pays cash up front for name and likeness rights and then has the right, as a bare licensee, to

8    market or not to market as it wishes — or so the jury could reasonably have found.

9         Defendants' most vigorous attack is on the $7.1 million compensatory award. This was

10   for breach of the fiduciary duty to market RPGLA class images and identities. The defense

11   contends that the award was utterly speculative and merely a number snatched from the ether.

12   The defense correctly points out that plaintiff's ambitious damage theory at trial was that the

13   *retired* players were entitled to share equally and shoulder to shoulder with the *active* players

14   in dividing up the huge GLR revenue pool. This theory was presented for both the contract

15   claim and the fiduciary duty claim. Plainly, it was rejected by the jury on both counts.

16   Instead, the jury awarded a far more modest amount, $7.1 million. That leads to the question

17   of whether there was a viable basis in the record to sustain the $7.1 million verdict for the

18   breach of fiduciary duty.

19        While it is true that plaintiff's counsel presented a luxurious damage theory, the

20   instructions themselves supplied the correct measure. The jury was instructed (¶ 50) that

21   "the measure of damages for breach of fiduciary duty is the amount of money necessary to

22   place RPGLA class members in the same economic position they would have been in if

23   defendants' fiduciary duty had not been breached." The jury was further instructed that

24   plaintiff had to first prove economic injury as a result of any breach, and that plaintiff had to

25   prove damages with reasonable certainty. The jury was told that "Plaintiff is not entitled to

26   recover damages which are speculative, remote, imaginary, contingent, or merely possible.

27   Your award must be based upon evidence and not from speculation, guesswork or conjecture"

28

United States District Court

For the Northern District of California

1  (¶ 51). They were further told that if they found plaintiff's proof to be vague or speculative,

2  then the jury could award nominal damages.

3      So the correct measure of damages was before the jury. Was there evidence from which

4  the jury, following this measure, could assemble its own calculation? The defense is correct in

5  that no expert testimony addressed the range of prices a group license for all 2074 class

6  members might have commanded in the market during the times in question. In this regard, it is

7  even true that the Court itself noted this omission before the case went to the jury and heard

8  argument on its significance. Possibly, the better plaintiff's practice would have been to have

9  called a sports agent to advise the jury on what the plausible range of prices that might have

10  been fetched had defendants complied with their fiduciary duty.

11      In the end, the Court decided to let the issue go to the jury. The Court determined that

12  despite this circumstance, there was sufficient other evidence from which the jury could

13  construct a reasonable damage award, applying the correct measure stated in the instructions.

14  For example, the jury was aware of the massive dollars paid for the *group* license for *active*

15  players and the separate more modest dollars garnered by the various ad hoc license agreements

16  for *retired* players. Plaintiff's memorandum references other benchmarks and evidence on the

17  subject. The verdict is sufficiently low in relation to the vast sums negotiated for the active

18  players and was sufficiently close to the ad hoc totals for retired players that by these

19  benchmarks the verdict was reasonable.

20      While the $7.1 million number was never testified to by any expert, such testimony is

21  not a prerequisite. Otherwise, virtually all verdicts would have to be tossed aside, for juries are

22  supposed to exercise their own critical judgment and not simply rubber-stamp the theories of

23  retained "experts." The evidence as a whole supported the conclusion that had defendants

24  tried to market the RPGLA class members rather than letting EA scramble their identifies, a

25  group royalty in the general vicinity of the verdict would have been obtainable. When viewed

26  against the massive amounts paid for *active* player group rights, the $7.1 million was reserved.

27  The verdict was within the bounds of reasonableness and the law does not require that the dollar

28  amount be amenable to reverse engineering to trace the exact methodology used by the jury.

**United States District Court**
For the Northern District of California

1    Under our jury system, jury verdicts must be accorded great deference and a jury is permitted

2    "to do its own math." *City Solutions, Inc. v. Clear Channel Communications, Inc.*, 365 F.3d

3    835, 840–41 (9th Cir. 2004) (reversal of Rule 50 JMOL in analogous circumstances). In sum,

4    in light of these cautionary instructions, the comparable moderation of the verdict, and the

5    plausible benchmarks in the evidence, the verdict will be sustained as anchored in the evidence,

6    even if not in the stratospheric range requested by counsel for the class.

7        The punitive damages award will not be set aside. The jury could reasonably have

8    found an intentional and calculated breach of a fiduciary duty by defendants, for the reason

9    stated. The amount was not disproportionate to the wrong done or to the compensatory award.

10   Viewed in a light most favorable to the verdict, the evidence was clear and convincing.

11       With respect to the separate contract claim (on which no damages were awarded but

12   a breach was found), defendants had no one to blame but themselves for the confounded

13   wording of the RPGLA which, as was earlier said, was a "masterpiece of obfuscation."

14   While defendants presented a plausible "understanding" of it, the jury could reasonably have

15   rejected that interpretation, especially given that it was so lacking in any contemporaneous

16   written support.

17       All other grounds asserted are denied as without merit or having been waived. As to any

18   other specific point raised by the motion, this order is in agreement with the memorandum filed

19   by plaintiff. All defense post-trial motions are **DENIED**.

20               *               *               *

21       With respect to a plan of distribution of the recovery to the class members, all

22   proceedings to collect the judgment and to devise a plan of allocation shall be **STAYED**

23   pending resolution of all appeals, subject to the inquiry below. If the judgment is affirmed,

24   then defendants must then promptly pay the judgment into registry of the court (with statutory

25   interest from the date of judgment) and then a plan of allocation shall be devised. This is

26   without prejudice to a motion for security for the judgment should the finances of defendants

27   deteriorate but such circumstances seem unlikely at present. Plaintiff, however, shall be entitled

28

1   to quarterly inquiry into defendants' financial condition, failing cooperation on which the Court

2   shall, on motion, consider a bond requirement.

3   So too as to any award of attorney's fees. It is unseemly to immediately lop a large

4   percentage off the top for the lawyers until the plan of distribution is determined and the Court

5   can see how prejudiced class members would be by any large fee award. The attorney's fee

6   motion and the motion for a side bonus payment to the class representative are DENIED

7   WITHOUT PREJUDICE to renewal in connection with the plan of distribution, which shall all

8   take place after all appeals of the main judgment.

9                                   *           *           *

10   By this order, the Court requests counsel to submit short memoranda on the issue of

11   whether it is necessary to approve a plan of distribution or take any further action before the

12   case can go on appeal. Please submit the memoranda within FOURTEEN CALENDAR DAYS of

13   this order. The same memoranda should address also whether notice and opportunity to be

14   heard should be given to the class as to the proposed plan of distribution and as to any

15   attorney's fee motion and/or a side bonus payment to the class representative.

16

17   **IT IS SO ORDERED.**

18

19   Dated: January 13, 2009.

20                                               WILLIAM ALSUP
                                                 UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

# EXHIBIT B

**JUSTICE NEWS**

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                                        Tuesday, February 10, 2009

### Former Executive Indicted for His Role in Two Cathode Ray Tube Price-Fixing Conspiracies

*Global Price-fixing Scheme Involves Tubes Used in Computer Monitors and Televisions*

WASHINGTON – A federal grand jury in San Francisco today returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa Picture Tubes Ltd. for his participation in global conspiracies to fix prices of two types of cathode ray tubes (CRTs) used in computer monitors and televisions, the U.S. Department of Justice announced today. This is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry.

The indictment, filed today in U.S. District Court in San Francisco, charges Cheng Yuan Lin, aka C.Y. Lin, a resident of Taiwan, with conspiring with others to suppress and eliminate competition by fixing prices, reducing output and allocating market shares of color display tubes (CDTs) to be sold in the U.S. and elsewhere, beginning at least as early as Jan. 28, 1997, until at least as late as April 7, 2003. The indictment also charges C.Y. Lin with conspiring with others to suppress and eliminate competition by fixing prices for color picture tubes (CPTs) to be sold in the U.S. and elsewhere, beginning at least as early as March 12, 1997, until at least as late as April 7, 2003.

CRTs consist of evacuated glass envelopes that contain an electron gun and a phosphorescent screen. When electrons strike the screen, light is emitted, creating an image on the screen. CDTs and CPTs are each types of CRTs. CDTs are used in computer monitors and other specialized applications, while CPTs are used in color televisions. The worldwide market for CRTs, including CPTs and CDTs, in 1997, at the start of the conspiracies has been estimated at approximately $26 billion.

"This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices," said Scott D. Hammond, Acting Assistant Attorney General in charge of the Antitrust Division. "The Antitrust Division will continue to prosecute individuals, wherever they are located and however high their position on the corporate ladder, who engage in price fixing aimed at U.S. businesses and consumers."

According to the charges, C.Y. Lin and co-conspirators carried out the CDT conspiracy by, among other things:

- Attending meetings and engaging in conversations and communications in Taiwan, Korea, Malaysia, China and elsewhere to discuss the prices, output and market shares of CDTs;
- Agreeing during those meetings, conversations and communications to charge prices of CDTs at certain target levels or ranges;
- Agreeing during those meetings, conversations and communications to reduce output of CDTs by shutting down CDT production lines for certain periods of time;
- Agreeing during those meetings, conversations and communications to allocate target market shares for the CDT market overall and for certain CDT customers;
- Exchanging CDT sales, production, market share and pricing information for the purpose of implementing, monitoring and enforcing adherence to the agreed-upon prices, output reduction and market share allocation;
- Implementing an auditing system that permitted co-conspirators to visit each other's production facilities to verify that CDT production lines had been shut down as agreed;
- Authorizing and approving the participation of subordinate employees in the conspiracy;
- Issuing price quotations and reducing output in accordance with the agreements reached; and
- Taking steps to conceal the conspiracy and conspiratorial contacts through various means.

C.Y. Lin is charged with carrying out the CPT conspiracy with his co-conspirators by, among other things:

- Attending meetings and engaging in conversations and communications in Taiwan, Korea, Malaysia, China, Thailand, Indonesia and elsewhere to discuss the prices of CPTs;
- Agreeing during those meetings, conversations and communications to charge prices of CPTs at certain target levels or ranges;
- Exchanging CPT pricing information for the purpose of implementing, monitoring and enforcing adherence to the agreed-upon prices;
- Authorizing and approving the participation of subordinate employees in the conspiracy;
- Issuing price quotations in accordance with the agreements reached; and
- Taking steps to conceal the conspiracy and conspiratorial contacts through various means.

On Feb. 3, 2009, Lin was indicted for his participation in a separate conspiracy to suppress and eliminate competition by fixing the prices of Thin Film Transistor-Liquid Crystal Display (TFT-LCD) panels.

Lin is charged with violating the Sherman Act, which carries a maximum penalty of three years imprisonment and a fine of $350,000 for individuals for violations occurring before June 22, 2004. The maximum fines may be increased to twice the gain derived from the crime or twice the loss suffered by the victims if either of those amounts is greater than the Sherman Act maximum fines.

This case is part of an ongoing joint investigation by the San Francisco Field Office of the Antitrust Division of the U.S. Department of Justice and the Federal Bureau of Investigation in San Francisco. Anyone with information concerning illegal conduct in the CRT industry is urged to call the San Francisco Field Office of the Antitrust Division at 415-436-6660.

