# ARNOLD & PORTER LLP

**Eric Shapland**
Eric.Shapland@aporter.com

+1 213.243.4238
+1 213.243.4199 Fax

777 South Figueroa Street
Forty-Fourth Floor
Los Angeles, CA 90017-5844

April 29, 2011

Hon. Charles A. Legge
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111

> Re:   *In Re Cathode Ray Tube Antitrust Litig.*, No. 07-CV-5944 SC, MDL No. 1917

Dear Judge Legge:

Hitachi America, Ltd., LG Electronics Inc., and Samsung SDI Co., Ltd. request on behalf of all defendants in this coordinated proceeding an order compelling the Direct Purchaser ("DP") Plaintiffs to produce documents and answer interrogatories related to their business, the purchase and resale of CRTs and CRT finished products.

The DP Plaintiffs' business is relevant. As private parties enforcing federal antitrust laws, the DP Plaintiffs must demonstrate the existence of a conspiracy and the fact and amount of injury the conspiracy caused to their business. Their theory of injury is that they paid overcharges for CRTs and CRT finished products. They, therefore, must show that the hypothetical price that they would have paid "but for" the alleged conspiracy was lower than the price they in fact paid and by how much. Because the DP Plaintiffs' purchases were for the purpose of resale, their customers' demand for CRTs or CRT finished products is an important factor to consider on these issues. A DP Plaintiff's sales forecast, for example, may include a party admission regarding a coming spike in consumer demand or some other non-conspiratorial influence on pricing decisions by each defendant. Or a DP Plaintiff's market analysis may admit that its customers considered TVs manufactured by Sony or other large finished-product manufacturers not alleged to be cartel members to be interchangeable with those manufactured by defendants, facts inconsistent with the alleged conspiracy and any impact on the DP Plaintiffs.

The DP Plaintiffs refuse to provide such forecasts or analyses of their customers' demand for TVs and nearly all other discovery into their resale of CRT finished products based on an assertion of a nonexistent privilege. They argue that *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968), creates a policy against discovery "down the stream of commerce" from their transactions with defendants. *Hanover Shoe*, however, holds only that a direct purchaser plaintiff's "pass-on" of alleged overcharges, with certain exceptions, is not a defense to a claim for damages in a federal antitrust case. Thus, it states a substantive rule of damages,

## ARNOLD & PORTER LLP

not a privilege against discovery.  To the extent that downstream information is otherwise relevant, it remains discoverable.  *E.g.*, *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1191-96 (11th Cir. 2003); *Meijer, Inc. v. Warner Chilcott Holdings Co., III, Ltd.*, 245 F.R.D. 26, 34-35 (D.D.C. 2007); *In re Urethane Antitrust Litig.*, 237 F.R.D. 454, 462 (D. Kan. 2006).

Here, what the DP Plaintiffs label as "downstream" discovery -- and the label does not always fit -- is relevant to the following issues: (a) conspiracy, impact, damages and class certification in the DP Plaintiffs' case; (b) the applicability of an exception to *Hanover Shoe* for instances in which direct purchasers made sales through cost-plus contracts or similar arrangements in which they clearly suffer no damage from an overcharge; and (c) damages and class certification under state-law claims by the Indirect Purchaser ("IP") Plaintiffs for overcharges allegedly passed on to them by direct purchasers.

Moreover, the DP Plaintiffs have not demonstrated any undue burden in providing the discovery as requested, and through the meet-and-confer process, defendants have limited the scope of the discovery that they seek to reduce any burden that might exist.  Accordingly, the defendants request that the Court enter an order compelling each DP Plaintiff to provide supplemental responses to discovery requests relating to their CRT business, as so limited by the defendants.  The items on which defendants seek an order and the relevance of each item are listed for the Court's convenience in Exhibit A hereto.

**Relevant Background.**  The complaints in these proceedings allege that some -- but not all -- of the world's CRT and CRT finished-product manufacturers agreed to restrict output and fix prices for CRTs and CRT finished products.  The DP Plaintiffs state claims under Section 1 of the Sherman Act and seek damages under Section 4 of the Clayton Act.  Their damages theory is that they purchased CRTs or CRT products directly from the defendants or their agents and affiliates and that they "paid more for such products than they would have paid in the absence of such antitrust violations."  DP Plaintiffs' Consolidated Amended Complaint ¶ 222.  They seek damages for sales going back further than that permitted by the statute of limitation, and they do so by alleging that the defendants fraudulently concealed their activities by, among other things, "giv[ing] pretextual reasons for price increases and output reductions to their customers."  *Id.* at 206.  At the same time, the IP Plaintiffs allege state-law antitrust claims and seek recovery of any overcharge passed on to them.  The IP Plaintiffs also assert a claim of unjust enrichment, and seek disgorgement of profits allegedly resulting from the IP Plaintiffs' purported overpayments to defendants.  The DP Plaintiffs and the IP Plaintiffs seek to represent classes of direct and indirect purchasers respectively.

