# SAVERI & SAVERI, INC.
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: (415) 217-6810
TELECOPIER: (415) 217-6813

May 31, 2011

Honorable Charles A. Legge
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, California 94111

      Re:    *In Re Cathode Ray Tube Antitrust Litig.*, No. 07-CV-5944 SC, MDL No. 1917;
Opposition to the Motion to Compel Direct Purchaser Plaintiffs to Produce
Downstream Discovery

Dear Judge Legge:

      Hitachi America, Ltd., LG Electronics Inc. and Samsung SDI Co., Ltd. ("Defendants") ask this Court to ignore the overwhelming weight of authority precluding downstream discovery in price-fixing antitrust class actions in seeking an order compelling Plaintiffs to respond to 24 document requests and eight interrogatories. Defendants' April 29, 2011 letter to Hon. Charles A. Legge ("Def. Br."). Defendants' requests for direct purchasers' contracts for sale, costs from sales, transaction-level sales data, revenue, profits, pricing policies, tax returns and other financial and pricing information are not relevant to Plaintiffs' claims or Defendants' defenses, are unduly burdensome and violate the long-standing policy against allowing downstream discovery in direct purchaser antitrust actions articulated by the Supreme Court in *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) ("*Hanover Shoe*"), and *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ("*Illinois Brick*"). As Judge Wilken noted in rejecting arguments similar to those advanced by Defendants here: "'[T]he Supreme Court has cautioned that the effectiveness of antitrust actions may be substantially reduced if defendants are allowed to pursue an inquiry into downstream activities and the massive discovery that such an inquiry would entail.'" *Meijer, Inc. v. Abbott Labs.*, 251 F.R.D. 431, 434 (N.D. Cal. 2008) ("*Abbott Labs.*") (quoting *In re Pressure Sensitive Labelstock Antitrust Litig.*, 226 F.R.D. 492, 496-98 (M.D. Pa. 2005) ("*Labelstock*").

      A vast body of case law directly contradicts the Defendants' arguments. *See* Def. Br. at 2. Defendants have cited no Ninth Circuit decision supporting such discovery and we are aware of none. *See* Def. Br. at 2. Indeed, there are at least three decisions in this district in addition to *Abbott Labs* that have rejected requests for such information. *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M-02-1486 PJH (JCS) (N.D. Cal. June 1, 2006) ("*DRAM*") (Spero, J.) (Attached as Exhibit 1 to the Declaration of R. Alexander Saveri in Support of Opposition to Motion to Compel Direct Purchaser Plaintiffs to Produce Downstream Discovery ("Exh.")); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M:07-md-1827 SI (N.D.

Honorable Charles A. Legge
May 31, 2011
Page 2

Cal. Jan. 13, 2009) (Smith, S.M.) (Exh. 2) ("*LCDs I*"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M:07-md-1827 SI (N.D. Cal. Nov. 10, 2010) (Quinn, S.M.) (Exh. 3) ("*LCDs III*").

Defendants have "a very high standard to meet to establish the right to seek downstream discovery." *In re K-Dur Antitrust Litig.*, Civ. A. No. 01-1652 (JAG), MDL No. 1419, 2007 WL 5302308, at \*14 (D.N.J. Jan. 2, 2007) ("*K-Dur*"). They have not met that standard here.

Plaintiffs have properly objected to the document requests and interrogatories Defendants propounded and respectfully ask the Court to deny Defendants' request for an order compelling production of Plaintiffs' downstream information.

### I. The Downstream Discovery Defendants Seek Is Irrelevant to Plaintiffs' Claims and Defendants' Defenses.

In *Hanover Shoe* and *Illinois Brick*, the Supreme Court held that, if a direct purchaser incurs an overcharge based on defendants' anticompetitive actions, the fact that the direct purchaser passes on the overcharge to its customers has no bearing on the issue of damages. *See Hanover Shoe*, 392 U.S. at 492-94; *Illinois Brick*, 431 U.S. at 725, 732. *See also*, *Abbott Labs.*, 251 F.R.D. at 433. The Supreme Court reasoned that introduction of a pass-on defense would "often require additional long and complicated proceedings involving massive evidence and complicated theories." *Hanover Shoe*, 392 U.S. at 493; *Illinois Brick*, 431 U.S. at 744-45.

