# Exhibit B

# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| IN RE NEW MOTOR VEHICLES | ] | |
| CANADIAN EXPORT ANTITRUST | ] | MDL DOCKET NO. 1532 |
| LITIGATION | ] | |

### MEMORANDUM ORDER AND DECISION ON PLAINTIFFS' APPLICATION FOR CERTIFICATION OF SETTLEMENT CLASSES

This is a long-running consumer antitrust MDL lawsuit against major automobile manufacturers. The plaintiffs achieved early success by persuading Toyota Motor Sales ("Toyota") and the Canadian Automobile Dealers' Association ("CADA") to settle in 2006 for over $35 million. Thereafter, the plaintiffs' case started to go downhill. Although I certified litigating classes in March 2006, the First Circuit vacated those class certification orders in 2008. Ultimately, I granted summary judgment to all the remaining defendants in 2009. All that remains now, therefore, are the Toyota and CADA settlements. Consequently, the plaintiffs ask me to certify a national settlement class with respect to those two settlements so that they can distribute the funds.[1] They seek certification of a class under Rule 23(b)(2) for the injunctive relief that Toyota and CADA have agreed to. They also seek certification under Rule 23(b)(3) of a nationwide damages class for the settlement funds. Toyota and CADA do not object. Nevertheless, following oral

---

[1] I resisted earlier requests to certify the settlement classes and to approve notice because I thought it would be confusing and expensive to have serial notices about settlements. Now that is no longer an issue.

presentations[2] on May 27, 2010, I conclude that Article III of the Constitution prevents me from certifying a class for injunctive relief.   I do certify a nationwide damages settlement class under Rule 23(b)(3) because, at the time the parties settled, the plaintiffs had (and still have) a right to appeal my dismissal, based on <u>Illinois Brick Co. v. Illinois</u>, 431 U.S. 720 (1977), of their national indirect purchaser claims under the Sherman Act.[3]

**BACKGROUND**

As summarized by the First Circuit in 2008, the plaintiffs' basic claim is that from at least 2001 and continuing into 2003, the exchange rate between Canadian and United States currencies created arbitrage opportunities to sell lower-priced Canadian cars in the United States; and that, in the face of those arbitrage opportunities, automobile manufacturers including Toyota and trade associations including CADA engaged in illegal business practices to restrict what would have been the flow of Canadian cars into the United States, thereby maintaining U.S. prices at a higher level.[4]

On February 24, 2006, Toyota settled with the plaintiffs.[5]   In March and May 2006 and March 2007, I certified litigation classes for the rest of the lawsuit under Rule 23(b)(2) and (3).[6]   On September 6, 2006, CADA settled.[7]

---

[2] I do not use the term "argument," because there is no adversarial posture to the case at this point.   No one in the courtroom opposed the plaintiffs' proposal.   I must nevertheless examine subject matter jurisdiction and the propriety of class certification on my own initiative.

[3] This right to appeal arises if either settlement becomes void.

[4] <u>Brown v. Am. Honda</u> (<u>In re New Motor Vehicles Canadian Exp. Antitrust Litig.</u>), 522 F.3d 6, 10-11 (1st Cir. 2008).

[5] Tabacco Decl. ¶ 7 (Docket Item 1043).

[6] <u>See In re New Motor Vehicles Canadian Exp. Antitrust Litig.</u>, 2006 U.S. Dist. LEXIS 10240 (D. Me. Mar. 10, 2006) (Rule 23(b)(2) class), overruled by <u>In re New Motor Vehicles</u>, 522 F.3d 6; <u>In re New Motor Vehicles Canadian Exp. Antitrust Litig.</u>, 235 F.R.D. 127, 148 (D. Me. 2006) (five

*(continued next page)*

2

As part of the settlements, Toyota paid $35,000,000 and CADA paid $700,000 into an interest bearing joint escrow account.[8]  Toyota and CADA both agreed not to conspire to violate the Sherman Act, 15 U.S.C. § 1, the Clayton Act, 15 U.S.C. § 26, and various state laws, or otherwise to prevent the importing of Canadian cars into the United States.[9]  CADA explicitly agreed to injunctive relief.[10]  The Toyota Settlement Agreement does not mention injunctive relief, but it says that the parties will agree upon the text of a final order and

Rule 23(b)(3) classes), overruled by In re New Motor Vehicles, 522 F.3d 6; In re New Motor Vehicles Canadian Exp. Antitrust Litig., 241 F.R.D. 77 (D. Me. 2007) (fifteen Rule 23(b)(3) classes), overruled by In re New Motor Vehicles, 522 F.3d 6.

[7] Tabacco Decl. ¶ 14.

[8] Id.  ¶¶ 8, 15. With accumulated interest, the amounts now exceed $37.3 million. Supplemental Tabacco Decl. ¶ 6 (Ex. 1 to Further Supplement to Pls.' Mot. for Certification of Settlement Classes (Docket Item 1108)) (Docket Item 1108-1).

[9] Pls.' Mot. for Certification of Settlement Classes at 5-6, 8, 13-14 (Docket Item 1042).  Toyota agreed not to "form an agreement with the Other Defendants that violates the Sherman Antitrust Act § 1, including agreements to share Blacklists and agreements to share Due Diligence Procedures, with both the objective and effect of jointly preventing the exportation of Canadian Market Vehicles from Canada to the United States."  Toyota Settlement Agreement ¶ 12(a) (Ex. A to Tabacco Decl. (Docket Item 1043)) (Docket Item 1043-1).  CADA agreed not to "provide information, know-how, or data relating to Canadian Export Vehicles to any motor vehicle manufacturer or distributor[,] . . . meet or communicate with, or provide information, data, or know-how to . . . trade association[s] for the purpose . . . of facilitating the prevention or reduction of the export from Canada to the [United States] of Canadian Export Vehicles[,] [or] facilitate the Canadian provincial dealer associations or their members to not sell Canadian Export Vehicles or to act to prevent the export from Canada to the United States of Canadian Export Vehicles."  CADA Settlement Agreement ¶ 12(a-d) (Ex. C to Tabacco Decl.) (Docket Item 1043-3).

The plaintiffs propose the same injunctive class for both settlements.  The proposed class comprises:

> All persons (excluding governmental entities, the Courts in The Litigated Actions, Defendants, their parents, subsidiaries, and affiliates, and their alleged co-conspirators) who purchased or leased a new motor vehicle manufactured by any Defendant from a United States dealer in the United States during the period January 1, 2001 to December 31, 2006.

