# ARNOLD & PORTER LLP

**Eric Shapland**
Eric.Shapland@aporter.com
+1 213.243.4238
+1 213.243.4199 Fax

777 South Figueroa Street
Forty-Fourth Floor
Los Angeles, CA 90017-5844

June 15, 2011

Hon. Charles A. Legge
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111

     Re:    *In Re Cathode Ray Tube Antitrust Litig.*, No. 07-CV-5944 SC, MDL No. 1917

Dear Judge Legge:

     LG Electronics Inc. submits this reply in support of certain defendants' "downstream" discovery motion of April 29 ("Br."). Defendants' motion should be granted, because DP Plaintiffs have identified neither (a) a flaw in Defendants' explanations of relevance of the downstream facts sought nor (b) "specific facts which indicate the nature and extent of [any undue] burden," a showing that the DP Plaintiffs recently argued is insufficient to resist discovery, DP Pls.' Apr. 20, 2011 Letter to Hon. Charles A. Legge at 4-5.

- **Relevance:** DP Plaintiffs' customer contracts could trigger an exception to *Hanover Shoe*. Moreover, even absent such an exception, DP Plaintiffs' information on consumer demand is relevant to conspiracy, impact, and predominance. Consumer demand constrained Defendants' upstream conduct, *i.e.*, a tube maker would not raise its prices without considering whether finished-product makers could raise their prices, while finished-product makers would not raise their prices without considering whether the DP Plaintiffs and, thus, their customers would pay the increases. During the May 26, 2011 hearing, this Court noted consumer demand's constraint. Tr. 10:5-17 (noting that finished-product prices "were really driving what price increases could be made on the CRTs") (attached to Supp. Shapland Decl. at Ex. M). In opposition, DP Plaintiffs argue that Defendants do not "need" discovery on consumer demand because Defendants can get data on it from other sources. "Need," however, is not the standard, and even if it were, DP Plaintiffs overstate the value of those other sources, which aggregate and average data in a manner that obscures variation and thus biases an analysis of predominance in favor of class certification. DP Plaintiffs' direct interaction with consumers put them in a front row seat to observe, track and study such variation. Their observations are certainly relevant. In addition, their pass on of alleged overcharges is relevant to IP Plaintiffs' state-law claims.

- **Burden:** DP Plaintiffs neither submit affidavits nor otherwise raise specific facts showing burden. Moreover, to avoid any burden, Defendants limit the scope of the discovery sought to seven specific items, and they state a willingness to accommodate any burden that may arise. DP Plaintiffs repeatedly label the requests at issue as "vast," but DP Plaintiffs neither describe them in detail nor offer any specific facts to demonstrate burden.

These two issues, relevance and burden, are dispositive here.  DP Plaintiffs' attempt to create a third issue -- in the nature of a privilege based upon what they call "[a] vast body of case law" that "directly contradicts the [d]efendants' arguments" and "prevents discovery of events occurring in the chain of distribution after the initial sales of the price-fixed product" -- fails.  DP Pls.' May 31, 2011 Letter to Hon. Charles A. Legge ("Opp.") at 1, 3 (internal quotes and cites omitted).  DP Plaintiffs refer to a collection of trial court orders not permitting downstream discovery under a particular discovery record.  Those orders are not authority for a heightened standard, nor are they pertinent on the issues whether all or any one of the seven items on which Defendants seek discovery is irrelevant or unduly burdensome.  Many simply do not provide persuasive reasoning, or any reasoning at all.  The special master's conclusory order in *DRAM*, for example, denied downstream discovery that the district judge later held was "unquestionably relevant to th[e] case."  Supp. Shapland Decl. Ex. N at 49:21-24.  Other orders rest on relevance and burden records that are distinguishable.  Discovery rejected in *LCD*, for example, sought "every document relating in any way to every sale of a TFT-LCD panel or finished product" and would "require[] retrieval and analysis of many thousands of hard-copy and electronic documents many years old."  Saveri Decl. Ex. 3 at 2.  In contrast, Defendants' request for transaction-level data -- far from "vast" -- asks only that DP Plaintiffs disclose whether they have such data, what format it is in, and how far it goes back; the parties can then confer over production.

**A.     *Hanover Shoe* does not impose a heightened standard to obtain downstream discovery.**  *Hanover Shoe* holds that "when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4 [of the Clayton Act]."  392 U.S. 481, 489 (1968).  The holding rejects the so-called "pass-on" defense to direct purchasers' damages claims; it does not prohibit downstream discovery on other relevant issues.

