1    Ronald C. Redcay  (SBN 67236)
     E-Mail:  Ronald.Redcay@aporter.com
2    John D. Lombardo (SBN 187142)
     E-Mail:  John.Lombardo@aporter.com
3    D. Eric Shapland (SBN 193853)
     E-Mail:  Eric.Shapland@aporter.com
4    Eric D. Mason (SBN 259233)
     E-Mail:  Eric.Mason@aporter.com
5    ARNOLD & PORTER LLP
     777 South Figueroa Street, Forty-Fourth Floor
6    Los Angeles, California  90017-5844
     Telephone:  213.243.4000
7    Facsimile:  213.243.4199

8    Beth H. Parker (SBN 104773)        Samuel R. Miller (SBN 66871)
     E-Mail:  Beth.Parker@aporter.com      E-Mail: srmiller@sidley.com
9    ARNOLD & PORTER LLP          Marie L. Fiala (SBN 79676)
     One Embarcadero Center          E-Mail: mfiala@sidley.com
10   Twenty-Second Floor            Ryan M. Sandrock (SBN 251781)
     San Francisco, California  94111-3711   E-Mail: rsandrock@sidley.com
11   Telephone:  415.356.3000         Robert B. Martin, III (SBN 235489)
     Facsimile:  415.356.3099          E-Mail: rbmartin@sidley.com
12                                      SIDLEY AUSTIN LLP
                                       555 California Street, 20th Floor
13                                     San Francisco, California  94104
                                    Telephone:     (415) 772-1200
14                                     Facsimile:     (415) 772-7400

15   Attorneys for Defendants LG Electronics, Inc.; LG
     Electronics USA, Inc.; and LG Electronics Taiwan
16   Taipei Co., Ltd.

17                    UNITED STATES DISTRICT COURT

18               NORTHERN DISTRICT OF CALIFORNIA

19                    SAN FRANCISCO DIVISION

| | |
|---|---|
| 20 | Case No.: 3:07-cv-5944 SC |
| 21   IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | MDL No. 1917 |
| 22 | **SUPPLEMENTAL DECLARATION OF ERIC SHAPLAND IN SUPPORT OF** |
| 23   This Document Relates To The Direct Purchaser Action | **MOTION TO COMPEL PLAINTIFFS TO PRODUCE DISCOVERY** |
| 24 | Judge:  Hon. Samuel Conti |
| 25 | Special Master:  Hon. Charles A. Legge (Ret.) |
| 26 | |
| 27 | |

28

30797588v1

1    I, Eric Shapland, declare as follows:

2       1.      I am counsel at the law firm of Arnold & Porter LLP, counsel for defendants LG

3    Electronics, Inc., LG Electronics USA, Inc., and LG Electronics Taiwan Taipei Co., Ltd. (the "LGE

4    Defendants").  I have personal and firsthand knowledge of the facts hereinafter set forth, and, if

5    called as a witness, I could and would competently testify thereto.

6       2.      Attached hereto as Exhibit M is a true and correct copy of excerpts from the Court

7    Reporter's Transcript of the Motion Hearing held in this case on May 26, 2011 before the

8    Honorable Charles A. Legge (Ret.).

9       3.      Attached hereto as Exhibit N is a true and correct copy of the February 20, 2007

10   Order Granting Summary Judgment in Part and Denying Summary Judgment in Part, issued by the

11   Honorable Phyllis J. Hamilton in the case *In re Dynamic Random Access (DRAM) Antitrust*

12   *Litigation*, Case No. M 02-1486 PJH (N.D. Cal.), Docket No. 1360.

13      4.      Attached hereto as Exhibit O is a true and correct copy of the Amended Direct

14   Purchaser Class Plaintiffs' Notice of Class Member Exclusions, filed on January 31, 2011 in the

15   case *In re: TFT-LCD (Flat Panel) Antitrust Litigation*, Case No. M:07-1827 SI (N.D. Cal.), Docket

16   No. 2384.

17      I declare under the penalty of perjury under the laws of the United States of America and the

18   State of California that the foregoing is true and correct.

19      Executed this 15th day of June, 2011, in Los Angeles, California.

20

21                                   */s/ Eric Shapland*
                                    Eric Shapland
22

23

24

25

26

27

28

SUPPLEMENTAL DECLARATION OF D. ERIC SHAPLAND IN SUPPORT OF MOTION TO COMPEL DIRECT
PURCHASER PLAINTIFFS TO PRODUCE DISCOVERY
Case No. 3:07-ca-5944 SC; MDL No. 1917

# EXHIBIT M

1

```
1              JUDICIAL ARBITRATION AND MEDIATION SERVICES
2                 Before:  Charles A. Legge, Judge (Ret.)
3                              --o0o--
4                IN THE UNITED STATES DISTRICT COURT
5              FOR THE NORTHERN DISTRICT OF CALIFORNIA
6                       SAN FRANCISCO DIVISION
7                              --O0O--
8    IN RE:  CATHODE RAY TUBE (CRI)      No. 08-5944 SC.
9    ANTITRUST LITIGATION,               MDL No. 1917
10   _____    JAMS No. 1100054618
11   CRAGO, INC., et al.,             )
                                      )
12              Plaintiffs,           )
                                      )
13        vs.                         )
                                      )
14   CHUNGHWA PICTURE TUBES, LTD., )
     et al.                           )
15                                    )
                Defendants.           )
16   _____ )
     THIS DOCUMENT RELATES TO ALL   )
17   CASES                          )
     _____)
18
19                      MOTION HEARING
20        _____
21              Thursday, May 26, 2011
22           Two Embarcadero, Suite 1500
23               San Francisco, CA
24
25   REPORTED BY: COREY W. ANDERSON, CSR 4096 (435627)
```

```
 1                    A P P E A R A N C E S
 2
 3    FOR THE DIRECT PURCHASER PLAINTIFFS:
 4              SAVERI & SAVERI
                Attorneys at Law
 5              GUIDO SAVERI, Esq.
                GEOFFREY C. RUSHING, Esq.
 6              R. ALEXANDER SAVERI, Esq.
                706 Sansome Street
 7              San Francisco, California  94111
                415.217.6810
 8              gsaveri@saveri.com
 9              and
10              PEARSON SIMON WARSHAW PENNY LLP
                Attorneys at Law
11              BRUCE L. SIMON, Esq.
                AARON M. SHEANIN, Esq.
12              44 Montgomery Street, Suite 2450
                San Francisco, California  94104
13              415.433.9000
                bsimon@pswplaw.com
14
15              and
16              HAUSFELD LLP
                Attorneys at Law
17              MICHAEL P. LEHMANN, Esq.
                44 Montgomery Street, Suite 3400
18              San Francisco, California  94104
                415.633.1908
19              mlehmann@hausfeldllp.com
20              and
21    FOR THE DIRECT PURCHASER PLAINTIFFS:
22              COTCHETT, PITRE & McCARTHY LLP
                STEVEN N. WILLIAMS, Esq.
23              840 Malcolm Road
                Burlingame, California  94010
24              650-697-6000
                swilliams@cpmlegal.com
25
```

3

```
 1    A P P E A R A N C E S  (Continued)
 2              and
 3    FOR THE INDIRECT PURCHASER PLAINTIFFS:
 4              ZELLE HOFMANN VOELBEL & MASON LLP
                Attorneys at Law
 5              CRAIG C. CORBITT, Esq.
                PATRICK B. CLAYTON, Esq.
 6              44 Montgomery Street, Suite 3400
                San Francisco, California  94104
 7              415.633.1905
                ccorbitt@zelle.com
 8
 9              and
10    FOR THE DEFENDANTS PANASONIC CORPORATION, PANASONIC
      NORTH AMERICA, MTPD:
11
12              DEWEY LeBOEUF
                Attorneys at Law
13              JEFFREY L. KESSLER, Esq.
                MOLLY M. DONOVAN, Esq.
14              1301 Avenue of the Americas
                New York, New York  10019-6092
15              213.259.7349
                jkessler@dl.com
16
17              and
18              WEIL, GOTSHAL & MANGES
                Attorneys at Law
19              ADAM C. HEMLOCK, Esq.
                767 Fifth Avenue
20              New York, New York  10153-0119
                212.310.8000
21
22
23
24
25
```

4

```
 1    A P P E A R A N C E S (Continued)
 2                and
 3    FOR THE DEFENDANT HITACHI DS:
 4                MORGAN LEWIS & BOCKIUS LLP
                  Attorneys at Law
 5                SCOTT A. STEMPEL, Esq.
                  1111 Pennsylvania Avenue, NW
 6                Washington, DC  20004
                  202.739.5211
 7                sstempel@morganlewis.com
 8                MORGAN LEWIS & BOCKIUS LLP
                  Attorneys at Law
 9                MICHELLE PARK CHIU, Esq.
                  One Market, Spear Street Tower
10                San Francisco, California  94105
                  415.442.1140
11                mchiu@morganlewis.com
12                and
13    FOR THE DEFENDANT SAMSUNG SDI:
14                SHEPPARD MULLIN RICHTER & HAMPTON LLP
                  Attorneys at Law
15                MICHAEL W. SCARBOROUGH, Esq.
                  JAMES L. McGINNIS, Esq.
16                Four Embarcadero Center, 17th Floor
                  San Francisco, California  94111
17                415.434.9100
                  mscarborough@sheppardmullin.com
18
19                and
20    FOR THE DEFENDANT LGE, LGUSA, LGETT:
21                ARNOLD & PORTER LLP
                  ERIC SHAPLAND, Esq.
22                One Embarcadero Center, 22nd Floor
                  San Francisco, California  94111
23                415.356-3051
                  eric.shepland@aporter.com
24
25
```

5

```
1    A P P E A R A N C E S (Continued)
2              ARNOLD & PORTER LLP
               BETH H. PARKER, Esq.
3              One Embarcadero Center, 22nd Floor
               San Francisco, California  94111
4              415.356-3051
               beth.parker@aporter.com
5
6              and
7    FOR THE DEFENDANT SAMSUNG ELECTRONICS CORPORATION,
     SAMSUNG ELECTRONICS OF AMERICA:
8
               O'MELVENY & MYERS
9              Attorneys at Law
               IAN SIMMONS, Esq.
10             BEN BRADSHAW, Esq.
               PATRICK HEIN, Esq.
11             Two Embarcadero Center, 28th Floor
               San Francisco, California  94111-3823
12             415.984.8700
               isimmons@omm.com
13
14
15                       --oOo--
16
17
18
19
20
21
22
23
24
25
```

6

```
 1                    SAN FRANCISCO, CALIFORNIA

 2                   THURSDAY,  May 26, 2011

 3                        9:54 A.M.

 4                        --o0o--

 5               P R O C E E D I N G S

 6           THE COURT:  All right.  Let's get started.

 7           Welcome back.  I gather from the full

 8   attendance here this morning that you all attach about

 9   as much significance to this motion, to these motions as

10   I do.  So I'm glad to have you all.

11           Now, we do have most everybody here.  We are

12   not using the star phone this morning for two reasons:

13   One is it's broken; and the second is that even if it

14   weren't broken, I wouldn't know how to use it.  So I

15   think we are good enough on this phone for the number of

16   people who will be here.

17           Most all of you have been here before, so you

18   know where the washrooms are, where the coffee is.  And

19   we do have two rooms available down the hallway for your

20   use as caucus rooms.

21           If you want to use your computers in here, we

22   are Wi-Fied.  To get through the code to get to our

23   Wi-Fi, Sarah's written it on the board up there.  The

24   magic word is "resolution," so that's what you have got

25   to type in to get through the process into our Wi-Fi
```

1    finished products from which one might draw an inference

2    or conclusion that any discussion of setting prices on

3    CRTs had to necessarily include fixing prices on the

4    finished products.

5         But as I read the evidence you folks have

6    given to me, I'm really not sure that's true.  Seems to

7    me at least in some that I have been reading that the

8    causation may work the other way, that the prices that

9    have been established somehow, somewhere, on the TV sets

10   and the monitors were really driving what price

11   increases could be made on the CRTs, that in setting CRT

12   prices the discussions were concerned with running up

13   against a ceiling, but from the TVs and the monitors, if

14   they couldn't raise the internal CRT prices without

15   running against, up against that ceiling above which

16   they didn't feel a television set or a monitor could be

17   marketed.

18        So I just offer those comments on the

19   structure of the industry, just to let you know what my

20   thinking is about it, then obviously indicating a

21   certain degree of uncertainty.

22        And defendants, when you come to argue, of

23   course, argue what you want to argue.  But I'm

24   particularly interested in your focusing on page 12 of

25   plaintiffs' arguments, page 12 and following.  They say

# EXHIBIT N

**United States District Court**
For the Northern District of California

1
2
3                    UNITED STATES DISTRICT COURT
4                   NORTHERN DISTRICT OF CALIFORNIA
5
6
7  In re DYNAMIC RANDOM ACCESS
   MEMORY (DRAM) ANTITRUST
8  LITIGATION                                    No. M 02-1486 PJH
                                        /
9                                               **ORDER GRANTING SUMMARY
                                                JUDGMENT IN PART AND
10 This Document Relates to:                    DENYING SUMMARY JUDGMENT
                                                IN PART**
11 All Direct Purchaser Actions
                                        /
12
13         Defendants' motions for summary judgment came on for hearing on January 10,
14 2007 before this court.  Plaintiffs, the direct purchaser class ("plaintiffs"), appeared through
15 their class counsel, Guido Saveri, Anthony Shapiro, Fred T. Isquith, R. Alexander Saveri,
16 Frank A. Bottini, Bruce L. Simon, George W. Sampson, Geoffrey C. Rushing, and Clinton
17 P. Walker.  Defendants appeared through their counsel, Paul R. Griffin, Robert B. Pringle,
18 Robert E. Freitas, Na'il Benjamin, Howard Ullman, Joel S. Sanders, Ronald C. Redcay,
19 William M. Goodman, Stephen V. Bomse, Harrison J. Frahn, William S. Farmer, and
20 Steven H. Morrissett.  Having read all the papers submitted and carefully considered the
21 relevant legal authority, the court hereby GRANTS the motions for summary judgment in
22 part and DENIES the motions for summary judgment in part, for the reasons stated at the
23 hearing, and as follows.
24                              **BACKGROUND**
25         The instant action is part of a larger multidistrict litigation proceeding, and arises
26 under section 1 of the Sherman Act.
27         A.      Background Facts
28         Dynamic random access memory ("DRAM") is an electronic memory microchip that

                                                                                    10

1   is used to store digital information and provide high-speed storage and retrieval of data.

2   DRAM is commonly used in a wide assortment of electronic devices, including personal

3   computers, printers, digital cameras, and wireless telephones.  It is also the most common

4   kind of random access memory chip sold in both new computers and computer upgrades in

5   the United States.  DRAM is primarily sold in two forms, component and module, both of

6   which come in different densities, speeds, and frequencies.  The defendants[1] in the instant

7   action are all engaged in the manufacture and/or sale of DRAM on the worldwide market.

8   Collectively, they are the leading manufacturers of DRAM, and control the majority of the

9   DRAM market.

10        Beginning in May 2002, the Antitrust Division of the Department of Justice ("DOJ")

11  began investigating the existence of price-fixing in the DRAM industry – specifically, the

12  existence of a conspiracy to restrict supply and raise prices for DRAM among the largest

13  makers and sellers of DRAM globally.  Several defendants were targeted by the DOJ as

14  part of this larger investigation.  As a result of the investigation, four defendants – Infineon,

15  Hynix, Samsung, and Elpida – have pled guilty to participation in a price-fixing conspiracy

16  in violation of federal antitrust law.  In addition, several of their employees and agents have

17  also pled guilty to criminal antitrust violations, and have been sentenced accordingly.

18        B.     The Instant Action

19        On June 21, 2002, on the heels of the DOJ's antitrust investigation, plaintiffs filed a

20

21        [1]      Defendants are: Micron Technology, Inc., and Micron Semiconductor Products,
    Inc. (collectively "Micron"); Infineon Technologies AG, and Infineon Technologies North
22  America Corp. (collectively "Infineon"); Hynix Semiconductor, Inc., and Hynix Semiconductor
    America, Inc. (collectively "Hynix"); Samsung Electronics Co., Ltd., and Samsung
23  Semiconductor, Inc. (collectively "Samsung"); Mosel-Vitelic Corporation, and Mosel-Vitelic
    Corporation (USA)(collectively "Mosel-Vitelic"); Nanya Technology Corporation, and Nanya
24  Technology Corporation USA ("NTC" and "NTC USA," respectively); Winbond Electronics
    Corporation, and Winbond Electronics Corporation America (collectively "Winbond"); Elpida
25  Memory, Inc., and Elpida Memory (USA) Inc. (collectively "Elpida"); and NEC Electronics
    America, Inc. ("NEC").  To date, however, seven of these nine defendant groupings have
26  entered into settlement agreements with plaintiffs.  Accordingly, only two defendant entities
    remain, and proceed before the court here on the instant motions for summary judgment –
27  Nanya, and Mosel-Vitelic.

28

**United States District Court**
For the Northern District of California

2

United States District Court

For the Northern District of California

1    class action lawsuit in the Southern District of New York, alleging federal antitrust violations

2    by defendants.  Plaintiffs are a class comprised of all persons and/or entities who

3    purchased DRAM in the United States market directly from defendants during the period

4    April 1, 1999 through June 30, 2002 (the "class period").  The original action, along with

5    numerous subsequently-filed actions, was later transferred to this court for consolidated

6    pre-trial proceedings, pursuant to the multidistrict litigation ("MDL") procedures set forth in

7    28 U.S.C. § 1407.  After the cases were transferred and consolidated, plaintiffs filed a

8    consolidated class action complaint on October 1, 2003.  The most recent and operative

9    complaint – the Third Consolidated Amended Class Action Complaint – was filed on June

10   30, 2005.

11        In their complaint, plaintiffs generally allege that defendants engaged in a global

12   conspiracy to "fix, raise, maintain and stabilize the prices of, and/or allocate the market for,

13   DRAM they sold in the United States" during the class period, and that plaintiffs were

14   injured by this activity when they were forced to pay artificially inflated prices for DRAM.

15   See, e.g.,Third Consolidated Amended Class Action Complaint ("Complaint"), ¶¶ 2, 55, 61-

16   65, 73-74.  As part of that conspiracy, plaintiffs allege that the defendants participated in

17   meetings and conversations to discuss the price of DRAM; agreed to manipulate prices and

18   supply so as to boost sagging DRAM sales; issued price announcements and price

19   quotations in accordance with the agreements reached by defendants; and sold DRAM to

20   customers in the United States at non-competitive prices.  See id. at ¶ 64.

21        Now post-discovery, plaintiffs present these allegations in more concrete form.  In

22   sum, they assert that defendants effectuated the alleged price-fixing conspiracy in two

23   ways: first, plaintiffs allege that defendants coordinated an industry-wide reduction in

24   DRAM production, or else created the appearance of such a reduction, in order create an

25   artificial DRAM shortage that would ultimately drive up the price of DRAM on the US

26   market.  See, e.g., Pl. Opp. Br. re Nanya MSJ at 2:23-3:8.  Second, plaintiffs contend that,

27   in connection with creating a supply shortage that would have the effect of increasing the

28

3

1   market price for DRAM, the defendants coordinated with each other – through frequent

2   high-level communications and meetings – to raise and keep the DRAM prices artificially

3   high to all DRAM purchasers.  See id. at 3:9-16.  All these actions, assert plaintiffs, resulted

4   in harm to DRAM purchasers, and render defendants liable to those purchasers under the

5   Sherman Act.

6           C.      The Instant Motions

7           The remaining defendants in this action now move for summary judgment.  There

8   are four motions in total, as follows:  (1) Nanya Technology Corporation's ("NTC") motion to

9   determine liability under the Sherman Act; (2) Nanya Technology Corporation USA's ("NTC

10  USA") companion motion to determine liability under the Sherman Act; (3) defendants'

11  motion for partial summary judgment based on pre-existing cost-plus contract purchases;

12  and (4) defendants' motion for partial summary judgment based on DRAM purchases from

13  April 1, 2001 to November 30, 2001.  In addition, the parties have both filed motions to seal

14  certain documents.

15                              **DISCUSSION**

16          A.      Summary Judgment Standard

17          Generally speaking, normal summary judgment standards apply.  That is to say,

18  summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

19  interrogatories, and admissions on file, together with the affidavits, if any, show that there is

20  no genuine issue as to any material fact and that the moving party is entitled to a judgment

21  as a matter of law."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The court

22  must view the facts in the light most favorable to the non-moving party and give it the

23  benefit of all reasonable inferences to be drawn from those facts.  Matsushita Elec. Indus.

24  Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

25          Where, as here, concerted price-fixing is alleged, the plaintiffs bear the ultimate

26  burden of presenting sufficient evidence to prove that an agreement to fix prices existed.

