Exhibit J

# In The Matter Of:

*CRAGO, INC., et al.*
*v.*
*CHUNGHWA PICTURE TUBES, LTD., et al.*

_____

## *MOTION HEARING*
*May 26, 2011*

_____

**MERRILL CORPORATION**
**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

JUDICIAL ARBITRATION AND MEDIATION SERVICES

Before:  Charles A. Legge, Judge (Ret.)

--oOo--

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

IN RE:  CATHODE RAY TUBE (CRI)      No. 08-5944 SC.

ANTITRUST LITIGATION,               MDL No. 1917

_____      JAMS No. 1100054618

CRAGO, INC., et al.,            )
                                )
            Plaintiffs,         )
                                )
        vs.                     )
                                )
CHUNGHWA PICTURE TUBES, LTD.,   )
et al.                          )
                                )
            Defendants.         )
_____ )
THIS DOCUMENT RELATES TO ALL    )
CASES                           )
_____ )


MOTION HEARING

_____

Thursday, May 26, 2011

Two Embarcadero, Suite 1500

San Francisco, CA


REPORTED BY: COREY W. ANDERSON, CSR 4096 (435627)

MOTION HEARING - 5/26/2011

Page 2

```
 1                  A P P E A R A N C E S

 2

 3    FOR THE DIRECT PURCHASER PLAINTIFFS:

 4            SAVERI & SAVERI
              Attorneys at Law
 5            GUIDO SAVERI, Esq.
              GEOFFREY C. RUSHING, Esq.
 6            R. ALEXANDER SAVERI, Esq.
              706 Sansome Street
 7            San Francisco, California  94111
              415.217.6810
 8            gsaveri@saveri.com

 9            and

10            PEARSON SIMON WARSHAW PENNY LLP
              Attorneys at Law
11            BRUCE L. SIMON, Esq.
              AARON M. SHEANIN, Esq.
12            44 Montgomery Street, Suite 2450
              San Francisco, California  94104
13            415.433.9000
              bsimon@pswplaw.com
14

15            and

16            HAUSFELD LLP
              Attorneys at Law
17            MICHAEL P. LEHMANN, Esq.
              44 Montgomery Street, Suite 3400
18            San Francisco, California  94104
              415.633.1908
19            mlehmann@hausfeldllp.com

20            and

21    FOR THE DIRECT PURCHASER PLAINTIFFS:

22            COTCHETT, PITRE & McCARTHY LLP
              STEVEN N. WILLIAMS, Esq.
23            840 Malcolm Road
              Burlingame, California  94010
24            650-697-6000
              swilliams@cpmlegal.com
25
```

MOTION HEARING - 5/26/2011

```
                                                            Page 3
 1   A P P E A R A N C E S (Continued)

 2              and

 3   FOR THE INDIRECT PURCHASER PLAINTIFFS:

 4              ZELLE HOFMANN VOELBEL & MASON LLP
                Attorneys at Law
 5              CRAIG C. CORBITT, Esq.
                PATRICK B. CLAYTON, Esq.
 6              44 Montgomery Street, Suite 3400
                San Francisco, California  94104
 7              415.633.1905
                ccorbitt@zelle.com
 8

 9              and

10   FOR THE DEFENDANTS PANASONIC CORPORATION, PANASONIC
     NORTH AMERICA, MTPD:
11

12              DEWEY LeBOEUF
                Attorneys at Law
13              JEFFREY L. KESSLER, Esq.
                MOLLY M. DONOVAN, Esq.
14              1301 Avenue of the Americas
                New York, New York  10019-6092
15              213.259.7349
                jkessler@dl.com
16

17              and

18              WEIL, GOTSHAL & MANGES
                Attorneys at Law
19              ADAM C. HEMLOCK, Esq.
                767 Fifth Avenue
20              New York, New York  10153-0119
                212.310.8000
21

22

23

24

25
```

MOTION HEARING - 5/26/2011

                                                              Page 4

 1   A P P E A R A N C E S (Continued)

 2              and

 3   FOR THE DEFENDANT HITACHI DS:

 4              MORGAN LEWIS & BOCKIUS LLP
                Attorneys at Law
 5              SCOTT A. STEMPEL, Esq.
                1111 Pennsylvania Avenue, NW
 6              Washington, DC  20004
                202.739.5211
 7              sstempel@morganlewis.com

 8              MORGAN LEWIS & BOCKIUS LLP
                Attorneys at Law
 9              MICHELLE PARK CHIU, Esq.
                One Market, Spear Street Tower
10              San Francisco, California  94105
                415.442.1140
11              mchiu@morganlewis.com

12              and

13   FOR THE DEFENDANT SAMSUNG SDI:

14              SHEPPARD MULLIN RICHTER & HAMPTON LLP
                Attorneys at Law
15              MICHAEL W. SCARBOROUGH, Esq.
                JAMES L. McGINNIS, Esq.
16              Four Embarcadero Center, 17th Floor
                San Francisco, California  94111
17              415.434.9100
                mscarborough@sheppardmullin.com
18

19              and

20   FOR THE DEFENDANT LGE, LGUSA, LGETT:

21              ARNOLD & PORTER LLP
                ERIC SHAPLAND, Esq.
22              One Embarcadero Center, 22nd Floor
                San Francisco, California  94111
23              415.356-3051
                eric.shapland@aporter.com

24

25

MOTION HEARING - 5/26/2011

Page 5

```
 1   A P P E A R A N C E S  (Continued)

 2          ARNOLD & PORTER LLP
            BETH H. PARKER, Esq.
 3          One Embarcadero Center, 22nd Floor
            San Francisco, California  94111
 4          415.356-3051
            beth.parker@aporter.com
 5

 6          and

 7   FOR THE DEFENDANT SAMSUNG ELECTRONICS CORPORATION,
     SAMSUNG ELECTRONICS OF AMERICA:
 8
            O'MELVENY & MYERS
 9          Attorneys at Law
            IAN SIMMONS, Esq.
10          BEN BRADSHAW, Esq.
            PATRICK HEIN, Esq.
11          Two Embarcadero Center, 28th Floor
            San Francisco, California  94111-3823
12          415.984.8700
            isimmons@omm.com
13

14

15                       --oOo--

16

17

18

19

20

21

22

23

24

25
```

MOTION HEARING - 5/26/2011

Page 6

1              SAN FRANCISCO, CALIFORNIA

2              THURSDAY,  May 26, 2011

3                   9:54 A.M.

4                   --o0o--

5          P R O C E E D I N G S

6          THE COURT:  All right.  Let's get started.

7          Welcome back.  I gather from the full

8    attendance here this morning that you all attach about

9    as much significance to this motion, to these motions as

10   I do.  So I'm glad to have you all.

11         Now, we do have most everybody here.  We are

12   not using the star phone this morning for two reasons:

13   One is it's broken; and the second is that even if it

14   weren't broken, I wouldn't know how to use it.  So I

15   think we are good enough on this phone for the number of

16   people who will be here.

17         Most all of you have been here before, so you

18   know where the washrooms are, where the coffee is.  And

19   we do have two rooms available down the hallway for your

20   use as caucus rooms.

21         If you want to use your computers in here, we

22   are Wi-Fied.  To get through the code to get to our

23   Wi-Fi, Sarah's written it on the board up there.  The

24   magic word is "resolution," so that's what you have got

25   to type in to get through the process into our Wi-Fi

MOTION HEARING - 5/26/2011

Page 7

1   system.

2           If you want to talk with a podium this

3   morning, if you are more comfortable standing up, you

4   can get the podium that's right beside me here and

5   behind me and put it at your desk when you speak.

6           I think the court reporter has most of your

7   names.  I see he has a flock of cards here.  So because

8   of the number, instead of going around and asking you

9   now for your names, when you rise to talk, would you

10  please state your name and if at the end of the

11  proceedings you want to show your appearance here, but

12  haven't spoken, then be sure you give your card to the

13  court reporter.

14          Okay.  Now, we are here for two motions, both

15  of which concern the by now familiar subject of finished

16  products.  I believe that the motion has at least

17  preliminarily and I hope finally resolved the definition

18  of what the plaintiffs are alleging by way of a finished

19  products conspiracy, and I'm taking this from page 3 of

20  their brief in this motion as being a single, unitary

21  conspiracy that encompassed both CRTs and the finished

22  products containing them.

23          So it's not two conspiracies, and it's not

24  just a conspiracy of CRTs which affected finished

25  products, but is a conspiracy of both, CRTs and the

MOTION HEARING - 5/26/2011

Page 8

1    finished products.

2              Now, as I said, I believe the motion,

3    particularly the Rule 11 motion, is important to all of

4    us in this case, and all of you and your clients.  So

5    I'm not going to cut anybody off in this argument today

6    unless things are getting just too repetitive, and then

7    I'll exercise the prerogatives of the Chair.

8              I have done the reading.  Have I read every

9    single page of all these exhibits?  No.  But I have

10   referred the ones, read the ones that you referred to me

11   that I thought were important.

12             So let me give us just a little bit of

13   guidance, and this is not by way of cutting you off or

14   restricting you from arguing whatever it is you want to

15   argue, but the particular things that I am concerned

16   about as I have done the reading.

17             One is the legal standard for a Rule 11

18   decision.  I read the two older cases, Townsend and

19   Unioil, I believe are the two, and I read Keegan.  And I

20   am very, I don't know what to say about Keegan.  I find

21   it very confusing.  To me its language is really

22   contrary to the rule.  But it purports to state a rule.

23             And I am particularly concerned about its

24   language that in deciding a Rule 11 motion a judge will

25   take into consideration not just the evidence that was

MOTION HEARING - 5/26/2011

1  there at the time the pleading was filed, but evidence

2  that comes in somehow somewhere later.  I find that

3  principle staggering, to put it bluntly.  But there it

4  is.  There it is.

5           Now, plaintiffs, when you argue, I appreciate

6  with the flow of your argument that at some point in

7  your argument point to me where you believe there is

8  actual evidence of an agreement, direct evidence of an

9  agreement among the defendants to fix the prices of the

10 alleged products.

11          Now, if you haven't got that, if you think

12 that really what instead you are arguing is inferences

13 and conclusions to be drawn from the evidence you have,

14 well, that's okay, that's okay, let me know that please,

15 because I am still searching for the killer piece of

16 evidence that was in the record that you had before the

17 complaint was filed.

18          The structure of the industry has been argued.

19 And I at first thought that this is kind of a slam dunk

20 for the plaintiffs, because if we have an industry here

21 where the CRTs are the most important, biggest, most

22 expensive part of the finished products, the TV sets,

23 the monitors, it ought to be pretty clear that certainly

24 the price of the biggest component affects, I'm going to

25 use that word artfully, affects the price of the

1    finished products from which one might draw an inference

2    or conclusion that any discussion of setting prices on

3    CRTs had to necessarily include fixing prices on the

4    finished products.

5            But as I read the evidence you folks have

6    given to me, I'm really not sure that's true.  Seems to

7    me at least in some that I have been reading that the

8    causation may work the other way, that the prices that

9    have been established somehow, somewhere, on the TV sets

10   and the monitors were really driving what price

11   increases could be made on the CRTs, that in setting CRT

12   prices the discussions were concerned with running up

13   against a ceiling, but from the TVs and the monitors, if

14   they couldn't raise the internal CRT prices without

15   running against, up against that ceiling above which

16   they didn't feel a television set or a monitor could be

17   marketed.

18           So I just offer those comments on the

19   structure of the industry, just to let you know what my

20   thinking is about it, then obviously indicating a

21   certain degree of uncertainty.

22           And defendants, when you come to argue, of

23   course, argue what you want to argue.  But I'm

24   particularly interested in your focusing on page 12 of

25   plaintiffs' arguments, page 12 and following.  They say

MOTION HEARING - 5/26/2011

Page 11

1    that you admit certain things.  I don't know whether you

2    do or not and whether there are just language

3    differences here.  But I wish you would focus on that

4    and tell me what you think.

5              Okay.  That's the only guidance I can give you

6    at the moment.  And so Mr. Kessler, this is your motion,

7    so I'll give it to you first.  Do you want to speak

8    where you are from here or do you want to bring the

9    podium over to speak from, whether -- whichever way you

10   are comfortable.

11             MR. KESSLER:  Your Honor, I'll -- I don't need

12   the podium.

13             THE COURT:  Okay.

14             MR. KESSLER:  I am happy to stand if your

15   Honor would like.

16             THE COURT:  No, no.

17             MR. KESSLER:  I am happy to sit if your Honor

18   would like.  I want to do whatever is most respectful in

19   this situation.

20             THE COURT:  Don't worry about respect.  Just

21   worry about clarity.

22             MR. KESSLER:  I'll just sit down, if that's

23   okay.

24             THE COURT:  Okay.

25             MR. KESSLER:  I can reach all my papers, I

MOTION HEARING - 5/26/2011

Page 12

1   don't have to bring them over the podium, do that.

2            THE COURT:  Okay.

3            MR. KESSLER:  First of all, good morning, your

4   Honor.  Jeffrey Kessler, for the purposes of the record.

5   I represent the Panasonic defendants on this motion.  I

6   am also arguing on behalf of the Hitachi defendants who

7   have joined this motion, and I am also arguing on behalf

8   of the two Samsung entities who have joined into this

9   motion.

10           Your Honor, let me start out by saying that

11  our clients, all of the clients in this motion, were

12  very --

13           THE COURT:  Pardon me.  Pardon me.  LGE is not

14  going to be speaking, they have simply sent their letter

15  and that's as far as they are going to go today?

16           MR. KESSLER:  As far as I know, your Honor.

17           THE COURT:  Okay.  Anybody here representing

18  LGE?

19           MR. SHAPLAND:  Here, Eric Shapland on behalf

20  of LGE.

21           THE COURT:  Do you plan on speaking, or are

22  you just --

23           MR. SHAPLAND:  To the extent that issues

24  raised in my letter become relevant and you would like

25  to ask questions about it --

MOTION HEARING - 5/26/2011

1          THE COURT:  Okay.

2          MR. SHAPLAND:  I am prepared to answer.

3          THE COURT:  Okay.

4          Go ahead.  I'm sorry.

5          MR. KESSLER:  Your Honor, the -- the companies

6    who joined into this Rule 11 motion did so with great

7    reluctance and did not do so lightly.  It would have

8    been our preference, our strong preference to have been

9    able to work out this issue with the plaintiffs, because

10   there are some things we are not challenging on this

11   motion.

12         Not that we admit, your Honor, that these

13   things happened.  So that's wrong.  Since we obviously

14   don't admit that there was an agreement regarding tubes.

15   Okay, to the extent that plaintiffs have used language

16   like that, no, we make no such admissions.

17         But on this motion, we are not challenging

18   under Rule 11 an allegation of a conspiracy involving

19   cathode ray tubes, we are not challenging that on this

20   motion, and we are not challenging an allegation that a

21   conspiracy involving cathode ray tubes had an effect on

22   the prices of finished products.

23         And in fact, we have resolved this matter with

24   the indirect plaintiffs.  The indirect plaintiffs have

25   now withdrawn by stipulation all allegations of a

MOTION HEARING - 5/26/2011

Page 14

1    unitary conspiracy involving both CRTs and finished

2    products, they have withdrawn all allegations that there

3    was any conspiracy involving finished products, and they

4    have agreed to pursue their claims simply against an

5    allegation of a conspiracy involving tubes with a claim

6    that it had an effect on finished products.  And we have

7    no motion against that pending.

8           Again, I certainly want to make it clear we

9    don't admit to any such conspiracy.

10          THE COURT:  All right.

11          MR. KESSLER:  And no one would do that.

12          We tried, your Honor, to explore this through

13   discovery.  And so rather than initially file a Rule 11

14   motion at the beginning or to do that, we said let's

15   find out what did the plaintiffs have as a basis for

16   alleging this conspiracy which we now understand, your

17   Honor, is a unitary conspiracy affecting both.

18          I think there was a lot of confusion, I agree

19   with your Honor, where there was two separate ones or

20   alternatively a separate in the unitary, but now the

21   direct plaintiffs I believe have limited their claim to

22   a unitary conspiracy claim.  At least as I understand

23   their papers, the same way you read --

24          THE COURT:  Oh, that's the way I understand

25   it.

MOTION HEARING - 5/26/2011

Page 15

1           MR. KESSLER:  Same way you read the papers.

2           THE COURT:  That's why I sort of read from it

3    was I talking earlier.

4           MR. KESSLER:  Right.

5           THE COURT:  Because I think that's the

6    definition we have got to use.

7           MR. KESSLER:  Yes.  I think that's the only

8    definition we can use right now.

9           So we tried to find out what is the basis for

10   that.  So we issued interrogatories, we issued document

11   requests.  Your Honor will recall the plaintiffs did not

12   want to add to that.  We had to have a proceeding before

13   your Honor.  Your Honor ruled it was important to get

14   this information, both because of the possibility this

15   might lead to a Rule 11 motion, as it has, and just to

16   understand the scope of the claims for how this case is

17   going to be run.

18          So why do we conclude that we had to file this

19   motion, reluctantly?  The reason we came to this

20   conclusion is because by injecting a now unitary

21   conspiracy claim that also involves finished products,

22   the plaintiffs have vastly expanded the scope of this

23   case, we believe without any basis to do so, and this is

24   true, your Honor, under an objective test or under a

25   subjective test for Rule 11.

MOTION HEARING - 5/26/2011

1                So while I share some of your confusion about

2      the Keegan case which seems to be, in its focus on

3      looking at material today seems to be inconsistent with

4      the language of the rule, as well as the re-hearing en

5      banc and Townsend, which should govern the Ninth Circuit

6      since that was a rehearing en banc, I don't think one

7      panel can change the standard that was set forth in

8      Townsend, but for the purposes of this motion it doesn't

9      matter.

10                And the reason it doesn't matter is that we

11      believe -- and I'll go through this -- what the record

12      now shows is there was no subjective basis, there was no

13      objective basis, and it doesn't matter whether you look

14      at the evidence at the time they filed the complaint or

15      anything else plaintiffs want to point to since that

16      time.  There still is to this moment as we are sitting

17      here nothing to suggest that there is any basis to

18      allege a conspiracy objectively that would extend beyond

19      the tubes.

20                And I'll explain why.

21                THE COURT:  But if the Ninth Circuit law is

22      that subsequent information can be used in the inquiry,

23      doesn't it follow from that that I have to give them

24      discovery rights before entertaining this motion?

25                MR. KESSLER:  Your Honor, that can't be the

MOTION HEARING - 5/26/2011

Page 17

1    law in that regard, and I'll explain why.

2           The Ninth Circuit has also held that if you

3    wait until summary judgment which would be the end of

4    the period, says to then move for Rule 11 back at the

5    time of the complaint, you have waited too long, because

6    you haven't given the plaintiffs a chance to withdraw

7    the claims and undo all the injury.

8           In other words, the injury where we are -- we

9    are incurring has been -- what has already been very

10   large expense costs of having to both defend and prepare

11   to defend against a claim that shouldn't be in the case.

12          Okay.  If the Ninth Circuit meant that you

13   have to wait 'til the end of discovery, okay, and then

14   it turns out let's say at the end of discovery we are

15   right, there is nothing to support this claim, that

16   would mean I would be asking for -- and I have no

17   intention of wanting to get into this position --

18   millions of dollars in sanctions, because it will have

19   taken me through all of the discovery that shouldn't

20   have been in the case in the first place, it would be a

21   Rule 11 violation at that time, the injury would occur

22   all the way back to the beginning of the case.

23          So it just utterly makes no sense to interpret

24   that that's what Keegan meant.  And it would defeat the

25   purposes of Rule 11 as set forth in the rule.

MOTION HEARING - 5/26/2011

Page 18

1           If you look at the notes to Rule 11 and the

2    history, why was the rule passed?  The rule was passed

3    very simply for the following reason.  Rule 12 as your

4    Honor knows takes a liberal view.  It says if you put an

5    allegation in the complaint, says, and you have to a

6    assume at that time that the allegations are true, you

7    have to give the plaintiffs the benefit of all

8    inferences on a Rule 12 motion.

9           So that potentially means that if you put in

10   an allegation, whether it's true or not, you can open

11   the door to massive discovery, years of litigation,

12   enormous expense, simply because you have to assume the

13   allegations are going to be true, says then you have to

14   give all the inferences to the plaintiffs.

15          Rule 11 was put in and then modified by the

16   drafters to put a reasonable check on that effect.  And

17   the reasonable check was okay, you have to at least have

18   a reasonable basis, some basis for putting in the

19   allegations you are making.  Okay.  And you know, so

20   it's a very logical rule, you know, to prevent frankly

21   federal court litigation from going wild.

22          Because think of the Ninth Circuit's rule the

23   other way.  It could be that a lawyer would just put in

24   the most frivolous allegations in a complaint.  I'm

25   talking let's say far more frivolous than anything we

MOTION HEARING - 5/26/2011

Page 19

1    are imagining here.  Okay.  The most frivolous.  And the

2    rule would be okay, they are entitled to go to all

3    discovery, the case goes forward, there is nothing here,

4    it's completely frivolous, you have to assume that they

5    are true, and then only at the end do you then get

6    Rule 11 sanctions after the case has been disrupted in

7    the courts.  It makes no sense to understand that.

8            So I think you have to view Keegan as

9    basically being not intending to state that the rule is

10   you give plaintiffs, you know, discovery to find out

11   whether there was a basis for their claims or not.

12           In fact, if that were true, Rule 11 wouldn't

13   do anything beyond Rule 12.  In other words, Rule 12

14   says you give plaintiffs discovery to decide if they can

15   support a claim and then the remedy is summary judgment.

16   And that's really plaintiffs' position.

17           If you look at plaintiffs' position in the

18   various papers, what they are really saying is they

19   claim well, we are making a hidden motion to dismiss, so

20   you should treat it as a motion to dismiss, and they are

21   entitled to discovery and our remedy is summary

22   judgment.

23           Well, with all due respect, Rule 11 has

24   independent life.  And I think the Ninth Circuit's made

25   that clear in Townsend.  It's also made it clear if you

MOTION HEARING - 5/26/2011

Page 20

1  look in the In Re Biala case which we cited as well, a
2  Ninth Circuit case.  What has to be -- and I'm willing
3  to go and objectively reasonable, I don't have a problem
4  with that, so that it's not just the -- what I think
5  Keegan was focusing on.  If I may, Keegan was focusing
6  on well, if there was information at the time in the
7  complaint, but the plaintiffs just did a poor job
8  investigating, it's not enough they did a poor job
9  investigating if -- you know, but the information was
10  there.  Okay.  That's what I think Keegan was saying,
11  not that you should allow a fishing evidence of
12  discovery and let's see what happens a year and a half
13  from now whether they had a basis.
14          So if they missed something somehow from a
15  poor investigation, but they found it, say look, here it
16  is, it existed at the time of the complaint, I have got
17  it, Keegan was a little troubled by that in terms of
18  doing it because they have now found the basis for the
19  case.
20          But what I'm saying here, your Honor, is that
21  this moment, they can't mean you have to wait further.
22  It was Keegan just looked at the time of the motion, it
23  didn't say wait 'til later in the case.  Okay.
24          Right now with this motion there is only the
25  following, and it hasn't changed.  Number one, and most

MOTION HEARING - 5/26/2011

Page 21

1    importantly, because this is mostly what they rely on,

2    is did Chunghwa proffer or the Chunghwa documents, in

3    other words, I don't care which because it doesn't

4    matter, they have now put in some of the documents

5    themselves which they didn't have at the time of the

6    complaint, but I am willing to look at the Chunghwa

7    documents themselves because they are no different than

8    what the proffer could have been.

