1 | Jessica L. Meyer (CA # 249064)
Lindquist & Vennum P.L.L.P.
2 | 4200 IDS Center
80 South Eighth Street
3 | Minneapolis, MN 55402
Tel.: 612-371-3211
4 | Fax: 612-371-3207
5 | jmeyer@lindquist.com
6 | *Attorneys for Plaintiffs*

E-filing

ORIGINAL
FILED

NOV – 7 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

7 | UNITED STATED DISTRICT COURT

8 | NORTHERN DISTRICT OF CALIFORNIA

9 | John R. Stoebner, as Chapter 7 Trustee for )
10 | PBE Consumer Electronics, LLC and )
related entities; and Douglas A. Kelley, as )
11 | Chapter 11 Trustee for Petters Company, )
Inc. and related entities, and as Receiver )
12 | for Petters Company, LLC and related )
entities, )
13 | )
14 | Plaintiffs, )
)
15 | v. )
)
16 | LG Electronics, Inc.; LG Electronics )
17 | U.S.A., Inc.; LG Electronics Taiwan Taipei )
Co., Ltd.; Koninklijke Philips Electronics )
18 | N.V. a/k/a Royal Philips Electronics N.V.; )
Philips Electronics North America )
19 | Corporation; Philips Electronics Industries )
(Taiwan), Ltd.; Philips da Amazonia )
20 | Industria Electronica Ltda; LP Displays )
International, Ltd. f/k/a LG.Philips )
21 | Displays; )
22 | Samsung Electronics Co., Ltd.; )
Samsung Electronics America, Inc.; )
23 | Samsung SDI Co., Ltd. f/k/a Samsung )
Display Device Co., Ltd.; Samsung SDI )
24 | America, Inc.; Samsung SDI Mexico S.A. )
de C.V.; Samsung SDI Brasil Ltda.; )
25 | Shenzhen Samsung SDI Co., Ltd.; Tianjin )
26 | Samsung SDI Co., Ltd.; )
Samsung SDI (Malaysia) Sdn. Bhd.; )
27 | Toshiba Corporation; )
Toshiba America, Inc.; )
28 | Toshiba America Consumer Products, )

Court File No.

C11-05381 EDL

COMPLAINT

ADR

EXHIBIT A

1  LLC; Toshiba America Information )
   Systems, Inc.; Toshiba America Electronics )
2  Components, Inc.; Toshiba Display Devices )
   (Thailand) Company, Ltd.; )
3  Panasonic Corporation; )
4  Panasonic Corporation of North America; )
   MT Picture Display Co., Ltd.; )
5  Beijing-Matsushita Color CRT Company, )
   Ltd.; Hitachi, Ltd.; Hitachi Displays, Ltd., )
6  Hitachi Electronic Devices (USA), Inc.; )
   Hitachi America, Ltd.; Hitachi Asia, Ltd.; )
7  Shenzhen SEG Hitachi Color Display )
8  Devices, Ltd.; Tatung Company of )
   America, Inc., Chunghwa Picture Tubes )
9  Ltd.; Chunghwa Picture Tubes (Malaysia) )
   Sdn. Bhd.; IRICO Group Corporation; )
10 IRICO Display Devices Co., Ltd.; )
11 IRICO Group Electronics Co., Ltd.; )
   Thai CRT Company, Ltd.; and )
12 Samtel Color, Ltd., )
                                            )
13                     Defendants. )
                                            )
14                                          )
                                            )
15                                          )

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   JURISDICTION AND VENUE .............................................................................2

III.  DEFINITIONS.......................................................................................................4

IV.   PLAINTIFFS .........................................................................................................5

V.    DEFENDANTS ......................................................................................................6

VI.   AGENTS AND CO-CONSPIRATORS ...............................................................21

VII.  INTERSTATE TRADE AND COMMERCE .......................................................22

VIII. FACTUAL ALLEGATIONS ...............................................................................22

    A.    CRT Technology.........................................................................................22

    B.    Structural Characteristics of ohe CRT Market............................................23

        a.    Market Concentration.........................................................................23

        b.    Information Sharing ...........................................................................23

        c.    Consolidation ....................................................................................24

        d.    Multiple Interrelated Business Relationships ....................................24

        e.    High Costs of Entry Into the Industry................................................26

        f.    The Maturity of the CRT Product Market .........................................26

        g.    Homogeneity of CRT Products..........................................................27

    C.    Pre-Conspiracy Market ..............................................................................27

    D.    Defendants' and Co-Conspirators' Illegal Agreements...............................27

        a.    "Glass Meetings" ..............................................................................28

        b.    Bilateral Discussions.........................................................................32

        c.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions.........................................................................34

    E.    The CRT Market During The Conspiracy ..................................................39

    F.    International Government Antitrust Investigations ......................................42

IX.   FRAUDULENT CONCEALMENT.......................................................................44

X.    VIOLATIONS ALLEGED ...................................................................................45

A.   First Claim for Relief: Violation of Section 1 of the Sherman Act .......................45

B.   Second Claim For Relief: Violation of Minnesota's Antitrust Statute .................47

C.   Third Claim For Relief: Violation of the California Cartwright Act ....................48

D.   Fourth Claim For Relief: Violation of California's Unfair Competition Statute ...........................................................................................49

E.   Fifth Claim for Relief: Unjust Enrichment and Disgorgement of Profits..............51

XI.   PRAYER FOR RELIEF .................................................................................51

XII.   JURY DEMAND.........................................................................................52

Plaintiffs John R. Stoebner, as Chapter 7 Trustee for PBE Consumer Electronics, LLC and related entities, and Douglas A. Kelley, as Chapter 11 Trustee for Petters Company, Inc. and related entities and as Receiver for Petters Company, LLC and related entities (collectively "Plaintiffs"), bring this action for damages and injunctive relief under state and federal antitrust, unfair competition, and consumer protection laws against the Defendants named herein, demanding trial by jury, and complaining and alleging as follows:

## I.   INTRODUCTION

1.      Plaintiffs indirectly purchased Cathode Ray Tube Products ("CRT Products") (as further defined below), in the United States from Defendants, their predecessors, any subsidiaries or affiliates thereof, or any of their unnamed co-conspirators, during the period beginning at least as early as March 1, 1995 until at least November 25, 2007 (the "Relevant Period"). Plaintiffs allege that during the Relevant Period the Defendants conspired to fix, raise, maintain and/or stabilize prices of CRT Products sold in the United States. Because of Defendants' unlawful conduct, Plaintiffs paid artificially inflated prices for CRT Products and have suffered antitrust injury to their business or property.

2.      As further detailed below, beginning in at least 1995, Defendants Samsung, Philips, LG, Chunghwa, and others met or talked with at least one other Defendant in order to discuss and agree upon CRT Product prices and the amount of CRT Products each would produce. Over time, these Defendants reached out to the other Defendant CRT Product manufacturers, including Toshiba, Panasonic, Hitachi, BMCC, IRICO, Thai CRT and Samtel, who then also met or talked with their competitors for the purpose of fixing the prices of CRT Products. By 1997, a formal system of multilateral and bilateral meetings was in place, involving the highest levels of the Defendant corporations, all with the sole purpose of fixing the prices of CRT Products at supracompetitive levels.

3.      Throughout the Relevant Period, Defendants' conspiracy was effective in moderating the normal downward pressure on prices for CRT Products caused by periods of

1    oversupply and competition from new technologies, such as TFT-LCD and Plasma.  Defendants'

2    conspiracy resulted in unusually stable pricing and even rising prices in a very mature, declining

3    market.  As a result of Defendants' unlawful conduct, Plaintiffs paid higher prices for CRT

4    Products than they would have paid in a competitive market.

5            4.      This global conspiracy is being investigated by the Antitrust Division of the

6    United States Department of Justice ("DOJ"), and by several other international competition

7    authorities.  On February 10, 2009, a federal grand jury in San Francisco issued a two-count

8    indictment against C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture

9    Tubes, Ltd., for his participation in a global conspiracy to fix the prices of CRTs used in

10   computer monitors and televisions.  On March 18, 2011, Samsung SDI pled guilty and agreed to

11   pay a $32 million criminal fine for its role in a global conspiracy to fix prices, reduce output and

12   allocate market shares of color display tubes, a type of cathode ray tube used in computer

13   monitors. The criminal information states that the illegal combination and conspiracy was carried

14   out, in part, in the Northern District of California.  Preceding Samsung SDI's guilty plea, Wen

15   Jun ("Tony") Cheng,  Chung Cheng "Alex" Yeh, Seung-Kyu "Simon" Lee, Yeong-Ug "Albert"

16   Yang and Jae-Sik "J.S." Kim  were indicted for their participation in the color display tube

17   conspiracy.

18           **II.      JURISDICTION AND VENUE**

19           5.      This action is instituted under Section 16 of the Clayton Act, 15 U.S.C. § 26, to

20   obtain injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, to recover

21   damages under Minnesota and California antitrust and unfair competition laws, and to recover

22   costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs sustained as a

23   result of the Defendants' violations of those laws.

24           6.      The Court has subject matter jurisdiction over the federal claim under 28 U.S.C.

25   §§ 1331 and 1337.  The Court has subject matter jurisdiction over the state law claims under 28

26   U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the

27   same case or controversy.

28

7.     Venue is proper in this Judicial District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 (b), (c) and (d), because during the Relevant Period one or more of the Defendants resided, transacted business, was found, or had agents in, this district, and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, and a substantial portion of the affected portion of the interstate trade and commerce described below has been carried out in this district.

8.     Defendants conduct business throughout the United States, including this jurisdiction, and they have purposefully availed themselves of the laws of the United States, including specifically the laws of the states of California and Minnesota. Defendants' products are sold in the flow of interstate commerce, and Defendants' activities had a direct, substantial and reasonably foreseeable effect on such commerce.

