William A. Isaacson
Jennifer Milici
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:  (202) 237-6131
Email:  wisaacson@bsfllp.com
Email:  jmilici@bsfllp.com

Stuart Singer
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone:  (954) 356-0011
Facsimile:  (954) 356-0022
Email:  ssinger@bsfllp.com

Philip J. Iovieno
Anne M. Nardacci
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY  12207
Telephone:  (518) 434-0600
Facsimile:  (518) 434-0665
Email:  piovieno@bsfllp.com
Email:  anardacci@bsfllp.com

*Liaison Counsel for Direct Action Plaintiffs*
*Additional Counsel Listed on Signature Page*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 3:07-cv-05944-SC |
| | MDL No. 1917 |
| This Document Relates to:<br><br>DIRECT PURCHASER PLAINTIFFS' ACTIONS | **DIRECT ACTION PLAINTIFFS' MEMORANDUM IN SUPPORT OF THE DIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>The Honorable Charles A. Legge<br>Court:     JAMS<br>Date:      March 20, 2012<br>Time:      10:00 a.m. |

## TABLE OF CONTENTS

Introduction ................................................................................................................. 1

Background ................................................................................................................... 5

    A.   Facts ........................................................................................................... 5

    B.   Procedural History ..................................................................................... 6

Argument ...................................................................................................................... 7

I.   Parties that Purchase Products Containing Price-Fixed Components Directly From the Conspirators or Their Affiliates Have Antitrust Standing ................................................. 7

    A.   Denying Antitrust Standing to Finished Product Purchasers Would Eviscerate the Antitrust Laws ............................................................................................ 11

    B.   Defendants' Cases Are Inapposite ........................................................... 13

    C.   Defendants' Arguments Concerning The Difficulties of Economic Analysis Are Misplaced ................................................................................................ 15

II.   Plaintiffs Also Fall Within the Well-Established *Royal Printing* Exception to *Illinois Brick* ........................................................................................................... 17

III.   Plaintiffs Are Not Seeking a "New Exception" to Illinois Brick ........................................ 20

IV.   Defendants' Motion Is Premature and Fails to Satisfy Rule 56 ........................................ 21

    Conclusion ................................................................................................... 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## *CASES*

*Delaware Valley Surgical Supply, Inc. v. Johnson & Johnson,*
    523 F.3d 1116 (9th Cir. 2008)..............................................................11, 12

*Florida Power Corp. v. Granlund,*
    78 F.R.D. 441 (D.C. Fla. 1978)...................................................................19

*Freeman v. San Diego Ass'n of Realtors,*
    322 F.3d 1133 (9th Cir. 2003)................................................3, 17, 21, 22

*Gaylord Container Corp. v. Garrett Paper, Inc.,*
    538 U.S. 977 (2003) ......................................................................................12

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
    392 U.S. 481 (1968) ......................................................................................17

*Illinois Brick Co. v. Illinois,*
    431 U.S. 720 (1977).................................................................1, 11, 13, 18

*In re Cathode Ray Tube (CRT) Antitrust Litigation,*
    738 F.Supp.2d 1011 (N.D. Cal. 2010) ..........................................................9

*In re Flat Glass Antitrust Litigation,*
    191 F.R.D. 472 (W.D. Penn. 1999)..............................................................13

*In re Linerboard Antitrust Litigation,*
    305 F.3d 145 (3d Cir. 2002)..........................................................2, 9, 10, 19

*In re Optical Disk Drive Antitrust Litigation,*
    No. 3:10-md-02143, 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011).............15

*In re Refrigerant Compressors Antitrust Litigation,*
    795 F. Supp. 2d 647 (E.D. Mich. 2011)................................................16, 17

*In re Sugar Indus. Antitrust Litig.,*
    579 F.2d 13 (3d Cir. 1978)....................................................................passim

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    267 F.R.D. 291 (N.D. Cal. 2010) ............................................................2, 19

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    586 F.Supp.2d 1109 (N.D. Cal. 2008) .....................................................2, 10

*In re TFT-LCD (Flat Panel) Antitrust Litigation,*
    2011 WL 5357906 (N.D.Cal. 2011).....................................................3, 21, 22

*Kansas v. UtiliCorp United, Inc.,*
    497 U.S. 199 (1990) .........................................................................10, 11, 12

*Loeb Indus., Inc. v. Sumitomo Corp.*,
   306 F.3d 469 (7th Cir. 2002) ........................................................................ 14

*Paper Sys., Inc. v. Nippon Paper Indus. Co., Ltd.*,
   281 F.3d 629 (7th Cir. 2002) .................................................... 11, 14, 19, 22

*Perma Life Mufflers, Inc. v. International Parts Corp.*,
   392 U.S. 134 (1968) .................................................................................... 14

*Prods. Antitrust Litig.*,
   497 F. Supp. 218 (C.D. Cal., 1980) ............................................................ 23

*Royal Printing Co. v. Kimberly Clark Corp.*,
   621 F.2d 323 (9th Cir. 1980) .............................................................. passim

*Stanislaus Food Prods. Co. v. USS POSCO Industries, NO. CV F ,*
   09-0560 LJO SMS, 2010 WL 3521979 (E.D. Cal. Sept. 3, 2010) .......................... 16

### *RULES*

Fed. R. Civ. P. 56(d) ........................................................................................ 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Direct Action Plaintiffs ("DAPs"), through their undersigned Counsel, submit this Memorandum in Support of the Direct Purchaser Plaintiffs' ("DPPs") Opposition to Defendants' Motion for Partial Summary Judgment.

## INTRODUCTION

The DAPs that have filed complaints thus far are large companies based in the United States that have been directly victimized by Defendants' massive price-fixing conspiracy of Cathode Ray Tubes ("CRTs"). The DAPs, which include companies such as Best Buy, Costco, Target, Office Depot, and Sears, purchased billions of dollars of televisions and computer monitors containing price-fixed CRTs directly from Defendants, and their subsidiaries and corporate affiliates. Just days after the DAPs filed their complaints, Defendants moved for partial summary judgment in the DPP case, claiming that they filed their Motion simply to "streamline this litigation." But nothing could be further from the truth. Defendants' Motion reflects a backdoor effort to immunize Defendants from any antitrust liability whatsoever for Defendants' agreements to fix the prices of billions of dollars of CRTs contained in finished products the DPPs—and the DAPs—purchased directly from the Defendants, and their subsidiaries and corporate affiliates.

Defendants' Motion raises one question: whether a company that purchased finished products containing price-fixed CRTs ("CRT Products") directly from one of the Defendant-conspirators, or from an entity related to or affiliated with one of the Defendant-conspirators, has standing to sue Defendants for their violation of the federal antitrust laws. Defendants argue that such a purchaser does not have standing and, for that reason, partial summary judgment should be granted. This argument is contrary to well-established and controlling federal law and, if accepted, would establish a new and radical loophole in federal antitrust law.

It has long been black-letter law that a party that purchases a finished product containing a price-fixed component directly from a participant in the conspiracy has standing to sue under the Sherman Act. This is not, as Defendants claim, a new exception to *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977) ("*Illinois Brick*"). *See, e.g., In re Linerboard Antitrust Litigation*, 305 F.3d

145 (3d Cir. 2002) ("*Linerboard*"); *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13 (3d Cir. 1978) ("*Sugar*").   In fact, in this case Judge Conti has already explicitly followed the well-established doctrine that direct purchasers of finished products containing a price-fixed component have standing to sue under the Sherman Act.  As Judge Conti held:

> Here, the Direct Purchaser Plaintiffs allege they purchased CRTs or CRT Products from Defendants or their subsidiaries at inflated prices due to Defendants' unlawful conduct…This is the type of injury the antitrust laws were intended to address. Furthermore, courts have found antitrust standing where plaintiffs purchased downstream goods from manufacturers who made, and allegedly fixed the price of, a component of these goods.  *See, e.g. In re Linerboard Antitrust Litig.*, 305 F.3rd 145, 159-160 (3d Cir. 2002) (in alleged conspiracy to fix the  prices of linerboard, plaintiffs who purchased corrugated sheets or boxes containing linerboard from defendants had standing).

