# DECLARATION OF JOSEPH M. FISHER

# EXHIBIT H

**SOAPBOX**

OFF THE SHELF

NANCY F. KOEHN

# *The Tale of the Dueling Economists*

JOHN MAYNARD KEYNES and Friedrich Hayek. The names conjure opposing poles of thought about making economic policy: Keynes is often held up as the flag bearer of vigorous government intervention in the markets, while Hayek is regarded as the champion of laissez-faire capitalism.

What these men actually thought — about the economy and each other — is more complicated, as Nicholas Wapshott demonstrates in "Keynes Hayek: The Clash That Defined Modern Economics" (W. W. Norton, $26.95). This lively book explores one of the most pressing economic questions of our time: To what extent should government intervene in markets? And in that search, it traces the interaction of the two men most responsible for the way we approach this question: the British economist Keynes and the Austrian economist Hayek.

Both men came of intellectual age in the aftermath of World War I. They lived through the boom of the 1920s and through the Great Depression and arrived at radically different views of the wisdom of letting free-market capitalism run its course.

Keynes concluded that markets would not automatically provide full employment and that during downturns there could be long periods of large-scale unemployment. He argued that it was the government's duty to relieve the plight of the jobless by increasing aggregate demand for goods and services.

Mr. Wapshott, a Reuters contributing columnist and a former senior editor at The Times of London, skillfully reconstructs the context in which Keynes formulated his theory. During the 1920s, Britain endured persistently high unemployment. Successive policy makers, worried about rising expenditures and falling tax revenue, ignored Keynes's calls for public spending, setting off what he called a "vicious circle."

"We do nothing because we have not the money," Keynes said in 1930 to a government committee investigating the causes of the economic crisis. "But it is precisely because we do not do anything that we have not the money." With the unemployment rate now at 9.1 percent, I gulped long and hard as I read these pages.

Hayek came to a very different conclusion. After serving in World War I, he found his beloved Vienna "devastated and its people's confidence broken," Mr. Wapshott writes. During the ensuing decade, hyperinflation pummeled the Austrian economy, melting away the savings of millions of people.

KEYNES

The Clash That Defined Modern Economics

HAYEK

Nicholas Wapshott

PATRICIA WALL/THE NEW YORK TIMES

This experience, Mr. Wapshott argues, hardened Hayek "against those who advocated inflation as a cure for a broken economy." And he came to believe "that those who advocated large-scale public spending programs to cure unemployment were inviting not just uncontrollable inflation but political tyranny."

Thus, the author writes, the battle lines between Keynes and Hayek were drawn. Yet it was a duel characterized by mutual respect. Keynes, for example, shared Hayek's distrust of socialism, while Hayek conceded that in the case of chronic unemployment, planning might play a role without leading to oppression.

But it was still a duel. In 1936, Keynes published "The General Theory of Employment, Interest and Money," which took on classical economics and people like Hayek who subscribed to its tenets. Keynes's targets included several long-accepted ideas: that employment levels are determined by the price of labor, that supply creates its own demand and that savings automatically translate into investment.

Keynes didn't expect that his findings would lead to an infringement of personal liberty. Instead, the author writes, Keynes believed "that a prosperous society in which everyone is employed was the surest way of maintaining the independence of thought and action he considered the guarantor of true democracy."

Hayek did not publicly detail any criticisms of "The General Theory." But in 1944, he brought out "The Road to Serfdom," which has become a libertarian classic. Hayek aimed to expose socialism and fascism as twin evils, warning of the potential dangers of central economic planning in the aftermath of World War II.

"It is Germany whose fate we are in some danger of repeating," Hayek wrote.

Keynes was swift to respond, reminding Hayek that the rise of National Socialism was fueled not by big government but by mass unemployment and a failure of capitalism.

**Thinkers with widely different notions of government's market role.**

The last third of the book focuses on the economists' legacies. Keynesian ideas were ascendant in the postwar era, but by the mid-1970s, with the onset of low economic growth and inflation — a combination previously deemed impossible — Mr. Wapshott says it seemed that "the Age of Keynes was in its death throes."

