1  Guido Saveri (22349); guido@saveri.com
   R. Alexander Saveri (173102); rick@saveri.com
2  Geoffrey C. Rushing (126910); grushing@saveri.com
   Cadio Zirpoli (179108); cadio@saveri.com
3  SAVERI & SAVERI, INC.
4  706 Sansome Street
   San Francisco, CA 94111
5  Telephone:   (415) 217-6810
   Facsimile:    (415) 217-6813
6

7  *Interim Lead Counsel for the Direct Purchaser
   Plaintiffs*

8

9

10                 **UNITED STATES DISTRICT COURT**

11              **NORTHERN DISTRICT OF CALIFORNIA**

12                    **SAN FRANCISCO DIVISION**

13

14  IN RE: CATHODE RAY TUBE (CRT)          MASTER FILE NO. 07-cv-5944 SC
    ANTITRUST LITIGATION
15  ─────────────────────────────          MDL NO. 1917

16  This Document Relates to:

17  ALL DIRECT PURCHASER CLASS             **DIRECT PURCHASER PLAINTIFFS'**
    ACTIONS                                **MEMORANDUM OF POINTS AND**
18                                         **AUTHORITIES IN OPPOSITION TO**
                                           **DEFENDANTS' MOTION FOR PARTIAL**
19                                         **SUMMARY JUDGMENT**

20                                         The Honorable Charles A. Legge
                                           Court:   JAMS
21                                         Date:    March 20, 2012
                                           Time:    10:00 a.m.
22

23

24                  **REDACTED VERSION**

25

26

27

28

837411.1

# TABLE OF CONTENTS

I. INTRODUCTION. ...................................................................................................1

II. FACTUAL BACKGROUND. ................................................................................3

    A. Engaged In A Decade-Long Conspiracy To Fix Prices Of CRTs.....................3

    B. Defendants' CRT And Finished Products Arms Are Vertically Integrated. ...................4

    C. Defendants' Finished Products Affiliates Consumed The Vast Majority Of The Price-Fixed CRTs...............................................................................................4

III. PROCEDURAL HISTORY ...................................................................................5

IV. ARGUMENT..........................................................................................................7

    A. The Rigorous Standards For Summary Judgment In This Circuit. ......................7

    B. *Illinois Brick* Does Not Bar Claims Of Plaintiffs Who Purchased Finished Products Directly From Defendants.....................................................................8

        1. *Illinois Brick* Precludes Only Indirect Purchasers From Bringing A Claim For Damages Under The Federal Antitrust Laws ........................................8

        2. Defendants' Motion Should Be Rejected Under *Sugar*, *Linerboard* And Their Progeny, Including Cases From This District ...................................10

        3. Defendants' Cases Are Distinguishable.................................................14

    C. Defendants' Motion Should Be Denied Because The Conspirators Owned Or Controlled Their Finished Products Affiliates. ....................................................16

        1. This Motion Is Governed By *Royal Printing* And *Freeman*.........................16

        2. Defendants' Criticism Of The *LCD* Decisions Is Unfounded ...........................19

        3. *Printing* Applies For Sales By The Finished Products Defendants. ...................20

    D. Plaintiffs Have Standing Under The Co-Conspirator Exception. .......................21

    E. Defendants' Motion Is Procedurally Deficient..............................................21

    F. Defendants' Motion Is Premature................................................................23

V. CONCLUSION. .....................................................................................................24

837411.1

i

**TABLE OF AUTHORITIES**

<u>Federal Cases</u>

*Anderson v. Liberty Lobby, Inc.*,

    477 U.S. 242 (1986) .................................................................................................8

*Arizona v. Shamrock Foods Co.*,

    729 F.2d 1208 (9th Cir. 1984) .............................................................................2, 21

*Beltz Travel Serv., Inc. v. Int'l Air Transport Ass'n*,

    620 F.2d 1360 (9th Cir. 1980) ...........................................................................8, 15

*British Airways Bd. v. Boeing Co.*,

    585 F.2d 946 (9th Cir. 1978) ...................................................................................8

*Chevron Corp. v. Pennzoil Co.*,

    974 F.2d 1156 (9th Cir. 1992) .................................................................................8

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,

    370 U.S. 690 (1962) .................................................................................................8

*Delaware Valley Surgical Supply, Inc. v. Johnson & Johnson*,

    523 F.3d 1116 (9th Cir. 2008) .....................................................................14, 21, 23

*Fontana Aviation, Inc. v. Cessna Aircraft Co.*,

    617 F.2d 478 (7th Cir.1980) ...................................................................................21

*Freeman v. San Diego Ass'n of Realtors*,

    322 F.3d 1133 (9th Cir. 2003), ...................................................................... passim

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,

    392 U.S. 481 (1968) .................................................................................................9

*HJB, Inc. v. AmeriSource Corp.*.,

    528 U.S. 1181 (2000) .............................................................................................21

*Illinois Brick Co. v. Illinois*,

    431 U.S. 720 (1977) ................................................................................... passim

*In re ATM Fee Antitrust Litig.*,

    No. C 04-02676 CRB, 2010 WL 3701912 (N.D. Cal. Sept. 16, 2010) ................21

837411.1

ii

Direct Purchaser Plaintiffs' MPA in Opposition to Defendants' Motion for Partial Summary Judgment
MDL No. 1917; Master File No. 07-cv-5944 SC

*In re Brand Name Prescription Drugs Antitrust Litig.*,

     123 F.3d 599 (7th Cir. 1997)..................................................................20, 21

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,

     738 F. Supp.2d 1011 (N.D. Cal. 2010) ............................................. passim

*In re Chicken Antitrust Litig.*,

     560 F. Supp. 943 (N.D. Ga. 1979) ...............................................................9

*In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*,

     691 F.2d 1335 (9th Cir. 1982)...................................................................16

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,

     497 F. Supp. 218 (C.D. Cal., 1980) ..........................................................20

*In re Flat Glass Antitrust Litig.*,

     191 F.R.D. 472 (W.D. Pa. 1999)........................................................11, 15

*In re Linerboard Antitrust Litig.*,

     305 F.3d 145 (3d Cir. 2002)...........................................................1, 12, 13

*In re Mid-Atlantic Toyota Antitrust Litig.*,

     516 F. Supp. 1287 (D. Md. 1981) ..............................................................21

*In re Midwest Milk Monopolization Litig.*,

     730 F.2d 528 (8th Cir. 1984),.....................................................................11

*In re New Mexico Natural Gas Antitrust Litig.*,

     MDL Dkt. No. 403, 1982 WL 1827 (D.N.M. Jan. 26, 1982) ............................21

*In re Nifedipine Antitrust Litig.*,

     335 F. Supp. 2d 6 (D.D.C. 2004) ...............................................................21

*In re Optical Disk Drive Antitrust Litigation,*

     No. 3:10-md-2143, 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011)...............15, 16

*In re Refrigerant Compressors Antitrust Litig.*,

     795 F. Supp. 2d 647 (E.D. Mich. 2011).................................................15, 19

*In re Sugar Industry Antitrust Litig.*,,

     579 F.2d 13 (3d Cir. 1978)....................................................... passim

837411.1

iii

Direct Purchaser Plaintiffs' MPA in Opposition to Defendants' Motion for Partial Summary Judgment
MDL No. 1917; Master File No. 07-cv-5944 SC

1  *In re TFT-LCD (Flat Panel) Antitrust Litig.*,

2      586 F. Supp. 2d 1109 (N.D. Cal. 2008) .............................................................7, 13

3  *In re TFT-LCD (Flat Panel) Antitrust Litig.*,

4      267 F.R.D. 291 (N.D. Cal. 2010) ................................................5, 7, 14, 18

5  *In re TFT-LCD (Flat Panel) Antitrust Litig.*,

6      No. M 07-1827 SI, 2009 WL 533130 (N.D. Cal. Mar. 3, 2009)...........................7

7  *In re TFT-LCD (Flat Panel) Antitrust Litig.*,

8      No. M 07-1827 SI, 2010 WL 1264230 (N.D. Cal. Mar. 28, 2010)..................7, 19

9  *In re TFT-LCD (Flat Panel) Antitrust Litig.*,

10      No. M 07-1827 SI, 2011 WL 5357906 (N.D. Cal. Nov. 7, 2011) ............7, 10, 19

11  *Jewish Hosp. Ass'n of Louisville, Ky., Inc. v. Stewart Mech. Enters., Inc.*,

12      628 F.2d 971 (6th Cir. 1980).................................................................11

13  *Kansas v. UtiliCorp United, Inc.*,

14      497 U.S. 199 (1990).............................................................11, 12, 17

15  *Loeb Indus., Inc. v. Sumitomo Corp.*,

16      306 F.3d 469, 482 (7th Cir. 2001).................................................................9

17  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,

18      210 F.3d 1099 (9th Cir. 2000)..........................................................22, 23

19  *Paper Sys., Inc. v. Nippon Paper Indus. Co., Ltd.*,

20      281 F.3d 629 (7th Cir. 2002)...............................................................9, 18

21  *Reiter v. Sonotone Corp.*,

22      486 F. Supp. 115 (D. Minn. 1980) ...............................................................21

