PATRICIA A. CONNERS (Trish.Conners@myfloridalegal.com)
R. SCOTT PALMER (Scott.Palmer@myfloridalegal.com)
LIZABETH A. BRADY (Liz.Brady@myfloridalegal.com)
NICHOLAS J. WEILHAMMER (Nicholas.Weilhammer@myfloridalegal.com)
SATU A. CORREA (Satu.Correa@myfloridalegal.com)
Office of the Attorney General
State of Florida
PL-01, The Capitol
Tallahassee, FL 32399-1050
Tel:      (850) 414-3300
Fax:     (850) 488-9134

Attorneys for Plaintiff State of Florida

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | MASTER FILE NO. 07-cv-5944 SC<br>MDL NO. 1917 |
| This Document Relates To:<br><br>Case No.  2011-CV-6205 SC<br><br>STATE OF FLORIDA,<br>OFFICE OF THE ATTORNEY GENERAL,<br>DEPARTMENT OF LEGAL AFFAIRS,<br><br>Plaintiff,<br>v.<br><br>LG ELECTRONICS, INC., LG ELECTRONICS U.S.A., INC., KONINKLIJKE PHILIPS ELECTRONICS N.V. A/K/A ROYAL PHILIPS ELECTRONICS N.V., PHILIPS ELECTRONICS NORTH AMERICA CORPORATION, PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD., PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA., SAMSUNG SDI CO., LTD. F/K/A SAMSUNG DISPLAY DEVICE CO., LTD., SAMSUNG SDI AMERICA, INC., SAMSUNG SDI MEXICO | **AMENDED COMPLAINT FOR DAMAGES, CIVIL PENALTIES, INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Judge: Samuel Conti |

1   S.A. DE C.V., SAMSUNG SDI BRASIL
2   LTDA., SHENZHEN SAMSUNG SDI CO.,
    LTD., TIANJIN SAMSUNG SDI CO., LTD.,
3   SAMSUNG SDI (MALAYSIA) SDN. BHD.,
    TOSHIBA CORPORATION, TOSHIBA
4   AMERICA ELECTRONIC COMPONENTS,
    INC., MT PICTURE DISPLAY CO., LTD.,
5   PANASONIC CORPORATION F/K/A
    MATSUSHITA ELECTRIC INDUSTRIAL
6   CO., LTD., PANASONIC CORPORATION
    OF NORTH AMERICA, BEIJING-
7   MATSUSHITA COLOR CRT COMPANY,
    LTD., HITACHI, LTD., HITACHI
8   DISPLAYS, LTD., HITACHI ELECTRONIC
    DEVICES (USA), INC., HITACHI ASIA,
9   LTD., IRICO GROUP CORPORATION,
10  IRICO DISPLAY DEVICES CO., LTD.,
    IRICO GROUP ELECTRONICS CO., LTD.,
11  THAI CRT COMPANY, LTD. AND
12  SAMTEL COLOR, LTD.

13                Defendants.

14

15      Plaintiff, the State of Florida, through the Attorney General and the Department of Legal

16  Affairs, files this Complaint against Defendants LG Electronics, Inc., LG Electronics U.S.A.,

17  Inc., Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V., Philips

18  Electronics North America Corporation, Philips Electronics Industries (Taiwan), Ltd., Philips Da

19  Amazonia Industria Electronica Ltda., Samsung SDI Co., Ltd. f/k/a Samsung Display Device

20  Co., Ltd., Samsung SDI America, Inc., Samsung SDI Mexico S.A. de C.V., Samsung SDI Brasil

21  Ltda., Shenzhen Samsung SDI Co., Ltd., Tianjin Samsung SDI Co., Ltd., Samsung SDI

22  (Malaysia) Sdn. Bhd., Toshiba Corporation, Toshiba America Electronic Components, Inc., MT

23  Picture Display Co., Ltd., Panasonic Corporation f/k/a Matsushita Electric Industrial Co., Ltd.,

24  Panasonic Corporation of North America, Beijing-Matsushita Color CRT Company, Ltd.,

25  Hitachi, Ltd., Hitachi Displays, Ltd., Hitachi Electronic Devices (USA), Inc., Hitachi Asia, Ltd.,

26

27

28

AMENDED COMPLAINT – STATE OF FLORIDA
Master File No. 07-cv-5944 SC;
Case No. 2011-cv-6205 SC

                                        - 2 -

IRICO Group Corporation, IRICO Display Devices Co., Ltd., IRICO Group Electronics Co., Ltd., Thai CRT Company, Ltd. and Samtel Color, Ltd., (collectively "Defendants"), and alleges:

## I.  NATURE OF THE ACTION

1.   The State of Florida brings this action against the Defendants under the Sherman Act, the Clayton Act, the Florida Antitrust Act, and the Florida Deceptive and Unfair Trade Practices Act on behalf of itself and its governmental entities, on behalf of businesses within Florida, and on behalf of natural persons in Florida. The State of Florida demands trial by jury of all issues stated herein.

2.   Defendants conspired to suppress and eliminate competition by fixing the prices of Cathode Ray Tubes (CRTs) and by agreeing to limit the production of CRTs.

3.   Defendants' conspiracy affected billions of dollars of commerce and damaged virtually every government entity, business, and consumer in Florida.

4.   The Attorney General of Florida has reviewed this matter and determined that an enforcement action serves the public interest.

## II.  JURISDICTION AND VENUE

5.   Count One alleges violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. It is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26 (injunctive relief). This Court has original jurisdiction over the federal antitrust claim pursuant to Title 28, United States Code Sections 1331 (federal question) and 1337 (original jurisdiction of proceeding under an Act of Congress regulating commerce or protecting trade and commerce against restraints).

6.   Counts Two and Three arise under the Florida Antitrust Act, Section 542.15, *et seq.,* Florida Statutes, and the Florida Deceptive and Unfair Trade Practices Act, Section 501.201, *et seq.,*

Florida Statutes, respectively. This Court has subject matter jurisdiction over the state claims pursuant to Title 28, United States Code Section 1367 (supplemental jurisdiction) because these claims are so related to the federal claim that they form part of the same case or controversy that would ordinarily be tried in one judicial proceeding. The exercise of supplemental jurisdiction avoids unnecessary duplication and multiplicity of actions and is in the interests of judicial economy, convenience, and fairness.

7.   Venue is proper in the United States District Court, Northern District of California, under Title 15, United States Code Section 22 (commerce and trade venue) and Title 28, United States Code Section 1391 (general venue). Each Defendant is an alien corporation or resides, transacts business, committed an illegal or tortious act, or is found in this district, and a substantial part of the events giving rise to the claims arose in this district.

