PATRICIA A. CONNERS (Trish.Conners@myfloridalegal.com)
R. SCOTT PALMER (Scott.Palmer@myfloridalegal.com)
LIZABETH A. BRADY (Liz.Brady@myfloridalegal.com)
NICHOLAS J. WEILHAMMER (Nicholas.Weilhammer@myfloridalegal.com)
SATU A. CORREA (Satu.Correa@myfloridalegal.com)
Office of the Attorney General
State of Florida
PL-01, The Capitol
Tallahassee, FL 32399-1050
Tel:      (850) 414-3300
Fax:      (850) 488-9134

Attorneys for Plaintiff State of Florida

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | MASTER FILE NO. 07-cv-5944 SC MDL NO. 1917 |

This Document Relates To:

Case No.  2011-CV-6205 SC

STATE OF FLORIDA,
OFFICE OF THE ATTORNEY GENERAL,
DEPARTMENT OF LEGAL AFFAIRS,

                    Plaintiff,
        v.

LG ELECTRONICS, INC., et al.,

                    Defendants.

**DECLARATION OF NICHOLAS J. WEILHAMMER IN SUPPORT OF PLAINTIFF STATE OF FLORIDA'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE STATE OF FLORIDA'S COMPLAINT**

1    I, Nicholas J. Weilhammer, declare as follows:

2    1.     I am admitted to practice in this Court pro hac vice pursuant to Pretrial Order No. 1,

3    waiving Civil L.R. 11-3.  (Master Dkt. No. 230.)  I am an Assistant Attorney General with the

4    State of Florida, Department of Legal Affairs, Office of the Attorney General.  I have personal

5    knowledge of the facts stated herein and, if called as a witness, I could competently testify

6    thereto.

7    2.     Attached hereto as Exhibit 1 is a true and correct copy of the Indirect Purchaser Plaintiffs

8    Consolidated Amended Complaint from this MDL relating to All Indirect Purchaser Actions,

9    Case No. 07-cv-5944 SC (Master Dkt No. 437) (N.D. Cal. filed Mar. 16, 2009).

10   3.     Attached hereto as Exhibit 2 is a true and correct copy of the Class Action Complaint

11   from this MDL titled *Juetten v. Chunghwa Picture Tubes, Ltd.*, Case No. 07-cv-06225-SC (Dkt.

12   1-1) (N.D. Cal. filed December 10, 2007).

13   4.     Attached hereto as Exhibit 3 is a true and correct copy of the Class Action Complaint

14   from this MDL titled *Stack v. Chunghwa Picture Tubes, Ltd.*, Case No. 08-cv-1319-SC (Dkt. 1)

15   (N.D. Cal. filed March 7, 2008).

16   5.     Attached hereto as Exhibit 4 is a true and correct copy of the Class Action Complaint

17   from this MDL titled *Ganz v. Chunghwa Picture Tubes, Ltd.*, Case No. 08-cv-1721-SC (Dkt. 1)

18   (N.D. Cal. filed March 31, 2008)

19   6.     Attached hereto as Exhibit 5 is a true and correct copy of the Class Action Complaint

20   from this MDL titled *Ross v. Chunghwa Picture Tubes, Ltd.*, Case No. 08-cv-1807-SC (Dkt. 1)

21   (N.D. Cal. filed April 3, 2008).

22   I declare under penalty of perjury under the laws of the United States that the foregoing is

23   true and correct.

DECLARATION OF NICHOLAS J. WEILHAMMER IN SUPPORT OF PLAINTIFF STATE OF FLORIDA'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE STATE OF FLORIDA'S COMPLAINT
Master File No. 07-cv-5944 SC;
Case No. 2011-cv-6205 SC

1   Executed this 20th  day of July, 2012, at Tallahassee, Florida.

2

3                                                       /s/ Nicholas J. Weilhammer

4                                                       Nicholas J. Weilhammer

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF NICHOLAS J. WEILHAMMER IN SUPPORT OF PLAINTIFF STATE OF FLORIDA'S BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE STATE OF FLORIDA'S COMPLAINT
Master File No. 07-cv-5944 SC;
Case No. 2011-cv-6205 SC

# EXHIBIT 1

MARIO N. ALIOTO, ESQ. (56433)
LAUREN C. RUSSELL, ESQ. (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 563-7200
Facsimile: (415) 346-0679
E-mail: malioto@tatp.com
laurenrussell@tatp.com

*Interim Lead Counsel*
*for the Indirect Purchaser Plaintiffs*
[Additional Attorneys Appear After Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** ) ) ) ) ) ) ) ) ) | Master File No. 3:07-cv-5944 SC<br><br>MDL No. 1917<br><br>**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT** |
| **This document relates to:** ) ) | |
| **ALL INDIRECT PURCHASER ACTIONS** ) ) ) ) | The Honorable Samuel Conti |

**<u>TABLE OF CONTENTS</u>**

I.      **INTRODUCTION** ……………………………………………………… 1

II.     **JURISDICTION AND VENUE** ………..……………………………… 2

III.    **DEFINITIONS** ……………..…..………………………………………….. 4

IV.     **PLAINTIFFS** …………………………………………………………… 5

V.      **DEFENDANTS** ………………………………………………………… 9

VI.     **AGENTS AND CO-CONSPIRATORS** …………………………………... 26

VII.    **INTERSTATE TRADE AND COMMERCE** …………………………… 27

VIII.   **FACTUAL ALLEGATIONS** ……………………………………… 27

        A.    CRT Technology………………………………………………… 27

        B.    Structural Characteristics Of The CRT Market……………………… 28

              a.    Market Concentration…………………………………… 28

              b.    Information Sharing……………………………………… 28

              c.    Consolidation…………………………………………… 29

              d.    Multiple Interrelated Business Relationships……………………… 29

              e.    High Costs Of Entry Into The Industry……………………………… 30

              f.    The Maturity Of The CRT Product Market……………………… 31

              g.    Homogeneity Of CRT Products………………………………… 32

        C.    Pre-Conspiracy Market……………………………………… 32

        D.    Defendants' And Co-Conspirators' Illegal Agreements……………….... 32

              a.    "Glass Meetings"………………………………………… 33

              b.    Bilateral Discussions…………………………………….. 37

              c.    Defendants' And Co-Conspirators' Participation In Group
                    And Bilateral Discussions………………………………….. 39

        E.    The CRT Market During The Conspiracy………………………... 44

        F.    International Government Antitrust Investigations…………………… 47

IX.     **THE PASS-THROUGH OF OVERCHARGES TO CONSUMERS**……... 50

X.      **CLASS ACTION ALLEGATIONS**……………………………………… 55

XI.  **VIOLATIONS ALLEGED**……………………………………………………  58

    A.  First Claim For Relief: Violation of Section 1 of the Sherman Act.........  58

    B.  Second Claim For Relief: Violation of State Antitrust Statutes ………..  60

    C.  Third Claim For Relief: Violation of State Consumer Protection and
        Unfair Competition Statutes…………………………………………..  73

    D.  Fourth Claim For Relief: Unjust Enrichment and Disgorgement
        Of Profits…………………………………………………………  88

XII.  **FRAUDULENT CONCEALMENT**…………………………………………  89

XIII.  **PRAYER FOR RELIEF**……………………………………………………  90

XIV.  **JURY DEMAND**………………………………………………………………  92

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917**

Plaintiffs Brian Luscher, Jeffrey Figone, Carmen Gonzalez, Dana Ross, Steven Ganz, Brady Lane Cotton, Colleen Sobotka, Daniel Riebow, Travis Burau, Southern Office Supply, Inc., Andrew Kindt, James Brown, Kory Pentland, Alan Rotman, Chad Klebs, David Norby, Ryan Rizzo, Charles Jenkins, Daniel R. Hergert, Samuel J. Nasto, Adrienne Belai, Craig Stephenson, Joshua Maida, Gary Hanson, Rosemary Ciccone, Donna Marie Ellingson, Frank Warner, Albert Sidney Crigler, Margaret Slagle, John Larch, and Brigid Terry ("Plaintiffs"), individually and on behalf of a Class of all those similarly situated in the United States, bring this action for damages and injunctive relief under state and federal antitrust, unfair competition, and consumer protection laws against the Defendants named herein, demanding trial by jury, and complaining and alleging as follows:

## I. **INTRODUCTION**

1. Plaintiffs bring this antitrust class action on behalf of individuals and entities that indirectly purchased Cathode Ray Tube Products ("CRT Products") (as further defined below), in the United States from Defendants, their predecessors, any subsidiaries or affiliates thereof, or any of their unnamed co-conspirators, during the period beginning at least as early as March 1, 1995 until at least November 25, 2007 (the "Class Period"). Plaintiffs allege that during the Class Period the Defendants conspired to fix, raise, maintain and/or stabilize prices of CRT Products sold in the United States. Because of Defendants' unlawful conduct, Plaintiffs and other Class Members paid artificially inflated prices for CRT Products and have suffered antitrust injury to their business or property.

2. As further detailed below, beginning in at least 1995, Defendants Samsung, Philips, Daewoo, LG and Chunghwa met or talked with at least one other Defendant in order to discuss and agree upon CRT Product prices and the amount of CRT Products each would produce. Over time, these Defendants reached out to the other Defendant CRT Product manufacturers, including Toshiba, Panasonic, Hitachi, BMCC, IRICO, Thai CRT and Samtel, who then also met or talked with their competitors for the purpose of fixing the prices of CRT Products. By 1997, a formal system of multilateral and bilateral meetings was in place,

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917**

involving the highest levels of the Defendant corporations, all with the sole purpose of fixing the prices of CRT Products at supracompetitive levels.

3. Throughout the Class Period, Defendants' conspiracy was effective in moderating the normal downward pressure on prices for CRT Products caused by periods of oversupply and competition from new technologies, such as TFT-LCD and Plasma. Defendants' conspiracy resulted in unusually stable pricing and even rising prices in a very mature, declining market. As a result of Defendants' unlawful conduct, Plaintiffs and Class members paid higher prices for CRT Products than they would have paid in a competitive market.

4. This global conspiracy is being investigated by the Antitrust Division of the United States Department of Justice ("DOJ"), and by several other international competition authorities. On February 10, 2009, a federal grand jury in San Francisco issued a two-count indictment against C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., for his participation in a global conspiracy to fix the prices of CRTs used in computer monitors and televisions. This is the first indictment to be issued in the DOJ's ongoing investigation into the CRT industry.

## II. JURISDICTION AND VENUE

5. This action is instituted under Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, to recover damages under state antitrust, unfair competition, and consumer protection laws, and to recover costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly situated sustained as a result of the Defendants' violations of those laws.

6. The Court has subject matter jurisdiction over the federal claim under 28 U.S.C. §§ 1331 and 1337. The Court has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.

7. This court also has subject matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act of 2005, which amended 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of

a class of Plaintiffs is a citizen of a state different from any Defendant and the aggregated amount in controversy exceeds $5,000,000, exclusive of interest and costs." This Court also has jurisdiction under 28 U.S.C. § 1332(d) because "one or more members of the class is a citizen of a state within the United States and one or more of the Defendants is a citizen or subject of a foreign state."

8.      Venue is proper in this Judicial District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 (b), (c) and (d), because during the Class Period one or more of the Defendants resided, transacted business, was found, or had agents in, this district, and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, and a substantial portion of the affected portion of the interstate trade and commerce described below has been carried out in this district.

9.      Defendants conduct business throughout the United States, including this jurisdiction, and they have purposefully availed themselves of the laws of the United States, including specifically the laws of the state of California and the individual states listed herein. Defendants' products are sold in the flow of interstate commerce, and Defendants' activities had a direct, substantial and reasonably foreseeable effect on such commerce.

10.      Defendants' conspiracy to fix the prices of CRT Products substantially affected commerce throughout the United States and in each of the states identified herein, because Defendants directly or through their agents, engaged in activities affecting each such state. Defendants have purposefully availed themselves of the laws of each of the states identified herein in connection with their activities relating to the production, marketing, and sale and/or distribution of CRT Products. Defendants produced, promoted, sold, marketed, and/or distributed CRT Products, thereby purposefully profiting from access to indirect purchaser consumers in each such state. As a result of the activities described herein, Defendants:

      a.      Caused damage to the residents of the states identified herein;

      b.      Caused damage in each of the states identified herein by acts or omissions committed outside each such state and by regularly doing or soliciting business in each such state;

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917**

    c.        Engaged in a persistent course of conduct within each state and/or derived substantial revenue from the marketing and sale of CRT Products in each such state; and

    d.        Committed acts or omissions that they knew or should have known would cause damage (and, in fact, did cause damage) in each such state while regularly doing or soliciting business in each such state, engaging in other persistent courses of conduct in each such state, and/or deriving substantial revenue from the marketing and sale of CRT Products in each such state.

11.    The conspiracy described herein adversely affected every person nationwide, and more particularly, consumers in each of the states identified in this Complaint, who indirectly purchased Defendants' CRT Products. Defendants' conspiracy has resulted in an adverse monetary effect on indirect purchasers in each state identified herein.

12.    Prices of CRT Products in each state identified in this Complaint were raised to supracompetitive levels by the Defendants and their co-conspirators. Defendants knew that commerce in CRT Products in each of the states identified herein would be adversely affecting by implementing their conspiracy.

## III.  **DEFINITIONS**

13.    As used herein, the term "CRT" or "CRTs" stands for "cathode ray tube(s)." A CRT is a display technology used in televisions, computer monitors and other specialized applications. The CRT is a vacuum tube that is coated on its inside face with light sensitive phosphors. An electron gun at the back of the vacuum tube emits electron beams. When the electron beams strike the phosphors, the phosphors produce either red, green, or blue light. A system of magnetic fields inside the CRT, as well as varying voltages, directs the beams to produce the desired colors. This process is rapidly repeated several times per second to produce the desired images.

14.    There are two types of CRTs: color display tubes ("CDTs") which are used in computer monitors and other specialized applications; and color picture tubes ("CPTs") which

are used in televisions. CDTs and CPTs are collectively referred to herein as "cathode ray tubes" or "CRTs."

15. As used herein "CRT Products" includes (a) CRTs; and (b) products containing CRTs, such as television sets and computer monitors.

16. The "Class Period" or "relevant period" means the period beginning at least March 1, 1995 through at least November 25, 2007.

17. "Person" means any individual, partnership, corporation, association, or other business or legal entity.

18. "OEM" means any Original Equipment Manufacturer of CRT Products.

## IV. **PLAINTIFFS**

19. Plaintiff Brian Luscher is an Arizona resident. During the relevant period, Mr. Luscher indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

20. Plaintiff Jeffrey Figone is a California resident. During the relevant period, Mr. Figone indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

21. Plaintiff Carmen Gonzalez is a California resident. During the relevant period, Ms. Gonzalez indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

22. Plaintiff Dana Ross is a California resident. During the relevant period, Mr. Ross indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

23. Plaintiff Steven Ganz is a California resident. During the relevant period, Mr. Ganz indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

24.     Plaintiff Brady Lane Cotton is a Florida resident. During the relevant period, Mr. Cotton indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

25.     Plaintiff Colleen Sobotka is a Florida resident. During the relevant period, Ms. Sobotka indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

26.     Plaintiff Daniel Riebow is a Hawaii resident. During the relevant period, Mr. Riebow indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

27.     Plaintiff Travis Burau is an Iowa resident. During the relevant period, Mr. Burau indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

28.     Plaintiff Southern Office Supply, Inc. is a Kansas corporation. During the relevant period, Southern Office Supply, Inc. indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

29.     Plaintiff Andrew Kindt is a Michigan resident. During the relevant period, Mr. Kindt indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

30.     Plaintiff James Brown is a Michigan resident. During the relevant period, Mr. Brown indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

31.     Plaintiff Kory Pentland is a Michigan resident. During the relevant period, Mr. Pentland indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

32.     Plaintiff Alan Rotman is a Minnesota resident. During the relevant period, Mr. Rotman indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

33.     Plaintiff Chad Klebs is a Minnesota resident. During the relevant period, Mr. Klebs indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

34.     Plaintiff David Norby is a Minnesota resident. During the relevant period, Mr. Norby indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

35.     Plaintiff Ryan Rizzo is a Minnesota resident. During the relevant period, Mr. Rizzo indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

36.     Plaintiff Charles Jenkins is a Mississippi resident. During the relevant period, Nasto indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

37.     Plaintiff Daniel R. Hergert is a Nebraska resident. During the relevant period, Mr. Hergert indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

38.     Plaintiff Samuel J. Nasto is a Nevada resident. During the relevant period, Mr. Nasto indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

39.     Plaintiff Craig Stephenson is a New Mexico resident. During the relevant period, Mr. Stephenson indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

40.     Plaintiff Adrienne Belai was a New York resident during the Class Period. During the relevant period, Ms. Belai indirectly purchased CRT Products in New York from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

41.     Plaintiff Joshua Maida was a North Carolina resident during the Class Period. During the relevant period, Mr. Maida indirectly purchased CRT Products in North Carolina

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917**

from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

42. Plaintiff Gary Hanson is a North Dakota resident. During the relevant period, Mr. Hanson indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

43. Plaintiff Rosemary Ciccone is a Rhode Island resident. During the relevant period, Ms. Ciccone indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

44. Plaintiff Donna Marie Ellingson is a South Dakota resident. During the relevant period, Ms. Ellingson indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

45. Plaintiff Frank Warner is a Tennessee resident. During the relevant period, Mr. Warner indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

46. Plaintiff Albert Sidney Crigler is a Tennessee resident. During the relevant period, Mr. Crigler indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

47. Plaintiff Margaret Slagle is a Vermont resident. During the relevant period, Ms. Slagle indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

48. Plaintiff John Larch is a West Virginia resident. During the relevant period, Mr. Larch indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

49.     Plaintiff Brigid Terry is a Wisconsin resident. During the relevant period, Ms. Terry indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

## V. DEFENDANTS

**LG Electronics Entities**

50.     Defendant LG Electronics, Inc. is a corporation organized under the laws of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeoungdeungpo-gu, Seoul 150-721, South Korea. LG Electronics, Inc. is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968. The company's name was changed from GoldStar Communications to LG Electronics, Inc. in 1995, the year in which it also acquired Zenith in the United States. In 2001, LG Electronics, Inc. transferred its CRT business to a 50/50 CRT joint venture with Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V. forming Defendant LG.Philips Displays (n/k/a LP Displays International, Ltd.). During the Class Period, LG Electronics, Inc. manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

51.     Defendant LG Electronics U.S.A., Inc. ("LGEUSA) is a Delaware corporation with its principal place of business located at 1000 Sylvan Avenue, Englewood Cliffs, NJ 07632. LG Electronics USA, Inc. is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc. During the class period, LG Electronics U.S.A., Inc. manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant LG Electronics, Inc. dominated and controlled the finances, policies, and affairs of LGEUSA relating to the antitrust violations alleged in this Complaint.

52.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No.47, Lane3, Jihu Road, NeiHu District, Taipei City, Taiwan. LGETT is a wholly-owned and controlled subsidiary of Defendant

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917**

LG Electronics, Inc. During the class period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant LG Electronics, Inc. dominated and controlled the finances, policies, and affairs of LGETT relating to the antitrust violations alleged in this Complaint.

53.    Defendants LG Electronics, Inc., LGEUSA, and LGETT are collectively referred to herein as "LG."

**Philips Entities**

54.    Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V. ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, Breitner Center, 1070 MX Amsterdam, The Netherlands. Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001. In 2001, Royal Philips transferred its CRT business to a 50/50 CRT joint venture with defendant LG Electronics, Inc. forming Defendant LG.Philips Displays (n/k/a LP Displays International, Ltd.). In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the joint venture. During the Class Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

55.    Defendant Philips Electronics North America Corporation ("PENAC") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, NY 10020-1104. Philips Electronics NA is a wholly owned and controlled subsidiary of Defendant Royal Philips. During the Class Period, Philips Electronics NA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies, and affairs of PENAC relating to the antitrust violations alleged in this Complaint.

56.     Defendant Philips Electronics Industries, Ltd. ("PEIL") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. PEIL is a subsidiary of Defendant Royal Philips. During the Class Period, PEIL manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies, and affairs of PEIL relating to the antitrust violations alleged in this Complaint.

57.     Defendant Philips Consumer Electronics Co. ("PCEC") is a company with its principal place of business located at 64 Perimeter Center E., Atlanta, GA 30346-2295. PCEC is a subsidiary of Defendant Royal Philips. During the Class Period, PCEC sold and distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies, and affairs of PCEC relating to the antitrust violations alleged in this Complaint.

58.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Electronics Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Electronics Taiwan is a subsidiary of Defendant Royal Philips. During the Class Period, Philips Electronics Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips Electronics Taiwan relating to the antitrust violations alleged in this Complaint.

59.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Class Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant

Royal Philips dominated and controlled the finances, policies, and affairs of Philips Brazil relating to the antitrust violations alleged in this Complaint.

60. Defendants Royal Philips, PENAC, PEIL, PCEC, Philips Electronics Taiwan, and Philips Brazil are collectively referred to herein as "Philips."

**LP Displays**

61. Defendant LP Displays International, Ltd. f/k/a LG.Philips Displays ("LP Displays") was created in 2001 as a 50/50 joint venture between Defendants LG Electronics, Inc. and Royal Philips Electronics of The Netherlands. In March 2007, LP Displays became an independent company organized under the laws of Hong Kong with its principal place of business located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong. LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion, and a market share of 27%. LP Displays announced in March 2007 that Royal Philips and LG Electronics would cede control over the company and the shares would be owned by financial institutions and private equity firms. During the Class Period, LP Displays manufactured, marketed, sold and distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

**Samsung Entities**

62. Defendant Samsung Electronics Co., Ltd. ("SEC") is South Korean company with its principal place of business located at Samsung Main Building, 250, 2-ga, Taepyong-ro, Jung-gu, Seoul 100-742, South Korea. During the Class Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

63. Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660. SEAI is a wholly-owned and controlled subsidiary of defendant SEC. During the Class Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers

throughout the United States. Defendant SEC dominated and controlled the finances, policies, and affairs of SEAI relating to the antitrust violations alleged in this Complaint.

64.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Co., Ltd. ("Samsung SDI"), is a South Korean company with its principal place of business located at 15th – 18th Floor, Samsung Life Insurance Building, 150, 2-ga, Taepyong-ro, Jung-gu, Seoul, 100-716, South Korea. Samsung SDI is a public company. SEC is a major shareholder holding almost 20 percent of the stock. Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy businesses, with 28,000 employees and facilities in 18 countries. In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than another other producer. Samsung SDI has offices in Chicago and San Diego. During the Class Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant SEC dominated and controlled the finances, policies, and affairs of Samsung SDI relating to the antitrust violations alleged in this Complaint.

65.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California. Samsung SDI America is a wholly-owned and controlled subsidiary of Samsung SDI. During the Class Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI America relating to the antitrust violations alleged in this Complaint.

66.     Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.21014, Parque Industrial El Florido, Tijuana, B.C. Mexico. Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Class Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products to customers, either

directly or indirectly through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this Complaint.

67.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil. Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Class Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products to customers, either directly or indirectly through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this Complaint.

68.     Defendant Shenzhen Samsung SDI Co. Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Class Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this Complaint.

69.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Class Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this Complaint.

70.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian company with its principal place of business located at Lot 635 & 660, Kawasan Perindustrian, Tuanku, Jaafar, 71450 Sungai Gadut, Negeri Semblian Darul Khusus, Malaysia. Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI Co., Ltd. During the Class Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this Complaint.

71.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Samsung SDI Malaysia are referred to collectively herein as "Samsung."

**Toshiba Entities**

72.     Defendant Toshiba Corporation is a Japanese corporation with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, Toshiba Corporation held a 5-10 % worldwide market share for CRTs used in televisions and computer monitors. In December 1995, Toshiba Corporation partnered with Orion Electric Company (n/k/a Daewoo Electronics Corporation) and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2002, Toshiba Corporation entered into a joint venture with Defendant Panasonic Corporation called MT Picture Display Co., Ltd. in which the entities consolidated their CRT businesses. During the Class Period, Toshiba Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

73.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, NY 10020. Toshiba America is a wholly owned and controlled subsidiary of defendant Toshiba Corporation. During the Class Period, Toshiba America sold and/or distributed CRT

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of Toshiba America relating to the antitrust violations alleged in this Complaint.

74.     Defendant Toshiba America Consumer Products, LLC ("TACP") is headquartered in 82 Totawa Rd., Wayne, New Jersey 07470-3114. TACP is a wholly owned and controlled subsidiary of Defendant Toshiba Corporation through Toshiba America. During the Class Period, TACP sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of TACP relating to the antitrust violations alleged in this Complaint.

75.     Defendant Toshiba America Consumer Products, Inc. ("TACPI") is a company that is headquartered at 1420-B Toshiba Drive, Lebanon, Tennessee, 37087.  TACPI is a wholly-owned and controlled subsidiary of Defendant Toshiba Corporation through Toshiba America.  During the Class Period, TACPI sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Toshiba Corporation dominated and controlled the finances, policies and affairs of TACPI relating to the antitrust violations alleged in this complaint.

76.     Toshiba America Information Systems, Inc. ("TAIP") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92718. TAIP is a wholly owned and controlled subsidiary of Toshiba Corporation through Toshiba America, Inc. During the Class Period, TAIP manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of TAIP relating to the antitrust violations alleged in this Complaint.

77.     Toshiba America Electronics Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 9775 Toledo Way, Irvine, California

92618, and 19000 MacArthur Boulevard, Suite 400, Irvine, California 92612. TAEC is a wholly owned and controlled subsidiary of Toshiba America, Inc., which is a holding company for defendant Toshiba Corporation. TAEC is currently the North American sales and marketing representative for defendant MTPD. Before MTPD's formation in 2003, TAEC was the North American engineering, manufacturing, marketing and sales arm of defendant Toshiba Corporation. During the Class Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of TAEC relating to the antitrust violations alleged in this Complaint.

78.     Toshiba Display Devices (Thailand) Company, Ltd. ("TDDT") is a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000. TDDT is a wholly-owned and controlled subsidiary of defendant Toshiba Corporation. During the Class Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of TDDT relating to the antitrust violations alleged in this Complaint.

79.     Defendants Toshiba Corporation, Toshiba America, Inc., TACP, TACPI, TAIP, TAEC and TDDT are referred to collectively herein as "Toshiba."

**Panasonic Entities**

80.     Defendant Panasonic Corporation, which was at all times during the Class Period known as Matsushita Electric Industrial Co., Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity with its principal place of business located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. In 2002, Panasonic Corporation entered into a CRT joint venture with defendant Toshiba forming defendant MT Picture Display Co., Ltd. ("MTPD"). Panasonic Corporation was the majority owner with 64.5 percent. On April 3, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making

1  MTPD a wholly-owned subsidiary of Panasonic Corporation. In 2005, the Panasonic brand had

2  the highest CRT Product revenue in Japan. During the Class Period, Panasonic Corporation

3  manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

4  through its subsidiaries or affiliates, to customers throughout the United States.

5      81.    Defendant Panasonic Corporation of North America ("Panasonic NA") is a

6  Delaware corporation with its principal place of business located at One Panasonic Way,

7  Secaucus, New Jersey. Panasonic NA is a wholly owned and controlled subsidiary of Defendant

8  Panasonic Corporation. During the Class Period, Panasonic NA manufactured, marketed, sold

9  and/or distributed CRT Products, either directly or indirectly through its subsidiaries or

10  affiliates, to customers throughout the United States. Defendant Panasonic Corporation

11  dominated and controlled the finances, policies, and affairs of Panasonic NA relating to

12  the antitrust violations alleged in this Complaint.

13      82.    Panasonic Consumer Electronics Company (Panasonic Consumer

14  Electronics") is a Delaware corporation with its principal place of business located at One

15  Panasonic Way, Secaucus, New Jersey. Panasonic Consumer Electronics is a wholly owned and

16  controlled subsidiary of Defendant Panasonic Corporation. During the Class Period, Panasonic

17  Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either

18  directly or indirectly through its subsidiaries or affiliates, to customers throughout the United

19  States. Defendant Panasonic Corporation dominated and controlled the finances,

20  policies, and affairs of Panasonic Consumer Electronics relating to the antitrust

21  violations alleged in this Complaint.

22      83.    Defendant Matsushita Electronic Corporation (Malaysia) Sdn Bhd. ("Matsushita

23  Malaysia") is a Malaysia company with its principal place of business located at Lot 1, Persiaran

24  Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam, Malaysia 40000.

25  Matsushita Malaysia is a wholly-owned and controlled subsidiary of Defendant Panasonic

26  Corporation. During the Class Period, Matsushita Malaysia manufactured, marketed, sold and/or

27  distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to

28  customers throughout the United States. Defendant Panasonic Corporation dominated and

controlled the finances, policies, and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this Complaint.

84. Defendants Panasonic Corporation, Panasonic NA, Panasonic Consumer Electronics, and Matsushita Malaysia are collectively referred to herein as "Panasonic."

85. Defendant MT Picture Display Co., Ltd. ("MTPD") was established as a CRT joint venture between defendants Panasonic Corporation and Toshiba. MTPD is a Japanese entity with its principal place of business located at 1-1, Saiwai-cho, Takatsuki-shi, Osaka 569-1193, Japan. On April 3, 2007, defendant Panasonic Corporation purchased the remaining stake in MTPD, making it a wholly-owned subsidiary, and renaming it MT Picture Display Co., Ltd. During the Class Period, MTPD manufactured, sold and distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

86. Defendant Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9, Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China. BMCC is a joint venture company, 50% of which is held by defendant MTPD. The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Branch of the Industrial and Commercial Bank of China, Ltd. (a China state-owned enterprise). Formed in 1987, BMCC was Matsushita's (n/k/a Panasonic) first CRT manufacturing facility in China. BMCC is the second largest producer of CRTs in China. During the Class Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

**Hitachi Entities**

87. Defendant Hitachi, Ltd. is a Japanese company with its principal place of business located at 6-1 Marunouchi Center Building 13F, Chiyoda-ku, Tokyo 100-8280, Japan. Hitachi Ltd. is the parent company for the Hitachi brand of CRT Products. In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Class Period, Hitachi

Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

88. Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at AKS Building, 3 Kandaneribeicho 3, Chiyoda-ku, Tokyo, 101-0022, Japan. Hitachi Displays, Ltd. was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays, Ltd. During the Class Period, Hitachi Displays, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Displays relating to the antitrust violations alleged in this Complaint.

89. Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located as 1000 Hurricane Shoals Road, Ste. D-100, Lawrenceville, GA 30043. HEDUS is a subsidiary of defendants Hitachi Displays, Ltd. and Hitachi, Ltd. During the Class Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products to customers, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Hitachi, Ltd. and Hitachi Displays, Ltd. dominated and controlled the finances, policies, and affairs of HEDUS relating to the antitrust violations alleged in this Complaint.

90. Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 2000 Sierra Point Parkway, Brisbane, California 94005. Hitachi America is a wholly-owned and controlled subsidiary of defendant Hitachi, Ltd. During the Class Period, Hitachi America sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi America relating to the antitrust violations alleged in this Complaint.

91.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singapore company with its principal place of business located at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore, 049318. Hitachi Asia is a wholly owned and controlled subsidiary of defendant Hitachi, Ltd. During the Class Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Asia relating to the antitrust violations alleged in this Complaint.

92.     Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") is a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China. Hitachi Shenzhen is a wholly-owned and controlled subsidiary of defendant Hitachi Displays, Ltd. During the Class Period, Hitachi Shenzhen manufactured, sold and distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this Complaint.

93.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, HEDUS, Hitachi Asia, and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

**Tatung Entities**

94.     Defendant Tatung Company is a Taiwanese corporation with its principal place of business located at 22, Sec. 3, Chung-Shan N. Rd., Taipei City, 104 Taiwan. Tatung Company dominated and controlled the finances, policies and affairs of Defendant Chunghwa relating to the antitrust violations alleged in this Complaint. Tatung Company lists Chunghwa on its website as one of its "global subsidiaries." Similarly, Tatung Company's website has recent investor presentations describing Chunghwa as part of the Tatung Group in the optoelectronics sector. And the Chairman of Chunghwa's 14- person Board of Directors, along with seven other members of that board, are executives and/or directors of Tatung Company or various of its subsidiaries. A ninth member of that board is a director at Tatung University.

During the Class Period, Tatung Company manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates (specifically Chunghwa and Tatung Company of America), to customers throughout the United States.

95.     Defendant Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California. Tatung America is a subsidiary of Tatung Company. Currently, Tatung Company owns approximately half of Tatung America. The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin. Following Lun Kuan Lin's recent death, her share recently passed to her two children.  During the Class Period, Tatung America manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Tatung Company dominated and controlled the finances, policies, and affairs of Tatung America relating to the antitrust violations alleged in this Complaint.

96.     Defendants Tatung Company and Tatung America are collectively referred to herein as "Tatung."

**Chunghwa Entities**

97.     Defendant Chunghwa Picture Tubes Ltd. ("CPT") is a Taiwanese company with its principal place of business located at 1127 Heping Road, Bade City, Taoyuan, Taiwan. CPT was founded in 1971 by Defendant Tatung Company. Throughout the majority of the Class Period, Tatung Company owned a substantial share in CPT. Although Tatung Company's holdings in CPT have fallen over time, it retains substantial control over CPT's operations. Tatung Company lists Chunghwa on its website as one of its "global subsidiaries." And the Chairman of CPT, Weishan Lin, is also the Chairman and General Manager of Tatung Company. CPT is a leading manufacturer of CRTs. During the Class Period, CPT manufactured, marketed, sold and/or distributed CRT Products, both directly and through its wholly-owned and controlled subsidiaries in Malaysia, China, and Scotland, to customers throughout the United States. Defendant Tatung Company dominated and controlled the finances, policies, and affairs of CPT relating to the antitrust violations alleged in this Complaint.

98.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business located at Lot 1, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. Chunghwa Malaysia a wholly-owned and controlled subsidiary of defendant Chunghwa Picture Tubes. Chunghwa Malaysia is a leading worldwide supplier of CRTs. During the Class Period, Chunghwa Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendants Tatung Company and CPT dominated and controlled the finances, policies, and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this Complaint.

99.     Defendants CPT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**IRICO Entities**

100.     Defendant IRICO Group Corporation ("IGC") is a Chinese corporation with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, sale and/or distribution of CRT Products. During the Class Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

101.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of defendant IGC. In 2006, IDDC was China's top CRT maker. During the Class Period, IDDC manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this Complaint.

102.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGE is owned by Defendant IGC. According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs. Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit and taxation. During the Class Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this Complaint.

