William A. Isaacson
Jennifer Milici
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:  (202) 237-6131
Email:  wisaacson@bsfllp.com
Email:  jmilici@bsfllp.com

*Liaison Counsel for Direct Action Plaintiffs*
*Additional Counsel Listed on Signature Page*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 3:07-cv-05944-SC |
| | MDL No. 1917 |
| This Document Relates to: | **DIRECT ACTION PLAINTIFFS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| DIRECT PURCHASER PLAINTIFFS' ACTIONS | |
| | The Honorable Samuel Conti |
| | Court: Courtroom 1, 17th Floor |

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................................ii

Introduction .......................................................................................................................... 1

Background ........................................................................................................................... 4

  A. Facts ...................................................................................................... 4

  B. Procedural History ............................................................................... 5

Argument .............................................................................................................................. 6

I. Summary Judgment Standard .................................................................................. 6

II. *ATM Fee* Compels the Rejection of the R&R and the Denial of Defendants' Motion .......... 7

  A. *ATM Fee* Reaffirms *Royal Printing's* Ownership or Control Exception to *Illinois Brick* .......................................................................................... 7

  B. Under *ATM Fee*, *Royal Printing's* Ownership or Control Exception Provides Standing to Plaintiffs For Their Finished Product Purchases ................... 10

III. Contrary to *ATM Fee's* Mandate, the R&R Would Insulate Defendants From Liability ............................................................................................................ 17

IV. At Best, Defendants' Motion Is Premature and Fails to Satisfy Rule 56 ................. 18

Conclusion .......................................................................................................................... 19

## TABLE OF AUTHORITIES

**CASES**

Page(s)

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).......................................................................................... 6

*Arizona v. Shamrock Foods Co.*,
   729 F.2d 1208 (9th Cir. 1984)....................................................................... 9, 12

*Beltz Travel Serv., Inc. v. Int'l Air Transport Ass'n*,
   620 F.2d 1360 (9th Cir. 1980)........................................................................... 6

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)........................................................................................... 6

*Freeman v. San Diego Ass'n of Realtors*,
   322 F.3d 1133 (9th Cir. 2003)..................................................................... 1, 8, 9

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977)........................................................................................ 2, 7

*In re ATM Fee Antitrust Litigation*,
   No. 10–17354, --- F.3d ----, 2012 WL 2855813 (9th Cir. July 12, 2012)....................... *passim*

*In re Optical Disk Drive (ODD) Antitrust Litigation*,
   No. 3:10–md–2143 RS, 2012 WL 1366718 (N.D. Cal. Apr. 19, 2012) ................................ 15

*In re Sugar Industries Antitrust Litigation*,
   579 F.2d 13 (3d Cir. 1978)........................................................................ *passim*

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
   3:07-md-01827-SI, 2009 WL 533130 (N.D. Cal. Mar. 3, 2009) ............................................ 14

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
   3:07-md-01827-SI, 2010 WL 1264230 (N.D. Cal. Mar. 28, 2010) ........................................ 14

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
   3:07-md-01827-SI, 2010 WL 2836955 (N.D. Cal. Jul. 19, 2010) ........................................ 14

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
   3:07-md-01827-SI, 2011 WL 5357906 (N.D. Cal. Nov. 7, 2011).................................... 13, 14

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
   3:07-md-01827-SI, WL 5357906 (N.D. Cal. Nov. 7, 2011).................................................. 8

*Kansas v. UtiliCorp United, Inc.*,
   497 U.S. 207 (1990)........................................................................................ 7, 13

*Loeb Indus., Inc. v. Sumitomo Corp.*,
   306 F.3d 469 (7th Cir. 2002)........................................................................... 18

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ............................................................................................ 6

*Perma Life Mufflers, Inc. v. International Parts Corp.*,
    392 U.S. 134 (1968) ........................................................................................... 17

*Royal Printing Co. v. Kimberly Clark Corp.*,
    621 F.2d 323 (9th Cir. 1990) ................................................................... *passim*

**OTHER AUTHORITIES**

2A Phillip E. Areeda et al., *Antitrust Law* ........................................... 12, 13, 17

Clayton Act ............................................................................................. 1, 4

Fed. R. Civ. P. 30(b)(6) ............................................................................... 19

Fed. R. Civ. P. 56 ............................................................................. 6, 18, 19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Pursuant to this Court's Scheduling Order (June 26, 2012) (Dkt. No. 1240), the Direct

2    Action Plaintiffs ("DAPs") submit the following Objections to the Special Master's Report and

3    Recommendation Regarding Defendants' Joint Motion for Summary Judgment (May 31, 2012)

4    (Dkt. No. 1221) ("R&R").

5    **INTRODUCTION**

6    The DAPs are large, United States-based companies that have opted out of the Direct

7    Purchaser and Indirect Purchaser class actions and have brought their own individual actions

8    alleging direct and indirect purchaser claims under the federal and state antitrust laws.   The

9    DAPs include companies such as Best Buy, Costco, Office Depot, Sears and Target, all of which

10   overwhelmingly purchased finished products containing CRTs (as opposed to standalone CRTs).

11   Thus, although the R&R was not issued in the DAP actions, the DAPs submit this brief to the

12   Court because the R&R may be the basis for summary judgment motions in the DAP cases.

13   Before the Special Master, Plaintiffs argued two principal legal points against

14   Defendants' motion for summary judgment on their federal antitrust claims.   First, Plaintiffs

15   argued that they were direct purchasers under federal law because they directly purchased CRTs

16   as part of products from Defendants and co-conspirators or their controlled affiliates.   The

17   Special Master disagreed with this contention on the ground that Plaintiffs bought finished

18   products containing CRTs and not CRTs on a stand-alone basis.  R&R at 3.

19   Second, Plaintiffs argued that, even if they were indirect purchasers, they had standing

20   under Section 4 of the Clayton Act under the Ninth Circuit's decision in *Royal Printing Co. v.*

21   *Kimberly Clark Corp.*, 621 F.2d 323 (9th Cir. 1990), and *Freeman v. San Diego Ass'n of*

22   *Realtors*, 322 F.3d 1133 (9th Cir. 2003), which permit indirect purchasers to sue for the full

23   amount of an overcharge "when a conspiring seller owns or controls the direct purchaser."   In

24   that situation, there is no other party available to vindicate federal law because "[t]he co-

25   conspirator parent will forbid its subsidiary or division to bring a lawsuit."  621 F.2d at 326.  The

26   Special Master found the *Royal Printing* line of cases inapplicable to this situation.  R&R at 10.

27

28

1    Following the R&R, the Ninth Circuit's decision in *In re ATM Fee Antitrust Litigation*,

2    No. 10–17354, --- F.3d ----, 2012 WL 2855813 (9th Cir. July 12, 2012), has ruled on both of

3    these issues and requires rejection of the R&R and the denial of Defendants' motion with respect

4    to the second issue: the applicability of *Royal Printing* and *Freeman*.  The Ninth Circuit has

5    agreed with the R&R with respect to whether Plaintiffs are direct purchasers and has held that

6    they are indirect purchasers.  But the Ninth Circuit has expressly overruled the R&R with respect

7    to whether Plaintiffs as indirect purchasers have standing under federal law for their purchases of

8    CRTs in CRT products.

9    In *ATM Fee*, the Ninth Circuit addressed allegations that defendants had fixed the prices

10   of "interchange fees" paid by banks to ATM machine owners.  2012 WL 2855813, at *1.

