# EXHIBIT

# 1

1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4    In re:  CATHODE RAY TUBE (CRT)          )
     ANTITRUST LITIGATION                    )
5                                            ) Case No.
                                             ) 07-5944SC
6                                            ) MDL No. 1917
     _____)
7

8

9

10

11

12         REPORTER'S TRANSCRIPT OF PROCEEDINGS

13

14              Tuesday, March 20, 2012

15

16

17                    Location:

18                      JAMS
          Two Embarcadero Center, Suite 1500
19             San Francisco, CA 94111

20

21

22

23

24

25   Reported By: Donna J. Blum, CSR No. 11133

                          2

BARKLEY
Court Reporters

```
 1    APPEARANCES:

 2
           HON. CHARLES A. LEGGE (RET.), Mediator & Arbitrator
 3         JAMS
           Two Embarcadero Center, Suite 1500
 4         San Francisco, CA 94111
           415-982-5267
 5         Email:  clegge@jamsadr.com

 6    FOR PLAINTIFFS:

 7         R. ALEXANDER SAVERI, ATTORNEY AT LAW
           GUIDO SAVERI, ATTORNEY AT LAW
 8         SAVERI & SAVERI, INC.
           706 Sansome Street
 9         San Francisco, CA 94111
           415-217-6810
10         Email:  guido@saveri.com
                   rick@saveri.com
11
      FOR DIRECT PURCHASER PLAINTIFFS:
12
           MICHAEL P. LEHMANN, PARTNER/ATTORNEY AT LAW
13         HAUSFELD, LLP
           44 Montgomery Street, Suite 3400
14         San Francisco, CA 94104
           415-633-1908
15         Email:  mlehmann@hausfeldllp.com

16         BRUCE L. SIMON, ATTORNEY AT LAW
           PEARSON, SIMON, WARSHAW, PENNY, LLP
17         44 Montgomery Street, Suite 2450
           San Francisco, CA 94104
18         415-433-9000
           Email:  bsimon@pswplaw.com
19
      FOR DEFENDANT SIMPSONS SDI:
20
           MICHAEL W. SCARBOROUGH, ATTORNEY AT LAW
21         JIM McGINNIS, ATTORNEY AT LAW
           SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
22         Four Embarcadero Center, 17th Floor
           San Francisco, CA 94111-4109
23         415-434-9100
           Email:  mscarborough@sheppardmullin.com
24

25
```

3

Reporter's Transcript of Proceedings

BARKLEY
Court Reporters

```
1    APPEARANCES (CONTINUED):

2    FOR DEFENDANT ELECTROGRAPH:

3         WILLIAM A. ISAACSON, ATTORNEY AT LAW
          BOIES, SCHILLER & FLEXNER, LLP
4         5301 Wisconsin Avenue N.W.
          Washington, D.C. 20015
5         202-237-2727
          Email:  wisaacson@bsfllp.com
6
     FOR DEFENDANTS PANASONIC:
7
          MOLLY M. DONOVAN, ATTORNEY AT LAW
8         JEFFREY L. KESSLER, ATTORNEY AT LAW
          DEWEY & LeBOEUF, LLP
9         1301 Avenue of the Americas
          New York, NY 10019-6092
10        212-259-7394
          Email:  mmdonovan@dl.com
11
     FOR DEFENDANTS SAMSUNG ELECTRONICS CORP., SAMSUNG
12   ELECTRONICS OF AMERICA:

13        IAN SIMMONS, ATTORNEY AT LAW
          DAVID K. ROBERTS, ATTORNEY AT LAW
14        O'MELVENY & MYERS, LLP
          1625 Eye Street, NW
15        Washington, D.C. 20006-4001
          202-383-5300
16        Email:  dkroberts@omm.com

17   FOR DEFENDANTS HITACHI:

18        KENT M. ROGER, ATTORNEY AT LAW
          MORGAN, LEWIS & BOCKIUS, LLP
19        One Market, Spear Street Tower
          San Francisco, CA 94105
20        415-442-1140
          Email:  kroger@morganlewis.com
21

22

23

24

25
```

4

**BARKLEY**
Court Reporters

1                           I N D E X

2                                                    PAGE

3    PROCEEDINGS                                        6

4

5

6

7                        E X H I B I T S

8                           (none)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

BARKLEY
Court Reporters

```
1          SAN FRANCISCO, CALIFORNIA; TUESDAY, MARCH 20, 2012

2                          9:54 A.M.

3                          ---oOo---

4                        PROCEEDINGS

5          HON. CHARLES LEGGE:  Okay, I guess the important

6   parties are here.  All right.  Welcome.

7          I won't call for appearances here this morning

8   because I think there are just a certain number of you

9   who will do the speaking.  So when you do speak, please

10  give your identification to the court reporter, and

11  that's all the appearances we'll note.

12         If at the end of the hearing you do want your

13  appearance to be noted on the record, you can give your

14  card to the court reporter.

15         I understand our two principal speakers are

16  located here in the middle.  If you want the podium, you

17  can slide the podium down and stand and talk if it's more

18  comfortable, or you can stay where you are in your seats.

19             (Phone interruption.)

20             (Discussion off the record.)

21         HON. CHARLES LEGGE:  All right.  Good morning.

22  We're here in the matter of Cathode Ray Tube Antitrust

23  litigation for the hearing on the defendants' joint

24  motion for summary judgment.

25         We're not calling for appearances here, but if
```

6

BARKLEY
Court Reporters

1  you're on the telephone and wish to have your appearance

2  noted, you can speak to the court reporter at a later

3  time.

4          Now, this is a motion, and I'm turning to the

5  proposed form of order by the defendants jointly for

6  summary judgment against the purported direct purchaser

7  plaintiffs who did not purchase CRTs.

8          This negligence has attracted a great deal of

9  paper, and I have read your briefs.  I've read some of

10  the cases.  I haven't read all of them yet.  No, I've

11  not.  But I think I'm sufficiently familiar with your

12  arguments and points to engage in a meaningful

13  discussion.

14          Mr. Kessler, I assume you're going to be

15  speaking on behalf of the defendants?

16          MR. KESSLER:  I will, your Honor.

17          HON. CHARLES LEGGE:  Okay, before you speak let

18  me raise a few points with your side of the table, and

19  that is, as I read what you're saying, what you're asking

20  for is an order that applies to all of the plaintiffs who

21  did not actually purchase a Cathode Ray Tube.  Not a

22  product obtaining Cathode Ray Tube but didn't purchase --

23  didn't purchase a Cathode Ray tube.  And I think what

24  you're looking for is what I would call a blanket order

25  applying to all members of the claimed class and not just

7

BARKLEY
Court Reporters

1   to the few who were named in the -- in the complaint

2   itself as being named plaintiffs.

3          And the effect I believe would really be to turn

4   this action, a direct action, to essentially an indirect

5   action except for the manufacturers who actually bought

6   CRTs and maybe a few other people who bought CRT, for

7   inventory or repair, or something like that, and that

8   we'd be taking TV sales and monitor sales out of the

9   case.  Really that's the question.  Would that have the

10  effect of taking TV sales and monitor sales totally out

11  of this case.

12         Another question is, are you asking for any

13  relief in the direct actions?  We had a voluminous brief

14  from the direction action plaintiffs, but I don't see

15  that your motion itself is directed at that.  The motion

16  had implications for it, yes, I'm sure it does, but I

17  just don't know whether I consider the separate positions

18  of the direct action plaintiffs in this particular

19  motion.

20         Now, another question, and I think from your

21  briefing you do accept the fact that Judge Illston's

22  decisions in the LCD case are contrary to what your

23  position is here.

24         And I gather from the briefing you're really not

25  attempting to distinguish but you're just saying that she

BARKLEY
Court Reporters

1    was wrong in what she did, but in doing that and

2    recommending that, I recommend to Judge Conti to do

3    something different.  You realize that you'll be creating

4    a split on the substantive issue of law here in this one

5    instance, which is rather significant.  So I think as you

6    interpret it, you're asking for really quite a lot in one

7    motion.

8           But looking at the motion, it seems to me your

9    essential point is simple.  And that is that the fixed

10   price product for purposes of this motion, I'm assuming

11   price fixing, I'm assuming things that we don't have to

12   repeat alleged all the time, the price fixed product in

13   this case is a CRT, that is a Cathode Ray Tube, and it's

14   not a product containing a CRT.  And any plaintiff who

15   didn't purchase a CRT, fixed price or not from anybody,

16   just simply has no standing, is not a plaintiff in the

17   case to complain about the price of CRTs.

18          Now, I think the point is well made and simply

19   made, and I think that's the essence of it.  The problems

20   are if that that's true, then what about Judge Illston's

21   decision do we just simply say it's incorrect and

22   recommend that Judge Conti take a position that is

23   opposed to hers and what do we do about sugar and what do

24   we do about line report.

25          One other thing I think bears on this and I

BARKLEY
Court Reporters

1    can't quite put it all together, is in this stipulation

2    and order last August concerning finished products,

3    operative paragraph number three, that the plaintiffs

4    withdrew their CRT finished products claims conspiracy

5    claims provided however that the issue of the possible

6    impact or effect of the alleged fixing of prices in CRTs

7    on the prices of finished products shall remain in the

8    case.  I'm a little puzzled by that language comparing

9    with this motion, and besides that, who would have the

10   right to complain about the price of a finished product

11   in this case.

12          Okay.  Those are thoughts, and that explains to

13   you or implies to you the extent of the preparation or

14   knowledge that I have now before me.  So go ahead with

15   your presentation.

16          MR. KESSLER:  Thank you, your Honor, and I will

17   address each of those points in the course of my

18   argument.  Let me start out though first about the

19   procedural context in which we face at this moment.

20          The motion we have filed is directed at the

21   eight individual plaintiffs where it is undisputed that

22   they purchased a product other than a CRT itself.  We are

23   seeking summary judgment solely against those eight

24   plaintiffs.  Your decision will obviously, on the legal

25   issue, set a precedent within the case, but we are not

BARKLEY
Court Reporters

1    moving at this time against the DAP complaint because the

2    time for doing that hasn't be even arisen yet.  But we

3    certainly would move against a DAP complaint on the same

4    ground, but it is not technically before your Honor on

5    this motion since the time to file such a motion --

6            HON. CHARLES LEGGE:  Okay, but with respect to

7    this case, you're not seeking a blanket order?

8            MR. KESSLER:  I am not, your Honor.

9            HON. CHARLES LEGGE:  Against the plaintiff class

10   as a whole?

11           MR. KESSLER:  No, your Honor.

12           HON. CHARLES LEGGE:  You're seeking an order

13   only as to the eight that are named in the complaint?

14           MR. KESSLER:  That's all I could do procedurally

15   because there's no class certified.  The only import of

16   your Honor's order would be to dismiss these eight

17   plaintiffs, and, of course, it would set a precedent, you

18   know, which obviously we would rely upon in the future

19   either against in a motion against the DAPs, or if there

20   was a motion to certify a class, we would obviously argue

21   the class should not include people who did not purchase

22   CITs because they would be indirect purchasers.  And as

23   your Honor noted, the consequence may be that the

24   indirect purchase of plaintiffs may choose to amend their

25   class definition to encompass people who would be

11

BARKLEY
Court Reporters

1    indirect.  We don't know.  That would be up to them, and

2    we'd have to see what transpired.

3           But the -- the order we're asking you to issue,

4    while it's very important, is actually very narrow.  So

5    that's what I would say to start out.

6           HON. CHARLES LEGGE:  Now, wait a minute.  By

7    doing that are you implying that in any later motion

8    you're going to have to have a factual basis as to

9    particular plaintiffs who did or did not purchase a CRT?

10          MR. KESSLER:  I think the way it would work out

11   is the following, if I may, your Honor.

12          HON. CHARLES LEGGE:  Yes.

13          MR. KESSLER:  If you were to grant a motion, if

14   on the DAP cases, for example, on the face of those

15   complaints I believe they -- many of them state that they

16   purchased only CRT televisions.  If, in fact, it wasn't

17   clear from the face of complaint, we'd probably have to

18   do the same interrogatories, you know, or discovery that

19   we did in this motion where it was confirmed as to

20   whether or not they purchased any CRTs themselves.

21          It's possible, for example, as your Honor said,

22   for repair purposes, even a retailer purchased, a certain

23   number of CRTs directly from a defendant in which case

24   for repair purposes they might be in.

25          So, yes, there could be factual issues, although

12

BARKLEY
Court Reporters

1   I think it would be very simple to resolve with an

2   interrogatory, and we would know which is in and which is

3   out.

4          With respect to the class, I think it would get

5   resolved in the motion for class certification, though we

6   would simply argue that the class should be limited to

7   those in a direct purchaser case who qualifies as direct

8   purchases, it would be purchases of CRTs.

9          So this would be cited as a precedent if we won

10  this in terms of how the class should be properly

11  defined.  So I don't think --

12         HON. CHARLES LEGGE:  Well, I'm a little confused

13  as to what the class now is in our direct case.  The

14  definition that's been in the complaint appears in

15  paragraph 85, all persons or entities who between certain

16  dates that purchased a CRT product in the United States

17  from any defendant, et cetera, et cetera.

18         I guess in view of the stipulation of August of

19  '11 that we have to substitute CRT or CRT product.

20         MR. KESSLER:  Certainly if our motion is

21  granted, I think you would give the class counsel an

22  opportunity to restate at some point what their class

23  they were seeking to still represent.  But you're right,

24  at the moment the complaint is based on the original

25  allegations of the complaint.

BARKLEY
Court Reporters

1        Also I have to correct something I said.  It's

2   nine of the 13 named direct plaintiffs who have conceded

3   that they did not purchase a CRT.  I said eight, and I

4   just made an error about that, for which I apologize.

5        So --

6        HON. CHARLES LEGGE:  Let's go back to where we

7   have to go.  For purposes of this motion and any order by

8   me on this motion, it concerns the nine named plaintiffs

9   who have, on the record, one way or the other, pleadings

10  or discovery --

11       MR. KESSLER:  Correct.

12       HON. CHARLES LEGGE:  -- established that they

13  did not purchase a CRT but only purchased a CRT product.

14       MR. KESSLER:  Right.  So you would be

15  granting --

16       HON. CHARLES LEGGE:  You have, lurking out

17  there, the entire class.  We have lurking out there the

18  direct action plaintiffs.  So whatever I or Judge Conti

19  ends up saying about this, Judge Conti obviously being

20  the final decider, we have to be concerned about the

21  precedent --

22       MR. KESSLER:  I agree with that, your Honor.

23       HON. CHARLES LEGGE:  I appreciate that.

24       MR. KESSLER:  What you literally would be doing

25  is granting the summary judgment against the claims of

14

BARKLEY
Court Reporters

1   the nine individuals, and that would be the import of the

2   order.

3            HON. CHARLES LEGGE:  I appreciate that.

4            MR. KESSLER:  So, as I said, this is important

5   but narrow.

6            Let me also explain why it is narrow for a

7   number of other reasons.  First of all, we're limiting it

8   again to the plaintiffs who there's no dispute did not

9   purchase the price fixed product.  The allegedly priced

10  fixed product, the CRT, so that's the only named

11  plaintiffs we are seeking to dismiss on this motion.

12           No. 2, and this does make this case different

13  from some of the other cases, even different in some ways

14  from Judge Illston's case, as I will talk in a little

15  while.  We have a stipulation here that there could be no

16  claim under any circumstances that there was a conspiracy

17  to fix the price with respect to the finished products.

18           HON. CHARLES LEGGE:  Yeah.

19           MR. KESSLER:  And I believe you could actually,

20  if your honor is more comfortable, limit your ruling in

21  the context of a case which has that particular

22  stipulation in other cases, and we'll get to this.  For

23  example, I'll come back to this in Linderboard.  It turns

24  out there were direct allegations that the prices of the

25  finished product were also subject to the price fixing

15

BARKLEY
Court Reporters

1    conspiracy.  So you had other elements in some of these

2    other cases that distinguished it from this particular

3    case which makes it narrow based on facts where we know

4    the only claim can be that the conspiracy related to the

5    CRTs as opposed to the television or the monitors.

6            The next thing that I believe makes this narrow

7    is that we believe your Honor can either take judicial

8    notice of the fact or accept it as undisputed, because I

9    believe it is undisputed, or follow it from your prior

10   opinions, which note the fact that a television and a

11   monitor is a different product, obviously, from a CRT.

12   It's going to be whatever the market is.  It's going to

13   be a different market.  I don't think there could be any

14   dispute about that.

15           Obviously people who buy televisions, especially

16   the plaintiffs here, are in a different market from

17   manufacturers who buy CRTs or even from a retailer who

18   buys it for the purposes of doing repairs.  It's a

19   different product in a different market that whatever it

20   is subject to a different array of market forces, and

21   that's going to become important.  Doesn't matter what

22   the forces are.  It just matters that they're not the

23   same.

24           And we know here that there's no allegation that

25   other purchases of CRTs are in any conspiracy.  So we

BARKLEY
Court Reporters

1    know we have people like HP and Dell or Apple or others

2    who purchased CRTs for monitors who were unrelated or not

3    in any conspiracy would be out there competing with

4    respect to the finished product.  We know that Sony

5    television, Sharp, Visio, others would be out there

6    competing in a different market with respect to the

7    televisions.

8              So, your Honor, could take notice of the fact

9    simply that the market forces are going to be different.

10             I also will note, your Honor, that the -- that

11   it's already been stated by the plaintiffs' counsel that

12   this would have to be an issue that would be proven in

13   the case for them to prevail.  And this isn't surprising,

14   because Illinois Brick and Hanover Shoe are really cases

15   under Section 4 of the clank (phonetic) net and have to

16   do with the need for any private plaintiff to show what

17   the impact is.  You can't escape that impact requirement.

18             And I'm reading now from the transcript of the

19   Rule 118 motion when your Honor was questioning counsel

20   for plaintiff and the Court noted what if a manufacturer

21   buys a higher priced tube but decides to absorb the

22   increased cost itself without increasing its product.

23   The answer of plaintiffs' counsel is then we'll find out

24   how much of that is in discovery and we'll see what that

25   impact is, but we don't know that now.

BARKLEY
Court Reporters

1          That's very important.  We don't know that now.

2          The Court:  That's impact, isn't it.

3          Plaintiffs' counsel:  It is, but it's not all

4    the impact.  It may be one percent of the impact.  Or it

5    may be ten percent of the impact.  Or it may be 50

6    percent of the impact.

7          The point of this, your Honor, is that that type

8    of proof, which would actually be required under Section

9    4 if this case were allowed to go forward, runs head on

10   into what Hanover Shoe said should not be done, what

11   Illinois Brick said should not be done, what UtiliCorp

12   said should not be done, and what the Ninth Circuit --

13   and this is very important, the Ninth Circuit in Delaware

14   Valley said should not be done.

15         That's why when your Honor said this may create

16   a conflict with Judge Illston, it may or may not because

17   of the stipulation issue.

18         But putting that aside, Judge Illston's decision

19   is in conflict, we believe, with Delaware Valley and has

20   Ninth Circuit controlling law.  And ultimately I think

21   what your Honor should be recommending to Judge Conti is

22   that Judge Conti needs to be guided by Ninth Circuit law

23   in Delaware Valley in terms of the bright line rules of

24   Illinois Brick and Hanover Shoe and UtiliCorp.

25         And the fact that you don't create case-by-case

18

BARKLEY
Court Reporters

1    exceptions based on specific facts of particular markets

2    as to whether or not the policies of Illinois Brick apply

3    or not.  That that itself, that case-by-case analysis

4    would add so much to the complexity of an antitrust

5    litigation that what the federal courts have done through

6    the Supreme Court and Ninth Circuit through Delaware

7    Valley say we understand this isn't ideal, and some

8    people who are injured may not be able to recover.  But

9    we believe this is the right result for federal antitrust

10   laws.

11          And I will note from the plaintiffs' standpoint

12   this may just make them indirect plaintiffs as opposed to

13   direct plaintiffs.  So it's not clear that, you know,

14   that they are out or in; it's a question of where do they

15   properly belong.  Is the indirect case going to be

16   bigger?  Is the direct case going to be smaller?  That's

17   really what you're facing here.

18          But let me read a particular passage of Illinois

19   Brick, because I think this goes right to our concern on

20   pass on.

21          What it says, and this is on 431 US 720, and

22   what it says is a wide range of factors influence a

23   company's pricing policies.  Normally the impact of a

24   single change in the relevant conditions cannot be

25   measured after the fact.  Indeed a businessman may be

19

BARKLEY
Court Reporters

1    unable to state whether had one fact been different, a

2    single supply less expensive, general economic conditions

3    more buoyant, or the labor market tighter, for example,

4    he would have chosen a different price.

5           Equally difficult to determine in the real

6    economic world rather than an economist hypothetical

7    model is what effect a change in a company's price will

8    have on its total sales.

9           Finally, costs per unit for different volume of

10   total sales are hard to estimate.  Even if it could be

11   shown that the buyer raised his price in response to in

12   the amount of the overcharge and that his margin of

13   profit and total sales had not thereafter declined, there

14   would remain the nearly insuperable difficulty of

15   demonstrating that the particular plaintiff would not

16   have or would not have raised his prices absent the

17   overcharge or maintained the higher price had the

18   overcharge been discontinued.

19          This goes on and on.

20          And what the Court is saying, we don't want the

21   federal courts doing that, even though it may have some

22   other impacts on other aspects of what we do under the

23   federal antitrust laws in terms of recovery.

24          We would submit there is no way that plaintiffs

25   here can go forward without having to go into precisely

BARKLEY
Court Reporters

1    that type of inquiry, and you see this in their

2    submission when they say they want to know what

3    percentage were related party sales, what were not

4    related party sales.  They want to explore the individual

5    decisions that may have affected the impact.  All these

6    other facts are not relevant to this motion.  They're

7    relevant to the -- precisely the type of pass on inquiry,

8    which Hanover Shoe --

9         And I'd urge your Honor to read Hanover Shoe in

10   addition to Illinois Brick, because Illinois Brick is

11   really focusing on Hanover Shoe.  And, in fact, what I

12   just read to you from Illinois Brick is mostly a quote

13   from Hanover Shoe.  In other words, they're taking -- the

14   idea is that it's the Hanover Shoe principles which led

15   to this concern about the pass on, even if it wouldn't

16   work out exactly the way we wanted it to.

17        Now, the Ninth Circuit in Delaware Valley, okay,

18   picks this up completely, and that's why I think this is

19   very important.

20        What the Ninth Circuit says, and this is after

21   UtiliCorp, the Supreme Court case we reaffirmed that we

22   don't want to go case by case in creating exceptions to

23   Illinois Brick.  The Ninth Circuit said it's a bright

24   line rule for Illinois Brick.  And what it does is the

25   Ninth Circuit follows what the Supreme Court did in

BARKLEY
Court Reporters

1   Utilicorp, and here is what the Ninth Circuit said.

2          In sum, even assuming that any economic

3   assumptions underlying the Illinois Brick rule might be

4   disproved in a specific case, we think it is an

5   unwarranted and counterproductive exercise to litigate a

6   series of exceptions having stated the rule in Hanover

7   Shoe and adhere to it in Illinois Brick.  We stand by

8   interpretation of Section 4.

9          Now, what that is, that's the Ninth Circuit

10  quoting UtiliCorp in the Supreme Court and then saying

11  that, therefore, we're not gonna look at different facts.

12         And now I'm looking at the Ninth Circuit

13  decision at 523 Fed Second 1116, and what they say is

14  that appellants fail to persuade this Court that there is

15  anything extraordinary about the facts of this case

16  warranting a deviation from the firmly established

17  Illinois Brick rule.

18         They then point out, they make an argument as to

19  why, you know, it would be easy to calculate the

20  overcharge or wouldn't be a problem here or why it would

21  serve the purposes.  And this is what the Ninth Circuit

22  says.  The Supreme Court has already rejected a similar

23  argument, see UtiliCorp, you know.

24         And so that's where we believe the Ninth Circuit

25  is.  That's where we believe the Supreme Court is.  And

BARKLEY
Court Reporters

1    that's why we believe that's where this Court and Judge

2    Conti should be.

3            Now, what do they say in response, because they

4    do make some arguments in response to this, and your

5    Honor raised some of this in his questioning too.  So let

6    me address that.

7            The first thing they say in response is, well,

8    we don't have to prove pass-on.  Okay.  We could just

9    assume pass-on.  And they cite Royal Printing for this

10   idea.

11           Basically you think about what they're arguing,

12   your Honor.  They're arguing is that somehow they can

13   avoid the entire requirements of Section 4 of the Clayton

14   Act and not show any pass-on alone.  What we would say

15   about that --

16           HON. CHARLES LEGGE:  By pass-on, you're talking

17   about literally passing on the higher price of the

18   price-fixed product that became a component in the

19   packaged product?

20           MR. KESSLER:  Right.

21           They're saying, just assume that they should

22   just be able to say we'll approve that CRT prices were

23   increased X percent and just assume that that increase

24   made its way into a television or a monitor regardless of

25   market conditions, regardless of what Sony did or Sanyo

23

BARKLEY
Court Reporters

1    did or Sharp did, regardless of what HP did or anyone

2    else, and regardless of the very clear stipulation.

3    That's why I come to the stipulation which says, and

4    we're not going to allege there was any conspiracy at all

5    among the defendants with regard to that finished product

6    price.

7              HON. CHARLES LEGGE:  But in this case it's been

8    reserved that the issue of the possible impact or effect

9    of the alleged fixing of prices of CRTs on the finished

10   products remains in the case?

11             MR. KESSLER:  Yes, it remains in the case, your

12   Honor, for now, consideration on this motion.

13             In other words, if we're right on this motion,

14   okay, then Illinois Brick precludes that evidence and

15   that proof.  Okay.  We're either right or we're wrong.

16             We obviously couldn't get them to stipulate that

17   we're right about Illinois Brick, that Illinois Brick was

18   not at issue in this stipulation.  If we're wrong, then,

19   yes, what they will have to do is not what they've

20   argued, is just presume that there will be an impact, and

21   that's -- that's what I'm getting at here.  They would

22   have to prove that impact.  They'd have to prove it for

23   each individual plaintiff.  They would have to deal with

24   that issue as a matter of class certification with

25   respect to what that impact would be, very much like an

24

BARKLEY
Court Reporters

1    indirect case where those issues come up in indirect

2    cases all the time where your Honor knows you have to

3    prove the pass-on and whether or not it could be done on

4    a class basis or not on a class basis, how much, and, you

5    know, how would you do that.

6            Those issues will be in this case, as the stip

7    says, unless we're right.  As a matter of law, your Honor

8    can't do it.

9            So I think the significance of that sentence in

10   the stip is it means they're gonna have to prove that

11   here, unless as a matter of law the courts have taken

12   that inquiry away from the federal courts, that's what I

13   believe is referenced and is the significance of the stip

14   in that issue.

15           I do think it's significant because it means

16   that it was never contemplated.  They just could argue

17   that the impact is presumed or that impact automatically

18   follows, which is the only way I see they could get by

19   Illinois Brick.

20           Now, with respect to the -- this is important,

21   is the Ninth Circuit cases regarding umbrella damages.

22   And the reason this is important is not because they're

23   seeking umbrella damages.  We know they're not seeking

24   umbrella damages.  The reason they're important is those

25   cases, as do all the umbrella cases, go through the fact

25

BARKLEY
Court Reporters

1    that the reason the Court won't allow umbrella damages,

2    which, your Honor, would be damages suffered from

3    companies who were not conspirators but the idea being

4    because someone else is conspiring, they add an umbrella

5    so they could add a higher price.

6           The reason that's not allowed, the Courts say,

7    is because Illinois Brick policy says don't allow that

8    type of proof of -- in effect, it's another variation of

9    pass-on in a different way.  Saying, well, the

10   non-conspirators would follow the conspiracy, and no one

11   knows what they would do in those market forces.  So they

12   specifically cite Illinois Brick and Hanover Shoe, and

13   they say we don't allow that type of proof because that's

14   what would have to happen here for televisions.  It's

15   what would have to happen here for monitors.

16          Now, they also make the argument, your Honor,

17   about the fact that there are a lot of sales, they claim,

18   to either related parties or affiliated parties or the

19   same party.  I think it's mostly related parties that

20   somehow that changes the analysis they argue, because for

21   those related party sales, they say, well, the related

22   party wouldn't be expected to sue because they are

23   related and that the turns would be lost with respect to

24   those sales.  So I think we have to address that

25   argument.

BARKLEY
Court Reporters

1          Does that argument offset the general

2     prohibition against proving pass-on getting into these

3     economic complexities what that would do, and our answer

4     is it does not for several different reasons.

5          First of all, the Supreme Court has made it

6     clear that the main focus here is the economic

7     complexity, and the pass-on issues even at the expense --

8     and they say this in UtiliCorp, if sometimes people who

9     were injured can't recover under the federal antitrust

10    laws, they say that directly and completely in UtiliCorp;

11    the Ninth Circuit says it in Delaware Valley.

12         No. 2, obviously there are direct purchasers who

13    will be able to pursue and provide a direct purchase of

14    function.  Whether it's HP or Dell or Sony or Sharp or

15    Visio, there are plenty of people who can sue to provide

16    a deterrence function as private plaintiffs.

17         And, third, the consequence here may be that

18    they move into indirect plaintiff status.  It doesn't

19    mean that the claims necessarily go away.

20         So it's not at all clear that there is in that

21    deterrence factor here as well.  So looking at that

22    situation, we don't see how any concern about not having

23    deterrence because of these particular plaintiffs may not

24    have a direct claim anymore says let them prove pass-on,

25    let's go in those complexities, than it does in other

BARKLEY
Court Reporters

1   cases.

2           I also will note the following.  This related

3   party issue is something of a -- of an illusion, and I'll

4   explain it the following way.

5           If the parties are so related that they are like

6   a division, you know, of the company and in effect

7   they're totally under control, then there's really no

8   economic transaction, as we pointed out.  In other words,

9   there was no CRT price to fix.  I mean, think of it, for

10  example, if it was just part of the company; if it wasn't

11  related.  Well, then, it's just there is no price

12  internally necessarily in a division.  It would just be,

13  well, that's the cost of manufacturing.  There's no

14  fixing of a price from any Sherman Act significant.  So

15  there's nothing to deter.

16          If their argument is, well, wait a minute, this

17  was a related party, you know, who is, you know, who was

18  independent joint venture, something else, well, then,

19  it's no different than anyone else.  In other words,

20  there's no conspiracy about the finish product prices.

21  That related party would be expected to charge a TV price

22  or a monitor price that would reflect the market forces

23  it faced from its competitors with there being no

24  conspiracy.

