# EXHIBIT

# 5
## (Part 2)

1    favor as a matter of law. *See* Fed. R. Civ. P. 56(a); *British Airways Bd. v. Boeing Co.*, 585 F.2d

2    946, 950–51 (9th Cir. 1978). "The evidence of the non-movant is to be believed, and all justifiable

3    inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

4    (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

5    inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for

6    summary judgment." *Id.* "Where material factual disputes exist, the court must allow a jury to

7    resolve them." *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 871 (9th Cir.

8    2010) (citing *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992)). "In antitrust

9    cases, these general standards are applied even more stringently and summary judgments granted

10    more sparingly." *Beltz Travel Serv., Inc. v. Int'l Air Transport Ass'n*, 620 F.2d 1360, 1364 (9th

11    Cir. 1980) ("*Beltz*"). Allegations of conspiratorial conduct, especially in a price-fixing antitrust

12    context, should be viewed as a whole. *See Continental Ore Co. v. Union Carbide & Carbon

13    Corp.*, 370 U.S. 690, 699 (1962). Finally, "[i]f a nonmovant shows by affidavit or declaration

14    that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

15    (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to

16    take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

17        **B.**     *Illinois Brick* **Does Not Bar Claims Of Plaintiffs Who Purchased Finished Products Directly From Defendants**

19           **1.**    *Illinois Brick* **Precludes Only Indirect Purchasers From Bringing A Claim For Damages Under The Federal Antitrust Laws**

In *Illinois Brick*, the Supreme Court held that indirect purchasers—persons who did not purchase from a member of the conspiracy—do not generally have standing to pursue damages claims under the federal antitrust laws. 431 U.S. at 735–36. The Court expressed the concern that allowing indirect purchasers to recover illegal overcharges passed-on to them by direct purchasers would "create a serious risk of multiple liability for defendants" and introduce substantial "evidentiary complexities and uncertainties" in federal antitrust litigation. *Id.* at 730, 732.

The purpose of *Illinois Brick* was to enable and encourage private enforcement of the federal antitrust laws, not to allow conspirators to insulate themselves from liability. *See In re*

837411.1                  8

1   *Chicken Antitrust Litig.*, 560 F. Supp. 943, 950 n.23 (N.D. Ga. 1979) ("Certainly, the direct-

2   purchaser rule was not intended to provide antitrust defendants with a shield from antitrust

3   liability.") (citing *Illinois Brick*, 431 U.S. at 736 n.16). The Supreme Court explained: "[T]he

4   antitrust laws will be more effectively enforced by concentrating the full recovery for the

5   overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by

6   the overcharge to sue only for the amount it could show was absorbed by it." *Illinois Brick*, 431

7   U.S. at 735. The Court in *Illinois Brick* did so by locating the right to assert claims for damages

8   under the Sherman Act in the persons or entities most likely to bring those claims, direct

9   purchasers. *See Paper Sys., Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629, 632 (7th Cir.

10   2002) ("*Paper Sys.*") ("concentrate damages in the hands of the initial purchasers, and thus

11   improve deterrence."); *Illinois Brick*, 431 U.S. 720; *Hanover Shoe, Inc. v. United Shoe Mach.*

12   *Corp.,* 392 U.S. 481 (1968) ("*Hanover Shoe*").

13         The sale to the first purchaser outside the conspiracy constitutes a direct purchase within

14   the meaning of the antitrust laws. *Paper Sys.*, 281 F.3d at 632. *Illinois Brick* limits federal

15   antitrust claims down the distribution chain, not because a particular defendant did not damage the

16   indirect purchaser, but rather because there was an intervening sale to a non-participant in the

17   conspiracy. As the Seventh Circuit has explained, "The reason the plaintiffs' suit in *Illinois Brick*

18   failed was not because the defendants did *not* sell to them. Rather, it was because the defendants

19   *did* sell to a third party who (after *Hanover Shoe*) could recover for any injury they claimed."

20   *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 482 (7th Cir. 2001), *cert. denied*, 539 U.S. 903

21   (2003) (emphasis in original).

22         Defendants invoke *Illinois Brick* as a basis for insulating themselves from damages claims

23   simply because they employed subsidiaries and affiliates to sell Finished Products containing their

24   price-fixed CRTs. But *Illinois Brick* was never intended to allow the use of artificial corporate

25   formalities to permit such a result. "To adopt any other view would invite evasion by the simple

26   expedient of inserting a subsidiary between the violator and the first noncontrolled purchaser."

27

28

837411.1           9

Direct Purchaser Plaintiffs' MPA in Opposition to Defendants' Motion for Partial Summary Judgment
MDL No. 1917; Master File No. 07-cv-5944 SC

1  *Sugar*, 579 F.2d at 19.  As the Third Circuit explained, to deny recovery under such circumstances

2  "would leave a gaping hole in the administration of the antitrust laws."  *Id.* at 18.[5]

3          The issue here is not academic.  Defendants sold the vast majority of the CRTs they

4  manufactured to their affiliates and those of their co-conspirators.  The price-fixed CRTs were the

5  primary components of the monitors and televisions the affiliates sold to Plaintiffs and other

6  members of the proposed class.  These companies have not sued, and will not sue, their affiliates

7  for antitrust violations.  Thus, Defendants' motion—far from being merely a case management

8  tool—is an improper attempt to eliminate their liability for billions of dollars of commerce.  To

9  avoid the exact result that Defendants seek, the federal courts have long recognized exceptions to

10  *Illinois Brick*.  As explained in *Sugar*, *Linerboard*, *Royal Printing* and *Freeman*, *Illinois Brick*

11  does not apply where the plaintiff purchased price-fixed products or products containing price-

12  fixed components from a division, subsidiary, or affiliate of a conspirator.

