# EXHIBIT 6

1  Terry Gross (103878)
   Adam C. Belsky (147800)
2  Monique Alonso (127078)
   GROSS BELSKY ALONSO LLP
3  180 Montgomery Street, Suite 2200
   San Francisco, California 94104
4  Telephone: (415) 544-0200          E-filing
   Facsimile:  (415) 544-0201
5
   Attorneys for Plaintiff
6  STEVEN GANZ and the Proposed Class

7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10             SAN FRANCISCO DIVISION

11

12  STEVEN GANZ,                        ) Case No.
                                        )
13            Plaintiff,                ) COMPLAINT
                                        )
14  v.                                  ) CLASS ACTION
                                        )
15  CHUNGHWA PICTURE TUBES, LTD.;       ) JURY TRIAL DEMANDED
    CHUNGHWA PICTURE TUBES              )
16  (MALAYSIA) SDN. BHD.;               )
    KONINKLIJKE PHILIPS ELECTRONICS     )
17  NV; LG ELECTRONICS INC.; LP         )
    DISPLAYS INTERNATIONAL, LTD.;       )
18  MATSUSHITA ELECTRIC INDUSTRIAL      )
    CO., LTD.; MATSUSHITA TOSHIBA       )
19  PICTURE DISPLAY CO., LTD.;          )
    BEIJING-MATSUSHITA COLOR CRT        )
20  CO., LTD.; ORION ELECTRIC CO.,      )
    LTD.; ORION AMERICA, INC.;          )
21  PANASONIC CORP. OF NORTH            )
    AMERICA; PHILIPS ELECTRONICS        )
22  NORTH AMERICA; SAMSUNG SDI          )
    CO., LTD.; SAMSUNG SDI AMERICA,     )
23  INC.; SAMTEL COLOR, LTD.; TCL       )
    INTERNATIONAL HOLDINGS LTD.;        )
24  THOMSON S.A.; TCL THOMSON           )
    ELECTRONICS CORP.; TOSHIBA          )
25  CORP.; and TOSHIBA AMERICA, INC.,   )
                                        )
26            Defendants.               )
                                        )
27

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
1

1    Plaintiff Steven Ganz, on behalf of himself and the class defined below, brings this action for

2    damages and injunctive relief against defendants Chunghwa Picture Tubes, Ltd.; Chunghwa Picture

3    Tubes (Malaysia) Sdn. Bhd; Koninklijke Philips Electronics NV; LG Electronics Inc.; LP Displays

4    International, Ltd.; Matsushita Electric Industrial Co., Ltd.; Matsushita Toshiba Picture Display Co.,

5    Ltd.; Beijing-Matsushita Color CRT Co., Ltd.; MT Picture Display Co., Ltd.; Orion Electric Co., Ltd.;

6    Orion America, Inc.; Panasonic Corp. of North America; Philips Electronics North America; Samsung

7    SDI Co., Ltd.; Samsung SDI America, Inc.; Samtel Color, Ltd.; TCL International Holdings Ltd.;

8    Thomson S.A.; TCL Thomson Electronics Corp.; Toshiba Corp.; and Toshiba America, Inc.

9    (collectively, "Defendants") and alleges as follows:

10   **INTRODUCTION**

11   1.    Defendants, the leading manufacturers and distributors of cathode ray tubes ("CRTs"),

12   which are used in a number of products including televisions and computer monitors ("CRT

13   Products"), have engaged in an illegal trust or combination beginning at least as early as January 1,

14   1998 and extending at least through November 9, 2007 (the "Class Period") to fix or maintain the

15   prices for CRTs.  Defendants and their co-conspirators formed an international cartel to illegally

16   restrict competition in the CRT market in order to moderate the downward pressure on CRTs (and, as

17   a result, products containing CRTs) caused by the rapidly increasing popularity of flat panel products

18   using liquid crystal displays ("LCD") and plasma display panels ("PDP") (collectively, "FPD").  As

19   a result of Defendants' unlawful conduct, Plaintiff and the other members of the Class paid higher

20   prices for products containing CRTs during the Class Period than they would have paid if the prices

21   for CRTs had been determined by a competitive market.

22   **JURISDICTION AND VENUE**

23   2.    This Court has original jurisdiction over this action under the provisions of 28 U.S.C.

24   § 1331 (federal question) and 28 U.S.C. § 1337 (original jurisdiction over any claims arising under any

25   Act of Congress regulating commerce or protecting trade and commerce against restraints and

26   monopolies), because the Complaint alleges violations of the Sherman Act, 15 U.S.C. § 1, and

27   Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.  The Court has supplemental

28   jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367, because those claims are so

1 related to Plaintiff's federal law claim that they form part of the same case or controversy. The Court
2 also has original jurisdiction over the entire action under 28 U.S.C. § 1332, because the amount in
3 controversy for the Class exceeds the sum or value of $5,000,000, exclusive and interest and costs, and
4 there are members of the Class who are citizens of a different state than Defendants, and certain
5 Defendants are citizens or subjects of foreign states..

6     3.     Venue is proper in this District under 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C.
7 § 1391(b) and (c), because Defendants resided, had an agent, transacted business, maintained an office,
8 or are otherwise found in this District. Moreover, many of Defendants' unlawful acts giving rise to
9 Plaintiff's claim occurred, and a substantial portion of the affected interstate trade and commerce
10 described below has been carried out, in this District because San Francisco International Airport is
11 a major hub of the price fixing conspiracy alleged herein and is located in this District.

12                                   **INTRADISTRICT ASSIGNMENT**

13     4.     Intradistrict assignment is proper in this Division because a substantial part of the
14 property that is the subject of this action is situated in, and a substantial part of the events or omissions
15 which give rise to the claim occurred in, the County of San Francisco.

16                                         **THE PARTIES**

17     5.     Plaintiff Steven Ganz ("Plaintiff") is a resident of the State of California, County of San
18 Francisco. Plaintiff indirectly purchased a CRT from one or more of Defendants during the Class
19 Period, and was injured as a result of Defendants' illegal conduct.

20     6.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa") is a Taiwanese company with
21 its principal place of business in Bade City, Taoyuan, Taiwan. During the Class Period, Chunghwa
22 manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

23     7.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is
24 a Malaysian company with its principal place of business in Shah Alam, Selangor Darul Ehsan,
25 Malaysia. During the Class Period, Chunghwa Malaysia manufactured, sold, and distributed CRTs
26 and/or CRT Products throughout the United States.

