1

2 <u>UNITED STATES DISTRICT COURT</u>

3 <u>NORTHERN DISTRICT OF CALIFORNIA</u>

4 <u>SAN FRANCISCO DIVISION</u>

5

6

7

8

| | |
|---|---|
| 9 In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 07-5944 DC |
| 10 | MDL No. 1917 |
| 11 This Document Relates to: | **DECLARATION OF KEUM-SEOK OH IN SUPPORT OF SHARP** |
| 12 IN RE: APPLICATION FOR JUDICIAL ASSISTANCE FOR THE ISSUANCE OF | **CORPORATION'S OPPOSITION TO DEFENDANTS' MOTION TO QUASH** |
| 13 SUBPOENAS PURSUANT TO 28 U.S.C. § 1782 TO OBTAIN DISCOVERY FOR | **SHARP SUBPOENA TO SAVERI & SAVERI, INC.** |
| 14 USE IN A FOREIGN PROCEEDING | |
| 15 Case No. CV-12-80151 MISC | |
| 16 | |

17

18

19

20

21

22

23

24

25

26

27

28

I, Keum-Seok Oh, declare as follows:

1.      I am a partner at the Korean law firm of Bae, Kim & Lee LLC.  I submit this declaration in support of Sharp Corporation's ("Sharp") Opposition to Defendants' Motion to Quash Sharp's Subpoena to Saveri & Saveri, Inc.

2.      I am licensed to practice law in Korea.  I have been a practicing litigator at Bae, Kim & Lee LLC since 2004.  Previous to entering private practice I served as a judge in various Korean courts for a period of 12 years.  My practice includes antitrust, fair trade, tax/administrative, civil and corporate law matters.  I make this declaration based on my own personal knowledge of the matters contained in this Declaration.

## Korean Litigation

3.      I, together with Jinhoon Gim and certain other members of our firm, represent Sharp and its subsidiaries[1] in Case No. 2010gahap21125 Claim for Damages (gi) filed in Suwon District Court (the "Korean Litigation").

4.      In the Korean Litigation, Sharp asserts that the defendants in the Korean Litigation (the "Korean Litigation Defendants")[2] sold cathode ray tubes ("CRT") to Sharp and its subsidiaries at prices equal to or greater than the minimum fixed target price and price guidelines that were determined and agreed to during CRT competitor[3] meetings, the "Glass Meetings", and as a result, the Korean Litigation Defendants generated revenue from the overcharge on its sales

[1] Sharp Manufacturing Corporation (M) Sdn. Bhd., Sharp Electronics (Malaysia) Sdn. Bhd., Sharp Roxy Appliances Corporation (M) Sdn. Bhd., P.T. Sharp Electronics Indonesia, Sharp Manufacturing (Thailand) Co., Ltd., Sharp Thai Co., Ltd., Nanjing Sharp Electronics Co., Ltd., Sharp India Ltd., and Sharp (Phils.) Corporation

[2] The Korean Litigation Defendants are Samsung SDI Co., Ltd., Samsung SDI (Malaysia) Sdn Bhd., Samsung SDI (HK) Ltd., Shenzhen Samsung SDI Co., Ltd., and Tianjin Samsung SDI Co., Ltd., LG Philips Display Co., Ltd., PT LP Displays Indonesia, LG Philips Displays (Singapore) Pte. Ltd., LG Philips (Shuguang) Displays, and Meridian Solar & Display Co.

[3] I understand that these CRT competitors include but are not limited to Chunghwa Entities, Daewoo Entities, Hitachi Entities, Irico Entities, Panasonic Entities, Samtel, Tatung Company of America, Inc, Thai CRT, Toshiba Entities, MT Picture Display Co., Ltd., etc, including the Korean Litigation Defendants.

DECLARATION OF KEUM-SEOK OH IN SUPPORT OF *EX PARTE* APPLICATION – Case No. _____

of CRTs to Sharp and its subsidiaries, and caused Sharp and its subsidiaries to sustain damages. Sharp and its subsidiaries seek monetary damages in the amount of the overcharges on its purchases from the Korean Litigation Defendants.

5.     On January 27, 2011, the Korea Fair Trade Commission ("KFTC") imposed fines totaling KRW 26.2 billion on five CRT manufacturers including Samsung SDI and LG Philips Display for participating in an international cartel to fix prices of CRTs made for computer monitors (referred to in the industry as color display tubes ("CDT")) from November 1996 to March 2006.  A true and correct copy of the KFTC's press release and its translation are attached hereto as Exhibit A.

6.     Almost concurrently with the CDT cartel investigations, the KFTC conducted an investigation into the alleged cartel activity by various color picture tube ("CPT") manufacturers, including the Korean Litigation Defendants.  CPTs are made for use in televisions.  The KFTC closed its investigation on the CPT manufacturers in November 2011, determining that the CPT manufacturers were "clear of suspicion".  However, the KFTC's determination is not binding on private litigants in Korea.  The Korean Supreme Court held, in an antitrust-related civil damages action, that the factual findings and decisions made by the KFTC with respect to an alleged antitrust law violation are not binding on the court presiding over a case involving the same conduct (Supreme Court Decision 98Da46587 dated December 10, 1999).

7.     The Korean Litigation Defendants were found to have engaged in CPT cartel activity by the Japanese Fair Trade Commission ("JFTC") and investigations into alleged cartel activity by CPT and CDT manufacturers, including the Korean Litigation Defendants, are on-going in various jurisdictions.  In October 2009, the JFTC issued a corrective order and imposed a surcharge for illegal collusive conduct against Samsung SDI and LG Philips Display, relating to CPTs sold to Japanese CRT TV manufacturers, including Sharp.  In November 2007, the United States Department of Justice ("U.S. DOJ") served grand jury subpoenas on various CRT

- 3 -

manufacturers including Samsung SDI and LG Philips Display. On February 10, 2009, the U.S. DOJ indicted Chunghwa's former Chairman and Chief Executive Officer, Cheng Yuan Lin, for his participation in global conspiracies to fix prices of two types of CRTs, CDTs and CPTs. In early November 2007, the European Commission's ("EC") investigation into price-fixing in the CRT industry became public after it raided the offices of various CRT manufacturers. The EC announced that it had reason to believe that certain CRT manufacturers may have colluded in fixing prices of CRTs.

8.      As the KFTC has closed its investigation of the Korean Litigation Defendants, Sharp does not have any reasonable means by which to gain access to documents and evidence necessary to establish its case from the KFTC.

