# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MARJORIE FERRELL, et al,          :     Case No. C-1-01-447

     Plaintiffs,               :     Judge Sandra S. Beckwith
                                 Magistrate Judge Timothy S.
v.                                :     Hogan

WYETH-AYERST LABORATORIES,        :
INC., et al,
                              :
     Defendants
                              :

**ORDER**

Before the Court are the following motions:

Plaintiffs motion for class certification (Doc. 40),

Defendants opposition (Doc. 57) and Plaintiffs reply (Docs. 63

and 64);

Defendants motion for evidentiary hearing on class

certification (Doc. 61), and Plaintiffs opposition (Doc. 62); and

Defendants motion for leave to file supplemental brief on

class certification (Doc. 68), Plaintiffs opposition (Doc. 69)

and Defendants reply (Doc. 70).

**BACKGROUND**

Wyeth[1] manufactures Premarin, an estrogen replacement

product that has been sold since 1943. (Compl.¶ 25)[2]  The FDA

_____

    [1] Unless otherwise indicated and for ease of reference,
"Wyeth" refers to the defendants Wyeth-Ayerst Pharmaceuticals
Inc. and American Home Products Corporation (the latter
apparently now known simply as "Wyeth").

    [2] All references to the Complaint (or "Compl.") are to the
Corrected Consolidated Amended Class Action Complaint (Doc. 31),
unless otherwise indicated.

-1-

approved Premarin for several uses, including relief from
menopausal vasomotor symptoms, vulvar and vaginal atrophy, and
prevention of osteoporosis.  Premarin is used for both estrogen
replacement therapy ("ERT") and hormone replacement therapy
("HRT").  Duramed Pharmaceuticals manufactures Cenestin.  After
Duramed unsuccessfully sought FDA approval to market Cenestin as
a generic substitute for Premarin, it sought approval for
Cenestin as a new, branded product.  On March 24, 1999, the FDA
approved Cenestin for a single indication: the treatment of
vasomotor symptoms of menopause.

Duramed later filed suit against Wyeth in this district,
contending that Wyeth engaged in monopolistic and anti-
competitive practices designed to keep Cenestin from the market
and/or from gaining market share.  (Case No. C-1-00-735)  Other
lawsuits against Wyeth followed Duramed's, including the "direct
purchaser" action (Case No. C-1-01-704), and these consolidated
actions brought by  "indirect purchasers" (or "end payors") of
Premarin.

The Complaint generally alleges that, both before and after
the FDA approved Cenestin, Wyeth engaged in a public campaign to
tout the benefits of Premarin, while unfairly and untruthfully
denigrating Cenestin. (Compl. ¶46-50) Plaintiffs allege that,
after Cenestin gained FDA approval, Wyeth engaged in a systematic
attempt to keep Cenestin from growing market share, by entering
into "exclusive" contracts with health insurers and pharmacy
benefit managers (PBMs) in the United States.  These exclusive

contracts require that Premarin be the only conjugated estrogen product on the plans' drug formulary.  Wyeth is able to procure these exclusive contracts by offering rebates, discounts, fees and other financial incentives to the plans and PBMs. (Compl. ¶61)  Thus, Plaintiffs allege, the plans or PBMs would incur substantial financial losses by adding Cenestin to their formularies, as they would lose their bargained for rebates, discounts or fees if the plans failed to meet their sales targets for Premarin.

The "indirect purchaser" Plaintiffs in this case generally allege that Wyeth's monopolistic and anti-competitive conduct relative to Duramed's marketing of Cenestin has injured them in two ways: (1) Wyeth's conduct caused plaintiffs to pay more for conjugated estrogens than they otherwise would have paid, and (2) Wyeth's conduct excluded Duramed (and other unnamed potential competitors) from the market, "thereby restricting consumers' access to alternative conjugated estrogen products."  (Compl. ¶35(b) and (c))

Plaintiff's motion (Doc. 40) seeks an order certifying a class of "end payors" (indirect purchasers) defined as:

The National Consumer Class: All persons in the United States (except California) who purchased or paid for Premarin at any time from March 24, 1999 to the present (the "Class Period").

The State Consumer Subclass: All members of the National Consumer Class who  purchased or paid for Premarin in Arizona, District of Columbia, Florida, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, or Wisconsin (the "Indirect Purchaser States").

-3-

The National Third Party Payor Class: All persons or
entities in the United States (except California) who, in whole
or in part, purchased, paid for, or reimbursed for Premarin
prescribed to covered individuals (including members,
beneficiaries, employees and insureds) at any time during the
Class Period.

The State Third-Party Payor Subclass: All members of the
National Third Party Payor Subclass who, in whole or in part,
purchased, paid for, or reimbursed for Premarin prescribed to
covered individuals (including members, beneficiaries, employees
and insureds)in the Indirect Purchaser States.

Excluded from all of the above definitions are Defendants

and their subsidiaries and affiliates, all governmental entities,

and anyone that purchased Premarin either for resale or directly

from any of the Defendants.

## ANALYSIS

A.   Fed. Rule Civ. Proc. 23

The proposed class representative must establish that

each of the four requirements of Rule 23(a) is satisfied with

respect to the proposed class.  See In re American Medical

Systems, Inc., 75 F.3d 1069, 1079 (6th Cir. 1996); Senter v.

General Motors Corp., 532 F.2d 511 (6th Cir.), cert. denied, 429

U.S. 870 (1976); Kutschbach v. Davies, 885 F. Supp. 1079, 1083

(S.D.Ohio 1995).  Within the framework of Rule 23, the Court has

broad discretion to determine whether an action is maintainable

as a class action.  See Kentucky Educators Public Affairs Council

v. Kentucky Registry of Election Finance, 677 F.2d 1125, 1135

(6th Cir. 1982).  The four requirements are as follows:

(1)   the members of the class must be so numerous that
      joinder of all members is impracticable (the
      "numerosity requirement");

-4-

(2)   questions of law or fact must be common to the
      entire class (the "commonality requirement");

(3)   the claims or defenses of the named representative
      must be typical of the claims or defenses of the
      class (the "typicality requirement"); and

(4)   the named representative must fairly and
      adequately represent the interests of the class as
      a whole (the "adequacy of representation"
      requirement).

Fed. R. Civ. P. 23(a).

