# EXHIBIT 1

1  ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
   Roman M. Silberfeld, Bar No. 62783
2  RMSilberfeld@rkmc.com
   David Martinez, Bar No. 193183
3  DMartinez@rkmc.com
   2049 Century Park East, Suite 3400
4  Los Angeles, CA  90067-3208
   Telephone:    310-552-0130
5  Facsimile:    310-229-5800

6  Attorneys for Plaintiffs
   BEST BUY CO., INC.; BEST BUY PURCHASING
7  LLC; BEST BUY ENTERPRISE SERVICES, INC.;
   BEST BUY STORES, L.P.; BESTBUY.COM,
8  L.L.C.; and MAGNOLIA HI-FI, INC.

9

10                UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12

13  BEST BUY CO., INC.; BEST BUY        CV  Case No.  11     5513
    PURCHASING LLC; BEST BUY
14  ENTERPRISE SERVICES, INC.; BEST     COMPLAINT
    BUY STORES, L.P.; BESTBUY.COM,
15  L.L.C.; and MAGNOLIA HI-FI, INC.,   JURY TRIAL DEMANDED

16              Plaintiffs,

17        v.

18  HITACHI, LTD.; HITACHI DISPLAYS,
    LTD.; HITACHI AMERICA, LTD.;
19  HITACHI ASIA, LTD.; HITACHI
    ELECTRONIC DEVICES (USA), INC.;
20  SHENZHEN SEG HITACHI COLOR
    DISPLAY DEVICES, LTD.; IRICO
21  GROUP CORPORATION; IRICO
    GROUP ELECTRONICS CO., LTD.;
22  IRICO DISPLAY DEVICES CO., LTD.;
    LG ELECTRONICS, INC.; LG
23  ELECTRONICS USA, INC.; LG
    ELECTRONICS TAIWAN TAIPEI CO.,
24  LTD.; LP DISPLAYS INTERNATIONAL
    LTD.; PANASONIC CORPORATION;
25  PANASONIC CORPORATION OF
    NORTH AMERICA; MT PICTURE
26  DISPLAY CO., LTD.; BEIJING
    MATSUSHITA COLOR CRT CO., LTD.;
27  KONINKLIJKE PHILIPS
    ELECTRONICS N.V.; PHILIPS
28  ELECTRONICS NORTH AMERICA

FILED  E-filing
NOV 1 4 2011
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
JSC

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

82633604.2                                        COMPLAINT

1  CORPORATION; PHILIPS
   ELECTRONICS INDUSTRIES
2  (TAIWAN), LTD.; PHILIPS DA
   AMAZONIA INDUSTRIA
3  ELECTRONICA LTDA.; SAMTEL
   COLOR LTD.; THAI CRT CO., LTD.;
4  TOSHIBA CORPORATION; TOSHIBA
   AMERICA, INC.; TOSHIBA AMERICA
5  CONSUMER PRODUCTS, LLC;
   TOSHIBA AMERICA ELECTRONIC
6  COMPONENTS, INC.; TOSHIBA
   AMERICA INFORMATION SYSTEMS,
7  INC.; CHUNGHWA PICTURE TUBES,
   LTD.; CHUNGHWA PICTURE TUBES
8  (MALAYSIA); TATUNG COMPANY OF
   AMERICA, INC.,
9
                    Defendants.
10

11      Plaintiffs, Best Buy Co., Inc.; Best Buy Purchasing LLC; Best Buy Enterprise Services,

12  Inc.; Best Buy Stores, L.P.; BestBuy.com, L.L.C.; and Magnolia Hi-Fi, Inc. (collectively

13  "Plaintiffs" or "Best Buy"), for their Complaint against all Defendants named herein, hereby

14  allege as follows:

15  **I.    INTRODUCTION**

16      1.      Defendants and their co-conspirators formed an international cartel which

17  conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

18  through at least November 25, 2007 (the "Relevant Period"). The purpose and effect of this

19  conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

20      2.      Defendants are or were among the leading manufacturers of: (a) color picture

21  tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes

22  ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices

23  containing CPTs (such as televisions) or CDTs (such as computer monitors). For the purposes of

24  this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively

25  as "CPT Products." Also for the purposes of this Complaint, CDTs of all sizes and the products

26  containing them shall be referred to as "CDT Products." CDT Products and CPT Products shall be

27  referred to collectively herein as "CRT Products."

28      3.      Defendants control the majority of the CRT industry, a multibillion dollar market,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  which in 1999 alone generated over $19 billion dollars in gross revenue. During the Relevant

2  Period, virtually every household in the United States owned at least one CRT Product.

3      4.    Since the mid-1990s, the CRT industry faced significant economic pressures as

4  customer preferences for other emerging technologies shrank profits and threatened the

5  sustainability of the industry. In order to maintain price stability, increase profitability, and

6  decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

7  contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

8  States.

9      5.    With respect to CRTs, Defendants or their agents agreed, *inter alia*, to: (a) fix

10  target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments,

11  prices, production and customer demand; (c) coordinate public statements regarding available

12  capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some

13  of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the

14  agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales;

15  (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit

16  competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of

17  certain key customers' sales; and (k) restrict output.

18      6.    The conspiracy concerning CRTs commenced with bilateral meetings that began

19  in at least March of 1995 and continued throughout the Relevant Period. Also beginning in 1995,

20  the co-conspirators began to engage in informal group meetings. By 1997, these group meetings

21  had become more formalized, as described in greater detail below. There were at least 500

22  conspiracy meetings during the Relevant Period, including hundreds of group meetings and

23  hundreds of bilateral meetings. These meetings occurred in various locales, including Taiwan,

24  South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe. These

25  meetings included representatives from the highest levels of the respective companies, as well as

26  regional managers and others.

27      7.    During the Relevant Period, the conspiracy affected billions of dollars of

28  commerce throughout the United States.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

8.    This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities. The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009. Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.    During the Relevant Period, Plaintiffs purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.    JURISDICTION AND VENUE

10.    Plaintiffs bring this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.    Plaintiffs also bring this action pursuant to the Minnesota Antitrust Act of 1971 because Plaintiffs purchased in Minnesota CRT Products from both Defendants and non-Defendant vendors containing price-fixed CRTs manufactured by Defendants.

12.    The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiffs' state law claim under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint. Plaintiffs' state law claims are so related to their claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.    The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import

2  trade or commerce. This effect gives rise to Plaintiffs' antitrust claims. During the Relevant

3  Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.

4  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected

5  the price of CRT Products purchased by Plaintiffs.

6      14.      This court has jurisdiction over each Defendant named in this action. Defendants

7  and their co-conspirators purposely availed themselves of the laws of the United States as they

8  manufactured CRT Products for sale in the United States, or CRTs which were incorporated into

9  CRT Products Defendants and their co-conspirators knew would be sold to customers in the

10  United States. Defendants' and their co-conspirators' conspiracy affected this commerce in CRT

11  Products in the United States.

12      15.      Venue is proper in the Northern District of California under Section 12 of the

13  Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien

14  corporation, transacts business in this District, or is otherwise found within this District. In

15  addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

16  events or omissions giving rise to this claim occurred in this District. Defendants and their co-

17  conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into

18  this District.

