## 4. Overview

### 4.1 LPD Holding, LPD Netherlands and LPD Investment

### 4.1.1 Causes of bankruptcy/investigation

According to the management board of LPD Holding the causes of e.g. the bankruptcies of LPD Holding, LPD Netherlands and LPD Investment should be looked for in, briefly stated, a considerable drop in the price for CRT products due to a strongly shrinking market for thick picture tubes because of an unexpectedly rapid rise of the flat picture screens and the resulting overcapacity in high wage countries such as Europe.

Because of this the management board eventually felt obliged to apply for a provisional moratorium on payment for LPD Holding, which was converted a few days later into bankruptcy, and to file for the bankruptcy of LPD Netherlands. In conjunction with the trustee of LPD Holding, the management board of LPD Investment has filed for the bankruptcy of LPD Investment.

The trustee will institute a further investigation into the events and (market) developments which together have led to the bankruptcy of LPD Holding and some of its participations.

The trustee has by now requested H.J. Neeleman, former chartered accountant, to assist him in the aforementioned investigation into the causes of the bankruptcy of the LPD companies in question, into the way in which the (former) management has performed its tasks and into the role of the two shareholders Philips and LGE.

**4.1.2 Valuation of transferred assets**

As has been set out in Chapter 3 'Status of the companies belonging to the LPD Group', various assets of LPD Holding, LPD Netherlands and LPD Investment have been transferred to, briefly stated, the Ongoing Group. It concerns the following assets:

a.     LPD Holding:

•     Inter company claims (*);

•     IT Agreements with LGE respectively Philips and a Patent Agreement with Philips;

•     General Service Agreement Korea;

•     Management Service Agreement with LPD International Ltd (Hong Kong);

•     Technology transfer and cooperation Agreement with LPD Hua Fei;

•     Shares in LPD International Ltd.


b.     LPD Netherlands:

•     Moveable property on the location Blackburn (United Kingdom) (*);

•     Moveable property on the locations Eindhoven, Sittard, Stadskanaal and Veldhoven (Netherlands) (*);

•     Claims on third parties (*);

•     Inter company claims (*);

•     IP rights Blackburn;


c.     LPD Investment:

•     All shares in LPD Brasil Ltda (*);

•     Two shares in P.T. LPD Indonesia;

•     All shares in LPD Korea (*);


The assets that have been marked with (*) have been provided as security to the Security Agent. The trustee is still investigating the validity etc. of these security assets.

As regards the assets transferred after the bankruptcy date in which a security right is vested for the benefit of the Security Agent, it has been agreed in advance that the (Security) Agent will reduce its claim on the company in question by the value of the assets. Most of the assets provided as security and transferred have by now been assessed. The trustee is at present negotiating with the Security Agent about the value which should be assigned to each asset.

As regards the transferred assets in which no security rights are vested, it has been agreed with the Ongoing Group that the trustee and the Ongoing Group will first determine the value of the transferred assets in mutual consultation after which the company in question to which the relevant asset has been sold will have to compensate the value to the relevant bankrupt company.

**4.2    LPD Holding and LPD Netherlands**

**4.2.1 "Trapped AR" Settlement**

After the bankruptcy date a number of points of dispute with LPD International have arisen, mainly concerning payments carried out and capital realised after the bankruptcy date.
This has led to an amicable settlement between the trustee and LPD International. This amicable settlement and the points of dispute to which this amicable settlement relates can be sketched in outline as follows:

•      It has become clear to the trustee that as of the bankruptcy date the bank accounts held by LPD Holding showed considerable credit balances, which balances were transferred (erroneously) after the moratorium/bankruptcy date, without the cooperation of the administrator/trustee, to bank accounts of subsidiaries of LPD International. It concerns a balance of € 2,142,941 and a balance of USD 846,201.
       It has been agreed with LPD International that these balances will be paid back to the estate of LPD Holding, which has by now been done;

- By the "restart agreement" of 29 January 2006 the trustee agreed with LPD International, among other things, that (i) all pledged accounts receivables of LPD Netherlands, including the right of pledge, will be assigned to LPD International, that (ii) all assigned receivables which will still be credited to the "old" bank account of LPD Netherlands after the date of the bankruptcy will be transferred by the trustee to LPD International and (iii) that all balances as existing on 27 January 2006 at 0:00 hours on the bank account of LPD Netherlands will be for the bankruptcy estate of LPD Netherlands. Since the wording of the agreement on the point of the balances was such that it was open to several interpretations, a dispute has arisen between the trustee on the one hand and LPD International on the other hand. LPD International interpreted the provision such that all balances existing on the date of the bankruptcy which had previously been built up from pledged accounts receivables belonged to LPD International, while the trustee was of the opposite view. The amount involved in this discussion was € 352,021. Eventually it could be agreed with LPD International that the latter amount will accrue to the bankruptcy estate of LPD Netherlands;

- After the date of the bankruptcy, as a result of the so-called zero balancing system, an amount of € 5,123,370 was debited automatically to one of the bank accounts of LPD International, and that amount was subsequently credited to one of the bank accounts of LPD Holding.

