# Exhibit A

Docket No. 10-17354

_In the_

# United States Court of Appeals

_for the_

## Ninth Circuit

_____

PAMELA BRENNAN, TERRY CRAYTON, and DARLA MARTINEZ,
on behalf of themselves and all others similarly situated,

_Plaintiffs-Appellants,_

v.

CONCORD EFS, INC., FIRST DATA CORP., BANK OF AMERICA, N.A.,
JPMORGAN CHASE BANK, N.A., BANK ONE, N.A., CITIBANK, N.A.,
CITIBANK (WEST), FSB, SUNTRUST BANKS, INC., WACHOVIA
CORPORATION, WELLS FARGO BANK, N.A., SERVUS FINANCIAL CORP.

_Defendants-Appellees._

_____

Appeal from Final Judgment of the
United States District Court
For the Northern District of California
_In re ATM Fee Antitrust Litigation_, Case No. 3:04-cv-026776-CRB

---

## AMICI CURIAE BRIEF OF INTERESTED RETAILERS AND THE AMERICAN ANTITRUST INSTITUTE IN SUPPORT OF APPELLANTS' PETITION FOR REHEARING EN BANC

---

Jonathan J. Ross
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, TX  77002
(713) 651-9366
**_Attorneys for Amici Curiae_**

## CORPORATE DISCLOSURE STATEMENTS

1.     Pursuant to Fed. R. App. P. 26.1, Alfred H. Siegel, as Trustee of The Circuit City Stores, Inc. Liquidating Trust states as follows:  Alfred H. Siegel, as Trustee of The Circuit City Stores, Inc. Liquidating Trust does not have a parent corporation and no publicly held company owns 10% or more of the amicus' stock.

2.     Pursuant to Fed. R. App. P. 26.1, P.C. Richard & Son Long Island Corporation states as follows: P.C. Richard & Son Long Island Corporation does not have a parent corporation and no publicly held company owns 10% or more of the amicus' stock.

3.     Pursuant to Fed. R. App. P. 26.1, Electrograph Systems, Inc. states as follows:  Electrograph Systems, Inc. is a wholly-owned subsidiary of Electrograph Technologies Corp. and no publicly held company owns 10% or more of the amicus' stock.

4.     Pursuant to Fed. R. App. P. 26.1, the American Antitrust Institute states that it is a nonprofit corporation and, as such, no entity has any ownership interest in it.

5.     Pursuant to Federal Rule of Appellate Procedure 26.1, Interested Retailers, Best Buy Co., Inc., Best Buy Purchasing LLC, Best Buy Enterprise Services, Inc., Best Buy Stores, L.P., Bestbuy.com, L.L.C., and Magnolia Hi-Fi, Inc. through their undersigned counsel, hereby certify as follows:  Best Buy Co.,

Inc. does not have a parent corporation and no publicly held company owns 10% or more of its stock.  Best Buy Enterprise Services, Inc., Best Buy Purchasing LLC, Best Buy Stores, L.P., Bestbuy.com, L.L.C., and Magnolia Hi-Fi, Inc. are wholly-owned by Best Buy Co., Inc.

6.      Pursuant to Fed. R. App. P. 26.1, Target Corporation states as follows: Target Corporation has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

7.      Pursuant to Fed. R. App. P. 26.1, Sears, Roebuck and Co. states as follows: Sears, Roebuck and Co.'s parent corporation is Sears Holdings Corporation.  Sears Holdings Corporation is a publicly held corporation that owns 10 percent or more of Sears, Roebuck and Co.'s stock.

8.      Pursuant to Fed. R. App. P. 26.1, Kmart Corporation states as follows: Kmart Corporation's indirect parent corporations are Sears Holdings Corporation and Kmart Holding Corporation, and its direct parent corporation is Kmart Management Corporation.   Sears Holdings Corporation is a publicly held corporation that owns 10 percent or more of Kmart Corporation's stock.

9.      Pursuant to Fed. R. App. P. 26.1, Old Comp Inc. states as follows: Old Comp Inc.'s parent corporation is Special Equity, LLC, and no publicly held corporation owns 10 percent or more of its stock.

ii

2359323v1/011997

10.   Pursuant to Fed. R. App. P. 26.1, Good Guys, Inc. states as follows: Good Guys, Inc.'s parent corporation is Old Comp Inc., and no publicly held corporation owns 10 percent or more of its stock.

