**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | ) MDL No. 1917 <br> ) <br> ) Case No. C-07-5944-SC <br> ) <br> ) ORDER GRANTING IN PART AND <br> ) DENYING IN PART DEFENDANTS' <br> ) JOINT MOTION FOR SUMMARY <br> ) <u>JUDGMENT</u> <br> ) |
| This Order Relates To: <br><br> DIRECT PURCHASER CLASS ACTION CASES | |

I.  **INTRODUCTION**

     This antitrust case arises from allegations that Defendants fixed the prices of cathode ray tubes ("CRTs"), which were common components of television sets and computer monitors before the advent of flat-panel screens.  On December 12, 2011, Defendants filed a joint motion for summary judgment against nine members of a purported class of alleged direct purchaser plaintiffs ("Named DPPs").[1]  ECF No. 1013 ("MSJ").  The Named DPPs are retailers who

---

[1] The nine Named DPPs are: Arch Electronics, Inc.; Crago d/b/a Dash Computers, Inc.; Electronic Design Company; Meijer, Inc. and Meijer Distribution, Inc.; Nathan Muchnick, Inc.; Orion Home Systems, LLC; Radio & TV Equipment, Inc.; Royal Data Services, Inc.; and Studio Spectrum, Inc.  The Named DPPs are only nine of the thirteen members of the entire putative DPP class.  As explained in Section IV.A <u>infra</u>, the term "direct purchaser" is a misnomer as applied to the Named DPPs, who are actually indirect purchasers.  However, the Court uses the term "DPP" to stay consistent with past orders and to differentiate the Named DPPs from a putative class called the indirect purchaser plaintiffs, as well as from the direct action plaintiffs.

United States District Court
For the Northern District of California

1  purchased televisions and monitors containing CRTs (finished

2  products or "FPs"), as opposed to purchasing the allegedly price-

3  fixed CRTs directly.  Defendants argue that, because the Named DPPs

4  did not purchase CRTs directly, they lack antitrust standing under

5  Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977).

6      On May 31, 2012, the Special Master[2] recommended that the

7  Court grant Defendants' motion and enter summary judgment against

8  the Named DPPs.  ECF No. 1221 ("R&R").  The Court ordered the

9  parties to submit any briefs addressing the R&R simultaneously, and

10 permitted a separate plaintiff group consisting of large retailers

11 who declined to join the DPP class action, the direct action

12 plaintiffs ("DAPs"), to participate in the briefing.  ECF No. 1240.

13 The Court received three briefs.  Defendants move for the Court to

14 adopt the R&R.  ECF No. 1274 ("Defs. Brief").  The Named DPPs have

15 filed an objection to the R&R under seal ("DPP Brief").[3]  The DAPs

16 also object.  ECF No. 1273 ("DAP Brief").  For the reasons set

17 forth herein, the Court GRANTS Defendants' motion for summary

18 judgment in part and DENIES it in part.

19

20 **II.  BACKGROUND**

21     The factual and procedural background of this case is familiar

22 to the parties and the Court, so only a brief review is provided

23 here.  Defendants are allegedly manufacturers of CRTs and, in some

24 _____

25 [2] On June 16, 2008, the Court appointed the Honorable Charles A.
   Legge, United States District Judge (Retired), as a Special Master
26 to assist the Court with this litigation.  ECF No. 302.

27 [3] The Court received the Named DPPs' brief in chambers under seal.
   See ECF Nos. 1271 (motion to seal), 1276 (notice of errata and
28 amended motion to seal), 1300 (order granting amended motion to
   seal).

**United States District Court**
For the Northern District of California

cases, of FPs as well.[4]  They are alleged to have engaged in a
conspiracy to fix the prices of CRTs.  The thrust of the DPPs'
allegations is that the allegedly price-fixed CRTs were
incorporated into FPs like television sets and computer monitors
and, hence, inflated the price of the FPs that the DPPs purchased.
See generally ECF No. 436 ("DPP Compl.").  The DPPs' complaint has
already survived a motion to dismiss.  CRT, 738 F. Supp. 2d 1011.
After the Court denied Defendants' motion to dismiss, Defendants,
pursuant to Federal Rule of Civil Procedure 11, moved to strike the
DPPs' allegations of a conspiracy to fix the price of FPs.  The
Special Master issued a report recommending that the Court grant
the Rule 11 motion.  ECF No. 947.  Before the Court ruled on the
Special Master's recommendation, however, the parties stipulated to
the DPPs' withdrawal of those allegations.  Specifically, the
stipulation withdrew and struck the DPPs' allegations of "a
conspiracy encompassing Finished Products . . . provided, however,
that the issue of the possible impact or effect of the alleged
fixing of prices of CRTs on the prices of Finished Products shall
remain in the case."  ECF No. 996 ("Stip.") at 2.

