# B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

10 NORTH PEARL STREET • 4TH FLOOR • ALBANY, NY 12207 • PH: 518.434.0600 • FX: 518.434.0665

December 6, 2012

**BY ECF AND HAND DELIVERY**
Hon. Charles A. Legge
c/o Sarah Nevins, Case Manager
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111

    Re: *In re: Cathode Ray Tube (CRT) Antitrust Litigation,*
      Case No. 07-5944 SC; MDL No. 1917

Dear Judge Legge:

   In my capacity as Liaison Counsel for the Direct Action Plaintiffs in the above-referenced litigation, I have attached two recent decisions that are directly relevant to the standing issues raised in the various motions to dismiss filed by the defendants, and issued after briefing on these motions concluded.  Oral argument is set for February 14, 2013.

   The first opinion, issued November 29, 2012, is Judge Conti's order in this case granting in part and denying in part Defendants' Joint Motion for Summary Judgment against the direct purchaser class.  In his opinion, Judge Conti holds that the class may not rely upon the co-conspirator exception to *Illinois Brick*'s direct purchaser standing requirement, but that it may rely upon the ownership or control exception as explicated in the Ninth Circuit's *Royal Printing* case.  The second opinion, issued November 19, 2012,  is Judge Illston's order in *In re: TFT-LCD (Flat Panel) Antitrust Litigation*, which similarly finds that the Ninth Circuit's recent *ATM Fee* decision did not alter the scope of the ownership or control exception of *Royal Printing*.

   We look forward to discussing these issues with you in February.

        Sincerely,

        */s Philip J. Iovieno*

        Philip J. Iovieno
        *Liaison Counsel for the*
        *Direct Action Plaintiffs*

cc:  All counsel of record via ECF

# Exhibit A

Case 3:07-cv-05944-SC Document 1470 Filed 11/29/12 Page 3 of 35

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | ) MDL No. 1917 ) ) Case No. C-07-5944-SC ) |
| _____ | ) ORDER GRANTING IN PART AND |
| This Order Relates To: | ) DENYING IN PART DEFENDANTS' ) JOINT MOTION FOR SUMMARY |
| DIRECT PURCHASER CLASS ACTION CASES | ) JUDGMENT ) ) |
| _____ | ) |

I.  **INTRODUCTION**

This antitrust case arises from allegations that Defendants fixed the prices of cathode ray tubes ("CRTs"), which were common components of television sets and computer monitors before the advent of flat-panel screens. On December 12, 2011, Defendants filed a joint motion for summary judgment against nine members of a purported class of alleged direct purchaser plaintiffs ("Named DPPs").[1]  ECF No. 1013 ("MSJ"). The Named DPPs are retailers who

_____

[1] The nine Named DPPs are: Arch Electronics, Inc.; Crago d/b/a Dash Computers, Inc.; Electronic Design Company; Meijer, Inc. and Meijer Distribution, Inc.; Nathan Muchnick, Inc.; Orion Home Systems, LLC; Radio & TV Equipment, Inc.; Royal Data Services, Inc.; and Studio Spectrum, Inc.  The Named DPPs are only nine of the thirteen members of the entire putative DPP class.  As explained in Section IV.A infra, the term "direct purchaser" is a misnomer as applied to the Named DPPs, who are actually indirect purchasers.  However, the Court uses the term "DPP" to stay consistent with past orders and to differentiate the Named DPPs from a putative class called the indirect purchaser plaintiffs, as well as from the direct action plaintiffs.

purchased televisions and monitors containing CRTs (finished products or "FPs"), as opposed to purchasing the allegedly price-fixed CRTs directly. Defendants argue that, because the Named DPPs did not purchase CRTs directly, they lack antitrust standing under <u>Illinois Brick Co. v. Illinois</u>, 431 U.S. 720 (1977).

On May 31, 2012, the Special Master[2] recommended that the Court grant Defendants' motion and enter summary judgment against the Named DPPs. ECF No. 1221 ("R&R"). The Court ordered the parties to submit any briefs addressing the R&R simultaneously, and permitted a separate plaintiff group consisting of large retailers who declined to join the DPP class action, the direct action plaintiffs ("DAPs"), to participate in the briefing. ECF No. 1240. The Court received three briefs. Defendants move for the Court to adopt the R&R. ECF No. 1274 ("Defs. Brief"). The Named DPPs have filed an objection to the R&R under seal ("DPP Brief").[3] The DAPs also object. ECF No. 1273 ("DAP Brief"). For the reasons set forth herein, the Court GRANTS Defendants' motion for summary judgment in part and DENIES it in part.

## II. <u>BACKGROUND</u>

The factual and procedural background of this case is familiar to the parties and the Court, so only a brief review is provided here. Defendants are allegedly manufacturers of CRTs and, in some

---

[2] On June 16, 2008, the Court appointed the Honorable Charles A. Legge, United States District Judge (Retired), as a Special Master to assist the Court with this litigation. ECF No. 302.

[3] The Court received the Named DPPs' brief in chambers under seal. <u>See</u> ECF Nos. 1271 (motion to seal), 1276 (notice of errata and amended motion to seal), 1300 (order granting amended motion to seal).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

cases, of FPs as well.[4]  They are alleged to have engaged in a conspiracy to fix the prices of CRTs.  The thrust of the DPPs' allegations is that the allegedly price-fixed CRTs were incorporated into FPs like television sets and computer monitors and, hence, inflated the price of the FPs that the DPPs purchased.  See generally ECF No. 436 ("DPP Compl.").  The DPPs' complaint has already survived a motion to dismiss.  CRT, 738 F. Supp. 2d 1011.  After the Court denied Defendants' motion to dismiss, Defendants, pursuant to Federal Rule of Civil Procedure 11, moved to strike the DPPs' allegations of a conspiracy to fix the price of FPs.  The Special Master issued a report recommending that the Court grant the Rule 11 motion.  ECF No. 947.  Before the Court ruled on the Special Master's recommendation, however, the parties stipulated to the DPPs' withdrawal of those allegations.  Specifically, the stipulation withdrew and struck the DPPs' allegations of "a conspiracy encompassing Finished Products . . . provided, however, that the issue of the possible impact or effect of the alleged fixing of prices of CRTs on the prices of Finished Products shall remain in the case."  ECF No. 996 ("Stip.") at 2.

Following this stipulation, Defendants moved for summary judgment on the ground that DPPs who had purchased FPs but not the allegedly price-fixed CRTs -- that is, the nine Named DPPs -- lacked antitrust standing under Illinois Brick.  MSJ at 1.  The Special Master, after briefing and a hearing, recommended that the Court grant the motion.  R&R at 12-13.  The Special Master first

---

[4] Though the DPPs have sued entire corporate families and often refer to them by a single name, a particular corporate entity within a family may be dedicated to selling FPs rather than CRTs. See In re Cathode Ray Tube (CRT) Antitrust Litig., 738 F. Supp. 2d 1011, 1019-1020 (N.D. Cal. 2010) (Conti, J.).

**United States District Court**
For the Northern District of California

1   found that the Named DPPs had never purchased a CRT, as opposed to

2   an FP containing a CRT.  <u>Id.</u> at 5.  He based this finding on both

3   the evidentiary record and the admission of counsel at oral

4   argument.  <u>Id.</u> (citing hearing transcript).  The Named DPPs do not

5   challenge this finding in their objection.  <u>See</u> DPP Brief at 16.

