# EXHIBIT A

1  Stephen E. Taylor (SBN 058452)
   Jonathan A. Patchen (SBN 237346)
2  TAYLOR & COMPANY LAW OFFICES, LLP
   One Ferry Building, Suite 355
3  San Francisco, California 94111
   Telephone: (415) 788-8200
4  Facsimile: (415) 788-8208
   Email: staylor@tcolaw.com
5  Email: jpatchen@tcolaw.com

6
   Kenneth A. Gallo (*pro hac vice to be submitted*)
7  Joseph J. Simons (*pro hac vice to be submitted*)
   Craig A. Benson (*pro hac vice to be submitted*)
8  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
   2001 K Street, NW
9  Washington, DC 20006-1047
   Telephone: (202) 223-7356
10 Facsimile: (202) 204-7356
   Email: kgallo@paulweiss.com
11 Email: jsimons@paulweiss.com
   Email: cbenson@paulweiss.com

12
   *Attorneys for Plaintiffs Sharp Electronics Corporation,*
13 *Sharp Electronics Manufacturing Company of America, Inc.*

14
                  UNITED STATES DISTRICT COURT

15
                 NORTHERN DISTRICT OF CALIFORNIA

16

17 SHARP ELECTRONICS CORPORATION;        Case No.   1173
   SHARP ELECTRONICS MANUFACTURING
18 COMPANY OF AMERICA, INC.,             **COMPLAINT**

19 Plaintiffs,                           **DEMAND FOR JURY TRIAL**

20              v.

21 HITACHI, LTD.; HITACHI DISPLAYS, LTD.;
   HITACHI AMERICA, LTD.; HITACHI ASIA,
22 LTD.; HITACHI ELECTRONIC DEVICES (USA),
   INC.; SHENZHEN SEG HITACHI COLOR
23 DISPLAY DEVICES, LTD.; LG ELECTRONICS,
   INC.; LG ELECTRONICS USA, INC.; LG
24 ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP
   DISPLAYS INTERNATIONAL, LTD.;
25 MERIDIAN SOLAR & DISPLAY CO., LTD.;
   LG.PHILIPS DISPLAYS HOLDING B.V.;
26 LG.PHILIPS DISPLAYS INTERNATIONAL B.V.;
   PANASONIC CORPORATION; PANASONIC
27 CORPORATION OF NORTH AMERICA;
   PANASONIC CONSUMER ELECTRONICS CO.;
28 MT PICTURE DISPLAY CO., LTD.;

                          - 1 -

1  MATSUSHITA ELECTRONIC CORPORATION
   (MALAYSIA) SDN BHD.; BEIJING
2  MATSUSHITA COLOR CRT CO., LTD.;
   SAMSUNG SDI CO., LTD.; SAMSUNG SDI
3  AMERICA, INC.; SAMSUNG SDI (MALAYSIA)
   SDN BHD.; SAMSUNG SDI MEXICO S.A. DE
4  C.V.; SAMSUNG SDI BRASIL LTDA.;
   SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN
5  SAMSUNG SDI CO., LTD.; SAMSUNG SDI
   (HONG KONG), LTD.; TOSHIBA
6  CORPORATION; PT.MT PICTURE DISPLAY
   INDONESIA; TOSHIBA AMERICA, INC.;
7  TOSHIBA AMERICA CONSUMER PRODUCTS
   LLC; TOSHIBA AMERICA ELECTRONIC
8  COMPONENTS, INC.; TOSHIBA AMERICA
   INFORMATION SYSTEMS, INC.; TOSHIBA
9  DISPLAY DEVICES (THAILAND) COMPANY,
   LTD.; THOMSON SA (N/K/A TECHNICOLOR
10 SA); THOMSON CONSUMER ELECTRONICS,
   INC. (N/K/A TECHNICOLOR USA, INC.);
11 VIDEOCON INDUSTRIES, LTD.;
   TECHNOLOGIES DISPLAYS AMERICAS LLC;
12 TECHNOLOGIES DISPLAYS MEXICANA, S.A.
   DE C.V.,

13 Defendants.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

COMPLAINT AND JURY DEMAND

1

# **TABLE OF CONTENTS**

2
<div align="right">

**Page**

</div>

3    I.    INTRODUCTION ............................................................................................................1

4    II.   JURISDICTION AND VENUE .....................................................................................3

5    III.  MULTIDISTRICT AND INTRADISTRICT ASSIGNMENT ...........................................5

6    IV.   PARTIES .......................................................................................................................6

7          A.    Plaintiffs...............................................................................................................6

8          B.    Defendants ...........................................................................................................7

9    V.    AGENTS AND CO-CONSPIRATORS .......................................................................20

10   VI.   TRADE AND COMMERCE .......................................................................................26

11   VII.  FACTUAL ALLEGATIONS .......................................................................................26

12         A.    CRT Technology and Products............................................................................26

13         B.    Structure of the CRT Industry ............................................................................27

14               1.    Market Concentration ..............................................................................28

15               2.    Information Sharing..................................................................................28

16               3.    Consolidation...........................................................................................28

17               4.    High Costs of Entry into the Industry.......................................................28

18               5.    Homogeneity of CRTs..............................................................................29

19         C.    International Antitrust Investigations ....................................................................29

20         D.    Pre-Conspiracy Market.......................................................................................33

21         E.    Defendants' and Co-conspirators' Illegal Agreements..........................................33

22               1.    "Glass Meetings".....................................................................................35

23               2.    Bilateral Discussions ...............................................................................39

24               3.    Defendants' and Co-conspirators' Participation in Group
                           and Bilateral Discussions.........................................................................40

25         F.    The CRT Market During the Conspiracy .............................................................47

26         G.    Effects of Defendants' Antitrust Violations .........................................................48

27               1.    Examples of Collusive Pricing for CRTs .................................................48

28

2.      Examples of Reductions in Manufacturing Capacity by
Defendants ...................................................................................................49

H.      Summary of Effects of the Conspiracy Involving CRTs.......................................50

VIII.    PLAINTIFFS' INJURIES .................................................................................................50

IX.     TOLLING.........................................................................................................................51

X.      FRAUDULENT CONCEALMENT ................................................................................52

XI.     CLAIM FOR VIOLATIONS ...........................................................................................54

FIRST CLAIM FOR RELIEF  (VIOLATION OF SECTION 1 OF THE
SHERMAN ACT, 15 U.S.C. § 1)........................................................................................54

SECOND CLAIM FOR RELIEF (VIOLATION OF THE CALIFORNIA
CARTWRIGHT ACT) ...........................................................................................................55

THIRD CLAIM FOR RELIEF (VIOLATION OF CALIFORNIA UNFAIR
COMPETITION LAW)..........................................................................................................57

FOURTH CLAIM FOR RELIEF (VIOLATION OF THE NEW YORK
DONNELLY ACT) .................................................................................................................58

FIFTH CLAIM FOR RELIEF (VIOLATION OF NEW YORK UNFAIR
COMPETITION LAW)..........................................................................................................59

SIXTH CLAIM FOR RELIEF (NEW JERSEY ANTITRUST ACT, N.J. STAT. §
56:9-1 *ET SEQ.*).................................................................................................................60

SEVENTH CLAIM FOR RELIEF (VIOLATION OF TENNESSEE CODE ANN.
§§ 47-258-101 *ET SEQ.*) .................................................................................................61

XII.    DAMAGES......................................................................................................................62

XIII.    PRAYER FOR RELIEF ..................................................................................................62

XIV.    JURY TRIAL DEMANDED...........................................................................................64

COMPLAINT AND JURY DEMAND

1       Plaintiffs Sharp Electronics Corporation and Sharp Electronics Manufacturing
2   Company of America, Inc., ("Sharp" or "Plaintiffs"), bring this action for damages and
3   injunctive relief under the antitrust laws of the United States and under the antitrust and fair
4   competition laws of California, New York, New Jersey, and Tennessee. Sharp alleges the
5   following based on personal knowledge, investigation by counsel, and publically available
6   materials, including publicly available materials from *In re Cathode Ray Tube (CRT) Antitrust*
7   *Litigation*, 3:07-cv-5944-SC (N.D. Cal.), MDL No. 1917, the U.S. Department of Justice
8   ("DOJ") website and other publicly available information regarding related criminal proceedings
9   by the DOJ, the findings of the Japanese Fair Trade Commission ("JFTC"), the Korean Fair
10  Trade Commission ("KFTC"), the European Commission ("EC"), and upon information and
11  belief.

12  **I.     INTRODUCTION**

13      1.      Sharp brings this action to recover damages on account of the antitrust injuries it
14  incurred as a result of a long-running conspiracy by suppliers of cathode ray tubes ("CRTs") to
15  coordinate and fix the prices of CRTs and exchange detailed competitive information. The
16  resulting damages include, but are not limited to, overcharges which Sharp paid, directly or
17  indirectly, as a result of purchases in the United States.

18      2.      Defendants and their co-conspirators formed an international cartel that conducted
19  a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least
20  December 2007 (the "Relevant Period"). The purpose and effect of this conspiracy was to fix,
21  raise, stabilize, and maintain prices for CRTs.

22      3.      Defendants are or were among the leading manufacturers of: (a) color picture
23  tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes
24  ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices
25  containing CPTs (such as televisions) or CDTs (such as computer monitors). For purposes of
26  this Complaint, CPTs and CDTs of all sizes will be referred to collectively as "CRTs". Also for
27  purposes of this Complaint, CRTs and/or the products containing CRTs shall be referred to
28  collectively as "CRT Products."

1    4.    Defendants control, or did control, the majority of the CRT industry, a

2 multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross

3 revenue. During the Relevant Period, virtually every household in the United States owned at

4 least one CRT Product.

5    5.    In order to maintain price stability, increase profitability, and decrease the erosion

6 of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise,

7 maintain, and stabilize the price at which CRTs were sold in the United States.

8    6.    With respect to CRTs, Defendants or their agents agreed, *inter alia*, to: (a) fix

9 target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments,

10 prices, production, and customer demand; (c) coordinate public statements regarding available

11 capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some

12 of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the

13 agreements and discuss the reconciliation of accounts; (g) allocate market share of overall sales;

14 (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

15 producer's share of certain key customers' sales; and (k) restrict output. Defendants' conspiracy

16 also included agreements on the prices at which certain Defendants would sell CRTs to their own

17 corporate subsidiaries and affiliates that manufactured finished products containing CRTs, such

18 as televisions and computer monitors. Defendants realized the importance of keeping the

19 internal pricing to their subsidiaries and affiliated original equipment manufacturers (OEMs) at a

20 high enough level to support the CRT pricing in the market to other OEMs.

21    7.    The conspiracy concerning CRTs commenced with bilateral meetings that began

22 in at least March of 1995 and continued throughout the Relevant Period. Also beginning in

23 1995, the co-conspirators began to engage in informal group meetings. By 1997, these group

24 meetings had become more formalized, as described in greater detail below. There were at least

25 500 multilateral and bilateral meetings during the Relevant Period, including hundreds of

26 multilateral meetings and hundreds of bilateral meetings. These meetings occurred in various

27 locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the

28

- 2 -

1  U.K. and elsewhere in Europe. These meetings included representatives from the highest levels
2  of the respective companies, as well as regional managers and others.

3      8.      During the Relevant Period, the conspiracy affected billions of dollars of
4  commerce throughout the United States.

5      9.      This conspiracy is being investigated by the DOJ and has been investigated by
6  multiple foreign competition authorities, including the JFTC, KFTC, and EC. The first
7  participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Chunghwa
8  Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury
9  in San Francisco on February 10, 2009. Since then, five additional individuals have been
10  indicted in connection with Defendants' CRT price-fixing conspiracy.

11      10.      On March 18, 2011, the DOJ issued a press release announcing that it had reached
12  an agreement with Samsung SDI in which Samsung SDI would plead guilty and pay a \$32
13  million fine for its role in a conspiracy to fix prices of CDTs. On May 12, 2011, the United
14  States and Samsung SDI entered into an amended plea agreement, where Samsung SDI pled
15  guilty to violating the Sherman Act, 15 U.S.C. § 1, from at least as early as January 1997, until at
16  least as late as March 2006.

17      11.      During the Relevant Period, Plaintiffs purchased CRT Products in the United
18  States and elsewhere directly and indirectly from Defendants and their co-conspirators, and/or
19  Defendants' and their co-conspirators' subsidiaries and affiliates, and/or any agents Defendants
20  or Defendants' subsidiaries and affiliates controlled, including but not limited to joint ventures.
21  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and brings this action to
22  recover the overcharges paid for the CRT Products they purchased during the Relevant Period.

23  **II.      JURISDICTION AND VENUE**

24      12.      Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and
25  Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief and to
26  recover damages, including treble damages, costs of suit, and reasonable attorneys' fees, arising
27  from Defendants' and their co-conspirators' violations of the Sherman Act. Jurisdiction also
28  exists under the Foreign Trade and Antitrust Improvement Act, 15 U.S.C. § 6a, because

- 3 -

COMPLAINT AND JURY DEMAND

1  Defendants' and their co-conspirators' conduct had a direct, substantial, and reasonably
2  foreseeable effect on United States domestic commerce, and such effect gave rise to Sharp's
3  claims alleged herein.

4      13.    Plaintiffs also bring this action pursuant to Section 16750(a) of the California
5  Business and Professions Code, for injunctive relief and treble damages that Plaintiffs sustained
6  due to Defendants' and their co-conspirators' violation of Section 16700 *et seq.* of the California
7  Business and Professions Code (the "Cartwright Act"). Plaintiffs' claims are also brought
8  pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain
9  restitution from and an injunction against Defendants due to their violations of Section 17200 *et*
10 *seq.* of the California Business and Professions Code (the "California Unfair Competition Act").

