# **<u>EXHIBIT A</u>**



**EUROPEAN COMMISSION**

**PRESS RELEASE**

Brussels, 5 December 2012

# Antitrust: Commission fines producers of TV and computer monitor tubes € 1.47 billion for two decade-long cartels

The European Commission has fined seven international groups of companies a total of € 1 470 515 000 for participating in either one or both of two distinct cartels in the sector of cathode ray tubes ("CRT"). For almost ten years, between 1996 and 2006, these companies fixed prices, shared markets, allocated customers between themselves and restricted their output. One cartel concerned colour picture tubes used for televisions and the other one colour display tubes used in computer monitors. The cartels operated worldwide. The infringements found by the Commission therefore cover the entire European Economic Area (EEA). Chunghwa, LG Electronics, Philips and Samsung SDI participated in both cartels, while Panasonic, Toshiba, MTPD (currently a Panasonic subsidiary) and Technicolor (formerly Thomson) participated only in the cartel for television tubes. Chunghwa received full immunity from fines under the Commission's 2006 Leniency Notice for the two cartels, as it was the first to reveal their existence to the Commission. Other companies received reductions of their fines for their cooperation in the investigation under the Commission's leniency programme.

Commission Vice President in charge of competition policy Joaquín Almunia said: *"These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behaviour that are strictly forbidden to companies doing business in Europe. Cathode ray tubes were a very important component in the making of television and computer screens. They accounted for 50 to 70% of the price of a screen. This gives an indication of the serious harm this illegal behaviour has caused both to television and computer screen producers in the EEA, and ultimately the harm it caused to the European consumers over the years".*

The two CRT cartels are among the most organised cartels that the Commission has investigated. For almost 10 years, the cartelists carried out the most harmful anti-competitive practices including price fixing, market sharing, customer allocation, capacity and output coordination and exchanges of commercial sensitive information. The cartelists also monitored the implementation, including auditing compliance with the capacity restrictions by plant visits in the case of the computer monitor tubes cartel.

Top management level meetings, dubbed "green(s) meetings" by the cartelists themselves because they were often followed by a golf game, designed the orientations for the two cartels. Preparation and implementation were carried out through lower level meetings, often referred to as "glass meetings", on a quarterly, monthly, sometimes even weekly basis. Meetings were held in various locations in Asia (Taiwan, Korea, Japan, Malaysia, Indonesia, Thailand, Hong Kong, etc.) and Europe (Amsterdam, Budapest, Glasgow, Paris, Rome). The cartels operated worldwide.

Multilateral meetings usually started with a review of demand, production, sales and capacity in the main sales areas, including Europe; then prices were discussed, including for individual customers, i.e. TV and computer manufacturers. They had therefore a direct impact on customers in the European Economic Area (EEA), ultimately harming final consumers. The cartelists were trying to address the decline of the CRT market in a collusive way, to the detriment of consumers. For example, one document recording the cartel discussions spells out clearly: *"producers need to avoid price competition through controlling their production capacity"*.

The investigation also revealed that the companies were well aware they were breaking the law. For instance, in a document found during the Commission's inspections, a warning goes as follows: *"Everybody is requested to keep it as secret as it would be serious damage if it is open to customers or European Commission"*. The participants were therefore taking precautions to avoid being in possession of anticompetitive documents. Some documents spelled out, for example: *"Please dispose the following document after reading it"*.

## Fines

The fines were set on the basis of the [Commission's 2006 Guidelines on fines](#) (see [IP/06/857](#) and [MEMO/06/256](#)).

In setting the level of fines, the Commission took into account the companies' sales of the products concerned in the EEA, the very serious nature of the infringement, its geographic scope, its implementation and its duration. If Chunghwa had not received full immunity, its fines would have been € 8 385 000 for the TV tubes cartel and € 8 594 000 for the computer monitor tubes cartel. Samsung SDI, Philips and Technicolor received reductions of fines ranging from 10 to 40% for their cooperation under the Commission's leniency programme. The reductions reflect the timing of their cooperation and the extent to which the evidence they provided helped the Commission to prove the respective cartels. One of the companies invoked its inability to pay the fine. The Commission assessed this claim under point 35 of the 2006 fines Guidelines and granted a reduction of the fine.

The fines imposed are as follows:

| Name of undertaking | Reduction under the Leniency Notice (%) | Fine for the TV tubes cartel[1] (€) | Fine for the computer monitor tubes cartel[1] (€) | Total fine[1] (€) |
|---|---|---|---|---|
| Chunghwa[2] | 100% | 0 | 0 | 0 |
| Samsung SDI | 40% | 81 424 000 | 69 418 000 | 150 842 000 |
| Philips | 30% | 240 171 000 | 73 185 000 | 313 356 000 |
| LG Electronics | 0% | 179 061 000 | 116 536 000 | 295 597 000 |
| Philips and LG Electronics[2] | 30% (reduction only for Philips) | 322 892 000 | 69 048 000 | 391 940 000 |
| Technicolor | 10% | 38 631 000 | | 38 631 000 |
| Panasonic | 0% | 157 478 000 | | 157 478 000 |
| Toshiba | 0% | 28 048 000 | | 28 048 000 |
| Panasonic, Toshiba and MTPD[2] | 0% | 86 738 000 | | 86 738 000 |
| Panasonic and MTPD[2] | 0% | 7 885 000 | | 7 885 000 |
| **TOTAL** | | 1 142 328 000 | 328 187 000 | **1 470 515 000** |

[1] *Legal entities within the undertaking may be held jointly and severally liable for the whole or part of the fine imposed.*

[2] *Jointly and severally liable for that whole fine imposed.*

## Background

A Cathode Ray Tube ("CRT") is an evacuated glass envelope containing an electron gun and a fluorescent screen. Two distinct types of CRTs are relevant for the cartels sanctioned in today's decisions: (i) colour display tubes (CDT) used in computer monitors and (ii) colour picture tubes (CPT) used for colour televisions. The CRT was gradually replaced by alternative techniques such as LCD and plasma displays.

The Commission's investigation started with unannounced inspections in November 2007 (see MEMO/07/453). A statement of objections was issued in November 2009 (see MEMO/09/525) on which the companies had the opportunity to comment and to be heard. A supplementary statement of objections concerning corporate liability was issued in June 2012 against two companies.

More information on this case will be available under the case number 39437 in the Commission's public case register on the competition website, once confidentiality issues have been dealt with. For more information on the Commission's action against cartels, see its cartels website.

## Action for damages

Any person or firm affected by anti-competitive behaviour as described in this case may bring the matter before the courts of the Member States and seek damages. The case law of the European Court of Justice (ECJ) and the Antitrust Regulation (Council Regulation 1/2003) both confirm that in cases before national courts, a Commission decision is binding proof that the behaviour took place and was illegal. Even though the Commission has fined the companies concerned, damages may be awarded without these being reduced on account of the Commission fine.

The Commission considers that meritorious claims for damages should be aimed at compensating, in a fair way, the victims of an infringement for the harm done. More information on antitrust damages actions, including the public consultation and a citizens' summary, is available at:

http://ec.europa.eu/comm/competition/antitrust/actionsdamages/documents.html

---

Contacts :
Antoine Colombani  (+32 2 297 45 13)
Marisa Gonzalez Iglesias  (+32 2 295 19 25)

---

# **<u>EXHIBIT B</u>**



ANNUAL REPORT **2011**
including the Annual Financial Report

ANNUAL REPORT 2011 ......................................................... 1

**1** PRESENTATION OF THE GROUP
AND ITS ACTIVITIES ................................................... 5
1.1   Selected Financial Data ............................................................ 6
1.2   History and Strategy of the Company .................................. 9
1.3   Business Overview ...................................................................13

**2** OPERATING AND FINANCIAL REVIEW
AND PROSPECTS ...................................................... 21
2.1   Overview ...................................................................................22
2.2   Trends in the Media & Entertainment industry ................22
2.3   Summary of results ................................................................ 23
2.4   Seasonality ...............................................................................24
2.5   Geographic breakdown of revenues & Effect of exchange rate
      fluctuations ..............................................................................24
2.6   Events subsequent to December 31, 2011 .......................25
2.7   Notification of interests acquired in the share capital of French
      companies in 2011 ..................................................................26
2.8   Notification of interests acquired in the share capital of French
      companies in 2010 ..................................................................26
2.9   Results of operations for 2011 and 2010 ..........................26
2.10  Liquidity and capital resources ........................................... 33
2.11  Priorities and objectives for 2012 ........................................41

**3** RISK FACTORS ......................................................... 43
3.1   Risk related to the debt restructuring ................................44
3.2   Market Risk ..............................................................................46
3.3   Risks related to the business ............................................... 47
3.4   Other risks ............................................................................... 53
3.5   Insurance ................................................................................. 55

**4** CORPORATE GOVERNANCE AND INTERNAL
CONTROL PROCEDURES ....................................... 57
4.1   Board of Directors ..................................................................58
4.2   Chairman's report on corporate governance, internal control and
      risk management .....................................................................64
4.3   Statutory Auditors' report on the Chairman's report on internal
      control procedures ................................................................ 76
4.4   Compensation and benefits of Directors ...........................77
4.5   Executive Committee ............................................................84

**5** TECHNICOLOR AND ITS SHAREHOLDERS ................... 87
5.1   Share capital ...........................................................................88
5.2   Listing information ................................................................. 95

**6** SOCIAL INFORMATION AND SUSTAINABILITY ........... 97
6.1   Employees and workforce .....................................................98
6.2   Environmental matters .........................................................107
6.3   Technicolor Foundation for Cinema Heritage ...................117

**7** ADDITIONAL INFORMATION .......................................... 119
7.1   Property, Plant and Equipment ..........................................120
7.2   Memorandum and bylaws ...................................................124
7.3   Material contracts .................................................................125
7.4   Additional tax information ...................................................126
7.5   Organization of the Group ..................................................127
7.6   Documents on display .........................................................130
7.7   Information on accounting services ...................................130
7.8   Accounting fees and services .............................................131
7.9   Persons responsible for the Registration Document
      and the Annual Financial Report .......................................132

**8** FINANCIAL STATEMENTS ................................................. 133
8.1   Technicolor 2011 consolidated financial statements .........134
8.2   Notes to the consolidated financial statements .................141
8.3   Statutory Auditors' report on the Consolidated Financial
      Statements ............................................................................. 231
8.4   Technicolor sa parent company financial statements .........233
8.5   Notes to the Parent Company Financial Statements ....... 236
8.6   Parent company financial data over the five last years
      (under article R.225-102 of the French Commercial code) ..........257
8.7   Statutory auditors' report on the financial statements for the
      year ended December 31, 2011 .........................................258
8.8   Statutory Auditor's Special report on regulated agreements
      and commitments .................................................................260

**9** REGISTRATION DOCUMENT CROSS REFERENCE
TABLE ...................................................................... 261



*Société anonyme* with a share capital of €223,759,083
Registered Office: 1-5, rue Jeanne d'Arc
92130 Issy-Les-Moulineaux
Nanterre Register of Commerce and companies No. 333 773 174

# ANNUAL REPORT **2011**



This Registration document *(Document de Référence)* was filed with the *Autorité des Marchés Financiers* (AMF) on March 27, 2012 in accordance with Article 212-13 of the AMF General Regulations. It may be used in connection with a financial transaction provided it is accompanied by a transaction note *(note d'opération)* approved by the AMF. This document was prepared by the issuer and is the responsibility of the signatories thereof.

This registration document can be consulted on the website of the AMF (French version only) (www.amf-france.org) and on the website of Technicolor (www.technicolor.com).

## Cathode Ray Tubes Investigations

On November 28, 2007, Technicolor USA, Inc. (US) (formerly Thomson, Inc.) received a subpoena issued on behalf of the Antitrust Division of the U.S. Department of Justice ("DOJ") investigating alleged anticompetitive conduct in the Cathode Ray Tubes ("CRT") industry, including Color Picture Tubes ("CPT") and Color Display Tubes ("CDT") businesses.

In addition, class action law suits asserting private antitrust claims were filed in early 2008 in the United States that originally named Thomson and others as defendants, although Thomson/Technicolor was dropped as a named defendant when amended complaints were filed in the spring of 2009.

On January 9, 2008, Thomson/Technicolor received a request under art 18 (2) of Council Regulation n°1/2003 from the European Commission (the "EC") also relating to the CRT industry. Thomson/Technicolor received three further requests for information from the EC on January 16, 2009, January 19, 2009, and September 15, 2009 respectively.

Thomson/Technicolor sold its CPT business in 2005 and never had activity in the CDT business. The Company has taken measures it considers appropriate to investigate the background to, and respond to, the subpoena and the EC requests.

On November 25, 2009, Thomson/Technicolor received a Statement of Objections ("SO") from the European Commission. The SO is an intermediate step in the EC's investigation and, therefore, is not in the nature of a final decision by the EC.

On March 3, 2010, Thomson/Technicolor filed its written response to the "SO". On May 26 and 27, 2010, Thomson/Technicolor attended an Oral Hearing together with the other parties and the European Commission. Thomson/Technicolor stated that it played a minor role in the alleged anticompetitive conduct. Thomson/Technicolor also informed the European Commission about its financial situation and continues to cooperate closely with the European Commission. The EC should render its decision in 2012, but the Company considers that the timetable for the remainder of this proceeding cannot be accurately determined.

On April 29, 2010 Technicolor's Brazilian affiliate received notice from the Brazilian Ministry of Justice indicating Brazilian authorities are initiating an investigation of possible cartel activity within the CRT industry in Brazil.

The Board of Directors has conducted a thorough examination of the risk associated with these proceedings and has determined that at this stage there are too many uncertainties to assess the extent of any liability that Technicolor may incur in consequence of these investigations. Given these conditions, the criteria for establishing a reserve are not satisfied.

## Environmental matters

A certain number of Technicolor's current and previously-owned manufacturing sites have an extended history of industrial use. Soil and groundwater contamination, which occurred at some sites, may occur or be discovered at other sites in the future. Industrial emissions at sites that Technicolor has built or acquired expose the Group to remediation costs. The Group has identified certain sites at which chemical contamination has required or will require remedial measures.

Soil and groundwater contamination was detected at a former production facility in Taoyuan, Taiwan acquired in the 1987 transaction with General Electric Company and Technicolor's affiliate in Taiwan owned the facility from approximately 1988 to 1992, when it was sold to an entity outside the Group. Soil remediation was completed in 1998.

In 2002, the Taoyuan Environmental Protection Bureau ordered remediation of the groundwater underneath the former facility. The groundwater remediation process is underway.

It is Technicolor's position that General Electric Company has a contractual obligation to indemnify Technicolor with respect to certain liabilities resulting from activities that occurred prior to the 1987 agreement with General Electric. General Electric denies the existence of any such obligations to Technicolor.

To date, TCETVT has incurred approximately U.S.$11 million in remediation costs. In the class action case referenced above under "Taoyuan County Former RCA Employees' Solicitude Association", TCETVT has incurred approximately U.S.$6.3 million to date to defend the action. It is TCETVT's position that General Electric is responsible for most if not all of the costs incurred by TCETVT for both matters, including all future costs and any judgment awarded.

In addition to soil and groundwater contamination, the Group sells or has sold in the past products which are subject to recycling requirements and is exposed to changes in environmental legislation affecting these requirements in various jurisdictions.

The Group believes that the amounts reserved and the contractual guaranties provided by its contracts for the acquisition of certain production assets will enable it to reasonably cover its safety, health and environmental obligations. However, potential problems cannot be predicted with certainty and it cannot be assumed that these reserve amounts will be precisely adequate.

In addition, future developments such as changes in governments or in safety, health and environmental laws or the discovery of new risks could result in increased costs and liabilities that could have a material effect on the Group's financial condition or results of operations. Based on current information and the provisions established for the uncertainties described above, the Group does not believe it is exposed to any material adverse effects on its business, financial condition or result of operations arising from its environmental, health and safety obligations and related risks.

# **EXHIBIT C**

1   David J. Burman (admitted *pro hac vice*)
    DBurman@perkinscoie.com
2   Cori G. Moore (admitted *pro hac vice*)
    CGMoore@perkinscoie.com
3   Eric J. Weiss (admitted *pro hac vice*)
    EWeiss@perkinscoie.com
4   Nicholas H. Hesterberg (admitted *pro hac vice*)
    NHesterberg@perkinscoie.com
5   **PERKINS COIE LLP**
    1201 Third Avenue, Suite 4900
6   Seattle, WA  98101-3099
    Telephone:  206.359.8000
7   Facsimile:  206.359.9000

8   Joren S. Bass, Bar No. 208143
    JBass@perkinscoie.com
9   **PERKINS COIE LLP**
    Four Embarcadero Center, Suite 2400
10  San Francisco, CA  94111-4131
    Telephone:  415.344.7120
11  Facsimilie:  415.344.7320

12  Attorneys for Plaintiff
    COSTCO WHOLESALE CORPORATION

13

14  ~~UNITED STATES DISTRICT COURT~~

15  ~~WESTERN DISTRICT OF WASHINGTON~~

16  ~~AT SEATTLE~~ UNITED STATES DISTRICT COURT

17  NORTHERN DISTRICT OF CALIFORNIA

18

| | |
|---|---|
| 19  COSTCO WHOLESALE CORPORATION, | Master File No. 3:07-cv-05944-SC |
| 20             Plaintiff, | MDL No. 1917 |
| 21       v. | Individual Case No. 3:11-cv-06397 |
| 22  HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS | FIRST AMENDED COMPLAINT AND JURY DEMAND |

1   ELECTRONICS N.V.; PHILIPS
    ELECTRONICS NORTH AMERICA
2   CORPORATION; PHILIPS ELECTRONICS
    INDUSTRIES (TAIWAN), LTD.; PHILIPS DA
3   AMAZONIA INDUSTRIA ELECTRONICA
    LTDA.; SAMSUNG ELECTRONICS CO.,
4   LTD.; SAMSUNG ELECTRONICS AMERICA,
    INC.; SAMSUNG SDI CO., LTD.; SAMSUNG
5   SDI AMERICA, INC.; SAMSUNG SDI
    MEXICO S.A. DE C.V.;  SAMSUNG SDI
6   BRASIL LTDA.; SHENZHEN SAMSUNG SDI
    CO., LTD.; TIANJIN SAMSUNG SDI CO.,
7   LTD.; SAMSUNG SDI (MALAYSIA) SDN.
    BHD.; SAMTEL COLOR LTD.; THAI CRT
8   CO., LTD.; TOSHIBA CORPORATION;
    TOSHIBA AMERICA, INC.; TOSHIBA
9   AMERICA CONSUMER PRODUCTS, LLC;
    TOSHIBA AMERICA ELECTRONIC
10  COMPONENTS, INC.; TOSHIBA AMERICA
    INFORMATION SYSTEMS, INC.;
11  CHUNGHWA PICTURE TUBES, LTD.;
    CHUNGHWA PICTURE TUBES
12  (MALAYSIA); TATUNG COMPANY OF
    AMERICA, INC. TECHNICOLOR SA;
13  TECHNICOLOR USA, INC.; MITSUBISHI
    ELECTRIC CORPORATION; MITSUBISHI
14  DIGITAL ELECTRONICS AMERICA, INC.;
    MITSUBISHI ELECTRIC & ELECTRONICS,
15  USA, INC.

16                       Defendants.

17

18       Plaintiff Costco Wholesale Corporation brings this action for damages and injunctive

19  relief under the antitrust laws of the United States and of the states of California, Arizona,

20  Florida, Illinois, and Washington.  Costco alleges as follows based on information including the

21  pleas and prosecutions of certain Defendants and their executives as well as allegations in the

22  complaints of the direct and indirect purchaser classes and of other direct action plaintiffs,

23  allegations that were in some cases tested by motions to dismiss in MDL No. 1917.

24                              **INTRODUCTION**

25       1.      Defendants and their co-conspirators formed an international cartel that conducted a

26  conspiracy extending at a minimum from March 1, 1995, through November 25, 2007 (the

27  "Relevant Period" in terms of unlawful acts) for the purpose and to the effect of raising or

28

                                          2

maintaining prices and reducing capacity and output for cathode ray tubes ("CRTs").  The effects of the conspiracy on prices lasted into at least 2008.

2.      Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them are referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them are referred to as "CDT Products."  CDT Products and CPT Products are referred to collectively as "CRT Products."

3.      Defendants control the CRT industry, a multibillion dollar market.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.  The conspiracy was directed at the United States and was intended to substantially affect prices and supply in the United States, including prices paid by and the supply available to Plaintiff.

4.      Since the mid-1990s, the CRT industry faced significant economic pressure as customer preferences for new technologies shrank profits and threatened the industry.  To increase profitability and decrease the erosion of pricing in the CRT market, Defendants conspired to fix prices.

5.      Defendants or their agents agreed, *inter alia*, to: (a) fix target prices and price guidelines; (b) exchange enabling information on shipments, prices, production, customer demand, and other factors; (c) coordinate public statements regarding capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain customers; (i) allocate customers and each producer's share of key customers' sales; and (j) restrict output.

3

6.     The conspiracy concerning CRTs began at least as early as March of 1995 with bilateral meetings.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings and communications during the Relevant Period.  Meetings occurred in locales including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K., and Europe and included representatives from the highest levels of the companies, as well as regional managers and others.

7.     The conspiracy affected billions of dollars of commerce throughout the United States.

8.     This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.     Throughout the Relevant Period, the conspiracy moderated the normal downward pressure on prices caused by periods of oversupply, process and other efficiency gains, and technological change.  The prices of producers who were not members of the conspiracy were also higher as a result of the conspiracy than they otherwise would have been.  Defendants' conspiracy resulted in unusually long periods of higher prices and higher profits.  Even when prices declined, they declined from supra-competitive levels, rather than levels set by free and open competition, and prices declined less than they would have in a competitive market.  As a result of Defendants' unlawful conduct, Plaintiff paid higher prices for CRT Products from any source than it would have paid in a competitive market.

10.     During the Relevant Period, Costco purchased CRT Products in the United States directly and indirectly from Defendants.  Costco thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

4

**PARTIES**

**A.      Plaintiff**

11.      Plaintiff Costco Wholesale Corporation is now a Washington corporation with its principal place of business in Issaquah, Washington.  Costco operates throughout the United States and elsewhere and sold CRT Products in its warehouses and on its website, Costco.com.

12.      Costco Wholesale Corporation is the result of the combination of two companies: Costco and Price Club.  Price Club was founded in San Diego, California, in 1976, and grew to 76 United States stores by 1992, with over half in California.  Costco was founded in 1983 in Washington and by 1992 had over 90 stores nationwide, with nearly half in California.  In 1993, Costco and Price Club merged, and Price/Costco, Inc. was formed and incorporated in Delaware.  As the new name suggested, the two companies were not fully integrated for many years, and the company had two principal executive offices, in San Diego, California, and Kirkland, Washington.  Many headquarters functions continued in California during the Relevant Period.  In 1999, the company changed its name to Costco Wholesale Corporation and reincorporated in Washington.

13.      During the Relevant Period, Costco purchased in the United States large numbers of CRT Products whose prices were inflated by the conspiracy.  Costco purchased and sold more such CRT Products in California than in any other state during the Relevant Period.  Costco's negotiations for the purchase of CRT Products took place primarily in the United States, and the basic choice of vendors was made from the company's headquarters.  Decisions among approved vendors and as to volumes to purchase were made in, and Costco purchase orders were created in and issued from, regional offices located in multiple states including California, Washington, Texas, Virginia, and Georgia.  Costco issued more purchase orders for CRT Products from California than from any other state.  The purchase orders reflected the volumes affected by and incorporated the supra-competitive prices resulting from the conspiracy.  Invoices were sent to Costco in Washington, with the invoices reflecting volumes and prices specified in purchase orders issued from the regional offices.

5

14.     Costco received CRT Products at distribution centers located in states including California, Washington, Illinois, Arizona, Utah, Texas, New Jersey, Georgia, and Florida.  Costco received far more CRT Products in California than in any other state.

15.     Costco felt the effects of Defendants' conspiracy in all of its stores, as elevated prices for CRT Products reduced sales of those products in each store, and reduced store income, profits, and employment needs.

16.     Costco purchased finished products containing CRTs from some Defendants and co-conspirators, from affiliates of some Defendants and co-conspirators, from companies that have other important business arrangements with Defendants and co-conspirators, from companies that cannot bring claims of their own due to the Foreign Trade Antitrust Improvements Act, and from companies that have since gone out of business.  There is no realistic possibility that these sellers will seek to recover for the damage caused by the conspiracy, and in fact they did not seek to recover before the expiration of the statute of limitations.  Many such sellers had their United States or only headquarters or centers of operations in California and both paid overcharges there and passed them onto Costco there.

**B.     Defendants**

      **1.     Hitachi Entities**

17.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

18.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at AKS Building 5F, Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing, and sales concerned with the display business of Hitachi,

6

1  Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant

2  Period, Hitachi Displays manufactured, marketed, sold, and distributed CRT Products, either

3  directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi,

4  Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Displays relating to

5  the antitrust violations alleged in this complaint.

6       19.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company

7  with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.

8  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During

9  the Relevant Period, Hitachi America manufactured, marketed, sold, and distributed CRT

10  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

11  Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi

12  America relating to the antitrust violations alleged in this complaint.

13       20.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its

14  principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore

15  528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.

16  During the Relevant Period, Hitachi Asia manufactured, marketed, sold, and distributed CRT

17  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

18  Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi

19  Asia relating to the antitrust violations alleged in this complaint.

20       21.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware

21  corporation with its principal place of business located at 208 Fairforest Way, Greenville, South

22  Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During

23  the Relevant Period, HEDUS manufactured, marketed, sold, and distributed CRT Products, either

24  directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi,

25  Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of HEDUS

26  relating to the antitrust violations alleged in this complaint.

27       22.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

28  Shenzhen") was a Chinese company with its principal place of business located at 5001

AMENDED COMPLAINT AND JURY DEMAND
MASTER FILE NO. 3:07-CV-05944-SC | MDL No. 1917 | INDIVIDUAL CASE NO. 3:11-cv-06397

Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25 percent interest in Hitachi Shenzhen until November 8, 2007 (which was around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

23.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS, and Hitachi Shenzhen are collectively referred to as "Hitachi."

**2.     IRICO Entities**

24.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

25.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  The website also claims that in 2003, IGE was the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies, and affairs of IGE relating to the antitrust violations alleged in this complaint.

8

26.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC. In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed, and sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies, and affairs of IDDC relating to the antitrust violations alleged in this complaint.

27.     Defendants IGC, IGE, and IDDC are collectively referred to as "IRICO."

**3.     LG Electronics Entities**

28.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances, and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

29.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies, and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

9

30.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies, and affairs of LGETT relating to the antitrust violations alleged in this complaint.

31.     Defendants LGEI, LGEUSA, and LGETT are collectively referred to as "LG Electronics."

**4.     LP Displays**

32.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27 percent.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**5.     BMCC**

33.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50 percent of which is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  BMCC is the second

10

largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**6.        Philips Entities**

34.        Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Breitner Center, Amstelplein 2, Amsterdam, 1096 BC, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

35.        Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips America relating to the antitrust violations alleged in this complaint.

36.        Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

11

1   Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips

2   Taiwan relating to the antitrust violations alleged in this complaint.

3          37.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a

4   Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1

5   andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and

6   controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil

7   manufactured, marketed, sold, and distributed CRT Products, either directly or through its

8   subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and

9   controlled the finances, policies, and affairs of Philips Brazil relating to the antitrust violations

10  alleged in this complaint.

11         38.    Defendants Royal Philips, Philips America, Philips Taiwan, and Philips Brazil are

12  collectively referred to as "Philips."

13      **7.    Samsung Entities**

14         39.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company

15  with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-

16  dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.

17  During the Relevant Period, SEC manufactured, marketed, sold, and distributed CRT Products,

18  either directly or through subsidiaries or affiliates, throughout the United States.

19         40.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

20  corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

21  Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

22  Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold, and distributed

23  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

24  States.  Defendant SEC dominated and controlled the finances, policies, and affairs of Samsung

25  SEAI relating to the antitrust violations alleged in this complaint.

26         41.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company

27  ("Samsung SDI") is a South Korean company with its principal place of business located at 575

28  Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a

12

1   major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims

2   to be the world's leading company in the display and energy business, with 28,000 employees and

3   facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the

4   market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San

5   Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or

6   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

7   United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

8   Samsung SDI relating to the antitrust violations alleged in this complaint.

9          42.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

10   corporation with its principal place of business located at 3333 Michelson Drive, Suite 700,

11   Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

12   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

13   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

14   affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

15   controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

16   violations alleged in this complaint.

17          43.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a

18   Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014,

19   Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned

20   and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI

21   Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through

22   its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

23   dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to

24   the antitrust violations alleged in this complaint.

25          44.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian

26   company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito

27   Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and

28   controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI

13

Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

45.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

46.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

47.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia. Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances,

14

policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

48.      Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, Samsung SDI Malaysia and their subsidiaries and affiliates are collectively referred to as "Samsung."

### 8.      Samtel

42.49.  Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40 percent, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9.      Thai CRT

43.50.  Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10.      Toshiba Entities

44.51.  Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC consolidated its CRT business into MTPD, a joint venture with co-conspirator

15

Panasonic Corporation.  During the Relevant Period, TC manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45.52.  Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

46.53.  Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TACP relating to the antitrust violations alleged in this complaint.

47.54.  Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TAEC relating to the antitrust violations alleged in this complaint.

48.55.  Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold, and

16

1  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

2  United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TAIS

3  relating to the antitrust violations alleged in this complaint.

4      49.56.  Defendants TC, Toshiba America, TACP, TAEC, and TAIS are collectively

5  referred to as "Toshiba."

6      **11.     Chunghwa Entities**

7      50.57.  Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese

8  company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan,

9  Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974,

10  Chunghwa PT's CRTs received certification by the United States, giving the company entry into

11  that market.  Chunghwa PT's Board of Directors includes representatives from Tatung Company,

12  and its Chairman is also the Chairman and General Manager of Tatung Company.  Throughout

13  the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the

14  Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly

15  or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United

16  States.

17      51.58.  Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

18  Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

19  Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-

20  owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT

21  production, and it has established itself as one of the leading worldwide suppliers of CRTs.

22  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT

23  Products either directly or through its subsidiaries or affiliates throughout the United States.

24  Defendant Chunghwa PT dominated and controlled the finances, policies, and affairs of

25  Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

26      52.59.  Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to as

27  "Chunghwa."

28

17

1

~~12.Tatung Company of America, Inc.~~

2

~~53.Tatung Company of America, Inc. ("Tatung America") is a California~~

3
~~corporation with its principal place of business located at 2850 El Presidio~~
~~Street, Long Beach, California.  Tatung America is a subsidiary of Tatung~~

4
~~Company.  Currently, Tatung Company owns approximately half of Tatung~~

5
~~America.  The other half used to be owned by Lun Kuan Lin, the daughter of~~
~~Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's~~

6
~~death, her shares passed to her two children.  During the Relevant Period,~~

7
~~Tatung America manufactured, marketed, sold, and distributed CRT~~
~~Products manufactured by, among others, Chunghwa Picture Tubes, Ltd.,~~

8
~~either directly or through its subsidiaries or affiliates throughout the United~~

9
~~States.~~

10

**12.     Thomson Entities**

11

60.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French

12

corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-

13

Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary Thomson Consumer

14

Electronics Corporation, was a major manufacturer of CRTs for the United States market, with

15

plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs

16

internally to its television-manufacturing division, which had plants in the United States and

17

Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's

18

television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT

19

televisions were sold in the United States to consumers under the RCA brand.  In November

20

2003, Thomson SA sold its television division to a joint venture it formed with Chinese company,

21

TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-

22

Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by

23

TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA

24

brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT

25

business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured,

26

marketed, sold and/or distributed CRT Products, either directly or indirectly through its

27

subsidiaries or affiliates, to customers throughout the United States.

28

AMENDED COMPLAINT AND JURY DEMAND
MASTER FILE NO. 3:07-CV-05944-SC | MDL No. 1917 | INDIVIDUAL CASE NO. 3:11-cv-06397

61.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

62.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**13.     Mitsubishi Entities**

63.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

64.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630.

19

1   Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

2   Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

3   Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

4   and monitor manufacturing division and to other television and monitor manufacturers in the U.S.

5   and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other

6   CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

7   marketed, sold and distributed CRT Products in the United States.

8      65. Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a

9   United States corporation located at 9351 Jeronimo Road, Irvine, California, 92618.  Mitsubishi

10   Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the Relevant Period,

11   Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and

12   monitors in the United States.

13      66. Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are

14   collectively referred to herein as "Mitsubishi."

15   **C.  Agents and Co-Conspirators**

16      ~~54.~~67.  The acts alleged against Defendants in this Complaint were authorized, ordered, or

17   done by their officers, agents, employees, or representatives while actively engaged in the

18   management and operation of Defendants' businesses or affairs.

19      ~~55.~~68.  Each Defendant acted as the principal, agent, or joint venturer of, or for, other

20   Defendants with respect to the acts, violations, and course of conduct alleged by Costco.

21      ~~56.~~69.  When Plaintiff refers to a corporate family or companies by a single name in

22   allegations of participation in the conspiracy, it is to be understood that one or more employees or

23   agents of entities within the corporate family engaged in conspiratorial meetings on behalf of

24   every company in that family.  In fact, the individual participants in the conspiratorial meetings

25   and discussions did not always know the corporate affiliation of their counterparts, nor did they

26   distinguish between the entities within a corporate family.

27      ~~57.~~70.  Individual participants entered into agreements on behalf of, and reported these

28   meetings and discussions to, their respective corporate families.  As a result, the entire corporate

1    families were represented in meetings and discussions by their agents and were parties to the

2    agreements reached in them.  Furthermore, to the extent that subsidiaries within the corporate

3    families distributed CRT Products, these subsidiaries played a significant role in the conspiracy

4    because Defendants wished to ensure that the prices for such products would not undercut the

5    pricing agreements reached at these various meetings.  Thus, all entities within the corporate

6    families were active, knowing participants in the alleged conspiracy.

7         58.71.  Various persons or firms not named as Defendants participated as co-conspirators

8    in the alleged violations, performed acts, and made statements in furtherance of the conspiracy,

9    and manufactured, sold, and distributed CRT Products to customers in the United States.  These

10   co-conspirators include, but are not limited to: Panasonic Corporation (f/k/a Matsushita Electric

11   Industrial Co., Ltd.), Panasonic Corporation of North America ("PCNA"), MT Picture Display

12   Co., Ltd. (f/k/a Matsushita Toshiba Picture Display Co., Ltd.) ("MTPD"), Matsushita Electronic

13   Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia"), Videocon Industries, Ltd., Mitsubishi

14   Electric Corporation, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société

15   Anonyme, PT.MT Picture Display Indonesia, P.T. Tosummit Electronic Devices Indonesia

16   ("TEDI"), and Toshiba Display Devices (Thailand) Co., Ltd.  Plaintiff reserves the right to name

17   some or all of these and other co-conspirators as Defendants at a later date.

18                                  **JURISDICTION AND VENUE**

19         59.72.  Plaintiff brings this action to obtain injunctive relief and to recover damages,

20   including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants'

21   violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and the antitrust laws of California,

22   Washington, Arizona, Florida, and Illinois.

23         60.73.  This action arises under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and

24   26, for violations of the antitrust laws of the United States, including Section 1 of the Sherman

25   Act, 15 U.S.C. § 1.  The jurisdiction of this Court is founded on those sections and on 28 U.S.C.

26   § 1331, which provides this Court with original jurisdiction over actions arising under the laws of

27   the United States, and 28 U.S.C. § 1337, which provides this Court with original jurisdiction over

28   any action arising under federal laws regulating commerce or protecting commerce against

1   restraints and monopolies.  This Court has jurisdiction over the state law claims under 28 U.S.C.

2   § 1332 or, alternatively, 28 U.S.C. § 1367.

3        61.74.  Venue is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28

4   U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in

5   this district and a substantial portion of affected interstate commerce was carried out in this

6   district.

7        62.75.  Defendants are subject to the jurisdiction of this Court by virtue of their

8   nationwide contacts and other activities, as well as their contacts with the State of Washington.

9        63.76.  Related cases are pending in MDL No. 1917 in the Northern District of California,

10  and this matter should be consolidated there for pretrial purposes but returned to this district for

11  trial.

12                              **FACTS AND BACKGROUND**

13  **A.     CRT Technology**

14       64.77.  A CRT has three components: (a) one or more electron guns, each of which is a

15  series of metallic structures used to generate a beam of electrons; (b) a magnetic or other

16  deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that

17  phosphoresces when struck by an electron beam, thereby producing a viewable image.  A

18  faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate

19  coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow

20  mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color

21  image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red,

22  green, blue, and black.

23       65.78.  CRT technology was first developed more than a century ago.  The first

24  commercially practical CRT television was made in 1931.  However, it was not until RCA

25  Corporation introduced the product at the 1939 World's Fair that it became widely available to

26  consumers.  After that, CRTs became the heart of most display products, including televisions,

27  computer monitors, oscilloscopes, air traffic control monitors, and ATMs.

28

66.79.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

67.80.  Although there have been refinements, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

68.81.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

69.82.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.  The market for CRTs and the market for the products into which they are placed are inextricably intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are effectively inseparable.  Defendants are well aware of this intimate relationship.

70.83.  Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

71.84.  Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, non-defendant original equipment manufacturers ("OEMs") had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed, and stabilized by Defendants' conspiracy.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has suffered a direct, substantial, and reasonably foreseeable injury as a result of Defendants' conspiracy.

**B.      Structure of the CRT Industry**

72.85.  The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces, and homogeneity of products.

**1.      Market Concentration**

73.86.  During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, four held a collective 78 percent share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.      Information Sharing**

74.87.  Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

75.88.  Defendants Hitachi, Samsung, and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

24

**3.      Consolidation**

76.89.  The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 creation of MTPD.

**4.      Multiple Interrelated Business Relationships**

77.90.  The industry is marked by a web of cross-licensing agreements, joint ventures, and other cooperative arrangements that can facilitate collusion.

78.91.  Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

a.      The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

b.      Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.      The formation of the CRT joint venture MTPD in 2003.

d.      In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

e.      Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

f.      Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

25

g.      Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips.

h.      Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale, and distribution of optical storage products such as DVD drives.

i.      Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

j.      Defendant Samtel claims to have supplied CRTs to Defendants including LG Electronics, Samsung, and Philips.

**5.      High Costs of Entry Into the Industry**

~~79.~~92.  There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources, and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

~~80.~~93.  During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.  A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.      Maturity of the CRT Product Market**

~~81.~~94.  Newer industries typically are characterized by rapid growth, innovation, and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

~~82.~~95.  Demand for CRT Products was declining through most or all of the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive

26

1   arrangement more likely because it provides a greater incentive to firms to avoid price

2   competition.

3       83.96.  In addition, conventional CRT televisions and computer monitors were being

4   replaced by LCD and plasma displays.  This was one of the factors which led Defendants to

5   engage in price-fixing to slow the decline of CRT Product prices.  Between 2000 and 2006,

6   revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were

7   predicted to decline by an additional 84.5 percent between 2006 and 2010.

8       84.97.  Although demand was declining as a result of the popularity of flat-panel LCD and

9   plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant

10  display technology during most of the Relevant Period, making Defendants' collusion and the

11  international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and

12  plasma displays during the Relevant Period, a substantial market for CRT Products existed as a

13  cheaper alternative to these new technologies.

14      85.98.  In 1999, CRT monitors accounted for 94.5 percent of the retail market for

15  computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a

16  substantial share of the market.

17      86.99.  As for CRT televisions, they accounted for 73 percent of the North American

18  television market in 2004, and by the end of 2006, still held a 46 percent market share.

19      **7.    Homogeneity of CRT Products**

20      87.100.CRT Products are commodity-like products manufactured in standardized sizes.

21  One Defendant's CRT Product for a particular application, such as a particular size television set

22  or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT

23  Products primarily on the basis of price.

24      88.101.It is easier to form and sustain a cartel when the product in question is commodity-

25  like because it is easier to agree on prices to charge and to monitor those prices once an

26  agreement is formed.

27

28

1

**C.      Pre-Conspiracy Market**

2      ~~89.~~102. The genesis of the CRT conspiracy was in the late 1980s as the CRT Products

3 business became more international and Defendants began serving customers that were also being

4 served by other international companies.  During this period, the employees of Defendants would

5 encounter employees from their competitors when visiting their customers.  A culture of

6 cooperation developed over the years, and these Defendant employees would exchange market

7 information on production, capacity, and customers.

8      ~~90.~~103. In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion

9 visited each other's factories in Southeast Asia.  During this period, these producers began to

10 include discussions about price in their meetings.

11      **D.      Defendants' and Co-Conspirators' Illegal Agreements**

12      ~~91.~~104. To control and maintain profitability during declining demand for CRT Products,

13 Defendants and their co-conspirators have engaged in a conspiracy, the effect of which has been

14 to fix and maintain prices at which they sold CRTs at artificially inflated levels from at least

15 March, 1995, through at least November 25, 2007.

16      ~~92.~~105. The CRT conspiracy was effectuated through a combination of group and bilateral

17 meetings and other communications and activities.  In the formative years of the conspiracy

18 (1995-1996), bilateral discussions were the primary method of communication and took place on

19 an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG

20 Electronics and Samsung visited the other Defendant manufacturers to discuss increasing prices

21 for CRTs in general and to specific customers.  These meetings took place in Taiwan, South

22 Korea, Thailand, Japan, Malaysia, Indonesia, and Singapore.

23      ~~93.~~106. Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with Daewoo, also

24 attended several ad hoc group meetings during this period.  The participants at these group

25 meetings also discussed increasing prices for CRTs.

26      ~~94.~~107. As more manufacturers formally entered the conspiracy, group meetings became

27 more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic

28

AMENDED COMPLAINT AND JURY DEMAND
MASTER FILE NO. 3:07-CV-05944-SC | MDL No. 1917 | INDIVIDUAL CASE NO. 3:11-cv-06397

fashion, and a formal system of multilateral and bilateral meetings was put in place.  Defendants' representatives attended hundreds of these meetings during the Relevant Period.

95.108.The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1.    "Glass Meetings"

96.109.The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three levels of Defendants' corporations.

97.110.The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

98.111.The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

99.112.Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

100.113.     The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants.

101.114.     Glass meetings also occurred occasionally in European countries.  Attendees at these meetings included those Defendants and co-conspirators that had subsidiaries and manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), and IRICO, and Thomson.  Chunghwa also attended these meetings.

102.115.     Representatives of Defendants also attended what were known in the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

103.116.     During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia, and the United States.

104.117.     Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales, and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

105.118.     The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the

30

following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

106.119.        During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

107.120.        Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

108.121.        Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on.

109.122.        The agreements reached at the glass meetings included:

        a.        agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges, and price guidelines;

        b.        placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

31

c. agreements on pricing for intra-company CRTs sales to vertically integrated customers;

d. agreements as to what to tell customers about the reason for a price increase;

e. agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f. agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe, and India;

g. agreements to exchange pertinent information regarding shipments, capacity, production, prices, and customer demands;

h. agreements to coordinate uniform public statements regarding available capacity and supply;

i. agreements to allocate both overall market shares and share of a particular customer's purchases;

j. agreements to allocate customers;

k. agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l. agreements to keep their meetings secret.

110.123.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal

32

1    customers; and 4) a recognition of a mutual interest in living up to the target price and living up to

2    the agreements that had been made.

3        111.124.        As market conditions worsened in 2005-2007, and the rate of replacement

4    of CRT Products by LCDs increased, the group glass meetings became less frequent and bilateral

5    meetings again became more prevalent.  In addition, in December 2006 the DOJ issued

6    subpoenas to manufacturers of LCDs and so the CRT co-conspirators began to have concerns

7    about antitrust liability.

8        **2.    Bilateral Discussions**

9        112.125.        Throughout the Relevant Period, the glass meetings were supplemented by

10   bilateral discussions between various Defendants.  The bilateral discussions were more informal

11   than the group meetings and occurred on a frequent, ad hoc basis, often between the group

12   meetings. These discussions, usually between sales and marketing employees, took the form of

13   in-person meetings, telephone contacts and emails.

14       113.126.        During the Relevant Period, in-person bilateral meetings took place in

15   Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand,

16   Brazil, and Mexico, and the United States.

17       114.127.        The purpose of the bilateral discussions was to exchange information about

18   past and future pricing, confirm production levels, share sales order information, confirm pricing

19   rumors, and coordinate pricing with manufacturers in other geographic locations, including

20   Brazil, Mexico, and Europe, and the United States.

21       115.128.        To ensure the efficacy of their global conspiracy, Defendants also used

22   bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, and Mexico, and the

23   United States.  These Brazilian and Mexican CRT manufacturers were particularly important

24   because they served the North American market for CRT Products.  North America was the

25   largest market for CRT televisions and computer monitors during the Relevant Period.  Because

26   these Brazilian and Mexican manufacturers are all wholly-owned and controlled subsidiaries of

27   Defendants, they adhered to the unlawful price-fixing agreements.  In this way, Defendants

28

33

AMENDED COMPLAINT AND JURY DEMAND
MASTER FILE NO. 3:07-CV-05944-SC | MDL No. 1917 | INDIVIDUAL CASE NO. 3:11-cv-06397

1    ensured that prices of all CRTs imported intosold in the United States were fixed, raised,

2    maintained, and stabilized at supracompetitive levels.

3        116.129.        Defendants also used bilateral discussions with each other during price

4    negotiations with customers to avoid being persuaded by customers to cut prices.  The

5    information gained in these communications was then shared with supervisors and taken into

6    account in determining the price to be offered.

7        117.130.        Bilateral discussions were also used to coordinate prices with CRT

8    manufacturers that did not ordinarily attend the group meetings.  It was often the case that in the

9    few days following a top or management meeting, the attendees at these group meetings would

10   meet bilaterally with the other Defendant manufacturers for the purpose of communicating

11   whatever CRT pricing and output agreements had been reached during the meeting.  For example,

12   Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing

13   agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for

14   communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral

15   communications with Thomson in Europe and the United States, and Samsung SDI had regular

16   communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was

17   responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba, and Samtel

18   implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics, and Thai CRT.

19   Sometimes Hitachi and Toshiba also attended the glass meetings.

20       **3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral**
21            **Discussions**

22       118.131.        Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd.,

23   Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in several glass meetings.

24   These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged

25   in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through

26   these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively

27   withdrew from this conspiracy.

28

119.132.      Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

120.133.      Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE, and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

121.134.      Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

122.135.      Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

123.136.      Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

35

1    were attended by the highest ranking executives from LP Displays.  Certain of these high level

2    executives from LP Displays had previously attended meetings on behalf of Defendants LG

3    Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.

4    Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

5         137.    Between at least 1996 and 2003, co-conspirator Panasonic, through Panasonic

6    Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003,

7    Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.

8    These meetings were attended by high level sales managers from Panasonic and MTPD.

9    Panasonic also engaged in multiple bilateral discussions with the Defendants.  Through these

10   discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively

11   withdrew from this conspiracy.

12        138.    PCNA was represented at those meetings and was a party to the agreements

13   entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers,

14   it played a significant role in the conspiracy because Defendants and their co-conspirators wished

15   to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT

16   pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing

17   participant in the alleged conspiracy.

18        139.    Between at least 2003 and 2006, co-conspirator MTPD participated in multiple

19   glass meetings and in fact led many of these meetings during the latter years of the conspiracy.

20   These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in

21   bilateral discussions with the Defendants.  Through these discussions, MTPD agreed on prices

22   and supply levels for CRTs.

23        ~~124.~~140.    Between at least 1998 and 2007, Defendant BMCC participated in multiple

24   glass meetings.  These meetings were attended by high level sales managers from BMCC.

25   BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other

26   Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply

27   levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was

28

1    mandated by the Chinese government.  BMCC was acting to further its own independent private

2    interests in participating in the alleged conspiracy.

3        125.141.        Between at least 1996 and 2001, Defendant Philips, through Royal Philips

4    and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips

5    participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a

6    LP Displays).  A substantial number of these meetings were attended by high level executives

7    from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.

8    Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never

9    effectively withdrew from this conspiracy.

10       126.142.        Defendants Philips America and Philips Brazil were represented at those

11   meetings and were a party to the agreements entered at them.  To the extent Philips America and

12   Philips Brazil sold or distributed CRT Products to direct purchasers, they played a significant role

13   in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by

14   direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.

15   Thus, Philips America and Philips Brazil were active, knowing participants in the alleged

16   conspiracy.

17       143.    Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung

18   SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin, participated in

19   at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by

20   the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions

21   with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed

22   on prices and supply levels for CRTs.

23       125.144.        Defendants SEAI, Samsung SDI America, Samsung SDI Brazil, and

24   Samsung SDI Mexico wereas represented at those meetings and wereas a party to the agreements

25   entered at them.  To the extent SEC and SEAI sold or distributed CRT Products, they played a

26   significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

27   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the

28

glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

128.145.      Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

129.146.      Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

147.    Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

148.    Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

130.149.      Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT, and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD.  These meetings were attended by high level sales managers from

38

1    Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other

2    Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and

3    supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

4    131.150.    Defendants Toshiba America, TACP, TAEC, and TAIS were represented

5    at those meetings and were a party to the agreements entered at them.  To the extent Toshiba

6    America, TACP, TAEC, and TAIS sold or distributed CRT Products to direct purchasers, they

7    played a significant role in the conspiracy because Defendants wished to ensure that the prices for

8    CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached

9    at the glass meetings.  Thus, Toshiba America, TACP, TAEC, and TAIS were active, knowing

10   participants in the alleged conspiracy.

11   132.151.    Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa

12   PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and

13   Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these

14   meetings were attended by the highest ranking executives from Chunghwa, including the former

15   Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions

16   with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa

17   agreed on prices and supply levels for CRTs.

18   133.Defendant Tatung America was represented at those meetings and was a party to the

19   agreements entered at them.  To the extent Tatung America sold or distributed CRT Products to

20   direct purchasers, it played a significant role in the conspiracy because Defendants wished to

21   ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT

22   pricing agreements reached at the glass meetings.  Thus, Tatung America was an active, knowing

23   participant in the alleged conspiracy.

24   134.152.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics,

25   Orion, and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number

26   of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also

27   engaged in bilateral discussions with other Defendants on a regular basis.  Through these

28   discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with

39

1   Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.

2   Daewoo never effectively withdrew from this conspiracy.

3   ~~135.~~153.        When Plaintiff refers to a corporate family or companies by a single name

4   in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more

5   employees or agents of entities within the corporate family engaged in conspiratorial meetings on

6   behalf of every company in that family.  In fact, the individual participants in the conspiratorial

7   meetings and discussions did not always know the corporate affiliation of their counterparts, nor

8   did they distinguish between the entities within a corporate family.  The individual participants

9   entered into agreements on behalf of, and reported these meetings and discussions to, their

10  respective corporate families.  As a result, the entire corporate family was represented in meetings

11  and discussions by their agents and was a party to the agreements reached in them.

12  **E.      The CRT Market During the Conspiracy**

13  ~~136.~~154.        Until the last few years of the CRT conspiracy, CRTs were the dominant

14  technology used in displays, including televisions and computer monitors.  During the Relevant

15  Period, this translated into the sale of millions of CRT Products, generating billions of dollars in

16  annual profits.

17  ~~137.~~155.        During the Relevant Period, North America was the largest market for

18  CRT TVs and computer monitors.

19  **F.      International Government Antitrust Investigations**

20  ~~138.~~156.        Defendants' conspiracy to fix, raise, maintain, and stabilize the prices of,

21  and restrict output for, CRTs sold in the United States during the Relevant Period, is

22  demonstrated by a multinational investigation commenced by the Antitrust Division of the United

23  States Department of Justice ("DOJ").

24  ~~139.~~157.        Separately, the European Commission and Japan and South Korea's Fair

25  Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being

26  sold in Europe and Asia.

27  ~~140.~~158.        In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is

28  also being investigated by the [European] Commission and/or the U.S. Department of Justice for

40

1  potential violations of competition laws with respect to semiconductors, LCD products, cathode

2  ray tubes (CRT) and heavy electrical equipment."

3  141.159.          On May 6, 2008, the Hungarian Competition Authority ("HCA")

4  announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The anti-competitive behaviour may have concerned the exchange
> of sensitive market information (about prices, volumes sold,
> demand and the extent to which capacities were exploited), price-
> fixing, the allocation of market shares, consumers and volumes to
> be sold, the limitation of output and coordination concerning the
> production. The undertakings evolved a structural system and
> functional mechanism of cooperation.

9  142.160.          On February 10, 2009, the DOJ issued a press release announcing that a

10  federal grand jury in San Francisco had that same day returned a two-count indictment against the

11  former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for

12  his participation in global conspiracies to fix the prices of two types of CRTs used in computer

13  monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the

14  Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release

15  further notes that Lin had previously been indicted for his participation in a conspiracy to fix the

16  prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the

17  prices of CRTs was carried out, in part, in California.

18  143.161.          On August 19, 2009, the DOJ issued a press release announcing that a

19  federal grand jury in San Francisco had returned a one-count indictment against Wu Jen Cheng

20  a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type

21  of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of

22  Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been

23  indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's

24  indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in

25  part, in California.

26  144.162.          On March 30, 2010, the DOJ issued a press release announcing that a

27  federal grand jury in San Francisco had that same day returned a one-count indictment against

28  Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of

41

1    CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former

2    director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The

3    indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in

4    part, in California.

5    145.163.    On November 9, 2010, the DOJ issued a press release announcing that a

6    federal grand jury in San Francisco had that same day returned a one-count indictment against

7    Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S.

8    Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used

9    in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives

10   from two color display tube (CDT) manufacturing companies."  The indictment states that the

11   combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

12   146.164.    On March 18, 2011, the DOJ issued a press release announcing that it had

13   reached an agreement with Samsung SDI in which it would plead guilty and pay a $32 million

14   fine for its role in a conspiracy to fix prices of CDTs.  Samsung SDI admitted that from at least as

15   early as January 1997 until at least as late as March 2006, it participated in a conspiracy among

16   major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the

17   United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the

18   conspiracy were carried in California.  The plea agreement of Samsung SDI requires that it

19   cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws

20   involving the manufacture or sale of CDTs and CPTs.

21   165.    On December 5, 2012, the European Commission announced that it had fined

22   seven international corporate families a total of over €1.4 billion for their two-decade-long effort

23   to fix prices, share markets, restrict output, and allocate customers between themselves in the

24   CRT market.  The companies fined by the European Commission included Chunghwa, LG

25   Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly

26   Thomson).  The Commission Vice President in charge of competition policy said, "These cartels

27   for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive

28   behavior that are strictly forbidden to companies doing business in Europe."  The press release

42

1  accompanying the fines further notes that the CRT cartels were "among the most organised

2  cartels that the Commission has investigated."

3  146.

4  147.166.        Several Defendants also have a history of "cooperation" and

5  anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S.

6  Department of Justice in October 2005 for participating in a conspiracy to fix the prices of

7  Dynamic Random Access Memory ("DRAM").

8  148.167.        Defendants Samsung and Toshiba have acknowledged being contacted by

9  the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static

10  Random Access Memory ("SRAM") and NAND Flash Memory.

11  149.168.        In December 2006, government authorities in Japan, Korea, the European

12  Union and the United States revealed a comprehensive investigation into anticompetitive conduct

13  in the closely-related TFT-LCD market.

14  150.169.        On November 12, 2008, the DOJ announced that it had reached agreements

15  with three LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display

16  America, Inc.), Sharp Corporation, and Chunghwa—to plead guilty to violations of Section 1 of

17  the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in

18  a conspiracy to fix prices of TFT-LCD panels.

19  151.170.        On March 10, 2009, the DOJ announced that it had reached an agreement

20  with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to

21  violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role

22  in a conspiracy to fix the prices of LCD panels.

23  **151.**

24  **H.G.   The Role of Trade Associations During the Relevant Period**

25  152.171.        Defendants' collusive activities have been furthered by trade associations

26  and trade events that provided opportunities to conspire and share information.  One example is

27  the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004,

28

43

by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

153.172.      Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

154.173.      The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun, and H.C. Kim of Samsung and S.T. Kim, S. Trinker, and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

155.174.      Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition, the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

156.175.      Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

44

1    I.H.    **Effects of the Conspiracy**

2       157.176.    The conspiracy has had the following effects, among others:

3          a.    Price competition in the sale of CRTs by Defendants and their co-
                 conspirators has been restrained, suppressed, and eliminated throughout the
4                United States;

5          b.    Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have
                 been raised, fixed, maintained, and stabilized at artificially high and
6                noncompetitive levels throughout the United States; and

7          c.    Plaintiff has been deprived of the benefit of free and open competition in
                 the purchase of CRT Products.

8

9       158.177.    During the Relevant Period, while demand in the United States for CRT

10   Products continued to decline, Defendants' conspiracy was effective in moderating the normal

11   downward pressures on prices for CRT Products caused by the entry and popularity of the new

12   generation LCD panels and plasma display products.

13      159.178.    As a direct and proximate result of the unlawful conduct of Defendants,

14   Plaintiff has been injured in its business and property in that they paid more for CRT Products

15   than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

16                              **FRAUDULENT CONCEALMENT**

17      160.179.    Costco had neither actual nor constructive knowledge of the facts

18   supporting its claim for relief despite diligence in trying to discover the pertinent facts.  Costco

19   did not discover, and could not have discovered through the exercise of reasonable diligence, the

20   existence of the conspiracy alleged herein until at least late November 2007, when investigations

21   by the United States and other antitrust authorities became widely reported.  Defendants' secret

22   conspiracy did not give rise to facts that would put Costco on inquiry notice that there was a

23   conspiracy to fix the prices of CRT Products.

24      161.180.    Because Defendants' conspiracy was kept secret, Plaintiff was unaware of

25   Defendants' unlawful conduct and did not know that it was paying artificially high prices for

26   CRT Products.

27      162.181.    The affirmative acts of Defendants alleged herein, including acts in

28   furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

                                             45

precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

163.182.        Defendants' price-fixing conspiracy was inherently self-concealing.

164.183.        Plaintiff could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conspiracy.  The conspiracy was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

165.184.        As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

166.185.        Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

167.186.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a CNET News.com article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

168.187.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

169.188.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

170.189.    In addition, when several CRT manufacturers, including Defendants Samsung, Philips, and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells used for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

171.190.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

172.191.    Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

173.192.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

*AMERICAN PIPE***, GOVERNMENT ACTION,
AND CROSS-JURISDICTIONAL TOLLING**

193.    As discussed at length in Paragraphs 158-72 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Costco's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

194.    Costco's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

195.    As shown by Costco's allegations in Paragraphs 1 and 10 and the following causes of action, Costco was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

~~173.~~

**FIRST CAUSE OF ACTION**
**(Violation of Section 1 of the Sherman Act)**

~~174.~~196.    Plaintiff realleges and incorporates by reference, as if fully set forth, the allegations in paragraphs 1 through 173 above.

~~175.~~197.    Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

~~176.~~198.    In particular, Defendants combined and conspired to raise and maintain prices of CRT Products sold to Costco and others in or intended for the United States.

48

177.199.      As a result of Defendants' unlawful conduct, prices for CRT Products were raised or maintained in the United States.

178.200.      The contract, combination, or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

179.201.      For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including: (a) participating in meetings and conversations to discuss the prices and supply of CRT Products; (b) communicating in writing and orally to fix target prices, floor prices, price ranges, and capacity and output for CRT Products; (c) agreeing to manipulate prices and supply of CRT Products in a manner that deprived purchasers of free and open competition; (d) issuing price announcements and price quotations in accordance with the agreements reached; (e) selling CRT Products to customers in the United States at noncompetitive prices; (f) exchanging competitively sensitive information in order to facilitate their conspiracy; (g) agreeing to maintain or lower production capacity; and (h) providing false statements to the public to explain increased prices for CRT Products.

180.202.      As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

**SECOND CAUSE OF ACTION**
**(Violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*)**

181.203.      Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 180 above.

182.204.      Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*

49

183.205.     As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

184.206.     Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.  Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.  Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

### THIRD CAUSE OF ACTION
#### (Violation of the Washington Consumer Protection Act, RCW 19.86.030)

185.207.     Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 184 above.

186.208.     Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the Washington Consumer Protection Act, RCW 19.86.030.

187.209.     As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

188.210.     Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.  Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.  Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

50

**FOURTH CAUSE OF ACTION**
**(Violation of the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*)**

189.211.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 188 above.

190.212.    Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the the of the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*

191.213.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

192.214.    Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.  Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.  Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

**FIFTH CAUSE OF ACTION**
**(Violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Stat.**
**§ 501.201, *et seq.*)**

193.215.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 192 above.

194.216.    Defendants and their co-conspirators engaged in unfair competition in violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.*

195.217.    Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRT Panels as described above.

51

AMENDED COMPLAINT AND JURY DEMAND
MASTER FILE NO. 3:07-CV-05944-SC | MDL No. 1917 | INDIVIDUAL CASE NO. 3:11-cv-06397

1    ~~196.~~218.        Defendants' and their co-conspirators' acts, omissions, misrepresentations,

2    practices, and non-disclosures are unfair, unconscionable, unlawful, and fraudulent independently

3    of whether they constitute a violation of the Sherman Act.

4    ~~197.~~219.        Defendants' and their co-conspirators' acts are fraudulent or deceptive.

5    ~~198.~~220.        As a result of Defendants' unlawful conduct, Costco was injured in its

6    business and property in that it paid more for CRT Products than it otherwise would have paid in

7    the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

8    ~~199.~~221.        Even CRT Product manufacturers who were not part of the conspiracy

9    charged higher prices than they otherwise would have when they were forced to pay supra-

10   competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their

11   customers, including Costco, overcharges caused by Defendants' and their co-conspirators'

12   conspiracy.  Costco was not able to pass on to its customers all of the overcharge caused by the

13   conspiracy.  Thus, Costco suffered injury whenever it purchased CRT Products that incorporated

14   panels made by Defendants and their co-conspirators.

15                           **SIXTH CAUSE OF ACTION**
16              **(Violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*)**

17   ~~200.~~222.        Plaintiff realleges and incorporates by reference, as if fully set forth herein,

18   the allegations in paragraphs 1 through 209 above.

19   ~~201.~~223.        Defendants and their co-conspirators entered into a continuing contract,

20   combination, or conspiracy to unreasonably restrain trade and commerce in violation of the the of the

21   Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*

22   ~~202.~~224.        As a result of Defendants' unlawful conduct, Costco was injured in its

23   business and property in that it paid more for CRT Products than it otherwise would have paid in

24   the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

25   ~~203.~~225.        Even CRT Product manufacturers who were not part of the conspiracy

26   charged higher prices than they otherwise would have when they were forced to pay supra-

27   competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their

28   customers, including Costco, overcharges caused by Defendants' and their co-conspirators'

52

conspiracy. Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Costco demands a trial by jury as to all issues so triable in this action.

## RELIEF

Costco requests that the Court enter judgment on its behalf that:

A. Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, the Washington Consumer Protection Act, R.C.W. 19.86, the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*, the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.*, and the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

B. Costco shall recover damages sustained by it, as provided by the state and federal antitrust laws, in an amount to be trebled in accordance with such laws, jointly and severally against each Defendant;

C. Defendants, their subsidiaries, affiliates, successors, transferees, and assignees, and their officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the alleged combination, conspiracy, or agreement;

D. Costco shall be awarded pre-judgment and post-judgment interest at the highest legal rate from the date of the initial direct purchaser complaint;

E. Costco shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

1         F.     Costco shall recover such other and further relief as the Court deems just.

2    DATED:                          By: _____

3                                 David J. Burman #10611(admitted *pro hac vice*)

                             Cori G. Moore (admitted *pro hac vice*)#28649

4                                 Noah G. Purcell #43492Eric J. Weiss (admitted *pro hac vice*)

5                                 Nicholas H. Hesterberg (admitted *pro hac vice*)#41970

6                                 **PERKINS COIE LLP**

                             **Perkins Coie LLP**

7                                 1201 Third Avenue, Suite 4800

                             Seattle, WA  98101-3099

8                                 Telephone:  206.359.8000

                             Facsimile:  206.359.9000

9                                 Email:  DBurman@perkinscoie.com

                                         CGMoore@perkinscoie.com

10                                            NPurcellEWeiss@perkinscoie.com

                                         NHesterberg@perkinscoie.com

11

12                                Joren S. Bass, Bar No. 208143

                             **PERKINS COIE LLP**

13                                Four Embarcadero Center, Suite 2400

                             San Francisco, CA  94111-4131

14                                Telephone:  415.344.7120

                             Facsimilie:  415.344.7320

15                                Email:  JBass@perkinscoie.com

16                                Attorneys for Plaintiff

                             COSTCO WHOLESALE CORPORATION

17

18

19   LEGAL25416835.5

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT AND JURY DEMAND
MASTER FILE NO. 3:07-CV-05944-SC | MDL No. 1917 | INDIVIDUAL CASE NO. 3:11-cv-06397

# **EXHIBIT D**

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
Roman M. Silberfeld, Bar No. 62783
RMSilberfeld@rkmc.com
David Martinez, Bar No. 193183
DMartinez@rkmc.com
2049 Century Park East, Suite 3400
Los Angeles, CA  90067-3208
Telephone:    310-552-0130
Facsimile:    310-229-5800

Attorneys for Plaintiffs
BEST BUY CO., INC.; BEST BUY PURCHASING
LLC; BEST BUY ENTERPRISE SERVICES, INC.;
BEST BUY STORES, L.P.; BESTBUY.COM,
L.L.C.; and MAGNOLIA HI-FI, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEST BUY CO., INC.; BEST BUY PURCHASING LLC; BEST BUY ENTERPRISE SERVICES, INC.; BEST BUY STORES, L.P.; BESTBUY.COM, L.L.C.; and MAGNOLIA HI-FI, ~~INC.~~LLC, | Case No.  Master File No. 3:07-cv-05944-SC |
| | MDL No. 1917 |
| | Individual Case No. 3:11-cv-05513-SC |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA | |

Left margin (vertical): ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

CORPORATION; PHILIPS
ELECTRONICS INDUSTRIES
(TAIWAN), LTD.; PHILIPS DA
AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMTEL
COLOR LTD.; THAI CRT CO., LTD.;
TOSHIBA CORPORATION; TOSHIBA
AMERICA, INC.; TOSHIBA AMERICA
CONSUMER PRODUCTS, LLC;
TOSHIBA AMERICA ELECTRONIC
COMPONENTS, INC.; TOSHIBA
AMERICA INFORMATION SYSTEMS,
INC.; CHUNGHWA PICTURE TUBES,
LTD.; CHUNGHWA PICTURE TUBES
(MALAYSIA); TATUNG COMPANY OF
AMERICA, INC.; THOMSON SA;
TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC
CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA,
INC.; MITSUBISHI ELECTRIC &
ELECTRONICS, USA, INC.,
Defendants.

Plaintiffs, Best Buy Co., Inc.; Best Buy Purchasing LLC; Best Buy Enterprise Services, Inc.; Best Buy Stores, L.P.; BestBuy.com, L.L.C.; and Magnolia Hi-Fi, Inc.LLC (collectively "Plaintiffs" or "Best Buy"), for their Complaint against all Defendants named herein, hereby allege as follows:

I.   **INTRODUCTION**

1.      Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2.      Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   containing them shall be referred to as "CDT Products."  CDT Products and CPT Products shall be

2   referred to collectively herein as "CRT Products."

3       3.      Defendants control the majority of the CRT industry, a multibillion dollar market,

4   which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant

5   Period, virtually every household in the United States owned at least one CRT Product.

6       4.      Since the mid-1990s, the CRT industry faced significant economic pressures as

7   customer preferences for other emerging technologies shrank profits and threatened the

8   sustainability of the industry.  In order to maintain price stability, increase profitability, and

9   decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

10   contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

11   States.

12       5.      With respect to CRTs, Defendants or their agents agreed, *inter alia*, to:  (a) fix

13   target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments,

14   prices, production and customer demand; (c) coordinate public statements regarding available

15   capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some

16   of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the

17   agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales;

18   (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit

19   competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of

20   certain key customers' sales; and (k) restrict output.

21       6.      The conspiracy concerning CRTs commenced with bilateral meetings that began

22   in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995,

23   the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings

24   had become more formalized, as described in greater detail below.  There were at least 500

25   conspiracy meetings during the Relevant Period, including hundreds of group meetings and

26   hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan,

27   South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These

28   meetings included representatives from the highest levels of the respective companies, as well as

1   regional managers and others.

2       7.      During the Relevant Period, the conspiracy affected billions of dollars of

3   commerce throughout the United States.

4       8.      This conspiracy is being investigated by the United States Department of Justice

5   ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by

6   the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes,

7   Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco

8   on February 10, 2009.  Since then, five more individuals have been indicted in connection with

9   Defendants' CRT price-fixing conspiracy.

10      9.      During the Relevant Period, Plaintiffs purchased CRT Products in the United

11  States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and

12  affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.

13  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to

14  recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased

15  during the Relevant Period.

16  **II.    JURISDICTION AND VENUE**

17      10.     Plaintiffs bring this action to obtain injunctive relief under Section 16 of the

18  Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton

19  Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1

20  of the Sherman Act (15 U.S.C. § 1).

21      11.     Plaintiffs also bring this action pursuant to the Minnesota Antitrust Act of 1971

22  because Plaintiffs purchased in Minnesota CRT Products from both Defendants and non-

23  Defendant vendors containing price-fixed CRTs manufactured by Defendants.

24      12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the

25  Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

26  supplemental jurisdiction over Plaintiffs' state law claim under 28 U.S.C. § 1367 because they

27  arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiffs' state law

28  claims are so related to their claims under Section 1 of the Sherman Act that they form part of the

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

- 4 -

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    same case or controversy.

2        13.    The activities of Defendants and their co-conspirators, as described herein,

3    involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did

4    have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import

5    trade or commerce.  This effect gives rise to Plaintiffs' antitrust claims.  During the Relevant

6    Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.

7    In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected

8    the price of CRT Products purchased by Plaintiffs.

9        14.    This court has jurisdiction over each Defendant named in this action.  Defendants

10   and their co-conspirators purposely availed themselves of the laws of the United States as they

11   manufactured CRT Products for sale in the United States, or CRTs which were incorporated into

12   CRT Products Defendants and their co-conspirators knew would be sold to customers in the

13   United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT

14   Products in the United States.

15       15.    Venue is proper in the Northern District of California under Section 12 of the

16   Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien

17   corporation, transacts business in this District, or is otherwise found within this District.  In

18   addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

19   events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

20   conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into

21   this District.

22   **III.    PARTIES**

23       **A.    Plaintiffs**

24       16.    Plaintiff Best Buy Co., Inc. is a Minnesota corporation with its headquarters and

25   principal place of business in Richfield, Minnesota.  Prior to 2004, Best Buy Co., Inc. operated

26   retail stores throughout the United States and sold CRT Products in those stores.

27       17.    Plaintiff Best Buy Purchasing LLC is a Minnesota Limited Liability Company and

28   Plaintiff Best Buy Enterprise Services, Inc. is a Minnesota corporation with their headquarters and

principal places of business in Richfield, Minnesota.

18.     Plaintiff Best Buy Stores, L.P. is a Virginia Limited Partnership with its headquarters and principal place of business in Richfield, Minnesota.  Best Buy Stores, L.P. operates retail stores throughout the United States and sells CRT Products in those stores.

19.     Plaintiff BestBuy.com, L.L.C. is a Virginia Limited Liability Company with its headquarters and principal place of business in Richfield, Minnesota.  BestBuy.com, L.L.C. is a wholly-owned subsidiary of Best Buy Stores, L.P. and operates Best Buy's retail online store.

20.     During the Relevant Period, Best Buy Purchasing LLC, Best Buy Enterprise Services, Inc. and/or Best Buy Co., Inc. negotiated for the purchase of, purchased, and paid for CRT Products for Plaintiff Best Buys Stores, L.P. and BestBuy.com, L.L.C.  These negotiations, purchasing and payments took place out of Best Buy's principal place of business and headquarters in Richfield, Minnesota.

21.     Plaintiff Magnolia Hi-Fi, ~~Inc.~~LLC ("MHF") is a wholly-owned subsidiary of Best Buy Co., Inc. with its headquarters in Kent, Washington, and has done business as Magnolia Home Theater and Magnolia Audio Video.  MHF is a specialty consumer electronic retailer that operates several Magnolia Audio Video standalone stores along the west coast and the greater Chicago area, and several Magnolia Home Theater stores located within Best Buy stores.  During the Relevant Time Period, MHF's purchasing of CRT Products took place in its headquarters in Kent Washington.

22.     During the Relevant Period, Best Buy purchased CRT Products directly and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Best Buy suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.

23.     Those products were kept as inventory and sold in Minnesota and every other state where Best Buy retail stores were located, and over the internet throughout the United States.

24.     As a result of the Best Buy Plaintiffs' presence, purchases, and sales in Minnesota, and the substantial business they conduct in and with entities in Minnesota, Plaintiffs are entitled to the protection of the Sherman Act and the antitrust laws of Minnesota.

- 6 -                                  FIRST AMENDED COMPLAINT

1

2          B.      **Defendants**

3                  1.      **Hitachi Entities**

4          25.      Defendant Hitachi, Ltd. is a Japanese company with its principal place of business

5   at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent

6   company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share

7   for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured,

8   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

9   affiliates, throughout the United States.

10         26.      Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with

11  its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.

12  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City,

13  Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and

14  sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate

15  company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured,

16  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

17  affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the

18  finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this

19  Complaint.

20         27.      Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company

21  with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.

22  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During

23  the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT

24  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

25  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi

26  America relating to the antitrust violations alleged in this complaint.

27         28.      Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its

28  principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore

- 7 -

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this Complaint.

29.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this Complaint.

30.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this Complaint.

31.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

### 2.     IRICO Entities

32.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.

IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

33.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this Complaint.

34.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC. In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this Complaint.

35.     Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

**3.     LG Electronics Entities**

36.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

37.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey  07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this Complaint.

38.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this Complaint.

39.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

**4.     LP Displays**

40.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and

a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**5.    Panasonic Entities**

41.    Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

42.    Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this Complaint.

43.    Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

44.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold

2  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout

3  the United States.

4     45. Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese

5  company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi

6  Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by

7  Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China

8  National Electronics Import & Export Beijing Company (a China state-owned enterprise), and

9  Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned

10  enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing

11  facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During

12  the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either

13  directly or through its subsidiaries or affiliates, throughout the United States.

14      **6.** **Philips Entities**

15     46. Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics

16  ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2,

17  1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's

18  largest electronics companies, with 160,900 employees located in over 60 countries.  Royal

19  Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its

20  CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP

21  Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT

22  Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment

23  and said it would not inject further capital into the venture.  During the Relevant Period, Royal

24  Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through

25  its subsidiaries or affiliates, throughout the United States.

26     47. Defendant Philips Electronics North America Corporation ("Philips America") is a

27  Delaware corporation with its principal place of business located at 1251 Avenue of the Americas,

28  New York, New York  10020-1104.  Philips America is a wholly-owned and controlled subsidiary

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured,

2  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

3  affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the

4  finances, policies and affairs of Philips America relating to the antitrust violations alleged in this

5  Complaint.

6         48.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a

7  Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street,

8  Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.

9  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT

10  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

11  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips

12  Taiwan relating to the antitrust violations alleged in this Complaint.

13         49.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a

14  Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1

15  andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and

16  controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil

17  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

18  subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and

19  controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations

20  alleged in this Complaint.

21         50.    Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are

22  collectively referred to herein as "Philips."

23         **7.**    **Samtel**

24         51.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal

25  place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.

26  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest

27  exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada,

28  Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

2  subsidiaries and affiliates, throughout the United States.

3          **8.**     **Thai CRT**

4       52.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26

5  Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement

6  Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

7  televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

8  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

9  United States.

10          **9.**     **Toshiba Entities**

11       53.     Defendant Toshiba Corporation ("TC") is a Japanese company with its principal

12  place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001,

13  TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer

14  monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-

15  Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.

16  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002,

17  TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the

18  entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured,

19  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

20  affiliates, throughout the United States.

21       54.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation

22  with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New

23  York, New York  10020.  Toshiba America is a wholly-owned and controlled subsidiary of

24  Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold

25  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout

26  the United States.  Defendant TC dominated and controlled the finances, policies and affairs of

27  Toshiba America relating to the antitrust violations alleged in this Complaint.

28       55.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.

2   TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.

3   During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT

4   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

5   Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the

6   antitrust violations alleged in this Complaint.

7          56.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

8   California corporation with its principal place of business located at 19900 MacArthur Boulevard,

9   Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of

10  Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured,

11  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

12  affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

13  policies and affairs of TAEC relating to the antitrust violations alleged in this Complaint.

14         57.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California

15  corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California

16  92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through

17  Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or

18  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

19  United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS

20  relating to the antitrust violations alleged in this Complaint.

21         58.    Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively

22  referred to herein as "Toshiba."

23              **10.    Chunghwa Entities**

24         59.    Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese

25  company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan,

26  Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974,

27  Chunghwa PT's CRTs received certification by the United States, giving the company entry into

28  that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT

1   manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed

2   CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou

3   subsidiary) throughout the United States.

4         60.    Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

5   Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

6   Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-

7   owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT

8   production, and it has established itself as one of the leading worldwide suppliers of CRTs.

9   During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT

10  Products either directly or through its subsidiaries or affiliates throughout the United States.

11  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa

12  Malaysia relating to the antitrust violations alleged in this Complaint.  Defendants Chunghwa PT

13  and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

14        **11.    Tatung Company of America, Inc.**

15        Tatung Company of America, Inc. ("Tatung America") is a California corporation with its

16  principal place of business located at 2850 El Presidio Street, Long Beach, California.  Tatung

17  America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately

18  half of Tatung America.  The other half used to be owned by Lun Kuan Lin, the daughter of

19  Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her share

20  passed to her two children.  During the Relevant Period, Tatung America manufactured, marketed,

21  sold and/or distributed CRT Products manufactured by, among others, Chunghwa Picture Tubes,

22  Ltd., either directly or through its subsidiaries or affiliates throughout the United States.

23        **12.    Thomson Entities**

24        61.    Defendant Thomson SA (n/k/a Technicolor SA) ("Thomson SA") is a French

25  corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-

26  Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary Thomson Consumer

27  Electronics Corporation, was a major manufacturer of CRTs for the United States market, with

28  plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  internally to its television-manufacturing division, which had plants in the United States and

2  Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's

3  television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT

4  televisions were sold in the United States to consumers under the RCA brand.  In November 2003,

5  Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL

6  Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-

7  Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by

8  TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA

9  brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT

10  business to Videocon.  During the Relevant Period, Thomson SA manufactured, marketed, sold

11  and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates,

12  to customers throughout the United States.

13          62.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.)

14  ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business

15  located at 10330 N Meridian St., Indianapolis, IN 46290-1024.  Thomson Consumer Electronics is

16  a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major

17  manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania,

18  Marion, Indiana and Mexicali, Mexico.  The United States-based plants were closed in 2004.

19  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing

20  division, which had plants in the United States and Mexico, and to other television manufacturers

21  in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to

22  United States consumers under the RCA brand.  Thomson Consumer Electronics' television

23  business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.

24  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or

25  distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to

26  customers throughout the United States.

27          63.     Thomson SA and Thomson Consumer Electronics are collectively referred to

28  herein as "Thomson."

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**12.     Mitsubishi Entities**

64.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

65.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630. Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

66.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.  Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

67.     Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

61.

**IV.     AGENTS AND CO-CONSPIRATORS**

62. 68.   The acts alleged against Defendants in this Complaint were authorized, ordered, or

- 18 -                                    FIRST AMENDED COMPLAINT

done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

63.69.  Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

64.70.  Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company, Samsung SDI America, Inc., Samsung SDI Mexico S.A. de C.V., Samsung SDI Brasil Ltda., Shenzhen Samsung SDI Co., Ltd., Tianjin Samsung SDI Co., Ltd., Samsung SDI (Malaysia) Sdn. Bhd., Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia, Videocon Industries, Ltd., and Toshiba Display Devices (Thailand) Co., Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

65.71.  Co-conspirator Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

66.72.  Co-conspirator Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey  07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this Complaint.

67.73.  Co-conspirator Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this Complaint.

68.74.  Co-conspirator Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California  92612.  Samsung America is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this Complaint.

69.75.  Co-conspirator Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating

to the antitrust violations alleged in this Complaint.

70.76.  Co-conspirator Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this Complaint.

71.77.  Co-conspirator Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this Complaint.

72.78.  Co-conspirator Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this Complaint.

73.79.  Co-conspirator Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this Complaint.

74.80.  Co-conspirators SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

75.81.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

76.82.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

77.83.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia

was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this Complaint.

78.84.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this Complaint.

79.85.  Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this Complaint.

80.86.  The acts charged in this Complaint have been done by Defendants and their Co-

FIRST AMENDED COMPLAINT

conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendants' or Co-conspirators' business or affairs.

**V.    TRADE AND COMMERCE**

~~81.~~87.  During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

~~82.~~88.  During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

~~83.~~89.  The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in Minnesota and caused antitrust injuries in Minnesota.

**VI.    FACTUAL ALLEGATIONS**

**A.    CRT Technology**

~~84.~~90.  A CRT has three components:  (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

~~85.~~91.  CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

computer monitors, oscilloscopes, air traffic control monitors and ATMs.

86.92.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

87.93.  Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

88.94.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

89.95.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

90.96.  The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

91.97.  Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRT Products containing price-fixed CRTs and their purchases of CRT Products containing price-fixed CRTs indirectly from non-Defendant original equipment manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs bought CRT Products, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRT Products.

92.98.  Plaintiffs have participated in the market for products containing CRTs.  To the extent Plaintiffs indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiffs were not able to pass the inflated prices on to their customers.

93.99.  Plaintiffs have been injured by paying supra-competitive prices for CRT Products.

**B.      Structure of the CRT Industry**

94.100.      The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.      Market Concentration**

95.101.      During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Co-Conspirators Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.      Information Sharing**

96.102.      Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

97.103.      Defendants Hitachi, and Chunghwa and Co-conspirator Samsung are all members of the Society for Information Display.  Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Co-conspirator Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their Co-

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  Conspirators used these trade associations as vehicles for discussing and agreeing upon their

2  pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary

3  and competitively sensitive information which they used to implement and monitor the

4  conspiracy.

### 3.    Consolidation

6  ~~98.~~104.         The CRT industry also had significant consolidation during the Relevant

7  Period, including but not limited to:  (a) the creation of LGPD in 2001, which was a joint venture

8  involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and

9  Panasonic's CRT businesses into MTPD.

### 4.    Multiple Interrelated Business Relationships

11  ~~99.~~105.         The industry is marked by a web of cross-licensing agreements, joint

12  ventures and other cooperative arrangements that can facilitate collusion.

13  ~~100.~~106.         Examples of the high degree of cooperation among Defendants in both the

14  CRT Product market and other closely related markets include the following:

15          a.   The formation of the CRT joint venture LGPD in 2001 by Defendants LG

16               Electronics and Philips.

17          b.   Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd.

18               n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of

19               manufacturing TFT-LCD panels.

20          c.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba

21               and Panasonic.

22          d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display

23               Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-

24               LCD panels.

25          e.   In December 1995, Defendant Toshiba partnered with Orion and two other non-

26               Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

27          f.   Defendant Toshiba and Orion also signed a cooperative agreement relating to

28               LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.   Defendant Chunghwa has a joint venture with Co-conspirator Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Co-conspirator Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Philips, Panasonic, and Co-conspirator Samsung.

**5.   Highest Costs of Entry Into the Industry**

~~101.~~107.   There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

~~102.~~108.   During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.  A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.   The Maturity of the CRT Product Market**

~~103.~~109.   Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

104.110.     Demand for CRT Products was declining throughout the Relevant Period. Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

105.111.     In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

106.112.     Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

107.113.     In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

108.114.     As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

**7.     Homogeneity of CRT Products**

109.115.     CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiffs purchased CRT Products primarily on the basis of price.

110.116.     It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once

1  an agreement is formed.

2        C.      **Pre-Conspiracy Market**

3        ~~111.~~117.       The genesis of the CRT conspiracy was in the late 1980s as the CRT

4  Products business became more international and Defendants began serving customers that were

5  also being served by other international companies.  During this period, the employees of

6  Defendants would encounter employees from their competitors when visiting their customers.  A

7  culture of cooperation developed over the years and these Defendant employees would exchange

8  market information on production, capacity and customers.

9        ~~112.~~118.       In the early 1990s, representatives from Samsung, Daewoo, Chunghwa,

10 and Orion visited each other's factories in Southeast Asia.  During this period, these producers

11 began to include discussions about price in their meetings.

12       D.      **Defendants' and Co-Conspirators' Illegal Agreements**

13       ~~113.~~119.       In order to control and maintain profitability during declining demand for

14 CRT Products, Defendants and their co-conspirators have engaged in a contract, combination,

15 trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at

16 which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least

17 November 25, 2007.

18       ~~114.~~120.       The CRT conspiracy was effectuated through a combination of group and

19 bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions

20 were the primary method of communication and took place on an informal, ad hoc basis.  During

21 this period, representatives from Daewoo and Defendants LG Electronics and Co-conspirator

22 Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT,

23 Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific

24 customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia,

25 Indonesia and Singapore.

26       ~~115.~~121.       Samsung, LG, Mitsubishi, and Chunghwa, along with and Daewoo, also

27 attended several ad hoc group meetings during this period.  The participants at these group

28 meetings also discussed increasing prices for CRTs.

116.122.       As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

117.123.       The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1. "Glass Meetings"

118.124.       The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' and Co-conspirator' corporations.

119.125.       The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

120.126.       The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

121.127.       Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   met in Korea, the Chinese in China, and so on.

2   ~~122.~~128.     The Chinese glass meetings began in 1998 and generally occurred on a

3   monthly basis following a top or management level meeting.  The China meetings had the

4   principal purpose of reporting what had been decided at the most recent glass meetings to the

5   Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located

6   in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants

7   and Co-conspirators, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen,

8   Samsung SDI Tianjin, and Chunghwa.

9   ~~123.~~129.     Glass meetings also occurred occasionally in various European countries.

10  Attendees at these meetings included those Defendants and Co-conspirators which had

11  subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics,

12  LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of

13  Daewoo) ~~and~~ IRICO, and Thomson.  Chunghwa also attended these meetings.

14  ~~124.~~130.     Representatives of Defendants also attended what were known amongst

15  members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The

16  green meetings were generally attended by top and management level employees of Defendants.

17  ~~125.~~131.     During the Relevant Period, glass meetings took place in Taiwan, South

18  Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, ~~and~~ Malaysia, and the United

19  States.

20  ~~126.~~132.     Participants would often exchange competitively sensitive information

21  prior to a glass meeting.  This included information on inventories, production, sales and exports.

22  For some such meetings, where information could not be gathered in advance of the meeting, it

23  was brought to the meeting and shared.

24  ~~127.~~133.     The glass meetings at all levels followed a fairly typical agenda.  First, the

25  participants exchanged competitive information such as proposed future CRT pricing, sales

26  volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts

27  of sales volumes for coming months.  The participants also updated the information they had

28  provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who

would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

128.134.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

129.135.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured CRT Products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid supracompetitive prices for CRTs.

130.136.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

131.137.    The agreements reached at the glass meetings included:

    a.  agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    b.  placing agreed-upon price differentials on various attributes of CRTs, such as

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  quality or certain technical specifications;

2  c.  agreements on pricing for intra-company CRTs sales to vertically integrated

3  customers;

4  d.  agreements as to what to tell customers about the reason for a price increase;

5

6  e.  agreements to coordinate with competitors that did not attend the group meetings

7  and agreements with them to abide by the agreed-upon pricing;

8  f.  agreements to coordinate pricing with CRT manufacturers in other geographic

9  markets such as Brazil, Europe and India;

10  g.  agreements to exchange pertinent information regarding shipments, capacity,

11  production, prices and customers demands;

12  h.  agreements to coordinate uniform public statements regarding available capacity

13  and supply;

14  i.  agreements to allocate both overall market shares and share of a particular

15  customer's purchases;

16  j.  agreements to allocate customers;

17  k.  agreements regarding capacity, including agreements to restrict output and to audit

18  compliance with such agreements; and

19  l.  agreements to keep their meetings secret.

20  ~~132.~~138.      Efforts were made to monitor each Defendant's adherence to these

21  agreements in a number of ways, including seeking confirmation of pricing both from customers

22  and from employees of Defendants themselves.  When cheating did occur, it was addressed in at

23  least four ways:  1) monitoring; 2) attendees at the meetings challenging other attendees if they did

24  not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers;

25  and 4) a recognition of a mutual interest in living up to the target price and living up to the

26  agreements that had been made.

27  ~~133.~~ As market conditions worsened in 2005-2007, and the rate of replacement of CRT

28  Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral

- 34 -

1   meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas

2   to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about

3   antitrust issues.

4

5              **2.      Bilateral Discussions**

6   ~~134.~~139.      Throughout the Relevant Period, the glass meetings were supplemented by

7   bilateral discussions between various Defendants.  The bilateral discussions were more informal

8   than the group meetings and occurred on a frequent, ad hoc basis, often between the group

9   meetings. These discussions, usually between sales and marketing employees, took the form of in-

10  person meetings, telephone contacts and emails.

11  ~~135.~~140.      During the Relevant Period, in-person bilateral meetings took place in

12  Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand,

13  Brazil,~~, and~~ Mexico, and the United States.

14  ~~136.~~141.      The purpose of the bilateral discussions was to exchange information about

15  past and future pricing, confirm production levels, share sales order information, confirm pricing

16  rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil,

17  Mexico, ~~and~~ Europe, and the United States.  .

18  ~~137.~~142.      In order to ensure the efficacy of their global conspiracy, Defendants also

19  used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, ~~and~~ Mexico, and

20  the United States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These

21  ~~Brazilian and Mexican~~CRT manufacturers were particularly important because they served the

22  North American market for CRT Products.  As further alleged herein, North America was the

23  largest market for CRT televisions and computer monitors during the Relevant Period.  Because

24  these ~~Brazilian and Mexican~~ manufacturers are all wholly-owned and controlled subsidiaries of

25  Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.  In

26  this way, Defendants ensured that prices of all CRTs ~~imported into~~sold in the United States were

27  fixed, raised, maintained and/or stabilized at supracompetitive levels.

28  ~~138.~~143.      Defendants also used bilateral discussions with each other during price

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  negotiations with customers to avoid being persuaded by customers to cut prices.  The information

2  gained in these communications was then shared with supervisors and taken into account in

3  determining the price to be offered.

4

5  139.144.    Bilateral discussions were also used to coordinate prices with CRT

6  manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi,

7  Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or

8  management meeting, the attendees at these group meetings would meet bilaterally with the other

9  Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output

10  agreements had been reached during the meeting.  For example, Samsung had a relationship with

11  Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG

12  Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing

13  agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in

14  Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.

15  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT

16  pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing

17  as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also

18  attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the

19  conspiracy to fix prices of CRTs.

20          **3.    Defendants' and Co-Conspirators' Participation in Group and
                    Bilateral Discussions**

21

22  140.145.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd.,

23  Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These

24  meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in

25  multiple bilateral discussions with other Defendants, particularly with Co-conspirator Samsung.

26  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never

27  effectively withdrew from this conspiracy.

28  141.146.    Defendants Hitachi America and HEDUS were represented at those

- 36 -

1    meetings and were a party to the agreements entered at them.  To the extent Hitachi America and

2    HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role

3    in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by

4    direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.

5    Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

6        ~~142.~~147.        Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and

7    IDDC, participated in multiple glass meetings.  These meetings were attended by the highest

8    ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other

9    Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO

10   agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in

11   connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its

12   own independent private interests in participating in the alleged conspiracy.

13       ~~143.~~148.        Between at least 1995 and 2001, Defendant LG Electronics, through LGEI

14   and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics

15   participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP

16   Displays).  A substantial number of these meetings were attended by the highest ranking

17   executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of

18   the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and

19   supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

20       ~~144.~~149.        Defendant LGEUSA was represented at those meetings and was a party to

21   the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it

22   played a significant role in the conspiracy because Defendants wished to ensure that the prices for

23   CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached

24   at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged

25   conspiracy.

26       ~~145.~~150.        Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD)

27   participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

28   were attended by the highest ranking executives from LP Displays.  Certain of these high level

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

1  executives from LP Displays had previously attended meetings on behalf of Defendants LG

2  Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.

3  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

4  146.151.        Between at least 1996 and 2003, Defendant Panasonic, through Panasonic

5  Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003,

6  Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.

7  These meetings were attended by high level sales managers from Panasonic and MTPD.

8  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these

9  discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively

10  withdrew from this conspiracy.

11  147.152.        PCNA was represented at those meetings and was a party to the

12  agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct

13  purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that

14  the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

15  agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the

16  alleged conspiracy.

17  148.153.        Between at least 2003 and 2006, Defendant MTPD participated in multiple

18  glass meetings and in fact led many of these meetings during the latter years of the conspiracy.

19  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in

20  bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices

21  and supply levels for CRTs.

22  149.154.        Between at least 1998 and 2007, Defendant BMCC participated in multiple

23  glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC

24  also engaged in multiple bilateral discussions with other Defendants, particularly the other

25  Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply

26  levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated

27  by the Chinese government.  BMCC was acting to further its own independent private interests in

28  participating in the alleged conspiracy.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

150.155.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

151.156.    Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

152.157.    Between at least 1995 and 2007, Co-conspirator Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

153.158.    Co-conspirators SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

154.159.    Between at least 1998 and 2006, Defendant Samtel participated in multiple

- 39 -

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

160.   Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

161.   Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.

162.   Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

~~155.~~

~~156.~~163.   Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this

2   conspiracy.

3   ~~157.~~164.       Defendants Toshiba America, TACP, TAEC and TAIS were represented at

4   those meetings and were a party to the agreements entered at them.  To the extent Toshiba

5   America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they

6   played a significant role in the conspiracy because Defendants wished to ensure that the prices for

7   CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached

8   at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing

9   participants in the alleged conspiracy.

10   ~~158.~~165.       Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa

11   PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland,

12   participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

13   were attended by the highest ranking executives from Chunghwa, including the former Chairman

14   and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each

15   of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on

16   prices and supply levels for CRTs.

17   ~~159.   Defendant Tatung America was represented at those meetings and was a party to~~

18   ~~the agreements entered at them.  To the extent Tatung America sold and/or distributed CRT~~

19   ~~Products to direct purchasers, it played a significant role in the conspiracy because Defendants~~

20   ~~wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut~~

21   ~~the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America was an active,~~

22   ~~knowing participant in the alleged conspiracy.~~

23   ~~160.~~166.       Between at least 1995 and 2004, Daewoo, through Daewoo Electronics,

24   Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of

25   these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also

26   engaged in bilateral discussions with other Defendants on a regular basis.  Through these

27   discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with

28   Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.

Daewoo never effectively withdrew from this conspiracy.

161.167.    When Plaintiffs refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.    The CRT Market During the Conspiracy**

162.168.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

163.169.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue(billion US dollars)[1] | Average Selling Price Per Unit |
|------|------------------------|--------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

164.170.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials*, Fuji Chimera Research, 1997, p.12.

---

[1] Estimated market value of CRT units sold.

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

165.171.       Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

166.172.       In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

167.173.       In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

168.174.       After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

169.175.       A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

170.176.       A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

171.177.        Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

172.178.        For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiffs were informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

173.179.        During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

174.180.        During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

175.181.        These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.        International Government Antitrust Investigations**

176.182.        Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Department of Justice ("DOJ").

177.183.     Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

178.184.     In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

179.185.     On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007.  The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production.  The undertakings evolved a structural system and functional mechanism of cooperation.
>
> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007.  The coordination concerning the Hungarian market allegedly formed part of the European coordination.  Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

180.186.     On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.187.     On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

182.188.     On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

183.189.     On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the

combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

184.190.     On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Co-conspirator Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

185.191.     Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere. Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers. During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

192.     The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

193.     On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

186.

187.194.     As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  businesses in the electronics industry.

2  188.195.      Several Defendants also have a history of "cooperation" and

3  anticompetitive conduct.  For example, Co-conspirator Samsung was fined $300 million by the

4  U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of

5  Dynamic Random Access Memory ("DRAM").

6  189.196.      Defendant Toshiba and Co-conspirator Samsung have acknowledged being

7  contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of

8  Static Random Access Memory ("SRAM") and NAND Flash Memory.

9  190.197.      In December 2006, government authorities in Japan, Korea, the European

10  Union and the United States revealed a comprehensive investigation into anticompetitive conduct

11  in the closely-related TFT-LCD market.

12  191.198.      On December 12, 2006, news reports indicated that Co-conspirator

13  Samsung and Defendant Chunghwa, as well as an LCD joint venture between Defendants Philips

14  and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-

15  LCDs.

16  192.199.      On November 12, 2008, the DOJ announced that it had reached agreements

17  with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display

18  America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of

19  the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in

20  a conspiracy to fix prices of TFT-LCD panels.

21  193.200.      On March 10, 2009, the DOJ announced that it had reached an agreement

22  with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to

23  violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in

24  a conspiracy to fix the prices of TFT-LCD panels.

25  194.201.      The plea agreements of LG Display Co., Ltd., Sharp Corporation,

26  Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of

27  TFT-LCDs was carried out, in part, in California.

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

## G. The Role of Trade Associations During the Relevant Period

195.202. Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information. One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers. Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea. EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC"). In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

196.203. Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

197.204. The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007. Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

198.205. Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

199.206. Through these trade association and trade events, and in meetings related to

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

### H.    Effects of Defendants' Antitrust Violations

#### 1.    Examples of Reductions in Manufacturing Capacity by Defendants

200.207.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

201.208.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

202.209.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

203.210.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

204.211.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

205.212.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

#### 2.    Examples of Collusive Pricing for CRTs

206.213.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

207.214.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

208.215.     In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

209.216.     Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to conceal the conspiracy.

210.217.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

211.218.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

212.219.     After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

213.220.     On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India. This price hike was falsely attributed exclusively to a shortage of glass needed

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

to manufacture CRTs.

214.221.    Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

215.222.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**I.    Summary Of Effects Of The Conspiracy Involving CRTs**

216.223.    The above combination and conspiracy has had the following effects, among others:

    a.    Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b.    Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.    Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRT Products.

    d.    As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

**VII.    PLAINTIFFS' INJURIES**

217.224.    As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels. Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

218.225. Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their Co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy. The conspiracy artificially inflated the prices of CRTs included in CRT Products.

219.226. Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product. Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiffs.

220.227. The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately. Defendants are well aware of this intimate relationship.

221.228. Throughout the Relevant Period, Defendants controlled the market for CRTs. Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

222.229. As a result, Plaintiffs were injured in connection with their purchases of CRT Products during the Relevant Period.

**VIII.  FRAUDULENT CONCEALMENT**

223.230. Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein. Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a

conspiracy to fix the prices of CRTs.

224.231.    Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRT Products.

225.232.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

226.233.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

227.234.    Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

228.235.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

229.236.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

230.237.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

231.238.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

232.239.    In addition, when several CRT manufacturers, including Defendant Philips and LG Electronics and Co-Conspirator Samsung, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

233.240.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

234.241.    Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

242.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this Complaint.

## IX.    *AMERICAN PIPE*, GOVERNMENT ACTION AND CROSS-JURISDICTIONAL TOLLING

243.    As discussed at length in Paragraphs 182-201 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009 through the present.  Best Buy's direct claims for violation of the Sherman Act have been tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

244.    As shown by Best Buy's allegations in Paragraphs 20, 21 & 22 above and 252 and 259 below, Plaintiffs were members of Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago Inc. v. Chunghwa Picture Tubes*, No. 3:07-cv-05944-SC  (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007)

- Direct Purchaser Plaintiffs' Consolidated Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009)

245.    Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of these Direct Purchaser Class Actions asserted against Defendants, and commencing on at least November 26, 2007 until Best Buy opted out on November 14, 2011. [2]

235.

## IX. X.   CLAIM FOR VIOLATIONS

### First Claim for Relief

---

[2] *See, e.g., Tosti v. City of Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1985); *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 U.S. Dist. LEXIS 125203, at 54 (C.D. Cal. May 5, 2011); *Jenson v. Allison-Williams Co.*, 1999 U.S. Dist. LEXIS 22170, at 18-19 (S.D.Cal. Aug. 23, 1999); *Cullen v. Margiotta*, 811 F.2d 698, 718-721 (2d Cir. 1987); *In re Linerboard Antitrust Litig.*, 223 F.R.D. 335, 341 (E.D. Pa. 2004); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1528-29 (M.D. Fla. 1989); *Bartlett v. Miller and Schroder Municipals, Inc.*, 355 N.W.2d 435, 439 (Minn. Ct. App. 1984); *Carson v. Independent School Dist. No.* 623, 392 N.W.2d 216, 223 (Minn. 1986).

**(Violation of Section 1 of the Sherman Act)**

236.246.        Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

237.247.        Beginning no later than March 1, 1995, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

238.248.        In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

239.249.        As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

240.250.        The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

241.251.        For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.  participating in meetings and conversations to discuss the prices and supply of CRTs;

    b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.  issuing price announcements and price quotations in accordance with the agreements reached;

    e.  selling CRTs to customers in the United States at noncompetitive prices;

    f.  exchanging competitively sensitive information in order to facilitate their

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

conspiracy;

    g.   agreeing to maintain or lower production capacity; and

    h.   providing false statements to the public to explain increased prices for CRTs.

242.252.     As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

<u>**Second Claim for Relief**</u>

**(Violation of Minnesota Antitrust Act of 1971, Minn. Stat. § 325D.52, *et seq*.)**

243.253.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

244.254.     Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.* Defendants conspired to and did fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.

245.255.     The aforesaid violations of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*., consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

246.256.     For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.   to fix, raise, maintain and stabilize the price of CRTs;

    b.   to allocate markets for CRTs amongst themselves;

    c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

d.  to allocate among themselves the production of CRTs.

~~247.~~247. 257.     The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

a.  price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

b.  prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.  those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

~~248.~~258.     As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRT Products they purchased during the Relevant Period.

~~249.~~259.     As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*., Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees.

## ~~X.~~XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging and decreeing that:

A.     Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*., and that Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.     Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against

FIRST AMENDED COMPLAINT

the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.      Defendants engaged in a contract, combination, and conspiracy in violation of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.*, and Plaintiffs were injured in their business and property as a result of Defendants' violations;

D.      Plaintiffs shall recover damages sustained by them, as provided by Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.*, and a joint and several judgment in favor of Plaintiffs shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

E.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F.      Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

G.      Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

H.      Plaintiffs shall receive such other or further relief as may be just and proper.

## ~~XI.~~XII.      JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

DATED:                                          **ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

By: _____
      Roman M. Silberfeld
      David Martinez

Attorneys for Plaintiffs
BEST BUY CO., INC.; BEST BUY PURCHASING
LLC; BEST BUY ENTERPRISE SERVICES, INC.;
BEST BUY STORES, L.P.; BESTBUY.COM,
L.L.C.; and MAGNOLIA HI-FI, ~~INC.~~LLC

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

# **EXHIBIT E**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

INTERBOND CORPORATION OF AMERICA,

_____

          Plaintiff,

_____

v.

HITACHI, LTD.; HITACHI DISPLAYS, LTD.;
HITACHI AMERICA, LTD.; HITACHI ASIA,
LTD.; HITACHI ELECTRONIC DEVICES (USA),
INC.; SHENZHEN SEG HITACHI COLOR
DISPLAY DEVICES, LTD.; IRICO GROUP
CORPORATION; IRICO GROUP ELECTRONICS
CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.;
LG ELECTRONICS, INC.; LG ELECTRONICS
USA, INC.; LG ELECTRONICS TAIWAN TAIPEI
CO., LTD.; LP DISPLAYS INTERNATIONAL
LTD.; PANASONIC CORPORATION;
PANASONIC CORPORATION OF NORTH
AMERICA; MT PICTURE DISPLAY CO., LTD.;
BEIJING MATSUSHITA COLOR CRT CO., LTD.;
KONINKLIJKE PHILIPS ELECTRONICS N.V.;
PHILIPS ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS DA
AMAZONIA INDUSTRIA ELECTRONICA
LTDA.; SAMSUNG ELECTRONICS CO., LTD.;
SAMSUNG ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
AMERICA, INC.; SAMSUNG SDI MEXICO S.A.
DE C.V.;  SAMSUNG SDI BRASIL LTDA.;
SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
(MALAYSIA) SDN. BHD.; SAMTEL COLOR
LTD.; THAI CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER PRODUCTS,
LLC; TOSHIBA AMERICA ELECTRONIC
COMPONENTS, INC.; TOSHIBA AMERICA
INFORMATION SYSTEMS, INC.; CHUNGHWA
PICTURE TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA); TATUNG COMPANY OF
AMERICA, INC.

_____

          Defendants.

_____

CASE NO. _____

COMPLAINT

JURY TRIAL DEMANDED

STUART H. SINGER (*Pro hac vice*)
BOIES, SCHILLER, & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011

Facsimile: (954) 356-0022
Email: ssinger@bsfllp.com
_____

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiff Interbond Corporation of America*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 11-cv-06275 |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 11-cv-06275 | MDL No. 1917 |
| INTERBOND CORPORATION OF AMERICA., d/b/a BrandsMart USA | **AMENDED COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

USA, INC.; LG ELECTRONICS TAIWAN
TAIPEI CO., LTD.; LP DISPLAYS
INTERNATIONAL LTD.; PANASONIC
CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA;
MT PICTURE DISPLAY CO., LTD.;
BEIJING MATSUSHITA COLOR CRT CO.,
LTD.; KONINKLIJKE PHILIPS
ELECTRONICS N.V.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS
DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG
SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.;  SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG
SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA PICTURE
TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA); TECHNICOLOR
SA; TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC CORPORATION;
MITSUBISHI DIGITAL ELECTRONICS
AMERICA, INC.; MITSUBISHI ELECTRIC
& ELECTRONICS, USA, INC.,

Defendants.

Plaintiff   Interbond   Corporation   of   America,   d/b/a   BrandsMart   USA
("BrandsMart") for its Complaint against all Defendants named herein, hereby alleges as
follows:

I.    **INTRODUCTION**

1.    Defendants and their co-conspirators formed an international cartel which
conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,
through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

1    conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2          2.      Defendants are or were among the leading manufacturers of: (a) color

3    picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

4    tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

5    devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

6    purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

7    to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

8    and the products containing them shall be referred to as "CDT Products."  CDT Products and

9    CPT Products shall be referred to collectively herein as "CRT Products."

10          3.      Defendants control the majority of the CRT industry, a multibillion dollar

11    market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

12    Relevant Period, virtually every household in the United States owned at least one CRT Product.

13          4.      Since the mid-1990s, the CRT industry faced significant economic

14    pressures as customer preferences for other emerging technologies shrank profits and threatened

15    the sustainability of the industry.  In order to maintain price stability, increase profitability, and

16    decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

17    contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

18    States.

19          5.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

20    fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*,

21    shipments, prices, production and customer demand; (c) coordinate public statements regarding

22    available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

23    among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

24    on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

25    overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic

26    areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

27    producer's share of certain key customers' sales; and (k) restrict output.

28          6.      The conspiracy concerning CRTs commenced with bilateral meetings that

began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.    <u>JURISDICTION AND VENUE</u>

10.      Plaintiff brings this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.      Plaintiff also brings this action pursuant to Section 501.211 of the Florida

1  Statutes, for declaratory relief and damages that Plaintiff sustained due to Defendants' and their

2  co-conspirators violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§

3  501.201, *et seq.* ("FDUTPA").

4          12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of

5  the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

6  supplemental jurisdiction over Plaintiff's FDUTPA claims under 28 U.S.C. § 1367 because they

7  arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law

8  claims are so related to its claim under Section 1 of the Sherman Act that they form part of the

9  same case or controversy.

10          13.     The activities of Defendants and their co-conspirators, as described herein,

11  involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

12  did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and

13  import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the

14  Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the

15  United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and

16  substantially affected the price of CRT Products purchased by Plaintiff in Florida.

17          14.     This court has jurisdiction over each Defendant named in this action under

18  Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely

19  availed themselves of the laws of the United States as they manufactured CRT Products for sale

20  in the United States, or CRTs which were incorporated into CRT Products Defendants and their

21  co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-

22  conspirators' conspiracy affected this commerce in CRT Products in the United States.

23          15.     Venue is proper in the Southern District of Florida under Section 12 of the

24  Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien

25  corporation, transacts business in this District, or is otherwise found within this District.   In

26  addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

27  events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

28  conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

1  into this District.

2  **III.    PARTIES**

3      **A.    Plaintiff**

4          16.    Plaintiff BrandsMart is a Florida corporation with its corporate

5  headquarters in Hollywood, Florida.  BrandsMart was incorporated in 1977 with the opening of

6  its first retail location in Miami, Florida.  Through the conclusion of Defendants' and the co-

7  conspirators' conspiracy, BrandsMart was a supplier of consumer electronics products and

8  services with 11 stores in Florida and Georgia.  In fiscal year 2010, BrandsMart sold $725

9  million of products and services.

10          17.    During the Relevant Period, BrandsMart purchased CRT Products directly

11  and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any

12  agents the Defendants or Defendants' subsidiaries and affiliates controlled.  As such, BrandsMart

13  suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.  Throughout the

14  Relevant Period, BrandsMart conducted a substantial amount of business in Florida.

15          18.    During the Relevant Period, BrandsMart's negotiations for the purchase

16  of CRT Products took place in the United States and were controlled by a department based at

17  the company's headquarters in Florida.  In addition, BrandsMart's purchase orders for CRT

18  Products were issued from Florida, all invoices for CRT Products were sent to BrandsMart in

19  Florida, and all payments for CRT Products were made by BrandsMart from Florida.

20  BrandsMart employees based in Florida were also responsible for selecting vendors and product

21  lines with respect to CRT Products.

22      **B.    Defendants**

23          **1.    Hitachi Entities**

24          19.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of

25  business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

26  parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

27  market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd.

28  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

1    subsidiaries or affiliates, throughout the United States.

2         20.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

3    company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

4    297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

5    in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

6    manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

7    create a separate company called Hitachi Displays.   During the Relevant Period, Hitachi

8    Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

9    through its subsidiaries or affiliates, throughout the United States.   Defendant Hitachi, Ltd.

10   dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

11   antitrust violations alleged in this complaint.

12        21.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

13   company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

14   York 10591.   Hitachi America is a wholly-owned and controlled subsidiary of Defendant

15   Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

16   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

17   United States.   Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

18   affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

19        22.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

20   with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,

21   Singapore 528736.   Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant

22   Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or

23   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

24   United States.   Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

25   affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

26        23.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a

27   Delaware corporation with its principal place of business located at 208 Fairforest Way,

28   Greenville, South Carolina 29607.   HEDUS is a subsidiary of Defendant Hitachi, Ltd and

1   Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or
2   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the
3   United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the
4   finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this
5   complaint.

6          24.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi
7   Shenzhen") was a Chinese company with its principal place of business located at 5001
8   Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at
9   least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally
10   around the time that the government investigations into the CRT industry began).  Thus, Hitachi
11   Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the
12   Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold
13   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,
14   throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and
15   controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust
16   violations alleged in this complaint.

17          25.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia,
18   HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

19          **2.**    **IRICO Entities**

20          26.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with
21   its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province
22   712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture,
23   marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC
24   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its
25   subsidiaries or affiliates, throughout the United States.

26          27.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese
27   company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi
28   Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

1    CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website

2    also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

3    and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

4    IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

5    subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

6    the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

7    complaint.

8           28.    Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

9    company with its principal place of business located at No. 16, Fenghui South Road West,

10   District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned

11   subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant

12   Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

13   through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

14   and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

15   alleged in this complaint.

16          29.    Defendants IGC, IGE and IDDC are collectively referred to herein as

17   "IRICO."

18          **3.    LG Electronics Entities**

19          30.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under

20   the laws of the Republic of Korea with its principal place of business located at LG Twin

21   Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5

22   billion global force in consumer electronics, home appliances and mobile communications,

23   which established its first overseas branch office in New York in 1968.  The company's name

24   was changed from Gold Star Communications to LGEI in 1995, the year in which it also

25   acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint

26   venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays

27   ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to

28   LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold

1   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

2   throughout the United States.

3          31.   Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware

4   corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs,

5   New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.

6   During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT

7   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

8   Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

9   to the antitrust violations alleged in this complaint.

10          32.   Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a

11   Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road,

12   NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of

13   Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed,

14   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

15   throughout the United States.  Defendant LGEI dominated and controlled the finances, policies

16   and affairs of LGETT relating to the antitrust violations alleged in this complaint.

17          33.   Defendants LGEI, LGEUSA and LGETT are collectively referred to

18   herein as "LG Electronics."

19         **4.**   **LP Displays**

20          34.   Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

21   Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

22   Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

23   which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

24   In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

25   of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

26   billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

27   and LGEI would cede control over the company and the shares would be owned by financial

28   institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

1  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or
2  affiliates, throughout the United States.

3  **5.   Panasonic Entities**

4  35.   Defendant Panasonic Corporation, which was at all times during the
5  Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic
6  Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,
7  Osaka 571-8501, Japan.   During the Relevant Period, Panasonic Corporation manufactured,
8  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or
9  affiliates, throughout the United States.

10  36.   Defendant Panasonic Corporation of North America ("PCNA") is a
11  Delaware corporation with its principal place of business located at One Panasonic Way,
12  Secaucus, New Jersey 07094.   PCNA is a wholly-owned and controlled subsidiary of Defendant
13  Panasonic Corporation.   During the Relevant Period, PCNA manufactured, marketed, sold and/or
14  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the
15  United States.   Defendant Panasonic Corporation dominated and controlled the finances, policies
16  and affairs of PCNA relating to the antitrust violations alleged in this complaint.

17  37.   Defendants Panasonic Corporation and PCNA are collectively referred to
18  herein as "Panasonic."

19  38.   Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture
20  Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,
21  Osaka, 571-8504, Japan.   In 2002, Panasonic Corporation entered into a joint venture with
22  Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to
23  manufacture CRTs.   Panasonic Corporation was the majority owner with 64.5 percent.   On
24  March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint
25  venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic
26  Corporation, and renaming it MT Picture Display Co., Ltd.   During the Relevant Period, MTPD
27  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its
28  subsidiaries or affiliates, throughout the United States.

39.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.     **Philips Entities**

40.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

41.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

1    subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and

2    controlled the finances, policies and affairs of Philips America relating to the antitrust violations

3    alleged in this complaint.

4           42.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips

5    Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu

6    Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal

7    Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or

8    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

9    United States.  Defendant Royal Philips dominated and controlled the finances, policies and

10   affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

11          43.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips

12   Brazil") is a Brazilian company with its principal place of business located at Av Torquato

13   Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a

14   wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant

15   Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either

16   directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal

17   Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

18   the antitrust violations alleged in this complaint.

19          44.    Defendants Royal Philips, Philips America, Philips Taiwan and Philips

20   Brazil are collectively referred to herein as "Philips."

21          **7.    <u>Samsung Entities</u>**

22          45.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

23   company with its principal place of business located at Samsung Electronics Building, 1320-10,

24   Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

25   company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

26   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

27   States.

28          46.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

47.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

48.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

49.    Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

50.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

51.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

52.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to

the antitrust violations alleged in this complaint.

53.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

54.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

### 8.     Samsel

55.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9.     Thai CRT

56.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

1

### 10.   Toshiba Entities

2      57.    Defendant Toshiba Corporation ("TC") is a Japanese company with its

3  principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

4  Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

5  and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two

6  other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

7  Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by

8  1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

9  in which the entities consolidated their CRT businesses.  During the Relevant Period, TC

10  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11  subsidiaries or affiliates, throughout the United States.

12      58.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

13  corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

14  4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled

15  subsidiary of Defendant TC.   During the Relevant Period, Toshiba America manufactured,

16  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

17  affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

18  policies and affairs of Toshiba America relating to the antitrust violations alleged in this

19  complaint.

20      59.    Defendant Toshiba America Consumer Products, LLC ("TACP") is a

21  limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-

22  3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba

23  America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed

24  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

25  States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP

26  relating to the antitrust violations alleged in this complaint.

27      60.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

28  California corporation with its principal place of business located at 19900 MacArthur

1   Boulevard, Suite 400, Irvine, California 92612.   TAEC is a wholly-owned and controlled

2   subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAEC

3   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

4   subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled

5   the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this

6   complaint.

7   　　　　　61.   Defendant Toshiba America Information Systems, Inc. ("TAIS") is a

8   California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

9   California 92618-1697.   TAIS is a wholly-owned and controlled subsidiary of Defendant TC

10  through Toshiba America.   During the Relevant Period, TAIS manufactured, marketed, sold

11  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

12  throughout the United States.   Defendant TC dominated and controlled the finances, policies and

13  affairs of TAIS relating to the antitrust violations alleged in this complaint.

14  　　　　　62.   Defendants TC, Toshiba America, TACP, TAEC and TAIS are

15  collectively referred to herein as "Toshiba."

16  　　　　　**11.**　　**Chunghwa Entities**

17  　　　　　63.   Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a

18  Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City,

19  Taoyuan, Taiwan.   It was established in 1971 by Tatung Corporation to manufacture CRTs.   In

20  1974, Chunghwa PT's CRTs received certification by the United States, giving the company

21  entry into that market.   Throughout the Relevant Period, Chunghwa PT was one of the major

22  global CRT manufacturers.   During the Relevant Period, Chunghwa PT manufactured, sold, and

23  distributed CRT Products either directly or through its subsidiaries or affiliates (such as its

24  Fuzhou subsidiary) throughout the United States.

25  　　　　　64.   Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

26  Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

27  Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.   It is a wholly-

28  owned and controlled subsidiary of Chunghwa.   Chunghwa Malaysia is focused on CRT

1    production, and it has established itself as one of the leading worldwide suppliers of CRTs.

2    During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT

3    Products either directly or through its subsidiaries or affiliates throughout the United States.

4    Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of

5    Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

6    Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as

7    "Chunghwa."

8                    **12.    Tatung Company of America, Inc.**

9            Tatung Company of America, Inc. ("Tatung America**12.    Thomson Entities**

10                    65.    Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a

11    California French corporation with its principal place of business located at 2850 El Presidio

12    Street, Long Beach, California.  Tatung America is a 5 Rue Jeanne d'Arc 92130 Issy-les-

13    Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary of Tatung Company.

14    Currently, Tatung Company owns approximately half of Tatung America.  The other half

15    usedThomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the

16    United States market, with plants located in the United States, Mexico, China and Europe.

17    Thomson SA sold its CRTs internally to be owned by Lun Kuan Lin, the daughter of Tatung

18    Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passedits

19    television-manufacturing division, which had plants in the United States and Mexico, and to her

20    two childrenother television manufacturers in the United States and elsewhere.  Thomson SA's

21    television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT

22    televisions were sold in the United States to consumers under the RCA brand.  In November

23    2003, Thomson SA sold its television division to a joint venture it formed with Chinese

24    company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics

25    Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that

26    televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the

27    Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson

28    SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Tatung

1  America Thomson SA manufactured, marketed, sold and/or distributed CRT Products

2  manufactured by, among others, Chunghwa Picture Tubes, Ltd.., either directly or indirectly

3  through its subsidiaries or affiliates, to customers throughout the United States.

66.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics,

5  Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of

6  business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson

7  Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer

8  Electronics was a major manufacturer of CRTs for the United States market, with plants located

9  in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based

10 plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own

11 television-manufacturing division, which had plants in the United States and Mexico, and to

12 other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions

13 were sold in the United States to United States consumers under the RCA brand.  Thomson

14 Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

15 business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer

16 Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

17 indirectly through its subsidiaries or affiliates, to customers throughout the United States.

67.     Thomson SA and Thomson Consumer Electronics are collectively referred

19 to herein as "Thomson."

20 **13.**     -**Mitsubishi Entities**

21 66.—

22 67.—

23 68.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

24 is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

25 Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

26 Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

27 internally to Mitsubishi's television and monitor manufacturing division and to other television

28 and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

69.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630. Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

70.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618. Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

71.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

IV.    **AGENTS AND CO-CONSPIRATORS**

68.72.  The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

69.73.  Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

70.74.  Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-conspirators as Defendants at a later date.

71.75.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.   In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

72.76.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

73.77.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic

1   Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co.,

2   Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT

3   Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until

4   its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed,

5   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

6   throughout the United States.  Defendant Panasonic Corporation dominated and controlled the

7   finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

8   this complaint.

9        74.78.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

10  venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's

11  principal place of business was located in Indonesia.  TEDI was projected to have an annual

12  production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant

13  MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT

14  Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold,

15  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

16  throughout the United States.  Defendant TC dominated and controlled the finances, policies, and

17  affairs of TEDI relating to the antitrust violations alleged in this complaint.

18       75.79.  Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai

19  company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate,

20  Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled

21  subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint

22  venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co.,

23  Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.

24  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT

25  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

26  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to

27  the antitrust violations alleged in this complaint.

28       76.80.  The acts charged in this Complaint have been done by Defendants and

1    their co-conspirators, or were authorized, ordered or done by their respective officers, agents,

2    employees or representatives while actively engaged in the management of each Defendant's or

3    co-conspirator's business or affairs.

4    **V.**    **TRADE AND COMMERCE**

5    ~~77.~~81. During the Relevant Period, each Defendant, or one or more of its

6    subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of

7    interstate commerce and foreign commerce, including through and into this judicial district.

8    ~~78.~~82. During the Relevant Period, Defendants collectively controlled a vast

9    majority of the market for CRT Products, both globally and in the United States.

10    ~~79.~~83. The business activities of Defendants substantially affected interstate trade

11    and commerce in the United States and caused antitrust injury in the United States. The business

12    activities of Defendants also substantially affected trade and commerce in Florida and caused

13    antitrust injuries in Florida.

14    **VI.**    **FACTUAL ALLEGATIONS**

15    **A.**    **CRT Technology**

16    ~~80.~~84. A CRT has three components: (a) one or more electron guns, each of

17    which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

18    other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate

19    that phosphoresces when struck by an electron beam, thereby producing a viewable image. A

20    faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate

21    coated with multiple colors of phosphor produces a polychromatic image. An aperture or

22    shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to

23    produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of

24    narrow lines of red, green, blue and black.

25    ~~81.~~85. CRT technology was first developed more than a century ago. The first

26    commercially practical CRT television was made in 1931. However, it was not until RCA

27    Corporation introduced the product at the 1939 World's Fair that it became widely available to

28    consumers. After that, CRTs became the heart of most display products, including televisions,

1  computer monitors, oscilloscopes, air traffic control monitors and ATMs.

2  ~~82.~~86.  The quality of a CRT itself determines the quality of the CRT display.  No

3  external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

4  the whole CRT product so that the product is often simply referred to as "the CRT."

5  ~~83.~~87.  Although there have been refinements and incremental advancements

6  along the way since then, such as the development of thinner CRTs and CRTs with a flat screen,

7  the CRT technology used today is similar to that RCA unveiled in 1939.

8  ~~84.~~88.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are

9  used primarily in televisions and related devices and CDTs are primarily used in computer

10  monitors and similar devices.  The primary difference is that CDTs typically yield a higher

11  resolution image requiring more pixels than do CPTs.

12  ~~85.~~89.  CRTs have no independent utility, and have value only as components of

13  other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives

14  from the demand for such products.

15  ~~86.~~90.  The market for CRTs and the market for the products into which they are

16  placed are inextricably linked and intertwined because the CRT market exists to serve the CRT

17  Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes,

18  inseparable in that one would not exist without the other.

19  ~~87.~~91.  Plaintiff has participated in the market for CRTs through its direct

20  purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of

21  CRT Products containing price-fixed CRTs indirectly from non-defendant original equipment

22  manufacturers ("OEMs") and others.  Defendants' unlawful conspiracy has inflated the prices at

23  which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-

24  competitive prices for CRT Products.

25  ~~88.~~92.  Plaintiff has participated in the market for products containing CRTs. To

26  the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their

27  co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs

28  in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

1   ~~89.~~93.  Plaintiff has been injured by paying supra-competitive prices for CRT

2   Products.

3   **B.      Structure of the CRT Industry**

4   ~~90.~~94.  The CRT industry has several characteristics that facilitated a conspiracy,

5   including market concentration, ease of information sharing, the consolidation of manufacturers,

6   multiple interrelated business relationships, significant barriers to entry, heightened price

7   sensitivity to supply and demand forces and homogeneity of products.

8   **1.      Market Concentration**

9   ~~91.~~95.  During the Relevant Period, the CRT industry was dominated by relatively

10  few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and

11  Chunghwa, together held a collective 78% share of the global CRT market.  The high

12  concentration of market share facilitates coordination because there are fewer cartel members

13  among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and

14  production of other cartel members.

15  **2.      Information Sharing**

16  ~~92.~~96.  Because of common membership in trade associations, interrelated

17  business arrangements such as joint ventures, allegiances between companies in certain countries

18  and relationships between the executives of certain companies, there were many opportunities

19  for Defendants to discuss and exchange competitive information.  The ease of communication

20  was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants

21  took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as

22  alleged below.

23  ~~93.~~97.  Defendants Hitachi, Samsung and Chunghwa are all members of the

24  Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-

25  founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG

26  Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial

27  Research Association.  Upon information and belief, Defendants and their co-conspirators used

28  these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

1    the meetings of these trade associations, Defendants exchanged proprietary and competitively

2    sensitive information which they used to implement and monitor the conspiracy.

3            **3.      Consolidation**

4            ~~94.~~98.   The CRT industry also had significant consolidation during the Relevant

5    Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture

6    involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's

7    and Panasonic's CRT businesses into MTPD.

8            **4.      Multiple Interrelated Business Relationships**

9            ~~95.~~99.  The industry is marked by a web of cross-licensing agreements, joint

10   ventures and other cooperative arrangements that can facilitate collusion.

11           ~~96.~~100.        Examples of the high degree of cooperation among Defendants in

12   both the CRT Product market and other closely related markets include the following:

13           a.   The formation of the CRT joint venture LGPD in 2001 by Defendants

14                LG Electronics and Philips.

15           b.   Defendants LG Electronics and Philips also formed LG.Philips LCD

16                Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the

17                purpose of manufacturing TFT-LCD panels.

18           c.   The formation of the CRT joint venture MTPD in 2003 by Defendants

19                Toshiba and Panasonic.

20           d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita

21                Display Technology Co., Ltd. as a joint venture for the purpose of

22                manufacturing TFT-LCD panels.

23           e.   In December 1995, Defendant Toshiba partnered with Orion and two

24                other non-defendant entities to form TEDI, which manufactured CRTs

25                in Indonesia.

26           f.   Defendant Toshiba and Orion also signed a cooperative agreement

27                relating to LCDs in 1995.   Pursuant to the agreement, Daewoo

28                produced STN-LCDs, and Toshiba, which had substituted its STN-

LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g. Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h. Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i. Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j. Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k. Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

### 5. High Costs of Entry Into the Industry

97.101.     There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

98.102.     During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6. The Maturity of the CRT Product Market

99.103.     Newer industries typically are characterized by rapid growth,

innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

100.104.      Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

101.105.      In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

102.106.      Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

103.107.      In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

104.108.      As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.      Homogeneity of CRT Products

105.109.      CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

1    106.110.    It is easier to form and sustain a cartel when the product in

2    question is commodity-like because it is easier to agree on prices to charge and to monitor those

3    prices once an agreement is formed.

4        **C.    Pre-Conspiracy Market**

5    107.111.    The genesis of the CRT conspiracy was in the late 1980s as the

6    CRT Products business became more international and Defendants began serving customers that

7    were also being served by other international companies.  During this period, the employees of

8    Defendants would encounter employees from their competitors when visiting their customers.  A

9    culture of cooperation developed over the years and these Defendant employees would exchange

10   market information on production, capacity and customers.

11   108.112.    In the early 1990s, representatives from Samsung, Daewoo,

12   Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these

13   producers began to include discussions about price in their meetings.

14       **D.    Defendants' and Co-Conspirators' Illegal Agreements**

15   109.113.    In order to control and maintain profitability during declining

16   demand for CRT Products, Defendants and their co-conspirators have engaged in a contract,

17   combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or

18   stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1,

19   1995 through at least November 25, 2007.

20   110.114.    The CRT conspiracy was effectuated through a combination of

21   group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral

22   discussions were the primary method of communication and took place on an informal, ad hoc

23   basis.  During this period, representatives from Daewoo and Defendants LG Electronics and

24   Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT,

25   Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific

26   customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia,

27   Indonesia and Singapore.

28   111.115.    Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with

1    ~~and~~ Daewoo, also attended several ad hoc group meetings during this period.  The participants at

2    these group meetings also discussed increasing prices for CRTs.

3            ~~112.~~116.        As more manufacturers formally entered the conspiracy, group

4    meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more

5    organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put

6    in place. Defendants' representatives attended hundreds of these meetings during the Relevant

7    Period.

8            ~~113.~~117.        The overall CRT conspiracy raised and stabilized worldwide and

9    U.S. prices that Defendants charged for CRTs.

10           **1.      "Glass Meetings"**

11           ~~114.~~118.        The group meetings among the participants in the CRT price-

12   fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended

13   by employees at three general levels of Defendants' corporations.

14           ~~115.~~119.        The first level meetings were attended by high level company

15   executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.

16   Top meetings occurred less frequently, typically quarterly, and were focused on longer term

17   agreements and forcing compliance with price-fixing agreements.  Because attendees at top

18   meetings had authority as well as more reliable information, these meetings resulted in

19   agreements.  Attendees at top meetings were also able to resolve disputes because they were

20   decision makers who could make agreements.

21           ~~116.~~120.        The second level meetings were attended by Defendants' high

22   level sales managers and were known as "management" meetings.  These meetings occurred

23   more frequently, typically monthly, and handled implementation of the agreements made at top

24   meetings.

25           ~~117.~~121.        Finally, the third level meetings were known as "working level"

26   meetings and were attended by lower level sales and marketing employees.  These meetings

27   generally occurred on a weekly or monthly basis and were mostly limited to the exchange of

28   information and discussing pricing since the lower level employees did not have the authority to

enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

118.122.      The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

119.123.      Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo)), IRICO, and IRICOThomson.  Chunghwa also attended these meetings.

120.124.      Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

121.125.      During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the United States.

122.126.      Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

123.127.	The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

124.128.	During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

125.129.	Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured CRT Products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid supracompetitive prices for CRTs.

126.	Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to

1     ~~indirect purchasers of CRT Products.~~

2          ~~127.~~130.        The agreements reached at the glass meetings included:

3          a.   agreements on CRT prices, including establishing target prices,

4               "bottom" prices, price ranges and price guidelines;

5          b.   placing agreed-upon price differentials on various attributes of CRTs,

6               such as quality or certain technical specifications;

7          c.   agreements on pricing for intra-company CRTs sales to vertically

8               integrated customers;

9          d.   agreements as to what to tell customers about the reason for a price

10              increase;

11         e.   agreements to coordinate with competitors that did not attend the

12              group meetings and agreements with them to abide by the agreed-

13              upon pricing;

14         f.   agreements to coordinate pricing with CRT manufacturers in other

15              geographic markets such as Brazil, Europe and India;

16         g.   agreements to exchange pertinent information regarding shipments,

17              capacity, production, prices and customer demands;

18         h.   agreements to coordinate uniform public statements regarding

19              available capacity and supply;

20         i.   agreements to allocate both overall market shares and share of a

21              particular customer's purchases;

22         j.   agreements to allocate customers;

23         k.   agreements regarding capacity, including agreements to restrict output

24              and to audit compliance with such agreements; and

25         l.   agreements to keep their meetings secret.

26         ~~128.~~131.        Efforts were made to monitor each Defendant's adherence to these

27    agreements in a number of ways, including seeking confirmation of pricing both from customers

28    and from employees of Defendants themselves.  When cheating did occur, it was addressed in at

1    least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they

2    did not live up to an agreement; 3) threats to undermine a competitor at one of its principal

3    customers; and 4) a recognition of a mutual interest in living up to the target price and living up

4    to the agreements that had been made.

5         129.132.    As market conditions worsened in 2005-2007, and the rate of

6    replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less

7    frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the

8    DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to

9    have concerns about antitrust issues.

10                    **2.    Bilateral Discussions**

11        130.133.    Throughout the Relevant Period, the glass meetings were

12   supplemented by bilateral discussions between various Defendants.  The bilateral discussions

13   were more informal than the group meetings and occurred on a frequent, ad hoc basis, often

14   between the group meetings. These discussions, usually between sales and marketing employees,

15   took the form of in-person meetings, telephone contacts and emails.

16        131.134.    During the Relevant Period, in-person bilateral meetings took

17   place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan,

18   Thailand, Brazil and, Mexico, and the United States.

19        132.135.    The purpose of the bilateral discussions was to exchange

20   information about past and future pricing, confirm production levels, share sales order

21   information, confirm pricing rumors, and coordinate pricing with manufacturers in other

22   geographic locations, including Brazil, Mexico and, Europe, and the United States.

23        133.136.    In order to ensure the efficacy of their global conspiracy,

24   Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil

25   and, Mexico, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.and the

26   United States.  These Brazilian and MexicanCRT manufacturers were particularly important

27   because they served the North American market for CRT Products.  As further alleged herein,

28   North America was the largest market for CRT televisions and computer monitors during the

Relevant Period.  Because these ~~Brazilian and Mexican~~CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants ~~Philips and Samsung SDI~~, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs ~~imported into~~sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

~~134.~~137.      Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

~~135.~~138.      Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.      **Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

~~136.~~139.      Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass

1   meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also

2   engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.

3   Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never

4   effectively withdrew from this conspiracy.

5   137.140.   Defendants Hitachi America and HEDUS were represented at

6   those meetings and were a party to the agreements entered at them.  To the extent Hitachi

7   America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a

8   significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

9   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

10   the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the

11   alleged conspiracy.

12   138.141.   Between at least 1998 and 2007, Defendant IRICO, through IGC,

13   IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the

14   highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions

15   with other Defendants, particularly with other Chinese manufacturers.  Through these

16   discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's

17   conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

18   IRICO was acting to further its own independent private interests in participating in the alleged

19   conspiracy.

20   139.142.   Between at least 1995 and 2001, Defendant LG Electronics,

21   through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001,

22   LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD

23   (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest

24   ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions

25   with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on

26   prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this

27   conspiracy.

28   140.143.   Defendant LGEUSA was represented at those meetings and was a

1    party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT

2    Products, it played a significant role in the conspiracy because Defendants wished to ensure that

3    the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

4    agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in

5    the alleged conspiracy.

6         141.144.     Between at least 2001 and 2006, Defendant LP Displays (f/k/a

7    LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these

8    meetings were attended by the highest ranking executives from LP Displays.  Certain of these

9    high level executives from LP Displays had previously attended meetings on behalf of

10   Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with

11   other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for

12   CRTs.

13        142.145.     Between at least 1996 and 2003, Defendant Panasonic, through

14   Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After

15   2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with

16   Toshiba.  These meetings were attended by high level sales managers from Panasonic and

17   MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.

18   Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic

19   never effectively withdrew from this conspiracy.

20        143.146.     PCNA was represented at those meetings and was a party to the

21   agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct

22   purchasers, it played a significant role in the conspiracy because Defendants wished to ensure

23   that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

24   agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in

25   the alleged conspiracy.

26        144.147.     Between at least 2003 and 2006, Defendant MTPD participated in

27   multiple glass meetings and in fact led many of these meetings during the latter years of the

28   conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD

1    also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD

2    agreed on prices and supply levels for CRTs.

3    145.148.    Between at least 1998 and 2007, Defendant BMCC participated in

4    multiple glass meetings.  These meetings were attended by high level sales managers from

5    BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants,

6    particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on

7    prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with

8    CRTs was mandated by the Chinese government.  BMCC was acting to further its own

9    independent private interests in participating in the alleged conspiracy.

10    146.149.    Between at least 1996 and 2001, Defendant Philips, through Royal

11    Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001,

12    Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD

13    (n/k/a LP Displays).  A substantial number of these meetings were attended by high level

14    executives from Philips.  Philips also engaged in numerous bilateral discussions with other

15    Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.

16    Philips never effectively withdrew from this conspiracy.

17    147.150.    Defendants Philips America and Philips Brazil were represented at

18    those meetings and were a party to the agreements entered at them.  To the extent Philips

19    America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they

20    played a significant role in the conspiracy because Defendants wished to ensure that the prices

21    for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements

22    reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing

23    participants in the alleged conspiracy.

24    148.151.    Between at least 1995 and 2007, Defendant Samsung, through

25    SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

26    participated in at least 200 glass meetings at all levels.  A substantial number of these meetings

27    were attended by the highest ranking executives from Samsung.  Samsung also engaged in

28    bilateral discussions with each of the other Defendants on a regular basis.  Through these

1   discussions, Samsung agreed on prices and supply levels for CRTs.

2   ~~149.~~152.      Defendants SEAI, Samsung SDI America, Samsung SDI Brazil

3   and Samsung SDI Mexico were represented at those meetings and were a party to the agreements

4   entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played

5   a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

6   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

7   the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

8   Mexico were active, knowing participants in the alleged conspiracy.

9        153.   Between at least 1998 and 2006, Defendant Samtel participated in

10  multiple bilateral discussions with other Defendants, particularly with Thai CRT.   These

11  meetings were attended by high level executives from Samtel.   Through these discussions,

12  Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from

13  this conspiracy.

14       154.   Between at least 1997 and 2006, Defendant Thai CRT participated in

15  multiple glass meetings.  These meetings were attended by the highest ranking executives from

16  Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

17  particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

18  levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

19       155.   Between at least 1996 and 2005, Defendant Thomson participated in

20  dozens of meetings with its competitors, including several glass meetings and multiple bilateral

21  meetings.  These meetings were attended by high level sales managers from Thomson.  At these

22  meetings, Thomson discussed such things as CRT prices, production, revenues, volumes,

23  demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product

24  development and agreed on prices and supply levels for CRTs.  Thomson never effectively

25  withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon

26  Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played

27  a role in the conspiracy.

28       156.   Between at least 1995 and 2005, Defendant Mitsubishi participated in

1   multiple bilateral meetings with its competitors.  These meetings were attended by high level
2   sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT
3   prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns,
4   customer allocation, and new product development, and agreed on prices and supply levels for
5   CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

6   150.157.        Between at least 1995 and 2003, Defendant Toshiba, through TC,
7   TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the
8   CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended
9   by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple
10  bilateral discussions with other Defendants, particularly with LG.  Through these discussions,
11  Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from
12  this conspiracy.

13  151.158.        Defendants Toshiba America, TACP, TAEC and TAIS were
14  represented at those meetings and were a party to the agreements entered at them.  To the extent
15  Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct
16  purchasers, they played a significant role in the conspiracy because Defendants wished to ensure
17  that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing
18  agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS
19  were active, knowing participants in the alleged conspiracy.

20  152.159.        Between at least 1995 and 2006, Defendant Chunghwa, through
21  Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China)
22  and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of
23  these meetings were attended by the highest ranking executives from Chunghwa, including the
24  former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral
25  discussions with each of the other Defendants on a regular basis.  Through these discussions,
26  Chunghwa agreed on prices and supply levels for CRTs.

27  153.   Defendant Tatung America was represented at those meetings and was a
28  party to the agreements entered at them.  To the extent Tatung America sold and/or distributed

1   CRT Products to direct purchasers, it played a significant role in the conspiracy because

2   Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would

3   not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America

4   was an active, knowing participant in the alleged conspiracy.

5   154.160.    Between at least 1995 and 2004, Daewoo, through Daewoo

6   Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.   A

7   substantial number of these meetings were attended by the highest ranking executives from

8   Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.

9   Through these discussions, Daewoo agreed on prices and supply levels for CRTs.   Bilateral

10  discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for

11  bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

12  155.161.    When Plaintiff refers to a corporate family or companies by a

13  single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or

14  more employees or agents of entities within the corporate family engaged in conspiratorial

15  meetings on behalf of every company in that family.  In fact, the individual participants in the

16  conspiratorial meetings and discussions did not always know the corporate affiliation of their

17  counterparts, nor did they distinguish between the entities within a corporate family.   The

18  individual participants entered into agreements on behalf of, and reported these meetings and

19  discussions to, their respective corporate families.  As a result, the entire corporate family was

20  represented in meetings and discussions by their agents and were parties to the agreements

21  reached in them.

22       **E.      The CRT Market During the Conspiracy**

23  156.162.    Until the last few years of the CRT conspiracy, CRTs were the

24  dominant technology used in displays, including televisions and computer monitors.  During the

25  Relevant Period, this translated into the sale of millions of CRT Products, generating billions of

26  dollars in annual profits.

27  157.163.    The following data was reported by Stanford Resources, Inc., a

28  market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------|------|------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

158.164.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

159.165.    In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

160.166.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

161.167.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

162.168.    Defendants also conspired to limit production of CRTs by shutting

---

[1]    Estimated market value of CRT units sold.

down production lines for days at a time, and closing or consolidating their manufacturing facilities.

163.169.     For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

164.170.     During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

165.171.     During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

166.172.     These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.     International Government Antitrust Investigations**

167.173.     Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice.

168.174.     Separately, the European Commission and Japan and South

Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

169.175.     In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

170.176.     On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.
>
> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

171.177.     On February 10, 2009, the DOJ issued a press release announcing

that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

172.178.	On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.   The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

173.179.	On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

174.180.	On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former

1  executives from two color display tube (CDT) manufacturing companies." The indictment states

2  that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in

3  California.

4  175.181.    On March 18, 2011, the DOJ issued a press release announcing

5  that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty

6  and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

7  176.182.    Samsung SDI admitted that from at least as early as January 1997

8  until at least as late as March 2006, participated in a conspiracy among major CDT producers to

9  fix prices, reduce output, and allocate market shares of CDTs sold in the United States and

10  elsewhere. Samsung SDI admitted that in furtherance of the conspiracy it, through its officers

11  and employees, engaged in discussions and attended meetings with representatives of other

12  major CDT producers. During these discussions and meetings, agreements were reached to fix

13  prices, reduce output, and allocate market shares of CDTs to be sold in the United States and

14  elsewhere. Samsung SDI further admitted that acts in furtherance of the conspiracy were carried

15  out in California.

16  177.183.    The plea agreement of Samsung SDI requires that it cooperate with

17  the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the

18  manufacture or sale of CDTs and CPTs.

19  184.    On December 5, 2012 the European Commission announced that it had

20  fined seven international corporate families a total of over €1.4 billion for their two-decade-long

21  effort to fix prices, share markets, restrict output, and allocate customers between themselves in

22  the CRT market. The companies fined by the European Commission included Chunghwa, LG

23  Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly

24  Thomson). The Commission Vice President in charge of competition policy said, "These cartels

25  for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive

26  behavior that are strictly forbidden to companies doing business in Europe." The press release

27  accompanying the fines further notes that the CRT cartels were "among the most organised

28  cartels that the Commission has investigated."

178.185.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

179.186.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

180.187.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

181.188.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

182.189.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

183.190.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

184.191.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

185.192.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

### G.        The Role of Trade Associations During the Relevant Period

186.193.        Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

187.194.        Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

188.195.        The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

189.196.        Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and

1  the annual International Display Workshops (the most recent ones of which have been held in
2  Japan).

3  190.197.   Through these trade association and trade events, and in meetings
4  related to these trade associations and trade events, on information and belief, Defendants shared
5  what would normally be considered proprietary and competitively sensitive information.  This
6  exchange of information was used to implement and monitor the conspiracy.

7  **H.**   **Effects of Defendants' Antitrust Violations**

8  **1.**   **Examples of Reductions in Manufacturing Capacity by Defendants**

9  191.198.   As explained above, during the Relevant Period, Defendants
10 consolidated their manufacturing facilities in lower-cost venues such as China and reduced
11 manufacturing capacity to prop up prices.

12 192.199.   In December of 2004, MTPD closed its American subsidiary's
13 operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that
14 the closing was part of the company's "global restructuring initiatives in the CRT business."  The
15 company further stated that in the future, "CRTs for the North American market will be supplied
16 by other manufacturing locations in order to establish an optimum CRT manufacturing
17 structure."

18 193.200.   In July of 2005, LGPD ceased CRT production at its Durham,
19 England facility, citing a shift in demand from Europe to Asia.

20 194.201.   In December of 2005, MTPD announced that it would close its
21 American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.
22 Like LG Philips, the company explained that it was shifting its CRT operations to Asian and
23 Chinese markets.

24 195.202.   In late 2005, Samsung SDI followed the lead of other
25 manufacturers, closing its CRT factory in Germany.

26 196.203.   In July of 2006, Orion shut down a CRT manufacturing plant in
27 Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory
28 in Malaysia and liquidating its joint venture with Toshiba.

1

2.      **Examples of Collusive Pricing for CRTs**

2      ~~197.~~204.          Defendants' collusion is evidenced by unusual price movements in

3      the CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation

4      predicted that "[e]conomies of scale, in conjunction with technological improvements and

5      advances in manufacturing techniques, will produce a drop in the price of the average electronic

6      display to about $50 in 1997."

7      ~~198.~~205.          In 1996, another industry source noted that "the price of the 14"

8      tube is at a sustainable USD50 and has been for some years . . . ."

9      ~~199.~~206.          In reality, prices for CRTs never approached $50 in 1997, and

10     were consistently more than double this price.

11     ~~200.~~207.          Despite  the  ever-increasing  popularity  of,  and  intensifying

12     competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high

13     price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization

14     was purportedly due exclusively to a shortage of critical components such as glass.  This was a

15     pretext used to conceal the conspiracy.

16     ~~201.~~208.          Prices for CRT monitors did fall sharply as a result of the Asian

17     economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote

18     speaker at Asia Display 1998, an annual conference for the display industry, to state:

19
               We believe that now is the time to revise our strategic plan in order to survive in
20             this tough environment and also to prepare for the coming years.  This means that
               we have to deviate from the traditional approach of the simple scale up of
21             production volume.

22     ~~202.~~209.          In early 1999, despite declining production costs and the rapid

23     entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price

24     increase was allegedly based on increasing global demand for the products.  In fact, this price

25     rise was the result of collusive conduct amongst Defendants.

26     ~~203.~~210.          After experiencing an oversupply of 17" CRTs in the second half

27     of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article

28

quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

204.211.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

205.212.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

### 3.    Summary Of Effects Of The Conspiracy Involving CRTs

206.213.    The above combination and conspiracy has had the following effects, among others:

a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.  Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.  Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

d.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.    PLAINTIFF'S INJURIES

207.214.    As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a

1   result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-

2   competitive levels.   Defendants' conspiracy artificially inflated the price of CRTs causing

3   Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

4           208.215.      Plaintiff also purchased CRT Products containing CRTs from

5   OEMs as well as others, which in turn purchased CRTs from Defendants and their co-

6   conspirators.   Defendants' conspiracy affected and artificially inflated the price of CRTs

7   purchased by these OEMs and others, which paid higher prices for CRTs than they would have

8   absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT

9   Products.

10          209.216.      The OEMs and others passed on to their customers, including

11   Plaintiff, the overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to

12   its customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiff suffered injury

13   when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

14          210.217.      Once a CRT leaves its place of manufacture, it remains essentially

15   unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical

16   objects that do not change form or become an indistinguishable part of a CRT Product.  Thus,

17   CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to

18   Plaintiff.

19          211.218.      The market for CRTs and the market for CRT Products are

20   inextricably linked and cannot be considered separately.  Defendants are well aware of this

21   intimate relationship.

22          212.219.      Throughout the Relevant Period, Defendants controlled the market

23   for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase

24   CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by

25   Defendants' conspiracy.

26          213.220.      As a result, Plaintiff was injured in connection with its purchases

27   of CRT Products during the Relevant Period.

28

## VIII.   FRAUDULENT CONCEALMENT

214.221.        Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

215.222.        Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

216.223.        The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

217.224.        By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

218.225.        Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and

concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

219.226.     As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

220.227.     Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

221.228.     As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

222.229.     As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

223.230.     In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated,

"[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

224.231.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

225.232.    Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

226.233.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

**IX.**

**IX.    *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING**

234.    As discussed at length in Paragraphs 173-192 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

235.    As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

236.    Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

# XI.    CLAIM FOR VIOLATIONS

## First Claim for Relief

## (Violation of Section 1 of the Sherman Act)

227.237.        Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

228.238.        Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

229.239.        In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

230.240.        As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

231.241.        The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

232.242.        For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.   participating in meetings and conversations to discuss the prices and supply of CRTs;

    b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.   issuing price announcements and price quotations in accordance with the agreements reached;

e.   selling CRTs to customers in the United States at noncompetitive prices;

f.   exchanging competitively sensitive information in order to facilitate their conspiracy;

g.   agreeing to maintain or lower production capacity; and

h.   providing false statements to the public to explain increased prices for CRTs.

~~233.~~243.     As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the Florida Deceptive and Unfair Trade Practices Act)**

~~234.~~244.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

~~235.~~245.     During the Relevant Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed CRT Products in commerce in the United States, including Florida.  Defendants' conduct and fraudulent concealment caused injury to Plaintiff, as both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to Plaintiff as a purchaser.

~~236.~~246.     Based on the foregoing, Defendants engaged in unfair and deceptive acts in violation of Fla. Stat. §§ 501.201 *et seq.*

~~237.~~247.     During the Relevant Period, Plaintiff maintained its principal place of business in Florida.  Plaintiff also conducted purchasing negotiations in Florida for CRT Products; made purchasing decisions in Florida regarding CRT Products; sent purchase orders and payment for CRT Products from Florida; was invoiced for CRT Products it purchased in

Florida; and resold CRT Products in Florida through its retail locations in Florida, among other Florida-based activities.  As a result of its presence in Florida, its purchases and sales in Florida, the substantial business it conducts in Florida, and the injury suffered in Florida, Plaintiff is entitled to the protection of the laws of Florida.

238.248.     In violation of Section 501.204, Defendants agreed to act, and did in fact act, in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Florida, and took efforts to conceal their agreements from Plaintiff.  These acts constitute a common and continuous course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices.

239.249.     The conduct of the Defendants described herein constitutes unfair and deceptive acts or practices within the meaning of FDUTPA, which is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any trade or commerce."  Fla. Stat. § 501.202(2).  FDUTPA is also intended to "make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection."  Fla. Stat. § 501.202(3).

240.250.     Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Florida; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supra-competitive, artificially inflated prices for CRT Products that it purchased both directly and indirectly. During the Relevant Period, Defendants' illegal conduct in violation of FDUTPA substantially affected Florida commerce, and injured Plaintiff in Florida, causing financial losses.

241.251.     As a result of Defendants' violation of the FDUTPA, Plaintiff is entitled to damages and the costs of suit, including attorneys' fees, pursuant to Fla. Stat. § 501.211.

1  **XI.    PRAYER FOR RELIEF**

2              WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf,

3  adjudging and decreeing that:

4              A.      Defendants engaged in a contract, combination, and conspiracy in

5  violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the FDUTPA, and that Plaintiff

6  was injured in its business and property as a result of Defendants' violations;

7              B.      Plaintiff shall recover damages sustained by it, as provided by the federal

8  and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered

9  against the Defendants in an amount to be trebled in accordance with such laws, including

10  Section 4 of the Clayton Act;

11             C.      Defendants engaged in a contract, combination, and conspiracy in

12  violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*., and

13  Plaintiff was injured in its business and property as a result of Defendants' violations;

14             D.      Plaintiff shall recover damages sustained by it, as provided by Florida

15  Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*., and a joint and several

16  judgment in favor of Plaintiff shall be entered against the Defendants;

17             E.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees,

18  and the respective officers, directors, partners, agents, and employees thereof, and all other

19  persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained

20  from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

21             F.      Plaintiff shall be awarded pre-judgment and post-judgment interest, and

22  such interest shall be awarded at the highest legal rate from and after the date of service of the

23  initial complaint in this action;

24             G.      Plaintiff shall recover its costs of this suit, including reasonable attorneys'

25  fees as provided by law; and

26             H.      Plaintiff shall receive such other or further relief as may be just and

27  proper.

28

1

**XII.**         <u>**JURY TRIAL DEMAND**</u>

2          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by

3   jury of all the claims asserted in this Complaint so triable.

4

5

6

7

8

9

10   Dated:                                    Respectfully Submitted,

11

_____

12   STUART H. SINGER (*Pro hac vice*)
     BOIES, SCHILLER, & FLEXNER LLP

13   401 East Las Olas Boulevard, Suite 1200
     Fort Lauderdale, Florida 33301

14   Telephone: (954) 356-0011
     Facsimile: (954) 356-0022

15   Email: ssinger@bsfllp.com

16
     WILLIAM A. ISAACSON (*Pro hac vice ~~to be filed~~*)

17   BOIES, SCHILLER & FLEXNER LLP
     5301 Wisconsin Ave. NW, Suite 800

18   Washington, DC 20015
     Telephone:  (202) 237-2727

19   Facsimile:   (202) 237-6131
     Email:  wisaacson@bsfllp.com

20

21   PHILIP J. IOVIENO (*Pro hac vice ~~to be filed~~*)
     ANNE M. NARDACCI (*Pro hac vice ~~to be filed~~*)

22   LUKE NIKAS (*Pro hac vice ~~to be filed~~*)
     ~~CHRISTIOPHER~~CHRISTOPHER V. FENLON (*Pro

23   hac vice ~~to be filed~~*)

24   BOIES, SCHILLER & FLEXNER LLP
     10 North Pearl Street, 4th Floor

25   Albany, NY 12207
     Telephone:  (518) 434-0600

26   Facsimile:   (518) 434-0665
     Email: piovieno@bsfllp.com

27

28                                         *Counsel for Plaintiff*

*Interbond Corporation of America*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

61

# **<u>EXHIBIT F</u>**

David H. Orozco (220732)
SUSMAN GODFREY LLP
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
dorozco@susmangodfrey.com

Attorneys for Alfred H. Siegel, as Trustee of
the Circuit City Stores, Inc. Liquidating Trust
[additional counsel listed on signature page]

H. Lee Godfrey (*pro hac vice to be submitted*)
Kenneth S. Marks (*pro hac vice to be submitted*)
Jonathan J. Ross (pro hac vice)
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
lgodfrey@susmangodfrey.com
kmarks@susmangodfrey.com
jross@susmangodfrey.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

ALFRED H. SIEGEL, AS TRUSTEE OF THE
CIRCUIT CITY STORES, INC. LIQUIDATING
TRUST,

                          Plaintiff,

v.

HITACHI, LTD.; HITACHI DISPLAYS, LTD.;
HITACHI AMERICA, LTD.; HITACHI ASIA,
LTD.; HITACHI ELECTRONIC DEVICES
(USA), INC.; SHENZHEN SEG HITACHI
COLOR DISPLAY DEVICES, LTD.; IRICO
GROUP CORPORATION; IRICO GROUP
ELECTRONICS CO., LTD.; IRICO DISPLAY
DEVICES CO., LTD.; LG ELECTRONICS, INC.;
LG ELECTRONICS USA, INC.; LG
ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP
DISPLAYS INTERNATIONAL LTD.;
PANASONIC CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA; MT
PICTURE DISPLAY CO., LTD.; BEIJING
MATSUSHITA COLOR CRT CO., LTD.;
KONINKLIJKE PHILIPS ELECTRONICS N.V.;
PHILIPS ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS DA
AMAZONIA INDUSTRIA ELECTRONICA
LTDA.; SAMSUNG ELECTRONICS CO., LTD.;
SAMSUNG ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
AMERICA, INC.; SAMSUNG SDI MEXICO S.A.
DE C.V.;  SAMSUNG SDI BRASIL LTDA.;

Master File No. 3:07-cv-05944-SC

MDL No. 1917

Individual Case No. 11-cv-05502 CASE NO.

FIRST AMENDED COMPLAINT

JURY TRIAL DEMANDED

1

COMPLAINT

1
2
3
4
5
6
7
8
9

SHENZHEN SAMSUNG SDI CO., LTD.;
TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG
SDI (MALAYSIA) SDN. BHD.; SAMTEL
COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER PRODUCTS,
LLC; TOSHIBA AMERICA ELECTRONIC
COMPONENTS, INC.; TOSHIBA AMERICA
INFORMATION SYSTEMS, INC.; CHUNGHWA
PICTURE TUBES, LTD.; CHUNGHWA
PICTURE TUBES (MALAYSIA); TATUNG
COMPANY OF AMERICA, INC., ;
TECHNICOLOR SA; TECHNICOLOR USA,
INC.; MITSUBISHI ELECTRIC
CORPORATION; MITSUBISHI DIGITAL
ELECTRONICS AMERICA, INC.; MITSUBISHI
ELECTRIC & ELECTRONICS, USA, INC.

10

Defendants.

11

12      Plaintiff, Alfred H. Siegel, as the duly appointed Trustee of the Circuit City Stores, Inc.

13  Liquidating Trust (the "Circuit City Trust"), submits this Complaint against all Defendants named

14  herein, and hereby alleges as follows:

15  **I.      INTRODUCTION**

16      1.      Plaintiff Circuit City Trust brings this action to recover those damages to

17  Circuit City Stores, Inc., and its affiliated companies ("Circuit City") caused by a long-running

18  conspiracy extending at a minimum from at least March 1, 1995, through at least November 25,

19  2007 (the "Relevant Period"), conducted by an international cartel formed by Defendants and

20  their co-conspirators.  The purpose and effect of this conspiracy was to fix, raise, stabilize and

21  maintain prices for cathode ray tubes ("CRTs").

22      2.      Defendants are or were among the leading manufacturers of: (a) color

23  picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

24  tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

25  devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

26  purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

27  to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and

28  the products containing them shall be referred to as "CDT Products."  CDT Products and CPT

2

Products shall be referred to collectively herein as "CRT Products."

3.    Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.    Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

5.    With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.    The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K., ~~and~~ Europe, and the United States.  These meetings included representatives from the highest levels of the respective

3

companies, as well as regional managers and others.

7.     During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.     This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with defendants' CRT price-fixing conspiracy.

9.     Circuit City was a leading national retailer of consumer electronics and operated over 700 electronics superstores in the United States.  Throughout the period of the conspiracy alleged herein, Circuit City purchased CRT Products manufactured by defendants and their co-conspirators both directly from defendants and from other vendors.  These purchases took place throughout the United States, including California and Illinois, where Circuit City's multiple regional distribution centers received CRT Products manufactured by defendants at prices that were artificially inflated based on defendants' conspiracy.

10.     On November 10, 2008, Circuit City Stores, Inc. and affiliated domestic companies commenced cases in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") under Chapter 11 of the Bankruptcy Code.[1]  On September 10, 2010, the Bankruptcy Court entered its Findings of Fact, Conclusions of Law and Order Confirming Modified Second Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors (the "Plan Confirmation Order"), which provided for the establishment of the Circuit City Stores, Inc. Liquidating Trust and the appointment of Alfred H. Siegel as trustee of the Circuit City Trust. Pursuant to the Plan Confirmation Order, on the Effective Date of the Modified Second Amended Plan of Liquidation (the "Plan"), all property of the Circuit City bankruptcy estates, including all causes of action, were to be vested in and transferred to the

---

[1] *In re Circuit City Stores, Inc., et al.,* Case No. 08-35653 (KRH), in the United States Bankruptcy Court for the Eastern District of Virginia.

4

Circuit City Trust. The Plan became effective on November 1, 2010.

11. During the Relevant Period, Circuit City purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. Circuit City thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II. JURISDICTION AND VENUE

12. Plaintiff brings this action to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

13. Plaintiff also brings this action pursuant to various state laws listed herein because Circuit City purchased CRT Products from both defendants and non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in those states.

14. The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiff's state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint. Plaintiff's state law claims are so related to their claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

15. The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce. This effect gives rise to Plaintiff's antitrust claims. During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States. In particular, Defendants' and their co-conspirators' conspiracy directly and substantially

COMPLAINT

affected the price of CRT Products purchased by Circuit City in the states identified herein.

16.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

17.     Venue is proper in the Northern District of California under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.   In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District.  Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

## III.    PARTIES

### A.    Plaintiff

18.     Circuit City Trust is a liquidating trust organized under the laws of the State of Virginia and established pursuant to the Plan Confirmation Order. Alfred H. Siegel, the Trustee of the Liquidating Trust, is a California citizen and resident.

19.     Circuit City was headquartered in Richmond, Virginia.   During the Relevant Period, Circuit City purchased in the United States CRT Products directly and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Circuit City suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.  Circuit City's negotiations for the purchase of CRT Products took place in the United States; purchase orders for CRT Products were issued from the United States; and invoices for CRT Products were

COMPLAINT

received by Circuit City in the United States.

20.     Upon information and belief, Circuit City purchased CRT Products, which contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially inflated prices because of the price-fixing conspiracy, in California and Illinois

21.     Upon information and belief, during the Relevant Period, Circuit City received shipments of and took title to CRT Products at its distribution centers in Walnut, California; Livermore, California, and Long Beach, California, among other locations, and therefore purchased products in California for purposes of the California laws invoked in this Complaint.  Under Circuit City's contracts with defendants and other CRT Product vendors, Circuit City did not take title to a substantial amount of the CRT Products ordered by Circuit City until it received and accepted shipments of those CRT Products at its distribution centers in California.  From its distribution centers in California and other states, Circuit City shipped CRT Products to its retail stores.  Circuit City also shipped CRT Products directly to consumers from its distribution centers in California through online sales.

22.     During the Conspiracy Period, Circuit City received shipments of and took title to CRT Products at its distribution center in Marion, Illinois, among other locations, and therefore purchased products in Illinois for purposes of the Illinois law invoked in this Complaint. Under Circuit City's contracts with defendants and other CRT Product vendors, Circuit City did not take title to a substantial amount of the CRT Products ordered by Circuit City until it received and accepted shipments of those CRT Products at its distribution center in Illinois.  From its distribution center in Illinois and other states, Circuit City shipped CRT Products to its retail stores.  Circuit City also shipped CRT Products directly to consumers from its distribution center in Illinois through online sales.

**B.     Defendants**

**1.     Hitachi Entities**

23.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

7

parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

24.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

25.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.   During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

26.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

COMPLAINT

United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

27.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 1000 Hurricane Shoals Road Suite D-100, Lawrenceville, GA 30043.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

28.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).   Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

29.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

**2.     <u>IRICO Entities</u>**

30.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.   IGC is the parent company for multiple subsidiaries engaged in the manufacture,

9

marketing, distribution and sale of CRT Products.   During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

31.   Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

32.   Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

33.   Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

### 3.   LG Electronics Entities

34.   Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion

global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968. The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States. In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD"). On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd. During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

35.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI. During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

36.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan. LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc. During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

37.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

**4.     LP Displays**

38.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 5.  Panasonic Entities

39.     Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

40.     Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

41.     Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

42.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

12

Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs. Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

43.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**6.     Philips Entities**

44.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and

13

prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45. Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

46. Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

47. Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

14

48.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

### 7.     Samsung Entities

49.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

50.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

51.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

15

52.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

53.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

54.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

55.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

56.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

57.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

58.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

**8.     Samsung**

59.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

17

principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9.   Thai CRT

60.   Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10.   Toshiba Entities

61.   Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.   During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

62.   Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled

subsidiary of Defendant TC.   During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

63.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.   TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

64.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.   TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

65.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.   TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

COMPLAINT

66.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.     Chunghwa Entities**

67.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.   It was established in 1971 by Tatung Corporation to manufacture CRTs.   In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.   Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.   During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

68.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.   It is a wholly-owned and controlled subsidiary of Chunghwa.   Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.   Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12.     Tatung Company of America, Inc.**

69.     Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.   Tatung America is a subsidiary of Tatung Company.   Currently, Tatung Company owns approximately half of Tatung America.   The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.   Following Lun Kuan Lin's death,

20

her share passed to her two children.  During the Relevant Period, Tatung America manufactured, marketed, sold and/or distributed CRT Products manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United States.

**13.     Thomson Entities**

70.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

71.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton,

21

COMPLAINT

Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

72.    Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**14.    Mitsubishi Entities**

73.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

74.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630.  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers

22

in the U.S. and elsewhere. Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers. During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

75. Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, California, 92618. Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA. During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

69.76. Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## IV.        AGENTS AND CO-CONSPIRATORS

70.77. The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

71.78. Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiff. Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

72.79. Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and Toshiba Display Devices (Thailand) Co., Ltd. Plaintiff reserves the right to name some or all of these and other co-conspirators as Defendants at a later date.

COMPLAINT

2625971v1/012325

73.80.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

74.81.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

75.82. Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

24

this complaint.

~~76.~~83.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

84.    Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

~~77.~~85. Defendant Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.

~~78.~~86.  The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.    TRADE AND COMMERCE

25

79.87.  During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

80.88.  During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

81.89.  The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in California and Illinois and caused antitrust injuries in California and Illinois.

## VII.   FACTUAL ALLEGATIONS

### A.   CRT Technology

82.90.  A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

83.91.  CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

84.92.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

26

the whole CRT product so that the product is often simply referred to as "the CRT."

85.93. Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

86.94. CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

87.95. CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors. The demand for CRTs thus directly derives from the demand for such products.

88.96. The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets. The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

89.97. Circuit City has participated in the market for CRTs through their direct purchases from Defendants of CRT Products containing price-fixed CRTs and their purchases of CRT Products containing price-fixed CRTs indirectly from non-Defendant original equipment manufacturers ("OEM") and others. Defendants' unlawful conspiracy has inflated the prices at which Circuit City bought CRT Products, and Circuit City has been injured thereby and paid supra-competitive prices for CRT Products.

90.98. Circuit City has participated in the market for products containing CRTs. To the extent Circuit City indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.

91.99. Circuit City has been injured by paying supra-competitive prices for CRT Products.

COMPLAINT

### B.    Structure of the CRT Industry

92.100.    The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

#### 1.    Market Concentration

93.101.    During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

#### 2.    Information Sharing

94.102.    Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

95.103.    Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

28

the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.    Consolidation

96.104.        The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.    Multiple Interrelated Business Relationships

97.105.        The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

98.106.        Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

    a.   The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

    b.   Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

    c.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

    d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

    e.   In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

    f.   Defendant Toshiba and Orion also signed a cooperative agreement

29

relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g. Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h. Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels. Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i. Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j. Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k. Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.      High Costs of Entry Into the Industry**

99.107.      There are significant manufacturing and technological barriers to entry into the CRT industry. It would require substantial time, resources and industry knowledge to overcome these barriers to entry. It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

100.108.      During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate. A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

30

**6.      The Maturity of the CRT Product Market**

101.109.      Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

102.110.      Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

103.111.      In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

104.112.      Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

105.113.      In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

106.114.      As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

**7.      Homogeneity of CRT Products**

31

107.115.    CRT Products are commodity-like products which are manufactured in standardized sizes. One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sold and Circuit City purchased CRT Products primarily on the basis of price.

108.116.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

C.    **Pre-Conspiracy Market**

109.117.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies. During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers. A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

110.118.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in S.E. Asia. During this period, these producers began to include discussions about price in their meetings.

D.    **Defendants' and Co-Conspirators' Illegal Agreements**

111.119.    In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

112.120.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings. In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc

32

basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

113.121.        Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with and Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

114.122.        As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

115.123.        The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

1.        **"Glass Meetings"**

116.124.        The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

117.125.        The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

118.126.    The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

119.127.    Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

120.128.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

121.129.    Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), and IRICO, and Thomson.  Chunghwa also attended these meetings.

122.130.    Representatives of Defendants also attended what were known

34

amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

123.131.	During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia, and the United States.

124.132.	Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

125.133.	The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

126.134.	During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

127.135.	Defendants' conspiracy included agreements on the prices at which

35

COMPLAINT

certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors. Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs. In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

128.136.     Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed. Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins. Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers. In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

129.137.     The agreements reached at the glass meetings included:

    a.   agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    b.   placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

    c.   agreements on pricing for intra-company CRTs sales to vertically integrated customers;

    d.   agreements as to what to tell customers about the reason for a price increase;

    e.   agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    f.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

36

g.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

h.  agreements to coordinate uniform public statements regarding available capacity and supply;

i.  agreements to allocate both overall market shares and share of a particular customer's purchases;

j.  agreements to allocate customers;

k.  agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.  agreements to keep their meetings secret.

~~130.~~138.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

~~131.~~139.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

**2.    Bilateral Discussions**

~~132.~~140.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees,

37

took the form of in-person meetings, telephone contacts and emails.

133.141.        During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, and Mexico, and the United States.

134.142.        The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, and Europe, and the United States.

135.143.        In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, and Mexico, and the United States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period. Because these Brazilian and Mexican manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs soldimported intto the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

136.144.        Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

137.145.        Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output

38

agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.   LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Phillips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.   In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3. Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

138.146.   Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

139.147.   Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

140.148.   Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions

with other Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

141.149.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels. After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by the highest ranking executives from LG Electronics. LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, LG agreed on prices and supply levels for CRTs. LG Electronics never effectively withdrew from this conspiracy.

142.150.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them. To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

143.151.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from LP Displays. Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips. LP Displays also engaged in bilateral discussions with other Defendants. Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

144.152.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings. After

40

2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

145.153.    PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

146.154.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

147.155.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

148.156.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level

41

executives from Philips.   Philips also engaged in numerous bilateral discussions with other Defendants.   Through these discussions, Philips agreed on prices and supply levels for CRTs. Philips never effectively withdrew from this conspiracy.

149.157.     Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

150.158.     Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.   Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.   Through these discussions, Samsung agreed on prices and supply levels for CRTs.

151.159.     Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.   Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

152.160.     Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.   Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

COMPLAINT

161.   Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

162.   Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

153.163.      Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

154.164.      Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

155.165.      Defendants Toshiba America, TACP, TAEC and TAIS were

43

represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

156.166.      Between at least 1995 and 2006, defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

157.167.      Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them.  To the extent Tatung America sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

158.168.      Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

159.169.      When Circuit City Trust refers to a corporate family or companies

by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

### E.   The CRT Market During the Conspiracy

160.170.   Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

161.171.   The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[2] | $235 |

162.172.   During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

163.173.   Defendants' collusion is evidenced by unusual price movements in

---

[2]   Estimated market value of CRT units sold.

45

the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

164.174.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

165.175.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

166.176.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

167.177.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

168.178.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells

46

used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

169.179.        Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

170.180.        For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

171.181.        During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

172.182.        During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

173.183.        These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

F.    **International Government Antitrust Investigations**

174.184.        Defendants' conspiracy to fix, raise, maintain and stabilize the

47

prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ").

175.185.        Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

176.186.        In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

177.187.        On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel. The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

> According to the available evidences it is presumable that the

48

coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

178.188.     On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

179.189.     On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

180.190.     On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The

indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.191.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

192.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

182.193.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

183.194.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and

50

employees, engaged in discussions and attended meetings with representatives of other major CDT producers. During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere. Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

184.195. The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

185.196. As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

186.197. Several Defendants also have a history of "cooperation" and anticompetitive conduct. For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

187.198. Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

188.199. In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

189.200. On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

190.201. On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of

Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

191.202.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

192.203.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.    The Role of Trade Associations During the Relevant Period**

193.204.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."   Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

194.205.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

195.206.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung,

52

Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

196.207.     Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

197.208.     Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

### H.   Effects of Defendants' Antitrust Violations

#### 1.   Examples of Reductions in Manufacturing Capacity by Defendants

198.209.     As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

199.210.     In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

200.211.     In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

201.212.     In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like

LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

~~202.~~213.      In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

~~203.~~214.      In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.      Examples of Collusive Pricing for CRTs

~~204.~~215.      Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

~~205.~~216.      In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

~~206.~~217.      In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

~~207.~~218.      Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

~~208.~~219.      Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

209.220.      In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

210.221.      After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

211.222.      On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

212.223.      Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

213.224.      CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

### H.    Summary Of Effects Of The Conspiracy Involving CRTs

214.225.    The above combination and conspiracy has had the following effects, among others:

 a. Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

 b. Prices for CRTs in CRT Products sold by Defendants to Circuit City directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

 c. Circuit City was deprived of the benefit of free and open competition in the purchase of CRT Products.

 d. As a direct and proximate result of the unlawful conduct of Defendants, Circuit City was injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VIII.   PLAINTIFF'S INJURIES

215.226.    As a purchaser of computer monitors, TVs and other devices that contained CRTs, Circuit City suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Circuit City to pay higher prices than they would have in the absence of Defendants' conspiracy.

216.227.    Circuit City also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.   Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

217.228.    The OEMs and others passed on to their customers, including Circuit City, the overcharges caused by Defendants' conspiracy.  Circuit City was not able to pass

on to their customers the overcharges caused by Defendants' conspiracy.  Thus, Circuit City suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

218.229.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Circuit City.

219.230.    The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

220.231.    Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

221.232.    As a result, Circuit City was injured in connection with their purchases of CRT Products during the Relevant Period.

## IX.    FRAUDULENT CONCEALMENT

222.233.    Neither Circuit City Trust nor Circuit City had actual or constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts.  Neither Circuit City Trust nor Circuit City discovered, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Circuit City Trust or Circuit City on inquiry notice that there was a conspiracy to fix the prices of CRTs.

223.234.    Because Defendants' agreement, understanding and conspiracy were kept secret, Circuit City Trust and Circuit City were unaware of Defendants' unlawful

57

conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

224.235.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

225.236.     By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

226.237.     Neither Circuit City nor Circuit City Trust could have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

227.238.     As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending

these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production. In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

228.239. Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

229.240. As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

230.241. As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

231.242. In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors. In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

232.243. Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

233.244. Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and

COMPLAINT

misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

245.   As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

## X.    *American Pipe*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

246.   As discussed at length in Paragraphs 184-203 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Circuit City's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

247.   Costco's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

248.   As shown by Circuit City Trust's allegations in Paragraphs 1 and 10 and the following causes of action, Circuit City was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- 234. Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

## X.XI.   CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

235.249.   Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

60

~~236.~~250.     Beginning no later than March 1, 1995, the exact date being unknown to Circuit City and Circuit City Trust and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

~~237.~~251.     In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

~~238.~~252.     As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

~~239.~~253.     The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

~~240.~~254.     For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.  participating in meetings and conversations to discuss the prices and supply of CRTs;

b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.  issuing price announcements and price quotations in accordance with the agreements reached;

e.  selling CRTs to customers in the United States at noncompetitive prices;

f.   exchanging competitively sensitive information in order to facilitate their conspiracy;

g.   agreeing to maintain or lower production capacity; and

h.   providing false statements to the public to explain increased prices for CRTs.

241.255.      As a result of Defendants' unlawful conduct, Circuit City was injured in its businesses and property in that it paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

### **Second Claim for Relief**

### **(Violation of the California Cartwright Act)**

242.256.      Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

243.257.      During the Relevant Period, Circuit City conducted a substantial volume of business in California.  In particular, Circuit City purchased CRT Products by sending purchase orders to California and sent payments to for CRT Products California.  Circuit City also received shipments of CRT Products at its warehouses in California.  In addition, upon information and belief, Circuit City maintained California inventories of CRT Products manufactured and sold by Defendants, their co-conspirators, and others, and operated warehouses in California.  Circuit City also sold CRT Products to customers in California.  Finally, Circuit City maintained offices and inventories in California of CRT Products and maintained agents and representatives in California who sold CRT Products to consumers in California.  As a result of Circuit City's business operations in California, it was registered to do business in the State and paid taxes to the State of California during the Relevant Period.   As a result of Circuit City's substantial contacts with California, Plaintiff is entitled to the protection of the laws of California**.**

244.258.      In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and

intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs. Defendant Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy were carried out in California. Defendants' conduct within California thus injured Plaintiff, both in California and throughout the United States.

245.259. Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720. Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels. Defendants' conduct substantially affected California commerce.

246.260. The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

247.261. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a. to fix, raise, maintain and stabilize the price of CRTs;

    b. to allocate markets for CRTs amongst themselves;

    c. to submit rigged bids for the award and performance of certain CRTs contracts; and

    d. to allocate among themselves the production of CRTs.

248.262. The combination and conspiracy alleged herein has had, inter alia, the following effects:

a. price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

b. prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c. those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

249.263.    As a result of the alleged conduct of Defendants, Circuit City paid supra-competitive, artificially inflated prices for the CRT Products it purchased during the Relevant Period.

250.264.    As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiff is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of California Unfair Competition Law)

251.265.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

252.266.    Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.*

253.267.    This Complaint is filed, and these proceedings are pursuant to Sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from Defendant of all revenues, earnings, profits compensation, and benefits which they obtained as a result of their unlawful, unfair, and fraudulent conduct.

254.268.   The unlawful, unfair, and fraudulent business practices of Defendants, as alleged above, injured Plaintiff and members of the public in that Defendants' conduct restrained competition, causing Circuit City and others to pay supra-competitive and artificially inflated prices for CRT Products.

a.   Defendants' Unlawful Business Practices: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

b.   Defendants' Unfair Business Practices: As alleged above, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

c.   Defendants' Fraudulent Business Practices: As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping meetings with coconspirators secret and making false public statements about the reasons for artificially inflated prices of CRTs. Members of the public were likely to be deceived, and Circuit City and Circuit City Trust were in fact deceived by Defendants' fraudulent actions. As a result of Defendants' unfair competition, Plaintiff suffered injury in fact and has lost money or property.

255.269.   The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

COMPLAINT

256.270.      Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

257.271.      Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 *et seq.*

258.272.      By reason of the foregoing, Plaintiff is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

**Fourth Claim for Relief**

**(Restitution and Unjust Enrichment Under California Law)**

259.273.      Circuit City Trust incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

260.274.      During the Relevant Period, and continuing thereafter at least up through the filing of this Complaint, defendants have received substantial benefits in the form of higher prices paid by Circuit City for CRT Products as a direct and proximate result of defendants' conspiracy. Defendants have unjustly retained these substantial benefits, at the expense of Circuit City, causing Circuit City damage.

**Fifth Claim for Relief**

**(Violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*)**

261.275.      Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

262.276.      During the Relevant Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed CRT Products in commerce in the United States, including Illinois.  Defendants' conspiracy constituted a conspiracy among competitors with the purpose and effect of restraining, suppressing and/or eliminating competition in the sale of CRT Products in Illinois and fixing, raising, maintaining and stabilizing CRT Product prices in Illinois at

66

artificially high, noncompetitive levels.  Defendants' conduct and fraudulent concealment caused injury to Circuit City, as both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to Circuit City as a purchaser.

263.277.    Defendants' conspiracy substantially affected Illinois commerce and unreasonably restrained trade in Illinois.

264.278.    During the Conspiracy Period, Circuit City received shipments of and took title to CRT Products at Circuit City's distribution center in Marion, Illinois and therefore purchased the products in Illinois at artificially-inflated prices because of defendants' price fixing conspiracy.  Under Circuit City's contracts with defendants and other vendors, Circuit City did not receive title to a substantial amount of the CRT Products ordered by Circuit City until it received and accepted shipments of those CRT Products at its Marion Illinois Distribution Center.

265.279.    During the Conspiracy Period, Circuit City conducted a substantial volume of business in Illinois.  Circuit City sold CRT Products and other products in retail stores in Illinois and on the Internet to Illinois customers.  In addition, Circuit City maintained in Illinois inventories of CRT Products manufactured and sold by defendants, their co-conspirators, and others.  As a result of Circuit City's presence in Illinois and the substantial business it conducted in Illinois, Circuit City Trust is entitled to the protection of the laws of Illinois; and

266.280.    As a direct and proximate result of defendants' conduct, Circuit City was injured by paying more for CRT Products purchased in Illinois from defendants, their co-conspirators and others than it would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under the Illinois Antitrust Act.

## XI.XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the California

Unfair Competition Law, and the Illinois Antitrust Act, and that Plaintiff was injured in its business and property as a result of Defendants' violations, and that defendants unjustly retained substantial benefits received due to such conspiracy;

   B. Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

   C. Defendants engaged in a contract, combination, and conspiracy in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

   D. Plaintiff shall recover damages sustained by it, as provided by California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

   E. Defendants engaged in unlawful, unfair, and fraudulent business practices in violation of California Business and Professions Code §§ 17200, *et seq.*, and Plaintiff was injured in its business as a result of Defendants' violations;

   F. Plaintiff shall recover damages sustained by it as a result of Defendants' violations of Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

   G. Defendants engaged in a contract, combination, and conspiracy in violation of the Illinois Antitrust Act, and Plaintiff was injured in its business and property as a result of Defendants' violations;

   H. Plaintiff shall recover damages sustained by it, as provided by the Illinois Antitrust Act, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

COMPLAINT

I.       Defendants received substantial benefits in the form of higher prices paid by Circuit City for CRT Products as a result of their conspiracy, and have unjustly retained these substantial benefits, at the expense of Circuit City;

J.       Defendants shall disgorge all ill-gotten gains and Plaintiff shall be entitled to restitution;

K.       Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

L.       Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

M.       Plaintiff shall receive such other or further relief as may be just and proper.

## ~~XII.~~XIII.    JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

Dated:                                                    SUSMAN GODFREY L.L.P.

By: _____

~~David Orozco (220732)~~
~~SUSMAN GODFREY L.L.P.~~
~~1901 Avenue of the Stars, Suite 950~~
~~Los Angeles, California 90067-6029~~
~~Telephone:  (310) 789-3100~~
~~Facsimile:  (310) 789-3150~~
~~Email: dorozco@susmangodfrey.com~~

H. Lee Godfrey
(*pro hac vice ~~to be submitted~~*)
Kenneth S. Marks
(*pro hac vice ~~to be submitted~~*)
Jonathan J. Ross
(*pro hac vice)*
SUSMAN GODFREY L.L.P.

69

COMPLAINT

1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
Email: lgodfrey@sumangodfrey.com
     kmarks@susmangodfrey.com

Parker C. Folse III
(*pro hac vice to be submitted*)
Rachel S. Black
(*pro hac vice to be submitted*)
Jordan Connors
(*pro hac vice to be submitted*)
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
Telephone:  (206) 516-3880
Facsimile:  (206) 516-3883
Email:  pfolse@susmangodfrey.com
   rblack@susmangodfrey.com
   jconnors@susmangodfrey.com

Attorneys for Plaintiff Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust

70

COMPLAINT

# **<u>EXHIBIT G</u>**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

MIKE MCKOOL, JR. (*Pro hac vice*)
LEWIS T. LECLAIR (*Pro hac vice*)
SCOTT R. JACOBS (*Pro hac vice*)
MCKOOL SMITH, P.C
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044
Email: mmckool@mckoolsmith.com

*Counsel for Plaintiff CompuCom Systems, Inc.*

COMPUCOM SYSTEMS, INC.,

Plaintiff,

v.

HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS

1  ~~INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA~~
~~LTDA.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA,~~
2  ~~INC.; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI~~
~~MEXICO S.A. DE C.V.; SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO.,~~
3  ~~LTD.; TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN. BHD.;~~
~~SAMTEL COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA~~
4  ~~AMERICA, INC.; TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA~~
~~AMERICA ELECTRONIC COMPONENTS, INC.; TOSHIBA AMERICA INFORMATION~~
5  ~~SYSTEMS, INC.; CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES~~
~~(MALAYSIA); TATUNG COMPANY OF AMERICA, INC.,~~

6                    ~~Defendants.~~  **UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
7                    **SAN FRANCISCO DIVISION**

8  IN RE CATHODE RAY TUBE (CRT)        Case No. 11-cv-06396
   ANTITRUST LITIGATION
9                                      Master File No. 3:07-cv-05944-SC

10 This Document Relates To Individual Case   MDL No. 1917
   No. 11-cv-06396
11

12 COMPUCOM SYSTEMS, INC.,             **AMENDED COMPLAINT**

13         Plaintiff,                  **JURY TRIAL DEMANDED**

14     vs.

15 HITACHI, LTD.; HITACHI DISPLAYS,
   LTD.; HITACHI AMERICA, LTD.;
16 HITACHI ASIA, LTD.; HITACHI
   ELECTRONIC DEVICES (USA), INC.;
17 SHENZHEN SEG HITACHI COLOR
   DISPLAY DEVICES, LTD.; IRICO GROUP
18 CORPORATION; IRICO GROUP
   ELECTRONICS CO., LTD.; IRICO
19 DISPLAY DEVICES CO., LTD.; LG
   ELECTRONICS, INC.; LG ELECTRONICS
20 USA, INC.; LG ELECTRONICS TAIWAN
   TAIPEI CO., LTD.; LP DISPLAYS
21 INTERNATIONAL LTD.; PANASONIC
   CORPORATION; PANASONIC
22 CORPORATION OF NORTH AMERICA;
   MT PICTURE DISPLAY CO., LTD.;
23 BEIJING MATSUSHITA COLOR CRT CO.,
   LTD.; KONINKLIJKE PHILIPS
24 ELECTRONICS N.V.; PHILIPS
   ELECTRONICS NORTH AMERICA
25 CORPORATION; PHILIPS ELECTRONICS
   INDUSTRIES (TAIWAN), LTD.; PHILIPS
26 DA AMAZONIA INDUSTRIA
   ELECTRONICA LTDA.; SAMSUNG
27 ELECTRONICS CO., LTD.; SAMSUNG
   ELECTRONICS AMERICA, INC.;
28 SAMSUNG SDI CO., LTD.; SAMSUNG
   SDI AMERICA, INC.; SAMSUNG SDI

MEXICO S.A. DE C.V.;  SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG
SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA PICTURE
TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA).; TECHNICOLOR
SA; TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC CORPORATION;
MITSUBISHI DIGITAL ELECTRONICS
AMERICA, INC.; MITSUBISHI ELECTRIC
& ELECTRONICS, USA, INC.,

    Defendants.

Plaintiff, CompuCom Systems, Inc. ("CompuCom") for its Complaint against all Defendants named herein, hereby alleges as follows:

I.    **INTRODUCTION**

1.    Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2.    Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products."  CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

3.    Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

1    Relevant Period, virtually every household in the United States owned at least one CRT Product.

2           4.      Since the mid-1990s, the CRT industry faced significant economic

3    pressures as customer preferences for other emerging technologies shrank profits and threatened

4    the sustainability of the industry.  In order to maintain price stability, increase profitability, and

5    decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

6    contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

7    States.

8           5.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

9    fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,*

10   shipments, prices, production and customer demand; (c) coordinate public statements regarding

11   available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

12   among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

13   on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

14   overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic

15   areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

16   producer's share of certain key customers' sales; and (k) restrict output.

17          6.      The conspiracy concerning CRTs commenced with bilateral meetings that

18   began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning

19   in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group

20   meetings had become more formalized, as described in greater detail below.  There were at least

21   500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and

22   hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan,

23   South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These

24   meetings included representatives from the highest levels of the respective companies, as well as

25   regional managers and others.

26          7.      During the Relevant Period, the conspiracy affected billions of dollars of

27   commerce throughout the United States.

28          8.      This conspiracy is being investigated by the United States Department of

COMPUCOM'S AMENDED COMPLAINT                    4                    Case No. 11-cv-06396
                                                                    Master File No. 3:07-cv-05944-SC

1   Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be

2   indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa

3   Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury

4   in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in

5   connection with Defendants' CRT price-fixing conspiracy.

6           9.       During the Relevant Period, Plaintiff purchased CRT Products in the

7   United States and elsewhere directly and indirectly from Defendants, and/or Defendants'

8   subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates

9   controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this

10  action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it

11  purchased during the Relevant Period.

12  **II.      JURISDICTION AND VENUE**

13          10.      Plaintiff brings this action to obtain injunctive relief under Section 16 of

14  the Clayton Act; and to recover damages, including treble damages under Section 4 of the

15  Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of

16  Section 1 of the Sherman Act (15 U.S.C. § 1).

17          11.      Plaintiff also brings this action pursuant to various state laws listed herein,

18  because Plaintiff purchased CRT Products from non-defendant vendors which contained price-

19  fixed CRTs manufactured by Defendants and their co-conspirators in New York and California.

20          12.      The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of

21  the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

22  supplemental jurisdiction over Plaintiff's state law claims listed herein under 28 U.S.C. § 1367

23  because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's

24  state law claims are so related to its claims under Section 1 of the Sherman Act that they form

25  part of the same case or controversy.

26          13.      The activities of Defendants and their co-conspirators, as described herein,

27  involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

28  did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and

import trade or commerce. This effect gives rise to Plaintiff's antitrust claims. During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States. In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiff in the states identified herein.

14. This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States. Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15. Venue is proper in the Northern District of Texas under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District. Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

## III. PARTIES

### A. Plaintiff

16. Plaintiff CompuCom is a Delaware corporation with its corporate headquarters in Dallas, Texas. Founded in 1987, CompuCom is a leading IT outsourcing company providing infrastructure management services, application services, systems integration and consulting services, as well as the procurement and management of hardware and software. In 2010, CompuCom had $1.4 billion in revenue. Through the conclusion of Defendants' and the co-conspirators' conspiracy, CompuCom maintained operations in several states including Texas, California, New York, and Massachusetts.

17. During the Relevant Period, CompuCom purchased CRT Products directly

1   from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the

2   Defendants or Defendants' subsidiaries and affiliates controlled.  CompuCom also purchased

3   CRT Products from original equipment manufacturers ("OEMs"), as well as other suppliers,

4   which contained CRTs that had been purchased from Defendants and their co-conspirators.  As

5   such, CompuCom suffered injury as a result of Defendants' and their co-conspirators' unlawful

6   conduct.

7           18.     During the Relevant Period, CompuCom purchased CRT Products in,

8   *inter alia*, California and New York containing CRTs manufactured and sold by Defendants and

9   their co-conspirators.  Plaintiff sent purchase orders to various CRT Product manufacturers in

10  each of these states and sent payment to these manufacturers in each of these states.  In addition,

11  Plaintiff supplied its offices in California and New York with CRT Products and maintained

12  corporate offices and inventories in these states and provided information technology services to

13  its customers in these states.

14      **B.**     **Defendants**

15          **1.**      **Hitachi Entities**

16          19.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of

17  business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

18  parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

19  market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd.

20  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

21  subsidiaries or affiliates, throughout the United States.

22          20.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

23  company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

24  297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

25  in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

26  manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

27  create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi

28  Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

1   through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

2   dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

3   antitrust violations alleged in this complaint.

4          21.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

5   company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

6   York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

7   Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

8   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

9   United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

10  affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

11         22.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

12  with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,

13  Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant

14  Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or

15  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

16  United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

17  affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

18         23.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a

19  Delaware corporation with its principal place of business located at 208 Fairforest Way,

20  Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and

21  Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or

22  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

23  United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the

24  finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this

25  complaint.

26         24.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

27  Shenzhen") was a Chinese company with its principal place of business located at 5001

28  Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at

least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

25.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

### 2.     IRICO Entities

26.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.   During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

27.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

28.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

1    company with its principal place of business located at No. 16, Fenghui South Road West,

2    District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned

3    subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant

4    Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

5    through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

6    and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

7    alleged in this complaint.

8           29.     Defendants IGC, IGE and IDDC are collectively referred to herein as

9    "IRICO."

10               **3.      LG Electronics Entities**

11          30.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under

12   the laws of the Republic of Korea with its principal place of business located at LG Twin

13   Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5

14   billion global force in consumer electronics, home appliances and mobile communications,

15   which established its first overseas branch office in New York in 1968.  The company's name

16   was changed from Gold Star Communications to LGEI in 1995, the year in which it also

17   acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint

18   venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays

19   ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to

20   LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold

21   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

22   throughout the United States.

23          31.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware

24   corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs,

25   New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.

26   During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT

27   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

28   Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

1    to the antitrust violations alleged in this complaint.

2            32.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a

3    Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road,

4    NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of

5    Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed,

6    sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

7    throughout the United States.  Defendant LGEI dominated and controlled the finances, policies

8    and affairs of LGETT relating to the antitrust violations alleged in this complaint.

9            33.    Defendants LGEI, LGEUSA and LGETT are collectively referred to

10   herein as "LG Electronics."

11           **4.    LP Displays**

12           34.    Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

13   Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

14   Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

15   which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

16   In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

17   of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

18   billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

19   and LGEI would cede control over the company and the shares would be owned by financial

20   institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

21   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

22   affiliates, throughout the United States.

23           **5.    Panasonic Entities**

24           35.    Defendant Panasonic Corporation, which was at all times during the

25   Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

26   Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

27   Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured,

28   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

1    affiliates, throughout the United States.

2         36.    Defendant Panasonic Corporation of North America ("PCNA") is a

3    Delaware corporation with its principal place of business located at One Panasonic Way,

4    Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

5    Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

6    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

7    United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

8    and affairs of PCNA relating to the antitrust violations alleged in this complaint.

9         37.    Defendants Panasonic Corporation and PCNA are collectively referred to

10   herein as "Panasonic."

11        38.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

12   Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

13   Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with

14   Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

15   manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On

16   March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

17   venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

18   Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

19   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

20   subsidiaries or affiliates, throughout the United States.

21        39.    Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

22   Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

23   Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which

24   is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co.,

25   Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

26   enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

27   China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT

28   manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in

China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**6.**   **Philips Entities**

40.    Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

41.    Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

42.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

1   United States. Defendant Royal Philips dominated and controlled the finances, policies and

2   affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

3          43.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips

4   Brazil") is a Brazilian company with its principal place of business located at Av Torquato

5   Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a

6   wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant

7   Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either

8   directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal

9   Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

10  the antitrust violations alleged in this complaint.

11         44.    Defendants Royal Philips, Philips America, Philips Taiwan and Philips

12  Brazil are collectively referred to herein as "Philips."

13         **7.    Samsung Entities**

14         45.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

15  company with its principal place of business located at Samsung Electronics Building, 1320-10,

16  Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea. It is South Korea's top electronics

17  company. During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

18  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

19  States.

20         46.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

21  corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

22  Ridgefield Park, New Jersey 07660. SEAI is a wholly-owned and controlled subsidiary of

23  Defendant SEC. During the Relevant Period, SEAI manufactured, marketed, sold and/or

24  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

25  United States. Defendant SEC dominated and controlled the finances, policies and affairs of

26  Samsung SEAI relating to the antitrust violations alleged in this complaint.

27         47.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

28  Company ("Samsung SDI") is a South Korean company with its principal place of business

located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

48.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

49.    Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

50.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

51.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

52.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

53.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the

1    finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged

2    in this complaint.

3              54.      Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung

4    SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung

5    SDI Malaysia are collectively referred to herein as "Samsung."

6              **8.      Samtel**

7              55.      Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

8    principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-

9    110065.   Samtel's market share for CRTs sold in India is approximately 40%, and it is that

10   country's largest exporter of CRT Products.   Samtel has gained safety approvals from the United

11   States, Canada, Germany, and Great Britain for its CRT Products.   During the Relevant Period,

12   Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

13   its subsidiaries and affiliates, throughout the United States.

14             **9.      Thai CRT**

15             56.      Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

16   1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.   Thai CRT is a subsidiary of Siam

17   Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

18   televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

19   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

20   United States.

21             **10.     Toshiba Entities**

22             57.      Defendant Toshiba Corporation ("TC") is a Japanese company with its

23   principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

24   Japan.   In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

25   and in computer monitors.   In December 1995, TC partnered with Orion Electronic Co. and two

26   other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

27   Indonesia.   TEDI was projected to have an annual production capacity of 2.3 million CRTs by

28   1999.   In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

1   in which the entities consolidated their CRT businesses.  During the Relevant Period, TC

2   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

3   subsidiaries or affiliates, throughout the United States.

4          58.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

5   corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

6   4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled

7   subsidiary of Defendant TC.   During the Relevant Period, Toshiba America manufactured,

8   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

9   affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

10  policies and affairs of Toshiba America relating to the antitrust violations alleged in this

11  complaint.

12         59.    Defendant Toshiba America Consumer Products, LLC ("TACP") is a

13  limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-

14  3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba

15  America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed

16  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

17  States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP

18  relating to the antitrust violations alleged in this complaint.

19         60.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

20  California corporation with its principal place of business located at 19900 MacArthur

21  Boulevard, Suite 400, Irvine, California 92612.   TAEC is a wholly-owned and controlled

22  subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC

23  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

24  subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled

25  the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this

26  complaint.

27         61.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a

28  California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

62.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

## 11.     Chunghwa Entities

63.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

64.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

1

**12.   Tatung Company of America, Inc.**

2

Tatung Company of America, Inc. ("Tatung America**12.   Thomson Entities**

3

65.   Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a

4

CaliforniaFrench corporation with its principal place of business located at 2850 El Presidio

5

Street, Long Beach, California.   Tatung America is a 5 Rue Jeanne d'Arc 92130 Issy-les-

6

Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary of Tatung Company.

7

Currently, Tatung Company owns approximately half of Tatung America.   The other half

8

usedThomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the

9

United States market, with plants located in the United States, Mexico, China and Europe.

10

Thomson SA sold its CRTs  internally to be owned by Lun Kuan Lin, the daughter of Tatung

11

Company's former Chairman, T.S. Lin.   Following Lun Kuan Lin's death, her shares passedits

12

television-manufacturing division, which had plants in the United States and Mexico, and to her

13

two childrenother television manufacturers in the United States and elsewhere.  Thomson SA's

14

television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT

15

televisions were sold in the United States to consumers under the RCA brand.  In November

16

2003, Thomson SA sold its television division to a joint venture it formed with Chinese

17

company, TCL Corporation.   The joint venture was called TCL-Thomson Electronics

18

Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that

19

televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the

20

Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson

21

SA sold its CRT business to Videocon Industries, Ltd.   During the Relevant Period, Tatung

22

AmericaThomson SA manufactured, marketed, sold and/or distributed CRT Products

23

manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or indirectly

24

through its subsidiaries or affiliates, to customers throughout the United States.

25

66.   Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics,

26

Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of

27

business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.   Thomson

28

Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer

1   Electronics was a major manufacturer of CRTs for the United States market, with plants located

2   in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico. The United States-based

3   plants were closed in 2004. Thomson Consumer Electronics sold its CRTs internally to its own

4   television-manufacturing division, which had plants in the United States and Mexico, and to

5   other television manufacturers in the United States and elsewhere. Thomson's CRT televisions

6   were sold in the United States to United States consumers under the RCA brand. Thomson

7   Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

8   business was sold to Videocon in 2005. During the Relevant Period, Thomson Consumer

9   Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

10  indirectly through its subsidiaries or affiliates, to customers throughout the United States.

11          67.     Thomson SA and Thomson Consumer Electronics are collectively referred

12  to herein as "Thomson."

13          **13.     Mitsubishi Entities**

14          68.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

15  is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

16  Japan. Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

17  Japan, Taiwan, Mexico and Canada for sale in the United States. These CRTs were sold

18  internally to Mitsubishi's television and monitor manufacturing division and to other television

19  and monitor manufacturers in the U.S. and elsewhere. Mitsubishi's television and monitor

20  division also purchased CRTs from other CRT manufacturers. During the Relevant Period,

21  Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

22  United States.

23          69.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

24  Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

25  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

26  Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

27  Mexico and Ontario, Canada. Mitsubishi Electric USA sold its CRTs internally to its television

28  and monitor manufacturing division and to other television and monitor manufacturers in the

1  U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

2  other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

3  marketed, sold and distributed CRT Products in the United States.

4          70.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

5  Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

6  Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.    During the

7  Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

8  CRT televisions and monitors in the United States.

9          71.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

10 are collectively referred to herein as "Mitsubishi."

11 **IV.    AGENTS AND CO-CONSPIRATORS**

12         66.72.  The acts alleged against Defendants in this Complaint were authorized,

13 ordered, or done by their officers, agents, employees, or representatives, while actively engaged

14 in the management and operation of Defendants' businesses or affairs.

15         67.73.  Each Defendant or co-conspirator acted as the principal, agent, or joint

16 venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

17 common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a

18 subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products

19 made by its parent company.

20         68.74.  Various persons and/or firms not named as Defendants in this Complaint

21 participated as co-conspirators in the violations alleged herein and may have performed acts and

22 made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

23 include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

24 Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

25 Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and

26 Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-

27 conspirators as Defendants at a later date.

28         69.75.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major

manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.   In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France. As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

70.76.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

71.77.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

72.78.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

venture formed by TC, Orion and two other non-defendant entities in December 1995. TEDI's principal place of business was located in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia. During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

73.79. Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

74.80. The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.   TRADE AND COMMERCE

75.81. During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

76.82. During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

77. 83.  The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in New York and California and caused antitrust injuries in New York and California.

## VI.    FACTUAL ALLEGATIONS

### A.    CRT Technology

78. 84.  A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

79. 85.  CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

80. 86.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

81. 87.  Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

82. 88.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer

monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

83.89.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

84.90.  The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

85.91.  Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant OEMs and others. Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

86.92.  Plaintiff has participated in the market for products containing CRTs. To the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

87.93.  Plaintiff has been injured by paying supra-competitive prices for CRT Products.

**B.**     **Structure of the CRT Industry**

88.94.  The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.**     **Market Concentration**

89.95.  During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and

1   Chunghwa, together held a collective 78% share of the global CRT market.   The high

2   concentration of market share facilitates coordination because there are fewer cartel members

3   among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and

4   production of other cartel members.

5                           **2.**      **Information Sharing**

6            ~~90.~~96.  Because of common membership in trade associations, interrelated

7   business arrangements such as joint ventures, allegiances between companies in certain countries

8   and relationships between the executives of certain companies, there were many opportunities

9   for Defendants to discuss and exchange competitive information.   The ease of communication

10  was facilitated by the use of meetings, telephone calls, e-mails and instant messages.   Defendants

11  took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as

12  alleged below.

13           ~~91.~~97.  Defendants Hitachi, Samsung and Chunghwa are all members of the

14  Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-

15  founders of the Korea Display Industry Association.   Similarly, Daewoo and Defendants LG

16  Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial

17  Research Association.  Upon information and belief, Defendants and their co-conspirators used

18  these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

19  the meetings of these trade associations, Defendants exchanged proprietary and competitively

20  sensitive information which they used to implement and monitor the conspiracy.

21                          **3.**      **Consolidation**

22           ~~92.~~98.   The CRT industry also had significant consolidation during the Relevant

23  Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture

24  involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's

25  and Panasonic's CRT businesses into MTPD.

26                          **4.**      **Multiple Interrelated Business Relationships**

27           ~~93.~~99.  The industry is marked by a web of cross-licensing agreements, joint

28  ventures and other cooperative arrangements that can facilitate collusion.

94.100.        Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

a.   The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

b.   Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.   In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.   Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage

1        products such as DVD drives.

2            j.    Defendant Samtel participates in a joint venture, Samcor Glass

3                  Limited, with Defendant Samsung and non-defendant Corning Inc.,

4                  USA for the production and supply of picture tube glass.

5            k.   Defendant Samtel claims to have supplied CRTs to Defendants LG

6                  Electronics, Samsung, Philips, and Panasonic.

7        **5.**    **High Costs of Entry Into the Industry**

8        ~~95.~~101.    There are significant manufacturing and technological barriers to

9 entry into the CRT industry. It would require substantial time, resources and industry knowledge

10 to overcome these barriers to entry. It is also extremely unlikely that a new producer would enter

11 the market in light of the declining demand for CRT Products.

12        ~~96.~~102.    During the Relevant Period, the costs of the assembly components,

13 both as a whole and individually, have been generally declining, and, in some periods, declining

14 at a substantial rate. A combination of price discussions and manipulation of the output of

15 CRTs allowed Defendants to keep prices above where they would have been but for the

16 conspiracy.

17        **6.**    **The Maturity of the CRT Product Market**

18        ~~97.~~103.    Newer industries typically are characterized by rapid growth,

19 innovation and high profits. The CRT Product market is a mature one, and like many mature

20 industries, is characterized by slim profit margins, creating a motivation to collude.

21        ~~98.~~104.    Demand for CRT Products was declining throughout the Relevant

22 Period. Static declining demand is another factor which makes the formation of a collusive

23 arrangement more likely because it provides a greater incentive to firms to avoid price

24 competition.

25        ~~99.~~105.    In addition, conventional CRT televisions and computer monitors

26 were being rapidly replaced by TFT-LCD and plasma displays. This was one of the factors

27 which led Defendants to engage in this alleged price-fixing scheme in order to slow down

28 declining CRT Product prices. Between 2000 and 2006, revenues from the sale of CRT

televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

100.106.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

101.107.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

102.108.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

**7.    Homogeneity of CRT Products**

103.109.    CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

104.110.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

**C.    Pre-Conspiracy Market**

105.111.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

106.112.      In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia. During this period, these producers began to include discussions about price in their meetings.

**D.      Defendants' and Co-Conspirators' Illegal Agreements**

107.113.      In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

108.114.      The CRT conspiracy was effectuated through a combination of group and bilateral meetings. In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis. During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers. These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

109.115.      Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with and Daewoo, also attended several ad hoc group meetings during this period. The participants at these group meetings also discussed increasing prices for CRTs.

110.116.      As more manufacturers formally entered the conspiracy, group meetings became more prevalent. Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

111.117.      The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

1.      **"Glass Meetings"**

112.118.      The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

113.119.      The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

114.120.      The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

115.121.      Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

116.122.      The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located

in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

117.123.    Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo)), IRICO, and IRICOThomson.  Chunghwa also attended these meetings.

118.124.    Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

119.125.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the United States.

120.126.    Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

121.127.    The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

1    of CRTs that were sold to specific customers, and agreed upon target prices to be used in

2    negotiations with large customers.  Having analyzed the supply and demand, the participants

3    would also discuss and agree upon production cutbacks.

4    122.128.    During periods of oversupply, the focus of the meeting participants

5    turned to making controlled and coordinated price reductions.  This was referred to as setting a

6    "bottom price."

7    123.129.    Defendants' conspiracy included agreements on the prices at which

8    certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that

9    manufactured CRT Products, such as televisions and computer monitors.  Defendants realized

10   the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to

11   support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all

12   OEMs paid supracompetitive prices for CRTs.

13   124.    Each of the participants in these meetings knew, and in fact discussed, the

14   significant impact that the price of CRTs had on the cost of the finished products into which they

15   were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there

16   were slim profit margins.  Defendants therefore concluded that in order to make their CRT price

17   increases stick, they needed to make the increase high enough that their direct customers (CRT

18   TV and monitor makers) would be able to justify a corresponding price increase to their

19   customers.  In this way, Defendants ensured that price increases for CRTs were passed on to

20   indirect purchasers of CRT Products.

21   125.130.    The agreements reached at the glass meetings included:

22   a.  agreements on CRT prices, including establishing target prices,

23       "bottom" prices, price ranges and price guidelines;

24   b.  placing agreed-upon price differentials on various attributes of CRTs,

25       such as quality or certain technical specifications;

26   c.  agreements on pricing for intra-company CRT sales to vertically

27       integrated customers;

28   d.  agreements as to what to tell customers about the reason for a price

increase;

e.   agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

h.   agreements to coordinate uniform public statements regarding available capacity and supply;

i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

j.   agreements to allocate customers;

k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.   agreements to keep their meetings secret.

126.131.     Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

127.132.     As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

## 2.   **Bilateral Discussions**

~~128.~~133.   Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

~~129.~~134.   During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil ~~and~~, Mexico, and the United States.

~~130.~~135.   The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico ~~and~~, Europe, and the United States.

~~131.~~136.   In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil ~~and~~, Mexico, ~~such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.~~and the United States.  These ~~Brazilian and Mexican~~CRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these ~~Brazilian and Mexican~~CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants ~~Philips and Samsung SDI~~, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs ~~imported into~~sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

~~132.~~137.   Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

133.138.      Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.   For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.   And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

**3.      Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

134.139.      Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

135.140.      Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

1   the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the

2   alleged conspiracy.

3   136.141.   Between at least 1998 and 2007, Defendant IRICO, through IGC,

4   IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the

5   highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions

6   with other Defendants, particularly with other Chinese manufacturers.   Through these

7   discussions, IRICO agreed on prices and supply levels for CRTs.   None of IRICO's

8   conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

9   IRICO was acting to further its own independent private interests in participating in the alleged

10  conspiracy.

11  137.142.   Between at least 1995 and 2001, Defendant LG Electronics,

12  through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001,

13  LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD

14  (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest

15  ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions

16  with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on

17  prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this

18  conspiracy.

19  138.143.   Defendant LGEUSA was represented at those meetings and was a

20  party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT

21  Products, it played a significant role in the conspiracy because Defendants wished to ensure that

22  the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

23  agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in

24  the alleged conspiracy.

25  139.144.   Between at least 2001 and 2006, Defendant LP Displays (f/k/a

26  LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these

27  meetings were attended by the highest ranking executives from LP Displays.  Certain of these

28  high level executives from LP Displays had previously attended meetings on behalf of

Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

140.145.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

141.146.    PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

142.147.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

143.148.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

144.149.        Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).   A substantial number of these meetings were attended by high level executives from Philips.   Philips also engaged in numerous bilateral discussions with other Defendants.   Through these discussions, Philips agreed on prices and supply levels for CRTs. Philips never effectively withdrew from this conspiracy.

145.150.        Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.   To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.   Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

146.151.        Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.   Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.   Through these discussions, Samsung agreed on prices and supply levels for CRTs.

147.152.        Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

153.        Between at least 1998 and 2006, Defendant Samtel participated in

multiple bilateral discussions with other Defendants, particularly with Thai CRT.   These meetings were attended by high level executives from Samtel.   Through these discussions, Samtel agreed on prices and supply levels for CRTs.   Samtel never effectively withdrew from this conspiracy.

148.154.        Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.   These meetings were attended by the highest ranking executives from Thai CRT.   Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.   Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.   Thai CRT never effectively withdrew from this conspiracy.

155.   Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several glass meetings and multiple bilateral meetings.   These meetings were attended by high level sales managers from Thomson.   At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.   Thomson never effectively withdrew from this conspiracy.   Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.   Thomson has admitted to the European Commission that it played a role in the conspiracy.

156.   Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral and some multilateral meetings with its competitors.   These meetings were attended by high level sales managers from Mitsubishi.   At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.   Mitsubishi never effectively withdrew from this conspiracy.

149.157.        Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.   After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.   These meetings were attended by high level sales managers from Toshiba and MTPD.   Toshiba also engaged in multiple

1   bilateral discussions with other Defendants, particularly with LG.  Through these discussions,

2   Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from

3   this conspiracy.

4              150.158.     Defendants Toshiba America, TACP, TAEC and TAIS were

5   represented at those meetings and were a party to the agreements entered at them.  To the extent

6   Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct

7   purchasers, they played a significant role in the conspiracy because Defendants wished to ensure

8   that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

9   agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS

10  were active, knowing participants in the alleged conspiracy.

11             151.159.     Between at least 1995 and 2006, Defendant Chunghwa, through

12  Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China)

13  and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of

14  these meetings were attended by the highest ranking executives from Chunghwa, including the

15  former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral

16  discussions with each of the other Defendants on a regular basis.  Through these discussions,

17  Chunghwa agreed on prices and supply levels for CRTs.

18             152.    Defendant Tatung America was represented at those meetings and was a

19  party to the agreements entered at them.  To the extent Tatung America sold and/or distributed

20  CRT Products to direct purchasers, it played a significant role in the conspiracy because

21  Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would

22  not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America

23  was an active, knowing participant in the alleged conspiracy.

24             153.160.     Between at least 1995 and 2004, Daewoo, through Daewoo

25  Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A

26  substantial number of these meetings were attended by the highest ranking executives from

27  Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.

28  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral

1  discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for

2  bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

3      154.161.    When Plaintiff refers to a corporate family or companies by a

4  single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or

5  more employees or agents of entities within the corporate family engaged in conspiratorial

6  meetings on behalf of every company in that family.  In fact, the individual participants in the

7  conspiratorial meetings and discussions did not always know the corporate affiliation of their

8  counterparts, nor did they distinguish between the entities within a corporate family.   The

9  individual participants entered into agreements on behalf of, and reported these meetings and

10 discussions to, their respective corporate families.  As a result, the entire corporate family was

11 represented in meetings and discussions by their agents and were parties to the agreements

12 reached in them.

13     **E.**    **The CRT Market During the Conspiracy**

14     155.162.    Until the last few years of the CRT conspiracy, CRTs were the

15 dominant technology used in displays, including televisions and computer monitors.  During the

16 Relevant Period, this translated into the sale of millions of CRT Products, generating billions of

17 dollars in annual profits.

18     156.163.    The following data was reported by Stanford Resources, Inc., a

19 market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

25     157.164.    During the Relevant Period, North America was the largest market

26 for CRT TVs and computer monitors.  According to a report published by Fuji Chimera

27 Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of

---

[1]     Estimated market value of CRT units sold.

which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

158.165.    In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

159.166.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

160.167.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

161.168.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

162.169.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

163.170.    During the Relevant Period, while demand in the United States for

CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

164.171.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

165.172.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

### F.    International Government Antitrust Investigations

166.173.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice in November 2007.

167.174.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

168.175.    In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

169.176.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH)

initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

170.177.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

171.178.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment

against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

172.179.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

173.180.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

174.181.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

175.182.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers

and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

176.183.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

184.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

177.185.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

178.186.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

179.187.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

180.188.     In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

181.189.     On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

182.190.     On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

183.191.     On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

184.192.     The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

> **G.**     **The Role of Trade Associations During the Relevant Period**

185.193.     Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information. One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers. Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea. EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK had a cooperation pact with the United

States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

186.194.          Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

187.195.          The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

188.196.          Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

189.197.          Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.      Effects of Defendants' Antitrust Violations**

**1.      Examples of Reductions in Manufacturing Capacity by Defendants**

190.198.          As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

191.199.     In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

192.200.     In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

193.201.     In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

194.202.     In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

195.203.     In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

**2.**  **Examples of Collusive Pricing for CRTs**

196.204.     Defendants' collusion is evidenced by unusual price movements in the CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

197.205.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

198.206.     In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

199.207.     Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

200.208.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

201.209.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

202.210.     After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

203.211.     On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

204.212.     CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

### 3.   Summary Of Effects Of The Conspiracy Involving CRTs

~~205.~~213.      The above combination and conspiracy has had the following effects, among others:

      a.   Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

      b.   Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

      c.   Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

      d.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.   PLAINTIFF'S INJURIES

~~206.~~214.      As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.   Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

~~207.~~215.      Plaintiff also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.   Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.   The conspiracy artificially inflated the prices of CRTs included in CRT Products.

208.216.        The OEMs and others passed on to their customers, including Plaintiff, the overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to its customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiff suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

209.217.        Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

210.218.        The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

211.219.        Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

212.220.        As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

213.221.        Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein that affected it until November 2007, when the investigation by the DOJ became public and class action complaints in the United States were filed.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

214.222.    Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

215.223.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

216.224.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

217.225.    Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

218.226.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending

1  these meetings were instructed on more than once occasion not to disclose the fact of these

2  meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or

3  production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their

4  arrivals and departures at such meetings to avoid being seen in public with each other and with

5  the express purpose and effect of keeping them secret.

6  ~~219.~~227.        Defendants also agreed at glass meetings and bilateral meetings to

7  give pretextual reasons for price increases and output reductions to their customers.

8  ~~220.~~228.        As alleged above, in early 1999, despite declining production costs

9  and the rapid entry of flat panel display products, the price of large-sized color CRTs actually

10  rose.  The price increase was allegedly based on increasing global demand for the products.  In

11  fact, this price rise was the result of collusive conduct amongst Defendants, which was

12  undisclosed at the time.

13  ~~221.~~229.        As alleged above, despite increased competition from flat panel

14  monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.

15  This price stabilization was purportedly due exclusively to a shortage of critical components

16  such as glass.  This was a pretext used to cover up the conspiracy.

17  ~~222.~~230.        In   addition,   when   several   CRT   manufacturers,   including

18  Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price

19  hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying

20  this price increase, a Deputy General Manager for an LG Electronics distributor in India stated,

21  "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the

22  prices of CRT monitors in due course of time."

23  ~~223.~~231.        Manufacturers  such  as  LG  Electronics  periodically  issued  press

24  statements falsely asserting that CRT prices were being driven lower by intense competition.

25  ~~224.~~232.        Plaintiff  is  informed  and  believes,  and  thereon  alleges,  that

26  Defendants' purported reasons for the price increases of CRTs were materially false and

27  misleading and made for the purpose of concealing Defendants' anti-competitive scheme as

28  alleged herein.

225.233.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

IX.

## IX.     *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

234.     As discussed at length in Paragraphs 173-192 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

235.     As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

226.236.     Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## XI.     CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

227.237.     Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

228.238.    Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

229.239.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

230.240.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

231.241.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

232.242.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.  participating in meetings and conversations to discuss the prices and supply of CRTs;

    b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.  issuing price announcements and price quotations in accordance with the agreements reached;

    e.  selling CRTs to customers in the United States at noncompetitive prices;

    f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

g.   agreeing to maintain or lower production capacity; and

h.   providing false statements to the public to explain increased prices for CRTs.

~~233.~~243.        As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

~~234.~~244.        Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

~~235.~~245.        During the Relevant Period, Plaintiff conducted a substantial volume of business in California.   In particular, Plaintiff purchased CRT Products, which contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially inflated prices because of the price-fixing conspiracy, in California.   Plaintiff prepared and sent purchase orders for CRT Products to various manufacturers in California.   Plaintiff also sent payment for CRT Products to these manufacturers in California.   In addition, Plaintiff sold CRT Products in California containing CRTs manufactured and sold by Defendants and their co-conspirators; maintained offices and inventories in California of CRT Products containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRT Products to consumers in California.   As a result of its substantial contacts with California, Plaintiff is entitled to the protection of the laws of California.

~~236.~~246.        In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.   Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs. Defendant Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy

were carried out in California.  Defendants' conduct within California thus injured Plaintiff, both in California and throughout the United States.

237.248.        Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.   Defendants' conduct substantially affected California commerce.

238.248.        The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

239.249.        For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.   to fix, raise, maintain and stabilize the price of CRTs;

    b.   to allocate markets for CRTs amongst themselves;

    c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

    d.   to allocate among themselves the production of CRTs.

240.250.        The combination and conspiracy alleged herein has had, inter alia, the following effects:

    a.   price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

b.  prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.  those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

241.251.    As a result of the alleged conduct of Defendants, Plaintiff paid supra-competitive, artificially inflated prices for the CRT Products they purchased during the Relevant Period.

242.252.    As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiff is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

## Third Claim for Relief

### (Violation of California Unfair Competition Law)

243.253.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

244.254.    Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.*

245.255.    This Complaint is filed, and these proceedings are pursuant to Sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from Defendant of all revenues, earnings, profits compensation, and benefits which they obtained as a result of their unlawful, unfair, and fraudulent conduct.

246.256.      The unlawful, unfair, and fraudulent business practices of Defendants, as alleged above, injured Plaintiff and members of the public in that Defendants' conduct restrained competition, causing Plaintiff and others to pay supra-competitive and artificially inflated prices for CRT Products.

        a.     <u>Defendants' Unlawful Business Practices</u>: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

        b.     <u>Defendants' Unfair Business Practices</u>: As alleged above, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

        c.     <u>Defendants' Fraudulent Business Practices</u>: As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping meetings with coconspirators secret and making false public statements about the reasons for artificially inflated prices of CRTs. Members of the public were likely to be deceived, and Plaintiff was in fact deceived by Defendants' fraudulent actions. As a result of Defendants' unfair competition, Plaintiff suffered injury in fact and has lost money or property.

247.257.      The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

248.258.      Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

249.259.        Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 *et seq.*

250.260.        By reason of the foregoing, Plaintiff is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

**Fourth Claim for Relief**

**(Violation of the New York Donnelly Act)**

251.261.        Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

252.262.        During the Relevant Period, Plaintiff conducted a substantial volume of business in New York.  In particular, Plaintiff purchased CRT Products, which contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially inflated prices because of the price-fixing Conspiracy, in New York.  Plaintiff prepared and sent purchase orders for CRT Products to various manufacturers in New York.  Plaintiff also sent payment for CRT Products to these manufacturers in New York.  In addition, Plaintiff sold CRT Products in New York containing CRTs manufactured and sold by Defendants and their co-conspirators; maintained offices, and inventories in New York of CRT Products containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in New York who sold CRT Products to consumers in New York.  As a result of its substantial contacts with New York, Plaintiff is entitled to the protection of the laws of New York.

253.263.        Beginning at a time presently unknown to Plaintiff, but at least as early as December 23, 1998, and continuing thereafter at least up to and including November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Donnelly Act, New York General Business Law §§ 340 *et seq.*

254.264.     Defendants' Conspiracy restrained, suppressed, and/or eliminated competition in the sale of CRT Products in New York and fixed, raised, maintained, and stabilized CRT Products prices in New York at artificially high, non-competitive levels.

255.265.     As a result, Defendants' Conspiracy substantially affected New York commerce.

256.266.     As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products purchased from Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy, and is therefore entitled to treble damages and the costs of suit, including attorneys' fees, pursuant to N.Y. Gen. Bus. Law § 340(5).

## XI.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.     Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the California Unfair Competition Law, and the New York Donnelly Act, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.     Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

D.     Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

1          E.     Plaintiff shall recover its costs of this suit, including reasonable attorneys'

2   fees as provided by law; and

3          F.     Plaintiff shall receive such other or further relief as may be just and

4   proper.

5   **XII.**          **<u>JURY TRIAL DEMAND</u>**

6          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by

7   jury of all the claims asserted in this Complaint so triable.

1    Dated:                                    Respectfully Submitted,

2

3                                              _____

4                                              ~~Mike McKool, Jr.~~
                                               ~~State Bar No. 13732100~~
5                                              ~~Email: mmckool@mckoolsmith.com~~
                                               ~~Lewis T. LeClair~~
6                                              ~~State Bar No. 12072500~~
                                               ~~Email: lleclair@mckoolsmith.com~~
7                                              ~~Scott R. Jacobs~~
                                               ~~State Bar No. 10521550~~
8                                              ~~Email: srjacobs@mckoolsmith.com~~
                                               ~~MCKOOL SMITH, P.C.~~
9                                              ~~300 Crescent Court, Suite 1500~~
                                               ~~Dallas, TX 75201~~
10                                             ~~Telephone: (214) 978-4000~~
                                               ~~Facsimile: (214) 978-4044~~
11

12                                             ~~*Counsel For Plaintiff Compucom Systems,*~~
                                               ~~*Inc.*~~
13   ~~**OF COUNSEL:**~~

14                                             William A. Isaacson *(Pro hac vice)*
15                                             **BOIES, SCHILLER & FLEXNER LLP**
                                               5301 Wisconsin Ave. NW, Suite 800
16                                             Washington, D.C.  20015
                                               Telephone:  (202) 237-2727
17                                             Facsimile:   (202) 237-6131
                                               Email:  wisaacson@bsfllp.com
18

19                                             Philip J. Iovieno *(Pro hac vice)*
                                               Anne M. Nardacci *(Pro hac vice)*
20                                             Luke Nikas *(Pro hac vice)*
                                               Christopher V. Fenlon *(Pro hac vice)*
21                                             **BOIES, SCHILLER & FLEXNER LLP**
22                                             10 North Pearl Street, 4th Floor
                                               Albany, NY  12207
23                                             Telephone:  (518) 434-0600
                                               Facsimile:   (518) 434-0665
24                                             Email: piovieno@bsfllp.com

25

26

27

28

COMPUCOM'S AMENDED COMPLAINT                   66                    Case No. 11-cv-06396
                                                                     Master File No. 3:07-cv-05944-SC

1    Email: anardacci@bsfllp.com
     Email: lnikas@bsfllp.com
2    Email: cfenlon@bsfllp.com

3

4    Mike McKool, Jr. (*Pro hac vice*)
     Email: mmckool@mckoolsmith.com
5    Lewis T. LeClair (*Pro hac vice*)
     Email: lleclair@mckoolsmith.com
6    Scott R. Jacobs (*Pro hac vice*)
     Email: srjacobs@mckoolsmith.com
7    **MCKOOL SMITH, P.C.**
     300 Crescent Court, Suite 1500
8    Dallas, TX 75201
     Telephone: (214) 978-4000
9    Facsimile: (214) 978-4044

10

11   *Counsel For Plaintiff*
     *Compucom Systems, Inc.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT H

1

~~UNITED STATES DISTRICT COURT~~
~~EASTERN DISTRICT OF NEW YORK~~

2

WILLIAM A. ISAACSON (*Pro hac vice*)

3

BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800

4

Washington, DC 20015
Telephone:  (202) 237-2727

5

Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

6

7

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)

8

LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)

9

BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor

10

Albany, NY 12207
Telephone:  (518) 434-0600

11

Facsimile:   (518) 434-0665

12

Email: piovieno@bsfllp.com

13

*Counsel for Plaintiffs Electrograph Systems, Inc.*
*and Electrograph Technologies Corp.*

14

15

**UNITED STATES DISTRICT COURT**

16

**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

17

IN RE CATHODE RAY TUBE (CRT)

18

ANTITRUST LITIGATION

19

This Document Relates To Individual Case

20

No. 11-cv-01656-SC

21

ELECTROGRAPH SYSTEMS, INC.;
ELECTROGRAPH TECHNOLOGIES

22

CORP.,

23

Plaintiffs,

24

vs.

25

HITACHI, LTD.; HITACHI DISPLAYS,
LTD.; HITACHI AMERICA, LTD.;

26

HITACHI ASIA, LTD.; HITACHI
ELECTRONIC DEVICES (USA), INC.;

27

SHENZHEN SEG HITACHI COLOR
DISPLAY DEVICES, LTD.; IRICO GROUP

28

CORPORATION; IRICO GROUP

Case No. 11-cv-01656-SC

Master File No. 3:07-cv-05944-SC

MDL No. 1917

~~FIRST~~SECOND **AMENDED**
**COMPLAINT**

**JURY TRIAL DEMANDED**

ELECTRONICS CO., LTD.; IRICO
DISPLAY DEVICES CO., LTD.; LG
ELECTRONICS, INC.; LG ELECTRONICS
USA, INC.; LG ELECTRONICS TAIWAN
TAIPEI CO., LTD.; LP DISPLAYS
INTERNATIONAL LTD.; PANASONIC
CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA;
MT PICTURE DISPLAY CO., LTD.;
BEIJING MATSUSHITA COLOR CRT CO.,
LTD.; KONINKLIJKE PHILIPS
ELECTRONICS N.V.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS
DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG
SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.;  SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG
SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; TECHNICOLOR SA;
TECHNICOLOR USA, INC.; MITSUBISHI
ELECTRIC CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA,
INC.; MITSUBISHI ELECTRIC &
ELECTRONICS, USA, INC.,

Defendants.

Plaintiffs Electrograph Systems, Inc. and Electrograph Technologies Corp., for

their Complaint against all Defendants named herein, hereby allege as follows:

I.          **INTRODUCTION**

1.          Defendants and their co-conspirators formed an international cartel which

conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs") and products containing CRTs.

2.      Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products."  CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

3.      Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.      Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRT Products were sold in the United States.

5.      With respect to CRT Products, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.      The conspiracy concerning CRT Products commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period. Also beginning in 1995, the co-conspirators began to engage in informal group meetings. By 1997, these group meetings had become more formalized, as described in greater detail below. There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings. These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe. These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities. Since February 10, 2009, federal indictments have been issued against six individuals in connection with Defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiffs purchased CRT Products, both CRTs and products containing CRTs, in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRT Products they purchased during the Relevant Period.

## II.      JURISDICTION AND VENUE

10.      Plaintiffs bring this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.      Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business and Professions Code, for injunctive relief and treble damages that Plaintiffs

1    sustained due to Defendants' and their co-conspirators' violation of Section 16700 *et seq.* of the

2    California Business and Professions Code (the "Cartwright Act").  Plaintiffs' claims are also

3    brought pursuant to Sections 17203 and 17204 of the California Business and Professions Code,

4    to obtain restitution from and an injunction against Defendants due to their violations of Section

5    17200 *et seq.* of the California Business and Professions Code (the "California Unfair

6    Competition Act").

7            12.    Plaintiffs also bring this action pursuant to Section 340 of the New York

8    General Business Law, for injunctive relief and treble damages that Plaintiffs sustained due to

9    Defendants' and their co-conspirators' violation of Section 340 *et seq.* of the New York General

10   Business Law (the "Donnelly Act").  Plaintiffs' claims are also brought pursuant to Section 349

11   of the New York General Business Law, to obtain restitution from and an injunction against

12   Defendants due to their violations of Section 349 *et seq.* of the New York General Business Law

13   (the "New York Unfair Competition Act").

14           13.    The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of

15   the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

16   supplemental jurisdiction over Plaintiffs' claims under the Cartwright Act, the California Unfair

17   Competition Act, the Donnelly Act, and the New York Unfair Competition Act under 28 U.S.C.

18   § 1367.  Plaintiffs' state law claims are related to their claims under Section 1 of the Sherman

19   Act and they form part of the same case or controversy.

20           14.    The activities of Defendants and their co-conspirators, as described herein,

21   involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

22   did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and

23   import trade or commerce.  This effect gives rise to Plaintiffs' antitrust claims.  During the

24   Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the

25   United States.

26           15.    The activities of Defendants and their co-conspirators, as described herein,

27   were within the flow of, were intended to, and did have a direct and substantial effect on

28   commerce in California and New York.  In particular Defendants' and their co-conspirators'

conspiracy directly and substantially affected the price of CRT Products purchased in these states.  These effects also give rise to Plaintiffs' antitrust claims.  Plaintiffs maintained operations in these states during the Relevant Period.

16.     This court has jurisdiction over each Defendant named in this action under both Section 12 of the Clayton Act (15 U.S.C. § 22) and section 302 of the New York CPLR. Each Defendant conducts substantial business in New York as well as California.  In addition, Defendants and their co-conspirators purposely availed themselves of the laws of the United States and the identified states insofar as they manufactured CRTs for sale in the United States, including New York and California, or which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States, including New York and California.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States, including in New York and California.

17.     Venue is proper in the Eastern District of New York under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c) and (d) because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.   In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District. Defendants and their co-conspirators knew that price-fixed CRT Products containing price-fixed CRTs would be sold and shipped into this District.

**III.     PARTIES**

**A.     Plaintiffs**

18.     Plaintiff Electrograph Systems, Inc. is a New York corporation with its principal place of business in New York.  Through May 2009, Electrograph Systems, Inc. conducted business as a value-added wholesale distributor of display technology solutions, including CRT displays and components, rear screen projection TVs, projectors, and digital electronic products, primarily to resellers and system integrators.  Electrograph Systems, Inc. specialized in display, audio, connectivity, and other complementary technologies for sale to commercial, retail and government customers.

19.      Plaintiff Electrograph Technologies Corp. is a New York corporation, with its principal place of business in New York.  Electrograph Technologies Corp. owns 100% of the outstanding capital stock of Electrograph Systems, Inc.   In addition to its ownership of Electrograph Systems, Inc. and various other businesses, through May 2004, Electrograph Technologies Corp. conducted business as an information technology solutions provider that specialized in hardware and software procurement, display technology, custom networking, security, IP telephony, remote management, application development/e-commerce, storage, and enterprise and Internet solutions.  Electrograph Technologies Corp. offered its customers single-source solutions customized to their information systems needs by integrating its analysis, design and implementation services with hardware, software, networking products and peripherals from leading vendors.

20.      During the Relevant Period, the Plaintiffs, and their predecessor entities described below, purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.   As such, the Plaintiffs suffered injury as a result of Defendants' unlawful conduct.   Throughout the Relevant Period, Plaintiffs, and their predecessor entities described below, conducted a substantial amount of business in New York and California.

### B.    Plaintiffs' Corporate History

21.      Electrograph Technologies Corp. was incorporated under the name Manchester Equipment Co., Inc. on August 21, 1973.  The company's name was changed to Manchester Technologies, Inc. on February 1, 2001, and then subsequently changed to Electrograph Technologies Corp. on August 1, 2005.  On August 1, 2005, upon consummation of a merger by and among Electrograph Holdings, Inc., a Delaware Corporation, CICE Acquisition Corp. ("merger sub"), a New York Corporation, and Manchester Technologies, Inc., the merger sub was merged with and into Manchester Technologies, Inc., and Manchester Technologies, Inc. became a wholly-owned subsidiary of Electrograph Holdings, Inc., and concurrently changed its name to Electrograph Technologies Corp.  During the Relevant Period, Electrograph Technologies Corp., and its subsidiaries and affiliates, purchased CRT Products in

1   the United States and elsewhere directly and indirectly from Defendants, and/or Defendants'

2   subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and

3   affiliates controlled.  As such, Electrograph Technologies Corp. suffered injury as a result of

4   Defendants' unlawful conduct.

5           22.    Electrograph Systems, Inc. was incorporated under the name Electrograph

6   Acquisitions, Inc. on April 10, 1997.  On April 28, 1997, Manchester Equipment Co., Inc.—the

7   predecessor to Electrograph Technologies Corp.—acquired the business of Electrograph

8   Acquisitions, Inc. from Bitwise Designs, Inc.  On April 29, 1997, Electrograph Acquisitions, Inc.

9   changed its name to Electrograph Systems, Inc.  During the Relevant Period, Electrograph

10  Systems, Inc., and its subsidiaries and affiliates, purchased CRT Products in the United States

11  and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or

12  affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As

13  such, Electrograph Systems, Inc. suffered injury as a result of Defendants' unlawful conduct.

14          23.    ActiveLight, Inc. was formed on April 16, 1998, as a Washington

15  company with its principal place of business in the State of Washington.  ActiveLight, Inc. was a

16  value-added wholesale distributor of display technology solutions and projectors to the

17  professional, commercial and high-end consumer markets.   During the Relevant Period,

18  ActiveLight, Inc. purchased CRT Products directly and indirectly from Defendants, and/or

19  Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants'

20  subsidiaries and affiliates controlled.  As such, ActiveLight, Inc. suffered injury as a result of

21  Defendants' unlawful conduct.

22          24.    On February 21, 2006, Plaintiff, Electrograph Systems, Inc. acquired

23  100% of the outstanding stock of ActiveLight, Inc.  From the acquisition date through March 2,

24  2008, ActiveLight, Inc. operated as a wholly-owned subsidiary of Electrograph Systems, Inc.

25  On March 3, 2008, ActiveLight, Inc. was merged into Electrograph Systems, Inc.

26          25.    CineLight Corporation was formed on June 11, 2001, as a Washington

27  company with its principal place of business in the State of Washington.  CineLight Corporation

28  was a value-added wholesale distributor of advanced display technology products and

accessories to home theater designers and resellers.  During the Relevant Period, CineLight Corporation purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As such, CineLight Corporation suffered injury as a result of Defendants' unlawful conduct.

26.     On February 21, 2006, Electrograph Systems, Inc. acquired 100% of the outstanding stock of CineLight Corporation.  From the date of the acquisition until July 2006, CineLight Corporation operated as a wholly-owned subsidiary of Electrograph Systems, Inc.  In July 2006, CineLight Corporation was merged into ActiveLight, Inc.

27.     International Computer Graphics, Inc. was formed on April 18, 1985, as a California company with its principal place of business in California.  International Computer Graphics, Inc. conducted business as a specialty wholesale distributor of CRT, LCD, plasma and desktop displays, digital imaging peripherals and AV presentation products.  During the Relevant Period, International Computer Graphics, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As such, International Computer Graphics, Inc. suffered injury as a result of Defendants' unlawful conduct.

28.     On June 16, 2006, Electrograph Systems, Inc. acquired 100% of the outstanding stock of International Computer Graphics, Inc.  From the date of the acquisition through March 2, 2008, International Computer Graphics, Inc. operated as a wholly-owned subsidiary of Electrograph Systems, Inc.  On March 3, 2008, International Computer Graphics, Inc. was merged into Electrograph Systems, Inc.

29.     Champion Vision, Inc. was formed on June 19, 2003, as a New York company with its principal place of business in New York.  During the Relevant Period, Champion Vision, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Champion Vision, Inc. suffered injury as a result of Defendants' unlawful conduct.

30.     On September 15, 2008, Champion Vision, Inc. was merged into Electrograph Systems, Inc.

31.     Coastal Office Products, Inc. was formed in 1987 as a Maryland corporation with its principal place of business in Maryland.  On January 6, 1998, Coastal Office Products, Inc. was acquired by and became a wholly owned subsidiary of Manchester Equipment Co., Inc., the predecessor to Electrograph Technologies Corp.  Coastal Office Products, Inc. was a reseller and provider of microcomputer services and peripherals to companies in the greater Baltimore, Maryland area.  During the Relevant Period, Coastal Office Products, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Coastal Office Products, Inc. suffered injury as a result of Defendants' unlawful conduct. In 2008, Coastal Office Products, Inc. was merged into Electrograph Systems, Inc.

32.     In 2008, Coastal Office Products, Inc. was merged into Electrograph Systems, Inc.

33.     During the Relevant Period, Electrograph Systems, Inc. acquired all of the outstanding stock of ActiveLight, Inc., CineLight Corporation and International Computer Graphics, Inc. and formed Champion Vision, Inc. as a wholly-owned subsidiary.  In addition, during the Relevant Period, Electrograph Technologies Corp. acquired all of the outstanding stock of Coastal Office Products, Inc.  As such, the entities known as ActiveLight, Inc., CineLight Corporation, International Computer Graphics, Inc., Champion Vision, Inc. and Coastal Office Products, Inc. are herein referred to collectively as the "predecessor entities."  By acquiring the stock of companies that purchased CRT Products, Electrograph Systems, Inc. obtained all claims and rights under federal and state laws to recover any overcharges suffered by the predecessor entities.  Some of the predecessor entities were also merged into Electrograph Systems, Inc. and thus, Electrograph Systems, Inc. obtained all claims and rights under federal and state laws to recover any overcharges suffered by the predecessor entities.  As stated above, during the Relevant Period, these predecessor companies purchased CRT Products manufactured and sold by Defendants, their co-conspirators, and others.  As a result of Defendants' conspiracy,

1    these predecessor entities were injured in their business and property because the prices they paid

2    for CRT Products were artificially inflated by Defendants' conspiracy.  As used herein, any

3    reference to either Electrograph Systems, Inc. or Electrograph Technologies Corp. includes any

4    of the predecessor entities whose stock was acquired or obtained by either Electrograph Systems,

5    Inc. or Electrograph Technologies Corp.

6        C.    **Defendants**

7            1.    **Hitachi Entities**

8            34.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of

9    business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

10   parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

11   market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd.

12   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

13   subsidiaries or affiliates, throughout the United States.

14           35.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

15   company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

16   297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

17   in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

18   manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

19   create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi

20   Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

21   through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

22   dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

23   antitrust violations alleged in this complaint.

24           36.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

25   company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

26   York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

27   Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

28   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

1  United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

2  affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

3        37. Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

4  with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,

5  Singapore 528736. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant

6  Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or

7  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

8  United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

9  affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

10        38. Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a

11  Delaware corporation with its principal place of business located at 208 Fairforest Way,

12  Greenville, South Carolina 29607. HEDUS is a subsidiary of Defendant Hitachi, Ltd and

13  Hitachi Displays. During the Relevant Period, HEDUS manufactured, marketed, sold and/or

14  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

15  United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the

16  finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this

17  complaint.

18        39. Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

19  Shenzhen") was a Chinese company with its principal place of business located at 5001

20  Huanggang Road, Futian District, Shenzhen 518035, China. Hitachi Displays, Ltd. owned at

21  least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally

22  around the time that the government investigations into the CRT industry began). Thus, Hitachi

23  Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the

24  Relevant Period. During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold

25  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

26  throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and

27  controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

28  violations alleged in this complaint.

40.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

**2.     IRICO Entities**

41.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.   IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.     During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

42.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

43.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.    IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

44.     Defendants IGC, IGE and IDDC are collectively referred to herein as

1    "IRICO."

2                          **3.      LG Electronics Entities**

3            45.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under

4    the laws of the Republic of Korea with its principal place of business located at LG Twin

5    Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5

6    billion global force in consumer electronics, home appliances and mobile communications,

7    which established its first overseas branch office in New York in 1968.  The company's name

8    was changed from Gold Star Communications to LGEI in 1995, the year in which it also

9    acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint

10   venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays

11   ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to

12   LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold

13   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

14   throughout the United States.

15           46.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware

16   corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs,

17   New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.

18   During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT

19   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

20   Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

21   to the antitrust violations alleged in this complaint.

22           47.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a

23   Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road,

24   NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of

25   Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed,

26   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

27   throughout the United States.  Defendant LGEI dominated and controlled the finances, policies

28   and affairs of LGETT relating to the antitrust violations alleged in this complaint.

48.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

### 4.     LP Displays

49.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 5.     Panasonic Entities

50.     Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

51.     Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

1       52.     Defendants Panasonic Corporation and PCNA are collectively referred to

2 herein as "Panasonic."

3       53.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

4 Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

5 Osaka, 571-8504, Japan.   In 2002, Panasonic Corporation entered into a joint venture with

6 Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

7 manufacture CRTs.   Panasonic Corporation was the majority owner with 64.5 percent.   On

8 March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

9 venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

10 Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

11 manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

12 subsidiaries or affiliates, throughout the United States.

13       54.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

14 Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

15 Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which

16 is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co.,

17 Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

18 enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

19 China state-owned enterprise).   Formed in 1987, BMCC was Panasonic Corporation's first CRT

20 manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in

21 China.   During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed

22 CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

23 States.

24      **6.**     **Philips Entities**

25       55.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips

26 Electronics ("Royal Philips") is a Dutch company with its principal place of business located at

27 Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one

28 of the world's largest electronics companies, with 160,900 employees located in over 60

countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

56.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

57.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

58.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal

1   Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

2   the antitrust violations alleged in this complaint.

3          59.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips

4   Brazil are collectively referred to herein as "Philips."

5                  **7.     Samsung Entities**

6          60.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

7   company with its principal place of business located at Samsung Electronics Building, 1320-10,

8   Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.   It is South Korea's top electronics

9   company.   During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

10  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

11  States.

12         61.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

13  corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

14  Ridgefield Park, New Jersey 07660.   SEAI is a wholly-owned and controlled subsidiary of

15  Defendant SEC.   During the Relevant Period, SEAI manufactured, marketed, sold and/or

16  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

17  United States.   Defendant SEC dominated and controlled the finances, policies and affairs of

18  Samsung SEAI relating to the antitrust violations alleged in this complaint.

19         62.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

20  Company ("Samsung SDI") is a South Korean company with its principal place of business

21  located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.   Samsung SDI is a public

22  company.   SEC is a major shareholder holding almost 20 percent of the stock.   Founded in 1970,

23  Samsung SDI claims to be the world's leading company in the display and energy business, with

24  28,000 employees and facilities in 18 countries.   In 2002, Samsung SDI held a 34.3% worldwide

25  market share in the market for CRTs; more than any other producer.   Samsung SDI has offices in

26  Chicago and San Diego.   During the Relevant Period, Samsung SDI manufactured, marketed,

27  sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

28  throughout the United States.   Defendant SEC dominated and controlled the finances, policies

1    and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

2                    63.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a

3    California corporation with its principal place of business located at 3333 Michelson Drive, Suite

4    700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

5    Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

6    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

7    affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

8    controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

9    violations alleged in this complaint.

10                   64.    Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico")

11   is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

12   21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

13   owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

14   Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either

15   directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

16   and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

17   Mexico relating to the antitrust violations alleged in this complaint.

18                   65.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a

19   Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,

20   Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

21   owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

22   Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

23   directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

24   and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

25   Brazil relating to the antitrust violations alleged in this complaint.

26                   66.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

27   is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian

28   Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

1    Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

2    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

3    affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

4    controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

5    violations alleged in this complaint.

6            67.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a

7    Chinese company with its principal place of business located at Developing Zone of Yi-Xian

8    Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

9    subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin

10   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11   subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

12   dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to

13   the antitrust violations alleged in this complaint.

14           68.    Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia")

15   is a Malaysian corporation with its principal place of business located at Lots 635 & 660,

16   Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus,

17   Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant

18   Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed,

19   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

20   throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the

21   finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged

22   in this complaint.

23           69.    Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung

24   SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung

25   SDI Malaysia are collectively referred to herein as "Samsung."

26       **8.    <u>Samtel</u>**

27           70.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

28   principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-

1    110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that

2    country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

3    States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period,

4    Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

5    its subsidiaries and affiliates, throughout the United States.

6                            **9.    Thai CRT**

7                 71.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

8    1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

9    Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

10   televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

11   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

12   United States.

13                           **10.    Toshiba Entities**

14                72.    Defendant Toshiba Corporation ("TC") is a Japanese company with its

15   principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

16   Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

17   and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two

18   other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

19   Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by

20   1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

21   in which the entities consolidated their CRT businesses.  During the Relevant Period, TC

22   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

23   subsidiaries or affiliates, throughout the United States.

24                73.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

25   corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

26   4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled

27   subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured,

28   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

74.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

75.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

76.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

77.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.     Thomson Entities**

78.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.   Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs  internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere. Thomson SA's television division also purchased CRTs from other CRT manufacturers. Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.   The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

79.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.   Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

1  business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer
2  Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or
3  indirectly through its subsidiaries or affiliates, to customers throughout the United States.

4       80.    Thomson SA and Thomson Consumer Electronics are collectively referred
5  to herein as "Thomson."

6  **12.    Mitsubishi Entities**

7       81.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")
8  is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,
9  Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in
10  Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold
11  internally to Mitsubishi's television and monitor manufacturing division and to other television
12  and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor
13  division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,
14  Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the
15  United States.

16       82.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi
17  Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.
18  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi
19  Electric USA manufactured CRTs for the United States market in plants located in Mexicali,
20  Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television
21  and monitor manufacturing division and to other television and monitor manufacturers in the
22  U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from
23  other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,
24  marketed, sold and distributed CRT Products in the United States.

25       83.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi
26  Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.
27  Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the
28  Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

1  CRT televisions and monitors in the United States.

2          84.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

3  are collectively referred to herein as "Mitsubishi."

4  **IV.        AGENTS AND CO-CONSPIRATORS**

5          78.85.  The acts alleged against Defendants in this Complaint were authorized,

6  ordered, or done by their officers, agents, employees, or representatives, while actively engaged

7  in the management and operation of Defendants' businesses or affairs.

8          79.86.  Each Defendant acted as the principal, agent, or joint venturer of, or for,

9  other Defendants with respect to the acts, violations, and common course of conduct alleged by

10  Plaintiffs.  Each Defendant that is a subsidiary of a foreign parent acts as the United States agent

11  for CRTs or CRT Products made by its parent company.

12          80.87.  Various persons and/or firms not named as Defendants in this Complaint

13  participated as co-conspirators in the violations alleged herein and may have performed acts and

14  made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

15  include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

16  Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

17  Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and

18  Videocon Industries, Ltd.  Plaintiffs reserve the right to name some or all of these and other co-

19  conspirators as Defendants at a later date.

20          81.88.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major

21  manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

22  2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

23  Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had

24  subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the

25  United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo

26  Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),

27  Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The

28  Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

1    joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

2    As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's

3    CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and

4    DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either

5    directly or through their subsidiaries or affiliates, throughout the United States.

6          82.89.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein

7    as "Daewoo."

8          83.90.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita

9    Malaysia") was a Malaysian company with its principal place of business located at Lot 1,

10   Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.

11   Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic

12   Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co.,

13   Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT

14   Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until

15   its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed,

16   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

17   throughout the United States.  Defendant Panasonic Corporation dominated and controlled the

18   finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

19   this complaint.

20         84.91.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

21   venture formed by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's

22   principal place of business was located in Indonesia.  TEDI was projected to have an annual

23   production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant

24   MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT

25   Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold,

26   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

27   throughout the United States.  Defendant TC dominated and controlled the finances, policies, and

28   affairs of TEDI relating to the antitrust violations alleged in this complaint.

85.92.  Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

86.93.  The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.  TRADE AND COMMERCE

87.94.  During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

88.95.  During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

89.96.  The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in California and New York and caused antitrust injuries in California and New York.

## VI.  FACTUAL ALLEGATIONS

### A.  CRT Technology

90.97.  A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

91.98.  CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

92.99.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

93.100.  Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

94.101.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

95.102.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

96.103.  The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and

1   purposes, inseparable in that one would not exist without the other.

2   ~~97.~~104.        Plaintiffs have participated in the market for CRTs through their

3   direct purchases from Defendants of CRTs and CRT Products and their purchases of CRT

4   Products indirectly from non-Defendant original equipment manufacturers ("OEM") and others.

5   Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs have bought CRTs

6   and CRT Products, and Plaintiffs have been injured thereby and paid supra-competitive prices

7   for CRTs and CRT Products.

8   ~~98.~~105.        Plaintiffs have participated in the market for products containing

9   CRTs. To the extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants'

10  and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others

11  resold CRTs in these products.  Plaintiffs were not able to pass the inflated prices on to their

12  customers.

13  ~~99.~~106.        Plaintiffs have been injured by paying supra-competitive prices for

14  CRTs and CRT Products.

15  **B.**    **Structure of the CRT Industry**

16  ~~100.~~107.        The CRT industry has several characteristics that facilitated a

17  conspiracy, including market concentration, ease of information sharing, the consolidation of

18  manufacturers, multiple interrelated business relationships, significant barriers to entry,

19  heightened price sensitivity to supply and demand forces and homogeneity of products.

20  **1.**    **Market Concentration**

21  ~~101.~~108.        During the Relevant Period, the CRT industry was dominated by

22  relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays),

23  MTPD, as well as Chunghwa Picture Tubes, Ltd. ("Chunghwa"), together held a collective 78%

24  share of the global CRT market.  The high concentration of market share facilitates coordination

25  because there are fewer cartel members among which to coordinate pricing or allocate markets,

26  and it is easier to monitor the pricing and production of other cartel members.

27  **2.**    **Information Sharing**

28  ~~102.~~109.        Because of common membership in trade associations, interrelated

ELECTROGRAPH'S SECOND AMENDED
COMPLAINT                                    29                    Case No. 11-cv-01656-SC
                                                                  Master File No. 3:07-cv-05944-SC

business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRT Products as alleged below.

103.110.    Defendants Hitachi and Samsung, as well as Chunghwa, are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRT Products.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.    Consolidation

104.111.    The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.    Multiple Interrelated Business Relationships

105.112.    The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

106.113.    Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

a.    The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

b.    Defendants LG Electronics and Philips also formed LG.Philips LCD

Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.   In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Chunghwa for large CPTs.

h.   Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k.   Defendant Samtel claims to have supplied CRTs to Defendants LG

Electronics, Samsung, Philips, and Panasonic.

**5.** **High Costs of Entry Into the Industry**

~~107.~~114.         There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

~~108.~~115.         During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRT Products allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.** **The Maturity of the CRT Product Market**

~~109.~~116.         Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

~~110.~~117.         Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

~~111.~~118.         In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.   Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

~~112.~~119.         Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion

and the international price fixing conspiracy worthwhile. Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

113.120.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America. By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

114.121.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.    Homogeneity of CRT Products

115.122.    CRT Products are commodity-like products which are manufactured in standardized sizes. One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sell and Plaintiffs purchase CRT Products primarily on the basis of price.

116.123.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.    Pre-Conspiracy Market

117.124.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies. During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers. A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

118.125.    In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa visited each other's factories in S.E. Asia. During this period, these producers began to include discussions about price in their meetings.

### D.    Defendants' and Co-Conspirators' Illegal Agreements

119.126.      In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRT Products to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

120.127.      The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRT Products in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

121.128.      Defendants Samsung, LG, and LGMitsubishi, along with Chunghwa and Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRT Products.

122.129.      As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

123.130.      The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRT Products.

### 1.      "Glass Meetings"

124.131.      The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

125.132.      The first level meetings were attended by high level company

executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

126.133.    The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

127.134.    Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The working level meetings also tended to be more regional and often took place near Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

128.135.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen and Samsung SDI Tianjin.

129.136.    Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and co-conspirators which had

subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) ~~and~~ IRICO, and Thomson.  Chunghwa also attended these meetings.

~~130.~~137.        Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

~~131.~~138.        During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand ~~and~~, Malaysia, and the United States.

~~132.~~139.        Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

~~133.~~140.        The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

~~134.~~141.        During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a

36

"bottom price."

135.142.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

136.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

137.143.    The agreements reached at the glass meetings included:

    a.  agreements on CRT Product prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    b.  placing agreed-upon price differentials on various attributes of CRT Products, such as quality or certain technical specifications;

    c.  agreements on pricing for intra-company CRT Product sales to vertically integrated customers;

    d.  agreements as to what to tell customers about the reason for a price increase;

    e.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    f.  agreements to coordinate pricing with CRT manufacturers in other

geographic markets such as Brazil, Europe and India;

g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

h.   agreements to coordinate uniform public statements regarding available capacity and supply;

i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

j.   agreements to allocate customers;

k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.   agreements to keep their meetings secret.

138.144.     Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

139.145.     As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

**2.     Bilateral Discussions**

140.146.     Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees,

took the form of in-person meetings, telephone contacts and emails.

141.147.      During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and, Mexico, and the United States.

142.148.      The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and, Europe, and the United States.

143.149.      In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT Product manufacturers in Brazil and, Mexico, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.and the United States.      These Brazilian and MexicanCRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these Brazilian and MexicanCRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRT Products imported intoCRTs sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

144.150.      Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

145.151.      Bilateral discussions were also used to coordinate prices with CRT Product manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT Product

pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT Product pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT Product pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT Product pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRT Products.

### 3.  Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

146.152.        Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRT Products. Hitachi never effectively withdrew from this conspiracy.

147.153.        Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

148.154.        Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions

1    with other Defendants, particularly with other Chinese manufacturers.   Through these

2    discussions, IRICO agreed on prices and supply levels for CRT Products.   None of IRICO's

3    conspiratorial conduct in connection with CRT Products was mandated by the Chinese

4    government.   IRICO was acting to further its own independent private interests in participating

5    in the alleged conspiracy.

6    149.155.    Between at least 1995 and 2001, Defendant LG Electronics,

7    through LGEI and LGETT, participated in at least 100 glass meetings at all levels.   After 2001,

8    LG Electronics participated in the CRT Product conspiracy through its joint venture with Philips,

9    LGPD (n/k/a LP Displays).   A substantial number of these meetings were attended by the highest

10   ranking executives from LG Electronics.   LG Electronics also engaged in bilateral discussions

11   with each of the other Defendants on a regular basis.   Through these discussions, LG agreed on

12   prices and supply levels for CRT Products.   LG Electronics never effectively withdrew from this

13   conspiracy.

14   150.156.    Defendant LGEUSA was represented at those meetings and was a

15   party to the agreements entered at them.   To the extent LGEUSA sold and/or distributed CRT

16   Products, it played a significant role in the conspiracy because Defendants wished to ensure that

17   the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements

18   reached at the glass meetings.   Thus, LGEUSA was an active, knowing participant in the alleged

19   conspiracy.

20   151.157.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a

21   LGPD) participated in at least 100 glass meetings at all levels.   A substantial number of these

22   meetings were attended by the highest ranking executives from LP Displays.   Certain of these

23   high level executives from LP Displays had previously attended meetings on behalf of

24   Defendants LG Electronics and Philips.   LP Displays also engaged in bilateral discussions with

25   other Defendants.   Through these discussions, LP Displays agreed on prices and supply levels for

26   CRT Products.

27   152.158.    Between at least 1996 and 2003, Defendant Panasonic, through

28   Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.   After

2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with other Defendants. Through these discussions, Panasonic agreed on prices and supply levels for CRT Products. Panasonic never effectively withdrew from this conspiracy.

153.159. PCNA was represented at those meetings and was a party to the agreements entered at them. To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, PCNA was an active, knowing participant in the alleged conspiracy.

154.160. Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high level sales managers from MTPD. MTPD also engaged in bilateral discussions with other Defendants. Through these discussions, MTPD agreed on prices and supply levels for CRT Products.

155.161. Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings. These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for CRT Products. None of BMCC's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government. BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

156.162. Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels. After 2001, Philips participated in the CRT Product conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by high level executives from Philips. Philips also engaged in numerous bilateral discussions with other

1    Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRT

2    Products.  Philips never effectively withdrew from this conspiracy.

3        157.163.        Defendants Philips America and Philips Brazil were represented at

4    those meetings and were a party to the agreements entered at them.  To the extent Philips

5    America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they

6    played a significant role in the conspiracy because Defendants wished to ensure that the prices

7    for CRT Products paid by direct purchasers would not undercut the pricing agreements reached

8    at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing

9    participants in the alleged conspiracy.

10        158.164.        Between at least 1995 and 2007, Defendant Samsung, through

11    SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

12    participated in at least 200 glass meetings at all levels.  A substantial number of these meetings

13    were attended by the highest ranking executives from Samsung.  Samsung also engaged in

14    bilateral discussions with each of the other Defendants on a regular basis.  Through these

15    discussions, Samsung agreed on prices and supply levels for CRT Products.

16        159.165.        Defendants SEAI, Samsung SDI America, Samsung SDI Brazil

17    and Samsung SDI Mexico were represented at those meetings and were a party to the agreements

18    entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played

19    a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

20    Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

21    the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

22    Mexico were active, knowing participants in the alleged conspiracy.

23        160.166.        Between at least 1998 and 2006, Defendant Samtel participated in

24    multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These

25    meetings were attended by high level executives from Samtel.  Through these discussions,

26    Samsung agreed on prices and supply levels for CRT Products.  Samtel never effectively withdrew

27    from this conspiracy.

28        161.167.        Between at least 1997 and 2006, Defendant Thai CRT participated

in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRT Products.  Thai CRT never effectively withdrew from this conspiracy.

168.  Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several glass meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

169.  Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral and some multilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

~~162.~~170.      Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRT Products.  Toshiba never effectively withdrew from this conspiracy.

~~163.~~171.      Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent

1  Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct

2  purchasers, they played a significant role in the conspiracy because Defendants wished to ensure

3  that the prices for CRT Products paid by direct purchasers would not undercut the pricing

4  agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS

5  were active, knowing participants in the alleged conspiracy.

6  164.172.       Between at least 1995 and 2004, Daewoo, through Daewoo

7  Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A

8  substantial number of these meetings were attended by the highest ranking executives from

9  Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.

10  Through these discussions, Daewoo agreed on prices and supply levels for CRT Products.

11  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary,

12  filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

13  165.173.       When Plaintiffs refer to a corporate family or companies by a

14  single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one

15  or more employees or agents of entities within the corporate family engaged in conspiratorial

16  meetings on behalf of every company in that family.  In fact, the individual participants in the

17  conspiratorial meetings and discussions did not always know the corporate affiliation of their

18  counterparts, nor did they distinguish between the entities within a corporate family.  The

19  individual participants entered into agreements on behalf of, and reported these meetings and

20  discussions to, their respective corporate families.  As a result, the entire corporate family was

21  represented in meetings and discussions by their agents and were parties to the agreements

22  reached in them.

23  **E.     The CRT Market During the Conspiracy**

24  166.174.       Until the last few years, CRTs were the dominant technology used

25  in displays, including televisions and computer monitors.  During the Relevant Period, this

26  translated into the sale of millions of CRT Products, generating billions of dollars in annual

27  profits.

28  167.175.       The following data was reported by Stanford Resources, Inc., a

market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|-----------------------|------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

168.176.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

169.177.    Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

170.178.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

171.179.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

---

[1]    Estimated market value of CRT units sold.

172.180.     After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

173.181.     A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

174.182.     A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

175.183.     Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

176.184.     For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRT Products.

177.185.     During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of

the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commerical Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

178.186.     During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

179.187.     These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

### F.     International Government Antitrust Investigations

180.188.     Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRT Products sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ") and others in November 2007.

181.189.     On November 8, 2007, antitrust authorities in Europe, Japan and South Korea raided the offices of manufacturers of CRTs as part of an international investigation of alleged price fixing.

182.190.     Defendant MTPD, now the CRT unit of Defendant Panasonic, has confirmed that it was raided by Japan's Fair Trade Commission.

183.191.     *Kyodo News* reported on November 8, 2007, upon information and belief, that MTPD fixed prices for CRTs with manufacturers in three Asian countries, including South Korea's Samsung SDI.  *Kyodo News* further reported that "[o]fficials of these three companies are believed to have had at least 10 meetings since 2005 in major Asian cities to coordinate target prices when delivering their products to TV manufacturers in Japan and South Korea, the sources said."

184.192.     Defendant Samsung SDI was raided by South Korea's Fair Trade

Commission, which has started an investigation into Samsung's CRT business.

185.193.     The *Asian Shimbun* further reported on November 10, 2007, that "[t]he representatives held meetings in Southeast Asia where the companies operate CRT factories, the sources said.  The European Commission, the European Union's executive branch, and the U.S. Justice Department have been investigating four companies' [referring to the four Asian-based manufacturers—MTPD, Samsung SDI, Chunghwa, and LP Displays] overseas units and are closely consulting with the Fair Trade Commission by sharing information."

186.194.     On November 21, 2007, Defendant Royal Philips publicly disclosed that it too is subject to one or more investigations into anticompetitive conduct in the CRT industry.   Royal Philips spokesman Joon Knapen declined to comment on which jurisdictions have started investigations.   Royal Philips stated that it intended to assist the regulators.

187.195.     In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

188.196.     On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were

49

exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

189.197.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

190.198.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

191.199.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the

prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

192.200.     On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

193.201.     On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

194.202.     Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

195.203.     The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

204.     On December 5, 2012, the European Commission announced that it had

fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

196.205.     As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

197.206.     Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

198.207.     Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

199.208.     In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

200.209.     On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

201.210.     On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of

Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

202.211.     On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

203.212.     The indictments of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

### G.     The Role of Trade Associations During the Relevant Period

204.213.     Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

205.214.     Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

206.215.     The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung,

Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

207.216.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

208.217.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.**    **Effects of Defendants' Antitrust Violations**

**1.**    **Examples of Reductions in Manufacturing Capacity by Defendants**

209.218.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

210.219.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

211.220.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

212.221.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

213.222.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

214.223.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.    Examples of Collusive Pricing for CRT Products

215.224.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

216.225.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

217.226.    In reality, consumer prices for CRT Products never approached $50 in 1997, and were consistently more than double this price.

218.227.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

219.228.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

220.229.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

221.230.     After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

222.231.     On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

223.232.     Over the course of the conspiracy period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

224.233.     CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

1    **H.      Summary Of Effects Of The Conspiracy Involving CRT Products**

2    ~~225.~~234.      The above combination and conspiracy has had the following

3    effects, among others:

4        a.   Price competition in the sale of CRT Products by Defendants and their

5        co-conspirators has been restrained, suppressed and eliminated

6        throughout the United States;

7

8        b.   Prices for CRT Products sold by Defendants to Plaintiffs directly and

9        indirectly have been raised, fixed, maintained and stabilized at

10       artificially high and noncompetitive levels throughout the United

11       States; and

12       c.   Plaintiffs have been deprived of the benefit of free and open

13       competition in the purchase of CRT Products.

14       d.   As a direct and proximate result of the unlawful conduct of

15       Defendants, Plaintiffs have been injured in their business and property

16       in that they paid more for CRT Products than they otherwise would

17       have paid in the absence of the unlawful conduct of Defendants.

18   **VII.     PLAINTIFFS' INJURIES**

19   ~~226.~~235.      As purchasers of computer monitors, TVs and other devices that

20   contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury

21   as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRT Products

22   at supra-competitive levels.   Defendants' conspiracy artificially inflated the price of CRT

23   Products causing Plaintiffs to pay higher prices than they would have in the absence of

24   Defendants' conspiracy.

25   ~~227.~~236.      Plaintiffs also purchased CRT Products containing CRTs from

26   OEMs as well as others, which in turn purchased CRTs from Defendants and their co-

27   conspirators.   Defendants' conspiracy affected and artificially inflated the price of CRTs

28   purchased by these OEMs and others, which paid higher prices for CRTs than they would have

1  absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT

2  Products.

3       228.237.       The OEMs and others passed on to their customers, including

4  Plaintiffs, the overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on

5  to their customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered

6  injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and

7  others.

8       229.238.       Once a CRT leaves its place of manufacture, it remains essentially

9  unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical

10 objects that do not change form or become an indistinguishable part of a CRT Product.  Thus,

11 CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to

12 Plaintiffs.

13       230.239.       The market for CRTs and the market for CRT Products are

14 inextricably linked and cannot be considered separately.  Defendants are well aware of this

15 intimate relationship.

16       231.240.       Throughout the Relevant Period, Defendants controlled the market

17 for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase

18 CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by

19 Defendants' conspiracy.

20       232.241.       As a result, Plaintiffs were injured in connection with their

21 purchases of CRT Products during the Relevant Period.

22 **VIII.   FRAUDULENT CONCEALMENT**

23       233.242.       Plaintiffs had neither actual nor constructive knowledge of the

24 facts supporting their claims for relief despite diligence in trying to discover the pertinent facts.

25 Plaintiffs did not discover, and could not have discovered through the exercise of reasonable

26 diligence, the existence of the conspiracy alleged herein until November 2007, when

27 investigations by the DOJ and other antitrust regulators became public.  Defendants engaged in a

28

1    secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that

2    there was a conspiracy to fix the prices of CRT Products.

3            234.243.      Because Defendants' agreement, understanding and conspiracy

4    were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and

5    did not know that they were paying artificially high prices for CRT Products.

6            235.244.      The affirmative acts of Defendants alleged herein, including acts in

7    furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

8    precluded detection.  As noted above, Defendants organized glass meetings to avoid detection,

9    conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of

10   pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate

11   and exchange in advance the texts of the proposed communications with customers containing

12   these pretextual statements and would coordinate which co-conspirator would first communicate

13   these pretextual statements to customers.

14           236.245.      By its very nature, Defendants' price-fixing conspiracy was

15   inherently self-concealing.

16           237.246.      Plaintiffs could not have discovered the alleged contract,

17   conspiracy or combination at an earlier date by the exercise of reasonable diligence because of

18   the deceptive practices and techniques of secrecy employed by Defendants and their co-

19   conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or

20   combination.   The contract, conspiracy or combination as herein alleged was fraudulently

21   concealed by Defendants by various means and methods, including, but not limited to, secret

22   meetings, surreptitious communications between Defendants by the use of the telephone or in-

23   person meetings in order to prevent the existence of written records, discussion on how to evade

24   antitrust laws and concealing the existence and nature of their competitor pricing discussions

25   from non-conspirators (including customers).

26           238.247.      As alleged above, Defendants in mid-2000 began to hold CDT and

27   CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were

28

also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy.

239.248.      Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

240.249.      As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

241.250.      As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

242.251.      In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRT Products in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

243.252.      Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

244.253.      Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRT Products were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

245.254.      As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

## IX.   *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

255.   As discussed at length in Paragraphs 188-212 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

256.   As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

257.   Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## IX.X.   CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

246.258.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

247.259.    Beginning no later than March 1, 1995, the exact date being unknown to plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

248.260.      In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of CRT Products sold in the United States.

249.261.      As a result of Defendants' unlawful conduct, prices for CRT Products were raised, fixed, maintained and stabilized in the United States.

250.262.      The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

251.263.      For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.  participating in meetings and conversations to discuss the prices and supply of CRT Products;

    b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRT Products;

    c.  agreeing to manipulate prices and supply of CRT Products sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.  issuing price announcements and price quotations in accordance with the agreements reached;

    e.  selling CRT Products to customers in the United States at noncompetitive prices;

    f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

    g.  agreeing to maintain or lower production capacity; and

    h.  providing false statements to the public to explain increased prices for CRT Products.

1    ~~252.~~264.        As a result of Defendants' unlawful conduct, Plaintiffs were

2    injured in their businesses and property in that they paid more for CRT Products than they

3    otherwise would have paid in the absence of Defendants' unlawful conduct.

4

5                            **Second Claim for Relief**

6                    **(Violation of the California Cartwright Act)**

7    ~~253.~~265.        Plaintiffs incorporate and reallege, as though fully set forth herein,

8    each and every allegation set forth in the preceding paragraphs of this Complaint.

9    ~~254.~~266.        During the Relevant Period, Plaintiffs, and their predecessor

10   entities, including International Computer Graphics, Inc., which was organized under the laws of

11   the State of California, conducted a substantial volume of business in California.  In particular,

12   Plaintiffs purchased CRT Products from Defendants and their co-conspirators in California;

13   maintained warehouses in California containing CRT Products manufactured and sold by

14   Defendants and co-conspirators; and maintained agents and representatives in California who

15   sold CRT Products to customers in California and elsewhere.  As a result of their presence in

16   California and the substantial business they conducted in California, Plaintiffs are entitled to the

17   protection of the laws of California.

18   ~~255.~~267.        In addition, Defendants LG Display, Samsung and Toshiba all

19   maintained offices in California during the Relevant Period.  Employees at Defendants' locations

20   in California participated in meetings and engaged in bilateral communications in California and

21   intended and did carry out Defendants' anticompetitive agreement to fix the price of CRT

22   Products.  Defendants' conduct within California thus injured Plaintiffs and their predecessor

23   entities, both in California and throughout the United States.

24   ~~256.~~268.        Beginning at a time presently unknown to Plaintiffs, but at least as

25   early as March 1, 1995, and continuing thereafter at least up to and including at least November

26   25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing

27   unlawful trust in restraint of the trade and commerce described above in violation of the

28   Cartwright Act, California Business and Professional Code Section 16720.  Defendants have

each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRT Products at supra-competitive levels.    Defendants' conduct substantially affected California commerce.

257.269.    The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRT Products.

258.270.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

a.   to fix, raise, maintain and stabilize the price of CRT Products;

b.   to allocate markets for CRT Products amongst themselves;

c.   to submit rigged bids for the award and performance of certain CRT Products contracts; and

d.   to allocate among themselves the production of CRT Products.

259.271.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

a.   price competition in the sale of CRT Products has been restrained, suppressed and/or eliminated in the State of California;

b.   prices for CRT Products sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.   those who purchased CRT Products from Defendants, their co-conspirators, and others and CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

1

2      260.272.       As a result of the alleged conduct of Defendants, Plaintiffs paid

3      supra-competitive, artificially inflated prices for the CRT Products they purchased during the

4      Relevant Period.

5      261.273.       As a direct and proximate result of Defendants' conduct, Plaintiffs

6      have been injured in their business and property by paying more for CRT Products containing

7      price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid

8      in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation

9      of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to

10     treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section

11     16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of California Unfair Competition Law)

14     262.274.       Plaintiffs incorporate and reallege, as though fully set forth herein,

15     each and every allegation set forth in the preceding paragraphs of this Complaint.

16     263.275.       During the Relevant Period, Plaintiffs, and their predecessor

17     entities, including International Computer Graphics, Inc., conducted a substantial volume of

18     business in California.  In particular, Plaintiffs purchased CRT Products from Defendants and

19     their co-conspirators in California; maintained warehouses in California containing CRT

20     Products manufactured and sold by Defendants and co-conspirators; and maintained agents and

21     representatives in California who sold CRT Products to consumers in California and elsewhere.

22     As a result of their presence in California and the substantial business they conducted in

23     California, Plaintiffs are entitled to the protection of the laws of California.

24     264.276.       Defendants have engaged in unfair competition in violation of

25     California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq*.

26     265.277.       Defendants committed acts of unfair competition, as defined by

27     Section 17200, *et seq*., by engaging in a conspiracy to fix and stabilize the price of CRT Products

28     as described above.

266.278.     The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act and (2) violation of the Cartwright Act.

267.279.     Defendants' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

268.280.     Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*;

269.281.     Defendants' conduct was carried out, effectuated, and perfected, at least in part, within the state of California.

270.282.     By reason of the foregoing, Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

**Fourth Claim for Relief**

**(Violation of the New York Donnelly Act)**

271.283.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

272.284.     Plaintiffs are corporations organized and existing under the laws of the State of New York and during the Relevant Period, Plaintiffs and their predecessor entities conducted a substantial volume of business in New York.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in New York; maintained warehouses in New York containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in New York who sold CRT Products to consumers in New York and elsewhere.  As a result of their presence in New York and the substantial business they conducted in New York, Plaintiffs are entitled to the protection of the laws of New York.

273.285.     Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Donnelly Act, New York General Business Law §§ 340 *et seq*.

274.286.     Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRT Products in New York and fixed, raised, maintained and stabilized CRT Products prices in New York at artificially high, non-competitive levels.

275.287.     As a result, Defendants' conspiracy substantially affected New York commerce

276.288.     As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products purchased from Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy, and are entitled to relief under New York General Business Law §§ 340 *et seq*.

277.289.     As a result of Defendants' violation of Section 340 of the New York General Business Law, Plaintiffs are entitled to treble damages and the costs of suit, including attorneys' fees.

**Fifth Claim for Relief**

**(Violation of New York Unfair Competition Law)**

278.290.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

279.291.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs.

280.292.     The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y General Business Law § 349,

1  which resulted in consumer injury and broad adverse impact on the public at large, and harmed

2  the public interest of New York State in an honest marketplace in which economic activity is

3  conducted in a competitive manner.

4        281.293.      Defendants' unlawful conduct had the following effects:  (1) CRT

5  price competition was restrained, suppressed and eliminated throughout New York; (2) CRT

6  Products prices were raised, fixed, maintained and stabilized at artificially high levels throughout

7  New York; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid

8  supra-competitive, artificially inflated prices for CRT Products.

9        282.294.      During  the  Relevant  Period,  Defendants'  illegal  conduct

10  substantially affected New York commerce and consumers.

11        283.295.      During the Relevant Period, each of Defendants named herein,

12  directly, or indirectly and through affiliates or subsidiaries or agents they dominated and

13  controlled, manufactured, sold and/or distributed CRT Products in New York.

14        284.296.      Plaintiffs seek treble damages for their injuries caused by these

15  violations in an amount to be determined at trial and are threatened with further injury.  Without

16  prejudice to their contention that Defendants' unlawful conduct was willful and knowing,

17  Plaintiffs do not seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus.

18  Law § 349(h).

19  **X.XI.  PRAYER FOR RELIEF**

20        WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf,

21  adjudging and decreeing that:

22        A.      Defendants engaged in a contract, combination, and conspiracy in

23  violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the

24  New York Donnelly Act and the unfair competition laws of California and New York and

25  Plaintiffs were injured in their business and property as a result of Defendants' violations;

26        B.      Plaintiffs shall recover damages sustained by them, as provided by the

27  federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be

28

1    entered against Defendants in an amount to be trebled in accordance with such laws, including

2    Section 4 of the Clayton Act;

3              C.      Defendants, their subsidiaries, affiliates, successors, transferees,

4    assignees and the respective officers, directors, partners, agents and employees thereof, and all

5    other persons acting or claiming to act on their behalf, shall be permanently enjoined and

6    restrained from continuing and maintaining the combination, conspiracy or agreement alleged

7    herein;

8              D.      Plaintiffs shall be awarded pre-judgment and post-judgment interest, and

9    such interest shall be awarded at the highest legal rate from and after the date of service of the

10   initial complaint in this action;

11             E.      Plaintiffs shall recover their costs of this suit, including reasonable

12   attorneys' fees as provided by law; and

13   Plaintiffs shall receive such other or further relief as may be just and proper.

14   **XI.XII.      JURY TRIAL DEMAND**

15             Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by

16   jury of all the claims asserted in this Complaint so triable.

17

18

19

20   Dated:                                    Respectfully Submitted,

21

22                                              _____
                                                Philip J. Iovieno
                                                Anne M. Nardacci
23                                              Benjamin D. Battles
                                                BOIES, SCHILLER & FLEXNER LLP
24                                              10 North Pearl Street, 4th Floor
                                                Albany, NY  12207
25                                              Telephone:  (518) 434-0600
                                                Facsimile:  (518) 434-0665
26                                              Email: piovieno@bsfllp.com
                                                        anardacci@bsfllp.com
27                                                      bbattles@bsfllp.com

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

William A. Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

*Counsel for Plaintiffs Electrograph Systems,
Inc. and Electrograph Technologies Corp.*

ELECTROGRAPH'S SECOND AMENDED
COMPLAINT

70

Case No. 11-cv-01656-SC
Master File No. 3:07-cv-05944-SC

# **<u>EXHIBIT I</u>**

1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

2

3

OFFICE DEPOT, INC.,
_____

4

——— Plaintiff, ———
_____

CASE NO. _____

5

v.

**COMPLAINT**

6

HITACHI, LTD.; HITACHI DISPLAYS, LTD.;
HITACHI AMERICA, LTD.; HITACHI ASIA,

**JURY TRIAL DEMANDED**

7

LTD.; HITACHI ELECTRONIC DEVICES (USA),
INC.; SHENZHEN SEG HITACHI COLOR

8

DISPLAY DEVICES, LTD.; IRICO GROUP
CORPORATION; IRICO GROUP ELECTRONICS

9

CO., LTD.; IRICO DISPLAY DEVICES CO.,
LTD.; LG ELECTRONICS, INC.; LG

10

ELECTRONICS USA, INC.; LG ELECTRONICS
TAIWAN TAIPEI CO., LTD.; LP DISPLAYS

11

INTERNATIONAL LTD.; PANASONIC
CORPORATION; PANASONIC CORPORATION

12

OF NORTH AMERICA; MT PICTURE DISPLAY
CO., LTD.; BEIJING MATSUSHITA COLOR

13

CRT CO., LTD.; KONINKLIJKE PHILIPS
ELECTRONICS N.V.; PHILIPS ELECTRONICS

14

NORTH AMERICA CORPORATION; PHILIPS
ELECTRONICS INDUSTRIES (TAIWAN), LTD.;

15

PHILIPS DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG

16

ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.; SAMSUNG

17

SDI CO., LTD.; SAMSUNG SDI AMERICA,
INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;

18

SAMSUNG SDI BRASIL LTDA.; SHENZHEN
SAMSUNG SDI CO., LTD.; TIANJIN SAMSUNG

19

SDI CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI CRT

20

CO., LTD.; TOSHIBA CORPORATION;
TOSHIBA AMERICA, INC.; TOSHIBA

21

AMERICA CONSUMER PRODUCTS, LLC;
TOSHIBA AMERICA ELECTRONIC

22

COMPONENTS, INC.; TOSHIBA AMERICA
INFORMATION SYSTEMS, INC.; CHUNGHWA

23

PICTURE TUBES, LTD.; CHUNGHWA
PICTURE TUBES (MALAYSIA); TATUNG

24

COMPANY OF AMERICA, INC.,
_____

25

——— Defendants. ———
_____

26

27

28

STUART H. SINGER (*Pro hac vice*)
BOIES, SCHILLER, & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email: ssinger@bsfllp.com

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiff Office Depot, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 11-cv-06276-SC |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 11-cv-06276-SC | MDL No. 1917 |
| OFFICE DEPOT, INC., | **AMENDED COMPLAINT** |
|          Plaintiff, | **JURY TRIAL DEMANDED** |
|          vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; | |

SHENZHEN SEG HITACHI COLOR
DISPLAY DEVICES, LTD.; IRICO GROUP
CORPORATION; IRICO GROUP
ELECTRONICS CO., LTD.; IRICO
DISPLAY DEVICES CO., LTD.; LG
ELECTRONICS, INC.; LG ELECTRONICS
USA, INC.; LG ELECTRONICS TAIWAN
TAIPEI CO., LTD.; LP DISPLAYS
INTERNATIONAL LTD.; PANASONIC
CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA;
MT PICTURE DISPLAY CO., LTD.;
BEIJING MATSUSHITA COLOR CRT CO.,
LTD.; KONINKLIJKE PHILIPS
ELECTRONICS N.V.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS
DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG
SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.;  SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG
SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA PICTURE
TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA); TECHNICOLOR
SA; TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC CORPORATION;
MITSUBISHI DIGITAL ELECTRONICS
AMERICA, INC.; MITSUBISHI ELECTRIC
& ELECTRONICS, USA, INC.,

Defendants.

Plaintiff, Office Depot, Inc. ("Office Depot"), for its Complaint against all Defendants named herein, hereby alleges as follows:

## I.    **INTRODUCTION**

1.     Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

1   through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

2   conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

3          2.      Defendants are or were among the leading manufacturers of: (a) color

4   picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

5   tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

6   devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

7   purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

8   to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

9   and the products containing them shall be referred to as "CDT Products."  CDT Products and

10  CPT Products shall be referred to collectively herein as "CRT Products."

11         3.      Defendants control the majority of the CRT industry, a multibillion dollar

12  market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

13  Relevant Period, virtually every household in the United States owned at least one CRT Product.

14         4.      Since the mid-1990s, the CRT industry faced significant economic

15  pressures as customer preferences for other emerging technologies shrank profits and threatened

16  the sustainability of the industry.  In order to maintain price stability, increase profitability, and

17  decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

18  contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

19  States.

20         5.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

21  fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*,

22  shipments, prices, production and customer demand; (c) coordinate public statements regarding

23  available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

24  among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

25  on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

26  overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic

27  areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

28  producer's share of certain key customers' sales; and (k) restrict output.

6.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.      JURISDICTION AND VENUE

10.      Plaintiff brings this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiff also brings this action pursuant to various state laws listed herein because Plaintiff purchased CRT Products from both Defendants and non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in those states.

12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to its claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiff in the states identified herein.

14.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15.     Venue is proper in the Southern District of Florida under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

events or omissions giving rise to this claim occurred in this District. Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

### III.    PARTIES

#### A.    Plaintiff

16.    Plaintiff Office Depot is a Delaware corporation with its corporate headquarters in Delray Beach, Florida. Office Depot was incorporated in 1986 with the opening of its first retail location in Fort Lauderdale, Florida. Through the conclusion of Defendants' and the co-conspirators' conspiracy, Office Depot was a global supplier of office products and services. In fiscal year 2010, Office Depot sold $11.6 billion of products and services to consumers and businesses of all sizes. Upon information and belief, Office Depot owns all claims and rights under federal law and state law to recover any overcharges suffered by Office Depot and the following subsidiaries: (1) Viking Office Products, Inc.; (2) Solutions4sure.com, Inc., d/b/a Tech Depot; and (3) Computers4sure.com, Inc., (collectively, the "Office Depot Subsidiaries").

17.    During the Relevant Period, Office Depot and the Office Depot Subsidiaries purchased CRT Products directly and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled. As such, Office Depot and the Office Depot Subsidiaries suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct. Throughout the Relevant Period, Office Depot conducted a substantial amount of business in Florida and California.

18.    Upon information and belief, during the Relevant Period, Office Depot and the Office Depot Subsidiaries purchased CRT Products in, *inter alia*, California and Florida containing CRTs manufactured and sold by Defendants and their co-conspirators. In addition, upon information and belief, Plaintiff supplied its offices in California and Florida with CRT Products and maintained corporate offices and inventories in these states.

19.    Upon information and belief, Plaintiff purchased CRT Products, which

1    contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially

2    inflated prices because of the price-fixing conspiracy, in California and Florida.

3        **B.    Defendants**

4            **1.    Hitachi Entities**

5            20.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of

6    business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

7    parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

8    market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd.

9    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

10   subsidiaries or affiliates, throughout the United States.

11           21.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

12   company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

13   297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

14   in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

15   manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

16   create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi

17   Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

18   through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

19   dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

20   antitrust violations alleged in this complaint.

21           22.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

22   company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

23   York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

24   Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

25   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

26   United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

27   affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

28           23.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

---

with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

24.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

25.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

26.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

1

## 2.   **IRICO Entities**

2      27.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with

3   its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

4   712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture,

5   marketing, distribution and sale of CRT Products.   During the Relevant Period, IGC

6   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

7   subsidiaries or affiliates, throughout the United States.

8      28.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese

9   company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

10  Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

11  CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website

12  also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

13  and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

14  IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

15  subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

16  the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

17  complaint.

18      29.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

19  company with its principal place of business located at No. 16, Fenghui South Road West,

20  District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned

21  subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant

22  Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

23  through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

24  and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

25  alleged in this complaint.

26      30.     Defendants IGC, IGE and IDDC are collectively referred to herein as

27  "IRICO."

28

OFFICE DEPOT'S AMENDED COMPLAINT                    10                    Case No. 11-cv-06276-SC
                                                                         Master File No. 3:07-cv-05944-SC

### 3.     LG Electronics Entities

31.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

32.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

33.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

34.     Defendants LGEI, LGEUSA and LGETT are collectively referred to

1    herein as "LG Electronics."

2         **4.    LP Displays**

3         35.    Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

4    Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

5    Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

6    which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

7    In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

8    of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

9    billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

10   and LGEI would cede control over the company and the shares would be owned by financial

11   institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

12   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

13   affiliates, throughout the United States.

14        **5.    Panasonic Entities**

15        36.    Defendant Panasonic Corporation, which was at all times during the

16   Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

17   Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

18   Osaka 571-8501, Japan.   During the Relevant Period, Panasonic Corporation manufactured,

19   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

20   affiliates, throughout the United States.

21        37.    Defendant Panasonic Corporation of North America ("PCNA") is a

22   Delaware corporation with its principal place of business located at One Panasonic Way,

23   Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

24   Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

25   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

26   United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

27   and affairs of PCNA relating to the antitrust violations alleged in this complaint.

28        38.    Defendants Panasonic Corporation and PCNA are collectively referred to

1    herein as "Panasonic."

2        39.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

3    Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

4    Osaka, 571-8504, Japan.   In 2002, Panasonic Corporation entered into a joint venture with

5    Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

6    manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.   On

7    March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

8    venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

9    Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

10   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11   subsidiaries or affiliates, throughout the United States.

12       40.    Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

13   Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

14   Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which

15   is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co.,

16   Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

17   enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

18   China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT

19   manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in

20   China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed

21   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

22   States.

23       **6.    Philips Entities**

24       41.    Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips

25   Electronics ("Royal Philips") is a Dutch company with its principal place of business located at

26   Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one

27   of the world's largest electronics companies, with 160,900 employees located in over 60

28   countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal

1    Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming

2    Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on

3    demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126

4    million Euros of its investment and said it would not inject further capital into the venture.

5    During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT

6    Products, either directly or through its subsidiaries or affiliates, throughout the United States.

7            42.    Defendant Philips Electronics North America Corporation ("Philips

8    America") is a Delaware corporation with its principal place of business located at 1251 Avenue

9    of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and

10   controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America

11   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

12   subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and

13   controlled the finances, policies and affairs of Philips America relating to the antitrust violations

14   alleged in this complaint.

15           43.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips

16   Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu

17   Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal

18   Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or

19   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

20   United States.  Defendant Royal Philips dominated and controlled the finances, policies and

21   affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

22           44.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips

23   Brazil") is a Brazilian company with its principal place of business located at Av Torquato

24   Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a

25   wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant

26   Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either

27   directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal

28   Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

the antitrust violations alleged in this complaint.

45.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.     Samsung Entities**

46.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.   It is South Korea's top electronics company.   During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

47.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.   SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.   During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

48.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.   Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

49.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

50.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

51.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

52.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

1  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

2  affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

3  controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

4  violations alleged in this complaint.

5           53.      Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a

6  Chinese company with its principal place of business located at Developing Zone of Yi-Xian

7  Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

8  subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin

9  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

10  subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

11  dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to

12  the antitrust violations alleged in this complaint.

13           54.      Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia")

14  is a Malaysian corporation with its principal place of business located at Lots 635 & 660,

15  Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus,

16  Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant

17  Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed,

18  sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

19  throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the

20  finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged

21  in this complaint.

22           55.      Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung

23  SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung

24  SDI Malaysia are collectively referred to herein as "Samsung."

25                          **8.      <u>Samtel</u>**

26           56.      Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

27  principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-

28  110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that

country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9.     Thai CRT

57.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10.     Toshiba Entities

58.     Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

59.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

1   policies and affairs of Toshiba America relating to the antitrust violations alleged in this

2   complaint.

3           60.    Defendant Toshiba America Consumer Products, LLC ("TACP") is a

4   limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-

5   3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba

6   America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed

7   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

8   States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP

9   relating to the antitrust violations alleged in this complaint.

10          61.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

11   California corporation with its principal place of business located at 19900 MacArthur

12   Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled

13   subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC

14   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

15   subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled

16   the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this

17   complaint.

18          62.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a

19   California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

20   California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC

21   through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold

22   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

23   throughout the United States.  Defendant TC dominated and controlled the finances, policies and

24   affairs of TAIS relating to the antitrust violations alleged in this complaint.

25          63.    Defendants TC, Toshiba America, TACP, TAEC and TAIS are

26   collectively referred to herein as "Toshiba."

27          **11.**    <u>**Chunghwa Entities**</u>

28          64.    Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a

Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

65.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.~~Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."~~

~~12.     Tatung Company of America, Inc.~~

~~66.     Tatung Company of America, Inc. ("Tatung America") is a California~~Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12.     Thomson Entities**

67.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at ~~2850 El Presidio Street, Long Beach, California.  Tatung America is a~~5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France. Thomson SA, through its wholly-owned subsidiary ~~of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America~~Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located

1  in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to its

2  television-manufacturing division, which had plants in the United States and Mexico, and to

3  other television manufacturers in the United States and elsewhere.  Thomson SA's television

4  division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions

5  were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson

6  SA sold its television division to a joint venture it formed with Chinese company, TCL

7  Corporation.    The ~~other half used to~~ joint venture was called TCL-Thomson Electronics

8  Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that

9  televisions made by TCL-Thomson would be ~~owned by Lun Kuan Lin, the daughter of Tatung~~

10  ~~Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passed to~~

11  ~~her two children~~marketed under the TCL brand in Asia and the Thomson and RCA brands in

12  Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to

13  Videocon Industries, Ltd.    During the Relevant Period, ~~Tatung America~~Thomson SA

14  manufactured, marketed, sold and/or distributed CRT Products ~~manufactured by, among others,~~

15  ~~Chunghwa Picture Tubes, Ltd.~~, either directly or indirectly through its subsidiaries or affiliates,

16  to customers throughout the United States.

17          68.    Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics,

18  Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of

19  business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.   Thomson

20  Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer

21  Electronics was a major manufacturer of CRTs for the United States market, with plants located

22  in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based

23  plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own

24  television-manufacturing division, which had plants in the United States and Mexico, and to

25  other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions

26  were sold in the United States to United States consumers under the RCA brand.  Thomson

27  Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

28  business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer

Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

69.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**13.     Mitsubishi Entities**

70.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

71.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630. Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

72.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618. Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

73.     Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## IV.     AGENTS AND CO-CONSPIRATORS

74.     The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

75.     Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

76.     Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-conspirators as Defendants at a later date.

77.     During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

1   joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

2   As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's

3   CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and

4   DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either

5   directly or through their subsidiaries or affiliates, throughout the United States.

6           78.     Daewoo Electronics, Orion, and DOSA are collectively referred to herein

7   as "Daewoo."

8           79.     Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita

9   Malaysia") was a Malaysian company with its principal place of business located at Lot 1,

10   Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.

11   Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic

12   Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co.,

13   Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT

14   Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until

15   its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed,

16   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

17   throughout the United States.  Defendant Panasonic Corporation dominated and controlled the

18   finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

19   this complaint.

20           80.     P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

21   venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's

22   principal place of business was located in Indonesia.  TEDI was projected to have an annual

23   production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant

24   MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT

25   Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold,

26   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

27   throughout the United States.  Defendant TC dominated and controlled the finances, policies, and

28   affairs of TEDI relating to the antitrust violations alleged in this complaint.

81.     Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

82.     The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.     TRADE AND COMMERCE

83.     During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

84.     During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

85.     The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in California and Florida and caused antitrust injuries in California and Florida.

## VI.    FACTUAL ALLEGATIONS

### A.     CRT Technology

86.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image. A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image. An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

87. CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers. After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

88. The quality of a CRT itself determines the quality of the CRT display. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

89. Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

90. CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

91. CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors. The demand for CRTs thus directly derives from the demand for such products.

92. The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets. The markets for CRTs and CRT Products are, for all intents and purposes,

inseparable in that one would not exist without the other.

93.     Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant original equipment manufacturers ("OEMs") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

94.     Plaintiff has participated in the market for products containing CRTs. To the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

95.     Plaintiff has been injured by paying supra-competitive prices for CRT Products.

**B.     Structure of the CRT Industry**

96.     The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.     Market Concentration**

97.     During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.     Information Sharing**

98.     Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries

1   and relationships between the executives of certain companies, there were many opportunities

2   for Defendants to discuss and exchange competitive information.  The ease of communication

3   was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants

4   took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as

5   alleged below.

6            99.     Defendants Hitachi, Samsung and Chunghwa are all members of the

7   Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-

8   founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG

9   Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial

10  Research Association.  Upon information and belief, Defendants and their co-conspirators used

11  these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

12  the meetings of these trade associations, Defendants exchanged proprietary and competitively

13  sensitive information which they used to implement and monitor the conspiracy.

14           **3.      Consolidation**

15           100.     The CRT industry also had significant consolidation during the Relevant

16  Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture

17  involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's

18  and Panasonic's CRT businesses into MTPD.

19           **4.      Multiple Interrelated Business Relationships**

20           101.     The industry is marked by a web of cross-licensing agreements, joint

21  ventures and other cooperative arrangements that can facilitate collusion.

22           102.     Examples of the high degree of cooperation among Defendants in both the

23  CRT Product market and other closely related markets include the following:

24                   a.   The formation of the CRT joint venture LGPD in 2001 by Defendants

25                        LG Electronics and Philips.

26                   b.   Defendants LG Electronics and Philips also formed LG.Philips LCD

27                        Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the

28                        purpose of manufacturing TFT-LCD panels.

OFFICE DEPOT'S AMENDED COMPLAINT                    28                    Case No. 11-cv-06276-SC
                                                                         Master File No. 3:07-cv-05944-SC

c.  The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.  In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f.  Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.  Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.  Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.  Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.  Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k.  Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

### 5. High Costs of Entry Into the Industry

103.    There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

104.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6. The Maturity of the CRT Product Market

105.    Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

106.    Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

107.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

108.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

30

109.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

110.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.    Homogeneity of CRT Products

111.    CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

112.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.    Pre-Conspiracy Market

113.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

114.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.    Defendants' and Co-Conspirators' Illegal Agreements

115.    In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least

1    November 25, 2007.

2          116.   The CRT conspiracy was effectuated through a combination of group and

3    bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions

4    were the primary method of communication and took place on an informal, ad hoc basis.  During

5    this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited

6    the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba

7    and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These

8    meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and

9    Singapore.

10          117.   Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with and

11    Daewoo, also attended several ad hoc group meetings during this period.  The participants at

12    these group meetings also discussed increasing prices for CRTs.

13          118.   As more manufacturers formally entered the conspiracy, group meetings

14    became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized,

15    systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.

16    Defendants' representatives attended hundreds of these meetings during the Relevant Period.

17          119.   The overall CRT conspiracy raised and stabilized worldwide and U.S.

18    prices that Defendants charged for CRTs.

19          **1.    "Glass Meetings"**

20          120.   The group meetings among the participants in the CRT price-fixing

21    conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by

22    employees at three general levels of Defendants' corporations.

23          121.   The first level meetings were attended by high level company executives

24    including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top

25    meetings occurred less frequently, typically quarterly, and were focused on longer term

26    agreements and forcing compliance with price-fixing agreements.  Because attendees at top

27    meetings had authority as well as more reliable information, these meetings resulted in

28    agreements.  Attendees at top meetings were also able to resolve disputes because they were

1    decision makers who could make agreements.

2           122.    The second level meetings were attended by Defendants' high level sales

3    managers and were known as "management" meetings.   These meetings occurred more

4    frequently, typically monthly, and handled implementation of the agreements made at top

5    meetings.

6           123.    Finally, the third level meetings were known as "working level" meetings

7    and were attended by lower level sales and marketing employees.   These meetings generally

8    occurred on a weekly or monthly basis and were mostly limited to the exchange of information

9    and discussing pricing since the lower level employees did not have the authority to enter into

10   agreements.   These lower level employees would then transmit the competitive information up

11   the corporate reporting chain to those individuals with pricing authority.   The working level

12   meetings also tended to be more regional and often took place near Defendants' factories.   In

13   other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean

14   manufacturers' employees met in Korea, the Chinese in China, and so on.

15          124.    The Chinese glass meetings began in 1998 and generally occurred on a

16   monthly basis following a top or management level meeting.   The China meetings had the

17   principal purpose of reporting what had been decided at the most recent glass meetings to the

18   Chinese manufacturers.   Participants at the Chinese meetings included the manufacturers located

19   in China, such as IRICO and BMCC, as well as the China-based branches of the other

20   Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung

21   SDI Tianjin, and Chunghwa.

22          125.    Glass meetings also occurred occasionally in various European countries.

23   Attendees at these meetings included those Defendants and co-conspirators which had

24   subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics,

25   LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf

26   of Daewoo)), IRICO, and ~~IRICO~~Thomson.   Chunghwa also attended these meetings.

27          126.    Representatives of Defendants also attended what were known amongst

28   members of the conspiracy as "green meetings."   These were meetings held on golf courses.   The

1    green meetings were generally attended by top and management level employees of Defendants.

2    127.   During the Relevant Period, glass meetings took place in Taiwan, South

3    Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the United

4    States.

5    128.   Participants would often exchange competitively sensitive information

6    prior to a glass meeting.  This included information on inventories, production, sales and exports.

7    For some such meetings, where information could not be gathered in advance of the meeting, it

8    was brought to the meeting and shared.

9    129.   The glass meetings at all levels followed a fairly typical agenda.  First, the

10   participants exchanged competitive information such as proposed future CRT pricing, sales

11   volume, inventory levels, production capacity, exports, customer orders, price trends and

12   forecasts of sales volumes for coming months.  The participants also updated the information

13   they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman"

14   who would write the information on a white board.  The meeting participants then used this

15   information to discuss and agree upon what price each would charge for CRTs to be sold in the

16   following month or quarter.  They discussed and agreed upon target prices, price increases, so-

17   called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

18   of CRTs that were sold to specific customers, and agreed upon target prices to be used in

19   negotiations with large customers.  Having analyzed the supply and demand, the participants

20   would also discuss and agree upon production cutbacks.

21   130.   During periods of oversupply, the focus of the meeting participants turned

22   to making controlled and coordinated price reductions.  This was referred to as setting a "bottom

23   price."

24   131.   Defendants' conspiracy included agreements on the prices at which certain

25   Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured

26   CRT Products, such as televisions and computer monitors.  Defendants realized the importance

27   of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT

28   pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid

1  supracompetitive prices for CRTs.

2  132.   Each of the participants in these meetings knew, and in fact discussed, the

3  significant impact that the price of CRTs had on the cost of the finished products into which they

4  were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there

5  were slim profit margins.  Defendants therefore concluded that in order to make their CRT price

6  increases stick, they needed to make the increase high enough that their direct customers (CRT

7  TV and monitor makers) would be able to justify a corresponding price increase to their

8  customers.  In this way, Defendants ensured that price increases for CRTs were passed on to

9  indirect purchasers of CRT Products.

10  133.132.   The agreements reached at the glass meetings included:

11      l.  agreements on CRT prices, including establishing target prices,

12          "bottom" prices, price ranges and price guidelines;

13      m.  placing agreed-upon price differentials on various attributes of CRTs,

14          such as quality or certain technical specifications;

15      n.  agreements on pricing for intra-company CRT sales to vertically

16          integrated customers;

17      o.  agreements as to what to tell customers about the reason for a price

18          increase;

19      p.  agreements to coordinate with competitors that did not attend the

20          group meetings and agreements with them to abide by the agreed-

21          upon pricing;

22      q.  agreements to coordinate pricing with CRT manufacturers in other

23          geographic markets such as Brazil, Europe and India;

24      r.  agreements to exchange pertinent information regarding shipments,

25          capacity, production, prices and customer demands;

26      s.  agreements to coordinate uniform public statements regarding

27          available capacity and supply;

28      t.  agreements to allocate both overall market shares and share of a

1    particular customer's purchases;

2    u.   agreements to allocate customers;

3    v.   agreements regarding capacity, including agreements to restrict output

4    and to audit compliance with such agreements; and

5    w.   agreements to keep their meetings secret.

6    ~~134.~~133.    Efforts were made to monitor each Defendant's adherence to these

7    agreements in a number of ways, including seeking confirmation of pricing both from customers

8    and from employees of Defendants themselves.  When cheating did occur, it was addressed in at

9    least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they

10   did not live up to an agreement; 3) threats to undermine a competitor at one of its principal

11   customers; and 4) a recognition of a mutual interest in living up to the target price and living up

12   to the agreements that had been made.

13   ~~135.~~134.    As market conditions worsened in 2005-2007, and the rate of

14   replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less

15   frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the

16   DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to

17   have concerns about antitrust issues.

18       **2.    Bilateral Discussions**

19   ~~136.~~135.    Throughout the Relevant Period, the glass meetings were

20   supplemented by bilateral discussions between various Defendants.  The bilateral discussions

21   were more informal than the group meetings and occurred on a frequent, ad hoc basis, often

22   between the group meetings. These discussions, usually between sales and marketing employees,

23   took the form of in-person meetings, telephone contacts and emails.

24   ~~137.~~136.    During the Relevant Period, in-person bilateral meetings took

25   place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan,

26   Thailand, Brazil ~~and~~, Mexico, and the United States.

27   ~~138.~~137.    The purpose of the bilateral discussions was to exchange

28   information about past and future pricing, confirm production levels, share sales order

1  information, confirm pricing rumors, and coordinate pricing with manufacturers in other

2  geographic locations, including Brazil, Mexico ~~and~~, Europe, and the United States.

3          ~~139.~~138.     In order to ensure the efficacy of their global conspiracy,

4  Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil

5  ~~and~~, Mexico, ~~such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.~~and the

6  United States.   These ~~Brazilian and Mexican~~CRT manufacturers were particularly important

7  because they served the North American market for CRT Products.  As further alleged herein,

8  North America was the largest market for CRT televisions and computer monitors during the

9  Relevant Period.  Because these ~~Brazilian and Mexican~~CRT manufacturers are all wholly-owned

10 and controlled subsidiaries of Defendants ~~Philips and Samsung SDI~~, they adhered to the

11 unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs

12 ~~imported into~~sold in the United States were fixed, raised, maintained and/or stabilized at

13 supracompetitive levels.

14          ~~140.~~139.     Defendants also used bilateral discussions with each other during

15 price negotiations with customers to avoid being persuaded by customers to cut prices.  The

16 information gained in these communications was then shared with supervisors and taken into

17 account in determining the price to be offered.

18          ~~141.~~140.     Bilateral discussions were also used to coordinate prices with CRT

19 manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi,

20 Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or

21 management meeting, the attendees at these group meetings would meet bilaterally with the

22 other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or

23 output agreements had been reached during the meeting.  For example, Samsung had a

24 relationship with Hitachi and was responsible for communicating CRT pricing agreements to

25 Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating

26 CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications

27 with Thomson in Europe and the United States, and Samsung SDI had regular communications

28 with Mitsubishi.   And Thai CRT had a relationship with Samtel and was responsible for

1    communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented

2    the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes

3    Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel

4    participated in the conspiracy to fix prices of CRTs.

5

6    **3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

7    ~~142.~~141.    Between at least 1996 and 2001, Defendant Hitachi, through

8    Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass

9    meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also

10   engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.

11   Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never

12   effectively withdrew from this conspiracy.

13   ~~143.~~142.    Defendants Hitachi America and HEDUS were represented at

14   those meetings and were a party to the agreements entered at them.  To the extent Hitachi

15   America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a

16   significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

17   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

18   the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the

19   alleged conspiracy.

20   ~~144.~~143.    Between at least 1998 and 2007, Defendant IRICO, through IGC,

21   IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the

22   highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions

23   with other Defendants, particularly with other Chinese manufacturers.   Through these

24   discussions, IRICO agreed on prices and supply levels for CRTs.   None of IRICO's

25   conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

26   IRICO was acting to further its own independent private interests in participating in the alleged

27   conspiracy.

28   ~~145.~~144.    Between at least 1995 and 2001, Defendant LG Electronics,

through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

146.145.      Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

147.146.      Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

148.147.      Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

149.148.      PCNA was represented at those meetings and was a party to the

agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

150.149.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

151.150.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

152.151.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

153.152.    Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices

for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

154.153.        Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

155.154.        Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

156.155.        Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

157.156.        Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

157.    Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral

meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

158.  Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral and some multilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

158.159.  Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

159.160.  Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

160.161.  Between at least 1995 and 2006, Defendant Chunghwa, through

Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin. Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

161. Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them. To the extent Tatung America sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

162. Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Daewoo. Daewoo also engaged in bilateral discussions with other Defendants on a regular basis. Through these discussions, Daewoo agreed on prices and supply levels for CRTs. Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

163. When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements

reached in them.

**E.   The CRT Market During the Conspiracy**

164.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

165.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars)[1] | Average Selling Price Per Unit |
|------|------------------------|----------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

166.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

167.    In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

168.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price

---

[1] Estimated market value of CRT units sold.

increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

169.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

170.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

171.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

172.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

173.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

174.    These price increases and price stability in the market for CRT Products

during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.     International Government Antitrust Investigations**

175.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice.

176.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

177.    In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

178.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

179.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

180.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.   The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."

The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

182.     On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

183.     On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

184.     Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

185.     The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

186.     On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG

Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

186.187.      As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

187.188.      Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

188.189.      Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

189.190.      In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

190.191.      On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

191.192.      On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

192.193.      On March 10, 2009, the DOJ announced that it had reached an

1    agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead

2    guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine

3    for its role in a conspiracy to fix the prices of TFT-LCD panels.

4            193.194.       The plea agreements of LG Display Co., Ltd., Sharp Corporation,

5    Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of

6    TFT-LCDs was carried out, in part, in California.

7        **G.    The Role of Trade Associations During the Relevant Period**

8            194.195.       Defendants' collusive activities have been furthered by trade

9    associations and trade events that provided opportunities to conspire and share information.  One

10   example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the

11   summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.

12   KODEMIA is a national trade organization representing about 80 member companies in the

13   Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004,

14   the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association

15   of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations

16   related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United

17   States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the

18   Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common

19   issues."

20           195.196.       Samsung and LG Electronics were members of both KODEMIA

21   and EDIRAK, and have participated extensively in the KDCs.

22           196.197.       The KDC has taken place in Seoul, Korea or other Korean venues

23   on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24,

24   2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's

25   and LG Electronics' CRT operations have participated at these events, including H.K. Chung,

26   Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S.

27   Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated,

28   such as Zenzou Tashima of Hitachi.

197.198.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

198.199.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.    Effects of Defendants' Antitrust Violations**

**1.    Examples of Reductions in Manufacturing Capacity by Defendants**

199.200.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

200.201.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

201.202.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

202.203.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

203.204.      In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

204.205.      In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

**2.      Examples of Collusive Pricing for CRTs**

205.206.      Defendants' collusion is evidenced by unusual price movements in the CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

206.207.      In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

207.208.      In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

208.209.      Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

209.210.      Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

210.211.      In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price

increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

211.212.        After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

212.213.        On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

213.214.        CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**3.      Summary Of Effects Of The Conspiracy Involving CRTs**

214.215.        The above combination and conspiracy has had the following effects, among others:

    a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b.  Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.  Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

    d.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in

that it paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.    PLAINTIFF'S INJURIES

215.216.        As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.   Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

216.217.        Plaintiff also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.   Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.   The conspiracy artificially inflated the prices of CRTs included in CRT Products.

217.218.        The OEMs and others passed on to their customers, including Plaintiff, the overcharges caused by Defendants' conspiracy.   Plaintiff was not able to pass on to its customers the overcharges caused by Defendants' conspiracy.   Thus, Plaintiff suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

218.219.        Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.   CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.   Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

219.220.        The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.   Defendants are well aware of this intimate relationship.

220.221.        Throughout the Relevant Period, Defendants controlled the market for CRTs.   Consequently, during the Relevant Period, the OEMs had no choice but to purchase

CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

221.222.     As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

222.223.     Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

223.224.     Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

224.225.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

225.226.     By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

226.227.     Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract,

conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

227.228.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

228.229.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

229.230.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

230.231.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

231.232.      In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

232.233.      Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

233.234.      Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

235.   As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.IX.

IX.    *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

236.   As discussed at length in Paragraphs 175-194 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

237.   As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

238.    Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## XI.    CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

234.239.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

235.240.    Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

236.241.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

237.242.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

238.243.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

239.244.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

        a.   participating in meetings and conversations to discuss the prices and supply of CRTs;

b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.   issuing price announcements and price quotations in accordance with the agreements reached;

e.   selling CRTs to customers in the United States at noncompetitive prices;

f.   exchanging competitively sensitive information in order to facilitate their conspiracy;

g.   agreeing to maintain or lower production capacity; and

h.   providing false statements to the public to explain increased prices for CRTs.

240.245.   As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the Florida Deceptive and Unfair Trade Practices Act)**

241.246.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

242.247.   During the Relevant Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed CRT Products in commerce in the United States, including Florida.  Defendants' conduct and fraudulent concealment caused injury to Plaintiff, as both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to Plaintiff as a purchaser.

1    243.248.    Based on the foregoing, Defendants engaged in unfair and

2    deceptive acts in violation of Fla. Stat. §§ 501.201 *et seq*.

3    244.249.    During the Relevant Period, Plaintiff maintained its principal place

4    of business in Florida.  Plaintiff also conducted purchasing negotiations in Florida for CRT

5    Products; made purchasing decisions in Florida regarding CRT Products; sent purchase orders

6    and payment for CRT Products from Florida; was invoiced for CRT Products it purchased in

7    Florida; and resold CRT Products in Florida through its retail locations in Florida, among other

8    Florida-based activities.  As a result of its presence in Florida, its purchases and sales in Florida,

9    the substantial business it conducts in Florida, and the injury suffered in Florida, Plaintiff is

10   entitled to the protection of the laws of Florida.

11   245.250.    In violation of Section 501.204, Defendants agreed to act, and did

12   in fact act, in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining

13   at artificial and non-competitive levels, the prices at which CRTs were sold, distributed or

14   obtained in Florida, and took efforts to conceal their agreements from Plaintiff.   These acts

15   constitute a common and continuous course of conduct of unfair competition by means of unfair,

16   unlawful and/or fraudulent business acts or practices.

17   246.251.    The conduct of the Defendants described herein constitutes unfair

18   and deceptive acts or practices within the meaning of FDUTPA, which is intended to "protect the

19   consuming public and legitimate business enterprises from those who engage in unfair methods

20   of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any

21   trade or commerce."  Fla. Stat. § 501.202(2).  FDUTPA is also intended to "make state consumer

22   protection and enforcement consistent with established policies of federal law relating to

23   consumer protection."  Fla. Stat. § 501.202(3).

24   247.252.    Defendants' unlawful conduct had the following effects: (1) CRT

25   price competition was restrained, suppressed, and eliminated throughout Florida; (2) CRT prices

26   were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3)

27   Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supra-competitive,

28   artificially inflated prices for CRT Products that it purchased both directly and indirectly. During

the Relevant Period, Defendants' illegal conduct in violation of FDUTPA substantially affected Florida commerce, and injured Plaintiff in Florida, causing financial losses.

248.253.        As a result of Defendants' violation of the FDUTPA, Plaintiff is entitled to damages and the costs of suit, including attorneys' fees, pursuant to Fla. Stat. § 501.211.

### Third Claim for Relief

### (Violation of the California Cartwright Act)

249.254.        Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

250.255.        During the Relevant Period, Plaintiff conducted a substantial volume of business in California.  In particular, upon information and belief, Plaintiff purchased CRT Products by sending purchase orders to California and sent payments to for CRT Products California.  Plaintiff also received shipments of CRT Products at its warehouses in California.  In addition, upon information and belief, Plaintiff maintained California inventories of CRT Products manufactured and sold by Defendants, their co-conspirators, and others, and operated warehouses in California.  Plaintiff also sold CRT Products to customers in California.  Finally, Plaintiff maintained offices and inventories in California of CRT Products and maintained agents and representatives in California who sold CRT Products to consumers in California.  As a result of Plaintiff's business operations in California, it was registered to do business in the State and, upon information and belief, paid taxes to the State of California during the Relevant Period.   As a result of its substantial contacts with California, Plaintiff is entitled to the protection of the laws of California.

251.256.        In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs. Defendant Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy

were carried out in California.  Defendants' conduct within California thus injured Plaintiff, both in California and throughout the United States.

252.257.        Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

253.258.        The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

254.259.        For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.  to fix, raise, maintain and stabilize the price of CRTs;

    b.  to allocate markets for CRTs amongst themselves;

    c.  to submit rigged bids for the award and performance of certain CRTs contracts; and

    d.  to allocate among themselves the production of CRTs.

255.260.        The combination and conspiracy alleged herein has had, inter alia, the following effects:

    a.  price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

62

b.  prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.  those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

256.261.    As a result of the alleged conduct of Defendants, Plaintiff paid supra-competitive, artificially inflated prices for the CRT Products it purchased during the Relevant Period.

257.262.    As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiff is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

**Fourth Claim for Relief**

**(Violation of California Unfair Competition Law)**

258.263.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

259.264.    Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.*

260.265.    This Complaint is filed, and these proceedings are pursuant to Sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from Defendant of all revenues, earnings, profits compensation, and benefits which they obtained as a result of their unlawful, unfair, and fraudulent conduct.

261.266.	The unlawful, unfair, and fraudulent business practices of Defendants, as alleged above, injured Plaintiff and members of the public in that Defendants' conduct restrained competition, causing Plaintiff and others to pay supra-competitive and artificially inflated prices for CRT Products.

a.	Defendants' Unlawful Business Practices: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

b.	Defendants' Unfair Business Practices: As alleged above, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

c.	Defendants' Fraudulent Business Practices: As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping meetings with coconspirators secret and making false public statements about the reasons for artificially inflated prices of CRTs. Members of the public were likely to be deceived, and Plaintiff was in fact deceived by Defendants' fraudulent actions. As a result of Defendants' unfair competition, Plaintiff suffered injury in fact and has lost money or property.

262.267.	The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

263.268.	Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

1    264.269.      Defendants' acts or practices are fraudulent or deceptive within the

2    meaning of Section 17200 *et seq.*

3    265.270.      By reason of the foregoing, Plaintiff is entitled to full restitution

4    and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have

5    been obtained by Defendants as result of such business acts and practices described above.

6    **XI.      PRAYER FOR RELIEF**

7          **WHEREFORE**, Plaintiff prays that the Court enter judgment on its behalf,

8    adjudging and decreeing that:

9          A.      Defendants engaged in a contract, combination, and conspiracy in

10   violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the FDUTPA, the California

11   Cartwright Act, and the California Unfair Competition Law, and that Plaintiff was injured in its

12   business and property as a result of Defendants' violations;

13         B.      Plaintiff shall recover damages sustained by it, as provided by the federal

14   and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered

15   against the Defendants in an amount to be trebled in accordance with such laws, including

16   Section 4 of the Clayton Act;

17         C.      Defendants engaged in a contract, combination, and conspiracy in

18   violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and Plaintiff

19   was injured in its business and property as a result of Defendants' violations;

20         D.      Plaintiff shall recover damages sustained by it, as provided by California

21   Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and a joint and several judgment in

22   favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in

23   accordance with such laws;

24         E.      Defendants engaged in unlawful, unfair, and fraudulent business practices

25   in violation of California Business and Professions Code §§ 17200, *et seq.*, and Plaintiff was

26   injured in its business as a result of Defendants' violations;

27

28

F.       Defendants shall be enjoined from engaging in further acts or practices in violation of and Plaintiff shall recover damages sustained by it as a result of Defendants' violations of Cal. Bus. & Prof. Code §§ 17200 *et seq*.;

G.       Defendants engaged in a contract, combination, and conspiracy in violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*., and Plaintiff was injured in its business and property as a result of Defendants' violations;

H.       Plaintiff shall recover damages sustained by it, as provided by Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*., and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

I.       Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

J.       Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

K.       Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

L.       Plaintiff shall receive such other or further relief as may be just and proper.

## XII.       <u>JURY TRIAL DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

Dated:                                   Respectfully Submitted,

1

2

3                                        _____
                                         STUART H. SINGER
4                                        (Florida Bar No.: 377325 (*Pro Hac Vice*)
                                         BOIES, SCHILLER, & FLEXNER LLP
5                                        401 East Las Olas Boulevard, Suite 1200
                                         Fort Lauderdale, Florida 33301
6                                        Telephone: (954) 356-0011
                                         Facsimile: (954) 356-0022
7                                        Email: ssinger@bsfllp.com

8                                        WILLIAM A. ISAACSON (*Pro Hac Vice to be filed*)
                                         BOIES, SCHILLER & FLEXNER LLP
9                                        5301 Wisconsin Ave. NW, Suite 800
                                         Washington, DC 20015
10                                       Telephone:  (202) 237-2727
                                         Facsimile:   (202) 237-6131
11                                       Email:  wisaacson@bsfllp.com

12

13                                       PHILIP J. IOVIENO  (*Pro Hac Vice to be filed*)
                                         BOIES, SCHILLER & FLEXNER LLP
14                                       10 North Pearl Street, 4th Floor
                                         Albany, NY 12207
15                                       Telephone:  (518) 434-0600
                                         Facsimile:   (518) 434-0665
16                                       Email: piovieno@bsfllp.com

17                                       *Counsel for Plaintiff Office Depot, Inc.*

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT J

1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

2

3
P.C.WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP

4
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015

5
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131

6
Email:  wisaacson@bsfllp.com

7

8
PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)

9
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP

10
10 North Pearl Street, 4th Floor
Albany, NY 12207

11
Telephone:  (518) 434-0600

12
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

13

14
*Counsel for Plaintiffs P.C. Richard &* SON LONG ISLAND CORPORATION*Son Long Island Corporation*;
MARTA COOPERATIVE*MARTA Cooperative* of AMERICA, INC*America, Inc*; and *ABC Appliance, Inc*

15

16
ABC APPLIANCE, INC.,

Plaintiffs,

17

18
v.

19
HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI MEXICO S.A. DE C.V.; SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN. BHD.; SAMTEL COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA AMERICA, INC.; TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC.; CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA); TATUNG COMPANY OF AMERICA, INC.,

20

21

22

23

24

25

26

27

28

1    ~~Defendants.~~

2    **UNITED STATES DISTRICT COURT**
     **NORTHERN DISTRICT OF CALIFORNIA**
3    **SAN FRANCISCO DIVISION**

4    IN RE CATHODE RAY TUBE (CRT)          Case No. 12-cv-02648
     ANTITRUST LITIGATION
5                                          Master File No. 3:07-cv-05944-SC

6                                          MDL No. 1917

7    This Document Relates To Individual Case
     No. 12-cv-02648

8    P.C. RICHARD & SON LONG ISLAND        **AMENDED COMPLAINT**
     CORPORATION; MARTA COOPERATIVE
9    OF AMERICA, INC; and  ABC            **JURY TRIAL DEMANDED**
     APPLIANCE, INC.,

10           Plaintiffs,

11       vs.

12   HITACHI, LTD.; HITACHI DISPLAYS,
     LTD.; HITACHI AMERICA, LTD.;
13   HITACHI ASIA, LTD.; HITACHI
     ELECTRONIC DEVICES (USA), INC.;
14   SHENZHEN SEG HITACHI COLOR
     DISPLAY DEVICES, LTD.; IRICO GROUP
15   CORPORATION; IRICO GROUP
     ELECTRONICS CO., LTD.; IRICO
16   DISPLAY DEVICES CO., LTD.; LG
     ELECTRONICS, INC.; LG ELECTRONICS
17   USA, INC.; LG ELECTRONICS TAIWAN
     TAIPEI CO., LTD.; LP DISPLAYS
18   INTERNATIONAL LTD.; PANASONIC
     CORPORATION; PANASONIC
19   CORPORATION OF NORTH AMERICA;
     MT PICTURE DISPLAY CO., LTD.;
20   BEIJING MATSUSHITA COLOR CRT CO.,
     LTD.; KONINKLIJKE PHILIPS
21   ELECTRONICS N.V.; PHILIPS
     ELECTRONICS NORTH AMERICA
22   CORPORATION; PHILIPS ELECTRONICS
     INDUSTRIES (TAIWAN), LTD.; PHILIPS
23   DA AMAZONIA INDUSTRIA
     ELECTRONICA LTDA.; SAMSUNG
24   ELECTRONICS CO., LTD.; SAMSUNG
     ELECTRONICS AMERICA, INC.;
25   SAMSUNG SDI CO., LTD.; SAMSUNG
     SDI AMERICA, INC.; SAMSUNG SDI
26   MEXICO S.A. DE C.V.;  SAMSUNG SDI
     BRASIL LTDA.; SHENZHEN SAMSUNG
27   SDI CO., LTD.; TIANJIN SAMSUNG SDI
     CO., LTD.; SAMSUNG SDI (MALAYSIA)

28

1
2
3
4
5
6
7
8
9

SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA PICTURE
TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA); TECHNICOLOR
SA; TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC CORPORATION;
MITSUBISHI DIGITAL ELECTRONICS
AMERICA, INC.; MITSUBISHI ELECTRIC
& ELECTRONICS, USA, INC.,

Defendants.

10
11
12
13
14
15
16
17
18
19
20

21   Plaintiffs, P.C. Richard & Son Long Island Corporation ("P.C. Richard"), MARTA

22   Cooperative of America, Inc. ("MARTA"), and ABC Appliance, Inc. d/b/a ABC Warehouse

23   ("ABC Warehouse"), for their Complaint against all Defendants named herein, hereby allege as

24   follows:

25   I.   **INTRODUCTION**

26         1.      Defendants and their co-conspirators formed an international cartel which

27   conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

28   through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

1    conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2        2.      Defendants are or were among the leading manufacturers of: (a) color

3    picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

4    tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

5    devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

6    purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

7    to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

8    and the products containing them shall be referred to as "CDT Products."  CDT Products and

9    CPT Products shall be referred to collectively herein as "CRT Products."

10       3.      Defendants control the majority of the CRT industry, a multibillion dollar

11   market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

12   Relevant Period, virtually every household in the United States owned at least one CRT Product.

13       4.      Since the mid-1990s, the CRT industry faced significant economic

14   pressures as customer preferences for other emerging technologies shrank profits and threatened

15   the sustainability of the industry.  In order to maintain price stability, increase profitability, and

16   decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

17   contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

18   States.

19       5.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

20   fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,*

21   shipments, prices, production and customer demand; (c) coordinate public statements regarding

22   available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

23   among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

24   on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

25   overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic

26   areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

27   producer's share of certain key customers' sales; and (k) restrict output.

28       6.      The conspiracy concerning CRTs commenced with bilateral meetings that

began in at least March of 1995 and continued throughout the Relevant Period. Also beginning in 1995, the co-conspirators began to engage in informal group meetings. By 1997, these group meetings had become more formalized, as described in greater detail below. There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings. These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe. These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7. During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8. This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities. The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009. Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9. During the Relevant Period, Plaintiffs purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs they purchased during the Relevant Period.

## II.   <u>JURISDICTION AND VENUE</u>

10. Plaintiffs bring this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11. Plaintiffs also bring this action pursuant to various state laws listed herein

1   because Plaintiffs purchased CRT Products from both Defendants and non-defendant vendors

2   which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in

3   those states.

4           12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of

5   the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

6   supplemental jurisdiction over Plaintiffs' state law claims listed herein under 28 U.S.C. § 1367

7   because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiffs'

8   state law claims are so related to their claims under Section 1 of the Sherman Act that they form

9   part of the same case or controversy.

10          13.     The activities of Defendants and their co-conspirators, as described herein,

11  involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

12  did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and

13  import trade or commerce.  This effect gives rise to Plaintiffs' antitrust claims.  During the

14  Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the

15  United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and

16  substantially affected the price of CRT Products purchased by Plaintiffs in the states identified

17  herein.

18          14.     This court has jurisdiction over each Defendant named in this action under

19  Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely

20  availed themselves of the laws of the United States as they manufactured CRT Products for sale

21  in the United States, or CRTs which were incorporated into CRT Products Defendants and their

22  co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-

23  conspirators' conspiracy affected this commerce in CRT Products in the United States.

24          15.     Venue is proper in the Eastern District of New York under Section 12 of

25  the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien

26  corporation, transacts business in this District, or is otherwise found within this District.  In

27  addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

28  events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

1    conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

2    into this District.

3    **III.    PARTIES**

4         **A.    Plaintiff**

5              **1.    P.C. Richard**

6              16.    Plaintiff P.C. Richard is a New York corporation with its corporate

7    headquarters in Farmingdale, New York.  P.C. Richard is the largest chain of private, family-

8    owned electronics and appliances stores in the United States with 65 stores in Connecticut, New

9    York, New Jersey, and Pennsylvania, as well as an online retail store.  Through the conclusion of

10   Defendants' and the co-conspirators' conspiracy, P.C. Richard was a supplier of consumer

11   electronics and appliances.

12             17.    During the Relevant Period, P.C. Richard purchased CRT Products

13   directly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents

14   the Defendants or Defendants' subsidiaries and affiliates controlled.   P.C. Richard also

15   purchased CRT Products from original equipment manufacturers ("OEMs"), as well as other

16   suppliers, which contained CRTs that had been purchased from Defendants and their co-

17   conspirators.   As such, P.C. Richard suffered injury as a result of Defendants' and co-

18   conspirators' unlawful conduct.

19             18.    During the Relevant Period, P.C. Richard's negotiations for the purchase

20   of CRT Products took place in the United States and were controlled by a department based at

21   the company's headquarters in New York.  In addition, P.C. Richard's purchase orders for CRT

22   Products were issued from New York, invoices for these CRT Products were sent to P.C.

23   Richard in New York, and payments for these CRT Products were issued from New York.  P.C.

24   Richard employees based in New York were also responsible for selecting vendors and product

25   lines with respect to CRT Products.

26             **2.    MARTA**

27             19.    Plaintiff MARTA is a Michigan corporation and has its corporate

28   headquarters in Scottsdale, Arizona.   MARTA was initially formed in 1965 by twelve

1  independent appliance and electronics retailers as a member-owned, not-for-profit, buying

2  cooperative serving a select group of retailers in the appliance and electronics industry. Through

3  the conclusion of Defendants' and the co-conspirators' conspiracy, MARTA was a buying group

4  comprised of larger, independent retailers selling appliances, electronics and furniture.

5  20.  During the Relevant Period, MARTA purchased CRT Products directly

6  from the Conspirators, including Defendants, and/or the Defendants' subsidiaries and affiliates

7  and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled. MARTA

8  also purchased CRT Products from OEMs, as well as other suppliers, which contained CRTs that

9  had been purchased from Defendants and their co-conspirators. As such, MARTA suffered

10  injury as a result of Defendants' and co-conspirators' unlawful conduct.

11  21.  During the Relevant Period, MARTA's negotiations for the purchase of

12  CRT Products took place in the United States and were controlled by a department based at the

13  company's headquarters in Arizona. In addition, MARTA's purchase orders for CRT Products

14  were issued from Arizona, invoices for these CRT Products were sent to MARTA in Arizona,

15  and payments for these CRT Products were issued from Arizona and Illinois. From its

16  headquarters in Arizona, MARTA selected vendors and product lines with respect to CRT

17  Products.

18  **3.  ABC Warehouse**

19  22.  Plaintiff ABC Warehouse is a Michigan corporation with its corporate

20  headquarters in Pontiac, Michigan. ABC Warehouse was founded in 1963 as a family-owned

21  appliance and electronics retailer. Through the conclusion of Defendants' and the co-

22  conspirators' conspiracy, ABC Warehouse was a supplier of consumer electronics and

23  appliances with approximately 60 stores in Michigan, Ohio, and Indiana, as well as an online

24  retail store.

25  23.  During the Relevant Period, ABC Warehouse purchased CRT Products

26  directly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents

27  the Defendants or Defendants' subsidiaries and affiliates controlled. As such, ABC Warehouse

28  suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

24. During the Relevant Period, ABC Warehouse's negotiations for the purchase of CRT Products took place in the United States and were controlled by a department based at the company's headquarters in Michigan. In addition, all ABC Warehouse purchase orders for CRT Products were issued from Michigan, invoices for these products were sent to ABC Warehouse in Michigan, and payments for these CRT Products were issued from ABC Warehouse in Michigan. ABC Warehouse employees based in Michigan were also responsible for selecting vendors and product lines with respect to CRT Products.

### B. Defendants

#### 1. Hitachi Entities

25. Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products. In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

26. Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

27. Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591. Hitachi America is a wholly-owned and controlled subsidiary of Defendant

Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

28.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

29.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

30.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and

1   controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

2   violations alleged in this complaint.

3          31.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia,

4   HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

5          **2.     IRICO Entities**

6          32.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with

7   its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

8   712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture,

9   marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC

10  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11  subsidiaries or affiliates, throughout the United States.

12         33.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese

13  company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

14  Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

15  CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website

16  also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

17  and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

18  IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

19  subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

20  the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

21  complaint.

22         34.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

23  company with its principal place of business located at No. 16, Fenghui South Road West,

24  District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned

25  subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant

26  Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

27  through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

28  and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

alleged in this complaint.

35.     Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

**3.     LG Electronics Entities**

36.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

37.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI. During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

38.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

1    throughout the United States.  Defendant LGEI dominated and controlled the finances, policies

2    and affairs of LGETT relating to the antitrust violations alleged in this complaint.

3        39.    Defendants LGEI, LGEUSA and LGETT are collectively referred to

4    herein as "LG Electronics."

5        **4.    LP Displays**

6        40.    Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

7    Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

8    Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

9    which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

10   In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

11   of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

12   billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

13   and LGEI would cede control over the company and the shares would be owned by financial

14   institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

15   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

16   affiliates, throughout the United States.

17       **5.    Panasonic Entities**

18       41.    Defendant Panasonic Corporation, which was at all times during the

19   Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

20   Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

21   Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured,

22   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

23   affiliates, throughout the United States.

24       42.    Defendant Panasonic Corporation of North America ("PCNA") is a

25   Delaware corporation with its principal place of business located at One Panasonic Way,

26   Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

27   Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

28   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

43.     Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

44.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.     Philips Entities

46.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at

Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

47.    Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

48.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

49.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant

1    Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either

2    directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal

3    Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

4    the antitrust violations alleged in this complaint.

5           50.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips

6    Brazil are collectively referred to herein as "Philips."

7           **7.     Samsung Entities**

8           51.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

9    company with its principal place of business located at Samsung Electronics Building, 1320-10,

10   Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

11   company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

12   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

13   States.

14          52.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

15   corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

16   Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

17   Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

18   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

19   United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

20   Samsung SEAI relating to the antitrust violations alleged in this complaint.

21          53.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

22   Company ("Samsung SDI") is a South Korean company with its principal place of business

23   located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public

24   company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

25   Samsung SDI claims to be the world's leading company in the display and energy business, with

26   28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide

27   market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in

28   Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed,

1   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

2   throughout the United States.  Defendant SEC dominated and controlled the finances, policies

3   and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

4            54.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a

5   California corporation with its principal place of business located at 3333 Michelson Drive, Suite

6   700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

7   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

8   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

9   affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

10  controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

11  violations alleged in this complaint.

12           55.    Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico")

13  is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

14  21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

15  owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

16  Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either

17  directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

18  and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

19  Mexico relating to the antitrust violations alleged in this complaint.

20           56.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a

21  Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,

22  Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

23  owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

24  Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

25  directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

26  and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

27  Brazil relating to the antitrust violations alleged in this complaint.

28           57.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

58.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

59.    Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

60.    Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**8.    Samtel**

61.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.   Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

**9.    Thai CRT**

62.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**10.    Toshiba Entities**

63.    Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.   During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

64.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.   During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

65.   Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.   TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

66.   Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.   TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

67.   Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.   TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

68.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.     Chunghwa Entities**

69.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

70.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.  Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

~~12.     Tatung Company of America, Inc.~~

~~Tatung Company of America, Inc. ("Tatung America~~**12.     Thomson Entities**

71.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a ~~California~~French corporation with its principal place of business located at ~~2850 El Presidio Street, Long Beach, California.  Tatung America is a~~ 5 Rue Jeanne d'Arc 92130 Issy-les-

Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary ~~of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half used~~Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to ~~be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passed~~its television-manufacturing division, which had plants in the United States and Mexico, and to ~~her two children~~other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, ~~Tatung America~~Thomson SA manufactured, marketed, sold and/or distributed CRT Products ~~manufactured by, among others, Chunghwa Picture Tubes, Ltd.,~~, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

72.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions

1   were sold in the United States to United States consumers under the RCA brand.  Thomson

2   Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

3   business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer

4   Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

5   indirectly through its subsidiaries or affiliates, to customers throughout the United States.

6          73.     Thomson SA and Thomson Consumer Electronics are collectively referred

7   to herein as "Thomson."

8                  **13.     Mitsubishi Entities**

9          74.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

10  is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

11  Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

12  Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

13  internally to Mitsubishi's television and monitor manufacturing division and to other television

14  and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

15  division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

16  Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

17  United States.

18         75.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

19  Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

20  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

21  Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

22  Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

23  and monitor manufacturing division and to other television and monitor manufacturers in the

24  U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

25  other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

26  marketed, sold and distributed CRT Products in the United States.

27         76.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

28  Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

77.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## IV.    AGENTS AND CO-CONSPIRATORS

~~72.~~78.  The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

~~73.~~79.  Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

~~74.~~80.  Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia ~~and~~, Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

~~75.~~81.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo

Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France. As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

76.82.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

77.83.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

78.84.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold,

and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

79.85. Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

80.86. The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.    TRADE AND COMMERCE

81.87. During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

82.88. During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

83.89. The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States. Defendants' business activities substantially affected trade and commerce within each of the 50 states, as the conspiracy artificially inflated the prices of CRT Products sold in all 50 states, and therefore caused antitrust injury in every state including the states identified herein. Moreover, Plaintiffs

1   purchased price-fixed goods directly and indirectly from Defendants for sale across the United

2   States.

3   **VI.**    **FACTUAL ALLEGATIONS**

4      **A.**    **CRT Technology**

5      ~~84.~~90.  A CRT has three components: (a) one or more electron guns, each of

6   which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

7   other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate

8   that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A

9   faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate

10   coated with multiple colors of phosphor produces a polychromatic image.   An aperture or

11   shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to

12   produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of

13   narrow lines of red, green, blue and black.

14      ~~85.~~91.  CRT technology was first developed more than a century ago.  The first

15   commercially practical CRT television was made in 1931.  However, it was not until RCA

16   Corporation introduced the product at the 1939 World's Fair that it became widely available to

17   consumers.  After that, CRTs became the heart of most display products, including televisions,

18   computer monitors, oscilloscopes, air traffic control monitors and ATMs.

19      ~~86.~~92.  The quality of a CRT itself determines the quality of the CRT display.  No

20   external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

21   the whole CRT product so that the product is often simply referred to as "the CRT."

22      ~~87.~~93.  Although there have been refinements and incremental advancements

23   along the way since then, such as the development of thinner CRTs and CRTs with a flat screen,

24   the CRT technology used today is similar to that RCA unveiled in 1939.

25      ~~88.~~94.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are

26   used primarily in televisions and related devices and CDTs are primarily used in computer

27   monitors and similar devices.  The primary difference is that CDTs typically yield a higher

28   resolution image requiring more pixels than do CPTs.

89.95.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

90.96.  The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

91.97.  Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRT Products containing price-fixed CRTs and their purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant OEMs and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs bought CRT Products, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRT Products.

92.98.  Plaintiffs have participated in the market for products containing CRTs.  To the extent Plaintiffs indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiffs were not able to pass the inflated prices on to their customers.

93.99.  Plaintiffs have been injured by paying supra-competitive prices for CRT Products.

## B.    Structure of the CRT Industry

94.100.    The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

### 1.    Market Concentration

95.101.    During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The

1    high concentration of market share facilitates coordination because there are fewer cartel

2    members among which to coordinate pricing or allocate markets, and it is easier to monitor the

3    pricing and production of other cartel members.

4              **2.       Information Sharing**

5              96.102.          Because of common membership in trade associations, interrelated

6    business arrangements such as joint ventures, allegiances between companies in certain countries

7    and relationships between the executives of certain companies, there were many opportunities

8    for Defendants to discuss and exchange competitive information.  The ease of communication

9    was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants

10   took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as

11   alleged below.

12             97.103.          Defendants Hitachi, Samsung and Chunghwa are all members of

13   the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-

14   founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG

15   Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial

16   Research Association.  Upon information and belief, Defendants and their co-conspirators used

17   these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

18   the meetings of these trade associations, Defendants exchanged proprietary and competitively

19   sensitive information which they used to implement and monitor the conspiracy.

20             **3.       Consolidation**

21             98.104.          The CRT industry also had significant consolidation during the

22   Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a

23   joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of

24   Toshiba's and Panasonic's CRT businesses into MTPD.

25             **4.       Multiple Interrelated Business Relationships**

26             99.105.          The industry is marked by a web of cross-licensing agreements,

27   joint ventures and other cooperative arrangements that can facilitate collusion.

28             100.106.          Examples of the high degree of cooperation among Defendants in

both the CRT Product market and other closely related markets include the following:

    a.   The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

    b.   Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

    c.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

    d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

    e.   In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

    f.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

    g.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

    h.   Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

    i.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.      High Costs of Entry Into the Industry**

~~101.~~107.      There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

~~102.~~108.      During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.      The Maturity of the CRT Product Market**

~~103.~~109.      Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

~~104.~~110.      Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

~~105.~~111.      In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an

1    additional 84.5 percent between 2006 and 2010.

2    106.112.    Although demand was declining as a result of the popularity of

3    flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were

4    still the dominant display technology during the Relevant Period, making Defendants' collusion

5    and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels

6    and plasma displays during the Relevant Period, a substantial market for CRT Products existed

7    as a cheaper alternative to these new technologies.

8    107.113.    In 1999, CRT monitors accounted for 94.5 percent of the retail

9    market for computer monitors in North America.  By 2002, that figure had dropped to 73

10   percent; still a substantial share of the market.

11   108.114.    As for CRT televisions, they accounted for 73 percent of the North

12   American television market in 2004, and by the end of 2006, still held a 46 percent market share.

13                **7.    Homogeneity of CRT Products**

14   109.115.    CRT  Products  are  commodity-like  products  which  are

15   manufactured in standardized sizes.  One Defendant's CRT Product for a particular application,

16   such as a particular size television set or computer monitor, is substitutable for another's.

17   Defendants sold and Plaintiffs purchased CRT Products primarily on the basis of price.

18   110.116.    It is easier to form and sustain a cartel when the product in

19   question is commodity-like because it is easier to agree on prices to charge and to monitor those

20   prices once an agreement is formed.

21        **C.    Pre-Conspiracy Market**

22   111.117.    The genesis of the CRT conspiracy was in the late 1980s as the

23   CRT Products business became more international and Defendants began serving customers that

24   were also being served by other international companies.  During this period, the employees of

25   Defendants would encounter employees from their competitors when visiting their customers.  A

26   culture of cooperation developed over the years and these Defendant employees would exchange

27   market information on production, capacity and customers.

28                112.118.    In  the  early  1990s,  representatives  from  Samsung,  Daewoo,

1    Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these

2    producers began to include discussions about price in their meetings.

3        **D.        Defendants' and Co-Conspirators' Illegal Agreements**

4            113.119.        In order to control and maintain profitability during declining

5    demand for CRT Products, Defendants and their co-conspirators have engaged in a contract,

6    combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or

7    stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1,

8    1995 through at least November 25, 2007.

9            114.120.        The CRT conspiracy was effectuated through a combination of

10   group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral

11   discussions were the primary method of communication and took place on an informal, ad hoc

12   basis.  During this period, representatives from Daewoo and Defendants LG Electronics and

13   Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT,

14   Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific

15   customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia,

16   Indonesia and Singapore.

17           115.121.        Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with

18   and Daewoo, also attended several ad hoc group meetings during this period.  The participants at

19   these group meetings also discussed increasing prices for CRTs.

20           116.122.        As more manufacturers formally entered the conspiracy, group

21   meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more

22   organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put

23   in place. Defendants' representatives attended hundreds of these meetings during the Relevant

24   Period.

25           117.123.        The overall CRT conspiracy raised and stabilized worldwide and

26   U.S. prices that Defendants charged for CRTs.

27        **1.        "Glass Meetings"**

28           118.124.        The group meetings among the participants in the CRT price-

---

P.C. RICHARD'S AMENDED COMPLAINT                33                    Case No. 12-cv-02648
                                                                     Master File No. 3:07-cv-05944-SC

fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

119.125.      The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

120.126.      The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

121.127.      Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

122.128.      The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung

1  SDI Tianjin, and Chunghwa.

2  ~~123.~~129.      Glass meetings also occurred occasionally in various European

3  countries.  Attendees at these meetings included those Defendants and co-conspirators which had

4  subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics,

5  LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf

6  of Daewoo~~)~~), IRICO, and ~~IRICO~~Thomson.  Chunghwa also attended these meetings.

7  ~~124.~~130.      Representatives of Defendants also attended what were known

8  amongst members of the conspiracy as "green meetings."  These were meetings held on golf

9  courses.  The green meetings were generally attended by top and management level employees

10  of Defendants.

11  ~~125.~~131.      During the Relevant Period, glass meetings took place in Taiwan,

12  South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand ~~and~~, Malaysia, and the

13  United States.

14  ~~126.~~132.      Participants would often exchange competitively sensitive

15  information prior to a glass meeting.  This included information on inventories, production, sales

16  and exports.  For some such meetings, where information could not be gathered in advance of the

17  meeting, it was brought to the meeting and shared.

18  ~~127.~~133.      The glass meetings at all levels followed a fairly typical agenda.

19  First, the participants exchanged competitive information such as proposed future CRT pricing,

20  sales volume, inventory levels, production capacity, exports, customer orders, price trends and

21  forecasts of sales volumes for coming months.  The participants also updated the information

22  they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman"

23  who would write the information on a white board.  The meeting participants then used this

24  information to discuss and agree upon what price each would charge for CRTs to be sold in the

25  following month or quarter.  They discussed and agreed upon target prices, price increases, so-

26  called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

27  of CRTs that were sold to specific customers, and agreed upon target prices to be used in

28  negotiations with large customers.  Having analyzed the supply and demand, the participants

1   would also discuss and agree upon production cutbacks.

2   128.134.    During periods of oversupply, the focus of the meeting participants

3   turned to making controlled and coordinated price reductions.  This was referred to as setting a

4   "bottom price."

5   129.135.    Defendants' conspiracy included agreements on the prices at which

6   certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that

7   manufactured CRT Products, such as televisions and computer monitors.  Defendants realized

8   the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to

9   support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all

10  OEMs paid supracompetitive prices for CRTs.

11  130.   Each of the participants in these meetings knew, and in fact discussed, the

12  significant impact that the price of CRTs had on the cost of the finished products into which they

13  were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there

14  were slim profit margins.  Defendants therefore concluded that in order to make their CRT price

15  increases stick, they needed to make the increase high enough that their direct customers (CRT

16  TV and monitor makers) would be able to justify a corresponding price increase to their

17  customers.  In this way, Defendants ensured that price increases for CRTs were passed on to

18  indirect purchasers of CRT Products.

19  131.136.    The agreements reached at the glass meetings included:

20          a.  agreements on CRT prices, including establishing target prices,

21              "bottom" prices, price ranges and price guidelines;

22          b.  placing agreed-upon price differentials on various attributes of CRTs,

23              such as quality or certain technical specifications;

24          c.  agreements on pricing for intra-company CRT sales to vertically

25              integrated customers;

26          d.  agreements as to what to tell customers about the reason for a price

27              increase;

28          e.  agreements to coordinate with competitors that did not attend the

group meetings and agreements with them to abide by the agreed-upon pricing;

    f.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

    g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

    h.   agreements to coordinate uniform public statements regarding available capacity and supply;

    i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

    j.   agreements to allocate customers;

    k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

    l.   agreements to keep their meetings secret.

132.137.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

133.138.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### 2.    **Bilateral Discussions**

134.139.    Throughout the Relevant Period, the glass meetings were

1   supplemented by bilateral discussions between various Defendants.  The bilateral discussions

2   were more informal than the group meetings and occurred on a frequent, ad hoc basis, often

3   between the group meetings. These discussions, usually between sales and marketing employees,

4   took the form of in-person meetings, telephone contacts and emails.

5   135.140.      During the Relevant Period, in-person bilateral meetings took

6   place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan,

7   Thailand, Brazil and, Mexico, and the United States.

8   136.141.      The purpose of the bilateral discussions was to exchange

9   information about past and future pricing, confirm production levels, share sales order

10  information, confirm pricing rumors, and coordinate pricing with manufacturers in other

11  geographic locations, including Brazil, Mexico and, Europe, and the United States.

12  137.142.      In order to ensure the efficacy of their global conspiracy,

13  Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil

14  and, Mexico, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.and the

15  United States.  These Brazilian and MexicanCRT manufacturers were particularly important

16  because they served the North American market for CRT Products.  As further alleged herein,

17  North America was the largest market for CRT televisions and computer monitors during the

18  Relevant Period.  Because these Brazilian and MexicanCRT manufacturers are all wholly-owned

19  and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the

20  unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs

21  imported intosold in the United States were fixed, raised, maintained and/or stabilized at

22  supracompetitive levels.

23  138.143.      Defendants also used bilateral discussions with each other during

24  price negotiations with customers to avoid being persuaded by customers to cut prices.  The

25  information gained in these communications was then shared with supervisors and taken into

26  account in determining the price to be offered.

27  139.144.      Bilateral discussions were also used to coordinate prices with CRT

28  manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi,

Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

**3.      Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

140.145.      Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

141.146.      Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

142.147.     Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

143.148.     Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

144.149.     Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

145.150.     Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for

CRTs.

146.151.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

147.152.    PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

148.153.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

149.154.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

150.155.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001,

1    Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD

2    (n/k/a LP Displays).   A substantial number of these meetings were attended by high level

3    executives from Philips.   Philips also engaged in numerous bilateral discussions with other

4    Defendants.   Through these discussions, Philips agreed on prices and supply levels for CRTs.

5    Philips never effectively withdrew from this conspiracy.

6        ~~151.~~156.        Defendants Philips America and Philips Brazil were represented at

7    those meetings and were a party to the agreements entered at them.   To the extent Philips

8    America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they

9    played a significant role in the conspiracy because Defendants wished to ensure that the prices

10   for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements

11   reached at the glass meetings.   Thus, Philips America and Philips Brazil were active, knowing

12   participants in the alleged conspiracy.

13       ~~152.~~157.        Between at least 1995 and 2007, Defendant Samsung, through

14   SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

15   participated in at least 200 glass meetings at all levels.   A substantial number of these meetings

16   were attended by the highest ranking executives from Samsung.   Samsung also engaged in

17   bilateral discussions with each of the other Defendants on a regular basis.   Through these

18   discussions, Samsung agreed on prices and supply levels for CRTs.

19       ~~153.~~158.        Defendants SEAI, Samsung SDI America, Samsung SDI Brazil

20   and Samsung SDI Mexico were represented at those meetings and were a party to the agreements

21   entered at them.   To the extent SEC and SEAI sold and/or distributed CRT Products, they played

22   a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

23   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

24   the glass meetings.   Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

25   Mexico were active, knowing participants in the alleged conspiracy.

26       ~~154.~~159.        Between at least 1998 and 2006, Defendant Samtel participated in

27   multiple bilateral discussions with other Defendants, particularly with Thai CRT.   These

28   meetings were attended by high level executives from Samtel.   Through these discussions,

1  Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from

2  this conspiracy.

3      155.160.      Between at least 1997 and 2006, Defendant Thai CRT participated

4  in multiple glass meetings.  These meetings were attended by the highest ranking executives

5  from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

6  particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

7  levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

8      161.   Between at least 1996 and 2005, Defendant Thomson participated in

9  dozens of meetings with its competitors, including several glass meetings and multiple bilateral

10  meetings.  These meetings were attended by high level sales managers from Thomson.  At these

11  meetings, Thomson discussed such things as CRT prices, production, revenues, volumes,

12  demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product

13  development and agreed on prices and supply levels for CRTs.  Thomson never effectively

14  withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon

15  Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played

16  a role in the conspiracy.

17      162.   Between at least 1995 and 2005, Defendant Mitsubishi participated in

18  multiple bilateral and some multilateral meetings with its competitors.  These meetings were

19  attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed

20  such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales,

21  plant shutdowns, customer allocation, and new product development, and agreed on prices and

22  supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

23      156.163.      Between at least 1995 and 2003, Defendant Toshiba, through TC,

24  TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the

25  CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended

26  by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple

27  bilateral discussions with other Defendants, particularly with LG.  Through these discussions,

28  Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from

this conspiracy.

157.164.     Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them. To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

158.165.     Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin. Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

159.     Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them. To the extent Tatung America sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

160.166.     Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Daewoo. Daewoo also engaged in bilateral discussions with other Defendants on a regular basis. Through these discussions, Daewoo agreed on prices and supply levels for CRTs. Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

161.167.       When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.      The CRT Market During the Conspiracy**

162.168.       Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

163.169.       The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

164.170.       During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and*

---

[1]       Estimated market value of CRT units sold.

*Related Display Materials,* Fuji Chimera Research, 1997, p.12.

165.171.    In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

166.172.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

167.173.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

168.174.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

169.175.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiffs were informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

170.176.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of

the new generation LCD panels and plasma display products. As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

171.177.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

172.178.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

### F.    International Government Antitrust Investigations

173.179.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice in November 2007.

174.180.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

175.181.    In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

176.182.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel. The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips

Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

177.183.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

178.184.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an

assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

179.185.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

180.186.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.187.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

182.188.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix

prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

183.189.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

190.   On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

184.191.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

185.192.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

186.193.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

187.194.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into

anticompetitive conduct in the closely-related TFT-LCD market.

188.195.      On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

189.196.      On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

190.197.      On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

191.198.      The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.      The Role of Trade Associations During the Relevant Period**

192.199.      Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the

Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

193.200.     Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

194.201.     The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

195.202.     Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

196.203.     Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.     Effects of Defendants' Antitrust Violations**

**1.     Examples of Reductions in Manufacturing Capacity by Defendants**

197.204.     As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

198.205.     In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

199.206.     In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

200.207.     In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

201.208.     In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

202.209.     In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

**2.     Examples of Collusive Pricing for CRTs**

203.210.     Defendants' collusion is evidenced by unusual price movements in the CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

204.211.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

205.212.     In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

206.213.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

207.214.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

208.215.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

209.216.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

210.217.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

211.218.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

### 3. Summary Of Effects Of The Conspiracy Involving CRTs

212.219.   The above combination and conspiracy has had the following effects, among others:

    a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b.  Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.  Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRT Products.

    d.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.   PLAINTIFF'S INJURIES

213.220.   As purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

214.221.   Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have

absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

215.222.      The OEMs and others passed on to their customers, including Plaintiffs, the overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when they purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

216.223.      Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiffs.

217.224.      The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

218.225.      Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

219.226.      As a result, Plaintiffs were injured in connection with their purchases of CRT Products during the Relevant Period.

**VIII.   FRAUDULENT CONCEALMENT**

220.227.      Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein that affected it until November 2007, when the investigation by the DOJ became public and class action complaints in the United

States were filed.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

221.228.     Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

222.229.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

223.230.     By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

224.231.     Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

225.232.     As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective

1   attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the

2   nature of their agreement.  During these meetings, top executives and other officials attending

3   these meetings were instructed on more than once occasion not to disclose the fact of these

4   meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or

5   production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their

6   arrivals and departures at such meetings to avoid being seen in public with each other and with

7   the express purpose and effect of keeping them secret.

8        226.233.      Defendants also agreed at glass meetings and bilateral meetings to

9   give pretextual reasons for price increases and output reductions to their customers.

10       227.234.      As alleged above, in early 1999, despite declining production costs

11  and the rapid entry of flat panel display products, the price of large-sized color CRTs actually

12  rose.  The price increase was allegedly based on increasing global demand for the products.  In

13  fact, this price rise was the result of collusive conduct amongst Defendants, which was

14  undisclosed at the time.

15       228.235.      As alleged above, despite increased competition from flat panel

16  monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.

17  This price stabilization was purportedly due exclusively to a shortage of critical components

18  such as glass.  This was a pretext used to cover up the conspiracy.

19       229.236.      In   addition,   when   several   CRT   manufacturers,   including

20  Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price

21  hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying

22  this price increase, a Deputy General Manager for an LG Electronics distributor in India stated,

23  "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the

24  prices of CRT monitors in due course of time."

25       230.237.      Manufacturers such as LG Electronics periodically issued press

26  statements falsely asserting that CRT prices were being driven lower by intense competition.

27       231.238.      Plaintiffs are informed and believe, and thereon allege, that

28  Defendants' purported reasons for the price increases of CRTs were materially false and

P.C. RICHARD'S AMENDED COMPLAINT                    58                    Case No. 12-cv-02648
                                                                   Master File No. 3:07-cv-05944-SC

misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

239.   As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.~~IX.~~

**IX.   _AMERICAN PIPE_, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING**

240.   As discussed at length in Paragraphs 179-198 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiffs' claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

241.   As shown by Plaintiffs' allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiffs were members of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- _Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al._, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

242.   Plaintiffs' claims were tolled under _American Pipe & Construction Co. v. Utah_, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

# XI.  CLAIM FOR VIOLATIONS

## First Claim for Relief

## (Violation of Section 1 of the Sherman Act)

232.243.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

233.244.    Beginning no later than March 1, 1995, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

234.245.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

235.246.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

236.247.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

237.248.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.   participating in meetings and conversations to discuss the prices and supply of CRTs;

    b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.   issuing price announcements and price quotations in accordance with the agreements reached;

e.   selling CRTs to customers in the United States at noncompetitive prices;

f.   exchanging competitively sensitive information in order to facilitate their conspiracy;

g.   agreeing to maintain or lower production capacity; and

h.   providing false statements to the public to explain increased prices for CRTs.

238.249.   As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of State Antitrust Laws)**

239.250.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

240.251.   During the Relevant Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust laws referenced below.  Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, subsidize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels. Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

241.252.   The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the price of CRTs.

242.253.   For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired

1  to do, including, but in no way limited to, the actions, practices and course of conduct set forth

2  above and the following:

3        a.  to fix, raise, maintain and stabilize the price of CRTs;

4        b.  to allocate the market for CRTs amongst themselves;

5        c.  to submit rigged bids for the award and performance of certain CRT

6             contracts; and

7        d.  to allocate among themselves the production of CRTs.

8  243.254.     The combination and conspiracy alleged herein has had, inter alia,

9  the following effects:

10        a.  price competition in the sale of CRTs has been restrained, suppressed,

11             and/or eliminated in the states listed below;

12        b.  prices for CRTs sold by Defendants, their co-conspirators, and others

13             have been fixed, raised, maintained and stabilized at artificially high,

14             non-competitive levels in the states listed below; and

15        c.  those who purchased CRTs from Defendants, their co- conspirators

16             and others and CRT Products containing price-fixed CRTs from

17             Defendants, their co-conspirators and others have been deprived of the

18             benefits of free and open competition.

19  244.255.     As a result of the alleged conduct Defendants and their co-

20  conspirators, Plaintiffs paid supra-competitive, artificially inflated prices for CRT Products they

21  purchased during the Relevant Period.

22  245.256.     By reason of the foregoing, Defendants and their co-conspirators,

23  have entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et*

24  *seq.*:

25        a.  Defendants and their co-conspirators' conspiracy restrained,

26             suppressed and/or eliminated competition in the sale of CRTs in

27             Arizona and fixed, raised, maintained and stabilized CRT prices in

28             Arizona at artificially high, non-competitive levels;

b. As a result, Defendants' and their co-conspirators' conspiracy substantially affected Arizona commerce;

c. During the Relevant Period, MARTA purchased CRT Products containing priced fixed CRTs in Arizona, and, as a result, MARTA is entitled to the protection of the laws of Arizona; and

d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, MARTA has been injured in its business and property by paying more for CRT Products containing CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' and their co-conspirators' combination and conspiracy, and is therefore entitled to damages and the costs of suit, including reasonable attorneys' fees, pursuant to Ariz. Rev. Stat §§ 44-1408(B).

246.257.      By reason of the foregoing, Defendants and their co-conspirators have entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Ill. Code 10/1, *et seq.*:

a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Illinois and fixed, raised, maintained and stabilized CRT prices in Illinois at artificially high, non-competitive levels;

b. As a result, Defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

c. During the Relevant Period, MARTA purchased CRT Products containing price-fixed CRTs in Illinois, and, as a result, MARTA is entitled to the protection of the laws of Illinois; and

d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, MARTA has been injured in its business and property by paying more for CRT Products containing CRTs

1          manufactured by Defendants, their co-conspirators, and others than it

2          would have paid in the absence of Defendants and their co-

3          conspirators' combination and conspiracy, and is therefore entitled to

4          treble damages and costs of suit, including reasonable attorneys' fees,

5          pursuant to the Illinois Antitrust Act, 740 Ill. Code 10/7(2).

6       ~~247.~~258.    By reason of the foregoing, Defendants and their co-conspirators

7 also have entered into a restraint of trade in violation of Mich. Comp. Laws §§ 445.771, et seq.:

8         a.  Defendants' and their co-conspirators' conspiracy restrained,

9            suppressed and/or eliminated competition in the sale of CRTs in

10           Michigan and fixed, raised, maintained, and stabilized CRT prices in

11           Michigan at artificially high, non-competitive levels;

12         b.  As a result, Defendants' and their co-conspirators' conspiracy

13           substantially affected Michigan commerce;

14         c.  During the Relevant Period, ABC Warehouse purchased CRT

15           Products containing price-fixed CRTs in Michigan, and, as a result,

16           ABC Warehouse is entitled to the protection of the laws of Michigan;

17           and

18         d.  As a direct and proximate result of Defendants' and their co-

19           conspirators' conduct, ABC Warehouse has been injured in its

20           business and property by paying more for CRT Products containing

21           CRTs manufactured by Defendants, their co-conspirators, and others

22           than it would have paid in the absence of Defendants' and their co-

23           conspirators' conspiracy, and is therefore entitled to damages and the

24           costs of suit, including reasonable attorneys' fees, pursuant to Mich.

25           Comp. Laws § 445.778(2).

26       ~~248.~~259.    By reason of the foregoing, Defendants and their co- conspirators

27 also have entered into an agreement in restraint of trade in violation of New York's Donnelly

28 Act, N.Y. Gen. Bus. Law §§ 340, et seq.:

a.   Defendants' and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in New York and fixed, raised, maintained and stabilized  CRT prices in New York at artificially high, non-competitive levels;

b.   As a result, Defendants' and their co-conspirators' conspiracy substantially affected New York  commerce;

c.   Beginning on December 23, 1998, P.C. Richard purchased CRT Products containing price-fixed CRT panels in New York, and, as a result, P.C. Richard is entitled to the protection of the laws of New York; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, P.C. Richard has been injured in its business and property by paying more for CRT Products containing CRT panels manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' and their co-conspirators' combination and conspiracy, and is therefore entitled to treble damages and costs of suit, including reasonable attorneys' fees, pursuant to N.Y. Gen. Bus. Law § 340(5).

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging and decreeing that:

A.   Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), Ariz. Rev. Stat. §§ 44-1401, *et seq.*, and the Illinois Antitrust Act, and that Plaintiffs were injured in their businesses and property as a result of Defendants' violations;

B.   Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be

1  entered against the Defendants in an amount to be trebled in accordance with such laws,

2  including Section 4 of the Clayton Act;

3        C.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees,

4  and the respective officers, directors, partners, agents, and employees thereof, and all other

5  persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained

6  from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

7        D.      Plaintiffs shall be awarded pre-judgment and post-judgment interest, and

8  such interest shall be awarded at the highest legal rate from and after the date of service of the

9  initial complaint in this action;

10        E.      Plaintiffs shall recover **its** costs of this suit, including reasonable

11  attorneys' fees as provided by law; and

12        F.      Plaintiffs shall receive such other or further relief as may be just and

13  proper.

14  **XII.**        **JURY TRIAL DEMAND**

15        Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by

16  jury of all the claims asserted in this Complaint so triable.

17

18

19

20

21

22

23

24

25

26

27

28

1    Dated:                                Respectfully Submitted,

2

3                                          _____
                                           PHILIP J. IOVIENO *(Pro Hac Vice)*
4                                          ANNE M. NARDACCI *(Pro Hac Vice ~~to be filed~~)*
                                           LUKE NIKAS *(Pro Hac Vice ~~to be filed~~)*
5                                          CHRISTOPHER V. FENLON *(Pro Hac Vice ~~to be*
6     ~~filed~~)*

                                           BOIES, SCHILLER & FLEXNER LLP
7                                          10 North Pearl Street, 4th Floor
                                           Albany, NY 12207
8                                          Telephone:  (518) 434-0600
                                           Facsimile:  (518) 434-0665
9                                          Email: piovieno@bsfllp.com
                                           Email: anardacci@bsfllp.com
10                                         Email: lnikas@bsfllp.com
                                           Email: cfenlon@bsfllp.com
11

12                                         WILLIAM A. ISAACSON *(Pro Hac Vice ~~to be filed~~)*
                                           BOIES, SCHILLER & FLEXNER LLP
13                                         5301 Wisconsin Ave. NW, Suite 800
                                           Washington, DC 20015
14                                         Telephone:  (202) 237-2727
                                           Facsimile:  (202) 237-6131
15                                         Email:  wisaacson@bsfllp.com

16                                         *Counsel for Plaintiffs P.C. Richard & Son Long*
                                           *Island Corporation, MARTA Cooperative of America,*
17                                         *Inc., and ABC Appliance, Inc.*

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT K

1   Richard Alan Arnold, Esquire
    William J. Blechman, Esquire
2   Kevin J. Murray, Esquire
    KENNY NACHWALTER, P.A.
3   201 S. Biscayne Boulevard, Suite 1100
    Miami, Florida  33131
4   Tel:     (305) 373-1000
    Fax:     (305) 372-1861
5   Email:  rarnold@knpa.com
6           wblechman@knpa.com
            kmurray@knpa.com
7

8   *Counsel for Plaintiffs Sears Roebuck
    and Co. and Kmart Corp.*

9   ~~Jason C. Murray (CA Bar No. 169806)~~
    ~~CROWELL & MORING LLP~~
10  ~~515 South Flower St., 40th Floor~~
    ~~Los Angeles, CA 90071~~
11  ~~Telephone:  213-443-5582~~
    ~~Facsimile:  213-622-2690~~
12  ~~Email: jmurray@crowell.com~~

13  ~~*Counsel for Plaintiffs*~~

14  [Additional counsel listed on signature page]

15

16

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION**

17

18  | | |
    |---|---|
    | ~~TARGET CORP.;~~ SEARS, ROEBUCK AND CO. and KMART CORP.~~; OLD COMP INC.;~~ ~~GOOD GUYS, INC.; RADIOSHACK CORP.,~~ | **Master File No. 3:07-cv-05944-SC** |
    | Plaintiffs | **MDL No. 1917** |
    | v. | **Individual Case No.~~CASE NO.~~** CV 11-5514 |
    | CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA); ~~TATUNG COMPANY OF AMERICA, INC.;~~ IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; | **SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

28

1

1   HITACHI, LTD.; HITACHI DISPLAYS, LTD.;
    HITACHI AMERICA, LTD.; HITACHI ASIA,
2   LTD.; HITACHI ELECTRONIC DEVICES
    (USA), INC.; SHENZHEN SEG HITACHI
3   COLOR DISPLAY DEVICES, LTD.;
    PANASONIC CORPORATION; PANASONIC
4   CORPORATION OF NORTH AMERICA; MT
    PICTURE DISPLAY CO., LTD.; BEIJING
5   MATSUSHITA COLOR CRT CO., LTD.;
6   KONINKLIJKE PHILIPS ELECTRONICS
    N.V.; PHILIPS ELECTRONICS NORTH
7   AMERICA CORPORATION; PHILIPS
    ELECTRONICS INDUSTRIES (TAIWAN),
8   LTD.; PHILIPS DA AMAZONIA INDUSTRIA
    ELECTRONICA LTDA.; SAMSUNG
9   ELECTRONICS CO., LTD.; SAMSUNG
    ELECTRONICS AMERICA, INC.; SAMSUNG
10  SDI CO., LTD.; SAMSUNG SDI AMERICA,
    INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;
11  SAMSUNG SDI BRASIL LTDA.; SHENZHEN
    SAMSUNG SDI CO., LTD.; TIANJIN
12  SAMSUNG SDI CO., LTD.; SAMSUNG SDI
13  (MALAYSIA) SDN. BHD.; SAMTEL COLOR
    LTD.; THAI CRT CO., LTD.; TOSHIBA
14  CORPORATION; TOSHIBA AMERICA, INC.;
    TOSHIBA AMERICA CONSUMER
15  PRODUCTS, LLC; TOSHIBA AMERICA
    ELECTRONIC COMPONENTS, INC.;
16  TOSHIBA AMERICA INFORMATION
17  SYSTEMS, INC., TECHNICOLOR SA;
    TECHNICOLOR USA, INC.; MITSUBISHI
18  ELECTRIC CORPORATION; MITSUBISHI
    DIGITAL ELECTRONICS AMERICA, INC.;
19  and MITSUBISHI ELECTRIC &
    ELECTRONICS, USA, INC.
20
21                          Defendants
22      Plaintiffs Target Corp.; Sears, Roebuck and Co. ("Sears") and; Kmart Corp. ("Kmart"); Old
23  Comp Inc.; Good Guys, Inc.; and RadioShack Corp. (hereafter "Plaintiffs") for their Second Amended
24  Complaint for Damages and Injunctive Relief against all Defendants named herein, hereby allege as
25  follows:
26
27
28                                  2
                    SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
                                         Case No. CV 11-5514

I.       **INTRODUCTION**

1.       Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").  Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs and CDTs of all sizes shall be referred to collectively as "CRTs."

2.       Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one product containing CRTs.

3.       Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

4.       With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

5.     The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

6.     During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

7.     This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

8.     On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  On May 12, 2011, the United States and Samsung SDI entered into an amended plea agreement, where Samsung SDI pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.

9.     During the Relevant Period, Plaintiffs purchased CRTs in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRTs they purchased during the Relevant Period.

**II.   JURISDICTION AND VENUE**

10.     Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain treble damages for their direct purchases of CRTs from certain Defendants and for injunctive relief against all Defendants.

11.     Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business and Professions Code (the "Cartwright Act") and the various state antitrust and unfair competition laws listed herein.

12.     This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 over Plaintiffs' claims arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.  In addition, this Court has supplemental jurisdiction over Plaintiffs' claims arising under the state antitrust and unfair competition laws listed herein under 28 U.S.C. §1367.  Plaintiffs' state law claims are so related to their claims under the federal antitrust laws that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in each of the states identified herein.  This effect gave rise to Plaintiffs' antitrust claims.  During the Relevant Period, Defendants and their co-conspirators' conspiracy affected the prices of the CRTs Plaintiffs purchased in the United States which moved through, were sold in, or used in each of the states identified herein.

14.     This court has jurisdiction over each Defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10.  Each Defendant conducts substantial business in the state of California, and a number of Defendants maintain their headquarters in this District or elsewhere in California.  In addition, Defendants all purposefully availed themselves of the laws of the United States and California insofar as they manufactured CRTs and products containing CRTs for sale in the United States and California and several Defendants have admitted that they engaged in conduct in furtherance of the conspiracy in the Northern District of California.

15.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S. § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in this district.

### III.     THE PARTIES

#### A.     Plaintiffs

##### 1.     Target

16.     Plaintiff Target Corporation is a Minnesota corporation with its headquarters in Minneapolis, Minnesota.  Target operates approximately 1,700 large-format general merchandise and food discount stores throughout the United States, as well as an online retail store, Target.com.  During the Relevant Period, Target purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  Target also purchased CRTs for internal use during the Relevant Period.  As a result of Defendants' and their co-conspirators' conspiracy, Target was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

17.     During the Relevant Period, Target's negotiations for the purchase of CRTs took place in the United States and were controlled by a merchandising department based at the company's headquarters in Minnesota.  In addition, all Target purchase orders for CRTs were issued from Minnesota and all invoices were sent to Target in Minnesota.  Target's merchandising department in Minnesota was also responsible for selecting vendors and product lines with respect to CRTs.

During the Relevant Period, Target also purchased CRTs at distribution centers located in multiple states, including Arizona, California, Florida, Illinois, Iowa, Kansas, Michigan, Minnesota, New York, North Carolina, and Wisconsin, where it received CRTs shipped to those distribution centers.

1

2

**2.   Sears**

18.16.  Plaintiff Sears, Roebuck and Co. is a New York corporation with its headquarters in Hoffman Estates, Illinois.  Plaintiff Kmart Corporation is a Michigan corporation with its headquarters in Hoffman Estates, Illinois.  Sears, Roebuck and Co. and Kmart Corporation are two of the nation's largest broadline retailers, and together operate 3,500 full-line and specialty retail stores in the United States under the "Sears" and "Kmart" brands, as well as online retail stores, including Sears.com and Kmart.com.  During the Relevant Period, Sears, Roebuck and Co. and Kmart Corporation purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  Sears, Roebuck and Co. and Kmart Corporation also purchased CRTs for internal use during the Relevant Period.

19.17.  On March 24, 2005, Sears, Roebuck and Co. and Kmart Corporation became wholly owned by a common corporate parent, Sears Holdings Corporation.  During and after the Relevant Period, Sears, Roebuck and Co. and Kmart Corporation purchased CRTs manufactured and sold by Defendants, their co-conspirators, and others.  As a result of Defendants' and their co-conspirators' conspiracy, both Sears, Roebuck and Co. and Kmart Corporation were injured in their business and property because the prices they paid for such CRTs were artificially inflated by that conspiracy.

20.18.  During the Relevant Period, all of both Sears, Roebuck and Co.'s and Kmart Corporation's negotiations for the purchase of CRTs took place in the United States and were controlled by merchandising departments based at the companies' respective headquarters in Illinois and Michigan. In addition, all purchase orders for CRTs were issued by those companies from Illinois and Michigan respectively and all invoices were sent to those companies in Illinois and Michigan respectively.  The merchandising departments in Illinois and Michigan were also responsible for selecting vendors and product lines with respect to CRTs.

21.19.  During the Relevant Period, Sears, Roebuck and Co. also purchased CRTs at distribution centers located in multiple states, including Arizona, California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, and Wisconsin, where it received CRTs shipped to those distribution centers.  Kmart Corporation likewise purchased

CRTs at distribution centers located in multiple states, including California, Florida, Illinois, Minnesota, Nebraska, Nevada, and North Carolina.

3.    Old Comp

22.    Plaintiff Old Comp Inc. is a Delaware corporation with its headquarters in Irving, Texas. During the Relevant Period, Old Comp was known as CompUSA Inc. ("CompUSA") and was headquartered in Dallas, Texas.

23.    Old Comp owns all claims and rights under federal and state law to recover any overcharges suffered by CompUSA and the following subsidiaries:  (1) CompUSA GP Holdings Company; (2) CompUSA Holdings Company; (3) CompUSA Stores L.P.; (4) CompUSA of Puerto Rico Inc.; (5) CompUSA Management Company; (6) CompTeam Inc.; (7) cozone.com inc.; (8) BeOn Inc.; and (9) BeOn Operating Company; and (10)  Computer City, Inc. (collectively, the "CompUSA Subsidiaries").

24.    During the Relevant Period, CompUSA, by itself or through the CompUSA Subsidiaries, purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  CompUSA and the CompUSA Subsidiaries also purchased CRTs for internal use during the Relevant Period.  As a result of Defendants' and their co-conspirators' conspiracy, CompUSA and the CompUSA Subsidiaries were injured in their business and property because the prices they paid for such CRTs were artificially inflated by that conspiracy.

25.    During the Relevant Period, all of CompUSA's negotiations for the purchase of CRTs took place in the United States and were controlled by the company's merchandising department at its Texas headquarters.  In addition, CompUSA issued all of its purchase orders for CRTs from Texas and received invoices for those orders in Texas.  CompUSA's Texas-based merchandising department was also responsible for selecting vendors and product lines with respect to CRTs.

26.    During the Relevant Period, CompUSA also purchased CRTs at distribution centers located in multiple states, including California and Illinois, where it received CRTs shipped to those distribution centers.

27.     CompUSA no longer operates any stores.  It sold its "CompUSA" brand names, service marks, and trademarks to an unrelated third party in 2008.

4.     Good Guys

28.     Plaintiff Good Guys, Inc. is a Delaware corporation with its headquarters in Irving, Texas.  During the Relevant Period, The Good Guys maintained its headquarters in California and then in Texas.

29.     The Good Guys owns all claims and rights under federal and state laws to recover any overcharges suffered by The Good Guys and the following subsidiaries: (1) Good Guys California, Inc. and (2) goodguys.com, inc. (collectively, the "Good Guys Subsidiaries").

30.     During the Relevant Period, The Good Guys, by itself or through the Good Guys Subsidiaries, purchased and then resold from their respective facilities substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  The Good Guys and the Good Guys Subsidiaries also purchased CRTs for internal use during the Relevant Period.  As a result of Defendants' and their co-conspirators' conspiracy, The Good Guys and the Good Guys Subsidiaries were injured in their business and property because the prices they paid for such CRTs were artificially inflated by that conspiracy.

31.     During the Relevant Period, all of The Good Guys' negotiations for the purchase of CRTs took place in the United States and were controlled by the company's merchandising department at its California, and then Texas headquarters.  In addition, The Good Guys issued all of its purchase orders for CRTs from California, and then Texas, and received invoices for those orders in California, and then Texas.  The Good Guys' California and then Texas based merchandising department was also responsible for selecting vendors and product lines with respect to CRTs.

32.     During the Relevant Period, The Good Guys also purchased CRTs at a distribution center located in California, where it received CRTs shipped to that distribution center.

33.     The Good Guys no longer operates any stores.

9

**5.**    **RadioShack**

34.    Plaintiff RadioShack Corporation is a Delaware corporation with its headquarters in Fort Worth, Texas.  RadioShack operates approximately 4,400 stores, 1,400 dealer outlets and nearly 700 wireless phone kiosks throughout the United States, as well as an online retail store, Radioshack.com. During the Relevant Period, RadioShack purchased and then resold from its facilities substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  RadioShack also purchased CRTs for internal use during the Relevant Period.  As a result of Defendants' and their co-conspirators' conspiracy, RadioShack was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

35.    During the Relevant Period, all of RadioShack's negotiations for the purchase of CRTs took place in the United States and were controlled by a merchandising department based at the company's Texas headquarters.  In addition, all RadioShack purchase orders for CRTs were issued from Texas and all invoices were sent to RadioShack in Texas.  RadioShack's Texas-based merchandising department was also responsible for selecting vendors and product lines with respect to CRTs.

36.20.  During the Relevant Period, RadioShack also purchased CRTs at distribution centers located in multiple states, including California, Massachusetts, and Mississippi, where it received CRTs shipped to those distribution centers.

**B.**    **The Defendants**

**1.**    **IRICO Entities**

37.21.  Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRTs.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

38.22.  Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and

1  one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the

2  largest CRT manufacturer in China in terms of production and sales volume, sales revenue and

3  aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or

4  distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

5  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the

6  antitrust violations alleged in this complaint.

7        39.23.  Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its

8  principal place of business located at No. 16, Fenghui South Road West, District High-tech

9  Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In

10  2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed,

11  distributed and/or sold CRTs, either directly or through its subsidiaries or affiliates, throughout the

12  United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC

13  relating to the antitrust violations alleged in this complaint.

14        40.24.  Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

15             **2.    LG Electronics Entities**

16        41.25.  Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the

17  Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong,

18  Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer

19  electronics, home appliances and mobile communications, which established its first overseas branch

20  office in New York in 1968.  The company's name was changed from Gold Star Communications to

21  LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred

22  its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called

23  LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and

24  changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured,

25  marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

26  throughout the United States.

27

28

1    42.26.  Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its

2    principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.

3    LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period,

4    LGEUSA manufactured, marketed, sold and/or distributed CRTs, either directly or through its

5    subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the

6    finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

7    43.27.  Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity

8    with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City,

9    Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.

10   During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRTs, either

11   directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI

12   dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations

13   alleged in this complaint.

14   44.28.  Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG

15   Electronics."

16          **3.     LP Displays**

17   45.29.  Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong

18   company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central,

19   Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a

20   50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became

21   an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and

22   computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP

23   Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company

24   and the shares would be owned by financial institutions and private equity firms.  During the Relevant

25   Period, LP Displays manufactured, marketed, sold and/or distributed CRTs, either directly or through its

26   subsidiaries or affiliates, throughout the United States.

27

28

**4.    Hitachi Entities**

46.30.  Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRTs.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

47.31.  Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

48.32.  Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

49.33.  Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated

13

1   and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged

2   in this complaint.

3       ~~50.~~34.  Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation

4   with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.

5   HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period,

6   HEDUS manufactured, marketed, sold and/or distributed CRTs, either directly or through its

7   subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays

8   dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations

9   alleged in this complaint.

10      ~~51.~~35.  Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was

11  a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian

12  District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi

13  Shenzhen until November 8, 2007 (which was coincidentally around the time that the government

14  investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi

15  corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period,

16  Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its

17  subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays

18  dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

19  violations alleged in this complaint.

20      ~~52.~~36.  Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and

21  Hitachi Shenzhen are collectively referred to herein as "Hitachi."

22      **5.      Panasonic Entities**

23      ~~53.~~37.  Defendant Panasonic Corporation, which was at all times during the Relevant Period

24  known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1,

25  2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During

26  the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRTs,

27  either directly or through its subsidiaries or affiliates, throughout the United States.

28

14
**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

1    54.38.  Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation

2    with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA

3    is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant

4    Period, PCNA manufactured, marketed, sold and/or distributed CRTs, either directly or through its

5    subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and

6    controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this

7    complaint.

8    55.39.  Defendants Panasonic Corporation and PCNA are collectively referred to herein as

9    "Panasonic."

10   56.40.  Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co.,

11   Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.

12   In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called

13   Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the

14   majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining

15   35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned

16   subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant

17   Period, MTPD manufactured, marketed, sold and/or distributed CRTs, either directly or through its

18   subsidiaries or affiliates, throughout the United States.

19   57.41.  Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company

20   with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District,

21   Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The

22   other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import &

23   Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the

24   Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC

25   was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest

26   producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured,

27

28

15

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514

1   marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

2   throughout the United States.

3         **6.**      **Philips Entities**

4       58.42.   Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal

5   Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX

6   Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics

7   companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of

8   its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint

9   venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a

10  result of increased pressure on demand and prices for CRTs, Royal Philips wrote off the remaining book

11  value of 126 million Euros of its investment and said it would not inject further capital into the venture.

12  During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRTs, either

13  directly or through its subsidiaries or affiliates, throughout the United States.

14      59.43.   Defendant Philips Electronics North America Corporation ("Philips America") is a

15  Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New

16  York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of

17  Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold

18  and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United

19  States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips

20  America relating to the antitrust violations alleged in this complaint.

21      60.44.   Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a

22  Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang

23  District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the

24  Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRTs, either directly

25  or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips

26  dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust

27  violations alleged in this complaint.

28

1    61.45.  Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a

2    Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar

3    (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled

4    subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured,

5    marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

6    throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies

7    and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

8    62.46.  Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are

9    collectively referred to herein as "Philips."

10    **7.    Samsung Entities**

11    63.47.  Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its

12    principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-

13    gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant

14    Period, SEC manufactured, marketed, sold and/or distributed CRTs, either directly or through its

15    subsidiaries or affiliates, throughout the United States.

16    64.48.  Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with

17    its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey

18    07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant

19    Period, SEAI manufactured, marketed, sold and/or distributed CRTs, either directly or through its

20    subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the

21    finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this

22    complaint.

23    65.49.  Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung

24    SDI") is a South Korean company with its principal place of business located at 575 Shin-dong,

25    Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder

26    holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading

27    company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In

28

1   2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other

2   producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung

3   SDI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or

4   affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies

5   and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

6       66.50.  Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

7   corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine,

8   California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant

9   Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or

10  distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

11  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of

12  Samsung SDI America relating to the antitrust violations alleged in this complaint.

13      67.51.  Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican

14  company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial

15  El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of

16  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed,

17  sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

18  United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and

19  affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

20      68.52.  Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company

21  with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480

22  Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of

23  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed,

24  sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

25  United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and

26  affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

27

28

69.53.  Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

70.54.  Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

71.55.  Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

72.56.  Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

### 8.   Samtel

73.57.  Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRTs.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRTs.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9.   Thai CRT

74.58.  Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10.   Toshiba Entities

75.59.  Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

76.60.  Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRTs, either directly

1    or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and

2    controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations

3    alleged in this complaint.

4        77.61.  Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability

5    company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-

6    owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant

7    Period, TACP manufactured, marketed, sold and/or distributed CRTs, either directly or through its

8    subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the

9    finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

10       78.62.  Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California

11   corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400,

12   Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through

13   Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed

14   CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant

15   TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust

16   violations alleged in this complaint.

17       79.63.  Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California

18   corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-

19   1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.

20   During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRTs, either directly

21   or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and

22   controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this

23   complaint.

24       80.64.  Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to

25   herein as "Toshiba."

26

27

28

**11. Chunghwa Entities**

81.65. Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan. It was established in 1971 by Tatung Corporation to manufacture CRTs. In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market. Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers. During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

82.66. Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. It is a wholly-owned and controlled subsidiary of Chunghwa. Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

83.67. Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12. Tatung Company of America, Inc.**

Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California. Tatung America is a subsidiary of Tatung Company. Currently, Tatung Company owns approximately half of Tatung America. The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin. Following Lun Kuan Lin's death, her share passed to her two children. During the Relevant Period, Tatung America manufactured, marketed, sold and/or distributed CRTs manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United States.

22

**Formatted:** Indent: Left: 0.5", No bullets or numbering

**12.    Thomson Entities**

68.    Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France. Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.   Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

69.    Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a United States corporation with its principal place of business located at 10330 N. Meridian Street, Indianapolis, Indiana 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in

23

1  2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson

2  Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

3  indirectly through its subsidiaries or affiliates, to customers throughout the United States.

4       70.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as

5  "Thomson."

6       **13.     Mitsubishi Entities**

7       71.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese

8  corporation located at Building 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi

9  Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and

10  Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and

11  monitor manufacturing division and to other television and monitor manufacturers in the United States

12  and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT

13  manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and

14  distributed CRT Products in the United States.

15       72.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a

16  United States corporation located at 5665 Plaza Drive, Cypress, California 90630.  Mitsubishi Electric

17  USA is a wholly-owned subsidiary of Mitsubishi Electric Japan.  Mitsubishi Electric USA manufactured

18  CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.

19  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division

20  and to other television and monitor manufacturers in the United States and elsewhere.  Mitsubishi's

21  television and monitor division also purchased CRTs from other CRT manufacturers.  During the

22  Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products

23  in the United States.

24       73.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United

25  States corporation located at 9351 Jeronimo Road, Irvine, California 92618.  Mitsubishi Digital is a

26  wholly-owned subsidiary of Mitsubishi Electric USA.  During the Relevant Period, Mitsubishi Digital

27  manufactured, marketed, sold and distributed CRT Products in the United States.

28

74.     Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## IV.   AGENTS AND CO-CONSPIRATORS

84.75.  The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

85.76.  Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.  Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs or CRTs made by its parent company.

86.77.  Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., Videocon Industries, Ltd., P.T. Tosummit Electronic Devices Indonesia and Toshiba Display Devices (Thailand) Co., Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

87.78.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRTs.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRTs.  Orion was involved in CRTs sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of

25

1   approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business

2   in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured,

3   marketed, sold and/or distributed CRTs, either directly or through their subsidiaries or affiliates,

4   throughout the United States.

5       88.79.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

6       89.80.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a

7   Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan

8   Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-

9   owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation

10  transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with

11  Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated

12  as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period,

13  Matsushita Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through

14  its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated

15  and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust

16  violations alleged in this complaint.

17      90.81.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed

18  by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of

19  business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3

20  million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with

21  Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the

22  Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRTs, either directly or

23  through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and

24  controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this

25  complaint.

26      91.82.  Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its

27  principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum

28

1   Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In

2   2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was

3   re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled

4   subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured,

5   marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

6   throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs

7   of TDDT relating to the antitrust violations alleged in this complaint.

8       92.83.  The acts charged in this Complaint have been done by Defendants and their co-

9   conspirators, or were authorized, ordered or done by their respective officers, agents, employees or

10  representatives while actively engaged in the management of each Defendant's or co-conspirator's

11  business or affairs.

12  **V.    TRADE AND COMMERCE**

13      93.84.  During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold

14  CRTs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign

15  commerce, including through and into this judicial district.

16      94.85.  During the Relevant Period, Defendants collectively controlled a vast majority of the

17  market for CRTs, both globally and in the United States.

18      95.86.  The business activities of Defendants substantially affected interstate trade and commerce

19  in the United States and caused antitrust injury in the United States.  The business activities of

20  Defendants also substantially affected trade and commerce and caused antitrust injuries in California,

21  Arizona, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska,

22  Nevada, New Mexico, New York, North Carolina, and Wisconsin.

23  **VI.   FACTUAL ALLEGATIONS**

24      **A.    CRT Technology**

25      96.87.  A CRT has three components: (a) one or more electron guns, each of which is a series of

26  metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used

27  to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by

28

1    an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor

2    produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a

3    polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the

4    faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of

5    thousands of narrow lines of red, green, blue and black.

6        ~~97.~~88.  CRT technology was first developed more than a century ago.  The first commercially

7    practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the

8    product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs

9    became the heart of most display products, including televisions, computer monitors, oscilloscopes, air

10   traffic control monitors and ATMs.

11       ~~98.~~89.  The quality of a CRT itself determines the quality of the CRT display.  No external

12   control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT

13   product so that the product is often simply referred to as "the CRT."

14       ~~99.~~90.  Although there have been refinements and incremental advancements along the way

15   since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology

16   used today is similar to that RCA unveiled in 1939.

17       ~~100.~~91.      CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used

18   primarily in televisions and related devices and CDTs are primarily used in computer monitors and

19   similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring

20   more pixels than do CPTs.

21       ~~101.~~92.      CRTs have no independent utility, and have value only as components of other

22   products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the

23   demand for such products.

24       ~~102.~~93.      The market for CRTs and the market for the products into which they are placed

25   are inextricably linked and intertwined because the CRT market exists to serve the CRTs products

26   markets.  The markets for CRTs and products containing CRTs are, for all intents and purposes,

27   inseparable in that one would not exist without the other.

28

103.94.    Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRTs and their purchases of CRTs indirectly from non-Defendant original equipment manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs have bought CRTs, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRTs.

104.95.    Plaintiffs have participated in the market for products containing CRTs.  To the extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiffs were not able to pass the inflated prices on to their customers.

105.96.    Plaintiffs have been injured by paying supra-competitive prices for CRTs.

**B.    Structure of the CRT Industry**

106.97.    The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.    Market Concentration**

107.98.    During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.    Information Sharing**

108.99.    Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was

1  facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took

2  advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

3    109.100.    Defendants Hitachi, Samsung and Chunghwa are members of the Society for

4  Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea

5  Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and

6  Samsung are members of the Electronic Display Industrial Research Association.  Upon information and

7  belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and

8  agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants

9  exchanged proprietary and competitively sensitive information which they used to implement and

10  monitor the conspiracy.

11             **3.      Consolidation**

12    110.101.    The CRT industry also had significant consolidation during the Relevant Period,

13  including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving

14  Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's

15  CRT businesses into MTPD.

16             **4.      Multiple Interrelated Business Relationships**

17    111.102.    The industry is marked by a web of cross-licensing agreements, joint ventures and

18  other cooperative arrangements that can facilitate collusion.

19    112.103.    Examples of the high degree of cooperation among Defendants in both the CRT

20  market and other closely related markets include the following:

21        i.      The formation of the CRT joint venture LGPD in 2001 by Defendants LG

22               Electronics and Philips.

23        ii.     Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd.

24               n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of

25               manufacturing TFT-LCDs.

26        iii.    The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba

27               and Panasonic.

28

1    iv.    Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display

2          Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-

3          LCDs.

4    v.    In December 1995, Defendant Toshiba partnered with Orion and two other non-

5          Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

6    vi.    Defendant Toshiba and Orion also signed a cooperative agreement relating to

7          LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and

8          Toshiba, which had substituted its STN-LCD production with TFT-LCD

9          production, marketed Daewoo's STN-LCDs globally through its network.

10   vii.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement

11         with Chunghwa for large CPTs.

12   viii.  Defendant Chunghwa has a joint venture with Defendant Samsung for the

13         production of CRTs.  Chunghwa now licenses the technology from Defendant

14         Philips, a recent development that helped resolve a patent infringement suit filed

15         in 2002.

16   ix.    Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the

17         manufacture, sale and distribution of optical storage products such as DVD

18         drives.

19   x.     Defendant Samtel participates in a joint venture, Samcor Glass Limited, with

20         Defendant Samsung and non-Defendant Corning Inc., USA for the production and

21         supply of picture tube glass.

22   xi.    Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics,

23         Samsung, Philips, and Panasonic.

24        **5.   High Costs of Entry Into the Industry**

25        ~~113.~~104.    There are significant manufacturing and technological barriers to entry into the

26   CRT industry.  It would require substantial time, resources and industry knowledge to overcome these

27

28

31

1  barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the

2  declining demand for CRTs.

3      114.105.      During the Relevant Period, the costs of the assembly components, both as a

4  whole and individually, have been generally declining, and, in some periods, declining at a substantial

5  rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants

6  to keep prices above where they would have been but for the conspiracy.

7          **6.      The Maturity of the CRT Market**

8      115.106.      Newer industries typically are characterized by rapid growth, innovation and high

9  profits.  The CRT market is a mature one, and like many mature industries, is characterized by slim

10  profit margins, creating a motivation to collude.

11      116.107.      Demand for CRTs was declining throughout the Relevant Period.  Static declining

12  demand is another factor which makes the formation of a collusive arrangement more likely because it

13  provides a greater incentive to firms to avoid price competition.

14      117.108.      In addition, conventional CRT televisions and computer monitors were being

15  rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to

16  engage in this alleged price fixing scheme in order to slow down declining CRT prices.  Between 2000

17  and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and

18  were predicted to decline by an additional 84.5 percent between 2006 and 2010.

19      118.109.      Although demand was declining as a result of the popularity of flat-panel LCD

20  and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display

21  technology during the Relevant Period, making Defendants' collusion and the international price fixing

22  conspiracy worthwhile.  Due to the high costs of CRTs and plasma displays during the Relevant Period,

23  a substantial market for CRTs existed as a cheaper alternative to these new technologies.

24      119.110.      In 1999, CRT monitors accounted for 94.5 percent of the retail market for

25  computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial

26  share of the market.

27

28

1      120.111.     As for CRT televisions, they accounted for 73 percent of the North American

2      television market in 2004, and by the end of 2006, still held a 46 percent market share.

3           **7.**    **Homogeneity of CRTs**

4      121.112.     CRTs are commodity-like products which are manufactured in standardized sizes.

5      One Defendant's CRT for a particular application, such as a particular size television set or computer

6      monitor, is substitutable for another's.  Defendants sell and Plaintiffs purchase CRTs primarily on the

7      basis of price.

8      122.113.     It is easier to form and sustain a cartel when the product in question is

9      commodity-like because it is easier to agree on prices to charge and to monitor those prices once an

10    agreement is formed.

11        **C.**    **Pre-Conspiracy Market**

12    123.114.     The genesis of the CRT conspiracy was in the late 1980s as the CRTs business

13    became more international and Defendants began serving customers that were also being served by other

14    international companies.  During this period, the employees of Defendants would encounter employees

15    from their competitors when visiting their customers.  A culture of cooperation developed over the years

16    and these Defendant employees would exchange market information on production, capacity and

17    customers.

18    124.115.     In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa

19    visited each other's factories in S.E. Asia.  During this period, these producers began to include

20    discussions about price in their meetings.

21        **D.**    **Defendants' and Co-Conspirators' Illegal Agreements**

22    125.116.     In order to control and maintain profitability during declining demand for CRTs,

23    Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the

24    effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to

25    artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

26    126.117.     The CRT conspiracy was effectuated through a combination of group and

27    bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the

28

1  primary method of communication and took place on an informal, ad hoc basis.  During this period,

2  representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant

3  manufacturers, including Philips, Chunghwa, Hitachi, Thai CRT, Toshiba and Panasonic, to discuss

4  increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan,

5  South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

6      127.118.      Defendants Samsung, LG, Mitsubishi and Chunghwa, along with Daewoo, also

7  attended several ad hoc group meetings during this period.  The participants at these group meetings also

8  discussed increasing prices for CRTs.

9      128.119.      As more manufacturers formally entered the conspiracy, group meetings became

10  more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion,

11  and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives

12  attended hundreds of these meetings during the Relevant Period.

13      129.120.      The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that

14  Defendants charged for CRTs.

15          1.    "Glass Meetings"

16      130.121.      The group meetings among the participants in the CRT price-fixing conspiracy

17  were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three

18  general levels of Defendants' corporations.

19      131.122.      The first level meetings were attended by high level company executives

20  including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings

21  occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing

22  compliance with price fixing agreements.  Because attendees at top meetings had authority as well as

23  more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also

24  able to resolve disputes because they were decision makers who could make agreements.

25      132.123.      The second level meetings were attended by Defendants' high level sales

26  managers and were known as "management" meetings.  These meetings occurred more frequently,

27  typically monthly, and handled implementation of the agreements made at top meetings.

28

1    133.124.    Finally, the third level meetings were known as "working level" meetings and

2    were attended by lower level sales and marketing employees.  These meetings generally occurred on a

3    weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing

4    since the lower level employees did not have the authority to enter into agreements.  These lower level

5    employees would then transmit the competitive information up the corporate reporting chain to those

6    individuals with pricing authority.  The working level meetings also tended to be more regional and

7    often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees

8    met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

9    134.125.    The Chinese glass meetings began in 1998 and generally occurred on a monthly

10   basis following a top or management level meeting.  The China meetings had the principal purpose of

11   reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.

12   Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and

13   BMCC, as well as the China-based branches of the other Defendants, including but not limited to

14   Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

15   135.126.    Glass meetings also occurred occasionally in various European countries.

16   Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries

17   and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays,

18   Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and

19   IRICO.

20   136.127.    Representatives of Defendants also attended what were known amongst members

21   of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings

22   were generally attended by top and management level employees of Defendants.

23   137.128.    During the Relevant Period, glass meetings took place in Taiwan, South Korea,

24   Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia and the United States.

25   138.129.    Participants would often exchange competitively sensitive information prior to a

26   glass meeting.  This included information on inventories, production, sales and exports.  For some such

27

28

35

1    meetings, where information could not be gathered in advance of the meeting, it was brought to the

2    meeting and shared.

3           139.130.       The glass meetings at all levels followed a fairly typical agenda.  First, the

4    participants exchanged competitive information such as proposed future CRT pricing, sales volume,

5    inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales

6    volumes for coming months.  The participants also updated the information they had provided in the

7    previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the

8    information on a white board.  The meeting participants then used this information to discuss and agree

9    upon what price each would charge for CRTs to be sold in the following month or quarter.  They

10   discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for

11   CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and

12   agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply

13   and demand, the participants would also discuss and agree upon production cutbacks.

14          140.131.       During periods of oversupply, the focus of the meeting participants turned to

15   making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

16          141.132.       Defendants' conspiracy included agreements on the prices at which certain

17   Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end

18   products, such as televisions and computer monitors.  Defendants realized the importance of keeping the

19   internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market

20   to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive

21   prices for CRTs.

22          142.133.       Each of the participants in these meetings knew, and in fact discussed, the

23   significant impact that the price of CRTs had on the cost of the finished products into which they were

24   placed.  Like CRTs themselves, the market for CRTs was a mature one, and there were slim profit

25   margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they

26   needed to make the increase high enough that their direct customers (CRT TV and monitor makers)

27

28

1    would be able to justify a corresponding price increase to their customers.  In this way, Defendants

2    ensured that price increases for CRTs were passed on to indirect purchasers of CRTs.

3        143.134.      The agreements reached at the glass meetings included:

4            i.      agreements on CRT prices, including establishing target prices, "bottom" prices,

5                    price ranges and price guidelines;

6            ii.     placing agreed-upon price differentials on various attributes of CRTs, such as

7                    quality or certain technical specifications;

8            iii.    agreements on pricing for intra-company CRT sales to vertically integrated

9                    customers;

10           iv.     agreements as to what to tell customers about the reason for a price increase;

11           v.      agreements to coordinate with competitors that did not attend the group meetings

12                   and agreements with them to abide by the agreed-upon pricing;

13           vi.     agreements to coordinate pricing with CRT manufacturers in other geographic

14                   markets such as Brazil, Europe and India;

15           vii.    agreements to exchange pertinent information regarding shipments, capacity,

16                   production, prices and customers demands;

17           viii.   agreements to coordinate uniform public statements regarding available capacity

18                   and supply;

19           ix.     agreements to allocate both overall market shares and share of a particular

20                   customer's purchases;

21           x.      agreements to allocate customers;

22           xi.     agreements regarding capacity, including agreements to restrict output and to

23                   audit compliance with such agreements; and

24           xii.    agreements to keep their meetings secret.

25       144.135.      Efforts were made to monitor each Defendant's adherence to these agreements in

26   a number of ways, including seeking confirmation of pricing both from customers and from employees

27   of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1)

28

37

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

1   monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an

2   agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of

3   a mutual interest in living up to the target price and living up to the agreements that had been made.

4   145.136.    As market conditions worsened in 2005-2007, and the rate of replacement of

5   CRTs by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings

6   again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to

7   manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust

8   issues.

9              **2.      Bilateral Discussions**

10   146.137.    Throughout the Relevant Period, the glass meetings were supplemented by

11   bilateral discussions between various Defendants.  The bilateral discussions were more informal than the

12   group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These

13   discussions, usually between sales and marketing employees, took the form of in-person meetings,

14   telephone contacts and emails.

15   147.138.    During the Relevant Period, in-person bilateral meetings took place in Malaysia,

16   Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and

17   Mexico.

18   148.139.    The purpose of the bilateral discussions was to exchange information about past

19   and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and

20   coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and

21   Europe.

22   149.140.    In order to ensure the efficacy of their global conspiracy, Defendants also used

23   bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, and Mexico and the United

24   States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These CRT Brazilian and

25   Mexican manufacturers were particularly important because they served the North American market for

26   CRTs.  As further alleged herein, North America was the largest market for CRT televisions and

27   computer monitors during the Relevant Period.  Because the CRT se Brazilian and Mexican

28

1   manufacturers are all wholly-owned and controlled subsidiaries of Defendants ~~Philips and Samsung~~

2   ~~SDI~~, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices

3   of all CRTs imported into the United States were fixed, raised, maintained and/or stabilized at

4   supracompetitive levels.

5     ~~150.~~141.  Defendants also used bilateral discussions with each other during price

6   negotiations with customers to avoid being persuaded by customers to cut prices.  The information

7   gained in these communications was then shared with supervisors and taken into account in determining

8   the price to be offered.

9     ~~151.~~142.  Bilateral discussions were also used to coordinate prices with CRT manufacturers

10  that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and

11  Samtel.  It was often the case that in the few days following a top or management meeting, the attendees

12  at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose

13  of communicating whatever CRT pricing and/or output agreements had been reached during the

14  meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating

15  CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was

16  responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular

17  bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular

18  communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible

19  for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the

20  agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and

21  Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the

22  conspiracy to fix prices of CRTs.

23     **3.**  **Defendants' and Co-Conspirators' Participation in Group and Bilateral**

24      **Discussions**

25    ~~152.~~143.  Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi

26  Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings

27  were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral

1   discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi

2   agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

3   153.144.   Defendants Hitachi America and HEDUS were represented at those meetings and

4   were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or

5   distributed CRTs to direct purchasers, they played a significant role in the conspiracy because

6   Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the

7   pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active,

8   knowing participants in the alleged conspiracy.

9   154.145.   Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC,

10  participated in multiple glass meetings.  These meetings were attended by the highest ranking executives

11  from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly

12  with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply

13  levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by

14  the Chinese government.  IRICO was acting to further its own independent private interests in

15  participating in the alleged conspiracy.

16  155.146.   Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and

17  LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated

18  in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial

19  number of these meetings were attended by the highest ranking executives from LG Electronics.  LG

20  Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.

21  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never

22  effectively withdrew from this conspiracy.

23  156.147.   Defendant LGEUSA was represented at those meetings and was a party to the

24  agreements entered at them.  To the extent LGEUSA sold and/or distributed CRTs, it played a

25  significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by

26  direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus,

27  LGEUSA was an active, knowing participant in the alleged conspiracy.

28

1    157.148.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD)

2    participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were

3    attended by the highest ranking executives from LP Displays.  Certain of these high level executives

4    from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.

5    LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP

6    Displays agreed on prices and supply levels for CRTs.

7    158.149.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic

8    Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic

9    participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were

10   attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple

11   bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and

12   supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

13   159.150.    PCNA was represented at those meetings and was a party to the agreements

14   entered at them.  To the extent PCNA sold and/or distributed CRTs to direct purchasers, it played a

15   significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by

16   direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus,

17   PCNA was an active, knowing participant in the alleged conspiracy.

18   160.151.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass

19   meetings and in fact led many of these meetings during the latter years of the conspiracy.  These

20   meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral

21   discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply

22   levels for CRTs.

23   161.152.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass

24   meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also

25   engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT

26   manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None

27   of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

28

1  BMCC was acting to further its own independent private interests in participating in the alleged

2  conspiracy.

3       ~~162.~~153.      Between at least 1996 and 2001, Defendant Philips, through Royal Philips and

4  Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated

5  in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A

6  substantial number of these meetings were attended by high level executives from Philips.  Philips also

7  engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips

8  agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

9       ~~163.~~154.      Defendants Philips America and Philips Brazil were represented at those meetings

10  and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil

11  sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy

12  because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not

13  undercut the pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil

14  were active, knowing participants in the alleged conspiracy.

15       ~~164.~~155.      Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung

16  SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least

17  200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest

18  ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other

19  Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels

20  for CRTs.

21       ~~165.~~156.      Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

22  Mexico were represented at those meetings and were a party to the agreements entered at them.  To the

23  extent SEC and SEAI sold and/or distributed CRTs, they played a significant role in the conspiracy

24  because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not

25  undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI

26  America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the

27  alleged conspiracy.

28

1    166.157.    Between at least 1998 and 2006, Defendant Samtel participated in multiple

2   bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended

3   by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply

4   levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

5    158.    Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass

6   meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT

7   also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through

8   these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively

9   withdrew from this conspiracy.

10    159.    Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings

11   with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings

12   were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such

13   things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant

14   shutdowns, customer allocation, and new product development and agreed on prices and supply levels

15   for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business

16   to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European

17   Commission that it played a role in the conspiracy.

18    167.160.    Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple

19   bilateral meetings with its competitors.  These meetings were attended by high level sales managers

20   from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production,

21   revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new

22   product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively

23   withdrew from this conspiracy.

24    168.161.    Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and

25   TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy

26   through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales

27   managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other

28

1    Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply

2    levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

3        ~~169.~~162.      Defendants Toshiba America, TACP, TAEC and TAIS were represented at those

4    meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP,

5    TAEC and TAIS sold and/or distributed CRTs to direct purchasers, they played a significant role in the

6    conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers

7    would not undercut the pricing agreements reached at the glass meetings.  Thus, Toshiba America,

8    TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

9        ~~170.~~163.      Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT,

10   Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland,

11   participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were

12   attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of

13   Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other

14   Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels

15   for CRTs.

16       ~~171.    Defendant Tatung America was represented at those meetings and was a party to the~~

17   ~~agreements entered at them.  To the extent Tatung America sold and/or distributed CRTs to direct~~

18   ~~purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the~~

19   ~~prices for CRTs paid by direct purchasers would not undercut the CRT pricing agreements reached at~~

20   ~~the glass meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.~~

21       ~~172.~~164.      Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion

22   and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these

23   meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in

24   bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo

25   agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion,

26   its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew

27   from this conspiracy.

28

173.165.	When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.      The CRT Market During the Conspiracy**

174.166.	Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRTs, generating billions of dollars in annual profits.

175.167.	The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

176.168.	During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor

---

[1] Estimated market value of CRT units sold.

1  supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997,

2  p.12.

3  ~~177.~~169.     Defendants' collusion is evidenced by unusual price movements in the CRT

4  market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in

5  consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market

6  Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological

7  improvements and advances in manufacturing techniques, will produce a drop in the price of the average

8  electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and

9  the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained

10  stable.

11  ~~178.~~170.     In 1996, another industry source noted that "the price of the 14" tube is at a

12  sustainable USD50 and has been for some years . . . ."

13  ~~179.~~171.     In early 1999, despite declining production costs and the rapid entry of flat panel

14  display products, the price of large sized color CRTs actually rose.  The price increase was allegedly

15  based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as

16  herein alleged.

17  ~~180.~~172.     After experiencing oversupply of 17" CRTs in the second half of 1999, the

18  average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly*

19  quoted an industry analyst as saying that this price increase was "unlike most other PC-related

20  products."

21  ~~181.~~173.     A BNET Business Network news article from August 1998 reported that "key

22  components (cathode ray tubes) in computer monitors have risen in price.  'Although several

23  manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are

24  expected for the beginning of October . . . . While computer monitor price increases may be a necessary

25  course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand

26  if we have to raise our prices relative to CRT price increases.'"

27

28

1      182.174.      A 2004 article from Techtree.com reports that various computer monitor

2   manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors

3   in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture

4   the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004]

5   there will be [a] 20% hike in the price of our CRT monitors."

6      183.175.      Defendants also conspired to limit production of CRTs by shutting down

7   production lines for days at a time, and closing or consolidating their manufacturing facilities.

8      184.176.      For example, Defendants' CRT factory utilization percentage fell from 90% in the

9   third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in

10  factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.

11  Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by

12  Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices

13  of CRTs.

14     185.177.      During the Relevant Period, while demand in the United States for CRTs

15  continued to decline, Defendants' conspiracy was effective in moderating the normal downward

16  pressures on prices for CRTs caused by the entry and popularity of the new generation CRTs and plasma

17  display products.  As Finsen Yu, President of Skyworth Macao Commerical Offshore Co., Ltd., a

18  television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and

19  technology have become stable."

20     186.178.      During the Relevant Period, there were not only periods of unnatural and

21  sustained price stability, but there were also increases in prices of CRTs and CRTs.  These price

22  increases were despite the declining demand due to the approaching obsolescence of CRTs caused by

23  the emergence of a new, potentially superior and clearly more popular, substitutable technology.

24     187.179.      These price increases and price stability in the market for CRTs during the

25  Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing

26  demand caused by a new, substitutable technology.

27

28
                                          47

1      **F.      International Government Antitrust Investigations**

2      ~~188.~~180.         On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its

3      investigation into the CRT cartel.  The HCA described the cartel as follows:

4                  The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH)
                   initiated a competition supervision proceeding against the following
5                  undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH,
                   Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips
6                  Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes
                   (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo
7                  Electronics Global HQ, Daewoo Electronics European HQ, MT Picture
                   Display Germany GmbH, Matsushita Global HQ, Matsushita European
8                  HQ.

9

10                 Based on the data available the undertakings mentioned above concerted
                   their practice regarding the manufacturing and distribution of cathode-ray
11                 tubes (including coloured pictures tubes and coloured screen tubes) on the
                   European market between 1995 and 2007. The anti-competitive behaviour
12                 may have concerned the exchange of sensitive market information (about
                   prices, volumes sold, demand and the extent to which capacities were
13                 exploited), price-fixing, the allocation of market shares, consumers and
                   volumes to be sold, the limitation of output and coordination concerning
14                 the production. The undertakings evolved a structural system and
                   functional mechanism of cooperation.

15

16                 According to the available evidences it is presumable that the coordination
                   of European and Asian undertakings regarding to the European market
17                 also included Hungary from 1995 to 2007. The coordination concerning
                   the Hungarian market allegedly formed part of the European coordination.
18                 Samsung SDI Magyarország. was called into the proceeding since it
                   manufactured and sold cathode-ray tubes in Hungary in the examined
19                 period, and it allegedly participated in the coordination between its parent
                   companies.

20

21     ~~189.~~181.         On February 10, 2009, the DOJ issued a press release announcing that a federal

22     grand jury in San Francisco had that same day returned a two-count indictment against the former

23     Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his

24     participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors

25     and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust

26     Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes

27     that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.

28
                                                   48

Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried

out, in part, in California.

190.182.    On August 19, 2009, the DOJ issued a press release announcing that a federal

grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen

Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type

of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and

Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his

participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the

combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

191.183.    On March 30, 2010, the DOJ issued a press release announcing that a federal

grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng

Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of

CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a

large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination

and conspiracy to fix the prices of CRTs was carried out, in part, in California.

192.184.    On November 9, 2010, the DOJ issued a press release announcing that a federal

grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee

a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their

participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer

monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display

tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to

fix the prices of CRTs was carried out, in part, in California.

185.    On March 18, 2011, the DOJ issued a press release announcing that Defendant Samsung

SDI Company Ltd. had agreed to plead guilty to participating in a conspiracy to fix the prices of, reduce

the output of, and allocate the market for CDTs.  The United States and Samsung SDI entered into an

amended plea agreement on May 12, 2011, where Samsung SDI paid a 32 million dollar criminal fine

and pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January

1  1997, until at least as late as March 2006.  The plea specified that, during this period, Samsung SDI,

2  through its officers and employees, participated in a conspiracy among major CDT producers, the

3  primary purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in

4  the United States and elsewhere.  In furtherance of the conspiracy, Samsung SDI, through its officers

5  and employees, engaged in discussions and attended meetings with representatives of other major CDT

6  producers.  During these discussions and meetings, agreements were reached to fix prices, reduce

7  output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Acts in

8  furtherance of this conspiracy were carried out within the Northern District of California.  The plea

9  agreement also requires Samsung SDI's cooperation with the DOJ's ongoing investigation of federal

10  antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

11  ~~193.~~186.        On December 5, 2012, the European Commission announced that it had fined

12  seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix

13  prices, share markets, restrict output, and allocate customers between themselves in the CRT market.

14  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips,

15  Samsung SDI, Panasonic, Toshiba, MTPD and Technicolor (formerly Thomson).  The Commission

16  Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook

17  cartels'; they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to

18  companies doing business in Europe."  The press release accompanying the fines further notes that the

19  CRT cartels were "among the most organized cartels that the Commission has investidated."

20  ~~194.~~187.        As outlined above, Defendants have a history of competitor contacts resulting

21  from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in

22  the electronics industry.

23  ~~195.~~188.        Several Defendants also have a history of "cooperation" and anticompetitive

24  conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in

25  October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory

26  ("DRAM").

27

28

196.189.　　　Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

197.190.　　　In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

198.191.　　　On December 12, 2006, news reports indicated that Defendants Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

199.192.　　　On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD Products.

200.193.　　　On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD Products.

201.194.　　　The indictments of LG Display Co., Ltd., Sharp Corporation, and Chunghwa, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.　　The Role of Trade Associations During the Relevant Period**

202.195.　　　Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including

51

1    manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the

2    Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting

3    co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a

4    cooperation pact with the United States Display Consortium ("USDC").  In describing that pact,

5    Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should

6    cooperate on common issues."

7        203.196.        Samsung and LG Electronics were members of both KODEMIA and EDIRAK,

8    and have participated extensively in the KDCs.

9        204.197.        The KDC has taken place in Seoul, Korea or other Korean venues on: December

10   4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4,

11   2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT

12   operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han,

13   Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.

14   Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

15       205.198.        Other opportunities to collude among Defendants were provided by events

16   sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information

17   Display, the annual International Display Manufacturing Conference and Exhibition (the most recent

18   one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays

19   (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent

20   ones of which have been held in Japan).

21       206.199.        Through these trade association and trade events, and in meetings related to these

22   trade associations and trade events, on information and belief, Defendants shared what would normally

23   be considered proprietary and competitively sensitive information.  This exchange of information was

24   used to implement and monitor the conspiracy.

**H.**   <u>Effects of Defendants' Antitrust Violations</u>

   **1.**   **Examples of Reductions in Manufacturing Capacity by Defendants**

   ~~207.~~200.      As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

   ~~208.~~201.      In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

   ~~209.~~202.      In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

   ~~210.~~203.      In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

   ~~211.~~204.      In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

   ~~212.~~205.      In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

   **2.**   **Examples of Collusive Pricing for CRTs**

   ~~213.~~206.      Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50

53
<u>SECOND</u> AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514

1   in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in

2   prices, CRT prices nonetheless remained stable.

3   ~~214.~~207.        In 1996, another industry source noted that "the price of the 14" tube is at a

4   sustainable USD50 and has been for some years . . . ."

5   ~~215.~~208.        In reality, consumer prices for CRTs never approached $50 in 1997, and were

6   consistently more than double this price.

7   ~~216.~~209.        Despite the ever-increasing popularity of, and intensifying competition from, flat

8   panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995

9   according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a

10  shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

11  ~~217.~~210.        Prices for CRT monitors did fall sharply as a result of the Asian economic crisis

12  of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display

13  1998, an annual conference for the display industry, to state:

14              We believe that now is the time to revise our strategic plan in order to
            survive in his tough environment and also to prepare for the coming years.
15          This means that we have to deviate from the traditional approach of the
            simple scale up of production volume.
16

17  ~~218.~~211.        In early 1999, despite declining production costs and the rapid entry of flat panel

18  display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly

19  based on increasing global demand for the products.  In fact, this price rise was the result of collusive

20  conduct amongst Defendants.

21  ~~219.~~212.        After experiencing an oversupply of 17" CRTs in the second half of 1999, the

22  average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry

23  analyst as saying that this price increase was "unlike most other PC-related products."

24  ~~220.~~213.        On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT

25  monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to

26  manufacture CRTs.

27

28

1    221.214.    Over the course of the Relevant Period, the price of CRTs remained stable, and in

2    some instances went up in an unexplained manner, despite the natural trend in most technology products

3    to go down over time.  CRT technology was mature, and the costs of production were relatively low

4    compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial

5    Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology

6    is very mature; prices and technology have become stable."

7    222.215.    CRT prices resisted downward price pressures and remained stable over a period

8    of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian

9    currency crisis, the prices of CRTs did not decline as much as they would have absent the conspiracy.

10   The stability of the price of CRTs was accomplished by the collusive activities alleged above.

11   **I.**    **Summary Of Effects Of The Conspiracy Involving CRTs**

12   223.216.    The above combination and conspiracy has had the following effects, among

13   others:

14        a.    Price competition in the sale of CRTs by Defendants and their co-conspirators has

15              been restrained, suppressed and eliminated throughout the United States;

16        b.    Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been

17              raised, fixed, maintained and stabilized at artificially high and noncompetitive

18              levels throughout the United States; and

19        c.    Plaintiffs have been deprived of the benefit of free and open competition in the

20              purchase of CRTs.

21        d.    As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs

22              have been injured in their business and property in that they paid more for CRTs

23              than they otherwise would have paid in the absence of the unlawful conduct of

24              Defendants.

25   **VII.**   **PLAINTIFFS' INJURIES**

26        224.217.    As purchasers of CRTs, Plaintiffs have suffered a direct, substantial and

27   reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain

28

1  CRT prices at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs,

2  causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

3      225.218.      Plaintiffs also purchased CRTs from OEMs as well as others, which in turn

4  purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and

5  artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for

6  CRTs than they would have absent the conspiracy.

7      226.219.      The OEMs and others passed on to their customers, including Plaintiffs, the

8  overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the

9  overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when they purchased

10  CRTs containing such price-fixed CRTs from the OEMs and others.

11      227.220.      Once a CRT leaves its place of manufacture, it remains essentially unchanged as

12  it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not

13  change form or become an indistinguishable part of a CRT product.  Thus, CRTs follow a physical chain

14  from Defendants through manufacturers of CRTs sold to Plaintiffs.

15      228.221.      The market for CRTs and the market for products containing CRTs are

16  inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate

17  relationship.

18      229.222.      Throughout the Relevant Period, Defendants controlled the market for CRTs.

19  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from

20  Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants'

21  conspiracy.

22      230.223.      As a result, Plaintiffs were injured in connection with their purchases of CRTs

23  during the Relevant Period.

24  **VIII.   FRAUDULENT CONCEALMENT**

25      231.224.      Plaintiffs had neither actual nor constructive knowledge of the facts supporting

26  their claims for relief despite diligence in trying to discover the pertinent facts.  Defendants engaged in a

27

28

1    secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was

2    a conspiracy to fix the prices of CRTs.

3        232.225.    Because Defendants' agreement, understanding and conspiracy were kept secret,

4    Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were

5    paying artificially high prices for CRTs.

6        233.226.    The affirmative acts of Defendants alleged herein, including acts in furtherance of

7    the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As

8    noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in

9    secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing

10   actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the

11   proposed communications with customers containing these pretextual statements and would coordinate

12   which co-conspirator would first communicate these pretextual statements to customers.

13       234.227.    By its very nature, Defendants' price-fixing conspiracy was inherently self-

14   concealing.

15       235.228.    Plaintiffs could not have discovered the alleged contract, conspiracy or

16   combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices

17   and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and

18   fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or

19   combination as herein alleged was fraudulently concealed by Defendants by various means and

20   methods, including, but not limited to, secret meetings, surreptitious communications between

21   Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written

22   records, discussion on how to evade antitrust laws and concealing the existence and nature of their

23   competitor pricing discussions from non-conspirators (including customers).

24       236.229.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings

25   at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take

26   minutes.  Attending companies also reduced the number of their respective attendees to maintain

27   secrecy.

28

237.230.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

238.231.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

239.232.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

240.233.    In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

241.234.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

242.235.    Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

236.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

**IX.   *AMERICAN PIPE,* GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING**

237.   As discussed at length in Paragraphs 183 through 187 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiffs' claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

238.   Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah,* 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

239.   As shown by Plaintiffs' allegations in Paragraphs 1 through 9, and the following causes of action, Plaintiffs were members of Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.,* No. 3:07-cv-05944 SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- 243. *Direct Purchaser Plaintiffs' Consolidated Amended Complaint,* No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009)

**IX.X.   CLAIM FOR VIOLATIONS**

**First Claim for Relief**

**(Violation of Section 1 of the Sherman Act)**

244.240.   Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

245.241.   Beginning no later than March 1, 1995, the exact date being unknown to plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

59

> **Formatted:** Indent: Hanging:  0.5", Line spacing:  single, Bulleted + Level: 1 + Aligned at:  0.75" + Indent at:  1"

1      246.242.    In particular, Defendants combined and conspired to raise, fix, maintain or

2  stabilize the prices of CRTs sold in the United States.

3      247.243.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed,

4  maintained and stabilized in the United States.

5      248.244.    The contract, combination or conspiracy among Defendants consisted of a

6  continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

7      249.245.    For purposes of formulating and effectuating their contract, combination or

8  conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or

9  conspired to do, including:

       a.    participating in meetings and conversations to discuss the prices and supply of
CRTs;

       b.    communicating in writing and orally to fix target prices, floor prices and price
ranges for CRTs;

       c.    agreeing to manipulate prices and supply of CRTs sold in the United States in a
manner that deprived direct purchasers of free and open competition;

       d.    issuing price announcements and price quotations in accordance with the
agreements reached;

       e.    selling CRTs to customers in the United States at noncompetitive prices;

       f.    exchanging competitively sensitive information in order to facilitate their
conspiracy;

       g.    agreeing to maintain or lower production capacity; and

       h.    providing false statements to the public to explain increased prices for CRTs.

      250.246.    As a result of Defendants' unlawful conduct, Plaintiffs were injured in their

businesses and property in that they paid more for CRTs than they otherwise would have paid in the

absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

251.247.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

252.248.     During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRTs from Defendants and their co-conspirators in California; maintained warehouses in California containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRTs to customers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

253.249.     In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

254.250.     Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

255.251.     The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

1    256.252.    For the purpose of forming and effectuating the unlawful trust, Defendants and

2    their co-conspirators have done those things which they combined and conspired to do, including but in

3    no way limited to the acts, practices and course of conduct set forth above and the following:

4         a.    to fix, raise, maintain and stabilize the price of CRTs;

5         b.    to allocate markets for CRTs amongst themselves;

6         c.    to submit rigged bids for the award and performance of certain CRTs contracts;

7         and

8         d.    to allocate among themselves the production of CRTs.

9    257.253.    The combination and conspiracy alleged herein has had, inter alia, the following

10   effects:

11        a.    price competition in the sale of CRTs has been restrained, suppressed and/or

12           eliminated in the State of California;

13        b.    prices for CRTs sold by Defendants, their co-conspirators, and others have been

14           fixed, raised, maintained and stabilized at artificially high, non-competitive levels

15           in the State of California; and

16        c.    those who purchased CRTs from Defendants, their co-conspirators, and others

17           and CRTs containing price-fixed CRTs from Defendants, their co-conspirators,

18           and others have been deprived of the benefit of free and open competition.

19   258.254.    As a result of the alleged conduct of Defendants, Plaintiffs paid supra-

20   competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

21   259.255.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been

22   injured in their business and property by paying more for CRTs containing price-fixed CRTs sold by

23   Defendants, their co-conspirators and others than they would have paid in the absence of Defendants'

24   combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California

25   Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including

26   reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions

27   Code.

28

**Third Claim for Relief**

**(Violation of State Antitrust and Unfair Competition Laws)**

~~260.~~256.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

~~261.~~257.     Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust and unfair competition laws referenced below.  Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

~~262.~~258.     The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

~~263.~~259.     For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

     a.     to fix, raise, maintain and stabilize the price of CRTs;

     b.     to allocate markets for CRTs amongst themselves;

     c.     to submit rigged bids for the award and performance of certain CRTs contracts; and

     d.     to allocate among themselves the production of CRTs.

~~264.~~260.     The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

     a.     price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

1         b.      prices for CRTs sold by Defendants, their co-conspirators, and others have been

2              fixed, raised, maintained and stabilized at artificially high, non-competitive levels

3              in the states listed below; and

4         c.      those who purchased CRTs from Defendants, their co-conspirators, and others

5              have been deprived of the benefits of free and open competition.

6    ~~265.~~261.    As a result of the alleged conduct of Defendants and their co-conspirators,

7  Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the

8  Relevant Period.

9    ~~266.~~262.    By reason of the foregoing, Defendants and their co-conspirators also have

10  engaged in unfair competition in violation of California's Unfair Competition Law, California Business

11  and Professional Code § 17200, *et seq.*

12         a.      Defendants and their co-conspirators committed acts of unfair competition, as

13              defined by Section 17200 *et seq.*, by engaging in a conspiracy to fix and stabilize

14              the price of CRTs as described above;

15         b.      Defendants' and their co-conspirators' acts, omissions, misrepresentations,

16              practices and non-disclosures, as described above, constitute a common,

17              continuous and continuing course of conduct of unfair competition by means of

18              unfair, unlawful and/or fraudulent business acts or practices with the meaning of

19              Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of

20              the Sherman Act; and (2) violation of the Cartwright Act;

21         c.      Defendants' and their co-conspirators' acts, omissions, misrepresentations,

22              practices and non-disclosures are unfair, unconscionable, unlawful and/or

23              fraudulent independently of whether they constitute a violation of the Sherman

24              Act or the Cartwright Act;

25         d.      Defendants' and their co-conspirators' acts or practices are fraudulent or

26              deceptive within the meaning of Section 17200, *et seq.*;

1       e.     Defendants' and their co-conspirators' conduct was carried out, effectuated, and

2              perfected within the state of California.  Defendants LG Display, Chunghwa,

3              Sharp, Chi Mei, HannStar, and Epson all admitted that acts in furtherance of the

4              conspiracy to fix the price of CRTs were carried out in California;

5       f.     During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in

6              California~~: Target, Sears, Kmart, Old Comp, Good Guys, and RadioShack~~.  As a

7              result, each is entitled to the protection of the laws of California; and

8       g.     By reason of the foregoing, each of those Plaintiffs is entitled to full restitution

9              and/or disgorgement of all revenues, earnings, profits, compensation, and benefits

10            that may have been obtained by Defendants or their co-conspirators as result of

11            such business acts and practices.

12  ~~267.~~263.     By reason of the foregoing, Defendants and their co-conspirators also have

13 entered into an agreement in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401, *et. seq:*

14       a.     Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

15            eliminated competition in the sale of CRTs in Arizona and fixed, raised,

16            maintained and stabilized CRT prices in Arizona at artificially high, non-

17            competitive levels;

18       b.     As a result, Defendants and their co-conspirators' conspiracy substantially

19            affected Arizona commerce;

20       c.     During the Relevant Period, ~~the following~~ Sears ~~Plaintiffs~~ purchased CRTs in

21            Arizona~~: Target and Sears~~.  As a result, Sears ~~each~~ is entitled to the protection of

22            the laws of Arizona; and

23       d.     As a direct and proximate result of Defendants' and their co-conspirators'

24            conduct, Sears ~~each of those Plaintiffs~~ has been injured in its business and

25            property by paying more for CRTs manufactured by Defendants, their co-

26            conspirators, and others than it would have paid in the absence of Defendants and

27

28

1      their co-conspirators' combination and conspiracy, and is therefore entitled to

2      relief under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

3      268.264.      By reason of the foregoing, Defendants and their co-conspirators also have

4   engaged in unfair competition in violation of Florida Stat. §§ 501.201, *et seq.*

5          a.    Defendants and their co-conspirators committed acts of unfair competition by

6                engaging in a conspiracy to fix and stabilize the price of CRTs as described

7                above;

8          b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations,

9                practices and non-disclosures, as described above, constitute a common,

10               continuous and continuing course of conduct of unfair competition by means of

11               unfair, unlawful and/or fraudulent business acts or practices, including, but not

12               limited to violation of Section 1 of the Sherman Act;

13         c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations,

14               practices and non-disclosures are unfair, unconscionable, unlawful and/or

15               fraudulent independently of whether they constitute a violation of the Sherman

16               Act;

17         d.    Defendants' and their co-conspirators' acts or practices are fraudulent or

18               deceptive;

19         e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and

20               perfected within Florida; and

21         f.    During the Relevant Period, the following Plaintiffs purchased CRTs in Florida:

22               Target, Sears and Kmart.  As a result, each is entitled to the protection of the laws

23               of Florida.

24      269.265.      By reason of the foregoing, Defendants and their co-conspirators also have

25   entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Code

26   10/1, *et seq.*

27

28

a.     Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Illinois and fixed, raised, maintained and stabilized CRT prices in Illinois at artificially high, non-competitive levels;

b.     As a result, Defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

c.     During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in Illinois~~:~~ ~~Target, Sears, Kmart and Old Comp~~.  As a result, each is entitled to the protection of the laws of Illinois; and

d.     As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq.*

~~270.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*~~

~~a.     Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Iowa and fixed, raised, maintained and stabilized CRT prices in Iowa at artificially high, non-competitive levels;~~

~~b.     As a result, Defendants and their co-conspirators' conspiracy substantially affected Iowa commerce;~~

~~c.     During the Relevant Period, the following Plaintiffs purchased CRTs in Iowa: Target.  As a result, each is entitled to the protection of the laws of Iowa; and~~

~~d.     As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and~~

67

1   others than it would have paid in the absence of Defendants and their co-
2   conspirators' combination and conspiracy, and is therefore entitled to relief under
3   Iowa Code §§ 553.1, *et seq.*

4   271.   By reason of the foregoing, Defendants and their co-conspirators also have entered into
5   an agreement in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*
6   a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or
7   eliminated competition in the sale of CRTs in Kansas and fixed, raised,
8   maintained and stabilized CRT prices in Kansas at artificially high, non-
9   competitive levels;
10  b.   As a result, Defendants and their co-conspirators' conspiracy substantially
11  affected Kansas commerce;
12  c.   During the Relevant Period, the following Plaintiffs purchased CRTs in Kansas:
13  Target.  As a result, each is entitled to the protection of the laws of Kansas; and
14  a.   As a direct and proximate result of Defendants' and their co-conspirators'
15  conduct, each of those Plaintiffs has been injured in its business and property by
16  paying more for CRTs manufactured by Defendants, their co-conspirators, and
17  others than it would have paid in the absence of Defendants and their co-
18  conspirators' combination and conspiracy, and is therefore entitled to relief under
19  Kansas Stat. Ann. §§ 50-101, *et seq.*

20  272.266.   By reason of the foregoing, Defendants and their co-conspirators also have
21  engaged in unfair competition in violation of Massachusetts G.L. c. 93A, §§ 2, *et seq.*
22  a.   Defendants and their co-conspirators committed acts of unfair competition by
23  engaging in a conspiracy to fix and stabilize the price of CRTs as described
24  above;
25  b.   Defendants' and their co-conspirators' acts, omissions, misrepresentations,
26  practices and non-disclosures, as described above, constitute a common,
27  continuous and continuing course of conduct of unfair competition by means of
28

1       unfair, unlawful and/or fraudulent business acts or practices, including, but not

2       limited to violation of Section 1 of the Sherman Act;

3       c.      Defendants' and their co-conspirators' acts, omissions, misrepresentations,

4               practices and non-disclosures are unfair, unconscionable, unlawful and/or

5               fraudulent independently of whether they constitute a violation of the Sherman

6               Act;

7       d.      Defendants' and their co-conspirators' acts or practices are fraudulent or

8               deceptive;

9       e.      Defendants' and their co-conspirators' conduct was carried out, effectuated, and

10              perfected within Massachusetts; and

11      f.      During the Relevant Period, Sears the following Plaintiffs purchased CRTs in

12              Massachusetts: Sears and RadioShack.  As a result, Sears each is entitled to the

13              protection of the laws of Massachusetts.

14      273.267.    By reason of the foregoing, Defendants and their co-conspirators also have

15  entered into an agreement in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771,

16  et seq.

17      a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

18              eliminated competition in the sale of CRTs in Michigan and fixed, raised,

19              maintained and stabilized CRT prices in Michigan at artificially high, non-

20              competitive levels;

21      b.      As a result, Defendants and their co-conspirators' conspiracy substantially

22              affected Michigan commerce;

23      c.      During the Relevant Period, the following Plaintiffs purchased CRTs in

24              Michigan: Target, Sears and Kmart.  As a result, each is entitled to the protection

25              of the laws of Michigan; and

26      d.      As a direct and proximate result of Defendants' and their co-conspirators'

27              conduct, each of those Plaintiffs has been injured in its business and property by

28

69

1      paying more for CRTs manufactured by Defendants, their co-conspirators, and

2      others than it would have paid in the absence of Defendants and their co-

3      conspirators' combination and conspiracy, and is therefore entitled to relief under

4      Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

5     274.268.  By reason of the foregoing, Defendants and their co-conspirators also have

6   entered into an agreement in restraint of trade in violation of Minnesota Stat. §§ 325D.50, *et seq.*

7      a.  Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

8        eliminated competition in the sale of CRTs in Minnesota and fixed, raised,

9        maintained and stabilized CRT prices in Minnesota at artificially high, non-

10       competitive levels;

11     b.  As a result, Defendants and their co-conspirators' conspiracy substantially

12       affected Minnesota commerce;

13     c.  During the Relevant Period, the following Plaintiffs purchased CRTs in

14       Minnesota. Target, Sears and Kmart.  As a result, each is entitled to the

15       protection of the laws of Minnesota; and

16     d.  As a direct and proximate result of Defendants' and their co-conspirators'

17       conduct, each of those Plaintiffs has been injured in its business and property by

18       paying more for CRTs manufactured by Defendants, their coconspirators and

19       others than it would have paid in the absence of Defendants and their co-

20       conspirators' combination and conspiracy, and is therefore entitled to relief under

21       Minnesota Stat. §§ 325D.50, *et seq.*

22    275.269.  By reason of the foregoing, Defendants and their co-conspirators also have

23  entered into an agreement in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

24     a.  Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

25       eliminated competition in the sale of CRTs in Mississippi and fixed, raised,

26       maintained and stabilized CRT prices in Mississippi at artificially high, non-

27       competitive levels;

28

1           b.     As a result, Defendants and their co-conspirators' conspiracy substantially

2              affected Mississippi commerce;

3           c.     During the Relevant Period, Sears ~~the following Plaintiffs~~ purchased CRTs in

4              Mississippi~~: Sears and RadioShack~~.  As a result, Sears ~~each Plaintiff~~ is entitled to

5              the protection of the laws of Mississippi; and

6           d.     As a direct and proximate result of Defendants' and their co-conspirators'

7              conduct, each of those Plaintiffs has been injured in its business and property by

8              paying more for CRTs manufactured by Defendants, their co-conspirators, and

9              others than it would have paid in the absence of Defendants and their co-

10             conspirators' combination and conspiracy, and is therefore entitled to relief under

11             Mississippi Code Ann. §§ 75-21-1, *et seq.*

12     ~~276.~~270.     By reason of the foregoing, Defendants and their co-conspirators also have

13 entered into an agreement in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801, *et seq.*

14           a.     Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

15             eliminated competition in the sale of CRTs in Nebraska and fixed, raised,

16             maintained and stabilized CRT prices in Nebraska at artificially high, non-

17             competitive levels;

18           b.     As a result, Defendants and their co-conspirators' conspiracy substantially

19             affected Nebraska commerce;

20           c.     During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in Nebraska~~:~~

21             ~~Sears and Kmart~~.  As a result, each is entitled to the protection of the laws of

22             Nebraska; and

23            d.     As a direct and proximate result of Defendants' and their co-conspirators'

24             conduct, each of those Plaintiffs has been injured in its business and property by

25             paying more for CRTs manufactured by Defendants, their co-conspirators, and

26             others than it would have paid in the absence of Defendants and their co-

27

28

1    conspirators' combination and conspiracy, and is therefore entitled to relief under

2    Nebraska Stat. §§ 59-801, *et seq.*

3    ~~277.~~271.    By reason of the foregoing, Defendants and their co-conspirators also have

4    entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

5        a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

6              eliminated competition in the sale of CRTs in Nevada and fixed, raised,

7              maintained and stabilized CRT prices in Nevada at artificially high, non-

8              competitive levels;

9        b.    As a result, Defendants and their co-conspirators' conspiracy substantially

10             affected Nevada commerce;

11       c.    During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in Nevada~~:~~

12             ~~Sears and Kmart~~.  As a result, each is entitled to the protection of the laws of

13             Nevada; and

14       d.    As a direct and proximate result of Defendants' and their co-conspirators'

15             conduct, each of those Plaintiffs has been injured in its business and property by

16             paying more for CRTs manufactured by Defendants, their co-conspirators, and

17             others than it would have paid in the absence of Defendants and their co-

18             conspirators' combination and conspiracy, and is therefore entitled to relief under

19             Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

20   ~~278.~~272.    By reason of the foregoing, Defendants and their co-conspirators also have

21   entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

22       a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

23             eliminated competition in the sale of CRTs in New Mexico and fixed, raised,

24             maintained and stabilized CRT prices in New Mexico at artificially high, non-

25             competitive levels;

26       b.    As a result, Defendants and their co-conspirators' conspiracy substantially

27             affected New Mexico commerce;

28

1    c.    During the Relevant Period, Sears ~~the following Plaintiffs~~ purchased CRTs in

2          New Mexico: Sears. As a result, Sears ~~each~~ is entitled to the protection of the

3          laws of New Mexico; and

4    d.    As a direct and proximate result of Defendants' and their co-conspirators'

5          conduct, each of those Plaintiffs has been injured in its business and property by

6          paying more for CRTs manufactured by Defendants, their co-conspirators, and

7          others than it would have paid in the absence of Defendants and their co-

8          conspirators' combination and conspiracy, and is therefore entitled to relief under

9          New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

10   ~~279.~~273.    By reason of the foregoing, Defendants and their co-conspirators also have

11   entered into an agreement in restraint of trade in violation of New York General Business Law §§ 340,

12   *et seq.*

13   a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

14         eliminated competition in the sale of CRTs in New York and fixed, raised,

15         maintained and stabilized CRT prices in New York at artificially high, non-

16         competitive levels;

17   b.    As a result, Defendants and their co-conspirators' conspiracy substantially

18         affected New York commerce;

19   c.    During the Relevant Period, Sears ~~the following Plaintiffs~~ purchased CRTs in

20         New York: Target and Sears. As a result, Sears ~~each~~ is entitled to the protection

21         of the laws of New York; and

22   d.    As a direct and proximate result of Defendants' and their co-conspirators'

23         conduct, each of those Plaintiffs has been injured in their business and property by

24         paying more for CRTs manufactured by Defendants, their co-conspirators, and

25         others than it would have paid in the absence of Defendants and their co-

26         conspirators' combination and conspiracy, and is therefore entitled to relief under

27         New York General Business Law §§ 340, *et seq.*

28

280.274.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

 a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in North Carolina and fixed, raised, maintained and stabilized CRT prices in North Carolina at artificially high, non-competitive levels;

 b. As a result, Defendants and their co-conspirators' conspiracy substantially affected North Carolina commerce;

 c. During the Relevant Period, the following Plaintiffs purchased CRTs in North Carolina: Target, Sears and Kmart. As a result, each is entitled to the protection of the laws of North Carolina; and

 d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under North Carolina Gen. Stat. §§ 75-1, *et seq.*

281.275.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

 a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Wisconsin and fixed, raised, maintained and stabilized CRT prices in Wisconsin at artificially high, non-competitive levels;

 b. As a result, Defendants and their co-conspirators' conspiracy substantially affected Wisconsin commerce;

c.     During the Relevant Period, Sears ~~the following Plaintiffs~~ purchased CRTs in Wisconsin~~: Target and Sears~~.  As a result, Sears ~~each~~ is entitled to the protection of the laws of Wisconsin; and

d.     As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Wisconsin Stat. §§ 133.01, *et seq.*

**~~X.~~XI.   PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf, adjudging and decreeing that:

A.     Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act,  and the unfair competition laws of California, Arizona, Florida, Illinois, ~~Iowa, Kansas,~~ Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, and Wisconsin, and Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.     Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

D.     Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

1       E.     Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as

2  provided by law; and

3       F.     Plaintiffs shall receive such other or further relief as may be just and proper.

4  / / /

5  / / /

6  / / /

7  / / /

8  ~~/ / /~~

9  ~~/ / /~~

10  ~~XI.~~**XII.**       **JURY TRIAL DEMAND**

11       Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the

12  claims asserted in this Complaint so triable.

13  Dated:                   Respectfully submitted

14

15  ~~Jason C. Murray (CA Bar No. 169806)~~

     ~~CROWELL & MORING LLP~~

16  ~~515 South Flower St., 40th Floor~~

17  ~~Los Angeles, CA  90071~~

     ~~Telephone:  213-443-5582~~

18  ~~Facsimile:  213-622-2690~~

19  ~~Email:~~                      ~~jmurray@crowell.com~~

20

21  ~~Jeffrey H. Howard (*pro hac vice*)~~

     ~~Jerome A. Murphy (*pro hac vice*)~~

22  ~~CROWELL & MORING LLP~~

23  ~~1001 Pennsylvania Avenue, N.W.~~

     ~~Washington, D.C. 20004~~

24  ~~Telephone:  202-624-2500~~

25  ~~Facsimile:  202-628-5116~~

     ~~E-mail:  jhoward@crowell.com~~

26  ~~jmurphy@crowell.com~~

27

28

*Counsel for Target Corp.; Sears, Roebuck and Co.; Kmart Corp.; Old Comp Inc.; Good Guys, Inc.; RadioShack Corp.*

_____

Richard Alan Arnold, Esquire (pro hac vice)
William J. Blechman, Esquire (pro hac vice)
Kevin J. Murray, Esquire (pro hac vice)
KENNY NACHWALTER, P.A.
201 S. Biscayne Boulevard, Suite 1100
Miami, Florida  33131
Tel:    (305) 373-1000
Fax:    (305) 372-1861
Email: rarnold@knpa.com
            wblechman@knpa.com
            kmurray@knpa.com

*Counsel for Plaintiffs Sears Roebuck and Co. and Kmart Corp.*

Field Code Changed

Field Code Changed

Field Code Changed

77

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Case No. CV 11-5514

# **EXHIBIT L**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

SCHULTZE AGENCY SERVICES WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiff Schultze Agency Services*, LLC
*on behalf of* TWEETER OPCO *Tweeter Opco*, LLC and TWEETER NEWCO *Tweeter Newco*,
LLC.

                    Plaintiff,

v.

HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA,
LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR
DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS
CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG
ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS
INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF
NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR
CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS
NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN),
LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SDI
CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;
SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN
SAMSUNG SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN. BHD.; SAMTEL COLOR
LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA AMERICA ELECTRONIC
COMPONENTS, INC.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC.;
CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA);
TATUNG COMPANY OF AMERICA, INC.,

Defendants.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 12-cv-02649 |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 12-cv-02649 | MDL No. 1917 |
| SCHULTZE AGENCY SERVICES, LLC on behalf of TWEETER OPCO, LLC and TWEETER NEWCO, LLC | **AMENDED COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| Plaintiff, | |
| vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;  SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN. BHD.; SAMTEL COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA AMERICA, INC.; TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA AMERICA | |

1
2
3
4
5

ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA PICTURE
TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA); TECHNICOLOR
SA; TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC CORPORATION;
MITSUBISHI DIGITAL ELECTRONICS
AMERICA, INC.; MITSUBISHI ELECTRIC
& ELECTRONICS, USA, INC.,

6
          Defendants.

7
8
9
10
11
12
13
14
15
16
17
18
19

20          Plaintiff, Schultze Agency Services, LLC ("Schultze Agency Services") on behalf

21 of Tweeter Opco, LLC ("Tweeter Opco") and Tweeter Newco, LLC ("Tweeter Newco")

22 (collectively "Plaintiff"), for its Complaint against all Defendants named herein, hereby alleges

23 as follows:

24 **I.      INTRODUCTION**

25        1.      Plaintiff brings this action to recover those damages to Tweeter Home

26 Entertainment Group, Inc. and its affiliated companies ("Tweeter") caused by a long-running

27 conspiracy among suppliers of cathode ray tubes ("CRTs") and related products.  Defendants and

28 their co-conspirators formed an international cartel which conducted a long-running conspiracy

---

TWEETER'S AMENDED COMPLAINT        3        Case No. 12-cv-02649
Master File No. 3:07-cv-05944-SC

1    extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the

2    "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and

3    maintain prices for CRTs.

4            2.       Defendants are or were among the leading manufacturers of: (a) color

5    picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

6    tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

7    devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

8    purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

9    to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

10    and the products containing them shall be referred to as "CDT Products."  CDT Products and

11    CPT Products shall be referred to collectively herein as "CRT Products."

12            3.       Defendants control the majority of the CRT industry, a multibillion dollar

13    market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

14    Relevant Period, virtually every household in the United States owned at least one CRT Product.

15            4.       Since the mid-1990s, the CRT industry faced significant economic

16    pressures as customer preferences for other emerging technologies shrank profits and threatened

17    the sustainability of the industry.  In order to maintain price stability, increase profitability, and

18    decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

19    contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

20    States.

21            5.       With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

22    fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*,

23    shipments, prices, production and customer demand; (c) coordinate public statements regarding

24    available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

25    among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

26    on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

27    overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic

28    areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

1  producer's share of certain key customers' sales; and (k) restrict output.

2      6.      The conspiracy concerning CRTs commenced with bilateral meetings that

3  began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning

4  in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group

5  meetings had become more formalized, as described in greater detail below.  There were at least

6  500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and

7  hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan,

8  South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These

9  meetings included representatives from the highest levels of the respective companies, as well as

10 regional managers and others.

11     7.      During the Relevant Period, the conspiracy affected billions of dollars of

12 commerce throughout the United States.

13     8.      This conspiracy is being investigated by the United States Department of

14 Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be

15 indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa

16 Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury

17 in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in

18 connection with Defendants' CRT price-fixing conspiracy.

19     9.      During the Relevant Period, Plaintiff purchased CRT Products in the

20 United States and elsewhere directly and indirectly from Defendants, and/or Defendants'

21 subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates

22 controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this

23 action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it

24 purchased during the Relevant Period.

25 **II.    JURISDICTION AND VENUE**

26     10.     Plaintiff brings this action to obtain injunctive relief under Section 16 of

27 the Clayton Act; and to recover damages, including treble damages under Section 4 of the

28 Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of

Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiff also brings this action pursuant to Massachusetts General Laws, chapter 93A. for injunctive relief and damages that Plaintiff sustained due to Defendants' and their co-conspirators' violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, because Plaintiff purchased CRT Products from non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in Massachusetts.

12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's Massachusetts state law claims under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to its claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiff in Massachusetts.

14.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15.     Venue is proper in the Eastern District of New York under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In

1    addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

2    events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

3    conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

4    into this District.

5    **III.    PARTIES**

6        **A.    Plaintiff**

7        16.    Through the conclusion of Defendants' and the co-conspirators'

8    conspiracy, Tweeter was headquartered in Massachusetts and operated as a regional retailer of

9    consumer electronics and operated dozens of stores in several states under the names Tweeter,

10   Sound Advice, HiFi Buys and Showcase Home Entertainment primarily in states along the east

11   coast and in Texas, Arizona, and Illinois.

12       17.    On June 11, 2007, Tweeter commenced cases in the United States

13   Bankruptcy Court for the District of Delaware under Chapter 11 of the Bankruptcy Code.  *In re*

14   *Tweeter Home Entertainment Group, Inc. et al.*, Case No. 07-10787 (PJW) (Jointly

15   Administered).   On July 13, 2007, the Court entered an Order (1) Approving Sale of

16   Substantially All of Debtors' Assets Free and Clear of All Liens, Claims, Interests and

17   Encumbrances; (2) Approving Assumption and Assignment of Certain Contracts and Leases; and

18   (3) Granting Related Relief (the "Sale Order"), which authorized the sale of substantially all the

19   assets of Tweeter, including the causes of action alleged herein, to Tweeter Newco and/or its

20   assignees (the "Sale").  The Sale was closed on or about July 13, 2007.

21       18.    Tweeter Newco is the sole member and owner of Tweeter Opco.  Both

22   were formed by Schultze Asset Management in 2007 for the purpose of purchasing the assets of

23   Tweeter pursuant to the Sale Order and the Court approved Asset Purchase Agreement (the

24   "APA").  Pursuant to Section 2 of the APA, Tweeter Newco purchased "any rights, claims or

25   causes of action of Sellers against third parties relating to the Purchased Assets arising out of

26   events occurring prior to the Closing Date."

27       19.    On November 5, 2008, Tweeter Opco and Tweeter Newco commenced

28   cases in the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the

1  Bankruptcy Code.  *In re Tweeter Opco, LLC, et al.*, Case No. 08-12646 (MFW) (Jointly

2  Administered).   On December 5, 2008, the Court issued an Order Converting the Debtors'

3  Chapter 11 Bankruptcy Cases to Cases Under Chapter 7 of the Bankruptcy Code.

4          20.     Schultze Agency Services is the agent bank for certain lenders which

5  provided secured financing to Tweeter Opco and Tweeter Newco pursuant to a credit agreement

6  dated as of August 28, 2008 by and between Tweeter Newco and its affiliates as borrowers and

7  Schultze Agency Services as agent for the lenders.  On March 23, 2009, the Court in the Tweeter

8  Opco bankruptcy issued an order compelling the chapter 7 bankruptcy trustee to abandon certain

9  of the estates' assets to Schultze Agency Services, including the claims alleged in this complaint.

10  Accordingly, Schultze Agency Services is entitled to bring all claims and rights under federal

11  and state law to recover any overcharges suffered by Tweeter Home Entertainment Group, Inc.

12  and its subsidiaries, affiliates and predecessors, including, but not limited to:  NEA Delaware,

13  Inc.; New England Audio Co., Inc.; Bryn Mawr Radio and Television, Inc.; HiFi Buys

14  Incorporated; Home Entertainment of Texas, Inc.; DOW Stereo/Video, Inc.; United Audio

15  Centers, Inc.; Douglas T.V. & Appliance, Inc. and Douglas Audio Video Centers, Inc.; The

16  Video Scene, Inc. d/b/a Big Screen City; SMK Marketing, Inc. d/b/a Audio Video Systems;

17  Sound Advice, Inc. d/b/a Sound Advice and Showcase Home Entertainment; Hillcrest High

18  Fidelity, Inc.; and Sumarc Electronics Incorporated d/b/a NOW! Audio Video.

19          21.     During the Relevant Period, Tweeter purchased CRT Products directly

20  from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the

21  Defendants or Defendants' subsidiaries and affiliates controlled.  Tweeter also purchased CRT

22  Products from original equipment manufacturers ("OEMs"), as well as other suppliers, which

23  contained CRT panels that had been purchased from Defendants and their co-conspirators.  As

24  such, Tweeter suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

25          22.     During the Relevant Period, Tweeter's negotiations for the purchase of

26  CRT Products took place in the United States and were controlled by a department based at the

27  company's headquarters in Massachusetts.  In addition, Tweeter's purchase orders for CRT

28  Products were issued from Massachusetts, invoices for these CRT Products were sent to Tweeter

1     in Massachusetts, and payments for these CRT Products were issued from Massachusetts.

2     Tweeter employees based in Massachusetts were also responsible for selecting vendors and

3     product lines with respect to CRT Products.

4         B.      **Defendants**

5               1.      **Hitachi Entities**

6               23.      Defendant Hitachi, Ltd. is a Japanese company with its principal place of

7     business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

8     parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

9     market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd.

10    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11    subsidiaries or affiliates, throughout the United States.

12              24.      Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

13    company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

14    297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

15    in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

16    manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

17    create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi

18    Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

19    through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

20    dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

21    antitrust violations alleged in this complaint.

22              25.      Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

23    company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

24    York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

25    Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

26    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

27    United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

28    affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

26.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

27.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

28.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

29.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

1  ### 2.  **IRICO Entities**

2  30.  Defendant IRICO Group Corporation ("IGC") is a Chinese company with

3  its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

4  712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture,

5  marketing, distribution and sale of CRT Products.   During the Relevant Period, IGC

6  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

7  subsidiaries or affiliates, throughout the United States.

8  31.  Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese

9  company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

10  Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

11  CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website

12  also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

13  and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

14  IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

15  subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

16  the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

17  complaint.

18  32.  Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

19  company with its principal place of business located at No. 16, Fenghui South Road West,

20  District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned

21  subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant

22  Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

23  through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

24  and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

25  alleged in this complaint.

26  33.  Defendants IGC, IGE and IDDC are collectively referred to herein as

27  "IRICO."

28

11

1

### 3. LG Electronics Entities

2       34.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under

3 the laws of the Republic of Korea with its principal place of business located at LG Twin

4 Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea. LGEI is a $48.5

5 billion global force in consumer electronics, home appliances and mobile communications,

6 which established its first overseas branch office in New York in 1968. The company's name

7 was changed from Gold Star Communications to LGEI in 1995, the year in which it also

8 acquired Zenith in the United States. In 2001, LGEI transferred its CRT business to a 50/50 joint

9 venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays

10 ("LGPD"). On April 1, 2007, LGPD became an independent company and changed its name to

11 LP Displays International Ltd. During the Relevant Period, LGEI manufactured, marketed, sold

12 and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

13 throughout the United States.

14       35.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware

15 corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs,

16 New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.

17 During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT

18 Products, either directly or through its subsidiaries or affiliates, throughout the United States.

19 Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

20 to the antitrust violations alleged in this complaint.

21       36.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a

22 Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road,

23 NeiHu District, Taipei City, Taiwan. LGETT is a wholly-owned and controlled subsidiary of

24 Defendant LG Electronics, Inc. During the Relevant Period, LGETT manufactured, marketed,

25 sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

26 throughout the United States. Defendant LGEI dominated and controlled the finances, policies

27 and affairs of LGETT relating to the antitrust violations alleged in this complaint.

28       37.     Defendants LGEI, LGEUSA and LGETT are collectively referred to

1  herein as "LG Electronics."

2          **4.      LP Displays**

3          38.      Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

4  Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

5  Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

6  which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

7  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

8  of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

9  billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

10 and LGEI would cede control over the company and the shares would be owned by financial

11 institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

12 marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

13 affiliates, throughout the United States.

14         **5.      Panasonic Entities**

15         39.      Defendant Panasonic Corporation, which was at all times during the

16 Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

17 Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

18 Osaka 571-8501, Japan.   During the Relevant Period, Panasonic Corporation manufactured,

19 marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

20 affiliates, throughout the United States.

21         40.      Defendant Panasonic Corporation of North America ("PCNA") is a

22 Delaware corporation with its principal place of business located at One Panasonic Way,

23 Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

24 Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

25 distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

26 United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

27 and affairs of PCNA relating to the antitrust violations alleged in this complaint.

28         41.      Defendants Panasonic Corporation and PCNA are collectively referred to

1   herein as "Panasonic."

2   　　　　42.　　Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

3   Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

4   Osaka, 571-8504, Japan.　In 2002, Panasonic Corporation entered into a joint venture with

5   Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

6   manufacture CRTs.　Panasonic Corporation was the majority owner with 64.5 percent.　On

7   March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

8   venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

9   Corporation, and renaming it MT Picture Display Co., Ltd.　During the Relevant Period, MTPD

10  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11  subsidiaries or affiliates, throughout the United States.

12  　　　　43.　　Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

13  Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

14  Dashanzi Chaoyang District, Beijing, China.　BMCC is a joint venture company, 50% of which

15  is held by Defendant MTPD.　The other 50% is held by Beijing Orient Electronics (Group) Co.,

16  Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

17  enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

18  China state-owned enterprise).　Formed in 1987, BMCC was Panasonic Corporation's first CRT

19  manufacturing facility in China.　BMCC is the second largest producer of CRTs for televisions in

20  China.　During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed

21  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

22  States.

23  　　　　**6.**　　**Philips Entities**

24  　　　　44.　　Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips

25  Electronics ("Royal Philips") is a Dutch company with its principal place of business located at

26  Amstelplein 2, 1070 MX Amsterdam, The Netherlands.　Royal Philips, founded in 1891, is one

27  of the world's largest electronics companies, with 160,900 employees located in over 60

28  countries.　Royal Philips had sole ownership of its CRT business until 2001.　In 2001, Royal

1   Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming

2   Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on

3   demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126

4   million Euros of its investment and said it would not inject further capital into the venture.

5   During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT

6   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

7          45.     Defendant Philips Electronics North America Corporation ("Philips

8   America") is a Delaware corporation with its principal place of business located at 1251 Avenue

9   of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and

10  controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America

11  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

12  subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and

13  controlled the finances, policies and affairs of Philips America relating to the antitrust violations

14  alleged in this complaint.

15         46.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips

16  Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu

17  Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal

18  Philips.   During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or

19  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

20  United States.  Defendant Royal Philips dominated and controlled the finances, policies and

21  affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

22         47.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips

23  Brazil") is a Brazilian company with its principal place of business located at Av Torquato

24  Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a

25  wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant

26  Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either

27  directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal

28  Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

1    the antitrust violations alleged in this complaint.

2           48.    Defendants Royal Philips, Philips America, Philips Taiwan and Philips

3    Brazil are collectively referred to herein as "Philips."

4           **7.    <u>Samsung Entities</u>**

5           49.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

6    company with its principal place of business located at Samsung Electronics Building, 1320-10,

7    Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

8    company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

9    CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

10   States.

11          50.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

12   corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

13   Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

14   Defendant SEC.   During the Relevant Period, SEAI manufactured, marketed, sold and/or

15   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

16   United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

17   Samsung SEAI relating to the antitrust violations alleged in this complaint.

18          51.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

19   Company ("Samsung SDI") is a South Korean company with its principal place of business

20   located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public

21   company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

22   Samsung SDI claims to be the world's leading company in the display and energy business, with

23   28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide

24   market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in

25   Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed,

26   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

27   throughout the United States.  Defendant SEC dominated and controlled the finances, policies

28   and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

52.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

53.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

54.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

55.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

56.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

57.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

58.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

## 8.     Samtel

59.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that

1  country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

2  States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period,

3  Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

4  its subsidiaries and affiliates, throughout the United States.

5  **9.**    **Thai CRT**

6  60.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

7  1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

8  Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

9  televisions.    During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

10  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

11  United States.

12  **10.**    **Toshiba Entities**

13  61.    Defendant Toshiba Corporation ("TC") is a Japanese company with its

14  principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

15  Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

16  and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two

17  other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

18  Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by

19  1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

20  in which the entities consolidated their CRT businesses.  During the Relevant Period, TC

21  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

22  subsidiaries or affiliates, throughout the United States.

23  62.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

24  corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

25  4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled

26  subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured,

27  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

28  affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

1  policies and affairs of Toshiba America relating to the antitrust violations alleged in this

2  complaint.

3            63.    Defendant Toshiba America Consumer Products, LLC ("TACP") is a

4  limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-

5  3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba

6  America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed

7  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

8  States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP

9  relating to the antitrust violations alleged in this complaint.

10            64.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

11  California corporation with its principal place of business located at 19900 MacArthur

12  Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled

13  subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC

14  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

15  subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled

16  the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this

17  complaint.

18            65.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a

19  California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

20  California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC

21  through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold

22  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

23  throughout the United States.  Defendant TC dominated and controlled the finances, policies and

24  affairs of TAIS relating to the antitrust violations alleged in this complaint.

25            66.    Defendants TC, Toshiba America, TACP, TAEC and TAIS are

26  collectively referred to herein as "Toshiba."

27       **11.    <u>Chunghwa Entities</u>**

28            67.    Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a

Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

68.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.   Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.  Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12.     Tatung Company of America, Inc.**

**Tatung Company of America, Inc. ("Tatung America12.        Thomson Entities**

69.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a CaliforniaFrench corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.  Tatung America is a 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary of Tatung Company. Currently, Tatung Company owns approximately half of Tatung America.  The other half usedThomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.

1   Thomson SA sold its CRTs  internally to ~~be owned by Lun Kuan Lin, the daughter of Tatung~~

2   ~~Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passed~~its

3   television-manufacturing division, which had plants in the United States and Mexico, and to ~~her~~

4   ~~two children~~other television manufacturers in the United States and elsewhere.  Thomson SA's

5   television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT

6   televisions were sold in the United States to consumers under the RCA brand.  In November

7   2003, Thomson SA sold its television division to a joint venture it formed with Chinese

8   company, TCL Corporation.   The joint venture was called TCL-Thomson Electronics

9   Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that

10  televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the

11  Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson

12  SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, ~~Tatung~~

13  ~~America~~Thomson SA  manufactured, marketed, sold and/or distributed CRT Products

14  ~~manufactured by, among others, Chunghwa Picture Tubes, Ltd.,~~ either directly or indirectly

15  through its subsidiaries or affiliates, to customers throughout the United States.

16          70.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics,

17  Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of

18  business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.   Thomson

19  Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer

20  Electronics was a major manufacturer of CRTs for the United States market, with plants located

21  in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based

22  plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own

23  television-manufacturing division, which had plants in the United States and Mexico, and to

24  other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions

25  were sold in the United States to United States consumers under the RCA brand.  Thomson

26  Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

27  business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer

28  Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

1    indirectly through its subsidiaries or affiliates, to customers throughout the United States.

2          71.    Thomson SA and Thomson Consumer Electronics are collectively referred

3    to herein as "Thomson."

4          **13.    Mitsubishi Entities**

5          72.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

6    is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

7    Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

8    Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

9    internally to Mitsubishi's television and monitor manufacturing division and to other television

10   and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

11   division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

12   Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

13   United States.

14         73.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

15   Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

16   Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

17   Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

18   Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

19   and monitor manufacturing division and to other television and monitor manufacturers in the

20   U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

21   other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

22   marketed, sold and distributed CRT Products in the United States.

23         74.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

24   Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

25   Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the

26   Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

27   CRT televisions and monitors in the United States.

28         75.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

1    are collectively referred to herein as "Mitsubishi."

2    **IV.    AGENTS AND CO-CONSPIRATORS**

3        70.76.  The acts alleged against Defendants in this Complaint were authorized,

4    ordered, or done by their officers, agents, employees, or representatives, while actively engaged

5    in the management and operation of Defendants' businesses or affairs.

6        71.77.  Each Defendant or co-conspirator acted as the principal, agent, or joint

7    venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

8    common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a

9    subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products

10   made by its parent company.

11       72.78.  Various persons and/or firms not named as Defendants in this Complaint

12   participated as co-conspirators in the violations alleged herein and may have performed acts and

13   made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

14   include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

15   Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

16   Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and

17   Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-

18   conspirators as Defendants at a later date.

19       73.79.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major

20   manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

21   2004.   In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

22   Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had

23   subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the

24   United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo

25   Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),

26   Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The

27   Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

28   joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

74.80.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

75.81. Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

76.82.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

77.83.  Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai

1  company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate,
2  Tivanon Road, Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled
3  subsidiary of Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint
4  venture with Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co.,
5  Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.
6  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT
7  Products, either directly or through its subsidiaries or affiliates, throughout the United States.
8  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to
9  the antitrust violations alleged in this complaint.

10  78.84. The acts charged in this Complaint have been done by Defendants and
11  their co-conspirators, or were authorized, ordered or done by their respective officers, agents,
12  employees or representatives while actively engaged in the management of each Defendant's or
13  co-conspirator's business or affairs.

14  **V.**     **TRADE AND COMMERCE**

15  79.85. During the Relevant Period, each Defendant, or one or more of its
16  subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of
17  interstate commerce and foreign commerce, including through and into this judicial district.

18  80.86. During the Relevant Period, Defendants collectively controlled a vast
19  majority of the market for CRT Products, both globally and in the United States.

20  81.87. The business activities of Defendants substantially affected interstate trade
21  and commerce in the United States and caused antitrust injury in the United States. The business
22  activities of Defendants also substantially affected trade and commerce in Massachusetts and
23  caused antitrust injuries in Massachusetts.

24  **VI.**     **FACTUAL ALLEGATIONS**

25        **A.**     **CRT Technology**

26  82.88. A CRT has three components: (a) one or more electron guns, each of
27  which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or
28  other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate

that phosphoresces when struck by an electron beam, thereby producing a viewable image. A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image. An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

83.89. CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers. After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

84.90. The quality of a CRT itself determines the quality of the CRT display. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

85.91. Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

86.92. CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

87.93. CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors. The demand for CRTs thus directly derives from the demand for such products.

88.94. The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets. The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

89.95.  Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant OEMs and others. Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

90.96.  Plaintiff has participated in the market for products containing CRTs. To the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

91.97.  Plaintiff has been injured by paying supra-competitive prices for CRT Products.

**B.** **Structure of the CRT Industry**

92.98.  The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.** **Market Concentration**

93.99.  During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.** **Information Sharing**

94.100.      Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication

1   was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants

2   took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as

3   alleged below.

4           95.101.     Defendants Hitachi, Samsung and Chunghwa are all members of

5   the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-

6   founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG

7   Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial

8   Research Association.  Upon information and belief, Defendants and their co-conspirators used

9   these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

10   the meetings of these trade associations, Defendants exchanged proprietary and competitively

11   sensitive information which they used to implement and monitor the conspiracy.

12          **3.**     **Consolidation**

13           96.102.     The CRT industry also had significant consolidation during the

14   Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a

15   joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of

16   Toshiba's and Panasonic's CRT businesses into MTPD.

17          **4.**     **Multiple Interrelated Business Relationships**

18           97.103.     The industry is marked by a web of cross-licensing agreements,

19   joint ventures and other cooperative arrangements that can facilitate collusion.

20           98.104.     Examples of the high degree of cooperation among Defendants in

21   both the CRT Product market and other closely related markets include the following:

22            a.   The formation of the CRT joint venture LGPD in 2001 by Defendants

23               LG Electronics and Philips.

24            b.   Defendants LG Electronics and Philips also formed LG.Philips LCD

25               Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the

26               purpose of manufacturing TFT-LCD panels.

27            c.   The formation of the CRT joint venture MTPD in 2003 by Defendants

28               Toshiba and Panasonic.

d.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.  In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f.  Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.  Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.  Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.  Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.  Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k.  Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.      High Costs of Entry Into the Industry**

99.105.       There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge

to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

100.106.        During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.    A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.        The Maturity of the CRT Product Market**

101.107.        Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

102.108.        Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

103.109.        In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.   Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

104.110.        Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

105.111.        In 1999, CRT monitors accounted for 94.5 percent of the retail

market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

~~106.~~112.        As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.        Homogeneity of CRT Products

~~107.~~113.        CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

~~108.~~114.        It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.        Pre-Conspiracy Market

~~109.~~115.        The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

~~110.~~116.        In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.        Defendants' and Co-Conspirators' Illegal Agreements

~~111.~~117.        In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

112.118.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

113.119.    Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with and Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

114.120.    As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

115.121.    The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

**1.    "Glass Meetings"**

116.122.    The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

117.123.    The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were

1    decision makers who could make agreements.

2       118.124.    The second level meetings were attended by Defendants' high

3    level sales managers and were known as "management" meetings.  These meetings occurred

4    more frequently, typically monthly, and handled implementation of the agreements made at top

5    meetings.

6       119.125.    Finally, the third level meetings were known as "working level"

7    meetings and were attended by lower level sales and marketing employees.  These meetings

8    generally occurred on a weekly or monthly basis and were mostly limited to the exchange of

9    information and discussing pricing since the lower level employees did not have the authority to

10   enter into agreements.   These lower level employees would then transmit the competitive

11   information up the corporate reporting chain to those individuals with pricing authority.  The

12   working level meetings also tended to be more regional and often took place near Defendants'

13   factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean

14   manufacturers' employees met in Korea, the Chinese in China, and so on.

15      120.126.    The Chinese glass meetings began in 1998 and generally occurred

16   on a monthly basis following a top or management level meeting.  The China meetings had the

17   principal purpose of reporting what had been decided at the most recent glass meetings to the

18   Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located

19   in China, such as IRICO and BMCC, as well as the China-based branches of the other

20   Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung

21   SDI Tianjin, and Chunghwa.

22      121.127.    Glass meetings also occurred occasionally in various European

23   countries.  Attendees at these meetings included those Defendants and co-conspirators which had

24   subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics,

25   LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf

26   of Daewoo)), IRICO, and IRICOThomson.  Chunghwa also attended these meetings.

27      122.128.    Representatives of Defendants also attended what were known

28   amongst members of the conspiracy as "green meetings."  These were meetings held on golf

1   courses.  The green meetings were generally attended by top and management level employees
2   of Defendants.

3   123.129.      During the Relevant Period, glass meetings took place in Taiwan,
4   South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the
5   United States.

6   124.130.      Participants   would   often   exchange   competitively   sensitive
7   information prior to a glass meeting.  This included information on inventories, production, sales
8   and exports.  For some such meetings, where information could not be gathered in advance of the
9   meeting, it was brought to the meeting and shared.

10   125.131.      The glass meetings at all levels followed a fairly typical agenda.
11   First, the participants exchanged competitive information such as proposed future CRT pricing,
12   sales volume, inventory levels, production capacity, exports, customer orders, price trends and
13   forecasts of sales volumes for coming months.  The participants also updated the information
14   they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman"
15   who would write the information on a white board.  The meeting participants then used this
16   information to discuss and agree upon what price each would charge for CRTs to be sold in the
17   following month or quarter.  They discussed and agreed upon target prices, price increases, so-
18   called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices
19   of CRTs that were sold to specific customers, and agreed upon target prices to be used in
20   negotiations with large customers.  Having analyzed the supply and demand, the participants
21   would also discuss and agree upon production cutbacks.

22   126.132.      During periods of oversupply, the focus of the meeting participants
23   turned to making controlled and coordinated price reductions.  This was referred to as setting a
24   "bottom price."

25   127.133.      Defendants' conspiracy included agreements on the prices at which
26   certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that
27   manufactured CRT Products, such as televisions and computer monitors.  Defendants realized
28   the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to

1  support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all
2  OEMs paid supracompetitive prices for CRTs.

3  ~~128.   Each of the participants in these meetings knew, and in fact discussed, the~~
4  ~~significant impact that the price of CRTs had on the cost of the finished products into which they~~
5  ~~were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there~~
6  ~~were slim profit margins.  Defendants therefore concluded that in order to make their CRT price~~
7  ~~increases stick, they needed to make the increase high enough that their direct customers (CRT~~
8  ~~TV and monitor makers) would be able to justify a corresponding price increase to their~~
9  ~~customers.  In this way, Defendants ensured that price increases for CRTs were passed on to~~
10 ~~indirect purchasers of CRT Products.~~

11 ~~129.~~134.      The agreements reached at the glass meetings included:

12      a.  agreements on CRT prices, including establishing target prices,
13          "bottom" prices, price ranges and price guidelines;

14      b.  placing agreed-upon price differentials on various attributes of CRTs,
15          such as quality or certain technical specifications;

16      c.  agreements on pricing for intra-company CRT sales to vertically
17          integrated customers;

18      d.  agreements as to what to tell customers about the reason for a price
19          increase;

20      e.  agreements to coordinate with competitors that did not attend the
21          group meetings and agreements with them to abide by the agreed-
22          upon pricing;

23      f.  agreements to coordinate pricing with CRT manufacturers in other
24          geographic markets such as Brazil, Europe and India;

25      g.  agreements to exchange pertinent information regarding shipments,
26          capacity, production, prices and customer demands;

27      h.  agreements to coordinate uniform public statements regarding
28          available capacity and supply;

i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

j.   agreements to allocate customers;

k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.   agreements to keep their meetings secret.

130.135.      Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

131.136.      As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

**2.   Bilateral Discussions**

132.137.      Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

133.138.      During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and, Mexico, and the United States.

134.139.      The purpose of the bilateral discussions was to exchange

information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and, Europe, and the United States.

135.140.     In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil and, Mexico, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.and the United States.   These Brazilian and MexicanCRT manufacturers were particularly important because they served the North American market for CRT Products.   As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.   Because these Brazilian and MexicanCRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.   In this way, Defendants ensured that prices of all CRTs imported intosold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

136.141.     Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.   The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

137.142.     Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.   It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.   For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.   LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.   Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications

with Mitsubishi.   And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

**3.**   **Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

138.143.   Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

139.144.   Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

140.145.   Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.   Through these discussions, IRICO agreed on prices and supply levels for CRTs.   None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

1        141.146.     Between at least 1995 and 2001, Defendant LG Electronics,

2  through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001,

3  LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD

4  (n/k/a LP Displays).   A substantial number of these meetings were attended by the highest

5  ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions

6  with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on

7  prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this

8  conspiracy.

9        142.147.     Defendant LGEUSA was represented at those meetings and was a

10  party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT

11  Products, it played a significant role in the conspiracy because Defendants wished to ensure that

12  the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

13  agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in

14  the alleged conspiracy.

15        143.148.     Between at least 2001 and 2006, Defendant LP Displays (f/k/a

16  LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these

17  meetings were attended by the highest ranking executives from LP Displays.  Certain of these

18  high level executives from LP Displays had previously attended meetings on behalf of

19  Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with

20  other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for

21  CRTs.

22        144.149.     Between at least 1996 and 2003, Defendant Panasonic, through

23  Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After

24  2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with

25  Toshiba.   These meetings were attended by high level sales managers from Panasonic and

26  MTPD.   Panasonic also engaged in multiple bilateral discussions with other Defendants.

27  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic

28  never effectively withdrew from this conspiracy.

145.150.     PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

146.151.     Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

147.152.     Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

148.153.     Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

149.154.     Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they

1   played a significant role in the conspiracy because Defendants wished to ensure that the prices

2   for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements

3   reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing

4   participants in the alleged conspiracy.

5   150.155.    Between at least 1995 and 2007, Defendant Samsung, through

6   SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

7   participated in at least 200 glass meetings at all levels.  A substantial number of these meetings

8   were attended by the highest ranking executives from Samsung.  Samsung also engaged in

9   bilateral discussions with each of the other Defendants on a regular basis.  Through these

10  discussions, Samsung agreed on prices and supply levels for CRTs.

11  151.156.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil

12  and Samsung SDI Mexico were represented at those meetings and were a party to the agreements

13  entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played

14  a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

15  Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

16  the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

17  Mexico were active, knowing participants in the alleged conspiracy.

18  157.    Between at least 1998 and 2006, Defendant Samtel participated in

19  multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These

20  meetings were attended by high level executives from Samtel.  Through these discussions,

21  Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from

22  this conspiracy.

23  152.158.    Between at least 1997 and 2006, Defendant Thai CRT participated

24  in multiple glass meetings.  These meetings were attended by the highest ranking executives

25  from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

26  particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

27  levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

28  159.    Between at least 1996 and 2005, Defendant Thomson participated in

dozens of meetings with its competitors, including several glass meetings and multiple bilateral meetings. These meetings were attended by high level sales managers from Thomson. At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs. Thomson never effectively withdrew from this conspiracy. Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005. Thomson has admitted to the European Commission that it played a role in the conspiracy.

160. Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral and some multilateral meetings with its competitors. These meetings were attended by high level sales managers from Mitsubishi. At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs. Mitsubishi never effectively withdrew from this conspiracy.

153.161. Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings. After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic. These meetings were attended by high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG. Through these discussions, Toshiba agreed on prices and supply levels for CRTs. Toshiba never effectively withdrew from this conspiracy.

154.162. Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them. To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

155.163.       Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

156.   Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them.  To the extent Tatung America sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

157.164.       Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

158.165.       When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was

represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.**    **The CRT Market During the Conspiracy**

159.166.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

160.167.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------|------|------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

161.168.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America. By 2002, North America still consumed around 35 percent of the world's CRT monitor supply. *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

162.169.    In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

163.170.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor

---

[1]    Estimated market value of CRT units sold.

price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

164.171.     A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

165.172.     Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

166.173.     For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

167.174.     During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

168.175.     During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

169.176.      These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.      International Government Antitrust Investigations**

170.177.      Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice in November 2007.

171.178.      Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

172.179.      In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

173.180.      On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning

the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

174.181.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

175.182.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

176.183.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as

a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

177.184.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

178.185.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

179.186.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

180.187.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

188.   On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long

effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

181.189.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

182.190.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

183.191.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

184.192.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

185.193.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

186.194.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for

1   their roles in a conspiracy to fix prices of TFT-LCD panels.

2   ~~187.~~195.    On March 10, 2009, the DOJ announced that it had reached an

3   agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead

4   guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine

5   for its role in a conspiracy to fix the prices of TFT-LCD panels.

6   ~~188.~~196.    The plea agreements of LG Display Co., Ltd., Sharp Corporation,

7   Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of

8   TFT-LCDs was carried out, in part, in California.

9   **G.    The Role of Trade Associations During the Relevant Period**

10   ~~189.~~197.    Defendants' collusive activities have been furthered by trade

11   associations and trade events that provided opportunities to conspire and share information.  One

12   example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the

13   summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.

14   KODEMIA is a national trade organization representing about 80 member companies in the

15   Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004,

16   the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association

17   of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations

18   related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United

19   States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the

20   Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common

21   issues."

22   ~~190.~~198.    Samsung and LG Electronics were members of both KODEMIA

23   and EDIRAK, and have participated extensively in the KDCs.

24   ~~191.~~199.    The KDC has taken place in Seoul, Korea or other Korean venues

25   on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24,

26   2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's

27   and LG Electronics' CRT operations have participated at these events, including H.K. Chung,

28   Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S.

1    Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated,

2    such as Zenzou Tashima of Hitachi.

3    ~~192.~~200.       Other opportunities to collude among Defendants were provided

4    by events sponsored by the Society for Information Display, such as the annual Asian

5    Symposiums on Information Display, the annual International Display Manufacturing

6    Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the

7    annual International Meeting on Information Displays (held each August in Daegu, Korea) and

8    the annual International Display Workshops (the most recent ones of which have been held in

9    Japan).

10    ~~193.~~201.       Through these trade association and trade events, and in meetings

11    related to these trade associations and trade events, on information and belief, Defendants shared

12    what would normally be considered proprietary and competitively sensitive information.  This

13    exchange of information was used to implement and monitor the conspiracy.

14    **H.**    **Effects of Defendants' Antitrust Violations**

15    **1.**    **Examples of Reductions in Manufacturing Capacity by Defendants**

16    ~~194.~~202.       As explained above, during the Relevant Period, Defendants

17    consolidated their manufacturing facilities in lower-cost venues such as China and reduced

18    manufacturing capacity to prop up prices.

19    ~~195.~~203.       In December of 2004, MTPD closed its American subsidiary's

20    operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that

21    the closing was part of the company's "global restructuring initiatives in the CRT business."  The

22    company further stated that in the future, "CRTs for the North American market will be supplied

23    by other manufacturing locations in order to establish an optimum CRT manufacturing

24    structure."

25    ~~196.~~204.       In July of 2005, LGPD ceased CRT production at its Durham,

26    England facility, citing a shift in demand from Europe to Asia.

27    ~~197.~~205.       In December of 2005, MTPD announced that it would close its

28    American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.

Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

198.206.      In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

199.207.      In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

## 2.      Examples of Collusive Pricing for CRTs

200.208.      Defendants' collusion is evidenced by unusual price movements in the CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

201.209.      In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

202.210.      In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

203.211.      Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

204.212.      Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

205.213.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

206.214.     After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

207.215.     On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

208.216.     CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**3.     <u>Summary Of Effects Of The Conspiracy Involving CRTs</u>**

209.217.     The above combination and conspiracy has had the following effects, among others:

        a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

        b.  Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

        c.  Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

1    d.  As a direct and proximate result of the unlawful conduct of

2    Defendants, Plaintiff has been injured in its business and property in

3    that it paid more for CRT Products than it otherwise would have paid

4    in the absence of the unlawful conduct of Defendants.

5    **VII.**   **PLAINTIFF'S INJURIES**

6    ~~210.~~218.   As a purchaser of computer monitors, TVs and other devices that

7    contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a

8    result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-

9    competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing

10   Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

11   ~~211.~~219.   Plaintiff also purchased CRT Products containing CRTs from

12   OEMs as well as others, which in turn purchased CRTs from Defendants and their co-

13   conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs

14   purchased by these OEMs and others, which paid higher prices for CRTs than they would have

15   absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT

16   Products.

17   ~~212.~~220.   The OEMs and others passed on to their customers, including

18   Plaintiff, the overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to

19   its customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiff suffered injury

20   when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

21   ~~213.~~221.   Once a CRT leaves its place of manufacture, it remains essentially

22   unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical

23   objects that do not change form or become an indistinguishable part of a CRT Product.  Thus,

24   CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to

25   Plaintiff.

26   ~~214.~~222.   The market for CRTs and the market for CRT Products are

27   inextricably linked and cannot be considered separately.  Defendants are well aware of this

28   intimate relationship.

215.223.     Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

216.224.     As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

**VIII.   FRAUDULENT CONCEALMENT**

217.225.     Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein that affected it until November 2007, when the investigation by the DOJ became public and class action complaints in the United States were filed.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

218.226.     Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

219.227.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

220.228.     By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

221.229.     Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

222.230.     As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

223.231.     Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

224.232.     As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

225.233.      As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

226.234.      In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

227.235.      Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

228.236.      Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

237.   As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.IX.

## IX.    *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

238.   As discussed at length in Paragraphs 177-196 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

239.   As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

1    • *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC

2        (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

3    • Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-

4        05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

5        240.    Plaintiff's claims were tolled under *American Pipe & Construction Co. v.*

6    *Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during

7    the pendency of the Direct Purchaser Class actions asserted against Defendants, and

8    commencing on at least November 26, 2007.

9    **XI.    CLAIM FOR VIOLATIONS**

10                              **First Claim for Relief**

11                    **(Violation of Section 1 of the Sherman Act)**

12       ~~229.~~241.    Plaintiff incorporates by reference all the above allegations as if

13   fully set forth herein.

14       ~~230.~~242.    Beginning no later than March 1, 1995, the exact date being

15   unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their

16   co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably

17   restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by

18   artificially reducing or eliminating competition in the United States.

19       ~~231.~~243.    In particular, Defendants and their co-conspirators combined and

20   conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

21       ~~232.~~244.    As a result of Defendants' unlawful conduct, prices for CRTs were

22   raised, fixed, maintained and stabilized in the United States.

23       ~~233.~~245.    The contract, combination or conspiracy among Defendants

24   consisted of a continuing agreement, understanding, and concerted action among Defendants and

25   their co-conspirators.

26       ~~234.~~246.    For purposes of formulating and effectuating their contract,

27   combination or conspiracy, Defendants and their co-conspirators did those things they

28   contracted, combined, or conspired to do, including:

a.   participating in meetings and conversations to discuss the prices and supply of CRTs;

b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.   issuing price announcements and price quotations in accordance with the agreements reached;

e.   selling CRTs to customers in the United States at noncompetitive prices;

f.   exchanging competitively sensitive information in order to facilitate their conspiracy;

g.   agreeing to maintain or lower production capacity; and

h.   providing false statements to the public to explain increased prices for CRTs.

235.247.    As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of Massachusetts General Laws Chapter 93A, §§ 2, *et seq.*)**

236.248.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

237.249.    Tweeter was a corporation organized and existing under the laws of the State of Massachusetts and during the Relevant Period, conducted a substantial volume of business in Massachusetts.  In particular, Tweeter purchased CRT Products from Defendants and their co-conspirators in Massachusetts; maintained warehouses in Massachusetts containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and

representatives in Massachusetts who sold CRT Products to consumers in Massachusetts and elsewhere.  As a result of its presence in Massachusetts and the substantial business it conducted in Massachusetts, Plaintiff is entitled to the protection of the laws of Massachusetts.

238.250.	Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter up to and including at least November 25, 2007, Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above in violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq*.

239.251.	The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the price of CRTs.

240.252.	For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but in no way limited to, the actions, practices and course of conduct set forth above and the following:

a.  to fix, raise, maintain and stabilize the price of CRTs;

b.  to allocate the market for CRTs amongst themselves;

c.  to submit rigged bids for the award and performance of certain CRTs contracts; and

d.  to allocate among themselves the production of CRTs.

241.253.	The combination and conspiracy alleged herein has had, *inter alia,* the following effects:

a.  price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

b.  prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

c.  those who purchased CRTs from Defendants, their co- conspirators and others and CRT Products containing price-fixed CRTs from Defendants, their co-conspirators and others have been deprived of the benefits of free and open competition.

242.254.    As a result of the alleged conduct Defendants and their co-conspirators, Plaintiff paid supra-competitive, artificially inflated prices for CRT Products it purchased during the Relevant Period.

243.255.    By reason of the foregoing, Defendants and their co-conspirators have engaged in unfair competition in violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*:

a.  Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b.  Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c.  Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

d.  Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

e.  Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Massachusetts; and

f.    During the Relevant Period, Tweeter purchased CRT Products containing price-fixed CRTs in Massachusetts, and, as a result, Tweeter is entitled to the protection of the laws of Massachusetts.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.    Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.    Defendants engaged in a contract, combination, and conspiracy in violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

D.    Plaintiff shall recover damages sustained by it, as provided by Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

E.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F.    Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

1           G.      Plaintiff shall recover its costs of this suit, including reasonable attorneys'

2  fees as provided by law; and

3           H.      Plaintiff shall receive such other or further relief as may be just and

4  proper.

5  **XII.**         **<u>JURY TRIAL DEMAND</u>**

6           Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by

7  jury of all the claims asserted in this Complaint so triable.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Dated:                          Respectfully Submitted,

2

3                                    _____
                                     PHILIP J. IOVIENO (*Pro Hac Vice*)
4                                    ANNE M. NARDACCI (*Pro Hac Vice to be filed*)
                                     LUKE NIKAS (*Pro Hac Vice to be filed*)
5                                    CHRISTOPHER V. FENLON (*Pro Hac Vice to be filed*)

6                                    BOIES, SCHILLER & FLEXNER LLP
                                     10 North Pearl Street, 4th Floor
7                                    Albany, NY 12207
                                     Telephone:  (518) 434-0600
8                                    Facsimile:   (518) 434-0665
                                     Email: piovieno@bsfllp.com
9                                    Email: anardacci@bsfllp.com
10                                   Email: lnikas@bsfllp.com
                                     Email: cfenlon@bsfllp.com
11
                                     WILLIAM A. ISAACSON (*Pro Hac Vice to be filed*)
12                                   BOIES, SCHILLER & FLEXNER LLP
                                     5301 Wisconsin Ave. NW, Suite 800
13                                   Washington, DC 20015
                                     Telephone:  (202) 237-2727
14                                   Facsimile:   (202) 237-6131
                                     Email:  wisaacson@bsfllp.com
15

16                                   *Counsel for Schultze Agency Services, LLC*

17

18

19

20

21

22

23

24

25

26

27

28

TWEETER'S AMENDED COMPLAINT                65                 Case No. 12-cv-02649
                                                              Master File No. 3:07-cv-05944-SC

# **EXHIBIT M**

1   Jason C. Murray (CA Bar No. 169806)
2   CROWELL & MORING LLP
    515 South Flower St., 40th Floor
3   Los Angeles, CA 90071
    Telephone:  213-443-5582
4   Facsimile:  213-622-2690
    Email: jmurray@crowell.com

5   Jerome A. Murphy (*pro hac vice*)
    Astor H.L. Heaven (*pro hac vice*)
6   CROWELL & MORING LLP
    1001 Pennsylvania Avenue, N.W.
7   Washington, D.C. 20004
    Telephone:  202-624-2500
8   Facsimile:  202-628-5116
    E-mail:  jmurphy@crowell.com
9              aheaven@crowell.com

10  *Counsel for Plaintiffs Target Corp. and RadioShack Corp*

11  [Additional counsel listed on signature page]

12              **UNITED STATES DISTRICT COURT**

13        **NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION**

14

15  TARGET CORP.; ~~SEARS, ROEBUCK AND CO.; KMART CORP.; OLD COMP INC.; GOOD GUYS, INC.;~~ RADIOSHACK CORP.~~;~~

16                                        Master File No. 3:07-cv-05944-SC

                                          MDL No. 1917
17                Plaintiffs
                                          ~~CASE NO~~Individual Case No. ~~CV~~3:11-~~5514~~cv-05514
18        v.

19  CHUNGHWA PICTURE TUBES, LTD.;          **SECOND** AMENDED COMPLAINT FOR
    CHUNGHWA PICTURE TUBES                 DAMAGES AND INJUNCTIVE RELIEF
20  (MALAYSIA)~~; TATUNG COMPANY OF AMERICA, INC.;~~ IRICO GROUP
21  CORPORATION; IRICO GROUP              **DEMAND FOR JURY TRIAL**
    ELECTRONICS CO., LTD.; IRICO DISPLAY
22  DEVICES CO., LTD.; LG ELECTRONICS,
    INC.; LG ELECTRONICS USA, INC.; LG
23  ELECTRONICS TAIWAN TAIPEI CO., LTD.;
    LP DISPLAYS INTERNATIONAL LTD.;
24  HITACHI, LTD.; HITACHI DISPLAYS, LTD.;
    HITACHI AMERICA, LTD.; HITACHI ASIA,
25  LTD.; HITACHI ELECTRONIC DEVICES
    (USA), INC.; SHENZHEN SEG HITACHI
26  COLOR DISPLAY DEVICES, LTD.;

27

~~28~~

PANASONIC CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA; MT
PICTURE DISPLAY CO., LTD.; BEIJING
MATSUSHITA COLOR CRT CO., LTD.;
KONINKLIJKE PHILIPS ELECTRONICS
N.V.; PHILIPS ELECTRONICS NORTH
AMERICA CORPORATION; PHILIPS
ELECTRONICS INDUSTRIES (TAIWAN),
LTD.; PHILIPS DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.; SAMSUNG
SDI CO., LTD.; SAMSUNG SDI AMERICA,
INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;
SAMSUNG SDI BRASIL LTDA.; SHENZHEN
SAMSUNG SDI CO., LTD.; TIANJIN
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
(MALAYSIA) SDN. BHD.; SAMTEL COLOR
LTD.; THAI CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.,; TECHNICOLOR SA;
TECHNICOLOR USA, INC.; MITSUBISHI
ELECTRIC CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA, INC.;
MITSUBISHI ELECTRIC & ELECTRONICS,
USA, INC.

Defendants

Plaintiffs Target Corp.; Sears, Roebuck and Co.; Kmart Corp.; Old Comp Inc.; Good Guys, Inc.;

and RadioShack Corp. (hereafter "Plaintiffs") for their Complaint against all Defendants named herein,

hereby allege as follows:

## I.   **INTRODUCTION**

1.     Defendants and their co-conspirators formed an international cartel which conducted a

long-running conspiracy extending at a minimum from at least March 1, 1995, through at least

November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise,

stabilize and maintain prices for cathode ray tubes ("CRTs").  Defendants are or were among the leading

manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions;

(b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs and CDTs of all sizes shall be referred to collectively as "CRTs."

2.     Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one product containing CRTs.

3.     Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

4.     With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

5.     The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the

1    highest levels of the respective companies, as well as regional managers and others.

2        6.    During the Relevant Period, the conspiracy affected billions of dollars of commerce

3    throughout the United States.

4        7.    This conspiracy is being investigated by the United States Department of Justice ("DOJ")

5    and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was

6    C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-

7    count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.

8    Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing

9    conspiracy.

10       8.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an

11   agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for

12   its role in a conspiracy to fix prices of CDTs.  On May 12, 2011, the United States and Samsung SDI

13   entered into an amended plea agreement, where Samsung SDI pled guilty to violating the Sherman

14   Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.

15       9.    During the Relevant Period, Plaintiffs purchased CRTs in the United States and

16   elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or

17   any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered

18   damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for

19   the CRTs they purchased during the Relevant Period.

20   **II.    <u>JURISDICTION AND VENUE</u>**

21       10.   Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and

22   Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain treble damages for their direct

23   purchases of CRTs from certain Defendants and for injunctive relief against all Defendants.

24       11.   Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business

25   and Professions Code (the "Cartwright Act") and the various state antitrust and unfair competition laws

26   listed herein.

27       12.   This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 over Plaintiffs' claims

28

arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.  In addition, this Court has supplemental jurisdiction over Plaintiffs' claims arising under the state antitrust and unfair competition laws listed herein under 28 U.S.C. §1367.  Plaintiffs' state law claims are so related to their claims under the federal antitrust laws that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in each of the states identified herein.  This effect gave rise to Plaintiffs' antitrust claims.  During the Relevant Period, Defendants and their co-conspirators' conspiracy affected the prices of the CRTs Plaintiffs purchased in the United States which moved through, were sold in, or used in each of the states identified herein.

14.     This court has jurisdiction over each Defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10.  Each Defendant conducts substantial business in the state of California, and a number of Defendants maintain their headquarters in this District or elsewhere in California.  In addition, Defendants all purposefully availed themselves of the laws of the United States and California insofar as they manufactured CRTs and products containing CRTs for sale in the United States and California and several Defendants have. Samsung SDI has also admitted that they engaged in conduct in furtherance of the conspiracy occurred in the Northern District of California.

15.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in this district.

1    III.     **THE PARTIES**

2         A.    **Plaintiffs**

3                1.    **Target**

4         16.     Plaintiff Target Corporation is a Minnesota corporation with its headquarters in

5    Minneapolis, Minnesota.  Target operates approximately 1,700 large-format general merchandise and

6    food discount stores throughout the United States, as well as an online retail store, Target.com.  During

7    the Relevant Period, Target purchased substantial amounts of CRTs manufactured by Defendants, their

8    co-conspirators, and others in the United States for resale there.  Target also purchased CRTs for internal

9    use during the Relevant Period.  As a result of Defendants' and their co-conspirators' conspiracy, Target

10   was injured in its business and property because the prices it paid for such CRTs were artificially

11   inflated by that conspiracy.

12        17.     During the Relevant Period, Target's negotiations for the purchase of CRTs took place in

13   the United States and were controlled by a merchandising department based at the company's

14   headquarters in Minnesota.  In addition, all Target purchase orders for CRTs were issued from

15   Minnesota and all invoices were sent to Target in Minnesota.  Target's merchandising department in

16   Minnesota was also responsible for selecting vendors and product lines with respect to CRTs.

17        18.     During the Relevant Period, Target also purchased CRTs at distribution centers located in

18   multiple states, including Arizona, California, Florida, Illinois, Iowa, Kansas, Michigan, Minnesota,

19   New York, North Carolina, and Wisconsin, where it received CRTs shipped to those distribution

20   centers.

21                2. Sears

22        19. Plaintiff Sears, Roebuck and Co. is a New York corporation with its headquarters in Hoffman

23   Estates, Illinois.  Plaintiff Kmart Corporation is a Michigan corporation with its headquarters in

24   Hoffman Estates, Illinois.  Sears, Roebuck and Co. and Kmart Corporation are two of the nation's

25   largest broadline retailers, and together operate 3,500 full-line and specialty retail stores in the United

26   States under the "Sears" and "Kmart" brands, as well as online retail stores, including Sears.com and

27   Kmart.com.  During the Relevant Period, Sears, Roebuck and Co. and Kmart Corporation purchased

28

6

**SECOND** AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5511405514

1   substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the

2   United States for resale there.  Sears, Roebuck and Co. and Kmart Corporation also purchased CRTs for

3   internal use during the Relevant Period.

4        20. On March 24, 2005, Sears, Roebuck and Co. and Kmart Corporation became wholly owned

5   by a common corporate parent, Sears Holdings Corporation.  During and after the Relevant Period,

6   Sears, Roebuck and Co. and Kmart Corporation purchased CRTs manufactured and sold by Defendants,

7   their co-conspirators, and others.  As a result of Defendants' and their co-conspirators' conspiracy, both

8   Sears, Roebuck and Co. and Kmart Corporation were injured in their business and property because the

9   prices they paid for such CRTs were artificially inflated by that conspiracy.

10        21. During the Relevant Period, all of both Sears, Roebuck and Co.'s and Kmart Corporation's

11   negotiations for the purchase of CRTs took place in the United States and were controlled by

12   merchandising departments based at the companies' respective headquarters in Illinois and Michigan.  In

13   addition, all purchase orders for CRTs were issued by those companies from Illinois and Michigan

14   respectively and all invoices were sent to those companies in Illinois and Michigan respectively.  The

15   merchandising departments in Illinois and Michigan were also responsible for selecting vendors and

16   product lines with respect to CRTs.

17        22. During the Relevant Period, Sears, Roebuck and Co. also purchased CRTs at distribution

18   centers located in multiple states, including Arizona, California, Florida, Illinois, Massachusetts,

19   Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, and Wisconsin,

20   where it received CRTs shipped to those distribution centers.  Kmart Corporation likewise purchased

21   CRTs at distribution centers located in multiple states, including California, Florida, Illinois, Minnesota,

22   Nebraska, Nevada, and North Carolina.

23        **3. Old Comp**

24        23. Plaintiff Old Comp Inc. is a Delaware corporation with its headquarters in Irving, Texas.

25   During the Relevant Period, Old Comp was known as CompUSA Inc. ("CompUSA") and was

26   headquartered in Dallas, Texas.

27        24. Old Comp owns all claims and rights under federal and state law to recover any overcharges

28

1   suffered by CompUSA and the following subsidiaries:  (1) CompUSA GP Holdings Company; (2)

2   CompUSA Holdings Company; (3) CompUSA Stores L.P.; (4) CompUSA of Puerto Rico Inc.; (5)

3   CompUSA Management Company; (6) CompTeam Inc.; (7) cozone.com inc.; (8) BeOn Inc.; and (9)

4   BeOn Operating Company; and (10)  Computer City, Inc. (collectively, the "CompUSA Subsidiaries").

5          25. During the Relevant Period, CompUSA, by itself or through the CompUSA Subsidiaries,

6   purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others

7   in the United States for resale there.  CompUSA and the CompUSA Subsidiaries also purchased CRTs

8   for internal use during the Relevant Period.  As a result of Defendants' and their co-conspirators'

9   conspiracy, CompUSA and the CompUSA Subsidiaries were injured in their business and property

10   because the prices they paid for such CRTs were artificially inflated by that conspiracy.

11          26. During the Relevant Period, all of CompUSA's negotiations for the purchase of CRTs took

12   place in the United States and were controlled by the company's merchandising department at its Texas

13   headquarters.  In addition, CompUSA issued all of its purchase orders for CRTs from Texas and

14   received invoices for those orders in Texas.  CompUSA's Texas-based merchandising department was

15   also responsible for selecting vendors and product lines with respect to CRTs.

16          27. During the Relevant Period, CompUSA also purchased CRTs at distribution centers located

17   in multiple states, including California and Illinois, where it received CRTs shipped to those distribution

18   centers.

19          28. CompUSA no longer operates any stores.  It sold its "CompUSA" brand names, service

20   marks, and trademarks to an unrelated third party in 2008.

21                  **4. Good Guys**

22          29. Plaintiff Good Guys, Inc. is a Delaware corporation with its headquarters in Irving, Texas.

23   During the Relevant Period, The Good Guys maintained its headquarters in California and then in

24   Texas.

25          30. The Good Guys owns all claims and rights under federal and state laws to recover any

26   overcharges suffered by The Good Guys and the following subsidiaries: (1) Good Guys California, Inc.

27   and (2) goodguys.com, inc. (collectively, the "Good Guys Subsidiaries").

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Case No. CV 11-5514 05514

1    ~~31. During the Relevant Period, The Good Guys, by itself or through the Good Guys~~
2    ~~Subsidiaries, purchased and then resold from their respective facilities substantial amounts of CRTs~~
3    ~~manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  The~~
4    ~~Good Guys and the Good Guys Subsidiaries also purchased CRTs for internal use during the Relevant~~
5    ~~Period.  As a result of Defendants' and their co-conspirators' conspiracy, The Good Guys and the Good~~
6    ~~Guys Subsidiaries were injured in their business and property because the prices they paid for such~~
7    ~~CRTs were artificially inflated by that conspiracy.~~
8    ~~32. During the Relevant Period, all of The Good Guys' negotiations for the purchase of CRTs~~
9    ~~took place in the United States and were controlled by the company's merchandising department at its~~
10   ~~California, and then Texas headquarters.  In addition, The Good Guys issued all of its purchase orders~~
11   ~~for CRTs from California, and then Texas, and received invoices for those orders in California, and then~~
12   ~~Texas.  The Good Guys' California and then Texas-based merchandising department was also~~
13   ~~responsible for selecting vendors and product lines with respect to CRTs.~~
14   ~~33. During the Relevant Period, The Good Guys also purchased CRTs at a distribution center~~
15   ~~located in California, where it received CRTs shipped to that distribution center.~~
16   ~~34. The Good Guys no longer operates any stores.~~
17              **2.** ~~5.~~ **RadioShack**
18   **19.** ~~35.~~ Plaintiff RadioShack Corporation is a Delaware corporation with its headquarters in
19   Fort Worth, Texas.  RadioShack operates approximately 4,400 stores, 1,400 dealer outlets and nearly
20   700 wireless phone kiosks throughout the United States, as well as an online retail store,
21   Radioshack.com.  During the Relevant Period, RadioShack purchased and then resold from its facilities
22   substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the
23   United States for resale there.  RadioShack also purchased CRTs for internal use during the Relevant
24   Period.  As a result of Defendants' and their co-conspirators' conspiracy, RadioShack was injured in its
25   business and property because the prices it paid for such CRTs were artificially inflated by that
26   conspiracy.
27   **20.** ~~36.~~ During the Relevant Period, all of RadioShack's negotiations for the purchase of
28

9

CRTs took place in the United States and were controlled by a merchandising department based at the company's Texas headquarters.  In addition, all RadioShack purchase orders for CRTs were issued from Texas and all invoices were sent to RadioShack in Texas.  RadioShack's Texas-based merchandising department was also responsible for selecting vendors and product lines with respect to CRTs.

21. 37. During the Relevant Period, RadioShack also purchased CRTs at distribution centers located in multiple states, including California, Massachusetts, and Mississippi, where it received CRTs shipped to those distribution centers.

B.   **The Defendants**

1.   **IRICO Entities**

22. 38. Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRTs.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

23. 39. Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

24. 40. Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed,

1    distributed and/or sold CRTs, either directly or through its subsidiaries or affiliates, throughout the

2    United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC

3    relating to the antitrust violations alleged in this complaint.

4         25.  41. Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

5           2.      **LG Electronics Entities**

6         26.  42. Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of

7    the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-

8    dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in

9    consumer electronics, home appliances and mobile communications, which established its first overseas

10   branch office in New York in 1968.  The company's name was changed from Gold Star

11   Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In

12   2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips

13   Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an

14   independent company and changed its name to LP Displays International Ltd.  During the Relevant

15   Period, LGEI manufactured, marketed, sold and/or distributed CRTs, either directly or through its

16   subsidiaries or affiliates, throughout the United States.

17        27.  43. Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its

18   principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.

19   LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period,

20   LGEUSA manufactured, marketed, sold and/or distributed CRTs, either directly or through its

21   subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the

22   finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

23        28.  44. Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity

24   with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City,

25   Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.

26   During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRTs, either

27   directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI

28

1    dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations

2    alleged in this complaint.

3        29.   45. Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG

4    Electronics."

5            **3.    LP Displays**

6        30.   46. Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong

7    Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road

8    Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in

9    2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP

10   Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in

11   television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share

12   of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over

13   the company and the shares would be owned by financial institutions and private equity firms.  During

14   the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRTs, either directly

15   or through its subsidiaries or affiliates, throughout the United States.

16           **4.    Hitachi Entities**

17       31.   47. Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at

18   6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company

19   for the Hitachi brand of CRTs.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20

20   percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed

21   CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

22       32.   48. Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its

23   principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi

24   Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.

25   In 2002, all the departments of planning, development, design, manufacturing and sales concerned with

26   the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.

27   During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRTs,

28

1   either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi,

2   Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

3   antitrust violations alleged in this complaint.

4   33. 49. Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with

5   its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591. Hitachi

6   America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant

7   Period, Hitachi America manufactured, marketed, sold and/or distributed CRTs, either directly or

8   through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated

9   and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations

10  alleged in this complaint.

11  34. 50. Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its

12  principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.

13  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the

14  Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRTs, either directly or

15  through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated

16  and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged

17  in this complaint.

18  35. 51. Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware

19  corporation with its principal place of business located at 208 Fairforest Way, Greenville, South

20  Carolina 29607. HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays. During the

21  Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRTs, either directly or

22  through its subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi

23  Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust

24  violations alleged in this complaint.

25  36. 52. Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen")

26  was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian

27  District, Shenzhen 518035, China. Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi

28

Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

37.   53. Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

### 5.   Panasonic Entities

38.   54. Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

39.   55. Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

40.   56. Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

41.   57. Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation

called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

42. 58. Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.      Philips Entities

43. 59. Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRTs, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture.  During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

1      44. 60. Defendant Philips Electronics North America Corporation ("Philips America") is a

2   Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New

3   York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of

4   Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold

5   and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United

6   States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips

7   America relating to the antitrust violations alleged in this complaint.

8      45.     61. Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a

9   Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang

10   District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the

11   Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRTs, either directly

12   or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips

13   dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust

14   violations alleged in this complaint.

15      46.     62. Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a

16   Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar

17   (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled

18   subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured,

19   marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

20   throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies

21   and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

22      47.     63. Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are

23   collectively referred to herein as "Philips."

24            **7.    Samsung Entities**

25      48.     64. Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with

26   its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong,

27   Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the

28

1    Relevant Period, SEC manufactured, marketed, sold and/or distributed CRTs, either directly or through

2    its subsidiaries or affiliates, throughout the United States.

3        49.   65. Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation

4    with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New

5    Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the

6    Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRTs, either directly or through

7    its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the

8    finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this

9    complaint.

10       50.   66. Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company

11   ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-

12   dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major

13   shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the

14   world's leading company in the display and energy business, with 28,000 employees and facilities in 18

15   countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more

16   than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant

17   Period, Samsung SDI manufactured, marketed, sold and/or distributed CRTs, either directly or through

18   its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the

19   finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this

20   complaint.

21       51.   67. Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

22   corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine,

23   California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant

24   Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or

25   distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

26   Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of

27   Samsung SDI America relating to the antitrust violations alleged in this complaint.

28

52.   68. Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

53.   69. Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

54.   70. Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

55.   71. Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

56. 72. Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

57. 73. Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

### 8. Samtel

58. 74. Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRTs.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRTs.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9. Thai CRT

59. 75. Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 10.   Toshiba Entities

60.   ~~76.~~ Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors. In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses. During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

61.   ~~77.~~ Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC. During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

62.   ~~78.~~ Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

63.   ~~79.~~ Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed

CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

64. 80. Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

65. 81. Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.     Chunghwa Entities**

66. 82. Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

67. 83. Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies

and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

68. ~~84.~~ Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**~~12. Tatung Company of America, Inc.~~**

**12.    Thomson Entities**

69.    Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France. Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

70.    ~~85. Tatung Company of America~~Defendant Technicolor USA, Inc. (~~"Tatung America"~~)~~is a California~~f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at ~~2850 El Presidio Street, Long Beach, California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her share passed to her two children~~10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had

1   plants in the United States and Mexico, and to other television manufacturers in the United States and

2   elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under

3   the RCA brand.  During the Relevant Period, ~~Tatung America~~Thomson Consumer Electronics

4   manufactured, marketed, sold and/or distributed CRTs ~~manufactured by, among others, Chunghwa~~

5   ~~Picture Tubes, Ltd.~~, either directly or indirectly through its subsidiaries or affiliates, to customers

6   throughout the United States.

7   71.   Thomson SA and Thomson Consumer Electronics are collectively referred to herein as

8   "Thomson."

9   **13.   Mitsubishi Entities**

10   72.   Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese

11   corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi

12   Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and

13   Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and

14   monitor manufacturing division and to other television and monitor manufacturers in the U.S. and

15   elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT

16   manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and

17   distributed CRTs in the United States.

18   73.   Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a

19   United States corporation located at 5665 Plaza Drive, Cypress, California, 90630.  Mitsubishi Electric

20   USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured

21   CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.

22   Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division

23   and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television

24   and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

25   Mitsubishi Electric USA manufactured, marketed, sold and distributed CRTs in the United States.

26   74.   Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United

27   States corporation located at 9351 Jeronimo Road, Irvine, California, 92618.  Mitsubishi Digital is a

28

wholly-owned subsidiary of Mitsubishi Electric USA.  During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

75.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## IV.    AGENTS AND CO-CONSPIRATORS

76.    86. The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

77.    87. Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs. Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs or CRTs made by its parent company.

78.    88. Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

79.    89. During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRTs.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRTs.  Orion was involved in CRTs sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components

Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs, either directly or through their subsidiaries or affiliates, throughout the United States.

80.  90. Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

81.  91. Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

82.  92. P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this

25

complaint.

83. ~~93.~~ Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

84. ~~94.~~ The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.    TRADE AND COMMERCE

85. ~~95.~~ During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRTs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

86. ~~96.~~ During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRTs, both globally and in the United States.

87. ~~97.~~ The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce and caused antitrust injuries in ~~California,~~ Arizona, California, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, ~~Nebraska, Nevada, New Mexico,~~ New York, North Carolina, and Wisconsin.

1   **VI.      FACTUAL ALLEGATIONS**

2        **A.      CRT Technology**

3        88.   98. A CRT has three components: (a) one or more electron guns, each of which is a series

4   of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system

5   used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck

6   by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of

7   phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor

8   produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is

9   welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving

10  a surface of thousands of narrow lines of red, green, blue and black.

11       89.   99. CRT technology was first developed more than a century ago.  The first commercially

12  practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the

13  product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs

14  became the heart of most display products, including televisions, computer monitors, oscilloscopes, air

15  traffic control monitors and ATMs.

16       90.   100. The quality of a CRT itself determines the quality of the CRT display.  No external

17  control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT

18  product so that the product is often simply referred to as "the CRT."

19       91.   101. Although there have been refinements and incremental advancements along the way

20  since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology

21  used today is similar to that RCA unveiled in 1939.

22       92.   102. CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used

23  primarily in televisions and related devices and CDTs are primarily used in computer monitors and

24  similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring

25  more pixels than do CPTs.

26       93.   103. CRTs have no independent utility, and have value only as components of other

27  products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the

28

1  demand for such products.

2      94.  104. The market for CRTs and the market for the products into which they are placed are

3  inextricably linked and intertwined because the CRT market exists to serve the CRTs products markets.

4  The markets for CRTs and products containing CRTs are, for all intents and purposes, inseparable in

5  that one would not exist without the other.

6      95.  105. Plaintiffs have participated in the market for CRTs through their direct purchases

7  from Defendants of CRTs and their purchases of CRTs indirectly from non-Defendant original

8  equipment manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices

9  at which Plaintiffs have bought CRTs, and Plaintiffs have been injured thereby and paid supra-

10  competitive prices for CRTs.

11      96.  106. Plaintiffs have participated in the market for products containing CRTs.  To the

12  extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and their co-

13  conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these

14  products.  Plaintiffs were not able to pass the inflated prices on to their customers.

15      97.  107. Plaintiffs have been injured by paying supra-competitive prices for CRTs.

16  **B.**   **Structure of the CRT Industry**

17      98.  108. The CRT industry has several characteristics that facilitated a conspiracy, including

18  market concentration, ease of information sharing, the consolidation of manufacturers, multiple

19  interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply

20  and demand forces and homogeneity of products.

21      **1.**   **Market Concentration**

22      99.  109. During the Relevant Period, the CRT industry was dominated by relatively few

23  companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as

24  Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of

25  market share facilitates coordination because there are fewer cartel members among which to coordinate

26  pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel

27  members.

28

### 2.      Information Sharing

100. 110. Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

101. 111. Defendants Hitachi, Samsung and Chunghwa are members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.      Consolidation

102. 112. The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.      Multiple Interrelated Business Relationships

103. 113. The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

104. 114. Examples of the high degree of cooperation among Defendants in both the CRT market and other closely related markets include the following:

> i.      The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

ii.   Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCDs.

iii.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

iv.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCDs.

v.   In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

vi.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

vii.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Chunghwa for large CPTs.

viii.   Defendant Chunghwa has a joint venture with Defendant Samsung for the production of CRTs.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

ix.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

x.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

xi.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics,

30

Samsung, Philips, and Panasonic.

### 5.     High Costs of Entry Into the Industry

105. ~~115.~~ There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRTs.

106. ~~116.~~ During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.  A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6.     The Maturity of the CRT Market

107. ~~117.~~ Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT market is a mature one, ~~and like many mature industries, is characterized by slim profit margins, creating a~~ where there is greater motivation to collude.

108. ~~118.~~ Demand for CRTs was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

109. ~~119.~~ In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

110. ~~120.~~ Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of CRTs and plasma displays during the Relevant Period, a substantial market for CRTs existed as a cheaper alternative to these new technologies.

111. 121. In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

112. 122. As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.     Homogeneity of CRTs

113. 123. CRTs are commodity-like products which are manufactured in standardized sizes. One Defendant's CRT for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sell and Plaintiffs purchase CRTs primarily on the basis of price.

114. 124. It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.     Pre-Conspiracy Market

115. 125. The genesis of the CRT conspiracy was in the late 1980s as the CRTs business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

116. 126. In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa visited each other's factories in S.E. Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.     Defendants' and Co-Conspirators' Illegal Agreements

117. 127. In order to control and maintain profitability during declining demand for CRTs, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to

artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

118.   128. The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Hitachi, Thai CRT, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

119.   129. Defendants Samsung, LG, Mitsubishi and Chunghwa, along with Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

120.   130. As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

121.   131. The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1.   "Glass Meetings"

122.   132. The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

123.   133. The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

124. 134. The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

125. 135. Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The working level meetings also tended to be more regional and often took place near Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

126. 136. The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

127. 137. Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and IRICO, and Thomson.

128. 138. Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings." These were meetings held on golf courses. The green meetings were generally attended by top and management level employees of Defendants.

129. 139. During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the United States.

130. 140. Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

131. 141. The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

132. 142. During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

133. 143. Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

134. 144. Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRTs was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they

needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRTs.

135. ~~145.~~ The agreements reached at the glass meetings included:

    i.     agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    ii.     placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

    iii.     agreements on pricing for intra-company CRT sales to vertically integrated customers;

    iv.     agreements as to what to tell customers about the reason for a price increase;

    v.     agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    vi.     agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

    vii.     agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

    viii.     agreements to coordinate uniform public statements regarding available capacity and supply;

    ix.     agreements to allocate both overall market shares and share of a particular customer's purchases;

    x.     agreements to allocate customers;

    xi.     agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

    xii.     agreements to keep their meetings secret.

136. ~~146.~~ Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of

1   Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring;

2   2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3)

3   threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual

4   interest in living up to the target price and living up to the agreements that had been made.

5        137.   147. As market conditions worsened in 2005-2007, and the rate of replacement of CRTs

6   by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again

7   became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of

8   TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

9                          **2.      Bilateral Discussions**

10       138.   148. Throughout the Relevant Period, the glass meetings were supplemented by bilateral

11  discussions between various Defendants.  The bilateral discussions were more informal than the group

12  meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions,

13  usually between sales and marketing employees, took the form of in-person meetings, telephone

14  contacts and emails.

15       139.   149. During the Relevant Period, in-person bilateral meetings took place in Malaysia,

16  Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and,

17  Mexico, and the United States.

18       140.   150. The purpose of the bilateral discussions was to exchange information about past and

19  future pricing, confirm production levels, share sales order information, confirm pricing rumors, and

20  coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and,

21  Europe, and the United States.

22       141.   151. In order to To ensure the efficacy of their global conspiracy, Defendants also used

23  bilateral meetings to coordinate pricing with CRT manufacturers in Brazil and, Mexico, such as Philips

24  Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These Brazilian and Mexican and the United

25  States.  These CRT manufacturers were particularly important because they served the North American

26  market for CRTs.  As further alleged herein, North America was the largest market for CRT televisions

27  and computer monitors during the Relevant Period.  Because these Brazilian and Mexican manufacturers

28

are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs imported intosold in the United States were fixed, raised, maintained, and/or stabilized at supracompetitive levels.

142.   152. Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

143.   153. Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba, and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics, and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

144.   154. Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral

1  discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi

2  agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

3      145.  155. Defendants Hitachi America and HEDUS were represented at those meetings and

4  were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or

5  distributed CRTs to direct purchasers, they played a significant role in the conspiracy because

6  Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the

7  pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active,

8  knowing participants in the alleged conspiracy.

9      146.  156. Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC,

10  participated in multiple glass meetings.  These meetings were attended by the highest ranking executives

11  from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly

12  with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply

13  levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by

14  the Chinese government.  IRICO was acting to further its own independent private interests in

15  participating in the alleged conspiracy.

16      147.  157. Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and

17  LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated

18  in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial

19  number of these meetings were attended by the highest ranking executives from LG Electronics.  LG

20  Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.

21  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never

22  effectively withdrew from this conspiracy.

23      148.  158. Defendant LGEUSA was represented at those meetings and was a party to the

24  agreements entered at them.  To the extent LGEUSA sold and/or distributed CRTs, it played a

25  significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by

26  direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus,

27  LGEUSA was an active, knowing participant in the alleged conspiracy.

28

149.   159. Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

150.   160. Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

151.   161. PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRTs to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

152.   162. Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

153.   163. Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

1    BMCC was acting to further its own independent private interests in participating in the alleged

2    conspiracy.

3        154.  164. Between at least 1996 and 2001, Defendant Philips, through Royal Philips and

4    Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated

5    in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A

6    substantial number of these meetings were attended by high level executives from Philips.  Philips also

7    engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips

8    agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

9        155.  165. Defendants Philips America and Philips Brazil were represented at those meetings

10   and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil

11   sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy

12   because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not

13   undercut the pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil

14   were active, knowing participants in the alleged conspiracy.

15       156.  166. Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI,

16   Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200

17   glass meetings at all levels.  A substantial number of these meetings were attended by the highest

18   ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other

19   Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels

20   for CRTs.

21       157.  167. Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

22   Mexico were represented at those meetings and were a party to the agreements entered at them.  To the

23   extent SEC and SEAI sold and/or distributed CRTs, they played a significant role in the conspiracy

24   because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not

25   undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI

26   America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the

27   alleged conspiracy.

28

41

158.   168. Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

159.   169. Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

160.   Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

161.   Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

162.   170. Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants,

42

1  particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.

2  Toshiba never effectively withdrew from this conspiracy.

3      163.  171. Defendants Toshiba America, TACP, TAEC and TAIS were represented at those

4  meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP,

5  TAEC and TAIS sold and/or distributed CRTs to direct purchasers, they played a significant role in the

6  conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers

7  would not undercut the pricing agreements reached at the glass meetings.  Thus, Toshiba America,

8  TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

9      164.  172. Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT,

10  Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland,

11  participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were

12  attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of

13  Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other

14  Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels

15  for CRTs.

16      173. Defendant Tatung America was represented at those meetings and was a party to the

17  agreements entered at them.  To the extent Tatung America sold and/or distributed CRTs to direct

18  purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the

19  prices for CRTs paid by direct purchasers would not undercut the CRT pricing agreements reached at

20  the glass meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

21      165.  174. Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and

22  DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

23  were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral

24  discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on

25  prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-

26  owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this

27  conspiracy.

28

166. 175. When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.    The CRT Market During the Conspiracy**

167. 176. Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRTs, generating billions of dollars in annual profits.

168. 177. The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

169. 178. During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

---

[1]    Estimated market value of CRT units sold.

170. 179. Defendants' collusion is evidenced by unusual price movements in the CRT market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

171. 180. In 1996 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

172. 181. In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged alleged.

173. 182. After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

174. 183. A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

175. 184. A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004]

there will be [a] 20% hike in the price of our CRT monitors."

176. 185. Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

177. 186. For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree. Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

178. 187. During the Relevant Period, while demand in the United States for CRTs continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRTs caused by the entry and popularity of the new generation CRTs and plasma display products.  As Finsen Yu, President of Skyworth Macao Commerical Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

179. 188. During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRTs.  These price increases were despite the declining demand due to the approaching obsolescence of CRTs caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

180. 189. These price increases and price stability in the market for CRTs during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.    International Government Antitrust Investigations**

181. 190. On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH,

Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

182. 191. On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

183. 192. On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and

47

Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

184. 193. On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

185. 194. On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

186. 195. On March 18, 2011, the DOJ issued a press release announcing that Defendant Samsung SDI Company Ltd. had agreed to plead guilty to participating in a conspiracy to fix the prices of, reduce the output of, and allocate the market for CDTs.  The United States and Samsung SDI entered into an amended plea agreement on May 12, 2011, where Samsung SDI paid a 32 million dollar criminal fine and pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.  The plea specified that, during this period, Samsung SDI, through its officers and employees, participated in a conspiracy among major CDT producers, the primary purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  In furtherance of the conspiracy, Samsung SDI, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce

output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Acts in furtherance of this conspiracy were carried out within the Northern District of California.  The plea agreement also requires Samsung SDI's cooperation with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

187.   On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

188.   196. As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

189.   197. Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

190.   198. Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

191.   199. In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

192.   200. On December 12, 2006, news reports indicated that Defendants Samsung and

49

1  Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG

2  Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

3      193.  201. On November 12, 2008, the DOJ announced that it had reached agreements with

4  three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America,

5  Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act,

6  15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix

7  prices of TFT-LCD Products.

8      194.  202. On March 10, 2009, the DOJ announced that it had reached an agreement with

9  Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of

10  Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix

11  the prices of TFT-LCD Products.

12      195.  203. The indictments of LG Display Co., Ltd., Sharp Corporation, and Chunghwa, all

13  state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in

14  California.

15      **G.    The Role of Trade Associations During the Relevant Period**

16      196.  204. Defendants' collusive activities have been furthered by trade associations and trade

17  events that provided opportunities to conspire and share information.  One example is the Korea Display

18  Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the

19  Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization

20  representing about 80 member companies in the Korean display industry, including manufacturers and

21  suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display

22  Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with

23  foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with

24  the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the

25  Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

26      197.  205. Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and

27  have participated extensively in the KDCs.

28

198. 206. The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

199. 207. Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

200. 208. Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.   Effects of Defendants' Antitrust Violations**

**1.   Examples of Reductions in Manufacturing Capacity by Defendants**

201. 209. As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

202. 210. In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

203. 211. In July of 2005, LGPD ceased CRT production at its Durham, England facility,

citing a shift in demand from Europe to Asia.

204. 212. In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

205. 213. In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

206. 214. In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana. The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.    Examples of Collusive Pricing for CRTs

207. 215. Defendants' collusion is evidenced by unusual price movements in the CRT market. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

208. 216. In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

209. 217. In reality, consumer prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

210. 218. Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

211. 219. Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display

1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

212. 220. In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

213. 221. After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

214. 222. On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India. This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

215. 223. Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time. CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies. As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

216. 224. CRT prices resisted downward price pressures and remained stable over a period of many years. Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRTs did not decline as much as they would have absent the conspiracy. The stability of the price of CRTs was accomplished by the collusive activities alleged above.

### I.    Summary Of Effects Of The Conspiracy Involving CRTs

217. 225. The above combination and conspiracy has had the following effects, among others:

    a.    Price competition in the sale of CRTs by Defendants and their co-conspirators has

been restrained, suppressed and eliminated throughout the United States;

b.     Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.     Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRTs.

d.     As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRTs than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.    PLAINTIFFS' INJURIES

218. 226. As purchasers of CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain CRT prices at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs, causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

219. 227. Plaintiffs also purchased CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.

220. 228. The OEMs and others passed on to their customers, including Plaintiffs, the overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when they purchased CRTs containing such price-fixed CRTs from the OEMs and others.

221. 229. Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRTs sold to Plaintiffs.

1    222.  230. The market for CRTs and the market for products containing CRTs are inextricably

2    linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

3    223.  231. Throughout the Relevant Period, Defendants controlled the market for CRTs.

4    Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from

5    Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants'

6    conspiracy.

7    224.  232. As a result, Plaintiffs were injured in connection with their purchases of CRTs

8    during the Relevant Period.

9    **VIII.  FRAUDULENT CONCEALMENT**

10    225.  233. Plaintiffs had neither actual nor constructive knowledge of the facts supporting their

11    claims for relief despite diligence in trying to discover the pertinent facts.  Defendants engaged in a

12    secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was

13    a conspiracy to fix the prices of CRTs.

14    226.  234. Because Defendants' agreement, understanding and conspiracy were kept secret,

15    Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were

16    paying artificially high prices for CRTs.

17    227.  235. The affirmative acts of Defendants alleged herein, including acts in furtherance of

18    the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As

19    noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in

20    secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing

21    actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the

22    proposed communications with customers containing these pretextual statements and would coordinate

23    which co-conspirator would first communicate these pretextual statements to customers.

24    228.  236. By its very nature, Defendants' price-fixing conspiracy was inherently self-

25    concealing.

26    229.  237. Plaintiffs could not have discovered the alleged contract, conspiracy or combination

27    at an earlier date by the exercise of reasonable diligence because of the deceptive practices and

28

techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

230. 238. As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy.

231. 239. Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

232. 240. As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

233. 241. As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

234. 242. In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

235. 243. Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

236. 244. Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

237. 245. As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

## IX. *AMERICAN PIPE*, GOVERNMENT ACTION AND CROSS-JURISDICTIONAL TOLLING

238. As discussed at length in paragraphs 181-195 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009 through the present. Plaintiffs' direct claims for violation of the Sherman Act have been tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

239. Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of these Direct Purchaser Class Actions asserted against Defendants, and commencing on at least November 26, 2007 until Plaintiffs opted out on November 14, 2011.

240. Plaintiffs were members of Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago Inc. v. Chunghwa Picture Tubes Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- *Direct Purchaser Plaintiffs' Consolidated Amended Complaint,* No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

1   **X.**   ~~IX.~~ **CLAIM FOR VIOLATIONS**

2   **First Claim for Relief**

3   **(Violation of Section 1 of the Sherman Act)**

4   241.   ~~246.~~ Plaintiffs incorporate by reference all the above allegations as if fully set forth

5   herein.

6   242.   ~~247.~~ Beginning no later than March 1, 1995, the exact date being unknown to

7   ~~plaintiffs~~Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-

8   conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade

9   and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or

10  eliminating competition in the United States.

11  243.   ~~248.~~ In particular, Defendants combined and conspired to raise, fix, maintain or stabilize

12  the prices of CRTs sold in the United States.

13  244.   ~~249.~~ As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed,

14  maintained and stabilized in the United States.

15  245.   ~~250.~~ The contract, combination or conspiracy among Defendants consisted of a

16  continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

17  246.   ~~251.~~ For purposes of formulating and effectuating their contract, combination or

18  conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or

19  conspired to do, including:

20         a.    participating in meetings and conversations to discuss the prices and supply of

21               CRTs;

22         b.    communicating in writing and orally to fix target prices, floor prices and price

23               ranges for CRTs;

24         c.    agreeing to manipulate prices and supply of CRTs sold in the United States in a

25               manner that deprived direct purchasers of free and open competition;

26         d.    issuing price announcements and price quotations in accordance with the

27               agreements reached;

28

1    e.  selling CRTs to customers in the United States at noncompetitive prices;

2    f.  exchanging competitively sensitive information in order to facilitate their

3      conspiracy;

4    g.  agreeing to maintain or lower production capacity; and

5    h.  providing false statements to the public to explain increased prices for CRTs.

6  247. 252. As a result of Defendants' unlawful conduct, Plaintiffs were injured in their

7 businesses and property in that they paid more for CRTs than they otherwise would have paid in the

8 absence of Defendants' unlawful conduct.

9          **Second Claim for Relief**

10       **(Violation of the California Cartwright Act)**

11  248. 253. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

12 allegation set forth in the preceding paragraphs of this Complaint.

13  249. 254. During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a

14 substantial volume of business in California.  In particular, Plaintiffs purchased CRTs from Defendants

15 and their co-conspirators in California; maintained warehouses in California containing CRTs

16 manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in

17 California who sold CRTs to customers in California and elsewhere.  As a result of their presence in

18 California and the substantial business they conducted in California, Plaintiffs are entitled to the

19 protection of the laws of California.

20  250. 255. In addition, Defendants LG Display Mitsubishi, Samsung and Toshiba all maintained

21 offices in California during the Relevant Period.  Employees at Defendants' locations in California

22 participated in meetings and engaged in bilateral communications in California and intended and did

23 carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendants' conduct within

24 California thus injured Plaintiffs and their predecessor entities, both in California and throughout the

25 United States.

26  251. 256. Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1,

27 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and

28

their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

252. 257. The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

253. 258. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.    to fix, raise, maintain and stabilize the price of CRTs;

    b.    to allocate markets for CRTs amongst themselves;

    c.    to submit rigged bids for the award and performance of certain CRTs contracts; and

    d.    to allocate among themselves the production of CRTs.

254. 259. The combination and conspiracy alleged herein has had, inter alia, the following effects:

    a.    price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

    b.    prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

    c.    those who purchased CRTs from Defendants, their co-conspirators, and others and CRTs containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

255. 260. As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

256. 261. As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRTs containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of State Antitrust and Unfair Competition Laws)

257. 262. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

258. 263. Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust and unfair competition laws referenced below.  Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

259. 264. The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

260. 265. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

      a.     to fix, raise, maintain and stabilize the price of CRTs;

b.     to allocate markets for CRTs amongst themselves;

c.     to submit rigged bids for the award and performance of certain CRTs contracts;
and

d.     to allocate among themselves the production of CRTs.

261. 266. The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

a.     price competition in the sale of CRTs has been restrained, suppressed, and/or
eliminated in the states listed below;

b.     prices for CRTs sold by Defendants, their co-conspirators, and others have been
fixed, raised, maintained and stabilized at artificially high, non-competitive levels
in the states listed below; and

c.     those who purchased CRTs from Defendants, their co-conspirators, and others
have been deprived of the benefits of free and open competition.

262. 267. As a result of the alleged conduct of Defendants and their co-conspirators, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

263. 268. By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200, *et seq*.

a.     Defendants and their co-conspirators committed acts of unfair competition, as
defined by Section 17200 *et seq*., by engaging in a conspiracy to fix and stabilize
the price of CRTs as described above;

b.     Defendants' and their co-conspirators' acts, omissions, misrepresentations,
practices and non-disclosures, as described above, constitute a common,
continuous and continuing course of conduct of unfair competition by means of
unfair, unlawful and/or fraudulent business acts or practices with the meaning of
Section 17200, *et seq*., including, but not limited to (1) violation of Section 1 of

1    the Sherman Act; and (2) violation of the Cartwright Act;

2    c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations,

3          practices and non-disclosures are unfair, unconscionable, unlawful and/or

4          fraudulent independently of whether they constitute a violation of the Sherman

5          Act or the Cartwright Act;

6    d.    Defendants' and their co-conspirators' acts or practices are fraudulent or

7          deceptive within the meaning of Section 17200, *et seq*.;

8    e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and

9          perfected within the state of California.  ~~Defendants LG Display, Chunghwa,~~

10         ~~Sharp, Chi Mei, HannStar, and Epson all~~Defendant Samsung SDI admitted that

11         acts in furtherance of the conspiracy to fix the price of CRTs were carried out in

12         California;

13   f.    During the Relevant Period, the following Plaintiffs purchased CRTs in

14         California:  Target~~, Sears, Kmart, Old Comp, Good Guys,~~ and RadioShack.  As a

15         result, each is entitled to the protection of the laws of California; and

16   g.    By reason of the foregoing, ~~each of those~~ Plaintiffs ~~is~~are entitled to full restitution

17         and/or disgorgement of all revenues, earnings, profits, compensation, and benefits

18         that may have been obtained by Defendants or their co-conspirators as result of

19         such business acts and practices.

20   264. ~~269.~~ By reason of the foregoing, Defendants and their co-conspirators also have entered

21   into an agreement in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401, *et. seq*:

22   a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

23         eliminated competition in the sale of CRTs in Arizona and fixed, raised,

24         maintained and stabilized CRT prices in Arizona at artificially high, non-

25         competitive levels;

26   b.    As a result, Defendants and their co-conspirators' conspiracy substantially

27         affected Arizona commerce;

28

c.   During the Relevant Period, the following Plaintiffs purchased CRTs in Arizona: Target and Sears.  As a result, eachTarget is entitled to the protection of the laws of Arizona; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those PlaintiffsTarget has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

265.   270. By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of Florida Stat. §§ 501.201, *et seq.*

a.   Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b.   Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c.   Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

d.   Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

e.   Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Florida; and

f.      During the Relevant Period, the following Plaintiffs purchased CRTs in Florida: Target, Sears and Kmart.  As a result, eachTarget is entitled to the protection of the laws of Florida.

266. 271. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq*.

a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Illinois and fixed, raised, maintained and stabilized CRT prices in Illinois at artificially high, non-competitive levels;

b.      As a result, Defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

c.      During the Relevant Period, the following Plaintiffs purchased CRTs in Illinois: Target, Sears, Kmart and Old Comp.  As a result, eachTarget is entitled to the protection of the laws of Illinois; and

d.      As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those PlaintiffsTarget has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq*.

267. 272. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*.

a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Iowa and fixed, raised, maintained and stabilized CRT prices in Iowa at artificially high, non-competitive levels;

b.      As a result, Defendants and their co-conspirators' conspiracy substantially

1  affected Iowa commerce;

2  c.  During the Relevant Period, the following Plaintiffs purchased CRTs in Iowa:

3  Target.  As a result, ~~each~~Target is entitled to the protection of the laws of Iowa;

4  and

5  d.  As a direct and proximate result of Defendants' and their co-conspirators'

6  conduct, ~~each of those Plaintiffs~~Target has been injured in its business and

7  property by paying more for CRTs manufactured by Defendants, their co-

8  conspirators, and others than it would have paid in the absence of Defendants and

9  their co-conspirators' combination and conspiracy, and is therefore entitled to

10  relief under Iowa Code §§ 553.1, *et seq*.

11  268.  ~~273.~~By reason of the foregoing, Defendants and their co-conspirators also have entered

12  into an agreement in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq*.

13  a.  Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

14  eliminated competition in the sale of CRTs in Kansas and fixed, raised,

15  maintained and stabilized CRT prices in Kansas at artificially high, non-

16  competitive levels;

17  b.  As a result, Defendants and their co-conspirators' conspiracy substantially

18  affected Kansas commerce;

19  c.  During the Relevant Period, the following Plaintiffs purchased CRTs in Kansas:

20  Target.  As a result, ~~each~~Target is entitled to the protection of the laws of Kansas;

21  and

22  d.  As a direct and proximate result of Defendants' and their co-conspirators'

23  conduct, ~~each of those Plaintiffs~~Target has been injured in its business and

24  property by paying more for CRTs manufactured by Defendants, their co-

25  conspirators, and others than it would have paid in the absence of Defendants and

26  their co-conspirators' combination and conspiracy, and is therefore entitled to

27  relief under Kansas Stat. Ann. §§ 50-101, *et seq*.

28

269. 274. By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of Massachusetts G.L. c. 93A, §§ 2, *et seq.*

    a.    Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

    b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

    c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

    d.    Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

    e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Massachusetts; and

    f.    During the Relevant Period, the following Plaintiffs purchased CRTs in Massachusetts: Sears and RadioShack.  As a result, each RadioShack is entitled to the protection of the laws of Massachusetts.

270. 275. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Michigan and fixed, raised, maintained and stabilized CRT prices in Michigan at artificially high, non-competitive levels;

1          b.     As a result, Defendants and their co-conspirators' conspiracy substantially

2                  affected Michigan commerce;

3          c.     During the Relevant Period, the following Plaintiffs purchased CRTs in

4                  Michigan:  Target, Sears and Kmart.  As a result, eachTarget is entitled to the

5                  protection of the laws of Michigan; and

6          d.     As a direct and proximate result of Defendants' and their co-conspirators'

7                  conduct, each of those PlaintiffsTarget has been injured in its business and

8                  property by paying more for CRTs manufactured by Defendants, their co-

9                  conspirators, and others than it would have paid in the absence of Defendants and

10                 their co-conspirators' combination and conspiracy, and is therefore entitled to

11                 relief under Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

12     271.   276. By reason of the foregoing, Defendants and their co-conspirators also have entered

13 into an agreement in restraint of trade in violation of Minnesota Stat. §§ 325D.50, *et seq.*

14         a.     Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

15                 eliminated competition in the sale of CRTs in Minnesota and fixed, raised,

16                 maintained and stabilized CRT prices in Minnesota at artificially high, non-

17                 competitive levels;

18         b.     As a result, Defendants and their co-conspirators' conspiracy substantially

19                 affected Minnesota commerce;

20         c.     During the Relevant Period, the following Plaintiffs purchased CRTs in

21                 Minnesota:  Target, Sears and Kmart.  As a result, eachTarget is entitled to the

22                 protection of the laws of Minnesota; and

23         d.     As a direct and proximate result of Defendants' and their co-conspirators'

24                 conduct, each of those PlaintiffsTarget has been injured in its business and

25                 property by paying more for CRTs manufactured by Defendants, their co-

26                 conspirators and others than it would have paid in the absence of Defendants and

27                 their co-conspirators' combination and conspiracy, and is therefore entitled to

28

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Case No. CV 11-5514 05514

1          relief under Minnesota Stat. §§ 325D.50, *et seq.*

2          272. 277. By reason of the foregoing, Defendants and their co-conspirators also have entered

3     into an agreement in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

4          a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

5                eliminated competition in the sale of CRTs in Mississippi and fixed, raised,

6                maintained and stabilized CRT prices in Mississippi at artificially high, non-

7                competitive levels;

8          b.    As a result, Defendants and their co-conspirators' conspiracy substantially

9                affected Mississippi commerce;

10         c.    During the Relevant Period, the following Plaintiffs purchased CRTs in

11               Mississippi: Sears and RadioShack.  As a result, each PlaintiffRadioShack is

12               entitled to the protection of the laws of Mississippi; and

13         d.    As a direct and proximate result of Defendants' and their co-conspirators'

14               conduct, each of those PlaintiffsRadioShack has been injured in its business and

15               property by paying more for CRTs manufactured by Defendants, their co-

16               conspirators, and others than it would have paid in the absence of Defendants and

17               their co-conspirators' combination and conspiracy, and is therefore entitled to

18               relief under Mississippi Code Ann. §§ 75-21-1, *et seq.*

19         278. By reason of the foregoing, Defendants and their co-conspirators also have entered into an

20    agreement in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801, *et seq.*

21         a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

22               eliminated competition in the sale of CRTs in Nebraska and fixed, raised,

23               maintained and stabilized CRT prices in Nebraska at artificially high, non-

24               competitive levels;

25         b. As a result, Defendants and their co-conspirators' conspiracy substantially affected

26               Nebraska commerce;

27         c. During the Relevant Period, the following Plaintiffs purchased CRTs in Nebraska:

28

1        Sears and Kmart.  As a result, each is entitled to the protection of the laws of

2        Nebraska; and

3    d. As a direct and proximate result of Defendants' and their co-conspirators' conduct,

4        each of those Plaintiffs has been injured in its business and property by paying

5        more for CRTs manufactured by Defendants, their co-conspirators, and others

6        than it would have paid in the absence of Defendants and their co-conspirators'

7        combination and conspiracy, and is therefore entitled to relief under Nebraska

8        Stat. §§ 59-801, *et seq*.

9    279. By reason of the foregoing, Defendants and their co-conspirators also have entered into an

10   agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq*.

11       a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

12          eliminated competition in the sale of CRTs in Nevada and fixed, raised,

13          maintained and stabilized CRT prices in Nevada at artificially high, non-

14          competitive levels;

15       b. As a result, Defendants and their co-conspirators' conspiracy substantially affected

16          Nevada commerce;

17       c. During the Relevant Period, the following Plaintiffs purchased CRTs in Nevada:  Sears

18          and Kmart.  As a result, each is entitled to the protection of the laws of Nevada;

19          and

20       d. As a direct and proximate result of Defendants' and their co-conspirators' conduct,

21          each of those Plaintiffs has been injured in its business and property by paying

22          more for CRTs manufactured by Defendants, their co-conspirators, and others

23          than it would have paid in the absence of Defendants and their co-conspirators'

24          combination and conspiracy, and is therefore entitled to relief under Nevada Rev.

25          Stat. Ann. §§ 598A, *et seq*.

26   280. By reason of the foregoing, Defendants and their co-conspirators also have entered into an

27   agreement in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

28

70

1     a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

2         eliminated competition in the sale of CRTs in New Mexico and fixed, raised,

3         maintained and stabilized CRT prices in New Mexico at artificially high, non-

4         competitive levels;

5     b. As a result, Defendants and their co-conspirators' conspiracy substantially affected

6         New Mexico commerce;

7     c. During the Relevant Period, the following Plaintiffs purchased CRTs in New Mexico:

8         Sears.  As a result, each is entitled to the protection of the laws of New Mexico;

9         and

10    d. As a direct and proximate result of Defendants' and their co-conspirators' conduct,

11        each of those Plaintiffs has been injured in its business and property by paying

12        more for CRTs manufactured by Defendants, their co-conspirators, and others

13        than it would have paid in the absence of Defendants and their co-conspirators'

14        combination and conspiracy, and is therefore entitled to relief under New Mexico

15        Stat. Ann. §§ 57-1-1, *et seq.*

16        273. 281. By reason of the foregoing, Defendants and their co-conspirators also have entered

17    into an agreement in restraint of trade in violation of New York General Business Law §§ 340, *et seq.*

18        a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

19              eliminated competition in the sale of CRTs in New York and fixed, raised,

20              maintained and stabilized CRT prices in New York at artificially high, non-

21              competitive levels;

22        b.    As a result, Defendants and their co-conspirators' conspiracy substantially

23              affected New York commerce;

24        c.    During the Relevant Period, the following Plaintiffs purchased CRTs in New

25              York:  Target and Sears.  As a result, each Target is entitled to the protection of

26              the laws of New York; and

27        d.    As a direct and proximate result of Defendants' and their co-conspirators'

28

71

1  conduct, ~~each of those Plaintiffs~~Target has been injured in their business and
2  property by paying more for CRTs manufactured by Defendants, their co-
3  conspirators, and others than it would have paid in the absence of Defendants and
4  their co-conspirators' combination and conspiracy, and is therefore entitled to
5  relief under New York General Business Law §§ 340, *et seq.*

6  274. ~~282.~~ By reason of the foregoing, Defendants and their co-conspirators also have entered
7  into an agreement in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

8  a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or
9  eliminated competition in the sale of CRTs in North Carolina and fixed, raised,
10  maintained and stabilized CRT prices in North Carolina at artificially high, non-
11  competitive levels;

12  b.   As a result, Defendants and their co-conspirators' conspiracy substantially
13  affected North Carolina commerce;

14  c.   During the Relevant Period, the following Plaintiffs purchased CRTs in North
15  Carolina:  Target~~, Sears and Kmart~~.  As a result, ~~each~~Target is entitled to the
16  protection of the laws of North Carolina; and

17  d.   As a direct and proximate result of Defendants' and their co-conspirators'
18  conduct, ~~each of those Plaintiffs~~Target has been injured in its business and
19  property by paying more for CRTs manufactured by Defendants, their co-
20  conspirators, and others than it would have paid in the absence of Defendants and
21  their co-conspirators' combination and conspiracy, and is therefore entitled to
22  relief under North Carolina Gen. Stat. §§ 75-1, *et seq.*

23  275. ~~283.~~ By reason of the foregoing, Defendants and their co-conspirators also have entered
24  into an agreement in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

25  a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or
26  eliminated competition in the sale of CRTs in Wisconsin and fixed, raised,
27  maintained and stabilized CRT prices in Wisconsin at artificially high, non-

28

1       competitive levels;

2     b.  As a result, Defendants and their co-conspirators' conspiracy substantially

3       affected Wisconsin commerce;

4     c.  During the Relevant Period, the following Plaintiffs purchased CRTs in

5       Wisconsin:  Target ~~and Sears~~Target .  As a result, ~~each~~Target is entitled to the protection

6       of the laws of Wisconsin; and

7     d.  As a direct and proximate result of Defendants' and their co-conspirators'

8       conduct, ~~each of those Plaintiffs~~Target has been injured in its business and

9       property by paying more for CRTs manufactured by Defendants, their co-

10      conspirators, and others than it would have paid in the absence of Defendants and

11      their co-conspirators' combination and conspiracy, and is therefore entitled to

12      relief under Wisconsin Stat. §§ 133.01, *et seq.*

13 **XI.** ~~X.~~**PRAYER FOR RELIEF**

14    WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf, adjudging and

15 decreeing that:

16    A.  Defendants engaged in a contract, combination, and conspiracy in violation of Section 1

17 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act,  and the unfair competition laws of

18 ~~California,~~ Arizona, California, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota,

19 Mississippi ~~Nebraska, Nevada, New Mexico~~, New York, North Carolina, and Wisconsin, and Plaintiffs

20 were injured in their business and property as a result of Defendants' violations;

21    B.  Plaintiffs shall recover damages sustained by them, as provided by the federal and state

22 antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against Defendants

23 in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

24    C.  Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the

25 respective officers, directors, partners, agents and employees thereof, and all other persons acting or

26 claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and

27 maintaining the combination, conspiracy or agreement alleged herein;

28

1    D.    Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest

2  shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this

3  action;

4    E.    Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as

5  provided by law; and

6    F.    Plaintiffs shall receive such other or further relief as may be just and proper.

7  ///

8  ///

9  ///

10  ///

11  ///

12  ///

13  **XII.**  ~~XI.~~ **JURY TRIAL DEMAND**

14    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the

15  claims asserted in this Complaint so triable.

16  Dated:    Respectfully submitted

17    _____
      Jason C. Murray (CA Bar No. 169806)
18    CROWELL & MORING LLP
      515 South Flower St., 40th Floor
19    Los Angeles, CA  90071
      Telephone:  213-443-5582
20    Facsimile:  213-622-2690
      Email: jmurray@crowell.com
21
      ~~Jeffrey H. Howard~~ (*pro hac vice*)
22    Jerome A. Murphy (*pro hac vice*)
      Astor H.L. Heaven *(pro hac vice)*
23    CROWELL & MORING LLP
      1001 Pennsylvania Avenue, N.W.
24    Washington, D.C. 20004
      Telephone:  202-624-2500
25    Facsimile:  202-628-5116
      E-mail:  ~~jhoward~~jmurphy@crowell.com
26    ~~jmurphy~~  _aheaven@crowell.com

27    *Counsel for Target Corp.~~, Sears, Roebuck  and Co.;~~*

28

74

1   *Kmart Corp.; Old Comp Inc.; Good Guys, Inc.;*and
    RadioShack Corp.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28