09-110                                                                                                                    Antitrust

# EXHIBIT C

1  LIDIA MAHER (CSBN 222253)
   MAY LEE HEYE (CSBN 209366)
2  TAI S. MILDER (CSBN 267070)
   Antitrust Division
3  U.S. Department of Justice
   450 Golden Gate Avenue
4  Box 36046, Room 10-0101
   San Francisco, CA 94102
5  Telephone: (415) 436-6660

6  Attorneys for the United States

7                UNITED STATES DISTRICT COURT

8            FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                   SAN FRANCISCO DIVISION

10

11 UNITED STATES OF AMERICA          )  Case No. CR 11-0162 (WHA)
                                     )
12                                   )  UNITED STATES' AND
              v.                     )  SAMSUNG SDI CO.'s
13                                   )  JOINT SENTENCING
                                     )  MEMORANDUM AND REQUEST
14 SAMSUNG SDI COMPANY, LTD.,        )  FOR EXPEDITED SENTENCING
                                     )  UNDER L.R. 32-1(b)
15            Defendant.             )
                                     )  _____
16                                   )
                                     )  DATE:   April 19, 2011
17                                   )  TIME:   2:00 p.m.
                                     )  COURT:  Hon. William Alsup
18 _____)

19              **JOINT SENTENCING MEMORANDUM**

20      The United States of America and the defendant, Samsung SDI Company, Ltd.

21 ("Samsung SDI"), file this Joint Sentencing Memorandum in support of their recommendation

22 that the Court sentence the defendant to pay an agreed fine of $32 million, payable in two

23 installments with interest over one year. The parties also request that sentence be imposed as

24 soon as possible, but no later than April 19, 2011, based on the current record without need of an

25 evidentiary sentencing hearing or a presentence report.

26                        **INTRODUCTION**

27      On March 18, 2011, the United States filed an Information charging Samsung SDI with

28 participating in a conspiracy to suppress and eliminate competition by fixing prices, reducing

JOINT SENTENCING MEMORANDUM - PAGE 1

1 output, and allocating market shares of color display tubes ("CDTs") sold in the United States

2 and elsewhere, from at least as early as January 1997, until at least as late as March 2006, in

3 violation of the Sherman Antitrust Act, 15 U.S.C. § 1. Samsung SDI is scheduled for a change

4 of plea and possible sentencing on April 19, 2011. Samsung SDI will waive indictment and

5 plead guilty under Fed. R. Crim. P. 11(c)(1)(C).

6      The United States and Samsung SDI jointly submit this memorandum to request that the

7 Court sentence Samsung SDI on an expedited basis under Crim. L.R. 32-1(b). This

8 memorandum also outlines the material terms of the Plea Agreement between the United States

9 and Samsung SDI, in the event the Court grants the parties' request to impose a sentence

10 immediately on April 19, 2011, after accepting Samsung SDI's guilty plea. In conjunction with

11 this Joint Sentencing Memorandum, the United States and Samsung SDI have filed a Stipulation

12 and Proposed Order for Expedited Sentencing Under L.R. 32-1(b).

13      The United States and Samsung SDI respectfully submit that this memorandum and the

14 Plea Agreement provide sufficient information for the Court to impose a sentence immediately

15 without a presentence report. If the Court finds that the Plea Agreement and this memorandum

16 do not provide sufficient information to allow for the imposition of sentence on the scheduled

17 date of the plea hearing, the parties are prepared to submit additional information requested by

18 the Court. A copy of the Samsung SDI 11(c)(1)(C) Plea Agreement is attached as Exhibit A.

19 <div align="center">**BACKGROUND**</div>

20      This is the first plea agreement in the United States' ongoing antitrust grand jury

21 investigation into price fixing in the CDT industry. Prior to this plea agreement, six individuals

22 were indicted in connection with their participation in the CDT conspiracy. The Indictments of

23 those individuals have been related to this Court, as has the Information charging Samsung SDI

24 with participation in the CDT conspiracy. *See United States v. Cheng Yuan "C.Y." Lin*, CR-09-

25 0131 (WHA), *United States v. Wen Jun "Tony" Cheng*, CR-09-0836 (WHA), *United States v.*

26 *Chung Cheng ("Alex") Yeh*, CR-10-0231 (WHA), and *United States v. Seung-Kyu "Simon" Lee;*

27 *Yeong-Ug "Albert" Yang, a.k.a. Yeong-Wook Yang, a.k.a. Yong-Shu Yang, a.k.a. Yong-Shu*

28 *Liang, a.k.a. Young-Uk Yang, a.k.a. Yeong-Eug Yang; and Jae-Sik Kim*, CR-10-0817 (WHA).

JOINT SENTENCING MEMORANDUM - PAGE 2

Immediately following service of grand jury subpoenas, Samsung SDI indicated a willingness to cooperate with the grand jury investigation. Since that time, Samsung SDI has provided valuable cooperation to the Antitrust Division in the course of its investigation, including providing access to witnesses and documents. Samsung SDI is obligated to continue to provide such cooperation with the government's investigation pursuant to the terms of the SDI Plea Agreement. These continuing obligations will include cooperation on all cathode ray tube ("CRT") products, and will also include the cooperation of Samsung SDI's current and former employees, with the exception of four specified individuals in the Plea Agreement who remain subject to prosecution.

Multiple civil direct and indirect purchaser antitrust class actions are currently pending against Samsung SDI and other CRT manufacturers. Over 40 such class actions were originally filed around the country alleging price fixing of CRT products. These cases were ordered transferred to this district for coordinated pretrial proceedings by order of the United States Judicial Panel on Multidistrict Litigation dated February 15, 2008. These consolidated actions were then assigned to Judge Samuel Conti, who has appointed the Honorable Charles Legge to serve as special master. *In Re Cathode Ray Tube (CRT) Antitrust Litigation*, Case No. 07-5944 SC, MDL No. 1917. Individual cases by direct purchasers recently have commenced being filed. Discovery is presently ongoing in these consolidated CRT MDL proceedings.

## MATERIAL TERMS OF SAMSUNG SDI PLEA AGREEMENT

The material terms of the Samsung SDI Plea Agreement include:

1.      Samsung SDI will waive indictment, waive all rights as enumerated in the Plea Agreement, and plead guilty to a one-count Information charging it with participating in a conspiracy to suppress and eliminate competition by fixing prices, reducing output, and allocating market shares of CDTs sold in the United States and elsewhere, from at least as early as January 1997, until at least as late as March 2006 (the "relevant period"), in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. During the relevant period, Samsung SDI was engaged in the sale of CDTs in the United States and elsewhere and employed 5,000 or more employees.

JOINT SENTENCING MEMORANDUM - PAGE 3

2.      The United States and Samsung SDI agree that the appropriate sentence in this case is a fine of $32 million and a special assessment of $400.  The fine is to be paid in two installments over one year, with interest as set forth in the Plea Agreement.  Samsung SDI agrees to have its sentence determined under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), although Samsung SDI understands the Guidelines are advisory, not mandatory.

3.      The United States will not seek restitution in this case in light of the civil cases filed against Samsung SDI, including *In re Cathode Ray Tube (CRT) Antitrust Litigation*, Case No. 07-5944 SC, MDL No. 1917, in the United States District Court, Northern District of California, which potentially provide for a recovery of a multiple of actual damages and the opportunity for potential victims to pursue damages through non-class claims in the multidistrict litigation and other proceedings.

4.      The United States agrees that it will not bring further criminal charges against Samsung SDI and its current and former officers, directors, and employees (except for the individuals specifically excluded from the Samsung SDI Plea Agreement) for their participation in any CDT conspiracy or color picture tube ("CPT") conspiracy.  In return, Samsung SDI agrees to cooperate fully in the ongoing cathode ray tube investigation, including CDTs and CPTs.  Samsung SDI has agreed to use its best efforts to secure the ongoing, full, and truthful cooperation of its current and former directors, officers, and employees, including making them available in the United States for interviews and producing documents located outside the country, which are beyond the jurisdictional reach of the government's grand jury subpoenas.  The documents to be produced and interviews to be conducted, as well as additional proffered cooperation, will assist the government in its investigation.

## UNITED STATES SENTENCING GUIDELINES CALCULATIONS

The parties agree to the following Guidelines calculations, which are based on a volume of affected commerce under U.S.S.G. § 2R1.1(d)(1) of $89,000,000.  The United States and Samsung SDI agree that the volume of affected commerce was calculated for purposes of this plea and sentencing only, and Samsung SDI does not object to the calculation for these specific and limited purposes.

JOINT SENTENCING MEMORANDUM - PAGE 4

| | | | |
|---|---|---|---|
| 1. | Base Fine (20% of $89,000,000 (Volume of Affected Commerce) (§ 2R1.1(d)(1) & § 8C2.4(b)) | | $17.8 |
| 2. | Culpability Score | | |
| | i. | Base (§ 8C2.5(a)) | 5 |
| | ii. | Involvement in or Tolerance of Criminal Activity (§ 8C2.5(b)(1)) | 5 |
| | iii. | Prior History (§ 8C2.5(c)) | 0 |
| | iv. | Violation of Order (§ 8C2.5(d)) | 0 |
| | v. | Obstruction of Justice (§ 8C2.5(e)) | 0 |
| | vi. | Effective Program to Prevent and Detect Violations of Law (§ 8C2.5(f)) | 0 |
| | vii. | Self-Reporting, Cooperation, and Acceptance of Responsibility (§ 8C2.5(g)(2)) | -2 |
| c. | Total Culpability Score: | | 8 |
| d. | Minimum and Maximum Multipliers (§ 8C2.6) | | 1.6 - 3.2 |
| e. | Minimum and Maximum Fine Range (§ 8C2.7) | | $28.5M - $57M |

The United States and Samsung SDI agree to a fine of $32 million, which represents a fine amount within the Guidelines range.

BY: _____
Gary L. Halling, Esq.
Sheppard Mullin Richter & Hampton LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111
Tel: (415) 434-9100
Fax: (415) 434-3947

Counsel for Samsung SDI Company, Ltd.

DATED: _April 4, 2011_____

Respectfully submitted,

BY: _____
Lidia Maher
May Lee Heye
Tai S. Milder
Attorneys
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, California 94102
Tel: (415) 436-6660
Fax: (415) 436-6687

DATED: _April 4, 2011_____

JOINT SENTENCING MEMORANDUM - PAGE 5

# EXHIBIT A

EXHIBIT A

1  LIDIA MAHER (CSBN 222253)
   MAY LEE HEYE (CSBN 209366)
2  TAI S. MILDER (CSBN 267070)
   Antitrust Division
3  U.S. Department of Justice
   450 Golden Gate Avenue
4  Box 36046, Room 10-0101
   San Francisco, CA 94102
5  Telephone: (415) 436-6660

6  Attorneys for the United States

7

8                     UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                        SAN FRANCISCO DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA | Case No. CR 11-0162 (WHA) |
| v. | |
| SAMSUNG SDI COMPANY, LTD., | |
| Defendant. | |

## PLEA AGREEMENT

The United States of America and Samsung SDI Company, Ltd. ("defendant"), a corporation organized and existing under the laws of the Republic of Korea, hereby enter into the following Plea Agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P."):

## RIGHTS OF DEFENDANT

1.    The defendant understands its rights:

    (a)    to be represented by an attorney;

    (b)    to be charged by Indictment;

    (c)    as a corporation organized and existing under the laws of the Republic of Korea, to decline to accept service of the Summons in this case, and to contest the jurisdiction of the United States to prosecute this case against it in the United States District Court for the Northern District of California;

PLEA AGREEMENT - SAMSUNG SDI - PAGE 1

(d)    to plead not guilty to any criminal charge brought against it;

(e)    to have a trial by jury, at which it would be presumed not guilty of the charge and the United States would have to prove every essential element of the charged offense beyond a reasonable doubt for it to be found guilty;

(f)    to confront and cross-examine witnesses against it and to subpoena witnesses in its defense at trial;

(g)    to appeal its conviction if it is found guilty; and

(h)    to appeal the imposition of sentence against it.