During discovery, a dispute arose between the parties regarding the propriety of discovery into the DP Plaintiffs' CRT business.  Defendants Hitachi America, Ltd., LG Electronics Inc., and Samsung SDI, Ltd. served document requests and interrogatories on the DP Plaintiffs covering, among other things, the DP Plaintiffs' CRT business.  Declaration of Eric Shapland ("Shapland Decl.") ¶ 2.  The DP Plaintiffs served written responses in which they objected to discovery requests covering their CRT or CRT finished-product "sales" on the

# ARNOLD & PORTER LLP

ground that they seek "downstream" discovery prohibited by *Hanover Shoe*. *Id.* ¶ 3. In some instances, the DP Plaintiffs rested on that objection even though the request also covered their "purchases" or "acquisitions" of CRTs or CRT finished products -- *i.e.*, upstream discovery. *Id.*

Through the meet and confer process, the parties have narrowed the scope of their dispute, but failed to reach a compromise. The parties met and conferred over the plaintiffs' *Hanover Shoe* objection through two conferences and several letters. *Id.* at ¶¶ 4–9. In their final letter, the defendants proposed the following compromise regarding downstream discovery:

*Item 1.* Pursuant to Hitachi Document Request Nos. 2 and 3, and Hitachi Interrogatory Nos. 4 and 5, each DP Plaintiff shall produce any contracts it entered for the sale of CRTs or CRT finished products, or represent that it has no such contracts. Each DP Plaintiff shall also produce any form contracts that it used and describe the terms of any contracts that may no longer be in its possession.

*Item 2.* Pursuant to LGE Document Request Nos. 5 through 7, each DP Plaintiff shall produce financial statements and documents *sufficient to show* its monthly or annual revenue, costs and profits from CRT or CRT finished-product sales.

*Item 3.* The LGE Defendants shall waive their Request No. 14 -- for tax filings -- if and to the extent a DP Plaintiff provides reliable documents in response to LGE Document Request Nos. 5 through 7, as narrowed above in Item 2.

*Item 4.* Pursuant to Hitachi Document Request Nos. 6 and 7, each DP Plaintiff shall produce actual policies or procedures that it has had for setting the price at which it sold CRTs or CRT finished products.

*Item 5.* Pursuant to Hitachi Document Request Nos. 2 and 3 and Interrogatory Nos. 2 through 7, each DP Plaintiff shall disclose whether it has transaction-level data for its sales of CRTs or CRT finished products, what format that data is in, and how far back it goes. The parties shall then discuss whether and to what extent the data should be produced.

*Item 6.* Pursuant to SDI Document Request Nos. 14 and 15, each DP Plaintiff shall produce actual budgets, forecasts or strategies for its acquisition or sale of CRTs or CRT finished products.

*Item 7.* Pursuant to Hitachi Interrogatory Nos. 8 and 9, each DP Plaintiff shall identify the individuals responsible for acquiring or pricing CRTs or CRT finished products. Each DP Plaintiff shall also produce from the files of individuals so identified documents on the following CRT or CRT finished-product topics (and document requests): (a) revenues, costs, profits and losses (pursuant to LGE Document Request Nos. 6-9); (b) relationships between costs and profits (pursuant to LGE Document Request Nos. 10-11); (c) cost-cutting or cost-saving measures (pursuant to LGE Document Request Nos. 12-13); (d) statements regarding actual or potential sales (pursuant to Hitachi Document

ARNOLD & PORTER LLP

Request Nos. 4-5); (e) pricing policies and practices (pursuant to Hitachi Document Request Nos. 6-7), (f) competition for sales (pursuant to Hitachi Document Request Nos. 8-9); (g) products marketed or sold as substitutes (pursuant to Hitachi Document Request Nos. 10-11); (h) reasons for purchases or sales (pursuant to Samsung SDI Document Request Nos. 12-13); (i) and purchase or sale budgets, forecasts, and strategies (pursuant to Samsung SDI Document Request Nos. 14-15).