In view of the policies and rationales underlying the Supreme Court's decisions in *Hanover Shoe* and *Illinois Brick*, courts consistently deny discovery of direct purchaser plaintiffs' pricing and sales to their customers, revenues, profits and costs where, as here, Plaintiffs seek overcharge damages on their direct purchases.[1]

---

[1] *See LCDs III* (Exh. 3) (denying discovery of direct purchasers' sales and customer data and pricing to indirect purchasers)*; DRAM* (denying downstream discovery concerning plaintiffs' contracts with their customers, how plaintiffs determined the amounts they charged customers and the amounts they charged customers) (Exh. 1); *In re Air Cargo Shipping Servs. Antitrust Litig.*, MDL 1775, 2010 WL 4916723, at \*2-4 (E.D.N.Y. Nov. 24, 2010) ("*Air Cargo*") (denying downstream discovery regarding the pricing of services provided by plaintiffs to their customers); *In re Chocolate Confectionary Antitrust Litig.*, MDL 1935 (M.D. Pa. Jan. 20, 2010) ("*Chocolate*") (denying discovery of downstream documents concerning plaintiffs' pricing, sales and marketing to their customers) (Exh. 4); *In re Aspartame Antitrust Litig.*, No. 2:06-CV-1732-LDD, 2008 WL 2275528, at \*6 (E.D. Pa. Apr. 8, 2008) ("*Aspartame*") (same); *In re Flat Glass Antitrust Litig. (II)*, MDL No. 1942 (W.D. Pa. Jan. 6, 2010) ("*Flat Glass*") (denying discovery of plaintiffs' sales data) (Exh. 5); *In re Auto. Refinishing Paint Antitrust Litig.*, No. MDL 1426, 2006 WL 1479819, at \*7-8 (E.D. Pa. May 26, 2006) ("*Auto Paint*") (precluding downstream discovery relating to market conditions, nature of the industry and damages); *In re Monosodium Glutamate Antitrust Litig.*, MDL 00-1328 (PAM/JGL) (D. Minn. Sept. 13, 2000) (denying discovery of plaintiffs' downstream sales information) (Exh. 6); *In re Vitamins Antitrust Litig.*, 198 F.R.D. 296 (D.D.C. Nov. 22, 2000) ("*Vitamins*") (affirming the denial of discovery of downstream documents regarding plaintiffs' use, manufacture, sale, marketing, distribution and supply of vitamins and vitamin products as not relevant to the demand for defendants' vitamin products or to injury/damage issues; and affirming the denial of discovery of plaintiffs' downstream financial statements and data as irrelevant in an overcharge case); *In re Carbon Dioxide Antitrust Litig.*, MDL Dkt. No. 940, at 4 (M.D. Fla. Nov. 19, 1993) (denying

Honorable Charles A. Legge
May 31, 2011
Page 3

### A. Plaintiffs' Downstream Information Is Not Relevant to Conspiracy, Impact or Damages Issues.

In antitrust price-fixing cases, whether a direct purchaser who suffered an overcharge passed on that overcharge to its own customers is irrelevant to its right to recovery. *See Abbott Labs.,* 251 F.R.D. at 433-34; *Air Cargo,* 2010 WL 4916723, at *2; *Auto Paint*, 2006 WL 1479819, at *8.

Defendants argue erroneously that Plaintiffs' customers' demand for CRTs or CRT finished products is an important factor to consider on the issue of determining the overcharges that Plaintiffs paid (*see* Def. Br. at 1) and that whether Plaintiffs' customers viewed non-conspirators' finished products to be substitutes is relevant (s*ee id.* at 5).  But, it is Defendants' activities and their sales that are relevant, and "case law prevents discovery of events occurring in the chain of distribution after the initial sales of the price-fixed product." *In re Plastics Additives Antitrust Litig.*, No. Civ. A. 03-2038, 2004 WL 2743591, at *16 (E.D. Pa. Nov. 29, 2004) ("*Plastics Additives*").  Plaintiffs' customers' views about CRTs or CRT finished products and their demand for these products are irrelevant.