Pls.' Mot. For Certification of Settlement Classes at 8 (Docket Item 1042); Toyota Settlement Agreement Amend. at 1 (Ex. B. to Tabacco Decl.) (Docket Item 1043-2); CADA Settlement Agreement Amend. at 2 (Ex. D to Tabacco Decl.) (Docket Item 1043-4).

[10] See CADA Settlement Agreement ¶ 8 (Ex. D to Tabacco Decl.) (Docket Item 1043-4); Stipulated Order & Inj. (attached as Ex. E to CADA Settlement Agreement).

judgment.[11]   The draft certification order submitted by the plaintiffs proposes that I find that both "[d]efendants have acted or refused to act on grounds generally applicable to the Settlement Classes, thereby making appropriate final injunctive relief . . . with respect to the Settlement Classes as a whole."[12] The parties have agreed that Toyota's and CADA's agreements not to enter antitrust conspiracies (and any associated injunctions against each of Toyota and CADA) will expire on December 31, 2011.[13]   The settlements contemplate global releases of the plaintiffs' claims against Toyota and CADA.[14]

In March of 2008, the First Circuit vacated my 2006 litigation class certifications.   It ruled that the 23(b)(2) injunctive class certification could not survive because of "lack of a live controversy between the parties such as would justify an injunctive remedy."[15]   The court found that arbitrage opportunities   disappeared   as   a   result   of   significant   changes   in Canadian/United States exchange rates, and the plaintiffs had made no suggestion that any named plaintiff had an imminent intention of buying a new car during an arbitrage opportunity.[16]   It then dismissed the injunctive relief claim outright on account of mootness.[17]   The First Circuit ruled that the 23(b)(3) damages class certifications (for twenty states) should be vacated and

---

[11] Toyota Settlement Agreement ¶ 8 (Ex. B to Tabacco Decl.) (Docket Item 1043-2).
[12] Proposed Order Re: Certification of Settlement Classes (Ex. 3 to Pls.' Mot. for Certification) (Docket Item 1042-3).
[13] Toyota Settlement Agreement Amend. at 1 (Ex. B. to Tabacco Decl.) (Docket Item 1043-2); CADA Settlement Agreement Amend. at 2 (Ex. D to Tabacco Decl.) (Docket Item 1043-4).
[14] Toyota Settlement Agreement ¶¶ 11, 13; CADA Settlement Agreement ¶¶ 11, 13.
[15] In re New Motor Vehicles, 522 F.3d at 16.
[16] Id. at 15.
[17] Id.

re-examined after discovery was complete, focusing on the issue of whether the plaintiffs could use common proof to show antitrust impact or causation.[18]

In 2009, without reaching the question whether litigation damages classes should be recertified, I granted summary judgment for the remaining defendants on all remaining counts.[19]   The plaintiffs did not appeal the summary judgment ruling.

In September 2009, the plaintiffs moved for certification of injunctive and damages settlement classes pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) for the Toyota and CADA settlements and for scheduling a final approval hearing.   Since that time, the plaintiffs have briefed the issues related to class certification extensively, and they have responded to my questions both in writing and orally at a hearing in May 2010.

## ANALYSIS

### 1.    The 23(b)(2) Injunctive Class

To obtain certification of an injunctive class, the plaintiffs must satisfy the four threshold requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation), and the specific requirements of Rule 23(b)(2).[20]   The requisite showing under Rule 23(b)(2) is that the defendants "acted or refused to act on grounds that apply generally to the

---

[18] Id. at 29-30.
[19] See In re New Motor Vehicles Canadian Exp. Antitrust Litig., 632 F. Supp. 2d 42 (D. Me. 2009).
[20] See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997).

class, *so that final injunctive relief . . . is appropriate* respecting the class as a whole."[21]

But first, the plaintiffs must have standing to seek the relief they request. Standing is the "essential and unchanging part of the case-or-controversy requirement of Article III" that "a plaintiff must present an injury that is concrete, particularized, and actual or imminent[,] fairly traceable to the defendant's challenged action[,] and redressable by a favorable ruling."[22]

In vacating my earlier 23(b)(2) certification, the First Circuit emphasized that to have standing for injunctive relief, plaintiffs must "face a threat of injury that is both real and immediate, not conjectural or hypothetical."[23]  The relevant question, it said, was not whether opportunities for arbitrage had permanently ended, but rather whether there was "any realistic current threat."[24]  The First Circuit found that a realistic threat of injury ended sometime after May 2003 when the exchange rate between the Canadian dollar ("CAD") and the United States dollar ("USD") fell below a level that could support the kind of cross-border arbitrage opportunities that the plaintiffs allege.[25]  The decline in the exchange rate from 2003 to 2008 effectively ended a "perfect storm" of "exceptional arbitrage opportunities [that] arose early in [the 2000s] due to a combination of relaxed trade restrictions between the United States and Canada, physical harmonization of cars manufactured for

---

[21] Fed. R. Civ. P. 23(b)(2) (emphasis added).
[22] <u>Horne v. Flores</u>, 129 S. Ct. 2579, 2592 (2009) (internal quotations omitted).
[23] <u>In re New Motor Vehicles</u>, 522 F.3d at 14 (internal quotations omitted).
[24] <u>Id</u>. at 15; <u>see also</u> <u>McInnis-Misenor v. Me. Med. Ctr.</u>, 319 F.3d 63, 68 (1st Cir. 2003) ("There must be some immediacy or imminence to the threatened injury.").
[25] <u>In re New Motor Vehicles</u>, 522 F.3d at 14-15.

the two markets, and a differential between the values of American and Canadian currencies."[26]   Moreover, the First Circuit noted that the plaintiffs had not alleged that any of their class representatives intended to buy or lease a new vehicle any time soon.[27]   Thus, "there [was] nothing to suggest that any named plaintiff harbors an 'imminent' intention to buy a new car in coincidence with another 'perfect storm' of arbitrage-friendly market conditions."[28]   Accordingly, the First Circuit vacated the Rule 23(b)(2) class certification "for lack of a live controversy between the parties such as would justify an injunctive remedy" and dismissed the federal injunctive claim altogether.[29]

The question, then, is the effect of that holding—eliminating any litigating class for federal injunctive relief—on the plaintiffs' request here for a settlement class obtaining injunctive relief.[30]

The plaintiffs say that the First Circuit's 2008 decision to vacate certification of the 23(b)(2) injunctive class should have no effect on my certification analysis because Toyota and CADA settled their claims in 2006.[31]

---

[26] Id. at 14.

[27] Id. at 15.

[28] Id.