Moreover, the Court's rationale does not warrant such an extension.  *Hanover Shoe* rests on a concern about the difficulty of proving that a buyer passed on an overcharge without harm.  *Id.* at 493.  It does not eliminate all complex issues from a direct purchaser's case; indeed, the direct purchaser still must prove the "difference between the price paid and what the market or fair price would have been had the sellers not combined."  *Id.* at 489.  *Hanover Shoe* also contemplates an exception for cost-plus pricing where no harm to the buyer is easy to establish.  *Id.* at 494.  The discovery that Defendants seek relates to these issues.  The Court's other consideration was that offsetting a buyer's recovery for any pass on could diminish its damages claims so much that the buyer would have little interest in seeking a recovery.  *Id.*  Care to craft substantive rules of standing and damages to avoid unduly fragmenting damages claims is a far cry from insulating plaintiffs, who can recover three times what they pass on, from reasonable, relevant discovery.

DP Plaintiffs' discovery orders do not demonstrate that a heightened standard applies.  Most of those orders do not even interpret *Hanover Shoe* in such a manner.  *E.g.*, *In re Vitamins Antitrust Litig.*, 198 F.R.D. 296, 299 (D.D.C. 2000) ("*Hanover Shoe* and its progeny do not render irrelevant plaintiffs' individualized downstream data because defendants are not seeking discovery on this data in order to assert a pass-on defense . . . ."); *In re Aspartame Antitrust Litig.*, No. 06-1732, 2008 WL 2275528, at *3 (E.D. Pa. Apr. 8, 2008); *In re Hypodermic Prod. Direct Purchaser Antitrust Litig.*, No. 05-1602, 2006 U.S. Dist. LEXIS 89353, at *3 n.1 (D.N.J. Sept. 7, 2006); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827 (N.D. Cal. Nov. 5, 2010) (attached at Saveri Decl. Ex. 3).  The few orders that might be interpreted as applying such a requirement misinterpret existing case law in short and hasty fashion, *e.g.*, *In re Plastics Additives Antitrust Litig.*, No. 03-

2038, 2004 WL 2743591, at *16 (E.D. Pa. Nov. 29, 2004) (citing *Hanover Shoe* and *Vitamins* for the conclusory proposition that "case law prevents discovery of events occurring in the chain of distribution after the initial sales of the price-fixed product"), or misunderstand the focus of *Hanover Shoe*'s concerns, *e.g.*, *In re Air Cargo Shipping Serv. Antitrust Litig.*, No. 06-1775, 2010 WL 4916723, at *2 (E.D.N.Y. Nov. 24, 2010) (erroneously equating downstream discovery on permissible issue of overcharge with impermissible inquiry into whether the buyer's profits would have been different but for any overcharge).

   **B.**  **Some requested discovery is appropriate to explore the applicability of an exception to *Hanover Shoe*.** DP Plaintiffs argue that "requests for downstream information is [sic] not justified based on the cost-plus exception to *Hanover Shoe*." Opp. 6. The argument is a straw man. Defendants do not use a potential *Hanover Shoe* exception to justify *all* the requested discovery, just Item Nos. 1, 2, 4, 5 and 7. Without discussing the specifics of those items, DP Plaintiffs argue that a *Hanover Shoe* exception does not justify *any* of the requested downstream discovery because downstream discovery is "vast," the established cost-plus exception to *Hanover Shoe* is limited, and courts are reluctant to create new exceptions to *Hanover Shoe*. Opp. 6-8. These arguments provide no reason to refuse the discovery sought by Item Nos. 1, 2, 4, 5 and 7.