27  See, e.g., In re Citric Acid Litig., 191 F.3d 1090, 1093 (9th Cir. 1999)(noting that price-fixing

28

**United States District Court**
For the Northern District of California

4

**United States District Court**
For the Northern District of California

1   is a per se violation of section 1 of the Sherman Act).  In order for them to survive

2   defendants' motion for summary judgment, therefore, plaintiffs must establish that there is

3   a genuine issue of material fact as to whether defendants entered into an illegal conspiracy

4   that caused respondents to suffer a cognizable injury.  See Matsushita, 475 U.S. at 585-86.

5   Plaintiffs can establish a genuine issue of material fact by producing either direct evidence

6   that defendants participated in an agreement to fix prices, or circumstantial evidence from

7   which a reasonable fact finder could conclude the same.  See, e.g.,Movie 1 & 2 v. United

8   Artists Commc'ns, 909 F.2d 1245, 1251-52 (9th Cir. 1990); United States v. Gen. Motors

9   Corp., 384 U.S. 127, 142-43 (1966).

10      With respect to proof by way of circumstantial evidence in section 1 cases, special

11  rules apply.  In Matsushita Elec. Indus. Co., the Supreme Court noted that "antitrust law

12  limits the range of permissible inferences from ambiguous evidence in a [section 1] case...".

13  See 475 U.S. at 588.  In addressing plaintiff's burden in proving that an issue of material

14  fact exists on the conspiracy question, the court stated, "conduct as consistent with

15  permissible competition as with illegal conspiracy does not, standing alone, support an

16  inference of antitrust conspiracy...".  See id.  In sum, to survive a motion for summary

17  judgment, "a plaintiff seeking damages for a violation of [section] 1 must present evidence

18  'that tends to exclude the possibility' that the alleged conspirators acted independently ...."

19  Id.

20      The Ninth Circuit has embraced Matsushita and has outlined a two-part test to be

21  applied whenever a plaintiff rests its case entirely on circumstantial evidence.  First, the

22  defendant can rebut an allegation of conspiracy by showing a plausible and justifiable

23  reason for its conduct that is consistent with proper business practice.  Second, the burden

24  then "shifts back to the plaintiff to provide specific evidence tending to show that the

25  defendant was not engaging in permissible competitive behavior."  See, e.g., In re Citric

26  Acid Litig., 191 F.3d at 1094.

27      These standards apply here, to the extent that plaintiffs seek to defeat summary

28

**United States District Court**
For the Northern District of California

1 judgment as to section 1 liability on the basis of circumstantial evidence, whether in whole

2 or in part.

3       The court now turns to the four summary judgment motions before it, and addresses

4 each in turn.

5       B.      NTC's Motion for Summary Judgment

6       NTC attacks plaintiffs' ability to prove that NTC – as distinguished from its

7 subsidiary, NTC USA – is liable for participation in any agreement to fix prices, reduce

8 output, or engage in any other prohibited activity under section 1 of the Sherman Act.

9 Focusing on its own conduct, NTC argues that plaintiffs cannot prove either (1) that NTC

10 itself is guilty of any unlawful activity, or (2) that NTC is guilty as a co-conspirator, by virtue

11 of its' participation in *other* defendants' unlawful activities.  In response, plaintiffs marshal

12 what they claim is both direct and circumstantial evidence of NTC's participation in the

13 alleged section 1 conspiracy.

14       Regardless of the parties' differing characterizations of their arguments – i.e.,

15 conduct v. nature of evidentiary proof – the fundamental issue raised by the parties is the

16 same:  whether there is sufficient direct and/or circumstantial evidence to create a triable

17 issue of fact as to whether NTC participated in the alleged conspiracy to "fix", via output

18 reduction and/or price manipulation, the market for DRAM.  In analyzing this issue, the

19 court must consider: (1) the preliminary issue whether plaintiffs may attempt to create a

20 triable issue as to NTC's participation in the overarching conspiracy vis-a-vis NTC's

21 relationship with its wholly owned subsidiary, NTC USA; (2) the direct evidence of NTC's

22 participation in the alleged conspiracy; and (3) the circumstantial evidence of NTC's

23 participation in the same.

24       1.      <u>NTC's Vicarious Liability Based on Relationship with NTC USA</u>

25       NTC claims that it has a separate legal existence from its wholly owned subsidiary,

26 NTC USA, and that NTC has not engaged in any direct sales of DRAM within the United

27 States since 1998, the year after NTC USA was incorporated.  <u>See</u> Declaration of Kenneth

28

<div align="center">6</div>

1   M. Hurley ("Hurley Decl."), ¶ 2.  In view of this distinction, NTC asserts that plaintiffs cannot

2   offer evidence of NTC USA's conduct in attempting to create a material dispute with

3   respect to NTC's participation in any unlawful activity.  See NTC MSJ Op. Br. at 4:18-7:14.

4   Specifically, NTC argues:  (1) that under principles of basic corporate law, a parent

5   corporation is not liable for the acts of its subsidiary; (2) that plaintiffs have not and cannot

6   establish liability through an alter ego theory; (3) that vicarious liability also may not be

7   established through the "single entity" doctrine applicable to antitrust cases; and (4) that,

8   even assuming that NTC USA participated in any unlawful acts, there is no evidence that

9   NTC knowingly participated in those unlawful acts.  Plaintiffs challenge these contentions,

10  asserting that the evidence of NTC's individual participation in the alleged conspiracy is

11  plentiful, but even if it weren't, NTC could still be found vicariously liable based on NTC

12  USA's conduct, since NTC is the alter ego and marketing conduit for NTC USA.

13        First, NTC is generally correct that corporate law prohibits a parent corporation from

14  being held liable on the basis of its subsidiary's actions.  See, e.g., U.S. v. Bestfoods, 524

15  U.S. 51 (1998)("It is a general principle of corporate law deeply 'ingrained in our economic

16  and legal systems' that a parent corporation (so-called because of control through

17  ownership of another corporation's stock) is not liable for the acts of its subsidiaries.").

18  However, a parent corporation *may* be held liable for the acts of its subsidiary "where stock

19  ownership has been resorted to, not for the purpose of participating in the affairs of a

20  corporation in the normal and usual manner, but for the purpose of controlling a subsidiary

21  company so that it may be used as a mere agency or instrumentality of the owning

22  company."  See id. at 62-63.  Accordingly, NTC may be held vicariously liable for NTC

23  USA's actions, but only if plaintiffs can establish that NTC USA is a mere 'agency or

24  instrumentality' of NTC's.

25        This brings the court to NTC's second argument, for plaintiffs have chosen to rely on

26  the alter-ego doctrine as an independent theory that would justify the imposition of vicarious

27  liability here.  In order to prove that the alter-ego theory applies, plaintiffs must show that

28

7

**United States District Court**
For the Northern District of California

1    there is "such unity of interest and ownership that the separate personalities [of the two

2    entities] no longer exist." See Doe v. Unocal Corp., 248 F.3d 915 (9th Cir. 2001).  An alter

3    ego or agency relationship is specifically proven up by facts that demonstrate "parental

4    control of the subsidiary's internal affairs or daily operations." See Doe, 248 F.3d at 927

5    (alter ego test also satisfied where the record indicates that the parent dictates "[e]very

6    facet [of the subsidiary's] business - from broad policy decisions to routine matters of day-

7    to-day operation [.]").

8           Here, plaintiffs attempt to satisfy the alter-ego test by showing that NTC had full

9    operational control over NTC USA and owned 100% of its stock; that NTC manufactured all

10   the DRAM sold by NTC USA; that certain of NTC USA's officers reported directly to NTC;

11   that two of the three directors on NTC USA's board of directors were from NTC; that NTC

12   had ultimate authority over, and made, all of NTC USA's pricing decisions; and that NTC

13   was merely NTC USA's "marketing conduit" during the alleged time period.  See Opp. Br. at

14   32:23-33:7.

15          The undisputed evidence that plaintiffs rely on, however, discloses only that NTC

16   USA's president, Kenneth Hurley, reported directly to NTC officers; that NTC USA's

17   executives had orders not to deviate from pricing policies set by NTC; and that NTC in fact

18   set the pricing policies that drove NTC USA's DRAM prices.  See Declaration of George

19   Sampson in Support of Oppositions ("Sampson Decl."), Exs. 104 at 22:13-16, 23:17-19,

20   24:18-27:24; 105 at 14; see also Plaintiffs' Slide Presentation in Opp. to NTC MSJ at 36.

21   Even combining this evidence with NTC's undisputed evidence that NTC USA is, in fact,

22   wholly owned by NTC, this evidence is insufficient to prove that NTC USA is NTC's alter

23   ego.  See, e.g., Hurley Decl., ¶ 1.  This is because the evidence as a whole does not

24   sufficiently speak to whether NTC actually controls the day to day operations and internal

25   affairs of NTC USA, even if NTC does control decisions regarding pricing, nor does it

26   demonstrate that NTC dictates "every facet of NTC USA's business."  In the absence of

27   evidence establishing these factors, the alter ego theory is unavailable to plaintiffs as a

28

8

**United States District Court**

For the Northern District of California

1    means of holding NTC vicariously liable for NTC USA's actions.[2]

2          Nor can plaintiffs demonstrate NTC's liability on the basis of NTC USA's conduct

3    through application of the single entity doctrine.  That doctrine, announced in <u>Copperweld</u>

4    <u>Corp. v. Independence Tube Corp</u>., 467 U.S. 752, 771 (1984), holds that parent and

5    subsidiary corporations are to be considered a single collective entity for purposes of

6    conspiracy liability under section 1 of the Sherman Act, and as such, they are incapable of

7    conspiring together under the Act.  The doctrine, however, is inapplicable here.  Although it

8    deals with the question whether a parent and subsidiary corporation may be charged with

9    conspiring with each other, it says nothing about whether a parent and subsidiary may,

10   collectively or individually, be charged with conspiring with *other* unaffiliated members of an

11   alleged conspiracy.  That is the issue before this court.  As such, the doctrine cannot be

12   used to invoke NTC's liability with respect to the global conspiracy alleged by plaintiffs.

13         Finally, NTC argues that no liability can possibly exist via NTC USA, because there

14   are no ties connecting NTC to any unlawful activity by NTC USA, to the extent NTC USA

15   engaged in such activity.  NTC USA acted independently, posits NTC, and without NTC's

16   participation.  In making this argument, NTC preemptively targets the deposition testimony

17   of Steven Hsu, an NTC USA employee, arguing that his testimony  – which confirms NTC's

18   influence over NTC USA's pricing policies – cannot be used to demonstrate NTC's

19   participation in NTC USA's allegedly unlawful activity.  Plaintiffs, for their part, fail to rebut

20   NTC's argument in this regard, and they rely on Hsu's testimony for proof of alter ego

21   liability only.  In the absence of argument by plaintiffs, the court finds, as NTC urges, that

22   Mr. Hsu's testimony standing alone does not form the basis for vicarious liability.

23

24         [2]      Plaintiffs also drop a footnote in their opposition brief, and further argued at the
     hearing on this matter, that NTC "could also be held vicariously liable for the acts of [NTC USA]
25   under an agency theory," as distinguished from an alter ego theory.  <u>See</u> Opp. Br. at 33 fn. 27.
     Plaintiffs cited no evidence in support of this assertion, however, relying only on the bald
26   assumption that "without [NTC USA], the parent company [NTC] would have to perform" the
     marketing and sales functions that Nanya USA engages in.  Such conclusory argument, with
27   no supporting evidence, is unpersuasive, and the court declines plaintiffs' invitation to find an
     agency theory of liability applicable to NTC on the record before it.
28

                                                    9

United States District Court
For the Northern District of California

1    In conclusion, the court finds that plaintiffs have not created a triable issue of

2  material fact with respect to NTC's vicarious liability for the overarching conspiracy alleged

3  by plaintiffs, on the basis of its relationship with NTC USA.  NTC's participation in the

4  alleged overarching conspiracy must be independently proven, either through direct or

5  circumstantial evidence.

6              2.    Direct Evidence of Conspiracy

7    NTC asserts that there is a general absence of any evidence proving that it (a)

8  participated in a price-fixing agreement with other defendants; (b) reduced its DRAM output

9  in order to drive up prices for DRAM; or (c) engaged in any exchange of price information

10  with any competitor that resulted in an increase or stabilization of market prices.[3]  See NTC

11  Op. Br. at 8-13.  Plaintiffs, however, assert that there is sufficient direct evidence of NTC's

12  participation in the alleged conspiracy to raise a genuine issue of material fact on the issue.

13  See In re Citric Acid Litig., 191 F.3d at 1093 (where a plaintiff produces direct evidence that

14  a defendant entered into an illegal price-fixing agreement, summary judgment will be

15  denied).

16    Direct evidence in a section 1 conspiracy case "must be evidence that is explicit and

17  requires no inferences to establish the proposition or conclusion being asserted."  See id. at

18  1094, citing In re Baby Food Antitrust Litig., 166 F.3d 112, 118 (3d Cir. 1999).  Here,

19  plaintiffs contend that they have direct evidence that NTC participated in secret price-fixing

20  meetings with its competitors to discuss DRAM pricing and to coordinate output reduction,

21  and furthermore, that NTC did in fact reduce its DRAM production.

22              a.    emails

23

24    [3]    NTC also makes the somewhat baffling argument that it does not stand accused
of price fixing.  Plaintiffs' complaint explicitly charges that defendant – among others – entered

25  into a contract, combination or conspiracy to unreasonably restrain trade, the substantial terms
of which were to fix and maintain the price for DRAM.  See Third Consolidated Amended

26  Complaint, ¶¶ 61, 63.  It is difficult to conclude from this that NTC does not stand "accused"
of price fixing, for it is clear from the complaint that this is precisely what plaintiffs accuse.  To

27  the extent, however, that NTC really means simply that plaintiffs have not successfully *proven*
the actual existence of any agreement to actually fix prices, this argument is dealt with in the

28  body of this section.

10

1    Plaintiffs claim that secret meetings among the defendants, including NTC, took

2 place in June and July 2001.  For the June meeting(s), plaintiffs first rely on email

3 communications sent in June 2001 by defendant Micron's Managing Director of

4 International Sales, Linda Turner, in which Ms. Turner reports that "the Taiwanese DRAM

5 dudes are pow-wowing next week on how to set a floor" regarding DRAM price, and notes

6 that "Sammy/Infineon/Hynix have had pricing discussions recently."  See Sampson Decl.,

7 Ex. 14, 15.  With respect to the alleged July 2001 meeting(s), plaintiffs point to a July 2001

8 bulletin to which all DRAM manufacturers subscribe (forwarded via email), which reported

9 that there was "a secret meeting hosted by Taiwanese DRAM companies in Taipei in early

10 July to coordinate a cut in output or at least try to hold the line on prices."  See id. at Ex. 86.

11 Although neither source specifically refers to either NTC or NTC USA, plaintiffs contend by

12 way of a separate article identifying NTC as a "local DRAM die manufacturer" that NTC

13 qualifies as one of the "Taiwanese" entities referred to in the above exhibits.  See id. at Ex.

14 85.

15    This evidence is neither direct nor persuasive.  Preliminarily, the court notes that

16 NTC has objected to each of the above exhibits submitted by plaintiffs, on grounds that

17 each constitutes impermissible hearsay.  NTC is correct.  Plaintiffs are seeking to introduce

18 out of court statements contained in individual emails and industry news bulletins, noting

19 the existence of so-called secret meetings between Taiwanese DRAM manufacturers, as

20 proof that the meetings actually took place.  This constitutes hearsay under Federal Rule of

21 Evidence 801(c).  Plaintiffs attempt to overcome the objections by invoking the co-

22 conspirator provision to Rule 801, which refuses to qualify as hearsay the statements made

23 by co-conspirators of a party during the course and in furtherance of the conspiracy.  See

24 Fed. R. Evid. 801(d)(2)(E); see also Bourjaily v. United States, 483 U.S. 171, 175-81

25 (1987).  However, as Bourjaily and the Ninth Circuit's subsequent interpretation of that case

26 in United States v. Silverman make clear, in order for such statements to be admissible,

27 there must be evidence beyond the statements in question, that demonstrate by a

28

11

20

United States District Court

For the Northern District of California

1    preponderance of the evidence the underlying conspiracy and NTC's connection to it.

2    Silverman, 861 F.2d 571, 576 (9th Cir. 1988); see also United States v. Tamez, 941 F.2d

3    770 (9th Cir. 1991).  Here, plaintiffs do not attempt to argue, and the court does not attempt

4    to scour the record for, the existence of any such independent evidence that would satisfy

5    the Silverman and Tamez standards.  As such, the hearsay objections lodged by NTC to

6    the above exhibits are sustained.  Furthermore, to the extent that plaintiffs would attempt to

7    meet their burden in establishing the co-conspirator definition under FRE 801(d)(2)(E) by

8    pointing to other sources of evidence that may itself be subject to hearsay objections, the

9    court would find such attempts similarly unpersuasive.

10          Moreover, even if the court did not sustain NTC's objections herein, the evidence

11   would still not prove persuasive as direct evidence of NTC's participation in secret meetings

12   to fix DRAM prices.  Ms. Turner, for example, was a *Micron* employee, not an NTC

13   employee, thereby diminishing the directness of the evidence as far as NTC is concerned.

14   But even if her emails were considered as direct evidence of NTC's own actions, the emails

15   are simply not dispositive of NTC's participation in any agreement or conspiracy.  Ms.

16   Turner states in one of her emails only that "the Taiwanese DRAM dudes" will be meeting.

17   Sampson Decl., Ex. 15.  She never references NTC specifically, but only defendants

18   Samsung, Infineon and Hynix.  And in her second email, while Ms. Turner states that she

19   has "heard rumors from one of the Taiwan DRAM makers that there is a meeting

20   scheduled with all of the Taiwan DRAM makers over the next week to discuss raising their

21   pricing," there is again no mention of NTC specifically, just an allegation of a "rumor" told to

22   Ms. Turner by an unnamed "Taiwan DRAM maker."  See Sampson Decl., Ex. 14.

23          In short, this evidence is not explicit, and would require that the court make certain

24   inferences unsupported by the record to conclude that NTC participated in any of the

25   alleged secret meetings, or for that matter in the conspiracy.  Accordingly, the court

26   concludes that the emails are not direct evidence sufficient to defeat NTC's motion for

27   summary judgment.

28

                                           12

United States District Court

For the Northern District of California

b.      Mr. Kau's testimony

1

2      Plaintiffs also rely on the deposition testimony of NTC Vice President Charles Kau,

3   as direct evidence that NTC participated in meetings and discussions with its Taiwanese

4   rivals regarding a DRAM production cut.  According to plaintiffs, Mr. Kau testified that there

5   was a local conference that took place around 2001, at which he recalls discussing a

6   DRAM production cut with NTC's competitors.  See Sampson Decl., Ex. 88 at 107:14-24.

7      Here, too, however, plaintiffs' reliance on this testimony as direct evidence of NTC's

8   participation in secret meetings to raise DRAM prices or cut production, is misplaced.  For

9   as NTC points out, plaintiffs have completely – and disingenuously – omitted Mr. Kau's

10   follow-up explanation with respect to the very statement upon which plaintiffs rely.  To wit,

11   when asked during follow-up deposition questioning about the 2001 conference at which

12   the production cut was discussed, Mr. Kau clarified that, while a discussion was in fact

13   raised about reducing DRAM output, the discussion was also immediately halted when

14   someone present during the discussion noted that cutting production would be illegal.  See

15   Benjamin Reply Decl., Ex. A at 160-161.  Mr. Kau then went on to testify that, at any rate,

16   NTC did not reduce production following that discussion.  Id.

17      In view of the complete testimony offered by Mr. Kau on the subject, Mr. Kau's

18   statements cannot be considered direct evidence of NTC's involvement in meetings to fix

19   DRAM prices or to cut production of DRAM in order to raise DRAM prices.

20               c.      industry news and articles

21      Finally, plaintiffs rely on a series of three news articles written in 2001, in which Mr.

22   Kau was quoted, and that refer to discussions about joint efforts by defendants to cut

23   DRAM production.  See Opp. Br. at 10:20-21.  First, on August 14, 2001, an EBN article

24   entitled "Taiwan DRAM makers may cut output" was published, in which Mr. Kau is quoted

25   as stating that NTC is "willing to cooperate" in a production cut.  See Sampson Decl., Ex.

26   22.  Second, on October 1, 2001, a Financial Times article entitled "Nanya raises the

27   prospect of cuts in DRAM output," quoted Mr. Kau as saying that NTC was "willing to cut

28

13

United States District Court
For the Northern District of California

1    production voluntarily, once we have got the right signal." See id. at Ex. 23. Finally, in a

2    separate Financial Times article also dated October 1, 2001, Mr. Kau purportedly stated

3    that "Taiwanese strategies include ... exploring the possibility of joint production cuts...",

4    and he furthermore joked that the DRAM industry might one day be called "D-Pec," like the

5    "Global oil cartel OPEC." See id. at Ex. 24; see also Ex. 88 at 125:6-127:23.