9              And what those documents reveal is exactly

10   what Chunghwa stated in its request, in its answers to

11   the request for admission.  Chunghwa, which is only a

12   tubes company, so it does not make a single finished

13   product, said "I have no information," that would be

14   based on all their documents and all their witnesses, "I

15   have no information of any conspiracy that would be to

16   fix the prices of finished products."  Chunghwa just

17   doesn't know that.

18             And if you look at their documents, that's

19   correct.  What the documents that plaintiffs have cited

20   show -- and we have looked at all the Chunghwa

21   documents, and you could presume, your Honor, plaintiffs

22   picked out the ones they thought were best, so let's

23   assume, you know, that's what the best is, what the best

24   documents show is that at some meetings -- of tube

25   manufacturers there was the discussion your Honor

MOTION HEARING - 5/26/2011

Page 22

1   highlighted, which is gee, what's going on in -- in
2   television prices, because are we really going to be
3   able to ask customers to absorb an increase in tube
4   prices to pay us a higher price if their TV prices,
5   which it was clear by those documents the two people had
6   no control over, if their TV prices are going down.
7   What they were looking at is they were observing the TV
8   market and saying gee, our customers' TV prices are
9   going down, how can we justify, do we really think that
10  they will be able to pay us for this.  So it is exactly
11  what your Honor thought that's what those documents say.
12          Now, could that be an objectively reasonable
13  basis for suggesting that the tube companies were
14  engaged in a conspiracy to fix the prices of the
15  televisions?  It's just the opposite.  It shows there
16  was no control or act by the tube companies over the
17  price of televisions or monitors, and they just had to
18  be aware of what that was because it was a barrier to
19  what they could get the customers to pay.
20          And this goes, your Honor, to the structural
21  issue you raised.  And plaintiffs have been very clever
22  about this.  They keep talking about how they examined
23  the structure of the industry and the structure of the
24  industry supports the existence of this agreement.
25          The truth is, your Honor, when you read the

MOTION HEARING - 5/26/2011

Page 23

1   complaints, the only industry structure they discuss is

2   the structure of the tube industry.  And yes, it is

3   correct, there were a small number of tube

4   manufacturers, they make various allegations about that.

5           There are no allegations about the structure

6   of the television and the monitor industry.  And they

7   wouldn't rely on such allegations.  Why?  Because many

8   of the dominant sellers in that industry are not alleged

9   to have anything to do with this.

10          So for example, there is no allegation that

11  Sony television had anything to do with this.  There is

12  no allegation that Sharp television had anything to do

13  with this.  There is no allegation that Apple Computer,

14  HP, Dell, Lenovo, any of the computer companies who made

15  the monitor screens had anything at all to do with this.

16          So what the structure allegations were were

17  again just about the tubes.  And what the facts are, if

18  you want to talk about the facts now, and they can't

19  deny these facts, is that there are the market shares in

20  the finished products are significantly held by people,

21  says who are not alleged to be part of this at all,

22  which is exactly why when you look at that document they

23  are saying well, television prices may not support this

24  going down.  Well, that's because if Sony says, and

25  Sharp and others are reducing television prices which

MOTION HEARING - 5/26/2011

1    everyone has to meet in competition in the television

2    market, including, for example, they say well, some of

3    our companies are affiliated, yes, Panasonic had a

4    television company, and it had a separate affiliated

5    company involved in CRTs, but its television company had

6    to compete with Sony and Sharp and others, and if TV

7    prices are going down, they have to meet that

8    competition.

9             So again, it's the idea that you could have a

10   unitary conspiracy simply by saying it to expand the

11   case, simply because there was a handful of documents

12   that mentioned the prices of TVs as being a constraint

13   on what the tube companies could charge can't possibly

14   be a basis for this.

15            Now, what else do they cite besides Chunghwa

16   and the market facts?  Well, the only other thing they

17   cite is the various government investigations and the

18   indictments.

19            Now, first, let me say I agree with

20   plaintiffs, they are not limited in their claims to what

21   governments charge.  That's not our argument.  Our

22   argument is they have said this is what they relied

23   upon.

24            So if they have chosen to say that's what they

25   are relying upon, it can only support what it is about.

MOTION HEARING - 5/26/2011

1   That's the point.

2          And when you look at all the government

3   claims, all the indictments, everything they cite,

4   whether it's the United States or whether it's Europe or

5   whether it's Japan, whatever they have cited, one thing

6   is consistent.  It's only about tubes.  The only

7   reference made that they claim is a reference to

8   finished products is an impact reference, which is then

9   in one of the statements -- one of the papers by the

10  Department of Justice in one of the pleadings says that

11  this had an impact, says on American consumers

12  suggesting those consumers could be people who bought

13  the finished products as well.

14         Well, again, that's impact.  If you read the

15  allegations of the government in all those documents

16  about the agreements, the agreements are only about

17  either CDTs, in some cases it's only CDTs, sometimes

18  it's CPTs, some cases there may be claims of both in

19  some countries, but it's never, is never once finished

20  products.

21         So your Honor, what we believe is the case is

22  that there is a Rule 11 is a rule that has a meaning.

23  It can't be it has no meaning.  Taking the most extreme

24  liberal view of the rule, even looking at Keegan, the

25  most it could mean, the most it could mean in their

Page 26

1    favor is that you look at it and see is there an

2    objective basis now at this moment, whether I believe

3    the proper rule is at the time of the complaint because

4    that's what the rule seems to say and the notes seem to

5    say, that's my view is the proper rule, I want to be

6    clear.  The proper rule is the time of the complaint.

7          But let's assume for the moment it's now,

8    either then or now, at this moment.  The only evidence

9    they can present to you is what they presented here.

10   And what they presented here does not provide an

11   objective basis for saying the conspiracy extends, the

12   alleged conspiracy extends beyond the tubes that they

13   identify.

14         Now, your Honor, a few more words about this.

15   First of all, your Honor asked me, you know, to focus in

16   particular on the admissions they allege on page 1.  So

17   I guess to make the record very clear, that defendants

18   do not admit that they attended conspiratorial meetings

19   during which the prices of CRT tubes were discussed and

20   agreed upon.  We do not admit that.  They know from our

21   answers that we deny that.  Okay.

22         Were there meetings?  Yes.  Do we admit that

23   there were prices fixed at those meetings?  No.  That's

24   what that case is about.  Okay.

25         They say we admit all but a few of the alleged

1   conspirators, including all moving defendants who

2   attended these meetings, manufactured finished products

3   as well as CRT tubes.  No, we don't admit that.

4           So for example, the Samsung entity who is here

5   says only made finished products.  Okay.  My companies

6   that I represent, one of them was a joint venture for

7   Toshiba over some of this period of time which made

8   tubes, and another one of my companies made televisions.

9           When they say it was part of a vertically

10  integrated corporate family and admitting vertical

11  integration of conspirators, no, we don't admit that the

12  vertical integration has anything to do with a

13  conspiracy.  There was some vertical integration by some

14  of the defendants here, and it's very well established,

15  vertical integration alone couldn't be evidence of a

16  conspiracy at all.

17          The third point they make is the effects on

18  finished product prices and other aspects of the

19  finished product market or the prices agreed upon by,

20  for CRTs were discussed at conspiratorial meetings,

21  admitting that conspirators considered where the

22  possible CRT price increases were going to be viable

23  based on the finished product prices."

24          No, we do not admit three as written.  We

25  don't admit there was any conspiracy, we don't admit

1    that there were output restrictions agreed upon for

2    CRTs.  All of these are loaded statements that there is

3    no basis --

4              THE COURT:  No, no, I'm focusing on the

5    distinction --

6              MR. KESSLER:  -- okay.  With respect to this.

7              THE COURT:  The distinction between finished

8    products and CRTs.

9              MR. KESSLER:  Okay.

10             I guess what I would say we admit, we admit

11   that the documents they identified from Chunghwa show

12   that there -- if those documents were -- assuming them

13   to be true, okay, which I don't have evidence, I don't

14   have foundation or anything else, but if they were true,

15   indicate as your Honor observed that there was some

16   discussion that the competition in televisions would be

17   a limitation on what tube prices could be charged, which

18   is the opposite of the unitary conspiracy.

19             I admit that's what those documents appear to

20   say, based on the translation that's there.  I can't

21   verify that because, you know, they are not my

22   documents, I wasn't at those meetings.  But that is what

23   those documents appear to say, that TV prices say

24   limitation because there is no agreement about TV

25   prices, and tube companies have no ability to control TV

MOTION HEARING - 5/26/2011

Page 29

1   prices.  That's what at least those few documents would

2   seem to indicate.

3          And obviously I don't agree to No. 4, that the

4   agreements reached at these meetings were expected to,

5   and did affect, the prices of the finished products.

6   All we are saying, your Honor, is that we are not

7   challenging on Rule 11, want to be very clear that they

8   have stated an allegation against tubes which they claim

9   affect it.

10         I think, your Honor, it may very well turn out

11  that anything involving tubes had no effect on

12  televisions because the television market was too

13  competitive, okay, and that it was competition in the

14  television market or in the monitor market.

15         So no, we do not admit that.  So basically we

16  don't admit any of them with respect to that.  Just want

17  the record to be very clear about that.

18         At bottom, your Honor, and I think I'm going

19  to be quiet and let the plaintiffs respond, what they

20  are doing is speculating.  Their whole thing is

21  speculation.  Says well, it says if we have enough to

22  allege a conspiracy about tubes, says they might have

23  agreed about televisions or monitors because at least

24  some of them were in this.

25         And by the way, my company, you know, we don't

MOTION HEARING - 5/26/2011

1    make monitors, we make televisions.  That's another

2    whole problem about this.  They try to lump it all

3    together.  They are completely different products.

4    Okay.  We -- so we are not making any monitors, you

5    know, and they don't want to distinguish that either.

6              But putting -- they are really two different

7    things, just as CDTs are different from CPTs.  You know,

8    they are for two different uses.

9              But they are purely speculating, just like

10   they say well, if somebody is in the LCD case -- and by

11   the way, Panasonic is not a defendant in the LCD case,

12   but they lump everybody together.  If someone is in the

13   LCD case, that factor in that case must mean there is a

14   basis to allege that they fixed finished products with

15   television and monitors?  I don't think so, your Honor.

16   There is no logic about that.  It's pure speculation.

17             And what are the consequences?  The

18   consequences are if we don't get these allegations out

19   of this case, one, I have to hire experts to do work to

20   study an alleged conspiracy that's unitary involving

21   televisions and end products at great expense and work

22   to study that when it's going to have no relevance to

23   this case.

24             You are going to have to hear class action

25   certification motions that are going to be a total

MOTION HEARING - 5/26/2011

1    nightmare because it's not going to be clear, is this

2    limited to tube purchasers?  No, it's -- I'm talking

3    about in the direct case now.  On the direct case.  Says

4    are the purchasers of TVs in the direct case or the

5    indirect case, are we looking at effect or are we

6    looking at conspiracy?  What is the claim that we are

7    going to be fighting on that class certification motion?

8    It would be impossible to discern.

9            They want to do discovery, as you'll hear,

10   where we have to go out not to -- and I want to be clear

11   about this, we have no problem producing documents about

12   CPTs, as we have agreed to do.  And if it says something

13   about televisions on those documents, we are not going

14   to strike it.

15           So if as they are speculating there is some

16   evidence at a discussion of -- of a tube there was some

17   mention of televisions, they'll get it, because we are

18   not going to redact the document.  It will be there just

19   like there is some mentions on televisions in the few

20   Chunghwa documents they pointed out to you.

21           But what this discovery fight is about, do we

22   have to go to separate companies that sold televisions?

23   And if they had any meeting, says with another company

24   who sold televisions, so for example, they buy and sell

25   products to each other, they go to trade associations,

MOTION HEARING - 5/26/2011

1    they do joint ventures, they attend government standard

2    setting meetings?  We have to go through thousands,

3    millions of those e-mails, reviewing them, many of which

4    are in multiple languages, Japanese, Chinese, Korean,

5    whatever it is, to figure out what to produce in the

6    case when there is no basis for this allegation?  The

7    burdens are gigantic for us, the burdens are gigantic

8    for you, they make the case unmanageable.

9              This is exactly what we believe was the whole

10   point of Rule 11.  If Rule 11 doesn't allow relief here,

11   then it really is meaningless for these -- in terms

12   of as a gatekeeper on having a basis for allegations in

13   a complaint.  It makes it meaningless.  It would be you

14   only can look at Rule 11 at the end of the case when you

15   are in summary judgment, which makes absolutely no sense

16   at all the way that rule is structured.

17             And I do not believe that's what Keegan meant

18   about that.  And I don't think it could mean that in

19   light of Townsend says in the en banc decision of the

20   Ninth Circuit.

21             Finally, on relief, your Honor, your Honor

22   has -- the one thing I think everyone agrees, you have

23   enormous discretion under Rule 11 to decide what's the

24   appropriate relief.  All the cases say that.  We believe

25   here the most important, appropriate relief is to strike

MOTION HEARING - 5/26/2011

Page 33

1    the allegations and basically just put the direct

2    purchasers in the same position as the indirect.  That's

3    all we are asking.  The case will go on, case will go

4    on.  Massive discovery still going to go on.  But it's

5    plenty massive just limited to the allegations of a tube

6    conspiracy, and we don't dispute they are entitled to

7    discovery of the effect of a -- of an alleged tube

8    conspiracy on the prices of TVs.

9           So no one is saying they can't do effect

10   discovery.  But the conspiracy allegations should be

11   stricken so that the complaint is limited just as the

12   indirects have agreed.

13          We have also asked your Honor for monetary

14   relief, which we believe is appropriate.  If your Honor

15   is inclined to consider both the forms of relief, what

16   we would do is put in a fee request, a reasonable fee

17   request, which would focus, your Honor, at this point we

18   believe on this motion practice and the discovery motion

19   practice which related to discovering this.  That's what

20   I believe at least would be the most appropriate way to,

21   you know, to narrow to date.

22          Because the big expense that we are going to

23   incur if we have to defend these finished products

24   claims that don't belong here is about to begin now.

25   You know, it will come up on the motion your Honor is

MOTION HEARING - 5/26/2011

Page 34

1    going to hear immediately after this.  You know, that's

2    when the huge expense is going to occur.  Right now we

3    have the opportunity to end this at an appropriate time.

4            Thank you, your Honor.  Unless you have any

5    questions, I think I'll stop at this time.

6            THE COURT:  All right.  Does any other defense

7    counsel wish to speak?

8            MR. SIMMONS:  Just in reply, your Honor.  Ian

9    Simmons for Samsung Electronics Corporation, Samsung

10   Electronics of America, your Honor.

11           I join, we join in everything Mr. Kessler has

12   said.  Just want to amplify briefly a couple of points.

13           The first is I think as the reply brief notes,

14   you want to bear in mind what is the standard for a

15   conspiracy.  The supreme Court is explicit about this,

16   and unambiguous in the Monsanto case, when it said a

17   conspiracy is a conscious commitment designed to achieve

18   an unlawful objective.

19           When you take that standard back to this

20   flurry of meetings that the plaintiffs like to point to,

21   I think tying that standard to what Mr. Kessler says,

22   these are meetings about two manufactures, and what can

23   they do on tubes, if anything, what effect does that

24   have on the finished products.

25           These are not meetings, not emphatically

MOTION HEARING - 5/26/2011

Page 35

1    meetings evincing a conscious commitment to conspire on
2    finished products.  And for good reason.  Most of the
3    players at those meetings didn't make finished products.
4    So I think it's very important to bear in mind the
5    substantive standard.
6              The next thing, your Honor, let me just point
7    out, Mr. Kessler likes to speak of expense and so on,
8    and defendants may be differently situated on them.
9              But I can say as I sit here right now my
10   clients have produced upwards of 600,000 documents.  My
11   clients make the finished products, and they purchase
12   the tubes.  We purchase the tubes.  We purchase the
13   things that are talked about in any of the criminal
14   resolutions, and we -- as of today we produced about
15   643,000 documents.  Those relate to finished products.
16             Prior to the filing of plaintiffs' opposition
17   in April, we were in the neighborhood of 571,000 pages.
18   Unless I'm mistaken, I don't see one of our documents
19   referenced by plaintiffs saying here you go, here --
20   here is my -- you know, here is my finished products
21   conspiracy claim.
22             We have already incurred immense expense on
23   this finished products phantom.  Will they continue to
24   bleed us if the motion is denied?  No doubt.  No doubt.
25   I mean, let me bleed you to the table and force some

MOTION HEARING - 5/26/2011

```
 1   sort -- I mean, that's sadly the -- it's too pervasive
 2   in American litigation.
 3           But some defendants may have produced
 4   something on finished products, some -- we as prior to
 5   their filing under opposition 571,000 pages.  Where is
 6   it?  Where is the finished products conspiracy on the
 7   part of people to buy the tubes?
 8           Final point I'd leave you with, your Honor,
 9   two final points.  And I know I am sounding a little
10   repetitive.
11           THE COURT:  I'm sorry, what?
12           MR. SIMMONS:  Couple of other points.
13           THE COURT:  Yeah.
14           MR. SIMMONS:  It's very rare where you get the
15   amnesty candidate, Chunghwa, answering requests for
16   admissions like what we put before the court here.
17   Chunghwa emphatically admitted they have no knowledge or
18   evidence of a finished products conspiracy.
19           You know, I spoke even to Joel Sanders of
20   Gibson Dunn about that when we were serving those.  He
21   said that's just not -- that's just not on green earth
22   ground.  So we can't discount the value of those
23   admissions.
24           Final point, your Honor, the indirects said
25   look, it's a tube case.  I am -- my putative class
```

MOTION HEARING - 5/26/2011

Page 37

1    members bought finished products and I think they were

2    impacted by an upstream input conspiracy, I want some

3    evidence on passthrough and so on.  I don't think there

4    is a defendant at this table, they can correct me if I

5    am wrong, who would take issue with that.  But that is a

6    dramatically different scope of discovery than produce

7    everything on finished products and the whole thing.

8            So long-winded way, your Honor, of saying

9    while I continue to be bled, my clients, maybe, maybe,

10   but I have already incurred upwards of 600,000 pages of

11   discovery because, you know, motion is denied, we are

12   going forward.

13           I think the defendants are being circumspect

14   with this motion.  No one is seeking monetary sanctions.

15   They are simply saying enough is enough, look at what is

16   before you, look at those requests for admissions by the

17   party that has been cooperating with opposing counsel.

18   Look at it.  And we have already incurred immense

19   expense.  It should stop.

20           That's -- I'll -- I'll maybe reserve depending

21   on what is said by the opposing table.  But that's all

22   I'll say for now.

23           Thank you for your consideration.

24           THE COURT:  Any other defendant want to be

25   heard?

1         MR. SHAPLAND:  This is Eric Shapland, your

2    Honor, on behalf of LG Electronics.  We did not join the

3    Rule 11 motion, so I didn't have an opportunity to

4    respond to some of these statements made in plaintiffs'

5    opposition.

6         I just wanted to make one footnote point.

7    Plaintiffs do a lot of lumping together of all the

8    various different defendants.  And in one place they

9    provide a list of all those defendants who have been

10   indicted or whose employees have been indicted, and they

11   include my client, LG Electronics, in that discussion.

12   I want to be clear that LG Electronics has not been

13   indicted, nor have any of its employees.

14        What plaintiffs are referring to are

15   indictments against employees of a joint venture which

16   is a separate company which was created in 2001.  And so

17   those individuals were not LGE employees.

18        THE COURT:  All right.  Anybody else on the

19   defense side?

20        All right.  Plaintiffs' side.

21        MR. LEHMANN:  Your Honor?

22        THE COURT:  Yeah.

23        MR. LEHMANN:  Mr. Saveri and Mr. Simon were to

24   discuss the factual components related to this claim.

25   But given what has gone before and your Honor's express

MOTION HEARING - 5/26/2011

Page 39

1    concerns about how to interpret the Keegan case, I think

2    it might be useful to first set the legal framework.

3                THE COURT:  That's fine.  Whatever way you

4    want to do it.  Do you want to speak sitting or do you

5    want the podium?

6                MR. LEHMANN:  I prefer to just speak here.

7                THE COURT:  Okay.  That's fine.  Go ahead.

8                MR. LEHMANN:  Your Honor, I'm going to start

9    with the Townsend case, the en banc decision of the

10   Ninth Circuit.

11               THE COURT:  Yes.

12               MR. LEHMANN:  And that case establishes that a

13   filing can be sanctionable under Rule 11 if it's done

14   either for an improper purpose or is frivolous.  The

15   Ninth Circuit en banc said frivolousness involves a

16   two-fold inquiry.  It is both baseless and made without

17   a reasonable and competent inquiry.

18               The Ninth Circuit in Townsend also recognized

19   that there is a sliding scale here in terms of the

20   circumstances of the case and the type of pleading that

21   is being attacked under Rule 11.  You would apply a

22   different standard with respect to a pleading submitted

23   in connection with summary judgment than you would with

24   respect to a complaint.

25               The Ninth Circuit in Townsend en banc said

MOTION HEARING - 5/26/2011

Page 40

1    this:  If the relevant facts are in control of the

2    opposing party, more leeway must be given to make

3    allegations in the early stages of litigation that may

4    not be well grounded.

5             In a similar vein, leeway should be given to

6    make allegations relating to an opposing party's

7    knowledge, purpose, or intent if the case is one in

8    which a prudent lawyer to be safe would name a number of

9    defendants such as in a complex product liability case.

10   Imprecision at the outset of the litigation should be

11   tolerated.

12            How does Keegan interpret Townsend?  The court

13   in Keegan read Townsend as what it called an "objective

14   objective standard" that turns on a conjunctive filing

15   of both baselessness and lack of reasonable inquiry.

16   But what does that mean?

17            I think the fair reading of Keegan -- and it's

18   directly derived from Townsend -- is that an attorney

19   cannot be sanctioned for a complaint that is not

20   well-founded so long as he or she conducted what a

21   reasonable person would view as a reasonable inquiry.

22            Likewise, under the logic of Keegan, derived

23   from Townsend, an attorney can't be sanctioned for a

24   complaint which is well-founded, but the attorney failed

25   to conduct a reasonable inquiry to know that it was

MOTION HEARING - 5/26/2011

Page 41

1   well-founded.