9.     Defendants' conspiracy to fix the prices of CRT Products substantially affected commerce throughout the United States and specifically in California and Minnesota, because Defendants directly or through their agents, engaged in activities affecting the states of California and Minnesota. Defendants have purposefully availed themselves of the laws of California and Minnesota in connection with their activities relating to the production, marketing, and sale and/or distribution of CRT Products. Defendants produced, promoted, sold, marketed, and/or distributed CRT Products, thereby purposefully profiting from access to indirect purchaser consumers in California and Minnesota. As a result of the activities described herein, Defendants:

    a.     Caused damage to the Plaintiffs in the United States, including the states of California and Minnesota;

    b.     Caused damage in the states of California and Minnesota by acts or omissions committed outside California and Minnesota and by regularly doing or soliciting business in California and Minnesota;

    c.     Engaged in a persistent course of conduct within the states of California and Minnesota and/or derived substantial revenue from the marketing and

sale of CRT Products in California and Minnesota; and

d.  Committed acts or omissions that they knew or should have known would cause damage (and, in fact, did cause damage) in the states of California and Minnesota while regularly doing or soliciting business in California and Minnesota, engaging in other persistent courses of conduct in California and Minnesota, and/or deriving substantial revenue from the marketing and sale of CRT Products in California and Minnesota.

10.  The conspiracy described herein adversely affected Plaintiffs, who indirectly purchased Defendants' CRT Products. Defendants' conspiracy has resulted in an adverse monetary effect on indirect purchasers, including Plaintiffs.

11.  Prices of CRT Products in California and Minnesota were raised to supracompetitive levels by the Defendants and their co-conspirators. Defendants knew that commerce in CRT Products in California and Minnesota would be adversely affecting by implementing their conspiracy.

## III.  DEFINITIONS

12.  As used herein, the term "CRT" or "CRTs" stands for "cathode ray tube(s)." A CRT is a display technology used in televisions, computer monitors and other specialized applications. The CRT is a vacuum tube that is coated on its inside face with light sensitive phosphors. An electron gun at the back of the vacuum tube emits electron beams. When the electron beams strike the phosphors, the phosphors produce either red, green, or blue light. A system of magnetic fields inside the CRT, as well as varying voltages, directs the beams to produce the desired colors. This process is rapidly repeated several times per second to produce the desired images.

13.  There are two types of CRTs: color display tubes ("CDTs") which are used in computer monitors and other specialized applications; and color picture tubes ("CPTs") which are used in televisions. CDTs and CPTs are collectively referred to herein as "cathode ray tubes" or "CRTs."

14.    As used herein "CRT Products" includes (a) CRTs; and (b) products containing CRTs, such as television sets and computer monitors.

15.    The "Relevant Period" means the period beginning at least March 1, 1995 through at least November 25, 2007.

16.    "Person" means any individual, partnership, corporation, association, or other business or legal entity.

17.    "OEM" means any Original Equipment Manufacturer of CRT Products.

## IV.    PLAINTIFFS

18.    John R. Stoebner is the Trustee of the Chapter 7 bankruptcy estates of PBE Consumer Electronics, LLC, f/k/a Polaroid Consumer Electronics, LLC and Petters Consumer Brands, LCC, and related entities.   PBE Consumer Electronics, LLC, its related entities, and Stoebner, in his official capacity as the Trustee thereof, collectively are referred to as "Polaroid." The Polaroid bankruptcy estates are jointly administered in the United States Bankruptcy Court, District of Minnesota, as *In re Polaroid Corporation, et al.*, Case No. 08-46617(GFK).  During the Relevant Period, Polaroid Consumer Electronics, LLC operated and did business in Minnesota, indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.

19.    Douglas A. Kelley is the Trustee of the Chapter 11 bankruptcy estate for Petters Company, Inc., which is jointly administered with several other affiliated debtors in the United States Bankruptcy Court, District of Minnesota, as *In re Petters Company, Inc., et al.*, Case No. 08-45257(GFK).

20.    Douglas A. Kelley is also the Receiver for Petters Company, LLC, pursuant to the order of the United States District Court, District of Minnesota, in *United States v. Thomas Joseph Petters, et al.*, Case No. 08-CV-05348(ADM/JSM).

21.    Petters Company, Inc., Petters Company, LLC, and Kelley, in his official capacity as Trustee and Receiver respectively thereof, collectively are referred to as "Petters."  During the relevant period, Petters operated and did business in Minnesota, indirectly purchased CRT

1  Products from one or more of the Defendants or their co-conspirators, and has been injured by

2  reason of the antitrust violations alleged in this Complaint.

3       22.     Polaroid and Petters collectively are referred to as "Plaintiffs."

## V.     DEFENDANTS

### LG Electronics Entities

6       23.     Defendant LG Electronics, Inc. is a corporation organized under the laws of the

7  Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-

8  dong, Yeoungdeungpo-gu, Seoul 150-721, South Korea.  LG Electronics, Inc. is a $48.5 billion

9  global force in consumer electronics, home appliances and mobile communications, which

10  established its first overseas branch office in New York in 1968.  The company's name was

11  changed from GoldStar Communications to LG Electronics, Inc. in 1995, the year in which it

12  also acquired Zenith in the United States.  In 2001, LG Electronics, Inc. transferred its CRT

13  business to a 50/50 CRT joint venture with Defendant Koninklijke Philips Electronics N.V. a/k/a

14  Royal Philips Electronics N.V. forming Defendant LG.Philips Displays (n/k/a LP Displays

15  International, Ltd.).  During the Relevant Period, LG Electronics, Inc. manufactured, marketed,

16  sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or

17  affiliates, to customers throughout the United States.

18       24.     Defendant LG Electronics U.S.A., Inc. ("LGEUSA) is a Delaware corporation

19  with its principal place of business located at 1000 Sylvan Avenue, Englewood Cliffs, NJ 07632.

20  LG Electronics USA, Inc. is a wholly-owned and controlled subsidiary of Defendant LG

21  Electronics, Inc.  During the Relevant Period, LG Electronics U.S.A., Inc. manufactured,

22  marketed, sold and/or distributed CRT Products, either directly or indirectly through its

23  subsidiaries or affiliates, to customers throughout the United States. Defendant LG Electronics,

24  Inc. dominated and controlled the finances, policies, and affairs of LGEUSA relating to the

25  antitrust violations alleged in this Complaint.

26       25.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese

27  entity with its principal place of business located at 7F, No.47, Lane3, Jihu Road, NeiHu District,

1    Taipei City, Taiwan. LGETT is a wholly-owned and controlled subsidiary of Defendant LG

2    Electronics, Inc. During the Relevant Period, LGETT manufactured, marketed, sold and/or

3    distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to

4    customers throughout the United States. Defendant LG Electronics, Inc. dominated and

5    controlled the finances, policies, and affairs of LGETT relating to the antitrust violations alleged

6    in this Complaint.

7        26.      Defendants LG Electronics, Inc., LGEUSA, and LGETT are collectively referred

8    to herein as "LG."

9    **Philips Entities**

10        27.      Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics

11    N.V. ("Royal Philips") is a Dutch company with its principal place of business located at

12    Amstelplein 2, Breitner Center, 1070 MX Amsterdam, The Netherlands. Royal Philips, founded

13    in 1891, is one of the world's largest electronics companies, with 160,900 employees located in

14    more than 60 countries. Royal Philips had sole ownership of its CRT business until 2001. In

15    2001, Royal Philips transferred its CRT business to a 50/50 CRT joint venture with defendant

16    LG Electronics, Inc. forming Defendant LG.Philips Displays (n/k/a LP Displays International,

17    Ltd.). In December 2005, as a result of increased pressure on demand and prices for CRT

18    Products, Royal Philips wrote off the remaining book value of 126 million Euros of its

19    investment and said it would not inject further capital into the joint venture. During the Relevant

20    Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either

21    directly or indirectly through its subsidiaries or affiliates, to customers throughout the United

22    States.

23        28.      Defendant Philips Electronics North America Corporation ("PENAC") is a

24    Delaware corporation with its principal place of business located at 1251 Avenue of the

25    Americas, New York, NY 10020-1104. Philips Electronics NA is a wholly owned and

26    controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips

27    Electronics NA manufactured, marketed, sold and/or distributed CRT Products, either directly or

28

1   indirectly through its subsidiaries or affiliates, to customers throughout the United States.

2   Defendant Royal Philips dominated and controlled the finances, policies, and affairs of PENAC

3   relating to the antitrust violations alleged in this Complaint.

4         29.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Electronics

5   Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu

6   Street, Nangang District, Taipei, Taiwan.  Philips Electronics Taiwan is a subsidiary of

7   Defendant Royal Philips.  During the Relevant Period, Philips Electronics Taiwan manufactured,

8   marketed, sold and/or distributed CRT Products, either directly or indirectly through its

9   subsidiaries or affiliates, to customers throughout the United States.  Defendant Royal Philips

10  dominated and controlled the finances, policies, and affairs of Philips Electronics Taiwan

11  relating to the antitrust violations alleged in this Complaint.

12        30.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a

13  Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1

14  andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and

15  controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil

16  manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

17  through its subsidiaries or affiliates, to customers throughout the United States.  Defendant Royal

18  Philips dominated and controlled the finances, policies, and affairs of Philips Brazil relating to

19  the antitrust violations alleged in this Complaint.

20        31.     Defendants Royal Philips, PENAC,  Philips Electronics Taiwan, and Philips

21  Brazil are collectively referred to herein as "Philips."

22  **LP Displays**

23        32.     Defendant LP Displays International, Ltd. f/k/a LG.Philips Displays ("LP

24  Displays") was created in 2001 as a 50/50 joint venture between Defendants LG Electronics, Inc.

25  and Royal Philips Electronics of The Netherlands.  In March 2007, LP Displays became an

26  independent company organized under the laws of Hong Kong with its principal place of

27  business located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road

28

1  Central, Sheung Wan, Hong Kong.  LP Displays is a leading supplier of CRTs for use in

2  television sets and computer monitors with annual sales for 2006 of over $2 billion, and a market

3  share of 27%.  LP Displays announced in March 2007 that Royal Philips and LG Electronics

4  would cede control over the company and the shares would be owned by financial institutions

5  and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold

6  and distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to

7  customers throughout the United States.

8  **Samsung Entities**

9      33.    Defendant Samsung Electronics Co., Ltd. ("SEC") is South Korean company with

10  its principal place of business located at Samsung Main Building, 250, 2-ga, Taepyong-ro, Jung-

11  gu, Seoul 100-742, South Korea.  During the Relevant Period, SEC manufactured, marketed,

12  sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or

13  affiliates, to customers throughout the United States.