*In re Cathode Ray Tube (CRT) Antitrust Litigation*, 738 F. Supp. 2d 1011, 1023 (N.D. Cal. 2010).

Judge Illston reached the same exact conclusion with respect to many of these same Defendants in the LCD case, as have other federal courts throughout the country.  *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.,* 267 F.R.D. 291 (N.D. Cal. 2010) (granting certification of class that included finished product purchasers, citing *Sugar* and *Linerboard*); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) (denying motion to dismiss claims of finished product purchasers, citing *Sugar* and *Linerboard*).

Defendants' Motion also runs directly counter to the well-established doctrine that purchasers of price-fixed products from parties unlikely to sue the conspirators, such as the conspirators' subsidiaries and affiliates, are also considered direct purchasers for purposes of antitrust standing.  *See, e.g., Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003) ("*Freeman*"); *Royal Printing Co. v. Kimberly Clark Corp*., 621 F.2d 323, 326 (9th Cir. 1980) ("*Royal Printing*").  Judge Illston recently applied this precedent in the LCD case when denying the Toshiba defendants' motion for summary judgment.  *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 3:07-md-01827-SI, 2011 WL 5357906 (N.D. Cal. Nov. 7, 2011) (citing *Royal Printing*).

1    Not even the combination of these two doctrines is novel: it has long been the law that a

2    party who purchases a finished product containing a price-fixed component from a company

3    related to or affiliated with a conspirator has standing to sue under the Sherman Act.   *See Sugar*,

4    579 F.2d at 18-19 (applying these doctrines together).

5    The decisions applying these doctrines are deeply rooted in the principles and purposes of

6    the federal antitrust laws:  if Defendants' view of the law were correct, Defendants would face no

7    liability under the Sherman Act for the majority of their sales of price-fixed CRTs.  Moreover,

8    future price-fixers would have a clear road-map to complete immunity from Sherman Act liability:

9    they would simply conspire to fix the price of a component part and then transfer the price-fixed

10   component to a co-conspirator, or to a corporate affiliate of a co-conspirator, for incorporation into

11   the finished product before selling the finished products in U.S. commerce.  Moreover, any

12   product may be transformed into a "component" by merely adding another element before sale.

13   Such a result would create a glaring loophole in the Sherman Act and directly contradict well-

14   settled law and the public policy underlying antitrust enforcement.

15   Defendants attempt to shield themselves from these doctrines by arguing that there are

16   entities other than the DPPs and the DAPs that can serve as direct purchasers under the federal

17   antitrust laws.  To this end, Defendants offer the following remarkable sentence:

18
19   > Television and monitor manufacturers are in fact the true direct purchasers of CRTs
>     and thus have standing to carry out the deterrence function of the antitrust laws.

20   Def. Mem. at 1.

21   Most of the Defendants, however, are vertically integrated manufacturers of CRT Products,

22   and thus the "television and monitor manufacturers" responsible for the majority of the sales of

23   CRT Products are the Defendants *themselves* and their *own* subsidiaries and affiliates.  Thus,

24   Defendants' Motion asks the Court to conclude that Defendants and their affiliates and

25   subsidiaries are the only entities that have standing to sue here.  Yet Defendants know full well

26   that their subsidiaries and affiliates have not—and will not—sue their corporate parents and

27   siblings for the billions of dollars of price-fixed CRTs that were contained in CRT Products these

28

1   subsidiaries and affiliates directly sold to purchasers in the United States, including the DPPs and

2   the DAPs.   Courts have long recognized the absurdity of trusting a conspirator's affiliate or

3   subsidiary to enforce the antitrust laws against the conspirator.  *See, e.g.*, *Royal Printing*, 621 F.2d

4   at 326.

5          Defendants cannot use their corporate structure as an end run around the Sherman Act, as

6   Judge Conti and established federal precedents have recognized.    Because Defendants'

7   subsidiaries and affiliates are not able to carry out the deterrence function of the antitrust laws, the

8   DPPs and the DAPs, as the parties who purchased the CRT Products directly from the Defendants,

9   or their affiliates and subsidiaries, are considered the direct purchasers with standing to bring a

10  claim under the federal antitrust laws.

11         Defendants even go so far as to state that the deterrence function of the antitrust laws will

12  be satisfied because completely unrelated manufacturers, such as HP, Sony, Dell, and Apple, can,

13  to the extent they purchased CRTs directly from Defendants, bring their own direct purchaser

14  claims.  Def. Mem. at 1, 8, 10.  Once again, Defendants have misstated the facts and misapplied

15  the law.  It is certainly true that those manufacturers have standing to sue under federal law for

16  their own direct purchases of CRTs and CRT Products directly from Defendants, or Defendants'

17  subsidiaries and corporate affiliates.  But that is beside the point: those manufacturers' purchases

18  are not at issue whatsoever in the DAPs' federal law claims, which solely arise from the CRT

19  Products the DAPs purchased directly from Defendants and their subsidiaries and affiliates—not

20  from HP, Sony, Dell, Apple or any other manufacturer unrelated to Defendants.  These unrelated

21  manufacturers certainly have standing to pursue their own claims for Defendants' unlawful acts,

22  but that is only one portion of the CRT market.   The majority of CRTs were sold by the

23  conspirators to their own affiliates and subsidiaries.  The DAPs' claims involve this portion of the

24  CRT market.

25         It is therefore not the case, as Defendants claim, that two companies at different levels in

26  the distribution chain are seeking damages under the federal antitrust laws for the same price-fixed

27  CRT.  The DAPs and these manufacturers can assert separate claims based on their own direct

28

1  purchases of CRT Products and CRTs, respectively, directly from the Defendants and Defendants'

2  subsidiaries and corporate affiliates. Defendants have failed to cite a single authority that prohibits

3  the assertion of these distinct claims. Additionally, Defendants have failed to cite a single

4  authority that holds that the deterrence function of the antitrust laws would be satisfied because

5  standing exists as to a small portion of the market (though Defendants would be otherwise

6  shielded from claims for a majority of the market). Indeed this is not and cannot be the case.

7      In sum, the sole goal of Defendants' Motion is to ensure that ***no*** party, including the DAPs,

8  may recover any damages under the federal antitrust laws for overcharges on the CRTs contained

9  in the CRT Products that Defendants, and their subsidiaries and affiliates, manufactured and sold

10  in the United States. But Judge Conti has already held that this is not the law. And Judge Illston

11  and other courts across the country have reached the same conclusion, because a contrary holding

12  would frustrate the public policy underpinning the federal antitrust laws and provide would-be

13  conspirators a clear and easy path to shield themselves from liability for their unlawful acts. The

14  Special Master should follow the same path as these controlling and persuasive precedents:

15  Defendants' Motion for Partial Summary Judgment should be denied because courts have long

16  recognized that Defendants may be held liable under the Sherman Act for the sale of finished

17  products containing price-fixed components when those products are purchased directly from the

18  conspirators or their affiliates and subsidiaries.