For the next few decades, Hayek's ideas and proponents like Milton Friedman, who argued that monetary and not fiscal policy was the major tool for managing the economy, gained steady influence. In the author's view, Hayek's influence was seen in the 1994 "Contract With America," the Republican pledge to shrink big government; in the later balanced-budget legislation of President Bill Clinton; and in the operations of the Federal Reserve under Alan Greenspan.

In 2007, the subprime mortgage market began to implode, suggesting that "the decades-long experiment in allowing barely restrained markets to generate growth and prosperity had failed," Mr. Wapshott writes. A rapid return to Keynesian prescriptions occurred in the next two years, culminating in President Obama's $787 billion recovery program in early 2009.

By then, however, the old ideological struggle had re-emerged. "Not a single Republican voted for the stimulus," the book notes. "And with barely a semi-quaver rest, the old Keynes-Hayek arguments broke out again. It was as if the intervening 80 years had not taken place."

Mr. Wapshott has written an important book. It is compelling not only as a history of two distinctive thinkers and their influence, but also as a narrative of political decision-making and its underlying priorities. At times, it seems that the author is as much under Keynes's charismatic thrall as some of his disciples; it would have been even stronger with more attention to Hayek and the evolution of his thought.

But these are quibbles. Underlying Mr. Wapshott's analysis are vital questions for this moment in American history: What kind of society do we want? How much faith do we have in individual agency? And what do we owe to our fellow citizens and our collective future? As Mr. Wapshott writes, these very questions animated Keynes and Hayek during a time when the stakes were also very high. □

LEGAL NOTICE

**If You Bought A Cathode Ray Tube Product, A Class Action Settlement May Affect You.**

Cathode Ray Tube (CRT) Products include CRTs, Televisions, Computer Monitors, and other products containing CRTs.

Para una notificación en Español, llame o visite nuestro website.

You may be affected by a class action lawsuit involving CRT Products purchased indirectly from the Defendant companies. "Indirect" means that you did not buy the CRT Product directly from any Defendant. The lawsuit seeks: (a) nationwide injunctive relief to prohibit the Defendants' behavior that is the subject of the lawsuit and (b) money for indirect purchasers in 24 states.

A settlement has been reached with Chunghwa Picture Tubes Ltd. ("Chunghwa"). The litigation is continuing against the remaining Defendants. A complete list of defendants is set out in the Detailed Notice available at **www.CRTsettlement.com**.

**What is this case about?**

The lawsuit claims that numerous Defendants, including Chunghwa, conspired to fix, raise, maintain or stabilize prices of CRT Products resulting in overcharges to consumers who bought CRT Products such as Televisions and Computer Monitors. The Defendants deny that they did anything wrong. The Court has not decided who is right.

**Who is Included?**

The "Settlors" include any person or business that indirectly bought in the U.S. (excluding claims under the Washington Unfair Business Practices and Consumer Protection Act) from March 1, 1995 through November 25, 2007, any CRT Product made by the Defendants. Both consumers and resellers are included in the Settlement.

**What does the Settlement Provide?**

The Settlement provides for the payment by Chunghwa of $10,000,000 in cash, plus interest, to the Settlors. It also provides that Chunghwa will furnish information about the case, including other Defendants' involvement in the alleged conspiracy to Class Counsel. Money will not be distributed to Settlors yet. The lawyers will pursue the lawsuit against the other Defendants to see if any future settlements or judgments can be obtained in the case and then distribute the funds together to reduce expenses. It is possible that money will be distributed to organizations who are, as nearly as practicable, representative of the interests of indirect purchasers of CRT Products instead of Settlors themselves if the cost to process claims would result in small payments to Settlors.

**Who Represents You?**

The Court has appointed Mario N. Alioto of Trump, Alioto, Trump & Prescott LLP as "Interim Lead Class Counsel" to represent members of the Settlement Class ("Settlors"). The Settlement Class is defined in Paragraph 1 of the Order Granting Preliminary Approval of Class Action Settlement with Defendant Chunghwa Picture Tubes, Ltd., which is available at **www.CRTsettlement.com**. If you are a resident of Illinois or Oregon, you are a member of the Settlement Class but are represented by the Attorney General of your State with respect to your claims under those states' antitrust laws. You do not have to pay these lawyers to represent you. You may hire your own attorney if you wish, but if you do so you will be responsible for your own attorney's fees and expenses.