23  *Rezner v. Bayerische Hypo-Und Vereinsbank AG*,

24      630 F.3d 866 (9th Cir. 2010)...............................................................8

25  *Royal Printing Co. v. Kimberly-Clark Corp.*,

26      621 F.2d 323 (9th Cir. 1980)................................................... passim

27  *Stanislaus Food Prods. Co. v. USS-POSCO Indus., No. CV F*,

28      09-0560 LJO SMS, 2010 WL 3521979 (E.D. Cal. Sept. 3, 2010)..................14, 15

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*,

    608 F. Supp. 2d 1166 (N.D. Cal. 2009) ............................................................20

*Technical Learning Collective, Inc. v. Daimler-Benz Aktiengesellschaft, No.*,

    N-77-1443, 1980 WL 1943 (D. Md. Aug. 28, 1980) ......................................21

<u>Federal Rules</u>

Fed. R. Civ. P. 11 ...........................................................................................5, 6

Fed. R. Civ. P. 56(a) ...........................................................................................8

Fed. R.Civ. P. 56(d) ..........................................................................2, 8, 23, 24

Direct Purchaser Plaintiffs' MPA in Opposition to Defendants' Motion for Partial Summary Judgment
MDL No. 1917; Master File No. 07-cv-5944 SC

## I.   INTRODUCTION.

Defendants move for partial summary judgment against certain Direct Purchaser Plaintiffs ("Plaintiffs") on the ground that they bought televisions or computer monitors ("Finished Products") containing price-fixed cathode ray tubes ("CRTs") from Defendants, rather than bare CRTs.  Defendants assert that such purchasers are indirect and that Plaintiffs lack standing to raise damages claims pursuant to *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ("*Illinois Brick*").[1] Defendants' motion is without merit, because Plaintiffs' purchases of Finished Products are direct under *In re Sugar Industry Antitrust Litig.*, 579 F.2d 13 (3d Cir. 1978) ("*Sugar*"), *In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002) ("*Linerboard*"), *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323 (9th Cir. 1980) ("*Royal Printing*"), and *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003), *cert. denied*, 540 U.S. 940 (2003) ("*Freeman*").

*Sugar* and *Linerboard* hold that plaintiffs who purchased goods from manufacturers (or their affiliates) who fixed the price of a component of those goods have standing as direct purchasers under the federal antitrust laws.  Judge Conti followed these principles in denying Defendants' motions to dismiss:  "Furthermore, courts have found antitrust standing where plaintiffs purchased downstream goods from manufacturers who made, and allegedly fixed the price of, a component of those goods."  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp.2d 1011, 1023 (N.D. Cal. 2010) ("*CRT*") (citing *Linerboard*, 305 F.3d at 159–60).

Defendants' argument is in conflict with the purpose of *Illinois Brick*, which was meant to increase the effectiveness of private antitrust enforcement, not shield wrongdoers from antitrust

---

[1] "Defendants' Joint Motion for Summary Judgment Against Purported Direct Purchaser Plaintiffs Who Did Not Purchase CRTs And Memorandum Of Points And Authorities In Support," p. 1 (Dec. 12, 2011) (Dkt. No. 1013) ("Def. Mem."), seeks dismissal of the claims of ten named Plaintiffs who purchased Finished Products:  Arch Electronics, Inc.; Crago, Inc. (d/b/a Dash Computers, Inc.); Electronic Design Co.; Meijer, Inc. and Meijer Distribution, Inc.; Nathan Muchnick, Inc.; Orion Home Systems, LLC; Radio & TV Equipment, Inc.; Royal Data Services, Inc.; and Studio Spectrum, Inc. *Id.* at 12. No motion is directed at the following Plaintiffs:  Hawel A. Hawel (d/b/a City Electronics.; Paula Call (d/b/a Rancho Bernardo TV): Princeton Display Technologies, Inc.; and Wettstein & Sons, Inc. (d/b/a Wettstein's).  Because the motion does not affect the claims of four named Plaintiffs who purchased CRTs, it will not dispose of this case.

1   liability.  Because ███████████ of the CRTs subject to Defendants' conspiracy were "sold" for

2   incorporation into Finished Products either internally (*i.e.*, within a defendant corporate family) or

3   to other conspirators, the rule Defendants propose would insulate them from liability for fixing

4   prices of billions of dollars of CRTs.  In other words, Defendants' interpretation of *Illinois Brick*

5   "would leave a gaping hole in the administration of the antitrust laws.  It would allow the price-

6   fixer of a basic commodity to escape the reach of a treble-damage penalty simply by incorporating

7   the tainted element into another product." *Sugar,* 579 F.2d at 17–18.

8          Moreover, the Ninth Circuit recognizes that *Illinois Brick* does not bar suit where, as here,

9   "the direct purchaser is a division or subsidiary of a co-conspirator," *Royal Printing*, 621 F.2d at

10  326, or "there is no realistic possibility that the direct purchaser will sue its supplier over the

11  antitrust violation," *Freeman*, 322 F.3d at 1145–46.  *Royal Printing* eliminates any complexities of

12  proof associated with a pass-on analysis by allowing the purchaser to recover the entire overcharge

13  resulting from the price-fixing conspiracy.  621 F.2d at 327.  A direct purchaser can recover all

14  overcharges on a price-fixed product, whether sold alone, incorporated into another product, or

15  sold through an affiliate of the conspirator.

16         Defendants' motion also fails for several other reasons.  First, *Illinois Brick* does not apply

17  where the intermediary seller from whom the plaintiff bought is itself part of the claimed price-

18  fixing conspiracy.  *See Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1211–12 (9th Cir. 1984)

19  ("*Shamrock*").  The evidence will show that the Defendants that sold Finished Products were also

20  part of the CRT conspiracy.[2]  Second, Defendants fail to carry their burden of production on

21  material disputed issues of fact for which they have not presented any evidentiary support.

22  Finally, the motion should be denied as premature.  Discovery is far from complete on matters

23  necessary to Plaintiffs' opposition, as described in detail in the accompanying "Declaration of R.

24  Alexander Saveri" ("Saveri Decl.") submitted pursuant to Fed. R.Civ. P. 56(d).

25  _____

26  [2] In addition, Defendants are not entitled to a complete dismissal of all of the claims of the ten
    Plaintiffs at issue because they can pursue claims for injunctive relief, as Judge Conti has found.
27  *CRT*, 738 F. Supp. 2d at 1024.

28

837411.1

2

Direct Purchaser Plaintiffs' MPA in Opposition to Defendants' Motion for Partial Summary Judgment
MDL No. 1917; Master File No. 07-cv-5944 SC

1    II.      **FACTUAL BACKGROUND**

2        A.      **Defendants Engaged In A Decade-Long Conspiracy To Fix Prices Of CRTs**

3        This class action arises out of a conspiracy among the major manufacturers of CRTs to fix

4    prices and restrict output of CRTs.  The conspiracy occurred between 1995 and 2007, and

5    involved at a minimum the CRT manufacturing arms of Samsung, LG Electronics, Philips,

6    Chunghwa, Toshiba, Matsushita/Panasonic, Hitachi, Orion, Irico, Thai-CRT, and their

7    subsidiaries, affiliates, and joint ventures with other manufacturers.

8        Discovery is in its early stages.  Defendants recently produced millions of pages of

9    documents, most of which require translation from foreign languages.  No depositions have been

10   taken.  Nonetheless, the evidence analyzed to date reveals that members of the cartel held

11   approximately ██████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   ████████████████████████████████████.  Chunghwa and other participants memorialized

17   cartel meetings in written reports.  Saveri Decl., ¶ 6, 55, 61, 72, 83–84, 93, 109.

18       The conspirators furthered their cartel with hundreds of bilateral meetings.  In recent

19   interrogatory responses, Defendants acknowledge that they routinely ██████████████████

20   ████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████

24   ████████████████████████████████████.  Saveri Decl., ¶ 19 & Exh. 23.[3]  Similarly,

25   _____

26   [3]

27   ████████████████████████████████████████████████████████████

28   (footnote continued)

837411.1

3

Direct Purchaser Plaintiffs' MPA in Opposition to Defendants' Motion for Partial Summary Judgment
MDL No. 1917; Master File No. 07-cv-5944 SC

1 ████████████████████████████████████████

2 █████████████████████████████████████████████

3 ███████████████. *Id.*, ¶ 24 & Exh. 26, at pp. 25, 49.

4     The conspirators knew their conduct was unlawful.  For example, the agenda topics for a

5 █████████████████████████████████████ Saveri

6 Decl., ¶ 7 (emphasis added), Exh. 16 at CHU00660727.  On February 10, 2009, C.Y. Lin,

7 Chunghwa's former Chairman and CEO, was indicted.  *Id.*, ¶ 8.  In announcing the indictment, the

8 Department of Justice ("DOJ") stated, "This conspiracy harmed countless Americans who

9 purchased computers and televisions using cathode ray tubes sold at fixed prices."  *Id.*, ¶ 8.  Five

10 other individuals employed by various Defendants (Alex Yeh, Simon Lee, Alex Yang, Jae-Sik

11 Kim, and Tony Cheng) were indicted as well.  *Id.*, ¶ 9 & Exhs. 19–21.  On March 18, 2011,

12 Samsung SDI pled guilty to participating in a conspiracy "to suppress and eliminate competition

13 by fixing prices, reducing output and allocating market shares" of color display tubes and was

14 fined $32 million.  *Id.*, ¶ 10.  Its guilty plea noted that the DOJ was not seeking restitution and that

15 victims of the conspiracy could seek compensation through this litigation, "which [would]

16 potentially provide for a recovery of a multiple of actual damages . . . ."  *Id.*, ¶ 10 & Exh. 22, at p.