### III.  DEFINITIONS

8.   As used herein,

    a.   "CRT" or "CRTs" means "cathode ray tube(s)." A CRT is a display technology used in televisions, computer monitors and other specialized applications. The CRT is a vacuum tube that is coated on its inside face with light sensitive phosphors. An electron gun at the back of the vacuum tube emits electron beams. When the electron beams strike the phosphors, the phosphors produce red, green, or blue light. A system of magnetic fields inside the CRT, as well as varying voltages, directs the beams to produce the desired colors. This process is rapidly repeated several times per second to produce the desired images.

    b.   There are two types of CRTs: color display tubes, which are used in computer monitors and other specialized applications, and color picture tubes, which are used in

televisions. Color display tubes and color picture tubes are collectively referred to herein as "cathode ray tubes" or "CRTs."

c.   "CRT Products" means products containing CRTs, such as televisions and computer monitors.

d.   "OEM" means any Original Equipment Manufacturer of CRT Products.

e.   "Person" means any individual, partnership, corporation, association, or other business or legal entity.

f.   "Relevant Period" means the period beginning at least March 1, 1995, through at least November 25, 2007.

## IV.  PARTIES

### A.  Plaintiff

9.   The State of Florida is authorized to file Count I under 15 U.S.C. § 26.

10. The Attorney General of Florida is the chief legal officer of Florida, is the enforcement authority of Chapter 542, Florida Statutes, and is authorized to file Count II seeking the full range of relief afforded by Chapter 542, Florida Statutes.

11. The Department of Legal Affairs of Florida is the enforcing authority for violations of Chapter 501, Florida Statutes, and has authority to file Count III to enjoin any person who has violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), and for actual damages on behalf of one or more individual consumers, businesses, and governmental entities in Florida, including direct and indirect purchases.

### B.  Defendants

12. Defendant LG Electronics, Inc. ("LGE") is a corporation organized under the laws of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong,

Yeoungdeungpo-gu, Seoul 150-721, South Korea. The company's name was changed from GoldStar Communications to LG Electronics, Inc. in 1995, the year in which it also acquired Zenith in the United States. In 2001, LGE transferred its CRT business to a 50/50 CRT joint venture with Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V. forming LG.Philips Displays. During the Relevant Period, LGE manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

13. Defendant LG Electronics U.S.A., Inc. ("LGEUSA) is a Delaware corporation with its principal place of business located at 1000 Sylvan Avenue, Englewood Cliffs, NJ 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGE. During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant LGE dominated and controlled the finances, policies, and affairs of LGEUSA.

14. Defendants LGE and LGEUSA are collectively referred to herein as "LG."

15. Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V. ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, Breitner Center, 1070 MX Amsterdam, The Netherlands. Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001, when it transferred its CRT business to a 50/50 CRT joint venture with Defendant LG Electronics, Inc., forming LG.Philips Displays. In December 2005, as a result of decreasing demand and prices for CRTs and CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the joint venture. During the Class

Period, Royal Philips manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

16. Defendant Philips Electronics North America Corporation ("PENAC") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, NY 10020-1104. PENAC is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Class Period, PENAC manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies, and affairs of PENAC.

17. Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips Taiwan.

18. Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its

subsidiaries or affiliates, to customers throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips Brazil.

19. Defendants Royal Philips, PENAC, Philips Taiwan, and Philips Brazil are collectively referred to herein as "Philips."

20. Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Co., Ltd. ("Samsung SDI"), is a South Korean company with its principal place of business located at 15th – 18th Floor, Samsung Life Insurance Building, 150, 2-ga, Taepyong-ro, Jung-gu, Seoul, 100-716, South Korea. Samsung SDI is a public company. In 2002, Samsung SDI held a 34.3% worldwide market share for CRTs; more than another other producer. During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

21. Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California. Samsung SDI America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI America.

22. Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.21014, Parque Industrial El Florido, Tijuana, B.C. Mexico. Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRTs to customers, either directly or

indirectly through its subsidiaries or affiliates, throughout the United States. Defendant Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Mexico.

23. Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil. Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRTs to customers, either directly or indirectly through its subsidiaries or affiliates, throughout the United States. Defendant Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Brazil.

24. Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Shenzhen.

25. Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Tianjin.

26. Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian company with its principal place of business located at Lot 635 & 660, Kawasan Perindustrian, Tuanku, Jaafar, 71450 Sungai Gadut, Negeri Semblian Darul Khusus, Malaysia. Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Malaysia.

27. Defendants Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Samsung SDI Malaysia are referred to collectively herein as "Samsung."

28. Defendant Toshiba Corporation is a Japanese corporation with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, Toshiba Corporation held a 5-10 % worldwide market share for CRTs used in televisions and computer monitors. In 2002, Toshiba Corporation entered into a joint venture with Defendant Panasonic Corporation called MT Picture Display Co. ("MTPD"), Ltd. in which the entities consolidated their CRT businesses. During the Relevant Period, Toshiba Corporation manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

29. Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 9775 Toledo Way, Irvine, California 92618, and 19000 MacArthur Boulevard, Suite 400, Irvine, California 92612. TAEC is a wholly-owned and controlled subsidiary of Toshiba America, Inc., which is a holding company for

Defendant Toshiba Corporation. TAEC is the North American sales and marketing representative for Defendant MTPD. Before MTPD's formation in 2003, TAEC was the North American engineering, manufacturing, marketing and sales arm of Defendant Toshiba Corporation. During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of TAEC.

30. Defendants Toshiba Corporation and TAEC are referred to collectively herein as "Toshiba."

31. Defendant MT Picture Display Co., Ltd. ("MTPD") was established as a CRT joint venture between Defendants Panasonic Corporation and Toshiba Corporation. MTPD is a Japanese entity with its principal place of business located at 1-1, Saiwai-cho, Takatsuki-shi, Osaka 569-1193, Japan. On April 3, 2007, Defendant Panasonic Corporation purchased the remaining stake in MTPD, making it a wholly-owned subsidiary, and renaming it MT Picture Display Co., Ltd. During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

32. Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co., Ltd. and became Panasonic Corporation on October 1, 2008, is a Japanese entity with its principal place of business located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. In 2002, Panasonic Corporation entered into a CRT joint venture with Defendant Toshiba Corporation forming Defendant MTPD. Panasonic Corporation was the majority owner of MTPD with a 64.5 percent ownership interest. On April 3, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making

MTPD a wholly-owned subsidiary of Panasonic Corporation. During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

33. Defendant Panasonic Corporation of North America ("Panasonic NA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey. Panasonic NA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. During the Relevant Period, Panasonic NA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies, and affairs of Panasonic NA.