103.     Defendants IGC, IDDC, and IGE are collectively referred to herein as "IRICO."

**Thai CRT**

104.     Defendant Thai CRT Company, Ltd. ("Thai CRT") is a Thai company with its principal place of business located at 1/F Siam Cement Road, Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement Group. It was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During the Class Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

**Samtel**

105.     Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40%. Samtel is India's largest exporter of CRTs. Samtel has gained safety approvals from the United States, Canada, Germany and Great Britain for its CRT Products. During the Class Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

//

INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917

**Daewoo Entities**

106.     Defendant Daewoo International Corporation ("Daewoo International") is a corporation organized under the laws of Korea with its principal place of business located at 84-11 Namdaemunno 5-ga, Jung-gu, Seoul, Korea (100-753). Daewoo International is a successor in interest to the Daewoo Group which was dismantled in or around 1999. During the Class Period, Daewoo International manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

107.     Defendant Daewoo Electronics Corporation f/k/a Daewoo Electronics Company, Ltd. ("Daewoo Electronics") is a corporation organized under the laws of Korea with its principal place of business located at 686 Ahyeon-dong, Mapagu, Seoul, Korea. Daewoo Electronics is a subsidiary of Daewoo International. Plaintiffs are informed and believe that Daewoo Electronics was, along Daewoo Telecom Company, Daewoo Corporation, and Orion Electric Components Company (all of whom were members of the "Daewoo Group"), a major shareholder of Orion Electric Company ("Orion"). Thus, Orion was wholly-owned by the Daewoo Group. Orion was a Korean corporation which filed for bankruptcy in 2004. During the Class Period, Orion was a major manufacturer of CRTs. In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRTs. Orion was involved in CRT Product sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States. Defendant Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France. As of approximately 1996, DOSA produced 1.2 million CRTs annually. Daewoo sold DOSA's CRT business in or around 2004. In December 1995, Orion partnered with defendant Toshiba and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. Defendant Daewoo Electronics dominated and controlled the finances, polices and affairs of Orion and DOSA relating to the antitrust violations alleged in this Complaint. During the Class Period, Daewoo Electronics manufactured, marketed, sold

and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates (specifically including Orion and DOSA), to customers throughout the United States. Defendant Daewoo International dominated and controlled the finances, policies and affairs of Daewoo Electronics relating to the antitrust violations alleged in this Complaint.

108.    Daewoo International, Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

109.    All of the above-listed defendants are collectively referred to herein as "Defendants."

## VI.   AGENTS AND CO-CONSPIRATORS

110.    Various other persons, firms and corporations, not named as Defendants herein, and presently unknown to Plaintiffs, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy and/or in furtherance of the anticompetitive, unfair or deceptive conduct. Plaintiffs reserve the right to name some or all of these Persons as Defendants at a later date.

111.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

112.    Defendants are also liable to acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

113.    Each of the Defendants named herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein. Each Defendant which is a subsidiary of a foreign parent acts as the sole United States agent for CRT Products made by its parent company.

//

//

# VII. INTERSTATE TRADE AND COMMERCE

114. Throughout the Class Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate and international commerce, including through and into this judicial district.

115. During the Class Period, Defendants collectively controlled the vast majority of the market for CRT Products, both globally and in the United States.

116. Defendants' unlawful activities, as described herein, took place within the flow of interstate commerce to purchasers of CRT Products located in states other than the states in which Defendants are located, as well as throughout the world, and had a direct, substantial and reasonably foreseeable effect upon interstate and international commerce, including the United States markets for CRT Products.

# VIII. FACTUAL ALLEGATIONS

## A. CRT Technology

117. CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. It was not until the RCA Corporation introduced the product at the 1939 World's Fair, however, that it became widely available to consumers. Since then, CRTs have become the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs. Even large public displays, including many scoreboards at sports arenas, are comprised of thousands of single color CRTs.

118. As noted above, the CRT is a vacuum tube that is coated on its inside face with light sensitive phosphors. An electron gun at the back of the vacuum tube emits electron beams. When the electron beams strike the phosphors, the phosphors produce either red, green, or blue light. A system of magnetic fields inside the CRT, as well as varying voltages, directs the beams to produce the desired colors. This process is rapidly repeated several times per second to produce the desired images.

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917**

119.    The quality of a CRT display is dictated by the quality of the CRT itself. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole product such that the product is often simply referred to as "the CRT."

120.    Until the last few years, CRTs were the dominant technology used in displays, including television and computer monitors. During the Class Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

### B. Structural Characteristics Of The CRT Market

121.    The structural characteristics of the CRT Product market are conducive to the type of collusive activity alleged in this Complaint. These characteristics include market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, maturity of the CRT Product market, and homogeneity of products.

### a.    Market Concentration

122.    During the Class Period, the CRT industry was dominated by relatively few companies. In 2004, defendants Samsung SDI, LG.Philips Displays (n/k/a LP Displays), MT Picture Display and Chunghwa together held a collective 78% share of the global CRT market. The high concentration of market share facilitates coordination since there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### b.    Information Sharing

123.    Because of common membership in trade associations for the CRT Product market and related markets (for e.g., TFT-LCD), interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information. The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages. Defendants took advantage of these opportunities to discuss and agree upon their pricing for CRT Products.

124.    Defendants Chunghwa, Hitachi and Samsung are all members of the Society for Information Display. Defendants Samsung and LG Electronics, Inc. are two of the co-founders of the Korea Display Industry Association. Similarly, Daewoo, LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association. Upon information and belief, Defendants used these trade associations as vehicles for discussing and agreeing upon their pricing for CRT Products. At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### c.    Consolidation

125.    The CRT Product industry also had significant consolidation during the Class Period, including but not limited to: (a) the creation of LG.Philips Displays (n/k/a LP Displays) in 2001 as a joint venture between Royal Philips and LG Electronics, Inc.; and (b) the 2002 merger of Toshiba and Matsushita/Panasonic's CRT business into MTPD.

126.    Defendants also consolidated their manufacturing facilities in lower cost venues such as China and reduced manufacturing capacity to prop up prices.

### d.    Multiple Interrelated Business Relationships

127.    The CRT Product industry has a close-knit nature whereby multiple business relationships between supposed competitors blur the lines of competition and provided ample opportunity to collude. These business relationships also created a unity of interest among competitors so that the conspiracy was easier to implement and enforce than if such interrelationships did not exist.

128.    Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

a.    The formation of the CRT joint venture LG.Philips Displays in 2001 by Defendants LG Electronics, Inc. and Royal Philips.

b.    Defendants LG Electronics, Inc. and Royal Philips also formed LG.Philips LCD Co., Ltd., n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

     c.     The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

     d.     Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

     e.     In December 1995, Defendants Daewoo and Toshiba partnered with two other non-Defendant entities to form P.T. Tosummit which manufactured CRTs in Indonesia.

     f.     Defendants Daewoo and Toshiba also signed a cooperative agreement relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN LCDs, and Toshiba, which had substituted its STN LCD production with TFT LCD production, marketed Daewoo's STN LCDs globally through its network.

     g.     Also in 1995, Defendant Chunghwa entered into a technology transfer agreement with Defendant Toshiba for large CPTs.

     h.     Defendant Chunghwa has a joint venture with Defendant Samsung Electronics Co., Ltd. for the production of liquid crystal display panels. Chunghwa now licenses the technology from Defendant Royal Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

     i.     Defendants LG Electronics, Inc. and Hitachi Ltd. entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

     j.     Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung Electronics Co., Ltd. and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

     k.     Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Inc., Samsung, Royal Philips, and Panasonic.

     **e.    High Costs Of Entry Into The Industry**

     129.     There are substantial barriers to entry in the CRT Products industry. It would require substantial time, resources and industry knowledge to even potentially overcome the

barriers to entry. It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

### f. The Maturity Of The CRT Product Market

130. Newer industries are typically characterized by rapid growth, innovation and high profits. The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

131. Demand for CRT Products was declining throughout the Class Period. Static or declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

132. In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and Plasma displays. This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices. Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and are predicted to decline by an additional 84.5 percent between 2006 and 2010.

133. Although demand was declining as a result of the popularity of flat-panel LCD/plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Class Period, making Defendants' collusion and the international price fixing conspiracy worthwhile. Due to the high costs of LCD panels and plasma displays during the Class Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

134. In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America. By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

135. As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share. CRT televisions continue to dominate the global television market, accounting for 75 percent of worldwide TV units in 2006.

### g.    Homogeneity Of CRT Products

136.    CRT Products are commodity-like products which are manufactured in standardized sizes. One Defendant's CRT Products for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sell and Plaintiffs (and Class members) purchase CRT Products primarily on the basis of price.

137.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.  Pre-Conspiracy Market

138.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and the Defendants began serving customers that were also being served by other international companies. During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers. A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity, and customers.

139.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa and Orion visited each other's factories in S.E. Asia. During this period, these producers began to include discussions about price in their meetings. The pricing discussions were usually limited, however, to exchanges of the range of prices that each competitor had quoted to specific customers.

### D.  Defendants' And Co-Conspirators' Illegal Agreements

140.    Plaintiffs are informed and believe, and thereon allege, that in order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRT Products to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

141.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings. In the formative years of the conspiracy (1995-1996), bilateral discussions

were the primary method of communication and took place on an informal, ad hoc basis. During this period, representatives from Defendants LG, Samsung and Daewoo visited the other Defendant manufacturers including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba, and Panasonic to discuss increasing prices for CRT Products in general and to specific customers. These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia, and Singapore.

142. Defendants Samsung, Chunghwa, LG and Daewoo also attended several ad hoc group meetings during this period. The participants at these group meetings also discussed increasing prices for CRT Products.

143. As more manufacturers formally entered the conspiracy, group meetings became more prevalent. Beginning in 1997, the Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Class Period.

144. The overall CRT conspiracy raised and stabilized worldwide prices (including United States prices) that Defendants charged for CRT Products.

**a. "Glass Meetings"**

145. The group meetings among the participants in the CRT price-fixing conspiracy were referred to by the participants as "Glass Meetings" or "GSM." Glass Meetings were attended by employees at three general levels of the Defendants' corporations.

146. The first level of these meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "Top Meetings." Top Meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements. Because attendees at Top Meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at Top Meetings were also able to resolve disputes because they were decision makers who could make agreements.

147. The second level of meetings were attended by the Defendants' high level sales managers and were known as "Management Meetings." These meetings occurred more

frequently, typically monthly, and handled implementation of the agreements made at Top Meetings.

148.    Finally, the third level of meetings were known as "Working Level Meetings" and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The Working Level Meetings also tended to be more regional and often took place near Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

    a.    The Chinese Glass Meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal purpose of reporting what had been decided at the most recent Glass Meeting to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

    b.    Glass Meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), and IRICO.

149.    Representatives of the Defendants also attended what were known amongst members of the conspiracy as "Green Meetings." These were meetings held on golf courses. The Green Meetings were generally attended by top and management level employees of the Defendants.

150.    During the Class Period, Glass Meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia.

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

151.    Participants would often exchange competitively sensitive information prior to a Glass Meeting. This included information on inventories, production, sales and exports. For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

152.    The Glass Meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends, and forecasts of sales volumes for coming months. The participants also updated the information they had provided in the previous meeting. Each meeting had a rotating, designated "Chairman" who would write the information on a white board. The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter. They discussed and agreed upon target prices, price increases, so-called "bottom" prices, and price ranges for CRTs. They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers. Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

153.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions. This was referred to as setting a "bottom price."

154.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors. Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs. In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

155.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed. Like CRTs themselves, the market for CRT Products was a mature one, and

there were slim profit margins. The Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers. In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

156. The agreements reached at the Glass Meetings included:

a. agreements on CRT Product prices, including establishing target prices, "bottom" prices, price ranges, and price guidelines;

b. placing agreed-upon price differentials on various attributes of CRT Products, such as quality or certain technical specifications;

c. agreements on pricing for intra-company CRT Product sales to vertically integrated customers;

d. agreements as to what to tell customers about the reason for a price increase;

e. agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f. agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g. agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

h. agreements to coordinate uniform public statements regarding available capacity and supply;

i. agreements to allocate both overall market shares and share of a particular customer's purchases;

j. agreements to allocate customers;

k. agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l. agreements to keep their meetings secret.

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

157.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of the Defendants themselves. When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition in a mutual interest in living up to the target price and living up to the agreements that had been made.

158.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group Glass Meetings became less frequent and bilateral meetings again became more prevalent. In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### b.    Bilateral Discussions

159.    Throughout the Class Period, the Glass Meetings were supplemented by bilateral discussions between various Defendants. The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

160.    During the Class Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and Mexico.

161.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and Europe.

162.    In order to ensure the efficacy of their global conspiracy, the Defendants also used bilateral meetings to coordinate pricing with CRT Product manufacturers in Brazil and Mexico, such as Philips Brazil, Samsung SDI Brazil, and Samsung SDI Mexico. These

INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917

Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRT Products. As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Class Period. Because these Brazilian and Mexican manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements. In this way, the Defendants ensured that prices of all CRT Products imported into the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

163.    Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

164.    Bilateral discussions were also used to coordinate prices with CRT Product manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic, Thai CRT, and Samtel. It was often the case that in the few days following a Top or Management Meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT Product pricing and/or output agreements had been reached during the meeting.

165.    For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT Product pricing agreements to Hitachi. LG had a relationship with Toshiba and was responsible for communicating CRT Product pricing agreements to Toshiba. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT Product pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG, and Thai CRT. Sometimes Hitachi and Toshiba also attended the Glass Meetings. In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRT Products.

//

//

INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917

c. **Defendants' And Co-Conspirators' Participation In Group And Bilateral Discussions**

166.     Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin, participated in at least 200 Glass Meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Samsung. Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Samsung agreed on prices and supply levels for CRT Products.

167.     Defendants SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them. To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the Glass Meetings. Thus, SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

168.     Between at least 1995 and 2001, Defendant LG, through LG Electronics, Inc. and LGETT, participated at least 100 Glass Meetings at all levels. After 2001, LG participated in the CRT Product conspiracy through its joint venture with Philips, LG.Philips Displays (n/k/a LP Displays). A substantial number of these meetings were attended by the highest ranking executives from LG. LG also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, LG agreed on prices and supply levels for CRT Products. LG never effectively withdrew from this conspiracy.

169.     Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them. To the extent LGEUSA sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

170.     Between at least 1996 and 2001, Defendant Philips, through Royal Philips, Philips Taiwan, and PEIL participated at least 100 Glass Meetings at all levels. After 2001, Philips participated in the CRT Product conspiracy through its joint venture with LG, LG.Philips Displays (n/k/a LP Displays). A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants. Through these discussions, Philips agreed on prices and supply levels for CRT Products. Philips never effectively withdrew from this conspiracy.

171.     Defendants PENAC, Philips Brazil, and PCEC were represented at those meetings and were a party to the agreements entered at them. To the extent PENAC, Philips Brazil and PCEC sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, PENAC, Philips Brazil and PCEC were active, knowing participants in the alleged conspiracy.

172.     Between at least 2001 and 2006, Defendant LP Displays (f/k/a LG.Philips Displays) participated at least 100 Glass Meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from LP Displays. Certain of these high level executives from LP Displays had previously attended meetings on behalf of defendants LG and Philips. LP Displays also engaged in bilateral discussions with other Defendants. Through these discussions, LP Displays agreed on prices and supply levels for CRT Products.

173.     Between at least 1995 and 2006, Defendant Chunghwa, through CPT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 Glass Meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of CPT, C.Y. Lin. Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Chunghwa agreed on prices and supply levels for CRT Products.

174.    Defendants Tatung Company and Tatung America were represented at those meetings and were a party to the agreements entered at them. To the extent Tatung Company and Tatung America sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Tatung Company and Tatung America were active, knowing participants in the alleged conspiracy.

175.    Between at least 1995 and 2004, Defendant Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 Glass Meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Daewoo. Daewoo also engaged in bilateral discussions with other Defendants on a regular basis. Through these discussions, Daewoo agreed on prices and supply levels for CRT Products. Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

176.    Defendant Daewoo International was represented at those meetings and was a party to the agreements entered at them. To the extent Daewoo International sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Daewoo International was an active, knowing participant in the alleged conspiracy.

177.    Between at least 1995 and 2003, Defendant Toshiba, through Toshiba Corporation and TDDT, participated in several Glass Meetings. After 2003, Toshiba participated in the CRT conspiracy through its joint venture with Panasonic, MTPD. These meetings were attended by high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG. Through these discussions, Toshiba agreed on prices and supply levels for CRT Products. Toshiba never effectively withdrew from this conspiracy.

178.     Defendants Toshiba America, TAIP, TACP, TACPI and TAEC were represented at those meetings and were a party to the agreements entered at them. To the extent Toshiba America, TAIP, TACP, TACPI and TAEC sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Toshiba America, TAIP, TACP, TACPI, and TAEC were active, knowing participants in the alleged conspiracy.

179.     Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in several Glass Meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRT Products. Hitachi never effectively withdrew from this conspiracy.

180.     Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them. To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

181.     Between at least 1996 and 2003, Defendant Panasonic (known throughout the class period as Matsushita Electric Industrial Co., Ltd.), through Panasonic Corporation and Matsushita Malaysia, participated in several Glass Meetings. After 2003, Panasonic participated in the CRT conspiracy through its joint venture with Toshiba, MTPD. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with other Defendants. Through these discussions, Panasonic agreed on prices and supply levels for CRT Products. Panasonic never effectively withdrew from this conspiracy.

182. Panasonic NA and Panasonic Consumer Electronics were represented at those meetings and were a party to the agreements entered at them. To the extent Panasonic NA and Panasonic Consumer Electronics sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Panasonic NA and Panasonic Consumer Electronics were active, knowing participants in the alleged conspiracy.

183. Between at least 2003 and 2006, Defendant MTPD participated in multiple Glass Meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high level sales managers from MTPD. MTPD also engaged in bilateral discussions with other Defendants. Through these discussions, MTPD agreed on prices and supply levels for CRT Products.

184. Between at least 1998 and 2007, Defendant BMCC participated in multiple Glass Meetings. These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for CRT Products. None of BMCC's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government. BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

185. Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE, and IDDC, participated in multiple Glass Meetings. These meetings were attended by the highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRT Products. None of IRICO's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

186. Between at least 1997 and 2006, Defendant Thai CRT participated in multiple Glass Meetings. These meetings were attended by the highest ranking executives from Thai

CRT. Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel. Through these discussions, Thai CRT agreed on prices and supply levels for CRT Products. Thai CRT never effectively withdrew from this conspiracy.

187.    Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT. These meetings were attended by high level executives from Samtel. Through these discussions, Samtel agreed on prices and supply levels for CRT Products. Samtel never effectively withdrew from this conspiracy.

188.    When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.  The CRT Market During The Conspiracy**

189.    Until the last few years, CRTs were the dominant technology used in displays, including television and computer monitors. During the Class Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

190.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------|------|------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

191.     During the Class Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America. By 2002, North America still consumed around 35 percent of the world's CRT monitor supply. *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

192.     Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Class Period. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Information Display 9/92 p.19. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

193.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years…."

194.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose. The price increase was allegedly based on increasing global demand. In fact, this price increase was a result of the collusive conduct as herein alleged.

195.     After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

196.     A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October….While computer monitor price increases

may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

197.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips, and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes. Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be 20% hike in the price of our CRT monitors."

198.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

199.    For example, the Defendants' CRT factory utilization percentage fell from 90 percent in the third quarter of 2000 to 62 percent in the first quarter of 2001. This is the most dramatic example of a drop in factory utilization. There were sudden drops throughout the Class Period but to a lesser degree. Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by the Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRT Products.

200.    During the Class Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products. As Finsen Yu, President of Skyworth Macao Commerical Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

201.    During the Class Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

202.    These price increases and price stability in the market for CRT Products during the Class Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.  International Government Antitrust Investigations**

203.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRT Products sold in the United States during the Class Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ") and others in November 2007.

204.    On November 8, 2007, antitrust authorities in Europe, Japan and South Korea raided the offices of manufacturers of CRTs as part of an international investigation of alleged price fixing.

205.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Defendant Chunghwa Picture Tubes, Ltd., Cheng Yuan Lin, aka C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry." The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in the Northern District of California.

206.    Defendant MT Picture Display Co., Ltd., the CRT unit of Defendant Panasonic, has confirmed that it was raided by Japan's Fair Trade Commission.

207.    *Kyodo News* reported on November 8, 2007, upon information and belief, that MT Picture Display fixed prices for CRTs with manufacturers in three Asian countries, including South Korea's Samsung SDI Co.

208.    *Kyodo News* further reported that:

> Officials of these three companies are believed to have had at least 10 meetings since 2005 in major Asian cities to coordinate target prices when delivering their products to TV manufacturers in Japan and South Korea, the sources said.

209. Defendant Samsung SDI Co., Ltd. was raided by South Korea's Fair Trade Commission, which has started an investigation into Samsung's CRT business.

210. The *Asian Shimbun* further reported on November 10, 2007 that "[t]he representatives held meetings in Southeast Asia where the companies operate CRT factories, the sources said. The European Commission, the European Union's executive branch, and the U.S. Justice Department have been investigating four companies' [referring to the four Asian-based manufacturers—MT Picture Display, Samsung SDI Co., Chunghwa Picture Tubes, LP Displays] overseas units and are closely consulting with the Fair Trade Commission by sharing information."

211. On November 21, 2007, Defendant Royal Philips publicly disclosed that it too is subject to one or more investigations into anticompetitive conduct in the CRT industry. Royal Philips spokesman Joon Knapen declined to comment on which jurisdictions have started investigations. Royal Philips stated that it intended to assist the regulators.

212. In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

213. On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel. The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Picture Tubes (UK), Ltd., Chunghwa Picture Tubes, Ltd., Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany Gmbh, Matsushita Global HQ, Matsushita European HQ.

Based on the data available, the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including colored picture tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

214.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

215.    Several Defendants also have a history of "cooperation" and anticompetitive conduct. For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory (DRAM).

216.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory and NAND Flash Memory.

217.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

218.    On December 12, 2006, news reports indicated that Defendants Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics, Inc, LG Display Co., Ltd., were all under investigation for price fixing of TFT-LCDs.

219. On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation, and Defendant Chunghwa Picture Tubes, Ltd.—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

220. On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, Ltd., a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

221. The indictments of LG Display Co., Ltd., Sharp Corporation, Chunghwa Picture Tubes, Ltd. and Hitachi Displays, Ltd., all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in the Northern District of California.

## IX. THE PASS-THROUGH OF OVERCHARGES TO CONSUMERS

222. Defendants' conspiracy to fix, raise, maintain and stabilize the price of CRT Products at artificial levels resulted in harm to Plaintiffs and the indirect purchaser consumer classes alleged herein because it resulted in their paying higher prices for CRT Products than they would have paid in the absence of Defendants' conspiracy. The entire overcharge at issue was passed on to Plaintiffs and members of the indirect purchaser classes. As the DOJ acknowledged in announcing the indictment of defendant Chunghwa's former Chairman and CEO, "This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices."

223. The Defendants identified above that attended the Glass Meetings, monitored the prices of televisions and computer monitors sold in the U.S. and elsewhere on a regular basis. The purpose and effect of investigating such retail market data was at least three fold. First, it permitted Defendants, such as Chunghwa, which did not manufacture CRT televisions or computer monitors the way that Samsung, LG, Daewoo, Panasonic, Toshiba, Philips, and Hitachi did, to police the price fixing agreement to make sure that intra-defendant CRT sales were kept at supra-competitive levels. Secondly, it permitted all Defendants to police their price

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

fixing agreement to independent OEMs who would reduce prices for finished goods if there was a corresponding reduction in CRT prices from a Defendant. Finally, as discussed above, Defendants used the prices of finished products to analyze whether they could increase prices or should agree to a "bottom" price instead. The Defendants concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers (for e.g., retailers and computer OEMs). In this way, Defendants assured that 100% of the supracompetitive overcharges for CRT Products were passed on to indirect purchaser consumers.

224.     The indirect purchaser consumer buys CRT Products from either a computer or TV OEM such as Dell or Sharp, or a reseller such as Best Buy.

225.     Because of the breadth of the price-fixing conspiracy here, the direct purchaser CRT TV and monitor manufacturers were not constrained by their competitors from passing on the overcharge. Because each of the direct purchaser's competitors were also buying CRTs at supracompetitive prices from conspiracy members, no direct purchaser faced end-product price competition from a competitor that was not paying supracompetitive prices for CRTs.

226.     The price of CRT Products is directly correlated to the price of CRTs. The margins for CRT TV and monitor makers are sufficiently thin that price increases of CRTs force them to increase the prices of their CRT Products. This means that increases in the price of CRTs lead to quick corresponding price increases at the OEM level for CRT Products.

227.     Computer and TV OEMs and retailers of CRT Products are all subject to vigorous price competition, whether selling CRT TVs or computer monitors. The demand for CRTs is ultimately determined by purchasers of products containing such products. The market for CRTs and the market for CRT Products are therefore inextricably linked and cannot be considered separately. Defendants are well aware of this intimate relationship, and use forecasts of CRT TVs and computer monitors to predict sales of and determine production levels and pricing for CRTs.

228.     Computers and televisions are commodities with little or no brand loyalty such that aggressive pricing causes consumers to switch preferences to different brands. Prices are closely based on production costs, which are in turn directly determined by component costs, as assembly costs are minimal. OEMs accordingly use component costs, like the cost of CRTs, as the starting point for all price calculations. On information and belief, computer and TV OEMs price their end-products on a "cost-plus" basis. Thus, computer and television prices closely track increases and decreases in component costs.

229.     The CRT is the most expensive component in the products into which they are incorporated. On information and belief, the cost of the CRT in a computer monitor is approximately 60% of the total cost to manufacture the computer monitor. On information and belief, the cost of the CRT in a television is a slightly smaller percentage of the total manufacturing cost because a television has more components than a computer monitor, such as the tuner and speakers.

230.     Economic and legal literature recognizes that the more pricing decisions are based on cost, the easier it is to determine the pass-through rate. The directness of affected costs refers to whether an overcharge affects a direct (*i.e.,* variable) cost or an indirect (*i.e.,* overhead) cost. Overcharges will be passed through sooner and at a higher rate if the overcharges affect direct costs. Here, CRTs are a direct and substantial cost of CRT Products. Therefore, Plaintiffs will be able to show that the overcharge on the CRTs was passed through to indirect purchasers.

231.     Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. CRTs are identifiable, discreet, physical objects that do not change form or become an indistinguishable part of the TV or computer monitor in which they are contained. Thus, CRTs follow a traceable physical chain from the Defendants to the OEMs to the purchasers of finished products incorporating CRTs.

232.     Moreover, just as CRTs can be physically traced through the supply chain, so can their price by traced to show that changes in the prices paid by direct purchasers of CRTs affect prices paid by indirect purchasers of CRT Products. On information and belief, computer and TV OEMs price their end-products on a "cost-plus" basis.

INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917

233.     In retailing, it is common to use a "mark-up rule." The retail price is set as the wholesale cost plus a percentage markup designed to recover non-product costs and to provide a profit. This system guarantees that increases in costs to the retailer will be passed on to end buyers. For example, CDW, a large seller of CRT monitors, uses such a system. A declaration in the *DRAM* case from CDW's director of pricing details exactly how they calculated selling prices:

> In general, CDW employs a "building block" approach to setting its advertised prices. The first building block is the Cost of Goods Sold (COGS), which represents the price CDW paid to acquire the product…CDW…adds a series of positive markups to the cost to CDW to acquire a given product. These markups are in addition to the pass through effect of changes in the costs charged to CDW for that product by a given vendor.

234.     Economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. As Professor Herbert Hovenkamp, a noted antitrust scholar, has stated in his treatise, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 624:

> A monopoly charge at the top of the distribution chain generally results in higher prices at every level below. For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and will pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain will be poorer as a result of the monopoly price at the top.

> Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

235.     Similarly, two other antitrust scholars—Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Hass School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern School of Law and author of the Handbook of the

Law of Antitrust)—have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception; it is the rule."

236.    As Professor Jeffrey McKie-Mason (Arthur W. Burks Professor for Information and Computer Science, Professor of Economics and Public Policy, and Associate Dean for Academic Affairs in the School of Information at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in a judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers…. Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

237.    The purpose of Defendants' conspiratorial conduct was to fix, raise, maintain and stabilize the price of CRTs and, as a direct and foreseeable result, CRT Products. The market for CRTs and the market for CRT Products are inextricably linked. One exists to serve the other. Defendants not only knew, but expressly contemplated that prices of CRT Products would increase as a direct result of their increasing the prices of CRTs.

238.    Finally, many of the Defendants and/or co-conspirators themselves have been and are currently manufacturers of CRT TVs and computer monitors. Such manufacturers include, for example, Samsung, LG, Hitachi, Toshiba, Philips, and Panasonic. Having agreed to fix prices for CRTs, the major component of the end products they were manufacturing, these Defendants intended to pass on the full cost of this component in their finished products, and in fact did so.

239.    As a direct and proximate result of Defendants' illegal conduct, Plaintiffs and other indirect purchasers have been forced to pay supra-competitive prices for CRT Products. These inflated prices have been passed on to them by direct purchaser manufacturers, distributors and retailers.

# X. CLASS ACTION ALLEGATIONS

240.    Plaintiffs bring this action individually and as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the following class (the "Nationwide Class"):

> All persons and or entities who or which indirectly purchased in the United States for their own use and not for resale, CRT Products manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or co-conspirator thereof, at any time during the period from at least March 1, 1995 through at least November 25, 2007. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and, any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local government entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

241.    Plaintiffs also bring this action on behalf of themselves and as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all members of the following State classes or subclasses (collectively "Indirect Purchaser State Classes"): Arizona, California, Florida, Hawaii, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

242.    Each of the Indirect Purchaser State Classes is defined as follows:

> All persons and or entities who or which indirectly purchased in each of the above States for their own use and not for resale, CRT Products manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or co-conspirator thereof, at any time during the period from at least March 1, 1995 through at least November 25, 2007. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and, any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local government entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

243.    This action has been brought and may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

a.    The Classes are ascertainable and there is a well-defined community of interest among members of the Classes;

b.    Based upon the nature of trade and commerce involved and the number of indirect purchasers of CRT Products, Plaintiffs believe that the number of Class members is very large, and therefore joinder of all Class members is not practicable;

c.    Plaintiffs' claims are typical of Class members' claims because Plaintiffs indirectly purchased CRT Products manufactured by Defendants or their co-conspirators, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Classes and the relief sought is common to the Classes;

d.    The following common questions of law or fact, among others, exist as to the members of the Classes:

i.    Whether Defendants formed and operated a combination or conspiracy to fix, raise, maintain, or stabilize the prices of CRT Products;

ii.    Whether the combination or conspiracy caused CRT Product prices to be higher than they would have been in the absence of Defendants' conduct;

iii.    The operative time period of Defendants' combination or conspiracy;

iv.    Whether Defendants' conduct caused injury to the business or property of Plaintiffs and the members of the Classes;

v.    The appropriate measure of the amount of damages suffered by the Classes;

vi.    Whether Defendants' conduct violates Section 1 of the Sherman Act (15 U.S.C. § 1) as alleged in the First Claim for Relief;

vii.    Whether Defendants' conduct violates the Indirect Purchaser States' antitrust laws as alleged in the Second Claim for Relief;

viii.     Whether Defendants' conduct violates the unfair competition and consumer protection laws of the Consumer Protection States as alleged in the Third Claim for Relief;

ix.     The appropriate nature of class-wide equitable relief.

e.     These and other questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages;

f.     After determination of the predominant common issues identified above, if necessary or appropriate, the Classes can be divided into logical and manageable subclasses;

g.     Plaintiffs will fairly and adequately protect the interests of the Classes in that Plaintiffs have no interests that are antagonistic to other members of the Classes and have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent them and the Classes;

h.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all damaged Class members is impractical. The damages suffered by the individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent the availability of class action procedures it would not be feasible for Class members to redress the wrongs done to them. Even if the Class members could afford individual litigation, the court system could not. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and the court system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision in a single court;

i.     Defendants have acted, and/or refused to act, on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes as a whole; and

j.     In the absence of a class action, Defendants would be unjustly enriched because they would be able to retain the benefits and fruits of its wrongful conduct.

## XI.  <u>VIOLATIONS ALLEGED</u>

### A.  <u>First Claim for Relief: Violation of Section 1 of the Sherman Act</u>

244.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

245.     Beginning at a time unknown to Plaintiffs, but at least as early as March 1, 1995, through at least November 25, 2007, the exact dates being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators, entered into a continuing agreement, understanding, and conspiracy to unreasonably restrain trade and commerce in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

246.     In particular, Defendants have combined and conspired to fix, raise, maintain or stabilize the prices of CRT Products sold in the United States.

247.     Defendants, by their unlawful conspiracy, artificially raised, inflated and maintained the market prices of CRT Products as herein alleged.

248.     The contract, combination or conspiracy consisted of a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of CRT Products they sold in the United States and elsewhere.

249.     In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

a.     Participated in meetings and conversations to discuss the prices and supply of CRT Products in the United States and elsewhere;

b.     Agreed to manipulate prices and limit supply of CRT Products sold in the United States and elsewhere in a manner that deprived direct and indirect purchasers of CRT Products of free and open competition;

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

c.    Issued price announcements and price quotations in accordance with the agreements reached;

d.    Sold CRT Products to customers in the United States at non-competitive prices; and

e.    Invoiced customers in the United States at the agreed-upon, fixed prices for CRT Products and transmitting such invoices via U.S. mail and other interstate means of delivery.

250.    The combination and conspiracy alleged herein has had the following effects, among others:

a.    Price competition in the sale of CRT Products has been restrained, suppressed and/or eliminated in the United States;

b.    Prices for CRT Products sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

c.    Those who purchased CRT Products directly or indirectly from Defendants have been deprived the benefits of free and open competition.

251.    As a direct result of the unlawful conduct of Defendants and their co-conspirators in furtherance of their continuing contract, combination or conspiracy, Plaintiffs and the members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for CRT Products purchased indirectly from the Defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy.

252.    These violations are continuing and will continue unless enjoined by this Court.

253.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Nationwide Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

//

//

## B. **Second Claim For Relief: Violation of State Antitrust Statutes**

254. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

255. Plaintiff Brian Luscher ("Arizona Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

    a.    Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Arizona; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) the Arizona Plaintiff and members of the Arizona Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

    b.    During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

    c.    As a direct and proximate result of Defendants' unlawful conduct, the Arizona Plaintiff and members of the Arizona Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§44-1401, *et seq*. Accordingly, the Arizona Plaintiff and the members of the Arizona Indirect Purchaser Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq*.

256. Plaintiffs Jeffrey Figone, Carmen Gonzalez, Dana Ross, and Steven Ganz ("California Plaintiffs") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.      Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professional Code. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of CRT Products at supra-competitive levels.

b.      The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for CRT Products.

c.      For the purpose of forming and effectuating the unlawful trust, the defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices, and course of conduct set forth above and the following: (1) fixing, raising, stabilizing and/or maintaining the price of CRT Products; and (2) allocating among themselves the production of CRT Products.

d.      The combination and conspiracy alleged herein has had, *inter alia,* the following effects: (1) price competition in the sale of CRT Products has been restrained, suppressed and/or eliminated in the State of California; (2) prices for CRT Products sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and (3) those who purchased CRT Products directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

**61**
**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

e.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the California Class have been injured in their business and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 *et seq.* of the California Business and Professions Code, Plaintiffs seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

257.    Plaintiff Travis Burau ("Iowa Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.      Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout the Iowa; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the Iowa; (3) the Iowa Plaintiff and the members of the Iowa Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

b.      During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, the Iowa Plaintiff and members of the Iowa Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1 et *seq*. Accordingly,

the Iowa Plaintiff and the members of the Iowa Indirect Purchaser Class
seek all forms of relief available under Iowa Code §§ 553.1.