11   Plaintiffs in that case did not pay interchange fees.  Instead, plaintiffs were consumers who

12   withdrew money from banks and paid a foreign ATM fee to the banks.  *Id.*  Plaintiffs argued that

13   defendants colluded to fix the interchange fee "which is then passed on to Plaintiffs as part of the

14   foreign ATM fee."  *Id.*  In that situation, the Ninth Circuit held that "[w]e agree with the district

15   court that Plaintiffs are indirect purchasers."  *Id.* at *6.

16   The Ninth Circuit in *ATM Fee* then considered the permissible exceptions to *Illinois*

17   *Brick Co. v. Illinois*, 431 U.S. 720 (1977), and held:

18   
19       *Royal Printing* allowed indirect purchasers to sue 'where a direct purchaser is a
         division or subsidiary of a co-conspirator.' *Royal Printing* created an exception
         when parental control existed because applying *Illinois Brick* 'would eliminate
20       the threat of private enforcement.'

21   *Id.* at *12.  This test would be met, according to the Ninth Circuit, if ownership or "control"

22   between a co-conspirator and a direct purchaser was established.  *Id.* at *13.  The Court further

23   held that the ownership or control exception applies in situations in which the plaintiff does not

24   pay the price-fixed fee, like when a plaintiff purchases a finished product containing a price-

25   fixed component, and on that ground agreed with the result in the Third Circuit's decision in *In*

26   *re Sugar Industries Antitrust Litigation*, 579 F.2d 13 (3d Cir. 1978).  *Id.* at *12 n. 7.  The Court

27   also followed *Freeman*, noting that "In *Freeman*, the Court was forced to find an exception to

28

1   *Illinois Brick* even though the Court found price fixing by setting the support fees and passing

2   them on through MLS fees." *Id*. at *11.

3          Thus, following the R&R, the Ninth Circuit has ruled on the relevant issues here and its

4   decision grants standing under federal law to Plaintiffs as indirect purchasers.   Plaintiffs

5   purchased CRT products from Defendants or their controlled affiliates and, according to the

6   Ninth Circuit, are indirect purchasers with standing.   In other words, because the price-fixing

7   conspirators in this case own or control the subsidiaries and affiliates from which Plaintiffs

8   purchased CRT products, *ATM Fee* and *Royal Printing* grant Plaintiffs standing under the

9   federal antitrust laws for purchases from those entities.

10          Prior to *ATM Fee*, Defendants have contended, and the R&R stated at one point, that

11   *Royal Printing* does not apply because Plaintiffs bought CRT finished products, and not

12   standalone CRTs and that therefore they never purchased price-fixed CRTS  at all, and therefore

13   are not even indirect purchasers.   R&R at 10.   Under this contention, there is never a purchaser

14   of CRTs and cartel conduct will be immune from all liability for damages for the CRTs at issue.

15   Elsewhere in the R&R however, the Special Master also stated "the purchasers of [finished

16   products] are probably indirect purchasers who can maintain causes of action." R&R at 11.   And

17   there is certainly no basis on summary judgment to conclude that Plaintiffs did not purchase

18   CRTs: Plaintiffs purchased the price-fixed CRTs as components in finished products from

19   Defendants and their subsidiaries, affiliates and co-conspirators.   Plaintiffs' purchases were the

20   first purchases of the price-fixed CRTs outside Defendants' corporate groups.   Upon purchase of

21   the finished products, Plaintiffs owned the CRTs, held title to the CRTs, and had the rights to the

22   CRTs.   To the extent that Plaintiffs prove at trial that these facts establish that they are direct

23   purchasers of the CRTs contained in the CRT products, then of course they have standing

24   directly under *Illinois Brick* rather than just as indirect purchasers with standing under the Ninth

25   Circuit-approved ownership or control exception.

26          In any event, the Ninth Circuit has now held that Plaintiffs here are indirect purchasers

27   with standing.   In *ATM Fee*, the Ninth Circuit held that consumers, who alleged that price fixing

28

1   of a fee paid by the defendant banks to ATM companies was passed on to them in a different fee

2   they separately paid to the banks, are indirect purchasers with standing to sue controlled

3   affiliates of the conspirators under *Royal Printing*. (Plaintiffs' claim in that case only failed

4   because the defendant banks did not own or control the ATM network that set the relevant fees.)

5   The Ninth Circuit further discussed the Third Circuit's decision in *In re Sugar Industries*

6   *Antitrust Litigation*, 579 F.2d 13 (3d Cir. 1978), in which plaintiffs were candy wholesalers who

7   alleged price-fixing of sugar which was part of candy sold by price-fixing defendants to

8   plaintiffs. 2012 WL 2855813 at *12 n. 7. The Court in *ATM Fee*, while disagreeing that candy

9   wholesalers were direct purchasers of sugar, agreed that there was standing: "*In re Sugar*

10  *Industries* actually exemplifies the exception allowed when an upstream violator controls or

11  owns the direct purchaser." *Id.*

12          Here, Plaintiffs have not only alleged that price fixing of CRTs was passed on to the

13  finished products they purchased from Defendants and the affiliates they control, Plaintiffs also

14  allege that they actually purchased the CRTs as part of the finished products. Based on the

15  Ninth Circuit's decision in *ATM Fee*, under the federal antitrust laws, there is no other candidate

16  with standing who will bring an action, and Section 4 of the Clayton Act grants standing here.

**BACKGROUND**

17

18          A.      Facts

19          As detailed in the Direct Purchaser Plaintiffs' Opposition to Defendants' Motion for

20  Partial Summary Judgment ("DPP Opposition" or "DPP Opp."), Defendants in this litigation

21  engaged in a long-running and well-documented conspiracy to fix the prices of CRTs, which are

22  the central components in CRT Products including color televisions and color computer

23  monitors. DPP Opp. at 3-4 (citing to the Declaration of R. Alexander Saveri in Opposition to

24  Defendants' Motion For Partial Summary Judgment ("Saveri Decl.")). Defendants' conspiracy

25  extended from at least March 1995 through November 2007 and included at least 500 conspiracy

26  meetings. *Id.* at 3. This conspiracy is being investigated by the United States Department of

27  Justice ("DOJ") and by multiple foreign competition authorities. Thus far, Defendant Samsung

28

SDI Company, Ltd. has agreed to plead guilty and pay a $32 million criminal fine, and six executives of Defendant companies have been indicted in connection with DOJ's investigation of the conspiracy. *See, e.g., id.* at 4.