25          You would have to have exactly the very

28

BARKLEY
Court Reporters

1    difficult analysis that Hanover Shoe and Illinois Brick

2    says you didn't do.  Try to figure out in their head,

3    well, how much of the price was determined by quote the

4    price fix.

5           So, to me, it's one or the other.  Either

6    they're so controlled that there's no economic

7    significance to the transaction from an antitrust

8    standpoint, in which case there's nothing to deter, or

9    they're sufficiently independent that, of course, without

10   any agreement to fixed prices on the finished products,

11   you can't just assume impact, which is what they're

12   trying to do.

13          They cite Royal Printing, and what was

14   significant in Royal Printing is that it was the same

15   product.  So basically what they ended up saying there is

16   that, well, if it's this exact same product, says -- and

17   Royal Printing was controlled by the defendants, in

18   effect one of the conspirators in that case controlled

19   them.  So if it's the same product, if the price has

20   already been increased, we'll assume it's the same price.

21   But that's completely different when you have different

22   products in another market with different products.  And

23   this is way beyond just saying, well, it's the same

24   product.  It's a controlled company.  So assume it's --

25   assume it's the pass-on.

BARKLEY
Court Reporters

1          That's the fallacy for trying to rely on Royal

2     Printing.  And Royal Printing does not discuss that at

3     all because it was the same product.  It wasn't there

4     with respect to that.

5          Same thing in Freeman.  They cite the Freeman

6     case.  The Freeman case allowed you to go forward with

7     respect to people who bought from a real estate

8     association real estate services.  It was the same

9     services, just a group of competitors who formed an

10    entity who then sold to services.  And they conspired to

11    fix whatever the prices of the services of the entity and

12    the exact same service was passed on.  There wasn't any

13    issue of transforming a different product with different

14    market forces.

15         So I don't believe either Freeman or Royal

16    Printing is of any help to them.

17         HON. CHARLES LEGGE:  Well, in Royal Printing

18    don't you have a fact there that the plaintiffs actually

19    purchased some of the price-fixed product?

20         MR. KESSLER:  Well, they had that as well, yes.

21    They actually purchased some of that as well.  But I'm

22    saying even to the extent there's dictor beyond that,

23    yes, your Honor, they did have that as well, which is

24    another distinction.

25         But I think to the extent Royal Printing

30

BARKLEY
Court Reporters

1    indicates even when they purchased a non-price fixed

2    product says it's the same product.  It's always the same

3    product.  In other words, that's the key point, your

4    Honor.  It wasn't a product in a different market.  It

5    wasn't a product with different competitors.  It wasn't a

6    product with different forces, which is what creates the

7    problem.

8            What we believe of the on-point cases here are

9    the cases we cited:  Stanislaus, the tin can case versus

10   -- the tin cans versus the tin case, which talks about

11   the fact that had the -- there were a couple of issues in

12   that case, but it spoke about the fact that had they

13   purchased from a co-conspirator the cans, it would have

14   been in different markets with different market forces.

15           The compressor case and the refrigerators where

16   they said you can't -- and in that case specifically

17   refused to follow Linderboard and Sugar, in specific.

18   I'm going to talk about those cases.  And they said

19   that's not the law of the Sixth Circuit, for example.

20   That's the case said in compressors, which is where that

21   case was.  Same as is not the law of the Ninth Circuit in

22   our view with respect to Linderboard and Sugar.

23           And they said you can't sue just for buying a

24   compressor and just buying a refrigerator as opposed to

25   buying a compressor.  The same right here in this

31

BARKLEY
Court Reporters

1    district when your Honor says, well, there's a conflict

2    in the district.  Well, right here in the ODD case, okay,

3    we believe the decision in ODD indicated you couldn't

4    just buy an ODD device as opposed to an ODD on exactly

5    this issue.  And it's dismissed.

6         Now there's no motions to dismiss pending an ODD

7    again.  There's another round of briefing, and there will

8    be another round of decisions.  But in the existing

9    decision in ODD the Court did not have a problem with

10   saying you've got to buy the ODD not buy the ODD devices

11   even though in that case there was an allegation that

12   there was an ODD conspiracy, just like there was

13   originally in this case.  But what the Court did was

14   dismissed it under Trombley (phonetic) for not being

15   sufficiently well pled with respect to that.

16   That was the import of that series of ODD rulings.

17        So we think the cases that have looked at this

18   other than Judge Illston here have, in fact, you know,

19   not felt that they suggested, nor this transformation.

20        Now, one of the things the plaintiff may say,

21   well, CRT is a big part of the television, and they may

22   argue that we think it would have had an impact here.

23   Well, maybe they're right; maybe they're wrong.  But

24   that's what UtiliCorp and Delaware Valley say you don't

25   do.  In other words, you don't do a case-by-case factual

32

BARKLEY
Court Reporters

1   analysis to say, well, in this case was there pass-on or

2   not pass-on.  It was that's not the issue before your

3   Honor.  Maybe they could prove pass-on.  Maybe they

4   couldn't prove pass-on.  Okay, that's not the point.

5         The point is you're not supposed to have a trial

6   on the issue of the pass-ons.  So the fact that -- and

7   this shows why you can't presume it just presume it.

8         Look for example at the refrigerator case.  So

9   in the refrigerator compressor case, the compressors are

10   a very small part of the refrigerator.  It's a small

11   part.  It -- it could be a $2000 refrigerator, $30

12   compressor.  Very, very small part.  And the point of

13   that is you don't do a case-by-case analysis.  So you

14   couldn't have a rule that said as they argue, well, if

15   you bought from a related party, just assume the impact

16   went down.  How would you ever do that in a refrigerator.

17   You'd assume if a compressor went up two dollars, it

18   affected a $2000 refrigerator?  You would never make that

19   assumption.  They would have to prove it.

20         Now, they would say it's easier to prove it over

21   here for televisions.  That's not the point.  The point

22   here is that we don't go through.  That's what Illinois

23   Brick, UtiliCorp, Delaware Valley say.  You don't go by

24   case by case trying to prove in this case I can't show

25   the pass-on, in this case I can't show the pass-on, in

33

BARKLEY
Court Reporters

1    this case it's easy, in this case it's hard.

2          What the Ninth Circuit said is bright line rule.

3    Now, that brings me to Sugar, Linerboard, and Judge

4    Illston's decision.

5          So why do we say your Honor should not follow

6    Judge Illston.  Judge Illston, in all due respect for

7    Judge Illston, did not discuss any of these issues.  You

8    should follow Judge Illston's decision if it's

9    persuasive.  It's not binding obviously.  It's a

10   sister-court decision, but it's not binding on Judge

11   Conti any more than the decision in ODD is binding on

12   Judge Conti, which is also in the northern district.

13         What is binding on Judge Conti is Delaware

14   Valley or UtiliCorp or Illinois Brick or Hanover Shoe.

15   That clearly is binding on Judge Conti with respect to

16   that.

17         So with respect to Judge Illston's decision,

18   it's really a question, is it persuasive.  When you look

19   at Judge Illston's decision, with all due respect,

20   there's no analysis of these issues.  She doesn't

21   consider at any length this issue of different markets,

22   different competitors, transformed products.  How do you

23   address those issues.  She just doesn't consider it.

24         No. 2, she cites, I believe, Linderboard and

25   Sugar, but she doesn't explain why she thinks that

34

BARKLEY
Court Reporters

 1    overcomes Delaware Valley.  She doesn't discuss Delaware

 2    Valley.  She doesn't discuss the bright line rule.

 3    There's just no persuasive analysis, I believe, to

 4    convince this Court that it makes sense for the Ninth

 5    Circuit to adopt that type of a ruling.

 6         The plaintiffs have also argued that Judge Conti

 7    somehow adopted this in his opinion accepting your

 8    recommendation decision.  Your Honor, I believe you know

 9    that at the time of that decision, none of these issues

10    were squarely presented to Judge Conti, because he did

11    that in the context of your Honor's decision, which

12    pointed out that they were alleging a conspiracy for

13    finished the products at the time.

14         He does cite, you know, in one short paragraph

15    he does cite, I believe, either Linerboard or Sugar,

16    maybe both, I think it was Linerboard.  But I also will

17    note he doesn't even discuss Illinois Brick in that

18    paragraph, or Hanover Shoe.

19         So I don't think Judge Conti has in any way

20    thought over the issues in this context, because when

21    your Honor ruled, they were not before your Honor in that

22    context, and your Honor didn't give them any

23    recommendations with respect to that context.  So I don't

24    think that is in any way --

25         I think this is an open issue in this case

                              35

BARKLEY
Court Reporters

1    certainly regarding that.

2         So that gets us to Sugar and Linerboard.  What I

3    would say is the following:  Sugar, okay, specifically

4    acknowledges that it was saying, well, let's -- let the

5    plaintiffs prove how much impact there was.  And they say

6    it could be difficult in some cases, could be easier in

7    other cases.  That's the Sugar analysis.

8         Frankly, there's no way to square that with

9    Utah.  Utah came later as a Supreme Court case.  I don't

10   think there's any way to square with Illinois Brick and

11   Hanover Shoe, but there's certainly no way to square that

12   with Utah regarding that or Delaware Valley.

13        That leaves Linerboard, which was after Utah.

14   And what I would say about Linerboard is it can't be

15   overlooked the fact that Linerboard had allegations of a

16   conspiracy regarding the finished products as well.  It

17   was in the record that went up to the court of appeals.

18   Okay.  There's no -- there could be no dispute about it.

19   That's what's discussed in the district court decision

20   that was being appealed, and that puts it in a different

21   context.  So, again, they didn't have to face the very

22   unique -- uniquely difficult issue that your Honor faces

23   where you have a stipulation that precludes any

24   conspiracy about that, where you have a different product

25   where it's there.  And we would respectfully suggest that

36

BARKLEY
Court Reporters

1    the Ninth Circuit after Delaware Valley would not follow

2    Linerboard to the extent it was meant to apply where

3    there's not an allegation of conspiracy if it's meant to

4    apply to that, and it certainly wouldn't follow Sugar

5    which is directly opposed.

6            Finally, your Honor, I just will conclude with

7    two things.  One, plaintiffs make a 56(b) argument.  I'm

8    not going to spend much time on that except to note all

9    of their facts they want to discover have nothing to do

10   with this issue that I'm arguing.  What it has to do with

11   some of the type of facts that they would need to prove

12   pass-on which we are arguing are precluded by the Supreme

13   Court and Ninth Circuit from considering.  There is no

14   dispute about the only facts that are relevant here, and,

15   therefore, your Honor, they made no 56(b) showing, and

16   the --

17           HON. CHARLES LEGGE:  And the fact you consider

18   important is that they did not purchase a CRT from

19   anybody?

20           MR. KESSLER:  That's the only -- the only fact.

21           HON. CHARLES LEGGE:  You think that's the only

22   fact you need?

23           MR. KESSLER:  Oh, and one more other thing that

24   I don't think is in dispute that a CRT is not a

25   television.  They're in different markets.  I don't think

                                 37

BARKLEY
Court Reporters

1    that would be disputed about that --

2            HON. CHARLES LEGGE:  Well, in this case I don't

3    think I need to make a factual inquiry at all of that

4    issue.

5            MR. KESSLER:  I believe that's correct, your

6    Honor.

7            And that leaves me finally, your Honor, I would

8    just close with the following quote from UtiliCorp, and

9    this is on page 497 US.  He -- I guess I can't do it that

10   way.  Page 216, your Honor, what it says in the

11   following, the proceeding conclusions bring us to a

12   broader point.

13           HON. CHARLES LEGGE:  Hang on a minute.  Let me

14   follow you.

15           MR. KESSLER:  It's 216 of UtiliCorp under D,

16   there's a heading D.

17           HON. CHARLES LEGGE:  Yeah.  Here we are Hanover

18   Shoe and --

19           MR. KESSLER:  It says the -- the rationales

20   underlying Hanover Shoe and Illinois Brick will not apply

21   with equal force in automatic cases.

22           That's basically what plaintiffs are arguing

23   here.  It doesn't apply here.  We, nonetheless, believe

24   that ample justification exists for our stated decision

25   not to carve out exceptions to the direct purchaser rule

                              38

BARKLEY
Court Reporters

1    for particular types of markets, the possibility of

2    allowing an exception even in rather meritorious

3    circumstances would undermine the rule.  And then the

4    last paragraph of D in sum even assuming that any --

5            HON. CHARLES LEGGE:  Wait a minute.

6            MR. KESSLER:  This is after the quote, your

7    Honor, just before point four.

8            HON. CHARLES LEGGE:  Okay.

9            MR. KESSLER:  In sum, even assuming that any

10   economic assumptions underlying the Illinois Brick rule

11   might be disproved in a specific case, which is basically

12   what they're arguing here, we think it is unwarranted and

13   counter productive exercise to litigate a series of

14   exceptions.

15           Your Honor, I would suggest that is the guiding

16   principle for this motion, and we respectfully urge you

17   to grant this which would have the effect of changing

18   eventually, as your Honor noted, the character of this

19   case so that it could go forward now knowing who are the

20   directs are, who might be the indirects, where people

21   fit, how classes should be looked at or not, which is one

22   of the reasons we believe it's so important to dissolve

23   this issue now because the worse issue from the

24   standpoint of case administration would be to proceed way

25   down the road in this case only to find out that the

39

BARKLEY
Court Reporters

1    classes, both the direct and indirect classes, you know,

2    have to be very different than the way in which the

3    litigation is preceding based on the allegations in the

4    complaint.

5              Thank you, your Honor.

6              HON. CHARLES LEGGE:  So you do recognize that if

7    we're -- if I were to adopt your position and if Judge

8    Conti were to adopt your position, that we really would

9    be shifting a lot of the directs to the indirect

10   category.

11             MR. KESSLER:  If they chose they would have to

12   redefine that class.  But, yes, they would have the

13   option of redefining that class to include all those.  I

14   think that's correct.

15             HON. CHARLES LEGGE:  And in the present direct

16   case, damages, causation based upon TV sales, prices, or

17   monitor sales is out of the case.

18             MR. KESSLER:  As a matter of law, the inquiry

19   would be precluded, is the way I would say it.

20             HON. CHARLES LEGGE:  All right.  I understand.

21             MR. KESSLER:  Okay.

22             HON. CHARLES LEGGE:  Okay.  Let's take a ten

23   minute recess.

24             (Break taken.)

25             HON. CHARLES LEGGE:  All right.  Let's go back

BARKLEY
Court Reporters

1    on the record and hear next from plaintiffs' counsel.

2             You're going to be arguing.

3             MR. LEHMANN:  Yes, your Honor.

4             Michael Lehmann on behalf of Housfeld, LLP.

5             We've divided up the matter in the following

6    manner.  I just want to apprise your Honor.

7             HON. CHARLES LEGGE:  Sure.

8             MR. LEHMANN:  I represent the direct purchaser

9    class, and I will be arguing the legal points.

10            Mr. William Isaacson of Boies, Schiller will be

11   arguing be arguing the points with respect to direct

12   purchasing plaintiffs.

13            And Mr. Rick Saveri will be arguing his points

14   raised in the Rule 56(d) declaration.

15            HON. CHARLES LEGGE:  All right.  Now, to start

16   out do you contest that these eight or nine plaintiffs

17   did not purchase a CRT.

18            MR. LEHMANN:  Your Honor, I am unaware of any

19   facts that would indicate that they purchased CRTs.

20            HON. CHARLES LEGGE:  Okay.

21            MR. LEHMANN:  As opposed to finished products.

22            HON. CHARLES LEGGE:  So really then your

23   position is that even though with what they purchased was

24   not a CRT because the product of which the CRT is a

25   component that under the various cases you're citing that

                              41

BARKLEY
Court Reporters

1   is an understanding.

2           MR. LEHMANN:  Our position is that where you're

3   in a situation where defendants manufacture a price-fixed

4   component and incorporate that component in a finished

5   product that they make and sell.

6           Plaintiff who only bought the finished product

7   from either the defendant itself or from a subsidiary or

8   division of the defendant has standing to sue for damages

9   under the Clayton Act for the conspiracy to fix the

10  component.

11          HON. CHARLES LEGGE:  Okay.  Now I'm not sure

12  whether you qualified your response.  What if it's

13  purchased through a third channel, a third source?

14  Suppose the manufacturing defendant puts the price-fixed

15  product in his own TVs, TVs he's selling and sells to a

16  wholesaler.

17          MR. LEHMANN:  Your Honor, if it's a situation

18  where the manufacturer sells to totally independent third

19  party, like a wholesaler, and that wholesaler in turn

20  sells to a member of an ultimate consumer or a retailer,

21  we would not contend that those purchases are within the

22  direct purchaser class.

23          HON. CHARLES LEGGE:  All right.  So your -- your

24  group is a purchaser from a defendant?

25          MR. LEHMANN:  Right.

42

BARKLEY
Court Reporters

```
1              HON. CHARLES LEGGE:  Or some subdivision.

2              MR. LEHMANN:  Correct.

3              HON. CHARLES LEGGE:  Or something of other of

4    the defendant.

5              Okay.  Go ahead.  Thank you.

6              MR. LEHMANN:  So, your Honor, given that

7    conceptual framework, I mean, the question I ask myself

8    is why are we here arguing this motion today.

9              It's the direct purchase plaintiff's belief that

10   this issue has already been raised and decided by Judge

11   Conti.  And let me explain why the principals of

12   Linerboard was argued to your Honor in opposing the

13   various motions to dismiss back in August of 2009.

14             They were also argued to Judge Conti in the

15   appeal from your Honor's report and recommendation in a

16   belief that the direct purchasers filed in February of

17   2010.  In that brief they cited Linerboard.  They also

18   quoted Sugar.

19             Now, your Honor, as defense counsel correctly

20   noted, did not discuss Linerboard in your recommended

21   decision.  But Judge Conti did in his March 2010 opinion.

22   And I've highlighted for your Honor's benefit the portion

23   of the opinion that we rely on.

24             HON. CHARLES LEGGE:  I've got it in its

25   typewritten form here.
```

43

BARKLEY
Court Reporters

1          MR. LEHMANN:  What Judge Conti -- this is his

2     opinion affirming your decision denying the various

3     motions to dismiss.  And what he said, and I'm quoting,

4     furthermore courts have found antitrust standing where

5     plaintiffs purchased downstream goods from manufacturers

6     who made an allegedly fix the price of a component of

7     those goods, and then he proceeded to site and summarize

8     the Linerboard opinion.

9          In your Honor's recommended decision on Rule 11,

10    you specifically noted that the complaint could be read

11    to allege that a conspiracy as to CRTs had an impact or

12    effect on finished products prices and that discovery as

13    to that impact or effect was appropriate.

14         And I would refer your Honor to page 14 of your

15    opinion, wooing and recommendation with respect to Rule

16    11.  Again, I've highlighted --

17         HON. CHARLES LEGGE:  Wait a minute.  I've got

18    mine here.  It's the one June of '11.  Right?

19         MR. LEHMANN:  Is your recommended decision on

20    docket No. 947.

21         HON. CHARLES LEGGE:  Yes.  What are you citing

22    then please?

23         MR. LEHMANN:  I'm citing page 14 where your

24    Honor indicates that your Rule 11 determination would not

25    remove finished products from the case in their entirety

                              44

BARKLEY
Court Reporters

1    but would -- there could still be limited discovery

2    allowed with respect to the issue of how the conspiracy

3    as to CRTs affected the prices of finished products.

4          As we noted in our brief in the May 2011 Rule 11

5    hearing, defense counsel said -- and we quoted this in

6    our brief, it's in the transcript of the May 26, 2011,

7    hearing at 109 to 110.

8          In LCD they argued impact, okay, and they argue

9    that under the Sugar Linerboard cases they have standing

10   to sue for that.  Okay.  Counsel goes on.  Okay.  So that

11   should be doing asserting what they asserted in LCD.

12         Well, that's exactly what we did in the

13   stipulation that we eventually entered into.

14         The stipulation resolving the Rule 11 issues

15   specifically stated, quote, the issue of the possible

16   impact of effect or affect of the alleged fixing of

17   prices of CRTs on the prices of finished product shall

18   remain in the case.  Clearly, if we thought by entering

19   into that stipulation the issues of finished products had

20   been eliminated from the case, why would we be

21   stipulating to allow for further discovery with respect

22   to such finished products.

23         Now, as I said defense counsel cited the LCD

24   case in the argument on the Rule 11 hearing.  In LCDs

25   Judge Susan Illston, whose opinions in this case your

45

BARKLEY
Court Reporters

1    Honor has followed before, twice adopted the principles

2    of Sugar and Linerboard.  She did so the first time in

3    denying a motion to dismiss for lack of standing with

4    respect to monitors and television containing LCD panels.

5             HON. CHARLES LEGGE:  I've got four decisions put

6    together here.

7             MR. LEHMANN:  The one I'm referring to, your

8    Honor, is 2008.  It's 586 fed sub second 1109 at pages

9    1118 and 1119.

10            HON. CHARLES LEGGE:  Yes.

11            MR. LEHMANN:  And then in a second decision on

12   class certification she again endorsed the principles of

13   Sugar and Linerboard and certified --

14            HON. CHARLES LEGGE:  That's the one.

15            MR. LEHMANN:  That opinion is 267.

16            HON. CHARLES LEGGE:  FRD.

17            MR. LEHMANN:  FRD 291 at pages 206 and 07.  He

18   certified direct purchaser plaintiff classes of purchases

19   of LCD panels and of purchasers of monitors, television

20   or mobile computers containing LCD panels.  In the recent

21   LCD criminal trial against AU Electronics, Judge Illston

22   instructed the jury that the elements of defense --

23            HON. CHARLES LEGGE:  I don't have it.

24            MR. LEHMANN:  You don't have it because it

25   occurred just very recently.

BARKLEY
Court Reporters

1          That the elements of the offense included fixing

2     the price of TTFT LCD panels that were incorporated into

3     finished products such as notebooks computers, desk top

4     computers, and televisions.

5          So we find ourselves in the situation where we

6     were told by the defendants, hey, why aren't you doing

7     what you did in LCDs.  We proceeded by the stipulation to

8     do exactly that, and now we're told by the defendants,

9     hey, LCDs is not the law.  Other judges had disagreed.

10         They site the opinion of Judge Richard Seaboard

11    (phonetic) in the optical disk drive litigation.  Judge

12    Seaborg there was concerned about the situation where he

13    perceived to be a conspiracy claim with respect to ODD

14    devices, finished products containing ODDs that were sold

15    by Dell and HP.  Wholesalers who were outside the

16    conspiracy.

17         But here's what he said with respect to Judge

18    Illston's opinion in LCDs.  Quote, plaintiffs in this

19    case do not have a standing problem with respect to any

20    ODD devices they may have purchased directly from

21    defendants.

22         That's us.  We're only arguing for devices,

23    finished product purchased directly from the defendants.

24    Not from HP.  Not from Dell.  Not from any third party

25    that's unaffiliated with the defendants.

47

BARKLEY
Court Reporters

1            So what have we got here.  Your Honor.  In

2    short, the article three judge presiding over this case

3    has stated unequivocally that Linerboard is applicable

4    here.

5            Your Honor viewed the issue of impact and effect

6    on finished products and said it wasn't affected by a

7    Rule 11 recommendation and that discovery could proceed

8    with respect to that impact.

9            The stipulation among the parties was -- simply

10   preserves the issue, and counsel for the defense said

11   that the DPPs should be following what was done in LCDs,

12   which was precisely what we did.

13           That's the overview.  Let's step back and talk a

14   little bit about some of their cases.

15           Illinois Brick.  It's important to consider the

16   fact situation in Illinois Brick.  In Illinois Brick you

17   had allegations of a conspiracy by manufacturers of

18   concrete block to fix the prices of such block.  Those

19   companies sold to independent third-party masonry

20   contractors who then resold them to independent

21   third-party general contractors who prepared bids for

22   construction projects that they then submitted to

23   plaintiffs like the State of Illinois.

24           So the case involved one product, a four-step

25   distribution change, where the two middle steps of the

BARKLEY
Court Reporters

1    chain were neither owned or controlled by any defendant

2    and were not accused of conspiring with any defendant.

3         The Court held that Illinois, the one who got

4    the bid, couldn't sue for damages under the Clayton Act.

5    Its reasoning was actually based on two factors.  The

6    first was concern about multiple liability by different

7    groups of purchasers.  And I should note in passing this

8    concern has been somewhat modified by the fact that the

9    US Supreme Court subsequently ruled that the states could

10   enact Illinois Brick repeating loss that afforded a

11   damage action to indirect purchasers to buy from our

12   cartel.  So you can have a situation now where both the

13   direct purchasers and the indirect purchasers can sue for

14   damages and there is no defense that the direct

15   purchasers passed on the overcharge down the distribution

16   chain.

17        The second concern as defendants note is that

18   there might be some evidentiary complexities caused by

19   offensive use of pass-on by a plaintiff several steps

20   removed in the chain of distribution.

21        If you look at the cases that have been decided

22   after Illinois Brick, particularly the cases that we

23   sight -- Royal Printing, Sugar, Linderboard -- those

24   cases are not really focused so much on exceptions to

25   Illinois Brick as they are focused on identifying which

BARKLEY
Court Reporters

1    plaintiff, outside the conspiracy, bought the price-fixed

2    product in the first instance and suffered injury and,

3    therefore, should obtain recovery.  Let me explain this a

4    little further.

5         Let me first take the example of Royal Printing.

6    And, again, Mr. Kessler is entirely correct, that case

7    involved a single product; that wasn't a case of a

8    component product and the finished product.  But the

9    analysis of deterrents that the Ninth Circuit engaged in

10   in Royal Printing is fairly significant and I think ties

11   in with the analysis you see in Sugar and in Linerboard.

12        There you had a situation where the plaintiff

13   bought paper from a division of one defendant and the

14   subsidiary of other defendant.  So you had this question,

15   well, you had this internal transfer price between the

16   manufacturer and either the subsidiary or the division,

17   how do you know how much of the over charge was passed

18   on.

19        The Ninth Circuit in Royal Printing acknowledged

20   that that was a potential issue, but what it said was

21   this, and I'm quoting at 621 Fed 2nd at 327.  The only

22   alternatives are to allow royal printing to sue the

23   appellees for the entire amount of the overcharge to the

24   wholesalers or not to allow Royal Printing to sue the

25   appellees at all.

50

BARKLEY
Court Reporters

1          Because, as we have already shown, as a

2    practical matter the direct purchasers here will never

3    sue, in this context they were talking about the

4    subdivision and the subsidiary, borrowing Royal Printing

5    suit would close off every avenue for private enforcement

6    in the antitrust laws.  This would be intolerable.

7          The Ninth Circuit went on to say that Royal

8    Printing could recover the full overcharge on its

9    purchase of the price-fixed products from the defendant.

10   On the same page of the opinion it said, quote, Hanover

11   Shoe teaches that in such situations there's nothing

12   wrong with the plaintiff winning a windfall gain so long

13   as the antitrust laws are vindicated and the defendant

14   does not suffer multiple liability.

15         And I note this analysis of Royal Printing has

16   been followed the Ninth Circuit as recently as 2008 in

17   Delaware Valley.

18         Now, Judge Illston in LCDs said, this deterrence

19   analysis in Royal Printing is really not all that

20   different from the deterrence analysis that the third

21   circuit undertook in Sugar and Linderboard.  She said

22   that in her opinion in November 7, 2011, opinion in the

23   TFT LCD cases 2011 west law 5357906.

24         In both Sugar and Linderboard, the conspiracy

25   focused on a complete product.  In each case the named

BARKLEY
Court Reporters

1    plaintiff bought a finished product, candy and sugar,

2    corrugated sheets in containers in Linerboard, either

3    directly or from a defendant or through a subsidiary.  In

4    each case the claim was that the conspiracy as to the

5    component was said to have the intended affect of raising

6    the price of finished products.

7           Now, the defendants in their brief, and it's

8    been repeated here today, said that, well, Linerboard is

9    distinguishable because there the conspiracy covered both

10   the component and the finished product.  And they cite

11   some language from the District Courts' 2001 opinion in

12   Linerboard.

13          We went back and looked at that language and

14   they had a little ellipsis in the middle of their quote,

15   and I'm going to tell you what was missing.  This is from

16   In re Linerboard antitrust litigation, 203 FRD 197 203.

17          The Court said that the allegations of the case

18   were grounded on allegations -- quote, grounded on

19   allegations that defendants conspired to restrict the

20   output of Linderboard -- here comes the missing part --

21   in order to support increases in the price of Linerboard.

22   And then we go back to the text, with the objective of

23   increasing the price of corrugated sheets and corrugated

24   boxes.

25          We contend the same thing.  We contend there was

BARKLEY
Court Reporters

1    a conspiracy to fix the prices of CRTs, and one of the

2    objectives there was that it had the effect of increasing

3    the prices of finished products by the amount of the

4    embedded overcharge.

5         And I note Judge Conti in this case, in the

6    opinion I gave to you, viewed Linerboard as a case

7    involving price fixing conspiracy with respect to

8    Linerboard.

9         So taking Sugar, which I think is the initial

10   opinion from the third circuit that addressed this topic,

11   there again, the concern was expressed by the defendants

12   in that case that if you had a situation where you tried

13   to trace the overcharge from the sugar into the candy

14   through potential multiple levels of distribution, you

15   might have additional complications.

16        The third circuit responded, however, this must

17   not be allowed to obscure the fact that the plaintiff did

18   purchase directly from the alleged violator.

19        True.  The price-fixed commodity had been

20   combined with other ingredients to form a different

21   product.  But such as a sugar sweetened the candy, the

22   price-fixing enhanced the profits of the candy

23   manufacturers.

24        It pointed out that the situation it had before

25   it was analogous to a situation that could have happened

BARKLEY
Court Reporters

1    in Illinois Brick where you had the general contractor

2    conspiring with the makers of the concrete block.  And in

3    that kind of a situation the third circuit said the

4    concern which the Supreme Court expressed about the

5    proration of overcharge among the number of entities in

6    the chain would not have been threatened.

7         The third circuit went on to talk about the

8    deterrence aspect in ways very similar to the way that

9    the Ninth Circuit said about Royal Printing.  Here's what

10   the third circuit said.  I'm quoting from 579 fed 2nd at

11   pages 17, 18.

12        We are also influenced by the realization that

13   to deny recovery in this instance would leave a gaping

14   hole in the administration of the antitrust laws.  It

15   would allow the price fixing of a basis commodity to

16   escape the reach of a treble damaged penalty simply by

17   incorporating the tainted element into another product.

18   That's the refinery who illegally set the price of sugar

19   could shield itself by putting all of the sugar into a

20   new product, syrup, simply by adding water and perhaps a

21   little flavoring.

22        We do not think the antitrust laws could be so

23   easily evaded.