13
                    2.          **Defendants' Motion Should Be Rejected Under *Sugar*, *Linerboard* And
                                Their Progeny, Including Cases From This District**
14

15          In *Sugar*, Stotter & Co. ("Stotter"), a wholesaler of candy, filed an antitrust class action

16  complaint against 12 sugar refiners that allegedly conspired to fix sugar prices.  Two of them

17  (Borden and SuCrest) also used sugar to make candy—transforming and altering the sugar in that

18  process.  Stotter did not buy sugar from any defendant.  Instead, it bought candy from Borden and

19  a subsidiary of SuCrest.  579 F.2d at 15.  In considering whether Stotter had standing under the

20  federal antitrust laws, the Third Circuit asked: "Does the decision [in *Illinois Brick*] also bar a suit

21  by a plaintiff who purchases directly from the alleged offender but buys a product which

22  incorporates the price-fixed product as one of its ingredients?  Stated another way, does the

23  _____
    [5] *See Freeman*, 322 F.3d at 1146 ("Were we to grant immunity from section 1 merely because
24  defendants nominally sell services through another entity rather than to consumers directly, we
    would risk opening a major loophole for resale price maintenance and retailer collusion."); *LCDs*
25  *III*, 2011 WL 5357906, at *2 (N.D. Cal. Nov. 7, 2011) (noting that eliminating antitrust liability to
    purchasers of a finished product from a subsidiary of a company that conspired to fix component
26  prices "would create a serious hole in the coverage of the antitrust laws, giving would-be price
    fixers a road map for successful avoidance of the Sherman Act.  Courts have understandably
27  sought to avoid such result.").

28

1  proscription against recovery for indirect purchases extend to the product as well as the buyer?"

2  *Id.* at 16. The Third Circuit answered these questions in the negative, persuasively explaining its

3  reasoning:

4  As the defendants here point out, the product which plaintiff purchased competes
   not with sugar, but with other candy, and more than one ingredient determines the
5  price. To this extent, there will be some additional complications underlying the
   damage claims. *However, this must not be allowed to obscure the fact that the*
6  *plaintiff did purchase directly from the alleged violator. True, the price-fixed*
   *commodity had been combined with other ingredients to form a different*
7  *product. But just as the sugar sweetened the candy, the price-fixing enhanced*
8  *the profits of the candy manufacturers.*

9                              *      *      *

10 *We are also influenced by the realization that to deny recovery in this instance*
   *would leave a gaping hole in the administration of the antitrust laws. It would*
11 *allow the price-fixer of a basic commodity to escape the reach of a treble-*
12 *damage penalty simply by incorporating the tainted element into another*
   *product.* Thus, a refiner who illegally set the price of sugar could shield itself by
13 putting all of the sugar into a new product, a syrup, simply by adding water and
14 perhaps a little flavoring. We do not think the antitrust laws should be so easily
   evaded. . . .

15
   *Illinois Brick* did not purport to provide any such escape.
16

17 579 F.2d at 17–18 (footnotes omitted; emphases added). In the decade after it was decided, *Sugar*

18 was cited with approbation in other courts, including other circuits.[6]

19       Defendants incorrectly contend that the Supreme Court overruled *Sugar sub silentio* in

20 *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990) ("*UtiliCorp*"). Def. Mem., pp. 11–12.

21
   ─────────────
22 [6] *See In re Midwest Milk Monopolization Litig.*, 730 F.2d 528, 530 n.2 (8th Cir. 1984), *cert.*
   *denied*, 469 U.S. 924 (1984) ("[W]e agree with the court in *In re Sugar* [] when it stated that a
23 change in the makeup of a product by incorporating an additional element cannot be used 'to
   escape the reach of a treble-damage penalty'"); *Jewish Hosp. Ass'n of Louisville, Ky., Inc. v.*
24 *Stewart Mech. Enters., Inc.*, 628 F.2d 971, 974–75 (6th Cir. 1980), *cert. denied*, 450 U.S. 966
   (1981) ("Even if the defendants submitted rigged bids to all the general contractors and were
25 indifferent which one was awarded the contract, this fact does nothing to convert the two-step
   transaction into the equivalent of a single sale. Compare *In re Sugar Industry Antitrust Litigation*
26 [] in which the court found no *Illinois Brick* problem where manufacturers allegedly fixed the
   price of sugar which their subsidiaries incorporated into candy purchased by the plaintiffs."); *In re*
27 *Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 480-81 (W.D. Pa. 1999) ("*Flat Glass*").

28

1  *UtiliCorp* only rejected the idea of "'carv[ing] out exceptions to the [direct purchaser] rule for

2  particular types of markets.'" 497 U.S. at 216 (quoting *Illinois Brick*, 431 U.S. at 744). It did not

3  overrule, explicitly or implicitly, the holding in *Sugar* that the purchase of a product containing a

4  price-fixed component from a conspirator or its subsidiary or affiliate is direct. Nothing in

5  *UtiliCorp* suggests that price-fixers may use *Illinois Brick* to avoid liability by interposing another

6  affiliated entity in the chain of manufacturing and sale of the price-fixed product.[7]

7      Defendants' argument is belied by the Third Circuit itself which, in 2002—twelve years

8  after *UtiliCorp*—reaffirmed its opinion in *Sugar* in the *Linerboard* case. In *Linerboard*, the Third

9  Circuit held that plaintiffs who purchased a product containing a price-fixed component, rather

10  than the component itself, had standing under the antitrust laws as direct purchasers:

11      [T]he putative class plaintiffs purchased corrugated sheets or boxes directly from
Appellants, and, like the candy in *In re Sugar*, which contained allegedly price-
12  fixed sugar, the corrugated sheets and boxes contain linerboard that was subject to
an agreement on output, which is equivalent to a price-fixing agreement.
13  Accordingly, the putative class members are direct purchasers and are entitled to
recover the full amount of any overcharge.
14

15  305 F.3d at 159–60. *Sugar* and *Linerboard* remain good law and are routinely cited with approval

16  by Courts in this District including Judge Conti in this very case.