27     8.     Defendant Koninklijke Philips Electronics NV ("Royal Philips") is a Dutch company
28 with its principal place of business in Amsterdam, The Netherlands. During the Class Period, Royal

1 Philips manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

2     9.     Defendant LG Electronics Inc. ("LG Electronics") is a Korean company with its
3 principal place of business in Seoul, South Korea. During the Class Period, LG Electronics
4 manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

5     10.     Defendant LP Displays International, Ltd. ("LP Displays") is a Hong Kong company
6 with its principal place of business in Hong Kong. During the Class Period, LP Displays
7 manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

8     11.     Defendant Matsushita Electric Industrial Co., Ltd. ("Matsushita Electric") is a Japanese
9 company with its principal place of business in Osaka, Japan. During the Class Period, Matsushita
10 Electric manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

11     12.     Defendant Matsushita Toshiba Picture Display Co., Ltd. ("MT Picture Display") is a
12 Japanese company with its principal place of business in Osaka, Japan. During the Class Period, MT
13 Picture Display manufactured, sold, and distributed CRTs and/or CRT Products throughout the United
14 States.

15     13.     Defendant Beijing-Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company
16 with its principal place of business in Beijing, China. During the Class Period, BMCC manufactured,
17 sold, and distributed CRTs and/or CRT Products throughout the United States.

18     14.     Defendant Orion Electric Co., Ltd. ("Orion Electric") is a Japanese company with its
19 principal place of business in Fukui, Japan. During the Class Period, Orion Electric manufactured,
20 sold, and distributed CRTs and/or CRT Products throughout the United States.

21     15.     Defendant Orion America, Inc. ("Orion America") is an Indiana corporation with its
22 principal place of business in Princeton, Indiana. During the Class Period, Orion America
23 manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

24     16.     Defendant Panasonic Corp. of North America ("Panasonic") is a Delaware corporation
25 with its principal place of business in Secaucus, New Jersey. During the Class Period, Panasonic sold
26 and distributed CRTs and/or CRT Products manufactured by Matsushita Electric throughout the
27 United States.

28 //

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

4

1    17.    Defendant Philips Electronics North America ("Philips America") is a Delaware

2 corporation with its principal place of business in New York, New York. During the Class Period,

3 Philips America sold and distributed CRTs and/or CRT Products manufactured by Royal Philips

4 throughout the United States.

5    18.    Defendant Samsung SDI Co., Ltd. ("Samsung SDI") is a Korean company with its

6 principal place of business in Kyonggi, South Korea. During the Class Period, Samsung SDI

7 manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States.

8    19.    Defendant Samsung SDI America, Inc. ("Samsung America") is a California

9 corporation with its principal place of business in Irvine, California. During the Class Period,

10 Samsung America sold and distributed CRTs and/or CRT Products manufactured by Samsung SDI

11 throughout the United States.

12    20.    Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its principal place

13 of business in New Delhi, India. During the Class Period, Samtel manufactured, sold, and distributed

14 CRTs and/or CRT Products throughout the United States.

15    21.    Defendant TCL International Holdings Ltd. ("TCL") is a Hong Kong company with its

16 principal place of business in Hong Kong. During the Class Period, TCL manufactured, sold, and

17 distributed CRTs and/or CRT Products throughout the United States.

18    22.    Defendant Thomson S.A. ("Thomson") is a French company with its principal place

19 of business in Boulogne, France. During the Class Period, Thomson manufactured, sold, and

20 distributed CRTs and/or CRT Products throughout the United States.

21    23.    Defendant TCL Thomson Electronics Corp. ("TTE") is a Chinese company with its

22 principal place of business in Guangdong, China. During the Class Period, TTE manufactured, sold,

23 and distributed CRTs and/or CRT Products throughout the United States.

24    24.    Defendant Toshiba Corp. ("Toshiba") is a Japanese company with its principal place

25 of business in Tokyo, Japan. During the Class Period, Toshiba manufactured, sold, and distributed

26 CRTs and/or CRT Products throughout the United States.

27    25.    Defendant Toshiba America, Inc. ("Toshiba America") is a wholly-owned subsidiary

28 of Toshiba with its principal place of business in New York, New York. During the Class Period,

1　Toshiba America manufactured, sold, and/or distributed CRTs and/or CRT Products throughout the
2　United States.

3　　　　26.　　Certain other persons, firms, corporations and entities, the identities of which Plaintiff
4　is not currently aware of, have participated as co-conspirators with Defendants in the violations and
5　conspiracies alleged in this Complaint. In order to engage in the offenses charged and violations
6　alleged herein, these co-conspirators have performed acts and made statements in furtherance of the
7　antitrust violations and conspiracies alleged herein.

8　　　　27.　　The acts alleged to have been done by Defendants were authorized, ordered or done by
9　their directors, officers, agents, employees, or representatives while actively engaged in the
10　management of each of the Defendants' affairs.

11　　　　　　　　　　　　　　　　**FACTUAL ALLEGATIONS**

12　　　　**The CRT Industry and Market**

13　　　　28.　　CRT is a widely used technology component utilized in products such as televisions
14　and computer monitors that allow devices to display images upon the screen.

15　　　　29.　　Known for their brightness, resolution, rich colors, contrast, and reliability, CRTs
16　evolved from early black-and-white television sets and monitors to today's high-resolution,
17　digital-ready graphic models. The basic components of a CRT are (a) a heated, cylindrical cathode,
18　or electron gun, that emits a steady stream of electrons; (b) a shadow mask that directs the electron
19　beams, (c) a phosphor-coated screen that absorbs the beams, (d) a deflection yoke that directs the
20　scanning electron beam, which strikes the screen to produce light; and (e) an evacuated glass envelope
21　that allows the entire process to take place in a vacuum.

22　　　　30.　　CRTs are manufactured in several standard sizes, including 17 inch, 19 inch, 23 inch,
23　and 27 inch. They are commodity products; those manufactured by Defendants are interchangeable.

24　　　　31.　　CRTs have no independent utility, and have value only as components of other
25　products, primarily televisions and computer monitors. Direct purchasers buy CRTs in order to
26　include them as components in televisions and computer monitors. The demand for CRTs thus
27　directly derives from the demand for such products.

28　//

1    32.    The market for CRTs and the market for CRT Products is one and the same, because
2    the CRT market exists to serve only the CRT Products market.  The market for CRT and the market
3    for CRT Products are, for all intents and purposes, a single market, as one would not exist without the
4    other.

5    33.    The largest direct purchasers of CRTs are television and computer OEMs.
6    Significantly, a number of Defendants are (or were, during the Class Period) also CRT television
7    and/or computer original equipment manufacturers ("OEMs"), such as Toshiba and Samsung SDI
8    and/or its parent corporation.

9    34.    Plaintiff and the other Class members have participated in this market through their
10   purchases of CRT Products.  When Plaintiff and the other Class members bought CRT Products,
11   Defendants' unlawful conspiracy inflated the prices at which such products were sold to Plaintiffs and
12   the Class members.