9.      The discovery available under the Korean Civil Procedure Act ("KCPA") is very limited compared to discovery available in U.S. litigation. Production of documents may be requested under Articles 345 and 352 of the KCPA. Article 345 permits a party to a lawsuit to request the production of documents in the possession of the other party to the lawsuit, provided that it is able to identify with specificity the document being requested and certain other requirements are met. Article 352 permits a party to an action to request the court to issue an order to a third party for the production of documents. Attached to this Declaration as Exhibit B is an English-language translation of Articles 345 and 352 of the KCPA.

10.     There is no reasonable likelihood that the document production procedure under Article 345 would be useful to Sharp, as Sharp is unable to identify the holder, location and specific contents of each document, all of which would be required to satisfy Article 345 of the KCPA. Article 345 of the KCPA requires that the party seeking a court order for production of documents must specify (i) the indication of the document, (ii) the purport of the document, (iii) the holder of the document, (iv) the facts sought to be proven by, and (v) the causes of the obligation to produce the requested documents. The term "indication of document" in Article

- 4 -

345 of the KCPA requires that the exact document if bound together with other documents must be identified specifically as to where it is to be found within the bound documents, in addition to specifying whether it is a copy or original. The term the "purport of the document" in Article 345 of the KCPA requires that the specific contents of the document sought be identified when making the document production request under Article 345 of the KCPA.

11.     Any document production request to the KFTC must be made under Article 352 of the KCPA. However, there is no reasonable likelihood that a document production request issued by a court to the KFTC would result in any documents being produced by the KFTC. Although it might conceivably be possible for Sharp to have the court issue a document production request to the KFTC, there is no means by which to enforce such a request, as the KFTC is under no legal obligation to comply with such request. This is especially true given the fact that the KFTC has closed its investigation. The fact that the investigation was closed means that the KFTC did not prepare or issue any formal document, such as an examiner's report (the official document that contains the findings of the KFTC and the corrective and punitive measures sought against the parties investigated), and may no longer have or may never have had substantial evidentiary documents. In any case, even if it did have documents in its possession, the KFTC would be unwilling to comply with a request for documents made under Article 352 of the KCPA in relation to a case which it closed with the defendants having been cleared of suspicion. This would especially be the case if the documents contained confidential or sensitive information.

12.     Under such circumstances, the only means available to Sharp is to seek access to the documents produced through discovery in the U.S. litigation.

13.     At a status hearing conducted by the Suwon District Court on June 28, 2012, we stated to the court that Sharp intends to submit evidentiary documents to the court which were produced through discovery procedures in the U.S. litigation and that we are in the process of

- 5 -

acquiring them through U.S. court procedure.  The court than asked how long this procedure would take, and when told that it would require a substantial amount of time, the court acknowledged our efforts and stated that it would not fix a date for the next hearing until Sharp submits evidence, implying that it would wait until Sharp submitted evidence it acquired through the U.S. court procedure before moving forward with the case.

**Korean Law**

14.     Deok-Gu Lee's Declaration states to the effect that, in a Korean civil litigation, there is a limit on the evidence that may be presented by the parties thereto, and concludes that, based on the Korean law and policy, the court presiding over the Korean Litigation likely would not welcome the extensive discovery that Sharp seeks.  However, the Declaration of Deok-Gu Lee is based on an incorrect understanding of Korean law and policy.

15.     Sharp's 1782 application has been filed by Sharp directly with the U.S. court, rather than using the Korean court as an intermediary.  Therefore, the argument that because the KCPA only recognizes limited discovery Sharp should not be able to use a more expanded scope of discovery through the 1782 application is without merit.  The KCPA does not regulate procedures before foreign courts, either generally or in this case.

16.     To the contrary, because Article 202 of the KCPA recognizes the principle of free evaluation of evidence, there is no restriction on the admissibility of evidence and, thus, even hearsay evidence is admissible in Korean court.  The Korean Supreme Court found it wrongful to deny the admissibility of hearsay evidence in a civil litigation (Supreme Court Decision 67Da67 dated March 21, 1967).  In short, a very broad range of evidence is admissible in Korean civil litigation.  Deok-Gu Lee is incorrect when he states in reference to Article 202 of the KCPA in his declaration that "[i]t has nothing to do with accepting evidence from a foreign jurisdiction." Courts have generally interpreted Article 202 of KCPA as providing courts broad discretion in determining the admissibility of evidence, and not limited to deciding on whether an alleged fact

- 6 -

is true or not.  In a number of cases, the Korean Supreme Court has confirmed that the principle of free evaluation of evidence under Article 202 of the KCPA allows courts unrestricted discretion to accept all types of evidence.  The Korean Supreme Court held that the principle of free evaluation of evidence permitted evidence acquired through illegal eavesdropping (Supreme Court Decision 99Da1789 dated May 25, 1999), a draft of a court decision which was not formally adopted by the court (Supreme Court Decision 92Da22107 dated November 10, 1992), and a private document prepared after civil litigation was commenced (Supreme Court Decision 91Da24755 dated April 14, 1992) to be admissible as evidence in court.  There is no law which limits the scope of evidence that may be admissible in a Korean civil litigation matter, or which supports the unusually restrictive interpretation provided by Deok-Gu Lee.

17.    Article 296 (2) of the KCPA provides that "[a]ny examination of evidence undertaken in a foreign country shall, even if it is contrary to the laws of that country, be valid unless it is contrary to this Act."  This KCPA provision was adopted as an expression of equal treatment with respect to the international legal principle that the examination of evidence undertaken in accordance with foreign law, if deemed to be legal under that foreign law, will be deemed to be valid even if it is contrary to the KCPA.  Thus, Article 296(2) of the KCPA may be construed as stating that evidence considered to be inadmissible under foreign law may nevertheless be recognized as admissible evidence in Korean civil litigation.  This also may support the view that a broad range of evidence may be admissible in Korean civil litigation.

18.    Deok-Gu Lee's Declaration at paragraph 10 appears to argue that because Article 1 of the KCPA provides that "A court shall endeavor to have the litigation procedures progress fairly, swiftly and economically," Sharp's 1782 application should not be permitted.  However, Article 1 of the KCPA does not have any bearing on the issue at hand, which is whether documents already discovered through U.S. court procedures may be admissible in Korean court, and thus the argument is without merit.