In determining whether to certify a class, the Court must
not consider the merits of the action.  See Eisen v. Carlisle &
Jacquelin, 417 U.S. 156, 178 (1974).  For purposes of a class
certification motion, the Court must accept as true the
allegations of the complaint.  See Shelter Realty Corp. v. Allied
Maintenance Corp., 574 F.2d 656, 661 n.15 (2d Cir. 1978); Blackie
v. Barrack, 524 F.2d 891, 901 n.17 (9th Cir. 1975), cert. denied,
429 U.S. 816 (1976).  The Court "may consider reasonable
inferences drawn from facts before [it] at that stage of the
proceedings."  Senter, 532 F.2d at 523.  While the court must not
determine the merits, "Actual, not presumed, conformance with
Rule 23(a) remains ... indispensable."  General Telephone Co. v.
Falcon, 457 U.S. 147, 160 (1982).

1.   Numerosity.

To satisfy Rule 23(a)(1), plaintiff must establish that
"the class is so numerous that joinder of all members is
impracticable."  Fed. R. Civ. P. 23(a)(1).  Here, numerosity is
not seriously challenged.  The Complaint alleges that some ten
million women in America take, or have taken, Premarin during the

-5-

class period.  The record establishes that the number of third
party payors who may have paid for Premarin during the class
period is sufficiently large to satisfy Rule 23(a)(1).

    2.   <u>Commonality of Issues</u>.

      The essential question, common to all members of the
proposed classes, is whether Wyeth's conduct as alleged in the
Complaint violates the antitrust laws.  For the state law claims,
an essential question is whether or not class members paid a
supracompetitive price for Premarin, and are thereby entitled to
damages.  Those issues are common across the classes as defined.
A "perfect fit" is not required.  Rather, the commonality test
under 23(a)(2) is "qualitative rather than quantitative, that is,
there need be only a single issue common to all members of the
class."  <u>In re American Med. Systems</u>, 75 F.3d 1069, 1080 (6th
Cir. 1996).  The common issue identified should advance the
litigation if resolved.  <u>Sprague v. General Motors Corp.</u>, 133
F.3d 388, 397 (6th Cir. 1998).  That test is met here.

    3.   <u>Typicality</u>.

    Rule 23(a)(3) requires that the named class representatives'
claims be "typical" of the absent class members claims.  Claims
in antitrust price-fixing cases generally satisfy Rule 23(a)(3)'s
typicality requirement, even if members purchase different
quantities and pay different prices.  See  <u>In re Potash Antitrust</u>
<u>Litig.</u>, 159 F.R.D. 682, 691 (D. Minn. 1995).  Differences among
the named representatives and the absent class members in the
amount of their damages, or variations in mathematical

computations of those damages, will not defeat typicality.   <u>In re</u>
<u>Playmobil Antitrust Litig.</u>, 35 F.Supp.2d 231, 241 (E.D.N.Y.
1998).

This case does not involve a "per se" price-fixing
conspiracy, nor does it involve agreements that are challenged as
per se illegal.   However, the Court finds that plaintiff
Ferrell's claim is typical, for Rule 23(a)(3) purposes, of other
consumers who purchased Premarin at the allegedly
supracompetitive price caused by Wyeth's challenged monopolistic
practices.   The Funds' claims are typical of the "Third Party
Payor" subclass defined in the plaintiff's Motion, in that they
paid for Premarin under pricing formulas that allegedly
incorporated the supracompetitive price.

   4.   <u>Adequacy of Representation</u>.

Rule 23(a)(4) requires that the "representative parties will
fairly and adequately protect the interests of the class."   To
satisfy this subsection of the Rule, plaintiffs must show that
the class representatives' interests do not conflict with the
absent class members' interest, and that the representatives and
their attorneys are able to and will vigorously prosecute the
action on behalf of the class.   To defeat "adequacy," Wyeth must
point to a "fundamental conflict" that exists between the named
class representatives and the absent class members.   See <u>Valley</u>
<u>Drug Co. v. Geneva Pharmaceuticals</u>, 350 F.3d 1181 (11th Cir.
2003), reversing certification of direct purchaser class due to
economic conflict between those who benefitted from market

-7-

exclusion of a generic drug and those who did not.  See also, Pickett v. IBP, Inc., 209 F.3d 1276 (11th Cir. 2000).

Ms. Ferrell, the individual named class representative, testified that she purchased Premarin from various retail pharmacies during the class period.  She was not insured for medications for most of the period (although she apparently acquired some coverage prior to her deposition).  She testified that she never considered switching to Cenestin (or another drug), as she took Premarin in large part for prevention of osteoporosis.  Cenestin is not FDA-approved for osteoporosis prevention.  Thus Ms. Ferrell cannot demonstrate that she sustained any injury that would have been redressed by the availability of Cenestin at any price.  See, In re Terazosin Hydrochloride Antitrust Litigation, 2004 U.S. Dist. LEXIS 6176 (S.D. Fla. April 8, 2004), at *32 (class representative who admitted he "never gave any thought" to substituting the generic form of Hytrin when it became available does not have standing to bring claim based on illegal agreement suppressing the availability of a generic substitute).

But Plaintiffs **concede** that they are not alleging a "substitution impact" theory in this case.  Plaintiffs admit they are relying **exclusively** upon the theory that Premarin was supracompetitively priced during the class period.  (See Doc. 63, pp. 27-28)  Given this concession, Ms. Ferrell is an adequate representative for consumers who bought Premarin during the class period and fully paid the allegedly supracompetitive price.

-8-

The two Funds seek to represent the National and State Third Party Payor Class and Subclass.  They purport to represent **all** entities who "in whole or in part" purchased, paid for, or reimbursed their members, beneficiaries, employees and/or insureds for Premarin at any time during the Class Period.  The definition of the Third Party Payor Class and Subclass in Plaintiff's class certification motion differs significantly from the definition contained in the Complaint, which is:  "All employee welfare benefit plans and employee benefit plans maintained pursuant to section 302(c)(5) of the LMRA, 29 U.S.C. §186(c)(5), and as defined by section 1002(1) and (3) of ERISA, 29 U.S.C. §1001, which are associated with passive formularies[3] and which have paid for or reimbursed their participants' and beneficiaries' purchases of Premarin in the United States, other than in California, at any time during the Class Period." (Compl. ¶28)

The "Third-Party Payor Class" defined by Plaintiffs' certification motion includes not only union or employer benefit plans like the Funds, but also would include private health insurers, managed care organizations, and pharmacy benefit managers.  This is a diverse mix of entities and interests.