19  **III.   PARTIES**

20      **A.   Plaintiffs**

21      16.      Plaintiff Best Buy Co., Inc. is a Minnesota corporation with its headquarters and

22  principal place of business in Richfield, Minnesota. Prior to 2004, Best Buy Co., Inc. operated

23  retail stores throughout the United States and sold CRT Products in those stores.

24      17.      Plaintiff Best Buy Purchasing LLC is a Minnesota Limited Liability Company and

25  Plaintiff Best Buy Enterprise Services, Inc. is a Minnesota corporation with their headquarters and

26  principal places of business in Richfield, Minnesota.

27      18.      Plaintiff Best Buy Stores, L.P. is a Virginia Limited Partnership with its

28  headquarters and principal place of business in Richfield, Minnesota. Best Buy Stores, L.P.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   operates retail stores throughout the United States and sells CRT Products in those stores.

2       19.    Plaintiff BestBuy.com, L.L.C. is a Virginia Limited Liability Company with its

3   headquarters and principal place of business in Richfield, Minnesota. BestBuy.com, L.L.C. is a

4   wholly-owned subsidiary of Best Buy Stores, L.P. and operates Best Buy's retail online store.

5       20.    During the Relevant Period, Best Buy Purchasing LLC, Best Buy Enterprise

6   Services, Inc. and/or Best Buy Co., Inc. negotiated for the purchase of, purchased, and paid for

7   CRT Products for Plaintiff Best Buys Stores, L.P. and BestBuy.com, L.L.C. These negotiations,

8   purchasing and payments took place out of Best Buy's principal place of business and

9   headquarters in Richfield, Minnesota.

10      21.    Plaintiff Magnolia Hi-Fi, Inc. ("MHF") is a wholly-owned subsidiary of Best Buy

11  Co., Inc. with its headquarters in Kent, Washington, and has done business as Magnolia Home

12  Theater and Magnolia Audio Video. MHF is a specialty consumer electronic retailer that operates

13  several Magnolia Audio Video standalone stores along the west coast and the greater Chicago

14  area, and several Magnolia Home Theater stores located within Best Buy stores. During the

15  Relevant Time Period, MHF's purchasing of CRT Products took place in its headquarters in Kent

16  Washington.

17      22.    During the Relevant Period, Best Buy purchased CRT Products directly and

18  indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any

19  agents the Defendants or Defendants' subsidiaries and affiliates controlled. As such, Best Buy

20  suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.

21      23.    Those products were kept as inventory and sold in Minnesota and every other state

22  where Best Buy retail stores were located, and over the internet throughout the United States.

23      24.    As a result of the Best Buy Plaintiffs' presence, purchases, and sales in Minnesota,

24  and the substantial business they conduct in and with entities in Minnesota, Plaintiffs are entitled

25  to the protection of the Sherman Act and the antitrust laws of Minnesota.

26

27

28

**B.  Defendants**

**1.  Hitachi Entities**

25.  Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

26.  Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this Complaint.

27.  Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

28.  Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.

1    During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT

2    Products, either directly or through its subsidiaries or affiliates, throughout the United States.

3    Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia

4    relating to the antitrust violations alleged in this Complaint.

5        29.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware

6    corporation with its principal place of business located at 208 Fairforest Way, Greenville, South

7    Carolina 29607. HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays. During

8    the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products,

9    either directly or through its subsidiaries or affiliates, throughout the United States. Defendants

10   Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of

11   HEDUS relating to the antitrust violations alleged in this Complaint.

12       30.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

13   Shenzhen") was a Chinese company with its principal place of business located at 5001

14   Huanggang Road, Futian District, Shenzhen 518035, China. Hitachi Displays, Ltd. owned at least

15   a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around

16   the time that the government investigations into the CRT industry began). Thus, Hitachi

17   Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the

18   Relevant Period. During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold

19   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout

20   the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the

21   finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this

22   Complaint.

23       31.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia,

24   HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

25            **2.    IRICO Entities**

26       32.    Defendant IRICO Group Corporation ("IGC") is a Chinese company with its

27   principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.

28   IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    distribution and sale of CRT Products. During the Relevant Period, IGC manufactured, marketed,

2    sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

3    throughout the United States.

4        33.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with

5    its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.

6    IGE is owned by Defendant IGC. According to its website, IGE was the first CRT manufacturer

7    in China and one of the leading global manufacturers of CRTs. Their website also claims that in

8    2003, they were the largest CRT manufacturer in China in terms of production and sales volume,

9    sales revenue and aggregated profit, and taxation. During the Relevant Period, IGE manufactured,

10    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

11    affiliates, throughout the United States. Defendant IGC dominated and controlled the finances,

12    policies and affairs of IGE relating to the antitrust violations alleged in this Complaint.

13        34.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with

14    its principal place of business located at No. 16, Fenghui South Road West, District High-tech

15    Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of Defendant IGC.

16    In 2006, IDDC was China's top CRT maker. During the Relevant Period, IDDC manufactured,

17    marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or

18    affiliates, throughout the United States. Defendant IGC dominated and controlled the finances,

19    policies and affairs of IDDC relating to the antitrust violations alleged in this Complaint.

20        35.     Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

21        **3.**     **LG Electronics Entities**

22        36.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the

23    laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20

24    Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea. LGEI is a $48.5 billion global

25    force in consumer electronics, home appliances and mobile communications, which established its

26    first overseas branch office in New York in 1968. The company's name was changed from Gold

27    Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United

28    States. In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD"). On April 1, 2007,

2   LGPD became an independent company and changed its name to LP Displays International Ltd.

3   During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products,

4   either directly or through its subsidiaries or affiliates, throughout the United States.

5       37.   Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with

6   its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey  07632.

7   LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant

8   Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly

9   or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated

10   and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations

11   alleged in this Complaint.

12       38.   Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese

13   entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District,

14   Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG

15   Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or

16   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

17   United States. Defendant LGEI dominated and controlled the finances, policies and affairs of

18   LGETT relating to the antitrust violations alleged in this Complaint.

19       39.   Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as

20   "LG Electronics."

21          4.   **LP Displays**

22       40.   Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong

23   Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux

24   Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was

25   created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March

26   2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs

27   for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and

28   a market share of 27%. LP Displays announced in March 2007 that Royal Philips and LGEI

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   would cede control over the company and the shares would be owned by financial institutions and

2   private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold

3   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout

4   the United States.

5   **5.   Panasonic Entities**

6      41.   Defendant Panasonic Corporation, which was at all times during the Relevant

7   Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation

8   on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-

9   8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold

10  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout

11  the United States.

12     42.   Defendant Panasonic Corporation of North America ("PCNA") is a Delaware

13  corporation with its principal place of business located at One Panasonic Way, Secaucus, New

14  Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic

15  Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed

16  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

17  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of

18  PCNA relating to the antitrust violations alleged in this Complaint.

19     43.   Defendants Panasonic Corporation and PCNA are collectively referred to herein as

20  "Panasonic."