  On the instruction of LPD International this amount of € 5,123,370 was subsequently retransferred from the bank account of LPD Holding to one of the bank accounts of LPD International. This retransfer has afterwards been approved by the trustee, since LPD Holding has never been entitled to this amount.

- After the date of the bankruptcy the bank accounts of LPD Netherlands have been credited with amounts of in total € 1,909,480 and USD 671,625 in pledged receivables, which had been assigned to LPD International, which amounts have been transferred, as a result of the aforementioned zero balancing system, to the bank accounts of LPD Holding. On the

instruction of LPD International these amounts were subsequently retransferred from the bank account of LPD Holding to one of the bank accounts of LPD International. In the spirit of the above-mentioned arrangements about the pledged accounts receivables which were credited after the bankruptcy date to one of the "old" accounts of LPD Netherlands, it has been agreed that LPD International does not have to compensate the estate of LPD Netherlands for these amounts.

- Furthermore, after the date of the bankruptcy the bank accounts of LPD Netherlands have been credited with amounts of in total € 1,076,066, USD 40,479 and £ 37,261 in pledged receivables, which amounts have been transferred by order of LPD International to one of its own bank accounts. It has been agreed that LPD International does not have to pay back these amounts to the estate of LPD International.

- Finally, after the date of the bankruptcy various accounts of LPD Netherlands have been credited with amounts of in total € 2,945,054 (minus € 352,021, see above), £ 20,060 and USD 538,336 in pledged receivables. These amounts are still on the accounts of LPD Netherlands and in the course of the negotiations have gradually been referred to as "Trapped AR". Eventually it has been agreed to act also in respect of the "Trapped AR" in the spirit of the agreement of 29 January 2006, in the sense that it has been agreed that the trustee will see to it that these amounts will be transferred to LPD International.

- As indicated, the above points of dispute have been settled. The amicable settlement laid down in the "Trapped AR" settlement has the de facto consequence that the estate assets of LPD Holding increase with an amount of € 2,142,941, respectively USD 846,201 and the estate assets of LPD Netherlands with an amount of € 352,021.

## 4.3    LPD Holding

### 4.3.1 Turkey Sales Office

LPD Holding had a Sales Office in Turkey which employed one employee. This Sales Office has by now been closed and the employee dismissed. In respect of the property of LPD Holding in Turkey which has not been provided as security, two vehicles and office furniture and equipment, it has been agreed, with the permission of the bankruptcy judge, that these assets will be sold to the highest bidder. The proceeds to be generated in this way will be added to the estate assets of LPD Holding.

## 4.4    LPD Netherlands

### 4.4.1 ESF subsidies

Shortly after the bankruptcy it became clear to the trustee that LPD Netherlands had applied to be considered for the ESF-3 Subsidy Scheme for the years 2004 and 2005. At the time of the bankruptcy judgement the subsidy application for the year 2004 had been almost completed while for the subsidy application for the year 2005 some work had still to be done.

In first instance LPD International adopted the standpoint that the claims resulting from the ESF subsidy application had been transferred to it.
After the trustee could show that according to the applicable regulations the subsidy claim could not be transferred, LPD International has agreed that the subsidy claim goes to the estate of LPD Netherlands.

In the meantime, in respect of the ESF subsidy relating to the year 2004, an amount of about € 500,000 has been paid.
On instruction of the trustee and with the permission of the bankruptcy judge, the ESF subsidy process for the year 2005 has been completed by Ernst & Young. It is expected that an amount of

about € 500,000 to € 540,000 in ESF subsidies, relating to the year 2005, will be paid to the estate of LPD Netherlands.

## 4.4.2 UL licences

Between LPD Netherlands and United Laboratories Inc. ("UL") an agreement has been concluded by virtue of which LPD Netherlands and its sister companies have the right to provide the products manufactured by them with an UL quality mark. An UL quality mark is mostly required by American and Canadian buyers of the CRT products.

After negotiations agreement has been reached with LPD Eindhoven about the transfer of the rights and obligations from this agreement between LPD Netherlands and UL against a compensation of € 17,500 exclusive of VAT. After the bankruptcy judge had agreed with this transaction the transfer has been effected.

## 4.4.3 Tax loss Agreement

In the past it was customary that the English branches of LPD Netherlands sold their losses to Philips Electronics UK. For a number of reasons the English tax authorities have decided no longer to accept this construction. The trustee has understood that one of the reasons was that selling losses is only possible by an English company while the English branches cannot be considered as such.