11.   Pursuant to Fed. R. App. P. 26.1, RadioShack Corporation states as follows: RadioShack Corporation has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENTS ........................................................i

TABLE OF CONTENTS..........................................................................iv

TABLE OF AUTHORITIES ....................................................................v

INTRODUCTION AND STATEMENT OF INTEREST OF AMICI.....................1

ARGUMENT ....................................................................................3

I.     Application of the Direct Purchaser Rule and Its Exceptions.......................3

      A.     *Illinois Brick*. ....................................................................3

      B.     Implementation of *Illinois Brick*'s Principles. .....................6

      C.     *Utilicorp* and *ARC America*. .............................................10

      D.     Appellate Practice After *Utilicorp*. ....................................12

II.     The Panel's Decision Is Contrary To Thirty-Five Years of Application of the Direct Purchaser Rule....................................16

      A.     Plaintiffs Are Not Indirect Purchasers. ...............................17

      B.     The Co-Conspirator Exception Applies Regardless of Which Price is Fixed. ...............................................................18

      C.     The Panel's Restriction of *Freeman* Is Unwarranted.........................20

CONCLUSION ....................................................................................21

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*Arizona v. Shamrock Foods Co.*,
  729 F.2d 1208 (9th Cir. 1984) .......................................................... 9, 10, 18

*Blue Shield of Virginia v. McCready*,
  457 U.S. 465 (1982).........................................................................7

*California v. ARC America Corp.*,
  490 U.S. 93 (1989).........................................................................10

*Campos v. Ticketmaster Corp.*,
  140 F.3d 1166 (8th Cir. 1998) ........................................................12

*Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*,
  523 F.3d 1116 (2008) ......................................................................15

*Fontana Aviation, Inc. v. Cessna Aircraft Co.*,
  617 F.2d 478 (7th Cir. 1980) ........................................................ 7, 8, 17, 18

*Free v. Abbott Laboratories, Inc.*,
  176 F.3d 298, 299 n.1 (1999) .....................................................12

*Freeman v. San Diego Ass'n of Realtors*,
  322 F.3d 1133 (2003) ........................................................... passim

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
  392 U.S. 481 (1968)............................................................ 3, 5, 11, 14

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977)............................................................. passim

*In re Beef Indus. Antitrust Lit.*,
  600 F.2d 1148 (5th Cir. 1979) .....................................................8

*In re Brand Name Prescription Drugs Antitrust Litigation*,
  123 F.3d 599, 604 (7th Cir. 1997) .................................................14

*In re Sugar Industry Antitrust Lit. v. Amstar Crop.*,
   579 F.2d 13 (3rd Cir. 1978) ................................................................. passim

*In Re: Linerboard Antitrust Litigation*,
   305 F.3d 145 (3rd Cir. 2002) ............................................................... passim

*Jewish Hospital Ass'n of Louisville, Kentucky,
   Inc. v. Stewart Mechanical Enterprises,
   Inc.*, 628 F.2d 971 (1980) ...........................................................................8

*Kansas v. Utilicorp United, Inc.*,
   497 U.S. 199 (1990)..................................................................... passim

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042, 1049-50 (9th Cir. 2008)............................................. 15, 18

*Lowell v. American Cyanamid Co.*,
   177 F.3d 1228 (11th Cir. 1999) ................................................................10

*Paper Systems Inc. v. Nippon Paper Indus. Co., Ltd.*,
   281 F.3d 629 (7th Cir. 2002) .............................................................. passim

*Royal Printing Co. v. Kimberly-Clark Corp.*,
   621 F.2d 323 (1980) ............................................................... 8, 9, 14, 15

## **Statutes**

Fed. R. App. P 32(a)(7)(B)(iii) ...............................................................22

Fed. R. App. P. 29(d) ..............................................................................22

Fed. R. App. P. 32 (a)(6)..........................................................................22

Fed. R. App. P. 32 (a)(7)(B) ....................................................................22

## INTRODUCTION AND STATEMENT OF INTEREST OF AMICI

Amici Curiae are a group of retailers ("Retailers") who have been in the past and are currently involved in antitrust litigation in the United States.[1]  Retailers have faced several large antitrust violations over the years from cartels and other conspiracies to fix the prices of either the goods Retailers sell or the key components of those goods.  As the first purchaser of goods outside of these conspiracies, Retailers often serve as the "private attorneys general" contemplated by the antitrust laws of the United States.[2]

The American Antitrust Institute (AAI) also joins this brief as amicus curiae. The AAI is an independent, non-profit education, research, and advocacy organization whose mission is to sustain the vitality of the antitrust laws which would be undermined by the Panel's application of the direct purchaser rule.[3]

Amici file this brief in support of Appellant's Petition for Rehearing en Banc to assist the Court in determining whether the Panel erred in three of its conclusions: (1) that plaintiffs are not direct purchasers where they are the first

---

[1]   The specific retailers joining this brief are Sears, Roebuck and Co., Target Corp., K-Mart Corp., RadioShack Corporation, Old Comp Inc. (f/k/a CompUSA), Good Guys, Inc., Electrograph Systems, Inc., P.C. Richard & Son Long Island Corp., Best Buy Co., Inc., Best Buy Purchasing LLC., Best Buy Enterprise Services, Inc., Best Buy Stores, L.P., Bestbuy.com, L.L.C., Magnolia Hi-Fi, Inc., and Alfred H. Siegel, as Trustee of The Circuit City Stores Liquidating Trust.