Following this stipulation, Defendants moved for summary
judgment on the ground that DPPs who had purchased FPs but not the
allegedly price-fixed CRTs -- that is, the nine Named DPPs --
lacked antitrust standing under Illinois Brick.  MSJ at 1.  The
Special Master, after briefing and a hearing, recommended that the
Court grant the motion.  R&R at 12-13.  The Special Master first

---

[4] Though the DPPs have sued entire corporate families and often
refer to them by a single name, a particular corporate entity
within a family may be dedicated to selling FPs rather than CRTs.
See In re Cathode Ray Tube (CRT) Antitrust Litig., 738 F. Supp. 2d
1011, 1019-1020 (N.D. Cal. 2010) (Conti, J.).

**United States District Court**
For the Northern District of California

found that the Named DPPs had never purchased a CRT, as opposed to an FP containing a CRT.  _Id._ at 5.  He based this finding on both the evidentiary record and the admission of counsel at oral argument.  _Id._ (citing hearing transcript).  The Named DPPs do not challenge this finding in their objection.  _See_ DPP Brief at 16.

Beginning from the premise that the Named DPPs purchased FPs only, the Special Master concluded that they lack standing under § 4 of the Clayton Act.  That statute provides that only a person "injured in his business or property by reason of anything forbidden in the antitrust laws" has standing to bring an antitrust suit.  15 U.S.C. § 15.  "The Supreme Court has interpreted that section narrowly, thereby constraining the class of parties that have statutory standing to recover damages through antitrust suits."  _Delaware Valley Surgical Supply Inc. v. Johnson & Johnson_, 523 F.3d 1116, 1120 (9th Cir. 2008) (citing _Illinois Brick_, 431 U.S. 720).  Only "the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party 'injured in his business or property' within the meaning of the section . . . ."  _Illinois Brick_, 431 U.S. at 729.

The Special Master emphasized the bright-line nature of the _Illinois Brick_ rule and described the Supreme Court, the Ninth Circuit, and district courts within the Ninth Circuit as having rejected the creation of exceptions to this rule.  R&R at 7-8 (collecting appellate cases), 8-9 (collecting district court cases).  The Special Master noted that the Named DPPs relied on exceptions to the _Illinois Brick_ rule that the Third Circuit articulated in _In re Sugar Industry Antitrust Litigation_, 579 F.2d 13 (3rd Cir. 1978) and _In re Linerboard Antitrust Litigation_, 305

4

**United States District Court**
For the Northern District of California

1   F.3d 145 (3rd Cir. 2002).  Id. at 10-11.  The Special Master also

2   observed that Judge Illston of this Court relied on the same Third

3   Circuit opinions in several rulings in the closely related TFT-LCD

4   antitrust litigation, rulings which, the Special Master noted, were

5   in tension with his recommendations.  Id. at 10.  The Special

6   Master distinguished the facts of the instant case from those

7   before Judge Illston.  Id. at 11.  He also concluded that Sugar and

8   Linerboard "are not the law of the Ninth Circuit."  Id.

9   Accordingly, the Special Master recommended that the Court enter

10  summary judgment against the Named DPPs on the ground that, because

11  they did not directly purchase the price-fixed CRTs, they were "at

12  best" indirect purchasers who lacked antitrust standing.  Id. at

13  12-13.

14

15  **III.  LEGAL STANDARD**

16      The Court reviews the Special Master's factual findings for

17  clear error and his legal conclusions de novo.  Fed. R. Civ. P.

18  53(f)(3), (f)(4); ECF No. 302 ("Order Appointing Special Master") ¶

19  18 (parties stipulated to "clear error" standard for factual

20  findings).  Entry of summary judgment is proper "if the movant

21  shows that there is no genuine dispute as to any material fact and

22  the movant is entitled to judgment as a matter of law."  Fed. R.

23  Civ. P. 56(a).  Summary judgment should be granted if the evidence

24  would require a directed verdict for the moving party.  Anderson v.

25  Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).  "A moving party

26  without the ultimate burden of persuasion at trial -- usually, but

27  not always, a defendant -- has both the initial burden of

28  production and the ultimate burden of persuasion on a motion for

**United States District Court**
For the Northern District of California

1  summary judgment." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz

2  Companies, Inc., 210 F.3d 1099, 1102 (9th Cir.2000).  "In order to

3  carry its burden of production, the moving party must either

4  produce evidence negating an essential element of the nonmoving

5  party's claim or defense or show that the nonmoving party does not

6  have enough evidence of an essential element to carry its ultimate

7  burden of persuasion at trial." Id.  "In order to carry its

8  ultimate burden of persuasion on the motion, the moving party must

9  persuade the court that there is no genuine issue of material

10  fact." Id.

11

12  **IV.   DISCUSSION**

13      **A.   Illinois Brick and Its Exceptions**

14      The Named DPPs do not challenge the Special Master's central

15  finding that they never purchased a CRT, as opposed to a FP.

16  Hence, absent a showing of clear error, the Court adopts this

17  finding and bases its de novo review of the Special Master's legal

18  conclusions on the factual premise that the Named DPPs purchased

19  FPs containing the allegedly price-fixed CRTs but did not directly

20  purchase CRTs themselves.  Accordingly, the Named DPPs, though they

21  are members of a putative class that has been denominated "direct

22  purchaser plaintiffs" throughout this litigation, are in fact

23  indirect purchasers for purposes of antitrust standing.