6        Beginning from the premise that the Named DPPs purchased FPs

7   only, the Special Master concluded that they lack standing under §

8   4 of the Clayton Act.  That statute provides that only a person

9   "injured in his business or property by reason of anything

10  forbidden in the antitrust laws" has standing to bring an antitrust

11  suit.  15 U.S.C. § 15.  "The Supreme Court has interpreted that

12  section narrowly, thereby constraining the class of parties that

13  have statutory standing to recover damages through antitrust

14  suits."  <u>Delaware Valley Surgical Supply Inc. v. Johnson & Johnson</u>,

15  523 F.3d 1116, 1120 (9th Cir. 2008) (citing <u>Illinois Brick</u>, 431

16  U.S. 720).  Only "the overcharged direct purchaser, and not others

17  in the chain of manufacture or distribution, is the party 'injured

18  in his business or property' within the meaning of the section . .

19  . ."  <u>Illinois Brick</u>, 431 U.S. at 729.

20       The Special Master emphasized the bright-line nature of the

21  <u>Illinois Brick</u> rule and described the Supreme Court, the Ninth

22  Circuit, and district courts within the Ninth Circuit as having

23  rejected the creation of exceptions to this rule.  R&R at 7-8

24  (collecting appellate cases), 8-9 (collecting district court

25  cases).  The Special Master noted that the Named DPPs relied on

26  exceptions to the <u>Illinois Brick</u> rule that the Third Circuit

27  articulated in <u>In re Sugar Industry Antitrust Litigation</u>, 579 F.2d

28  13 (3rd Cir. 1978) and <u>In re Linerboard Antitrust Litigation</u>, 305

Case 3:07-cv-05944-SC   Document 1470   Filed 11/29/12   Page 6 of 23

F.3d 145 (3rd Cir. 2002).  <u>Id.</u> at 10-11.  The Special Master also observed that Judge Illston of this Court relied on the same Third Circuit opinions in several rulings in the closely related TFT-LCD antitrust litigation, rulings which, the Special Master noted, were in tension with his recommendations.  <u>Id.</u> at 10.  The Special Master distinguished the facts of the instant case from those before Judge Illston.  <u>Id.</u> at 11.  He also concluded that <u>Sugar</u> and <u>Linerboard</u> "are not the law of the Ninth Circuit."  <u>Id.</u> Accordingly, the Special Master recommended that the Court enter summary judgment against the Named DPPs on the ground that, because they did not directly purchase the price-fixed CRTs, they were "at best" indirect purchasers who lacked antitrust standing.  <u>Id.</u> at 12-13.

### III.  <u>LEGAL STANDARD</u>

The Court reviews the Special Master's factual findings for clear error and his legal conclusions de novo.  Fed. R. Civ. P. 53(f)(3), (f)(4); ECF No. 302 ("Order Appointing Special Master") ¶ 18 (parties stipulated to "clear error" standard for factual findings).  Entry of summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment should be granted if the evidence would require a directed verdict for the moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251 (1986).  "A moving party without the ultimate burden of persuasion at trial -- usually, but not always, a defendant -- has both the initial burden of production and the ultimate burden of persuasion on a motion for

**United States District Court**
For the Northern District of California

summary judgment." <u>Nissan Fire & Marine Ins. Co., Ltd. v. Fritz</u>
<u>Companies, Inc.</u>, 210 F.3d 1099, 1102 (9th Cir.2000). "In order to
carry its burden of production, the moving party must either
produce evidence negating an essential element of the nonmoving
party's claim or defense or show that the nonmoving party does not
have enough evidence of an essential element to carry its ultimate
burden of persuasion at trial." <u>Id.</u>  "In order to carry its
ultimate burden of persuasion on the motion, the moving party must
persuade the court that there is no genuine issue of material
fact." <u>Id.</u>

**IV.   DISCUSSION**

   **A.   Illinois Brick <u>and Its Exceptions</u>**

      The Named DPPs do not challenge the Special Master's central
finding that they never purchased a CRT, as opposed to a FP.
Hence, absent a showing of clear error, the Court adopts this
finding and bases its de novo review of the Special Master's legal
conclusions on the factual premise that the Named DPPs purchased
FPs containing the allegedly price-fixed CRTs but did not directly
purchase CRTs themselves.  Accordingly, the Named DPPs, though they
are members of a putative class that has been denominated "direct
purchaser plaintiffs" throughout this litigation, are in fact
indirect purchasers for purposes of antitrust standing.

      This brings the Named DPPs squarely within the scope of the
<u>Illinois Brick</u> rule.  The rule is straightforward: "only direct
purchasers have standing under § 4 of the Clayton Act to seek
damages for antitrust violations." <u>Del. Valley</u>, 523 F.3d at 1120-
21.  "[I]ndirect purchasers in a chain of distribution are

**United States District Court**
For the Northern District of California

precluded from suing for damages based on unlawful overcharges passed on to them by intermediaries in the distribution chain who purchased directly from the alleged antitrust violator." <u>Arizona v. Shamrock Foods Co.</u>, 729 F.2d 1208, 1211-12 (9th Cir. 1984) (citing <u>Illinois Brick</u>, 431 U.S. at 746).  In other words, <u>Illinois Brick</u> prevents the offensive use of a "pass-through" theory.  431 U.S. at 729-35.[5]  Under the general rule, then, only the first party in the chain of distribution to purchase a price-fixed product has standing to sue.  <u>See</u>, <u>e.g.</u>, <u>Shamrock Foods</u>, 729 F.2d at 1212 (where plaintiffs who paid only retail price abandoned allegations of wholesale price-fixing but continued to allege retail price-fixing, <u>Illinois Brick</u> was no bar because no pass-through was alleged).

"The underlying purposes for the [<u>Illinois Brick</u>] rule are (1) to eliminate the complications of apportioning overcharges between direct and indirect purchasers . . . ; (2) to eliminate multiple recoveries . . . ; and (3) to promote the vigorous enforcement of the antitrust laws . . . ." <u>ATM Fee</u>, 686 F.3d 741, 748 (internal quotation marks and citations omitted) (quoting <u>Kansas v. UtiliCorp United, Inc.</u>, 497 U.S. 199, 208, 212, 214 (1990)).  With respect to the first, "apportionment" rationale, <u>Illinois Brick</u> "sought to avoid increasing the cost and burden of antitrust actions with complicated damage theories necessitating massive evidence to determine how the overcharge was apportioned throughout the

---

[5]  In <u>Hanover Shoe</u>, the Supreme Court barred the defensive use of a pass-through theory, thereby allowing antitrust plaintiffs to recover damages in excess of their actual losses.  <u>Hanover Shoe, Inc. v. United Shoe Mach. Corp.</u>, 392 U.S. 481, 491-94 (1968). <u>Illinois Brick</u> extended the holding of <u>Hanover Shoe</u> to the offensive context.  <u>E.g.</u>, <u>Del. Valley</u>, 523 F.3d at 1120 (citing <u>Illinois Brick</u>, 431 U.S. at 728).

1    distribution chain." <u>Shamrock Foods</u>, 729 F.2d at 1212 (citing

2    <u>Illinois Brick</u>, 431 U.S. at 731-32).  As to the second, "multiple

3    recoveries" rationale, the Ninth Circuit has explained that

4    "allowing every person along a chain of distribution to claim

5    damages arising from a single violation of the antitrust laws would

6    create a risk of duplicative recovery against the violator

7    unintended by Congress." <u>Id.</u> (citing <u>Illinois Brick</u>, 431 U.S. at

8    730).  This risk is especially severe in light of the availability

9    of treble damages. <u>Cf. Illinois Brick</u>, 431 U.S. at 729-730.  As to

10   the third, "enforcement" rationale, <u>Illinois Brick</u>, as well as

11   Ninth Circuit cases following it, have recognized Congress's intent

12   to utilize overcharged purchasers as "private attorneys general" to

13   deter anticompetitive behavior and enforce the antitrust laws. <u>See</u>

14   <u>id.</u> at 745-46; <u>Royal Printing Co. v. Kimberly-Clark Corp.</u>, 621 F.2d

15   323, 325-26 (9th Cir. 1980); <u>Shamrock Foods</u>, 729 F.2d at 1212; <u>Del.</u>

16   <u>Valley</u>, 523 F.3d at 1124.  The <u>Illinois Brick</u> rule is intended to

17   promote enforcement of the antitrust laws by conferring standing on

18   the party most likely to bring suit. <u>See Illinois Brick</u>, 431 U.S.