11     14.    Plaintiffs also bring this action pursuant to Section 340 of the New York General
12 Business Law, for injunctive relief and treble damages that Plaintiffs sustained due to
13 Defendants' and their co-conspirators' violation of Section 340 *et seq.* of the New York General
14 Business Law (the "Donnelly Act"). Plaintiffs' claims are also brought pursuant to Section 349
15 of the New York General Business Law, to obtain restitution from and an injunction against
16 Defendants due to their violations of Section 349 *et seq.* of the New York General Business Law
17 (the "New York Unfair Competition Act").

18     15.    Plaintiffs also bring this action pursuant to N.J. Stat. § 56:9-1 *et seq.*, for
19 injunctive relief and damages that Plaintiffs sustained due to Defendants' and their co-
20 conspirators' violation of N.J. Stat. Section 56:9-1 *et seq.* ("New Jersey Antitrust Act").

21     16.    Plaintiffs also bring this action pursuant to Tenn. Code. Ann. §§ 47-258-101 *et*
22 *seq.*, for injunctive relief and damages that Plaintiffs sustained due to Defendants' and their co-
23 conspirators' violation of Tenn. Code. Ann. §§ 47-258-101 *et seq.*

24     17.    This Court has jurisdiction over Plaintiffs' claims arising under Section 1 of the
25 Sherman Act and Sections 4 and 16 of the Clayton Act pursuant to 28 U.S.C. §§ 1331, and
26 1337(a). Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Plaintiffs'
27 state antitrust and unfair competition claims because they are so related to Plaintiffs' Sherman
28 Act and Clayton Act claims that they form part of the same case and controversy.

- 4 -

COMPLAINT AND JURY DEMAND

1    18.    The activities of Defendants and their co-conspirators, as described herein,

2    involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

3    did have a direct, substantial, and reasonably foreseeable effect on United States domestic and

4    import trade or commerce.  This effect gave rise to Plaintiffs' antitrust claims.  During the

5    Relevant Period, Defendants' and their co-conspirators' conspiracy affected the prices of CRT

6    Products in the United States, and specifically the CRT Products Plaintiffs purchased in the

7    United States.

8    19.    This Court has jurisdiction over each Defendant named in this action under

9    Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10.  Each Defendant

10   conducts substantial business in the state of California, and a number of Defendants and their co-

11   conspirators maintain their headquarters in this District or elsewhere in California.  In addition,

12   Defendants all purposefully availed themselves of the laws of the United States and California

13   insofar as they manufactured, marketed, or distributed CRT Products in the United States and

14   California, and several co-conspirators have admitted that they engaged in conduct in furtherance

15   of the conspiracy in the Northern District of California.

16   20.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and

17   28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this

18   District, or is otherwise found within this District.  In addition, venue is proper in this District

19   under 28 U.S.C. § 1391 because a substantial part of the events or admissions giving rise to this

20   claim occurred in this District.  Defendants and their co-conspirators knew that affected CRT

21   Products would be sold and shipped into this District.

22   **III.    MULTIDISTRICT AND INTRADISTRICT ASSIGNMENT**

23   21.    This action concerns substantially the same defendants, co-conspirators,

24   transactions and events that are involved in Case No. 3:07-cv-5944-SC (N.D. Cal.) before the

25   Honorable Samuel Conti in the San Francisco Division, insofar as it involves a suit for damages

26   and injunctive relief arising out of the conspiracy to fix the price of CRTs or restrain the output

27   of CRTs in violation of the Sherman Act and state law.

28

- 5 -

COMPLAINT AND JURY DEMAND

**IV. PARTIES**

**A. Plaintiffs**

22. Plaintiff Sharp Electronics Corporation ("Sharp Electronics") is a New York corporation, with its principal place of business in Mahwah, New Jersey. Sharp Electronics is the wholly owned U.S. sales and marketing subsidiary of Osaka-based Sharp Corporation.

23. Sharp Manufacturing Company of America, Inc. ("SMCA") is a division of Sharp Electronics, with its principal place of business in Memphis, Tennessee.

24. Plaintiff Sharp Electronics Manufacturing Company of America, Inc. ("SEMA") is a corporation organized and existing under the laws of California and has its principal place of business in San Diego, California. SEMA is a wholly owned subsidiary of Sharp Electronics.

25. Sharp Electronica Mexico, S.A. de C.V. ("SEMEX") is a *maquiladora* company (manufacturing facility). SEMEX is 99% owned by SEMA, and 1% owned by Sharp Electronics.

26. Sharp Electronics and SEMA are sometimes referred to collectively herein as "Sharp" or "Plaintiffs."

27. During the Relevant Period, Sharp Electronics, directly and through its subsidiaries, purchased substantial amounts of CRTs manufactured by Defendants and/or their subsidiaries, their co-conspirators, and others, in the United States for incorporation into CRT televisions ("CRT TVs"). As a result of Defendants' and their co-conspirators' conspiracy, Sharp Electronics was injured in its business and property because the prices it paid for such CRTs and CRT Products were artificially inflated by that conspiracy.

28. During the Relevant Period, SMCA purchased substantial amounts of CRTs manufactured by Defendants and/or their subsidiaries, their co-conspirators, and others, in the United States, for incorporation into CRT TVs. SMCA issued purchases orders from and received invoices for its CRT Product purchases at its offices in Tennessee. As a result of Defendants' and their co-conspirators' conspiracy, SMCA was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

- 6 -

COMPLAINT AND JURY DEMAND

29.     During the Relevant Period, SEMA purchased and invoiced substantial amounts of CRTs manufactured by Defendants and/or their subsidiaries, their co-conspirators, and others, in the United States that were then sent to SEMEX for assembly into CRT TVs. SEMA issued purchases orders from and received invoices for its CRT Product purchases at its offices in California. After the manufacturing process was complete, all of the finished televisions were shipped FOB back to SEMA in San Diego, California. SEMA retained ownership of the CRTs throughout the entire manufacturing process. Additionally, SEMA recognized all of the revenue from the sales of CRT TVs. As a result of Defendants' and their co-conspirators' conspiracy, SEMA was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

30.     Plaintiffs also purchased, directly and/or through their subsidiaries, CRT Products, including, but not limited to, from third party system integrators and OEMs, that contained CRTs manufactured by Defendants and/or their subsidiaries, and/or their co-conspirators, in the United States.

31.     During the Relevant Period, Sharp's negotiations for the purchase of CRTs took place in the United States. In addition, Sharp issued purchase orders for CRTs from the United States and invoices for those CRT purchases were sent to Sharp in the United States.

**B.     Defendants**

**Hitachi Entities**

32.     Defendant Hitachi, Ltd. is a Japanese company with its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products. In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

33.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") (now known as Japan Display East, Inc.) is a Japanese company with its principal place of business located at AKS Building, 5F 6-2 Kanda Neribei-cho 3 Chiyoda-ku, Tokyo, 101-0022, Japan. Hitachi Displays,

- 7 -

COMPLAINT AND JURY DEMAND

1 Ltd. was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.
2 In 2002, all the departments of planning, development, design, manufacturing and sales
3 concerned with the display business of Hitachi, Ltd. were spun off to create a separate company
4 called Hitachi Displays. During the Relevant Period, Hitachi Displays manufactured, marketed,
5 sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates
6 throughout the United States. Defendant Hitachi, Ltd. dominated and/or controlled the finances,
7 policies and/or affairs of Hitachi Displays relating to the antitrust violations alleged in this
8 Complaint.

9     34. Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company
10 with its principal place of business at 50 Prospect Avenue, Tarrytown, New York. Hitachi
11 America is a wholly owned and controlled subsidiary of Defendant Hitachi, Ltd. During the
12 Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT
13 Products, either directly or through its subsidiaries or affiliates, throughout the United States.
14 Hitachi, Ltd. dominated and/or controlled the finances, policies and/or affairs of Hitachi America
15 relating to the antitrust violations alleged in this Complaint.

16     35. Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its
17 principal place of business at 7 Tampines Grandes, #08-01 Hitachi Square, Singapore 528736.
18 Hitachi Asia is a wholly owned and controlled subsidiary of Hitachi, Ltd. During the Relevant
19 Period, Hitachi Asia manufactured, marketed, sold, and/or distributed CRT Products either
20 directly or through its subsidiaries or affiliates throughout the United States. Hitachi, Ltd.
21 dominated and/or controlled the finances, policies and/or affairs of Hitachi Asia relating to the
22 antitrust violations alleged in this Complaint.

23     36. Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware
24 corporation with its principal place of business at 208 Fairforest Way, Greenville, South Carolina
25 29607. HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays. During the
26 Relevant Period, HEDUS manufactured, marketed, sold, and/or distributed CRT Products either
27 directly or through its subsidiaries or affiliates throughout the United States. Hitachi, Ltd.

28

- 8 -

COMPLAINT AND JURY DEMAND

1  dominated and/or controlled the finances, policies and/or affairs of HEDUS relating to the
2  antitrust violations alleged in this Complaint.

3      37.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi
4  Shenzhen") was a Chinese company with its principal place of business located at 5001
5  Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at
6  least a 25% interest in Hitachi Shenzhen until November 8, 2007 (around the time that the
7  government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member
8  of the Hitachi corporate group for all but the last few weeks of the Relevant Period.  During the
9  Relevant Period, Hitachi Shenzhen manufactured, marketed, sold, and/or distributed CRT
10 Products either directly or through its subsidiaries or affiliates throughout the United States.
11 Hitachi, Ltd. and Hitachi Displays dominated and/or controlled the finances, policies and/or
12 affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this Complaint.

13     38.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, Hitachi
14 Shenzhen and HEDUS are collectively referred to herein as "Hitachi."

15 **LG Electronics Entities**

16     39.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the
17 laws of the Republic of Korea with its principal place of business located at LG Twin Towers 20,
18 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LG is a $48.97 billion global
19 force in consumer electronics, home appliances, and mobile communications.  It established its
20 first overseas branch office in New York in 1968.  The company's name was changed from Gold
21 Star Communications to LGEI in 1995.  In 2001, LGEI entered into a 50/50 joint venture with
22 Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD"), in which the entities
23 combined their CRT businesses.  On April 1, 2007, LGPD became an independent company and
24 changed its name to LP Displays International, Ltd.  During the Relevant Period, LGEI
25 manufactured, marketed, sold, and/or distributed CRT Products either directly or through its
26 subsidiaries or affiliates throughout the United States.

27     40.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation
28 with its principal place of business at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.

- 9 -

COMPLAINT AND JURY DEMAND

1  LGEUSA is a wholly owned and controlled subsidiary of Defendant LGEI. During the Relevant
2  Period, LGEUSA manufactured, marketed, sold, and/or distributed CRT Products either directly
3  or through its subsidiaries or affiliates throughout the United States. Defendant LGEI dominated
4  and/or controlled the finances, policies and/or affairs of LGEUSA relating to the antitrust
5  violations alleged in this Complaint.

6  41.  Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese
7  entity with its principal place of business located at 7F, No. 47, Lane 3, Chi Hu Road, NeiHu
8  District, Taipei City, Taiwan. LGETT is a wholly owned and controlled subsidiary of LGEI.
9  During the Relevant Period, LGETT manufactured, marketed, sold, and/or distributed CRT
10 Products either directly or through its subsidiaries or affiliates throughout the United States.
11 Defendant LGEI dominated and/or controlled the finances, policies, and/or affairs of LGETT
12 relating to the antitrust violations alleged in this Complaint.

13 42.  Defendants LGEI, LGEUSA, and LGETT are referred to collectively herein as
14 "LG Electronics."

15 **LP Displays**

16 43.  Defendant LP Displays International, Ltd. ("LP Displays International") is a Hong
17 Kong company located at 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan,
18 Hong Kong. LP Displays International is the successor entity to LGPD, which was created in
19 2001 as a 50/50 joint venture between LGEI and Royal Philips. In March 2007, LP Displays
20 International became an independent company. LP Displays International is a leading supplier
21 of CRTs for use in television sets and computer monitors. LP Displays International announced
22 in March 2007 that Royal Philips and LGEI would cede control over the company, and the
23 shares would be owned by financial institutions and private equity firms. Prior to March 2007,
24 LGEI and/or Royal Philips dominated and/or controlled the finances, policies, and/or affairs of
25 LP Displays International relating to the antitrust violations alleged in this Complaint. During
26 the Relevant Period, LP Displays International manufactured, marketed, sold, and/or distributed
27 CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

28

- 10 -

COMPLAINT AND JURY DEMAND

1    44.    Defendant LG.Philips Displays Holding B.V. is a Dutch company located at
2    Zwaanstraat 2A, Eindhoven, 5651 CA, the Netherlands. Prior to undergoing bankruptcy
3    proceedings, LGEI and Philips had consolidated their global CRT businesses in LG.Philips
4    Displays Holding, with LP Displays International managing the activities of the LPD Group
5    worldwide.

6    45.    Defendant LG.Philips Displays International B.V. is a Dutch company located at
7    Postbus 3, 5600 AA Eindhoven, the Netherlands, registered with the Chamber of Commerce
8    under number 34154.55. During the LPD Group's bankruptcy proceedings, the viable LPD
9    businesses were transferred to LG.Philips Displays International B.V., including LP Displays
10   International, Ltd.

11   46.    Defendant Meridian Solar & Display Co., Ltd. ("Meridian"), is a Korean
12   company located at 184 Gongdan-Dong Kumi Ksb, South Korea. As described in the JFTC's
13   October 2009 Announcement regarding the CRT cartel, LG Philips Display Korea, Co. (LPD
14   Korea) transferred its business of manufacturing and selling cathode ray tubes for televisions to
15   Meridian Solar & Display Co., Ltd. on July 21, 2009.