## AGREEMENT TO PLEAD GUILTY
## AND WAIVE CERTAIN RIGHTS

2.    The defendant knowingly and voluntarily waives the rights set out in Paragraph 1(b)-(g) above, including all jurisdictional defenses to the prosecution of this case, and agrees voluntarily to consent to the jurisdiction of the United States to prosecute this case against it in the United States District Court for the Northern District of California. The defendant also knowingly and voluntarily waives the right to file any appeal, any collateral attack, or any other writ or motion, including but not limited to an appeal under 18 U.S.C. § 3742, that challenges the sentence imposed by the Court if that sentence is consistent with or below the recommended sentence in Paragraph 8 of this Plea Agreement, regardless of how the sentence is determined by the Court. This agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b) and (c). Nothing in this paragraph, however, shall act as a bar to the defendant perfecting any legal remedies it may otherwise have on appeal or collateral attack respecting claims of ineffective assistance of counsel or prosecutorial misconduct. Pursuant to Fed. R. Crim. P. 7(b), the defendant will waive indictment and plead guilty at arraignment to a one-count Information to be filed in the United States District Court for the Northern District of California. The Information will charge the defendant with participating in a conspiracy to suppress and eliminate competition by fixing prices, reducing output, and allocating market shares of color display tubes ("CDTs") sold in the United States and elsewhere, from at least as early as January 1997, until at least as late as March 2006, in violation of the Sherman Antitrust

PLEA AGREEMENT - SAMSUNG SDI - PAGE 2

1   Act, 15 U.S.C. § 1.

2        3.     The defendant, pursuant to the terms of this Plea Agreement, will plead guilty to

3   the criminal charge described in Paragraph 2 above and will make a factual admission of guilt to

4   the Court in accordance with Fed. R. Crim. P. 11, as set forth in Paragraph 4 below.

5                **FACTUAL BASIS FOR OFFENSE CHARGED**

6        4.     Had this case gone to trial, the United States would have presented evidence

7   sufficient to prove the following facts:

8        (a)     For purposes of this Plea Agreement, the "relevant period" is that period from at

9   least as early as January 1997, until at least as late as March 2006.  During the relevant period,

10   the defendant was a corporation organized and existing under the laws of the Republic of Korea.

11   The defendant has its principal place of business in Giheung, Republic of Korea.  During the

12   relevant period, the defendant was a producer of CDTs, was engaged in the sale of CDTs in the

13   United States and elsewhere, and employed over 5,000 individuals.

14        (b)     CDTs are a type of cathode ray tube.  Cathode ray tubes consist of evacuated glass

15   envelopes that contain an electron gun and a phosphorescent screen.  When electrons strike the

16   screen, light is emitted, creating an image on the screen.  CDTs are the specialized cathode ray

17   tubes manufactured for use in computer monitors and other products with similar technological

18   requirements.  CDTs are distinguished from another type of specialized cathode ray tube product,

19   color picture tubes ("CPTs"), which are manufactured for use in televisions.

20        (c)     During the relevant period, the defendant, through its officers and employees,

21   including high-level personnel of the defendant, participated in a conspiracy among major CDT

22   producers, the primary purpose of which was to fix prices, reduce output, and allocate market

23   shares of CDTs sold in the United States and elsewhere.  In furtherance of the conspiracy, the

24   defendant, through its officers and employees, engaged in discussions and attended meetings

25   with representatives of other major CDT producers.  During these discussions and meetings,

26   agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be

27   sold in the United States and elsewhere.

28        (d)     During the relevant period, CDTs sold by one or more of the conspirator firms,

PLEA AGREEMENT - SAMSUNG SDI - PAGE 3

and equipment and supplies necessary to the production and distribution of CDTs, as well as payments for CDTs, traveled in interstate and foreign commerce. The business activities of the defendant and its co-conspirators in connection with the production and sale of CDTs that were the subjects of this conspiracy were within the flow of, and substantially affected, interstate and foreign trade and commerce. During the relevant period, the defendant's CDT sales, directly affected by the conspiracy, to customers in the United States totaled approximately $89 million.

(e)     Acts in furtherance of this conspiracy were carried out within the Northern District of California. CDTs that were the subject of this conspiracy were transported by one or more of the conspirators through this District.

## POSSIBLE MAXIMUM SENTENCE

5.     The defendant understands that the statutory maximum penalty which may be imposed against it upon conviction for a violation of Section One of the Sherman Antitrust Act is a fine in an amount equal to the greatest of:

(a)     $100 million (15 U.S.C. § 1);

(b)     twice the gross pecuniary gain the conspirators derived from the crime (18 U.S.C. § 3571(c) and (d)); or

(c)     twice the gross pecuniary loss caused to the victims of the crime by the conspirators (18 U.S.C. § 3571(c) and (d)).

6.     In addition, the defendant understands that:

(a)     pursuant to 18 U.S.C. § 3561(c)(1), the Court may impose a term of probation of at least one year, but not more than five years;

(b)     pursuant to §8B1.1 of the United States Sentencing Guidelines ("U.S.S.G.," "Sentencing Guidelines," or "Guidelines") or 18 U.S.C. § 3563(b)(2) or 3663(a)(3), the Court may order it to pay restitution to the victims of the offense; and

(c)     pursuant to 18 U.S.C. § 3013(a)(2)(B), the Court is required to order the defendant to pay a $400 special assessment upon conviction for the charged crime.

///

///

PLEA AGREEMENT - SAMSUNG SDI - PAGE 4

1

## SENTENCING GUIDELINES

2    7.    The defendant understands that the Sentencing Guidelines are advisory, not

3 mandatory, but that the Court must consider the Guidelines in effect on the day of sentencing,

4 along with the other factors set forth in 18 U.S.C. § 3553(a), in determining and imposing

5 sentence. The defendant understands that the Guidelines determinations will be made by the

6 Court by a preponderance of the evidence standard. The defendant understands that although the

7 Court is not ultimately bound to impose a sentence within the applicable Guidelines range, its

8 sentence must be reasonable based upon consideration of all relevant sentencing factors set forth

9 in 18 U.S.C. § 3553(a). Pursuant to U.S.S.G. §1B1.8, the United States agrees that

10 self-incriminating information that the defendant provides to the United States pursuant to this

11 Plea Agreement will not be used to increase the volume of affected commerce attributable to the

12 defendant or in determining the defendant's applicable Guidelines range, except to the extent

13 provided in U.S.S.G. §1B1.8(b).

14

## SENTENCING AGREEMENT

15    8.    Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the defendant

16 agree that the appropriate disposition of this case is, and agree to recommend jointly that the

17 Court impose, a sentence within the applicable Guidelines range requiring the defendant to pay to

18 the United States a criminal fine of $32 million, payable in installments as set forth below, with

19 interest accruing under 18 U.S.C. § 3612(f)(1)-(2) ("the recommended sentence"). The parties

20 agree that there exists no aggravating or mitigating circumstance of a kind, or to a degree, not

21 adequately taken into consideration by the U.S. Sentencing Commission in formulating the

22 Sentencing Guidelines justifying a departure pursuant to U.S.S.G. §5K2.0. The parties agree not

23 to seek or support any sentence outside of the Guidelines range nor any Guidelines adjustment

24 for any reason that is not set forth in this Plea Agreement. The parties further agree that the

25 recommended sentence set forth in this Plea Agreement is reasonable.

26    (a)    The United States and the defendant agree to recommend, in the interest of

27       justice pursuant to 18 U.S.C. § 3572(d)(1) and U.S.S.G. §8C3.2(b), that the fine be paid

28       in the following installments: within fifteen (15) days of imposition of sentence – $16

PLEA AGREEMENT - SAMSUNG SDI - PAGE 5

million (plus any accrued interest); and at the one-year anniversary of imposition of sentence – $16 million (plus any accrued interest); provided, however, that the defendant shall have the option at any time before the one-year anniversary of prepaying the remaining balance (plus any accrued interest) then owing on the fine.

(b)     The defendant understands that the Court will order it to pay a $400 special assessment, pursuant to 18 U.S.C. § 3013(a)(2)(B), in addition to any fine imposed.

(c)     Both parties will recommend that no term of probation be imposed, but the defendant understands that the Court's denial of this request will not void this Plea Agreement.

(d)     The United States and the defendant jointly submit that this Plea Agreement, together with the record that will be created by the United States and the defendant at the plea and sentencing hearings, and the further disclosure described in Paragraph 9, will provide sufficient information concerning the defendant, the crime charged in this case, and the defendant's role in the crime to enable the meaningful exercise of sentencing authority by the Court under 18 U.S.C. § 3553. The United States and defendant agree to request jointly that the Court accept the defendant's guilty plea and impose sentence on an expedited schedule as early as the date of arraignment, based upon the record provided by the defendant and the United States, under the provisions of Fed. R. Crim. P. 32(c)(1)(A)(ii), U.S.S.G. §6A1.1, and Rule 32-1(b) of the Criminal Local Rules. The Court's denial of the request to impose sentence on an expedited schedule will not void this Plea Agreement.

9.     Subject to the ongoing, full, and truthful cooperation of the defendant described in Paragraph 12 of this Plea Agreement, and before sentencing in the case, the United States will fully advise the Court of the fact, manner, and extent of the defendant's cooperation and its commitment to prospective cooperation with the United States' investigation and prosecutions, all material facts relating to the defendant's involvement in the charged offense, and all other relevant conduct.

PLEA AGREEMENT - SAMSUNG SDI - PAGE 6

1     10.     The United States and the defendant understand that the Court retains complete

2    discretion to accept or reject the recommended sentence provided for in Paragraph 8 of this Plea

3    Agreement.

4           (a)     If the Court does not accept the recommended sentence, the United States

5           and the defendant agree that this Plea Agreement, except for Paragraph 10(b) below, shall

6           be rendered void.

7           (b)     If the Court does not accept the recommended sentence, the defendant will

8           be free to withdraw its guilty plea (Fed. R. Crim. P. 11(c)(5) and (d)).  If the defendant

9           withdraws its plea of guilty, this Plea Agreement, the guilty plea, and any statement made

10          in the course of any proceedings under Fed. R. Crim. P. 11 regarding the guilty plea or

11          this Plea Agreement or made in the course of plea discussions with an attorney for the

12          government shall not be admissible against the defendant in any criminal or civil

13          proceeding, except as otherwise provided in Fed. R. Evid. 410.  In addition, the defendant

14          agrees that, if it withdraws its guilty plea pursuant to this subparagraph of the Plea

15          Agreement, the statute of limitations period for any offense referred to in Paragraph 16 of

16          this Plea Agreement shall be tolled for the period between the date of the signing of the

17          Plea Agreement and the date the defendant withdrew its guilty plea or for a period of

18          sixty (60) days after the date of the signing of the Plea Agreement, whichever period is

19          greater.