*Id.* ¶ 7, Ex. K.

The DP Plaintiffs refuse to respond to any of these modified requests, except that they will simply state whether, in their opinion, they resold any of the CRTs and/or CRT Products upon which they base their claims herein pursuant to a "cost plus" contract. *Id.* ¶ 9, Ex. L.

**Argument.**  No "privilege" prevents discovery of relevant information about a DP Plaintiff's "downstream" business.  The test is relevance and burden.  Defendants have proposed a few discrete categories for discovery.  Those categories seek relevant information on a number of theories of defense and they are reasonably tailored to avoid unreasonably burdening the DP Plaintiffs.  The DP Plaintiffs have refused even to look for the requested information.  They have not demonstrated any undue burden in providing the information.  If they were to, defendants would modify their requests to accommodate that burden.

### A.     The DP Plaintiffs' CRT Business Is Relevant to Issues of Conspiracy, Impact, Damages and Class Certification Arising in Their Action.

The DP Plaintiffs' CRT business -- including the sales side of that business -- is at the heart of their case.  Because the DP Plaintiffs are resellers, their demand for CRT or CRT finished products is derived from the downstream purchasers who consumed CRT finished products.  *E.g.*, *Illinois v. Panhandle E. Pipe Line Co.*, 730 F. Supp. 826, 866 (C.D. Ill. 1990) (reasoning that reseller's demand is a derived demand "reflecting the demand characteristics of final consumers").  Information bearing on downstream consumer demand, therefore, is relevant to the allegation that a conspiracy extended to finished products.  Admissions that consumer demand for defendants' finished products is elastic -- *i.e.*, that consumers consider other manufacturers' products to be substitutes for, or interchangeable with, the defendants' products -- would be inconsistent with an inference that any conspiracy covered finished products.  *See In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 169 (D. Conn. 2009).  Those same admissions or admissions regarding shifts in consumer demand would also bear on whether the price that each DP Plaintiff paid for CRTs or CRT finished products was greater than the price it would have paid "but for" any conspiracy (the fact of injury or "impact") and by how much (the amount of damages).  *See, e.g.*, *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1503-04 (D. Kan. 1995).  They can also reveal geographic and product differences between putative class members' demand for CRTs or CRT finished products sufficient to prevent the use of common proof on those elements and thus the certification of a class.  *E.g.*, *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 327-28 (5th Cir.1978); *Windham v. American Brands, Inc.*, 565 F.2d 59, 66 (4th Cir. 1977).  In addition,

# ARNOLD & PORTER LLP

downstream sales information may reveal disparities or conflicts among the class members sufficient to defeat the typicality and adequacy requirements for class certification. *See, e.g.*, *Deiter v. Microsoft Corp.*, 436 F.3d 461, 465-68 (4th Cir. 2006); *Valley Drug Co.*, 350 F.3d at 1195-96; *In re Graphics Processing Units ("GPU") Antitrust Litig.*, 253 F.R.D. 478, 493-94 (N.D. Cal. 2008); *Allied Orthopedic Appliances v. Tyco Healthcare Grp.*, 247 F.R.D. 156, 177-78 (C.D. Cal. 2007).

The discovery that the DP Plaintiffs object to as "downstream" discovery is directly relevant to those issues of conspiracy, impact, damages and class certification.

*Item 2.* Aggregated CRT cost, revenue and profit data will help the defendants compare the size and sales volumes of the  named DP Plaintiffs' businesses with those of unnamed members of the putative class. To the extent that small, low-volume retailers seek to represent a class that includes large, high-volume retailers, the typicality requirement will not be satisfied.  Defendants will also be able to examine correlations between costs and profits, which could show that a named DP Plaintiff may have profited from overcharges and therefore may have a conflict with other members of the class.

*Item 4.* Pricing policies and practices may demonstrate that the DP Plaintiffs used price categories for particular products and brands. They could therefore evidence the extent to which the DP Plaintiffs and their customers recognized that certain CRTs or CRT finished products were considered substitutes for the defendants' products or the extent of product differentiation among the defendants' products.

*Item 5.* Transaction-level sales data will allow defendants to compare prices for the defendants' products with those for third-party products and to draw conclusions from there about the extent to which each DP Plaintiff's customers viewed non-conspirators' finished products to be substitutes for the defendants' products.  Similar comparisons can be made among the defendants' products to assess the extent to which brands and features differentiated products sufficient to cause myriad price points, which would reveal variations in product demand sufficient to prevent use of common proof to establish the fact of the alleged conspiracies' impact on the price of all products.  It will also reveal each DP Plaintiff's entire volume of CRT or CRT product sales -- even those by non-defendants -- and thus provide a complete picture of the buyer's potential bargaining power and demonstrate whether it is a typical class member or whether variation in bargaing power prevents a showing of impact by common proof.