Further, the vast majority of the information Defendants seek – *e.g.,* tax returns and financial records showing revenues and profits – are of no value in determining questions like "demand" or "fungibility" of CRT Products, because Plaintiffs' businesses involve more than the purchase and resale of CRT Products.  For example, Plaintiffs Wettstein's and Meijer are retailers that sell a wide variety of products.  In addition, as explained more fully below, these records would have no marginal value to Defendants in light of the vast amount of data already in Defendants' possession – *e.g.,* their own sales records and market research materials, as well as the pricing, sales and market research data they have subpoenaed from forty of the largest retailers in the country.

### B. The Requested Downstream Discovery Is Not Relevant to Class Certification Issues.

Defendants contend that several types of information are "directly relevant" to class certification issues, including typicality and adequacy.  *See* Def. Brf. at 5.  Courts have repeatedly found to the contrary.[2]

---

discovery of plaintiffs' costs and profits) (Exh. 7); *In re Wirebound Boxes Antitrust Litig.*, 131 F.R.D. 578, 578 (D. Minn. 1990) (denying discovery of plaintiffs' financial information where plaintiffs sought to recover overcharges).

[2] *See Abbott Labs.*, 251 F.R.D. at 434 (rejecting discovery of plaintiffs' downstream sales); *Air Cargo*, 2010 WL 4916723, at *3-4  (denying downstream discovery of pricing information that defendants claimed was "crucial to an examination of the predominance requirement for class certification"); *Aspartame*, 2008 WL 2275528, at *1-3, *6 (denying downstream discovery of plaintiffs' terms and conditions of sale, identity of plaintiffs' customers, and plaintiffs' financial statements, revenue and profits); *K-Dur*, 2007 WL 5302308, at *4, *10-12 (denying downstream discovery of sales and prices and

Honorable Charles A. Legge
May 31, 2011
Page 4

> **1. The Requested Downstream Discovery Is Not Relevant to Typicality.**

According to Defendants, aggregated CRT cost, revenue, profit data and transaction-level sales data are relevant to determining typicality. *See* Def. Br. at 5. Defendants claim that "[t]o the extent [] small, low-volume retailers seek to represent a class that includes large, high-volume retailers," the typicality requirement will not be satisfied. *Id.* However, "[u]nder the rule's [Fed. R. Civ. P. 23(a)(3)] permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 300 (N.D. Cal. 2010) ("*LCDs II*") (Illston, J.) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

The Northern District of California recently rejected an argument similar to Defendants' in *LCDs II*. Defendants there argued that differences in bargaining power between high-volume class member purchasers and small plaintiff purchasers undermined typicality. *See* 267 F.R.D. at 303. Judge Illston found that, "even if large-volume purchasers interacted with and purchased from defendants in different ways than the proposed class representatives, because of the alleged price-fixing scheme, prices paid for *all* TFT-LCD panels and products were artificially inflated and supracompetitive." *Id.* at 305. Like the plaintiffs in *LCDs II*, each class member's claim here arises from the same course of conduct – Defendants' price-fixing scheme – and the legal arguments of each class member are identical. Therefore, any downstream discovery that Defendants seek is not relevant to typicality, and the burden and expense that downstream discovery would entail far outweighs its likely benefit.

> **2. The Requested Downstream Discovery Is Not Relevant to Adequacy.**

Defendants also claim that aggregated CRT cost, revenue and profit data could show that a direct purchaser plaintiff may have profited from overcharges and therefore may have a conflict with other class members. Def. Br. at 5. "Regardless of whether some class members profited from the alleged activity in this case, the controlling question is whether the class members suffered an overcharge: if an overcharge occurred, *all* class members are entitled to recover." *In re Wellbutrin SR Direct Purchaser Antitrust Litig.*, Civ. A. No. 04-5525, 2008 WL 1946848, at *6 (E.D. Pa. May 2, 2008) (emphasis in original) ("*Wellbutrin*"). Furthermore, Defendants have failed to identify any potential conflicts and, "[a]s a rule, 'courts are generally