[29] Id. at 16.

[30] The "mandate rule" prevents parties from relitigating in the trial court any "matters that were explicitly or implicitly decided by an earlier appellate decision in the same case." Negron-Almeda v. Santiago, 579 F.3d 45, 50 (1st Cir. 2009) (citation omitted).  The plaintiffs say that the mandate rule does not apply because Toyota and CADA were not parties to the appeal and the settlement agreements and proposed settlement classes were not before the appellate court. Pls.' Resp. to Certain Questions in Procedural Order Dated Feb. 18, 2010 at 5 (Docket Item 1104).  But the plaintiffs were part of the appeal, and they lost on some significant issues. Nevertheless, I find it unnecessary to decide whether the mandate rule has any effect on my decision here, because the stare decisis effect of that decision is enough to decide the issues before me.

[31] Pls.' Mot. for Certification at 13.

The issues before me now, they say, are whether there was jurisdiction *in 2006* based on the "then-prevailing exchange rates," and/or whether changes in the exchange rate after the First Circuit's decision show that a realistic threat of harm exists *now*.[32]   They stress that when Toyota and CADA settled, the parties did not know whether exchange rates would rise or fall, they faced "significant risks," and they "reached an informed settlement, after extensive good faith negotiations, in part to resolve those risks and avoid uncertainty."[33] They contend that loss of jurisdiction after a settlement has been reached does not remove the court's jurisdiction to enforce the settlement over which it "properly had jurisdiction at the time the claims were settled."[34]

In Ehrheart v. Verizon Wireless, 609 F.3d 590 (3d Cir. 2010), the Third Circuit held that the trial court could enforce a settlement of claims under the Fair and Accurate Credit Transaction Act, 15 U.S.C. § 1681c(g)(1), even though—after the settlement—Congress amended the law to eliminate the plaintiffs' cause of action.  Noting the "strong presumption in favor of voluntary settlement agreements," the Ehrheart court concluded that it "is essential that the parties to class action settlements have complete assurance that a settlement agreement is binding once it is reached" and that where "the parties have executed an agreement, a party cannot avoid its independent contractual

---

[32] Pls. Resp. to Certain Questions in Procedural Order Dated Feb. 18, 2010 at 5 (Docket Item 1104); see also May 27, 2010 Hr'g Tr. at 13-17 (Docket Item 1107).
[33] Pls.' Mot. for Certification at 14.
[34] Pls.' Resp. to Certain Questions at 3.

obligations simply because a change in the law confers upon it a benefit that could have altered the settlement calculus."[35]

A month later, in <u>Sullivan v. DB Investments, Inc.</u>, 2010 U.S. App. LEXIS 14375 (3d Cir. July 13, 2010), on the other hand, the Third Circuit construed the First Circuit's <u>In re New Motor Vehicles</u> decision as mandating that an injunctive settlement class must be *de*certified if the harm against which the injunction was sought had dissipated during the litigation.[36]   The <u>Sullivan</u> plaintiffs had alleged that the diamond conglomerate, De Beers, engaged in price fixing in violation of the Sherman Act, 15 U.S.C. §§ 1-2.[37]   Thereafter, De Beers entered into two settlement agreements that created a settlement fund of $295 million and provided for a stipulated injunction to restrain it from violating United States antitrust laws.[38]   The district court certified a 23(b)(2) injunctive class, but the Third Circuit vacated that certification, stating that "a defendant's willingness to stipulate to liability for the purpose of effectuating a class action settlement does not relieve the Court of its independent obligation to ensure that the facts of the underlying case adequately establish a basis for liability."[39]   The Third Circuit concluded that the plaintiffs lacked standing to seek injunctive relief because, "according to [the plaintiffs'] experts, the [diamond] market has become increasingly competitive from 2006 onward, and there is no longer any guarantee that the prices De Beers sets will hold in the

---

[35] <u>Ehrheart</u>, 609 F.3d at 594, 596.
[36] <u>See</u> <u>Sullivan</u>, 2010 U.S. App. LEXIS 14375, at *59.
[37] <u>Id</u>. at *2.
[38] <u>Id</u>. at *3, *10-12.
[39] <u>Id</u>. at *61 (citation omitted).

marketplace."[40]    Accordingly, it vacated the 23(b)(2) settlement class certification.

In Ehrheart, a case or controversy indisputably existed when the plaintiffs settled their claims; the statute creating the right to recovery was amended only later.[41]   Here, however, as I explain below, the First Circuit's analysis compels me to conclude that the case or controversy for injunctive relief had already disappeared at the time of these 2006 settlements.  Although the plaintiffs, Toyota, and CADA all agreed to injunctive settlement classes and injunctive relief, parties cannot create federal court subject matter jurisdiction by agreement.[42]   As for the alternative argument, that exchange rates today have re-created case or controversy because of continuing fluctuations in the Canadian/United States exchange rates, the First Circuit's analysis still compels me to conclude (as I explain below) that there is now no case or controversy for injunctive relief.   I therefore find it unnecessary to decide whether to take Sullivan's additional step, that a settlement injunctive class certified when jurisdiction did exist, must later be decertified when the case or controversy thereafter disappears.

I turn to the substance of the First Circuit's 2008 decision.  The court of appeals accepted my finding based on the plaintiffs' expert's affidavit that, after April 30, 2003, arbitrage opportunities that were significant enough to affect

---

[40] Id. at *64 (citation and quotation omitted).
[41] Similarly, in Miller v. Am. Stock Exch. (in Re Stock Exchs. Options Trading Antitrust Litig.), 317 F.3d 134 (2d Cir. 2003), the Second Circuit held that a district court had jurisdiction to enforce a settlement agreement entered into before the court had decided whether the defendants were entitled to immunity from antitrust liability due to an implied repeal.
[42] See American Policyholders Ins. Co. v. Nyacol Prods., 989 F.2d 1256, 1258 (1st Cir. 1993).

United States prices ended.  The exchange rate then was $1.43 CAD to $1.00 USD.[43]  The First Circuit took judicial notice that only once in history had the exchange rate risen *above* $1.40 CAD to $1.00 USD for any significant period.[44] That was between 1998 and 2003, "an apex unseen in at least the last half century."[45]  Noting that after 2003 the exchange rate had not returned to a level that would support arbitrage, and had in fact been "in more or less steady decline", the First Circuit concluded that in 2008 there was no "realistic current threat" of arbitrage and that the certification of an injunctive class was therefore moot.[46]

The plaintiffs argue that regardless of the situation in 2008, there was an injunctive relief case or controversy in 2006 when they settled with Toyota and CADA.[47]  They argue that "a later divestiture of jurisdiction does not affect [my] power to certify settlement classes and approve settlements of claims over which [I] properly had jurisdiction at the time the claims were settled."[48]  But the standard announced by the First Circuit was "any realistic current

---

[43] In re New Motor Vehicles, 522 F.3d at 14-15 & n. 11.