  None of these objections applies to Item No. 1, which seeks discovery of DP Plaintiffs' actual sales contracts. The requested contracts are direct evidence whether DP Plaintiffs engaged in cost-plus pricing that might satisfy the requirements for the existing exception to *Hanover Shoe*. DP Plaintiffs identify no undue burden, and Defendants will accommodate any that may arise. DP Plaintiffs, therefore, cannot distinguish *Meijer, Inc. v. Warner Chilcott Holdings Co.*, 245 F.R.D. 26 (D.D.C. 2007), on the ground that Item No. 1 seeks "vast downstream discovery." Opp. 8. *Meijer* held that the defendant "Barr is entitled to explore the applicability of a cost plus exception" and ordered the "production of documents that will allow Barr to determine the applicability, if any, of the cost-plus exception." *Id.* at 35. DP Plaintiffs' orders on downstream discovery are not to the contrary. Several rest on records in which the direct purchaser plaintiffs were ordered to produce their customer contracts. *E.g.*, *LCD*, No. 07-1827 (N.D. Cal. Jan. 13, 2009) (attached at Saveri Decl. Ex. 2); *Hypodermic*, 2006 U.S. Dist. LEXIS 89353, at *30, 34, 39-40. The only order that denied a request for contracts between direct purchasers and their downstream buyers is a special master's order in *DRAM* noted above (and attached at Saveri Decl. at Ex. 1). On summary judgment, the district court held that "the existence of cost-plus contracts is . . . unquestionably relevant . . . . As such, had the issue been properly raised . . . the court would have provided defendants with timely relief." Supp. Shapland Decl. Ex. N at 49:21-24.

  DP Plaintiffs' only attempt to address Item No. 1 is to repeat their offer to state whether they have entered any cost-plus contracts meeting the requirements for the exception to *Hanover Shoe*. Opp. 7. But as the opening brief makes clear, Defendants have legitimate interests in examining DP Plaintiffs' sales contracts for themselves, and DP Plaintiffs have made no showing that the production of their sales contracts would be any more burdensome than the due diligence required to state whether those contracts contain cost-plus pricing mechanisms. Br. 7. DP Plaintiffs respond by repeating the erroneous propositions that requiring such discovery would "swallow [a] rule" against downstream discovery and subject them to vast requests. Opp. 8. They also attempt to distinguish *El Badrawi* on this point on the ground that it is not an antitrust case (Opp. n.6), but that case reflects a general principle of discovery applicable in antitrust cases too, *Duplan Corp. v. Deering Milliken, Inc.*, 397 F. Supp. 1146, 1188 (D.S.C. 1974) (a party "can better determine the usefulness of an ambivalent document to the presentation of its case").

Although Item Nos. 2, 4, 5 and 7 do -- as DP Plaintiffs argue -- relate to the application of an exception to *Hanover Shoe* for the functional equivalent of a cost-plus contract, that is an appropriate objective for discovery, and it is not the only appropriate objective for these items. These items seek aggregated revenue data, pricing policies, transactional-sales data, and the identity of deposition candidates and document custodians on related issues. These items are relevant to the conspiracy, impact, damages and class certification issues discussed below. They also will help Defendants assess whether DP Plaintiffs were insulated from any decrease in margins resulting from overcharges for the products they resell, the gravamen of any exception to *Hanover Shoe*, *see Ill. Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977). Defendants can then assess the extent to which this occurs through written or oral cost-plus agreements that DP Plaintiffs may have forgotten about, lost or destroyed. Defendants can also assess whether pricing formulae served as the functional equivalent of cost-plus contracts under circumstances triggering another exception to *Hanover Shoe*, *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1166 (5th Cir. 1979).

**C.     Other requested discovery is appropriate on issues of conspiracy, impact, damages and predominance.**  Defendants have *explained* how DP Plaintiffs' pricing policies, transaction-level data, and strategies for product purchases and sales relate to issues of conspiracy, impact, damages, and predominance. Br. 4-6, 7-9 (citing *In re Urethane Antitrust Litig.*, 237 F.R.D. 454 (D. Kan. 2006)). In response, DP Plaintiffs declare that "downstream demand and pricing is [sic] irrelevant" (Opp. 5, 3), but they fail to identify a flaw in Defendants' arguments; and they make claims of undue burden (Opp. 3, 9) that ignore the significance of the requested discovery on the issue of predominance.

On pure relevance, DP Plaintiffs declare that "it is Defendants' activities and their sales that are relevant." Opp. 3. DP Plaintiffs' activities, however, can also bear on Defendants' conduct -- *i.e.*, both can be relevant, and consumer demand's constraint on upstream conduct shows that they are, as *Urethane* recognized. DP Plaintiffs' various discovery orders identify no flaw in that point. Some admit relevance but elect not to require the discovery under a balancing of the benefits and burdens that (as discussed below) has no application here, *e.g.*, *Vitamins*, 198 F.R.D. at 299-300, while others take the same conclusory approach as DP Plaintiffs do, *e.g.*, *Air Cargo*, No. 06-1775, 2010 WL 4916723, at *3 ("[T]he common issues to be resolved, if any, were not in the downstream markets but in the upstream market where the plaintiffs were alleging they were overcharged."). DP Plaintiffs' only tangible effort to do so addresses the element of predominance. They admit that fungibility and, thus, substitutability, interchangeability and elasticity of demand are relevant to the issue of predominance (in that variation across products, geography and customers causes individual issues to predominate on the issue of impact). But they contend that these concepts are determined based solely on the "characteristics of the product," not reference to consumer demand. Opp. 5. Objective characteristics are a factor, but subjective elements of consumer preference are too: "fungibility (or substitutability)" includes "consideration of specific customer requirements." *Corus Staal BV v. U.S. Int'l Trade Comm'n*, 27 Ct. Int'l Trade 459, 471 (2003); *see also Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp.*, 247 F.R.D. 156, 170-71 (C.D. Cal. 2007).