6         Preliminarily, as with the emails discussed above, NTC has raised hearsay

7    objections to the three articles in question. Plaintiffs seek to use statements in each article

8    attributed to Mr. Kau, to the effect that NTC was willing to participate in joint efforts to cut

9    DRAM production. In the court's view, plaintiffs offer Mr. Kau's statements for the truth of

10   the matter asserted therein, and as such, the statements uttered by Mr. Kau are

11   inadmissible hearsay. Furthermore, none of the hearsay exceptions relied on by plaintiffs –

12   i.e., co-conspirator or party admission exceptions – apply. The co-conspirator exception

13   fails for the same reasons already enunciated above. As for the party admission exception,

14   while it is true that the statements at issue were made by Mr. Kau in his representative

15   capacity for NTC, the statements as relayed in the newspaper articles simply do not bear

16   sufficient indicia of reliability such that the party admission exception is warranted. The

17   court finds newspaper articles, even the direct quotes contained within them, to be

18   inherently unreliable. Moreover, there is proof of such unreliability here. As Mr. Kau

19   testified, his comments were translated into English from the Chinese language, and the

20   content of the statements as written does not accurately reflect the content of Mr. Kau's

21   statements to the articles' authors. See Benjamin Reply Decl., Ex. A at 112-15.

22   Accordingly, NTC's objections to the articles on hearsay grounds, are sustained.

23        Even if Mr. Kau's statements in the newspaper articles in question were to be

24   considered substantively, the court would nonetheless find that they do not constitute direct

25   evidence of NTC's participation in a conspiracy to cut DRAM production or fix DRAM

26   prices. It is true enough that the statements attributed to Mr. Kau in the articles deal with

27   the concept of cutting DRAM production. See Sampson Decl., Exs. 22-24. However, Mr.

28

14

1   Kau's statements are not statements that explicitly concede the existence of any actual

2   agreement to limit production of DRAM, nor are they statements that would lead to such a

3   conclusion without need of any inferences.  For example, in the first EBN article, Mr. Kau

4   said only that everyone was feeling the need to cut production, but that "as of how to

5   engage in the cut is an issue that needs to be discussed."  See id. at Ex. 22.  This

6   statement expressly leaves open the question of whether NTC would choose to limit

7   production, and if so, how it would do so.  Similarly, in the first Financial Times article, Mr.

8   Kau is referenced as stating that DRAM rivals had approached NTC about coordinating

9   output cuts, but he is also referenced as stating that any moves would have to be led by

10   other producers, that "leading by example was more important than attempts to coordinate,

11   and that [NTC] would be 'willing to cut production voluntarily, once we have got the right

12   signal.'"  See id. at Ex. 23.  This, too, expressly leaves open the possibility of a voluntary

13   production cut independent of any joint attempt to coordinate production cuts.[4]  Finally, with

14   respect to the last article Financial Times article cited by plaintiffs, while Mr. Kau may have

15   engaged in the unwise strategy of joking about the future existence of a "D-Pec", there is

16   simply nothing in the article that indicates NTC's participation in an actual agreement or

17   conspiracy to limit production or raise prices.

18        In sum, as with the emails and the evidence of Mr. Kau's deposition testimony, none

19   of the news articles or Mr. Kau's statements therein constitute direct evidence of NTC's

20   participation in the conspiracy alleged by plaintiffs.  Accordingly, the court finds that

21   plaintiffs have not presented any direct evidence that successfully defeats NTC's motion for

22   summary judgment.

23            3.   Circumstantial Evidence of Conspiracy

24        The above conclusion brings the court to the central issue raised by the parties –

25

26        [4]      As defendants note, even conscious parallelism – i.e., a company's independent
27   and voluntary decision to track prices and production of competitors – is not unlawful standing
    alone.  See, e.g., Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, 203 F.3d 1028,
28   1032 (8th Cir.).

15

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   whether there is sufficient circumstantial evidence of NTC's participation in an agreement to

2   fix the ultimate price of DRAM, whether via participation in a coordinated output reduction

3   or discussions regarding pricing.  Keeping in mind the <u>Matsushita</u> standards enunciated

4   above, the critical question in evaluating this issue is "whether all the evidence considered

5   as a whole can reasonably support the inference that [NTC] conspired with the admitted

6   conspirators to fix prices."  <u>See In re Citric Acid</u>, 191 F.3d at 1097.

7          Plaintiffs generally point to three categories of evidence that they claim supports an

8   "inference" of collusive conduct sufficient to preclude summary judgment: (a) economic

9   evidence; (b) evidence of NTC's "frequent, high-level communications" correlated to

10  specific collusive behavior; and (c) evidence of several co-defendants' guilty pleas in the

11  DOJ's related criminal antitrust proceedings.

12                       a.    economic evidence

13         Plaintiffs contend that two types of economic evidence in this case demonstrate that

14  a conspiracy makes economic sense and is plausible.  First, plaintiffs point to evidence

15  regarding the structure of the DRAM market as a whole, and specifically to their expert, Dr.

16  Roger Noll, whose report and testimony plaintiffs assert establishes that the conditions of

17  the DRAM market made NTC's participation in the alleged conspiracy economically viable

18  and productive.[5]  Second, plaintiffs point to evidence that they claim proves that NTC's

19  behavior was consistently anticompetitive and against its own economic self interest –

20  thereby further supporting the inference of NTC's participation in the conspiracy.  <u>See, e.g.,</u>

21  <u>Zoslaw v. MCA Distrib. Corp.</u>, 693 F.2d 870, 884 (9th Cir. 1982)("plaintiff must demonstrate

22  that [allegedly parallel acts] were against each conspirator's self-interest").

23

24          [5]     Originally, Dr. Noll's report was submitted in connection with the Winbond entity
    defendants' accompanying motion for summary judgment, and plaintiffs relied on that
25  submission in citing to the report.  Winbond withdrew its motion, however, following its
    settlement with plaintiffs, thereby withdrawing the Noll report from consideration as well.  In
26  order to cure this problem, and at the court's request, plaintiffs re-submitted Dr. Noll's report
    by way of a separate declaration.  The Nanya entity defendants have now filed objections to
27  the re-submission of Dr. Noll's expert report, in part based on timeliness issues.  The court
    hereby OVERRULES defendants' objections.
28

United States District Court

For the Northern District of California

i.     structure of the DRAM market

Dr. Noll, plaintiffs' expert, analyzed five key characteristics of the DRAM industry –

concentration in the industry, defendants' market share, DRAM's commodity status, the

size of DRAM buyers/transactions, and the effect of US anti-dumping restrictions on DRAM

pricing – and concluded that the DRAM industry was favorable to successful collusion

during the relevant class period.  See Saveri Decl., Ex. A at 31-46.  Although this testimony

standing alone does not necessarily implicate NTC's individual participation in any such

collusion, plaintiffs also point to the testimony of NTC's expert, Dr. Alan Cox, on which

plaintiffs rely for support of their claim that NTC's increasing technological advantages at

the time of the conspiracy provided an economic reason for the top DRAM manufacturers

to include NTC in their conspiracy, even if NTC was a smaller player in the market for

DRAM.  See, e.g., Declaration of Alan Cox in Support of Nanya's Motion for Summary

Judgment ("Cox Decl.,"), Ex. A at ¶ 78 (noting that "Nanya/Nanya USA gained a significant

advantage" due to "product innovation" in 2001).  Given both the DRAM market's

receptiveness to collusion and the significance of NTC's position in the market, plaintiffs

contend that the economic evidence regarding the structure of the market supports NTC's

participation in the alleged conspiracy.

As plaintiffs note, persuasive authority suggests that evidence bearing on the

economic structure of the market, and evidence specifically suggesting that particular

characteristics of the market are conducive to the creation of, and participation in, an

overarching price-fixing conspiracy, can be relevant in supporting an inference that a

defendant participated in such a conspiracy.  See, e.g., In re Flat Glass Antitrust Litig., 385

F.3d 350, 360 (3d Cir. 2004)("[e]vidence that the defendant had a motive to enter into a

price-fixing conspiracy means evidence ... that the structure of the market was such as to

make secret price-fixing feasible"); In re High Fructose Corn Syrup Antitrust Litigation, 295

F.3d 651, 655-56 (7th Cir. 2002).  Nonetheless, while relevant, the economic evidence

surrounding the DRAM market is not, in and of itself, a sufficient basis upon which to infer a

17

**United States District Court**
For the Northern District of California

1  conspiracy here.  See, e.g., In re Flat Glass, 385 F.3d at 360 n. 12 ("this type of economic

2  evidence is neither necessary nor sufficient to conclude that sufficient proof of an

3  agreement exists to preclude summary judgment, but it is relevant and courts should as a

4  general matter consider it").  This conclusion is strengthened by the observation that,

5  despite plaintiffs' reliance on Dr. Cox's testimony regarding NTC's technological capacities,

6  Dr. Cox's actual conclusion was that it was *unlikely* that other defendants would have

7  wanted to include NTC in the conspiracy, since NTC's capacity for DRAM production was

8  never greater than 6% of industry capacity during the class period, and less than 1.5%

9  when the conspiracy purportedly began.  See Cox Decl., Ex. A at ¶ 14.  Plaintiffs present

10 no other testimony that supports the conclusion that the structure of the market would have

11 been receptive to *NTC itself* engaging in a conspiracy.

12      In sum, plaintiffs' evidence regarding the structure of the DRAM market, even if

13 relevant to the larger question whether an inference of conspiracy may be made on the

14 whole cannot, standing alone, conclusively establish an inference of conspiracy.

15                              ii.      anticompetitive behavior

16      Plaintiffs also claim that the economic evidence discloses that NTC behaved in an

17 anticompetitive manner during the conspiracy period, such that an inference of conspiracy

18 is reasonable.  Specifically, plaintiffs assert that during the conspiracy period, NTC reduced

19 its DRAM output in coordination with the top 5 DRAM producers in the industry; that NTC

20 failed to price aggressively and consistently passed up opportunities to undercut its

21 competitors and grow its market share; and that NTC refused to bid in an auction held by

22 Compaq in November 2001.  See Opp. Br. at 19:13-22:17.

23      Output reduction.  Plaintiffs assert that NTC reduced its DRAM output during the

24 fourth quarter of 2001 ("2001Q4") and the first quarter of 2002 ("2002Q1"), in step with the

25 top DRAM producers and other co-conspirators.  They rely specifically on Exhibit 10 of Dr.

26 Cox's expert report, which consists of a chart comparing NTC's DRAM output growth

27 during the conspiracy period with that of the top 5 DRAM manufacturers (defined as Elpida,

28

18

**United States District Court**
For the Northern District of California

1   Hynix, Infineon, Micron and Samsung).  See Cox Decl., Ex. A at Ex. 10.  The chart

2   demonstrates that, during 2001Q4 and 2002Q1, NTC's DRAM output growth dropped, at

3   the same time that the top 5 DRAM producers' output growth also collectively dropped.  Id.

4   Plaintiffs argue that this supports an inference of conspiracy, since the timing of NTC's

5   output reduction coincided with the conspiracy period.

6        Naturally, NTC disputes the significance of the evidence.  NTC points out that NTC's

7   own actual output data – which was not used in compiling Dr. Cox's exhibit 10 – indicates

8   that between October 2001 and March 2002 (e.g., during 2001Q4 and 2002Q1), NTC's

9   output of finished DRAM wafers ("wafer outs") actually increased, with the exception of only

10  November 2001 and February 2002.  See Reply Declaration of Vincent O'Brien in Support

11  of Nanya's Motions for Summary Judgment ("O'Brien Reply Decl."), Ex. A, E.  Similarly,

12  NTC's sales grew, instead of fell, from the fourth quarter of 2001 to the first quarter of 2002.

13  See id. at Ex. B.  To the extent that November 2001 and February 2002 saw any decline in

14  "wafer outs," NTC submits that the declines were due in part to "yield" issues (i.e., a decline

15  in the amount of viable DRAM chips that NTC was able to produce from raw wafers), as

16  NTC shifted production from 128 Mb of DRAM to 256 Mb of DRAM.  See O'Brien Reply

17  Decl., Ex. A.; Ex. C at NTC 65-00006200; Ex. E at NTC 73-00022899-22922; Ex. F at NTC

18  73-00037436.

19       Generally speaking, evidence that a defendant reduced production at the same time

20  as other admitted members of an alleged conspiracy may be relevant on the question of

21  conspiratorial conduct.  See In re Petroleum Prod. Antitrust Litig., 906 F.2d 432, 460-62 (9th

22  Cir. 1990) (considering conspiracy allegations based in part on supply reduction); see also,

23  e.g., In re Citric Acid, 191 F.3d at 1102 (evidence of parallel pricing decisions undertaken

24  by defendant also relevant to conspiracy question, in conjunction with other "plus" factors).

25  Here, however, the evidence ultimately does not support the inference of a conspiracy.

26  This is because defendants have articulated a plausible competitive justification for any

27  production cut.  As they point out, although there were wafer out production declines in

28

19

1   November 2001 and February 2002 – periods that fall within 2001Q4 and 2002Q1 as

2   indicated in exhibit 10 to the Cox report – those production declines appear to be

3   attributable to root causes.  The November 2001 decline, for example, corresponded with

4   NTC's decreased production of 128 Mb DRAM chips, as its second fabrication plant

5   switched over to 256 Mb DRAM chips, and its first fabrication plant, which was focusing on

6   the 128 Mb DRAM chips, experienced yield problems.  <u>See</u> O'Brien Reply Decl., A; Ex. C

7   at NTC 64-00006200; Ex. E at NTC 73-00022899-22922; Ex. F at NTC 73-00037436.  The

8   February 2002 decline also occurred in tandem with reported yield problems.  <u>See id.</u> at Ex.

9   D at NTC 64-00012021; Ex. G at NTC 73-00008704-8709.

10       Not only does this evidence demonstrate a plausible justification for NTC's 2001Q4

11   and 2002Q1 decreased wafer out DRAM production, but the justification is made more

12   plausible by Mr. Kau's testimony, noted elsewhere herein, that NTC did not cut its DRAM

13   production pursuant to any agreement to do so.  <u>See</u>  Benjamin Reply Decl., Ex. A at 160-

14   161.

15       In the face of this evidence, plaintiffs must "provide specific evidence tending to

16   show that the defendant was *not* engaging in permissible competitive behavior." <u>See, e.g.,</u>

17   <u>In re Citric Acid Litig.</u>, 191 F.3d at 1094.  In other words, as explained in the legal standard

18   section above, plaintiffs' evidence must tend to *exclude* the possibility of independent

19   behavior.  <u>Id.</u> at 1096.  Here, plaintiffs' evidence of output reduction – the sum total of

20   which appears to be evidenced by Exhibit 10 to the Cox report – does not, in the face of the

21   evidence demonstrating a production shift to 256 Mb chips at one of NTC's fabrication

22   plants, and yield problems, tend to exclude the possibility that NTC, acting independently,

23   suffered declines as a result of internal decision-making, rather than a coordinated effort at

24   output reduction.

25       <u>NTC's failure to price aggressively and grow market share</u>.  Plaintiffs also contend

26   that NTC failed to price aggressively during the conspiracy period and consistently passed

27   up opportunities to undercut competitors and grow its market share, something NTC would

28

<div align="center">20</div>

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1   have done if it had been behaving competitively.  See Opp. Br. at 20:23-24.  Plaintiffs rely

2   for support on three exhibits produced from non-NTC sources, relaying through emails and

3   spreadsheet notes, NTC's supposed price quotes for DRAM at different points in November

4   and December 2001.  Plaintiffs point out that the prices quoted therein show that NTC's

5   DRAM price was among the highest among competitors, and that NTC would not come

6   down from the price of DRAM it was quoting to Dell Computers, despite Dell's desire to

7   negotiate a lower price.  See Sampson Decl., Exs. 63, 116, 118.

8        Preliminarily, the court once again confronts NTC's hearsay objections, which NTC

9   has submitted in response to all three exhibits.  The court is of the opinion that all three

10  constitute inadmissible hearsay.  For the reasons already described in connection with

11  plaintiffs' direct evidence of conspiracy, plaintiffs' invocation of the co-conspirator exception

12  does not save the evidence.  See Fed. R. Evid. 801(d)(2)(E).  Nor does plaintiffs' invocation

13  of other hearsay exceptions, as the court finds that the statements contained in the exhibits

14  do not bear on the declarants' state of mind, and there is insufficient foundational testimony

15  upon which to base application of the business records exception.  See, e.g., Plaintiffs'

16  Summary Responses to Winbond and Nanya Defendants' Objections to Exhibits, Ex. C.

17  Furthermore, none of the documents exhibit any indicia of reliability that would incline the

18  court toward admitting the documents.  Accordingly, the court hereby sustains NTC's

19  objections to the documents.

20       Even if the court were to consider the documents substantively, it would still decline

21  to find that the evidence supports an inference of collusive behavior.  To begin with, none

22  of the documents compel the conclusion that plaintiffs urge upon the court – i.e., that NTC

23  consistently passed up opportunities to grow market share by lowering prices.  The

24  statements contained in the documents show only that: (1) on December 19, 2001, David

25  Lin, an Elpida employee, had been told by one of his "buddies" that NTC was quoting a

26  "$21/$42" DRAM price that NTC wanted to raise in January; (2) that Mr. Lin was also aware

27  that back on November 23, 2001, NTC had tried to "increase pricing" but failed; and (3) that

28

United States District Court

For the Northern District of California

1 earlier still, on November 8, 2001, Mr. Lin had "polled the market" and discovered that NTC

2 would not be moving on price.  See Sampson Decl., Exs. 63, 116, 118.  These statements

3 indicate, at most, that someone at NTC told Mr. Lin that NTC had a desire to raise prices.

4 But they do not establish or even suggest whether NTC actually did, in fact, raise prices, or,

5 to the contrary, whether NTC refused to raise prices, or refused to compete for Dell's

6 business by lowering price.  Nor does the evidence indicate whether NTC had a habit of

7 passing up opportunities to increase market share, as plaintiffs contend.  Indeed, NTC

8 points to evidence that demonstrates the opposite – that, during the same time period, NTC

9 *increased* both overall DRAM production and total sales of DRAM (accomplished through

10 NTC USA).  See O'Brien Decl., Ex. B; O'Brien Reply Decl., Ex. E.

11      Moreover, plaintiffs do not rely on any legal authority that requires a defendant to

12 have affirmatively engaged in undercutting competitors in order for the court to consider

13 that defendant as having acted competitively.  Although plaintiffs cite most persuasively to

14 In re Citric Acid, the Ninth Circuit there did not hold that undercutting competitors is

15 generally evidence of competitive behavior, let alone did it hold that lack of evidence as to a

16 defendant affirmatively undercutting its competitors supports an inference of uncompetitive

17 behavior.  It simply held that, in the case before it, evidence that defendant priced

18 aggressively in its actual contracts and had gained market share by consistently

19 underpricing its competitors in the price-fixed market, was sufficient to demonstrate the

20 possibility that defendant acted legally in its pricing decisions.  See 191 F.3d at 1103.

21      Here, by contrast, plaintiffs' evidence – which does not conclusively indicate whether

22 NTC priced aggressively with respect to Dell, or whether it had a policy of pricing

23 aggressively – fails to exclude the possibility that NTC was acting competitively as a whole,

24 particularly in view of the fact that the evidence does indicate that NTC's sales and

25 production were increasing.  As such, it simply cannot be said that, based on the three

26 exhibits relied on by plaintiffs, they have sufficiently excluded the possibility that NTC was

27 acting competitively and in its own self-interest.

28

22

1   <u>Compaq auction</u>.  Finally, plaintiffs point to NTC's purported refusal to bid in a

2   DRAM auction held by Compaq, as proof that NTC was engaged in behavior against its

3   own self-interest, and therefore that an inference of conspiratorial activity may be made.

4   <u>See</u> Sampson, Ex. 93 at 173:4-177:2 (deposition testimony of Ken Hurley, Nanya USA's

5   President).  On its face, however, this evidence cannot support an inference of collusive

6   activity by NTC.  The evidence – which is the sole basis for plaintiffs' claim – refers to *NTC*

7   *USA*'s refusal to participate in the Compaq auction, not NTC's.  And since, as discussed

8   previously, NTC USA's actions here may not be imputed to NTC for liability purposes, the

9   evidence fails to raise a material dispute of fact with respect to NTC's participation in the

10   alleged conspiracy.

11       In sum, the court concludes that none of the 'economic' evidence relied on by

12   plaintiffs supports an inference of collusive activity on NTC's part.  This is true whether the

13   evidence is viewed independently, or in the aggregate, as the evidence simply does not

14   tend to exclude the possibility that NTC acted in a competitive manner.