2           The objective objective test as viewed in

3   Keegan means that you don't rely solely on what the

4   plaintiffs knew what they filed the lawsuit.  The court

5   said that under that test, for example, the fact that an

6   attorney didn't rely in certain cases before raising a

7   claim that showed that the claim was non-frivolous was

8   irrelevant, because it's not a subjective inquiry, it's

9   an objective inquiry as to both baselessness and lack of

10  due diligence.

11          And consider the facts that were involved in

12  Keegan.  There, there was a securities suit filed in

13  1991.  It turned out as discovery progressed there was a

14  scientific study in 1989 that supported the theories

15  advanced in the plaintiffs' suit about why the

16  securities filings of the defendant were inaccurate and

17  misleading.

18          The court below, the district court, said too

19  bad, you have to look at what the plaintiffs

20  subjectively relied on in 1991, and even if they would

21  have been right under that 1989 study, if they didn't

22  rely on it, they should be sanctioned.  The Ninth

23  Circuit said no, that's incorrect.

24          So what's the takeaway from Keegan?  You can't

25  grant a Rule 11 motion if there existed evidence of

MOTION HEARING - 5/26/2011

Page 42

1   which the plaintiffs were unaware at the time of the

2   filing and on which they didn't rely that would support

3   their claim and establish that their claims were not

4   baseless.  That would include, for example, in the

5   context of this case evidence of discussions between

6   defendants on finished product that might be in these

7   500,000 pages, which we are only in the process of now

8   starting to review, it might be in the documents that

9   are going to be produced by other defendants that we

10  haven't yet received because you have to look at all of

11  the evidence that would have been available and on which

12  they could have relied at the time they filed the

13  complaint, and we are talking about documents that

14  obviously antedated the complaint in 2009.

15          So Keegan to my mind flows directly from

16  Townsend and states the correct rule.  It says you

17  shouldn't be looking at the subjective intent or

18  knowledge of the plaintiffs who filed the claim, you

19  should be looking about what's objectively reasonable,

20  and part of that inquiry would include evidence that

21  existed, but was unknown to and not relied on by the

22  plaintiffs at the time they made their claim.

23          THE COURT:  Well, is Mr. Kessler correct,

24  then, that no Rule 11 motion could ever be made until

25  you are at least beyond the discovery stage and into

MOTION HEARING - 5/26/2011

Page 43

 1   motions for summary judgment?

 2            MR. LEHMANN:  Well, I'll tell you, in Keegan

 3   it wasn't at the point of summary judgment.  Judge Conti

 4   in the Hayes Microcomputer case said citing this

 5   conjunctive standard that it's a difficult standard to

 6   meet, and the moving party rarely meets it.

 7            Let me overlay something else on top of this.

 8            THE COURT:  Well now, wait a minute.  Answer

 9   my question.

10            MR. LEHMANN:  The answer, your Honor --

11            THE COURT:  Does Keegan entitle you to all the

12   discovery you want on all the issues in the complaint

13   and they can't be reached by a Rule 11 motion until all

14   that discovery is finished?

15            MR. LEHMANN:  In my view, the holding of

16   Keegan is such if they want to file their Rule 11

17   motion, they should do it at the time of summary

18   judgment, not now.

19            And there is another reason why I would say

20   that.  This is an antitrust case involving allegations

21   of conspiracy.  The Ninth Circuit has said that the

22   evidentiary requirements imposed by Rule 11 must be

23   applied with particular latitude in antitrust cases

24   involving conspiracy allegations.

25            In the decision in the Community Electrical

MOTION HEARING - 5/26/2011

Page 44

 1    Services case cited in our brief, the court said the

 2    antitrust aspects of this case also affect our

 3    determination under Rule 11.  We acknowledge the lenient

 4    evidentiary requirements for proving a conspiracy

 5    violating antitrust laws.  Federal courts grant wide

 6    latitude in concluding conspiracy or collusion from

 7    parallel conduct and the inferences drawn from the

 8    circumstances.

 9            We grant summary judgment less frequently in

10    the antitrust context in part because the alleged

11    conspirators control the proof.  The less demand -- this

12    less demanding standard should also apply under Rule 11

13    to evaluate the associated documents.  That's 869 F.2nd

14    1235 at 1246.

15            Townsend disagreed with Community Electric on

16    another point, but not on this point.  And this holding

17    in Community Electric has been followed by the Ninth

18    Circuit in an opinion as recently as 1997, it's an

19    unpublished opinion, so we didn't include it in our

20    brief.  But if your Honor wants to see it, it's 1997

21    Westlaw 76177, Hilo versus BP Exploration.

22            Other courts besides the Ninth Circuit take a

23    similar liberal view of Rule 11 in the context of

24    pleading antitrust conspiracies.  The Third Circuit held

25    this in the Mary Ann Pensiero case, 847 F.2nd 90 at page

1    95, cited in our brief.  Proving a conspiracy is a

2    usually difficult and often impossible without resort to

3    discovery procedures.  This is particularly true in

4    antitrust actions where the proof is largely in the

5    hands of the alleged conspirators.  A requirement that

6    counsel before filing a complaint secure the type of

7    proof necessary to withstand a motion for summary

8    judgment would set a prefiling standard beyond that

9    contemplated by Rule 11.  At the time plaintiffs'

10   counsel filed the complaint here he knew facts that

11   supported a reasonable suspicion of cooperation between

12   defendants and other parties who could have been

13   expected to benefit from the defendant's intransigence.

14          These factual circumstances and the rational

15   inferences that may be drawn from them convince us that

16   allegations of the first count comported with Rule 11's

17   prefiling investigation requirement.

18          That ties into another point that needs to be

19   considered here.  Under the applicable Ninth Circuit

20   standards as set forth in the Met Life case, you don't

21   have to have, you don't have to have a smoking gun in

22   order to get past a Rule 11 motion with the complaint.

23   You don't need killer evidence.  You can rely on

24   inference, you can rely on inferences that would be

25   drawn from conclusions.  All you need is some evidence.

MOTION HEARING - 5/26/2011

1           The Met Life case which we cited extensively

2     in our brief makes this point.  It says that to satisfy

3     a Rule 11, a factual allegation need only have some

4     evidentiary support.  I'm citing Met Life 2010 Westlaw

5     5559693 at pages 10 and following.

6           An attorney satisfies his or her burden under

7     Rule 11 by confirming that some evidence supports their

8     claim, his or her claims.  For Rule 11 purposes the

9     allegation merely must be supported by some evidence.

10    Because we are unable to say that plaintiffs have had no

11    factual basis for the allegation we cannot conclude that

12    plaintiffs violated Rule 11's factual injury.

13          For purposes of Rule 11, circumstantial

14    evidence and the reasonable inferences drawn from that

15    evidence are treated as evidentiary support to overcome

16    a Rule 11 motion.

17          You don't need killer evidence when you file

18    an antitrust complaint.  You certainly don't need it to

19    avoid a Rule 11 motion based on that complaint.

20          I hand it over to my colleagues.

21          THE COURT:  Okay.

22          MR. GUIDO SAVERI:  Your Honor, I'd like to

23    make a few statements before we get things going.  You

24    mentioned what the standard was.  What Mr. Kessler in

25    effect has said, and what he's argued is, a motion for

MOTION HEARING - 5/26/2011

Page 47

1    summary judgment.  And that is not a proper motion for a

2    Rule 11 as indicated by the advisory notes under

3    Rule 11.

4          His whole thrust is that you don't have a

5    case, and consequently you should grant the motion.  We

6    do -- we have alleged certain things in our complaint,

7    and we are not -- eventually we should be given the

8    right to prove those things.  And Mr. Kessler's making

9    the motion that he should make at the end of the case.

10         And then I want to start talking about

11   standards.  I view this Rule 11 motion as an insult to

12   me and to my co-counsel.  It violates the purpose of

13   Rule 11 and was filed for improper motives, as discussed

14   below.

15         In ruling on a Rule 11 motion, the court must

16   consider the signage credibility, the signers'

17   credibility, the persons who signed that complaint.

18         Judge Conti was part of the appellate panel in

19   Rofact International, Inc. versus Hitachi, 931 F.2nd,

20   147 Fed Circuit 1990, where it was stated that, quote

21   "Considering whether a complaint was supported by fact

22   and law to the best of the signer's knowledge,

23   information, and belief, a court must make some

24   assessment of the signer's credibility.  And a district

25   court's ruling that a litigant's position is factually

MOTION HEARING - 5/26/2011

Page 48

```
1   well grounded and legally tenable for Rule 11 purposes
2   is similarly fact specific."  And he was quoting from
3   the U.S. Supreme Court's opinion in Cooter versus Dell,
4   496 U.S. 384 1990.
5           Now, I have been practicing plaintiffs'
6   antitrust class action law since 1959, and I have
7   settled or won many cases and obtained collectively
8   billions of dollars for classes.  I was selected by the
9   State Bar Of Unfair Competition and antitrust section as
10  lawyer of the year in 2007.  I have testified before the
11  federal Judiciary Committee on antitrust matters, and I
12  have lectured on antitrust matters before the Federal
13  Practice Institute and other lawyers associations.
14          Without being boastful, I believe I have a
15  reputation for poverty, honesty, and the ethical
16  practice of the law.
17          I have filed more than 100 antitrust
18  complaints in my career.  Many of them were based on
19  government investigations and many were not.  I have
20  never filed a complaint in bad faith, nor have I ever
21  been accused of doing so.  Such a motion impugns my
22  integrity and those of my co-counsel.
23          The consolidated complaint in this case was
24  signed by the most prominent and experienced antitrust
25  attorneys in the United States.  The executive committee
```

MOTION HEARING - 5/26/2011

Page 49

1    alone, alone is composed of the following attorneys and

2    firms, and I'm going to list six or seven of them that

3    are most prominent and best class action antitrust

4    attorneys in the United States and have been so for the

5    past 30 years.

6              In fact, Mr. Cocette, who is on a steering

7    committee and signed this complaint, was recently

8    inducted into the Trial Lawyer Hall of Fame for 2011.

9    It is the most prestigious trial lawyer association in

10   the United States.

11             Joseph Cotchett, Michael Lehmann of the

12   Hausfeld office, his office has been lead counsel in I

13   don't know how many cases, and they know what they are

14   doing.

15             Richard Heimann of the Lieff Cabraser office

16   is lead counsel in LCD, and is a very prominent

17   antitrust lawyer.

18             Bruce Simon of Pearson, Simon, Warshaw, Penny,

19   he is the lead counsel in LCD, and his background is

20   impeccable on antitrust litigation.

21             Laddie Montague out of Philadelphia is one of

22   the leading attorneys in the United States on antitrust

23   litigation, and is lead counsel in many cases, including

24   a chocolate case back East.

25             Joseph Bruckner of Lockridge, Grindal and

MOTION HEARING - 5/26/2011

Page 50

1    Nauren in Minneapolis is of the same kind, has been lead

2    counsel in many cases in the United States.

3              And Michael Free of Free, Scanner, London, and

4    Million in Chicago has been lead counsel in many cases.

5    In fact, Mr. Freed and I were lead counsel in a brand

6    name prescription drug case in front of Judge Kocoras

7    that we tried in Chicago eight or nine years ago.  That

8    case did not have any government basis allegations or

9    anything else.  We developed that case and we settled it

10   for $735 million.  We went to trial, we lost it on a

11   trial, it was affirmed on appeal.  But Mr. Freed is one

12   of the most prominent attorneys in the business.

13             So the point that I'm making, if you read what

14   Conti says, you have got to look at the credibility of

15   the lawyers.

16             So we don't file actions in bad faith.  And

17   that is the allegation in this complaint, that we have

18   filed this action in bad faith.

19             The present Rule 11 motion is a fragrant abuse

20   of Rule 11, and is the type of motion specifically

21   criticized by the advisory committee notes to Rule 11,

22   which state that, quote, "Rule 11 should not be employed

23   as a discovery device or to test the legal sufficiency

24   of all allegations in the pleadings, and that other

25   motions, other motions are available for these

MOTION HEARING - 5/26/2011

Page 51

1    purposes."

2              And that's exactly what Mr. Kessler and his

3    group are doing.  And it's interesting to note that only

4    three law firms have filed the Rule 11 motion in this

5    case, all the other defendants have not filed it.

6              The defendants here have tried three times to

7    get the allegations of the direct purchaser's complaint

8    overturned, once before your Honor, again before

9    Judge Conti and seeking review of your Honor's decision,

10   and a third time in seeking an interlocutory appeal.

11   All these efforts failed.

12             Rather than fairly litigating the issues

13   framed by the complaint, a subset other than the three

14   here, defendants have chosen the tactic of using this

15   Rule 11 motion as another thinly disguised dismissal

16   attempt.  That's what they are trying to do.  It's a

17   collateral attack, a collateral attack on what your

18   Honor ruled, what Judge Conti ruled, and what the Ninth

19   Circuit ruled.

20             The court should not tolerate this conduct.

21   In assessing this latest motion, the court should keep

22   in mind that counsel for Panasonic has a pattern and a

23   practice of making un-meritorious Rule 11 motions as

24   reflected in footnote 2 in our brief.

25             Also, this motion is not a discovery motion.

MOTION HEARING - 5/26/2011

1   It does not relate to the scope of discovery that

2   plaintiffs are entitled to under the liberal rules of

3   discovery to prove their case.  That is a discovery

4   issue which is being separately argued, and it's going

5   to be argued a little later.  And it gets into the

6   number of custodians, how many custodians do you really

7   need to get into this question of finished products.

8           And as Mr. Savari will argue later, we have

9   worked that problem out with every defendant.  And it

10  covers pursuant to the -- to your order and it covers

11  finished products.  We worked out a custodian basis with

12  everybody, every defendant in this case on finished

13  products with the exception of Mr. Kessler.

14          It is plaintiffs' position that discovery

15  should be broad enough to permit them to fully discover

16  the issues presented by the complaint and should not be

17  truncated by unfounded arguments of burden which are

18  universally raised by defendants in cases of this kind

19  by the use of adjectives such as "massive, global," and

20  similar adjectives in an effort, in an effort to mislead

21  a court into improperly limited discovery simply because

22  in doing so it would make the case easier and perhaps

23  shorter, but at the same time depriving the plaintiffs

24  of the discovery that they are entitled to in order to

25  prove their case.

MOTION HEARING - 5/26/2011

Page 53

1           Like DRAM, SRAM and LCD, the CRT is a global

2    conspiracy involving both cathode ray tubes and finished

3    products.  And a court should not deprive plaintiffs of

4    the discovery they are lawfully entitled to by the

5    defendants.

6           The length of the class period, the length of

7    the class period and the products involved and the

8    global nature of the conspiracy were created by the

9    unlawful conduct of the defendants, not by us, and the

10   plaintiffs should not be penalized because of it.  This

11   case is not different from what happened in DRAM, SR and

12   LCD.  These are global conspiracies.

13          And the nature of the cases that we have

14   throughout the United States like the air passenger case

15   and the transport case back in New York involving the

16   airlines, they are all global conspiracies.  The

17   antibiotics case was a global conspiracy.  You cannot

18   cut these cases down, because they are global

19   conspiracies.

20          And the defendants always come in with these

21   arguments, they are massive, we have got to do a lot of

22   work, and they have all been rejected because they are

23   global conspiracies which affect everything, and you

24   can't curtail the discovery in a case on a basis of

25   so-called "massiveness."  These cases are big and

MOTION HEARING - 5/26/2011

Page 54

1    require a lot of work.

2            To violate Rule 11, a pleading must have been

3    filed without a reasonable investigation.  Under all the

4    circumstances, and -- and it must be objectively

5    baseless.  And we refer the court to the Townsend and

6    Keegan cases, and specifically to Judge Conti's decision

7    in the Ray Hayes Microproducts case.

8            The allegations in the consolidated complaint,

9    the allegations of the consolidated complaints are

10   neither objectively baseless, nor made with a reasonable

11   investigation under all the circumstances.

12           In other words, the -- the allegations of our

13   complaint are neither objectively baseless, nor were

14   made without a reasonable investigation of all the

15   circumstances.

16           Plaintiffs' extensive prefiling investigation

17   covered substantial evidence that included finished

18   products.  Its prefiling investigation was extensive and

19   included the following:  An extensive oral proffer from

20   a participant in the conspiracy, defendant Chunghwa.

21   Chunghwa identified the participants and provided the

22   dates of over 500 meetings, described the different

23   types of meetings and explained the typical matters

24   discussed.

25           It provided an evidentiary basis for alleging

1    that the conspiracy including finished products.  As an

2    example, the CRT prices agreed upon at the meetings

3    apply to internal, internal transactions of the

4    vertically integrated conspirators; that is, those that

5    also manufactured TVs and monitors as well as to third

6    parties.  These internal sales constitute the majority

7    of defendants' sales of CRTs.

8            Now, Mr. Simon talked about his client.  And I

9    don't want to get off the tangents.

10           MR. SIMON:  Ian Simmons.  Ian Simmons.  Not

11   Simons.

12           MR. SAVERI:  Ian Simmons.

13           MR. SIMON:  There is a big difference.

14           MR. SAVERI:  And he makes a big deal that his

15   client doesn't manufacture tubes, it just manufactures

16   finished products, and he is a big victim of the

17   conspiracy.

18           So on behalf of Samsung, he is going to sue

19   his parent who just pled guilty in front of Judge Alsup

20   last week.  So he is going sue his client, another

21   Samsung subsidiary, for fixing the prices of the product

22   that it sold to his client, the other Samsung person.

23   And presumably when he does that he will have to take

24   the deposition of the chief executive officers and

25   managing pricing agents of Samsung, the parent of his

1   company.  And I'd like to see that when that happens.

2           So these arguments that they are making are so

3   ridiculous that they are absurd.  This is why we are

4   talking about you have to look at the internal

5   situation.

6           One Samsung company makes the tubes, it sells

7   it to another Samsung who takes those tubes, puts the

8   increased price in the finished product, sells that

9   product at a high price, and steals money from my

10  client.  And for them to come in and say they are

11  victims is the most ridiculous statement I have ever

12  seen.

13          I want to be present when he takes the

14  deposition of the president of the parent company.  And

15  that theory and idea permeates a lot of these cases

16  because one company manufactures the product and sells

17  to the other product, and then it goes on.

18          And in that connection, it's a little late,

19  but I want to read to you a statement about

20  conspiracies.  You talked about direct evidence.

21  Seldom, seldom in antitrust case do you ever find direct

22  evidence of a conspiracy.  And I have been in these

23  cases for many years.  And I don't know of anyone, maybe

24  one exception, that can find direct evidence of people

25  agreeing all right, let's sit down, fix this.

MOTION HEARING - 5/26/2011

Page 57

1    Everything is circumstantial.  You have got to prove a

2    conspiracy by circumstantial evidence.  That is the only

3    way you can do it.

4           And when you put all the pieces together

5    sufficiently so to let a jury determine whether or not a

6    conspiracy existed, we do not have to prove direct

7    evidence.

8           In fact, as I said, the experience in all

9    these cases, in all these major cases, in the DRAM case,

10   in the LCD case, in the antibiotic case, in brand name

11   prescription drug cases, all involving circumstantial

12   evidence cases.

13          And in that connection, your Honor, I want to

14   read to you one small paragraph of a case, United States

15   versus Consolidated Packaging Company, 575 F.2nd 117 at

16   126, Seventh Circuit, 1978.  And this is what the

17   appellate court said.  This is a case where the

18   government tried the plaintiff, he was convicted, and he

19   took an appeal.  And this is what the court says:  "The

20   law has some obligation to keep up with the ingenuity

21   and subtlety of sophisticated businessmen, to keep up

22   with the ingenuity and subtlety of sophisticated

23   businessmen.  If persons devise some subtle, unique form

24   of conspiracy tailored to best serve their own purposes

25   which leaves few tracks or fingerprints, it may violate

MOTION HEARING - 5/26/2011

Page 58

1    the law, even though it cannot be easily accommodated in
2    the familiar mode of a simple and limited conspiracy."
3              That is the best statement that I have seen in
4    my years of what goes on in conspiracy.  You get these
5    high class guys that get together and try to beat the
6    system.
7              In fact, the documents that we will -- that
8    Chunghwa produced, there is one great one that says how
9    to -- how to avoid the antitrust laws.  And then they
10   list how, what you do to avoid the antitrust laws.
11   That's one of the documents that we got from Chunghwa.
12             And when you are talking about direct
13   evidence, I may go back to the -- to the electrical
14   cases.  There were a lot of indictments in the
15   electrical cases, about 17 of them.  They were
16   individual indictments on different products.  They were
17   of steam turbine generators, hydro generators and
18   everything else.  And there was one product that there
19   was a conspiracy on, and the FBI couldn't figure out how
20   they did it.  They couldn't figure out how they -- they
21   worked the conspiracy on this product.
22             So they finally went to the defendants who
23   pled guilty on that product and said "How did you do it?
24   How did you fix the price on this product?  We can't
25   figure out how you did it."

MOTION HEARING - 5/26/2011

Page 59

1          And the representatives of the company said
2     "We did it by the phase of the moon."  I'm not
3     exaggerating.  By the phase of the moon, depending what
4     phase of the moon was that would tip off what guy that
5     came in with the highest price.
6          Well, that's the stuff that we find when we
7     filed these cases.  And I wanted to bring that court's
8     attention.
9          But let's get back to what we have.  As I
10    said, what we have found in this case, the CRT prices
11    agreed upon at the meetings apply to internal
12    transactions, as I just said, internal transactions of
13    the vertically integrated conspirators; that is, those
14    that also manufactured TVs and monitors as well as to
15    third parties.  These internal sales constitute the
16    majority of defendants' sales of products.
17         We also found that the status of the finished
18    product market, that is, prices, sales, projected
19    demand, and whether the prices of finished products
20    could be increased in the amount of the agreed upon CRT
21    price increase were regularly discussed at the
22    conspiratorial meetings.  And the defendants admit this.
23    They admit that these things were discussed at the
24    meeting.
25         And I am repeating.  The status of the

MOTION HEARING - 5/26/2011

Page 60

1   finished product market, that is, prices, sales,

2   projected demand, and whether the prices of finished

3   products could be increased in the amount of the agreed

4   upon CRT prices increased -- price increased.  These

5   were regularly discussed at conspiratorial meetings.

6           THE COURT:  What are you reading from?  Where

7   does that quote come from?

8           MR. SAVERI:  This is -- this is not a quote.

9           THE COURT:  Okay.

10          MR. SAVERI:  But this is what we have found in

11  our investigation.

12          THE COURT:  All right.

13          MR. SAVERI:  We also have found the following

14  in our investigation.  And I'm getting -- I'm citing

15  this because this is what we found in our investigation

16  and to support our theory -- not our theory, but to

17  support the allegations of our complaint that we did

18  make a reasonable investigation under the circumstances,

19  and that our complaint is not objectively baseless.

20          We also found that the prices of CRTs was set

21  based on the conspirator's view of their effects on the

22  finished product.

23          While Chunghwa --

24          THE COURT:  Would you read me that again,

25  please?

1          MR. SAVERI:  The prices for CRTs were set

2    based on the conspirator's view of their effects on the

3    finished products.