14      34.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

15  corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

16  Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

17  defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

18  distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to

19  customers throughout the United States.  Defendant SEC dominated and controlled the finances,

20  policies, and affairs of SEAI relating to the antitrust violations alleged in this Complaint.

21      35.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Co., Ltd.

22  ("Samsung SDI"), is a South Korean company with its principal place of business located at 15th

23  – 18th Floor, Samsung Life Insurance Building, 150, 2-ga, Taepyong-ro, Jung-gu, Seoul, 100-

24  716, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding

25  almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading

26  company in the display and energy businesses, with 28,000 employees and facilities in 18

27  countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs;

28

more than another other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.  Defendant SEC dominated and controlled the finances, policies, and affairs of Samsung SDI relating to the antitrust violations alleged in this Complaint.

36.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California.  Samsung SDI America is a wholly-owned and controlled subsidiary of Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI America relating to the antitrust violations alleged in this Complaint.

37.    Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products to customers, either directly or indirectly through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this Complaint.

38.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products to customers, either directly or indirectly through its subsidiaries or affiliates, throughout the United States.

1  Defendants SEC and Samsung SDI dominated and controlled the finances, policies, and affairs

2  of Samsung SDI Brazil relating to the antitrust violations alleged in this Complaint.

3       39.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a

4  Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu,

5  Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

6  Defendant Samsung SDI. During the Relevant Period, Samsung SDI Shenzhen manufactured,

7  marketed, sold and/or distributed CRT Products, either directly or indirectly through its

8  subsidiaries or affiliates, to customers throughout the United States. Defendant SEC and

9  Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI

10  Shenzhen relating to the antitrust violations alleged in this Complaint.

11       40.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese

12  company with its principal place of business located at Developing Zone of Yi-Xian Park,

13  Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled

14  subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Tianjin

15  manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

16  through its subsidiaries or affiliates, to customers throughout the United States. Defendant SEC

17  and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI

18  Tianjin relating to the antitrust violations alleged in this Complaint.

19       41.    Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a

20  Malaysian company with its principal place of business located at Lot 635 & 660, Kawasan

21  Perindustrian, Tuanku, Jaafar, 71450 Sungai Gadut, Negeri Semblian Darul Khusus, Malaysia.

22  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI

23  Co., Ltd. During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold

24  and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates,

25  to customers throughout the United States. Defendant SEC and Samsung SDI dominated and

26  controlled the finances, policies, and affairs of Samsung SDI Malaysia relating to the antitrust

27  violations alleged in this Complaint.

28

42. Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Samsung SDI Malaysia are referred to collectively herein as "Samsung."

**Toshiba Entities**

43. Defendant Toshiba Corporation is a Japanese corporation with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, Toshiba Corporation held a 5-10 % worldwide market share for CRTs used in televisions and computer monitors. In December 1995, Toshiba Corporation partnered with Orion Electric Company (n/k/a Daewoo Electronics Corporation) and two other entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2002, Toshiba Corporation entered into a joint venture with Defendant Panasonic Corporation called MT Picture Display Co., Ltd. in which the entities consolidated their CRT businesses. During the Relevant Period, Toshiba Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

44. Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, NY 10020. Toshiba America is a wholly owned and controlled subsidiary of defendant Toshiba Corporation. During the Relevant Period, Toshiba America sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of Toshiba America relating to the antitrust violations alleged in this Complaint.

45. Defendant Toshiba America Consumer Products, LLC ("TACP") is headquartered in 82 Totawa Rd., Wayne, New Jersey 07470-3114. TACP is a wholly owned and controlled subsidiary of Defendant Toshiba Corporation through Toshiba America. During the Relevant Period, TACP sold and/or distributed CRT Products, either directly or indirectly

1   through its subsidiaries or affiliates, to customers throughout the United States.  Defendant

2   Toshiba Corporation dominated and controlled the finances, policies, and affairs of TACP

3   relating to the antitrust violations alleged in this Complaint.

4       46.     Defendant Toshiba America Information Systems, Inc. ("TAIP") is a California

5   corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California

6   92718.  TAIP is a wholly owned and controlled subsidiary of Toshiba Corporation through

7   Toshiba America, Inc.  During the Relevant Period, TAIP manufactured, marketed, sold and/or

8   distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to

9   customers throughout the United States.  Defendant Toshiba Corporation dominated and

10  controlled the finances, policies, and affairs of TAIP relating to the antitrust violations alleged in

11  this Complaint.

12      47.     Defendant Toshiba America Electronics Components, Inc. ("TAEC") is a

13  California corporation with its principal place of business located at 9775 Toledo Way, Irvine,

14  California 92618, and 19000 MacArthur Boulevard, Suite 400, Irvine, California 92612. TAEC

15  is a wholly owned and controlled subsidiary of Toshiba America, Inc., which is a holding

16  company for defendant Toshiba Corporation.  TAEC is currently the North American sales and

17  marketing representative for defendant MTPD.  Before MTPD's formation in 2003, TAEC was

18  the North American engineering, manufacturing, marketing and sales arm of defendant Toshiba

19  Corporation.  During the Relevant Period, TAEC manufactured, marketed, sold and/or

20  distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to

21  customers throughout the United States.  Defendant Toshiba Corporation dominated and

22  controlled the finances, policies, and affairs of TAEC relating to the antitrust violations alleged

23  in this Complaint.

24      48.     Toshiba Display Devices (Thailand) Company, Ltd. ("TDDT") was a Thai

25  company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate,

26  Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled

27  subsidiary of defendant Toshiba Corporation.  Toshiba Corporation transferred Toshiba Thailand

28

1    to its CRT joint venture with Panasonic Corporation, MT Picture Display Co., Ltd., in 2003. It

2    was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned

3    subsidiary of MT Picture Display until its closure in 2007. During the Relevant Period, TDDT

4    manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

5    through its subsidiaries or affiliates, to customers throughout the United States. Defendant

6    Toshiba Corporation dominated and controlled the finances, policies, and affairs of TDDT

7    relating to the antitrust violations alleged in this Complaint.

8        49.    P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture

9    formed by Toshiba Corporation, Orion Electric Company and two other non-defendant entities in

10   December 1995. TEDI's principal place of business was located in Indonesia. TEDI was

11   projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI

12   was transferred to MT Picture Display Co., Ltd. and its name was changed to PT.MT Picture

13   Display Indonesia. During the Relevant Period, TEDI manufactured, marketed, sold and/or

14   distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to

15   customers throughout the United States. Defendant Toshiba Corporation dominated and

16   controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in

17   this Complaint.

18       50.    Defendants Toshiba Corporation, Toshiba America, Inc., TACP, and TAIP are

19   referred to collectively herein as "Toshiba."

20   **Panasonic Entities**

21       51.    Defendant Panasonic Corporation, which was at all times during the Relevant

22   Period known as Matsushita Electric Industrial Co., Ltd. and only became Panasonic Corporation

23   on October 1, 2008, is a Japanese entity with its principal place of business located at 1006 Oaza

24   Kadoma, Kadoma-shi, Osaka 571-8501, Japan. In 2002, Panasonic Corporation entered into a

25   CRT joint venture with defendant Toshiba forming defendant MT Picture Display Co., Ltd.

26   ("MTPD"). Panasonic Corporation was the majority owner with 64.5 percent. On April 3, 2007,

27   Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making

28

1  MTPD a wholly-owned subsidiary of Panasonic Corporation. In 2005, the Panasonic brand had

2  the highest CRT Product revenue in Japan. During the Relevant Period, Panasonic Corporation

3  manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

4  through its subsidiaries or affiliates, to customers throughout the United States.

5      52.    Defendant Panasonic Corporation of North America ("Panasonic NA") is a

6  Delaware corporation with its principal place of business located at One Panasonic Way,

7  Secaucus, New Jersey. Panasonic NA is a wholly owned and controlled subsidiary of Defendant

8  Panasonic Corporation. During the Relevant Period, Panasonic NA manufactured, marketed,

9  sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or

10  affiliates, to customers throughout the United States. Defendant Panasonic Corporation

11  dominated and controlled the finances, policies, and affairs of Panasonic NA relating to the

12  antitrust violations alleged in this Complaint.

13      53.    Matsushita Electronic Corporation (Malaysia) Sdn Bhd. ("Matsushita Malaysia")

14  was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku

15  Ampuan Section 21, Shah Alam Industrial Site, Shah Alam, Malaysia 40000. Matsushita

16  Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.

17  Panasonic Corporation transferred Matsushita Malaysia to its CRT joint venture with Toshiba

18  Corporation, MT Picture Display Co., Ltd., in 2003. It was re-named as MT Picture Display

19  (Malaysia) Sdn. Bhd. and operated as a wholly-owned subsidiary of MT Picture Display until its

20  closure in 2006. During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold

21  and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates,

22  to customers throughout the United States. Defendant Panasonic Corporation dominated and

23  controlled the finances, policies, and affairs of Matsushita Malaysia relating to the antitrust

24  violations alleged in this Complaint.

25      54.    Defendants Panasonic Corporation and Panasonic NA are collectively referred to

26  herein as "Panasonic."

27      55.    Defendant MT Picture Display Co., Ltd. ("MTPD") was established as a CRT

28

1  joint venture between defendants Panasonic Corporation and Toshiba.  MTPD is a Japanese

2  entity with its principal place of business located at 1-1, Saiwai-cho, Takatsuki-shi, Osaka 569-

3  1193, Japan.  On April 3, 2007, defendant Panasonic Corporation purchased the remaining stake

4  in MTPD, making it a wholly-owned subsidiary, and renaming it MT Picture Display Co., Ltd.

5  During the Relevant Period, MTPD manufactured, sold and distributed CRT Products, either

6  directly or indirectly through its subsidiaries or affiliates, to customers throughout the United

7  States.

8       56.     Defendant Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a Chinese

9  company with its principal place of business located at No. 9, Jiuxianqiao N. Rd., Dashanzi

10  Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by

11  defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China

12  National Electronics Import & Export Beijing Company (a China state-owned enterprise), and

13  Beijing Yayunchun Branch of the Industrial and Commercial Bank of China, Ltd. (a China state-

14  owned enterprise).  Formed in 1987, BMCC was Matsushita's (n/k/a Panasonic) first CRT

15  manufacturing facility in China.  BMCC is the second largest producer of CRTs in China.