19                                  **BACKGROUND**

20      A.   Facts

21      Defendants in this litigation engaged in a long-running conspiracy to fix the prices of

22  CRTs, which are used in CRT Products including color televisions and color computer monitors.

23  See, e.g., Best Buy Complaint (No. 11-cv-05513-SC (N.D. Cal.), Dkt No. 1); Circuit City

24  Complaint (No. 11-cv-05502-SC (N.D. Cal.), Dkt No. 1); Costco Complaint (No. 11-cv-06397-SC

25  (N.D. Cal.), Dkt. No. 1); Office Depot Complaint (No. 11-cv-06276-SC (N.D. Cal.), Dkt No. 1);

26  Target Complaint (No. 11-cv-05514-EDL (N.D. Cal.), Dkt. No. 1) at ¶¶ 1-2. Defendants'

27  conspiracy extended from at least March 1995 through November 2007 and included at least 500

28

conspiracy meetings. *See, e.g., id.* at ¶¶ 1, 6. This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities. Thus far, Defendant Samsung SDI Company, Ltd. has agreed to plead guilty and pay a $32 million criminal fine and six executives of Defendant companies have been indicted in connection with DOJ's investigation of the conspiracy. *See, e.g., id.* at ¶ 8.

Defendants are or were among the leading manufacturers of CRTs and CRT Products and control the majority of the multibillion-dollar CRT industry. *See, e.g., id.* at ¶¶ 2-3. Many of the Defendants are "vertically integrated" manufacturers, meaning they manufacture CRTs and either they or their subsidiaries and/or affiliates also manufacture CRT Products. Declaration of R. Alexander Saveri In Opposition to Defendants' Motion For Partial Summary Judgment ("Saveri Decl.") at ¶ 43. Plaintiffs expect that the evidence will show that, as a result of this vertical integration, the majority of Defendants' CRT production during the conspiracy period was consumed internally. *Id.* at ¶ 46.

The DAPs are leading United States' retailers, distributors, and other businesses that purchased CRTs and/or CRT Products directly from Defendants, their affiliates, and subsidiaries.[1] As a result of the conspiracy, the DAPs were overcharged on the billions of dollars of CRTs and CRT Products they purchased. *See, e.g.,* Best Buy Complaint; Circuit City Complaint; Costco Complaint; Office Depot Complaint; Target Complaint at ¶ 9.

---

[1] The Direct Action Plaintiffs that have filed suit are Target, Sears, Kmart, Comp USA, the Good Guys, Radio Shack, Best Buy, Circuit City, Costco, Polaroid, Office Depot, PC Richards, Tweeter, Electrograph, CompuCom, BrandsMart, Marta Cooperative, and ABC Appliance. *See generally Target Corp., et al. v. Chunghwa Picture Tubes, Ltd.*, No. 11-cv-05514 (EDL) (N.D. Cal.); *Best Buy Co., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-05513 (SC) (N.D.Cal.); *Siegel v. Hitachi, Ltd., et al.*, No. 11-cv-05502 (SC) (N.D. Cal.); *Costco Wholesale Corp. v. Hitachi, Ltd., et al.*, No. 11-cv-06397 (SC) (N.D. Cal.); *Stoebner, et al. v. LG Electronics, et al.*, No. 11-cv-05381 (SC) (N.D. Cal); *Office Depot, Inc. v. Hitachi Ltd., et al.*, 11-cv-06276-SC (N.D. Cal.); *P.C. Richard and Son Long Island Corp., et al. v. Hitachi, Ltd., et al.*, 11-cv-05530 (JBW, VVP) (E.D.N.Y.); *Schultze Agency Services, LLC, et al. v. Hitachi, Ltd., et al.*, 11-cv-05528 (BMC) (E.D.N.Y.); *Electrograph Systems, Inc. et al v. Hitachi Ltd. et al*. 11-cv-01656-SC (N.D. Cal.); *Compucom Systems, Inc. v. Hitachi, Ltd., et al.*, No. 11-cv-06396 (SC) (N.D. Cal.); and *Interbond Corporation of America v. Hitachi, et al.*, No 11-cv-06275 (SC) (N.D. Cal.).

B.      Procedural History

The DAPs are new entrants to this litigation, most having filed suit in November 2011. Defendants have not yet responded to the DAPs' complaints, and no discovery has been conducted on the DAPs' claims.  Additionally, if the LCD case is any indication, there are likely to be a substantial number of other DAP cases that will be filed in the coming months.  Defendants' Motion for Partial Summary Judgment is not facially directed at any of the DAP cases that has been filed thus far.  However, at the January 19, 2012 Case Management Conference held in this litigation, this Court acknowledged that Defendants' Motion could potentially affect not only the claims of those DAPs that have recently filed suit, but also the claims of those DAPs who have yet to file.  Accordingly, the DAPs that are currently parties to the litigation are submitting this brief for the Court's consideration, notwithstanding the fact that Defendants' Motion has not been made in any of their cases.

**ARGUMENT**

**I.      Parties that Purchase Products Containing Price-Fixed Components Directly From the Conspirators or Their Affiliates Have Antitrust Standing**

It is well-established that if a plaintiff purchases a finished product containing a price-fixed component directly from a defendant, or one of the defendants' related or affiliated entities, that plaintiff has standing as a direct purchaser to bring a claim under the federal antitrust laws.  For example, the defendants in *Sugar* had allegedly conspired to fix the price of refined sugar. One of the plaintiffs had not purchased any refined sugar, but rather had directly purchased, from a subsidiary of one of the defendants and a division of another of the defendants, hard candy made from refined sugar.  *Sugar,* 579 F.2d at 15.   In *Sugar* there was no allegation that the defendants had fixed the price of the finished product (hard candy).  Rather, the plaintiff alleged that it had purchased the finished product containing the price-fixed component directly from one of the defendants.  In vacating the district court's grant of summary judgment to defendants, the Third Circuit stated:

> As the defendants here point out, the product which plaintiff purchased competes not with sugar, but with other candy, and more than one ingredient determines the

1

price. To this extent, there will be some additional complications underlying the
damage claims. However, this **must not be allowed to obscure the fact that the
plaintiff did purchase directly from the alleged violator.** True, the price-fixed
commodity had been combined with other ingredients to form a different product.
But just as the sugar sweetened the candy, the price-fixing enhanced the profits of
the candy manufacturers.

2

3

4

*Sugar,* 579 F.2d at 17-18.[2]

5

6

Likewise, in *Linerboard* the plaintiff classes included finished product purchasers of

corrugated sheets or boxes that incorporated linerboard, the product subject to alleged output

7

restrictions. *Linerboard,* 305 F.3d at 159. As in *Sugar*, there was no allegation that the defendants

8

had fixed the price of the finished product (corrugated sheets and boxes), but merely that the

9

plaintiff had purchased the finished product containing the price-fixed component (linerboard)

10

directly from one of the defendants. As in *Sugar*, the Third Circuit held:

11

12

the putative class plaintiffs purchased corrugated sheets or boxes directly from
Appellants, and, like the candy in *In re Sugar*, which contained allegedly price-
fixed sugar, the corrugated sheets and boxes contain linerboard that was subject to
an agreement on output, which is equivalent to a price-fixing agreement.
Accordingly, the putative class members are direct purchasers and are entitled to
recover the full amount of any overcharge.

13

14

15

*Id.* at 159-60.

16

17

As Judge Conti has recognized in this case, *Linerboard* states the applicable law:

18

Here, the Direct Purchaser Plaintiffs allege they purchased CRTs or CRT Products
from Defendants or their subsidiaries at inflated prices due to Defendants' unlawful
conduct…This is the type of injury the antitrust laws were intended to address.
Furthermore, courts have found antitrust standing where plaintiffs purchased
downstream goods from manufacturers who made, and allegedly fixed the price of,
a component of these goods. *See, e.g. In re Linerboard Antitrust Litig*., 305 F.3rd
145, 159-160 (3d Cir. 2002) (in alleged conspiracy to fix the prices of linerboard,
plaintiffs who purchased corrugated sheets or boxes containing linerboard from
defendants had standing.)