**What are your Options?**

If you wish to remain a Settlor you do not need to take any action at this time. If you don't want to be legally bound by the Settlement, you must exclude yourself in writing by **February 1, 2012**, or you will not be able to sue, or continue to sue, Chunghwa about the legal claims in this case. If you remain a Settlor, you may object to the Settlement by **February 1, 2012**. The Detailed Notice describes how to exclude yourself or to object. The U.S. District Court for the Northern District of California will hold a Fairness Hearing at **2:00 pm on March 15, 2012**, at JAMS, Two Embarcadero, Suite 1500, San Francisco, CA 94111. The hearing may be moved to a different date or time without additional notice, so it is a good idea to check **www.CRTsettlement.com**. At this hearing the Special Master will consider whether the Settlement is fair, reasonable and adequate. The Special Master will also consider Interim Lead Class Counsel's request for payment of $2.5 million from the Settlement Fund to be used for expenses incurred in this case. If there are objections or comments, the Special Master will consider them at that time. You may appear at the hearing, but you don't have to. After the hearing, the Special Master will decide whether to approve the Settlement. We do not know how long these decisions will take. Please do not contact JAMS or the Court about this case. Please retain any receipts or other evidence of purchase of any CRT Product. Before disposing of any CRT Product please see the Detailed Notice for recommendations on preserving proof of ownership.

For more details, call toll free 1-800-673-4790, visit **www.CRTsettlement.com**, or write to CRT Indirect Settlement, c/o The Notice Company, P.O. Box 778, Hingham, MA 02043.

**1-800-673-4790** **www.CRTsettlement.com**

**BUSINESS / FRANCHISE OPPORTUNITIES**

**Routes-for-Sale**
Ready for that CHANGE?
Get Back-to-Work NOW
• • OVER 250 AVAILABLE • •
• VITAMINWATER: NET $2,700/wk
• FEDEX: $229KTOT, NETS $2,700/wk
• COKEVEND'G: 5HRS, NET $2,500
• ITALBREAD: $79KDN, NET $1,775
BUY USING YOUR IRA OR 401K
RouteBrokers.com
1-877-476-8837

INTRODUCING TIMESLIMITED.
EXCLUSIVE OFFERS DELIVERED TO YOUR INBOX.
Sign up today at NYTimes.com/TimesLimited
TimesLimited

**LETTERS**

### The Power of Pink And the Cancer Fight

To the Editor:

Re "Welcome, Fans, to the Pinking of America" (Oct. 16), which described fund-raising efforts in the fight against breast cancer:

In medical circles, we often discuss whether spending more money on one type of cancer cannibalizes research dollars from another.

Yes, the enthusiasm of patients, survivors and the rest of society is the engine pushing researchers to make significant advances against all types of cancer. When one discovers a new breakthrough for breast cancer, it may translate into an advancement for pancreatic cancer.

But vying for scarce research funds can pit special interest groups against one another. Coordination and communication among researchers are needed. And this is where a research czar, who best understands the science and the various needs, could help.

We need to make patients aware that coordinated research across many disciplines is best. We need a better way to speed the process without hindering the intellectual enthusiasm that leads to cures.

ANTHONY F. PROVENZANO, M.D.
Bronxville, N.Y., Oct. 16

*The writer is chief of medical oncology at Lawrence Hospital Center.*

BRANDON THIBODEAUX FOR THE NEW YORK TIMES

### Spending, Taxes And the Infrastructure

To the Editor:

Re "Making the Most of Our Financial Winter" (Economic View, Oct. 16), in which Robert J. Shiller advocates increased spending on infrastructure to provide jobs — with all of it made possible by taxes:

Have we not learned from the failed stimulus that both the Bush and Obama administrations have tried? And do we really think the wealthy who will be the target of the taxes won't find ways around them? And won't the higher taxes give them less incentive to engage in the economic activity that will generate the required revenues?