17 4.

18     **B.**    **Defendants' CRT And Finished Products Arms Are Vertically Integrated**

19     The record is undisputed that CRT manufacturers also manufactured Finished Products

20 during the class period.  *See Id.*, ¶ 44–46, 56, 62.  While several Defendants eventually moved

21 their CRT businesses to joint ventures or affiliates, the evidence shows that they maintained the

22 conspiracy and acted as a single unit.  *Id.*, ¶ 44–46, 56, 62, 68, 75, 81, 88, 90–91.  The record,

23 though incomplete, also shows that many Defendants were organized into vertically-integrated

24 corporate families with common ownership.  *Id.*; *see also id.* ¶¶ 43, 59–63, 96–108, 112–14.

25     **C.**    **Defendants' Finished Products Affiliates Consumed The Vast Majority Of The Price-Fixed CRTs**

26

27 ████████████████████████████████████████ *Id.*, ¶ 20 & Exh. 23.

28

837411.1

4

Direct Purchaser Plaintiffs' MPA in Opposition to Defendants' Motion for Partial Summary Judgment
MDL No. 1917; Master File No. 07-cv-5944 SC

CRTs have no independent utility and are not generally available.  Instead, they are incorporated into Finished Products as discrete components.[4]  *See* Saveri Decl., ¶ 49. CRTs were the largest single cost component of the televisions and monitors Defendants sold, generally comprising approximately ▮▮▮▮ of the cost of the Finished Products.  *See* Saveri Decl., ¶ 48. CRTs underwent no substantial transformation when Defendants incorporated them into their Finished Products.  To the contrary, they remained largely unchanged.  *See id.*, ¶ 49.  Critically, the evidence will show that ▮▮▮▮ of CRTs the conspirators manufactured were sold to their subsidiaries, affiliates or other co-conspirators.  *Id.*, ¶ 46.  If Defendants prevail on this motion, they will have succeeded in evading antitrust liability on sales of billions of dollars of CRTs they either transferred internally or sold to their co-conspirators for incorporation into televisions or monitors that Plaintiffs purchased directly.

## III.   PROCEDURAL HISTORY.

On March 16, 2009, Direct Purchaser Plaintiffs filed a Consolidated Amended Complaint ("Complaint") alleging that Defendants engaged in a unitary conspiracy to fix prices of CRTs and Finished Products.  (Dkt. No. 436.)  On February 5, 2010, the Special Master recommended that the District Court deny Defendants' motions to dismiss.  "Report, Recommendations and Tentative Rulings Regarding Defendants' Motions to Dismiss" (Dkt. No. 597) ("Report").  On March 30, 2010, the District Court denied Defendants' motions to dismiss, specifically rejecting the standing argument Defendants reiterate here.  *In re CRT*, 738 F. Supp. 2d at 1023.

On March 21, 2011, certain Defendants moved pursuant to Fed. R. Civ. P. 11 to strike Plaintiffs' allegations concerning a conspiracy to fix prices of Finished Products.  At oral

---

[4] As Judge Illston explained in certifying a class of purchasers of finished products containing TFT-LCD panels, which have similar properties to CRTs:  "TFT-LCD panels have no independent utility, but have value only as components of other products.  When a TFT-LCD panel is incorporated into a finished product, the panel is not modified, and remains a discrete, physical object within the finished product."  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 296 (N.D. Cal. 2010) ("*LCDs II*"), *review denied*, Nos. 10-8088 & 10-8089 (9th Cir. June 14, 2010).

837411.1

5

Direct Purchaser Plaintiffs' MPA in Opposition to Defendants' Motion for Partial Summary Judgment
MDL No. 1917; Master File No. 07-cv-5944 SC

1  argument, Defendants conceded that the *LCD* litigation provided the appropriate template for

2  litigating these antitrust claims.  In *LCD*, the plaintiffs alleged that many of the same defendants

3  being sued here conspired to fix prices of component parts (LCD screens), and that the conspiracy

4  had an impact on the prices of finished products containing those parts (televisions, monitors and

5  notebook computers).  The plaintiffs, purchasers of components and finished products, sued the

6  component manufacturers and their finished product selling affiliates, and as described in detail

7  below, Judge Illston consistently held that their claims were not barred by *Illinois Brick*.

8  At the Rule 11 hearing in this matter, defense counsel's argument rested on the fact that

9  Plaintiffs had alleged a broader conspiracy than in *LCD*:

10  In *LCD* they argued impact, okay, and they argued that under the *Sugar*
   *Linerboard* cases they have standing to sue for that.  Okay.

11

12  ***If they were doing that here, I wouldn't have this motion.  Okay.  So they***
    ***should be doing, asserting what they asserted in LCD.***  That's why I am

13  stunned that they are talking about LCD so much, because that's exactly what
    they are not doing here.

14

15  Transcript of Hearing of May 26, 2011 at 110–11 (emphasis added).  On June 15, 2011, the

16  Special Master recommended that the District Court grant the motion.  Dkt. No. 947.  Prior to a

17  hearing on Plaintiffs' objection to the Special Master's recommendation, the parties stipulated that

18  "the allegations of the Direct CAC purporting to allege a conspiracy encompassing Finished

19  Products are stricken from the Direct CAC, provided, however, that the issue of the possible

20  impact or effect of the alleged fixing of prices of CRTs on the prices of Finished Products shall

21  remain in the case."  "Stipulation And Order Concerning Pending Motion Re: Finished Products,"

22  p. 2 (Aug. 26, 2011) (Dkt. No. 996) ("Stipulation").  The District Court entered the Stipulation on

23  August 26, 2011.

24  Defendants' assertion that the Stipulation precludes claims by direct purchasers of Finished

25  Products is erroneous, as the Stipulation expressly preserves claims based on the "impact or effect

26  of the alleged fixing of prices of the CRTs on the prices of Finished Products . . . ."  Stipulation, p.

27  3.  Plaintiffs no longer contend that there was a conspiracy involving Finished Products.  Plaintiffs

28  do, however, continue to contend, as they have from the outset of this case, that there was a CRTs

837411.1

6

Direct Purchaser Plaintiffs' MPA in Opposition to Defendants' Motion for Partial Summary Judgment
MDL No. 1917; Master File No. 07-cv-5944 SC

1   conspiracy that impacted the prices of Finished Products sold by Defendants.  The operative

2   allegations of this case now adhere to the template established in *LCD*.  It is noteworthy that Judge

3   Illston rejected the same arguments that Defendants raise here in no less than five separate

4   decisions, that were premised on either *Sugar/Linerboard* or *Royal Printing/Freeman*:

- *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1118–19 (N.D. Cal. 2008) ("*LCDs I*") (denying motions to dismiss claims of finished products purchasers on antitrust standing grounds);

- *LCDs II*, 267 F.R.D. at 306–07 (certifying class of finished products purchasers over objections concerning antitrust standing);

- *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2011 WL 5357906 at *2 (N.D. Cal. Nov. 7, 2011) ("*LCDs III*") (denying motion for partial summary judgment, and finding that purchasers of finished products from Toshiba America had antitrust standing);

- *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2009 WL 533130 at *2 (N.D. Cal. Mar. 3, 2009) ("*LCDs IV*") (denying Tatung Co. of America's ("Tatung") motion to dismiss claims of finished products purchasers on antitrust standing grounds); and

- *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2010 WL 1264230 at *1–2 (N.D. Cal. Mar. 28, 2010) ("*LCDs V*") (denying Tatung's motion for reconsideration of decision finding finished products purchasers has antitrust standing).

20   Defendants have long contended that Plaintiffs should modify their Finished Products

21   allegations to conform to *LCDs*.  Now that Plaintiffs have done so, Defendants assert that the

22   opinions in *LCDs* allowing finished products claims to proceed should be ignored and summary

23   judgment should be granted.  Defendants cannot have it both ways; a grant of summary judgment

24   here would be inconsistent with the precedents in this Circuit and would be reversible error.

25   **IV.   ARGUMENT.**

26       **A.   The Rigorous Standards For Summary Judgment In This Circuit.**

27       A motion for summary judgment may not be granted unless the moving party shows both:

28   (1) that there is no genuine issue as to any material fact; and (2) that it is entitled to judgment in its

837411.1                                      7

Direct Purchaser Plaintiffs' MPA in Opposition to Defendants' Motion for Partial Summary Judgment
MDL No. 1917; Master File No. 07-cv-5944 SC

1  favor as a matter of law.  *See* Fed. R. Civ. P. 56(a); *British Airways Bd. v. Boeing Co.*, 585 F.2d

2  946, 950–51 (9th Cir. 1978). "The evidence of the non-movant is to be believed, and all justifiable

3  inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

4  (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

5  inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for

6  summary judgment." *Id.*  "Where material factual disputes exist, the court must allow a jury to

7  resolve them." *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 871 (9th Cir.