34. Defendants MTPD, Panasonic Corporation, and Panasonic NA are collectively referred to herein as "Panasonic."

35. Defendant Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9, Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China. BMCC is a joint venture company, 50% of which is owned by Defendant MTPD. The other 50% ownership interest is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Branch of the Industrial and Commercial Bank of China, Ltd. (a China state-owned enterprise). Formed in 1987, BMCC was Matsushita's (n/k/a Panasonic) first CRT manufacturing facility in China. BMCC is the second largest producer of CRTs in China. During the Relevant Period, BMCC manufactured, marketed, sold and/or

distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

36. Defendant Hitachi, Ltd. is a Japanese company with its principal place of business located at 6-1 Marunouchi Center Building 13F, Chiyoda-ku, Tokyo 100-8280, Japan. Hitachi Ltd. is the parent company for the Hitachi brand of CRT Products. In 1996, Hitachi, Ltd.'s worldwide market share for CRTs was approximately 20 percent. During the Relevant Period, Hitachi Ltd. manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

37. Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at AKS Building, 3 Kandaneribeicho 3, Chiyoda-ku, Tokyo, 101-0022, Japan. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays, Ltd. Hitachi Displays, Ltd. was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. During the Relevant Period, Hitachi Displays and its predecessor companies manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Displays.

38. Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located as 1000 Hurricane Shoals Road, Ste. D-100, Lawrenceville, GA 30043. HEDUS is a subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRTs to customers, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of HEDUS during the Relevant Period.

39. Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singapore company with its principal place of business located at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore, 049318. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Asia during the Relevant Period.

40. Defendants Hitachi Ltd., Hitachi Displays, HEDUS, and Hitachi Asia are collectively referred to herein as "Hitachi."

41. Defendant IRICO Group Corporation ("IGC") is a Chinese corporation with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, sale and/or distribution of CRTs. During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

42. Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of Defendant IGC. In 2006, IDDC was China's top CRT maker. During the Relevant Period, IDDC manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its

subsidiaries or affiliates, to customers throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IDDC.

43. Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGE is a subsidiary of Defendant IGC. According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs. Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit and taxation. During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IGE.

44. Defendants IGC, IDDC, and IGE are collectively referred to herein as "IRICO."

45. Defendant Thai CRT Company, Ltd. ("Thai CRT") is a Thai company with its principal place of business located at 1/F Siam Cement Road, Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement Group. During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

46. Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel is India's largest exporter of CRTs. During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

## V.  CO-CONSPIRATORS AND AGENTS

47. Chunghwa Picture Tubes Ltd. ("CPT") is a Taiwanese company with its principal place of business located at 1127 Heping Road, Bade City, Taoyuan, Taiwan. During the Relevant Period, CPT manufactured, marketed, sold and/or distributed CRTs, both directly and through its wholly-owned and controlled subsidiaries in Malaysia, China, and Scotland, to customers throughout the United States.

48. CPTF Optronics Co., Ltd. ("CPTF") is a Chinese company with its principal place of business located at NO.1 Xing Ye Road, Mawei Hi-tech Development Zone, Fuzhou, China. During the Relevant Period, CPTF manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.  CPT dominated and controlled the finances, policies, and affairs of CPTF during the Relevant Period.

49. Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business located at Lot 1, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. Chunghwa Malaysia a wholly-owned and controlled subsidiary of Chunghwa Picture Tubes. Chunghwa Malaysia is a leading worldwide supplier of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. CPT dominated and controlled the finances, policies, and affairs of Chunghwa Malaysia during the Relevant Period.

50. CPT, CPTF, and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

51. Various other Persons, unknown to the State of Florida at the present, conspired with the Defendants in the violations of law alleged in this Complaint. These co-conspirators engaged in conduct and made statements in furtherance of the conspiracy.

52. Any reference in this Complaint to any act, deed, or transaction by a corporation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

53. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

54. Each of the Defendants named herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## VI.  TRADE AND COMMERCE

55. Throughout the period of time covered by this Complaint, Defendants and their co-conspirators engaged in the business of manufacturing, marketing, and selling CRTs in a continuous and uninterrupted flow of interstate and foreign trade and commerce to consumers located in Florida and the United States.

56. The price-fixing activities complained of herein were within the flow of and substantially affected interstate trade and commerce, as well as trade and commerce within the State of Florida.

57. Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on domestic interstate commerce within the United States, including Florida. These effects proximately caused the domestic injuries alleged in this complaint in that governmental purchasers,

AMENDED COMPLAINT – STATE OF FLORIDA
Master File No. 07-cv-5944 SC;
Case No. 2011-cv-6205 SC

businesses, consumers, and other end-payors paid more for CRT Products than they would have absent the conspiracy.

58. Defendants' conspiracy specifically targeted the United States market. The United States has been and remains one of the most important markets for the ultimate consumption of CRT Products, and therefore accounts for a significant portion of Defendants' revenue.

59. The effect of Defendants' anticompetitive conduct (higher prices for CRT Products) did not change in any substantial way between the beginning of the process (overcharges for CRTs) and the end (overcharges for CRT monitors and televisions). Thus, the effect on prices proceeded without deviation or interruption from the CRT manufacturer to the United States retail store. Therefore, there is a domestic injury here that is concrete, quantifiable and directly traceable back to the Defendants' anticompetitive conduct.

60. Most of the Defendants and/or their affiliates maintained corporate offices in the United States. Most of the Defendants had marketing, sales, and account management personnel specifically designated or designed to handle United States customer accounts and the United States market for CRTs and/or CRT Products. For example, most of the Defendants, if not all, sponsored advertising within the United States for the purpose of maintaining and increasing CRT Product sales and provided other marketing support.

61. Defendants sold billions of dollars of price-fixed CRTs and products containing price-fixed CRTs to the United States and to OEMs that sold CRT Products directly into the United States. Those OEMs manufactured millions of CRT Products destined for sale in the United States.

62. In furtherance of the conspiracy, Defendants regularly monitored "street prices" or retail prices of CRT Products, including those in the United States, to ensure that the cartel had set profit-maximizing prices for CRTs.

63. Defendants' price-fixing activities directly and substantially affected the price of CRTs and CRT Products purchased in the United States, including Florida. Defendants intentionally sent price-fixed CRTs into a stream of commerce destined for the United States with the expectation of producing a substantial adverse effect in the United States, and within Florida, in the form of inflated prices for CRTs and CRT Products. The artificial inflation of prices for CRT Products was a foreseeable and immediate consequence of Defendants' illegal activities. Accordingly, Defendants' unlawful conduct directly and substantially affected the price of CRT Products and unreasonably restrained commerce within Florida.

64. Defendants' conspiracy also affected the activities of the Defendants, which in turn had a substantial effect on interstate commerce, as well as trade and commerce within the State of Florida.