258. Plaintiff Southern Office Supply, Inc. ("Kansas Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

  a. Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Kansas; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) the Kansas Plaintiff and members of the Kansas Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

  b. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

  c. As a direct and proximate result of Defendants' unlawful conduct, the Kansas Plaintiff and members of the Kansas Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

  d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§50-101 *et seq.* Accordingly, the Kansas Plaintiff and the members of the Kansas Indirect Purchaser Class seek all forms of relief available under Kansas Stat. Ann. §§50-101 *et seq.*

259. Plaintiffs Andrew Kindt, James Brown, and Kory Pentland ("Michigan Plaintiffs") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

  a. Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Michigan; (2) CRT Product prices were raised,

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917**

fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) the Michigan Plaintiffs and members of the Michigan Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

b.    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, the Michigan Plaintiffs and members of the Michigan Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771 *et seq.* Accordingly, the Michigan Plaintiffs and the members of the Michigan Indirect Purchaser Class seek all forms of relief available under Michigan Comp. Laws Ann. §§ 445.771 *et seq.*

260.    Plaintiffs Chad Klebs, David Norby, Alan Rotman, and Ryan Rizzo ("Minnesota Plaintiffs") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

a.    Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) the Minnesota Plaintiffs and members of the Minnesota Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

b.    During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, the Minnesota Plaintiffs and members of the Minnesota Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.50 *et seq.* Accordingly, the Minnesota Plaintiffs and the members of the Minnesota Indirect Purchaser Class seek all forms of relief available under Minnesota Stat. §§ 325D.50 *et seq.*

261.    Plaintiff Charles Jenkins ("Mississippi Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.    Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) the Mississippi Plaintiff and members of the Mississippi Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

b.    During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, the Mississippi Plaintiff and members of the Mississippi Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §75-21-1 et seq. Accordingly, the Minnesota Plaintiff and the members of the Mississippi

Indirect Purchaser Class seek all forms of relief available under
Mississippi Code Ann. §75-21-1 et seq.

262. Plaintiff Daniel R. Hergert ("Nebraska Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

    a.    Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

    b.    During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

    c.    As a direct and proximate result of Defendants' unlawful conduct, the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. § 59-801 *et seq.* Accordingly, the Nebraska Plaintiff and the members of the Nebraska Indirect Purchaser Class seek all forms of relief available under Nebraska Rev. Stat. § 59-801 *et seq.*

263. Plaintiff Samuel Nasto ("Nevada Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

    a.    Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and

eliminated throughout Nevada; (2) CRT Product prices were raised, fixed,

maintained, and stabilized at artificially high levels throughout Nevada;

(3) the Nevada Plaintiff and members of the Nevada Indirect Purchaser

Class paid supracompetitive, artificially inflated prices for CRT Products.

b.      During the Class Period, Defendants' illegal conduct substantially

affected Nevada commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, the

Nevada Plaintiff and members of the Nevada Indirect Purchaser Class

have been injured in their business and property and are threatened with

further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in

restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq.*

Accordingly, the Nevada Plaintiff and the members of the Nevada

Indirect Purchaser Class seek all forms of relief available under Nevada

Rev. Stat. Ann. §§ 598A *et seq.*

264.    Plaintiff Craig Stephenson ("New Mexico Plaintiff") incorporates and realleges

each and every allegation set forth in the preceding paragraphs of this Complaint and further

alleges as follows:

a.      Defendants' combinations or conspiracies had the following effects: (1)

CRT Product price competition was restrained, suppressed, and

eliminated throughout New Mexico; (2) CRT Product prices were raised,

fixed, maintained, and stabilized at artificially high levels throughout New

Mexico; (3) the New Mexico Plaintiff and members of the New Mexico

Indirect Purchaser Class paid supracompetitive, artificially inflated prices

for CRT Products.

b.      During the Class Period, Defendants' illegal conduct substantially

affected New Mexico commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq.* Accordingly, the New Mexico Plaintiff and the members of the New Mexico Indirect Purchaser Class seek all forms of relief available under New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

265.   Plaintiff Joshua Maida ("North Carolina Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.   Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) the North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

b.   During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, the North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1 *et seq.* Accordingly, the North Carolina Plaintiff and the members of the North

Carolina Indirect Purchaser Class seek all forms of relief available under North Carolina Gen. Stat. §§ 75-1 *et seq.*

266. Plaintiff Gary Hanson ("North Dakota Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

    a.    Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) the North Dakota Plaintiff and members of the North Dakota Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

    b.    During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce.

    c.    As a direct and proximate result of Defendants' unlawful conduct, the North Dakota Plaintiff and members of the North Dakota Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq.* Accordingly, the North Dakota Plaintiff and the members of the North Dakota Indirect Purchaser Class seek all forms of relief available under North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

267. Plaintiff Donna Marie Ellingson ("South Dakota Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

    a.    Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and

eliminated throughout South Dakota; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) the South Dakota Plaintiff and members of the South Dakota Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

b.    During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, the South Dakota Plaintiff and members of the South Dakota Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1 *et seq.* Accordingly, the South Dakota Plaintiff and the members of the South Dakota Indirect Purchaser Class seek all forms of relief available under South Dakota Codified Laws Ann. §§ 37-1 *et seq.*

268.    Plaintiffs Frank Warner and Albert Sidney Crigler ("Tennessee Plaintiffs") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

a.    Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) the Tennessee Plaintiffs and members of the Tennessee Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

b.    During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce.

**70**

c.      As a direct and proximate result of Defendants' unlawful conduct, the Tennessee Plaintiffs and members of the Tennessee Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101 *et seq.* Accordingly, the Tennessee Plaintiffs and the members of the Tennessee Indirect Purchaser Class seek all forms of relief available under Tennessee Code Ann. §§ 47-25-101 *et seq.*

269.    Plaintiff Margaret Slagle ("Vermont Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.      Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Vermont; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) the Vermont Plaintiff and members of the Vermont Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

b.      During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, the Vermont Plaintiff and members of the Vermont Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453 *et seq.* Accordingly, the Vermont Plaintiff and the members of the Vermont

Indirect Purchaser Class seek all forms of relief available under Vermont Stat. Ann. 9 §§ 2453 *et seq.*

270.    Plaintiff John Larch ("West Virginia Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

    a.    Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) the West Virginia Plaintiff and members of the West Virginia Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

    b.    During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce.

    c.    As a direct and proximate result of Defendants' unlawful conduct, the West Virginia Plaintiff and members of the West Virginia Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1 *et seq.* Accordingly, the West Virginia Plaintiff and the members of the West Virginia Indirect Purchaser Class seek all forms of relief available under West Virginia Code §§ 47-18-1 *et seq.*

271.    Plaintiff Brigid Terry ("Wisconsin Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

    a.    Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and

eliminated throughout Wisconsin; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) the Wisconsin Plaintiff and members of the Wisconsin Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

b.     During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, the Wisconsin Plaintiff and members of the Wisconsin Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§133.01 *et seq.* Accordingly, the Wisconsin Plaintiff and the members of the Wisconsin Indirect Purchaser Class seek all forms of relief available under Wisconsin Stat. §§133.01 *et seq.*

**C.  Third Claim for Relief: Violation of State Consumer Protection and Unfair Competition Statutes**

272.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

273.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

274.     California Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege as follows:

a.     Beginning on a date unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up through and including

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

November 25, 2007, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

b. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

c. The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.,* including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.,* of the California Business and Professions Code, set forth above;

d. Defendants' acts, omissions, misrepresentations, practices and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; Defendants' act and practices are unfair to consumers of CRT Products in the State of California and throughout the United States, within the meaning of Section 17200, California Business and Professions Code; and

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

e.   Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

f.   California Plaintiffs and each of the California Indirect Purchaser Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

g.   The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

h.   The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause the California Plaintiffs and the members of the California Indirect Purchaser Class to pay supra-competitive and artificially-inflated prices for CRT Products. The California Plaintiffs and the members of the Class suffered injury in fact and lost money or property as a result of such unfair competition.

i.   The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

j.   As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. The California Plaintiffs and the members of the California Indirect Purchaser Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business practices, pursuant to California Business & Professions Code §17200 *et seq.*

275. Plaintiffs Brady Lane Cotton and Colleen Sobotka ("Florida Plaintiffs") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in Florida.

b. The foregoing conduct constitutes "unfair methods of competition," and "unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Florida Stat. § 501.204.

c. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

d. Defendants' unlawful conduct had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Florida; (2) CRT Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) the Florida Plaintiffs and members of the Florida Indirect Purchaser Class were deprived of free and open competition; and (4) the Florida Plaintiffs and members of the Florida Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

e. As a direct and proximate result of Defendants' conduct, the Florida Plaintiffs and members of the Florida Indirect Purchaser Class have been injured and are threatened with further injury.

f. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201 *et seq.*, and accordingly, the Florida Plaintiffs and members of the Florida Indirect Purchaser Class seek all relief available under that statute.

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

276.     Plaintiff Daniel Riebow ("Hawaii Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in Hawaii.

b.     The foregoing conduct constitutes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Hawaii Rev. Stat. § 480-2.

c.     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

d.     Defendants' unlawful conduct had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) CRT Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Hawaii; (3) the Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class were deprived of free and open competition; and (4) the Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

e.     As a direct and proximate result of Defendants' conduct, the Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class have been injured and are threatened with further injury.

f.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-2, and accordingly, the Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class seek all relief available under Hawaii Rev Stat. § 480 *et seq*.

277. Plaintiff Barbara Caldwell ("Massachusetts Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

    a.    Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

    b.    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in Massachusetts.

    c.    Defendants took efforts to conceal their agreements from the Massachusetts Plaintiff and members of the Massachusetts Indirect Purchaser Class.

    d.    The foregoing conduct constitutes "unfair competition or unfair or deceptive acts or practices" within the meaning of Massachusetts G.L. c. 93A, §2 *et seq.*

    e.    During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.

    f.    Defendants' unlawful conduct had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) CRT Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Massachusetts; (3) the Massachusetts Plaintiff and members of the Massachusetts Indirect Purchaser Class were deprived of free and open competition; and (4) the Massachusetts Plaintiff and members of the Massachusetts Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

g.     As a direct and proximate result of Defendants' conduct, the Massachusetts Plaintiff and members of the Massachusetts Indirect Purchaser Class have been injured and are threatened with further injury.

h.     By reason of the foregoing, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts G.L. c. 93A, §2. Defendants' and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling the Massachusetts Plaintiffs and members of the Massachusetts Indirect Purchaser Class to multiple damages.

278.     The Nebraska Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in Nebraska.

b.     The foregoing conduct constitutes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Neb. Rev. Stat. § 59-1602.

c.     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

d.     Defendants' unlawful conduct had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) CRT Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class were deprived of free and open competition; and (4) the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT
MDL NO. 1917

e.    As a direct and proximate result of Defendants' conduct, the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class have been injured and are threatened with further injury.

f.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §§ 59-1601 *et seq.*, and accordingly, the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class seek all relief available under that statute.

279.    The New Mexico Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in New Mexico.

b.    Defendants also took efforts to conceal their agreements from the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class.

c.    The foregoing conduct constitutes "unfair or deceptive trade practices" and "unconscionable trade practices in the conduct of any trade or commerce" within the meaning of New Mexico Stat. § 57-12-3, in that such conduct resulted in a gross disparity between the value received by New Mexico Plaintiffs and the members of the New Mexico Indirect Purchaser Class and the prices paid by them for CRT Products as set forth in New Mexico Stat. § 57-12-2E.

d.    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

e.    Defendants' unlawful conduct had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) CRT Product prices were raised, fixed, maintained and

stabilized at artificially high levels throughout New Mexico; (3) the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class were deprived of free and open competition; and (4) the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

f.  As a direct and proximate result of Defendants' conduct, the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class have been injured and are threatened with further injury.

g.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1 *et seq.*, and accordingly, the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class seek all relief available under that statute.

280.  Plaintiff Adrienne Belai ("New York Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in New York.

b.  Defendants also took efforts to conceal their agreements from the New York Plaintiff and members of the New York Indirect Purchaser Class.

c.  Defendants' illegal conduct substantially affected New York commerce and consumers.

d.  The conduct of Defendants as described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State

in an honest marketplace in which economic activity is conducted in a competitive manner.

e. As consumers, the New York Plaintiff and the members of the New York Indirect Purchaser Class were targets of the conspiracy.

f. Defendants' secret agreements as described herein were not known to the New York Plaintiff or the members New York Indirect Purchaser Class.

g. Defendants made public statements about the price of CRT Products that Defendants knew would be seen by the New York Plaintiff and the members of the New York Indirect Purchaser Class; such statements either omitted material information that rendered these statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for CRT Products; and, Defendants alone possessed material information that was relevant to consumers, but failed to provide the information.

h. Because of Defendants' unlawful trade practices in the State of New York, there was a broad impact on the New York Plaintiff and the members of the New York Indirect Purchaser Class who indirectly purchased CRT Products; and the New York Plaintiff and the members of the New York Indirect Purchaser Class have been injured because they have paid more for CRT Products than they would have paid in the absence of Defendants' unlawful trade acts and practices, and are threatened with further injury.

i. Because of Defendants' unlawful trade practices in the State of New York, the New York Plaintiff and the members of the New York Indirect Purchaser Class who indirectly purchased CRT Products were misled to believe that they were paying a fair price for CRT Products, or that the price increases for CRT Products were for valid business reasons.

      j.     Defendants knew that their unlawful trade practices with respect to pricing of CRT Products would have an impact on the New York Plaintiff and the members of the New York Indirect Purchaser Class and not just Defendants' direct customers;

      k.     Defendants knew that their unlawful trade practices with respect to pricing of CRT Products would have a broad impact, causing consumer class members who indirectly purchased CRT Products to be injured by paying more for CRT Products than they would have paid in the absence of Defendants' unlawful trade acts and practices.

      l.     During the Class Period, each of the Defendants named herein, directly or indirectly through affiliates they dominated and controlled, manufactured, sold and/or distributed CRT Products in New York.

      m.     The New York Plaintiff and members of the New York Indirect Purchaser Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial. Without prejudice to their contention that Defendants' unlawful conduct was willful and knowing, the New York Plaintiff and members of the New York Indirect Purchaser Class do not seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus. Law § 349 (h).

281.    The North Carolina Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

      a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in North Carolina.

      b.     Defendants also took efforts to conceal their agreements from the North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class.

c.      The conduct of Defendants as described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina Gen. Stat. §75-1.1 *et seq.*, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

d.      During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

e.      Defendants' unlawful conduct had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) CRT Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) the North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class were deprived of free and open competition; and (4) the North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

f.      As a direct and proximate result of Defendants' conduct, the North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class have been injured and are threatened with further injury.

g.      During the Class Period, each of the Defendants named herein, directly or indirectly through affiliates they dominated and controlled, manufactured, sold and/or distributed CRT Products in North Carolina.

h.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1 *et seq.*, and accordingly, the North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class seek all relief available under that statute.

282.     Plaintiff Rosemary Ciccone ("Rhode Island Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

    a.    Rhode Island Plaintiff and members of the Rhode Island Indirect Purchaser Class purchased CRT Products primarily for personal, family, or household purposes.

    b.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in Rhode Island.

    c.    Defendants deliberately failed to disclose material facts to the Rhode Island Plaintiff and members of the Rhode Island Indirect Purchaser Class concerning Defendants' unlawful activities and artificially inflated prices for CRT Products. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that Defendants CRT Product prices were competitive and fair.

    d.    Defendants made public statements that Defendants knew would be seen by the Rhode Island Plaintiff and members of the Rhode Island Indirect Purchaser Class who indirectly purchased CRT Products primarily for personal, family or household purposes; such statements created a likelihood of confusion or misunderstanding with respect to the real reasons that the prices of CRT Products were rising; and, such statements either omitted material information that rendered the statements materially misleading and confusing, or affirmatively deceived such consumers about the real cause of price increases for CRT Products.

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

e. Because of Defendants' unlawful and unscrupulous trade practices in Rhode Island, the Rhode Island Plaintiff and members of the Rhode Island Indirect Purchaser Class who indirectly purchased CRT Products primarily for personal, family or household purposes were misled or deceived to believe that they were paying a fair price for CRT Products or that the price increases for CRT Products were for valid business reasons.

f. Defendants knew that their unscrupulous and unlawful trade practices with respect to pricing CRT Products would have an impact on Rhode Island natural persons who indirectly purchased CRT Products primarily for personal, family or household purposes and not just Defendants' direct customers.

g. Defendants knew that their violations with respect to pricing of CRT Products would have a broad impact, causing natural persons who indirectly purchased CRT Products primarily for personal, family or household purposes to be injured by paying more for CRT Products than they would have paid in the absence of Defendants' unlawful trade acts and practices.

h. Defendants' violations adversely affected public policy in Rhode Island.

i. Defendants' unlawful conduct had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) CRT Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) the Rhode Island Plaintiff and members of the Rhode Island Indirect Purchaser Class were deprived of free and open competition; and (4) the Rhode Island Plaintiff and members of the Rhode Island Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

j.     As a direct and proximate result of Defendants' illegal conduct, the Rhode Island Plaintiff and the members of the Rhode Island Indirect Purchaser Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

k.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws § 6-13.1-1, *et seq.,* and accordingly, the Rhode Island Plaintiff and members of the Rhode Island Indirect Purchaser Class seek all relief available under that statute.

283.     The Vermont Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in Vermont.

b.     Defendants deliberately failed to disclose material facts to the Vermont Plaintiff and members of the Vermont Indirect Purchaser Class concerning Defendants' unlawful activities and artificially inflated prices for CRT Products. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that Defendants CRT Product prices were competitive and fair.

c.     Because of Defendants' unlawful and unscrupulous trade practices in Vermont, the Vermont Plaintiff and members of the Vermont Indirect Purchaser Class who indirectly purchased CRT Products were misled or

deceived to believe that they were paying a fair price for CRT Products or that the price increases for CRT Products were for valid business reasons.

d.       Defendants' unlawful conduct had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Vermont; (2) CRT Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) the Vermont Plaintiff and members of the Vermont Indirect Purchaser Class were deprived of free and open competition; and (4) the Vermont Plaintiff and members of the Vermont Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

e.       As a direct and proximate result of Defendants' illegal conduct, the Vermont Plaintiff and the members of the Vermont Indirect Purchaser Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

f.       Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of Vermont Stat. Ann. Title 9, § 2451 *et seq.,* and accordingly, Vermont Plaintiff and members of the Vermont Indirect Purchaser Class seek all relief available under that statute.

### D.   Fourth Claim for Relief: Unjust Enrichment and Disgorgement of Profits

284.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

285.    Defendants have been unjustly enriched through overpayments by Plaintiffs and the Class members and the resulting profits.

286.    Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred via overpayments by Plaintiffs and class members in

the following states: Arizona, California, Hawaii, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

287.     Plaintiffs and class members in each of the states listed above seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and the Class members may seek restitution.

## XII.  FRAUDULENT CONCEALMENT

288.     Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct against Plaintiffs and the Classes.

289.     Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, that Defendants were violating the law as alleged herein until shortly before this litigation was commenced. Nor could Plaintiffs and the Class members have discovered the violations earlier than that time because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection. In addition, the conspiracy was by its nature self-concealing.

290.     Defendants engaged in a successful, illegal price-fixing conspiracy with respect to CRT Products, which they affirmatively concealed, in at least the following respects:

a.     By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme, and by agreeing to expel those who failed to do so;

b.     By agreeing among themselves to limit the number of representatives from each Defendant attending the meetings so as to avoid detection;

c.     By agreeing among themselves to refrain from listing the individual representatives of the Defendants in attendance at meetings in any meeting report;

d.     By agreeing among themselves to refrain from taking meeting minutes or taking any kind of written notes during the meetings;

e.     By giving false and pretextual reasons for their CRT Product price increases during the relevant period and by describing such pricing falsely as being the result of external costs rather than collusion;

f.     By agreeing among themselves on what to tell their customers about price changes, and agreeing upon which attendee would communicate the price change to which customer;

g.     By agreeing among themselves to quote higher prices to certain customers than the fixed price in effect to give the appearance that the price was not fixed;

h.     By agreeing among themselves upon the content of public statements regarding capacity and supply;

i.     By agreeing among themselves to eliminate references in expense reports which might reveal the existence of their unlawful meetings; and

j.     By agreeing on other means to avoid detection of their illegal conspiracy to fix the prices of CRT Products.

291.     As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiffs and the Classes assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiffs and the members of the Classes.

## XIII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray as follows:

A.     That the Court determine that the claims alleged herein under the Sherman Act, state antitrust laws, state consumer protection and/or unfair competition laws may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, as informed by the respective state class action laws;

B.     That the Court adjudge and decree that the unlawful conduct, contract, combination and conspiracy alleged herein constitutes:

a.     A violation of the Sherman Act, 15 U.S.C. §1, as alleged in the First Claim for Relief;

      b.   A violation of the state antitrust laws as alleged in the Second Claim for
Relief;

      c.   A violation of the state consumer protection and unfair competition laws as
alleged in the Third Claim for Relief; and

      d.   Acts of unjust enrichment as set forth in the Fourth Claim for Relief herein.

C.     That Plaintiffs and the Indirect Purchaser State Classes recover damages, as provided by the state antitrust, consumer protection, and unfair competition laws alleged herein, and that a joint and several judgment in favor of Plaintiffs and the Classes be entered against the Defendants in an amount to be trebled in accordance with such laws;

D.     That Defendants, their co-conspirators, successors, transferees, assigns, parents, subsidiaries, affiliates, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on behalf of Defendants, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action, or adopting or following any practice, plan, program or design having a similar purpose or effect in restraining competition;

E.     That Plaintiffs and the Classes be awarded restitution, including disgorgement of profits obtained by Defendants as a result of its acts of unfair competition and acts of unjust enrichment;

F.     That the Court award Plaintiffs and the Classes they represent pre-judgment and post-judgment interest as permitted by law;

G.     That Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees as provided by law; and

H.     That the Court award Plaintiffs and the Classes they represent such other and further relief as may be necessary and appropriate.

//

//

//

## XIV.  JURY DEMAND

Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: March 16, 2009          By:      /s/ Mario N. Alioto
                                        Mario N. Alioto (56433)
                                        Lauren C. Russell (241151)
                                        **TRUMP, ALIOTO, TRUMP & PRESCOTT,
                                        LLP**
                                        2280 Union Street
                                        San Francisco, CA  94123
                                        Telephone:  (415) 563-7200
                                        Facsimile: (415) 346-0679
                                        malioto@tatp.com
                                        laurenrussell@tatp.com

                                        *Interim Lead Counsel
                                        for the Indirect Purchaser Plaintiffs*

**Plaintiffs' Counsel:**

| | |
|---|---|
| Joseph M. Patane<br>**LAW OFFICES OF JOSEPH M. PATANE**<br>2280 Union Street<br>San Francisco, CA 94123<br>Telephone: (415) 563-7200<br>Facsimile: (415) 346-0679<br>jpatane@tatp.com | Francis O. Scarpulla<br>Craig C. Corbitt<br>Judith A. Zahid<br>Qianwei Fu<br>**ZELLE, HOFMANN, VOELBEL & MASON, LLP**<br>44 Montgomery Street, Suite 3400<br>San Francisco, CA 94104<br>fscarpulla@zelle.com<br>ccorbitt@zelle.com<br>jzahid@zelle.com<br>qfu@zelle.com |
| Christopher Lovell<br>Craig Essenmacher<br>Keith Essenmacher<br>Imtiaz A. Siddiqui<br>**LOVELL STEWART HALEBIAN LLP**<br>500 Fifth Avenue, Floor 58<br>New York, NY 10110<br>clovell@lshllp.com<br>cessenmacher@lshllp.com | Lawrence G. Papale<br>**LAW OFFICES OF LAWRENCE G. PAPALE**<br>1308 Main Street #117<br>St. Helena, CA 94574<br>Telephone: (707) 963-1704<br>Facsimile: (707) 963-0706<br>lgpapale@papalelaw.com |
| Marvin A. Miller<br>Lori A. Fanning<br>Matthew E. Van Tine<br>**MILLER LAW LLC**<br>115 South LaSalle Street, Suite 2910<br>Chicago, IL 60603<br>mmiller@millerlawllc.com<br>lfanning@millerlawllc.com | Terry R. Saunders<br>Thomas A. Doyle<br>**SAUNDERS & DOYLE**<br>20 South Clark Street, Suite 1720<br>Chicago, IL 60603<br>trsaunders@saundersdoyle.com<br>tadoyle@saundersdoyle.com |
| Sherman Kassof<br>**LAW OFFICES OF SHERMAN KASSOF**<br>954 Risa Road, Suite B<br>Lafayette, CA 94549<br>Telephone: (510) 652 2554<br>Facsimile: (510) 652 9308<br>heevay@att.net | Andrew Morganti<br>Peter Safirstein<br>**MILBERG LLP**<br>One Pennsylvania Plaza<br>49th Floor<br>New York, New York 10119<br>Telephone: (212) 594-5300<br>Facsimile: (212) 868-1229<br>amorganti@milberg.com |

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

| | |
|---|---|
| Seymour J. Mansfield<br>Jean B. Roth<br>Charles Horowitz<br>**MANSFIELD, TANICK & COHEN, P.A.**<br>1700 U.S. Bank Plaza<br>220 South Sixth Street<br>Minneapolis, MN 55402<br>Telephone: (612) 339-4295<br>Facsimile: (612) 339-3161<br>smansfield@mansfieldtanick.com | Joel Flom<br>**JEFFRIES, OLSON & FLOM, P.A.**<br>1202 27th Street South<br>Fargo, N.D. 58103<br>Telephone: (701) 280-2300<br>Facsimile: (701) 280-1800<br>joel@jeffrieslaw.com |
| Michael G. Simon<br>M. Eric Frankovitch<br>**FRANKOVITCH, ANETAKIS, COLANTONIO & SIMON**<br>337 Penco Road<br>Weirton, WV 26062<br>Telephone: (304) 723-4400<br>Facsimile: (304) 723-5892<br>msimon@facslaw.com | Robert Gerard<br>**GERARD & OSUCH, LLP**<br>2840 South Jones Blvd.<br>Building D, Unit 4<br>Las Vegas, NV 89146<br>Telephone: (702) 251-0093<br>rgerard@gerardlaw.com |
| Robert G. Methvin, Jr.<br>Philip W. McCallum<br>Matt Stephens<br>**McCALLUM, METHVIN & TERRELL, P.C.**<br>2201 Arlington Avenue South<br>Birmingham, AL 35305<br>Telephone: (205) 939-0199<br>Facsimile: (205) 939-0399<br>Rgm@mmlaw.net<br>pwm@mmlaw.net<br>rem@mmlaw.net | Rodney Ray<br>**FORD & RAY**<br>301 Fifth Street South, Suite C<br>P.O. Box 1018<br>Columbus, MS 39703<br>Telephone: (662) 329-0110<br>Facsimile: (662) 329-3522<br>rray@fordraylaw.com |
| Christy Crow<br>**JINKS, CROW & DICKSON, P.C.**<br>P.O. Box 350<br>219 Prairie Street N.<br>Union Springs, AL 36089<br>Telephone: (334) 738-4225<br>Facsimile: (334) 738-4229<br>cdc@jinkslaw.com | Joel Smith<br>**WILLIAMS, POTTHOFF, WILLIAMS & SMITH**<br>125 South Orange Avenue<br>Eufaula, AL 36027<br>Telephone: (334) 687-5834<br>Facsimile: (334) 687-5722<br>joelpsmith@bellsouth.net |

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

| Chris Cantrell<br>Kit Belt<br>**BELT LAW FIRM PC**<br>Lakeshore Park Plaza, Suite 208<br>2204 Lakeshore Drive<br>Birmingham, AL 35209<br>keithb@beltlawfirm.com<br>chris@beltlawfirm.com | Brent Irby<br>Eric Hoagland<br>**McCALLUM, HOAGLAND, COOK &<br>IRBY, LLP**<br>905 Montgomery Street, Suite 201<br>Vestavia Hills, AL 35216<br>birby@mhcilaw.com<br>ehoagland@mhcilaw.com |
|---|---|
| Richard F. Horsley<br>1 Metroplex Drive, Suite 280<br>Birmingham, AL 35209-6895<br>rfhala@cs.com | Jeff Crabtree<br>**LAW OFFICES OF JEFF CRABTREE**<br>820 Mililani Street, Suite 701<br>Honolulu, HI 96813<br>lawyer@consumerlaw.com |
| Daniel R. Karon<br>Mark S. Goldman<br>Brian D. Penny<br>**GOLDMAN SCARLATO & KARON,<br>P.C.**<br>55 Public Square, Suite 1500<br>Cleveland, OH 44113<br>karon@gsk-law.com | S. Randall Hood<br>William A. McKinnon<br>**McGOWAN HOOD & FELDER, LLC**<br>1659 Healthcare Drive<br>Rock Hill, SC 29732 |
| John G. Felder, Jr.<br>**McGOWAN HOOD & FELDER, LLC**<br>1405 Calhoun Street<br>Columbia, SC 29201 | Krishna B. Narine<br>**LAW OFFICE OF KRISHNA B. NARINE**<br>7839 Montgomery Avenue<br>Elkins Park, PA 19027<br>knarine@kbnlaw.com |
| Isaac L. Diel<br>**SHARP McQUEEN**<br>135 Oak Street<br>Bonner Springs, KS 66012<br>dslawkc@aol.com | Donna F. Solen<br>**THE MASON LAW FIRM, LLP**<br>1225 19th Street, N.W., Suite 500<br>Washington, DC 20036<br>dsolen@masonlawdc.com |
| Mary G. Kirkpatrick<br>**KIRKPATRICK & GOLDSBOROUGH,<br>PLLC**<br>Lakewood Commons<br>1233 Shelburne Road, Suite E-1<br>South Burlington, VT 05401<br>mkirk@vtlawfirm.com | Robert J. Pohlman<br>**RYLEY CARLOCK & APPLEWHITE**<br>One North Central Avenue, Suite 1200<br>Phoenix, AZ 85004-4417<br>rpohlman@rcalaw.com |

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**
**MDL NO. 1917**

| | |
|---|---|
| Charles M. Kester<br>**THE KESTER LAW FIRM**<br>P.O. Box 184<br>Fayetteville, AR 72702-0184<br>cmkester@nwark.com | Bruce Mulkey<br>**THE MULKEY ATTORNEYS GROUP,**<br>**P.A.**<br>1039 W. Walnut, Suite 3<br>Rogers, AR 72756<br>bruce@mulkeylaw.com |
| David Boies<br>Timothy Battin<br>Christopher Le<br>**STRAUS & BOIES, LLP**<br>4041 University Drive, Fifth Floor<br>Fairfax, VA 22030<br>dboies@straus-boies.com<br>tbattin@straus-boies.com<br>cle@straus-boies.com | Daniel E. Birkhaeuser<br>Jennifer S. Rosenberg<br>**BRAMSON, PLUTZIK, MAHLER &**<br>**BIRKHAEUSER, LLP**<br>2125 Oak Grove Road, Suite 120<br>Walnut Creek, CA 94598<br>dbirkhaeuser@bramsonplutzik.com<br>jrosenberg@bramsonplutzik.com |
| Joseph M. Alioto<br>**ALIOTO LAW FIRM**<br>555 California Street, 31 st Floor<br>San Francisco, CA 94104<br>sexton@aliotolaw.com | James H. McManis<br>Marwa Elzankaly<br>**McMANIS FAULKNER & MORGAN**<br>A Professional Corporation<br>50 W. Fernando Street, 10 th Floor<br>San Jose, CA 95113<br>jmcmanis@mfmlaw.com<br>melzankaly@mfmlaw.com |
| Donald Amamgbo<br>**AMAMGBO & ASSOCIATES**<br>7901 Oakport Street, Suite 4900<br>Oakland, CA 94621<br>donald@amamgbolaw.com | Reginald Terrell<br>**THE TERRELL LAW GROUP**<br>223 25th Street<br>Richmond, CA 94804<br>reggiet2@aol.com |
| Susan G. Kupfer (skupfer@glancylaw.com)<br>Kathleen S. Rogers<br>**GLANCY BINKOW & GOLDBERG,**<br>**LLP**<br>One Embarcadero Center, Suite 760<br>San Francisco, CA 94111<br>Tel: (415) 972-8160<br>Fax: (415) 972-8166 | Robert Bonsignore (rbonsignore@aol.com)<br>ATTORNEY AT LAW<br>23 Forest Street<br>Medford, MA 02155 |

| | |
|---|---|
| Eric J. Pickar (epickar@bangsmccullen.com) **BANGS, McCULLEN, BUTLER, FOYE & SIMMONS, LLP** 333 West Boulevard, Suite 400 P.O. Box 2670 Rapid City, SD 57709-2670 Tel: (605) 343-1040 | David Freedman (daf@fbdlaw.com) Joseph Goldberg **FREEDMAN, BOYD, HOLLANDER, GOLDBERG & IVES, PA** 20 First Plaza, Suite 700 Albuquerque, NM 87102 Tel: (505) 842-9960 Fax: (505) 842-0761 |
| Jeffrey Bartos (jbartos@geclaw.com) **GUERRIERI, EDMOND, CLAYMAN & BARTOS PC** 1625 Massachusetts Ave., N.W. Suite 700 Washington, DC 20036 Tel: (202) 624-7400 | Frank Balint (fbalint@bffb.com) **BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.** 2901 North Central Avenue, Suite 1000 Phoenix, AZ 85012-3311 Tel: (602) 274-1100 Fax: (602) 274-1199 |
| Terry Gross (terry@grossbelsky.com) **GROSS & BELSKY, LLP** 180 Montgomery Street, Suite 2200 San Francisco, CA 94104 Tel: (415) 544-0200 Fax: (415) 544-0201 | Jennie Lee Anderson **ANDRUS ANDERSON LLP** 155 Montgomery Street, 9th Floor San Francisco, California 94104 Telephone: (415) 986-1400 Facsimile: (415) 986-1474 jennie@andrusanderson.com |
| Kenneth L. Valinoti **VALINOTI & DITO LLP** 180 Montgomery Street, Suite 940 San Francisco, CA 94104 Telephone: (415) 986-1338 Facsimile: (415) 986-1231 kvalinoti@valinoti-dito.com | Josef D. Cooper Tracy D. Kirkham **COOPER & KIRKHAM, P.C.** 357 Tehama Street, Second Floor San Francisco, CA 94103 Telephone: (415) 788-3030 Facsimile: (415) 882-7040 jdc@coopkirk.com |
| Guri Ademi Shpetim Ademi **ADEMI & O'REILLY, LLP** 3620 East Layton Ave. Cudahy, WI 53110 Telephone: (414) 482-8000 Facsimile: (414) 482-8001 gademi@ademilaw.com | |

**Attorneys For Plaintiffs**

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT MDL NO. 1917**

# EXHIBIT 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

E-filing

1   Francis O. Scarpulla (41059)
    Craig C. Corbitt (83251)
2   Matthew R. Schultz (220641)
    Judith A. Zahid (215418)
3   ZELLE HOFMANN VOELBEL
    MASON & GETTE LLP
4   44 Montgomery Street, Suite 3400
    San Francisco, CA 94104
5   Telephone:    (415) 693-0700
    Facsimile:    (415) 693-0770
6   fscarpulla@zelle.com
    ccorbitt@zelle.com
7
    Richard M. Hagstrom
8   Michael Jacobs
    ZELLE HOFMANN VOELBEL
9   MASON & GETTE LLP
    500 Washington Ave. South, Suite 400
10  Minneapolis, MN 55415
    Telephone:    (612) 339-2020
11  Facsimile:    (612) 336-9100
    rhagstrom@zelle.com
12  mjacobs@zelle.com

13  *Attorneys for Plaintiffs*

14

15                  UNITED STATES DISTRICT COURT

16                NORTHERN DISTRICT OF CALIFORNIA

17                    SAN FRANCISCO DIVISION

18  MICHAEL JUETTEN, a California resident    )  CASE NO.
    and CHAD KLEBS, a Minnesota resident, on  )
19  behalf of themselves and all others similarly )  **CLASS ACTION COMPLAINT**
    situated,                                  )
20                                             )  JURY TRIAL DEMANDED
                    Plaintiffs,                )
21                                             )
                                               )
22                  v.                         )
                                               )
23  CHUNGHWA PICTURE TUBES, LTD.; LP           )
    DISPLAYS INTERNATIONAL, LTD.;              )
24  MATSUSHITA ELECTRIC INDUSTRIAL             )
    CO., LTD.; MT PICTURE DISPLAY CO.,         )
25  LTD.; KONINKLIJKE PHILIPS                  )
    ELECTRONICS NV; SAMSUNG SDI CO.;           )
26  TOSHIBA CORP.; TOSHIBA AMERICA,            )
    INC.                                       )
27                                             )
                    Defendants.                )
28  ─────────────────────────────────────────
                           1
    CLASS ACTION COMPLAINT

1    Plaintiffs Michael Juetten and Chad Klebs, on behalf of themselves and the classes defined

2    below ("Plaintiffs"), by their attorneys, bring this civil action for damages and injunctive relief

3    against the above-named Defendants, and demanding a trial by jury, complain and allege as

4    follows:

5    ## I.    **INTRODUCTION**

6    1.    This case arises out of a long-running conspiracy extending from at least May 1,

7    1998 through November 9, 2007 (the "Class Period") among Defendants and their co-conspirators,

8    with the purpose and effect of fixing, raising, and/or maintaining the prices for cathode ray tubes

9    ("CRTs") sold indirectly to Plaintiffs and other indirect purchasers throughout the United States.