Defendants are or were among the leading manufacturers of CRTs and CRT Products. Many of the Defendants are "vertically integrated" manufacturers, meaning they manufactured CRTs and they (or their subsidiaries and affiliates) also manufactured CRT Products. DPP Opp. at 4. The evidence will show that the vast majority of the CRTs the conspirators manufactured were sold to their subsidiaries, affiliates, and co-conspirators for incorporation into finished products. *Id.* at 5 (citing Saveri Decl. at ¶ 46).

The DAPs are leading U.S. retailers, distributors, and other businesses, including companies such as Best Buy, Costco, Office Depot, Sears and Target.[1] The DAPs purchased CRTs and/or CRT Products from Defendants' U.S.-based marketing and sales subsidiaries and affiliates, which were owned or controlled by Defendants. As a result of the conspiracy, the DAPs were overcharged on the billions of dollars of CRTs and CRT Products they purchased. *See, e.g.,* DAP Memorandum in Support of DPP Opposition to Defendants' Motion for Partial Summary Judgment (Dkt. No. 1056) ("DAP Opposition" or "DAP Opp.") at 6. The overwhelming majority of their purchases were CRT Products (as opposed to standalone CRTs).

B.    Procedural History

The DAPs are new entrants to this litigation, most having filed suit in November 2011. Defendants have not yet responded to the DAPs' complaints. No discovery has taken place in

---

[1] *See generally Electrograph Systems, Inc. et al v. Hitachi Ltd. et al*. 11-cv-01656-SC (N.D. Cal.); *Stoebner, et al. v. LG Electronics, et al.*, No. 11-cv-05381 (SC) (N.D. Cal.); *Siegel v. Hitachi, Ltd., et al.*, No. 11-cv-05502 (SC) (N.D. Cal.); *Best Buy Co., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-05513 (SC) (N.D. Cal.); *Target Corp., et al. v. Chunghwa Picture Tubes, Ltd.*, No. 11-cv-05514 (EDL) (N.D. Cal.); *Interbond Corporation of America v. Hitachi, et al.*, No. 11-cv-06275 (SC) (N.D. Cal.); *Office Depot, Inc. v. Hitachi Ltd., et al.*, 11-cv-06276-SC (N.D. Cal.); *Compucom Systems, Inc. v. Hitachi, Ltd., et al.*, No. 11-cv-06396 (SC) (N.D. Cal.); *Costco Wholesale Corp. v. Hitachi, Ltd., et al.*, No. 11-cv-06397 (SC) (N.D. Cal.); *P.C. Richard and Son Long Island Corp., et al. v. Hitachi, Ltd., et al.*, 12-cv-02648 (SC) (N.D. Cal.); and *Schultze Agency Services, LLC, et al. v. Hitachi, Ltd., et al.*, 12-cv-02649 (SC) (N.D. Cal.).

the DAP actions as of yet.  Defendants have served an initial set of discovery in the DAP actions, but the DAPs have not yet served responses and objections to that discovery. Defendants' Motion for Partial Summary Judgment is not facially directed at any of the DAP cases that have been filed thus far.  However, the Special Master invited the DAPs to participate in the initial briefing on Defendants' Motion at the January 19, 2012 Case Management Conference.  In his decision, the Special Master noted that the R&R may serve as the basis for summary judgment motions in the DAP actions.  R&R at 3-4.  Thus, the DAPs are submitting this brief for the Court's consideration, notwithstanding the fact that Defendants' Motion has not been made in any of their cases.  The Court gave the DAPs permission to participate in the briefing on this issue in its recent Scheduling Order (June 26, 2012) (Dkt. No. 1240).

## ARGUMENT

### I.     Summary Judgment Standard

Defendants' motion for summary judgment must be denied unless they demonstrate that there is "no genuine issue of material fact" and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Whether Plaintiffs can recover for the purchases at issue here is a question of standing that may not be determined on summary judgment "if there is a genuine issue of material fact." *ATM*, 2012 WL 2855813, at *4.  "Because the court (and not a jury) decides standing, the district court must decide issues of fact necessary to make the standing determination." *Id*.  In making this inquiry, the court must view the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "In antitrust cases, these general standards are applied even more stringently and summary judgments granted more sparingly." *Beltz Travel Serv., Inc. v. Int'l Air Transport Ass'n*, 620 F.2d 1360, 1364 (9th Cir. 1980).

## II. *ATM Fee* Compels the Rejection of the R&R and the Denial of Defendants' Motion

The Ninth Circuit's *ATM Fee* decision, which was handed down after the R&R in this litigation, is directly applicable here and compels the rejection of the R&R and the denial of Defendants' Motion.  While the Ninth Circuit has agreed with the R&R that Plaintiffs are indirect purchasers,[2] it has expressly overruled the R&R with respect to whether an exception to the *Illinois Brick* direct purchaser rule grants Plaintiffs as indirect purchasers standing under federal law.  Under *ATM Fee*, it is clear that the *Royal Printing* ownership and control exception applies to Plaintiffs' purchases of finished products containing price-fixed CRTs from Defendants and their subsidiaries and affiliates.  Thus, Plaintiffs have standing.

### A. *ATM Fee* Reaffirms *Royal Printing's* Ownership or Control Exception to *Illinois Brick*

In *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court ruled that indirect purchasers do not have standing to sue under the federal antitrust laws.  Thus, only direct purchasers, *i.e.*, those who purchase a price-fixed good or service directly from a conspirator, may bring suit.  As the Ninth Circuit recognized in *ATM Fee*, this bright-line direct-purchaser rule has three primary purposes: "'(1) to eliminate the complications of apportioning damages between direct and indirect purchasers,' [*Kansas v. UtiliCorp United, Inc.*, 497 U.S. 207, 208 (1990)]; (2) 'to eliminate multiple recoveries,' *id*. at 212; and (3) 'to promote the vigorous enforcement of the antitrust laws,' *id*. at 214."  2012 WL 2855813, at *5.

As the Ninth Circuit further recognized in *ATM Fee*, however, certain limited exceptions to *Illinois Brick* give indirect purchasers standing under the federal antitrust laws.  *Id*. at *6.  One such exception was adopted by the Ninth Circuit over thirty years ago in *Royal Printing*.  *Id*. (citing *Royal Printing*, 621 F.2d at 326).  In *Royal Printing,* the defendants conspired to fix the prices of paper products.  The defendants each sold the paper products they manufactured only through wholesalers, many of which were either subsidiaries or divisions of one of the

---

[2] Plaintiffs respectfully disagree with and reserve all rights to object to this part of the decision.  As noted in the Introduction, Plaintiffs purchased CRTs when they purchased CRT Products and have standing to bring their antitrust claims directly under *Illinois Brick*.