24        As the Court went on in Sugar to note, there

25   would be no allocation problems in the circumstance

54

BARKLEY
Court Reporters

1    before it.  Quote, plaintiff is a direct purchaser and,

2    therefore, entitled to recover the full amount of the

3    overcharge.

4           As we pointed out in our briefs, Sugar and

5    Linerboard have been cited on this point with approbation

6    or at least followed in seven cases as recently as 2010.

7    Those cases include LCDs one and two.  And as you see

8    Judge Conti endorsed Linerboard in his opinion in this

9    case.

10          Now, in the LCDs cases, Judge Illston

11   specifically relied on this deterrence rationale that's

12   expressed in Sugar.  405 million dollars in settlements

13   have been paid so far to resolve direct purchaser

14   complainant components finished product claims in LCD.

15   And Toshiba, one of the defendants here, is going to

16   trial in the next month or two on both sets of claims.

17          And, your Honor, it makes absolutely no sense to

18   say that the direct purchaser plaintiffs in LCDs have

19   standing to sue for overcharges in both LCD panels and

20   monitors, televisions and laptops, but DPT's in this case

21   have standing to sue in this case only with respect to

22   CRTs and can't make any kind of claim with respect to the

23   monitors and TVs that incorporate CRTs and are sold by

24   the defendants.

25          We talked about the fact in our brief that we

1     believe that, although discovery is far from complete in

2     this topic, that perhaps as much as 60, 70, 80 percent of

3     CRTs are sold in subsidiaries or affiliated companies who

4     then incorporate them into TVs or monitors.

5          It's clear that you can't expect those

6     subsidiaries or fellow defendants or divisions to sue

7     their parents or coconspirators during this entire class

8     period March 1, 1995, November 25, 2007, no coconspirator

9     or subsidiary coconspirator has sued a co-conspirator or

10    parent entity with respect to the allegations of this

11    conspiracy.

12         Under defendants' theory of the case, these

13    sales, the ones that do these divisions, codefendants,

14    subsidiaries, there will be no direct purchaser who can

15    recover with respect to that.  Judge Illston and LCDs

16    refuse to count such a result.  Your Honor should resist

17    the temptation and invitation to be the first jurist in

18    this district to take an opposite view.  And you ought to

19    especially resist it because Judge Conti has aligned

20    himself with Judge Illston on this topic.  His language

21    following Linerboard was an independent affirmative

22    ground to deny the motions to dismiss.

23         Now, the defendants also talk in their brief and

24    in their argument today about the fact that the federal

25    antitrust laws really shouldn't be concerned with

56

BARKLEY
Court Reporters

1    intra-company transfers because they have no external

2    competitive significance, to which I say wrong.  That

3    argument ignores the fact that the record to date shows

4    that defendants at the glass meetings strove to ensure

5    that the fixed CRT prices charged to third-party

6    affiliates, third-party entities, finished product

7    makers, were also charged to subsidiaries or affiliates

8    of defendants.

9           The defendants clearly did not think these

10   inter-company sales were irrelevant or significant.  They

11   wanted to make sure the prices were the same in both

12   directions so the intra-corporate sales wouldn't

13   undermine the CRT conspiracy.

14          I want to talk a little bit about some of the

15   cases that defendant cite to support their position.

16   They site two case.  It's UtiliCorp and Delaware Valley

17   that do not involve finished products.  They cite three

18   other cases that do involve component products and

19   finished products, ODDs, the optical disk drive case,

20   Stanislaus Food Products versus Costco, and the

21   refrigerator compressor antitrust litigation.  All of

22   these latter three cases are distinguishable because the

23   finished products were purchased from a non-defendant.

24          In UtiliCorp you had a situation where several

25   states filed antitrust suits on behalf of their residents

57

BARKLEY
Court Reporters

1    accusing national gas producers of conspiring to

2    infiltrate the price for gas, for utilities.  The Supreme

3    Court had this to say, quote, and I'm quoting from 497 US

4    at 207, the consumers in this case have the status of

5    indirect purchasers.  In the distribution chain they are

6    not the immediate buyers from the alleged antitrust

7    violators.  They bought their gas from utilities, not

8    from the suppliers said to have conspired to have fixed

9    the price of gas.

10           That's the difference between that case and

11   ours.

12           In Delaware Valley various plaintiffs including

13   Bamberg County Memorial Nursing and Hospital Center

14   challenged Johnson & Johnson selling sutures and

15   endomechanical products as an unlawful.

16           Bamberg didn't buy the products directly from

17   Johnson & Johnson.  It rather dealt solely with an

18   independent third-party distributor named Owens and Meyer

19   nor controlled by J&J nor alleged to be a conspirator.

20           The Ninth Circuit deemed the Illinois Brick bar

21   applicable on their facts.  But those aren't our facts.

22           Defendants claim that Delaware Valley created a

23   bright line rule with respect to the finished product

24   component product situation.  No.  No where does Delaware

25   Valley address that situation, and nowhere does it state

BARKLEY
Court Reporters

1    such a rule.

2            ODDs, I've already said that Judge Seaborg in

3    ODDs agreed with us in this situation where you're

4    talking about purchases from a defendant with respect to

5    devices that contain as a component of price-fixed

6    product.  His concern, as I say, was that he viewed the

7    plaintiff in this case as covering situations where the

8    purchases might be from non-defendant third parties like

9    Hewlett Packard and Dell.  And he said, once again, the

10   problem --

11           I'm quoting from 2011 West Law 38944376, et

12   cetera.

13           Once again, the problem is that plaintiffs are

14   attempting to extend the price-fixing conspiracy to

15   finished products not produced by the defendants,

16   An issue not expressly addressed in Cathode Ray.

17           Well, that's not our case.  We're limiting it

18   here to the purchases from the defendants with respect to

19   CRT -- price-fixed CRTs contained in the finished

20   products that they sell.  Not that Circuit City sells.

21   Not that Dell sells.  Not that HP sells.  That's the

22   indirect purchaser case.  We're talking about purchasers

23   directly from the defendant.

24           In Costco the district court held that

25   purchasers of tin cans lacked standing to sue for alleged

BARKLEY
Court Reporters

1    conspiracy involving the prices of tin mill products,

2    steel sheets coated with tin, which undergo multiple

3    production processes before contained.

4           The opinion has no discussion of Sugar or

5    Linerboard, no discussion of any of the opinions in LCDs.

6    The case is distinguishable because there the plaintiff

7    bought from a non-defendant who was alleged to be dealing

8    vertically with the other defendants.

9           The case is also distinguishable because we

10   contend here that when you put a CRT into a television,

11   you're not talking about multiple production steps that

12   change its character.  The CRT basically remains

13   insignificantly changed when it's incorporated into the

14   product.

15          And that brings us to the compressor case.  This

16   is the one reported decision that defendants have managed

17   to dredge up that questions whether Sugar and Linerboard

18   should be followed.  It's distinguishable, and it also

19   has language that supports our position.

20          There you had a situation where it was alleged

21   that manufacturers of refrigerant compressors fixed the

22   prices for those products.  Some of those manufacturers

23   also produced refrigerators and sold them from the

24   price-fixed compressors.  The issue was whether the

25   plaintiffs who bought only the refrigerators had standing

60

BARKLEY
Court Reporters

1    to sue under the Clayton Act.

2         The District Court took the view that it was not

3    required to follow Sugar.  The District Court also noted,

4    however, in its view, that Sugar might not run afoul of

5    Illinois Brick.

6         Here's what it said.  Under those unique

7    circumstances, there is no pass-on theory in play.  In

8    the situation presented In re Sugar, the plaintiff

9    asserting antitrust injury does not allege an offensive

10   pass-on theory at all, because the defendant at issue

11   made both the price-fixed product, sugar, and the

12   finished product containing the price-fixed product,

13   candy, and thus there was no middleman.

14        In other words, Stotter (phonetic), the

15   plaintiff in Sugar, was not asserting was not asserting a

16   pass-on theory because the defendant violated that sold

17   the candy also manufactured the price-fixed sugar.  And,

18   therefore, there was no middleman and thus no issue as to

19   whether or not that middleman absorbed the overcharge for

20   the sugar.

21        I am quoting here from 795 Fed sub second and

22   pages 657 and 658.

23        The Court in the compressor case went on to note

24   at page 658 that no plaintiff had alleged that it bought

25   from a defendant any refrigerator containing an alleged

BARKLEY
Court Reporters

1    price-fixed compressor.  As I say, that's different from

2    this case as well.

3            We've also raised in our brief and argument that

4    defendants' motion is procedurally deficient because they

5    haven't provided facts on what we think are contested

6    issues.  And the types of facts we're talking about have

7    been outlined in our brief, but to give you an example,

8    defendants assert that the market for finished products

9    is different from the market for CRT and materials in

10   complex ways.  We contend that although they might be

11   distinct markets, they are inextricably intertwined, and

12   the price of the CRT that's a component into the finished

13   product, has a definite effect on the finished products

14   price.

15           Defendants also assert that plaintiffs did not

16   purchase finished products from a controlled independent

17   mediary.

18           We contend that they did purchase from

19   controlled intermediaries --

20           HON. CHARLES LEGGE:  If they didn't buy CRT at

21   all, what difference does that make?

22           MR. LEHMANN:  I'm reading to you what they said.

23   This is an issue they raised.

24           So they've raised the issue of controlled

25   intermediaries.  They assert that CRTs in the finished

BARKLEY
Court Reporters

1    products were plaintiffs that -- they assert that the

2    CRTs in the products that the plaintiffs bought were

3    substantially altered, and that relates back to the issue

4    in the Costco case where the Court viewed it as kind of

5    important about whether or not the component was

6    substantially altered on its way to be included in the

7    finished product.

8          We think that presents a factual issue.

9          They also assert that entities such as Hewlett

10   Packard or Dell or others purchased CRTs directly from

11   one of the defendants.  There's no record to support

12   there.  Maybe that's true.  I assume it would be.  But

13   the fact of the matter is I don't think they've

14   established it for purchases of summary judgment.

15         And so we think that each of these assertions

16   which defendants are relying on as a factual matter in

17   their motion needs support.  And their answer is, well,

18   it's undisputed.  Well, you can take judicial notice of

19   it.  Well, what are they giving you to take judicial

20   notice of?  This is a complex interaction between two

21   markets.  You've got no record to rule on.

22         HON. CHARLES LEGGE:  The issue is whether a

23   person, company who did not buy a CRT has standing to sue

24   in this case where the allegation is price fixing of the

25   CRT.

BARKLEY
Court Reporters

1          MR. LEHMANN:  That's right.

2          HON. CHARLES LEGGE:  I don't think any of those

3    facts are necessary for that kind of decision.  That's a

4    pure question of law.

5          MR. LEHMANN:  I think it's a mixed question of

6    law in fact that I would agree with your Honor that it's

7    predominantly a legal question.  Certainly the question

8    of whether the Courts in this district and circuit follow

9    Sugar and Linerboard is a legal question.

10         HON. CHARLES LEGGE:  Okay.

11         MR. LEHMANN:  I'm finished, your Honor.

12         HON. CHARLES LEGGE:  Okay.

13         MR. LEHMANN:  And I'll turn the floor over to

14   Mr. Isaacson.

15         HON. CHARLES LEGGE:  Okay, sir.

16         MR. ISAACSON:  Thank you, your Honor, for

17   hearing from us.

18         As your Honor has said, that while the order

19   today doesn't technically imply to the direct action

20   purchasers, the effect of the order as a precedent, if

21   adopted and sustained, would drive a hole through our

22   cases and preclude the federal claims of many of the

23   direct action purchases and preclude the federal claims

24   for large parts of other purchases.

25         And to just pick up where you last spoke, your

64

BARKLEY
Court Reporters

1    Honor, is the issue here is did a person who did not buy

2    a CRT have standing.  And I think the more precise

3    question is, did a person who did not buy a CRT alone

4    have standing.  Because there is no issue that direct

5    purchasers of televisions and monitors from a conspiracy

6    or from conspirators or their controlled affiliates are

7    direct purchases.  They directly purchased both the

8    finished product and all of the components.  They are

9    also the only direct purchasers of those CRTs and

10   finished products.

11            There's the conspiracy.  There's the purchaser.

12   What is purchased is a television or monitor that

13   includes components, perhaps the most important of which

14   is the CRT.  There's no -- there's no question that that

15   is a direct purchase.

16            From the very beginning of when this issue was

17   first raised in the Sugar/Linerboard case, in the Sugar

18   case the Third Circuit explained that.  And this is at

19   17, that decision.  I've also took the chance to just

20   summarize the points I want to make on three pages that I

21   want to leave with you.

22            And the Court in Sugar explained what is

23   self-evident, that we have standing because we directly

24   purchased CRTs from members of a price-fixing conspiracy

25   or from their own on controlled affiliates.

65

BARKLEY
Court Reporters

1            And the Court in Sugar explained at 579 F 2d at

2    17, as the defendants here point out, the product which

3    plaintiff purchased is not with sugar but with other

4    candy, more than one ingredient in terms of the product.

5            So you'll remember the sugar case involved

6    putting sugar in candy.  And they made the same argument.

7    Defendants made the same argument Mr. Kessler makes here,

8    that a television would have different consideration than

9    candy.

10           To the extent there will be some additional

11   complications underlying the damage claims, however, this

12   must not be allowed to obscure the fact that the

13   plaintiff did purchase directly from the alleged

14   violator.

15           It goes on to say the concern which the Supreme

16   Court in Illinois Brick expressed about the proration of

17   overcharge among a number of entities in the chain would

18   not have been present, nor is that problem of allocation

19   amongst various distributors present in this case.

20           Plaintiff is a direct purchaser and, therefore,

21   entitled to recover the full extent of the overcharge.

22           When Illinois Brick or Delaware Valley is

23   talking about when are we going to permit exceptions to

24   the direct purchaser rule, that's not what we're talking

25   about here.  We are direct purchasers.

Reporter's Transcript of Proceedings

BARKLEY
Court Reporters

1          The defense argument is that there's still some

2     complications in showing the price -- effect on the price

3     of a price-fixed component.  That is not a complication

4     or pass-through analysis that is discussed in Illinois

5     Brick or UtiliCorp or those lines of cases.

6          Where you have a direct purchaser instead the

7     Supreme Court has said -- that in all of the other

8     decisions that Mr. Lehmann just talked to you about, said

9     there the direct purchaser recovers the full overcharge.

10    If there are complexities in demonstrating that

11    overcharge, such as it was -- that the price fix was on a

12    50 percent component, that is different and does not

13    matter and does not make Illinois Brick applicable.

14         Mr. Lehmann just read to you language from the

15    compressors case.  The only Court that questioned Sugar,

16    though it does not reject it, that says no, we're not

17    talking about pass-through analysis when we're talking

18    about this.

19         So when defendants are arguing that complexities

20    in analysis are a reason for denying standing, they are

21    doing it based on this component principle, and they're

22    making that argument even if the CRTs are an important

23    part of the product, 50 percent of the product, 75

24    percent of the product, 90 percent of the product.  It

25    would not matter.  You would still knock out a federal

67

BARKLEY
Court Reporters

1    claim of a direct purchaser.

2            Mr. Lehmann also -- Mr. Kessler, even to make

3    this argument, expressed to you that it would be okay to

4    price fix a cost of manufacturing.  That's just an

5    internal price.  A horizontal conspiracy to fix the price

6    of a key component of a product creates a federal claim

7    for direct purchases and its also a per se violation of

8    the antitrust laws.

9            That was the instruction to the jury that

10   Mr. Lehmann just read to you from the AUO case.

11           They're not just trying to drive a truck through

12   direct purchaser law.  They're also questioning the whole

13   underpinning of antitrust liability for a conspiracy that

14   would jeopardize the other cases that are going on the

15   civil side and would be grounds to question the jury

16   instructions that are being given in these cases.

17           If conspirators agree to fix 50 percent of a

18   product, the direct purchaser has standing to bring a

19   claim.  That is not a pass-through analysis through

20   multiple channels of distribution, that that's -- that

21   which is the issue of Illinois Brick.  It is entirely

22   different analysis.  Does not matter whether it's

23   complex.

24           The Supreme Court in Illinois Brick did not say,

25   well, if there's complex analysis, we're not going to

BARKLEY
Court Reporters

1    allow an antitrust claim.  They spoke about the

2    complexities through multiple channels of distribution

3    and the difficulties, therefore, of allocating damages

4    amongst all those different channels because you would

5    have this group saying, well, we think we got 25 percent

6    of the cost and the other group saying, no, we have 50

7    percent and how are you going to be able to globally do

8    that.  How are you going to apportion the claim.

9           That apportionment does not happen here, because

10   we are the direct purchasers entitled to the full

11   overcharge.  And that apportionment is the key to the

12   Illinois Brick decision and the complexities that

13   Mr. Kessler raises in his argument.

14          When he read from Illinois Brick, Illinois Brick

15   goes on to say, we understand Hanover Shoe has rested on

16   the judgment that the antitrust laws will be more

17   effectively enforced by concentrating the full recovery

18   for the overcharge in the direct purchasers rather than

19   by allowing every plaintiff potentially affected by the

20   overcharge to sue only for the amount it could show was

21   absorbed by it.

22          That issue does not come up with a direct

23   purchaser of a finished product, a component of which was

24   subject to price fixing.  We are the direct purchaser of

25   the full product and of its components.

69

BARKLEY
Court Reporters

1          No other plaintiff is going to have standing to

2     bring that federal claim.  Apple, HP did not buy directly

3     the CRTs in our finished goods.  We bought them.  We

4     bought them from conspirators, and we bought them from

5     their controlled affiliates.  No one else has that

6     federal claim.  That's a mathematical truth.  It's a

7     different CRT, which means that it's also a mathematical

8     truth that if you accept this argument that the

9     conspirators are going to reap their ill-gotten gains for

10    every screen that they put into a finished good and sold

11    to a direct purchaser.

12          They tell you, well, there's still going to be

13    complex analysis, but no Court has said that where

14    there's complex analysis you deny recovery to the direct

15    purchaser.  Every Court to consider the issues here where

16    there's a direct purchaser of a product with component

17    price fixing has gone in favor of finding that, yes, you

18    are a direct purchaser with antitrust standing.  And

19    those are the decisions that Mr. Lehmann just went

20    through with you Sugar/Linerboard, Judge Illston in the

21    LCDs case and Judge Conti in this case on the motion to

22    dismiss.

23          Mr. Kessler tries to distinguish Linerboard by

24    saying no, it's -- and relies on the stipulation here to

25    which we're to say, well, Linerboard alleged the finished

70

BARKLEY
Court Reporters

1   products conspiracy, and goes borrowing into the record

2   below the third circuit to try to find that.  Mr. Lehmann

3   has explained why that's not correct because of the

4   ellipsis.  But you can read the third circuit decision

5   and see that it does rely on a finished goods conspiracy.

6          It is following the Sugar line of analysis and

7   endorsing it and applying it, such as Judge Illston has

8   done and Judge Conti has done.

9          Now, in the cases the defendants are relying on

10  direct purchasers are not being denied standing.  Optical

11  disk drive, Mr. Lehmann read to you the language from

12  Judge Seaborg where he confirms that he agrees with Judge

13  Conti and Judge Illston that plaintiffs in this case do

14  not have a standing problem with respect to any ODD

15  devices that they may have purchased directly from

16  defendants.  He was dealing with the purchases from

17  non-defendants.

18         Illinois Brick, not at the intermediaries that

19  Mr. Lehmann described.

20         UtiliCorp, the utilities purchased the natural

21  gas, not the natural utility company.

22         Compressors, there the issue, as the Court said,

23  was no named direct purchaser plaintiff has alleged and

24  bought a finished product containing a compressor from a

25  defendant or manufactured a compress and use those

71

BARKLEY
Court Reporters

```
 1    compressors to manufacture that finished good.

 2              Delaware Valley bundled products purchased from

 3    an independent third-party distributor.

 4              And Stanislaus was purchases from non-parties to

 5    a horizontal conspiracy.  The plaintiffs there tried to

 6    bring in as a direct purchase claim by going downstream

 7    and alleging a vertical conspirator.  And the Court said

 8    no, that was not good enough to bring that claim.

 9              If you accept this standing argument, you're not

10    only going to be making new law; you're going to be

11    reeking havoc in federal antitrust.  This is a road map

12    for a cartel.  And this was the language from Sugar that

13    Mr. Lehmann read to you.

14              It will allow the price fixer of a basic

15    commodity to escape simply by incorporating the tainted

16    element into another product.  It can be 90 percent of

17    the product, 80 percent of the product.  There's no

18    limits here.  And it's a road map for a cartel to how to

19    make profits.  And if you wipe out the direct purchasers,

20    well, we'll have deterrence for indirect purchasers.

21              Mr. Kessler says those are state law claims.

22    Obviously not all state passed those.  But you are taking

23    federal law and federal deterrence out of the picture,

24    which is directly contrary to the whole point of the

25    direct purchaser rule of achieving deterrence and going
```

72

BARKLEY
Court Reporters

1    after and creating private attorney generals the direct

2    purchasers to create deterrence against cartels,

3    including international cartels.

4           This would do a severe blow to antitrust laws,

5    which is why you're not seeing the Courts embrace it or

6    endorse this principle.

7           It would be a ground-breaking ruling that would

8    undermine this case that would create the conflict that

9    you've expressed between this case and the LCDs case

10   creating delays in the schedule of that case where our

11   plaintiffs are also parties and creating the slow-down in

12   cases that happen when you have intra-district conflicts

13   going up to the Ninth Circuit, which would be the next

14   step of the defendants.

15          It would be used to challenge the AUO verdict

16   and the instructions there.

17          This is a severe thing that's being asked that

18   doesn't have any authority behind it.  And we think you

19   should reject it and allow these cases to go forward.

20          HON. CHARLES LEGGE:  Bear in mind with respect

21   to your case, my recommendation that Judge Conti,

22   whichever it will be, will contain to operative language

23   doing anything to your case for you or against you

24   whichever way it is.  Now, I understand that you're

25   concerned about what might be done in this case, its

                              73

BARKLEY
Court Reporters

1    impact on your case.  I understand that.  And that's why

2    I'm listening to you.  And accepting the caution of being

3    careful what I do recommend with this should have some

4    resident impact on the case.  I accept that.  Whether

5    you're right or wrong, I'm not discussing the merits.

6              MR. ISAACSON:  Right.

7              HON. CHARLES LEGGE:  But I am not going to enter

8    any recommendation that Judge Conti make any ruling on

9    your cases as all.  Okay.

10             MR. ISAACSON:  Understood, your Honor.  We take

11   the presidential effect --

12             HON. CHARLES LEGGE:  No, I understand that, and

13   I appreciate your concern, and I appreciate --

14             MR. SAVERI:  May it please the Court, your

15   Honor, Rick Saveri.  I'm going to be very brief.  I'm

16   just going to speak regarding the Rule 56(d) declaration

17   that we submitted in support of the summary judgment.

18             I'll also try to speak up so the court reporter

19   can hear me and the people at the other end of the hall

20   and on the phone hear me.

21             Importantly, your Honor, the Rule 56(d)

22   declaration sets forth the factual issues in dispute

23   between the parties, the status of discovery of the

24   action as it relates to the issues at hand, and the

25   further discovery needed to be resolved pending before

74

BARKLEY
Court Reporters

1    your Honor.  Importantly many of the cases cited to your

2    Honor, and particularly the LCD opinion denying summary

3    judgment for Toshiba, the same Toshiba in this case, the

4    identical Toshiba companies in this case, and the issue

5    before your Honor was decided after a full discovery and

6    a complete record.  It was not decided --

7              HON. CHARLES LEGGE:  I'm sorry, which case is

8    that?

9              MR. SAVERI:  Let me give that to your Honor.

10   That was the summary judgment decision that was

11   decided --

12             HON. CHARLES LEGGE:  In LCD?

13             MR. SAVERI:  In LCD.  And I'll give you that

14   cite.

15             It was November 7, 2011, 2011 West Law 5357906.

16             And that was like your Honor has done here,

17   there was a full schedule that was set up where there was

18   then the discovery motions, expert reports, and then a

19   full hearing after the whole discovery was done, and a

20   complete record was made before your Honor.

21             Currently, as your Honor knows, discovery we

22   have just begun.  The defendants have just turned over

23   roughly five million pages of documents, many of which

24   are in foreign language.  We are going through those and

25   have yet to complete the review of those documents.

75

BARKLEY
Court Reporters

1          Just yesterday your Honor has ruled on the

2     schedule in this matter setting forth the completion of

3     fact discovery and the hearing and the discovery

4     protocols for depositions.  That has yet to be turned

5     into an order by Judge Conti.  So that's still pending to

6     be an order.

7          Importantly, that relates to the pending summary

8     judgment motion here your Honor.  Plaintiffs served

9     30b(6) declarations on the defendants related to the

10    issues needed to be decided.  All of the defendants --

11         HON. CHARLES LEGGE:  But the rule on this for or

12    against, do I need any of that?  Isn't it enough, isn't

13    it enough that they've got in the record that these nine

14    companies, I guess they are, never purchased CRT?  Isn't

15    that enough to rule for or against them on what

16    Mr. Kessler --

17         Do I need any of this discovery?

18         MR. SAVERI:  We feel that you do, your Honor,

19    because a few of the facts that they put before you, for

20    example, that we asked in these 30b(6)s were -- are the

21    markets for CRTs and the televisions and the monitors --

22         HON. CHARLES LEGGE:  If there is a bright light

23    rule.

24         MR. ISAACSON:  Right.

25         HON. CHARLES LEGGE:  That purchaser of finished

BARKLEY
Court Reporters

1   product does not have standing to sue for the price-fixed

2   product that is incorporated into it.  If that's a rule

3   of law, I don't need to analyze markets.  I don't need to

4   analyze complexity, although I think it's self-evident.

5   But I don't have to do that.

6         MR. SAVERI:  Well, your Honor, as far as exactly

7   that, are they separate markets, there's no expert report

8   on that.

9         HON. CHARLES LEGGE:  I don't care.

10        MR. SAVERI:  In fact, your Honor, there's not

11   even a declaration that they sold product to the Dell,

12   the Visio, or Sharp, or anybody they say is protectors --

13        HON. CHARLES LEGGE:  I don't need that to rule

14   on the motion, do I?

15        MR. SAVERI:  Well, your Honor, we feel some of

16   those issues are intertwined into the decisions.

17        HON. CHARLES LEGGE:  They are in the rationale.

18   I'll recognize they are in the rationale of some of the

19   decisions.  But I don't think I need that to rule on

20   their motion.

21        MR. SAVERI:  Fair enough, your Honor.  We set

22   that forth in our declaration.  And so, like I said

23   before, your Honor, the declaration set forth what we

24   believe are those factual issues, and we presented those

25   issues.  We asked for 30b(6) of the defendants.  They've

BARKLEY
Court Reporters

1    all been objected to.  So that issue is in the

2    declaration before your Honor.

3            Thank you, your Honor.

4            HON. CHARLES LEGGE:  Thank you.  All right,

5    Mr. Kessler, do you want to take a few minutes break

6    here?

7            MR. KESSLER:  I will do whatever the Court would

8    prefer.  I could plow in or if the Court would --

9            HON. CHARLES LEGGE:  Let's take ten minutes and

10   maybe get it organized.

11           (Break taken.)

12           HON. CHARLES LEGGE:  All right, back on the

13   record.

14           Defendants rebuttal argument please,

15   Mr. Kessler.

16           MR. KESSLER:  Thank you, your Honor.

17           I want to start out that contrary to what was

18   argued to your Honor, this Court would be the first to

19   rule that there is no Illinois Brick standing for someone

20   who did not purchase a price-fixed product and that it

21   would not punch a major hole in antitrust jurisprudence

22   and the world would not come to an end.

23           First of all, I am reading now from the

24   Stanislaus case, September 3, 2010, decided in the

25   Eastern District of California, I believe the world is

78

BARKLEY
Court Reporters

1    still standing.  Plaintiff alleges the defendants

2    conspired to fix the price of the raw materials for tin

3    cans, not the product plaintiff purchases.

4            This, by the way, is on page -- this is on page

5    8 of the decision.

6            The Court then quotes Shamrock, the Ninth

7    Circuit case in Shamrock.

8            Illinois Brick is inapplicable to claims against

9    remote sellers when the plaintiffs allege that the

10   sellers conspired with intermediaries in the distribution

11   change to fix the price at which the plaintiffs

12   purchased, at which the plaintiffs purchased.

13           The Court then goes to say thus the products

14   purchased by plaintiffs must be the subject of the

15   price-fixing conspiracy.

16           Think how significant that ruling is for this

17   case where we have a stipulation that the product

18   purchased by these nine plaintiffs is not the subject of

19   the price-fixing conspiracy.

20           And then it goes on to say, compare Shamrock

21   Foods, plaintiff alleged the conspiracy was to fix the

22   prices of the dairy products at the retail level.

23           By analogy the Court concludes if Stanislaus is

24   the consumer, then plaintiff must allege there was a

25   conspiracy to fix the price at the retail level, the

79

BARKLEY
Court Reporters

1    price at the tin cans.

2           No Illinois Brick standing.  The world did not

3    fall off its axis.  That's what the Eastern District of

4    California has stated.  You would be joining the Eastern

5    District of California in that ruling.

6           Next decision, the refrigerator compressors

7    decision.  And I'm now quoting -- this is on page -- what

8    page is this?  658 of that decision, as follows --

9           HON. CHARLES LEGGE:  I'm sorry, I forgot what

10   Court that is.

11          MR. KESSLER:  This is by the judge in the

12   Eastern District of Michigan.  Okay.  And this was

13   decided June 13, 2011.

14          And you remember, your Honor, this was a case

15   where the plaintiffs only claim they purchased

16   refrigerators, not the price-fix component which were

17   compressors that go inside a refrigerator.

18          And they're discussing Linerboard.  And this is

19   what the Court said.

20          This case can be distinguished In re Linerboard

21   in two important respects.  First, although the Court did

22   not focus on this, the plaintiffs in In re Linerboard

23   alleged a conspiracy to fix both Linerboard, a component,

24   and corrugated sheets, a finished product.

25          I'm noting that because it was stated by counsel

BARKLEY
Court Reporters

1    that we misrepresented Linerboard.  I would submit we did

2    not misrepresent Linerboard.

3           Further what the quote that plaintiffs' counsel

4    read from Linerboard spoke about was a conspiracy to

5    increase the price of the Linerboard for the purposes

6    with the motive to increase the price of the finished

7    product.

8           They are precluded from making that claim here.

9    That's the conspiracy agreement that they argue to your

10   Honor on the Rule 11 motion, which ultimately your Honor

11   said that was no basis for, and then they stipulated they

12   wouldn't allege it.