17      In denying Defendants' motion to dismiss Plaintiffs' complaint, Judge Conti recognized

18  that *Linerboard* is on point. As in this motion for summary judgment, Defendants argued that

19  Plaintiffs who purchased Finished Products lacked standing. Judge Conti held otherwise:

20      Here, the Direct Purchaser Plaintiffs allege they purchased CRTs or CRT
Products from Defendants or their subsidiaries at inflated prices due to
21  Defendants' unlawful conduct. Direct Compl. ¶¶ 11–23. This is the type of
injury the antitrust laws were intended to address. *Furthermore, courts have*
22  *found antitrust standing where plaintiffs purchased downstream goods from*

23

24  [7] In *UtiliCorp*, two states brought a *parens patriae* action for price-fixing against a pipeline
company and five natural gas production companies on behalf of consumers. *See* 497 U.S. at
25  204–05. The Supreme Court held that *Illinois Brick* prohibited the states' damages action because
the consumers they represented were indirect purchasers who had bought natural gas from public
26  utilities, independent third-parties that held the direct purchaser claims. *See id.* at 207. The
Supreme Court concluded that *parens patriae* litigation, rather than an action by natural gas
27  purchasers, would create unnecessary complications that *Illinois Brick* was designed to avoid.

28

837411.1     12

1   *manufactures who made, and allegedly fixed the price of, a component of those*
2   *goods. See, e.g., In re Linerboard Antitrust Litig.*, 305 F.3d 145, 159–60 (3d Cir. 2002) (in alleged conspiracy to fix prices of linerboard, plaintiffs who purchased
3   corrugated sheets or boxes containing linerboard from defendants had standing).

4   *CRT*, 738 F. Supp. 2d at 1023.

5   Judge Conti's conclusion is in no way undermined by the intervening Stipulation.

6   Defendants are incorrect in asserting that the Court denied their motion to dismiss based solely on

7   Plaintiffs' Finished Product conspiracy allegations. Def. Mem., pp. 2–3. Rather, Judge Conti

8   expressly agreed with Plaintiffs' assertion that they could recover for direct purchases of Finished

9   Products under the *Sugar/Linerboard* cases. The issue presented by this motion is identical to that

10   Judge Conti previously decided, and the Special Master is bound by Judge Conti's decision.

11   Judge Conti's well-reasoned analysis is consistent with Judge Illston's decisions in the

12   *LCD* litigation, which addressed the successor conspiracy to CRTs and involved many of the same

13   conspirators and their corporate affiliates. Specifically, in denying a motion to dismiss claims of

14   purchasers of finished products containing TFT-LCD panels, Judge Illston ruled:

15   Here, the complaint alleges that the direct purchaser plaintiffs purchased TFT-
       LCD products directly from cartel members at supra-competitive prices as the
16   result of a conspiracy to fix prices. . . . *Defendants do not cite any case holding
       that a plaintiff who purchases directly from an alleged cartel does not have
17   standing. In contrast, courts have found antitrust standing where plaintiffs
       purchased downstream goods from a cartel of manufacturers who made, and
18   fixed the price of, a component of those goods. See, e.g., In re Linerboard
       Antitrust Litig.*, 305 F.3d 145, 159–60 (3d Cir. 2002).
19

20   *LCDs I*, 586 F. Supp. 2d at 1118 (emphasis added).

21   Judge Illston subsequently amplified this analysis, relying directly on *Linerboard* and

22   *Sugar* in certifying a class of direct purchasers of products containing TFT-LCD panels:

23   *Illinois Brick*'s prohibition against suits by indirect purchasers extends only to the
       indirect purchaser plaintiff, not to the price-fixed product itself if incorporated
24   into another product. *See [Linerboard*, 305 F.3d at 159–60]; *see also In re Sugar
       Indus. Antitrust Litig.*, 579 F.2d 13, 18 (3d Cir.1978). If the case were otherwise,
25   producers would be free to fix the price of component prices, provided those
       components were later incorporated into another finished product: under this
26   scenario, any purchaser of a finished product containing a price-fixed component
       would automatically become an indirect purchaser and, thus, barred from suit.
27

28

1 | *LCDs II*, 267 F.R.D. at 306–07.

2 | ### 3.   Defendants' Cases Are Distinguishable.

3 |     Defendants' repeated reliance on *Delaware Valley Surgical Supply, Inc. v. Johnson &*

4 | *Johnson*, 523 F.3d 1116 (9th Cir. 2008) ("*Delaware Valley*") (Def. Mem., pp. 2, 5, 9, 11, 12), is

5 | unavailing.  That case contains no discussion of *Sugar*, *Linerboard* or whether the purchase from a

6 | defendant of a finished product containing a price-fixed component is direct or indirect.  The case

7 | is also distinguishable.  There, Bamberg challenged Johnson & Johnson's ("J & J") use of

8 | "bundled discounts" in selling endomechanical products as an unlawful monopolistic practice;

9 | Bamberg did not buy the products directly from J & J, but rather purchased solely from an

10 | independent third-party distributor that was neither owned or controlled by J & J nor alleged to be

11 | a co-conspirator.  523 F.3d at 1118–19.  The Ninth Circuit unsurprisingly concluded that

12 | "Bamberg lacks standing because [it] . . . is *not* a direct purchaser from J & J." *Id.* at 1122.  That

13 | is simply not this case.  Defendants' assertion, moreover, that *Delaware Valley* creates a "bright

14 | line rule" that purchasers of a product incorporating a "price-fixed" component are, by definition,

15 | indirect purchasers, even if they purchased directly from a defendant is simply false. *See* Def.