13   35.    The market for CRTs in the United States is extremely large.  In 1997, the worldwide
14   CRT market exceeded $24 billion.  In 2006, industry experts estimated that televisions containing
15   CRTs made up at least half of all of the projected 29,000,000 televisions shipped to North America
16   that year.

17   36.    CRT televisions currently account for 37% of television revenues in the United States.

18   37.    The structure of the CRT industry facilitates collusion.

19   38.    There is significant market concentration.  During the Class Period, Defendants
20   collectively owned the majority of the market share for CRTs used in televisions and computer
21   monitors.

22   39.    Defendant Samsung SDI is currently the largest manufacturer of products containing
23   CRTs.  In 2004, it held approximately 30% of the global CRT market.

24   40.    Defendant LP Displays currently has the second largest share of the global CRT market.
25   In 2004, it held approximately 27% of the global CRT market.

26   41.    Defendant MT Picture Display held approximately 9% of the global CRT market in
27   2004.

28   //

42.     Defendant Chunghwa Picture Tubes held approximately 6.9% of the global CRT market in 2005.

43.     There are also significant barriers to entry in the CRT industry in the form of high manufacturing and technological barriers to entry. Construction and maintenance of fabrication plants is extremely expensive. Because of increased competition and ongoing technological advances, manufacturers' research and development expenses are also extremely high.

44.     There are multiple interrelated business relationships in the CRT industry. For example, in November 2000, Defendants LG Electronics and Koninklijke Philips Electronics agreed to enter into a joint venture that combined their CRT manufacturing operations. The resulting company (LG Philips Displays, now known as LP Displays) entered the market with a 25% share of the global CRT market.

45.     Defendants Matsushita Electric Industrial Co., Ltd. and Toshiba Corporation also entered into a joint venture combining their CRT manufacturing operations during the Class Period. The resulting company (MT Picture Display) immediately enjoyed a significant share of the global CRT market.

46.     In 2002, Matsushita and TCL formed a "collaborative relationship" in the consumer electronics business. The stated purpose of the collaboration is to "achiev[e] mutually beneficial effects" by supply of cathode-ray tubes to TCL from Matsushita, sales of Matsushita's products through TCL's sales channels in China, collaboration in the supply of products, including televisions, through OEM and ODM (original design manufacturing) and collaboration on research and development.

47.     In 2005, Defendants Samsung SDI and LG Philips Displays entered into an agreement to work together by sharing parts with respect to CRTs.

**Defendants' Illegal Conspiracy**

48.     The price of CRTs or CRT Products during the Class Period did not fully reflect the sharp decline in demand for CRTs caused by the entry of the new generation of competing technologies. Despite the introduction of technologically superior and increasingly popular alternatives to televisions and monitors using CRTs, the price of CRTs and CRT Products remained

1  unnaturally high throughout the Class Period, with periods of sustained and unnatural price stability.

2  49.  CRTs, as the established technology, had a distinct price advantage over these new

3  technologies. In contrast to an emerging industry where participants invest heavily in research,

4  development, and bringing capacity online, the CRT industry made and recouped such investments

5  long before the start of the Class Period. Thus, CRT manufacturers had very little debt or interest

6  expense on their facilities, and the pressure to produce at full capacity (to avoid default) was lessened.

7  The concentration of CRT manufacturers, the declining CRT share of the total market for television

8  and computer screens, and the higher price of FPD Products gave Defendants the means and incentive

9  to conspire and collude to artificially fix, maintain, and/or stabilize the prices at which CRTs and CRT

10  Products were sold.

11  50.  During the Class Period, the CRT industry faced significant market pressures and

12  reduced profitability. As stated in a September 25, 2001 article on ZDNet News entitled Report. CRT

13  Revenue to plunge:

14  After decades of growth, revenue from cathode ray tube monitors is expected
   to drop significantly over the next several years ... 'A combination of price
15  erosion, a slowing in the movement to large screens, and a gradual shift in
   market opportunities from developed regions to developing regions is causing
16  the drop in revenue,' Stanford Resources analyst Rhonda Alexander said
   Tuesday. The growing popularity of flat panel monitors will also have an effect
17  on CRT revenue.

18  51.  Market research firm iSuppli Corp. predicted in 2006 that sales of LCD televisions in

19  2007 would, for the first time, surpass sales of CRT televisions. The firm also forecasted that sales of

20  CRTs would drop from an estimated 14.4 million units in 2006 to 10.4 million units in 2007. iSuppli

21  predicted that in 2010, CRT televisions would account for only 2.1 million of the 44 million

22  televisions sold.

23  52.  Due to their price and durability, CRTs still remain popular in schools and other public

24  areas, as well as in developing countries like China. CRT technology is also maintaining its popularity

25  in the area of low-cost monitor and smaller size televisions. According to Japanese industry estimates,

26  some 60 percent of the demand for color televisions in the 12 month period ending in March of 2008

27  will be for CRT-based models. Recent press reports have indicated that slim CRT televisions

28  developed by Samsung and LG Electronics may help to revitalize the category.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

53.  DisplaySearch Inc. predicts that the worldwide capacity to manufacture CRTs will decrease from over 250 million units in 2006 to less than 150 million units by 2010. At various times during the conspiracy, in order to keep prices high, Defendants colluded to restrain output of CRTs as alleged below.

54.  Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices during the Class Period.

55.  On July 15, 2003, Mitsubishi Electric closed a CRT plant in northern Mexico, just five years after the plant was opened. The plant's closure resulted in a loss of capacity to manufacture 2.7 million CRTs a year for 17-inch computer monitors. This was one of the principal applications for CRTs during this time period.

56.  In December of 2004, Matsushita Toshiba closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion. Matsushita announced that the closing was part of the company's "global restructuring initiatives in the CRT business." The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

57.  In December 2004, Toshiba announced that it too would discontinue manufacturing traditional CRT televisions. Thereafter, Toshiba entered into an agreement to have Orion manufacture all Toshiba-brand CRT televisions.

58.  In July 2005, LG Philips discontinued CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

59.  In December 2005, MT Picture Display announced that it would close its American subsidiary's operations in Ohio. The company also announced that it would close its operations in Germany by early 2006. Similar to LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

60.  In late 2005, Samsung SDI closed its CRT factory in Germany, following the lead of other CRT manufacturers.

61.  In July 2006, Orion America shut down a CRT manufacturing plant in Princeton, Indiana. In the same month, Matsushita announced it was shutting down its CRT factory in Malaysia

1 and liquidating its joint venture with Toshiba.

2     62.    Plaintiff is informed and believes, and thereon alleges, that in order to control and
3 maintain profitability during a time when the demand for CRTs was declining, Defendants conspired
4 to fix, raise, maintain, and stabilize the price at which CRT Products were sold in the United States
5 at artificially inflated and anticompetitive levels.