- 7 -

19.     Deok-Gu Lee wrongly cites to the Hague Convention accession language that Korean courts will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents in asserting that such language expresses a national policy of not admitting into court documents discovered in U.S. litigation.  Deok-Gu Lee has clearly misconstrued this language. The language clearly applies only to the case where a foreign court makes a request to a Korean court for the discovery of documents in Korea, and has nothing to do with Sharp's efforts to obtain documents through the 1782 application.  The purpose of the Hague Convention is to enhance international judicial cooperation with respect to procedures such as service and the taking of evidence, meaning that it applies to the cooperation between courts of different countries and not to a private party's request made to a court.  Thus, the Hague Convention is not applicable to this case because Sharp's 1782 application has been filed by Sharp directly with the U.S. court, rather than using the Korean court as an intermediary. In any case, the Hague Convention accession language has no bearing on how such evidence gathered from foreign proceedings can be used by a Korean court.

20.     Deok-Gu Lee's Declaration refers to a recent price-fixing case in which the court put a limit on the amount of damages available to the plaintiff.  The fact that Korean courts sometimes limit the damages sought by the plaintiff in a price-fixing case where the plaintiff was an intermediary purchaser that passed on the increased cost to consumers is entirely unrelated to Korean court's receptivity to admitting documents discovered through foreign court procedures and has no bearing either generally or in this case.

21.     As shown above, there is nothing in Deok-Gu Lee's Declaration supporting the argument that the court presiding over a civil case would not be receptive to admitting documents obtained through the 1782 application.  As indicated above, the Korean court presiding over this case has acknowledged our efforts to obtain evidentiary documents through the 1782 application and stated that it would not fix a date for the next hearing until Sharp

- 8 -

submits evidence, implying that it would wait until Sharp submitted evidence it acquired through the U.S. court procedure before moving forward with the case.

### Protection of Confidentiality

22.     Sharp and outside counsel, including Bae, Kim & Lee LLC, have agreed to sign onto the Protective Order and have executed copies of the Agreement and Acknowledgement to Be Bound, as modified to reflect use of the documents in the Korean Litigation.

23.     Upon obtaining the discovered documents through the 1782 application, only my colleagues and I will review them and only those limited documents containing evidence relevant to the Korean Litigation will be submitted to the court.

24.     The documents that are submitted to the court will be filed under Article 163 of the KCPA that provides protection for documents containing "secret" information.  Korean courts regularly grant requests made under Article 163 of the KCPA, and there is no reason why the Korean court presiding over the Korean Litigation would not grant Sharp's request filed under Article 163 of the KCPA.   The court will not allow access, whether by physical inspection, copying or otherwise, by third parties to documents filed with the court under Article 163. Attached to this Declaration as Exhibit C is an English-language translation of Article 163 of the KCPA.

25.     Deok-Gu Lee's Declaration wrongly states that "Sharp's outside Korean counsel would be free to disclose such information to third parties." Article 26 of the Korean Lawyers Code of Conduct requires lawyers to keep in strict confidence all confidential information acquired during in their practice of the law.  Confidential information not only includes that of the lawyer's clients but also that of third parties.  Article 317(1) of the Korean Criminal Code also makes it a crime for a lawyer to divulge confidential information of another acquired while engaging in his profession, the violation of which may result in imprisonment of up to three

- 9 -

years.  Article 317(1) of the Korean Criminal Code likewise applies to the confidential

information of not only clients but third parties as well.

I declare under the penalty of perjury under the laws of the United States of America that

the foregoing is true and correct.

Dated: September 5, 2012

Keum-Seok Oh

DECLARATION OF KEUM-SEOK OH IN SUPPORT OF *EX PARTE* APPLICATION -- Case No. _____

# EXHIBIT A

| | | **보 도 자 료** | 공정한 기업활동 |
|---|---|---|---|
| 공정거래위원회<br>www.ftc.go.kr | 보도일시 | 2011.1.28(금) 조간부터 보도가능<br>(방송·인터넷 매체는 전일 낮12시) | 활짝웃는 서민생활 |
| | 담당부서 | 카르텔조사국 국제카르텔과 | 대변인실 |
| 배포일시<br>2011.1.27.(목) | 담당자 | 과  장 김정기 02)2023-4473<br>사무관 이정원 02)2023-4474 | 전화 02)2023-4044<br>Fax 02)599-1085 |

# 브라운관 국제카르텔 적발, 총 262억원 과징금 부과
## - 미국, EU 경쟁당국과 공조, 4개국 5개 브라운관 업체 제재 -

◆ 공정거래위원회(위원장 김동수)는 2011.1.26.(수) 전원회의를 개최하여
5개 브라운관 업체*들이 1996년 11월부터 2006년 3월까지 약 10년에 걸쳐
컴퓨터 컬러 모니터용 브라운관(CDT)의 가격과 생산량을 담합한 국제
카르텔에 대하여 총 262억원의 과징금을 부과하기로 결정

* 5개 브라운관 업체
  ① 삼성 에스디아이 (한국)
  ② 엘지 필립스 디스플레이 (한국)
  ③ 중화 픽쳐 튜브스 리미티드 (대만)
  ④ 중화 픽쳐 튜브스(말레이시아) 에스디엔 비에이치디 (말레이시아)
  ⑤ 씨피티에프 옵트로닉스 컴퍼니 리미티드 (중국)

** CDT(Color Display Tube)란 컴퓨터 컬러 모니터에 사용되는 브라운관을 말함

## 1  담합 배경

□ 브라운관 업체들은 90년대 중반부터 브라운관의 초과공급이 문제되면서
  생산량을 감축하고 가격경쟁을 제한하기로 상호 합의

○ 특히 2000년대 들어 브라운관이 LCD 등 평판 디스플레이 제품으로
  대체되면서 급격하게 수요가 감소

* 당초 일본업체를 비롯한 다수 업체가 카르텔에 참여했으나 2000년대 초반
  브라운관 사업에서 철수하거나 도산하여 이번조치에서 제외

- 1 -

## 2 ‖ 담합 내용

□ 5개 브라운관 업체들은 최소한 1996년 11월부터 2006년 3월까지 한국, 대만, 말레이시아 등 각지에서 월 1회 이상* 직급에 따라 중층적으로 구성된 카르텔 회의*를 통해 가격 설정, 생산량 감축에 대하여 합의하고 이를 실행

  * 이들 업체들은 담합기간 동안 최소 148 차례이상 담합모임을 개최

  ** 최고위급 회의를 통해 카르텔 기본 방향 합의를 결정하면, 관리자급 회의를 통해 가격 등 구체적 수치에 대하여 합의를 하고, 실무자급 회의를 통해 이행여부 점검 등이 이뤄짐

○ 가격 합의는 제품규격, 고객, 사업자별 등으로 세분하여 진행

  * 예: 1997.5.20.자 합의 ① 규격별 최저가격 합의: 14인치-72달러/개, 15인치-100달러/개 ② 주요고객과 중소규모 고객간 가격 차이 합의: 2달러/개 ③ 중화 픽쳐 튜브스 리미티드 등과 삼성 에스디아이와의 가격 차이: 3달러/개