---

[3]The Complaint does not define the term "passive formulary" and the Court is unable to discern its precise meaning from the parties' pleadings.  Testimony from the TCBW representative Johnson described a passive formulary as a pricing system:  ". . .[F]or brand name drugs our pricing is on AWP minus 10 percent.  For generic drugs we use MAC pricing.  So it's not brand specific."

Moreover, the putative class is not limited to plans with "passive" formularies, as the parties' pleadings make clear.

Wyeth argues there is an inherent, fundamental conflict within the class defined in Plaintiffs' motion, because some third party payors (apparently including the named class representative TCBW) receive rebates from Wyeth under the challenged "exclusive" contracts.[4] Wyeth suggests that UCBW and TCBW do not "derive substantial benefit" from Wyeth's rebate system, and therefore cannot adequately represent Third Party Payors who do substantially benefit from the rebates. And, Wyeth contends that any class member who is a party to one of Wyeth's contracts has a conflict with both individual consumers, and with third party payors who lack a Wyeth incentive contract.

Plaintiffs respond that no member of the putative Third-Party Payor class is alleged to have conspired with Wyeth in entering into these rebate contracts. Nor is there any allegation that the putative class members' receipt of rebates was itself illegal. Plaintiffs contend that rebates would simply affect the calculation of damages for those class members, but would not create any fundamental, inherent conflict preventing class certification.

Similar challenges were raised in In re Terazosin Hydrochloride Antitrust Lit., supra. There, the defendants

---

[4] TCBW's contract with its pharmacy benefit manager, NPA, provides that manufacturer rebates are paid to TCBW, less a "formulary management fee" retained by NPA.

-10-

argued that the presence of pharmacy benefit managers and third-party private insurers in the same class with individual consumers was fraught with potential, irreconcilable conflicts. The district court rejected this argument, noting that actual evidence of **fundamental** conflicts among class members (and not a generalized "tension" that might exist between consumers and their medical insurers) was required to deny certification on this basis.

The Court has reviewed Wyeth's evidence, particularly the Snyder Affidavit, and is unable to discern the sort of fundamental conflict between consumers, on the one hand, and third party payors on the other, that would prevent certification at this juncture. The fact that some TPPs "may" have received "substantial" Wyeth rebates does not, standing alone, create a fundamental conflict among the Third Party Payors at this juncture. By way of contrast, in <u>Valley Drug</u>, the Eleventh Circuit noted that just three national wholesalers that together represented 50% of plaintiffs' total claims, experienced a net economic benefit during the time that generic Hytrin was kept off the market. This presented a fundamental conflict between the three "giants" and other wholesalers. Evidence was also presented that retailers will often bypass the national wholesalers in order to purchase generics when they enter the market, as the retailers can buy directly from the generic manufacturers. Since the wholesalers and the retailers were both included in the proposed class, a fundamental economic conflict

-11-

presented itself.  Here, the evidence presented to date does not
disclose a fundamental conflict like that shown in <u>Valley Drug</u>.

The Court takes note, however, of the record suggesting that
there are over 800 managed care plans in the United States, but
that only thirteen of those entities account for almost 137
million covered lives, more than 50 percent of the entire United
States population.  It is not clear if, and to what extent,
these thirteen experienced a "net economic benefit" from the
Wyeth contracts.  The Court also notes that Plaintiffs' expert
assumes that the challenged rebate contracts would be prohibited
in his "but for" world.   Should the evidence in this case
establish a fundamental conflict among differently-situated
members of the Third Party Payor class with respect to the
economics of the challenged rebate system, the Court will revisit
this issue.  See Rule 23(c)(1)(C) [certification order may be
altered or amended any time before final judgment].

Finally, the adequacy of representation inquiry encompasses
whether counsel is qualified to represent the class and has no
conflicts with any member of the class.  The record establishes
that Plaintiffs' counsel is well qualified to prosecute this
complex antitrust action, and has experience in several other
large antitrust class actions.  (Doc. 40, Exhibits B - E)  Wyeth
alleges, however, that class counsel has created a conflict, by
arguing that both consumers and third party payors can recover
treble damages for the same conduct. (See Plaintiff's Opposition
to Wyeth's Motion for Leave to File Supplemental Memo re Motion

to Dismiss, Doc. # 56).  Counsel's zealous advocacy, and citation

of a case that may support that argument, do not render counsel

inadequate to represent the Plaintiffs.[5]

The Court therefore finds that, with the exceptions noted,

Plaintiffs have satisfied the requirements of Rule 23(a) at this

juncture.

B.   Rule 23(b)

If the proposed class representative establishes that each

of the requirements of Rule 23(a) is satisfied, he must also

demonstrate that the class is an appropriate one for

certification under one of the three subsections of Rule 23(b).

See Kutschbach, 885 F. Supp. at 1083-84.  Plaintiffs urge the

Court to certify the proposed classes and subclasses pursuant to

Rule 23(b)(2) **and** 23(b)(3).  They argue that the federal claims

in Counts I and II, which seek only injunctive relief, should be

certified under b(2), and the state law claims in Counts III and

IV should be certified under b(3).

Authorities discussing hybrid or dual class certification

_____

[5] Plaintiffs cite Goda v. Abbott Laboratories, D.C. Sup.
Ct., 1997 WL 156541 (Feb. 3, 1997) for the proposition that
consumers **and** their insurers can both recover damages, because
the "collateral source" rule would not apply.  That argument
overstates what Goda actually held. In Goda, the D.C. superior
court granted class certification, but specifically reserved the
"collateral source" issues for the damages portion of the case.
The court noted that the consumer's insurance company or managed
care plan "may be entitled to indemnification" from the class
consumer, but third party payors were **not** part of the Goda
plaintiffs' proposed class.  Furthermore, the court created
separate subclasses for consumers without "collateral source"
benefits (e.g., uninsured consumers) and those with such
benefits.

-13-

are not legion.  This Court previously certified a hybrid
settlement class under Rule (b)(2) and required notice and opt
out rights to the absent class members.   In Re Cincinnati
Radiation Litigation, 187 F.R.D. 549 (S.D. Ohio 1999).  Other
courts have granted dual certification within the same lawsuit.
See, e.g., Wilson v. United International Investigative Services,
2002 U.S. Dist. LEXIS 7235 (E.D. Pa. 2002), certifying a (b)(2)
and (b)(3) class in a suit challenging defendants' method for
depositing employer 401k contributions, which sought both
injunctive relief and monetary damages.

     Assuming the Court can certify under two subsections,
Plaintiffs must satisfy the requirements for each.