21     44.   Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display

22  Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-

23  8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba

24  Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic

25  Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic

26  Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita

27  Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it

28  MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout

2  the United States.

3      45.    Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese

4  company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi

5  Chaoyang District, Beijing, China. BMCC is a joint venture company, 50% of which is held by

6  Defendant MTPD. The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China

7  National Electronics Import & Export Beijing Company (a China state-owned enterprise), and

8  Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned

9  enterprise). Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing

10  facility in China. BMCC is the second largest producer of CRTs for televisions in China. During

11  the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either

12  directly or through its subsidiaries or affiliates, throughout the United States.

13            **6.**    **Philips Entities**

14      46.    Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics

15  ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2,

16  1070 MX Amsterdam, The Netherlands. Royal Philips, founded in 1891, is one of the world's

17  largest electronics companies, with 160,900 employees located in over 60 countries. Royal

18  Philips had sole ownership of its CRT business until 2001. In 2001, Royal Philips transferred its

19  CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP

20  Displays). In December 2005, as a result of increased pressure on demand and prices for CRT

21  Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment

22  and said it would not inject further capital into the venture. During the Relevant Period, Royal

23  Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through

24  its subsidiaries or affiliates, throughout the United States.

25      47.    Defendant Philips Electronics North America Corporation ("Philips America") is a

26  Delaware corporation with its principal place of business located at 1251 Avenue of the Americas,

27  New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary

28  of Defendant Royal Philips. During the Relevant Period, Philips America manufactured,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this Complaint.

48.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this Complaint.

49.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this Complaint.

50.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

### 7.     Samtel

51.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products. Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products. During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

- 13 -

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  subsidiaries and affiliates, throughout the United States.

2  **8.  Thai CRT**

3  52.  Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26

4  Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement

5  Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

6  televisions. During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

7  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

8  United States.

9  **9.  Toshiba Entities**

10  53.  Defendant Toshiba Corporation ("TC") is a Japanese company with its principal

11  place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001,

12  TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer

13  monitors. In December 1995, TC partnered with Orion Electronic Co. and two other non-

14  Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.

15  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2002,

16  TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the

17  entities consolidated their CRT businesses. During the Relevant Period, TC manufactured,

18  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

19  affiliates, throughout the United States.

20  54.  Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation

21  with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New

22  York, New York 10020. Toshiba America is a wholly-owned and controlled subsidiary of

23  Defendant TC. During the Relevant Period, Toshiba America manufactured, marketed, sold

24  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout

25  the United States. Defendant TC dominated and controlled the finances, policies and affairs of

26  Toshiba America relating to the antitrust violations alleged in this Complaint.

27  55.  Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited

28  liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.

2  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT

3  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

4  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the

5  antitrust violations alleged in this Complaint.

6       56.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

7  California corporation with its principal place of business located at 19900 MacArthur Boulevard,

8  Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of

9  Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured,

10  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

11  affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

12  policies and affairs of TAEC relating to the antitrust violations alleged in this Complaint.

13       57.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California

14  corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California

15  92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through

16  Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or

17  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

18  United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS

19  relating to the antitrust violations alleged in this Complaint.

20       58.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively

21  referred to herein as "Toshiba."

22       **10.**     **Chunghwa Entities**

23       59.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese

24  company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan,

25  Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974,

26  Chunghwa PT's CRTs received certification by the United States, giving the company entry into

27  that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT

28  manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou

2    subsidiary) throughout the United States.

3         60.    Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

4    Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

5    Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. It is a wholly-

6    owned and controlled subsidiary of Chunghwa. Chunghwa Malaysia is focused on CRT

7    production, and it has established itself as one of the leading worldwide suppliers of CRTs.

8    During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT

9    Products either directly or through its subsidiaries or affiliates throughout the United States.

10   Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa

11   Malaysia relating to the antitrust violations alleged in this Complaint. Defendants Chunghwa PT

12   and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

13                    **11.    Tatung Company of America, Inc.**

14        61.    Tatung Company of America, Inc. ("Tatung America") is a California corporation

15   with its principal place of business located at 2850 El Presidio Street, Long Beach, California.

16   Tatung America is a subsidiary of Tatung Company. Currently, Tatung Company owns

17   approximately half of Tatung America. The other half used to be owned by Lun Kuan Lin, the

18   daughter of Tatung Company's former Chairman, T.S. Lin. Following Lun Kuan Lin's death, her

19   share passed to her two children. During the Relevant Period, Tatung America manufactured,

20   marketed, sold and/or distributed CRT Products manufactured by, among others, Chunghwa

21   Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United

22   States.

23   **IV.    AGENTS AND CO-CONSPIRATORS**

24        62.    The acts alleged against Defendants in this Complaint were authorized, ordered, or

25   done by their officers, agents, employees, or representatives, while actively engaged in the

26   management and operation of Defendants' businesses or affairs.

27        63.    Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of,

28   or for, other Defendants and co-conspirators with respect to the acts, violations, and common

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  course of conduct alleged by Plaintiffs. Each Defendant and co-conspirator that is a subsidiary of

2  a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent

3  company.

4       64.    Various persons and/or firms not named as Defendants in this Complaint

5  participated as co-conspirators in the violations alleged herein and may have performed acts and

6  made statements in furtherance thereof. These co-conspirators who are not named as Defendants

7  include, but are not limited to, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc.,

8  Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company, Samsung SDI America, Inc.,

9  Samsung SDI Mexico S.A. de C.V., Samsung SDI Brasil Ltda., Shenzhen Samsung SDI Co., Ltd.,

10 Tianjin Samsung SDI Co., Ltd., Samsung SDI (Malaysia) Sdn. Bhd., Orion Electronic Co.,

11 Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic

12 Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and Toshiba

13 Display Devices (Thailand) Co., Ltd. Plaintiffs reserve the right to name some or all of these and

14 other co-conspirators as Defendants at a later date.