At the time of the bankruptcy judgement of LPD Netherlands, proceedings about this issue were pending between the English tax authorities on the one hand and Philips Electronics UK, respectively LPD Netherlands on the other hand. Together with Philips Electronics UK the trustee is now examining in which way the proceedings may be continued.

### 4.4.4 Barcelona Sales Office

Until mid 2005 LPD Netherlands had a Sales Office in Barcelona (Spain). However, when closing this Sales Office LPD Netherlands failed to notify the Spanish tax authorities because of which the Spanish tax authorities continue to make tax assessments on LPD Netherlands. The trustee is now working on the cancellation of the registration of the Barcelona Sales Office. It is also investigated whether and, if so, in which way the assessments made can as yet be undone.

### 4.4.5 Rent

As set out in the trustee's first report, LPD Netherlands rented the following industrial premises and residential accommodation:

- Industrial premises, situated in Eindhoven at the Zwaanstraat 2 a. This lease has by now been terminated with the permission of the bankruptcy judge;
- Industrial premises, situated in Eindhoven at the Zwaanstraat, the buildings TY and TZ. This lease has by now been terminated with the permission of the bankruptcy judge;
- Industrial premises, situated in Sittard at the Rijksweg Noord 281. This lease has been taken over by LG.Philips Displays Sittard BV;
- Industrial premises, situated in Stadskanaal at the Electronicaweg 1. This lease has by now been terminated with the permission of the bankruptcy judge;
- Storage space, situated in Veldhoven at the Run 5139-5151 (partly), 5201-5209 (partly) and 5202 (partly). This lease has by now been terminated with the permission of the bankruptcy judge;
- Residential accommodation, situated in Geldrop at the Hulst 147a. This rental agreement has by now been terminated with the permission of the bankruptcy judge;
- Residential accommodation, situated in Son at the Vliehors 38. This rental agreement has by now been terminated with the permission of the bankruptcy judge;

- Residential accommodation, situated in Eindhoven at the Heesakkerstraat 27. This rental agreement has by now been terminated with the permission of the bankruptcy judge.

The leases that have not been taken over have been terminated, as indicated, with due observance of Article 39 Bankruptcy Act. By now various lessors have made known their unsecured claims on the estate. The trustee is still investigating these claims. The trustee does not exclude that the number of claims on the estate will further increase due to the premature termination of the leases, for instance since the trustee is unable to comply (in full) with his obligation to vacate. In that connection the trustee draws for instance attention to the fact that it has become clear to him that LPD, and formerly Philips, have permitted a number of companies to place sheds and suchlike on the site of the industrial premises in Eindhoven at the Zwaanstraat 2a while in the meantime a number of those businesses have gone bankrupt, due to which the trustee should now examine whether and, if so, how these sheds should be removed.

### 4.4.6. Current proceedings

It has recently become known to the trustee that an employee in the United Kingdom has instituted proceedings against LPD Netherlands. The trustee has by now engaged an English lawyer in order to be advised about the claim instituted by the employee and also, if needed, to put up a defence.

38

## 5. Financing / Security assets

### 5.1   Facility Agreement / Restructuring Agreement

As described in the first report, when setting up of the joint venture, LPD Holding attracted capital (a so-called Syndicated Loan) for a total amount of USD 2 billion. The financing has been laid down in a so-called "Facility Agreement" which Facility Agreement is governed by English law. LPD Holding is Borrower and virtually all LPD companies, including LPD Netherlands and LPD Investment, are joint and several co-debtors (Guarantors). In addition, LGE and Philips have each provided a guarantee of USD 50 million to the Bank Syndicate. The guarantees have by now been invoked and LGE and Philips have honoured them at the end of 2005.

Of the borrowed amount of USD 2 billion an amount of USD 1.1 billion has been paid to LGE for the purchase of a few factories which were owned by LGE. The payment of the USD 1.1 billion in question has been realised by the issue of Floating Rate Notes to the value of USD 1.1 billion by (the present) LPD Korea. LPD Holding is the holder of all Floating Rate Notes and LPD Holding has paid an amount of USD 1.1 billion to LPD Korea. LPD Korea has subsequently paid USD 1.1 billion to LGE.

An amount of USD 255,000,000 has been paid to Philips for the purchase of a few factories.

Already at the end of 2001 LPD Holding defaulted on its obligations under the Facility Agreement, reason why a restructuring appeared necessary in order to be able to fulfil its obligations under the Facility Agreement. After a first restructuring in 2001/2002 a second restructuring necessitated by continuously worsening market conditions took place in 2003/2004. The restructuring measures have been laid down in two "Restructuring Agreements" which Agreements are a supplement to the Facility Agreement.

As regards providing security, it applies that at the commencement of the Facility Agreement no security was provided to LPD Holding and its subsidiaries. A number of companies did provide