[2]   Retailers are currently serving in that role in two cases pending in this Circuit, *In re TFT LCD (Flat Panel) Antitrust Litigation* and *In re Cathode Ray Tube (CRT) Antitrust Litigation.*

[3]   The Board of Directors has approved this filing for AAI; views of individual members of AAI's Advisory Board may differ from AAI's positions.  Certain members of AAI's Advisory Board are at law firms that are the co-lead counsel for plaintiffs in this matter, but those members played no role in the Directors' deliberations or the drafting of the brief.  Pursuant to Fed. R. App. P. 29(c)(5), amici state that none of the parties to the *ATM Fee* case made any financial contribution to the drafting or filing of this brief.  Nor did any of the lawyers employed by those parties contribute to any work on this brief.

1

purchaser outside of the conspiracy, (2) that the co-conspirator exception to the direct purchaser rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), should be limited in its application only to circumstances when the conspirators conspire to fix the price paid by the antitrust plaintiff (as opposed to the upstream price one conspirator charges another), and (3) that the "no realistic possibility that direct purchasers will sue" doctrine enunciated by the Ninth Circuit in *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (2003), is limited solely to situations where a defendant in the conspiracy owns or controls (as narrowly defined by the Panel) the direct purchaser which sold the product to the antitrust plaintiff.

All three of these conclusions fail to recognize that the touchstone question is which entity is the first in the chain of distribution to have the ability and incentive to bring an antitrust action.  Instead, the Panel focused on specifics like ownership and control, while ignoring the purpose behind the ownership and control exception: that the "direct" purchaser in cases where it is owned or controlled by the conspirator will obviously never sue.  The Panel's focus on the tree of ownership and control ignores the forest of whether or not a party has the capacity and incentive to sue.

An examination of *Illinois Brick* and its appellate progeny demonstrate that the Panel's conclusions are not consistent with the Supreme Court's purpose in creating the direct purchaser rule, nor the case law implementing that purpose,

2

including that of this Circuit.  If the Panel's conclusions stand, they give a roadmap to antitrust conspirators on how to avoid the antitrust laws of the United States: two arms-length entities simply enter into a conspiracy to fix the price of a key component of a finished product that the downstream conspirator then sells to purchasers such as Retailers.  The Panel's decision creates a large and exploitable loophole in the direct purchaser rule, which should be corrected.

## ARGUMENT

## I.    Application of the Direct Purchaser Rule and Its Exceptions

To best understand the Panel's failure to abide by the principles enunciated above, it is useful to first examine the Supreme Court's decision in *Illinois Brick*, the implementation of the rule announced therein by the appellate courts, the two subsequent Supreme Court cases that commented on that implementation, and the subsequent appellate case law.

### A.    *Illinois Brick*.

The Supreme Court's decision in *Illinois Brick* answered a question that had been lingering since its decision in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968): if a defendant could not use as a defense to an antitrust claim the argument that the true antitrust injury was suffered by indirect (downstream) purchasers rather than the direct (midstream) purchaser plaintiff,

could an indirect purchaser use the argument offensively and assert claims against the antitrust conspirator?  The Supreme Court's answer was no.

The Court gave two reasons.  First, the Court indicated that it would not be fair to allow plaintiffs the same antitrust theory as a weapon that it had denied defendants as a defense.  *Illinois Brick*, 431 U.S. at 735.  The Court then turned to an examination of the economic challenges of determining which potential plaintiff downstream from the conspiring defendants was in the best position to recover damages.  The Court concluded that the first potential plaintiff in the distribution chain, the "direct purchaser," was the plaintiff best suited to sue for damages.  *Id.* at 737-38.  In doing so, the Court expressed concern that if all the potential purchasers in the distribution chain had a right to sue, actions would become unmanageable from both an economic (partitioning of damages) and legal (multiplicity of parties) standpoint.  *Id*. at 738-45.

The Court's concerns were in part based on the detrimental effect on antitrust litigation if causes of action were not limited to the direct purchaser.  "The apportionment of the recovery throughout the distribution chain would increase the overall costs of recovery by injecting extremely complex issues into the case; at the same time such an apportionment would reduce the benefits to each plaintiff by dividing the potential recovery among a much larger group….The combination of

increasing the costs and diffusing the benefits of bringing a treble-damages action could seriously impair this important weapon of antitrust enforcement." *Id.* at 745.

The Court concluded its analysis with an elegant statement on the purpose of the direct purchaser rule:

> We think the longstanding policy of encouraging vigorous private enforcement of the antitrust laws supports our adherence to the *Hanover Shoe* rule, under which direct purchasers are not only spared the burden of litigating the intricacies of pass-on but are also permitted to recover the full amount of the overcharge. We recognize that direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers. But on balance, and until there are clear directions from Congress to the contrary, we conclude that the legislative purpose in creating a group of "private attorneys general" to enforce the antitrust laws under § 4 is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it.

*Id.* at 745-46 (citations omitted). With that purpose in mind, the Court recognized that there would be exceptions to the rule it just announced. In fact, the Court indicated two potential exceptions: cases involving cost-plus contracts (because the pass-on concerns would not exist), and cases where the direct purchaser is owned or controlled by its customer. *Id.* at 736 & n.16. It did not preclude other exceptions, other than to comment that the direct purchaser rule was not a rule whose application should be determined on a market by market (or industry by industry) basis. *Id.* at 744.