24      This brings the Named DPPs squarely within the scope of the

25  Illinois Brick rule.  The rule is straightforward: "only direct

26  purchasers have standing under § 4 of the Clayton Act to seek

27  damages for antitrust violations." Del. Valley, 523 F.3d at 1120-

28  21.  "[I]ndirect purchasers in a chain of distribution are

precluded from suing for damages based on unlawful overcharges passed on to them by intermediates in the distribution chain who purchased directly from the alleged antitrust violator." Arizona v. Shamrock Foods Co., 729 F.2d 1208, 1211-12 (9th Cir. 1984) (citing Illinois Brick, 431 U.S. at 746). In other words, Illinois Brick prevents the offensive use of a "pass-through" theory. 431 U.S. at 729-35.[5] Under the general rule, then, only the first party in the chain of distribution to purchase a price-fixed product has standing to sue. See, e.g., Shamrock Foods, 729 F.2d at 1212 (where plaintiffs who paid only retail price abandoned allegations of wholesale price-fixing but continued to allege retail price-fixing, Illinois Brick was no bar because no pass-through was alleged).

"The underlying purposes for the [Illinois Brick] rule are (1) to eliminate the complications of apportioning overcharges between direct and indirect purchasers . . . ; (2) to eliminate multiple recoveries . . . ; and (3) to promote the vigorous enforcement of the antitrust laws . . . ." ATM Fee, 686 F.3d 741, 748 (internal quotation marks and citations omitted) (quoting Kansas v. UtiliCorp United, Inc., 497 U.S. 199, 208, 212, 214 (1990)). With respect to the first, "apportionment" rationale, Illinois Brick "sought to avoid increasing the cost and burden of antitrust actions with complicated damage theories necessitating massive evidence to determine how the overcharge was apportioned throughout the

---

[5] In Hanover Shoe, the Supreme Court barred the defensive use of a pass-through theory, thereby allowing antitrust plaintiffs to recover damages in excess of their actual losses. Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 491-94 (1968). Illinois Brick extended the holding of Hanover Shoe to the offensive context. E.g., Del. Valley, 523 F.3d at 1120 (citing Illinois Brick, 431 U.S. at 728).

United States District Court
For the Northern District of California

distribution chain." <u>Shamrock Foods</u>, 729 F.2d at 1212 (citing <u>Illinois Brick</u>, 431 U.S. at 731-32).  As to the second, "multiple recoveries" rationale, the Ninth Circuit has explained that "allowing every person along a chain of distribution to claim damages arising from a single violation of the antitrust laws would create a risk of duplicative recovery against the violator unintended by Congress." <u>Id.</u> (citing <u>Illinois Brick</u>, 431 U.S. at 730).  This risk is especially severe in light of the availability of treble damages.  <u>Cf.</u> <u>Illinois Brick</u>, 431 U.S. at 729-730.  As to the third, "enforcement" rationale, <u>Illinois Brick</u>, as well as Ninth Circuit cases following it, have recognized Congress's intent to utilize overcharged purchasers as "private attorneys general" to deter anticompetitive behavior and enforce the antitrust laws.  <u>See id.</u> at 745-46; <u>Royal Printing Co. v. Kimberly-Clark Corp.</u>, 621 F.2d 323, 325-26 (9th Cir. 1980); <u>Shamrock Foods</u>, 729 F.2d at 1212; <u>Del. Valley</u>, 523 F.3d at 1124.  The <u>Illinois Brick</u> rule is intended to promote enforcement of the antitrust laws by conferring standing on the party most likely to bring suit.  <u>See Illinois Brick</u>, 431 U.S. at 745-46 (concluding that Congressional intent to empower private attorneys general "is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it"); <u>see also Shamrock Foods</u>, 729 F.2d at 1212 (citing <u>Illinois Brick</u>, 431 U.S. at 746-47) ("[D]irect purchasers absorb at least some and often most of the overcharges and are more likely to come forward to collect their damages" than indirect purchasers.).

The so-called "<u>Illinois Brick</u> wall," <u>Kendall v. Visa U.S.A.,</u>

8

**United States District Court**
For the Northern District of California

_Inc._, 518 F.3d 1042, 1049 (9th Cir. 2008), looms as an imposing barrier for antitrust plaintiffs who, like the Named DPPs here, rely on a pass-through theory. The wall is not impassable, however, for although "the Supreme Court has expressed reluctance in carving out exceptions to the _Illinois Brick_ rule, limited exceptions do exist." _ATM Fee_, 686 F.3d at 749. These exceptions, when applicable, permit indirect purchasers to pursue private treble-damages claims notwithstanding the usual prohibition of _Illinois Brick_. Hence, the question of whether the Named DPPs have standing does not turn solely on their status as direct or indirect purchasers. As indirect purchasers, their standing depends on whether any of the recognized exceptions apply.