19   at 745-46 (concluding that Congressional intent to empower private

20   attorneys general "is better served by holding direct purchasers to

21   be injured to the full extent of the overcharge paid by them than

22   by attempting to apportion the overcharge among all that may have

23   absorbed a part of it"); <u>see also Shamrock Foods</u>, 729 F.2d at 1212

24   (citing <u>Illinois Brick</u>, 431 U.S. at 746-47) ("[D]irect purchasers

25   absorb at least some and often most of the overcharges and are more

26   likely to come forward to collect their damages" than indirect

27   purchasers.).

28       The so-called "<u>Illinois Brick</u> wall," <u>Kendall v. Visa U.S.A.</u>,

**United States District Court**
For the Northern District of California

1    *Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008), looms as an imposing

2    barrier for antitrust plaintiffs who, like the Named DPPs here,

3    rely on a pass-through theory.  The wall is not impassable,

4    however, for although "the Supreme Court has expressed reluctance

5    in carving out exceptions to the *Illinois Brick* rule, limited

6    exceptions do exist."  *ATM Fee*, 686 F.3d at 749.  These exceptions,

7    when applicable, permit indirect purchasers to pursue private

8    treble-damages claims notwithstanding the usual prohibition of

9    *Illinois Brick*.  Hence, the question of whether the Named DPPs have

10   standing does not turn solely on their status as direct or indirect

11   purchasers.  As indirect purchasers, their standing depends on

12   whether any of the recognized exceptions apply.

13        In *ATM Fee*, which was decided after the Special Master issued

14   his report, the Ninth Circuit outlined the three recognized

15   exceptions to *Illinois Brick* in systematic fashion.  First, the

16   panel explained that the Supreme Court has "recognized standing for

17   indirect purchasers when a preexisting cost-plus contract with the

18   direct purchaser exists."  *Id.* (citing *Illinois Brick*, 431 U.S. at

19   736; *UtiliCorp*, 497 U.S. at 217-18).  "Second, indirect purchasers

20   may have standing under a 'co-conspirator' exception."  *Id.* (citing

21   2A Phillip E. Areeda *et al.*, *Antitrust Law* ¶ 346h (3d ed. 2007)).

22   Under this exception, "an indirect purchaser may bring suit where

23   he establishes a price-fixing conspiracy between the manufacturer

24   and the middleman."  *Id.* (quoting *Del. Valley*, 523 F.3d at 1123

25   n.1).  "However, for the indirect purchaser to merit standing under

26   this exception, the conspiracy must fix the price paid by the

27   plaintiffs."  *Id.* (citing *Shamrock Foods*, 729 F.2d at 1211).

28   Finally, under the third exception, "indirect purchasers may sue

**United States District Court**
For the Northern District of California

when customers of the direct purchaser own or control the direct
purchaser . . . or when a conspiring seller owns or controls the
direct purchaser . . . ."  <u>Id.</u> (citing <u>Illinois Brick</u>, 431 U.S. at
736 n.16; <u>Royal Printing</u>, 621 F.2d at 326).  "For example, an
indirect purchaser may sue if the direct purchaser is a division or
subsidiary of the price-fixing seller."  <u>Id.</u>[6]

Importantly, these exceptions are not based on market-specific
factors; indeed, courts regularly acknowledge <u>Illinois Brick</u>'s
warning against carving out exceptions for certain kinds of
markets.  <u>E.g.</u>, <u>UtiliCorp</u>, 497 U.S. at 216 (citing <u>Illinois Brick</u>,
431 U.S. at 744); <u>Del. Valley</u>, 523 F.3d at 1124 (same).  Neither do
they depend on case-specific factors.  <u>See</u> <u>UtiliCorp</u>, 497 U.S. at
216-17 (observing that <u>Illinois Brick</u>'s rationale "will not apply
with equal force in all cases" and that its economic assumptions
"might be disproved in a specific case," but affirming its bright-
line rule regardless).  The exceptions cover situations where
either <u>Illinois Brick</u>'s concern over multiple recovery and
apportionment does not apply, or its policy of encouraging private
antitrust suits would be stymied by mechanical application of its
bright-line rule.  <u>See</u> <u>Shamrock Foods</u>, 729 F.2d at 1214 (holding
"that the policy considerations identified in Illinois Brick do not
apply" in co-conspirator cases); <u>Royal Printing</u>, 621 F.2d at 326
n.7 (establishing ownership and control exception because "blind

---

[6] Before <u>ATM Fee</u>, the case law hinted at the possible existence of
a fourth exception that would apply when "there is no realistic
possibility that the direct purchaser will sue."  686 F.3d at 749
(quoting <u>Freeman v. San Diego Ass'n of Realtors</u>, 322 F.3d 1133,
1145-46 (9th Cir. 2003)).  The <u>ATM Fee</u> panel explained, however,
that <u>Freeman</u> did not create a fourth exception.  It simply restated
the ownership and control exception already established by <u>Royal
Printing</u>.  <u>See</u> <u>id.</u> at 756.

application of the Illinois Brick rule would eliminate the threat of private enforcement" in such cases). Thus, in the instant case, the Court must attend carefully to the contours of the exceptions recognized by the Ninth Circuit, as well as to the policies of Illinois Brick justifying those exceptions.

To begin, the Named DPPs do not allege that they had a preexisting cost-plus contract with any of the Defendants, so the first Illinois Brick exception clearly does not apply. See ATM Fee, 686 F.3d at 750. The other two exceptions, the co-conspirator exception and the ownership and control exception, bear more extended discussion, and the Court turns now to them.

**B.   The Co-Conspirator Exception**

The co-conspirator exception allows an indirect purchaser to sue when the direct purchaser conspires horizontally or vertically to fix the price paid by the plaintiffs. ATM Fee, 686 F.3d at 750 (citing Shamrock Foods, 729 F.2d at 1211). Put another way, "the co-conspirator exception applies when the conspirators set the price paid by the consumer." Id. at 751 (citing Kendall, 518 F.3d 1042); see also Shamrock Foods, 729 F.2d at 1211. Conversely, the exception does not apply if the plaintiff's "theory of recovery depends on pass-on damages." Id. at 755. The rationale for the exception is that co-conspirator cases do not implicate two key policies underlying the Illinois Brick rule -- the elimination of multiple recoveries by successive tiers of plaintiffs, as well as of the complicated apportionment of damages among them -- because the co-conspirator exception confers standing on only a single tier of plaintiffs, those who directly pay the fixed price. See Shamrock Foods, 729 F.2d at 1213-14. Indeed, as the Ninth Circuit

11

**United States District Court**
For the Northern District of California

1    recently explained, "this co-conspirator exception is not really an

2    exception at all," but rather a straightforward application of

3    Illinois Brick in situations where the direct purchaser is part of

4    the price-fixing conspiracy and the plaintiff directly pays the

5    price set by the conspiracy.   See ATM Fee, 686 F.3d at 750.

6        In this case, the DPPs have alleged a conspiracy to fix the

7    price of CRTs, but they have expressly stipulated to the withdrawal

8    of their allegations of a conspiracy to fix the price of FPs

9    incorporating those CRTs.   Stip. at 2.   Accordingly, the conspiracy

10   alleged by the DPPs extends only far enough to fix the price of

11   CRTs.   As the Special Master found, and the Named DPPs do not deny,

12   the price of CRTs is not the price the Named DPPs paid.   The Named

13   DPPs paid only for FPs.   Accordingly, because the Named DPPs'

14   "theory of recovery depends on pass-on damages," the co-conspirator

15   exception does not and cannot apply to them.   See ATM Fee, 686 F.3d

16   at 755.