16   47.    Defendants LP Displays International, LG.Philips Displays Holding B.V.,
17   LG.Philips Displays International B.V., and Meridian are referred to collectively herein as "LP
18   Displays."

19   **Panasonic Entities**

20   48.    Defendant Panasonic Corporation, which at all times during the Relevant Period
21   was known as Matsushita Electric Industrial Co., Ltd. (referred to hereafter as either Panasonic
22   or MEI) and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located
23   at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. The entity known as MEI
24   operated under that name until October 1, 2008 when it changed its name to Panasonic
25   Corporation. During the Relevant Period, MEI manufactured, marketed, sold and/or distributed
26   CRT Products either directly or through its subsidiaries or affiliates throughout the United States.
27   49.    Defendant Panasonic Corporation of North America ("PCNA") is a Delaware
28   corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey

- 11 -

COMPLAINT AND JURY DEMAND

07094. PCNA is a wholly owned and controlled subsidiary of Defendant Panasonic Corporation. During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates, throughout the United States. Panasonic Corporation dominated and/or controlled the finances, policies, and/or affairs of PCNA relating to the antitrust violations alleged in this Complaint.

50. Defendant Panasonic Consumer Electronics Co. ("PACEC") is a Delaware corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey 07094. PACEC is a subsidiary of Defendant PCNA. During the Relevant Period, PACEC manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Panasonic Corporation dominated and/or controlled the finances, policies, and/or affairs of PACEC relating to the antitrust violations alleged in this Complaint.

51. Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-Cho, Kadoma-shi, Osaka, 571-8504, Japan. In 2002, Panasonic entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs. Panasonic Corporation was the majority owner with a 64.5 percent interest. On April 3, 2007, MEI purchased the remaining 35.5 percent stake in the joint venture, making it a wholly owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd. During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Panasonic Corporation dominated and/or controlled the finances, policies, and/or affairs of MTPD relating to the antitrust violations alleged in this Complaint.

52. Defendant Matsushita Electronic Corporation (Malaysia) Sdn Bhd. ("Matsushita Malaysia") was a Malaysian entity located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly owned and controlled subsidiary of Panasonic Corporation, which then transferred it to MT Picture Display

- 12 -

Co. in 2003. It was renamed MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006. During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRTs manufactured by MEI either directly or through its subsidiaries or affiliates. Panasonic Corporation dominated and/or controlled the finances, policies, and/or affairs of Matsushita Malaysia relating to the antitrust violations alleged in this Complaint.

53. Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqioa N. Rd., Dashanzi Chaoyang District, Beijing, China. BMCC is a joint venture company, 50% of which is held by Defendant MTPD. Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China. BMCC is the second largest producer of CRTs for televisions in China. During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Panasonic Corporation dominated and/or controlled the finances, policies, and/or affairs of BMCC relating to the antitrust violations alleged in this Complaint.

54. PT.MT Picture Display Indonesia is an Indonesian company located at Kawasan EJIP Industrial Park Plot 3-G, Bekasi 17550, Desa Sukaresmi, Kecamatan Cikarang Selatan, Kabupaten Bekasi, Republic of Indonesia. In December 1995, TC partnered with Orion Electronic Co. and two other entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2002, TC entered into a joint venture with Defendant MEI (now Panasonic Corporation) called Matsushita Toshiba Picture Display Co., Ltd., in which the entities consolidated their CRT businesses. In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia. During the Relevant Period, PT.MT Picture Display manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Toshiba Corporation (when it was TEDI) and then Panasonic

- 13 -

1  Corporation dominated and/or controlled the finances, policies, and/or affairs of PT.MT Picture

2  Display relating to the antitrust violations alleged in this Complaint.

3  55. Defendants Panasonic Corporation (f/k/a MEI), MTPD, Matsushita Malaysia,

4  PCNA, PACEC, PT.MT Picture Display and BMCC are collectively referred to herein as

5  "Panasonic."

6  **Samsung Entities**

7  56. Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company

8  ("Samsung SDI") is a South Korean company with its principal place of business at 428 5

9  Gongse-dong, Giheung-gu Yongin 446577, South Korea. Samsung SDI is a public company.

10 Founded in 1970, Samsung SDI claims to be the world's leading company in the display and

11 energy business, with 12,000 employees and facilities in 16 countries. Samsung SDI is one of

12 the largest CRT producers in the world. Samsung SDI was the top manufacturer for CRTs in

13 2000, with a market share of approximately 20%. In 2002, Samsung SDI held a 34.3%

14 worldwide market share in the market for CRTs; more than any other producer. Samsung SDI

15 has offices in Chicago and San Diego. During the Relevant Period, Samsung SDI manufactured,

16 marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or

17 affiliates throughout the United States.

18 57. Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

19 corporation with its principal place of business at 85 West Tasman Dr., San Jose, California.

20 Samsung America is subsidiary of Defendant Samsung SDI. During the Relevant Period,

21 Samsung SDI America manufactured, marketed, sold, and/or distributed CRT Products either

22 directly or through its subsidiaries or affiliates throughout the United States. Defendant

23 Samsung SDI dominated and/or controlled the finances, policies, and/or affairs of Samsung SDI

24 America relating to the antitrust violations alleged in this Complaint.

25 58. Defendant Samsung SDI (Malaysia) Sdn Bhd. ("Samsung SDI Malaysia") is a

26 Malaysian corporation with its principal place of business at Lots 635 & 660, Kawasan

27 Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.

28 Samsung SDI Malaysia is a subsidiary of Samsung SDI. During the Relevant Period, Samsung

- 14 -

COMPLAINT AND JURY DEMAND

1    SDI Malaysia manufactured, marketed, sold, and/or distributed CRT Products either directly or

2    through its subsidiaries or affiliates throughout the United States. Defendant Samsung SDI

3    dominated and/or controlled the finances, policies, and/or affairs of Samsung SDI Malaysia

4    relating to the antitrust violations alleged in this Complaint.

5           59.    Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a

6    Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014,

7    Parque Industrial El Florida, Tijuana, B.C. Mexico. Samsung SDI Mexico is a subsidiary of

8    Defendant Samsung SDI. During the Relevant Period, Samsung SDI Mexico manufactured,

9    marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or

10   affiliates throughout the United States. Defendant Samsung SDI dominated and/or controlled the

11   finances, policies, and/or affairs of Samsung SDI Mexico relating to the antitrust violations

12   alleged in this Complaint.

13          60.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian

14   company with its principal place of business located at Av. Eixo Norte Sul, SIN, Distrito

15   Industrial, 69088-480 Manaus, Amazonas, Brazil. Samsung SDI Brazil is a subsidiary of

16   Defendant Samsung SDI. During the Relevant Period, Samsung SDI Brazil manufactured,

17   marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or

18   affiliates throughout the United States. Defendant Samsung SDI dominated and/or controlled the

19   finances, policies, and/or affairs of Samsung SDI Brazil relating to the antitrust violations

20   alleged in this Complaint.

21          61.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a

22   Chinese company with its principal place of business located at No. 5003 Huanggang Bei Lu,

23   Futian Gu, Shenzhen, China. Samsung SDI Shenzhen is a subsidiary of Defendant Samsung

24   SDI. During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold, and/or

25   distributed CRT Products either directly or through its subsidiaries or affiliates throughout the

26   United States. Defendant Samsung SDI dominated and/or controlled the finances, policies,

27   and/or affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this

28   Complaint.

- 15 -

1    62.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese

2    company with its principal place of business located at Developing Zone of Yi-Xian Park,

3    Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a subsidiary of Defendant Samsung

4    SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold, and/or

5    distributed CRT Products either directly or through its subsidiaries or affiliates throughout the

6    United States.  Defendant Samsung SDI dominated and/or controlled the finances, policies,

7    and/or affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this

8    Complaint.

9    63.    Defendant Samsung SDI (Hong Kong), Ltd. ("Samsung SDI HK") is a Hong

10   Kong corporation with its principal place of business at 8/F., Central Plaza 18 Harbour Road

11   Wanchai, Hong Kong. During the Relevant Period, Samsung SDI HK manufactured, marketed,

12   sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates

13   throughout the United States.  Defendant Samsung SDI dominated and/or controlled the

14   finances, policies, and/or affairs of Samsung SDI HK relating to the antitrust violations alleged

15   in this Complaint.

16   64.    Defendants Samsung SDI, Samsung SDI America, Samsung SDI Mexico,

17   Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, Samsung SDI Malaysia,

18   and Samsung SDI HK are collectively referred to herein as "Samsung."

19   **Toshiba Entities**

20   65.    Defendant Toshiba Corporation ("TC") is a Japanese company with its principal

21   place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001,

22   Toshiba held a 5 to 10 percent worldwide market share for CRTs used in televisions and in

23   computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other

24   entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was

25   projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC

26   entered into a joint venture with Defendant MEI (now Panasonic Corporation) called Matsushita

27   Toshiba Picture Display Co., Ltd., in which the entities consolidated their CRT businesses.  In

28   2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic

- 16 -

1 Corporation, and its name was changed to PT.MT Picture Display Indonesia. During the
2 Relevant Period, TC manufactured, marketed, sold, and/or distributed CRT Products either
3 directly or through its subsidiaries or affiliates throughout the United States.

4     66.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation
5 with its principal place of business at 1251 Avenue of the Americas, Suite 4110, New York, New
6 York 10020. Toshiba America is a wholly owned and controlled subsidiary of Defendant TC.
7 During the Relevant Period, Toshiba America manufactured, marketed, sold, and/or distributed
8 CRT Products either directly or through its subsidiaries or affiliates (such as Toshiba Hawaii,
9 Inc.) throughout the United States. Defendant TC dominated and/or controlled the finances,
10 policies, and/or affairs of Toshiba America relating to the antitrust violations alleged in this
11 Complaint.

12     67.    Defendant Toshiba America Consumer Products LLC ("TACP") is a limited
13 liability company that is headquartered at 82 Totawa Rd., Wayne, New Jersey 07470-3114.
14 TACP is a wholly owned and controlled subsidiary of Defendant TC through Toshiba America.
15 During the Relevant Period, TACP manufactured, marketed, sold, and/or distributed CRT
16 Products either directly or through its subsidiaries or affiliates throughout the United States.
17 Defendant TC dominated and/or controlled the finances, policies, and/or affairs of TACP relating
18 to the antitrust violations alleged in this Complaint.

19     68.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is
20 headquartered at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612. TAEC is a
21 wholly owned and controlled subsidiary of Defendant TC through Toshiba America. TAEC is
22 currently the North American sales and marketing representative for MTPD. During the
23 Relevant Period, TAEC manufactured, marketed, sold, and/or distributed CRT Products either
24 directly or through its subsidiaries or affiliates throughout the United States. Defendant TC
25 dominated and/or controlled the finances, policies, and/or affairs of TAEC relating to the
26 antitrust violations alleged in this Complaint.

27     69.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is headquartered
28 at 9740 Irvine Blvd., Irvine, California 92618. TAIS is a wholly owned and controlled

- 17 -

COMPLAINT AND JURY DEMAND

1 subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAIS

2 manufactured, marketed, sold, and/or distributed CRT Products either directly or through its

3 subsidiaries or affiliates throughout the United States. Defendant TC dominated and/or

4 controlled the finances, policies, and/or affairs of TAIS relating to the antitrust violations alleged

5 in this Complaint.

6 70. Defendant Toshiba Display Devices (Thailand) Company, Ltd. ("TDDT") was a

7 Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial

8 Estate, Tivanon Road, Pathurn Thani, Thailand 12000. TDDT was a wholly owned and

9 controlled subsidiary of Defendant TC. In 2003, TDDT was transferred to Defendant MTPD,

10 TC's joint venture with Panasonic Corporation. It was re-named as MT Picture Display

11 (Thailand) Co., Ltd. and operated as a wholly owned and controlled subsidiary of MTPD until its

12 closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or

13 distributed CRT Products either directly or through its subsidiaries or affiliates throughout the

14 United States. Defendant TC dominated and/or controlled the finances, policies, and/or affairs of

15 TDDT relating to the antitrust violations alleged in this Complaint.

16 71. Defendants TC, Toshiba America, TDDT, TACP, TAEC, and TAIS are referred

17 to collectively as "Toshiba."

18 **Thomson Entities**

19 72. Defendant Thomson SA (n/k/a Technicolor SA) ("Thomson SA") is a French

20 corporation with its principal place of business located at 1-5 Rue Jeanne d'Arc 92130 Issy-les-

21 Moulineaux, France. Thomson SA, through its wholly owned subsidiary Thomson Consumer

22 Electronics Corporation, was a major manufacturer of CRTs for the United States market, with

23 plants located in the United States, Mexico, China and Europe. Thomson SA sold its CRTs

24 internally to its television-manufacturing division, which had plants in the United States and

25 Mexico, and to other television manufacturers in the United States and elsewhere. In 2005,

26 Thomson SA sold its CRT business to Videocon Industries, Ltd. During the Relevant Period,

27 Thomson SA manufactured, marketed, sold and/or distributed CRT Products either directly or

28 through its subsidiaries or affiliates throughout the United States.

- 18 -

COMPLAINT AND JURY DEMAND

73.     Defendant Thomson Consumer Electronics, Inc. (n/k/a Technicolor USA, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, IN 46290-1024. Thomson Consumer Electronics is a wholly owned subsidiary of Thomson SA. Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania, Marion, Indiana and Mexicali, Mexico. The United States-based plants were closed in 2004.   Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson Consumer Electronics' CRT business was eventually sold to Videocon Industries, Ltd. in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Thomson SA dominated and/or controlled the finances, policies, and/or affairs of Thomson Consumer Electronics relating to the antitrust violations alleged in this Complaint.