20     11.     In light of the civil class action cases filed against the defendant, including *In re*

21    *Cathode Ray Tube (CRT) Antitrust Litigation*, No. C07-5944 SC, MDL No. 1917, in the United

22    States District Court, Northern District of California, which potentially provide for a recovery of

23    a multiple of actual damages, and the opportunity for potential victims to pursue damages

24    through non-class claims in the multidistrict litigation and other proceedings, the United States

25    agrees that it will not seek a restitution order for the offense charged in the Information.

26                             **DEFENDANT'S COOPERATION**

27     12.     The defendant, its subsidiaries, and related corporate entities engaged in the sale

28    or production of any cathode ray tube products, including CDTs and CPTs (collectively, "related

PLEA AGREEMENT - SAMSUNG SDI - PAGE 7

entities") will cooperate fully and truthfully with the United States in the prosecution of this case, the conduct of the current federal investigation of violations of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs in the United States and elsewhere, any other federal investigation resulting therefrom, and any litigation or other proceedings arising or resulting from any such investigation to which the United States is a party ("Federal Proceeding"). The ongoing, full, and truthful cooperation of the defendant shall include, but not be limited to:

> (a)     producing to the United States all non-privileged documents, information, and other materials wherever located, in the possession, custody, or control of the defendant or any of its related entities, requested by the United States in connection with any Federal Proceeding; and

> (b)     using its best efforts to secure the ongoing, full, and truthful cooperation, as defined in Paragraph 13 of this Plea Agreement, of the current and former directors, officers, and employees of the defendant or any of its related entities as may be requested by the United States – but excluding Jae-Sik Kim, Seung-Kyu Park, a.k.a. Sang-Kyu Park, a.k.a. Sky Park, Duck-Yun Kim, a.k.a. Deok-Yun Kim, a.k.a. Deok-Yeon Kim, and Hoo-Mok Ha, a.k.a. Hu-Mok Ha – including making these persons available in the United States and at other mutually agreed-upon locations, at the defendant's expense, for interviews and the provision of testimony in grand jury, trial, and other judicial proceedings in connection with any Federal Proceeding.

13.     The ongoing, full, and truthful cooperation of each person described in Paragraph 12(b) above will be subject to the procedures and protections of this paragraph, and shall include, but not be limited to:

> (a)     producing in the United States and at other mutually agreed-upon locations all non-privileged documents, including claimed personal documents, and other materials, wherever located, requested by attorneys and agents of the United States;

> (b)     making himself or herself available for interviews in the United States and at other mutually agreed-upon locations, not at the expense of the United States, upon the

PLEA AGREEMENT - SAMSUNG SDI - PAGE 8

request of attorneys and agents of the United States;

(c)    responding fully and truthfully to all inquiries of the United States in connection with any Federal Proceeding, without falsely implicating any person or intentionally withholding any information, subject to the penalties of making false statements (18 U.S.C. § 1001) and obstruction of justice (18 U.S.C. § 1503, *et seq.*);

(d)    otherwise voluntarily providing the United States with any non-privileged material or information not requested in (a) - (c) of this paragraph that he or she may have that is related to any Federal Proceeding;

(e)    when called upon to do so by the United States in connection with any Federal Proceeding, testifying in grand jury, trial, and other judicial proceedings in the United States fully, truthfully, and under oath, subject to the penalties of perjury (18 U.S.C. § 1621), making false statements or declarations in grand jury or court proceedings (18 U.S.C. § 1623), contempt (18 U.S.C. §§ 401-402), and obstruction of justice (18 U.S.C. § 1503, *et seq.*); and

(f)    agreeing that, if the agreement not to prosecute him or her in this Plea Agreement is rendered void under Paragraph 15(c), the statute of limitations period for any Relevant Offense as defined in Paragraph 15(a) shall be tolled as to him or her for the period between the date of the signing of this Plea Agreement and six (6) months after the date that the United States gave notice of its intent to void its obligations to that person under the Plea Agreement.

## GOVERNMENT'S AGREEMENT

14.    Upon acceptance of the guilty plea called for by this Plea Agreement and the imposition of the recommended sentence, and subject to the cooperation requirements of Paragraph 12 of this Plea Agreement, the United States agrees that it will not bring further criminal charges against the defendant or any of its related entities for any act or offense committed before the date of this Plea Agreement that was undertaken in furtherance of an antitrust conspiracy involving the manufacture or sale of any cathode ray tube products, including CDTs and CPTs, in the United States and elsewhere. The nonprosecution terms of this

PLEA AGREEMENT - SAMSUNG SDI - PAGE 9

paragraph do not apply to civil matters of any kind, to any violation of the federal tax or securities laws, or to any crime of violence.

15.     The United States agrees to the following:

(a)     Upon the Court's acceptance of the guilty plea called for by this Plea Agreement and the imposition of the recommended sentence and subject to the exceptions noted in Paragraph 15(c), the United States will not bring criminal charges against any current or former director, officer, or employee of the defendant or its related entities for any act or offense committed before the date of this Plea Agreement and while that person was acting as a director, officer, or employee of the defendant or its related entities that was undertaken in furtherance of an antitrust conspiracy involving the manufacture or sale of any cathode ray tube products, including CDTs and CPTs, in the United States and elsewhere ("Relevant Offense"), except that the protections granted in this paragraph shall not apply to Jae-Sik Kim, Seung-Kyu Park, a.k.a. Sang-Kyu Park, a.k.a. Sky Park, Duck-Yun Kim, a.k.a. Deok-Yun Kim, a.k.a. Deok-Yeon Kim, and Hoo-Mok Ha, a.k.a. Hu-Mok Ha;

(b)     Should the United States determine that any current or former director, officer, or employee of the defendant or its related entities may have information relevant to any Federal Proceeding, the United States may request that person's cooperation under the terms of this Plea Agreement by written request delivered to counsel for the individual (with a copy to the undersigned counsel for the defendant) or, if the individual is not known by the United States to be represented, to the undersigned counsel for the defendant;

(c)     If any person requested to provide cooperation under Paragraph 15(b) fails to comply with his or her obligations under Paragraph 13, then the terms of this Plea Agreement as they pertain to that person, and the agreement not to prosecute that person granted in this Plea Agreement, shall be rendered void;

(d)     Except as provided in Paragraph 15(e), information provided by a person described in Paragraph 15(b) to the United States under the terms of this Plea Agreement

PLEA AGREEMENT - SAMSUNG SDI - PAGE 10

pertaining to any Relevant Offense, or any information directly or indirectly derived from that information, may not be used against that person in a criminal case, except in a prosecution for perjury (18 U.S.C. § 1621), making a false statement or declaration (18 U.S.C. §§ 1001, 1623), or obstruction of justice (18 U.S.C. § 1503, *et seq.*);

(e)     If any person who provides information to the United States under this Plea Agreement fails to comply fully with his or her obligations under Paragraph 13 of this Plea Agreement, the agreement in Paragraph 15(d) not to use that information or any information directly or indirectly derived from it against that person in a criminal case shall be rendered void;

(f)     The nonprosecution terms of this paragraph do not apply to civil matters of any kind, to any violation of the federal tax or securities laws, or to any crime of violence; and

(g)     Documents provided under Paragraphs 12(a) and 13(a) shall be deemed responsive to outstanding grand jury subpoenas issued to the defendant or any of its related entities.

16.     The United States agrees that when any person travels to the United States for interviews, grand jury appearances, or court appearances pursuant to this Plea Agreement, or for meetings with counsel in preparation therefor, the United States will take no action, based upon any Relevant Offense, to subject such person to arrest, detention, or service of process, or to prevent such person from departing the United States. This paragraph does not apply to an individual's commission of perjury (18 U.S.C. § 1621), making false statements (18 U.S.C. § 1001), making false statements or declarations in grand jury or court proceedings (18 U.S.C. § 1623), obstruction of justice (18 U.S.C. § 1503, *et seq.*), or contempt (18 U.S.C. §§ 401-402) in connection with any testimony or information provided or requested in any Federal Proceeding.

17.     The defendant understands that it may be subject to administrative action by federal or state agencies other than the United States Department of Justice, Antitrust Division, based upon the conviction resulting from this Plea Agreement, and that this Plea Agreement in no way controls whatever action, if any, other agencies may take. However, the United States

PLEA AGREEMENT - SAMSUNG SDI - PAGE 11

agrees that, if requested, it will advise the appropriate officials of any governmental agency considering such administrative action of the fact, manner, and extent of the cooperation of the defendant and its related entities as a matter for that agency to consider before determining what administrative action, if any, to take.

## REPRESENTATION BY COUNSEL

18.     The defendant has been represented by counsel and is fully satisfied that its attorneys have provided competent legal representation.  The defendant has thoroughly reviewed this Plea Agreement and acknowledges that counsel has advised it of the nature of the charge, any possible defenses to the charge, and the nature and range of possible sentences.

## VOLUNTARY PLEA

19.     The defendant's decision to enter into this Plea Agreement and to tender a plea of guilty is freely and voluntarily made and is not the result of force, threats, assurances, promises, or representations other than the representations contained in this Plea Agreement.  The United States has made no promises or representations to the defendant as to whether the Court will accept or reject the recommendations contained within this Plea Agreement.

## VIOLATION OF PLEA AGREEMENT

20.     The defendant agrees that, should the United States determine in good faith, during the period that any Federal Proceeding is pending, that the defendant or any of its related entities have failed to provide full and truthful cooperation, as described in Paragraph 12 of this Plea Agreement, or has otherwise violated any provision of this Plea Agreement, the United States will notify counsel for the defendant in writing by personal or overnight delivery or facsimile transmission and may also notify counsel by telephone of its intention to void any of its obligations under this Plea Agreement (except its obligations under this paragraph), and the defendant and its related entities shall be subject to prosecution for any federal crime of which the United States has knowledge including, but not limited to, the substantive offenses relating to the investigation resulting in this Plea Agreement.  The defendant may seek Court review of any determination made by the United States under this Paragraph to void any of its obligations under the Plea Agreement.  The defendant and its related entities agree that, in the event that the United

PLEA AGREEMENT - SAMSUNG SDI - PAGE 12

1  States is released from its obligations under this Plea Agreement and brings criminal charges

2  against the defendant or its related entities for any offense referred to in Paragraph 14 of this Plea

3  Agreement, the statute of limitations period for such offense shall be tolled for the period

4  between the date of the signing of this Plea Agreement and six (6) months after the date the

5  United States gave notice of its intent to void its obligations under this Plea Agreement.

6       21.    The defendant understands and agrees that in any further prosecution

7  of it or its related entities resulting from the release of the United States from its obligations

8  under this Plea Agreement, because of the defendant's or its related entities' violation of the Plea

9  Agreement, any documents, statements, information, testimony, or evidence provided by it, its

10  related entities, or current or former directors, officers, or employees of it or its related entities to

11  attorneys or agents of the United States, federal grand juries, or courts, and any leads derived

12  therefrom, may be used against it or its related entities in any such further prosecution.  In

13  addition, the defendant unconditionally waives its right to challenge the use of such evidence in

14  any such further prosecution, notwithstanding the protections of Fed. R. Evid. 410.

15  **ENTIRETY OF AGREEMENT**

16       22.    This Plea Agreement constitutes the entire agreement between the

17  United States and the defendant concerning the disposition of the criminal charge in this case.

18  This Plea Agreement cannot be modified except in writing, signed by the United States and the

19  defendant.