*Item 6.* Sales forecasts and strategies may contain assessments of consumer demand -- or even upstream conditions such as input costs or supply -- that would serve as party admissions regarding non-conspiratorial explanations for actual price.  Such admissions would help the defendants negate the existence of the conspiracy alleged and the fact and extent of the alleged conspiracies' effect on price and the allegation that the defendants' explanations for price increases or output reductions were "pretextual."  Sales forecasts and strategies could also reveal that the named DP Plaintiffs have long known facts about

ARNOLD & PORTER LLP

competition sufficient to put them on notice of their claims and prevent them from relying on the doctrine of fraudulent concealment to toll the statute of limitations. They may also reveal the extent to which the DP Plaintiffs and their customers recognized that certain CRTs or CRT finished products were considered substitutes for the defendants' products.

*Item 7.* Disclosure of the identities of those responsible for acquiring or pricing CRTs or CRT finished products will provide defendants with a list of potential deposition candidates on issues of conspiracy, impact, damages and class certification. The following categories of documents sought from those key individuals are also relevant: (a) revenues, costs, profits and losses (LGE Document Request Nos. 6-9); (b) relationships between costs and profits (LGE Document Request Nos. 10-11); (c) cost-cutting or cost-saving measures (LGE Document Request Nos. 12-13); (d) statements regarding actual or potential sales (Hitachi Document Request Nos. 4-5); (e) purchase or sale policies and practices (Hitachi Document Request Nos. 6-7), (f) competition for sales (Hitachi Document Request Nos. 8-9); (g) products marketed or sold as substitutes (Hitachi Document Request Nos. 10-11); (h) reasons for purchases or sales (Samsung SDI Document Request Nos. 12-13); and (i) purchase or sale budgets, forecasts, and strategies (Samsung SDI Document Request Nos. 14-15).

For these reasons, the defendants request that the Court enter an order compelling the requested discovery into the DP Plaintiffs' CRT business, including their re-sales. Defendant manufacturers obtained just such an order in the *In re Urethane Antitrust Litig.*, 237 F.R.D. 454 (D. Kan. 2006). There, like here, defendant manufacturers sought direct purchaser plaintiffs' sales volume and prices, customer lists, customer communications, sales policies and practices, and analyses of supply and demand. Granting a motion to compel, the court held that that the discovery is relevant and "neither *Hanover Shoe* nor *Illinois Brick* holds that downstream data is irrelevant or non-discoverable." *Id.* at 462. Downstream demand and pricing, the court reasoned, could show "'industry characteristics'" or "significant differences in the product market for different purchasers" that make "individual issues overwhelm any common issues." *Id.* at 459-60. Qualitative information regarding the plaintiffs' sales practices, policies and analyses show whether plaintiffs viewed the products as non-fungible and believed that there were substitutes, which would prevent them from showing "class-wide impact." *Id.* at 461. Plaintiffs' sales volume and customer identities reveal their "buying power, elasticity of demand and leverage" and bear on whether "representation of class members with significantly different leverage may be inadequate, and/or individual issues concerning impact and damages may predominate." *Id.*

**B.    Many of the Discovery Requests at Issue Are Appropriate to Explore the Potential for an Exception to *Hanover Shoe*.**

The DP Plaintiffs object to downstream discovery under *Hanover Shoe* even when that discovery would help determine whether an exception to *Hanover Shoe* applies. Exceptions to

# ARNOLD & PORTER LLP

the rule against a pass-on defense are necessary in some instances, as *Hanover Shoe* itself recognized. 392 U.S. at 494. One such instance is "when an overcharged buyer has a pre-existing 'cost-plus' contract." *Id.* There, "the purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price." *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977).

Items 1, 2, 4, 5 and 7 are reasonably calculated to explore the basis for an exception to *Hanover Shoe* in this case. Accordingly, the defendants are entitled to an order compelling further responses to this "downstream" discovery. For example, in *Meijer, Inc. v. Warner Chilcott Holdings Co., III, Ltd.*, 245 F.R.D. 26 (D.D.C. 2007), the court granted a motion to compel downstream discovery to the extent necessary to allow the defendant to determine the applicability of the cost-plus exception. The defendant did not have to satisfy any precondition such as making a prima facie showing that the plaintiff purchasers had "cost plus" contracts. Rather, the court found defendant was "entitled to explore the applicability of a cost plus exception." *Id.* at 35.