---

finding downstream discovery irrelevant as a matter of law); *Labelstock*, 226 F.R.D. 492, 496-98 (M.D. Pa. 2005) (denying discovery of downstream financial statements and data regarding plaintiffs' sales to their customers); *In re Hypodermic Prod. Direct Purchaser Antitrust Litig.*, MDL No. 1730, Master Dkt. No. 05-CV-1602 (JLL/RJH), 2006 U.S. Dist. LEXIS 89353, at *6-7, *11-41 (D.N.J. Sept. 7, 2006) ("*Hypodermic*") (precluding downstream discovery regarding plaintiffs' sales to and communications with their customers); *Plastics Additives*, 2004 WL 2743591, at *15-16 (denying downstream discovery relating to demand conditions in markets in which plaintiffs sold); *In re Carbon Dioxide Indus. Antitrust Litig.*, M.D.L. 92-940 (M.D. Fla. Dec. 10, 1992) (denying downstream discovery concerning plaintiffs' resales) (Exh. 8).

skeptical of defenses to class certification based on conflicts between the proposed class members.'" *Id.* at *5 n.14. (quoting *In re Bulk [Extruded] Graphite Prods. Antitrust Litig.*, 2006 U.S. Dist. LEXIS 16619, at *24 (D.N.J. Apr. 4, 2006)).

### C.  Defendants' Cases Do Not Justify Downstream Discovery Here.

Defendants rely on *In re Urethane Antitrust Litig.*, 237 F.R.D. 454 (D. Kan. 2006) ("*Urethane*") to argue that the downstream discovery they seek is discoverable.  *See* Def. Br. at 2, 6.  *Urethane* was erroneously decided and this Court should decline to follow it.  *See LCDs III* at 4 (Exh. 3) ("with all respect to the Kansas court, the great weight of authority is to the contrary").

The court in *Urethane* expressed the view, urged by Defendants here (Def. Br. at 6), that downstream demand and pricing could show "industry characteristics" or "significant differences in the product market for different purchasers."  237 F.R.D. at 460.  As stated above, downstream demand and pricing is irrelevant, and, since the *Urethane* decision, courts continue to deny production of this type of discovery.  *See, e.g.*, *LCDs III* (Exh. 3); *Abbott Labs.*, 251 F.R.D. at 433-36; *Air Cargo*, 2010 WL 4916723, at *3 (finding that the decision in *Urethane* was "not persuasive" and that "[t]he [*Urethane*] court seemed to overlook the fact that the common issues to be resolved, if any, were not in the downstream markets but in the upstream market where the plaintiffs were alleging they were overcharged"); *Chocolate*, MDL 1935 (Exh. 4); *Flat Glass* (Exh. 5); *Aspartame*, 2008 WL 2275528, at *6; *K-Dur*, 2007 WL 5302308, at *17; *Hypodermic*, 2006 U.S. Dist. LEXIS 89353, at *20.

The *Urethane* court also incorrectly found that plaintiff purchasers' policies, practices and procedures regarding sales of end products had some bearing on whether the inputs that were the subject of the conspiracy were fungible.  237 F.R.D. at 460-61.  Fungible products are "commodity products, standard products," *Arden Architectural Specialties, Inc. v. Wash. Mills Electro Minerals Corp.*, Nos. 95-CV-7574 CJS, 95-CV-780 CJS, 2002 WL 31421915, at *3 (W.D.N.Y. Sept. 17, 2002).  Fungibility is determined by the nature of the product, not its use.  *Id.*  While courts do consider fungibility of the price-fixed product on class certification, fungibility does not depend on downstream end uses, but on the characteristics of the product that is the subject of the suit.

Similarly, the *Urethane* court found that "buying power, elasticity of demand, and leverage" may be relevant to class certification issues.  *Urethane*, 237 F.R.D. at 461.  These issues are not dependent on the characteristics of indirect purchasers but only on the characteristics of direct purchasers.  For example, there might be five distributors of a product bought by millions of customers.  The "buying power" of the five distributors might be relevant in determining the prices colluding manufacturers could charge the distributors, but the lack of "buying power" of the millions of retail customers is wholly irrelevant to that analysis.  The controlling question is whether the class members suffered an overcharge.  *See Wellbutrin*, 2008 WL 1946848, at *5 n.14.  If so, all class members are entitled to recover, and, "[t]o the extent there is a dispute about the extent of the overcharge for different sized class members, the problem is simply one of the calculation of damages as to each, not a zero sum game requiring a