[44] Id. at 15 n.11.

[45] Id. at 14-15.

[46] Id. at 14-16 & 15 n. 11.  Relying on the Federal Reserve statistics, the First Circuit stated that on February 1, 2008 the exchange rate was $.90 CAD to $1.00 USD.  Id. at 15 n. 11.  My reading of the Federal Reserve statistics convinces me that on February 1, 2008 the exchange rate was $.99 CAD to $1.00 USD.

The First Circuit found that in the "circumstances of this case, [the drop in the exchange rate] *alone* eliminates any realistic current threat."  In re New Motor Vehicles, 522 F.3d at 15 (emphasis added).  The court then noted that the "speculative nature of the claim that exchange rates could one day create additional arbitrage opportunities" was reinforced by "a second contingency":  in order to suffer an antitrust injury, someone has to intend to buy a car, and the plaintiffs nowhere alleged that a named plaintiff intended to do so.  Id.

[47] The plaintiffs cite Miller v. Am. Stock Exch. (In Re Stock Exchs. Options Trading Antitrust Litig.), 317 F.3d 134 (2d Cir. 2003), as authority for this proposition, but the settlements eventually approved in that case were damage classes under Rule 23(b)(3), see In re Stock Exchs. Options Trading Antitrust Litig., 2006 U.S. Dist. LEXIS 87825, at *17, *20-21 (S.D.N.Y. Dec. 4, 2006), not involving the court's injunctive power.

[48] Pls.' Resp. to Certain Questions at 3.

11

threat."[49]   By the time of the Toyota and CADA settlements, February and September 2006 respectively, the exchange rate had already fallen for three years and was well below arbitrage levels.[50]   While opportunities for arbitrage may not have ended permanently, they were nevertheless not real and immediate in 2006.  There was no "imminence" to the threat of future arbitrage opportunities.  Since "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects,"[51] I conclude, contrary to my prior ruling, that the plaintiffs did not have standing to seek certification of an injunctive class in 2006.[52]

The plaintiffs say, however, that *after* the First Circuit's decision, the exchange rate again changed sharply.   Specifically, it rose from $1.04 CAD/$1.00 USD on September 29, 2008 to $1.29 CAD/$1.00 USD on October 27, 2008.[53]   At the hearing in May 2010, the plaintiffs urged me to take judicial notice of these changes and argued that for a time, the higher

---

[49] In re New Motor Vehicles, 522 F.3d at 15.

[50] The First Circuit took judicial notice of historical data on the Canadian/United States exchange rate showing that on April 30, 2003 (the date that marks the end of arbitrage opportunities), the exchange rate was $1.43 CAD/$1.00 USD.  In re New Motor Vehicles, 522 F.3d at 15 n.11.  The plaintiffs have asked me to take judicial notice of the same data.  See May 27, 2010 Hr'g Tr. at 21, (Docket Item 1107); see also Fed. R. Evid. 201(b).  At the plaintiffs' request and following the First Circuit's lead, I therefore take judicial notice of the same data. These data are subject to accurate and ready determination at the website of the United States Board of Governors of the Federal Reserve System.  See Federal Reserve Statistical Release: Historical Rates for Canada, http://www.federalreserve.gov/releases/h10/hist/dat00_ca.htm.  On February 24, 2006 (Toyota settlement) and September 6, 2006 (CADA settlement), the exchange rates were $1.15 CAD/$1.00 USD and $1.11 CAD/$1.00 USD, respectively.

[51] In re New Motor Vehicles, 522 F.3d at 14 (citation omitted).

[52] I also follow the First Circuit in noting that in 2006, none of the named plaintiffs had alleged any intention to buy or lease a car during a period when the threat of arbitrage existed.  The speculative nature of the claim was (then as in 2008 when the First Circuit ruled) two-fold: first, there had to be another perfect storm of arbitrage friendly conditions; and second, someone had to intend to buy or lease a new car then.

[53] Pls.' Mot. for Certification at 13 n.5.

12

"currency exchange rates clearly favored a flow of vehicles, should other market conditions permit, from Canada to the United States."[54]

The United States Federal Reserve Board statistics to which the plaintiffs refer, however, show that the exchange rate never climbed back to, or even approached, pre-2003 arbitrage levels.   The rate peaked at around $1.30 CAD/$1.00 USD in March 2009 and subsequently fell back to levels on a par with those that the First Circuit observed.[55]   Based on the logic of the First Circuit's decision, the currently existing rate, and the fact that in more than seven years the rate has not approached levels sufficient for arbitrage, I cannot conclude that the plaintiffs now face a realistic, imminent threat of losing the benefit of price competition that arbitrage could provide.[56]

Since there was no case or controversy in support of the injunctive relief claim either at the time of settlement or at any time from then until now, the plaintiffs' request for certification of a nationwide injunctive settlement class under Rule 23(b)(2) is **DENIED**.

### 2.    The 23(b)(3) Damages Class

In 2006, I certified separate damages classes under Rule 23(b)(3) for each of five states, and in 2007, I certified an additional fifteen state damage classes,

---

[54] May 27, 2010 Hr'g Tr. at 19-21.

[55] The plaintiffs explicitly requested that I take judicial notice of the Federal Reserve data, May 27, 2010 Hr'g Tr. 19-21, but should they wish, they may certainly be heard on the "tenor" of the notice, i.e., the accuracy of the facts.  See Fed. R. Evid. 201(e).