On the issue of undue burden, DP Plaintiffs argue that their granular information on consumer demand is only marginally useful because Defendants can obtain market-wide information from other sources. Opp. 3, 9. However, that is not the standard. Moreover, DP Plaintiffs' information regarding consumer demand -- such as store-specific sales data and considerations of substitutability -- can reveal important differences in putative class members'

derived demand for CRTs or CRT finished products.  For example, a retailer located in a wealthy neighborhood may have had customers who viewed Sony products as strong substitutes for Defendants' CRT TVs, while a retailer serving a poor community may have had customers who did not.  The market-wide data that DP Plaintiffs would have Defendants rely on would mask such differences among retailers and thus bias the analysis of predominance in favor of class certification.  *See In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 493-94 (N.D. Cal. 2008) (rejecting certification and discussing problems associated with aggregated data when assessing whether impact requires individual proof).  Party admissions and granular data bearing on a DP Plaintiffs' customers' demand, therefore, are invaluable in uncovering erroneous inferences from aggregated data and avoiding this bias.  DP Plaintiffs' discovery orders fail to recognize this bias, *e.g.*, *Aspartame*, 2008 WL 2275528 *4, or do not involve requests relating to class certification and so do not have this benefit to weigh, *e.g.*, *Vitamins*, 198 F.R.D. at 298.

    **D.** **Some of the requested discovery is appropriate on typicality and adequacy.**
DP Plaintiffs oppose discovery into the nature and size of their CRT and CRT finished-product businesses (Item Nos. 2 and 5) on the ground that discrepancies between them and other members of the putative class will not defeat a showing of adequacy and typicality for purposes of class certification.  Opp. 5.  DP Plaintiffs cite *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291 (N.D. Cal. 2010) (Illston, J.), which held that discrepancies on the record -- one built *without* the requested discovery -- were insufficient to prevent class certification.  *Id.* at 303-05.  The certified class subsequently experienced a significant opt-out rate.  Supp. Shapland Decl. Ex. O.  Even if a single plaintiff's allegations of price-fixing resemble those that absent class members would make, "[t]he gravamen of the complaint is not the conspiracy; the crux of the action is injury," *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 66 (4th Cir. 1977).  Defendants seek discovery to build a better record than in *LCD* on the typicality of the named plaintiffs' claims on that critical issue and to do so before an overly broad class is certified.  On other records, courts have held that "meaningful differences" in bargaining power and the "competitive context" between putative class representatives and members could reveal "factual dissimilarities as to market, injury to competition, and causation" that would defeat typicality.  *Deiter v. Microsoft Corp.*, 436 F.3d 461, 468 (4th Cir. 2006); *GPU*, 253 F.R.D. at 489-90; *Allied Orthopedic*, 247 F.R.D. at 178.  DP Plaintiffs' assertion that Defendants, as sellers of CRT and CRT finished-product, already have perfect knowledge about the nature and size of the DP Plaintiffs' businesses (Opp. 5) assumes that Defendants are the only sellers.  They are not.

    **E.** **Several of the requested items have the additional benefit of relating to the issue of pass on in coordinated proceedings by Indirect Purchaser Plaintiffs.**  DP Plaintiffs do not dispute that the extent to which they passed on any overcharge is relevant to the IP Plaintiffs' coordinated state-law claims or that the requested discovery is relevant to that issue.  The requested discovery therefore provides a benefit in addition to those relating to the DP Plaintiffs' case.  One of the purposes of coordination in MDL proceedings is to allow for discovery across related cases.  DP Plaintiffs identify no reason why they should fare better with regard to this discovery than the third parties that the IP Plaintiffs have subpoenaed.

            Respectfully submitted,

            */s/ Eric Shapland*
            Eric Shapland

cc:  All Counsel via ECF