15               b.     NTC's "frequent, high-level communications"

16       Besides the economic evidence, plaintiffs also rely on evidence of NTC's allegedly

17   frequent communications with the other co-defendants as circumstantial evidence that

18   supports an inference of collusive activity.  Specifically, plaintiffs point to communications

19   that took place throughout five different periods:  summer 2001; fall 2001; November 2001;

20   December 2001/January 2002; and early 2002 through June 2002.  All of these

21   communications, argue plaintiffs, corresponded with collusive activity taking place in the

22   DRAM market.

23       The communications themselves are extensive.  For each of the periods mentioned,

24   plaintiffs cite to numerous emails or correspondence between the Nanya defendants and

25   various other defendants, detailing alleged exchanges of information and meetings

26   between the parties, all of which purportedly track the defendants' alleged production cuts

27   and price increases.  <u>See, e.g.</u>, Sampson Decl., Exs. 15, 22, 46, 55, 57, 86, 94, 103

28

23

1   Appendix A, 105-112, 114-125, 127-129, 132-34.

2          Despite its volume, however, there exist fundamental problems with the evidence.

3   Namely, the communications relied on by plaintiffs are largely irrelevant as far as NTC is

4   concerned.  For the vast majority of the "high-level" communications relied upon by

5   plaintiffs concern NTC USA, not NTC.  See, e.g., id. at Exs. 94, 103 Appendix A, 105, 106,

6   111-12.  Once again, for the reasons already outlined, NTC USA's contacts cannot be

7   imputed to NTC.  As such, to the extent this is true, the court disregards those

8   communications dealing with NTC USA.

9          This leaves the court with exhibits such as 46, 57, and 120 to the Sampson

10  Declaration.  These exhibits are communications made within Mosel Vitelic, discussing or

11  reiterating the prices applicable to "Nanya's" DRAM.  Preliminarily, it is not clear whether

12  the communications even refer to NTC as opposed to NTC USA, as they by refer only to

13  "Nanya" generally.  More importantly, however, these exhibits do not constitute probative

14  information that tends to exclude the possibility of permissible competitive conduct.  At

15  best, they merely repeat pricing information that has presumably been relayed to the

16  sender by a marketing director at NTC.  See id. at Ex. 46.  But there is nothing inherently

17  wrong with a company's marketing director sharing pricing information with another

18  company. See In re Citric Acid,191 F.3d at 1103, citing In re Baby Food, 166 F.3d 112, 126

19  (3d Cir. 1999)("[C]ommunications between competitors do not permit an inference of an

20  agreement to fix prices unless 'those communications rise to the level of an agreement,

21  tacit or otherwise.'"); Rutledge v. Elec. Hose & Rubber Co., 327 F. Supp. 1267, 1271 (C.D.

22  Cal. 1971)("Absent an agreement to fix prices, there is nothing unlawful about competitors

23  meeting and exchanging price information or discussing problems common in their

24  industry, or even exchanging information as to the cost of their product.").

25         This same analysis applies to other exhibits relied on by plaintiffs, which constitute

26  communications and correspondence that do not expressly implicate NTC – or even come

27  from NTC – but at most refer to "Nanya" generally.  See, e.g., Sampson Decl., Exs. 116-

28

24

1   119.

2        Accordingly, even crediting the three exhibits as referring to NTC rather than NTC

3   USA as evidence, they still do not provide a basis from which the court may infer

4   conspiratorial activity.  Thus the court rejects the evidence of "high-level" communications

5   as circumstantial proof that NTC engaged in collusive activity.

6                    c.    guilty pleas

7        Finally, plaintiffs urge the court take notice of certain guilty pleas that other co-

8   defendants have entered into, as well as the fact that NTC USA's employees invoked the

9   Fifth Amendment during their depositions.

10       First, as NTC points out, it is improper for the court accept evidence of the co-

11  defendants' guilty pleas as evidence tending to support an inference of NTC's collusive

12  activity when none of those guilty pleas implicated NTC in their criminal activity.  Given that

13  NTC was not implicated, the court declines to consider these pleas as evidence bearing on

14  NTC's participation in the alleged unlawful activity.

15       Second, and with respect to any adverse inferences to be drawn from the testimony

16  of NTC USA's employees, the fact remains, as noted above, that there is simply no basis

17  here upon which to impute NTC USA's actions or testimony to NTC.  Accordingly, the court

18  similarly declines to draw an adverse inference as to NTC's participation in the alleged

19  conspiracy, based on testimony or lack of testimony of NTC USA employees.

20       Accordingly, the court does not find that the evidence of other co-defendants' guilty

21  pleas, or the invocation of 5th Amendment protection by NTC USA employees, supports an

22  inference of collusive activity with respect to NTC.

23                                  * * *

24       In conclusion, and having considered plaintiffs' circumstantial evidence, individually

25  and in the aggregate, the court simply cannot find that the evidence relied on by plaintiffs

26  supports an inference of collusive activity on NTC's part, under the standard contemplated

27  by Matsushita.  Accordingly, the court hereby GRANTS summary judgment in NTC's favor.

28

**United States District Court**
For the Northern District of California

25

34

**United States District Court**
For the Northern District of California

1          C.     NTC USA's Motion for Summary Judgment

2          NTC USA makes the same general argument that NTC made – i.e., that there is no

3   evidence of NTC USA's involvement in the alleged conspiracy to fix the market prices for

4   DRAM.  NTC USA's focus, however, is slightly different than NTC.  Since NTC USA does

5   not actually manufacture DRAM, but only buys and sells the DRAM manufactured by its

6   parent corporation, NTC USA does not address proof of conspiracy via concerted output

7   reduction.  Rather, it focuses on plaintiffs' ability to prove a section 1 violation via an actual

8   agreement to fix prices, or an exchange of price information among defendants.  NTC USA

9   argues that plaintiffs cannot demonstrate NTC USA's participation in either activity.  It

10  contends that, not only is the evidence insufficient to prove an agreement or an exchange

11  of information, but the evidence does not even support the conclusion that DRAM pricing

12  was affected by any of NTC USA's actions.

13         Before weighing the evidence of NTC USA's participation in conspiratorial activity,

14  the court preliminarily addresses two of the arguments raised by NTC USA.  First, whether

15  the court should employ a rule of reason analysis.  NTC USA relies on Dr. Noll's report and

16  testimony, and argues that the analysis therein demonstrates that plaintiffs have rejected a

17  price-fixing claim in favor of alleging an unlawful exchange of price information.  This type

18  of activity, asserts NTC USA, is not subject to per se treatment, but rather to a rule of

19  reason analysis.

20         The court declines this invitation, however.  Plaintiffs have alleged that all

21  defendants participated in an agreement to fix, raise, and maintain the price of DRAM, and

22  that, in order to effectuate that agreement, defendants engaged in numerous actions,

23  including a coordinated reduction in DRAM output, as well as engaging in meetings and

24  discussions with each other regarding price.  See Third Consolidated Amended Class

25  Action Complaint, ¶ 61-64.  Dr. Noll's expert report is but one of the types of evidence on

26  which plaintiffs rely to support the allegation of collusive activity.  See, e.g., Saveri Decl.,

27  Ex. A at 2-6.  And while NTC USA is correct, as stated in Dr. Noll's report and testimony,

28

26

United States District Court

For the Northern District of California

1   that plaintiffs assert that NTC USA unlawfully exchanged price information, such testimony

2   and evidence is consistent with plaintiffs' allegation that NTC USA did so *in a manner*

3   *consistent with an overriding agreement* to fix price and reduce supply.[6]  And such

4   allegations, if proven, support per se treatment.  See United States v. Socony-Vacuum Oil

5   Co., 310 U.S. 150 (1940); see also In re Petroleum Prods. Antitrust Litig., 906 F.2d 432,

6   445-50 (9th Cir. 1990)(proof that competitors shared price information treated as evidence

7   of per se illegal conspiracy to fix prices).  In sum, while plaintiffs' ability to prove NTC USA's

8   involvement in the alleged conspiracy remains to be seen, there is simply no basis upon

9   which to deviate from the well-accepted principle that a conspiracy to fix prices – even if

10  effectuated in part by an exchange of information regarding price – is worthy of per se

11  treatment.

12        Second, the court addresses NTC USA's intimation that it cannot be held liable for

13  an unlawful conspiracy to reduce output, as alleged by plaintiffs in their complaint, because

14  it does not actually manufacture any DRAM, but rather buys and sells DRAM obtained from

15  its parent company NTC.  While this may be true, it is not exculpatory.  It is well-settled, as

16  a principle of co-conspirator liability, that even if NTC USA did not itself engage in a

17  reduction in DRAM output, it may nonetheless be held liable for the actions of other co-

18  defendants in reducing their DRAM output, if it is proven that NTC USA otherwise

19  participated in an unlawful conspiracy with those defendants.  See, e.g., BBD Transp. Co.,

20  Inc. v. Southern Pac. Transp. Co., 627 F.2d 170, 173 (9th Cir. 1980)("To be liable as a co-

21  conspirator for the anticompetitive acts of [other co-conspirators], the railroads need not

22  have known of or participated in those acts themselves.").

23

24        [6]       Moreover, contrary to NTC USA's characterization of Dr. Noll's testimony, what
25  Dr. Noll actually said was that plaintiffs' collusion allegations can include the exchange of
    information regarding price, *in addition to* "a naked price fixing agreement."  See Benjamin
26  Decl., Ex. W at 164:3-17.  This supports, rather than undercuts, the application of per se
    analysis here.  To the extent, therefore, that NTC USA's arguments address the need for
27  plaintiffs to establish harm or impact on the market, as part of a rule of reason analysis, NTC
    USA's arguments are irrelevant.  See, e.g., National Soc'y of Prof'l Eng'rs v. United States, 435
28  U.S. 679, 690 (1978)(rule of reason requires analysis of alleged conduct's effect on market).

27

**United States District Court**
For the Northern District of California

1      Having dispensed with these preliminary issues, the salient issue as to NTC USA

2  remains:  whether there is any direct or circumstantial evidence that NTC USA participated

3  in any unlawful conspiracy to fix, maintain, or stabilize, the price of DRAM.

4      NTC USA asserts, not only that the evidence does not support plaintiffs' allegations

5  against it, but that the evidence affirmatively answers this question in the negative.  NTC

6  USA points, for example, to the various testimony of other co-defendants' employees, in

7  which every single one states that they had no pricing communications with NTC USA.

8  See Benjamin Decl., Exs. A-S.  It also points to the testimony of its expert, Dr. Cox, noting

9  NTC USA's small market share, stating that NTC USA was expanding its business during

10  the relevant time period, rather than restricting it – as would be consistent with

11  anticompetitive behavior – and further opining that NTC USA was committed to aggressive

12  and competitive pricing.  See Hurley Decl., ¶ 7.  NTC USA even relies on Dr. Hall's

13  testimony, in which he acknowledges that Micron, an admitted co-conspirator, testified that

14  it was *unsuccessful* in getting Nanya USA President Ken Hurley to go along with it in its bid

15  to raise prices.  See Benjamin Decl., Ex. Y.  All of which, according to NTC USA, points to

16  an utter lack of evidence tying it to the conspiracy alleged by plaintiffs.

17      This evidence is sufficient to switch the burden to plaintiffs to come forward with

18  either direct or circumstantial evidence that creates a material issue of fact regarding NTC

19  USA's involvement in the alleged section 1 conspiracy.  Plaintiffs attempt to meet this

20  burden with the same argument and evidence that was submitted in response to NTC's

21  motion.  As it did in connection with NTC's motion, the court has attempted to distinguish

22  the evidence where it is clear that it relates to NTC USA specifically.

23                 1.     Direct Evidence of Conspiracy

24      Plaintiffs' "direct" evidence of NTC USA's participation in the overarching DRAM

25  conspiracy is largely the same as that which was discussed in connection with NTC's

26  motion.  Namely, that NTC USA participated in "secret" meetings with its fellow Taiwanese

27  manufacturers to discuss cutbacks and price increases.

28

28

**United States District Court**
For the Northern District of California

1    For support, plaintiffs rely for the most part on the same evidence already discussed

2    – i.e., Micron emails, and news articles in which NTC's president, Mr. Kau, is quoted.  See

3    Sampson Decl., Exs. 13-15, 22-24, 86.  Substantively, this evidence fails for the same

4    reasons discussed in connection with NTC's motion.  In addition, however, the evidence

5    fails because it relates to the actions of NTC and NTC's President, *not* directly to NTC

6    USA, or NTC USA's president, Kenneth Hurley.  And, as stated above, NTC USA cannot

7    be liable for NTC's acts and events without proving some theory of liability that would allow

8    such a conclusion, which plaintiffs have not done.

9    This is not to say that plaintiffs have submitted *no* evidence specific to NTC USA.

10   For plaintiffs also rely on an email that indicates that a meeting was scheduled for

11   November 2001 between Mr. Kau, Mr. Hurley, and Mike Sadler, among others.  See

12   Sampson Decl., Ex. 87.  Mr. Sadler was a Micron executive, alleged by plaintiffs to be the

13   "ringleader" of the conspiracy.

14   The court does not find this email, however, to be direct evidence of NTC USA's

15   participation in the alleged conspiracy.  To begin with, it requires the court to draw the

16   inference that the alleged meeting actually took place, for the email itself only indicates that

17   such a meeting was scheduled.  See In re Citric Acid Litig., 191 F.3d at 1093 (direct

18   evidence of conspiracy requires no inferences).  Although this deficiency is not critical,

19   given that NTC USA has conceded the meeting's existence, see NTC USA Reply Br. at

20   3:1-9, the fact that NTC USA points to evidence establishing a legitimate business reason

21   for the meeting *is* critical.  Specifically, NTC USA points to the deposition testimony of Mr.

22   Kau, Mr. Hurley, and Mr. Appleton – Micron's president who was also at the meeting.  All

23   testify that the purpose of the meeting was to discuss the possibility of technological

24   collaboration between the two entities, since NTC USA's original licensor was exiting the

25   DRAM business.  See Benjamin Reply Decl., Ex. A at 76-80; Ex. I at 72-75; Ex. K at 187-

26   88.  Moreover, none of the deponents recall that any discussions regarding DRAM pricing

27   took place at the meeting.  See id.  Plaintiffs submit no evidence that actually refutes these

28

United States District Court

For the Northern District of California

1   facts.  In view of this, the court does not find that the email relied on by plaintiffs constitutes

2   direct evidence of NTC USA's participation in the overarching conspiracy.

3       Accordingly, with no other evidence to rely on, the court concludes that plaintiffs

4   have not submitted sufficient direct evidence of NTC USA's participation.

5           2.   Circumstantial Evidence of Conspiracy

6       The court next turns to plaintiffs' circumstantial evidence connecting NTC USA to the

7   alleged conspiracy.  In turning to this evidence, the court is mindful once again that the

8   principles espoused in Matsushita, as reaffirmed by the Ninth Circuit in In re Citric Acid,

9   apply.

10      Preliminarily, NTC USA has come forward with evidence that its participation in the

11  alleged conspiracy would be economically implausible.  It points to its small market share,

12  which ranged from 1.4% in 1999 to 5.5% in 2002 at the end of the class period; the fact

13  that with such a small market share NTC USA could not be expected to have had an

14  impact on the market for DRAM by its participation in any conspiracy; Dr. Noll's supporting

15  explanation that price collusion is not possible unless a seller involved in the collusion

16  represents a significant portion of the market share (e.g., 40 to 60 percent); and the fact

17  that NTC USA was pricing aggressively during the time period in question.  See, e.g., Cox

18  Decl., Ex. A at 10, ¶¶ 7-11; Benjamin Decl., Ex. Y at 7, Ex. W at 183:16-22; Hurley Decl., ¶

19  7.  The court finds this evidence sufficient to shift the burden to plaintiffs, who must, in

20  order to defeat summary judgment, come forward with evidence tending to exclude the

21  possibility that NTC USA was engaging in permissible competitive behavior.  See In re

22  Citric Acid, 191 F.3d at 1094.  In other words, plaintiffs must introduce evidence sufficient

23  to exclude the possibility of independent conduct by NTC USA, such that an inference of

24  collusion is reasonable.  See id. at 1096.

25      Here, too, plaintiffs' circumstantial evidence largely overlaps with that already

26  discussed in connection with NTC's motion for summary judgment.  This includes plaintiffs'

27  (a) economic evidence; (b) evidence of NTC USA's "frequent, high-level communications"

28

30

1   correlated to specific collusive behavior; and (c) evidence of co-defendants' guilty pleas in

2   the DOJ's related criminal antitrust proceedings.  Each category, as it relates to NTC USA,

3   is discussed in turn.

4                           a.    economic evidence

5        Generally speaking, plaintiffs rely on the same economic evidence here as they did

6   with NTC – i.e., evidence relating to the structure of the DRAM market, and evidence

7   relating to NTC USA's anticompetitive behavior.

8        With respect to its evidence relating to the structure of the DRAM market, plaintiffs

9   again rely on Dr. Noll's report and testimony, as well as Dr. Cox's testimony regarding

10  increasing technological advances exhibited by NTC and NTC USA.  The merits of the

11  parties' competing arguments on this point – and whether NTC USA's collusion in the

12  market would make economic sense – need not be repeated here.  It is sufficient for the

13  court to reiterate only that this evidence, while relevant, is not in and of itself a sufficient

14  basis upon which to infer a conspiracy.  <u>See In re Flat Glass</u>, 385 F.3d at 360 n. 12.

15       With respect to plaintiffs' evidence regarding NTC USA's anticompetitive behavior,

16  however, the arguments and evidence related to NTC USA are slightly different.  Contrary

17  to their arguments with respect to NTC, plaintiffs here do not submit evidence that NTC

18  USA reduced its output of DRAM.  As already noted, they cannot, since NTC USA did not

19  actually manufacture DRAM, but rather purchased it from NTC.

20       Plaintiffs do argue that, as with NTC, NTC USA (1) failed to grow its market share by

21  pricing aggressively, and (2) failed to compete by refusing to bid in an auction held by

22  computer manufacturer Compaq.  However, the analysis of these two claims is slightly

23  different with respect to NTC USA.

24       <u>Failure to grow market share/price aggressively</u>.  For proof of NTC USA's failure to

25  price aggressively and grow market share during the relevant time period, plaintiffs rely on

26  the same documents as they did with respect to NTC's motion – i.e., the three exhibits

27  produced from non-NTC sources, relaying through emails and spreadsheet notes NTC's

28

<div align="left"><strong>United States District Court</strong><br>For the Northern District of California</div>

31

**United States District Court**
For the Northern District of California

1   supposed price quotes for DRAM at different points in November and December 2001.

2   Plaintiffs, once again, are seeking to prove that the prices quoted therein show that NTC

3   USA's DRAM price was the highest among competitors, and that NTC USA would not

4   come down from the price of DRAM it was quoting to Dell Computers.  See Sampson Decl.,

5   Exs. 63, 116, 118.

6          As the court has already found, these documents constitute inadmissible hearsay,

7   and are therefore inadmissible.  Moreover, even if substantively admitted, they would not

8   support an inference of conspiracy, as they do not actually demonstrate NTC USA's failure

9   to price aggressively and grow market share.

10          Most significantly, however, plaintiffs' argument on this point fails because they have

11   not disputed the most fundamental point argued by NTC USA – that, during the class

12   period, NTC USA actually succeeded in *increasing* sales and market share.  See, e.g., Cox

13   Decl., ¶¶ 13-14.  Without disputing this point, plaintiffs cannot demonstrate NTC USA's

14   failure to grow market share, or otherwise support any inference of conspiracy whatsoever.

15   See In re Citric Acid, 191 F.3d at 1102 (lack of evidence in record establishing that

16   defendant's market share stayed the same required conclusion that inference of conspiracy

17   was "necessarily unreasonable").

18          Accordingly, plaintiffs' lack of evidence on this point does not enable the court to

19   infer that NTC USA conspired with any co-defendants in unlawful section 1 activity.

20          Compaq auction.  Plaintiffs assert that NTC USA's anticompetitive behavior with

21   respect to the Compaq auction supports an inference of conspiracy.  Specifically, plaintiffs

22   contend that NTC USA refused to bid in the Compaq auction –  which was held in order to

23   attempt to procure DRAM at lower prices – pursuant to the DRAM cartel's goal of ensuring

24   that no competitor bid in the auction, thereby keeping the prices for DRAM high.  See Opp.

25   Br. at 21:13-14.

26          This evidence, too, fails.  NTC USA's president, Mr. Hurley, specifically states that

27   NTC USA had a policy in place that forbid it from bidding in auctions, including the Compaq

28

32

United States District Court
For the Northern District of California

1   auction.  See Hurley Decl.,¶¶ 8-9.  Mr. Hurley testified that the no-bid policy was prompted

2   by the potential for market forces to intervene between auction and delivery of DRAM to

3   create a loss for the manufacturer.  See id.  This is a plausible explanation for NTC USA's

4   refusal to bid in the auction.

5        In response, plaintiffs contend that the no-bid policy was inherently anticompetitive,

6   but present no authority for this conclusion.  Nor do they submit contrary evidence

7   establishing that Mr. Hurley's explanation is purely pretextual.  Indeed, plaintiffs offer only

8   speculation, and a series of rhetorical questions (i.e., why wouldn't Nanya USA make an

9   "exception" in the case of the Compaq auction?), in their attempt to create an issue of

10  material fact on the issue.  See Opp. Br. at 21:19-21.