4             In other words, the CRT price was set, what

5    effect is it going to have on the finished products.

6    Because if I'm selling the tube, I want to know what --

7    and fixing the price, I want to know what effect that

8    has on the finished product.  Because if -- if the price

9    is low, then the price of the finished product is going

10   to be less.  So if you fix the price of the tube, we

11   know that the finished product price is going to be

12   higher.

13            And that in and of itself is a unitary

14   conspiracy.  That's a price fix on -- that's a price fix

15   on -- on the tube and on the finished product.

16            You and I get together and say okay, I'm doing

17   the tubes, but I know it's going to have an effect on

18   the price.  So I'm going to fix my tube because I know

19   it's going to have an effect, and the price of the

20   finished product is also going to be affected, and so

21   that the price of the finished product passed on is

22   going to be excessive.

23            Now, under Socony-Vacuum, under the Catalano

24   cases and other cases we cite, that in and of itself is

25   a conspiracy to fix the price of the tube and the

MOTION HEARING - 5/26/2011

Page 62

1   finished product.  That's what Socony says, that's what

2   Socony says, and the other cases we cite.  That in and

3   of itself is a conspiracy to fix the price on the tube

4   and on the finished product.  That is the law.

5           Now, what else did we find?  The prices of

6   CRTs was set based on the conspirators' view of their

7   effects on the finished product.  While Chunghwa was not

8   allowed by the DOJ to provide documents, they were not

9   allowed to give us documents, Chunghwa read, Chunghwa

10  read the various notes of these meetings to the

11  plaintiffs' counsel, they read various notes of these

12  meetings to the plaintiffs' counsel which confirmed

13  these discussions, including notes that showed the

14  conspirators deriving the CRT price from a targeted

15  finished product price.

16          In other words, they read to us.  They

17  couldn't give us the documents, but they read to us

18  these -- they read to us that this is what the documents

19  you get are going to show.  And on the basis of what we

20  got, those are one of the reasons why we filed a

21  complaint.

22          Now, here are a few examples.  There is an

23  April 13th, 1999, April 13th, 1999 top management report

24  gives consideration to colored display tube prices as a

25  way to punish sellers of monitors.  That's TVs.  That is

1    TVs who set their monitor price too low.

2              In other words, a April 13th, 1999 top

3    management report gives consideration to increasing

4    color display tube prices as a way to punish sellers of

5    monitors.  That is TVs who set their monitor prices too

6    low.

7              So in other words, we have got to see what we

8    are doing.  If our monitor price is too low, that

9    finished product price is going to be too low.

10             There is a June 23, 1999 top manager report, a

11   top manager report, where it was discussed that raising

12   prices on 15-inch CDTs by $5.00 would allow monitor

13   makers, that is, TV makers to adjust their prices upward

14   to make an extra profit.

15             So what are they talking about finished

16   products if it has nothing to do with finished products?

17   Here is a guy talking about tubes and say hey, we better

18   watch out on 15-inch CDTs because by allowing five bucks

19   we are going -- that's going to affect the price of the

20   finished product, so we are going to increase the price

21   of the tube.  That's what that document says.

22             Note another one.  Notes from the June 23,

23   2000 CDT working meeting where it was noted that an

24   increase in monitor prices directly benefits CDT

25   increases.  In other words, the increase on the price of

MOTION HEARING - 5/26/2011

Page 64

1    a monitor price directly affects, when they talk about

2    monitor prices talking about TVs, affects CDT increase.

3              There is a September 21, 2001 CDT top

4    management meeting where the prices charged for monitors

5    were used as a benchmark to set the prices for CDTs so

6    that the CRT monitors should be priced at a defined

7    level below the LCD monitors.  This is what now -- we

8    even discussed, the LCD discussion; in other words, that

9    the CRT tube prices should be priced at a defined level

10   below LCD monitors.

11             At these meetings they talk about the tubes

12   and they talk about the prices and they talk about

13   finished pricing, and the information that we have been

14   given shows that.

15             Then there is a February 22, 2002 top

16   management level meeting where the CPT, where Chunghwa

17   indicated that the $2.00 price increase this time, I'm

18   quoting, has to facilitate monitor makers, it has to

19   facilitate monitor makers, that is, TV makers, the

20   transfer of the CD increase to customers, and that the

21   increase in price will increase each size again by $3.00

22   in April.  It hopes that makers can have a common

23   understanding and implement accordingly.  I'm quoting

24   here.  The English isn't correct, but this is how the

25   foreign people work.

MOTION HEARING - 5/26/2011

Page 65

1            There is a March 25, 1927 (sic) top manager

2    level meeting where a CD price hypothetical hike was

3    discussed, and it was said that, quote "As this wave of

4    price -- again as this wave --" I'm sorry, that's not

5    the proper use of it, but this is what he says.  This is

6    what the memo says.  "As this wave of price hike comes

7    with short notice, price would go up by only USD 2 to 3

8    at the post stage.  We should also inform the customers

9    of a possible second stage price hike so that they can

10   take time to pass it on to the OEM customers."  Now, the

11   EOM customers are the guys that are making the finished

12   products.

13           Plaintiffs have more evidentiary support for

14   these allegations that moving defendants failed to

15   credit.  Defendants cannot dispute that there is

16   evidence that the conspiratorially set prices for CRT

17   tubes explicitly apply to internal transfers within

18   vertically integrated defendants.  This fact alone

19   supports plaintiffs' allegations of a unitary conspiracy

20   because such internal prices are meaningful to a

21   vertically integrated company, or a member of a

22   vertically integrated corporate family, it's meaningful

23   only as a basis to determine the pricing of the finished

24   products, of which the tube was a primary and most

25   expensive component, over 50 percent, 50 percent.

MOTION HEARING - 5/26/2011

Page 66

1          From this fact alone a jury could infer a
2    common scheme that the illegal tube price increases
3    would be incorporated into the prices of defendants'
4    finished products.
5          Moreover, it makes no sense for a manufacturer
6    of CRTs to fix prices to itself.  It's not going to fix
7    a price to itself when it sells to a subsidiary.
8          Again, the vast majority of the vertically
9    integrated defendants' price fixed CRT sales were to
10   themselves.  In other words, most of the sales from one
11   subsidiary to the other were on an integrated,
12   vertically integrated basis.
13         Similarly, moving defendants -- I'm going
14   through some of these things -- what are the reasons I'm
15   going through this is that the two standards that we
16   have, you asked what are the standards of the Rule 11.
17   We have got to show that we made a reasonable
18   investigation under all the circumstances, and we have
19   got to show that what we have alleged is not objectively
20   baseless.  And I'm reading these things to you as to
21   what we found out in these things that support our
22   finding that these are not objectively baseless and that
23   we did make a sufficient investigation under the
24   circumstances.
25         And nothing that Mr. Kessler said disputes

MOTION HEARING - 5/26/2011

Page 67

1   this, and nothing that he has so far has indicated or

2   proven that we did not objectively, or that we did not

3   make a reasonable investigation and that our complaint

4   and our allegations or our claim is objectively

5   baseless.  There is no grounds, and he hasn't shown

6   anything.

7           He comes up with a lot of conclusions, you

8   have no evidence, you have no evidence, and I have been

9   reading you a bunch of documents that reflect exactly

10  that prices were discussed and it affected both the

11  finished product and the tube.

12          And under the law as I have discussed, Socony

13  and all those cases, that in and of itself is a price

14  fixed on that product.  That is the law.

15          And again, what we are doing in this case, we

16  are arguing a summary judgment motion.  That's not the

17  purpose of a Rule 11.  The question, did we make a

18  reasonable investigation, and was our claim objectively

19  baseless.

20          And it's no question about that they haven't

21  complied with it, that we have complied with that, and

22  they haven't proved that we didn't.  And the facts that

23  I am giving you to indicate that our claim was not

24  objectively baseless.  And I can go on and give you

25  more.

MOTION HEARING - 5/26/2011

1           Now, here is an interesting document.  The

2    moving defendants ignore evidence showing that

3    defendants -- strike it.

4           Similarly, moving defendants ignore evidence

5    showing that defendants deriving the price of the tube

6    from their judgment of the maximum finished product

7    prices obtainable.  As plaintiffs explained in their

8    responses to the LG documents request, a September 21,

9    2000 top meeting, it's a 2000, 21 2000 top meeting

10   between Samsung, LG, Orient, Phillips, and Chunghwa, the

11   conspirators reviewed and compared.  This is what they

12   reviewed and this is what they compared:  The costs of a

13   15-inch LCD monitor and a 17-inch CD flat monitor.  Each

14   product had its current price and a forecast price and

15   each is broken down by various component parts.  The

16   retail price of the CDT monitor was less than $249 to

17   275.  The wholesale price was listed at 247 to 260, and

18   the FOB price at 190.  Of this latter price $110 was

19   attributable to the cost of the CD and $80.00 was

20   attributable to other costs.

21           Using this breakdown of monitor costs as a

22   foundation, Mr. Kim concluded how much the group would

23   be able to charge for a CD to stay in competition with

24   LCD panel makers.

25           I continue -- I can continue to go on and read

MOTION HEARING - 5/26/2011

Page 69

1    these because they are very, very important.

2              THE COURT:  What you just read sounds like

3    it's working the other way.

4              MR. SAVERI:  What?  No, it isn't.

5              THE COURT:  The maximum available price or

6    maximum market price at which the finished product is

7    being sold is driving how much of an increase of the

8    component part that the manufacturer --

9              MR. SAVERI:  No, but what they are doing is

10   they are discussing both the tube price and the finished

11   product to see that you can't fool around with the tube

12   price and keep it too low because it can affect the

13   finished price.

14             And so that you have to increase the -- as you

15   increase the tube price, you are also going to in effect

16   increase the price of the finished product.  This is

17   what they talked about.  They were related.  They didn't

18   keep them separate.

19             And the notes that we have shown and what we

20   have discussed in our -- in our brief, there are a lot

21   of indications that that is what happened.  Now, I can

22   continue to go on and read it.

23             Now, so that's when -- the one we filed, when

24   we filed our complaint, we had direct evidence that

25   defendants not only knew with great precision what the

MOTION HEARING - 5/26/2011

Page 70

1   finished product price would be, based on a given tube
2   price, they set the tube price based on a targeted
3   finished price, product price.  Again, this alone is
4   sufficient to support plaintiffs' finished product
5   allegations.
6          And to repeat, when plaintiffs filed our
7   complaint, we had direct evidence that defendants not
8   only knew with great precision what the finished product
9   price would be based on a given tube price, they set the
10  tube price based on a targeted finished product price.
11  That's a price fix.
12         Now, the moving defendants ignore plaintiffs'
13  investigation of the CRT price industry.  We made an
14  investigation of the CRT price industry.  This analysis
15  showed the historical pricing of CRTs and the finished
16  products, and the structure of the industry also support
17  the existence of a conspiracy encompassing both.  Again,
18  this analysis by itself constitutes some evidentiary
19  support, and that is all that Rule 11 requires, our
20  analysis of the industry.
21         Now, in this case we talked -- here.  Now, in
22  this case, as Mr. Kessler concedes, there were a myriad
23  of governmental investigations, a myriad of governmental
24  investigations.  The DOJ and many foreign governments
25  conducted investigations into the price fixing

```
 1    activities of the defendants.  These investigations
 2    confirmed that the prices set for the CRTs directly
 3    increased the prices of finished products.  The DOJ
 4    press release, the DOJ press release announcing
 5    indictment of C. Y. Lin of Chunghwa expressly stated,
 6    this is what the press release stated by the DOJ, this
 7    conspiracy harmed countless Americans who purchased
 8    computers and televisions using cathode ray tubes.  So
 9    that fixed prices.
10            The following defendants or their employees
11    have been indicted or their foreign -- or their foreign
12    equivalent for their participation in the conspiracy:
13    Chunghwa, LGE, LP Displays, which is the joint venture
14    between defendants LG and Phillips, and MTPD, which is
15    the joint venture between defendants Panasonic and
16    Toshiba.  Samsung, SDI recently pleaded guilty to
17    participation in the conspiracy.
18            Plaintiffs also conducted extensive research
19    of the corporate relationships of defendants, both
20    within and without the various corporate families.
21    Plaintiffs' research included review of public financial
22    data, regulatory filings by defendants, newspaper and
23    magazine articles, and other publicly available data.
24    This research showed that most of the conspirators also
25    manufactured finished products or were amendments of
```

MOTION HEARING - 5/26/2011

1   corporate families that didn't.

2           It further showed that the corporate families

3   were operated in an integrated and or coordinated manner

4   by the parent corporations.  This is what our research

5   showed, and it's the investigation that we made before

6   we filed the complaint.

7           The plaintiffs also conducted extensive

8   research of the structure and history of the CRT

9   products, that is, the CRT's products and the finished

10  product market.  This research, this research included

11  inter alia a review of historical sales and prices,

12  market shares, pricing trends, barriers to entry, and

13  the interrelationship of market participants.

14          This information showed parallel pricing,

15  anomalous pricing, a highly concentrated industry,

16  significant barriers to entry with no competitive

17  fringe, a standardized product with competition mainly

18  on price, a history of consolidation and joint ventures

19  within the industry, the climbing demand, a record of

20  antitrust inquiry, the fact that the CRT is the major

21  and most expensive part of a display, vertical

22  integration of many of the manufacturers, both CRTs and

23  finished products, and upward movement in or

24  stabilization of prices for CRTs and the finished

25  products, despite the climbing demand.

MOTION HEARING - 5/26/2011

Page 73

1            All of these factors support the existence of

2      a conspiracy extending to finished products as well.

3      These are the investigations that we made and on which

4      we based our complaint.  Only this is some of the stuff

5      on which we based our complaint.

6            We also had consultation with an expert

7      economist.  Plaintiffs' consultant was an expert

8      economist who also examined the structure and the

9      history of the CRT products market.  The expert provided

10     plaintiffs with his opinion that there was evidence to

11     support a conspiracy encompassing both CRTs and finished

12     products based on a review of market data and the

13     government investigations.

14            Plaintiffs also conducted a review of

15     defendants' participation in other conspirators

16     including the related LCD products conspiracy.  We

17     looked into this.  The LCD conspiracy had been going on,

18     or the case had been going on for some time.  Mr. Simon

19     is the lead counsel and knows all about it.

20            So when we prepared our complaint, we looked

21     at LCDs and manufacture of the panel, and is also the

22     manufacture of the finished product.  We have CRTs, it's

23     a manufacture of the tube, and also the manufacturer of

24     the finished product.

25            And it's rather interesting when you look at

MOTION HEARING - 5/26/2011

Page 74

1    the CRT case and you look at the LCD case.  The CRT

2    case, this conspiracy preceded the conspiracy in LCD.  I

3    don't know how the government didn't find out about the

4    CRT case before it found out the LCD case, that's rather

5    interesting, and how we were supposed to find out, and

6    it's sort of analogous to the cases that we had in the

7    citric acid cases where there was a -- where the

8    conspiracy among the defendants started in lysine, they

9    set up a program on how to fix the price of lysine.

10   Incidentally, the defendants in the lysine case all pled

11   guilty, some went to jail, and they settled for a

12   substantial amount of money.

13            So they set up such a great deal on LC -- on

14   lysine and how to fix prices and everything else.  So

15   the same people also sold citric acid.  They said since

16   we are so successful in lysine, why don't we do the same

17   thing in LCD, which they did, and they went -- and they

18   all were indicted.  In fact, there was a trial back in

19   Chicago and I think the vice-president of AMD went to

20   jail.

21            So we looked at the LCD case to see what --

22   what similarity does that have with us in CRT.  What can

23   we do.  Does that give us some information, indication

24   of what's going on in CRT.

25            Now, in LCD, virtually all of the defendants

MOTION HEARING - 5/26/2011

Page 75

1    in this action are known to have participated in other
2    price fixing conspiracies.  Panasonic, formerly
3    Matsushita, Toshiba, Hitachi, fixed television prices in
4    Japan in the early 1990s and before.  Defendant SEC,
5    defendant Samsung Electronics of America, Inc., and
6    other Samsung entities, defendant Hitachi Ltd.,
7    defendant Hitachi Device, Ltd; defendant Hitachi
8    Electronics Devices USA, various LG subsidiaries,
9    defendant Toshiba Corporation, defendant Toshiba
10   American Electronics Corporation, defendant Toshiba
11   American Information Systems, defendant Chunghwa, and
12   defendant Tatung Company of America, Inc. named in the
13   related LCD price fixing class actions.  Same people we
14   have here in LCD.
15           As here, the LCD complaint was informed by
16   inside information from Chunghwa.  That's how they
17   started.  Chunghwa gave, made a profit in the LCD case,
18   and just as in the CRT, Chunghwa and LCD doesn't make
19   the finished product.  It makes the panel.  And it pled
20   guilty, and also settled the case.  And Chunghwa settled
21   the case with us in this case.
22           Also, as here, the conspiracy alleged in the
23   LCD action includes finished products.  Those
24   allegations survived motions to dismiss prior to filing
25   the CAC complaint.

MOTION HEARING - 5/26/2011

Page 76

1        Judge Illston has since certified a direct
2   purchase of finished product claims.  Moreover,
3   defendant SEC is the amnesty applicant in the LCD case.
4   These are the same people we have here.
5        SEC also admitted prior fixing with regard to
6   DRAM.  SEC was in the DRAM case in which I was lead
7   counsel and they admitted to fixing prices and have a
8   guilty plea by SEC and its subsidiary.
9        And in the DRAM case, SEC was the amnesty
10  applicant.  Also SEC -- when I say SEC, I'm talking
11  about Samsung, Samsung was the amnesty applicant in the
12  SRAM case.
13       And in addition, these same people were also
14  involved in the flash case.  In other words, you are
15  getting these companies that have been involved in
16  flash, LCD, DRAM, and SRAM, all the same people
17  involving conspiracies.  We looked at these things
18  and -- and there is -- there are rulings by Judge
19  Wilkins and also a ruling by Judge Armstrong and flash
20  and Wilkin in SRAM that if people are fixing prices in
21  one industry, the same type of people, same guys, there
22  is an inference that they are doing it in the other --
23  in the other -- in another industry where the same
24  people are involved.
25       These are the things that we considered and

MOTION HEARING - 5/26/2011

Page 77

1   took into consideration when we prepared our complaint.

2          The plaintiffs here have alleged just as in

3   LCD that those defendant entities who participated in

4   the glass meetings did so on behalf of their respective

5   families of companies.

6          In other words, where they attended these

7   meetings, they attended on behalf of their all

8   companies.  They didn't say "I represent this person, I

9   represent --" when they went to these meetings if

10  anybody appeared for Samsung it was understood that he

11  spoke on behalf of all the related companies.

12         Now, as indicated, the plaintiffs here have

13  alleged just as in LCDs that those defendant entities

14  who participated in the glass meetings did so on behalf

15  of their respective meetings of companies, allegations

16  that Judge Illston deemed sufficient to tie in related

17  entities who manufactured finished products.

18         As in LCDs, we, the plaintiffs in this case,

19  were lead to believe from the Chunghwa proffer that

20  individual participants in the conspiratorial meetings

21  did not necessarily know the corporate affiliation of

22  their counterparts and didn't distinguish between the

23  entities and a corporate family.  Indeed, even third

24  party makers of finished products attended some of the

25  conspiratorial meetings.

 1        As in LCD, plaintiffs could reasonably believe
 2   that subsidiaries who manufactured downstream products
 3   could be held liable along with their parent entities
 4   for acts of -- of the alleged overarching conspiracies.
 5        The plaintiffs in this case also knew, also
 6   knew for vertically integrated defendants' public
 7   filings that the various related companies in the
 8   Samsung, Hitachi, Toshiba, Panasonic, Philips, LG, and
 9   Tatung corporate families were closely intertwined,
10   intertwined, and managed on a central top-down basis,
11   they were intertwined and managed on a central top-down
12   basis.
13        Thus a conspiracy involving the manufacturing
14   entities of the CRTs within those families could be
15   reasonably viewed to also encompass the manufacturing
16   entities that made the finished CRT products within
17   those families, especially given intra-family corporate
18   sales that occurred.
19        The plaintiffs in this case also knew that the
20   DOJs in February of 2009 indicted C. Y. Lin of Chunghwa.
21   And it was accompanied by a press release that stated,
22   the indictment was accompanied by a press release that
23   stated this conspiracy harmed countless Americans who
24   purchased computers and televisions using cathode ray
25   tubes sold at fixed prices.  This could be reasonably

MOTION HEARING - 5/26/2011

1    interpreted that the conspiratorial impact extended to

2    finished CRT products.

3              Indeed, Judge Conti, Judge Conti in upholding

4    the special master's ruling denied motions to dismiss

5    said that, quote "When announcing the indictment, the

6    acting assistant attorney general in charge of the

7    antitrust division suggested the conspiracy extended

8    beyond CRT themselves."  That same inference is present

9    here, exactly what Judge Conti said.  From reading these

10   releases he made that, drew that inference, that same

11   inference could be drawn here.

12             Now, since the filing, since the filing, since

13   the filing of our complaint, the DOJ has indicted in

14   August of 2009 and November of 2010 five more executives

15   of the defendants here:  Simon Lee, Albert Yang, Alex

16   Yen, Tony Chung, and Jason Kim.  The DOJ has indicted

17   Samsung SDI through its participation in the CRT

18   conspiracy and Samsung, SDI pled guilty earlier this

19   month.

20             The publicly available guilty pleas refer to,

21   quote, "Antitrust conspiracy involving the manufacture

22   or sale of cathode ray tube products, including CDTs and

23   CPTs in the United States and elsewhere."  In other

24   words, it says includes the manufacture and sale of

25   cathode ray products including CDTs --

Page 80

1          THE COURT:  Well, does that mean finished

2   products --

3          MR. SAVERI:  Yes, it does.

4          THE COURT:  -- or does it mean the product of

5   the cathode ray tube or the --

6          MR. SAVERI:  When they start talking about --

7          THE COURT:  -- companies --

8          MR. SAVERI:  When they start talking about the

9   victims of people who bought TV, the victims -- the

10  victims were the people who bought the TVs.  That's what

11  they said.  These are the releases that the government

12  said when they came out with the announcements.

13         I can go on on this, your Honor.  I'm getting

14  down to the bottom here.  I'm going to cut down -- I --

15  most of this or a lot of it is included in our brief.

16         THE COURT:  Yeah, I know.

17         MR. SAVERI:  And I'm going through these

18  things.

19         THE COURT:  I hear you.

20         MR. KESSLER:  I'm making a little more detail

21  than I probably should.

22         But I want to show you what we -- the

23  investigation that we mapped and what we saw and what

24  was the basis of our complaint.  And from looking at all

25  this stuff, no one can conclude that our complaint was

MOTION HEARING - 5/26/2011

Page 81

1    objectively baseless.