16  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT

17  Products, either directly or indirectly through its subsidiaries or affiliates, to customers

18  throughout the United States.

19  **Hitachi Entities**

20       57.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business

21  located at 6-1 Marunouchi Center Building 13F, Chiyoda-ku, Tokyo 100-8280, Japan.  Hitachi

22  Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s

23  worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi

24  Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

25  through its subsidiaries or affiliates, to customers throughout the United States.

26       58.     Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its

27  principal place of business located at AKS Building, 3 Kandaneribeicho 3, Chiyoda-ku, Tokyo,

28

1   101-0022, Japan. Hitachi Displays, Ltd. was originally established as Mobara Works of Hitachi,

2   Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development,

3   design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun

4   off to create a separate company called Hitachi Displays, Ltd. During the Relevant Period,

5   Hitachi Displays, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either

6   directly or indirectly through its subsidiaries or affiliates, to customers throughout the United

7   States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of

8   Hitachi Displays relating to the antitrust violations alleged in this Complaint.

9        59.    Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation

10   with its principal place of business located as 1000 Hurricane Shoals Road, Ste. D-100,

11   Lawrenceville, GA 30043. HEDUS is a subsidiary of defendants Hitachi Displays, Ltd.

12   and Hitachi, Ltd. During the Relevant Period, HEDUS manufactured, marketed, sold and/or

13   distributed CRT Products to customers, either directly or indirectly through its subsidiaries or

14   affiliates, to customers throughout the United States. Defendant Hitachi, Ltd. and Hitachi

15   Displays, Ltd. dominated and controlled the finances, policies, and affairs of HEDUS relating to

16   the antitrust violations alleged in this Complaint.

17        60.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company

18   with its principal place of business located at 2000 Sierra Point Parkway, Brisbane, California

19   94005. Hitachi America is a wholly-owned and controlled subsidiary of defendant Hitachi, Ltd.

20   During the Relevant Period, Hitachi America sold and/or distributed CRT Products, either

21   directly or indirectly through its subsidiaries or affiliates, to customers throughout the United

22   States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of

23   Hitachi America relating to the antitrust violations alleged in this Complaint.

24        61.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singapore company with its

25   principal place of business located at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore,

26   049318. Hitachi Asia is a wholly owned and controlled subsidiary of defendant Hitachi, Ltd.

27   During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT

28

1  Products, either directly or indirectly through its subsidiaries or affiliates, to customers

2  throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances,

3  policies, and affairs of Hitachi Asia relating to the antitrust violations alleged in this Complaint.

4      62.    Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a

5  Chinese company with its principal place of business located at 5001 Huanggang Road, Futian

6  District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interest in

7  Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the

8  government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member

9  of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the

10  Relevant Period, Hitachi Shenzhen manufactured, sold and distributed CRT Products, either

11  directly or indirectly through its subsidiaries or affiliates, to customers throughout the United

12  States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances,

13  policies, and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this

14  Complaint.

15      63.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, HEDUS, Hitachi

16  Asia, and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

17  **Tatung**

18      64.    Defendant Tatung Company of America, Inc. ("Tatung America") is a California

19  corporation with its principal place of business located at 2850 El Presidio Street, Long Beach,

20  California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company

21  owns approximately half of Tatung America.  The other half used to be owned by Lun Kuan Lin,

22  the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's

23  recent death, her share recently passed to her two children.  During the Relevant Period, Tatung

24  America manufactured, marketed, sold and/or distributed CRT Products, either directly or

25  indirectly through its subsidiaries or affiliates, to customers throughout the United States.

26  **Chunghwa Entities**

27      65.    Defendant Chunghwa Picture Tubes Ltd. ("CPT") is a Taiwanese company with

28

1   its principal place of business located at 1127 Heping Road, Bade City, Taoyuan, Taiwan. CPT

2   was founded in 1971 by Tatung Company. Throughout the majority of the Relevant Period,

3   Tatung Company owned a substantial share in CPT. Although Tatung Company's holdings in

4   CPT have fallen over time, it retains substantial control over CPT's operations. Tatung

5   Company lists Chunghwa on its website as one of its "global subsidiaries." And the Chairman of

6   CPT, Weishan Lin, is also the Chairman and General Manager of Tatung Company. CPT is a

7   leading manufacturer of CRTs. During the Relevant Period, CPT manufactured, marketed, sold

8   and/or distributed CRT Products, both directly and through its wholly-owned and controlled

9   subsidiaries in Malaysia, China, and Scotland, to customers throughout the United States.

10          66.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

11   Malaysia") is a Malaysian company with its principal place of business located at Lot 1, Subang

12   Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.

13   Chunghwa Malaysia a wholly-owned and controlled subsidiary of defendant Chunghwa Picture

14   Tubes. Chunghwa Malaysia is a leading worldwide supplier of CRTs. During the Relevant

15   Period, Chunghwa Malaysia manufactured, marketed, sold and/or distributed CRT Products,

16   either directly or indirectly through its subsidiaries or affiliates, to customers throughout the

17   United States. Defendant CPT dominated and controlled the finances, policies, and affairs of

18   Chunghwa Malaysia relating to the antitrust violations alleged in this Complaint.

19          67.     Defendants CPT and Chunghwa Malaysia are collectively referred to herein as

20   "Chunghwa."

21   **IRICO Entities**

22          68.     Defendant IRICO Group Corporation ("IGC") is a Chinese corporation with its

23   principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.

24   IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, sale

25   and/or distribution of CRT Products. During the Relevant Period, IGC manufactured, marketed,

26   sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or

27   affiliates, to customers throughout the United States.

28

1      69.    Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company

2  with its principal place of business located at No. 16, Fenghui South Road West, District High-

3  tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of defendant

4  IGC. In 2006, IDDC was China's top CRT maker. During the Relevant Period, IDDC

5  manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

6  through its subsidiaries or affiliates, to customers throughout the United States. Defendant IGC

7  dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust

8  violations alleged in this Complaint.

9      70.    Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with

10  its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

11  712021. IGE is owned by Defendant IGC. According to its website, IGE was the first CRT

12  manufacturer in China and one of the leading global manufacturers of CRTs. Their website also

13  claims that in 2003, they were the largest CRT manufacturer in China in terms of production and

14  sales volume, sales revenue and aggregated profit and taxation. During the Relevant Period, IGE

15  manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

16  through its subsidiaries or affiliates, to customers throughout the United States. Defendant IGC

17  dominated and controlled the finances, policies and affairs of IGE relating to the antitrust

18  violations alleged in this Complaint.

19      71.    Defendants IGC, IDDC, and IGE are collectively referred to herein as "IRICO."

20  **Thai CRT**

21      72.    Defendant Thai CRT Company, Ltd. ("Thai CRT") is a Thai company with its

22  principal place of business located at 1/F Siam Cement Road, Bangsue Dusit, Bangkok,

23  Thailand. Thai CRT is a subsidiary of Siam Cement Group. It was established in 1986 as

24  Thailand's first manufacturer of CRTs for color televisions. During the Relevant Period, Thai

25  CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

26  through its subsidiaries or affiliates, to customers throughout the United States.

27  **Samtel**

28

73.     Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40%. Samtel is India's largest exporter of CRTs. Samtel has gained safety approvals from the United States, Canada, Germany and Great Britain for its CRT Products. During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

74.     All of the above-listed defendants are collectively referred to herein as "Defendants."

## VI.   AGENTS AND CO-CONSPIRATORS

75.     Various other persons, firms and corporations, not named as Defendants herein, and presently unknown to Plaintiffs, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy and/or in furtherance of the anticompetitive, unfair or deceptive conduct. Plaintiffs reserves the right to name some or all of these Persons as Defendants at a later date.

76.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

77.     Defendants are also liable to acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

78.     Each of the Defendants named herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein. Each Defendant which is a subsidiary of a foreign parent acts as the sole United States agent for CRT Products made by its parent company.

## VII.   INTERSTATE TRADE AND COMMERCE

79.     Throughout the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate and international commerce, including through and into this judicial district.

80.     During the Relevant Period, Defendants collectively controlled the vast majority of the market for CRT Products, both globally and in the United States.

81.     Defendants' unlawful activities, as described herein, took place within the flow of interstate commerce to purchasers of CRT Products located in states other than and in addition to the states in which Defendants are located, as well as throughout the world, and had a direct, substantial and reasonably foreseeable effect upon interstate and international commerce, including the United States markets for CRT Products.

## VIII.   FACTUAL ALLEGATIONS

### A.   CRT Technology

82.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  It was not until the RCA Corporation introduced the product at the 1939 World's Fair, however, that it became widely available to consumers.  Since then, CRTs have become the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs.  Even large public displays, including many scoreboards at sports arenas, are comprised of thousands of single-color CRTs.

83.     As noted above, the CRT is a vacuum tube that is coated on its inside face with light sensitive phosphors.  An electron gun at the back of the vacuum tube emits electron beams. When the electron beams strike the phosphors, the phosphors produce either red, green, or blue light.  A system of magnetic fields inside the CRT, as well as varying voltages, directs the beams to produce the desired colors.  This process is rapidly repeated several times per second to produce the desired images.

84.     The quality of a CRT display is dictated by the quality of the CRT itself.  No

1  external control or feature can make up for a poor-quality tube.  In this regard, the CRT defines

2  the whole product such that the product is often simply referred to as "the CRT."

3      85.  Until the last few years, CRTs were the dominant technology used in displays,

4  including television and computer monitors.  During the Relevant Period, this translated into the

5  sale of millions of CRT Products, generating billions of dollars in annual profits.

6  **B.**  **Structural Characteristics of the CRT Market**

7      86.  The structural characteristics of the CRT Product market are conducive to the type

8  of collusive activity alleged in this Complaint.  These characteristics include market

9  concentration, ease of information sharing, the consolidation of manufacturers, multiple

10  interrelated business relationships, significant barriers to entry, maturity of the CRT Product

11  market, and homogeneity of products.