19

20

21

22

23

*In re Cathode Ray Tube (CRT) Antitrust Litigation*, 738 F. Supp. 2d 1011, 1023 (N.D. Cal. 2010).

24

25

26

---

27

[2]   Throughout this Memorandum, unless otherwise stated, all citations have been removed from
quotations and all emphasis added.

28

Likewise, in the LCD case, Judge Illston followed *Sugar* and *Linerboard* in the same fashion as Judge Conti, holding that the Direct Purchasers of LCD finished products had antitrust standing under federal law:

> Here, the complaint alleges that the direct purchaser plaintiffs purchased TFT-LCD products directly from cartel members at supra-competitive prices as the result of a conspiracy to fix prices. Defendants do not cite any case holding that a plaintiff who purchases directly from an alleged cartel does not have standing. In contrast, courts have found antitrust standing where plaintiffs purchased downstream goods from a cartel of manufacturers who made, and fixed the price of, a component of those goods. *See, e.g.*, *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 159-60 (3d Cir. 2002) ("*Linerboard I*") (in alleged conspiracy to fix prices of linerboard, plaintiffs who purchased corrugated sheets or boxes containing linerboard directly from defendants had standing).

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d at 1118.

Defendants make no attempt to distinguish *Sugar* or *Linerboard,* and fail to even acknowledge that these cases have been followed by Judge Conti in this litigation and Judge Illston in the LCD case involving many of the very same Defendants. Instead, Defendants falsely claim that the Third Circuit's opinions in *Sugar* and *Linerboard* "directly contravene" *Illinois Brick*, were abrogated by the Supreme Court's decision in *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990) ("*UtiliCorp*"), and are not good law. These arguments lack merit and are directly contrary to the prior rulings by Judge Conti in this case and Judge Illston in the LCD case.

First, in *Sugar* the Third Circuit directly confronted the question "[d]oes *Illinois Brick* bar suit by a plaintiff who purchases directly from the alleged offender, but buys a product which incorporates the price-fixed product as one of its ingredients?" *Sugar,* 579 F.2d at 16. In analyzing that question, the Third Circuit considered at length the Supreme Court's decision in *Illinois Brick.* As the Third Circuit correctly noted, the Supreme Court was concerned in *Illinois Brick* with multiple liability for the same product and the apportionment of damages among multiple purchasers of that product in the distribution chain. *Id.* at 17. That issue was not present in *Sugar* or *Linerboard*, and is not present here, because the plaintiffs were the first purchasers of the price-fixed component outside of the conspiracy. *Id.* at 18; *see also Paper Sys., Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629, 632 (7th Cir. 2002) ("*Paper Sys.*") (The sale to the first

1    purchaser outside the conspiracy constitutes a direct purchase within the meaning of the antitrust

2    laws.). *Sugar* thus follows, and is entirely consistent with, *Illinois Brick*.

3        Second, *Sugar* was not implicitly or explicitly overruled by *Utilicorp*. In *Utilicorp*, the

4    Supreme Court considered whether two states had standing to assert claims against natural gas

5    companies on behalf of consumers who purchased natural gas directly from independent utilities,

6    who had also sued the natural gas companies. *Utilicorp*, 497 U.S. at 205-06. The Supreme Court

7    determined that the consumers were indirect purchasers and that the utilities, not the consumers,

8    were direct purchasers and had antitrust standing:

9        In the distribution chain, [the consumers] are not the immediate buyers from the
         alleged antitrust violators. They bought their gas from the utilities, not from the
10       suppliers said to have conspired to fix the price of the gas.

11   *Utilicorp*, 497 U.S. at 207.

12       The plaintiff states sought an exception to the indirect purchaser rule for utilities that are

13   permitted by statute to pass-on 100% of their overcharges to consumers. The Supreme Court

14   rejected "'carv[ing] out exceptions to the [direct purchaser] rule for particular types of markets.'"

15   *Utilicorp*., 497 U.S. at 216 (quoting *Illinois Brick*, 431 U.S. at 744).

16       Defendants also cite *Delaware Valley Surgical Supply, Inc. v. Johnson & Johnson*, 523

17   F.3d 1116 (9th Cir. 2008) ("*Delaware Valley*") as the sole authority supporting the proposition

18   that *Utilicorp* implicitly abrogated *Sugar*. But *Delaware Valley*, like *Utilicorp*, concerned a

19   plaintiff that purchased from an independent third party, not from the alleged antitrust violators,

20   and a request by the plaintiff for an exception from the indirect purchaser rule due to unique

21   features of the market at issue. *Delaware Valley*, 523 F. 3d at 1122-23. In rejecting the request

22   for an exception, the Ninth Circuit relied on *Utilicorp* which "closed the door on the theory that an

23   end user who **buys from an independent distributor**, rather than the manufacturer, should have

24   standing because it may be the most efficient enforcer of antitrust laws." *Delaware Valley*, 523

25   F.3d at 1123.

26       Neither *Utilicorp* nor *Delaware Valley* mention *Sugar* nor do they undermine its holding.

27   Unlike *Sugar*, and unlike the present case, *Utilicorp* and *Delaware Valley* involved consumers

28

who purchased price-fixed products from **independent** distributors with standing and incentive to sue. *See Utilicorp*, 497 U.S. at 214 ("Utilities, moreover, have an established record of diligent antitrust enforcement, having brought highly successful [antitrust] actions in many instances"). And also unlike *Utilicorp* and *Delaware Valley*, the DPPs and DAPs are not arguing that the unique nature of the CRT market somehow warrants an exception to black letter antitrust law. In fact, they argue the opposite: that well-established law must continue to apply to Defendants' unlawful acts.

Thus, *Utilicorp* and *Delaware Valley* do no more than reaffirm the rule that a party may not recover when others more directly injured are better able to state a claim. Here, as in *Sugar* and *Linerboard*, there is no party more directly injured, or better able to state a claim, than Direct Action Plaintiffs and Direct Purchaser Plaintiffs.

Third, as Judge Conti and Judge Illston's prior orders reflect, *Sugar* and *Linerboard* remain good law. The Supreme Court denied certiorari in *Linerboard*, which expressly reaffirmed *Sugar* twelve years after *Utilicorp* purportedly abrogated it. *Gaylord Container Corp. v. Garrett Paper, Inc.*, 538 U.S. 977 (2003) (denying certiorari *sub nom*). Moreover, *Sugar* has been cited by many courts since *Utilicorp* was decided in 1990. For example, in *In re Flat Glass Antitrust Litigation*, 191 F.R.D. 472, 481 (W.D. Penn. 1999), plaintiffs brought claims against flat glass manufacturers for finished products purchased from the conspirators and their affiliates containing price-fixed flat glass. The *Flat Glass* court relied on *Sugar* for the notion that *Illinois Brick* "does not preclude a suit by a plaintiff who purchases directly from the alleged offender, as did plaintiffs, but buys a product which incorporates the price-fixed product as one of its ingredients." *Id.*

A.    Denying Antitrust Standing to Finished Product Purchasers Would Eviscerate the Antitrust Laws

The Supreme Court has identified three distinct rationales for the indirect purchaser rule adopted in *Illinois Brick*: (1) avoiding multiple treble damage liability, (2) avoiding complications of apportioning damages between direct and indirect purchaser plaintiffs, and (3) ensuring the vigorous enforcement of the antitrust laws. *Illinois Brick*, 431 U.S. at 730–35, 740–43. The first two rationales are not implicated here because no entity above or below the Plaintiffs in the supply

1    chain has standing to sue Defendants under the federal antitrust laws for fixing the prices of the

2    CRTs contained in the CRT Products purchased by Plaintiffs.  As discussed above, any suit by

3    unrelated manufacturers, such as HP or Dell, would be for an entirely different segment of the

4    CRT market than the DAPs' claims.  The third rationale, however, is directly implicated in this

5    case and requires this Court to deny Defendants' Motion.