Let's also not forget about the alternative minimum tax, another levy intended to force the rich to pay more taxes. This tax now afflicts many middle-class taxpayers and has required frequent fixes by Congress so it doesn't impact even more.

Why trust our government, which is responsible for such fiscal travesties as the "Big Dig" and the "bridge to nowhere," to wisely and efficiently spend the additional taxes that would be extracted by the jobs proposal? The main beneficiaries won't be the American people, but a favored few unions and politically connected corporations.

DAVID KELSON
Scarsdale, N.Y., Oct. 17

•

To the Editor:

To Robert J. Shiller's case for infrastructure spending now, I would add the following:

As an architect with 40 years of experience, I know that the best time for infrastructure work is when the economy is weak, because labor and material costs, contractor profit margins and financing costs are lowest then.

Delaying necessary maintenance and repairs can increase their costs exponentially, and excessive delays can turn manageable repair work into a costly replacement project.

Timely infrastructure spending provides a powerful damper on inflation. Unfortunately, the common response to a severe economic downturn is to defer capital projects and maintenance. That creates pent-up demand, leading to a construction boom as economic times improve. And that, in turn, drives inflation with higher construction and borrowing costs.

We have ample evidence that many crucially important projects are now long overdue. Democrats and Republicans may disagree on many issues, but providing funds now for essential infrastructure projects shouldn't be one of them.

JOSEPH C. RIZZO
Spring Lake, N.J., Oct. 19

•

To the Editor:

In arguing for President Obama's jobs proposal, Robert J. Shiller says it would be comparable to farmers using their winter downtime to work on their farms' infrastructure — repairing buildings and equipment, for example, in preparation for future crops.

While time is an asset that is completely lost if not used, those who use their time to work need food, tools, etc. The food may come from seeds to be planted in the spring (savings) and the work may not be very productive if the repairs are temporary or poorly done (typical of government projects).

So here is the important question: Shall we deplete our seed stock (savings) to produce something of questionable value, especially when the seed is crucial to our future survival? While we can "print money," we cannot as easily replace seeds that have been consumed to "look busy."

GUNTHER GEISS, Ph.D.
Southold, N.Y., Oct. 16

*The writer is a professor emeritus in the School of Business at Adelphi University.*

•

*Sunday Business welcomes letters from readers. Letters must include the writer's name, address and telephone number and may be sent to Letters, Sunday Business, The New York Times, 620 Eighth Avenue, New York, N.Y. 10018-1405, or by e-mail to sunbiz@nytimes.com. Letters selected for publication may be abridged.*

### Of Errors and Calories

To the Editor:

In "Made a Mistake? Just Treat Us to Ice Cream" (Corner Office, Oct. 16), Dan Schneider, C.E.O. of SJB Development and Consulting, says that instead of berating an employee for making a big mistake, he asks him to hold an ice cream party.

I applaud the emphasis on positivity, as opposed to the negativity of a tirade that we might expect from top executives. But couldn't he, as well as others who take his lead, opt for a healthier choice? How about: "Made a mistake? Let's have a cottage cheese party."

BARRY STRAUBER
Pittsford, N.Y., Oct. 16

LEGAL NOTICE

# If You Bought A Cathode Ray Tube Product, A Class Action Settlement May Affect You.

Cathode Ray Tube (CRT) Products include CRTs, Televisions, Computer Monitors, and other products containing CRTs.

Para una notificación en Español, llamar o visitar nuestro website.

You may be affected by a class action lawsuit involving CRT Products purchased indirectly from the Defendant companies. "Indirect" means that you did not buy the CRT Product directly from any Defendant. The lawsuit seeks: (a) nationwide injunctive relief to prohibit the Defendants' behavior that is the subject of the lawsuit and (b) money for indirect purchasers in 24 states.

A Settlement has been reached with Chunghwa Picture Tubes Ltd. ("Chunghwa"). The litigation is continuing against the remaining Defendants. A complete list of defendants is set out in the Detailed Notice available at **www.CRTsettlement.com**.