8  2010) (citing *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992)). "In antitrust

9  cases, these general standards are applied even more stringently and summary judgments granted

10  more sparingly." *Beltz Travel Serv., Inc. v. Int'l Air Transport Ass'n*, 620 F.2d 1360, 1364 (9th

11  Cir. 1980) ("*Beltz*").  Allegations of conspiratorial conduct, especially in a price-fixing antitrust

12  context, should be viewed as a whole. *See Continental Ore Co. v. Union Carbide & Carbon*

13  *Corp.*, 370 U.S. 690, 699 (1962).  Finally, "[i]f a nonmovant shows by affidavit or declaration

14  that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

15  (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to

16  take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

**B.** **  *Illinois Brick* Does Not Bar Claims Of Plaintiffs Who Purchased Finished Products Directly From Defendants**

**1.** **  *Illinois Brick* Precludes Only Indirect Purchasers From Bringing A Claim For Damages Under The Federal Antitrust Laws**

In *Illinois Brick*, the Supreme Court held that indirect purchasers—persons who did not purchase from a member of the conspiracy—do not generally have standing to pursue damages claims under the federal antitrust laws.  431 U.S. at 735–36.  The Court expressed the concern that allowing indirect purchasers to recover illegal overcharges passed-on to them by direct purchasers would "create a serious risk of multiple liability for defendants" and introduce substantial "evidentiary complexities and uncertainties" in federal antitrust litigation. *Id.* at 730, 732.

The purpose of *Illinois Brick* was to enable and encourage private enforcement of the federal antitrust laws, not to allow conspirators to insulate themselves from liability. *See In re*

1   *Chicken Antitrust Litig.*, 560 F. Supp. 943, 950 n.23 (N.D. Ga. 1979) ("Certainly, the direct-

2   purchaser rule was not intended to provide antitrust defendants with a shield from antitrust

3   liability.") (citing *Illinois Brick*, 431 U.S. at 736 n.16).  The Supreme Court explained:  "[T]he

4   antitrust laws will be more effectively enforced by concentrating the full recovery for the

5   overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by

6   the overcharge to sue only for the amount it could show was absorbed by it." *Illinois Brick*, 431

7   U.S. at 735.  The Court in *Illinois Brick* did so by locating the right to assert claims for damages

8   under the Sherman Act in the persons or entities most likely to bring those claims, direct

9   purchasers.  *See Paper Sys., Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629, 632 (7th Cir.

10  2002) ("*Paper Sys.*") ("concentrate damages in the hands of the initial purchasers, and thus

11  improve deterrence."); *Illinois Brick*, 431 U.S. 720; *Hanover Shoe, Inc. v. United Shoe Mach.*

12  *Corp.,* 392 U.S. 481 (1968) ("*Hanover Shoe*").

13      The sale to the first purchaser outside the conspiracy constitutes a direct purchase within

14  the meaning of the antitrust laws.  *Paper Sys.*, 281 F.3d at 632.  *Illinois Brick* limits federal

15  antitrust claims down the distribution chain, not because a particular defendant did not damage the

16  indirect purchaser, but rather because there was an intervening sale to a non-participant in the

17  conspiracy.  As the Seventh Circuit has explained, "The reason the plaintiffs' suit in *Illinois Brick*

18  failed was not because the defendants did *not* sell to them.  Rather, it was because the defendants

19  *did* sell to a third party who (after *Hanover Shoe*) could recover for any injury they claimed."

20  *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 482 (7th Cir. 2001), *cert. denied*, 539 U.S. 903

21  (2003) (emphasis in original).

22      Defendants invoke *Illinois Brick* as a basis for insulating themselves from damages claims

23  simply because they employed subsidiaries and affiliates to sell Finished Products containing their

24  price-fixed CRTs.  But *Illinois Brick* was never intended to allow the use of artificial corporate

25  formalities to permit such a result.  "To adopt any other view would invite evasion by the simple

26  expedient of inserting a subsidiary between the violator and the first noncontrolled purchaser."

27

28

837411.1

9

1   *Sugar*, 579 F.2d at 19.  As the Third Circuit explained, to deny recovery under such circumstances

2   "would leave a gaping hole in the administration of the antitrust laws." *Id.* at 18.[5]

3          The issue here is not academic.  Defendants sold the vast majority of the CRTs they

4   manufactured to their affiliates and those of their co-conspirators.  The price-fixed CRTs were the

5   primary components of the monitors and televisions the affiliates sold to Plaintiffs and other

6   members of the proposed class.  These companies have not sued, and will not sue, their affiliates

7   for antitrust violations.  Thus, Defendants' motion—far from being merely a case management

8   tool—is an improper attempt to eliminate their liability for billions of dollars of commerce.  To

9   avoid the exact result that Defendants seek, the federal courts have long recognized exceptions to

10  *Illinois Brick*.  As explained in *Sugar*, *Linerboard*, *Royal Printing* and *Freeman*, *Illinois Brick*

11  does not apply where the plaintiff purchased price-fixed products or products containing price-

12  fixed components from a division, subsidiary, or affiliate of a conspirator.

13                    **2.     Defendants' Motion Should Be Rejected Under *Sugar*, *Linerboard* And**
                                **Their Progeny, Including Cases From This District**
14

15         In *Sugar*, Stotter & Co. ("Stotter"), a wholesaler of candy, filed an antitrust class action

16  complaint against 12 sugar refiners that allegedly conspired to fix sugar prices.  Two of them

17  (Borden and SuCrest) also used sugar to make candy—transforming and altering the sugar in that

18  process.  Stotter did not buy sugar from any defendant.  Instead, it bought candy from Borden and

19  a subsidiary of SuCrest.  579 F.2d at 15.  In considering whether Stotter had standing under the

20  federal antitrust laws, the Third Circuit asked:  "Does the decision [in *Illinois Brick*] also bar a suit

21  by a plaintiff who purchases directly from the alleged offender but buys a product which

22  incorporates the price-fixed product as one of its ingredients?  Stated another way, does the

---

23  [5] *See Freeman*, 322 F.3d at 1146 ("Were we to grant immunity from section 1 merely because
24  defendants nominally sell services through another entity rather than to consumers directly, we
    would risk opening a major loophole for resale price maintenance and retailer collusion."); *LCDs*
25  *III*, 2011 WL 5357906, at *2 (N.D. Cal. Nov. 7, 2011) (noting that eliminating antitrust liability to
    purchasers of a finished product from a subsidiary of a company that conspired to fix component
26  prices "would create a serious hole in the coverage of the antitrust laws, giving would-be price
    fixers a road map for successful avoidance of the Sherman Act.  Courts have understandably
27  sought to avoid such result.").

28

proscription against recovery for indirect purchases extend to the product as well as the buyer?" *Id.* at 16.  The Third Circuit answered these questions in the negative, persuasively explaining its reasoning:

> As the defendants here point out, the product which plaintiff purchased competes not with sugar, but with other candy, and more than one ingredient determines the price.  To this extent, there will be some additional complications underlying the damage claims.  ***However, this must not be allowed to obscure the fact that the plaintiff did purchase directly from the alleged violator.  True, the price-fixed commodity had been combined with other ingredients to form a different product. But just as the sugar sweetened the candy, the price-fixing enhanced the profits of the candy manufacturers.***
>
> *       *       *
>
> ***We are also influenced by the realization that to deny recovery in this instance would leave a gaping hole in the administration of the antitrust laws.  It would allow the price-fixer of a basic commodity to escape the reach of a treble-damage penalty simply by incorporating the tainted element into another product.***  Thus, a refiner who illegally set the price of sugar could shield itself by putting all of the sugar into a new product, a syrup, simply by adding water and perhaps a little flavoring.  We do not think the antitrust laws should be so easily evaded. . . .
>
> *Illinois Brick* did not purport to provide any such escape.

579 F.2d at 17–18 (footnotes omitted; emphases added).  In the decade after it was decided, *Sugar* was cited with approbation in other courts, including other circuits.[6]

Defendants incorrectly contend that the Supreme Court overruled *Sugar sub silentio* in *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990) ("*UtiliCorp*").  Def. Mem., pp. 11–12.

---

[6] *See In re Midwest Milk Monopolization Litig.*, 730 F.2d 528, 530 n.2 (8th Cir. 1984), *cert. denied*, 469 U.S. 924 (1984) ("[W]e agree with the court in *In re Sugar* [] when it stated that a change in the makeup of a product by incorporating an additional element cannot be used 'to escape the reach of a treble-damage penalty'"); *Jewish Hosp. Ass'n of Louisville, Ky., Inc. v. Stewart Mech. Enters., Inc.*, 628 F.2d 971, 974–75 (6th Cir. 1980), *cert. denied*, 450 U.S. 966 (1981) ("Even if the defendants submitted rigged bids to all the general contractors and were indifferent which one was awarded the contract, this fact does nothing to convert the two-step transaction into the equivalent of a single sale. Compare *In re Sugar Industry Antitrust Litigation* [] in which the court found no *Illinois Brick* problem where manufacturers allegedly fixed the price of sugar which their subsidiaries incorporated into candy purchased by the plaintiffs."); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 480-81 (W.D. Pa. 1999) ("*Flat Glass*").