## VII.  BACKGROUND
### A.  CRT Background

65. CRT technology was developed over a century ago. A commercially practical CRT television was first made in 1931 but it was only after the RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers. Since that time, CRTs have become commonplace, and are widely used in many display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs. Large public displays, such as scoreboards at sports arenas, can consist of thousands of individual single color CRTs.

66. During the Relevant Period, this meant sales of millions of CRTs and products containing CRTs which resulted in billions of dollars in annual profits to the Defendants.

## B.  CRT Market Dynamics

67. The CRT market is structurally conducive to the type of collusion alleged in this Complaint because of characteristics such as market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, maturity of the CRT market, and the homogeneity of products.

### 1.  Market Concentration

68. During the Relevant Period, the CRT industry was dominated by relatively few companies. In 2004, Samsung SDI, LG.Philips Displays, MTPD and Chunghwa together held a collective 78% share of the global CRT market. This high degree of market concentration has facilitated coordination since there are fewer cartel members among which to coordinate pricing or allocate markets, making it easier to monitor the pricing and production of the cartel members.

### 2.  Information Sharing

69. There have been frequent opportunities for Defendants to discuss and exchange competitive information: common membership in trade associations for the CRTs market and related markets (e.g., TFT-LCD); interrelated business arrangements (i.e. joint ventures); allegiances between companies in certain countries; and relationships between the executives of certain companies. Communications between Defendants took place through the use of meetings, telephone calls, e-mails, and instant messages. Defendants took advantage of these opportunities to discuss and agree upon their pricing for CRTs.

70. Chunghwa and Defendants Hitachi and Samsung are all members of the Society for Information Display. Defendants Samsung and LGE are two of the co-founders of the Korea Display Industry Association. Similarly, LGE, LG.Philips Displays, and Samsung were all members of the Electronic Display Industrial Research Association. Plaintiff believes that

Defendants discussed and agreed upon pricing for CRTs under the guise of these trade associations. Defendants implemented and monitored the conspiracy by exchanging proprietary and competitively sensitive information at these trade association meetings.

### 3. Consolidation

71. The CRT Product industry also experienced a significant degree of consolidation during the Relevant Period, including, but not limited to: (a) the creation of LG.Philips Displays in 2001 as a joint venture between Royal Philips and LGE.; and (b) the 2002 merger of Toshiba Corporation and Matsushita/Panasonic's CRT business into MTPD.

72. Defendants also consolidated their manufacturing facilities in lower cost venues, such as China, and reduced manufacturing capacity to artificially inflate prices.

### 4. Multiple Interrelated Business Relationships

73. Multiple business relationships between Defendants and co-conspirators have blurred the lines of competition and provided ample opportunity for those companies in the interconnected CRT industry to collude.  These business relationships have also created a unity of interest among competitors, making the conspiracy easier to implement and to enforce than without such relationships.

74. The high degree of cooperation among Defendants and co-conspirators in the CRTs market include the following:

    a.   The formation of the CRT joint venture LG.Philips Displays in 2001 by Defendants LGE and Royal Philips.

    b.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba Corporation and Panasonic Corporation.

c.   In 1995, Chunghwa entered into a technology transfer agreement with Defendant Toshiba for large CRTs.

d.   Defendant Samtel claims to have supplied CRTs to Defendants LG, Samsung, Philips, and Panasonic.

### 5.  High Costs of Entry into the Industry

75. To potential newcomers, the CRT industry presents substantial barriers to entry, which would require substantial time, resources, and industry knowledge. It is extremely unlikely that, at this point in time, a new producer would want to try to enter the CRT market in light of the declining demand for CRT Products.

### 6.  The Maturity of the CRT Product Market

76. Typical characteristics of a new industry include rapid growth, frequent innovation, and high profits. A mature industry, such as the CRT market, is characterized by slim profit margins, which create a strong motivation for competitors to collude.

77. CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America in 1999. Although that figure had dropped to 73 percent by 2002, it was still a substantial share of the market.

78. CRT televisions accounted for 73 percent of the North American television market in 2004 and still held a 46 percent market share at the end of 2006. Globally, CRT televisions accounted for 75 percent of TV units in 2006.

### 7.  Homogeneity of CRT Products

79. CRTs are commodity-like products that are manufactured in standardized sizes. One Defendant's CRT for a particular application, such as a particular size television or computer

monitor, would be substitutable for another's. Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

80. Forming and sustaining a cartel is easier when the product in question is commodity-like because it is easier to come to an agreement on prices to charge and to monitor the agreed-upon prices.

### C. Pre-Conspiracy Market

81. In the late 1980s, the CRTs business became more international and Defendants began to serve customers that were also being served by other international companies. At this time, the employees of Defendants would encounter employees from their competitors when visiting their customers, and a culture of cooperation developed, whereby these employees would exchange market information on production, capacity, and customers.

### VIII. Defendants' Anticompetitive Conduct

82. Upon information and belief, during a time when the demand for CRT products was declining, Defendants and their co-conspirators engaged in a contract, combination, trust, or conspiracy in order to control and maintain profitable prices of CRTs. The effect of this unlawful behavior has been to raise, fix, maintain, and/or stabilize the prices at which Defendants and co-conspirators sold CRTs to artificially inflated levels from at least March 1, 1995, through at least November 25, 2007.

83. The conspiracy for CRTs was carried out through a combination of group and bilateral meetings. Initially, from 1995-1996, informal bilateral discussions were the primary method of communication between Defendants and occurred on an ad hoc basis. During this period, representatives from Defendants LG and Samsung visited other Defendant and co-conspirator manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba, and Panasonic, to

discuss raising prices for CRTs generally and to specific customers. These meetings took place in Taiwan, Thailand, Japan, Malaysia, Indonesia, and Singapore.

84. Chunghwa and Defendants Samsung and LG also attended several ad hoc group meetings during this period. The participants at these group meetings discussed increasing prices for CRTs.

85. Group meetings became more prevalent as more manufacturers formally entered the conspiracy. Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

86. The overall CRT conspiracy raised and stabilized worldwide prices (including United States prices) that Defendants charged for CRTs.

### A.  Glass Meetings

87. Defendants held meetings at secret locations, and discussed price forecasts, volume, allocation, and supply and demand for CRTs ("Glass Meetings").

88. At these meetings, Defendants agreed to fix the price of CRTs and reduce the output of CRTs. Defendants exchanged information on inventories, production, sales, and exports. This information was exchanged in ways designed to enable the attendees to agree on what the price should be for CRTs.