10   2.    CRTs are used in a number of products, including but not limited to, televisions and

11   computer monitors.  Throughout the Class Period, Defendants' conspiracy was intended to, and

12   did, moderate the downward pressure on CRTs (and, as a result, products containing CRTs) caused

13   by the rapidly increasing popularity of flat panel products using liquid crystal displays ("LCD")

14   and plasma display panels ("PDP") (collectively, "FPD").

15   3.    Defendants and their co-conspirators formed an international cartel to illegally

16   restrict competition in the CRT market, targeting and severely burdening indirect-purchasers

17   throughout the United States.  During the Class Period, Defendants' conspiracy affected billions of

18   dollars of commerce throughout the United States.  As a result of this conspiracy, Plaintiff and

19   indirect-purchasers have been injured in their business and property by paying more for CRTs than

20   they otherwise would have paid in the absence of Defendants' conspiracy.

21   4.    Plaintiffs bring this action seeking federal injunctive relief under Section 16 of the

22   Clayton Act, 15 U.S.C. § 26 for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to

23   recover damages under state antitrust, consumer protection, unfair trade, and/or deceptive trade

24   practices laws, common law principles of restitution, disgorgement, unjust enrichment, as well as

25   to recover the costs of suit, including reasonable attorneys fees, for the injuries that Plaintiffs and

26   all others similarly situated sustained as a result of the Defendants' conspiracy to fix, raise,

27   maintain and stabilize the prices of CRTs.

28

CLASS ACTION COMPLAINT

## II.    JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Section 16 of the Clayton Antitrust Act (15 U.S.C. 26) and Title 28 United States Code Sections 1331 and 1337, and Section 1 of the Sherman Act (15 U.S.C. 1). This Court has subject matter jurisdiction of the state-law claims asserted in this action under Title 28, United States Code Sections 1332(d) and 1367, in that the matter in controversy exceeds the sum of $5 million exclusive of interest and costs, members of the indirect-purchaser plaintiff class are citizens of states different from Defendants, and certain Defendants are citizens or subjects of foreign states.

6.    Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391, because one or more of the Defendants reside, is licensed to do business, or is found or transacts business in this District, and a substantial part of the events or omissions giving rise to the Plaintiffs' claims arose in this District.

7.    Defendants conduct business throughout the United States, including in this jurisdiction, and they have purposefully availed themselves of the laws of the United States, including specifically the laws of the individual states listed herein. Defendants' products are sold in the flow of interstate commerce, and Defendants' activities had a direct, substantial and reasonably foreseeable effect on such commerce.

8.    The activities of the Defendants and their co-conspirators, as described herein, substantially affected commerce throughout the United States and in each of the states identified herein because Defendants, directly or through their agents, engaged in activities affecting each such state. Defendants have purposefully availed themselves of the laws of each of the states identified herein in connection with their activities relating to the production, marketing, and/or sale of CRTs. Defendants produced, promoted, sold, marketed, and/or distributed CRTs, thereby purposefully profiting from access to indirect-purchaser end-user businesses and consumers in each such state. Defendants also contracted to supply or obtain goods or revenue related to the business for CRTs. As a result of the activities described herein, Defendants:

CLASS ACTION COMPLAINT

a. Caused damage to the residents of the states identified herein;

b. Caused damage in each of the states identified herein by acts or omissions committed outside each such states by regularly doing or soliciting business in each such state;

c. Engaged in persistent courses of conduct within each such state and/or derived substantial revenue from the marketing of CRTs or the products in which they are used in each such state (and services relating to such marketing); and

d. Committed acts or omissions that they knew or should have known would cause damage (and did, in fact, cause such damage) in each such state while regularly doing or soliciting business in each such state, engaging in other persistent courses of conduct in each such state, and/or deriving substantial revenue from the marketing of CRTs or the products in which they are used in each such state.

9. The conspiracy described herein affected adversely every person nationwide and in each of the states identified in this Complaint who indirectly bought Defendants' CRTs. Defendants' conspiracy has resulted in an adverse monetary effect on indirect-purchasers in each state identified herein.

10. Prices of CRTs in each state can be manipulated by conspirators within that state, outside of it, or both. Without enforcing the antitrust and/or consumer protection laws of each of the states identified herein, companies that break the law will go unpunished. Defendants knew that commerce in each of the states identified herein would be adversely affected by implementing their conspiracy.

## III. THE PARTIES

### A. The Plaintiffs

11. Michael Juetten, a resident of California, indirectly purchased a CRT from one or more defendants during the Class Period, and was injured as a result of defendants' illegal conduct.

4

12.     Chad Klebs, a resident of Minnesota, indirectly purchased a CRT from one or more of the defendants during the Class Period, and was injured as a result of defendants' illegal conduct.

**B.     <u>The Defendants</u>**

13.     Defendant Chunghwa Picture Tubes Ltd. is a Taiwan business entity with its principal place of business at No. 1127, Heping Rd, Bade City, Taoyuan, Taiwan, 334. During the Class Period, said defendant manufactured, marketed, sold and/or distributed CRTs to customers throughout the United States.

14.     Defendant LP Displays International, Ltd., f/k/a/ LG Philips Displays, Ltd., is a Hong Kong business entity with its principal place of business at 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong. During the Class Period, said defendant manufactured, marketed, sold and/or distributed CRTs to customers throughout the United States.

15.     Defendant Matsushita Electric Industrial Co., Ltd. (d/b/a "Panasonic"), is a Japanese business entity with its principal place of business at 1006, Kadoma, Kadoma City, Osaka 571-8501 Japan. During the Class Period, said defendant manufactured, marketed, sold and/or distributed CRTs to customers throughout the United States.

16.     Defendant MT Picture Display Co., Ltd. (f/k/a Matsushita Toshiba Picture Display Co.), a wholly-owned subsidiary of Matsushita Electric Industrial Co., Ltd., with its principal place of business located at Takatsuki-shi, Osaka, Japan. MT Picture Display Co. was formerly owned and controlled by both Defendants Matsushita and Toshiba Corp. until earlier this year, when Toshiba Corp. sold its share of the business. During the Class Period, MT Picture Display Co., Ltd. manufactured, marketed, sold and/or distributed CRTs to customers throughout the United States.

17.     Defendant Koninklijke (Royal) Philips Electronics NV, is a Dutch business entity, with its principal place of business at Breitner Center, Amselplein 2, 1096 BC Amsterdam, The Netherlands. During the Class period, said defendant manufactured, marketed, sold and/or distributed CRTs to customers throughout the United States.

5

18.     Defendant Samsung SDI Co., is a South Korea business entity, with its principal place of business at 575 Shin-dong, Youngtong-gu, Suwon, Kyongi, South Korea. During the Class Period, said defendant manufactured, marketed, sold and/or distributed CRTs to customers throughout the United States.

19.     Defendant Toshiba Corp. is a Japanese business entity, with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. During the Class Period, said defendant manufactured, marketed, sold and/or distributed CRTs to customers throughout the United States.

20.     Defendant Toshiba America, Inc., is a wholly-owned subsidiary of Toshiba Corp., and has its principal place of business at 1251 Avenues of the Americas, New York, NY. During the Class Period, said defendant manufactured, marketed, sold and/or distributed CRTs to customers throughout the United States.

C.     **Co-Conspirators**

21.     Various persons and entities, whose identities are at this time unknown to plaintiffs, participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. When plaintiffs learn the identities of such co-conspirators, plaintiffs will seek leave to amend this complaint to add such co-conspirators as defendants.

22.     The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered, or done by their respective officers, agents, employees, or representatives while actively engaged in the management of each defendant's business or affairs.

23.     Each of the Defendants named herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein. Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs made by its parent company.

# IV.   FACTUAL ALLEGATIONS

## A.   CRT Technology

24.     CRT is a widely used technology utilized in products such as TVs and computer monitors that allow devices to display images upon the screen.

25.     Known for their brightness, resolution, rich colors, contrast, and reliability, CRTs evolved from early black-and-white TV sets and monitors to today's high-resolution, digital-ready graphic models.  The basic components of a CRT are (a) a heated, cylindrical cathode, or electron gun, that emits a steady stream of electrons; (b) a shadow mask that directs the electron beams, (c) a phosphor-coated screen that absorbs the beams, (c) a deflection yoke that directs the scanning electron beam, which strikes the screen to produce light; and (d) an evacuated glass envelope that allows the entire process to take place in a vacuum.

26.     CRTs are manufactured in several standard sizes, including 17 inch, 19 inch, 27 inch, and 23 inch.  They are commodity products; those manufactured by Defendants are interchangeable.

## B.   The CRT Market

27.     CRTs have no independent utility, and have value only as components of other products, primarily televisions and computer monitors.  Direct purchasers buy CRTs in order to include them as components in televisions and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

28.     The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT products markets.  The market for CRT and the markets for the products in which CRTs are placed are, for all intents and purposes, inseparable in that one would not exist without the other.

29.     The largest direct purchasers of CRTs are television and computer OEMs.  Significantly, some of the defendants are (or were, during the Class Period) also CRT television and/or computer OEMs, such as Toshiba Corp. and Samsung SDI and/or its parent corporation.

30.     Plaintiffs and the indirect purchaser class members have participated in the market

CLASS ACTION COMPLAINT

for CRTs through their purchases of products containing CRTs. To the extent plaintiffs and indirect purchasers bought CRTs as part of a television or computer monitor, Defendants' unlawful conspiracy inflated the prices at which OEMs resold such products.

31.     The market for CRTs in the United States is and remains extremely large. In 1997, the worldwide CRT market exceeded $24 billion. In 2006, industry experts estimated that televisions containing CRTs made up at least half of all of the projected 29,000,000 televisions shipped to North America that year.

32.     Nonetheless, while CRTs were once the dominant display screen technology used in television and computer monitors, the market for CRT televisions and computer screens has been in decline during the Class Period, due to the increased demand for FPD Products which are used in place of CRT models.

33.     FPD Products such as televisions and computer monitors first began competing with CRT models in the 1990s. By 1998, FPD products had taken over 32% of the market for televisions and computer monitors.

34.     While priced much higher than televisions and computer screens using CRTs, FPDs offered benefits to businesses and consumers unavailable in CRT models. Televisions using FPD technology offer smaller dimensions, increased aperature ratios, higher brightness, and lower power consumption. Computers using FPD technology offer greater mobility due to their smaller size, and lower power consumption.

35.     Despite the high difference in price between televisions and computer screens using CRTs and those using FPD technology, throughout the Class Period, the percentage of televisions and computer screens purchased in the United States using FPD technology increased dramatically, while the percentage of those utilizing CRTs fell.

36.     CRT televisions currently account for only 37% of television set revenues in the United States. Industry experts have predicted that by 2008, CRT screen shipments will constitute only 23% of the total television shipments in North America, while LCD screen shipments will compromise over 50% of the total shipments.

C.      **Structural Features Of The CRT Industry**

37.      The CRT industry is characterized by a number of structural features that facilitate collusion.

38.      First, there is significant market concentration. The increase in the popularity of FPD Products caused many CRT manufacturers to exit the market during the Class Period. This caused increased consolidation and concentration in the CRT manufacturing industry.

39.      During the Class Period, the Defendants collectively owned the majority of the market share for CRTs used in televisions and computer monitors.

40.      Defendant Samsung SDI is currently the largest manufacturer of products containing CRTs. In 2004, it held (approximately) a 30% share of the global CRT market.

41.      Defendant LP Displays currently has the second largest share of the global CRT market. In 2004, it held (approximately) a 27% share of the global CRT market.

42.      Defendant MT Picture Display held (approximately) a 9% share of the global CRT market in 2004.

43.      Defendant Chunghwa Picture Tubes held (approximately) a 6.9% share of the global CRT market in 2005.

44.      There are also significant barriers to entry in the CRT industry in the form of high manufacturing and technological barriers to entry. Construction and maintenance of fabrication plants is extremely expensive. Because of increased competition and ongoing technological advances, manufacturers' research and development expenses are also extremely high.

45.      There are also multiple interrelated business relationships in the CRT industry. For example, in November 2000, Defendants LG Electronics and Koninklijke Philips Electronics agreed to enter into a joint venture that combined their CRT manufacturing operations. The resulting company (LG Philips Displays, now known as LP Displays) entered the market with a 25% share in the global CRT market.

46.      Defendants Matsushita Electric Industrial Co., Ltd. and Toshiba Corporation also entered into a joint venture combining their CRT manufacturing operations during the Class

9

Period.  The resulting company (MT Picture Display Co.) immediately enjoyed a significant share of the global CRT market.

47.     In 2005, Defendants Samsung SDI and LG Philips Displays entered into an agreement to work together by sharing parts with respect to CRTs.

**D.     The Defendants' Illegal Conspiracy**

48.     The price of CRTs during the Class Period did not fully reflect the sharp decline in demand for CRTs caused by the entry of the new generation of competing technologies.  Despite the introduction of technologically superior and increasingly popular alternatives to televisions and monitors using CRTs, the price of CRTs remained unnaturally high throughout the Class Period, with periods of sustained and unnatural price stability.

49.     The concentration of CRT manufacturers, the declining CRT share of the total market for television and computer screens, and the higher price of FPD Products gave Defendants the means and incentive to conspire and collude to artificially fix, maintain, and/or stabilize the prices at which CRTs were sold.

50.     During the class period, Defendants and their co-conspirators agreed, combined, and conspired artificially to raise, maintain, and stabilize the prices at which CRTs were sold directly and indirectly in the United States at artificial levels.  This illegal combination was effectuated by means of illegal contracts, agreements, or secret negotiations between Defendants through their officers, directors and employees.

51.     For example, despite falling demand and increased use of FPD technology in televisions and computer monitors, Defendants increased the prices of CRTs sold in February of 2002 and at other points of time throughout the Class Period.  This price increase was the result of an agreement among Defendants to collectively raise the prices of CRTs.

52.     Defendants also agreed to fix, maintain, and/or stabilize the price of CRTs by collectively agreeing to reduce the production of CRTs through plant closures and work slowdowns.

53.     This conspiracy resulted in unnaturally higher prices for CRTs which were

10

fundamentally inconsistent with the low demand for them and their rapidly approaching obsolescence.

### E. International Antitrust Investigations

54. On or about November 8, 2007, government agencies from Japan, South Korea, the European Union and the United States each opened coordinated investigations into CRT manufacturers based on a suspicion that they formed an international price cartel to fix the prices for CRTs.

55. On or about November 8, 2007, news reports stated that CRT manufacturers are "suspected of holding meetings to discuss the price targets in Southeast Asian countries where CRT manufacturing bases are located." Another stated that "[t]he CRT manufacturers are suspected of operating an international cartel since 2005 or earlier."

56. On or about November 8, 2007, Defendant Matsushita Electric Industrial Company confirmed that Japan's Fair Trade Commission raided MT Picture Display Co. as part of this international price-fixing investigation. Akira Dadota, a spokesman for Matsushita, admitted that Japan's Fair Trade Commission conducted an on-site inspection of MT Picture Display Company's offices in Japan. Up until earlier this year, MT Picture Display was formerly owned by Toshiba Corp. as well as Defendant Matsushita Electric Industrial Company.

57. On or about November 8, 2007, Defendant Samsung SDI confirmed that South Korea's Fair Trade Commission launched a probe into Samsung SDI as part of this international price-fixing investigation.

58. On or about November 8, 2007, news reports stated that defendant LP Displays was visited by antitrust regulators as part of this international price-fixing investigation.

59. On or about November 12, 2007, Defendant Chunghwa Picture Tubes admitted that the company had received a summons from the United States Department of Justice ("DOJ") as part of this international price-fixing investigation.

60. On or about November 21, 2007, Defendant Royal Phillips Electronics admitted that the company is subject to this international price-fixing investigation.

11

**F.     The Pass-Through Of The Overcharges To End-Users**

61.     OEMs and retailers of televisions and monitors containing CRTs are all subject to vigorous price competition. Televisions and computers are commodities, with little or no brand loyalty, such that aggressive pricing causes businesses and consumers to switch preferences to different brands. Television and computer prices are closely based on production costs, which are in turn directly determined by component costs, as assembly costs are minimal. OEMs accordingly use component costs, like the cost of CRTs, as the starting point for all price calculations. Television and computer monitor prices thus closely track increases and decreases in component costs.

62.     Defendants' conspiracy to raise, fix, or maintain the price of CRTs at artificial levels resulted in harm to Plaintiffs and the indirect-purchaser classes alleged herein because it resulted in them paying higher prices for televisions and monitors containing CRTs than they would have in the absence of Defendants' conspiracy. The entire overcharge for CRTs at issue was passed on to plaintiffs and members of the indirect-purchaser class.

63.     An increase in the cost of purchasing a CRT significantly affects the price of television or computer monitors using CRTs.

64.     CRTs account for a significant percentage of the overall cost of a television or computer monitor. For example, CRTs account for approximately thirty (30) percent of the cost of manufacturing a television set.

65.     CRTs are commodity products, with functionally equivalent products available from the Defendants, which manufacture them pursuant to standard specifications and sizes.

66.     Because OEMs and retailers have thin net margins, they must pass on any increase in component costs, such that increases in the price of CRTs lead to quick corresponding price increases at the OEM and retail level for products containing CRTs.

67.     Thus, all supracompetitive overcharges are always passed through to the indirect-purchaser, end-user plaintiff class members, which pay more for televisions and monitors containing CRTs than in a competitive market place.

12

## G.     The Effect Of The Price Of CRTs On The Price Of Products

68.     Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. CRTs are identifiable, discreet physical objects that do not change form or become an indistinguishable part of TVs or computer monitors.

69.     Thus, CRTs follow a traceable physical chain from the defendants to the OEMs to the purchasers of the finished products incorporating the CRT.

70.     Moreover, just as CRTs can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of CRTs affect prices paid by indirect purchasers of televisions and monitors containing CRTs.

71.     Because Defendants control the market for CRTs, there are virtually no choices for persons and businesses that require products containing such products other than buying such products manufactured by a direct purchaser that paid supracompetitive prices for CRTs to Defendants because of Defendants' conspiracy alleged herein.

72.     When distribution markets are highly competitive, as they are in the case of televisions and monitors containing CRTs, all of the overcharge will be passed through to ultimate end user businesses and consumers, such as the indirect-purchaser plaintiffs and class members. In addition, most of the defendants themselves manufacture, market, and distribute televisions and monitors containing CRTs. This means that these defendants will pass through to their customers 100% of the supracompetitive price increases that result from the defendants' conspiracy, combination, and agreement to fix, increase, and stabilize the prices for CRTs.

73.     Hence, the inflated prices of televisions and monitors containing CRTs resulting from defendants' price-fixing conspiracy have been passed on to plaintiffs and the other class members by direct purchasers.

74.     During the Class Period, a number of large OEMs sold televisions and monitors containing CRTs directly to end-buyers. For example, the OEM with the largest share of computer monitor sales in the United States market, Dell, sold exclusively to end-buyers, as did Gateway. During the Class Period, Compaq and Apple also sold large portions of their computer monitors

13

1  directly to the end-buyer.

2      75.    Computer models sold by other OEMs to retailers were generally updated several

3  times a year, and the price was changed for each new model. For example, for one large retailer,

4  more than 90 percent of the computers sold during 2000 were either new models or were sold at a

5  different price from the price in the previous month. OEMs, retailers and distributors often use a

6  "standard markup" method to set prices, meaning that they add a standard percentage to their own

7  costs to determine selling prices. Thus, changes in the price of CRTs were passed on rapidly rather

8  than absorbed.

9      76.    In retailing, it is common to use a "markup rule." The retail price is set as the

10  wholesale cost plus a percentage markup designed to recover non-product costs and to provide a

11  profit. This system guarantees that increases in costs to the retailer will be passed on to end

12  buyers. For example, CDW, a large seller of computer monitors, uses such a system, and a

13  declaration in the DRAM case from CDW's director of pricing details exactly how they calculated

14  selling prices:

> In general, CDW employs a "building block" approach to setting
> its advertised prices. The first building block is the Cost of Goods
> Sold (COGS), which represents the price CDW paid to acquire the
> product…CDW… adds a series of positive markups to the cost to
> CDW to acquire a given product. These markups are in addition to
> the pass through effect of changes in the costs charged to CDW for
> that product by a given vendor.

19      77.    The economic and legal literature has recognized that unlawful overcharges in a

20  component normally result in higher prices for products containing that price-fixed component. As

21  Professor Herbert Hovenkamp, a noted antitrust scholar, has stated in his treatise, FEDERAL

22  ANTITRUST POLICY, THE LAW OF COMPETITITON AND ITS PRACTICE (1994) at 564:

> A monopoly overcharge at the top of a distribution chain generally
> results in higher prices at every level below. For example if
> production of aluminum is monopolized or cartelized, fabricators
> of aluminum cookware will pay higher prices for aluminum. In
> most cases they will absorb part of these increased costs
> themselves and pass part along to cookware wholesalers. The
> wholesalers will charge higher prices to the retail stores, and the
> stores will do it once again to retail consumers. Every person at
> every stage in the chain likely will be poorer as a result of the
> monopoly price at the top.

Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

78. Similarly, two other antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."

79. As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers... Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

80. The purpose of the conspiratorial conduct of the defendants was to raise, fix or stabilize the price of CRTs and, as a direct and foreseeable result, televisions and monitors containing CRTs. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in dependent variable are explained by changes in a multitude of variables--- when all such variables may be changing simultaneously. That analysis-called regression analysis- is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of CRTs on prices for televisions and monitors containing CRTs even though such products contain a number of other components whose prices

15

may be changing over time. A regression model can explain how variation in the price of CRTs affects changes in the price of televisions and monitors containing CRTs. In such models, rather than being treated as the dependent variable, the price of CRTs is treated as an independent or explanatory variable. The model can isolate how changes in the price of CRTs impact the price of televisions and monitors containing such CRTs while holding controlling for the impact of other price-determining factors.

81. Economic and legal literature recognizes that the more pricing decisions are based on cost, the easer it is to determine the pass-through rate. The directness of affected costs refers to whether an overcharge affects a direct (*i.e.* variable) cost or an indirect (*i.e.*, overhead) cost. Overcharges will be passed-through sooner and at a higher rate if the overcharge affects direct costs. Here CRTs are a direct (and substantial) cost of products containing CRTs.

82. Other factors that lead to the pass-through of overcharges include: (i) whether price changes are frequent; (ii) the duration of the anti-competitive overcharge; (iii) whether pricing decisions are based on cost; (iv) whether the overcharge affects variable, as opposed to overhead, costs; (v) whether the resellers' production technology is uniform; (vi) whether the reseller supply curve exhibits a high degree of elasticity; and (vii) whether the demand of the resellers is inelastic. All of these factors were present in the CRT market during the Class Period. The precise amount of such an impact on the prices of products containing CRTs can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed-through the chain of distribution.

83. Plaintiffs and other indirect purchasers have been forced to pay supracompetitive prices for televisions and monitors containing CRTs. These inflated prices have been passed on to them by direct purchaser manufacturers, distributors, and retailers. Those overcharges have unjustly enriched defendants.

## V. CLASS ACTION ALLEGATIONS

84. Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the following Class (the

16

"Nationwide Class"):

> All persons and entities residing in the United States which, from January 1, 1998 through and including November 9, 2007, indirectly purchased in the United States, for their own use and not for resale, a CRT which was manufactured and/or sold by one or more of the Defendants. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

85. Plaintiffs also bring this action on their own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all members of the following classes or subclasses (collectively, the "Indirect Purchaser State Classes"):

a. **CALIFORNIA:** All persons and entities in California who indirectly purchased CRTs manufactured and/or sold by one or more of the Defendants during the Class Period for their end use and not for resale. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "California Class").

b. **MINNESOTA:** All persons and entities in Minnesota who indirectly purchased CRTs manufactured and/or sold by one or more of the Defendants during the Class Period for their end use and not for resale. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any judicial officer presiding over this

CLASS ACTION COMPLAINT

1    action and the members of his/her immediate family and judicial staff, and

2    any juror assigned to this action (the "Minnesota Class").

3    86.    Plaintiffs do not know the exact size of the Classes at the present time.  However,

4    Plaintiffs believe that due to the nature of the trade and commerce involved, there are at least

5    thousands in each separate state class, and hundreds of thousands of class members geographically

6    dispersed throughout the United States, such that joinder of all class members would be

7    impracticable.

8    87.    Plaintiffs' claims are typical of the claims of their respective Classes, and Plaintiffs

9    will fairly and adequately protect the interests of the Classes.  Plaintiffs' interests are coincident

10   with, and not antagonistic to, those of the members of their respective Classes.  Plaintiffs have

11   retained competent counsel experienced in class action and complex antitrust and consumer

12   protection litigation.

13   88.    Common questions of law and fact exist, including:

14        a.    Whether Defendants and their Co-Conspirators engaged in a contract,

15              combination or conspiracy among themselves to fix, raise, maintain or

16              stabilize the process of, or allocate the market of CRTs sold in the United

17              States;

18        b.    The duration and extent of the contract, combination or conspiracy;

19        c.    Whether the Defendants and their co-conspirators were participants in the

20              contracts, combinations or conspiracies alleged herein;

21        d.    Whether Defendants and their co-conspirators engaged in conduct that

22              violated Section 1 of the Sherman act;

23        e.    Whether Defendants and their co-conspirators engaged in unlawful, unfair

24              or deceptive contracts, combinations or conspiracies among themselves,

25              express or implied, to fix, raise, maintain, or stabilize prices of CRTs sold in

26              and/or distributed in the United States;

27        f.    Whether the Defendants and their co-conspirators engaged in conduct in

28

18

CLASS ACTION COMPLAINT

1                   violation of the antitrust, consumer protection, unfair trade, and/or deceptive

2                   trade practices laws of the various Indirect Purchaser States as alleged

3                   below;

4         g.     Whether the anticompetitive conduct of the Defendants and their co-

5                   conspirators caused prices of CRTs to be artificially inflated to non-

6                   competitive levels;

7         h.     Whether the Defendants and their co-conspirators unjustly enriched

8                   themselves as a result of their inequitable conduct at the expense of the

9                   members of the Classes;

10        i.     Whether Defendants and their co-conspirators fraudulently concealed the

11                  existence of their unlawful conduct;

12        j.     Whether Plaintiffs and the Classes are entitled to injunctive relief; and

13        k.     Whether Plaintiffs and other members of the Indirect Purchaser Classes

14                  were injured by the conduct of Defendants and, if so, the appropriate

15                  measure of damages for each of the Classes.

16      89.    These and other questions of law and fact are common to the Classes and

17 predominate over any questions affecting only individual class members, including legal and

18 factual issues relating to liability, damages, and restitution.

19      90.    Class action treatment is a superior method for the fair and efficient adjudication of

20 this controversy because:

21         a.     It will avoid a multiplicity of suits and consequent burden on the courts and

22                  Defendants;

23         b.     It would be virtually impossible for all members of the Classes to intervene

24                  as parties-plaintiff in this action;

25         c.     It will allow numerous individuals with claims too small to adjudicate on an

26                  individual basis because of the prohibitive cost of this litigation, to obtain

27                  redress for their economic injuries;

28

CLASS ACTION COMPLAINT

d.   It is appropriate for treatment on a fluid recovery basis, which obviate any manageability problems; and

e.   It will provide court oversight of the claims process, once Defendants' liability is adjudicated.

91.   The named plaintiffs will fairly and adequately protect the interests of the Class in that the named plaintiffs have no interests antagonistic to the interests of the other members of the Class, and have retained counsel competent and experienced in the prosecution of class actions and antitrust cases to represent themselves and the Class.

92.   This case is also appropriate for certification as a class action because the defendants have acted and refused to act on grounds generally applicable to the Class, so that final injunctive relief will be appropriate with respect to the Class as a whole.

93.   The claims asserted herein are also appropriate for class certification under each of the states under which claims are asserted.

## VI.   FRAUDULENT CONCEALMENT

94.   Plaintiffs and members of the Classes alleged herein did not discover and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until after November 9, 2007, when the investigations by the DOJ and other antitrust regulators became public, because defendants and their co-conspirators actively and fraudulently concealed the existence of their contract, combination or conspiracy. Because defendants' agreement, understanding and conspiracy were kept secret, plaintiffs and Class members were unaware of defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRTs and the products in which they were used.

95.   The affirmative acts of the defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

96.   By its very nature, defendants' price-fixing conspiracy was inherently self-concealing. As alleged above, defendants had secret discussions about price and output. Defendants agreed not to publicly discuss the existence or the nature of their agreement.

CLASS ACTION COMPLAINT

97.     As a result of defendants' fraudulent concealment of their conspiracy, the running of any statue of limitations has been tolled with respect to any claims that plaintiffs and the Class members have as a result of the anticompetitive conduct alleged in this Complaint

## VII.   VIOLATIONS ALLEGED

### First Claim for Relief
### (Violation of Section 1 of the Sherman Act)

98.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

99.     Beginning at a time currently unknown to plaintiffs, but at least as early as January 1, 1997, and continuing through November of 2007, the exact dates being unknown to plaintiffs, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, stabilize, and peg prices for CRTs and televisions and monitors containing CRTs sold in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

100.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, the defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

    a.      Fixing, raising, stabilizing, and pegging the price of CRTs; and

    b.      Allocating among themselves and collusively reducing the production of CRTs.

101.    The combination and conspiracy alleged herein has had the following effects, among others:

    a.      Price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the United States;

    b.      Prices for CRTs sold by defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive

21

levels throughout the United States; and

    c.    Those who purchased CRTs directly or indirectly from defendants and their co-conspirators have been deprived of the benefits of free and open competition.

102.    Plaintiffs and other Nationwide Class members have been injured and will continue to be injured in their businesses and property by paying more for CRTs purchased indirectly from the defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy, including paying more for televisions and monitors in which CRTs are included, as a result of higher prices paid for CRTs by the direct purchasers of CRTs.

103.    Plaintiffs and the Nationwide Class are entitled to an injunction against defendants, preventing and restraining the violations alleged herein.

## Second Claim for Relief
### (Unjust Enrichment and Disgorgement of Profits)

104.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

105.    Defendants have been unjustly enriched through overpayments by plaintiffs and class members and the resulting profits.

106.    Under principles of unjust enrichment which exist in every state, Defendants should not be permitted to retain the benefits conferred via overpayments by plaintiffs and class members.

107.    Plaintiffs and all members of the Nationwide Class seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which plaintiffs and class members may seek restitution.

## Third Claim for Relief
### (Violation of State Antitrust Laws)

108.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

109.    Defendants' intentional and purposeful anti-competitive acts that are described above including but not limited to acts of collusion to set prices and the actual act of price-fixing

22

1  itself was intended to and did cause Plaintiff to pay supra-competitive prices for CRT prices

2  charged for consumer products containing CRTs in the Indirect Purchaser States.

3      110.    Defendants' monopolistic and anticompetitive acts as described above violate the

4  following state antitrust statutes:

5      111.    Defendants have violated California Business and Professions Code § 16720, *et seq.*

6      112.    Defendants have violated Minnesota Statutes § 325D.51, *et seq.*

7      113.    Plaintiff and the Indirect Purchasers Classes in states with statute antitrust statutes

8  listed above seek actual damages for their injuries caused by these violations in amount to be

9  determined at trial.

10     114.    Plaintiff and the Indirect Purchaser Classes in states with statute antitrust statutes

11  listed above further seek treble damages and attorneys' fees pursuant to the Indirect Purchaser

12  States' antitrust laws as stated above to the extent allowed by law.

13     115.    Plaintiffs and the Indirect Purchaser Classes in states with statute antitrust statutes

14  listed above further seek attorneys' fees and costs pursuant to the Indirect Purchaser States'

15  antitrust laws as stated above to the extent allowed by law, due to Defendants' willful and unlawful

16  conduct as alleged above.

17                    **Fourth Claim for Relief**
                   **(Violation of California Unfair Competition Law)**
18

19     116.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

   allegation set forth in the preceding paragraphs of this Complaint.
20

21     117.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or

22  fraudulent acts or practices in violation of the California Business & Professions Code § 17200, *et*

   *seq.*
23

24     118.    Plaintiff Juetten and the California Class seek restitution and disgorgement of

25  defendant's unlawfully obtained profits for their injuries caused by these violations, in an amount

   to be determined at trial.
26

27     119.    Plaintiffs and the Indirect Purchaser Class in California seek attorneys' fees due to

   Defendants' willful and unlawful conduct where allowable by law.
28

                                    23

## VIII.  **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray:

A.  That the Court determine that the Sherman Act, California and Minnesota antitrust law, and California unfair competition law claims alleged herein may be maintained as class actions under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, as informed by the respective state class action laws.

B.  That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

    1.  A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;

    2.  Acts of unjust enrichment as set forth in the Second Claim for Relief;

    3.  An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the California and Minnesota antitrust laws identified in the Third Claim for Relief; and

    4.  A violation of the California Unfair Competition Law as alleged in the Fourth Claim for Relief.

C.  On the First Claim for Relief, that defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.  On the Second Claim for Relief, that plaintiffs and the members of the Nationwide Class recover the amounts by which the defendants have been unjustly enriched as a result of their unlawful conduct;

24

E.      On the Third Claim for Relief, that the plaintiffs and the members of the California and Minnesota Classes recover damages, to the maximum extent allowed under such laws as provided by the state antitrust laws listed above, and that a joint and several judgment in favor of plaintiffs and these classes be entered against the defendants in an amount to be trebled to the extent permitted by such laws;

F.      On the Fourth Claim for Relief, that plaintiff Juetten and the members of the California Class be awarded restitution, including disgorgement of profits obtained by defendants as a result of their acts of unfair competition and acts of unjust enrichment;

G.      That plaintiffs and members of each of the classes listed herein be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

H.      That plaintiffs and members of each of the classes listed herein recover their costs of suit, including a reasonable attorney's fee, as provided by law; and

I.      That plaintiffs and members of each of the classes listed herein have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

Dated:  December 7, 2007                     Respectfully submitted,

_____
Francis O. Scarpulla (41059)
Craig C. Corbitt (83251)
Matthew R. Schultz (220641)
Judith Zahid (No. 215418)
ZELLE HOFMANN VOELBEL MASON &
GETTE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone:    (415) 693-0700
Facsimile:    (415) 693-0770
fscarpulla@zelle.com
ccorbitt@zelle.com

CLASS ACTION COMPLAINT

1   Richard M. Hagstrom
    Michael Jacobs
2   ZELLE HOFMANN VOELBEL MASON &
    GETTE LLP
3   500 Washington Ave. South, Suite 400
    Minneapolis, MN 55415
4   Telephone:     (612) 339-2020
    Facsimile:     (612) 336-9100
5   rhagstrom@zelle.com
    mjacobs@zelle.com
6
    *Attorneys for Plaintiffs*
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by jury.