1    conspirators. 621 F.2d at 326. The Ninth Circuit held that *Illinois Brick* "does not bar an

2    indirect purchaser's suit where the direct purchaser is a division or subsidiary of a co-

3    conspirator." *Id*. at 326. The Court explained its rationale for this holding:

4           There is little reason for the price-fixer to fear a direct purchaser's suit when the
            direct purchaser is a subsidiary or division of a co-conspirator. Even if the
5           pricing decisions of such a subsidiary or division are necessarily determined by
            market forces, its litigation decisions will usually be subject to parental control.
6

7    *Id.*

8           The vertically integrated defendants in *Royal Printing* sold both their own paper products

9    and those of other conspirators to the plaintiffs through their wholesale divisions and

10   subsidiaries. *Id*. at 324. As the Ninth Circuit held, such a distinction is immaterial because

11   "[t]he co-conspirator parent will forbid its subsidiary or division to bring a lawsuit that would

12   only reveal the parents own participation in the conspiracy." *Id.* at 326.[3] Even though the

13   pricing decisions of the subsidiary-wholesalers were determined by market forces, the Ninth

14   Circuit held that plaintiffs were entitled to recover the full amount of the overcharge. *Id.*

15          The Ninth Circuit subsequently affirmed *Royal Printing* in *Freeman v. San Diego Ass'n*

16   *of Realtors*, 322 F.3d 1133 (9th Cir. 2003). In *Freeman*, realtor associations formed a single

17   Multiple Listing Service (MLS) database run by Sandicor, a corporation they created, owned,

18   and controlled. The associations conspired to fix support fees charged to Sandicor, which

19   inflated the MLS fees that Sandicor charged the plaintiffs (real estate agents) for access to the

20   MLS database. 322 F.3d at 1147 (plaintiffs alleged that defendants fixed the price of support

21   fees and that Sandicor "passed on some portion of that inflated support fee to its agents").

22   Although the plaintiffs only paid the MLS fee and never paid the price-fixed fee (the support

23   fee), the Ninth Circuit held that the plaintiffs had standing to sue the associations because there

24   was "no realistic possibility Sandicor will sue them." *Id*. at 1146.

25

---

26   [3] *Royal Printing* thus focuses not on the relationship between the subsidiary-seller and the
     manufacturer-parent, but on the relationship between the subsidiary-seller and *any* conspirator-
27   manufacturer. *See In re TFT-LCD (Flat Panel) Antitrust Litigation,* 3:07-md-01827-SI, WL
     5357906, *1 (N.D. Cal. Nov. 7, 2011).
28

1    The policy underlying *Royal Printing* and *Freeman* is to prevent price-fixers from

2    shielding themselves from liability by making sales through a non-conspiring subsidiary or

3    affiliate.   Barring plaintiffs that purchased directly from subsidiaries or affiliates of the

4    conspirators from bringing suit "would eliminate the threat of private enforcement," *Royal*

5    *Printing*, 621 F.2d at 326 n.7, by "clos[ing] off every avenue for private enforcement of the

6    antitrust laws in such cases," *id.* at 327.  In the words of the Ninth Circuit, "[t]his would be

7    intolerable." *Id.*; *see also Freeman*, 322 F.3d at 1145-46 (failing to grant standing to purchasers

8    from subsidiaries of conspirators "would risk opening up a major loophole [in the antitrust

9    laws]" by allowing defendants to transform "a horizontal agreement to fix prices into something

10   innocuous just by changing the way they keep their books").

11   In *ATM Fee*, the Ninth Circuit revisited the *Illinois Brick* direct purchaser rule and

12   several exceptions to that rule, including the *Royal Printing* exception.  There, the plaintiffs did

13   not allege that the defendants fixed the prices of fees the plaintiffs paid, but rather alleged that

14   the defendants fixed the prices of "interchange fees" paid by banks to ATM machine owners.

15   *ATM Fee*, 2012 WL 2855813, at *1.  The plaintiffs withdrew money from banks and paid a

16   foreign ATM fee to the banks.  *Id.*  The plaintiffs argued that the defendants colluded to fix the

17   interchange fee, "which is then passed on to Plaintiffs as part of the foreign ATM fee." *Id.* at *2.

18   The Court held that where plaintiffs do not pay the price-fixed fee directly, those plaintiffs are

19   "indirect purchasers." *Id.* at *1; *6.[4]

20   The Court went on to reaffirm the ownership or control exception to *Illinois Brick* set

21   forth in its prior holding in *Royal Printing*, stating that indirect purchasers may sue "when a

22   conspiring seller owns or controls the direct purchaser." *Id.* at *6 (citing *Royal Printing*, 621

23   F.2d at 326); *see also id.* at *12-13.  The Court endorsed *Royal Printing's* rationale for creating

24   an exception to *Illinois Brick* where a conspirator owns or controls the direct purchaser, *i.e.*, to

25   maintain private enforcement of the antitrust laws. *Id.* at *12 (quoting *Royal Printing*, 621 F.2d

---

[4] In addition, the Court held that where a plaintiff does not pay the price-fixed fee directly, the
co-conspirator exception to *Illinois Brick*, originally set forth by the Ninth Circuit in *Arizona v.*
*Shamrock Foods Co.*, 729 F.2d 1208, 1211 (9th Cir. 1984), does not apply and the plaintiff
remains an indirect purchaser without standing under the federal antitrust laws. *Id.* at *6.

at 326 & n.7, 327). In addition, the Court clarified its holding in *Freeman*, stating that *Freeman* should be read in accord with *Royal Printing*:

> …*Freeman* did not create a new variation of the *Royal Printing* exception, because *Freeman* relied on ownership or control to find standing.…[] *Freeman* outlines that, whether a realistic possibility of suit exists, depends on the existence of ownership or control between the direct purchaser and the seller.

2012 WL 2855813, at *13 (citations omitted).

Importantly, and as discussed further below, the Court made it clear that, under *Royal Printing*, a plaintiff may recover the full overcharge even if that overcharge was passed on to it. *See, e.g., id.* at *6. The Court also explained that this was the holding in *Freeman*, which granted standing to indirect purchasers who alleged the price fixed fee was passed on to them. *Id.* at *11.

The Court concluded that the plaintiffs in *ATM Fee* had failed to demonstrate the ownership or control necessary to apply *Royal Printing*. *Id.* at *14-15. The ownership or control test is met, according to the Ninth Circuit, if the ordinary meaning of "control" is met. *Id.* at *14. Unlike the situation in *Freeman*, the Court found that the bank defendants' approximately 10% ownership share in the corporation that owned the ATM network at issue was insufficient to control the ATM network. *Id.* at *14. Thus, the Court found that, on the facts presented in *ATM Fee*, the *Royal Printing* exception did not apply and held that the plaintiffs lacked standing. *Id.* at *15.