13          So they cannot allege here with this stipulation

14   and ruling the conspiracy alleged in Linerboard.

15          And reading back in compressors, here the DP

16   plaintiffs allege only a conspiracy to fix the price of

17   compressors, which they claim had the ultimate effect of

18   increasing prices for compressor products.

19          That is, the DP plaintiffs do not allege that

20   defendants conspired to fix the price of finished

21   products that contain compressors.

22          That, of course, as this case, has to be by

23   stipulation.  What does the judge go on to say.  That is

24   a fundamental difference because the plaintiffs in In re

25   Linerboard allege that the defendants had conspired to

81

BARKLEY
Court Reporters

1   increase the price of corrugated sheets and that the

2   plaintiffs were direct purchasers of the corrugated

3   sheets.

4           So, again, the Court concludes that only the

5   purchasers of the compressors can have standing.

6           That, your Honor, again, you would be joining

7   this second court to rule this way with respect to that.

8   So, again, this would not be unprecedented.  This would

9   not be causing the world to change.

10          It was mentioned this would somehow affect the

11  government's case under LCD in the jury trial.  The

12  government does not sue under Section 4 of the Clayton

13  Act.  The government does not have to prove its right to

14  damages.  Whatever your Honor rules has no impact on the

15  United States of America or any government case.

16          HON. CHARLES LEGGE:  I understand.

17          MR. KESSLER:  And this is what I want to get to.

18  You know if this case is all about Section 4.  If you

19  read -- if you read Illinois Brick, what they end up

20  saying and what they say again in UtiliCorp, is that

21  we're not changing our ruling under Section 4 of the

22  Clayton Act.

23          In fact, going back in UtiliCorp, okay, to that

24  page we quoted before which was right before Roman four,

25  it says having stated the rule in Hanover Shoe and adhere

82

BARKLEY
Court Reporters

1    to it in Illinois Brick, we stand by our interpretation

2    of Section 4.  That's what this is about.

3           Now, why is that significant?  Well, we heard a

4    lot of word games from plaintiffs' counsel.  One thing

5    was said was, well, these are direct purchases.  So of

6    course they have standing.

7           No, that's putting the rabbit in the hat.

8           The Illinois Brick question is are they direct

9    purchases of the price-fixed product.  There's no

10   disputes.  They did not purchase the price-fixed product.

11   They purchased a television or they purchased a computer

12   monitor, which means the only way to show Section 4

13   injury, it is impossible to show it without proving to

14   what degree did the price of the television or the

15   monitor reflect any conspiratorial -- alleged

16   conspiratorial increase in the price of the CRT.

17          There's no dispute here, for example, that there

18   are these separate entities affiliated companies they

19   have.  This is in their complaint.  Your Honor know

20   there's LPD which was a joint venture which they claim

21   was affiliated with Phillips and with LG.  There's MTPD

22   who was affiliated with Panasonic and Toshiba.  There are

23   other affiliated entities, you know, involved here.

24          And the point is the direct purchasers here on

25   the Illinois Brick are either the unrelated direct

83

BARKLEY
Court Reporters

1    purchasers like HP, Dell, Sony, Visio, et cetera, or

2    they're the affiliated companies.

3          So what if -- which they claim, well, you should

4    ignore that and go through it.

5          The point here is under no circumstances are

6    these particular plaintiffs direct purchases of the

7    price-fixed product.

8          So what they want your Honor to do is to create

9    a new exception for that group, saying it will help

10   antitrust deterrence.

11         We would respectfully suggest the Supreme Court

12   and the Ninth Circuit has said the Courts are not in that

13   business of going through one by one and deciding is this

14   good for deterrence or bad for deterrence, is it good for

15   -- is it easy to prove pass-on or not easy to prove

16   pass-on.  That's what's been taken away.

17         We heard arguments, well, what if it's 50

18   percent of the product?  What if it's a big product?

19   What if it's 80 percent affiliated?

20         Those are all issues of how easy or difficult it

21   is to prove pass-on.  That's all.  It's always pass-on.

22         I heard it said, well, you don't have to prove

23   pass-on if it's the same company.  Of course you have to

24   prove pass-on.  If it's a different product, which they

25   can't dispute, so a television, let's say, costs X.

84

BARKLEY
Court Reporters

1    Okay.  A $700 television.  And a CRT costs, pick your

2    price, they want to use 50 percent, say it's a $350 CRT.

3    And let's say the allegation is the price was increased

4    ten percent, $35.

5            Okay.  This doesn't matter because it doesn't

6    matter what the numbers are.  The point is to satisfy

7    Section 4 they'd have to say how much of any of that $35

8    made its way into the price of the television, and what

9    the Supreme Court said is we can't do that, as opposed to

10   the economist theoretical models in the real world trying

11   to litigate case by case how much of that was -- affected

12   the price.  Whether it went there is not in the federal

13   antitrust law is what we want to do.

14           Now in indirect cases some states, whatever the

15   states are have said we do want to do that.  That's okay.

16   That's the policy of those states.  But in the federal

17   context it's been directed.

18           I want to come back to Judge Conti's opinion

19   because they spent a lot of time arguing Judge Conti

20   decided that.

21           In all due respect, I think this is completely

22   wrong.  Here is what Judge Conti said about this issue in

23   the context.

24           First of all, his discussion to start under F

25   antitrust standing, and he says -- he starts out solely

85

BARKLEY
Court Reporters

1  with the discussion of AGC standing, nothing about

2  Illinois Brick at all.  If you look at the context that's

3  leading this, he says the special master recognizes --

4  recommends denial of the motion to dismiss based on

5  supposed lack of standing, and then he sites the AGC

6  factors.  No mention of Illinois Brick in that paragraph.

7       Then after discussing AGC he says the following.

8  The first sentence is critical.

9       Here the direct purchase plaintiffs allege they

10 purchased CRTs or CRT products from defendants or their

11 subsidiaries at inflated prices due to defendants'

12 unlawful conduct citing the direct complaint.

13      Well, if you look at those paragraphs of the

14 direct complaint, you'll find this is where the

15 conspiracies alleged regarding not just CRTs but also CRT

16 products.  And that's what he's dealing with here.  We

17 also know that because in your Honor's recommendation

18 decision, which is what he's basing this on, and this is

19 page 18 of the printed version of your Honor's decision,

20 says the following.

21      He says -- he says defenders move to dismiss

22 based upon an argument of plaintiffs supposed lack of

23 standing.  However that argument is based in turn upon

24 defendant's perception that the complaints allege a

25 price-fixing conspiracy only as the CRTs.  And the

86

BARKLEY
Court Reporters

1    special master interprets the complaints as alleging a

2    conspiracy as to CRT products as well.

3          That's what was presented to judge -- to Judge

4    Conti.  And it's in that context when he says this is the

5    type of injury the antitrust laws were attended to

6    address, and, yes, he does cite Linerboard, but without

7    any discussion at all about any of the issues we're

8    discussing now.

9          He then goes on for the first time to mention

10    Illinois Brick in the next paragraph, and only does that

11    for the indirects saying Illinois Brick's been repealed.

12    There's absolutely no discussion of the relationship

13    between Illinois Brick and Linerboard or anything else.

14          So for them to say this is a ruling by Judge

15    Conti in light of your Honor's recommendation, in light

16    of the fact that the conspiracy involved both in this

17    language, I would suggest, your Honor, is simply not

18    correct.  I would also note that --

19          Well, that's my point about Judge Conti's

20    decision.

21          The next thing I want to mention is they spoke

22    about ODDs.  What happened in ODDs is Judge Seaborg was

23    dealing with a conspiracy to fix the price of both ODDs

24    and ODD devices.  He says that repeatedly.  ODD devices

25    are the equivalent of CRT products.

BARKLEY
Court Reporters

1          Okay.  It is true he was particularly skeptical

2     of the conspiracy that involved third parties like HP and

3     Dell, and he granted a Cromley (phonetic) motion based on

4     that.  But he independently said they're alleging a

5     conspiracy regarding both the products and the finished

6     products which is the only reason why he suggested they

7     might have standing for the ODD devices if they purchased

8     it because there was a conspiracy alleged with respect to

9     that.

10          It's very much like your Honor's original

11     recommendation decision.

12          And when he goes on to say is that, but I don't

13     see in any event how there could be a conspiracy

14     involving HP and Dell and others who were victims.

15     Totally separate issue in the case.

16          On the issue that's on point he says nothing

17     inconsistent with the motion we're making.  In fact, he's

18     very consistent with the motion he's making because he

19     ends up saying you must allege a conspiracy that you

20     bought the ODDs.  That's his bottom line with regard to

21     that.

22          And, again, as I said, they pled their case, and

23     that's now before him.  But there's no way that decision

24     is inconsistent on that point.

25          Next point here is Hanover Shoe, Illinois Brick,

BARKLEY
Court Reporters

1    Delaware Valley, UtiliCorp.  I have no doubt that if your

2    honor looks at those decisions, you will come to the

3    conclusion that contrary to what's been argued, that the

4    complexity of proving Section 4 pass-on is -- was the

5    primary consideration that motivated each of those

6    decisions.  In fact, it is specifically noted in

7    UtiliCorp that that argument, not deterrence, was the

8    first concern of Hanover Shoe and Illinois Brick.  Your

9    Honor will see that.  That was the major concern in those

10   cases.

11          Plaintiffs conceded, conceded that the line of

12   cases here which involve --

13          Lost my train of thought for a second.

14          The line of cases here based on the controlled

15   subsidiary exception involved the same product, not, you

16   know, not a transformed product, not a different product.

17   It does not matter, as your Honor said, how much it's

18   transformed.  It does not matter, as your Honor said, how

19   different the markets are.  It's the mere fact that it's

20   a different product, in a different market.  Whatever it

21   may be, is that alone enough where they didn't purchase

22   the price-fixed product as a matter of law to say there

23   isn't standing.  There's no factual issue regarding any

24   of that here.

25          This will not have any impact on LCD.  LCD

BARKLEY
Court Reporters

1  obviously has its own rulings.  Okay.  They will

2  presumably be appealed and not appealed to the Ninth

3  Circuit.  They're either wrong or right.  What your Honor

4  does I don't think is going to have any impact on Judge

5  Illston anymore, frankly, your Honor, than I hope Judge

6  Illston's decision has any impact on your Honor.

7         I think you're both going to independently

8  decide what you believe is correct, and then ultimately

9  the Ninth Circuit may be the one who either decides it in

10  LCD or here.

11         What I am very comfortable about is that the

12  governing Ninth Circuit will in Delaware Valley in the

13  Supreme Court indicate that where these issues must be

14  proven, and there's no way again for plaintiffs to avoid

15  this by saying, well, they're direct purchasers.  They're

16  not direct purchasers of the price-fixed product.

17  There's no way for them to say they don't have to prove

18  pass-on because the argument they make as well is not

19  vertically different.

20         Frankly, your Honor, it is more difficult to go

21  from one market to another where other companies are not

22  conspiring in terms of the complexity of proof than it is

23  to go down the distribution chain.  That's why we cited

24  the umbrella price-fixing cases.  In other words, the

25  complexities are each more profound of trying to figure

BARKLEY
Court Reporters

1   out what was passed on in the television or refrigerator

2   or in ODD device or in a tin can, that's what those cases

3   stand for, than it would be just by going up and down on

4   a distribution chain issue.

5          So the fact that it's not vertical, that their

6   problems are horizontal complexity, because it's a

7   different product in a different market, makes this worse

8   from a Clayton Act Section 4 standing standpoint.

9          Finally, your Honor, I want to come back to the

10  questions that your Honor asked at the very beginning.

11         First, we're looking for a narrow ruling on a

12  narrow issue based on this stipulation which does not

13  allow them to allege a conspiracy with a motive to fix

14  the prices of the finished products and which there's no

15  dispute we heard from counsel that these nine plaintiffs

16  did not purchase CRTs, that there's no dispute they are

17  different products in different markets, whatever those

18  differences may be, and there's no dispute as,

19  plaintiffs' counsel argue, they don't deny this, that the

20  impact could vary.  In that narrow set of cases and

21  circumstances, we believe Section 4 of the Clayton Act

22  would require them to prove things which Illinois Brick,

23  Delaware Valley, UtiliCorp all say is not for the federal

24  courts.  And whatever deterrence needs to be done here

25  will be provided by the HP, Dells, Sonys of the world, by

BARKLEY
Court Reporters

1    the United States government, which was not affected by

2    this, by the indirect case that may to decide to include

3    the purchases in indirect.

4              In fact, the fact that of the indirects decided

5    not to include these purchases in their definition of

6    indirect is pure happenstance.  If your honor were to

7    rule that we -- that they can be included in direct case,

8    that would not preclude another plaintiffs' counsel from

9    coming in and saying they're indirect too.

10             In other words, the mere fact that there seems

11   to be an understanding between counsel on this side does

12   not eliminate this problem.  It seems to me either

13   they're direct or they're indirect under federal law.

14   You know, it's not that you could avoid the issue simply

15   because the indirect plaintiffs' counsel here have now

16   tried to pick a fight, if you will, with the direct

17   plaintiffs as to what's there.  That wouldn't protect us

18   from another suit from somebody else saying I've got

19   these indirect plaintiffs.

20             So the question is someone has to decide.

21   They're in one box or the other.  We would respectfully

22   submit, because they must prove impact on another product

23   in another market, they are at best indirect.

24             Unless your Honor has any other questions, I

25   think I've covered what I need to do.

BARKLEY
Court Reporters

1          HON. CHARLES LEGGE:  Well, I'd like to return

2     back to this stipulated order.

3          MR. KESSLER:  Yes.

4          HON. CHARLES LEGGE:  Tell me what you think the

5     significance of the provisions' portion of that paragraph

6     three is.

7          MR. KESSLER:  Okay.  Let me just get that out in

8     front of me.

9          Paragraph three.  Okay.  I believe that what

10    this means is that this was an acknowledgement that by

11    dropping the claim of a conspiracy, which is what this

12    does, they withdraw their -- their claim of a conspiracy

13    encompassing finished products.  That's what they

14    dropped.  So they can't --

15         So, first of all, they can't allege, as they

16    said was alleged in Linerboard, that there's a conspiracy

17    to fix CRTs for the purpose of increasing the price of

18    television or monitors.  They're precluded from that.

19    This then said provided that this was not resolving the

20    issue, that the issue or possible impact remained in the

21    case.  And in our view it remains in the case in the

22    following way.

23         If we are right, the Supreme Court says it's in

24    the case but they are not direct purchasers, at least

25    with respect to Section 4.

BARKLEY
Court Reporters

1           By the way, they could possibly allege a Section

2    16 injunctive relief claim, which as your Honor knows is

3    not bound the same way.  That's not an Illinois Brick

4    issue.  So it may remain in the case with respect to

5    Section 16 anyway with respect to that.

6           But with respect to Section 4 of the Clayton

7    Act, if we're right, they're precluded from trying to

8    move that.  If we're wrong, it remains in the case

9    because they now have to go forward and try to prove that

10   impact plaintiff by plaintiff.  Or if it's a class, on a

11   class-wide basis with respect to that, which makes them,

12   by the way, look exactly like who?  It makes them look

13   exactly like the indirect plaintiffs.  So that even --

14          what they're saying they're entitled to try to

15   prove it under the step.  If we're wrong in Illinois

16   Brick, it puts them right in the indirect category

17   because they'd have to prove the impact or effect on the

18   prices of finished products.

19          Now, we believe on the pure legal issue, under

20   Section 4 they can't allege Section 4 standing with

21   respect to that.  If they are right, it would continue,

22   but it'd make them exactly the same as the indirects,

23   which is why I said they've got to in one bucket or the

24   other.

25          So basically, your Honor, I believe what this

BARKLEY
Court Reporters

1    stip does is it leaves this issue now for your Honor to

2    resolve whether as a matter of law they can seek to prove

3    this impact or whether Illinois Brick precludes it or

4    whether they --

5         HON. CHARLES LEGGE:  You don't think that

6    language entitles them to go through discovery, go to

7    summary judgment, go to trial on the impact issue?

8         MR. KESSLER:  Absolutely not, your Honor.

9    Because we did not change by this stipulation either what

10   the Illinois Brick rule is or is not.  And, in fact, even

11   if we're wrong about Illinois Brick, they would still

12   have to, under Section 4, raise a genuine issue of

13   material fact on the impact or they couldn't go to file

14   on summary judgment.

15        In other words, there's two steps to this

16   analysis which clearly the stipulation did not change.

17        One is can they -- as a matter of law can they

18   prove Section 4 injury not being direct purchasers, which

19   this step didn't address at all.  And, No. 2, if they

20   can, as a matter of law, pursue it, they'd still have to

21   raise a general issue of material fact to go to trial

22   even on the impact issue.  And we got there.

23        So this step doesn't change either of those

24   points.

25        MR. SIMON:  Your Honor, I wasn't going to speak

                              95

BARKLEY
Court Reporters

1    today, but what Mr. Kessler is saying right now is

2    totally revisionist history.

3            I stood I think this in very spot, and I was

4    arguing at one of the hearings, and Mr. Kessler pointed

5    to me and said, Mr. Simon, do you stipulate that fact

6    that impact can remain in this case.

7            And he said it in the middle of my argument.

8            He also said at the May 26, 2011, hearing

9    exactly what Lehmann said to you.  "In LCD they argued

10   impact, okay, and they argue that under the Sugar

11   Linerboard cases.  They have standing to sue for that.

12   Okay.  If they were doing that here, I wouldn't have this

13   motion.  Okay.  So they should be doing, asserting what

14   they asserting in LCD."

15           That's exactly what the stipulation was

16   negotiated and intended to be.  And Mr. Kessler is now

17   running away from it, and he's running away from it

18   because he wants it to suit his argument here today.

19           If you accept his argument, it takes entirely

20   the entire history of this case out of that stipulation.

21   He's reading it out just like he wants to read out

22   Hanover Shoe and Royal Printing and everything else.

23   It's actually revisionist history.

24           MR. KESSLER:  Your Honor, if I may respond since

25   Mr. Simon came into my argument.

96

BARKLEY
Court Reporters

1          First of all, what he is quoting when I said we

2     wouldn't be here making this motion here today was we

3     wouldn't be making the Rule 11 motion.  What that

4     argument was about had nothing to do with the subsequent

5     negotiation of this stip, in all due respect to Mr.

6     Simon.

7          During the Rule 11 motion, okay, which your

8     Honor recalls was quite contentious, what we said is had

9     they been making the argument in LCD under Sugar and

10    Linerboard, we would not have brought a Rule 11 motion.

11    And that is a hundred percent correct.

12         The Rule 11 motion was solely based on the lack

13    of any objective basis for alleging a conspiracy on the

14    finished products.  That's what was discussed in that

15    hearing.  That's what was discussed about will you

16    stipulate to that.  It had nothing to do with this.

17         After that hearing, your Honor ruled and

18    granted, made a recommendation on Rule 11.

19         Subsequent to that, we negotiated a stip to

20    vacate the Rule 11 sections and to do this stip.  And

21    this stip, I am happy has an officer of the court, had

22    nothing to do with Illinois Brick one way or the other.

23    It neither required them to agree with our argument or

24    required us to not agree or required us to agree with

25    their argument.

1                It had nothing to do with Illinois Brick, which
2        we now are arguing to the Court.
3                In fact, your Honor will remember, and this I'm
4        quite sure, okay, in the argument for Rule 11, we said
5        what are the reasons to consider that motion now was
6        because it could lead to issues like who's in the class,
7        who's not in class, who is direct, who's not indirect.
8        In fact, your Honor noted that in your Honor's opinion on
9        the Rule 11 that this could have significance with
10       respect to other issues in the case.
11               Well, now it has significance with respect to
12       other issues in the case because it's clear if they were
13       alleging a conspiracy of finished products, then we
14       couldn't make this Illinois Brick argument because then
15       we would have been -- they would be direct purchasers of
16       the product that was there.
17               So, again, with all due respect to Mr. Simon,
18       he's conflating what was going on during the Rule 11 in
19       this stip, and I'm not arguing this stip precludes them
20       from taking this position.  Quite the contrary, I want to
21       be clear.  The stip has nothing to do with this argument
22       one way or the other except to the extent it precludes
23       them making the conspiracy claim.  It has great
24       significance on that point of the argument, but it
25       doesn't preclude them from --

                                    98

BARKLEY
Court Reporters

1              HON. CHARLES LEGGE:  Whether the stipulation

2      precluded you from making any contention other than they

3      can go ahead all the way with their case --

4              MR. KESSLER:  And I would say, your Honor, that

5      was the intention of this.  It would have said something

6      like parties hereby will not make any argument that Sugar

7      and Linerboard is not the law and would that said it

8      won't make any Illinois Brick argument that there's no

9      way to read that into that particular language.

10             HON. CHARLES LEGGE:  What you're really saying

11     is the thing was flowing along.

12             MR. KESSLER:  Yes.

13             HON. CHARLES LEGGE:  You took one rock out of

14     the river bed, which was the issue of is there -- are we

15     concerned with the conspiracy of the finished product and

16     just simply leave the rest to flow along as it will.

17             MR. KESSLER:  That's correct.  And they wanted

18     -- the reason for that language, to make it clear, is

19     that they were not precluded from arguing this.  But it

20     wasn't to make it clear that we were precluded from that,

21     that we were waiving Illinois Brick.  That would make no

22     sense in the language of this stip.

23             I don't think anyone waived anything other than

24     the conspiracy point.

25             MR. GUIDO SAVERI:  Your Honor, I've been quiet.

BARKLEY
Court Reporters

```
 1              HON. CHARLES LEGGE:  I was wondering, Mr.
 2    Saveri.  It's been two hours 25 minutes and you haven't
 3    said a word.
 4              MR. GUIDO SAVERI:  Your Honor, the record speaks
 5    for itself.  I think the position that Mr. Lehmann made,
 6    this is a -- it's a simple issue.  There's no doubt that
 7    what Mr. Kessler is saying is incorrect.  He doesn't have
 8    standing.
 9              The position that we took that we do have the
10    right to go forward in spite of the fact that our nine
11    day plaintiffs only bought the finished product.
12              I think the feel that I feel maybe surprised
13    that I think that Mr. Kessler, with all due respect to
14    Mr. Kessler, and although we fight back and forth, we're
15    relatively good friend.  I just --
16              HON. CHARLES LEGGE:  Comes now the but.
17              MR. GUIDO SAVERI:  He's making all that money
18    that he's making on representing the National Football
19    League, and I told him this morning that my office when I
20    was with Joe Allioto was responsible under the Radovich
21    case, to have football under the antitrust laws rather
22    than the rules that applies to baseball.
23              HON. CHARLES LEGGE:  Will you take him out to
24    continue dinner please?
25              MR. KESSLER:  You know what, I told him I
```

BARKLEY
Court Reporters

1   thanked him for that and maybe dinner is a good idea.

2           MR. GUIDO SAVERI:  But the point is he's

3   reneging, he's reneging on the stipulation that we made

4   in connection with the Rule 11 motion.

5           The stipulation, as Mr. Simon said, was exactly

6   the reason we entered into that stipulation.  We could

7   have denied that, taken an appeal on the ruling and

8   everything else.  The purpose of that stipulation was as

9   is specifically written into it, that the issue of the

10  finished product and the effect that the price fix on the

11  -- on the tube, the price fix on the tube had an effect

12  on the finished product, and that based on that

13  stipulation, the agreement was that we would be permitted

14  to show that the price fix on the tube had an effect just

15  like LCD on a finished product.

16          That is why we entered into the stipulation, and

17  it surprises me to hear of the position of

18  Mr. Kessler.  He's taken that position because he is

19  stuck with the stipulation that he suggested, and

20  specifically when he threw it at Mr. Simon time and time

21  and again and at me, why don't you do what was done in

22  LCD.  Why don't you do what you're doing in LCD.  Why

23  don't you do what you're doing in LCD.  We did.  And he

24  ought to live by it.  And the stipulation that we entered

25  into is exactly what the law is and what it permits us to

BARKLEY
Court Reporters

1   do.

2           He is knocking the antitrust law back a million

3   years.  That he has to argue that because he put himself

4   in a position that now he wants to renig from.

5           The position that we took in this case is

6   absolutely right.  If you listen to his arguments, you'll

7   knock out all the law.

8           MR. SIMMONS:  Mr. Kessler's clients aren't the

9   only one that signed the stipulation.

10          HON. CHARLES LEGGE:  No, I understand.

11          MR. SIMMONS:  I think Mr. Kessler put it very

12  succinctly.

13          Nothing in that stipulation precludes the Court

14  from considering the motion that has been brought before

15  it.  What it does require is that if that motion is

16  denied, if we lose, that the plaintiffs have to put to

17  their burden of maintaining their status of direct

18  purchasers by showing that there was an impact on the

19  alleged price-fixed -- from the alleged price-fixed

20  product, the tubes, into the product that they didn't

21  purchase and for which there is no price-fixing

22  conspiracy, the finished products.  That's what the

23  stipulation says.

24          They're not relieved of that burden if they're

25  permitted to go forward, but there's no -- we've had no

BARKLEY
Court Reporters

1    understanding to the contrary.  The notion that anyone is

2    reneging on the stipulation is simply, with all due

3    respect, that is revisionist --

4              MR. KESSLER:  Your Honor, I have great fondness

5    and respect for Mr. Saveri, and everyone on the

6    plaintiffs' side.  I have a 25-page brief filed in

7    opposition to our motion.  Nowhere in the 25 -- this is

8    their brief.  And nowhere in the 25 pages did they make

9    what they now believe is this preclusive argument that

10   the stipulation precludes this motion.

11             One would think --

12             HON. CHARLES LEGGE:  Maybe I invited it by

13   asking the question.

14             MR. KESSLER:  One would think if that was the

15   clear understanding the way they make it, that somewhere

16   in these 25 pages they could have squeezed that argument

17   in.  I would suggest, your Honor, that wasn't the

18   understanding.  What we did was we left this issue for

19   the Courts to decide, which is where we are.

20             MR. GUIDO SAVERI:  I just want to say, one

21   minute, aside from the stipulation which I think he

22   should live by, the position we made today we are right

23   on the law.  Aside from the stipulation, even if there

24   were no stipulation, which he should live by, we are

25   right on the position that we made that we have stated

103

BARKLEY
Court Reporters

1    what the law is and what the Court should follow.

2         MR. SIMON:  The stipulation all allows us to do

3    discovery on the very issue he's saying shouldn't be in

4    the case for which it's purely a legal issue and not a

5    factual issue.

6         We would never have end into agreement to do

7    discovery on that issue unless as we say as opposed to

8    what Mr. Kessler says.

9         MR. GUIDO SAVERI:  And, technically speaking, in

10   relation to the comment just made down there, should

11   there be a ruling that a finished product is not involved

12   in the case, Toshiba is still in the case, in the LCD

13   case.  And if there's a ruling in this case to the

14   contrary, there's nothing to prevent Toshiba to going to

15   Judge Illston and saying there's a contrary decision in

16   CRT right on the button.  Because Toshiba is still in

17   both cases.

18        And so there be would a ruling, which it would

19   be wrong, respectfully, your Honor.  They would cite that

20   decision, and they would go in Monday because it's the

21   LCD case is set to be tried on April 23.  So they'll go

22   in with a ruling and say that judge issued a ruling

23   exactly contrary to yours.

24        I respectfully submit that our position is

25   correct, but that's what could happen and would happen.

BARKLEY
Court Reporters

1          HON. CHARLES LEGGE:  All right.  The motion will

2   stand submitted.

3          MR. ALLIOTO:  Your Honor, I beg your pardon.

4   This is Mario Allioto on behalf of the indirect

5   purchasers.  May I be heard?  I know you've heard a lot

6   of argument, and I want to make a few points.

7          There was some suggestion today that there is

8   just a labeling problem or a realignment problem, that if

9   the direct purchasers' claims are knocked out, that they

10  would simply be thrown into the indirect purchaser

11  bucket.  I think that was the phrase that was used, "the

12  indirect purchaser bucket."

13         HON. CHARLES LEGGE:  And you're the bucket

14  bearer?

15         MR. ALLIOTO:  Yes.

16         There is an indirect purchaser bucket, and it's

17  a bucket that alleges a class on behalf of end users of

18  CRT products.  End users.  That has nothing to do with

19  the class that is being alleged by these, we'll call them

20  for the time being, direct purchasers.

21         HON. CHARLES LEGGE:  Are you picking up that,

22  are you picking that language up out of your consolidated

23  complaint?

24         MR. ALLIOTO:  Yes, your Honor.

25         HON. CHARLES LEGGE:  I don't have it in front of

BARKLEY
Court Reporters

1   me, and I've forgotten the language.

2          MR. ALLIOTO:  We will see to it that you've got

3   it.

4          HON. CHARLES LEGGE:  I've got it.  It's in my

5   cubicle.  I've got it.  But I wanted to make sure where

6   you were getting that language.  That's from your own

7   complaint?

8          MR. ALLIOTO:  From the most recent operative

9   complaint.  It would have been end user complaint.

10          And that is very important because this group,

11   this direct group has completely different claim.

12   They're not subsumed within our class.  They would have

13   to -- I don't know what would happen, but they would, I

14   assume, would have to realign claims under the state law.

15   And let me just say what the effect of that would be.  It

16   would drastically reduce their case because, as your

17   Honor knows, under the state law not every thing has an

18   indirect purchaser statute.

19          HON. CHARLES LEGGE:  I'm aware of the economic

20   impact on the case.

21          MR. ALLIOTO:  Okay.  Well, that is, I would go

22   so far as to say I don't even know if there would be a

23   case.  But I'll leave that to other --

24          HON. CHARLES LEGGE:  What you're telling me -- I

25   think what you're telling me is that were I to agree with

106

BARKLEY
Court Reporters

1    the defendants, it wouldn't be automatically that they'd

2    suddenly fall into your group and proceed ahead with your

3    case because you are now proceeding with it.

4            MR. ALLIOTO:  Yes, it would be automatic that

5    they would not fall into my group.

6            HON. CHARLES LEGGE:  Okay.  Okay.  I understand

7    what you're saying.

8            MR. ALLIOTO:  That is the point, your Honor.

9            HON. CHARLES LEGGE:  I understand.

10           MR. ALLIOTO:  That is the only point.

11           I appreciate you hearing me out.  Thank you.

12           HON. CHARLES LEGGE:  By the way, I got your

13   letter yesterday about the matter of the translations,

14   and I'll go back and take another look at that.  Okay.

15           MR. ALLIOTO:  Thank you, your Honor.

16           HON. CHARLES LEGGE:  We'll recess then.  I'm

17   signing off on the telephone.

18           (Hearing concluded at 12:54 p.m.)