16 | Mem, pp. 5, 8–9.  Nowhere does *Delaware Valley* address that issue or state such a rule.

17 |     Defendants also rely on *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, No. CV F 09-

18 | 0560 LJO SMS, 2010 WL 3521979 (E.D. Cal. Sept. 3, 2010) ("*POSCO*"), (Def. Mem., p. 7),

19 | where the district court held that purchasers of tin cans lacked standing to sue for an alleged

20 | conspiracy involving the prices of tin mill products (steel sheets coated with tin), which undergo

21 | multiple production processes before they are included in tin cans.  Again, that opinion contains

22 | no discussion of *Sugar* or *Linerboard*.  That case is distinguishable as well.  There, the plaintiff

23 | bought tin cans from an independent wholesaler, but not the defendants themselves.  2010 WL

24 | 3521979, at *6.  That is not this case; here, the ten Plaintiffs at issue all bought Finished Products

25 | containing price-fixed CRTs from named Defendants who are alleged to have participated in the

26 | conspiracy and were affiliates of the co-conspirators.  The district court also took the view that

27 | there was no case authority for the proposition that the plaintiff could be a direct purchaser where

28 | the product has been substantially transformed. *See id.* at *6.  Of course, that was the case in

837411.1
14

1 | *Sugar* where sugar was processed in candy. It was also the case in *Flat Glass*, where the products
2 | in question included flat glass and automotive replacement glass, a fabricated product in which flat
3 | glass is an input. 191 F.R.D. at 480–81 (holding that *Illinois Brick* "does not preclude a suit by a
4 | plaintiff who purchases directly from the alleged offender . . . but buys a product which
5 | incorporates the price-fixed product as one of its ingredients"). Moreover, as with the LCD panels
6 | in *LCD*, CRTs are not "altered" when they are placed inside televisions or computer monitors.
7 | *See* Saveri Decl., ¶ 49. *POSCO* is inapplicable.

8 | Defendants rely on *In re Refrigerant Compressors Antitrust Litig.*, 795 F. Supp. 2d 647
9 | (E.D. Mich. 2011) ("*Compressors*"), (Def. Mem., p. 7), but that case is contrary to the law of this
10 | Circuit. There, the district court held that only plaintiffs who purchased a price-fixed component
11 | directly from a defendant had federal antitrust standing; plaintiffs who purchased directly from a
12 | defendant a finished product containing a price-fixed component did not have standing, even if the
13 | component was manufactured by an affiliate or co-conspirator of the defendant. *Id.* at 652, 658–
14 | 59. The district court rejected *Sugar* and *Linerboard*, concluding that those cases were limited to
15 | "situations where a plaintiff purchases a product containing a price-fixed component directly from
16 | an alleged violator who makes both the component and the product containing the component."
17 | *Id.* at 659. The district court did not attempt to reconcile its holding with contrary rulings
18 | including *CRT* and *LCDs I–V*.

19 | *Compressors* is predicated on the flawed assumption that a price-fixing conspirator is only
20 | liable for the sales of its own product. To the contrary, under the Sherman Act, price-fixers are
21 | jointly and severally liable for all acts of all conspirators in furtherance of the conspiracy. *See*
22 | *Beltz*, 620 F.2d at 1367 ("If [appellant] can establish the existence of a conspiracy in violation of
23 | the antitrust laws and that appellees were part of such a conspiracy, appellees will be liable for the
24 | acts of all members of the conspiracy in furtherance of the conspiracy, regardless of the nature of
25 | appellees' own actions.").[8] Moreover, while *Compressors* assumes that *Illinois Brick* bars suit
26 |
27 | [8] Defendants' reliance on *In re Optical Disk Drive Antitrust Litigation*, No. 3:10-md-2143, 2011
28 | WL 3894376 (N.D. Cal. Aug. 3, 2011) ("*In re ODDs*"), is also misplaced. There, the court held (footnote continued)

837411.1
15

1  where the initial purchaser is a participant in the conspiracy, as described below, the Ninth Circuit

2  has repeatedly held that plaintiffs may sue conspirators who sell their price-fixed products through

3  their subsidiaries and affiliates, notwithstanding *Illinois Brick*. *See Royal Printing*, 621 F.2d at

4  326; *Freeman*, 322 F.3d at 1145–46.[9]

5          **C.      Defendants' Motion Should Be Denied Because The Conspirators Owned Or**
           **Controlled Their Finished Products Affiliates.**

6

7                    **1.      This Motion Is Governed By *Royal Printing* And *Freeman*.**

8          More than three decades ago, the Ninth Circuit held that *Illinois Brick* does not apply

9  where the plaintiff purchased products from a corporate affiliate of a price-fixing conspirator.  In

10 *Royal Printing*, the plaintiffs alleged that a group of paper manufacturers conspired to fix the price

11 of paper products sold through their wholesaling divisions and subsidiaries.  The Ninth Circuit

12 held that "*Illinois Brick* does not bar an indirect purchaser's suit where the direct purchaser is a

13 division or subsidiary of a co-conspirator."  621 F.2d at 326.  The Court explained that *Illinois*

14 *Brick*'s prudential rationale of preventing recoveries from both direct and indirect purchasers

15 because such recoveries are difficult to apportion and potentially duplicative does not apply where

16 the direct purchaser is an affiliate of a corporation accused of an antitrust violation.  *Id.*  In these

17 situations, the corporate affiliate (the direct purchaser) cannot be expected to sue the antitrust

18 conspirator.  *Id.* (explaining that a subsidiary's or division's "litigation decisions will usually be