6     63.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel
7 displays, prices for CRTs were "stuck stubbornly at high price levels" throughout 1995 according to
8 a CNET News.com article. This price stabilization was purportedly due to a shortage of critical
9 components such as glass. However, this was a pretext used to conceal the conspiracy.

10     64.    On June 1, 2004, LG Electronics raised the prices of its 15-inch and 17-inch CRT
11 monitors in India. This price hike was falsely attributed to a shortage of glass needed to manufacture
12 CRTs.

13     65.    Over the course of the conspiracy period, despite the natural trend in most technology
14 products to go down over time, the price of CRTs remained stable, and in some instances went up in
15 an unexplained manner. Given the mature nature of CRT technology, the costs of production were
16 relatively low compared to other emerging technologies. Yet, CRT prices withstood downward price
17 pressures and remained stable over a period of many years. Even in periods of declining prices caused
18 by outside factors, such as the Asian currency crisis, the prices of CRT Products did not fall as much
19 as they would have absent anticompetitive conduct. As Finsen Yu, President of Skyworth Macao
20 Commercial Offshore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he
21 CRT technology is very mature; prices and technology have become stable."

22     66.    Defendants' collusive activities have also been furthered by trade associations and trade
23 events which provided opportunities to conspire and share information. One example is the Korea
24 Display Conference ("KDC"), hosted by Displaybank and, since the summer of 2004, by KODEMIA,
25 the Korean Display Equipment Material Industry Association. KODEMIA is a national trade
26 organization representing approximately 80 member companies in the Korean display industry,
27 including manufacturers and suppliers. Prior to the summer of 2004, the KDC had been hosted by
28 EDIRAK, the Electronic Display Industrial Research Association of Korea. EDIRAK had a stated goal

1 of "promoting co-activity with foreign Organizations related to display industries."

2     67.     Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and

3 have participated extensively in the KDCs. In addition to Samsung and LG's participation in

4 EDIRAK, Orion Electric Co., Ltd. and LG Philips Displays (now LP Displays) were also members of

5 the association.

6     68.     The KDC has taken place in Seoul, Korea or other Korean venues on December 4,

7 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4,

8 2005; July 6-7, 2006; and June 26-27, 2007. Top executives in the CRT operations of Samsung, LG

9 Electronics, and Hitachi attended these events, including, among others: H.K. Chung, Woo Jong Lee,

10 Bae Choe1-Han, Jung Ho-Oyun and H.C. Kim of Samsung; S.T. Kim, S. Trinker and Ney Corsino of

11 LG Electronics; and Zenzou Tashima of Hitachi.

12     69.     In May of 2007, EDIRAK and KODEMIA were subsumed into the Korean Display

13 Industry Association ("KDIA"). The companies which were the initial participants in this association

14 included those within Samsung and LG Electronics which had responsibility for CRT Products. Lee

15 Sang-Wan of Samsung promised that "[w]e will carve out the future of the industry through official

16 gatherings of the association."

17     70.     This cooperation is not confined to South Korea. In August 2007, Samsung's Lee Sang-

18 Wan stated:

19     [M]ore than any other industry field, the global partnership among the
companies in the display field has been in good operation, and this has

20     been the driving force behind the technology development of displays
and industrial growth . . . . [O]ur association, too, plans to seek global

21     coexistence and cooperation among the panel producing countries that
happen to be concentrated in Northeast Asia; that is Japan, Taiwan, and

22     China. Specifically, we plan to set up a system that can handle the
matters related with the information sharing between the producers,

23     cope with the issues of intellectual property rights, request governments
to improve systems and jointly deal with the regulations of North

24     America and Europe. To achieve this, we plan to arrange a meeting
among the heads of display associations so that they can discuss ways

25     to enhance mutual cooperation within the end of this year.

26     71.     Other opportunities to collude among the Defendants were provided by events

27 sponsored by the Society for Information Display, such as the annual Asian Symposiums on

28 Information Display, the annual International Display Manufacturing Conference and Exhibition (the

1    most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information

2    Displays (held in Daegu, Korea) and the annual International Display Workshops (the most recent ones

3    of which have been held in Japan).

4         72.    This conspiracy resulted in artificially higher prices for CRTs and CRT Products which

5    were fundamentally inconsistent with the low demand for them and their rapidly approaching

6    obsolescence.

7              **International Antitrust Investigations**

8         73.    On or about November 8, 2007, government agencies from Japan, South Korea, the

9    European Union and the United States each opened coordinated investigations into CRT manufacturers

10   based on a plausible belief that they formed an international cartel to fix the prices for CRTs.

11        74.    On or about November 8, 2007, news reports stated that CRT manufacturers are

12   "suspected of holding meetings to discuss the price targets in Southeast Asian countries where CRT

13   manufacturing bases are located." One report stated that "[t]he CRT manufacturers are suspected of

14   operating an international cartel since 2005 or earlier."

15        75.    On or about November 8, 2007, Defendant Matsushita Electric confirmed that Japan's

16   Fair Trade Commission raided MT Picture Display Co. as part of this international price-fixing

17   investigation.  Akira Dadota, a spokesman for Matsushita, admitted that Japan's Fair Trade

18   Commission conducted an on-site inspection of MT Picture Display's offices in Japan. Up until early

19   2007, MT Picture Display was owned by Toshiba Corp. as well as Matsushita Electric.

20        76.    On or about November 8, 2007, Defendant Samsung SDI confirmed that South Korea's

21   Fair Trade Commission launched a probe into Samsung SDI as part of this international price-fixing

22   investigation.

23        77.    On or about November 8, 2007, news reports stated that defendant LP Displays was

24   visited by antitrust regulators as part of this international price-fixing investigation.

25        78.    On or about November 12, 2007, Defendant Chunghwa admitted that the company had

26   received a summons from the United States Department of Justice ("DOJ") as part of this international

27   price-fixing investigation.

28        79.    On or about November 21, 2007, Defendant Royal Phillips admitted that the company

---

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1  is subject to this international price-fixing investigation.

2        80.    On February 21, 2008, the DOJ filed a motion to intervene in the pending CRT price-

3  fixing litigation, citing its "ongoing criminal grand jury investigation."

4        81.    In order for the DOJ to institute a grand jury investigation, a DOJ Antitrust Division

5  attorney must believe that a crime has been committed and prepare a detailed memo to that effect.

6  Antitrust Grand Jury Practice Manual, Vol. 1, Ch. I.B.1. Then, the request for a grand jury must be

7  approved by the Assistant Attorney General for the Antitrust Division based on the same standard of

8  a crime having been committed. The fact that the DOJ Antitrust Division's investigation is criminal,

9  as opposed to civil, is particularly relevant to the plausibility of the allegations of CRT and CRT

10  Product price-fixing. The Antitrust Division's "Standards for Determining Whether to Proceed by

11  Civil or Criminal Investigation" state: "In general, current Division policy is to proceed by criminal

12  investigation and prosecution in cases involving horizontal, *per se* unlawful agreements such as price

13  fixing, bid rigging and horizontal customer and territorial allocations. Antitrust Division Manual, Ch.