  - 특히 가격 인상을 합의하는 경우 인상사실을 고객에게 통보할 회사와 고객에게 설명할 인상 배경 등에 대해서도 조율

○ 생산량 감축 합의는 전세계 예측 수요량에 맞춰 감축량을 정하고 각 사별로 월별 조업중단일수, 폐쇄할 생산라인 등을 할당하는 방식으로 이뤄짐

  * 예: 2000.2.24.자 합의 - 조업중단일수 ① 15인치-10일/월 ② 17인치-5일/월

  - 생산라인 폐쇄 여부 점검을 위해 ① 각 사별로 2인의 감사인을 배정*하고 ② 사전 고지 없이 Free Pass로 공장을 상호 방문하기로 합의

  * 예: 중화픽쳐 튜브스 리미티드의 경우 삼성 에스디아이가 주감사인, 엘지 필립스 디스 플레이가 부감사인으로 배정되어 총 2인의 감사인이 배정되었음

□ 또한, 5개 브라운관 업체는 카르텔 회의의 위법성을 인식하고 동 회의의 비밀을 유지하기 위한 방안으로 참석자 수 제한*, 회의록 작성 금지 등에 대해서도 합의

  * 담합모임 참석자수를 각 사당 2~3인으로 제한

**3** **조치내용**

□ 적용법조 : 공정거래법 제19조 제1항 제1호(가격의 결정·유지·변경) 및 제3호
    (상품의 생산·출고·수송 또는 거래의 제한 행위)

□ 조치내용

ㅇ 과징금 부과 : 4개사에 총 26,271백만원

(단위 : 백만원)

| 업체명 | 과징금액 |
|--------|---------|
| 삼성 에스디아이 | 24,013 |
| 엘지 필립스 디스플레이 | 0 |
| 중화 픽쳐 튜브스 리미티드 | 2,198 |
| 중화 픽쳐 튜브스(말레이시아) 에스디엔 비에이치디 | 32 |
| 씨피티에프 옵트로닉스 컴퍼니 리미티드 | 28 |

※ 엘지 필립스 디스플레이는 2009.6.8. 홍콩계 법인에 브라운관 사업을 양도한 후 현재
    폐업상태로 과징금 납부능력이 없어 전액 면제
※ 상기 과징금액은 자진신고자에 대한 감면액은 반영되지 않은 금액이며, 추후
    관련매출액 확정과정에서 일부 조정될 수 있음

**4** **이번 조치의 의의 및 기대효과**

□ 2007.11월 미국, EU 등 외국 경쟁당국과의 조사공조를 거쳐 성공적으로
    사건을 마무리함으로써 공정위의 국제카르텔 조사역량 제고

    * 미국, EU 등 여타 경쟁당국은 현재 조사 진행 중

□ 2010.5월 사상 최대의 항공화물 사건에 연이어 브라운관(CDT) 국제카르텔 사건을
    엄정하게 조치함으로써 한국 시장을 타켓으로 한 사업자들의 담합행위 억제 기대

    * 2008년 국제카르텔과 신설 이래 복사용지 사건(2008), 마린호스 사건(2009), 항공
      화물운임 사건(2010), 브라운관(CDT) 국제카르텔 사건(2011) 제재

[별첨] 브라운관(CDT) 시장 현황

[별첨] 브라운관 시장현황

## 1. 브라운관의 개념 및 종류

○ CRT(Cathode Ray Tube, 음극선관)는 전기신호를 영상이나 도형, 문자 등의 광학적인 상(像)으로 변환하여 표시하는 진공관을 말함 (소위'브라운관'이라 함)

○ CRT는 용도에 따라  컴퓨터 모니터용으로 사용되는 CDT(Color Display Tube)와 컬러 TV용으로 사용되는 CPT(Color Picture Tube)로 구분

○ 제품의 크기는 인치(")로 표시되는데, CDT의 규격은 14″, 15″, 17″, 19″ 등으로 표준화되어 있음

### CRT 구조



## 2. 시장규모 및 점유율 현황

□ 전세계 CDT 시장의 규모는 2002년 5조원에 달하였으나 LCD등 평판 디스플레이로 대체되어 2005년도에는 1조 8천억원 규모로 감소

○ 한국CDT 시장규모도 2000년도 4,500억원에서 2005년도 500억원 규모로 급격히 감소한 것으로 추산

\* CDT는 1999년에 전세계 컴퓨터 모니터 시장의 84%를 차지하였으나, 2004년에는 40%수준으로 감소

□ 5개 브라운관 업체들은 2002년 이후 2009년까지 전 세계 시장의 85% 이상을 공급

* 당초 마쯔시타, 히타치, 소니, 도시바 등 일본기업이 1980년대부터 CDT 산업을 주도하였으나, 1990년대말 2000년대 초반 시장에서 철수

* 2009년 중화 픽쳐 튜브스 리미티드 등 3개사의 철수와 함께 현재 전세계적으로 CDT 생산업체는 없음

## 전세계 CDT 업체별 점유율

(단위: %)

| 연도<br>업체 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| 삼성 에스디아이 | 33.5 | 39.0 | 42.0 | 43.8 |
| 엘지필립스<br>디스플레이 | 28.1 | 30.7 | 32.1 | 32.2 |
| 중화 픽쳐 튜브스<br>리미티드 등 3개사 | 22.9 | 23.6 | 22.1 | 22.8 |
| 5사 합계 | 84.5 | 93.3 | 96.2 | 98.8 |
| 기타 | 15.5 | 6.7 | 3.8 | 1.2 |
| 합계 | 100.0 | 100.0 | 100.0 | 100.0 |

* 자료출처: DisplaySearch, Stanford Resources Display Insight

| | **Press Release** | | |
|---|---|---|---|
| [KFTC's Logo]<br><br>www.ftc.go.kr | Please commence the reporting in the morning paper on Friday, January 28, 2011 (at noon of Thursday, January 27, 2011 for broadcast and Internet media) | | [KFTC's Slogan] |
| | Provided by | International Cartel Division, Cartel Investigation Department | |
| Distributed on Thursday, Jan. 27, 2011 | Persons in charge | Division Chief: Jung Ki KIM, 02)2023-4473<br>Clerical Staff: Jung Won Lee, 02)2023-4474 | Spokesperson's Office:<br>Tel: 02)2023-4044<br>Fax: 02)599-1085 |

## Korea Fair Trade Commission imposes a total of 26.2-billion-Won surcharge on five CRT manufacturers for international cartel

-in cooperation with US and EU competition authorities, involving five CRT manufacturers from four different countries –

◆ At a full committee meeting held on Wednesday, January 26, 2011, the Korea Fair Trade Commission (Chairman: Dong Su Kim) (the "KFTC") decided to impose a total of 26.2-billion-Won surcharge on five CRT manufacturers* for having engaged in an international cartel to fix prices and production of color display tubes (CDT) for computer monitors for a period of approximate ten years from November 1996 to March 2006.