     1.   23(b)(2) Certification:  Rule 23(b)(2) applies when
"the party opposing the class has acted or refused to act on
grounds generally applicable to the class, thereby making
appropriate final injunctive relief or corresponding declaratory
relief with respect to the class as a whole."  The putative
National Consumer Class and National Third Party Payor Class seek
injunctive relief under federal antitrust law - the prohibition
of the Wyeth anti-competitive rebate contracts.  This relief
would apply "to the class as a whole."

     Wyeth argues that Plaintiffs' "primary" claim is for money
damages, making b(2) certification inapplicable.  As noted in
Lemon v. International Union of Operating Engineers, 216 F.3d
577, 580-81 (7th Cir. 2000), 23(b)(2) certification assumes that
the interests of all class members are cohesive and homogenous,

-14-

and that the remedy sought would not materially differentiate among the class members.  Thus, due process rights are not violated in the absence of notice to the class, which is not required for a 23(b)(2) class.  A claim for money damages certified under b(3) does require notice and opt out rights, in order to protect the due process rights of the absent class members.

Here, the "national" classes for which b(2) certification is sought encompass an enormous variety of people and entities.  As noted above, the Court is concerned that there may in fact be differences among the class members with respect to Plaintiffs' challenge to Wyeth's conduct.  And, as a practical matter, in order to prove that final injunctive relief is "appropriate," Plaintiffs will have to prove antitrust impact, an element of antitrust liability.  Where the questions of liability significantly overlap (and appear to be virtually identical), judicial economy is not well-served by certification of separate 'injunction' and 'damage' classes.  Plaintiffs' proposed 'damage' classes can serve as an appropriate mechanism to pursue the remedy of injunctive relief should that prove warranted.  See, e.g., In Re Northwest Airlines Corp. Antitrust Lit., 208 F.R.D. 174, 183 (E.D. Mich. 2002), noting that dual certification is unnecessary where equitable relief sought by the 'damages' class would also accrue to the benefit of the proposed 'injunctive only' class.  Accordingly, the Court will address whether Plaintiffs have satisfied the requirements of Rule 23(b)(3).

2.   23 b(3) Certification:  Plaintiffs must demonstrate
"that the questions of law or fact common to the members of the
class predominate over any questions affecting only individual
members, and that a class action is superior to other available
methods for the fair and efficient adjudication of the
controversy."  Fed. R. Civ. P. 23(b)(3).  Factors pertinent to
the superiority requirement are (A) the interest of class members
in individual control of prosecution of an action; (B) the extent
of other pending litigation; (C) the desirability of litigating
the claims in this forum; and (D) the difficulties likely to be
encountered in the management of a class action.  Manageability
is a consideration that is "peculiarly within the court's
discretion."  In re Visa Check/MasterMoney Antitrust Litig., 280
F.3d 124, 141 (2nd Cir. 2001) (citation omitted).

It is here that the parties devote the bulk of their
arguments for and against certification.  Plaintiffs contend they

To succeed on their antitrust claims, Plaintiffs will have
to prove: (1) that Wyeth violated the antitrust laws; (2) that
the alleged violations caused plaintiffs to suffer injury (the
antitrust "impact"); and (3) that the extent of this injury can
be quantified with requisite precision.  See generally, Zenith
Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n.9,
89 S. Ct. 1562 (1969), rev'd on other grounds, 401 U.S. 321
(1971); see also Associated Gen. Contractors of Cal., Inc v.
California State Council of Carpenters, 459 U.S. 519, 103 S. Ct.
897 (1983).

It is here that the parties devote the bulk of their
arguments for and against certification.  Plaintiffs contend they

have presented an adequate method for demonstrating class-wide
impact and quantifying damages to class members.  They contend
that differences among class members concerning the calculation
of individual damages do not prevent certification when the
issues concerning liability are suited to class determination.
Predictably, Wyeth disputes both of these contentions.

     (a)  <u>Common Method of Proof of Impact</u>.

    The Court's task at this point is not to determine which
expert's opinion has merit, but rather to determine if
Plaintiffs' proffered method for common proof of impact is
"colorable" and "not fatally flawed."  <u>In re Visa
Check/MasterMoney Antitrust Litigation</u>, 280 F.3d at 135.  On the
other hand, the mere existence of a "battle of the experts" does
not require the court to certify a class.  The Court must be
satisfied that the proposed method to determine impact, an
element of antitrust **liability** common to all of Plaintiffs'
claims, meets basic prerequisite standards, and is not mere
speculation or conjecture.

    Both parties agree that in this indirect purchaser action, a
class member is "impacted" if the class member bought Premarin at
a supracompetitive price during the class period.[6]  The issue
then becomes whether the supracompetitive price Wyeth charged to

---

[6] Plaintiffs assert the class period should start on the day
the FDA approved Cenestin, March 24, 1999.  Actual sales of
Cenestin did not begin until May 12, 1999.  This fact may require
adjustment of the dates of the class period, but the Court
assumes for purposes of this Order that the operative date is
March 24, 1999.

its direct purchasers was "passed on" to the indirect purchasers, and whether that impact can be demonstrated on a class-wide basis.

As the Court understands the parties' arguments, Plaintiffs' expert, Dr. Gary French, assumes that the "but-for" average wholesale price (AWP) for Premarin would have been lower by some ascertainable percentage in the absence of Wyeth's alleged anticompetitive conduct. He also assumes that a lowered AWP would be "passed through" to all members of the plaintiff class through standard pharmaceutical pricing formulas. For third party payors, Dr. French asserts that their base prices are keyed to the AWP. For cash-paying consumers, he states that average retail price (ARP) is "directly related" to the AWP.

French states that he will be able to calculate the "but-for" AWP by reference to a "competitive benchmark." This benchmark could be derived in several proposed ways: by using previous studies of substitute drug marketplace introduction; using rebate renegotiations with certain large MCOs; utilizing tax incidence analysis; or using "some other method" he does not specifically describe. French asserts that all information necessary to construct any of these proposed models is available either from Wyeth or from public sources.

For individual consumers, French proposes to use the same benchmark derived for the third party payors, apparently based on his assumption that the ARP is directly related to the AWP. He then intends to calculate the aggregate retail value of Premarin

-18-

sold during the class period, and to reduce that amount to reflect the average percentage of the United States' uninsured population during the class period.