15      65.    Co-conspirator Samsung Electronics Co., Ltd. ("SEC") is a South Korean

16 company with its principal place of business located at Samsung Electronics Building, 1320-10,

17 Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea. It is South Korea's top electronics

18 company. During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT

19 Products, either directly or through its subsidiaries or affiliates, throughout the United States.

20      66.    Co-conspirator Samsung Electronics America, Inc. ("SEAI") is a New York

21 corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

22 Ridgefield Park, New Jersey 07660. SEAI is a wholly-owned and controlled subsidiary of

23 Defendant SEC. During the Relevant Period, SEAI manufactured, marketed, sold and/or

24 distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

25 United States. Defendant SEC dominated and controlled the finances, policies and affairs of

26 Samsung SEAI relating to the antitrust violations alleged in this Complaint.

27      67.    Co-conspirator Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company

28 ("Samsung SDI") is a South Korean company with its principal place of business located at 575

1   Shin-dong, Youngtong-gu, Suwon, South Korea. Samsung SDI is a public company. SEC is a

2   major shareholder holding almost 20 percent of the stock. Founded in 1970, Samsung SDI claims

3   to be the world's leading company in the display and energy business, with 28,000 employees and

4   facilities in 18 countries. In 2002, Samsung SDI held a 34.3% worldwide market share in the

5   market for CRTs; more than any other producer. Samsung SDI has offices in Chicago and San

6   Diego. During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or

7   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

8   United States. Defendant SEC dominated and controlled the finances, policies and affairs of

9   Samsung SDI relating to the antitrust violations alleged in this Complaint.

10          68.     Co-conspirator Samsung SDI America, Inc. ("Samsung SDI America") is a

11   California corporation with its principal place of business located at 3333 Michelson Drive, Suite

12   700, Irvine, California 92612. Samsung America is a wholly-owned and controlled subsidiary of

13   Co-Conspirator Samsung SDI. During the Relevant Period, Samsung SDI America manufactured,

14   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

15   affiliates, throughout the United States. Co-conspirators SEC and Samsung SDI dominated and

16   controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

17   violations alleged in this Complaint.

18          69.     Co-conspirator Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a

19   Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014,

20   Parque Industrial El Florido, Tijuana, B.C. Mexico. Samsung SDI Mexico is a wholly-owned and

21   controlled subsidiary of Co-Conspirator Samsung SDI. During the Relevant Period, Samsung SDI

22   Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through

23   its subsidiaries or affiliates, throughout the United States. Co-Conspirators SEC and Samsung

24   SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating

25   to the antitrust violations alleged in this Complaint.

26          70.     Co-conspirator Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian

27   company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito

28   Industrial, 69088-480 Manaus, Amazonas, Brazil. Samsung SDI Brazil is a wholly-owned and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  controlled subsidiary of Co-Conspirator Samsung SDI. During the Relevant Period, Samsung SDI

2  Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

3  subsidiaries or affiliates, throughout the United States. Co-Conspirators SEC and Samsung SDI

4  dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the

5  antitrust violations alleged in this Complaint.

6       71.    Co-conspirator Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a

7  Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu,

8  Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Co-

9  Conspirator Samsung SDI. During the Relevant Period, Samsung SDI Shenzhen manufactured,

10  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

11  affiliates, throughout the United States. Co-Conspirators SEC and Samsung SDI dominated and

12  controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

13  violations alleged in this Complaint.

14       72.    Co-conspirator Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a

15  Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park,

16  Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled

17  subsidiary of Co-Conspirator Samsung SDI. During the Relevant Period, Samsung SDI Tianjin

18  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

19  subsidiaries or affiliates, throughout the United States. Co-Conspirators SEC and Samsung SDI

20  dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the

21  antitrust violations alleged in this Complaint.

22       73.    Co-conspirator Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is

23  a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan

24  Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.

25  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung

26  SDI. During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or

27  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

28  United States. Co-Conspirators SEC and Samsung SDI dominated and controlled the finances,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this

2  Complaint.

3      74.    Co-conspirators SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI

4  Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI

5  Malaysia are collectively referred to herein as "Samsung."

6      75.    During the Relevant Period, Orion Electronic Co. ("Orion") was a major

7  manufacturer of CRT Products. Orion was a Korean corporation which filed for bankruptcy in

8  2004. In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.

9  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries

10  all over the world, including South Africa, France, Indonesia, Mexico, and the United States.

11  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group." The

12  Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom

13  Co., Daewoo Corporation, and Orion Electronic Components Co. The Daewoo Group was

14  dismantled in or around 1999. Daewoo Electronics and Orion were 50/50 joint venture partners in

15  an entity called Daewoo-Orion Société Anonyme ("DOSA") in France. As of approximately

16  1996, DOSA produced 1.2 million CRTs annually. Daewoo sold DOSA's CRT business in or

17  around 2004. During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured,

18  marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their

19  subsidiaries or affiliates, throughout the United States.

20      76.    Daewoo Electronics, Orion, and DOSA are collectively referred to herein as

21  "Daewoo."

22      77.    Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia")

23  was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku

24  Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia

25  was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. Panasonic

26  Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT

27  joint venture with Toshiba Corporation, in 2003. It was re-named MT Picture Display (Malaysia)

28  Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006. During

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   the Relevant Period. Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT

2   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

3   Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of

4   Matsushita Malaysia relating to the antitrust violations alleged in this Complaint.

5         78.    P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture

6   formed by TC, Orion and two other non-Defendant entities in December 1995. TEDI's principal

7   place of business was located in Indonesia. TEDI was projected to have an annual production

8   capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to Defendant MTPD, TC's

9   joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display

10  Indonesia. During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed

11  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

12  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the

13  antitrust violations alleged in this Complaint.

14        79.    Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with

15  its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road,

16  Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of

17  Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint venture with

18  Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated

19  as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the

20  Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either

21  directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC

22  dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust

23  violations alleged in this Complaint.

24        80.    The acts charged in this Complaint have been done by Defendants and their Co-

25  conspirators, or were authorized, ordered or done by their respective officers, agents, employees or

26  representatives while actively engaged in the management of each Defendants' or Co-

27  conspirators' business or affairs.

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

V.      **TRADE AND COMMERCE**

81.      During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

82.      During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

83.      The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States. The business activities of Defendants also substantially affected trade and commerce in Minnesota and caused antitrust injuries in Minnesota.

VI.     **FACTUAL ALLEGATIONS**

        A.      **CRT Technology**

84.      A CRT has three components:  (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

85.      CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

86.     The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

87.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

88.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

89.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

90.     The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

91.     Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRT Products containing price-fixed CRTs and their purchases of CRT Products containing price-fixed CRTs indirectly from non-Defendant original equipment manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs bought CRT Products, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRT Products.

92.     Plaintiffs have participated in the market for products containing CRTs.  To the extent Plaintiffs indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiffs were not able to pass the inflated prices on to their customers.

93.     Plaintiffs have been injured by paying supra-competitive prices for CRT Products.

## B.     Structure of the CRT Industry

94.     The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

### 1.     Market Concentration

95.     During the Relevant Period, the CRT industry was dominated by relatively few companies. In 2004, Co-Conspirators Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market. The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2.     Information Sharing

96.     Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information. The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages. Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

97.     Defendants Hitachi, and Chunghwa and Co-conspirator Samsung are all members of the Society for Information Display. Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association. Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Co-conspirator Samsung are members of the Electronic Display Industrial Research Association. Upon information and belief, Defendants and their Co-Conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs. At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

### 3.    Consolidation

98.    The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.    **Multiple Interrelated Business Relationships**

99.    The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

100.    Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

a.    The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

b.    Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.    The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d.    Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.    In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f.    Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.    Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

h.   Defendant Chunghwa has a joint venture with Co-conspirator Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Co-conspirator Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Philips, Panasonic, and Co-conspirator Samsung.