5

**B.      Implementation of *Illinois Brick*'s Principles.**

The Third Circuit was the first circuit court to implement the holding of *Illinois Brick*.  In *In re Sugar Industry Antitrust Lit. v. Amstar Crop.*, 579 F.2d 13 (3rd Cir. 1978), the Circuit was faced with a similar fact pattern to the one confronted by the Panel.  Manufacturers of sugar conspired to fix the price of sugar that was used in food products sold by themselves and others in the conspiracy.  The manufacturers did not fix the price of the food products themselves, but rather just the price of the upstream ingredient: sugar.  *Id.* at 15-16.

The defendants argued that *Illinois Brick* deprived plaintiff of standing because it was an indirect purchaser of the sugar, which was purchased by members of the conspiracy for use in the finished food products.   The Court disagreed, finding that the plaintiff, as the first purchaser outside of the conspiracy, had standing as the direct purchaser.  *Id.* at 18.   It expressed concern that a refiner who illegally set the price of sugar could shield itself from the antitrust laws by putting the price-fixed product into the finished product.   "*Illinois Brick* did not purport to provide any such escape.  The opinion was at pains to point out that all of the overcharges could be collected by direct purchasers, the parties the Court believed most likely to take action against price-fixers."  *Id.*

The opinion further pointed out that there was no need to differentiate between sales by a division of one defendant and those by a subsidiary of another,

6

that either was controlled by the parent conspirator and thus could not be expected to sue its parent as the Supreme Court anticipated in *Illinois Brick*. *Id*. at 18-19. Thus for the Third Circuit, the principles enunciated in *Illinois Brick* were best followed by finding the direct purchaser to be the first purchaser in the distribution chain outside of the conspiracy (i.e., conspirators or entities controlled by a conspirator cannot be direct purchasers).

Other circuits followed this basic principle. In *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478 (7th Cir. 1980), the plaintiff purchased aircraft from an entity separate from the defendant manufacturer, Cessna. Cessna asserted that *Illinois Brick* barred plaintiff from having standing to sue, and the district court agreed. *Id*. at 479.

The Seventh Circuit reversed. It pointed out that while the plaintiff had not sued the distributor, it alleged that the manufacturing defendant conspired with the distributor to monopolize the market in question. The Court noted that in effect, *Illinois Brick* did not apply to these circumstances as the both the manufacturer and the distributor were alleged to be co-conspirators in a common illegal scheme. *Id*. at 481. Thus in this circumstance, a court again looked to the first purchaser outside of the conspiracy to find standing to enforce the antitrust laws.[4]

---

[4]   Two years later the Supreme Court itself noted that its holding in *Illinois Brick* was not meant to be applied blindly in all cases. *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 474-75 (1982) (holding that *Illinois Brick*'s focus on the risk of duplicative recoveries engendered by allowing every person along a chain of distribution

The Sixth Circuit applied these principles in *Jewish Hospital Ass'n of Louisville, Kentucky, Inc. v. Stewart Mechanical Enterprises, Inc.*, 628 F.2d 971 (1980).  The Court recognized both the control and cost-plus exceptions enunciated in *Illinois Brick*, as well as the concept enunciated in *Fontana Aviation* that, given a vertical conspiracy between the two defendants, *Illinois Brick* was not applicable. It found, however, that the pleadings before it did not allege facts sufficient to sustain any of the exceptions.  It distinguished the facts alleged in the case before it from the facts alleged in *In re Sugar* while accepting the rationale of the Third Circuit.  *Id*. at 975.[5]

In the first decade after *Illinois Brick* this Circuit applied its principles in two cases heavily discussed in the Panel decision.  In *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323 (1980), plaintiffs alleged that defendant manufacturers of paper products sold their products through their wholesale divisions or wholly-owned subsidiaries, as well as through independent wholesalers[6].  The plaintiffs alleged purchases from different divisions or subsidiaries of the defendants,

---

to claim damages arising from a single transaction not applicable where the facts of the antitrust case before it "offers not the slightest possibility of a duplicative exaction").

[5]  In the immediate aftermath of *Illinois Brick* the Fifth Circuit also recognized the concept that in a vertical conspiracy what it called a "co-conspirator exception" to the *Illinois* Brick rule could be recognized (though it found it was not adequately pled in the case before it), though it expressed a belief, contrary to the Seventh Circuit's ruling in *Fontana Aviation*, that the middle-men who were alleged to be co-conspirators should be named as party defendants so as to avoid potential overlapping liability.  *See In re Beef Indus. Antitrust Lit.*, 600 F.2d 1148, 160-63 (5th Cir. 1979).  *See also Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1171 & n.4 (8th Cir. 1998).

[6]  As to purchases plaintiffs made from the independent wholesalers, this Court found plaintiffs to be classic indirect purchasers and have no standing under *Illinois Brick*.  *Royal Printing*, 621 F.2d at 327-38.  That finding is entirely consistent with *Illinois Brick* and the view of Retailers in this brief.

8

including paper manufactured by one defendant and sold to the subsidiary of another defendant, before being re-sold to plaintiffs. *Id.* at 324.