In _ATM Fee_, which was decided after the Special Master issued his report, the Ninth Circuit outlined the three recognized exceptions to _Illinois Brick_ in systematic fashion. First, the panel explained that the Supreme Court has "recognized standing for indirect purchasers when a preexisting cost-plus contract with the direct purchaser exists." _Id._ (citing _Illinois Brick_, 431 U.S. at 736; _UtiliCorp_, 497 U.S. at 217–18). "Second, indirect purchasers may have standing under a 'co-conspirator' exception." _Id._ (citing 2A Phillip E. Areeda _et al._, _Antitrust Law_ ¶ 346h (3d ed. 2007)). Under this exception, "an indirect purchaser may bring suit where he establishes a price-fixing conspiracy between the manufacturer and the middleman." _Id._ (quoting _Del. Valley_, 523 F.3d at 1123 n.1). "However, for the indirect purchaser to merit standing under this exception, the conspiracy must fix the price paid by the plaintiffs." _Id._ (citing _Shamrock Foods_, 729 F.2d at 1211). Finally, under the third exception, "indirect purchasers may sue

**United States District Court**
For the Northern District of California

1  when customers of the direct purchaser own or control the direct

2  purchaser . . . or when a conspiring seller owns or controls the

3  direct purchaser . . . ."  Id. (citing Illinois Brick, 431 U.S. at

4  736 n.16; Royal Printing, 621 F.2d at 326).  "For example, an

5  indirect purchaser may sue if the direct purchaser is a division or

6  subsidiary of the price-fixing seller."  Id.[6]

7      Importantly, these exceptions are not based on market-specific

8  factors; indeed, courts regularly acknowledge Illinois Brick's

9  warning against carving out exceptions for certain kinds of

10  markets.  E.g., UtiliCorp, 497 U.S. at 216 (citing Illinois Brick,

11  431 U.S. at 744); Del. Valley, 523 F.3d at 1124 (same).  Neither do

12  they depend on case-specific factors.  See UtiliCorp, 497 U.S. at

13  216-17 (observing that Illinois Brick's rationale "will not apply

14  with equal force in all cases" and that its economic assumptions

15  "might be disproved in a specific case," but affirming its bright-

16  line rule regardless).  The exceptions cover situations where

17  either Illinois Brick's concern over multiple recovery and

18  apportionment does not apply, or its policy of encouraging private

19  antitrust suits would be stymied by mechanical application of its

20  bright-line rule.  See Shamrock Foods, 729 F.2d at 1214 (holding

21  "that the policy considerations identified in Illinois Brick do not

22  apply" in co-conspirator cases); Royal Printing, 621 F.2d at 326

23  n.7 (establishing ownership and control exception because "blind

24

25  [6] Before ATM Fee, the case law hinted at the possible existence of
    a fourth exception that would apply when "there is no realistic
26  possibility that the direct purchaser will sue."  686 F.3d at 749
    (quoting Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133,
27  1145-46 (9th Cir. 2003)).  The ATM Fee panel explained, however,
    that Freeman did not create a fourth exception.  It simply restated
28  the ownership and control exception already established by Royal
    Printing.  See id. at 756.

**United States District Court**
For the Northern District of California

1  application of the <u>Illinois Brick</u> rule would eliminate the threat

2  of private enforcement" in such cases).  Thus, in the instant case,

3  the Court must attend carefully to the contours of the exceptions

4  recognized by the Ninth Circuit, as well as to the policies of

5  <u>Illinois Brick</u> justifying those exceptions.

6      To begin, the Named DPPs do not allege that they had a

7  preexisting cost-plus contract with any of the Defendants, so the

8  first <u>Illinois Brick</u> exception clearly does not apply.  <u>See</u> <u>ATM</u>

9  <u>Fee</u>, 686 F.3d at 750.  The other two exceptions, the co-conspirator

10 exception and the ownership and control exception, bear more

11 extended discussion, and the Court turns now to them.

12      B.    **The Co-Conspirator Exception**

13      The co-conspirator exception allows an indirect purchaser to

14 sue when the direct purchaser conspires horizontally or vertically

15 to fix the price paid by the plaintiffs.  <u>ATM Fee</u>, 686 F.3d at 750

16 (citing <u>Shamrock Foods</u>, 729 F.2d at 1211).  Put another way, "the

17 co-conspirator exception applies when the conspirators set the

18 price paid by the consumer."  <u>Id.</u> at 751 (citing <u>Kendall</u>, 518 F.3d

19 1042); <u>see also</u> <u>Shamrock Foods</u>, 729 F.2d at 1211.  Conversely, the

20 exception does not apply if the plaintiff's "theory of recovery

21 depends on pass-on damages."  <u>Id.</u> at 755.  The rationale for the

22 exception is that co-conspirator cases do not implicate two key

23 policies underlying the <u>Illinois Brick</u> rule -- the elimination of

24 multiple recoveries by successive tiers of plaintiffs, as well as

25 of the complicated apportionment of damages among them -- because

26 the co-conspirator exception confers standing on only a single tier

27 of plaintiffs, those who directly pay the fixed price.  <u>See</u>

28 <u>Shamrock Foods</u>, 729 F.2d at 1213-14.  Indeed, as the Ninth Circuit

**United States District Court**
For the Northern District of California

1    recently explained, "this co-conspirator exception is not really an

2    exception at all," but rather a straightforward application of

3    <u>Illinois Brick</u> in situations where the direct purchaser is part of

4    the price-fixing conspiracy and the plaintiff directly pays the

5    price set by the conspiracy.  See <u>ATM Fee</u>, 686 F.3d at 750.