17       The parties' stipulation eliminates any genuine question of

18   material fact with respect to the Named DPPs' purchase of the

19   allegedly price-fixed CRTs.   With respect to the co-conspirator

20   exception, Defendants have carried their burden of production by

21   showing that the Named DPPs cannot produce evidence sufficient to

22   establish their status as direct purchasers of CRTs.   Further, for

23   the reasons just stated, Defendants have shown that they would be

24   entitled to judgment as a matter of law if the Named DPPs relied

25   only on the co-conspirator exception.   Accordingly, the Court

26   GRANTS Defendants' motion for summary judgment against the Named

27   DPPs to the extent that Defendants' motion challenges the Named

28   DPPs' right to proceed under the co-conspirator exception.

United States District Court
For the Northern District of California

## C.  **The Ownership and Control Exception**

Though Illinois Brick generally bars federal antitrust suits by indirect purchasers, Ninth Circuit precedent "allow[s] indirect purchasers to sue 'where a direct purchaser is a division or subsidiary of a co-conspirator.'"  ATM Fee, 686 F.3d at 756 (quoting Royal Printing, 621 F.2d at 326).  "Royal Printing created an exception when parental control existed, because applying Illinois Brick would eliminate the threat of private enforcement . . . and close off every avenue for private enforcement."  Id. (internal quotation marks and citations omitted).  As the Royal Printing court explained:

> There is little reason for the price-fixer to fear a direct purchaser's suit when the direct purchaser is a subsidiary or division of a co-conspirator.  Even if the pricing decisions of such a subsidiary or division are necessarily determined by market forces, its litigation decisions will usually be subject to parental control.  The co-conspirator parent will forbid its subsidiary or division to bring a lawsuit that would only reveal the parent's own participation in the conspiracy.

621 F.2d at 326 (footnote omitted).

Defendants argue that the Court must distinguish Royal Printing from the instant case on the ground that some of the Royal Printing plaintiffs purchased the allegedly price-fixed product -- paper -- while, in this case, no Named DPP purchased the allegedly price-fixed CRTs, as opposed to FPs which incorporated them.  Defs. Brief at 20 (citing Royal Printing, 621 F.2d at 326-27).  The Court disagrees.  For the reasons set forth below, the Court concludes that Royal Printing controls here and that the Named DPPs have antitrust standing under it.  Because Royal Printing controls, the Court reviews its facts and holding at some length.

**United States District Court**
For the Northern District of California

### 1.  Royal Printing's Facts and Holding

In Royal Printing, two plaintiffs, a printer and a grocery store, brought a treble-damage antitrust suit against a group consisting of the nation's ten largest paper manufacturers.  621 F.2d at 324.  The manufacturers did not sell their paper directly, but rather distributed it through two kinds of wholesalers: (1) the manufacturers' own wholesaling divisions or wholly-owned wholesaler subsidiaries, and (2) independent, unaffiliated wholesalers.  Id. The wholesalers thus were direct purchasers, because they bought paper directly from the accused manufacturers.  See id. at 326-27. Each defendant-affiliated wholesaler sold paper manufactured by all of the defendants, "not limiting themselves to in-house products." Id. at 324.  The court noted that wholesale prices were set by market conditions, meaning that the conspiracy alleged among the paper manufacturers did not extend to the wholesale level.  See id. at 324 n.1.

Crucially, the printer and grocer never bought paper directly from the allegedly conspiring manufacturers.  Id. at 324.  They bought paper only from non-conspiring wholesalers.  Thus, they were indirect purchasers whose suit Illinois Brick normally would bar. See id. at 325; see also ATM Fee, 686 F.3d at 754 (to be a direct purchaser, "the price paid by plaintiffs must be the price set [by the conspiracy] (not merely 'fixed' in some broad sense)").  The printer, however, had purchased some paper from wholesalers owned or controlled by two of the defendants.  Royal Printing, 621 F.2d at 325.  The paper the printer bought from those wholesalers was not manufactured by the wholesalers' respective corporate parents; it was manufactured by some other defendant.  See id.

14

The Ninth Circuit held that the printer had standing to sue under a theory of joint and several liability, regardless of its status as an indirect purchaser and regardless of which defendant had manufactured the purchased paper, but only to the extent that it purchased paper sold by defendant-owned or -controlled wholesalers. Id. at 327. The Ninth Circuit reasoned that, because all the manufacturers were highly unlikely to authorize their controlled wholesalers (i.e., the direct purchasers) to sue and thereby risk revealing the conspiracy, the deterrent effect and enforceability of the antitrust laws depended on the existence of antitrust standing for indirect purchasers situated like the printer. Id. at 326-27. The grocer, however, which had purchased defendants' paper only through unaffiliated wholesalers, was "truly" an indirect purchaser under Illinois Brick and therefore barred from suit. Id. Illinois Brick also barred the printer to the extent it had purchased defendants' paper from anyone other than a defendants' subsidiary or division. Id.

### 2. **Royal Printing** Controls Here

Put simply, the Court sees no meaningful distinction between the facts of Royal Printing and the facts of this case. In Royal Printing, neither plaintiff ever directly bought the price-fixed paper directly from the manufacturer.[7] Likewise, here, the Named

---

[7] It has been suggested that Royal Printing is distinguishable from this case because the Royal Printing plaintiffs purchased price-fixed paper while the Named DPPs never purchased a price-fixed CRT from anyone. See Defs' Brief at 20; R&R at 10, 11. The difficulty with this position is that the Royal Printing plaintiffs did not purchase price-fixed paper. They paid the wholesale price, which was set by market forces. See Royal Printing, 621 F.2d at 324 (plaintiffs bought only at wholesale), 326 n.4 ("[T]he wholesalers' pricing decisions are determined by market forces . . . ."). The Royal Printing plaintiffs, like the Named DPPs here, were indirect purchasers. Ninth Circuit cases distinguish between, on the one

DPPs never bought the price-fixed CRT directly from the alleged conspirators (since, to the extent that any named Defendants are wholesalers, they are, by stipulation, not alleged to have conspired to fix the price of any FPs they may have sold to the Named DPPs). In Royal Printing, the alleged conspiracy did not include the wholesalers who sold plaintiffs the paper, as shown by the market pricing evident at the wholesale level. Likewise, in this case, the conspiracy alleged among sellers of CRTs does not reach the sellers of FPs. In Royal Printing, the court held that, notwithstanding the plaintiffs' status as indirect purchasers, Illinois Brick did not bar their suit insofar as they paid a passed-on overcharge to a non-conspiring direct purchaser owned or controlled by any alleged conspirator. That holding applies here as well. The Named DPPs are indirect purchasers, but, under Royal Printing, they have standing to sue insofar as they purchased FPs incorporating the allegedly price-fixed CRTs from an entity owned or controlled by any allegedly conspiring defendant.

Defendants suggest that Royal Printing is distinguishable because in that case "no other entity [was] in a position to sue if [the printer's] claims were dismissed on summary judgment." Defs. Brief at 20-21 (citing Royal Printing, 621 F.2d at 327). Here, as Defendants point out, the Named DPPs represent only nine of the thirteen members of the putative DPP class, so even if the Court

hand, an overcharge directly set by and paid to the conspiracy and, on the other, a price paid farther along in the distribution chain which includes a passed-on overcharge. E.g., ATM Fee, 686 F.3d at 754 (distinguishing between direct payment of the price set by conspiring defendants and indirect payment of that price via pass-through, the latter being 'merely 'fixed' in some broad sense"). Making antitrust standing depend on whether a plaintiff bought the price-fixed product -- that is, whether plaintiff was a direct purchaser -- would wipe out the Royal Printing exception.