74.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**Videocon**

75.     Defendant Videocon Industries, Ltd. ("Videocon") is an Indian corporation with its principal place of business located at Aurangabad Paithan Road 14, KM Stone, Chitegaon, Aurangabad 431005, India.  In 2005, Videocon acquired Thomson's CRT businesses, which included manufacturing facilities in Poland, Italy, Mexico and China.  Videocon acquired the businesses, including Thomson Displays Americas LLC and Thomson Display Mexicana S.A. de CV, through its wholly owned investment entity located in the Cayman Islands, Eagle Corporation Limited.  Videocon manufactured its CRTs for the United States market in Thomson's former CRT plants in Mexicali, Mexico and China.  During the Relevant Period, Videocon manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

- 19 -

1

**Technologies Displays**

2 76. Defendant Technologies Displays Americas LLC (formerly Thomson Displays
3 Americas LLC) is a Delaware limited liability company with its principal place of business
4 located at 1778 Carr Road Ste 4B, Calexico, California 92231. Technologies Displays Americas
5 is the parent corporation of Technologies Displays Mexicana, a Mexican corporation which
6 during the Relevant Period manufactured CRTs and sold the CRTs to Technologies Displays
7 Americas for sale and distribution. During the Relevant Period, Technologies Displays
8 manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly
9 through its subsidiaries or affiliates, to customers throughout the United States. Defendants
10 Thomson SA and then Videocon dominated and/or controlled the finances, policies, and/or
11 affairs of Technologies Displays Americas relating to the antitrust violations alleged in this
12 Complaint.

13 77. Defendant Technologies Displays Mexicana, S.A. de C.V. (formerly Thomson
14 Displays Mexicana) is a Mexican corporation with its principal place of business located at Calz.
15 Robledo Industrial Colorad, Mexicali, B.C. 21384, Mexico. Technologies Displays Mexicana is
16 a wholly owned subsidiary of Technologies Displays Americas. During the Relevant Period,
17 Technologies Displays manufactured, marketed, sold and/or distributed CRT Products, either
18 directly or indirectly through its subsidiaries or affiliates, to customers throughout the United
19 States. Defendants Thomson SA and then Videocon dominated and/or controlled the finances,
20 policies, and/or affairs of Technologies Displays Mexicana relating to the antitrust violations
21 alleged in this Complaint.

22 78. Technologies Displays Americas and Technologies Displays Mexicana are
23 collectively referred to herein as "Technologies Displays."

24 **V. AGENTS AND CO-CONSPIRATORS**

25 79. The acts alleged against Defendants in this Complaint were authorized, ordered,
26 or done by their officers, agents, employees, or representatives, while actively engaged in the
27 management and operation of Defendants' businesses or affairs.

28

- 20 -

COMPLAINT AND JURY DEMAND

1    80.    Each of the Defendants named herein acted as the principal, agent, or joint

2 venture of, or for, other Defendants with respect to the acts, violations, and common course of

3 conduct alleged by Plaintiffs. Each Defendant that is a subsidiary of a foreign parent acts as the

4 United States agent for CRT Products made by its parent company.

5    81.    Whenever in this Complaint reference is made to any act, deed or transaction of

6 any corporation, the allegation means that the corporation engaged in the act, deed or transaction

7 by or through its officers, directors, agents, employees or representatives while they were

8 actively engaged in the management, direction, control or transaction of the corporation's

9 business or affairs.

10    82.    Defendants are also liable for acts done in furtherance of the alleged conspiracy

11 by companies they acquired through mergers and acquisitions.

12    83.    Various persons and/or firms not named as Defendants in this Complaint

13 participated as co-conspirators in the violations alleged herein and may have performed acts and

14 statements in furtherance thereof. These co-conspirators who are not named as Defendants

15 include, but are not limited to Koninklijke Philips Electronics N.V. ("Royal Philips"), Philips

16 Electronics Industries Ltd. ("PEIL"), Philips Electronics North America Corporation ("Philips

17 America"), Philips Consumer Electronics Co. ("PCEC"), Philips da Amazonia Industria

18 Electronica Ltda. ("Philips Brazil"), IRICO Group Corporation, IRICO Group Electronics Co.,

19 Ltd., IRICO Display Devices Co., Ltd., Chunghwa Picture Tubes, Ltd., Chunghwa Picture Tubes

20 (Malaysia) Sdn. Bhd., Samtel Color, Ltd., Thai CRT, Orion, Orion Engineering and Domex.

21 Plaintiffs reserve the right to name some or all of these persons as Defendants at a later date.

22    **Philips Entities**

23    84.    Co-conspirator Koninklijke Philips Electronics N.V., a/k/a Royal Philips

24 Electronics ("Royal Philips"), is a Dutch entity with its principal place of business at

25 Amstelplein 2, 1070 MX Amsterdam, The Netherlands. Royal Philips, founded in 1891, is one

26 of the world's largest electronics companies, with 121,000 employees located in over 100

27 countries. In 2000, Royal Philips was the leading global supplier of CRTs. Royal Philips

28 operated in Asia directly through divisions (such as Philips Components Asia and Philips

- 21 -

COMPLAINT AND JURY DEMAND

1 BGTV) and through wholly owned and separately incorporated subsidiaries. In 2001, Royal
2 Philips entered into a joint venture with Defendant LGEI forming Defendant LGPD, in which the
3 entities combined their CRT businesses. LGPD operated in Asia and in Europe through its
4 division LG.Philips Displays Europe Region. In December 2005, as a result of increased
5 pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book
6 value of 126 million Euros of its investment and said it would not inject further capital into the
7 venture. On April 1, 2007, LGPD became an independent company and changed its name to LP
8 Displays International, Ltd. During the Relevant Period, Royal Philips manufactured, marketed,
9 sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates
10 throughout the United States.

11      85.    Co-conspirator Philips Electronics Industries Ltd. ("PEIL") is a Taiwanese
12 corporation with its principal place of business at 15F, 3-1 Yuan Chu St., Nangang District,
13 Taipei 115, Taiwan. PEIL is a subsidiary of Royal Philips. During the Relevant Period, PEIL
14 manufactured, marketed, sold, and/or distributed CRT Products either directly or through its
15 subsidiaries or affiliates throughout the United States. Co-conspirator Royal Philips dominated
16 and/or controlled the finances, policies, and/or affairs of PEIL relating to the antitrust violations
17 alleged in this Complaint.

18      86.    Co-conspirator Philips Electronics North America Corporation ("Philips
19 America") is a Delaware corporation with its principal place of business at 1251 Avenue of the
20 Americas, New York, New York, 10020. Philips America is a wholly owned and controlled
21 subsidiary of Royal Philips. During the Relevant Period, Philips America manufactured,
22 marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or
23 affiliates throughout the United States. Co-conspirator Royal Philips dominated and/or
24 controlled the finances, policies, and/or affairs of Philips America relating to the antitrust
25 violations alleged in this Complaint.

26      87.    Co-conspirator Philips Consumer Electronics Co. ("PCEC") has its principal
27 place of business at 64 Perimeter Center E, Atlanta, Georgia 30346-2295. PCEC is a subsidiary
28 of Royal Philips. During the Relevant Period, PCEC manufactured, marketed, sold, and/or

- 22 -

COMPLAINT AND JURY DEMAND

1  distributed CRT Products either directly or through its subsidiaries or affiliates throughout the

2  United States. Co-conspirator Royal Philips dominated and/or controlled the finances, policies,

3  and/or affairs of PCEC relating to the antitrust violations alleged in this Complaint.

4      88.    Co-conspirator Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil")

5  is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236,

6  1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly owned and

7  controlled subsidiary of Royal Philips. During the Relevant Period, Philips Brazil manufactured,

8  marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or

9  affiliates throughout the United States. Co-conspirator Royal Philips dominated and/or

10  controlled the finances, policies, and/or affairs of Philips Brazil relating to the antitrust violations

11  alleged in this Complaint.

12      89.    Co-conspirators Royal Philips, PEIL, PCEC, Philips America, and Philips Brazil

13  are collectively referred to herein as "Philips."

14      **Chunghwa Entities**

15      90.    Co-conspirator Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese

16  company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan,

17  Taiwan. It was established in 1971 by Tatung Corporation to manufacture CRTs. In 1974,

18  Chunghwa PT's CRTs received certification by the United States, giving the company entry into

19  that market. Throughout the Relevant Period, Chunghwa PT was one of the major global CRT

20  manufacturers. During the Relevant Period, co-conspirator Chunghwa PT manufactured,

21  marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or

22  affiliates (such as its Fuzhou subsidiary) throughout the United States.

23      91.    Co-conspirator Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

24  Malaysia") is a Malaysian company with its principal place of business at Lot 1, Subang Hi-Tech

25  Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. It is a wholly

26  owned and controlled subsidiary of Chunghwa. Chunghwa Malaysia is focused on CRT

27  production, and it has established itself as one of the leading worldwide suppliers of CRTs.

28  During the Relevant Period, Chunghwa Malaysia manufactured, marketed, sold, and/or

- 23 -

1 distributed CRT Products either directly or through its subsidiaries or affiliates throughout the

2 United States. Co-conspirator Chunghwa PT dominated and/or controlled the finances, policies,

3 and/or affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this

4 Complaint.

5      92. Co-conspirators Chunghwa PT and Chunghwa Malaysia are collectively referred

6 to herein as "Chunghwa."

7 **Irico Entities**

8      93. Co-conspirator Irico Group Corporation ("IGC") is a Chinese entity with its

9 principal place of business at No.11 Xinxi Road, Shangdi, Haidian District. Irico Group

10 Corporation is the parent company for multiple subsidiaries engaged in the manufacture,

11 distribution, and/or sale of CRT Products. During the Relevant Period, Irico Group Corporation

12 manufactured, marketed, sold, and/or distributed CRT Products either directly or through its

13 subsidiaries or affiliates throughout the United States.

14      94. Co-conspirator Irico Group Electronics Co., Ltd. ("IGE") is a Chinese entity

15 located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. During the Relevant

16 Period, IGE manufactured, marketed, sold, and/or distributed CRT Products either directly or

17 through its subsidiaries or affiliates throughout the United States. IGC dominated and/or

18 controlled the finances, policies, and/or affairs of IGE relating to the antitrust violations alleged

19 in this Complaint.

20      95. Co-conspirator Irico Display Devices Co., Ltd. ("IDDC") is a Chinese entity

21 located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI

22 710075. IDDC is a partially-owned subsidiary of IGC. In 2006, IDDC was China's top CRT

23 maker. During the Relevant Period, IDDC manufactured, marketed, distributed, and/or sold

24 CRT Products either directly or through its subsidiaries or affiliates or through other Defendants

25 and co-conspirators in the United States. IGC dominated and/or controlled the finances, policies,

26 and/or affairs of IDDC Asia relating to the antitrust violations alleged in this Complaint.

27      96. IGC, IGE, and IDDC are collectively referred to herein as "Irico."

28

- 24 -

**Samtel**

97.     Co-conspirator Samtel Color, Ltd. ("Samtel") is an Indian company with its registered office at 6th Floor, 7 TDI Centre, Dist. Centre, Jasola, New Delhi-110025.  During the Relevant Period, Samtel manufactured, marketed, sold, and/or distributed CRT Products throughout the United States.

**Thai CRT**

98.     Co-conspirator Thai CRT Company, Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group that was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

**Orion Entities**

99.     Co-conspirator Orion Electric Company ("Orion"), a South Korean corporation that filed for bankruptcy in 2004, was a major manufacturer of CRT Products during the Relevant Period.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico and the United States.  In December 1995, Orion partnered with Defendant Toshiba Corporation and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.

100.     During the Relevant Period Orion owned and/or controlled a Mexican corporation that manufactured and sold CRTs to customers in the United States known as Display Orion Mexicana, S.A. de C.V., ("Domex"), located at KM. 10.5 Carretera A San Luis Rio Colorado, Corredor Industrial Palaco, Gonzalez Ortega, Mexicali, B.C. 21397, Mexico.  Orion dominated and/or controlled the policies and/or affairs of Domex relating to the antitrust violations alleged in this Complaint.

- 25 -

101.     During the Relevant Period Orion owned and/or controlled Orion Engineering
Services, Inc., ("Orion Engineering") a California corporation located at PO Box 2768, Calexico,
California 92232 that sold CRT Products to customers in the United States.  Orion dominated
and/or controlled the policies and/or affairs of Orion Engineering relating to the antitrust
violations alleged in this Complaint.

102.     Orion, Orion Engineering and Domex are collectively referred to herein as
"Orion."

## VI.     TRADE AND COMMERCE

103.     During the Relevant Period, each Defendant, or one or more of its subsidiaries,
sold CRT Products in the United States in a continuous and uninterrupted flow of interstate
commerce and foreign commerce, including through and into this judicial district.

104.     During the Relevant Period, Defendants and their co-conspirators collectively
controlled a vast majority of the market for CRTs, both globally and in the United States.

105.     The business activities of the Defendants substantially affected interstate trade
and commerce in the United States, caused antitrust injury in the United States, and restrained
competition.  The business activities of Defendants also substantially affected trade and
commerce in California, New Jersey, Tennessee, and New York, caused antitrust injuries in and
restrained competition in California, New Jersey, Tennessee, and New York.

## VII.     FACTUAL ALLEGATIONS

## A.     CRT Technology and Products

106.     A CRT has three components: (a) one or more electron guns, each of which is a
series of metallic structures used to generate a beam of electrons; (b) a magnetic or other
deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that
phosphoresces when struck by an electron beam, thereby producing a viewable image.  A
faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate
coated with multiple colors of phosphor produces a polychromatic image.  An aperture or
shadow mask – a thin screen of perforated metal – is welded to the faceplate panel and, to

- 26 -

produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

107. CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers. After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs.