20       23.    The undersigned is authorized to enter this Plea Agreement on behalf of the

21  defendant as evidenced by the Resolution of the Board of Directors of the defendant attached to,

22  and incorporated by reference in, this Plea Agreement.

23       24.    The undersigned attorneys for the United States have been authorized

24  by the Attorney General of the United States to enter this Plea Agreement on behalf of the United

25  States.

26  / / /

27  / / /

28  / / /

PLEA AGREEMENT - SAMSUNG SDI - PAGE 13

1      25.    A facsimile or PDF signature shall be deemed an original signature for the

2  purpose of executing this Plea Agreement. Multiple signature pages are authorized for the

3  purpose of executing this Plea Agreement.

Respectfully submitted,

BY: _____

Sang Soo Noh
Vice President
Samsung SDI Company, Ltd.
428-5 Gongse-dong
Giheung-gu, Yongin-si
Gyeonggi-do, 446-577
Republic of Korea

DATED: 3 / 9 / 11

BY: _____

Lidia Maher
May Lee Heye
Tai S. Milder
Attorneys
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, California 94102
Tel: (415) 436-6660
Fax: (415) 436-6687

DATED: March 10, 2011

BY: _____

Gary L. Halling, Esq.
Counsel for Samsung SDI Company, Ltd.
Sheppard Mullin Richter & Hampton LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111
Tel: (415) 434-9100
Fax: (415) 434-3947

DATED: March 10, 2011

PLEA AGREEMENT - SAMSUNG SDI - PAGE 14

RESOLUTION OF THE BOARD OF DIRECTORS
OF
SAMSUNG SDI CO., LTD.


A meeting of the Board of Directors (the "Board") of SAMSUNG SDI, CO., LTD. (the "Company"), a Korean corporation, was held on March 9, 2011 at the Company's Seoul office having its address at 21st Fl., SEC Bldg., Samsung Seocho Tower, 1320-10 Seocho 2-Dong, Seocho-Gu, Seoul 137-965, Korea.


The following Directors of the Company were present and constituted a quorum:


MR. CHI HUN CHOI
MR. JUNG WHA LEE
MR. BYEONG BOK JEON
MR. YEONG KIL BAE
MR. JUNE CHULL CHANG
MS. HEE KYUNG KIM


The following resolutions are hereby adopted by the Board of the Company in accordance with the Commercial Laws of Korea:

WHEREAS, it is deemed in the best interest of the Company to enter a plea agreement with the United States Department of Justice;

NOW, THEREFORE, be it

RESOLVED, that execution, delivery and performance of a plea agreement, by and between the Company and the United States Department of Justice (the "Agreement"), in substantially the form made available to the Board, is

hereby approved; and

FUTHER RESOLVED, that MR. SANG SOO NOH, the Vice President of the Company, is hereby fully authorized to execute the Agreement and any other related documents on behalf of the Company and take all necessary actions, including representing the Company at any hearing in order to waive any and all rights of the Company referred to in the Agreement and to plead guilty on behalf of the Company according to the terms of the Agreement.

DATE:    MARCH 9, 2011

MR. CHI HUN CHOI                    MR. JUNG WHA LEE

MR. BYEONG BOK JEON                 MR. YEONG KIL BAE

MR. JUNE CHULL CHANG                MS. HEE KYUNG KIM

# EXHIBIT D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ELECTROGRAPH SYSTEMS, INC.;
ELECTROGRAPH TECHNOLOGIES CORP.,

     Plaintiffs,

v.

HITACHI, LTD.; HITACHI DISPLAYS, LTD.;
HITACHI AMERICA, LTD.; HITACHI ASIA,
LTD.; HITACHI ELECTRONIC DEVICES (USA),
INC.; SHENZHEN SEG HITACHI COLOR
DISPLAY DEVICES, LTD.; IRICO GROUP
CORPORATION; IRICO GROUP ELECTRONICS
CO., LTD.; IRICO DISPLAY DEVICES CO.,
LTD.; LG ELECTRONICS, INC.; LG
ELECTRONICS USA, INC.; LG ELECTRONICS
TAIWAN TAIPEI CO., LTD.; LP DISPLAYS
INTERNATIONAL LTD.; PANASONIC
CORPORATION; PANASONIC CORPORATION
OF NORTH AMERICA; MT PICTURE DISPLAY
CO., LTD.; BEIJING MATSUSHITA COLOR
CRT CO., LTD.; KONINKLIJKE PHILIPS
ELECTRONICS N.V.; PHILIPS ELECTRONICS
NORTH AMERICA CORPORATION; PHILIPS
ELECTRONICS INDUSTRIES (TAIWAN), LTD.;
PHILIPS DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.; SAMSUNG
SDI CO., LTD.; SAMSUNG SDI AMERICA,
INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;
SAMSUNG SDI BRASIL LTDA.; SHENZHEN
SAMSUNG SDI CO., LTD.; TIANJIN SAMSUNG
SDI CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI CRT
CO., LTD.; TOSHIBA CORPORATION;
TOSHIBA AMERICA, INC.; TOSHIBA
AMERICA CONSUMER PRODUCTS, LLC;
TOSHIBA AMERICA ELECTRONIC
COMPONENTS, INC.; TOSHIBA AMERICA
INFORMATION SYSTEMS, INC.;

     Defendants.

CASE NO. 11-CV-0831 (JS) (AKT)

**FIRST AMENDED COMPLAINT**

Plaintiffs Electrograph Systems, Inc. and Electrograph Technologies Corp., for
their Complaint against all Defendants named herein, hereby allege as follows:

## I.   INTRODUCTION

1.   Defendants and their co-conspirators formed an international cartel which
conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,
through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this
conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs") and
products containing CRTs.

2.   Defendants are or were among the leading manufacturers of: (a) color
picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display
tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic
devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the
purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred
to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes
and the products containing them shall be referred to as "CDT Products."  CDT Products and
CPT Products shall be referred to collectively herein as "CRT Products."

3.   Defendants control the majority of the CRT industry, a multibillion dollar
market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the
Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.   Since the mid-1990s, the CRT industry faced significant economic
pressures as customer preferences for other emerging technologies shrank profits and threatened
the sustainability of the industry.  In order to maintain price stability, increase profitability, and
decrease the erosion of pricing in the CRT market, Defendants conspired, combined and
contracted to fix, raise, maintain and stabilize the price at which CRT Products were sold in the
United States.

5.   With respect to CRT Products, Defendants or their agents agreed, *inter*

2

*alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,* shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

      6.      The conspiracy concerning CRT Products commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period. Also beginning in 1995, the co-conspirators began to engage in informal group meetings. By 1997, these group meetings had become more formalized, as described in greater detail below. There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings. These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe. These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

      7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

      8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities. Since February 10, 2009, federal indictments have been issued against six individuals in connection with Defendants' CRT price-fixing conspiracy.

      9.      During the Relevant Period, Plaintiffs purchased CRT Products, both CRTs and products containing CRTs, in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. Plaintiffs thus suffered damages as a result of

Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRT
Products they purchased during the Relevant Period.

## II.   JURISDICTION AND VENUE

10.     Plaintiffs bring this action to obtain injunctive relief under Section 16 of
the Clayton Act; and to recover damages, including treble damages under Section 4 of the
Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of
Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiffs also bring this action pursuant to Section 16750(a) of the
California Business and Professions Code, for injunctive relief and treble damages that Plaintiffs
sustained due to Defendants' and their co-conspirators' violation of Section 16700 *et seq.* of the
California Business and Professions Code (the "Cartwright Act"). Plaintiffs' claims are also
brought pursuant to Sections 17203 and 17204 of the California Business and Professions Code,
to obtain restitution from and an injunction against Defendants due to their violations of Section
17200 *et seq.* of the California Business and Professions Code (the "California Unfair
Competition Act").

12.     Plaintiffs also bring this action pursuant to Section 340 of the New York
General Business Law, for injunctive relief and treble damages that Plaintiffs sustained due to
Defendants' and their co-conspirators' violation of Section 340 *et seq.* of the New York General
Business Law (the "Donnelly Act"). Plaintiffs' claims are also brought pursuant to Section 349
of the New York General Business Law, to obtain restitution from and an injunction against
Defendants due to their violations of Section 349 *et seq.* of the New York General Business Law
(the "New York Unfair Competition Act").

13.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of
the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337. The Court has
supplemental jurisdiction over Plaintiffs' claims under the Cartwright Act, the California Unfair
Competition Act, the Donnelly Act, and the New York Unfair Competition Act under 28 U.S.C.
§ 1367. Plaintiffs' state law claims are related to their claims under Section 1 of the Sherman

Act and they form part of the same case or controversy.

14.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce. This effect gives rise to Plaintiffs' antitrust claims. During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.

15.     The activities of Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a direct and substantial effect on commerce in California and New York. In particular Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased in these states. These effects also give rise to Plaintiffs' antitrust claims. Plaintiffs maintained operations in these states during the Relevant Period.

16.     This court has jurisdiction over each Defendant named in this action under both Section 12 of the Clayton Act (15 U.S.C. § 22) and section 302 of the New York CPLR. Each Defendant conducts substantial business in New York as well as California. In addition, Defendants and their co-conspirators purposely availed themselves of the laws of the United States and the identified states insofar as they manufactured CRTs for sale in the United States, including New York and California, or which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States, including New York and California. Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States, including in New York and California.

17.     Venue is proper in the Eastern District of New York under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c) and (d) because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District.

Defendants and their co-conspirators knew that price-fixed CRT Products containing price-fixed CRTs would be sold and shipped into this District.

III.    **PARTIES**

A.    **Plaintiffs**

18.    Plaintiff Electrograph Systems, Inc. is a New York corporation with its principal place of business in New York. Through May 2009, Electrograph Systems, Inc. conducted business as a value-added wholesale distributor of display technology solutions, including CRT displays and components, rear screen projection TVs, projectors, and digital electronic products, primarily to resellers and system integrators. Electrograph Systems, Inc. specialized in display, audio, connectivity, and other complementary technologies for sale to commercial, retail and government customers.

19.    Plaintiff Electrograph Technologies Corp. is a New York corporation, with its principal place of business in New York. Electrograph Technologies Corp. owns 100% of the outstanding capital stock of Electrograph Systems, Inc. In addition to its ownership of Electrograph Systems, Inc. and various other businesses, through May 2004, Electrograph Technologies Corp. conducted business as an information technology solutions provider that specialized in hardware and software procurement, display technology, custom networking, security, IP telephony, remote management, application development/e-commerce, storage, and enterprise and Internet solutions. Electrograph Technologies Corp. offered its customers single-source solutions customized to their information systems needs by integrating its analysis, design and implementation services with hardware, software, networking products and peripherals from leading vendors.

20.    During the Relevant Period, the Plaintiffs, and their predecessor entities described below, purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, the Plaintiffs suffered injury as a result of Defendants' unlawful conduct. Throughout the Relevant Period, Plaintiffs, and their predecessor entities

described below, conducted a substantial amount of business in New York and California.