The DP Plaintiffs' offer to state whether they have any cost-plus contracts is an appropriate start to the discovery that defendants seek on this issue, but it fails to represent a reasonable balance between relevance and any demonstrated burden. The defendants have a legitimate interest in examining the DP Plaintiffs' sales contracts for themselves. Through such an examination, they can look beneath a "cost-plus" label for provisions that contain cost-plus pricing mechanisms. They can also assess the credibility of any representation by plaintiffs that there are no such provisions. *See, e.g.*, *El Badrawi v. Dep't of Homeland Sec.*, 258 F.R.D. 198, 202 (D. Conn. 2009). Plaintiffs have made no showing that the production of their sales contracts would be any more burdensome than the due diligence they should exercise to form their opinion whether those contracts contain provisions creating a cost-plus pricing mechanism. Moreover, the other items that defendants seek would help indicate whether cost-plus pricing occurred through written agreements that the DP Plaintiffs may have forgotten about, lost or destroyed; through oral agreements; or under circumstances that create the functional equivalent of a cost-plus contract.

### C. The DP Plaintiffs' Sales Information Is Also Relevant to Impact, Damages and Class Certification in the IP Plaintiffs' Action.

Discovery into the DP Plaintiffs' CRT or CRT finished-product sales is also relevant to the IP Plaintiffs' action. Like the DP Plaintiffs, the IP Plaintiffs seek recovery of alleged overcharges and, therefore, must prove the fact and amount of the alleged overcharges. *E.g.*, *GPU*, 253 F.R.D. at 499. However, unlike direct purchasers, the IP Plaintiffs do not allege that they paid any overcharge directly to the defendants; any overcharge must have been passed on to them by direct and other downstream purchasers. Each IP Plaintiff was injured only if and to the

# ARNOLD & PORTER LLP

extent that an overcharge was passed on to it.[1]  This is true under the IP Plaintiffs' state antitrust claims and under their unjust enrichment claims, which require that the IP Plaintiffs establish, among other things, that they conferred a benefit on defendants, 26 Williston on Contracts § 68:5 (4th ed. 2010).  Moreover, because the IP Plaintiffs seek to represent a class, they must prove "with evidence common to all class members that the direct purchasers 'passed on' their purported [ ] overcharges."  *California v. Infineon Techs. AG*, No. 06-4333, 2008 WL 4155665, at *6 (N.D. Cal. Sept. 5, 2008).  To the extent that direct purchasers respond to cost changes in different ways, charge different prices to different customers, or simply price under different competitive pressures, indirect purchasers will have difficulty satisfying that requirement.  *E.g.*, *Somers v. Apple, Inc.*, 258 F.R.D. 354, 360-61 (N.D. Cal. 2009); *In re Flash Memory Antitrust Litig.*, No. 07-0086, 2010 WL 2332081, at *11 (N.D. Cal. June 9, 2010); *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 165 (N.D. Cal. 2001).

Defendants have tailored the following "downstream" discovery requests to ascertain these impact, damages and class certification issues relevant to the IP Plaintiffs' action:

*Item 1*. Sales contracts will allow defendants to determine whether, and to what extent, the DP Plaintiffs passed on any alleged overcharges to the IP Plaintiffs as a matter of right.

*Item 2*. Aggregated CRT cost, revenue and profit data will allow defendants to establish whether a DP Plaintiff's profits remained constant amid fluctuating costs indicating the extent to which it effectively passed on alleged overcharges to indirect purchasers.

*Item 4*. Pricing policies and practices show the extent to which each DP Plaintiff set its prices by using formulae consciously to pass on cost increases, charged different prices to different customers, or viewed different products to be interchangeable.  They may also reveal the extent to which each DP Plaintiff changed its price only periodically and therefore did not immediately pass on price increases or do so to all customers.  They will also reveal the extent to which such practices varied among DP Plaintiffs.

*Item 5*. Transaction-level data will help correlate a DP Plaintiff's cost increases with price to determine whether and to what extent it passed on any overcharge and thereby determine whether any of the IP Plaintiffs themselves paid any such overcharge (*i.e.*, conferred a benefit to defendants).  They also will reveal whether a DP Plaintiff charged different prices to different customers, or different prices for similar products, and the extent to which prices varied among DP Plaintiffs.