Honorable Charles A. Legge
May 31, 2011
Page 6

comparable subtraction from the damages of other class members." *In Re Carbon Black Antitrust Litig.*, No. Civ. A. 03-10191-DPW, MDL No. 1543, 2005 WL 102966, at *13 (D. Mass. Jan. 18, 2005). *See Wellbutrin*, 2008 WL 1946848, at *5 n.14. Further, Defendants do not need downstream discovery to evaluate direct purchasers' buying power. Defendants can determine whether direct purchasers were large or small purchasers from their own sales information.

Defendants also rely on *Valley Drug Co. v. Geneva Pharm. Inc.*, 350 F.3d 1181 (11th Cir. 2003) ("*Valley Drug*"). *See* Def. Br. at 2. *Valley Drug* was based on unique circumstances related to wholesale name brand and generic pharmaceuticals distribution, and courts have held that it is inapposite outside of the specific facts present in the pharmaceutical industry.[3] Courts outside the Eleventh Circuit have rejected the decision's conflict rationale as inconsistent with *Hanover Shoe* and *Illinois Brick,* and have rejected the argument that downstream economic effects of a price-fixing conspiracy can give rise to intra-class conflicts in price-fixing cases seeking an overcharge recovery.[4] Here, Defendants have made no showing of any intra-class conflict within the direct purchaser class that Plaintiffs seek to represent, and the generic drug by-pass dynamic unique to the drug industry in *Valley Drug* is not present. Moreover, in an overcharge case seeking damages for past conduct, all putative class members share an identical interest in recovering the full amount of any overcharges resulting from defendants' price fixing, irrespective of whether certain class members made downstream profits.

> **II.    Defendants' Requests for Downstream Information Is Not Justified Based on the Cost-Plus Exception to *Hanover Shoe*.**

Defendants further argue that production of downstream data is justified based on the possibility that the "cost-plus contract" exception to *Hanover Shoe (*and *Illinois Brick*) might apply. Def. Br. at 6-7. Plaintiffs have agreed to respond to a narrowly tailored interrogatory

---

[3] *See Meijer Inc. v. Warner Chilicott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 304 (D.D.C. 2007) (finding *Valley Drug*'s "holding fails to appreciate the true import of the *Hanover Shoe* rule that a direct purchaser may recover the full amount of the overcharge, even if he is otherwise benefitted, because the antitrust 'injury occurs and is complete when the defendant sells at the illegally high price'" (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 313 (E.D. Mich. 2001))); *Air Cargo.*, 2010 WL 4916723, at *3-4  (finding *Valley Drug* inapposite where there was no "demonstration that the markets at issue [] share any of the unique market characteristics the court in *Valley Drug* found significant to its decision"); *Labelstock*, 226 F.R.D. at 498 (holding *Valley Drug* inapplicable "[i]n the absence of some showing of conditions making it probable that some large subset of the class benefitted from the price fixing conspiracy, making their interests antagonistic to other class members").

[4] *Abbott Labs.*, 251 F.R.D. at 434 (finding *Valley Drug* contrary to the "principal basis" underlying *Hanover Shoe* and *Illinois Brick*: "the practical difficulty of determining whether and to what extent a party benefits from one economic arrangement as opposed to another"); *Hypodermic* 2006 U.S. Dist. LEXIS 89353, at *19 (finding *Valley Drug* incorrectly found a conflict where direct purchasers had suffered an overcharge); *K-Dur*, 2007 WL 5302308, at *12 (rejecting *Valley Drug* and finding that there could be no conflict on the issue of damages that could be revealed by downstream discovery "[b]ecause all members of the putative class in this case will be entitled to the same measure of damages if successful – the amount of the overcharge").

Honorable Charles A. Legge
May 31, 2011
Page 7

going to this issue. *See* September 24, 2010 Letter from Geoffrey C. Rushing to Eric Shapland ("Rushing Ltr.") at 2 (Exhibit L to Def. Br.). Beyond this, however, Defendants' arguments lack merit. Their assertion that they are entitled to establish a "functional equivalent" to a "cost-plus contract" defies the clear prohibition of "pass-on analysis" by *Hanover Shoe* and *Illinois Brick*.