[56] The plaintiffs implicitly recognize the contingent nature of future harm from antitrust violations by noting that arbitrage would only be possible if the exchange rate recovered and "other market conditions permit[ted]."  May 27, 2010 Hr'g Tr. at 20.  Their theory is that the arbitrage at issue became possible due to a "perfect storm" of circumstances.  In re New Motor Vehicles, 522 F.3d at 10.  The law is clear that standing is lacking "where any possible injury to the plaintiff [is] 'contingent on several events which may or may not happen.'"  Id. at 15 (citation omitted).

for a total of twenty.[57]   The premises for certifying classes state by state, and then only as to some states, were my rulings that there was no federal damages remedy and that in many states, state law likewise did not allow damages recovery.   The First Circuit vacated those state damages class certifications until discovery was completed so that I could re-examine on a complete record whether antitrust impact (causation) could be determined by common proof across a particular class.[58]

Here, I face a different question:   whether to certify a *nationwide* damages class for purposes of these two settlements.   The plaintiffs say, properly, that even though I ruled against their federal damages claim in 2004 because of my reading of <u>Illinois Brick</u>, they could appeal that ruling. Therefore, it was open to Toyota and CADA to demand compromise of that nationwide claim (as well as claims for states where I had ruled that damages could not be recovered) as part of their willingness to settle with the plaintiffs, despite my rulings.   I have previously recognized the validity of that proposition.[59]   I proceed, therefore, to examine whether the plaintiffs satisfy the Rule 23 criteria for their proposed nationwide damages class.   Since the First Circuit has not yet decided that a trial court at certification must make findings by a preponderance of the evidence, I follow the standard of a

---

[57] <u>See</u> <u>In re New Motor Vehicles</u>, 522 F.3d at 18.

[58] <u>Id</u>. at 30.

[59] <u>See</u> <u>Ramirez v. DeCoster</u>, 142 F. Supp. 2d 104 (D. Me. 2001).

"searching inquiry into the viability" of the plaintiffs' rationale for certification and "the existence of the facts necessary for the [rationale] to succeed."[60]

### (a)    Rule 23(a)(1) Numerosity

I found previously the numerosity criterion satisfied for the individual state damages classes.[61]   It goes without saying that it is satisfied for a nationwide damages class.

### (b)    Rule 23(a)(2) Commonality

In my litigation class certifications, I found that

> there [was] no dispute that *some* claims of the members of each proposed class involve "questions of law or fact common to the class."   On the factual level, common questions include whether any of the defendants agreed among themselves to restrict Canadian car exports to the United States so as to protect United States prices and, if so, whether that agreement affected the prices that manufacturers posted as their dealer invoice prices and their suggested resale prices.[62]

That finding applies to the proposed nationwide damages class as well.  On the legal level, there is also the common question whether the activity violated the Sherman Act and whether these plaintiffs and the class they represent have any right to recover.  (Although I ruled against them on account of <u>Illinois Brick</u>, that ruling is still subject to appeal.)   There are also non-common questions, of course, particularly the difference as to which state laws permit damage recovery.   I will assess those non-common questions under the predominance inquiry below.   I also recognize that in <u>Sullivan</u>, the Third Circuit vacated a nationwide damages class for state indirect purchaser claims,

---

[60] <u>In re New Motor Vehicles</u>, 522 F.3d at 26.
[61] <u>See</u> <u>In re New Motor Vehicles</u>, 235 F.R.D. at 130.
[62] <u>Id</u>. at 130 (citation omitted).

stating that "there can be no certification of a nationwide class of state indirect purchaser plaintiffs because there is no common question of law or material fact."[63]   But in <u>Sullivan</u>, unlike this case, no federal damages claim was ever asserted.   Moreover, the nationwide damages class certified in <u>Sullivan</u> made no distinction among those states that permitted damages recovery and those that did not.[64]   Both of those conditions are satisfied for the proposed nationwide damages class here.

### (c)      Rule 23(a)(3) Typicality

In my litigation class certification, I focused primarily on the proof of antitrust causation or impact under this criterion of typicality.[65]   I will address that topic under predominance, as the First Circuit did on appeal.[66]   Here, it suffices to say under typicality that the claims of the named plaintiff purchasers are typical of the class:   that they bought or leased new cars at prices that were higher than they should have been because the defendants illegally conspired to keep lower priced Canadian cars out of the U.S. market.

### (d)      Rule 23(a)(4) Adequacy of Representation

Under this criterion, the question is whether "the representative parties will fairly and adequately protect the interests of the class."[67]

<u>Amchem Products, Inc. v. Windsor</u>, 521 U.S. 591 (1997), warns specifically about conflicts of interest within a settlement class.   In <u>Amchem</u>, the Court concluded that the settlement there improperly "achieved a global

---

[63] 2010 U.S. App. Lexis 14375 at *33-34.
[64] <u>Id</u>. at *34.
[65] <u>See</u> <u>In re New Motor Vehicles</u>, 235 F.R.D. at 132-39.
[66] <u>See</u> <u>In re New Motor Vehicles</u>, 522 F.3d at 27-29.
[67] Fed. R. Civ. P. 23(a)(4).

compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected."[68]  It is difficult to apply this element of <u>Amchem</u> to the facts of this case.  Here, I am asked to certify a nationwide damages settlement class for the period 2001 through 2006.  The settlement agreements themselves do not distinguish among class members.  They are simply lump sum settlements, with no reference to allocation of proceeds.  In <u>Amchem</u>, by contrast, the settlement agreement that the parties negotiated "does more than simply provide a general recovery fund[;] . . . rather, it makes important judgments on how recovery is to be allocated among different kinds of plaintiffs, decisions that necessarily favor some claimants over others."[69]  But although the settlement agreements here do not distinguish among class members, there are previous judicial rulings that do draw distinctions, allowing for damages recovery in some states but not others and for only a portion of the class time period.  The allocation plan that the plaintiffs now propose for examination at the fairness hearing (if a class is certified) reflects those distinctions in proposing which class members will be able to have a cash recovery.   If <u>Amchem</u> means that because of those distinctions, a putative subclass had to be in existence ("structural assurance") when the settlement agreement was first negotiated,[70] that did not occur here.  If <u>Amchem</u> means that at the time of settlement negotiation there had to be at least one named plaintiff from each segment of the class that might receive

---

[68] <u>Amchem</u>, 521 U.S. at 627.
[69] <u>Id</u>. at 610 (quoting <u>Georgine v. Amchem Prods.</u>, 83 F.3d 610, 630 (3d Cir. 1996)).
[70] <u>See id</u>. at 627.

17

different treatment in the ultimate proposed allocation of settlement proceeds, that did occur here, but some of them are no longer named class representatives.[71]

What is important here, I conclude, is that unlike <u>Amchem</u>, the distinctions that now appear within the class result from previous judicial rulings based upon conventional adversarial arguments.  At the outset, the plaintiffs argued strenuously that they should be able to recover nationwide damages under their federal antitrust claim.  The defendants resisted that argument, and I ruled in the defendants' favor.[72]  Next, the plaintiffs argued strenuously for damages in every jurisdiction based upon state law.  The defendants resisted that argument, and I ruled partly in favor of each, finding that damages were available in some jurisdictions, not in others.[73]  Next there was prolonged argument over both causation and when the class should close and, in that connection, the scope and length of the arbitrage opportunity.  That controversy provoked rulings both here and in the court of appeals.  The

---

[71] I note that the Fourth Amended Complaint, which was the operative document in February and September 2006 when the parties entered into the settlements, included: named plaintiffs from damage recovery states within the perfect storm timeframe, named plaintiffs from Georgia and Utah—neither of which is a damage recovery state, and named plaintiffs from Arizona, Idaho, Kansas, Michigan, Mississippi, Nebraska, Nevada, North Dakota, Tennessee, Vermont and West Virginia who leased or purchased vehicles after the close of the eligible damages recovery period.