11       Based on the record before it, the court cannot conclude that plaintiffs' evidence

12  regarding the Compaq auction sufficiently overcomes NTC USA's plausible explanation for

13  its no-bid policy, such that an inference of collusive activity is reasonable.

14              b.      NTC USA's "frequent, high-level communications"

15       Plaintiffs again rely on proof of numerous communications between and among NTC

16  USA employees and competitors, in their effort to establish an inference of conspiracy.

17  The communications purportedly took place throughout five different periods in 2001 and

18  2002, and plaintiffs assert that all can be tied to NTC USA's pricing decisions.

19       As a preliminary matter, the court notes that the evidence of communications relied

20  on by plaintiffs with respect to NTC USA is of a different character than that relied on in

21  connection with NTC.  Whereas plaintiffs' submission of actual evidence with respect to

22  NTC's contacts was slim, this is not the case with respect to NTC USA.  Plaintiffs have

23  submitted evidence with respect to the latter that indicates a much higher volume of

24  communication and contact with other defendants.

25       Having reviewed all evidence submitted by plaintiffs in connection with this issue, the

26  court finds that the evidence can generally be classified into two general categories:  (i)

27  communications from or to NTC USA regarding NTC USA's contacts with defendants; and

28

                                          33

**United States District Court**
For the Northern District of California

1    (ii) communications from or to non-NTC USA sources regarding NTC USA's contacts with

2    defendants.

3          The correspondence from or to NTC USA sources demonstrates that numerous

4    contacts and communications took place during the relevant period between NTC USA

5    executives – namely, Mr. Hurley and North American Sales Director Mike Walsh – and

6    other defendants.  See Sampson Decl., Ex. 103 Appendix A, Ex. 105, Exs. 106,109-112,

7    114, 124; see also Benjamin Reply Decl., Ex. R.  While it seems apparent that some of the

8    evidence, when viewed for its substance, conveys only innocent information, it is equally

9    apparent that some of the evidence conveys actions taken by NTC USA executives that

10   may, in fact, be suggestive of collusive behavior.  See, e.g., id. at Ex. 105 at 39 (describing

11   Mr. Hurley's "chance encounter" with alleged co-conspirators), cf. Ex. 130 at 103-05 (Steve

12   Thorsen deposition testimony re discussions with Mr. Hurley re DRAM pricing); see also In

13   re Citric Acid, 191 F.3d at 1103 (suggesting that specific discussions between competitors

14   regarding price may give rise to inference of conspiracy).

15          This also holds true with respect to the communications relied from or to non-NTC

16   USA sources regarding NTC USA's communications with defendants.  See Sampson Decl.,

17   Exs. 15, 22, 46, 55, 57, 86, 107-08, 115-123, 125, 127-129, 132-34.  Some of these

18   communications indicate innocent conduct.  See id. at Ex. 133 (email from Elpida employee

19   merely noting he had "polled the market place and found that most suppliers have moved

20   to $38 for 128MB SDR").  Some are more suggestive.  Id. at Ex. 134 (Hynix notes

21   conveying detailed product information purportedly learned from "Nanya", including price

22   info).[7]

23   _____

24          [7]    Defendants have lodged numerous objections to the documents discussed
     herein.  The court notes that some of the documents relied on by plaintiffs and objected to by
25   defendants – particularly those belonging to the first category of communications from or to
     NTC USA – are admissible.  See, e.g., Sampson Decl., Exs. 106, 111-12.  By contrast, it is
26   unlikely that many of the documents belonging to the category of communications from or to
     non-NTC USA sources are admissible.  See, e.g., Sampson Decl., Exs. 46, 57.  The court
27   need not rule on the admissibility of all documents submitted and at issue, however; it is
     enough that it finds some documents admissible and sufficient to raise a triable issue of
28   material fact, as described above.  The parties are, of course, entitled to raise objections to

34

1    As such, and given the volume of communications present, and the varying degrees

2  to which the communications may suggest collusive activity by NTC USA, the court finds

3  that plaintiffs have, in fact, successfully met their burden in arguing that the evidence,

4  considered as a whole, might reasonably support the inference that NTC USA conspired

5  with the admitted conspirators in this action, to fix the actual prices for DRAM in the

6  marketplace.  The volume of contact and communications, and the presence of at least

7  some discussion regarding pricing, when viewed in the aggregate, and considering the fact

8  that some of the defendants and individuals with whom NTC USA was communicating are

9  admitted conspirators in this action, support this inference.

10    Accordingly, the court concludes that plaintiffs have presented a disputed issue of

11  fact as to proof of NTC USA's involvement in the overarching conspiracy alleged by

12  plaintiffs.

13                    c.    guilty pleas

14    Finally, plaintiffs once again argue that the guilty pleas entered into by other co-

15  defendants, and the fact that three of NTC USA's employees invoked the Fifth Amendment

16  at their depositions, further supports an inference of conspiracy.  For the reasons already

17  discussed in connection with NTC's motion, the court declines to accept the former – i.e.,

18  other co-defendants' guilty pleas –  as evidence of conspiracy.

19    The court also comes to the same conclusion with respect to the latter.  However,

20  the court's analysis in doing so, is different than before.  This is because, whereas it would

21  *not* have been proper to draw adverse inferences against NTC based on *NTC USA*

22  employees' invocation of the 5th Amendment, it *may* be proper draw those inferences

23  against NTC USA.

24    The seminal case on the issue, <u>Baxter v. Palmigiano</u>, 425 U.S. 308 (1976), holds

25  that adverse inferences are permissible in certain situations.  However, lower courts

26  interpreting <u>Baxter</u> have been uniform in suggesting that the key to the <u>Baxter</u> holding is

27  _____

28  evidence not ruled on herein at trial.

35

**United States District Court**

For the Northern District of California

United States District Court

For the Northern District of California

1   that such adverse inference can only be drawn when independent evidence exists of the

2   fact to which the party refuses to answer.  See, e.g., LaSalle Bank Lake View v. Seguban,

3   54 F.3d 387, 391 (7th Cir.1995); Peiffer v. Lebanon Sch. Dist., 848 F.2d 44, 46 (3d

4   Cir.1988).  Thus, an adverse inference can be drawn when silence is countered by

5   independent evidence of the fact being questioned, but that same inference cannot be

6   drawn when, for example, silence is the answer to an allegation contained in a complaint.

7   See Nat'l Acceptance Co. v. Bathalter, 705 F.2d 924, 930 (7th Cir.1983).  This

8   interpretation is, however, premised on the basic notion that, prior to drawing any adverse

9   inference, there must be, at a minimum, a foundation laid by the party seeking the adverse

10  inference, as to the fact upon which such an inference should be taken.

11        Here, plaintiffs have not made a sufficient foundational showing regarding the

12  specific questions and facts upon which they would like adverse inferences to be drawn.

13  Accordingly, the court will not grant them a sort of generic adverse inference based on the

14  mere fact that three of NTC USA's employees asserted the 5th Amendment.

15                                            * * *

16        In conclusion, and based on all the above, the court DENIES NTC USA's motion for

17  summary judgment regarding its liability pursuant to section 1 of the Sherman Act.

18  Plaintiffs have successfully demonstrated that disputed issues of fact are present with

19  respect to NTC USA's participation in the alleged conspiracy, based on circumstantial

20  evidence of NTC USA's contacts and communications with competitors.

21        D.     Motion for Summary Judgment re DRAM Purchases from April 1, 2001 to
               November 30, 2001
22

23        Defendants seek an order declaring that plaintiffs' claims based on DRAM

24  purchases made during the period April 1, 2001 through November 30, 2001, fail as a

25  matter of law.  Defendants contend that plaintiffs have admitted they cannot prove impact

26  for this eight month period, and that as a result, all claims based on purchases made during

27  this period are doomed.

28

                                            36

1    Plaintiffs who bring suit for antitrust violations pursuant to section 4 of the Clayton

2   Act must satisfy antitrust standing requirements.  This standing requirement means that a

3   plaintiff must prove that he or she has been (1) "injured in his business or property; and (2)

4   "by reason of anything forbidden in the antitrust laws...".  See 15 U.S.C. § 15(a).  The first

5   of these two elements, which is at issue here, refers to 'impact,' whereby plaintiffs must

6   demonstrate the 'fact of damage', or the existence of injury to themselves.

7    The parties here do not actually dispute the fundamental legal standards applicable

8   for analyzing antitrust 'impact'.  Defendants, for instance, note the well-established maxim

9   that impact, or injury itself, is the "sine qua non" for stating a cause of action based on

10  antitrust conspiracy.   See, e.g., McClure v. Undersea Indus., Inc., 671 F.2d 1287, 1289

11  (11th Cir. 1982).  Plaintiffs, for their part, cite to legal authority indicating that antitrust

12  impact is satisfied by proof that the antitrust violation alleged is a material and substantial

13  cause of plaintiffs' injury.  See, e.g., Rossi v. Standard Roofing, Inc., 156 F.3d 452, 483 (3d

14  Cir. 1998); see also Supermarkets of Marlinton, Inc. v. Valley Rich Dairy, 1998 WL 610648,

15  **2 fn. 18 (4th Cir. Va. 1998)(unpublished opinion)(citing with approval notion that "in order

16  to establish the fact of injury, an antitrust plaintiff must demonstrate that it suffered 'some

17  damage' as a causal result of the defendant's violation").  Both are accurate statements of

18  the law.  For it is true here that, in order to show impact, plaintiffs must demonstrate both

19  that they have been injured, and that their injuries were caused by the alleged antitrust

20  violation in question.  See also In re Tamoxifen Citrate Antitrust Litigation, 2006 WL

21  2401244, *26 (2d Cir. 2006)(injury in fact must "flow[] from that which makes defendants'

22  acts unlawful").

23    Having noted the applicable legal standards, the court must decide whether, in light

24  of certain statements made by plaintiffs' experts, Dr. Noll and Dr. Liu, plaintiffs' claims

25  based on DRAM purchases made from April 1, 2001 to November 30, 2001, fail for

26  plaintiffs' inability to establish impact.

27    First, the court considers the evidence upon which defendants base their motion.

28

37

1    Defendants rely almost entirely on statements made by two of plaintiffs' experts, Dr. Noll

2    and Dr. Liu.  To begin with, defendants point to:  Dr. Noll's expert report in which he states

3    that "during most of 2001," the defendants were engaged in activity with "a different

4    character" than that which resulted in higher prices for other periods of the alleged

5    conspiracy; Dr. Noll's statement that this activity consisted of defendants' concerted

6    attempt to lower DRAM prices in order to drive co-defendant Hynix out of the market; and

7    Dr. Noll's statement that during this period, "DRAM buyers did not suffer harm from the

8    price war" because although "[c]oordinated action to set prices below cost in order to drive

9    a firm from the market is a form of collusion, ... an industry's customers are not harmed

10   during the period while the concerted attempt to drive prices down takes place."  <u>See</u>

11   Declaration of Ross S. Goldstein in Support of MSJ re DRAM Purchases ("Goldstein

12   Decl."), Ex. A.  Second, defendants rely on Dr. Liu's expert report stating that the April 2001

13   to October 2001 period of the alleged conspiracy was a "predatory" period in which Dr. Liu

14   failed to find "price elevation" and failed to find "damages."  <u>See id</u>. at Ex. B.

15         The question for the court to address is what effect, if any, these statements have on

16   plaintiffs' ability to demonstrate antitrust impact.  Defendants argue that the above

17   statements amount to judicial admissions that, for the eight month period in question, not a

18   single member of the class suffered any injury in fact, since there was no artificially raised

19   price at issue that could have harmed plaintiffs.  Plaintiffs respond that defendants confuse

20   proof of impact, which requires only that plaintiffs prove that the conspiracy as a whole

21   caused some damage to plaintiffs, with proof of damages, which requires plaintiffs to

22   demonstrate overpayments for DRAM at artificially high prices in order to recover damages.

23   According to plaintiffs, the above statements are only relevant to the damages issue.

24         Neither party presents legal authority that is directly on point.  Nonetheless, the court

25   finds plaintiffs' arguments more persuasive.  To begin with, defendants' request that the

26   court carve out an eight month period from the broader three-year conspiracy period that

27   has always been alleged by plaintiffs is counter-intuitive.  <u>See, e.g.</u>, Third Consolidated

28

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1   Amended Class Action Complaint, ¶¶ 1, 37, 72.  As the US Supreme Court has said in the

2   past with respect to Sherman Act antitrust cases, and as plaintiffs point out, "[i]n cases

3   such as [these], plaintiffs should be given the full benefit of their proof without tightly

4   compartmentalizing the various factual components and wiping the slate clean after

5   scrutiny of each.... [T]he character and effect of a conspiracy are not to be judged by

6   dismembering it and viewing its separate parts, but only by looking at it as a whole."  See

7   Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962).

8   Accordingly, the court must view the conspiracy alleged by plaintiffs in its entirety.

9        Second, viewing the conspiracy in question as a whole, plaintiffs are correct that the

10  question is simply whether plaintiffs can prove 'some damage' as a result of the alleged

11  antitrust violation by defendants – i.e., whether plaintiffs can prove some damage *as a*

12  *result of the alleged three-year conspiracy* engaged in by defendants.  See, e.g.,

13  Supermarkets of Marlinton, Inc. v. Valley Rich Dairy, 1998 WL 610648, **2 fn. 18; In re

14  Tamoxifen Citrate Antitrust Litigation, 2006 WL 2401244, *26 (injury in fact must "flow[]

15  from that which makes defendants' acts unlawful").  Here, defendants do not dispute that

16  plaintiffs have done so with respect to the three year conspiracy as a whole.  See Def.

17  Reply Br. ISO MSJ re DRAM Purchases at 3 n.1.  For purposes of this motion, this satisfies

18  plaintiffs' burden of proving that antitrust impact is present.

19       Moreover, plaintiffs' expert Dr. Noll also testified that the eight month period in

20  question formed an integral part of the overall 3 year conspiracy alleged by plaintiffs, as it

21  represents the period of time during which defendants conspired in an ultimately

22  unsuccessful attempt to drive Hynix out of the market, in order to decrease total DRAM

23  supply, thereby raising prices for DRAM.  As such, the period in question, even though

24  marked by lower prices on the surface that may not give rise to damages, nonetheless

25  forms a critical part of the conspiracy that led to plaintiffs' actual injury.  See, e.g.,

26  Declaration of Guido Saveri in Support of the Re-Submission of the Expert Report of Roger

27  G. Noll ("Saveri Decl."), Ex. A at 5, 50-51 (Noll Report).

28

39

1    Indeed, as plaintiffs point out, In re NASDAQ Market -Makers Antitrust Litig. is

2    instructive.  There, the court specifically found that even where some class members

3    escape injury altogether, impact may still be found on the basis of the class members'

4    injury as a whole.  See 169 F.R.D. 493, 523 (S.D. N.Y. 1996).  The district court in that

5    case said that "unless it is clear that no ultimate consumers were damaged, the exact

6    amount each may have sustained is an issue to be treated at the damages phase of the

7    litigation," not at the preliminary stage in deciding whether plaintiffs had adequately made

8    out a prima facie case of impact.  See id.  This reasoning is relevant here.  For when

9    considering the conspiracy as alleged in its entirety, all indications are that there were at

10   least some "ultimate consumers" who were harmed at the end of the conspiracy period by

11   paying artificially high prices.  And since plaintiffs assert that those high prices stem from all

12   conspiratorial acts detailed by their experts – including the strategy to drive Hynix out of the

13   market, even if it involved lower prices for awhile – there is simply no justification for

14   finding, as defendants urge, that no liability can be premised on claims that are based on

15   that "kill Hynix" period.

16   Moreover, to the extent that – as defendants point out – there are some plaintiffs

17   who made purchases limited only to the eight month period in question and therefore truly

18   did not suffer any impact or injury, the above reasoning is also helpful.  In short, this is a

19   factor to be taken into account at the damages phase.  In other words, the lack of harm to

20   those individual plaintiffs whose claims are limited to the eight month period at issue does

21   not cause plaintiffs' class claims as a whole to fail where impact is undisputedly present for

22   other class members for the whole conspiracy period.  That lack of harm would, however,

23   prevent those plaintiffs whose claims are limited to the eight months in question from

24   recovering any damages on their individual claims, as none are present.  Furthermore, as

25   plaintiffs point out, this is an issue that is specifically contemplated – and dealt with – by Dr.

26   Liu.  Accordingly, the issue poses no barrier to allowing plaintiffs' class claims to proceed

27   as alleged.

28

**United States District Court**
For the Northern District of California

40

United States District Court

For the Northern District of California

1    In conclusion, defendants present no reason for overlooking the more apt principles

2    relied on by plaintiffs, which dictate that defendants' motion for summary judgment as to all

3    claims based on purchases from April 1, 2001 to November 30, 2001 be, and hereby is,

4    DENIED.

5        E.    Motion for Summary Judgment re Purchases Based on Pre-Existing Cost
            Plus Contracts
6

7        Defendants seek summary judgment on all claims brought by direct purchasers who

8    bought DRAM pursuant to pre-existing cost-plus contracts.  The gist of defendants'

9    argument is that these purchasers, who buy and then resell DRAM to indirect purchasers at

10   a fixed mark-up over the price paid for the DRAM, have not suffered actual injury for

11   purposes of recovery under section 1.  While they acknowledge such argument would

12   normally be ineffective under the Supreme Court's well-established prohibition on the use

13   of "pass-on" defenses in antitrust cases, defendants rely on the narrow exception that the

14   court has specifically carved out for qualifying cost-plus contracts.

15       Resolution of defendants' motion requires determination of three issues: (1) the

16   applicable legal standards involved; (2) whether plaintiffs or defendants bear the burden of

17   proof on this issue; and (3) whether there is, in fact, any evidence of claims brought

18   pursuant to pre-existing cost-plus contracts.

19        1.    Legal Standards

20       The general argument that a direct purchaser plaintiff does not suffer injury where

21   that plaintiff passes on all or part of an illegal overcharge to subsequent purchasers is not

22   new.  This is frequently referred to as the "pass-on defense," and was first considered by

23   the Supreme Court in Hanover Shoe, Inc., v. United Machinery Corp., 392 U.S. 481, 491-

24   493 (1968).  There, the court held that a pass-on defense cannot be relied on by

25   defendants seeking to prove that a direct purchaser plaintiff was not actually injured by a

26   violation of the antitrust laws.  See 392 U.S. at 491-493.  The court adhered to the "general

27   principle" that the victim of an overcharge "is damaged within the meaning of [the antitrust

28

41

1    standing statute] to the extent of the overcharge." <u>Id</u>. at 491.  It ruled against the pass-on

2    defense, in part based on concerns that use of the defense could complicate antitrust

3    litigation (due to problems of proof) and reduce incentives for private plaintiffs to sue.

4            The Supreme Court followed this holding with <u>Illinois Brick Co. v. Illinois</u>, in which it

5    considered the pass-on defense, but this time from a plaintiff's perspective.  <u>See</u> 431 U.S.

6    720 (1977).  In <u>Illinois Brick</u>, plaintiffs were indirect purchasers who argued that they had

7    antitrust standing to sue because the illegal overcharge that resulted from defendants'

8    antitrust conspiracy had been passed on to them by direct purchasers of defendants'.

9    Consistent with its holding in <u>Hanover Shoe</u>, the Supreme Court held that the principles of

10   that earlier case also bar indirect purchasers' claims, in addition to pass-on defenses

11   employed by defendants.  The court again expressed concerns with the complexity of proof

12   involved in any contrary rule, as well as the risk of multiple liability for defendants.  <u>See id</u>.

13   at 731-35.

14           Despite having twice rejected the use of pass-on theories – whether to demonstrate

15   lack of injury or to allow indirect purchaser standing – the Supreme Court noted, in both

16   cases, that an exception to the general rule is possible.  That exception, at issue here, is

17   contemplated "when an overcharged buyer has a pre-existing 'cost-plus' contract, thus

18   making it easy to prove that he has not been damaged."  <u>See Hanover Shoe</u>, 392 U.S. at

19   494; <u>see also Illinois Brick</u>, 431 U.S. at 736 (reiterating <u>Hanover Shoe</u> exception for fixed

20   quantity, pre-existing, cost-plus contracts).  The theory is that, pursuant to a pre-existing

21   cost-plus contract, it may be possible to easily prove that 100% of an overcharge is directly

22   passed through to an indirect purchaser, pursuant to pre-negotiated terms by which a

23   price-fixed product is charged at cost to the indirect purchaser, the end result of which

24   eliminates any injury borne by the direct purchaser.