2              I would like to finish with the -- what I said

3    before.  A conspiracy to fix the prices of a component

4    of a finished product operates as a conspiracy to fix

5    prices of that finished product to the extent company

6    conspirators sold both products.  And I cite the

7    Catalano case, Supreme Court case, U.S. versus Socony

8    and the Northwest case also, and they are all cited in

9    our brief.

10             I want to conclude this way.  The present

11   motion is a --

12             THE COURT:  Wait a minute.  Wait a minute.

13   Are you arguing that because a component price was fixed

14   by conspirators and the component price is a factor in

15   determining the price of the finished product, that

16   automatically there is a conspiracy to fix the price of

17   the finished product?

18             MR. SAVERI:  That's correct.

19             MR. SIMON:  If I could elucidate on that, what

20   we are saying is the fact that the finished products and

21   the components were both discussed, the prices amongst

22   competitors, and that those competitors are vertically

23   integrated companies that make both, and that we have

24   sufficient facts to show that there is impact on both,

25   is a unified conspiracy, as Mr. Savari is describing it.

MOTION HEARING - 5/26/2011

Page 82

1          And this is not new, your Honor.  This is what

2     we argued twice before you in the motion to dismiss

3     hearing on October 5th, 2009, and at the discovery

4     hearing on November 12th, 2010.  It is the same theory.

5          And the fact of the matter is is that

6     Mr. Kessler in his argument, if you go back and read it,

7     I know it seems like it's some time ago, but if you go

8     back and read it, he has said it both ways himself,

9     because the fact of the matter is the economic reality

10    of these vertically integrated companies -- and seven of

11    them are defendants in this case, and they control most

12    of the market -- is they cannot get the price fix under

13    tubes, the benefits of that when they sell it to their

14    affiliated companies unless the price of the finished

15    product picks up the price fix.

16         And that's why they were talking about it.

17         THE COURT:  What if they are caught in a

18    competitive market at the finished product level with

19    prices diminishing for the general, because of general

20    demand, and price competition among manufacturers where

21    that ceiling is bringing it down?  Doesn't that indicate

22    that those things flow differently?

23         MR. SIMON:  No.  No.  Hold on a second.

24         Whether the prices are going down in the

25    finished product market or the food market, so long as

MOTION HEARING - 5/26/2011

Page 83

1   the prices are stabilized, it doesn't matter if prices
2   are going down.
3           If they are pegging their prices on the tubes
4   in their discussions based on what the prices of the
5   finished products are doing and they are taking that
6   into consideration and discussing it amongst themselves,
7   they can keep the price from going down further.  They
8   are pegging the prices against each other.  And when
9   they do that, that's a conspiracy.
10          THE COURT:  How can they -- how can they agree
11  at the manufacturing of the tube level to agree on
12  prices at which the finished products are going to be
13  sold?
14          MR. SIMON:  Because they are making --
15          THE COURT:  Or a price increase for each of
16  these products when at the finished product level they
17  are competing with a universe of other people who are
18  helping to set by natural competition, set a price?
19          MR. SIMON:  Because they have enough of the
20  market that they can control their own prices, and no
21  matter how much they go up and down, it's always going
22  to be related to the price they fix in the conspiracy.
23  That's the whole point.
24          They can't control Sony and the other people
25  in that market, but that's irrelevant.  They are --

MOTION HEARING - 5/26/2011

Page 84

 1           THE COURT:  Why?  Because Sony and the other
 2    people in the market are the ones who help determine the
 3    price for the finished product, not by conspiracy, but
 4    by ordinary competition.
 5           MR. SIMON:  You know, the manufacturers, all
 6    these seven vertically integrated companies not only
 7    sell to themselves, they sell to each other, they sell
 8    to Sony, they had an agreement as we allege in the
 9    complaint at paragraph 144 and 146, and multiple other
10    paragraphs after that that we cite in the brief,
11    starting at 161, et seq, that they had an agreement that
12    their pricing to the people that they sell to is going
13    to be consistent with the conspiratorial price.  That
14    makes all boats float to the same level.  And it affects
15    the competition not only in the tube market, but in the
16    finished product market.
17           If the effect in the finished product market
18    is less, it doesn't mean there isn't an effect.
19           And by the way, on a Rule 11 motion, you can't
20    decide any of this.  This is -- this is every -- this is
21    what we were arguing in summary judgment.
22           THE COURT:  I'm following your argument, I'm
23    trying to understand your argument, because I think it
24    runs up against some fundamental economics of how prices
25    are fixed at the finished product level.

MOTION HEARING - 5/26/2011

Page 85

1            MR. SIMON:  It does not.

2            THE COURT:  Not fixed in a conspiratorial

3    sense.  That's what's bothering me.

4            MR. SIMON:  No.  I'll try and explain again.

5            If you have vertically integrated companies,

6    some of the biggest in the world like Samsung and

7    others, and they are making a fixed on the component,

8    okay, and that the finished product is also affected by

9    that, by intent, and discussion of the component, and

10   they are selling not only to themselves on an agreement

11   that it's going to be the conspiratorial price because

12   they want that full price captured in the finished

13   product and they are selling to others at that same

14   price, it has an impact on competition in both markets.

15           And that is a unified conspiracy.  And that's

16   what economists would say the economics --

17           THE COURT:  What if a manufacturer buys a

18   higher priced tube but decides to absorb the increased

19   cost itself without increasing its product?

20           MR. SIMON:  Then we'll find out how much of

21   that is in discovery and we'll see what impact that is.

22   But we don't know that now.

23           THE COURT:  That's impact, isn't it?

24           MR. SIMON:  It is, but it's not all the

25   impact.  It may be one percent of the impact or it may

MOTION HEARING - 5/26/2011

1    be ten percent of the impact or it maybe 50 percent of

2    the impact.

3                THE COURT:  Impact makes conspiracy?

4                MR. SIMON:  No.  The discussion of the two

5    products in the same setting in the same meetings with

6    people who do both products makes the conspiracy, with

7    the stated intent that they are going to be affecting

8    both products.

9                THE COURT:  So this applies only to the

10   integrated companies?

11               MR. SIMON:  No, because the non-integrated

12   companies are there as well.  I mean, they're part of

13   the fix.  Whether -- if they don't make finished

14   products, they are still agreeing that their tube prices

15   are going to be consistent with those people who make

16   the finished products.

17               So they are selling to outsiders in the

18   conspiratorial price too which drives the finished

19   product in a certain direction.  And economists are

20   going to tell us ultimately at the end of the day what

21   that impact is.

22               But I will tell you, just having gone through

23   it in LCD and just having filed our expert reports last

24   night, not only the defense experts, but the plaintiffs'

25   experts all say the same thing, it is economically

MOTION HEARING - 5/26/2011

1    implausible that the final price of the finished product

2    will not capture 100 percent of the component costs,

3    fixed or not.

4              And if they are going to bring the price

5    down --

6              THE COURT:  Regardless of the competitive

7    conditions in the finished product markets?

8              MR. SIMON:  They can bring their price down

9    based on other things that they put in there.  They

10   write off the cost of the tuner or they write off with

11   something else.

12             But if the primary component of the finished

13   product --

14             THE COURT:  Which means the prices didn't go

15   up?

16             MR. SIMON:  It doesn't matter if they go up or

17   down, your Honor.  That's what I'm trying to say.

18             THE COURT:  But there is where your impact is

19   on the buyers.

20             MR. SIMON:  The impact can be described either

21   by prices going up, which they did in CRT, both on

22   finished products and tubes in certain periods, prices

23   stabilizing, in other words, we just won't raise the

24   price now and let market demand on the finished products

25   settle down, and stabilizing the price, or prices going

Page 88

1   down, in which case they would have gone down further
2   had they not been involved in the price fix.
3          Those are three economic theories, all of
4   which exist in reality, all of which happened in LCD,
5   and all of which are proved to happen in this case which
6   we already have evidence of.
7          And the fact of the matter is when the experts
8   get together at the appropriate time in this case,
9   they'll argue with what the impact is, but that doesn't
10  mean we didn't allege a complaint where there is such
11  impact and stated and known impact with intent to --
12         THE COURT:  You allege impact and they are not
13  disputing impact.  They are going to let you have
14  whatever discovery you want on impact.
15         What they are disputing is does impact prove
16  conspiracy so that your discovery and your proof at
17  trial can include price fixing on television sets and TV
18  monitor -- or the computer monitors --
19         MR. SIMON:  But your Honor, let me go back to
20  the Sugar case, we have already discussed.
21         THE COURT:  Yeah.
22         MR. SIMON:  The Sugar case, the only quote I
23  want to remind you about in there is that the court
24  considered whether or not it should allow the plaintiffs
25  to proceed on the finished product because the finished

MOTION HEARING - 5/26/2011

Page 89

1    product contained the Sugar.  And the court concluded if

2    it did not allow that in that case, and Linerboard is

3    consistent with that, and Kenevilbord in the Ninth

4    Circuit, it would leave a gaping hole in the antitrust

5    laws.

6           And by the way, Judge Elston in LCD when she

7    certified a product class, a component class and a

8    finished product class, that he said in her class

9    certificate order at 267 FRD at 306 if there is no

10   finished product class, then it gives the defendants

11   basically -- these are not her words, this is my

12   paraphrasing -- a free pass to fix the components that

13   go into the finished product.

14          If you don't hold them responsible for the

15   finished products Judge Elston said in LCD then they are

16   going to get away with fixing the price of the tubes and

17   they should be responsible for the finished products as

18   well.

19          And that's exactly what they are trying to

20   argue here.  That's exactly what Sugar says.

21          THE COURT:  Why would they get away with that?

22   I don't understand that.

23          MR. SIMON:  Because they are controlling

24   the -- their own finished products.  If you let them

25   fix -- take for example in Samsung's case, we just

1    recently got their data, and we haven't examined all of
2    it, if they sell let's say 90 percent, Samsung SDI sells
3    90 percent to SEC, a defendant who settled in LCD, by
4    the way, recently, if they do that, if they do that,
5    then the only way they are going to capture that price
6    fix back is by the sale of those finished products.
7    That's -- this is transfer pricing between two
8    companies.  That's how it works.
9            The full cost, the full burden of that price
10   fix is going to show up in the finished products.  It
11   has to.
12           And if they discuss that and they recognize
13   that --
14           THE COURT:  Wait a minute.  Wait a minute.
15           MR. SIMON:  It's a conspiracy.
16           THE COURT:  Why does it happen?  Can't -- at
17   the manufacturing and retail product, can't they decide
18   to absorb that cost in order to stay competitive with
19   their other competitors in the marketplace for
20   television sets and --
21           MR. SIMON:  They could if there wasn't an
22   agreement amongst the better people who are in the
23   vertically integrated companies.  They are going to pay
24   that price against --
25           THE COURT:  You are back to vertical

MOTION HEARING - 5/26/2011

Page 91

1   integration again.  All right.

2           MR. SIMON:  The --

3           THE COURT:  Bear in mind, look.  I'm not

4   disagreeing with you.

5           MR. SIMON:  No.  I understand.

6           THE COURT:  I'm not necessarily agreeing with

7   them.

8           MR. SIMON:  Right.  You are trying to

9   understand.

10          THE COURT:  I'm simply saying I'm puzzled, I'm

11  troubled by these so-called economic relationships that

12  have to be automatic.  And that's what I'm questioning.

13          MR. SIMON:  I'm not saying they are automatic,

14  your Honor.

15          But I'm saying this.  You are asking questions

16  that cannot be challenged on a Rule 11 motion.

17  Mr. Kessler, Mr. Simmons and the three movants are

18  saying to you at this point you answer those questions.

19  They can't be answered at this point.  Not certainly by

20  Rule 11 and saying that it's baseless.  That's the point

21  we have here.

22          They are trying to put a square peg in a round

23  hole, and they are doing it because they want to hit us

24  over the head with it, because they want to intimidate

25  us into doing something in this case and they want you

MOTION HEARING - 5/26/2011

Page 92

```
 1   to cut down the case and this is their way of educating
 2   you about how to cut down the case.
 3            Whatever you do with the case you could do in
 4   other means, but Rule 11 is not the proper basis to do
 5   it upon, for all the reasons that Mr. Saveri and
 6   Mr. Lehmann told you.
 7            You know, one thing I would want to say is --
 8   and I'm not going to take up a whole bunch of time, but
 9   I want to make two quick points -- is that Mr. Kessler
10   said, I wrote it down, when you asked him do they admit
11   anything, he said they don't admit there was any
12   conspiracy.  Well, Samsung, SDI just pled guilty and
13   they admit there is a conspiracy.
14            He says "We don't admit anything."  We have
15   companies, one of whom has now pled guilty, we have 500
16   meetings, thousands of pages of documents, and they're
17   coming in to you, the people who want Rule 11 sanctions
18   against us, and they say they don't admit anything.
19            And on the flip side of that what do they want
20   you to do?  They want you to take the admission of
21   Chunghwa, a continued participant in this case, who --
22   and say but because they answered that request for
23   admission, that that should be held against us.
24            And I want to talk about that, because that's
25   one of the things that was assigned to me.
```

MOTION HEARING - 5/26/2011

1            The request for admissions have little or no

2     weight.  And I would suggest, your Honor, you should

3     give them no weight.

4            And here is the reason they have little or no

5     weight.  Under the Federal Rules of Evidence, you don't

6     have to look at any cases, Rule 801, there is no reason

7     to give those requests for admissions any weight at all

8     because they are hearsay.

9            Chunghwa's request for admissions are a

10    statement not made by the movants, not made by the

11    plaintiffs which is offered for the truth of the matter

12    stated under Rule 801(c), the movants who were not the

13    declarant under that rule want to use it against the

14    plaintiffs who are not -- both of whom are not -- we are

15    not a declarant either.

16            So it's actually the type of hearsay rule you

17    would see.  And they are trying to use it offensively.

18    There has to be an exception.  There is no exception.

19            The reason there is no exception is because I

20    doubt Mr. Kessler and Mr. Simmons and counsel are going

21    to say oh, it should come in under the coconspirator

22    exception because the request for admissions says there

23    was no conspiracies according to them, so they got no

24    exception.

25            By the way, in every case that we have with

1    them, every other case that Mr. Saveri mentioned, when

2    we get to the point of trying to put in guilty pleas or

3    admissions by defendants against other defendants, what

4    do they stand up and say?  Under Rule 801 they say "You

5    can't use those against us."

6              Well, the same thing is true here.  The fact

7    of the matter is those requests for admissions should be

8    excluded by you, they bear no weight, they are hearsay,

9    and they have not shown that they should be admitted.

10             The person signing the verification on those

11   requests for admissions signed them on information and

12   belief.  I don't believe he even gave us his title.

13   That's another reason why you should give them no

14   weight.

15             The request for admissions, they presume the

16   assertion of these separate conspiracies that I guess

17   the idea is if you keep saying it enough it somehow gets

18   some truth to it, it assumes that presumption, but it

19   asks the wrong question.  It doesn't ask the question

20   about the conspiracy we allege or the one we say that

21   existed.

22             So the answer of Chunghwa with respect to

23   those requests for admissions are not the answer to the

24   right question.

25             THE COURT:  All right.  Why not?

MOTION HEARING - 5/26/2011

Page 95

1             MR. SIMON:  Because they are asking about a

2    conspiracy that's characterized in the manner they want

3    to characterize it.

4             THE COURT:  Well, wait a minute.

5             MR. SIMON:  They didn't ask the right

6    question.

7             THE COURT:  Well, again, my question to you is

8    why not.

9             MR. SIMON:  Here, let's take --

10            THE COURT:  They admit that Chunghwa is not

11   aware of any agreement among manufacturers or sellers of

12   CRT finished products to allocate customers' territories

13   or markets.

14            What's --

15            MR. SIMON:  Take request for admission No. 2,

16   for example.

17            THE COURT:  No. 2?

18            MR. SIMON:  Yes.  It says --

19            THE COURT:  Wait a minute.  Wait a minute.

20   Wait a minute.

21            MR. SIMON:  Okay.

22            THE COURT:  Okay.

23            MR. SIMON:  Okay.  It says "admit that

24   Chunghwa is not aware of any conspiracy amongst

25   manufacturers or sellers of CRT finished products," of

MOTION HEARING - 5/26/2011

1   which they are not one, that's admitted by Mr. Kessler,

2   "including any dependents or managers or sellers of CRT

3   finished products to fix, set the price at which any

4   such manufacturer or sellers sell those finished

5   products."

6           That is a statement in our view which is a

7   statement of their idea that there has to be separate

8   conduct related to a finished product conspiracy.

9   That's the question that they are asking and that's

10  susceptible to that reasonable interpretation.

11          They didn't ask the question as you said at

12  page 12 of our brief is it a conspiracy like we said at

13  page 12 of our brief.  We don't know what the answer to

14  that question is.

15          They asked the question exactly how they

16  wanted to frame the issue before your Honor.  And that

17  is the point I'm making.

18          THE COURT:  Well, except that it's up to

19  Chunghwa to admit or not admit it.

20          MR. SIMON:  It's up to Chunghwa.  And by what

21  I just argued to you, their admission should have no

22  effect on how you perceive the case or how the case

23  should be perceived against us for the evidentiary

24  reasons and for the additional reasons that they --

25  there is simply not credibility to what they are saying.

MOTION HEARING - 5/26/2011

Page 97

1   They are going to be in this case.  They have a reason

2   to say with their co-conspirators what they want to say.

3           I'll also point out at page 2 the objections

4   under the request for admissions "To the extent Chunghwa

5   admits any request, the response should be not

6   interpreted as admitting anything other than the matters

7   specifically stated in that request."

8           That means that if they are answering their

9   specific question which they framed on a separateness of

10  a finished product conspiracy, they are not admitting

11  that there isn't something else there.

12          THE COURT:  Let me ask you a question then.

13          MR. SIMON:  Sure.

14          THE COURT:  You may not be able to answer it

15  and they may not be able to.

16          With all of the meetings identified by

17  Chunghwa, whether they were conspiratorial or not,

18  meetings.

19          MR. SIMON:  Yes.

20          THE COURT:  Do you think that this room

21  collectively has its arms around the overwhelming

22  majority of the meetings that occurred?

23          MR. SIMON:  Do we think we have our arms

24  around it?

25          THE COURT:  Yeah.  Yeah.

MOTION HEARING - 5/26/2011

Page 98

1          MR. SIMON:  I think we have our arms around
2     the core meetings.
3          THE COURT:  Yeah.
4          MR. SIMON:  But I will tell you from my
5     experience in another case, LCD, that there are
6     undocumented meetings.
7          THE COURT:  Yeah.
8          MR. SIMON:  That there are meetings that came
9     up in depositions that weren't in the notes.
10         THE COURT:  Okay.
11         MR. SIMON:  So I think the answer to that
12    question is we probably --
13         THE COURT:  Or they picked up the phone and
14    said something to be that that didn't get in there.
15         MR. SIMON:  Exactly.  So there were
16    discussions amongst people in the United States, their
17    representatives, there were bilateral meetings.
18         THE COURT:  Okay.
19         MR. SIMON:  There were trips.  There were all
20    sorts of things that weren't in the actual notes.
21         THE COURT:  But the effective meetings, I
22    guess if the meeting was really effective to fix prices
23    of tubes, probably it was in the meetings of Chunghwa's
24    disclosing?
25         MR. SIMON:  Yes and no.

MOTION HEARING - 5/26/2011

Page 99

1               THE COURT:  Yes and no?  Okay.

2               MR. SIMON:  Because you know, part of a

3     conspiracy, your Honor, as you know, is monitoring how

4     effective the conspiracy is --

5               THE COURT:  Okay.  All right.  Okay.

6               MR. SIMON:  -- in policing it.  So that was

7     done in meetings outside the Crystal meetings in -- in

8     the case of --

9               THE COURT:  Yeah, I understand.

10              MR. SIMON:  Okay.

11              THE COURT:  Of course.

12              MR. SIMON:  Can I make one last point, your

13    Honor?

14              THE COURT:  Yeah.  Sure.

15              MR. SIMON:  And I want to give you something,

16    because I really -- it kind of is the character of what

17    is going on here.  I made just a little chart, it's

18    nothing fancy.

19              But in the reply brief, Mr. Kessler and his

20    colleagues --

21              THE COURT:  Well, did you give that to him?

22              MR. SIMON:  Yeah, I'll hand it around.

23              They make a lot of statements, and I have

24    outlined them here, about that the indirects have seen

25    the light.

MOTION HEARING - 5/26/2011

Page 100

1        THE COURT:  I'm not attributing --

2        MR. SIMON:  Okay.

3        THE COURT:  -- much to the fact that one group

4   of defendant -- plaintiffs is not alleging.  They can

5   have their own reasons.  It can be practical reasons,

6   they can be tactical reasons.  They can say that in

7   their case with their people they are representing being

8   indirects, the dollars don't make any difference to them

9   or that people's position doesn't make any difference to

10  them.

11       And I don't think by settling their -- their

12  taking any position on the merits of the -- of the

13  allegations.

14       MR. SIMON:  But my point is more this.

15       THE COURT:  Okay.

16       MR. SIMON:  We have a group of attorneys who

17  are accusing us of very bad things and saying Rule 11

18  should be issued against us.  In their reply brief they

19  make the four statements on the left-hand side here

20  about what the indirects supposedly acknowledge, whether

21  you buy it or not.

22       THE COURT:  No, that's what I'm saying.

23       MR. SIMON:  But then in the stipulation itself

24  it's mischaracterizing exactly what the indirects said

25  in the stipulation.

MOTION HEARING - 5/26/2011

Page 101

1           THE COURT:  Okay.  But you see --

2           MR. SIMON:  That's the type of evidence that's

3    being presented here.

4           THE COURT:  I'm not putting any weight on the

5    fact that the indirects dropped out of it.

6           MR. SIMON:  Okay.

7           THE COURT:  They can have their own reasons,

8    purely economic practical ones, for dropping out.  Okay.

9           MR. SIMON:  Well --

10          THE COURT:  Maybe they don't need the same

11   type of discovery, for example, that you need.

12          You know, this -- so I'm just, I'm not

13   attributing anything to it.

14          MR. SIMON:  I understand.

15          The only -- last thing I would say because

16   it's late and I'm sure there are some responses.

17          THE COURT:  Yeah.  And we haven't even gotten

18   to the second motion.

19          MR. SIMON:  I want to -- I want to say

20   something about what Mr. Simmons said.  He made this

21   comment that he spoke to Joel Sanders and Joel Sanders

22   said something to him, counsel for Chunghwa.  It's

23   totally outside the record.

24          THE COURT:  Yeah.

25          MR. SIMON:  It's beyond the papers.

MOTION HEARING - 5/26/2011

1          And actually, a number of things Mr. Kessler

2    and Mr. Simmons said are not within the safe harbor

3    provision of the Rule 11 motion because they are outside

4    of what they presented in that motion to us, and I

5    suggest to you you should completely disregard it.  But

6    if you consider it, he has probably blown the safe

7    harbor provision.

8          And lastly, what this is all about is an

9    argument about burden, an argument that should be

10   handled in the context of creating discovery procedures

11   that will allow us to prove our case based on a good

12   complaint and a massive amount of evidence.  And that's

13   how it should be handled.  And that's where you have the

14   greatest discretion.