12      **a.**  **Market Concentration**

13      87.  During the Relevant Period, the CRT industry was dominated by relatively few

14  companies.  In 2004, defendants Samsung SDI, LG.Philips Displays (n/k/a LP Displays), MT

15  Picture Display and Chunghwa together held a collective 78% share of the global CRT market.

16  The high concentration of market share facilitates coordination because there are fewer cartel

17  members among which to coordinate pricing or allocate markets, and it is easier to monitor the

18  pricing and production of other cartel members.

19      **b.**  **Information Sharing**

20      88.  Because of common membership in trade associations for the CRT Product

21  market and related markets (for e.g., TFT-LCD), interrelated business arrangements such as joint

22  ventures, allegiances between companies in certain countries, and relationships between the

23  executives of certain companies, there were many opportunities for Defendants to discuss and

24  exchange competitive information.  The ease of communication was facilitated by the use of

25  meetings, telephone calls, e-mails, and instant messages.  Defendants took advantage of these

26  opportunities to discuss and agree upon their pricing for CRT Products.

27      89.  Defendants Chunghwa, Hitachi and Samsung are all members of the Society for

28

1   Information Display.  Defendants Samsung and LG Electronics, Inc. are two of the co-founders

2   of the Korea Display Industry Association.  Similarly, Daewoo, LG Electronics, LP Displays,

3   and Samsung are members of the Electronic Display Industrial Research Association.  Upon

4   information and belief, Defendants used these trade associations as vehicles for discussing and

5   agreeing upon their pricing for CRT Products.  At the meetings of these trade associations,

6   Defendants exchanged proprietary and competitively sensitive information which they used to

7   implement and monitor the conspiracy.

8          **c.      Consolidation**

9          90.     The CRT Product industry also had significant consolidation during the Relevant

10  Period, including but not limited to: (a) the creation of LG.Philips Displays (n/k/a LP Displays)

11  in 2001 as a joint venture between Royal Philips and LG Electronics, Inc.; and (b) the 2002

12  merger of Toshiba and Matsushita/Panasonic's CRT business into MTPD.

13         91.     Defendants also consolidated their manufacturing facilities in lower cost venues

14  such as China and reduced manufacturing capacity to prop up prices.

15         **d.      Multiple Interrelated Business Relationships**

16         92.     The CRT Product industry has a close-knit nature whereby multiple business

17  relationships between supposed competitors blur the lines of competition and provided ample

18  opportunity to collude.  These business relationships also created a unity of interest among

19  competitors so that the conspiracy was easier to implement and enforce than if such

20  interrelationships did not exist.

21         93.     Examples of the high degree of cooperation among Defendants in both the CRT

22  Product market and other closely related markets include the following:

23              a.      The formation of the CRT joint venture LG.Philips Displays in 2001 by

24                      Defendants LG Electronics, Inc. and Royal Philips.

25              b.      Defendants LG Electronics, Inc. and Royal Philips also formed LG.Philips

26                      LCD Co., Ltd., n/k/a LG Display Co., Ltd. in 1999 as a joint venture for

27                      the purpose of manufacturing TFT-LCD panels.

28

c.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.   In December 1995, Daewoo and Toshiba partnered with two other entities to form TEDI which manufactured CRTs in Indonesia.

f.   Daewoo and Toshiba also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN LCDs, and Toshiba, which had substituted its STN LCD production with TFT LCD production, marketed Daewoo's STN LCDs globally through its network.

g.   Also in 1995, Defendant Chunghwa entered into a technology transfer agreement with Defendant Toshiba for large CPTs.

h.   Defendant Chunghwa has a joint venture with Defendant Samsung Electronics Co., Ltd. for the production of liquid crystal display panels. Chunghwa now licenses the technology from Defendant Royal Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.   Defendants LG Electronics, Inc. and Hitachi Ltd. entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung Electronics Co., Ltd. and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Inc., Samsung, Royal Philips, and Panasonic.

1

    e.     **High Costs of Entry Into the Industry**

2

    94.     There are substantial barriers to entry in the CRT Products industry. It would

3

require substantial time, resources and industry knowledge to even potentially overcome the

4

barriers to entry. It is also extremely unlikely that a new producer would enter the market in

5

light of the declining demand for CRT Products.

6

    f.     **The Maturity of the CRT Product Market**

7

    95.     Newer industries are typically characterized by rapid growth, innovation and high

8

profits. The CRT Product market is a mature one, and like many mature industries, is

9

characterized by slim profit margins, creating a motivation to collude.

10

    96.     Demand for CRT Products was declining throughout the Relevant Period. Static

11

or declining demand is another factor which makes the formation of a collusive arrangement

12

more likely because it provides a greater incentive to firms to avoid price competition.

13

    97.     In addition, conventional CRT televisions and computer monitors were being

14

rapidly replaced by TFT-LCD and Plasma displays. This was one of the factors which led

15

Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT

16

Product prices. Between 2000 and 2006, revenues from the sale of CRT televisions in the United

17

States declined by 50.7 percent and are predicted to decline by an additional 84.5 percent

18

between 2006 and 2010.

19

    98.     Although demand was declining as a result of the popularity of flat-panel

20

LCD/plasma televisions and LCD monitors, CRT televisions and monitors were still the

21

dominant display technology during the Relevant Period, making Defendants' collusion and the

22

international price fixing conspiracy worthwhile. Due to the high costs of LCD panels and

23

plasma displays during the Relevant Period, a substantial market for CRT Products existed as a

24

cheaper alternative to these new technologies.

25

    99.     In 1999, CRT monitors accounted for 94.5 percent of the retail market for

26

computer monitors in North America. By 2002, that figure had dropped to 73 percent; still a

27

substantial share of the market.

28

100.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and, by the end of 2006, still held a 46 percent market share. CRT televisions continue to dominate the global television market, accounting for 75 percent of worldwide TV units in 2006.

### g.    Homogeneity of CRT Products

101.    CRT Products are commodity-like products which are manufactured in standardized sizes. One Defendant's CRT Products for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sell and Plaintiffs purchase CRT Products primarily on the basis of price.

102.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.    Pre-Conspiracy Market

103.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and the Defendants began serving customers that were also being served by other international companies. During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers. A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity, and customers.

104.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa and Orion visited each other's factories in S.E. Asia. During this period, these producers began to include discussions about price in their meetings. The pricing discussions were usually limited, however, to exchanges of the range of prices that each competitor had quoted to specific customers.

### D.    Defendants' and Co-Conspirators' Illegal Agreements

105.    Plaintiffs are informed and believe, and thereon allege, that in order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-

1   conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has

2   been to raise, fix, maintain and/or stabilize the prices at which they sold CRT Products to

3   artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

4         106.   The CRT conspiracy was effectuated through a combination of group and

5   bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions

6   were the primary method of communication and took place on an informal, ad hoc basis.  During

7   this period, representatives from LG, Samsung and Daewoo visited the other Defendant

8   manufacturers including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba, and Panasonic to

9   discuss increasing prices for CRT Products in general and to specific customers.  These meetings

10   took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia, and Singapore.

11         107.   Samsung, Chunghwa, LG and Daewoo also attended several ad hoc group

12   meetings during this period.  The participants at these group meetings also discussed increasing

13   prices for CRT Products.

14         108.   As more manufacturers formally entered the conspiracy, group meetings became

15   more prevalent.  Beginning in 1997, the Defendants began to meet in a more organized,

16   systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.

17   Defendants' representatives attended hundreds of these meetings during the Relevant Period.

18         109.   The overall CRT conspiracy raised and stabilized worldwide prices (including

19   United States prices) that Defendants charged for CRT Products.

20   a.      "Glass Meetings"

21         110.   The group meetings among the participants in the CRT price-fixing conspiracy

22   were referred to by the participants as "Glass Meetings" or "GSM."  Glass Meetings were

23   attended by employees at three general levels of the Defendants' corporations.

24         111.   The first level of these meetings were attended by high level company executives

25   including CEOs, Presidents, and Vice Presidents, and were known as "Top Meetings."  Top

26   Meetings occurred less frequently, typically quarterly, and were focused on longer term

27   agreements and forcing compliance with price fixing agreements.  Because attendees at Top

28

1   Meetings had authority as well as more reliable information, these meetings resulted in

2   agreements.  Attendees at Top Meetings were also able to resolve disputes because they were

3   decision makers who could make agreements.

4          112.   The second level of meetings were attended by the Defendants' high level sales

5   managers and were known as "Management Meetings."  These meetings occurred more

6   frequently, typically monthly, and handled implementation of the agreements made at Top

7   Meetings.

8         113.   Finally, the third level of meetings were known as "Working Level Meetings" and

9   were attended by lower level sales and marketing employees.  These meetings generally occurred

10  on a weekly or monthly basis and were mostly limited to the exchange of information and

11  discussing pricing since the lower level employees did not have the authority to enter into

12  agreements.  These lower level employees would then transmit the competitive information up

13  the corporate reporting chain to those individuals with pricing authority.  The Working Level

14  Meetings also tended to be more regional and often took place near Defendants' factories.  In

15  other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean

16  manufacturers' employees met in Korea, the Chinese in China, and so on.

17           a.   The Chinese Glass Meetings began in 1998 and generally occurred on a

18                  monthly basis following a top or management level meeting.  The China

19                  meetings had the principal purpose of reporting what had been decided at

20                  the most recent Glass Meeting to the Chinese manufacturers. Participants

21                  at the Chinese meetings included the manufacturers located in China, such

22                  as IRICO and BMCC, as well as the China-based branches of the other

23                  Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI

24                  Shenzhen, Samsung SDI Tianjin, and Chunghwa.

25           b.   Glass Meetings also occurred occasionally in various European countries.

26                  Attendees at these meetings included those Defendants which had

27                  subsidiaries and/or manufacturing facilities located in Europe, including

28

1    Philips, LG, LP Displays, Chunghwa, Samsung, and IRICO.

2       114.    Representatives of the Defendants also attended what were known amongst

3    members of the conspiracy as "Green Meetings."  These were meetings held on golf courses.

4    The Green Meetings were generally attended by top and management level employees of the

5    Defendants.

6       115.    During the Relevant Period, Glass Meetings took place in Taiwan, South Korea,

7    Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia.

8       116.    Participants would often exchange competitively sensitive information prior to a

9    Glass Meeting.  This included information on inventories, production, sales and exports.  For

10   some such meetings, where information could not be gathered in advance of the meeting, it was

11   brought to the meeting and shared.