6        In *Illinois Brick*, the Supreme Court concluded that "that the legislative purpose in creating

7    a group of 'private attorneys general' to enforce the antitrust laws under § 4 is better served by

8    holding direct purchasers to be injured to the full extent of the overcharge paid by them than by

9    attempting to apportion the overcharge among all that may have absorbed a part of it." 431 U.S. at

10   721.  The restriction on indirect purchaser recovery improves deterrence by concentrating damages

11   in the hands of direct purchasers.  *Paper Sys.*, 281 F.3d at 633.  "Firms that deal directly with the

12   manufacturers are apt to know the most about the industry's behavior and thus are in the best

13   position to detect cartels; allowing them to collect the full overcharge, trebled, creates powerful

14   incentives to investigate and file suit." *Id.*

15       If Defendants' argument is accepted, **no** party would be entitled to seek damages for the

16   CRTs incorporated into the CRT Products purchased by Plaintiffs.  As previously stated, such a

17   holding would completely insulate Defendants from any liability whatsoever for the majority of

18   the CRTs they price-fixed, as these were incorporated into finished products and sold to

19   purchasers directly by one of the Defendants, their subsidiaries or corporate affiliates.  As the

20   Third Circuit held in *Sugar*:

21           **to deny recovery in this instance would leave a gaping hole in the**
             **administration of the antitrust laws.  It would allow the price-fixer … to**
22           **escape the reach of a treble-damage penalty simply by incorporating the**
             **tainted element into another product.**  Thus, a refiner who illegally set the price
23           of sugar could shield itself by putting all of the sugar into a new product, a syrup,
             simply by adding water and perhaps a little flavoring.  We do not think the antitrust
24           laws should be so easily evaded.....*Illinois Brick* did not purport to provide any such
             escape.
25

26   *Sugar,* 579 F.2d at 17-18.

27

28

1    Immunizing price-fixers from federal antitrust liability would be flatly inconsistent with

2    *Illinois Brick* and would be contrary to the well-established public policy underlying antitrust

3    enforcement.  *See Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 139

4    (1968) ("the purposes of the antitrust laws are best served by insuring that the private action will

5    be an ever-present threat to deter any one contemplating business behavior in violation of the

6    antitrust laws"); *Royal Printing*, 621 F.2d at 325 ("The threat of private treble-damages suits is

7    vital to the enforcement of the antitrust laws"); *see also See Loeb Indus., Inc. v. Sumitomo Corp.,*

8    306 F.3d 469, 483 (7th Cir. 2002) (the Supreme Court's pass-on jurisprudence "at times favors

9    plaintiffs (*Hanover Shoe*) and at times defendants (*Illinois Brick* ), but it never operates entirely to

10   preclude market recovery for an injury.").  Moreover, allowing Defendants to escape liability for

11   their unlawful acts would not only result in injustice in this instance but would provide a roadmap

12   for future price-fixers to avoid liability for their own conspiracies as well.

13       B.   Defendants' Cases Are Inapposite.

14       Defendants cite no binding authority contradicting the holdings of *Sugar* and *Linerboard*.

15   Rather, Defendants cite to *In re Optical Disk Drive Antitrust Litigation*, No. 3:10-md-02143, 2011

16   WL 3894376 (N.D. Cal. Aug. 3, 2011) ("*ODD*"), but misrepresent the holding of that case.

17       According to Defendants, the Court in *ODD* held that "absent a plausible conspiracy to

18   price-fix finished products, to establish antitrust standing plaintiffs must allege that they purchased

19   'actual ODD devices' and not finished 'ODD products.'"  Def. Mem. at 7.  To the contrary, the

20   Court in *ODD* held that plaintiffs that had purchased finished products incorporating ODDs **from**

21   **non-defendant companies** were indirect purchasers.  According to the plaintiffs' allegations,

22   those non-defendant finished product manufacturers "were unwitting dupes of the illegal activity,

23   not co-conspirators." *Id.* at *8.  To be clear, those non-defendant manufacturers share the same

24   role as Dell or HP in this case—they are a separate segment of the CRT market, and the DAPs

25   claim damages for an entirely different segment of the market.

26       Consistent with *Sugar* and *Linerboard*, the Court in *ODD* explicitly stated that "plaintiffs

27   in this case **do not have a standing problem with respect to any ODD devices they may have**

28

1  **purchased directly from defendants**….” *Id*. at *7.  Further underscoring the inapplicability of

2  the *ODD* case to Plaintiffs claims in this case, the *ODD* Court expressly distinguished Judge

3  Illston's decisions in the *LCD* case and Judge Conti's decision in this case: “Once again, the

4  problem is that plaintiffs are attempting to extend the price-fixing conspiracy to **finished products**

5  **not produced by the defendants**, an issue not expressly addressed in *Cathode Ray*.” *Id.* at *7.

6       Likewise, Defendants cite *Stanislaus Food Prods. Co. v. USS POSCO Industries*, NO. CV

7  F 09-0560 LJO SMS, 2010 WL 3521979 (E.D. Cal. Sept. 3, 2010) (“*Stanislaus*”), but again

8  misrepresent the holding.  According to Defendants, the Court in *Stanislaus* held that the plaintiff

9  was an indirect purchaser because the allegedly price-fixed product had been altered in the

10  distribution process.  Def. Mem. at 7.  But the Court held that the plaintiff was an indirect

11  purchaser **because it purchased finished products from an independent wholesaler** and did not

12  purchase *any* product from *any* defendant.  *Stanislaus*, 2010 WL 3521979 at *6.  The Court

13  explicitly stated that, although the case concerned a product that was “transformed” or “altered” as

14  it was passed down the distribution line, it “assume[d] for purposes of this motion that the

15  transformation process is **irrelevant to the antitrust analysis**.”  *Id.* at *6-*7.

16       Finally, Defendants rely on a decision from the Eastern District of Michigan in *In re*

17  *Refrigerant Compressors Antitrust Litigation*, 795 F. Supp. 2d 647 (E.D. Mich. 2011)

18  (“*Compressors*”).  In *Compressors*, unlike here, “no named DP Plaintiff has alleged that it bought

19  a finished product containing a compressor from a Defendant who both manufactured the

20  compressors and used those compressors to manufacture that finished good.” *Id.*, at 658.  Here,

21  DAPs and DPPs have purchased CRT Products from Defendants who both manufactured the CRT

22  and used the CRT to manufacture the finished product.

23       Moreover, even where CRTs contained in a finished product sold by one defendant were

24  manufactured by another defendant, *Compressors* is not binding on this Court, and is directly

25  contrary to the Third Circuit's rulings in *Linerboard* and *Sugar*, as well as Judge Conti's prior

26  order in this case and Judge Illston's orders in the LCD case.  In *Compressors*, the Court

27  determined that a plaintiff lacked standing under the Sherman Act if the finished product it

28

1   purchased from a defendant contained a price-fixed component manufactured by another

2   defendant. *Id.* The Court based this ruling on several errors of law. For example, the Court

3   erroneously assumed that the *Illinois Brick* rule against "pass-on" theories applies even where the

4   initial purchaser is a participant in the price-fixing conspiracy. But, as the Ninth Circuit has

5   repeatedly held in decisions that are binding on this Court, *Illinois Brick* does not bar plaintiffs

6   from bringing suit against manufacturers that distribute price-fixed products through their affiliates

7   and subsidiaries or the affiliates and subsidiaries of their co-conspirators. *See, e.g, Freeman*, 322

8   F.3d 1133; *Royal Printing*, 621 F.2d 323. In addition, the Court in *Compressors* failed to address

9   the "gaping hole in the administration of the antitrust laws" that is the unavoidable result of a rule

10   establishing that antitrust liability can be avoided by the mere transferring of price-fixed

11   components among members of the price-fixing conspiracy.