**What is this case about?**

The lawsuit claims that numerous Defendants, including Chunghwa, conspired to fix, raise, maintain or stabilize prices of CRT Products resulting in overcharges to consumers who bought CRT Products such as Televisions and Computer Monitors. The Defendants deny that they did anything wrong. The Court has not decided who is right.

**Who is Included?**

The "Settlors" include any person or business that indirectly bought in the U.S. (excluding claims under the Washington Unfair Business Practices and Consumer Protection Act) from March 1, 1995 through November 25, 2007, any CRT Product made by the Defendants. Both consumers and resellers are included in the Settlement.

**What does the Settlement Provide?**

The Settlement provides for the payment by Chunghwa of $10,000,000 in cash, plus interest, to the Settlors. It also provides that Chunghwa will furnish information about the case, including other Defendants' involvement in the alleged conspiracy, to Class Counsel. Money will not be distributed to Settlors yet. The lawyers will pursue the lawsuit against the other Defendants to see if any future settlements or judgments can be obtained in the case and then distribute the funds together to reduce expenses. It is possible that money will be distributed to organizations who are, as nearly as practicable, representative of the interests of indirect purchasers of CRT Products instead of Settlors themselves if the cost to process claims would result in small payments to Settlors.

**Who Represents You?**

The Court has appointed Mario N. Alioto of Trump, Alioto, Trump & Prescott LLP as "Interim Lead Class Counsel" to represent members of the Settlement Class ("Settlors"). The Settlement Class is defined in Paragraph 1 of the Order Granting Preliminary Approval of Class Action Settlement with Defendant Chunghwa Picture Tubes, Ltd., which is available at **www.CRTsettlement.com**. If you are a resident of Illinois or Oregon, you are a member of the Settlement Class but are represented by the Attorney General of your State with respect to your claims under those states' antitrust laws. You do not have to pay these lawyers to represent you. You may hire your own attorney. If you wish, but if you do so you will be responsible for your own attorney's fees and expenses.

**What are your Options?**

If you wish to remain a Settlor you do not need to take any action at this time. If you don't want to be legally bound by the Settlement, you must exclude yourself in writing by **February 1, 2012**, or you will not be able to sue, or continue to sue, Chunghwa about the legal claims in this case. If you remain a Settlor, you may object to the Settlement by **February 1, 2012**. The Detailed Notice describes how to exclude yourself or to object. The U.S. District Court for the Northern District of California will hold a Fairness Hearing at **2:00 pm on March 15, 2012**, at JAMS, Two Embarcadero, Suite 1500, San Francisco, CA 94111. The hearing may be moved to a different date or time without additional notice, so it is a good idea to check **www.CRTsettlement.com**. At this hearing, the Special Master will consider whether the Settlement is fair, reasonable and adequate. The Special Master will also consider Interim Lead Class Counsel's request for payment of $2.5 million from the Settlement Fund to be used for expenses incurred in this case. If there are objections or comments, the Special Master will consider them at that time. You may appear at the hearing, but you don't have to. After the hearing, the Special Master will decide whether to approve the Settlement. We do not know how long these decisions will take. Please do not contact JAMS or the Court about this case. Please retain any receipts or other evidence of purchase of any CRT Product. Before disposing of any CRT Product please see the Detailed Notice for recommendations on preserving proof of ownership.

For more details, call toll free 1-800-673-4790, visit **www.CRTsettlement.com**, or write to CRT Indirect Settlement, c/o The Notice Company, P.O. Box 778, Hingham, MA 02043.

**1-800-673-4790** **www.CRTsettlement.com**

# CERTIFICATION OF PUBLICATION

OCT 24 2011 20

I, Arice Weber, in my capacity as a Principal Clerk of the Publisher of **The New York Times** a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of **The New York Times** on the following date or dates, to wit on

OCT 23 2011 20

[signature]

Approved:

[signature: Maria Pannullo]

THIS CERTIFICATION NOT VALID WITHOUT NYT RAISED SEAL