837411.1

11

Direct Purchaser Plaintiffs' MPA in Opposition to Defendants' Motion for Partial Summary Judgment
MDL No. 1917; Master File No. 07-cv-5944 SC

1   *UtiliCorp* only rejected the idea of "'carv[ing] out exceptions to the [direct purchaser] rule for

2   particular types of markets.'" 497 U.S. at 216 (quoting *Illinois Brick*, 431 U.S. at 744).  It did not

3   overrule, explicitly or implicitly, the holding in *Sugar* that the purchase of a product containing a

4   price-fixed component from a conspirator or its subsidiary or affiliate is direct.  Nothing in

5   *UtiliCorp* suggests that price-fixers may use *Illinois Brick* to avoid liability by interposing another

6   affiliated entity in the chain of manufacturing and sale of the price-fixed product.[7]

7        Defendants' argument is belied by the Third Circuit itself which, in 2002—twelve years

8   after *UtiliCorp*—reaffirmed its opinion in *Sugar* in the *Linerboard* case.  In *Linerboard*, the Third

9   Circuit held that plaintiffs who purchased a product containing a price-fixed component, rather

10  than the component itself, had standing under the antitrust laws as direct purchasers:

11       [T]he putative class plaintiffs purchased corrugated sheets or boxes directly from
         Appellants, and, like the candy in *In re Sugar*, which contained allegedly price-
12       fixed sugar, the corrugated sheets and boxes contain linerboard that was subject to
         an agreement on output, which is equivalent to a price-fixing agreement.
13       Accordingly, the putative class members are direct purchasers and are entitled to
         recover the full amount of any overcharge.
14

15  305 F.3d at 159–60.  *Sugar* and *Linerboard* remain good law and are routinely cited with approval

16  by Courts in this District including Judge Conti in this very case.

17       In denying Defendants' motion to dismiss Plaintiffs' complaint, Judge Conti recognized

18  that *Linerboard* is on point.  As in this motion for summary judgment, Defendants argued that

19  Plaintiffs who purchased Finished Products lacked standing.  Judge Conti held otherwise:

20       Here, the Direct Purchaser Plaintiffs allege they purchased CRTs or CRT
         Products from Defendants or their subsidiaries at inflated prices due to
21       Defendants' unlawful conduct. Direct Compl. ¶¶ 11–23. This is the type of
         injury the antitrust laws were intended to address. ***Furthermore, courts have***
22       ***found antitrust standing where plaintiffs purchased downstream goods from***

23  _____

24  [7] In *UtiliCorp*, two states brought a *parens patriae* action for price-fixing against a pipeline
    company and five natural gas production companies on behalf of consumers. *See* 497 U.S. at
25  204–05. The Supreme Court held that *Illinois Brick* prohibited the states' damages action because
    the consumers they represented were indirect purchasers who had bought natural gas from public
26  utilities, independent third-parties that held the direct purchaser claims. *See id.* at 207. The
    Supreme Court concluded that *parens patriae* litigation, rather than an action by natural gas
27  purchasers, would create unnecessary complications that *Illinois Brick* was designed to avoid.

28

1   *manufactures who made, and allegedly fixed the price of, a component of those*
2   *goods.  See, e.g., In re Linerboard Antitrust Litig.*, 305 F.3d 145, 159–60 (3d Cir.
    2002) (in alleged conspiracy to fix prices of linerboard, plaintiffs who purchased
3   corrugated sheets or boxes containing linerboard from defendants had standing).

4   *CRT*, 738 F. Supp. 2d at 1023.

5       Judge Conti's conclusion is in no way undermined by the intervening Stipulation.
6   Defendants are incorrect in asserting that the Court denied their motion to dismiss based solely on
7   Plaintiffs' Finished Product conspiracy allegations.  Def. Mem., pp. 2–3.  Rather, Judge Conti
8   expressly agreed with Plaintiffs' assertion that they could recover for direct purchases of Finished
9   Products under the *Sugar/Linerboard* cases.  The issue presented by this motion is identical to that
10  Judge Conti previously decided, and the Special Master is bound by Judge Conti's decision.
11      Judge Conti's well-reasoned analysis is consistent with Judge Illston's decisions in the
12  *LCD* litigation, which addressed the successor conspiracy to CRTs and involved many of the same
13  conspirators and their corporate affiliates.  Specifically, in denying a motion to dismiss claims of
14  purchasers of finished products containing TFT-LCD panels, Judge Illston ruled:

15      Here, the complaint alleges that the direct purchaser plaintiffs purchased TFT-
        LCD products directly from cartel members at supra-competitive prices as the
16      result of a conspiracy to fix prices. . . . ***Defendants do not cite any case holding
        that a plaintiff who purchases directly from an alleged cartel does not have
17      standing.  In contrast, courts have found antitrust standing where plaintiffs
        purchased downstream goods from a cartel of manufacturers who made, and
18      fixed the price of, a component of those goods.  See, e.g., In re Linerboard
        Antitrust Litig.*, 305 F.3d 145, 159–60 (3d Cir. 2002).**
19
20  *LCDs I*, 586 F. Supp. 2d at 1118 (emphasis added).

21      Judge Illston subsequently amplified this analysis, relying directly on *Linerboard* and
22  *Sugar* in certifying a class of direct purchasers of products containing TFT-LCD panels:

23      *Illinois Brick*'s prohibition against suits by indirect purchasers extends only to the
        indirect purchaser plaintiff, not to the price-fixed product itself if incorporated
24      into another product.  *See [Linerboard*, 305 F.3d at 159–60]; *see also In re Sugar
        Indus. Antitrust Litig.*, 579 F.2d 13, 18 (3d Cir.1978).  If the case were otherwise,
25      producers would be free to fix the price of component prices, provided those
        components were later incorporated into another finished product:  under this
26      scenario, any purchaser of a finished product containing a price-fixed component
27      would automatically become an indirect purchaser and, thus, barred from suit.

28

1   *LCDs II*, 267 F.R.D. at 306–07.

2   **3.     Defendants' Cases Are Distinguishable.**

3   Defendants' repeated reliance on *Delaware Valley Surgical Supply, Inc. v. Johnson &*

4   *Johnson*, 523 F.3d 1116 (9th Cir. 2008) ("*Delaware Valley*") (Def. Mem., pp. 2, 5, 9, 11, 12), is

5   unavailing.  That case contains no discussion of *Sugar*, *Linerboard* or whether the purchase from a

6   defendant of a finished product containing a price-fixed component is direct or indirect.  The case

7   is also distinguishable.  There, Bamberg challenged Johnson & Johnson's ("J & J") use of

8   "bundled discounts" in selling endomechanical products as an unlawful monopolistic practice;

9   Bamberg did not buy the products directly from J & J, but rather purchased solely from an

10  independent third-party distributor that was neither owned or controlled by J & J nor alleged to be

11  a co-conspirator.  523 F.3d at 1118–19.  The Ninth Circuit unsurprisingly concluded that

12  "Bamberg lacks standing because [it] . . . is *not* a direct purchaser from J & J." *Id*. at 1122.  That

13  is simply not this case.  Defendants' assertion, moreover, that *Delaware Valley* creates a "bright

14  line rule" that purchasers of a product incorporating a "price-fixed" component are, by definition,

15  indirect purchasers, even if they purchased directly from a defendant is simply false.  *See* Def.

16  Mem, pp. 5, 8–9.  Nowhere does *Delaware Valley* address that issue or state such a rule.

17  Defendants also rely on *Stanislaus Food Prods. Co. v. USS-POSCO Indus*., No. CV F 09-

18  0560 LJO SMS, 2010 WL 3521979 (E.D. Cal. Sept. 3, 2010) ("*POSCO*"), (Def. Mem., p. 7),

19  where the district court held that purchasers of tin cans lacked standing to sue for an alleged

20  conspiracy involving the prices of tin mill products (steel sheets coated with tin), which undergo

21  multiple production processes before they are included in tin cans.  Again, that opinion contains

22  no discussion of *Sugar* or *Linerboard*.  That case is distinguishable as well.  There, the plaintiff

23  bought tin cans from an independent wholesaler, but not the defendants themselves.  2010 WL

24  3521979, at *6.  That is not this case; here, the ten Plaintiffs at issue all bought Finished Products

25  containing price-fixed CRTs from named Defendants who are alleged to have participated in the

26  conspiracy and were affiliates of the co-conspirators.  The district court also took the view that

27  there was no case authority for the proposition that the plaintiff could be a direct purchaser where

28  the product has been substantially transformed.  *See id*. at *6.  Of course, that was the case in

837411.1

14

1   *Sugar* where sugar was processed in candy.  It was also the case in *Flat Glass*, where the products

2   in question included flat glass and automotive replacement glass, a fabricated product in which flat

3   glass is an input.  191 F.R.D. at 480–81 (holding that *Illinois Brick* "does not preclude a suit by a

4   plaintiff who purchases directly from the alleged offender . . . but buys a product which

5   incorporates the price-fixed product as one of its ingredients").  Moreover, as with the LCD panels

6   in *LCD*, CRTs are not "altered" when they are placed inside televisions or computer monitors.