89. All Glass Meetings, as detailed below, had a fairly similar structure. The attendees first exchanged competitive information, such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends, and forecasts of sales volumes for coming months. The attendees also updated previously provided information. At each meeting, one attendee was designated as "Chairman," which was a rotating position,

who then wrote the information provided on a whiteboard. The attendees then used this information to discuss and agree upon what price each would charge for CRTs in the following month or quarter. Target prices, price increases, so-called "bottom" prices, and price ranges for CRTs were discussed and agreed upon. The attendees also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers. Having analyzed the supply and demand of CRTs, the attendees would also discuss and agree upon production output of CRTs. During periods of oversupply of CRTs, the focus of the attendees turned to making controlled and coordinated price reductions, referred to as setting a "bottom price."

90. Top Meetings, the first level of Glass Meetings, were attended by high-level company executives including CEOs, Presidents, and Vice Presidents and occurred less frequently, generally quarterly. Because the attendees at Top Meetings were the decision-makers, and because they had more reliable information, these meetings resulted in price-fixing agreements of CRTs. Top Meetings were focused on making long-term agreements and enforcing compliance of the cartel's agreements, as well as resolving disputes.

91. Management Meetings, the second level of meetings, were attended by the Defendants' high level sales managers and typically occurred monthly. Attendees at Management Meetings handled the implementation of the agreements made at Top Meetings.

92. Working Level Meetings, the third level of meetings, were attended by lower level sales and marketing employees, and generally took place weekly or monthly. Working Level Meetings were mostly limited to exchanging information and discussing pricing of CRTs because these lower-level employees did not have authority to enter into agreements. The attendees transmitted the competitive information received at meetings up the corporate ladder to those employees

with pricing authority. Working Level Meetings were more localized and generally took place near Defendants' factories, so that the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, among others.

93. The Chinese Glass Meetings began in 1998 and occurred monthly following a Top or Management Meeting. The principal purpose of these meetings was to report to the Chinese manufacturers what had been decided at the most recent Glass Meeting. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants and co-conspirators, including, but not limited to, Samsung SDI Shenzhen, Samsung SDI Tianjin, and CPTF.

94. Occasionally, Glass Meetings also occurred in various European countries. Attendees at these meetings included Defendants and co-conspirators with subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG, Chunghwa, Samsung and IRICO.

95. Glass Meetings occurred in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia during the Relevant Period.

96. Examples of specific agreements reached at the Glass Meetings include, but are not limited to, the following:

    a.   agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges, and price guidelines;

    b.   placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

    c.   agreements on pricing for intra-company CRT sales to vertically integrated customers;

    d.   agreements as to what to tell customers about the reason for a price increase;

e.   agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe, and India;

g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices, and customers demands;

h.   agreements to coordinate uniform public statements regarding available capacity and supply;

i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

j.   agreements to allocate customers;

k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.   agreements to keep their meetings secret.

97. Defendants also agreed on the prices at which some of the Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured the end products, i.e. televisions and computer monitors. Defendants were aware that it was important to keep internal pricing to their affiliated OEMs at a high enough level to support the high CRT prices set for other OEMs in the market. By keeping both prices at the same levels, Defendants ensured that all direct-purchaser OEMs paid supracompetitive prices for CRTs.

98. Defendants knew and discussed at Glass Meetings the significant impact that the price of CRTs had on the cost of the finished CRT Products. Upon information and belief, and similar to CRTs, the market for CRT Products was a mature one and profit margins were slim. Therefore,

Defendants concluded that they needed to make their price increase on CRTs high enough so that their direct customers (CRT television and monitor manufacturers) would be able to justify a corresponding price increase to their customers. Defendants thus ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

99. Defendants monitored each other's adherence to these agreements in several ways. For example, Defendants sought confirmation of pricing both from customers and from employees of the Defendants themselves. Cheating, when it did occur, was addressed in at least four different ways: 1) monitoring; 2) attendees at meetings challenging other attendees for not abiding by an agreement; 3) threatening to undermine a competitor at one of its principal customers; and 4) recognizing that there was a mutual interest in abiding by the target price and the agreements that had been made.

100.    Defendants' collusion was possible and extremely successful because of the nature of the CRT industry, which included high concentration, barriers to entry, standardized products, cooperative arrangements, information exchanges, and because of the blatant nature of the terms of the conspiracy.

101.    Additionally, "Green Meetings" were meetings held on golf courses, which were generally attended by top and management level employees of the Defendants.

## B.  Bilateral Meetings and Communications

102.    Throughout the Relevant Period, Defendants supplemented their group meetings with bilateral discussions. These bilateral discussions occurred on a frequent, ad hoc basis, often in-between the group meetings, and were more informal than the group meetings. These discussions usually took place between sales and marketing employees and consisted of in-person meetings, telephone calls, and/or e-mails.

103.     Defendants had bilateral discussions in order to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and Europe.

104.     Defendants also engaged bilateral discussions during price negotiations with customers. To avoid being persuaded by customers to lower their prices, supervisors took into account the information gained from these communications in determining the price to offer to a customer.

105.     Upon information and belief, bilateral meetings supplemented group meetings and were used to coordinate pricing. Frequently, shortly after a Top or Management Meeting, Defendants that had attended these meetings would meet bilaterally with non-attending manufacturers to inform them of the CRT pricing and/or output agreements that had been reached during the group meeting. For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi. LG had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba. Similarly, Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel. After these meetings, Hitachi, Toshiba, and Samtel implemented the agreed-upon pricing. Hitachi and Toshiba occasionally attended the Glass Meetings. Thus, Hitachi, Toshiba, and Samtel participated in the conspiracy to fix the prices of CRTs.

**C.  Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

106.     Beginning in 1995, examples of Defendants' and co-conspirators' participation in Glass Meetings and bilateral communications include, but are not limited to, the following:

    a.   From at least 1995 through 2007, Defendant Samsung, through Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin, Samsung

SDI America, Samsung SDI Brazil, and Samsung SDI Mexico, participated in 200 or more Glass Meetings at all levels. A substantial number of the meetings were attended by high ranking Samsung executives. In addition, Samsung regularly engaged in bilateral discussions with each of the other Defendants. Through these discussions, Samsung agreed on prices and supply levels for CRTs.

b.   From at least 1995 through 2001, Defendant LG, through LGE, participated in 100 or more Glass Meetings at all levels. After 2001, LG participated in the CRT conspiracy through its joint venture with Royal Philips, LG.Philips Displays. A substantial number of these meetings were attended by high-ranking LG executives. LG also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, LG agreed on prices and supply levels for CRTs.

c.   Defendant LGEUSA participated or was represented in the Glass Meetings and became an important part of the agreements entered into at the Glass Meetings. To the extent LG entities sold and/or distributed CRT Products, they had an important role in the conspiracy since Defendants wanted to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the Glass Meetings. Thus, LGEUSA was an active participant in the alleged conspiracy. After 2001, LG participated in the CRT conspiracy through its joint venture with Royal Philips, LG.Philips Displays.