Dated:  December 7, 2007

                                                _Craig Corbitt_

Francis O. Scarpulla (41059)
Craig C. Corbitt (83251)
Matthew R. Schultz (220641)
Judith A. Zahid (215418)
ZELLE HOFMANN VOELBEL MASON &
GETTE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Telephone:      (415) 693-0700
Facsimile:      (415) 693-0770
fscarpulla@zelle.com
ccorbitt@zelle.com

Richard M. Hagstrom
Michael Jacobs
ZELLE HOFMANN VOELBEL MASON &
GETTE LLP
500 Washington Ave. South, Suite 400
Minneapolis, MN 55415
Telephone:      (612) 339-2020
Facsimile:      (612) 336-9100
rhagstrom@zelle.com
mjacobs@zelle.com

*Attorneys for Plaintiffs*

#3171415v1

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 3

1  Francis O. Scarpulla (41059)
   Craig C. Corbitt (83251)
2  Matthew R. Schultz (220641)
   Judith A. Zahid (215418)
3  Traviss Galloway (234678)
   ZELLE HOFMANN VOELBEL
4     MASON & GETTE LLP
   44 Montgomery Street, Suite 3400
5  San Francisco, CA 94104
   Telephone:    (415) 693-0700
6  Facsimile:    (415) 693-0770
   fscarpulla@zelle.com
7  ccorbitt@zelle.com

8  Terry Rose Saunders                        Christopher Lovell
      (*Pro Hac Vice* Admission Pending)      Imtiaz Siddiqui
9  Thomas A. Doyle                            LOVELL STEWART & HALEBIAN, LLP
      (*Pro Hac Vice* Admission Pending)      500 Fifth Avenue, 58th Floor
10 SAUNDERS & DOYLE                           New York, NY 10110
   20 South Clark Street, Suite 1720          Telephone: (212) 608-1900
11 Chicago, IL 60603                          Facsimile: (212) 719-4677
   Telephone:    (312) 551-0051               clovell@lshllp.com
12 Facsimile:    (312) 551-4467
   trsaunders@saundersdoyle.com
13 tadoyle@saundersdoyle.com

14 Attorneys for Plaintiffs

15              UNITED STATES DISTRICT COURT

16             NORTHERN DISTRICT OF CALIFORNIA

17                SAN FRANCISCO DIVISION

18 WILLIAM E. STACK, a Tennessee resident,   ) CASE NO.
   and MARGO STACK, a Tennessee resident,    )
19 on behalf of themselves and all others similarly ) CLASS ACTION COMPLAINT
   situated,                                  )
20                                            ) JURY TRIAL DEMANDED
                Plaintiffs,                   )
21                                            )
          v.                                  )
22                                            )
   CHUNGHWA PICTURE TUBES, LTD.;             )
23 CHUNGHWA PICTURE TUBES                     )
   (MALAYSIA) SDN. BHD.; KONINKLIJKE          )
24 PHILIPS ELECTRONICS NV; LG                 )
   ELECTRONICS INC.; LP DISPLAYS              )
25 INTERNATIONAL, LTD.; MATSUSHITA            )
   ELECTRIC INDUSTRIAL CO., LTD.;             )
26 MATSUSHITA TOSHIBA PICTURE                 )
   DISPLAY CO., LTD.; BEIJING-                )
27 MATSUSHITA COLOR CRT COMPANY,              )
   LTD.; LTD.; ORION ELECTRIC CO.,            )
28 [Caption continued on next page]           )

                              -1-

1  LTD.; ORION AMERICA, INC.;  )
   PANASONIC CORPORATION OF NORTH  )
2  AMERICA; PHILIPS ELECTRONICS  )
   NORTH AMERICA; SAMSUNG SDI CO.,  )
3  LTD.; SAMSUNG SDI AMERICA, INC.;  )
   SAMTEL COLOR, LTD.; TCL  )
4  INTERNATIONAL HOLDINGS LTD. (TCL);  )
   THOMSON S.A.; TCL THOMSON  )
5  ELECTRONICS CORPORATION;  )
   TOSHIBA CORPORATION; and TOSHIBA  )
6  AMERICA, INC.,  )
                                       )
7          Defendants.                 )
                                       )
8  _____  )

9          Plaintiffs William E. Stack and Margo Stack, for themselves and on behalf of the

10  classes defined below ("Plaintiffs"), by their attorneys, bring this civil action for injunctive

11  relief and for damages against the Defendants named herein and, demanding a trial by jury,

12  complain and allege as follows:

13                              **INTRODUCTION**

14          1.      This case arises out of a long-running conspiracy extending from at least May

15  1, 1998 through November 9, 2007 (the "Class Period") among Defendants and their co-

16  conspirators, with the purpose and effect of fixing, raising, and/or maintaining the prices for

17  cathode ray tubes ("CRTs") and products containing CRTs ("CRT Products") sold indirectly

18  to Plaintiffs and other indirect purchasers throughout the United States.

19          2.      CRTs are used in a number of products, including but not limited to,

20  televisions and computer monitors. Throughout the Class Period, Defendants' conspiracy

21  was intended to, and did, moderate the downward pressure on CRTs and CRT Products

22  caused by the rapidly increasing popularity of flat panel products using liquid crystal displays

23  ("LCD") and plasma display panels ("PDP") (collectively, "FPD").

24          3.      Defendants and their co-conspirators formed an international cartel to illegally

25  restrict competition in the CRT and CRT Products markets, targeting and severely burdening

26  indirect-purchasers throughout the United States. During the Class Period, Defendants'

27  conspiracy affected billions of dollars of commerce throughout the United States. As a result

28  of this conspiracy, Plaintiffs and indirect-purchasers have been injured in their business and

                                  -2-

property by paying more for CRTs and CRT Products than they otherwise would have paid in the absence of Defendants' conspiracy.

4. Plaintiffs bring this action seeking federal injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26 for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to recover damages under state antitrust laws of Tennessee, common law principles of restitution, disgorgement, unjust enrichment, as well as to recover the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly situated sustained as a result of Defendants' conspiracy to fix, raise, maintain and stabilize the prices of CRTs and CRT Products.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Section 16 of the Clayton Antitrust Act (15 U.S.C. §26) and Title 28, United States Code, Sections 1331 and 1337, and Section 1 of the Sherman Act (15 U.S.C. §1). This Court has subject matter jurisdiction of the claims asserted under Tennessee law, pursuant to Title 28, United States Code, Sections 1332(d) and 1367, in that the matter in controversy exceeds the sum of $5 million, exclusive of interest and costs, class members are citizens of states different from Defendants, and certain Defendants are citizens or subjects of foreign states.

6. Venue is proper in this District pursuant to Title 15, United States Code, Section 22 and Title 28, United States Code, Section 1391, because one or more of the Defendants reside, is licensed to do business, or is found or transacts business in this District and a substantial part of the events or omissions giving rise to the Plaintiffs' claims arose in this District.

7. Defendants conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States, including specifically the laws of Tennessee. Defendants' products are sold in the flow of

interstate commerce, and Defendants' activities had a direct, substantial and reasonably foreseeable effect on such commerce.

8.     The activities of the Defendants and their co-conspirators, as described herein, substantially affected commerce throughout the United States, as well as in Tennessee, because Defendants, directly or through their agents, engaged in activities affecting Tennessee and other states. Defendants have purposefully availed themselves of the laws of Tennessee in connection with their activities relating to the production, marketing, and/or sale of CRTs and CRT Products. Defendants produced, promoted, sold, marketed, and/or distributed CRTs and CRT Products in the United States, thereby purposefully profiting from access to indirect-purchaser end-user businesses and consumers in Tennessee and elsewhere. Defendants also contracted to supply or obtain goods or revenue related to the business for CRTs and CRT Products in the United States. As a result of the activities described herein, Defendants:

a.     Caused damage to the residents of Tennessee;

b.     Caused damage in Tennessee by acts or omissions committed outside Tennessee that had an effect in Tennessee;

c.     Engaged in persistent courses of conduct within Tennessee and/or derived substantial revenue from the marketing of CRTs and CRT Products in Tennessee (and services relating to such marketing); and

d.     Committed acts or omissions that they knew or should have known would cause damage (and did, in fact, cause such damage) in Tennessee while regularly doing or soliciting business in Tennessee, engaging in other persistent courses of conduct in Tennessee, and/or deriving substantial revenue from the marketing of CRTs and CRT Products in Tennessee.

9.     The conspiracy described herein affected adversely every person nationwide, and every person in Tennessee, who indirectly bought Defendants' CRTs and CRT products.

CLASS ACTION COMPLAINT

1 Defendants' conspiracy has resulted in an adverse monetary effect on indirect-purchasers
2 nationwide and in Tennessee.

3     10.    Prices of CRTs and CRT Products in Tennessee can be manipulated by
4 conspirators within that state, outside of it, or both. Without enforcing the antitrust and/or
5 consumer protection laws of Tennessee, companies that break the law will go unpunished.
6 Defendants knew that commerce in Tennessee would be adversely affected by implementing
7 their conspiracy.

8 **THE PARTIES**

9     **A.**    **The Plaintiffs**

10     11.    William E. Stack, a resident of Tennessee, indirectly purchased a CRT and/or
11 CRT Product from one or more Defendants during the Class Period, and was injured as a
12 result of Defendants' illegal conduct.

13     12.    Margo Stack, a resident of Tennessee, indirectly purchased a CRT and/or
14 CRT Product from one or more of the Defendants during the Class Period, and was injured as
15 a result of Defendants' illegal conduct.

16     **B.**    **The Defendants**

17     13.    Chunghwa Picture Tubes, Ltd., a Taiwanese company with its principal place
18 of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan, is hereby named as a
19 defendant. Chunghwa was established in 1971 by Tatung Corporation to manufacture CRTs.
20 In 1974, Chunghwa's CRTs received certification by the United States, giving the company
21 entry into that market. By 1991, Chunghwa had claimed the leading position in the global
22 CRT industry. Ten years later, in 2001, Chunghwa remained one of the top two
23 manufacturers of CRTs worldwide with a 15 to 20 percent market share. During the Class
24 Period, Chunghwa manufactured, sold, and distributed CRTs and/or CRT Products
25 throughout the United States.

26     14.    Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia"), a
27 Malaysian company with its principal place of business at Lot 1, Subang Hi-Tech Industrial
28 Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia, is hereby named as a

-5-
CLASS ACTION COMPLAINT

1  defendant. Chunghwa Malaysia is a wholly-owned and controlled subsidiary of Chunghwa.

2  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the

3  leading worldwide suppliers of CRTs. Its product line ranges from 10-inch CRTs to 29-inch

4  CRTs. During the Class Period, Chunghwa Malaysia manufactured, sold, and distributed

5  CRTs and/or CRT Products throughout the United States.

6      15.    Defendants Chunghwa Picture Tubes, Ltd. and Chunghwa Picture Tubes

7  (Maylaysia) Sdn. Bhd. are referred to collectively herein as "Chunghwa."

8      16.    Koninklijke Philips Electronics N.V. ("Royal Philips"), which translates to

9  Royal Philips Electronics, a Dutch entity with its principal place of business at Breitner

10  Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands, is hereby named as a

11  defendant. In 2000, Royal Philips was the leading global supplier of CRTs. In 2001, Royal

12  Philips entered into a joint venture with Defendant LG Electronics called LG.Philips

13  Displays, in which the entities combined their CRT businesses. On April 1, 2007, LG.Philips

14  Displays became an independent company and changed its name to LP Displays

15  International, Ltd. During the Class Period, Royal Philips manufactured, sold, and

16  distributed CRTs and/or CRT Products throughout the United States.

17      17.    LG Electronics Inc. ("LG Electronics"), a Korean entity headquartered at LG

18  Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, South Korea 150-721, is hereby

19  named as a defendant. In 2001, LG Electronics entered into a joint venture with Defendant

20  Koninklijke Philips Electronics N.V. called LG.Philips Displays, in which the entities

21  combined their CRT businesses. In 2002, LG Electronics had a 24.4 percent worldwide CRT

22  market share. On April 1, 2007, LG.Philips Displays became an independent company and

23  changed its name to LP Displays International, Ltd. During the Class Period, LG Electronics

24  manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

25      18.    LP Displays International, Ltd. ("LP Displays"), a Hong Kong company

26  located at 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong, is

27  hereby named as a defendant. LP Displays was formed as a CRT joint venture between

28  Defendants LG Electronics and Royal Philips, called Philips Displays. On April 1, 2007,

LG.Philips Displays became an independent company and changed its name to LP Displays. LP Displays is a leading CRT supplier, and currently produces one in every four CRT televisions and computer monitors sold. LP Displays had a worldwide CRT market share of 27% in 2006. During the Class Period, LP Displays manufactured, sold, and distributed CRTs and/or CRT Products to customers throughout the United States.

19. Matsushita Electric Industrial Co., Ltd. ("Matsushita Electric"), a Japanese entity located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan, is hereby named as a defendant. In 2002, Matsushita Electric entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs. Matsushita Electric was the majority owner with 64.5 percent. On April 3, 2007, Matsushita Electric purchased the remaining 35.5 percent stake in the joint venture, making it a wholly-owned subsidiary of Matsushita Electric. Matsushita Electric is best known for its Panasonic brand, which in 2005 had the highest CRT revenue in Japan. During the Class Period, Matsushita Electric sold and distributed CRTs and/or CRT Products throughout the United States.

20. Matsushita Toshiba Picture Display Co., Ltd. ("MT Picture Display Co."), a Japanese entity located at 1-1, Saiwai-cho, Takatsuki-shi, Osaka 569-1193, Japan, is hereby named as a defendant. MT Picture Display Co. was formed as a CRT joint venture between Defendants Matsushita Electric and Toshiba. On April 3, 2007, Defendant Matsushita Electric purchased the remaining stake in MT Picture Display Co., making it a wholly-owned subsidiary. During the Class Period, MT Picture Display Co. manufactured, sold, and distributed CRTs and/or CRT products throughout the United States.

21. Beijing-Matsushita Color CRT Company, Ltd. ("BMCC"), a Chinese company with its principal place of business at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China, is hereby named as a defendant. BMCC is the second largest producer of CRTs for televisions in China. During the Class Period, BMCC manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

22. Defendants Matsushita Electric, MT Picture Display Co., and BMCC are referred to collectively herein as "Matsushita."

23. Orion Electric Co., Ltd., a Japanese company with its principal place of business at 41-1 Iehisa-cho Echizen-shi Fukui 915-8555, Japan, is hereby named as a defendant. It is the parent company of the Orion entities. Orion Electric, Ltd. currently manufactures CRTs and CRT Products for Defendant Toshiba Corporation. During the Class Period, Orion Electric Co., Ltd. manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

24. Orion America, Inc., an Indiana corporation with its principal place of business at Hwy 41 North, Orion Place, Princeton, Indiana, is hereby named as a defendant. Orion America is a wholly-owned and controlled subsidiary of Defendant Orion Electric Co., Ltd. During the Class Period, Orion America manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

25. Defendants Orion Electric Co., Ltd. and Orion America, Inc. are referred to collectively herein as "Orion."

26. Panasonic Corporation of North America ("Panasonic"), a Delaware corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey, is hereby named as a defendant. Panasonic is a wholly-owned and controlled subsidiary of Defendant Matsushita Electric. During the Class Period, Panasonic sold and distributed CRTs and/or CRT Products manufactured by Matsushita Electric.

27. Philips Electronics North America ("Philips America"), a Delaware corporation with its principal place of business at 1251 Avenue of the Americas, New York, New York, 10020, is hereby named as a defendant. Philips America is a subsidiary of Defendant Royal Philips. During the Class Period, Philips America sold and distributed CRTs and/or CRT Products manufactured by Royal Philips throughout the United States.

28. Samsung SDI Co., Ltd. ("Samsung SDI"), a Korean company with its principal place of business at 575 Shin-dong, Youngtong-gu Suwon, Kyonggi, South Korea, is hereby named as a defendant. Samsung SDI is one of the largest CRT producers in the

1     world. Samsung SDI was the top manufacturer for CRTs in 2000, with a market share of

2     approximately 20%. During the Class Period, Samsung SDI manufactured, sold, and

3     distributed CRTs and/or CRT Products throughout the United States.

4           29.      Samsung SDI America, Inc. ("Samsung America"), a California corporation

5     with its principal place of business at 3333 Michelson Drive, Suite 700, Irvine, California, is

6     hereby named as a defendant. Samsung America is a wholly-owned and controlled

7     subsidiary of Defendant Samsung SDI. During the Class Period, Samsung America sold and

8     distributed CRTs and/or CRT Products manufactured by Samsung SDI throughout the United

9     States.

10           30.      Defendants Samsung SDI Co., Ltd. and Samsung SDI America, Inc. are

11     referred to collectively herein as "Samsung."

12           31.      Samtel Color, Ltd. ("Samtel"), an Indian company with its principal place of

13     business at 52, Community Centre, New Friends Colony, New Delhi-110065, is hereby

14     named as a defendant. Samtel's market share for CRTs sold in India is approximately 40%,

15     and is that country's largest exporter of CRT Products. Samtel has gained safety approvals

16     from the United States, Canada, Germany, and Great Britain for its CRT Products. During

17     the Class Period, Samtel manufactured, sold, and distributed CRTs and/or CRT Products

18     throughout the United States.

19           32.      Defendant TCL International Holdings Ltd. (TCL) is headquartered at 13th

20     Floor, TCL Tower, 8 Tai Chung Road, Tsuen Wan, Hong Kong. During the Class Period,

21     TCL manufactured, sold and distributed CRTs and/or CRT Products throughout the United

22     States.

23           33.      Defendant Thomson S.A. (Thomson) is a French company, with its

24     headquarters at 46, quai Alphonse Le Gallo, Boulogne, France 92100. During the Class

25     Period, Thomson manufactured, sold and distributed CRTs and/or CRT products throughout

26     the United States.

27           34.      Defendant TCL Thomson Electronics Corporation (TTE) is a joint venture

28     formed in 2004 by TCL and Thomson. TTE Corporation is headquartered at TCL Building,

CLASS ACTION COMPLAINT

1  South Nanhai Road, Nanshan District, Shenzhen, Guangdong, China. TTE is best known in

2  the United States for its "RCA" brand electronics. During the Class Period, TTE

3  manufactured, sold and distributed CRTs and/or CRT Products throughout the United States.

4      35.     Defendants TCL, Thomson S.A. and TCL Thomson Electronics Corporation

5  shall be referred to collectively herein as "Thompson."

6      36.     Toshiba Corporation ("Toshiba Corp."), a Japanese company with its

7  principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan, is

8  hereby named as a defendant. In 2001, Toshiba held a 5 to 10 percent worldwide market

9  share for CRTs used in televisions and in computer monitors. In 2002, Toshiba entered into a

10 joint venture with Defendant Matsushita Electric called Matsushita Toshiba Picture Display

11 Co., Ltd., in which the entities consolidated their CRT businesses. In 2004, Toshiba entered

12 into a contract with Defendant Orion whereby Orion became the supplier and maker of

13 Toshiba-branded CRT televisions. During the Class Period, Toshiba manufactured, sold, and

14 distributed CRTs and/or CRT Products throughout the United States.

15     37.     Toshiba America, Inc., a wholly-owned subsidiary of Toshiba, with its

16 principal place of business at 1251 Avenue of the Americas, New York, NY, is hereby

17 named as a defendant. During the Class Period, said Defendant manufactured, marketed,

18 sold and/or distributed CRTs and/or CRT Products throughout the United States.

19     38.     Defendants Toshiba Corp. and Toshiba America, Inc. shall be referred to

20 hereinafter as "Toshiba."

21     **C.     Co-Conspirators**

22     39.     Various persons and entities, whose identities are at this time unknown to

23 Plaintiffs, participated as co-conspirators in the violations alleged herein and performed acts

24 and made statements in furtherance thereof. When Plaintiffs learn the identities of such co-

25 conspirators, Plaintiffs will seek leave to amend this Complaint to add such co-conspirators

26 as defendants.

27     40.     The acts charged in this Complaint have been done by Defendants and their

28 co-conspirators, or were authorized, ordered, or done by their respective officers, agents,

CLASS ACTION COMPLAINT

1    employees, or representatives while actively engaged in the management of each Defendant's

2    business or affairs.

3        41.    Each of the Defendants named herein acted as the agent or joint venturer of or

4    for the other Defendants with respect to the acts, violations and common course of conduct

5    alleged herein. Each Defendant that is a subsidiary of a foreign parent acts as the sole United

6    States agent for CRTs and/or CRT Products made by its parent company.

7                              **FACTUAL ALLEGATIONS**

8        **A.    The CRT Industry**

9        42.    CRT is a widely used technology utilized in products such as TVs and

10   computer monitors that allow devices to display images upon the screen.

11       43.    Known for their brightness, resolution, rich colors, contrast, and reliability,

12   CRTs evolved from early black-and-white TV sets and monitors to today's high-resolution,

13   digital-ready graphic models. The basic components of a CRT are (a) a heated, cylindrical

14   cathode, or electron gun, that emits a steady stream of electrons; (b) a shadow mask that

15   directs the electron beams, (c) a phosphor-coated screen that absorbs the beams, (d) a

16   deflection yoke that directs the scanning electron beam, which strikes the screen to produce

17   light; and (e) an evacuated glass envelope that allows the entire process to take place in a

18   vacuum.

19       44.    CRTs are manufactured in several standard sizes, including 17 inch, 19 inch,

20   23 inch, and 27 inch. They are commodity products; those manufactured by Defendants are

21   interchangeable.

22       **B.    The CRT Market**

23       45.    CRTs have no independent utility, and have value only as components of

24   other products, primarily televisions and computer monitors. Original Equipment

25   Manufacturers ("OEMs") buy CRTs in order to include them as components in televisions

26   and computer monitors. The demand for CRTs thus directly derives from the demand for

27   CRT Products.

28

46.     The market for CRTs and the market for CRT Products are one and the same, because the CRT market exists to serve only the CRT Products market. The market for CRTs and the market for CRT Products are, for all intents and purposes, a single market, as one would not exist without the other.

47.     The largest direct purchasers of CRTs are television and computer OEMs. Significantly, many of the Defendants are (or were, during the Class Period) also CRT television and/or computer OEMs (original equipment manufacturers), such as Toshiba and Samsung SDI and/or its parent corporation.

48.     Plaintiffs and class members have participated in this market through their purchases of CRT Products. When Plaintiffs bought CRT Products, Defendants' unlawful conspiracy inflated the prices at which such products are sold to Plaintiffs and class members.

49.     The market for CRTs in the United States is extremely large. In 1997, the worldwide CRT market exceeded $24 billion. In 2006, industry experts estimated that televisions containing CRTs made up at least half of all of the projected 29,000,000 televisions shipped to North America that year.

50.     CRT televisions currently account for 37% of television set revenues in the United States.

C.      **Structural Features of the CRT Industry**

51.     The structure of the CRT industry facilitates collusion.

52.     During the Class Period, the Defendants collectively owned the majority of the market share for CRTs used in televisions and computer monitors.

53.     Defendant Samsung SDI is currently the largest manufacturer of products containing CRTs. In 2004, it held about 30% of the global CRT market.

54.     Defendant LP Displays currently has the second largest share of the global CRT market. In 2004, it held about 27% of the global CRT market.

55.     Defendant MT Picture Display Co. held about 9% of the global CRT market in 2004.

CLASS ACTION COMPLAINT

56. Defendant Chunghwa held about 6.9% of the global CRT market in 2005.

57. There are also significant barriers to entry in the CRT industry in the form of high manufacturing and technological barriers to entry. Construction and maintenance of fabrication plants is extremely expensive. Because of technological advances, manufacturers' research and development expenses are extremely high.

58. There are multiple interrelated business relationships in the CRT industry. For example, in November 2000, Defendants LG Electronics and Royal Philips agreed to enter into a joint venture that combined their CRT manufacturing operations. The resulting company (Defendant LP Displays) entered the market with a 25% share of the global CRT market.

59. Defendants Matsushita Electric and Toshiba also entered into a joint venture combining their CRT manufacturing operations during the Class Period. The resulting company, Defendant MT Picture Display Co., immediately enjoyed a significant share of the global CRT market.

60. In 2002, Matsushita Electric and TCL formed a "collaborative relationship" in the consumer electronics business. The stated purpose of the collaboration is to "achiev[e] mutually beneficial effects" by supply of cathode-ray tubes to TCL from Matsushita Electric, sales of Matsushita Electric's products through TCL's sales channels in China, collaboration in the supply of products, including televisions, through OEM and ODM (original design manufacturing) and collaboration on research and development

61. In 2005, Defendants Samsung SDI and LP Displays f/k/a LG Philips Displays also entered into an agreement to work together by sharing parts with respect to CRTs.

**D.    The Defendants' Illegal Conspiracy**

62. The price of CRTs or CRT Products during the Class Period did not fully reflect the sharp decline in demand for CRTs caused by the entry of the new generation of competing technologies. Despite the introduction of technologically superior and increasingly popular alternatives to televisions and monitors using CRTs, the price of CRTs

1  or CRT Products remained artificially high throughout the Class Period, with periods of

2  sustained and unnatural price stability.

3       63.    CRTs, as the established technology, had a distinct price advantage over these

4  new technologies. In contrast to an emerging industry where participants invest heavily in

5  research, development, and bringing capacity online, the CRT industry made and recouped

6  such investments long before the start of the Class Period. Thus, CRT manufacturers had

7  very little debt or interest expense on their facilities, and the pressure to produce at full

8  capacity (to avoid default) was lessened. The concentration of CRT manufacturers, the

9  declining CRT share of the total market for television and computer screens, and the higher

10  price of FPD Products gave Defendants the means and incentive to conspire and collude to

11  artificially fix, maintain, and/or stabilize the prices at which CRTs and CRT Products were

12  sold.

13       64.    During the Class Period, the CRT industry faced significant market pressures

14  and reduced profitability. As stated in a September 25, 2001 article on ZDNet News entitled

15  Report. CRT Revenue to plunge:

16          After decades of growth, revenue from cathode ray tube
        monitors is expected to drop significantly over the next several
17          years … 'A combination of price erosion, a slowing in the
        movement to large screens, and a gradual shift in market
18          opportunities from developed regions to developing regions is
        causing the drop in revenue,' Stanford Resources analyst
19          Rhonda Alexander said Tuesday. The growing popularity of
        flat panel monitors will also have an effect on CRT revenue.
20

21       65.    Market research firm iSuppli Corp. predicted in 2006 that sales of LCD

22  televisions in 2007 would, for the first time, surpass sales of CRT televisions. The firm also

23  forecasted that sales of CRTs would drop from an estimated 14.4 million units in 2006 to

24  10.4 million units in 2007. iSuppli predicted that in 2010, CRT televisions would account for

25  only 2.1 million of the 44 million televisions sold.

26       66.    Due to their price and durability, CRTs still remain popular in schools and

27  other public areas, as well as in developing countries like China. CRT technology is also

28  maintaining its popularity in the area of low-cost monitor and smaller size televisions.

According to Japanese industry estimates, some 60 percent of the demand for color televisions in the 12 month period ending in March of 2008 will be for CRT-based models. Recent press reports have indicated that slim CRT televisions developed by Samsung and LG Electronics may help to revitalize the category.

67.     DisplaySearch Inc. predicts that the worldwide capacity to manufacture CRTs will decrease from over 250 million units in 2006 to less than 150 million units by 2010. At various times during the conspiracy, in order to keep prices high, Defendants colluded to restrain output of CRTs as alleged below.

68.     The Defendants herein consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices during the Class Period.

69.     On July 15, 2003, Mitsubishi Electric closed a CRT plant in northern Mexico, just five years after the plant was opened. The plant's closure resulted in a loss of capacity to manufacture 2.7 million CRTs a year for 17-inch computer monitors. This was one of the principal applications for CRTs during this time period.

70.     In December of 2004, MT Picture Display Co. closed its American subsidiary's operations in Horseheads, New York citing price and market erosion. Matsushita Electric announced that the closing was part of the company's "global restructuring initiatives in the CRT business." The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

71.     In December 2004, Toshiba announced that it too would discontinue manufacturing traditional CRT televisions. Thereafter, Toshiba entered into an agreement to have Orion manufacture all Toshiba-brand CRT televisions.

72.     In July 2005, LG Philips discontinued CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

73.     In December 2005, MT Picture Display Co. announced it would close its American subsidiary's operations in Ohio. The company also announced that it would close

-15-

CLASS ACTION COMPLAINT

1   its operations in Germany, by early 2006. Similar to LG Philips, the company explained that

2   it was shifting its CRT operations to Asian and Chinese markets.

3       74.     In late 2005, Samsung SDI closed its CRT factory in Germany, following the

4   lead of other CRT manufacturers.

5       75.     In July 2006, Orion America shut down a CRT manufacturing plant in

6   Princeton, Indiana. In the same month, Matsushita Electric announced it was shutting down

7   its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

8       76.     Plaintiffs are informed and believe, and thereon allege, that in order to control

9   and maintain profitability during a time when the demand for CRTs was declining,

10  Defendants conspired to fix, raise, maintain, and stabilize the price at which CRT Products

11  were sold in the United States at artificially inflated and anticompetitive levels.

12      77.     Despite the ever-increasing popularity of, and intensifying competition from,

13  flat panel displays, prices for CRTs were "stuck stubbornly at high price levels" throughout

14  1995 according to a CNET News.com article.  This price stabilization was purportedly due to

15  a shortage of critical components such as glass.  However, this was a pretext used to conceal

16  the conspiracy.

17      78.     On June 1, 2004, LG Electronics raised the prices of its 15-inch and 17-inch

18  CRT monitors in India.  This price hike was falsely attributed to a shortage of glass needed to

19  manufacture CRTs.

20      79.     Over the course of the conspiracy period, despite the natural trend in most

21  technology products to go down over time, the price of CRTs remained stable, and in some

22  instances went up in an unexplained manner. Given the mature nature of CRT technology,

23  the costs of production were relatively low compared to other emerging technologies. Yet,

24  CRT prices withstood downward price pressures and remained stable over a period of many

25  years. Even in periods of declining prices caused by outside factors, such as the Asian

26  currency crisis, the prices of CRT Products did not fall as much as they would have absent

27  anticompetitive conduct.  As Finsen Yu, President of Skyworth Macao Commercial Offshore

28

1  Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT
2  technology is very mature; prices and technology have become stable."

3       80.     Defendants' collusive activities have also been furthered by trade associations
4  and trade events which provided opportunities to conspire and share information. One
5  example is the Korea Display Conference ("KDC"), hosted by Displaybank and, since the
6  summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry
7  Association. KODEMIA is a national trade organization representing approximately 80
8  member companies in the Korean display industry, including manufacturers and suppliers.
9  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display
10 Industrial Research Association of Korea. EDIRAK had a stated goal of "promoting co-
11 activity with foreign organizations related to display industries."

12      81.     Samsung and LG Electronics were members of both KODEMIA and
13 EDIRAK, and have participated extensively in the KDCs. In addition to Samsung and LG
14 Electronic's participation in EDIRAK, Orion Electric Co., Ltd. and LP Displays f/k/a LG
15 Philips Displays were also members of the association.

16      82.     The KDC has taken place in Seoul, Korea or other Korean venues on
17 December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24,
18 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives in the
19 CRT operations of Samsung, LG Electronics, and Hitachi attended these events, including,
20 among others, H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Oyun and H.C. Kim of
21 Samsung, S.T. Kim, S. Trinker and Ney Corsino of LG Electronics, and Zenzou Tashima of
22 Hitachi.

23      83.     In May of 2007, EDIRAK and KODEMIA were subsumed into the Korean
24 Display Industry Association ("KDIA"). The companies which were the initial participants in
25 this association included those within Samsung and LG Electronics which had responsibility
26 for CRT Products. Lee Sang-Wan of Samsung promised that "[w]e will carve out the future
27 of the industry through official gatherings of the association."

28

84.     This cooperation is not confined to South Korea. In August of 2007, Samsung's Lee Sang-Wan stated:

> [M]ore than any other industry field, the global partnership among the companies in the display field has been in good operation, and this has been the driving force behind the technology development of displays and industrial growth . . . . [O]ur association, too, plans to seek global coexistence and cooperation among the panel producing countries that happen to be concentrated in Northeast Asia; that is Japan, Taiwan, and China. Specifically, we plan to set up a system that can handle the matters related with the information sharing between the producers, cope with the issues of intellectual property rights, request governments to improve systems and jointly deal with the regulations of North America and Europe. To achieve this, we plan to arrange a meeting among the heads of display associations so that they can discuss ways to enhance mutual cooperation within the end of this year.

85.     Other opportunities to collude among the Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

86.     This conspiracy resulted in artificially higher prices for CRTs and CRT Products which were fundamentally inconsistent with the low demand for them and their rapidly approaching obsolescence.

**E.      <u>International Antitrust Investigations</u>**

87.     On or about November 8, 2007, government agencies from Japan, South Korea, the European Union and the United States each opened coordinated investigations into CRT manufacturers based on a plausible belief that they formed an international cartel to fix the prices for CRTs.

88.     On or about November 8, 2007, news reports stated that CRT manufacturers are "suspected of holding meetings to discuss the price targets in Southeast Asian countries where CRT manufacturing bases are located." Another stated that "[t]he CRT manufacturers are suspected of operating an international cartel since 2005 or earlier."

-18-

89.     On or about November 8, 2007, Defendant Matsushita Electric Industrial Company confirmed that Japan's Fair Trade Commission raided MT Picture Display Co. as part of this international price-fixing investigation. Akira Dadota, a spokesman for Matsushita, admitted that Japan's Fair Trade Commission conducted an on-site inspection of MT Picture Display Co.'s offices in Japan. Up until earlier 2007, MT Picture Display Co. was formerly owned by Toshiba Corp. as well as Matsushita Electric.

90.     On or about November 8, 2007, Defendant Samsung SDI confirmed that South Korea's Fair Trade Commission launched a probe into Samsung SDI as part of this international price-fixing investigation.

91.     On or about November 8, 2007, news reports stated that Defendant LP Displays was visited by antitrust regulators as part of this international price-fixing investigation.

92.     On or about November 12, 2007, Defendant Chunghwa Picture Tubes admitted that the company had received a summons from the United States Department of Justice ("DOJ") as part of this international price-fixing investigation.

93.     On or about November 21, 2007, Defendant Royal Phillips admitted that the company is the subject of this international price-fixing investigation.

F.      **Recent Department of Justice Action**

94.     On February 21, 2008, the DOJ filed a motion to intervene in the pending CRT price-fixing litigation, citing its "ongoing criminal grand jury investigation."

95.     In order for the DOJ to institute a grand jury investigation, a DOJ Antitrust Division attorney must believe that a crime has been committed and prepare a detailed memo to that effect. Antitrust Grand Jury Practice Manual, Vol. 1, Ch. I.B.1. Then, the request for a grand jury must be approved by the Assistant Attorney General for the Antitrust Division based on the same standard of a crime having been committed. The fact that the DOJ Antitrust Division's investigation is criminal, as opposed to civil, is particularly relevant to the plausibility of the allegations of CRT and CRT Product price-fixing. The Antitrust Division's "Standards for Determining Whether to Proceed by Civil or Criminal

1  Investigation" state: "In general, current Division policy is to proceed by criminal

2  investigation and prosecution in cases involving horizontal, *per se* unlawful agreements such

3  as price fixing, bid rigging and horizontal customer and territorial allocations. Antitrust

4  Division Manual, Ch. III.C.5. (emphasis added). In short, the DOJ's initiation and

5  continuation of criminal proceedings shows that there is good reason to believe that

6  Defendants violated the antitrust laws.

7  ### G.  The Pass-Through of the Overcharges To End-Users

8  96.  OEMs of televisions and monitors containing CRTs and retailers of CRT

9  Products would be subject to vigorous price competition absent Defendants' collusion.

10  Televisions and computer monitors are commodities, with little or no brand loyalty, such that

11  aggressive pricing causes businesses and consumers to switch preferences to different brands.