### B. Under *ATM Fee*, *Royal Printing's* Ownership or Control Exception Provides Standing to Plaintiffs For Their Finished Product Purchases

The Special Master stated in the R&R that the Ninth Circuit's decisions in *Royal Printing* and *Freeman* do not apply in this case because Plaintiffs purchased finished products containing price-fixed CRTs and not standalone CRTs. R&R at 10. The Special Master also stated "the purchasers of [finished products] are probably indirect purchasers who can maintain causes of action." R&R at 11. The Ninth Circuit makes clear in *ATM Fee* that Plaintiffs here are indirect purchasers with standing. *ATM Fee* confirms that *Royal Printing's* ownership or control

1   exception applies regardless of whether Plaintiffs paid the price-fixed price directly, so long as

2   the requisite ownership or control exists.  2012 WL 2855813, at *12 n.7 & *14-15.  Thus, under

3   the law of the Ninth Circuit as set forth in *ATM Fee*, *Royal Printing* is directly on point and

4   compels the denial of Defendants' motion.

5       In *ATM Fee*, the Ninth Circuit held that indirect purchasers may sue "when a conspiring

6   seller owns or controls the direct purchaser."  2012 WL 2855813, at *6 (citing *Royal Printing*,

7   621 F.2d at 326).  The Ninth Circuit's application of *Royal Printing* to the facts of *ATM Fee*

8   demonstrates that *Royal Printing's* ownership or control exception applies regardless of whether

9   a plaintiff paid the price-fixed price directly.  In *ATM Fee*, the Court engaged in a *Royal Printing*

10  analysis of whether ownership or control existed, despite the fact that the plaintiffs in *ATM Fee*

11  did not pay the price-fixed price directly.  2012 WL 2855813, at *14-15.

12      In addition, the Court reviewed *Freeman* and confirmed that it permitted indirect

13  purchaser standing, even where pass on was alleged.  *Id*. at *11.  Indeed, the holding in *Freeman*

14  is directly on point:  "The associations engaged in price fixing, and plaintiffs have standing to

15  sue them.   The associations purposely fixed the support fee they charged Sandicor at a

16  supracompetitive level.  Sandicor passed on some portion of that inflated support fee to agents,

17  who paid higher prices for the MLS as a result."  *Freeman*, 322 F.3d at 1147.  Likewise, here the

18  Defendants purposely fixed the price of CRTs and Defendants' controlled affiliates passed on

19  the overcharge to Plaintiffs in the price of CRT products.   As the Ninth Circuit stated in

20  *Freeman*, "This is precisely the type of injury the antitrust laws are designed to prevent."  *Id*.

21  The Special Master incorrectly held that "*Freeman* is not applicable to this motion" based on the

22  (erroneous) belief that the plaintiffs in that case "did pay the price-fixed services of the Multiple

23  Listing Service."  R&R at 10.  But it was the support fee – and not the MLS fee – that was the

24  subject of the price-fixing conspiracy.  *Freeman*, 322 F.3d at 1145 (plaintiffs suffered injury as a

25  result of Sandicor "pass[ing] on" the support fees "in the form of higher MLS fees").

26      Thus, in *ATM Fee*, the Court drew a clear distinction between the *Royal Printing*

27  ownership and control exception to *Illinois Brick* and the so-called "co-conspirator exception" to

28

1    *Illinois Brick* originally set forth by the Ninth Circuit in *Arizona v. Shamrock Foods, Co.*, 729

2    F.2d 1208 (9th Cir. 1984).  While the co-conspirator exception applies only where a plaintiff

3    directly purchases the price fixed item, that is not the case under the *Royal Printing* ownership or

4    control exception.  *See id.* at *6; *compare id.* at *12 with *id.* at *14-15.

5         Moreover, in an important footnote (footnote 7), the Court stated that the Third Circuit's

6    decision in *In re Sugar Industries Antitrust Litigation*, 579 F.2d 13 (3d Cir. 1978), "exemplifies

7    the exception allowed when an upstream violator controls or owns the direct purchaser."  *Id.* at

8    *12 n.7 (citing *Sugar*, 579 F.2d at 18-19; 2A Phillip E. Areeda et al., *Antitrust Law* ("Areeda")

9    ¶ 346f & n.41).  In *Sugar*, a plaintiff purchased a finished product (candy) containing a price-

10   fixed component (sugar) from a subsidiary of a conspirator.  The Third Circuit found that the

11   ownership or control exception to *Illinois Brick* granted standing to the plaintiff for those

12   purchases.  579 F.2d at 18-19.  Thus, the Ninth Circuit's citation of the result in *Sugar* with

13   approval leaves no doubt that *Royal Printing's* ownership or control exception applies where a

14   plaintiff purchases a finished product containing a price-fixed component from a conspirator's

15   subsidiary or affiliate.

16        In addition, the Ninth Circuit also cited with approval Areeda's discussion of the

17   ownership and control exception to *Illinois Brick*, which further confirmed that *Sugar* is good

18   law.  *Id.* at *12 n.7 (citing Areeda ¶ 346f & n.41).  Subsequent to the Third Circuit's decision in

19   *Sugar*, Areeda, the foremost treatise on antitrust law, declared that although the Supreme Court

20   had not addressed the question of direct purchasers owned or controlled by a conspirator in

21   *Illinois Brick*, "most courts considering the question correctly allow the indirect purchaser to

22   recover."  Areeda ¶ 346f.  Under those circumstances, "[t]he indirect purchaser has obviously

23   borne all of the loss; denying relief would insulate the violator from suit."  *Id.*  Areeda cited

24   *Sugar* as one of the courts that had correctly allowed an indirect purchaser to recover under the

25   ownership or control exception.  *Id.* at n.41.

26        Thus, the Special Master's contention that *Sugar* is "not the law of the Ninth Circuit,"

27   R&R at 11, is now superseded by the Ninth Circuit's own statement in *ATM Fee* that *Sugar*

28

1   "exemplifies the exception allowed when an upstream violator controls or owns the direct

2   purchaser." *Id*. at *12 n.7 (citing *Sugar*, 579 F.2d at 18-19; Areeda ¶ 346f & n.41).  Likewise,

3   the Special Master's assertion that *Sugar*'s "conclusions have not been adopted by the Ninth

4   Circuit Court of Appeals," R&R at 11, is not correct in light of *ATM Fee*.

5          Moreover, the Ninth Circuit was explicit that *Sugar* does not run afoul of the Supreme

6   Court's decision in *Kansas v. UtiliCorp United, Inc.,* 497 U.S. 199 (1990).  2012 WL 2855813,

7   at *12 n.7.  Thus, the R&R's contention that *Sugar* would create a new exception to *Illinois*

8   *Brick*, in contravention of *UtiliCorp*, R&R at 11, is also incorrect.

9          *ATM Fee* is also consistent with the application of *Royal Printing* by Judge Illston in the

10  *LCD* antitrust action and by Judge Seeborg in the *ODD* antitrust action (where the plaintiffs

11  purchased finished products containing price-fixed components) and thus confirms that Judges

12  Illston and Seeborg applied *Royal Printing* correctly.  The facts of *LCD* and *ODD* are nearly

13  identical to those here and thus Plaintiffs respectfully submit that *Royal Printing* must be applied

14  here, too.