19

20

21

22

23

24

25

Reporter's Transcript of Proceedings

BARKLEY
Court Reporters

```
1                    COURT REPORTERS CERTIFICATE

2     STATE OF CALIFORNIA      )
                               )  ss.
3     COUNTY OF MARIN          )

4

5

6            I, Donna J. Blum , hereby certify:

7            I am a duly qualified Certified Shorthand

8     Reporter, in the State of California, holder of

9     Certificate Number CSR 11133 issued by the Court

10    Reporters Board of California and which is in full

11    force and effect.

12           I am not financially interested in this

13    action and am not a relative or employee of any

14    attorney of the parties, or of any of the parties.

15           I am the reporter that stenographically

16    recorded the testimony in the foregoing

17    proceeding and the foregoing transcript is a true

18    record of the testimony given.

19

20    Dated: APRIL 9, 2012

21

22

23

24

25


                             108
```

BARKLEY
Court Reporters

**$**

**$2000 (2)**
33:11,18
**$30 (1)**
33:11
**$35 (2)**
85:4,7
**$350 (1)**
85:2
**$700 (1)**
85:1

**0**

**07 (1)**
46:17

**1**

**1 (1)**
56:8
**109 (1)**
45:7
**11 (20)**
13:19;44:9,16,18,24;
45:4,14,24;48:7;81:10;
97:3,7,10,12,18,20;98:4,
9,18;101:4
**110 (1)**
45:7
**1109 (1)**
46:8
**1116 (1)**
22:13
**1118 (1)**
46:9
**1119 (1)**
46:9
**118 (1)**
17:19
**12:54 (1)**
107:18
**13 (2)**
14:2;80:13
**14 (2)**
44:14,23
**16 (2)**
94:2,5
**17 (3)**
54:11;65:19;66:2
**18 (2)**
54:11;86:19
**197 (1)**
52:16
**1995 (1)**
56:8

**2**

**2 (4)**
15:12;27:12;34:24;

95:19
**20 (1)**
6:1
**2001 (1)**
52:11
**2007 (1)**
56:8
**2008 (2)**
46:8;51:16
**2009 (1)**
43:13
**2010 (4)**
43:17,21;55:6;78:24
**2011 (9)**
45:4,6;51:22,23;
59:11;75:15,15;80:13;
96:8
**2012 (1)**
6:1
**203 (2)**
52:16,16
**206 (1)**
46:17
**207 (1)**
58:4
**216 (2)**
38:10,15
**23 (1)**
104:21
**25 (6)**
56:8;69:5;100:2;
103:7,8,16
**25-page (1)**
103:6
**26 (2)**
45:6;96:8
**267 (1)**
46:15
**291 (1)**
46:17
**2d (1)**
66:1
**2nd (2)**
50:21;54:10

**3**

**3 (1)**
78:24
**30b6 (2)**
76:9;77:25
**30b6s (1)**
76:20
**327 (1)**
50:21
**38944376 (1)**
59:11

**4**

**4 (19)**
17:15;18:9;22:8;
23:13;82:12,18,21;83:2,

12;85:7;89:4;91:8,21;
93:25;94:6,20,20;95:12,
18
**405 (1)**
55:12
**431 (1)**
19:21
**497 (2)**
38:9;58:3

**5**

**50 (7)**
18:5;67:12,23;68:17;
69:6;84:17;85:2
**523 (1)**
22:13
**5357906 (2)**
51:23;75:15
**56b (2)**
37:7,15
**56d (3)**
41:14;74:16,21
**579 (2)**
54:10;66:1
**586 (1)**
46:8

**6**

**60 (1)**
56:2
**621 (1)**
50:21
**657 (1)**
61:22
**658 (3)**
61:22,24;80:8

**7**

**7 (2)**
51:22;75:15
**70 (1)**
56:2
**720 (1)**
19:21
**75 (1)**
67:23
**795 (1)**
61:21

**8**

**8 (1)**
79:5
**80 (3)**
56:2;72:17;84:19
**85 (1)**
13:15

**9**

**9:54 (1)**
6:2
**90 (2)**
67:24;72:16
**947 (1)**
44:20

**A**

**able (4)**
19:8;23:22;27:13;69:7
**absent (1)**
20:16
**absolutely (4)**
55:17;87:12;95:8;
102:6
**absorb (1)**
17:21
**absorbed (2)**
61:19;69:21
**accept (6)**
8:21;16:8;70:8;72:9;
74:4;96:19
**accepting (2)**
35:7;74:2
**accused (1)**
49:2
**accusing (1)**
58:1
**achieving (1)**
72:25
**acknowledged (1)**
50:19
**acknowledgement (1)**
93:10
**acknowledges (1)**
36:4
**Act (10)**
23:14;28:14;42:9;
49:4;61:1;82:13,22;
91:8,21;94:7
**action (10)**
8:4,4,5,14,18;14:18;
49:11;64:19,23;74:24
**actions (1)**
8:13
**actually (9)**
7:21;8:5;12:4;15:19;
18:8;30:18,21;49:5;
96:23
**add (3)**
19:4;26:4,5
**adding (1)**
54:20
**addition (1)**
21:10
**additional (2)**
53:15;66:10
**address (7)**
10:17;23:6;26:24;
34:23;58:25;87:6;95:19
**addressed (2)**
53:10;59:16

**adhere (1)**
22:7;82:25
**administration (2)**
39:24;54:14
**adopt (3)**
35:5;40:7,8
**adopted (3)**
35:7;46:1;64:21
**affect (3)**
45:16;52:5;82:10
**affected (7)**
21:5;33:18;45:3;48:6;
69:19;85:11;92:1
**affiliated (8)**
26:18;56:3;83:18,21,
22,23;84:2,19
**affiliates (5)**
57:6,7;65:6,25;70:5
**affirmative (1)**
56:21
**affirming (1)**
44:2
**afforded (1)**
49:10
**afoul (1)**
61:4
**again (17)**
15:8;32:7;36:21;
44:16;46:12;50:6;53:11;
59:9,13;82:4,6,8,20;
88:22;90:14;98:17;
101:21
**against (15)**
7:6;10:23;11:1,3,9,19,
19;14:25;27:2;46:21;
73:2,23;76:12,15;79:8
**AGC (3)**
86:1,5,7
**agree (7)**
14:22;64:6;68:17;
97:23,24,24;106:25
**agreed (1)**
59:3
**agreement (4)**
29:10;81:9;101:13;
104:6
**agrees (1)**
71:12
**ahead (4)**
10:14;43:5;99:3;107:2
**aligned (1)**
56:19
**allegation (5)**
16:24;32:11;37:3;
63:24;85:3
**allegations (9)**
13:25;15:24;36:15;
40:3;48:17;52:17,18,19;
56:10
**allege (17)**
24:4;44:11;61:9;79:9,
24;81:12,13,16,19,25;
86:9,24;88:19;91:13;

Case 4:07-cv-05944-JST   Document 1274-2   Filed 07/24/12   Page 110 of 125
In Re: Cathode Ray Tube (CRT)                                    Reporter's Transcript of Proceedings
Antitrust Litigation                                                              March 20, 2012

93:15;94:1,20

**alleged (25)**
9:12;10:6;24:9;45:16;
53:18;58:6,19;59:25;
60:7,20;61:24,25;66:13;
70:25;71:23;79:21;
80:23;81:14;83:15;
86:15;88:8;93:16;
102:19,19;105:19

**allegedly (2)**
15:9;44:6

**alleges (2)**
79:1;105:17

**alleging (6)**
35:12;72:7;87:1;88:4;
97:13;98:13

**Allioto (12)**
100:20;105:3,4,15,24;
106:2,8,21;107:4,8,10,
15

**allocating (1)**
69:3

**allocation (2)**
54:25;66:18

**allow (11)**
26:1,7,13;45:21;
50:22,24;54:15;69:1;
72:14;73:19;91:13

**allowed (6)**
18:9;26:6;30:6;45:2;
53:17;66:12

**allowing (2)**
39:2;69:19

**allows (1)**
104:2

**alone (3)**
23:14;65:3;89:21

**along (2)**
99:11,16

**altered (2)**
63:3,6

**alternatives (1)**
50:22

**although (6)**
12:25;56:1;62:10;
77:4;80:21;100:14

**always (2)**
31:2;84:21

**amend (1)**
11:24

**America (1)**
82:15

**among (4)**
24:5;48:9;54:5;66:17

**amongst (2)**
66:19;69:4

**amount (5)**
20:12;50:23;53:3;
55:2;69:20

**ample (1)**
38:24

**analogous (1)**
53:25

**analogy (1)**
79:23

**analysis (23)**
19:3;26:20;29:1;33:1,
13;34:20;35:3;36:7;
50:9,11;51:15,19,20;
67:4,17,20;68:19,22,25;
70:13,14;71:6;95:16

**analyze (2)**
77:3,4

**Antitrust (31)**
6:22;19:4,9;20:23;
27:9;29:7;44:4;51:6,13;
52:16;54:14,22;56:25;
57:21,25;58:6;61:9;
68:8,13;69:1,16;70:18;
72:11;73:4;78:21;84:10;
85:13,25;87:5;100:21;
102:2

**anymore (2)**
27:24;90:5

**apologize (1)**
14:4

**appeal (2)**
43:15;101:7

**appealed (3)**
36:20;90:2,2

**appeals (1)**
36:17

**appearance (2)**
6:13;7:1

**appearances (3)**
6:7,11,25

**appears (1)**
13:14

**appellants (1)**
22:14

**appellees (2)**
50:23,25

**Apple (2)**
17:1;70:2

**applicable (3)**
48:3;58:21;67:13

**applies (2)**
7:20;100:22

**apply (5)**
19:2;37:2,4;38:20,23

**applying (2)**
7:25;71:7

**apportion (1)**
69:8

**apportionment (2)**
69:9,11

**appreciate (5)**
14:23;15:3;74:13,13;
107:11

**apprise (1)**
41:6

**approbation (1)**
55:5

**appropriate (1)**
44:13

**approve (1)**

23:22

**April (1)**
104:21

**argue (11)**
11:20;13:6;25:16;
26:20;32:22;33:14;45:8;
81:9;91:19;96:10;102:3

**argued (8)**
24:20;35:6;43:12,14;
45:8;78:18;89:3;96:9

**arguing (19)**
23:11,12;37:10,12;
38:22;39:12;41:2,9,11,
11,13;43:8;47:22;67:19;
85:19;96:4;98:2,19;
99:19

**argument (42)**
10:18;22:18,23;26:16,
25;27:1;28:16;37:7;
45:24;56:24;57:3;62:3;
66:6,7;67:1,22;68:3;
69:13;70:8;72:9;78:14;
86:22,23;89:7;90:18;
96:7,18,19,25;97:4,9,23,
25;98:4,14,21,24;99:6,8;
103:9,16;105:6

**arguments (4)**
7:12;23:4;84:17;102:6

**arisen (1)**
11:2

**array (1)**
16:20

**article (1)**
48:2

**aside (3)**
18:18;103:21,23

**aspect (1)**
54:8

**aspects (1)**
20:22

**assert (5)**
62:8,15,25;63:1,9

**asserted (1)**
45:11

**asserting (6)**
45:11;61:9,15,15;
96:13,14

**assertions (1)**
63:15

**association (1)**
30:8

**assume (12)**
7:14;23:9,21,23;
29:11,20,24,25;33:15,
17;63:12;106:14

**assuming (5)**
9:10,11;22:2;39:4,9

**assumption (1)**
33:19

**assumptions (2)**
22:3;39:10

**attempting (2)**
8:25;59:14

attended (1)
87:5

**attorney (1)**
73:1

**attracted (1)**
7:8

**AU (1)**
46:21

**August (3)**
10:2;13:18;43:13

**AUO (2)**
68:10;73:15

**authority (1)**
73:18

**automatic (2)**
38:21;107:4

**automatically (2)**
25:17;107:1

**avenue (1)**
51:5

**avoid (1)**
23:13;90:14;92:14

**aware (1)**
106:19

**away (5)**
25:12;27:19;84:16;
96:17,17

**axis (1)**
80:3

**B**

**back (17)**
14:6;15:23;40:25;
43:13;48:13;52:13,22;
63:3;78:12;81:15;82:23;
85:18;91:9;93:2;100:14;
102:2;107:14

**bad (1)**
84:14

**Bamberg (2)**
58:13,16

**bar (1)**
58:20

**baseball (1)**
100:22

**based (15)**
13:24;16:3;19:1;40:3,
16;49:5;67:21;86:4,22,
23;88:3;89:14;91:12;
97:12;101:12

**basic (1)**
72:14

**Basically (6)**
23:11;29:15;38:22;
39:11;60:12;94:25

**basing (1)**
86:18

**basis (7)**
12:8;25:4,4;54:15;
81:11;94:11;97:13

**Bear (1)**
73:20

**bearer (1)**
105:14

**bears (1)**
9:25

**became (1)**
23:18

**become (1)**
16:21

**bed (1)**
99:14

**beg (1)**
105:3

**beginning (2)**
65:16;91:10

**begun (1)**
75:22

**behalf (5)**
7:15;41:4;57:25;
105:4,17

**behind (1)**
73:18

**belief (2)**
43:9,16

**belong (1)**
19:15

**below (1)**
71:2

**benefit (1)**
43:22

**besides (1)**
10:9

**best (1)**
92:23

**beyond (2)**
29:23;30:22

**bid (1)**
49:4

**bids (1)**
48:21

**big (2)**
32:21;84:18

**bigger (1)**
19:16

**binding (5)**
34:9,10,11,13,15

**bit (2)**
48:14;57:14

**blanket (2)**
7:24;11:7

**block (3)**
48:18,18;54:2

**blow (1)**
73:4

**Boies (1)**
41:10

**borrowing (2)**
51:4;71:1

**both (16)**
35:16;40:1;49:12;
51:24;52:9;55:16,19;
57:11;61:11;65:7;80:23;
87:16,23;88:5;90:7;
104:17

Case 4:07-cv-05944-JST   Document 1274-2   Filed 07/24/12   Page 111 of 125
In Re: Cathode Ray Tube (CRT)
Antitrust Litigation
Reporter's Transcript of Proceedings
March 20, 2012

**bottom (1)**
88:20
**bought (19)**
8:5,6;30:7;33:15;42:6;
50:1,13;52:1;58:7;60:7,
25;61:24;63:2;70:3,4,4;
71:24;88:20;100:11
**bound (1)**
94:3
**box (1)**
92:21
**boxes (1)**
52:24
**Break (3)**
40:24;78:5,11
**Brick (69)**
17:14;18:11,24;19:2,
19;21:10,10,12,23,24;
22:3,7,17;24:14,17,17;
25:19;26:7,12;29:1;
33:23;34:14;35:17;
36:10;38:20;39:10;
48:15,16,16;49:10,22,
25;54:1;58:20;61:5;
66:16,22;67:5,13;68:21,
24;69:12,14,14;71:18;
78:19;79:8;80:2;82:19;
83:1,8,25;86:2,6;87:10,
13;88:25;89:8;91:22;
94:3,16;95:3,10,11;
97:22;98:1,14;99:8,21
**Brick's (1)**
87:11
**brief (12)**
8:13;43:17;45:4,6;
52:7;55:25;56:23;62:3,
7;74:15;103:6,8
**briefing (3)**
8:21,24;32:7
**briefs (2)**
7:9;55:4
**bright (6)**
18:23;21:23;34:2;
35:2;58:23;76:22
**bring (5)**
38:11;68:18;70:2;
72:6,8
**brings (2)**
34:3;60:15
**broader (1)**
38:12
**brought (2)**
97:10;102:14
**bucket (6)**
94:23;105:11,12,13,
16,17
**bundled (1)**
72:2
**buoyant (1)**
20:3
**burden (2)**
102:17,24
**business (1)**

**businessman (1)**
19:25
**button (1)**
104:16
**buy (12)**
16:15,17;32:4,10,10;
49:11;58:16;62:20;
63:23;65:1,3;70:2
**buyer (1)**
20:11
**buyers (1)**
58:6
**buying (3)**
31:23,24,25
**buys (2)**
16:18;17:21

## C

**calculate (1)**
22:19
**CALIFORNIA (4)**
6:1;78:25;80:4,5
**call (3)**
6:7;7:24;105:19
**calling (1)**
6:25
**came (2)**
36:9;96:25
**can (27)**
6:13,17,18;7:2;16:4,7;
20:25;23:12;27:15;31:9;
49:12,13;56:14;63:18;
71:4;72:16;74:19;80:20;
82:5;91:2;92:7;95:2,17,
17,20;96:6;99:3
**candy (9)**
52:1;53:13,21,22;
61:13,17;66:4,6,9
**cans (5)**
31:10,13;59:25;79:3;
80:1
**card (1)**
6:14
**care (1)**
77:9
**careful (1)**
74:3
**cartel (3)**
49:12;72:12,18
**cartels (2)**
73:2,3
**carve (1)**
38:25
**case (154)**
8:9,11,22;9:13,17;
10:8,11,25;11:7;12:23;
13:7,13;15:12,14,21;
16:3;17:13;18:9;19:15,
16;21:21,22,22;24:15;
24:7,10,11;25:1,6;29:8,
18;30:6,6;31:9,10,12,15,

84:13

16,20,21;32:2,11,13;
33:1,8,9,24,24,24,25;
34:1,1;35:25;36:9;38:2;
39:11,19,24,25;40:16,
17;44:25;45:18,20,24,
25;47:19;48:2,24;50:6,
7;51:25;52:4,17;53:5,6,
12;55:9,20,21;56:12;
57:16,19;58:4,10;59:7,
17,22;60:6,9,15;61:23;
62:2;63:4,24;65:17,18;
66:5,19;67:15;68:10;
70:21,21;71:13;73:8,9,9,
10,21,23,25;74:1,4;75:3,
4,7;78:24;79:7,17;80:14,
20;81:22;82:11,15,18;
85:11,11;88:15,22;92:2,
7;93:21,21,24;94:4,8;
96:6,20;98:10,12;99:3;
100:21;102:5;104:4,12,
12,13,13,21;106:16,20,
23;107:3
**case-by-case (4)**
18:25;19:3;32:25;
33:13
**cases (49)**
7:10;12:14;15:13,22;
16:2;17:14;25:2,21,25,
25;28:1;31:8,9,18;
32:17;36:6,7;38:21;
41:25;45:9;48:14;49:21,
22,24;51:23;55:6,7,10;
57:15,18,22;64:22;67:5;
68:14,16;71:9;73:12,19;
74:9;75:1;85:14;89:10,
12,14;90:24;91:2,20;
96:11;104:17
**category (2)**
40:10;94:16
**Cathode (6)**
6:22;7:21,22,23;9:13;
59:16
**causation (1)**
40:16
**caused (1)**
49:18
**causing (1)**
82:9
**caution (1)**
74:2
**Center (1)**
58:13
**certain (3)**
6:8;12:22;13:15
**certainly (6)**
11:3;13:20;36:1,11;
37:4;64:7
**certification (3)**
13:5;24:24;46:12
**certified (3)**
11:15;46:13,18
**certify (1)**
11:20

cetera (4)
13:17,17;59:12;84:1
**chain (8)**
49:1,16,20;54:6;58:5;
66:17;90:23;91:4
**challenge (1)**
73:15
**challenged (1)**
58:14
**chance (1)**
65:19
**change (9)**
19:24;20:7;48:25;
60:12;79:11;82:9;95:9,
16,23
**changed (1)**
60:13
**changes (1)**
26:20
**changing (2)**
39:17;82:21
**channel (1)**
42:13
**channels (3)**
68:20;69:2,4
**character (2)**
39:18;60:12
**charge (2)**
28:21;50:17
**charged (2)**
57:5,7
**CHARLES (90)**
6:5,21;7:17;11:6,9,12;
12:6,12;13:12;14:6,12,
16,23;15:3,18;23:16;
24:7;30:17;37:17,21;
38:2,13,17;39:5,8;40:6,
15,20,22,25;41:7,15,20,
22;42:11,23;43:1,3,24;
44:17,21;46:5,10,14,16,
23;62:20;63:22;64:2,10,
12,15;73:20;74:7,12;
75:7,12;76:11,22,25;
77:9,13,17;78:4,9,12;
80:9;82:16;93:1,4;95:5;
99:1,10,13;100:1,16,23;
102:10;103:12;105:1,13,
21,25;106:4,19,24;
107:6,9,12,16
**choose (1)**
11:24
**chose (1)**
40:11
**chosen (1)**
20:4
**Circuit (45)**
18:12,13,20,22;19:6;
21:17,20,23,25;22:1,9,
12,21,24;25:21;27:11;
31:19,21;34:2;35:5;
37:1,13;50:9,19;51:7,16,
21;53:10,16;54:3,7,9,10;
58:20;59:20;64:8;65:18;

71:2,4;73:13;79:7;
84:12;90:3,9,12
**circumstance (1)**
54:25
**circumstances (5)**
15:16;39:3;61:7;84:5;
91:21
**cite (12)**
23:9;26:12;29:13;
30:5;35:14,15;52:10;
57:15,17;75:14;87:6;
104:19
**cited (7)**
13:9;31:9;43:17;
45:23;55:5;75:1;90:23
**cites (1)**
34:24
**citing (4)**
41:25;44:21,23;86:12
**CITs (1)**
11:22
**City (1)**
59:20
**civil (1)**
68:15
**claim (27)**
15:16;16:4;26:17;
27:24;47:13;52:4;55:22;
58:22;68:1,6,19;82:18;
70:2,6;72:6,8;80:15;
81:8,17;83:20;84:3;
93:11,12;94:2;98:23;
106:11
**claimed (1)**
7:25
**claims (13)**
10:4,5;14:25;27:19;
55:14,16;64:22,23;
66:11;72:21;79:8;105:9;
106:14
**clank (1)**
17:15
**class (29)**
7:25;11:9,15,20,21,25;
13:4,5,6,10,13,21,22;
14:17;24:24;25:4,4;
40:12,13;41:9;42:22;
46:12;56:7;94:10;98:6,
7;105:17,19;106:12
**classes (4)**
39:21;40:1,1;46:18
**class-wide (1)**
94:11
**Clayton (9)**
23:13;42:9;49:4;61:1;
82:12,22;91:8,21;94:6
**clear (11)**
12:17;19:13;24:2;
27:6,20;56:5;98:12,21;
99:18,20;103:15
**clearly (4)**
34:15;45:18;57:9;
95:16

clients (1)
102:8
close (2)
38:8;51:5
coated (1)
60:2
coconspirator (2)
56:8,9
co-conspirator (2)
31:13;56:9
coconspirators (1)
56:7
codefendants (1)
56:13
combined (1)
53:20
comfortable (3)
6:18;15:20;90:11
coming (1)
92:9
comment (1)
104:10
commodity (3)
53:19;54:15;72:15
companies (8)
26:3;48:19;56:3;75:4;
76:14;83:18;84:2;90:21
company (6)
28:6,10;29:24;63:23;
71:21;84:23
company's (2)
19:23;20:7
compare (1)
79:20
comparing (1)
10:8
competing (2)
17:3,6
competitive (1)
57:2
competitors (4)
28:23;30:9;31:5;34:22
complain (2)
9:17;10:10
complainant (1)
55:14
complaint (17)
8:1;11:1,3,13;12:17;
13:14,24,25;40:4;44:10;
83:19;86:12,14;105:23;
106:7,9,9
complaints (3)
12:15;86:24;87:1
complete (5)
51:25;56:1;75:6,20,25
completely (5)
21:18;27:10;29:21;
85:21;106:11
completion (1)
76:2
complex (6)
62:10;63:20;68:23,25;
70:13,14

complexities (8)
27:3,25;49:18;67:10,
19;69:2,12;90:25
complexity (6)
19:4;27:7;77:4;89:4;
90:22;91:6
complication (1)
67:3
complications (3)
53:15;66:11;67:2
component (22)
23:18;41:25;42:4,4,
10;44:6;50:8;52:5,10;
57:18;58:24;59:5;62:12;
63:5;67:3,12,21;68:6;
69:23;70:16;80:16,23
components (4)
55:14;65:8,13;69:25
compress (1)
71:25
compressor (12)
31:15,24,25;33:9,12,
17;57:21;60:15;61:23;
62:1;71:24;81:18
compressors (13)
31:20;33:9;60:21,24;
67:15;71:22;72:1;80:6,
17;81:15,17,21;82:5
computer (1)
83:11
computers (3)
46:20;47:3,4
conceded (3)
14:2;89:11,11
concentrating (1)
69:17
conceptual (1)
43:7
concern (13)
19:19;21:15;27:22;
49:6,8,17;53:11;54:4;
59:6;66:15;74:13;89:8,9
concerned (5)
14:20;47:12;56:25;
73:25;99:15
concerning (1)
10:2
concerns (1)
14:8
conclude (1)
37:6
concluded (1)
107:18
concludes (2)
79:23;82:4
conclusion (1)
89:3
conclusions (1)
38:11
concrete (2)
48:18;54:2
conditions (3)
19:24;20:2;23:25

conduct (1)
86:12
confirmed (1)
12:19
confirms (1)
71:12
conflating (1)
98:18
conflict (4)
18:16,19;32:1;73:8
conflicts (1)
73:12
confused (1)
13:12
connection (1)
101:4
consequence (2)
11:23;27:17
consider (7)
8:17;34:21,23;37:17;
48:15;70:15;98:5
consideration (3)
24:12;66:8;89:5
considering (2)
37:13;102:14
consistent (1)
88:18
consolidated (1)
105:22
conspiracies (1)
86:15
conspiracy (67)
10:4;15:16;16:1,4,25;
17:3;24:4;26:10;28:20,
24;32:12;35:12;36:16,
24;37:3;42:9;44:11;
45:2;47:13,16;48:17;
50:1;51:24;52:4,9;53:1,
7;56:11;57:13;59:14;
60:1;65:5,11,24;68:5,13;
71:1,5;72:5;79:15,19,21,
25;80:23;81:4,9,14,16;
86:25;87:2,16,23;88:2,5,
8,13,19;91:13;93:11,12,
16;97:13;98:13,23;
99:15,24;102:22
conspirator (2)
58:19;72:7
conspiratorial (2)
83:15,16
conspirators (6)
26:3;29:18;65:6;
68:17;70:4,9
conspired (7)
30:10;52:19;58:8;
79:2,10;81:20,25
conspiring (5)
26:4;49:2;54:2;58:1;
90:22
construction (1)
48:22
consumer (2)
42:20;79:24

consumers (1)
58:4
contain (3)
59:5;73:22;81:21
contained (2)
59:19;60:3
containers (1)
52:2
containing (7)
9:14;46:4,20;47:14;
61:12,25;71:24
contemplated (1)
25:16
contend (6)
42:21;52:25,25;60:10;
62:10,18
contention (1)
99:2
contentious (1)
97:8
contest (1)
41:16
contested (1)
62:5
context (12)
10:19;15:21;35:11,20,
22,23;36:21;51:3;85:17,
23;86:2;87:4
Conti (32)
9:2,22;14:18,19;
18:21,22;23:2;34:11,12,
13,15;35:6,10,19;40:8;
43:11,14,21;44:1;53:5;
55:8;56:19;70:21;71:8,
13;73:21;74:8;76:5;
85:19,22;87:4,15
continue (2)
94:21;100:24
Conti's (2)
85:18;87:19
contractor (1)
54:1
contractors (2)
48:20,21
contrary (9)
8:22;72:24;78:17;
89:3;98:20;103:1;
104:14,15,23
control (1)
28:7
controlled (13)
29:6,17,18,24;49:1;
58:19;62:16,19,24;65:6,
25;70:5;89:14
controlling (1)
18:20
convince (1)
35:4
correctly (1)
43:19
corrugated (6)
52:2,23,23;80:24;
82:1,2

consumers (1)
cost (2)
17:22;28:13;68:4;69:6
Costco (3)
57:20;59:24;63:4
costs (3)
20:9;84:25;85:1
counsel (19)
13:21;17:11,19,23;
18:3;41:1;43:19;45:5,
10,23;48:10;80:25;81:3;
83:4;91:15,19;92:8,11,
15
count (1)
56:16
counter (1)
39:13
counterproductive (1)
22:5
County (1)
58:13
couple (1)
31:11
course (6)
10:17;11:17;29:9;
81:22;83:6;84:23
court (65)
6:10,14;7:2;17:20;
18:2;19:6;20:20;21:21,
25;22:10,14,22,25;23:1;
26:1;27:5;32:9,13;35:4;
36:9,17,19;37:13;49:3,9;
52:17;54:4,24;58:3;
59:24;61:2,3,23;63:4;
65:22;66:1,16;67:7,15;
68:24;70:13,15;71:22;
72:7;74:14,18;78:7,8,18;
79:6,13,23;80:10,19,21;
82:4,7;84:11;85:9;
90:13;93:23;97:21;98:2;
102:13;104:1
courts (11)
19:5;20:21;25:11,12;
26:6;44:4;64:8;73:5;
84:12;91:24;103:19
Courts' (1)
52:11
covered (2)
52:9;92:25
covering (1)
59:7
create (5)
18:15,25;73:2,8;84:8
created (1)
58:22
creates (2)
31:6;68:6
creating (5)
9:3;21:22;73:1,10,11
criminal (1)
46:21
critical (1)
86:8
Cromley (1)

88:3
**CRT (48)**
  8:6;9:13,14,15;10:4,
  22;12:9,16;13:16,19,19;
  14:3,13,13;15:10;16:11;
  23:22;28:9;32:21;37:18,
  24;41:17,24,24;57:5,13;
  59:19;60:10,12;62:9,12,
  20;63:23,25;65:2,3,14;
  70:7;76:14;83:16;85:1,
  2;86:10,15;87:2,25;
  104:16;105:18
**CRTs (34)**
  7:7;8:6;9:17;10:6;
  12:20,23;13:8;16:5,17,
  25;17:2;24:9;41:19;
  44:11;45:3,17;53:1;
  55:22,23;56:3;59:19;
  62:25;63:2,10;65:9,24;
  67:22;70:3;76:21;86:10,
  15,25;91:16;93:17
**cubicle (1)**
  106:5
**Currently (1)**
  75:21

---

**D**

**dairy (1)**
  79:22
**damage (2)**
  49:11;66:11
**damaged (1)**
  54:16
**damages (11)**
  25:21,23,24;26:1,2;
  40:16;42:8;49:4,14;
  69:3;82:14
**DAP (3)**
  11:1,3;12:14
**DAPs (1)**
  11:19
**date (1)**
  57:3
**dates (1)**
  13:16
**day (1)**
  100:11
**deal (2)**
  7:8;24:23
**dealing (4)**
  60:7;71:16;86:16;
  87:23
**dealt (1)**
  58:17
**decide (4)**
  90:8;92:2,20;103:19
**decided (10)**
  43:10;49:21;75:5,6,
  11;76:10;78:24;80:13;
  85:20;92:4
**decider (1)**
  14:20