19

---

20 that plaintiffs that had purchased finished products from *non-defendants* were indirect purchasers.
   The court explicitly stated that "plaintiffs in this case do not have a standing problem with respect

21 to any ODD devices they may have purchased directly from defendants . . . ." *Id.* at *7.  Moreover,
   the court specifically distinguished *In re ODDs* from Judge Conti's decision here:  "Once again,

22 the problem here is that plaintiffs are attempting to extend the price-fixing conspiracy to finished

23 products *not* produced by the defendants, an issue not expressly addressed in *Cathode Ray*."  *Id.*

   [9] Defendants' assertion that *Illinois Brick* precludes Plaintiffs from seeking "umbrella" damages is

24 off-point.  Def. Mem. at 6.  *See In re Coordinated Pretrial Proceedings in Petroleum Prod.*
   *Antitrust Litig.*, 691 F.2d 1335, 1338–39 (9th Cir. 1982) (rejecting as inconsistent with *Illinois*

25 *Brick* claims that "defendants' successful price-fixing conspiracy created a 'price umbrella' under
   which non-conspiring competitors of the defendants raised their . . . prices to an artificial level at

26 or near the fixed price").  Plaintiffs do not seek umbrella damages.  Rather, they seek to recover

27 overcharges set by the conspirator Defendants on the CRTs incorporated in the Finished Products
   they purchased from those Defendants and their affiliates.

28

1   subject to parental control. The co-conspirator parent will forbid its subsidiary or division to bring
2   a lawsuit that would only reveal the parent's own participation in the conspiracy."). To prohibit
3   suit would "effectively immunize the transactions here from private antitrust liability, thus
4   thwarting a vital part of the antitrust enforcement scheme and the express purpose of *Illinois*
5   *Brick*." *Id.* As a result, persons and entities that purchased price-fixed products from an affiliate
6   of a conspirator have standing to sue for damages. *Id.* at 326–27.

7          Defendants are incorrect in arguing that Plaintiffs lack standing because adjudicating their
8   claims would involve the type of evidentiary complexities and uncertainties that the *Illinois Brick*
9   rule was designed to avoid. *See* Def. Mem. at 9–10. To the contrary, the Ninth Circuit in *Royal*
10  *Printing* expressly resolved this "dilemma" by ruling that, as a matter of law, a court should
11  presume 100 percent pass-through of the price-fixed amount and allow the purchaser to recover
12  the entire overcharge without regard to the amounts supposedly passed-on or absorbed by
13  intermediaries. *See Royal Printing*, 621 F.3d at 327. The Ninth Circuit explained:

14         The only alternatives are to allow Royal Printing to sue the appellees for the entire
           amount of the overcharge to the wholesalers, or not to allow Royal Printing to sue
15         the appellees at all.

16         Because, as we have already shown, as a practical matter the direct purchasers
           here will never sue, barring Royal Printing's suit would close off every avenue for
17         private enforcement of the antitrust laws in such cases. This would be intolerable.

18
    *Id.* The Ninth Circuit concluded that allowing purchasers from the affiliate of a conspirator to
19
    recover the entire overcharge served the purposes of the Sherman Act better than construing
20
    *Illinois Brick* to enable price-fixers to escape antitrust liability. Thus, Plaintiffs may recover the
21
    entire overcharge on the CRTs incorporated in the Finished Products they purchased.
22
           The Ninth Circuit reaffirmed the rule of *Royal Printing* in *Freeman*.[10] There, the plaintiffs
23
    paid a fee set by an entity known as "Sandicor" for access to a real estate multiple-listing-service
24
    in the San Diego area. 322 F.3d at 1140–41. The complaint alleged that the fee was inflated by
25

26  _____

27  [10] There can be no argument that *UtiliCorp* overruled *Royal Printing*, which the Ninth Circuit
    reaffirmed in *Freeman* thirteen years after the Supreme Court decided *UtiliCorp.*
28

1  collusively set "support fees" that Sandicor paid to the real estate associations that owned and

2  controlled it. *Id.* at 1142. Relying on *Royal Printing*, the Ninth Circuit ruled that the plaintiffs

3  could sue the associations that set the support fee because there was "no realistic possibility that

4  the direct purchaser will sue its supplier over the antitrust violation." *Id.* at 1145–46.

5      Defendants assert that *Illinois Brick* precludes suit where one issue to be determined is the

6  extent to which a price-fixed component affects the price of a finished product. *See* Def. Mem. at

7  10. That argument is erroneous. *Illinois Brick* only precludes recovery by an indirect purchaser.

8  It allows full recovery by a direct purchaser, regardless of whether the price-fixed product is sold

9  by itself or as a component of another product. As the Third Circuit explained in *Sugar*:

> Plaintiff is a direct purchaser and, therefore, entitled to recover the full extent of the overcharge. As one of its basic premises, *Illinois Brick* held that "the overcharged direct purchaser, and not others in the chain of manufacture or distribution is the party 'injured in his business or property' within the meaning of the section". 431 U.S. at 729. . . . ***The difficulty in computation here is not in parceling out damages among entities in the chain, but in isolating the excessive cost of one ingredient which goes into the product purchased by the plaintiff. Conceivably, in some cases that may be a problem not easily solved, but here we think it not serious enough to invoke the obstacle of Illinois Brick.***

16  579 F.2d at 18 (citation and footnotes omitted, emphasis added). *See also LCDs II*, 267 F.R.D. at

17  306 ("*Illinois Brick's* prohibition against suits by indirect purchasers extends only to the indirect

18  purchaser plaintiff, not to the price-fixed product itself if incorporated into another product."). As

19  a result, *Illinois Brick* does not bar Plaintiffs who purchased Finished Products from bringing

20  suit.[11]