14  III.C.5. (emphasis added). In short, the DOJ's initiation and continuation of criminal proceedings

15  shows that there is good reason to believe that Defendants violated the antitrust laws.

16                  **Pass Through of the Overcharges to End Users**

17        82.    OEMs and retailers of televisions and monitors containing CRTs would be subject to

18  vigorous price competition absent Defendants' collusion. Televisions and computer monitors are

19  commodities, with little or no brand loyalty, such that aggressive pricing causes businesses and

20  consumers to switch preferences to different brands. Television and computer monitor prices are

21  based on production costs, which in turn are directly determined by component costs, as assembly

22  costs are minimal. OEMs accordingly use component costs, like the cost of CRTs, as the starting point

23  for all price calculations. Television and computer monitor prices thus closely track increases and

24  decreases in component costs. Likewise, retailers set the price of CRT Products based on the costs of

25  good sold. When Samsung, for example, increases the prices of its CRT Products to retailers, retailers

26  pass on these increased costs to their customers.

27        83.    Defendants' conspiracy to raise, fix, or maintain the price of CRTs at artificial levels

28  resulted in harm to Plaintiff and the indirect-purchaser class alleged herein because it resulted in their

1  paying higher prices for CRT Products than they would have in the absence of Defendants' conspiracy.
2  The entire supracompetitive overcharge for CRTs at issue was passed on to plaintiff and the other
3  indirect purchaser class members.

4      84.    An increase in the cost of purchasing a CRT or a CRT Product by OEMs or retailers
5  significantly affects the price the end-user consumer will ultimately pay.

6      85.    CRTs account for a significant percentage of the overall cost of a television or computer
7  monitor. For example, CRTs account for approximately 30% of the cost of manufacturing a television.

8      86.    CRTs are commodity products, with functionally equivalent products available from
9  Defendants, which manufacture them pursuant to standard specifications and sizes.

10      87.    Because OEMs and retailers have thin net margins, they must pass on any increase in
11  component costs, such that increases in the price of CRTs and CRT Products lead to quick
12  corresponding price increases at the OEM and retail level.

13      88.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it
14  moves through the distribution system. CRTs are identifiable, discreet physical objects that do not
15  change form or become an indistinguishable part of televisions or computer monitors.

16      89.    Thus, CRTs follow a traceable physical chain from the defendants to the OEMs to the
17  purchasers of the finished products incorporating the CRT.

18      90.    Moreover, just as CRTs can be physically traced through the supply chain, so can their
19  price be traced to show that changes in the prices paid by direct purchasers of CRTs affect prices paid
20  by indirect purchasers of televisions and monitors containing CRTs.

21      91.    Because Defendants control the market for CRTs, there are virtually no choices for
22  persons and businesses that require CRT Products other than buying such products manufactured by
23  a direct purchaser that paid supracompetitive prices for CRTs to Defendants because of Defendants'
24  conspiracy alleged herein.

25      92.    When distribution markets are highly competitive, as they are in the case of televisions
26  and monitors containing CRTs, all of the overcharge will be passed through to ultimate end-user
27  businesses and consumers, such as Plaintiff and the other class members. In addition, most of the
28  Defendants themselves manufacture, market, and distribute televisions and monitors containing CRTs.

1   This means that these Defendants will pass through to their customers 100% of the supracompetitive

2   price increases that result from Defendants' conspiracy, combination, and agreement to fix, increase,

3   and stabilize the prices for CRTs.

4   93.     All of this means that the inflated prices of televisions and computer monitors

5   containing CRTs resulting from defendants' price-fixing conspiracy have been passed on to plaintiff

6   and the other class members by the direct purchasers of the CRTs.

7   94.     During the Class Period, a number of large OEMs sold televisions and computer

8   monitors containing CRTs directly to consumers. For example, the OEM with the largest share of

9   computer monitor sales in the United States market, Dell, sold exclusively to consumers, as did

10  Gateway. During the Class Period, Compaq and Apple also sold large portions of their computer

11  monitors directly to consumers.

12  95.     Computer models sold by direct-purchasing OEMs to retailers were generally updated

13  several times a year, and the price was changed for each new model. OEMs, retailers and distributors

14  often use a "standard markup" method to set prices, meaning that they add a standard percentage to

15  their own costs to determine selling prices. Thus, changes in the price of CRTs were passed on rapidly

16  and were not absorbed.

17  96.     In retailing, it is common to use a "markup rule." The retail price is set as the wholesale

18  cost plus a percentage markup designed to recover non-product costs and to provide a profit. This

19  system guarantees that increases in costs to the retailer will be passed on to end buyers. For example,

20  CDW, a large seller of computer monitors, uses such a system, and a declaration in the DRAM case

21  from CDW's director of pricing details exactly how CDW calculated selling prices:

22          In general, CDW employs a "building block" approach to setting its
            advertised prices. The first building block is the Cost of Goods Sold
23          (COGS), which represents the price CDW paid to acquire the
            product...CDW... adds a series of positive markups to the cost to
24          CDW to acquire a given product. These markups are in addition to the
            pass through effect of changes in the costs charged to CDW for that
25          product by a given vendor.

26  97.     The economic and legal literature has recognized that unlawful overcharges in a

27  component normally result in higher prices for products containing that price-fixed component. As

28  Professor Herbert Hovenkamp, a noted antitrust scholar, has stated in his treatise, FEDERAL

---

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

16

1    ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 624:

2    A monopoly overcharge at the top of a distribution chain generally
     results in higher prices at every level below.  For example if production
3    of aluminum is monopolized or cartelized, fabricators of aluminum
     cookware will pay higher prices for aluminum.  In most cases they will
4    absorb part of these increased costs themselves and pass part along to
     cookware wholesalers.  The wholesalers will charge higher prices to the
5    retail stores, and the stores will do it once again to retail consumers.
     Every person at every stage in the chain likely will be poorer as a result
6    of the monopoly price at the top.

7    Theoretically, one can calculate the percentage of any overcharge that
     a firm at one distributional level will pass on to those at the next level.

8
     98.     Similarly, two other antitrust scholars – Professors Robert G. Harris (Professor
9
     Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business
10
     at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law
11
     Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have
12
     observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the
13
     exception: it is the rule."
14
     99.     As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information
15
     and Computer Science and Professor of Economics and Public Policy at the University of Michigan),
16
     an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft
17
     Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):
18
     As is well known in economic theory and practice, at least some of the
19   overcharge will be passed on by distributors to end consumers.  When
     the distribution markets are highly competitive, as they are here, all or
20   nearly the entire overcharge will be passed on through to ultimate
     consumers... Both of Microsoft's experts also agree upon the economic
21   phenomenon of cost pass through, and how it works in competitive
     markets.  This general phenomenon of cost pass through is well
22   established in antitrust laws and economics as well.