* Five CRT manufacturers:
(1) Samsung SDI (Korea)
(2) LG Philips Display (Korea)
(3) Chunghwa Picture Tubes Limited (Taiwan)
(4) Chunghwa Picture Tubes (Malaysia) SDN. BHD. (Malaysia)
(5) CPTF Optronics Company Limited (China)

**CDT (Color Display Tube) refers to a Braun tube used for computer color monitors.

## 1. Background

▫ As the problem of the excess supply of CRTs arose in the middle of 1990s, the CRT manufacturers concerned agreed on reduction of the production amount and price fixing.

○ Especially, as the CRTs began to be replaced by the flat panel display such as the LCDs in 2000s, the demand for CRTs has decreased dramatically.

* At the beginning, other manufacturers, including manufactures in Japan, participated in the cartel, but they are exempt from the surcharge imposed in this case as they suspended the production of CRTs from the beginning of 2000 or went bankrupt.

## 2. Findings

☐ The five manufacturers met at least once per month* in Korea, Taiwan or Malaysia from November 1996 to March 2006 (the "Cartel Period") and agreed on and implemented price fixing and decrease in production as determined at a series of cartel meetings held for each position level*.

\* The manufacturers have held **over 148 cartel meetings** during the Cartel Period.

\*\* Once the basic standards for the cartel were determined at the high-level meeting, the agreement on the price of the product, etc. was made at the manager-level meeting, and the implementation of such price, etc. was reviewed at the working-level meeting thereafter.

○ The **price was fixed** per product standard, customer and manufacturer.

\* Example: Agreement dated May 20, 1997: (1) Agreement on the minimum price per product standard: 14-inch- USD72/unit, 15-inch- USD100/unit, (2) Agreement on the difference in the price offered to key customers and relatively insignificant customers: USD 2/unit, (3) Agreement on the price difference between Chunghwa Picture Tubes Limited and Samsung SDI: USD 3/unit

- Especially, upon the agreement on the price increase, the manufacturers in question appointed one of them as a company to be in charge of notifying the relevant price increase to customers and adjusted the grounds for such price increase to be explained to customers.

○ For the **agreement on decrease in production**, the manufacturers determined the degree of decrease in production based on the estimated worldwide demand and allotted the number of days of operation shutdown and production lines to be closed per manufacturer.

\* Example: Agreement dated February 24, 2000- Number of Days of Operation Shutdown (1) 15-inch: 10 days /month, (2) 17-inch: 5 days/month

- For the review of the closing of production lines, the manufacturers agreed to (1) assign 2 auditors per manufacturer* and (2) visit other manufacturers' factory without a prior notice using a free pass.

\* Example: In case of Chunghwa Picture Tubes Limited, Samsung SDI was assigned as the main auditor and the LG Philip Display was assigned as the sub-auditor.

☐ Furthermore, these five manufacturers were aware of the illegal nature of the foregoing cartel meetings and took measures necessary to keep such meetings confidential, such as the limitation on the number of attendees* and prohibition on the preparation of minutes thereof.

\* It was limited to 2 to 3 persons per manufacturer.

**3.  Measures Taken**

□  Applied Act: Articles 19(1)1 (Act Fixing, Maintaining or Changing the Price) and 19(1)3 (Act Restricting Production, Delivery, Transportation or Transaction of Goods or Services) of the Monopoly Regulation and Fair Trade Act

□  Measures Taken

○  Imposition of Surcharge: A total of 26,271 million Won on four companies

(Unit: Million Won)

| Company Name | Amount of Surcharge |
|---|---|
| Samsung SDI | 24,013 |
| LG Philips Display | 0 |
| Chunghwa Picture Tubes Limited | 2,198 |
| Chunghwa Picture Tubes (Malaysia) SDN. BHD | 32 |
| CPTF Optronics Company Limited | 28 |

* LG Philips Display was exempt from the surcharge only because it was taken over by a Hong Kong-based corporation on June 8, 2009 and is currently closed down.
* The surcharges above do not reflect decreased and exempted amounts of the leniency applicants and are subject to adjustments in the course of the confirmation of the relevant sales amount.

**4.  Significance and Effect**

□  By successfully concluding this case in cooperation with the US and EU competition authorities from November 2007, the KFTC enhanced its ability to investigate into international cartel cases.

* The US and EU competition authorities are still under the investigation process.

□  Through the tough measure taken on this CDT international cartel case right after the imposition of fines on airlines in the biggest cartel case in May 2010, the KFTC expects that this case will prevent recurrence of similar cartels in the Korean market.

* After the establishment of the International Cartel Division in 2008, the KFTC has 6imposed sanctions on the paper cartel case (2008), marine hose cartel case (2009), airline freight cartel case (2010) and CDT international cartel case (2011).

[Attachment] Status of CDT Market

**[Attachment] Status of CRT Market**

1. Definition and Type of CRT

   o CRT (Cathode Ray Tube) is a vacuum tube that converts an electric signal into an optical image such as pictures, figures or characters (so-called the "Braun tube").

   o CRT may be divided into CDT (Color Display Tube) for computer monitors and CPT (Color Picture Tube) for color televisions.

   o The size of CRT products is expressed in inches, and the CDT size is standardized by 14-inch, 15-inch, 17-inch, 19- inch, etc.

<u>Structure of CRT</u>



2. Status of Market Size and Share

□ The size of the worldwide CDT market reached 5 trillion Won in 2002, but as the CDTs were replaced by the flat panel display such as the LCDs, the size of the CDT market shrank to 1.8 trillion Won in 2005.

   o It is estimated that the size of the Korean CDT market has also decreased dramatically to 50 billion Won in 2005 from 450 billion Won in 2000.