Wyeth objects to this proposed methodology, arguing that French's assumptions are fatally flawed in several key respects. Wyeth contends that its expert Snyder's "real-world statistics" (based on data from IMS, which both experts agree provides reliable empirical data about pharmaceutical pricing) disprove French's basic assumptions.  The proposed "competitive benchmark" studies are all critically flawed and do not apply to the facts concerning Cenestin's introduction to the market, especially because Cenestin is not a true "substitute" for Premarin.  Wyeth contends there are critical distinctions between "average" retail prices (which French proposes to use) and "actual" retail prices, that vary widely.  And, Wyeth argues that Plaintiffs fail to account for the real-world impact of consumer insurance coverage and drug "co-pays" on the proposed consumer class members who have insurance.

Plaintiffs' expert French has not actually constructed the pricing model he describes, nor has he actually calculated the "competitive benchmark" he describes.  This makes "rigorous analysis"[7] of the facts and assumptions he will **actually** use to derive that benchmark somewhat difficult.  The Court expresses no opinion on the ultimate validity of his proposed model, or

---

[7] See General Tel. Co. of S.W. v. Falcon, 457 U.S. 147, 161 (1982).

whether his actual "competitive benchmark" method will be able to demonstrate "common impact" under Rule 23.  The "reasonable quantification" of damages may also be more difficult here than in cases involving agreements among competitors to restrain the introduction of true generic substitutes for a branded pharmaceutical.  Finally, the Court expresses no opinion on the validity of "fluid recovery" or "class-wide damage calculations" which Wyeth posits as evils inherent in Dr. French's proposals. It is beyond dispute that Plaintiffs must prove not only antitrust impact but quantifiable, actual damages flowing from that impact.  These subjects will no doubt be addressed in later proceedings.

Although this is a close question on the record presented to date, the Court cannot find that French's proposed methodology is so fatally flawed that Plaintiffs should be denied class certification at this point.

(b)   <u>Consumers With Co-Pays:</u>

Wyeth asserts that the original named class representatives who were withdrawn by Plaintiffs (Doc. 49) were all members of health plans that charge subscribers "flat copays" for medications.  Wyeth asserts these people were not "impacted" by Wyeth's alleged anticompetitive conduct, because their cost for Premarin was not affected by Wyeth's pricing.   French apparently agrees, as he testified that he found it "hard to see" that someone with a flat co-pay was injured.  He also acknowledged that his proposed model will not account for damages allegedly

-20-

sustained by insured consumers with partial co-pays of any sort. (French Depo. pp. 475-479)  Despite this, Plaintiffs argue that the issue of co-pays is not relevant under the "collateral source" doctrine, or at worst may be relevant only to individual damage calculations.

It is conceivable that Wyeth's alleged anti-competitive price for Premarin had some economic "impact" on consumers with flat co-pays; premiums for health insurance, for example, might be affected by higher pharmaceutical prices paid by the insurer. But, the evidentiary difficulties involved in such an inquiry would overwhelm the common issues of proof of the supracompetitive price, and the pass-on to indirect purchasers. The Court finds that consumers who paid a fixed copayment for brand name drugs should be excluded from the class.  See In re Cardizem CD Antitrust Lit., 200 F.R.D. 326, 347 (E.D. Mich. 2001); In Re Relafen Antitrust Litigation, 2004 U.S. Dist. LEXIS 8539 (D. Mass. 2004), at *33-39.  Similarly, consumers whose health plans fully cover their medication costs were not "impacted" and should be excluded.[8]  These individuals are excluded from the National Consumer Class and State Consumer Subclass.

(c)  Predominance of State Law Questions:

---

[8] The same result applies to any consumer who received Premarin at no cost to herself, such as Medicaid recipients. Furthermore, Dr. French acknowledged the issue of cash-paying patients who purchased Premarin during a hospital stay, at fixed per-dose prices exceeding all market-driven prices.  The Court finds these consumers should also be excluded.

Plaintiffs assert that all of the "Indirect Purchaser States" antitrust statutes are essentially the same, and that the law of "unjust enrichment" is substantially the same in all 50 states. Plaintiffs also suggest that the law of one state - Pennsylvania - could apply to their unjust enrichment claims for class members throughout the 50 states. Thus, Plaintiffs argue, common issues of law predominate for purposes of the state law Subclasses.

Ohio choice-of-law rules apply to this case. Cole v. Mileti, 133 F.3d 433, 437 (6th Cir. 1998). For tort actions, the law of the state where the injury took place will apply unless another state has a more significant relationship to the claim. Morgan v. Biro Mfg. Co., 15 Ohio St.3d 339, 342, 474 N.E.2d 286 (1984). The factors set forth in the Restatement (Second) of Conflict of Laws, Section 6 (1998) apply to determine whether another state has a more significant relationship. Those factors include the needs of the interstate system; relevant policies of both the forum and other interested states; the protection of justified expectations; and certainty and uniformity of result.

The "injury" here is a plaintiff's payment of the allegedly supracompetitive price for Premarin. Thus, at least for purposes of class certification, it appears that the law of the state where the consumer or third-party payor paid for Premarin will apply to that class member's state law claims. The Court rejects Plaintiffs' suggestion that it should apply the law of just one state - Pennsylvania - to the unjust enrichment claims.

Class actions governed by the laws of multiple states have been viewed with serious reservations. See In re American Med. Systems, Inc., 75 F.3d 1069, 1085 (6th Cir. 1996); In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1015 (7th Cir. 2002). If state law is uniform, however, the fact that multiple states' laws will be applied does not raise manageability issues that would militate against certification. See, e.g., Stirman v. Exxon Corp., 280 F.3d 554, 563-64 (5th Cir. 2002) [court must consider whether variations in state law defeat predominance under Rule 23(b)(3)]. Moreover, the Court can create subclasses to properly address state law variation without destroying the superiority of the class action device, assuming some degree of uniformity in the "critical" state law issues. See, e.g., In Re Telectronics Pacing Systems, 172 F.R.D. 271 (S.D. Ohio 1997), creating subclasses to account for state law variations in negligence and strict liability laws.

(i)  Count III (State Law Antitrust Claims):

Plaintiffs' survey of state statutes (Doc. 63, Exhibit A) attempts to illustrate uniformity among the twenty-two states listed there.[9]  A closer inspection reveals this is not necessarily the case.  It is not enough that a state statute is

---

[9] The Court has dismissed the state law claims under New Jersey and Louisiana law, leaving the following states for which Plaintiffs seek certification: Arizona, District of Columbia, Florida, Iowa (raised for the first time in Plaintiffs' Reply Memorandum based on recent case law), Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

"generally" in harmony with federal antitrust law.  Rather, the state laws at issue must be substantially similar with respect to important issues such as required proof of individual injury, statutes of limitation, or remedies available (especially with regard to treble or exemplary damages), in order to establish "predominance" for purposes of Rule 23(b)(3).