### 5.   High Costs of Entry Into the Industry

101.   There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

102.   During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.  A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6.   The Maturity of the CRT Product Market

103.   Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

104.   Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

105.   In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays. This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices. Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

106.   Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile. Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

107.   In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America. By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

108.   As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.   **Homogeneity of CRT Products**

109.   CRT Products are commodity-like products which are manufactured in standardized sizes. One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sold and Plaintiffs purchased CRT Products primarily on the basis of price.

110.   It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.   **Pre-Conspiracy Market**

111.   The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  served by other international companies. During this period, the employees of Defendants would

2  encounter employees from their competitors when visiting their customers. A culture of

3  cooperation developed over the years and these Defendant employees would exchange market

4  information on production, capacity and customers.

5      112.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion

6  visited each other's factories in Southeast Asia. During this period, these producers began to

7  include discussions about price in their meetings.

8      **D.    Defendants' and Co-Conspirators' Illegal Agreements**

9      113.    In order to control and maintain profitability during declining demand for CRT

10  Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or

11  conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which

12  they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least

13  November 25, 2007.

14      114.    The CRT conspiracy was effectuated through a combination of group and bilateral

15  meetings. In the formative years of the conspiracy (1995-1996), bilateral discussions were the

16  primary method of communication and took place on an informal, ad hoc basis. During this

17  period, representatives from Daewoo and Defendants LG Electronics and Co-conspirator Samsung

18  visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi,

19  Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.

20  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and

21  Singapore.

22      115.    Samsung, LG, and Chunghwa, along with and Daewoo, also attended several ad

23  hoc group meetings during this period. The participants at these group meetings also discussed

24  increasing prices for CRTs.

25      116.    As more manufacturers formally entered the conspiracy, group meetings became

26  more prevalent. Beginning in 1997, Defendants began to meet in a more organized, systematic

27  fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants'

28  representatives attended hundreds of these meetings during the Relevant Period.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

117.   The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1.   "Glass Meetings"

118.   The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM." Glass meetings were attended by employees at three general levels of Defendants' and Co-conspirator' corporations.

119.   The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

120.   The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

121.   Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The working level meetings also tended to be more regional and often took place near Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

122.   The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    manufacturers.  Participants at the Chinese meetings included the manufacturers located in China,

2    such as IRICO and BMCC, as well as the China-based branches of the other Defendants and Co-

3    conspirators, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung

4    SDI Tianjin, and Chunghwa.

5         123.    Glass meetings also occurred occasionally in various European countries.

6    Attendees at these meetings included those Defendants and Co-conspirators which had

7    subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics,

8    LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of

9    Daewoo) and IRICO.  Chunghwa also attended these meetings.

10        124.    Representatives of Defendants also attended what were known amongst members

11   of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green

12   meetings were generally attended by top and management level employees of Defendants.

13        125.    During the Relevant Period, glass meetings took place in Taiwan, South Korea,

14   Europe, China, Singapore, Japan, Indonesia, Thailand and Malaysia.

15        126.    Participants would often exchange competitively sensitive information prior to a

16   glass meeting.  This included information on inventories, production, sales and exports.  For some

17   such meetings, where information could not be gathered in advance of the meeting, it was brought

18   to the meeting and shared.

19        127.    The glass meetings at all levels followed a fairly typical agenda.  First, the

20   participants exchanged competitive information such as proposed future CRT pricing, sales

21   volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts

22   of sales volumes for coming months.  The participants also updated the information they had

23   provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who

24   would write the information on a white board.  The meeting participants then used this

25   information to discuss and agree upon what price each would charge for CRTs to be sold in the

26   following month or quarter.  They discussed and agreed upon target prices, price increases, so-

27   called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of

28   CRTs that were sold to specific customers, and agreed upon target prices to be used in

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

negotiations with large customers. Having analyzed the supply and demand, the participants
would also discuss and agree upon production cutbacks.

128. During periods of oversupply, the focus of the meeting participants turned to
making controlled and coordinated price reductions. This was referred to as setting a "bottom
price."

129. Defendants' conspiracy included agreements on the prices at which certain
Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured
CRT Products, such as televisions and computer monitors. Defendants realized the importance of
keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT
pricing in the market to other OEMs. In this way, Defendants ensured that all OEMs paid
supracompetitive prices for CRTs.

130. Each of the participants in these meetings knew, and in fact discussed, the
significant impact that the price of CRTs had on the cost of the finished products into which they
were placed. Like CRTs themselves, the market for CRT Products was a mature one, and there
were slim profit margins. Defendants therefore concluded that in order to make their CRT price
increases stick, they needed to make the increase high enough that their direct customers (CRT TV
and monitor makers) would be able to justify a corresponding price increase to their customers. In
this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers
of CRT Products.

131. The agreements reached at the glass meetings included:

   a. agreements on CRT prices, including establishing target prices, "bottom" prices,
      price ranges and price guidelines;

   b. placing agreed-upon price differentials on various attributes of CRTs, such as
      quality or certain technical specifications;

   c. agreements on pricing for intra-company CRTs sales to vertically integrated
      customers;

   d. agreements as to what to tell customers about the reason for a price increase;

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

e.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.  agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

h.  agreements to coordinate uniform public statements regarding available capacity and supply;

i.  agreements to allocate both overall market shares and share of a particular customer's purchases;

j.  agreements to allocate customers;

k.  agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.  agreements to keep their meetings secret.

132.  Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways:  1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

133.  As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

- 32 -

## 2.   **Bilateral Discussions**

134.   Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants. The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

135.   During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and Mexico.

136.   The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and Europe.

137.   In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil and Mexico, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico. These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRT Products. As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period. Because these Brazilian and Mexican manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements. In this way, Defendants ensured that prices of all CRTs imported into the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

138.   Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

139. Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel. It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting. For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi. LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT. Sometimes Hitachi and Toshiba also attended the glass meetings. In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3. Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

140. Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Co-conspirator Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs. Hitachi never effectively withdrew from this conspiracy.

141. Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them. To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

142. Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    participated in multiple glass meetings. These meetings were attended by the highest ranking

2    executives from IRICO. IRICO also engaged in multiple bilateral discussions with other

3    Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO

4    agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in

5    connection with CRTs was mandated by the Chinese government. IRICO was acting to further its

6    own independent private interests in participating in the alleged conspiracy.

7        143.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and

8    LGETT, participated in at least 100 glass meetings at all levels. After 2001, LG Electronics

9    participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP

10   Displays). A substantial number of these meetings were attended by the highest ranking

11   executives from LG Electronics. LG Electronics also engaged in bilateral discussions with each of

12   the other Defendants on a regular basis. Through these discussions, LG agreed on prices and

13   supply levels for CRTs. LG Electronics never effectively withdrew from this conspiracy.

14       144.    Defendant LGEUSA was represented at those meetings and was a party to the

15   agreements entered at them. To the extent LGEUSA sold and/or distributed CRT Products, it

16   played a significant role in the conspiracy because Defendants wished to ensure that the prices for

17   CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached

18   at the glass meetings. Thus, LGEUSA was an active, knowing participant in the alleged

19   conspiracy.