This Court held that *Illinois Brick* does not deprive an indirect purchaser of standing where the direct purchaser is a division or subsidiary of a co-conspirator. *Id*. at 326. Given that there was "little reason for a price-fixer to fear a direct purchaser's suit when the direct purchaser is a subsidiary or division of a co-conspirator," the Court noted that allowing the plaintiff to sue would not "pose the same risk of multiple liability held objectionable in *Illinois Brick*." *Id.* The touchstone of this Court's analysis was consistent with the other cases cited above: the direct purchaser rule is designed to promote, not undermine, the effective enforcement of the antitrust laws.

This Court further addressed the issue in *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208 (9th Cir. 1984). This Court held that consumers who purchased dairy products from grocery stores have standing to sue dairy product producers to the extent that the plaintiffs allege either (a) a horizontal conspiracy amongst the grocery stores to fix prices, or (b) a vertical conspiracy between the dairy product manufacturers and the retail grocery stores to fix the price paid by the consumers.

*Id.* at 1211-12.  Either way, the consumers would be the first party outside of the conspiracy able and willing to bring suit.[7]

### C.   *Utilicorp* and *ARC America*.

In 1989 and 1990 the Supreme Court had occasion to comment on and discuss its holding in *Illinois Brick*.  In *California v. ARC America Corp.*, 490 U.S. 93 (1989), the Court briefly commented on the concerns that motivated its adoption of the direct purchaser rule:

> In *Illinois Brick*, the Court was concerned not merely that direct purchasers have sufficient incentive to bring suit under the antitrust laws, as the Court of  Appeals asserted, but rather that at least some party have sufficient incentive to bring suit.  Indeed, we implicitly recognized as much in noting that indirect purchasers might be allowed to bring suit in cases in which it would be easy to prove the extent to which the overcharge was passed on to them.

*Id.* at 102 n.6.  Again, the Court reminded lower courts of the rationale behind the rule: to find the party in the best position to enforce the antitrust rules.

In *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990), the Court had occasion to reinforce both its rationale for the rule, and its previous instruction that the rule was not to be subject to an industry by industry review.  The Court began its review by reiterating its holding in *Illinois Brick* that it is the first purchaser

---

[7]   The Panel's decision argues that this Court restricted its holding with regard to vertical conspiracies only to those cases where the retail price (the price paid by the plaintiff) is the price specifically being fixed.  As discussed *infra*, that issue was not before this Court in *Shamrock Foods* and the Panel's attempt to use that case to support its new restriction on a long-held exception to application of *Illinois Brick*'s indirect purchaser rule is unavailing.  Other appellate decisions have cited *Shamrock Foods* for the proposition that *Illinois Brick* does not apply to a vertical conspiracy to fix the retail price paid by the plaintiff, but none have taken the step that the Panel took in declaring that *Illinois Brick* denies standing to a downstream plaintiff if the conspirators conspire to fix the input price in order to raise the output price.  *See, e.g., Lowell v. American Cyanamid Co.*, 177 F.3d 1228, 1229-32 (11th Cir. 1999).

10

outside of the conspiracy who is the direct purchaser by defining who is an indirect purchaser:  "In the distribution chain, they are not the immediate buyers from the alleged antitrust violators."  *Id.* at 207.

Because the consumers had no argument that they were the first buyer outside of the conspiracy, they asserted that the industry in question (regulated public utilities) was not suitable to the direct purchaser rule.  The idea that the rule should be subject to an industry-by-industry standard, however, had been rejected by the Supreme Court in *Illinois Brick* and that rejection was reiterated here: "Although the rationales of *Hanover Shoe* and *Illinois Brick* may not apply with equal force in all instances, we find it inconsistent with precedent and imprudent in any event to create an exception for regulated public utilities."  *Id.*

In its discussion the Court re-iterated that its interpretation of § 4 "must promote the vigorous enforcement of the antitrust laws," noting that if they were "convinced that indirect suits would secure this goal better in cases involving utilities, the argument to interpret § 4 to create the exception sought by the petitioners might be stronger."  *Id*. at 214.  But in the end, it determined that not to be the case: "Petitioners' argument does no persuade us that utilities will lack incentives to sue overcharging suppliers."  *Id.*  The Court concluded by reiterating that despite the fact that the economic rationales of its previous decisions might not apply with equal force in all cases, they were correct not to carve out exceptions

11

for "particular types of markets," quoting the phrase from *Illinois Brick*. *Id.* at 216. "[W]e remain unconvinced that the exception sought by the petitioners would promote antitrust enforcement better that the current *Illinois Brick* rule." *Id.*

Important to this discussion is what the Court did *not* do in *Utilicorp*. It did not reject any of the circuit court interpretations of *Illinois Brick* discussed above. It did not declare that any of the existing exceptions had gone too far or should be questioned. The only exception that it questioned was the one it originally posited and rejected in *Illinois Brick*: varying application of the direct purchaser rule by industry.