6        In this case, the DPPs have alleged a conspiracy to fix the

7    price of CRTs, but they have expressly stipulated to the withdrawal

8    of their allegations of a conspiracy to fix the price of FPs

9    incorporating those CRTs.  Stip. at 2.  Accordingly, the conspiracy

10   alleged by the DPPs extends only far enough to fix the price of

11   CRTs.  As the Special Master found, and the Named DPPs do not deny,

12   the price of CRTs is not the price the Named DPPs paid.  The Named

13   DPPs paid only for FPs.  Accordingly, because the Named DPPs'

14   "theory of recovery depends on pass-on damages," the co-conspirator

15   exception does not and cannot apply to them.  See <u>ATM Fee</u>, 686 F.3d

16   at 755.

17       The parties' stipulation eliminates any genuine question of

18   material fact with respect to the Named DPPs' purchase of the

19   allegedly price-fixed CRTs.  With respect to the co-conspirator

20   exception, Defendants have carried their burden of production by

21   showing that the Named DPPs cannot produce evidence sufficient to

22   establish their status as direct purchasers of CRTs.  Further, for

23   the reasons just stated, Defendants have shown that they would be

24   entitled to judgment as a matter of law if the Named DPPs relied

25   only on the co-conspirator exception.  Accordingly, the Court

26   GRANTS Defendants' motion for summary judgment against the Named

27   DPPs to the extent that Defendants' motion challenges the Named

28   DPPs' right to proceed under the co-conspirator exception.

**United States District Court**
For the Northern District of California

C. **The Ownership and Control Exception**

Though <u>Illinois Brick</u> generally bars federal antitrust suits by indirect purchasers, Ninth Circuit precedent "allow[s] indirect purchasers to sue 'where a direct purchaser is a division or subsidiary of a co-conspirator.'"  <u>ATM Fee</u>, 686 F.3d at 756 (quoting <u>Royal Printing</u>, 621 F.2d at 326).  "<u>Royal Printing</u> created an exception when parental control existed, because applying <u>Illinois Brick</u> would eliminate the threat of private enforcement . . . and close off every avenue for private enforcement."  <u>Id.</u> (internal quotation marks and citations omitted).  As the <u>Royal Printing</u> court explained:

> There is little reason for the price-fixer to fear a direct purchaser's suit when the direct purchaser is a subsidiary or division of a co-conspirator.  Even if the pricing decisions of such a subsidiary or division are necessarily determined by market forces, its litigation decisions will usually be subject to parental control.  The co-conspirator parent will forbid its subsidiary or division to bring a lawsuit that would only reveal the parent's own participation in the conspiracy.

621 F.2d at 326 (footnote omitted).

Defendants argue that the Court must distinguish <u>Royal Printing</u> from the instant case on the ground that some of the <u>Royal Printing</u> plaintiffs purchased the allegedly price-fixed product -- paper -- while, in this case, no Named DPP purchased the allegedly price-fixed CRTs, as opposed to FPs which incorporated them.  Defs. Brief at 20 (citing <u>Royal Printing</u>, 621 F.2d at 326-27).  The Court disagrees.  For the reasons set forth below, the Court concludes that <u>Royal Printing</u> controls here and that the Named DPPs have antitrust standing under it.  Because <u>Royal Printing</u> controls, the Court reviews its facts and holding at some length.

13

**United States District Court**
For the Northern District of California

### 1.   **Royal Printing's Facts and Holding**

In <u>Royal Printing</u>, two plaintiffs, a printer and a grocery store, brought a treble-damage antitrust suit against a group consisting of the nation's ten largest paper manufacturers.  621 F.2d at 324.  The manufacturers did not sell their paper directly, but rather distributed it through two kinds of wholesalers: (1) the manufacturers' own wholesaling divisions or wholly-owned wholesaler subsidiaries, and (2) independent, unaffiliated wholesalers.  <u>Id.</u> The wholesalers thus were direct purchasers, because they bought paper directly from the accused manufacturers.  <u>See id.</u> at 326-27. Each defendant-affiliated wholesaler sold paper manufactured by all of the defendants, "not limiting themselves to in-house products." <u>Id.</u> at 324.  The court noted that wholesale prices were set by market conditions, meaning that the conspiracy alleged among the paper manufacturers did not extend to the wholesale level.  <u>See id.</u> at 324 n.1.