16

Case 3:07-cv-05944-SC  Document 1476  Filed 11/29/12  Page 19 of 35

**United States District Court**
For the Northern District of California

1    enters summary judgment against those nine parties, other parties

2    stand ready to prosecute this action.  The Special Master also

3    relied on this fact, among others, when recommending that

4    Defendants' motion be granted.  See R&R at 11-12 (noting that the

5    instant motion is not against all DPP class members; that this

6    litigation includes a putative class of indirect purchasers relying

7    on the antitrust laws of states that have passed so-called

8    "Illinois Brick repealer" statutes; and that "the Antitrust

9    Division of the Department of Justice has been pursuing criminal

10   actions against some of these defendants").

11        The Court recognizes that, in the particular circumstances of

12   this case, the enforcement goals of Illinois Brick appear already

13   to have been met, which suggests that the policy rationale behind

14   Royal Printing does not apply.  Defendants urge the Court to

15   decline to apply the Royal Printing exception for that reason.

16   Defs. Brief at 20 n.10.  Defendants, however, cite no case where a

17   court has refused to apply Royal Printing on those grounds, and

18   this Court is not inclined to become the first to do so.  Though

19   there is some intuitive appeal to refusing to apply the exception

20   in cases where enforcement by other parties is ongoing or likely,

21   the better course is to apply the Royal Printing exception to any

22   plaintiff who meets the formal criteria.  To do otherwise is to

23   engage in the very case-by-case recalibration of Illinois Brick

24   that the cases so frequently disapprove.  Having been warned

25   against the ad hoc creation or expansion of exceptions, this Court

26   sees no reason why ad hoc disregard or narrowing of the established

27   exceptions is any more justifiable.  Cf. Utilicorp, 497 U.S. at

28   216-217 (recognizing that rationales behind Illinois Brick might

17

**United States District Court**
For the Northern District of California

1   not be apply in all cases but standing by <u>Illinois Brick</u>

2   regardless). Moreover, Defendants' interpretation of <u>Royal</u>

3   <u>Printing</u> would undermine the "vigorous private enforcement of the

4   antitrust laws," a policy objective which both <u>Illinois Brick</u> and

5   <u>Royal Printing</u> explicitly seek to vindicate. <u>Illinois Brick</u>, 431

6   U.S. at 745; <u>Royal Printing</u>, 621 F.2d at 326 n.7. Defendants'

7   position, if accepted, would bar private treble-damages actions

8   against an antitrust defendant whenever the Department of Justice

9   engaged in a criminal prosecution of that same defendant. Even in

10  cases where no criminal charges are filed, Defendants' position

11  would deny antitrust standing to any private plaintiff so long as

12  the antitrust defendant could point to some other person who also

13  could sue. That result cannot be squared with the goal of vigorous

14  private antitrust enforcement. The Court therefore applies <u>Royal</u>

15  <u>Printing</u> even though, in the circumstances of this case, other

16  parties stand ready to enforce the antitrust laws.[8]

17       Defendants' other arguments are similarly unavailing.

18  Defendants suggest that the physical differences between the paper

19  at issue in <u>Royal Printing</u> and the CRTs at issue here support

20  denial of antitrust standing to the Named DPPs. Defs. Brief at 16-

21  17. Defendants focus on how the paper in <u>Royal Printing</u> was "not

22  changed in any way" between manufacture and wholesale, while in

23  this case, "the products have been changed" because the CRTs were

24  integrated into FPs. <u>Id.</u> Supposing that paper and CRTs differ in

25  this way, the Court discerns no reason why the difference would

26

27  [8] The Court notes that <u>Illinois Brick</u> itself set forth a rule aimed
    at preventing multiple recoveries even though "[t]he potential of

28  possible multiple recoveries [was] not present in [that] case."
    431 U.S. at 763 n.22 (Brennan, J., dissenting).

United States District Court
For the Northern District of California

matter for standing purposes.  Cf. UtiliCorp, 497 U.S. at 216
(quoting Illinois Brick, 431 U.S. at 744) (declining to apply
Illinois Brick differently in "particular types of markets").  The
policies underlying Illinois Brick and its exceptions apply with
equal force regardless of whether or how a particular good is
modified as it passes through the chain of distribution.  For
instance, the risk of multiple liability from indirect purchasers
does not depend on whether a defendant sells paper or CRTs.
Nothing suggests that CRT sellers are any more likely than paper
manufacturers to permit direct purchasers over whom they exert
ownership or control to bring a lawsuit that would reveal an
alleged conspiracy.  See Royal Printing, 621 F.2d at 326.  Further,
the Ninth Circuit has applied Illinois Brick and its exceptions
without comment in cases involving fees, which obviously do not
involve modification of any physical product.  E.g., ATM Fee, 686
F.3d 741; Freeman, 322 F.3d 1133.  Physical differences between
paper and CRTs supply no reason to refrain from applying the
ownership and control exception here.

Next, Defendants argue that the Court should disregard Royal
Printing because its "underlying rationale . . . no longer carries
the same force as it once did."  Defs. Brief at 20-21.  Defendants
explain that, when the Ninth Circuit decided Royal Printing, its
precedents denied indirect purchasers any remedy under state
antitrust laws, whereas now indirect purchasers may seek such
remedies and, in this case, have done so.  Id. (citing In re Cement
& Concrete Antitrust Litig., 817 F.2d 1435, 1447 (9th Cir. 1987)
rev'd sub nom. California v. ARC Am. Corp., 490 U.S. 93 (1989)).
According to Defendants, indirect purchasers' standing to bring

United States District Court

For the Northern District of California

state antitrust actions obviates the need for the <u>Royal Printing</u> exception.  <u>Id.</u> at 21; <u>see also</u> <u>id.</u> at 23-24 (acknowledging existence of other direct purchasers, as well as ongoing criminal prosecution of some Defendants).  Whatever the merits of Defendants' argument, it is better addressed to the Ninth Circuit, which not only has yet to overrule or narrow <u>Royal Printing</u>, but reaffirmed and clarified its holding just months ago in <u>ATM Fee</u>. <u>See</u> 686 F.3d at 756-58.  <u>Royal Printing</u> remains the law of this circuit and binding on this Court.

Defendants next criticize the Named DPPs' reliance on two Third Circuit decisions, <u>Sugar</u> and <u>Linerboard</u>.  Defs. Brief at 22. Defendants describe <u>ATM Fee</u> as having "expressly rejected the approach taken by the Third Circuit."  <u>Id.</u>  It is true that <u>Sugar</u> and <u>Linerboard</u> conflict with Ninth Circuit law concerning the co-conspirator exception.  <u>See</u> <u>ATM Fee</u>, 686 F.3d at 755 n.7.  However, the <u>ATM Fee</u> court specifically noted that <u>Sugar</u> "exemplifies the exception allowed when an upstream violator controls or owns the direct purchaser" -- that is, the <u>Royal Printing</u> exception.  <u>Id.</u> <u>ATM Fee</u> makes clear that, while <u>Sugar</u> and <u>Linerboard</u> do not reflect the law of the Ninth Circuit where the co-conspirator exception is concerned, <u>Sugar</u>, at least, does exemplify the law of the Ninth Circuit where the ownership and control exception is concerned.

Defendants characterize the Named DPPs' citation of <u>Freeman</u> and the two Third Circuit cases as an impermissible attempt to fashion a new exception to <u>Illinois Brick</u>.  Defs. Brief at 21-23. That characterization is inaccurate.  As discussed earlier, <u>Freeman</u> and <u>Sugar</u> are applications, not expansions, of the ownership and control exception already set forth in <u>Royal Printing</u>.