108. The quality of a CRT itself determines the quality of the CRT display. No external control or feature can make up for a poor quality tube.

109. Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

110. CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

111. CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors. The demand for CRTs thus directly derives from the demand of such products. Accordingly, the market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined.

112. Plaintiffs and/or their affiliates have purchased CRT Products from Defendants, co-conspirators, and/or their subsidiaries and affiliates. Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which Plaintiffs purchased CRT Products to supracompetitive levels, and Plaintiffs have thereby been injured.

**B.    Structure of the CRT Industry**

113. The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers,

- 27 -

1 multiple interrelated business relationships, significant barriers to entry, heightened price
2 sensitivity to supply and demand forces, and homogeneity of products.

3 **1.  Market Concentration**

4     114.  During the Relevant Period, the CRT industry was dominated by relatively few
5 companies.  In 2004, Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together
6 held a collective 78% share of the global CRT market.  The high concentration of market share
7 facilitates coordination because there are fewer cartel members among which to coordinate
8 pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel
9 members.

10 **2.  Information Sharing**

11     115.  There were many opportunities for Defendants and their co-conspirators to
12 discuss and exchange competitive information.  The ease of communication was facilitated by
13 the use of meetings, telephone calls, e-mails and instant messages.  Defendants and their co-
14 conspirators took advantage of these opportunities to discuss, and agree upon, their pricing for
15 CRTs as alleged below.

16 **3.  Consolidation**

17     116.  The CRT industry also had significant consolidation during the Relevant Period,
18 including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture
19 involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's
20 and Panasonic's CRT businesses into MTPD.

21 **4.  High Costs of Entry into the Industry**

22     117.  There are significant manufacturing and technological barriers to entry into the
23 CRT industry.  It would require substantial time, resources and industry knowledge to overcome
24 these barriers to entry.  It is also extremely unlikely that a new producer would enter the market
25 in light of the declining demand for CRTs.

26     118.  During the Relevant Period, the costs of the assembly components, both as a
27 whole and individually, have been generally declining, and, in some periods, declining at a
28 substantial rate.  A combination of price discussions and manipulation of the output of CRTs

- 28 -

allowed Defendants and their co-conspirators to keep prices above where they would have been but for the conspiracy.

### 5. Homogeneity of CRTs

119. CRTs are commodity-like products that are manufactured in standardized sizes. One Defendant's or conspirator's CRT for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants and their co-conspirators sell and Plaintiffs purchase CRTs primarily on the basis of price.

120. It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C. International Antitrust Investigations

121. In November 2007, the DOJ and others commenced an investigation into price-fixing in the CRT industry. The United States investigation of the CRT conspiracy is being conducted by the DOJ's Antitrust Division's office in the Northern District of California.

122. On November 8, 2007, antitrust authorities in Europe, Japan, and South Korea raided the offices of manufacturers of CRTs as part of an international investigation of alleged price fixing.

123. On November 8, 2007, it was reported that EC officials carried out unannounced raids on manufacturers of CRTs based on suspected anticompetitive conduct. That same day, the EC issued a press release stating that, "[t]he commission has reason to believe that the companies concerned may have violated EU rules against price-fixing, sharing markets or exchanging market information."

124. On November 9, 2007, MEI (now known as Panasonic Corporation) and Samsung SDI reported that they were cooperating with the JFTC, which raided the companies' CRT production facilities on suspicion of anticompetitive conduct.

125. On that same day, a Samsung spokesperson announced that its CRT subsidiary in South Korea was being investigated by the KFTC as "part of an international probe into alleged price-fixing."

- 29 -

1    126.    On November 12, 2007, Chunghwa announced that it had received a summons

2    from the DOJ with respect to involvement in a CRT price-fixing cartel.

3    127.    And on November 21, 2007, Philips acknowledged that it was being investigated

4    as well. *The International Herald Tribune* reported that "competition authorities in several

5    jurisdictions had started investigations," and that Philips "would assist regulators."

6    128.    In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also

7    being investigated by the [European] Commission and/or the U.S. Department of Justice for

8    potential violations of competition laws with respect to . . . cathode ray tubes (CRT) . . . ."

9    129.    On February 10, 2009, the DOJ issued a press release announcing that C.Y. Lin of

10   Chunghwa was indicted for participating in a conspiracy to fix the prices of CRTs. The DOJ's

11   announcement of the indictment explained it as follows:

12   The indictment, filed today in U.S. District Court in San Francisco, charges
     Cheng Yuan Lin, aka C.Y. Lin, a resident of Taiwan, with conspiring with others
13   to suppress and eliminate competition by fixing prices, reducing output and
     allocating market shares of color display tubes (CDTs) to be sold in the U.S. and
14   elsewhere, beginning at least as early as Jan. 28, 1997, until at least as late as
     April 7, 2003. The indictment also charges C.Y. Lin with conspiring with others
15   to suppress and eliminate competition by fixing prices for color picture tubes
     (CPTs) to be sold in the U.S. and elsewhere, beginning at least as early as
16   March 12, 1997, until at least as late as April 7, 2003.

17   CRTs consist of evacuated glass envelopes that contain an electron gun and a
     phosphorescent screen. When electrons strike the screen, light is emitted, creating
18   an image on the screen. CDTs and CPTs are each types of CRTs. CDTs are used
     in computer monitors and other specialized applications, while CPTs are used in
19   color televisions. The worldwide market for CRTs, including CPTs and CDTs, in
     1997, at the start of the conspiracies has been estimated as approximately \$26
20   billion.

21   "This conspiracy harmed countless Americans who purchased computers and
     televisions using cathode ray tubes sold at fixed prices," said Scott D. Hammond,
22   Acting Assistant Attorney General in charge of the Antitrust Division. "The
     Antitrust Division will continue to prosecute individuals, wherever they are
23   located and however high their position on the corporate ladder, who engage in
     price fixing aimed at U.S. businesses and consumers."

24   According to the charges, C.Y. Lin and co-conspirators carried out the CDT
     conspiracy by, among other things:
25
       --Attending meetings and engaging in conversations and communications
26     in Taiwan, Korea, Malaysia, China and elsewhere to discuss the prices,
       output and market shares of CDTs;
27
       --Agreeing during those meetings, conversations and communications to
28     charge prices of CDTs at certain target levels or ranges;

- 30 -

COMPLAINT AND JURY DEMAND

--Agreeing during those meetings, conversations and communications to reduce output of CDTs by shutting down CDT production lines for certain periods of time;

--Agreeing during those meetings, conversations and communications to allocate target market shares for the CDT market overall and for certain CDT customers;

--Exchanging CDT sales, production, market share and pricing information for the purpose of implementing, monitoring and enforcing adherence to the agreed-upon prices, output reduction and market share allocation;

-- Implementing an auditing system that permitted co-conspirators to visit each other's production facilities to verify that CDT production lines had been shut down as agreed;

--Authorizing and approving the participation of subordinate employees in the conspiracy;

--Issuing price quotations and reducing output in accordance with the agreements reached; and

--Taking steps to conceal the conspiracy and conspiratorial contacts through various means.

C.Y. Lin is charged with carrying out the CPT conspiracy with his co-conspirators by, among other things:

--Attending meetings and engaging in conversations and communications in Taiwan, Korea, Malaysia, China, Thailand, Indonesia and elsewhere to discuss the prices of CPTs;

--Agreeing during those meetings, conversations and communications to charge prices of CPTs at certain target levels or ranges;

--Exchanging CPT pricing information for the purpose of implementing, monitoring and enforcing adherence to the agreed-upon prices;

--Authorizing and approving the participation of subordinate employees in the conspiracy;

--Issuing price quotations in accordance with the agreements reached; and

--Taking steps to conceal the conspiracy and conspiratorial contacts through various means.[1]

130. On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. Tony Cheng was a former assistant Vice-President of Sales

---

[1] The significance of the April 7, 2003 ending date in this indictment is that it is when C.Y. Lin left the employ of Chunghwa PT.

- 31 -

1 and Marketing at Chunghwa. Mr. Cheng's indictment states that the combination and conspiracy
2 to fix the prices of CRTs was carried out, in part, in California.

3     131. In November 2009, the EC confirmed that it had sent Statements of Objections to
4 companies suspected of participation in two cartels in the CRT industry—one involving CPTs
5 and one involving CDTs.

6     132. On March 30, 2010, the DOJ issued a press release announcing that a federal
7 grand jury in San Francisco had returned a one-count indictment against Cheng Cheng Yeh a/k/a
8 Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT
9 used in computer monitors. The press release identified Yeh as a "former director of sales" at "a
10 large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the
11 combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

12     133. On November 9, 2010, the DOJ issued a press release announcing that a federal
13 grand jury in San Francisco had that same day returned a one-count indictment against Seung-
14 Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim
15 for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in
16 computer monitors. The press release identifies Lee, Yang, and Kim as "former executives from
17 two color display tube (CDT) manufacturing companies." The indictment states that the
18 combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

19     134. On March 18, 2011, the DOJ issued a press release announcing that Samsung SDI
20 Company Ltd. had agreed to plead guilty and pay a \$32 million criminal fine for its role in a
21 global conspiracy to fix prices, reduce output, and allocate market shares of CDTs from at least
22 as early as January 1997 until at least as late as March 2006.

23     135. In June 2012, the EC sent a supplementary Statement of Objections to both Royal
24 Philips Electronics N.V. and LG Electronics, Inc. to hold them responsible for the conduct of
25 LPD.

26     136. On December 5, 2012, the EC announced that it had fined seven international
27 groups of companies a total of €1,470,515,000 for participating in cartels to fix prices of CPTs
28 and/or CDTs. Fines were imposed on the following companies for price-fixing CPTs: Samsung

- 32 -

SDI, Philips, LG Electronics, Philips/LG Electronics, Thomson (now Technicolor), Panasonic, and Panasonic/Toshiba/MPTD, and Panasonic/MTPD. Fines were also imposed on the following companies for price-fixing CDTs: Samsung SDI, Philips, LG Electronics, and Philips/LG Electronics. The EC found that "between 1996 and 2006, these companies fixed prices, shared markets, allocated customers between themselves and restricted their output," and stated that "[t]he two CRT cartels are among the most organized cartels that the Commission has investigated." The EC further found that "the cartelists carried out the most harmful anti-competitive practices including price fixing, market sharing, customer allocation, capacity and output coordination and exchanges of commercial[ly] sensitive information" and that meetings were held in various locations in Asia and Europe.

**D.    Pre-Conspiracy Market**

137.    The CRT conspiracy began in the late 1980s, as the CRT business became more international and Defendants began serving customers that were also being served by other international companies. During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers. A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity, and customers.

138.    In the early 1990s, representatives from Samsung, Chunghwa and others visited each other's factories in Southeast Asia. During this period, these producers began to include discussions about price in their meetings.

**E.    Defendants' and Co-conspirators' Illegal Agreements**

139.    In order to control and maintain profitability for CRTs, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least December 2007.

140.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings. Bilateral contacts and communications among Defendants commenced in the late 1980s to early 1990s on an *ad hoc* basis. Competitively sensitive information on pricing,

- 33 -

1  production capacity, product mix and customer information was exchanged.  In 1995, these

2  bilateral meetings began to increase in frequency.  There were more than a dozen such meetings

3  in 1995 and several dozen such meetings in 1996 alone.  In those formative years, bilateral

4  discussions were the primary method of communication and took place on an *ad hoc* basis.

5  During the early to mid-1990s, representatives from Defendants LG Electronics and Samsung

6  visited the other manufacturers, including Philips, Thai CRT, Hitachi, Toshiba and Panasonic, to

7  discuss increasing prices for CRTs in general and for specific customers.  These meetings took

8  place in Taiwan, South Korean, Thailand, Japan, Malaysia, Indonesia and Singapore.

9      141.  The meetings continued throughout the Relevant Period.  Bilateral contacts and

10  communications were conducted in person, by telephone or by e-mail.  As time went on, bilateral

11  meetings encompassed specific intercompany agreements or followed up on agreements reached

12  at group meetings.  Bilateral meetings were conducted in person, by telephone or by e-mail.

13      142.  Defendants Samsung and LG Electronics, along with Chunghwa, also attended

14  several *ad hoc* group meetings in the early to mid-1990s.  The participants at these group

15  meetings also discussed increasing prices for CRTs.

16      143.  As more manufacturers entered the conspiracy, group meetings became more

17  prevalent.

18      144.  With respect to CRTs, Defendants or their agents agreed to, *inter alia*: (a) fix

19  target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments,

20  prices, production, and customer demand; (c) coordinate public statements regarding available

21  capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some

22  of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the

23  agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall

24  sales; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

25  producer's share of certain key customers' sales; and (k) restrict output.

26      145.  The overall CRT conspiracy set and/or affected worldwide prices (including

27  prices in the United States) that Defendants charged for CRTs.

28

- 34 -

COMPLAINT AND JURY DEMAND

1    146.   Agreements as to CRTs were conducted through bilateral meetings as described
2    above, through informal multilateral meetings as described above, and through more formal
3    "Glass Meetings."

4    **1.    "Glass Meetings"**

5    147.   Beginning in 1997, CRT makers started to meet in a more organized, systematic
6    fashion. At some point, these meetings became known as "Glass Meetings" or "GSM."

7    148.   The Glass Meetings conducted with respect to CRTs fell into several categories:

8          a.     "Top Meetings" – these meetings were held by individuals at the highest
9    level of the Defendant companies, including CEOs, Presidents, and Vice Presidents. These
10   happened less frequently, typically on a quarterly basis, and were focused on longer term
11   agreements and dispute resolution. Because attendees at top meetings had authority as well as
12   more reliable information, these meetings resulted in agreements. Attendees at top meetings
13   were also able to resolve disputes because they were decision makers who could make
14   agreements. Top Meetings occurred in South Korea, Taiwan, and China.