**B.      Plaintiffs' Corporate History**

21.      Electrograph Technologies Corp. was incorporated under the name Manchester Equipment Co., Inc. on August 21, 1973. The company's name was changed to Manchester Technologies, Inc. on February 1, 2001, and then subsequently changed to Electrograph Technologies Corp. on August 1, 2005. On August 1, 2005, upon consummation of a merger by and among Electrograph Holdings, Inc., a Delaware Corporation, CICE Acquisition Corp. ("merger sub"), a New York Corporation, and Manchester Technologies, Inc., the merger sub was merged with and into Manchester Technologies, Inc., and Manchester Technologies, Inc. became a wholly-owned subsidiary of Electrograph Holdings, Inc., and concurrently changed its name to Electrograph Technologies Corp. During the Relevant Period, Electrograph Technologies Corp., and its subsidiaries and affiliates, purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, Electrograph Technologies Corp. suffered injury as a result of Defendants' unlawful conduct.

22.      Electrograph Systems, Inc. was incorporated under the name Electrograph Acquisitions, Inc. on April 10, 1997. On April 28, 1997, Manchester Equipment Co., Inc.—the predecessor to Electrograph Technologies Corp.—acquired the business of Electrograph Acquisitions, Inc. from Bitwise Designs, Inc. On April 29, 1997, Electrograph Acquisitions, Inc. changed its name to Electrograph Systems, Inc. During the Relevant Period, Electrograph Systems, Inc., and its subsidiaries and affiliates, purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, Electrograph Systems, Inc. suffered injury as a result of Defendants' unlawful conduct.

23.      ActiveLight, Inc. was formed on April 16, 1998, as a Washington company with its principal place of business in the State of Washington. ActiveLight, Inc. was a

value-added wholesale distributor of display technology solutions and projectors to the professional, commercial and high-end consumer markets. During the Relevant Period, ActiveLight, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, ActiveLight, Inc. suffered injury as a result of Defendants' unlawful conduct.

24.     On February 21, 2006, Plaintiff, Electrograph Systems, Inc. acquired 100% of the outstanding stock of ActiveLight, Inc. From the acquisition date through March 2, 2008, ActiveLight, Inc. operated as a wholly-owned subsidiary of Electrograph Systems, Inc. On March 3, 2008, ActiveLight, Inc. was merged into Electrograph Systems, Inc.

25.     CineLight Corporation was formed on June 11, 2001, as a Washington company with its principal place of business in the State of Washington. CineLight Corporation was a value-added wholesale distributor of advanced display technology products and accessories to home theater designers and resellers. During the Relevant Period, CineLight Corporation purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, CineLight Corporation suffered injury as a result of Defendants' unlawful conduct.

26.     On February 21, 2006, Electrograph Systems, Inc. acquired 100% of the outstanding stock of CineLight Corporation. From the date of the acquisition until July 2006, CineLight Corporation operated as a wholly-owned subsidiary of Electrograph Systems, Inc. In July 2006, CineLight Corporation was merged into ActiveLight, Inc.

27.     International Computer Graphics, Inc. was formed on April 18, 1985, as a California company with its principal place of business in California. International Computer Graphics, Inc. conducted business as a specialty wholesale distributor of CRT, LCD, plasma and desktop displays, digital imaging peripherals and AV presentation products. During the Relevant Period, International Computer Graphics, Inc. purchased CRT Products directly and indirectly

8

from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, International Computer Graphics, Inc. suffered injury as a result of Defendants' unlawful conduct.

28.     On June 16, 2006, Electrograph Systems, Inc. acquired 100% of the outstanding stock of International Computer Graphics, Inc. From the date of the acquisition through March 2, 2008, International Computer Graphics, Inc. operated as a wholly-owned subsidiary of Electrograph Systems, Inc. On March 3, 2008, International Computer Graphics, Inc. was merged into Electrograph Systems, Inc.

29.     Champion Vision, Inc. was formed on June 19, 2003, as a New York company with its principal place of business in New York. During the Relevant Period, Champion Vision, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, Champion Vision, Inc. suffered injury as a result of Defendants' unlawful conduct.

30.     On September 15, 2008, Champion Vision, Inc. was merged into Electrograph Systems, Inc.

31.     Coastal Office Products, Inc. was formed in 1987 as a Maryland corporation with its principal place of business in Maryland. On January 6, 1998, Coastal Office Products, Inc. was acquired by and became a wholly owned subsidiary of Manchester Equipment Co., Inc., the predecessor to Electrograph Technologies Corp. Coastal Office Products, Inc. was a reseller and provider of microcomputer services and peripherals to companies in the greater Baltimore, Maryland area. During the Relevant Period, Coastal Office Products, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, Coastal Office Products, Inc. suffered injury as a result of Defendants' unlawful conduct. In 2008, Coastal Office Products, Inc. was merged into Electrograph Systems, Inc.

32.     In 2008, Coastal Office Products, Inc. was merged into Electrograph

Systems, Inc.

33.    During the Relevant Period, Electrograph Systems, Inc. acquired all of the outstanding stock of ActiveLight, Inc., CineLight Corporation and International Computer Graphics, Inc. and formed Champion Vision, Inc. as a wholly-owned subsidiary.  In addition, during the Relevant Period, Electrograph Technologies Corp. acquired all of the outstanding stock of Coastal Office Products, Inc.  As such, the entities known as ActiveLight, Inc., CineLight Corporation, International Computer Graphics, Inc., Champion Vision, Inc. and Coastal Office Products, Inc. are herein referred to collectively as the "predecessor entities."  By acquiring the stock of companies that purchased CRT Products, Electrograph Systems, Inc. obtained all claims and rights under federal and state laws to recover any overcharges suffered by the predecessor entities.  Some of the predecessor entities were also merged into Electrograph Systems, Inc. and thus, Electrograph Systems, Inc. obtained all claims and rights under federal and state laws to recover any overcharges suffered by the predecessor entities.  As stated above, during the Relevant Period, these predecessor companies purchased CRT Products manufactured and sold by Defendants, their co-conspirators, and others.  As a result of Defendants' conspiracy, these predecessor entities were injured in their business and property because the prices they paid for CRT Products were artificially inflated by Defendants' conspiracy.  As used herein, any reference to either Electrograph Systems, Inc. or Electrograph Technologies Corp. includes any of the predecessor entities whose stock was acquired or obtained by either Electrograph Systems, Inc. or Electrograph Technologies Corp.

### C.    Defendants

#### 1.    Hitachi Entities

34.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

subsidiaries or affiliates, throughout the United States.

35.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

36.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591. Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

37.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

38.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way,

11

Greenville, South Carolina 29607. HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays. During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

39.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China. Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began). Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period. During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

40.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

### 2.     IRICO Entities

41.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products. During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

42.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

Province 712021. IGE is owned by Defendant IGC. According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs. Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation. During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

43.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of Defendant IGC. In 2006, IDDC was China's top CRT maker. During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

44.     Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

### 3.     LG Electronics Entities

45.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea. LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968. The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States. In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays

13

("LGPD"). On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd. During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

46.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI. During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

47.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan. LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc. During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

48.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

### 4.    **LP Displays**

49.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong. LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company. LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

14

billion and a market share of 27%. LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms. During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 5.   **Panasonic Entities**

50.    Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

51.    Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094. PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

52.    Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

53.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan. In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs. Panasonic Corporation was the majority owner with 64.5 percent. On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd. During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

54.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China. BMCC is a joint venture company, 50% of which is held by Defendant MTPD. The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise). Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China. BMCC is the second largest producer of CRTs for televisions in China. During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.     Philips Entities

55.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands. Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001. In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays). In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

16

56. Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

57. Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

58. Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

59. Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

### 7. **Samsung Entities**

60. Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea. It is South Korea's top electronics company. During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

61.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660. SEAI is a wholly-owned and controlled subsidiary of Defendant SEC. During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

62.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea. Samsung SDI is a public company. SEC is a major shareholder holding almost 20 percent of the stock. Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries. In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer. Samsung SDI has offices in Chicago and San Diego. During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

63.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612. Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI America manufactured,

marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

64.     Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico. Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

65.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil. Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

66.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

violations alleged in this complaint.

67.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

68.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia. Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

69.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

**8.    Samtel**

70.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products. Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products. During the Relevant Period,

Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9. **Thai CRT**

71.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10. **Toshiba Entities**

72.     Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors. In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses. During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

73.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020. Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC. During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this

complaint.

74.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114. TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

75.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612. TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

76.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697. TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

77.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

## IV.     AGENTS AND CO-CONSPIRATORS

78.     The acts alleged against Defendants in this Complaint were authorized,

ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

79. Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs. Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs or CRT Products made by its parent company.

80. Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and Toshiba Display Devices (Thailand) Co., Ltd. Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

81. During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products. Orion was a Korean corporation which filed for bankruptcy in 2004. In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products. Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States. Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group." The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co. The Daewoo Group was dismantled in or around 1999. Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France. As of approximately 1996, DOSA produced 1.2 million CRTs annually. Daewoo sold DOSA's CRT business in or around 2004. During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or

through their subsidiaries or affiliates, throughout the United States.

82.     Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

83.     Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003. It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006. During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

84.     P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-Defendant entities in December 1995. TEDI's principal place of business was located in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia. During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

85.     Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled

subsidiary of Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint

venture with Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co.,

Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.

During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT

Products, either directly or through its subsidiaries or affiliates, throughout the United States.

Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to

the antitrust violations alleged in this complaint.

86.     The acts charged in this Complaint have been done by Defendants and

their co-conspirators, or were authorized, ordered or done by their respective officers, agents,

employees or representatives while actively engaged in the management of each Defendant's or

co-conspirator's business or affairs.

## V.     TRADE AND COMMERCE

87.     During the Relevant Period, each Defendant, or one or more of its

subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of

interstate commerce and foreign commerce, including through and into this judicial district.

88.     During the Relevant Period, Defendants collectively controlled a vast

majority of the market for CRT Products, both globally and in the United States.

89.     The business activities of Defendants substantially affected interstate trade

and commerce in the United States and caused antitrust injury in the United States. The business

activities of Defendants also substantially affected trade and commerce in California and New

York and caused antitrust injuries in California and New York.

## VII.    FACTUAL ALLEGATIONS

### A.     CRT Technology

90.     A CRT has three components: (a) one or more electron guns, each of

which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate

that phosphoresces when struck by an electron beam, thereby producing a viewable image. A

faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image. An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

91.     CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers. After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

92.     The quality of a CRT itself determines the quality of the CRT display. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

93.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

94.     CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

95.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors. The demand for CRTs thus directly derives from the demand for such products.

96.     The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets. The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

97. Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRTs and CRT Products and their purchases of CRT Products indirectly from non-Defendant original equipment manufacturers ("OEM") and others. Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs have bought CRTs and CRT Products, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRTs and CRT Products.

98. Plaintiffs have participated in the market for products containing CRTs. To the extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products. Plaintiffs were not able to pass the inflated prices on to their customers.

99. Plaintiffs have been injured by paying supra-competitive prices for CRTs and CRT Products.

**B.     Structure of the CRT Industry**

100. The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.     Market Concentration**

101. During the Relevant Period, the CRT industry was dominated by relatively few companies. In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as Chunghwa Picture Tubes, Ltd. ("Chunghwa"), together held a collective 78% share of the global CRT market. The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.     Information Sharing**

102. Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries

27

and relationships between the executives of certain companies, there were many opportunities for

Defendants to discuss and exchange competitive information. The ease of communication was

facilitated by the use of meetings, telephone calls, e-mails and instant messages. Defendants

took advantage of these opportunities to discuss, and agree upon, their pricing for CRT Products

as alleged below.