---

[1] *E.g.*, D.C. Code § 28-4509(b); Fla. Stat. § 542.22; Haw. Rev. Stat. § 480-13(c); Minn. Stat. Ann. § 325D.57; Neb. Rev. Stat. § 59-821.01(1); N.M. Stat. Ann. § 57-1-3(C); N.Y. Gen. Bus. Law § 340(6); N.D. Cent. Code § 51-08.1-08(4); S.D. Codified Laws Ann. § 37-1-33; Vt. Stat. Ann. § 2465(b); *In re W. Liquid Asphalt Cases*, 487 F.2d 191, 201 (9th Cir. 1973); *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 787 (2010).

# ARNOLD & PORTER LLP

*Item 6.* Budgets, forecasts and strategies will assist defendants in evaluating whether the DP Plaintiffs have divergent pricing strategies based on different competitive pressures. They may also identify shifts in consumer demand, supply or costs that could provide a non-conspiratorial explanation for changes in price.

*Item 7.* Disclosure of individuals responsible for pricing will provide defendants with a list of potential deposition candidates on sales and pricing issues.  Those individuals also would provide documents in their files on the following CRT and CRT finished-product topics related to the IP Plaintiffs' damages and class certification: (a) revenues, costs, profits and losses (pursuant to LGE Document Request Nos. 6-9); (d) statements regarding actual or potential sales (pursuant to Hitachi Document Request Nos. 4-5); (e) sales policies and practices (pursuant to Hitachi Document Request Nos. 6-7), (f) competition for sales (pursuant to Hitachi Document Request Nos. 8-9); (g) products marketed or sold as substitutes (pursuant to Hitachi Document Request Nos. 10-11); (h) reasons for purchases or sales (pursuant to Samsung SDI Document Request Nos. 12-13); and (i) purchase or sale budgets, forecasts, and strategies (pursuant to Samsung SDI Document Request Nos. 14-15).

**Conclusion.**  Based on the foregoing reasons, the defendants request that each DP Plaintiff provide the discovery requested by Item Nos. 1 through 7 above.

Respectfully submitted,

*/s/ Eric Shapland*

Eric Shapland

cc:    All Counsel via ECF

# EXHIBIT A

# ARNOLD & PORTER LLP

**Exhibit A:**
**Table of Items Requested &**
**Grounds for Relevance**

| | Items Requested | | Relevance | | |
|---|---|---|---|---|---|
| Item | Category | Requests | Conspiracy Impact | Cost-Plus | IP Case |
| 1 | Sales Contracts, Forms and Terms | Hitachi RFP Nos. 2-3 & Interrogatory Nos. 4-5 | | x | x |
| 2 | Aggregated Financial Data | LGE RFP Nos. 5 through 7 | x | x | x |
| 3 | Tax Filings if Necessary | LGE RFP No. 14 | x | x | x |
| 4 | Pricing Policies & Procedures | Hitachi RFP Nos. 6-7 | x | x | x |
| 5 | Transaction-Level Data | Hitachi RFP Nos. 2-3 & Interrogatory Nos. 2-7 | x | x | x |
| 6 | Buy & Sale Budgets, Forecasts, Strategies | SDI RFP Nos. 14-15 | x | | x |
| 7 | Buys/Sales Personnel & Their Documents Re: | Hitachi Interrogatory Nos. 8-9 | x | x | x |
| | (a) Revenues, Costs, Profits and Losses | LGE RFP Nos. 6-9 | x | x | x |
| | (b) Costs & Profits Inter-Relationship | LGE RFP Nos. 10-11 | x | x | |
| | (c) Cost-Cutting or Cost-Saving Measures | LGE RFP Nos. 12-13 | x | | |
| | (d) Statements Re Actual/Potential Sales | Hitachi RFP Nos. 6-7 | x | | x |
| | (e) Sales Policies & Practices | Hitachi RFP Nos. 6-7 | x | x | x |
| | (f) Competition for Sales | Hitachi RFP Nos. 8-9 | x | | x |
| | (g) Products Marketed or Sold as Substitutes | Hitachi RFP Nos. 10-11 | x | | x |
| | (h) Reasons for Purchases or Sales; and | Samsung SDI RFP Nos. 12-13 | x | | x |
| | (i) Budgets, Forecasts, Strategies | Samsung SDI RFP Nos. 14-15 | x | | x |