To qualify for the "cost-plus contract" exception, the contract at issue must 1) pre-date the conspiracy; 2) require the purchase of a fixed amount of product; and 3) determine the purchase price on a "cost-plus" basis. *See Stanislaus Food Products Co. v. USS-POSCO Indus.*, -- F.Supp.2d --, 2011 WL 1677957, at * 5 (E.D.Cal. Feb. 24, 2011). *See also Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 217-18 (1990) ("*Utilicorp*"); *Hanover Shoe*, 392 U.S. at 494. The exception is allowed because "the pre-existing cost-plus contract makes easy the normally complicated task of demonstrating that the overcharge has not been absorbed by the direct purchaser." *Illinois Brick*, 431 U.S. at 732 n.12. The exception, however, is extremely narrow and few contracts satisfy its strict requirements. *See Utilicorp,* 497 U.S. at 217-18; *Illinois Brick*, 431 U.S. at 732 n.12. *See Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1121 (9th Cir. 2008) (*Delaware Valley*"); *see also Abbott Labs.*, 251 F.R.D. at 434. Indeed, some courts have questioned whether the cost-plus exception can ever be satisfied. *See, e.g., K-Dur*, 2007 WL 5302308, at *15 (citing *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996)).

Both the Supreme Court and the Ninth Circuit have warned against broadening the exception (or creating new exceptions). In *Utilicorp,* the Supreme Court held that the exception could not apply to a contract that did not meet the three enumerated requirements even where it was subject to a law *requiring* the utility to pass-on 100% of a price increase to its customers. *Utilicorp,* 497 U.S. at 208; *Delaware Valley,* 523 F. 3d at 1121, 1123; *see also In re Ditropan XL Antitrust Litigation,* 2007 WL 2978329, at *4 (N.D. Cal. October 7, 2007) (in *Utilicorp* "the Supreme Court 'cautioned lower federal courts against creating new exceptions to the *Illinois Brick* rule.'" (citation omitted)).

As noted, Plaintiffs have agreed to respond to an interrogatory directed at the existence of purchases pursuant to contracts which meet the three requirements for the exception. *See* Rushing Ltr. at 2.[5] Beyond this, Defendants' argument that they are entitled to discovery of a large range of downstream data because they might be able to establish the "functional equivalent" of a "cost plus contract" with regard to purchases that do not meet those requirements, however, is plainly contrary to the rule of *Hanover Shoe* and *Illinois Brick*. Defendants argue that they should be allowed to assert the very "pass-on" defense prohibited by those cases. Not surprisingly, Defendants could provide no authority in support of their "functional equivalent" theory in the meet and confer process, and provide none here. *See* Rushing Ltr. at 3. Indeed, if such an exception existed, it would swallow the rule, and the "pass-on" defense would be asserted in every case.

---

[5] Plaintiffs offered to resolve this dispute by answering the following interrogatory: With reference to the purchases of CRTs and/or CRT Products upon which you base your claims herein, please state whether you resold any of those products pursuant to a "cost-plus" contract. *See* Def. Br. at 7; Rushing Ltr. at 2

Defendants' insistence that they are entitled to downstream discovery to test Plaintiffs' credibility and memory would similarly swallow the rule and defeat the purpose of the interrogatory Plaintiffs have agreed to answer.[6]  Def. Br. at 7.  Defendants' wish to attack Plaintiffs' good faith representations is not a legitimate reason to burden Plaintiffs with production of these voluminous documents.

Defendants cite *Meijer, Inc. v. Warner Chilcott Holdings Co., III, Ltd.*, 245 F.R.D. 26 (D.D.C. 2007) ("*Warner*"), to support their argument that they are entitled to downstream discovery based on exploration of the cost-plus contract exception.  Def. Br. at 7.  But this case is hardly an example of a court compelling the vast downstream discovery requested by Defendants.  The court in this case merely directed the parties to meet and confer in an effort to "compromise on the *limited* production of some additional information." *Warner*, 245 F.R.D. at 35 (emphasis added).  Furthermore, the court offered to intervene, "[i]f Plaintiffs determine that the data requested [] is unavailable or it is overly burdensome to produce." *Id.*  Here, Plaintiffs have already agreed to the sort of limited discovery contemplated by the court in that case.  In addition, other courts have rejected defendants' requests for downstream discovery to determine whether contracts fall within the cost-plus exception.  *See, e.g.*, *K-Dur*, 2007 WL 5302308, at *15.