Candidly speaking, the presence of a named plaintiff for a particular category is generally a formal requirement at best for complex litigation involving individually small stakes like this case.  Experienced judges and practitioners know that in such cases the named plaintiffs generally have minimal substantive input.  As the Principles of the Law of Aggregate Litigation state:  "In many cases, class representatives are little more than placeholders (assuring that the minimum requirements of a case or controversy are met), with the litigation being controlled entirely or mainly by class counsel."  Principles of the Law of Aggregate Litig. § 3.02 § 3.02 cmt. a (2010).

[72] <u>See In re New Motor Vehicles Canadian Exp. Antitrust Litig.</u>, 307 F. Supp. 2d at 137.

[73] <u>See In re New Motor Vehicles Canadian Exp. Antitrust Litig.</u>, 350 F. Supp. 2d 160 (D. Me. 2004).

ultimate conclusion that buyers/lessees outside the twenty states and the January 1, 2001 to April 30, 2003, time period lack a successful damages claim comes from those rulings based upon strong adversarial presentations.

In other words, this proposed class and how it came about are very different from what concerned the Supreme Court and the Third Circuit in Amchem.  In Amchem, the representative plaintiffs and their lawyers, holding thousands of "inventory" cases of asbestos-related injuries, agreed with the defendants to compromise, in addition, a host of "future" claims, namely, claims on behalf of anyone who (or a spouse or family member) had been exposed to asbestos but had not yet made any claim.[74]  As the Supreme Court said, there was never any intent to litigate the Amchem class action (the lawsuit was filed simultaneously with the settlement).[75]  In Amchem, the distinctions made within the class were not the product of judicial rulings, but created by the settlement itself.[76]  By contrast, this lawsuit has been intensively and extensively litigated from start to finish.  These two settlements are only a minimal part of it.  The settlements themselves do not distinguish among class members.  If distinctions among class members are made, it will be as a result of previous judicial rulings and only after court approval following a fairness hearing.

The claims in Amchem too were quite different from those here. Amchem's asbestos personal injury claims would typically be of a size large

---

[74] Amchem, 521 U.S. at 600-01.
[75] Id. at 601-02.
[76] Id.

19

enough to justify independent legal representation and lawsuits.  The plaintiffs' lawyers who negotiated the <u>Amchem</u> settlement had attorney-client relationships with the claimants in their "inventory" cases, but none with the claims not yet made, which they wanted to settle.[77]  Hence, the courts' concern with the overbroad class definition.[78]  Here, by contrast, the size of the individual claims does not justify an independent lawsuit and representation for any claim.  These claims proceed by class action, or they do not proceed at all.

Moreover, unlike the Third Circuit's and the Supreme Court's conclusion in <u>Amchem</u>, I conclude that the "absentees' interests" and the diverse individuals and groups within that category here have been fairly and adequately, indeed strenuously, represented to date.  This is not the case feared by the Supreme Court of a trial judge "fac[ing] a bargain proffered for its approval without benefit of adversarial investigation."[79]  Are there now, at the allocation stage, conflicts within the class?  Arguably, in the pending proposal that only purchasers/lessees in certain states during certain years will get any recovery; certainly I will hear any objectors on that topic at the fairness

---

[77] <u>Id</u>. at 601.
[78] The Supreme Court quoted approvingly the following portion of the 1966 Advisory Committee Note:

> The interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action.  On the other hand, these interests may be theoretic rather than practical; the class may have a high degree of cohesion and prosecution of the action through representatives would be quite unobjectionable, *or the amounts at stake for individuals may be so small that separate suits would be impracticable.*

<u>Amchem</u>, 521 U.S. at 616 (emphasis added).  This case is undeniably the latter.
[79] <u>Id</u>. at 621.

hearing.  But I conclude that it makes little sense at this stage to hire more lawyers to represent individual segments of this overall class.[80]  Their fees would only further reduce the recovery available to consumers, and the issues about recovery have already been thoroughly explored and resolved.   The Principles of the Law of Aggregate Litigation usefully frame the court's obligation on this point as follows:

> Determine that there are no structural conflicts of interest . . . among the claimants themselves that would present a significant risk that the lawyers for claimants might skew systematically the conduct of the litigation so as to favor some claimants over others *on grounds aside from reasoned evaluation of their respective claims* or to disfavor claimants generally vis-à-vis the lawyers themselves.[81]

I conclude that "the representative parties will fairly and adequately protect the interests of the class."[82]

### (e)    Rule 23(b)(3) Factors:  Predominance and Superiority

To satisfy Rule 23(b)(3), a court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[83]

---

[80] No subclasses as such have been created under Rule 23(c)(5), and there are no lawyers who are separately representing the segment of the proposed class that will receive no direct cash recovery, the usual consequence of creating subclasses.  <u>See</u> Manual on Complex Litigation, Fourth, § 21.23 (2004).

[81] Aggregate Litig. § 2.07(a)(1) (emphasis added).

[82] Fed. R. Civ. P. 23(a)(4).

[83] Fed. R. Civ. P. 23(b)(3).  As for the particular factors that the Rule enumerates, I find that: (A) class members have no interests in individually controlling the prosecution of separate actions in this case because the small value of individual claims makes it economically pointless; (B) this is an MDL consolidated lawsuit of all federal proceedings, and any parallel state proceedings have been stayed pending the outcome of this proceeding (California is now moving forward, following my Order Dismissing without Prejudice the California Plaintiffs' *(continued next page)*

Superiority is easy.  There is no other way to adjudicate this controversy.

Individual damages are too small to justify a lawsuit.  Only a class action can

or will lead to adjudication of these claims.

Predominance is somewhat more difficult.  Here, the existence of a

conspiracy, the existence of favorable arbitrage opportunities, the effect on

competition and pricing, the effect of legal vertical restraints, and the

recoverability of federal damages are all questions common to the class.