25           The cost-plus contract exception was expressly considered in <u>Kansas v. UtiliCorp</u>

26   <u>United, Inc.</u>, 497 U.S. 199 (1990).  There, the Supreme Court held that the direct purchaser

27   is the appropriate plaintiff in virtually every case, and that the opening for the cost-plus

28

                                          42

**United States District Court**

For the Northern District of California

1    exception is extremely narrow.  The court was dealing with a parens patriae action brought

2    by state attorneys general ("AG"s), who sued defendant utility corporation on behalf of

3    natural gas consumers.  The AG plaintiffs argued that state regulations ensured that the

4    utility corporation passed on 100% of the overcharge directly to the state consumers in the

5    form of increased rates – thereby invoking the cost-plus contract exception.  The court,

6    however, declined to place the case within the cost-plus contract exception, holding that in

7    the absence of any such physical contract, the case only "resembled" the cost-plus contract

8    exception, which contemplates that a 100% overcharge may be proven with certainty.  <u>See</u>

9    497 U.S. at 218.

10        The <u>Kansas</u> court expressly reaffirmed its adherence to the prohibition on pass-on

11   theories, as well as the court's prior precedent regarding availability of the cost-plus

12   contract exception.  The court specifically noted and implied that the cost-plus contract

13   exception applies where the contract in question commits the buyer to purchasing "a fixed

14   quantity regardless of price," with the end result that "the effect of the overcharge is

15   essentially determined in advance, without reference to the interaction of supply and

16   demand that complicates the determination" of pass-on cost in the usual situation.  <u>Id</u>. at

17   217.  In other words, the court noted that it "might allow indirect purchasers to sue only

18   when, by hypothesis, the direct purchaser will bear no portion of the overcharge and

19   otherwise suffer no injury."  <u>Id</u>. at 218.

20        Since <u>Kansas</u>, some circuit courts have expressed the opinion that it is doubtful

21   whether the cost-plus exception can ever truly be used to get around the prohibition on

22   pass-on theories.  <u>See, e.g., McCarthy v. Recordex Servs.</u>, 80 F.3d 842, 855 (3d Cir.

23   1996)(the "vitality of the pre-existing cost-plus contract exception is doubtful, however, in

24   view of <u>Utilicorp</u>); <u>Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.</u>, 935 F.2d 1469, 1478

25   (7th Cir. 1991)("The Court's interpretation of the cost-plus exception appears so narrow

26   (setting up as it does a demand for rigorous proof of a 100% pass through and then

27   suggesting an unwillingness to consider such detailed evidence) as to preclude its

28

43

1    application in any case.").

2          There is no Ninth Circuit decision directly on point.  However, prior Ninth Circuit

3    precedent would appear to indicate that the Ninth Circuit continues to recognize the validity

4    of the pre-existing cost-plus exception to the prohibition on pass-on theories, although this

5    conclusion is to be inferred from dicta, as the court never actually discussed the

6    applicability of the exception.  See Lucas Automotive Engineering v. Bridgestone/Firestone,

7    Inc., 140 F.3d 1228, 1234 (9th Cir. 1998)(noting existence of exception for pre-existing,

8    "*fixed quantity*, cost-plus contract[s]", but refusing to discuss it as appellant failed to offer

9    any evidence that any purchases were made pursuant to such a contract)(emphasis

10   added).

11         Accordingly, based on review of controlling precedent, the court concludes that,

12   while there *is* a pre-existing cost-plus contract exception that may theoretically be stated,

13   the exception is to be applied extremely narrowly.  It requires proof of a pre-existing cost-

14   plus contract, pursuant to which a subsequent purchaser purchased a fixed quantity of

15   goods.  And it should only be applied where it is absolutely clear that the direct purchaser in

16   question will bear no portion of the overcharge and will otherwise suffer no injury as a result

17   of defendants' alleged antitrust violations.

18              2.      Burden of Proof

19         Having determined that the exception for pre-existing cost-plus contracts is still

20   legally viable, and having established the contours of the exception, the question remains

21   whether plaintiffs or defendants have the burden of burden of proof with respect to the

22   issue.  Defendants argue that plaintiffs bear the burden of proof, since the cost-plus

23   contract exception goes to the issue of injury in fact, an essential element for section 1

24   recovery, upon which plaintiffs undisputably bear the burden.  Plaintiffs, by contrast, argue

25   that defendants have it backwards:  Hanover Shoe established that plaintiffs make out a

26   prima facie case of injury merely by showing that they have been illegally overcharged, and

27   by demonstrating the amount of the overcharge.  Thereafter, it is *defendants* who bear both

28

**United States District Court**
For the Northern District of California

44

United States District Court
For the Northern District of California

1 the burden of production and proof as to the exception, and who must come forward here

2 with evidence of any qualifying cost-plus contracts.

3       The court has found no cases that squarely address the question of who bears the

4 burden of proof in establishing the cost-plus contracts exception. However, the language of

5 the controlling cases themselves suggest that it is defendants, and not plaintiffs, who have

6 the burden here of proving that this exception to the Hanover Shoe/Illinois Brick doctrine

7 applies. A review of Hanover Shoe – the case that considered the *defensive* use of the

8 pass-on theory – makes clear, even obvious, that the court considered that it would be

9 defendants' burden to meet the "normally ... insurmountable" task of proving that the pass

10 on defense applies. See, e.g., 392 U.S. at 493 (in rejecting use of pass-on defense, noting

11 that, "if the existence of the defense [were to be] generally confirmed, antitrust *defendants*

12 [would] frequently seek to *establish its applicability*") (emphasis added). Similarly, since

13 defendants here seek to establish an exception that would allow a narrow form of the pass-

14 on defense, defendants should also bear the burden of establishing its applicability.[8]

15       Moreover, as plaintiffs correctly point out, the Hanover Shoe court also expressly

16 held that a plaintiff's "prima facie case of injury and damage" is satisfied "when a buyer

17 shows that the price paid by him for materials purchased for use in his business is illegally

18 high and also shows the amount of the overcharge." See id. at 489. As such, plaintiffs

19 satisfy their prima facie case of injury here by demonstrating simply that plaintiffs paid an

20 illegally inflated amount for DRAM, and by showing the amount of that overcharge. It would

21 step beyond the boundaries of the Hanover Shoe ruling to require plaintiffs to do more than

22

23        [8] The court's conclusion is also guided in part by the fact that the Supreme Court

24 has specifically recognized two types of "pass-on" theories that may be used – defensive, and offensive. The defensive pass-on theory was first discussed in Hanover Shoe, where

25 *defendants* attempted to use it to demonstrate that the direct purchaser plaintiffs had not established true antitrust injury. See 392 U.S. 481. In Illinois Brick, by contrast, the offensive

26 use of the pass-on theory was utilized by indirect purchaser *plaintiffs* trying to establish antitrust injury for standing purposes under the Sherman Act. See 431 U.S. 720. As a practical

27 matter, it makes intuitive sense that where – as here – defendants utilize the defensive pass-on theory, they should bear the burden of proof (and where plaintiffs employ offensive use of

28 the pass-on theory, it is plaintiffs who bear the burden).

1  what the court there required – i.e., by forcing plaintiffs to establish the *absence* of any

2  exception to the prohibition on use of the pass-on defense, in addition to demonstrating the

3  amount of any illegal overcharge that was paid due to defendants' unlawful activities.

4         Furthermore, defendants' reliance on <u>Burkhalter Travel Agency v. MacFarms Int'l,</u>

5  <u>Inc.</u> for the contrary proposition is unpersuasive.  <u>See</u> 141 F.R.D. 144 (N.D. Cal. 1991).  It

6  is true that in that case, the court considered the cost-plus contract exception post-<u>Kansas</u>,

7  and held that the exception applied.  However, the court did not engage in any discussion

8  related to the burden of proof with respect to its application.  Accordingly, it does not aid the

9  analysis here.

10        In conclusion, the court holds that it is defendants who must prove that the cost-plus

11  contract exception applies.  In seeking summary judgment as to this issue, therefore,

12  defendants must produce admissible evidence demonstrating that there are no triable

13  issues of fact regarding application of the exception.  It then falls to plaintiffs to overcome

14  defendants' evidence, with proof of materially disputed facts.

15               3.    Evidence of Pre-existing Cost-plus Contracts

16        This brings the court to the final issue presented by the instant motion:  whether

17  defendants have presented sufficient evidence of qualifying cost-plus contracts to warrant

18  application of the exception.  In accordance with the standards enunciated above, to be

19  successful, defendants must specifically point to evidence of *pre-existing* cost-plus

20  contracts, pursuant to which subsequent purchasers purchased a *fixed quantity* of goods.

21  <u>See Lucas Automotive Eng'g</u>, 140 F.3d at 1234.

22        Defendants rely on three sources of evidence in their attempt to meet this burden.

23  First, they point to deposition testimony purportedly demonstrating that "several plaintiffs

24  package DRAM as one item among a bundle of goods and services that they provide to

25  their customers...".  <u>See</u> Declaration of Christopher Flack ("Flack Decl."), Exs. A-E.

26  Second, they point to "one example uncovered through discovery," of a purported qualifying

27  cost-plus contract between Apple computer and Solectron Corporation – Solectron directly

28

46

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1   buys DRAM from entities like defendants and uses it to manufacture products for Apple

2   under a cost-plus pricing formula.  See Flack Decl., Ex. H.  According to defendants, this

3   single contract demonstrates that Apple, as the final OEM to whom Solectron sells its

4   products, is charged the full cost that Solectron pays for the DRAM it purchases, plus a

5   one-percent margin over that cost.  See id. at SOL000196, 163.  Finally, defendants also

6   cite to the Declaration of Michael Bokan – a director of sales for Micron – in which Mr.

7   Bokan claims that he knows of numerous customers who purchase DRAM for resale in

8   accordance with "cost-plus" contracts.  See Bokan Decl., ¶¶ 3-4.

9          This evidence, however, is deficient.  First, the deposition testimony relied on by

10  defendants do not say what defendants say it does.  Presumably, defendants hope to

11  prove with the testimony that the DRAM packaged as an item can be separately tracked

12  through to the ultimate purchaser of the item – thereby providing a foundation for

13  application of the cost-plus contract rule.  But actual review of the deposition testimony

14  demonstrates that the deponents are nearly all testifying as to general job duties and

15  descriptions for what their companies do.  See Flack Decl., Exs. A-E.  They are in no way

16  affirmatively stating that DRAM is sold, or can be characterized, as a separate item within a

17  bundle of goods and services.  Furthermore, even if the testimony did support this

18  interpretation, it would still fall short of establishing the existence of any physical, pre-

19  existing, fixed quantity cost-plus contracts that qualify for application of the exception.

20  Indeed, to the contrary, the testimony of one of the deponents, Steven Coraluzzi, expressly

21  states that Mr. Coraluzzi had no contracts whatsoever with Crucial Technologies, a division

22  of defendant Micron.  See id. at Ex. A.

23         Second, with respect to the Apple/Solectron contract, neither Apple nor Solectron

24  are named plaintiffs in the instant action.  Assuming, therefore, that defendants attempt to

25  use the Apple/Solectron contract as evidence of unnamed class members' cost-plus

26  contracts, defendants provide no legal or other authority that would justify imputing the

27  existence of this single agreement to other unnamed class members, or to the class as a

28

47

United States District Court

For the Northern District of California

1  whole.  Nor is there any reason to assume, based on this one agreement, that other

2  unnamed class members had similar agreements.  Moreover, plaintiffs raise valid

3  arguments regarding the agreement itself.  Notably, they point out that the contract does

4  not appear to require the purchase of a fixed quantity of DRAM.  See Flack Decl., Ex. H.

5  Defendants, for their part, fail to overcome this with any evidence to the contrary.  As such,

6  it simply cannot be said that the Apple/Solectron contract qualifies as a valid pre-existing

7  cost-plus contract.

8          Finally, to the extent that defendants rely on the Bokan Declaration for added

9  support of its argument that cost-plus contracts exist, the Bokan Declaration is wholly

10 unpersuasive.  Mr. Bokan does not affirmatively point to any cost-plus contracts

11 whatsoever.  He merely states that he "believe[s] that contract manufacturers frequently

12 agree to take no profit, or to take a fixed, cost-plus profit, on DRAM purchased for use in an

13 OEM's products."  See Bokan Decl., ¶ 3.  Not only is this insufficient proof of the existence

14 of any cost-plus contracts, but as plaintiffs point out, most of this testimony is objectionable

15 as inadmissible hearsay.  To that end, the court disregards the testimony contained therein.

16

17          In sum, it simply cannot be said that defendants have met their burden in pointing to

18 evidence establishing that there are valid pre-existing, fixed quantity, cost-plus contracts

19 that warrant imposition of the exception in this case.

20          Nor does Burkhalter Travel Agency, discussed above, require a contrary conclusion.

21 In Burkhalter, the court considered a situation in which the plaintiff directly purchased

22 macadamia nuts from defendants, and subsequently passed the entire cost of the

23 macadamia nuts on to a subsequent purchaser pursuant to an existing agreement between

24 them.  Defendants argued that the cost-plus contract exception applied, and the court

25 agreed.  The court, however, assumed the existence of a qualifying cost-plus agreement.

26 Here, by contrast, as analysis of the above evidence demonstrates, defendants have not

27 proven the existence of any qualifying agreement, either between a named plaintiff and a

28

                                                48

1    subsequent purchaser, or even between an unnamed plaintiff and a subsequent purchaser.

2    As such, there is simply no proof that the exception applies.

3         Defendants attempt to avoid this inevitable conclusion by arguing that, if they lack

4    sufficient evidence, it is only because plaintiffs thwarted their prior discovery efforts to

5    obtain relevant evidence going to this issue.  They note that, despite their seeking

6    information relating to cost-plus contracts during discovery, plaintiffs refused to produce

7    any, and after a motion to compel, the magistrate judge refused to order its production.

8    See Flack Decl., Exs. F, G.  To that end, defendants also seek an order from the court

9    "soliciting the information needed to determine whether the cost-plus contract rule applies."

10   Plaintiffs strenuously oppose this request, asserting that discovery has closed, that only

11   one defendant – Micron – ever sought discovery on the cost-plus contracts issue in the first

12   place, and that defendants failed to timely object to the magistrate judge's discovery ruling.

13        As the court stated at the hearing on this motion, these facts do present cause for

14   concern.  The court is particularly troubled by the fact that plaintiffs' counsel appears to

15   have engaged in the practice of regularly instructing clients and deponents not to answer

16   deposition questions regarding the existence of qualifying cost-plus contracts.  See, e.g.,

17   Sampson Decl., Ex. 138 at 184.  As counsel for plaintiffs is undoubtedly aware, instructions

18   not to answer are not proper in practice before this court, unless made in response to

19   inquiries that would require the disclosure of privileged information.  The impropriety of

20   such instructions here is made all the more striking because evidence with respect to the

21   existence of cost-plus contracts is, as demonstrated above, unquestionably relevant to this

22   case.  As such, had the issue been properly raised before the court – and there is no

23   indication that the issue as presently framed before the court was even raised with the

24   magistrate judge – the court would have provided defendants with timely relief.   As it

25   stands, however, the court is left only with the present discovery record.  For having made

26   a strategic decision not to challenge the magistrate judge's earlier decision, or to raise the

27   issue prior to the close of discovery, defendants are bound by their actions, unfortunate

28

49

<div style="transform: rotate(-90deg)">

**United States District Court**
For the Northern District of California

</div>

1 | though the result may be.

2 |     As such, the court is left with no choice but to conclude, based on the evidence

3 | submitted before it, that defendants have failed to present, as is their burden, evidence that

4 | there are qualifying cost-plus contracts that warrant application of the exception here.

5 | Having failed to so demonstrate, it is irrelevant whether plaintiffs present any facts that

6 | materially dispute the exception's application, as the exception itself is not before the court.

7 | Accordingly, summary judgment on the issue is DENIED.

8 |     F.    Motions to Seal

9 |     The parties have also filed numerous administrative requests to seal certain

10 | documents and portions of briefs filed in connection with the present motions for summary

11 | judgment.  The court has made a good faith effort to review these requests, alongside the

12 | actual exhibits to which the requests purportedly refer.  However, after trying

13 | unsuccessfully to match each document sought to be filed under seal with a corresponding

14 | administrative request referring to the specific document and setting forth good cause, the

15 | court concludes that the parties' motions to seal are simply too piecemeal to lend

16 | themselves to a satisfactory determination by the court.  Moreover, as the supporting

17 | declarations themselves indicate, it is not wholly clear that many of the documents justify a

18 | sealing order, under the standard enunciated in Kamakana v. City of Honolulu, 447 F.3d

19 | 1172 (9th Cir. 2006).

20 |     As such, if the parties wish the court to grant sealing requests covering certain

21 | documents or portions thereof in connection with the instant motions, the parties must (1)

22 | withdraw all pending administrative requests to seal that have been filed in connection with

23 | the instant motions; and (2) each re-file one comprehensive administrative request to seal,

24 | which specifically sets forth each individual exhibit, document, or portion thereof that the

25 | parties wish to have sealed, and which sets forth, by way of accompanying declaration, a

26 | "compelling reason" for the sealing of each individual document.  See id. at 1136.  Any

27 | revised request to seal filed pursuant to these instructions must be filed no later than

28 |

50

1  February 28, 2007.

2        If the parties' re-filed administrative requests to seal do not comply with the above,

3  the court will deny the parties' sealing request.  Alternatively, if the parties do not withdraw

4  their pending motions or file any revised administrative requests to seal by February 28,

5  2007, it will treat the pending motions to seal as either denied or moot.

6        G.    Conclusion

7        For the reasons stated above, the court hereby GRANTS summary judgment in part

8  and DENIES summary judgment in part, as follows: (1) NTC's motion for summary

9  judgment on liability under the Sherman Act is GRANTED; (2) NTC USA's motion for

10  summary judgment on liability under the Sherman Act is DENIED; (3) defendants' motion

11  for partial summary judgment based on DRAM purchases from April 1, 2001 to November

12  30, 2001 is DENIED; and (4) defendants' motion for partial summary judgment based on

13  pre-existing cost-plus contract purchases is DENIED.

14

15  **IT IS SO ORDERED.**

16  Dated: February 20, 2007

17  _____
    PHYLLIS J. HAMILTON
18  United States District Judge

19

20

21

22

23

24

25

26

27

28

*United States District Court*
For the Northern District of California

**EXHIBIT O**

1
Richard M. Heimann (State Bar No. 063607)
Joseph R. Saveri (State Bar No. 130064)
2
Eric B. Fastiff (State Bar No. 182260)
Brendan Glackin (State Bar No. 199643)
3
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
4
San Francisco, CA  94111-3339
Telephone:  415.956.1000
5
Facsimile:  415.956.1008

6
Bruce L. Simon (State Bar No. 096241)
PEARSON, SIMON, WARSHAW & PENNY, LLP
7
44 Montgomery Street, Suite 2450
San Francisco, CA  94104
8
Telephone:     (415) 433-9000
Facsimile:      (415) 433-9008
9

10
*Co-Lead Counsel for the Direct Purchaser Plaintiffs*

11
UNITED STATES DISTRICT COURT

12
NORTHERN DISTRICT OF CALIFORNIA

13
SAN FRANCISCO DIVISION

14
| IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | No. M: 07-1827 SI MDL No. 1827 |
|---|---|

15

16
This Document Relates To:

17
*Direct Purchaser Class Actions*

**[AMENDED] DIRECT PURCHASER CLASS PLAINTIFFS' NOTICE OF CLASS MEMBER EXCLUSIONS**

18

19

20

21

22

23

24

25

26

27

28

1           Attached as Exhibit A is a list of persons and entities who requested exclusion

2    from the Chunghwa Settlement Class, the Epson Settlement Class, and for the Litigation Classes.[1]

3    Dated: January 31, 2011                    Respectfully submitted,

4                                       LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

5                                       By:       */s/ Eric B. Fastiff*
6                                                     Eric B. Fastiff

7                                       Richard M. Heimann (State Bar No. 063607)
                                   Joseph R. Saveri (State Bar No. 130064)
8                                       Eric B. Fastiff (State Bar No. 182260)
                                   Brendan P. Glackin (State Bar No. 199643)
9                                       LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                   275 Battery Street, 29th Floor
10                                      San Francisco, CA  94111-3339

11                                      Bruce L. Simon (State Bar No. 096241)
                                   PEARSON, SIMON, WARSHAW & PENNY, LLP
12                                      44 Montgomery Street, Suite 2450
                                   San Francisco, CA  94104

13                                      *Co-Lead Counsel for the Direct Purchaser Class Plaintiffs*

14

15

16

17

18

19

20

21

22

23

24

25

26   _____
[1] This [Amended] Notice differs from the previously filed Notice:
27       1) Adds Family Webb d/b/a A&B TV, Intercounty Appliance Corporation, Audrey Warner.
    2) Notes that the exclusion requests submitted by Judith Cingcade and Audrey Warner were
28   postmarked after January 4, 2010, the exclusion deadline.