15         And that's where we are already working, as

16   Mr. Saveri will tell you, to get custodians and

17   everything else put into place so that the burden isn't

18   this monumental calamity.

19         I almost feel like Mr. Kessler and Mr. Simmons

20   are talking about judgment day coming, and they are

21   about as right as judgment day coming as the other guy

22   was the last two times, now he says he is going to come

23   again in October.

24         There is no calamity here.  It's been managed

25   in LCD, it can be managed here, and there is no threat

MOTION HEARING - 5/26/2011

Page 103

1   of a calamity as they say it.  That shouldn't even be

2   part of the consideration.

3          MR. LEHMANN:  Your Honor, one concluding legal

4   observation.

5          THE COURT:  Yes.

6          MR. LEHMANN:  And I'll keep it short.

7          We talked about the expert analysis that would

8   be applied to the evidence here of pass-on, whether

9   they -- some of the costs are absorbed, some are not.

10  That's going to be the subject of economic evidence in

11  this case and would normally be tested on opposing

12  expert reports in connection with summary judgment.

13         As Mr. Saveri pointed out, and it is important

14  for this context under Rule 11 we did consult with an

15  expert before we filed the consolidated amended

16  complaint, and that consultation along with all the

17  other things he identified informed a decision on how to

18  plead.

19         Page 15 of our opposition brief, there are

20  cases that say that where you go and consult with an

21  expert prefiling, that is a factor that will typically

22  satisfy your due diligence responsibility, so in the due

23  diligence inquiry requirement under Townsend, and under

24  Townsend and under Keegan, I go back to where I started

25  off at the beginning.  If we satisfy either one of those

MOTION HEARING - 5/26/2011

Page 104

1   problems, defendants have not met their burden.

2             THE COURT:  Okay.

3             MR. CORBITT:  Your Honor, could I say one

4   thing?

5             MR. SAVERI:  Let me just make one statement

6   before we finish.  I should --

7             THE COURT:  Oh, you aren't finished?

8             MR. SAVERI:  As your Honor is aware, a

9   separate complaint has been filed by the Voice Schiller

10  office in New York.

11            THE COURT:  Yes.  The stipulation wraps that

12  case.

13            MR. SAVERI:  You are going to end up with it.

14            THE COURT:  Okay.

15            MR. SAVERI:  And the allegations in their

16  complaint are practically identical to ours.  They

17  allege a complaint of price fix both on CRT --

18            THE COURT:  So their due diligence was talking

19  with you?

20            MR. SAVERI:  Excuse me, your Honor?

21            THE COURT:  So their due diligence was talking

22  with you?

23            MR. SAVERI:  I don't know what their due

24  diligence was.  It could have been other -- other

25  material.

MOTION HEARING - 5/26/2011

Page 105

```
 1              But the last thing I want to say, your Honor,

 2    and I know it's getting on long, but very respectfully,

 3    the discussions that we have had today about impact and

 4    Catalano and Socony and what effect one price has on the

 5    other, those -- those are motions for summary judgment

 6    motions, a Rule 11, a Rule 11 motion just addresses the

 7    two standards that it requires, whether we made a

 8    sufficient investigation under the circumstances and

 9    whether our complaint is subjectively baseless.

10              And on the basis of that --

11              THE COURT:  Well, see --

12              MR. SAVERI:  It's not -- what they are doing

13    is exactly what Rule 11, the notes say you are not

14    supposed to do.  It's not a motion for summary judgment,

15    it's not a question of whether we should prove our

16    allegations or not, your Honor.

17              THE COURT:  No, I understand that.  The only

18    reason I'm talking about that, the only reason it

19    tweaked me was that you appear to be making a per se

20    argument, that if the unit price -- I'm sorry, the price

21    of the component unit is agreed upon among

22    manufacturers, is it per se an increase in the price of

23    a finished product and hence impacts the public.

24              You see, that's all I'm questioning.

25              MR. SAVERI:  But that eventually --
```

MOTION HEARING - 5/26/2011

Page 106

```
 1              THE COURT:  You can tell me in response that
 2      at this stage is none of my business.
 3              MR. SAVERI:  Okay, but eventually, your Honor,
 4      that's going to be a motion either at summary judgment
 5      or it's going to be a legal motion that we'll have to
 6      argue.  But that's not a proper motion for a Rule 11.
 7      The Rule 11 are the two standards that we indicated.
 8              MR. SIMON:  And just so the answer is clear,
 9      your Honor, it's not as black and white as that.  But
10      that's the whole point.
11              THE COURT:  Well, that's what sounded to me
12      like what you are arguing.
13              Okay.  I agree --
14              MR. SIMON:  Well, that's our experience.
15              THE COURT:  What?
16              MR. SIMON:  That's our experience in other
17      cases.
18              THE COURT:  Okay.
19              MR. SIMON:  It's not as black as white, I
20      would concede.  But that's a factual issue.
21              THE COURT:  Yes?
22              MR. CORBITT:  Your Honor, Craig Corbitt, I am
23      just here for the indirects today.  And I appreciate
24      your comments a few minutes ago that you are not going
25      to put any weight on the decision of the indirect
```

MOTION HEARING - 5/26/2011

Page 107

1    purchasers to enter into this stipulation, and I was

2    just going to say what you just said.

3              But I wanted to also point out that in the

4    stipulation, in fact the very last sentence of it,

5    paragraph 6, it says "This stipulation and evidence of

6    any negotiations of this stipulation shall not

7    constitute any admission, evidence, concession, or

8    waiver by the indirect purchaser plaintiffs regarding

9    the merits of the Rule 11 motion."

10             We signed it, Mr. Alioto signed it as counsel.

11             THE COURT:  I understand.

12             MR. CORBITT:  Defense counsel signed it.  And

13   frankly, it's improper for them based on this

14   stipulation to be making the arguments that what we did

15   has any bearing on their motion against the direct

16   purchasers.

17             And if I might say one more thing, and it's

18   not substantive, but simply the point that Mr. Savari

19   made about the reputation of counsel and that that is

20   something, and their history and so forth, that that is

21   something that you should give weight to --

22             THE COURT:  I hate you people making these

23   things personal.

24             MR. CORBITT:  And that Mr. Saveri and all his

25   colleagues on this side of the table and the other

MOTION HEARING - 5/26/2011

Page 108

1   people he mentioned, I know from personal experience is

2   the highest.  And I am confident that they would not do

3   anything that did not meet the highest standards of

4   complete...

5              THE COURT:  Okay.  All right.

6              MR. KESSLER:  Shall we take a few-minute

7   break --

8              THE COURT:  Yes.

9              MR. KESSLER:  -- before we go up?  Because we

10  have been going at it for I think over two hours.

11             THE COURT:  Yeah.  And our court reporter...

12             MR. KESSLER:  In deference to our court

13  reporter and to your Honor.

14             THE COURT:  Wait, let me tell you what I want

15  to do.

16             We'll take a break, then you come back with

17  your closing remarks on this motion, then I want to

18  immediately proceed to the discovery motion.

19             Who is going to argue the discovery motions?

20             MR. HEMLOCK:  I will, your Honor, for on

21  behalf of the plaintiffs.

22             THE COURT:  Okay.

23             MR. KESSLER:  Mr. Hemlock will.

24             THE COURT:  Okay.

25             MR. KESSLER:  But my reply, your Honor, will

MOTION HEARING - 5/26/2011

Page 109

1    take just a little bit of time since they went on for

2    some time.

3              THE COURT:  Oh, I understand.  We want to do

4    that.  What I'm trying to say is we are not going to

5    take a break for lunch.

6              MR. KESSLER:  That's fine.

7              THE COURT:  We are just going to take a short

8    break, come back for your reply, and then argument --

9              MR. KESSLER:  Thank you, your Honor.

10             THE COURT:  -- on the discovery motion.

11             (Whereupon, a recess was taken

12              commencing at 12:14 P.M. and

13              concluding at 12:29 P.M.)

14             THE COURT:  All right.  Let's resume, please.

15   Let's resume, please.

16             All right, Mr. Kessler, you are standing up.

17             MR. KESSLER:  Standing up for this part.

18             THE COURT:  Okay.

19             MR. KESSLER:  Got myself a little time.

20             THE COURT:  Do you want the podium?

21             MR. KESSLER:  No, your Honor.

22             THE COURT:  Okay.

23             MR. KESSLER:  Your Honor, first, again, lots

24   of the argument we heard have nothing to do with the

25   issues on this motion.  I want to make that clear so

MOTION HEARING - 5/26/2011

Page 110

1    your Honor knows.

2            I want plaintiffs' counsel to know, we did not

3    make an argument, we did not make a motion under 28 USC

4    1927 accusing them of bad faith.  And I will state we

5    are not accusing plaintiffs' counsel of bad faith, so if

6    anyone thought that, I thought we were very clear in our

7    brief we were not making that type of claim here.

8            I also want to make it clear that this is not

9    the time we agree to argue whether they have standing

10   under the Sugar case or the Linerboard case or whether

11   this constitutes whatever the conduct is constitutes a

12   violation under Sony or Catalano.  Those are not issues

13   we presented in our motion.  Okay.  And they are not

14   issues that are here.

15           And I'm particularly interested because there

16   was so much discussion about LCD.  Let's be clear about

17   LCD.  And I think Bruce was clear about this, but I want

18   your Honor to be clear about it.

19           There is no claim in LCD of a unitary

20   conspiracy that fixed the prices of the end products

21   that they have just articulated here.  In LCD they

22   argued impact, okay, and they argued that under the

23   Sugar Linerboard cases they have standing to sue for

24   that.  Okay.

25           If they were doing that here, I wouldn't have

MOTION HEARING - 5/26/2011

Page 111

1    this motion.  Okay.  So they should be doing, asserting

2    what they is asserted in LCD.  That's why I am stunned

3    that they are talking about LCD so much, because that's

4    exactly what they are not doing hear here.

5              Here they made a decision, they made a

6    decision to expand and change the claim in a way for

7    which there is no objectively reasonable basis at all.

8    And I am stating objectively reasonable.

9              It's interesting, Mr. Saveri said he thought

10   this was an attack on his credibility and it was an

11   attack on his pre-investigation, and he went through

12   that.  That's not the basis of our motion, again.  Okay.

13   We are not making this a personal inquiry as to what did

14   counsel do and what did counsel not do.

15             We are going their way on objectively

16   reasonable, okay, that there is no objectively

17   reasonable basis that they had to assert a conspiracy

18   claim here that extended beyond tubes, except for

19   impact.

20             And on the issue of impact, to say it the way

21   your Honor said it, when asked the question, impact is

22   not conspiracy.  There is no such economic doctrine,

23   there is no such legal doctrine, there is no such

24   logical doctrine, there is no such objectively

25   reasonable doctrine.  There is no way to say because

MOTION HEARING - 5/26/2011

Page 112

1   they have a basis to allege impact that that gives them
2   a basis to allege a conspiracy with respect to that.
3          Now, here is the type of problems we have.  So
4   Mr. Savari read from the recent joint sentencing
5   memorandum involving SEC.  And he said aha, they spoke
6   about the CRT products, which must mean that it includes
7   finished products in that.
8          Now, the term "products" is defined in the
9   joint sentencing memorandum as we pointed out in
10  footnote 2 of our reply brief.  It's defined by the
11  government and SCI -- I'm sorry, SDI, not SEC, sorry,
12  different company.  Sorry.  SDI.  Sorry.  It's defined
13  in the memorandum to apply only to the tubes by
14  virtue -- so what -- and this is typical of what we
15  have, is that they take something and they go here is my
16  objectively reasonable basis.  It's defined the other
17  way.  That's the problem we have, your Honor.
18         Your Honor heard Mr. Saveri read a lot of the
19  documents.  The documents are exactly what your Honor's
20  impression of them are.  They are documents.  He had one
21  about LCD, that the TVs have to compete with the LCD, so
22  this constrains what the TV prices can be.  Therefore,
23  we have to think about how much could we charge for a
24  tube because of what the TV price market is like.
25         That doesn't show a basis, an objectively

MOTION HEARING - 5/26/2011

Page 113

1   reasonable basis to allege there was a conspiracy

2   involving the TV prices.  That's the opposite.  It's

3   exactly the opposite, as your Honor said.

4         And this is completely, you know, you are

5   sitting and it's like Alice In Wonderland because it's

6   the opposite of an objectively reasonable basis.

7         Think, your Honor, the following in terms of

8   their argument.  Let's imagine a world in which there

9   were no integration, okay, and that which a group of

10  tube manufacturers who had nothing to do with television

11  manufacturers got together and imagined an allegation,

12  they are sitting there discussing tube prices, and they

13  said to each other gee, we have to worry about how much

14  these TV companies are going to be able to charge

15  because they are competing with each other and this is

16  what they can charge and they only can absorb so much,

17  they are going to refuse our price increases, especially

18  since LCD competes with CRT, plasma competes with CRT.

19  They are not even these components.

20        So we have to think about that.  Would that

21  mean because they discussed impact there was a

22  conspiracy involving a basis to allege a conspiracy

23  involving the televisions when they wouldn't even make

24  the televisions?

25        And then they say well, wait a minute,

1   Mr. Kessler, but the facts are some of you are

2   integrated, says well, how does that charge anything --

3   change anything?  As your Honor pointed out, they don't

4   allege anywhere that all of the TV manufacturers met,

5   they don't even allege that the affiliated TV companies

6   met.

7           In other words, there is no Chunghwa document

8   to show -- and I'll give what you I mean by that.  MTPD

9   is a Panasonic joint venture with Toshiba -- eventually

10  Panasonic today owns it all, but at the time with

11  Toshiba, so it's another company, they made tubes.

12  Okay.  They did sell some of their tubes, although not

13  all of them, they sold some of them to Toshiba

14  sometimes, and sometimes to Panasonic, a different

15  company.

16          There is no allegation in any of those

17  Chunghwa documents that any of those companies met to

18  discuss TV prices, the affiliated companies.  The only

19  one who met was MTPD according to those documents that

20  they cite.  Chunghwa had no affiliated company.

21          And as your Honor pointed out, there is no

22  allegation that Sony or Sharp -- Sony is a great

23  example.  Sony made its own tube called the Trinitron

24  tube, your Honor may have heard of that.  Okay.  It's

25  different from a cathode ray tube.  None of these

 1  companies even made the Trinitron tube.

 2          So Sony made its own tubes.  So it had nothing

 3  to do with this whole issue with respect, it wasn't even

 4  behind the tubes for this.

 5          Now, the idea that because someone might say

 6  Sony is out there competing and it's going to limit what

 7  the TV prices are, so that makes it a TV conspiracy to

 8  allege?  And again, this is -- there is just no

 9  objectively reasonable basis.

10          These arguments started by saying they have

11  killer evidence.  They don't have killer evidence.  They

12  have no evidence.  This is zero.  It's a zero, empty

13  box.  It was an empty box at the time of the complaint

14  about this claim, and it's an empty box now.

15          Now, they have a lot of evidence they used,

16  the 400 plus meetings and all that.  But they don't have

17  any basis for this portion of it.

18          And your Honor, here is what I want to get to.

19          THE COURT:  Wait, wait a minute.  On this

20  industry structure and all.

21          MR. KESSLER:  Yes.

22          THE COURT:  I -- I have made the argument to

23  plaintiffs' counsel that I didn't think impact equaled

24  conspiracy.  But before any final decision were made on

25  the relationship between tubes pricing and finished

MOTION HEARING - 5/26/2011

1    pricing, aren't both sides going to have to have some

2    economic evidence and some economic opinion --

3              MR. KESSLER:  On the issue --

4              THE COURT:  -- about cause and effect?

5              MR. KESSLER:  On the issue of impact.  The

6    point here is under no circumstances with impact,

7    imagine 100 percent impact, it wouldn't still make it

8    into a conspiracy among the television manufacturers or

9    the tube --

10             THE COURT:  Well, if there were 100 percent

11   impact, would it not be logical that the people meeting

12   over fixing the price of tubes would necessarily be

13   meeting about fixing the price of finished product?

14             MR. KESSLER:  Absolutely not.  And -- that's

15   absolutely not.  And that's why I gave you my

16   hypothetical.

17             Let's assume that it is completely no

18   integration at all.  Okay.  But let's assume that there

19   is going to be a hundred percent impact shown that if

20   they raise the price of their -- of their -- of their

21   tubes, a group of completely unrelated television

22   companies, the victims, if you will, the direct

23   purchaser, in fact the direct purchaser are members of

24   their class, the direct purchasers let's say for

25   whatever economic reason turned out passed it all down

MOTION HEARING - 5/26/2011

Page 117

1    to the consumers, completely passed it down, would that

2    mean that that in any way would be an objectively

3    reasonable basis to show that the component suppliers

4    were conspiring to fix the price of the televisions,

5    which they don't even make or determine the price?

6            It would mean that their alleged price fixing

7    agreement had a big impact.  That's what it would mean.

8    A very big impact.  But it would do nothing if a group

9    of automobile suppliers agreed to fix the price of

10   engines, okay, and GM and Ford and Toyota raised their

11   prices.  Would that be a price fixing conspiracy of the

12   price of cars?  No.  It's just impact.  That's all that

13   it is is impact.  And it doesn't ever raise to this.

14           And that's by the way what they alleged in

15   LCD.  In other words, that's -- that's an allegation

16   that I wouldn't make a Rule 11 motion against.  It's

17   what the indirects are now alleging here.  And I'm not

18   arguing the fact that the indirects stipulated has to do

19   with whether they have a good faith basis or not, but

20   the point here is that's the correct allegation that

21   they can make without running into Rule 11 about this.

22           Now, your Honor, I want to go to the timing

23   point, because you know, this is an important point.  So

24   I'm reading from the Federal Rules of Civil Procedure,

25   the Advisory Committee notes, on subdivision B and C.

MOTION HEARING - 5/26/2011

Page 118

1   This is --

2           THE COURT:  On Rule 11?

3           MR. KESSLER:  Yes.  And this is interesting

4   because your Honor will know that Rule 11 was -- was --

5   specifically addresses what happens when you make an

6   allegation on information and belief, okay, as opposed

7   to, you know, just state the allegation.

8           THE COURT:  Yeah.

9           MR. KESSLER:  Hey, and in fact, it's

10  interesting because the allegations we are talking on

11  here are not made on information and belief.  But that's

12  a different story.

13          But even if you make it on information and

14  belief, what the advisory committee notes says is the

15  following:  "Tolerance of factual contentions in initial

16  pleadings by plaintiffs or defendants when specifically

17  identified as made on information and belief does not

18  relieve litigants from the obligation to conduct an

19  appropriate investigation into the facts that is

20  reasonable under the circumstances."  And this is the

21  key point, "It is not a license to join parties, make

22  claims, or present defenses without any factual basis or

23  justification."

24          That's what we are arguing here, that this is

25  a claim that was asserted without any factual basis and

MOTION HEARING - 5/26/2011

Page 119

1    justification.

2            And what the advisory committee notes is

3    saying, even if you do it on information and belief,

4    says you have to have some, some modicum factual

5    justification or basis before doing this.  And the

6    Townsend case makes it clear it could be just part of a

7    claim, it doesn't have to be the whole complaint, I

8    don't even hear them arguing that any more because the

9    law is pretty clear in the Ninth Circuit through the en

10   banc decision.

11           Another point on timing, the rules of this

12   court, if I can find that, the local rules of the

13   Northern District of California state as follows, this

14   is local rule 7-8(c), quote, this is on Rule 11 motion,

15   "The motion must be made as soon as practicable after

16   the filing party learns of the circumstances that it

17   alleges make the motion appropriate."

18           And then they cite a Supreme Court case that's

19   relevant to this, okay, which says district courts can

20   adopt rules, that's the Cooter case, to do the timing.

21           Now, why did this court, the Northern District

22   say that?

23           THE COURT:  What's the local rule?

24           MR. KESSLER:  It's local rule 7-8(c).

25           And the reason they said that is because

MOTION HEARING - 5/26/2011

1    nobody thinks that the rule of Keegan is what plaintiffs

2    suggested at the beginning, which is that what you have

3    to do is wait until all discovery is done, which could

4    be, in this case could be years later, and then they

5    make a Rule 11 motion back about the complaint that had

6    been filed years before.  How can I comply with the

7    local rule?  What we did is we did something else.  We

8    served discovery.

9         Now, unfortunately your Honor knows it took a

10   long time to get that discovery answered, but we served

11   discovery, we pursued that diligently, it took months to

12   get it before your Honor after meet and confers and

13   argument, then your Honor order it, and then eventually

14   it took more time for them to comply, as soon as we

15   could evaluate what they had and didn't have, that's

16   when we brought the motion, that's what the rule

17   requires.

18        And so it can be that somehow Keegan is meant

19   to understand -- and I don't think there is any case

20   that I am aware of, and they point to none, that says

21   since Keegan, and Keegan was rendered in 1996, right?

22   So we have gone now 15 years since Keegan.  I have never

23   seen a district court case that I am aware of, at least

24   in the entire Ninth Circuit that has said that what

25   Keegan means is that you can no longer bring a Rule 11

MOTION HEARING - 5/26/2011

1    motion until all discovery is done because it may turn

2    out that somehow discovery would back, you know,

3    would -- would support it there.  This makes absolutely

4    no sense.  It would defeat the whole basis of the rule.

5           I also would note that post Keegan, the Ninth

6    Circuit ruled in the Barber case that we cited, 1998, it

7    said there you can't wait until after the summary

8    judgment in which the criticism was the reverse, said

9    you got to bring it early enough that -- that the

10   parties can react to it and avoid -- that was the whole

11   purpose of safe harbor.  Safe harbor was the idea

12   someone does something that you think has a Rule 11

13   issue, give them 21 days to cite it before the adverse

14   effects occur.  So it's safe for both sides.  And that's

15   the only thing that makes sense in terms of this.

16          The Chunghwa admissions, I would submit, your

17   Honor that these are first of all, they are relevant.

18   And Mr. Simon's arguing the wrong point.  Okay.  The

19   issue is not whether they could be admissible at trial

20   against the plaintiff.  We are not here in a trial

21   setting where you consider admissible evidence.  What

22   you are looking at is did they have an objectively

23   reasonable basis for making this particular claim.

24          Their response was we had this massive proffer

25   from Chunghwa and all these documents.  It is relevant

MOTION HEARING - 5/26/2011

Page 122

1    to your inquiry to see what Chunghwa responded by the
2    way under penalty, because these are verified answers.
3    I know they seem to impugn the person who signed them,
4    but these are verified on behalf of the party, and you
5    can absolutely rely upon these to make the determination
6    as to whether they had an objectively reasonable basis.
7            But your Honor has to assume Chunghwa is not
8    lying now in these verified answers, so this has to have
9    been the same information that they would have gotten
10   from Chunghwa.
11           And by the way, what I didn't hear them say
12   when Mr. Saveri read his notes, I didn't hear in any of
13   his notes that anyone from Chunghwa told them there was
14   a conspiracy that fixed the prices of televisions or
15   monitors or affected, you know, or, you know, and set
16   the prices or did allocation for that.  In other words,
17   that wasn't in any of his notes of his conversations
18   with Chunghwa.
19           All that was there at least that I heard was
20   the same thing the documents say, which is that they
21   took into account sometimes the prices in deciding what
22   they could do with respect to tube prices.
23           So again, I think, your Honor, these are very
24   relevant and they go, you know, to your determination
25   today as to whether there is an objectively reasonable

MOTION HEARING - 5/26/2011

Page 123

1    basis or not.