12      117.    The Glass Meetings at all levels followed a fairly typical agenda.  First, the

13   participants exchanged competitive information such as proposed future CRT pricing, sales

14   volume, inventory levels, production capacity, exports, customer orders, price trends, and

15   forecasts of sales volumes for coming months.  The participants also updated the information

16   they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman"

17   who would write the information on a white board.  The meeting participants then used this

18   information to discuss and agree upon what price each would charge for CRTs to be sold in the

19   following month or quarter.  They discussed and agreed upon target prices, price increases, so-

20   called "bottom" prices, and price ranges for CRTs.  They also discussed and agreed upon prices

21   of CRTs that were sold to specific customers, and agreed upon target prices to be used in

22   negotiations with large customers.  Having analyzed the supply and demand, the participants

23   would also discuss and agree upon production cutbacks.

24      118.    During periods of oversupply, the focus of the meeting participants turned to

25   making controlled and coordinated price reductions.  This was referred to as setting a "bottom

26   price."

27      119.    Defendants' conspiracy included agreements on the prices at which certain

28

1   Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured

2   end products, such as televisions and computer monitors.  Defendants realized the importance of

3   keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT

4   pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser

5   OEMs paid supracompetitive prices for CRTs.

6        120.    Each of the participants in these meetings knew, and in fact discussed, the

7   significant impact that the price of CRTs had on the cost of the finished products into which they

8   were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there

9   were slim profit margins.  The Defendants therefore concluded that in order to make their CRT

10  price increases stick, they needed to make the increase high enough that their direct customers

11  (CRT TV and monitor makers) would be able to justify a corresponding price increase to their

12  customers.  In this way, Defendants ensured that price increases for CRTs were passed on to

13  indirect purchasers of CRT Products.

14       121.    The agreements reached at the Glass Meetings included:

15        a.    agreements on CRT Product prices, including establishing target prices,

16              "bottom" prices, price ranges, and price guidelines;

17        b.    placing agreed-upon price differentials on various attributes of CRT

18              Products, such as quality or certain technical specifications;

19        c.    agreements on pricing for intra-company CRT Product sales to vertically

20              integrated customers;

21        d.    agreements as to what to tell customers about the reason for a price

22              increase;

23        e.    agreements to coordinate with competitors that did not attend the group

24              meetings and agreements with them to abide by the agreed-upon pricing;

25        f.    agreements to coordinate pricing with CRT manufacturers in other

26              geographic markets such as Brazil, Europe and India;

27        g.    agreements to exchange pertinent information regarding shipments,

28

1    capacity, production, prices and customers demands;

2        h.    agreements to coordinate uniform public statements regarding available

3              capacity and supply;

4        i.    agreements to allocate both overall market shares and share of a particular

5              customer's purchases;

6        j.    agreements to allocate customers;

7        k.    agreements regarding capacity, including agreements to restrict output and

8              to audit compliance with such agreements; and

9        l.    agreements to keep their meetings secret.

10       122.   Efforts were made to monitor each Defendant's adherence to these agreements in

11   a number of ways, including seeking confirmation of pricing both from customers and from

12   employees of the Defendants themselves.  When cheating did occur, it was addressed in at least

13   four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not

14   live up to an agreement; 3) threats to undermine a competitor at one of its principal customers;

15   and 4) a recognition in a mutual interest in living up to the target price and living up to the

16   agreements that had been made.

17       123.   As market conditions worsened in 2005-2007, and the rate of replacement of CRT

18   Products by TFT-LCDs increased, the group Glass Meetings became less frequent and bilateral

19   meetings again became more prevalent.  In addition, in December 2006 the DOJ issued

20   subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have

21   concerns about antitrust issues.

22       **b.    Bilateral Discussions**

23       124.   Throughout the Relevant Period, the Glass Meetings were supplemented by

24   bilateral discussions between various Defendants.  The bilateral discussions were more informal

25   than the group meetings and occurred on a frequent, ad hoc basis, often between the group

26   meetings. These discussions, usually between sales and marketing employees, took the form of

27   in-person meetings, telephone contacts and emails.

28

125.   During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and Mexico.

126.   The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and Europe.

127.   In order to ensure the efficacy of their global conspiracy, the Defendants also used bilateral meetings to coordinate pricing with CRT Product manufacturers in Brazil and Mexico, such as Philips Brazil, Samsung SDI Brazil, and Samsung SDI Mexico.  These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these Brazilian and Mexican manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.  In this way, the Defendants ensured that prices of all CRT Products imported into the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

128.   Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

129.   Bilateral discussions were also used to coordinate prices with CRT Product manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic, Thai CRT, and Samtel.  It was often the case that in the few days following a Top or Management Meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT Product pricing and/or output agreements had been reached during the meeting.

1    For example, Samsung had a relationship with Hitachi and was responsible for

2  communicating CRT Product pricing agreements to Hitachi.  LG had a relationship with Toshiba

3  and was responsible for communicating CRT Product pricing agreements to Toshiba.  And Thai

4  CRT had a relationship with Samtel and was responsible for communicating CRT Product

5  pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing

6  as conveyed by Samsung, LG, and Thai CRT.  Sometimes Hitachi and Toshiba also attended the

7  Glass Meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix

8  prices of CRT Products.

9    **c.    Defendants' and Co-Conspirators' Participation in Group and Bilateral**
        **Discussions**

10

11    130.    Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung

12  SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin, participated in

13  at least 200 Glass Meetings at all levels.  A substantial number of these meetings were attended

14  by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions

15  with each of the other Defendants on a regular basis.  Through these discussions, Samsung

16  agreed on prices and supply levels for CRT Products.

17    131.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung

18  SDI Mexico were represented at those meetings and were a party to the agreements entered at

19  them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a

20  significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

21  Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

22  the Glass Meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung

23  SDI Mexico were active, knowing participants in the alleged conspiracy.

24    132.    Between at least 1995 and 2001, Defendant LG, through LG Electronics, Inc. and

25  LGETT, participated at least 100 Glass Meetings at all levels.  After 2001, LG participated in the

26  CRT Product conspiracy through its joint venture with Philips, LG.Philips Displays (n/k/a LP

27  Displays).  A substantial number of these meetings were attended by the highest ranking

28

1  executives from LG. LG also engaged in bilateral discussions with each of the other Defendants

2  on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRT

3  Products. LG never effectively withdrew from this conspiracy.

4        133.    Defendant LGEUSA was represented at those meetings and was a party to the

5  agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, they

6  played a significant role in the conspiracy because Defendants wished to ensure that the prices

7  for CRT Products paid by direct purchasers would not undercut the pricing agreements reached

8  at the Glass Meetings.  Thus, LGEUSA was an active, knowing participant in the alleged

9  conspiracy.

10       134.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and

11 Philips Taiwan, participated at least 100 Glass Meetings at all levels.  After 2001, Philips

12 participated in the CRT Product conspiracy through its joint venture with LG, LG.Philips

13 Displays (n/k/a LP Displays).  A substantial number of these meetings were attended by high

14 level executives from Philips.  Philips also engaged in numerous bilateral discussions with other

15 Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRT

16 Products. Philips never effectively withdrew from this conspiracy.

17       135.    Defendants PENAC and Philips Brazil were represented at those meetings and

18 were a party to the agreements entered at them.  To the extent PENAC and Philips Brazil sold

19 and/or distributed CRT Products to direct purchasers, they played a significant role in the

20 conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct

21 purchasers would not undercut the pricing agreements reached at the Glass Meetings.  Thus,

22 PENAC and Philips Brazil were active, knowing participants in the alleged conspiracy.

23       136.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LG.Philips

24 Displays) participated at least 100 Glass Meetings at all levels.  A substantial number of these

25 meetings were attended by the highest ranking executives from LP Displays.  Certain of these

26 high level executives from LP Displays had previously attended meetings on behalf of

27 defendants LG and Philips.  LP Displays also engaged in bilateral discussions with other

28

1   Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRT

2   Products.

3       137.    Between at least 1995 and 2006, Defendant Chunghwa, through CPT, Chunghwa

4   Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated

5   in at least 100 Glass Meetings at all levels.  A substantial number of these meetings were

6   attended by the highest ranking executives from Chunghwa, including the former Chairman and

7   CEO of CPT, C.Y. Lin. Chunghwa also engaged in bilateral discussions with each of the other

8   Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and

9   supply levels for CRT Products.

10      138.    Defendant Tatung America was represented at those meetings and was a party to

11  the agreements entered at them.  To the extent Tatung America sold and/or distributed CRT

12  Products to direct purchasers, it played a significant role in the conspiracy because Defendants

13  wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut

14  the pricing agreements reached at the Glass Meetings.  Thus, Tatung America was an active,

15  knowing participant in the alleged conspiracy.

16      139.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion

17  and DOSA, participated in at least 100 Glass Meetings at all levels.  A substantial number of

18  these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also

19  engaged in bilateral discussions with other Defendants on a regular basis.  Through these

20  discussions, Daewoo agreed on prices and supply levels for CRT Products.  Bilateral discussions

21  with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in

22  2004.  Daewoo never effectively withdrew from this conspiracy.

23      140.    Between at least 1995 and 2003, Defendant Toshiba, through Toshiba

24  Corporation, TDDT and TEDI, participated in several Glass Meetings.  After 2003, Toshiba

25  participated in the CRT conspiracy through its joint venture with Panasonic, MTPD.  These

26  meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also

27  engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through

28

1   these discussions, Toshiba agreed on prices and supply levels for CRT Products.  Toshiba never

2   effectively withdrew from this conspiracy.

3       141.    Defendants Toshiba America, Inc., TACP, TAIP and TAEC were represented at

4   those meetings and were a party to the agreements entered at them.  To the extent Toshiba

5   America, Inc., TACP, TAIP and TAEC sold and/or distributed CRT Products to direct

6   purchasers, they played a significant role in the conspiracy because Defendants wished to ensure

7   that the prices for CRT Products paid by direct purchasers would not undercut the pricing

8   agreements reached at the Glass Meetings.  Thus, Toshiba America, TACP, TAIP, and TAEC

9   were active, knowing participants in the alleged conspiracy.