12        C.    <u>Defendants' Arguments Concerning the Difficulties of Economic Analysis Are</u>
<u>Misplaced.</u>

13

14        Defendants repeatedly argue that CRT Product purchasers' claims are barred because they

15   are based on impermissible "pass-on" theories, which would create a knot of economic issues that

16   this Court is incapable of untangling. This argument fundamentally misconstrues the Supreme

17   Court's holdings in *Illinois Brick* and *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S.

18   481 (1968) ("*Hanover Shoe*") and ignores the details of Plaintiffs' claims. In *Hanover Shoe* the

19   Supreme Court held that antitrust defendants could not argue that direct purchaser plaintiffs had

20   passed on overcharges to their customers and thus were not themselves injured by the alleged

21   antitrust violation. In *Illinois Brick*, the Supreme Court considered whether the rule adopted in

22   *Hanover Shoe* should be applied with equal force to prevent an indirect purchaser plaintiff from

23   arguing that a direct purchaser passed on its overcharges to it. In reaching its decision that

24   offensive pass-on arguments are prohibited, the Supreme Court noted that allowing an indirect

25   purchaser to utilize a pass-on theory, while not allowing a defendant to rely upon the same theory

26   to defend itself against a direct purchaser suit, would result in the direct purchaser collecting the

27   full overcharge, trebled, and the indirect purchaser collecting additional treble damages. *Illinois*

28

*Brick,* 431 U.S. at 737. Because the indirect and direct purchasers would both be seeking damages from the same recovery pool, each party's recovery would be reduced and the incentive for any party to bring suit would be diminished. *Id.* at 745. Such incentives would be further diminished because litigating the issue of how to apportion damages between the indirect and direct purchaser plaintiffs would increase litigation costs. *Id.*

Here, there are no direct purchasers with standing to sue under the federal antitrust laws other than Plaintiffs because Plaintiffs purchased CRT products directly from the Defendant price-fixers, their corporate subsidiaries or affiliates. Defendants' argument that some unrelated manufacturers, such as Dell, Sony, HP and Apple, purchased CRTs from the Defendants, and thus have standing to sue for other purchases, misses the point entirely. Only Plaintiffs here may bring claims as direct purchasers of the CRTs contained in the CRT Products Plaintiffs' purchased from Defendants, their corporate subsidiaries and affiliates. The fact that some independent manufacturers may also have standing to sue for *their* entirely separate direct purchasers of CRTs is irrelevant to Plaintiffs claims, and both claims address different segments of the CRT market.

Because Plaintiffs do not seek any damages under federal law for any purchases from independent third parties, but only for their direct purchases from Defendants, their corporate subsidiaries and affiliates, there is no possibility of multiple treble-damage recoveries for the same CRT. Likewise, this Court is not required to determine how to allocate damages between purchasers of the same product at different levels in the supply chain. As the first purchasers outside of the conspiracy, Plaintiffs are direct purchasers from Defendants and they are entitled to recover the full amount of the overcharges under federal law. *See Linerboard*, 305 F.3d at 159-60.

Despite these obvious distinctions, Defendants argue that this case is nonetheless barred by *Illinois Brick* because Plaintiffs must prove how much they were overcharged for the CRTs incorporated into CRT Products they purchased. This argument was squarely rejected in *Sugar:*

> The situation is the same as if the general contractor which sold the building to the plaintiff in *Illinois Brick* were the manufacturer of the concrete block which went into the structure. In that situation, the concern which the Supreme Court expressed about the proration of overcharge among a number of entities in the chain would not have been present.

> Nor is that problem of allocation among various distributors present in the case *Sub judice*…. The difficulty in computation here is not in parceling out damages among entities in the chain, but in isolating the excessive cost of one ingredient which goes into the product purchased by the plaintiff.

*Sugar,* 579 F.2d at 18; *see also Paper Sys.*, 281 F.3d at 633 (holding that the difficulty of tracing overcharges through a chain of distribution is "unimportant" where there is no prospect of multiple liability); *In re TFT-LCD (Flat Panel) Antitrust Litig.,* 267 F.R.D. at 306 ("*Illinois Brick's* prohibition against suits by indirect purchasers extends only to the indirect purchaser plaintiff, not to the price-fixed product itself if incorporated into another product"); *Florida Power Corp. v. Granlund*, 78 F.R.D. 441, 443 (D.C. Fla. 1978) ("The mere fact that the allegedly price-fixed product is only a partial constituent of the ultimate product purchased" from a conspirator does not bar recovery under *Illinois Brick*).

Finally, Defendants rely on cases concerning "umbrella" damages to argue that CRT Product purchasers' claims are barred by *Illinois Brick*. These arguments are irrelevant. As Defendants' characterize them "umbrella" damages are "damages for purchases from non-conspirator competitors based on the premise that such competitors, though not members of the alleged conspiracy, raised their prices in response to conspiratorial agreements." Def. Mem. at 6. Here, Plaintiffs are not seeking "umbrella" damages for purchases from non-conspirator competitors. Instead, Plaintiffs are only seeking damages for their purchases directly from the conspirator-defendants and their affiliates. Any discussion of "umbrella" damages is a misguided attempt to confuse and distract the Court from Plaintiffs' actual claims.

## II. Plaintiffs Also Fall Within the Well-Established *Royal Printing* Exception to *Illinois Brick*

Even if this Court were to disagree that Plaintiffs' purchases of CRT Products directly from Defendants constitute claims under federal law pursuant to the established precedents of *Sugar, Linerboard* and *LCD,* which have already been acknowledged by Judge Conti in this case, these purchases also clearly fall within the exception to the *Illinois Brick* rule adopted by the Ninth Circuit in *Royal Printing* and its progeny.

It is well-established that *Illinois Brick* does not bar suit by a purchaser where there is no realistic possibility that the intermediary from which it purchased will sue its supplier over the antitrust violation. This exception was first adopted over thirty years ago by the Ninth Circuit in *Royal Printing*. In *Royal Printing,* the Defendants conspired to fix the prices of paper products. The defendants each sold the paper products they manufactured only through wholesalers, many of which were either subsidiaries or divisions of one of the conspirators. 621 F.2d at 326. The Ninth Circuit held that *Illinois Brick* "does not bar an indirect purchaser's suit where the direct purchaser is a division or subsidiary of a co-conspirator." *Id*. at 326. The Ninth Circuit explained its rationale for this holding, stating:

> There is little reason for the price-fixer to fear a direct purchaser's suit when the direct purchaser is a subsidiary or division of a co-conspirator. Even if the pricing decisions of such a subsidiary or division are necessarily determined by market forces, its litigation decisions will usually be subject to parental control.

*Id.*

The vertically integrated Defendants in *Royal Printing* sold both their own paper products and those of other conspirators to the Plaintiffs through their wholesale divisions and subsidiaries. *Id.* at 324. As the Ninth Circuit held, such a distinction is immaterial because "[t]he co-conspirator parent will forbid its subsidiary or division to bring a lawsuit that would only reveal the parents own participation in the conspiracy." *Id.*, at 326.[3] Further, while the pricing decisions of the subsidiary-wholesalers were determined by market forces, the Ninth Circuit held that plaintiffs were entitled to recover the full amount of the overcharge. *Id.*

The Ninth Circuit subsequently affirmed *Royal Printing* in *Freeman*. In *Freeman*, the plaintiffs, subscribers to a real estate multiple listing service (MLS), had sued the corporation that provided the MLS, as well as the real estate associations that were the corporation's shareholders and provided support services for the MLS, alleging violations of Section 1 of the Sherman Act.