7   *See* Saveri Decl., ¶ 49.  *POSCO* is inapplicable.

8          Defendants rely on *In re Refrigerant Compressors Antitrust Litig.*, 795 F. Supp. 2d 647

9   (E.D. Mich. 2011) ("*Compressors*"), (Def. Mem., p. 7), but that case is contrary to the law of this

10   Circuit.  There, the district court held that only plaintiffs who purchased a price-fixed component

11   directly from a defendant had federal antitrust standing; plaintiffs who purchased directly from a

12   defendant a finished product containing a price-fixed component did not have standing, even if the

13   component was manufactured by an affiliate or co-conspirator of the defendant.  *Id.* at 652, 658–

14   59.  The district court rejected *Sugar* and *Linerboard*, concluding that those cases were limited to

15   "situations where a plaintiff purchases a product containing a price-fixed component directly from

16   an alleged violator who makes both the component and the product containing the component."

17   *Id.* at 659.  The district court did not attempt to reconcile its holding with contrary rulings

18   including *CRT* and *LCDs I–V*.

19          *Compressors* is predicated on the flawed assumption that a price-fixing conspirator is only

20   liable for the sales of its own product.  To the contrary, under the Sherman Act, price-fixers are

21   jointly and severally liable for all acts of all conspirators in furtherance of the conspiracy.  *See*

22   *Beltz*, 620 F.2d at 1367 ("If [appellant] can establish the existence of a conspiracy in violation of

23   the antitrust laws and that appellees were part of such a conspiracy, appellees will be liable for the

24   acts of all members of the conspiracy in furtherance of the conspiracy, regardless of the nature of

25   appellees' own actions.").[8]  Moreover, while *Compressors* assumes that *Illinois Brick* bars suit

26   _____

27   [8] Defendants' reliance on *In re Optical Disk Drive Antitrust Litigation*, No. 3:10-md-2143, 2011
     WL 3894376 (N.D. Cal. Aug. 3, 2011) ("*In re ODDs*"), is also misplaced.  There, the court held

28   (footnote continued)

837411.1

15

Direct Purchaser Plaintiffs' MPA in Opposition to Defendants' Motion for Partial Summary Judgment
MDL No. 1917; Master File No. 07-cv-5944 SC

1   where the initial purchaser is a participant in the conspiracy, as described below, the Ninth Circuit

2   has repeatedly held that plaintiffs may sue conspirators who sell their price-fixed products through

3   their subsidiaries and affiliates, notwithstanding *Illinois Brick*. *See Royal Printing*, 621 F.2d at

4   326; *Freeman*, 322 F.3d at 1145–46.[9]

5           **C.**     **Defendants' Motion Should Be Denied Because The Conspirators Owned Or Controlled Their Finished Products Affiliates.**

6

7           **1.**     **This Motion Is Governed By *Royal Printing* And *Freeman*.**

8          More than three decades ago, the Ninth Circuit held that *Illinois Brick* does not apply

9   where the plaintiff purchased products from a corporate affiliate of a price-fixing conspirator. In

10  *Royal Printing*, the plaintiffs alleged that a group of paper manufacturers conspired to fix the price

11  of paper products sold through their wholesaling divisions and subsidiaries. The Ninth Circuit

12  held that "*Illinois Brick* does not bar an indirect purchaser's suit where the direct purchaser is a

13  division or subsidiary of a co-conspirator." 621 F.2d at 326. The Court explained that *Illinois*

14  *Brick*'s prudential rationale of preventing recoveries from both direct and indirect purchasers

15  because such recoveries are difficult to apportion and potentially duplicative does not apply where

16  the direct purchaser is an affiliate of a corporation accused of an antitrust violation. *Id.* In these

17  situations, the corporate affiliate (the direct purchaser) cannot be expected to sue the antitrust

18  conspirator. *Id.* (explaining that a subsidiary's or division's "litigation decisions will usually be

---

20  that plaintiffs that had purchased finished products from *non-defendants* were indirect purchasers.
    The court explicitly stated that "plaintiffs in this case do not have a standing problem with respect
21  to any ODD devices they may have purchased directly from defendants . . . ." *Id.* at *7. Moreover,
    the court specifically distinguished *In re ODDs* from Judge Conti's decision here: "Once again,
22  the problem here is that plaintiffs are attempting to extend the price-fixing conspiracy to finished
23  products *not* produced by the defendants, an issue not expressly addressed in *Cathode Ray*." *Id.*

    [9] Defendants' assertion that *Illinois Brick* precludes Plaintiffs from seeking "umbrella" damages is
24  off-point. Def. Mem. at 6. *See In re Coordinated Pretrial Proceedings in Petroleum Prod.*
25  *Antitrust Litig.*, 691 F.2d 1335, 1338–39 (9th Cir. 1982) (rejecting as inconsistent with *Illinois*
    *Brick* claims that "defendants' successful price-fixing conspiracy created a 'price umbrella' under
26  which non-conspiring competitors of the defendants raised their . . . prices to an artificial level at
    or near the fixed price"). Plaintiffs do not seek umbrella damages. Rather, they seek to recover
27  overcharges set by the conspirator Defendants on the CRTs incorporated in the Finished Products
    they purchased from those Defendants and their affiliates.
28

837411.1           16
Direct Purchaser Plaintiffs' MPA in Opposition to Defendants' Motion for Partial Summary Judgment
MDL No. 1917; Master File No. 07-cv-5944 SC

1   subject to parental control.  The co-conspirator parent will forbid its subsidiary or division to bring

2   a lawsuit that would only reveal the parent's own participation in the conspiracy.").  To prohibit

3   suit would "effectively immunize the transactions here from private antitrust liability, thus

4   thwarting a vital part of the antitrust enforcement scheme and the express purpose of *Illinois*

5   *Brick*."  *Id.*  As a result, persons and entities that purchased price-fixed products from an affiliate

6   of a conspirator have standing to sue for damages.  *Id.* at 326–27.

7       Defendants are incorrect in arguing that Plaintiffs lack standing because adjudicating their

8   claims would involve the type of evidentiary complexities and uncertainties that the *Illinois Brick*

9   rule was designed to avoid.  *See* Def. Mem. at 9–10.  To the contrary, the Ninth Circuit in *Royal*

10  *Printing* expressly resolved this "dilemma" by ruling that, as a matter of law, a court should

11  presume 100 percent pass-through of the price-fixed amount and allow the purchaser to recover

12  the entire overcharge without regard to the amounts supposedly passed-on or absorbed by

13  intermediaries.  *See Royal Printing*, 621 F.3d at 327.  The Ninth Circuit explained:

14      The only alternatives are to allow Royal Printing to sue the appellees for the entire
15      amount of the overcharge to the wholesalers, or not to allow Royal Printing to sue
        the appellees at all.

16      Because, as we have already shown, as a practical matter the direct purchasers
17      here will never sue, barring Royal Printing's suit would close off every avenue for
        private enforcement of the antitrust laws in such cases.  This would be intolerable.

18
19  *Id.*  The Ninth Circuit concluded that allowing purchasers from the affiliate of a conspirator to

20  recover the entire overcharge served the purposes of the Sherman Act better than construing

21  *Illinois Brick* to enable price-fixers to escape antitrust liability.  Thus, Plaintiffs may recover the

22  entire overcharge on the CRTs incorporated in the Finished Products they purchased.

23      The Ninth Circuit reaffirmed the rule of *Royal Printing* in *Freeman*.[10]  There, the plaintiffs

24  paid a fee set by an entity known as "Sandicor" for access to a real estate multiple-listing-service

25  in the San Diego area.  322 F.3d at 1140–41.  The complaint alleged that the fee was inflated by

26

27  [10] There can be no argument that *UtiliCorp* overruled *Royal Printing*, which the Ninth Circuit
    reaffirmed in *Freeman* thirteen years after the Supreme Court decided *UtiliCorp.*

28

837411.1

17

Direct Purchaser Plaintiffs' MPA in Opposition to Defendants' Motion for Partial Summary Judgment
MDL No. 1917; Master File No. 07-cv-5944 SC

1  collusively set "support fees" that Sandicor paid to the real estate associations that owned and

2  controlled it. *Id.* at 1142.  Relying on *Royal Printing*, the Ninth Circuit ruled that the plaintiffs

3  could sue the associations that set the support fee because there was "no realistic possibility that

4  the direct purchaser will sue its supplier over the antitrust violation." *Id.* at 1145–46.

5        Defendants assert that *Illinois Brick* precludes suit where one issue to be determined is the

6  extent to which a price-fixed component affects the price of a finished product. *See* Def. Mem. at

7  10.  That argument is erroneous. *Illinois Brick* only precludes recovery by an indirect purchaser.