d.   Between at least 1996 and 2001, Defendant Philips, through Royal Philips and PENAC, participated in 100 or more Glass Meetings at all levels. After 2001, Philips participated in the alleged CRT conspiracy through its joint venture with LGE, LG.Philips Displays. A substantial number of these meetings were attended by high level

executives from Philips. Philips also engaged in numerous bilateral discussions with other Defendants. Through these discussions, Philips agreed on prices and supply levels for CRTs.

e.   Defendants Philips Brazil and Philips Taiwan participated or were represented in the Glass Meetings and became an important part of the agreements entered into at the Glass Meetings. To the extent Philips entities sold and/or distributed CRT Products, they had an important role in the conspiracy since Defendants wanted to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the Glass Meetings. Thus, Philips Brazil and Philips Taiwan were active participants in the alleged conspiracy. After 2001, Philips participated in the alleged CRT conspiracy through its joint venture with LGE, LG.Philips Displays.

f.   From at least 1995 through 2006, Chunghwa, through CPT, CPTF, Chunghwa Malaysia, and representation from their factory in Scotland, participated in 100 or more Glass Meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of CPT, C.Y. Lin. Chunghwa also engaged in bilateral discussions with each of the Defendants on a regular basis. Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

g.   Between at least 1995 and 2003, Defendant Toshiba, through Toshiba Corporation and TAEC, participated in several Glass Meetings. After 2003, Toshiba participated in the CRT conspiracy through its joint venture with Panasonic Corporation, MTPD. These meetings were attended by high-level sales managers from Toshiba and MTPD. Toshiba

also engaged in multiple bilateral discussions with other Defendants, particularly with LG. Through these discussions, Toshiba agreed on prices and supply levels for CRTs.

h.   Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., HEDUS, and Hitachi Asia, participated in several Glass Meetings which included attendance by high-level sales managers from Hitachi. Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs.

i.   Defendant Hitachi Displays participated or was represented in the Glass Meetings and became an important part of the agreements entered into at the Glass Meetings. To the extent Hitachi entities sold and/or distributed CRT Products, they had an important role in the conspiracy since Defendants wanted to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the Glass Meetings. Thus, Hitachi Displays was an active participant in the alleged conspiracy.

j.   Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation (known throughout the Relevant Period as Matsushita Electric Industrial Co., Ltd.), participated in several Glass Meetings. After 2003, Panasonic participated in the CRT conspiracy through its joint venture with Toshiba Corporation, MTPD. These meetings were attended by high-level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with other Defendants. Through these discussions, Panasonic agreed on prices and supply levels for CRTs.

k.   Defendant Panasonic NA participated or was represented in the Glass Meetings and became an important part of the agreements entered into at the Glass Meetings. To the

extent Panasonic entities sold and/or distributed CRT Products, they had an important role in the conspiracy since Defendants wanted to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the Glass Meetings. Thus, Panasonic NA was an active participant in the alleged conspiracy. After 2003, Panasonic participated in the CRT conspiracy through its joint venture with Toshiba Corporation, MTPD.

l.   Between at least 2003 and 2006, Defendant MTPD participated in multiple Glass Meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high-level sales managers from MTPD. In addition, MTPD engaged in bilateral discussions with other Defendants. Through these discussions, MTPD agreed on prices and supply levels for CRTs.

m.   From at least 1998 and 2007, Defendant BMCC participated in multiple Glass Meetings. These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for CRTs.

n.   Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE, and IDDC, participated in multiple Glass Meetings. These meetings were attended by the highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRTs.

o.   From at least 1997 through 2006 Defendant Thai CRT participated in multiple Glass Meetings. These meetings were attended by the highest ranking executives from Thai

CRT. Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel. Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.

p.   From at least 1998 through 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT. These meetings were attended by high level executives from Samtel. Through these discussions, Samtel agreed on prices and supply levels for CRTs.

q.   When Plaintiff refers to a corporate family or companies by a single name in its allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and was a party to the agreements reached in them.

### 4.  The CRT Market During the Conspiracy

107.   Until recently, CRTs were the dominant technology used in displays such as television and computer monitors. During the Relevant Period, this translated into the sale of millions of CRT Products, resulting in billions of dollars in annual profits to the Defendants.

108.   The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

AMENDED COMPLAINT – STATE OF FLORIDA
Master File No. 07-cv-5944 SC;
Case No. 2011-cv-6205 SC

- 34 -

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------|------|------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

109.    During the Relevant Period, North America was the largest market for CRT televisions and computer monitors. The 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America. By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.

110.    Defendants' collusion is evidenced by unusual price behavior in the CRT Product market during the Relevant Period. Despite industry predictions that the price of CRT Products would drop, and the existence of economic conditions warranting a drop in prices, CRT Product prices remained stable.

111.    In early 1999, despite declining production costs and the entry of flat panel display products, the price of large-sized CRTs actually increased. Although the price increase was alleged to have been based on increasing global demand, this price increase was in fact a result of the collusive conduct herein alleged.

112.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. This price increase was unlike most other PC-related products.

113.    Defendants also conspired to limit the production of CRTs by shutting down production lines for days at a time and closing or consolidating their manufacturing facilities.

114.    For example, the Defendants' CRT factory utilization percentage fell from 90 percent in the third quarter of 2000 to 62 percent in the first quarter of 2001. There were sudden drops in

factory utilization throughout the Relevant Period but to a lesser degree. Upon information and belief, Plaintiff alleges that these sudden, coordinated drops in factory utilization by the Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

115.    Early in the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs. These price increases were despite the declining demand due to the approaching obsolescence of CRTs caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

116.    Later in the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRTs caused by the entry and popularity of the new generation LCD panels and plasma display products.

117.    The price increases and later relative price stability in the market for CRTs during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

### 5.  Criminal and International Proceedings

118.    In August 2011, Samsung SDI paid a $32,000,000 fine to the United States Department of Justice and pled guilty to violating Section 1 of the Sherman Act by fixing prices, reducing output and allocating market shares of color display tubes from at least as early as January 1997 until at least as late as March 2006.

119.    The Samsung SDI plea agreement stated that, in furtherance of the conspiracy, Samsung SDI, through its officers and employees, engaged in discussions and attended meetings with representatives of other major color display tube producers and that in these meetings,

agreements were reached to fix prices, reduce output, and allocate market shares of color display tubes to be sold in the United States and elsewhere.

120.     On February 10, 2009, a federal grand jury in San Francisco returned a two-count indictment against the former Chairman and Chief Executive Officer of CPT, Cheng Yuan Lin, aka C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The combination and conspiracy to fix the prices of CRTs was carried out, in part, in the Northern District of California.