12  Television and computer monitor prices are based on production costs, which are in turn

13  directly determined by component costs, as assembly costs are minimal. OEMs accordingly

14  use component costs, like the cost of CRTs, as the starting point for all price calculations.

15  Television and computer monitor prices thus closely track increases in component costs.

16  Likewise, retailers set the price of CRT Products based on the costs of good sold. When

17  Samsung, for example, increases the prices of its CRT Products to retailers, retailers pass on

18  these increased costs to their customers.

19  97.  Defendants' conspiracy to raise, fix, or maintain the price of CRTs at artificial

20  levels resulted in harm to Plaintiffs and the classes alleged herein because it resulted in their

21  paying higher prices for CRT Products than they would have in the absence of Defendants'

22  conspiracy. The entire supracompetitive overcharge for CRTs at issue was passed on to

23  Plaintiffs and the class members.

24  98.  An increase in the cost of purchasing a CRT or a CRT Product by OEMs or

25  retailers significantly affects the price consumers will ultimately pay.

26  99.  CRTs account for a significant percentage of the overall cost of a television or

27  computer monitor. For example, CRTs account for approximately thirty percent (30%) of the

28  cost of a television set.

-20-

CLASS ACTION COMPLAINT

100. CRTs are commodity products, with functionally equivalent products available from the Defendants, which manufacture them pursuant to standard specifications and sizes.

101. Because OEMs and retailers have thin net margins, they must pass on any increase in component costs, such that increases in the price of CRTs and CRT Products lead to quick corresponding price increases at the OEM and retail level.

**H. The Effect of the Price of CRTs on the Price of Products**

102. Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. CRTs are identifiable, discreet physical objects that do not change form or become an indistinguishable part of TVs or computer monitors.

103. Thus, CRTs follow a traceable physical chain from the Defendants to the OEMs to the purchasers of the finished products incorporating the CRT.

104. Moreover, just as CRTs can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers such as OEMs and retailers of CRTs and CRT Products affect prices paid by indirect purchasers of CRT Products.

105. Because Defendants control the market for CRTs, there are virtually no choices for persons and businesses that require CRT Products other than buying such products manufactured by a direct purchaser that paid supracompetitive prices for CRTs to Defendants because of Defendants' conspiracy alleged herein.

106. When distribution markets are highly competitive, as they are in the case of televisions and monitors containing CRTs, all of the overcharge will be passed through to ultimate end user businesses and consumers, such as the Plaintiffs and class members. In addition, most of the Defendants themselves manufacture, market, and distribute televisions and monitors containing CRTs. This means that these Defendants will pass through to their customers 100% of the supracompetitive price increases that result from the Defendants' conspiracy, combination, and agreement to fix, increase, and stabilize the prices for CRTs.

107.    Hence, the inflated prices of CRT Products resulting from Defendants' price-fixing conspiracy have been passed on to Plaintiffs and the other class members by direct purchasers.

108.    During the Class Period, a number of large OEMs sold televisions and monitors containing CRTs directly to consumers. For example, the OEM with the largest share of computer monitor sales in the United States market, Dell, sold exclusively to consumers, as did Gateway.  During the Class Period, Compaq and Apple also sold large portions of their computer monitors directly to the consumers.

109.    Computer monitors sold by direct-purchasing OEMs to retailers were generally updated several times a year, and the price was changed for each new model. OEMs, distributors and retailers often use a "standard markup" method to set prices, meaning that they add a standard percentage to their costs to determine selling prices. Thus, changes in the price of CRTs were passed on rapidly and were not absorbed.

110.    In retailing, it is common to use a "markup rule." The retail price is set as the wholesale cost plus a percentage markup designed to recover non-product costs and to provide a profit. This system guarantees that increases in costs to the retailer will be passed on to end buyers. For example, CDW, a large seller of computer monitors, uses such a system, and a declaration in the DRAM case from CDW's director of pricing details exactly how they calculated selling prices:

> In general, CDW employs a "building block" approach to setting its advertised prices. The first building block is the Cost of Goods Sold (COGS), which represents the price CDW paid to acquire the product ... CDW ... adds a series of positive markups to the cost to CDW to acquire a given product. These markups are in addition to the pass through effect of changes in the costs charged to CDW for that product by a given vendor.

111.    The economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. As Professor Herbert Hovenkamp, a noted antitrust scholar has stated in his treatise, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITITON AND ITS PRACTICE (1994) at 624:

> A monopoly overcharge at the top of a distribution chain generally results in higher prices at every level below. For example if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain likely will be poorer as a result of the monopoly price at the top.
>
> Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

112.     Similarly, two other antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."

113.     As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of the indirect-purchaser antitrust class action involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers... Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

114.     The purpose and effect of the conspiratorial conduct of the Defendants was to raise, fix or stabilize the price of CRTs and CRT Products. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in dependent variable are explained by

changes in a multitude of variables – when all such variables may be changing simultaneously. That analysis – called regression analysis – is commonly used in the real world and in litigation to determine the impact of a price increase on one component part in a product (or service) that is an assemblage of many parts. Thus, it is possible to isolate and identify only the impact of an increase in the price of CRTs on prices for televisions and monitors containing CRTs even though such products contain a number of other components, whose prices may change over time. A regression model can explain how variation in the price of CRTs affects changes in the price of televisions and monitors containing CRTs. In such models, rather than being treated as the dependent variable, the price of CRTs is treated as an independent or explanatory variable. The model can isolate how changes in the price of CRTs impact the price of televisions and monitors containing such CRTs while holding controlling for the impact of other price-determining factors.

115.    Economic and legal literature recognizes that the more pricing decisions are based on cost, the easer it is to determine the pass-through rate. The directness of affected costs refers to whether an overcharge affects a direct (*i.e.*, variable) cost or an indirect (*i.e.*, overhead) cost. Overcharges will be passed-through sooner and at a higher rate if the overcharge affects direct costs. Here CRTs are a direct (and substantial) cost of products containing CRTs.

116.    Other factors that lead to the pass-through of overcharges include:  (i) whether price changes are frequent; (ii) the duration of the anti-competitive overcharge; (iii) whether pricing decisions are based on cost; (iv) whether the overcharge affects variable, as opposed to overhead, costs; (v) whether the resellers' production technology is uniform; (vi) whether the reseller supply curve exhibits a high degree of elasticity; and (vii) whether the demand of the resellers is inelastic.  All of these factors were present in the CRT and CRT Products market during the Class Period.  The precise amount of such an impact on the prices of products containing CRTs can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed through the chain of distribution.

117.     Plaintiffs and the class members have been forced to pay supracompetitive

prices for CRT Products. These inflated prices have been passed on to them by direct-

purchaser OEMs, distributors, and retailers. Those overcharges have unjustly enriched

Defendants.

## CLASS ACTION ALLEGATIONS

118.     Plaintiffs bring this action on their own behalf and as a class action pursuant

to Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the following

class (the "Nationwide Class"):

> All persons and entities residing in the United States who, from
> January 1, 1998 through and including November 9, 2007,
> indirectly purchased in the United States, for their own use and
> not for resale, a CRT or CRT Product which was manufactured
> and/or sold by one or more of the Defendants. Specifically
> excluded from this Class are the Defendants; the officers,
> directors or employees of any Defendant; any entity in which
> any Defendant has a controlling interest; and any affiliate, legal
> representative, heir or assign of any Defendant. Also excluded
> are any judicial officer presiding over this action and the
> members of his/her immediate family and judicial staff, and
> any juror assigned to this action.

119.     Plaintiffs also bring this action on their own behalf and as a class action

pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the

following class or subclass (the "Tennessee Class"):

> All persons and entities residing in Tennessee who, from
> January 1, 1998 through and including November 9, 2007,
> indirectly purchased a CRT or CRT Product manufactured
> and/or sold by one or more of the Defendants for their end use
> and not for resale. Specifically excluded from this Class are the
> Defendants; the officers, directors or employees of any
> Defendant; any entity in which any Defendant has a controlling
> interest; and any affiliate, legal representative, heir or assign of
> any Defendant. Also excluded are any judicial officer presiding
> over this action and the members of his/her immediate family
> and judicial staff, and any juror assigned to this action.

120.     Plaintiffs do not know the exact size of the classes at the present time.

However, Plaintiffs believe that, due to the nature of the trade and commerce involved, there

are at least thousands in each of the classes, and hundreds of thousands of class members

CLASS ACTION COMPLAINT

1  geographically dispersed throughout the United States, such that joinder of all class members

2  would be impracticable.

3      121.    Plaintiffs' claims are typical of the claims of the classes, and Plaintiffs will

4  fairly and adequately protect the interests of the classes. Plaintiffs' interests are coincident

5  with, and not antagonistic to, those of the class members. Plaintiffs have retained competent

6  counsel experienced in class action and complex antitrust and consumer protection litigation.

7      122.    Common questions of law and fact exist, including:

8          a.    Whether Defendants and their Co-Conspirators engaged in a contract,

9                combination or conspiracy among themselves to fix, raise, maintain or

10               stabilize the process of, or allocate the market of, CRTs or CRT

11               Products sold in the United States;

12         b.    The duration and extent of the contract, combination or conspiracy;

13         c.    Whether the Defendants and their co-conspirators were participants in

14               the contracts, combinations or conspiracies alleged herein;

15         d.    Whether Defendants and their co-conspirators engaged in conduct that

16               violated Section 1 of the Sherman Act;

17         e.    Whether Defendants and their co-conspirators engaged in unlawful,

18               unfair or deceptive contracts, combinations or conspiracies among

19               themselves, express or implied, to fix, raise, maintain, or stabilize

20               prices of CRTs or CRT Products sold in and/or distributed in the

21               United States;

22         f.    Whether the Defendants and their co-conspirators engaged in conduct

23               in violation of the antitrust laws of Tennessee;

24         g.    Whether the anticompetitive conduct of the Defendants and their co-

25               conspirators caused prices of CRTs or CRT Products to be artificially

26               inflated to non-competitive levels;

27

28

-26-

CLASS ACTION COMPLAINT

h.   Whether the Defendants and their co-conspirators unjustly enriched themselves as a result of their inequitable conduct at the expense of the members of the classes;

i.   Whether Defendants and their co-conspirators fraudulently concealed the existence of their unlawful conduct;

j.   Whether Plaintiffs and the class members are entitled to injunctive relief; and

k.   Whether Plaintiffs and other members of the Tennessee Class were injured by the conduct of Defendants and, if so, the appropriate measure of damages for the Tennessee Class.

123.   These and other questions of law and fact are common to the classes and predominate over any questions affecting only individual class members, including legal and factual issues relating to liability, damages, and restitution.

124.   Class action treatment is a superior method for the fair and efficient adjudication of this controversy because:

a.   It will avoid a multiplicity of suits and consequent burden on the courts and Defendants;

b.   It would be virtually impossible for all members of the classes to intervene as parties-plaintiff in this action;

c.   It will allow numerous individuals with claims too small to adjudicate on an individual basis, because of the prohibitive cost of this litigation, to obtain redress for their economic injuries;

d.   It is appropriate for treatment on a fluid recovery basis, which obviates any manageability problems; and

e.   It will provide court oversight of the claims process, once Defendants' liability is adjudicated.

125.   Plaintiffs will fairly and adequately protect the interests of the classes in that Plaintiffs have no interests antagonistic to the interests of the other class members, and have

-27-

1   retained counsel competent and experienced in the prosecution of class actions and antitrust

2   cases to represent themselves and the classes.

3       126.    This case is also appropriate for certification as a class action because the

4   Defendants have acted and refused to act on grounds generally applicable to the classes, so

5   that final injunctive relief will be appropriate with respect to the classes as a whole.

6       127.    The claims asserted herein are also appropriate for class certification under

7   Tennessee law.

8                           **FRAUDULENT CONCEALMENT**

9       128.    Plaintiffs and the Class members did not discover and could not have

10  discovered, through the exercise of reasonable diligence, the existence of the conspiracy

11  alleged herein until after November 9, 2007, when the investigations by the DOJ and other

12  antitrust regulators became public, because Defendants and their co-conspirators actively and

13  fraudulently concealed the existence of their contract, combination or conspiracy.  Because

14  Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs and class

15  members were unaware of Defendants' unlawful conduct alleged herein and did not know

16  that they were paying artificially high prices for CRTs or CRT Products.

17      129.    By its very nature, Defendants' price-fixing conspiracy was inherently self-

18  concealing.  As alleged above, Defendants had secret discussions about price and output.

19  Defendants agreed not to discuss publicly the existence or the nature of their agreement.

20      130.    As alleged above, despite increased competition from flat panel monitors,

21  prices for CRT monitors were "stuck stubbornly at high price levels."  This price

22  stabilization was purportedly the result of a shortage of critical components such as glass.

23  This was a pretext used to conceal the conspiracy.

24      131.    Additionally, when several CRT manufacturers, including Defendants

25  Samsung, Philips, and LG Electronics, increased the price of CRT Products in 2004, the price

26  hike was attributed to a shortage of glass shells use for manufacturing CRT monitors.  In

27  justifying this price increase, a Deputy General Manager for an LG Electronics distributor in

28  India stated (in an article available at

-28-

www.techtree.com/techtree/jsp/article.jsp?article_id=52715&cat_id=581), that "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

132.   Plaintiffs had no reason to disbelieve these statements which on their face appeared to explain reasonably the increase in the prices of CRTs and CRT Products. Furthermore, most of the explanations provided by Defendants involved non-public and/or proprietary information that was within Defendants' control, such that Plaintiffs and the class members could not verify their accuracy. Defendants' purported reasons for the price increases of CRTs were materially false and misleading and were made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

133.   These affirmative acts of the Defendants, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

134.   As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the class members have as a result of the anticompetitive conduct alleged in this Complaint.

## VIOLATIONS ALLEGED

### First Claim for Relief
### (Violation of Section 1 of the Sherman Act)

135.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

136.   Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 1997, and continuing through November of 2007, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, stabilize, and peg prices for CRTs and CRT Products sold in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

137.     In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

        a.     Fixing, raising, stabilizing, and pegging the price of CRTs and CRT Products; and

        b.     Allocating among themselves and collusively reducing the production of CRTs and CRT Products.

138.     The combination and conspiracy alleged herein has had the following effects, among others:

        a.     Price competition in the sale of CRTs and CRT Products has been restrained, suppressed, and/or eliminated in the United States;

        b.     Prices for CRTs and CRT Products sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

        c.     Those who purchased CRTs and CRT Products directly or indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

139.     Plaintiffs and other Nationwide Class members have been injured and will continue to be injured in their businesses and property by paying more for CRTs and CRT Products purchased indirectly from the Defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy.

140.     Plaintiffs and the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

///

///

///

**Second Claim for Relief**
**(Unjust Enrichment and Disgorgement of Profits)**

141.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

142.   Defendants have been unjustly enriched through overpayments by Plaintiffs and class members and the resulting profits.

143.   Under principles of unjust enrichment which exist in every state, Defendants should not be permitted to retain the benefits conferred *via* overpayments by Plaintiffs and class members.

144.   Plaintiffs and all members of the Nationwide Class seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and class members may seek restitution.

**Third Claim for Relief on Behalf Of Tennessee Class**
**(Violation of the Tennessee Antitrust Law)**

145.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

146.   Defendants' intentional and purposeful anti-competitive acts that are described above including but not limited to acts of collusion to set prices and the actual act of price-fixing itself was intended to and did cause Plaintiffs to pay supra-competitive prices for CRT and CRT Products in Tennessee.

147.   Defendants' monopolistic and anticompetitive acts as described above violate the antitrust law of the state of Tennessee (Tenn. Code Ann. §§ 47-25-101, *et seq.*), as follows:

  a.   Defendants' combinations or conspiracies had the following effects: (1) price competition for CRTs and CRT Products was restrained, suppressed and eliminated throughout Tennessee; (2) prices for CRTs and CRT Products were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and the

members of the Tennessee Class were deprived of free and open competition; and (4) Plaintiffs and members of the Tennessee Class paid supracompetitive, artificially inflated prices for CRTs and CRT Products.

b.     During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce as CRTs and CRT Products were sold in Tennessee.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Tennessee Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violated of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly, Plaintiffs and all members of the Tennessee Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

148.     Plaintiffs and the Tennessee Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial.

149.     Plaintiffs and the Tennessee Class further seek treble damages and attorneys' fees pursuant to the Tennessee antitrust laws to the extent allowed by law.

150.     Plaintiffs and the Tennessee Class further seek attorneys' fees and costs pursuant to Tennessee law to the extent allowed by law, due to Defendants' willful and unlawful conduct as alleged above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray:

A.     That the Court determine that the Sherman Act, unjust enrichment, and Tennessee antitrust law claims alleged herein may be maintained as class actions under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, as informed by the respective state class action laws.

B.     That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

      1.    A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;

      2.    Acts of unjust enrichment as set forth in the Second Claim for Relief; and

      3.    An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the Tennessee antitrust laws identified in the Third Claim for Relief.

C.     On the First Claim for Relief, that Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.     On the Second Claim for Relief, that the Plaintiffs and the members of the Nationwide Class recover the amounts by which the Defendants have been unjustly enriched as a result of their unlawful conduct;

E.     On the Third Claim for Relief, that the Plaintiffs and the members of the Tennessee Class recover damages, to the maximum extent allowed under Tennessee law, and that a joint and several judgment in favor of Plaintiffs and the Tennessee Class be entered against the Defendants in an amount to be trebled to the extent permitted by applicable law;

F.     That Plaintiffs and members of the classes identified herein be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.      That Plaintiffs and members of the classes identified herein recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.      That Plaintiffs and members of the classes identified herein have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

Dated: March 7, 2008          By: _____
                                    Matthew R. Schultz (220641)

                                    Francis O. Scarpulla (41059)
                                    Craig C. Corbitt (83251)
                                    Judith A. Zahid (215418)
                                    Traviss Galloway (234678)
                                    ZELLE HOFMANN VOELBEL MASON
                                        & GETTE LLP
                                    44 Montgomery Street, Suite 3400
                                    San Francisco, CA 94104
                                    Telephone:    (415) 693-0700
                                    Facsimile:    (415) 693-0770
                                    fscarpulla@zelle.com
                                    ccorbitt@zelle.com

                                    Terry Rose Saunders
                                    Thomas A. Doyle
                                    SAUNDERS & DOYLE
                                    20 South Clark Street, Suite 1720
                                    Chicago, IL 60603
                                    Telephone:    (312) 551-0051
                                    Facsimile:    (312) 551-4467
                                    trsaunders@saundersdoyle.com
                                    tadoyle@saundersdoyle.com

                                    Christopher Lovell
                                    Imtiaz Siddiqui
                                    LOVELL STEWART & HALEBIAN, LLP
                                    500 Fifth Avenue, 58th Floor
                                    New York, NY 10110
                                    Telephone: (212) 608-1900
                                    Facsimile: (212) 719-4677
                                    clovell@lshllp.com

                                    Attorneys for Plaintiffs

1

**JURY TRIAL DEMAND**

2        Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a

3 trial by jury.

4 Dated: March 7, 2008            By:        _____
                                            Matthew R. Schultz (220641)
5

6                                  Francis O. Scarpulla (41059)
                                   Craig C. Corbitt (83251)
7                                  Judith A. Zahid (215418)
                                   Traviss Galloway (234678)
8                                  ZELLE HOFMANN VOELBEL MASON
                                      & GETTE LLP
9                                  44 Montgomery Street, Suite 3400
                                   San Francisco, CA  94104
10                                 Telephone:    (415) 693-0700
                                   Facsimile:    (415) 693-0770
11                                 fscarpulla@zelle.com
                                   ccorbitt@zelle.com
12
                                   Terry Rose Saunders
13                                 Thomas A. Doyle
                                   SAUNDERS & DOYLE
14                                 20 South Clark Street, Suite 1720
                                   Chicago, IL  60603
15                                 Telephone:    (312) 551-0051
                                   Facsimile:    (312) 551-4467
16                                 trsaunders@saundersdoyle.com
                                   tadoyle@saundersdoyle.com
17
                                   Christopher Lovell
18                                 Imtiaz Siddiqui
                                   LOVELL STEWART & HALEBIAN, LLP
19                                 500 Fifth Avenue, 58th Floor
                                   New York, NY  10110
20                                 Telephone:  (212) 608-1900
                                   Facsimile:  (212) 719-4677
21                                 clovell@lshllp.com

22                                 Attorneys for Plaintiffs

23

24

25

26

27

28 3172515

CLASS ACTION COMPLAINT

# EXHIBIT 4

1   Terry Gross (103878)
    Adam C. Belsky (147800)
2   Monique Alonso (127078)
    GROSS BELSKY ALONSO LLP
3   180 Montgomery Street, Suite 2200
    San Francisco, California 94104
4   Telephone: (415) 544-0200        E-filing
    Facsimile:  (415) 544-0201
5
    Attorneys for Plaintiff
6   STEVEN GANZ and the Proposed Class

7

8                   UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10                   SAN FRANCISCO DIVISION

11

12   STEVEN GANZ,                        ) Case No.
                                         )
13                    Plaintiff,         ) COMPLAINT
                                         )
14   v.                                  ) CLASS ACTION
                                         )
15   CHUNGHWA PICTURE TUBES, LTD.;       ) JURY TRIAL DEMANDED
     CHUNGHWA PICTURE TUBES             )
16   (MALAYSIA) SDN. BHD.;               )
     KONINKLIJKE PHILIPS ELECTRONICS    )
17   NV; LG ELECTRONICS INC.; LP         )
     DISPLAYS INTERNATIONAL, LTD.;       )
18   MATSUSHITA ELECTRIC INDUSTRIAL     )
     CO., LTD.; MATSUSHITA TOSHIBA       )
19   PICTURE DISPLAY CO., LTD.;          )
     BEIJING-MATSUSHITA COLOR CRT        )
20   CO., LTD.; ORION ELECTRIC CO.,      )
     LTD.; ORION AMERICA, INC.;          )
21   PANASONIC CORP. OF NORTH            )
     AMERICA; PHILIPS ELECTRONICS        )
22   NORTH AMERICA; SAMSUNG SDI          )
     CO., LTD.; SAMSUNG SDI AMERICA,     )
23   INC.; SAMTEL COLOR, LTD.; TCL       )
     INTERNATIONAL HOLDINGS LTD.;        )
24   THOMSON S.A.; TCL THOMSON           )
     ELECTRONICS CORP.; TOSHIBA          )
25   CORP.; and TOSHIBA AMERICA, INC.,   )
                                         )
26                    Defendants.        )
                                         )
27

28

_____
           CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
                              1

1     Plaintiff Steven Ganz, on behalf of himself and the class defined below, brings this action for

2  damages and injunctive relief against defendants Chunghwa Picture Tubes, Ltd.; Chunghwa Picture

3  Tubes (Malaysia) Sdn. Bhd; Koninklijke Philips Electronics NV; LG Electronics Inc.; LP Displays

4  International, Ltd.; Matsushita Electric Industrial Co., Ltd.; Matsushita Toshiba Picture Display Co.,

5  Ltd.; Beijing-Matsushita Color CRT Co., Ltd.; MT Picture Display Co., Ltd.; Orion Electric Co., Ltd.;

6  Orion America, Inc.; Panasonic Corp. of North America; Philips Electronics North America; Samsung

7  SDI Co., Ltd.; Samsung SDI America, Inc.; Samtel Color, Ltd.; TCL International Holdings Ltd.;

8  Thomson S.A.; TCL Thomson Electronics Corp.; Toshiba Corp.; and Toshiba America, Inc.

9  (collectively, "Defendants") and alleges as follows:

10                                **INTRODUCTION**

11     1.     Defendants, the leading manufacturers and distributors of cathode ray tubes ("CRTs"),

12  which are used in a number of products including televisions and computer monitors ("CRT

13  Products"), have engaged in an illegal trust or combination beginning at least as early as January 1,

14  1998 and extending at least through November 9, 2007 (the "Class Period") to fix or maintain the

15  prices for CRTs. Defendants and their co-conspirators formed an international cartel to illegally

16  restrict competition in the CRT market in order to moderate the downward pressure on CRTs (and, as

17  a result, products containing CRTs) caused by the rapidly increasing popularity of flat panel products

18  using liquid crystal displays ("LCD") and plasma display panels ("PDP") (collectively, "FPD"). As

19  a result of Defendants' unlawful conduct, Plaintiff and the other members of the Class paid higher

20  prices for products containing CRTs during the Class Period than they would have paid if the prices

21  for CRTs had been determined by a competitive market.

22                          **JURISDICTION AND VENUE**

23     2.     This Court has original jurisdiction over this action under the provisions of 28 U.S.C.

24  § 1331 (federal question) and 28 U.S.C. § 1337 (original jurisdiction over any claims arising under any

25  Act of Congress regulating commerce or protecting trade and commerce against restraints and

26  monopolies), because the Complaint alleges violations of the Sherman Act, 15 U.S.C. § 1, and

27  Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. The Court has supplemental

28  jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367, because those claims are so

1 related to Plaintiff's federal law claim that they form part of the same case or controversy. The Court
2 also has original jurisdiction over the entire action under 28 U.S.C. § 1332, because the amount in
3 controversy for the Class exceeds the sum or value of $5,000,000, exclusive and interest and costs, and
4 there are members of the Class who are citizens of a different state than Defendants, and certain
5 Defendants are citizens or subjects of foreign states..

6     3.     Venue is proper in this District under 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C.
7 § 1391(b) and (c), because Defendants resided, had an agent, transacted business, maintained an office,
8 or are otherwise found in this District. Moreover, many of Defendants' unlawful acts giving rise to
9 Plaintiff's claim occurred, and a substantial portion of the affected interstate trade and commerce
10 described below has been carried out, in this District because San Francisco International Airport is
11 a major hub of the price fixing conspiracy alleged herein and is located in this District.

12 ## INTRADISTRICT ASSIGNMENT

13     4.     Intradistrict assignment is proper in this Division because a substantial part of the
14 property that is the subject of this action is situated in, and a substantial part of the events or omissions
15 which give rise to the claim occurred in, the County of San Francisco.

16 ## THE PARTIES

17     5.     Plaintiff Steven Ganz ("Plaintiff") is a resident of the State of California, County of San
18 Francisco. Plaintiff indirectly purchased a CRT from one or more of Defendants during the Class
19 Period, and was injured as a result of Defendants' illegal conduct.

20     6.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa") is a Taiwanese company with
21 its principal place of business in Bade City, Taoyuan, Taiwan. During the Class Period, Chunghwa
22 manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

23     7.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is
24 a Malaysian company with its principal place of business in Shah Alam, Selangor Darul Ehsan,
25 Malaysia. During the Class Period, Chunghwa Malaysia manufactured, sold, and distributed CRTs
26 and/or CRT Products throughout the United States.

27     8.     Defendant Koninklijke Philips Electronics NV ("Royal Philips") is a Dutch company
28 with its principal place of business in Amsterdam, The Netherlands. During the Class Period, Royal

---

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

3

Philips manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

9. Defendant LG Electronics Inc. ("LG Electronics") is a Korean company with its principal place of business in Seoul, South Korea. During the Class Period, LG Electronics manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

10. Defendant LP Displays International, Ltd. ("LP Displays") is a Hong Kong company with its principal place of business in Hong Kong. During the Class Period, LP Displays manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

11. Defendant Matsushita Electric Industrial Co., Ltd. ("Matsushita Electric") is a Japanese company with its principal place of business in Osaka, Japan. During the Class Period, Matsushita Electric manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

12. Defendant Matsushita Toshiba Picture Display Co., Ltd. ("MT Picture Display") is a Japanese company with its principal place of business in Osaka, Japan. During the Class Period, MT Picture Display manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

13. Defendant Beijing-Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business in Beijing, China. During the Class Period, BMCC manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

14. Defendant Orion Electric Co., Ltd. ("Orion Electric") is a Japanese company with its principal place of business in Fukui, Japan. During the Class Period, Orion Electric manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

15. Defendant Orion America, Inc. ("Orion America") is an Indiana corporation with its principal place of business in Princeton, Indiana. During the Class Period, Orion America manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

16. Defendant Panasonic Corp. of North America ("Panasonic") is a Delaware corporation with its principal place of business in Secaucus, New Jersey. During the Class Period, Panasonic sold and distributed CRTs and/or CRT Products manufactured by Matsushita Electric throughout the United States.

//

17. Defendant Philips Electronics North America ("Philips America") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, Philips America sold and distributed CRTs and/or CRT Products manufactured by Royal Philips throughout the United States.

18. Defendant Samsung SDI Co., Ltd. ("Samsung SDI") is a Korean company with its principal place of business in Kyonggi, South Korea. During the Class Period, Samsung SDI manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

19. Defendant Samsung SDI America, Inc. ("Samsung America") is a California corporation with its principal place of business in Irvine, California. During the Class Period, Samsung America sold and distributed CRTs and/or CRT Products manufactured by Samsung SDI throughout the United States.

20. Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its principal place of business in New Delhi, India. During the Class Period, Samtel manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

21. Defendant TCL International Holdings Ltd. ("TCL") is a Hong Kong company with its principal place of business in Hong Kong. During the Class Period, TCL manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

22. Defendant Thomson S.A. ("Thomson") is a French company with its principal place of business in Boulogne, France. During the Class Period, Thomson manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

23. Defendant TCL Thomson Electronics Corp. ("TTE") is a Chinese company with its principal place of business in Guangdong, China. During the Class Period, TTE manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

24. Defendant Toshiba Corp. ("Toshiba") is a Japanese company with its principal place of business in Tokyo, Japan. During the Class Period, Toshiba manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

25. Defendant Toshiba America, Inc. ("Toshiba America") is a wholly-owned subsidiary of Toshiba with its principal place of business in New York, New York. During the Class Period,

1 Toshiba America manufactured, sold, and/or distributed CRTs and/or CRT Products throughout the
2 United States.

3     26.     Certain other persons, firms, corporations and entities, the identities of which Plaintiff
4 is not currently aware of, have participated as co-conspirators with Defendants in the violations and
5 conspiracies alleged in this Complaint. In order to engage in the offenses charged and violations
6 alleged herein, these co-conspirators have performed acts and made statements in furtherance of the
7 antitrust violations and conspiracies alleged herein.

8     27.     The acts alleged to have been done by Defendants were authorized, ordered or done by
9 their directors, officers, agents, employees, or representatives while actively engaged in the
10 management of each of the Defendants' affairs.

11 **FACTUAL ALLEGATIONS**

12 **The CRT Industry and Market**

13     28.     CRT is a widely used technology component utilized in products such as televisions
14 and computer monitors that allow devices to display images upon the screen.

15     29.     Known for their brightness, resolution, rich colors, contrast, and reliability, CRTs
16 evolved from early black-and-white television sets and monitors to today's high-resolution,
17 digital-ready graphic models. The basic components of a CRT are (a) a heated, cylindrical cathode,
18 or electron gun, that emits a steady stream of electrons; (b) a shadow mask that directs the electron
19 beams, (c) a phosphor-coated screen that absorbs the beams, (d) a deflection yoke that directs the
20 scanning electron beam, which strikes the screen to produce light; and (e) an evacuated glass envelope
21 that allows the entire process to take place in a vacuum.

22     30.     CRTs are manufactured in several standard sizes, including 17 inch, 19 inch, 23 inch,
23 and 27 inch. They are commodity products; those manufactured by Defendants are interchangeable.

24     31.     CRTs have no independent utility, and have value only as components of other
25 products, primarily televisions and computer monitors. Direct purchasers buy CRTs in order to
26 include them as components in televisions and computer monitors. The demand for CRTs thus
27 directly derives from the demand for such products.

28 //

32.     The market for CRTs and the market for CRT Products is one and the same, because the CRT market exists to serve only the CRT Products market. The market for CRT and the market for CRT Products are, for all intents and purposes, a single market, as one would not exist without the other.

33.     The largest direct purchasers of CRTs are television and computer OEMs. Significantly, a number of Defendants are (or were, during the Class Period) also CRT television and/or computer original equipment manufacturers ("OEMs"), such as Toshiba and Samsung SDI and/or its parent corporation.

34.     Plaintiff and the other Class members have participated in this market through their purchases of CRT Products. When Plaintiff and the other Class members bought CRT Products, Defendants' unlawful conspiracy inflated the prices at which such products were sold to Plaintiffs and the Class members.

35.     The market for CRTs in the United States is extremely large. In 1997, the worldwide CRT market exceeded $24 billion. In 2006, industry experts estimated that televisions containing CRTs made up at least half of all of the projected 29,000,000 televisions shipped to North America that year.

36.     CRT televisions currently account for 37% of television revenues in the United States.

37.     The structure of the CRT industry facilitates collusion.

38.     There is significant market concentration. During the Class Period, Defendants collectively owned the majority of the market share for CRTs used in televisions and computer monitors.

39.     Defendant Samsung SDI is currently the largest manufacturer of products containing CRTs. In 2004, it held approximately 30% of the global CRT market.

40.     Defendant LP Displays currently has the second largest share of the global CRT market. In 2004, it held approximately 27% of the global CRT market.

41.     Defendant MT Picture Display held approximately 9% of the global CRT market in 2004.

//

42. Defendant Chunghwa Picture Tubes held approximately 6.9% of the global CRT market in 2005.

43. There are also significant barriers to entry in the CRT industry in the form of high manufacturing and technological barriers to entry. Construction and maintenance of fabrication plants is extremely expensive. Because of increased competition and ongoing technological advances, manufacturers' research and development expenses are also extremely high.

44. There are multiple interrelated business relationships in the CRT industry. For example, in November 2000, Defendants LG Electronics and Koninklijke Philips Electronics agreed to enter into a joint venture that combined their CRT manufacturing operations. The resulting company (LG Philips Displays, now known as LP Displays) entered the market with a 25% share of the global CRT market.

45. Defendants Matsushita Electric Industrial Co., Ltd. and Toshiba Corporation also entered into a joint venture combining their CRT manufacturing operations during the Class Period. The resulting company (MT Picture Display) immediately enjoyed a significant share of the global CRT market.

46. In 2002, Matsushita and TCL formed a "collaborative relationship" in the consumer electronics business. The stated purpose of the collaboration is to "achiev[e] mutually beneficial effects" by supply of cathode-ray tubes to TCL from Matsushita, sales of Matsushita's products through TCL's sales channels in China, collaboration in the supply of products, including televisions, through OEM and ODM (original design manufacturing) and collaboration on research and development.

47. In 2005, Defendants Samsung SDI and LG Philips Displays entered into an agreement to work together by sharing parts with respect to CRTs.

**Defendants' Illegal Conspiracy**

48. The price of CRTs or CRT Products during the Class Period did not fully reflect the sharp decline in demand for CRTs caused by the entry of the new generation of competing technologies. Despite the introduction of technologically superior and increasingly popular alternatives to televisions and monitors using CRTs, the price of CRTs and CRT Products remained

1   unnaturally high throughout the Class Period, with periods of sustained and unnatural price stability.

2       49.    CRTs, as the established technology, had a distinct price advantage over these new

3   technologies. In contrast to an emerging industry where participants invest heavily in research,

4   development, and bringing capacity online, the CRT industry made and recouped such investments

5   long before the start of the Class Period. Thus, CRT manufacturers had very little debt or interest

6   expense on their facilities, and the pressure to produce at full capacity (to avoid default) was lessened.