15         In the *LCD* case, Judge Illston applied the *Royal Printing* ownership or control exception

16  to deny Toshiba's motion for summary judgment.  *In re TFT-LCD (Flat Panel) Antitrust*

17  *Litigation*, 3:07-md-01827-SI, 2011 WL 5357906 (N.D. Cal. Nov. 7, 2011).  The Court found

18  that although "the manufacturer of all Toshiba TFT-LCD panels had only an indirect corporate

19  relationship to the exclusive distributor of Toshiba-branded products in the United States," those

20  entities were unlikely to sue Toshiba Corporation, the parent company that had participated in

21  the conspiracy.  *Id.* at *1.  On this basis, Judge Illston found that *Royal Printing* applied and

22  denied Toshiba's motion:

23         Toshiba's argument rests on a misreading of *Royal Printing*. That case was not
           concerned with the relationship between the manufacturer of a price-fixed
24         product and the direct purchaser; rather, it was concerned with the relationship
           between the conspirator and the direct purchaser. The Ninth Circuit could not
25         have been clearer: 'We hold that *Illinois Brick* does not bar an indirect
           purchaser's suit where the direct purchaser is a division or subsidiary of a co-
26         conspirator.' *Royal Printing*, 621 F.2d at 326.

27

28

1

2

3

4

> Indeed, *Royal Printing* explicitly disclaimed any reliance on evidence that the direct purchaser was owned or controlled by its customer…. Instead, the Ninth Circuit's reasoning stemmed from its concern with the parent company's control over the litigation decisions of its subsidiary…. Due to this control, the parent company will be unlikely to allow its subsidiary to file suit, thwarting a vital part of the antitrust enforcement scheme and the expressed purpose of *Illinois Brick*.

5

*Id.*

6       Likewise, at the motion to dismiss stage, Judge Illston also denied multiple motions to

7   dismiss by Tatung Company of America ("TUS"), holding that its corporate relationship with

8   conspirator Chunghwa was sufficient to apply *Royal Printing* to grant plaintiffs standing under

9   the federal antitrust laws to recover for purchases of finished products from TUS.  The Court

10  stated that "*Illinois Brick*'s rationale of preventing potentially duplicative recoveries from both

11  direct and indirect purchasers does not apply when the direct purchaser is an affiliate of the

12  corporation accused of an antitrust violation." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 3:07-

13  md-01827-SI, 2010 WL 2836955, at *3 (N.D. Cal. Jul. 19, 2010); (citing *Royal Printing*, 621

14  F.2d at 326; *Freeman*, 322 F.3d at 1145-46); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 3:07-

15  md-01827-SI, 2009 WL 533130, at *1-2 (N.D. Cal. Mar. 3, 2009) (same).  *See also In re TFT-

16  LCD (Flat Panel) Antitrust Litig.*, 3:07-md-01827-SI, 2010 WL 1264230, at *1-2 (N.D. Cal.

17  Mar. 28, 2010) at *1.

18      The Special Master suggests that Judge Illston's decisions in *LCD* are "an incorrect

19  interpretation of prior precedent as applied to this present case."  R&R at 10.  He goes on to state

20  that "Judge Illston did not have occasion to discuss the factual setting that is controlling in this

21  motion: that is, that the plaintiffs here did <u>not</u> purchase <u>any</u> price-fixed product from anyone."

22  *Id.*[5]  This is manifestly incorrect.  There is no difference between the LCDs incorporated into the

23  LCD finished products purchased by Plaintiffs from the Defendants in the LCD action and the

24

25

_____

26  [5] In *ATM Fee*, the Court cited one of Judge Illston's opinions in *LCD* and contrasted it with the facts in *ATM Fee*.  2012 WL 2855813 at *12 n.7 (citing *In re TFT-LCD (Flat Panel) Antitrust

27  Litig.*, 267 F.R.D. 291, 306-07 (N.D. Cal. 2010)).  *ATM Fee* did not disapprove of or contrast any of Judge Illston's opinions in *LCD* applying *Royal Printing* and instead its decision confirms

28  their correctness.

CRTs incorporated in the CRT finished products purchased by the Plaintiffs from the Defendants in this action.

Moreover, the R&R  does not address Judge Seeborg's even more recent decision in *In re Optical Disk Drive (ODD) Antitrust Litigation*, No. 3:10–md–2143 RS, 2012 WL 1366718 (N.D. Cal. Apr. 19, 2012), which correctly applied *Royal Printing* to nearly identical facts to deny a motion to dismiss.  That case concerns the price-fixing of optical disk drives (ODDs), which are component parts in finished products including computers, videogame consoles and camcorders.  As is the case here, the plaintiffs there do not allege a conspiracy to fix the price of the finished products themselves, but rather only the component parts (ODDs).  Citing *Royal Printing* for the same exact proposition for which Plaintiffs here cite it, Judge Seeborg held that purchasers of finished products containing price-fixed ODDs have standing under the federal antitrust laws:

> Where a price-fixing manufacturer sells through a subsidiary, affiliate and/or co-conspirator, not only is there little risk of multiple liability (since the "middleman" in such instances is unlikely to sue) it would undermine the private enforcement mechanism of the antitrust law to preclude the only party with an interest in pursuing the claim from proceeding.  *See* [*Royal Printing*, 621 F.2d] at 327 ("Because, as we have already shown, as a practical matter the direct purchasers here will never sue, barring Royal Printing's suit would close off every avenue for private enforcement of the antitrust laws in such cases.  This would be intolerable.").  Accordingly…the Direct Purchasers are entitled to pursue claims arising from purchases of preinstalled ODDs in computers, videogame consoles and camcorders, manufactured and sold by defendants, their affiliates, or subsidiaries.

2012 WL 1366718 at *6.  Thus, this decision, like Judge Illston's decision in *LCD*, is directly on point and fully supports the denial of Defendants' Motion.

Here, discovery will show that Plaintiffs' purchases of CRT products involved essentially three manufacturing and distribution scenarios.  By far, the most common scenario involves Plaintiffs' purchase of CRT products from a controlled affiliate of the Defendant that manufactured the CRT contained in the product.  As discussed above, in *ATM Fee*, the Ninth Circuit has re-affirmed Plaintiffs' standing under this scenario.  Another common scenario involves Plaintiffs' purchase of CRT products from a controlled affiliate of a Defendant, which

1   purchased the CRT contained in the finished product from a different Defendant in the

2   conspiracy.  This fact pattern is exactly the fact pattern found in the Ninth Circuit's *Royal*

3   *Printing* case, re-affirmed by the Ninth Circuit in *ATM Fee*.  *Royal Printing*, 621 F.2d at 324.