**decides (2)**
  17:21;90:9
**deciding (1)**
  84:13
**decision (40)**
  9:21;10:24;18:18;
  22:13;32:3,9;34:4,8,10,
  11,17,19;35:8,9,11;
  36:19;38:24;43:21;44:2,
  9,19;46:11;60:16;64:3;
  65:19;69:12;71:4;75:10;
  79:5;80:6,7,8;86:18,19;
  87:20;88:11,23;90:6;
  104:15,20
**decisions (10)**
  8:22;21:5;32:8;46:5;
  67:8;70:19;77:16,19;
  89:2,6
**declaration (7)**
  41:14;74:16,22;77:11,
  22,23;78:2
**declarations (1)**
  76:9
**declined (1)**
  20:13
**deemed (1)**
  58:20
**defendant (21)**
  12:23;13:17;42:7,8,
  14,24;43:4;49:1,2;50:13,
  14;51:9,13;52:3;57:15;
  59:4,23;61:10,16,25;
  71:25
**defendants (46)**
  7:5,15;24:5;29:17;
  42:3;47:6,8,21,23,25;
  49:17;52:7,19;53:11;
  55:15,24;56:6,23;57:4,8,
  9;58:22;59:15,18;60:8,
  16;62:8,15;63:11,16;
  66:2,7;67:19;71:9,16;
  73:14;75:22;76:9,10;
  77:25;78:14;79:1;81:20,
  25;86:10;107:1
**defendant's (1)**
  86:24
**defendants' (4)**
  6:23;56:12;62:4;86:11
**defenders (1)**
  86:21
**defense (7)**
  43:19;45:5,23;46:22;
  48:10;49:14;67:1
**deficient (1)**
  62:4
**defined (1)**
  13:11
**definite (1)**
  62:13
**definition (3)**
  11:25;13:14;92:5
**degree (1)**
  83:14

**Delaware (23)**
  18:13,19,23;19:6;
  21:17;27:11;32:24;
  33:23;34:13;35:1,1;
  36:12;37:1;51:17;57:16;
  58:12,22,24;66:22;72:2;
  89:1;90:12;91:23
**delays (1)**
  73:10
**Dell (11)**
  17:1;27:14;47:15,24;
  59:9,21;63:10;77:11;
  84:1;88:3,14
**Dells (1)**
  91:25
**demonstrating (2)**
  20:15;67:10
**denial (1)**
  86:4
**denied (3)**
  71:10;101:7;102:16
**deny (4)**
  54:13;56:22;70:14;
  91:19
**denying (4)**
  44:2;46:3;67:20;75:2
**depositions (1)**
  76:4
**described (1)**
  71:19
**desk (1)**
  47:3
**deter (2)**
  28:15;29:8
**determination (1)**
  44:24
**determine (1)**
  20:5
**determined (1)**
  29:3
**deterrence (16)**
  27:16,21,23;51:18,20;
  54:8;55:11;72:20,23,25;
  73:2;84:10,14,14;89:7;
  91:24
**deterrents (1)**
  50:9
**deviation (1)**
  22:16
**device (2)**
  32:4;91:2
**devices (9)**
  32:10;47:14,20,22;
  59:5;71:15;87:24,24;
  88:7
**dictor (1)**
  30:22
**difference (3)**
  58:10;62:21;81:24
**differences (1)**
  91:18
**different (55)**
  9:3;15:12,13;16:11,

13,16,19,19,20;17:6,9;
  20:1,4,9;22:11;26:9;
  27:4;28:19;29:21,21,22;
  30:13,13;31:4,5,6,14,14;
  34:21,22;36:20,24;
  37:25;40:2;49:6;51:20;
  53:20;62:1,9;66:8;
  67:12;68:22;69:4;70:7;
  84:24;89:16,19,20,20;
  90:19;91:7,7,17,17;
  106:11
**difficult (6)**
  20:5;29:1;36:6,22;
  84:20;90:20
**difficulties (1)**
  69:3
**difficulty (1)**
  20:14
**dinner (2)**
  100:24;101:1
**direct (82)**
  7:6;8:4,13,18;13:7,7,
  13;14:2,18;15:24;19:13,
  16;27:12,13,24;38:25;
  40:1,15;41:8,11;42:22;
  43:9,16;46:18;49:13,14;
  51:2;55:1,13,18;56:14;
  64:19,23;65:4,7,9,15;
  66:20,24,25;67:6,9;68:1,
  7,12,18;69:10,18,22,24;
  70:11,14,16,18;71:10,
  23;72:6,19,25;73:1;
  82:2;83:5,8,24,25;84:6;
  86:9,12,14;90:15,16;
  92:7,13,16;93:24;95:18;
  98:7,15;102:17;105:9,
  20;106:11
**directed (3)**
  8:15;10:20;85:17
**direction (1)**
  8:14
**directions (1)**
  57:12
**directly (16)**
  12:23;27:10;37:5;
  47:20,23;52:3;53:18;
  58:16;59:23;63:10;65:7,
  23;66:13;70:2;71:15;
  72:24
**directs (2)**
  39:20;40:9
**disagreed (1)**
  47:9
**discontinued (1)**
  20:18
**discover (1)**
  37:9
**discovery (20)**
  12:18;14:10;17:24;
  44:12;45:1,21;48:7;
  56:1;74:23,25;75:5,18,
  19,21;76:3,3,17;95:6;
  104:3,7

**discuss (6)**
  30:2;34:7;35:1,2,17;
  43:20
**discussed (4)**
  36:19;67:4;97:14,15
**discussing (4)**
  74:5;80:18;86:7;87:8
**Discussion (8)**
  6:20;7:13;60:4,5;
  85:24;86:1;87:7,12
**disk (3)**
  47:11;57:19;71:11
**dismiss (10)**
  11:16;15:11;32:6;
  43:13;44:3;46:3;56:22;
  70:22;86:4,21
**dismissed (2)**
  32:5,14
**disproved (2)**
  22:4;39:11
**dispute (11)**
  15:8;16:14;36:18;
  37:14,24;74:22;83:17;
  84:25;91:15,16,18
**disputed (1)**
  38:1
**disputes (1)**
  83:10
**dissolve (1)**
  39:22
**distinct (1)**
  62:11
**distinction (1)**
  30:24
**distinguish (2)**
  8:25;70:23
**distinguishable (5)**
  52:9;57:22;60:6,9,18
**distinguished (2)**
  16:2;80:20
**distribution (10)**
  48:25;49:15,20;53:14;
  58:5;68:20;69:2;79:10;
  90:23;91:4
**distributor (2)**
  58:18;72:3
**distributors (1)**
  66:19
**district (14)**
  32:1,2;34:12;36:19;
  52:11;56:18;59:24;61:2,
  3;64:8;78:25;80:3,5,12
**divided (1)**
  41:5
**division (5)**
  28:6,12;42:8;50:13,16
**divisions (2)**
  56:6,13
**docket (1)**
  44:20
**documents (2)**
  75:23,25
**dollars (2)**

33:17;55:12
**done (14)**
  18:10,11,12,14,19:5;
  25:3;48:11;71:8,8;
  73:25;75:16,19;91:24;
  101:21
**doubt (2)**
  89:1;100:6
**down (7)**
  6:17;33:16;39:25;
  49:15;90:23;91:3;
  104:10
**downstream (2)**
  44:5;72:6
**DP (2)**
  81:15,19
**DPPs (1)**
  48:11
**DPT's (1)**
  55:20
**drastically (1)**
  106:16
**dredge (1)**
  60:17
**drive (5)**
  47:11;57:19;64:21;
  68:11;71:11
**dropped (1)**
  93:14
**dropping (1)**
  93:11
**due (8)**
  34:6,19;85:21;86:11;
  97:5;98:17;100:13;
  103:2
**during (1)**
  56:7;97:7;98:18

**E**

**easier (2)**
  33:20;36:6
**easily (1)**
  54:23
**Eastern (4)**
  78:25;80:3,4,12
**easy (5)**
  22:19;34:1;84:15,15,
  20
**economic (9)**
  20:2,6;22:2;27:3,6;
  28:8;29:6;39:10;106:19
**economist (2)**
  20:6;85:10
**effect (24)**
  8:3,10;10:6;20:7;24:8;
  26:8;28:6;29:18;39:17;
  44:12,13;45:16;48:5;
  53:2;62:13;64:20;67:2;
  74:11;81:17;94:17;
  101:10,11,14;106:15
**effectively (1)**
  69:17

**eight (6)**
  10:21,23;11:13,16;
  14:3;41:16
**either (16)**
  11:19;16:7;24:15;
  26:18;29:5;30:15;35:15;
  42:7;50:16;52:2;83:25;
  90:3,9;92:12;95:9,23
**Electronics (1)**
  46:21
**element (2)**
  54:17;72:16
**elements (3)**
  16:1;46:22;47:1
**eliminate (1)**
  92:12
**eliminated (1)**
  45:20
**ellipsis (2)**
  52:14;71:4
**else (9)**
  24:2;26:4;28:18,19;
  70:5;87:13;92:18;96:22;
  101:8
**embedded (1)**
  53:4
**embrace (1)**
  73:5
**enact (1)**
  49:10
**encompass (1)**
  11:25
**encompassing (1)**
  93:13
**end (8)**
  6:12;74:19;78:22;
  82:19;104:6;105:17,18;
  106:9
**ended (1)**
  29:15
**endomechanical (1)**
  58:15
**endorse (1)**
  73:6
**endorsed (2)**
  46:12;55:8
**endorsing (1)**
  71:7
**ends (2)**
  14:19;88:19
**enforced (1)**
  69:17
**enforcement (1)**
  51:5
**engage (1)**
  7:12
**engaged (1)**
  50:9
**enhanced (1)**
  53:22
**enough (6)**
  72:8;76:12,13,15;
  77:21;89:21

**ensure (1)**
  57:4
**enter (1)**
  74:7
**entered (4)**
  45:13;101:6,16,24
**entering (1)**
  45:18
**entire (5)**
  14:17;23:13;50:23;
  56:7;96:20
**entirely (3)**
  50:6;68:21;96:19
**entirety (1)**
  44:25
**entities (7)**
  13:15;54:5;57:6;63:9;
  66:17;83:18,23
**entitled (4)**
  55:2;66:21;69:10;
  94:14
**entitles (1)**
  95:6
**entity (3)**
  30:10,11;56:10
**equal (1)**
  38:21
**Equally (1)**
  20:5
**equivalent (1)**
  87:25
**error (1)**
  14:4
**escape (3)**
  17:17;54:16;72:15
**especially (2)**
  16:15;56:19
**essence (1)**
  9:19
**essential (1)**
  9:9
**essentially (1)**
  8:4
**established (3)**
  14:12;22:16;63:14
**estate (2)**
  30:7,8
**estimate (1)**
  20:10
**et (4)**
  13:17,17;59:11;84:1
**evaded (1)**
  54:23
**even (25)**
  11:2;12:22;15:13;
  16:17;20:10,21;21:15;
  22:2;27:7;30:22;31:1;
  32:11;35:17;39:2,4,9;
  41:23;67:22;68:2;77:11;
  94:13;95:10,22;103:23;
  106:22
**event (1)**
  88:13

**eventually (2)**
  39:18;45:13
**everyone (1)**
  103:5
**evidence (1)**
  24:14
**evidentiary (1)**
  49:18
**exact (2)**
  29:16;30:12
**exactly (14)**
  21:16;28:25;32:4;
  45:12;47:8;77:6;94:12,
  13,22;96:9,15;101:5,25;
  104:23
**example (11)**
  12:14,21;15:23;20:3;
  28:10;31:19;33:8;50:5;
  62:7;76:20;83:17
**except (3)**
  8:5;37:8;98:22
**exception (3)**
  39:2;84:9;89:15
**exceptions (7)**
  19:1;21:22;22:6;
  38:25;39:14;49:24;
  66:23
**exercise (2)**
  22:5;39:13
**existing (1)**
  32:8
**exists (1)**
  38:24
**expect (1)**
  56:5
**expected (2)**
  26:22;28:21
**expense (1)**
  27:7
**expensive (1)**
  20:2
**expert (2)**
  75:18;77:7
**explain (5)**
  15:6;28:4;34:25;
  43:11;50:3
**explained (4)**
  65:18,22;66:1;71:3
**explains (1)**
  10:12
**explore (1)**
  21:4
**expressed (6)**
  53:11;54:4;55:12;
  66:16;68:3;73:9
**expressly (1)**
  59:16
**extend (1)**
  59:14
**extent (7)**
  10:13;30:22,25;37:2;
  66:10,21;98:22
**external (1)**

  57:1
**extraordinary (1)**
  22:15

**F**

**face (4)**
  10:19;12:14,17;36:21
**faced (1)**
  28:23
**faces (1)**
  36:22
**facing (1)**
  19:17
**fact (47)**
  8:21;12:16;16:8,10;
  17:8;18:25;19:25;20:1;
  21:11;25:25;26:17;
  30:18;31:11,12;32:18;
  33:6;36:15;37:17,20,22;
  48:16;49:8;53:17;55:25;
  56:24;57:3;63:13;64:6;
  66:12;76:3;77:10;82:23;
  87:16;88:17;96:9,19;
  91:5;92:4,4,10;95:10,13,
  21;96:5;98:3,8;100:10
**factor (1)**
  27:21
**factors (3)**
  19:22;49:5;86:6
**facts (15)**
  16:3;19:1;21:6;22:11,
  15;37:9,11,14;41:19;
  58:21,21;62:5,6;64:3;
  76:19
**factual (10)**
  12:8,25;32:25;38:3;
  63:8,16;74:22;77:24;
  89:23;104:5
**fail (1)**
  22:14
**Fair (1)**
  77:21
**fairly (1)**
  50:10
**fall (3)**
  80:3;107:2,5
**fallacy (1)**
  30:1
**familiar (1)**
  7:11
**far (4)**
  55:13;56:1;77:6;
  106:22
**favor (1)**
  70:17
**February (1)**
  43:16
**Fed (5)**
  22:13;46:8;50:21;
  54:10;61:21
**federal (20)**
  19:5,9;20:21,23;

Case 4:07-cv-05944-JST   Document 1274-2   Filed 07/24/12   Page 115 of 125
In Re: Cathode Ray Tube (CRT)                                    Reporter's Transcript of Proceedings
Antitrust Litigation                                                             March 20, 2012

25:12;27:9;56:24;64:22,
23;67:25;68:6;70:2,6;
72:11,23,23;85:12,16;
91:23;92:13

**feel (4)**
76:18;77:15;100:12,
12

**fellow (1)**
56:6

**felt (1)**
32:19

**few (6)**
7:18;8:1,6;76:19;78:5;
105:6

**fight (2)**
92:16;100:14

**figure (2)**
29:2;90:25

**file (2)**
11:5;95:13

**filed (4)**
10:20;43:16;57:25;
103:6

**final (1)**
14:20

**Finally (4)**
20:9;37:6;38:7;91:9

**find (5)**
17:23;39:25;47:5;
71:2;86:14

**finding (1)**
70:17

**finish (1)**
28:20

**finished (72)**
10:2,4,7,10;15:17,25;
17:4;24:5,9;29:10;
35:13;36:16;41:21;42:4,
6;44:12,25;45:3,17,19,
22;47:3,14,23;48:6;
50:8;52:1,6,10;53:3;
55:14;57:6,17,19,23;
58:23;59:15,19;61:12;
62:8,12,13,16,25;63:7;
64:11;65:8,10;69:23;
70:3,10,25;71:5,24;72:1;
76:25;80:24;81:6,20;
88:5;91:14;93:13;94:18;
97:14;98:13;99:15;
100:11;101:10,12,15;
102:22;104:11

**firmly (1)**
22:16

**first (20)**
10:18;15:7;23:7;27:5;
46:2;49:6;50:2,5;56:17;
65:17;78:18,23;80:21;
85:24;86:8;87:9;89:8;
91:11;93:15;97:1

**fit (1)**
39:21

**five (1)**
75:23

**fix (25)**
15:17;28:9;29:4;
30:11;42:9;44:6;48:18;
53:1;67:11;68:4,5,17;
79:2,11,21,25;80:23;
81:16,20;87:23;91:13;
93:17;101:10,11,14

**fixed (10)**
9:9,12,15;15:9,10;
29:10;31:1;57:5;58:8;
60:21

**fixer (1)**
72:14

**fixing (12)**
9:11;10:6;15:25;24:9;
28:14;45:16;47:1;53:7;
54:15;63:24;69:24;
70:17

**flavoring (1)**
54:21

**floor (1)**
64:13

**flow (1)**
99:16

**flowing (1)**
99:11

**focus (2)**
27:6;80:22

**focused (1)**
49:24,25;51:25

**focusing (1)**
21:11

**follow (11)**
16:9;26:10;31:17;
34:5,8;37:1,4;38:14;
61:3;64:8;104:1

**followed (4)**
46:1;51:16;55:6;60:18

**following (13)**
12:11;28:2,4;36:3;
38:8,11;41:5;48:11;
56:21;71:6;86:7,20;
93:22

**follows (3)**
21:25;25:18;80:8

**fondness (1)**
103:4

**Food (1)**
57:20

**Foods (1)**
79:21

**Football (2)**
100:18,21

**force (1)**
38:21

**forces (8)**
16:20,22;17:9;26:11;
28:22;30:14;31:6,14

**foreign (1)**
75:24

**forgot (1)**
80:9

**forgotten (1)**

**106:1**

**form (3)**
7:5;43:25;53:20

**formed (1)**
30:9

**forth (5)**
74:22;76:2;77:22,23;
100:14

**forward (8)**
18:9;20:25;30:6;
39:19;73:19;94:9;
100:10;102:25

**found (1)**
44:4

**four (3)**
39:7;46:5;82:24

**four-step (1)**
48:24

**framework (1)**
43:7

**FRANCISCO (1)**
6:1

**Frankly (3)**
36:8;90:5,20

**FRD (3)**
46:16,17;52:16

**Freeman (4)**
30:5,5,6,15

**friend (1)**
100:15

**front (2)**
93:8;105:25

**full (10)**
51:8;55:2;66:21;67:9;
69:10,17,25;75:5,17,19

**function (2)**
27:14,16

**fundamental (1)**
81:24

**further (4)**
45:21;50:4;74:25;81:3

**furthermore (1)**
44:4

**future (1)**
11:18

### G

**gain (1)**
51:12

**gains (1)**
70:9

**games (1)**
83:4

**gaping (1)**
54:13

**gas (5)**
58:1,2,7,9;71:21

**gather (1)**
8:24

**gave (1)**
53:6

**general (5)**

**20:2;27:1;48:21;54:1;
95:21**

**generals (1)**
73:1

**genuine (1)**
95:12

**gets (1)**
36:2

**given (2)**
43:6;68:16

**giving (1)**
63:19

**glass (1)**
57:4

**globally (1)**
69:7

**goes (10)**
19:19;20:19;45:10;
66:15;69:15;71:1;79:13,
20;87:9;88:12

**gonna (2)**
22:11;25:10

**Good (8)**
6:21;70:10;72:1,8;
84:14,14;100:15;101:1

**goods (4)**
44:5,7;70:3;71:5

**governing (1)**
90:12

**government (4)**
82:12,13,15;92:1

**government's (1)**
82:11

**grant (2)**
12:13;39:17

**granted (3)**
13:21;88:3;97:18

**granting (2)**
14:15,25

**great (3)**
7:8;98:23;103:4

**ground (2)**
11:4;56:22

**ground-breaking (1)**
73:7

**grounded (2)**
52:18,18

**grounds (1)**
68:15

**group (9)**
30:9;42:24;69:5,6;
84:9;106:10,11;107:2,5

**groups (1)**
49:7

**guess (4)**
6:5;13:18;38:9;76:14

**guided (1)**
18:22

**guiding (1)**
39:15

**GUIDO (6)**
99:25;100:4,17;101:2;
103:20;104:9

### H

**hall (1)**
74:19

**hand (1)**
74:24

**Hang (1)**
38:13

**Hanover (22)**
17:14;18:10,24;21:8,
9,11,13,14;22:6;26:12;
29:1;34:14;35:18;36:11;
38:17,20;51:10;69:15;
82:25;88:25;89:8;96:22

**happen (7)**
26:14,15;69:9;73:12;
104:25,25;106:13

**happened (2)**
53:25;87:22

**happenstance (1)**
92:6

**happy (1)**
97:21

**hard (2)**
20:10;34:1

**hat (1)**
83:7

**havoc (1)**
72:11

**head (2)**
18:9;29:2

**heading (1)**
38:16

**hear (4)**
41:1;74:19,20;101:17

**heard (6)**
83:3;84:17,22;91:15;
105:5,5

**hearing (13)**
6:12,23;45:5,7,24;
64:17;75:19;76:3;96:8;
97:15,17;107:11,18

**hearings (1)**
96:4

**held (2)**
49:3;59:24

**help (2)**
30:16;84:9

**hereby (1)**
99:6

**here's (3)**
47:17;54:9;61:6

**Hewlett (2)**
59:9;63:9

**hey (2)**
47:6,9

**higher (4)**
17:21;20:17;23:17;
26:5

**highlighted (2)**
43:22;44:16

**himself (2)**

Case 4:07-cv-05944-JST   Document 1274-2   Filed 07/24/12   Page 116 of 125
In Re: Cathode Ray Tube (CRT)
Antitrust Litigation
Reporter's Transcript of Proceedings
March 20, 2012

56:20;102:3
**history (3)**
96:2,20,23
**hole (3)**
54:14;64:21;78:21
**HON (90)**
6:5,21;7:17;11:6,9,12;
12:6,12;13:12;14:6,12,
16,23;15:3,18;23:16;
24:7;30:17;37:17,21;
38:2,13,17;39:5,8;40:6,
15,20,22,25;41:7,15,20,
22;42:11,23;43:1,3,24;
44:17,21;46:5,10,14,16,
23;62:20;63:22;64:2,10,
12,15;73:20;74:7,12;
75:7,12;76:11,22,25;
77:9,13,17;78:4,9,12;
80:9;82:16;93:1,4;95:5;
99:1,10,13;100:1,16,23;
102:10;103:12;105:1,13,
21,25;106:4,19,24;
107:6,9,12,16
**Honor (127)**
7:16;10:16;11:4,8,11,
23;12:11,21;14:22;
15:20;16:7;17:8,10,19;
18:7,15,21;21:9;23:5,12;
24:12;25:2,7;26:2,16;
30:23;31:4;32:1;33:3;
34:5;35:8,21,21,22;
36:22;37:6,15;38:6,7,10;
39:7,15,18;40:5;41:3,6,
18;42:17;43:6,12,19;
44:14,24;46:1,8;48:1,5;
55:17;56:16;64:6,11,16,
18;65:1;74:10,15,21;
75:1,2,5,9,16,20,21;76:1,
8,18;77:6,10,15,21,23;
78:2,3,16,18;80:14;
81:10,10;82:6,14;83:19;
84:8;87:17;89:2,9,17,18;
90:3,5,6,20;91:9,10;
92:6,24;94:2,25;95:1,8,
25;96:24;97:8,17;98:3,
8;99:4,25;100:4;103:4,
17;104:19;105:3,24;
106:17;107:8,15
**Honor's (10)**
11:16;35:11;43:15,22;
44:9;86:17,19;87:15;
88:10;98:8
**hope (1)**
90:5
**horizontal (3)**
68:5;72:5;91:6
**Hospital (1)**
58:13
**hours (1)**
100:2
**Housfeld (1)**
41:4
**HP (11)**

17:1;24:1;27:14;
47:15,24;59:21;70:2;
84:1;88:2,14;91:25
**hundred (1)**
97:11
**hypothetical (1)**
20:6

## I

**idea (4)**
21:14;23:10;26:3;
101:1
**ideal (1)**
19:7
**identical (1)**
75:4
**identification (1)**
6:10
**identifying (1)**
49:25
**ignore (1)**
84:4
**ignores (1)**
57:3
**illegally (1)**
54:18
**ill-gotten (1)**
70:9
**Illinois (72)**
17:14;18:11,24;19:2,
18;21:10,10,12,23,24;
22:3,7,17;24:14,17,17;
25:19;26:7,12;29:1;
33:22;34:14;35:17;
36:10;38:20;39:10;
48:15,16,16,23;49:3,10,
22,25;54:1;58:20;61:5;
66:16,22;67:4,13;68:21,
24;69:12,14,14;71:18;
78:19;79:8;80:2;82:19;
83:1,8,25;86:2,6;87:10,
11,13;88:25;89:8;91:22;
94:3,15;95:3,10,11;
97:22;98:1,14;99:8,21
**Illston (16)**
18:16;32:18;34:6,6,7;
45:25;46:21;51:18;
55:10;56:15,20;70:20;
71:7,13;90:5;104:15
**Illston's (10)**
8:21;9:20;15:14;
18:18;34:4,8,17,19;
47:18;90:6
**illusion (1)**
28:3
**immediate (1)**
58:6
**impact (46)**
10:6;17:17,17,25;
18:2,4,4,5,6;19:23;21:5;
24:8,20,22,25;25:17,17;
29:11;32:22;33:15;36:5;

44:11,13;45:8,16;48:5,8;
74:1,4;82:14;89:25;
90:4,6;91:20;92:22;
93:20;94:10,17;95:3,7,
13,22;96:6,10;102:18;
106:20
**impacts (1)**
20:22
**implications (1)**
8:16
**implies (1)**
10:13
**imply (1)**
64:19
**implying (1)**
12:7
**import (3)**
11:15;15:1;32:16
**important (18)**
6:5;12:4;15:4;16:21;
18:1,13;21:19;25:20,22,
24;37:18;39:22;48:15;
63:5;65:13;67:22;80:21;
106:10
**Importantly (3)**
74:21;75:1;76:7
**impossible (1)**
83:13
**inapplicable (1)**
79:8
**include (5)**
11:21;40:13;55:7;
92:2,5
**included (3)**
47:1;63:6;92:7
**includes (1)**
65:13
**including (2)**
58:12;73:3
**inconsistent (2)**
88:17,24
**incorporate (3)**
42:4;55:23;56:4
**incorporated (3)**
47:2;60:13;77:2
**incorporating (2)**
54:17;72:15
**incorrect (2)**
9:21;100:7
**increase (5)**
23:23;81:5,6;82:1;
83:16
**increased (4)**
17:22;23:23;29:20;
85:3
**increases (1)**
52:21
**increasing (5)**
17:22;52:23;53:2;
81:18;93:17
**Indeed (1)**
19:25
**independent (9)**

28:18;29:9;42:18;
48:19,20;56:21;58:18;
62:16;72:3
**independently (2)**
88:4;90:7
**indicate (2)**
41:19;90:13
**indicated (1)**
32:3
**indicates (2)**
31:1;44:24
**indirect (33)**
8:4;11:22,24;12:1;
19:12,15;25:1,1;27:18;
40:1,9;49:11,13;58:5;
59:22;72:20;85:14;92:2,
3,6,9,13,15,19,23;94:13,
16;98:7;105:4,10,12,16;
106:18
**indirects (4)**
31:20;87:11;92:4;
94:22
**individual (3)**
10:21;21:4;24:23
**individuals (1)**
15:1
**inextricably (1)**
62:11
**infiltrate (1)**
58:2
**inflated (1)**
86:11
**influence (1)**
19:22
**influenced (1)**
54:12
**ingredient (1)**
66:4
**ingredients (1)**
53:20
**initial (1)**
53:9
**injunctive (1)**
94:2
**injured (2)**
19:8;27:9
**injury (5)**
50:2;61:9;83:13;87:5;
95:18
**inquiry (5)**
21:1,7;25:12;38:3;
40:18
**inside (1)**
80:17
**insignificantly (1)**
60:13
**instance (3)**
9:5;50:2;54:13
**instead (1)**
67:6
**instructed (1)**
46:22
**instruction (1)**

68:9
**instructions (2)**
68:16;73:16
**insuperable (1)**
20:14
**intended (2)**
52:5;96:16
**intention (1)**
99:5
**interaction (1)**
63:20
**inter-company (1)**
57:10
**intermediaries (4)**
62:19,25;71:18;79:10
**internal (2)**
50:15;68:5
**internally (1)**
28:12
**international (1)**
73:3
**interpret (1)**
9:6
**interpretation (2)**
22:8;83:1
**interprets (1)**
87:1
**interrogatories (1)**
12:18
**interrogatory (1)**
13:2
**interruption (1)**
6:19
**intertwined (2)**
62:11;77:16
**into (3)**
18:10;20:25;23:24;
27:2,18;45:13,19;47:2;
53:13;54:17;76:5;77:2,
16;85:8;96:25;99:9;
101:6,9,16,25;102:20;
104:6;105:10;107:2,5
**intolerable (1)**
51:6
**intra-company (1)**
57:1
**intra-corporate (1)**
57:12
**intra-district (1)**
73:12
**inventory (1)**
8:7
**invitation (1)**
56:17
**invited (1)**
103:12
**involve (3)**
57:17,18;89:12
**involved (6)**
48:24;50:7;66:5;
83:23;87:16;88:2;89:15;

Case 4:07-cv-05944-JST   Document 1274-2   Filed 07/24/12   Page 117 of 125
In Re: Cathode Ray Tube (CRT)                                    Reporter's Transcript of Proceedings
Antitrust Litigation                                                              March 20, 2012

104:11
**involving (3)**
   53:7;60:1;88:14
**irrelevant (1)**
   57:10
**Isaacson (6)**
   41:10;64:14,16;74:6,
   10;76:24
**issue (69)**
   9:4;10:5,25;12:3;
   17:12;18:17;24:8,18,24;
   25:14;28:3;30:13;32:5;
   33:2,6;34:21;35:25;
   36:22;37:10;38:4;39:23,
   23;43:10;45:2,15;48:5,
   10;50:20;59:16;60:24;
   61:10,18;62:23,24;63:3,
   8,22;65:1,4,16;68:21;
   69:22;71:22;75:4;78:1;
   85:22;88:15,16;89:23;
   91:4,12;92:14;93:20,20;
   94:4,19;95:1,7,12,21,22;
   99:14;100:6;101:9;
   103:18;104:3,4,5,7
**issued (1)**
   104:22
**issues (26)**
   12:25;25:1,6;27:7;
   31:11;34:7,20,23;35:9,
   20;45:14,19;62:6;70:15;
   74:22,24;76:10;77:16,
   24,25;84:20;87:7;90:13;
   98:6,10,12