---

22  [11] Defendants' argument is not bolstered by the decision in *Compressors*, which, as noted above, is inconsistent with *Royal Printing*. The Ninth Circuit held that "[n]either of the rationales (multiple

23  liability and complexity) underlying *Illinois Brick* bars Royal Printing's suit against the manufacturers of the products it purchased from Great Northern Nekoosa's subsidiary and from

24  Crown Zellerbach's division. *Whichever of the appellees those manufacturers might be, Royal*

25  *Printing can also sue all the other appellees on a theory of joint and several liability.*" *Royal Printing*, 621 F.2d at 327 (emphasis added). In other words, Plaintiffs can sue all co-conspirators

26  on a theory of joint and several liability to recover the overcharges on their Finished Products purchases. See *Paper Sys.*, 281 F.3d at 632, 634 ("Nothing in *Illinois Brick* displaces the rule of

27  joint and several liability, under which each member of a conspiracy is liable for all damages caused by the conspiracy's entire output. . . . Every participant in the conspiracy remains liable

28  (footnote continued)

837411.1

18

1        **2.    Defendants' Criticism Of The *LCD* Decisions Is Unfounded**

2        After having demanded that Plaintiffs employ the *LCD* model to prosecute this litigation,

3   Defendants now criticize the decisions in that case as incorrect and contrary to the fundamental

4   policies of *Illinois Brick.* Defendants cannot have it both ways. Their attack on *LCD* lacks merit.

5   Judge Illston has consistently adhered to the Ninth Circuit's ruling in *Royal Printing* and *Freeman.*

6        Recently, in *LCDs III*, 2011 WL 5357906 at *2, Judge Illston denied Toshiba's motion for

7   partial summary judgment under *Illinois Brick*, finding that *Royal Printing* applied to the

8   plaintiffs' purchases of finished products containing allegedly price-fixed LCD screens from that

9   company's indirect subsidiary Toshiba America, where the parent company participated in the

10  conspiracy. The plaintiffs had standing because the finished products seller would not sue its

11  conspirator parent: "[T]he Ninth Circuit's reasoning [in *Royal Printing*] stemmed from its

12  concern with the parent company's control over the litigation decisions of its subsidiary. . . . Due

13  to this control, the parent company will be unlikely to allow its subsidiary to file suit, thwarting a

14  vital part of the antitrust enforcement scheme and the expressed purpose of *Illinois Brick.*" *Id.* at

15  *1. Previously, the *LCD* court recognized that the rule of *Royal Printing* and *Freeman* applies

16  with equal force to corporate affiliates. *See LCDs V*, 2010 WL 1264230, at *1 (holding that *Royal*

17  *Printing* is satisfied where the component manufacturer (alleged conspirator) and the finished

18  products seller are "part of a vertically-integrated *corporate group*," even if they are "not a

19  vertically-integrated *single entity*") (emphasis in original).

20       These decisions flatly dispose of Defendants' argument here. As in *LCD*, Defendants sold

21  Finished Products containing components manufactured by members of the cartel including their

22  corporate parents and affiliates. There is no realistic possibility that those Defendants will sue the

23  other members of the conspiracy, because doing so would expose their parents and affiliates to

24  massive antitrust liability. Only Plaintiffs have the ability to enforce the antitrust laws under these

25  _____

26  for damages on every sale to every direct purchaser from any of the manufacturers."). Contrary to
    the teaching of *Compressors*, in this Circuit, which co-conspirator manufactured the CRTs
27  incorporated in the Finished Products sold to Plaintiffs purchased is irrelevant.

28

    Direct Purchaser Plaintiffs' MPA in Opposition to Defendants' Motion for Partial Summary Judgment
    MDL No. 1917; Master File No. 07-cv-5944 SC

1 │ circumstances.  Accordingly, they have standing to bring suit.

2 │            **3.**      ***Royal Printing* Applies For Sales By The Finished Products Defendants.**

3 │      The ownership or control exception under *Royal Printing* and *Freeman* applies here.  That

4 │ exception to the *Illinois Brick* "has been construed to encompass relationships involving such

5 │ functional economic or other unity between the direct purchaser and either the defendant or the

6 │ indirect purchaser, that there effectively has been only one sale." *Sun Microsystems Inc. v. Hynix*

7 │ *Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1180 (N.D. Cal. 2009).  "Some examples of the types

8 │ of facts that would satisfy the control exception have furthermore been defined as: 'interlocking

9 │ directorates, minority stock ownership, loan agreements that subject the wholesalers to the

10 │ manufacturers' operating control, trust agreements, or other modes of control separate from

11 │ ownership of a majority of the wholesalers' common stock.'" *Id.* (quoting *In re Brand Name*

12 │ *Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 606 (7th Cir. 1997)).

13 │      Here, Plaintiffs have adduced sufficient evidence for each Defendant family—LGE,

14 │ Panasonic, Philips, Toshiba, Hitachi, Samsung, Chunghwa/Tatung—to invoke *Royal Printing*. *See*

15 │ Saveri Decl. ¶¶ 50–115.  The evidence includes the following:  (1) certain Defendants

16 │ manufactured and sold both CRTs and Finished Products during the class period; (2) Finished

17 │ Products seller Defendants were owned in whole or in part by CRT manufacturer Defendants who

18 │ participated in the conspiracy, or otherwise were members of the same corporate families; (3)

19 │ directors, officers and other high-level corporate executives served in overlapping capacities for

20 │ both the CRT manufacturer Defendants and their Finished Products affiliates; and (4) the CRT

21 │ manufacturer Defendants have not been sued by the Finished Products affiliates, and there is no

22 │ evidence in the record to suggest they will be. *See id.* ¶¶ 52–115.  The evidence adduced to date is

23 │ sufficient to deny Defendants' motion outright.  However, further discovery, including deposition

24 │ testimony in response to Plaintiffs' Rule 30(b)(6) notices, will reveal additional facts to

25 │ demonstrate the applicability of *Royal Printing* and *Freeman*. *See In re Coordinated Pretrial*

26 │ *Proceedings in Petroleum Prods. Antitrust Litig.*, 497 F. Supp. 218, 227 (C.D. Cal., 1980) ("The

27 │ question of how much control is required to meet the exception cannot be decided until a factual

28 │ record is developed.  The degree of ownership, profit taking, or ability to set prices will be

837411.1
                         20

1 | important considerations in determining whether the intermediate seller is 'controlled.'").