23   100.    The purpose of the conspiratorial conduct of Defendants was to raise, fix or stabilize

24   the price of CRTs and, as a direct and foreseeable result, CRT Products.  Economists have developed

25   techniques to isolate and understand the relationship between one "explanatory" variable and a

26   "dependent" variable in those cases when changes in dependent variable are explained by changes in

27   a multitude of variables – when all such variables may be changing simultaneously.  That analysis,

28   called regression analysis, is commonly used in the real world and in litigation to determine the impact

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
17

1   of a price increase on one cost in a product (or service) that is an assemblage of may parts. Thus, it
2   is possible to isolate and identify only the impact of an increase in the price of CRTs on prices for
3   televisions and monitors containing CRTs even though such products contain a number of other
4   components whose prices may be changing over time. A regression model can explain how variation
5   in the price of CRTs affects changes in the price of televisions and monitors containing CRTs. In such
6   models, rather than being treated as the dependent variable, the price of CRTs is treated as an
7   independent or explanatory variable. The model can isolate how changes in the price of CRTs impact
8   the price of televisions and monitors containing such CRTs while controlling for the impact of other
9   price-determining factors.

10      101.    Economic and legal literature recognizes that the more pricing decisions are based on
11  cost, the easer it is to determine the pass-through rate. The directness of affected costs refers to
12  whether an overcharge affects a direct (i.e. variable) cost or an indirect (i.e., overhead) cost.
13  Overcharges will be passed-through sooner and at a higher rate if the overcharge affects direct costs.
14  Here CRTs are a direct (and substantial) cost of CRT Products.

15      102.    Other factors that lead to the pass-through of overcharges include: (i) whether price
16  changes are frequent; (ii) the duration of the anti-competitive overcharge; (iii) whether pricing
17  decisions are based on cost; (iv) whether the overcharge affects variable, as opposed to overhead,
18  costs; (v) whether the resellers' production technology is uniform; (vi) whether the reseller supply
19  curve exhibits a high degree of elasticity; and (vii) whether the demand of the resellers is inelastic.
20  All of these factors were present in the CRT market during the Class Period. The precise amount of
21  such an impact on the prices of products containing CRTs can be measured and quantified. Commonly
22  used and well-accepted economic models can be used to measure both the extent and the amount of
23  the supracompetitive charge passed through the chain of distribution.

24      103.    Plaintiff and the other Class members have been forced to pay supracompetitive prices
25  for CRT Products. These inflated prices have been passed on to them by direct-purchaser OEMs,
26  distributors, and retailers. These overcharges have unjustly enriched Defendants.

27  //

28  //

1                                 **CLASS ACTION ALLEGATIONS**

2       104.    Plaintiff brings this action as a class action, pursuant to Federal Rule of Civil Procedure

3   23, on behalf of himself and a class ("the Nationwide Class") composed of and defined as follows:

4                  All persons and entities residing in the United States who, from January
                    1, 1998 through and including November 9, 2007, indirectly purchased

5                  in the United States, for their own use and not for resale, a CRT which
                    was manufactured and/or sold by one or more of Defendants.

6                  Specifically excluded from this Class are Defendants; the officers,
                    directors or employees of any Defendant; any entity in which any

7                  Defendant has a controlling interest; and any affiliate, legal
                    representative, heir or assign of any Defendant. Also excluded are any

8                  judicial officer presiding over this action and the members of his/her
                    immediate family and judicial staff, and any juror assigned to this

9                  action.

10      105.    Plaintiff also brings this action as a class action, pursuant to Federal Rule of Civil

11   Procedure 23, on behalf of himself and a subclass ("the California Subclass") composed of and defined

12   as follows:

13                  All persons and entities residing in California who, from January 1,
                    1998 through and including November 9, 2007, indirectly purchased

14                  a CRT, for their own use and not for resale, a CRT which was
                    manufactured and/or sold by one or more of Defendants. Specifically

15                  excluded from this Class are Defendants; the officers, directors or
                    employees of any Defendant; any entity in which any Defendant has a

16                  controlling interest; and any affiliate, legal representative, heir or assign
                    of any Defendant. Also excluded are any judicial officer presiding over

17                  this action and the members of his/her immediate family and judicial
                    staff, and any juror assigned to this action.

18

19      106.    This action has been brought and may be properly maintained as a class action pursuant

to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

20              a.    The Class is ascertainable and there is a well-defined community of interest

21                  among the members of the Class;

22              b.    Based upon the nature of the trade and commerce involved and the number of

23                  indirect purchasers of CRTs, Plaintiff believes that the members of the Class

24                  number in the thousands, and therefore is sufficiently numerous that joinder of

25                  all Class members is not practicable;

26              c.    Plaintiff's claims are typical of the claims of the members of the Class because

27                  Plaintiff indirectly purchased CRTs from one or more of the Defendants or

28                  their co-conspirators, and therefore Plaintiff's claims arise from the same

common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class;

    d.    The following common questions of law or fact, among others, exist as to the members of the Class:

        i.    whether Defendants and their co-conspirators engaged in a contract, combination or conspiracy among themselves to fix, raise, maintain or stabilize the process of, or allocate the market of CRTs or CRT Products sold in the United States;

        ii.    the duration and extent of the contract, combination or conspiracy;

        iii.    whether Defendants and their co-conspirators were participants in the contracts, combinations or conspiracies alleged herein;

        iv.    whether Defendants and their co-conspirators engaged in conduct that violated Section 1 of the Sherman Act;

        v.    whether Defendants and their co-conspirators engaged in unlawful, unfair or deceptive contracts, combinations or conspiracies among themselves, express or implied, to fix, raise, maintain, or stabilize prices of CRTs or CRT Products sold in and/or distributed in the United States;

        vi.    whether Defendants' conduct violates Sections 16720 and 17200 of the California Business and Professions Code;

        vii.    whether the anticompetitive conduct of Defendants and their co-conspirators caused prices of CRTs or CRT Products to be artificially inflated to non-competitive levels;

        viii.    whether Defendants and their co-conspirators unjustly enriched themselves as a result of their inequitable conduct at the expense of the members of the Classes;

        ix.    whether Defendants and their co-conspirators fraudulently concealed the existence of their unlawful conduct;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

      x.    whether Plaintiff and the other Class members are entitled to injunctive relief; and

      xi.    whether Plaintiffs and the other Class members were injured by the conduct of Defendants and, if so, the appropriate measure of damages.

  e.    These, and other questions of law or fact, which are common to the members of the Class predominate over any questions affecting only individual members of the Class;

  f.    Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff has no interests that are antagonistic to other members of the Class and has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent himself and the Class;

  h.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all damaged Class members is impractical. The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent the availability of class action procedures, it would not be feasible for Class members to redress the wrongs done to them. Even if the Class members could afford individual litigation, the court system could not. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court;

  i.    Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole; and

  j.    In the absence of a class action, Defendants would be unjustly enriched because

1                              they would be able to retain the benefits and fruits of their wrongful conduct.