   * The CDTs accounted for 84% of the worldwide computer monitor market in 1999, but its market share shrank to 40% in 2004.

□ The five manufacturers concerned accounted for 85% of the worldwide CDT market from 2002 to 2009.

   * At the beginning Japanese manufacturers such as Matsushita, Hitachi, Sony and Toshiba, took the lead at the CDT market from 1980s, but they evacuated from the market at the end of 1990s and the beginning of 2000s.

*After the suspension of CDT production by three CDT manufacturers, including Chunghwa Picture Tubes Limited, in 2009, there exist no CDT manufacturers at present.

Market Share of Worldwide CDT Manufacturers

(Unit: %)

|  | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| **Samsung SDI** | 33.5 | 39.0 | 42.0 | 43.8 |
| **LG Philips Display** | 28.1 | 30.7 | 32.1 | 32.2 |
| **3 Manufacturers including Chunghwa Picture Tubes Limited** | 22.9 | 23.6 | 22.1 | 22.8 |
| **Sub-Total** | 84.5 | 93.3 | 96.2 | 98.8 |
| **Others** | 15.5 | 6.7 | 3.8 | 1.2 |
| **Total** | 100.0 | 100.0 | 100.0 | 100.0 |

* Source: DisplaySearch, Stanford Resources Display Insight

# EXHIBIT B

🖨 인쇄하기

# CIVIL PROCEDURE ACT

Wholly Amended by Act No. 6626,  Jan. 26, 2002
Amended by Act No. 7427,  Mar. 31, 2005
Act No. 7428,  Mar. 31, 2005
Act No. 7849,  Feb. 21, 2006
Act No. 8438,  May 17, 2007
Act No. 8499,  Jul. 13, 2007
Act No. 9171,  Dec. 26, 2008

## PART Ⅰ GENERAL PROVISIONS

**Article 1 (Ideal of Civil Procedure and Principle of Sincerity and Faithfulness)**
(1) A court shall endeavor to have the litigation procedures progress fairly, swiftly and economically.
(2) The concerned parties and participants of litigation shall perform the litigation sincerely and faithfully.

## CHAPTER Ⅰ COURTS

### SECTION 1 Jurisdiction

**Article 2 (General Forum)**
A lawsuit is subject to the jurisdiction of a court at the place where a defendant's general forum is located.

**Article 3 (General Forum of Person)**
General forum of a person shall be determined by his domicile: *Provided*, That in cases where he has no domicile in the Republic of Korea or his domicile is unknown, it shall be determined pursuant to his residence, and if his residence is unfixed or unknown, it shall be determined pursuant to his last domicile.

**Article 4 (General Forum of Ambassador or Minister, etc.)**
In cases where an ambassador, a minister and other citizens of the Republic of Korea who are exempted from an exercise of foreign jurisdiction have no general forum under Article 3, their general forums shall be the place where the Supreme Court is located.

**Article 5 (General Forum of Juristic Person, etc.)**
(1) General forum of a juristic person or any other association or foundation shall be determined pursuant to the place where its principal office or business place is located, and in cases where there exists no office and business place, it shall be determined pursuant to the domicile of the person principally in charge of its duties.
(2) In cases where the provisions of paragraph (1) are applied to a foreign juristic person and any other foreign association or foundation, their general forums shall be determined pursuant to their offices, business places, or the domiciles of the persons in charge of their duties, in the Republic of Korea.

**Article 6 (General Forum of State)**
General forum of the State shall be the seat of the government agency, which represents the State in the relevant litigation, or that of the Supreme Court.

**Article 7 (Special Forum of Workplace)**
A lawsuit against a person who works continuously in an office or business place may be brought to the court having the jurisdiction over the seat of such office or business place.

Examinations as to the facts known through a special knowledge and experience shall be governed by the provisions relating to the examination of a witness.

**Article 341 (Entrustment for Expert Testimony)**
(1) A court may, if deemed necessary, entrust an expert testimony to a public agency, school, other organization having an adequate equipment, or a foreign public agency. In this case, the provisions relating to oaths shall not be applicable.
(2) The court may, if deemed necessary in the case of paragraph (1), have the person designated by a public agency, school, other organization or a foreign public agency make an explanation on a written expert testimony.

**Article 342 (Disposition Necessary for Expert Testimony)**
(1) Expert witnesses may, in case where required for an expert testimony, gain access to other person's land, residence, house under management, structure, airplane, vessel, vehicle or other installations, by obtaining a permit of the court.
(2) When facing with any resistance in the case of paragraph (1), the expert witness may request national police officials to provide an assistance. *<Amended by Act No. 7849, Feb. 21, 2006>*

## SECTION 4 Documentary Evidence

**Article 343 (Method of Offering Documentary Evidence)**
When a party intends to offer any documentary evidence, he shall do so by a method of submitting the document, or by filing a request for an order to make the person holding the document submit it.

**Article 344 (Obligation to Submit Document)**
(1) In the cases falling under any of the following subparagraphs, the holder of a document shall not refuse to submit it:
  1. When the party holds the document quoted in a lawsuit;
  2. When the applicant holds a judicial right to ask the holder of the document to transfer or show it to him; and
  3. When the document has been prepared for the benefit of the applicant, or prepared as to a legal relationship between the applicant and the holder of document: *Provided,* That the same shall not apply to the case falling under any one of the following causes:
  (a) A document in which matters listed in Articles 304 through 306 are entered, and for which a consent stipulated in the same Articles has not been obtained;
  (b) A document in which matters listed in Article 314 are entered as to the person holding the document or a person in any such relation with him as falling under any subparagraph of the same Article; and
  (c) A document in which matters stipulated in anyone among those listed in each subparagraph of Article 315 (1) are entered, and for which an obligation to keep secrets has not been exempted.
(2) Even except for the case of paragraph (1), in case where the document (excluding the document kept or held by a public official or ex-public official in connection with his duties) does not fall under any one of the following subparagraphs, the person holding the document shall not refuse to submit it:
  1. A document listed in paragraph (1) 3 (b) and (c); and
  2. A document for the exclusive use by its holder.

**Article 345 (Method of Requesting Submission of Document)**
A request for submission of a document shall clarify matters falling under each of the following subparagraphs:
  1. Indication of the document;
  2. Purport of the document;
  3. Holder of the document;
  4. Facts to be proved; and
  5. Causes of an obligation to submit the document.