A review of some of these questions reveals some significant differences.  For example:

• The District of Columbia antitrust statute appears to be unique in its express language regarding the required quantum of proof: "In any class action brought under this section by purchasers or sellers, the fact of injury and the amount of damages sustained by members of the class may be proven on a class-wide basis, without requiring proof of such matters by each individual member of the class."  D.C. Code Section 28-4508(c). Other "indirect purchaser states" appear to require proof of injury to **each** class member.  See, e.g., <u>In re Florida Microsoft Antitrust Lit.</u>, 2002 WL 31423620 (Fla. Cir. Ct. Aug. 26, 2002) [granting certification to indirect purchaser class because plaintiffs' economist presented plausible method to demonstrate that overcharges "were passed on to **every class member**"]; <u>Melnick v. Microsoft Corp</u>., 2001 WL 1012261 (Me. Super.Ct., Aug. 24, 2001) [denying class certification because plaintiff's expert had not undertaken an analysis on **Maine** data that could prove impact to **each class member**]; <u>A&M Supply v. Microsoft Corp</u>., 252 Mich.App. 580, 654 N.W.2d 572 (2002) [reviewing Michigan cases

-24-

and denying class certification]; and Gordon v. Microsoft Corp.,
2001 WL 366432 (Minn. Dist. Ct. Mar. 30, 2001) [discussing
Minnesota cases, and granting certification because plaintiffs
presented viable method for proving individual damages].

Given this critical distinction, the Court will not certify
the District of Columbia claim.

• New York law expressly provides that any action to recover a
statutory penalty may not be maintained as a class action, unless
the statute at issue specifically authorizes class certification.
N.Y. C.P.L.R. §901(b). New York's antitrust statute (the "Donnelly
Act") authorizes treble damages recovery, which has been held to be
a "penalty" covered by §901(b). See Cox v. Microsoft Corp., 290
A.D.2d 206, 737 N.Y.S.2d 1, 2 (N.Y. App. Div. 2002); and Asher v.
Abbott Labs., 290 A.D. 208, 737 N.Y.S.2d 4 (N.Y. App. Div. 2002).
This is not merely a state procedural requirement which, under Hanna
v. Plumer, 380 U.S. 460, 471-74 (1965), would yield to federal
procedure embodied in Rule 23. Rather, Section 901(b) is a
substantive law of the state of New York, which under the Erie
doctrine this Court cannot ignore in analyzing Rule 23's
predominance question. Plaintiffs' claims under New York law, if
certified, could proceed only for actual damages. This would
require the class representatives to waive all claims for treble
damages or other "penalties" within the meaning of CPLR §901(b) on
behalf of all New York class members. Imposing such a waiver at the
outset would raise inherent conflicts in the putative class, along
with manageability issues at trial. The Court will not certify the

-25-

Count III claim under New York law.

• Plaintiffs purport to bring some of their state law claims under "consumer protection" statutes, rather than state antitrust statutes that presumably mirror the federal antitrust laws.  These states appear to be Florida, Massachusetts and Vermont.  While cases from those jurisdictions have permitted indirect purchaser suits under those consumer protection statutes, Plaintiffs do not discuss any potential differences in the qualitative conduct covered by the statute, nor any differences in the proofs required or remedies available.

• At least one state - Nevada - has a fairly recent statutory amendment permitting indirect purchaser actions.  See N.R.S. §598A.210, effective October 1, 1999.  The only Nevada case cited by the parties indicates that the amendment is not retroactive, and the Court is unable to find any contrary authority.  Thus, Nevada class members have no claim prior to that date.  This conflicts with the Class Period Plaintiffs seek, which begins on March 24, 1999.[10]

• Finally, at least one state antitrust statute seems to proscribe only "concerted action."  Compare: Kan. Stat. Ann. §50-132: "No person . . . shall **conspire or combine with any other persons**, within or without the state for the purpose of monopolizing any line of business. ..." with 9 Vt. Stat. Ann. 2453(a),

---

[10] The Nevada statute also requires the complaint to be mailed to the Nevada Attorney General "simultaneously" with the filing of the Complaint.  This requirement may be a substantive requirement of Nevada law, as the pre-1999 history of Nevada's antitrust statute makes clear that only the state had the right to bring antitrust damage actions.

proscribing "unfair method of competition or unfair or deceptive acts . . .". It is not clear that the challenged rebate contracts, which are not per se illegal, are the type of "conspiracy" or "combination" that the Kansas statute (and any others like it) are intended to reach.

In sum, the Court finds:

(1) a State Subclass will be certified in those "Indirect Purchaser States" with an antitrust statute and that do not substantially vary in critical aspects of substantive law. These states preliminarily appear to be: Arizona, Iowa, Maine, Michigan, Minnesota, Mississippi, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia and Wisconsin. Kansas shall be included in this group, assuming that the "concerted action" language in its statute can reach the conduct challenged in this case. This certification will be amended or revoked should this conclusion prove unsound.

(2) A State Subclass for the states of Florida, Massachusetts and Vermont will be certified, for the Plaintiffs' claims arising under these states' "consumer protection" statutes. Further briefing will be necessary concerning the critical issues discussed above.

(3) A Nevada Subclass will have to be certified for the Nevada plaintiffs, as there will have to be separate treatment of the Nevada consumers due to the unique statutory situation there.

(b)  Unjust Enrichment Claims:

Plaintiffs seek certification of a nationwide class, of all

-27-

Premarin consumers and TPP's in all fifty states, for the equitable
claim of unjust enrichment.  Plaintiffs argue that the law of unjust
enrichment is substantially similar in all fifty states, justifying
a "nationwide" class.  Plaintiffs do not address in a meaningful way
the question of whether states that do not recognize indirect
purchaser antitrust suits would permit indirect purchasers to seek
the equitable remedy of unjust enrichment as an alternative.  It is
clear that, at least in some states, the answer to that question is
no.  See, e.g., Johnson v. Microsoft Corp., 155 Ohio App.3d 626,
2003 Ohio 7153 (Ohio App. Dec. 30, 2003), review granted, 2004 Ohio
2763, 2004 Ohio LEXIS 1189 (May 27, 2004) [indirect purchasers'
unjust enrichment claim was essentially an "antitrust claim in a
different guise" and prohibited by Ohio's bar on antitrust indirect
purchaser suits].  See also, Abbott Labs. v. Segura, 907 S.W.2d 503
(Tex. 1995) [indirect purchasers barred from suit under Texas
antitrust act cannot bring similar action under Texas consumer
protection act, but no explicit discussion of  availability of
unjust enrichment remedy].