20       145.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated

21   in at least 100 glass meetings at all levels. A substantial number of these meetings were attended

22   by the highest ranking executives from LP Displays. Certain of these high level executives from

23   LP Displays had previously attended meetings on behalf of Defendants LG Electronics and

24   Philips. LP Displays also engaged in bilateral discussions with other Defendants. Through these

25   discussions, LP Displays agreed on prices and supply levels for CRTs.

26       146.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic

27   Corporation and Matsushita Malaysia, participated in several glass meetings. After 2003,

28   Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   These meetings were attended by high level sales managers from Panasonic and MTPD.

2   Panasonic also engaged in multiple bilateral discussions with other Defendants. Through these

3   discussions, Panasonic agreed on prices and supply levels for CRTs. Panasonic never effectively

4   withdrew from this conspiracy.

5        147.    PCNA was represented at those meetings and was a party to the agreements

6   entered at them. To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it

7   played a significant role in the conspiracy because Defendants wished to ensure that the prices for

8   CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached

9   at the glass meetings. Thus, PCNA was an active, knowing participant in the alleged conspiracy.

10       148.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass

11   meetings and in fact led many of these meetings during the latter years of the conspiracy. These

12   meetings were attended by high level sales managers from MTPD. MTPD also engaged in

13   bilateral discussions with other Defendants. Through these discussions, MTPD agreed on prices

14   and supply levels for CRTs.

15       149.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass

16   meetings. These meetings were attended by high level sales managers from BMCC. BMCC also

17   engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese

18   CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for

19   CRTs. None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the

20   Chinese government. BMCC was acting to further its own independent private interests in

21   participating in the alleged conspiracy.

22       150.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and

23   Philips Taiwan, participated in at least 100 glass meetings at all levels. After 2001, Philips

24   participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP

25   Displays). A substantial number of these meetings were attended by high level executives from

26   Philips. Philips also engaged in numerous bilateral discussions with other Defendants. Through

27   these discussions, Philips agreed on prices and supply levels for CRTs. Philips never effectively

28   withdrew from this conspiracy.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

151.   Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them. To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

152.   Between at least 1995 and 2007, Co-conspirator Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Samsung. Samsung also engaged in bilateral discussions with each of the Defendants on a regular basis. Through these discussions, Samsung agreed on prices and supply levels for CRTs.

153.   Co-conspirators SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them. To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

154.   Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT. These meetings were attended by high level executives from Samtel. Through these discussions, Samtel agreed on prices and supply levels for CRTs. Samtel never effectively withdrew from this conspiracy.

155.   Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings. These meetings were attended by the highest ranking executives from Thai CRT. Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel. Through these discussions, Thai CRT agreed on prices and supply levels for CRTs. Thai

1  CRT never effectively withdrew from this conspiracy.

2      156.   Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and

3  TEDI, participated in several glass meetings. After 2003, Toshiba participated in the CRT

4  conspiracy through MTPD, its joint venture with Panasonic. These meetings were attended by

5  high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple bilateral

6  discussions with other Defendants, particularly with LG. Through these discussions, Toshiba

7  agreed on prices and supply levels for CRTs. Toshiba never effectively withdrew from this

8  conspiracy.

9      157.   Defendants Toshiba America, TACP, TAEC and TAIS were represented at those

10  meetings and were a party to the agreements entered at them. To the extent Toshiba America,

11  TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a

12  significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

13  Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the

14  glass meetings. Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing

15  participants in the alleged conspiracy.

16      158.   Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT,

17  Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland,

18  participated in at least 100 glass meetings at all levels. A substantial number of these meetings

19  were attended by the highest ranking executives from Chunghwa, including the former Chairman

20  and CEO of Chunghwa PT, C.Y. Lin. Chunghwa also engaged in bilateral discussions with each

21  of the other Defendants on a regular basis. Through these discussions, Chunghwa agreed on

22  prices and supply levels for CRTs.

23      159.   Defendant Tatung America was represented at those meetings and was a party to

24  the agreements entered at them. To the extent Tatung America sold and/or distributed CRT

25  Products to direct purchasers, it played a significant role in the conspiracy because Defendants

26  wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut

27  the CRT pricing agreements reached at the glass meetings. Thus, Tatung America was an active,

28  knowing participant in the alleged conspiracy.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1      160.  Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and

2  DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these

3  meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in

4  bilateral discussions with other Defendants on a regular basis.  Through these discussions,

5  Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo

6  continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo

7  never effectively withdrew from this conspiracy.

8      161.  When Plaintiffs refers to a corporate family or companies by a single name in their

9  allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or

10  agents of entities within the corporate family engaged in conspiratorial meetings on behalf of

11  every company in that family.  In fact, the individual participants in the conspiratorial meetings

12  and discussions did not always know the corporate affiliation of their counterparts, nor did they

13  distinguish between the entities within a corporate family.  The individual participants entered into

14  agreements on behalf of, and reported these meetings and discussions to, their respective corporate

15  families.  As a result, the entire corporate family was represented in meetings and discussions by

16  their agents and were parties to the agreements reached in them.

17      **E.**  **The CRT Market During the Conspiracy**

18      162.  Until the last few years of the CRT conspiracy, CRTs were the dominant

19  technology used in displays, including televisions and computer monitors.  During the Relevant

20  Period, this translated into the sale of millions of CRT Products, generating billions of dollars in

21  annual profits.

22      163.  The following data was reported by Stanford Resources, Inc., a market research

23  firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue(billion US dollars)[1] | Average Selling Price Per Unit |
|---|---|---|---|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

[1] Estimated market value of CRT units sold.

164.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America. By 2002, North America still consumed around 35 percent of the world's CRT monitor supply. *See, The Future of Liquid Crystal and Related Display Materials*, Fuji Chimera Research, 1997, p.12.

165.    Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Information Display 9/92 p.19. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

166.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

167.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose. The price increase was allegedly based on increasing global demand. In fact, this price increase was a result of the collusive conduct as herein alleged.

168.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

169.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a

2    drop in demand if we have to raise our prices relative to CRT price increases.'"

3         170.    A 2004 article from Techtree.com reports that various computer monitor

4    manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their

5    monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used

6    to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of

7    September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

8         171.    Defendants also conspired to limit production of CRTs by shutting down

9    production lines for days at a time, and closing or consolidating their manufacturing facilities.

10        172.    For example, Defendants' CRT factory utilization percentage fell from 90% in the

11   third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a

12   drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a

13   lesser degree.  Plaintiffs were informed and believe that these sudden, coordinated drops in factory

14   utilization by Defendants were the result of Defendants' agreements to decrease output in order to

15   stabilize the prices of CRTs.

16        173.    During the Relevant Period, while demand in the United States for CRT Products

17   continued to decline, Defendants' conspiracy was effective in moderating the normal downward

18   pressures on prices for CRT Products caused by the entry and popularity of the new generation

19   LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao

20   Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT

21   technology is very mature; prices and technology have become stable."