### D.    Appellate Practice After *Utilicorp*.

After *Utilicorp* appellate courts continued to recognize the first purchaser outside of the conspiracy concept laid out by the Supreme Court. The Fifth Circuit noted that indirect purchasers "'are not the immediate buyers from the alleged antitrust violators,' but are those who buy goods through an intermediary such as a retailer or wholesaler." *Free v. Abbott Laboratories, Inc.*, 176 F.3d 298, 299 n.1 (1999) (*quoting Utilicorp*, 497 U.S. at 207). *See also Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1169 (8th Cir. 1998) (quoting same).

In *In Re: Linerboard Antitrust Litigation*, 305 F.3d 145 (3rd Cir. 2002), the Third Circuit returned to the issue. In *Linerboard*, the plaintiffs purchased corrugated sheets from defendants that contained a price-fixed component:

linerboard.  In the defendants' view, since the price that was fixed was upstream and not paid by the plaintiffs, *Illinois Brick* deprived plaintiffs of standing.  The Third Circuit disagreed.  As in *Sugar*, the Court found that the plaintiffs purchased from the conspirators themselves: thus *Illinois Brick* did not apply.  *Id.* at 159-60.  Nothing in *Utilicorp* cast any doubt that *Sugar* continued to be good law.

The Seventh Circuit reinforced its previous understanding of the direct purchaser rule in *Paper Systems Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629 (7th Cir. 2002), and in the process discussed the different labels that courts had applied to the same concept: the first purchaser outside of the conspiracy is the direct purchaser of *Illinois Brick*.  In that case, defendants conspired to fix the price of a specialty paper.  Plaintiffs purchased paper in several different ways: (1) directly from some of the defendant manufacturers, (2) from co-conspirators of the defendant manufacturers, and (3) from middlemen who were not alleged to be part of the conspiracy.  *Id.* at 631-32.

The Court applied *Illinois Brick* and *Utilicorp* and found standing for the plaintiffs in the first two examples, but not in the third, consistent with prior application of the direct purchaser rule.  As the court noted in discussing the purchases from the middlemen:

> The complaint alleges that Elof and the two Mitsubishi trading firms are members of the conspiracy, which makes plaintiffs the first purchasers from *outside* the conspiracy.  The right to sue middlemen that joined the conspiracy is sometimes referred to as a co-conspirator

13

> "exception" to *Illinois Brick* but it would be better to recognize that
> *Hanover Shoe* and *Illinois Brick* allocate to the first non-conspirator in
> the distribution chain the right to collect 100% of the damages.

*Id.* at 631-32 (emphasis in original).   *See also In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599, 604 (7th Cir. 1997) (any indirect purchaser defense goes by the board where wholesalers participate in manufacturers' conspiracy since the wholesalers' customers are then direct purchasers from the conspirators).   Tellingly, in neither case was the Seventh Circuit's understanding of the application of the direct purchaser rule based on which price was being fixed.

This Circuit has also reinforced post-*Utilicorp* its understanding that the first purchaser outside of the conspiracy has standing to sue.   In *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (2003), this Circuit reiterated its holding in *Royal Printing* that indirect purchasers can sue for damages "if there is no realistic possibility that the direct purchaser will sue its supplier over the antitrust violation."   *Id*. at 1145-46.   In this case, this Circuit found a unity of interest because the defendants at the top of the distribution chain both owned the middleman and were accused of conspiring with it.   *Id.* at 146.   Unlike the Panel's decision, however, nowhere in *Freeman* does this Circuit suggest that *Royal Printing*'s "no realistic possibility" exception should be limited solely to ownership or control.   To the contrary:

> The associations engaged in price fixing, and plaintiffs have standing to sue them.  The associations purposely fixed the support fee they charged Sandicor at a supracompetitive level.  Sandicor passed on some portion of the inflated support fee to agents, who paid higher prices for the MLS as a result.  This is precisely the type of injury the antitrust laws are designed to prevent.

*Id.* at 1147.  This Circuit's holding in *Freeman* is completely consistent with the Third Circuit's holdings in *Sugar* and *Linerboard*: the first entity outside of the conspiracy has direct standing to sue, regardless of the level at which the price was fixed.

This Circuit also reaffirmed the principles of *Royal Printing* in *Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116 (2008), noting that *Royal Printing* allowed the suit to proceed against the wholesalers who were subsidiaries of the defendants, but not against the independent wholesalers where there was no allegation of control or participation in the conspiracy.  *Id.* at 1121.

The *Delaware Valley* Court further noted that it had recently reaffirmed the direct purchaser rule in *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049-50 (9th Cir. 2008), where it held that the banks were middlemen between the merchant plaintiffs and the defendant credit card companies, and thus it was the banks who had the right to sue as direct purchasers, not the merchant plaintiffs.  Critical to this Court's conclusion was the fact that in *Kendall*, the merchant plaintiffs "failed to allege any facts showing that the banks were either controlled by or in a conspiracy with the credit card companies."  *Delaware Valley*, 523 F.3d at 1122.  Again, this

15

Court, along with the other circuits, looked to find the first entity outside of the conspiracy to find *Illinois Brick*'s direct purchaser.