Crucially, the printer and grocer never bought paper directly from the allegedly conspiring manufacturers.  <u>Id.</u> at 324.  They bought paper only from non-conspiring wholesalers.  Thus, they were indirect purchasers whose suit <u>Illinois Brick</u> normally would bar. <u>See id.</u> at 325; <u>see also</u> <u>ATM Fee</u>, 686 F.3d at 754 (to be a direct purchaser, "the price paid by plaintiffs must be the price set [by the conspiracy] (not merely 'fixed' in some broad sense)").  The printer, however, had purchased some paper from wholesalers owned or controlled by two of the defendants.  <u>Royal Printing</u>, 621 F.2d at 325.  The paper the printer bought from those wholesalers was not manufactured by the wholesalers' respective corporate parents; it was manufactured by some other defendant.  <u>See</u> <u>id.</u>

**United States District Court**
For the Northern District of California

The Ninth Circuit held that the printer had standing to sue under a theory of joint and several liability, regardless of its status as an indirect purchaser and regardless of which defendant had manufactured the purchased paper, but only to the extent that it purchased paper sold by defendant-owned or -controlled wholesalers.  Id. at 327.  The Ninth Circuit reasoned that, because all the manufacturers were highly unlikely to authorize their controlled wholesalers (i.e., the direct purchasers) to sue and thereby risk revealing the conspiracy, the deterrent effect and enforceability of the antitrust laws depended on the existence of antitrust standing for indirect purchasers situated like the printer.  Id. at 326-27.  The grocer, however, which had purchased defendants' paper only through unaffiliated wholesalers, was "truly" an indirect purchaser under Illinois Brick and therefore barred from suit.  Id.  Illinois Brick also barred the printer to the extent it had purchased defendants' paper from anyone other than a defendants' subsidiary or division.  Id.

## 2.   **Royal Printing Controls Here**

Put simply, the Court sees no meaningful distinction between the facts of Royal Printing and the facts of this case.  In Royal Printing, neither plaintiff ever directly bought the price-fixed paper directly from the manufacturer.[7]  Likewise, here, the Named

---

[7] It has been suggested that Royal Printing is distinguishable from this case because the Royal Printing plaintiffs purchased price-fixed paper while the Named DPPs never purchased a price-fixed CRT from anyone.  See Defs' Brief at 20; R&R at 10, 11.  The difficulty with this position is that the Royal Printing plaintiffs did not purchase price-fixed paper.  They paid the wholesale price, which was set by market forces.  See Royal Printing, 621 F.2d at 324 (plaintiffs bought only at wholesale), 326 n.4 ("[T]he wholesalers' pricing decisions are determined by market forces . . . .").  The Royal Printing plaintiffs, like the Named DPPs here, were indirect purchasers.  Ninth Circuit cases distinguish between, on the one

DPPs never bought the price-fixed CRT directly from the alleged conspirators (since, to the extent that any named Defendants are wholesalers, they are, by stipulation, not alleged to have conspired to fix the price of any FPs they may have sold to the Named DPPs).  In Royal Printing, the alleged conspiracy did not include the wholesalers who sold plaintiffs the paper, as shown by the market pricing evident at the wholesale level.  Likewise, in this case, the conspiracy alleged among sellers of CRTs does not reach the sellers of FPs.  In Royal Printing, the court held that, notwithstanding the plaintiffs' status as indirect purchasers, Illinois Brick did not bar their suit insofar as they paid a passed-on overcharge to a non-conspiring direct purchaser owned or controlled by any alleged conspirator.  That holding applies here as well.  The Named DPPs are indirect purchasers, but, under Royal Printing, they have standing to sue insofar as they purchased FPs incorporating the allegedly price-fixed CRTs from an entity owned or controlled by any allegedly conspiring defendant.

Defendants suggest that Royal Printing is distinguishable because in that case "no other entity [was] in a position to sue if [the printer's] claims were dismissed on summary judgment."  Defs. Brief at 20-21 (citing Royal Printing, 621 F.2d at 327).  Here, as Defendants point out, the Named DPPs represent only nine of the thirteen members of the putative DPP class, so even if the Court

hand, an overcharge directly set by and paid to the conspiracy and, on the other, a price paid farther along in the distribution chain which includes a passed-on overcharge.  E.g., ATM Fee, 686 F.3d at 754 (distinguishing between direct payment of the price set by conspiring defendants and indirect payment of that price via pass-through, the latter being "merely 'fixed' in some broad sense").  Making antitrust standing depend on whether a plaintiff bought the price-fixed product -- that is, whether plaintiff was a direct purchaser -- would wipe out the Royal Printing exception.

**United States District Court**
For the Northern District of California

1    enters summary judgment against those nine parties, other parties

2    stand ready to prosecute this action.   The Special Master also

3    relied on this fact, among others, when recommending that

4    Defendants' motion be granted.   See R&R at 11-12 (noting that the

5    instant motion is not against all DPP class members; that this

6    litigation includes a putative class of indirect purchasers relying

7    on the antitrust laws of states that have passed so-called

8    "Illinois Brick repealer" statutes; and that "the Antitrust

9    Division of the Department of Justice has been pursuing criminal

10   actions against some of these defendants").

11        The Court recognizes that, in the particular circumstances of

12   this case, the enforcement goals of Illinois Brick appear already

13   to have been met, which suggests that the policy rationale behind

14   Royal Printing does not apply.   Defendants urge the Court to

15   decline to apply the Royal Printing exception for that reason.