Defendants also argue that they are immunized from antitrust liability for the sole reason that CRTs are a "vital input" into FPs. Defs. Brief at 23. They emphasize a passage in ATM Fee which described Illinois Brick as having "rejected exceptions for markups by middlemen or when the price-fixed good is a vital input to a larger product." ATM Fee, 686 F.3d at 753 (citing Illinois Brick, 431 U.S. at 743-45). Defendants' argument overshoots the mark. This passage in ATM Fee merely states the general prohibition against standing based on pass-on damages, and says nothing about "rejecting" established exceptions, such as the Royal Printing exception. Indeed, rather than rejecting the three established exceptions, ATM Fee affirmed and applied each of them, making them part of the case's holding. Moreover, Defendants' interpretation of ATM Fee's "vital input" remark would create, in effect, an exception to the exceptions, one that would apply whenever the price-fixed good was a "vital input." Even assuming that one could define what makes some inputs "vital" and others not, this Court has already declined to narrow the established Royal Printing exception for reasons unique to the particularities of this case or to the physical nature of CRTs.

Lastly, Defendants suggest that standing should be denied to the Named DPPs because, as indirect purchasers, their claims would involve the complicated apportionment of damages warned against in Illinois Brick. Defs. Brief at 21-22. The concern is misplaced. Royal Printing explicitly addressed the issue of apportioning damages and held that, in cases proceeding under the ownership and control exception, no apportionment is needed; plaintiffs are permitted to sue "for the entire overcharge." 621 F.2d at 327.

The Court expresses no view as to whether the Named DPPs will be able to prove what is needed to win relief as indirect purchasers under the ownership and control exception. In their sealed brief and its supporting declarations, the Named DPPs present evidence based on the discovery they have taken so far. DPP Brief at 4-5, 13. This evidence raises a genuine issue of material fact as to whether the Named DPPs purchased FPs incorporating the allegedly price-fixed CRTs from some defendant-owned or -controlled division or subsidiary. Accordingly, Defendants have not carried their summary judgment burden of showing an absence of evidence in support of applying the ownership and control exception. To the extent that Defendants' summary judgment motion challenges the Named DPPs' standing on that ground, the motion is DENIED.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

**V.    CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment against Plaintiffs Arch Electronics, Inc.; Crago d/b/a Dash Computers, Inc.; Electronic Design Company; Meijer, Inc. and Meijer Distribution, Inc.; Nathan Muchnick, Inc.; Orion Home Systems, LLC; Radio & TV Equipment, Inc.; Royal Data Services, Inc.; and Studio Spectrum, Inc., is GRANTED IN PART and DENIED IN PART.  Because these Plaintiffs did not purchase allegedly price-fixed CRTs directly, they are indirect purchasers and Illinois Brick bars their suit unless one of the three recognized exceptions applies.  The Court concludes that the ownership-and-control exception of Royal Printing does apply.  Therefore, the Named DPPs have standing to sue for alleged overcharges passed on to them when they purchased an FP containing an allegedly price-fixed CRT from an entity allegedly owned or controlled by any allegedly conspiring Defendant.  The Named DPPs do not have standing, however, to sue for alleged overcharges passed on to them from any other seller of FPs.

IT IS SO ORDERED.

Dated:  November 29, 2012          _____
                                    UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

# Exhibit B

United States District Court
For the Northern District of California

1

2

3

4

5          IN THE UNITED STATES DISTRICT COURT

6          FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   IN RE: TFT-LCD (FLAT PANEL) ANTITRUST          No. M 07-1827 SI
    LITIGATION                                     MDL. No. 1827
9   _____/      Case Nos. C 09-4997 SI; C 10-4572 SI; C 10-
                                                   1064 SI; C 10-0117 SI; C 10-4945 SI; C 11-
10   This Order Relates to:                        0058 SI

11  *AT&T Mobility LLC, et al. v. AU Optronics*    **ORDER DENYING DEFENDANTS'**
    *Corp., et al.,* C 09-4997 SI                  **JOINT MOTION AND TOSHIBA'S**
12                                                 **SEPARATE MOTION FOR PARTIAL**
    *Best Buy Co., Inc., et al. v. AU Optronics*   **SUMMARY JUDGMENT FOR LACK OF**
13  *Corp.,* *et al.,* C 10-4572 SI                **STANDING UNDER *ILLINOIS BRICK***
                                                   **AND *IN RE ATM FEE***
14  *Dell Inc., et al. v. Sharp Corp., et al.,* C 10-1064
    SI
15
    *Electrograph Systems, Inc., et al. v. Epson*
16  *Imaging Devices Corp., et al.,* C 10-0117 SI

17  *Target Corp., et al. v. AU Optronics Corp., et al.,*
    C 10-4945 SI
18
    *Costco Wholesale Corp. v. AU Optronics Corp.,*
19  *et al.,* C 11-0058 SI

20  _____/

21          Currently before the Court are defendants' joint motion and Toshiba's separate motion for partial

22  summary judgment for lack of standing under *Illinois Brick* and *In Re ATM Fee*.  Having considered the

23  moving papers and the arguments of the parties, and for good cause appearing, the Court hereby

24  DENIES the motions.  Docket 6342 and 6367.

25

26                                    **BACKGROUND**

27          In *Illinois Brick*, the Supreme Court held that only direct purchasers of price-fixed goods may

28  bring suit under the federal antitrust laws. *Illinois Brick Co. v. Illinois*, 431 US 720 (1977).  Subsequent

United States District Court
For the Northern District of California

cases have outlined limited exceptions to the *Illinois Brick* rule and held that indirect purchasers may have standing to bring suit in one of the following three situations: (1) a pre-existing cost-plus contract with the direct purchaser exists; (2) the indirect purchaser establishes a price-fixing conspiracy between the manufacturer and the middle-man, making the latter entities co-conspirators as to the price paid by the plaintiffs; and (3) customers of the direct purchaser own or control the direct purchaser, or a conspirator owns or controls the direct purchaser. *Royal Printing v. Kimberly-Clark Corp.,* 621 F. 2d 323 (9th Cir. 1980)*; Freeman v. San Diego Ass'n of Realtors*, 322 F. 3d 1133 (9th Cir. 2003).

In a recent decision, the Ninth Circuit clarified the scope of the latter two of these exceptions. *See In Re ATM Fee Antitrust Litigation*, 686 F.3d 741 (9th Cir. 2012). Plaintiffs, automated teller machine ("ATM") cardholders, alleged that the defendants, bank members of an ATM network, engaged in horizontal price fixing by conspiring to fix the fees the banks paid to ATM owners ("interchange fees") when cardholders retrieve cash from an ATM not owned by their bank. *ATM Fee* held that the manufacturer-middleman/co-conspirator exception did not apply because this exception is only applicable if the co-conspirators fix the price paid by the plaintiff, but in that case plaintiff cardholders did not pay the price-fixed fee, the ATM network owners did. *Id.* at 744. With respect to the ownership/control exception, *ATM Fee* held that the "no realistic possibility" inquiry that the Ninth Circuit had recognized in *Freeman* is not a separate exception to the *Illinois Brick* rule, and does not apply outside the ownership or control context. *Id*. at 756-58.