15         b.     "Management Meetings" – these meetings were held by high-level sales
16   executives and/or managers. These meetings occurred more frequently than "Top Meetings,"
17   typically on a monthly basis, and handled implementation of agreements made at "Top
18   Meetings." Management Meetings occurred in South Korea, Taiwan, China, Indonesia, Japan,
19   and Thailand.

20         c.     "Working Level Meetings" – these meetings were attended by lower level
21   sales and marketing employees. These meetings generally occurred on a weekly or monthly
22   basis and were mostly limited to the exchange of information and discussing pricing since the
23   lower level employees did not have the authority to enter into agreements. These lower level
24   employees would then transmit the competitive information up the corporate reporting chain to
25   those individuals with pricing authority. The Working Level Meetings also tended to be more
26   regional and often took place near Defendants' factories. In other words, the Taiwanese
27   manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea,
28   the Chinese in China, and so on.

- 35 -

1    d.    "Green Meetings" – these meetings occurred on golf courses. These

2  meetings were generally attended by top and management level employees of Defendants.

3    149.    The Chinese Glass Meetings began in 1998 and generally occurred on a monthly

4  basis following a top or management level meeting. The China Glass Meetings had the principal

5  purpose of reporting what had been decided at the most recent Glass Meetings to the Chinese

6  manufacturers. Participants at the Chinese Glass Meetings included the manufacturers located in

7  China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants,

8  including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen and Samsung SDI

9  Tianjin.

10    150.    Glass Meetings also occurred occasionally in various European countries.

11  Attendees at these meetings included those Defendants and co-conspirators that had subsidiaries

12  and/or manufacturing facilities located in Europe, including Philips, LG Electronics, and LP

13  Displays.

14    151.    Participants would often exchange competitively sensitive information prior to a

15  Glass Meeting. This included information on inventories, production, sales and exports. For

16  some such meetings, where information could not be gathered in advance of the meeting, it was

17  brought to the meeting and shared.

18    152.    The meetings at all levels followed a fairly typical pattern. First, participants

19  exchanged competitive information such as proposed future CRT pricing, sales volume,

20  inventory levels, future production capacity, exports, customer orders, price trends and forecasts

21  of sales volumes for coming months. The participants also updated the information they had

22  provided in the previous meetings. Each of the other participants then had the opportunity to

23  challenge the presenter on the information being presented, reflecting monitoring of the

24  conspiracy.

25    153.    Each meeting had a rotating, designated "Chairman" who would write the

26  information on a white board. (However, with respect to meetings on CPT Products, one person

27  typically served as chair after 2002.) Then the meeting participants used this information to

28  discuss and agree upon what price each would charge for CRTs to be sold in the following

- 36 -

COMPLAINT AND JURY DEMAND

1  month or quarter. Participants often computed overall production for each product and compared
2  that to estimated demand.

3  154. Based on this information, the meeting participants discussed and agreed upon
4  target prices, price increases, so-called "bottom" prices and price ranges for CRTs. They also
5  discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon
6  target prices to be used in negotiations with large customers. Having analyzed the supply and
7  demand, the participants would also discuss and agree upon production cutbacks.

8  155. During periods of oversupply, the focus of the meeting participants turned to
9  making controlled and coordinated price reductions. This was referred to as setting a "bottom
10  price."

11  156. The agreements encompassed prices in United States dollars to specific third
12  party customers, and prices reflecting inclusion of specific features in a CRT (such as certain
13  types of coating or the differing types of shadow mask).

14  157. The agreements included not only prices charged to third party customers, but, in
15  the case of vertically integrated manufacturers who produced both CRTs and CRT Products, also
16  encompassed: (a) prices charged by the CRT manufacturing arm of each such integrated
17  company to the corporate division or subsidiary that manufactured or sold computer monitors,
18  televisions or other similar CRT Products and (b) price floors on quotations offered by the
19  competitors of the integrated company to such a division or subsidiary.

20  158. Defendants also realized the importance of keeping the pricing to their affiliated
21  OEMs at a high enough level to support the CRT pricing in the market to other OEMs. In this
22  way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

23  159. The Defendants often also agreed and implemented coordinated output
24  restrictions. These output agreements began as agreements to shut down production lines for a
25  certain number of days. As time went on, they changed to agreements to shut down entire
26  production lines. To police this aspect of the conspiracy, there were in-person follow-up audits,
27  in which a designated participant would visit the facilities of another participant in order to
28  ensure that output restrictions were being implemented. Sometimes, they also discussed plans

- 37 -

1    related to future capacity expansion. Defendants based these determinations on what the market

2    would look like, after jointly analyzing anticipated supply and demand. The analysis often

3    included consideration of downstream prices for televisions, computer monitors, or similar

4    products and how they would affect the price ranges being collusively set.

5    160.    Defendants would also agree on what to say about price changes or output

6    restrictions to their customers in order to conceal their conspiracy. Often, one participant was

7    chosen to make the first price announcement, with the others following on an agreed-upon

8    schedule.

9    161.    During the course of these meetings, attending Defendants would be assigned the

10    task of contacting non-attendees in order to secure their consent to the agreements reached.

11    162.    Finally, the attending Defendants would organize the next upcoming meeting.

12    163.    Efforts were also made to monitor each Defendant's and co-conspirator's

13    adherence to these agreements in a number of ways, including seeking confirmation of pricing

14    both from customers and from employees of Defendants and their co-conspirators themselves.

15    When cheating did occur, it was addressed in at least four ways: (1) monitoring; (2) attendees at

16    the meetings challenging other attendees if they did not live up to an agreement; (3) threats to

17    undermine a competitor at one of its principal customers; and (4) a recognition of a mutual

18    interest in living up to the target price and living up to the agreements that had been made.

19    164.    From 2005 - 2007, the group Glass Meetings became less frequent, and bilateral

20    meetings again became more prevalent.

21    165.    In summary, the types of agreements reached at the Glass Meetings included:

22        i.    Agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

23        ii.    Placing agreed-upon price differentials on various attributes of CRTs, such

24            as quality or certain technical specifications;

25        iii.    Agreements on pricing for intra-company CRT sales to vertically integrated customers;

26

27        iv.    Agreements as to what to tell customers about the reason for a price increase;

28

- 38 -

v.    Agreements to coordinate with CRT manufacturers and marketers that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

vi.    Agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers' demands;

vii.    Agreements to coordinate uniform public statements regarding available capacity and supply;

viii.    Agreements to allocate both overall market shares and share of a particular customer's purchases;

ix.    Agreements to allocate customers;

x.    Agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

xi.    Agreements to keep their meetings secret.

### 2. Bilateral Discussions

166. Throughout the Relevant Period, the Glass Meetings were supplemented by bilateral discussions between various Defendants and their co-conspirators. The bilateral discussions were more informal than the group meetings and occurred on a frequent, *ad hoc* basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

167. During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, and Mexico.

168. The purpose of the bilateral discussions was to exchange information about past and future pricing, coordinate pricing with manufacturers, confirm production levels, share sales order information, and confirm pricing rumors.

169. In order to ensure the efficacy of their global conspiracy, Defendants and their co-conspirators also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil and Mexico, such as Philips Brazil, Samsung SDI Brazil, and Samsung SDI Mexico. These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRTs. In this way, Defendants and their co-conspirators ensured that

- 39 -

prices of all CRTs imported into the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels. North America was the largest market for CRT televisions and computer monitors during the Relevant Period. Defendants and their co-conspirators also used bilateral discussions with each other during the price negotiations with customers to avoid being persuaded by customers to cut prices. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

170. Bilateral discussions were also used to coordinate prices with CRT manufacturers that sometimes missed the group meetings, such as Toshiba, Panasonic and Samtel. It was often the case that in the few days following a Top or Management Meeting, the attendees at these group meetings would meet bilaterally with the other Defendant or co-conspirator manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting. For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing and/or output agreements to Hitachi. LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing and/or output agreements to Toshiba. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing and/or output agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing and/or output agreements as conveyed by Samsung, LG Electronics and Thai CRT. Other times, Hitachi and Toshiba attended the Glass Meetings themselves. In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3. Defendants' and Co-conspirators' Participation in Group and Bilateral Discussions

171. When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate

- 40 -

1 family. The individual participants entered into agreements on behalf of, and reported these

2 meetings and discussions to, their respective corporate families. As a result, the entire corporate

3 family was represented in meetings and discussions by their agents and was a party to the

4 agreements reached in them. For the various meeting participants identified below, in many

5 instances, their high-ranking executives participated in a significant number of the meetings

6 described.

7 172. Between at least 1996 and 2001, Hitachi, through Hitachi Ltd., Hitachi Shenzhen,

8 Hitachi Displays, and Hitachi Asia, participated in and/or was party to over a dozen bilateral and

9 group meetings in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or

10 customer and market allocation of CRTs occurred. These included more than ten bilateral

11 meetings and more than five group meetings of the types described herein, which took place in

12 Taiwan and China. Hitachi never effectively withdrew from this conspiracy.

13 173. Hitachi America and HEDUS were represented at those meetings and were parties

14 to the agreements entered at them. Further, to the extent Hitachi America and HEDUS

15 distributed CRT Products to direct purchasers, they played a significant role in the conspiracy

16 because Defendants wished to ensure that the prices for such products paid by direct purchasers

17 would not undercut the pricing agreements reached at these various meetings. Thus, Hitachi

18 America and HEDUS were active, knowing participants in this conspiracy.

19 174. Between at least 1995 and 2001, LG Electronics participated in, through LGPD,

20 LP Displays, LGEI, and LGETT, and/or was party to more than a dozen bilateral meetings and

21 more than one hundred group meetings in which unlawful agreements as to, *inter alia*, price,

22 output restrictions, and/or customer and market allocation of CRTs occurred. After 2001, LG

23 participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP

24 Displays). A substantial number of these meetings were attended by the highest ranking

25 executives from LG Electronics. LG Electronics never effectively withdrew from this

26 conspiracy.

27 175. LGEUSA was represented at these meetings and/or was a party to the agreements

28 entered at them. To the extent LGEUSA sold and/or distributed CRT Products, it played a

- 41 -

1  significant role in the conspiracy because Defendants wished to ensure that the prices for such

2  products paid by direct purchasers would not undercut the pricing agreements reached at these

3  various meetings. Thus, LGEUSA was an active, knowing participant in this conspiracy.

4      176.   Between at least 2001 and 2006, LP Displays (f/k/a LGPD) participated in and/or

5  was party to at least one hundred Glass Meetings at all levels in which illegal agreements as to,

6  *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred. A

7  substantial number of these meetings were attended by the highest ranking executives from LP

8  Displays. Certain of these high level executives from LP Displays had previously attended

9  meetings on behalf of LG Electronics and Philips. LP Displays also engaged in bilateral

10  discussions with Defendants or other co-conspirators. Through these discussions, LP Displays

11  agreed on prices and supply levels for CRTs. LP Displays never effectively withdrew from this

12  conspiracy.

13      177.   Between at least 1996 and 2003, Panasonic, directly or through Panasonic

14  Corporation, Matsushita Malaysia, PT.MT Picture Display and MTPD, participated in and/or

15  was party to several dozen bilateral and group meetings in which unlawful agreements as to,

16  *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred.

17  These included bilateral meetings and group meetings of the types described herein. These

18  meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic

19  never effectively withdrew from this conspiracy.

20      178.   PCNA and PACEC were represented at those meetings and/or were parties to the

21  agreements entered at them. To the extent PCNA and PACEC distributed CRT Products to

22  direct purchasers, they played a significant role in the conspiracy because Defendants wished to

23  ensure that the prices for such products paid by direct purchasers would not undercut the pricing

24  agreements reached at these various meetings. Thus, PCNA and PACEC were active, knowing

25  participants in the alleged conspiracy.

26      179.   Between at least 2003 and 2006, MTPD participated in and/or was party to

27  multiple Glass Meetings in which unlawful agreements as to, *inter alia*, price, output restrictions,

28  and/or customer and market allocation of CRTs occurred, and in fact MTPD led many of these

- 42 -

COMPLAINT AND JURY DEMAND

1  meetings during the latter years of the conspiracy. These meetings were attended by high level

2  sales managers from MTPD. MTPD also engaged in bilateral discussions with Defendants or

3  other co-conspirators. Through these discussions, MTPD agreed on prices and supply levels for

4  CRTs. MTPD never effectively withdrew from this conspiracy.

5       180. Between at least 1998 and 2007, BMCC participated in and/or was party to

6  multiple Glass Meetings in which unlawful agreements as to, *inter alia*, price, output restrictions,

7  and/or customer and market allocation of CRTs occurred. These meetings were attended by high

8  level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with

9  Defendants or other co-conspirators, particularly the other Chinese CRT manufacturers.

10  Through these discussions, BMCC agreed on prices and supply levels for CRTs. None of

11  BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese

12  government. BMCC was acting to further its own independent private interests in participating

13  in the alleged conspiracy. BMCC never effectively withdrew from this conspiracy.

14       181. Between at least 1996 and 2007, Philips, through Royal Philips, PEIL, LGPD,

15  and/or LP Displays, participated in and/or was party to over one hundred bilateral and group

16  meetings in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or

17  customer and market allocation of CRTs occurred. A substantial number of these meetings were

18  attended by high level executives from Philips. Philips participated through Royal Philips or its

19  subsidiaries into 2001 and participated thereafter through LGPD. Philips never effectively

20  withdrew from this conspiracy.