103.    Defendants Hitachi and Samsung, as well as Chunghwa, are all members

of the Society for Information Display. Defendants Samsung and LG Electronics are two of the

co-founders of the Korea Display Industry Association. Similarly, Daewoo and Defendants LG

Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial

Research Association. Upon information and belief, Defendants and their co-conspirators used

these trade associations as vehicles for discussing and agreeing upon their pricing for CRT

Products. At the meetings of these trade associations, Defendants exchanged proprietary and

competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.    Consolidation

104.    The CRT industry also had significant consolidation during the Relevant

Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture

involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's

and Panasonic's CRT businesses into MTPD.

### 4.    Multiple Interrelated Business Relationships

105.    The industry is marked by a web of cross-licensing agreements, joint

ventures and other cooperative arrangements that can facilitate collusion.

106.    Examples of the high degree of cooperation among Defendants in both the

CRT Product market and other closely related markets include the following:

a.  The formation of the CRT joint venture LGPD in 2001 by Defendants
    LG Electronics and Philips.

b.  Defendants LG Electronics and Philips also formed LG.Philips LCD
    Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the

purpose of manufacturing TFT-LCD panels.

c. The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d. Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e. In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f. Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g. Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Chunghwa for large CPTs.

h. Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels. Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i. Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j. Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k. Defendant Samtel claims to have supplied CRTs to Defendants LG

Electronics, Samsung, Philips, and Panasonic.

**5.    High Costs of Entry Into the Industry**

107.    There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

108.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.  A combination of price discussions and manipulation of the output of CRT Products allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.    The Maturity of the CRT Product Market**

109.    Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

110.    Demand for CRT Products was declining throughout the Relevant Period. Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

111.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

112.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the

international price fixing conspiracy worthwhile. Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

113.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America. By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

114.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.    **Homogeneity of CRT Products**

115.    CRT Products are commodity-like products which are manufactured in standardized sizes. One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sell and Plaintiffs purchase CRT Products primarily on the basis of price.

116.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.    **Pre-Conspiracy Market**

117.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies. During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers. A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

118.    In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa visited each other's factories in S.E. Asia. During this period, these producers began to include discussions about price in their meetings.

**D.      Defendants' and Co-Conspirators' Illegal Agreements**

119.     In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRT Products to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

120.     The CRT conspiracy was effectuated through a combination of group and bilateral meetings. In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis. During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRT Products in general and to specific customers. These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

121.     Defendants Samsung and LG, along with Chunghwa and Daewoo, also attended several ad hoc group meetings during this period. The participants at these group meetings also discussed increasing prices for CRT Products.

122.     As more manufacturers formally entered the conspiracy, group meetings became more prevalent. Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

123.     The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRT Products.

**1.      "Glass Meetings"**

124.     The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM." Glass meetings were attended by employees at three general levels of Defendants' corporations.

32

125. The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

126. The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

127. Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The working level meetings also tended to be more regional and often took place near Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

128. The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen and Samsung SDI Tianjin.

129. Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and IRICO. Chunghwa also attended these meetings.

130. Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings." These were meetings held on golf courses. The green meetings were generally attended by top and management level employees of Defendants.

131. During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and Malaysia.

132. Participants would often exchange competitively sensitive information prior to a glass meeting. This included information on inventories, production, sales and exports. For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

133. The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months. The participants also updated the information they had provided in the previous meeting. Each meeting had a rotating, designated "Chairman" who would write the information on a white board. The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter. They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs. They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers. Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

134. During periods of oversupply, the focus of the meeting participants turned

to making controlled and coordinated price reductions. This was referred to as setting a "bottom price."

135. Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors. Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs. In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

136. Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed. Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins. Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers. In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

137. The agreements reached at the glass meetings included:

    a. agreements on CRT Product prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    b. placing agreed-upon price differentials on various attributes of CRT Products, such as quality or certain technical specifications;

    c. agreements on pricing for intra-company CRT Product sales to vertically integrated customers;

    d. agreements as to what to tell customers about the reason for a price increase;

    e. agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-

upon pricing;

f.  agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

h.  agreements to coordinate uniform public statements regarding available capacity and supply;

i.  agreements to allocate both overall market shares and share of a particular customer's purchases;

j.  agreements to allocate customers;

k.  agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.  agreements to keep their meetings secret.

138.  Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

139.  As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

## 2. Bilateral Discussions

140.  Throughout the Relevant Period, the glass meetings were supplemented by

36

bilateral discussions between various Defendants. The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

141.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and Mexico.

142.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and Europe.

143.    In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT Product manufacturers in Brazil and Mexico, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico. These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRT Products. As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period. Because these Brazilian and Mexican manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements. In this way, Defendants ensured that prices of all CRT Products imported into the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

144.    Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

145.    Bilateral discussions were also used to coordinate prices with CRT Product manufacturers that did not ordinarily attend the group meetings, such as Defendants

Hitachi, Toshiba, Panasonic and Samtel. It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT Product pricing and/or output agreements had been reached during the meeting. For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT Product pricing agreements to Hitachi. LG Electronics had a relationship with Toshiba and was responsible for communicating CRT Product pricing agreements to Toshiba. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT Product pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT. Sometimes Hitachi and Toshiba also attended the glass meetings. In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRT Products.

### 3. Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

146. Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRT Products. Hitachi never effectively withdrew from this conspiracy.

147. Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them. To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

148. Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and

IDDC, participated in multiple glass meetings. These meetings were attended by the highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRT Products. None of IRICO's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

149. Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels. After 2001, LG Electronics participated in the CRT Product conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by the highest ranking executives from LG Electronics. LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, LG agreed on prices and supply levels for CRT Products. LG Electronics never effectively withdrew from this conspiracy.

150. Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them. To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

151. Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from LP Displays. Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips. LP Displays also engaged in bilateral discussions with other Defendants. Through these discussions, LP Displays agreed on prices and supply levels for CRT Products.

152.     Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings. After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with other Defendants. Through these discussions, Panasonic agreed on prices and supply levels for CRT Products. Panasonic never effectively withdrew from this conspiracy.

153.     PCNA was represented at those meetings and was a party to the agreements entered at them. To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, PCNA was an active, knowing participant in the alleged conspiracy.

154.     Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high level sales managers from MTPD. MTPD also engaged in bilateral discussions with other Defendants. Through these discussions, MTPD agreed on prices and supply levels for CRT Products.

155.     Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings. These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for CRT Products. None of BMCC's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government. BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

156.     Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels. After 2001, Philips

participated in the CRT Product conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by high level executives from Philips. Philips also engaged in numerous bilateral discussions with other Defendants. Through these discussions, Philips agreed on prices and supply levels for CRT Products. Philips never effectively withdrew from this conspiracy.

157. Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them. To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

158. Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Samsung. Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Samsung agreed on prices and supply levels for CRT Products.

159. Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them. To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

160. Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT. These meetings were

attended by high level executives from Samtel. Through these discussions, Samtel agreed on prices and supply levels for CRT Products. Samtel never effectively withdrew from this conspiracy.

161. Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings. These meetings were attended by the highest ranking executives from Thai CRT. Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel. Through these discussions, Thai CRT agreed on prices and supply levels for CRT Products. Thai CRT never effectively withdrew from this conspiracy.

162. Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings. After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic. These meetings were attended by high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG. Through these discussions, Toshiba agreed on prices and supply levels for CRT Products. Toshiba never effectively withdrew from this conspiracy.

163. Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them. To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

164. Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Daewoo. Daewoo also engaged in bilateral discussions with other Defendants on a regular basis. Through these discussions, Daewoo agreed on prices and supply levels for CRT Products. Bilateral discussions

with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

165. When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

### E.   The CRT Market During the Conspiracy

166. Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

167. The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

168. During the Relevant Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5

---

[1]   Estimated market value of CRT units sold.

percent) were consumed in North America. By 2002, North America still consumed around 35 percent of the world's CRT monitor supply. *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

169. Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Information Display 9/92 p.19. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

170. In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

171. In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose. The price increase was allegedly based on increasing global demand. In fact, this price increase was a result of the collusive conduct as herein alleged.

172. After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

173. A BNET Business Network news article from August 1998 reported that

"key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

174.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes. Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

175.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

176.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001. This is the most dramatic example of a drop in factory utilization. There were sudden drops throughout the Relevant Period but to a lesser degree. Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRT Products.

177.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products. As Finsen Yu, President of Skyworth Macao Commerical Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he

CRT technology is very mature; prices and technology have become stable."

178.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

179.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.    International Government Antitrust Investigations**

180.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRT Products sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ") and others in November 2007.

181.    On November 8, 2007, antitrust authorities in Europe, Japan and South Korea raided the offices of manufacturers of CRTs as part of an international investigation of alleged price fixing.

182.    Defendant MTPD, now the CRT unit of Defendant Panasonic, has confirmed that it was raided by Japan's Fair Trade Commission.

183.    *Kyodo News* reported on November 8, 2007, upon information and belief, that MTPD fixed prices for CRTs with manufacturers in three Asian countries, including South Korea's Samsung SDI. *Kyodo News* further reported that "[o]fficials of these three companies are believed to have had at least 10 meetings since 2005 in major Asian cities to coordinate target

46

prices when delivering their products to TV manufacturers in Japan and South Korea, the sources said."

184.     Defendant Samsung SDI was raided by South Korea's Fair Trade Commission, which has started an investigation into Samsung's CRT business.

185.     The *Asian Shimbun* further reported on November 10, 2007, that "[t]he representatives held meetings in Southeast Asia where the companies operate CRT factories, the sources said. The European Commission, the European Union's executive branch, and the U.S. Justice Department have been investigating four companies' [referring to the four Asian-based manufacturers—MTPD, Samsung SDI, Chunghwa, and LP Displays] overseas units and are closely consulting with the Fair Trade Commission by sharing information."

186.     On November 21, 2007, Defendant Royal Philips publicly disclosed that it too is subject to one or more investigations into anticompetitive conduct in the CRT industry. Royal Philips spokesman Joon Knapen declined to comment on which jurisdictions have started investigations. Royal Philips stated that it intended to assist the regulators.

187.     In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

188.     On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel. The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures

Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

189. On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry." The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

190. On August 19, 2009, the DOJ issued a press release announcing that a

federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa. The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

191.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

192.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

193.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related

49

businesses in the electronics industry.

194.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

195.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

196.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

197.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

198.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

199.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

200. The indictments of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

### G. The Role of Trade Associations During the Relevant Period

201. Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information. One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers. Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea. EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC"). In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

202. Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

203. The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007. Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S.

Trinker and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

204.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

205.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information. This exchange of information was used to implement and monitor the conspiracy.

### H.    Effects of Defendants' Antitrust Violations

#### 1.    Examples of Reductions in Manufacturing Capacity by Defendants

206.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

207.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion. Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business." The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

208.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

209.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

210.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

211.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana. The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.    Examples of Collusive Pricing for CRT Products

212.    Defendants' collusion is evidenced by unusual price movements in the CRT market. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

213.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

214.    In reality, consumer prices for CRT Products never approached $50 in 1997, and were consistently more than double this price.

215.     Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

216.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

217.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

218.     After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

219.     On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

220.     Over the course of the conspiracy period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of

production were relatively low compared to other emerging technologies. As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

221. CRT prices resisted downward price pressures and remained stable over a period of many years. Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy. The stability of the price of CRTs was accomplished by the collusive activities alleged above.