### III.  Defendants Are Not Entitled to Compel Discovery Related to the Indirect Purchaser Case From the Direct Purchaser Class Representatives.

Defendants list several ways in which the direct purchaser plaintiffs' downstream sales information may help Defendants defend pending state antitrust and unjust enrichment claims in the indirect purchaser action, including impact, damages and class certification issues.  Def. Br. at 7-8.  Nonetheless, courts consistently refuse to require production of downstream sales information where companion indirect purchaser claims exist.[7]

Further, the indirect purchaser plaintiffs in this case have subpoenaed downstream data from forty purchasers of the largest purchasers of CRTs and CRT products.  *See* Notice of Intent to Serve Subpoenas[8], Exh. 9.  The documents requested from these third parties include

---

[6] Defendants cite *El Badrawi v. Dep't of Homeland Sec.*, 258 F.R.D. 198 (D. Conn. 2009) ("*El Badrawi*"), in support of the argument that they are entitled to the documents to assess Plaintiffs' credibility.  *El Badrawi* involved a motion to compel records from the National Crime Information Center in a civil lawsuit for false arrest and other related claims.  *Id.* at 201.  The facts of *El Badrawi* are not analogous to this antitrust class action.

[7] *See LCDs III*, at 4 (Exh. 3) ("Even where, as here, there are companion indirect purchaser claims, courts have refused to require production of downstream sales data."); *Aspartame*, 2008 WL 2275528, at *6 (denying defendants' request for downstream discovery); *Vitamins*, 198 F.R.D. at 301 ("[T]he proposition that there are indirect purchasers in this case who may assert claims for damages other than direct overcharges is not sufficient to carry defendants' burden of showing that this information ought to be produced by the direct purchasers.").

[8] Plaintiffs have omitted Exhibits A-NN (360 pages) attached to the Notice of Intent to Serve Subpoenas

transactional data for purchases and sales as well as studies and analyses concerning costs, pricing, and competition for CRTs or CRT products. Consequently, Defendants already have access to the information they seek, and, therefore, they do not need to obtain this information from the class representatives.

Furthermore, even if Plaintiffs produced all of the documents Defendants seek, it is unlikely that it would meaningfully assist in the economic analyses Defendants identify. In a market comprising tens of billions of dollars in sales, information from 13 individual purchasers would likely be swamped by the data Defendants already have. *See Aspartame,* 2008 WL 2275528, *4 ("Any analysis of the multi-billion dollar aspartame market is unlikely to be at all affected" by information from direct plaintiffs.).

### IV.     The Downstream Discovery Sought by Defendants Is Unduly Burdensome.

Compelling production of the downstream discovery that Defendants request would impose an undue burden on Plaintiffs. Defendants seek the production of essentially every document that Plaintiffs possess relating to Plaintiffs' sales to their customers. Requiring Plaintiffs to comply with these requests would vastly increase the scope and expense of Plaintiffs' discovery burden. Given the minimal relevance, if any, of Defendants' downstream discovery requests, the burden and expense that would be imposed on Plaintiffs far outweighs the potential benefit Defendants might obtain from this information. *See* Rule 26(b)(2)(C)(iii); *Aspartame*, 2008 WL 2275528, at *5; *Vitamins*, 198 F.R.D. at 301; *Abbott Labs*, 251 F.R.D. at 434.

For the foregoing reasons, Plaintiffs ask that Defendants' request for an order compelling production of Plaintiffs' downstream information be denied.

Sincerely,

   /s/ Guido Saveri
Guido Saveri
*Interim Lead Counsel for the Direct Purchaser Plaintiffs*

cc:     All Counsel via E-Mail

Crt.418

---

in an effort to conserve resources. A list of the parties subpoenaed is provided in the actual Notice attached as Exhibit 9.