Questions that are not common to the nationwide class are recoverability

of damages under various state laws (I have already ruled which states permit

recovery and which do not, so that will not be a management issue, but it is a

matter of law that is not "common" to the class); and individual damages in the

sense of how the pricing of a particular purchase or lease was affected.  As I

pointed out in my earlier certification, First Circuit precedents are clear that

individual damages determinations alone do not prevent class certification.[84]

---

Claims (Docket Item 1003)); (C) it is desirable to concentrate the litigation here, as assigned by the MDL Panel, and as reflected in the consolidated amended complaint; (D) the likely difficulties in managing the class action are minimal, given the previous summary judgment rulings and these two settlements.

[84] See In re New Motor Vehicles, 235 F.R.D. at 143 (quoting Smilow v. Sw. Bell Mobile Sys., 323 F.3d 32, 40 (1st Cir. 2003) ("Where . . . common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.")).  Although individual questions could arise regarding the amount of damages suffered by each class member, the plaintiffs here offer a common method to estimate damages for each class member who purchased in a state permitting damage recovery during the litigated damages period.  The damages were estimated by Professor Hall using a standard benchmark method.  Professor Hall studied how automobile prices decreased in the United Kingdom in the face of an increased threat of exports from Ireland after the passage of a law that loosened export restrictions between the two countries.  See Expert Report of Robert E. Hall, Ph.D., on Impact and Class Damages ("Hall May 10, 2007 Report") ¶¶ 108, 170 (Pls.' Summ. J. Ex. 711) (Docket Item 602).  See also id. ¶¶ 109-68; Prof. Hall's Resp. to Defs.' Rebuttal Reports ¶¶ 181-308 (Pls.' Summ. J. Ex. 709) (Docket Item 894-16) (providing further support for the United Kingdom benchmark).  The United Kingdom-Ireland benchmark provided a case study that was similar in all material respects to the Canada-United States automobile export trade that is the subject of this action.  See Expert Report of Robert E. Hall,

*(continued next page)*

Indeed, "[p]redominance is a test readily met in certain cases alleging consumer . . . fraud or violations of the antitrust laws."[85]   Moreover, "Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class."[86]   To be sure, the broadening of the class as now proposed introduces a new difference, in the effect of the arbitrage opportunities during time periods when the exchange rate was no longer creating the "perfect storm."  I continue to find, nevertheless, that the common questions predominate so far as management of the case is concerned.

What troubled the First Circuit when it vacated the earlier litigation class certifications was whether antitrust impact—causation—could be proven by evidence common to the class, or whether individual proof would be required for each purchase or lease.[87]   If the latter, a litigation class could not be certified because common issues would not predominate.

To the extent that the First Circuit's concern had to do with trial management, it is no longer pertinent because there will be no trial.[88]   The Supreme Court has said that "[c]onfronted with a request for settlement-only

---

Ph.D., on Impact and Class Damages ("Hall May 10, 2007 Report") ¶¶ 127-36.  Professor Hall rescaled the price decreases he observed in the United Kingdom benchmark to the Canada-United States market and, based on the make and model of the vehicle purchased, estimated the damages each class member suffered. Id. ¶ 148; see also Hall May 10, 2007 Report Ex. 19: % Version (attached as Schedule A to Pls.' Summ. J. Ex. 744) (Docket Item 870-16) (showing percentage overcharge based on car model and month of purchase).  This method of proof for damages is common to all class members.  Therefore, common issues predominate in the damages inquiry.

[85] Amchem, 521 U.S. at 625 (citation omitted).

[86] Smilow, 323 F.3d at 39 (citations omitted).

[87] See In re New Motor Vehicles, 522 F.3d at 28-29.

[88] See Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 298 (1st Cir. 2000) (difficulties in managing a class action are pertinent to predominance inquiry and need not be pursued if there is settlement).

class certification, a district court need not inquire whether the case, if tried, would present intractable management problems."[89]

Moreover, at summary judgment I specifically observed that the proof on which the plaintiffs relied was common.[90]  I ruled that with common proof the plaintiffs had enough to get to a jury on the existence of a conspiracy; its effect on new motor vehicle prices during the period of January 1, 2001, to April 30, 2003; their assertion that without the conspiracy automakers would have lowered their U.S. new vehicle effective list prices (*i.e.,* enough Canadian cars poised on the border to make a difference); and their assertion that legal vertical restraints would have disappeared.[91]  I ruled that the plaintiffs also had common evidence on the next step, to show that customers actually paid higher transaction prices, but I found the common proof insufficient to get to a jury on the final stage, of showing causation as to *every* member of the putative class.[92]

To the extent that the First Circuit's concern about certification goes instead to deeper questions concerning the necessary unity of a class, or in Amchem's words, "whether proposed classes are sufficiently cohesive to warrant adjudication by representation,"[93] I address it here, in connection with the general teachings of Amchem.

---

[89] Amchem, 521 U.S. 591, 620 (1997).
[90] See In re New Motor Vehicles Canadian Exp. Antitrust Litig., 632 F. Supp. 2d 42, 51 n.13 (D. Me. 2009) ("[M]y summary judgment ruling considers only the class-wide impact evidence, and that is how the parties have presented this summary judgment dispute to me.").
[91] Id. at 50-55.
[92] Id. at 55-56.
[93] 521 U.S. at 623 (citation omitted).

Amchem warns about the risk of overly broad class definitions in a proposed settlement class.[94]   It says that in a settlement class, a court "will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold."[95]   That particular Amchem warning is not pertinent here because, unlike Amchem, this is not a settlement proposed at the outset of the lawsuit.   Instead, here over the very lengthy course of the litigation, I have made rulings on all the substantive recovery issues, discovery has been completed in full, and summary judgment has been filed and decided.   In short, I have ruled on virtually all the issues.   So unlike Amchem, I do have the opportunity to make an informed adjustment of the class.

Indeed, the progress of this lawsuit has revealed pretty much everything that is pertinent.   In the end, it comes down to this:   Toyota and CADA bought a settlement binding purchasers and lessees in all states and for the years 2001 through 2006.   The parties know from my pretrial rulings that only twenty states allow damages recovery, and they know from discovery and the First Circuit decision that factually the alleged conspiracy could affect retail prices only from January 1, 2001 to April 30, 2003.   In addition, the plaintiffs have preserved appeal rights as to my Illinois Brick ruling denying Sherman Act damages.   (Appellate reversal of that decision would affect the ability of purchasers in other states to recover, but would not affect the dates when prices were concretely affected.)

---

[94] Id. at 620.
[95] Id.