# EXHIBIT A

**LCD Direct Purchaser Class Member Exclusions**

| | Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|---|
| 1 | 1st National Bank of South Florida | | | Yes |
| 2 | Amazon.com, Inc. | Yes | Yes | Yes |
| 3 | Ambort, Beverly K. | | | Yes |
| 4 | ABC Appliance Inc. | | | Yes |
| 5 | Acer America Corporation | | | Yes |
| | Acer Incorporated | | | Yes |
| | Gateway, Inc. | | | Yes |
| 6 | Adams, Daniel H. | Yes | Yes | Yes |
| 7 | Aitoro Appliance Co. Inc. | Yes | Yes | Yes |
| 8 | All American Semiconductor, Inc. (through Kenneth A. Welt, Liquidating Trustee) Access Micro Products, Inc., All American A.V.E.O., Inc., All American Added Value, Inc., All American Semiconductor of Atlanta, Inc., All American Semiconductor of Chicago, Inc., All American Semiconductor of Florida, Inc., All American Semiconductor of Huntsville, Inc., All American Semiconductor of Massachusetts, Inc., All American Semiconductor of Michigan, Inc., All American Semiconductor of Minnesota, Inc., All American Semiconductor of New York, Inc., All American Semiconductor of Philadelphia, Inc., All American Semiconductor of Phoenix, Inc., All American Semiconductor of Portland, Inc., All American Semiconductor of Rockville, Inc., All American Semiconductor of Salt Lake, Inc., All American Semiconductor of Texas, Inc., All American SemiconductorNorthern California, Inc., All American Semiconductor of Washington, Inc., All American Technologies, Inc., All American Transistor of California, Inc., Aved Industries, Inc., Palm Electronics Manufacturing Corp., All American Semiconductor of Ohio, Inc., All American Semiconductor of Wisconsin, Inc., All American Semiconductor of Rhode Island, Inc., All American lOT, Inc., | Yes | Yes | Yes |

1 of 21

**LCD Direct Purchaser Class Member Exclusions**

| | Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|---|
| | AmeriCapital, LLC,<br>AGO China, Inc.,<br>All American Semiconductor of Canada, Inc.,<br>AllAmMex Components, S. de R.L. de C.V.,<br>AGO Electronics Asia Pacific Co., Ltd.,<br>AGO Electronics Limited | | | |
| 9 | Apple Inc. (f/k/a Apple Computer, Inc.)<br>Apple Operations<br>Apple Operations Europe (f/k/a Apple Computer Ltd.)<br>Apple Sales International (f/ka Apple Computer International)<br>Apple Operations Europe | | | Yes |
| 10 | Appliance Center of Toledo, Inc. | Yes | Yes | Yes |
| 11 | Appliance Dealers Cooperative Inc. | Yes | Yes | Yes |
| 12 | AT&T Mobility LLC<br>AT&T Corp.<br>AT&T DataComm, Inc.<br>AT&T Operations, Inc.<br>AT&T Services, Inc.<br>Southwestern Bell Telephone Company<br>BellSouth Telecommunications, Inc.<br>Pacific Bell Telephone Company | Yes | Yes | Yes |
| 13 | ATS Claim, LLC | Yes | Yes | Yes |
| 14 | Best Buy Co., Inc.<br>Best Buy Purchasing, LLC<br>Best Buy Enterprise Services, Inc.<br>Best Buy Stores, LP<br>Magnolia Hi-Fi, Inc.<br>Best Buy China Ltd. | Yes | Yes | Yes |
| 15 | Casa Linda Furniture, Inc. | Yes | Yes | Yes |
| 16 | Cingcade, Judith[1] | Yes | Yes | Yes |
| 17 | Circuit City Stores, Inc.<br>(through Alfred H. Siegel, Liquidating Trustee) | Yes | Yes | Yes |
| 18 | Colder's Inc. | Yes | Yes | Yes |
| 19 | CompuCom Systems, Inc. | Yes | Yes | Yes |
| 20 | CompUSA GP Holdings Company | Yes | Yes | Yes |

[1] Received after January 4, 2011.

908290.1
1/31/11 5:39 PM

**LCD Direct Purchaser Class Member Exclusions**

| | Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|---|
| | CompUSA Holdings Company<br>Old Comp Inc. (formerly known as CompUSA Inc.)<br>CompUSA Management Company<br>CompUSA Stores L.P.<br>BeOn Inc. (formerly known as CompUSA PC Inc.)<br>BeOn Operating Company (formerly known as CompUSA PC Operating Company)<br>CompTeam Inc.<br>Computer City, Inc.<br>Cozone.com Inc.<br>Good Guys California, Inc.<br>Goodguys.com Inc.<br>Good Guys Inc. | | | |
| 21 | Costco Wholesale Corporation | Yes | Yes | Yes |
| 22 | DePue Unit School District #103 | | | Yes |
| 23 | Dell Inc.<br>Abu Dhabi Branch of PSC Healthcare Software, Inc.<br>Dell Gesm.b.H.<br>Dell FZ-LLC — Bahrain Branch<br>Dell N.V.<br>Dell Emerging Markets (EMEA) Limited Trade Representative Office (Bulgaria)<br>Dell Emerging Markets (EMEA) Limited — RepresentativeOffice (Republic of Croatia)<br>Dell Computer spol. sro.<br>Perot Systems (Czech Republic) s.r.o.<br>Dell A/S<br>Dell Emerging Markets (EMEA) Limited — Egypt Representative Office<br>Perot Systems Europe Limited<br>Perot Systems (UK) Ltd.<br>Oy Dell A.B.<br>26éme Avenue SAS<br>Dell International Holdings SAS<br>Dell S.A.<br>SCI New-Tech<br>SCI Siman<br>Perot Systems S.AS.<br>Dell GmbH<br>Dell Halle GmbH<br>Perot Systems GmbH | Yes | | Yes |

908290.1
1/31/11 5:39 PM

**LCD Direct Purchaser Class Member Exclusions**

| Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|
| HighQIT for the Manufacturing Industry GmbH | | | |
| Fleetwood Personal & Marketing GmbH | | | |
| Perot Systems (Germany) GmbH | | | |
| Dell Distribution (EMEA) Limited External Company (Ghana) | | | |
| Dell Technology Products and Services S.A | | | |
| Dell DFS Holdings Kft. | | | |
| Dell Emerging Markets (EMEA) Limited Magyarorszagi Kereskedelmi Kepviselet — Rep. Office | | | |
| Dell Hungary Technology Solutions Trade LLC | | | |
| Dell International Holdings Kft. | | | |
| Perot Systems TSI (Hungary) Liquidity Management LLC | | | |
| Alienware Limited | | | |
| Dell Direct | | | |
| Dell International Holdings XI | | | |
| Dell Products | | | |
| Dell Products Manufacturing | | | |
| Dell Research | | | |
| Original Solutions Limited | | | |
| Persys Ireland Limited | | | |
| Persys TSI (Ireland) Limited | | | |
| Dell Technology & Solutions Israel Ltd. | | | |
| Dell S.p.A. | | | |
| Dell Services S.r.l. | | | |
| Perot Systems S.r.l. | | | |
| Dell Emerging Markets (EMEA) Limited — Representative Office (Jordan) | | | |
| Jordan Branch of Perot Systems Europe Limited | | | |
| Dell Emerging Markets (EMEA) Limited (Kazakhstan Representative Office) | | | |
| Dell Emerging Markets (EMEA) Limited Representative Office — Lebanon | | | |
| Dell SA | | | |
| Perot Systems TSI (Mauritius) Pvt. Ltd. | | | |
| Dell Distribution Maroc (Succ) | | | |
| Dell SAS | | | |
| Dell Asia B.V. | | | |
| Dell B.V. | | | |
| Dell Global B.V. | | | |
| Dell Global Holdings I BV | | | |
| Dell Global Holdings II BV | | | |
| Dell Global Holdings III BV | | | |
| Dell Global International B.V. | | | |

4 of 21

908290.1
1/31/11 5:39 PM

## LCD Direct Purchaser Class Member Exclusions

| Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|
| Dell International Holdings IX B.V. | | | |
| Dell International Holdings VIII B.V. | | | |
| Dell International Holdings X B.V. | | | |
| Dell International Holdings XII Coöperatoef U.A. | | | |
| Dell Products (Europe) B.V. | | | |
| Dell Taiwan B.V. | | | |
| DIH VI CV | | | |
| DIH VII CV | | | |
| DIH VIII CV | | | |
| DIH IX CV | | | |
| Perot Systems B.V. | | | |
| Perot Systems Nederland B.V. | | | |
| Perot Systems Investments B.V. | | | |
| Perot Systems TSI (Netherlands) B.V. | | | |
| Dell Technology & Solutions (Nigeria) Limited | | | |
| Dell Corporation Limited — Northern Ireland Place of Business Ireland | | | |
| Dell A.S. | | | |
| Dell Products (Poland) Sp. z o.o. | | | |
| Dell Sp.z.o.o. | | | |
| Dell Computer Holding I, SGPS, Unipessoal Lda | | | |
| Dell Computer Holding II, SGPS, Unipessoal Lda | | | |
| Dell Computer International (II) Comercio de Computadores Sociedade Unipessoal Lda | | | |
| Dell III — Comercio de Computadores, Unipessoal LDA   Portugal | | | |
| Dell Emerging Markets (EMEA) Limited — Representative Office | | | |
| Perot Systems Romania SRL | | | |
| Dell Emerging Market (EMEA) Ltd (Russia Representative Office) | | | |
| Dell L.L.C. | | | |
| Branch of Dell (Free Zone Company L.L.C.) | | | |
| Dell s.r.o. | | | |
| Perot Systems (Slovakia) s.r.o. | | | |
| Dell Computer (Proprietary) Ltd | | | |
| Dell Computer S.A. | | | |
| Dell A.B. | | | |
| Dell International Holdings Kft. — Zurich Branch | | | |
| Dell S.A | | | |
| Perot Systems A.G. | | | |
| Queequeg A.G. | | | |
| Perot Systems (Switzerland) GmbH | | | |
| Dell Emerging Markets (EMEA) Limited — Turkey (Istanbul) Liaison Office | | | |

5 of 21

**LCD Direct Purchaser Class Member Exclusions**

| Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|
| Dell Teknoloji Limited Şirketi | | | |
| Dell FZ — LLC | | | |
| Dell Emerging Markets (EMEA) Limited (Uganda Representative Office) | | | |
| Dell Emerging Markets (EMEA) Limited — Representative Office Ukraine | | | |
| LLC Dell Ukraine | | | |
| Perot Systems TSI (Middle East) FZ-LLC | | | |
| Bracknell Boulevard Management Company Limited | | | |
| Dell Computer EEIG | | | |
| Dell Corporation Limited | | | |
| Dell Emerging Markets (EMEA) Limited | | | |
| Dell Solutions (UK) Limited | | | |
| The Networked Storage Company Limited | | | |
| Alienware Corporation (Pacific Rim), Pty Ltd. | | | |
| Dell Australia Pty. Limited | | | |
| Australia Branch of Perot Systems (Singapore) Pte. Ltd. | | | |
| Dell (China) Co., Ltd., Guangzhou Liaison Office | | | |
| Dell (China) Company Limited | | | |
| Dell (China) Company Limited, Beijing Branch | | | |
| Dell (China) Company Limited, Beijing Liaison Office | | | |
| Dell (China) Company Limited, Chengdu Liaison Office | | | |
| Dell (China) Company Limited, Chengdu Branch | | | |
| Dell (China) Company Limited, Dalian Branch | | | |
| Dell (China) Company Limited, Guangzhou Branch | | | |
| Dell (China) Company Limited, Hangzhou Liaison Office | | | |
| Dell (China) Company Limited, Nanjing Liaison Office | | | |
| Dell (China) Company Limited, Shanghai Branch | | | |
| Dell (China) Company Limited, Shanghai Liaison Office | | | |
| Dell (China) Company Limited, Shenzhen Liaison Office | | | |
| Dell (China) Company Limited, Xiamen Branch | | | |
| Dell (Xiamen) Company Limited | | | |
| Dell (Xiamen) Company Limited, Dalian Branch | | | |
| Dell Procurement (Xiamen) Company Limited | | | |
| Dell Procurement (Xiamen) Company Limited, Shanghai Branch | | | |
| Dell Procurement (Xiamen) Company Limited, Shenzhen Liaison Office | | | |
| Perot Systems (Shanghai) Consulting Co., Limited | | | |
| Perot Systems (Shanghai) Consulting Co., Ltd. | | | |
| Dell Hong Kong Limited | | | |
| Hong Kong Branch of Perot Systems (Singapore) Pte. Ltd. | | | |
| ACS (India) Limited | | | |

908290.1
1/31/11 5:39 PM

**LCD Direct Purchaser Class Member Exclusions**

| Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|
| Dell India Private Ltd. | | | |
| Dell International Services India Private Limited | | | |
| Perot Systems TSI (India) Private Limited | | | |
| Perot Systems Business Process Solutions India Private Limited | | | |
| Perot Systems India Foundation | | | |
| Dell Global BV (Indonesia Representative Office) | | | |
| PT Dell Indonesia | | | |
| Dell Japan Inc. | | | |
| EqualLogic Japan Company Limited | | | |
| Perot Systems (Japan) Ltd. | | | |
| Dell Asia Pacific Sdn. | | | |
| Dell Asia Pacific Sdn. Bhd. | | | |
| Dell Global Business Center Sdn. Bhd | | | |
| Dell Global Procurement Malaysia Sdn. Bhd. | | | |
| Dell Sales Malaysia Sdn Bhd | | | |
| Perot Systems (Malaysia) Sdn. Bhd. | | | |
| Dell New Zealand Limited   New Zealand | | | |
| Dell Asia Pacific Sdn Bhd (Pakistan Liaison Office) | | | |
| Dell Global BV (Pakistan Liaison Office) | | | |
| Dell Asia Pacific Sdn. Philippines Representative Office | | | |
| Dell Catalog Sales L.P. — Rep Office | | | |
| Dell Global BV (Philippines Representative Office) | | | |
| Dell International Services Philippines Inc. | | | |
| Perot Systems Philippines, Inc. | | | |
| Dell Asia Holdings Pte. Ltd. | | | |
| Dell Asia Pte. Ltd. | | | |
| Dell Global B.V., Singapore Branch | | | |
| Dell Global Pte. Ltd. | | | |
| Dell Singapore Pte. Ltd. | | | |
| Perot Systems Holdings Pte Ltd | | | |
| Perot Systems (Singapore) Pte. Ltd. | | | |
| Perot Systems Holdings Pte. Ltd. | | | |
| Dell International Inc. | | | |
| Dell Asia B.V., Taiwan Branch | | | |
| Dell B.V., Taiwan Branch | | | |
| Dell Taiwan B.V., Taiwan Branch | | | |
| Dell (Thailand) Co., Ltd. | | | |
| Dell Global BV (Vietnam Representative Office) | | | |
| Health Systems Design Corp. | | | |
| Kay Software, Inc. | | | |
| Bracknell Boulevard (Block C) L.L.C. | | | |
| Bracknell Boulevard (Block D) L.L.C. | | | |

**LCD Direct Purchaser Class Member Exclusions**

| Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|
| DCC Executive Security Inc. | | | |
| Dell America Latina Corp. | | | |
| Dell Asset Revolving Trust | | | |
| Dell Asset Securitization GP L.L.C. | | | |
| Dell Asset Securitization Holding L.P. | | | |
| Dell Colombia Inc. | | | |
| Dell Conduit Funding L.P. | | | |
| Dell Conduit GP L.L.C. | | | |
| Dell DFS Corporation | | | |
| Dell DFS Holdings L.L.C. | | | |
| Dell Equipment Funding L.P. | | | |
| Dell Equipment GP L.L.C | | | |
| Dell Federal Systems Corporation | | | |
| Dell Federal Systems GP L.L.C. | | | |
| Dell Federal Systems LP L.L.C. | | | |
| Dell Financial Services L.L.C. | | | |
| Dell Global Holdings IV L.L.C. | | | |
| Dell Global Holdings L.L.C. | | | |
| Dell Global Holdings IX L.L.C. | | | |
| Dell International Holdings I L:.L.C | | | |
| Dell International L.L.C. | | | |
| Dell Marketing Corporation | | | |
| Dell Marketing GP L.L.C. | | | |
| Dell Marketing LP L.L.C. | | | |
| Dell Marketing USA GP L.L.C. | | | |
| Dell Marketing USA LP L.L.C. | | | |
| Dell Products Corporation | | | |
| Dell Products GP L.L.C. | | | |
| Dell Products LP L.L.C. | | | |
| Dell Protective Services Inc. | | | |
| Dell Receivables Corporation | | | |
| Dell Receivables GP L.L.C. | | | |
| Dell Receivables LP L.L.C. | | | |
| Dell Revolver Company L.P. | | | |
| Dell Revolver GP. L.L.C. | | | |
| Dell USA Corporation | | | |
| Dell USA GP L.L.C. | | | |
| Dell USA LP L.L.C. | | | |
| Dell World Trade Corporation | | | |
| Dell World Trade GP L.L.C. | | | |
| Dell World Trade LP L.L.C. | | | |
| DFS Equipment General Partner L.L.C. | | | |

908290.1
1/31/11 5:39 PM

**LCD Direct Purchaser Class Member Exclusions**

| Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|
| DFS Funding L.L.C. | | | |
| DFS-SPV L.L.C. | | | |
| License Technologies Group, Inc. | | | |
| Plural Acquisition I, Inc. | | | |
| Dell Global Holdings VI L.L.C. | | | |
| Dell Global Holdings VII L.L.C. | | | |
| Dell Global Holdings VIII L.L.C. | | | |
| Perot Systems Corporation | | | |
| Perot Systems Government Solutions, Inc. | | | |
| Perot Systems Government Healthcare Solutions, Inc. | | | |
| perot.com inc. | | | |
| Perot Systems Application Solutions Inc. | | | |
| PS eServe Corp. | | | |
| Solutions Consulting LLC | | | |
| Perot Systems Communications Services, Inc. | | | |
| Perot Systems Healthcare Services LLC | | | |
| PSC Healthcare Software, Inc. | | | |
| The Technical Resource Connection, Inc. | | | |
| Vision Business Process Solution, Inc. | | | |
| Perot Systems Revenue Cycle Solutions, Inc. | | | |
| Hospital Revenue Associates LLC | | | |
| PS BP Services LLC | | | |
| Perot Systems BPS, LLC | | | |
| PSC LP Corporation | | | |
| PSC GP Corporation | | | |
| KACE Networks, Inc. | | | |
| Alienware Corporation | | | |
| ASAP Software Express Inc. | | | |
| QSS Group, Inc. | | | |
| Perot Systems Healthcare Solutions, Inc. | | | |
| Technical Management, Inc. | | | |
| Transaction Applications Group, Inc. | | | |
| Third Party Administration Group, Inc. | | | |
| Dell Funding L.L.C. | | | |
| Dell Revolver Funding L.L.C. | | | |
| PrSM Corporation | | | |
| Dell Computer Holdings L.P. | | | |
| Dell Federal Systems L.P. | | | |
| Dell Marketing L.P. | | | |
| Dell Marketing USA L.P. | | | |
| Dell Products L.P. | | | |
| Dell Receivables L.P. | | | |

908290.1
1/31/11 5:39 PM

**LCD Direct Purchaser Class Member Exclusions**

| | Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|---|
| | Dell USA L.P.<br>Dell World Trade L.P.<br>Perot Systems Business Process Solutions, Inc.<br>Perot Systems FS Limited Partnership<br>PSC Management Limited Partnership<br>Protega Services, LLC<br>Perot Systems Government Services, Inc.<br>Dell America Latina Corp., Argentina Branch<br>Dell Export Sales Corporation<br>Perot Systems TSI (Bermuda) Ltd.<br>TXZ Holding Company Limited<br>Dell Computadores do Brasil Ltda.<br>EqualLogic Canada<br>Canada Branch of Perot Systems Healthcare Solutions, Inc.<br>Canada Branch ofPerot Systems Corporation<br>Dell Global Holdings Ltd.<br>Dell Global Holdings III L.P.<br>Dell Computer de Chile Ltda.<br>Dell Colombia Inc., Colombia Branch<br>Alienware Latin America, S.A<br>Dell Technology Services Inc. S.R.L<br>Dell Ecuador Cia Ltda<br>Dell Guatemala Ltda<br>Dell Honduras S de RL de CV<br>Dell Computer Services de Mexico SA de CV<br>Dell Mexico, S.A. de C.V.<br>Perot Systems Mexico, S. de R.L. de C.V.<br>Perot Systems Services Mexico, S.C<br>Dell Canada Inc.<br>Dell Panama S. de R.L<br>Dell Perú, SAC<br>Dell Puerto Rico Corp.<br>Dell Quebec Inc.<br>Perot Systems (Canada) Corporation<br>Dell Trinidad and Tobago Limited<br>Corporacion Dell de Venezuela SA | | | |
| 24 | Design Research Engineering LLC | Yes | Yes | |
| 25 | Durochers TV & Appliance, Inc. | Yes | Yes | Yes |
| 26 | Dynamic Marketing, Inc. | Yes | Yes | Yes |
| 27 | Electrograph Technologies Corp.<br>and its affiliates, subsidiaires and prdecessor entities: | Yes | Yes | Yes |