2            Now, I also want to say, your Honor, the issue

3    of internal transfer prices they discussed about.  Okay.

4    Their argument was that there was an indication by the

5    two companies that that would apply, for example, to a

6    sale by MTPD to Panasonic, let's say.  That's what they

7    are calling an internal transfer.  Well, I don't

8    understand how that gets them to -- to -- to a monitor

9    or a television conspiracy.  Let's look at that.

10           MTPD was a joint venture between Toshiba and

11   Panasonic.  So their allegation is as a tube company,

12   MTPD was agreeing to prices for everyone, including a

13   company for which it had an affiliation.  So let's give

14   them that that's their allegation, that the price was

15   set to Panasonic as a purchaser.

16           What does that say about what price

17   Panasonic's going to charge as a television company?

18   Panasonic, which is a different company with a different

19   ownership, is going to then have to decide whether it's

20   an affiliated company or not, this is how much I paid,

21   so it may have some impact, it may not, depending on the

22   competition in the television market.

23           No matter what, it's just an impact issue.

24   Again, it does nothing to get them, whether it's a --

25   whether it applied to those related company sales or

MOTION HEARING - 5/26/2011

Page 124

1    not, doesn't get you to a conspiracy at the end, because

2    for that they would have to have an allegation that

3    somehow the TV companies themselves had some discussions

4    among themselves about TV prices or the computer monitor

5    companies themselves had some discussions about

6    computers.  There is no allegations of that.  There is

7    nothing in the documents about that.  There is nothing

8    in the basis for that.  So again, they just can't add

9    something for which there is no basis in that way.

10            Okay.  Next point.  The statements about all,

11   when what Mr. Simon's argument is is as follows, if I

12   understand it, if they had discussions of TV prices and

13   if it had an impact on TV prices, then that's enough for

14   them to allege a conspiracy regarding the TV prices as

15   well.  That's how I understand both unitary, both the

16   CRTs and the TV prices.

17            I would say, you know, it is not only

18   reasonable to reach that conclusion, that just like you

19   can apply common economics on a Twamly motion, which as

20   you know the courts do, that they will say well, this

21   doesn't make any economic sense, I can't credit that as

22   being plausible, you can -- and objectively

23   reasonable -- say what they had a basis to do is to

24   allege what they allege in LCD or what the indirects are

25   now alleging and that that's the case we should be

MOTION HEARING - 5/26/2011

Page 125

1   prosecuting so that the parties are not going to incur,

2   it can't be the rule that you have to incur without any

3   objectively reasonable basis class action defense,

4   expert analysis, all of these different things when

5   there is no objectively reasonable basis for their...

6          Finally the statement about the expert, that's

7   what I want the mention.  We heard that they had an

8   expert look at this.  If they want to submit that to

9   your Honor in-camera, I have no objection to that.

10  That's actually what the rule says.  It says they are

11  not required to share it with us.  If they want to rely

12  upon it, they could submit an in camera to your Honor.

13         I am 100 percent confident that their expert

14  did not say based on whatever they told him that there

15  was an objectively reasonable basis for a conspiracy

16  involving televisions and monitors based on, as

17  Mr. Saveri said, looking at the government

18  investigations, says and looking at the market facts,

19  all of which related to CRT.  When he talked about, for

20  example, a homogeneous product and concentration, that's

21  CRTs where price is the only element.

22         Your Honor, as a TV purchaser, could there

23  have been a market fact that televisions are

24  homogeneous?  Could there have been a market fact that

25  price is the only element in consumers purchasing

MOTION HEARING - 5/26/2011

Page 126

1    televisions?  Could there have been a market fact that

2    the television industry is concentrated, given the vast

3    number of sellers of televisions?  No, there is no such

4    fact.

5            And that's why I invite, I welcome and I

6    implore him to give you in-camera whatever his expert

7    said.  It won't say that.  I am quite confident it won't

8    say that.

9            And so, your Honor, the end of the game here

10   is at a minimum, at a minimum this case should be --

11   result in a Rule 11 finding, not bad faith, your Honor

12   doesn't have to make any finding of bad faith, just on

13   objectively reasonable that the allegation should be

14   limited to essentially what they did in LCD and to what

15   the indirects are doing here, we'll move forward with

16   the case then.

17           All the other issues -- Sugar, Sony,

18   Catalano -- those are issues for another day.  They are

19   not issues for today.  Those are issues, you know,

20   whether or not they have standing or whether or not they

21   don't have standing, that's not for this motion.  This

22   is simply to define what was a proper allegation they

23   had a basis of in this case.

24           I think Mr. Simmons may want to say one more

25   thing.  Otherwise unless your Honor has questions, I

MOTION HEARING - 5/26/2011

Page 127

1    think I have covered it as well.

2              THE COURT:  Thank you.

3              MR. SIMMONS:  Two things, actually, very

4    brief, your Honor.  Thank you for all the time you have

5    afforded everyone in this room.

6              First thing, let me take the expert point.  We

7    cite this in the brief, and the Supreme Court has said

8    it many times, expert testimony -- in the Brook Group

9    case, expert testimony is useful as a guide for

10   interpreting facts, it's not a substitute for them.

11   This motion is shining a spotlight on what facts they

12   had.  I still think is it a zero on the finished

13   product.

14             Second point, very brief, your Honor.

15   Mr. Simon in virtually every hearing lovers to trot out

16   the Sugar case, trot it out in what it purportedly

17   shows.  Let me read this briefly, a passage from their

18   opposition on Sugar and identify for you the slight of

19   hand they are making for the court.

20             They say on page 23, quote "Finally, as

21   plaintiffs have explained in their supplemental

22   interrogatory answers (DPP's response to LGE at 66-67) a

23   conspiracy as to CRT dollars is equivalent to a

24   conspiracy as to finished products."  Period.  Close

25   quote.  They are equating the two.

MOTION HEARING - 5/26/2011

Page 128

```
 1              THE COURT:  I'm sorry, what are you reading
 2   from?
 3              MR. SIMMONS:  Page 23.
 4              THE COURT:  Of what?
 5              MR. SIMMONS:  Plaintiffs' opposition to the
 6   Rule 11.
 7              THE COURT:  Page 23?
 8              MR. SIMMONS:  Uh-huh.  Plaintiffs' memorandum
 9   of points and authorities.
10              THE COURT:  Yeah, I have got it.  Now, where
11   are you reading?
12              MR. SIMMONS:  Page 23.
13              THE COURT:  Yeah.
14              MR. SIMMONS:  Line 6, your Honor.  You see
15   beginning "Timely"?
16              THE COURT:  Yeah.
17              MR. SIMMONS:  Okay.  I just read that first
18   sentence.
19              Then they cite Sugar and they have the quote.
20   "Plaintiff is a direct purchaser and therefore entitled
21   to recover the full extent of the overcharge."
22              Let me say a word about Sugar.  Mr. Simon
23   loves to always hold that case up.
24              MR. SIMON:  I thought we weren't being
25   personal.
```

MOTION HEARING - 5/26/2011

Page 129

1          MR. SIMMONS:  Well, I'm just referring you

2     to --

3          THE COURT:  Okay.  All right.  Come on.

4          MR. SIMMONS:  Counsel likes to hold up Sugar.

5     Sugar was a case where the question presented to the

6     Third Circuit, whether -- whether you agree that they

7     came out with the correct way or the incorrect way on

8     the question presented, I believe they came up with the

9     incorrect way on the question presented.

10         The question presented was the following:

11    Whether a plaintiff that purchased candy from a company

12    that made both refined sugar and candy had standing as a

13    direct purchaser where the conspiracy extended only to

14    refined sugar, the input itself.

15         Sugar proves our point.  No one is -- proves

16    our point.  The third circuit did not say that, well,

17    there is a conspiracy both as to refined sugar, a

18    conspiracy as to refined sugar is equivalent to a

19    conspiracy as to candy.  That's not what they said.

20         They said that if a company made both, the

21    refined sugar, that was the subject of the price fix,

22    and the candy, and the plaintiff purchased the candy,

23    the Third Circuit said you are not barred under

24    Illinois --

25         MR. KESSLER:  And that issue isn't being

MOTION HEARING - 5/26/2011

Page 130

 1   argued today.

 2            MR. SIMMONS:  And -- Mr. Kessler, if I could

 3   just finish -- I happen to believe that rule of law is

 4   incorrect and many circuits have disagreed with it.  But

 5   counsel has made our point.  The Third Circuit said that

 6   the conspiracy is about -- is about refined sugar, the

 7   input.  That's what we are saying here.  If there is a

 8   conspiracy here, it's about the tubes.

 9            They did not say ipso facto it's a conspiracy

10   as to candy.  They said the opposite.

11            And I'll rest with that.

12            THE COURT:  Okay.  Anybody else wish to speak

13   for defendant?

14            Plaintiffs, you want --

15            MR. LEHMANN:  Can I take two or three minutes

16   max?

17            THE COURT:  I'm literally going to give you

18   three minutes.

19            MR. LEHMANN:  Okay.  Going to be quick.

20            Let me sum up what we told you that we had

21   when we filed this complaint.

22            THE COURT:  I'm sorry --

23            MR. LEHMANN:  We had the oral reports from

24   Chunghwa proffer on documents showing discussion --

25            THE COURT:  Yes, that's right.

MOTION HEARING - 5/26/2011

Page 131

1          MR. LEHMANN:  -- of pricing of products

2     containing CRTs.

3          THE COURT:  Yeah.

4          MR. LEHMANN:  And the interrelatedness of how

5     prices were set for CRTs and those products.

6          We had the expert analysis that's been

7     discussed, we had the evidence of vertical integration

8     of the seven defendant groups that we talked about, and

9     which Judge Conti said it is economically plausible that

10    affiliated companies would wish to see any price

11    increases in CRTs pass through to the purchasers of CRT

12    products.

13         We had the comments of the DOJ in February

14    10th, 2009, shortly before we filed the complaint

15    regarding the indictment C. Y. Lin, and again Judge

16    Conti said when he looked at that press release that

17    when announcing the indictment the acting assistant AG

18    in charge of antitrust division suggested the conspiracy

19    extended beyond CRTs themselves.  Our interpretation is

20    a reasonable one.

21         We had evidence of JFTC proceedings that found

22    Panasonic, Toshiba, Hitachi fixed resale prices of CRT

23    televisions.

24         We had evidence of the economic structure of

25    the market and reports that indicated that CRT tube

MOTION HEARING - 5/26/2011

Page 132

1  prices determined CRT television prices.

2            And we had evidence from what happened in LCDs

3  which was a very similar industry and a very similar

4  conspiracy where the complaint was sustained.  And what

5  did that complaint allege, your Honor?  It said the

6  class was those who directly purchased a TFT LCD product

7  in the U.S. from any defendant or coconspirator, and a

8  TFT LCD product was defined in that complaint as

9  including TFT LCDs and products containing them.

10            The totality of this we think establishes that

11  the complaint was not objectively baseless, baseless

12  with respect to the claims involving products containing

13  CRTs.

14            But even if you disagreed with us there, it

15  certainly establishes a reasonable inquiry.  And if we

16  win on that point, they lose on their motion.

17            One last point, and then I'm done.  Timing.

18  The defendants neglect to cite the advisory committee

19  notes of Rule 1 which state "In the case of pleadings,

20  the sanctions issue under Rule 11 normally will be

21  determined at the end of the litigation."  Where did the

22  advisory group get that?  They got from it Supreme

23  Court's decision in 1990 in Cooter and Gell where it

24  said exactly that.  The time, they want to make a

25  Rule 11 motion is to defer it until we deal with summary

MOTION HEARING - 5/26/2011

Page 133

1    judgment.

2              That's what the Supreme Court said, that's

3    what the advisory committee has said.  And we think your

4    Honor is bound by that.

5              MR. KESSLER:  Your Honor, just one --

6              THE COURT:  I am confused.

7              MR. KESSLER:  Yes.

8              THE COURT:  Not confused.  I am hearing two

9    different things.  I heard him say that LCD did not

10   involve conspiracy in finished products.  I think what

11   he just read indicated it did.

12             MR. SIMON:  The class was certified for two

13   subclasses:  Finished products and components.  And I

14   think there were several hearings.  I have explained

15   what my understanding of the allegations in this

16   complaint are.  And I think your Honor could look at the

17   LCD rulings which we cited to you and could read the

18   allegations thereunder compare the two.

19             THE COURT:  Well, I would have to do the

20   homework.

21             MR. SIMON:  No matter how much Mr. Kessler

22   tries to argue it and I try to argue what I'm arguing,

23   it seems like we are never going to have a meeting of

24   the minds, and I would prefer that your Honor look at

25   those cases and I think it will be self-evident.

MOTION HEARING - 5/26/2011

Page 134

1           But at the time we filed the complaint in the

2     this case, we had the 2008 decision of Judge Illston in

3     LCD sustaining that complaint with those allegations.

4           THE COURT:  Well, but what, a Rule 12 motion?

5           MR. SIMON:  Rule 12 motion.

6           THE COURT:  Well, that doesn't get eye

7     anywhere.  I mean --

8           MR. SIMON:  But the fact is, the question is

9     not whether it gets us anywhere, but whether that's part

10    of our reasonable inquiry.  And under an objective basis

11    we could say that considering the law that existed in

12    the circuit at the time we filed the complaint, we had a

13    good faith basis for proceeding here.

14          MR. KESSLER:  Your Honor, this --

15          THE COURT:  I don't follow.

16          MR. KESSLER:  One minute.  Because --

17          THE COURT:  I don't follow that.

18          MR. KESSLER:  Here is -- here is what they are

19    conflating.  They are conflating Rule 11 and Rule 12.

20    It is true that Judge Conti ruled here that the

21    allegations they set forth passed Rule 12.  We don't

22    disagree with that.  And Judge Illston said that.

23          That tells you nothing about in either case

24    whether there was an objectively reasonable basis based

25    on a reasonable inquiry to make the allegations were

MOTION HEARING - 5/26/2011

Page 135

1   there, Judge Conti didn't examine that, Judge Illston

2   didn't examine that.  So we know nothing.

3             And I am listening to Mr. Simon very

4   carefully, who is a great lawyer and I praise him, and

5   an honest lawyer.  He is not going to tell your Honor in

6   this record that they are alleging in LCD, in that case,

7   that there is a unitary conspiracy to fix the prices of

8   the finished products, because he knows that's not what

9   they are doing.

10            There is a direct purchaser class and an

11  indirect purchaser class.  It is true that they are an

12  impact, you know, they are an impact in LCD letting that

13  case go forward, but not based on the type of allegation

14  made here.  Mr. Simon knows that, and to his credit he

15  hasn't said anything else.

16            He's done a very effective job to say a lot of

17  other things, but he won't say that.

18            THE COURT:  Okay.  Okay.

19            Matter stands submitted?

20            MR. SIMMONS:  Yes, your Honor.  Despite the

21  fact I have a lot more to say.

22            THE COURT:  Pardon me?  Oh, I'm sure.

23            MR. SIMMONS:  Especially on the evidentiary

24  point.

25            THE COURT:  Okay.

MOTION HEARING - 5/26/2011

Page 136

1           MR. SIMMONS:  But I won't say anything.

2           THE COURT:  All right.  Here we are.  Okay.

3           Now let's turn to the plaintiffs' motion by

4    the direct purchaser plaintiffs against Panasonic, MT,

5    and it started out against LG also, but I did receive a

6    letter indicating that the plaintiffs and LG have agreed

7    on that, so they are out of it.

8           Now, the motion itself, the motion of April

9    20, what does it ask for?  At the very end it says

10   plaintiffs' motion to develop discovery with respect to

11   CRT products should be granted.

12          Now, at that point, then, I'm saying to myself

13   well, that's the issue we have got in the Rule 11

14   motion, and plaintiffs want discovery on that issue.

15   And it's not necessary for me to go through and parse

16   out the specific questions that were asked or the

17   specific demands made and see whether that's been

18   complied with, but just deal with the subject of CRT

19   products.

20               BY MR. R. ALEXANDER SAVERI

21          MR. SAVERI:  If I may, your Honor, address two

22   things you have talked about, first of all.

23          THE COURT:  Yeah.

24          MR. SAVERI:  The first thing is you are

25   correct, the initial motion was against two defendants,

MOTION HEARING - 5/26/2011

Page 137

1    LG as well as the Panasonic defendants.

2              THE COURT:  Yeah.  Right.

3              MR. SAVERI:  The reason we have dropped the

4    motion against LG is because we have worked that out

5    with them.

6              THE COURT:  Yeah, I understand that.

7              MR. SAVERI:  And they are producing finished

8    product documents on a custodial basis.

9              What we are asking for now is that the

10   Panasonic defendants be treated just like all the other

11   defendants, that they produce finished product discovery

12   on -- on a custodial basis just like you ordered against

13   Hitachi, just like LG has agreed to do, and just like

14   every other defendant has agreed to do, and your Honor

15   has ordered it against Hitachi.

16             Where we are with Panasonic, and I think this

17   is very clear, your Honor, originally -- let me back up,

18   let me say one thing.

19             With Panasonic we have agreed on the

20   custodians.  It's done.  We have 53 agreed-upon

21   custodians.  There is no longer a dispute of who or

22   where those people are or where they will go look for

23   documents.

24             And as your Honor said in his previous hearing

25   on the custodian, this issue, the issue of going on the

MOTION HEARING - 5/26/2011

Page 138

1    custodial basis will take in this overarching objection

2    that we started almost a year ago.

3                THE COURT:  Yeah.  Yeah.

4                MR. SAVERI:  Which was time period, the --

5                THE COURT:  I understand.

6                MR. SAVERI:  And the finished product.

7                THE COURT:  I understand.

8                MR. SAVERI:  And so by going custodial, that

9    will take out the big undue burden issue for defendants

10   and resolve those overarching objections so that we

11   could get to the responsive material that plaintiffs are

12   seeking.

13               And we have worked that out with everybody,

14   your Honor ordered it as against Hitachi.

15               But more particularly --

16               THE COURT:  Well, have you agreed with them on

17   custodians, leaving the issue of subject matter aside?

18               MR. SAVERI:  Say that again?  I'm sorry, your

19   Honor?

20               THE COURT:  Have you agreed with the

21   respondents here, Panasonic --

22               MR. SAVERI:  Yes.

23               THE COURT:  -- and MT about custodians?

24               MR. SAVERI:  Yes.

25               THE COURT:  Who they are?

MOTION HEARING - 5/26/2011

Page 139

1          MR. SAVERI:  Yes.

2          THE COURT:  How many there are?

3          MR. SAVERI:  53, your Honor.  We have the

4    names.

5          THE COURT:  Okay.

6          MR. SAVERI:  All 53.

7          And I want to make one point very clear here,

8    your Honor, which is when this meet and confer process

9    started with Panasonic, they initially agreed to produce

10   finished product discovery on the custodial basis.

11   There was no undue burden at that point.

12          They changed position 180 degrees because your

13   Honor ordered us to answer the contention

14   interrogatories.  When we had to answer the contention

15   interrogatories, Panasonic withdrew its position and

16   said we will not produce finished product discovery

17   until -- and until we see your discovery and until we

18   are satisfied with your discovery.  That then derailed

19   all the finished product discovery against Panasonic.

20          And that exact issue came up before your Honor

21   with Hitachi.  And as your Honor may recall, your Honor

22   instructed all parties that one party's discovery is not

23   conditioned on another party's discovery.  That's the

24   whole point.  Your Honor wanted to move discovery

25   against all parties.

MOTION HEARING - 5/26/2011

Page 140

1          So one party can't say well, let me see what
2    you produce and then only if I'm satisfied with that
3    well then I agree to respond to your discovery.  That
4    issue was resolved.
5          And that objection made by Hitachi you
6    overruled, your Honor, that's the same objection being
7    made by Panasonic.
8          There is two -- there is two objections that
9    they are holding up, your Honor, given finished product
10   discovery.  One, we haven't made a prima facie case.  We
11   haven't made a showing.  We haven't made a showing there
12   is any evidence of a conspiracy in finished products,
13   therefore you don't get any.
14         Your Honor, we cited that, the transcript
15   where you overruled that.  We held that.  There is no
16   requirement of a prima facie showing.
17         The second one is burden, undue burden.  But
18   that was also overruled by your Honor and we said we are
19   going to go custodial base.  And the whole purpose of
20   the custodial base was to limit them having to do from
21   the top of the roof down to the basement to go search
22   everybody's files for responsive material.
23         And it was to limit it to a set amount of
24   agreed upon custodians.  And we have done that.  We have
25   done that amount with Panasonic.  We have agreed on

MOTION HEARING - 5/26/2011

Page 141

1  those people.

2           And second of all, that undue burden argument

3  here is a disguise, your Honor, because in fact they

4  agreed to produce finished product documents originally

5  and then took a 180 degrees because we had to answer the

6  contention interrogatories, your Honor.

7           So their undue burden argument or burden

8  argument at this point is just completely false.  It's

9  our position it's just completely false.  We agreed with

10  the custodians and they should produce just like you

11  ordered against Hitachi, just like LG is agreeing to

12  produce, and just like every other defendant here has

13  agreed to produce, finished product discovery.

14           One last point too, your Honor, is this.  For

15  them to make a burden argument, they have to come up

16  with some showing of it, some declaration "We have cited

17  to the law" in there, some declaration, some affidavit

18  of the cost of what it will do, this really undue

19  burden.  They made none here, your Honor, because there

20  isn't any.

21           In fact, Mr. Kessler's letter, I think we have

22  attached it as Exhibit 12, he says "We will now proceed

23  on a finished product discovery on a custodial basis,"

24  but he preserves his objection.

25           Then later when your Honor ordered the

1   contention interrogatories, "Oh, no, we got to stop, we

2   have to wait for your discovery and then we will decide

3   whether we will give it."

4           The fact of the matter here is there is no

5   undue burden on behalf of the defendants.  We are not

6   required to make a prima facie showing.  And in fact, we

7   have agreed on the custodians, and we have agreed on the

8   people that they are to search, and Panasonic, each of

9   the Panasonic entities should produce finished product

10  responsive material just like the other defendants.

11          Thank you, your Honor.

12          THE COURT:  All right.  Anything else from the

13  plaintiffs?

14          All right.

15          MR. HEMLOCK:  Thank you, your Honor, Adam

16  Hemlock for the Panasonic defendants.  As a threshold

17  matter, your Honor, obviously if the Rule 11 motion is

18  granted, this should all go away.