10      142.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi

11  Displays, Hitachi Shenzhen, and Hitachi Asia, participated in several Glass Meetings.  These

12  meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in

13  multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these

14  discussions, Hitachi agreed on prices and supply levels for CRT Products.  Hitachi never

15  effectively withdrew from this conspiracy.

16      143.    Defendants Hitachi America and HEDUS were represented at those meetings and

17  were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold

18  and/or distributed CRT Products to direct purchasers, they played a significant role in the

19  conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct

20  purchasers would not undercut the pricing agreements reached at the Glass Meetings.  Thus,

21  Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

22      144.    Between at least 1996 and 2003, Defendant Panasonic (known throughout the

23  Relevant Period as Matsushita Electric Industrial Co., Ltd.), through Panasonic Corporation and

24  Matsushita Malaysia, participated in several Glass Meetings.  After 2003, Panasonic participated

25  in the CRT conspiracy through its joint venture with Toshiba, MTPD.  These meetings were

26  attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in

27  multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic

28

1   agreed on prices and supply levels for CRT Products.  Panasonic never effectively withdrew

2   from this conspiracy.

3        145.    Panasonic NA was represented at those meetings and was a party to the

4   agreements entered at them.  To the extent Panasonic NA sold and/or distributed CRT Products

5   to direct purchasers, it played a significant role in the conspiracy because Defendants wished to

6   ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing

7   agreements reached at the Glass Meetings.  Thus, Panasonic NA was an active, knowing

8   participant in the alleged conspiracy.

9        146.    Between at least 2003 and 2006, Defendant MTPD participated in multiple Glass

10  Meetings and in fact led many of these meetings during the latter years of the conspiracy.  These

11  meetings were attended by high level sales managers from MTPD.  MTPD also engaged in

12  bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices

13  and supply levels for CRT Products.

14       147.    Between at least 1998 and 2007, Defendant BMCC participated in multiple Glass

15  Meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC

16  also engaged in multiple bilateral discussions with other Defendants, particularly the other

17  Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply

18  levels for CRT Products.  None of BMCC's conspiratorial conduct in connection with CRT

19  Products was mandated by the Chinese government.  BMCC was acting to further its own

20  independent private interests in participating in the alleged conspiracy.

21       148.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE, and

22  IDDC, participated in multiple Glass Meetings.  These meetings were attended by the highest

23  ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other

24  Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO

25  agreed on prices and supply levels for CRT Products.  None of IRICO's conspiratorial conduct in

26  connection with CRT Products was mandated by the Chinese government.  IRICO was acting to

27  further its own independent private interests in participating in the alleged conspiracy.

28

149.    Between at least 1997 and 2006, Defendant Thai CRT participated in multiple Glass Meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRT Products.  Thai CRT never effectively withdrew from this conspiracy.

150.    Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRT Products.  Samtel never effectively withdrew from this conspiracy.

151.    When Plaintiffs refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

E.      **The CRT Market During The Conspiracy**

152.    Until the last few years, CRTs were the dominant technology used in displays, including television and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

153.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold | Revenue (billion | Average Selling |
|------|------------|------------------|-----------------|

| | (millions) | US dollars) | Price Per Unit |
|---|---|---|---|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

154.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

155.    Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

156.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years...."

157.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

158.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

159.  A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October....While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

160.  A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips, and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes. Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be 20% hike in the price of our CRT monitors."

161.  Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

162.  For example, the Defendants' CRT factory utilization percentage fell from 90 percent in the third quarter of 2000 to 62 percent in the first quarter of 2001. This is the most dramatic example of a drop in factory utilization. There were sudden drops throughout the Relevant Period but to a lesser degree. Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by the Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRT Products.

163.  During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products. As Finsen Yu, President of Skyworth Macao Commerical Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

164.  During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRT Products. These price

1   increases were despite the declining demand due to the approaching obsolescence of CRT

2   Products caused by the emergence of a new, potentially superior and clearly more popular,

3   substitutable technology.

4       165.   These price increases and price stability in the market for CRT Products during

5   the Relevant Period are inconsistent with a competitive market for a product facing rapidly

6   decreasing demand caused by a new, substitutable technology.

7   **F.**   **International Government Antitrust Investigations**

8       166.   On February 10, 2009, the Antitrust Division of he United States Department of

9   Justice ("DOJ") issued a press release announcing that a federal grand jury in San Francisco had

10   that same day returned a two-count indictment against the former Chairman and Chief Executive

11   Officer of Defendant Chunghwa Picture Tubes, Ltd., Cheng Yuan Lin, aka C.Y. Lin, for his

12   participation in global conspiracies to fix the prices of two types of CRTs used in computer

13   monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the

14   Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press

15   release further notes that Lin had previously been indicted for his participation in a conspiracy to

16   fix the prices of TFT-LCDs. Mr. Lin's indictment states that the combination and conspiracy to

17   fix the prices of CRTs was carried out, in part, in the Northern District of California.

18       167.   The "ongoing investigation" referred to by the DOJ included raids and

19   investigatory demands carried out by DOJ and antitrust authorities in Europe, Japan and South

20   Korea on defendants including MT Picture Display Co., Ltd., the CRT unit of Defendant

21   Panasonic, and Defendant Samsung SDI Co., Ltd.

22       168.   On March 18, 2011, Samsung SDI pled guilty and agreed to pay a $32 million

23   criminal fine for its role in a global conspiracy to fix prices, reduce output and allocate market

24   shares of color display tubes, a type of cathode ray tube used in computer monitors. The criminal

25   information states that the illegal combination and conspiracy was carried out, in part, in the

26   Northern District of California.

27       169.   Preceding Samsung SDI's guilty plea, Wen Jun ("Tony") Cheng,  Chung Cheng

28

1  "Alex" Yeh, Seung-Kyu "Simon" Lee, Yeong-Ug "Albert" Yang and Jae-Sik "J.S." Kim  were

2  indicted for their participation in the color display tube conspiracy.

3      170.    In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also

4  being investigated by the [European] Commission and/or the U.S. Department of Justice for

5  potential violations of competition laws with respect to semiconductors, LCD products, cathode

6  ray tubes (CRT) and heavy electrical equipment."

7      171.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its

8  own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Picture Tubes (UK), Ltd., Chunghwa Picture Tubes, Ltd., Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany Gmbh, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available, the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured picture tubes and coloured screen tubes) on the European market between 1995 and 2007.  The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

26      172.    As outlined above, Defendants have a history of competitor contacts resulting

27  from joint ventures, numerous cross-licensing agreements, and other alliances in related

1  businesses in the electronics industry.

2  173.  Several Defendants also have a history of "cooperation" and anticompetitive

3  conduct. For example, Defendant Samsung was fined $300 million by the U.S. Department of

4  Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random

5  Access Memory (DRAM). Four TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S.

6  subsidiary, LG Display America, Inc.), Sharp Corporation, Defendant Hitachi Displays, Ltd., a

7  subsidiary of Defendant Hitachi, Ltd., and Defendant Chunghwa Picture Tubes, Ltd.— agreed to

8  plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay criminal fines

9  for their roles in a conspiracy to fix prices of TFT-LCD panels.

## IX.  FRAUDULENT CONCEALMENT

174.  Throughout the Relevant Period, Defendants affirmatively and fraudulently

concealed their unlawful conduct against Plaintiffs.

175.  Plaintiffs did not discover, and could not discover through the exercise of

reasonable diligence, that Defendants were violating the law as alleged herein until Defendants'

officers pled guilty to or were indicted for fixing the prices of CRTs.  Nor could Plaintiffs have

discovered the violations earlier than that time because Defendants conducted their conspiracy in

secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and

fraudulently concealed their activities through various other means and methods designed to

avoid detection.  In addition, the conspiracy was by its nature self-concealing.

176.  Defendants engaged in a successful, illegal price-fixing conspiracy with respect to

CRT Products, which they affirmatively concealed, in at least the following respects:

  a.  By agreeing among themselves not to discuss publicly, or otherwise
      reveal, the nature and substance of the acts and communications in
      furtherance of their illegal scheme, and by agreeing to expel those who
      failed to do so;

  b.  By agreeing among themselves to limit the number of representatives from
      each Defendant attending the meetings so as to avoid detection;

c.   By agreeing among themselves to refrain from listing the individual representatives of the Defendants in attendance at meetings in any meeting report;

d.   By agreeing among themselves to refrain from taking meeting minutes or taking any kind of written notes during the meetings;

e.   By giving false and pretextual reasons for their CRT Product price increases during the Relevant Period and by describing such pricing falsely as being the result of external costs rather than collusion;

f.   By agreeing among themselves on what to tell their customers about price changes, and agreeing upon which attendee would communicate the price change to which customer;

g.   By agreeing among themselves to quote higher prices to certain customers than the fixed price in effect to give the appearance that the price was not fixed;

h.   By agreeing among themselves upon the content of public statements regarding capacity and supply;

i.   By agreeing among themselves to eliminate references in expense reports which might reveal the existence of their unlawful meetings; and

j.   By agreeing on other means to avoid detection of their illegal conspiracy to fix the prices of CRT Products.

177.   As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiffs assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiffs.

## X.   VIOLATIONS ALLEGED

**A.   First Claim for Relief: Violation of Section 1 of the Sherman Act**

178.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

179.    Beginning at a time unknown to Plaintiffs, but at least as early as March 1, 1995, through at least November 25, 2007, the exact dates being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators, entered into a continuing agreement, understanding, and conspiracy to unreasonably restrain trade and commerce in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

180.    In particular, Defendants have combined and conspired to fix, raise, maintain or stabilize the prices of CRT Products sold in the United States.

181.    Defendants, by their unlawful conspiracy, artificially raised, inflated and maintained the market prices of CRT Products as herein alleged.

182.    The contract, combination or conspiracy consisted of a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of CRT Products they sold in the United States and elsewhere.

183.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

a.    Participated in meetings and conversations to discuss the prices and supply of CRT Products in the United States and elsewhere;

b.    Agreed to manipulate prices and limit supply of CRT Products sold in the United States and elsewhere in a manner that deprived direct and indirect purchasers of CRT Products of free and open competition;

c.    Issued price announcements and price quotations in accordance with the agreements reached;

d.    Sold CRT Products to customers in the United States at non-competitive prices; and

e.    Invoiced customers in the United States at the agreed-upon, fixed prices

1    for CRT Products and transmitting such invoices via U.S. mail and other

2    interstate means of delivery.