---

[3] *Compressors*, which held that a plaintiff only has standing under the Sherman Act if it purchased a product from the same defendant that manufactured the price-fixed component is thus irreconcilable with the binding precedent of *Royal Printing*, which focuses not on the relationship between the subsidiary-seller and the manufacturer-parent, but on the relationship between the subsidiary-seller and **any** conspirator-manufacturer. *See In re TFT-LCD (Flat Panel) Antitrust Litigation,* 3:07-md-01827-SI, WL 5357906, * 1 (N.D. Cal. Nov. 7, 2011)

*Freeman,* 322 F.3d at 1142.    The Ninth Circuit held that the plaintiffs had standing to sue the defendant associations because there was "no realistic possibility [the corporation would] sue them." *Id*. at 1146.

Here, the defendant-conspirators sold the price-fixed components to their subsidiaries or affiliates for incorporation into the CRT Products purchased by Plaintiffs.    Just as in *Royal Printing* and *Freeman*, there is no realistic possibility that the subsidiaries and affiliates will sue their parent or their parent's co-conspirators and, as a result, Plaintiffs are considered direct purchasers and have standing to sue under *Illinois Brick*.   Moreover, there is no need to calculate "pass-on" damages because Plaintiffs are entitled to recover the full amount of the overcharge. *Royal Printing*, 621 F.2d at 327; *see also Paper Sys.*, 281 F.3d at 631–632 ("*Hanover Shoe* and *Illinois Brick* allocate to the first non-conspirator in the distribution chain the right to collect 100 percent of the damages…").

The policy underlying this precedent is to prevent price-fixers from shielding themselves from liability by making sales through a non-conspiring affiliate or subsidiary.   Barring plaintiffs that purchased directly from subsidiaries or affiliates of the conspirators from bringing suit "would close off every avenue for private enforcement of the antitrust laws in such cases." *Royal Printing*, 621 F.2d at 327.   In the words of the Ninth Circuit, "**[t]his would be intolerable**." *Id*.; *see also Freeman*, 322 F.3d at 1145-46 (failing to grant standing to purchasers from subsidiaries of conspirators "would risk opening up a major loophole [in the antitrust laws]" by allowing defendants to transform "a horizontal agreement to fix prices into something innocuous just by changing the way they keep their books").

In the *LCD* case, Judge Illston recently applied this precedent to deny Toshiba's motion for summary judgment.  *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 3:07-md-01827-SI, 2011 WL 5357906 (N.D. Cal. Nov. 7, 2011).   The Court found that although "the manufacturer of all Toshiba TFT-LCD panels had only an indirect corporate relationship to the exclusive distributor of Toshiba-branded products in the United States," those entities were unlikely to sue Toshiba

1   Corporation, the parent company that had participated in the conspiracy. *Id.* at *1. On this basis,

2   Judge Illston found that *Royal Printing* applied and denied Toshiba's motion:

3

4       Toshiba's argument rests on a misreading of *Royal Printing*. That case was not

5       concerned with the relationship between the manufacturer of a price-fixed product
        and the direct purchaser; rather, it was concerned with the relationship between the

6       **conspirator** and the direct purchaser. The Ninth Circuit could not have been
        clearer: 'We hold that *Illinois Brick* does not bar an indirect purchaser's suit where

7       the direct purchaser is a division or subsidiary of a co-conspirator.' *Royal Printing*,

8       621 F.2d at 326.

9       Indeed, *Royal Printing* explicitly disclaimed any reliance on evidence that the direct
        purchaser was owned or controlled by its customer…. Instead, the Ninth Circuit's

10      reasoning stemmed from its concern with the parent company's control over the
        litigation decisions of its subsidiary…. Due to this control, the parent company will

11      be unlikely to allow its subsidiary to file suit, thwarting a vital part of the antitrust
        enforcement scheme and the expressed purpose of *Illinois Brick*.

12

13  *Id.*

14      Here, there is no realistic possibility that the "direct purchasers" will sue, given that they

15  have corporate relationships with members of the conspiracy, and thus the Plaintiffs who

16  purchased CRT Products from those entities have standing as direct purchasers.[4]   Indeed,

17  Plaintiffs are the **only** parties capable of bringing claims under the Sherman Act for overcharges

18  imposed upon the CRTs contained in the CRT Products they purchased directly from Defendants,

19  and their subsidiaries and corporate affiliates.

20  **III.    Plaintiffs Are Not Seeking a "New Exception" to *Illinois Brick***

21      As Direct Action Plaintiffs have shown, the law is clear that conspirators cannot escape

22  liability for illegal price-fixing by merely (1) fixing the price of a component and then selling a

23  finished product containing that component; or (2) selling a price-fixed product to a subsidiary or

24  affiliate, which then sells to independent purchasers. Defendants' argument that they have

---

25  [4]  To the extent there is any doubt about the relationships between Defendants and their

26  manufacturing affiliates, summary judgment is not appropriate and the factual record must be
    developed.  *See In re Petro. Prods. Antitrust Litig.*, 497 F. Supp. 218, 227 (C.D. Cal. 1980) ("The

27  question of how much control is required to meet the exception cannot be decided until a factual
    record is developed.  The degree of ownership, profit taking, or ability to set prices will be

28  important considerations in determining whether the intermediate seller is 'controlled'").

successfully shielded themselves from liability for their illegal actions by doing <u>both</u> must be rejected.  In short, Defendants claim that two wrongs somehow make a right.

Setting aside the obvious flaws of logic and policy, what Defendants claim would be a "new exception" to *Illinois Brick* has existed for more than thirty-three years.  In *Sugar*, a plaintiff purchased a finished product (candy) containing a price-fixed component (sugar) from one conspirator directly and from a subsidiary of another conspirator.  After holding that the plaintiffs could sue for purchases of the finished product, the Court addressed whether purchases from a subsidiary of a conspirator should be treated differently from purchases made directly from a conspirator:

> We see no need to differentiate between the sales of a division of Borden and those by a subsidiary of SuCrest.  A division of a corporation is not a separate entity but is the corporation itself.  Although the subsidiary does have a separate legal existence, it is owned by the parent company, and would not ordinarily sue it.  After considering all of the facts in this case, we conclude that, at least, for this purpose and in this context, the subsidiary should be treated as the alter ego of the parent. **To adopt any other view would invite evasion by the simple expedient of inserting a subsidiary between the violator and the first noncontrolled purchaser.**

*Sugar*, 579 F.2d at 18-19.

This combination of the doctrines of *Linerboard* (regarding price-fixed components in finished products) and *Royal Printing* (regarding purchases from entities unlikely to sue conspirators) is not a new or novel exception to *Illinois Brick*.  As the Ninth Circuit stated in *Royal Printing*, the result Defendants seek – antitrust immunity for the majority of the price-fixed components they sold into U.S. commerce – is "intolerable."  Defendants' attempts to evade liability under the federal antitrust laws must be rejected.