8  It allows full recovery by a direct purchaser, regardless of whether the price-fixed product is sold

9  by itself or as a component of another product.  As the Third Circuit explained in *Sugar*:

> Plaintiff is a direct purchaser and, therefore, entitled to recover the full extent of
> the overcharge.  As one of its basic premises, *Illinois Brick* held that "the
> overcharged direct purchaser, and not others in the chain of manufacture or
> distribution is the party 'injured in his business or property' within the meaning of
> the section". 431 U.S. at 729. . . . ***The difficulty in computation here is not in
> parceling out damages among entities in the chain, but in isolating the
> excessive cost of one ingredient which goes into the product purchased by the
> plaintiff. Conceivably, in some cases that may be a problem not easily solved,
> but here we think it not serious enough to invoke the obstacle of Illinois Brick.***

16  579 F.2d at 18 (citation and footnotes omitted, emphasis added).  *See also LCDs II*, 267 F.R.D. at

17  306 ("*Illinois Brick's* prohibition against suits by indirect purchasers extends only to the indirect

18  purchaser plaintiff, not to the price-fixed product itself if incorporated into another product.").  As

19  a result, *Illinois Brick* does not bar Plaintiffs who purchased Finished Products from bringing

20  suit.[11]

---

22  [11] Defendants' argument is not bolstered by the decision in *Compressors*, which, as noted above, is
23  inconsistent with *Royal Printing*.  The Ninth Circuit held that "[n]either of the rationales (multiple
    liability and complexity) underlying *Illinois Brick* bars Royal Printing's suit against the
24  manufacturers of the products it purchased from Great Northern Nekoosa's subsidiary and from
    Crown Zellerbach's division.  *Whichever of the appellees those manufacturers might be, Royal
25  Printing can also sue all the other appellees on a theory of joint and several liability.*" *Royal
    Printing*, 621 F.2d at 327 (emphasis added).  In other words, Plaintiffs can sue all co-conspirators
26  on a theory of joint and several liability to recover the overcharges on their Finished Products
    purchases.  See *Paper Sys.*, 281 F.3d at 632, 634 ("Nothing in *Illinois Brick* displaces the rule of
27  joint and several liability, under which each member of a conspiracy is liable for all damages
    caused by the conspiracy's entire output. . . .  Every participant in the conspiracy remains liable
28  (footnote continued)

### 2.   Defendants' Criticism Of The *LCD* Decisions Is Unfounded

After having demanded that Plaintiffs employ the *LCD* model to prosecute this litigation, Defendants now criticize the decisions in that case as incorrect and contrary to the fundamental policies of *Illinois Brick*. Defendants cannot have it both ways. Their attack on *LCD* lacks merit. Judge Illston has consistently adhered to the Ninth Circuit's ruling in *Royal Printing* and *Freeman*.

Recently, in *LCDs III*, 2011 WL 5357906 at *2, Judge Illston denied Toshiba's motion for partial summary judgment under *Illinois Brick*, finding that *Royal Printing* applied to the plaintiffs' purchases of finished products containing allegedly price-fixed LCD screens from that company's indirect subsidiary Toshiba America, where the parent company participated in the conspiracy. The plaintiffs had standing because the finished products seller would not sue its conspirator parent: "[T]he Ninth Circuit's reasoning [in *Royal Printing*] stemmed from its concern with the parent company's control over the litigation decisions of its subsidiary. . . . Due to this control, the parent company will be unlikely to allow its subsidiary to file suit, thwarting a vital part of the antitrust enforcement scheme and the expressed purpose of *Illinois Brick*." *Id.* at *1. Previously, the *LCD* court recognized that the rule of *Royal Printing* and *Freeman* applies with equal force to corporate affiliates. *See LCDs V*, 2010 WL 1264230, at *1 (holding that *Royal Printing* is satisfied where the component manufacturer (alleged conspirator) and the finished products seller are "part of a vertically-integrated *corporate group*," even if they are "not a vertically-integrated *single entity*") (emphasis in original).

These decisions flatly dispose of Defendants' argument here. As in *LCD*, Defendants sold Finished Products containing components manufactured by members of the cartel including their corporate parents and affiliates. There is no realistic possibility that those Defendants will sue the other members of the conspiracy, because doing so would expose their parents and affiliates to massive antitrust liability. Only Plaintiffs have the ability to enforce the antitrust laws under these

_____

for damages on every sale to every direct purchaser from any of the manufacturers."). Contrary to the teaching of *Compressors*, in this Circuit, which co-conspirator manufactured the CRTs incorporated in the Finished Products sold to Plaintiffs purchased is irrelevant.

837411.1

19

Direct Purchaser Plaintiffs' MPA in Opposition to Defendants' Motion for Partial Summary Judgment
MDL No. 1917; Master File No. 07-cv-5944 SC

1    circumstances.  Accordingly, they have standing to bring suit.

2              3.      *Royal Printing* **Applies For Sales By The Finished Products Defendants.**

3          The ownership or control exception under *Royal Printing* and *Freeman* applies here.  That

4    exception to the *Illinois Brick* "has been construed to encompass relationships involving such

5    functional economic or other unity between the direct purchaser and either the defendant or the

6    indirect purchaser, that there effectively has been only one sale." *Sun Microsystems Inc. v. Hynix*

7    *Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1180 (N.D. Cal. 2009).  "Some examples of the types

8    of facts that would satisfy the control exception have furthermore been defined as: 'interlocking

9    directorates, minority stock ownership, loan agreements that subject the wholesalers to the

10   manufacturers' operating control, trust agreements, or other modes of control separate from

11   ownership of a majority of the wholesalers' common stock.'" *Id.* (quoting *In re Brand Name*

12   *Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 606 (7th Cir. 1997)).

13         Here, Plaintiffs have adduced sufficient evidence for each Defendant family—LGE,

14   Panasonic, Philips, Toshiba, Hitachi, Samsung, Chunghwa/Tatung—to invoke *Royal Printing*. *See*

15   Saveri Decl. ¶¶ 50–115.  The evidence includes the following:  (1) certain Defendants

16   manufactured and sold both CRTs and Finished Products during the class period; (2) Finished

17   Products seller Defendants were owned in whole or in part by CRT manufacturer Defendants who

18   participated in the conspiracy, or otherwise were members of the same corporate families; (3)

19   directors, officers and other high-level corporate executives served in overlapping capacities for

20   both the CRT manufacturer Defendants and their Finished Products affiliates; and (4) the CRT

21   manufacturer Defendants have not been sued by the Finished Products affiliates, and there is no

22   evidence in the record to suggest they will be. *See id.* ¶¶ 52–115.  The evidence adduced to date is

23   sufficient to deny Defendants' motion outright.  However, further discovery, including deposition

24   testimony in response to Plaintiffs' Rule 30(b)(6) notices, will reveal additional facts to

25   demonstrate the applicability of *Royal Printing* and *Freeman*. *See In re Coordinated Pretrial*

26   *Proceedings in Petroleum Prods. Antitrust Litig.*, 497 F. Supp. 218, 227 (C.D. Cal., 1980) ("The

27   question of how much control is required to meet the exception cannot be decided until a factual

28   record is developed.  The degree of ownership, profit taking, or ability to set prices will be

837411.1                                          20

1    important considerations in determining whether the intermediate seller is 'controlled.'").

2         **D.    Plaintiffs Have Standing Under The Co-Conspirator Exception.**

3         Plaintiffs allege that the Defendants from whom they purchased Finished Products were

4    participants in the conspiracy to fix CRT prices. *See, e.g.*, Saveri Decl., ¶¶ 55, 61, 72, 83–84, 93,

5    109, 116–19.  The Ninth Circuit in *Shamrock* held that *Illinois Brick* does not bar an antitrust

6    claim against a manufacturer where the intermediary from whom the plaintiff bought conspired

7    with the manufacturer.[12] 729 F.2d at 1212–13.  Defendants respond that this doctrine applies only

8    when the plaintiff has bought the price-fixed product, not some other product into which the price-

9    fixed product is integrated.  Def. Mem., p. 10.  But, as noted above, the focus of the indirect

10   purchaser rule is on the purchaser, not the product.[13]  Whether the evidence will show that

11   Defendants from whom Plaintiffs purchased their Finished Products did participate in the

12   conspiracy is an ultimate issue in this case.  It cannot be determined now before all documents

13   have been produced, translated and reviewed, and before any depositions have been taken. *See*

14   Saveri Decl., ¶¶ 11–40.

15        **E.    Defendants' Motion Is Procedurally Deficient.**

16        While Defendants have styled their motion as presenting a pure question of law, their

17   arguments are predicated on numerous disputed factual assertions as to which they present no

18

19   [12] *See also In re Brand Name Prescription Drug Antitrust Litig,* 186 F.3d 781, 790 (7th Cir. 1999),
20   *cert. denied sub nom. HJB, Inc. v. AmeriSource Corp..,* 528 U.S. 1181 (2000);  *Fontana Aviation,
     Inc. v. Cessna Aircraft Co.,* 617 F.2d 478, 480–82 (7th Cir.1980) ("*Fontana*"); *In re Nifedipine
21   Antitrust Litig.,* 335 F. Supp. 2d 6, 14–15 (D.D.C. 2004); *In re Mid-Atlantic Toyota Antitrust
     Litig.,* 516 F. Supp. 1287, 1294–95 (D. Md. 1981); *Reiter v. Sonotone Corp.,* 486 F. Supp. 115,
22   119–21 (D. Minn. 1980); *In re New Mexico Natural Gas Antitrust Litig.,* MDL Dkt. No. 403, 1982
     WL 1827, at *10 (D.N.M. Jan. 26, 1982); *Technical Learning Collective, Inc. v. Daimler-Benz
23   Aktiengesellschaft,* No. N-77-1443, 1980 WL 1943, at *9 (D. Md. Aug. 28, 1980).