121.     In January 2011, the Korean Fair Trade Commission collectively fined Samsung SDI, CPT, Chunghwa Malaysia and CPTF approximately $23,600,000 for agreeing to fix prices and cut production in the color display tube market from 1996 through 2006. In addition, the Korean Fair Trade Commission concluded that LG Philips Display Korea Co. Ltd. participated in the cartel.

## IX.  THE PASS-THROUGH OF OVERCHARGES TO CONSUMERS

122.     Defendants' conspiracy to fix, raise, maintain, and/or stabilize the price of CRTs at artificial levels resulted in harm to Plaintiff because it resulted in Plaintiff paying higher prices for CRT Products than they would have paid in the absence of Defendants' conspiracy. The entire overcharge at issue was passed on to Plaintiff.

123.     The Defendants monitored the prices of CRT Products sold in the United States on a regular basis. The purpose and effect of investigating such retail market data was at least threefold. First, it permitted Defendants and co-conspirators, such as Samsung and Chunghwa, which did not manufacture CRT televisions or computer monitors (unlike LG, Panasonic, Toshiba, Philips, and Hitachi), to police the price-fixing agreement to make sure that intra-defendant CRT sales were kept at supracompetitive levels. Second, it permitted all Defendants to

AMENDED COMPLAINT – STATE OF FLORIDA
Master File No. 07-cv-5944 SC;
Case No. 2011-cv-6205 SC

police their price-fixing agreement to independent OEMs that would reduce prices for CRT Products if there was a corresponding reduction in CRT prices from a Defendant. Third, Defendants used the prices of CRT Products to analyze whether they could increase prices or should agree to a "bottom" price instead. The Defendants concluded that in order to make their illegal CRT price increases effective, they needed to make the price increase high enough that their direct customers (OEM television and monitor manufacturers) would be able to justify a corresponding price increase to their customers (i.e., retailers and computer OEMs). This way Defendants assured that 100% of the overcharges for CRTs were passed on to consumers who purchased CRT Products.

124.    The indirect purchaser consumer buys CRT Products from either a computer or television OEM such as Dell or Sharp, or a reseller such as Best Buy.

125.    Because of the breadth of the price-fixing conspiracy, the direct purchaser CRT television and monitor manufacturers were not constrained by their competitors from passing on the overcharge. Since each of the direct purchaser's competitors were also buying CRTs at supracompetitive prices from conspiracy members, no direct purchaser faced end-product price competition from a competitor that was not paying supracompetitive prices for CRTs.

126.    The price of CRT Products is directly correlated to the price of CRTs. The margins for CRT television and monitor manufacturers are sufficiently thin that price increases of CRTs force them to increase the prices of their CRT Products. This means that increases in the price of CRTs lead to quick corresponding price increases at the OEM level for CRT Products.

127.    Computer and television OEMs and retailers of CRT Products are all subject to vigorous price competition, whether selling CRT televisions or computer monitors. The demand for CRTs is ultimately determined by purchasers of CRT Products. The market for CRTs and the market

for CRT Products are therefore inextricably linked and cannot be considered separately. Defendants were well aware of this intimate relationship, and used forecasts of CRT television and computer monitor production to predict sales of and determine production levels and pricing for CRTs.

128.    Computers and televisions are commodities with little or no brand loyalty such that aggressive pricing causes consumers to switch preferences to different brands. Prices are closely based on production costs, which are in turn directly determined by component costs, as assembly costs are minimal. OEMs accordingly use component costs, like the cost of CRTs, as the starting point for all price calculations. On information and belief, computer and television OEMs price their end-products on a "cost-plus" basis. Thus, computer and television prices closely track increases and decreases in component costs.

129.    The CRT is the most expensive component in the products into which they are incorporated. On information and belief, the cost of the CRT in a computer monitor is approximately 60% of the total cost to manufacture the computer monitor. On further information and belief, the cost of the CRT in a television is a slightly smaller percentage of the total manufacturing cost because a television has more components than a computer monitor, such as a tuner and speakers.

130.    Economic and legal literature recognizes that the more pricing decisions are based on cost, the easier it is to determine the pass-through rate. The directness of affected costs refers to whether an overcharge affects a direct (i.e., variable) cost or an indirect (i.e., overhead) cost. Overcharges will be passed through sooner and at a higher rate if the overcharges affect direct costs. Here, CRTs are a direct and substantial cost of CRT Products. Therefore, Plaintiff will be able to show that the overcharge on the CRTs was passed through to indirect purchasers.

131.     Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. CRTs are identifiable, discreet, physical objects that do not change form or become an indistinguishable part of the TV or computer monitor in which they are contained. Thus, CRTs follow a traceable physical chain from the Defendants to the OEMs to the purchasers of finished products incorporating CRTs.

132.     Moreover, just as CRTs can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of CRTs affect prices paid by indirect purchasers of CRT Products. On information and belief, computer and television OEMs price their end-products on a "cost-plus" basis. In retailing, it is common to use a "mark-up rule." The retail price is set as the wholesale cost plus a percentage mark-up designed to recover non-product costs and to provide a profit. This system guarantees that increases in costs to the retailer will be passed on to end buyers. Unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. In a multiple-level chain of distribution, passing on monopoly overcharges is not the exception; it is the rule.

133.     The purpose of Defendants' conspiratorial conduct was to fix, raise, maintain, and/or stabilize the price of CRTs and, as a direct and foreseeable result, CRT Products. The market for CRTs and the market for CRT Products are inextricably linked. One exists to serve the other. Defendants not only knew, but expressly contemplated, that prices of CRT Products would increase as a direct result of their increasing the prices of CRTs.

134.     Finally, many of the Defendants and/or co-conspirators have themselves been and/or are manufacturers of CRT televisions and computer monitors. Such manufacturers include, for example, LG, Hitachi, Toshiba, Philips, and Panasonic. Having agreed to fix prices for CRTs,

the major component of the end products they were manufacturing, these Defendants intended to pass on the full cost of this component in their finished products, and in fact did so.

135.    As a direct and proximate result of Defendants' illegal conduct, Plaintiff has been forced to pay supracompetitive prices for CRT Products containing price-fixed CRTs. These inflated prices have been passed onto Plaintiff by direct purchaser manufacturers, distributors, and retailers.

## X.  FRAUDULENT CONCEALMENT

136.    Defendants have fraudulently concealed the existence of conspiracy alleged in this Complaint.

137.    The State of Florida has exercised due diligence to learn of its legal rights and, despite such diligence, failed to uncover the existence of the violations alleged below until after November 25, 2007.