7   The concentration of CRT manufacturers, the declining CRT share of the total market for television

8   and computer screens, and the higher price of FPD Products gave Defendants the means and incentive

9   to conspire and collude to artificially fix, maintain, and/or stabilize the prices at which CRTs and CRT

10   Products were sold.

11       50.    During the Class Period, the CRT industry faced significant market pressures and

12   reduced profitability. As stated in a September 25, 2001 article on ZDNet News entitled Report. CRT

13   Revenue to plunge:

14             After decades of growth, revenue from cathode ray tube monitors is expected
                to drop significantly over the next several years … 'A combination of price
15            erosion, a slowing in the movement to large screens, and a gradual shift in
                market opportunities from developed regions to developing regions is causing
16            the drop in revenue,' Stanford Resources analyst Rhonda Alexander said
                Tuesday. The growing popularity of flat panel monitors will also have an effect
17            on CRT revenue.

18       51.    Market research firm iSuppli Corp. predicted in 2006 that sales of LCD televisions in

19   2007 would, for the first time, surpass sales of CRT televisions. The firm also forecasted that sales of

20   CRTs would drop from an estimated 14.4 million units in 2006 to 10.4 million units in 2007. iSuppli

21   predicted that in 2010, CRT televisions would account for only 2.1 million of the 44 million

22   televisions sold.

23       52.    Due to their price and durability, CRTs still remain popular in schools and other public

24   areas, as well as in developing countries like China. CRT technology is also maintaining its popularity

25   in the area of low-cost monitor and smaller size televisions. According to Japanese industry estimates,

26   some 60 percent of the demand for color televisions in the 12 month period ending in March of 2008

27   will be for CRT-based models. Recent press reports have indicated that slim CRT televisions

28   developed by Samsung and LG Electronics may help to revitalize the category.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1        53.      DisplaySearch Inc. predicts that the worldwide capacity to manufacture CRTs will

2 decrease from over 250 million units in 2006 to less than 150 million units by 2010. At various times

3 during the conspiracy, in order to keep prices high, Defendants colluded to restrain output of CRTs

4 as alleged below.

5        54.      Defendants consolidated their manufacturing facilities in lower-cost venues such as

6 China and reduced manufacturing capacity to prop up prices during the Class Period.

7        55.      On July 15, 2003, Mitsubishi Electric closed a CRT plant in northern Mexico, just five

8 years after the plant was opened. The plant's closure resulted in a loss of capacity to manufacture 2.7

9 million CRTs a year for 17-inch computer monitors. This was one of the principal applications for

10 CRTs during this time period.

11        56.      In December of 2004, Matsushita Toshiba closed its American subsidiary's operations

12 in Horseheads, New York, citing price and market erosion. Matsushita announced that the closing was

13 part of the company's "global restructuring initiatives in the CRT business." The company further

14 stated that in the future, "CRTs for the North American market will be supplied by other

15 manufacturing locations in order to establish an optimum CRT manufacturing structure."

16        57.      In December 2004, Toshiba announced that it too would discontinue manufacturing

17 traditional CRT televisions. Thereafter, Toshiba entered into an agreement to have Orion manufacture

18 all Toshiba-brand CRT televisions.

19        58.      In July 2005, LG Philips discontinued CRT production at its Durham, England facility,

20 citing a shift in demand from Europe to Asia.

21        59.      In December 2005, MT Picture Display announced that it would close its American

22 subsidiary's operations in Ohio. The company also announced that it would close its operations in

23 Germany by early 2006. Similar to LG Philips, the company explained that it was shifting its CRT

24 operations to Asian and Chinese markets.

25        60.      In late 2005, Samsung SDI closed its CRT factory in Germany, following the lead of

26 other CRT manufacturers.

27        61.      In July 2006, Orion America shut down a CRT manufacturing plant in Princeton,

28 Indiana. In the same month, Matsushita announced it was shutting down its CRT factory in Malaysia

and liquidating its joint venture with Toshiba.

62. Plaintiff is informed and believes, and thereon alleges, that in order to control and maintain profitability during a time when the demand for CRTs was declining, Defendants conspired to fix, raise, maintain, and stabilize the price at which CRT Products were sold in the United States at artificially inflated and anticompetitive levels.

63. Despite the ever-increasing popularity of, and intensifying competition from, flat panel displays, prices for CRTs were "stuck stubbornly at high price levels" throughout 1995 according to a CNET News.com article. This price stabilization was purportedly due to a shortage of critical components such as glass. However, this was a pretext used to conceal the conspiracy.

64. On June 1, 2004, LG Electronics raised the prices of its 15-inch and 17-inch CRT monitors in India. This price hike was falsely attributed to a shortage of glass needed to manufacture CRTs.

65. Over the course of the conspiracy period, despite the natural trend in most technology products to go down over time, the price of CRTs remained stable, and in some instances went up in an unexplained manner. Given the mature nature of CRT technology, the costs of production were relatively low compared to other emerging technologies. Yet, CRT prices withstood downward price pressures and remained stable over a period of many years. Even in periods of declining prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not fall as much as they would have absent anticompetitive conduct. As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

66. Defendants' collusive activities have also been furthered by trade associations and trade events which provided opportunities to conspire and share information. One example is the Korea Display Conference ("KDC"), hosted by Displaybank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing approximately 80 member companies in the Korean display industry, including manufacturers and suppliers. Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea. EDIRAK had a stated goal

1 of "promoting co-activity with foreign Organizations related to display industries."

2     67.     Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and
3 have participated extensively in the KDCs. In addition to Samsung and LG's participation in
4 EDIRAK, Orion Electric Co., Ltd. and LG Philips Displays (now LP Displays) were also members of
5 the association.

6     68.     The KDC has taken place in Seoul, Korea or other Korean venues on December 4,
7 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4,
8 2005; July 6-7, 2006; and June 26-27, 2007. Top executives in the CRT operations of Samsung, LG
9 Electronics, and Hitachi attended these events, including, among others: H.K. Chung, Woo Jong Lee,
10 Bae Choe1-Han, Jung Ho-Oyun and H.C. Kim of Samsung; S.T. Kim, S. Trinker and Ney Corsino of
11 LG Electronics; and Zenzou Tashima of Hitachi.

12     69.     In May of 2007, EDIRAK and KODEMIA were subsumed into the Korean Display
13 Industry Association ("KDIA"). The companies which were the initial participants in this association
14 included those within Samsung and LG Electronics which had responsibility for CRT Products. Lee
15 Sang-Wan of Samsung promised that "[w]e will carve out the future of the industry through official
16 gatherings of the association."

17     70.     This cooperation is not confined to South Korea. In August 2007, Samsung's Lee Sang-
18 Wan stated:

19         [M]ore than any other industry field, the global partnership among the
companies in the display field has been in good operation, and this has
20         been the driving force behind the technology development of displays
and industrial growth . . . . [O]ur association, too, plans to seek global
21         coexistence and cooperation among the panel producing countries that
happen to be concentrated in Northeast Asia; that is Japan, Taiwan, and
22         China. Specifically, we plan to set up a system that can handle the
matters related with the information sharing between the producers,
23         cope with the issues of intellectual property rights, request governments
to improve systems and jointly deal with the regulations of North
24         America and Europe. To achieve this, we plan to arrange a meeting
among the heads of display associations so that they can discuss ways
25         to enhance mutual cooperation within the end of this year.

26     71.     Other opportunities to collude among the Defendants were provided by events
27 sponsored by the Society for Information Display, such as the annual Asian Symposiums on
28 Information Display, the annual International Display Manufacturing Conference and Exhibition (the

most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

72.     This conspiracy resulted in artificially higher prices for CRTs and CRT Products which were fundamentally inconsistent with the low demand for them and their rapidly approaching obsolescence.

**International Antitrust Investigations**

73.     On or about November 8, 2007, government agencies from Japan, South Korea, the European Union and the United States each opened coordinated investigations into CRT manufacturers based on a plausible belief that they formed an international cartel to fix the prices for CRTs.

74.     On or about November 8, 2007, news reports stated that CRT manufacturers are "suspected of holding meetings to discuss the price targets in Southeast Asian countries where CRT manufacturing bases are located." One report stated that "[t]he CRT manufacturers are suspected of operating an international cartel since 2005 or earlier."

75.     On or about November 8, 2007, Defendant Matsushita Electric confirmed that Japan's Fair Trade Commission raided MT Picture Display Co. as part of this international price-fixing investigation.    Akira Dadota, a spokesman for Matsushita, admitted that Japan's Fair Trade Commission conducted an on-site inspection of MT Picture Display's offices in Japan. Up until early 2007, MT Picture Display was owned by Toshiba Corp. as well as Matsushita Electric.

76.     On or about November 8, 2007, Defendant Samsung SDI confirmed that South Korea's Fair Trade Commission launched a probe into Samsung SDI as part of this international price-fixing investigation.

77.     On or about November 8, 2007, news reports stated that defendant LP Displays was visited by antitrust regulators as part of this international price-fixing investigation.

78.     On or about November 12, 2007, Defendant Chunghwa admitted that the company had received a summons from the United States Department of Justice ("DOJ") as part of this international price-fixing investigation.

79.     On or about November 21, 2007, Defendant Royal Phillips admitted that the company

1 is subject to this international price-fixing investigation.

2     80.    On February 21, 2008, the DOJ filed a motion to intervene in the pending CRT price-
3 fixing litigation, citing its "ongoing criminal grand jury investigation."

4     81.    In order for the DOJ to institute a grand jury investigation, a DOJ Antitrust Division
5 attorney must believe that a crime has been committed and prepare a detailed memo to that effect.
6 Antitrust Grand Jury Practice Manual, Vol. 1, Ch. I.B.1. Then, the request for a grand jury must be
7 approved by the Assistant Attorney General for the Antitrust Division based on the same standard of
8 a crime having been committed. The fact that the DOJ Antitrust Division's investigation is criminal,
9 as opposed to civil, is particularly relevant to the plausibility of the allegations of CRT and CRT
10 Product price-fixing. The Antitrust Division's "Standards for Determining Whether to Proceed by
11 Civil or Criminal Investigation" state: "In general, current Division policy is to proceed by criminal
12 investigation and prosecution in cases involving horizontal, *per se* unlawful agreements such as price
13 fixing, bid rigging and horizontal customer and territorial allocations. Antitrust Division Manual, Ch.
14 III.C.5. (emphasis added). In short, the DOJ's initiation and continuation of criminal proceedings
15 shows that there is good reason to believe that Defendants violated the antitrust laws.

16                   **Pass Through of the Overcharges to End Users**

17     82.    OEMs and retailers of televisions and monitors containing CRTs would be subject to
18 vigorous price competition absent Defendants' collusion. Televisions and computer monitors are
19 commodities, with little or no brand loyalty, such that aggressive pricing causes businesses and
20 consumers to switch preferences to different brands. Television and computer monitor prices are
21 based on production costs, which in turn are directly determined by component costs, as assembly
22 costs are minimal. OEMs accordingly use component costs, like the cost of CRTs, as the starting point
23 for all price calculations. Television and computer monitor prices thus closely track increases and
24 decreases in component costs. Likewise, retailers set the price of CRT Products based on the costs of
25 good sold. When Samsung, for example, increases the prices of its CRT Products to retailers, retailers
26 pass on these increased costs to their customers.

27     83.    Defendants' conspiracy to raise, fix, or maintain the price of CRTs at artificial levels
28 resulted in harm to Plaintiff and the indirect-purchaser class alleged herein because it resulted in their

1  paying higher prices for CRT Products than they would have in the absence of Defendants' conspiracy.
2  The entire supracompetitive overcharge for CRTs at issue was passed on to plaintiff and the other
3  indirect purchaser class members.

4    84.    An increase in the cost of purchasing a CRT or a CRT Product by OEMs or retailers
5  significantly affects the price the end-user consumer will ultimately pay.

6    85.    CRTs account for a significant percentage of the overall cost of a television or computer
7  monitor. For example, CRTs account for approximately 30% of the cost of manufacturing a television.

8    86.    CRTs are commodity products, with functionally equivalent products available from
9  Defendants, which manufacture them pursuant to standard specifications and sizes.

10    87.    Because OEMs and retailers have thin net margins, they must pass on any increase in
11  component costs, such that increases in the price of CRTs and CRT Products lead to quick
12  corresponding price increases at the OEM and retail level.

13    88.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it
14  moves through the distribution system. CRTs are identifiable, discreet physical objects that do not
15  change form or become an indistinguishable part of televisions or computer monitors.

16    89.    Thus, CRTs follow a traceable physical chain from the defendants to the OEMs to the
17  purchasers of the finished products incorporating the CRT.

18    90.    Moreover, just as CRTs can be physically traced through the supply chain, so can their
19  price be traced to show that changes in the prices paid by direct purchasers of CRTs affect prices paid
20  by indirect purchasers of televisions and monitors containing CRTs.

21    91.    Because Defendants control the market for CRTs, there are virtually no choices for
22  persons and businesses that require CRT Products other than buying such products manufactured by
23  a direct purchaser that paid supracompetitive prices for CRTs to Defendants because of Defendants'
24  conspiracy alleged herein.

25    92.    When distribution markets are highly competitive, as they are in the case of televisions
26  and monitors containing CRTs, all of the overcharge will be passed through to ultimate end-user
27  businesses and consumers, such as Plaintiff and the other class members. In addition, most of the
28  Defendants themselves manufacture, market, and distribute televisions and monitors containing CRTs.

---

1   This means that these Defendants will pass through to their customers 100% of the supracompetitive

2   price increases that result from Defendants' conspiracy, combination, and agreement to fix, increase,

3   and stabilize the prices for CRTs.

4   93.   All of this means that the inflated prices of televisions and computer monitors

5   containing CRTs resulting from defendants' price-fixing conspiracy have been passed on to plaintiff

6   and the other class members by the direct purchasers of the CRTs.

7   94.   During the Class Period, a number of large OEMs sold televisions and computer

8   monitors containing CRTs directly to consumers. For example, the OEM with the largest share of

9   computer monitor sales in the United States market, Dell, sold exclusively to consumers, as did

10   Gateway. During the Class Period, Compaq and Apple also sold large portions of their computer

11   monitors directly to consumers.

12   95.   Computer models sold by direct-purchasing OEMs to retailers were generally updated

13   several times a year, and the price was changed for each new model. OEMs, retailers and distributors

14   often use a "standard markup" method to set prices, meaning that they add a standard percentage to

15   their own costs to determine selling prices. Thus, changes in the price of CRTs were passed on rapidly

16   and were not absorbed.

17   96.   In retailing, it is common to use a "markup rule." The retail price is set as the wholesale

18   cost plus a percentage markup designed to recover non-product costs and to provide a profit. This

19   system guarantees that increases in costs to the retailer will be passed on to end buyers. For example,

20   CDW, a large seller of computer monitors, uses such a system, and a declaration in the DRAM case

21   from CDW's director of pricing details exactly how CDW calculated selling prices:

22   In general, CDW employs a "building block" approach to setting its
     advertised prices. The first building block is the Cost of Goods Sold

23   (COGS), which represents the price CDW paid to acquire the
     product...CDW... adds a series of positive markups to the cost to

24   CDW to acquire a given product. These markups are in addition to the
     pass through effect of changes in the costs charged to CDW for that

25   product by a given vendor.

26   97.   The economic and legal literature has recognized that unlawful overcharges in a

27   component normally result in higher prices for products containing that price-fixed component. As

28   Professor Herbert Hovenkamp, a noted antitrust scholar, has stated in his treatise, FEDERAL

---

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

16

1 | ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 624:

2
3
4
5
6

> A monopoly overcharge at the top of a distribution chain generally results in higher prices at every level below. For example if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain likely will be poorer as a result of the monopoly price at the top.

7

> Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

8
9
10
11
12
13

98. Similarly, two other antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."

14
15
16
17
18

99. As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

19
20
21
22

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers... Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

23
24
25
26
27
28

100. The purpose of the conspiratorial conduct of Defendants was to raise, fix or stabilize the price of CRTs and, as a direct and foreseeable result, CRT Products. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in dependent variable are explained by changes in a multitude of variables – when all such variables may be changing simultaneously. That analysis, called regression analysis, is commonly used in the real world and in litigation to determine the impact

of a price increase on one cost in a product (or service) that is an assemblage of may parts. Thus, it is possible to isolate and identify only the impact of an increase in the price of CRTs on prices for televisions and monitors containing CRTs even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of CRTs affects changes in the price of televisions and monitors containing CRTs. In such models, rather than being treated as the dependent variable, the price of CRTs is treated as an independent or explanatory variable. The model can isolate how changes in the price of CRTs impact the price of televisions and monitors containing such CRTs while controlling for the impact of other price-determining factors.

101. Economic and legal literature recognizes that the more pricing decisions are based on cost, the easer it is to determine the pass-through rate. The directness of affected costs refers to whether an overcharge affects a direct (i.e. variable) cost or an indirect (i.e., overhead) cost. Overcharges will be passed-through sooner and at a higher rate if the overcharge affects direct costs. Here CRTs are a direct (and substantial) cost of CRT Products.

102. Other factors that lead to the pass-through of overcharges include: (i) whether price changes are frequent; (ii) the duration of the anti-competitive overcharge; (iii) whether pricing decisions are based on cost; (iv) whether the overcharge affects variable, as opposed to overhead, costs; (v) whether the resellers' production technology is uniform; (vi) whether the reseller supply curve exhibits a high degree of elasticity; and (vii) whether the demand of the resellers is inelastic. All of these factors were present in the CRT market during the Class Period. The precise amount of such an impact on the prices of products containing CRTs can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed through the chain of distribution.

103. Plaintiff and the other Class members have been forced to pay supracompetitive prices for CRT Products. These inflated prices have been passed on to them by direct-purchaser OEMs, distributors, and retailers. These overcharges have unjustly enriched Defendants.

//

//

## CLASS ACTION ALLEGATIONS

104.    Plaintiff brings this action as a class action, pursuant to Federal Rule of Civil Procedure

23, on behalf of himself and a class ("the Nationwide Class") composed of and defined as follows:

> All persons and entities residing in the United States who, from January 1, 1998 through and including November 9, 2007, indirectly purchased in the United States, for their own use and not for resale, a CRT which was manufactured and/or sold by one or more of Defendants. Specifically excluded from this Class are Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

105.    Plaintiff also brings this action as a class action, pursuant to Federal Rule of Civil

Procedure 23, on behalf of himself and a subclass ("the California Subclass") composed of and defined

as follows:

> All persons and entities residing in California who, from January 1, 1998 through and including November 9, 2007, indirectly purchased a CRT, for their own use and not for resale, a CRT which was manufactured and/or sold by one or more of Defendants. Specifically excluded from this Class are Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

106.    This action has been brought and may be properly maintained as a class action pursuant

to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

a.    The Class is ascertainable and there is a well-defined community of interest among the members of the Class;

b.    Based upon the nature of the trade and commerce involved and the number of indirect purchasers of CRTs, Plaintiff believes that the members of the Class number in the thousands, and therefore is sufficiently numerous that joinder of all Class members is not practicable;

c.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff indirectly purchased CRTs from one or more of the Defendants or their co-conspirators, and therefore Plaintiff's claims arise from the same

common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class;

    d.    The following common questions of law or fact, among others, exist as to the members of the Class:

        i.    whether Defendants and their co-conspirators engaged in a contract, combination or conspiracy among themselves to fix, raise, maintain or stabilize the process of, or allocate the market of CRTs or CRT Products sold in the United States;

        ii.    the duration and extent of the contract, combination or conspiracy;

        iii.    whether Defendants and their co-conspirators were participants in the contracts, combinations or conspiracies alleged herein;

        iv.    whether Defendants and their co-conspirators engaged in conduct that violated Section 1 of the Sherman Act;

        v.    whether Defendants and their co-conspirators engaged in unlawful, unfair or deceptive contracts, combinations or conspiracies among themselves, express or implied, to fix, raise, maintain, or stabilize prices of CRTs or CRT Products sold in and/or distributed in the United States;

        vi.    whether Defendants' conduct violates Sections 16720 and 17200 of the California Business and Professions Code;

        vii.    whether the anticompetitive conduct of Defendants and their co-conspirators caused prices of CRTs or CRT Products to be artificially inflated to non-competitive levels;

        viii.    whether Defendants and their co-conspirators unjustly enriched themselves as a result of their inequitable conduct at the expense of the members of the Classes;

        ix.    whether Defendants and their co-conspirators fraudulently concealed the existence of their unlawful conduct;

x.    whether Plaintiff and the other Class members are entitled to injunctive relief; and

xi.    whether Plaintiffs and the other Class members were injured by the conduct of Defendants and, if so, the appropriate measure of damages.

e.    These, and other questions of law or fact, which are common to the members of the Class predominate over any questions affecting only individual members of the Class;

f.    Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff has no interests that are antagonistic to other members of the Class and has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent himself and the Class;

h.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all damaged Class members is impractical. The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent the availability of class action procedures, it would not be feasible for Class members to redress the wrongs done to them. Even if the Class members could afford individual litigation, the court system could not. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court;

i.    Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole; and

j.    In the absence of a class action, Defendants would be unjustly enriched because

1 they would be able to retain the benefits and fruits of their wrongful conduct.

2 107. The Claims in this case are also properly certifiable under the laws of the State of

3 California.

4 ## ACTIVE CONCEALMENT

5 108. Plaintiff and the other Class members did not discover and could not have discovered,

6 through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until after

7 November 9, 2007, when the investigations by the DOJ and other antitrust regulators became public,

8 because Defendants and their co-conspirators actively and fraudulently concealed the existence of their

9 contract, combination or conspiracy. Because Defendants' agreement, understanding and conspiracy

10 were kept secret, Plaintiff and the other Class members were unaware of Defendants' unlawful conduct

11 alleged herein and did not know that they were paying artificially high prices for CRTs and CRT

12 Products.

13 109. By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

14 As alleged above, Defendants had secret discussions about price and output. Defendants agreed not

15 to discuss publicly the existence or the nature of their agreement.

16 110. In 1999, as alleged above, despite declining production costs and the rapid entry of flat

17 panel display products, the price of large-sized color CRTs actually rose. The price increase was

18 allegedly based on increasing global demand for the products. However, this price rise was the result

19 of collusive conduct among Defendants, which was undisclosed at the time.

20 111. As alleged above, despite increased competition from flat panel monitors, prices for

21 CRT monitors were "stuck stubbornly at high price levels" throughout 2001. This price stabilization

22 was purportedly the result of a shortage of critical components such as glass. This was a pretext used

23 to conceal the conspiracy.

24 112. Additionally, when several CRT manufacturers, including Defendants Samsung,

25 Philips, and LG Electronics, increased the price of CRT Products in 2004, the price hike was attributed

26 to a shortage of glass shells use for manufacturing CRT monitors. In justifying this price increase, a

27 Deputy General Manager for an LG Electronics distributor in India stated (in an article available at

28 http://www.techtree.com/IndialNews/Major Monitor Manufacturers hike CRT-prices LG follows

1   Suitl551-52715-581.html), that "[t]his shortage [of glass shells] is a global phenomena and every
2   company has to increase the prices of CRT monitors in due course of time."

3       113.   Plaintiff and the other Class members had no reason to disbelieve these statements,
4   which on their face appeared to explain reasonably the increase in the prices of CRTs and CRT
5   Products.  Further, most of the explanations provided by Defendants involved non-public and/or
6   proprietary information that was within Defendants' control, such that Plaintiffs and the Class
7   members could not verify their accuracy.  Defendants' purported reasons for the price increases of
8   CRTs were materially false and misleading and were made for the purpose of concealing Defendants'
9   anti-competitive scheme as alleged herein.

10      114.   These affirmative acts of Defendants, including acts in furtherance of the conspiracy,
11  were wrongfully concealed and carried out in a manner that precluded detection.

12      115.   As a result of the active concealment of the conspiracy by Defendants and their co-
13  conspirators, any and all applicable statutes of limitations otherwise applicable to the allegations herein
14  have been tolled.

15                          **VIOLATIONS ALLEGED**

16                          **First Claim for Relief**

17                  **(Violation of Section 1 of the Sherman Act)**

18      116.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every
19  allegation set forth in the preceding paragraphs of this Complaint.

20      117.   Beginning at a time presently unknown to Plaintiff, but at least as early as January 1,
21  1997, and continuing through at least November 9, 2007, the exact dates being unknown to Plaintiff,
22  Defendants and their co-conspirators entered into a continuing agreement, understanding, and
23  conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for CRTs and
24  CRT Products sold in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

25      118.   The activities of Defendants and their co-conspirators, as described herein, were within
26  the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce
27  of the United States.

28      119.   In formulating and carrying out the alleged agreement, understanding, and conspiracy,

---

1 Defendants and their co-conspirators did those things that they combined and conspired to do,

2 including but not limited to the acts, practices, and course of conduct set forth above, and the

3 following, among others:

4         a.   To fix, raise, maintain and stabilize the price of CRTs and CRT Products; and

5         b.   Allocating among themselves and collusively reducing the production of CRTs

6            and CRT Products.

7     120.   The combination and conspiracy alleged herein has had the following effects, among

8 others:

9         a.   Price competition in the sale of CRTs and CRT Products has been restrained,

10            suppressed, and/or eliminated in the United States;

11         b.   Prices for CRTs and CRT Products sold by Defendants and their co-

12            conspirators have been fixed, raised, maintained and stabilized at artificially

13            high, noncompetitive levels throughout the United States; and

14         c.   Those who purchased CRTs and CRT Products directly or indirectly from

15            Defendants and their co-conspirators have been deprived of the benefits of free

16            and open competition.

17     121.   Plaintiff and the members of the Class have been injured and will continue to be injured

18 in their business and property by paying more for CRTs and CRT Products purchased indirectly from

19 Defendants and their co-conspirators than they would have paid and will pay in the absence of the

20 combination and conspiracy, including paying more for televisions and computer monitors in which

21 CRTs are a component as a result of higher prices paid for CRTs by the manufacturers of those

22 products.

23     122.   Plaintiff and the class are entitled to an injunction against Defendants, preventing and

24 restraining the violations alleged herein.

25 **Second Claim for Relief**

26 **(Violation of the California Cartwright Act)**

27     123.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every

28 allegation set forth in the preceding paragraphs of this Complaint.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

24

124. Defendants' contract, combination, trust or conspiracy was centered in, carried out, effectuated and perfected mainly within the State of California, and Defendants' conduct within California injured all members of the Class throughout the United States. Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents

125. Beginning at a time presently unknown to Plaintiff, but at least as early as January 1, 1997, and continuing through at least November 9, 2007, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professional Code. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs and CRT Products at supra-competitive levels.

126. The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs and CRT Products .

127. For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.    To fix, raise, maintain and stabilize the price of CRTs and CRT Products; and

    b.    Allocating among themselves and collusively reducing the production of CRTs and CRT Products.

128. The combination and conspiracy alleged herein has had, inter alia, the following effects:

a.    Price competition in the sale of CRTs and CRT Products has been restrained, suppressed, and/or eliminated in the United States;

    b.    Prices for CRTs and CRT Products sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, noncompetitive levels throughout the United States; and

1                c.     Those who purchased CRTs and CRT Products directly or indirectly from

2                    Defendants and their co-conspirators have been deprived of the benefits of free

3                    and open competition.

4        129.    Plaintiff and the other members of the Class paid supra-competitive, artificially inflated

5 prices for CRTs and CRT Products.

6        130.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the

7 members of the Class have been injured in their business and property in that they paid more for CRTs

8 and CRT Products than they otherwise would have paid in the absence of Defendants' unlawful

9 conduct. As a result of Defendants' violation of Section 16720 of the California Business and

10 Professions Code, Plaintiff seeks treble damages and the costs of suit, including reasonable attorneys'

11 fees, pursuant to Section 16750(a) of the California Business and Professions Code.

12                                  **Third Claim for Relief**

13               **(Violation of the California Unfair Competition Law)**

14        131.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every

15 allegation set forth in the preceding paragraphs of this Complaint.

16        132.    This Claim is instituted pursuant to Sections 17203 and 17204 of the California

17 Business and Professions Code, to obtain restitution from Defendants for acts, as alleged herein, that

18 violated Section 17200 of the California Business and Professions Code, commonly known as the

19 Unfair Competition Law.

20        133.    Defendants' conduct as alleged herein violated Section 17200. The acts, omissions,

21 misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a

22 common continuous and continuing course of conduct of unfair competition by means of unfair,

23 unlawful and/or fraudulent business acts or practices within the meaning of California Business and

24 Professions Code, Section 17200, et seq., including, but not limited to, the following:

25                a.     The violations of Section 1 of the Sherman Act, as set forth above;

26                b.    The violations of Section 16720, *et seq.*, of the California Business and

27                    Professions Code, set above:

28                c.     Defendants' acts, omissions, misrepresentations, practices and non-disclosures,

as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

d.    Defendants' acts and practices are unfair to consumers of CRTs and CRT Products in the State of California, within the meaning of Section 17200, California Business and Professions Code; and

e.    Defendants' acts and practices are fraudulent and deceptive within the meaning of Section 17200 of the California Business and Professions Code.

134.    Plaintiff and each of the Class members is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business acts or practices.

135.    The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

136.    The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiff and the members of the Class to pay supra-competitive and artificially-inflated prices for CRTs and CRT Products. Plaintiff and the members of the class suffered injury in fact and lost money or property as a result of such unfair competition.

137.    The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

138.    As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

//

//

1    **Fourth Claim for Relief**

2    **(Unjust Enrichment and Disgorgement of Profits)**

3    139.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every

4    allegation set forth in the preceding paragraphs of this Complaint.

5    140.    Defendants have been unjustly enriched through overpayments by Plaintiff and the

6    other Class members and the resulting profits.

7    141.    Under common law principles of unjust enrichment, Defendants should not be

8    permitted to retain the benefits conferred via overpayments by Plaintiff and the other Class members.

9    142.    Plaintiff seeks disgorgement of all profits resulting from such overpayments and

10   establishment of a constructive trust from which Plaintiff and Class members may seek restitution.

11   **PRAYER FOR RELIEF**

12   WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

13   1.    That the Court determine that the claims alleged herein may be maintained as a class

14   action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

15   2.    That the unlawful conduct, contract, conspiracy or combination alleged herein be

16   adjudged and decreed to be:

17            a.    a restraint of trade or commerce in violation of Section 1 of the Sherman Act,

18                 as alleged in the First Claim for Relief;

19            b.    an unlawful combination, trust, agreement, understanding, and/or concert of

20                 action in violation of the California antitrust laws identified in the Second

21                 Claim for Relief herein;

22            c.    violations of the California unfair competition laws identified in the Third

23                 Claim for Relief herein; and

24            d.    acts of unjust enrichment as set forth in the Fourth Claim for Relief herein.

25   3.    On the First Claim for Relief, that Defendants, their affiliates, successors, transferees,

26   assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons

27   acting or claiming to act on their behalf or in concert with them, be permanently enjoined and

28   restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy

1  or combination alleged herein, or from entering into any other conspiracy alleged herein, or from

2  entering into any other contract, conspiracy or combination having a similar purpose or effect, and

3  from adopting or following any practice, plan, program, or device having a similar purpose or effect;

4      4.    On the Second Claim for Relief, that Plaintiff and the members of the California

5  Subclass recover damages, to the maximum extent allowed under the California Cartwright Act, and

6  that a joint and several judgment in favor of Plaintiffs and the California Subclass be entered against

7  Defendants in an amount to be trebled in accordance with California law;

8      5.    On the Third Claim for Relief, that Plaintiff and the members of the California Subclass

9  be awarded restitution, as a result of the herein alleged acts of unfair competition;

10      6.    On the Fourth Claim for Relief, that Plaintiff and the members of the Nationwide Class

11  recover the amounts by which Defendants have been unjustly enriched as a result of their unlawful

12  conduct;

13      7.    That Plaintiff and the members of the Class be awarded pre- and post-judgment interest,

14  and that interest be awarded at the highest legal rate from and after the date of service of the initial

15  complaint in this action;

16      8.    That Plaintiff and the members of the Class recover their costs of this suit, including

17  reasonable attorneys' fees as provided by law; and

18      9.    That Plaintiff and the members of the Class have such other, further, and different relief

19  as the case may require and the Court may deem just and proper under the circumstances.

20  Dated: March 31, 2008

21                          Terry Gross (103878)
                        Adam C. Belsky (147800)

22                          Monique Alonso (127078)
                        GROSS BELSKY ALONSO LLP

23                          180 Montgomery Street, Suite 2200
                        San Francisco, California 94104
                        Telephone: (415) 544-0200

24                          Facsimile: (415) 544-0201

25

26                          By:                
                                  Terry Gross

27                          Attorneys for Plaintiff STEVEN GANZ
                        and the Proposed Class

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

29

1    **JURY TRIAL DEMAND**

2    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury

3    for all issues so triable.

4    Dated: March 31, 2008

                                        Terry Gross (103878)
5                                       Adam C. Belsky (147800)
                                        Monique Alonso (127078)
6                                       GROSS BELSKY ALONSO LLP
                                        180 Montgomery Street, Suite 2200
7                                       San Francisco, California 94104
                                        Telephone: (415) 544-0200
8                                       Facsimile: (415) 544-0201

9
                                        By: _____
10                                              Terry Gross

11                                      Attorneys for Plaintiff STEVEN GANZ
                                        and the Proposed Class
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 5

ORIGINAL

*FILED*

08 APR -3 PM 3:18

E-filing

1  Susan G. Kupfer (Bar No. 141724)
   Kathleen S. Rogers (Bar No. 122853)
2  GLANCY BINKOW & GOLDBERG LLP
   One Embarcadero Center, Suite 760
3  San Francisco, CA 94111
   Telephone: (415) 972-8160
4  Facsimile: (415) 972-8166
   skupfer@glancylaw.com
5  krogers@glancylaw.com

6

7  *Attorneys for Plaintiff and the Proposed Classes*

8                UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

VRW

10

11 DANA ROSS, on behalf of himself and all     **CV** Case No. **08      1807**
   others similarly situated,
12                                              **CLASS ACTION COMPLAINT FOR
                         Plaintiff,             DAMAGES**
13
                         vs.                    **JURY TRIAL DEMANDED**
14
   CHUNGHWA PICTURE TUBES, LTD.; LP
15 DISPLAYS INTERNATIONAL, LTD;
   MATSUSHITA ELECTRIC INDUSTRIAL
16 CO., LTD.; MT PICTURE DISPLAY CO.,
   LTD.; KONINKLIJKE PHILIPS
17 ELECTRONICS NV; SAMSUNG SDI CO.;
   TOSHIBA CORP.; TOSHIBA AMERICA,
18 INC.,
                         Defendants.
19

20

21        Plaintiff Dana Ross, on behalf of himself and the classes defined below ("Plaintiff"), by

22 his attorneys, brings this civil action for damages and injunctive relief against the above-named

23 Defendants, and demanding a trial by jury, complains and alleges as follows:

24

25

1

## INTRODUCTION

2   1.   This case arises out of a long-running conspiracy extending from at least May 1,

3   1998 through November 9, 2007 (the "Class Period") among Defendants and their co-

4   conspirators, with the purpose and effect of fixing, raising, and/or maintaining the prices for

5   cathode ray tubes ("CRTs") sold indirectly to Plaintiff and other indirect purchasers in California

6   and throughout the United States.

7   2.   CRTs are used in a number of products, including but not limited to televisions

8   and computer monitors. Throughout the Class Period, Defendants' conspiracy was intended to,

9   and did, moderate the downward pressure on CRTs (and, as a result, products containing CRTs)

10   caused by the rapidly increasing popularity of flat panel products using liquid crystal displays

11   ("LCD") and plasma display panels ("PDP") (collectively, "FPD").

12   3.   Defendants and their co-conspirators formed an international cartel to illegally

13   restrict competition in the CRT market, targeting and severely burdening indirect purchasers in

14   California and throughout the United States. During the Class Period, Defendants' conspiracy

15   affected billions of dollars of commerce throughout the United States, including in California.