4        The final scenario, which Plaintiffs believe to be the least common, involves one

5   Defendant in the conspiracy purchasing the CRT from another Defendant in the conspiracy and

6   incorporating the CRT into a finished product that is then sold through a controlled affiliate to

7   Plaintiffs.  This scenario also comes under the *Royal Printing* standard.  In this situation, the

8   relationship among the Defendant entities is even closer than in *Royal Printing*.  In *Royal*

9   *Printing*, a Defendant's controlled affiliate would have had to sue the Defendant that sold it the

10  paper products in order to recoup any overcharge it suffered, thereby exposing its parent

11  company's participation in the conspiracy.  Here, the Defendant that bought the CRT would

12  have to sue another Defendant, thereby exposing *its own* participation in the conspiracy.  Thus,

13  all of the policy considerations underlying *Royal Printing* apply even more strongly in this

14  instance, and Plaintiffs have standing. [6]

15       In all of these scenarios, the Defendant-conspirators sold price-fixed components to their

16  subsidiaries or affiliates (or to each other) for incorporation into the CRT Products purchased by

17  Plaintiffs.  *See, e.g.,* DPP Opp. at 5 (citing Saveri Decl. at ¶ 46).  Just as in *Royal Printing*,

18  *Sugar*, *LCD* and *ODD*, these subsidiaries and affiliates will not bring suit to expose their parent

19  companies' participation in the conspiracy.  As a result, Plaintiffs have standing to sue under the

20  ownership and control exception to *Illinois Brick*.[7]  Moreover, there is no need to calculate pass

21

---

22  [6] The co-conspirator exception to *Illinois Brick* does not apply to these claims.  As discussed in
23  *ATM Fee*, that theory of standing applies only in cases where middlemen, like distributors or the
    bank defendants in *ATM Fee*, conspire with entities on a different tier of the distribution chain,
24  such as manufacturers, and then sell the price-fixed product.  *ATM Fee*, 2012 WL 2855813, at
    *6.  That is not this fact pattern, as no such middleman or distributor is alleged to have
25  participated in the conspiracy involving Plaintiffs' purchases of CRT products.
    [7] In any event, this discussion demonstrates that Defendants are simply wrong in their assertion
26  that this issue is ripe for summary judgment determination.  Once discovery is complete,
    Defendants can make their arguments that Plaintiffs do not have standing to bring a case on
27  some purchases meeting certain fact patterns.  What they cannot do, especially after *ATM Fee*, is
    ask this Court to rule that Plaintiffs have no standing to bring a case on any purchase of a CRT
28  product regardless of the fact pattern.

1    on damages, because Plaintiffs are entitled to recover the full amount of the overcharge.  *Royal*

2    *Printing*, 621 F.2d at 327; *Sugar* at 18; Areeda ¶ 346f.

3    **III.    Contrary to *ATM Fee's* Mandate, the R&R Would Insulate Defendants
         From Liability**

4

5         The R&R would have the effect of insulating Defendants from liability under the federal

6    antitrust laws.  The Special Master states that "it seems evident without the necessity for factual

7    development, that if there is a manufacturer of television sets or computer monitors who

8    purchased allegedly price-fixed CRTs from one of the defendants or its affiliates, that

9    manufacturer would have the incentive to bring a direct suit against the CRT manufacturers."

10   R&R at 11.  The exact consequence of the R&R, however, is that Defendants would escape

11   liability under the federal antitrust laws for the vast majority of their sales of price-fixed CRTs

12   because their subsidiaries, controlled affiliates and co-conspirators have absolutely no incentive

13   to file suit against them (and indeed have incentives not to file suit).  *See* DPP Opp. at 5 (citing

14   Saveri Decl. at ¶ 46).  Thus, if the R&R is accepted, no party would be entitled to seek damages

15   for the CRTs incorporated into the CRT Products purchased by Plaintiffs.

16        As the Third Circuit held in *Sugar*:

17        to deny recovery in this instance would leave a gaping hole in the administration
          of the antitrust laws.  It would allow the price-fixer . . . to escape the reach of a
18        treble-damage penalty simply by incorporating the tainted element into another
          product.  Thus, a refiner who illegally set the price of sugar could shield itself by
19        putting all of the sugar into a new product, a syrup, simply by adding water and
          perhaps a little flavoring.  We do not think the antitrust laws should be so easily
20        evaded . . . . *Illinois Brick* did not purport to provide any such escape.

21   *Sugar,* 579 F.2d at 17-18.

22        Immunizing price-fixers from federal antitrust liability would be flatly inconsistent with

23   *Illinois Brick* and would be contrary to the well-established public policy underlying antitrust

24   enforcement.  *See Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 139

25   (1968) ("the purposes of the antitrust laws are best served by insuring that the private action will

26   be an ever-present threat to deter any one contemplating business behavior in violation of the

27   antitrust laws"); *Royal Printing*, 621 F.2d at 325 ("The threat of private treble-damages suits is

28

1   vital to the enforcement of the antitrust laws"); *see also See Loeb Indus., Inc. v. Sumitomo Corp.,*

2   306 F.3d 469, 483 (7th Cir. 2002) (the Supreme Court's pass-on jurisprudence "at times favors

3   plaintiffs (*Hanover Shoe*) and at times defendants (*Illinois Brick* ), but it never operates entirely

4   to preclude market recovery for an injury").

5          Finally, the R&R asserts that "it is a matter of record that the Antitrust Division of the

6   Department of Justice has been pursuing criminal actions against some of these Defendants." *Id.*

7   at 11-12.  Of course, criminal actions cannot and do not replace civil enforcement of the antitrust

8   laws.   In this case, the Department of Justice contemplated that civil enforcement would

9   supplement criminal enforcement by providing restitution to injured plaintiffs.  In its guilty plea,

10   Defendant Samsung SDI noted that the DOJ was not seeking restitution and that victims of the

11   conspiracy could seek compensation through this litigation, "which [would] potentially provide

12   for a recovery of a multiple of actual damages...."   DPP Opp. at 4 (citing Saveri Decl. at ¶ 10 &

13   Exh. 22, at p.4).  In sum, allowing Defendants to escape liability for their unlawful acts would

14   not only result in injustice in this instance but would provide a roadmap for future price-fixers to

15   avoid liability for their own conspiracies, as well.