**J**

**J&J (1)**
   58:19
**jeopardize (1)**
   68:14
**Joe (1)**
   100:20
**Johnson (4)**
   58:14,14,17,17
**joining (2)**
   80:4;82:6
**joint (3)**
   6:23;28:18;83:20
**jointly (1)**
   7:5
**Judge (70)**
   8:21;9:2,20,22;14:18,
   19;15:14;18:16,18,21,
   22;23:1;32:18;34:3,6,6,
   7,8,10,12,13,15,17,19;
   35:6,10,19;40:7;43:10,
   14,21;44:1;45:25;46:21;
   47:10,11,17;48:2;51:18;
   53:5;55:8,10;56:15,19,
   20;59:2;70:20,21;71:7,8,
   12,12,13;73:21;74:8;
   76:5;80:11;81:23;85:18,
   19,22;87:3,3,14,19,22;

90:4,5;104:15,22
**judges (1)**
   47:9
**judgment (12)**
   6:24;7:6;10:23;14:25;
   63:14;69:16;74:17;75:3,
   10;76:8;95:7,14
**judicial (3)**
   16:7;63:18,19
**June (2)**
   44:18;80:13
**jurisprudence (1)**
   78:21
**jurist (1)**
   56:17
**jury (4)**
   46:22;68:9,15;82:11
**justification (1)**
   38:24

**K**

**Kessler (60)**
   7:14,16;10:16;11:8,
   11,14;12:10,13;13:20;
   14:11,14,22,24;15:4,19;
   23:20;24:11;30:20;
   37:20,23;38:5,15,19;
   39:6,9;40:11,18,21;50:6;
   66:7;68:2;69:13;70:23;
   72:21;76:16;78:5,7,15,
   16;80:11;82:17;93:3,7;
   95:8;96:1,4,16,24;99:4,
   12,17;100:7,13,14,25;
   101:18;102:11;103:4,
   14;104:8
**Kessler's (1)**
   102:8
**key (3)**
   31:3;68:6;69:11
**kind (4)**
   54:3;55:22;63:4;64:3
**knock (2)**
   67:25;102:7
**knocked (1)**
   105:9
**knocking (1)**
   102:2
**knowing (1)**
   39:19
**knowledge (1)**
   10:14
**knows (5)**
   25:2;26:11;75:21;
   94:2;106:17

**L**

**labeling (1)**
   105:8
**labor (1)**
   20:3
**lack (4)**

46:3;86:5,22;97:12
**lacked (1)**
   59:25
**language (18)**
   10:8;52:11,13;56:20;
   60:19;67:14;71:11;
   72:12;73:22;75:24;
   87:17;95:6;99:9,18,22;
   105:22;106:1,6
**laptops (1)**
   55:20
**large (1)**
   64:24
**last (3)**
   10:2;39:4;64:25
**later (3)**
   7:2;12:7;36:9
**latter (1)**
   57:22
**law (33)**
   9:4;18:20,22;25:7,11;
   31:19,21;40:18;47:9;
   51:23;59:11;64:4,6;
   68:12;72:10,21,23;
   75:15;77:3;85:13;89:22;
   92:13;95:2,17,20;99:7;
   101:25;102:2,7;103:23;
   104:1;106:14,17
**laws (13)**
   19:10;20:23;27:10;
   51:6,13;54:14,22;56:25;
   68:8;69:16;73:4;87:5;
   100:21
**LCD (28)**
   8:22;45:8,11,23;46:4,
   19,20,21;47:2;51:23;
   55:14,19;75:2,12,13;
   82:11;89:25,25;90:10;
   96:9,14;97:9;101:15,22,
   22,23;104:12,21
**LCDs (13)**
   45:24;47:7,9,18;
   48:11;51:18;55:7,10,18;
   56:15;60:5;70:21;73:9
**lead (1)**
   98:6
**leading (1)**
   86:3
**League (1)**
   100:19
**least (2)**
   55:6;93:24
**leave (4)**
   54:13;65:21;99:16;
   106:23
**leaves (3)**
   36:13;38:7;95:1
**led (1)**
   21:14
**left (1)**
   103:18
**legal (6)**
   10:24;41:9;64:7,9;

94:19;104:4
**LEGGE (90)**
   6:5,21;7:17;11:6,9,12;
   12:6,12;13:12;14:6,12,
   16,23;15:3,18;23:16;
   24:7;30:17;37:17,21;
   38:2,13,17;39:5,8;40:6,
   15,20,22,25;41:7,15,20,
   22;42:11,23;43:1,3,24;
   44:17,21;46:5,10,14,16,
   23;62:20;63:22;64:2,10,
   12,15;73:20;74:7,12;
   75:7,12;76:11,22,25;
   77:9,13,17;78:4,9,12;
   80:9;82:16;93:1,4;95:5;
   99:1,10,13;100:1,4,13;
   102:10;103:12;105:1,13,
   21,25;106:4,19,24;
   107:6,9,12,16
**LEHMANN (34)**
   41:3,4,8,18,21;42:2,
   17,25;43:2,6;44:1,19,23;
   46:7,11,15,17,24;62:22;
   64:1,5,11,13;67:8,14;
   68:2,10;70:19;71:2,11,
   19;72:13;96:9;100:5
**length (1)**
   34:21
**less (1)**
   20:2
**letter (1)**
   107:13
**level (2)**
   79:22,25
**levels (1)**
   53:14
**LG (1)**
   83:21
**liability (3)**
   49:6;51:14;68:13
**light (3)**
   76:22;87:15,15
**limit (1)**
   15:20
**limited (2)**
   13:6;45:1
**limiting (2)**
   15:7;59:17
**limits (1)**
   72:18
**Linderboard (8)**
   15:23;31:17,22;34:24;
   49:23;51:21,24;52:20
**line (10)**
   9:24;18:23;21:24;
   34:2;35:2;58:23;71:6;
   88:20;89:11,14
**Linerboard (48)**
   34:3;35:15,16;36:2,
   13,14,15;37:2;43:12,17,
   20;44:8;45:9;46:2,13;
   48:3;50:11;52:2,8,12,16,
   21;53:6,8;55:5,8;56:21;

94:19;104:4
**LEGGE (90)**
   60:5,17;64:9;70:23,25;
   80:18,20,22,23;81:1,2,4,
   5,14,25;87:6,13;93:16;
   96:11;97:10;99:7
**lines (1)**
   67:5
**listen (1)**
   102:6
**listening (1)**
   74:2
**literally (2)**
   14:24;23:17
**litigate (3)**
   22:5;39:13;85:11
**litigation (6)**
   6:23;19:5;40:3;47:11;
   52:16;57:21
**little (8)**
   10:8;13:12;15:14;
   48:14;50:4;52:14;54:21;
   57:14
**live (3)**
   101:24;103:22,24
**LLP (1)**
   41:4
**located (1)**
   6:16
**long (1)**
   51:12
**look (9)**
   22:11;33:8;34:18;
   49:21;86:2,13;94:12,12;
   107:14
**looked (3)**
   32:17;39:21;52:13
**looking (5)**
   7:24;9:8;22:12;27:21;
   91:11
**looks (1)**
   89:2
**lose (1)**
   102:16
**loss (1)**
   49:10
**lost (2)**
   26:23;89:13
**lot (6)**
   9:6;26:17;40:9;83:4;
   85:19;105:5
**LPD (1)**
   83:20
**lurking (2)**
   14:16,17

**M**

**main (1)**
   27:6
**maintained (1)**
   20:17
**maintaining (1)**
   102:17
**major (2)**

Case 4:07-cv-05944-JST   Document 1274-2   Filed 07/24/12   Page 118 of 125
In Re: Cathode Ray Tube (CRT)                    Reporter's Transcript of Proceedings
Antitrust Litigation                                          March 20, 2012

78:21;89:9
**makers (2)**
54:2;57:7
**makes (8)**
16:3,6;35:4;55:17;
66:7;91:7;94:11,12
**making (12)**
67:22;72:10;81:8;
88:17,18;97:2,3,9;98:23;
99:2;100:17,18
**managed (1)**
60:16
**manner (1)**
41:6
**manufacture (2)**
42:3;72:1
**manufactured (2)**
61:17;71:25
**manufacturer (3)**
17:20;42:18;50:16
**manufacturers (7)**
8:5;16:17;44:5;48:17;
53:23;60:21,22
**manufacturing (3)**
28:13;42:14;68:4
**many (4)**
12:15;64:22;75:1,23
**map (2)**
72:11,18
**MARCH (3)**
6:1;43:21;56:8
**margin (1)**
20:12
**Mario (1)**
105:4
**market (21)**
16:12,13,16,19,20;
17:6,9;20:3;23:25;
26:11;28:22;29:22;
30:14;31:4,14;62:8,9;
89:20;90:21;91:7;92:23
**markets (12)**
19:1;31:14;34:21;
37:25;39:1;62:11;63:21;
76:21;77:3,7;89:19;
91:17
**masonry (1)**
48:19
**master (2)**
86:3;87:1
**material (2)**
95:13,21
**materials (2)**
62:9;79:2
**mathematical (2)**
70:6,7
**matter (23)**
6:22;16:21;24:24;
25:7,11;40:18;41:5;
51:2;63:13,16;67:13,25;
68:22;76:2;85:5,6;
89:17,18,22;95:2,17,20;
107:13

**matters (1)**
16:22
**may (31)**
11:23,24;12:11;18:4,
5,5,15,16,16;19:8,12,25;
20:21;21:5;27:17,23;
32:20,21;45:4,6;47:20;
71:15;74:14;89:21;90:9;
91:18;92:2;94:4;96:8,
24;105:5
**maybe (11)**
8:6;32:23,23;33:3,3;
35:16;63:12;78:10;
100:12;101:1;103:12
**mean (3)**
27:19;28:9;43:7
**meaningful (1)**
7:12
**means (5)**
25:10,15;70:7;83:12;
93:10
**meant (2)**
37:2,3
**measured (1)**
19:25
**mediary (1)**
62:17
**meetings (1)**
57:4
**member (1)**
42:20
**members (2)**
7:25;65:24
**Memorial (1)**
58:13
**mention (3)**
86:6;87:9,21
**mentioned (1)**
82:10
**mere (2)**
89:19;92:10
**meritorious (1)**
39:2
**merits (1)**
74:5
**Meyer (1)**
58:18
**Michael (1)**
41:4
**Michigan (1)**
80:12
**middle (4)**
6:16;48:25;52:14;96:7
**middleman (3)**
61:13,18,19
**might (11)**
12:24;22:3;39:11,20;
49:18;53:15;59:8;61:4;
62:10;73:25;88:7
**mill (1)**
60:1
**million (3)**
55:12;75:23;102:2

**mind (1)**
73:20
**mine (1)**
44:18
**minute (7)**
12:6;28:16;38:13;
39:5;40:23;44:17;
103:21
**minutes (3)**
78:5,9;100:2
**misrepresent (1)**
81:2
**misrepresented (1)**
81:1
**missing (2)**
52:15,20
**mixed (1)**
64:5
**mobile (1)**
46:20
**model (1)**
20:7
**models (1)**
85:10
**modified (1)**
49:8
**moment (2)**
10:19;13:24
**Monday (1)**
104:20
**money (1)**
100:17
**monitor (9)**
8:8,10;16:11;23:24;
28:22;40:17;65:12;
83:12,15
**monitors (11)**
16:5;17:2;26:15;46:4,
19;55:20,23;56:4;65:5;
76:21;93:18
**month (1)**
55:16
**more (10)**
6:17;15:20;20:3;
34:11;37:23;65:2;66:4;
69:16;90:20,25
**morning (3)**
6:7,21;100:19
**most (2)**
65:13;106:8
**mostly (2)**
21:12;26:19
**motion (53)**
6:24;7:4;8:15,15,19;
9:7,8,10;10:9,20;11:5,5,
19,20;12:7,13,19;13:5,
20;14:7,8;15:11;17:19;
21:6;24:12,13;39:16;
70:21;76:8;77:14,20;
81:10;86:4;88:3,17,18;
96:13;97:2,3,7,10,12;
98:5;101:4;102:14,15;

103:7,10;105:1
**motions (5)**
32:6;43:13;44:3;
56:22;75:18
**motivated (1)**
89:5
**motive (2)**
81:6;91:13
**move (4)**
11:3;27:18;86:21;94:8
**moving (1)**
11:1
**MTPD (1)**
83:21
**much (14)**
17:24;19:4;24:25;
25:4;29:3;36:5;37:8;
49:24;50:17;56:2;85:7,
11;88:10;89:17
**multiple (7)**
49:6;51:14;53:14;
60:2,11;68:20;69:2
**must (7)**
53:16;66:12;79:14,24;
88:19;90:13;92:22
**myself (1)**
43:7

---

**N**

**named (9)**
8:1,2;11:13;14:2,8;
15:10;51:25;58:18;
71:23
**narrow (8)**
12:4;15:5,6;16:3,6;
91:11,12,20
**national (2)**
58:1;100:18
**natural (2)**
71:20,21
**nearly (1)**
20:14
**necessarily (2)**
27:19;28:12
**necessary (1)**
64:3
**need (11)**
17:16;37:11,22;38:3;
76:12,17;77:3,3,13,19;
92:25
**needed (2)**
74:25;76:10
**needs (3)**
18:22;63:17;91:24
**negligence (1)**
7:8
**negotiated (2)**
96:16;97:19
**negotiation (1)**
97:5
**neither (2)**
49:1;97:23

**net (1)**
17:15
**new (3)**
54:20;72:10;84:9
**next (8)**
16:6;41:1;55:16;
73:13;80:6;87:10,21;
88:25
**nine (8)**
14:2,8;15:1;41:16;
76:13;79:18;91:15;
100:10
**Ninth (33)**
18:12,13,20,22;19:6;
21:17,20,23,25;22:1,9,
12,21,24,25;21:27;11:11;
31:21;34:2;35:4;37:1,
13;50:9,19;51:7,16;
54:9;58:20;73:13;79:6;
84:12;90:2,9,12
**non-conspirators (1)**
26:10
**non-defendant (1)**
57:23;59:8;60:7
**non-defendants (1)**
71:17
**none (1)**
35:9
**nonetheless (1)**
38:23
**non-parties (1)**
72:4
**non-price (1)**
31:1
**nor (4)**
32:19;58:19,19;66:18
**Normally (1)**
19:23
**northern (1)**
34:12
**note (14)**
6:11;16:10;17:10;
19:11;28:2;35:17;37:8;
49:7,17;51:15;53:5;
54:24;61:23;87:18
**notebooks (1)**
47:3
**noted (11)**
6:13;7:2;11:23;17:20;
39:18;43:20;44:10;45:4;
61:3;89:6;98:8
**notice (4)**
16:8;17:8;63:18,20
**noting (1)**
80:25
**notion (1)**
103:1
**November (3)**
51:22;56:8;75:15
**nowhere (1)**
58:25;103:7,8
**number (6)**
6:8;10:3;12:23;15:7;

Case 4:07-cv-05944-JST   Document 1274-2   Filed 07/24/12   Page 119 of 125
In Re: Cathode Ray Tube (CRT)                    Reporter's Transcript of Proceedings
Antitrust Litigation                                              March 20, 2012

54:5;66:17
**numbers (1)**
85:6
**Nursing (1)**
58:13

# O

**objected (1)**
78:1
**objective (2)**
52:22;97:13
**objectives (1)**
53:2
**obscure (2)**
53:17;66:12
**obtain (1)**
50:3
**obtaining (1)**
7:22
**obviously (11)**
10:24;11:18,20;14:19;
16:11,15;24:16;27:12;
34:9;72:22;90:1
**occurred (1)**
46:25
**ODD (18)**
32:2,3,4,4,6,9,10,10,
12,16;34:11;47:13,20;
71:14;87:24,24;88:7;
91:2
**ODDs (8)**
47:14;57:19;59:2,3;
87:22,22,23;88:20
**off (4)**
6:20;51:5;80:3;107:17
**offense (1)**
47:1
**offensive (2)**
49:19;61:9
**office (1)**
100:19
**officer (1)**
97:21
**offset (1)**
27:1
**once (2)**
59:9,13
**one (43)**
9:4,6,25;14:9;18:4;
20:1;26:10;29:5,18;
32:20;35:14;37:7,23;
39:21;44:18;46:7,14;
48:24;49:3;50:13;53:1;
55:7,15;60:16;63:11;
66:4;70:5;83:4;84:13,
13;90:9,21;92:21;94:23;
95:17;96:4;97:22;98:22;
99:13;102:9;103:11,14,
20
**ones (1)**
56:13
**only (31)**

11:13,15;12:16;14:13;
15:10;16:4;25:18;37:14,
20,20,21;39:25;42:6;
47:22;50:21;55:21;
60:25;65:9;67:15;69:20;
72:10;80:15;81:16;82:4;
83:12;86:25;87:10;88:6;
100:11;102:9;107:10
**on-point (1)**
31:8
**oOo- (1)**
6:3
**open (1)**
35:25
**operative (3)**
10:3;73:22;106:8
**opinion (20)**
35:7;43:21,23;44:2,8,
15;46:15;47:10,18;
51:10,22,22;52:11;53:6,
10;55:8;60:4;75:2;
85:18;98:8
**opinions (3)**
16:10;45:25;60:5
**opportunity (1)**
13:22
**opposed (9)**
9:23;16:5;19:12;
31:24;32:4;37:5;41:21;
85:9;104:7
**opposing (1)**
43:12
**opposite (1)**
56:18
**opposition (1)**
103:7
**optical (3)**
47:11;57:19;71:10
**option (1)**
40:13
**order (16)**
7:5,20,24;10:2;11:7,
12,16;12:3;14:7;15:2;
52:21;64:18,20;76:5,6;
93:2
**organized (1)**
78:10
**original (2)**
13:24;88:10
**originally (1)**
32:13
**others (4)**
17:1,5;63:10;88:14
**ought (2)**
56:18;101:24
**ours (1)**
58:11
**ourselves (1)**
47:5
**out (41)**
8:8,10;10:18;12:5,10;
13:3;14:16,17;15:24;
17:3,5,23;19:14;21:16;

22:18;28:8;29:2;35:12;
38:25;39:25;40:17;
41:16;53:24;55:4;66:2;
67:25;72:19,23;78:17;
85:25;91:1;93:7;96:20,
21,21;99:13;100:23;
102:7;105:9,22;107:11
**outlined (1)**
62:7
**output (1)**
52:20
**outside (2)**
47:15;50:1
**over (6)**
33:20;35:20;48:2;
50:17;64:13;75:22
**overcharge (19)**
20:12,17,18;22:20;
49:15;50:23;51:8;53:4,
13;54:5;55:3;61:19;
66:17,21;67:9,11;69:11,
18,20
**overcharges (1)**
55:19
**overcomes (1)**
35:1
**overlooked (1)**
36:15
**overview (1)**
48:13
**Owens (1)**
58:18
**own (4)**
42:15;65:25;90:1;
106:6
**owned (1)**
49:1

# P

**packaged (1)**
23:19
**Packard (2)**
59:9;63:10
**page (12)**
38:9,10;44:14,23;
51:10;61:24;79:4,4;
80:7,8;82:24;86:19
**pages (8)**
46:8,17;54:11;61:22;
65:20;75:23;103:8,16
**paid (1)**
55:13
**Panasonic (1)**
83:22
**panels (5)**
46:4,19,20;47:2;55:19
**paper (2)**
7:9;50:13
**paragraph (9)**
10:3;13:15;35:14,18;
39:4;86:6;87:10;93:5,9
**paragraphs (1)**

86:13
**pardon (1)**
105:3
**parent (1)**
56:10
**parents (1)**
56:7
**part (7)**
28:10;32:21;33:10,11,
12;52:20;67:23
**particular (11)**
8:18;12:9;15:21;16:2;
19:1,18;20:15;27:23;
39:1;84:6;99:9
**particularly (3)**
49:22;75:2;88:1
**parties (11)**
6:6;26:18,18,19;28:5;
49:8;59:8;73:11;74:23;
88:2;99:6
**parts (1)**
64:24
**party (11)**
21:3,4;26:19,21,22;
28:3,17,21;33:15;42:19;
47:24
**pass (3)**
19:20;21:7,15
**passage (1)**
19:18
**passed (5)**
30:12;49:15;50:17;
72:22;91:1
**passing (2)**
23:17;49:7
**pass-on (29)**
23:8,9,14,16;25:3;
26:9;27:2,7,24;29:25;
33:1,2,3,4,25,25;37:12;
49:19;61:7,10,16;84:15,
16,21,21,23,24;89:4;
90:18
**pass-ons (1)**
33:6
**pass-through (3)**
67:4,17;68:19
**penalty (1)**
54:16
**pending (4)**
32:6;74:25;76:5,7
**people (8)**
8:6;11:21,25;16:15;
17:1;19:8;27:8,15;30:7;
39:20;74:19
**per (2)**
20:9;68:7
**perceived (1)**
47:13
**percent (19)**
18:4,5,6;23:23;56:2;
67:12,23,24,24;68:17;
69:5,7;72:16,17;84:18,
19;85:2,4;97:11

**percentage (1)**
21:3
**perception (1)**
86:24
**perhaps (3)**
54:20;56:2;65:13
**period (1)**
56:8
**permit (1)**
66:23
**permits (1)**
101:25
**permitted (2)**
101:13;102:25
**person (3)**
63:23;65:1,3
**persons (1)**
13:15
**persuade (1)**
22:14
**persuasive (3)**
34:9,18;35:3
**Phillips (1)**
83:21
**Phone (2)**
6:19;74:20
**phonetic (5)**
17:15;32:14;47:11;
61:14;88:3
**phrase (1)**
105:11
**pick (3)**
64:25;85:1;92:16
**picking (2)**
105:21,22
**picks (1)**
21:18
**picture (1)**
72:23
**plaintiff (35)**
9:14,16;11:9;17:16,
20;20:15;24:23;27:18;
32:20;42:6;46:18;49:19;
50:1,12;51:12;52:1;
53:17;55:1;59:7;60:6;
61:8,15,24;66:3,13,20;
69:19;70:1;71:23;79:1,
3,21,24;94:10,10
**plaintiffs (65)**
7:7,20;8:2,14,18;10:3,
21,24;11:17,24;12:9;
14:2,8,18;15:8,11;16:16;
19:12,13;20:24;27:16,
23;30:18;35:6;36:5;
37:7;38:22;41:12,16;
44:5;47:18;48:23;55:18;
58:12;59:13;60:25;
62:15;63:1,2;71:13;
72:5;73:11;76:8;79:9,
11,12,14,18;80:15,22;
81:16,19,24;82:2;84:6;
86:9,22;89:11;90:14;
91:15;92:17,19;94:13;

Case 4:07-cv-05944-JST   Document 1274-2   Filed 07/24/12   Page 120 of 125
In Re: Cathode Ray Tube (CRT)     Reporter's Transcript of Proceedings
Antitrust Litigation     March 20, 2012

100:11;102:16
**plaintiff's (1)**
43:9
**plaintiffs' (11)**
17:11,23;18:3;19:11;
41:1;81:3;83:4;91:19;
92:8,15;103:6
**play (1)**
61:7
**pleadings (1)**
14:9
**please (5)**
6:9;44:22;74:14;
78:14;100:24
**pled (2)**
32:15;88:22
**plenty (1)**
27:15
**plow (1)**
78:8
**pm (1)**
107:18
**podium (2)**
6:16,17
**point (28)**
9:9,18;13:22;18:7;
22:18;31:3;33:4,5,12,21,
21;38:12;39:7;55:5;
66:2;72:24;83:24;84:5;
85:6;87:19;88:16,24,25;
98:24;99:24;101:2;
107:8,10
**pointed (5)**
28:8;35:12;53:24;
55:4;96:4
**points (9)**
7:12,18;10:17;41:9,
11,13;65:20;95:24;
105:6
**policies (2)**
19:2,23
**policy (2)**
26:7;85:16
**portion (2)**
43:22;93:5
**position (18)**
8:23;9:22;40:7,8;
41:23;42:2;57:15;60:19;
98:20;100:5,9;101:17,
18;102:4,5;103:22,25;
104:24
**positions (1)**
8:17
**possibility (1)**
39:1
**possible (5)**
10:5;12:21;24:8;
45:15;93:20
**possibly (1)**
94:1
**potential (2)**
50:20;53:14
**potentially (1)**

69:19
**practical (1)**
51:2
**precedent (5)**
10:25;11:17;13:9;
14:21;64:20
**preceding (1)**
40:3
**precise (1)**
65:2
**precisely (3)**
20:25;21:7;48:12
**preclude (1)**
64:22,23;92:8;98:25
**precluded (8)**
37:12;40:19;81:8;
93:18;94:7;99:2,19,20
**precludes (7)**
24:14;36:23;95:3;
98:19,22;102:13;103:10
**preclusive (1)**
103:9
**predominantly (1)**
64:7
**prefer (1)**
78:8
**preparation (1)**
10:13
**prepared (1)**
48:21
**present (3)**
40:15;66:18,19
**presentation (1)**
10:15
**presented (4)**
35:10;61:8;77:24;87:3
**presents (1)**
63:8
**preserves (1)**
48:10
**presidential (1)**
74:11
**presiding (1)**
48:2
**presumably (1)**
90:2
**presume (3)**
24:20;33:7,7
**presumed (1)**
25:17
**prevail (1)**
17:13
**prevent (1)**
104:14
**price (68)**
9:10,11,12,15,17;
10:10;15:9,17,25;20:4,7,
11,17;23:17;24:6;26:5;
28:9,11,14,21,22;29:3,4,
19,20;44:6;47:2;50:15;
52:6,21,23;53:7;54:15,
18;58:2,9;62:12,14;
63:24;67:2,2,11;68:4,5,

5;69:24;70:17;72:14;
79:2,11,25;80:1;81:5,6,
16,20;82:1;83:14,16;
85:2,3,8,12;87:23;93:17;
101:10,11,14
**priced (2)**
15:9;17:21
**price-fix (1)**
80:16
**price-fixed (24)**
23:18;30:19;42:3,14;
50:1;51:9;53:19;59:5,
19;60:24;61:11,12,17;
62:1;67:3;77:1;78:20;
83:9,10;84:7;89:22;
90:16;102:19,19
**price-fixing (8)**
53:22;59:14;65:24;
79:15,19;86:25;90:24;
102:21
**prices (26)**
10:6,7;15:24;20:16;
23:22;24:9;28:20;29:10;
30:11;40:16;44:12;45:3,
17,17;48:18;53:1,3;57:5,
11;60:1,22;79:22;81:18;
86:11;91:14;94:18
**pricing (1)**
19:23
**primary (1)**
89:5
**principal (1)**
6:15
**principals (1)**
43:11
**principle (3)**
39:16;67:21;73:6
**principles (3)**
21:14;46:1,12
**printed (1)**
86:19
**Printing (21)**
23:9;29:13,14,17;
30:2,2,16,17,25;49:23;
50:5,10,19,22,24;51:4,8,
15,19;54:9;96:22
**prior (1)**
16:9
**private (4)**
17:16;27:16;51:5;73:1
**probably (1)**
12:17
**problem (11)**
22:20;31:7;32:9;
47:19;59:10,13;66:18;
71:14;92:12;105:8,8
**problems (3)**
9:19;54:25;91:6
**procedural (1)**
10:19
**procedurally (2)**
11:14;62:4
**proceed (3)**

39:24;48:7;107:2
**proceeded (2)**
44:7;47:7
**proceeding (2)**
38:11;107:3
**PROCEEDINGS (1)**
6:4
**processes (1)**
60:3
**produced (2)**
59:15;60:23
**producers (1)**
58:1
**product (109)**
7:22;9:10,12,14;
10:10,22;13:16,19;
14:13;15:9,10,25;16:11,
19;17:4,22;23:18,19;
24:5;28:20;29:15,16,19,
24;30:3,13,19;31:2,2,3,
4,5,6;36:24;41:24;42:5,
6,15;45:17;47:23;48:24;
50:2,7,8,8;51:25;52:1,
10;53:21;54:17,20;
55:14;57:6;58:23,24;
59:6;60:14;61:11,12,12;
62:13;63:7;65:8;66:2,4;
67:23,23,24,24;68:6,18;
69:23,25;70:16;71:24;
72:16,17,17;77:1,2,11;
78:20;79:3,17;80:24;
81:7;83:9,10;84:7,18,18,
24;89:15,16,16,20,22;
90:16;91:7;92:22;98:16;
99:15;100:11;101:10,12,
15;102:20,20;104:11
**production (2)**
60:3,11
**productive (1)**
39:13
**products (60)**
10:2,4,7;15:17;24:10;
29:10,22,22;34:22;
35:13;36:16;41:21;
44:12,25;45:3,19,22;
47:3,14;48:6;51:9;52:6;
53:3;57:17,18,19,20,23;
58:15,16;59:15,20;60:1,
22;62:8,13,16;63:1,2;
65:10;71:1;72:2;79:13,
22;81:18,21;86:10,16;
87:2,25;88:5,6;91:14,17;
93:13;94:18;97:14;
98:13;102:22;105:18
**profit (1)**
20:13
**profits (2)**
53:22;72:19
**profound (1)**
90:25
**prohibition (1)**
27:2
**projects (1)**

48:22
**proof (5)**
18:8;24:15;26:8,13;
90:22
**properly (2)**
13:10;19:15
**proposed (1)**
7:5
**proration (2)**
54:5;66:16
**protect (1)**
92:17
**protectors (1)**
77:12
**protocols (1)**
76:4
**prove (27)**
23:8;24:22,22;25:3,
10;27:24;33:3,4,19,20,
24;36:5;37:11;82:13;
84:15,15,21,22,24;
90:17;91:22;92:22;94:9,
15,17;95:2,18
**proven (2)**
17:12;90:14
**provide (2)**
27:13,15
**provided (4)**
10:5;62:5;91:25;93:19
**proving (3)**
27:2;83:13;89:4
**provisions' (1)**
93:5
**punch (1)**
78:21
**purchase (28)**
7:7,21,22,23;9:15;
11:21,24;12:9;14:3,13;
15:9;27:13;37:18;41:17;
43:9;51:9;53:18;62:16,
18;65:15;66:13;72:6;
78:20;83:10;86:9;89:21;
91:16;102:21
**purchased (36)**
10:22;12:16,20,22;
13:16;14:13;17:2;30:19,
21;31:1,13;41:19,23;
42:13;44:5;47:20,23;
57:23;63:10;65:7,12,24;
66:3;71:15,20;72:2;
76:14;79:12,12,14,18;
80:15;83:11,11;86:10;
88:7
**purchaser (33)**
7:6;13:7;38:25;41:8;
42:22,24;46:18;55:1,13,
18;56:14;59:22;65:11;
66:20,24;67:6,9;68:1,12,
18;69:23,24;70:11,15,
16,18;71:23;72:25;
76:25;105:10,12,16;
106:18
**purchasers (35)**