2 | **D.    Plaintiffs Have Standing Under The Co-Conspirator Exception.**

3 | Plaintiffs allege that the Defendants from whom they purchased Finished Products were

4 | participants in the conspiracy to fix CRT prices. *See, e.g.*, Saveri Decl., ¶¶ 55, 61, 72, 83–84, 93,

5 | 109, 116–19. The Ninth Circuit in *Shamrock* held that *Illinois Brick* does not bar an antitrust

6 | claim against a manufacturer where the intermediary from whom the plaintiff bought conspired

7 | with the manufacturer.[12]  729 F.2d at 1212–13. Defendants respond that this doctrine applies only

8 | when the plaintiff has bought the price-fixed product, not some other product into which the price-

9 | fixed product is integrated. Def. Mem., p. 10. But, as noted above, the focus of the indirect

10 | purchaser rule is on the purchaser, not the product.[13]  Whether the evidence will show that

11 | Defendants from whom Plaintiffs purchased their Finished Products did participate in the

12 | conspiracy is an ultimate issue in this case. It cannot be determined now before all documents

13 | have been produced, translated and reviewed, and before any depositions have been taken. *See*

14 | Saveri Decl., ¶¶ 11–40.

15 | **E.    Defendants' Motion Is Procedurally Deficient.**

16 | While Defendants have styled their motion as presenting a pure question of law, their

17 | arguments are predicated on numerous disputed factual assertions as to which they present no

18 |

19 | [12] *See also In re Brand Name Prescription Drug Antitrust Litig.* 186 F.3d 781, 790 (7th Cir. 1999),
20 | *cert. denied sub nom. HJB, Inc. v. AmeriSource Corp..*, 528 U.S. 1181 (2000); *Fontana Aviation, Inc. v. Cessna Aircraft Co.,* 617 F.2d 478, 480–82 (7th Cir.1980) ("*Fontana*"); *In re Nifedipine*
21 | *Antitrust Litig.*, 335 F. Supp. 2d 6, 14–15 (D.D.C. 2004); *In re Mid-Atlantic Toyota Antitrust Litig.*, 516 F. Supp. 1287, 1294–95 (D. Md. 1981); *Reiter v. Sonotone Corp.,* 486 F. Supp. 115,
22 | 119–21 (D. Minn. 1980); *In re New Mexico Natural Gas Antitrust Litig.*, MDL Dkt. No. 403, 1982
23 | WL 1827, at \*10 (D.N.M. Jan. 26, 1982); *Technical Learning Collective, Inc. v. Daimler-Benz Aktiengesellschaft*, No. N-77-1443, 1980 WL 1943, at \*9 (D. Md. Aug. 28, 1980).

24 | [13] Defendants rely on *In re ATM Fee Antitrust Litig.*, No. C 04-02676 CRB, 2010 WL 3701912, at
25 | \*5 (N.D. Cal. Sept. 16, 2010) for a different conclusion. Def. Mem., p. 10. But the court there merely noted that in *Shamrock*, the Ninth Circuit was dealing with claims of a conspiracy among
26 | milk producers and distributors to fix retail prices. *Shamrock* has been read more broadly to hold
27 | "that an indirect purchaser may bring suit where he establishes a price-fixing conspiracy between the manufacturer and the middleman." *Delaware Valley*, 523 F.3d at 1123 n.1.

28 |

1   evidentiary support. This deficiency also requires the denial of their motion. The moving party
2   on a motion for summary judgment must carry an initial "burden of production" before the
3   opposing party is even required to respond on the merits. *Nissan Fire & Marine Ins. Co. v. Fritz*
4   *Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000) ("*Nissan Fire*"). If the moving party will bear the
5   burden of proof at trial as to a claim or defense, on summary judgment it must present admissible
6   evidence affirmatively showing there is no triable issue of fact as to that claim or defense to carry
7   its "burden of production." *Id.* If the moving party will not bear the burden of proof, it may
8   satisfy its initial burden of production in one of two ways: (1) by negating an essential element of
9   the claim; or (2) a showing that the opposing party does not have enough evidence of an essential
10  element of the claim. *Id.* Defendants fail to satisfy any of these standards.

11          The sole evidentiary basis for this motion is a set of interrogatory responses by the ten
12  Plaintiffs at issue and a letter from counsel by which Defendants purport to establish that those
13  Plaintiffs only purchased Finished Products.[14] Def. Mem., pp. 3–4. Yet Defendants' motion
14  contains many other unsupported, material factual assertions. For example, Defendants assert that
15  the market for Finished Products is different from the market for CRTs in material and complex
16  ways. *See e.g., id.*, pp. 1 (Finished Products sold "in a different downstream market, with a
17  different array of competitors"); 10 (Finished Product prices determined by "thousands of other
18  component part costs, to variable labor and manufacturing facility costs, to numerous fixed
19  manufacturing costs"); 12 (Finished Products subject to "vigorous competition"). They assert that
20  Plaintiffs did not purchase Finished Products from a "controlled intermediary" of Defendants such
21  that Plaintiffs satisfy the requirements of *Royal Printing. Id.*, p. 9. They assert that the CRTs in
22  the Finished Products Plaintiffs purchased were substantially altered. *See, e.g., id.*, p. 9
23  ("Plaintiffs only purchased an altered, downstream finished product"). They assert that entities
24  such as Hewlett-Packard, Dell, Sharp, Vizio, Apple, Sanyo and Sony purchased CRTs directly

25

26  [14] "Declaration of Molly M. Donovan In Support of Defendants' Joint Motion for Summary
27  Judgment Against Purported Direct Purchaser Plaintiffs Who Did Not Purchase CRTs", Exhs. A-I
    (Dec. 12, 2011) (Dkt. No. 1013-1).