2      107.    The Claims in this case are also properly certifiable under the laws of the State of

3 California.

4                                 **ACTIVE CONCEALMENT**

5      108.    Plaintiff and the other Class members did not discover and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until after November 9, 2007, when the investigations by the DOJ and other antitrust regulators became public, because Defendants and their co-conspirators actively and fraudulently concealed the existence of their contract, combination or conspiracy. Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff and the other Class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRTs and CRT Products.

109.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing. As alleged above, Defendants had secret discussions about price and output. Defendants agreed not to discuss publicly the existence or the nature of their agreement.

110.    In 1999, as alleged above, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. However, this price rise was the result of collusive conduct among Defendants, which was undisclosed at the time.

111.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 2001. This price stabilization was purportedly the result of a shortage of critical components such as glass. This was a pretext used to conceal the conspiracy.

112.    Additionally, when several CRT manufacturers, including Defendants Samsung, Philips, and LG Electronics, increased the price of CRT Products in 2004, the price hike was attributed to a shortage of glass shells use for manufacturing CRT monitors. In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated (in an article available at http://www.techtree.com/lndialNews/Major Monitor Manufacturers hike CRT-prices LG follows

Suitl551-52715-581.html), that "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

113. Plaintiff and the other Class members had no reason to disbelieve these statements, which on their face appeared to explain reasonably the increase in the prices of CRTs and CRT Products. Further, most of the explanations provided by Defendants involved non-public and/or proprietary information that was within Defendants' control, such that Plaintiffs and the Class members could not verify their accuracy. Defendants' purported reasons for the price increases of CRTs were materially false and misleading and were made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

114. These affirmative acts of Defendants, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

115. As a result of the active concealment of the conspiracy by Defendants and their co-conspirators, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## VIOLATIONS ALLEGED

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

116. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

117. Beginning at a time presently unknown to Plaintiff, but at least as early as January 1, 1997, and continuing through at least November 9, 2007, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for CRTs and CRT Products sold in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

118. The activities of Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

119. In formulating and carrying out the alleged agreement, understanding, and conspiracy,

1     Defendants and their co-conspirators did those things that they combined and conspired to do,

2     including but not limited to the acts, practices, and course of conduct set forth above, and the

3     following, among others:

4              a.    To fix, raise, maintain and stabilize the price of CRTs and CRT Products; and

5              b.    Allocating among themselves and collusively reducing the production of CRTs

6                   and CRT Products.

7        120.    The combination and conspiracy alleged herein has had the following effects, among

8     others:

9              a.    Price competition in the sale of CRTs and CRT Products has been restrained,

10                  suppressed, and/or eliminated in the United States;

11              b.    Prices for CRTs and CRT Products sold by Defendants and their co-

12                  conspirators have been fixed, raised, maintained and stabilized at artificially

13                  high, noncompetitive levels throughout the United States; and

14              c.    Those who purchased CRTs and CRT Products directly or indirectly from

15                  Defendants and their co-conspirators have been deprived of the benefits of free

16                  and open competition.

17        121.    Plaintiff and the members of the Class have been injured and will continue to be injured

18     in their business and property by paying more for CRTs and CRT Products purchased indirectly from

19     Defendants and their co-conspirators than they would have paid and will pay in the absence of the

20     combination and conspiracy, including paying more for televisions and computer monitors in which

21     CRTs are a component as a result of higher prices paid for CRTs by the manufacturers of those

22     products.

23        122.    Plaintiff and the class are entitled to an injunction against Defendants, preventing and

24     restraining the violations alleged herein.

25                             **Second Claim for Relief**

26                  **(Violation of the California Cartwright Act)**

27        123.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every

28     allegation set forth in the preceding paragraphs of this Complaint.

1      124.   Defendants' contract, combination, trust or conspiracy was centered in, carried out,
2 effectuated and perfected mainly within the State of California, and Defendants' conduct within
3 California injured all members of the Class throughout the United States. Therefore, this claim for
4 relief under California law is brought on behalf of all members of the Class, whether or not they are
5 California residents

6      125.   Beginning at a time presently unknown to Plaintiff, but at least as early as January 1,
7 1997, and continuing through at least November 9, 2007, the exact dates being unknown to Plaintiff,
8 Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in
9 restraint of the trade and commerce described above in violation of Section 16720, California Business
10 and Professional Code. Defendants, and each of them, have acted in violation of Section 16720 to fix,
11 raise, stabilize and maintain prices of, and allocate markets for, CRTs and CRT Products at supra-
12 competitive levels.

13     126.   The aforesaid violations of Section 16720, California Business and Professions Code,
14 consisted, without limitation, of a continuing unlawful trust and concert of action among the
15 Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and
16 stabilize the prices of, and to allocate markets for, CRTs and CRT Products .

17     127.   For the purpose of forming and effectuating the unlawful trust, the Defendants and their
18 co-conspirators have done those things which they combined and conspired to do, including but in no
19 way limited to the acts, practices and course of conduct set forth above and the following:

20        a.   To fix, raise, maintain and stabilize the price of CRTs and CRT Products; and
21        b.   Allocating among themselves and collusively reducing the production of CRTs
22        and CRT Products.

23    128.   The combination and conspiracy alleged herein has had, inter alia, the following effects:
24  a.   Price competition in the sale of CRTs and CRT Products has been restrained,
25    suppressed, and/or eliminated in the United States;
26    b.   Prices for CRTs and CRT Products sold by Defendants and their co-
27    conspirators have been fixed, raised, maintained and stabilized at artificially
28    high, noncompetitive levels throughout the United States; and

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
25

1                 c.    Those who purchased CRTs and CRT Products directly or indirectly from

2                     Defendants and their co-conspirators have been deprived of the benefits of free

3                     and open competition.

4       129.    Plaintiff and the other members of the Class paid supra-competitive, artificially inflated

5  prices for CRTs and CRT Products.

6       130.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the

7  members of the Class have been injured in their business and property in that they paid more for CRTs

8  and CRT Products than they otherwise would have paid in the absence of Defendants' unlawful

9  conduct. As a result of Defendants' violation of Section 16720 of the California Business and

10  Professions Code, Plaintiff seeks treble damages and the costs of suit, including reasonable attorneys'

11  fees, pursuant to Section 16750(a) of the California Business and Professions Code.