**Article 346 (Submission of Document's Catalogue)**
A court may, if deemed necessary for a request under Article 345, and pursuant to a request by the party that has generally indicated the purport of documents subject to such a request or the facts to be proved by such documents, order the other party to submit a written statement of the

indication and purport concerning the documents held by him in relation to the contents of request or those to be submitted as a documentary evidence in relation to the contents of request.

**Article 347 (Judgment on Whether or not to Admit Request for Submission of Document)**
(1) A court may, if deemed that a request for submission of documents is justifiable, order the holder of documents to submit them, by its ruling.
(2) If deemed that a request for submission of documents is well-grounded only as to a part of such documents, the court shall order to submit such part only.
(3) In case where a third person is ordered to submit a document, the court shall examine the said person or a person designated by him.
(4) The court may, if deemed necessary for judging on whether a document corresponds to Article 344, order its holder to produce such document. In this case, the court shall not make such document open to other persons.

**Article 348 (Appeal)**
An immediate appeal may be made against the ruling of a request for an order to submit a document.

**Article 349 (Effect When Party Fails to Submit Document)**
When a party fails to comply with the order under Article 347 (1), (2) and (4), the court may admit that the allegations of the other party as to the entries in such document prove true.

**Article 350 (Effect When Party Obstructs Any Use)**
When a party has, on purpose to prevent any use by the other party of the document which he is ordered to submit, destroyed the document or made it unusable, the court may admit that the allegations of the other party as to the entries in such document prove true.

**Article 351 (Sanction against Non-submission of Document by Third Person)**
When a third party fails to comply with the order under Article 347 (1), (2) and (4), the provisions of Article 318 shall apply *mutatis mutandis*.

**Article 352 (Entrusting Forwarding of Document)**
A request for submission of a documentary evidence may also be made by filing a request for entrusting the holder of document with forwarding such document, notwithstanding the provisions of Article 343: *Provided*, That the same shall not apply to cases where the parties are entitled to demand delivery of the authentic copy or a certified copy of the document under Acts and subordinate statutes.

**Article 352-2 (Obligation to Cooperate)**
(1) A person who has been entrusted with forwarding documents from the court under Article 352 or a person who keeps documents that are the object of investigation of evidence under Article 297 shall cooperate with it unless there are justifiable reasons.
(2) When the person who has been entrusted with forwarding of documents does not keep the documents or cannot comply with the entrustment of forwarding due to unavoidable reasons, he shall notify the court of such reasons.
*[This Article Newly Inserted by Act No. 8438, May 17, 2007]*

**Article 353 (Custody of Submitted Document)**
A court may, if deemed necessary, have custody of the documents which have been submitted or forwarded.

**Article 354 (Examination by Commissioned Judge or Entrusted Judge)**
(1) In cases where a court makes, pursuant to the provisions of Article 297, a commissioned judge or an entrusted judge conduct an examination of evidence as to a document, it may determine the matters to be entered in the relevant protocol.
(2) A certified copy or an abridged copy of the document shall be attached to the protocol under paragraph (1).

**Article 355 (Method, etc. of Submission of Documents)**
(1) When documents are submitted or forwarded to a court, they shall be done in the form of an original copy, an authentic copy, or a certified copy with authentication.
(2) The court may, if deemed necessary, either order to submit an original copy or entrust to forward it.
(3) The court may make a party submit a certified copy or an abridged copy of the document quoted by him.
(4) When a document has not been adopted as an evidence, the court may, upon hearing

# EXHIBIT C



# CIVIL PROCEDURE ACT

Wholly Amended by Act No. 6626,  Jan. 26, 2002
Amended by Act No. 7427,  Mar. 31, 2005
Act No. 7428,  Mar. 31, 2005
Act No. 7849,  Feb. 21, 2006
Act No. 8438,  May 17, 2007
Act No. 8499,  Jul. 13, 2007
Act No. 9171,  Dec. 26, 2008

## PART Ⅰ GENERAL PROVISIONS

**Article 1 (Ideal of Civil Procedure and Principle of Sincerity and Faithfulness)**
(1) A court shall endeavor to have the litigation procedures progress fairly, swiftly and economically.
(2) The concerned parties and participants of litigation shall perform the litigation sincerely and faithfully.

## CHAPTER Ⅰ COURTS

### SECTION 1 Jurisdiction

**Article 2 (General Forum)**
A lawsuit is subject to the jurisdiction of a court at the place where a defendant's general forum is located.

**Article 3 (General Forum of Person)**
General forum of a person shall be determined by his domicile: *Provided,* That in cases where he has no domicile in the Republic of Korea or his domicile is unknown, it shall be determined pursuant to his residence, and if his residence is unfixed or unknown, it shall be determined pursuant to his last domicile.

**Article 4 (General Forum of Ambassador or Minister, etc.)**
In cases where an ambassador, a minister and other citizens of the Republic of Korea who are exempted from an exercise of foreign jurisdiction have no general forum under Article 3, their general forums shall be the place where the Supreme Court is located.

**Article 5 (General Forum of Juristic Person, etc.)**
(1) General forum of a juristic person or any other association or foundation shall be determined pursuant to the place where its principal office or business place is located, and in cases where there exists no office and business place, it shall be determined pursuant to the domicile of the person principally in charge of its duties.
(2) In cases where the provisions of paragraph (1) are applied to a foreign juristic person and any other foreign association or foundation, their general forums shall be determined pursuant to their offices, business places, or the domiciles of the persons in charge of their duties, in the Republic of Korea.

**Article 6 (General Forum of State)**
General forum of the State shall be the seat of the government agency, which represents the State in the relevant litigation, or that of the Supreme Court.

**Article 7 (Special Forum of Workplace)**
A lawsuit against a person who works continuously in an office or business place may be brought to the court having the jurisdiction over the seat of such office or business place.

**Article 159 (Stenographing and Tape-recording of Pleadings)**
(1) A court may, if deemed necessary, tape-record the whole or part of pleadings, or order a stenographer to dictate them, and if any party requests to tape-record or stenograph them, it shall order to do so, unless there exists any special reason.
(2) The recorded tapes and stenographic records under paragraph (1) shall be made a part of the protocol.
(3) In cases where any entry in the protocol has been substituted by the recorded tapes or stenographic records pursuant to paragraphs (1) and (2), upon request by the parties or when otherwise prescribed by the Supreme Court Regulations prior to the closure of litigation, a protocol shall be prepared by adjusting the gist of the recorded tapes or stenographic records.
(4) In cases where a protocol has been prepared under paragraph (3), the court may destroy the recorded tapes or stenographic records, if the judgment becomes final or both parties consent thereto. In this case, if the parties fail to raise any objection within two weeks from the date of receiving a notice that the recorded tapes and stenographic records will be destroyed, they shall be deemed to consent to destruction.