     The Court finds that certifying an unjust enrichment claim in a
state where no antitrust claim is being certified gives rise to a
multitude of manageability and due process issues.  The Court is
also concerned that the contrary approach is inconsistent with the
superiority requirements of Rule 23.  For example, if the Court
certified the New York unjust enrichment claim, a judgment in this
case could be found to be a waiver of the New York class members'
antitrust claims, which this Court is not certifying.  Providing

-28-

notice to the purported "nationwide" class poses serious problems.
Ongoing management of this case would devolve into a procedural
morass.   Considering all of the Rule 23 factors, it appears
appropriate and fair to all parties that the unjust enrichment
claims be certified only in those states where the antitrust claims
are being certified. See, e.g., In Re Relafen Antitrust Lit., 2004
U.S. Dist. LEXIS at *70-71.

### CONCLUSION

Plaintiffs' motion for class certification is granted in part
and denied in part.   Defendants' motion for an evidentiary hearing
is denied.   Defendants' motion for leave to file supplemental brief
in opposition to Plaintiffs' motion for certification is granted.

DATED:    June 30, 2004          s/ Sandra S. Beckwith
                              Sandra S. Beckwith
                              United States District Judge

-29-

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MARJORIE FERRELL, et al, | : | Case No. 1:01-cv-447 |
| | : | |
| Plaintiffs, | : | Judge Sandra S. Beckwith |
| | : | |
| v. | : | Magistrate Judge Timothy S. |
| | : | Hogan |
| WYETH-AYERST LABORATORIES, | : | |
| INC., et al, | : | |
| | : | |
| Defendants | : | |
| | : | |

**ORDER**

Following the Sixth Circuit's denial of defendants' petition for review of this Court's previous class certification order, the parties submitted briefs concerning several unresolved issues concerning certification. The Court has reviewed Plaintiffs' Supplemental Brief (Doc. 107), Defendants' Response (Doc. 108), and Plaintiffs' Reply (Doc. 109).

The Court's June 30, 2004 order (Doc. 100) granted certification under Fed. R. Civ. P. 23(b)(3) of:

(1) A subclass of consumers and of third party payors in thirteen states that permit indirect purchaser antitrust claims: Arizona, Iowa, Maine, Michigan, Minnesota, Mississippi, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia and Wisconsin. These subclasses include plaintiffs' claims for unjust enrichment in the included states. Kansas was provisionally included in that group, pending additional briefing to ascertain that its antitrust statute covers unilateral conduct;

-1-

(2) A subclass of consumers and of third party payors in Massachusetts, Vermont and Florida for claims brought under those states' consumer protection statutes (and claims for unjust enrichment), pending further review of any substantial conflicts among those statutes; and

(3) a subclass of consumers and of third party payors in Nevada, given the more recent statutory change giving indirect purchasers the right to sue, and a unique statutory notice requirement.

The Court excluded from all subclasses any consumer who paid a fixed cost, or "flat co-pay," to purchase Premarin, as well as any consumer who was fully insured or fully reimbursed for such purchases.

**DISCUSSION**

1.   <u>Kansas Law.</u>

The Court's prior certification order noted that the Kansas antitrust statute appeared to be limited to conspiracies or combinations to monopolize, as the district court concluded in <u>In re Relafen Antitrust Litig.</u>, 221 F.R.D. 260, 283 (D. Mass. 2004). Recent Kansas decisions suggest otherwise, however.  In <u>Schecher v. Purdue Pharma LP</u>, 317 F.Supp.2d 1253 (D. Kan. 2004), the Kansas district court indicated that Kansas law does recognize antitrust claims based on a defendant's unilateral actions (in that case, actions regarding the defendant's own patent applications).  And, in <u>Bellinder v. Microsoft Corp.</u>, 2001 WL 1397995 (Sedgwick County Dist. Ct., Sept. 7, 2001), the court

-2-

certified a class of Microsoft indirect purchasers under Kansas antitrust law, based on allegations of Microsoft's marketing efforts concerning Windows.  The Kansas Supreme Court denied review of that certification order; see <u>Bellinder v. Microsoft</u>, 2002 Kan. LEXIS 519 (July 11, 2002).

K.S.A. §50-132, cited by Wyeth, prohibits conspiracies to monopolize.  But K.S.A. §50-112 is broader; its pertinent language makes unlawful "contracts" that "tend to prevent full and free competition," and "arrangements" that "tend to" control the consumer's cost of a product.  This language can reach unilateral activity.  While the Kansas antitrust statute is somewhat undeveloped by state case law, the Kansas Supreme Court noted that the statute covers "almost every conceivable device by which freedom of commerce might be hampered, competition restricted, or the price of commodities controlled."  See <u>Bergstrom v. Noah</u>, 266 Kan. 829, 844, 974 P.2d 520, 530 (1999)(citation omitted).

Wyeth also suggests that the passage of the Kansas "repealer statute" in 2000 differentiates Kansas from the other states.  But, in <u>Bellinder</u>, <u>supra</u>, the Kansas court held that the 2000 "repealer statute" grants standing to indirect purchasers for claims accruing **prior to** the statute's effective date.  As noted, the Kansas Supreme Court denied review of this decision.  Wyeth presents no persuasive argument why this Court should not follow the state court's opinion concerning the statute's application.

For these reasons, the Court concludes that the Kansas

-3-

consumers and third-party payors are properly included in the
State Antitrust Subclasses.

    2.   <u>Tennessee and Maine Antitrust Claims</u>.

    Wyeth argues that the Tennessee and Maine plaintiffs should
be excluded from the State Antitrust Subclass.  The Tennessee
antitrust statute is substantially similar to the Kansas statute
quoted above.  The Tennessee Court of Appeals held that the
statute encompasses the claims of indirect purchasers against
Microsoft for its alleged anticompetitive conduct concerning the
marketing of Windows.  See, <u>Sherwood v. Microsoft Corp.</u>, 2003
Tenn. App. LEXIS 539 (Tenn. App. July 31, 2003).  The Tennessee
Supreme Court has denied review; see, <u>Sherwood v. Microsoft
Corp.</u>, 2004 Tenn. LEXIS 648 (August 2, 2004).  Tennessee is
properly included in the State Antitrust Subclasses.