22        174.    During the Relevant Period, there were not only periods of unnatural and sustained

23   price stability, but there were also increases in prices of CRTs and CRT Products.  These price

24   increases were despite the declining demand due to the approaching obsolescence of CRT

25   Products caused by the emergence of a new, potentially superior and clearly more popular,

26   substitutable technology.

27        175.    These price increases and price stability in the market for CRT Products during the

28   Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    demand caused by a new, substitutable technology.

2    **F.    International Government Antitrust Investigations**

3    176.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and

4    restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by

5    a multinational investigation commenced by the Antitrust Division of the United States

6    Department of Justice ("DOJ").

7    177.    Separately, the European Commission and Japan and South Korea's Fair Trade

8    Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in

9    Europe and Asia.

10    178.    In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also

11    being investigated by the [European] Commission and/or the U.S. Department of Justice for

12    potential violations of competition laws with respect to semiconductors, LCD products, cathode

13    ray tubes (CRT) and heavy electrical equipment."

14    179.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its

15    own investigation into the CRT cartel.  The HCA described the cartel as follows:

16    The Hungarian Competition Authority (Gazdasági Versenyhivatal –
GVH) initiated a competition supervision proceeding against the
17    following undertakings: Samsung SDI Co., Ltd., Samsung SDI
Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP
18    sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays,
Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes
19    Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo
Electronics European HQ, MT Picture Display Germany GmbH,
20    Matsushita Global HQ, Matsushita European HQ.

21    Based on the data available the undertakings mentioned above
concerted their practice regarding the manufacturing and
22    distribution of cathode-ray tubes (including coloured pictures tubes
and coloured screen tubes) on the European market between 1995
23    and 2007.  The anti-competitive behaviour may have concerned the
exchange of sensitive market information (about prices, volumes
24    sold, demand and the extent to which capacities were exploited),
price-fixing, the allocation of market shares, consumers and
25    volumes to be sold, the limitation of output and coordination
concerning the production.  The undertakings evolved a structural
26    system and functional mechanism of cooperation.

27    According to the available evidences it is presumable that the
coordination of European and Asian undertakings regarding to the
28    European market also included Hungary from 1995 to 2007.  The

> coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

180. On February 10, 2009. the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry." The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181. On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa. The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

182. On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

183. On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

184. On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Co-conspirator Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

185. Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere. Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers. During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere. Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

186. The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

187. As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

188. Several Defendants also have a history of "cooperation" and anticompetitive conduct. For example, Co-conspirator Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

189.   Defendant Toshiba and Co-conspirator Samsung have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

190.   In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

191.   On December 12, 2006, news reports indicated that Co-conspirator Samsung and Defendant Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

192.   On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

193.   On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

194.   The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

### G.   The Role of Trade Associations During the Relevant Period

195.   Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information. One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers. Prior to the summer of 2004, the KDC had been

- 45 -

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea. EDIRAK

2   had a stated goal of "promoting co-activity with foreign Organizations related to display

3   industries." Since 1996, EDIRAK had a cooperation pact with the United States Display

4   Consortium ("USDC"). In describing that pact, Malcolm Thompson, then the Chairman of

5   USDC's governing board, said "[e]ven competitors should cooperate on common issues."

6          196.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK,

7   and have participated extensively in the KDCs.

8          197.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4,

9   2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November

10  3-4, 2005; July 6-7, 2006; and June 26-27, 2007. Top executives of Samsung's and LG

11  Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong

12  Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney

13  Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou

14  Tashima of Hitachi.

15         198.    Other opportunities to collude among Defendants were provided by events

16  sponsored by the Society for Information Display, such as the annual Asian Symposiums on

17  Information Display, the annual International Display Manufacturing Conference and Exhibition

18  (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on

19  Information Displays (held each August in Daegu, Korea) and the annual International Display

20  Workshops (the most recent ones of which have been held in Japan).

21         199.    Through these trade association and trade events, and in meetings related to these

22  trade associations and trade events, on information and belief, Defendants shared what would

23  normally be considered proprietary and competitively sensitive information. This exchange of

24  information was used to implement and monitor the conspiracy.

25     **H.     Effects of Defendants' Antitrust Violations**

26          **1.     Examples of Reductions in Manufacturing Capacity by Defendants**

27         200.    As explained above, during the Relevant Period, Defendants consolidated their

28  manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  to prop up prices.

2       201.    In December of 2004, MTPD closed its American subsidiary's operations in

3  Horseheads, New York, citing price and market erosion. Panasonic announced that the closing

4  was part of the company's "global restructuring initiatives in the CRT business." The company

5  further stated that in the future, "CRTs for the North American market will be supplied by other

6  manufacturing locations in order to establish an optimum CRT manufacturing structure."

7       202.    In July of 2005, LGPD ceased CRT production at its Durham, England facility,

8  citing a shift in demand from Europe to Asia.

9       203.    In December of 2005, MTPD announced that it would close its American

10  subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG

11  Philips, the company explained that it was shifting its CRT operations to Asian and Chinese

12  markets.

13       204.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its

14  CRT factory in Germany.

15       205.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton,

16  Indiana. The same month, Panasonic announced it was shutting down its CRT factory in Malaysia

17  and liquidating its joint venture with Toshiba.

18            **2.    Examples of Collusive Pricing for CRTs**

19       206.    Defendants' collusion is evidenced by unusual price movements in the CRT

20  market. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs

21  that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research

22  Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements

23  and advances in manufacturing techniques, will produce a drop in the price of the average

24  electronic display to about $50 in 1997." Despite such predictions, and the existence of economic

25  conditions warranting a drop in prices, CRT prices nonetheless remained stable.

26       207.    In 1996, another industry source noted that "the price of the 14" tube is at a

27  sustainable USD50 and has been for some years . . . ."

28       208.    In reality, prices for CRTs never approached $50 in 1997, and were consistently

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  more than double this price.

2      209.    Despite the ever-increasing popularity of, and intensifying competition from, flat

3  panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout

4  1995 according to a *CNET News.com* article. This price stabilization was purportedly due

5  exclusively to a shortage of critical components such as glass. This was a pretext used to conceal

6  the conspiracy.

7      210.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of

8  1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia

9  Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order
> to survive in his tough environment and also to prepare for the
> coming years. This means that we have to deviate from the
> traditional approach of the simple scale up of production volume.

11      211.    In early 1999, despite declining production costs and the rapid entry of flat panel

13  display products, the price of large-sized color CRTs actually rose. The price increase was

14  allegedly based on increasing global demand for the products. In fact, this price rise was the result

15  of collusive conduct amongst Defendants.

16      212.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the

17  average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an

18  industry analyst as saying that this price increase was "unlike most other PC-related products."

19      213.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors

20  in India. This price hike was falsely attributed exclusively to a shortage of glass needed to

21  manufacture CRTs.

22      214.    Over the course of the Relevant Period, the price of CRTs remained stable, and in

23  some instances went up in an unexplained manner, despite the natural trend in most technology

24  products to go down over time. CRT technology was mature, and the costs of production were

25  relatively low compared to other emerging technologies. As Finsen Yu, President of Skyworth

26  Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of

27  2007, "[t]he CRT technology is very mature; prices and technology have become stable."