## II.     The Panel's Decision Is Contrary To Thirty-Five Years of Application of the Direct Purchaser Rule.

In *ATM Fee* the Panel ignores thirty-five years of jurisprudence in finding that the plaintiffs do not have standing to allege antitrust violations because they are indirect purchasers under *Illinois Brick*.  The panel makes this finding despite acknowledging that the plaintiffs are the first entity outside of the conspiracy to make any purchases.  In fact, the Panel is unequivocal in its assertion that it does not matter to its determination whether anyone would sue the defendants under its view of the law.  That antitrust violations would go unpunished is, to the Panel's view, irrelevant.

The Panel supports this position by arguing that (1) the plaintiffs are indirect purchasers because they did not pay the fee that was fixed, despite the fact that the fixed fee was incorporated into the product and plaintiffs are the first purchasers outside of the conspiracy, (2) the conspiracy fixed an up-stream price rather than the price paid by the plaintiffs, and thus the co-conspirator exception does not apply, and (3) *Freeman*'s "no realistic possibility of suit" doctrine must be limited to a situation where the middleman is owned or controlled by the upstream defendant.

16

All three of these propositions are wrong, and will be addressed in turn below.  But it is worth noting that all three collectively violate the Supreme Court's admonition in *Illinois Brick* that a purpose of the direct purchaser rule is to find a purchaser outside of the conspiracy to uphold the federal antitrust laws.  Instead, accepting the plaintiffs' allegations as correct, under the Panel's interpretation of the rule no entity will uphold the antitrust laws.  The Panel finds that a conspirator is the only entity that can sue as the direct purchaser.  The Panel's decision leaves a gaping hole in enforcement of the antitrust laws.

### A.    Plaintiffs Are Not Indirect Purchasers.

The Panel in short order determines that plaintiffs are indirect purchasers because they did not pay the illegally-fixed interchange fee, but rather paid the foreign ATM fee which contained the fixed fee.  In a footnote, the Panel stated its rejection of the Third and Seventh Circuits cases whose holdings reject the Panel's understanding of the applicability of the direct purchaser rule.

As we have seen, the Third Circuit found in *Sugar* and *Linerboard* that fixing the price of an item that was incorporated into the item purchased by the plaintiff made the plaintiff the direct purchaser of the product, thus *Illinois Brick* did not apply.  The Seventh Circuit, in *Fontana Aviation* and *Nippon Paper*, found that the first purchaser from outside the conspiracy could bring suit as the direct purchaser.

In its footnote, the Panel simply states that these holdings are in violation of the Supreme Court's admonition in *Utilicorp* not to carve out exceptions for particular types of markets. But that is not what *Sugar, Linerboard, Fontana Aviation,* or *Nippon Paper* do. They are not exceptions based on the economics of a particular industry, which the Supreme Court disapproved in both *Illinois Brick* and *Utilicorp*. Rather, these decisions simply support the proposition that the direct purchaser rule has no application until one is outside of the conspiracy. *Sugar* and *Fontana Aviation* were decided just a few years after *Illinois Brick*, and nothing in *Utilicorp* indicated disapproval with their reasoning as to why the direct purchaser rule did not apply. En banc review is necessary in this case in order to overrule the Panel's rejection of these longstanding principles.

## B. The Co-Conspirator Exception Applies Regardless of Which Price is Fixed.

The Panel's second mistake is its finding that the co-conspirator exception to the direct purchaser rule only applies when the price that is fixed is the price paid by the downstream plaintiff. The Panel finds irrelevant that the co-conspirators fixed the upstream price that was incorporated into the price paid by the plaintiffs.

The Panel relies on both *Shamrock Foods* and *Visa U.S.A.* for this proposition. While it is true that this Court in both those cases dealt with a fact pattern in which the fixed price was the price paid by the plaintiff, in neither case did this Court address, much less hold, that the fixing of an upstream price that was

18

included in the price paid by the downstream plaintiff was insufficient to confer standing under the co-conspirator exception.[8]

The Panel's decision, therefore, is the first circuit decision restricting the exception in this way.  It is a blueprint for the would-be antitrust violator.  If you want to avoid application of the antitrust laws, conspire with a middleman to fix the price of a component part of something the middleman sells.  Under the Panel's logic, so long as the middleman is a separate entity not owned or controlled by the first conspirator, both conspirators are immune from antitrust prosecution by the private attorneys general contemplated by § 4.

As both the Panel in its decision and the Seventh Circuit in *Nippon Paper* recognize, whether you call it a co-conspirator exception, or you find that the direct purchaser rule is not applicable in vertical conspiracies, you are really talking about the same thing.  The Panel does not dispute that under its holding there will be no one with any incentive to enforce the antitrust law with regard to the price fixing between the two conspirators.  When you deny standing to the true direct purchaser outside of the conspiracy, you effectively immunize the conspiracy from civil liability.  There is simply no question that such a result was not what the Supreme Court intended in either *Illinois Brick* or *Utilicorp*.

---

[8]  The Panel also cites to *Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002) for support.  That case stands for the proposition that the co-conspirator exception should be restricted to "a particular type of conspiracy – price-fixing conspiracies."  *Id.* at 215.  It did not address the question the Panel sets forth: whether the exception should be restricted solely to the fixing of the price paid by the plaintiff.

19

## C.     The Panel's Restriction of *Freeman* Is Unwarranted.

The Supreme Court in *Illinois Brick* was careful not to foreclose the possibility of exceptions to the direct purchaser rule over and above the cost-plus or owned or controlled exceptions it enunciated.  As we have discussed, the Supreme Court wanted a rule that would apply across the board (thus no industry by industry analysis) but one that also ensured enforcement by the first purchaser outside of the conspiracy.

This Circuit, in *Freeman*, was true to the Supreme Court's admonitions by enunciating the doctrine that "indirect purchasers can sue for damages if there is no realistic possibility that the direct purchaser will sue its supplier over the antitrust violation."  *Freeman*, 322 F.3d at 1145-46.  The Panel stated that the doctrine is limited to the facts of *Freeman*, where one of the co-conspirators owned the other, and that it declined to extend the exception to situations where there is no ownership or control, narrowly defined.

This Circuit imposed no such limitation in *Freeman*.  The Panel's opinion is not a "de-inclination to extend *Freeman*" but rather an unwarranted restriction on this Circuit's previous decisions.   As with the Panel's other restrictions, it fundamentally misunderstands and misapplies the purpose of the direct purchaser rule.  *Freeman*'s recognition that indirect purchasers must be allowed to sue if there is no realistic possibility that the direct purchaser will sue is a direct

20

confirmation of *Illinois Brick*'s admonition that the first purchaser outside of the conspiracy has standing to bring suit.  The Panel's truncating of this principal to narrowly defined ownership and control should be rejected.

## <u>CONCLUSION</u>

Retailers submit that the Panel's opinion is contrary to the settled law of the Supreme Court, this Circuit, and other circuits.  En banc review should be granted so this Circuit can ensure that vigorous enforcement of the antitrust laws continues as the Supreme Court and Ninth Circuit decisions contemplate.

Dated:  August 6, 2012

By: */s/* Jonathan J. Ross
    Jonathan J. Ross
    H. Lee Godfrey
    Kenneth S. Marks
    SUSMAN GODFREY L.L.P.
    1000 Louisiana Street, Suite 5100
    Houston, Texas 77002
    Telephone:  (713) 651-9366
    Facsimile:  (713) 654-6666
    Email:  jross@susmangodfrey.com
      lgodfrey@sumangodfrey.com
      kmarks@susmangodfrey.com

    David Orozco (220732)
    SUSMAN GODFREY L.L.P.
    1901 Avenue of the Stars, Suite 950
    Los Angeles, California 90067-6029
    Telephone:  (310) 789-3100
    Facsimile:  (310) 789-3150
    Email:dorozco@susmangodfrey.com

Parker C. Folse III
Jordan Connors
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
Telephone:  (206) 516-3880
Facsimile:  (206) 516-3883
Email:  pfolse@susmangodfrey.com
    jconnors@susmangodfrey.com


William A. Isaacson
Melissa Felder
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:   wisaacson@bsfllp.com
    mfelder@bsfllp.com

Philip J. Iovieno
Anne M. Nardacci
Luke M. Nikas
Christopher V. Fenlon
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY  12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email:   piovieno@bsfllp.com
    anardacci@bsfllp.com
    lnikas@bsfllp.com
    cfenlon@bsfllp.com

22

2359323v1/011997

Roman M. Silberfeld, Bar No. 62783
David Martinez. Bar No. 193183
Lauren E. Wood, Bar No. 280096
ROBINS, KAPLAN, MILLER &
CIRESI L.L.P.
12049 Century Park East, Suite 3400
Los Angeles, CA 90067
Telephone:  (310) 552-0130
Facsimile:  (310) 229-5800
Email: rmsilberfeld@rkmc.com
        dmartinez@rkmc.com.com
        lewood@rkmc.com.com


Elliot S. Kaplan
K. Craig Wildfang
ROBINS, KAPLAN, MILLER &
CIRESI L.L.P.
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN  55402
Telephone:  (612) 349-8500
Facsimile  (612) 339-4181
Email: eskaplan@rkmc.com
        kcwildfang@rkmc.com

***Attorneys for Retailer Amici Curiae***

23

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7)(B) as modified by Fed. R. App. P. 29(d) for amicus curiae submissions because it contains 5,463 words, as determined by Microsoft Word 2012, excluding the parts of the brief exempted by Fed. R. App. P 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type style requirements of Fed. R. App. P. 32 (a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word 2012 in 14-point Times New Roman.

SUSMAN GODFREY, LLP

By: */s/ Jonathan J. Ross*
        Jonathan J. Ross

**Attorneys for Retailer Amici Curiae**

2359323v1/011997

| 9th Circuit Case Number(s) | 10-17354 |
|---|---|

NOTE: To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) _____ .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When Not All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | Aug 6, 2012 | .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Daniel B. Allanoff
Meredith Cohen Greenfogel & Skirnick, P.C.
1521 Locust St.
Philadelphia, PA  19102

Signature (use "s/" format) | /s/ Jonathan J. Ross