16   Defs. Brief at 20 n.10.   Defendants, however, cite no case where a

17   court has refused to apply Royal Printing on those grounds, and

18   this Court is not inclined to become the first to do so.   Though

19   there is some intuitive appeal to refusing to apply the exception

20   in cases where enforcement by other parties is ongoing or likely,

21   the better course is to apply the Royal Printing exception to any

22   plaintiff who meets the formal criteria.   To do otherwise is to

23   engage in the very case-by-case recalibration of Illinois Brick

24   that the cases so frequently disapprove.   Having been warned

25   against the ad hoc creation or expansion of exceptions, this Court

26   sees no reason why ad hoc disregard or narrowing of the established

27   exceptions is any more justifiable.   Cf. Utilicorp, 497 U.S. at

28   216-217 (recognizing that rationales behind Illinois Brick might

17

**United States District Court**
For the Northern District of California

1  not be apply in all cases but standing by <u>Illinois Brick</u>

2  regardless).  Moreover, Defendants' interpretation of <u>Royal</u>

3  <u>Printing</u> would undermine the "vigorous private enforcement of the

4  antitrust laws," a policy objective which both <u>Illinois Brick</u> and

5  <u>Royal Printing</u> explicitly seek to vindicate.  <u>Illinois Brick</u>, 431

6  U.S. at 745; <u>Royal Printing</u>, 621 F.2d at 326 n.7.  Defendants'

7  position, if accepted, would bar private treble-damages actions

8  against an antitrust defendant whenever the Department of Justice

9  engaged in a criminal prosecution of that same defendant.  Even in

10  cases where no criminal charges are filed, Defendants' position

11  would deny antitrust standing to any private plaintiff so long as

12  the antitrust defendant could point to some other person who also

13  could sue.  That result cannot be squared with the goal of vigorous

14  private antitrust enforcement.  The Court therefore applies <u>Royal</u>

15  <u>Printing</u> even though, in the circumstances of this case, other

16  parties stand ready to enforce the antitrust laws.[8]

17      Defendants' other arguments are similarly unavailing.

18  Defendants suggest that the physical differences between the paper

19  at issue in <u>Royal Printing</u> and the CRTs at issue here support

20  denial of antitrust standing to the Named DPPs.  Defs. Brief at 16-

21  17.  Defendants focus on how the paper in <u>Royal Printing</u> was "not

22  changed in any way" between manufacture and wholesale, while in

23  this case, "the products have been changed" because the CRTs were

24  integrated into FPs.  <u>Id.</u>  Supposing that paper and CRTs differ in

25  this way, the Court discerns no reason why the difference would

26

27  [8] The Court notes that <u>Illinois Brick</u> itself set forth a rule aimed
    at preventing multiple recoveries even though "[t]he potential of

28  possible multiple recoveries [was] not present in [that] case."
    431 U.S. at 763 n.22 (Brennan, J., dissenting).

**United States District Court**
For the Northern District of California

matter for standing purposes.  Cf. UtiliCorp, 497 U.S. at 216
(quoting Illinois Brick, 431 U.S. at 744) (declining to apply
Illinois Brick differently in "particular types of markets").  The
policies underlying Illinois Brick and its exceptions apply with
equal force regardless of whether or how a particular good is
modified as it passes through the chain of distribution.  For
instance, the risk of multiple liability from indirect purchasers
does not depend on whether a defendant sells paper or CRTs.
Nothing suggests that CRT sellers are any more likely than paper
manufacturers to permit direct purchasers over whom they exert
ownership or control to bring a lawsuit that would reveal an
alleged conspiracy.  See Royal Printing, 621 F.2d at 326.  Further,
the Ninth Circuit has applied Illinois Brick and its exceptions
without comment in cases involving fees, which obviously do not
involve modification of any physical product.  E.g., ATM Fee, 686
F.3d 741; Freeman, 322 F.3d 1133.  Physical differences between
paper and CRTs supply no reason to refrain from applying the
ownership and control exception here.

Next, Defendants argue that the Court should disregard Royal
Printing because its "underlying rationale . . . no longer carries
the same force as it once did."  Defs. Brief at 20-21.  Defendants
explain that, when the Ninth Circuit decided Royal Printing, its
precedents denied indirect purchasers any remedy under state
antitrust laws, whereas now indirect purchasers may seek such
remedies and, in this case, have done so.  Id. (citing In re Cement
& Concrete Antitrust Litig., 817 F.2d 1435, 1447 (9th Cir. 1987)
rev'd sub nom. California v. ARC Am. Corp., 490 U.S. 93 (1989)).
According to Defendants, indirect purchasers' standing to bring

**United States District Court**
For the Northern District of California

state antitrust actions obviates the need for the Royal Printing exception.  Id. at 21; see also id. at 23-24 (acknowledging existence of other direct purchasers, as well as ongoing criminal prosecution of some Defendants).  Whatever the merits of Defendants' argument, it is better addressed to the Ninth Circuit, which not only has yet to overrule or narrow Royal Printing, but reaffirmed and clarified its holding just months ago in ATM Fee.  See 686 F.3d at 756-58.  Royal Printing remains the law of this circuit and binding on this Court.

Defendants next criticize the Named DPPs' reliance on two Third Circuit decisions, Sugar and Linerboard.  Defs. Brief at 22.  Defendants describe ATM Fee as having "expressly rejected the approach taken by the Third Circuit."  Id.  It is true that Sugar and Linerboard conflict with Ninth Circuit law concerning the co-conspirator exception.  See ATM Fee, 686 F.3d at 755 n.7.  However, the ATM Fee court specifically noted that Sugar "exemplifies the exception allowed when an upstream violator controls or owns the direct purchaser" -- that is, the Royal Printing exception.  Id.  ATM Fee makes clear that, while Sugar and Linerboard do not reflect the law of the Ninth Circuit where the co-conspirator exception is concerned, Sugar, at least, does exemplify the law of the Ninth Circuit where the ownership and control exception is concerned.

Defendants characterize the Named DPPs' citation of Freeman and the two Third Circuit cases as an impermissible attempt to fashion a new exception to Illinois Brick.  Defs. Brief at 21-23.  That characterization is inaccurate.  As discussed earlier, Freeman and Sugar are applications, not expansions, of the ownership and control exception already set forth in Royal Printing.

**United States District Court**
For the Northern District of California

Defendants also argue that they are immunized from antitrust liability for the sole reason that CRTs are a "vital input" into FPs.  Defs. Brief at 23.  They emphasize a passage in <u>ATM Fee</u> which described <u>Illinois Brick</u> as having "rejected exceptions for markups by middlemen or when the price-fixed good is a vital input to a larger product."  <u>ATM Fee</u>, 686 F.3d at 753 (citing Illinois Brick, 431 U.S. at 743-45).  Defendants' argument overshoots the mark.  This passage in <u>ATM Fee</u> merely states the general prohibition against standing based on pass-on damages, and says nothing about "rejecting" established exceptions, such as the <u>Royal Printing</u> exception.  Indeed, rather than rejecting the three established exceptions, <u>ATM Fee</u> affirmed and applied each of them, making them part of the case's holding.  Moreover, Defendants' interpretation of <u>ATM Fee</u>'s "vital input" remark would create, in effect, an exception to the exceptions, one that would apply whenever the price-fixed good was a "vital input."  Even assuming that one could define what makes some inputs "vital" and others not, this Court has already declined to narrow the established <u>Royal Printing</u> exception for reasons unique to the particularities of this case or to the physical nature of CRTs.

Lastly, Defendants suggest that standing should be denied to the Named DPPs because, as indirect purchasers, their claims would involve the complicated apportionment of damages warned against in <u>Illinois Brick</u>.  Defs. Brief at 21-22.  The concern is misplaced.  <u>Royal Printing</u> explicitly addressed the issue of apportioning damages and held that, in cases proceeding under the ownership and control exception, no apportionment is needed; plaintiffs are permitted to sue "for the entire overcharge."  621 F.2d at 327.

1    The Court expresses no view as to whether the Named DPPs will

2  be able to prove what is needed to win relief as indirect

3  purchasers under the ownership and control exception.  In their

4  sealed brief and its supporting declarations, the Named DPPs

5  present evidence based on the discovery they have taken so far.

6  DPP Brief at 4-5, 13.  This evidence raises a genuine issue of

7  material fact as to whether the Named DPPs purchased FPs

8  incorporating the allegedly price-fixed CRTs from some defendant-

9  owned or -controlled division or subsidiary.  Accordingly,

10  Defendants have not carried their summary judgment burden of

11  showing an absence of evidence in support of applying the ownership

12  and control exception.  To the extent that Defendants' summary

13  judgment motion challenges the Named DPPs' standing on that ground,

14  the motion is DENIED.

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

United States District Court
For the Northern District of California

**V.     CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment against Plaintiffs Arch Electronics, Inc.; Crago d/b/a Dash Computers, Inc.; Electronic Design Company; Meijer, Inc. and Meijer Distribution, Inc.; Nathan Muchnick, Inc.; Orion Home Systems, LLC; Radio & TV Equipment, Inc.; Royal Data Services, Inc.; and Studio Spectrum, Inc., is GRANTED IN PART and DENIED IN PART.  Because these Plaintiffs did not purchase allegedly price-fixed CRTs directly, they are indirect purchasers and Illinois Brick bars their suit unless one of the three recognized exceptions applies.  The Court concludes that the ownership-and-control exception of Royal Printing does apply.  Therefore, the Named DPPs have standing to sue for alleged overcharges passed on to them when they purchased an FP containing an allegedly price-fixed CRT from an entity allegedly owned or controlled by any allegedly conspiring Defendant.  The Named DPPs do not have standing, however, to sue for alleged overcharges passed on to them from any other seller of FPs.

IT IS SO ORDERED.

Dated:  November 29, 2012

UNITED STATES DISTRICT JUDGE