In two separate motions for summary judgment, a joint group of defendants[1] and Toshiba[2] (generally "defendants") argue that pursuant to the holding in *In Re ATM Fee,* plaintiffs lack standing to pursue Sherman and Clayton Act claims because they purchased finished products only and not the

---

[1]LG Display Co., Ltd. and LG Display America, Inc.; Epson Imaging Devices Corporation and Epson Electronics America, Inc.; AU Optronics Corporation and AU Optronics Corporation America; Philips Electronics North America Corporation; Chunghwa Picture Tubes, Ltd.; HannStar Display Corporation; Mitsui & Co. (Taiwan), Ltd.; Sharp Corporation and Sharp Electronics Corporation; Samsung SDI, Inc., Samsung SDI Co., Ltd., and Samsung SDI America, Inc.; Sanyo Consumer Electronics Co., Ltd.; Hitachi, Ltd., Hitachi Displays, Ltd. (n/k/a Japan Display East, Inc.) and Hitachi Electronic Devices (USA), Inc.; Chimei Innolux Corporation (f/k/a Chi Mei Optoelectronics Corporation), Chi Mei Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc. and Nexgen Mediatech USA, Inc.

[2]Toshiba Corporation, Toshiba Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc.

1    price-fixed good, and because no *Illinois Brick* exception applies.

2

3                                  **LEGAL STANDARD**

4         Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and

5    any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled

6    to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of

7    demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317,

8    323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving

9    party will have the burden of proof at trial. The moving party need only demonstrate to the Court that

10   there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

11        Once the moving party has met its burden, the burden shifts to the non-moving party to "set out

12   'specific facts showing a genuine issue for trial.'" *Id.* at 324 (quoting then Fed. R. Civ. P. 56(e)). To

13   carry this burden, the non-moving party must "do more than simply show that there is some

14   metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

15   475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence ... will be insufficient; there

16   must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v.*

17   *Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

18        In deciding a summary judgment motion, the Court must view the evidence in the light most

19   favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255.

20   "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from

21   the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.*

22   However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise

23   genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d

24   730, 738 (9th Cir.1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)).

25

26

27

28                                 **DISCUSSION**

                                        3

United States District Court
For the Northern District of California

Plaintiffs[3] are retailers, distributors, original equipment manufacturers (OEMs), and other businesses which purchased finished products containing price-fixed LCD panels from defendants, co-conspirators, and other related entities. These Direct Action Purchasers ("DAPs") claim that as a result of these purchases, they sustained damages in the form of overcharges. Defendants argue that plaintiffs lack standing to sue because they did not directly purchase the price-fixed good, namely, the LCD panel, and no *Illinois Brick* exception applies. The parties do not dispute that the first two *Illinois Brick* exceptions are inapplicable. They do, however, interpret the holdings of *ATM Fee* differently, and they dispute how the ownership/control exception, as explained in *ATM Fee,* applies to the case at hand. Additionally, defendants argue that the exceptions must be evaluated on a purchase-by-purchase basis, and that plaintiffs cannot demonstrate whether each individual finished product contains a panel made by an alleged conspirator.

**1.      Ownership/Control Exception**

Defendants contend that because plaintiffs purchased finished products containing price-fixed LCD panels, not the raw panels themselves, they have no standing, even though the plaintiffs' purchases were made from defendants, co-conspirators and affiliates. They urge this Court to hold that *ATM Fee* changed and narrowed the scope of *Royal Printing Company v. Kimberly-Clark Corp.*, 621 F.3d 323, 326 (9th Cir. 1980), by limiting the ownership/control exception to cases in which the seller of the price-fixed good (here, the LCD panels) owns/controls the direct purchaser.[4] Defendants argue that this excludes cases in which a co-conspirator owns/controls the direct purchaser and cases in which the direct purchaser owns/controls the seller or co-conspirator.

The Court disagrees with defendants' interpretation of *ATM Fee*. In *Royal Printing*, the Ninth

---

[3]Toshiba has withdrawn its motion as to Eastman Kodak Company and Nokia Corporation and Nokia Inc. Docket Nos. 6473 and 6601.

[4]Toshiba argues that *Royal Printing* is no longer supportable because its reasoning was based on the theory that applying *Illinois Brick* to cases where parental control existed would close off every avenue for private enforcement, but a subsequent case held that *Illinois Brick* does not preempt lawsuits under state indirect purchaser antitrust statutes. The Court disagrees with Toshiba: state antitrust enforcement would not replace *federal* antitrust liability, which was *Illinois Brick*'s concern. *See Illinois Brick*, 431 U.S. at 745-46.

**United States District Court**
For the Northern District of California

Circuit outlined the ownership/control exception and held that *"Illinois Brick* does not bar an indirect purchaser's suit where the direct purchaser is a division or subsidiary of a co-conspirator." As this Court stated in a previous Order in the Direct Purchaser action, *Royal Printing* was not concerned with the relationship between the manufacturer of a price-fixed product and the direct purchaser; rather, it was concerned with the relationship between the *conspirator* and the direct purchaser. Docket No. 4108. Indeed, the facts in *Royal Printing* confirm this: Royal Printing sought damages for its purchases from a co-conspirator's wholesaling division, but had never bought any of the parent company's products from that division -- it had only bought products of other defendant manufacturers. *Royal Printing*. 621 F.2d at 324.

*ATM Fee* did not purport to change the *Royal Printing* standard, but rather applied it to the complicated facts of that case. Nowhere in the *ATM Fee* decision did the court mandate that the ownership/control relationship be limited *only* to a manufacturer/seller and direct purchaser. That the facts of that particular case involved only a seller and direct purchasers does not restrict the standard in *Royal Printing,* which involved multiple sellers and direct purchasers. To the contrary, *ATM Fee* expressly cited the *Royal Printing* standard and then held that the ATM cardholder plaintiffs, who alleged only that the direct purchaser banks owned/controlled the ATM Network (the seller), could not establish ownership/control based on the "ordinary, contemporary, and common meaning" of the word "control." *ATM Fee*, 686 F.3d at 756-58. The Court's determination hinged on the facts surrounding stock ownership and board control of the ATM Network and STAR, rather than any purported change in ownership/control standard itself. Indeed, the *ATM Fee* case effectively refutes defendants' claim that the ownership/control exception can only apply downstream, *id*. at 757-58, by analyzing whether direct purchaser bank defendants owned/controlled seller ATM Network/STAR.

The *ATM Fee* opinion never suggested any intention to alter the standard in *Royal Printing*. The *ATM Fee* discussion recognized that the touchstone question is ownership or control, and clarified that the "realistic possibility of suit" inquiry outlined in *Royal Printing* is not a *separate* exception -- it is an analysis to be done in connection with the ownership/control exception. As the Court noted, "*Freeman* outlines that, whether a realistic possibility of suit exists, depends on the ownership or control between the direct purchaser and the seller." *ATM Fee,* at 756. In this case, plaintiffs argue that the

5

there is evidence of ownership/control between the direct purchaser and a co-conspirator, and they contend that they have standing based on the ownership/control exception outlined in *Royal Printing* and affirmed by *ATM Fee*.[5]

The joint defendants argue that plaintiffs are unable to demonstrate that the sellers of LCD panels own/control the direct purchasers in this action. They point to the example of the LG entities and assert that LG Display, an alleged co-conspirator, owns/controls LG Electronics, a direct purchaser, and that plaintiffs admit LG Electronics has never been a division or subsidiary of LG Display, an alleged co-conspirator. They also assert that mere corporate "affiliation" is not sufficient to meet the ownership/control standard. Joint Motion at 18. Toshiba asserts that plaintiffs lack standing because TMD, the only Toshiba entity that manufactured LCD panels during the relevant period, did not own or control TAIS, Toshiba's U.S. subsidiary, and a direct purchaser.

However, as discussed *supra*, ownership/control may exist if the direct purchaser owns/controls the seller/manufacturer or if a co-conspirator owns/controls the direct purchaser. Thus, the ownership/control exception will apply if, as plaintiffs allege, LG Electronics owns/controls LG Display, and TAIS is owned by a co-conspirator (TSB, in this case).[6] Using the example of the LG entities, LG Display was formed as a joint venture, with two shareholders, each owning a 50% interest: LG Electronics (an alleged conspirator) and Royal Phillips. *See* Iovieno Decl., Exh. 78, No. 2. However, Royal Philips had

---

[5]In asserting that plaintiffs lack standing even if the ownership/control exception applies, because they only bought finished products, and not the price-fixed LCD panels, defendants misconstrue not only the holding in *Royal Printing*, but the very reasoning of the ownership/control exception. As the court in *ATM Fee* explained, *Royal Printing* created the ownership/control exception because *Illinois Brick* would close off "every avenue for private enforcement" if only direct purchasers could sue as "the co-conspirator parent will forbid its subsidiary or division to bring a lawsuit that would only reveal the parent's own participation in the conspiracy." *ATM Fee*, 686 F.3d at 756 (quoting *Royal Printing*, 631 F.3d at 326-27). These cases make clear that indirect purchasers may sue even if, and precisely *because*, they did not purchase the price-fixed good, if it falls within the ownership/control exception. *See ATM Fee*, at 756.

[6]To the extent defendants argue that plaintiffs lack standing for finished products purchased by or sold to a systems integrator, ODM or other third party before reaching the Direct Action purchasers, the Court finds that a genuine issue of material fact exists as to whether these parties actually buy price-fixed panels directly from panel manufacturers or whether they are retained by direct purchaser companies to merely assemble finished products. Plaintiffs assert that these intervening companies do not directly purchase price-fixed panels from alleged conspirators and sell them to indirect purchasers, and plaintiffs provide evidence in the form of deposition testimony and an expert report to support these assertions. *See* Opposition at 9, 17-18; Iovieno Decl., Exh. 61; Exh. 67.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1  acquired a 50% interest in LG Electronic's TFT-LCD panel business to form LG Philips, the

2  predecessor to LG Display. *See id.* Nos. 1-2. Moreover, LG Display's Shareholder Committee

3  consisted exclusively of members affiliated with LG Electronics or Royal Philips, *see id.* at 14; 36-61,

4  and under the terms of the joint venture agreement, LG Display and LG Electronics agreed to maintain

5  joint ownership of patents relating to TFT-LCD that were not assigned to LG Display, *see id.* at 62.[7]

6  This evidence supports plaintiffs' contention that LG Electronics owns/controls LG Display.

7      Like LG, Toshiba argues that the only panel-making seller in the Tohiba family is its joint

8  venture, TMD, and TMD does not own/control the direct purchaser, TAIS. However, it is undisputed

9  that the direct purchaser, TAIS, is wholly owned by Toshiba America, Inc., which is wholly owned by

10 the parent company, TSB, an alleged co-conspirator.[8] Toshiba Motion at 7. Further, the evidence

11 demonstrates that TSB controls TMD, and TMD was formed as a joint venture between TSB and

12 Matsushita in April 2002. *See* Iovieno Decl., Exh. 4 at TSB_LCD _0058000. At the time of formation,

13 TSB owned a 60% interest in TMD, transferred its panel manufacturing business to TMD, and appointed

14 six of TMD's board members. *Id.*, Exh. 4, 20 at TSB_LCD_0247635, 25 at 32:10–32:21.

15     This evidence is sufficient to establish standing to present these claims at trial.

16

17 **2.    Proof of Injury and Ownership/Control**

18     Defendants also argue that plaintiffs cannot provide evidence sufficient to show standing because

19 they cannot identify the manufacturer of each LCD panel in the finished products they purchased and

20 thus, they are unable to demonstrate that the products contain panels made by alleged conspirators or

21 that the finished products were sold by a direct purchaser which is owned/controlled by a conspiring

22 seller/manufacturer.

23     The Court has addressed related issues of proof for purposes of standing in its prior orders. *See*

24 Docket 4848, 4683. The Court noted that "[t]he difficulties that defendants have seized on involve

25

26        [7]*Cf. ATM Fee*, 686 F.3d at 757-58 ("to control STAR [the ATM Network], the Bank Defendants must have had control of Concord's board of directors. . .").

27        [8]To the extent plaintiffs rely on the jury verdict from the direct-purchaser class action, the Court

28 notes that this verdict is likely to be vacated as part of a settlement agreement between the class and the Toshiba entities, which has received preliminary approval from the Court. Docket No. 6988.

United States District Court
For the Northern District of California

1   matters of proof of the plaintiffs' claims. They do not equate to a lack of standing." Docket No. 4683.

2   Here, LG's motion revives the issue of standing of the DAP plaintiffs, which involves the same type of

3   analysis of proof of injury. Additionally, in a separate Order, the Court considered that plaintiffs in

4   antitrust cases benefit from an "especially lenient burden" in demonstrating proof of impact and that the

5   nature of the TFT-LCD industry renders a panel-by-panel proof requirement "inappropriately strict."

6   The Court thus held, "[i]t is therefore unnecessary for plaintiffs to provide evidence of panel-by-panel

7   impact. Rather, plaintiffs may resort to generalized methods of proof." Docket No. 4848. As these

8   Orders indicate, for purposes of standing plaintiffs are not required to identify impact based on each

9   individual panel.

10       Additionally, defendants argue that because plaintiffs cannot identify the manufacturer of the

11   LCD panels in each of the products they purchased, they cannot satisfy the factual predicate to establish

12   ownership/control of the direct purchasers of those products. Plaintiffs dispute this claim, arguing that

13   there is sufficient evidence to demonstrate that the ownership/control exception applies. Plaintiffs point

14   to a chart submitted by defendants that lists the 151 entities from which plaintiffs purchased the LCD

15   products that form the basis for their federal claims. *See* Berger Decl., Exh. X. Defendants acknowledge

16   that plaintiffs have submitted evidence sufficient on summary judgment to show "downstream, parental

17   ownership or control" of 47 of the 149 direct purchasers identified in plaintiffs' expert reports. *See* Joint

18   Reply at 12-13. They dispute, however, plaintiffs' evidence for the following categories of purchasers:

19   33 direct purchasers who own/control conspiring sellers, 90 direct purchasers with "attenuated

20   relationships" with conspiring sellers, 29 direct purchasers only minimally owned by a conspiring seller,

21   and 42 direct purchasers which plaintiffs do not discuss. *Id*. at 13-16. Defendants' claims about the

22   evidence of these purchases are without merit. Because ownership/control may be demonstrated

23   between a direct purchaser and a co-conspirator, rather than just a seller, sufficient evidence exists to

24   create a genuine issue of material fact regarding the ability of plaintiffs to show that the product they

25   purchased was manufactured by *any* of the co-conspirators. This is particularly compelling based on

26   the apparent control/ownership between various defendant entities, including their joint ventures, as

27   discussed *supra*, and when viewed in light of the fact that defendants held an overwhelming market

28

**United States District Court**
For the Northern District of California

share during the conspiracy period, as this Court has previously identified.[9]  Dkt. 4683.  Accordingly, the Court finds that defendants have failed to meet their burden in demonstrating the absence of evidence to support plaintiffs' claim of standing under *Royal Printing* and *ATM Fee*.

For the foregoing reasons and for good cause shown, the Court hereby DENIES defendants' joint motion and Toshiba's separate motion for partial summary judgment for lack of standing under *Illinois Brick* and *In Re ATM Fee*.  Master Docket Nos. 6342 & 6367.

**IT IS SO ORDERED.**

Dated: November 19, 2012

SUSAN ILLSTON
United States District Judge

---

[9] Defendants' LCD panels were used in 97.4% of LCD TVs, 93.2% of notebook computers, and 87.88% of desktop monitors sold during the relevant period.  Dkt. 4683.

9