21       182. Philips America, Philips Brazil, and PCEC were represented at those meetings

22  and were parties to the agreements entered at them. To the extent Philips America, Philips

23  Brazil, and PCEC distributed CRT Products to direct purchasers, they played a significant role in

24  the conspiracy because the conspirators wished to ensure that the prices for such products paid

25  by direct purchasers would not undercut the pricing agreements reached at these various

26  meetings. Thus, Philips America, Philips Brazil, and PCEC were active, knowing participants in

27  this conspiracy.

28

- 43 -

183.    Between at least 1995 and 2007, Samsung, through Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Samsung SDI HK participated in and/or was party to  hundreds of bilateral and group meetings in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred. These included dozens of bilateral meetings and several hundred group meetings of the types described herein.  Samsung never effectively withdrew from this conspiracy.

184.    Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were represented at those meetings and/or were parties to the agreements entered at them.  To the extent Samsung America, Samsung SDI Brazil, and Samsung SDI Mexico distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings.  Thus, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were active, knowing participants in this conspiracy.

185.    Between at least 1995 and 2003, Toshiba, through TC, MTPD, TDDT and TEDI, participated in over 50 bilateral and group meetings in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba never effectively withdrew from this conspiracy.

186.    Toshiba America, TAIS, TACP, and TAEC were represented at those meetings and/or were parties to the agreements entered at them.  To the extent Toshiba America, TAIS, TACP, and TAEC distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings.  Thus, Toshiba America, TAIS, TACP, and TAEC were active, knowing participants in this conspiracy.

187.    Between at least 1996 and 2005, Thomson participated in and/or was a party to bilateral and group meetings in which unlawful agreements as to, *inter alia*, price, output

- 44 -

1  restrictions, and/or customer and market allocation of CRTs occurred. These meetings were
2  attended by high level sales managers from Thomson. Thomson never effectively withdrew from
3  this conspiracy.

4       188.    Thomson Consumer Electronics, Technologies Displays Americas (then known as
5  Thomson Displays Americas), and Technologies Displays Mexicana (then known as Thomson
6  Displays Mexicana) were at those meetings and/or were parties to the agreements entered at
7  them. To the extent Thomson Consumer Electronics, Technologies Displays Americas, and
8  Technologies Displays Mexicana distributed CRT Products to direct purchasers, they played a
9  significant role in the conspiracy because Defendants wished to ensure that the prices for such
10 products paid by direct purchasers would not undercut the pricing agreements reached at these
11 various meetings. Thus, Thomson Consumer Electronics, Technologies Displays Americas, and
12 Technologies Displays Mexicana were at those meetings and/or were parties to the agreements
13 and were active, knowing participants in this conspiracy.

14      189.    Upon information and belief, between 2005 and 2007, Videocon participated in
15 several Glass Meetings and multiple bilateral meetings with its competitors. These meetings
16 were attended by high level sales managers from Videocon. At these meetings, Videocon
17 discussed such things as CRT prices, production, revenues, volumes, demand, inventories,
18 estimated sales, plant shutdowns, customer allocation, and new product development, and agreed
19 on prices and supply levels for CRT Products. Videocon never effectively withdrew from this
20 conspiracy.

21      190.    Technologies Displays Americas and Technologies Displays Mexicana were at
22 those meetings and/or were parties to the agreements entered at them. To the extent
23 Technologies Displays Americas and Technologies Displays Mexicana distributed CRT Products
24 to direct purchasers, they played a significant role in the conspiracy because Defendants wished
25 to ensure that the prices for such products paid by direct purchasers would not undercut the
26 pricing agreements reached at these various meetings. Thus, Technologies Displays Americas
27 and Technologies Displays Mexicana were at those meetings and/or were parties to the
28 agreements and were active, knowing participants in this conspiracy.

- 45 -

191.     Between at least 1996 and 2004, Orion participated in and/or was party to multiple bilateral and at least several dozen group meetings in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred. Orion never effectively withdrew from this conspiracy.

192.     TEDI, Domex, and Orion Engineering were represented at those meetings and/or were parties to the agreements entered at them. To the extent TEDI, Domex, and Orion Engineering distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings. Thus, TEDI, Domex, and Orion Engineering were active, knowing participants in this conspiracy.

193.     Between at least 1995 and 2007, Chunghwa, through Chunghwa PT and Chunghwa Malaysia, participated in and/or were parties to hundreds of bilateral and group meetings in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and/or market allocation of CRTs occurred. These included hundreds of bilateral meetings and hundreds of group meetings of all the types described herein that took place in Southeast Asia, China, Europe and Scotland. The representatives of Chunghwa who participated in some of these meetings included its highest executives, such as the former Chairman and CEO of Chunghwa PT, C.Y. Lin. Chunghwa never effectively withdrew from the conspiracy.

194.     Between at least 1998 and 2007, IRICO, through IGC, IGE, and IDDC, participated in and/or was party to multiple bilateral meetings and at least several dozen group meetings in which unlawful agreements as to *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred. These meetings were attended by the highest ranking executives from IRICO. IRICO engaged in multiple bilateral discussions with Defendants or other co-conspirators, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy. IRICO never effectively withdrew from this conspiracy.

- 46 -

1   195.   Between at least 1998 and 2006, Samtel participated in and/or was party to

2   multiple bilateral meetings in which unlawful agreements as to, *inter alia*, price, output

3   restrictions, and/or customer and market allocation of CRTs occurred. These meetings occurred

4   in Malaysia. Samtel never effectively withdrew from this conspiracy.

5   196.   Between at least 1998 and 2006, Thai CRT participated in and/or was party to

6   over 50 bilateral and group meetings in which unlawful agreements as to, *inter alia*, price, output

7   restrictions, and customer and/or market allocation of CRTs occurred. Thai CRT never

8   effectively withdrew from this conspiracy.

9   **F.   The CRT Market During the Conspiracy**

10   197.   Until the last few years, CRTs were the dominant technology used in displays,

11   including televisions and computer monitors. During the Relevant Period, this translated into the

12   sale of millions of CRTs, generating billions of dollars in annual profits.

13   198.   The following data was reported by Stanford Resources, Inc., a market research

14   firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------------------------|-------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

199.   During the Relevant Period, North America was the largest market for CRT TVs

and computer monitors. According to a report published by Fuji Chimera Research, the 1995

worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5%) were

consumed in North America. By 2002, North America still consumed around 35% of the

world's CRT monitor supply.

- 47 -

**G.  Effects of Defendants' Antitrust Violations**

200.   During the Relevant Period, while demand in the United States for CRTs continued to decline, Defendants' and their co-conspirators' conspiracy was effective in moderating the normal downward pressures on prices for CRTs caused by the entry and popularity of the new generation CRTs and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

**1.  Examples of Collusive Pricing for CRTs**

201.   Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

202.   In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."  In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

203.   In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large color CRTs also rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

204.   After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

205.   A BNET Business Network news article from August 1998 reported that "the components (cathode ray tubes) in computer monitors have risen in price.  'Although several

- 48 -

manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

206.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes. Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors." In fact, this price increase was a result of the collusive conduct as herein alleged.

**2.    Examples of Reductions in Manufacturing Capacity by Defendants**

207.    Defendants and their co-conspirators also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

208.    For example, Defendants' and their co-conspirators' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001. This is the most dramatic example of a drop in factory utilization. There were sudden drops throughout the Relevant Period but to a lesser degree. Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by Defendants and their co-conspirators were the result of their agreements to decrease output in order to stabilize the prices of CRTs.

209.    In December of 2004, MTPD closed its American subsidiary's operations in Horeseheads, New York, citing price and market erosion. Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business." The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

210.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

- 49 -

211. In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

212. In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

213. In July of 2006, Orion America shut down a CRT manufacturing plant in Princeton, Indiana. The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

**H. Summary of Effects of the Conspiracy Involving CRTs**

214. The above combination and conspiracy has had the following effects, among others:

    a. Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b. Prices for CRTs sold by Defendants has been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c. Plaintiffs are deprived of the benefit of free and open competition in the purchase of CRTs.

    d. As a direct and proximate result of the unlawful conduct of Defendants and their co-conspirators, Plaintiffs have been injured in their business and property in that they paid more for CRTs than it otherwise would have paid in the absence of the unlawful conduct of Defendants. Plaintiffs were also injured in that they paid more for CRT Products than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

**VIII. PLAINTIFFS' INJURIES**

215. As direct purchasers of CRTs, Plaintiffs have suffered a direct, substantial, and reasonably foreseeable injury as a result of Defendants' and their co-conspirators' conspiracy to raise, fix, stabilize or maintain CRT prices at supra-competitive levels. Defendants' and their co-

- 50 -

1  conspirators' conspiracy artificially inflated the price of CRTs, causing Plaintiffs to pay higher

2  prices than they would have in the absence of Defendants' conspiracy.

3      216.   Throughout the Relevant Period, Defendants and their co-conspirators controlled

4  the market for CRTs.

5      217.   Once a CRT leaves its place of manufacture, it remains essentially unchanged as

6  it moves through the distribution system. CRTs are identifiable, discrete physical objects that do

7  not change from or become an indistinguishable part of a CRT Product. Thus, CRTs follow a

8  physical chain from Defendants through manufacturers of CRTs sold to Plaintiffs.

9      218.   Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as

10  others, which in turn purchased CRTs from Defendants and/or their co-conspirators.

11  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these

12  OEMs and others, which paid higher prices for CRTs than they would have absent the

13  conspiracy.

14      219.   Consequently, during the Relevant Period, the OEMs had no choice but to

15  purchase CRTs from Defendants and their co-conspirators and others at prices that were

16  artificially inflated, fixed and stabilized by Defendants' conspiracy.

17  **IX.   TOLLING**

18      220.   As discussed in paragraphs 9-10, and 121-36 above, the DOJ instituted criminal

19  proceedings and investigations against several Defendants and co-conspirators commencing on

20  at least November 2007 through the present. Plaintiffs' claims have been tolling during these

21  criminal proceedings pursuant to 15 U.S.C. § 16. Plaintiffs were also members of the putative

22  class actions asserted against Defendants, including but not limited to the following complaints:

23      • *Nathan Muchnick, Inc. v. Chunghwa Picture Tubes Ltd.*, Case No. 3:07-cv-5981
24         (N.D. Cal., filed Nov. 27, 2007).

25      • *In re: Cathode Ray Tube (CRT) Antitrust Litigation*, Direct Purchaser Plaintiffs'
26         Consolidated Amended Complaint, MDL No. 1917, Lead Case No. 3:07-cv-5944
         (N.D. Cal., filed March 16, 2009).

27

28

COMPLAINT AND JURY DEMAND

1  221.  Plaintiffs' claims also have been tolled under the doctrine announced in *American*

2  *Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and related authorities recognizing cross-

3  jurisdictional tolling during the pendency of the putative class actions asserted against

4  Defendants, which commenced as early as November 27, 2007.

5  **X.  FRAUDULENT CONCEALMENT**

6  222.  Plaintiffs had neither actual nor constructive knowledge of the facts constituting

7  their claim for relief despite diligence in trying to discover the pertinent facts. Defendants and

8  their co-conspirators engaged in a secret conspiracy that did not give rise to facts that would put

9  Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

10  223.  The affirmative acts of the Defendants alleged herein, including acts in

11  furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

12  precluded detection. As noted above, Defendants organized Glass Meetings to avoid detection,

13  conducted bilateral meetings in secret and agreed at Glass Meetings to orchestrate the giving of

14  pretextual reasons for their pricing actions and output restrictions. Defendants would coordinate

15  and exchange in advance the texts of the proposed communications with customers containing

16  these pretextual statements and would coordinate which co-conspirator would first communicate

17  these pretextual statements to customers.

18  224.  By its very nature, Defendants' price-fixing conspiracy was inherently self-

19  concealing.

20  225.  Plaintiffs could not have discovered the alleged contract, conspiracy or

21  combination at an earlier date by the exercise of reasonable diligence because of the deceptive

22  practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid

23  detection of, and fraudulently conceal, their contract, conspiracy or combination. The contract,

24  conspiracy or combination as herein alleged was fraudulently concealed by Defendants by

25  various means and methods, including, but not limited to, secret meetings, surreptitious

26  communications between the Defendants by the use of the telephone or in-person meetings in

27  order to prevent the existence of written records, discussion on how to evade antitrust laws and

28

- 52 -

1  concealing the existence and nature of their competitor pricing discussions from non-
2  conspirators (including customers).

3      226.    Participants at Glass Meetings were also told not to take minutes. Attending
4  companies also reduced the number of their respective attendees to maintain secrecy.

5      227.    Defendants also agreed at Glass Meetings and bilateral meetings to give
6  pretextual reasons for price increases and output reductions to their customers.

7      228.    As alleged above, in early 1999, despite declining production costs and the rapid
8  entry of flat panel display products, the price of large-sized color CRTs actually rose. The price
9  increase was allegedly based on increasing global demand for the products. In fact, this price
10  rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

11      229.    As alleged above, despite increased competition from flat panel monitors, prices
12  for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price
13  stabilization was purportedly due exclusively to a shortage of critical components such as glass.
14  This was a pretext used to cover up the conspiracy.

15      230.    In addition, when several CRT manufacturers, including Samsung, Philips, and
16  LG Electronics, increased the price of CRT Products in 2004, the price hike was blamed on a
17  shortage of glass shells used for manufacturing CRT monitors. In justifying this price increase, a
18  Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of
19  glass shells] is a global phenomena and every company has to increase the prices of CRT
20  monitors in due course of time."

21      231.    Manufacturers such as LG Electronics periodically issued press statements falsely
22  asserting that CRT prices were being driven lower by intense competition.

23      232.    Plaintiffs are informed and believe, and thereon allege, that Defendants' purported
24  reasons for the price increases of CRTs were materially false and misleading and made for the
25  purpose of concealing Defendants' anti-competitive scheme as alleged herein.

26      233.    As a result of Defendants' fraudulent concealment of their conspiracy, the running
27  of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a
28  result of the anticompetitive conduct alleged in this Complaint.

- 53 -

## XI. CLAIM FOR VIOLATIONS

### First Claim for Relief
### (Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

234. Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

235. From March 1, 1995, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

236. In particular, Defendants have combined and conspired to raise, fix, maintain or stabilize the prices of CRTs sold in the United States.

237. As a result of Defendants' and their co-conspirators' unlawful conduct, prices for CRTs were raised, fixed, maintained, and stabilized in the United States.

238. The contract, combination or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

239. For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a. Participating in meetings and conversations to discuss and agree upon the prices and supply of CRTs;

b. Communicating in writing and orally to fix prices, allocate customers, and restrict output;

c. Agreeing to manipulate prices and supply of CRTs sold in the United States, and to allocate customers of such products, in a manner that deprived direct purchasers of free and open competition;

- 54 -

1       d.      Issuing price announcements and price quotations in accordance with the
2  agreements reached;

3               e.      Selling CRTs to customers in the United States at non-competitive prices;

4               f.      Exchanging competitive sensitive information in order to facilitate their
5  conspiracy;

6               g.      Agreeing to maintain or lower production capacity; and

7               h.      Providing false statements to the public to explain increased prices for
8  CRTs.

9       240.    As a result of Defendants' unlawful conduct, Plaintiffs have been injured in their
10 businesses and property in that they have paid more for CRT Products than they otherwise would
11 have paid in the absence of Defendants' unlawful conduct.

12
                                    **Second Claim for Relief**
13                        **(Violation of the California Cartwright Act)**

14
        241.    Plaintiffs incorporate by reference all the above allegations as if fully set forth
15
   herein.
16
        242.    During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a
17
   substantial volume of business in California.  In particular, Plaintiffs purchased CRT Products
18
   from Defendants and their co-conspirators in California by issuing purchase orders from
19
   California and receiving invoices on those purchases there.  As a result of Plaintiffs presence in
20
   California and the substantial business they conducted in California, Plaintiffs are entitled to the
21
   protection of the laws of California.
22
        243.    In addition, Defendants LP Display, Samsung and Toshiba all maintained offices
23
   in California during the Relevant Period.  Employees at Defendants' and co-conspirators'
24
   locations in California participated in meetings and engaged in bilateral communications in
25
   California and intended and did carry out Defendants' and their co-conspirators' anticompetitive
26
   agreement to fix the price of CRTs.  Defendant Samsung SDI admitted in its plea agreement that
27
   acts in furtherance of the conspiracy were carried out in California.  Defendants' and their co-
28
                                           - 55 -

1 conspirators' conduct within California thus injured Plaintiffs and their predecessor entities, both
2 in California and throughout the United States.

3     244.   Beginning at a time presently unknown to Plaintiffs, but at least as early as March
4 1, 1995, and continuing thereafter at least up to and including at least December 2007,
5 Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in
6 restraint of the trade and commerce described above in violation of the Cartwright Act,
7 California Business and Professional Code Section 16720.

8     245.   Defendants have each acted in violation of Section 16720 to fix, raise, stabilize
9 and maintain prices of, and allocate markets for, CRTs at supracompetitive levels. Defendants'
10 and their co-conspirators' conduct substantially affected California commerce.

11     246.   The aforesaid violations of Section 16720, California Business and Professional
12 Code, consisted, without limitation, of a continuing unlawful trust and concert of action among
13 Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain
14 and stabilize the prices of, and to allocate markets for, CRTs.

15     247.   For the purpose of forming and effectuating the unlawful trust, Defendants and
16 their co-conspirators have done those things which they combined and conspired to do, including
17 but in no way limited to the acts, practices and course of conduct set forth above and the
18 following:

19         a.  to fix, raise, maintain and stabilize the price of CRTs;

20         b.  to allocate markets for CRTs amongst themselves; and

21         c.  to allocate among themselves the production of CRTs.

22     248.   The combination and conspiracy alleged herein has had, *inter alia*, the following
23 effects:

24       a. price competition in the sale of CRTs has been restrained, suppressed and/or
25 eliminated in the State of California;

26       b. prices for CRTs sold by Defendants, their co-conspirators, and others have
27 been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in
28 the State of California; and

- 56 -

COMPLAINT AND JURY DEMAND

1      c. those who purchased CRTs from Defendants, their co-conspirators, and others

2      and CRT Products containing price-fixed CRTs from Defendants, their co-conspirators,

3      and others have been deprived of the benefit of free and open competition.

4      249.    As a result of the alleged conduct of Defendants and their co-conspirators,

5  Plaintiffs paid supracompetitive, artificially inflated prices for the CRTs they purchased during

6  the Relevant Period.

7      250.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been

8  injured in their business and property by paying more for CRT Products than they would have

9  paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants'

10  violation of Section 16720 of the California Business and Professional Code, Plaintiffs are

11  entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to

12  Section 16750(a) of the California Business and Professions Code.

13

14  <center>**Third Claim for Relief**
**(Violation of California Unfair Competition Law)**</center>

15      251.    Plaintiffs incorporate by reference all the above allegations as if fully set forth

16  herein.

17      252.    During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a

18  substantial volume of business in California.  In particular, Plaintiffs purchased CRT Products

19  from Defendants and their co-conspirators in California by issuing purchase orders from

20  California and receiving invoices on those purchases there.  As a result of Plaintiffs presence in

21  California and the substantial business they conducted in California, Plaintiffs are entitled to the

22  protection of the laws of California.

23      253.    During the Relevant Period, Defendants engaged in unfair competition in

24  violation of California's Unfair Competition Law, California Business and Professional Code §

25  17200 *et seq.*

26      254.    Defendants committed acts of unfair competition, as defined by Section 17200, *et*

27  *seq.*, by engaging in a conspiracy to fix and stabilize the price of CRTs as described above.

28

- 57 -

COMPLAINT AND JURY DEMAND

255. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) a violation of Section 1 of the Sherman Act and (2) violation of the Cartwright Act.

256. Defendants' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or Cartwright Act.

257. Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*

258. Defendants' conduct was carried out, effectuated, and perfected, at least in part, within the state of California.

259. By reason of the foregoing, Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business acts and practices described above.

## Fourth Claim for Relief
### (Violation of the New York Donnelly Act)

260. Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

261. During the Relevant Period, Plaintiffs and their affiliated entities conducted a substantial volume of business in New York. For example, Plaintiffs warehoused CRT Products in New York. As a result of the substantial business they conducted in New York, Plaintiffs are entitled to the protection of the laws of New York.

262. Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including December 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the

- 58 -

trade and commerce described above in violation of the Donnelly Act, New York General Business Law §§ 340 *et seq.*

263.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in New York and fixed, raised, maintained and stabilized the price of CRTs in New York at artificially high, non-competitive levels.

264.    As a result, Defendants' conspiracy substantially affected New York commerce.

265.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products purchased from Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy, and are entitled to relief under New York General Business Law §§ 340 *et seq.*

266.    As a result of Defendants' violation of Section 340 of the New York General Business Law, Plaintiffs are entitled to treble damages and the costs of suit, including attorneys' fees.

<div align="center">

**Fifth Claim for Relief**
**(Violation of New York Unfair Competition Law)**

</div>

267.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

268.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which CRTs were sold, distributed or obtained in New York, and took efforts to conceal their agreements from Plaintiffs.

269.    The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. General Business Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

- 59 -

1       270.    Defendants' unlawful conduct had the following effects: (1) CRT price

2 competition was restrained, suppressed and eliminated throughout New York; (2) CRT prices

3 were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3)

4 Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supracompetitive,

5 artificially inflated prices for CRT Products.

6       271.    During the Relevant Period, Defendants' illegal conduct substantially affected

7 New York commerce and consumers.

8       272.    During the Relevant Period, each of the Defendants named herein, directly, or

9 indirectly and through affiliates or subsidiaries or agents they dominated and controlled,

10 manufactured, sold and/or distributed CRT Products in New York.

11       273.    Plaintiffs seek treble damages for their injuries caused by these violations in an

12 amount to be determined at trial and are threatened with further injury.

13

14 <div align="center">**Sixth Claim for Relief**<br>**(New Jersey Antitrust Act, N.J. Stat. § 56:9-1 _et seq_.)**</div>

15       274.    Plaintiffs incorporate by reference all the above allegations as if fully set forth

16 herein.

17       275.    During the Relevant Period, Sharp Electronics resided in New Jersey, and

18 Plaintiffs and their affiliated entities conducted a substantial volume of business in New Jersey.

19 Sharp Electronics oversaw SMCA's CRT procurement activities. Once the CRTs were

20 purchased, Sharp Electronics instructed SMCA and SEMA on the number of finished products

21 that customers requested. As a result of Plaintiffs presence in New Jersey and the substantial

22 business they conducted in New Jersey, Plaintiffs are entitled to the protection of the laws of

23 New Jersey.

24       276.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March

25 1, 1995, and continuing thereafter at least up to and including December 2007, Defendants and

26 their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the

27

28

- 60 -

COMPLAINT AND JURY DEMAND

trade and commerce described above in violation of the New Jersey Antitrust Act, N.J. Stat. § 56:9-1 *et seq.*

277.  Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in New Jersey and fixed, raised, maintained and stabilized CRTs in New Jersey at artificially high, non-competitive levels.

278.  As a result, Defendants' conspiracy substantially affected New Jersey commerce.

279.  As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products purchased from Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy, and are entitled to relief under N.J. Stat. § 56:9-1 *et seq.*

280.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.J. Stat. § 56:9-1 *et seq.* Plaintiffs seek all forms of relief available under N.J. Stat. § 56:9-1 *et seq.*

### Seventh Claim for Relief
### (Violation of Tennessee Code Ann. §§ 47-258-101 *et seq.*)

281.  Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

282.  Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs were deprived of free and open competition in Tennessee; and (4) Plaintiffs paid supracompetitive and artificially inflated prices for CRT Products in Tennessee.

283.  During the Relevant Period, Plaintiffs purchased CRT Products in Tennessee, with purchase orders issuing from, and invoices being received, in Tennessee.

- 61 -

1     284.    During the Relevant Period, Defendants' and their co-conspirators' illegal

2 conduct substantially affected Tennessee commerce.

3     285.    As a direct and proximate result of Defendants' and their co-conspirators'

4 unlawful conduct, Plaintiffs have been injured in their business and property and are threatened

5 with further injury.

6     286.    By reason of the foregoing, Defendants have entered into agreements in restraint

7 of trade in violation of Tennessee Code Ann. §§ 47-25-101 *et seq.* Plaintiffs seek all forms of

8 relief available under Tennessee Code Ann. §§ 47-25-101 *et seq.*

9 **XII. DAMAGES**

10     287.    During the Relevant Period, Plaintiffs purchased CRT Products directly from

11 Defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of the antitrust

12 violations herein alleged, paid more for such products than they would have paid in the absence

13 of such antitrust violations. During the Relevant Period, Plaintiffs also purchased CRT Products

14 indirectly from Defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of the

15 antitrust violations herein alleged, paid more for such CRT Products than they would have paid

16 in the absence of such antitrust violations. As a result, Plaintiffs have sustained damages to their

17 business and property in an amount to be determined at trial.

18 **XIII. PRAYER FOR RELIEF**

19     WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging

20 and decreeing that:

21     A.     Defendants engaged in a contract, combination, and conspiracy in violation of

22 Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the Unfair

23 Competition Law of California, the New York Donnelly Act, New Jersey Antitrust Act, New

24 York General Business Law § 349, and Tennessee Code Ann. §§ 47-25-101 *et seq.*, Plaintiffs

25 were injured in their business and property as a result of Defendants' violations;

26     B.     Plaintiffs shall recover damages sustained, as provided by federal and state

27 antitrust laws, and that a joint and several judgment in favor of Plaintiffs be entered against the

28 Defendants in an amount to be trebled in accordance with such laws;

- 62 -

1    C.    Defendants, their subsidiaries, affiliates, joint ventures, successors, transferees,

2    assignees and the respective officers, directors, partners, agents, and employees thereof and all

3    other persons acting or claiming to act on their behalf be permanently enjoined and restrained

4    from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

5    D.    Plaintiffs shall be awarded pre-judgment and post-judgment interest, and that such

6    interest be awarded at the highest legal rate from and after the date of service of the initial

7    Complaint in this action;

8    E.    Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees

9    as provided by law; and

10    F.    Plaintiffs shall receive such other or further relief as may be just and proper.

11    ///

12    ///

13    ///

14    ///

15    ///

16    ///

17    ///

18    ///

19    ///

20    ///

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

- 63 -

## XIV. JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: March 15, 2013          By: _____
                                        Stephen E. Taylor

Stephen E. Taylor (SBN 058452)
Jonathan A. Patchen (SBN 237346)
TAYLOR & COMPANY LAW OFFICES, LLP
One Ferry Building, Suite 355
San Francisco, California 94111
Telephone: (415) 788-8200
Facsimile: (415) 788-8208
Email: staylor@tcolaw.com
Email: jpatchen@tcolaw.com

Kenneth A. Gallo (*pro hac vice to be submitted*)
Joseph J. Simons (*pro hac vice to be submitted*)
Craig A. Benson (*pro hac vice to be submitted*)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
Telephone: (202) 223-7356
Facsimile: (202) 204-7356
Email: kgallo@paulweiss.com
Email: jsimons@paulweiss.com
Email: cbenson@paulweiss.com

*Attorneys for Plaintiffs*

- 64 -

COMPLAINT AND JURY DEMAND