### H. Summary Of Effects Of The Conspiracy Involving CRT Products

222. The above combination and conspiracy has had the following effects, among others:

    a. Price competition in the sale of CRT Products by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b. Prices for CRT Products sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c. Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRT Products.

    d. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRT Products than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VIII. PLAINTIFFS' INJURIES

223. As purchasers of computer monitors, TVs and other devices that contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result

of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRT Products at supra-competitive levels. Defendants' conspiracy artificially inflated the price of CRT Products causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

224.    Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy. The conspiracy artificially inflated the prices of CRTs included in CRT Products.

225.    The OEMs and others passed on to their customers, including Plaintiffs, the overcharges caused by Defendants' conspiracy. Plaintiffs were not able to pass on to their customers the overcharges caused by Defendants' conspiracy. Thus, Plaintiffs suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

226.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product. Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiffs.

227.    The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately. Defendants are well aware of this intimate relationship.

228.    Throughout the Relevant Period, Defendants controlled the market for CRTs. Consequently, during the Relevant Period, the OEMs had no choice but to purchase

CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

229.    As a result, Plaintiffs were injured in connection with their purchases of CRT Products during the Relevant Period.

## IX.    FRAUDULENT CONCEALMENT

230.    Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until November 2007, when investigations by the DOJ and other antitrust regulators became public.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRT Products.

231.    Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRT Products.

232.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

233.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

234.    Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination. The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

235.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection. Participants at glass meetings were also told not to take minutes. Attending companies also reduced the number of their respective attendees to maintain secrecy.

236.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

237.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

238.     As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

239.     In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRT Products in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors. In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

240.     Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

241.     Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRT Products were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

242.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

## X.     CLAIM FOR VIOLATIONS

### First Claim for Relief
### (Violation of Section 1 of the Sherman Act)

243.     Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

244.    Beginning no later than March 1, 1995, the exact date being unknown to plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

245.    In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of CRT Products sold in the United States.

246.    As a result of Defendants' unlawful conduct, prices for CRT Products were raised, fixed, maintained and stabilized in the United States.

247.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

248.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.  participating in meetings and conversations to discuss the prices and supply of CRT Products;

    b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRT Products;

    c.  agreeing to manipulate prices and supply of CRT Products sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.  issuing price announcements and price quotations in accordance with the agreements reached;

    e.  selling CRT Products to customers in the United States at noncompetitive prices;

    f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

    g.  agreeing to maintain or lower production capacity; and

    h.  providing false statements to the public to explain increased prices for CRT Products.

249.  As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

### Second Claim for Relief
### (Violation of the California Cartwright Act)

250.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

251.  During the Relevant Period, Plaintiffs, and their predecessor entities, including International Computer Graphics, Inc., which was organized under the laws of the State of California, conducted a substantial volume of business in California. In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in California; maintained warehouses in California containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRT Products to customers in California and elsewhere. As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

252.  In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period. Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRT

Products. Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

253. Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720. Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRT Products at supra-competitive levels. Defendants' conduct substantially affected California commerce.

254. The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRT Products.

255. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

a. to fix, raise, maintain and stabilize the price of CRT Products;

b. to allocate markets for CRT Products amongst themselves;

c. to submit rigged bids for the award and performance of certain CRT Products contracts; and

d. to allocate among themselves the production of CRT Products.

256. The combination and conspiracy alleged herein has had, inter alia, the following effects:

    a. price competition in the sale of CRT Products has been restrained, suppressed and/or eliminated in the State of California;

    b. prices for CRT Products sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

    c. those who purchased CRT Products from Defendants, their co-conspirators, and others and CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

257. As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRT Products they purchased during the Relevant Period.

258. As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy. As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief
### (Violation of California Unfair Competition Law)

259. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

260.     During the Relevant Period, Plaintiffs, and their predecessor entities, including International Computer Graphics, Inc., conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in California; maintained warehouses in California containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRT Products to consumers in California and elsewhere. As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

261.     Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.*

262.     Defendants committed acts of unfair competition, as defined by Section 17200, *et seq.*, by engaging in a conspiracy to fix and stabilize the price of CRT Products as described above.

263.     The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act and (2) violation of the Cartwright Act.

264.     Defendants' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

265.     Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*;

266. Defendants' conduct was carried out, effectuated, and perfected, at least in part, within the state of California.

267. By reason of the foregoing, Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

## Fourth Claim for Relief
### (Violation of the New York Donnelly Act)

268. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

269. Plaintiffs are corporations organized and existing under the laws of the State of New York and during the Relevant Period, Plaintiffs and their predecessor entities conducted a substantial volume of business in New York. In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in New York; maintained warehouses in New York containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in New York who sold CRT Products to consumers in New York and elsewhere. As a result of their presence in New York and the substantial business they conducted in New York, Plaintiffs are entitled to the protection of the laws of New York.

270. Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Donnelly Act, New York General Business Law §§ 340 *et seq.*

271.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRT Products in New York and fixed, raised, maintained and stabilized CRT Products prices in New York at artificially high, non-competitive levels.

272.    As a result, Defendants' conspiracy substantially affected New York commerce

273.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products purchased from Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy, and are entitled to relief under New York General Business Law §§ 340 *et seq.*

274.    As a result of Defendants' violation of Section 340 of the New York General Business Law, Plaintiffs are entitled to treble damages and the costs of suit, including attorneys' fees.

### Fifth Claim for Relief
### (Violation of New York Unfair Competition Law)

275.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

276.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs.

277.    The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y General Business Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the

public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

278.    Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed and eliminated throughout New York; (2) CRT Products prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supra-competitive, artificially inflated prices for CRT Products.

279.    During the Relevant Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

280.    During the Relevant Period, each of Defendants named herein, directly, or indirectly and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold and/or distributed CRT Products in New York.

281.    Plaintiffs seek treble damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Without prejudice to their contention that Defendants' unlawful conduct was willful and knowing, Plaintiffs do not seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus. Law § 349(h).

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the New York Donnelly Act and the unfair competition laws of California and New York and Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.      Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

D.      Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.      Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

Plaintiffs shall receive such other or further relief as may be just and proper.

## XII.   **JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by

jury of all the claims asserted in this Complaint so triable.

Dated: March 10, 2011

<div style="margin-left: 40%;">

_____/s/ Philip J. Iovieno_____

Philip J. Iovieno
Anne M. Nardacci
Benjamin D. Battles
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY  12207
Telephone:  (518) 434-0600
Facsimile:  (518) 434-0665
Email: piovieno@bsfllp.com
          anardacci@bsfllp.com
          bbattles@bsfllp.com


William Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:  (202) 237-6131
Email:  wisaacson@bsfllp.com

_Counsel for Plaintiffs, Electrograph Systems,_
_Inc. and Electrograph Technologies Corp._

</div>

# EXHIBIT E

This document is available in two formats: this web page (for browsing content) and PDF (comparable to original document formatting). To view the PDF you will need Acrobat Reader, which may be downloaded from the Adobe site. For an official signed copy, please contact the Antitrust Documents Group.

NIALL E. LYNCH (State Bar No. 157959)
MICHAEL L. SCOTT (State Bar No. 165452)
DAVID J. WARD (State Bar No. 239504)
HEATHER S. TEWKSBURY (State Bar No. 222202)
ALEXANDRA J. SHEPARD (State Bar No. 205143)
Antitrust Division
U.S. Department of Justice
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
Telephone: (415) 436-6660

Attorneys for the United States

**FILED**

**09 MAR 10 AM 9:29**

**RICHARD W. WIEKING
CLERK, U.S. DISTRICT
COURT**
**NORTHERN DISTRICT OF
CALIFORNIA**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>HITACHI DISPLAYS LTD.,<br><br>Defendant. | Case No. CR 09-0247 MHP<br><br>**INFORMATION**<br><br>VIOLATIONS:<br>Title 15, United States Code,<br>Section 1 (Price Fixing)<br><br>San Francisco Venue<br><br>Date Filed: 03/10/2009 |

The United States of America, acting through its attorneys, charges:

DESCRIPTION OF THE OFFENSE

1. HITACHI DISPLAYS LTD. ("defendant") is made a defendant on the charge stated below.

2. From on or about April 1, 2001 to on or about March 31, 2004, defendant and its coconspirators entered into and engaged in a combination and conspiracy in the

United States and elsewhere to suppress and eliminate competition by fixing the prices of thin-film transistor liquid crystal display panels ("TFT-LCD") sold to Dell Inc. or its subsidiaries ("Dell") for use in desktop monitors and notebook computers. The combination and conspiracy engaged in by the defendant and its coconspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

3. The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendant and its coconspirators, the substantial terms of which were to agree to fix the prices of TFT-LCD to be sold to Dell.

4. For the purpose of forming and carrying out the charged combination and conspiracy, the defendant and its coconspirators did those things that they combined and conspired to do, including, among other things:

    a.  participating in bilateral meetings, conversations, and communications in Japan, Korea, and the United States to discuss the prices of TFT-LCD to be sold to Dell;

    b.a  greeing, during those bilateral meetings, conversations, and communications, to charge prices of TFT-LCD to be sold to Dell at certain predetermined levels;

    c.  issuing price quotations in accordance with the agreements reached; and

    d.e  xchanging information on sales of TFT-LCD sold to Dell, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

<u>DEFENDANT AND COCONSPIRATORS</u>

5. HITACHI DISPLAYS LTD. is a corporation organized and existing under the laws of Japan. During the period covered by this Information, HITACHI DISPLAYS LTD. engaged in the business of producing and selling TFT-LCD to customers in the United States and elsewhere.

6. Various corporations and individuals, not made defendants in this Information, participated as coconspirators in the offense charged in this Information and performed acts and made statements in furtherance of it.

7. Whenever in this Information reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, employees, agents, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

<u>TRADE AND COMMERCE</u>

8. TFT-LCD are glass panels composed of an array of tiny pixels that are electronically manipulated to display images. TFT-LCD are manufactured in a

broad range of sizes and specifications for use in televisions, notebook computers, desktop monitors, mobile devices, and other applications.

9. During the period covered by this Information, the defendant and its coconspirators sold and distributed TFT-LCD in a continuous and uninterrupted flow of interstate and foreign trade and commerce to customers located in states or countries other than the states or countries in which the defendant and its coconspirators produced TFT-LCD.

10. The business activities of the defendant and its coconspirators that are the subject of this Information were within the flow of, and substantially affected, interstate and foreign trade and commerce.

<u>JURISDICTION AND VENUE</u>

11. The combination and conspiracy charged in Count One of this Information was carried out, in part, in the Northern District of California, within the five years preceding the filing of this Information.

ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

| _____/s/_____ | _____/s/_____ |
|---|---|
| Scott D. Hammond | Phillip H. Warren |
| Acting Assistant Attorney General | Chief, San Francisco Office |

| _____/s/_____ | _____/s/_____ |
|---|---|
| Marc Siegel | Niall E. Lynch |
| Director of Criminal Enforcement | Assistant Chief, San Francisco Office |

United States Department of Justice
Antitrust Division

| _____/s/_____ | _____/s/_____ |
|---|---|
| Joseph P. Russoniello | David J. Ward |
| United States Attorney | Michael L. Scott |
| Northern District of California | Alexandra J. Shepard |
| | Heather S. Tewksbury |
| | Attorneys |
| | United States Department of Justice |
| | Antitrust Division |
| | 450 Golden Gate Avenue |
| | Box 36046, Room 10-0101 |
| | San Francisco, CA 94102 |
| | (415) 436-6660 |