25

The plaintiffs now propose to deal with the variations within the nationwide class by providing for cash payments only to purchasers in the twenty states that allow damages recovery and only for the January 1, 2001 to April 30, 2003 period when prices were affected.[96]  They have a formula from their expert that will assign damages based upon a car's manufacturer, model, and year of purchase.[97]  But because the damage settlement class Toyota and CADA bargained for is nationwide and covers a broader time period, the plaintiffs propose to recognize those class members who will not receive money by establishing a cy pres fund of $500,000 (they propose that it could grow as high as $1 million) to be donated to organizations or government agencies that advocate for or educate consumers, especially car purchasers.[98]  I have not yet approved the plan of allocation and will not do so until public notice to the class and a fairness hearing take place.

So is there "sufficient unity" in the proposed nationwide class to justify binding absent members who fail to opt out?[99]  Aside from trial management (no longer a concern here), Amchem speaks of the "specifications of the rule" as "those designed to protect absentees by blocking unwarranted or overbroad class definitions."[100]

I have little guidance on what is "sufficient unity" or an "unwarranted or overbroad class definition."  Would a damages class limited to twenty states

---

[96] See Pls.' Mot. for Certification at 28-30.
[97] Id. at 28.
[98] Id. at 29.
[99] Amchem, 521 U.S. at 621.
[100] Id. at 620.

26

and January 1, 2001 to April 30, 2003 be cleaner now that we know the full factual and legal development of the case?  Yes.  But at the time the parties negotiated this settlement, more was in play.  It is not surprising that defendants would demand wider protection as a condition of paying money.[101] Worrying that too many members are included in this class seems an unrealistic theoretical exercise.  Given the small size of the individual claims and the complexity of the basis for recovery, no one would pursue these claims on his or her own, and statutes of limitations have by now eliminated most of them anyway.  Practically speaking, there *is* no claim unless the class action lawyers handle it, and no one is prejudiced by failing to opt out.  I conclude that the settlement class definition is not unwarranted or overbroad.  Instead, it has sufficient unity in its claim of an illegal conspiracy to block Canadian imports so as to maintain United States prices; and the lengthy adversarial examination of liability and recovery issues over the past seven years provides a basis reasonably to evaluate the class members' claims and review the proposed plan of allocation to reflect differences within the nationwide class and the class period.

I conclude, therefore, that a 23(b)(3) nationwide damages class should be certified for the period January 1, 2001, to December 31, 2006.  Resolution of the allocation questions will not occur until after the fairness hearing under Rule 23(e)(2).

---

[101] It appears that the settlements are contingent upon certification of a nationwide class. Toyota Settlement Agreement ¶ 11 (releases), ¶ 13 (waiver of rights), and ¶ 22 (effect of disapproval) (Docket Item 1042-2) and CADA Settlement Agreement ¶ 11 (releases), ¶ 13 (waiver of rights), and ¶ 22 (effect of disapproval) (Docket Item 1043-4).

## CONCLUSION

I am prepared to certify a nationwide 23(b)(3) damages class, but not a 23(b)(2) injunctive class.  As a result, I do not know how this ruling affects the Toyota and CADA settlements generally.   The CADA settlement agreement includes injunctive relief explicitly.   The Toyota agreement does not.   At the May 2010 hearing, the plaintiffs' lawyer represented that "anything short" of a "release that is 50[-]state and nationwide and releases [Toyota and CADA] from all the claims that both could be brought for injunctive relief as well as damages" would deny the defendants the benefit of their bargain.[102]   But in counsel's letter of July 23, 2010, he stated that the "Toyota and CADA settlements could and should still go ahead under Rule 23(b)(3)" even in the absence of a 23(b)(2) class.[103]  I do not know which is correct.

If the settlements do survive and the matter proceeds, counsel shall prepare an Order that complies with Rule 23(c)(1)(B), noting particularly the Third Circuit's criticism of the failures of the Order in <u>Sullivan</u>, 2010 U.S. App. LEXIS 14375, at *54-58.   I also have a handful of remaining questions for counsel to answer before I schedule the final fairness hearing and approve issuing class notice.[104]   Some of them can be answered in writing; others may

---

[102] May 27, 2010 Hr'g Tr. at 18.

[103] Letter from Joseph J. Tabacco, Jr. to the Honorable D. Brock Hornby at 2 (July 23, 2010) (Docket Item 1113).

[104] The questions are:

    1.  Why are governmental entity purchasers, including government fleet purchasers, excluded from the class?

    2.  Can someone who purchased in one of the damage recovery states and during the damage recovery period but who now is living outside the United States nevertheless file a claim?  <u>See</u> Long Form Settlement question 6, ¶ (b) (Docket Item 1110-3).

*(continued next page)*

deserve discussion on a conference call.  Counsel can ask the Clerk's Office to schedule such a conference call if the matter is proceeding.

**SO ORDERED.**

**DATED THIS 17TH DAY OF AUGUST, 2010**

/s/D. Brock Hornby
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

3.  The paper claim form refers to making "photo copies" for extra purchases (Docket Item 1110-10, at section 3).  Does the online claim form permit a claimant to list more than one purchase during the class period?

4.  How does the payout formula work if a class member opts out of one settlement, but not the other?  See Long Form Settlement question 14, ¶ 1 (Docket Item 1110-3).

5.  I need more explanation as to why the particular publications were selected for the notice program (*i.e.*, given the table in ¶ 23 of the Gilardi Declaration (Docket Item 1108-3) why was the selection those listed in ¶ 24?)

6.  What are the fraud prevention procedures that will be used for fleet purchase claims?

7.  On the Long Form Settlement caption, Exhibit C to Pearson Affidavit, (Docket Item 1110-3), should it be amended to refer to "manufactured" as in other documents?

8.  Can the notices that say simply that money "will be donated to charity" (for example the short form notice) and other references to the proposed cy pres program be clarified to say some or all of the following: that a cy pres donation is *proposed*; that the proposal is because some class members' claims are too low to justify an actual payment; that the funds will go to a nonprofit or government agency; that they will be for education or advocacy on behalf of consumer car buyers? Other references to cy pres also need improvement.  For example, in Long Form Settlement Notice at 8 (Docket No. 1110-3) question # 11, the statement that the cy pres money will go "to a charity or charities for the indirect benefit of all car consumers" is potentially misleading. Similarly, in Appendix A to the Settlement Notice at 1 (Docket Item 1110-5), the description "a Charity Fund for the benefit of all car purchasers in the Settlement Classes" is also potentially misleading.