908290.1
1/31/11 5:39 PM

**LCD Direct Purchaser Class Member Exclusions**

| | Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|---|
| | Electrograph Systems, Inc.;<br>International Computer Graphics, Inc.;<br>ActiveLight, Inc.;<br>CineLight Corporation;<br>Manchester Technologies, Inc.;<br>Manchester Equipment Co., Inc.;<br>Champion Vision, Inc.;<br>Coastal Office Products, Inc. | | | |
| 28 | Electronic Express, Inc. | Yes | Yes | Yes |
| 29 | Family Webb d/b/a A&B TV | Yes | Yes | Yes |
| 30 | Farag, Mohamed | | | Yes |
| 31 | Frederick Boulevard Baptist Church | | | Yes |
| 32 | Gnanam, Vijayalakshmi | | | Yes |
| 33 | Hayden, Michael V. | Yes | Yes | Yes |
| 34 | Helsel, Joy | | | Yes |
| 35 | Hewlett-Packard Company<br>Hewlett-Packard Japan Ltd.<br>Hewlett-Packard AP (Hong Kong) Limited<br>Hewlett-Packard GmbH<br>Hewlett-Packard International Pte. Ltd.<br>Hewlett-Packard Singapore (Private) Ltd.<br>Hewlett-Packard Asia Pacific Pte. Ltd.<br>Hewlett-Packard Products, C.V.<br>Hewlett-Packard International Pte. Ltd.<br>Hewlett-Packard Taiwan Ltd.<br>Hewlett-Packard Technology (Shanghai) Co. Ltd.<br>Hewlett-Packard Mexico, S. De RL. de C.V.<br>Hewlett-Packard India Sales Private Ltd.<br>Hewlett-Packard Servicios Profesionales, S. de RL. de C.V.<br>Hewlett-Packard Centro de Servicios Globales, S. de RL. de C.V.<br>Hewlett-Packard Caribe B.V.<br>Hewlett-Packard International Sari<br>Hewlett-Packard Centre de Competences France SaS<br>Hewlett-Packard Australia Pty. Limited<br>Hewlett-Packard Computadores Limitada<br>Hewlett-Packard Marigalante Ltd.<br>Hewlett-Packard Korea Ltd.<br>Hewlett-Packard Indigo, Ltd. | Yes | Yes | Yes |

11 of 21

**LCD Direct Purchaser Class Member Exclusions**

| | Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|---|
| | Hewlett-Packard Technology Licenses and Licensing Limited Liability Company, Luxembourg<br>Hewlett-Packard Espanola S.L.<br>Hewlett-Packard (Chongqing) Manufacturing, Export, Procurement and Settlement Co., Ltd.<br>Hewlett-Packard Brasil Ltda.<br>Hewlett-Packard s.r.o.<br>Hewlett-Packard (Manufacturing) Ltd.<br>Hewlett-Packard (Canada) Co.<br>Hewlett-Packard (Chongqing) Co. Ltd.<br>Shanghai Hewlett-Packard Co. Ltd.<br>Hewlett-Packard Trading (Shanghai) Co. Ltd.<br>Com pal Electronics Inc.<br>Flextronics International Limited<br>Innolux Display Corporation (acquired by and now part of Chi Mei Innolux Corporation)<br>Inventec Corporation, Inventec Building<br>LiteOn Technology Corporation<br>Qisda Corporation<br>Quanta Computer Inc.<br>Tatung Company<br>TPV Technology Limited<br>Wistron Corporation | | | |
| 36 | IEC Electronics | | | Yes |
| 37 | IMTS/JBDevelopers | | | Yes |
| 38 | Interbond Corp. of America (and all affiliates) | Yes | Yes | Yes |
| 39 | Intercounty Appliance Corporation | Yes | Yes | Yes |
| 40 | Jabil Circuit, Inc. | Yes | Yes | Yes |
| 41 | Jaco Electronics, Inc.<br>Corona Electronics, Inc.<br>Distel Inc.<br>Interface Electronics Corp.<br>Quality Components, Inc.<br>R.C. Components, Inc.<br>Micatron Inc.<br>Nexus Custom Electronics<br>Reptron, Inc. | Yes | Yes | Yes |
| 42 | Longs Electronics Inc. | Yes | Yes | Yes |

908290.1
1/31/11 5:39 PM

**LCD Direct Purchaser Class Member Exclusions**

| | Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|---|
| 43 | Marta Cooperative of America, Inc. | Yes | Yes | Yes |
| 44 | Mazzi, Marco | | | Yes |
| 45 | MetroPCS Communications, Inc.<br>MetroPCS, Inc.<br>MetroPCS Wireless, Inc. | Yes | Yes | Yes |
| 46 | Midwest Sales & Service, Inc. | Yes | Yes | Yes |
| 47 | Motorola Asia Limited<br>Motorola Asia Pacific Limited<br>Motorola (China) Electronics Limited<br>Motorola (China) Investment Limited<br>Motorola de Nogales, S.A. de C.V.<br>Motorola Electronics Pte. Ltd.<br>Motorola GmbH<br>Hangzhou Motorola Cellular Equipment Co. Ltd.<br>Motorola, Inc.<br>Motorola Solutions, Inc.<br>Motorola India Private Limited<br>Motorola Industrial Ltda.<br>Motorola Korea, Inc.<br>Motorola Limited<br>Motorola de Mexico, S.A.<br>Motorola Mobility, Inc.<br>Motorola South Israel Limited<br>General Instrument of Taiwan, Ltd.<br>Motorola Technology Sdn. Bhd.<br>Motorola Trading Center Pte. Ltd. | Yes | Yes | Yes |
| 48 | Nationwide of Connecticut, Inc. | Yes | Yes | Yes |
| 49 | The New England Appliance & Electronics Group Inc. | Yes | Yes | Yes |
| 50 | NECO Alliance LLC (and all affiliates) | Yes | Yes | Yes |
| 51 | Newegg Inc.<br>Magnell Associate, Inc.<br>USOPC, Inc.<br>Rosewill Inc.<br>Nutrend Computer Products, Inc. | Yes | Yes | Yes |
| 52 | Nokia Corporation<br>Nokia Incorporated<br>Nokia Mexico S.A. de C.V. | Yes | Yes | Yes |

908290.1
1/31/11 5:39 PM

**LCD Direct Purchaser Class Member Exclusions**

| | Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|---|
| 53 | Office Depot Asia Holding Limited<br>Office Depot BA SAS<br>(formerly, Guilbert France S.AS.)<br>Office Depot BVBA<br>(f.k.a Guilbert Belgium BVBA)<br>Office Depot Brasil Limitada (inactive)<br>Office Depot Brasil Participacoes Limitad<br>Office Depot Centro America, SA de CV<br>Office Depot Chile Limitada (inactive)<br>Office Depot Cyprus Limited (f.k.a Claigan Ltd.)<br>Office Depot Delaware Overseas Finance No.1, LLC<br>(f.k.a Office Depot Delaware Overseas Finance No.1, Inc.)<br>Office Depot de Mexico SA de CV<br>Office Depot Deutschland GmbH<br>(f.k.a Guilbert Deutschland GmbH)<br>Office Depot France SNC (f.k.a Office Depot France SAS )<br>Office Depot Hungary Kft (f.k.a Elso Iroda Superstore Kft.)<br>Office Depot, Inc.<br>Office Depot International BVBA<br>OD International (Luxembourg) Finance<br>Office Depot, B. V.<br>(formerly Guilbert Netherland BV)<br>Office Depot Cooperatief W.A.<br>Office Depot Europe B. V.<br>Office Depot Europe Holdings Ltd.<br>Office Depot GmbH + Switzerland<br>Office Depot Holding GmbH + Switzerland<br>Office Depot Holdings Ltd.<br>Office Depot Holdings 2 Ltd.<br>Office Depot Holdings 3 Ltd.<br>Office Depot International B.V.<br>Office Depot International (UK) Ltd.<br>Office Depot Ireland Limited (f.k.a Guilbert Ireland Ltd)<br>Office Depot (Israel) Ltd.<br>Office Depot Italia S.r.l.<br>Office Depot Japan Limited<br>Office Depot Korea Limited (f.k.a Best Office Co., Ltd.)<br>Office Depot Latin American Holdings B.V.<br>Office Depot MDF SNC<br>Office Depot NA B. V.<br>Office Depot N.A. Shares Services LLC<br>Office Depot Netherland B.V. (f.k.a Office Depot International, B.V.) | Yes | Yes | Yes |

908290.1
1/31/11 5:39 PM

**LCD Direct Purchaser Class Member Exclusions**

| Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|
| (f.k.a Viking Direct (Holdings) B.V.) | | | |
| Office Depot Network Technology Ltd. | | | |
| Office Depot (Operations) Holding B.V. (f.k.a Guilbert Trademarks B.V.) | | | |
| Office Depot Overseas Limited | | | |
| Office Depot Overseas Holding Limited | | | |
| Office Depot Overseas 2 Limited | | | |
| Office Depot Poland Sp Z.O.o. (f.k.a Fontinalis) | | | |
| Office Depot Private Limited | | | |
| Office Depot Procurement and Sourcing (Shenzhen) Company Ltd. Or translated: Office Depot Merchandising (Shenzhen) Company Ltd. | | | |
| Office Depot Puerto Rico, LLC | | | |
| Office Depot SAS (f.k.a Guilbert SAS) | | | |
| Office Depot Service Center SRL | | | |
| Office Depot Service – und BeteiligungsGmbH&Co.KG | | | |
| Office Depot s.r.o. (f.k.a Papirius s.r.o.) | | | |
| Office Depot S.L. (f.k.a Guilbert Espana S.L.) | | | |
| Office Depot Tokumei Kumiai | | | |
| Office Depot UK Limited (f.k.a Guilbert UK Ltd ) | | | |
| Office Depot -Viking Holdings B.V. | | | |
| 2300 South Congress LLC | | | |
| 4Sure.com, Inc. | | | |
| AGE Kontor & Data AB | | | |
| AsiaEC.com Limited | | | |
| BizDepot, LLC (inactive) | | | |
| Centro de Apoyo Caribe SA de CV | | | |
| Centro de Apoyo SA de CV | | | |
| Computers4Sure.com, Inc. | | | |
| Curry's Limited | | | |
| Deo Deo Tokumei Kumiai | | | |
| eOffice Planet India Private Limited | | | |
| Erial BQ S.A. | | | |
| Europa S.A.S. | | | |
| Gosta Hansson & Co AB | | | |
| Guilbert Beteiligungsholding GmbH | | | |
| Guilbert International B.V. | | | |
| Guilbert Luxembourg S.AR.L. | | | |

<div align="center">15 of 21</div>

**LCD Direct Purchaser Class Member Exclusions**

| Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|
| Guilbert UK Holdings Ltd | | | |
| Guilbert UK Pension Trustees Ltd | | | |
| HC Land Company LLC | | | |
| Helge Dahnberg AB + Sweden | | | |
| Heteyo Holdings B V. | | | |
| Hutter GmbH | | | |
| Japan Office Supplies, LLC | | | |
| Kontorsfackhandlarna Stockholm AB + Sweden | | | |
| Kontorsgruppen i Sverige AB + Sweden | | | |
| NEWGOH Immobilienverwaltung GmbH | | | |
| Neighborhood Retail Development Fund, LLC (inactive) | | | |
| Niceday Distribution Centre Ltd | | | |
| North American Card and Coupon Services, LLC | | | |
| Notus Aviation, Inc. | | | |
| OD Acquisition Canada ULC | | | |
| OD Aviation, Inc. | | | |
| OD Colombia Ltda | | | |
| OD El Salvador, Ltda. de C.V. | | | |
| OD France, LLC | | | |
| ODV France LLC | | | |
| ODG Caribe SA de CV (f.k.a Urguguay Cia. Papelera, SA de CV) | | | |
| OD Guatemala y Compania. Limitada | | | |
| OD Honduras S de RL | | | |
| OD International, Inc. | | | |
| OD International Holdings CV | | | |
| OD International (Luxembourg) Holdings S.A.R.L. | | | |
| OD International (Luxembourg) Participation S.A.R.L. | | | |
| OD Management SNC | | | |
| OD Medical Solutions LLC | | | |
| OD of Texas, LLC (f.k.a OD of Texas Inc.) | | | |
| ODPanamaSA | | | |
| OD S.N.C. | | | |
| ODST, LLC (inactive) | | | |
| OD Tressorerie (f.k.a om S.N.C.) | | | |
| Office 1 Ltd | | | |
| Office 1 (1995) Ltd | | | |
| Office Club, Inc. | | | |
| OfficeSupplies.com, Inc. | | | |
| Office Town, Inc. (inactive) | | | |
| Papirius Kft. | | | |
| Pappersnabben i Malmo AB + Sweden | | | |
| Patitucci Ltd. | | | |

908290.1
1/31/11 5:39 PM

**LCD Direct Purchaser Class Member Exclusions**

| | Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|---|
| | Reliable Uk Ltd<br>Ritma AB + Sweden<br>S.A.R.L.<br>Servicios Administrativos Office Depot SAdeCV<br>Servicios y Material De Escritorio S.L.<br>Solutions4Sure.com, Inc.<br>Stichting Office Depot Charity for Children<br>Swinton Avenue Trading Limited, Inc.<br>Viking Direct B.V.<br>Viking Direct (Holdings) Limited<br>Viking Direct (Ireland) Limited (f.k.a Viking Direct (Ireland) Limited; then Office Depot International (Ireland) Limited -new change effective as of 912004)<br>Viking Direct S.A.R.L.<br>Viking Direkt GesmbH<br>Viking Finance (Ireland) Limited<br>Viking Office Products, Inc.<br>Viking Office Products KK<br>Viking Office Products S.r.l. (f.k.a Viking Direct SrI)<br>VOP (Ireland) Limited<br>VPC System S.r.l (inactive) | | | |
| 54 | Otawa, Toru | Yes | Yes | Yes |
| 55 | P.C. Richard & Son, Inc.<br>for itself and on behalf of its affiliateed and subsidiary companies including, but not limited to,<br>P.C. Richard & Son Long Island Corporation;<br>A.J. Richard & Sons, Inc.;<br>P.C. Richard & Son, LLC;<br>P.C. Richard Servcie Company;<br>Alfred Reliable Appliances, Inc.;<br>Reliable Richard's Service Corp.;<br>AGP Services Corp.;<br>Two Guys Ventures Corp.;<br>A.J. Staten Island, LLC;<br>P.C. Deer Park, LLC;<br>P.C. 185 Price Parkway, LLC;<br>P.C. 1574, Inc.;<br>P.C. 1574 Milford, LLC;<br>P.C. Lawrenceville, LLC;<br>P.C. Brick 70, LLC;<br>P.C. Richard & Son Connecticut, LLC | Yes | Yes | Yes |

## LCD Direct Purchaser Class Member Exclusions

| | Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|---|
| 56 | Planar Systems, Inc. | | | Yes |
| 57 | RadioShack Corporation | Yes | Yes | Yes |
| 58 | Rockwell Automation, Inc. | Yes | Yes | Yes |
| 59 | SB Liquidation Trust, Successor-in-interest to Syntax-Brillian Corporation, Syntax Groups Corporation, Syntax-Brillian SPE, Inc. | Yes | Yes | Yes |
| 60 | Schaed, Doris P. | | | Yes |
| 61 | Sears, Roebuck and Co. Sears Holdings Corporation Sears Holdings Management Corporation Kmart Corporation Kmart Management Corporation Kmart Holdings Corporation | Yes | Yes | Yes |
| 62 | Sitzmann, Holly | | | Yes |
| 63 | Sony Electronics Inc. | Yes | Yes | Yes |
| 64 | Sovran Acquisition Limited Partnership | Yes | Yes | Yes |
| 65 | State Farm Mutual Automobile Insurance Company (and affiliates and subsidiaries) | | | Yes |
| 66 | Sweat, Robin C. (Thomson) | Yes | Yes | Yes |
| 67 | Symank, Patricia | | | Yes |
| 68 | T-Mobile USA, Inc. and Voicestream | Yes | Yes | Yes |
| 69 | Target Corporation | Yes | Yes | Yes |
| 70 | Tech Data, and subsidiaries, including: AKL Telecommunications GmbH, Azlon European Finance Limited, Azlan GmbH, Azlan Limited, Azlan Logistics Limited, Azlan Overseas Holdings Limited, Azlan Scandinavia AB, Battrex B.V., Computer 2000 Distribution Ltd., Datatechnology Datech Ltd., | Yes | Yes | Yes |

908290.1
1/31/11 5:39 PM

**LCD Direct Purchaser Class Member Exclusions**

| Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|
| Datech 2000 Ltd., E.C.A. Produktie B.V., European Communications Asociation (E.C.A.) B.V., FCB Nominees Limited, Frontline Distribution (Ireland) Limited, Frontline Distribution Ltd., Hakro-Ooseterberg-Nijkerk B.V., Horizon Technical Services (UK) Limited, Horizon Technical Services AB, Hotlamps Limited, Managed Training Services Limited, Managed Training Services Limited, Maneboard Limited, Maverick Presentation Products Limited, Quadrangle Technical Services Limited, Quote Components B.V., Rosenmeier Electronics A/S, Rosenmeier Electronics Holdings A/S, Screen Expert Limited UK, Soft Europe SAS, TD Facilities, Ltd., TD Fulfillment Services, LLC, TD Tech Data AB, TD Tech Data Portugal, Lda, Tech Data (Netherlands) B.V., Tech Data (Schweiz) GmbH, Tech Data Brasil Ltda, Tech Data bvba/sprl, Tech Data Canada Corporation, Tech Data Chile. S.A., Tech Data Colombia S.A.S., Tech Data Denmark ApS, Tech Data Deutschland GmbH, Tech Data Distribution s.r.o., Tech Data Education, Inc., Tech Data Espana S.L.U., Data Europe GmbH, Tech Data European Management GmbH, Tech Data Finland OY, Tech Data Florida Services. Inc., Tech Data France Holding Sarl, Tech Data France S.A.S., | | | |

908290.1
1/31/11 5:39 PM

**LCD Direct Purchaser Class Member Exclusions**

| | Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|---|
| | Tech Data Global Finance L.P., Tech Data GmbH & Co. OHG, Tech Data Information Technology GmbH, Tech Data International Sarl, Tech Data ltalia s.r.l., Tech Data Latin America, Inc., Tech Data Limited, Tech Data Mexico S. de R. L. de C.V., Tech Data Midrange GmbH, Tech Data Nederland B.V., Tech Data Norge AS, Tech Data Operations,Center, S.A., Tech Data Osterreich GmbH, Tech Data Peru S.A.C., Tech Data Polska Sp.z.o.o., Tech Data Product Management. Inc., Tech Data Service GmbH, Tech Data Uruguay, S.A., Triade Holding B.V., Triade Rosenmeier Electronics AS | | | |
| 71 | Time Warner Inc. | Yes | Yes | Yes |
| 72 | TracFone Wireless, Inc. | Yes | Yes | Yes |
| 73 | Tweeter Newco, LLC Tweeter Opco, LLC Tweeter Intellectual Property, LLC Tweeter Tivoli, LLC Tweeter Home Entertainment Group, Inc Sound Advice Hifi Buys Tweeter Etc. Showcase Entertainment Douglas TV United Audio Now! Audio Video Bryn Mawr Stereo Big Screen City Hillcrest Audio DOW Stereo/ Video Home Entertainment | Yes | Yes | Yes |
| 74 | Uniden America Corporation | | | Yes |

20 of 21

**LCD Direct Purchaser Class Member Exclusions**

|  | Name | Opt out of Epson Settlement | Opt out of Chunghwa Settlement | Opt out of Litigation Class |
|---|---|---|---|---|
| 75 | Uni Device Corporation | | | Yes |
| 76 | ViewSonic Corporation<br>ViewSonic International Corporation<br>ViewSonic Display Limited<br>ViewSonic Hong Kong Limited<br>C/o Kai Tak Commercial Building | Yes | Yes | Yes |
| 77 | Vila, Alma | Yes | Yes | Yes |
| 78 | Wal-Mart Stores, Inc.<br>and its subsidiaries and affiliates, including but not limited to,<br>Wal-Mart-Stores East, LP;<br>Wal-Mart Stores Texas, LLC;<br>Wal-Mart Louisiana, LCC;<br>Wal-Mart Stores Arkansas, LLC;<br>Walmart.com USA, LCC (collectively operating as Walmart);<br>Sam's West, Inc. and Sam's East, Inc. (collectivley operating as Sam's Club). | Yes | Yes | Yes |
| 79 | Warner, Audrey[2] | Yes | Yes | Yes |
| 80 | Wollaston, Charles C. | Yes | Yes | |

---

[2] Received after January 4, 2011.

908290.1
1/31/11 5:39 PM