19          The specific nature of the discovery that we

20  understand they are seeking, and your Honor is right

21  that their motion brief in that regard, the letter is a

22  little unclear about exactly what it is they are talking

23  about when they say they're moving to compel production

24  of CRT product discovery, we -- we have interpreted it

25  to mean that they are specifically looking for document

MOTION HEARING - 5/26/2011

Page 143

```
 1    litigation information relating to the alleged CRT
 2    products conspiracy.
 3                THE COURT:  That's --
 4                MR. HEMLOCK:  Now, I'll get in a moment to the
 5    issue of unitary versus unitary versus non-unitary and
 6    so on, but that is the scope of the discovery that
 7    Panasonic is objecting to produce.
 8                Even if the Rule 11 motion is denied, your
 9    Honor, for reasons I'll explain in a moment, we still
10    believe that the motion to compel is -- should be denied
11    as well, that not only are what they seeking is
12    burdensome, but we don't believe there is any
13    established likelihood that the discovery they are
14    seeking exists, and --
15                THE COURT:  Seeking what?
16                MR. HEMLOCK:  The discovery that they are
17    seeking actually exists --
18                THE COURT:  As it says --
19                MR. HEMLOCK:  -- in discovery.
20                MR. SIMON:  Okay.
21                MR. HEMLOCK:  And furthermore, with respect to
22    this unitary conspiracy about which we have heard a lot
23    today, frankly we are already producing documents that
24    would be directly relevant to that.
25                Of course the Panasonic defendants deny that
```

MOTION HEARING - 5/26/2011

Page 144

1   that discovery -- that that conspiracy exists, but they

2   have the list if you look at the categories of documents

3   in discovery that we have agreed to produce, it would be

4   directly relevant to such an alleged conspiracy.

5           If you look, your Honor, at the plaintiffs'

6   positions --

7           THE COURT:  Now, wait a minute, wait a minute,

8   wait a minute.  I read your opposition as saying that

9   you have produced the documents under duress, both CRTs

10  and finished products.

11          MR. HEMLOCK:  Right.

12          THE COURT:  If it's within a document, then

13  says both, you produced it.

14          MR. HEMLOCK:  Right.

15          THE COURT:  So the only thing you are not

16  producing then are those documents which might be

17  responsive to a call of the discovery that simply talks

18  about finished products.

19          Is that the --

20          MR. HEMLOCK:  That -- that -- well, to be more

21  precise, your Honor, that would be searching for and

22  producing documents that relate solely to the finished

23  product element --

24          THE COURT:  Well, that's what I mean.

25          MR. HEMLOCK:  -- of their alleged conspiracy.

MOTION HEARING - 5/26/2011

Page 145

1           THE COURT:  Yes, well, that's what I mean.
2  That's what I mean.  Okay.
3           MR. HEMLOCK:  Yes, you are correct.
4           THE COURT:  All right.
5           MR. HEMLOCK:  So the briefing, your Honor,
6  that the plaintiffs have put in, they talk a lot and
7  refer today about this prima facie showing, and they
8  talk a lot about how the complaints set forth their
9  conspiracy theory, and then there was a motion to
10 dismiss, and those motions were denied.  And now they
11 believe that they are entitled to all discovery based on
12 whatever they had in the complaints.
13          It's a little bit of the flip side of the Rule
14 11 which is your Honor is entitled to actually not just
15 look at what was -- what existed at the time of the
16 complaints, but up until where we are now.
17          And the big missing picture that they don't
18 address in their brief is that we have their
19 interrogatory responses which show clearly, as
20 Mr. Kessler argued today and Mr. Simmons argued, that
21 they don't have a legitimate Rule 11 basis for the
22 finished products conspiracy that they are alleging.
23          And you know, I won't go through it again, but
24 there are the interrogatory responses, the Chunghwa
25 documents that proffer all of that stuff we have heard

MOTION HEARING - 5/26/2011

Page 146

1    about.

2              And when you look at all of that, what it

3    tells us is that they don't have anything to point to to

4    say that there would be those categories of documents in

5    Panasonic's files.

6              But they nevertheless want us to go search

7    through all these custodians' files and look for them,

8    and it's the Panasonic defendant's position that that's

9    unreasonable and unduly burdensome.

10             THE COURT:  Well, what do you think you have

11   agreed to by agreeing upon, what was it, 53, 83

12   custodians?

13             MR. HEMLOCK:  Well, we -- there is no question

14   we agreed with plaintiffs' counsel, we have agreed on

15   their custodians.  The question is what we looked for

16   within the files of those custodians.

17             I get the sense that plaintiffs' counsel

18   believe that -- that agreeing on custodians is kind of a

19   panacea, that once you have agreed on the custodians --

20             MR. SIMON:  Well, you see --

21             MR. HEMLOCK:  -- it's all well and good.

22             THE COURT:  -- that's kind of the way it

23   develops here when we started out arguing about a whole

24   lot of things such as timing and subject matter and

25   things like that came up at a hearing like this where

MOTION HEARING - 5/26/2011

Page 147

1    two sides seem to be agreeing.  If you agree on

2    custodians, you get agreement on that, that would

3    subsume all the other objections.

4              MR. HEMLOCK:  Well, your Honor, the problem is

5    that even though you pick those 53 custodians, and even

6    beyond the custodians we are producing data, we are

7    going to be searching through some central files, as

8    Mr. Kessler pointed out earlier, there are all sorts of

9    burdens relating to language and so on.

10             THE COURT:  Oh, I'm sure.

11             MR. HEMLOCK:  Even 53 custodians is going to

12   be a material burden.

13             An as your Honor knows through the procedure

14   as how discovery gets done these days, we don't take

15   those 53 custodians and look at every single document

16   they have in their files, we use some search terms, we

17   use other methodologies --

18             MR. SIMON:  Sure.

19             MR. HEMLOCK:  -- to cut it down.

20             MR. SIMON:  Sure.

21             MR. HEMLOCK:  If you had to look at every

22   single document of all 53 of those custodians, it would

23   be an unreasonable burden, and frankly, we would have

24   never agreed to it.

25             But we anticipate that we are going to take

MOTION HEARING - 5/26/2011

Page 148

1    that, the volume of the 53 custodians, whatever it is
2    that results, use some search terms, use some keywords,
3    and when we think about what is a reasonable burden that
4    we are willing to accept or not, it's based on what's
5    going to come out at the end of that process, not just,
6    you know, the volume of 53 and whether that alone is too
7    much or too little.
8            But I think, your Honor, an additional point
9    that's really important to keep in mind here is what it
10   is that we have already agreed to produce.  So as you
11   mentioned, we make the point in our opposition brief
12   that they have alleged a unitary conspiracy, and then
13   with respect to, you know, the request, let me list some
14   requests and I'll say with respect to these we have
15   agreed to produce the documents if they address both
16   CRTs and CRT finished products.
17           And we have heard today about meetings, you
18   know, CRT tube meetings where finished products were
19   discussed.  So they also mention in their interrogatory
20   responses that there was a single set of meetings.
21           Bearing that in mind, we have agreed to
22   produce documents produced by the defendant, by the
23   Panasonic defendants to the DOJ, communications between
24   competitors, meetings between competitors, detailed
25   sales data, inventory levels, business plans, planning

MOTION HEARING - 5/26/2011

Page 149

1    analyses, documents relating to market shares,

2    production, capacity, sales, shipments.  The full list

3    is in the brief and I won't bore you with it.

4           But the point is, if you take their assertions

5    at face value, that there was a single set of meetings

6    with respect to both, and we have agreed to produce all

7    these categories with respect to CRT tubes, and CRT

8    finished products were discussed at those meetings, the

9    impact, all of that stuff, then what we have agreed to

10   produce, frankly, your Honor, is to capture what it is

11   that they are looking for.

12          Now, what they want us to go beyond that to do

13   is to find some document, you know, if it exists, where

14   this, the finished product element of the alleged

15   conspiracy was discussed on kind of a standalone basis.

16          And let me provide one clear example of why

17   that would be burdensome.  Our client, MTPD, one of the

18   companies that we have talked about today, was a tube

19   maker.  All they do all day is they do out and meet

20   television manufacturers and try to sell them product.

21   Now, if we had to go through all of that stuff, all of

22   their e-mail communications --

23          THE COURT:  But hasn't that been answered by

24   your already identifying the custodians you are going to

25   search their files?

MOTION HEARING - 5/26/2011

1           MR. HEMLOCK:  Well, what it identifies is

2     whose files we are going to have to look for for those

3     documents.

4           THE COURT:  Yeah.

5           MR. HEMLOCK:  But to have to go through

6     thousands of innocuous documents where some guy says

7     "Oh, I met with, you know, the TV division of so and so

8     company and, you know, we negotiated a price or we have

9     to supply by so and so date," we are going to have to go

10    through all of those documents because those are

11    meetings between a TV -- a tube manufacturer, in this

12    case us, and a TV manufacturer, and that are going to be

13    entirely innocuous.

14          THE COURT:  So after you have scanned the

15    document onto your computer software system, okay, you

16    have designed your search terms, you want it to be in

17    such a way that anything pertaining to CRT finished

18    products that doesn't include another way to catch it,

19    another hook on the definition --

20          MR. HEMLOCK:  That's actually --

21          THE COURT:  -- doesn't get selected.

22          MR. HEMLOCK:  There are actually two -- well,

23    you raise a good point.

24          There are really two complexities to this.

25    One is coming up with search terms that would -- you

MOTION HEARING - 5/26/2011

Page 151

1   would have to capture certain -- you would have to use

2   search terms that capture all the communications between

3   MTPD or our tube business and its customers.  And to do

4   that, you are going to have to come up with search terms

5   that not only would capture that, but would have to be

6   even broader, we would have to look through even more

7   nonresponsive stuff.

8           But secondly, once you use those search terms,

9   your Honor, all those documents get pulled up and then

10  you have to have an army of reviewers going through all

11  of them.  And I just picture all these reviewers sitting

12  there reviewing tons of innocuous communications between

13  the company and its customers with, you know, when is it

14  we have to bid for the next round or how much is the

15  price or how do we need to change the tube to satisfy

16  you and all of that stuff, none of which is going to

17  have anything to do with, you know, this alleged TV

18  conspiracy, which as Jeffrey pointed out, we just think

19  there doesn't seem to be any evidence that it exists and

20  they are asking us to undertake this huge burden to look

21  for this.

22          I mean, you know, we use the term "fishing

23  expedition" in a lot in these types of case.  I honestly

24  believe this is really the appropriate example where

25  four years into the case we are just not seeing any

MOTION HEARING - 5/26/2011

Page 152

1   evidence of this unitary conspiracy, but they want us to

2   dig around and look for it.

3           And that's what we object to.

4           THE COURT:  But your search is going to

5   include any document that pertains to CRTs and finished

6   products, and finished products.

7           MR. HEMLOCK:  Correct.  Correct.

8           THE COURT:  Okay.  Counsel?

9           MR. KESSLER:  Your Honor, if I could just say

10  one thing?

11          THE COURT:  Yeah.

12          MR. KESSLER:  Is reason for this is, this is

13  the way to look at it, we will put in all the CRT search

14  terms.  So if it refers to CRTs, it's automatically

15  going to get picked up with all CTR competitors, whether

16  or not it has something about finished products.

17          THE COURT:  Sure.

18          MR. KESSLER:  What we think is unduly

19  burdensome for these custodians is to pick up documents

20  simply because it only mentions a finished product and

21  has nothing to do with a CRT except for things like say

22  price data and -- you know, in other words, we'll give

23  them prices of televisions and all that, that's a

24  separate, that's not a custodian issue, that's just a

25  pricing list data, that's a separate thing.

MOTION HEARING - 5/26/2011

Page 153

```
 1             But the burden here is so that if you have a
 2   custodian who -- who -- who did something with another
 3   television company having nothing to do with CRTs, it
 4   will get picked up.  And if it gets picked up, it could
 5   be hundreds of thousands or a million more hits which we
 6   have to review.  And that's -- that's the burden.
 7   That's the burden.  For the same custodian.
 8             Because you remember we are also talking about
 9   a period of, you know, they want to go back 18 years,
10   and they want to do this globally.
11             So it's not like we are talking about oh,
12   let's just do the last three years of somebody's hits.
13   Any time you add this way, the expansion becomes quite
14   gigantic.
15             MR. RICK SAVERI:  Your Honor, if I --
16             MR. HEMLOCK:  I'm sorry, I just have a couple
17   more points.
18             MR. SAVERI:  Absolutely.  Just let me know
19   when you are done.  We'll pick it right up.
20             MR. HEMLOCK:  Your Honor, counsel for
21   plaintiffs made a point in their brief and also today in
22   oral argument about a purported flip-flop, that they
23   claim that we had agreed to produce finished products,
24   conspiracy documents --
25             THE COURT:  So you entered into a stipulation
```

MOTION HEARING - 5/26/2011

Page 154

1   or an agreement, if it wasn't an agreement, I'm not

2   concerned with it.

3           MR. HEMLOCK:  Well, if I just may point out

4   that I believe what they are relying on is a letter that

5   was sent by Mr. Kessler in September 21, 2010, and all

6   he said, your Honor, is that we were willing to consider

7   proceeding that way.  We were willing to discuss it.  We

8   never agreed to it or committed to it.

9           Your Honor, we frankly agree that once it was

10  clear that we couldn't get responses to the

11  interrogatories and we wanted to see what those

12  responses were, and your Honor, when you ordered them to

13  respond to those interrogatories, you expressly pointed

14  out in your order that the responses would be directly

15  relevant to the scope of discovery in the case.  And you

16  know, we -- we took you up on that.

17          THE COURT:  Uh-huh.

18          MR. HEMLOCK:  And we expressly told them that

19  we felt that was directly relevant.  We weren't willing

20  to undertake this extra burden to look for these extra

21  documents unless we thought there was a Rule 11 basis to

22  do so, and that's why we are where we are today.

23          THE COURT:  Uh-huh.

24          MR. HEMLOCK:  Thank you.

25          MR. SHAPLAND:  Your Honor, Eric Shapland on

MOTION HEARING - 5/26/2011

Page 155

1    behalf of LG Electronics.

2            THE COURT:  Yes.

3            MR. SHAPLAND:  I just want to make one point.

4    I don't want you to be left with a misimpression that we

5    have a final agreement.

6            THE COURT:  You --

7            MR. SHAPLAND:  I don't want you to be left

8    with a misimpression that we have final agreement with

9    the plaintiffs with respect to finished products, the

10   scope of finished product discovery.  We still stand

11   behind our March 21st letter to you which describes the

12   implications of plaintiffs' inadequate discovery

13   responses on the scope of finished product discovery.

14           And we will stand by those principles in that

15   letter to the extent that we are sitting down and making

16   decisions about who should be a custodian on the

17   finished product side of the case.

18           THE COURT:  Okay.

19           MR. SAVERI:  Your Honor?

20           THE COURT:  But to the extent you agree on

21   custodian, what are you doing about finished products?

22   You are producing?

23           MR. SHAPLAND:  Right.

24           MR. SAVERI:  They are producing finished

25   product responsive material.

MOTION HEARING - 5/26/2011

Page 156

 1           THE COURT:  Finished, if you agreed on the
 2    custodians.
 3           MR. SAVERI:  Right.
 4           THE COURT:  I guess you can finish
 5    discussions.
 6           If you reach an agreement on custodians you
 7    are agreeing that your discovery, your production by
 8    those custodians will include finished products
 9    information.
10           MR. SHAPLAND:  That's right.  We are taking a
11    different approach to managing the --
12           THE COURT:  No, I understand.  I understand.
13           MR. SHAPLAND:  You know, it's costing upwards
14    of $100,000 with going through custodians' documents.
15           MR. SIMON:  I understand.
16           MR. SHAPLAND:  We have the same burden --
17           THE COURT:  Each company has its own reasons
18    for taking a specific position.  I respect that.
19           MR. SAVERI:  If I may, your Honor?
20           THE COURT:  Yes.
21           MR. SAVERI:  I'd like to pick up with where
22    Mr. Kessler left off and saying that the burden of going
23    into these custodians to look, there has been no showing
24    made, your Honor, no declaration of costs, time,
25    anything as to that burden.  There is just a blanket

MOTION HEARING - 5/26/2011

Page 157

1    claim.

2              Your Honor, on behalf of plaintiffs, there

3    will be no -- it will be very easy for them to get and

4    review that material.  It's the same showing, your

5    Honor.  They haven't made any on that point.

6              I also, it's like Yogi Berra, it's deja vu all

7    over again, your Honor.  And I can't believe they said

8    it, and I wrote it down.  And the position of Panasonic

9    is if they don't believe the conspiracy exists, we don't

10   get any discovery.

11             THE COURT:  No.  Okay.

12             MR. SAVERI:  That's what they just said.

13             THE COURT:  No, I understand that.

14             MR. SAVERI:  All right.  And we have a

15   sustained complaint, your Honor.  And the whole purpose

16   of it --

17             THE COURT:  I understand.

18             MR. SAVERI:  And I want to make another point,

19   your Honor.  The whole purpose of, your Honor, we went

20   to this custodian based approach, is to get at the issue

21   of the finished products.  What they --

22             THE COURT:  Well, among others.

23             MR. SAVERI:  Among other things, your Honor,

24   correct.

25             But what they are saying now is when they get

MOTION HEARING - 5/26/2011

Page 158

1    these custodians, these 53 custodians and they collect
2    the material, when and if they find material of
3    Matsushita, Panasonic or MTPD talking only about
4    televisions, fixing prices on televisions, they are
5    going to exclude them.
6             THE COURT:  Yeah, I think that's right.
7             MR. SAVERI:  That's what they want to exclude,
8    your Honor.
9             THE COURT:  Right.
10            MR. SAVERI:  That's why we are moving to
11   compel.
12            THE COURT:  I think the thing that leads him
13   to that result is the fact that you have now defined the
14   conspiracy as being a unitary conspiracy involving both
15   products.
16            MR. SAVERI:  Well, it does involve both
17   products, and that's just it.  That's just it.
18            And one thing on that, your Honor, he talks
19   about MTPD.  MTPD.  MTPD, your Honor, is a joint venture
20   between Matsushita and Toshiba.  But during the
21   conspiracy, MTPD didn't exist the entire time.
22   Matsushita, the tube and TV company, attended.  Toshiba
23   attended.  LG Electronics.  The tube and TV companies.
24   Same companies going to the conspiracy, conspirators
25   going to conspiracy meetings.

MOTION HEARING - 5/26/2011

Page 159

1           Then seven years down the road, oh, let's form

2      a joint venture where we spin off our tube manufacturing

3      facilities, we both own it, and we buy the product.

4      That's what they are doing here, your Honor.

5           So actually, the TV and tube company,

6      Matsushita Electronics is attending the meetings.  TV

7      and tube.

8           So that's why we want that material, your

9      Honor, of the discussions regarding if it's only TV

10     related.  It's not just tube people attending, your

11     Honor.  They are both.  It's a company that does both

12     products, your Honor.

13          It's a very, very relevant thing.

14          THE COURT:  All right.

15          MR. SAVERI:  The other point here where they

16     are making is that it will be very difficult to look for

17     the material that because we sell it to our customers,

18     that MTPD would sell it to customers.  Well, the

19     material the customers are selling it to are the other

20     coconspirators that are here before you, your Honor.

21     That's why we want it.  We exactly want the discussions

22     of when Matsushita or MTPD talks to Hitachi about buying

23     tubes.  That's exactly why we want them to look at it.

24     Because they said "Hey, by the way, we just got back

25     from the conspiracy meeting, we've got to set TV prices

MOTION HEARING - 5/26/2011

Page 160

1    at X."  That's why they want them to talk to their

2    customers.  That's exactly the point.  They want to

3    exclude that.

4              So that once again, your Honor, all the other

5    defendants are on board.  We feel here with Panasonic --

6              THE COURT:  Well, no, yeah, I don't pay much

7    attention to that because every company can have its own

8    reasons for agreeing or not agreeing on the work its got

9    to do to produce.  And somebody may say well, we have

10   got so little, what could possibly be there, we are not

11   going to disagree at all, we are just going to crank the

12   computers out, check all the e-mails, and produce

13   everything.  It's easier than sorting.  Others may say

14   no, that burden is too big, it's too heavy, too much to

15   do.

16             So everybody may have their own reasons.

17             MR. SAVERI:  That's correct, your Honor.

18             But there still has been no showing as far as

19   burden here.

20             MR. SIMON:  I agree.  I agree there has not

21   been a factual showing of burden.  Okay.

22             MR. SAVERI:  Thank you, your Honor.  Enough

23   said.

24             Thank you, your Honor.

25             MR. HEMLOCK:  May I just make one more point,

MOTION HEARING - 5/26/2011

Page 161

1    your Honor?

2             THE COURT:  Sure.

3             MR. HEMLOCK:  Sorry.  I would just note, by

4    the way, that all of this is also in the context of what

5    we have already agreed to produce.  We have produced

6    already, your Honor, tens of thousands of documents.  I

7    believe we produced 5,000 documents today.  We have --

8    I'm sure at the end there will be hundreds of thousands,

9    again all directly what we believe is addressing this

10   alleged unitary conspiracy.

11            So I can say with confidence there will be a

12   lot of stuff that the plaintiffs will be receiving that

13   will also be in that bucket.

14            MR. SAVERI:  Yeah, but "a lot of stuff" is not

15   relevant stuff.

16            THE COURT:  I know, I know.  We could package

17   up the New York telephone directory and send it to you

18   and it would be --

19            MR. SAVERI:  It would be a lot of pages, your

20   Honor.

21            THE COURT:  -- 200,000 pages and 100 million

22   line items.

23            But you know, I understand.

24            MR. SAVERI:  I appreciate it, your Honor.

25            THE COURT:  Come on now.

MOTION HEARING - 5/26/2011

Page 162

```
 1            MR. SAVERI:  It's tough to hear, your Honor.

 2            THE COURT:  Okay.  Submitted?

 3            MR. SAVERI:  Submitted.

 4            MR. KESSLER:  Thank you, your Honor.  We

 5   appreciate your time very much.

 6            THE COURT:  Thank you.

 7            MR. KESSLER:  Thank you for your patience.

 8            (Whereupon, the proceedings were

 9            adjourned at 1:31 P.M.)

10                      --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MOTION HEARING - 5/26/2011

1                    CERTIFICATE OF REPORTER

2

3           I, COREY W. ANDERSON, a Certified Shorthand

4    Reporter, hereby certify that the foregoing proceedings

5    were taken down in shorthand by me, a disinterested

6    person, at the time and place therein stated, and that

7    the proceedings were thereafter reduced to typewriting,

8    by computer, under my direction and supervision;

9           I further certify that I am not of counsel or

10   attorney for either or any of the parties to the said

11   proceeding, nor in any way interested in the event of

12   this cause, and that I am not related to any of the

13   parties thereto.

14

15           DATED:

16

17

18

19                  _____

20                  COREY W. ANDERSON, CSR NO 4096

21

22

23

24

25