3    184.    The combination and conspiracy alleged herein has had the following effects,

4    among others:

5    a.    Price competition in the sale of CRT Products has been restrained,

6    suppressed and/or eliminated in the United States;

7    b.    Prices for CRT Products sold by Defendants and their co-conspirators

8    have been fixed, raised, maintained and stabilized at artificially high, non-

9    competitive levels throughout the United States; and

10   c.    Those who purchased CRT Products directly or indirectly from

11   Defendants have been deprived the benefits of free and open competition.

12   185.    As a direct result of the unlawful conduct of Defendants and their co-conspirators

13   in furtherance of their continuing contract, combination or conspiracy, Plaintiffs have been

14   injured and will continue to be injured in their business and property by paying more for CRT

15   Products purchased indirectly from the Defendants and their co-conspirators than they would

16   have paid and will pay in the absence of the combination and conspiracy.

17   186.    These violations are continuing and will continue unless enjoined by this Court.

18   187.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs seek the

19   issuance of an injunction against Defendants, preventing and restraining the violations alleged

20   herein.

21   **B.    Second Claim For Relief: Violation of Minnesota's Antitrust Statute**

22   188.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

23   allegation set forth in the preceding paragraphs of this Complaint.

24   189.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by

25   affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the

26   prices at which CRT Products were sold, distributed or obtained in Minnesota, in violation of

27   Minnesota Stat. § 325D.51.

28

190.    Defendants' combinations or conspiracies had the following effects, in violation of Minn. Stat. § 325D.53: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; and (3) Plaintiffs paid supracompetitive, artificially inflated prices for CRT Products.

191.    During the Relevant Period, Defendants' illegal conduct substantially affected Minnesota commerce.

192.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property.

193.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minn. Stat. §§ 325D.49 *et seq.*, including without limitation Minn. Stat. §§ 325D.51 and 325.53. Accordingly, the Plaintiffs seek all forms of relief available under Minn. Stat. §§ 325D.49 *et seq.*, including without limitation Minn. Stat. §§ 325D.57 and 325D.58.

**C.    Third Claim For Relief: Violation of the California Cartwright Act**

194.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

195.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professional Code. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of CRT Products at supra-competitive levels.

196.    The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for CRT Products.

197.    For the purpose of forming and effectuating the unlawful trust, the defendants and

1   their co-conspirators have done those things which they combined and conspired to do, including

2   but in no way limited to the acts, practices, and course of conduct set forth above and the

3   following: (1) fixing, raising, stabilizing and/or maintaining the price of CRT Products; and (2)

4   allocating among themselves the production of CRT Products.

5        198.   The combination and conspiracy alleged herein has had, *inter alia,* the following

6   effects: (1) price competition in the sale of CRT Products has been restrained, suppressed and/or

7   eliminated in the State of California; (2) prices for CRT Products sold by Defendants and their

8   co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-

9   competitive levels in the State of California; and (3) those who purchased CRT Products directly

10   or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free

11   and open competition.

12        199.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have

13   been injured in their business and property in that they paid more for CRT Products than they

14   otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of

15   Defendants' violation of Section 16720 *et seq.* of the California Business and Professions Code,

16   Plaintiffs seek treble damages and the costs of suit, including reasonable attorneys' fees,

17   pursuant to Section 16750(a) of the California Business and Professions Code.

18   **D.**    **Fourth Claim For Relief: Violation of California's Unfair Competition Statute**

19        200.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

20   allegation set forth in the preceding paragraphs of this Complaint.

21        201.   Defendants engaged in unfair competition or unfair, unconscionable, deceptive or

22   fraudulent acts or practices in violation of the state consumer protection and unfair competition

23   statutes listed below.

24        202.   Beginning on a date unknown to Plaintiffs, but at least as early as March 1, 1995,

25   and continuing thereafter at least up through and including November 25, 2007, Defendants

26   committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et*

27   *seq.* of the California Business and Professions Code, by engaging in the acts and practices

28

1    specified above.

2       203.   This claim is instituted pursuant to Sections 17203 and 17204 of the California

3    Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged

4    herein, that violated Section 17200 of the California Business and Professions Code, commonly

5    known as the Unfair Competition Law.

6       204.   The Defendants' conduct as alleged herein violated Section 17200. The acts,

7    omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein,

8    constituted a common continuous and continuing course of conduct of unfair competition by

9    means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of

10   California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to,

11   the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; and (2) the

12   violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth

13   above.

14      205.   Defendants' acts, omissions, misrepresentations, practices and non-disclosures, as

15   described above, whether or not in violation of Section 16720, *et seq.* of the California Business

16   and Professions Code, and whether or not concerted or independent acts, are otherwise unfair,

17   unconscionable, unlawful or fraudulent; Defendants' act and practices are unfair to consumers of

18   CRT Products in the State of California and throughout the United States, within the meaning of

19   Section 17200, California Business and Professions Code.

20      206.   Defendants' acts and practices are fraudulent or deceptive within the meaning of

21   Section 17200 of the California Business and Professions Code.

22      207.   Plaintiffs are entitled to full restitution and/or disgorgement of all revenues,

23   earnings, profits, compensation, and benefits that may have been obtained by Defendants as a

24   result of such business acts or practices.

25      208.   The illegal conduct alleged herein is continuing and there is no indication that

26   Defendants will not continue such activity into the future.

27      209.   The unlawful and unfair business practices of Defendants, and each of them, as

28

described above, have caused Plaintiffs to pay supra-competitive and artificially-inflated prices for CRT Products. Plaintiffs suffered injury in fact and lost money or property as a result of such unfair competition.

210.    The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

211.    As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business practices, pursuant to California Business & Professions Code §17200 *et seq.*

**E.    Fifth Claim for Relief: Unjust Enrichment and Disgorgement of Profits**

212.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

213.    Defendants have been unjustly enriched through overpayments by Plaintiffs and the resulting profits.

214.    Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred via overpayments by Plaintiffs.

215.    Plaintiffs seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs may seek restitution.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays as follows:

A.    That the Court adjudge and decree that the unlawful conduct, contract, combination and conspiracy alleged herein constitutes:

a.  A violation of the Sherman Act, 15 U.S.C. §1, as alleged in the First Claim for Relief;

    b.  A violation of the antitrust laws of the State of Minnesota as alleged in the Second Claim for Relief;

    c.  A violation of California's Cartwright Act as alleged in the Third Claim for Relief;

    d.  A violation of California's Unfair Competition Statute, as alleged in the Fourth Claim for Relief; and

    e.  Unjust enrichment for which Defendants' profits should be disgorged.

B.    That Plaintiffs recover damages, as provided by the state antitrust laws alleged herein, and that a joint and several judgment in favor of Plaintiffs be entered against the Defendants in an amount to be trebled in accordance with such laws;

C.    That Defendants, their co-conspirators, successors, transferees, assigns, parents, subsidiaries, affiliates, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on behalf of Defendants, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action, or adopting or following any practice, plan, program or design having a similar purpose or effect in restraining competition;

D.    That the Court award Plaintiffs pre-judgment and post-judgment interest as permitted by law;

E.    That Plaintiffs recover its costs of suit, including reasonable attorneys' fees as provided by law; and

F.    That the Court award Plaintiffs such other and further relief as may be necessary and appropriate.

## XII.   JURY DEMAND

Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

DATED: __11|4|11__                     **LINDQUIST & VENNUM P.L.L.P.**


By ___Jessica Meyer___
    Jessica L. Meyer, (CA # 249064)
    jmeyer@lindquist.com
    James M. Lockhart (not admitted)
    jlockhart@lindquist.com
    James P. McCarthy (not admitted)
    jmccarthy@lindquist.com
    Kelly G. Laudon (not admitted)
    klaudon@lindquist.com
Lindquist & Vennum P.L.L.P.
4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 371-3211
**ATTORNEYS FOR PLAINTIFFS**

<u>EXHIBIT A</u>

**Plaintiffs:**

John R. Stoebner, as Chapter 7 Trustee for PBE Consumer Electronics, LLC and related entities; and
Douglas A. Kelley, as Chapter 11 Trustee for Petters Company, Inc. and related entities, and as Receiver for Petters Company, LLC and related entities

**Defendants:**

LG Electronics, Inc.;
LG Electronics U.S.A., Inc.;
LG Electronics Taiwan Taipei Co., Ltd.;
Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V.;
Philips Electronics North America Corporation;
Philips Electronics Industries (Taiwan), Ltd.;
Philips da Amazonia Industria Electronica Ltda;
LP Displays International, Ltd. f/k/a LG.Philips Displays;
Samsung Electronics Co., Ltd.;
Samsung Electronics America, Inc.;
Samsung SDI Co., Ltd. f/k/a Samsung Display Device Co., Ltd.;
Samsung SDI America, Inc.;
Samsung SDI Mexico S.A. de C.V.;
Samsung SDI Brasil Ltda.;
Shenzhen Samsung SDI Co., Ltd.;
Tianjin Samsung SDI Co., Ltd.;
Samsung SDI (Malaysia) Sdn. Bhd.;
Toshiba Corporation;
Toshiba America, Inc.;
Toshiba America Consumer Products, LLC;
Toshiba America Information Systems, Inc.;
Toshiba America Electronics Components, Inc.;
Toshiba Display Devices (Thailand) Company, Ltd.;
Panasonic Corporation;
Panasonic Corporation of North America;
MT Picture Display Co., Ltd.;
Beijing-Matsushita Color CRT Company, Ltd.;
Hitachi, Ltd.;
Hitachi Displays, Ltd.,
Hitachi Electronic Devices (USA), Inc.;
Hitachi America, Ltd.;
Hitachi Asia, Ltd.;
Shenzhen SEG Hitachi Color Display Devices, Ltd.;

Tatung Company of America, Inc.,
Chunghwa Picture Tubes Ltd.;
Chunghwa Picture Tubes (Malaysia) Sdn. Bhd.;
IRICO Group Corporation;
IRICO Display Devices Co., Ltd.;
IRICO Group Electronics Co., Ltd.;
Thai CRT Company, Ltd.; and
Samtel Color, Ltd.