## IV.   Defendants' Motion Is Premature and Fails to Satisfy Rule 56.

Not only is Defendants' Motion for Partial Summary Judgment wrong on the law, it is also premature given that fact discovery has only recently begun in the Direct Purchaser Plaintiffs' action. *See generally* Saveri Decl. at ¶¶ 11-40.  To the extent that Defendants dispute that (1) the corporate relationships between and among Defendants and their affiliates are sufficient under the

law; or (2) Plaintiffs purchased CRTs and CRT Products directly from Defendants and their affiliates, their arguments are more properly made at the close of fact discovery, after Direct Purchaser Plaintiffs have had the opportunity to adduce discovery on this issue. For the purpose of responding to Defendants' Motion, Direct Purchaser Plaintiffs also have served Rule 30(b)(6) deposition notices concerning the relationships between and among Defendants and Defendants' production and sales of CRTs and CRT Products. *Id.* at ¶¶ 28-40. Defendants objected and refused to appear. In fact, no depositions have yet gone forward in the Direct Purchaser Plaintiffs' action. As such, Defendants' Motion is deficient under Rule 56(d). Fed. R. Civ. P. 56(d) (addressing summary judgment motions made when facts are unavailable to the non-movant).[5]

Moreover, discovery has yet to begin at all in the DAPs' actions, given that most of these actions were only recently filed. Those DAPs that have filed suit have purchased billions of dollars in CRT Products from Defendants and their subsidiaries and affiliates and, additionally, there are likely a substantial number of DAPs that have yet to file suit. *See, supra,* Section __. Notwithstanding the fact that Defendants' Motion is not directed to the DAPs, as this Court has recognized, it could potentially affect the claims of both those DAPs that have already filed suit and those that may file suit in the coming months. As such, Defendants' motion is exceedingly premature.

## CONCLUSION

For all of the foregoing reasons, Defendants' Motion should either be denied outright or, in the alternative, deferred pursuant to Rule 56(d).

---

[5] As Judge Conti noted in denying Defendants' motions to dismiss based on an alleged failure to adequately plead against each Defendant, "Defendants[]…rely upon arguments more appropriate at the summary judgment stage of these proceedings when Defendants can put Plaintiffs to their burden of proof….it would be inappropriate to dismiss any of the Defendants from this action without the benefit of discovery." 738 F. Supp. 2d at 1022. The same is true here, where discovery concerning any dispute as to which entities purchased directly from Defendants and/or their affiliates has yet to go forward.

1    DATED:  February 24, 2012          /s/      William A. Isaacson
2                                        William A. Isaacson
                                         Jennifer Milici
3                                        BOIES, SCHILLER & FLEXNER LLP
                                         5301 Wisconsin Ave. NW, Suite 800
4                                        Washington, D.C.  20015
                                         Telephone:  (202) 237-2727
5                                        Facsimile:   (202) 237-6131
                                         Email:  wisaacson@bsfllp.com
6                                        Email:  jmilici@bsfllp.com

7                                        Stuart Singer
                                         BOIES, SCHILLER & FLEXNER LLP
8                                        401 East Las Olas Blvd., Suite 1200
                                         Fort Lauderdale, FL 33301
9                                        Telephone:  (954) 356-0011
                                         Facsimile:   (954) 356-0022
10                                       Email:  ssinger@bsfllp.com

11                                       Philip J. Iovieno
                                         Anne M. Nardacci
12                                       BOIES, SCHILLER & FLEXNER LLP
                                         10 North Pearl Street, 4th Floor
13                                       Albany, NY  12207
                                         Telephone:  (518) 434-0600
14                                       Facsimile:   (518) 434-0665
                                         Email:  piovieno@bsfllp.com
15                                       Email:  anardacci@bsfllp.com

16                                       *Liaison Counsel for Direct Action Plaintiffs and*
                                         *Attorneys for Plaintiffs Electrograph Systems, Inc.,*
17                                       *Electrograph Technologies, Corp., Office Depot, Inc.,*
                                         *Compucom Systems, Inc., Interbond Corporation of*
18                                       *America, P.C. Richard & Son Long Island Corporation,*
                                         *Marta Cooperative of America, Inc., ABC Appliance, Inc.,*
19                                       *Schultze Agency Services LLC on behalf of Tweeter Opco,*
                                         *LLC and Tweeter Newco, LLC*
20

21

22

23

24

25

26

27

28
     DAP MEMORANDUM IN SUPPORT OF DPPS'                    23                    Master File No. 3:07-md-05944-SC
     OPPOSITION TO DEFENDANTS' MOTION FOR
     PARTIAL SUMMARY JUDGMENT

/s/     Roman M. Silberfeld
Roman M. Silberfeld, (SBN 62783)
David Martinez, (SBN 193183)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2049 Century Park East, Suite 3400
Los Angeles, CA  90067-3208
Telephone:  (310) 552-0130
Facsimile:  (310) 229-5800
Email:  RMSilberfeld@rkmc.com
Email:  DMartinez@rkmc.com

*Attorneys For Plaintiffs Best Buy Co., Inc, Best Buy Purchasing LLC, Best Buy Enterprise Services, Inc., Best Buy Stores, L.P., Bestbuy.com, L.L.C., and Magnolia Hi-Fi, Inc.*


/s/     Kenneth S. Marks
H. Lee Godfrey
Kenneth S. Marks
Jonathan J. Ross
Johnny W. Carter
David M. Peterson
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
Email:  lgodfrey@sumangodfrey.com
Email:  kmarks@susmangodfrey.com
Email:  jross@susmangodfrey.com
Email:  jcarter@susmangodfrey.com
Email:  dpeterson@susmangodfrey.com


Parker C. Folse III
Rachel S. Black
Jordan Connors
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
Telephone:  (206) 516-3880
Facsimile:  (206) 516-3883
Email:  pfolse@susmangodfrey.com
Email:  rblack@susmangodfrey.com
Email:  jconnors@susmangodfrey.com

*Attorneys for Plaintiff Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

/s/      David. J. Burman
DAVID J. BURMAN
(*pro hac vice* application to be submitted)
NICHOLAS H. HESTERBERG
(*pro hac vice* application to be submitted)
PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Telephone:  (206) 359-8000
Facsimile:   (206) 359-9000
Email:  DBurman@perkinscoie.com
Email:  NHesterberg@perkinscoie.com

Euphemia N. Thomopulos, Cal. Bar No. 262107
PERKINS COIE LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA  94111-4131
Telephone:  (415) 344.7000
Facsimile:   (415) 344.7050
Email:  EThomopulos@perkinscoie.com

*Attorneys for Plaintiff Costco Wholesale Corporation*


/s/      Jason C. Murray
Jason C. Murray (CA Bar No. 169806)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone:  (213) 622-4750
Facsimile:   (213) 622-2690
Email:  jmurray@crowell.com


*Counsel for Plaintiffs Target Corp.; Sears, Roebuck and Co.;
Kmart Corp.; Old Comp Inc.; Good Guys, Inc.; RadioShack
Corp.*

DAP MEMORANDUM IN SUPPORT OF DPPS'
OPPOSITION TO DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT

25

Master File No. 3:07-md-05944-SC

1

/s/      James P. McCarthy
2     Jessica L. Meyer, (SBN: 249064)
James M. Lockhart (*pro hac vice*)
3     James P. McCarthy (*pro hac vice*)
Kelly G. Laudon (*pro hac vice*)
4     Lindquist & Vennum P.L.L.P.
4200 IDS Center
5     80 South Eighth Street
Minneapolis, MN 55402
6     Telephone:  (612) 371-3211
Facsimile:   (612) 371-3207
7     Email:  jmeyer@lindquist.com
Email:  jlockhart@lindquist.com
8     Email:  jmccarthy@lindquist.com
Email:  klaudon@lindquist.com

9

*Attorneys for Plaintiffs John R. Stoebner, As Chapter 7*
10    *Trustee for PBE Consumer Electronics, LLC and related*
*entities; And Douglas A. Kelley, as Chapter 11 Trustee for*
11    *Petters Company, Inc. and Related Entities, and as Receiver*
*for Petters Company, LLC and related entities*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28