24   [13] Defendants rely on *In re ATM Fee Antitrust Litig.*, No. C 04-02676 CRB, 2010 WL 3701912, at
25   *5 (N.D. Cal. Sept. 16, 2010) for a different conclusion.  Def. Mem., p. 10.  But the court there
     merely noted that in *Shamrock*, the Ninth Circuit was dealing with claims of a conspiracy among
26   milk producers and distributors to fix retail prices.  *Shamrock* has been read more broadly to hold
     "that an indirect purchaser may bring suit where he establishes a price-fixing conspiracy between
27   the manufacturer and the middleman."  *Delaware Valley,* 523 F.3d at 1123 n.1.

28

1    evidentiary support.  This deficiency also requires the denial of their motion.  The moving party

2    on a motion for summary judgment must carry an initial "burden of production" before the

3    opposing party is even required to respond on the merits.  *Nissan Fire & Marine Ins. Co. v. Fritz*

4    *Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000) ("*Nissan Fire*").  If the moving party will bear the

5    burden of proof at trial as to a claim or defense, on summary judgment it must present admissible

6    evidence affirmatively showing there is no triable issue of fact as to that claim or defense to carry

7    its "burden of production."  *Id.*   If the moving party will not bear the burden of proof, it may

8    satisfy its initial burden of production in one of two ways:  (1) by negating an essential element of

9    the claim; or (2) a showing that the opposing party does not have enough evidence of an essential

10   element of the claim.  *Id.*  Defendants fail to satisfy any of these standards.

11        The sole evidentiary basis for this motion is a set of interrogatory responses by the ten

12   Plaintiffs at issue and a letter from counsel by which Defendants purport to establish that those

13   Plaintiffs only purchased Finished Products.[14]  Def. Mem., pp. 3–4.  Yet Defendants' motion

14   contains many other unsupported, material factual assertions.  For example, Defendants assert that

15   the market for Finished Products is different from the market for CRTs in material and complex

16   ways.  *See e.g., id.*, pp. 1 (Finished Products sold "in a different downstream market, with a

17   different array of competitors"); 10 (Finished Product prices determined by "thousands of other

18   component part costs, to variable labor and manufacturing facility costs, to numerous fixed

19   manufacturing costs"); 12 (Finished Products subject to "vigorous competition").  They assert that

20   Plaintiffs did not purchase Finished Products from a "controlled intermediary" of Defendants such

21   that Plaintiffs satisfy the requirements of *Royal Printing. Id.*, p. 9.  They assert that the CRTs in

22   the Finished Products Plaintiffs purchased were substantially altered.  *See, e.g., id.*, p. 9

23   ("Plaintiffs only purchased an altered, downstream finished product").  They assert that entities

24   such as Hewlett-Packard, Dell, Sharp, Vizio, Apple, Sanyo and Sony purchased CRTs directly

25   _____

26   [14] "Declaration of Molly M. Donovan In Support of Defendants' Joint Motion for Summary
     Judgment Against Purported Direct Purchaser Plaintiffs Who Did Not Purchase CRTs", Exhs. A-I
27   (Dec. 12, 2011) (Dkt. No. 1013-1).

28

1   from one of the Defendants. *Id.*, pp. 1 ("Television and monitor manufacturers are in fact the true

2   direct purchasers of CRTs . . . ."), 8.  They assert that the determination of how any overcharge on

3   CRTs affected the price of Finished Products sold by Defendants is enormously complex. *Id.*, pp.

4   9–10.

5          Each of these assertions is material to Defendants' argument, each is disputed by Plaintiffs,

6   and the discovery record is replete with relevant evidence primarily from Defendants' own

7   records.  Saveri Decl. ¶¶ 41–119.  Yet Defendants make no attempt to support these assertions

8   with *any* evidence.[15]  Nor have they purported to show that Plaintiffs lack essential evidence.  *See*

9   *Nissan Fire*, 210 F.3d at 1105 ("[a] moving party may not require the nonmoving party to produce

10  evidence supporting its claim or defense simply by saying that the nonmoving party has no such

11  evidence.").  Because Defendants fail to carry their burden of production, their motion must be

12  denied.

13         **F.      Defendants' Motion Is Premature.**

14         Defendants' motion should also be denied as premature pursuant to Federal Rule of Civil

15  Procedure 56(d).  Not a single deposition has been taken in this case.  The parties and the Court

16  have proceeded on the reasonable assumption that depositions should not occur until Defendants'

17  document production was substantially complete.  At the January 19, 2012 case management

18  conference, Defendants argued that no depositions should be taken until the Court had entered a

19  protocol concerning the time, place and manner for taking depositions.  The Special Master

20  directed the parties to meet and confer on these procedures, effectively precluding depositions

21  until the completion of that process.  *See* Saveri Decl., ¶¶ 28–33.[16]

22  _____

23  [15] Defendants cite to the Indirect Purchaser Plaintiffs' complaint in support of their assertion that
    "the finished product markets at issue—in which televisions and monitors were sold—were
24  subject to 'vigorous competition' and involved numerous companies not alleged to be part of any
    conspiracy."  The Indirect Purchaser Plaintiffs' allegations do not constitute "admissible evidence"
25  against the Direct Purchaser Plaintiffs.

26  [16] Moreover, deposition discovery was stayed until March 1, 2011. *Id.* ¶ 28.  Witnesses have also
    been unavailable because of the pendency of the (now ongoing) criminal trial in the *LCD*
27  litigation. *Id.*

28

1    Recognizing that the motion for summary judgment may turn on specific facts in evidence,

2    Plaintiffs served several Rule 30(b)(6) deposition notices concerning the relationships between

3    Defendants and their production and sales of CRTs and Finished Products. *See id.*, ¶¶ 30–31.

4    Defendants objected and refused to appear for deposition, depriving Plaintiffs of critical facts

5    necessary to respond to this motion. *See id.*, ¶¶ 33–40.  If the Special Master chooses not to deny

6    Defendants' motions as a matter of law, then discovery will be needed as to factual issues

7    associated with the legal arguments presented above.

8        Plaintiffs expect that the evidence—when fully developed—will show that ████████

9    ████████████████████████████████████████████████████ of the

10   value of televisions and monitors made from them; that a CRT has no other meaningful use; that

11   CRTs are unchanged by their incorporation into a television or monitor.  Saveri Decl., ¶ 46, 49.

12   Plaintiffs will offer evidence that the CRT conspiracy made no sense unless the Defendants could

13   "recoup" the illegal overcharge on CRTs in the form of higher prices on their Finished Product

14   sales. *Id.* ¶ 45.  As noted above, Plaintiffs also will offer evidence establishing they purchased

15   from members of the conspiracy or a "controlled entity."  This evidence will contradict the

16   (unsupported) facts Defendants take for granted and requires that Defendants' motion be denied.

17   **V.    CONCLUSION.**

18       For all of the foregoing reasons, Defendants' motion should either be denied outright or, in

19   the alternative, deferred until after the close of discovery pursuant to Rule 56(d).

20   Dated: February 24, 2012          Respectfully Submitted,

21

22                   By    /s/ Guido Saveri    
                      Guido Saveri

23                         R. Alexander Saveri
                      Geoffrey C. Rushing

24                         Cadio Zirpoli
                      SAVERI & SAVERI, INC.

25                         706 Sansome Street
                      San Francisco CA  94111

26                         Telephone:  (415) 217-6810
                      Facsimile:  (415) 217-6813

27                         *Interim Lead Counsel for Direct Purchaser*
                      *Plaintiffs*

28

837411.1

24

Direct Purchaser Plaintiffs' MPA in Opposition to Defendants' Motion for Partial Summary Judgment
MDL No. 1917; Master File No. 07-cv-5944 SC

Bruce L. Simon
Aaron M. Sheanin
PEARSON, SIMON, WARSHAW &
PENNY LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone:  (415) 433-9000
Facsimile:  (415) 433-9008

H. Laddie Montague, Jr.
Ruthanne Gordon
Charles P. Goodwin
Candice Enders
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (800) 424-6690
Facsimile: (215) 875-4604

Michael P. Lehmann
HAUSFELD LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone:  (415) 633-1908
Facsimile:  (415) 358-4980

Gary Specks
KAPLAN FOX
423 Sumac Road
Highland Park, IL 60035
Telephone: (847) 831-1585
Facsimile: (847) 831-1580