138.    Additionally, Plaintiff State of Florida's claims alleged herein were tolled in the interim as a result of Plaintiff being included as a member of putative classes in multiple class action suits.

139.    Defendants effectively, affirmatively, and fraudulently concealed the existence of the violations alleged below through the following actions, among others:

a.   by engaging in a conspiracy through secret discussions and meetings regarding pricing and output that did not give rise to fact that would put the State of Florida on inquiry notice that the Defendants conspired to fix prices for CRTs;

b.   by agreeing to not publicly discuss the nature of their price-fixing agreement;

c.   by agreeing limit the number of representatives from each Defendant attending the meetings and limit written communication regarding their ongoing price-fixing agreement to avoid detection and prosecution under the antitrust laws;

d.   by agreeing to disseminate false and pretextual reasons for the inflated prices of CRTs during the relevant period and by describing such pricing falsely as being the result of external costs rather than collusion;

e.   by agreeing among themselves on what to tell their customers about price changes, and agreeing upon which attendee would communicate the price change to which customer;

f.   by agreeing among themselves upon the content of public statements regarding capacity and supply;

g.   by agreeing among themselves to eliminate references in expense reports that might reveal the existence of their unlawful meetings; and

h.   by engaging in a successful, illegal price-fixing conspiracy that by its nature was inherently self-concealing.

140.   The State of Florida has exercised due diligence by promptly investigating the facts giving rise to the claims asserted herein upon having reasonable suspicion of the existence of Defendants' conspiracy to the extent permitted by law.

## XII.  VIOLATIONS ALLEGED
## COUNT I

### (Illegal Restraint of Trade Under Section One of the Sherman Act)

141.   The State of Florida incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

142.    This is an action that alleges a violation of Section One of the Sherman Act, 15 U.S.C. § 1.

143.    Defendants knowingly – that is, voluntarily and intentionally – entered into a continuing agreement, understanding and conspiracy to fix, control, raise, maintain, and/or stabilize the prices charged for CRTs during the relevant period, continuing through the filing of this Complaint.

144.    Defendants knowingly – that is, voluntarily and intentionally – entered into a continuing agreement, understanding, and conspiracy to limit the production of CRTs during the relevant period, continuing through the filing of this Complaint.

145.    The agreement caused the State of Florida to suffer a continuing injury to its property for the following reasons:

    a.   Price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated throughout Florida and the United States.

    b.   Purchasers of CRTs and CRT Products have been deprived of the benefits of competition.

## COUNT II

### (Illegal Restraint of Trade Under the Florida Antitrust Act)

146.    The State of Florida incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

147.    This is an action that alleges a violation of Section 542.18, Florida Statutes.

148.    Defendants knowingly – that is, voluntarily and intentionally – entered into a continuing agreement, understanding, and conspiracy to fix, control, raise, maintain, and/or stabilize the

prices charged for CRTs during the relevant period, continuing through the filing of this Complaint.

149.    Defendants knowingly – that is, voluntarily and intentionally – entered into a continuing agreement, understanding, and conspiracy to limit the production of CRTs during the relevant period, continuing through the filing of this Complaint.

150.    The sale of CRTs and CRT Products involves trade or commerce within the meaning of the Florida Antitrust Act.

151.    The agreement caused the State of Florida to suffer a continuing injury to its property for the following reasons:

a.   Price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated throughout Florida and the United States.

b.   Purchasers of CRTs and CRT Products have been deprived of the benefits of competition.

## COUNT III

### (Unfair Trade Practice Under FDUTPA)

152.    The State of Florida incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

153.    This is an action that alleges a violation of Section 501.204, Florida Statutes, for all direct and indirect purchases of CRTs by governmental entities, businesses, and individual consumers in the State of Florida pursuant to Section 501.207(1)(c), Florida Statutes.

154.    The sale of CRTs involves trade or commerce within the meaning of the FDUTPA.

155.    Defendants' actions offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to Florida governmental entities, to

businesses in the State of Florida, and to individual residents in the State of Florida. Thus, Defendants' unfair methods of competition and unconscionable acts and practices in the conduct of trade and commerce violate Section 501.204, Florida Statutes.

### XIII.  PRAYER FOR RELIEF

156.   Accordingly, the State of Florida requests that this Court:

a.   Adjudge and decree that Defendants violated Section 1 of the Sherman Act, 15 U.S.C. §1;

b.   Adjudge and decree that Defendants violated Section 542.18, Florida Statutes;

c.   Adjudge and decree that Defendants violated Section 501.204, Florida Statutes;

d.   Enjoin and restrain, pursuant to federal and state law, Defendants, their affiliates, assignees, subsidiaries, successors, and transferees, and their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing to engage in any anticompetitive conduct and from adopting in the future any practice, plan, program, or device having a similar purpose or effect to the anticompetitive actions set forth above;

e.   Award to the State of Florida any other equitable relief as the Court finds appropriate to redress Defendants' violations of federal or state law to restore competition;

f.   Award to the State of Florida any other statutory damages, restitution or equitable disgorgement for the benefit of the state and its consumers, as appropriate;

g.   Award to the State of Florida the maximum civil penalties under Section 542.21, Florida Statutes, for each contract, combination, or conspiracy in restraint of trade or commerce;

AMENDED COMPLAINT – STATE OF FLORIDA
Master File No. 07-cv-5944 SC;
Case No. 2011-cv-6205 SC

h.   Award to the State of Florida the maximum civil penalties under Sections 501.2075 and 501.2077, Florida Statutes, for each violation of FDUTPA;

i.   Award to the State of Florida its costs, including reasonable attorneys' fees and, as may be appropriate under state law, expert witness fees and investigation costs; and

j.   Order any other relief that this Court deems proper.

### XIV.  DEMAND FOR JURY TRIAL

157.   The State of Florida demands a trial by jury of all issues so triable in this case.

Respectfully submitted,                              Dated:  July 16, 2012

The State of Florida

PAMELA JO BONDI
Attorney General
STATE OF FLORIDA

/s/ Nicholas J. Weilhammer
PATRICIA A. CONNERS (Trish.Conners@myfloridalegal.com)
R. SCOTT PALMER (Scott.Palmer@myfloridalegal.com)
LIZABETH A. BRADY (Liz.Brady@myfloridalegal.com)
NICHOLAS J. WEILHAMMER (Nicholas.Weilhammer@myfloridalegal.com)
SATU A. CORREA (Satu.Correa@myfloridalegal.com)
Office of the Attorney General
State of Florida
PL-01, The Capitol
Tallahassee, FL 32399-1050
Tel:      (850) 414-3300
Fax:      (850) 488-9134

Attorneys for Plaintiff State of Florida