16   As a result of this conspiracy, Plaintiff and indirect purchasers have been injured in their

17   business and property by paying more for CRTs than they otherwise would have paid in the

18   absence of Defendants' conspiracy.

19   4.   Plaintiff brings this action seeking federal injunctive relief under Section 16 of the

20   Clayton Act, 15 U.S.C. §26, for violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and to

21   recover damages under state antitrust, consumer protection, unfair trade, and/or deceptive

22   practices laws, common law principles of restitution, disgorgement, unjust enrichment, as well as

23   to recover the costs of the suit, including reasonable attorney's fees, for the injuries that Plaintiff

24   and all others similarly situated sustained as a result of the Defendants' conspiracy to fix, raise,

25   maintain and stabilize the prices of CRTs.

1    **JURISDICTION AND VENUE**

2    5.    Plaintiff brings this action under Sections 4, 12 and 16 of the Clayton Act (15

3    U.S.C. §§15, 22 and 26) for treble damages and injunctive relief, arising from violations by

4    Defendants of the antitrust laws, including Section 1 of the Sherman Antitrust Act (15 U.S.C.

5    §1).

6    6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and

7    1337(a).

8    7.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§15, 22 and 26, and

9    28 U.S.C. §§1391(b), (c) and (d) in that Defendants reside, transact business, are found and/or

10   have agents within this judicial district, and a substantial part of the events giving rise to

11   plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce

12   described below has been carried out in this district.

13   8.    Defendants conduct business throughout the United States, including this

14   jurisdiction, and they have purposefully availed themselves of the laws of the United States,

15   including specifically the laws of California, as alleged in this Complaint. Defendants' products

16   are sold in the flow of interstate commerce, and Defendants' activities had a direct, substantial

17   and reasonably foreseeable effect on such commerce.

18   9.    Defendants and their co-conspirators directly or through their agents engaged in

19   the activities alleged in this Complaint and substantially affected commerce in California and

20   throughout the United States. Defendants have purposefully availed themselves of the laws of

21   California in connection with their activities relating to the production, marketing, and/or sale of

22   CRTs. Defendants produced, promoted, sold, marketed, and/or distributed CRTs, thereby

23   purposefully profiting from access to indirect purchaser end-user businesses and consumers in

24   California. Defendants also contracted to supply or obtain goods or revenue related to the

25   business for CRTs. As a result of the activities described in this Complaint, Defendants:

CLASS ACTION COMPLAINT

- 3 -

a.  Caused damage to the residents of the state of California;

b.  Caused damage in California by acts or omissions committed outside California by regularly doing or soliciting business in the state;

c.  Engaged in persistent courses of conduct within California and/or derived substantial revenue from the marketing of CRTs or the products in which they are used in California (and services relating to such marketing); and

d.  Committed acts or omissions that they knew or should have known would cause damage (and did, in fact, cause such damage) in California while regularly doing or soliciting business in the state, engaging in other persistent courses of conduct in the state, and/or deriving substantial revenue from the marketing of CRTs or the products in which they are used in California.

10.  The conspiracy described in this Complaint affected adversely every person nationwide and in California who indirectly bought Defendants' CRTs. Defendants' conspiracy has resulted in an adverse monetary effect on indirect purchasers in California.

11.  Prices of CRTs in California can be manipulated by conspirators within the state, outside of it, or both. If the antitrust and/or consumer protection laws of California are not enforced, companies that break the law will go unpunished. Defendants knew that commerce in California would be adversely affected by implementing their conspiracy.

### INTRADISTRICT ASSIGNMENT

12.  As indicated on the Civil Cover Sheet accompanying this Complaint, related multi-district litigation ("MDL") is pending in this Court before the Honorable Samuel Conti, 3:07-cv-05944-SC, *In re Cathode Ray Tube (CRT) Antitrust Litigation*. The Defendants, the industry, the geography and the basic allegations of the conspiracy alleged in this Complaint

CLASS ACTION COMPLAINT

- 4 -

1  substantially overlap the allegations in the complaints already consolidated before the Honorable

2  Samuel Conti in 3:07-cv-05944-SC.

3  ## PARTIES

4  **A.   Plaintiff**

5  13.   Plaintiff Dana Ross is a resident of Ventura County, California. During the Class

6  Period, he indirectly purchased a CRT from one or more Defendants, and was injured as a result

7  of Defendants' illegal conduct.

8  **B.   Defendants**

9  14.   Defendant Chunghwa Picture Tubes Ltd. is a Taiwanese business entity with its

10  principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan, 334. During

11  the Class Period, said Defendant manufactured, marketed, sold and/or distributed CRTs to

12  customers throughout the United States.

13  15.   Defendant LP Displays International, Ltd., f/k/a LG Philips Displays, Ltd., is a

14  Hong Kong business entity with its principal place of business at 6th Floor, ING Tower, 308 Des

15  Voeux Central, Sheun Wan, Hong Kong. During the Class Period, said Defendant

16  manufactured, marketed, sold and/or distributed CRTs to customers throughout the United States

17  16.   Defendant Matsushita Electric Industrial Co., Ltd. (d/b/a "Panasonic") is a

18  Japanese business entity with its principal place of business at 1006, Kadoma, Kadoma City,

19  Osaka 571-8501, Japan. During the Class Period, said Defendant manufactured, marketed, sold

20  and/or distributed CRTs to customers throughout the United States.

21  17.   Defendant MT Picture Display Co., Ltd. (f/k/a Matsushita Toshiba Picture

22  Display Co.) is a wholly-owned subsidiary of Matsushita Electric Industrial Co., Ltd., with its

23  principal place of business located at Takatsuki-shi, Osaka, Japan. MT Picture Display Co. was

24  formerly owned and controlled by both Defendants Matsushita and Toshiba Corp. until early

25  2007, when Toshiba Corp. sold its share of the business. During the Class Period, MT Picture

1  Display Co., Ltd. manufactured, marketed, sold and/or distributed CRTs to customers throughout

2  the United States.

3      18.    Defendant Koninklijke (Royal) Philips Electronics NV is a Dutch business entity,

4  with its principal place of business at Breitner Cetner, Amselplein 2, 1096 BC Amsterdam, The

5  Netherlands. During the Class Period, said Defendant manufactured, marketed, sold and/or

6  distributed CRTs to customers throughout the United States.

7      19.    Defendant Samsung SDI Co. is a South Korean business entity with its principal

8  place of business at 575 Shin-dong, Youngtong-gu, Suwon, Kyongi, South Korea. During the

9  Class Period, said Defendant manufactured, marketed, sold and/or distributed CRTs to customers

10  throughout the United States.

11      20.    Defendant Toshiba Corp. is a Japanese business entity with its principal place of

12  business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. During the

13  Class Period, said Defendant manufactured, marketed, sold and/or distributed CRTs to customers

14  throughout the United States.

15      21.    Defendant Toshiba America, Inc. is a wholly-owned subsidiary of Toshiba Corp.,

16  and has its principal place of business at 1251 Avenue of the Americas, New York, NY. During

17  the Class Period, said Defendant manufactured, marketed, sold and/or distributed CRTs to

18  customers throughout the United States.

19

20  **C.    Co-Conspirators**

21      22.    Various persons and entities, whose identities are at this time unknown to

22  plaintiffs, participated as co-conspirators in the violations alleged in this Complaint and

23  performed acts and made statements in furtherance of said violations. When Plaintiff learns the

24  identities of such co-conspirators, he will seek leave to amend this Complaint to add such co-

25  conspirators as defendants.

CLASS ACTION COMPLAINT

- 6 -

1    23.    The acts charged in this Complaint have been done by Defendants and their co-

2  conspirators, or were authorized, ordered, or done by their respective officers, agents, employees,

3  or representatives while actively engaged in the management of each Defendant's business or

4  affairs.

5    24.    Each of the Defendants named in this Complaint acted as the agent or joint

6  venturer of or for the other Defendants with respect to the acts, violations and common course of

7  conduct alleged. Each Defendant that is a subsidiary of a foreign parent acts as the United States

8  agent for CRTs made by its parent company.

9                                **FACTUAL ALLEGATIONS**

10  **A.    CRT Technology**

11    25.    CRT is a widely used technology utilized in products such as televisions and

12  computer monitors that allow devices to display images upon the screen.

13    26.    Known for their brightness, resolution, rich colors, contrast, and reliability, CRTs

14  evolved from early black and white television sets and monitors to today's high-resolution,

15  digital-ready graphic models. The basic components of a CRT are (a) a heated, cylindrical

16  cathode, or electron gun, that emits a steady stream of electrons; (b) a shadow mask that directs

17  the electron beams; (c) a phosphor-coated screen that absorbs the beams; (d) a deflection yoke

18  that directs the scanning electron beam, which strikes the screen to produce light; and (e) an

19  evacuated glass envelope that allows the entire process to take place in a vacuum.

20    27.    CRTs are manufactured in several standard sizes, including 17 inch, 19 inch, 23

21  inch, and 27 inch. They are commodity products; those manufactured by Defendants are

22  interchangeable.

23  **B.    The CRT Market**

24    28.    CRTs have no independent utility, and have value only as components of other

25  products, primarily televisions and computer monitors. Direct purchasers buy CRTs in order to

1  include them as components in televisions and computer monitors. The demand for CRTs thus
2  directly derives from the demand for such products.

3    29.    The market for CRTs and the market for the products into which they are placed
4  are inextricably linked and intertwined because the CRT market exists to serve the CRT products
5  markets. The market for CRTs and the markets for the products in which CRTs are placed are,
6  for all intents and purposes, inseparable in that one would not exist without the other.

7    30.    The largest direct purchasers of CRTs are television and computer Original
8  Equipment Manufacturers ("OEMs"). Significantly, some of the Defendants are (or were, during
9  the Class Period) also CRT television and/or computer OEMs, such as Toshiba Corp. and
10 Samsung SDI and/or its parent corporation.

11   31.    Plaintiff and the members of the classes defined below have participated in the
12 market for CRTs through their purchases of products containing CRTs. To the extent Plaintiff
13 and these indirect purchasers bought CRTs as part of a television or computer monitor,
14 Defendants' unlawful conspiracy inflated the prices at which OEMs resold such products.

15   32.    The market for CRTs in the United States is and remains extremely large. In
16 1997, the worldwide CRT market exceeded $24 billion. In 2006, industry experts estimated that
17 televisions containing CRTs made up at least half of all the projected 29 million televisions
18 shipped to North America that year.

19   33.    Nonetheless, while CRTs were once the dominant display screen technology used
20 in television and computer monitors, the market for CRT televisions and computer screens has
21 been in decline during the Class Period, due to the increased demand for FPD Products which are
22 used in the place of CRT models.

23   34.    FPD Products such as televisions and computer monitors first began competing
24 with the CRT models in the 1990s. By 1998, FPD products had taken over 32% of the market
25 for televisions and computer monitors.

35.    While priced much higher than televisions and computer screens using CRTs, FPDs offered benefits to businesses and consumers unavailable in CRT models.  Televisions using FPD technology offer smaller dimensions, increased aperture ratios, higher brightness, and lower power consumption.  Computers using FPD technology offer greater mobility due to their smaller size, and lower power consumption.

36.    Despite the large difference in price between televisions and computer screens using CRTs and those using FPD technology, throughout the Class Period, the percentage of televisions and computer screens purchased in the United States using FPD technology increased dramatically, while the percentage of those utilizing CRTs fell.

37.    CRT televisions currently account for only 37% of television set revenues in the United States.  Industry experts have predicted that by 2008, CRT screen shipments will constitute only 23% of the total television shipments in North America, while LCD screen shipments will comprise over 50% of the total shipments.

**C.    Structural Features of the CRT Industry**

38.    The CRT industry is characterized by a number of structural features that facilitate collusion.

39.    First, there is significant market concentration.  The increase in the popularity of FPD products caused many CRT manufacturers to exit the market during the Class Period.  This caused increased consolidation and concentration in the CRT manufacturing industry.

40.    During the Class Period, the Defendants collectively owned the majority of the market share for CRTs used in televisions and computer monitors.

41.    Defendant Samsung SDI is currently the largest manufacturer of products containing CRTs.  In 2004, it held (approximately) a 30% share of the global CRT market.

42.    Defendant LP Displays currently has the second largest share of the global CRT market.  In 2004, it held (approximately) a 27% share of the global CRT market.

1    43.    Defendant MT Picture Display held (approximately) a 9% share of the global
2    CRT market in 2004.

3    44.    Defendant Chunghwa Picture Tubes held (approximately) a 9% share of the
4    global CRT market in 2004.

5    45.    There are also significant barriers to entry in the CRT industry in the form of high
6    manufacturing and technological barriers to entry.  Construction and maintenance of fabrication
7    plants is extremely expensive.  Because of increased competition and ongoing technological
8    advances, manufacturers' research and development expenses are also extremely high.

9    46.    There are also multiple interrelated business relationships in the CRT industry.
10   For example, in November 2000, Defendants LG Electronics and Koninklijke Philips Electronics
11   agreed to enter into a joint venture that combined their CRT manufacturing operations.  The
12   resulting company (LG Philips Displays, now known as LP Displays) entered the market with a
13   25% share in the global CRT market.

14   47.    Defendants Matsushita Electric Industrial Co., Ltd. and Toshiba Corporation also
15   entered into a joint venture combining their CRT manufacturing operations during the Class
16   Period.  The resulting company (MT Picture Display Co.) immediately enjoyed a significant
17   share of the global CRT market.

18   48.    In 2005, Defendants Samsung SDI and LG Philips Displays entered into an
19   agreement to work together by sharing parts with respect to CRTs.

20   **D.    The Defendants' Illegal Conspiracy**

21   49.    The price of CRTs during the Class Period did not fully reflect the sharp decline
22   in demand for CRTs caused by the entry of the new generation of competing technologies.
23   Despite the introduction of technologically superior and increasingly popular alternatives to
24   televisions and monitors using CRTs, the price of CRTs remained unnaturally high throughout
25   the Class Period, with periods of sustained and unnatural price stability.

CLASS ACTION COMPLAINT

- 10 -

50.    The concentration of CRT manufacturers, the declining CRT share of the total market for television and computer screens, and the higher price of FPD Products gave Defendants the means and incentive to conspire and collude to artificially fix, maintain, and/or stabilize the prices at which CRTs were sold.

51.    During the Class Period, Defendants and their co-conspirators agreed, combined, and conspired to raise, maintain, and stabilize the prices at which CRTs were sold directly and indirectly in the United States at artificial levels. This illegal combination was effectuated by means of illegal contracts, agreements, or secret negotiations between Defendants through their officers, directors, and employees.

52.    For example, despite falling demand and increased use of FPD technology in televisions and computer monitors, Defendants increased the prices of CRTs sold in February of 2002 and at other points of time throughout the Class Period. This price increase was the result of an agreement among Defendants to collectively raise the prices of CRTs.

53.    Defendants also agreed to fix, maintain, and/or stabilize the price of CRTs by collectively agreeing to reduce the production of CRTs through plant closures and work slowdowns.

54.    This conspiracy resulted in unnaturally higher prices for CRTs which were fundamentally inconsistent with the low demand for them and their rapidly approaching obsolescence.

**E.    International Antitrust Investigations**

55.    On or about November 8, 2007, government agencies from Japan, South Korea, the European Union and the United States each opened coordinated investigations into CRT manufacturers based on suspicions that Defendants formed an international price cartel to fix the prices for CRTs.

56. On or about November 8, 2007, new reports stated that CRT manufacturers were "suspected of holding meetings to discuss the price targets in Southeast Asian countries where CRT manufacturing bases are located." Another stated that "[t]he CRT manufacturers are suspected of operating an international cartel since 2005 or earlier."

57. On or about November 8, 2007, Defendant Matsushita Electric Industrial Company confirmed that Japan's Fair Trade Commission raided MT Picture Display Co. as part of this international price-fixing investigation. Akira Dadota, a spokesman for Matsushita, admitted that Japan's Fair Trade Commission conducted an on-site inspection of MT Picture Display Company's offices in Japan. Up until early 2007, MT Picture Display Company was co-owned by Defendant Toshiba Corporation and Defendant Matsushita Electric Industrial Company.

58. On or about November 8, 2007, Defendant Samsung SDI confirmed that South Korea's Fair Trade Commission launched a probe into Samsung SDI as part of this international price-fixing investigation.

59. On or about November 8, 2007, news reports stated that Defendant LP Displays was visited by antitrust regulators as part of this international price-fixing investigation.

60. On or about November 12, 2007, Defendant Chunghwa Picture Tubes admitted that the company had received a summons from the United States Department of Justice ("DOJ") as part of this international price-fixing investigation.

61. On or about November 21, 2007, Defendant Royal Phillips Electronics admitted that the company is subject to this international price-fixing investigation.

**F.    The Pass-Through Of Overcharges To End-Users**

62. OEMs and retailers of televisions and monitors containing CRTs are all subject to vigorous price competition. Televisions and computers are commodities, with little or no brand loyalty, such that aggressive pricing causes businesses and consumers to switch preferences to

1   different brands. Television and computer prices are closely based on production costs, which
2   are in turn directly determined by component costs, as assembly costs are minimal. OEMs
3   accordingly use component costs, like the cost of CRTs, as the starting point for all price
4   calculations. Television and computer monitor prices thus closely track increases and decreases
5   in component costs.

6        63.    Defendants' conspiracy to raise, fix, or maintain the price of CRTs at artificial
7   levels resulted in harm to Plaintiff and the indirect-purchaser classes because it resulted in them
8   paying higher prices for televisions and monitors containing CRTs than they would have in the
9   absence of Defendants' conspiracy. The entire overcharge for CRTs at issue was passed on the
10   Plaintiff and members of the indirect-purchaser class.

11       64.    An increase in the cost of purchasing a CRT significantly affects the price of
12   television or computer monitors using CRTs.

13       65.    CRTs account for a significant percentage of the overall cost of a television or
14   computer monitor. For example, CRTs account for approximately thirty (30) percent of the cost
15   of manufacturing a television set.

16       66.    CRTs are commodity products, with functionally equivalent products available
17   from the Defendants, which manufacture them pursuant to standard specifications and sizes.

18       67.    Because OEMs and retailers have thin net margins, they must pass on any
19   increase in component costs, such that increases in the price of CRTs lead to quick
20   corresponding price increases at the OEM and retail level for products containing CRTs.

21       68.    Thus, all supracompetitive overcharges are always passed through to the indirect-
22   purchaser, end-user plaintiff class members, who pay more for televisions and monitors
23   containing CRTs than in a competitive market place.

24

25

**G.** **The Effect Of The Price Of CRTs On The Price Of Products**

69. Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of televisions or computer monitors.

70. Thus, CRTs follow a traceable physical chain from the Defendants to the OEMs to the purchasers of the finished products incorporating the CRT.

71. Moreover, just as CRTs can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of CRTs affect prices paid by indirect purchasers of televisions and monitors containing CRTs.

72. Because Defendants control the market for CRTs, there are virtually no choices for persons and businesses that require products containing CRTs other than buying such products manufactured by a direct purchaser that paid supracompetitive prices for CRTs to Defendants because of Defendants' conspiracy alleged in this Complaint.

73. When distribution markets are highly competitive, as they are in the case of televisions and monitors containing CRTs, all of the overcharge will be passed through to ultimate end-user businesses and consumers, such as the Plaintiff and members of the indirect-purchaser classes. In addition, most of the Defendants themselves manufacture, market, and distribute televisions and monitors containing CRTs. This means that these Defendants will pass on through to their customers 100% of the supracompetitive price increases that result from the Defendants' conspiracy, combination, and agreement to fix, increase, and stabilize the prices for CRTs.

74. Hence, the inflated prices of televisions and monitors containing CRTs resulting from Defendants' price-fixing conspiracy have been passed on to Plaintiffs and the other class members by direct purchasers.

75. During the Class Period, a number of large OEMs sold televisions and monitors containing CRTs directly to end-buyers. For example, the OEM with the largest share of computer monitor sales in the United States market, Dell, sold exclusively to end-buyers, as did Gateway. During the Class Period, Compaq and Apple also sold large portions of their computer monitors directly to the end-buyer.

76. Computer models sold by other OEMs to retailers were generally updated several times a year, and the price was changed for each new model. For example, for one large retailer, more than 90 percent of the computers sold during 2000 were either new models or were sold at a different price from the price in the previous month. OEMs, retailers and distributors often use a "standard markup" method to set prices, meaning that they add a standard percentage to their own costs to determine selling prices. Thus, changes in the price of CRTs were passed on rapidly rather than absorbed.

77. In retailing, it is common to use a "markup rule." The retail price is set as the wholesale cost plus a percentage markup designed to recover non-product costs and to provide a profit. This system guarantees that increases in costs to the retailer will be passed on to end buyers. For example, CDW, a large seller of computer monitors, uses such a system, and a declaration in the DRAM case from CDW's director of pricing details exactly how they calculated selling prices:

> In general, CDW employs a "building block" approach to setting its advertised prices. The first building block is the Cost of Goods Sold (COGS), which represents the price CDW paid to acquire the product... CDW... adds a series of positive markups to the cost to CDW to acquire a given product. These markups are in addition to the pass through effect of changes in the costs charged to CDW for that product by a given vendor.

78. The economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. As Professor Herbert Hovenkamp, a noted antitrust scholar, has stated in his treatise, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 564:

A monopoly overcharge at the top of a distribution chain generally results in higher prices at every level below. For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain likely will be poorer as a result of the monopoly price at the top.

Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

79. Similarly, two other antitrust scholars- Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust)- have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."

80. As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers... Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

81. The purpose of the conspiratorial conduct of the Defendants was to raise, fix or stabilize the price of CRTs and, as a direct and foreseeable result, televisions and monitors containing CRTs. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when

1  changes in dependent variable are explained by changes in a multitude of variables- when all
2  such variables may be changing simultaneously.  That analysis- called regression analysis- is
3  commonly used in the real world and in litigation to determine the impact of a price increase on
4  one cost in a product (or service) that is an assemblage of costs.  Thus, it is possible to isolate
5  and identify only the impact of an increase in the price of CRTs on prices for televisions and
6  monitors containing CRTs even through such products contain a number of other components
7  whose prices may be changing over time.  A regression model can explain how variation in the
8  price of CRTs affects changes in the price of televisions and monitors containing CRTs.  In such
9  models, rather than being treated as the dependent variable, the price of CRTs is treated as an
10  independent or explanatory variable.  The model can isolate how changes in the price of CRTs
11  impact the price of televisions and monitors containing such CRTs while controlling for the
12  impact of other price-determining factors.

13       82.  Economic and legal literature recognized that the more pricing decisions are
14  based on cost, the easier it is to determine the pass-through rate.  The directness of affected costs
15  refers to whether an overcharge affects a direct (*i.e.* variable) cost or an indirect (*i.e.* overhead)
16  cost.  Overcharges will be passed-through sooner and at a higher rate if the overcharge affects
17  direct costs.  Here CRTs are a direct (and substantial) cost of products containing CRTs.

18       83.  Other factors that lead to the pass-through of overcharges include: (i) whether
19  price changes are frequent; (ii) the duration of the anti-competitive overcharge; (iii) whether
20  pricing decisions are based on cost; (iv) whether the overcharge affects variable, as opposed to
21  overhead, costs; (v) whether the resellers' production technology is uniform; (vi) whether the
22  reseller supply curve exhibits a high degree of elasticity; and (vii) whether the demand of the
23  resellers is inelastic.  All of these factors were present in the CRT market during the Class
24  Period.  The precise amount of such an impact on the prices of products containing CRTs can be
25  measured and quantified.  Commonly-used and well-accepted economic models can be used to

1  measure both the extent and the amount of the supracompetitive charge passed-through the chain

2  of distribution.

3      84.   Plaintiff and other indirect purchasers have been forced to pay supracompetitive

4  prices for televisions and monitors containing CRTs. These inflated prices have been passed on

5  to them by direct purchaser manufacturers, distributors, and retailers. Those overcharges have

6  unjustly enriched Defendants.

7  **CLASS ACTION ALLEGATIONS**

8      85.   Plaintiff brings this action on his own behalf and as a class action pursuant to

9  Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the following Class

10  (the "Nationwide Class"):

11      All persons and entities residing in the United States which, from January 1, 1998

12  through and including November 9, 2007, indirectly purchased in the United
States, for their own use and not for resale, a CRT which was manufactured

13  and/or sold by one or more of the Defendants. Specifically excluded from this
Class are the Defendants; the officers, directors, or employees of any Defendant;

14  any entity in which any Defendant has a controlling interest; and any affiliate,
legal representative, heir or assign of any Defendant. Also excluded are any

15  judicial officer presiding over this action and the members of his/her immediate
family and judicial staff, and any juror assigned to this action.

16      86.   Plaintiff also brings this action on his own behalf and as a class action pursuant to

17  Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all

18  members of the following class or subclass (the "California Indirect Purchaser Class"):

19      **CALIFORNIA:** All persons and entities in California who indirectly

20  purchased CRTs manufactured and/or sold by one or more of the

21  Defendants during the Class Period for their end use and not for resale.

22  Specifically excluded from this Class are the Defendants; the officers,

23  directors, or employees of any Defendant; any entity in which any

24  Defendant has a controlling interest; and any affiliate, legal representative,

25  heir or assign of any Defendant. Also excluded are any judicial officer

presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

87.     Plaintiff does not know the exact size of the classes at the present time. However, Plaintiff believes that due to the nature of the trade and commerce involved, there are at least thousands in the California Indirect Purchaser Class, and hundreds of thousands of class members geographically dispersed throughout the United States in the Nationwide Class, such that joinder of all class members would be impracticable.

88.     Plaintiff's claims are typical of the claims of the classes, and Plaintiff will fairly and adequately protect the interests of the classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the classes. Plaintiff has retained competent counsel experienced in class action and complex antitrust and consumer protection litigation.

89.     Common questions of law and fact exist, including:

a.     Whether Defendants and their Co-Conspirators engaged in a contract, combination or conspiracy among themselves to fix, raise, maintain or stabilize the prices of, or allocate the market for CRTs sold in the United States;

b.     The duration and extent of the contract, combination, or conspiracy;

c.     Whether the Defendants and their co-conspirators were participants in the contracts, combinations or conspiracies alleged in this Complaint;

d.     Whether Defendants and their co-conspirators engaged in conduct that violated Section 1 of the Sherman Act;

e.     Whether Defendants and their co-conspirators engaged in unlawful, unfair or deceptive contracts, combinations or conspiracies among themselves,

express or implied, to fix, raise, maintain, or stabilize prices of CRTs sold in and/or distributed in the United States;

f.  Whether the Defendants and their co-conspirators engaged in conduct in violation of the antitrust, consumer protection, unfair trade, and/or deceptive trade practices laws of California as alleged below;

g.  Whether the anticompetitive conduct of the Defendants and their co-conspirators caused prices of CRTs to be artificially inflated to non-competitive levels;

h.  Whether the Defendants and their co-conspirators unjustly enriched themselves as a result of their inequitable conduct at the expense of the members of the Classes;

i.  Whether Defendants and their co-conspirators fraudulently concealed the existence of their unlawful conduct;

j.  Whether Plaintiff and the classes are entitled to injunctive relief; and

k.  Whether Plaintiff and other members of the classes were injured by the conduct of Defendants and, if so, the appropriate measure of damages for each of the classes.

90.  These and other questions of law and fact are common to the classes and predominate over any questions affecting only individual class members, including legal and factual issues relating to liability, damages, and restitution.

91.  Class action treatment is a superior method for the fair and efficient adjudication of this controversy because:

a.  It will avoid a multiplicity of suits and consequent burden on the courts and Defendants;

b.  It would be virtually impossible for all members of the classes to intervene as parties-plaintiff in this action;

c.  It will allow numerous individuals with claims too small to adjudicate on an individual basis because of the prohibitive cost of this litigation, to obtain redress for their economic injuries;

d.  It is appropriate for treatment on a fluid recovery basis, which obviates any manageability problems; and

e.  It will provide court oversight of the claims process, once Defendants' liability is adjudicated.

92.  This case is also appropriate for certification as a class action because the Defendants have acted and refused to act on grounds generally applicable to the classes, so that final injunctive relief will be appropriate with respect to the classes as a whole.

93.  The claims asserted in this Complaint are also appropriate for class certification under each of the states under which claims are asserted.

## FRAUDULENT CONCEALMENT

94.  Plaintiff and the members of the classes did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants were violating the antitrust laws as alleged in this Complaint until November 9, 2007, when the investigations by the DOJ and other antitrust regulators became public, because Defendants and their co-conspirators actively and fraudulently concealed the existence of their contract, combination or conspiracy. Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff and the members of the classes were unaware of Defendants' unlawful conduct and did not know that they were paying artificially high prices for CRTs and the products in which they were used.

95.     The affirmative acts of the Defendants, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

96.     By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.  As alleged above, Defendants had secret discussions about price and output. Defendants agreed not to publicly discuss the existence or the nature of their agreement.

97.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and the members of the classes have as a result of the anticompetitive conduct alleged in this Complaint.

## VIOLATIONS ALLEGED

## FIRST CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

98.     Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth.

99.     Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 1998 and continuing through November of 2007, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, stabilize, and peg prices for CRTs and televisions and monitors using CRTs sold in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

100.     In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

a.     Fixing, raising, stabilizing, and pegging the price of CRTs; and

b.      Allocating amongst themselves and collusively reducing the production of
CRTs.

101.    The combination and conspiracy alleged in this Complaint has had the following
effects, among others:

a.      Price competition in the sale of CRTs has been restrained, suppressed,
and/or eliminated throughout the United States;

b.      Prices for CRTs sold by Defendants have been raised, fixed, maintained
and stabilized at artificially high and non-competitive levels throughout
the United States; and

c.      Those that purchased CRTs directly or indirectly from Defendants and
their co-conspirators have been deprived of the benefits of free and open
competition.

102.    Plaintiff and the Nationwide Class members have been injured and will continue
to be injured in their businesses and property by paying more for CRTs purchased indirectly
from the Defendants and their co-conspirators than they would have paid and will pay in the
absence of the combination and conspiracy, including paying more for televisions and monitors
in which CRTs are included, as a result of higher prices paid for CRTs by the direct purchasers
of CRTs.

103.    Plaintiff and the Nationwide Class members are entitled to an injunction against
Defendants, preventing and restraining the violations alleged in this Complaint.

## SECOND CLAIM FOR RELIEF

### Unjust Enrichment and Disgorgement of Profits

104.    Plaintiff incorporates by reference the preceding allegations of this Complaint as
if fully set forth.

CLASS ACTION COMPLAINT

1    105.    Defendants have been unjustly enriched through overpayments by Plaintiff and

2  the members of the Nationwide Class and the resulting profits.

3    106.    Under principles of unjust enrichment which exist in every state, Defendants

4  should not be permitted to retain the benefits conferred via overpayments by Plaintiff and the

5  members of the Nationwide Class.

6    107.    Plaintiff and all members of the Nationwide Class seek disgorgement of all profits

7  resulting from such overpayments and establishment of a constructive trust from which Plaintiff

8  and members of the Nationwide Class may seek restitution.

9                          **THIRD CLAIM FOR RELIEF**

10                     **Violation of California Antitrust Laws**

11    108.    Plaintiff incorporates by reference the preceding allegations of this Complaint as

12  if fully set forth.

13    109.    Defendants' intentional and purposeful anti-competitive acts that are described

14  above, including but not limited to acts of collusion to set prices and the actual act of price-fixing

15  itself, was intended to and did cause Plaintiff and the other members of the California Indirect

16  Purchaser Class to pay supra-competitive prices for consumer products containing CRTs

17  purchased in California.

18    110.    Defendants' monopolistic and anti-competitive acts as described above violate the

19  California Business and Professions Code §16720, *et seq.*

20    111.    Plaintiff and the California Indirect Purchaser Class seek actual damages for their

21  injuries caused by these violations in amount to be determined at trial.

22    112.    Plaintiff and the California Indirect Purchaser Class further seek treble damages

23  and attorneys' fees pursuant to California's antitrust laws as stated above to the extent allowed

24  by law.

25

113.   Plaintiff and the California Indirect Purchaser Class further seek attorneys' fees and costs pursuant to California's antitrust laws as stated above to the extent allowed by law, due to Defendants' willful and unlawful conduct as alleged above.

## FOURTH CLAIM FOR RELIEF

### Violation of California Unfair Competition Law

114.   Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth.

115.   Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business & Professions Code §17200, *et seq.*

116.   Plaintiff and the California Indirect Purchaser Class seek restitution and disgorgement of Defendants' unlawfully obtained profits for their injuries caused by these violations, in an amount to be determined at trial.

117.   Plaintiff and the California Indirect Purchaser Class seek attorneys' fees due to Defendants' willful and unlawful conduct where allowable by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

A.   That the Court determine that the Sherman Act, California antitrust law, and California unfair competition law claims alleged in this Complaint may be maintained as class actions under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, as informed by California's class action laws;

B.   That the unlawful conduct, contract, conspiracy or combination alleged in this Complaint be adjudged and decreed to be:

1.   A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;

CLASS ACTION COMPLAINT

- 25 -

2.      Acts of unjust enrichment as set forth in the Second Claim for Relief;

3.      An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of California's antitrust laws identified in the Third Claim for Relief; and

4.      A violation of the California Unfair Competition Law as alleged in the Fourth Claim for Relief.

C.      On the First Claim for Relief, that Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged in this Complaint, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.      On the Second Claim for Relief, that Plaintiff and the members of the Nationwide Class recover the amounts by which the Defendants have been unjustly enriched as a result of their unlawful conduct;

E.      On the Third Claim for Relief, that Plaintiff and the members of the California Indirect Purchaser Class recover damages, to the maximum extent allowed under California's antitrust laws set forth above, and that a joint and several judgment in favor of Plaintiff and the California Indirect Purchaser Class be entered against the Defendants in an amount to be trebled to the extent permitted by such laws;

F.      On the Fourth Claim for Relief, that Plaintiff and the members of the California Indirect Purchaser Class be awarded restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unfair competition and acts of unjust enrichment;

CLASS ACTION COMPLAINT

1        G.     That Plaintiff and members of each of the classes defined in this Complaint be

2  awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at

3  the highest legal rate from and after the date of service of the initial Complaint in this action;

4        H.     That Plaintiff and members of each of the classes defined in this Complaint

5  recover their costs of suit, including a reasonable attorney's fee, as provided by law; and

6        I.     That Plaintiff and members of each of the classes defined in this Complaint have

7  such other, further, and different relief as the case may require and the Court may deem just and

8  proper under the circumstances.

9  DATED: April 3, 2008

10

*Susan G. Kupfer*

Susan G. Kupfer (Bar No. 141724)
Kathleen S. Rogers (Bar No. 122853)
GLANCY BINKOW & GOLDBERG LLP
One Embarcadero Center, Suite 760
San Francisco, CA 94111
Telephone: (415) 972-8160
Facsimile: (415) 972-8166
skupfer@glancylaw.com
krogers@glancylaw.com

*Attorneys for Plaintiff and the Proposed
Classes*

## JURY DEMAND

Plaintiff demands a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), of all

triable issues.

CLASS ACTION COMPLAINT

DATED: April 3, 2008

Susan G. Kupfer (Bar No. 141724)
Kathleen S. Rogers (Bar No. 122853)
GLANCY BINKOW & GOLDBERG LLP
One Embarcadero Center, Suite 760
San Francisco, CA 94111
Telephone: (415) 972-8160
Facsimile: (415) 972-8166
skupfer@glancylaw.com
krogers@glancylaw.com

*Attorneys for Plaintiff and the Proposed Class*