16          **IV.    At Best, Defendants' Motion Is Premature and Fails to Satisfy Rule 56**

17          *ATM Fee* compels the rejection of the R&R and the denial of Defendants' Motion on the

18   law.  Defendants have presented no facts that would call into question whether *ATM Fee*

19   controls here.  There is also no basis on summary judgment to conclude that Plaintiffs did not

20   purchase CRTs: Plaintiffs purchased the price-fixed CRTs as components in finished products

21   directly from Defendants and their subsidiaries, affiliates, and co-conspirators.   Plaintiffs'

22   purchases were the first purchases of the price-fixed CRTs outside Defendants' corporate

23   groups.  Upon purchase of the finished products, Plaintiffs owned the CRTs, held title to the

24   CRTs, and had the rights to the CRTs.

25          At best, Defendants' Motion is premature given that fact discovery has only recently

26   begun in the Direct Purchaser Plaintiffs' action.  *See generally* Saveri Decl. at ¶¶ 11-40.  To the

27   extent that Defendants dispute that (1) the corporate relationships between and among

28

1   Defendants and their subsidiaries and affiliates are sufficient under the law; or (2) Plaintiffs
2   purchased CRTs and CRT Products directly from Defendants and their subsidiaries and
3   affiliates, their arguments are more properly made at the close of fact discovery, after Direct
4   Purchaser Plaintiffs have had the opportunity to adduce discovery on this issue.  For the purpose
5   of responding to Defendants' Motion, Direct Purchaser Plaintiffs served Rule 30(b)(6)
6   deposition notices concerning the relationships between and among Defendants and Defendants'
7   production and sales of CRTs and CRT Products.  *Id.* at ¶¶ 28-40.  Defendants objected and
8   refused to appear.  In fact, depositions have only recently commenced in the Direct Purchaser
9   Plaintiffs' action and have largely focused on class certification issues to date.  As such,
10  Defendants' Motion is deficient under Rule 56(d).  Fed. R. Civ. P. 56(d) (addressing summary
11  judgment motions made when facts are unavailable to the non-movant).[8]

12       Moreover, discovery has yet to begin at all in the DAPs' actions, given that most of these
13  actions were only filed at the end of last year.  Those DAPs that have filed suit have purchased
14  billions of dollars in CRT Products from Defendants and their subsidiaries and affiliates.

### CONCLUSION

16       For all of the foregoing reasons, Defendants' Motion should either be denied outright or,
17  in the alternative, deferred pursuant to Rule 56(d).

---

[8] As the Court noted in denying Defendants' motions to dismiss based on an alleged failure to adequately plead against each Defendant, "Defendants[]…rely upon arguments more appropriate at the summary judgment stage of these proceedings when Defendants can put Plaintiffs to their burden of proof….it would be inappropriate to dismiss any of the Defendants from this action without the benefit of discovery." 738 F. Supp. 2d at 1022.  The same is true here, where discovery concerning any dispute as to which entities purchased directly from Defendants and/or their subsidiaries and affiliates has yet to go forward.

DATED:  July 24, 2012

/s/      William A. Isaacson

William A. Isaacson
Jennifer Milici
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:  (202) 237-6131
Email:  wisaacson@bsfllp.com
Email:  jmilici@bsfllp.com

Stuart Singer
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone:  (954) 356-0011
Facsimile:   (954) 356-0022
Email:  ssinger@bsfllp.com

Philip J. Iovieno
Anne M. Nardacci
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY  12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email:  piovieno@bsfllp.com
Email:  anardacci@bsfllp.com

*Liaison Counsel for Direct Action Plaintiffs and
Attorneys for Plaintiffs Electrograph Systems, Inc.,
Electrograph Technologies, Corp., Office Depot, Inc.,
Compucom Systems, Inc., Interbond Corporation of
America, P.C. Richard & Son Long Island Corporation,
Marta Cooperative of America, Inc., ABC Appliance, Inc.,
Schultze Agency Services LLC on behalf of Tweeter Opco,
LLC and Tweeter Newco, LLC*

/s/      Roman M. Silberfeld

Roman M. Silberfeld, (SBN 62783)
David Martinez, (SBN 193183)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2049 Century Park East, Suite 3400
Los Angeles, CA  90067-3208
Telephone:  (310) 552-0130
Facsimile:   (310) 229-5800
Email:  RMSilberfeld@rkmc.com
Email:  DMartinez@rkmc.com

*Attorneys For Plaintiffs Best Buy Co., Inc, Best Buy
Purchasing LLC, Best Buy Enterprise Services, Inc., Best
Buy Stores, L.P., Bestbuy.com, L.L.C., and Magnolia Hi-
Fi, Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

/s/      Kenneth S. Marks
H. Lee Godfrey
Kenneth S. Marks
Jonathan J. Ross
Johnny W. Carter
David M. Peterson
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
Email:  lgodfrey@sumangodfrey.com
Email:  kmarks@susmangodfrey.com
Email:  jross@susmangodfrey.com
Email:  jcarter@susmangodfrey.com
Email:  dpeterson@susmangodfrey.com

Parker C. Folse III
Rachel S. Black
Jordan Connors
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
Telephone:  (206) 516-3880
Facsimile:  (206) 516-3883
Email:  pfolse@susmangodfrey.com
Email:  rblack@susmangodfrey.com
Email:  jconnors@susmangodfrey.com

*Attorneys for Plaintiff Alfred H. Siegel, as Trustee of the
Circuit City Stores, Inc. Liquidating Trust*

/s/      David. J. Burman
David J. Burman
Cori G. Moore
Nicholas H. Hesterberg
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:  (206) 359-8000
Facsimile:   (206) 359-9000
Email:  DBurman@perkinscoie.com
Email:  CGMoore@perkinscoie.com
Email:  NHesterberg@perkinscoie.com

1

Jordan S. Bass, Cal. Bar No. 208143
PERKINS COIE LLP
2
Four Embarcadero Center, Suite 2400
San Francisco, CA  94111-4131
3
Telephone:  (415) 344.7000
Facsimile:  (415) 344.7050
Email:  JBass@perkinscoie.com
4

5
*Attorneys for Plaintiff Costco Wholesale Corporation*

6
/s/     Jason C. Murray
7
Jason C. Murray (CA Bar No. 169806)
CROWELL & MORING LLP
8
515 South Flower St., 40th Floor
Los Angeles, CA 90071
9
Telephone:  (213) 622-4750
Facsimile:  (213) 622-2690
10
Email:  jmurray@crowell.com

11
*Counsel for Plaintiffs Target Corp.; Sears, Roebuck and Co.; Kmart Corp.; Old Comp Inc.; Good Guys, Inc.; RadioShack Corp.*
12

13
/s/     James P. McCarthy
14
Jessica L. Meyer, (SBN: 249064)
James M. Lockhart (*pro hac vice*)
15
James P. McCarthy (*pro hac vice*)
Kelly G. Laudon (*pro hac vice*)
16
Lindquist & Vennum P.L.L.P.
4200 IDS Center
17
80 South Eighth Street
Minneapolis, MN 55402
18
Telephone:  (612) 371-3211
Facsimile:  (612) 371-3207
19
Email:  jmeyer@lindquist.com
Email:  jlockhart@lindquist.com
20
Email:  jmccarthy@lindquist.com
Email:  klaudon@lindquist.com

21
*Attorneys for Plaintiffs John R. Stoebner, As Chapter 7 Trustee for PBE Consumer Electronics, LLC and related entities; And Douglas A. Kelley, as Chapter 11 Trustee for Petters Company, Inc. and Related Entities, and as Receive for Petters Company, LLC and related entities*
22

23

24

25

26

27

28

DAP OBJECTIONS TO R&R REGARDING
DEFENDANTS' MPSJ
Master File No. 3:07-md-05944-SC