11:22;27:12;43:16;
46:19;49:7,11,13,13,15;
51:2;58:5;59:22,25;
64:20;65:5,9;66:25;
69:10,18;71:10;72:19,
20;73:2;82:2,5;83:24;
84:1;90:15,16;93:24;
95:18;98:15;102:18;
105:5,20
**purchasers' (1)**
105:9
**purchases (21)**
13:8,8;16:25;42:21;
46:18;59:4,8,18;63:14;
64:23,24;65:7;68:7;
71:16;72:4;79:3;83:5,9;
84:6;92:3,5
**purchasing (1)**
41:12
**pure (3)**
64:4;92:6;94:19
**purely (1)**
104:4
**purported (1)**
7:6
**purpose (2)**
93:17;101:8
**purposes (7)**
9:10;12:22,24;14:7;
16:18;22:21;81:5
**pursue (2)**
27:13;95:20
**put (8)**
10:1;46:5;60:10;
70:10;76:19;102:3,11,16
**puts (3)**
36:20;42:14;94:16
**putting (4)**
18:18;54:19;66:6;83:7
**puzzled (1)**
10:8

## Q

**qualified (1)**
42:12
**qualifies (1)**
13:7
**quiet (1)**
99:25
**quite (5)**
9:6;10:1;97:8;98:4,20
**quote (12)**
21:12;29:3;38:8;39:6;
45:15;47:18;51:10;
52:14,18;55:1;58:3;81:3
**quoted (3)**
43:18;45:5;82:24
**quotes (1)**
79:6
**quoting (9)**
22:10;44:3;50:21;
54:10;58:3;59:11;61:21;

80:7;97:1

## R

**rabbit (1)**
83:7
**Radovich (1)**
100:20
**raise (3)**
7:18;95:12,21
**raised (9)**
20:11,16;23:5;41:14;
43:10;62:3,23,24;65:17
**raises (1)**
69:13
**raising (1)**
52:5
**range (1)**
19:22
**rather (6)**
9:5;20:6;39:2;58:17;
69:18;100:21
**rationale (3)**
55:11;77:17,18
**rationales (1)**
38:19
**raw (1)**
79:2
**Ray (6)**
6:22;7:21,22,23;9:13;
59:16
**re (5)**
52:16;61:8;80:20,22;
81:24
**reach (1)**
54:16
**read (19)**
7:9,9,10,19;19:18;
21:9,12;44:10;67:14;
68:10;69:14;71:4,11;
72:13;81:4;82:19,19;
96:21;99:9
**reading (5)**
17:18;62:22;78:23;
81:15;96:21
**reaffirmed (1)**
21:21
**real (4)**
20:5;30:7,8;85:10
**realign (1)**
106:14
**realignment (1)**
105:8
**realization (1)**
54:12
**realize (1)**
9:3
**really (15)**
8:3,9,24;9:6;17:14;
19:17;21:11;28:7;34:18;
40:8;41:22;49:24;51:19;
56:25;99:10
**reap (1)**

70:9
**reason (8)**
25:22,24;26:1,6;
67:20;88:6;99:18;101:6
**reasoning (1)**
49:5
**reasons (4)**
15:7;27:4;39:22;98:5
**rebuttal (1)**
78:14
**recalls (1)**
97:8
**recent (2)**
46:20;106:8
**recently (3)**
46:25;51:16;55:6
**recess (2)**
40:23;107:16
**recognize (2)**
40:6;77:18
**recognizes (1)**
86:3
**recommend (1)**
9:2,22;74:3
**recommendation (10)**
35:8;43:15;44:15;
48:7;73:21;74:8;86:17;
87:15;88:11;97:18
**recommendations (1)**
35:23
**recommended (3)**
43:20;44:9,19
**recommending (2)**
9:2;18:21
**recommends (1)**
86:4
**record (14)**
6:13,20;14:9;36:17;
41:1;57:3;63:11,21;
71:1;75:6,20;76:13;
78:13;100:4
**recover (6)**
19:8;27:9;51:8;55:2;
56:15;66:21
**recovers (1)**
67:9
**recovery (5)**
20:23;50:3;54:13;
69:17;70:14
**redefine (1)**
40:12
**redefining (1)**
40:13
**reduce (1)**
106:16
**reeking (1)**
72:11
**refer (1)**
44:14
**referenced (1)**
25:13
**referring (1)**
46:7

**refinery (1)**
54:18
**reflect (2)**
28:22;83:15
**refrigerant (1)**
60:21
**refrigerator (12)**
31:24;33:8,9,10,11,16,
18;57:21;61:25;80:6,17;
91:1
**refrigerators (4)**
31:15;60:23,25;80:16
**refuse (1)**
56:16
**refused (1)**
31:17
**regard (2)**
24:5;88:20
**regarding (8)**
25:21;36:1,12,16;
74:16;86:15;88:5;89:23
**regardless (4)**
23:24,25;24:1,2
**reject (2)**
67:16;73:19
**rejected (1)**
22:22
**related (15)**
16:4;21:3,4;26:18,19,
21,21,23;28:2,5,11,17,
21;33:15;76:9
**relates (3)**
63:3;74:24;76:7
**relation (1)**
104:10
**relationship (1)**
87:12
**relatively (1)**
100:15
**relevant (4)**
19:24;21:6,7;37:14
**relied (1)**
55:11
**relief (2)**
8:13;94:2
**relies (1)**
70:24
**relieved (1)**
102:24
**rely (4)**
11:18;30:1;43:23;71:5
**relying (2)**
63:16;71:9
**remain (5)**
10:7;20:14;45:18;
94:4;96:6
**remained (1)**
93:20
**remains (5)**
24:10,11;60:12;93:21;
94:8
**remember (3)**
66:5;80:14;98:3

**remote (1)**
79:9
**remove (1)**
44:25
**removed (1)**
49:20
**reneging (3)**
101:3,3;103:2
**renig (1)**
102:4
**repair (3)**
8:7;12:22,24
**repairs (1)**
16:18
**repealed (1)**
87:11
**repeat (1)**
9:12
**repeated (1)**
52:8
**repeatedly (1)**
87:24
**repeating (1)**
49:10
**report (3)**
9:24;43:15;77:7
**reported (1)**
60:16
**reporter (4)**
6:10,14;7:2;74:18
**reports (1)**
75:18
**represent (2)**
13:23;41:8
**representing (1)**
100:18
**require (2)**
91:22;102:15
**required (5)**
18:8;61:3;97:23,24,24
**requirement (1)**
17:17
**requirements (1)**
23:13
**reserved (1)**
24:8
**resident (1)**
74:4
**residents (1)**
57:25
**resist (2)**
56:16,19
**resold (1)**
48:20
**resolve (3)**
13:1;55:13;95:2
**resolved (1)**
13:5;74:25
**resolving (2)**
45:14;93:19
**respect (52)**
11:6;13:4;15:17;17:4,
6;24:25;25:20;26:23;

Case 4:07-cv-05944-JST   Document 1274-2   Filed 07/24/12   Page 122 of 125
In Re: Cathode Ray Tube (CRT)
Antitrust Litigation
Reporter's Transcript of Proceedings
March 20, 2012

30:4,7;31:22;32:15;
34:6,15,17,19;35:23;
41:11;44:15;45:2,21;
46:4;47:13,17,19;48:8;
53:7;55:21,22;56:10,15;
58:23;59:4,18;71:14;
73:20;82:7;85:21;88:8;
93:25;94:4,5,6,11,21;
97:5;98:10,11,17;
100:13;103:3,5
**respectfully (6)**
36:25;39:16;84:11;
92:21;104:19,24
**respects (1)**
80:21
**respond (1)**
96:24
**responded (1)**
53:16
**response (5)**
20:11;23:3,4,7;42:12
**responsible (1)**
100:20
**rest (1)**
99:16
**restate (1)**
13:22
**rested (1)**
69:15
**restrict (1)**
52:19
**result (2)**
19:9;56:16
**retail (2)**
79:22,25
**retailer (3)**
12:22;16:17;42:20
**return (1)**
93:1
**review (1)**
75:25
**revisionist (3)**
96:2,23;103:3
**Richard (1)**
47:10
**Rick (2)**
41:13;74:15
**right (41)**
6:6,21;10:10;13:23;
14:14;19:9,19;23:20;
24:13,15,17;25:7;31:25;
32:2,23;40:20,25;41:15;
42:23,25;44:18;64:1;
74:5,6;76:24;78:4,12;
82:13,24;90:3;93:23;
94:7,16,21;96:1;100:10;
102:6;103:22,25;
104:16;105:1
**river (1)**
99:14
**road (3)**
39:25;72:11,18
**rock (1)**

99:13
**Roman (1)**
82:24
**roughly (1)**
75:23
**round (2)**
32:7,8
**Royal (21)**
23:9;29:13,14,17;
30:1,2,15,17,25;49:23;
50:5,10,19,22,24;51:4,7,
15,19;54:9;96:22
**Rule (48)**
17:19;21:24;22:3,6,
17;33:14;34:2;35:2;
38:25;39:3,10;41:14;
44:9,15,24;45:4,14,24;
48:7;58:23;59:1;63:21;
66:24;72:25;74:16,21;
76:11,15,23;77:2,13,19;
78:19;81:10;82:7,25;
92:7;95:10;97:3,7,10,12,
18,20;98:4,9,18;101:4
**ruled (4)**
35:21;49:9;76:1;97:17
**rules (3)**
18:23;82:14;100:22
**ruling (16)**
15:20;35:5;73:7;74:8;
79:16;80:5;81:14;82:21;
87:14;91:11;101:7;
104:11,13,18,22,22
**rulings (2)**
32:16;90:1
**run (1)**
61:4
**running (2)**
96:17,17
**runs (1)**
18:9

**S**

**sales (17)**
8:8,8,10,10;20:8,10,
13;21:3,4;26:17,21,24;
40:16,17;56:13;57:10,12
**same (27)**
11:3;12:18;16:23;
26:19;29:14,16,19,20,
23;30:3,5,8,12;31:2,2,
21,25;51:10;52:25;
57:11;66:6,7;75:3;
84:23;89:15;94:3,22
**SAN (1)**
6:1
**Sanyo (1)**
23:25
**satisfy (1)**
85:6
**Saveri (18)**
41:13;74:14,15;75:9,
13;76:18;77:6,10,15,21;

99:25;100:2,4,17;101:2;
103:5,20;104:9
**saying (29)**
7:19;8:25;14:19;
20:20;22:10;23:21;26:9;
29:15,23;30:22;32:10;
36:4;69:5,6;70:24;
82:20;84:9;87:11;88:19;
90:15;92:9,18;94:14;
96:1;99:10;100:7;104:3,
15;107:7
**schedule (3)**
73:10;75:17;76:2
**Schiller (1)**
41:10
**screen (1)**
70:10
**se (1)**
68:7
**Seaboard (1)**
47:10
**Seaborg (4)**
47:12;59:2;71:12;
87:22
**seats (1)**
6:18
**Second (7)**
22:13;46:8,11;49:17;
61:21;82:7;89:13
**Section (21)**
17:15;18:8;22:8;
23:13;82:12,18,21;83:2,
12;85:7;89:4;91:8,21;
93:25;94:1,5,6,20,20;
95:12,18
**sections (1)**
97:20
**seeing (1)**
73:5
**seek (1)**
95:2
**seeking (7)**
10:23;11:7,12;13:23;
15:11;25:13,23
**seems (3)**
9:8;92:10,12
**self-evident (2)**
65:23;77:4
**sell (2)**
42:5;59:20
**sellers (2)**
79:9,10
**selling (2)**
42:15;58:14
**sells (6)**
42:15,18,20;59:20,21,
21
**sense (3)**
35:4;55:17;99:22
**sentence (2)**
25:9;86:8
**separate (4)**
8:17;77:7;83:18;88:15

**September (1)**
78:24
**series (3)**
22:6;32:16;39:13
**serve (1)**
22:21
**served (1)**
76:8
**service (1)**
30:12
**services (4)**
30:8,9,10,11
**set (8)**
10:25;11:17;54:18;
75:17;77:21,23;91:20;
104:21
**sets (2)**
55:16;74:22
**setting (1)**
76:2
**settlements (1)**
55:12
**seven (1)**
55:6
**several (3)**
27:4;49:19;57:24
**severe (2)**
73:4,17
**shall (2)**
10:7;45:17
**Shamrock (3)**
79:6,7,20
**Sharp (4)**
17:5;24:1;27:14;77:12
**sheets (6)**
52:2,23;60:2;80:24;
82:1,3
**Sherman (1)**
28:14
**shield (1)**
54:19
**shifting (1)**
40:9
**Shoe (22)**
17:14;18:10,24;21:8,
9,11,13,14;22:7;26:12;
29:1;34:14;35:18;36:11;
38:18,20;51:11;69:15;
82:25;88:25;89:8;96:22
**short (2)**
35:14;48:2
**show (8)**
17:16;23:14;33:24,25;
69:20;83:12,13;101:14
**showing (3)**
37:15;67:2;102:18
**shown (2)**
20:11;51:1
**shows (2)**
33:7;57:3
**side (4)**
7:18;68:15;92:11;
103:6

**sight (1)**
49:23
**signed (1)**
102:9
**significance (8)**
25:9,13;29:7;57:2;
93:5;98:9,11,24
**significant (8)**
9:5;25:15;28:14;
29:14;50:10;57:10;
79:16;83:3
**signing (1)**
107:17
**similar (2)**
22:22;54:8
**SIMMONS (2)**
102:8,11
**SIMON (8)**
95:25;96:5,25;97:6;
98:17;101:5,20;104:2
**simple (3)**
9:9;13:1;100:6
**simply (14)**
9:16,18,21;13:6;17:9;
48:9;54:16,20;72:15;
87:17;92:14;99:16;
103:2;105:10
**single (3)**
19:24;20:2;50:7
**sister-court (1)**
34:10
**site (3)**
44:7;47:10;57:16
**sites (1)**
86:5
**situation (18)**
27:22;42:3,17;47:5,
12;48:16;49:12;50:12;
53:12,24,25;54:3;57:24;
58:24,25;59:3;60:20;
61:8
**situations (2)**
51:11;59:7
**Sixth (1)**
31:19
**skeptical (1)**
88:1
**slide (1)**
6:17
**slow-down (1)**
73:11
**small (3)**
33:10,10,12
**smaller (1)**
19:16
**sold (9)**
30:10;47:14;48:19;
55:23;56:3;60:23;61:16;
70:10;77:11
**solely (4)**
10:23;58:17;85:25;
97:12
**somebody (1)**

Case 4:07-cv-05944-JST   Document 1274-2   Filed 07/24/12   Page 123 of 125
In Re: Cathode Ray Tube (CRT)                                    Reporter's Transcript of Proceedings
Antitrust Litigation                                                              March 20, 2012

92:18
**somehow (4)**
  23:12;26:20;35:7;
  82:10
**someone (3)**
  26:4;78:19;92:20
**sometimes (1)**
  27:8
**somewhat (1)**
  49:8
**somewhere (1)**
  103:15
**Sony (4)**
  17:4;23:25;27:14;84:1
**Sonys (1)**
  91:25
**sorry (2)**
  75:7;80:9
**source (1)**
  42:13
**speak (6)**
  6:9;7:2,17;74:16,18;
  95:25
**speakers (1)**
  6:15
**speaking (3)**
  6:9;7:15;104:9
**speaks (1)**
  100:4
**special (2)**
  86:3;87:1
**specific (4)**
  19:1;22:4;31:17;39:11
**specifically (9)**
  26:12;31:16;36:3;
  44:10;45:15;55:11;89:6;
  101:9,20
**spend (1)**
  37:8
**spent (1)**
  85:19
**spite (1)**
  100:10
**split (1)**
  9:4
**spoke (5)**
  31:12;64:25;69:1;
  81:4;87:21
**spot (1)**
  96:3
**square (3)**
  36:8,10,11
**squarely (1)**
  35:10
**squeezed (1)**
  103:16
**stand (5)**
  6:17;22:7;83:1;91:3;
  105:2
**standing (37)**
  9:16;42:8;44:4;45:9;
  46:3;47:19;55:19,21;
  59:25;60:25;63:23;65:2,

4,23;67:20;68:18;70:1,
  18;71:10,14;72:9;77:1;
  78:19;79:1;80:2;82:5;
  83:6;85:25;86:1,5,23;
  88:7;89:23;91:8;94:20;
  96:11;100:8
**standpoint (4)**
  19:11;29:8;39:24;91:8
**Stanislaus (5)**
  31:9;57:20;72:4;
  78:24;79:23
**start (5)**
  10:18;12:5;41:15;
  78:17;85:24
**starts (1)**
  85:25
**state (8)**
  12:15;20:1;48:23;
  58:25;72:21,22;106:14,
  17
**stated (9)**
  17:11;22:6;38:24;
  45:15;48:3;80:4,25;
  82:25;103:25
**States (8)**
  13:16;49:9;57:25;
  82:15;85:14,15,16;92:1
**status (4)**
  27:18;58:4;74:23;
  102:17
**statute (1)**
  106:18
**stay (1)**
  6:18
**steel (1)**
  60:2
**step (5)**
  48:13;73:14;94:15;
  95:19,23
**steps (4)**
  48:25;49:19;60:11;
  95:15
**still (11)**
  13:23;45:1;67:1,25;
  70:12;76:5;79:1;95:11,
  20;104:12,16
**stip (12)**
  25:6,10,13;95:1;97:5,
  19,20,21;98:19,19,21;
  99:22
**stipulate (3)**
  24:16;96:5;97:16
**stipulated (2)**
  81:11;93:2
**stipulating (1)**
  45:21
**stipulation (41)**
  10:1;13:18;15:15,22;
  18:17;24:2,3,18;36:23;
  45:13,14,19;47:7;48:9;
  70:24;79:17;81:13,23;
  91:12;95:9,16;96:15,20;
  99:1;101:3,5,6,8,13,16,

19,24;102:9,13,23;
  103:2,10,21,23,24;104:2
**stood (1)**
  96:3
**Stotter (1)**
  61:14
**strove (1)**
  57:4
**stuck (1)**
  101:19
**sub (2)**
  46:8;61:21
**subdivision (2)**
  43:1;51:4
**subject (5)**
  15:25;16:20;69:24;
  79:14,18
**submission (1)**
  21:2
**submit (4)**
  20:24;81:1;92:22;
  104:24
**submitted (3)**
  48:22;74:17;105:2
**subsequent (2)**
  97:4,19
**subsequently (1)**
  49:9
**subsidiaries (5)**
  56:3,6,14;57:7;86:11
**subsidiary (7)**
  42:7;50:14,16;51:4;
  52:3;56:9;89:15
**substantially (2)**
  63:3,6
**substantive (1)**
  9:4
**substitute (1)**
  13:19
**subsumed (1)**
  106:12
**succinctly (1)**
  102:12
**suddenly (1)**
  107:2
**sue (20)**
  26:22;27:15;31:23;
  42:8;45:10;49:4,13;
  50:22,24;51:3;55:19,21;
  56:6;59:25;61:1;63:23;
  69:20;77:1;82:12;96:11
**sued (1)**
  56:9
**suffer (1)**
  51:14
**suffered (2)**
  26:2;50:2
**sufficiently (3)**
  7:11;29:9;32:15
**sugar (49)**
  9:23;31:17;22:34:3,
  25;35:15;36:2,3,7;37:4;
  43:18;45:9;46:2,13;

49:23;50:11;51:21,24;
  52:1;53:9,13,21;54:18,
  19,24;55:4,12;60:4,17;
  61:3,4,8,11,15,17,20;
  64:9;65:17,22;66:1,3,5,
  6;67:15;71:6;72:12;
  96:10;97:9;99:6
**Sugar/Linerboard (2)**
  65:17;70:20
**suggest (5)**
  36:25;39:15;84:11;
  87:17;103:17
**suggested (3)**
  32:19;88:6;101:19
**suggestion (1)**
  105:7
**suit (3)**
  51:5;92:18;96:18
**suits (1)**
  57:25
**sum (3)**
  22:2;39:4,9
**summarize (2)**
  44:7;65:20
**summary (11)**
  6:24;7:6;10:23;14:25;
  63:14;74:17;75:2,10;
  76:7;95:7,14
**suppliers (1)**
  58:8
**supply (1)**
  20:2
**support (5)**
  52:21;57:15;63:11,17;
  74:17
**supports (1)**
  60:19
**Suppose (1)**
  42:14
**supposed (3)**
  33:5;86:5,22
**Supreme (19)**
  19:6;21:21,25;22:10,
  22,25;27:5;36:9;37:12;
  49:9;54:4;58:2;66:15;
  67:7;68:24;84:11;85:9;
  90:13;93:23
**sure (6)**
  8:16;41:7;42:11;
  57:11;98:4;106:5
**surprised (1)**
  100:12
**surprises (1)**
  101:17
**surprising (1)**
  17:13
**Susan (1)**
  45:25
**sustained (1)**
  64:21
**sutures (1)**
  58:14
**sweetened (1)**

53:21
**syrup (1)**
  54:20

**T**

**table (1)**
  7:18
**tainted (2)**
  54:17;72:15
**talk (7)**
  6:17;15:14;31:18;
  48:13;54:7;56:23;57:14
**talked (2)**
  55:25;67:8
**talking (10)**
  23:16;51:3;59:4,22;
  60:11;62:6;66:23,24;
  67:17,17
**talks (1)**
  31:10
**teaches (1)**
  51:11
**technically (3)**
  11:4;64:19;104:9
**telephone (2)**
  7:1;107:17
**television (18)**
  16:5,10;17:5;23:24;
  32:21;37:25;46:4,19;
  60:10;65:12;66:8;83:11,
  14;84:25;85:1,8;91:1;
  93:18
**televisions (9)**
  12:16;16:15;17:7;
  26:14;33:21;47:4;55:20;
  65:5;76:21
**telling (2)**
  106:24,25
**temptation (1)**
  56:17
**ten (4)**
  18:5;40:22;78:9;85:4
**terms (5)**
  13:10;18:23;20:23;
  64:4;90:22
**TFT (1)**
  51:23
**thanked (1)**
  101:1
**theoretical (1)**
  85:10
**theory (4)**
  56:12;61:7,10,16
**thereafter (1)**
  20:13
**therefore (7)**
  22:11;37:15;50:3;
  55:2;61:18;66:20;69:3
**third (16)**
  27:17;42:13,13,18;
  47:24;51:20;53:10,16;
  54:3,7,10;59:8;65:18;

71:2,4;88:2
**third-party (6)**
48:19,21;57:5,6;
58:18;72:3
**though (6)**
10:18;13:5;20:21;
32:11;41:23;67:16
**thought (3)**
35:20;45:18;89:13
**thoughts (1)**
10:12
**threatened (1)**
54:6
**three (7)**
10:3;48:2;57:17,22;
65:20;93:6,9
**threw (1)**
101:20
**thrown (1)**
105:10
**thus (3)**
61:13,18;79:13
**ties (1)**
50:10
**tighter (1)**
20:3
**tin (9)**
31:9,10,10;59:25;
60:1,2;79:2;80:1;91:2
**today (9)**
43:8;52:8;56:24;
64:19;96:1,18;97:2;
103:22;105:7
**together (2)**
10:1;46:6
**told (4)**
47:6,8;100:19,25
**took (5)**
61:2;65:19;99:13;
100:9;102:5
**top (1)**
47:3
**topic (3)**
53:10;56:2,20
**Toshiba (8)**
55:15;75:3,3,4;83:22;
104:12,14,16
**total (3)**
20:8,10,13
**totally (5)**
8:10;28:7;42:18;
88:15;96:2
**trace (1)**
53:13
**train (1)**
89:13
**transaction (2)**
28:8;29:7
**transcript (2)**
17:18;45:6
**transfer (1)**
50:15
**transfers (1)**

57:1
**transformation (1)**
32:19
**transformed (3)**
34:22;89:16,18
**transforming (1)**
30:13
**translations (1)**
107:13
**transpired (1)**
12:2
**treble (1)**
54:16
**trial (6)**
33:5;46:21;55:16;
82:11;95:7,21
**tried (4)**
53:12;72:5;92:16;
104:21
**tries (1)**
70:23
**Trombley (1)**
32:14
**truck (1)**
68:11
**true (4)**
9:20;53:19;63:12;88:1
**truth (2)**
70:6,8
**Try (5)**
29:2;71:2;74:18;94:9,
14
**trying (7)**
29:12;30:1;33:24;
68:11;85:10;90:25;94:7
**TTFT (1)**
47:2
**Tube (9)**
6:22;7:21,22,23;9:13;
17:21;101:11,11,14
**tubes (1)**
102:20
**TUESDAY (1)**
6:1
**turn (4)**
8:3;42:19;64:13;86:23
**turned (2)**
75:22;76:4
**turning (1)**
7:4
**turns (2)**
15:23;26:23
**TV (4)**
8:8,10;28:21;40:16
**TVs (4)**
42:15,15;55:23;56:4
**twice (1)**
46:1
**two (12)**
6:15;33:17;37:7;
48:25;49:5;55:7,16;
57:16;63:20;80:21;
95:15;100:2

**type (8)**
18:7;21:1,7;26:8,13;
35:5;37:11;87:5
**types (2)**
39:1;62:6
**typewritten (1)**
43:25

## U

**ultimate (2)**
42:20;81:17
**ultimately (3)**
18:20;81:10;90:8
**umbrella (7)**
25:21,23,24,25;26:1,4;
90:24
**unable (1)**
20:1
**unaffiliated (1)**
47:25
**unaware (1)**
41:18
**under (30)**
15:16;17:15;18:8;
20:22;27:9;28:7;32:14;
38:15;41:25;42:9;45:9;
49:4;56:12;61:1,6;
82:11,12,21;84:5;85:24;
92:13;94:15,19;95:12;
96:10;97:9;100:20,21;
106:14,17
**undergo (1)**
60:2
**underlying (4)**
22:3;38:20;39:10;
66:11
**undermine (3)**
39:3;57:13;73:8
**underpinning (1)**
68:13
**Understood (1)**
74:10
**undertook (1)**
51:21
**undisputed (4)**
10:21;16:8,9;63:18
**unequivocally (1)**
48:3
**unique (2)**
36:22;61:6
**uniquely (1)**
36:22
**unit (1)**
20:9
**United (3)**
13:16;82:15;92:1
**unlawful (2)**
58:15;86:12
**unless (4)**
25:7,11;92:24;104:7
**unprecedented (1)**
82:8

**unrelated (2)**
17:2;83:25
**unwarranted (2)**
22:5;39:12
**up (19)**
12:1;14:19;21:18;
25:1;29:15;33:17;36:17;
41:5;60:17;64:25;69:22;
73:13;74:18;75:17;
82:19;88:19;91:3;
105:21,22
**upon (4)**
11:18;40:16;86:22,23
**urge (2)**
21:9;39:16
**use (3)**
49:19;71:25;85:2
**used (2)**
73:15;105:11
**user (1)**
106:9
**users (2)**
105:17,18
**Utah (1)**
36:9,9,12,13
**UtiliCorp (22)**
18:11,24;21:21;22:1,
10,23;27:8,10;32:24;
33:23;34:14;38:8,15;
57:16,24;67:5;71:20;
82:20,23;89:1,7;91:23
**utilities (3)**
58:2,7;71:20
**utility (1)**
71:21

## V

**vacate (1)**
97:20
**Valley (23)**
18:14,19,23;19:7;
21:17;27:11;32:24;
33:23;34:14;35:1,2;
36:12;37:1;51:17;57:16;
58:12,22,25;66:22;72:2;
89:1;90:12;91:23
**variation (1)**
26:8
**various (5)**
41:25;43:13;44:2;
58:12;66:19
**vary (1)**
91:20
**venture (2)**
28:18;83:20
**verdict (1)**
73:15
**version (1)**
86:19
**versus (3)**
31:9,10;57:20
**vertical (2)**

72:7;91:5
**vertically (2)**
60:8;90:19
**victims (1)**
88:14
**view (6)**
13:18;31:22;56:18;
61:2,4;93:21
**viewed (4)**
48:5;53:6;59:6;63:4
**vindicated (1)**
51:13
**violated (1)**
61:16
**violation (1)**
68:7
**violator (2)**
53:18;66:14
**violators (1)**
58:7
**Visio (1)**
17:5;27:15;77:12;84:1
**volume (1)**
20:9
**voluminous (1)**
8:13

## W

**wait (4)**
12:6;28:16;39:5;44:17
**waived (1)**
99:23
**waiving (1)**
99:21
**wants (3)**
96:18,21;102:4
**warranting (1)**
22:16
**water (1)**
54:20
**way (38)**
12:10;14:9;20:24;
21:16;23:24;25:18;26:9;
28:4;29:23;35:19,24;
36:8,10,11;38:10;39:24;
40:2,19;54:8;63:6;
73:24;79:4;82:7;83:12;
85:8;88:23;90:14,17;
93:22;94:1,3,12;97:22;
98:22;99:3,9;103:15;
107:12
**ways (3)**
15:13;54:8;62:10
**Welcome (1)**
6:6
**west (3)**
51:23;59:11;75:15
**what's (5)**
36:19;84:16;89:3;
92:17
**whichever (2)**
73:22,24

Case 4:07-cv-05944-JST   Document 1274-2   Filed 07/24/12   Page 125 of 125
In Re: Cathode Ray Tube (CRT)                                    Reporter's Transcript of Proceedings
Antitrust Litigation                                                            March 20, 2012

**whole (4)**
  11:10;68:12;72:24;
  75:19
**wholesaler (3)**
  42:16,19,19
**Wholesalers (2)**
  47:15;50:24
**who's (3)**
  98:6,7,7
**whose (1)**
  45:25
**wide (1)**
  19:22
**William (1)**
  41:10
**windfall (1)**
  51:12
**winning (1)**
  51:12
**wipe (1)**
  72:19
**wish (1)**
  7:1
**withdraw (1)**
  93:12
**withdrew (1)**
  10:4
**within (3)**
  10:25;42:21;106:12
**without (5)**
  17:22;20:25;29:9;
  83:13;87:6
**won (1)**
  13:9
**wondering (1)**
  100:1
**wooing (1)**
  44:15
**word (2)**
  83:4;100:3
**words (10)**
  21:13;24:13;28:8,19;
  31:3;32:25;61:14;90:24;
  92:10;95:15
**work (2)**
  12:10;21:16
**world (7)**
  20:6;78:22,25;80:2;
  82:9;85:10;91:25
**worse (2)**
  39:23;91:7
**written (1)**
  101:9
**wrong (13)**
  9:1;24:15,18;32:23;
  51:12;57:2;74:5;85:22;
  90:3;94:8,15;95:11;
  104:19

---

## Y

**years (1)**
  102:3

**yesterday (2)**
  76:1;107:13