28

1 from one of the Defendants. *Id.*, pp. 1 ("Television and monitor manufacturers are in fact the true
2 direct purchasers of CRTs . . . ."), 8. They assert that the determination of how any overcharge on
3 CRTs affected the price of Finished Products sold by Defendants is enormously complex. *Id.*, pp.
4 9–10.

5      Each of these assertions is material to Defendants' argument, each is disputed by Plaintiffs,
6 and the discovery record is replete with relevant evidence primarily from Defendants' own
7 records. Saveri Decl. ¶¶ 41–119. Yet Defendants make no attempt to support these assertions
8 with *any* evidence.[15] Nor have they purported to show that Plaintiffs lack essential evidence. *See*
9 *Nissan Fire*, 210 F.3d at 1105 ("[a] moving party may not require the nonmoving party to produce
10 evidence supporting its claim or defense simply by saying that the nonmoving party has no such
11 evidence."). Because Defendants fail to carry their burden of production, their motion must be
12 denied.

13 **F.     Defendants' Motion Is Premature.**

14      Defendants' motion should also be denied as premature pursuant to Federal Rule of Civil
15 Procedure 56(d). Not a single deposition has been taken in this case. The parties and the Court
16 have proceeded on the reasonable assumption that depositions should not occur until Defendants'
17 document production was substantially complete. At the January 19, 2012 case management
18 conference, Defendants argued that no depositions should be taken until the Court had entered a
19 protocol concerning the time, place and manner for taking depositions. The Special Master
20 directed the parties to meet and confer on these procedures, effectively precluding depositions
21 until the completion of that process. *See* Saveri Decl., ¶¶ 28–33.[16]

22

23 [15] Defendants cite to the Indirect Purchaser Plaintiffs' complaint in support of their assertion that
24 "the finished product markets at issue—in which televisions and monitors were sold—were
subject to 'vigorous competition' and involved numerous companies not alleged to be part of any
25 conspiracy." The Indirect Purchaser Plaintiffs' allegations do not constitute "admissible evidence"
against the Direct Purchaser Plaintiffs.

26 [16] Moreover, deposition discovery was stayed until March 1, 2011. *Id.* ¶ 28. Witnesses have also
27 been unavailable because of the pendency of the (now ongoing) criminal trial in the *LCD*
litigation. *Id.*

28

1       Recognizing that the motion for summary judgment may turn on specific facts in evidence,

2 Plaintiffs served several Rule 30(b)(6) deposition notices concerning the relationships between

3 Defendants and their production and sales of CRTs and Finished Products. *See id.*, ¶¶ 30–31.

4 Defendants objected and refused to appear for deposition, depriving Plaintiffs of critical facts

5 necessary to respond to this motion. *See id.*, ¶¶ 33–40. If the Special Master chooses not to deny

6 Defendants' motions as a matter of law, then discovery will be needed as to factual issues

7 associated with the legal arguments presented above.

8       Plaintiffs expect that the evidence—when fully developed—will show that ███████

9 ████████████████████████████████████████████████ of the

10 value of televisions and monitors made from them; that a CRT has no other meaningful use; that

11 CRTs are unchanged by their incorporation into a television or monitor. Saveri Decl., ¶ 46, 49.

12 Plaintiffs will offer evidence that the CRT conspiracy made no sense unless the Defendants could

13 "recoup" the illegal overcharge on CRTs in the form of higher prices on their Finished Product

14 sales. *Id.* ¶ 45. As noted above, Plaintiffs also will offer evidence establishing they purchased

15 from members of the conspiracy or a "controlled entity." This evidence will contradict the

16 (unsupported) facts Defendants take for granted and requires that Defendants' motion be denied.

17 **V. CONCLUSION.**

18       For all of the foregoing reasons, Defendants' motion should either be denied outright or, in

19 the alternative, deferred until after the close of discovery pursuant to Rule 56(d).

20 Dated: February 24, 2012              Respectfully Submitted,

21

22                    By    /s/ Guido Saveri
                       Guido Saveri

23                        R. Alexander Saveri
                       Geoffrey C. Rushing

24                        Cadio Zirpoli
                       SAVERI & SAVERI, INC.

25                        706 Sansome Street
                       San Francisco CA 94111

26                        Telephone: (415) 217-6810
                       Facsimile: (415) 217-6813

27                        *Interim Lead Counsel for Direct Purchaser*
                       *Plaintiffs*

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Bruce L. Simon
Aaron M. Sheanin
PEARSON, SIMON, WARSHAW &
PENNY LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone:  (415) 433-9000
Facsimile:  (415) 433-9008

H. Laddie Montague, Jr.
Ruthanne Gordon
Charles P. Goodwin
Candice Enders
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (800) 424-6690
Facsimile: (215) 875-4604

Michael P. Lehmann
HAUSFELD LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone:  (415) 633-1908
Facsimile:  (415) 358-4980

Gary Specks
KAPLAN FOX
423 Sumac Road
Highland Park, IL 60035
Telephone: (847) 831-1585
Facsimile: (847) 831-1580