12                            **Third Claim for Relief**

13            **(Violation of the California Unfair Competition Law)**

14       131.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every

15  allegation set forth in the preceding paragraphs of this Complaint.

16       132.    This Claim is instituted pursuant to Sections 17203 and 17204 of the California

17  Business and Professions Code, to obtain restitution from Defendants for acts, as alleged herein, that

18  violated Section 17200 of the California Business and Professions Code, commonly known as the

19  Unfair Competition Law.

20       133.    Defendants' conduct as alleged herein violated Section 17200. The acts, omissions,

21  misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a

22  common continuous and continuing course of conduct of unfair competition by means of unfair,

23  unlawful and/or fraudulent business acts or practices within the meaning of California Business and

24  Professions Code, Section 17200, et seq., including, but not limited to, the following:

25                 a.    The violations of Section 1 of the Sherman Act, as set forth above;

26                 b.    The violations of Section 16720, *et seq.*, of the California Business and

27                     Professions Code, set above:

28                 c.    Defendants' acts, omissions, misrepresentations, practices and non-disclosures,

1              as described above, whether or not in violation of Section 16720, *et seq.*, of the

2              California Business and Professions Code, and whether or not concerted or

3              independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

4          d.    Defendants' acts and practices are unfair to consumers of CRTs and CRT

5              Products in the State of California, within the meaning of Section 17200,

6              California Business and Professions Code; and

7          e.    Defendants' acts and practices are fraudulent and deceptive within the meaning

8              of Section 17200 of the California Business and Professions Code.

9    134. Plaintiff and each of the Class members is entitled to full restitution and/or

10   disgorgement of all revenues, earnings, profits, compensation and benefits which may have been

11   obtained by Defendants as a result of such business acts or practices.

12   135. The illegal conduct alleged herein is continuing and there is no indication that

13   Defendants will not continue such activity into the future.

14   136. The unlawful and unfair business practices of Defendants, and each of them, as

15   described above, have caused and continue to cause Plaintiff and the members of the Class to pay

16   supra-competitive and artificially-inflated prices for CRTs and CRT Products. Plaintiff and the

17   members of the class suffered injury in fact and lost money or property as a result of such unfair

18   competition.

19   137. The conduct of Defendants as alleged in this Complaint violates Section 17200 of the

20   California Business and Professions Code.

21   138. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly

22   enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and

23   the members of the Class are accordingly entitled to equitable relief including restitution and/or

24   disgorgement of all revenues, earnings, profits, compensation and benefits which may have been

25   obtained by Defendants as a result of such business practices, pursuant to the California Business and

26   Professions Code, Sections 17203 and 17204.

27   //

28   //

1                           **Fourth Claim for Relief**

2            **(Unjust Enrichment and Disgorgement of Profits)**

3       139.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every

4 allegation set forth in the preceding paragraphs of this Complaint.

5       140.    Defendants have been unjustly enriched through overpayments by Plaintiff and the

6 other Class members and the resulting profits.

7       141.    Under common law principles of unjust enrichment, Defendants should not be

8 permitted to retain the benefits conferred via overpayments by Plaintiff and the other Class members.

9       142.    Plaintiff seeks disgorgement of all profits resulting from such overpayments and

10 establishment of a constructive trust from which Plaintiff and Class members may seek restitution.

11                              **PRAYER FOR RELIEF**

12       WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

13       1.    That the Court determine that the claims alleged herein may be maintained as a class

14 action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

15       2.    That the unlawful conduct, contract, conspiracy or combination alleged herein be

16 adjudged and decreed to be:

17            a.    a restraint of trade or commerce in violation of Section 1 of the Sherman Act,

18                 as alleged in the First Claim for Relief;

19            b.    an unlawful combination, trust, agreement, understanding, and/or concert of

20                 action in violation of the California antitrust laws identified in the Second

21                 Claim for Relief herein;

22            c.    violations of the California unfair competition laws identified in the Third

23                 Claim for Relief herein; and

24            d.    acts of unjust enrichment as set forth in the Fourth Claim for Relief herein.

25       3.    On the First Claim for Relief, that Defendants, their affiliates, successors, transferees,

26 assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons

27 acting or claiming to act on their behalf or in concert with them, be permanently enjoined and

28 restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy

1  or combination alleged herein, or from entering into any other conspiracy alleged herein, or from

2  entering into any other contract, conspiracy or combination having a similar purpose or effect, and

3  from adopting or following any practice, plan, program, or device having a similar purpose or effect;

4      4.    On the Second Claim for Relief, that Plaintiff and the members of the California

5  Subclass recover damages, to the maximum extent allowed under the California Cartwright Act, and

6  that a joint and several judgment in favor of Plaintiffs and the California Subclass be entered against

7  Defendants in an amount to be trebled in accordance with California law;

8      5.    On the Third Claim for Relief, that Plaintiff and the members of the California Subclass

9  be awarded restitution, as a result of the herein alleged acts of unfair competition;

10      6.    On the Fourth Claim for Relief, that Plaintiff and the members of the Nationwide Class

11  recover the amounts by which Defendants have been unjustly enriched as a result of their unlawful

12  conduct;

13      7.    That Plaintiff and the members of the Class be awarded pre- and post-judgment interest,

14  and that interest be awarded at the highest legal rate from and after the date of service of the initial

15  complaint in this action;

16      8.    That Plaintiff and the members of the Class recover their costs of this suit, including

17  reasonable attorneys' fees as provided by law; and

18      9.    That Plaintiff and the members of the Class have such other, further, and different relief

19  as the case may require and the Court may deem just and proper under the circumstances.

20  Dated: March 31, 2008

21                      Terry Gross (103878)
                    Adam C. Belsky (147800)
                    Monique Alonso (127078)

22                      GROSS BELSKY ALONSO LLP
                    180 Montgomery Street, Suite 2200

23                      San Francisco, California 94104
                    Telephone: (415) 544-0200

24                      Facsimile: (415) 544-0201

25

26                      By: _____
                            Terry Gross

27                      Attorneys for Plaintiff STEVEN GANZ
                    and the Proposed Class

28

1   **JURY TRIAL DEMAND**

2   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury

3   for all issues so triable.

4   Dated: March 31, 2008

Terry Gross (103878)
5   Adam C. Belsky (147800)
Monique Alonso (127078)
6   GROSS BELSKY ALONSO LLP
180 Montgomery Street, Suite 2200
7   San Francisco, California 94104
Telephone: (415) 544-0200
8   Facsimile: (415) 544-0201

9
By:_____
10                  Terry Gross

11   Attorneys for Plaintiff STEVEN GANZ
and the Proposed Class
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
30