**Article 160 (Provisions Applied Mutatis Mutandis to Other Protocols)**
The provisions of Articles 152 through 159 shall apply *mutatis mutandis* to the interrogation or question, and the examination of evidence by a court or a commissioned or entrusted judge.

**Article 161 (Method of Motion or Statement)**
(1) Motions and other statements may be made either in writing or orally, unless there exists a special provision.
(2) Oral statements shall be made in the presence of the junior administrative officer, etc. of a court.
(3) In cases of paragraph (2), the junior administrative officer, etc. of the court shall prepare a protocol or other documents pursuant to the purport of motions or statements, and then sign and seal thereon.

**Article 162 (Request for Perusal of Litigation Record, and for Delivery of Certificates)**
(1) A party or a third person vindicating the interests may, as prescribed by the Supreme Court Regulations, file a request with a junior administrative officer, etc. of a court for a perusal and copying of litigation records, and delivery of the authentic copy, a certified copy or an abridged copy of the judicial documents or protocol, or delivery of a certificate of matters related to the litigation.
(2) Anyone may apply for a perusal of litigation records of the final and conclusive judgement for the purpose of relief of right, academic research or public interest to a junior administrative officer, etc. of the court as prescribed by the Supreme Court Regulations: *Provided*, That to the litigation records concerning oral proceedings that have been prohibited from opening to the public, this shall not apply. *<Newly Inserted by Act No. 8438, May 17, 2007>*
(3) In cases where the relevant interested parties to the litigation do not agree, the court shall not allow perusal in the case of an application for perusal under paragraph (2). In this case, matters necessary for the extent of interested parties to litigation, agreement, etc. shall be prescribed by the Supreme Court Regulations. *<Newly Inserted by Act No. 8438, May 17, 2007>*
(4) Those who have perused or copied litigation records shall not injure public order or good public morals, nor harm reputation or quiet life of the interested parties by utilizing the matters that they came to know by perusal or copying. *<Newly Inserted by Act No. 8438, May 17, 2007>*
(5) For the request under paragraphs (1) and (2), one shall pay the fees as prescribed by the Supreme Court Regulations. *<Amended by Act No. 8438, May 17, 2007>*
(6) The authentic copy, a certified copy or an abridged copy of the judicial documents or protocol shall contain their purports, and a junior administrative officer, etc. of the court shall sign and seal thereon.

**Article 163 (Restriction on Perusal, etc. for Protection of Secrets)**
(1) In cases where there exists a vindication that it falls under any of the following subparagraphs, the court may limit the parties by its ruling, upon their motion, to the persons eligible to file a request for perusal or copying of the portions containing any secrets from among the litigation records, or for delivery of the authentic copy, a certified copy or an abridged copy of the portions containing any secrets from among the judicial documents or protocol (hereinafter referred to as the "perusal, etc. of the portions containing secrets"):
　1. When any grave secrets concerning the party's private life are entered in the litigation records, and if the perusal, etc. of the portions containing secrets is allowed to a third party,

there exists a concern about causing a great impediment to the party's social life; and
2. When any business secrets of the party (referring to the trade secrets as stipulated in subparagraph 2 of Article 2 of the Unfair Competition Prevention and Trade Secret Protection Act) are entered in the litigation records.
(2) In cases where there exists a request under paragraph (1), no third party may apply for a perusal, etc. of the portions containing secrets not later than the time when the judgment on such request becomes final and conclusive.
(3) The court keeping the litigation records may, upon request of a third party vindicating interests, revoke the ruling under paragraph (1) on the ground that there exists no cause falling under any subparagraph of paragraph (1), or such a cause has been extinguished.
(4) An immediate appeal may be made against the ruling rejecting a request under paragraph (1), or against the ruling as to a request under paragraph (3).
(5) The ruling of revocation under paragraph (3) shall take effect only when it becomes final and conclusive.

### Article 164 (Objection against Protocol)
When the concerned persons have raised any objection against matters entered in a protocol, the purports thereof shall be entered in the protocol.

## SECTION 2 Specialized Examination Commissioner

### Article 164-2 (Participation of Specialized Examination Commissioner)
(1) In order to make litigation relations clear or to proceed litigation procedures (including investigation of evidence, reconciliation, etc.; hereafter the same shall apply in this Section) smoothly, the court may designate, pursuant to Article 164-4 (1), specialized examination commissioners *ex officio* or upon application of parties and have them participate in the litigation procedures.
(2) Specialized examination commissioners may submit a paper stating explanation or opinion, or declare explanation or opinion after attending the litigation procedures that require specialized knowledge on the appointed date: *Provided,* That in the mutual consent of a judgement, they shall not participate.
(3) Specialized examination commissioners may question the parties of litigation, such as parties, witnesses, appraisers, etc. on the appointed date with permission of the presiding judge.
(4) The court shall give the parties an opportunity to state an opinion orally or in writing with regard to the paper submitted by specialized examination commissioners pursuant to paragraph (2), or to the statement of explanation or opinion of specialized examination commissioners pursuant to paragraph (2).
*[This Article Newly Inserted by Act No. 8499, Jul. 13, 2007]*

### Article 164-3 (Revocation of Decision of Participation of Specialized Examination Commissioner)
(1) When the court recognizes it as appropriate, it may revoke the decision pursuant to Article 164-2 (1) *ex officio* or upon application of the parties.
(2) When parties apply for the revocation of decision pursuant to Article 164-2 (1) by mutual agreement notwithstanding paragraph (1), the court shall revoke the decision.
*[This Article Newly Inserted by Act No. 8499, Jul. 13, 2007]*

### Article 164-4 (Designation, etc. of Specialized Examination Commissioner)
(1) Where the court has specialized examination commissioners participate in the litigation procedures pursuant to Article 164-2 (1), it shall designate one or more specialized examination commissioners for each case after hearing opinions of the parties.
(2) Specialized examination commissioners shall be paid allowances as prescribed by the Supreme Court Regulations, and shall also be paid traveling expenses, daily wages and lodging expenses if necessary.
(3) Other matters necessary for the designation of specialized examination commissioners shall be prescribed by the Supreme Court Regulations.
*[This Article Newly Inserted by Act No. 8499, Jul. 13, 2007]*

### Article 164-5 (Exclusion and Challenge of Specialized Examination Commissioner)
(1) Articles 41 through 45 and 47 shall apply *mutatis mutandis* to specialized examination commissioners.