    Concerning Maine, Wyeth argues that a monopolization claim
requires proof of a "specific intent" to monopolize, which other
states may not require.  But the statute plainly reaches more
than conspiracies to monopolize; see 10 M.R.S. §1101, which
proscribes contracts "in restraint of trade or commerce in this
State."  The Court concludes that the Maine consumers and third
party payors are properly included in the State Antitrust
Subclasses.

    3.   <u>Differences in State Law Concerning Treble or
Exemplary Damages</u>.

    Wyeth argues that seven of the states included in the State
Antitrust Subclasses have differing laws concerning treble

-4-

damages.  Mississippi and Tennessee permit only actual damages.
Iowa, Arizona, Michigan and North Dakota permit exemplary damages
but only for "willful" and/or "flagrant" conduct.  New Mexico
permits "up to" three times any actual damages, but the statute
does not mention any requirement of "willful" or "flagrant"
conduct.

    This potential difference in the type and amount of damages
that might be recovered is not a bar to class certification.  In
<u>Sterling v. Velsicol Chem. Corp.</u>, 855 F.2d 1188, at 1197 (6th
Cir. 1988), the Sixth Circuit noted that  ". . .the mere fact
that questions peculiar to each individual member of the class
remain after the common questions of the defendant's liability
have been resolved does not dictate the conclusion that a class
action is impermissible."  The same principle applies to
questions that may be peculiar to groups of plaintiffs residing
in different states.  See, e.g., <u>In Re Northwest Airlines
Antitrust Litig.</u>, 208 F.R.D. 174, at 224 (individualized damage
inquiries do not detract from the typicality of named plaintiffs'
claims).  If conflicts should arise that would prevent the
representative plaintiffs from vigorously pursuing the claims of
class members residing in states permitting additional damages
for "willful" and/or "flagrant" conduct, the Court can create
additional subclasses or exclude these states from the subclass.
At this time, however, these states will remain in the State
Antitrust Subclasses.

    4.   <u>Vermont, Massachusetts and Florida "Consumer</u>

Protection" Statutes.

Wyeth next asserts that the "consumer protection" statutes of Vermont, Massachusetts and Florida differ so much that class certification is impossible.  Wyeth claims that the Vermont statute applies only to "consumers" and not to corporations and businesses.  This argument misstates the statute.  Vt. Stat. Ann. Tit. 9, §2451a, defining "consumer," expressly includes businesses.  The case Wyeth cites was decided under an earlier version of that statute.  Moreover, V.S.A. §2465, the antitrust remedy section, grants a cause of action to "any person" which in Vermont includes a corporation or business entity.

With regard to Massachusetts, the "consumer protection" statute, Ch. 93A et seq, contains two different sections granting private rights of action.  Section 9 applies to "consumers" and Section 11 applies to business entities.  A plaintiff may not proceed under both sections, as they are mutually exclusive. See, Beaudette, Inc. v. Sentry Insurance, 94 F. Supp. 2d 77 (D.C. Mass. 1999), and cases discussed therein.  The Court sees no statutory impediment to permitting different plaintiffs to proceed with claims under both sections, when the claims arise out of the same facts.  Other aspects of the Massachusetts statute which Wyeth discusses do not prevent certification of a class.  For instance, Section 11 (but not section 9) requires that the challenged conduct occur "primarily" in Massachusetts. This is an issue to be decided on the merits, not one that prevents class certification.  See, Kuwaiti Danish Computer Co.

-6-

v. Digital Equipment Corp., 438 Mass. 459, 473; 781 N.E.2d 787
(Mass. 2003), where the Massachusetts Supreme Court held that the
trial judge should consider the established facts in the context
of the entire claim, to determine ". . . whether the center of
gravity of the circumstances that give rise to the claim is
primarily and substantially within the Commonwealth."

Wyeth also claims that consumers proceeding under Section 9
are entitled to recover statutory minimum damages without proof
of "injury." This is not correct. The Massachusetts Supreme
Court has clearly stated that **causation** of the alleged loss or
injury is an essential element of a Ch. 93A claim. See,
Aspinall v. Philip Morris Cos., 442 Mass. 381, 400-401, 813
N.E.2d 476, 492 (Mass. 2004).

With regard to Florida, Wyeth raises only the point that
Florida does not permit treble damages. As discussed above, this
does not prevent class certification.

5. Nevada Subclasses.

The Court will not revisit its prior order concerning the
creation of Nevada subclasses, as Wyeth urges. The statutory
requirement of notice to the state appears to be a merits issue,
not an issue that prevents class certification. The Court will
order that these subclasses have a separate representative
plaintiff, as discussed below.

6. Representation of Certified Subclasses.

Finally, Wyeth contends that the three class representatives
who were discussed in the Court's previous certification order

-7-

are inadequate to represent all of the subclasses.  The Court agrees that some additional class representatives should be identified, given the issues discussed above.  The Court will permit Plaintiffs time to accomplish that task.

## CONCLUSION

The Court certifies the following subclasses under Fed. R. Civ. P. 23(b)(3) and (c):

1.   A subclass of individual consumers in the states of Arizona, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia and Wisconsin.

2.   A subclass of third-party payors in the states identified immediately above, represented by Plaintiffs United Food & Commercial Workers Midwest Health Benefits Fund ("UFCW"), and Twin Cities Bakery Workers Health & Welfare Fund ("TCBW").

3.   A subclass of consumers in the states of Florida, Vermont and Massachusetts, represented by Plaintiff Marjorie Ferrell.

4.   A subclass of third-party payors in the states of Florida, Vermont and Massachusetts.  UFCW alleges that it has members in Florida, and the Court finds that UFCW is an adequate representative for this subclass.

5.   A subclass of consumers in the state of Nevada.

6.   A subclass of third-party payors in the state of Nevada.

Plaintiffs shall identify a representative for subclasses 1,

-8-

5 and 6 within thirty days and inform the Court and the parties
of the representative's identity.  Defendant shall have the
opportunity to challenge the adequacy of any newly-identified
representative.


DATED: February 2, 2005          s/ Sandra S. Beckwith
                                 Sandra S. Beckwith, Chief Judge
                                 United States District Court

-9-