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

215. CRT prices resisted downward price pressures and remained stable over a period of many years. Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy. The stability of the price of CRTs was accomplished by the collusive activities alleged above.

## I. Summary Of Effects Of The Conspiracy Involving CRTs

216. The above combination and conspiracy has had the following effects, among others:

   a. Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

   b. Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

   c. Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRT Products.

   d. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII. PLAINTIFFS' INJURIES

217. As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels. Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

218. Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their Co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy. The conspiracy artificially inflated the prices of CRTs included in CRT Products.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

219. Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product. Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiffs.

220. The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately. Defendants are well aware of this intimate relationship.

221. Throughout the Relevant Period, Defendants controlled the market for CRTs. Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

222. As a result, Plaintiffs were injured in connection with their purchases of CRT Products during the Relevant Period.

## VIII. FRAUDULENT CONCEALMENT

223. Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein. Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

224. Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRT Products.

225. The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions. Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1 | statements and would coordinate which co-conspirator would first communicate these pretextual
2 | statements to customers.

3 |     226.    By its very nature, Defendants' price-fixing conspiracy was inherently self-
4 | concealing.

5 |     227.    Plaintiffs could not have discovered the alleged contract, conspiracy or
6 | combination at an earlier date by the exercise of reasonable diligence because of the deceptive
7 | practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid
8 | detection of, and fraudulently conceal, their contract, conspiracy or combination. The contract,
9 | conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various
10 | means and methods, including, but not limited to, secret meetings, surreptitious communications
11 | between Defendants by the use of the telephone or in-person meetings in order to prevent the
12 | existence of written records, discussion on how to evade antitrust laws and concealing the
13 | existence and nature of their competitor pricing discussions from non-conspirators (including
14 | customers).

15 |     228.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings
16 | at separate venues in order to avoid detection. Participants at glass meetings were also told not to
17 | take minutes. Attending companies also reduced the number of their respective attendees to
18 | maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their
19 | agreement. During these meetings, top executives and other officials attending these meetings
20 | were instructed on more than once occasion not to disclose the fact of these meetings to outsiders,
21 | or even to other employees of Defendants not involved in CRT pricing or production. In fact, the
22 | top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at
23 | such meetings to avoid being seen in public with each other and with the express purpose and
24 | effect of keeping them secret.

25 |     229.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual
26 | reasons for price increases and output reductions to their customers.

27 |     230.    As alleged above, in early 1999, despite declining production costs and the rapid
28 | entry of flat panel display products, the price of large-sized color CRTs actually rose. The price

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    increase was allegedly based on increasing global demand for the products. In fact, this price rise

2    was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

3        231.    As alleged above, despite increased competition from flat panel monitors, prices

4    for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price

5    stabilization was purportedly due exclusively to a shortage of critical components such as glass.

6    This was a pretext used to cover up the conspiracy.

7        232.    In addition, when several CRT manufacturers, including Defendant Philips and LG

8    Electronics and Co-Conspirator Samsung, increased the price of CRTs in 2004, the price hike was

9    blamed on a shortage of glass shells use for manufacturing CRT monitors. In justifying this price

10   increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his

11   shortage [of glass shells] is a global phenomena and every company has to increase the prices of

12   CRT monitors in due course of time."

13       233.    Manufacturers such as LG Electronics periodically issued press statements falsely

14   asserting that CRT prices were being driven lower by intense competition.

15       234.    Plaintiffs are informed and believe, and thereon allege, that Defendants' purported

16   reasons for the price increases of CRTs were materially false and misleading and made for the

17   purpose of concealing Defendants' anti-competitive scheme as alleged herein.

18       235.    As a result of Defendants' fraudulent concealment of their conspiracy, the running

19   of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a

20   result of the anticompetitive conduct alleged in this Complaint.

21   **IX.    CLAIM FOR VIOLATIONS**

22                          **First Claim for Relief**

23                **(Violation of Section 1 of the Sherman Act)**

24       236.    Plaintiffs incorporate by reference all the above allegations as if fully set forth

25   herein.

26       237.    Beginning no later than March 1, 1995, the exact date being unknown to Plaintiffs

27   and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered

28   into a continuing contract, combination or conspiracy to unreasonably restrain trade and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or

2  eliminating competition in the United States.

3      238.   In particular, Defendants and their co-conspirators combined and conspired to

4  raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

5      239.   As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed,

6  maintained and stabilized in the United States.

7      240.   The contract, combination or conspiracy among Defendants consisted of a

8  continuing agreement, understanding, and concerted action among Defendants and their co-

9  conspirators.

10      241.   For purposes of formulating and effectuating their contract, combination or

11  conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or

12  conspired to do, including:

13      a.  participating in meetings and conversations to discuss the prices and supply of

14          CRTs;

15      b.  communicating in writing and orally to fix target prices, floor prices and price

16          ranges for CRTs;

17      c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a

18          manner that deprived direct purchasers of free and open competition;

19      d.  issuing price announcements and price quotations in accordance with the

20          agreements reached;

21      e.  selling CRTs to customers in the United States at noncompetitive prices;

22      f.  exchanging competitively sensitive information in order to facilitate their

23          conspiracy;

24      g.  agreeing to maintain or lower production capacity; and

25      h.  providing false statements to the public to explain increased prices for CRTs.

26      242.   As a result of Defendants' unlawful conduct, Plaintiffs were injured in their

27  businesses and property in that they paid more for CRT Products than they otherwise would have

28  paid in the absence of Defendants' unlawful conduct.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

## Second Claim for Relief

### (Violation of Minnesota Antitrust Act of 1971, Minn. Stat. § 325D.52, *et seq.*)

243.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

244.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.* Defendants conspired to and did fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.

245.    The aforesaid violations of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.*, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

246.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

      a.   to fix, raise, maintain and stabilize the price of CRTs;

      b.   to allocate markets for CRTs amongst themselves;

      c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

      d.   to allocate among themselves the production of CRTs.

247.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

      a.   price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

- 54 -

b.  prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.  those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

248.    As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRT Products they purchased during the Relevant Period.

249.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy. As a result of Defendants' violation of Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.*, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees.

## X.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.*, and that Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.    Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.    Defendants engaged in a contract, combination, and conspiracy in violation of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.*, and Plaintiffs were injured in their business and property as a result of Defendants' violations;

D.  Plaintiffs shall recover damages sustained by them, as provided by Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.*, and a joint and several judgment in favor of Plaintiffs shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

E.  Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F.  Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

G.  Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

H.  Plaintiffs shall receive such other or further relief as may be just and proper.

## XI.  JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

DATED: November 14, 2011           **ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

By: _____
Roman M. Silberfeld
David Martinez

Attorneys for Plaintiffs
BEST BUY CO., INC.; BEST BUY PURCHASING LLC; BEST BUY ENTERPRISE SERVICES, INC.; BEST BUY STORES, L.P.; BESTBUY.COM, L.L.C.; and MAGNOLIA HI-FI, INC.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES